IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRAHAM CHASE ROBINSON<br><br>*Plaintiff,*<br><br>v.<br><br>ROBERT DE NIRO and<br>CANAL PRODUCTIONS, INC.<br><br>*Defendants.* | COMPLAINT<br><br>(JURY TRIAL DEMANDED)<br><br>Case No. |

Plaintiff Graham Chase Robinson ("Ms. Robinson") hereby sues her former employers, Defendants Robert De Niro ("De Niro") and Canal Productions, Inc. ("Canal" or "Canal Productions") to recover her damages, including back pay, front pay, compensatory damages, and punitive damages, pursuant to the New York City Human Rights Law, the New York State Labor Law (including the New York Equal Pay Law), and the Fair Labor Standards Act (including the Equal Pay Act), each as amended. She alleges upon knowledge as to her own acts and upon information and belief as to all other matters.

**I.  OVERVIEW**

1. Robert De Niro, the world-famous actor, producer, and director, is one of the most powerful people in the entertainment industry. De Niro has a business empire whose value approaches $1 billion, and he has a personal net worth reported to be in excess of $300 million.

2. Graham Chase Robinson began working for De Niro as an executive assistant in 2008, when she was just 25 years old. She hoped to build a career in the entertainment industry, and she approached her job duties with diligence and integrity.

1

3. But De Niro and his corporate alter ego, Canal Productions, Inc. subjected Ms. Robinson to years of gender discrimination and harassment. She eventually quit because she could no longer endure the hostile work environment, and through her counsel she warned De Niro and Canal Productions that she was considering bringing a discrimination lawsuit.

4. De Niro was enraged at the prospect of Ms. Robinson bringing a lawsuit challenging his behavior. So, he retaliated and struck first. On the heels of Ms. Robinson's complaints of gender discrimination, De Niro had Canal Productions file an abusive, preemptive lawsuit against her. The lawsuit concocted false allegations designed to inhibit Ms. Robinson from pursuing her claims, destroy her reputation, and obliterate her job prospects.

5. Ms. Robinson will not be intimidated. She brings this lawsuit to obtain justice for herself and to send a message that even the most powerful men should not be permitted to escape the consequences of their illegal behavior.

## II.   SUMMARY

6. For many, the "good old days" were really the bad old days. Sexism and sex stereotyping were commonplace, and a patriarchal sensibility was pervasive among the nation's powerbrokers. While those days are largely behind us, the "Me Too" scandals sweeping Hollywood reveal that too many powerful men in the entertainment industry still cling to the old ways. As the allegations against Robert De Niro's frequent professional collaborator Harvey Weinstein make clear, much work remains to be done before equality is reached.

7. Robert De Niro is someone who has clung to old mores. He does not accept the idea that men should treat women as equals. He does not care that gender discrimination in the workplace violates the law. Ms. Robinson is a casualty of this attitude.

8.      De Niro subjected Ms. Robinson to gratuitous unwanted physical contact.  He made sexually-charged comments to her.  He was verbally abusive.  He treated Ms. Robinson as his "office wife," assigned her stereotypically female duties like housework, and insisted that she be available to him around the clock.  He underpaid her because she was not a male breadwinner and denied her overtime pay even though she worked punishingly long hours.

9.      Ms. Robinson's position became increasingly intolerable, and over the years she announced her intent to resign multiple times.  De Niro responded with both a carrot and a stick – he made promises to induce to her stay and threatened repercussions if she left.  Given De Niro's prominence in the entertainment industry, he had the power to carry out his threats.

10.     By April 2019, Ms. Robinson had enough and submitted her final resignation.  Ms. Robinson's lawyer informed De Niro's counsel that she was contemplating a lawsuit that would address De Niro's gender discrimination and wage violations.

11.     In response, De Niro took a page out of the Bill O'Reilly playbook.[1]  Before Ms. Robinson could sue, De Niro retaliated.  He had Canal sue Ms. Robinson in New York County Supreme Court and ensured that the suit would be widely publicized.  The lawsuit is replete with "clickbait" allegations that falsely characterize Ms. Robinson as a loafer, a thief, and a miscreant.  Now, when her name is Googled, these allegations pop up on the screen.  The results have been devasting to Ms. Robinson.  Her reputation and her career have been destroyed.

### III.    THE PARTIES

12.     **PLAINTIFF GRAHAM CHASE ROBINSON** was an employee of Canal Productions, Inc. from February 4, 2008, until she was forced to resign on April 6, 2019.  Ms.

---

[1] *See, e.g.*, Emily Steel and Michael S. Schmidt, *Bill O'Reilly Thrives at Fox News, Even as Harassment Settlements Add Up*, N.Y. TIMES, (Apr. 1, 2017), *available at* https://www.nytimes.com/2017/04/01/business/media/bill-oreilly-sexual-harassment-fox-news.html.

Robinson is domiciled in Manhattan, and she worked for Canal in Manhattan.

13. **DEFENDANT CANAL PRODUCTIONS, INC.** is a private corporation owned and controlled by Defendant Robert De Niro. Canal is headquartered in Manhattan.

14. **DEFENDANT ROBERT DE NIRO** is an actor, director, and producer and the owner of Canal Productions, Inc. De Niro is domiciled in Manhattan.

### IV. JURISDICTION AND VENUE

15. This Court has jurisdiction over this suit under 28 U.S.C. § 1331 because Plaintiff brings claims pursuant to the Fair Labor Standards Act. This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendant Canal is headquartered in this District, and Defendant De Niro is domiciled in this District. The unlawful employment practices complained of herein occurred in this District, and the events or omissions giving rise to Plaintiff's claim occurred in this District.

### V. FACTUAL ALLEGATIONS

#### A. Background

17. Ms. Robinson began working for De Niro and Canal Productions in 2008, hoping to pursue a career in the entertainment industry. During her years of employment, Ms. Robinson was a conscientious, diligent, loyal, and ethical employee to De Niro and Canal.

18. Ms. Robinson held the position of Executive Assistant to De Niro until April 2011. Her title changed to Director of Productions in April 2011 and to Vice President of Production and Finance in December 2017. However, De Niro always referred to Ms. Robinson as his "assistant" and continued to assign her the duties of a personal assistant.

#### B. Defendants' Gender Discrimination

4

### i. Abusive and Sexist Comments Towards Ms. Robinson

19. De Niro communicated in a hostile, abusive, and intimidating manner with Ms. Robinson. He attacked her in gender terms, calling her a "bitch" and a "brat." In speaking to Ms. Robinson, he called his female business partner a "cunt" and referred to his executive assistants as "the girls." De Niro would unleash tirades against Ms. Robinson – often while he was intoxicated – in which he denigrated, berated, bullied, and hurled expletives at her.

20. De Niro made vulgar, inappropriate, and gendered comments to Ms. Robinson. He would joke with Ms. Robinson about his Viagra prescription. De Niro smirked to Ms. Robinson about his young paramour, who was around Ms. Robinson's age. De Niro directed Ms. Robinson to imagine him on the toilet. He told Ms. Robinson that doing manual labor would "make a man out of you." De Niro suggested that Ms. Robinson could get pregnant using sperm from her (married) male co-worker.

21. De Niro permitted his wife and then his paramour to target Ms. Robinson based on her gender and create a hostile work environment for her, including disparaging her and assigning her demeaning job duties based on her gender.

### ii. Demeaning and Inappropriate Conduct Towards Ms. Robinson

22. De Niro engaged in inappropriate conduct during meetings and telephone calls with Ms. Robinson. He urinated during telephone calls with her and met with her wearing only his pajamas or a bathrobe. In addition, De Niro directed Ms. Robinson to come to his bedroom to wake him up and directed her to meet alone with him in empty apartments and hotel suites.

23. De Niro initiated gratuitous physical contact with Ms. Robinson based on her gender. Among other things, De Niro would direct Ms. Robinson to scratch his back, button his

shirts, fix his collars, tie his ties, and prod him awake when he was in bed. De Niro also stood idly by while his friend slapped Ms. Robinson on her buttocks.

### iii.  De Niro's Treatment of Ms. Robinson as His "Office Wife"

24. While Ms. Robinson held the title of Director of Productions and eventually Vice President of Production & Finance, De Niro assigned her job duties that were not commensurate with her title.

25. De Niro routinely assigned Ms. Robinson job duties that were stereotypically female. Among these duties, De Niro directed Ms. Robinson to put away his boxers, hang up his clothes, wash his sheets, vacuum his apartment, set his table, mend his clothing, and select gifts for his children. De Niro insisted on having a female take care of him and responded angrily when Ms. Robinson objected to performing these stereotypically female duties.

### iv.  De Niro Overworks Ms. Robinson and Underpays Her Because of her Gender

26. De Niro required that Ms. Robinson be "on call" all the time and insisted she drop everything to attend to his purported "needs." Once when she did not pick up his phone call, De Niro left Ms. Robinson a voicemail filled with expletives in which he called her a "spoiled brat," said "how dare you fucking disrespect me," and threatened her, saying "you're fucking history."[2]

27. As a result of the demands De Niro placed on Ms. Robinson, she had to work longer hours than her male colleagues. De Niro described Ms. Robinson as "chained" to the office. On weekdays, it was typical for Ms. Robinson to start working by around 7 a.m. and stop working around 8 p.m. She typically worked through breakfast, lunch, and dinner. In addition, she also routinely worked additional hours during weekends. In sum, Ms. Robinson routinely worked approximately 20 to 30 hours of overtime per week (or more) without receiving any overtime pay.

---

[2] The voicemail may be accessed at https://sanfordheisler.com/DeNiro-audio-file.

6

28. De Niro was aware of his legal obligations to pay overtime but repeatedly refused to do so. For example, approximately a month before Ms. Robinson resigned, De Niro sought to have his female assistants perform additional work duties on weekends or otherwise after working hours without any additional pay. Ms. Robinson objected to this unlawful pay practice and told De Niro that he needed to pay his assistants overtime. De Niro refused.

29. De Niro also underpaid Ms. Robinson based on her gender. De Niro insisted on paying Ms. Robinson less than a male whose job required no greater skill, effort, or responsibility than Ms. Robinson's position. Ms. Robinson sought pay parity and objected to this pay discrimination, including in her communications with De Niro in late 2018 and early 2019. To defend his conduct, De Niro invoked gender-laden stereotypes and implied that a male breadwinner deserved more pay than Ms. Robinson, a woman without children.

30. De Niro did not take seriously his legal obligations not to discriminate. After a discussion with Ms. Robinson of policies prohibiting workplace discrimination and harassment, De Niro launched into an inappropriate joke, referring to another employee and asking, "Who do you think we can have sexually harass [the employee]?"

  **v.**  **Ms. Robinson is Constructively Discharged**

31. Through De Niro's course of conduct described above, Defendants treated Ms. Robinson less well based on sex. Defendants did not inflict such treatment on male employees.

32. On multiple occasions, Ms. Robinson told De Niro that she was being harassed. In addition, on multiple occasions, Ms. Robinson reported to people who work for Mr. De Niro that she was being harassed. But no action was taken to remedy the discrimination.

33. On November 9, 2018, Ms. Robinson met with De Niro and told him she would be resigning, but he induced her to stay by promising that her work conditions would improve. De Niro also threatened Ms. Robinson, telling her he would give a "bad recommendation" if she left.

34. But the work conditions deteriorated and became so intolerable that no reasonable person would be able to stay.

35. Ms. Robinson was left with no choice but to resign. Ms. Robinson was constructively discharged on April 6, 2019, when she tendered her final resignation.

**C.    Plaintiff's Protected Activity and Defendants' Retaliation**

36. As described above, Ms. Robinson repeatedly engaged in protected activity prior to her resignation, including objecting to Mr. DeNiro's discriminatory pay practices and his illegal refusal to pay overtime to his (female) assistants.

37. On March 7, 2019, for example, Ms. Robinson complained to Mr. De Niro's lawyer/fixer that her employment situation was "down right harassment." No action was taken to address the concerns that Ms. Robinson raised, and Ms. Robinson resigned shortly thereafter.

38. Following her departure, Ms. Robinson requested a letter of recommendation from De Niro, her long-time employer, in support of her application to attend business school. At the request of De Niro's lawyer/fixer, Ms. Robinson prepared a draft for De Niro to review and edit. In retaliation for her protected activity, however, De Niro refused to provide Ms. Robinson with a letter of recommendation.

39. In further retaliation for Ms. Robinson's protected activity, Defendants launched a retaliatory investigation into Ms. Robinson after she resigned. Defendants subjected her to heightened scrutiny to which other employees had not been subjected.

40. After Ms. Robinson requested a letter of recommendation, De Niro through counsel presented Ms. Robinson with a release of legal claims for her to sign. Ms. Robinson responded by identifying the consideration she would need in order to sign a release, and she indicated she would involve a lawyer in order to protect her interests if she did not hear back by July 12, 2019.

41. Shortly after being warned about Ms. Robinson involving counsel to protect her interests if she did not hear back by July 12, 2019, De Niro's lawyer/fixer (the same individual who had failed to act in response to her prior report of harassment) went on the offensive and sent Ms. Robinson a letter on July 11, 2019, in which he falsely accused her of wrongdoing.

42. On July 31, 2019, Ms. Robinson asserted through counsel that she had claims of sex discrimination, sexual stereotyping, hostile work environment, and retaliation under, *inter alia*, the New York Human Rights Law, the New York Labor Law, and the Fair Labor Standards Act. She made clear that she was willing to pursue these claims through litigation; to that end, her counsel asked if De Niro's lawyer was authorized to accept service of a lawsuit on behalf of De Niro and Canal Productions, Inc. Ms. Robinson emphasized through counsel that Defendants' accusations of wrongdoing were baseless and designed to inhibit her from pursuing her claims.

43. On August 2, 2019, Ms. Robinson through counsel elaborated on her claims, providing specific examples of discriminatory comments made by De Niro.

44. On August 13, 2019, Ms. Robinson through counsel asserted that she had been subjected to a "completely sexist work environment sponsored and created by De Niro utilizing the employment platform of Canal Productions" and explained that the hostile work environment had made it impossible for Ms. Robinson to remain employed there.

45. On August 17, 2019, Defendants further retaliated against Ms. Robinson for engaging in protected activity. That day, Canal Productions, Inc. filed a complaint against Ms.

9

Robinson in the Supreme Court of the State of New York, County of New York, demanding a judgment of $6 million or more. The retaliatory lawsuit was designed to inhibit Ms. Robinson from pursuing her claims and to destroy her reputation. None of the allegations that Canal made against Ms. Robinson had been raised with her prior to her resignation.

46. Canal's lawsuit against Ms. Robinson was filled with baseless, bad faith, and frivolous allegations. Canal falsely accused Ms. Robinson of doing things that she had never done and repeatedly claimed that Ms. Robinson had engaged in improper transactions when, in fact, De Niro himself had approved those transactions. To be clear, Ms. Robinson did not "loaf" or "binge-watch" during work, did not make unauthorized use of Canal's credit card for personal expenses, did not make unauthorized use of Canal's petty cash account for personal items, did not engage in unauthorized conversion of frequent flyer miles, and did not submit false information about her unused vacation allotment.

**D. Damages**

47. Because of Defendants' unlawful conduct, Ms. Robinson has suffered and will continue to suffer economic damages, including the loss of her salary and benefits at Canal and the loss of future employment opportunities. Her career has been destroyed. She is wholly unable to obtain other employment in the entertainment industry and beyond.

48. Because of Defendants' unlawful conduct, Ms. Robinson has experienced severe reputational harm. She has been pilloried in media and news outlets worldwide based on false accusations that characterize her as a loafer, a liar, and a thief.

49. Because of Defendants' unlawful conduct, Ms. Robinson has suffered substantial emotional distress, including feelings of depression, anxiety, panic, and humiliation, as well as

other physiological and psychological manifestations of emotional distress, including insomnia and weight loss.  Ms. Robinson's whole life has been transformed.

VI.    **COUNTS**

**COUNT I**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
**GENDER DISCRIMINATION**
**New York City Administrative Code § 8-107**
**(Against All Defendants)**

50.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

51.    Plaintiff was a female employee of Canal Productions, Inc.  Canal Productions, Inc. was Plaintiff's employer within the meaning of the New York City Human Rights Law.

52.    De Niro is the owner, as well as an employee and agent, of Defendant Canal. During all times relevant to this claim, Defendant De Niro functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

53.    De Niro participated in the conduct giving rise to this claim.  He aided, abetted, directed, incited, compelled, or coerced the unlawful acts alleged herein.

54.    Defendants subjected Plaintiff to discrimination in the terms, conditions, and privileges of employment in violation of the New York City Human Rights Law, including gender-based harassment, pay discrimination, and constructive discharge.  Defendants have treated Plaintiff differently from and less preferably than male employees.

55.    Plaintiff's sex has been a determining factor in Defendants' subjecting of Plaintiff to discrimination in the terms, conditions, and privileges of employment.

56. By reason of the continuous nature of Defendants' discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

57. Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard. Accordingly, Plaintiff is entitled to punitive damages.

58. As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

59. As a result of Defendants' unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT II
## VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—
## RETALIATION
## New York City Administrative Code § 8-107
## (Against All Defendants)

60. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

61. Plaintiff was a female employee of Canal Productions, Inc. Canal Productions, Inc. was Plaintiff's employer within the meaning of the New York City Human Rights Law.

62. De Niro is the owner, as well as an employee and agent, of Defendant Canal. During all times relevant to this claim, Defendant De Niro functioned in a managerial or supervisory capacity towards Plaintiff and had the power to alter the terms and conditions of Plaintiff's employment.

63. De Niro participated in the conduct giving rise to this claim. He aided, abetted, directed, incited, compelled, or coerced the unlawful acts alleged herein.

64. Plaintiff engaged in protected activity, and Defendants were aware of Plaintiff's protected activity. Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to De Niro and others who worked for him and by threatening to bring a lawsuit alleging gender discrimination and retaliation.

65. The practices opposed by Plaintiff constitute colorable violations of the New York City Human Rights Law.

66. Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in a protected activity. Among other things, Defendant De Niro refused to provide Ms. Robinson, a long-time employee, with any reference and Canal, at De Niro's direction, filed a retaliatory lawsuit against her.

67. There was a causal connection between Plaintiff's protected activities and Defendants' actions. Defendants subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities.

68. By reason of the continuous nature of Defendants' retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

69. Defendants' actions amount to willful or wanton negligence, and/or recklessness, and/or exhibit a conscious disregard for the rights of Plaintiff, and/or constitute conduct so reckless as to amount to such disregard. Accordingly, Plaintiff is entitled to punitive damages.

70. As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future

employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

71. Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT III
## VIOLATION OF THE EQUAL PAY ACT
## 29 U.S.C. § 206(d)
## (Against All Defendants)

72. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

73. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of the Fair Labor Standards Act (including the Equal Pay Act).

74. Defendants discriminated against Plaintiff in violation of 29 U.S.C. § 206(d), by subjecting her to unequal pay on the basis of sex.

75. Defendants discriminated against Plaintiff by providing her with discriminatorily lower compensation than less qualified male employees and by paying her less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

76. Defendants caused, attempted to cause, contributed to, or caused the continuation of the wage rate discrimination based on sex in violation of the Equal Pay Act. Moreover, Defendants willfully violated the Equal Pay Act by intentionally paying Plaintiff less than similarly situated or less qualified male employees.

77. Plaintiff is entitled to all remedies available for violations of the Equal Pay Act, including damages in the amount of that she was underpaid based on her gender, liquidated damages, and attorneys' fees and costs.

## COUNT IV
## VIOLATION OF THE NEW YORK EQUAL PAY LAW
### N.Y. Labor Law § 194
### (Against All Defendants)

78. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

79. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of the New York Labor Law (including the New York Equal Pay Law).

80. Defendants discriminated against Plaintiff in violation of New York Labor Law § 194, by subjecting her to unequal pay on the basis of sex.

81. Defendants discriminated against Plaintiff by providing her with discriminatorily lower compensation than less qualified male employees and by paying her less than similarly-situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

82. Defendants caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendants willfully violated the New York Equal Pay Law by intentionally paying Plaintiff less than similarly situated or less qualified male employees.

83. Plaintiff is entitled to all remedies available for violations of New York Labor Law, including damages in the amount of that she was underpaid based on her gender, liquidated damages, and attorneys' fees and costs.

## COUNT V
## UNLAWFUL FAILURE TO PAY OVERTIME COMPENSATION
## IN VIOLATION OF NEW YORK LABOR LAW
### (Against All Defendants)

84. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

85. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of the New York Labor Law.

86. Throughout the statute of limitations period covered by these claims, Plaintiff regularly worked in excess of forty (40) hours per workweek.

87. At all relevant times, Defendants willfully failed and refused to pay Plaintiff at one-and-one-half times her regular rate of pay for work in excess of forty (40) hours per workweek, even though Plaintiff was entitled to overtime compensation.

88. At all relevant times, Defendants willfully, regularly and repeatedly failed to pay Plaintiff at the required overtime rate for hours worked in excess of forty (40) hours per workweek.

89. Plaintiff is entitled to all remedies available for violations of New York Labor Law, including damages in the amount of her unpaid overtime compensation, liquidated damages, and attorneys' fees and costs.

## COUNT VI
## VIOLATION OF NEW YORK LABOR LAW—RETALIATION
### N.Y. Labor Law § 215
### (Against All Defendants)

90. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

91. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of the New York Labor Law.

92. Plaintiff engaged in protected activity under New York Labor Law § 215. Among other things, Plaintiff raised complaints with Defendants about their violations of New York Labor Law, including overtime violations and unequal pay in violation of the New York Equal Pay Act, and indicated that she was prepared to initiate a proceeding for such violations.

93. In violation of N.Y. Labor Law § 215, Defendants retaliated against Plaintiff for raising these complaints. Among other things, Defendant De Niro refused to provide Plaintiff, a long-time employee, with any reference and Canal, at De Niro's direction, filed a retaliatory lawsuit against her.

94. There was a causal connection between Plaintiff's protected activities and Defendants' actions. Defendants subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities.

95. By reason of the continuous nature of Defendants' retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

96. As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

97. Plaintiff is entitled to all remedies available for violations of the New York Labor Law, including back pay, front pay, liquidated damages, attorneys' fees, costs, and other appropriate relief.

**COUNT VII**
**VIOLATION OF FAIR LABOR STANDARDS ACT—RETALIATION**
**29 U.S.C. § 215**
**(Against All Defendants)**

98. Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

99. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of the Fair Labor Standards Act.

100. Plaintiff engaged in protected activity under 29 U.S.C. § 215. Among other things, Plaintiff raised complaints with Defendants about their violations of the Fair Labor Standards Act, including overtime violations and violations of the Equal Pay Act, and indicated that she was prepared to initiate a proceeding for such violations.

101. In violation of 29 U.S.C. § 215, Defendants retaliated against Plaintiff for raising these complaints. Among other things, Defendant De Niro refused to provide Plaintiff, a long-time employee, with any reference and Canal, at De Niro's direction, filed a retaliatory lawsuit against her.

102. There was a causal connection between Plaintiff's protected activities and Defendants' actions. Defendants subjected Plaintiff to such actions because of and in retaliation for Plaintiff's protected activities.

103. By reason of the continuous nature of Defendants' retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

104. As a result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

105. Plaintiff is entitled to all remedies available for violations of the Fair Labor Standards Act, including back pay, front pay, liquidated damages, attorneys' fees, costs, and other appropriate relief.

### VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

### VIII. PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiff prays that this Court:

A. Award Plaintiff all of her damages under applicable law, in excess of $12 million, including back pay, front pay, compensatory damages, liquidated damages, and punitive damages;

B. Award Plaintiff all attorneys' fees, costs, and expenses available under law;

C. Award Plaintiff all pre-judgment interest and post-judgment interest available under law; and

D. Award Plaintiff such additional and further relief as this Court may deem just and proper.

DATED: October 3, 2019                    Respectfully submitted,

                                                      Jeremy Heisler (JH-0145)
                                                     Alexandra Harwin (AH-3111)
                                                     **SANFORD HEISLER SHARP, LLP**
                                                     1350 Avenue of the Americas, 31st Floor
                                                     New York, New York 10019
                                                     Telephone: (646) 402-5650
                                                     Facsimile: (646) 402-5651
                                                     jheisler@sanfordheisler.com
                                                     aharwin@sanfordheisler.com
                                                     *Counsel for Plaintiff*