# EXHIBIT 2

UNITED STATES SOUTHERN DISTRICT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
GRAHAM CHASE ROBINSON,

                 Plaintiff,


      -against-      Case No:
                    1:19-cv-09156 (LTS) (KHP


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,

                 Defendants.
---------------------------------------------x
DEPOSITION TAKEN VIA ZOOM

December 20, 2021
10:00 a.m.



      DEPOSITION of GRAHAM CHASE ROBINSON, the
Plaintiff herein, taken by the Defendants, pursuant to
Article 31 of the Civil Practice Law & Rules of
Testimony, and Court Order, held at the above-mentioned
time, before, PAIGE HAYDEN, a Court Reporter and Notary
Public of the State of New York.
    ---------------------------------------------X




MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



## Page 2

```
 1    A P P E A R A N C E S :
 2    SANFORD HEISLER SHARP, LLP
              Attorneys for Plaintiff
 3            1350 6th Avenue 31st floor
              New York, New York 10019
 4
      BY:   ALEXANDRA HARWIN, ESQ.
 5
 6
 7    TRAUB LIEBERMAN
              Attorneys for Defendant
 8            Seven Skyline Drive
              HAWTHORNE, NEW YORK 10532
 9
      BY:   GREGORY BENNETT, ESQ.
10
11
12    TARTER KRINSKY & DROGIN LLP
              Attorneys for Defendant
13            1350 Broadway
              New York, New York 10018
14
      BY:   LAURENT DROGIN, ESQ.
15
16
17    ALSO PRESENT:
18    KATE MACMULLIN, SANFORD HEISLER SHARP, LLP
      ANNIE SLOAN, SANFORD HEISLER SHARP, LLP
19    DAVID SANFORD, SANFORD HEISLER SHARP, LLP
20
      BRITTANY K. LAZZARO, TARTER KRINSKY & DROGIN LLP
21    TOM HARVEY
22
23
24
25
```

## Page 3

```
 1    F E D E R A L   S T I P U L A T I O N S :
 2
 3
 4    IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN THE
 5    ATTORNEYS FOR THE RESPECTIVE PARTIES HEREIN, THAT FILING
 6    AND SEALING BE AND THE SAME ARE HEREBY WAIVED.
 7
 8    IT IS FURTHER STIPULATED AND AGREED THAT ALL OBJECTIONS,
 9    EXCEPT AS TO FORM OF THE QUESTION, SHALL BE RESERVED TO
10    THE TIME OF THE TRIAL.
11
12    IT IS FURTHER STIPULATED AND AGREED THAT THE WITHIN
13    DEPOSITION MAY BE SWORN TO AND SIGNED BEFORE ANY OFFICER
14    AUTHORIZED TO ADMINISTER AN OATH, WITH THE SAME FORCE
15    AND EFFECT AS IF SIGNED AND SWORN TO BEFORE THIS COURT.
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2        GRAHAM CHASE ROBINSON, the WITNESS
 3    herein, having been first duly sworn by
 4    a Notary Public of the State of New
 5    York, was examined and testified as
 6    follows:
 7    EXAMINATION BY
 8    MR. DROGIN:
 9        Q.   State your name for the
10    record, please.
11        A.   Graham Chase Robinson.
12        Q.   State your address for the
13    record, please.
14        A.   ████████████████████
15
16        MR. DROGIN:  Paige, can
17    you read into the record the
18    Federal Stipulations?
19        THE COURT REPORTER:  It
20    is hereby stipulated and
21    agreed by and between the
22    attorneys for the respective
23    parties herein, that filing
24    and sealing be and the same
25    are hereby waived.
```

## Page 5

```
 1        G. C. ROBINSON
 2        It is hereby stipulated
 3    and agreed that all
 4    objections, except as to form
 5    of the question, shall be
 6    reserved to the time of the
 7    trial.
 8        It is hereby stipulated
 9    and agreed that the within
10    deposition may be sworn to
11    and signed before any officer
12    authorized to administer an
13    oath, with the same force and
14    effect as if signed and sworn
15    to before this Court.
16        MR. DROGIN:  I am
17    prepared to so stipulate.
18        MS. HARWIN:  Yes, that is
19    fine.
20        MR. BENNETT:  As am I.
21    Just to put it on the record,
22    we are obviously proceeding
23    under the terms of the
24    stipulation that the Court
25    has entered into with respect
```



```
 1              G. C. ROBINSON
 2    to remote depositions.
 3       Q.   Good morning, Chase.
 4       A.   Good morning.
 5       Q.   How long have you lived at
 6    the address where you are -- where
 7    you are currently at?
 8              MS. HARWIN:  Objection to
 9    the form.
10              MR. DROGIN:  How would
11    you like me to rephrase it?
12              MS. HARWIN:  Ask how long
13    she lived at her residential
14    address?
15              MR. DROGIN:  I will adopt
16    your attorney's question.
17       A.   This is my family home that
18    I grew up in.  I live with my
19    mother.
20       Q.   How long have you lived
21    with your mother?
22       A.   I can't recall how many
23    years I have lived with her.  This
24    is my childhood home so --
25       Q.   Okay.
```

```
 1              G. C. ROBINSON
 2         And during the period of
 3    time from when you were growing up,
 4    until now, has anyone else resided
 5    with you on a more or less permanent
 6    basis?
 7       A.   On a permanent basis, no.
 8       Q.   Have you ever had your
 9    deposition taken before?
10       A.   No.
11       Q.   Have you ever previously
12    attended a deposition either
13    remotely or in person?
14       A.   No.
15       Q.   Alright.
16         So the way that we are
17    going to proceed is just as you have
18    been doing.  It is a
19    question-and-answer format.
20         It is very important that
21    you listen to the whole question.
22    Often you may be able to anticipate
23    where I am going, and sometimes you
24    may be right, sometimes you may be
25    wrong.  But to ensure that you are
```

```
 1              G. C. ROBINSON
 2    truly and actually answering the
 3    question that I am asking, it is
 4    important that you listen to the
 5    whole question.
 6         Is that understood?
 7       A.   Yes.
 8       Q.   It is also important since
 9    we are not videotaping that you give
10    verbal answers to my questions.
11         Is that understood?
12       A.   Yes.
13       Q.   If you want to speak with
14    any of the four attorneys you have
15    got here, that is fine.  However,
16    you need to answer the question
17    first, and then just let us know
18    that you want to speak with counsel
19    and we will take a break.
20         Is that understood?
21       A.   Yes.
22       Q.   It is also important that
23    you tell me if there are any words
24    that I use that you don't
25    understand.
```

```
 1              G. C. ROBINSON
 2    Is that understood?
 3       A.   Yes.
 4              MS. HARWIN:  Objection.
 5    It is not her job to rephrase
 6    or identify errors in your
 7    questioning.
 8              MR. DROGIN:  Are you
 9    objecting to something other
10    than the form of the
11    question?
12              MS. HARWIN:  I am
13    objecting to the instruction.
14              MR. DROGIN:  We just not
15    five minutes in and we
16    already agreed and stipulated
17    that all objections other
18    than the form are not
19    permitted.  I ask that you
20    withdraw your objection.
21              MS. HARWIN:  I made the
22    objection.  You can continue.
23              MR. DROGIN:  So you are
24    going to stand on your
25    objection?
26              MS. HARWIN:  Yes.
```





Page 10

```
 1          G. C. ROBINSON
 2     MR. DROGIN:  Okay.
 3     Q.   If there is a word that you
 4 don't understand, will you tell me?
 5     MS. HARWIN:  Objection to
 6 the form.
 7     Q.   You can answer.
 8     A.   Yes, I will try to.
 9     Q.   Alright.
10     If you need me to repeat
11 the question, just let me know, and
12 either I will or I will ask the
13 court reporter to read it back.
14     Is that okay?
15     A.   Yes.
16     Q.   If you answer the question
17 that I have asked, I am going to
18 make the assumption that you heard
19 the question, you understood the
20 question, and you are answering that
21 question.
22     Is that understood?
23     A.   Yes.
24     Q.   Please take your time in
25 answering my questions.  While we
```

Page 11

```
 1          G. C. ROBINSON
 2 are under some time restraint, I
 3 would rather get right answers than
 4 quick answers that you might want to
 5 change later.
 6     Do you agree to answer to
 7 the best of your ability?
 8     A.   Yes.
 9     Q.   We are going to be talking
10 about events that happened, on many
11 occasions, many years ago.  It is
12 perfectly alright to tell me if you
13 don't know or you don't remember.
14     Is that understood?
15     A.   Yes.
16     Q.   It is important that you
17 don't guess.
18     Is that understood?
19     A.   Yes.
20     Q.   So when you answer a
21 question, I am going to assume that
22 you answer to the full extent and
23 best of your ability.
24     Is that understood?
25     A.   That is understood.
```

Page 12

```
 1          G. C. ROBINSON
 2     Q.   Are you currently alone
 3 where you are right now?
 4     A.   Yes.
 5     Q.   Do you understand that
 6 during this deposition while you are
 7 being questioned no else is is to be
 8 present?
 9     A.   Yes.
10     Q.   And do you understand that
11 while you are being questioned, you
12 are not to have any communications
13 with anyone either by text, or
14 e-mail, or other means of electronic
15 communication?
16     A.   Yes.
17     Q.   Is there any reason why you
18 can't proceed under the instructions
19 that we have just been discussing
20 for the past few minutes?
21     A.   Not that I am aware of.
22     Q.   Are you currently taking
23 any medication that would impair
24 your ability to hear my questions?
25     A.   No, not that I am aware of.
```

Page 13

```
 1          G. C. ROBINSON
 2     Q.   Okay.
 3     Are you currently under any
 4 medications that would impair your
 5 ability to answer my questions?
 6     A.   No, not that I am aware of.
 7     Q.   And before we began, you
 8 raised your right hand and you swore
 9 to tell the truth.  Correct?
10     A.   Yes.
11     Q.   What does that oath mean to
12 you?
13     MS. HARWIN:  Objection to
14 the form.
15     Q.   Does that oath have a
16 meaning to you?
17     MS. HARWIN:  Objection to
18 the form.
19     A.   The oath means to tell the
20 truth.
21     Q.   Will you agree to tell the
22 truth, even if the answer may be
23 damaging to your case?
24     MS. HARWIN:  Objection to
25 the form.
```



```
                                              Page 14
 1            G. C. ROBINSON
 2    A.   Yes.
 3    Q.
 4
 5
 6
 7
 8
 9       MS. HARWIN:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 15
 1            G. C. ROBINSON
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 16
 1            G. C. ROBINSON
 2
 3
 4       MR. DROGIN:  I am
 5   prepared to stipulate that
 6   you have a standing objection
 7   to the form of every question
 8   that I ask.  Is that okay?
 9       MS. HARWIN:  I think it
10   makes sense for me to object
11   to the specific question.
12       MR. DROGIN:  You don't
13   have to.  I am telling you
14   that in order to save time, I
15   am willing to stipulate that
16   you have a standing to the
17   form of every single
18   questions that I ask today.
19   How is that?
20       MS. HARWIN:  We will
21   consider that and address it
22   during the next time we
23   return from a break.
24       MR. DROGIN:  I am going
25   to make it easy for you.
```

```
                                              Page 17
 1            G. C. ROBINSON
 2   There is obviously a delay
 3   and I know that is not what
 4   you are trying to do.
 5       MS. HARWIN:  I appreciate
 6   that.  We will consider that.
 7       MR. DROGIN:  You will
 8   revert back, I imagine,
 9   today?
10       MS. HARWIN:  Yes.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5  (Pages 14 to 17)





Page 18

```
 1              G. C. ROBINSON
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24        You worked for Canal for
25   about 11 years, is that right?
```

Page 19

```
 1              G. C. ROBINSON
 2    A.   A little over 11 years.
 3    Q.   And who hired you?
 4    A.   Bob and Lauren Hertz (ph),
 5  I guess.
 6    Q.   Okay.
 7         And just -- I think it will
 8  make it easier, you mean -- when you
 9  say, "Bob," you mean Robert De Niro?
10    A.   Yes.
11    Q.   So Bob was involved in your
12  hiring, is that correct?
13    A.   Yes.
14    Q.   And Bob promoted you during
15  your employment?
16    A.   Yes.
17    Q.   How many times did Bob
18  promote you during your employment?
19    A.   He gave me two titles
20  during my employment.
21    Q.   Other than title change,
22  were those promotions?
23         MS. HARWIN:  Objection to
24    the form.
25         MR. DROGIN:  I will
```

Page 20

```
 1              G. C. ROBINSON
 2  rephrase it.
 3    Q.   When your titled changed,
 4  did your duties and responsibilities
 5  change as well?
 6         MS. HARWIN:  Objection to
 7    the form.
 8         MR. DROGIN:  How would
 9    you rephrase that question so
10    it wouldn't draw an
11    objection?
12         MS. HARWIN:  I would
13    specify which positions you
14    are referring to.
15         MR. DROGIN:  I am
16    referring to the two that she
17    is talking about.
18    Q.   Are you able to answer the
19  question with that clarification?
20    A.   The majority of my job did
21  not change with the two title
22  changes.
23    Q.   Okay.
24         And did your duties and
25  responsibilities increase over time
```

Page 21

```
 1              G. C. ROBINSON
 2  over that 11 years?
 3         MS. HARWIN:  Objection to
 4    the form.
 5    Q.   You can answer.
 6    A.   There -- there were certain
 7  tasks or jobs that I did here and
 8  there, but the majority of my job
 9  had remained the same.
10    Q.   Over the entire 11-year
11  period?
12    A.   Over the -- I would say so,
13  yes.
14    Q.   And you received salary
15  increases over the years, is that
16  correct?
17    A.   Yes.
18    Q.   Do you remember how many
19  salary increases you received?
20    A.   No, I don't.
21    Q.   Do you recall whether Bob
22  was involved in giving you those
23  salary increases?
24    A.   Yes, he was.
25    Q.   Is it fair to say that Bob
```



| Page 22 | Page 23 |
|---|---|

**Page 22**

1  G. C. ROBINSON
2  came to rely on you to handle many
3  things about his life?
4  MS. HARWIN: Objection to
5  the form.
6  Q. When she objects to the
7  form, you can answer it.
8  A. I think that there are -- I
9  think there were, like many
10 employees, things that Bob had asked
11 -- many of the things he had asked
12 me had to do with his potential
13 life, his domestic life, items that
14 were personal in nature or items
15 that dealt with his ex-girlfriend,
16 Toukie Smith or his kids.
17 Q. Okay.
18 I am going to come back to
19 my question.
20 In performing your duties
21 for Canal, however, is it fair to
22 say that he would rely on you, in
23 your role as a Canal employee, to do
24 certain things for him and the
25 company?

**Page 23**

1  G. C. ROBINSON
2  MS. HARWIN: Objection to
3  the form.
4  A. I believe that is a core
5  job of all Canal employees.
6  Q. What is?
7  A. To do what Bob asked.
8  Q. Okay.
9  And again, I am going to
10 come back to my question.
11 Does that mean that he
12 relied on you to do what he asked?
13 MS. HARWIN: Objection to
14 the form.
15 A. I believe he relied on me
16 as he did other employees to do what
17 he asked.
18 Q. As time went on, as you
19 indicated, you learned a great deal
20 about his personal life, is that
21 correct?
22 MS. HARWIN: Objection to
23 the form.
24 A. Like many employees, yes, I
25 did.

| Page 24 | Page 25 |
|---|---|

**Page 24**

1  G. C. ROBINSON
2  Q. So is it fair to say over
3  time you came to know his likes and
4  dislikes?
5  MS. HARWIN: Objection to
6  the form.
7  Q. Not about everything under
8  the universe, but in general?
9  MS. HARWIN: Objection to
10 the form.
11 A. Like many of the employees,
12 I came to know what his needs were.
13 Q. I am not asking about
14 needs. I am asking about likes and
15 dislikes. Certain things that he
16 liked and didn't like, and you
17 became aware of them. Is that
18 correct?
19 MS. HARWIN: Objection to
20 the form.
21 A. I became aware of the --
22 some of the things that he liked and
23 didn't like during my time in Canal.
24 Q. Did you come to an
25 understanding as to some of the

**Page 25**

1  G. C. ROBINSON
2  things that make him happy or
3  upset him?
4  A. Can you repeat the
5  question?
6  MR. DROGIN: Can you read
7  it back?
8  (Whereupon, the requested
9  portion was read back by the
10 reporter:
11 Q: Did you come to an
12 understanding as to some of
13 the things that may make him
14 happy or upset him?)
15 A. Yes.
16 Q. Did you feel that over time
17 you got to know how to read his
18 mood, what kind of mood he was in?
19 MS. HARWIN: Objection to
20 the form.
21 MR. DROGIN: What is
22 wrong with the form of the
23 question?
24 MS. HARWIN: It is vague
25 and ambiguous.



## Page 26

G. C. ROBINSON

1
2    Q.   You can answer unless you
3  don't understand the question.  You
4  told me that you would tell me if
5  you don't understand the question,
6  right?  You will tell me if you
7  don't understand the question, is
8  that fair?
9    A.   Yes, I said I would try.
10        MR. DROGIN:  I will
11     rephrase the question.
12    Q.   Over time, is it fair to
13  say that you learned how to read his
14  mood?
15        MS. HARWIN:  Objection to
16     the form.
17    A.   I think at times you could
18  understand his mood.  He was at
19  times quite verbal about his likes
20  and dislikes.
21    Q.   And you -- is it fair to
22  say that you knew a great deal about
23  not -- a great deal of nonpublic
24  information about him, is that
25  correct?

## Page 27

G. C. ROBINSON

1
2        MS. HARWIN:  Objection to
3     the form.
4    A.   I became aware of
5  information like other Canal
6  employees that was not common
7  knowledge or in public.
8    Q.   So for example, health
9  issues that he had, correct, that is
10  one thing?
11        MS. HARWIN:  Objection to
12     the form.
13    A.   Yes, I believe there were
14  some that weren't --
15    Q.   And you became privy to
16  certain marital issues that he was
17  having over this 11-year period, is
18  that fair?
19    A.   Yes, some of the ones that
20  weren't public.  Others that were.
21    Q.   Is it also fair to say that
22  there were ups and downs in your
23  relationship with Bob?
24        MS. HARWIN:  Objection to
25     the form.

## Page 28

G. C. ROBINSON

1
2    A.   I think that there were
3  times that he was incredibly abusive
4  and it was very difficult to work at
5  Canal Productions.  There were other
6  times where he would try to erase
7  what he had done, whether it was
8  berating me or the abuse of trying
9  to do something sweet or nice.  So
10  there were many ups and downs during
11  my time at Canal.  Many of them were
12  -- were down.
13    Q.   And you -- is it fair to
14  say that you went through some good
15  times in his life together?
16        MS. HARWIN:  Objection to
17     the form.
18    A.   I think there were time
19  that were better than others.
20    Q.   Okay.
21        Was he a father figure to
22  you?
23        MS. HARWIN:  Objection to
24     the form.
25    A.   I had used that term at

## Page 29

G. C. ROBINSON

1
2  times to offset other thoughts of
3  what people would think.
4    Q.   Okay.
5        So you admit then that you
6  told people, on occasion, that he
7  was like a father or father figure
8  to you, isn't that right?
9        MS. HARWIN:  Objection to
10     the form.
11    A.   I said that to offset the
12  thoughts of anything else for
13  specific reasons.
14    Q.   So the answer to my
15  question is yes, you did tell people
16  that?
17        MS. HARWIN:  Objection to
18     the form.
19    A.   Yes, to offset other
20  thoughts that people might have.
21    Q.   So you were lying to these
22  other people, is that what you are
23  saying?
24        MS. HARWIN:  Objection to
25     the form.

8  (Pages 26 to 29)



Page 30

```
 1            G. C. ROBINSON
 2       Q.  Can you answer the
 3  question?
 4       A.  No, I wasn't -- I wasn't.
 5  I was trying to, again, offset
 6  thoughts of any -- of people
 7  thinking anything else.
 8  Specifically, things that were said
 9  -- because of things that were said
10  to me.
11       Q.  So when you told people
12  that he was like a father figure to
13  you, what did you mean?
14       MS. HARWIN:  Objection to
15    the form.
16       A.  That that is the way that I
17  saw him, that there wasn't anything
18  else.
19       Q.  So you saw him as a father
20  figure?
21       MS. HARWIN:  Objection to
22    the form.
23       A.  At times.
24       Q.  Let's go to the summer of
25  2018.  Bob was in California.  Is
```

Page 31

```
 1            G. C. ROBINSON
 2  that correct?
 3       A.  I'm sorry, you broke up for
 4  a second.  Can you repeat that?
 5       Q.  Sure.  I want to go to the
 6  summer of 2018.
 7       Am I correct Bob was in
 8  California?
 9  ████████████████████████████
10  ██████████████████.
11       Q.  ████████████████
12       A.  Yes.  I -- yes.  Yes,
13  ███████████████████
14       Q.  At that time he was
15  ████████████████████████████
16  ██████████
17       MS. HARWIN:  Objection to
18    the form.
19       Q.  During the summer of 2018,
20  ████████████████████████████
21  ████████████
22       A.  No, I don't believe it was
23  at that time, during the summer.  He
24  was at ████████████████
25       Q.  Okay.
```

Page 32

```
 1            G. C. ROBINSON
 2       Had it been -- was he going
 3  through ████████████████ at that
 4  time over the summer of 2018?
 5       A.  No.
 6       Q.  When did ██████████
 7  ██████████████████████████
 8  start, if you remember?
 9       A. ████████████
10  ██████████▌████████████
11  ████████████.
12       Q.  Of 2018?
13       A.  2018, yes.
14       Q.  Did you have a sense of how
15  ████████████████████████████
16  ██████████▌
17       MS. HARWIN:  Objection to
18    the form.
19       A.  I don't think there is
20  anything -- it is speculation.  I
21  can't speculate.
22       Q.  When he came back to New
23  York, from California, did you
24  notice that there were changes in
25  his behavior?
```

Page 33

```
 1            G. C. ROBINSON
 2       MS. HARWIN:  Objection to
 3    the form.
 4       A.  I can't really recall if
 5  there were changes in his behavior
 6  at that time.
 7       Q.  Did there come a time after
 8  he returned to New York that you
 9  began to notice changes in his
10  behavior?
11       MS. HARWIN:  Objection to
12    the form.
13       A.  Not that I can recall.
14       MR. DROGIN:  I'm sure you
15    are probably objecting to 97
16    percent of my questions.  You
17    want to revisit -- you want
18    to take a break and revisit
19    my offer to take a standing
20    objection to all of my
21    questions?
22       MS. HARWIN:  Sure.  We
23    can take a five-minute break.
24       (Whereupon, a recess was
25    taken at this time.)
```





| Page 34 |
| --- |

G. C. ROBINSON

1  
2      MR. DROGIN:  Ms. Harwin,  
3  I offered you a stipulation  
4  where you could have a  
5  standing objection to the  
6  form for every single  
7  question that I was asking.  
8      MS. HARWIN:  Yes,  
9  Plaintiff will -- we will  
10  stipulate that Plaintiff has  
11  a standing objection to form  
12  of all questions posed in the  
13  deposition.  
14      MR. DROGIN:  And that is,  
15  I mean, obviously for me.  
16  When Mr. Bennett is  
17  questioning, we will see how  
18  he does and if his questions  
19  draw so many objections.  
20      MS. HARWIN:  Plaintiff  
21  stipulates that Plaintiff --  
22  the parties stipulate that  
23  Plaintiff has a standing  
24  objection to the form of all  
25  questions posed by Mr. Drogin  

| Page 35 |
| --- |

G. C. ROBINSON

1  
2  during the deposition.  
3      Q.   When Bob returned from  
4  California, isn't is true that he  
5  needed a place to live?  
6      A.   Yes.  
7      Q.   When was it he returned,  
8  about, if you don't know the exact  
9  date?  
10      A.   I don't recall.  
11      Q.   It was sometime before  
12  November 20th, 2018?  
13      A.   Yes.  
14      Q.   Did he -- when he came  
15  back, he was renting a house in the  
16  Hamptons, isn't that right?  
17      A.   I can't recall.  
18      Q.   Okay.  
19          Was there a time when he  
20  was also living in a hotel?  
21      A.   Yes.  
22      Q.   Around what period of time  
23  was that?  
24      A.   Around July, August,  
25  September, October, November.  He  

| Page 36 |
| --- |

G. C. ROBINSON

1  
2  came back during the time that he  
3  was ███████  
4  ████████████  
5      Q.   And he would stay in a  
6  hotel?  
7      A.   Yes.  
8      Q.   Are you familiar with a  
9  property known as ████████  
10      A.   Yes.  
11      Q.   What was ██████  
12      A.   ████████████████ was  
13  Bob's rental townhouse that he moved  
14  into.  
15      Q.   When did he move in?  
16      A.   I can't recall when he  
17  moved in.  It was, I believe, end of  
18  October, beginning of November.  
19      Q.   This being 2018?  
20      A.   Yes.  
21      Q.   Before he moved in, the  
22  townhouse needed to be furnished, is  
23  that correct?  
24      A.   Yes, all four stories.  
25      Q.   And it needed furniture for  

| Page 37 |
| --- |

G. C. ROBINSON

1  
2  all four stories, correct?  
3      A.   Yes.  
4      Q.   It needed rugs or flooring,  
5  is that right?  
6      A.   Yes.  
7      Q.   It needed artwork, correct?  
8      A.   Yes.  
9      Q.   And it needed other  
10  necessities, even down to like  
11  vacuum cleaners, is that right?  
12      A.   Yes.  
13      Q.   And am I correct that Canal  
14  employees were used to assist in the  
15  furnishing of ██████  
16      A.   Some employees were.  Bob  
17  had asked me to help him design it.  
18      Q.   When you say, "design it,"  
19  what do you mean?  
20      A.   Figure out layouts for the  
21  rooms, source fabrics, send him  
22  options for all the different items  
23  that one would put in a house,  
24  whether it was plates, glasses,  
25  fabric for couches, couches,  



Page 38

```
 1            G. C. ROBINSON
 2   antiques things, all along the lines
 3   of that.
 4      Q.   And which other Canal
 5   employees assisted with the
 6   furnishing of █████?
 7      A.   Sabrina Weeks-Britan and Lu
 8   Lu White.
 9      Q.   Who is Sabrina?
10      A.   Sabrina was Bob's -- one of
11   Bob's executive assistants.
12      Q.   And who was Lu Lu?
13      A.   Lu Lu White was an
14   assistant -- was supposed to be an
15   assistant to me and the office, but
16   her job surrounded more of the █████
17   apartment then.
18      Q.   And the █████ apartment,
19   when did that start?
20      A.   I believe the lease began
21   on August 1st of 2018.
22      Q.   And the best -- your best
23   recollection is he moved in around
24   the fall of 2018, is that right?
25      A.   Yes.  The four-story
```

Page 39

```
 1            G. C. ROBINSON
 2   townhouse needed to be furnished.
 3      Q.   And after it was furnished,
 4   did he move in?
 5      A.   I wouldn't characterize it
 6   that way.
 7      Q.   Alright.
 8           How would you characterize
 9   it?
10      A.   He moved in while it was
11   still in process -- in the process
12   of furnishing.
13      Q.   So while this was in
14   process, did your duties and
15   responsibilities relating to █████
16   continue?
17      A.   Yes.
18      Q.   Was that true for the other
19   Canal employees who were pitching
20   in?
21      A.   Some of them.  Lu Lu White.
22   Lu Lu White did.
23      Q.   What about Sabrina?
24      A.   She only had, I believe, a
25   little involvement in the beginning.
```

Page 40

```
 1            G. C. ROBINSON
 2      Q.   What about Michael Tasch,
 3   T-A-S-C-H?
 4      A.   Can you specify or rephrase
 5   on what you are asking?
 6      Q.   Sure.
 7           How, if at all, was Michael
 8   Tasch involved with the operation to
 9   get █████ furnished for Bob?
10      A.   Other than paying some of
11   the bills, or checks for the
12   furnishing, I can't recall how else
13   he would have had involvement.
14      Q.   What about Tom Harvey?
15      A.   (No verbal response.)
16      Q.   I'm sorry.  Did you answer
17   the question?
18      A.   Tom Harvey had helped
19   during the rental process and the
20   lease, but in terms of the actual
21   furnishing I can't recall him having
22   --
23      Q.   What about Michael Kaplan
24   (ph)?
25      A.   Michael Kaplan was not
```

Page 41

```
 1            G. C. ROBINSON
 2   involved in the furnishing, more in
 3   the maintenance of things that
 4   needed to be fixed.
 5      Q.   Was Lu Lu involved in the
 6   maintenance of things that needed to
 7   be fixed, like Michael Kaplan?
 8      A.   No.  More in the design and
 9   the items -- other items for the
10   apartment.
11      Q.   What about Sabrina?
12      A.   As I said, she only had a
13   small role in the beginning.
14      Q.   Okay.
15           Were there any household or
16   domestic employees who assisted at
17   that time with █████?
18      A.   There was only -- for
19   domestic employees, there was only a
20   housekeeper, but not with the design
21   of █████.
22      Q.   But anybody else --
23   forgetting the design, was the
24   housekeeper involved in some of the
25   things that needed to be done to get
```



Page 42

```
 1              G. C. ROBINSON
 2  it set up so he could move in?
 3      A.   The housekeeper cleaned.
 4      Q.   Alright.
 5           Did Bob ask you to assist
 6  in this process with ████?
 7      A.   Yes.  He specifically asked
 8  me to help him design and design it
 9  with him.
10      Q.   Did you agree?
11      A.   I objected to want to go
12  work on it.
13      Q.   But eventually, not
14  withstanding your objection, you did
15  do it, correct?
16      A.   Yes, I had to.
17      Q.   Did you do it as a favor to
18  him?
19      A.   No.
20      Q.   Were you trying to help
21  him?
22      A.   I was asked to do it as one
23  of my job duties.
24      Q.   And are you saying that you
25  did it against your will?
```

Page 43

```
 1              G. C. ROBINSON
 2      A.   I had made objections on
 3  multiple occasions of not wanting to
 4  be involved in the ████ project.  It
 5  was his domestic life, and it wasn't
 6  any job under the title that went
 7  with the title VP of production and
 8  finance.
 9      Q.   So this was separate and
10  apart -- what he was asking you to
11  do was separate and apart from your
12  ordinary duty, is that right?
13      A.   It had nothing to do with
14  my duties as VP of production and
15  finance, but it was something that
16  he had redirected me to do instead
17  of other work.  It was -- he
18  prioritized it.
19      Q.   Is it fair to say that that
20  increased your work load?
21      A.   It became a majority of my
22  work load.
23      Q.   Who is Tiffany Chen (ph)?
24      A.   The woman that ████
25  ████████ and now his,
```

Page 44

```
 1              G. C. ROBINSON
 2  I believe, current girlfriend.
 3      Q.   When was the first time
 4  that you met Tiffany?
 5      A.   During the films of The
 6  Intern, and I believe that was 2014.
 7      Q.   And to your knowledge, when
 8  did their relationship begin?
 9  ████████████████████████
10  ████████████████████████,
11  ████████████████████████
12  ████████████████████
13  ████████
14  ████████
15      Q.   So is it fair to say that
16  you met her before the summer of
17  2018?
18      A.   Yes, I believe on one
19  occasion.
20      Q.   And before the summer of
21  2018, had you interacted with her
22  with any regularity?
23      A.   No.
24      Q.   When Bob returned to New
25  York, from California, is that a
```

Page 45

```
 1              G. C. ROBINSON
 2  period of time when you considered
 3  her to be his girlfriend?
 4      A.   I don't think I would
 5  characterize it that way.
 6      Q.   Okay.
 7           How would you characterize
 8  it?
 9      A.   That it was ████████████
10  ████████████.
11      Q.   Was it your understanding
12  that they were going to live
13  together in ████?
14      A.   In the beginning -- the
15  very beginning after I met her, that
16  was not something that I was aware
17  of.
18      Q.   Did there come a time where
19  you became aware that she was going
20  to move into ████?
21      A.   I can't recall exactly when
22  I became aware of that.  For a
23  couple of months ████████████
24  ████████████████████████
25  ████████████████████████
```



Page 46

```
 1            G. C. ROBINSON
 2 ████, so I can't recall
 3 exactly when she -- I knew she was
 4 moving in.
 5     Q.   I'm sorry, you did know she
 6 was moving in?
 7     A.   I can't recall when.
 8     Q.   Okay.
 9         And she had, at one point,
10 claimed there was a mold problem in
11 ████, is that right?
12     A.   Yes.
13     Q.   And this was an issue that
14 consumed a lot of your time, is that
15 fair?
16     A.   It consumed a bit of my
17 time, in addition to Tom Harvey and
18 Michael Tasch's as well.
19     Q.   ████████████████
20 ████████████████.
21     A.   ████.
22     Q.   She insisted there was mold
23 in ████.
24     A.   Yes.
25     Q.   And there were all sorts of
```

Page 47

```
 1            G. C. ROBINSON
 2 testing being done to show there was
 3 no mold in ████, right?
 4     A.   There were tests that were
 5 done in ████, in 2019, that Michael
 6 Tasch and Tom Harvey were involved
 7 in as well.
 8     Q.   When Bob got back from
 9 California, do you recall him being
10 very uptight?
11     A.   No, I don't recall that.
12     Q.   Had he been -- when he came
13 back from California, was he
14 screaming at you more regularly than
15 he had been in recent years?
16     A.   In 2019, it had gotten --
17 his behavior and his berating had
18 gotten worse.
19     Q.   This would have been after
20 he had announced ████████████████
21 ██████████████?
22 ████████████████████.
23 I don't recall when they announced
24 they were divorced.
25     Q.   Did this also happen over
```

Page 48

```
 1            G. C. ROBINSON
 2 the period of time that you and
 3 others were dealing with the
 4 supposed mold issue in ████?
 5     A.   Can you clarify?  Are you
 6 asking his behavior?
 7     Q.   Yes.  The screaming and
 8 berating, as you described it, was
 9 that all happening around the same
10 time?
11     A.   It was happening --
12 happening prior to the mold
13 situation.
14     Q.   And also during the mold
15 situation?
16     A.   It got worse and more
17 abusive during the mold situation.
18 But his behavior in yelling, and
19 screaming, and berating was pretty
20 consistent through my employment at
21 Canal.
22     Q.   So there wasn't, let's say
23 a period of time, several years
24 perhaps, where he really hadn't been
25 yelling or berating you -- let me
```

Page 49

```
 1            G. C. ROBINSON
 2 rephrase it.
 3         Are you saying that his
 4 yelling and berating at you occurred
 5 throughout the entire time that you
 6 worked for Canal?
 7     A.   It -- it varied at times,
 8 but he was ████████████████
 9 ████████ berating, and yelling,
10 but this was depending on the year.
11 It was pretty consistent.
12     Q.   So there was some years
13 where it was less and some years
14 where it was more?
15     A.   I don't know.  I can't -- I
16 worked at Canal for over a decade.
17     Q.   You turned over multiple
18 audio recordings that you made in
19 this case.  Are you aware of that?
20 I should say your attorneys turned
21 over.
22     A.   Yes, I am aware of that.
23     Q.   Do you know how many audio
24 recordings were actually turned
25 over?
```



Page 50

```
 1              G. C. ROBINSON
 2      A.   I don't know.
 3      Q.   Do you have any
 4  documentation that shows the dates
 5  and times that the recordings were
 6  made?
 7          MS. HARWIN:  I would just
 8      note that obviously the
 9      Plaintiff is not to provide
10      any attorney-client privilege
11      information.
12          MR. DROGIN:  So noted.
13      A.   Not that I am aware of.
14      Q.   Okay.
15          Do you have any other audio
16  recordings that you have related to
17  your employment that you have not
18  turned over to your attorney?
19      A.   Not that I am aware of.
20      Q.   Do you have any video
21  recordings that have not been turned
22  over to your attorney that relate in
23  any way to your employment?
24      A.   Not that I am aware of.
25      Q.   Did you have any other
```

Page 51

```
 1              G. C. ROBINSON
 2  audio recordings that you erased?
 3      A.   Are you talking about
 4  during my whole entire time at
 5  Canal, like a voicemail, or --
 6      Q.   No.  Specifically I am
 7  talking in connection with the audio
 8  recordings, let's say that were made
 9  in 2018 and 2019.
10      A.   No.
11      Q.   No, there were none that
12  you erased?
13      A.   Yes, that is correct.
14      Q.   Did you destroy any audio
15  recordings that you made during that
16  time period?
17      A.   No, not that I am aware of.
18      Q.   Do you know how many hours
19  of recordings you turned over to
20  your attorney -- attorneys, roughly?
21      A.   I don't know.  I can't
22  recall.
23      Q.   During what period of time
24  were those recordings made?
25      A.   I can't recall -- I can't
```

Page 52

```
 1              G. C. ROBINSON
 2  recall exactly when they began.  I
 3  believe in March 2019.
 4      Q.   That is when you started
 5  making these recordings?
 6      A.   I believe so, yes.
 7      Q.   And was there a time that
 8  you stopped making the recordings?
 9      A.   I can't recall when I
10  stopped.
11      Q.   But there did come a time
12  that you stopped making the
13  recordings?
14      A.   There came a time that I
15  was not speaking to other Canal
16  Productions or people in connection
17  with Canal.
18      Q.   So is it fair to say then
19  that you stopped recording them?
20      A.   Yes.
21      Q.   Why did you start making
22  these recordings?
23      A.   I wanted some backup with
24  some of the items for the ███████
25  ██████████████, Bob's
```

Page 53

```
 1              G. C. ROBINSON
 2  townhouse.
 3      Q.   Okay.
 4          What do you mean by that?
 5      A.   Some of the work that was
 6  being done, decisions that were
 7  being made, issues with the
 8  apartment that had absolutely
 9  nothing to do with -- with my job.
10      Q.   Why did you feel it was
11  necessary to document this?
12      A.   I felt that I needed a
13  backup, in addition to speaking to
14  Tom Harvey and Michael Tasch about
15  apartment issues.
16      Q.   Were these all phone calls
17  that you were recording?
18      A.   Yes, I believe so.
19      Q.   And how did you record
20  them?
21      A.   I -- from what I can
22  recall, the phone was on speaker and
23  I used the -- I don't know what app
24  it is on the computer, but the Voice
25  app.  There is an icon for it to
```




| Page 54 | Page 55 |
|---|---|

**Page 54**

G. C. ROBINSON

1   record.
2   record.
3       Q.   So that was on the iPhone
4   you recorded on speaker phone, is
5   that what you said?
6       A.   I recorded with the phone
7   on speaker phone, and recorded in on
8   an app on my computer that recorded
9   it.
10      Q.   Alright.
11          And were you always in New
12   York when you recorded this -- these
13   calls?
14      A.   I believe that -- I can't
15   recall.  I believe I was in New
16   York.
17      Q.   Okay.
18          Did you ever record any of
19   these calls when you were in Spain?
20      A.   Yes, after I left Canal
21   Productions, I believe there was one
22   in Spain.
23          MS. HARWIN:  If there is
24   a good time for a bathroom
25   break, I would appreciate it.

**Page 55**

G. C. ROBINSON

1   MR. DROGIN:  Sure.  Give
2          MR. DROGIN:  Sure.  Give
3   me two minutes.
4       Q.   And did you record all of
5   your calls with these Canal
6   employees or just some?
7       A.   I didn't record all of my
8   conversations with Canal employees.
9       Q.   How did you go about
10   deciding which ones to record and
11   which ones not to record?
12      A.   I think that there were
13   probably factors including what the
14   topic was going to be, if it was
15   about the apartment.  But I can't
16   recall any other decisions on why.
17      Q.   So am I correct that these
18   were all calls that you initiated as
19   opposed to calls that you received?
20      A.   I wouldn't say that that is
21   correct, but I can't recall whether
22   somebody called me or I called them.
23      Q.   Okay.
24          Did you record any of these
25   calls while you were in California?

**Page 56**

G. C. ROBINSON

1       A.   I can't recall a specific
2       A.   I can't recall a specific
3   -- a specific one that was in
4   California.
5       Q.   But you may have?
6       A.   I don't know.  I don't want
7   to guess.
8       Q.   Okay.
9          Does your iPhone store the
10   location as where it is?
11      A.   No.  Not that I am aware
12   of.
13      Q.   Alright.
14          Some of the recordings that
15   you made were while you were still
16   employed, is that correct?
17      A.   Yes.
18      Q.   And while you were making
19   these recordings, was that working
20   time?
21      A.   Can you clarify?  I mean, I
22   was working.
23      Q.   So -- at the time --
24   withdrawn.
25          So some of these calls that

**Page 57**

G. C. ROBINSON

1   you made, where you were recording
2   you made, where you were recording
3   people, you were actually being paid
4   by Canal, correct?
5       A.   Yes.  I mean -- yeah.  That
6   was part of discussing the work.
7       Q.   At the time that you were
8   recording these calls, had you told
9   anyone that they were being
10   recorded?
11      A.   No, not that I believe.
12      Q.   Is it a fair statement to
13   say that to the best of your
14   recollection none of the people with
15   whom you were speaking were aware
16   that you were recording their call?
17      A.   I didn't discuss it with
18   any of them.
19      Q.   Do you have any reason to
20   believe that any of the people that
21   you were recording were aware that a
22   recording was being made of your
23   phone call with them?
24      A.   I can't speculate about
25   what they thought.




Page 58

G. C. ROBINSON
1
2     Q.   To the best of your
3  recollection?
4     A.   I can't speculate what
5  somebody else thought.
6     Q.   But as a general rule, you
7  didn't make people aware that they
8  were being recorded, isn't that
9  right?
10    A.   Not that I am aware of.
11         MR. DROGIN:  This is a
12    good time for that break that
13    you wanted.
14         MS. HARWIN:  Thank you
15    very much.  What time would
16    you like to come back on the
17    record?
18         MR. DROGIN:  You tell me.
19         MS. HARWIN:  Just five
20    minutes.
21         MR. DROGIN:  That means
22    ten, right?
23         MS. HARWIN:  I will try
24    to keep it under ten.  Why
25    don't we say 11:30?  That is

Page 59

G. C. ROBINSON
1
2  eight minutes.
3         MR. DROGIN:  So
4    stipulated.
5         (Whereupon, a recess was
6    taken at this time.)
7     Q.   I want to make sure I
8  understood your testimony.  When you
9  were making these recordings, are
10 you saying it was on an app on the
11 computer, or an app on your phone?
12    A.   It is an app on my
13 computer.  I think it is called
14 Voice.
15    Q.   Okay.
16         And when you say, "my
17 computer," are you talking about a
18 personal computer or a computer that
19 you had through Canal?
20    A.   A personal computer.
21    Q.   And that -- that
22 information from your personal
23 computer has not been turned over to
24 your attorney or has it?
25    A.   It has been.

Page 60

G. C. ROBINSON
1
2     Q.   Okay.
3         Have you ever told Robin
4  Chambers that you have recordings of
5  some of your calls with her?
6     A.   Not that I can recall.
7     Q.   And when you were having
8  these conversations that you
9  recorded, were you trying to be
10 honest?
11    A.   Yes, of course.
12    Q.   Okay.
13         So you weren't, for
14 example, trying to create a record
15 by saying things that might support
16 yourself if there was ever
17 litigation?
18    A.   No.
19    Q.   Sometimes would you
20 exaggerate?
21    A.   Not that I am aware of.
22    Q.   Is it fair to say that if
23 you stated an opinion on something
24 that was truly held by you, that
25 that was what you believed?

Page 61

G. C. ROBINSON
1
2     A.   Can you give me an example
3  or --
4     Q.   If you stated an opinion,
5  for example, like there was an old
6  Bob and a new Bob.  Is that
7  something that you said because you
8  believed it?
9     A.   If it is something that I
10 said then -- I don't know what the
11 specific context of an old Bob and a
12 new Bob in that conversation was.
13 But it would be within that context
14 of whatever I was discussing.
15    Q.   Okay.
16         But in other words, if you
17 were expressing your opinion about
18 something, it was truly what you
19 believed, is that fair?
20    A.   In that moment.
21    Q.   In that moment.
22         Are you familiar with the
23 phrase confidant?
24    A.   Yes.
25    Q.   The word confidant?

16  (Pages 58 to 61)



Page 62

```
 1            G. C. ROBINSON
 2    A.   Yes.
 3    Q.   What is a confidant?
 4    A.   Somebody that you confide
 5 in.
 6    Q.   Did you confide in Robin?
 7    A.   Yes.
 8    Q.   Would you agree that Robin
 9 was a confidant of yours?
10    A.   I believe at times she was
11 the only person that I could speak
12 to about the issues that I was
13 facing and receive advice from.
14 When I was having issues or having
15 Bob berate me, I used to call her
16 crying.
17    Q.   Did you value her advice?
18    A.   Yes.
19    Q.   Did you value her opinion?
20    A.   At times, I did.  Yes.
21    Q.   Were there times that you
22 didn't value her opinion?
23    A.   I mean, I can't recall
24 every conversation or every piece of
25 opinion she gave me.
```

Page 63

```
 1            G. C. ROBINSON
 2    Q.   Do you recall ever telling
 3 Robin that when Bob returned from
 4 California he was in a "weakened
 5 state?"
 6    A.   I don't recall specifically
 7 saying that, but we had a lot of
 8 conversations.
 9    Q.   Alright.
10         When Bob returned from
11 California, did you believe he was
12 in a weakened state?
13    A.   ███████████████
14         ███  I think I would need to know
15 the context of that conversation.
16 ███████████████████████████████
17 ██.
18    Q.   When he came back from
19 █████, did you believe that his
20 judgment was impaired because of
21 Tiffany?
22    A.   I can't speculate on
23 whether his judgment was impaired by
24 Tiffany.  His judgment was impaired.
25    Q.   I am asking, from your
```

Page 64

```
 1            G. C. ROBINSON
 2 perception, did you believe his
 3 judgment was impaired or being
 4 impaired by Tiffany?
 5    A.   When he came back from
 6 █████, I don't know.
 7    Q.   Was there subsequently a
 8 point in time when you believe Bob's
 9 judgment was being impaired by
10 Tiffany?
11    A.   Can you clarify judgment or
12 what is -- can you rephrase it?
13    Q.   Did there come a time where
14 you believed that Tiffany was having
15 an adverse impact on Bob?
16    A.   Yes, I believe at times in
17 --
18    Q.   In what way or in general
19 how?
20    A.   I can't really recall any
21 specifics at this moment.
22    Q.   Did you come to believe
23 that Tiffany was controlling Bob?
24    A.   Controlling Bob, no.  Not
25 that I can recall.
```

Page 65

```
 1            G. C. ROBINSON
 2    Q.   Now, you began to have
 3 problems with Tiffany in 2018, is
 4 that correct?
 5    A.   There were concerns in --
 6 in 2018 and 2019.  I felt that she
 7 was really targeting me based on my
 8 gender, giving me demeaning jobs,
 9 having me do things for her for the
10 house.
11    Q.   Okay.
12         When did this begin?
13    A.   Which part of my answer is
14 it that you are --
15    Q.   Any part of it.
16         When did this first sort of
17 hit your radar, so to speak, that
18 you began to have those problems
19 with her.  I believe you used the
20 word targeting.  When did you think
21 the targeting began?
22    A.   I started to feel very
23 uncomfortable at times on some of
24 the items that she was texting me
25 and compliments that she was making.
```

17  (Pages 62 to 65)


MAGNA ▶
LEGAL SERVICES

Page 66

```
 1            G. C. ROBINSON
 2   They seemed to be concerning is how
 3   I would probably phrase it
 4   especially when it came to items
 5   that she was gifting me.  A pack of
 6   massages and told me how the man or
 7   the person there would massage me
 8   and what I had to wear.  To me, it
 9   was crossing of line of business.
10   And she was trying to make it more
11   personal, which was concerning.  And
12   there were a lot of things that she
13   was asking of me to help her
14   facilitate in the apartment which
15   were problematic.
16            Again, it wasn't part of my
17   job as VP of production, but I found
18   myself doing a lot of housework and
19   party for the birthday and picking
20   up items for her and Bob for the
21   home.  Yeah.
22       Q.   Let me know when you are
23   ready.
24       A.   Yes.
25       Q.   I am going to come back to
```

Page 67

```
 1            G. C. ROBINSON
 2   my question, which is, when did this
 3   begin?
 4       A.   I felt some form of it in
 5   probably February.  It wasn't until
 6   probably about March where I really
 7   felt that I was being targeted based
 8   on my gender, and based on items
 9   that she wanted me to do at the
10   apartment that I had objected to.
11       Q.   Isn't it true that the
12   problems with Tiffany actually
13   started in August of 2018?
14       A.   No, that would not be true.
15   And I am not quite sure I met her
16   until September.  I can't recall
17   when Bob had me come over and meet
18   her on a Saturday or Sunday.
19       Q.   And in September or October
20   of 2018, she sent you texts that you
21   were uncomfortable with, right?
22       A.   I believe they were
23   September/October.  I didn't have
24   much interaction with her in the
25   beginning.  It was -- I -- you know.
```

Page 68

```
 1            G. C. ROBINSON
 2   Yeah.
 3       Q.   Let's come back to my
 4   question.
 5            So around September or
 6   October of 2018, she began sending
 7   you texts that made you feel
 8   uncomfortable, is that right?
 9       A.   They were uncomfortable
10   texts.  They were.  At times.
11       Q.   So in short, yes?
12       A.   Yes, at times.
13       Q.   She referred to you as a
14   unicorn?
15       A.   She referred to me as a
16   unicorn, but she also in some of
17   these texts discussed this perceived
18   notion of Bob and I being so close,
19   and creating such a wonderful home
20   for her to live in, and how she
21   wanted to record the two of us doing
22   this, and she got to benefit from
23   how close Bob and I were in creating
24   this home that she could live in
25   with Bob.
```

Page 69

```
 1            G. C. ROBINSON
 2       Q.   And that made you feel
 3   uncomfortable?
 4       A.   It made me feel
 5   uncomfortable in that there was
 6   something she was starting to
 7   perceive and I had faced that with
 8   ███████████████████████
 9   ███████████████████████
10   ███████████████████████
11   ███████████████████████
12   ███████████████████████
13   ███████████████████████
14   ███████████████████████
15   ███████████████████████
16       Q.   Let's come back to my
17   question.
18            You also, I believe, said
19   that there were weird comments that
20   she would make.  Are those the ones
21   that you just described?
22       A.   Those are -- are some of
23   them.
24       Q.   What were some of the other
25   weird comments that she made that
```




| | |
|---|---|
| **Page 70** | **Page 71** |

**Page 70**

G. C. ROBINSON

1
2 you remember?
3    A.   She would demean and
4 denigrate the work that I did.  At
5 one point I had been asked by Bob to
6 pick out a Christmas tree for -- for
7 them and for the house.  And I
8 picked one and she was quick to let
9 me know that when Bob came back from
10 his trip he said, and I am quoting,
11 "That tree is so fucking fat, let's
12 just throw it out and get another
13 one."  And she repeated that to me.
14 I ended up having to get another
15 Christmas tree for them.  There were
16 other comments made about setting me
17 up with a guy that -- like a -- the
18 RTK worker.  And that he and I would
19 be good together.  There were just a
20 lot of -- of comments that were
21 concerning and just made me feel
22 uncomfortable.
23    Q.   Would you describe them as
24 red flags?
25    A.   I would describe them as

**Page 71**

G. C. ROBINSON

1
2 something of -- something being
3 uncomfortable that she was
4 perceiving something that wasn't --
5 wasn't there.
6    Q.   You just told us a story
7 about a Christmas tree.  Obviously
8 that was before February of 2019,
9 correct?
10    A.   That was December.  And
11 that was about her demeaning me and
12 sort of letting me know that the
13 work that I had done -- the
14 Christmas tree was -- needed to be
15 replaced, and was just thrown out to
16 get another one.
17    Q.   So this was an unpleasant
18 interaction that you had with her
19 before February of 2019, correct?
20    A.   I wouldn't characterize it
21 that way.
22    Q.   Okay.
23        How would you characterize
24 it?
25    A.   I wouldn't characterize it

| | |
|---|---|
| **Page 72** | **Page 73** |

**Page 72**

G. C. ROBINSON

1
2 as unpleasant.  It was just a
3 comment that she had made to me,
4 that I felt degraded me and put down
5 the work that I was doing,
6 specifically, for their domestic
7 life.
8    Q.   The work being picking out
9 a Christmas tree?
10    A.   Yes.  And then being asked
11 to decorate it by Bob.
12    Q.   There was a point in time
13 where you gave Bob a hug and she was
14 very upset.
15        Do you remember that?
16    A.   I don't recall her -- I
17 don't recall ever initiating a hug
18 with Bob.  And I don't recall a time
19 where she was upset with me giving
20 Bob a hug.  I don't recall either of
21 those.
22    Q.   Okay.
23        Do you think she may have
24 been jealous based on the fact that
25 you had this longstanding and close

**Page 73**

G. C. ROBINSON

1
2 relationship, and I am not
3 suggesting there was anything
4 physical ever between you.  I am
5 asking whether you thought she might
6 be jealous?
7    A.   It is something that Robin
8 and I discussed, and I also
9 discussed it with Michael Kaplan,
10 Michael Tasch, and possibly Tom
11 Harvey.
12    Q.   Alright.
13        I am going to read a couple
14 of words and I want you to tell me
15 whether any of these accurately
16 describe your opinion of Tiffany
17 Chen during your employment.  Okay?
18    A.   Yes.
19    Q.   Abusive?
20    A.   I don't know if I would use
21 that word.
22    Q.   Psychotic?
23    A.   Yes, I think there were
24 times that Michael Tasch or Robin,
25 those words have been used.



Page 74

```
 1            G. C. ROBINSON
 2     Q.   That is not my question.
 3  And if we need to go back to abusive
 4  we can.
 5         My question is, which of
 6  these words accurately describes
 7  your opinion of Tiffany Chen during
 8  the course of your employment?
 9     A.   Okay.
10     Q.   Abusive?
11     A.   I don't believe I would use
12  that word.
13     Q.   Psychotic?
14     A.   I think at times in certain
15  situations, things didn't logically
16  make sense.
17     Q.   So does that mean the
18  answer --
19     A.   Yes.
20     Q.   Yes?
21     A.   Yes.
22     Q.   Okay.
23         ████████████████████████
24     A.   Yes, I believe that was.
25     Q.   Suffers from Munchausen?
```

Page 75

```
 1            G. C. ROBINSON
 2     A.   Yes, that was in response
 3  to Tom Harvey.
 4     Q.   I'm sorry, you -- are you
 5  saying that you told Tom Harvey that
 6  you believed that Tiffany suffered
 7  from Munchausen?
 8     A.   It was a conversation
 9  between Tom Harvey and I where he
10  said that she has something when he
11  was discussing her mentally.  And he
12  couldn't think of it, and I said
13  Munchausen?  And he said, "Yeah, I
14  think."
15     Q.   What is your understanding
16  of Munchausen to be?
17     A.   Somebody creating a false
18  situation or -- I can't recall the
19  exact definition of Munchausen.
20     Q.   Okay.
21         Someone who acts sick and
22  wants to be the center of attention.
23  Does that comport with your
24  understanding?
25     A.   Yes.
```

Page 76

```
 1            G. C. ROBINSON
 2     Q.   Sociopath?
 3     A.   Yes.
 4     Q.   Drunk with power?
 5     A.   At times.
 6     Q.   Mean?
 7     A.   I think at times.
 8     Q.   Manipulative?
 9     A.   I think at times that would
10  apply.
11     Q.   Insecure?
12     A.   I think at times that would
13  apply.
14     Q.   I would like to talk now
15  about how Tiffany made you feel.
16         Am I correct that you felt
17  Tiffany did not like you?
18     A.   Towards the end of my
19  employment, I began to feel that
20  there was -- that that existed after
21  March probably March 27th, around
22  March 27th.
23     Q.   So it was at the end of
24  March that you began to get the
25  sense that she didn't like you, is
```

Page 77

```
 1            G. C. ROBINSON
 2  that what you are saying?
 3     A.   I think that there were
 4  issues of me being involved in the
 5  house at a certain point in that
 6  late February to March period.  I
 7  had tried to remove myself from the
 8  house multiple times, but -- in
 9  January as well and continued a
10  discussion with Bob.
11     Q.   In January, didn't Tiffany
12  make clear to you that she didn't
13  want you involved in the house, the
14  house being ████?
15     A.   I can't recall.  I recall
16  me speaking to Bob about not wanting
17  to be involved in the house.
18     Q.   Do you have any
19  recollection of telling Robin
20  Chambers, that it was made clear to
21  you in January, by Tiffany, that she
22  did not want you involved in the
23  house?
24     A.   I believe that is something
25  that Robin and I discussed, but it
```




Page 78

```
 1            G. C. ROBINSON
 2    is not based on Tiffany specifically
 3    saying to me I don't want you being
 4    involved in the house.  It is a
 5    feeling of that she wanted to handle
 6    the house.  But I was still being
 7    asked to do the house work and help
 8    with the domestic life with Bob, who
 9    specifically requested that I do
10    specific things.
11        Q.   Was Tiffany out for you?
12        A.   I felt targeted by her, but
13    out for me maybe towards -- I felt
14    that way maybe towards the last week
15    of my employment.
16        Q.   Did you feel that she --
17    that she was a threat to your
18    employment?
19        A.   Not to my employment until
20    the very end of my employment.
21        Q.   Did you feel that she was
22    out, or to use your word, targeting
23    others?
24        A.   During my employment I was
25    concerned that she might target
```

Page 79

```
 1            G. C. ROBINSON
 2    other female executive assistants,
 3    and it was something that I voiced
 4    concern with both Robin and Michael
 5    Tasch about.
 6        MR. DROGIN:  Can you read
 7    back my question?
 8        (Whereupon, the requested
 9    portion was read back by the
10    reporter:
11        Q:  Did you feel that she
12    was out, or to use your word,
13    targeting others?)
14        A.   As I said, I was concerned
15    about her possibly targeting other
16    female executive assistants.
17        Q.   And did she target other
18    female executive assistants?
19        A.   Not that I am aware of.
20    This is at the tail end of my
21    employment with Canal.
22        Q.   Did she target Tom Harvey?
23        A.   Not that I am aware of.
24        Q.   Did she target Michael
25    Tasch?
```

Page 80

```
 1            G. C. ROBINSON
 2        A.   I don't know if she had
 3    targeted him.  I am aware that
 4    Michael Tasch had told me that there
 5    had been some e-mails that had been
 6    sent to Mark Bosswick about him.
 7    And in the conversation he, I
 8    believe, had already consulted an
 9    attorney, and said that, "You and
10    I," meaning, me, could sue her for
11    what she was saying.
12        Q.   So just so we are clear.
13    You and Michael Tasch had a
14    conversation, where among other
15    things, he was talking about suing
16    Tiffany, isn't that right?
17        A.   Not necessarily suing, but
18    I believe that he had been in
19    contact with somebody about some
20    e-mails that had been sent, and I
21    don't recall exactly when -- when
22    that was.
23        Q.   Do you recall having a
24    conversation with Michael Tasch
25    where you told him your
```

Page 81

```
 1            G. C. ROBINSON
 2    understanding of the labor law and
 3    whether or not you and he could sue
 4    Tiffany?
 5        A.   No.  For me, no, I don't
 6    recall that.
 7        Q.   Did you believe that
 8    Tiffany was targeting Michael
 9    Kaplan?
10        A.   I believe that there were
11    certain things that she was unhappy
12    with.  But, again, targeting, I -- I
13    don't think that she was
14    specifically targeting him the way
15    that I felt she was targeting me.
16        Q.   What kind of things was she
17    unhappy with about Michael Kaplan
18    based on your knowledge and
19    understanding?
20        A.   I will give an example.
21    She was unhappy that Michael Kaplan
22    was unable to be present when I
23    believe the dishwasher needed to be
24    fixed and needed to move the
25    appointment to be there for the
```



Page 82

```
 1          G. C. ROBINSON
 2   maintenance guy.  And she wanted it
 3   done, so she ended up doing it.  I
 4   think she was upset that Michael
 5   Kaplan told her that he couldn't be
 6   there because he had other work.
 7       Q.   Did Michael Kaplan have to
 8   do with anything at ███
 9       A.   He did some of the
10   maintenance and wait for delivery.
11   He also dealt with the Robert De
12   Niro, Sr., paintings.
13       Q.   Anything else that you
14   recall?
15       A.   A washer and dryer that
16   needed to be put in, and technology,
17   TVs, Internet.  He helped Dan Harvey
18   with the gym.
19       Q.   Anything else that you can
20   recall?
21       A.   Not that I can recall at
22   this moment.
23       Q.   From your understanding,
24   were those things part of Michael
25   Kaplan's job?
```

Page 83

```
 1          G. C. ROBINSON
 2       A.   He handled some of the
 3   maintenance at Bob's other
 4   properties, such as, 110 Hudson
 5   Street, Bob's gym apartment, in
 6   addition to Bob's fathers' art
 7   studio.
 8       Q.   I am confining my question
 9   to ███ because that is what you
10   have described that you were -- you
11   were brought in on.  What other
12   duties and responsibilities, if any,
13   did he have towards ████
14       A.   He handled the security
15   cameras.
16       Q.   And my question is, these
17   things that he was being asked to do
18   at ███, was that part of his
19   regular job or was this in addition
20   to his regular Canal job?
21       A.   They were things that Bob
22   had asked him to do.
23       Q.   Right.  But they were in
24   line with his regular Canal job or
25   were these like with you, additional
```

Page 84

```
 1          G. C. ROBINSON
 2   things that you were made to do?
 3       A.   I don't know if you would
 4   call it additional.  I think that
 5   they -- the core responsibility --
 6   the core material duties at Canal
 7   Productions were to do what Bob
 8   asked of you.  That means everybody.
 9       MR. DROGIN:  Can you read
10   that back?
11       (Whereupon, the requested
12   portion was read back by the
13   reporter:
14       A: I don't know if you
15   would call it additional.  I
16   think that they -- the core
17   responsibility -- the core
18   material duties at Canal
19   Productions were to do what
20   Bob asked of you.  That means
21   everybody.)
22       Q.   So are you saying that
23   everybody at Canal was being asked
24   to do personal things for Bob?
25       A.   No.  What I am trying to
```

Page 85

```
 1          G. C. ROBINSON
 2   say is that I don't believe these
 3   were additional duties.  I think
 4   that the job, as we all function as
 5   executive assistants, regardless of
 6   title were to do what Bob asked.
 7   For example, when I objected to
 8   wanting to do work with Toukie Smith
 9   not only based on health and ███
10   ██████, but also financial stuff,
11   and working on the ███ project, and
12   objected to that.  Bob said that I
13   had to continue to do that.  He
14   redirected my job to solely work on
15   that, and that was what became my
16   job.  So additional, I don't know,
17   because I was -- my job was
18   redirected to handle all these
19   personal things for him, and that
20   was what my job was under VP of
21   production/finance and it had
22   nothing do with my title.  I don't
23   believe it was additional duty.  It
24   was the job that Bob gave me.
25       Q.   Just so we are clear, other
```



Page 86

```
1              G. C. ROBINSON
2  people at Canal were also used for
3  handling Bob's personal affairs?
4      A.   The female executive
5  assistants handled more centered on
6  typically female-gendered roles.
7  Helping Bob with kid's schedules,
8  same with me, picking out -- I
9  picked out presents at Christmas
10 time, went shopping with him,
11 created photo albums for his
12 anniversary, things for his kid's
13 birthday, handled his prescriptions,
14 medications, supplements.  There
15 were --
16     Q.   This is for throughout the
17 entire 11 years, is that right?
18     A.   Yes.
19     Q.   But the change in
20 2018/2019, is it additional
21 responsibilities, those related to
22 ███, correct?
23     A.   I don't think you would
24 characterize it, as I said,
25 additional responsibilities.  Bob
```

Page 87

```
1              G. C. ROBINSON
2  redirected my role and job to
3  prioritize and solely work on these
4  specific -- the domestic house,
5  helping Toukie Smith with her needs
6  and her ███, helping Bob
7  with his divorce, things of personal
8  nature.
9      Q.   Okay.
10          And this was redirected
11 starting March of 2019, is that
12 right?
13     A.   No.  It was a conversation
14 that I had in September -- late
15 September, beginning of October,
16 when I objected to working on this
17 -- these items.  And he had
18 redirected my job.
19     Q.   Okay.
20          With regard to ███, wasn't
21 Tiffany running the show, not Bob?
22     A.   I wouldn't characterize it
23 that way.  Bob was making the
24 decisions on the house and the
25 contents of the house.
```

Page 88

```
1              G. C. ROBINSON
2      Q.   Okay.
3          But I am coming back to
4  something that you said to Robin,
5  that Tiffany was quote, "running the
6  show."
7          Do you not stand by that
8  comment?
9      A.   I stand by the comment in
10 -- but I don't know the context of
11 what Robin and I were discussing
12 when I said that.  So unless you can
13 tell me the full context of it, then
14 you know --
15     Q.   Was Tiffany trying to force
16 you out?
17     A.   That was a feeling that I
18 got.
19     Q.   Did she try to keep you out
20 of the loop?
21     A.   That was a feeling that I
22 got the last couple of days of my
23 employment, and Bob was -- was aware
24 of all -- was aware of e-mails and
25 conversations.  And he and I talked.
```

Page 89

```
1              G. C. ROBINSON
2      Q.   Isn't it true that you
3  didn't want to be involved in a
4  triangle between Bob and Tiffany,
5  and that you were pulling away from
6  the Bob and Tiffany dynamic?
7      A.   I didn't want to be
8  involved in -- in personal items.  I
9  was -- I worked at Canal
10 Productions.  It was -- I was
11 business related, not personal
12 related, and I didn't feel it was
13 appropriate to be pulled in to any
14 triangle that had nothing to do with
15 -- with my work at Canal
16 Productions.  It really crossed what
17 the employer/employee relationship
18 should be.  To be dragged into --
19 into personal items such as that.
20     Q.    And just so I am clear,
21 these personal items that you felt
22 were not to be part of the
23 employment -- employer/employee
24 relationship, those were the same
25 types of things that you had been
```

23  (Pages 86 to 89)





1          G. C. ROBINSON
2  doing for 11 years, right, because
3  you told us earlier that your job
4  title didn't change?
5      A.   There were certain items
6  and many of them I objected to or
7  had conversations with Bob about not
8  being involved in.  Personal items
9  when it came to ██ or the kids.
10  There were many conversations about
11  that, but Bob continued to redirect
12  my job to these personal items, or
13  -- or being a part of things that he
14  and I had already discussed that I
15  objected to.
16     Q.   Did that impact your
17  ability to do the other aspects of
18  your job?
19     A.   When Bob would redirect my
20  job or prioritize my job, it would
21  change what my job was.
22     Q.   These redirections that you
23  are talking about, were any of them
24  permanent or were they situational?
25     A.   I think some of them were

1          G. C. ROBINSON
2  situational, and some of them were
3  permanent.  But I would add that
4  regardless of my objection in doing
5  these, he would -- I would end up
6  having to do them.  Or he would
7  redirect it and there were
8  conversations where I would have to
9  sit down with Bob and constantly
10  realign my job, and find myself
11  forced to do these personal items
12  after that conversation.  It was
13  incredibly frustrating and
14  demeaning.  It was something that
15  was strenuous through my employment.
16     Q.   And the duties and
17  responsibilities regarding ██, was
18  that situational or was that
19  permanent?
20     A.   When we discussed it in
21  September and October, it was
22  permanent in where he redirected
23  don't do this work, do less work.
24  And when I objected to doing it, he
25  said that I was shaking him down,

1          G. C. ROBINSON
2  and that he needed me to do the
3  Toukie Smith work, and the apartment
4  work, and that is what needed to be
5  done and prioritized.  So I would
6  say that that was permanent.  And
7  then a discussion that we had in
8  January I tried to realign my
9  position again, objected to doing
10  additional work in the house where
11  he made me agree to finishing four
12  items that had to do with the hours,
13  but I found myself involved more and
14  more in Bob's domestic and personal
15  life, and yeah.
16     Q.   So you understood that that
17  was going to be permanent, that was
18  going to be a permanent part of your
19  job, is that right?
20     A.   It seemed as if it was
21  going to be a permanent part of my
22  job for the design, and for putting
23  the house together, and working on
24  that project.  It was prioritized so
25  I don't --

1          G. C. ROBINSON
2     Q.   But what I am getting at
3  is, was that project or was that you
4  were -- it was now a component of
5  your position from then on until the
6  future was going to be the design
7  furnishing of this home, what was
8  your understanding?
9     A.   My understanding is that
10  Bob wanted that prioritized and
11  everything else was pushed to the
12  side other than the work at ██.
13  The domestic, and housework, and
14  then also the Toukie Smith items
15  that is needed to be done.  It was
16  incredibly frustrating, and has
17  nothing do with my title, with my
18  title of VP finance.  It had nothing
19  to do with Canal Productions.  It
20  had to do with Bob's domestic home
21  life, and the life of his
22  ex-girlfriend.
23     Q.   You were an at-will
24  employee to be clear, right?
25     A.   I believe so.



Page 94

```
 1            G. C. ROBINSON
 2     Q.   You didn't have an
 3 employment agreement guaranteeing
 4 you employment, did you?
 5     A.   No, not that I am aware of.
 6     Q.   He could have terminated
 7 you at any time, correct?
 8     A.   Yes.
 9     Q.   You could have left at any
10 time?
11     A.   No.  That was -- I don't
12 believe that that would be correct.
13     Q.   You couldn't have -- you
14 couldn't have resigned if you wanted
15 to?
16     A.   I had resigned on multiple
17 occasions and was unable to resign
18 for -- for many reasons.
19     Q.   Okay.  I guess we will come
20 back to that.
21        Now, in February of 2019,
22 you were in London, is that right?
23     A.   Can you repeat your
24 question?  You broke up for a
25 second.
```

Page 95

```
 1            G. C. ROBINSON
 2     Q.   In February of 2019, you
 3 were in London?
 4     A.   Yes, that is I believe
 5 correct.
 6     Q.   You came back around
 7 February 25th?
 8     A.   I can't recall when I came
 9 back.
10     Q.   When you came back from
11 London, did you notice that Bob
12 wasn't talking to you?
13     A.   When I had come back from
14 -- from London, he actually had
15 given me a call when I landed so I
16 don't -- so I don't think that would
17 be completely correct.
18     Q.   Okay.
19        When you came back from
20 London, did you feel that you were
21 going to be fired?
22     A.   No.
23     Q.   Did somebody tip you off
24 that you were going to be fired?
25     A.   No.
```

Page 96

```
 1            G. C. ROBINSON
 2     Q.   In other words, had someone
 3 told you that you were going to be
 4 fired, not withstanding how you
 5 felt?
 6     A.   No.
 7     Q.   Did you begin to feel like
 8 you meant nothing to Bob?
 9     A.   I wouldn't characterize it
10 that way.  I feel that --
11     Q.   I mean, I have your answer.
12 That is fine.
13     A.   I don't know.  I don't know
14 if I would characterize it that way.
15     Q.   And at that point in time
16 when you came back from London, is
17 it true that Tiffany was harassing
18 you daily?
19     A.   I feel there were a lot of
20 -- of items that she was requiring
21 of me to do, and on a lot of
22 demeaning work and issues with the
23 house that even when I was in London
24 I was getting calls and e-mails
25 about.
```

Page 97

```
 1            G. C. ROBINSON
 2     Q.   So if you told Robin that
 3 Tiffany had been harassing you
 4 daily, was that an exaggeration?
 5     A.   I think all e-mails and
 6 issues of the house and items that
 7 she was asking me to do, and was,
 8 you know, harassment on the
 9 apartment items -- house items.  The
10 -- for example, putting together a
11 --
12     Q.   I don't need examples.  She
13 accused you of stealing pots and
14 pans at one point, correct?
15     A.   Yes.  I had spoken to both
16 Bob and Tom Harvey about that.
17     Q.   The answer to my question
18 is yes?
19     A.   Can I finish, please?
20     Q.   No.  It is a yes-or-no
21 question.  The judge has limited us
22 to at least one day, I don't think
23 we would like a third.
24        She accused you of screwing
25 up something regarding catering on a
```



| Page 98 |
| --- |

G. C. ROBINSON

1  plane, correct?
2      A.   She had made a bizarre
3  accusation about that.
4      Q.   She told you to stop
5  e-mailing her?
6      A.   I had never -- I don't
7  recall ever her saying stop
8  e-mailing me.
9      Q.   Did you feel she was
10 controlling Bob at that time?
11     A.   No, I believe Bob was aware
12 of everything.  He was CC'd on all
13 the e-mails.  It was discussed with
14 him.
15     Q.   Did you believe that Bob
16 was merely relaying what she had
17 told him to say to you?
18     A.   I wouldn't say all the
19 time.  I think that there was maybe
20 one thing that conversation where
21 she was adding, you know, items that
22 she wanted to have Bob include.
23     Q.   Did you believe that she
24 was ghostwriting e-mails from him to

| Page 99 |
| --- |

G. C. ROBINSON

1  you?
2      A.   I --
3      Q.   I will include texts in
4  that.  E-mail or texts?
5      A.   I don't know.  I mean, I
6  think that --
7      Q.   You said that you don't
8  know, so that is fine.  Did she want
9  you gone?
10     A.   I believe that is something
11 that I felt at the very end of the
12 last couple of days.
13     Q.   Did you feel that your job
14 had been taken away from you?
15     A.   I believe, in general, my
16 job had been taken away when Bob
17 redirected me to his domestic -- to
18 handle his domestic home life and
19 personal items.  My job at Canal
20 Productions kind of had been
21 redirected to all of this gender
22 female role where I was handling
23 this housework, and vacuuming, and
24 doing all of these things, and

| Page 100 |
| --- |

G. C. ROBINSON

1  organizing closets, and washing bed
2  sheets and making his bed.  This is
3  what my job had become.  It had
4  nothing do with VP production of
5  finance.  That was incredibly
6  demeaning and frustrating for me to
7  deal with.
8      Q.   And when did that
9  redirection start?
10     A.   I had spoken to Bob and
11 objected to this work at the end of
12 September, beginning of October.
13     Q.   Hadn't you agreed, in fact,
14 to Bob's request that you take this
15 on?
16     A.   I had objected to it, but I
17 didn't have a choice.  It is
18 something that he asked me to, and I
19 had to.
20     Q.   Didn't you tell Robin
21 Chambers that you agreed to it
22 because you cared about him?
23     A.   I might have said that
24 during the time when I was basically

| Page 101 |
| --- |

G. C. ROBINSON

1  mentally breaking down, and not
2  eating or sleeping because of the
3  incredibly toxic work environment
4  and just the -- just everything that
5  had been -- been going on.  It was
6  very difficult at that time.  I
7  think that -- I think that it was a
8  very traumatic time where I was
9  really sort of breaking down under
10 the work, and the harassment, and
11 everything that was going on.
12     Q.   Was it a traumatic time for
13 Bob, in your opinion, having come
14 back from ███████, having -- going
15 through ████████████████████,
16 having to have a townhouse furnished
17 for him?
18     A.   I don't believe it is the
19 place of an employer to put his
20 personal problems on an employee.  I
21 don't -- I can't speculate what he
22 found to be traumatic or not.  I can
23 only speak to what I felt.
24     Q.   I am asking -- I am not



| Page 102 | Page 103 |
|---|---|
| G. C. ROBINSON | G. C. ROBINSON |

**Page 102**

1        G. C. ROBINSON
2 asking for the 60-minute answers. I
3 am asking for your impression as to
4 whether or not Robert De Niro was
5 going through a traumatic time in
6 his life, in the fall of 2018 into
7 early 2019?
8    A.   I don't know. These are
9 decisions that he made. And again,
10 he is an employer that should not
11 put an employee in a position of
12 having to deal with his, you know,
13 personal issues.
14    Q.   Okay.
15      Can you answer --
16     MS. HARWIN: I just -- if
17 you could sort of find a good
18 time for a lunch break, that
19 would be -- that would be
20 appreciated.
21     MR. DROGIN: Sure.
22    Q.   In your opinion, was this a
23 traumatic time in his life?
24    A.   I don't -- I don't know.
25    Q.   Did you believe it was a

**Page 103**

1        G. C. ROBINSON
2 difficult time in his life?
3    A.   I don't know if I would
4 separate the decisions that he made,
5 or what he was going through with
6 other -- other times. I don't know
7 if it was or wasn't.
8    Q.   Okay.
9     MR. DROGIN: Can you read
10 back my question?
11     (Whereupon, the requested
12 portion was read back by the
13 reporter:
14     Q: Did you believe it
15 was a difficult time in his
16 life?)
17    A.   I don't know.
18    Q.   Isn't it true that you
19 resigned because of Tiffany, not
20 Bob?
21    A.   No, I wouldn't say that is
22 true.
23    Q.   Did you tell Robin --
24 didn't you tell Robin, "In the end
25 it wasn't him. It was Tiffany?"

**Page 104**

1        G. C. ROBINSON
2    A.   Again, I don't know the
3 full context of the -- of the
4 discussion, but I will say that I
5 had reached out to Bob on multiple
6 occasions to discuss and try to fix,
7 you know, the issues that were going
8 on. And my employer wasn't
9 resolving any of these issues in the
10 beginning of April and end of March.
11 And it made it very difficult to the
12 point where for me it was very
13 emotionally distressing that my
14 employer wasn't speaking to me about
15 these issues. And I had hit a
16 breaking point where I wasn't eating
17 or sleeping. It was very traumatic
18 for me, and I couldn't continue.
19     (Playing recording)
20    Q.   Didn't you resign because
21 of Tiffany not Bob?
22     MS. HARWIN: Can you
23 identify for the record what
24 -- what this exhibit is that
25 you are using and what the

**Page 105**

1        G. C. ROBINSON
2 corresponding Bates number
3 is?
4     MR. DROGIN: No. I am
5 just asking the witness
6 whether or not she told Robin
7 that she resigned because of
8 Tiffany not Bob.
9     MS. HARWIN: Is the
10 content of what was just
11 played part of the record?
12     THE COURT REPORTER: It
13 was not taken down on the
14 record, as I couldn't hear it
15 clearly.
16    Q.   Didn't you tell that to
17 Robin?
18     MS. HARWIN: Is it part
19 of the record or not?
20     MR. DROGIN: Yeah, it is
21 part of the record.
22     MS. HARWIN: It needs to
23 be identified in some way.
24     MR. DROGIN: I will
25 identify it after the witness





| Page 106 |
|---|

G. C. ROBINSON

1
2     answers my question as to
3     whether or not she told that
4     to Robin. That is my
5     question. We have hours of
6     these conversations where she
7     tells the truth.
8        Q.   So my question is, didn't
9     you resign because of Tiffany, not
10    because of Bob?
11       A.   No. Again, it is part of
12    -- you know.
13       Q.   Thank you.
14       A.   And having a context of --
15    can I please finish?
16       Q.   No. It was a yes-or-no
17    question. You said no. I take your
18    answer at its word because you
19    were --
20          (Simultaneous speaking)
21       Q.   You had an agreement with
22    Bob that you would work with him for
23    two years, correct?
24       A.   We had a discussion that I
25    -- I wanted to transition out of

| Page 107 |
|---|

G. C. ROBINSON

1
2     Canal Productions, and I would make
3     sure that items were handled for him
4     and he was comfortable with whatever
5     needed to be transferred over to
6     somebody else, and that it would
7     take, you know, up to two years.
8     But it was something that he and I
9     would discuss.
10       Q.   And if Tiffany had been out
11    of the picture, would you have
12    honored that commitment?
13       A.   I would have tried however
14    I could have tried to honor a
15    commitment that I made.
16       Q.   I am asking specifically if
17    Tiffany was out of the picture.
18    Would you have tried to honor that
19    commitment?
20       A.   As I said, I would try to
21    honor a commitment that I made. I
22    can't tell you what it would have
23    been with or without Tiffany. I
24    mean, you know --
25       Q.   You didn't honor your

| Page 108 |
|---|

G. C. ROBINSON

1
2     commitment, did you, you resigned?
3        A.   I resigned because it
4     became -- it hit a breaking point
5     where I wasn't able to -- to
6     continue with my job, as I said. I
7     was not eating or sleeping. I was
8     under a lot of -- had a lot of
9     anxiety and just could not continue.
10       Q.   Okay.
11          MS. HARWIN: Are we at a
12    good point for lunch?
13          MR. DROGIN: We are. And
14    the -- just so we can provide
15    you with the sampling, that
16    was Robinson recording number
17    63. That appears at roughly
18    the 17 minute -- ten to 17:50
19    mark. It is -- it is in
20    there. I think going forward
21    what we will do is have these
22    things ready, and when we
23    play back the conversations,
24    we will identify them at that
25    time.

| Page 109 |
|---|

G. C. ROBINSON

1
2     What time do you want to
3     come back, 1:30?
4          MS. HARWIN: That is
5     fine. Or 1:15?
6          MR. DROGIN: You choose.
7          MS. HARWIN: Let's split
8     the difference. Let's say
9     1:20.
10          MR. DROGIN: 1:20 it is.
11          (Whereupon, a recess was
12    taken at this time.)
13          EXAMINATION BY
14          MR. BENNETT:
15       Q.   Good afternoon, Ms.
16    Robinson. My name is Gregory
17    Bennett. I represent Defendants in
18    this case. I am going to be taking
19    over the questioning from attorney
20    Drogin for a little while.
21          Okay?
22       A.   Okay.
23       Q.   In some of the answers that
24    you provided in attorney Drogin's
25    questions, it appeared that you may

28 (Pages 106 to 109)



**Page 110**

```
 1              G. C. ROBINSON
 2   have lost track of the question.  I
 3   would just ask that you try to
 4   please confine your answer to the
 5   question.
 6          Do you understand?
 7      A.   Yes.
 8      Q.   Thank you.
 9          You went to Sacred Heart
10   for high school, is that right?
11      A.   No.
12      Q.   Where did you go to high
13   school?
14      A.   Saddle River Day School.
15      Q.   Did you go to a school
16   called Sacred Heart at some point?
17      A.   Yes.
18      Q.   When?
19      A.   I went -- I don't know the
20   years off the top of my head, but I
21   went there from kindergarten to
22   beginning of the high school.
23      Q.   Okay.
24          Saddle River Hill did you
25   say?
```

**Page 111**

```
 1              G. C. ROBINSON
 2      A.   Saddle River Day School.
 3      Q.   Excuse me.
 4          That is in New Jersey?
 5      A.   Yes.
 6      Q.   After you graduated from
 7   high school, did you immediately
 8   begin attending St. Lawrence or did
 9   you work in between?
10      A.   I immediately attended St.
11   Lawrence.
12      Q.   Did you focus in a
13   particular area of study?
14      A.   English writing, speech and
15   theater and film.
16      Q.   And did you have a minor?
17      A.   Let me clarify.  Film, and
18   speech, and theatre were minors.  My
19   major was English writing.
20      Q.   And did you graduate from
21   St. Lawrence?
22      A.   Yes.
23      Q.   What type of degree?
24      A.   BA.
25      Q.   Okay.
```

**Page 112**

```
 1              G. C. ROBINSON
 2          What year did you graduate?
 3      A.   2005.
 4      Q.   Aside from the BA that you
 5   acquired from St. Lawrence
 6   University, in 2005, have you
 7   obtained any other degrees from
 8   educational institutions?
 9      A.   No other official degrees.
10      Q.   Okay.
11          Have you obtained any
12   certifications or licenses in any
13   professional, clinical, or education
14   area?
15      A.   No.  Over the last year I
16   do have certifications from classes
17   that I took in Spanish.
18      Q.   Okay.
19          Are you a certified
20   personal trainer?
21      A.   No.
22          MS. HARWIN:  Objection to
23      the form.
24      Q.   Have you obtained any
25   formal medical training which
```

**Page 113**

```
 1              G. C. ROBINSON
 2   resulted in the acquisition or
 3   earning of a degree or certificate
 4   at all?
 5      A.   Not in the field of
 6   medicine or medical.
 7      Q.   Okay.
 8          After graduating from St.
 9   Lawrence, did you start at Cardenas
10   (ph)?
11      A.   I -- Cardenas was my first
12   official job after college.
13      Q.   You might have had a summer
14   in between, but that was the first
15   real job, correct?
16      A.   Yes.
17      Q.   How did you get that job?
18          MS. HARWIN:  Objection to
19      the form.
20      A.   I had sent my resume to, I
21   believe, the HR at Cardenas, and I
22   was, I believe, called about the
23   position.
24      Q.   Had your mom worked at
25   Cardenas or did she work elsewhere
```

29 (Pages 110 to 113)



| | |
|---|---|
| **Page 114** | **Page 115** |

**Page 114**

G. C. ROBINSON

1  
2 at that time?  
3     MS. HARWIN: Objection to  
4 the form.  
5    A. She was not currently  
6 working at Cardenas at the time.  
7    Q. As far as you can recall,  
8 back when you applied to the  
9 position with Cardenas, did your mom  
10 have any type of acquaintances, or  
11 friendships, or was colleagues with  
12 anyone who was then employed with  
13 Cardenas?  
14     MS. HARWIN: Objection to  
15 the form.  
16    A. I can't -- I can't recall  
17 who -- I can't recall what  
18 colleagues or who my mother would  
19 have -- had contacts with. She  
20 worked -- she had worked at Cardenas  
21 when she was younger.  
22    Q. As far as you can recall,  
23 did your mom pull strings to get you  
24 the job or not?  
25     MS. HARWIN: Objection to

**Page 115**

G. C. ROBINSON

1  
2 the form.  
3    A. I am not aware of her  
4 pulling strings to get me employed  
5 at Cardenas.  
6    Q. Okay.  
7     What was the job that you  
8 were hired into at Cardenas?  
9    A. To be the assistant to  
10 Michael Robert, who was the fashion  
11 style director at Vanity Fair.  
12    Q. And generally -- you don't  
13 have to go into too much detail.  
14 But generally what were your job  
15 responsibilities in that position?  
16    A. Picking up the phone,  
17 scheduling meetings for him, towards  
18 the end I started to help and he  
19 gave me the opportunity to produce  
20 photo shoots with him.  
21    Q. How long did you serve in  
22 that role?  
23    A. Almost two years, I  
24 believe.  
25    Q. And why did you leave?

**Page 116**

G. C. ROBINSON

1  
2    A. I left because I wanted to  
3 work in the film industry, not in  
4 publishing magazines or fashion.  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  

**Page 117**

G. C. ROBINSON

1  
2  
3  
4  
5  
6    Q. Okay.  
7     Prior to February of 2020,  
8 you were a fairly avid runner, is  
9 that right?  
10     MS. HARWIN: Objection to  
11 the form.  
12    A. I would say prior to  
13 sometime in the winter of 2019,  
14 being February or March.  
15    Q. Okay.  
16     So before then you were an  
17 avid runner?  
18    A. Yes.  
19    Q. Okay.  
20     Why did you run?  
21     MS. HARWIN: Objection to  
22 the form.  
23    A. Running was a way for me to  
24 battle the anxiety and stress that I  
25 faced. A way to relieve stress,





LEGAL SERVICES

| Page 118 | Page 119 |
|---|---|

**Page 118**

1          G. C. ROBINSON
2  anxiety.
3     Q.   I don't want to interrupt
4  you.  Are you complete?
5     A.   That is -- I mean, that is
6  what I can say at that moment.
7     Q.   Aside from experiencing
8  some relief regarding anxiety issues
9  that you may have experienced, did
10  you otherwise enjoy running?
11       MS. HARWIN:  Objection to
12    the form.
13    A.   I enjoyed running because
14  it gave me a mental break and helped
15  with my anxiety and stress.  It gave
16  me this blank sort of Zen feeling to
17  relieve it.
18    Q.   Between January of 2016,
19  and April of 2019, how frequently,
20  on average, ballpark, would you run
21  per week?
22    A.   I can't recall weeks and
23  months.  It varies depending on what
24  was going on with -- with work, or
25  weather, or -- I just wouldn't be

**Page 119**

1          G. C. ROBINSON
2  able to put an average to it.
3     Q.   Could you give me a low and
4  a high?
5       MS. HARWIN:  Objection to
6    the form.
7     A.   I wouldn't be able to.
8     Q.   Were there times where you
9  ran ten times a week?
10       MS. HARWIN:  Objection to
11    the form.
12    A.   No.
13    Q.   Okay.
14       Were there times when you
15  didn't run at all on a particular
16  week?
17       MS. HARWIN:  Objection to
18    the form.
19    A.   Again, as I said, it
20  varied.  So I just I can't recall
21  all the way from 2016 to 2019.
22    Q.   Right.
23       What did it vary on, the
24  level of stress?
25    A.   Sorry?

**Page 120**

1          G. C. ROBINSON
2     Q.   The level of stress, is
3  that what it varied on?
4       MS. HARWIN:  Objection to
5    the form.
6     A.   Not necessarily.  As I
7  said, it varied depending on work,
8  or weather, or, I mean, there were
9  many factors so --
10    Q.   Okay.
11       I am just trying to have
12  some notion as to how much you would
13  run per week.  We can take it on a
14  monthly basis.
15       Can you assume any
16  numerical number to how often a week
17  or month you would run?  Would you
18  run 20 times a month, or --
19    A.   I mean, I would say -- I
20  would say more often than not, but
21  again, I can't -- anything varied
22  upon what was depending on the job,
23  what the weather was, if I had time,
24  there are a bunch of factors.  And I
25  wouldn't be able to recall a month

**Page 121**

1          G. C. ROBINSON
2  or, you know, put an average to a
3  month or week because everything
4  varied.
5     Q.   Okay.
6       Was there a point in time
7  where a bad condition developed
8  which impaired or constricted you
9  from running?
10    A.   Yes.
11    Q.   When was that?
12    A.   During the project with the
13  ████ apartment.
14    Q.   So late fall, early -- late
15  fall of 2018, early 2019?
16       MS. HARWIN:  Objection to
17    the form.
18    A.   Late fall.  Late fall it
19  became incredibly painful.  In
20  January it became unbearable, and
21  the pain continued for quite a bit.
22    Q.   Have you been able to
23  resume running today?
24    A.   No.
25       MS. HARWIN:  Objection to



Page 122

```
 1           G. C. ROBINSON
 2    the form.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
 1           G. C. ROBINSON
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12    We have had many conversations about
13    not being able to run, or the
14    anxiety or stress that I had been
15    going through with this.  I started
16    seeing her at a time when I had just
17    found out that I was being
18    investigated by the Manhattan
19    District Attorney's Office where I
20    had a lot of panic and anxiety.
21    That was very much unbearable.
22
23
24
25
```

Page 124

```
 1           G. C. ROBINSON
 2    the form.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 125

```
 1           G. C. ROBINSON
 2    Q.   Okay.
 3         Do you recall --
 4         MS. HARWIN:  Counsel, I
 5    just want to note for the
 6    record, I don't believe that
 7    Defendants have produced to
 8    Plaintiff any medical records
 9    that you have obtained from
10    Dr.        .  If you have
11    obtained from Dr.        any
12    medical records, we would
13    request those be produced to
14    us, preferably today, while
15    the deposition is pending.
16         MR. BENNETT:  They are
17    Plaintiff's own medical
18    records.
19         MS. HARWIN:  We are
20    entitled to them.
21         MR. BENNETT:  Does
22    Plaintiff not have these
23    records?
24         MS. HARWIN:  We don't
25    have a copy of whatever you
```

32 (Pages 122 to 125)



Page 126

```
1        G. C. ROBINSON
2    received from Dr. ████, no.
3        MR. BENNETT:  You don't
4    have any medical records from
5    Dr. ████.
6        MS. HARWIN:  We don't
7    have a copy of whatever Dr.
8    ████ provided to you.
9        MR. BENNETT:  That is not
10   what I am asking.  Do you
11   have the medical records
12   independently?  Than what is
13   the issue?
14       MS. HARWIN:  I simply
15   note that Defendants haven't
16   produced these documents in
17   discovery.  If you are
18   relying on them, we are
19   entitled to have them.
20       MR. BENNETT:  The
21   Defendants will make those
22   records available to you
23   following the deposition.
24       (Whereupon, a discussion
25   was held off the record.)
```

Page 127

```
1
2
3
4
5
6
7
8
9                              .
10       Q.  Do you remember ever
11   suggesting that it was because of
12   Mr. De Niro that you didn't want to
13   go outside?
14       A.  I can't -- I can't recall
15   specifically why or what I had said
16   to her.  I can recall the time not
17   feeling safe and wanting to go out.
18   I had just found out that I was
19   being investigated with the false
20   allegations, and I did not feel
21   safe.  I had mentioned to her that
22   Bob was at times in my neighborhood,
23   and that I had run into him and that
24   I didn't necessarily want to go out
25   or feel safe going out.  I had a lot
```

Page 128

```
1        G. C. ROBINSON
2    of anxiety and felt safe at home.  I
3    felt --
4        (Simultaneous speaking)
5        Q.  Sorry.
6        A.  I am finished.
7        Q.  And you had concerns for
8    your physical safety or something
9    else?
10       A.  Again, I can't recall
11   specifically what I said to her.
12   But I do remember feeling that it
13   was very difficult.  I was
14   incredibly humiliated and
15   embarrassed, and found it very hard
16   to go out and interact with people.
17   I felt paranoid in a way that I was
18   either being followed by a private
19   investigator or photographer or
20   something or someone else.  I was
21   afraid to run into Bob, which I had
22   run into him twice close to my
23   house, and I just felt I didn't feel
24   as -- as safe going out.  I really
25   stayed where I felt safe, which was
```

Page 129

```
1        G. C. ROBINSON
2    at my home.
3        Q.  So if I understand that
4    testimony correctly, you had no
5    concerns about your physical safety,
6    but it was more of a psychological
7    standpoint, is that correct?
8        A.  I would probably say more
9    that than my physical safety, but it
10   had crossed my mind about my
11   physical safety with the lengths of
12   retaliation that Bob and his agents
13   have gone to -- that he has directed
14   them to go to.
15       Q.  And his agents, who are you
16   referring to when you say "his
17   agents?"
18       A.  People who worked on the
19   forms of retaliation and people who
20   --
21       Q.  Specifically who?
22       A.  Tom Harvey.
23       Q.  Okay.
24       Anyone else?
25       A.  Not that I can recall.
```

33 (Pages 126 to 129)



Page 130

G. C. ROBINSON

1
2    Q.   At some point when you were
3 in treatment with Dr. Ryan, did you
4 face some sort of a tax audit?
5    A.   Sorry.  Can you repeat your
6 question?
7    Q.   In the last two years, have
8 you been subject to any form of tax
9 audit?
10    A.   I was audited in -- I found
11 out I was being audited in 2020.
12    Q.   Did you suspect at any
13 time, even as of today, that Mr. De
14 Niro was behind the tax audit?
15       MS. HARWIN:  Objection to
16  the form.
17    A.   I think there were a lot of
18 forms of retaliation, and I -- I
19 don't know if --
20    Q.   Did you suspect it?
21    A.   I mean, I think with all
22 the forms of retaliation, I
23 suspected a lot of retaliating.
24    Q.   So yes?
25       MS. HARWIN:  Objection to

Page 131

G. C. ROBINSON

1
2 the form.
3    A.   I believe it crossed my
4 mind that he could have.
5    Q.   Is that audit concluded at
6 this time, or does it remain
7 ongoing?
8    A.   It was concluded.
9    Q.   And what was the result of
10 it; did you pay, was there a
11 deficiency that was noted?
12       MS. HARWIN:  Note my
13  objection.
14    A.   No, I was sent my refund.
15
16
17
18
19
20
21
22
23
24
25

Page 132

G. C. ROBINSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

G. C. ROBINSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

34  (Pages 130 to 133)



Page 134

G. C. ROBINSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

G. C. ROBINSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16   Q.   No.  That is alright.
17       You resigned from Canal on
18   April 6th, 2019, is that right?
19   A.   Yes, that is correct.
20   Q.   Did you look for a job
21   after that date?
22       MS. HARWIN:  Objection to
23   the form.
24   A.   Yes, I applied to jobs
25   after I left Canal Productions.

Page 136

G. C. ROBINSON

1
2   Q.   Without referring to any
3   documents, what is your first
4   recollection about the steps that
5   you first took to begin looking for
6   alternative employment after you
7   resigned?
8       MS. HARWIN:  Objection to
9   the form.
10   A.   The first steps I had taken
11   was trying to reach out to people to
12   find out if there were any open
13   positions or get some advice on
14   people that I could send my resume
15   to.  After that, I applied to two
16   job positions.
17   Q.   Okay.
18       And you looked both in the
19   UK and the US, is that right?
20   A.   I looked all over -- I
21   looked all over.  Not just the UK
22   and the US.
23   Q.   Geographically, within the
24   United States, generally, where did
25   you look, did you look on the East

Page 137

G. C. ROBINSON

1
2   and West Coast?
3       MS. HARWIN:  Objection to
4   the form.
5   A.   I applied to jobs in New
6   York, in Boston, in Texas, in
7   Georgia, in San Diego, I believe,
8   San Francisco, Los Angeles, and I
9   believe other locations as well.
10   New York.
11   Q.   Do you recall applying to
12   any administrative assistant
13   positions?
14       MS. HARWIN:  Objection to
15   the form.
16   A.   I can't recall specific
17   ones that I applied to.  But I do
18   know that I applied to executive
19   assistant positions.
20   Q.   Administrative assistant
21   was the question?
22       MS. HARWIN:  Objection to
23   the form.
24   A.   I believe I applied to jobs
25   with administrative assistant.

35  (Pages 134 to 137)


MAGNA
LEGAL SERVICES

| | Page 138 |
|---|---|

G. C. ROBINSON

1
2    Q.   I am just going to list out
3  a couple of titles.  When I am done
4  I am going to ask if they sound
5  familiar to you in terms of
6  applications that you applied to for
7  positions, okay?
8    A.   Yes.
9    Q.   Senior director Warner
10  Brother, senior vice president of
11  productions Lions Gate, senior
12  production executive Amazon, senior
13  director unscripted production HBO,
14  creative director Hulu, director of
15  original programming Show Time, VP
16  production Master Class.  I am not
17  asking for you to have a perfect
18  memory, but do these titles sound
19  consistent with job applications
20  that you submitted?
21       MS. HARWIN:  Objection to
22   the form.
23    A.   I don't want to speculate
24  on a specific job.  Some of the
25  companies sound familiar.  I can't

| | Page 139 |
|---|---|

G. C. ROBINSON

1
2  recall all of the jobs or the titles
3  that I applied to.
4    Q.   Do you recall when you
5  applied to -- well, withdrawn.
6       Do you recall applying to
7  the Juilliard School?
8       MS. HARWIN:  Objection to
9   the form.
10    A.   I have applied to almost
11  400 jobs.  I --
12    Q.   If you don't recall, you
13  don't recall.  I am just wondering
14  if you recall applying to the
15  Juilliard School or not?
16    A.   I don't --
17    Q.   So no?
18    A.   No, I can't recall that
19  specific one.
20    Q.   Do you recall formulating
21  in your own mind during your job
22  hunt what the minimum salary
23  requirement would be for you to
24  accept the job?
25       MS. HARWIN:  Objection to

| | Page 140 |
|---|---|

G. C. ROBINSON

1
2   the form.
3    A.   Could you repeat your
4  question?
5    Q.   Sure.
6       In -- in coming up with
7  your strategy to decide to look for
8  work following your resignation from
9  Canal, did you come up with a salary
10  figure that was the floor, the
11  lowest that you would accept for a
12  new job?
13       MS. HARWIN:  Objection to
14   the form.
15    A.   No.
16    Q.   And when you resigned from
17  Canal Productions, you were making a
18  base of 300,000, is that right?
19    A.   Yes.
20    Q.   Okay.
21       So since your last paycheck
22  from Canal Productions, in April of
23  2019, have you had any stream or
24  form of income?
25       MS. HARWIN:  Objection to

| | Page 141 |
|---|---|

G. C. ROBINSON

1
2   the form.
3    A.   I have not had income from
4  any job positions or employment.
5    Q.   Have you had income from
6  any sort whatsoever?
7       MS. HARWIN:  Objection to
8   the form.
9    A.   I have not had income.
10    Q.   Okay.
11       How have you made ends meet
12  without income since 2019 in April?
13       MS. HARWIN:  Objection to
14   the form.
15    A.   I have relied upon my
16  savings, and support from my family.
17    Q.   Soon after you resigned and
18  you alluded to this earlier, you
19  heard from the New York District
20  Attorney's Office, is that right?
21    A.   Yes.
22    Q.   Okay.
23       And did you retain legal
24  counsel once you heard from the
25  District Attorney's Office?




| Page 142 | Page 143 |
|---|---|
| G. C. ROBINSON | G. C. ROBINSON |

**Page 142**

G. C. ROBINSON

1
2  A.   Yes, I did.
3  Q.   Who did you retain?
4  A.   Neighborhood Defender
5  Service of Harlem.
6  Q.   Is that a not-for-profit
7  service?
8  A.   Yes.
9  Q.   And did you have to
10 compensate them in any way for their
11 legal representation?
12 A.   No.
13 Q.   Did you have to complete
14 any paperwork before they agreed to
15 represent you?
16     MS. HARWIN:  Objection.
17     I would also direct the
18     client not to answer anything
19     that goes to attorney-client
20     privileged communications.
21     MR. BENNETT:  Unless --
22     that is a good point.  I will
23     be very clear.
24 Q.   I am sure your counsel
25 already addressed this.  Let me make

**Page 143**

G. C. ROBINSON

1
2  it very clear, I am not intending to
3  ask any question designed to elicit
4  communications between you and your
5  counsel.  I want to know if you
6  recall completing any paperwork in
7  connection with the Neighborhood
8  Defender Service?
9  A.   I can't recall.
10 Q.   Did anyone assist you when
11 you first spoke with anyone from the
12 Neighborhood Defender Service?
13     MS. HARWIN:  Objection to
14     the form.  I would also note
15     again to not provide any
16     attorney-client privilege
17     communication.
18 A.   Can you clarify assist,
19 what you mean by assist?
20 Q.   How did you first speak
21 with anyone at the Neighborhood
22 Defender Service, was it by phone,
23 or in person, or e-mail?
24     MS. HARWIN:  Objection to
25     the form.  I don't see how

**Page 144**

G. C. ROBINSON

1
2  this doesn't encroach on
3  attorney-client privilege
4  issue.
5     MR. BENNETT:  I am simply
6  looking for how it was
7  initiated and whether a third
8  party who was not an attorney
9  was present.  That is all I
10 am trying to figure out.
11 A.   There was no third party
12 that wasn't an attorney that was
13 present.
14 Q.   That is fine.  But I think
15 the question I am looking for is,
16 how did you first speak with anyone
17 at Neighborhood Defender Services,
18 by phone, by phone or e-mail?
19 A.   I believe it was by e-mail.
20 Q.   And Jeffrey Pagano is an
21 attorney that you are familiar with,
22 is that right?
23 A.   Yes.
24 Q.   When did you first meet
25 Attorney Pagano?

**Page 145**

G. C. ROBINSON

1
2     MS. HARWIN:  Objection to
3     the form.
4  A.   I had spoken -- I connected
5  with him in regards to Canal, I
6  believe, sometime in March.
7  Q.   Prior to March 2019, had
8  you ever spoken to Attorney Pagano
9  before in your life?
10     MS. HARWIN:  Objection to
11     the form.
12 A.   I believe I had.  I don't
13 recall exactly when.
14 Q.   Was he an acquaintance of
15 your mom's?
16     MS. HARWIN:  Objection to
17     the form.
18 A.   He is a family attorney.
19 An attorney for my mother.
20 Q.   Okay.
21     Between October 2016, and
22 the date that you resigned from
23 Canal, April 6, 2019, did you look
24 for other employment opportunities?
25     MS. HARWIN:  Objection to




| Page 146 | Page 147 |
|---|---|
| G. C. ROBINSON | G. C. ROBINSON |

**Page 146**

1  G. C. ROBINSON
2  the form.
3  A.   I am just going to clarify,
4  you said November of 2019?
5  Q.   October of 2016, to April
6  2019?
7  A.   Yes, I believe I did.
8  Q.   Geographically, where were
9  you looking during that time period?
10  A.   I believe New York, Los
11  Angeles, and the UK.
12  Q.   Would you have used your
13  e-mail address to look for those
14  employment opportunities?
15  MS. HARWIN:  Objection to
16  the form.
17  A.   Can you clarify which
18  e-mail address are you speaking to?
19  Or are you talking about my Canal or
20  my personal --
21  Q.   No, your personal █████
22  address?
23  A.   Yes, I would have used my
24  ████ address.
25  Q.   Okay.

**Page 147**

1  G. C. ROBINSON
2  And can you tell me what
3  that is, just so there is no
4  confusion?
5  ██████████████████
6  Q.   Did you get any offers
7  during that period of time?
8  MS. HARWIN:  Objection to
9  the form.
10  A.   No.  I think that I would
11  clarify and say that I didn't apply
12  for specific jobs.  I had been
13  networking.  Looking for work.
14  Q.   Okay.
15  Do you recall with whom you
16  were networking?
17  A.   I don't recall off the top
18  of my head from the 16th to the 2019
19  -- sorry, 2016 to 2019.
20  Q.   Between April 6, 2019, and
21  March 15, 2020, did you leave New
22  York State?
23  A.   Can you repeat that?
24  Sorry.
25  Q.   That is okay.

| Page 148 | Page 149 |
|---|---|
| G. C. ROBINSON | G. C. ROBINSON |

**Page 148**

1  G. C. ROBINSON
2  April 6, 2019, to March 15,
3  2020?
4  A.   Did I leave New York State?
5  Yes.
6  Q.   When was the first date
7  that you left New York?
8  MS. HARWIN:  Objection to
9  the form.
10  A.   I can't recall the specific
11  date.
12  Q.   Well, you resigned on April
13  6, 2019, right?
14  A.   Yes.
15  Q.   Did you --
16  MS. HARWIN:  Objection to
17  the form.
18  Q.   Did -- did you go on a trip
19  within a month?
20  MS. HARWIN:  Objection to
21  the form.
22  A.   I believe.
23  Q.   Where did you go?
24  A.   Los Angeles.
25  Q.   Where did you stay, hotel?

**Page 149**

1  G. C. ROBINSON
2  A.   No.
3  Q.   Where did you stay?
4  A.   I stayed with Amelia Brain,
5  who was a former employee of Canal.
6  Q.   Yes.  We will get there in
7  a moment.
8  How long did you stay with
9  Ms. Brain during that trip?
10  A.   A couple of days I believe.
11  I can't recall the specific number.
12  Q.   And what was the purpose of
13  that trip?
14  MS. HARWIN:  Objection to
15  the form.
16  A.   I can't recall the -- the
17  purpose.
18  Q.   Was it personal or was it
19  professional?
20  A.   I believe it was both.  It
21  was networking a little bit, but
22  also personal.
23  Q.   Okay.
24  When did you book that
25  trip?

38 (Pages 146 to 149)



| Page 150 |
| --- |

G. C. ROBINSON

1
2     A.   I can't recall exactly when
3 I booked the trip.
4     Q.   Did you fly?
5     A.   Yes.
6     Q.   What airline?
7     A.   Delta.
8     Q.   Okay.
9         After that, you returned to
10 your apartment in New York City, is
11 that right?
12     A.   Yes.
13     Q.   Okay.
14         So if -- roughly we are
15 still in May of 2019, is that fair?
16     A.   Yes.
17     Q.   Okay.
18         From May of 2019 forward,
19 what is your next trip?
20         MS. HARWIN:  Objection to
21   the form.
22     A.   I can't recall what my next
23 trip was after that.
24     Q.   Are there any records that
25 you could refer to that would

| Page 151 |
| --- |

G. C. ROBINSON

1
2 refresh your recollection as to the
3 trips that you took between April 6,
4 2019 and March 15, 2020?
5     A.   Not -- not on me.
6     Q.   I understand that.
7         But what documents would
8 you look at to refresh your
9 recollection?
10         MS. HARWIN:  Objection to
11   the form.
12     A.   Records would include my
13 flight, my tickets.
14     Q.   So do you recall again,
15 April 6, 2019, to March 15, 2020, do
16 you recall going to Spain?
17     A.   Yes.
18     Q.   How many times?
19     A.   I believe it was once.
20     Q.   Where did you stay?
21         MS. HARWIN:  Objection to
22   the form.
23     A.   A hotel.
24     Q.   Do you recall the hotel, is
25 it the Four Seasons?

| Page 152 |
| --- |

G. C. ROBINSON

1
2     A.   No.
3     Q.   Do you recall the hotel?
4     A.   I can't recall the name of
5 the hotel.
6     Q.   Okay.
7         Aside from Spain, did you
8 go to London?
9         MS. HARWIN:  Objection to
10   the form.
11     A.   I can't recall what month,
12 but I did go to London.
13     Q.   How many times did you go
14 to London between those time
15 periods?
16         MS. HARWIN:  Objection to
17   the form.
18     A.   I believe I stayed in
19 London one time.
20     Q.   And did you go to LA again
21 or -- within that timeframe?
22         MS. HARWIN:  Objection to
23   the form.
24     A.   I can't recall specifically
25 the dates, but I went to LA one more

| Page 153 |
| --- |

G. C. ROBINSON

1
2 time.
3     Q.   Do you recall where you
4 stayed when you went to LA on that
5 occasion?
6     A.   I stayed at, I believe, the
7 Four Seasons with my mother.
8     Q.   So for the two LA trips,
9 the one to Spain, the one to the UK,
10 you flew to all four of those
11 locations, correct?
12     A.   To LA, to Spain, to UK,
13 yes.
14     Q.   Three locations on four
15 occasions, correct?
16     A.   Yes.
17     Q.   And you used Delta for each
18 flight or a different airline?
19     A.   I used Delta.
20     Q.   And do you recall if you
21 booked any of those trips after
22 April 6, 2019?
23         MS. HARWIN:  Objection to
24   the form.
25     A.   Yes, some of them -- most



| Page 154 | Page 155 |
|---|---|

**Page 154**

G. C. ROBINSON

1
2 of them were trips that I discussed
3 with -- with Bob, while I was still
4 at Canal.
5     Q.   The answer was yes, if I
6 understood?
7     A.   Yes.
8     Q.   Okay.
9         Ms. Brain, you mentioned
10 her recently.  When is the last time
11 you spoke to her?
12     A.   I can't recall the last
13 time I spoke to her.
14     Q.   Have you ever spoken to her
15 in 2021?
16     A.   I don't recall we
17 communicated in 2021.
18     Q.   Lu Lu or Lu Lu White,
19 Louisa I believe was her full name,
20 but you know her as Lu Lu, is that
21 right?
22     A.   Yes.
23     Q.   Have you spoken to her in
24 2021?
25     A.   No.

**Page 155**

G. C. ROBINSON

1
2     Q.   Do you recall speaking with
3 her before March 15, 2020,
4 withdrawn.
5         Do you recall speaking with
6 her after March 15, 2020?
7     A.   After March 15th, 2020?
8     Q.   Yes.
9     A.   I can't recall the last
10 time I spoke to Lu Lu White.
11         MR. BENNETT:  I am going
12     to -- counsel, I am going to
13     send the first exhibit
14     around.
15     Q.   Ms. Robinson, you have
16 access to e-mail, I assume?
17     A.   My applications aren't
18 open, but yes.
19         MR. BENNETT:  I will send
20     it to you and you forward it
21     on to your client however you
22     would like.
23         MS. HARWIN:  One thing
24     Greg that I believe you could
25     do is you could drop a

**Page 156**

G. C. ROBINSON

1
2 document into the chat so if
3 you would like Ms. Robinson
4 to open a document without
5 the need for opening an
6 e-mail application that could
7 be a way to do that.
8     A.   Can we take a quick break?
9     Q.   Sure.  Yes.
10         We will come back at 2:20
11 if that is okay?
12     A.   That is perfect.
13         (Whereupon, a recess was
14     taken at this time.)
15     Q.   Ms. Robinson, so off the
16 record we circulated the first
17 exhibit, and I think we are going to
18 refer to this as Exhibit A.  I
19 believe your counsel has sent it to
20 you through e-mail as well.  If you
21 can do whatever you need to do to
22 open the e-mail and open the
23 attachment, I would appreciate it.
24         (Whereupon, ROBINSON
25     Exhibit A, a three-page PDF

**Page 157**

G. C. ROBINSON

1
2 document that was filed in
3 the New York State Action as
4 document number 10, was
5 marked for identification, as
6 of this date.)
7         MR. BENNETT:  While Ms.
8     Robinson is doing that, I am
9     going to describe what the
10     document is for the record.
11     It is a three-page PDF
12     document that was filed in
13     the New York State Action as
14     document number 10.
15     A.   I see Exhibit D and Exhibit
16 E 191213.
17     Q.   Sorry.  Just give me a
18 moment, please.  It says, "A1319?"
19     A.   The top of it says, "81319"
20 and in it it has book marks of --
21     Q.   I see that, too.  I don't
22 know where that comes from to be
23 honest.  So I am going to direct
24 your attention to -- to the
25 three-page document.  I am going to




| Page 158 |
| --- |

G. C. ROBINSON

1  
2  direct your attention to the bottom
3  of page one, and I am going to
4  describe it for you, and we will go
5  down to the second page. It as an
6  e-mail from Jeffery Pagano to
7  Laurent Drogin, dated August 13,
8  2019, at 2:53 p.m.
9        Do you see that?
10  A.   Yes.
11  Q.   At the time, August 13,
12  2019, tell me if I am wrong,
13  Attorney Pagano was representing
14  you, correct?
15  A.   August 2019?
16  Q.   Yes.
17  A.   Yes.
18  Q.   Okay.
19        Now if you go to the second
20  page, I am going to direct your
21  attention to the paragraph that
22  starts with, "We recognize."
23        Do you see that on the
24  second page?
25  A.   Yes, I do.

| Page 159 |
| --- |

G. C. ROBINSON

1  
2  Q.   Within that paragraph, if
3  you look sort of in the middle and
4  it is going to be seven -- six lines
5  down, and it is a sentence that
6  begins with "On the other hand."
7  A.   Okay. Yes, I see that.
8  Q.   If you can, just read that
9  sentence to yourself and I am going
10  to ask you a question.
11  A.   (Witness complies).
12        Okay.
13  Q.   Do you have any plans to
14  write a book about your experience
15  working with Mr. De Niro?
16        MS. HARWIN: Objection to
17   the form.
18  A.   No.
19  Q.   Have you spoken with anyone
20  about that?
21        MS. HARWIN: Objection to
22   the form.
23  A.   No. Not that I can recall.
24  Q.   Okay.
25        And then if you can, in the

| Page 160 |
| --- |

G. C. ROBINSON

1  
2  same paragraph, the next sentence
3  which begins with "Unfortunately,"
4  do you see that?
5  A.   Yes.
6  Q.   If you can, just please
7  read that sentence to yourself, and
8  I will ask you a question when you
9  completed it.
10  A.   (Witness complies.)
11        Okay.
12  Q.   Do you agree with that
13  sentence?
14        MS. HARWIN: Objection to
15   the form.
16  A.   I agree with that sentence,
17  but would also add that my future
18  had been -- because of this has been
19  destroyed. My ability to obtain
20  work has been destroyed, my
21  reputation has been destroyed
22  because of the false accusations and
23  statements and retaliatory lawsuit.
24  Q.   I just wanted to know if
25  you agreed with the sentence. That

| Page 161 |
| --- |

G. C. ROBINSON

1  
2  is it.
3  A.   Yes, and I added. I added
4  to it.
5  Q.   So did you -- do you agree
6  with the accuracy of that sentence?
7  A.   Yes, at the time I did, but
8  I -- in addition I added to --
9  Q.   Okay.
10  A.   It.
11  Q.   You added what you added.
12  The record will reflect what you
13  added.
14        In the complaints that you
15  filed in this action you cite to
16  certain reputational damages, right?
17  A.   Yes.
18  Q.   Okay.
19        Beyond what we just talked
20  about, how has your reputation been
21  damaged specifically?
22        MS. HARWIN: Objection to
23   the form.
24  A.   There are many ways that my
25  reputation has been damaged by Bob's

41 (Pages 158 to 161)



| Page 162 | Page 163 |
|---|---|

**Page 162**

1          G. C. ROBINSON
2 retaliatory lawsuit, the false
3 allegations that were meant to
4 humiliate me, ruin me.
5     Q.   Have you spoken to anyone
6 about prospective employment who has
7 referred to this lawsuit?
8          MS. HARWIN:  Objection to
9     the form.
10     A.   Can you clarify in what way
11 they would have -- what way --
12     Q.   Sure.
13          Have you spoken with anyone
14 about prospective employment,
15 following April 6, 2019, which has
16 -- who has referred to Canal's State
17 Court against you, or your
18 commencement of this action against
19 Mr. De Niro?
20          MS. HARWIN:  Objection to
21     the form.
22     A.   I can't recall a specific
23 conversation with some -- with
24 somebody that I was applying for a
25 job about this lawsuit, or Canal, or

**Page 163**

1          G. C. ROBINSON
2 my lawsuit.
3     Q.   Thank you.
4          MR. BENNETT:  I sent the
5     second exhibit, which Paige
6     will eventually mark as
7     Defendant's Exhibit B.
8          (Whereupon, ROBINSON
9     Exhibit B, a seven-page PDF
10     starting with Bates stamped
11     Robinson 5114, was marked for
12     identification, as of this
13     date.)
14     Q.   Ms. Robinson, if you could
15 please open it up when you get it
16 and I will direct you to a
17 particular aspect of it.
18          MS. HARWIN:  It has now
19     been sent.
20          THE WITNESS:  I will let
21     you know when I receive it.
22          MR. BENNETT:  Thank you.
23     A.   I have it opened.
24     Q.   Great.
25          If you can, just open it,

**Page 164**

1          G. C. ROBINSON
2 and I am going to describe for the
3 record.
4          MR. BENNETT:  It is a
5     seven-page PDF.  The first
6     page is Bates Stamped
7     Robinson 5114.
8     Q.   When you open it, I would
9 like to direct your attention to the
10 top e-mail from you to Anne Barkley.
11 Let me know if you see that?
12     A.   Yes.
13     Q.   You see where it says,
14 "Saturday, May 11, 2019?"
15     A.   May 11, 2019, yes.
16     Q.   So it is about a month
17 after you resigned, correct?
18     A.   Yes.
19     Q.   If you look at the second
20 paragraph of that e-mail, read that
21 to yourself, please, it begins with
22 "I am in the process of?"
23     A.   Uh-huh.
24     Q.   Do you see that?
25     A.   Yes.

**Page 165**

1          G. C. ROBINSON
2     Q.   It refers to you quote,
3 "Working on a few development
4 projects I have been writing and
5 putting together."
6          Do you see that?
7     A.   Yes.
8     Q.   What does that refer to?
9          MS. HARWIN:  Objection to
10     the form.
11     A.   When I left Canal
12 Productions, my plan was to apply to
13 business school for my MBA, and in
14 addition start my own production
15 company.  Development projects are
16 -- were a part of what I was
17 planning on doing with my production
18 company.
19     Q.   What does that mean,
20 development projects?
21     A.   Development projects --
22          MS. HARWIN:  Objection to
23     the form.
24     A.   Development projects are
25 things that I have researched or



| Page 166 |
|---|

```
 1          G. C. ROBINSON
 2   scripts that I wanted to write,
 3   whether they were projects that were
 4   documentaries that I had to
 5   research.  It is just about putting
 6   scripts together and developing
 7   them.  Ideas.  That is what I was
 8   planning on doing starting a
 9   production company.
10      Q.   Documentaries?
11      A.   There were different types
12   of projects that I was looking to
13   possibly do.
14      Q.   Did you begin any of that
15   work on these development projects
16   before April 6, 2019?
17          MS. HARWIN:  Objection to
18      the form.
19      A.   Yes.
20      Q.   When did you start working
21   on development projects?
22          MS. HARWIN:  Objection to
23      the form.
24      Q.   During your employment with
25   Canal?
```

| Page 167 |
|---|

```
 1          G. C. ROBINSON
 2          MS. HARWIN:  Objection to
 3      the form.
 4      A.   I wouldn't characterize
 5   them as development projects.
 6      Q.   Okay.
 7          I think -- well, it was
 8   your answer I was going off of.
 9          What would you characterize
10   it as?
11      A.   Writing.  I have always,
12   like other employees, whether it was
13   Michael Weber or Michael Kaplan, I
14   write.  I like writing.
15      Q.   When did you begin writing
16   anything that you would ultimately
17   use in any of the development
18   projects that you would use that you
19   referred to in this May 2019 e-mail?
20          MS. HARWIN:  Objection to
21      the form.
22      A.   I can't recall the exact
23   date.  I believe one of them was
24   written after college that I was
25   revising.  There was another one
```

| Page 168 |
|---|

```
 1          G. C. ROBINSON
 2   that I had done a little bit of
 3   writing on here and there when I had
 4   time.  But it really wasn't in any
 5   sort of phase of development just
 6   because I didn't have any personal
 7   time to work on it.
 8      Q.   Okay.
 9          If you can refer to pages
10   two through seven of Defendant's
11   Exhibit B.
12      A.   You said two through seven?
13      Q.   Yes.
14      A.   Okay.  I am on two.  Page
15   two.
16          MS. HARWIN:  I will note
17      for the record that we object
18      to the presentation of this
19      exhibit which seems to be
20      multiple separate documents
21      that seem to be spliced
22      together in one PDF.
23          MR. BENNETT:  There is a
24      reason for that, but, yes.
25      It was because of how it was
```

| Page 169 |
|---|

```
 1          G. C. ROBINSON
 2   produced.
 3          MR. DROGIN:  So the
 4      objection is overruled.
 5      A.   What am I specifically
 6   looking at?
 7      Q.   Did you -- did you review
 8   pages two through seven?
 9      A.   Okay.  Okay.
10      Q.   Who is Brian Zach?
11      A.   Brian is a friend of mine.
12      Q.   Does he live in New Canaan?
13      A.   No.
14      Q.   Does -- is he a friend or a
15   romantic -- something more than a
16   friend?
17          MS. HARWIN:  Objection to
18      the form.
19      A.   He is a friend.
20      Q.   Okay.
21          You can close -- actually,
22   sorry, with respect to the text that
23   you just reviewed between you and
24   Brian Zach, do you recall when you
25   retained or first met with Sanford
```





MAGNA
LEGAL SERVICES

| Page 170 |
| --- |

```
1            G. C. ROBINSON
2   Heisler?  I am not asking for
3   anything that you discussed with
4   them but a date?
5            MS. HARWIN:  Objection to
6        the form.
7        A.   I can't recall.
8        Q.   You can close that out.
9            MR. BENNETT:  I am going
10       to circulate another exhibit.
11       You can send that over to
12       your client.  We are now
13       going to get into the exhibit
14       this second.
15       Q.   Ms. Robinson, you commenced
16   employment with Canal in 2008, is
17   that correct?
18       A.   I started my employment
19   with Canal in 2008.
20       Q.   When you started with
21   Canal, what type of business was it?
22            MS. HARWIN:  Objection to
23        the form.
24        A.   I don't know specifically
25   what type of business or -- Canal
```

| Page 171 |
| --- |

```
1            G. C. ROBINSON
2   was.
3        Q.   What type of services did
4   Canal offer?
5            MS. HARWIN:  Objection to
6        the form.
7        A.   Services related to Bob, to
8   his businesses, his personal life, I
9   --
10       Q.   Would you agree that Canal
11   was a loan out company for the
12   acting services of Robert De Niro?
13            MS. HARWIN:  Objection to
14        the form.
15        A.   I don't know if I would
16   characterize it that way.  I think
17   that it was -- I think that did --
18        Q.   Let me try to clarify the
19   question for you, Ms. Robinson.
20            Did Mr. De Niro offer his
21   acting services through Canal, even
22   though Canal might have done other
23   things?
24            MS. HARWIN:  Objection to
25        the form.
```

| Page 172 |
| --- |

```
1            G. C. ROBINSON
2        A.   I believe at times it did.
3        Q.   Okay.
4            Canal was Mr. De Niro, and
5   Mr. De Niro was Canal, would you
6   agree with that?
7            MS. HARWIN:  Objection to
8        the form.
9        A.   Yes, it was Bob's business
10   and personal.
11       Q.   What led you to first start
12   looking for employment with Canal?
13            MS. HARWIN:  Objection to
14        the form.
15        A.   I did not look for
16   employment with Canal productions.
17       Q.   What led you to Canal?
18        A.   My -- I received an e-mail
19   from Megan Livers (ph) who worked
20   for Jane Rosenfeld (ph) asking if I
21   - if she could forward my resume on
22   for on open position as an executive
23   assistant to Bob.  I said, "yes,"
24   and my resume was forwarded on.
25       Q.   Do you recall ever learning
```

| Page 173 |
| --- |

```
1            G. C. ROBINSON
2   who you were replacing specifically,
3   or who it was contemplated that you
4   might replace?
5            MS. HARWIN:  Objection to
6        the form.
7        A.   Yes.
8        Q.   Who?
9        A.   I was interviewed by Lauren
10   Hertz, Bob's executive assistant at
11   the time to replace her as she was
12   leaving.
13       Q.   Was there somebody employed
14   there by the name of Andrea Cutter
15   (ph)?
16        A.   Not at the time.
17       Q.   Okay.
18            Before Canal extended an
19   offer of employment to you, did you
20   meet with anyone, go through
21   interviews?
22            MS. HARWIN:  Objection to
23        the form.
24        A.   Yes.
25       Q.   Who did you meet with?
```





Page 174

```
1              G. C. ROBINSON
2      A.   I met with the executive
3  assistants, Lauren Hertz, Jessie
4  Spellman (ph), and Michael Kaplan,
5  and I believe I also met with
6  Michael Weber.
7      Q.   Did you meet with Bob?
8      A.   I met with Bob, and in
9  addition, I also met with ████
10  ██████ who signed off on -- on me
11  being hired.
12      Q.   Did you interview with Jane
13  Rosenthal (ph)?
14      A.   I had met with her, I
15  believe, in -- I had met with her,
16  but not in connection with the
17  position at Canal Productions.
18      Q.   What was it in connection
19  with?
20      A.   A possible job at Tribeca
21  in the -- in film production.
22      Q.   And that was before the
23  offer from Canal Productions was
24  extended to you?
25      A.   Yes.
```

Page 175

```
1              G. C. ROBINSON
2      Q.   So ballpark, you are around
3  25 years of age when you start
4  working with Canal, is that fair?
5      A.   Yes, I believe so.
6      Q.   Okay.
7          You are working with Mr. De
8  Niro, one of the most well-known
9  actores in history, right?
10          MS. HARWIN:  Objection to
11  the form.
12      A.   I worked for Bob.
13      Q.   Okay.
14          Did -- in light of your
15  minor at St. Lawrence, was it
16  exciting for you, with the prospect
17  of working alongside Mr. De Niro?
18          MS. HARWIN:  Objection to
19  the form.
20      A.   I was excited to continue
21  or to start a foundation for my
22  career in -- in working in the
23  entertainment industry and film.
24      Q.   I don't want to interrupt
25  you.  Are you done?
```

Page 176

```
1              G. C. ROBINSON
2      A.   Yeah.
3      Q.   Okay.
4          So the fact that you were
5  working alongside Mr. De Niro didn't
6  mean anything?
7          MS. HARWIN:  Objection to
8  the form.
9      A.   I wouldn't characterize it
10  that way.  I think that I just -- I
11  wouldn't characterize it that way.
12      Q.   How would you characterize
13  it?
14          MS. HARWIN:  Objection to
15  the form.
16      A.   I think -- I think with the
17  job with Bob and being in the
18  entertainment industry, I was
19  excited about the start of my career
20  in the film industry.  It
21  incorporated not only working for
22  somebody in the film industry, but
23  also working in that industry.
24      Q.   Did you supervise anyone
25  during your first year on the job?
```

Page 177

```
1              G. C. ROBINSON
2          MS. HARWIN:  Objection to
3  the form.
4      A.   Not that I am aware of.
5      Q.   What were your job
6  responsibilities?
7          MS. HARWIN:  Objection to
8  the form.
9      Q.   Withdrawn.
10          During the first year you
11  were employed by Canal, what were
12  your job responsibilities?
13      A.   My job responsibilities
14  included handling Bob's schedule,
15  messages, a birthday list in and
16  picking out gifts, very large
17  Christmas gifts and picking out
18  gifts.
19          In addition, there was a
20  portion of being on call for Bob
21  which -- I mean, handling other sort
22  of personal items for him.  Whatever
23  he asked or directed me to do is
24  what I did.
25      Q.   You started off with an
```



| | Page 178 |
|---|---|

```
 1         G. C. ROBINSON
 2  annual salary of 95,000, is that
 3  correct?
 4     A.   I don't believe that is
 5  correct.
 6     Q.   What do you think it
 7  started out as?
 8         MS. HARWIN:  Objection to
 9    the form.
10     A.   I can't recall what exactly
11  my starting salary was.
12     Q.   Okay.
13         Between the first day that
14  you started with Canal, and October
15  of 2012, where did you physically
16  perform the job?
17         MS. HARWIN:  Objection to
18    the form.
19     A.   From -- I need to clarify,
20  from the beginning when I started in
21  February 2008 to October of 2013?
22     Q.   2012?
23     A.   Oh, 2012.  Mainly the
24  office at Canal Productions, but
25  there were additional times because
```

| | Page 179 |
|---|---|

```
 1         G. C. ROBINSON
 2  I was Bob's only executive assistant
 3  for much of that time, I worked
 4  while I was away as well.  So there
 5  were times where I worked while I
 6  was away in LA or other locations.
 7  I can't recall during those
 8  dates where I would have
 9  additionally been working from.
10     Q.   Okay.
11         Do you know when Dan Harvey
12  commenced employment with Canal?
13         MS. HARWIN:  Objection to
14    the form.
15     A.   No.
16     Q.   Do you know when Kaplan
17  commenced employment with Canal?
18         MS. HARWIN:  Objection to
19    the form.
20     A.   I don't know when Michael
21  Kaplan started at Canal.
22     Q.   Did Mr. Kaplan supervise
23  you when you began working for
24  Canal?
25         MS. HARWIN:  Objection to
```

| | Page 180 |
|---|---|

```
 1         G. C. ROBINSON
 2    the form.
 3     A.   Yes.  In -- in some ways,
 4  he did.
 5     Q.   In what ways?
 6     A.   He, like Jesse Spellman
 7  (ph) and Michael Weber were senior
 8  to me, and they would direct me on
 9  how things were handled or done.
10  That is what comes to mind at this
11  moment.
12     Q.   Okay.  There is a new
13  exhibit.  If you could just open it,
14  please.
15         MR. BENNETT:  For the
16    record it is a PDF, 20 pages.
17    The file name is P13908.
18         (Whereupon, ROBINSON
19    Exhibit C, a 20-page PDF,
20    file name P13908, was marked
21    for identification, as of
22    this date.)
23         MS. HARWIN:  If we could
24    take a one-minute bathroom
25    break while Ms. Robinson is
```

| | Page 181 |
|---|---|

```
 1         G. C. ROBINSON
 2  opening the exhibit.
 3         MR. BENNETT:  Yeah.  That
 4    is fine.
 5         MS. HARWIN:  One minute.
 6         (Whereupon, a recess was
 7    taken at this time.)
 8     Q.   Did you see that new file?
 9     A.   I did.  It is quite -- it
10  is a lot of pages.  20.  Is there
11  something that you would like to
12  direct me to?
13     Q.   Absolutely.  We are going
14  to look at pages one and two.  So
15  specifically I would like you to
16  look at the bottom of page one.  It
17  is an e-mail, dated April 8, 2011,
18  at 11:05 a.m., from you to Bosswick.
19         Do you see that?
20     A.   Yes.
21     Q.   And if you -- I am going to
22  direct your attention to the third
23  paragraph which starts with, "As for
24  me."
25         Do you see that?
```




| Page 182 |
|---|

G. C. ROBINSON

1
2     A.   Yes.
3     Q.   And just read that whole
4  paragraph to yourself, please.
5     A.   (Witness complies).
6          Yes, I read it.
7     Q.   What was the change to your
8  title that you are referring to
9  here?
10    A.   My title was changed to
11 director of production.
12    Q.   Why was it changed?
13         MS. HARWIN:  Objection to
14    the form.
15    A.   I had spoken to Bob,
16 probably starting in 2010, about
17 wanting to focus my career on film
18 production, and he and I had
19 multiple discussions on that I could
20 continue my career at Canal and
21 Tribeca working on film production
22 instead of moving on from being his
23 executive assistant.
24    Q.   Did Canal produce films?
25         MS. HARWIN:  Objection to

| Page 183 |
|---|

G. C. ROBINSON

1
2  the form.
3     A.   Bob produced them through
4  Tribeca Productions.
5     Q.   But Canal did not, correct?
6          MS. HARWIN:  Objection to
7     the form.
8     A.   I can't recall if they were
9  ever listed as a company that
10 produced films.
11    Q.   Okay.
12         So your title was being
13 changed following, and that was in
14 response to the conversation that
15 you just explained to me with Mr. De
16 Niro, correct?
17    A.   Yes.  We had multiple
18 conversations about it.
19    Q.   And if you look down at the
20 paragraph below that, it starts with
21 "We will also be looking."
22         Do you see that?
23    A.   Yes.
24    Q.   It refers to hiring an
25 assistant, correct?

| Page 184 |
|---|

G. C. ROBINSON

1
2     A.   Yes.
3     Q.   Now Amelia started in
4  February of 2012, does that sound
5  right to you?
6          MS. HARWIN:  Objection to
7     the form.
8     A.   I can't recall when she
9  started at Canal Productions.
10    Q.   Do you know who you are
11 referring to here when you say that
12 you are looking to hire an assistant
13 this summer?
14         MS. HARWIN:  Objection to
15    the form.
16    A.   I believe it is in
17 reference to finding an assistant to
18 replace me.
19    Q.   To replace you?
20    A.   Yes.
21    Q.   So you are informing Mr.
22 Bosswick that your title is being
23 changed to director of production,
24 and then in the same communication
25 explaining to him that you are

| Page 185 |
|---|

G. C. ROBINSON

1
2  leaving?
3          MS. HARWIN:  Objection to
4     the form.
5     A.   No, that is not correct.
6     Q.   So you were an assistant at
7  the time, you were moved up to
8  director of production, and you are
9  hiring an assistant to replace your
10 old position, is that correct?
11         MS. HARWIN:  Objection to
12    the form.
13    A.   I believe it is in
14 reference of replacing the -- since
15 I was moving up to director of
16 production and handling production
17 items, which is what Bob and I
18 discussed, we were replacing -- or
19 Canal and Bob were replacing the
20 executive assistant position.  And
21 that is what that is in reference
22 to.
23    Q.   Okay.
24         While you might not recall
25 the specific date or month, does it

47 (Pages 182 to 185)





| Page 186 |
| --- |

G. C. ROBINSON

1
2 sound right that Amelia was hired in
3 2012?
4          MS. HARWIN:  Objection to
5     the form.
6     A.   Again, I can't recall
7 exactly when Amelia Brain was hired.
8     Q.   I am not asking for
9 exactly.  I am just looking for the
10 year.  Does 2012 sound right?
11         MS. HARWIN:  Objection to
12     the form.
13     A.   No, I don't believe that
14 sounds correct.
15     Q.   Whenever Ms. Brain was
16 hired, why was she hired?
17         MS. HARWIN:  Objection to
18     the form.
19     A.   From what I can recall, she
20 was hired to help out the office.
21 She began working hours here and
22 there while she was also working for
23 the Tribeca Grill, and I believe her
24 hours continued to increase.  I
25 don't know exactly when she was

| Page 187 |
| --- |

G. C. ROBINSON

1
2 specifically hired at Canal
3 Productions.
4     Q.   At some point she comes on
5 to Canal in a full-time capacity, is
6 that right?
7     A.   Yes.
8     Q.   When it came to the
9 decision to extend a salary to Ms.
10 Brain for her full-time position,
11 how was the salary determination
12 arrived at?
13         MS. HARWIN:  Objection to
14     the form.
15     A.   I can't exactly recall
16 except that any salaries or amounts
17 were approved by -- by Bob.
18     Q.   Right.  Would you have had
19 that conversation with Mr. De Niro
20 or someone else?
21         MS. HARWIN:  Objection to
22     the form.
23     A.   I can't recall a specific
24 conversation with him.
25     Q.   When Amelia Brain came on

| Page 188 |
| --- |

G. C. ROBINSON

1
2 to work at Canal, did you or Mr.
3 Kaplan have the authority to make an
4 offer of employment to a prospective
5 new hire without consulting with Mr.
6 De Niro?
7         MS. HARWIN:  Objection to
8     the form.
9     A.   No.  Bob would have to have
10 approval for hiring of employees at
11 Canal Productions.
12     Q.   Did you interview Ms.
13 Brain?
14         MS. HARWIN:  Objection to
15     the form.
16     A.   I can't recall ever
17 interviewing Amelia Brain.
18     Q.   Once Amelia starts working
19 with Canal, did you supervise her?
20         MS. HARWIN:  Objection to
21     the form.
22     A.   I believe at times there
23 were things where I passed along
24 what Bob wanted to do, same as
25 Michael Kaplan.  She helped out the

| Page 189 |
| --- |

G. C. ROBINSON

1
2 office with miscellaneous random
3 things and when Bob asked for work
4 to be done.
5     Q.   So the answer to the
6 question is yes I think?
7         MS. HARWIN:  Objection to
8     the form.
9     Q.   You did supervise her?
10     A.   I mean, at times -- at
11 times, but it wasn't something that
12 was consistent.  The job itself was
13 again what Bob needed or what Bob
14 wanted done.  And at times I would
15 be a middleman passing along, you
16 know, what Bob wanted.
17     Q.   Okay.
18         Do you recall who assigned
19 her work duties?
20         MS. HARWIN:  Objection to
21     the form.
22     A.   I think that we all had a
23 team effort in trying to get
24 everything done for what Bob was
25 requesting and directing to be done.

48 (Pages 186 to 189)





| Page 190 |
| --- |

G. C. ROBINSON
1
2    Q.   Who are you referring to,
3  when you say, "team effort"?
4    A.   Team effort, myself,
5  Michael Kaplan, Amelia, people who
6  were in the office.
7    Q.   Right.  So the question was
8  focused on who is assigning work
9  duties to Ms. Brain.  She is not
10  assigning work duties to herself.
11    Is it you and Mr. Kaplan
12  who is referring work duties to her,
13  or is it someone else?
14    MS. HARWIN:  Objection to
15    the form.
16    A.   It was a combination of
17  Bob, ▮▮▮▮▮  There were things that
18  I passed along that needed to be
19  done for Bob, same with Michael
20  Kaplan, to Amelia.  It was just work
21  that needed to be done.  I don't
22  know how it was distributed or how
23  each specific task was -- there were
24  --
25    Q.   Did you ever evaluate or

| Page 191 |
| --- |

G. C. ROBINSON
1
2  provide constructive feedback to her
3  regarding her performance?
4    MS. HARWIN:  Objection to
5    the form.
6    A.   Can repeat the question?
7  Sorry.
8    Q.   When it comes to Ms.
9  Brain's performance of her work
10  duties, did you ever evaluate her or
11  provide constructive feedback about
12  it?
13    MS. HARWIN:  Objection to
14    the form.
15    A.   No.  I can't recall a time
16  when I did.
17    Q.   Did you ever provide her
18  with information about compensation
19  issues?
20    MS. HARWIN:  Objection to
21    the form.
22    A.   Can you clarify
23  compensations issues?
24    Q.   Anything affecting her pay,
25  benefits or pay?

| Page 192 |
| --- |

G. C. ROBINSON
1
2    A.   Not that I can recall.
3    Q.   Who did?
4    MS. HARWIN:  Objection to
5    the form.
6    A.   Can you clarify who did
7  what?
8    Q.   Sure.
9    I am just trying to
10  understand.  Ms. Brain comes on
11  working as an executive assistant
12  working for Canal, correct?
13    MS. HARWIN:  Objection to
14    the form.
15    A.   No, I wouldn't characterize
16  it that way.  She was an assistant
17  to the office at Canal Productions.
18  She wasn't an executive position to
19  Bob.
20    Q.   She comes in, she starts
21  performing work, correct?
22    A.   Yes.
23    Q.   As far as you are aware,
24  how does she know what she is
25  earning?

| Page 193 |
| --- |

G. C. ROBINSON
1
2    MS. HARWIN:  Objection to
3    the form.
4    A.   I can't recall how she
5  would have known how she was -- what
6  she was earning.  I am -- I know
7  that in the beginning of her
8  employment she would send the hours
9  that she had worked, and they would
10  be sent to Burton to be paid for the
11  hours that she worked.
12    Q.   As far as you recall, she
13  sent e-mails directly to Burton?
14    A.   I believe she either sent
15  them to me and Michael, or just me
16  and I would forward them to Burton
17  in the beginning of her employment.
18    Q.   Did Amelia perform any type
19  of personal duties or work
20  responsibilities for ▮▮▮▮▮ or Bob?
21    MS. HARWIN:  Objection to
22    the form.
23    A.   Yes.
24    Q.   Did you ever provide Amelia
25  with any information about




1         G. C. ROBINSON
2    vacations, holidays or office
3    closures?
4         A.   At times --
5         MS. HARWIN:  Objection to
6    the form.
7         A.   At times, I believe, I did.
8         Q.   Okay.
9              And other times, are you
10   aware of anyone else who did?
11        MS. HARWIN:  Objection to
12   the form.
13        A.   We received e-mails from
14   Tribeca HR with the office closures.
15        Q.   Okay.
16             Do you ever recall --
17   withdrawn.
18             We can refer to page three
19   of that same exhibit, please.  This
20   is an e-mail at the top.  Just let
21   me know when you see it.  It is
22   dated September 13, 2012, at 7:55
23   a.m.
24             Do you see that?
25        A.   Yes.

1         G. C. ROBINSON
2         Q.   If you can, please just
3    review the e-mail to yourself, and I
4    am going to ask you some questions.
5         A.   (Witness complies).
6              I have read it.
7         Q.   So tell me if I am wrong.
8    In this e-mail you are trying to
9    explain to Mr. De Niro why your
10   salary should go up to 190, among
11   perhaps other things, is that fair?
12        MS. HARWIN:  Objection to
13   the form.
14        A.   We had been in discussion
15   about a raise.
16        Q.   Okay.
17        MR. BENNETT:  Can you
18   read the question back?
19             (Whereupon, the requested
20   portion was read back by the
21   reporter:
22        Q:  So tell me if I am
23   wrong.  In this e-mail you
24   are trying to explain to Mr.
25   De Niro why your salary

1         G. C. ROBINSON
2    should go up to 190, among
3    perhaps other things, is that
4    fair?)
5         MS. HARWIN:  Objection to
6    the form.
7         A.   In this conversation, we
8    had been discussing a raise -- the
9    conversation about a raise and
10   bonus.
11        Q.   And the raise would be up
12   to 190, correct?
13        MS. HARWIN:  Objection to
14   the form.
15        A.   In this specific e-mail I
16   believe so.
17        Q.   I am not referring to any
18   other e-mail.  That is my point.  If
19   we can try to confine your answers
20   to the questions that I am asking,
21   this will go faster.  This is the
22   one we are looking at right now.
23   Okay?
24             If you can please, I would
25   like you to look at the paragraph

1         G. C. ROBINSON
2    that begins with "In the office."
3         Do you see that?
4         A.   Yes, I see that.
5         Q.   And it seems to be that you
6    are explaining to Mr. De Niro why
7    you don't think giving out
8    performance-based bonuses is a good
9    idea for yourself or Canal
10   personnel, correct?
11        MS. HARWIN:  Objection to
12   form.
13        A.   Yes.
14        Q.   Okay.
15             And in this -- if you look
16   at -- I don't know what sentence it
17   is.  It starts with, "In the case of
18   Michael."
19             Do you see that?  It is
20   like the third line down.
21        A.   Yes.
22        Q.   That is Kaplan, right?
23        A.   Yes.
24        Q.   "I have given him a little
25   extra bonus when he worked hard





| | Page 198 |
|---|---|

```
1              G. C. ROBINSON
2    during the festival," et cetera,
3    correct?
4              MS. HARWIN:  Objection to
5        the form.
6    Q.   Do you see that?
7    A.   Yes, that is what it says.
8    Q.   Okay.
9         So at this point in time,
10   September 2012, it seems like
11   according to this e-mail you are
12   making a decisions as to whether Mr.
13   Kaplan receives a bonus, or at a
14   minimum, that you are recommending
15   that to Mr. De Niro, is that fair?
16             MS. HARWIN:  Objection to
17       the form.
18   A.   I don't know if I would
19   characterize it that way.
20   Q.   How would you characterize
21   it?
22   A.   These are all things that
23   Bob would have to approve if they --
24   if Michael was given more of a bonus
25   or something after the festival.  It
```

| | Page 199 |
|---|---|

```
1              G. C. ROBINSON
2    would be a discussion between Bob
3    and myself, or Mark Bosswick and
4    Bob.  I did not have the approval to
5    actually make decisions on who got
6    bonuses.  There would be -- at this
7    time, there would be a suggestion,
8    but it would be Bob's decision of
9    what he would like to do.
10   Q.   So you would make
11   recommendations, correct?
12             MS. HARWIN:  Objection to
13       the form.
14   A.   In this case, yes, I did.
15   Q.   Okay.
16        And as far as you recall,
17   did Mr. De Niro adopt your
18   recommendations?
19             MS. HARWIN:  Objection to
20       the form.
21   A.   Are you talking about this
22   specific paragraph and whether he
23   did or not?
24   Q.   It is referring to the past
25   tense.  So I am guessing that Mr.
```

| | Page 200 |
|---|---|

```
1              G. C. ROBINSON
2    Kaplan was given this extra bonus
3    that you referred, no?
4              MS. HARWIN:  Objection to
5        the form.
6    A.   I believe he was, with
7    Bob's approval, of course.
8    Q.   Following your
9    recommendation?
10             MS. HARWIN:  Objection to
11       the form.
12   A.   Yes, following a discussion
13   that Bob and I had.
14   Q.   Okay.
15        So according to this --
16   withdrawn.
17        November 1, 2012, your
18   salary goes up to 150, is that
19   consistent with your recollection?
20             MS. HARWIN:  Objection to
21       the form.
22   A.   I can't recall the amount
23   that it went up to or what it was in
24   2012.
25   Q.   Do you recall ever
```

| | Page 201 |
|---|---|

```
1              G. C. ROBINSON
2    receiving $150,000 per year from
3    Canal?
4              MS. HARWIN:  Objection to
5        the form.
6    A.   I can't recall the specific
7    salary of 150.
8    Q.   Beyond 95,000 -- excuse me.
9         Above 95,000, what specific
10   salary do you recall earning from
11   Canal?
12             MS. HARWIN:  Objection to
13       the form.
14   A.   I can recall in 2019 being
15   given an annual salary of 300.
16   Q.   You have no recollection of
17   any other salaries?
18   A.   I am still going.  I can
19   recall at some point it being 175,
20   but I can't recall the year.  And I
21   believe at one point I can recall
22   200, but I can't -- the earlier
23   years I can't recall specifically
24   what my salaries were -- what my
25   base salaries were.  I can't recall
```

51 (Pages 198 to 201)





MAGNA
LEGAL SERVICES

| Page 202 |
| --- |

G. C. ROBINSON

1    off the top of my head.
2        Q.   Following the time that
3    Canal increased your salary after
4    95,000, what was your understanding
5    as to why you were receiving more
6    compensation?
7            MS. HARWIN:  Objection to
8        the form.
9        A.   I don't recall specifically
10    when it was 95, and when -- when it
11    was changed to 95.  So I wouldn't be
12    able to discuss why it was changed
13    if I don't have the date and the
14    information of when it was.
15        Q.   At any time after --
16    whatever salary you were earning at
17    the time that you commenced your
18    employment with Canal, what was your
19    understanding as to why it was ever
20    increased?
21            MS. HARWIN:  Objection to
22        the form.
23        A.   I think some of the reasons
24    would have been my requests for it,

| Page 203 |
| --- |

G. C. ROBINSON

1    the amount of hours that I continued
2    to work that were -- where I had
3    felt that I wasn't being compensated
4    for the hours that I was working,
5    and I would also add the promotion.
6        Q.   And when you say,
7    "promotion," what are you referring
8    to?
9            MS. HARWIN:  Objection to
10        the form.
11        A.   The change in title with
12    director of production.
13        Q.   So you received a raise
14    when you were -- when your title
15    changed to director of production,
16    correct?
17        A.   I can't specifically recall
18    exactly when I was given a raise
19    around the time that I had my title
20    changed.
21        Q.   When your title changed to
22    director of production, it was, as
23    you just characterized it, a
24    promotion.  What was your

| Page 204 |
| --- |

G. C. ROBINSON

1    understanding as to why you were
2    being promoted?
3            MS. HARWIN:  Objection to
4        the form.
5        A.   Bob and I had discussions,
6    as I said, that I would be
7    transitioning from executive
8    assistant to focusing on production
9    and working with Berry Welsh at
10    Tribeca.  He would -- he handled
11    creative or development, and I would
12    be handling production.
13        Q.   Did your responsibilities
14    within Canal also increase before
15    the time that Mr. De Niro approved
16    your title change to director of
17    production?
18            MS. HARWIN:  Objection to
19        the form.
20        A.   During the early -- during
21    the earlier years, there were jobs
22    where Bob would ask me to -- to do
23    something such as -- there was just
24    different jobs that I would -- that

| Page 205 |
| --- |

G. C. ROBINSON

1    Bob had directed me to do that were
2    not the things that necessarily
3    continued -- I think there were --
4    there were additional jobs I just
5    can't think of what they were during
6    that time period at this moment.
7        Q.   So your responsibilities,
8    with respect to managing Canal
9    personnel, increased at the time
10    that you received the director of
11    production title?
12            MS. HARWIN:  Objection to
13        the form.
14        A.   They weren't supposed to.
15    I was supposed to focus my job
16    solely on production and replacing
17    myself with somebody to be Bob's
18    executive assistant, and then I
19    would move on to solely work in
20    production.  But like many of the
21    titles that I had, and many of the
22    jobs that I had in the office, I
23    would be redirected to work on
24    something personal for Bob.  I was




| Page 206 |
|---|

G. C. ROBINSON

1
2       --
3       Q.   Hold on a second.  I'm
4   sorry to interrupt.  We are
5   getting --
6           MR. BENNETT:  Can you
7       read the question back?
8           (Whereupon, the requested
9       portion was read back by the
10      reporter:
11          Q: So your
12      responsibilities, with
13      respect to managing Canal
14      personnel, increased at the
15      time that you received the
16      director of production
17      title?)
18      Q.   It is a yes or no, Ms.
19  Robinson.
20          MS. HARWIN:  Objection to
21      the form.
22          MR. DROGIN:  For the
23      record, that wasn't a
24      question that you objected to
25      the form of, it was a

| Page 207 |
|---|

G. C. ROBINSON

1
2   statement.
3           MS. HARWIN:  There is no
4       question pending then --
5           MR. BENNETT:  There is a
6       question pending.
7           MR. DROGIN:  I think the
8       statement --
9           MS. HARWIN:  Mr. Bennett,
10      do you want to clarify the
11      question that is pending?
12          MR. DROGIN:  I just think
13      the record should be clear
14      that Mr. Bennett's statement
15      was it is just a yes-or-no
16      question and you objected to
17      the form of that statement.
18      You should let him ask the
19      question before you object to
20      it.
21          MR. BENNETT:  Can you
22      read the question back again,
23      please?
24          (Whereupon, the requested
25      portion was read back by the

| Page 208 |
|---|

G. C. ROBINSON

1
2   reporter:
3           Q: So your
4       responsibilities, with
5       respect to managing Canal
6       personnel, increased at the
7       time that you received the
8       director of production
9       title?)
10          MS. HARWIN:  Objection to
11      the form.
12      A.   I can't recall that they
13  were -- I can't recall that they
14  were.
15      Q.   As of the date that your
16  title goes -- becomes director of
17  production, did you manage Canal's
18  personnel?
19          MS. HARWIN:  Objection to
20      the form.
21      A.   When I had received the
22  title of director of production I
23  was still functioning as Bob's
24  executive assistant.
25      Q.   Is that a yes or no, Ms.

| Page 209 |
|---|

G. C. ROBINSON

1
2   Robinson?
3       A.   I was still functioning as
4   Bob's executive assistant, and when
5   he directed me to do something, I
6   did it.  I wasn't --
7       Q.   Were you -- go on.
8       A.   I was Bob's executive
9   assistant at the time.
10      Q.   Were you managing Canal
11  personnel at all?
12          MS. HARWIN:  Objection to
13      the form.
14      A.   I think that there were
15  times that Bob directed me to.  I
16  think there were times that Bob
17  directed me to, but it wasn't
18  something that was a regular part of
19  my job.  I facilitated a lot of
20  messages from him to others, but it
21  wasn't, again, a regular part of my
22  job.
23          MR. BENNETT:  I would
24      like to take a break.  Let's
25      come back at 3:35, please.



| Page 210 |
|---|

G. C. ROBINSON

1
2      MS. HARWIN:  Okay.
3          (Whereupon, a recess was
4      taken at this time.)
5      Q.   Ms. Robinson, you talked to
6  me a little bit about what you were
7  doing for Canal during various
8  years.  As of 2015, what was Dan
9  Harvey doing for Canal?
10         MS. HARWIN:  Objection to
11     the form.
12     A.   Dan Harvey, like I, was
13  functioning as an executive
14  assistant.
15     Q.   In what way -- withdraw the
16  question.
17         What is your understanding
18  as to the term executive assistant,
19  what type of job duties fall within
20  that description?
21         MS. HARWIN:  Objection to
22     the form.
23     A.   I would say core material
24  duties of an executive assistant is
25  doing what Bob asks and directing an

| Page 211 |
|---|

G. C. ROBINSON

1
2  employee to do.
3      Q.   Okay.
4          And going back to my
5  question earlier, what does Dan
6  Harvey do.  I will reiterate that
7  question again.
8          What was Dan Harvey doing
9  for Canal, specifically, as of 2015?
10         MS. HARWIN:  Objection to
11     the form.
12     A.   Dan Harvey --
13         (Whereupon, a discussion
14     was held off the record.)
15     A.   Dan Harvey, like me,
16  handled what Bob directed us to do,
17  whether it was picking him up
18  coffee, or newspapers, or at times
19  organizing a meeting for Bob,
20  accompanying Bob on set when I was
21  requested.  He helped put together
22  the gym at ▮▮▮▮.  He, like I, did
23  supported his wellbeing, his
24  physical wellbeing, and his -- and
25  his health.  Dan worked a couple --

| Page 212 |
|---|

G. C. ROBINSON

1
2  at times an hour or two a couple of
3  times a week training Bob, but at
4  times he did not train Bob for weeks
5  at a time and at times a month.
6  When Bob was in California at ▮▮▮▮
7  Dan facilitated items that Bob
8  needed during that time.  Dan, in
9  addition, at times, worked with
10  production on Bob's needs when it
11  came to gym or anything related to
12  his -- his needs.  There were --
13     Q.   From your perspective --
14     A.   Can I finish?
15     Q.   No.  Because it is really
16  running far afield.
17         Is your perspective that
18  every person that Canal compensated
19  had no independent role, they simply
20  did what Mr. De Niro directed them
21  to do or was it something different?
22         MS. HARWIN:  Objection to
23     the form.
24     A.   I think that is the core
25  material responsibility at Canal is

| Page 213 |
|---|

G. C. ROBINSON

1
2  to do what Bob directed of you
3  regardless what title or what jobs
4  you might do a little bit more of.
5  It really was what Bob asked you to
6  do.  And a lot of times it went
7  outside any title that any Canal
8  employee would have.  Everybody --
9      Q.   Do you know specifically
10  what Mr. De Niro directed Mr. Dan
11  Harvey to do on a day-to-day basis?
12         MS. HARWIN:  Objection to
13     the form.
14     A.   I don't know the full
15  extent of what Dan Harvey's role is.
16  I can only, as discussed before,
17  give examples of things that I had
18  seen.
19     Q.   And have you ever seen Dan
20  Harvey hand out work assignments to
21  Sabrina, Jillian, or Katherine, or
22  Lu Lu, or anyone else that were
23  employed as administrative
24  assistants?
25         MS. HARWIN:  Objection to



| Page 214 |
|---|

```
 1          G. C. ROBINSON
 2      the form.
 3      A.   I had seen Dan Harvey
 4   direct Michael Kaplan when it came
 5   to gym equipment and things that had
 6   to do with 110.  I had been directed
 7   by Dan Harvey, as did Amelia and
 8   Olivia, to book flights for Dan
 9   Harvey.  There -- those are some of
10   the things that I can recall at this
11   moment.
12      Q.   Did Dan Harvey ever work on
13   the transactional documents related
14   to any particular film production
15   that Mr. De Niro was involved in?
16          MS. HARWIN:  Objection to
17      the form.
18      A.   Can you clarify
19   transactional documents?
20      Q.   Well, in -- in connection
21   with your various roles within
22   Canal, over the course of the years,
23   you interacted with Peter Grant on
24   transactions involving Mr. De Niro's
25   acting services, correct?
```

| Page 215 |
|---|

```
 1          G. C. ROBINSON
 2          MS. HARWIN:  Objection to
 3      the form.
 4      A.   I spoke to Peter Grant
 5   about Bob's needs in production.
 6      Q.   Your work went a little bit
 7   more beyond speaking with him,
 8   correct?
 9          MS. HARWIN:  Objection to
10      the form.
11      A.   Can you clarify?  Can you
12   rephrase that?
13      Q.   It is your words, Ms.
14   Robinson.  Over the course of years
15   you have probably hundreds of
16   e-mails back and forth with Peter
17   Grant reflecting various aspects of
18   work relating to a varying number of
19   films or movies or production that
20   Mr. De Niro was involved in.
21      A.   Yes.
22      Q.   Do you recall specifically
23   working with Peter Grant about, for
24   example, perk budgets?
25          MS. HARWIN:  Objection to
```

| Page 216 |
|---|

```
 1          G. C. ROBINSON
 2      the form.
 3      A.   Yes, there were a few times
 4   where I did, which goes to, as I
 5   said, working with Bob -- what Bob's
 6   needs are on productions.  What he
 7   needed.
 8      Q.   Right.  So on those
 9   occasions that you were working with
10   Peter Grant on the perk budgets for
11   a particular production, what were
12   you doing specifically?
13          MS. HARWIN:  Objection to
14      the form.
15      A.   On the couple of films that
16   had perk budgets, I was researching
17   costs of hotel rooms for Bob, and
18   Bob's family, researching costs and
19   providing them for what Bob's needs
20   were on -- on set.
21      Q.   Relative to the overall
22   budget of the perks, correct?
23          MS. HARWIN:  Objection to
24      the form.
25      A.   The perk budget was what
```

| Page 217 |
|---|

```
 1          G. C. ROBINSON
 2   Bob's needs were on --
 3      Q.   Right.
 4      A.   -- on a couple of films.
 5      Q.   Did Dan Harvey ever
 6   exchange e-mails with Attorney Grant
 7   relative to any issue with a perk
 8   budget on any film?
 9          MS. HARWIN:  Objection to
10      the form.
11      A.   Not that I can recall.
12      Q.   Did Dan Harvey ever notify
13   employees about raises or bonuses?
14          MS. HARWIN:  Objection to
15      the form.
16      A.   Not that I can recall.
17      Q.   Did Dan Harvey ever inform
18   Burton, Michael Tasch, Mark
19   Bosswick, or anyone else about
20   raises or bonuses of Canal
21   personnel?
22          MS. HARWIN:  Objection to
23      the form.
24      A.   Other than himself, I can't
25   recall.
```




| Page 218 | Page 219 |
|---|---|

**Page 218**

G. C. ROBINSON

1  
2  Q.  Did Dan Harvey ever make
3  recommendations to Mr. De Niro about
4  an increase or a decrease of
5  compensation for Canal personnel at
6  any time?
7  MS. HARWIN:  Objection to
8  the form.
9  A.  I can't recall or I don't
10  know the full extent of Dan Harvey's
11  position, or what he may or -- I am
12  not going to speculate to what he
13  may or may not have spoken to Bob
14  about.
15  Q.  So you don't know?
16  MS. HARWIN:  Objection to
17  the form.
18  A.  I don't know to which
19  question?
20  MR. BENNETT:  Can you
21  read the question back?
22  (Whereupon, the requested
23  portion was read back by the
24  reporter:
25  Q:  Did Dan Harvey ever

**Page 219**

G. C. ROBINSON

1  
2  make recommendations to Mr.
3  De Niro about an increase or
4  a decrease of compensation
5  for Canal personnel at any
6  time?)
7  A.  I don't know and I can't
8  recall a time when I was present
9  that he did.
10  Q.  Did Dan Harvey, as far as
11  you are aware of, have an e-mail
12  address for Canal -- withdrawn.
13  At the time that you were
14  employed by Canal Productions, one
15  of the e-mail addresses that you had
16  ended in @CanalProductions.com,
17  correct?
18  A.  Yes, that was one of them.
19  Q.  Okay.
20  Did Dan Harvey ever have an
21  e-mail address that ended in
22  @CanalProductions.com?
23  MS. HARWIN:  Objection to
24  the form.
25  A.  During the time that I was

**Page 220**

G. C. ROBINSON

1  
2  at Canal, I can't recall him having
3  one.
4  Q.  To clarify -- thank you.
5  There is no question today that I am
6  going to ask you that occurs outside
7  of the time period that you were
8  employed.
9  As far as you can recall,
10  between 2008, when you commenced
11  employment with Canal, and the date
12  of your resignation, on April 6,
13  2019, how many times did Dan Harvey
14  step inside Canal's office?
15  MS. HARWIN:  Can I
16  clarify, the office at 375
17  Greenwich Street?
18  MR. BENNETT:  Yes.  That
19  is correct.
20  A.  I can't recall.
21  Q.  Do you recall ever seeing
22  him in that office?
23  A.  Yes.
24  Q.  Okay.
25  More than once?

**Page 221**

G. C. ROBINSON

1  
2  A.  Yes.
3  Q.  As far as you are aware,
4  where would Mr. Harvey regularly
5  stay when he was in New York?
6  MS. HARWIN:  Objection to
7  the form.
8  A.  He would either stay at --
9  either stay at the Greenwich Hotel
10  or with his mother in Long Island,
11  from what I can recall.
12  Q.  Okay.
13  Do you know how many films
14  Mr. Harvey has worked with Mr. De
15  Niro on?
16  MS. HARWIN:  Objection to
17  the form.
18  A.  I don't.
19  Q.  Do you know anything about
20  his educational or work experience
21  prior to beginning employment with
22  Canal?
23  MS. HARWIN:  Objection to
24  the form.
25  A.  No, I can't recall a




| Page 222 |
|---|

```
 1          G. C. ROBINSON
 2   conversation where I would have --
 3   that I would have known anything
 4   about what he did prior to Canal.
 5      Q.   As far as you recall,
 6   within the amounts included with any
 7   particular perk budget that Mr. De
 8   Niro obtained at any point over the
 9   course of your employment with
10   Canal, was there a portion of that
11   perk budget that was intended to
12   offset your salary that was paid by
13   Canal?
14          MS. HARWIN:  Objection to
15      the form.
16      A.   Not specific to my salary,
17   no.
18      Q.   Can you refer to the
19   exhibit?  I am just going to ask you
20   to please turn to page nine of 20.
21      A.   Which exhibit?
22      Q.   It is the one P13908.
23      A.   What page?
24      Q.   Nine.
25          Before we talk about this,
```

| Page 223 |
|---|

```
 1          G. C. ROBINSON
 2   my understanding is one of the
 3   claims that you have made in this
 4   action is that you feel as though
 5   you were not paid in an equivalent
 6   manner to Dan Harvey, is that
 7   correct?
 8          MS. HARWIN:  Objection to
 9      the form.
10      A.   I had made a complaint
11   about, and objected to, being paid
12   less than Dan Harvey.
13      Q.   Right.  But the claim in
14   this action is basically saying the
15   same thing, correct?
16          MS. HARWIN:  Objection to
17      the form.
18      A.   I have a claim, yes.
19      Q.   What duties of yours and
20   Dan Harvey overlapped?
21          MS. HARWIN:  Objection to
22      the form.
23      Q.   If any?
24      A.   As I said, both Dan and I
25   functioned as executive assistant to
```

| Page 224 |
|---|

```
 1          G. C. ROBINSON
 2   Bob.  When directed to, we ran
 3   errands, picked up coffee, did what
 4   Bob directed us to do.  We both
 5   supported his physical wellbeing and
 6   his health.  We both had a part in
 7   helping with the ████ project.  Dan
 8   Harvey helped put the gym together
 9   and what equipment would be needed
10   there.  We both -- we both did what
11   Bob directed us to do.  When Bob
12   asked either Dan Harvey or I to
13   accompany on set, we did.  Dan
14   Harvey helped arrange meetings for
15   Bob at times when they were on set
16   and away.  He facilitated paperwork
17   when it came to when Bob was on set.
18   He traveled with Bob when Bob asked
19   him to, which is what I did as well.
20   There are many -- many examples, but
21   that is what comes to mind at this
22   moment.
23      Q.   You testified not long ago
24   that you weren't sure what Mr. De
25   Niro asked Mr. Harvey to do,
```

| Page 225 |
|---|

```
 1          G. C. ROBINSON
 2   correct?
 3          MS. HARWIN:  Objection to
 4      the form.
 5      A.   I wasn't sure of the full
 6   extent of what Bob had asked Dan
 7   Harvey to do.  As I am not aware of
 8   the full extent of what Dan Harvey's
 9   general responsibilities were.
10      Q.   Right, so in that respect,
11   how is it that you have knowledge of
12   overlapping duties?
13          MS. HARWIN:  Objection to
14      the form.
15      A.   As I said, I can only
16   attest to ones that I had seen, been
17   involved in, or knew about.
18      Q.   Are there any duties that
19   you performed that Mr. Harvey did
20   not perform?
21          MS. HARWIN:  Objection to
22      the form.
23      A.   I think there were duties
24   that were stereotypically female
25   that I was asked to do, such as set
```

57 (Pages 222 to 225)



MAGNA
LEGAL SERVICES

| Page 226 |
| --- |

1     G. C. ROBINSON
2  up tables for the birthday party for
3  Bob, picking out gifts, going
4  shopping with him.
5    Q.  How do you know Mr. Harvey
6  didn't do those things?
7    MS. HARWIN:  Objection to
8  the form.
9    I will note that it
10  appears that the witness did
11  not complete --
12    MR. DROGIN:  It appears
13  that the witness wasn't
14  answering the question
15  actually.
16    A.  I'm sorry to ask, can the
17  court reporter just read the last
18  portion of my answer?
19    (Whereupon, the requested
20  portion was read back by the
21  reporter:
22    A: I think there were
23  duties that were
24  stereotypically female that I
25  was asked to do, such as set

| Page 227 |
| --- |

1     G. C. ROBINSON
2  up tables for the birthday
3  party for Bob, picking out
4  gifts, going shopping with
5  him.)
6    A.  I have lost my train of
7  thought.  Let's move to the --
8  whatever question you have next.
9    Q.  So do you not have an
10  answer to that?
11    A.  Can you repeat your
12  question?
13    MR. BENNETT:  Can you
14  read it back?
15    (Whereupon, the requested
16  portion was read back by the
17  reporter:
18    Q: Are there any duties
19  that you performed that Mr.
20  Harvey did not perform?)
21    MS. HARWIN:  Objection to
22  the form.
23    A.  I don't know because I
24  don't know the full extent of Dan
25  Harvey's responsibility, or what Bob

| Page 228 |
| --- |

1     G. C. ROBINSON
2  directed him to do, or asked him to
3  do.
4    Q.  During the work that you
5  performed on perk budgets, do you
6  ever recall seeing Mr. Harvey's name
7  referenced?
8    MS. HARWIN:  Objection to
9  the form.
10    A.  Yes.  He was on -- I can
11  recall him being on a perk budget
12  for expenses.
13    Q.  He was listed as a personal
14  trainer, correct?
15    MS. HARWIN:  Objection to
16  the form.
17    A.  He was listed as what --
18  one of Bob's needs on sets.  I don't
19  recall if it was specified -- if he
20  was specified with the title of
21  trainer.  I recall putting in Dan
22  Harvey.
23    Q.  Do you think you described
24  his job function as whatever Bob
25  needed or personal trainer?

| Page 229 |
| --- |

1     G. C. ROBINSON
2    MS. HARWIN:  Objection to
3  the form.
4    A.  I wouldn't -- I don't ever
5  recall describing what Dan Harvey
6  was on a perk fund budget.
7    Q.  Okay.
8    Do you know if Mr. Harvey
9  was ever credited in any films, and
10  if so, what title was within the
11  credit?
12    MS. HARWIN:  Objection to
13  the form.
14    A.  I can't recall seeing him
15  on the credits on any of Bob's
16  films.
17    Q.  And at one point you were
18  advised by, I think, it was Berry
19  Welsh, that you were not able to be
20  credited on a particular film.  Is
21  that right?
22    MS. HARWIN:  Objection to
23  the form.
24    A.  No, that is not correct.
25    Q.  Did anyone from Tribeca





MAGNA
LEGAL SERVICES

| Page 230 |
|---|

```
 1          G. C. ROBINSON
 2  inform you that they were not able
 3  to reference you to give a credit as
 4  quote unquote "director" in whole or
 5  in part on any film?
 6          MS. HARWIN:  Objection to
 7     the form.
 8      A.   Berry Welsh had e-mailed me
 9  about being unable to have me
10  credited as director of production.
11  And therefore, offered to give me an
12  assistant credit, in which I
13  declined to do because it wasn't --
14  it was lower than director of
15  production, and I had spoken to Bob
16  about it.
17      Q.   And at the time, Mr. Welsh
18  advised you in the e-mail that HBO
19  prohibited him from doing so,
20  correct?
21          MS. HARWIN:  Objection to
22     the form.
23      A.   I can't recall what was
24  specifically in that e-mail.
25      Q.   Okay.
```

| Page 231 |
|---|

```
 1          G. C. ROBINSON
 2      Would it surprise you if
 3  that is what the reason was?
 4          MS. HARWIN:  Objection to
 5     the form.
 6      A.   Because I don't know, I am
 7  not going to speculate on -- on it.
 8      Q.   Okay.
 9          Can you just please look at
10  page nine of the exhibit called
11  P13908?  I would like you to please
12  focus your attention on the e-mail
13  at the bottom, which is February 26,
14  2019, at 9:46 p.m.  If you could
15  read that to yourself, and I will
16  ask you a question.
17      A.   (Witness complies).
18          Okay.
19      Q.   Are you making a
20  distinction here between yourself
21  and Sabrina and Jillian?
22          MS. HARWIN:  Objection to
23     the form.
24      A.   Yes.
25      Q.   And in the second
```

| Page 232 |
|---|

```
 1          G. C. ROBINSON
 2  paragraph, you say, "I have long
 3  moved on to film production,
 4  financial matters, oversight, and a
 5  host of other things."
 6          Do you see that?
 7      A.   Yes.
 8      Q.   Was that true?
 9          MS. HARWIN:  Objection to
10     the form.
11          MR. DROGIN:  You are
12     objecting to the form of the
13     question that asks your
14     client to confirm whether or
15     not something she wrote is
16     true?
17          MS. HARWIN:  I objected
18     to the form of the question.
19          MR. DROGIN:  Okay.
20      A.   That is what I wrote in the
21  e-mail.
22      Q.   That wasn't the question.
23  Is it true or not?
24          MS. HARWIN:  Objection to
25     the form.
```

| Page 233 |
|---|

```
 1          G. C. ROBINSON
 2      A.   Yes, that is what I wrote
 3  in the e-mail.
 4      Q.   Do you understand what I am
 5  asking?  I am asking you to confirm
 6  whether it was truthful or not.  If
 7  it is not, it was not.  It is not a
 8  difficult question.
 9      A.   As I said, yes, that is
10  what I wrote in the e-mail.
11      Q.   So it is true?
12          MS. HARWIN:  Objection to
13     the form.
14      A.   As I said, yes.
15      Q.   Okay.  Thank you.
16          MR. DROGIN:  I think the
17     question is asking -- I think
18     the question was, was it true
19     that, and then just go
20     through each of these things,
21     was it true that A, was it
22     true that B, was it true that
23     C.  That is the only way you
24     are going to get the answer
25     is asking directly was it
```




Page 234

```
1          G. C. ROBINSON
2    true.
3       Q.   If you could please focus
4    your attention on page seven.  It is
5    an e-mail from yourself to Bob
6    Shepherd, which is Bob.  December
7    11th, 2017 at 9:55.
8          Do you see that?
9       A.   Yes.
10      Q.   At the time that you sent
11   this, in December of 2017, was it
12   accurate that your job for Canal
13   encompassed production, including
14   budget, deals, logistics, and
15   financial perks?
16      A.   There were times that I
17   handled these items for Bob, but one
18   of the biggest issues that I faced
19   is that Bob and I would discuss this
20   job or being director of production
21   or VP of finance and what the job
22   would entail.  But it was continuous
23   where Bob would redirect me, and my
24   job to do what he directed.  And it
25   was -- the redirection was always
```

Page 235

```
1          G. C. ROBINSON
2    doing things that were personal or
3    not what the title or the job that
4    we had discussed that I had hoped to
5    do.  For example, when I was
6    director of production, he --
7       Q.   At the time that you sent
8    this, were you doing budgets deals,
9    logistics, and financial perks?
10      A.   Can I --
11          MS. HARWIN:  Objection to
12      the form.
13      Q.   That is the question.  I am
14   not asking for a lengthy narrative
15   response over the course of six
16   months or a year.
17          When you sent this e-mail
18   to Mr. De Niro, was that correct,
19   were you doing budgets deals,
20   logistics, and financial perks?
21      A.   There were items that he
22   had directed me to do that
23   encompassed those things.  But it
24   wasn't something that I did on a
25   regular basis.  He directed me to do
```

Page 236

```
1          G. C. ROBINSON
2    them, and then he would direct me to
3    do something else, as I was trying
4    to discuss in my last response.
5       Q.   So at the time that you
6    sent this e-mail, were you also
7    managing the office, including
8    oversight, finance, salary/bonuses,
9    HR, and operational issues?
10          MS. HARWIN:  Can you
11      clarify where you are in the
12      exhibit?
13          MR. BENNETT:  At the
14      bottom of page one, right
15      below the bolded language of
16      the e-mail.  It is page seven
17      of the exhibit.
18          MS. HARWIN:  Oh.  Page
19      seven, not page one.  Okay.
20      Q.   Do you understand the
21   question, Ms. Robinson?
22      A.   Yes.  There were items that
23   Bob directed me to do that included
24   those things.  But as I said, again,
25   they were things that he directed me
```

Page 237

```
1          G. C. ROBINSON
2    to do.  Whether it was helping to
3    Toukie Smith with her financial
4    items after her ███████████,
5    or, you know, handling -- talking to
6    Bob and having him approve to put
7    petty cash Excel sheet in the office
8    to sort of track things.  These were
9    not things that were consistently
10   done or regularly done, but they are
11   things that I did.  As I was trying
12   to explain prior to, there were a
13   lot conversations with Bob where I
14   would have to try to realign my job
15   with what he and I had discussed on
16   the job that I should have been
17   doing, and that I wanted to do where
18   he was redirected me to do things
19   that were in a personal nature and
20   had nothing do with these things.
21   There were many conversations over
22   my employment that was -- was
23   exactly -- was exactly that.
24      Q.   Can you please go down to
25   page 13?
```

60  (Pages 234 to 237)



| Page 238 | Page 239 |
|---|---|
| G. C. ROBINSON<br>1<br>2    A.   Okay.<br>3    Q.   Sorry, just give me one<br>4  moment, please.  I am going to go<br>5  backwards a little bit.  If you<br>6  don't mind, please go to page four.<br>7    A.   (Witness complies).<br>8    Okay.<br>9    Q.   If you look at the second<br>10  to last paragraph, this is an e-mail<br>11  July 18, 2017, at 8:59 p.m.,<br>12  correct?<br>13    A.   Yes.<br>14    Q.   You see the second to last<br>15  paragraph, it starts with, "You<br>16  know?"<br>17    A.   Yes, I see that.<br>18    Q.   Okay.<br>19    As of July 2017, were you<br>20  considering or looking for<br>21  alternative employment outside of<br>22  Canal?<br>23    MS. HARWIN:  Objection to<br>24  the form.<br>25    A.   Prior to -- sorry.  Can you | G. C. ROBINSON<br>1  repeat your question?<br>2<br>3    Q.   In July of 2017, were you<br>4  looking to leave Canal, were you<br>5  looking for alternative employment<br>6  at that time?<br>7    MS. HARWIN:  Objection to<br>8  the form.<br>9    A.   No.  This was a<br>10  conversation with Bob where I<br>11  discussed wanting to eventually<br>12  transition out of Canal Productions.<br>13    Q.   And as of July 2017, you<br>14  were telling him that you loved your<br>15  job and you adored him, correct?<br>16    MS. HARWIN:  Objection to<br>17  the form.<br>18    A.   I understand what that<br>19  reads, but I think that in working<br>20  for Bob one of the things that when<br>21  you -- when he agrees to something,<br>22  or you approach something like this,<br>23  you are always sensitive to how he<br>24  would react.  As I have learned in<br>25  the past, how retaliatory he could |

| Page 240 | Page 241 |
|---|---|
| G. C. ROBINSON<br>1<br>2  be, if you don't approach it in a<br>3  way where he has adoration in -- you<br>4  know, being grateful or not<br>5  disrespecting him.  So there are<br>6  lines of that in -- in this -- in<br>7  this e-mail.<br>8    Q.   Okay.  Great.<br>9    Please flip to page 13.<br>10  Tell me if this is incorrect, that<br>11  you provided a draft recommendation<br>12  letter to Mr. De Niro, to consider<br>13  on June 4, 2019?<br>14    A.   I provided a recommendation<br>15  -- a draft recommendation letter at<br>16  Tom Harvey's request for Bob.<br>17    Q.   Did Tom Harvey tell you to<br>18  lie?<br>19    MS. HARWIN:  Objection to<br>20  the form.<br>21    A.   No.<br>22    Q.   Okay.<br>23    Can you read -- could you<br>24  go to page 14 and page 15, please?<br>25    A.   Okay. | G. C. ROBINSON<br>1<br>2    Q.   I am going to represent to<br>3  you that what appears on pages 14<br>4  and 15 were the attachments to the<br>5  e-mails that we just looked at.  At<br>6  the time that you wrote this letter<br>7  and presented it to Mr. De Niro, did<br>8  it contain truthful information?<br>9    MS. HARWIN:  Objection to<br>10  the form.<br>11    A.   Yes.<br>12    Q.   If you go down to page 18<br>13  and 19, please.<br>14    A.   18 and 19?<br>15    Q.   Yes.<br>16    A.   (Witness complies).<br>17    Yes.<br>18    Q.   Is this a draft of the<br>19  statement that we just looked at, or<br>20  is it something different?<br>21    A.   I don't know.<br>22    Q.   Did you draft this<br>23  statement?<br>24    A.   I wrote this statement,<br>25  yes. |

61 (Pages 238 to 241)





MAGNA ▶
LEGAL SERVICES

Page 242

```
 1              G. C. ROBINSON
 2     Q.   Is it truthful?
 3     A.   Yes.
 4          MS. HARWIN:  Objection to
 5     the form.
 6     Q.   When it comes to the
 7     personal work that you have
 8     explained to us at various points
 9     throughout today that you performed
10     for ████, for Mr. De Niro, for
11     Tiffany, is it your testimony here
12     today that you performed more of
13     that personal work on a yearly basis
14     than managing Canal's office?
15          MS. HARWIN:  Objection to
16     the form.
17     A.   I would say from 2015 on I
18     handled more personal projects and
19     items for Bob than I did managing
20     the office.
21     Q.   Alright.
22          MR. BENNETT:  It is 4:12.
23     I would like to take a break
24     until 4:25.  4:25.  Thank
25     you.
```

Page 243

```
 1              G. C. ROBINSON
 2          (Whereupon, a recess was
 3     taken at this time.)
 4     Q.   Ms. Robinson, Dan Harvey
 5     was hired by Canal in 1991, is that
 6     correct?
 7          MS. HARWIN:  Objection to
 8     the form.
 9     A.   I do not know when Dan
10     Harvey was hired by Canal
11     Productions.
12     Q.   Mr. Harvey was credited in
13     film productions as Mr. De Niro's
14     trainer, yes or no?
15          MS. HARWIN:  Objection to
16     the form.
17     A.   I am not aware of him being
18     credited as Mr. De Niro's trainer on
19     any films.
20     Q.   Mr. De Niro and Mr. Harvey
21     worked together on more than one
22     hundred films, yes or no?
23          MS. HARWIN:  Objection to
24     the form.
25     A.   I am not aware of how many
```

Page 244

```
 1              G. C. ROBINSON
 2     films Dan worked on.
 3     Q.   Under any perk budget that
 4     Mr. De Niro received during a
 5     particular film, there were amounts
 6     allocated for both personal
 7     assistant and personal trainer,
 8     correct?
 9          MS. HARWIN:  Objection to
10     the form.
11     A.   I don't think that is
12     correct.
13     Q.   Can you recall a specific
14     film where that was not correct?
15          MS. HARWIN:  Objection to
16     the form.
17     A.   I believe it would be a
18     production assistant.  And I don't
19     know what Dan was filed as.  I don't
20     recall ever titling him in any perk
21     fund budget.
22     Q.   Did you ever serve as a
23     production assistant on set for Mr.
24     De Niro?
25          MS. HARWIN:  Objection to
```

Page 245

```
 1              G. C. ROBINSON
 2     the form.
 3     A.   Not formally, no.
 4     Q.   You testified earlier, and
 5     a few times over the course of
 6     today, that you and everyone else
 7     who work for Canal were essentially
 8     interchangable in that employees
 9     just carried out Mr. De Niro's wish,
10     is that correct?
11          MS. HARWIN:  Objection to
12     the form.
13     A.   I don't think I would
14     characterize it that way.
15     Q.   Okay.
16          Relative to -- let's just
17     focus on the end part of your
18     employment with Canal.  Focusing on
19     Sabrina, Jillian, and Mr. Kaplan,
20     why was it that your salary was so
21     significantly above all three of
22     them?
23          MS. HARWIN:  Objection to
24     the form.
25     A.   I think that there were
```




| Page 246 |
|---|

```
 1        G. C. ROBINSON
 2   several reasons, including the --
 3   the job that Bob and I had discussed
 4   that -- let me start over.  What I
 5   am trying to say is that in part
 6   because of the job that Bob and I
 7   had discussed and agreed on that I
 8   was -- was not able to completely do
 9   because Bob was redirecting me to
10   other -- other personal items, such
11   as, the ▮▮▮▮ housing and redirecting
12   me to that.  In addition I had also
13   discussed with Bob in 2008 and 2009,
14   parity and having parity when it
15   came to Dan Harvey.  Those are some
16   of the reasons that come to mind
17   right now.
18        MR. BENNETT:  Sorry.  I
19     had technical issues.
20        MR. DROGIN:  I suggest
21     you move to strike the answer
22     as nonresponsive and ask the
23     question again.
24        MR. BENNETT:  I will move
25     to strike the answer if it is
```

| Page 247 |
|---|

```
 1        G. C. ROBINSON
 2   not responsive to the
 3   question that was posed.
 4    Q.   Ms. Robinson, at the time
 5   that you resigned, on April 6, 2019,
 6   you were earning $300,000 a year
 7   from Canal, correct?
 8        MS. HARWIN:  Objection to
 9     the form.
10    A.   I had an annual salary of
11   300,000.
12    Q.   And Michael Kaplan, as far
13   as you can recall, was making 80,000
14   per year at that time, correct?
15        MS. HARWIN:  Objection to
16     the form.
17    A.   I can't recall the exact
18   amount of the salary or compensation
19   he was given at that time.
20    Q.   I am going to represent to
21   you that your salary was more than
22   three times Mr. Kaplan.  And Mr.
23   Kaplan was above Jillian and
24   Sabrina's.
25        The question is this, you
```

| Page 248 |
|---|

```
 1        G. C. ROBINSON
 2   were earning that compensation
 3   relative to the remaining personnel
 4   within Canal, Jillian, Sabrina, and
 5   Kaplan, because you were managing
 6   all of them, correct?
 7    A.   No.
 8        MS. HARWIN:  Objection to
 9     the form.
10    Q.   You were making
11   recommendations to Mr. De Niro about
12   salary increases, office closures,
13   holiday schedules, and related
14   issues, correct?
15        MS. HARWIN:  Objection to
16     the form.
17    A.   I don't think I would
18   characterize it that way, and I
19   think some of the items that you
20   said are incorrect.
21    Q.   Okay.
22        And you decided to
23   implement particular policies within
24   Canal, correct?
25        MS. HARWIN:  Objection to
```

| Page 249 |
|---|

```
 1        G. C. ROBINSON
 2   the form.
 3    A.   At times when I was
 4   directed to, I implemented what I --
 5   policies that I was directed to
 6   implement.
 7    Q.   You recommended to Mr. De
 8   Niro that Canal adopt a policy,
 9   whereby Canal personnel would be
10   reimbursed on a monthly basis for
11   gym memberships, correct?
12    A.   I wouldn't necessarily
13   characterize it that way.
14    Q.   Okay.
15        Did you identify or
16   recommend to Mr. De Niro that Canal
17   consider adopting some of the
18   services that Vantage Point Partners
19   were offering?
20        MS. HARWIN:  Objection to
21     the form.
22    A.   I had discussed Vantage
23   Point benefits with Bob, and he had
24   directed me to look into it, and we
25   discussed it.
```



| Page 250 |
| --- |

```
 1            G. C. ROBINSON
 2      Q.  And you made certain
 3  recommendations to Mr. De Niro,
 4  correct?
 5           MS. HARWIN:  Objection to
 6    the form.
 7      A.  Can you clarify what
 8  recommendations or give me examples?
 9      Q.  I will withdraw the
10  question.
11           Jillian and Sabrina would
12  send you completed time sheets,
13  correct?
14           MS. HARWIN:  Objection to
15    the form.
16      A.  Yes, I was asked to collect
17  their time sheets, and send the
18  overtime to Burton.
19      Q.  And you would correct them
20  where you noticed mistakes, correct?
21      A.  If I noticed a mistake, I
22  would ask them to correct them so
23  that they were correct.
24      Q.  And you and Tasch were the
25  only people who knew everyone's
```

| Page 251 |
| --- |

```
 1            G. C. ROBINSON
 2  salary within Canal, correct?
 3           MS. HARWIN:  Objection to
 4    the form.
 5      A.  No, that would not be
 6  correct.
 7      Q.  Who else was privy to Canal
 8  personnel salaries?
 9           MS. HARWIN:  Objection to
10    the form.
11      A.  They would include Michael
12  Kaplan, Robin Chambers, Mark
13  Bosswick.
14      Q.  Canal personnel I am asking
15  about, not external people.
16      A.  Michael Tasch is not -- he
17  is employed by -- sorry.  Michael
18  Kaplan, Robin Chambers.  That is
19  what comes to mind right now.
20      Q.  And you worked regularly
21  with Peter Grant, correct?
22           MS. HARWIN:  Objection to
23    the form.
24      A.  It is -- it varied over the
25  years, depending on Bob's film work
```

| Page 252 |
| --- |

```
 1            G. C. ROBINSON
 2  and projects.
 3      Q.  Was there ever a time, a
 4  year, where you did not work with
 5  Peter Grant?
 6           MS. HARWIN:  Objection to
 7    the form.
 8      A.  I believe in some way I
 9  either worked or communicated with
10  him each year.
11      Q.  Are you done?
12      A.  Again, it varied depending
13  on what Bob's production was.
14      Q.  And you also worked on an
15  annual basis with Burton, which
16  served as the external financial arm
17  of Canal, correct?
18           MS. HARWIN:  Objection to
19    the form.
20      A.  Can you repeat that
21  question?  Sorry.
22           MR. BENNETT:  Can you
23    read it back?
24           (Whereupon, the requested
25    portion was read back by the
```

| Page 253 |
| --- |

```
 1            G. C. ROBINSON
 2  reporter:
 3      Q:  And you also worked
 4  on an annual basis with
 5  Burton, which served as the
 6  external financial arm of
 7  Canal, correct?)
 8      A.  I don't know if I would
 9  characterize it as an external arm
10  for financial for Canal, but I did
11  communicate with people at Burton on
12  a yearly basis.
13      Q.  You communicated with Tasch
14  and Bosswick on a regular basis,
15  didn't you?
16           MS. HARWIN:  Objection to
17    the form.
18      A.  I communicated more often
19  with Michael Tasch than Mark
20  Bosswick.
21      Q.  And when it came to films
22  where Mr. De Niro would be required
23  to travel outside of New York, you
24  would help to facilitate Bob's
25  typical crew members so they would
```

64  (Pages 250 to 253)





| Page 254 | Page 255 |
|---|---|

**Page 254**

```
1            G. C. ROBINSON
2   be on the film production, correct?
3        MS. HARWIN:  Objection to
4    the form.
5    A.   I would liaise with the
6   production about Bob's crew, and
7   they would be hired by production.
8    Q.   And you would communicate
9   with the crew directly regarding
10  various issues that would come up on
11  one or more of the film productions,
12  correct?
13       MS. HARWIN:  Objection to
14   the form.
15   A.   At times, yes.
16   Q.   Ernest, Voud (ph), other
17  folks that were included within the
18  crew, correct?
19       MS. HARWIN:  Objection to
20   the form.
21   A.   I communicated with them at
22  Bob's direction.
23   Q.   So yes, you communicated
24  with them?
25   A.   Yes, I communicated with
```

**Page 255**

```
1            G. C. ROBINSON
2   them at Bob's direction.
3    Q.   And would you travel to the
4   various film locations before
5   production -- before filming was
6   scheduled to commence, to scout it
7   out for Mr. De Niro?
8        MS. HARWIN:  Objection to
9    the form.
10   A.   At times I would travel to
11  locations outside of New York to
12  scout hotels and Bob's needs on
13  productions.
14   Q.   And you would interview
15  prospective personal assistants,
16  correct?
17       MS. HARWIN:  Objection to
18   the form.
19   A.   At times I would interview
20  or more meet possible production
21  assistants for Bob.
22   Q.   Thank you.
23       Can we just go back to some
24   --
25       MR. DROGIN:  Do you mind
```

| Page 256 | Page 257 |
|---|---|

**Page 256**

```
1            G. C. ROBINSON
2   if I ask some questions?
3        MS. HARWIN:  We can't
4    have two different counsel
5    switching on and off asking
6    questions.
7        MR. DROGIN:  Why not?
8        MS. HARWIN:  It is -- it
9    is -- that is not how
10   depositions go.  We don't
11   switch on and off when
12   counsel likes.  Mr. Bennett
13   is in the middle of asking
14   questions.
15       MR. DROGIN:  There is no
16   rule against it.  We didn't
17   stipulate that only one
18   attorney would ask questions.
19   I just want to go back to
20   something.
21   EXAMINATION
22   BY MR. DROGIN:
23   Q.   Are you aware of any time
24  that Dan Harvey was on the perk
25  budget as Bob's personal trainer?
```

**Page 257**

```
1            G. C. ROBINSON
2        MS. HARWIN:  Objection to
3    the form.
4    A.   I don't recall a time where
5   he was listed as Bob's personal
6   trainer on --
7    Q.   So -- so let's assume that
8   you don't recall.  But if -- on a
9   production, if someone is listed as
10  a personal trainer, isn't the
11  company reimbursed for that portion
12  of the compensation paid to the
13  personal trainer?
14       MS. HARWIN:  Objection to
15   the form.
16   Q.   Can you answer that?  Do
17  you understand the question?
18   A.   Can you repeat if, please?
19   Q.   Sure.  I will give you an
20  example.
21       Let's say hypothetically
22  that Dan Harvey was listed in the
23  perk budget as Bob's personal
24  trainer for a movie, and there was
25  $50,000 allocated to that.
```





| Page 258 | Page 259 |
|---|---|

**Page 258**

G. C. ROBINSON
1
2 Wouldn't that mean that Bob
3 would be compensated $50,000 under
4 the perk budget for the personal
5 trainer?
6 MS. HARWIN: Objection to
7 the form.
8 A. I can't really answer that.
9 Q. Okay. Okay. Good.
10 Now you were the vice
11 president of production and finance,
12 correct?
13 A. That was the title that I
14 was given at the end of 2017.
15 Q. You asked for that title,
16 didn't you, you came up with that
17 title?
18 MS. HARWIN: Objection to
19 the form.
20 Q. Did you come up with that
21 title?
22 A. Bob and I discussed several
23 different titles leading up to the
24 decision that that would be my
25 title.

**Page 259**

G. C. ROBINSON
1
2 Q. It was part of the
3 discussion that you had with him
4 that was your new title, correct?
5 A. Yes.
6 Q. Were there any changes to
7 your job duties and responsibilities
8 as a consequence of that title
9 change, any?
10 MS. HARWIN: Objection to
11 the form.
12 MR. DROGIN: You can
13 object. You have an
14 objection to every word that
15 comes out my mouth you can
16 object to.
17 Q. Did your job change at all
18 other than title?
19 MS. HARWIN: Objection to
20 the form.
21 MR. DROGIN: We just went
22 through this.
23 A. My job in the end did not
24 really change.
25 Q. Thank you. Who was -- was

**Page 260**

G. C. ROBINSON
1
2 there a president of production and
3 finance?
4 A. Could I finish my --
5 Q. No. No.
6 Was there -- I am asking
7 the questions. I don't need
8 rambling answers. I don't need
9 rambling answers. I want to get
10 done with this in less than three
11 days.
12 Was there a president of
13 production and finance, yes or no?
14 A. There was no one with the
15 title of president of production and
16 finance.
17 Q. Other than Mr. De Niro, in
18 the organizational chart, was there
19 anyone between you and Mr. De Niro?
20 MS. HARWIN: Objection to
21 the form.
22 MR. DROGIN: You don't
23 have to keep objecting. The
24 world knows every time I ask
25 a question, you have an

**Page 261**

G. C. ROBINSON
1
2 objection to the form of it.
3 You are impeding my ability
4 to ask questions. You have a
5 standing objection. There is
6 no reason that you should be
7 interrupting my questioning
8 of this witness, and I am
9 going to ask you to stop.
10 Q. Can you please answer the
11 question? Was there anyone in
12 between you and Mr. De Niro?
13 A. Yes.
14 Q. Who?
15 A. There were people that were
16 senior to me including --
17 Q. Who?
18 MS. HARWIN: Counsel, she
19 is entitled to finish her
20 answer. The yelling at the
21 witness is not appropriate.
22 MR. DROGIN: Okay.
23 MS. HARWIN: She is
24 entitled to finish her
25 answers.



| Page 262 | Page 263 |
|---|---|

**Page 262**

G. C. ROBINSON

1
2     MR. DROGIN: She is
3  entitled to finish her answer
4  to the question, not to the
5  narrative that she has been
6  programed to resort to. We
7  all understand it. You have
8  made a wonderful record here
9  of showing how you can take,
10  what should be a short
11  deposition, and turn it into
12  a long deposition. But now
13  we need to get this
14  consolidated so we can show
15  the court how we had to rush
16  through to the end after what
17  has been going on all day.
18     Q.   Who was above you below Mr.
19  De Niro?
20     A.   They included Robin
21  Chambers, Michael Kaplan, on certain
22  subjects or jobs at Canal
23  Productions, and it also included
24  people who made decisions on
25  management for Canal Productions

**Page 263**

G. C. ROBINSON

1
2  including Tom Harvey, Michael Tasch,
3  Mark Bosswick. There were several
4  people that were senior to me that
5  made management decisions for Canal.
6     Q.   And how many of the people
7  were Canal employees that were
8  senior to you?
9     A.   I would say one, but Bob
10  relied on these other people outside
11  of Canal for management in Canal.
12     Q.   I am not asking about
13  non-Canal employees, because
14  non-Canal employees are not suing
15  him here, or suing Canal here.
16        Who -- what Canal employee
17  or employees were above you and
18  below Mr. De Niro, if any?
19     A.   I think at times Robin
20  Chambers and Michael Kaplan, like I
21  said. There were --
22     Q.   Okay.
23        So -- and what was Robin
24  Chambers' compensation, do you know?
25     A.   I am not aware of what her

**Page 264**

G. C. ROBINSON

1
2  compensation was.
3     Q.   So Robin Chambers was above
4  you in the organizational chart
5  here?
6     A.   She was senior to me. It
7  wasn't --
8     Q.   Senior, meaning, the years
9  she had worked, or senior in terms
10  of duties and responsibilities, what
11  does senior mean?
12        MS. HARWIN: Objection to
13  the form.
14     A.   Senior means that people
15  that you would go to where Bob would
16  direct you to -- to help or advise
17  you on certain issues, which is why
18  I also said Tom Harvey and Michael
19  Tasch, which Bob would direct me to
20  those people when it came to
21  management or decisions on Canal
22  when he would not handle them.
23     Q.   Weren't you a direct report
24  to Robert De Niro?
25     A.   Yes.

**Page 265**

G. C. ROBINSON

1
2     Q.   You reported to him and he
3  directed you, isn't that right?
4     A.   He directed me in my job
5  duty.
6     Q.   He told you what to do,
7  isn't that right?
8     A.   Yes.
9     Q.   He could change your title
10  if he wanted, correct?
11     A.   Yes.
12     Q.   He could change your
13  compensation if he wanted, correct?
14     A.   Yes.
15     Q.   He could have fired you if
16  he wanted, correct?
17     A.   Yes.
18     Q.   He could have changed your
19  duties and responsibilities if he
20  wanted to, right?
21     A.   Technically, I guess, yes.
22     Q.   And in that regard, he
23  could have changed the duties and
24  responsibilities for other people
25  who worked for Canal, couldn't he?

67 (Pages 262 to 265)





| Page 266 |
|---|

```
1           G. C. ROBINSON
2    A.   Yes.
3    Q.   He was the boss, wasn't he?
4    A.   Yes.
5    Q.   Alright.  Now we are
6  getting somewhere.
7        Now when you became the
8  vice president of production and
9  finance, did you feel that some
10 employees were misusing money in
11 Canal -- in the Canal organization?
12   A.   No, not that I recall.
13   Q.   Great.
14       Would you agree that during
15 your employment you kept copious and
16 voluminous records?
17   A.   Yes, I would agree to that
18 statement.
19   Q.   Okay.
20       Do you know the phrase
21 "mind the store," have you ever
22 heard that phrase?
23   A.   I can't think if I ever
24 heard that phrase before.
25   Q.   Do you know what it means?
```

| Page 267 |
|---|

```
1           G. C. ROBINSON
2    A.   If I haven't heard that
3  phrase before, no.
4    Q.   Did you view your position
5  as one of trust, that Mr. De Niro
6  had to have trust in you?
7    A.   I think like all employees,
8  he had to have trust.
9    Q.   And did you trust him?
10   A.   On certain things, yes.  On
11 others, no.  He was still my
12 employer.
13   Q.   So you received a letter on
14 July 11, 2011, from Tom Harvey,
15 right?  Sorry.  July 11, 2019,
16 right?
17   A.   Yes.
18   Q.   And that was after you
19 resigned, correct?
20   A.   Yes.
21   Q.   And you had been trying to
22 reach Bob to sit down and talk to
23 him about what had happened, is that
24 fair?
25   A.   Yes, I reached out to him
```

| Page 268 |
|---|

```
1           G. C. ROBINSON
2  on several occasions.
3    Q.   And he ignored you, right?
4    A.   He did not respond.
5    Q.   So he ignored you, right?
6    A.   Again, I go with my answer,
7  he did not respond.
8    Q.   So when someone doesn't
9  respond, that is different than
10 ignoring in your world, is that what
11 you are telling me?  Those two
12 phrases have different meanings;
13 ignore and failed to respond have
14 different meanings to you?
15   A.   I am not going to speculate
16 on why he didn't respond.  I am just
17 going to say that he didn't respond.
18   Q.   Okay.  He didn't respond.
19       Now in Tom Harvey's letter
20 to you, he wrote, "Please note that
21 Bob does not wish to communicate
22 with you."
23       Do you recall reading those
24 words?
25   A.   Off the top of my head, I
```

| Page 269 |
|---|

```
1           G. C. ROBINSON
2  can't recall what the specific lines
3  were.
4    Q.   Okay.  Fair enough.  Let's
5  see -- go to that letter.  I will
6  help you out here.
7        Can you see that, Tom's
8  letter?
9    A.   That is good.
10   Q.   See it says, "Please note
11 that Bob does not wish to
12 communicate with you."  Do you see
13 that?
14   A.   Yes.
15       MS. HARWIN:  Are you
16  going to mark this exhibit
17  that is being shown and
18  identify it for the record?
19       MR. DROGIN:  Yeah.  We
20  will mark it.  We will mark
21  it later.
22       Is there a dispute that
23  -- this is the letter that
24  you filed, Ms. Harwin.  Is
25  there a dispute about this
```




| Page 270 | Page 271 |
|---|---|

Page 270

```
 1        G. C. ROBINSON
 2   letter?
 3        MS. HARWIN:  We just need
 4   it for the record, the
 5   exhibit number.
 6        MR. DROGIN:  It is the
 7   Harvey letter, from July 11,
 8   2019.  Will you stipulate to
 9   that?
10        MS. HARWIN:  This is
11   Defendant's Exhibit D, is
12   that correct, sir?
13        MR. DROGIN:  Sure.
14   Whatever -- yeah.  Is it
15   correct is it D, E?
16        MR. BENNETT:  I think D
17   is right.
18        MS. HARWIN:  Mr. Drogin,
19   please remember to send it to
20   the court reporter so that
21   she has a copy that can be
22   appended to the deposition.
23        MR. DROGIN:  Very good.
24   Thank you.  We will do that.
25        (Whereupon, ROBINSON
```

Page 271

```
 1        G. C. ROBINSON
 2   Exhibit D, a Tom Harvey
 3   letter, from July 11, 2019,
 4   was marked for
 5   identification, as of this
 6   date.)
 7   Q.   Now at this point in time
 8   when you got this letter, were you
 9   mad at Bob?
10   A.   I was shocked.
11   Q.   Were you -- I understand
12   that.
13        Were you mad?
14   A.   I don't know if I would
15   characterize it as mad.
16   Q.   Okay.
17        As we go on in this letter,
18   there is a couple of things here and
19   I will go through a bunch of them.
20   Can you see -- still see the letter?
21   A.   Yes.
22        (Whereupon, a discussion
23   was held off the record.)
24   Q.   Now you had not spoken with
25   Bob since you resigned, is that
```

Page 272

```
 1        G. C. ROBINSON
 2   correct?
 3   A.   I believe, yes, that is
 4   correct.
 5   Q.   And at the time that you
 6   received this letter, you had
 7   already conferred with Mr. Pagano,
 8   is that right?
 9        MS. HARWIN:  Objection.
10   It is privileged.
11        MR. DROGIN:  The fact
12   that she consulted with an
13   attorney when she testified
14   that she conferred with him
15   in March?  Do you want to
16   rethink that?
17        MS. HARWIN:  The
18   substance of her
19   communications with counsel
20   are privileged.  In so far
21   as, your question has already
22   been answered on the record,
23   there is no need to
24   further --
25        MR. DROGIN:  I haven't
```

Page 273

```
 1        G. C. ROBINSON
 2   asked her what was
 3   communicated.  My question
 4   wasn't answered on the
 5   record, and even if it was, I
 6   am allowed to ask it a second
 7   time.
 8   Q.   At the time that you
 9   received this letter, hadn't you
10   already conferred with Attorney
11   Pagano?
12   A.   I had already connected
13   with Jeff Pagano.
14   Q.   At the time that you
15   received this letter, you were aware
16   from Robin Chambers that Tiffany
17   Chen was conducting an investigation
18   into the use of Canal's expense
19   report, isn't that right?
20   A.   I don't believe that is
21   correct.
22   Q.   Well, at some point Robin
23   told you, in substance, hey Tiffany
24   is looking around at expenses.
25        Do you recall that?
```





MAGNA
LEGAL SERVICES

| Page 274 |
| --- |

1          G. C. ROBINSON
2      A.   I can't recall from a
3  specific conversation that we had
4  unless --
5      Q.   So in general, did you ever
6  become aware that Tiffany was asking
7  questions about your use of Canal
8  funds?
9      A.   My specific use?
10     Q.   Yes.
11     A.   Not at that time, no.
12     Q.   Okay.
13          Were you concerned when you
14 received this letter that Canal
15 might be conjuring up some sort of
16 false claims against you?
17     A.   Yes, because it is filled
18 with nothing but false allegations,
19 and it is also --
20     Q.   Hold on.  Can you -- so
21 look at the letter, is there
22 anything --
23     A.   Can I finish my responses?
24     Q.   No.  Your attorney can ask
25 questions.  You said it was filled

| Page 275 |
| --- |

1          G. C. ROBINSON
2  with falsehoods.  Is there anything
3  in Tom Harvey's letter that is
4  correct, or is the entire thing
5  false?
6      A.   The contents of it is
7  designed to intimidate me, to -- has
8  false allegations.  It is -- it is
9  something that -- to threaten me, to
10 discourage me from moving forward
11 with my claims, that in my -- in the
12 e-mail that came with this, it was
13 -- that was sent, it states that I
14 will involve an attorney.  And it is
15 also somebody who wrote this, Tom
16 Harvey, who was aware of my claims
17 and the harassment.
18     Q.   Okay.  And just getting
19 back to what I was asking.
20          Is there anything in this
21 letter that is accurate or is it all
22 false?
23     A.   Are you asking me to go
24 through every single line of it?
25     Q.   You have said that it is

| Page 276 |
| --- |

1          G. C. ROBINSON
2  filled with falsehoods.  I am just
3  wondering if anything in it is true,
4  or is that just an exaggeration on
5  your part?
6      A.   The claims that Tom Harvey
7  makes in these letters are false.
8      Q.   Okay.
9           And just so we are clear,
10 at the time that you received this,
11 you had counsel, correct?
12     A.   As I stated before, yes.
13     Q.   So when you talk about
14 being intimidated, you already had
15 counsel on your side, correct?
16     A.   I don't think having
17 counsel negates the fact that this
18 was meant to threaten me, to create
19 these false allegations so that I
20 wouldn't move forward with my own
21 claims to -- yeah.
22     Q.   Okay.
23          Now you gave Robin once an
24 example about how somebody could
25 turn something around against you if

| Page 277 |
| --- |

1          G. C. ROBINSON
2  they wanted to.  I am going to ask
3  you if you recall giving her this
4  example.  You said that -- let me
5  break it down.
6           Wasn't there a time when,
7  in connection with , you had
8  Dyson vacuum cleaners sent to your
9  apartment and you had to pay your
10 doorman to accept them?
11     A.   Yes, Bob directed me to
12 have things sent to my apartment
13 because Tiffany and Bob did not want
14 having things delivered to their
15 home since it was a townhouse and
16 there was no doorman.  There were
17 multiple things that were shipped to
18 either the office and sent to my
19 house or to ▮▮▮, and also directly
20 to my house, and --
21          (Simultaneously speaking)
22     Q.   I want to make sure I
23 understand something.
24          Did you take any
25 independent action, whatsoever, in



| Page 278 |
| --- |

G. C. ROBINSON

1
2    your position as vice president of
3    production and finance?
4        A.   Can you clarify in regards
5    to -- are you --
6        Q.   Well --
7        A.   What specifically?
8        Q.   Sure.  I will clarify.
9            You keep saying that Bob
10   directed you.  And it is a theme
11   that you keep coming back to.  Bob
12   directed you.  Bob directed all
13   these people.
14           Did you have any
15   independent autonomy to do anything,
16   or were you just there to jump when
17   he said jump and that was it?
18       A.   As I said before, and I
19   will give the example that Bob would
20   continue to redirect my job to --
21           (Simultaneous speaking)
22       Q.   I know.  I would like to
23   redirect you back to my question.
24   You keep repeating this theme again
25   and we will explain this to the

| Page 279 |
| --- |

G. C. ROBINSON

1
2    court.  I am asking a different
3    question.  You keep saying he is
4    directing and redirecting.
5            Do you have any independent
6    authority, do you have any autonomy,
7    do you do anything other than what
8    he tells you to do?
9            MS. HARWIN:  She should
10       be allowed to answer the
11       question.
12           MR. DROGIN:  I just asked
13       the question.
14       A.   It was very difficult to
15   have autonomy based on environment
16   and -- the environment that Bob had
17   created.  I spoke to him at length
18   about, you know, every topic and
19   everything that was going on with
20   Canal.  One of my complaints was
21   that --
22       Q.   Stop.  Please.  I haven't
23   ask you about your complaints.  This
24   is what you are doing.  I don't want
25   to hear about your complaints.  I

| Page 280 |
| --- |

G. C. ROBINSON

1
2    just want to make a record that
3    every single time somebody asks you
4    a question, you don't answer it so
5    the judge can see exactly what we
6    have endured today that you will not
7    answer questions directly.  You are
8    just returning to your narrative.
9    Which is fine.  Just don't expect
10   that we are going to get done with
11   this deposition any time soon.
12   Please don't tell me how he
13   redirected you.
14           I am asking about in your
15   $300,000 a year job as vice
16   president of finance for Canal
17   Productions, whether you had any
18   autonomy or you were just a puppet
19   for Robert De Niro?
20       A.   It very little autonomy
21   based on the fact that I wasn't
22   doing the job that he and I
23   discussed.
24       Q.   Thank you.  Okay.
25           And he was micromanaging

| Page 281 |
| --- |

G. C. ROBINSON

1
2    you, is that fair?  Is that fair, he
3    was micromanaging you?
4        A.   I would say at times, yes.
5        Q.   As an example, he is Robert
6    De Niro, he is just gotten back from
7    California, he is made this
8    announcement that he is getting a
9    divorce, he is dealing with Tiffany,
10   he is dealing with ███, and not
11   withstanding that and his career, he
12   needs to take the time to tell you
13   how to coordinate to get vacuum
14   cleaners delivered, is that your
15   testimony?
16       A.   Yes, because the issue was
17   that they didn't want them delivered
18   to the townhouse because somebody
19   wasn't home all the time.  Bob was
20   aware that I had a doorman, and he
21   had them sent directly, and his
22   driver would call, and I would pick
23   them up.  That is an example.
24       Q.   Okay.
25           So he is down at the vacuum

71  (Pages 278 to 281)



| Page 282 |
|---|

G. C. ROBINSON

1
2  cleaner level with you.
3        Now didn't you tell Robin
4  that if one of the Dysons hadn't
5  been delivered, someone could have
6  accused you of stealing it?
7    A.  I am not aware of that.  I
8  can't recall off the top of my head.
9    Q.  But when we are talking
10 about conjuring up claims, and you
11 said there was a concern that you
12 had, that they were going to conjure
13 up claims against you, is that the
14 type of thing that you meant?
15   A.  I am not aware or I can't
16 recall that specific conversation so
17 unless you can, you know -- I can
18 see it within the context or that
19 there was a conversation there, I
20 can't really quite --
21   Q.  That is okay.  I assure you
22 there is a conversation there.  I
23 wouldn't be bringing these things up
24 if there wasn't a conversation
25 there.  You should assume that

| Page 283 |
|---|

G. C. ROBINSON

1
2  pretty much every question that I
3  ask you is based on your own words.
4  That is what we are going to use
5  against you here.  Your own words.
6        Now Tom's letter identified
7  a number of items that he believed
8  you had improperly charged to Canal
9  as personal expenses.
10       Is that fair that that is
11 what it says?  I know you don't
12 agree with it.
13   A.  Those are claims that he
14 made, yes.
15   Q.  You did have access to
16 Canal's American Express card,
17 didn't you?
18   A.  Yes.  As did other
19 employees.
20   Q.  Yes.  But for the moment I
21 am just going to confine myself to
22 you.  Okay?  Okay?
23   A.  Okay.
24   Q.  Did you have access to any
25 other corporate credit cards or

| Page 284 |
|---|

G. C. ROBINSON

1
2  debit cards?
3    A.  Yes.
4    Q.  Okay.
5        And what were they?
6    A.  I had access to Toukie
7  Smith's Canal American Express,
8  Michael Kaplan.  These were all
9  things that Michael Kaplan --
10 specifically that other employees
11 had.  And also Toukie Smith as well.
12   Q.  But are these Canal
13 American Express cards with
14 individual users, is that what you
15 are saying?
16   A.  Yes.
17   Q.  There was also a master
18 account, correct?
19   A.  Yes.
20   Q.  And you were the one that
21 had access to the master account,
22 correct?
23   A.  I don't -- I wouldn't
24 characterize it that way.
25   Q.  How would you characterize

| Page 285 |
|---|

G. C. ROBINSON

1
2  it?
3    A.  The main account holder and
4  credit card was under Robert De
5  Niro.  There was several credit
6  cards for Bob's business,
7  operational business needs, or
8  expenses, operational, personal.
9  Dan Harvey had a credit card, Canal
10 American Express's credit card, and
11 also Toukie Smith, Bob's
12 ex-girlfriend had a Canal American
13 Express.
14   Q.  Did you have any
15 responsibilities regarding the use
16 of this American Express card, like
17 paying the bills or verifying
18 charges, or anything like that?
19   A.  Both Michael Kaplan and I
20 reviewed bills when they were sent
21 to us.
22   Q.  For what purpose did you
23 review the bills?
24   A.  We reviewed the bills to --
25 to look over the charges, but we



| Page 286 |
| --- |

```
 1          G. C. ROBINSON
 2   weren't the only people who had eyes
 3   on the American Express card.
 4      Q.   Did you ever sit down with
 5   Dan Harvey to review the American
 6   Express bills?
 7      A.   No.
 8      Q.   Now, on occasion, would you
 9   ever charge personal expenses on the
10   American Express card?
11      A.   I can't recall a time where
12   I would have placed anything that
13   was personal unless it was an
14   accident.
15      Q.   And if it was an accident,
16   assuming it happened, you would
17   reimburse Canal, is that fair?
18      A.   I would, and I have
19   reimbursed Canal for an accidental
20   charge that I can recall.  And I
21   also reversed charges when I
22   realized the mistake I had made.
23   Both my American Express and Canal's
24   American Express look exactly the
25   same.
```

| Page 287 |
| --- |

```
 1          G. C. ROBINSON
 2      Q.   So sometimes mistakes would
 3   be made, and we should be able to
 4   identify what you reimbursed Canal
 5   for by looking at the records,
 6   correct?
 7      A.   At the -- at the
 8   reimbursements or the refund on it
 9   if I had made a mistake, which I can
10   recall one, I -- in addition there
11   was a check that I had sent to
12   Burton for something that I had seen
13   that I had charged accidentally to
14   the credit card.  I had sent Burton
15   a check.
16      Q.   I am not suggesting there
17   is anything wrong with that.
18   Sometimes -- I have a firm credit
19   card, and sometimes I use it and I
20   reimburse the firm.  I am not
21   suggesting that you did anything
22   wrong.  I am just saying that
23   sometimes there might be personal
24   expenses on there, and there would
25   be a reason for it, correct?
```

| Page 288 |
| --- |

```
 1          G. C. ROBINSON
 2      A.   I can't recall what
 3   personal expenses I would have put
 4   on Canal production credit card.
 5      Q.   So is it fair to assume
 6   that if there were charges put on
 7   the Canal American Express they were
 8   business expenses, correct?
 9      A.   They were business
10   expenses, or related to Canal, or
11   something that had an expense that
12   Bob had approved.
13      Q.   Okay.
14          Let me turn now to one of
15   the things that Tom talks about in
16   his letter and that is SkyMiles.
17          Am I correct that the use
18   of the American Express credit card
19   would generate credits or points
20   that could then be converted in
21   Delta SkyMiles, is that fair?
22      A.   Yes, American Express
23   credit cards.
24      Q.   And Canal had a SkyMiles
25   account, and then you had your own
```

| Page 289 |
| --- |

```
 1          G. C. ROBINSON
 2   SkyMiles account, is that right?
 3      A.   There were several Delta
 4   accounts, including one for Robert
 5   De Niro, one that was mine, and one
 6   for Dan Harvey.
 7      Q.   Okay.
 8          And one of the perks that
 9   you had during your employment was
10   if you were traveling, personally,
11   on vacation, or something like that,
12   you could use Canal's SkyMiles,
13   isn't that right?
14      A.   I wouldn't characterize it
15   that way, but one -- I wouldn't
16   characterize it that way.
17      Q.   Well, you did -- during
18   your employment, you did use Canal's
19   SkyMiles, didn't you?
20      A.   Yes, that -- and Bob
21   approved of that.
22      Q.   That was -- part of your
23   employment was that one of the perks
24   was you could travel on Canal's
25   SkyMiles, do I understand that
```



| | |
|---|---|
| Page 290 | Page 291 |

Page 290

```
 1           G. C. ROBINSON
 2   right?
 3      A.   Yes, with Bob's -- it was
 4   approved by Bob.
 5      Q.   Was that in writing
 6   anywhere?  I am not questioning that
 7   that existed.  I am asking if it was
 8   memorialized in writing anywhere
 9   because I know you made copious
10   notes and records on things.
11      A.   I can't recall any specific
12   e-mails or it being written.
13      Q.   Okay.
14           You knew about this, and
15   Bob knew about this, is that right?
16      A.   Yes.
17      Q.   Who else, if anyone, knew
18   about that arrangement?
19      A.   Michael Kaplan -- they
20   include Michael Kaplan, Robin
21   Chambers, I believe Olivia was
22   aware.  I believe some of the
23   executive assistants were aware.
24   Michael Tasch, Mark Bosswick, and
25   also Tom Harvey.
```

Page 291

```
 1           G. C. ROBINSON
 2      Q.   Now at some point, in
 3   January of 2019, you placed a call
 4   and asked about the maximum number
 5   of SkyMiles that could be
 6   transferred from one account to
 7   another, isn't that right?
 8      A.   I can't recall my specific
 9   conversation with American Express
10   at that time.
11      Q.   Do you know how many
12   SkyMiles could be transferred in any
13   24-hour period?
14      A.   999,000.
15      Q.   Per day?
16      A.   Per day.
17      Q.   How do you know that?
18      A.   It was something -- it had
19   come up in a conversation when I was
20   trying to transfer points with Delta
21   at some point.
22      Q.   And in beginning of January
23   of 2019, up until the date that you
24   resigned, did you, in fact, transfer
25   some Canal SkyMiles into your
```

| | |
|---|---|
| Page 292 | Page 293 |

Page 292

```
 1           G. C. ROBINSON
 2   personal SkyMiles account?
 3      A.   Yes, as I said -- as I had
 4   done with Bob's approval.
 5      Q.   When you say as you had
 6   done, isn't it true that when you
 7   use them, on some occasions, you
 8   would transfer the actual amount
 9   that you needed for the particular
10   airplane flight or whatever it was?
11      A.   No, that is not correct.
12      Q.   So each time you needed to
13   use SkyMiles, you would just move
14   999,000, is that right?
15      A.   No, that is not correct.
16      Q.   So then, before January of
17   2019, if you needed a certain number
18   of SkyMiles, how would you go about
19   transferring them into your account?
20      A.   I would transfer the
21   balance of the SkyMiles into my
22   account, at times where Bob and I
23   had discussed, and he had approved
24   of my trip and my travel.
25      Q.   Okay.
```

Page 293

```
 1           G. C. ROBINSON
 2           And would you transfer the
 3   amount that you needed or just
 4   whatever amount you saw fit?
 5      A.   I wouldn't characterize it
 6   that way.
 7      Q.   Well, was there any
 8   limitation on the number of SkyMiles
 9   that you would use for a particular
10   trip where he had approved the use
11   of it?
12      A.   I would transfer the
13   balance of the SkyMiles account into
14   my Delta account.
15      Q.   So are you saying you would
16   empty Canal's SkyMiles account into
17   your personal account, is that what
18   you are saying?
19      A.   It is the same that Michael
20   Kaplan did when he transferred them
21   out of Bob's black card into Bob's
22   Delta SkyMiles.  It was -- we would
23   transfer what was available.
24      Q.   I am just talking about you
25   now.  I am not talking about
```





Page 294

```
 1              G. C. ROBINSON
 2   whatever arrangement Michael Kaplan
 3   might have had.
 4        Do you know how many
 5   SkyMiles you transferred from
 6   Canal's account to your personal
 7   account between January of 2019, and
 8   the day that you resigned?
 9     A.   I don't know the amount.
10     Q.   Okay.
11        Would it surprise you if I
12   told you the records show that you
13   transferred just under 4.5 million
14   SkyMiles?
15     A.   I don't know the amount.
16     Q.   I understand that.  My
17   question is -- I will ask it a
18   different way.
19        There were five transfers
20   of 999,000 SkyMiles made from the
21   Canal account to your personal
22   account, between January 28, 2019,
23   and March 18th, 2019.
24        Does that refresh your
25   recollection any -- does that
```

Page 295

```
 1              G. C. ROBINSON
 2   refresh your recollection you have
 3   about transfers that you made
 4   between January and the day that you
 5   resigned?
 6     A.   I don't know specifically
 7   as I said to the amounts -- the
 8   amount of points that were
 9   transferred.
10     Q.   Okay.
11        But you were transferring
12   miles to your personal account,
13   correct?
14     A.   Yes, with Bob's approval.
15     Q.   You are saying that he had
16   made specific approval for each of
17   those transfers, what are you
18   saying?
19     A.   For the overall of
20   transferring the points into my
21   Delta SkyMiles account, he and I had
22   discussed it on multiple occasions,
23   including a time in I believe in
24   2019, where Bob, himself, was
25   frustrated that I did not have the
```

Page 296

```
 1              G. C. ROBINSON
 2   access to transfer miles.
 3     Q.   Let's go back to my
 4   question.  Let's go back to January
 5   of 2019.
 6        During the period of time
 7   in January, that was the point in
 8   time that you were -- you testified
 9   you were in such acute pain because
10   of your back.  Weren't you also
11   talking to Robin Chambers about the
12   fact that you were thinking about
13   resigning?
14     A.   No.
15     Q.   During the period of time
16   that transfers were made, between
17   January and the time that you
18   resigned, weren't you contemplating
19   resigning?
20     A.   No, quite the opposite.  I
21   was trying to reach out to my
22   employer to fix any issues and speak
23   to him about any problems.  I had
24   reached out to him several times
25   about that.
```

Page 297

```
 1              G. C. ROBINSON
 2     Q.   Do you recall having any
 3   conversations with Robin where you
 4   were talking about resigning during
 5   that period of time?
 6     A.   During the period, just to
 7   clarify, January through April?
 8     Q.   January 28th, 2019, which
 9   was the day of the first transfer,
10   up until April 6th, which was the
11   day of your resignation?
12     A.   I can't recall a
13   conversation with her about it about
14   resigning.  It was a very toxic and
15   abusive work environment, but -- and
16   I was in pain, but I don't recall
17   specifically talking to her about
18   resigning because I didn't -- I
19   didn't think about resigning my
20   position until much later.
21     Q.   And was there ever a
22   conversation with you and Mr. De
23   Niro about what would happen to
24   SkyMiles after you left the company,
25   did that ever come up?
```





| Page 298 |
| --- |

G. C. ROBINSON

1
2       A.   I can't recall us ever
3   discussing that.
4       Q.   Do you recall having a
5   conversation with Robin Chambers
6   where you told her that Tom Harvey
7   had accused you of stealing
8   SkyMiles?
9       A.   There was a conversation at
10  some point where Tom Harvey had told
11  me that Bob was upset about the
12  SkyMiles, and also said that he knew
13  that I used them.
14      Q.   I know all of that.  But I
15  am talking about the conversation --
16  a conversation you had with Robin
17  Chambers, where you explained to her
18  that Tom Harvey was accusing you of
19  stealing the SkyMiles.  Do you have
20  any recollection of that
21  conversation?
22      A.   I have recollection of a
23  conversation about the SkyMiles
24  after I got off the phone with Tom
25  Harvey, where he --

| Page 299 |
| --- |

G. C. ROBINSON

1
2       Q.   I am not asking about that.
3   Please don't tell me about Tom
4   Harvey.  If you remember it -- I can
5   play it for you if you want.
6       Do you remember a
7   conversation with Robin Chambers,
8   where you told her, "Tom Harvey is
9   accusing me of stealing the
10  SkyMiles?"
11      A.   I don't recall the exact
12  words that I used that I had
13  discussed with her about the
14  SkyMiles.
15      Q.   I am not asking for the
16  exact words.  I am just asking if
17  you remember having a conversation
18  with her about it.
19      A.   I believe I just answered
20  that, and said that I do recall a
21  conversation where we discussed the
22  SkyMiles.
23      Q.   And didn't she tell you,
24  "Chase, it is like a computer, you
25  can use it while you are working,

| Page 300 |
| --- |

G. C. ROBINSON

1
2   but you can't take it with you,"
3   isn't that what she told you?
4       A.   I can't recall the
5   specifics of what he she said, but I
6   wouldn't characterize it in that way
7   myself.
8       Q.   Well, if you can't tell me
9   the specifics of what she said, how
10  can you tell me how you would
11  characterize it?
12      A.   Because you just quoted
13  her, supposedly, in saying that it
14  was like a computer.  So I don't
15  characterize the SkyMiles in that
16  way.  Once you transfer the SkyMiles
17  you can't transfer them back.
18      Q.   Right.
19      So what you are telling me
20  then -- I want to make sure I
21  understand what is going on in your
22  head.
23      If Robin told you, in
24  substance, "Chase, it is like a
25  computer, you can use it while you

| Page 301 |
| --- |

G. C. ROBINSON

1
2   are working, but you can't take it
3   with you," that is not something
4   that you see?  You see it
5   differently, is that correct?
6       A.   No.  As I said, I wouldn't
7   characterize it that way because
8   SkyMiles are not a computer.  And
9   once you transfer the SkyMiles, you
10  cannot transfer them back.
11      Q.   Okay.
12      So since you can't transfer
13  them back, is it fair to say that
14  you never tried to transfer them
15  back?
16      A.   At this time once I had had
17  -- Tom Harvey had sent this letter,
18  anything that I had discussed about
19  the SkyMiles would be privileged.
20      Q.   I am not understanding your
21  answer.  Did you ever try to
22  transfer them back is the question
23  simply, yes or no?
24      A.   I was aware that you could
25  not transfer them back.  So,





| Page 302 | Page 303 |
|---|---|

**Page 302**

```
 1          G. C. ROBINSON
 2   therefore, I didn't try to transfer
 3   them back on something that I knew
 4   could not be transferred back.
 5      Q.   And again, Tom's letter, at
 6   the bottom of page one, he wrote, "I
 7   strongly suggest you speak to an
 8   attorney and return the SkyMiles
 9   immediately."
10          Do you see that?
11      A.   Yes.
12      Q.   And at that point you had
13   spoken with an attorney, correct?
14      A.   I had been in contact with
15   an attorney.
16      Q.   And at that point in time
17   when you got the letter, were you
18   already aware that you couldn't
19   return the SkyMiles or did you learn
20   that later?
21      A.   When you call to transfer
22   the SkyMiles, they gave you -- it is
23   like a disclaimer about how when you
24   transfer them, you cannot transfer
25   them back.  It is something that you
```

**Page 303**

```
 1          G. C. ROBINSON
 2   -- from transferring SkyMiles as --
 3   you know I am aware.
 4          (Simultaneous speaking)
 5      Q.   It's like Hilton.  You get
 6   on the phone, where you have a
 7   reservation, and you get on the
 8   phone, you find the right person,
 9   and you make a few calls.  You say,
10   listen, "Mr. De Niro is accusing me
11   of stealing this stuff, I need to
12   get it back."
13          Did you ever try to do
14   that?
15      A.   No, I didn't try to call
16   where I knew that once you transfer
17   it, you cannot transfer it back.
18   This would have been something -- a
19   topic that we spoke about during the
20   transition if it had been finalized.
21      Q.   Okay.  Did not attempt to
22   transfer them back.  Okay.
23          Are you aware of whether in
24   any of Mr. Pagano's e-mails, he ever
25   indicated that there was no way to
```

**Page 304**

```
 1          G. C. ROBINSON
 2   return the SkyMiles?  I am talking
 3   about the -- in the e-mail that he
 4   is written that you have seen that
 5   -- let me be clear, that you sent
 6   back to me?
 7      A.   I have -- I can't recall.
 8      Q.   In Tom's letter, he also
 9   indicated that he believed you were
10   in possession of cash belonging to
11   Canal, isn't that right?
12      A.   In his letter, he did state
13   that.
14      Q.   Okay.
15          And at the time that you
16   received the letter, you were in
17   possession of cash belonging to
18   Canal, weren't you?
19      A.   Yes.
20      Q.   How much cash, belonging to
21   Canal, were you in possession of at
22   the time that you received this
23   letter?
24      A.   I can't recall the specific
25   amounts in the Toukie Smith petty
```

**Page 305**

```
 1          G. C. ROBINSON
 2   cash or the Canal petty cash.
 3      Q.   I am just talking about
 4   Canal.  When Tom asked you --
 5   mentioned that you were in
 6   possession of cash, whatever you
 7   understood that to mean, do you
 8   remember the approximate amount of
 9   cash?
10      A.   I don't know what the
11   approximate amount of those two
12   petty cashes were.
13      Q.   And in it, in his letter,
14   he asks at the bottom here, right
15   before the bottom of page two, "I
16   strongly urge you to mitigate the
17   damages that you have caused and
18   return the various computers,
19   iPhones, cameras, and other property
20   in your possession that belongs to
21   Canal."
22          Do you see that?
23      A.   Yes.
24      Q.   When did you return the
25   cash, and how much did you return?
```




| Page 306 |
| --- |

G. C. ROBINSON

1
2     A.   It was returned with the
3  rest of Canal Productions's property
4  that was in my possession, I
5  believe, November 5th of this year.
6     Q.   Okay.
7        So Tom asked you to return
8  this in July of 2019, correct?
9     A.   I wouldn't --
10    Q.   Correct?
11    A.   I wouldn't --
12    Q.   It is okay.  You can say
13  it.
14    A.   I wouldn't put the context
15  of this.
16    Q.   Earlier I asked you -- at
17  the beginning of the deposition, I
18  asked if you understood the oath,
19  and that if some answers that you
20  gave were going to be hurtful to
21  your case, and you agreed to be
22  truthful.
23        I'm asking you now, didn't
24  you hold on to Canal's cash for more
25  than two years before you returned

| Page 307 |
| --- |

G. C. ROBINSON

1
2  it, yes or no?
3     A.   Yes, but I don't think that
4  is the context of why the -- I had
5  the possession of the property.
6        MR. DROGIN:  I move to
7     strike everything you said
8     after the word "yes."
9     Q.   Is there a reason why you
10  returned the cash in November of
11  2021?
12    A.   I don't know how to answer
13  that without discussing something
14  that was -- that was privileged.
15    Q.   Okay.
16        So I think we can infer
17  from that that your attorney told
18  you to return the cash, but I can't
19  ask you about that because it is
20  privileged, so that is okay.  We
21  will move on.
22        How much cash did you
23  return?
24    A.   All of the Canal and Toukie
25  Smith petty cash that I had had.  I

| Page 308 |
| --- |

G. C. ROBINSON

1
2  don't recall the amount.
3     Q.   So when you returned this
4  cash, you don't even know how much
5  you returned?
6     A.   Off the top of my head, I
7  can't recall the amount.
8     Q.   Can you approximate how
9  much cash you had?
10    A.   I don't want to guess.
11    Q.   I am not asking you to
12  guess.  I am asking you to
13  approximate?
14    A.   I don't know the amount.
15    Q.   Would it surprise you if it
16  was more than $10,000?
17    A.   I don't believe it was
18  $10,000, but again, I will state
19  that I do not recall the amount of
20  the petty cash.
21    Q.   Now Tom also mentioned to
22  you in his letter that he believed
23  that you were in possession of
24  certain gift cards belonging to
25  Canal.

| Page 309 |
| --- |

G. C. ROBINSON

1
2        Do you see that?
3     A.   What line is that under or
4  what paragraph?
5     Q.   It is in Paragraph 3.  It
6  says, "These include food,
7  transportation, such as Uber and
8  taxis, dog sitting, groceries,
9  cameras, iPhones, subscriptions to
10  magazines, and newspapers, Pilates
11  classes, dry cleaning, flowers for
12  your residence, an unknown number of
13  gift cards, and helped yourself to
14  petty cash."
15        I am talking about the gift
16  card part of this.
17    A.   Can you repeat your
18  question?
19    Q.   At the time that you
20  received that letter, did you, in
21  fact, have gift cards belonging to
22  Canal?
23    A.   Yes, I had gift cards.  But
24  what -- the line that you are
25  referring to in the letter is him

78 (Pages 306 to 309)





| Page 310 |
| --- |

G. C. ROBINSON

1
2 making a claim that I had used an
3 unknown number of gift cards for my
4 personal expenses.
5     Q.   Right.  But I'm not asking
6 that question.  I am just asking
7 whether you had Canal gift cards in
8 your possession at the time that you
9 received the letter?
10     A.   Yes, I had gift cards
11 amongst other items here at the --
12 the approved office that I had.  My
13 office here in my home.
14     Q.   So the answer to my
15 question is yes, you had Canal gift
16 cards, correct?
17     A.   Okay.
18     Q.   Did you ever return those
19 gift cards?
20     A.   They were returned with the
21 rest of the Canal items.
22     Q.   So they were returned in
23 November of 2021?
24     A.   Yes.
25     Q.   And Tom, in his letter,

| Page 311 |
| --- |

G. C. ROBINSON

1
2 asked you to return them in July of
3 2019, isn't that right?
4     A.   Yes.  But he was also aware
5 that I had items in my possession
6 that were Canal's, and that he was
7 handling my transition, and in no
8 point did he finalize my transition
9 before he sent this threatening
10 letter with false allegations in it.
11         MR. DROGIN:  Move to
12     strike everything you said
13     after the word yes.
14     Q.   Do you know the dollar
15 value of the gift cards that you
16 returned?
17     A.   I am not aware off the top
18 of my head what the value of it was.
19     Q.   Would it surprise you that
20 based on the ones that we can tell
21 it was over $19,000 in gift cards;
22 would that come as a shock to you?
23     A.   Again, I don't recall the
24 total amount, but I would take your
25 word for it.

| Page 312 |
| --- |

G. C. ROBINSON

1
2     Q.   But before returning the
3 cash, you didn't think to count it,
4 correct?
5     A.   I believe that there is
6 documentation somewhere what was
7 returned.
8     Q.   Okay.
9         Is that documentation that
10 you prepared?
11         MS. HARWIN:  Without
12     disclosing anything that is
13     attorney-client privilege.
14     Obviously you are not to
15     disclose any attorney-client
16     privileged communications.
17         MR. DROGIN:  We can
18     specifically ask her whether
19     there was inventory.  So if
20     there was an inventory
21     prepared by the witness, I
22     think we are entitled to it.
23         MS. HARWIN:  Counsel, you
24     know there was a deadline on
25     Friday for the information as

| Page 313 |
| --- |

G. C. ROBINSON

1
2 to an inventory, and we will
3     comply with the Court's
4     deadline.
5         MR. DROGIN:  So we will
6     leave that open.  We will
7     leave that part of this open.
8     Q.   So just so I don't lose my
9 train of thought, so you didn't
10 count up the amount of the gift
11 cards that you were returning, is
12 that right?
13     A.   I can't recall the amount
14 of the gift cards that were
15 returned.
16     Q.   I know that.  And that is
17 because you didn't count them, isn't
18 that right?
19     A.   No, I would not say that is
20 correct.  But again --
21     Q.   If you counted them, then
22 you would know, right?  If you
23 counted the gift cards, then you
24 would know the value of the gift
25 cards, right?





| Page 314 | Page 315 |
|---|---|
| G. C. ROBINSON | G. C. ROBINSON |

**Page 314**

G. C. ROBINSON

1
2    A.   (No verbal response.)
3    Q.   Correct?  I am not trying
4  to trick you here.  I know the
5  answer is obvious, but it is not a
6  trick question.
7    A.   I don't know the total
8  amount of the gift cards off the top
9  of my head.
10   Q.   So just to go back to this
11 theory that you were concerned
12 about, that Canal was conjuring up
13 claims against you, so had you
14 returned the cash, when it was
15 requested, Canal could have said,
16 "Hey, wait, where is the rest of the
17 cash?  This is only $5,000, and we
18 think you have more."  They could
19 have made up a fake claim like that,
20 right?
21   A.   I can't speculate on
22 something unless you give me an
23 example of it or on just what could
24 have -- -
25   Q.   Let's take as an example

**Page 315**

G. C. ROBINSON

1
2  where you have an employer's
3  property and they ask for it back
4  and you don't return it.  The
5  employer can say, "What about the
6  rest of the property?  You stole the
7  rest of the property.  You gave me
8  back this, but you didn't give me
9  that back."  They could have
10 conjured up that claim, right?
11   A.   I can't speculate on a
12 hypothetical on something that has
13 -- is not something in front of me
14 with this -- with what Canal
15 Productions had done.
16   Q.   Do you remember having a
17 conversation with Robin Chambers
18 about the property that you had
19 retained?
20   A.   I can't recall a specific
21 conversation.  We have had many
22 conversations over the years and
23 during that period of time.
24   Q.   Did Robin Chambers ever
25 tell you in one of those phone

**Page 316**

G. C. ROBINSON

1
2  calls, "I think you should give it
3  back?"
4    A.   No, I can't recall that
5  that that was discussed or that she
6  said that.  But, again, we had many
7  conversations over that period of
8  time.  In the -- during that time I
9  was in transition and speaking to
10 Tom Harvey about it.  E-mails went
11 to Bob about the transition that it
12 would take me a while to put things
13 together.  I had never finalized
14 anything with Tom Harvey, and then I
15 was sent this threatening letter
16 with false allegations.
17   Q.   Right.  I got that.
18       So you resigned on April
19 6th, and July 11th you are asked to
20 return the property, and you
21 returned it in November, two years
22 later, is that factually correct?
23   A.   Yes, but without context.
24   Q.   Okay.  Camera equipment.
25       On November 5th, 2021, you

**Page 317**

G. C. ROBINSON

1
2  returned camera equipment, is that
3  correct?
4    A.   Yes.
5    Q.   Is that camera equipment
6  that belonged to Canal?
7    A.   Yes.
8    Q.   Okay.
9        Where -- was this stuff all
10 kept together, like the gift cards,
11 the cash, camera equipment, was this
12 all kept in one place?
13   A.   During Canal they were kept
14 at my office for Canal, which was
15 approved to be my home.
16   Q.   Okay.
17       So they were at home with
18 you.  And did they stay there until
19 they were returned, or did they go
20 somewhere else in between?
21   A.   I preserved the items here.
22 They were here.
23   Q.   So when they were shipped
24 back to Canal, they were shipped
25 from your home?



| Page 318 |
| --- |

G. C. ROBINSON

1
2    A.   They went from my home to
3    Greg's office.
4    Q.   Okay.
5        So a trucking company came,
6    physically picked up the items, and
7    delivered them to Mr. Bennett's
8    office?
9    A.   I'm sorry.  Can you just
10   repeat --
11   Q.   I am trying to figure out
12   the chain of custody, whether this
13   ever went through your attorneys, or
14   it simply left your apartment and
15   went to Mr. Bennett's firm?
16   A.   It went from my apartment
17   to Mr. Bennett's firm.
18   Q.   Did you -- the camera
19   equipment that you had, why didn't
20   you return it sooner?
21   A.   As I stated, I was in
22   transition with Tom Harvey regarding
23   all of this stuff.  After I resigned
24   I had not heard back from Tom Harvey
25   about finalizing any of the

| Page 319 |
| --- |

G. C. ROBINSON

1
2    transition, and then I was sent this
3    threatening, false letter.
4    Q.   Well, actually, after this
5    letter, that you are characterizing
6    as threatening and false, actually a
7    lawsuit was started against you.
8    Isn't that right?
9    A.   A retaliatory lawsuit was
10   started against me.
11   Q.   Well, retaliatory is not --
12   that is a conclusion.  At the
13   moment, let's just call it the
14   lawsuit and not put labels on it.  I
15   won't call you a thief, even though
16   I think you stole.  I will give you
17   the respect of, you know, just
18   keeping it at arm's length.
19       MS. HARWIN:  Counsel,
20   that is inappropriate.
21       MR. DROGIN:  What is
22   inappropriate?
23       MS. HARWIN:  Just ask
24   your question.
25       MR. DROGIN:  I am.  I am

| Page 320 |
| --- |

G. C. ROBINSON

1
2    trying to.  I just don't
3    appreciate statements being
4    added onto very simple
5    questions.
6    Q.   The question was, wasn't
7    the lawsuit started?
8    A.   Canal filed a lawsuit on
9    August 17th, Bob's birthday, 2019.
10   Q.   In other words, the answer
11   to my question is yes?
12   A.   I have stated that, I
13   believe, twice now.
14   Q.   So at that point would you
15   say that your communications in this
16   winding down with Tom Harvey had
17   come to a conclusion?
18   A.   Yes.
19   Q.   But still, when the lawsuit
20   was filed in 2019, you still didn't
21   return all of this loot.  Why not?
22   A.   I wouldn't characterize it
23   that way.
24   Q.   Okay.
25       Why didn't you return

| Page 321 |
| --- |

G. C. ROBINSON

1
2    Canal's property?
3    A.   Again, it would go to
4    privileged conversation that I had
5    with my attorneys.
6    Q.   Wow.  You know, there is a
7    crime fraud exception to the
8    attorney-client privilege?  And this
9    could be construed as stolen
10   property.  If you are going to tell
11   me that your attorney counseled you
12   to retain property that didn't
13   belong to you, we are going to have
14   to leave that open.  We will move
15   on.
16       MS. HARWIN:  Counselor,
17   the speeches are wildly
18   inappropriate.
19       MR. DROGIN:  I think they
20   --
21       (Simultaneous speaking)
22       MS. HARWIN:  Ask your
23   question.
24       (Whereupon, a recess was
25   taken at this time.)

81 (Pages 318 to 321)




| | |
|---|---|
| Page 322 | Page 323 |

**Page 322**

G. C. ROBINSON

1
2   MS. HARWIN: Before we
3 begin, I want to note for the
4 record that a lot of the
5 questioning has been filled
6 with speeches, attacks,
7 interruption, and
8 intimidation tactics. We
9 object to that, and we will
10 object to the continuation of
11 the deposition if you
12 continue to fill your time
13 with that.
14   MR. DROGIN: Okay. Does
15 that mean that if I don't,
16 you will consent to the
17 continuation of the
18 deposition, or are you going
19 to object anyway?
20   MS. HARWIN: We will see
21 where you end today.
22   MR. DROGIN: I am going
23 to probably ask three more
24 questions, and ask them
25 really politely.

**Page 323**

G. C. ROBINSON

1
2   Q. Ms. Robinson, after you
3 received the letter from Tom Harvey,
4 on July 11, did you speak with Mr.
5 Harvey at any time before Canal
6 started its lawsuit against you?
7   A. I don't believe I did.
8   Q. Back in November, one of
9 the items that you returned to Canal
10 was on iPhone, is that correct?
11   A. Yes.
12   Q. Did you ever access that
13 iPhone on or after April 6th, 2019?
14   A. Yes.
15   Q. When, and for what purpose?
16 And if when is many times, then just
17 tell me what purpose.
18   A. I recall accessing it to
19 make sure that when giving it to the
20 tech vendor that they were going to
21 give us a correct phone and the
22 password was correct. That I was
23 given the correct information.
24   Q. Anything else that you did
25 on that phone?

| | |
|---|---|
| Page 324 | Page 325 |

**Page 324**

G. C. ROBINSON

1
2   A. Not that I recall during
3 that -- that time.
4   Q. And same question regarding
5 an external hard drive that you
6 returned. Did you access that
7 external hard drive after you
8 resigned?
9   A. I can't recall except for
10 when handing the stuff over to the
11 tech vendor, making sure there was
12 no password on the phone. I can't
13 recall accessing it.
14   Q. On the iPhone, what -- what
15 mailboxes were there?
16   A. The -- I can't recall. It
17 is a clone copy of Bob's phone that
18 he gave me for the work on the
19 divorce. I don't know. I believe
20 his -- his e-mail, but I don't know
21 what other mailbox -- inboxes there
22 were.
23   Q. So you are saying,
24 physically, the phone was his?
25   A. It was a clone copy of his

**Page 325**

G. C. ROBINSON

1
2 iPhone.
3   Q. So the iPhone that you had
4 was a clone of his. It was -- was
5 it one that you used?
6   A. It was one that was given
7 to me to take the information and
8 give it to ████████, Bob's
9 divorce attorney. It was something
10 that was for that -- for that
11 purpose, for that project.
12   Q. Okay.
13   So just for clarification,
14 the iPhone that you returned was not
15 one that you used as part of your
16 job, is that correct?
17   A. That is correct.
18   Q. I am not trying to trick
19 you. I am just trying to
20 understand.
21   A. As I said, that is correct.
22   Q. Okay. Good.
23   And what about text
24 accounts, were there any accounts
25 there, other than Bob's, I guess



| | Page 326 |
|---|---|

1          G. C. ROBINSON
2    that assumes the fact that you have
3    -- were Bob's text accounts on that
4    phone?
5      A.  I can't recall off the top
6    of my head, other than that it was a
7    clone copy of Bob's phone.  So
8    whatever was on his phone and I -- I
9    believe it was his texts.  But I
10   don't know if there was other --
11     Q.  Okay.  Thank you.
12        MR. DROGIN:  Hopefully my
13     behavior during the last
14     three minutes did not offend
15     or intimidate anyone.  Can we
16     talk about how we want to
17     proceed?  Because this is a
18     logical breaking point.  I
19     know we have some additional
20     time left today.  There are a
21     couple of open issues.  We
22     have had conversations with
23     the judge about additional
24     time.  Do you want to discuss
25     that on the record, off the

| | Page 327 |
|---|---|

1          G. C. ROBINSON
2    record, do you have a
3    position on that?
4        MS. HARWIN:  I believe
5     that, you know, counsel
6     should finish the questioning
7     today and use its time, and
8     then, you know, if there are
9     any questions that you
10    contend have been prevented
11    from asking, you know, we
12    will meet and confer with you
13    about that.
14        MR. DROGIN:  I think that
15    the point that we are making,
16    and I think the point that
17    the judge understood, was
18    that it was going to be
19    impossible to finish in one
20    day.  The question is
21    whether, now, at 6:00 p.m.,
22    everybody wants to push on
23    for another 45 minutes on the
24    record, and then have a
25    discussion about a second day

| | Page 328 |
|---|---|

1          G. C. ROBINSON
2    or whether we want to pause
3    here, at 6:00, and then have
4    that discussion?  I am not
5    suggesting that we are going
6    to need an additional seven
7    hours.  I am just asking if
8    you want to break here.  That
9    is all I am asking.  I am
10   fine either way.
11        MS. HARWIN:  Why don't we
12    take a five-minute break and
13    then we can address that?
14        MR. DROGIN:  Okay.
15        (Whereupon, a recess was
16    taken at this time.)
17        MR. DROGIN:  So it is --
18   I have 6:07 here in New York.
19   We have been on the record,
20   according to Ms. Hayden, for
21   six hours and 20 minutes.  We
22   are agreeing, without
23   prejudice to adjourn for the
24   day, with the understanding
25   that we have 40 minutes

| | Page 329 |
|---|---|

1          G. C. ROBINSON
2    remaining, and then we will
3    attempt to meet and confer to
4    determine how much additional
5    time we would like with Ms.
6    Robinson.  Ms. Harwin, is
7    that fair?
8        MS. HARWIN:  We
9    understand that you want to
10   adjourn for the day, we are
11   agreeing to adjourn, and we
12   will meet and confer with
13   you, as to directed by the
14   Court, concerning your
15   request for additional time.
16   And we would ask you to
17   identify for us what it is
18   that you contend requires
19   additional time, and how
20   much, and we will be prepared
21   to meet and confer with you
22   about that.
23        I will note for the
24   record that pursuant to
25   Federal Rule 30E, Plaintiff



| Page 330 |
|---|

```
1              G. C. ROBINSON
2    requests review of her
3    deposition transcript.  We
4    will reserve signature
5    following the review of her
6    deposition.  And I will also
7    note pursuant to Paragraph 1
8    of the Protective Order in
9    this case that we will advise
10   counsel on the record that
11   within 30 days after the
12   completion of Plaintiff's
13   deposition as to the
14   confidentiality designation.
15   And I just remind everyone
16   that during the 30-day period
17   following this deposition,
18   the entirety of the
19   deposition transcript is to
20   be treated as confidential.
21       MR. BENNETT:  Before we
22   go off the record, if you
23   have not -- I guess I am
24   going to ask, have you sent
25   the one exhibit that I
```

| Page 331 |
|---|

```
1              G. C. ROBINSON
2    circulated to you to your
3    client as of yet?
4        MS. HARWIN:  Let me
5    check.  I don't recall.  Can
6    you tell me which exhibit
7    number that was?
8        MR. BENNETT:  6478.
9        MS. HARWIN:  I don't
10   believe I did.  There was
11   only -- it was Exhibits A, B,
12   and C.  The ones that we went
13   on the record with were the
14   ones that were sent to Ms.
15   Robinson.
16       MR. BENNETT:  Okay.  I
17   would just ask that you hold
18   onto it.
19       MS. HARWIN:  That's fine.
20       MR. DROGIN:  For
21   clarification, I am prepared
22   to move on and do the
23   additional 40 minutes.  I
24   really thought it was just
25   for the convenience of the
```

| Page 332 |
|---|

```
1              G. C. ROBINSON
2    parties.  I thought we were
3    agreeing to this.  I didn't
4    -- I am not formally
5    requesting it.  I just
6    thought it was good for
7    everybody, and everybody was
8    in agreement on that.  I am
9    not looking to make
10   additional problems or
11   hurdles for myself later
12   where you say that we
13   insisted or something like
14   that.
15       MS. HARWIN:  You
16   requested to adjourn for the
17   day, and we are amenable to
18   doing that.  We are going to
19   meet and confer about your
20   request for additional time
21   as directed by the Court.
22       MR. DROGIN:  But are you
23   saying that we no longer have
24   40 minutes, are you waiving
25   our 40 minutes?  If that i
```

| Page 333 |
|---|

```
1              G. C. ROBINSON
2    your position, then I don't
3    want to stop.
4        MS. HARWIN:  I think we
5    will consider that 40
6    minutes, as well as your
7    request for additional time.
8    I understand that you are
9    seeking more time beyond the
10   40 minutes.
11       MR. DROGIN:  I am.  But I
12   don't want to waive the 40
13   minutes.  And I am sort of
14   not like getting a warm and
15   fuzzy feeling from you.
16       MS. HARWIN:  Our position
17   is that if the Court entitles
18   you to X minutes of
19   additional time, that will be
20   in addition to the 40 minutes
21   that you haven't used today.
22       MR. DROGIN:  Right.  So
23   at the very least, if the
24   Court says no, we are
25   reconvening for 40 minutes?
```

84 (Pages 330 to 333)



Page 334

```
 1              G. C. ROBINSON
 2      Is that your understanding,
 3      or are you going to oppose
 4      that as well?
 5          MS. HARWIN:  We will
 6      agree to reconvene for 40
 7      minutes if the Court allows
 8      additional time.
 9          (Continued on next page
10      to accommodate jurat.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 335

```
 1              G. C. ROBINSON
 2          MR. DROGIN:  That is all
 3      I was asking.
 4          MR. BENNETT:  Requesting
 5      a rough transcript.
 6          MR. DROGIN:  Requesting a
 7      copy of the transcript and a
 8      rough transcript.
 9          MS. HARWIN:  Requesting a
10      copy of the transcript.
11
12          (Time Noted:  6:11 p.m.)
13
14      GRAHAM CHASE ROBINSON
15
16      Subscribed and sworn to
17      before me this   day of
18              2021.
19
20
21          Notary Public
22
23
24
25
```

Page 336

```
 1
 2              I N D E X
 3
    WITNESS      EXAMINATION BY  PAGE
 4
    Graham Chase
 5  Robinson
            Mr. Drogin      4
 6
            Mr. Bennett    109
 7
            Mr. Drogin     256
 8
 9
10
            EXHIBITS
11
12  ROBINSON   DESCRIPTION   PAGE
13  A    a three-page PDF   156
         document that was
14       filed in the New
         York State Action
15       as document number
         10
16
17  B    a seven-page PDF   163
         starting with
18       Bates stamped
         Robinson 5114
19  C    a 20-page PDF,     180
         file name P13908
20
21  D    a Tom Harvey       270
         letter, from July
22       11, 2019
23
24
25
```

Page 337

```
 1          C E R T I F I C A T E
 2
 3          I, PAIGE HAYDEN, hereby certify that the
 4      Examination Before Trial of GRAHAM CHASE ROBINSON was
 5      held before me on the 20th day of December, 2021; that
 6      said witness was duly sworn before the commencement of
 7      her testimony; that the testimony was taken
 8      stenographically by myself and then transcribed by
 9      myself; that the party was represented by counsel as
10      appears herein;
11          That the within transcript is a true record of
12      the Examination Before Trial of said witness;
13          That I am not connected by blood or marriage
14      to any of the parties; that I am not interested directly
15      or indirectly in the outcome of this matter; that I am
16      not in the employ of any of the counsel.
17          IN WITNESS WHEREOF, I have hereunto set my
18      hand this 20th day of December, 2021.
19
20
21          PAIGE HAYDEN
22
23
24
25
```



Page 338

```
 1              ERRATA SHEET
 2
 3     PAGE  LINE (S)   CHANGE     REASON
 4     ___|_____|_____|_____|_____
 5     ___|_____|_____|_____|_____
 6     ___|_____|_____|_____|_____
 7     ___|_____|_____|_____|_____
 8     ___|_____|_____|_____|_____
 9     ___|_____|_____|_____|_____
10     ___|_____|_____|_____|_____
11     ___|_____|_____|_____|_____
12     ___|_____|_____|_____|_____
13     ___|_____|_____|_____|_____
14     ___|_____|_____|_____|_____
15
16
17            GRAHAM CHASE ROBINSON
18     SUBSCRIBED AND SWORN TO BEFORE ME
19     THIS ____ DAY OF _____, 20__.
20     _____  _____
21     (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
22
23
24
25
```

