```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK


In re:                            :
                                       Docket #1:19-cv-09156-
 GRAHAM CHASE ROBINSON,           : LJL-KHP

                  Plaintiff,      :

   - against -                    :

 ROBERT DE NIRO, et al,           : New York, New York
                                    April 21, 2022
                  Defendants.      :

----------------------------------- : DISCOVERY CONFERENCE

                    PROCEEDINGS BEFORE
           THE HONORABLE JUDGE KATHERINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          SANFORD HEISLER SHARP, LLP
                        BY:  KATE MACMULLIN, ESQ.
                             ALEXANDRA HARWIN, ESQ.
                             DAVID SANFORD, ESQ. (via
                             telephone)
                        1350 6th Avenue, Floor 31
                        New York, New York 10019


For Defendant
Canal Productions,      TARTER KRINSKY & DROGIN LLP
Inc.:                   BY:  LAURENT SCOTT DROGIN, ESQ.
                             BRITTANY KATE LAZZARO, ESQ.
                        1350 Broadway
                        New York, New York 10018

Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For All Defendants:        TRAUB LIEBERMAN STRAUS & SHREWSBERRY
                           BY:  GREGORY R. BENNETT, ESQ.
                           7 Skyline Drive
                           Hawthorne, New York 10532

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|

None

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

```
 1                         PROCEEDINGS              4

 2            THE CLERK:  Calling case 19cv9156, Robinson versus

 3  De Niro.

 4            Beginning with counsel for the plaintiff, please

 5  make your appearance for the record?

 6            MS. ALEXANDRA HARWIN:  I'm Alexandra Harwin from

 7  Sanford Heisler Sharp on behalf of plaintiff, Graham Chase

 8  Robinson.

 9            HONORABLE KATHARINE H. PARKER (THE COURT):   Good

10  morning.

11            MS. KATE MACMULLIN:  Kate MacMullin from Sanford

12  Heisler Sharp, also --

13            MR. DAVID SANFORD:  (via telephone) This is David

14  Sanford by phone, Your Honor, good morning, counsel for

15  the plaintiff.

16            THE COURT:  Good morning. And I'm going to ask

17  counsel that are present in the courtroom to speak

18  into the microphone because otherwise Mr. Sanford is

19  not going to be able to hear it.  So go ahead, Ms.

20  MacMullin.

21            MS. MACMULLIN:  Sure, this is Kate MacMullin

22  from Sanford Heisler Sharp on behalf of plaintiff,

23  Graham Chase Robinson.

24            THE COURT:  Thank you.

25            THE CLERK:  And counsel for the defendants, please
```

```
 1                          PROCEEDINGS                    5

 2   make your appearance for the record.

 3            MR. LAURENT S. DROGIN:  For defendant Canal

 4   Productions, Laurent Drogin from Tarter Krinsky & Drogin.

 5            MS. BRITTANY K. LAZZARO:  Brittany Lazzaro from

 6   Tarter Krinsky & Drogin for defendant Canal Productions.

 7            MR. GREGORY BENNETT:  Gregory Bennett for

 8   defendants, Traub Lieberman Straus & Shrewsbury, good

 9   morning.

10            THE COURT:  Good morning, everyone, nice to see

11   everybody in person finally. There are a number of

12   discovery issues.  You started out this case with not many

13   issues and now you've just accelerated into a flurry of

14   issues. So there's, there's some pending motions. First I'm

15   going to take the, what I think may be the easiest one

16   which is the motion to compel compliance with the ESI

17   order.  As I understand from plaintiff's counsel, they're

18   working to rectify the metadata snafu, what's the story

19   with that?

20            MS. HARWIN:  That's correct, Your Honor. So

21   after defendants raised a concern about the metadata

22   we were in frequent communication with our ESI vendor

23   to try to investigate and rectify the issue. They

24   brought in additional personnel and identified that it

25   is a software issue that was causing this problem,
```

```
 1                        PROCEEDINGS              6
 2  they're working to correct that and are contemplating
 3  being in a position to make a supplemental production
 4  of metadata that we hope will be complete next week.
 5          THE COURT:  Okay, so next week.  And that
 6  should provide the date when these recordings were --
 7          MS. HARWIN:  That's what we understand.
 8          THE COURT:  (continuing) -- made.  Okay. All
 9  right, that's, I'm glad that will be cleared up. Okay,
10  so I don't think there is anything more for me to do
11  on that, there's no need for further motion practice
12  and I'm going to assume that this issue is resolved
13  unless I hear otherwise.
14          Next, let's talk about the request for more
15  time to depose Mr. De Niro. I've read through the
16  letters and also through the deposition transcript, so
17  I'm not sure why four hours is necessary, can you
18  enlighten me on that?
19          MS. HARWIN:  Yes, and Mr. Sanford who is on
20  the phone is going to address that.
21          THE COURT:  Okay.
22          MR. SANFORD:  Yes, Your Honor, good morning
23  again.  Yeah, this is a complex case that involves
24  many disputed facts that go back over approximately
25  one decade. And a lot of the case hinges on
```

PROCEEDINGS                    7

communications between Mr. De Niro and Ms. Robinson.
During Mr. De Niro's deposition, plaintiff was not able
to complete questioning concerning Canal's fraud
claim, Mr. De Niro's communication with the Manhattan
D.A.'s office, Mr. De Niro's communications with the media
concerning the litigation, Canal's more favorable
treatment of employees who did not engage in protected
activity, the financial oversight provided by Canal's
accountants, and plaintiff's pay comparators. So there are
a lot of issues left.

        I mean the case has, you know, eleven legal
claims, seven causes of action brought under the New York
City Human Rights Law, and the New York Labor Law and the
Fair Labor Standards Act, and in light of all of what
remain, we proposed initially five and then suggested four
would be sufficient. I had two conversations with opposing
counsel and they offered one and they said maybe they
could do two, and that's kind of where we left it after
two sessions of a meet and confer.

        In addition to that, Your Honor, there are a
number of instances which we cite and the Court has
reviewed concerning the directions not to answer.  I
think the rules are pretty clear, Rule 30(c)(2) states
that objections at the time of a deposition must be

1                             PROCEEDINGS                    8

2    noted on the record with testimony preceding subject

3    to any objections, and an attorney may instruct the

4    deponent not to answer only when one of three things

5    is true, either to preserve a privilege, to enforce a

6    limitation ordered by the Court or to present a motion

7    under Rule 30(d)(3).  And that didn't happen here.

8              As an initial matter, opposing counsel did not

9    abide by the rules, did not properly instruct his

10   client not to answer, there was no applicable

11   privilege asserted and there was no limitation ordered

12   by this Court. And, importantly, there was no motion

13   to terminate or limit the scope of the deposition as

14   the deposition as envisioned by the Federal Rules.

15             Opposing counsel could have and should have

16   done three things.  He should have and could have

17   directed his client not to answer, he could have ended

18   the deposition, and he could have called the Court for

19   a ruling.  And it is clearly the burden of the moving

20   party to seek a protective order under those

21   circumstances and that didn't happen here.

22             So in light of the numerous instances of

23   directing his client not to answer which, themselves,

24   were improper, and then Mr. De Niro, himself, refusing

25   to answer questions on his own apart from the

PROCEEDINGS                    9

1

2   directions, we respectfully ask that the Court allow

3   us more time to conduct the remaining portions of the

4   deposition which are really critical to our case and

5   our defenses, as well as to instruct opposing counsel

6   to, you know, confer with his client and mandate that

7   the client order -- answer the questions that been

8   posed.

9          THE COURT:  Okay, I'll hear from defendant.

10          MR. DROGIN:  Your Honor, a complex --

11          THE COURT:  If you could just speak into the

12   microphone, I want to make sure that -- yes, thank

13   you.

14          MR. DROGIN:  As complex as the case may or may

15   not be, the Court is well aware of how the defendants

16   were required to depose the plaintiff. There are claims

17   here, counterclaims here, there are two sets of law firms.

18   The Court is familiar with its own decision on how we had to

19   pretty much fight tooth and nail to get additional time

20   where the Court pointed out that there were some issues in

21   how both sides behaved during the deposition.

22          I come back to your initial question as to why

23   can't this, or I guess it's my question really, why

24   can't this be done in one hour. As we say in our

25   letter to the Court, they chose the topics, they chose

```
 1                        PROCEEDINGS              10
 2  the order. They chose to go off the record and stop
 3  the clock.  They had nine hours over two days.  we did
 4  direct Mr. De Niro not to answer a handful of
 5  questions and the Court is now familiar with the
 6  subject area of those questions. We felt they were
 7  proper directions at the time which is why we did it,
 8  we didn't do it lightly and, in fact, as the
 9  transcript shows, we gave a tremendous amount of
10  leeway before stepping in to develop the record so
11  that if the transcript was presented to the Court you
12  could see when, in fact, we pulled the trigger and
13  that we, and that we used sound discretion. And, in
14  fact, we had alerted chambers that the depositions
15  were taking place, we had offered on the record to
16  call the Court for a ruling and plaintiff's counsel
17  declined.  I cannot believe that we get hung up here
18  on the fact that we didn't either cancel the
19  deposition or interrupt the deposition to place a
20  call. If counsel was upset with the fact that we were
21  directing the witness not to answer these questions,
22  all he had to say was, fine, let's call the Court but,
23  you know, he chose not to.
24            As far as Mr. De Niro's refusal to answer
25  certain questions, again, as we say in the letter,
```

```
 1                            PROCEEDINGS                    11
 2  maybe he should have answered them.  In many cases he
 3  was told to answer and he did, there are a certain
 4  number of questions that he refused to answer. He can
 5  answer them, if the, you know, the Court directs him
 6  to answer them they will. There's probably fewer than
 7  ten instances where that happened, it shouldn't take
 8  more than ten minutes to get the answers to those
 9  questions, putting aside whether, not even addressing
10  whether they're relevant or probative, if anything
11  just, again, for the sake of not arguing, if you want
12  him to answer the questions, you know, then he will.
13          The Court is very familiar that this, with
14  this case, it's a contentious litigation, there are a
15  lot of strong feelings and emotions on both sides.
16  He, Mr. De Niro has now literally sat and been deposed
17  in the room for 9 hours with an efficiency of 6 hours
18  and 22 minutes, there's 38 minutes left, I'm not going
19  to stand on ceremony and say that there is no leeway
20  there, we think that an hour is plenty of time to
21  complete the deposition.
22          THE COURT:  What areas do you, does defendant
23  think remain that are relevant?  Mr. Sanford identified a
24  couple, for example, financial oversight and treatment of
25  other employees.
```

```
 1                        PROCEEDINGS              12

 2           MR. DROGIN:  Well he was free to ask those

 3  questions and some of that was gone into at the deposition.

 4  I'm not quite sure what he means by financial

 5  oversight, but treatment of other employees, many

 6  other employees have already testified. You can see

 7  from the transcript that rather than asking questions

 8  about how he behaved towards other employees, male or

 9  female, the questions were, you know, instead

10  redirected into other areas. So, again, I come back to

11  if he squandered the time asking whether Mr. De Niro

12  owned, you know, planes, helicopters or boats, or he

13  wanted to know about allegations that may have been

14  made in a foreign country, you know, years ago or

15  anything of the like, that was his choice.  You know,

16  you get to choose the order in which you ask your

17  questions and you shouldn't assume that you can leave

18  the most important stuff for the tail end. So, you

19  know, my view is he should have an hour and I don't

20  understand why he would need more.

21           THE COURT:  Okay.  So having taken a look at

22  the transcript, again, I think both sides engaged in

23  improper behavior.  There clearly were questions that

24  were not relevant, and a lot of times repeat questions

25  on the same areas, that's not proper. Both sides have
```

PROCEEDINGS                13

1

2  an obligation under Rule 1 to try to be efficient and

3  under Rule 26 the topics explored in depositions

4  should be relevant and proportional to the needs of

5  the case.  At the same time, there were times when

6  arguably defense counsel should have controlled their

7  client a little bit more and tried to, tried to

8  facilitate getting through some of the areas. Or you

9  could have, as Mr. Sanford said, simply called the

10 Court to the extent that you felt certain questions

11 about his personal life were improper or harassing.

12 Those questions, I don't see how they're relevant

13 actually to this case and you very well could have

14 gotten a protective order on those questions. I'm not

15 going to permit any more questioning on those areas.

16          Based on what plaintiff has said is remaining,

17 I don't think more than two hours is necessary. It

18 does not take long to get the answer to who, who was

19 responsible for overseeing the expense reports, who

20 was responsible for checking the Sky Miles account,

21 did you do that, who did that, what was done about

22 that, these are easy questions.  Similarly, if there

23 are specific individuals, at this point in discovery

24 plaintiff's counsel certainly knows if there's other

25 employees who they feel were treated more favorably,

PROCEEDINGS                    14

 1
 2   you can ask those questions. But just as I told
 3   defense counsel, you have to be judicious with the
 4   questions, you have to be strategic with the
 5   questions. So I'm going to allow two more hours and
 6   that's it.
 7           I also am going to warn defense counsel that
 8   the objections need to be limited to, directions not
 9   to answer need to be limited to areas of privilege.
10   And I've already said I'm not going to permit any more
11   questions into marital issues, family issues, health
12   issues, alcohol issues.  The deponent's emotions at a
13   particular time.  This is not, this is neither here
14   nor there, at the bottom line for this case.  So those
15   questions are off, are off, there's been enough of
16   those questions.  So I'll allow the plaintiff two more
17   questions -- two more hours to complete and you, I'm
18   going to advise you to focus on what's really needed
19   for the claims.
20           Okay --
21           MR. SANFORD:  Thank you, Your Honor.
22           THE COURT:  So let's talk now about the --
23           MR. DROGIN:  Judge, may I ask a question just
24   for clarification?
25           THE COURT:  Yes.

```
 1                         PROCEEDINGS                15

 2            MR. DROGIN:  One of, one of the things that

 3   happened during the deposition that to some extent

 4   confound, confounded us, was the, we went off the

 5   record each time the witness was showed a document,

 6   irrespective of how long or short the document was.

 7   We actually looked into the issue as to whether

 8   there's any case law on that and I would propose that

 9   since it is such a time killer that if counsel wants

10   to show Mr. De Niro a document that we remain on the

11   record.

12            THE COURT:  Well, normally the witness is

13   given a chance to take a look at the document, to read

14   the document, and normally, in my experience, it does

15   stay on the record. Now it could be that there's a

16   tape recording or something very long where you agree

17   to take a break. The other thing plaintiffs could

18   think about is if there are particular documents you

19   want to show Mr. De Niro, you could show it to him in

20   advance and then maybe it will be less time for him

21   to, to answer questions about those documents.  But

22   normally, normally that time is included except, you

23   know, with certain, certain exceptions within reason.

24   So I would just ask the parties to be reasonable and

25   flexible on this issue depending, you know, I don't
```

```
 1                         PROCEEDINGS                16
 2  know what, if it's going to be tape recordings that
 3  are going to be played, if it's going to be long
 4  documents, what have you, so.
 5            MR. SANFORD:  Well, Your Honor, if I may, this
 6  is David Sanford, we started out not doing that but
 7  there were I think some issues with Mr. De Niro's
 8  ability to bring up the document and there were some
 9  delays, and we were concerned that, you know, our time
10  was going to be used in part by, you know, that kind
11  of issue.
12            THE COURT:  Right, and I appreciate that
13  because we're in the Covid world with technology and
14  so the fact that there's technology snafus shouldn't
15  count against one party or another. I think both, that's a
16  rule that both sides should agree to and that's fair. So
17  when I say be reasonable, you know, but, again, it may
18  make sense for plaintiff to send the exhibits in advance
19  and just have hard copies. You can also have, you can send
20  them in a sealed envelope and defense counsel can open the
21  envelope on Zoom if that's how you want to do it. So there
22  are a number of ways you can avoid technical issues while
23  still, you know, preserving your time and preserving some
24  of the whatever surprise or strategy you want to retain in
25  connection with a deposition.
```

1                          PROCEEDINGS                    17

2          MR. SANFORD:  We will certainly consider that,

3  Your Honor, thank you.

4          THE COURT:  Okay, so let's talk next about

5  this mental examination of plaintiff.  The -- the

6  defense has identified someone to examine the

7  plaintiff and when would such an examination take

8  place?

9          MR. BENNETT:  Your Honor, I can deal with that

10  unless you're --

11          THE COURT:  Sure, I want to hear first from

12  the defense and then I'm going to hear from plaintiff.

13          MR. BENNETT:  The defendants have identified

14  and retained Dr. Kimberly Resnick as an expert witness

15  in the area of psychiatry. She has estimated, per our

16  motion papers, that she can complete her examination

17  and report within 25 days of the Court's order

18  allowing the defendant to proceed. We thought that was

19  a reasonable time period compared to the time period

20  that the plaintiff had, as well, to complete that

21  examination.

22          THE COURT:  But why eight hours, that seems a

23  pretty long time, that's what the doctor said was

24  required?

25          MR. BENNETT:  Yes, Your Honor, I'm really

```
  1                      PROCEEDINGS                18
  2   deferring to her expertise in this, she submitted a
  3   declaration in support of our motion finding that
  4   eight hours was reasonable. Of course, whatever Your
  5   Honor deems reasonable is what we'll take, so to
  6   speak.
  7          THE COURT:  Okay, so let me ask plaintiff,
  8   there's no, there's not really any case law that you
  9   cited from within the Second Circuit that was binding
 10   saying that this, such an exam is not appropriate. You
 11   have expert witnesses on psychiatry, it's pretty
 12   typical in personal injury cases to have an IME after
 13   the plaintiff files an expert report. So this doesn't
 14   seem out of the ordinary, why, what case would you
 15   have me rely on that this shouldn't be granted?
 16          MS. HARWIN:  Well, you know, it certainly is
 17   out of the ordinary in the context of employment
 18   discrimination cases, and this is simply not a common
 19   practice in this kind of case.  And also --
 20          THE COURT:  But here most of her injury is
 21   emotional, is that not correct?
 22          MS. HARWIN:  Well she has economic injury, as
 23   well --
 24          THE COURT:  Sure, but the greater amount is
 25   associated with emotional, is that not correct?
```

1                          PROCEEDINGS                    19

2              MS. HARWIN:  You know, I don't know that I

3    would quantify it in that way, I mean ultimately it's

4    going to be a jury's determination as to the

5    allocation of damages, but there are very significant

6    economic damages in this case with the economic expert

7    calculating economic damages up to $9 million. So, you

8    know, it is not the case that the emotional distress

9    damages sought are $12 million.

10             And it's ultimately defendant's burden to show

11   good cause and good cause has not been established

12   here. There's nothing, you know, in the cases that

13   defendants cite it's typically where there's a paucity

14   of information as to a plaintiff's mental state. Here

15   we've produced complete, or here defendants have

16   access to plaintiff's full medical history, all of her

17   primary care records, all of our mental health

18   treatment records for years, and defendants don't

19   identify why that is insufficient, they don't even proffer

20   that their expert has attempted to review those materials.

21   And so there's no explanation as to what specifically would

22   be adduced from a compulsory mental examination that isn't

23   already identified in the extensive records that have been

24   produced as well as --

25             THE COURT: Let me stop you for a second.

```
 1                         PROCEEDINGS                    20

 2              MS. HARWIN:  Sure.

 3              THE COURT:  Frequently, experts would be attacked,

 4    cross examined, for not having examined the patient, are you

 5    willing to stipulate that you would not use that as a basis

 6    for challenging any of the opinions of the defendants'

 7    expert, that she wasn't, she wasn't, she didn't examine the

 8    plaintiff?

 9              MS. HARWIN:  Well and expert's opinions need to be

10    well rounded and so, you know, if an expert goes beyond what

11    they could reasonably opine --

12              THE COURT:  That's not my question, are you

13    willing to stipulate that you will not make any suggestion

14    or challenge to the expert's opinion because she did not

15    examine the plaintiff, that's my question, are you willing

16    to stipulate to that?

17              MS. HARWIN:  I, the reason I began there is that

18    there's certain things that an expert, you know, presumably

19    can't do without an examination. She can't proffer an

20    independent diagnosis, for instance. And so if the expert

21    were to overstep and do something like that we would want

22    the ability to challenge if the expert does something like

23    that, I don't anticipate that being the case --

24              THE COURT:  What do you mean, you're saying the

25    expert couldn't say the patient, in the expert's opinion the
```

1                              PROCEEDINGS                    21

2   patient does not have PTSD, something like that?  Because

3   it's --

4              MS. HARWIN:  No.

5              THE COURT:  It's not uncommon for an expert in

6   personal injury cases to say, hey, this back surgery was

7   unnecessary, it didn't need to even happen.

8              MS. HARWIN:  That's not what I'm saying.  So, you

9   know, the expert could challenge the opinion presented by

10  plaintiff's treating physician or the expert psychiatrist,

11  but if, for instance, the expert were to, you know, instead

12  opine that plaintiff has X, Y or Z condition instead, that's

13  something that, you know, would be my understanding, based

14  on the medical profession, would be beyond what an expert

15  could do.  But, again, as I said, I don't anticipate that

16  being the case here, I would think that the nature of the

17  expert's opinion will be along the lines of what you just

18  described which is trying to challenge a diagnosis proffered

19  by someone else.  And that we wouldn't, the absence of an

20  examination in our, we wouldn't challenge that type of

21  expert opinion based on the absence of an examination.

22             THE COURT:  Okay, but that still doesn't answer my

23  question about the stipulation.

24             MS. HARWIN:  So as long as the expert isn't

25  proffering an independent separate diagnosis, we would have

1                              PROCEEDINGS                    22

2    no challenge based on the absence of an examination.

3              So if the plaintiff is willing to stipulate --

4              MR. BENNETT:  Your Honor, if I could just add a

5    couple of points --

6              THE COURT:  Yes.

7              MR. BENNETT:  I don't mean to waste the

8    Court's time. From the filing of this complaint in

9    October of 2019 until today, nothing about this case

10   is ordinary, nothing. This is not a run of the mill

11   employment dispute, and plaintiff's counsel has

12   prosecuted it as such. So whatever cases that

13   plaintiff's counsel has cited to in response to our

14   letter or, excuse me, or formal motion, really isn't

15   on point. This is, I think we're looking at it through

16   the lens of is Ms. Robinson asserting garden variety

17   pain and suffering, emotional distress damages, or

18   not.  She's clearly not, she's asserting, she's

19   seeking damages for anxiety, nervousness, sleep --

20             THE COURT:  Sure, there's no question she's

21   not, she's seeking more than garden variety, that's

22   absolutely clear.

23             MR. BENNETT:  All we're looking for, all the

24   defendants are looking for is to play on a level field with

25   plaintiff. The plaintiff has an expert.  The plaintiff's

```
 1                        PROCEEDINGS              23
 2  expert had the ability and did interview Ms. Robinson before
 3  preparing a very comprehensive and lengthy report --
 4           THE COURT:  You mean a non, a non-treating expert.
 5           MR. BENNETT:  Correct, that's correct, yes.
 6           THE COURT:  And that non-treating doctor did
 7  examine the plaintiff.
 8           MR. BENNETT:  Correct, yes.
 9           THE COURT:  Once.
10           MR. BENNETT:  One that they retained --
11           THE COURT:  A consultative exam.
12           MR. BENNETT:  (continuing) -- especially for this
13  litigation, yes.
14           THE COURT:  Okay, and so you're saying in fairness
15  you should have, your expert should have a consultative
16  exam.
17           MR. BENNETT:  Number one, yes --
18           THE COURT:  Okay.
19           MR. BENNETT:  But, more importantly, and, again,
20  I'm really deferring to the qualifications and the expertise
21  of Dr. Resnick who we've retained, she told me at the outset
22  of consultations with her she won't issue a report unless
23  she can examine somebody because she will be, her
24  opinions will not be solvent.
25           THE COURT:  Okay.
```

1

2        MR. BENNETT:  And that's an expert. I mean

3   we're looking for something that will, an opinion that

4   is within a reasonable degree of medical certainty and

5   without the examination from what Dr. Resnick has told

6   us, she can't offer that.

7        THE COURT:  Okay, I will take this under

8   advisement and I will issue a decision in short order.

9   And I, I'll address whatever timeline is appropriate

10  as applicable.

11       MR. BENNETT:  Thank you.

12       THE COURT:  Okay, are there other issues that

13  plaintiff wanted to raise today?

14       MR. SANFORD:  Yes, Your Honor, this is David

15  Sanford.  I understand the Court's order regarding the

16  lines of questioning having to do with marital issues,

17  and family issues, and alcoholism, and so on, you've

18  made that clear.  There are a couple of questions,

19  however, Your Honor, that don't fall in those

20  categories and I just was hoping to get guidance from

21  the Court today so that we don't have issues in the

22  continued deposition with respect to a couple of

23  questions that Mr. De Niro was directed not to answer

24  and did not answer but where those questions don't

25  fall under the categories you listed.

```
 1                         PROCEEDINGS                    25

 2              THE COURT:  Okay, well what are those

 3    questions?

 4              MR. SANFORD:  One question has to do with his

 5    approximate net worth, he --

 6              THE COURT:  I'm sorry, I didn't, you cut out

 7    for a second.

 8              MR. SANFORD:  Yeah, one question has to do

 9    with the approximate net worth of Mr. De Niro, he

10    refused to answer saying it was none of my business,

11    and it is important to understand that for purposes of

12    punitive damages.

13              THE COURT:  Well can the, can the parties just

14    enter into a stipulation on that?

15              MR. SANFORD:  We certainly can if, if opposing

16    counsel is willing to do that?

17              MR. DROGIN:  You know, it assumes that he can

18    approximate that number.

19              THE COURT:  Well most, most people can, I mean

20    you look at your bank account, your stock portfolio,

21    property that you own and any debts that you have and

22    you make an approximation.

23              MR. SANFORD:  Your Honor, Your Honor --

24              MR. DROGIN:  I guess really it would be framed

25    as a yes or no question, so if the answer is no I
```

```
1                        PROCEEDINGS                    26
```

2  cannot we're done with that line of questioning. That

3  information, you can probably Google that and find a

4  lot of different authorities on it that may be more

5  accurate than he, himself.

6           MR. SANFORD:  Your Honor --

7           THE COURT:  Look, if this is, a net worth is

8  relevant to punitive damages and it seems to me that

9  there's no point in asking these questions in, in a

10  deposition, you can just, you can just make a

11  stipulation as to this. Or if you don't want to say

12  exactly, you can say it's in excess of $50 million or

13  whatever it is, because any, you know, above a certain

14  amount it really doesn't matter, you know, I don't

15  think plaintiff really needs to have it to the last

16  penny, we're talking about scales, right, this is not

17  somebody who is, who is poverty stricken, we know

18  that, he's a movie star. So I think that you can have,

19  you can have, you can also stipulate to a range, but

20  that's, that's not something that a jury is really

21  going to hear a lot about, they're going to hear one

22  question or one statement, you know, his net worth is

23  over $25 million, whatever it is, that's it, it's one

24  point.

25           MR. SANFORD:  Your Honor, if I may, I gave him

PROCEEDINGS                    27

1

2  many opportunities to respond because there are

3  reports that his net worth is about $500 million --

4          THE COURT:  Okay.

5          MR. SANFORD:  But he wouldn't say yes to that

6  and he wouldn't say anything about 400 or 300 or 200

7  or 100, I think he admitted just that having it be

8  over $10 million, but that's really inadequate and

9  cagey when there are reports saying that he is worth

10 upwards of a half a billion dollars. So I do think

11 it's important --

12         THE COURT:  Well is he on the Forbes list?

13         MR. BENNETT:  He did answer those questions, I

14 believe his answer was I wish actually in response to

15 half a billion.

16         THE COURT:  Okay, yes, I think half a billion

17 sounds pretty high frankly, but I'm sure his

18 accountant has and, you know, his personal wealth is

19 different from the entity wealth, so I am going to

20 direct that there be no more questions on this and the

21 parties meet and confer about a stipulation. I mean

22 this is, this is just basic information.

23         MR. SANFORD:  I'm happy to meet and confer,

24 Your Honor, and hopefully get that stipulation and if

25 we do that, you won't hear from us again on this

```
 1                          PROCEEDINGS              28

 2   point.

 3          THE COURT:  Good.

 4          MR. SANFORD:  But if we don't, we'll be back

 5   to the Court seeking relief.

 6          THE COURT:  Okay.  Anything further on

 7   plaintiff's side?

 8          MR. SANFORD:  Yes, Your Honor, there is one

 9   other issue. I think all the other questions probably

10   fall within the categories you listed except for one,

11   and that is my question, and I apologize in advance

12   for using this word, but I asked Mr. De Niro whether

13   he called any women a cunt, C-U-N-T, and he said it's

14   none of my business.  It actually is relevant because

15   it goes to credibility because there is an issue about

16   his use of that word, and it goes to the gender claims

17   that we have.

18          THE COURT:  Well, it would be, it would be --

19   what would be relevant is whether he used that term

20   toward women he worked with or worked for, or worked

21   for him. I mean in his private life if he might have

22   used that or what have you, I don't know that that's,

23   you know, that relevant.

24          MR. SANFORD:  Right, there is an allegation --

25          THE COURT:  Or the context in which it was
```

PROCEEDINGS                    29

 1
 2  used, you know, so I think the question would need to
 3  be tailored specifically to whether he used that term
 4  toward or when referring to employees.
 5          MR. SANFORD:  Right, and there is an
 6  allegation in the case and testimony about that with
 7  respect to an employee.
 8          THE COURT:  Okay, so just, just focus the
 9  question, yes.
10          MS. HARWIN:  Actually, the allegation in the
11  complaint is with respect to a business partner, not
12  an employee.
13          MR. SANFORD:  A partner, that's right,
14  someone, someone --
15          THE COURT:  Well so why is that relevant if
16  it's a business partner, not an employee?
17          MR. SANFORD:  Because it's used, because it's
18  used in the context of communications with our client
19  and it goes to gender hostility, which is very much front
20  and center of this case.
21          MR. BENNETT:  Your Honor --
22          THE COURT:  Look, I'll allow the question. I'm
23  going to allow the question, he's got to answer the
24  question, he either used it or he didn't use it and
25  you can make whatever arguments you want. I mean, you

```
 1                       PROCEEDINGS               30

 2  know, I'm sure, I'm confident I know what you're going

 3  to argue if he used, if he did use that term, so he

 4  used the term, that doesn't really reflect his, his

 5  attitude all the time. So, you know, people use bad

 6  words, that doesn't necessarily reflect their

 7  behavior, that's the argument, okay, I understand what

 8  you're going to argue and I understand what the

 9  plaintiff is going to argue, that not everybody uses

10  those words and that reflects something about their

11  motivation and the jury can decide or the Court can

12  decide. The Court can decide whether it's a stray

13  remark or not, whether it's, you know, so but he has

14  to answer the question if it's specifically related to

15  a question concerning plaintiff and so I'll allow that

16  one, one question.

17            MR. SANFORD:  Thank you, Your Honor.

18            MR. DROGIN:  Your Honor, the question was

19  actually answered.  It's on page 132 of the

20  transcript.

21            THE COURT:  Well if it was answered then it's

22  not going to be asked again, I'm sorry.

23            MR. DROGIN:  The question was, "Question: And

24  at times you described Ms. Rosenthal as a cunt to Ms.

25  Robinson?  Answer:  No.  No, I have never done that. I
```

```
 1                          PROCEEDINGS                    31
 2  would never, ever, ever say anything like that to
 3  Chase Robinson, never, ever, that's the kind of thing
 4  she would want to hear me say, that's in her mind,
 5  that's an illusion, never, ever would I do that."
 6              THE COURT:  So the question was, so the
 7  question was answered, was asked and answered.
 8              MR. SANFORD:  Well --
 9              MR. DROGIN:  It went on, there were two more
10  questions about it.  He was then asked, "Well, did you
11  call Ms. Rosenthal a cunt to anyone else besides Ms.
12  Robinson?  Answer:  No, no, no, no, no.  Question:
13  Have you called any other woman a cunt?  Answer:
14  That's none of your business."  So the question that
15  he said that's none of your business to was exactly
16  what the Court said, it was open ended to any other
17  woman.
18              THE COURT:  Well it seems that this issue has
19  been covered, I'm not going to allow any more
20  questions on this given the clarification about, about
21  this and the direct (inaudible) to this particular
22  line of questions.
23              MR. DROGIN:  Thank you.
24              MR. SANFORD:  All right, just to be clear,
25  Your Honor, when you said particular line of
```

PROCEEDINGS                    32

1

2    questions, is that with respect to his use of

3    adjectives with respect to women in other contexts or

4    other terms or --

5             THE COURT:  You asked me if you could have a

6    question about use of this particular word in the

7    context of employees and this conversation with a

8    business partner, and now I've been directed to the

9    specific portion of the transcript where that question

10   was asked and some, a little more questions, no

11   further questions on that and the use of that word.

12            MR. SANFORD:  Thank you, Your Honor.

13            THE COURT:  Anything further on plaintiff's --

14            MS. HARWIN:  Yes.

15            MR. DROGIN:  Just --

16            THE COURT:  Hold on, I'm going to get to

17   plaintiffs and then you'll have your turn.

18            MS. HARWIN:  So, you know, obviously Your

19   Honor has addressed a number of discovery issues.

20   Another, I just wanted to flag for the Court that

21   there are a handful of issues that we're still in the

22   process of meeting and conferring with defendants about.

23   One key issue arose during the Rule 30(b)(6) depositions

24   that were held which was that Canal's designated witnesses

25   were unable to testify on a host of designated topics,

```
 1                       PROCEEDINGS                    33
 2  including aspects of Canal's investigation, the substance of
 3  its claims, it's policies and procedures and its
 4  communications with the Manhattan District Attorney's
 5  Office. And so that is something that we're working with
 6  defendant's counsel to try to get answers to questions
 7  without the need for Court intervention but I just wanted
 8  clarify for the Court that that's an ongoing --
 9           THE COURT:  Well who was deposed about the
10  investigation, wasn't that the accountant?
11           MS. HARWIN:  Yes, it was.
12           THE COURT:  And so the accountant didn't know what
13  he or she did?
14           MS. HARWIN:  Well the accountant was not involved
15  and disclaimed involvement in the investigation and
16  disclaimed knowledge of what was done to investigate. The
17  accountant was unequivocal that the accountants did not
18  initiate a review or review of Canal's records which was the
19  claim in Canal's counterclaims and claimed to have very
20  limited involvement limited to --
21           THE COURT:  Okay.
22           MS. HARWIN:  (continuing) -- sending some emails.
23           THE COURT:  And what policies and procedures don't
24  you know about?
25           MS. HARWIN:  Well, for instance, Canal designated
```

```
 1                           PROCEEDINGS                    34
 2  the accountant as the Rule 30(b)(6) witness concerning
 3  discrimination policies. He said he had no knowledge of the
 4  discrimination policies at all, couldn't even recognize the
 5  policy that existed when presented with it.  And so --
 6            THE COURT:  But wasn't your client kind of the
 7  head person for Canal, she was head of finance?
 8            MS. HARWIN:  Well our client, at the end of her
 9  employment, had the title of VP of production and finance,
10  her role was --
11            THE COURT:  And finance. And wasn't she also
12  hiring people or supervising people?
13            MR. BENNETT:  Yes.
14            MS. HARWIN:  She was involved in the hiring of
15  individuals but the bottom line is she had discrimination
16  complaints and we're entitled to --
17            THE COURT:  Sure --
18            MS. HARWIN:  (continuing) -- testimony about the
19  policies.
20            THE COURT:  There's no question, there's no
21  question but if, in fact, she was the one who has the most
22  knowledge about the policies, who do you think would have
23  more policies?  In a small company if there's just, you
24  know, a handful of employees, sometimes there's not a formal
25  handbook or a formal policy or process. I don't know if
```

1
2    there's a board, I don't know how it's, how this entity is

3    structured, but it's not unusual for a very small company

4    not to have, I mean it's not, for obvious reasons, it's not

5    going to be built out like a Citibank or Bank of America, I

6    mean they don't have, they're not going to have that kind of

7    HR apparatus, right?  So --

8            MS. HARWIN:  That's certainly the case.

9            THE COURT:  So the question is, you know, who's

10   the, who's the right person. Maybe it is Mr. De Niro, to ask

11   about that?

12           MS. HARWIN:  That's ultimately up to Canal to

13   designate the witness. But ultimately these were not

14   questions posed to the accountant as a fact witness, they

15   were posed as a 30(b)(6) witness.

16           THE COURT:  Right.

17           MS. HARWIN:  And so a 30(b)(6) witness who comes

18   in without having any knowledge at all has an obligation to

19   interview people, to review documents and prepare.

20           THE COURT:  Yes.

21           MS. HARWIN:  And they simply didn't do that.

22           THE COURT:  That is correct, okay.

23           MS. HARWIN:  And this was their choice, they could

24   have designated, for instance, their external general

25   counsel who's in the room here, they didn't do that, they

PROCEEDINGS                        36

designated the accountant as to the investigation, which
again he disclaimed involvement with and as to policies and
procedures which he disclaimed knowledge of. You know, in
addition, questions were posed concerning the policies as to
overtime that existed, again, didn't know, you know, was
there a policy of not paying overtime prior to this year,
had no idea. And so this was, I mean a recurrent problem --

          THE COURT:  Well, a 30(b)(6) deposition is
designed to avoid this, a party getting a runaround
and not getting answers to basic questions, that's the
whole purpose of Rule 30(b)(6). And so the company is
required to prepare that witness and those witnesses are
required to answer those questions and they're going to
binding on the company. So if you don't have answers on some
basic things, I mean if the answer with the policies and
procedures were there really weren't formal ones, okay, so
then that's the answer.

          MS. HARWIN:  Right.

          THE COURT:  There's nothing more, there is nothing
more to say about it.

          MS. HARWIN:  Right.

          THE COURT:  But you're entitled to get some
answers on that.

          MS. HARWIN:  And similar, Your Honor, with

PROCEEDINGS                    37

1

2   respect to another 30(b)(6) topic had to do with, you

3   know, the specific transactions, expenses, et cetera, that

4   are at issue in defendants' complaints against Ms.

5   Robinson. And we were unable to get the most basic

6   information about what are the transactions that are at

7   issue in the claims. For instance, there's a claim about

8   fraud with respect to the claiming of vacation days,

9   well what are the days that Canal contends she was on

10  vacation and that wasn't answered.

11          With respect to claims about, they claim that

12  flowers were improperly charged. Well what were the

13  stores you claim that they were charged at, what is

14  the amount that you claim was charged.

15          THE COURT:  Well I thought there was a

16  forensic, what's --

17          MS. HARWIN:  There was no forensic accounting.

18          THE COURT:  Let me ask defendant, what, was

19  there some forensic accounting, isn't there some

20  report that says this many, this is what we estimate

21  the vacation days, even if you can't get it exactly

22  based on, you know, these emails or whatever, isn't

23  there some report like that?

24          MS. HARWIN:  No, Your Honor, there is not.

25          MR. BENNETT:  Your Honor, whenever you're

1
2  ready --

3          THE COURT:  I'd like to hear from defendant.

4          MR. BENNETT:  There is no formal forensic

5  accounting that was performed, it's before Canal

6  commenced its action against Ms. Robinson in the State

7  Court in August of 2019.

8          THE COURT:  Okay.

9          MR. BENNETT:  However, going back at least a

10 year, perhaps a year and a half ago, the plaintiff

11 served us with a set of interrogatories designed for

12 us to identify, essentially contention

13 interrogatories. They wanted us to identify every

14 single vacation day that served as the basis for the

15 Canal case, every single flower order that was

16 unauthorized, et cetera, et cetera, and there are a

17 lot of details and minutia that served as the basis

18 for Canal's State Court action against, against, Ms.

19 Robinson.

20          THE COURT:  Um-hmm.

21          MR. BENNETT:  So at the time we said that's

22 improper, with all due respect, we'll revisit this

23 issue after depositions have been conducted. Fast

24 forward to depositions at the 30(b)(6), and there were

25 two 30(b)(6) deponents because there were five different

```
 1                        PROCEEDINGS                    39

 2   categories, attorney Harvey here was one of the

 3   witnesses, and Mr. Tash (phonetic) from Burden was the

 4   second witness.  It's unrealistic to think, and I say

 5   this cognizant that a 30(b)(6) representative must be

 6   prepared to testify as to the topics --

 7            THE COURT:  Yes.

 8            MR. BENNETT:  But for them to come in and say

 9   these 27 categories from the 400 pages of Amex

10   statements that we produced already in discovery form

11   the basis.

12            THE COURT:  Sure, it's not a memory contest.

13            MR. BENNETT:  Right.

14            THE COURT:  It's not a memory contest and if

15   there is not a specific report but rather there's

16   expense reports that have been produced and

17   highlighted. I mean, look, an employer's not, not --

18   even if there was more instances of alleged theft,

19   there really only needs to be one as a basis to fire

20   somebody if that's, if there's a loss of trust in

21   that. So to the extent, to the extent the action was

22   taken, well I guess Ms. Robinson resigned, but to the

23   extent, to the extent there was, you know, a couple of

24   items that were significant and that was the basis and

25   you know what that, for bringing the suit, and you can
```

PROCEEDINGS                    40

1

2   identify that, and if you at that time didn't identify

3   every other one, then that's what the witness can say.

4   But at the same time, if subsequent -- so you must

5   know what transactions were the basis for bringing that

6   suit --

7           MR. BENNETT:  Yes.

8           THE COURT:  I mean I assume there were some.

9           MR. BENNETT:  Your Honor, yes --

10          THE COURT:  Let me hear from the defendant

11  first.

12          MR. BENNETT:  Thank you.  The way we viewed

13  it, both the contention interrogatories and the

14  questions that were put to the witness during the

15  30(b)(6) depositions was they want a roadmap of every form

16  of evidence that we have to support our claim.

17          THE COURT:  They're entitled to, they're entitled

18  to understand the basis for bringing that lawsuit and

19  accusing her of theft.

20          MR. BENNETT:  We understand that, Your Honor, we

21  have produced all of the documents that Canal relied

22  on --

23          THE COURT:  But they're entitled to

24  understand, to have you say she did this, this and

25  this, there entitled to that.  They don't have to go

PROCEEDINGS                    41

1

2  through the records and guess, you should know that,

3  you brought the suit.

4          MR. BENNETT:  And we do, but just taking as

5  one example, we produced a document that I think is

6  roughly 500 pages, it's a collection, compilation of

7  American Express statements with various unauthorized

8  transactions within those, within that compilation. Is

9  Your Honor saying that we need to go through and

10 identify every single specific basis that served as

11 the grounds for commencing the Canal action or

12 categorically can we identify the subject matters that

13 are at the heart informed the basis.

14         THE COURT:  You don't know, at this late date

15 you don't know which transactions were at issue?

16         MR. BENNETT:  We do know the transactions --

17         THE COURT:  Well then point them out.  Point

18 them out, yes, of course. I mean this is basic

19 information.

20         MS. HARWIN:  Thank you, Your Honor --

21         MR. BENNETT:  Judge --

22         MS. HARWIN:  If I could just, you know,

23 address that. I mean some of the questions were as

24 simple as, you know, here's a highlighted spreadsheet,

25 are the ones highlighted in pink the items that you

1

2  claim are improperly charged for this and there was no

3  answer provided.

4          THE COURT:  Well there has to be, look, at the

5  time that you brought the lawsuit you were aware of

6  certain transactions, you have to identify what those

7  transactions were. Those specific transactions. And if you

8  found more later, fine, you can say you found more later

9  and it only, it only, you know, increased our concern.

10 That's fine. That's fine, you don't have to know all of

11 the information when you bring the lawsuit, if you have a

12 colorable basis for it, but the plaintiff is entitled to

13 know what transactions you're basing it on. I mean this

14 is, at this point in the lawsuit they should have this

15 explanation.

16         MR. DROGIN:  Your Honor --

17         MS. HARWIN:  If I could just quickly, and I

18 will certainly give you the opportunity to address, but

19 during the 30(b)(6) deposition, for instance, I mean they

20 could not provide even the most basic range of the claimed

21 charges. For instance, you know, a question as to whether,

22 whether the claim is that Ms. Robinson improperly charged

23 hundreds of thousands of dollars on this credit card or

24 $60,000, no answer --

25         THE COURT:  Well that also needs to be, that also

PROCEEDINGS                    43

1

2   need, I mean if you, if you, if it turns out you were wrong

3   and the number is $10,000 more or less or whatever, okay, so

4   I mean that's the point of discovery, plaintiff can say

5   you're wrong about this particular charge and the number is

6   really $50,000. I mean, you know, that's, sometimes people

7   don't always get everything, all the math right or all the

8   transactions right, but the plaintiff is entitled to

9   certainly know and say, hey, this is, this was proper.

10          MR. DROGIN:  Judge, this part of the

11   conversation began with counsel saying that we're

12   working on this and that there's nothing being

13   presented to the Court right now --

14          THE COURT:  Okay.

15          MR. DROGIN:  Because we are working on this

16   and we've actually proposed solutions to get them the

17   information.

18          THE COURT:  Well what's taken so long, I don't

19   really get it?

20          MR. DROGIN:  The 30(b)(6) witnesses were just

21   recently deposed, so we've already been in touch with them

22   about going through the areas where they feel the answers

23   were deficient and formulating a way to get them the

24   information. But it should not be lost and Mr. Bennet was

25   not exaggerating that we are deep, deep, deep into the weeds

```
 1                          PROCEEDINGS                    44
 2  here. And to be very, very clear, the allegations relating
 3  to this lawsuit indisputably she had cash, she had gift
 4  cards and she had property. We asked for them back.  They
 5  were given back to us by van or truck --
 6            THE COURT:  I understand that.
 7            MR. DROGIN:  So when we're talking about line
 8  items for flowers, let's not forget she still has the Sky
 9  Miles, we still don't have them back.  So we can talk about
10  flowers all we want, but there's, there's a circus full of
11  elephants in the room.
12            THE COURT:  Fine but, for example, at the very
13  least you could have some report by someone that says here's
14  a stack of the Amex bills, every highlighted transaction is
15  improper in our view.
16            MR. DROGIN:  That's what was done.  That's what
17  was done.
18            THE COURT:  Well I'm hearing from plaintiff's
19  counsel that wasn't done.
20            MR. DROGIN:  Then they need to check, they need to
21  check the highlights on the Amex statement. And they asked
22  another witness who was not a 30(b)(6) witness just that
23  question.  And they tallied it up and they said this is the
24  exact amount that's highlighted, is that where you go that
25  number?
```

1

2          THE COURT:  Well so do you have the information or

3  do you not have the information?

4          MS. HARWIN:  We don't have the information from

5  Canal as its 30(b)(6) witness as to what these --

6          THE COURT:  Do you have the, do you have it from a

7  knowledgeable witness?

8          MS. HARWIN:  I don't believe we do.

9          MR. DROGIN:  We'll work with them, Judge.

10          THE COURT:  Okay, so I, meet and confer on this

11  because the fact that it's not a 30(b)(6) witness but

12  it's a knowledgeable fact witness who went through it and

13  can testify, you know, that's fine, then you have the

14  information.

15          MS. HARWIN:  And we, there was testimony by

16  one person who was involved and this raises and issue

17  that I think it would be helpful to have the Court's

18  guidance on which has to do with privilege issues. You

19  know, Canal had a fact witness who testified that in

20  coming up with these numbers they were just, you know,

21  three idiots in front of a computer, I believe that

22  was the term he used, they were just tabulating

23  numbers and they weren't making any conclusion that

24  there was any wrongdoing.  And then we deposed the

25  accountant who said likewise, they made no conclusion

PROCEEDINGS                          46

1
2   as to wrongdoing, and then the question then comes to
3   well, you know, did anyone make any, you know,
4   investigate to determine whether these charges were
5   authorized or not --
6           THE COURT:  I've already seen documents that
7   there was some collection of information prior to the
8   lawsuit. There was an investigation that employees
9   were involved in.  Whether it looked like, whether it
10  looked like what an investigation in your mind should
11  look like, you know, is another question. Again, this
12  a small organization but I've already seen documents
13  showing that employees were forwarding emails --
14          MS. HARWIN:  Yes, Your Honor.
15          THE COURT:  And there was, there was a
16  collection of information to ascertain what happened.
17          MS. HARWIN:  Well let me be clear because I
18  think perhaps I was imprecise, what I'm describing is
19  that the employees tabulated expenses but reached no
20  conclusion as to whether the charges were proper or
21  improper, they just tabulated here's the number of
22  Ubers that are on this credit card. And then the
23  accountant said likewise, they didn't reach any
24  determination as to whether they were authorized or
25  not, they actually disclaimed any involvement in even

PROCEEDINGS                    47

1
2    the tabulation.

3            And then, so then the question arises as to

4    what did Canal actually do to investigate whether

5    these charges were proper or not, and then we're

6    running into objections on grounds of privilege.  That

7    essentially the employees didn't do anything to

8    investigate whether the charges were proper or not,

9    the accountants didn't, and we're told that the lawyer

10   for Canal was involved in doing this. But this leaves

11   us with, you know, no information as to what was done

12   to ascertain whether the charges were proper or not.

13           THE COURT:  Well to the extent the lawyer is

14   acting as a fact witness, as a fact investigator, and

15   is making conclusions as to what the investigation

16   results and that is a basis for a claim, there is no,

17   there is not going to be a privilege that protects

18   that.  The privilege is waived or other Courts say

19   that it's not subject to a privilege. So, you know,

20   you can look back at the *Pray* case, which I'm

21   intimately familiar with and that's one of the early

22   decisions about investigations.

23           And so, look, if that's what happened, then

24   you're going to have to straighten that out, but

25   discovery is coming to an end here. I mean this is,

PROCEEDINGS                    48

1
2   somebody made a conclusion based on, you know, the
3   information. If the conclusion was we know there were
4   Sky Miles taken, we know there was property taken and
5   that's the basis of the suit, and since then we've
6   found more, then that's the basis. I mean I have no
7   idea what you're going to say but you certainly know
8   why you acted, what the basis of the lawsuit was and
9   plaintiff is entitled to understand the factual basis
10  supporting the claims.  And entitled to evaluate and
11  discovery so that she can rebut them possibly.
12          MS. HARWIN:  Thank you, Your Honor.
13          MR. DROGIN:  No one, no one is contesting
14  that.  There are privilege issues here and it, it's
15  not always black and white and we're trying to
16  navigate through them.  You know, for example, when we
17  asked Ms. Robinson why didn't you return this property
18  sooner, she invoked the attorney-client privilege,
19  that's what that whole --
20          THE COURT:  That's a different, that's a
21  different, that's a different issue than the aspects
22  of an investigation that might be, that might
23  privileged.
24          MR. DROGIN:  It is, but it's one of the
25  privilege issues that I'm saying that these are not,

PROCEEDINGS                    49

1

2  they're not clear cut.

3         THE COURT:  Well I've issued some opinions on

4  this, the case law is pretty clear on if you're using

5  an investigation, if you conducted an investigation

6  and made conclusions based on the investigation and

7  that's the basis of a claim, that you're supporting a

8  claim, that's not privileged, the plaintiff's entitled

9  to that information.

10        MR. DROGIN:  I'm not contesting that and I

11 understand the *Pray* decision well, I'm simply

12 highlighting for the Court that privilege is an issue

13 that we've run into in this case and we're trying to

14 navigate it.

15        THE COURT:  Yes, you and a lot of other

16 litigants in a lot of other cases.  Okay, anything

17 else?

18        MS. HARWIN:  I think, I just want to flag a

19 scheduling issue which I understand Mr. Bennet will,

20 I'm happy to pass it over to you if you want to

21 address it.

22        THE COURT:  Okay?

23        MR. BENNETT:  Okay, thank you.  Three quick

24 issues, Your Honor, the Court has certainly been

25 tolerant with respect to scheduling issues and I don't

1                            PROCEEDINGS                    50

2  mean to push the Court's patience any further than

3  necessary.  The first is really just an FYI, counsel

4  and I are working with respect to, as the Court is

5  aware the plaintiff produced more than 100 audio

6  recordings, we had a dispute and it remains open as of

7  right now but it seems likely that we're going to

8  resolve it with respect to authentication of

9  recordings.  That's number one.  It's possible to the

10 extent we can't work it out the Court may hear from

11 us, but I think, I'm optimistic we will, okay.

12         Number two, the scheduling issue that Ms.

13 Harwin referred to is with respect to our, the

14 defendants' expert witness in the area of vocational

15 evaluation. It has been exceedingly different and I'm

16 personally dealing with it, to schedule, to find time for

17 our witness to be available for a deposition. He is very

18 busy, he has a national practice, he's throughout the

19 country. We are working very hard to, we've obtain three

20 dates in May, I presented them to Ms. Harwin before this

21 morning's conference, we will schedule it as soon as

22 possible. The deadline right now is April 30th, so I wanted

23 to bring it to the Court's attention. We're not --

24         THE COURT:  Okay, so are the dates in May, is one

25 of the dates acceptable to both sides?

| | PROCEEDINGS | 51 |

1

2          MS. HARWIN:  Unfortunately, I had to (inaudible)

3  my phone to the, to get into the courtroom, so I haven't

4  been able to confirm since getting those dates this morning,

5  but I anticipate that one of those dates should work.

6          THE COURT:  So I can extend the deadline so that

7  that deposition can be taken in May.

8          MS. HARWIN:  Thank you.

9          MR. BENNETT:  Of the three dates the outlier is

10 the 26th of May.

11         THE COURT:  Okay.

12         MR. BENNETT:  And then the third is really an FYI

13 as well, we alerted the Court quite a while ago to a third

14 party subpoena that we served on an entity called

15 Neighborhood Defender Service, we were seeking certain

16 documents in connection with that entity's

17 representation of Ms. Robinson in response to the

18 investigation by the D.A.  They served some, one

19 category of documents in response to I think five or

20 six.  We are going to follow up with them because we

21 think that production is deficient. It's our hope to

22 resolve it without bothering the Court, but it is

23 possible we may need to bring that dispute to your

24 attention.

25         THE COURT:  There was no indictment, right?

```
 1                         PROCEEDINGS                52

 2            MR. BENNETT:  No, the Court is correct.

 3            THE COURT:  So there was an investigation, an

 4  internal investigation by the D.A. --

 5            MR. BENNETT:  Yes.

 6            THE COURT:  And no presentation to the grand

 7  jury.

 8            MR. BENNETT:  Correct.

 9            THE COURT:  So, okay, and so the defense

10  lawyer is going to have mostly privileged documents

11  except --

12            MR. BENNETT:  We are certainly not looking for

13  that, the organization has produced communications

14  between itself and the D.A.'s investigator.

15            THE COURT:  Okay.

16            MR. BENNETT:  What we are looking for are some

17  other documents that we think still are relevant. One

18  is, and it still is odd to us that it wasn't produced,

19  the mission statement for the organization. This is a

20  not for profit organization and --

21            THE COURT:  Why is that relevant to this case?

22            MR. BENNETT:  From what we understand, Ms.

23  Robinson was not really within what's called the

24  catchment area of this organization --

25            THE COURT:  So what?  So what?
```

```
1                          PROCEEDINGS                    53

2              MR. BENNETT:  Well there is a connection --

3              THE COURT:  She's entitled to a, she's

4    entitled to get a lawyer, if that organization said,

5    oh, we'll, we'll allow it, so what, what does, how

6    does that, how is that material to the main issues in

7    this case?

8              MR. BENNETT:  Your Honor, there is a

9    connection between the plaintiff's legal counsel in

10   this case and that organization.  That is one of the

11   reasons we wanted to look into it.

12             THE COURT:  Again, so what?

13             MR. BENNETT:  I think it goes to credibility

14   with respect to Ms. Robinson's retention of a not for

15   profit organization to defend her in response to a

16   criminal investigation when she had resources

17   allegedly to maintain, retain her own separate private

18   counsel.

19             THE COURT:  How is that issue ever going to be

20   presented to a jury, how does that bear on any of the

21   claims?  And I don't understand how that bears on, on

22   the plaintiff's credibility either. So what, so she,

23   so she's friends with an attorney or an attorney

24   referred another attorney, she made, so what, she has

25   attorneys?
```

```
 1                       PROCEEDINGS                  54

 2           MR. BENNETT:  Well this is the problem, Your

 3  Honor, with due respect, with these issue, where we

 4  get so far afield that sometimes sight is lost. The

 5  only question here --

 6           THE COURT:  The sight would be lost in

 7  pursuing discovery about why she hired this, this

 8  Bronx Defenders, who cares really?

 9           MR. BENNETT:  I just want you to understand

10  the stream here and how we've wound up here.  The

11  entire allegation relating to the District Attorney's

12  Office is that Canal and Mr. De Niro went to the

13  District Attorney's Office in retaliation for her

14  bringing this lawsuit.

15           THE COURT:  I understand, and you say, no, you

16  went there because you believe she stole.

17           MR. BENNETT:  Not only that, we went there and

18  we produced documentation --

19           THE COURT:  Fine.

20           MR. BENNETT:  (continuing) -- that the

21  communications with the D.A.'s Office --

22           THE COURT:  Right.

23           MR. BENNETT:  (continuing) -- were before the

24  lawsuit was started.

25           THE COURT:  Okay.
```

```
 1                         PROCEEDINGS                 55

 2              MR. BENNETT:  So the theory is caput.

 3              THE COURT:  Well, this, this is, this is a

 4    discovery conference, these are arguments that will be

 5    made later in the case, right, you each will make your

 6    own, your own arguments on that.  But the details of

 7    why a particular counsel was retained is really not,

 8    not so relevant to the case.  I mean this is, both

 9    sides have been somewhat scorched earth in this case,

10    and you need to dial it back and just finish getting

11    to the core issues.

12              MR. BENNETT:  But is it also relevant then, as

13    counsel proposes to do, to ask Mr. De Niro about his

14    communications with the District Attorney's Office,

15    who was there at the meeting, what were you wearing,

16    what did you eat for breakfast that day --

17              THE COURT:  What you were wearing, what you

18    ate for breakfast, no, of course not. But what

19    information did you provide, sure, that's relevant

20    because she's entitled to know what information was

21    provided for, regarding the suspected theft. I'm sure

22    there was certain information.

23              MR. BENNETT:  Documentation or verbal

24    statements?

25              THE COURT:  Either, either is, what, you know,
```

```
 1                          PROCEEDINGS                  56
 2  because he may have provided context, you know, these
 3  are my Sky Miles, this is why I think she stole the
 4  Sky Miles.
 5          MR. BENNETT:  Very well.
 6          THE COURT:  That's just the factual
 7  presentation made to the D.A. so the D.A. could then
 8  decide is this a criminal matter or not.
 9          MR. BENNETT:  Understood. For us it was a
10  fairly novel issue as to whether you bring something
11  to the D.A.'s office, whether or not there's any sort
12  of privilege that might attach to those communications
13  --
14          THE COURT:  I don't see why there's a
15  privilege, I mean it's not grand jury.
16          MR. BENNETT:  We couldn't find one either.
17          THE COURT:  No, there's not a privilege.
18          MS. HARWIN:  Your Honor, if I could just raise
19  one final issue which is just a plea for compliance
20  with this Court's rules.  One of the things that we've
21  encountered and the reason I think there's been such a
22  flurry of filings is that defendants have repeatedly
23  chosen to file letter motions with the Court without meeting
24  and conferring with plaintiff. This is something that
25  occurred with respect to the Rule 35 request for an
```

PROCEEDINGS                            57

examination, with respect to their filing a letter

motion concerning trying to prohibit the videotaping

of Mr. De Niro's deposition and a whole host of other

matters.  You know, we, we diligently abide by the

Court's rules, we don't raise issues with the Court

without having a communication with defendants first, we

don't present letter motions without conferring with

defendants, and I would just ask the Court to enforce its

own rules and direct defendants to comply.

        THE COURT:  Well both sides have caused the others

agitation in this case.  What I'm going to do is I'm going

to set another conference because I don't want to have, I

don't want to have any letter motions between now and

the next conference, we can address issues at the next

conference.

        MS. HARWIN:  Thank you, Your Honor.

        THE COURT:  Chris, is there a day maybe before

I'm on criminal duty or the week of the 16th maybe?

What about late in the day on the 18th at like 4?  We

may be done by like 4.  I can give you 4:00 on May

18th.

        MS. HARWIN:  On May 18th?

        THE COURT:  Yes.

        MS. HARWIN:  I'm sorry, would someone mind

```
 1                         PROCEEDINGS                    58

 2  telling me what day of the week that is?

 3              THE COURT:  It's a Wednesday.

 4              MS. HARWIN:  Thank you.

 5              THE COURT:  Okay, 4 p.m. in person, no letter

 6  motions between now and then, you can submit a three-

 7  page joint agenda letter by the 16th.

 8              MS. HARWIN:  Thank you, Your Honor.

 9              THE COURT:  If there's no reason to have the

10  conference, you can let me know that, too, but somehow

11  I suspect there will be.

12              Okay, is there anything further?

13              MR. BENNETT:  No, Your Honor.

14              MS. HARWIN:  Thank you, Your Honor.

15              THE COURT:  All right, nice to see everybody.

16              MR. SANFORD:  Thank you, Your Honor.

17               (Whereupon, the matter is adjourned.)

18

19

20

21

22

23

24

25
```

59

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Robinson v. De Niro et al, Docket #19-cv-09156-LJL-KHP, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  *Carole Ludwig*

       Carole Ludwig

Date:    April 26, 2022