# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,


                    Plaintiff,


              - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x



          ZOOM VIDEOCONFERENCE DEPOSITION OF

                  ROBERT DE NIRO

                  April 4, 2022




              MAGNA LEGAL SERVICES

                (866) 624-6221
                www.MagnaLS.com



Page 85

```
 1    say what it is.
 2              But I saw that she wanted to control
 3    everything.  And what -- that's a problem when
 4    people want to control everything.  They don't
 5    realize that you just have to use the best of
 6    what the people have.  Respect them and you will
 7    get a lot further.
 8              She had ideas about wanting to be an
 9    executive and this and that, wanting me to give
10    her all kinds of titles.  I said the only thing
11    you need from me -- you don't need those titles.
12    They mean nothing.  All you need is a letter of
13    recommendation from me, and that's it.
14              And I didn't even say do your job.
15    What I was thinking is just do your job.  Do the
16    right thing.  Be honest.  Be straightforward.
17    You'll always come out ahead.
18              That's all I ask.  It is the honor
19    system.  You do the right thing, you get repaid
20    accordingly.  It is that simple.
21    BY MR. SANFORD:
22         Q.   Do you remember my question?
23         A.   You can repeat it if you want.
24         Q.   Do you remember it?
25              MR. DROGIN:  Note the objection
```



Case 1:19-cv-09156-LJL-KHP   Document 219-2   Filed 04/29/22   Page 4 of 35

Page 92

1    things so I don't have to go to each person and

2    say you do this, you do that.

3                 That is what that was.  She had a

4    lot of control.

5         Q.   So she controlled delegating

6    assignments and she was that point person

7    throughout the time she had worked for you?

8         A.   Yes, pretty much, yes.

9         Q.   All right.

10                During her employment -- during

11   Ms. Robinson's employment at Canal, how many

12   times would you communicate with her during an

13   average day?

14                MR. DROGIN:  Objection to form.

15        A.   A few times.

16                THE WITNESS:  Sorry.

17                MR. DROGIN:  Objection to the

18         form.

19                You can answer.

20   BY MR. SANFORD:

21        Q.   You can answer.

22        A.   I would be talking to her a lot

23   during the day.  How is this?  How is that?  She

24   would call me, e-mail.  This is being done, dah,

25   dah, dah.  You know, it was just the usual



 1    stuff.

 2            Q.   How frequently would you text

 3    Ms. Robinson during an average day?

 4            A.   I don't remember.  You know, I don't

 5    remember.

 6            Q.   How often would you meet with

 7    Ms. Robinson in a typical day?

 8            A.   It could be once a day.  Sometimes

 9    not for a day or two or three if I'm busy doing

10    something other than just being out of town.

11            Q.   During Ms. Robinson's employment at

12    Canal, Ms. Robinson generally kept you apprised

13    of where she was throughout the course of a day,

14    didn't she?

15                 MR. BENNETT:  Objection.

16            A.   I think she probably did, but I'm

17    not a hundred percent sure.  Sometimes she

18    didn't.  But I would just rely on her.  I would

19    call her or say call me and that would be that.

20    BY MR. SANFORD:

21            Q.   It was common for you and

22    Ms. Robinson to speak early in the morning

23    before 9:00 a.m., right?

24            A.   I think yes --

25                 MR. BENNETT:  Objection.



Page 94

1          A.   I think in the beginning of the day,

2    yes.

3    BY MR. SANFORD:

4          Q.   And it was common for Ms. Robinson

5    to do work for you early in the morning as well,

6    right?

7                MR. BENNETT:  Objection.

8          A.   At times.

9    BY MR. SANFORD:

10         Q.   And it was common for you and

11   Ms. Robinson to speak late at night until 8:00

12   o'clock or later, right?

13               MR. BENNETT:  Objection.

14         A.   It could be.

15               THE WITNESS:  I'm sorry, should I

16          not answer?  Or are you saying

17          objection?

18               MR. BENNETT:  It's okay, Bob, go

19          ahead.  I'll be very clear if I don't

20          want you to answer.

21   BY MR. SANFORD:

22         Q.   And it was common for you and

23   Ms. Robinson or Ms. Robinson to speak with you

24   and do work on the weekends, right?

25               MR. BENNETT:  Objection.



Page 95

1          A.   Yes, if need be, yes.

2   BY MR. SANFORD:

3          Q.   And it was common for you and

4   Ms. Robinson to speak on holidays, right?

5                MR. BENNETT:  Objection.

6          A.   If need be, yes.

7   BY MR. SANFORD:

8          Q.   And during Ms. Robinson's employment

9   at Canal, Ms. Robinson kept you apprised if she

10  was going to be away from New York, right?

11               MR. BENNETT:  Objection.

12         A.   Yes, she said she would like to go

13  to Spain or London and do this, and I -- you

14  know, with the internet and technology these

15  days, I said okay.  Even phones, okay.

16  That's -- I want to accommodate her.  I want to

17  make her happy.  I just -- that's how I am.

18               If people want to do something, they

19  need to do it that way.  I'll say okay.  I'm

20  okay with that as long as you do what you need

21  to have done.

22  BY MR. SANFORD:

23         Q.   Ms. Robinson checked with you before

24  traveling from New York, going outside of New

25  York, right?



Page 98

1    Yes, she is a personal assistant.  She also was

2    very important as far as helping me with those

3    things.

4    BY MR. SANFORD:

5         Q.   So besides getting presents and

6    going to stores, what else would she do?

7         A.   Well, you know, whatever,

8    whatever -- she helped me with the house.  She

9    pulled in a friend of hers.  I said fine, an

10   interior designer.

11            We would go to the design center or

12   here and there, look for furniture.  Order

13   furniture to certain specifications.  She helped

14   me with this, a piece of furniture.  Be there

15   waiting when it would come in, or somebody --

16   she would have Michael there waiting for when it

17   would come in.

18            You know, it was anything.  Anything

19   and everything.

20         Q.   Okay.

21            Ms. Robinson's titles changed at

22   various times during her employment at Canal,

23   didn't they?

24         A.   At her request.

25                 MR. SANFORD:  We are sharing a



Page 109

1   saying how about -- she kept coming back with
2   different titles and that was head of finance.
3                 So I said okay.  I mean, I was so
4   tired of her asking for this and I thought to
5   myself, well, this is what people do and certain
6   people want.  They want some raise in their
7   stature in the company.  So the company will
8   give them a title.  That way they don't have to
9   give them as much money.
10                 In my case, I gave her money and the
11   title, but the title meant nothing.  I said at
12   the end of the day, it is just what you do for
13   me, what you do, what you do for the company
14   is -- and do it honorably, there's nothing, you
15   know -- I would give you the highest
16   recommendation.
17                 And if you had to go to another
18   company because you got a better offer, more
19   power to you.  I would never stop anybody.  I
20   would encourage people, especially if they're
21   younger.
22                 They might -- the job -- what is
23   good for them is for a while, but they want to
24   move on.  So, fine, I want to help you.  I'm not
25   going to stop you.



1    you don't know whether you promised Ms. Robinson

2    that her work conditions would improve during

3    the meeting with her in early January 2019?

4                    MR. DROGIN:  Objection to the

5            form.

6                    You can answer, Bob.

7            A.   I can't -- I don't know what she's

8    talking about.  If she said you promised me

9    this, you promised me that, you promised me

10   this, I'd say well, I did promise you that, but

11   not this and not that.

12                   But I don't see any of that here.  I

13   don't know what she is talking about.

14   BY MR. SANFORD:

15           Q.   All right.

16                   You were the final decision maker

17   when it came to employee salaries at Canal,

18   right?

19           A.   Yes.

20           Q.   Ms. Robinson could not set employee

21   salaries without your approval, right?

22           A.   Yes.

23                   MR. BENNETT:  Objection.

24   BY MR. SANFORD:

25           Q.   You were the final decision maker



Page 127

1   when it came to employee bonuses at Canal,

2   right?

3          A.   I was made aware and then I would

4   say okay.

5          Q.   Ms. Robinson could not set employee

6   bonuses without your approval, correct?

7          A.   Yes, I mean, she should -- I mean,

8   the only thing I think of is after a couple of

9   years is she knew this would be the norm.  We do

10  the same as last year.  That's the only thing.

11               But if anything was changing or

12  anything was up or this and that, she was

13  obligated to make me aware of that.

14         Q.   You were the final decision maker

15  when it came to hiring employees at Canal,

16  correct?

17         A.   Yes.

18         Q.   Ms. Robinson could not make an offer

19  of employment without your approval, right?

20         A.   Yes, but I don't know what -- you're

21  asking me a question that I'm waiting for some

22  kind of curve ball to come and say -- yes.

23         Q.   There's no curve ball, Mr. De Niro.

24  I'm just asking a simple question and asking for

25  simple answers.



 1          A.   To you guys, I don't know.  But
 2   anyway.
 3          Q.   So the answer to my question --
 4   Ms. Robinson could not make an offer of
 5   employment without your approval, right?
 6          A.   That's probably, yes.
 7          Q.   All right.
 8               You were the final decision maker --
 9          A.   Sorry, go ahead.
10          Q.   I'm sorry?
11          A.   At face value what it said, I could
12   say yes.
13          Q.   Okay.
14               You were the final decision maker
15   when it came to terminating employees at Canal,
16   correct?
17          A.   Yes, yes.
18          Q.   Ms. Robinson could not terminate an
19   employee without your approval, right?
20          A.   No.
21          Q.   That is to say she could not
22   terminate?
23          A.   No, she couldn't.  The people in the
24   office, in my immediate office, that's all, the
25   only jurisdiction she would have.  And she would



Page 129

1    have to run that by me, yes.

2          Q.   Okay.

3               You were the final decision maker

4    when it came to Canal's policies, correct?

5          A.   Yes.

6          Q.   And Ms. Robinson could not implement

7    an office policy of significance without your

8    approval, right?

9               MR. BENNETT:  Objection.

10         A.   She couldn't, but we don't know -- I

11   don't know what she did in my name and said that

12   I approved it.  I wouldn't at this point put

13   things past her knowing what she has done.

14              So I have to think about that and

15   know exactly what she did or what was done that

16   I got my approval or not.

17   BY MR. SANFORD:

18         Q.   I'm not asking what, in fact,

19   happened.  I'm just saying as a matter of

20   policy, you needed to approve, you know --

21         A.   As a matter of policy that is honest

22   and transparent and well-meaning and positive,

23   yes.

24         Q.   Okay.

25              You were the final decision maker



```
 1          form.
 2                 You can answer.
 3          A.   I don't remember.
 4   BY MR. SANFORD:
 5          Q.   Is that right?
 6          A.   I don't remember that.
 7          Q.   Do you remember Martin Scorsese's
 8   birthday party at your house?
 9          A.   No.  I don't even remember.  When
10   was that?  How long ago was that?
11          Q.   I'm asking you.
12                 Do you remember it at all?
13          A.   I don't remember.
14          Q.   Do you remember having a birthday
15   party at your house for Martin Scorsese?
16          A.   When, what year was this?
17          Q.   Any year you can remember.
18          A.   I can't remember it.
19          Q.   Ms. Robinson would at times mend
20   your clothing, correct?
21          A.   No, she wouldn't.
22          Q.   Ms. Robinson would at times select
23   gifts for your children; wouldn't she?
24          A.   That might be so, yes.
25          Q.   Okay.
```



Page 157

```
 1              A.    With me.

 2              Q.    It is not that it might be so, you

 3     have already testified that it is so?

 4                    MR. BENNETT:  Objection.

 5              A.    Well, then it is.  Whatever.  That's

 6     fine.

 7     BY MR. SANFORD:

 8              Q.    Ms. Robinson would at times make

 9     your bed; wouldn't she?

10              A.    No.

11              Q.    Ms. Robinson would at times --

12              A.    Is she trying to say that she used

13     to make my bed?  This is nonsense.

14              Q.    Ms. Robinson would at times

15     organize your closets; wouldn't she?

16              A.    That, she did a little of, yes,

17     because she ordered the closet.  California

18     Closets.  And she did it wrong too, by the way.

19              Q.    Okay.

20                    Ms. Robinson would routinely

21     throughout her tenure at Canal oversee your

22     schedule; wouldn't she?

23              A.    Yes.

24              Q.    Ms. Robinson would remind you to

25     take and refill your medicine; wouldn't she?
```



1          A.   She wouldn't remind me.  I knew.

2    She would refill my medicine.  She didn't do

3    that.  See, right now these are questions like

4    she is a wife or something or my assistant.  I

5    don't know what this is.  What this implies.

6    But it is creepy.

7          Q.   Ms. Robinson would routinely

8    communicate with your doctors; wouldn't she?

9          A.   No.

10              MR. DROGIN:  Objection to the

11       form.

12   BY MR. SANFORD:

13        Q.   Ms. Robinson would arrange furniture

14   deliveries for you; wouldn't she?

15        A.   That, yes, she would do.

16        Q.   Ms. Robinson would routinely arrange

17   flower deliveries for you; wouldn't she?

18        A.   That, she could do.

19        Q.   Ms. Robinson would help organize and

20   decorate parties for you; wouldn't she?

21        A.   That, she could do.

22        Q.   Ms. Robinson would arrange your

23   travel via private jet; wouldn't she?

24        A.   That, she could do.

25        Q.   Ms. Robinson -- and when you say she



Page 159

1   could do, she did do it, right?

2          A.   She did.

3          Q.   Ms. Robinson would routinely run

4   errands for the Canal office and for you and

5   your family; wouldn't she?

6                 MR. BENNETT:   Objection.

7          A.   Yes.

8   BY MR. SANFORD:

9          Q.   Ms. Robinson would RSVP to events on

10  your behalf; wouldn't she?

11         A.   Yes.

12         Q.   Ms. Robinson would at times field

13  media requests on your behalf; wouldn't she?

14                MR. BENNETT:   Objection.

15         A.   Yes.

16  BY MR. SANFORD:

17         Q.   Ms. Robinson would generally remind

18  you to pick out gifts; wouldn't she?

19         A.   She could.  Her job was to remind

20  me.  I say remind me, there's a list, I have to

21  get these particular gifts for certain people

22  for their birthday, for Christmas, whatever,

23  yes.

24         Q.   Ms. Robinson often accompanied you

25  while you picked out gifts for family and close



Page 160

1   familiar friends; wouldn't she?

2              MR. DROGIN:  Objection to form.

3        A.   Yes.

4   BY MR. SANFORD:

5        Q.   Ms. Robinson would generally help

6   manage your contacts list; wouldn't she?

7              MR. BENNETT:  Objection.

8        A.   Yes.

9   BY MR. SANFORD:

10       Q.   Ms. Robinson would coordinate your

11  award show votes; wouldn't she?

12       A.   My award show what?

13       Q.   Votes.

14       A.   Well, help set it up for me and then

15  I would do my own voting.  It wasn't like she

16  was part of.

17       Q.   And by that, I mean the Oscar votes,

18  right?

19              MR. BENNETT:  Objection.

20       A.   Yes, but that's in the computer.

21  Not -- that's all she did.

22  BY MR. SANFORD:

23       Q.   Ms. Robinson would often look up

24  restaurants for you; wouldn't she?

25       A.   Yes.



Page 161

```
 1          Q.   I'm sorry?
 2          A.   Yes, she did.
 3          Q.   Ms. Robinson would vet vacation
 4    rentals for you; wouldn't she?
 5          A.   Yes, she did.
 6          Q.   Ms. Robinson vetted home rentals for
 7    you; wouldn't she?
 8          A.   Yes, she did.
 9          Q.   Ms. Robinson researched potential
10    schools for your son; didn't she?
11          A.   She might have done some, yes.
12          Q.   Ms. Robinson assisted with your
13    pets; didn't she?
14          A.   She might have.
15          Q.   When you say might have, you're
16    saying "yes"?
17          A.   I don't know because I have pets.
18    We had pets.  Tiffany had pets.  I don't know.
19    That was the overlap.  So I don't know.
20          Q.   Ms. Robinson scouted hotels all over
21    the world for you; didn't she?
22          A.   Not all -- wherever I had to go on
23    location she did go.  I trusted her to go do
24    that.
25          Q.   Ms. Robinson researched options for
```



1    the purchase of your bed; didn't she?

2          A.    The purchase of my bed?  Yes.  My

3    furniture.  All my furniture, yes.

4          Q.    Ms. Robinson helped buy furnishings

5    for your home; didn't she?

6          A.    She did, yes.

7          Q.    Ms. Robinson vetted housekeepers for

8    you; didn't she?

9          A.    Yes.

10         Q.    Ms. Robinson researched options for

11   planters and pots for your plants; didn't she?

12         A.    Yes.

13         Q.    Ms. Robinson assisted with the

14   delivery of your plants; didn't she?

15         A.    Yes.

16         Q.    Ms. Robinson went plant shopping

17   with you; didn't she?

18         A.    Yes, yes.

19         Q.    Ms. Robinson went antique shopping

20   with you?

21         A.    Yes, she did.

22               THE VIDEOGRAPHER:  The time is

23          12:41.  We are going off the record for

24          technical reasons.

25                    (Whereupon, at 12:41 o'clock



Page 163

1              p.m., a recess was taken until 12:43

2              o'clock p.m.)

3                  THE VIDEOGRAPHER:  The time is

4           1243.  We are back on record.

5    BY MR. SANFORD:

6         Q.   Mr. De Niro, you understand you're

7    still under oath?

8         A.   Yes.

9         Q.   All right.

10              Ms. Robinson collected photo options

11   to be framed for your home; didn't she?

12        A.   What was that again?

13        Q.   Ms. Robinson collected photo options

14   to be framed for your home, correct?

15        A.   Yes, uh-hum.

16        Q.   Ms. Robinson researched options for

17   talents; didn't she?

18        A.   Yes, I think so.

19        Q.   Ms. Robinson bought vacuums for your

20   home; didn't she?

21        A.   Yes.

22        Q.   Ms. Robinson reminded you to speak

23   with your children; didn't she?

24        A.   No, she didn't remind me to speak

25   with my children.  She was trying to do some of



1    that and my children resented her doing that.

2    Trying to, you know.

3         Q.   You had Ms. Robinson coordinate your

4    schedule so that you could spend time with your

5    children over spring break; didn't you?

6         A.   Yes, she coordinated all of that

7    stuff, yes.

8         Q.   You had Ms. Robinson assist with

9    various items related to your former partner

10   Toukie Smith, didn't you?

11        A.   Say that again.

12        Q.   You had Ms. Robinson assist with

13   various things related to your former partner?

14        A.   There was a point that she did that

15   briefly and that was it.

16        Q.   What point was that?

17        A.   Somewhere a couple years ago where

18   she was -- I asked her and Robin to do

19   something, but it didn't go very long.

20        Q.   What did you ask Ms. Robinson to do

21   with respect to --

22        A.   To help her with certain things.

23   Just it didn't --

24        Q.   And this was about 2018, 2019,

25   correct?



1          A.   Yes, around there, yes.

2          Q.   And do you remember what you asked

3    Ms. Robinson to do with respect to Toukie Smith?

4          A.   To help her out with certain things.

5    There was a nurse involved in getting and so on

6    and make sure she was okay.

7          Q.   And who is Toukie Smith?

8          A.   She is the mother of my twins.

9          Q.   And, specifically, what did you ask

10   Ms. Robinson to do?

11         A.   I don't remember specifically other

12   than to help out with Toukie and what she needed

13   with whatever it was at that time.  I'm

14   forgetting.

15         Q.   You asked Ms. Robinson to assist

16   with your divorce; didn't you?

17         A.   In what way?

18         Q.   Any way that you can remember.

19         A.   No, she didn't assist in my divorce

20   other than helping me find a place.  You know,

21   that was the townhouse.

22         Q.   Do you remember if Ms. Robinson

23   pulled text messages and e-mails from Grace

24   Hightower?

25         A.   She pulled what she could have, yes.



Page 166

```
 1          Q.   And that assisted you in your
 2   divorce; didn't it?
 3          A.   I guess if it was related to that,
 4   yes.
 5          Q.   And she reviewed Black Amex card
 6   statements regarding charges concerning your
 7   kids; didn't she?
 8          A.   I don't remember.  She could have.
 9          Q.   She basically collected evidence for
10   you to use in your divorce proceedings, isn't
11   that right?
12          A.   She could have.
13          Q.   When you say she could have, do you
14   mean "yes"?
15          A.   I'm saying she could have.  I don't
16   remember a hundred percent.
17          Q.   Well, you would have no reason to
18   say that Ms. Robinson is lying under oath if she
19   testified to that?
20          A.   Well, I think some things she's
21   not -- she's delusional.  So what can I say?
22   There were things that she did pull.  I just,
23   I'm worried because when I say one thing and
24   then it is made into a positive there's a
25   condition somewhere in the middle there.  So I
```



Page 167

```
 1   say she could have.  So that's it.
 2           Q.   Well, you don't dispute that Ms.
 3   Robinson collected evidence to help you in your
 4   divorce, right?
 5           A.   Yes, I think she did.  I'll say that
 6   like that.
 7           Q.   All right.
 8                You asked Ms. Robinson to
 9   communicate with your divorce attorney; didn't
10   you?
11           A.   I might have.
12           Q.   Is that a "yes"?
13           A.   That's all I can say, is I might
14   have.  You have the e-mails, so you have them.
15   So you know.
16           Q.   On two occasions you asked Ms.
17   Robinson to accompany you to the emergency room,
18   didn't you?
19           A.   Yes.
20           Q.   Ms. Robinson on several occasions
21   accompanied you to doctors; didn't she?
22           A.   Yes.  I went to the emergency room
23   and maybe another doctor.  I can't remember
24   specifically, yes.
25           Q.   So a significant part of Ms.
```



1    Robinson's work for you at Canal involved
2    assisting you with your personal life; fair to
3    say?
4          A.   Yes.
5                MR. DROGIN:  Objection to the
6           form.
7                You can answer.
8    BY MR. SANFORD:
9          Q.   What's the answer, sir?
10         A.   Yes.
11         Q.   Okay.
12              Ms. Robinson would create a list and
13   research your supplements for you; didn't she?
14         A.   I don't know if she did that.  I had
15   some supplements.  She wouldn't research them.
16   She would get what I asked her to get me.
17         Q.   Ms. Robinson would help you
18   understand the instructions before your
19   ████████████; didn't she?
20         A.   No, no, no.  She might have -- no.
21         Q.   She might have what?
22         A.   Nothing.  I know what the
23   instructions are.  She might have read them once
24   and now all the sudden she's helping me with
25   instructions for my ██████████.  No, I did that



Page 169

1    many times.  I knew how to do it.  I knew what

2    the procedure was.

3          Q.   Ms. Robinson filled out medical

4    forms for you; didn't she?

5          A.   She might have.

6          Q.   Ms. Robinson was listed as your

7    emergency contact on medical forms; wasn't she?

8          A.   Might have been if I thought she was

9    the fastest person to get because then she would

10   know who to get.

11         Q.   When you say might have been, you're

12   saying "yes"?

13         A.   Yes, that I'm saying "yes".

14         Q.   Ms. Robinson would tour some of the

15   potential apartment rentals with you in person;

16   wouldn't she?

17         A.   Yes.

18         Q.   Ms. Robinson would tour some of the

19   potential apartment rentals with you on

20   FaceTime; wouldn't she?

21         A.   Yes.

22         Q.   Ms. Robinson would put the utility

23   accounts for the townhouse under her name if she

24   was unable to list them under a company name;

25   isn't that right?



Page 170

1          A.   She might have, yes.

2          Q.   Ms. Robinson used her cell phone

3    number as the emergency contact for your ADT

4    system at your townhouse; didn't she?

5          A.   She might have.  And there was

6    something about she did that instead of giving

7    it to us or giving it to Tiffany.  She was,

8    again, possessive my understanding was about

9    that.

10         Q.   Ms. Robinson, in fact, gave you the

11   information regarding the ADT system; didn't she

12   or do you not remember?

13         A.   I'm not sure.  She might have given

14   it to me or Tiffany.

15         Q.   You told Ms. Robinson that working

16   on the design and townhouse project was a good

17   skill for Ms. Robinson to have; didn't you?

18         A.   I don't know if I said that.  And if

19   I did so what?  What does that mean?

20         Q.   You asked Ms. Robinson to buy

21   interior design magazines and go over ideas with

22   you for the townhouse; didn't you?

23         A.   I could have, yes.

24         Q.   You asked Ms. Robinson to organize

25   your suits and shirts for you; didn't you?



Page 171

1          A.   I don't know if I did that.  She did

2     the closet.  So when I had stuff, I asked her to

3     put it in the closet.

4          Q.   Well, she helped you unpack when you

5     moved in to ███, right?

6          A.   That's what she does.  That's what

7     she was supposed to do, yes.  I mean, help me or

8     get somebody else to do it or she would, you

9     know, do it.

10         Q.   You asked Ms. Robinson to go --

11         A.   I don't, you know this is all crazy,

12    yes, okay.

13         Q.   You asked Ms. Robinson to go to the

14    Decoration and Design and New York Design

15    Center, otherwise known as the D&D Building?

16         A.   Yes.

17         Q.   Sorry, Mr. De Niro, I need to finish

18    --

19         A.   Rachel.  The person she found, her

20    friend.

21         Q.   I just have to finish my question so

22    we have a record.

23         A.   Okay.

24         Q.   You asked Ms. Robinson to go to the

25    Decoration and Design and New York Design Center



Page 172

1   otherwise known as the D&D Building with you;

2   didn't you?

3          A.   Yes.

4          Q.   You looked at furnishings with Ms.

5   Robinson at those buildings, right?

6          A.   Yes.

7          Q.   And you looked at furnishings at

8   other outlets like Restoration Hardware, right?

9          A.   Yes.

10         Q.   And Ms. Robinson helped plan and

11  design room layouts in your townhouse, correct?

12         A.   She helped with that, yes, to some

13  degree.

14         Q.   And she helped pick out paint colors

15  for your townhouse; didn't she?

16         A.   Yes.

17         Q.   And Ms. Robinson helped you picked

18  out fabric options for your townhouse; didn't

19  she?

20         A.   Yes.

21         Q.   Ms. Robinson picked out a Christmas

22  tree for your townhouse in 2018; didn't she?

23         A.   She did.

24         Q.   Ms. Robinson went to art stores and

25  picked out art from your father for your



Page 173

1  townhouse in 2018 and 2019; didn't she?

2         A.   She could have, yes.

3         Q.   Ms. Robinson helped coordinate in

4  2018 childproofing for your townhouse windows,

5  didn't she?

6         A.   Yes.

7         Q.   Ms. Robinson would display purchases

8  for the townhouse like blankets and lamps for

9  you to confirm what you liked or did not like,

10 correct?

11        A.   Yes.

12        Q.   Ms. Robinson designed and put an

13 anniversary photo album together as a gift for

14 your former wife Grace De Niro, correct?

15        A.   Uh-hum.  Yes.

16        Q.   And she put together -- Ms. Robinson

17 put together photo albums for your children's

18 big birthdays, right?

19        A.   Yes.

20        Q.   Ms. Robinson met you at Blue Tree to

21 shop for gifts?

22        A.   Yes.

23        Q.   Ms. Robinson met you at the MoMA

24 store to shop for holiday gifts?

25        A.   She had a couple times, yes.



Page 174

```
 1          Q.   Ms. Robinson met you at the Neue
 2    Galerie to shop for gifts?
 3          A.   Yes.
 4          Q.   Ms. Robinson made a photo card for
 5    your former wife for Valentine's Day?
 6          A.   She, she was very good at making
 7    those cards.
 8          Q.   Is that a "yes"?
 9          A.   That's a "yes".
10          Q.   You had Ms. Robinson help your
11    former wife with decorating and planning Lucy
12    Damon's baby shower?
13          A.   I don't know.  She might have.  I
14    don't, I don't know.
15          Q.   You had Ms. Robinson help your
16    former wife schedule appointments for your
17    daughter's Helen's school search?
18          A.   Could be.  Yes.
19          Q.   You had Ms. Robinson speak to your
20    former wife about the research she did for your
21    son Elliot's school search?
22          A.   Say that again.
23          Q.   You had Ms. Robinson speak to your
24    former wife about the research Ms. Robinson did
25    for your son Elliot's school search?
```



Page 175

1          A.   I'm sorry, just repeat that one more

2     time.  I don't know why.

3          Q.   Sure.

4               You had Ms. Robinson speak to your

5     former wife about the research she did relating

6     to Elliot's school search?

7          A.   Okay.  I could have, yes.

8          Q.   And you had Ms. Robinson assist your

9     former wife with whatever your former wife

10    needed, correct?

11              MR. DROGIN:  Objection to the

12          form.

13              You can answer it.

14    BY MR. SANFORD:

15         Q.   Is that a "yes"?

16         A.   What's the question again, sorry?

17         Q.   You had Ms. Robinson assist your

18    former wife with whatever she needed?

19              MR. DROGIN:  Objection to the

20          form.

21         A.   Yes, that's too general.

22    BY MR. SANFORD:

23         Q.   You had Ms. Robinson speak to your

24    current girlfriend Tiffany Chen and coordinate

25    what time she could come to your townhouse ▮



Page 176

```
 1                                                    ?
 2            A.    No, no.
 3            Q.    That never happened?
 4            A.    No, I don't know what the point of
 5      that question is either.
 6            Q.    You asked Ms. Robinson to find
 7      Tiffany Chen medical insurance; didn't you?
 8            A.    I could have.
 9            Q.    You had Ms. Robinson assist Tiffany
10      Chen what with whatever Ms. Chen needed; didn't
11      you?
12                     MR. DROGIN:   Objection to the
13             form.
14            A.    I could have.
15      BY MR. SANFORD:
16            Q.    I'm sorry, the answer is?
17            A.    Probably I could have, yes.
18            Q.    You asked Ms. Robinson to review
19      your son Julian's              when he was
20      about 16 years old; didn't you?
21            A.    I don't know if I would have asked
22      her to review his         .
23            Q.    You might have, you just don't
24      remember?
25            A.    Huh?
```



# EXHIBIT 2