UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

GRAHAM CHASE ROBINSON,

Plaintiff,

-against-

Case No. 1:19-cv-09156(LJL)(KHP)

ROBERT DE NIRO AND CANAL PRODUCTIONS, INC.,

Defendants.

----------------------------------------x

EXAMINATION BEFORE TRIAL of the Plaintiff, GRAHAM CHASE ROBINSON, taken by the Defendant, pursuant to Notice, held via REMOTE PROCEEDINGS, on February 9, 2022, at 10:00 a.m., before a Notary Public of the State of New York.

*********************************************

*CONFIDENTIAL*

```
 1   A P P E A R A N C E S:
 2    SANFORD HEISLER SHARP, LLP
              Attorneys for Plaintiff
 3            1350 Avenue of the Americas, 31st Floor
              New York, New York 10019
 4
      BY:     ANNIE SLOAN, ESQ.
 5
 6
      TRAUB, LIEBERMAN, STRAUS & SHREWSBERRY LLP
 7            Attorneys for Defendant
              ROBERT DE NIRO & CANAL PRODUCTIONS, INC.
 8            Seven Skyline Drive
              Hawthorne, New York 10532
 9
      BY:     GREGORY R. BENNETT, ESQ.
10
11
12    TARTER KRINSKY & DROGIN LLP
              Attorneys for Defendant
13            CANAL PRODUCTIONS, INC.
              1350 Broadway
14            New York, New York 10018
15    BY:     LAURENT S. DROGIN, ESQ.
              BRITTANY K. LAZZARO, ESQ.
16
17
18
      ALSO PRESENT:
19
      NATE LANINGHAM-Videographer
20                 Magna Legal Services
21    THOMAS HARVEY, ESQ.-for Robert De Niro
22
23
24
25
```

```
 1           S T I P U L A T I O N S :
 2   IT IS STIPULATED AND AGREED by and between the attorneys
     for the respective parties herein, and in compliance
 3   with Rule 221 of the Uniform Rules for the Trial Courts:
 4   THAT the parties recognize the provision of Rule 3115
     subdivisions (b), (c) and/or (d).  All objections made
 5   at a deposition shall be noted by the officer before
     whom the deposition is taken, and the answer shall be
 6   given and the deposition shall proceed subject to the
     objections and to the right of a person to apply for
 7   appropriate relief pursuant to Article 31 of the CPLR;
 8   THAT every objection raised during a deposition shall be
     stated succinctly and framed so as not to suggest an
 9   answer to the deponent and, at the request of the
     questioning attorney, shall include a clear statement as
10   to any defect in form or other basis of error or
     irregularity. Except to the extent permitted by CPLR
11   Rule 3115 or by this rule, during the course of the
     examination persons in attendance shall not make
12   statements or comments that interfere with the
     questioning.
13
     THAT a deponent shall answer all questions at a
14   deposition, except (i) to preserve a privilege or right
     of confidentiality, (ii) to enforce a limitation set
15   forth in an order of a court, or (iii) when the question
     is plainly improper and would, if answered, cause
16   significant prejudice to any person. An attorney shall
     not direct a deponent not to answer except as provided
17   in CPLR Rule 3115 or this subdivision. Any refusal to
     answer or direction not to answer shall be accompanied
18   by a succinct and clear statement on the basis
     therefore. If the deponent does not answer a question,
19   the examining party shall have the right to complete the
     remainder of the deposition.
20
     THAT an attorney shall not interrupt the deposition for
21   the purpose of communicating
22   with the deponent unless all parties consent or the
     communication is made for the purpose of determining
23   whether the question should not be answered on the
     grounds set forth in Section
24   221.2 of these rules, and, in such event, the reason for
     the communication shall be stated for the record
25   succinctly and clearly.
```

1   THAT the failure to object to any question or to move to
    strike any testimony at this examination shall not be a
2   bar or waiver to make such objection or motion at the
    time of the trial of this action, and is hereby
3   reserved; and
4   THAT this examination may be signed and sworn to by the
    witness examined herein before any Notary Public, but
5   the failure to do so or to return the original of the
    examination to the attorney on whose behalf the
6   examination is taken, shall not be deemed a waiver of
    the rights provided by Rule 3116 and 3117 of the CPLR,
7   and shall be controlled thereby; and
8   THAT the certification and filing of the original of
    this examination are hereby waived; and
9
    THAT the questioning attorney shall provide counsel for
10  the witness examined herein with a copy of this
    examination at no charge.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                    THE VIDEOGRAPHER:  We are now on the

 3          record.  This begins media file number one in

 4          the deposition of Graham Chase Robinson in the

 5          matter of Graham Chase Robinson versus Robert

 6          De Niro and Canal Productions Incorporated.  In

 7          the United States District Court Southern

 8          District of New York.  Case Number

 9          1:19-cv-09156 (LJL)(KHP), today is Wednesday

10          February 9, 2022 and the time is 10:04 a.m.

11          This deposition is being taken remotely at the

12          request of Traub, Lieberman, Straus and

13          Shrewsberry, LLP.

14                    The videographer is Nate Laningham of

15          Magna Legal Services and the Court Reporter is

16          Brooke Perry.  All counsel will be noted on the

17          stenographic record.  Will the court reporter

18          please swear in the witness.

19    G R A H A M   C H A S E   R O B I N S O N, the witness

20    herein, having been first duly sworn by a Notary Public

21    of the State of New York, was examined and testified as

22    follows:

23    EXAMINATION BY

24    MR. DROGIN:

25    Q.     State your name for the record, please.
```

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    A.        Graham Chase Robinson.

 3    Q.        State your address for the record, please.

 4    A.        ████████████████████████████████

 5                   MR. DROGIN:  Okay.  And we are

 6         operating here under direction of the court

 7         that we're limited to five hours and 40 minutes

 8         so I would appreciate it if you can keep a

 9         running track of how much elapsed time we have

10         on the record, okay?  I don't know if that's

11         the video or stenographic --

12                   THE REPORTER:  Nate can you do that,

13         please?

14                   THE VIDEOGRAPHER:  Absolutely, yes.

15                   MR. DROGIN:  Great.  And we have -- we

16         have -- I'll just propose it again, Ms. Harwin,

17         that you have a standing objection to the form

18         to every single question that I ask today,

19         correct?

20                   MS. HARWIN:  That's correct.  We so

21         stipulate and Mr. Drogin and Mr. Bennett, if

22         you could also --

23                   MR. DROGIN:  Excuse me, excuse me.  I

24         just asked if you stipulated.  You know that we

25         have an issue with time here, so as long as
```

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2         you're --

 3                   MS. HARWIN:  Yes, I'm just asking to

 4         confirm back on the record both of you that

 5         that's the party's stipulation.

 6                   MR. DROGIN:  I proposed it and you

 7         confirmed it and then you kept speaking, so --

 8                   MS. HARWIN:  Mr. Bennett, can you

 9         confirm that as well.

10                   MR. BENNETT:  Confirmed.

11                   MR. DROGIN:  Okay.  This is a

12         continuation of Ms. Robinson's deposition.  I'd

13         like to mark as Exhibit E the court's decision

14         dated January 26, 2022.  If we could get that

15         up on the screen.  This will be Exhibit E.

16                   MS. LAZZARO:  It should be in the chat.

17                   (Whereupon, the Court's Decision dated

18         1/26/22 was marked as Defendant's Exhibit E,

19         for identification, as of this date.)

20    Q.   Ms. Robinson you see the document?

21    A.   Yes.

22    Q.   Have you ever seen this document before?

23    A.   Can I -- how can I scroll?  I have like a wheel

24    spinning.

25                   MR. DROGIN:  Let's go off the record,
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2           please.

3                    THE VIDEOGRAPHER:  We are off the

4           record.  The time is 10:08 a.m.

5            (Whereupon, a discussion was held off the

6     record.)

7                    THE VIDEOGRAPHER:  We are back on the

8           video record, the time is 10:09 a.m.

9    Q.     Ms. Robinson, have you seen this document

10   before?

11   A.     I'm looking at it right now.

12   Q.     The question is, have you seen it before, not

13   whether you're looking at it right now.

14   A.     I wouldn't be able to know unless I actually

15   looked at the document, let me --

16   Q.     Okay.  Go ahead, look at the document.  Have

17   you seen this document before?

18   A.     I don't believe I have.

19   Q.     Okay.  Let's proceed.  Ms. Robinson, your

20   father's name is Donald Robinson; is that right?

21   A.     Yes.

22   Q.     And what is his home address?

23   A.     Oh um --

24                    MR. DROGIN:  Why don't we leave a blank

25           in the transcript and you can fill it out.

1          GRAHAM CHASE ROBINSON–CONFIDENTIAL



12    REQUEST NOTED

13    Q.     You at one point were represented by an

14    attorney named Jeff Pagano, correct?

15    A.     Yes.

16    Q.     Did you ever meet with him in person?

17    A.     No.

18    Q.     In connection with his representation of you,

19    did you communicate with him at all by telephone?

20    A.     Yes.

21    Q.     Approximately how many times?

22    A.     I don't know.

23    Q.     During any of the telephone calls that you had

24    with him, was anyone else present on the line?

25    A.     Not in connection with Canal Productions or my

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    employment.

3    Q.      Well, at the period of time that Mr. Pagano was

4    representing you, during any of the phone calls that you

5    had with him, was anyone else present on the line?

6    A.      Not that I can recall, no.

7    Q.      Okay.  Did you have any video meetings with Mr.

8    Pagano?

9    A.      Not that I can recall.

10   Q.      Did you have any texts with Mr. Pagano?

11   A.      Yes.

12   Q.      To the best of your recollection, was anyone

13   else on any of the text messaging, in other words, was

14   it a group text with anyone else?

15   A.      No.

16   Q.      Did you share any of the texts between you and

17   Mr. Pagano with anyone else?

18   A.      No.

19   Q.      Did you have e-mail communications with Mr.

20   Pagano?

21   A.      Yes.

22   Q.      In any of those e-mail communications was

23   anyone else CC'd or BCC'd?

24   A.      No.

25   Q.      ████████████████████████████████████

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.



18    Q.       And when you were a teenager, a very close

19    friend of yours died; is that correct?

20    A.       I -- yes.

21    Q.       And who was that friend?  I don't need a name,

22    I just need a relation.

23    A.       She was somebody that I grew up with.

24    Q.       And how did she pass?

25    A.       She had cystic fibrosis and died a couple of

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    days before Christmas from pneumonia, I believe.

3    Q.    And would you describe there as being any other

4    traumatic events in your life unrelated to your

5    employment?

6                    MR. DROGIN:  After we get this answer

7            we'll go to Exhibit F.

8    A.    Nothing that I can recall at this moment.

9                    MR. DROGIN:  Can you please take a look

10           at what we've marked as Exhibit F, which was

11           produced as Robinson pages 16396 and 16397.

12                   (Whereupon, a document Bates numbered

13           Robinson 16396 and 16397 were marked as Exhibit

14           F, for identification, as of this date.)

15   Q.    Are they in the chat?

16   A.    Um, yeah I'm looking at them right now.

17   Q.    Okay.  Okay, can you take a look on the second

18   page?

19   A.    Okay, yeah, I'm just reading.

20   Q.    I'm just directing you to the second page.  Let

21   me know when you're there.

22   A.    Okay.

23   Q.    Alright, in the third bullet point, the one

24   that starts "historically", could you just read that

25   third bullet point out loud?

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.       Historically she -- is this the right one?

3    Yes.  Historically she is an avid runner and in the past

4    has run as many times as 13 miles daily on a regular

5    basis.  She had -- has had to take time off to 2 lower

6    back and hip issues.  More recently she has been running

7    two miles a day, five days a week.  This is very helpful

8    for her anxiety.  She also does yoga.

9    Q.       The specific sentence there that talks about

10   you running two miles a day, five days a week, is that

11   something that you told your doctor?

12   A.       If this is something that she noted.

13   Q.       Okay.  So if she noted it, then it's something

14   that you told her?

15   A.       It's something that she and I discussed, if she

16   noted it.

17   Q.       Is it factually accurate?

18   A.       I believe it would be if she noted it.  I don't

19   --

20   Q.       Okay.  And the date of this visit, if you look

21   at the very top of the first page, can you just confirm

22   that you had an appointment with her on December 21,

23   2021?

24   A.       It seems that that's when I did it because it's

25   listed there.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.     Okay.  So as of December 21, 2021, you had been

3   running two miles a day, five days a week or at least

4   that's what you told your doctor; is that correct?

5   A.     Um --

6   Q.     Yes or no.

7   A.     Yes.  Can I clarify?

8               MR. DROGIN:  That's okay.  Your

9          attorney can clarify.  We're going to try to

10         get through this with yes or no question,

11         that's fine.

12              MS. HARWIN:  Mr. Drogin, I would note

13         for the record this does not appear to be the

14         document that was Robinson as 16396 through 99

15         this document is not Bates labelled, uh --

16              MR. DROGIN:  Okay.  So noted.  It was

17         part of your document production 12.  I can't

18         tell you why this one doesn't have your Bates

19         number on it.  That's above my pay grade.  But

20         if you think it's a document that's not

21         authentic, I'm sure you'll let us know.

22  Q.     Did there come a point in time, Ms. Robinson,

23  where you began to work more frequently from home as

24  opposed to Canal's office?

25  A.     Yes.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      When was that approximately, if you recall?

3   A.      I recall it was about 2015 or '16 when I was

4   doing the albums, work on the albums for Bob.

5   Q.      Did you maintain a home office right through

6   the end of your employment?

7   A.      Starting in 2017, yes.  I had an official

8   office at my home.

9   Q.      During the period of time from 2017 until the

10  end of your employment, how frequently would you visit

11  the Canal office as opposed to working what we now call

12  remotely?

13  A.      I would say frequently, but I would clarify and

14  say again it depended on what the schedule was.  During

15  2018, 2019, I worked a lot at the ███ townhouse, Bob's

16  townhouse or running errands for the townhouse.  There

17  were other times when I -- yeah, I mean there were -- it

18  varied depending on what Bob's schedule was, what the

19  year was, what the work was.

20  Q.      Okay.  And for some point over the duration of

21  your employment, you worked out of LA; is that correct?

22  A.      Yes.

23  Q.      And for some part of your employment, you

24  worked out of Spain; is that correct?

25  A.      In earlier -- in earlier years there was a

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   period of time when I went back and forth from Spain to

3   be out of sight out of mind with Grace, and then there

4   was the flexibility after 2015 where I spent -- I took a

5   trip here and there and worked from Spain.

6   Q.     So the answer -- so notwithstanding the

7   elaborate answer that you just gave, the actual answer

8   to my question is yes; is that right?

9   A.     At times, yes.

10               MR. DROGIN:  Okay.  I'm trying as hard

11          as I can to make these yes or no questions,

12          which is, as I understand it, the best way to

13          move through this quickly as possible.  So I

14          would appreciate, if it's a yes or no question,

15          please answer it.  If I don't pursue it, that's

16          my bad and your attorney can question you to

17          try to correct it.

18  Q.     When you were working outside of Canal's

19  office, you could set your own hours; isn't that true?

20  A.     I would not say that is correct.

21  Q.     Alright.  And that's because the job could be

22  24/7; is that right?

23  A.     That would be one of the reasons, yes.

24  Q.     You could however, structure the day how you

25  wanted subject to the responsibilities of that day;

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     isn't that true?

3     A.      I don't believe that's correct.

4     Q.      Alright.  And can you describe for us what your

5     home office set up was?

6     A.      Um, I would -- my home office set up was um --

7     uh, the dining room I would have a printer, I would have

8     all my documents on the dining room table.  I would sit

9     at the dining room table.  Um, that would be the room

10    that would be -- I would be at the majority of the time,

11    it's where we sort of worked out of.

12    Q.      Okay.  And what kind of chair did you sit in?

13    A.      Um, a regular chair.

14    Q.      Alright.  Did that put strain on your back?

15    A.      No.

16    Q.      Did you use a desktop computer or a laptop

17    computer or both or neither?

18    A.      Majority was my work laptop, but at times I

19    also had the Canal desktop computer in my home, so I

20    guess, mostly my Canal laptop and other times the

21    desktop.

22    Q.      Okay.  So you had access essentially to two

23    different computers, correct?

24    A.      Specifically my laptop, rarely the Canal

25    desktop.  It was only when I was organizing files I

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    would have that.

3    Q.     And did you return that desktop to Canal?

4    A.     Yes, I did.

5    Q.     Peter Grant is an attorney who represents Bob

6    or represented Bob; is that correct?

7    A.     Yes.

8    Q.     And you would interact with Mr. Grant; is that

9    right?

10   A.     Yes.

11   Q.     In connection with your dealings with Mr.

12   Grant, you would negotiate perk deals for Bob, correct?

13   A.     I don't know if I would characterize it that

14   way.

15   Q.     Okay.  Perk budgets, are you familiar with that

16   term?

17   A.     Yes.

18   Q.     What is a perk budget?

19   A.     A perk budget is an allotment of money that Bob

20   would get in order to pay for certain as -- certain

21   things -- certain needs that he um, would have on a film

22   such as crew or private planes, um hotel, I mean there

23   are all different types of um -- different types of perk

24   budgets.  Some of them were only private plane travel,

25   some of them were more broad and included below the line

Page 19

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    items.

3    Q.      What does that mean, below the line items?

4    A.      Crew, hotel, just um, his needs.

5    Q.      And those things were negotiated, correct?

6    A.      Those were negotiated by Peter Grant or Josh

7    Lieberman, Bob's agent.  Mostly, I think by Josh

8    Lieberman.  I would be a part of the discussion of what

9    Bob's needs were and what would need to be in the perk

10   plan, like how many hotel rooms he would need or which

11   gym equipment or how many private planes he'll need back

12   and forth, things of that nature.

13   Q.      So you were familiar with the perk budgets on

14   Mr. De Niro's projects; is that fair?

15   A.      At the time that they were created probably,

16   yes.  The answer is yes to that.  But now I wouldn't

17   recall.

18   Q.      Okay.  And on occasion the perk budget would

19   include a line item for Mr. De Niro's personal trainer;

20   is that right?

21   A.      I wouldn't characterize it that way.  There was

22   money allotted for Dan Harvey.

23   Q.      Well, who is Dan Harvey?

24   A.      Dan Harvey is -- does some work as Bob's

25   personal trainer, but he is an executive assistant.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     Q.      I see.  And the -- when there was a line item

3     for Mr. Harvey in the perk budget, that would be money

4     that Canal could utilize to pay Mr. Harvey; isn't that

5     right?

6     A.      It would be money that Bob was reimbursed for

7     Dan Harvey's expense.  And to clarify, it was discussed

8     that Dan did more on set than just train Bob.  And

9     that's how it was conveyed to the production, is that

10    Dan worked him out, but also had other responsibilities.

11    Q.      Okay.  Do you have any recollection as to some

12    of the amounts, weekly amounts that were negotiated as

13    part of the perk budget for Mr. Harvey, Dan Harvey?

14    A.      Sometimes none at all, production wouldn't pay

15    for it.  He would have a hotel room, sometimes a rental

16    car if he requested one.  In terms of the amounts that I

17    can recall, I think that -- I was told by Michael Tasch

18    that they wanted 5,000 per week for Dan, but they didn't

19    always get that amount because a lot of productions

20    wouldn't pay for it.

21    Q.      You were present for Mr. Harvey's deposition;

22    is that right?

23    A.      Yes.

24    Q.      Have you read the transcript of his deposition?

25    A.      No.

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     Q.      What, if anything, did you learn about Mr.

3     Harvey's duties and responsibilities that you did not

4     know before his deposition?

5     A.      Sorry, can you repeat your question.

6     Q.      Yeah.  What, if anything, did you learn about

7     his duties that you didn't know before the deposition?

8     A.      I think that there were a couple of things that

9     I can recall.  Some of them were suspicions that I

10    thought that were part of his job duties, but again, one

11    of them was him being on call for Bob while he was on

12    set and on location.  I was -- I didn't believe it, and

13    I still don't, but working out with Bob 35 hours a week,

14    I believe is what he had cited because Bob didn't work

15    out that many hours per day, six or seven days a week,

16    that would be five or six hours a day, I think if we

17    break it down.  Um --

18                  MR. DROGIN:  Why don't we do this, why

19           don't we leave it blank in the transcript and

20           if there's anything else that you recall at a

21           later time you can add that.

22           (INSERT:)_____.

23    REQUEST NOTED

24    Q.      Now you sort of changed titles in 2017; isn't

25    that right?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.     Bob and I had a discussion about that, yes.

3    Q.     Can you open up, please take a look at Exhibit

4    G?

5    A.     There are a bunch of other ones that have been

6    put.

7    Q.     Yeah, just to stay ahead, I've asked Brittany

8    to upload a bunch at a time, so we --

9    A.     Okay.  Thank you.  So I skip F and I go to G.

10   Q.     Well, we've --

11   A.     Oh, F was corrected?

12              MS. LAZZARO:  Just for clarification, I

13              uploaded the same Exhibit F with the Bate stamp

14              number that's reflected on the document now,

15              but you can go to G.

16              THE WITNESS:  Okay.  Downloading it.

17              Clicking to open.

18              (Whereupon, a document Bates numbered

19              Robinson 00003284 was marked as Exhibit G, for

20              identification, as of this date.)

21   Q.     You have it?

22   A.     Yes.

23   Q.     So this was a discussion that you actually

24   initiated in August of 2017; is that right?

25   A.     This e-mail I initiated in August of 2017.  I

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    don't recall exactly when the discussions on job title

3    started.  This is all from a conversation that we had

4    had -- we had.

5    Q.      So the bottom e-mail, August 28, 2017, you

6    indicate, "I know we said we'd finalize and discuss

7    'later'.  So I thought I'd e-mail you regarding the

8    title change we discussed:  VP, Production & Finance".

9            Do you see that?

10   A.      Yes.

11   Q.      So is it fair to say that in August of 2017,

12   you were looking for a title change?

13   A.      It's something that Bob and I discussed, yes.

14   Q.      Alright.  And then an e-mail above it, you

15   follow-up with him on September 12th to remind him about

16   that; is that true?

17   A.      Yes.

18   Q.      And then an e-mail above that, you remind him

19   again on November 9th; is that true?

20   A.      Yes, it looks to be true.

21   Q.      Okay.  And then you reminded him again on

22   November 10th, correct?

23   A.      Yes, and I believe I continued to remind him

24   until December.

25                   MR. DROGIN:  Alright.  So let's take a

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          look at Exhibit H.

3                    (Whereupon, a document Bates numbered

4          Canal 0045968-69 was marked as Exhibit H, for

5          identification, as of this date.)

6    Q.    Okay.  So you said that you reminded him until

7    December and you sent an e-mail to him on December 11th

8    recapping a discussion that you had with him; is that

9    correct?

10   A.    I wouldn't characterize that it was a -- as a

11   discussion that we had.  I think it -- like I don't mean

12   -- let me read it, please.

13   Q.    No, that's okay.  You disagree with my

14   characterization and that's fine.  In your December 11th

15   e-mail you list below the title, you see that, a

16   discussion of what your job encompasses, do you see

17   that?  And it goes on, it's four paragraphs long.

18          Do you see that?

19   A.    Yeah, I'm reading it.  Yes.

20   Q.    Was that an accurate description of what your

21   job duties, what your job encompassed in December of

22   2017?

23   A.    They were jobs at times that I was asked to do

24   by Bob.

25   Q.    Let's go back to my question.  Is that an

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   accurate depiction of what your job encompassed in

 3   December of 2017, yes or no?

 4   A.      Yes, they were some job duties that my job had

 5   been.

 6                  MR. DROGIN:  Let's just stop at yes.  I

 7           don't want to have to go back to the Judge and

 8           show how you refused to answer with yes or no.

 9           I want to make it very easy.

10   Q.      Now it was common to begin discussions with Bob

11   at one point and you would need to remind him and they

12   would eventually get resolved at a later point; isn't

13   that true?

14   A.      Can you repeat that question again.

15   Q.      Sure.  He was not quick to follow-up when you

16   wanted to have conversations with him about, call it

17   meaningful topics; is that fair?

18   A.      I don't see that -- I don't think that that

19   would be fair to -- I believe that there were other

20   conversations that we had had that were quicker, but

21   this one -- this one, yes.

22   Q.      Alright but in the top e-mail, the one sent by

23   you Sunday, December 24th, do you see that?  At the very

24   top of the page.

25   A.      Yes, on Christmas Eve.
```

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Okay.  You said, "thank you, this means the

3    world to me, hope you are enjoying some down time" and

4    then there's two X's.

5            Do you see that?

6    A.      Yes.

7    Q.      What are the X's?

8    A.      They're a way of signing off.

9    Q.      Yeah, isn't that like the universal signal for

10   a hug?

11                   MR. DROGIN:  Hey cut it out, we're on

12           video here.  Cut it out.  Dog, man.  Go ahead.

13   Q.      Isn't that symbol you understand to be a hug?

14   A.      No, when I sign off --

15   Q.      That's fine.  If you don't understand it to be

16   hugs, that's fine.

17                   MS. HARWIN:  Counsel, please let her

18           finish her answer.

19   Q.      I'm asking yes or no questions.  Do you

20   understand X's to be the universal sign for hugs?

21   A.      I do not use them in that way, no.

22   Q.      Not my question.  Do you understand X's to be a

23   symbol for hugs?

24   A.      No.

25   Q.      Okay.

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Can I clarify that I -- it's an ending of a

3    conversation or like a, you know, that's how I use them.

4    Q.      So now is it your testimony that whenever you

5    would end a conversation you would just put two X's?

6    A.      Not on every conversation, but I used them to

7    stop the conversation.

8                      MR. DROGIN:  Got it.  Okay.  Now in --

9              let's go to Exhibit I, please.

10                     (Whereupon, a document Bate stamp

11             numbered Robinson 00002607 was marked as

12             Exhibit I, for identification, as of this

13             date.)

14   Q.      Let me know when you've got it.

15   A.      I have it.  I'm reading it.  There's some weird

16   funky symbols on it.  Is that how it's supposed to be?

17   Q.      Yeah, this is just how we got it from Counsel.

18   I guess that's just the way that it was produced.

19             But do you see there's mention of tabling a

20   conversation since the prior fall?

21   A.      Let me read it.

22   Q.      I'll help you out here, it's the bold

23   paragraph.  Also we've been tabling a conversation since

24   the last fall (how unlike us:).

25             Do you see that?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Yes, I'm just trying to read that.

3    Q.      Just that paragraph.  My question is, what was

4    the conversation that had been tabled since last fall?

5    A.      This was sent in 2017.

6    Q.      We'll ask it a different way.  Do you recall

7    what the conversation was that had been tabled, yes or

8    no?

9    A.      I don't recall what the specific conversation

10   was.

11   Q.      Okay.  Thank you.  Now how long have you known

12   that Bob ███████████████████

13   A.      Since my employment began it was well known.

14   Q.      And he would ████████████████████████████████

███   ███████████; is that right?

16   A.      Yes.

17   Q.      In that paragraph, you say, no heart attacks,

18   it will be quick.  But I have a large bottle of aspirin

19   on hand for you and a nice cold martini for me or is it

20   the other way around?

21           Do you see that?

22   A.      Yes.

23   Q.      ██████████████████████████████████████████

███   ████████████████████████████████

25   A.      It's being -- the way that I had written it, I

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    believe it was being lighthearted, you know, just making

3    sure that he knows that it wasn't a serious conversation

4    or just something that we could just talk.  It's --

5    yeah.  But I'm also --

6    Q.     So my question is whether that was supposed to

7    be --

8                   MS. HARWIN:  Counsel, she was in the

9              middle of completing a sentence.

10                  MR. DROGIN:  The question was, was it

11             supposed to be funny.  It's a yes or no

12             question.

13                  THE WITNESS:  It's supposed to be

14             lighthearted is what I would say.

15                  MR. DROGIN:  Okay.  Take a look please

16             at Exhibit J.

17                  (Whereupon, the Complaint was marked as

18             Exhibit J, for identification, as of this

19             date.)

20   Q.     I'll represent to you that's the copy of the

21   Complaint that you filed in this lawsuit.

22   A.     Yes.

23   Q.     Alright.  Take a look at Paragraph 19.  Let us

24   know when you're there.

25   A.     Yes.

Page 30

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Now isn't it true that you told Robin

3    Chambers -- back up.

4            In the spring of 2019, isn't it true that you

5    told Robin Chambers that Bob had not yelled at you for

6    four or five years?

7    A.      I don't recall that.

8                    MR. DROGIN:  Alright.  So we're going

9                to play an audio clip which is at Robinson

10               7158, at roughly the seven minute and 51 second

11               mark.  And I'd ask if you could listen to it

12               and then I'll come back to my question.

13                   MS. HARWIN:  Can you please --

14                   (Whereupon, the recording was played at

15               this time as follows:

16                   MS. ROBINSON:  Or in the sense that

17               even when he travels with her -- I swear, the

18               e-mail that I got from Tiffany -- Bob has

19               screamed at me before, I've had it, but not in

20               the last, like, four or five years.  You know,

21               I've never -- I've never had him screaming or

22               yelling.)

23   Q.      Does that refresh your recollection as to

24   whether or not you told Robin Chambers that Bob had not

25   screamed at you in, like, the last four or five years,

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    yes or no?

3    A.      No.  Because I don't know what that was in

4    context with --

5    Q.      That's fine.  That's fine.

6    A.      So it could have been a subject that he had or

7    I can't remember.

8    Q.      Okay.  I'm just asking yes or no.  Now within

9    the last three years of your employment, how frequently

10   did Mr. De Niro call you a bitch?

11   A.      On several occasions.

12   Q.      Alright, more than 10?

13   A.      And this is the last three years, just to

14   clarify?

15   Q.      Yes.

16   A.      I would say in the range -- like more than

17   five.

18   Q.      Alright and --

19   A.      Like the three years that I can --

20   Q.      Right.  And during that same period of time,

21   approximately how many times did he call you a brat?

22   A.      Again three years?

23   Q.      Yes.

24   A.      Multiple times.

25   Q.      Who was the female business partner that Mr. De

Page 32

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    Niro referred to as a cunt?

 3    A.      Jane Rosenthal.

 4    Q.      And didn't you in fact refer to Tiffany Chen as

 5    a cunt, yes or no?

 6    A.      I can't recall a specific time when I referred

 7    to her like that.

 8    Q.      Okay.  Didn't you call Tiffany a cunt to Robin

 9    Chambers?

10    A.      I don't recall that.

11    Q.      Didn't you refer to Tiffany Chen as a cunt to

12    your friend Brian Zack?

13    A.      I don't recall that.

14    Q.      Do you recall ever referring to Tiffany Chen as

15    a bitch to Robin Chambers?

16    A.      I don't recall specifically a time where I did.

17    Q.      Okay.  Now sometimes you would scream at Bob as

18    well; isn't that right?  It's just a yes or no question.

19    A.      I wouldn't say that is correct.  I can recall

20    one time in which I had raised my voice.

21    Q.      Alright.  Now Paragraph 19, you talk about Mr.

22    De Niro referring to his executive assistants as the

23    girls.

24            Do you see that?

25    A.      Yes.
```

Page 33

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Okay.  And that was a reference to whom?  Who

3    were the girls?

4    A.      The girls were the female executive assistants

5    in the office.

6    Q.      Now that's a -- okay that's a reference that

7    Michael Kaplan used to describe them as well, isn't it?

8    A.      Yes.

9    Q.      And that's a term that Robin Chambers used to

10   describe those women; isn't that right?

11   A.      Yes, it was engrained by Bob who had -- who

12   often used that term.

13   Q.      So the answer to my question is yes, Robin

14   would use that term as well, correct?

15   A.      Yes.

16   Q.      And you used that term to refer to the

17   executive assistants in the office, did you not?

18   A.      Yes.

19   Q.      At one point, one of those females came to you

20   and complained to you that she did not like the fact

21   that they were being referred to as the girls; isn't

22   that true?

23   A.      Um, I would clarify that -- yes, I mean yes.

24   There was contention about that.

25   Q.      And after that complaint, did you ask Bob not

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    to use that term?

3    A.      I don't recall.

4    Q.      Did you make Bob aware that someone had

5    complained to you about this?

6    A.      It was at the very tail end of my employment.

7    Q.      Okay.  So approximately when was this complaint

8    made?

9    A.      The range would probably be the last couple of

10   weeks, I believe, you know, I don't know.  I don't want

11   to guess, so I don't know.

12   Q.      My question though is, did you ever make Bob

13   aware that you had received this complaint, yes or no?

14   A.      Not that I can recall.

15   Q.      And did you modify your own behavior after that

16   to stop using the term?

17   A.      Yes.

18   Q.      Take a look at Paragraph 20 where you talk

19   about a joke that was made about Viagra.  Do you see

20   that?

21   A.      20.

22   Q.      20, "De Niro, made vulgar, inappropriate and

23   gender comments to Ms. Robinson.  He would joke with Ms.

24   Robinson about his Viagra prescription".  Do you see

25   that?

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    A.       Yes.
 3    Q.       That -- about how many times did he joke with
 4    you about his Viagra prescription?
 5    A.       Would joke on multiple occasions, very
 6    inappropriately.
 7    Q.       Inappropriate jokes?
 8    A.       Yes.
 9    Q.       When was the last time that happened, what
10    year?
11    A.       I believe 2018.
12    Q.       In Paragraph 20, he told you to imagine him on
13    the toilet.  How many times did that happen?
14    A.       That was on one occasion in 2018 at his
15    townhouse.
16    Q.       And what did he say?  What were his words as
17    you recall them?
18    A.       He brought me into the bathroom in his -- the
19    master bathroom in his um -- in his townhouse.  And he
20    said, he wanted to show me where he wanted me to put the
21    TV in the bathroom and he said you have to picture me um
22    --
23    Q.       Have you completed your answer?
24    A.       No, I'm trying to -- I'm just trying to -- just
25    give me a second to recall.  He said you have to picture
```

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     me on the toilet and he squatted on the toilet, imagine

3     me sitting on the toilet and then he pointed to, like,

4     where he would want the TV to show me that when he was

5     sitting on the toilet, where he would want to be

6     watching the TV.  And I felt it was incredibly

7     appropriate and I did say something to him at that point

8     that that was disgusting.

9     Q.      Okay.  And also on Paragraph 20, there was a

10    comment about manual labor would make a man out of you.

11    Do you see that?

12    A.      Yes.

13    Q.      But that's actually an expression that you used

14    with some of the female employees in Canal's office;

15    isn't that true?

16    A.      I would not say that is true.  I don't recall

17    any time that I said, make a man out of you.

18    Q.      Okay.  How many times did he say that to you?

19    A.      It was 2018 he had made a specific comment

20    after I had lifted this very gigantic large flat screen

21    TV box up two flights of stairs with Michael Kaplan and

22    I had spoken to Bob, he had called right after it and

23    Michael Kaplan was standing right there, and I told him

24    that we did it.  And he said, haa, haa, haa, that's what

25    makes a man out of you Chase.  And I said no, that's not

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    correct.

3    Q.      Okay.  And he said haa, haa, haa?

4    A.      I mean, he does this, like, haa, haa, haa, haa,

5    sort of --

6    Q.      Got it.  Also in Paragraph 20 you say to him --

7    sorry, you said that he suggested that you could get

8    pregnant using sperm from her married male coworker.  Do

9    you see that?

10   A.      Yes.

11   Q.      How many times did that happen?

12   A.      That was an incident that happened when we were

13   sitting in the drawing room and I was discussing my

14   career and wanting to, you know, focus on that.  But

15   also have some personal time and he had said, Chase,

16   women can get pregnant whenever they want.  You just

17   need to get some sperm.  He paused and then said, you

18   can just get some from -- you know, you can get some

19   free sperm from Michael Kaplan and I was horrified at

20   that.

21   Q.      Now as you were just saying that, it sounded

22   like -- I know we have a video of it, so we'll have the

23   audio as well, but did you say it with sort of a

24   chuckle?

25   A.      With, like, I would say, a smirk and it was my

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    face, I was -- it was just the most inappropriate and

3    most disgusting thing that an employer could say or one

4    of the most disgusting and -- it was just incredibly

5    inappropriate.

6    Q.      Alright.  Now you didn't think he was serious

7    though did you?

8    A.      I -- I can't speculate on whether Bob thought

9    it was serious or not, but it was incredibly disgusting

10   and inappropriate.

11   Q.      I'm asking you whether you thought he was

12   serious, that this was a serious suggestion he was

13   making?

14   A.      I don't know what -- it was horrible to have

15   that hear that from my employer, and incredibly

16   inappropriate.

19   A.      Yes.

20   Q.      And is that something that you shared with

21   people in the office at that --

22   A.      I wouldn't say that that is correct.  I've

23   shared it with Robin Chambers.

24   Q.      Isn't she one of the people in the office?

25   A.      Yes, technically, I guess, yes.

1        GRAHAM CHASE ROBINSON-CONFIDENTIAL

2  

10   A.      No.

11   Q.      Let's go to Paragraph 22.  How many times did

12   he urinate during telephone calls with you over the

13   course of 11 years.

14   A.      Dozens of times.  He had absolutely no

15   boundaries.

16   Q.      And when was the last time?

17   A.      2018, 2019.

18   Q.      Alright.  And did you ever tell him that you

19   didn't like that or protest in any way?  Yes or no?

20   A.      Can you repeat your question.

21   Q.      Did you ever ask him to stop doing that or make

22   it known to him that you didn't like that?

23   A.      Yes.

24   Q.      Did he stop doing it?

25   A.      No.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.     Did you continue to make it known to him that

3 you didn't like it?  Just a yes or no question.

4   A.     No, I don't believe I did continue after.  It

5 was quite awkward to have to discuss or hear it.

6   Q.     But just as an example, I mean, could you have

7 said in substance, Bob, I don't like the sound of your

8 peeing, call me back when you're done?  You could have

9 said that, right?  I mean --withdrawn.

10   A.     No, I don't believe I could have.

11   Q.     You couldn't have said that, okay.

12   A.     I think you have to be very careful on how you

13 approached Bob and what you said because he could be

14 very retaliatory and he could take offense to a lot of

15 --

16   Q.     Okay.  I'm not asking about retaliation yet.

17 The Paragraph 23, the physical contact based on your

18 gender, you said he would direct you to scratch his

19 back.

20         How many times did he direct you to scratch his

21 back?

22   A.     More than a dozen.

23   Q.     And obviously that would have been at times

24 when you were physically in the same location?

25   A.     Yes.

Page 41

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     Q.      When was the last time that happened?

3     A.      Probably 2017, 2018.

4     Q.      Alright.  And did you tell him that you didn't

5     like that or you didn't want to do that?

6     A.      I think my face and how awkward it was could be

7     seen.  I did at one point suggest that he use the back

8     scratcher that Daphna Keitel had given to him for

9     Christmas and he preferred that I scratch his back.

10    Q.      Okay.  And did you?

11    A.      Yes.

12    Q.      Alright.  And how many times did he ask you to

13    button his shirts?

14    A.      I would say dozens of times when he was getting

15    ready for an event or a press -- the Tribeca Film

16    Festival press day, fix his collars, tie his ties,

17    things like that.  He would direct me to come into the

18    bathroom in his office.  He'd close the door and he

19    would ask me to do these things.

20    Q.      And prod him awake when he was in bed, how many

21    times did that happen?

22    A.      About five.  I would say the range of five to

23    seven times.

24    Q.      Okay.  Any idea why he asked you to do that?

25    A.      The why --

Page 42

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Yes or no, do you have any idea why?

3    A.      To wake him up, to go into the bedroom and wake

4    him up.  Which again, totally inappropriate.

5    Q.      Yes, but do you know why?  Do you know why

6    these requests were made?

7    A.      To -- I guess to wake him up.

8    Q.      Okay.  Now do you know whether he ever asked

9    Dan Harvey to do any of the things we've just been

10   talking about; scratch his back, button his shirts, fix

11   his collars, tie his ties or prod him awake when he was

12   in bed?  Yes or no question.

13           Do you know whether Dan Harvey was ever asked

14   to do any of those things by him or as well?

15   A.      Not that I'm aware of.

16   Q.      Let's go to Paragraph 25, we're now talking in

17   the second paragraph, you said, "among these duties, De

18   Niro directed Ms. Robinson to put away his boxers, hang

19   up his clothes, wash his sheets, vacuum his apartment,

20   set his table, mend his clothing and select gifts for

21   his children."

22           Do you see that?

23   A.      Yes.

24   Q.      With what frequency did these things happen

25   that you're mentioning here?

Page 43

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Some of them are more frequent than others.

3    Q.      So for example, setting his table, is that a

4    reference to Martin Scorsese's birthday party?

5    A.      That was one of the many times that I've had to

6    set a table.

7    Q.      Okay.  That was a party, right?

8    A.      That was one of -- yes, one of many.

9    Q.      Okay.  But are you suggesting that you were

10   some sort of domestic servant who would come in and set

11   a table for him, like a housekeeper?

12   A.      That's what the Martin Scorsese one is.  I

13   vacuumed the apartment.  I cleaned the apartment.  I set

14   up the table, put the napkins, the plates, light the

15   candles.  Tiffany and Bob had me straighten up the

16   house.  It was just very demeaning and I like -- I can't

17   believe that I was asked to do that.  I was VP of

18   production and finance at the time and here I am setting

19   a table and vacuuming his home.

20   Q.      Okay.  So the vacuuming the apartment, that was

21   a one-time event relating the birthday dinner; is that

22   right?

23   A.      No.

24   Q.      So how many times did you vacuum the apartment?

25   A.      Excludeing vacuuming in the office, his

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   apartment, I would say more than a dozen times.

3   Q.      Was that at ▮▮▮▮ or are we talking about a

4   different apartment?

5   A.      I mean there were different apartments where I

6   had vacuumed at, like, that were his, whether they were

7   gym apartments that he had, having to set those up for

8   him or the ▮▮▮▮ apartment which had -- I vacuumed on

9   many occasions.

10  Q.      And washed his sheets.  You actually washed his

11  sheets at your apartment; is that right?

12  A.      I washed his sheets at my apartment, at his

13  apartment.  Yeah, I spent hours and hours washing bed

14  sheets, towels.  Yes.

15  Q.      Okay.  Did he ask you to do all those things?

16  A.      Yes.

17  Q.      Let's go to Paragraph 32.

18                  THE WITNESS:  Can we take a five-minute

19          break, I have to turn down the heater.

20                  MR. DROGIN:  Absolutely.  Why don't we

21          come back at 11:15, we'll take 10 minutes.

22                  THE WITNESS:  Do you want to go to

23          Paragraph 30?

24                  MR. DROGIN:  No, no.  If you want a

25          break, we're up to Paragraph 32, let's just go

Page 45

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          off the record and we'll come back at 11:15.

3                    THE WITNESS:  Okay.

4                    THE VIDEOGRAPHER:  Okay.  We're off the

5          video record, the time is 11:06 a.m.

6             (Whereupon, a short break was taken.)

7                    THE VIDEOGRAPHER:  We're back on the

8          video record, the time is 11:16 a.m.

9    Q.     So if I could direct your attention to

10   Paragraph 32 of the Complaint.  You said.  "On multiple

11   occasions, Ms. Robinson told De Niro that she was being

12   harassed."

13          What did you tell Mr. De Niro you were being

14   harassed about and by whom?

15   A.     There were many occasions that I spoke to Bob

16   about being harassed, whether it was by him, by his

17   wife, by his business partner Jane Rosenthal, by um, a

18   house manager Peter Lambert, in terms of -- those are

19   some of the people.  In terms of what was discussed with

20   Bob, I had on occasion, spoke to him about how he was

21   harassing me on the apartment work in 2019.  He had been

22   berating me about items that needed to be done for the

23   apartment.  In addition, there were other times in where

24   I had told him that he was either harassing me or his

25   wife had been targeting and harassing me on um -- on uh

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     -- on items.

3     Q.     So in particular -- with regard to him, with

4     regard to --

5                    MS. HARWIN:  Counsel can she finish her

6               answer?

7                    MR. DROGIN:  I'm sorry I thought she

8               had.

9                    THE WITNESS:  I was going to go and

10              discuss the other ones, but I had spoken to Bob

11              about being harassed and Jane Rosenthal

12              creating a toxic work environment including

13              refusing to allow me entry through a door, her

14              berating me, there were multiple complaints

15              with her.  I had spoken on many occasions to

16              Bob about Peter Lambert and the harassment that

17              I received from him and on Grace Hightower-De

18              Niro targeting me.  I mean there was a lot of

19              discussions I had with Bob.

20    Q.     What was the harassment from Peter Lambert?

21    A.     I wasn't the only one to complain about

22    harassment with Peter.  The harassment was about

23    personal items for Bob and his family, whether it was

24    the catering that they had or just in general, it was

25    something that Bob and I spoke on many occasions and he

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2   agreed that Peter had been harassing me and Grace had
 3   been harassing me and targeting me.  It was a very
 4   difficult time to -- it was very difficult to work, um,
 5   in that environment, the toxic work environment.  Um --
 6   Q.      Have you completed your answer?
 7   A.      Yes.
 8   Q.      Alright.  And did you ever complain to Bob that
 9   Tiffany was harassing you?  Hello.
10   A.      Yeah, I'm trying to think.
11              MR. DROGIN:  So just so that the record
12          should reflect --
13              THE WITNESS:  I --
14              MR. DROGIN:  Excuse me.  The record
15          should reflect how long it's taking Ms.
16          Robinson to answer a yes or no question as to
17          whether or not she ever told Mr. De Niro that
18          Tiffany Chen was harassing her.  Go ahead.
19              MS. HARWIN:  Ms. Robinson was beginning
20          to answer as you interrupted her.
21              MR. DROGIN:  I guess not.
22              THE WITNESS:  I believe --
23              MR. DROGIN:  Should we go off the
24          record maybe?
25              MS. HARWIN:  She's answering it.
```

```
                                                    Page 48
 1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2               THE WITNESS:  I'm trying to answer and

 3          I keep getting interrupted.  Um, I was advised

 4          by Mr. --

 5    Q.     Yes or no, did you tell Mr. De Niro that

 6    Tiffany was harassing you?  Yes?  No?  Which one?

 7    A.     I believe that she and he were incorporated

 8    into the discussion that I had on him harassing me --

 9    them harassing me about apartment items in the ████

10    apartment.  Um, I had to be very careful though on how I

11    phrased everything, but if this is a yes or no answer, I

12    mean that's my answer.

13    Q.     Great.  Okay thank you.  Now Jane's harassment

14    of you, what did you attribute that to?

15    A.     Um, I would say in the beginning part of it was

16    um, Bob and Jane's own issues with each other and at the

17    time -- at the beginning of her harassment, Bob was

18    thinking about ending his partnership with Jane

19    Rosenthal and it was very toxic between the two of them.

20    Um, she had helped me in a way pass along through Megan

21    Livers (phonetic) my resumé.  And she once told me that

22    I owed loyalty to her because she helped me get the job.

23    And Bob and Jane were just constantly fighting and in a

24    very difficult or challenging partnership between the

25    two of them.  I mean they were not getting along at all,
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    so I feel that --

3    Q.     How did she harass you?

4    A.     She berated me at times for things that I

5    didn't do.  She made comments -- backhanded comments in

6    front of people.  Again, as I had spoken to Bob about

7    all of those incidents and some of them were witnessed

8    by other Canal employees, she had stood in the doorway

9    refusing to let me enter the 8th floor.  There were a

10   lot of different ones, but that's what I can recall at

11   this moment.  I did speak to Bob about every single one

12   of them, I believe.  It wasn't something that I thought

13   was appropriate, should be done.  I complained that she

14   created a completely hostile work environment.

15   Q.     By the way, what is a hostile work environment?

16   Can you define that term?

17   A.     A hostile work environment?

18   Q.     Yeah.

19   A.     An environment where it's very difficult to do

20   one's job, where you're being targeted, where you're

21   being harassed.  I mean it's a very, very difficult

22   environment.

23   Q.     Anything else?  Can you expand on that or is

24   that -- is that what you understand it to be?

25                  MS. HARWIN:  Are you asking in a legal

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2           sense?  Can you clarify what this question is

3           about.

4                    MR. DROGIN:  Yeah, the witness keeps

5           using the term, I want to prove that she

6           doesn't actually understand what it means.  So

7           I'm asking her to tell me what she understands

8           it to mean, so I can then show that she really

9           doesn't understand what the term means, which

10          is why her entire harassment case unravels

11          because she's using a buzz word that she

12          doesn't really know what the legal term means.

13          Is that clear enough for you?

14                   MS. HARWIN:  The question remains

15          unclear.

16                   MR. DROGIN:  Let me ask it another way,

17          Chase.

18   Q.     For a work environment to be hostile, do you

19   believe that there has to be an unlawful basis for the

20   harassment?

21   A.     I'm not an attorney, so I wouldn't know how to

22   answer that.  If you're asking me not in the sense of,

23   like, being an attorney, I believe that, you know,

24   whether it's a toxic work environment or a hostile work

25   environment, it's an environment where you are being

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    targeted, where you are being harassed, where it's

3    difficult to do your job or you're stopped from doing

4    your job, it is an environment that no employee -- you

5    know, employees can't function in.  It is a very

6    difficult environment.  I -- I don't --

7    Q.     Do you understand a toxic work environment to

8    be the same as a hostile work environment or something

9    else?  Because you've used both terms.

10   A.     I mean a toxic work environment is, I believe,

11   similar to a hostile work environment.

12   Q.     How do they differ?

13              MS. HARWIN:  Again Counsel, can you

14         clarify in what context you're asking this

15         question.

16              MR. DROGIN:  The witness is using

17         terms, so I don't understand how she's using

18         the terms.  I'm asking her to clarify what

19         these terms mean to her since she's using them.

20              MS. HARWIN:  Do you mean in relation to

21         the discussion of Jane Rosenthal?

22              MR. DROGIN:  I haven't limited it.

23         I've just asked what she understands the term

24         to mean.

25   A.     Well, if I go back to what I had been

Page 52

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    discussing about Jane Rosenthal creating --

3    Q.     Excuse me, I'm not going back to Jane

4    Rosenthal.  I'm simply asking you about your

5    understanding of the term toxic work environment and

6    hostile work environment.  I asked you if they were the

7    same, you said they are similar, so I'm asking you how

8    they differ.

9    A.     One has the word toxic and the other has the

10   word hostile.  Toxic work environment, I would say it's

11   a very toxic place to work.  I think that it can be

12   contributed to an employer, to you know -- again, a very

13   uncomfortable place for an employee to work.  You know

14   what I mean?  I -- we're switching between hostile and

15   toxic at this point, hostile, you know, I go to that

16   you're being targeted and harassed.  That um, it is a

17   very uncomfortable, a very difficult work place, um, I

18   would -- you know, yeah.

19   Q.     Okay.  Does it matter why you're targeted, for

20   there to be a hostile work environment?

21             MS. HARWIN:  Counsel, again, can you

22        clarify what this question is.  Are you asking

23        about under the law?

24             MR. DROGIN:  I'm just asking for her

25        understanding.

Page 53

GRAHAM CHASE ROBINSON-CONFIDENTIAL

1

2          MS. HARWIN:  But the question is

3      totally devoid of context.

4   Q.     Well, Ms. Robinson, you disseminated an

5   antiharassment policy to Canal employees, didn't you?

6   A.     I facilitated paperwork which your -- Tarter

7   Krinsky and Drogin had given me to have employees sign.

8   I not only passed it along to Tom Harvey to approve, but

9   I also went over it with Bob about --

10  Q.     Okay.  It's a yes or no question.  You

11  disseminated that policy, didn't you?

12  A.     I wouldn't characterize it that way.  I would

13  characterize it as facilitating the paperwork that

14  Tarter Krinsky and Drogin gave me to have the employees

15  sign.

16  Q.     Okay.  And you read it?

17  A.     Yes, I read it.  I read it with Bob.

18  Q.     And you signed it?

19  A.     I can't recall signing.

20  Q.     If there was a complaint about violation of

21  that policy, Canal employees were supposed to bring it

22  to you, correct?

23  A.     That is what you, Laurent Drogin and Tom Harvey

24  set up, yes.

25  Q.     Did you make any complaints to Tom Harvey about

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    harassment?

3    A.      Yes, it was widely -- yes.

4    Q.      Okay.  What was the complaint that you made to

5    Tom?

6    A.      One that I can recall is in a text message that

7    it was downright harassment regarding the Bob and

8    Tiffany harassing me about the apartment items and

9    things that needed to be done in the apartment.  There

10   were other discussions with him about Bob and Tiffany's

11   behavior and the phone calls that I was receiving.  It

12   was widely known with -- with people such as Tom Harvey,

13   Michael Tasch, Robin Chambers and Michael Kaplan.

14   Q.      Other than with regard to Tiffany, did you ever

15   complain to Tom Harvey about other harassment?

16   A.      Can I clarify, it's harassment with Bob or --

17   Q.      Well --

18   A.      In the decade plus of me working there?  I'm

19   just trying to clarify so --

20   Q.      You've given examples of harassment that you

21   raised with Tom concerning Tiffany and Tiffany and Bob,

22   that interaction.  So I'm asking whether there were any

23   other types of harassment that you've complained about,

24   let's say with other people outside of the Tiffany

25   context?

1                    GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.       In terms of -- the questions I think are a

3    little -- I'm trying to understand.  You're asking about

4    conversations of harassment outside of Tiffany with

5    other people other Tom.

6    Q.       No.  Take Tiffany and put her aside.  Did you

7    ever complain to Tom in sum and substance, hey, Tom, I'm

8    being harassed by blank?

9    A.       Yes.

10   Q.       Okay.  To whom did you complain about?  Sorry.

11   To Tom, who did you complain about?

12   A.       Grace Hightower-De Niro, Peter Lambert, Bob.

13   Over a decade plus there were many conversations.

14                    MR. DROGIN:  Okay.  Let's go now to

15            Exhibit K, please.

16                    (Whereupon, a document Bate Stamped

17            Robinson 00002608 was marked as Exhibit K, for

18            identification, as of this date.)

19   Q.       Do you have it?

20   A.       Yes.

21   Q.       So this is an e-mail you sent to Bob on July

22   18, 2017; is that right?

23   A.       Yes.  It appears to be.

24   Q.       Alright and then the second to last paragraph

25   you wrote, "you know how much I love my job and adore

Page 56

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     you."  Do you see that?

3     A.      Yes.

4     Q.      Was that an honest and accurate expression of

5     how you were feeling at that time?  Just a yes or no

6     question.

7     A.      I'm reading the e-mail so I can --

8     Q.      Well, not really asking about the rest of the

9     e-mail.  Just asking, when you wrote, "you know how much

10    I love my job and adore you", was that a genuine

11    expression as to how you were feeling at the time, yes

12    or no?

13    A.      In that moment, yes.

14    Q.      Now after you resigned, do you recall telling

15    Tom Harvey over the telephone "I hope that Bob knows how

16    much I love working for him and how much I adore him".

17            Do you recall saying that to Tom?

18    A.      I don't recall.  We had many conversations.

19                 MR. DROGIN:  This is going to be

20            document 7195, and it's approximately six

21            minutes and 10 seconds into the recording.

22            Please listen to it.

23                 MS. HARWIN:  Can you label it --

24                 (Whereupon, the recording was played at

25            this time as follows:

Page 57

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                     MS. ROBINSON:  And I hope that Bob

3              knows that, you know -- how much I love working

4              for him and how much I adore him.  I mean I

5              don't know --)

6   Q.    Was that a true statement that you -- was that

7   a true statement when you made it?

8   A.    I would need to know more about, like, the date

9   and the context.  I would probably say that it was in

10  consideration of trying to balance not being retaliated

11  against and trying to keep things calm when I was

12  exiting.

13  Q.    Alright.  So the answer to my question is no,

14  it wasn't a true statement or yes, it was a true

15  statement or you can't answer it?

16                    MS. HARWIN:  Can you repeat the full

17             question that's pending.

18         (Whereupon, the record was read by the

19  reporter.)

20  Q.    Are you able to answer the question?

21  A.    With context I would say --

22  Q.    Let me rephrase the question.  You heard your

23  own voice, correct?

24  A.    Yes.

25  Q.    Those are the words that you said, correct?

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.     Yes.

3                  MR. DROGIN:  Alright.  Can we go to

4           Exhibit L, please.

5                  (Whereupon, a document Bate Stamped

6           Canal 23017-20 was marked as Exhibit L, for

7           identification, as of this date.)

8                  MS. HARWIN:  Counsel, moving forward,

9           if you're using recordings, please insert them

10          into the chat so that we actually have the

11          recording as an exhibit.  Right now the

12          recordings that are being used, they're not

13          being provided and they're not being identified

14          and labeled as exhibits.  Everything that's

15          being used in a deposition needs to be labeled

16          as an exhibit.

17                 MR. DROGIN:  Okay.  We'll do that

18          afterwards.

19                 MS. HARWIN:  Thank you.

20                 MR. DROGIN:  Noting of course that we

21          got them from you, but okay.

22   Q.     Who is -- we have Exhibit L.  Who is Raphael De

23   Niro?

24                 MS. HARWIN:  Hold on, let me download

25          it.

Page 59

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.       Bob's son.

3     Q.       And in February 2019, Bob was looking for a

4     summer rental in the Hamptons; isn't that right?

5     A.       Uh, yes.

6     Q.       Now in Exhibit L on the second page you wrote

7     an e-mail at 9:46 p.m.  Do you see that?

8     A.       On the second page?

9     Q.       I'm sorry, on the first page, you wrote an

10    e-mail at 9:46 p.m. and you say, "Sabrina and Gillian

11    are your father's assistants."  Do you see that?

12    A.       Yes.

13    Q.       Was that true?

14    A.       Yes.

15    Q.       You say, "while I am happy to be CC'd too,

16    they're the ones that handle your father's schedule,

17    travel, flights, hotel, needs, etcetera."

18             Is that true, yes or no?

19    A.       Yes.  Some of that stuff, yes.

20    Q.       Then you say, "as for my role, I'm not sure

21    where the hostility comes from, but I am not your

22    father's assistant."

23             Was that true, yes or no?

24    A.       Yes, it was realigning my job, again, with what

25    Bob and I had discussed and I was constantly being put

```
 1               GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    back in by Bob in the role of being his assistant --
 3    Q.      Okay.  And I will come back to that.
 4    A.      I'm trying to clarify.
 5    Q.      I'm not asking you to.  I'm just asking you
 6    whether the words you wrote were true, yes or no?
 7    A.      Yes.
 8                   MS. HARWIN:  Counsel, please do not
 9               interrupt her in the middle of a sentence to
10               have a clear record for the court reporter.  If
11               counsel wants to interject, please do so after
12               a sentence is complete.  There's a lot of
13               talking over one another.
14                   MR. DROGIN:  I'm trying very hard to
15               make it yes or no, so if I'm talking over, it's
16               because we're getting beyond yes or no.
17    Q.      You then wrote I have long moved on to --
18    A.      Can I finish that -- the answer to the first
19    question.
20    Q.      I'll withdraw the question and I'll ask it
21    again.  You wrote, "as for my role, I'm not sure where
22    the hostility comes from, but I am not your father's
23    assistant."
24                   Was that true?
25    A.      It needs context, but yes.
```

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Alright.  You then wrote, "I have long moved on

3    to film production, financial matters and oversight and

4    a host of other things."

5            Was that true?

6    A.      With context, yes.

7                   (Whereupon, a document Bate Stamped

8                   Robinson 00002141-42 was marked as Exhibit M,

9                   for identification, as of this date.)

10   Q.      Okay.  Let's take a look at Exhibit M.  I

11   believe this is a resumé that you prepared in 2015.  Can

12   you confirm that?

13   A.      I wouldn't be able to confirm when or what

14   version or draft of a resumé this was.

15   Q.      Alright.  So we know, however, it says that

16   your title was "director of production, film 2011 to

17   present."

18           Do you see that?

19   A.      Yes.

20   Q.      So we know it's after 2011, correct?

21   A.      Yes.

22   Q.      And we know it's before your title changed to

23   VP of production and finance because that entitle

24   doesn't appear anywhere, correct?

25   A.      It appears that that is correct.

Page 62

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Now do the bullet points in your resumé

3    accurately reflect some of the tasks that you were doing

4    in the capacity listed?

5                    MS. HARWIN:  Counsel, can you clarify

6              what point in time you're asking about.

7                    MR. DROGIN:  Sure, in 2011.

8    A.      And this is -- you're asking if it was true

9    from 2011 to present?

10   Q.      Well, not present.  I'm going to ask you 2011

11   because that's the starting date.  I'm hoping you were

12   going to tell me it was true in 2011.

13   A.      My responsibilities under director of

14   production at times grew with the job.  I became

15   director of production of film in 2011 and my job's -- I

16   increased during that time.

17   Q.      Were these bullet points a fair depiction of

18   your duties and responsibilities during the period of

19   time that you were the director of production?

20   A.      They were some of them.

21   Q.      Okay.  And the bullet points under office

22   manager, are some of those -- do those reflect

23   accurately some of the duties and responsibilities of

24   your role of office manager?

25                   MS. HARWIN:  You mean in 2010?

1               GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MR. DROGIN:  In 2010.

3    A.     They were some of the job duties I did, but it

4    wasn't consistent.

5    Q.     Okay.  And what about with regard to your role

6    as executive assistant 2008 to 2010, were those some of

7    the things that you did?

8    A.     Those were small amounts of things that I had

9    done between 2008 and 2010.

10   Q.     Okay.  Take a look at Exhibit N.

11   A.     N?

12   Q.     N, the next one.

13                    (Whereupon, a document Bate Stamped

14                    Robinson 00004642 was marked as Exhibit N, for

15                    identification, as of this date.)

16   Q.     Do you see it?

17   A.     Yes.

18   Q.     That's an e-mail you sent to your mother on

19   February 24, 2019, correct?

20   A.     Yes.

21   Q.     And that was a resumé that was current at the

22   time?

23   A.     It was a draft.

24   Q.     Alright.  In the section titled VP production

25   and finance, there are six bullet points.  Do you see

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    them?

3    A.        Yes, let me read them.  Yes.

4    Q.        Did that accurately depict some of your duties

5    and responsibilities as VP of production and finance?

6                    MS. HARWIN:  At what time?

7    Q.        At the time you sent it to your mother.

8    A.        It was some of the job duties that I was given,

9    but it wasn't a continuous or regular portion of my job.

10   Um --

11   Q.        What did you -- sorry, go ahead.

12   A.        It was something that -- again I bring up that

13   Bob and I had discussed what my job --

14   Q.        No, I know that.  I get that.  Please don't go

15   astray.  I'm just asking if these were accurate

16   representations of some of your duties and

17   responsibilities as VP of production and finance, yes or

18   no?

19   A.        With the context of that it wasn't -- my,

20   like -- it wasn't something that was regularly done and

21   these were jobs that were given to me at times during

22   that period, yes.

23   Q.        And the last bullet point it says, "labor

24   regulations oversight."  What does that mean?

25   A.        It means facilitating the paperwork that I

Page 65

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2      discussed with both you, Laurent Drogin and Hagit Feder,

3      Tom Harvey.  I would facilitate and make sure that all

4      the paperwork was signed and was sent to the correct

5      people that needed the copies of it.  I went over the

6      paperwork that you, Laurent had sent to me with Bob and

7      with Tom.  I helped facilitate when Bob was in violation

8      of overtime and not having it for our paperwork in the

9      office.

10     Q.      Did you interview Sabrina for her position?

11     A.      Yeah.

12     Q.      Did you interview Lulu White for her position?

13     A.      Yes.

14     Q.      Did you interview Gillian Spear for her

15     position?

16     A.      Yes.

17     Q.      Did you extend offers of employment to any of

18     them?

19     A.      I facilitated the paperwork that I was given by

20     your firm to them.  But I believe the person listed on

21     that was Bob.

22     Q.      Okay.  But in terms of personally extending the

23     offer to join the firm, did you do that with Sabrina?

24     A.      I facilitated and passed the paperwork that I

25     was given.

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Okay.  But was there ever a phone call with

3    Sabrina saying in sum and substance, we'd like to offer

4    you a position?

5    A.      A phone call I'm not aware of.  Yeah, in some

6    way, e-mail, meeting, phone, she was offered the

7    position based on Bob's, you know, approval.

8    Q.      And did you make the recommendations to Bob

9    that those individuals be hired?

10   A.      Michael Kaplan and I discussed the candidates

11   with Bob, ultimately it was Bob's decision.  Bob had--

12   Q.      So you and Michael --

13   A.      --had actually been in ████, so --

14   Q.      Hold on, stop.  Let's not go down that road.

15   You and Michael made recommendations to Bob about the

16   hiring of those three employees, correct?

17   A.      We, we --

18   Q.      Yes or no.

19   A.      With context, yes.

20   Q.      Do you remember approximately when Lulu White

21   was hired?

22   A.      August, I believe, of 2018.

23   Q.      Lulu was hired as your assistant, wasn't she?

24   A.      That was -- she was hired to be my assistant

25   and the assistant to the office, that was the position.

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    But that's not what ended up happening with her

3    position.

4    Q.      So she was hired as your assistant, yes or no?

5    A.      And the office assistant as well.

6    Q.      She had a Canal Productions e-mail address; is

7    that right?

8    A.      Yes.

9    Q.      And her signature line included the phrase

10   "office of Chase Robinson" did it not?

11   A.      I can't recall the specifics of what was

12   written on the bottom of her e-mail.  I believe there

13   was something along the lines of that.

14   Q.      Are you familiar with something called the

15   "office of Chase Robinson"?

16   A.      With it -- with the -- I mean, I don't know --

17   I can't recall off the top of my head what was written

18   at the bottom of her e-mail.

19   Q.      At the time that you resigned in April of 2019,

20   you had been searching and interviewing for a full-time

21   bookkeeper; isn't that right?

22   A.      No, I wouldn't say that that is correct.

23              MR. DROGIN:  Okay.  We're going to play

24          recording 7199 at approximately 10 minutes and

25          8 seconds.

Page 68

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    (Whereupon, the recording was played at

3          this time as follows:

4                    MS. ROBINSON:  I'll discuss it, it's

5          like all where we were, it's like you know

6          under financial, I put bookkeeper for search

7          because I've been interviewing and searching

8          for that full-time bookkeeper --)

9     Q.   Does that refresh your -- first of all, were

10    those your words?

11                   MS. HARWIN:  Counsel, I had trouble

12         hearing the recording.  Can you replay it

13         louder.

14                   MR. DROGIN:  Yeah, she said she was

15         searching and interviewing for a full-time

16         bookkeeper, but we'll play it again.

17                   (Whereupon, the recording was played at

18         this time as follows:

19                   MS. ROBINSON:  It's like all where we

20         were.  It's like, you know, under financial I

21         put bookkeeper search because I was

22         interviewing and searching for that full-time

23         bookkeeper so it didn't fall through the

24         cracks.  It was like --)

25    A.   I don't believe that that is accurate.  Not my

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    words, what I'm saying is the context of the question I

3    believe is something that I said I was doing not at the

4    moment of 2019 resigning.  There was a period of time

5    where I had spoken to Bob and he had asked me to look

6    for a possible bookkeeper and that was, I believe, 2017

7    or '18.  So I think that when you're saying that the

8    audio recording is saying that I was presently looking

9    for a bookkeeper, I think that from what I hear of the

10   conversation as I was or I had been, it's not that I was

11   at that time.  But I had been and was in 2018 or -- you

12   know.  So I think that it's not within -- I don't think

13   that your question is the right -- has the right context

14   to what the recording refers to.  And I also would need

15   to listen to a little bit more of the recording to

16   understand when -- when or you know, what else was said

17   in the conversation for that small piece that you gave

18   me.

19   Q.    So at one point in time you were searching and

20   interviewing for a full-time bookkeeper; is that

21   correct?

22   A.    I don't know that I would characterize it that

23   way.  There was a bookkeeper but I don't know if it was

24   full-time or it was something that Bod had discussed.

25   Q.    What was Vantage Point?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   A.      Vantage Point was a benefits company that was

3   brought up during a period of when myself, Michael

4   Kaplan and Michael Tasch were looking into medical

5   benefits and how if Canal switched from being on

6   Tribeca's medical, could, you know, have its own broker

7   and stuff.  It was -- it -- it was the company that was

8   brought up, to you know, by the company to -- by the --

9   by Peter Jones the insurance broker as a possibility to

10  help with --

11  Q.      I just want the record to be clear, my question

12  was simply what was Vantage Point?

13  A.      It was a benefit's company.

14  Q.      That's how I would really like you to answer

15  these questions so we don't have to show this transcript

16  to the Court.  We've got a lot to get through with a

17  limited amount of time.

18          Now Vantage Point was something you were

19  working on in February of 2019; isn't that true?

20  A.      Working on, I wouldn't characterize it that

21  way.

22              MR. DROGIN:  Alright, let's take a look

23          at Exhibit O.

24              MS. HARWIN:  And counsel, if we can

25          find time for a lunch break soon, we'd

Page 71

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2           appreciate it.

3                     MR. DROGIN:  Okay.

4                     (Whereupon, a document Bate Stamped

5           Robinson 00001522-23 was marked as Exhibit O,

6           for identification, as of this date.)

7    Q.     So Exhibit O is a series of e-mails that you've

8    produced in the course of discovery.  This is a

9    three-page document and the first page shows an e-mail

10   at the bottom or actually second from the bottom from

11   David Earls to you at your ███████████████████████

12   dated February 14, 2019.  Do you see that?

13   A.     Yes.

14   Q.     Okay.  And then in April -- on April 2nd, at

15   7:59 a.m., you sent it to Bob saying hi, let me know

16   when you have time to meet and go over.  Wanted to get

17   started on VPB and gathering information.

18          Do you see that?

19   A.     Yes.

20   Q.     So these Vantage Point benefits this was

21   something you had been working on from February up until

22   April; is that right?

23   A.     I wouldn't characterize it that way.

24   Q.     Okay.

25   A.     Working on -- yeah, I wouldn't characterize it

Page 72

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    that way.

3    Q.      Okay.  Now you had employee files kept on your

4    home office; isn't that right?

5    A.      There were some, yes.

6    Q.      Alright.  You had Lulu's original timesheets in

7    your home office, correct?

8    A.      I wouldn't characterize it that way or say that

9    is correct.

10   Q.      Okay.  Well, with regard to timesheets, what

11   was it that you returned to Canal?

12   A.      I had the timesheets that I had printed out and

13   checked off that the information was correct in sending

14   the overtime to Michael Tasch as requested.  So the

15   original timesheets that employees sent to me were on my

16   e-mail.

17   Q.      Alright.  And this was for Lulu, Gillian and

18   Sabrina; is that right?

19   A.      Those were some of the ones that I had, yes.

20   Q.      Why were they kept in your home office?

21   A.      Well, my office was my official office as

22   decided and agreed to with Bob in 2017.  So I had that

23   -- this was my office.  I didn't have an office at Canal

24   nor did I have filing cabinets.  Um --

25   Q.      So you would work on this at home, correct?

Page 73

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   A.      In the office or at home, it varied.

3   Q.      And you would -- I want to make sure I

4   understood it.  You would flag it for overtime and then

5   send that to Michael Tasch?

6   A.      I was asked by Michael Tasch to send him what

7   the overtime was so that he could pay it by, like, on

8   Monday or Tuesday I could send it to him so it would go

9   into the paycheck of that week.  So I would double check

10  that it was correct and send him the amount --

11  Q.      Okay.  I'm not asking about that.  Okay.  You

12  also had NDA's, nondisclosure agreements in your home

13  office; is that right?

14  A.      Yes, I was asked by Tom Harvey to keep them.

15                  MR. DROGIN:  Okay.  Let's go to Exhibit

16          P, please.

17                  MS. HARWIN:  That's not appearing in

18          the chat.

19                  MS. LAZZARO:  Bear with me.  It should

20          be uploaded now.

21                  (Whereupon, a document Bate Stamped

22          Robinson 00005160 was marked as Exhibit P, for

23          identification, as of this date.)

24  Q.      You see Exhibit P?

25  A.      Yes.

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    Q.      This is a document entitled personal statement.
 3    Is this a draft or something that you were going to send
 4    as part of your application to the London School of
 5    Economics?
 6                     MR. DROGIN:  Would you like to go off
 7              the record and take some more time?
 8                     THE WITNESS:  No, I'm finished reading
 9              it now.
10    Q.      I'm just asking you what it is.  And to make it
11    simpler, can you identify this?
12    A.      That's why I'm reading it.  Can I read it or --
13    Q.      Well, I really just have one question.  Maybe
14    we'll just do it that way.  One, two, in the fourth
15    paragraph you say, "in managing the RDM team, whether it
16    was his employees, film crew or contracted workers, his
17    hands-off approach gave me the chance to be hands-on."
18              And I want to know what employees you were
19    managing?
20    A.      At times the female executive assistants, this
21    wasn't a regular part of what I did, but --
22    Q.      I just want to know who they were.  I just
23    wanted to know and you told me who they were.
24    A.      Okay.
25    Q.      Now you would set the annual holidays for Canal
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    and send them to Bob for approval; isn't that right?

3    A.     I wouldn't characterize it that way.

4    Q.     Well, you would send Bob a document that said,

5    in substance, these are the days that we're going to be

6    closed for holidays this year; isn't that right?

7    A.     I don't think that's correct.  Can I clarify or

8    --

9    Q.     Not necessary.  Did someone determine what

10   holidays the office would be closed each year?

11   A.     The federal government.  There was a list of

12   the federal holidays and Bob would be reminded that it

13   was Labor Day or you know, whatever federal holiday so

14   he would be e-mailed to be reminded that, you know,

15   Memorial Day was coming up.

16   Q.     Did Amelia Brain perform any services for Canal

17   in 2018?

18   A.     Yes.

19   Q.     When did you first discuss with Amelia Brain

20   the concept of her returning to work for Canal?

21   A.     After she left, there were multiple occasions

22   even when she came back and worked -- or helped out

23   Canal on various different ways, whether it was where

24   she lived in LA or in New York.  So I don't know when --

25   it was just after she left.

Page 76

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      In 2018, did you discuss it with her in March

3    when you were out in Los Angeles?

4    A.      I can't recall.

5    Q.      Alright.  Olivia Janpol; J-A-N-P-O-L, that's a

6    former Canal employee; is that right?

7    A.      Yes.

8    Q.      Alright.  Let me go back, I skipped an exhibit.

9    I want to go back to Exhibit Q.  We'll go through this

10   real quick.  Actually, you know what, I'm not sure this

11   is the right exhibit.  Let's just go to R.  Let's just

12   pull up R, we'll catch up and then we'll take our break.

13                   (Whereupon, a document Bate Stamped

14              Canal 2793-99 was marked as Exhibit Q, for

15              identification, as of this date.)

16                   (Whereupon, a document Bate Stamped

17              Canal 36322-23 was marked as Exhibit R, for

18              identification, as of this date.)

19   Q.      Do you have R?

20   A.      Yes.

21   Q.      Alright.  So this is an e-mail from you to Bob

22   May 19, 2016 and you're sending him some information

23   about office closures and holidays; is that correct?

24   A.      Can you repeat your question.

25   Q.      Yeah, this e-mail shows you sending Bob

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   information about office closures --

 3   A.      About a discussion of office closures of when

 4   people were taking off, Memorial Day, obviously federal

 5   holidays.

 6   Q.      Yes.

 7   A.      We followed the Tribeca -- Tribeca Enterprise

 8   or Tribeca Film Center sheet that they send.

 9   Q.      So you were just sending this as a reminder to

10   Bob; is that right?

11   A.      Reminder -- it's a discussion.  Like, you know,

12   everything was a discussion based on Bob's schedule.  So

13   any time off, whether it was holiday, Thanksgiving,

14   summer --

15                   MR. DROGIN:  That's -- that's fine.

16           Let's take a look at S, Exhibit S.

17                   (Whereupon, a document Bate Stamped

18           Canal 44293-94 was marked as Exhibit S, for

19           identification, as of this date.)

20   Q.      If I can direct you to the -- it's a two-page

21   document.  Let's start on the last page.  And you sent

22   an e-mail to Olivia and third line down you said, "next

23   time you want to take vacation, you e-mail me the days

24   and I will decide if it is the right time.  It is not

25   for you just to take off when you want."
```

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2            Do you see that?

3    A.     I've lost -- where is this?

4    Q.     Second page, there's a short e-mail there sent

5    to Olivia, signed by Chase, without two little X's.  But

6    it says, "next time you want to take vacation, you

7    e-mail me the days and I will decide if it is the right

8    time.  It is not for you just to take off when you

9    want."

10           Do you see that?

11   A.     I don't know if that was the inflection or tone

12   of my e-mail what you had just said, but yes, I see

13   that.

14   Q.     Okay.  So Olivia would have to clear her

15   vacation days with you first, correct?

16   A.     Well, would have to be -- at this time in 2012,

17   it would have to be worked out so that -- because Olivia

18   was Bob's executive assistant, that the work would need

19   to be continued while she was away, so therefore, she

20   had to work it out with -- with, you know, myself or

21   Michael or Amelia at the time --

22   Q.     Please, please Ms. Robinson, I really don't

23   want to have to go back to the Court.  You told her that

24   she needed to e-mail you the days and you will decide if

25   she could, is that right?  That's what it says.

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2  A.      With context it was implied that --
 3  Q.      Yes or no?
 4  A.      Without the context -- it needs context for me
 5  to say yes.
 6  Q.      Okay.  That's fine.  Now in the next e-mail on
 7  November 30th, you write, "going on into the future,
 8  when anyone takes days off, they e-mail me their request
 9  three weeks in advance and I'll decide."
10          Do you see that?
11  A.      Yes, it's a compliant and a discussion --
12  Q.      I'll take a yes.  The question was only whether
13  you saw it.
14  A.      Yes.
15  Q.      Did you write it?
16  A.      Yes.  But I would also just note that --
17  Q.      I haven't asked.  I just asked if you wrote it.
18  A.      I was just going to say that the e-mail itself
19  is corrupt in some way, just to point that out.
20  Q.      Okay.  Well, I guess we'll just have to deal
21  with that.  In the next e-mail you wrote, "you will
22  e-mail me at least three weeks prior to the day
23  requesting off.  I will let you know if it is possible.
24  It is not something you discuss with Bob, you discuss it
25  with me."
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          Do you see those words?

3    A.    Yes.

4    Q.    And then November 5, 2014, you've now jumped

5    almost two years, it's an e-mail from you to Olivia and

6    then it says, "and in addition you don't dictate to your

7    job when you take time off, you request it as it is done

8    in every job.  You need to e-mail me, not mention it to

9    me or Bob."

10         Do you see that?

11   A.    I do, but I note that Olivia did not work at

12   Canal in 2014.  The e-mail itself is corrupt.

13   Q.    Okay.  I guess we'll just have to look into

14   that.

15   A.    My e-mail is corrupt at that time.

16   Q.    Alright.

17              MS. HARWIN:  And Counsel, just a

18              reminder, if we can take a lunch break at some

19              point.

20              MR. DROGIN:  Yeah, I'm going to do that

21              very shortly.  We're going to go until 12:15.

22   Q.    Were you Canal's IT system administrator?

23   A.    There were several IT administrators.

24   Q.    Were you one of them?

25   A.    I wouldn't consider me one of them.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     Q.      Did you have access to Canal employee's

3     passwords?

4     A.      I would clarify that when we switched, Michael

5     Kaplan was the main administrator and then I had a login

6     too with administrator capabilities for e-mails when we

7     switched over from one company to another.

8     Q.      Alright.  So you could access other employee's

9     e-mails, correct?

10    A.      Yes.

11    Q.      Sorry?

12    A.      Yes.  Technically yes.

13    Q.      Alright.  Did you ever review e-mails sent to

14    or from Bob on which you were not copied?

15    A.      To or from Bob?

16    Q.      Yes.

17    A.      Not that I can recall.

18    Q.      What about after you resigned?

19    A.      After I resigned?  No.

20    Q.      Did you ever access e-mails sent to or from

21    Canal employees on which you were not copied?

22    A.      What time period?

23    Q.      During your employment?

24    A.      During my employment, um, there were times when

25    -- we had all -- there were times when I had to go and

Page 82

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    find a receipt or find information, that's why we kept

3    all the other employees e-mails active after they

4    resigned.

5    Q.      So after -- so during the course of your

6    employment, if you wanted to, you could go in and see

7    e-mails sent to or received by the Canal Productions or

8    the Canal Productions e-mails of it's -- let me rephrase

9    the question.

10          So you had access to the e-mails that were

11   being sent and received by Canal employees; is that

12   right?

13   A.      Technically yes.

14   Q.      Did you have access to Bob's text messages?

15   A.      Can you clarify in what way or when.

16   Q.      During the course of your employment, did you

17   have access to Bob's text messages?

18   A.      Only if he provided me his phone or computer.

19   And technically, I guess, but not -- I couldn't -- yeah,

20   just technically -- if he gave me his phone and asked me

21   to do something or gave me his computer and asked me to

22   do something, at that point, yes.  But in general, no.

23                   MR. DROGIN:  Okay.  Let me just go

24          through one more exhibit and then we'll take

25          that break that your attorney is asking about.

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Over the course of the 11 years that you worked

3    for Canal, you understood that at times you would have

4    to work nights; is that right?

5    A.      I was on call 24/7, yes.  Many nights or

6    weekends.

7    Q.      Right.  Early mornings, correct?

8    A.      Yes, I mean at times, yes.

9    Q.      So sometimes you and Bob were actually in

10   different time zones, correct?

11   A.      Yes.

12   Q.      And sometimes you would have to do work while

13   you were on vacation; is that right?

14   A.      I wouldn't -- I don't think that -- I wouldn't

15   characterize it that way.

16   Q.      Okay.  How would you characterize it?

17   A.      I wouldn't characterize it that I was on

18   vacation.  Bob and I had an agreement that I would work

19   while I was away.  There were very, very, few vacation

20   days or days off that I took while I worked at Canal.  I

21   was expected to be on call 24/7.

22   Q.      Understood.  So these were working vacations,

23   if you will?

24   A.      I wouldn't even put the word vacation in there.

25   They were work while away, which is what Bob and I

Page 84

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    agreed to.

3                     (Whereupon, a document Bate Stamped

4              Canal 45967-69 was marked as Exhibit T, for

5              identification, as of this date.)

6    Q.       Okay.  In Exhibit T, I know this is the same

7    e-mail that we've seen before, the last question I'm

8    going to ask you about it is, how did you make Canal

9    labor law compliant?

10   A.       In meeting with you, Laurent Drogin and Hagit

11   Feder, I facilitated all the paperwork that needed to be

12   done with timesheets.  At one point the um -- I mean

13   that was what I can recall at this moment.

14   Q.       Alright.  And if you had questions about wage

15   and hour law, you would call my firm?

16   A.       Yes or I would speak to Michael Tasch or Tom

17   Harvey.  Can you clarify, like, the time period or --

18   Q.       The time period from when you started to make

19   Canal labor law compliant?

20   A.       Bob -- Tom Harvey had referred me to you and I

21   had spoken to Bob about it.  Bob was --

22   Q.       Alright.  It's fine.  For overtime purposes,

23   you would give this information to Tasch?

24   A.       I was asked by Michael Tasch to send him how

25   much -- like, how many hours overtime the employees

Page 85

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    would receive overtime.

3    Q.      So you would send this to Tasch?

4    A.      I would send the amount of overtime to Tasch.

5    Q.      And you got that from the timesheets that the

6    employees would send you?

7    A.      Yes.

8    Q.      And you gave Tasch accurate information?

9    A.      Yes.

10   Q.      Did Bob review the timesheets before you sent

11   them to Tasch?

12   A.      Not that I can recall.

13   Q.      How did you know who was eligible for overtime?

14   A.      It was a discussion with you and Hagit Feder.

15   Q.      And what was your understanding as to when

16   Canal employees would be entitled to overtime?

17                   MS. HARWIN:  You mean legally or as a

18           practical matter, when they would be paid

19           overtime?

20   Q.      Practical matter, what you understood.

21   A.      I can't recall the specific hours that they

22   would receive.  Because I think that they were -- I

23   can't recall exac -- I can't recall the exact hours.

24   Q.      Okay.  And in this lawsuit, you claim that

25   you're entitled to overtime; is that right?

Page 86

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Yes.

3    Q.      Did you ever instruct Michael Tasch to pay you

4    overtime?

5    A.      No, not that I can recall.

6    Q.      Okay.  Wasn't one of the things that you

7    discussed with my law firm the fact that you were exempt

8    from receiving overtime?

9    A.      With Michael Tasch, a discussion with Michael

10   Tasch?

11   Q.      No, with my firm.

12   A.      I don't recall us discussing that I wasn't

13   eligible for overtime.  I don't think we really

14   discussed -- I think our conversations focussed on the

15   female executive assistants.

16   Q.      Just a couple of more questions.  In your

17   Complaint, you say that Bob was aware of his legal

18   obligation to pay overtime.

19          How did he come to have that knowledge?

20   A.      Not only with the conversations that I had had

21   with him after discussing it with you, but through Tom

22   Harvey, Bob was aware.  And again, everything that was

23   discussed with you or any paperwork was also reviewed

24   and approved by Bob.

25   Q.      Didn't Bob tell you that he wanted you to try

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    to avoid having the employees incur overtime?

3    A.       Can you clarify what time period?  Are we --

4    Q.       Sure.  When you discussed this with him?

5    A.       In 2017, I don't recall him saying that.

6    Q.       So in Paragraph 28 of your Complaint, you

7    recount a conversation where you said, Bob told you not

8    to pay overtime.  We can look --

9    A.       Yes.

10   Q.       You know what I'm talking about?

11   A.       Yes.

12   Q.       So just tell us what happened in that

13   conversation from your perspective?

14   A.       Bob had asked that I give one of the -- and I'm

15   quoting him "girls on call", whoever the girl was on

16   call, a key to his apartment.  I had -- he discussed

17   wanting one of them to stop by and check on his

18   apartment for he and Tiffany while he was away.  And I

19   had said that it might be better suited for the

20   housekeeper who is familiar with the house to do it.

21   And he said no, he wanted one of the girls to do it.  I

22   reminded him that it was something that he would have to

23   pay extra for in overtime, and he got very upset and

24   said I am not going to pay them for the work that they

25   do in checking for his house, that he pays them enough

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2   and doesn't want to pay them overtime.  I walked out of
 3   -- from what I recall, I walked out of the apartment and
 4   down the stairs saying that I wouldn't do anything that
 5   was illegal.  He had to pay them for the hours that they
 6   worked.
 7   Q.    And did he?
 8   A.    I -- for the time that I was at Canal, I
 9   believe he did, but that again, was at the tail end of
10   my employment with Canal.
11              MR. DROGIN:  Okay.  This is a good time
12         for the break.  I'm sorry, I went a little bit
13         over.  Let me know what time you'd like to
14         return.  And can we also have a running total
15         as to how long we've been on the record.
16              THE VIDEOGRAPHER:  Yes, just one moment
17         on that.  We're off the record, it's 12:21 p.m.
18              (Whereupon, a luncheon recess was taken
19         from 12:21 p.m. to 1:01 p.m.)
20              THE VIDEOGRAPHER:  We are back on the
21         video record, the time is 1:01.
22   Q.    Ms. Robinson, did you speak with anyone during
23   the lunch break we just took?
24              MS. HARWIN:  You mean other than
25         counsel?
```

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.     My question was, did you speak with anyone,

3    it's a yes or no question?

4    A.     Other than my counsel, no.

5                    MS. HARWIN:  Counsel, I apologize,

6            there's a noise that's going on in my house,

7            can you just hold on one moment for me to turn

8            it off.

9                    MR. DROGIN:  Sure.  Let's go off the

10           record.

11                   THE VIDEOGRAPHER:  Sure.  We're off the

12           video record.  It is 1:02 p.m.

13        (Whereupon, a short break was taken.)

14                   THE VIDEOGRAPHER:  We are back on the

15           record it is 1:03 p.m.

16   Q.     So my question was, did you speak with anyone

17   during the lunch break and I believe your answer is yes?

18   A.     Yes.

19   Q.     With whom did you speak?

20   A.     My counsel.

21   Q.     Did you discuss any aspect of the testimony

22   that you gave earlier this morning, without telling me

23   the details?

24                   MS. HARWIN:  I'm going to direct her

25           not to answer.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MR. DROGIN:  Simply as to whether or

3          not you spoke with a witness on a break from a

4          deposition about the substance of her

5          testimony?

6                    MS. HARWIN:  I'm not going to have her

7          answer a question about the substance of our

8          discussion.

9                    MR. DROGIN:  Even to confirm that it

10         didn't relate to her testimony?

11                   MS. HARWIN:  I'm going to direct the

12         witness not to answer.

13    Q.    Alright.  I want to -- I'll use your words.  I

14    want to redirect you to the fall of 2018.  There was a

15    conversation that you had with Bob where you were asking

16    about increasing your compensation and he told you that

17    he felt like you were shaking him down; is that correct?

18    A.    I wouldn't characterize it in that way, no.

19    Q.    Was there a conversation where Bob told you

20    that he felt you were shaking him down?

21    A.    Yes, those words were brought up in a

22    conversation that I had with -- with him.

23    Q.    And what were you discussing?

24    A.    Um, we were discussing the amount of work um,

25    the hours that I worked -- I felt that I wasn't paid

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     for.  The work that I was doing of other people.  Um, we

3     discussed, uh -- I had objected and didn't want to work

4     on the Toukie Smith items or the apartment items and um,

5     we had discussed -- I had discussed wanting to be

6     compensated for the hours that I worked.

7     Q.     Okay.  So my question was, you were talking

8     with him about money, correct?

9     A.     Yes.

10    Q.     And he told you that he thought you were

11    shaking him down; is that right?

12    A.     I can't answer that without providing context.

13    Q.     Did his remark to you that he felt you were

14    shaking him down upset you?

15    A.     Yes.

16    Q.     And you told Robin that the shake down comment

17    didn't have anything to do with Tiffany Chen; isn't that

18    right?

19    A.     I can't recall speaking to Robin about --

20               MR. DROGIN:  Okay.  So we're going to

21            play a recording that's been produced as number

22            7160 at roughly the five minute 40 second point

23            in that recording.

24               MS. HARWIN:  And can you identify the

25            span of how long the recording will go on.

Page 92

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MR. DROGIN:  I'll tell you after, I

3          don't really know.

4                    MR. BENNETT:  Just give me one moment,

5          please.

6                    (Whereupon, the recording was played at

7          this time as follows:

8                    MS. ROBINSON:  It kind of just sounds

9          like one thing that, you know he and I agree on

10         in some way.  But for Bob, I kind of tried to

11         gear him onto, like, supposedly kids are going

12         to be around or, like, something is going on

13         and in the end it was just -- I was being

14         attacked by Bob.  And look, Bob and I yes, we

15         have had our problems.  Like, when I asked for

16         the raise in October and, you know, and Bob's

17         response was, you know, okay Chase, just start

18         working less hours, I can't do it, I can't do

19         it.  And then when I said I can't do the

20         apartment and I can't do the Toukie work which

21         is not my job and extra stuff, he ends up

22         saying that I'm shaking him down, and then --)

23                   MR. DROGIN:  Can you keep going with

24         that?  If not --

25                   (Whereupon, the recording was played at

Page 93

1        GRAHAM CHASE ROBINSON-CONFIDENTIAL

2        this time as follows:

3               MS. ROBINSON:  And then it goes

4        through, like, me leaving and like, you know,

5        it's just been such tense fucking time with him

6        where, you know --

7               MS. CHAMBERS:  What do you mean?  What

8        do you mean?

9               MS. ROBINSON:  It's just -- I don't

10       know what it is.  It's just, like, I feel like,

11       you know -- the shake down comment hurt.

12              MS. CHAMBERS:  Yeah.

13              MS. ROBINSON:  Then I dealt with --

14       then I deal with the um -- I'm just trying to

15       sort my thoughts out right now.  Um --

16              MS. CHAMBERS:  You know what, you never

17       addressed that either, you never got to tell

18       him.  You're holding so much in, Chase.

19              MS. ROBINSON:  Oh no, then it was --

20       when finally, like I quit, I finally quit, he

21       started bullying me into kind of staying, not

22       wanting to speak about it.

23              MS. CHAMBERS:  That's right.  That's

24       right.

25              MS. ROBINSON:  He ended up, like,

Page 94

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2           stringing me along until, you know, giving up

3           an opportunity.  We sat down.  I mean you were

4           there.  We sat down, I was in tears at that

5           point with Bob and I screaming at each other.

6           And Bob saying, that if I didn't give him any

7           notice, that I would -- he would give me a bad

8           recommendation, like, after 11 fucking years

9           --)

10                    MR. DROGIN:  We'll stop it there.

11                    MS. HARWIN:  Can you identify the time

12          stamp for the end of the clip, please.

13                    MR. BENNETT:  Seven minutes 24 seconds.

14                    MS. HARWIN:  Thank you.

15   Q.     Okay.  So in 2018 you actually gave notice that

16   you were leaving; isn't that right?

17   A.     Yes.

18                    MR. DROGIN:  And we'll go to Exhibit U,

19          which, I think everything has been uploaded at

20          this point, not everything, but the next

21          couple.

22                    (Whereupon, a document Bate Stamped

23          Robinson 00004504 was marked as Exhibit U, for

24          identification, as of this date.)

25   Q.     Exhibit U.  This was the resignation e-mail

Page 95

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    that you sent in 2018, correct?

3    A.     I'm reading it.

4                  MS. HARWIN:  Counsel, are you

5            identifying the correct exhibit?  This is an

6            e-mail that was not sent to Mr. De Niro.

7    Q.     You know what, I think it was, but I think

8    you're right, we've just -- we probably just uploaded

9    the wrong one, but that's fine.

10   A.     I don't.

11   Q.     Okay.  We'll -- we can come back to it.  It's

12   not terribly important.  Now when you resigned though,

13   in 2018, you gave Bob -- originally you gave him about

14   eight weeks notice; is that right?

15   A.     I believe it was a little over two weeks -- uh,

16   two months.

17   Q.     And then you extended it to 10 or 11 weeks?

18   A.     No, I don't recall extending it.

19                 MR. DROGIN:  Okay.  Can we play 7187 at

20           11 minutes and 10 seconds.

21                 (Whereupon, the recording was played as

22           follows:

23                 MS. CHAMBERS:  Well, Chase, but it

24           seems like it was a pretty quick thing.  It

25           wasn't like, six months.  It was -- how much

Page 96

1

2      time did you give him?

3              MS. ROBINSON:  No, I gave him two

4      months.

5              MS. CHAMBERS:  Okay.  So that was

6      probably --

7              MS. ROBINSON:  I gave him a little shy

8      of eight weeks, a little shy of eight weeks.

9              MS. CHAMBERS:  Right, right.  Okay.

10             MS. ROBINSON:  But there was no point

11     on me staying another week through the

12     Christmas holiday.  Like, why pay me while

13     everybody is away and out of the office.  Like

14     it just didn't make sense for me to and I

15     wanted to be in London by, you know, mid

16     January.  So I wanted to take a break, I wanted

17     to have, like, you know, go for the rush and

18     then get out.  Then I said, January, then I

19     kept saying January 7th.  Bob that gave him 10

20     weeks or 11 weeks, I forgot whatever it goes

21     out to, I give him that.  But he never wanted

22     to sit down and talk about, you know, me

23     leaving.  He wanted to ignore, he wanted to say

24     it didn't happen.  He bullied me, he was an

25     asshole to me for a while and was, like

Page 97

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2          snapping at me about everything --

 3                    MR. DROGIN:  We can stop it.

 4                    MS. HARWIN:  Can you identify the time

 5          stamp.

 6                    MR. DROGIN:  Yeah, it's 11 minute and

 7          10 seconds to approximately 12 minutes 25

 8          seconds.  And as I indicated, we'll send you

 9          all the clips.

10                    MS. HARWIN:  Thank you.

11   Q.    Alright.  Does that refresh your recollection

12   as to whether you initially gave a little bit shy of

13   eight weeks and then you extended it to 10 or 11 weeks?

14   A.     I don't recall having the conversation with Bob

15   about extending it.  There were many times, like, that I

16   had reached out to him to try to meet with him.  So it

17   may be in one of those conversations, but I can't recall

18   specifically other than in that recording giving him a

19   deadline of, like, right after the holidays or -- there

20   were many conversations of trying to discuss it with

21   him.

22                    MR. DROGIN:  Let's go to Exhibit V,

23          please.

24                    (Whereupon, a document Bate Stamped

25          Canal 46029-30 was marked as Exhibit V, for
```

Page 98

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              identification, as of this date.)

3                      MS. HARWIN:  G you said?

4                      MR. DROGIN:  V as in Victor.

5                      MS. HARWIN:  Oh.

6    Q.      Let me know when you're ready, I just have a

7    couple of questions about this.

8    A.      I'm reading it.

9    Q.      Okay.  So in this e-mail you were asking him

10   for a raise, is that right among other things?  Should

11   we go off the record?

12   A.      Can you repeat your question, I was reading it

13   while you were --

14   Q.      Yeah, in this e-mail you, among other things,

15   you were asking him for a raise; is that right?

16   A.      Yes, he and I --

17   Q.      And you compared your compensation to Dan

18   Harvey, correct?

19   A.      This is one of the times that I did, yes.

20   Q.      Well, I'm just talking about this document and

21   as a follow-up to this conversation he -- Mr. De Niro

22   increased your compensation from 200,000 a year to

23   300,000 a year; is that right?

24   A.      I wouldn't characterize it that way.

25   Q.      What was your salary at the time that you wrote

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2   this e-mail?  Wasn't it $200,000 a year?
 3   A.      My base salary was 200.
 4   Q.      And did you get a 100,000 a year increase?
 5   A.      After my meeting with --
 6   Q.      Just yes or no?
 7   A.      Yes, in 2019.
 8   Q.      So 200,000 plus 100,000 is 300,000, right?
 9   A.      Yes.
10   Q.      That was your new salary?
11   A.      My base salary was going to be 300.
12   Q.      You actually turned down a position in order to
13   stay on with Canal, didn't you?
14   A.      I wouldn't characterize it in that way.
15   Q.      Did you have an offer of employment that you
16   turned down?
17   A.      No, not an offer and I wouldn't characterize it
18   in that way.
19   Q.      Well, did you turn down another position?
20   A.      I turned down an opportunity.
21   Q.      Did you have an offer?
22   A.      I wouldn't characterize it that way.  I would
23   say it was a job opportunity which is -- which is what
24   it was.
25   Q.      So it wasn't an offer, right?
```

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2   A.      I --
 3   Q.      Right?
 4   A.      It was an opportunity.
 5   Q.      Did you have a job offer?  Question mark.
 6                  MS. HARWIN:  Counsel, please do not
 7           yell.
 8   Q.      Yes or no?
 9   A.      As I said, it was not a job offer.
10   Q.      Thank you.  So if you told someone that you
11   turned down a job offer, that would have been a lie,
12   right?
13   A.      I don't believe I said it was a job offer.  I
14   believe I said that it was an opportunity.  I've always
15   said it was an opportunity.
16   Q.      Got it.  And who was that opportunity with?
17   A.      The opportunity was what I was planning on
18   doing was starting my own production company, working on
19   my own script and applying for a business school.  That
20   was my opportunity was going out on my own with my
21   scripts, that was the time I was ready to do so.
22   Q.      So do you recall telling people that you had
23   turned down a position?
24   A.      I recall saying it was a job opportunity or an
25   opportunity or career opportunity, but not -- I don't
```

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    recall a position or an offer.

3    Q.     Okay.  Well, we've got plenty of -- we won't

4    bother with those tapes.  Now you met with Bob on

5    January 3, 3019; isn't that right?

6    A.     Yes.

7    Q.     And following that meeting you decided to stay

8    with Canal, correct?

9    A.     I had no choice but to stay.

10   Q.     Were you threatened with bodily harm if you

11   followed through on your resignation?

12   A.     Bob had said he would give me a bad

13   recommendation.

14   Q.     And that's why you stayed?

15   A.     I felt forced to stay as Bob -- I had done on

16   multiple occasions trying to resign and Bob bullied me,

17   this time he stated he would give me a bad

18   recommendation.  I feared retaliation.

19   Q.     A bad recommendation why?

20   A.     For leaving him.

21   Q.     Just for leaving?

22   A.     For leaving him.  I discussed this with Robin

23   as well.

24              MR. DROGIN:  I'm not up to that, yet.

25              Can we go to Exhibit W.

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                    (Whereupon, a document Bate Stamped

 3            Robinson 00000008 was marked as Exhibit W, for

 4            identification, as of this date.)

 5   Q.    Do you see Exhibit W?

 6   A.    Yes.

 7   Q.    Now here you say, "it's been so busy I haven't

 8   had a chance to send you an e-mail to say thank you for

 9   the meeting, so thank you.  We discussed a lot, could

10   you give me until tomorrow morning to think it through."

11            Do you see that?

12   A.    Yes.

13   Q.    Now the comment where you say he threatened to

14   give you a bad recommendation if you left, that was

15   actually made in November; isn't that right?

16   A.    No.

17   Q.    When was it made, do you remember?

18   A.    It was made at a meeting in December with Bob

19   and Robin Chambers.

20   Q.    So you just testified that you felt forced to

21   leave because you were threatened that if you left he'd

22   give you a bad recommendation.  What were you thinking

23   --

24                    MS. HARWIN:  Counsel, I think you made

25            an error in your phrasing.  I think you meant
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              forced to stay, not forced to leave.

3                  MR. DROGIN:  Forced to stay.  Forced to

4              leave comes later.  Yeah I'll rephrase it.

5    Q.    What were you thinking through?

6    A.    I wanted to leave.  I wanted to depart Canal

7    Productions.  I had spoken to Bob resign and he refused

8    to allow me to leave.  He said that he would give me a

9    bad recommendation and I was thinking how could I

10   depart, you know, and balancing the fact that he said

11   that he would give me a bad recommendation and I felt

12   bullied to stay.

13   Q.    Alright.  Now the deal that you made with him,

14   that was a two-year commitment, right?

15   A.    We had discussed transitioning --

16   Q.    Yes or no.

17   A.    I wouldn't be able to answer it a yes or no

18   without context.

19   Q.    Okay.  Now whatever that agreement was, it was

20   never memorialized in writing; isn't that true?

21   A.    I can't recall a specific document of where it

22   was.

23   Q.    Okay.  Now isn't it true that the actual

24   comment Bob made was that he would give you a bad

25   recommendation if you left him in the lurch?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   A.     I wouldn't characterize -- I don't think that's

3   correct.  I wouldn't characterize it that way.

4                MR. DROGIN:  Okay.  Let's hear what you

5           had to say at that time.  7186 from 34:40 to

6           34:50.

7   Q.     Before you play it, Robin Chambers was present

8   when that comment was made, wasn't she?

9   A.     Yes, but that was -- just to clarify the bad

10  recommendation.

11               MR. DROGIN:  Yes, let's hear it.

12               (Whereupon, the recording was played at

13          this time as follows:

14               MS. ROBINSON:  And because Bob, was

15          just, you know, doing the whole bullying thing

16          and being an asshole and saying, if you leave

17          me in the lurch I'll give you a bad

18          recommendation and stuff like that, I said --

19               MR. KAPLAN:  You had a job offer and

20          you --)

21               MR. DROGIN:  Can we continue to play

22          that.

23               MR. BENNETT:  Let me start over.

24               MR. DROGIN:  Yeah, just play it.  I

25          didn't even realize Kaplan used the word job

Page 105

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          offer, let's hear what she says.

3                  (Whereupon, the recording was played at

4          this time as follows:

5                  MS. ROBINSON:  I had to get Robin

6          looped into the whole thing because Bob was

7          just, you know, doing the whole bullying thing

8          and being an asshole and saying, if you leave

9          me in the lurch, I'll give you a bad

10          recommendation and stuff like that.

11                  MR. KAPLAN:  Hold on, so you had

12          another job offer?  And --

13                  MS. ROBINSON:  Are you fucking kidding,

14          me?

15                  MR. KAPLAN:  You should have talked to

16          me, I would have told you to take the other

17          job, God damn it.  That would have been the

18          perfect time to --

19                  MS. ROBINSON:  I felt bad because -- I

20          gave job, like, you know, my two months notice.

21          Like, I gave it to him in November when I got

22          back from London, I said I'm leaving --)

23                  MR. DROGIN:  You can stop.  I thought

24          there was more about the job offer.  I know it

25          appears at multiple places in the tape.

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   Q.       Okay.  Does that --

 3                  MS. HARWIN:  Can we verify the time

 4          stamp of what was just played.

 5                  MR. DROGIN:  Yeah, it starts at 34:40.

 6                  MS. HARWIN:  And when does it end?

 7                  MR. DROGIN:  I don't know, we'll send

 8          it to you.

 9                  MR. BENNETT:  35:50.

10                  MR. DROGIN:  Yeah, let's not waste

11          time.  You have all these.  We'll give you all

12          the information.

13                  MS. HARWIN:  We need a clear record for

14          the transcript as to what was played and what

15          the exhibits are that are being used in the --

16                  MR. BENNETT:  Counsel, it's being

17          recorded.  I mean, I don't think there's going

18          to be any discrepancy or any confusion.

19                  MS. HARWIN:  We need a record for the

20          transcript.

21                  MR. DROGIN:  Let's not waste time.

22          Please record me saying let's not waste time.

23          I want to get through this.

24   Q.       Now does that refresh your recollection as to

25   whether or not Mr. De Niro actually said, if you leave
```

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     me in the lurch, I will give you a bad recommendation?

3     A.     It was part of --

4     Q.     Yes or no, it either refreshes your

5     recollection or it doesn't?

6     A.     I cannot answer yes or no without context.

7     Q.     Okay.  So and that was an actual threat he

8     made, right?

9     A.     Yes, he made a threat.

10    Q.     You believed him, didn't you?

11    A.     Yes.

12    Q.     Did Robin agree with you?

13    A.     Robin --

14    Q.     Yes or no, did Robin agree with you?

15    A.     She agreed that it was a threat.

16    Q.     Did she agree with you that it was a real

17    threat, yes or no?  If you say yes, I'm dumb -- done --

18    I'm dumb.  I'm done.  If you say no, it's no.

19           Question, did Robin agree with you that this

20    was a real threat?

21    A.     I don't know.

22                MR. DROGIN:  Okay 7174 at one hour 18

23           minutes 25 seconds.  You spent a lot of time on

24           the phone during working hours, I'll tell you

25           that.

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                      MR. BENNETT:  After Ms. Robinson

 3              provides an answer, if we could take a very

 4              brief break, less than five minutes, I would

 5              appreciate it.

 6                      MR. DROGIN:  Yeah.

 7                      (Whereupon, the recording was played at

 8              this time as follows:

 9                      MS. CHAMBERS:  Yeah, yeah, yeah.

10                      MS. ROBINSON:  You know, I mean I think

11              my relationship with Bob has changed since he

12              got back anyway.  You know, I mean I think,

13              there were things that he said to me, you know,

14              and while you say that he felt hurt, I mean, to

15              say that he would give me a bad recommendation,

16              I mean -- I couldn't -- like when you heard

17              that, like -- I mean, wouldn't you take offense

18              to that?  You were sitting right next to me.  I

19              took such offense to that.

20                      Ms. CHAMBERS:  No, no, because I don't

21              buy his stupid threats.  Number one, I know

22              him, I've heard him say that before about other

23              people.  Well, fuck it, you've heard him say it

24              about -- I won't give them a good

25              recommendation -- he doesn't mean it, he's
```

Page 109

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          never -- you know, I've never known him to --

3          he just says those things in anger.  It was

4          stupid sounding frankly.)

5                    MR. DROGIN:  Stop.

6                    MS. HARWIN:  Time stamps.

7                    MR. BENNETT:  I'm sorry, I actually --

8          that was my mistake, I actually closed it out.

9                    MR. DROGIN:  We'll get it to you.

10    Q.    Did you believe it was a serious threat?

11    A.    I'm sorry, can you repeat --

12    Q.    Did you believe it was a serious threat?

13    A.    Yes.

14    Q.    Now in that clip, you heard yourself say that

15    your relationship with Bob had changed since he got

16    back.  Did you hear that?

17    A.    Yes.

18    Q.    Got back was got back from ████  right?

19    A.    I don't know.  I don't know when that recording

20    was from.  Robin and I had many conversations.

21                    MR. DROGIN:  Okay.  Greg, do you want

22          to take a break?

23                    MR. BENNETT:  Two minutes, yes, please,

24          if we could.  Before we -- we can go off the

25          record, I just have a quick question for Brooke

Page 110

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          when we're off.

3                    THE VIDEOGRAPHER:  We are off the video

4          record it is 1:26 p.m.

5                    (Whereupon, a recess was taken at this

6          time.)

7                    THE VIDEOGRAPHER:  We are back on the

8          video record.  It is 1:31 p.m.

9   Q.     Ms. Robinson, you actually took steps to resign

10  in 2014, didn't you?

11  A.     I can't recall.  There were multiple times that

12  I tried to resign.

13  Q.     You tried to resign in 2015?

14  A.     I don't recall in 2015.

15  Q.     Okay.  Remember a little while ago we saw a

16  resumé that you sent to your mother back in 20 -- I

17  think it was 2015.

18         Does that refresh your recollection?

19  A.     I'd have to go back and look to see what the

20  date of that was.

21  Q.     Alright.  Now the deal that you struck with Bob

22  in 2019, one of the things that it included was a

23  clearer definition of your job duties; is that right?

24  A.     Uh, I -- part of it was.

25  Q.     At that time you had been pulled into doing

1             GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    work at ████ is that right?

3    A.      Yes, it became a -- yes.

4    Q.      And that wasn't part of your job as Vice

5    president of production and finance, correct?

6    A.      Yes.

7    Q.      So one of the things in the deal that you

8    struck in January 2019 is that you would have less

9    involvement in ████ is that right?

10   A.      There were only four items that I would finish

11   with the design and then I would have no other

12   involvement in ████

13   Q.      Right.  And the deal also included the

14   understanding that you would be transitioning out over a

15   two-year period, correct?

16   A.      That was part of the discussion that I had with

17   Bob.

18   Q.      That was --

19   A.      It was part of it, yes.

20   Q.      And one of the reasons that you agreed to stay

21   on in this fashion was because you felt bad for Bob and

22   everything that he was going through in his life at that

23   time; is that correct?

24   A.      I think a small portion, yes.

25   Q.      He had just come back from ████ correct?

1                 GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.      Yes.

3     Q.      He was going through a divorce?

4     A.      He was going through a separation at that time.

5     Q.      And then there was a part of you that loved

6     Bob; is that right?

7     A.      I wouldn't say that it's correct loving Bob,

8     but I would say that there were times that I did enjoy

9     my job, I did enjoy working for Bob.

10    Q.      One of the other things that was going on was

11    that Bob's kid's didn't like Tiffany, isn't that true?

12    A.      What time period are we -- still January?

13    Q.      Yeah, early 2019?

14    A.      I don't know when I became aware that Bob's

15    children did not like her.

16                    MR. DROGIN:  Alright, can we go to

17            audio clip 7186 at 36 minute to 36 minutes and

18            36 seconds.

19                    (Whereupon, the recording was played at

20            this time as follows:

21                    MS. ROBINSON:  Talking to him about I

22            will get you -- I will get you a career

23            assistant, you know, for the office when

24            Gillian needs or finds someone, like, it will

25            all be smooth and right in the next two years.

1         GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              But Kap, I'm not fucking doing this for the

3              rest of my life.  But did I feel bad that Bob

4              had just gotten out of ███████ was in the middle

5              of a divorce, like, the part of me that loves

6              Bob because I worked for him for 11 years said

7              okay, I'll fucking -- okay, I'll fucking stay

8              for a little bit more time, like, you know,

9              whatever.  You know, I'll do it.  As long as I

10             have my flexibility, being able to travel to

11             London and I can work on whatever, that's

12             fine.)

13    Q.    Does that refresh your recollection as to

14    whether there was a side of you that stayed because you

15    loved Bob?

16    A.    I don't think that the way that I used -- okay.

17    Q.    It's just a yes or no question.  It either

18    refreshes your recollection or it doesn't?

19    A.    I don't think that I can answer that without a

20    clarification, the yes or no.

21    Q.    Alright.  So that arrangement was supposed to

22    begin immediately, the January agreement?

23    A.    Yes, that was in our discussion.

24    Q.    Right now, by February, the end of February,

25    2019, you had already updated your resumé and were

1               GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     thinking of leaving again; isn't that true?

3     A.      No, I wouldn't say that's correct.

4                     MR. DROGIN:  Alright.  Let's take a

5               look at Exhibit X.

6                     (Whereupon, a document Bate Stamped

7               Robinson 00004642 was marked as Exhibit X, for

8               identification, as of this date.)

9                     MS. HARWIN:  Is this the same exhibit

10              that was previously introduced as a different

11              exhibit number?

12                    MS. LAZZARO:  Yes.

13                    MS. HARWIN:  Can we make this one

14              unitary exhibit?

15                    MR. DROGIN:  You know we've marked them

16              all, so it's going to be easier if we just have

17              it duplicated.  In a perfect world --

18    Q.      Ms. Robinson, is it fair to say that by the end

19    of February, you were having some misgivings about

20    whether or not Bob was living up to the terms of your

21    agreement?

22    A.      Can you repeat your question, sorry.

23    Q.      Yeah.  Is it fair to say that by the end of

24    February, you were having some misgivings as to whether

25    or not Bob was prepared to live up to his end of the

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     agreement?

3     A.     I don't think I would characterize it in that

4     way -- I think there were items --

5     Q.     So the answer is --

6     A.     I wouldn't characterize it in that way.

7     Q.     But you had concerns that the agreement had not

8     been followed by Bob; is that true?

9     A.     I feel that there were items that --

10    Q.     Just a yes or no.

11    A.     Uh, can you repeat your question.

12               MR. DROGIN:  Yeah, can you read it back

13          and Britt, can you upload some documents, you

14          know X and Y.

15        (Whereupon, the record was read by the

16    reporter.)

17               THE WITNESS:  I can't recall when, you

18          know, I wouldn't -- I just wouldn't

19          characterize it in that way, that wasn't --

20          yeah, I wouldn't characterize it in that way.

21               MR. DROGIN:  Britt can you put in X and

22          Y.

23               MS. LAZZARO:  They should be there, I

24          see them on my end.

25               MR. DROGIN:  I don't see them, can you

1                 GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          do it again.

3                    MS. LAZZARO:  Yeah.

4    Q.     In February of 2019 had you phased out of the

5    four projects that were supposed to wrap up your

6    involvement with ▆▆▆▆

7    A.     No.

8    Q.     So you were still involved in ▆▆▆at the end

9    of February?

10   A.     Yes.

11                   MR. DROGIN:  Now let's take a look at

12            Exhibit X.

13                   MS. HARWIN:  Is this the same document

14            we were just looking at as exhibit --

15                   MR. DROGIN:  Probably, yeah, I think

16            you had asked that, yeah, this is an e-mail

17            from Chase to her mother with the resume that

18            we did talk about earlier, it's here again.

19   Q.     Do you see that Ms. Robinson?

20   A.     Yes.

21   Q.     So you e-mailed a copy of your resumé to your

22   mother on February 24, 2019; is that right?

23   A.     I drafted it.

24   Q.     And is it your testimony that as of February

25   24th you were not thinking about leaving?

Page 117

 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   A.      No, I wasn't thinking about leaving.

 3                    MR. DROGIN:  And then in exhibit Y,

 4           please --

 5                    (Whereupon, a document Bate Stamped

 6           Robinson 00004648 was marked as Exhibit Y, for

 7           identification, as of this date.)

 8   Q.      Do you see Exhibit Y?

 9   A.      Yes.

10   Q.      So you e-mailed yourself two bullet points, one

11   says business applications and the other says

12   recommendation letter.

13           Do you see that?

14   A.      Yes.

15   Q.      Do you recall why you e-mailed this to

16   yourself?

17   A.      Yes, it was in preparation for looking at

18   business schools.

19   Q.      And the recommendation letter?

20   A.      Again, you would need recommendation letters

21   for business school.

22   Q.      So as of February 28th or 29th, it was your

23   plan to go to business school; is that right?

24   A.      My plan is always whether resigning in 2018 or

25   after I resigned in 2019, my plan was to start my own

     1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

     2    production company, work on my development projects and

     3    apply to business school.

     4    Q.       Alright.  So you have -- you've -- in January

     5    you reach an oral agreement with Bob that you would

     6    transition out over two years, correct?

     7    A.       Yeah, around two years.

     8    Q.       And roughly two months later, you've sent your

     9    resumé to your mother, correct?

    10    A.       It's correct that I sent my resumé to my

    11    mother.

    12    Q.       And you've e-mailed yourself a reminder, I

    13    guess, to do something with business applications and a

    14    recommendation letter, correct?

    15    A.       For -- for business school, not for applying

    16    for jobs.

    17    Q.       Was it your plan to go to business school

    18    within that two-year window that you had committed to

    19    remain with Canal?

    20    A.       I don't think I had thought about whether I

    21    would during that time.  I just wanted to prepare for

    22    when I do, because business school isn't something that

    23    you just tomorrow apply for.  It's something that you

    24    think of, take the GMAT's again there was a process that

    25    goes with it, it's not a --

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.     Didn't you tell Robin that you had begun to

3    prepare your resumé in February of 2019 because Bob

4    wasn't living up to his end of the deal?

5    A.     I can't recall.  There were so many

6    conversation and so much chaos during that time.

7              MR. DROGIN:  Alright.  We'll get to

8              that case in just a minute.  Let's go to

9              Exhibit Z.  I actually think was marked earlier

10             as well, this is a personal statement.

11             MS. LAZZARO:  Exhibit Z is a partial

12             copy of Exhibit P.

13             THE WITNESS:  It's not downloading for

14             me.  It just keeps spinning round and round.

15             (Whereupon, a document Bate Stamped

16             Robinson 00005155 was marked as Exhibit Z, for

17             identification, as of this date.)

18   Q.     You can go back to P, it's the same exhibit.

19   A.     I got Z up.

20   Q.     In this document on the first page in the last

21   paragraph, fourth line down you wrote, "I also learned

22   that one of the most powerful assets of any company is

23   adaptability and willingness to change when the

24   situation, project, or employee requires it."

25             Do you see that?

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      I'm missing what paragraph you're on.  Second

3    paragraph?

4    Q.      It's in the last paragraph on the first page

5    it's on the fourth line down and it's the sentence that

6    starts, "I also learned that one of the most powerful

7    assets of any company is adaptability and willingness to

8    change."

9            Do you see that?

10   A.      Yes.

11   Q.      Were you describing that as an asset that you

12   possessed?

13   A.      Not that -- I don't read it as that I

14   possessed.  I read it as one of the most powerful assets

15   of a company is being able to adapt and to change to a

16   situation or -- you know, if an employee requires it.

17   Q.      But as part of your personal statement, were

18   you saying that you possess those abilities?

19   A.      Let me read my personal statement.

20   Q.      I'm just asking you about that sentence though.

21   I'm not asking you about the entire personal statement.

22   I'm just asking whether you attribute those abilities to

23   yourself?

24   A.      I attribute it to something that I've learned

25   while working at Canal Productions.

Page 121

1                 GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      Okay, so do you possess those attributes?

3   A.      Being able to adapt, willingness to change,

4   putting that line aside, I would say yes.

5   Q.      Now in -- beginning in 2018, Tiffany had been

6   pulling a whole bunch of employees onto the ████

7   project; isn't that right?

8   A.      In the beginning of 2019?

9   Q.      I actually think it went back --

10                      MR. DROGIN:  Stop.

11  Q.      I actually think it went back before then into

12  2018?

13  A.      I don't -- sorry, that's a distraction.  No --

14                      MR. DROGIN:  What distraction?

15                      MS. HARWIN:  Why don't you wait until

16              the dog stops barking?

17                      THE WITNESS:  No, I don't believe that

18              would be a correct statement.

19  Q.      At some point wasn't Tiffany making Canal

20  employees do things for ████

21  A.      She was having me handle items for her for ████

22  in 2019.

23  Q.      Wasn't she also doing that with other employees

24  too, other Canal employees?

25  A.      At times Mike Kaplan regarding fixing items and

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     --

3     Q.     So the answer is yes?

4     A.     Mike Kaplan and myself, yes.

5     Q.     And Lulu?

6     A.     Lulu --

7     Q.     Yes or no, was she one of the people who was --

8     A.     She was involved in the ████ --

9     Q.     Was Sabrina involved?

10    A.     As I said at the very beginning of the project,

11    but for a very short period of time.

12    Q.     Okay.  Now in 2019, Michael Kaplan had ███████

██    ███████, right?

14    A.     Yes.

15    Q.     ███████████████████████████████████████

██  ██   ██████

17    Q.     That increase created even more pressure on the

18    Canal employees who were pitching in at █████ isn't that

19    right?

20    A.     I would say that it was correct that it put

21    more pressure on me at █████ other -- the other

22    employees other than Lulu helping out were not involved

23    at the 117A project.

24    Q.     Alright.  Now Tiffany made it clear to you by

25    some of the comments that she made that she did not want

Page 123

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    you in the apartment -- in the apartment, the townhouse,

3    ████ however, you want to refer to it; isn't that true?

4    A.     I wouldn't characterize it in that way.  I

5    would say it's a feeling that I got from some of her

6    behavior and comments that she didn't want me involved

7    in the ████

8    Q.     So you're saying it wasn't very clear; is that

9    what you're saying?

10   A.     If you're saying -- clarify, the beginning of

11   2019 or when is the time period that you're asking

12   about?

13   Q.     I'll rephrase the question.  Did Tiffany make

14   it very clear based on several comments that she made

15   that she did not want you in the apartment?

16   A.     It was --

17   Q.     Yes or no?

18   A.     I wouldn't be able to answer it as a yes or no.

19              MR. DROGIN:  Okay.  Let's play the

20         clip, 7174 from 59:50 to one hour and 28

21         seconds.  So it looks like it's a 38 second

22         clip.  Let's hear it.

23              (Whereupon, the recording was played at

24         this time as follows:

25              MS. ROBINSON:  --January, February,

Page 124

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2               about being anywhere near that house.

3                    MR. KAPLAN:  Right.

4                    MS. ROBINSON:  She made it very clear

5               on several comments that she made that she did

6               not want me there.  She made several looks at

7               me, you know, it was just -- it was like, get

8               the fuck out of my house.  You know, so, you

9               know, I did.  And you know, look, one thing

10              that she does have is, yes, it's her home with

11              Bob, you know, it's their home, you know.  So I

12              don't want to be in the middle of it, but, you

13              know, it's just -- it is -- it's just -- I

14              don't know, I try to stay out of it, and I keep

15              getting pulled back in.)

16                   MR. DROGIN:  You can stop.

17   Q.    Alright.  So does that refresh your

18   recollection as to whether Tiffany made it very clear

19   that she did not want you in the apartment, sounds like

20   it was in or around January or February of 2019?

21   A.    Yeah, there were certain -- it refreshes my

22   that there were certain comments and again, certain

23   looks or behavior, that made me feel that she didn't,

24   but she didn't come out and say, I don't want you

25   involved.

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      So the answer is yes, and you stand by the

3    audio recording that you made, correct?

4    A.      Yes.  At that moment yes, that's what the

5    discussion was.

6    Q.      And at one point she used the phrase there were

7    too many cooks in the kitchen; is that right?

8    A.      I don't recall her using that.

9    Q.      The ████ work that she was pulling you into

10   differed from the four projects that you had agreed to

11   say on with when you spoke with Bob in January, isn't

12   that right?

13   A.      There were additional items.

14   Q.      She kept pulling you in adding more and more

15   things to your task list that you were not supposed to

16   have to be doing; isn't that what was going on?

17   A.      I wouldn't clarify -- let me clarify that it

18   was both Bob and Tiffany giving me the same thing.  They

19   were CC'd om everything together, they were in

20   conversation together.  It was the two of them that were

21   giving me this additional work that was not something

22   that Bob and I had discussed.

23   Q.      Fair enough.  Okay.  And the last time that you

24   were actually physically in ████ was December of 2018;

25   isn't that right?

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    A.      That is not correct.
 3    Q.      Alright.  When was the last time you were in
 4    ██████  that you recall?
 5    A.      That I recall --
 6                    MR. DROGIN:  We'll leave it blank in
 7              the transcript, so you can just fill it in.
 8                    THE WITNESS:  Can I -- I think it was
 9              around the end of March 2019.
10    Q.      Alright.  Now, Tiffany -- in your opinion,
11    Tiffany would draw you in to the ████ project because
12    she wanted to dictate to you; isn't that right?
13    A.      I think -- I don't think that is correct.  I
14    think that it would -- it was one of many reasons.
15    Q.      Alright.  And was it your opinion that Tiffany
16    hates people who have Bob's ear?
17    A.      I can't recall --
18    Q.      Okay.  Well, I can help.
19    A.      I can't recall on Tiffany.  I do recall saying
20    that about Grace.
21                    MR. DROGIN:  7174, it's a 15-second
22              clip from 48:55 to 49:10.
23                    MR. BENNETT:  Give me one second,
24              please.
25                    (Whereupon, the recording was played at
```

Page 127

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2         this time as follows:
 3              MS. ROBINSON:  January, February about
 4         being anywhere near that house.
 5              MR. KAPLAN:  Right.
 6              MS. ROBINSON:  She made it very clear
 7         on several comments that she made that she did
 8         not want me there.  She made several looks at
 9         me, you know it was just -- it was like, get
10         the fuck out of my house.  You know, so -- so
11         you know, I did.  And you know, look, one thing
12         that she does have, is yes it's her home with
13         Bob, you know it's their home, you know, so I
14         don't want to be --)
15              MR. DROGIN:  I don't think that's the
16         right clip, is that 7174?
17              MR. BENNETT:  Yes, but it's the wrong
18         site.  So I think the one you want to open is
19         7209.
20              MR. DROGIN:  That's okay.  We have the
21         testimony on the record and we have the --
22    Q.    Was one of the things that you agreed to wind
23    down with Bob this mold issue in ████
24    A.    No, that was not one of the items.
25    Q.    So that was one of the things that Bob and
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Tiffany brought you back into even though it wasn't part

3    of your job, right?

4    A.     Yes.

5    Q.     And then there was a painting issue that came

6    up when there was some misunderstanding about the Robert

7    De Niro, Sr. paintings that you got dragged into; isn't

8    that right?

9    A.     There was an issue with the paintings.  I had

10   received e-mails about -- about that that were --

11   Q.     Right.  And that wasn't one of the four things

12   you had agreed to; isn't that true?

13   A.     Yes.

14   Q.     There was also some door issue that you got

15   dragged into, that wasn't part of your job, right?

16   A.     That was one of he four items was the door, was

17   finishing the door.  But it was something that Bob and I

18   had discussed -- it was just something that was going to

19   take a little bit longer because they were being made.

20   Q.     So is it fair to say, Chase, that there were

21   boundary issues here, that you had your job, you had

22   worked out this arrangement with Bob and then you're

23   getting dragged into to these tasks relating to ██████ is

24   that really what was going on here?

25   A.     That was the constant in my job from the-get-go

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     is that we would have to realign and Bob would cross the

3     boundaries and forget the agreement and then I would

4     have to realign my job.  It was incredibly frustrating

5     to have to do that.

6     Q.      Right.  And I'll grant you this, that really

7     does come true, that the lines have been blurred here

8     and it was difficult for you to know what people

9     actually wanted you to do or not do; is that true?

10    A.      Can you give me more clarification on --

11    Q.      Yeah, yeah, the rules kept changing.  As an

12    example, at one point, you were told to copy Tiffany on

13    e-mails, and then you were told don't copy Tiffany on

14    e-mails as an example.

15    A.      I don't recall that.

16    Q.      Alright.  But if somebody didn't respond fast

17    enough to an e-mail that was sent by Tiffany, you would

18    get blamed for it?

19    A.      I can recall an incident in speaking to Tom

20    Harvey and Michael Tasch about that I was being targeted

21    base on my gender by Tiffany, and being blamed for

22    people not getting back to her.  She blamed me.

23                    MR. DROGIN:  Right, but you see, now I

24             got to move to strike everything that you said

25             there.  Because we're not -- I'm just asking --

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      I'm actually trying to agree with you that this

3    was somewhat of a shit show that you kept getting

4    dragged into this stuff and you were getting mixed

5    messages.  I have here in my notes, one time she said

6    she didn't want you involved, but then there was a

7    incident where she got mad at you because you weren't

8    communicating with her?

9              Is it fair to say you were getting really mixed

10   and confusing messages from Tiffany and Bob about what

11   you should or shouldn't be doing at this time?

12   A.      I was following what my employer Bob asked of

13   me.

14   Q.      But it was conflicting and confusing at times;

15   isn't that true?

16   A.      At the tail end of my employment in some way --

17   I mean during the February and March, with the constant

18   harassment about the apartment issues and um, being

19   constantly dragged into their domestic life, it was

20   difficult, there were all these tasks, whether it was

21   Tiffany asking me to do every demeaning tasks or Bob to

22   be doing stuff that Tiffany wanted to do,

23   stereotypically female stuff, it was very frustrating

24   and made a very difficult situation.  And I was being

25   harassed the way that I was by Bob and Tiffany about the

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    apartment items.  It became very difficult to do my job

3    on the --

4                   MR. DROGIN:  Again, I have to, you

5              know, strike everything that you said.  I'm

6              actually trying to agree with you.

7    Q.    Because in listening to these tapes and seeing

8    these e-mails, you were between a rock and a hard place,

9    weren't you?

10                  MS. HARWIN:  Can you clarify what

11             period you're referring to?

12                  MR. DROGIN:  Yeah, let's go to March of

13             2019, right up to the time you resigned.

14                  THE WITNESS:  At the end of March 2019

15             it just became impossible.  Like, I didn't -- I

16             was under such emotional distress at that point

17             with everything, that I -- I -- yes, I was

18             between a rock and a hard place.  I was -- you

19             know.

20   Q.    Damned if you do, damned if you don't.  There

21   was nothing you could do right, it was going to upset

22   one of them; is that fair?  I'm not trying to put words

23   in your mouth, but I -- we've heard --

24   A.    I don't know if I would say it would be fair

25   because I was doing what my employer was asking of me.

GRAHAM CHASE ROBINSON-CONFIDENTIAL

1

2  Q.     Okay.  And in fact the employer here was giving

3  you conflicting instructions at times; isn't that true?

4  That's one of the problems.  It was very difficult to

5  follow those instructions because they were either

6  incomplete or they were conflicted?

7  A.     I don't -- I wouldn't -- I wouldn't say that it

8  was Bob that was giving me most of the conflicting work.

9  It was Tom Harvey and Michael Tasch and what they were

10  saying to be done vetoing Bob and being put in this rock

11  and a hard place and speaking to them.  And it just

12  became very, very, toxic and hostile and very

13  uncomfortable and very difficult to work.  I was at the

14  time not eating or sleeping, I was having emotional

15  breakdown.

16  Q.     Alright.  Now one of the things that happened

17  toward the end of March was that Tiffany wanted Lulu to

18  work with her in the apartment as opposed to working

19  with you on your main duties and responsibilities; is

20  that right?

21  A.     No, I would not say that is correct.  To

22  clarify, it was the beginning of -- it was the beginning

23  of April when Bob put Tiffany in touch with Lulu and

24  took her away from being my assistant, demeaned me --

25  yelled at me in front of the other employees and took

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    the person who is supposed to be my assistant away from

3    me and repurposed her for Tiffany and the house.

4    Q.      Right.  And it wasn't nice for her to take your

5    assistant away from you?

6    A.      It was disrespectful.

7    Q.      Disrespectful to take your assistant away from

8    you.

9    A.      In front of -- in front of -- and berating me

10   in front of the house.

11                   MR. DROGIN:  Understood.  Now even as

12            late as April 4th, if we go to Exhibit -- we're

13            at double A, right?  We did Z, can we do double

14            A, please.

15                   (Whereupon, a document Bate Stamped

16            Robinson 00001602 was marked as Exhibit AA, for

17            identification, as of this date.)

18   Q.      This is an e-mail you sent to Bob on April 4,

19   2019.  And you reference here, you say, I've worked for

20   you for 11 years.  I bent over backwards and done

21   everything and anything you've asked.  We addressed part

22   of an issue yesterday and I thought we better -- we were

23   in a better place through mutual understanding.

24            Do you see that?  Do you see that?

25   A.      I'm reading it first.  Yes, I see that.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.       Alright.  And then you say, of course I won't

3    go to London if you need me.  You have always come first

4    but I need to sit down with you and we need to discuss

5    the going forward expectations from me in my position.

6    Under the circumstances, the current responsibilities of

7    my position are unclear, although I thought we clarified

8    them in January.  As you recall in January you increased

9    my salary and altered the duties of my position

10   effective for the next two years, I turned down another

11   position in reliance upon our understanding.

12            Do you see that?

13   A.       Yes.

14   Q.       So is it fair to say that as of April 4, 2019,

15   there was still this lack of clarity about your duties

16   and responsibilities?

17   A.       It was heading in the direction that I had

18   faced on many occasions during my employment at Canal,

19   where the lines were blurred, I was no longer doing the

20   job that was commensurate to my title and at this point,

21   I was working in their domestic home --

22   Q.       I'm just asking whether the current

23   responsibilities of your position were unclear as of

24   April 4, 2019, as you wrote in the e-mail?  That's my

25   only question.

Page 135

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   A.      Yes, I would say yes.

3                   MR. DROGIN:  Yes is fine.  Yes is fine.

4            It keeps it short.

5                   MS. HARWIN:  Sorry, Counsel, can we

6            just take a three-minute bathroom break when

7            you're at a good moment.

8                   MR. DROGIN:  Yeah, sure, sure, sure.

9   Q.      Then you say, I turned down another position in

10  reliance upon our understanding.  I mean, that's a lie,

11  isn't it?

12  A.      That is my error in writing position when I

13  meant to write opportunity.

14                  MR. DROGIN:  Okay.  Great time for a

15           bathroom break.

16                  THE WITNESS:  Okay.

17                  MS. HARWIN:  Thank you.

18                  THE VIDEOGRAPHER:  We are off the video

19           record.  The time is 2:07 p.m.

20          (Whereupon, a short break was taken.)

21                  THE VIDEOGRAPHER:  We're back on the

22           video record.  It's 2:15 p.m.

23  Q.      Ms. Robinson, why didn't you leave before April

24  to pursue this opportunity in London?

25  A.      Um, I had spoken to Bob in January about

Page 136

 1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2     continuing with Canal Productions.

 3     Q.      Right.  But when things started to go south,

 4     why didn't you just leave then to pursue your goal in

 5     London?

 6     A.      Can I clarify, are you talking about February

 7     March or are you talking about a different time period?

 8     Q.      Yeah, yeah.  You had this deal with him in

 9     January, he wasn't honoring it, why didn't you just

10     leave and go to London?

11     A.      Because I had spoken to Bob and I had been

12     trying to reach him on multiple occasions to work things

13     out and to discuss -- discuss.

14     Q.      Okay.  I want to talk about what you call

15     targeting.  This a term that you used.  Was it your

16     belief that Bob knew as far back as October of 2018 that

17     Tiffany did not like you and wanted you gone?

18     A.      I -- October 2018?

19     Q.      Yes.

20     A.      I don't -- I don't think that October would be

21     correct.  I would probably say that -- December -- from

22     my knowledge, December 2018 that she was targeting based

23     on my gender.

24                     MR. DROGIN:  Let's go to 7209 at 23

25              minutes 55 seconds.

```
 1          GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2                    (Whereupon, the recording was played at
 3             this time as follows:
 4                    MS. CHAMBERS:  I told him --
 5                    MS. ROBINSON:  But you know what I
 6             mean, I was put into the center of it.  And Bob
 7             knew in October that she didn't like me.  Bob
 8             knew in November she didn't like me, Bob knew
 9             in December that she didn't like me and wanted
10             me gone.  And yet, I still like --)
11   Q.      Alright.  So does that refresh your
12   recollection as to whether or not you believed that Bob
13   knew since October that Tiffany didn't like you and
14   wanted you gone?
15   A.      I can't recall --
16   Q.      That's fine, if you can't recall, you can't
17   recall.
18   A.      Why I thought in October 2018 --
19   Q.      That wasn't my question.  See we're wasting
20   time.  That wasn't my question.  Tiffany was out for
21   you, wasn't she?
22   A.      At the tail end of my employment I felt that
23   she was.
24   Q.      Now you thought that Tiffany could not have
25   people around her who had Bob's ear; isn't that right?
```

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      I can't recall.  I recall it with Grace, that

3    Grace didn't want people that had Bob's ear.

4    Q.      I'm not asking about Grace.  Please, let's stay

5    to task.  Did you believe that Tiffany could not have

6    people around her who had Bob's ear, yes or no, you

7    either believed it or you didn't, yes or no?

8    A.      I believe women such as myself, I think it was

9    women around Bob who had Bob's ear, and that was me.

10   Targeting me based on my gender.

11                   MR. DROGIN:  Okay.  Nice answer, move

12           to strike.

13   Q.      Actually, you know what, let me ask it this

14   way, she was only targeting you?

15   A.      She was only targeting me based on gender.  I

16   don't know what happened after I left.  But from my

17   knowledge, she was targeting me based on my gender and

18   --

19   Q.      I got it.  I got it.  I got it.  Now you told

20   Robin that you believed that Tiffany would have targeted

21   you even if you refused to take on the work at █████ that

22   she and Bob were giving you; isn't that right?

23   A.      I can't recall.  We had so many discussions.

24   Q.      Alright.  Tiffany targeted Robin, didn't she?

25   A.      After my employment ended, yes, it seemed she

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    had.

3    Q.      So the answer to my question is, yes, Tiffany

4    targeted Robin?

5    A.      Tiffany targeted Robin after I resigned.

6    Q.      And Tiffany targeted Lulu, yes or no?

7    A.      I don't know if I would characterize it as

8    targeting Lulu.  Um, she um -- she didn't trust Lulu and

9    wanted her fired is what I was told.

10   Q.      Now she targeted Michael Kaplan and wanted to

11   get rid of him too, didn't she?

12   A.      I don't recall.  I don't recall that.

13   Q.      Alright.  And she even targeted Michael Tasch,

14   didn't she?

15   A.      I don't know if I would use the word targeted.

16   Q.      But she wanted Michael Tasch out, right?

17   A.      I can't recall what she wanted with Michael

18   Tasch, I know that they are -- I'll just leave it at

19   that.

20   Q.      Tasch was someone who had Bob's ear, right?

21   A.      I don't believe he had Bob's ear in the way

22   that she would target somebody.  I believe it was based

23   on -- it was based on gender and it was based on, you

24   know, this perceived notion of me being close with Bob

25   which she constantly repeated and repeated.

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                      MR. DROGIN:  Okay.  And let's go back

 3            to 7226 from 18:50 to 19:23.  And let's hear

 4            what you said that day.  It starts with I

 5            honestly, so this is going to be honest.

 6                      (Whereupon, the recording was played at

 7            this time as follows:

 8                      MS. ROBINSON:  Honestly the way that I

 9            go -- and again, this is just a perspective,

10            you don't have to -- please don't think that

11            this is necessarily what it's going to be.  But

12            the only way that I can see it is that she

13            cannot have people around Bob who have his ear,

14            for anything.  Like, you just talking about Kap

15            and not getting rid of Kap right away and that

16            you want to work with Kap, when she finds out

17            about that, she's going to go fuck him --

18                      MS. CHAMBERS:  Right, right.

19                      MS. ROBINSON:  I want him gone.  I want

20            him gone.  He's lazy, he's dishonest, I want

21            him gone.)

22                      MR. DROGIN:  That's it.

23                      MS. HARWIN:  Can you provide the time

24            stamp.

25                      MR. DROGIN:  Yeah, 18:50 to 19:23.
```

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Now when you were saying this, you didn't say

3    she wanted females gone, you said the only way that I

4    can see this is, she cannot have people around Bob who

5    have his ear.  Did you hear yourself say that?

6    A.      I did, but I --

7    Q.      Yes or no.  Did you hear yourself say that?

8    A.      Yes, I heard myself say that but --

9    Q.      Great.  That's all I wanted to know.  My only

10   question was, did you hear yourself say it.  You heard

11   yourself say it.

12           Now then you talked about getting rid of Kap.

13   Did you hear yourself say that?  Yes or no, if not we'll

14   play it again.  I just want to know, did you hear

15   yourself say it?

16   A.      This was a hypothetical I believe and it was

17   after I resigned.  It was a conversation -- I need more

18   context of what the conversation was -- this, again what

19   she would do --

20   Q.      Stop.  My only question is whether you heard

21   yourself say it?

22                   MS. HARWIN:  Counsel the tape speaks

23           for itself.

24                   MR. DROGIN:  No, it doesn't.  It

25           doesn't.  There's a Witness here and I'm asking

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          the Witness if she heard what she said.

3  A.     I didn't hear what I said before or after the

4  context of it, but I did hear myself say that.

5  Q.     Thank you.  Now did you feel that Tiffany also

6  wanted Michael Tasch out?

7  A.     I believe that there was a time in which --

8  Q.     Yes or no.

9  A.     Can you clarify when you mean out.

10  Q.     Fired.

11  A.     I can't recall if she wanted him fired.

12              MR. DROGIN:  7174 five minutes 15

13          seconds to five minutes 45 seconds.

14              (Whereupon, the recording was played at

15          this time as follows:

16              MS. ROBINSON:  Michael Tasch called

17          yesterday and he basically is out.  He

18          basically -- she cut him out, she wants him

19          gone, basically --

20              MR. KAPLAN:  This was last week, when

21          he showed up to the office (sic)?

22              MS. ROBINSON:  Yeah, it was basically,

23          the way that the John Hacket said to me, he

24          said Tiffany has a noose around his neck right

25          now.

Page 143

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                    MR. KAPLAN:  Right.  Didn't she want

 3            Tasch to get back to her on something (sic).

 4                    MS. ROBINSON:  Yeah, and then --)

 5   Q.     Alright.  Did you hear the audio clip?

 6   A.     Yes.

 7   Q.     Does that refresh your recollection as to

 8   whether or not you believed that Tiffany wanted Michael

 9   Tasch out?

10   A.     I don't know the context of out was out of the

11   apartment or out of the situation, that -- I did hear

12   him say that, but again, I don't know the full context

13   or when that was happening or when that happened that

14   day.

15   Q.     So we've got all the tapes but when you

16   mentioned John Hacket told him that Tasch had a noose

17   around his neck --

18   A.     Was it -- I don't recall, was it John Hacket

19   who -- is that what the audio said?

20                    MR. DROGIN:  Let's try another one,

21            7224 at 13:55 to 14:15.

22                    (Whereupon, the recording was played at

23            this time as follows:

24                    MS. ROBINSON:  --belongs in Bellevue.

25            Michael Tasch is also going to be gone.  He's
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          probably safe right now because he's giving her

3          the information that she wants.  But

4          eventually --

5               MS. CHAMBERS:  Bob said for me to call

6          Michael Tasch, I guess, about money now and

7          stuff, which I said no.  I said he is to all me

8          back, I said, he's very nice, but he doesn't --

9               MR. DROGIN:  Okay.  7224 15:40 to

10         16:30.

11               (Whereupon, the recording was played at

12         this time as follows:

13               MS. ROBINSON:  Tasch will be next

14         because all of this stuff, you know, with Kap,

15         and the petty cash and everything, Michael

16         Tasch is the one that was getting all those

17         sheets.

18               MS. CHAMBERS:  Yeah, I believe you.

19         You've been right so far.  I think the thing

20         that saved me today is I said, I quit, number

21         one.  And then number two, I said I can't do

22         this forever.

23               MS. ROBINSON:  And by the way, it's not

24         in Tiffany or Bob's -- it's not in their

25         personality to want you to quit, they want to

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              fire you, they want to get rid of you.

3                    MS. CHAMBERS:  Okay, wow.

4                    MS. ROBINSON:  As you told me, Bob does

5              not like to be left.

6                    MS. CHAMBERS:  Yeah, he doesn't.

7                    MS. ROBINSON:  He doesn't want to be

8              left by you, 30 years.  He didn't want to be

9              left by me.  He wanted, you know -- and Tiffany

10             wanted to destroy me.  And in the end, you know

11             it's --

12                    MS. CHAMBERS:  You're right.)

13                    MR. DROGIN:  You could stop it.

14    Q.    So would you agree with me that back when you

15    made these recording, you believed that Tiffany wanted

16    to Michael Tasch fired out, removed, gone, yes or no?

17    A.    I wouldn't agree with you with that.  I would

18    say that --

19    Q.    Okay.  What about Michael Kaplan?

20    A.    That was a perspective of whatever Robin and I

21    were discussing.  I will say it's correct that, you

22    know, you can see that Tiffany was targeting Robin based

23    on gender and Bob was retaliatory in not wanting

24    people -- women, specifically myself or Robin to leave

25    him.  It was well known, that was, again, based on

Page 146

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    gender.

3                        MR. DROGIN:  Just so we're clear, every

4                time you say that, I move to strike.  You keep

5                looking to redirect to get those words in, it's

6                not going to work, so you don't have --

7                        MS. HARWIN:  Counsel, she's entitled to

8                provide her answer to your question.

9                        MR. DROGIN:  She's wasting my time at

10                my deposition by polluting my transcript with

11                conclusory statements.  And I'm happy to make

12                the record and document it.  Saying gender

13                doesn't make it so.  That's why we're listening

14                to these recordings.  Can you go to BB, please.

15                Let me know when you have it.

16                        THE WITNESS:  Yes, can I read it?

17                        (Whereupon, a document Bate Stamped

18                Robinson 00007976 was marked as Exhibit BB, for

19                identification, as of this date.)

20                        MS. HARWIN:  Is BB in the chat?

21                        MR. DROGIN:  BB is in the chat.

22    Q.    You don't really have to read it.  I just have

23    a single question about it.  Let me know when you're

24    ready about the question?

25    A.    Okay.  Let me read it so I can answer your

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   question.

 3   Q.      Well, you don't have to read it to answer my

 4   question.  You just have to look at what it is.  Let me

 5   know when you're ready.  Do you recognize the phone

 6   number ███████████?

 7   A.      I believe that is -- I don't want to guess.

 8   Q.      What do you believe?

 9   A.      Tiffany Chen.

10   Q.      Okay.  I think you're right.  Look at the

11   bottom right corner.  Do you see it says Robinson 7976?

12   A.      Yes.

13   Q.      How did you get a text between Tiffany Chen and

14   Robert De Niro?

15   A.      As I told you in my last deposition, I had a

16   copy of Bob's phone.  This was a text message that I

17   came across while doing the work on the divorce for Bob.

18   Q.      And when did you start reviewing documents on

19   his phone and when did you stop?

20   A.      I can't recall the specific dates other than,

21   say, the range was probably end of January, February.

22   Q.      So during your employment, you came across this

23   text; is that right?

24   A.      Yes.

25   Q.      And you came across it in connection with
```

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    working with him and his attorney on his divorce; is

 3    that right?

 4    A.      Yes.

 5    Q.      And this is a document that you retained after

 6    you resigned your employment?

 7    A.      Can you repeat that question.

 8    Q.      Is this a document that you retained after you

 9    resigned your employment?

10    A.      I don't know.

11    Q.      Well, did you have it after you resigned your

12    employment?

13    A.      I had it during my employment.  It was during

14    my employment.  Actually no, let me correct that.  I had

15    seen a copy of this during my employment.

16    Q.      Okay.  And after you resigned, did you continue

17    to have a copy of it, either in hard or electronic

18    format?

19    A.      No, I had seen it.  I recall seeing it, like,

20    when I was doing work on the divorce for Bob's project.

21    Q.      Right.  Let's not talk past each other.  The

22    bottom right-hand corner reflects that you produced this

23    document to us.  My question is, how did you come to

24    have it in your physical possession such that you could

25    turn it over to us?
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.     I had -- I returned a copy of Bob's -- a clone

3    of Bob's phone to you.

4    Q.     How did you come to have a copy of this text

5    after your employment?

6    A.     I don't know where this copy came from.  I

7    don't know where this copy came from.

8    Q.     So this is a text sent by Tiffany to Bob that

9    you produced after this litigation began, correct?

10   A.     It was produced, yes.  I don't know --

11   Q.     No question pending.  Now at the end of March

12   of 2019, Bob was ignoring you; isn't that true?

13   A.     Yes, I wouldn't clarify it as ignoring me, he

14   wasn't speaking to me um -- he wasn't speaking to me.

15   Q.     And in fact he wasn't speaking to other Canal

16   employees in the office; isn't that true?

17   A.     He wasn't speaking to them?

18   Q.     Yes, I'll rephrase it in the positive.  Was he

19   speaking with the girls in the office less frequently as

20   well?

21   A.     No, I don't believe that would be correct.

22              MR. DROGIN:  Okay 7175 at one hour 31

23          minutes and 15 seconds.

24              MR. BENNETT:  I'm going to start at 10

25          because I think it was chopped off.

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                     (Whereupon, the recording was played at

3           this time as follows.

4                     MS. CHAMBERS:  He's avoiding, like a

5           you know what.  Yeah, he is.

6                     MS. ROBINSON:  I don't think that he's

7           talking to the girls as much either.  I think

8           they get little bits and pieces here and there

9           at this time.  So I think it's also --

10                    MS. CHAMBERS:  Yeah, it's not just

11          you.)

12                    MR. DROGIN:  That's fine.

13   Q.    So does that refresh your recollection as to

14   whether it was your perception that he was speaking with

15   the girls in the office less also?

16   A.    On that day --

17                    MS. HARWIN:  Can you clarify the

18          timeframe for your question, Counsel?

19                    MR. DROGIN:  1:31:10 to 20.

20                    MS. HARWIN:  No, I'm sorry, the

21          contents of your question, over what period of

22          time are you asking?

23                    MR. DROGIN:  At the time the recording

24          was made.

25                    THE WITNESS:  On that day or in that

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              moment.  But in general the way that he was --

3     Q.     That's all I needed to know.  I don't need to

4     know in general.  At the end of March you thought that

5     Bob might want to end your employment; is that true?

6     A.     Can you repeat your question.  At the end of --

7     Q.     Around the end of March you thought that Bob

8     might want to end your employment?

9     A.     I don't recall -- I don't recall like -- I

10    don't recall when or if.

11    Q.     Now around the end of March, you -- I think you

12    testified you were having some sort of breakdown,

13    correct?

14    A.     End of January, February, March, yes.

15    Q.     Alright.  And at one point you and Robin were

16    on the phone and you were discussing concocting a scheme

17    in order to get time off by making up a fake story about

18    your mother having a medical crisis that required you to

19    be away.  Do you recall that?

20    A.     I don't recall that.

21              MR. DROGIN:  Alright.  So it's 7168 at

22              7 minutes 32 seconds to 8 minutes and 10

23              seconds.

24              (Whereupon, the recording was played at

25              this time as follows:

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MS. ROBINSON:  So I think that we have

3            a -- I think that we have a plan there.  So I

4            think that um -- I think that this, I do think

5            that this scenario, at this moment, if I'm in

6            good standing with Bob, which I know that I am

7            today, tomorrow, Wednesday pulling the rug out

8            and making him wonder, holy shit, four days

9            without her, I'm stuck with this fucking nut

10           job, oh my God, she can't do this, what's going

11           on, where is she?

12                   MS. CHAMBERS:  Yeah, it's time if he

13           realizes what that life looks like (sic).

14                   MS. ROBINSON:  And that's what I want

15           him to realize.  Because I can't keep getting

16           beaten up by Tiffany.  Her fucking e-mails to

17           me are --)

18                   MR. DROGIN:  That's fine, let's stop.

19    Q.     You heard that clip Chase?

20    A.     Yes.

21    Q.     You're trying to make him jealous, weren't you?

22    A.     I think Robin --

23    Q.     Yes or no.  You were?

24    A.     I wouldn't characterize it in that way.

25    Q.     Okay.  You were trying to create a scenario

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    when you were out of sight, out of mind and he would

3    realize how much he needed you.  Isn't that what you

4    were trying to do?

5    A.      I wouldn't characterize it in that way.

6    Q.      Then just say no.  If I'm wrong, I'm wrong.

7    No?

8    A.      Again, I wouldn't be able to answer that

9    without --

10   Q.      Weren't you looking to get his attention

11   because he had been ignoring you?

12   A.      From that conversation I think Robin and I had

13   all different sort of discussions.  We spoke about, you

14   know, a range of different things, you know, I --

15                   MR. DROGIN:  Got it, okay.  Now let's

16           take a look at CC, Exhibit CC.

17                   (Whereupon, a document Bate Stamped

18           Robinson 00001347-49 was marked as Exhibit CC,

19           for identification, as of this date.)

20   Q.      So this is a string of e-mails beginning on

21   March 27th.  And if you go to the one on page two,

22   towards the middle of the page, Tiffany writes, it's

23   sometimes hard to fully understand your hierarchy of

24   responsibility of who does what for who and when.  Do

25   you see that?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.     Yes.

3     Q.     And this was an e-mail that you were actually

4     copied on, right?

5     A.     This e-mail was sent to me.

6     Q.     Right.  A chain that you are on?  Now at the --

7     A.     She sent it to me.

8     Q.     Right.  You're in copy on this e-mail, fair

9     enough?

10    A.     It was sent to me.

11    Q.     Okay.  Now Bob was skiing out West at the time;

12    isn't that true?

13    A.     I can't recall.

14    Q.     Alright.  And you responded to her at 11:47

15    a.m.  Do you see that?

16    A.     Yes.

17    Q.     And then she responded to you at noon with the

18    language that I've just read from, I'm sorry, I haven't

19    read from it yet.  The last sentence says, I don't know

20    why I have to go through explaining this logic to you.

21    It is clear there are things you do not and will not do.

22    Did I read that right?

23    A.     It is clear there are things you do not and

24    will not do.  Yes.

25    Q.     And that really angered you, didn't it?

Page 155

1                 GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.       I think the whole e-mail and communication from

3    Tiffany -- I wouldn't characterize it as angry.  It was

4    demeaning and horrible and it's not -- from my employer

5    it was very upsetting and --

6    Q.       I'll stick with upsetting and we can just

7    assume it was all based on your gender too, okay?  We

8    can do that because I know that you want to get that in.

9    So I'll put it in there that that's your assumption.

10           Now you replied to her at 12:38.  Do you see

11   that?

12   A.       That, I forwarded it to Bob.  Not replying to

13   her.  I forwarded it to Bob.  I think you're incorrect

14   with that.

15   Q.       Actually you e-mailed it to Bob taking her off

16   copy and you e-mailed it to him at his Mac address

17   whereas she had sent it to him at iCloud.  Do you see

18   that?

19   A.       iCloud and Mac are the same -- iCloud, Mac,

20   they are all the same it just depends on how it's

21   labelled on your computer.

22   Q.       Okay.  So you used the Mac address.  And in

23   this e-mail, you told him among other things that it

24   wasn't working, right?

25           It has been pretty obvious for a while that

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    there is an issue with me working for you.  And I've

3    tried really hard without bothering you to get out of

4    the middle and out of your home and get back to my job,

5    it's not working", correct?

6    A.      The issue being working in the home with

7    Tiffany.  And Tiffany was having the issue of me working

8    and that was not about throwing in the towel, I just

9    want to talk to him and make sure everything runs

10   smoothly.  I'm asking for his guidance on this.  It's

11   not about throwing in the towel or quitting.

12   Q.      I understand.  And you say here, I hope you and

13   Helen are having fun skiing.  Do you see that?

14   A.      Yes.

15   Q.      Does that refresh your recollection as to

16   whether or not Bob was skiing on March 27, 2019?

17   A.      It seems as if he was, yes.

18   Q.      Okay.  Now you didn't receive a response to

19   that e-mail; isn't that true?

20   A.      I don't recall.

21   Q.      So on April 2nd you sent him an e-mail which I

22   think we referred to as the out of sight out of mind

23   e-mail.  Do you recall that?

24   A.      I don't know what date that was sent.  But

25   there was an e-mail sent that did state out of sight out

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     of mind as a possibility to help with Tiffany targeting

3     me and my gender as Grace did in the beginning.  It was

4     out of sight, out of mind, what Bob utilized to --

5                    MR. DROGIN:  Just a simple question.

6               Can we -- Britt, I don't know if that's the

7               next document.  It's Robinson 8921 or do we

8               have it tagged as something else.

9                    MS. LAZZARO:  It's not the next, but

10              give me a second.

11                   MR. DROGIN:  Yeah, I think we marked it

12              later.  It can be DD.  Let's go off the record

13              just so we can not waste time.  And can you

14              give us a count please of how many minutes

15              we're in?

16                   THE VIDEOGRAPHER:  Yeah, just one

17              moment.  We're off the record.  It's 2:45 p.m.

18               (Whereupon, a discussion was held off the

19     record.)

20                   THE VIDEOGRAPHER:  We are back on the

21              video record.  It is 2:53 p.m.

22                   (Whereupon, a document Bate Stamped

23              Robinson 8921 was marked as Exhibit TT, for

24              identification, as of this date.)

25     Q.     Okay.  So Ms. Robinson I've now put up in front

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    of you what we've marked as Exhibit TT here.  One page

3    string of e-mails.  Starting at the bottom, this was an

4    e-mail you sent to Bob and you say in the second

5    paragraph, "I know that you didn't respond to my e-mail,

6    but since that e-mail on 3/27, I've had some time to

7    think about everything and I didn't want to bother you

8    while you were away with the kids."  Do you see that?

9    A.      Yes.

10   Q.      Does that refresh your recollection as to

11   whether or not you received a response to the March 27th

12   e-mail that you sent that was Exhibit CC?

13   A.      Yes, it does.

14   Q.      And you in fact did not receive a response?

15   A.      Not to that specific e-mail, no.

16   Q.      Okay.  And in this e-mail, the second to last

17   paragraph, you say, you know how much I love this job

18   and even when I was based away from New York, I was

19   always if you needed me, I want to go back to that

20   arrangement.  Do you see that?

21   A.      Yes.

22   Q.      Were you being honest when you said that you

23   loved the job?

24   A.      At times I did love the job.

25   Q.      Okay.  In fact weren't you really looking here

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2   to get away from Tiffany?

 3   A.      Let me just read it because I just want to

 4   answer your question correctly.  To answer your

 5   question, I believe that was part of it, yes.

 6   Q.      You were proposing that you had worked

 7   somewhere other than New York, correct?

 8   A.      Be out of sight out of mind, yes.

 9   Q.      But particularly you were talking about leaving

10   New York; is that right?

11   A.      That is what the e-mail says, based away from

12   New York.

13   Q.      Okay.  How frequently around this time, and

14   I'll confine that to February, March, April of 2019 were

15   you actually in Tiffany's presence?

16   A.      In Tiffany's presence I can't recall how many

17   times.

18   Q.      But it was infrequent, wasn't it?

19   A.      At times several times a week at the apartment.

20   I was also in contact with her with e-mails um --

21   Q.      But I'm asking about physical presence.

22   A.      I -- there were times that I was there multiple

23   times a week at the ███ apartment.

24   Q.      Where she was there?

25   A.      Yes.
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      Did you speak with her by phone as well?

3   A.      Yes.

4   Q.      Now at the time that you sent this e-mail on

5   April 2nd, you had a suspicion that she was reading his

6   e-mails; isn't that true?

7   A.      I believe it had crossed my mind that there was

8   a possibility, but I didn't have any evidence or know.

9   Q.      In fact, you told Robin that you felt that some

10  of the e-mails from Bob were actually written by

11  Tiffany, correct?

12  A.      I believe there was a discussion on something

13  like that in relation to -- yes, there was a

14  conversation I believe in reference to --

15  Q.      Yes is all I needed.  Did it occur to you that

16  Bob might share this e-mail with Tiffany?

17  A.      I don't think that crossed my mind that he

18  would share -- he was my employer, so -- I didn't think

19  that he would.

20               (Whereupon, a document Bate Stamped

21          Canal 34641-4 was marked as Exhibit DD, for

22          identification, as of this date.)

23  Q.      Alright.  Can you take a look at Exhibit DD.

24  Do you see Exhibit DD, the end of the first page and on

25  to the second page.  That is your e-mail to Bob of 1/29.

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Do you see that?

3    A.      Yes.

4    Q.      Okay.  And if you scroll to the top, you see

5    there's an e-mail from Bob -- I'm sorry, from Tiffany to

6    Bob at 1:59 p.m.?

7    A.      Yes.

8    Q.      It says, "this shit really pisses me off.  That

9    is so manipulative and nasty that she has the gall to

10   place blame on me for her lies.  This bitch needs to get

11   put in her fucking place."

12           Do you see that?

13   A.      Yes.

14   Q.      Now that's a response to her 1/29 e-mail that

15   you sent to Bob.  Do you see that?

16   A.      Yes.

17   Q.      Now that comment, "this bitch needs to get put

18   in her fucking place," that really upset you, didn't it?

19   A.      I have never seen this e-mail until this

20   moment.

21               MR. DROGIN:  Wow, can you read that

22          question and answer back.

23          (Whereupon, the record was read by the

24   reporter.)

25               MR. DROGIN:  7175 at 26 minutes and 39

Page 162

```
1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2            seconds to 27 minutes and 8 seconds.

3                     (Whereupon, the recording was played at

4            this time as follows:

5                     MS. ROBINSON:  Well, look what she said

6            in that text, put her in her place.  Put her in

7            her place.  Her whole e-mail is like --

8                     MS. CHAMBERS: (Inaudible).

9                     MS. ROBINSON:  Put here in her place is

10           what she said.  And then in her e-mail it was

11           like, you need to write a guide on what you do

12           and what you don't do.  Like, I mean, I don't

13           do any of this stuff.  This is all a favor for

14           Bob.  You know this is all -- this is all --)

15                    MR. DROGIN:  Let's stop.  That's fine.

16   Q.    Now two things there, you said, put her in her

17   place, put her in her place, which e-mail is that from?

18   A.    You're incorrect from the audio.  It said from

19   her text message.

20   Q.    Which text message are we talking about?

21   A.    Obviously from the audio, there was a text

22   message in some way to put her in her place.  I can't

23   recall specifically which text message.  I believe it

24   was one of the ones that I found during the divorce

25   work.  But in terms of this e-mail, I have never seen
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   this e-mail until this point.  But again, I'm talking in

3   the audio about the March 27th e-mail and her asking me

4   to put a guide together and then I'm talking about a

5   text message where she said put me in my place or

6   something along the lines of that.  So it's not in

7   reference to this e-mail.

8   Q.      Okay.  Alright.  Now who is Rachel Humphries?

9   A.      Rachel Humphries was an assistant designer that

10  helped Bob with the ███ apartment.

11                  MR. DROGIN:  Okay.  And you had --

12          let's go to EE.

13                  (Whereupon, a document Bate Stamped

14          Robinson 6484 was marked as Exhibit EE, for

15          identification, as of this date.)

16  Q.      Let me know when you're there.

17  A.      Yes.

18  Q.      If you look, there's a text where you tell her

19  that you can't just walk out.

20  A.      Yes, I see that.

21  Q.      Okay.  So as of April 4th had you made a

22  decision to resign?

23  A.      No.

24                  MR. DROGIN:  Let's take a look at FF.

25          Let me know when you're there.

Page 164

GRAHAM CHASE ROBINSON-CONFIDENTIAL

1

2     A.     I'm reading it.

3                    (Whereupon, a document Bate Stamped

4             Robinson 1641 was marked as Exhibit FF, for

5             identification, as of this date.)

6     Q.     The bottom e-mail is your resignation e-mail?

7     A.     Yes.

8     Q.     When you woke up that morning, had you decided

9     you were going to resign that day?

10    A.     No.

11    Q.     Did something happen during the day that caused

12    you to resign that evening?

13    A.     Yes.

14    Q.     What happened?

15    A.     I had spoken to Robin Chambers and also had --

16    I had spoken to Lulu White.  I had become aware of

17    Tiffany e-mailing the office and in -- in speaking to

18    Michael Kaplan, I think he put it in the terms of, like,

19    cutting me out, if I recall correctly.  She had been

20    e-mailing the office and telling them not to --

21    basically taking my job away and telling them not to

22    respond or let me know that she was doing this.

23    Q.     How did you come to see those e-mails?

24    A.     I logged into Lulu White's e-mail after I had

25    spoken to her and came across them.

Page 165

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.     Okay.  So you gave no notice, correct?

3    A.     Um --

4    Q.     Correct?

5    A.     I'm just --

6                 MS. HARWIN:  Talking about on April

7           6th?

8    Q.     Let me ask it another way.  Your resignation

9    was effective; isn't that right?

10   A.     As I had written effective immediately.

11   Q.     And the resignation was made known simply by

12   this e-mail?

13   A.     That was the resignation e-mail, yes.

14   Q.     And then you got a response at 8:30.  Do you

15   see that?

16   A.     Yes.

17   Q.     Were you surprised by his response?

18   A.     No.  Bob tends to ignore items that he doesn't

19   want to deal with.  So the answer is no.

20   Q.     Now you then responded back, replied back 8:41

21   and you wrote in the second line, "Bob, please read the

22   e-mail below from me, I have decided to no longer work

23   for you, please respect my wishes."

24          Do you see that?

25   A.     Yes.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      Are you telling him that you did not want to be

3   contacted by him any further?

4   A.      That I no longer worked for him.

5   Q.      And therefore you didn't want to do anymore

6   work; is that right?

7   A.      Well, I decided to no longer work for him or

8   for Canal.

9   Q.      You kind of left him in the lurch so to speak,

10  right?

11  A.      I wouldn't characterize it that way.  I was at

12  a breaking point and there was no way.

13  Q.      Okay.  Were you expecting that he was going to

14  come after you and try to work it out with you, smooth

15  things over?

16  A.      No, I think what was going through my head --

17                  MR. DROGIN:  I don't care about your

18          head.  I don't care about your head.  I just

19          want an answer to my question.

20                  MS. HARWIN:  You asked her a question

21          about what she thought.

22                  MR. DROGIN:  Can we hear the question

23          back.

24          (Whereupon, the record was read by the

25  reporter.)

1                  GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.        Yes or no.

3    A.        I don't know what he was going to do or what I

4    expected him to do.

5    Q.        Well, in 2018, when you resigned, there were

6    further discussions and that resulted in the January

7    2019 agreement; isn't that correct?

8    A.        At that time, yes.

9    Q.        So did you have an expectation that he might

10   reach out to you try to sit down and work things out?

11   A.        I don't recall thinking that in my mind,

12   especially with what had transpired.

13   Q.        Isn't that what you wanted though, you wanted

14   him to come back to you and smooth things over?

15   A.        I can't recall ever feeling that way.

16   Q.        So at the time that you resigned, you actually

17   believed that you were going to be fired; is that right?

18   A.        No.

19   Q.        Well, then why did you resign?

20   A.        Because I hit a breaking point.  I couldn't

21   continue working.  Everything seemed to always continue

22   in the same pattern with him.  I was not eating, I was

23   not sleeping.  I was in extreme emotional distress, I

24   just couldn't continue anymore.

25   Q.        Okay.  But the last straw were these e-mails

Page 168

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    that you saw?

3    A.     So the last straw was the e-mails, the

4    discussion with Robin, um --

5    Q.     Let's just back up a second.  You woke up that

6    morning and you had not intended to resign.  Did I hear

7    you correctly?

8    A.     Yes.

9    Q.     And at some point during the day, you viewed

10   some e-mails that you described a few moments ago?

11   A.     Yes.

12   Q.     My question is, was that the last straw, seeing

13   those e-mails?

14   A.     I believe it was one of the last straws.

15   Q.     How can you have more than one last straw?  It

16   was the last straw.  What was the last straw, not one of

17   the last straws, the last straw.  That's it, I'm done,

18   I'm out of here.

19   A.     I go back and say it's one of the last straws,

20   I think the combination of everything was the final

21   straw.

22   Q.     Okay.  So you resigned because you were

23   stressed out; is that fair?

24   A.     I wouldn't characterize it that way.

25                    MR. DROGIN:  Alright.  Let's go to the

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2              April 6th e-mails which we've consolidated as

 3              Exhibit GG.  I just want to make sure I have

 4              it.  There's six pages here.

 5                   (Whereupon, a document Bate Stamped

 6              Robinson 1383 was marked as Exhibit GG, for

 7              identification, as of this date.)

 8   Q.    And my question is, are these the e-mail that

 9   you've just been testifying about that you reviewed on

10   April 6, 2019?

11   A.    Let me look through them.

12   Q.    Please.

13                   MR. DROGIN:  Why don't we take a

14              two-minute break so you can do that and we

15              won't waste time on the record.

16                   THE VIDEOGRAPHER:  Okay.  We are off

17              video record.  The time is 3:11 p.m.

18                   (Whereupon, a short break was taken at

19              this time.)

20                   THE VIDEOGRAPHER:  We're back on the

21              video record.  It's 3:12 p.m.

22   Q.    So we are at GG, correct?

23   A.    Yes.

24   Q.    Alright.  So my question to you was whether

25   these are the e-mails that you've just been testifying
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     about?

3     A.      Yes.

4     Q.      And if we go to the first one, I'll put it in

5     here, this e-mail suggests that you are being removed

6     from ████ and that others are taking over; is that a

7     fair characterization of it?

8     A.      The first one?

9     Q.      Yes.

10    A.      In part, yes.

11    Q.      So she says in the fourth paragraph, "Chase is

12    no longer involved with anything regarding the townhouse

13    or the twins."  Do you see that?

14    A.      Yes.

15    Q.      Isn't that good news?  Isn't that what you

16    wanted?

17    A.      This is somebody who --

18    Q.      Yes or no.  Isn't that what you wanted, yes or

19    no?

20    A.      I did not.  I did not and had objected to

21    working on the townhouse.

22    Q.      And she is saying, Chase is no longer involved

23    with anything regarding the townhouse or the twins.  My

24    question is, isn't that what you wanted to?

25    A.      Yes, but this is not at the direction of my

1                    GRAHAM CHASE ROBINSON-CONFIDENTIAL

2      employer.  This is my employer's girlfriend directing

3      the office to not tell me, you know, what's going on and

4      to cut me out of work that my employer was giving.

5      Q.       Hold on.  Hold on.  It's a simple sentence.

6      What does it matter who said it?  Isn't this what you

7      wanted?  You wanted out of the townhouse.  Isn't that

8      what you wanted, yes or no?

9      A.       I didn't want to work on the townhouse.  I

10     didn't want to work on the design or that.

11     Q.       Okay.  As I read this, this is your dream come

12     true, she says, Chase is no longer involved with

13     anything regarding the townhouse or the twins.  You are

14     not to discuss anything with her that you discuss with

15     us.  Any e-mails between us are not to be shared with

16     Chase.  Did I read that right?

17     A.       I think you read that incorrectly.

18     Q.       Did I miss a word?  Did I add a word?  What did

19     I do wrong?

20     A.       I would say that I think that you are reading

21     it incorrectly on what the contents mean.

22     Q.       Okay.  But again, this wasn't an e-mail that

23     was sent to you.  So you're actually surmising as well

24     what it means; isn't that fair?

25     A.       With the addition of the other e-mails, I don't

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    believe I am incorrect on sort of my thought on what

3    these e-mails are about, cutting out my job, cutting me

4    out from the office --

5    Q.      Well, wait a minute.  Where in this e-mail does

6    it say, you're cut out from the office?

7    A.      Well, I mean saying with the addition of the

8    other e-mails altogether.  This one in itself is any

9    e-mails between us are not to be shared with Chase is

10   just not -- you know, is -- it's just not appropriate.

11   Q.      So here's the question, I read that since it's

12   in the same paragraph as removing you from the

13   townhouse, I read that saying, e-mails regarding the

14   townhouse were not to be shared with Chase, you read it

15   differently; is that right?

16   A.      I read it differently.

17   Q.      That's all.  That's all I needed to.

18   A.      No, it's not in the --

19   Q.      That's all I needed to know if you read it

20   differently.  Now in the next page this is an e-mail to

21   Lulu, right?

22   A.      Yes.

23   Q.      And she says to Lulu, I would like to remind

24   you that we all work for Bob and you are not Chase's

25   assistant.  Do you see that?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Yes.

3    Q.      Is there a problem with that?

4    A.      Yes.  I'm being demoted and demeaned in this.

5    Um --

6    Q.      Show me where you're being demoted?

7    A.      I'm having somebody who was intended to be my

8    assistant, I was VP of production and finance being

9    taken away by my employer's girlfriend and you know --

10   and having these messages sent where I am not included

11   on them.  It is -- it is -- it is cutting me out of --

12              MR. DROGIN:  Okay.  Spoiler alert,

13          every time you refer to Lulu as your assistant,

14          this side of the screen loves it.  Because we

15          agree that she was your assistant.  That's one

16          of the reasons that you're an exempt employee,

17          but we'll come back to that later.

18              Hey, I'm not done yet.  Cut it out.

19          Don't bark now or just take a break.  Don't do

20          that to me.

21              MS. HARWIN:  Let the record reflect

22          that the last part of that discussion was

23          directed not to the parties on screen, but to a

24          dog off screen.

25              MR. DROGIN:  Thank you so much, that

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          would have been ridiculous in the transcript.

3          Ally, I owe you one for that one.  That would

4          have been so bizarre.

5   Q.     Okay.  Now there's nothing in this second

6   e-mail about you actually being demoted, right --

7   there's nothing in here that -- I'm asking two questions

8   at once.  Let me just back up.

9          Nothing in this e-mail changes your duties and

10  responsibilities; isn't that correct?

11  A.     Let me read it.

12  Q.     Sure.

13  A.     I disagree with you.  There are items that are

14  from what her actual job responsibilities have been, she

15  is now working under the guidance of Gillian and

16  Sabrina.  I am being cut out on not being -- this is not

17  being discussed with me and again --

18  Q.     Sorry, where in this e-mail are your duties and

19  responsibilities being changed?

20  A.     She is being asked to inform Gillian of what

21  her job responsibilities have been and that she now

22  works under the guidance of both Gillian and Sabrina,

23  it's cutting me out of this.  This is not an e-mail in

24  any discussion that Bob and I discussed.  It is -- I'm

25  not CC'd on it, it is cutting me out.

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    Q.      So in this e-mail that you obtained which you

 3    were not CC'd on it, there's actually nothing there that

 4    says your job is changing in this particular e-mail;

 5    isn't that right?

 6    A.      I would sort of disagree with you in the way

 7    that it was composed.  That's it's being sent by

 8    somebody who is not an employee of Canal who is taking

 9    over a managing an office and telling people what to do

10    with Bob CC'd.  So what it means and the contents of it

11    is --

12    Q.      So the answer is you disagree with me?

13    A.      Yes.

14    Q.      Alright.  And let's take a -- the next two

15    pages, 1340 and 41, this is just a continuation of that

16    thread, correct?

17    A.      It's a continuation of their discussion.

18    Q.      And then the last two pages, it's separate a

19    e-mail, correct?  This went to Sabrina rather than Lulu,

20    right?

21    A.      Uh --

22    Q.      Tiffany sends an e-mail at 7:10 a.m., there's a

23    response at 11:41 a.m. and then there's a reply at 11:43

24    a.m., right?

25    A.      Yes.
```

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      And at 1:00 p.m. and 1:01 p.m., you print these

3    e-mails?

4    A.      I believe that's correct.

5    Q.      And roughly 6 o'clock that night you resign?

6    A.      I believe that -- is there an e-mail that is

7    missing from what --

8    Q.      I don't know what else did you steal?  This is

9    all you produced.  Anyway --

10               MS. HARWIN:  Counsel, the rhetoric is

11          inappropriate.

12               MR. DROGIN:  You're right.  I didn't

13          mean to imply that you stole it.  Unauthorized

14          access is probably a better way to do it.

15   Q.      But had you ever -- other than this time, had

16   you ever accessed other employee's e-mails to see what

17   was being said?

18   A.      I had accessed when I needed -- when employees

19   had left when I needed to print out receipts or get

20   information for Bob on specific things, but --

21   Q.      So sequentially Lulu spoke to you that day and

22   told you in substance what Tiffany had said in this

23   e-mail; is that right?

24   A.      No, the conversation with her, there was

25   something that was a red flag on the way that she was

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     sort of discussing stuff that things had been discussed

3     behind my back and um --

4     Q.      So the answer to my question is no?

5     A.      Sorry I --

6     Q.      Did you have a conversation with Lulu that

7     prompted you to check her e-mail?

8     A.      Yes.

9     Q.      And what did she tell you that prompted you to

10    check her e-mail?

11    A.      I don't think it is exactly what she told me.

12    It was the conversation I was having with her.  There

13    was sort of a red flag or a distance -- I can't recall

14    specifically, I just had this gut feeling that there was

15    something going on with Lulu and -- yeah.

16                     MR. DROGIN:  Okay.  Let's go to HH.

17                     (Whereupon, a document Bate Stamped

18            Canal 44560 was marked as Exhibit HH, for

19            identification, as of this date.)

20    Q.      And you told Bob on April 6th you don't work

21    for him anymore?

22    A.      Yes.

23    Q.      And on April 8th Michael Kaplan sends you this

24    e-mail asking if you mind sending a password, Canal

25    administrative password.  Do you see that?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Yes.

3    Q.      So when I asked you before about who was the

4    administrator.  Was it your understanding that Michael

5    already had that password?

6    A.      To clarify, the Canal admin password is not the

7    overall e-mails, with all the employees, the Canal

8    administrator was the password to the Canal computer and

9    the overall, I believe it was like an iCloud account

10   that all the computers were attached to.  But Michael

11   Kaplan had that password and he had been given it and

12   used it on many occasions.  This was not somebody who

13   kept things organized.

14   Q.      Okay.  And in the second e-mail that's here,

15   that's regarding American Airlines?

16   A.      Yes.

17   Q.      And it says in part, the one in context is hold

18   and there's a bunch of security questions.  I don't know

19   if those are Bob's answers or yours.  Do you see that?

20   A.      Yes.

21   Q.      Did you have a master list of passwords that

22   you kept at Canal?

23   A.      Um, there was one with, like, some passwords --

24   the answer is yes, some.  Some of them were kept on an

25   Excel document.  Others were, to clarify, kept in the

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Canal contacts.  And some were, each individual employee

3   had passwords to different websites or accounts or

4   things like that.

5   Q.     Now after you resigned you told Tom Harvey that

6   there were a lot of open items that needed to be tended

7   to; is that correct?

8   A.     We had discussed --

9   Q.     Yes or no?

10  A.     I can't recall if it was me or Tom saying that

11  there open items.  But I assumed there would be an

12  orderly transition need.

13  Q.     What do you mean by orderly transition?

14  A.     A transition, as, you know, as Tom had e-mailed

15  Bob about a transition and making sure that nothing fell

16  under the cracks and making sure that everything was

17  passed on, you know, whatever outstanding work or what

18  needed to be done, that was the e-mail in my

19  resignation, Bob had written that he would be let know

20  what is needed from you.  There's certain work that

21  needs to be done by you and only you, you will be let

22  know.  So I was waiting for, you know, what was needed

23  for me in this transition.  I had been in touch with Tom

24  Harvey about it.

25  Q.     There were production issues that were open?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Um --

3    Q.      Yes or no or you don't remember?

4    A.      There were items related to production.

5    Q.      Were there open financial items?

6    A.      I mean, there were always ongoing bill paying

7    items like that.

8    Q.      Were there insurance?

9    A.      Can you clarify insurance.

10   Q.      Sure.  Did you put together a document in the

11   days after you resigned that you and Robin referred to

12   as "the bible"?

13   A.      The bible.  I can't recall discussing anything

14   called the bible.  But there was a document that I was

15   working on, to clarify, of all the outstanding things or

16   things that I thought that Bob should think about or

17   that we had discussed.  It sort of tried to incorporate

18   everything that we had done or that we had discussed

19   that should be done or just, you know trying to put as

20   much information and put it all together for them.

21   Q.      Now you didn't have to do that, right?  You

22   could have refused?

23   A.      I could have, but that's not the type of person

24   or ex-employee I was.

25   Q.      You could have resigned, given him notice and

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    said, I'm done, I'm going to put together this stuff to

3    aid with transition, but that's not what you chose to

4    do, right?

5    A.       I'm sorry, can you repeat that -- you're saying

6    I didn't choose to --

7    Q.       Well, you had choices with how you were going

8    to resign, didn't you?

9    A.       At that time there was only one way to resign.

10   Again, as I said it was --

11   Q.       My only question is, you had choices, and your

12   answer is no?

13   A.       I don't think at that time I had another choice

14   of the way to resign.

15   Q.       But you expected that after you resigned there

16   would be this transition period when you would continue

17   to do things?

18   A.       Well, I was e-mailed by Bob on my resignation

19   e-mail that things would -- outstanding things would

20   need to be done by me.  So I assumed that I would work

21   with Tom as I was about trying to make sure that nothing

22   fell through the cracks.

23   Q.       Yeah, but actually in your resignation e-mail,

24   you wrote back, "Bob, please read the e-mail from me

25   below.  I have decided to no longer work for you.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Please respect my wishes."

3          Isn't that an indication that you don't want to

4   do anymore work period?

5   A.      It was in response to his e-mail, just

6   completely ignoring the fact that I had resigned.  And

7   yet if I could just -- in addition --

8                    MR. DROGIN:  No, it's okay.  It's okay.

9          I think it does speak for itself.  Let's go to

10         II.  Got to get through this.  II.

11                    (Whereupon, a document Bate Stamped

12                    Robinson 1667 was marked as Exhibit II, for

13                    identification, as of this date.)

14   Q.     This is an e-mail you sent to Bob on June 11,

15   2019, correct?

16   A.      Yes.

17   Q.      Alright.  In the second paragraph you said, I

18   felt forced to resign the way I did.  You are very aware

19   of why there was no choice.

20          What did you believe he was aware of?

21   A.      He was aware of Tiffany targeting me and aware

22   of my job being taken away from me.  He was aware of the

23   hostile work environment.  He was aware of -- he was

24   aware of everything.  He was CC'd on everything.  We had

25   conversations, he was very aware of why I chose to

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     resign.  It was --

3     Q.     Well, this -- to be fair, this is your

4     perception of his awareness, right?

5     A.     My perception for seeing him on e-mails and

6     having conversations with him and --

7     Q.     Your perception.  This was your perception,

8     correct?

9     A.     I don't think that that would be correct, but

10    --

11               MR. DROGIN:  Okay.  JJ.

12               (Whereupon, a document Bate Stamped

13          Robinson 1655 was marked as Exhibit JJ, for

14          identification, as of this date.)

15    Q.     E-mail you sent on April 9th, do you see that?

16    A.     Yes.

17    Q.     And you say in the second paragraph, "I will

18    need to be in contact with Robin regarding outstanding

19    Toukie Smith items and other items related to what she

20    and I discussed and worked on.  Do I have your approval

21    to call her and discuss these items with her?"

22         Do you see that?

23    A.     Yes.

24    Q.     Did you believe that you needed Bob's

25    authorization to speak with Robin about these items?

Page 184

1                   GRAHAM CHASE ROBINSON-CONFIDENTIAL

2       A.      I was no longer an employee at Canal

3       Productions and I didn't want to do anything without his

4       approval.  So I spoke and asked him if it was okay to

5       have a conversation.  I was no longer an employee at

6       Canal, I was in transition.  So I felt it was the

7       appropriate thing to do.

8       Q.      To get approval?

9       A.      To get approval when I'm no longer an employee

10      of Canal Productions.

11      Q.      I heard you.  Did you ever get written

12      approval?

13      A.      On this one, yes, I did.

14      Q.      And that was an e-mail?

15      A.      Yes, I believe it was.  Or yes it was because

16      it would have been a response.

17                      MR. DROGIN:  Okay.  Let's go to KK,

18              please.  And spoiler alert, you know this ends

19              at SS because we had to mark the other one TT.

20                      (Whereupon, a document Bate Stamped

21              Robinson 4874 was marked as Exhibit KK, for

22              identification, as of this date.)

23      Q.      Alright.  So KK is an April 10th e-mail you

24      sent to Tom Harvey, correct?

25      A.      Yes, this is an e-mail that I sent to Tom

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2     Harvey.
 3     Q.     Okay.  You say in the second paragraph, I've
 4     been thinking that it's best we enter into a severance
 5     agreement that includes financial compensation,
 6     confidentiality provisions and provisions for
 7     recommendation and/or mutually agreeable terms.
 8            Did I read that right?
 9     A.     Yes, you read the sentence correctly.
10                 MS. HARWIN:  Just to clarify, I don't
11            think you did, I think it was read incorrect.
12     Q.     I've been thinking that it best we enter into a
13     severance agreement that includes, financial
14     compensation, confidentiality provisions and provisions
15     for recommendations and other mutually agreeable terms.
16            Did I read it right?
17     A.     I believe so.
18     Q.     Why would you think that Canal would want to
19     enter into a severance agreement with you containing
20     these terms?
21     A.     Tom Harvey had asked me in conversation let him
22     know what my needs are.  Robin had mentioned that I
23     would receive severance at some point or there would be
24     a conversation about severance.  Yeah.
25     Q.     So other than Robin -- let's -- with regard to
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Tom, when did that conversation with Tom happen?  Was it

3    before or after this e-mail, to the best of your

4    recollection?

5    A.      This is April 10th um -- I recall having a

6    conversation with Tom, I believe the day after or two

7    days after I resigned where we discussed, you know, a

8    bunch of different outstanding items and other topics.

9    Q.      So from your recollection, that had already

10   been discussed before -- on or before April 10th, right?

11   A.      He had asked me to let him know what my needs

12   were.  And being -- we had been in discussion because of

13   JJ there's an e-mail about us discussing transition

14   um --

15   Q.      Alright.  Now before resigning you had become

16   aware that Tiffany Chen was asking questions of certain

17   Canal employees about receipts and petty cash; is that

18   right?

19   A.      Prior to my resignation?

20   Q.      Yes.

21   A.      No.

22   Q.      Weren't you aware that Tiffany had been asking

23   Kap about petty cash?

24   A.      I believe that was after I resigned.

25   Q.      Weren't you aware before you resigned that

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Tiffany was looking into the apartment accounting that's

3   ███ to see the moneys that were spent?

4   A.      I believe that I had heard that she wanted to

5   look into apartment expenses.  But again, all of them

6   had been approved by Bob and the contents of it had been

7   approved by Bob.

8   Q.      Well, irrespective of whether they had been

9   approved by Bob, this was something that before you

10  resigned, you heard that she was looking into; isn't

11  that right?

12  A.      Yes, she wanted to with the apartment.

13  Q.      In fact Robin Chambers made you aware that

14  Tiffany was asking questions about petty cash; isn't

15  that true?

16  A.      Not during my employment.  After.

17  Q.      Okay.  After you resigned, Robin told you that

18  Tiffany was speaking to people about you, in an effort

19  to show that you were dishonest; isn't that true?

20  A.      Just to clarify, Tiffany was speaking about me

21  to other people to show that I was dishonest.

22  Q.      Yes.  The question is, didn't Robin tell you

23  that Tiffany was asking questions of people, trying to

24  show that you were dishonest?  That's really the

25  question.

Page 188

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.       I can't recall her specifically telling me

3    about people, but there was a discussion on Tiffany's

4    bizarre claims and about -- Robin had said something

5    about Tiffany saying that she was dishonest.  I can't

6    recall specifics.

7    Q.       So that's my next question, so Robin was

8    actually being questioned about her own expenses by

9    Tiffany, correct?

10   A.       I wouldn't say that is correct.  It was a Bob

11   and Tiffany.

12   Q.       Okay.  Bob and Tiffany.  And the recordings

13   that you made with Robin, do you recall approximately

14   when the last one was?

15   A.       I don't.

16   Q.       Was it into the summer?

17   A.       Um, the summer being what, June, July, August

18   or --

19   Q.       Yeah, June -- well, you resigned in April.

20   June, June --

21   A.       Somewhere in the range of between May and June

22   sometime.  I can't recall specifically.

23   Q.       Okay.  But sometime -- I'll ask the question in

24   a different way.

25            Before Canal started this lawsuit against you,

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    you were actually aware that Tiffany had been asking
 3    questions about expenses; isn't that true?
 4    A.      Just to clarify, my expenses or other people's
 5    expenses?
 6    Q.      Anyone's expenses.
 7    A.      I recall --
 8    Q.      Just yes or no.  I don't care what you recall.
 9    I just want to know if you had an awareness that Tiffany
10    was asking questions about expenses.
11    A.      She -- I believe that she was, based on my
12    conversations, but I will say that it --
13    Q.      There's no but, it's fine.  I just want to show
14    that before this lawsuit was started, you knew questions
15    were being asked.  People, were asking questions.
16    That's all I'm trying -- I mean would you agree with me
17    that you knew that?  Isn't that fair?
18    A.      I think that you're mischaracterizing it.  I
19    wasn't aware that she was looking specifically into my
20    expenses.  I believe that I spoke to Robin and asked
21    Robin, she said no, you're wrong, you're not even --
22    she's not even -- she's off of you and, you know, on to
23    looking at expenses in the office.  So I wasn't aware
24    that she was looking at expenses into me and that's what
25    I was trying to clarify.  I wasn't aware of that.
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.     Alright.  Now let's go to the recommendation

3   letter.  You believed that Tiffany was actually behind

4   Bob's decision not to sign a recommendation letter for

5   you; isn't that right?

6   A.     I wouldn't say that is correct.

7                  MR. DROGIN:  Alright.  7226 at 45

8          seconds.

9                  (Whereupon, the recording was played at

10         this time as follows:

11                 MS. ROBINSON:  That you know, this has

12         been a month and a half of trying to get this

13         letter signed and I'm down to the wire.  And

14         he's saying Bob has reservations about signing

15         it he's going to try to rework it so that Bob

16         can -- but he thinks that I should ask Peter or

17         him to sign a letter on my behalf, so you know,

18         it doesn't really, like, you know, do anything,

19         you know, but --

20                 MS. CHAMBERS:  Is this her -- is

21         this -- I'm reading between the lines, Chase.

22                 MS. ROBINSON:  What?

23                 MS. CHAMBERS:  Is this Tiffany?

24                 MS. ROBINSON:  Not allowing him to sign

25         something?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MS. CHAMBERS:  Yeah.

3                    MS. ROBINSON:  Yeah.

4                    MS. CHAMBERS:  I mean, I --)

5                    MR. DROGIN:  We can stop.

6    Q.     So did you believe that Tiffany was behind

7    Bob's refusal to sign a recommendation letter for you?

8    A.     That was a --

9    Q.     Yes or no, you either did or you didn't?

10   A.     Overall, no.

11   Q.     And you said it's been a month and a half in

12   that audio tape.  Did you hear it?

13   A.     Yes.

14   Q.     So that would place it around the middle

15   towards the end of May?

16   A.     Okay.  I don't know -- I can't recall when that

17   was -- conversation was.

18   Q.     Now you also told Robin at another point that

19   you actually didn't know why but Bob wouldn't sign it;

20   isn't that true?

21   A.     I believe there was discussion -- I mean, we

22   had a range of discussions on troubleshooting or

23   thinking or, you know, perspective or you know, there

24   was just a lot of conversations in different directions.

25   Q.     Alright.  Now in this lawsuit, you claimed that

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Bob refused to sign the recommendation letter as an act

3    of retaliation because you had complained about

4    harassment; isn't that true?

5    A.      Yes, I said that I would involve a lawyer.

6    Q.      Let's come back to my question.  In your

7    lawsuit, this lawsuit, you are claiming that one of the

8    acts of retaliation was Bob's refusal to sign a

9    recommendation letter, yes or no?

10   A.      Yes, he had --

11   Q.      Yes is fine.  Yes is fine.  You resigned on

12   April 6th, correct?

13   A.      Yes.

14   Q.      You had been considering business school before

15   you resigned as we saw from those February 2019 e-mails,

16   correct?

17   A.      Correct.

18   Q.      So this concept of applying to business schools

19   was not something that you came up with after April 6th,

20   correct?

21   A.      It had been something I had been thinking about

22   for years.

23   Q.      And you first e-mailed Tom Harvey about the

24   need for business school recommendation on May 7, 2019

25   and that's in Exhibit LL.

Page 193

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      I'll have to look at that.

3                    (Whereupon, a document Bate Stamped

4              Robinson 00005128 was marked as Exhibit LL, for

5              identification, as of this date.)

6    Q.      It's right at the bottom.  It's the last page

7    right at the top.  May 7, 2019, 7:52 p.m.  Do you see

8    that?

9            I'm in the process of submitting my business

10   school applications and would like to get a few business

11   school recommendations from Bob, this is time sensitive,

12   so I don't miss the application deadlines.

13           Do you see that?

14   A.      Yes, I do.

15   Q.      So that's a month and a day after you resigned,

16   correct?

17   A.      Yes, it seems to be about a month and a day.

18   Q.      Alright.  And then in -- if you go up to the

19   first page at the bottom, you're still communicating

20   with Tom eight days later.

21   A.      Yes.

22   Q.      Alright.  And this was -- I'll represent to you

23   that May 15th was a Wednesday.  So on Wednesday, May

24   15th, you were looking to get this turned around by

25   Monday or Tuesday of the following week; is that right?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      I was -- yes, I was hoping to send -- it says,

3    I was hoping to send it by Monday or Tuesday.

4                    MR. DROGIN:  Okay, let's go to MM.

5                    (Whereupon, a document Bate Stamped

6              Canal 49267-71 was marked as Exhibit MM, for

7              identification, as of this date.)

8                    THE WITNESS:  I don't have it.

9    Q.      You should have it now.

10   A.      Yes, I have it.

11   Q.      You e-mailed Bob directly on June 4th?

12   A.      Yes.

13   Q.      And that was the reference letter to the London

14   School of the Economics?

15   A.      Yes.

16   Q.      And you followed up with him again on June 7th?

17   A.      Yes.

18   Q.      In the June 4th e-mail you attached a proposed

19   recommendation letter as well as a separate additional

20   form that the London School of Economics required; is

21   that correct?

22   A.      Yes.

23                    (Whereupon, a document Bate Stamped

24              Robinson 1669 was marked as Exhibit NN, for

25              identification, as of this date.)

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      In Exhibit NN?

3    A.      NN, Nancy, Nancy.

4    Q.      Yeah, Nancy, Nancy.  In that e-mail you

5    acknowledge that -- you acknowledge your understanding

6    that Bob was refusing to sign the recommendation letter;

7    isn't that true?  In the one, two, three, four, fifth

8    paragraph, you write, "now I've been told by Tom Harvey

9    that you're unwilling to sign the letter of

10   recommendation for the London School of Economics.  I've

11   also been given a release to sign by Laurent and Tom

12   Harvey."

13            Do you see that?

14   A.      Yes.

15   Q.      So as of June 11, 2009 (sic), you were aware

16   that Bob was refusing to sign that recommendation

17   letter; isn't that right?

18   A.      No, I don't believe that is correct.  I had a

19   conversation with Tom at that time in which he said --

20   um, it was -- I can't recall if it was -- Tom and I had

21   a conversation that he would speak to Bob about how Bob

22   might want to change the draft so that he would sign it

23   and then Tom Harvey said that he would get back to me

24   and then I never heard from Tom Harvey.  So I sent an

25   e-mail, but I can't recall specifically what the order

Page 196

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    of that was.  So for me, Tom said that he would try to

3    see what Bob would sign.  Because it was important that

4    my employer sign for --

5    Q.      Right.  Right.  But my question is just this,

6    as of June 11, 2009, you had been told by Tom Harvey

7    that Bob was unwilling to sign a letter of

8    recommendation; isn't that right?  Because that's what

9    you wrote.

10   A.      I'm looking to see where I wrote that just to

11   confirm.

12   Q.      I just read it.

13   A.      Oh, June 11th, yes.  I was told by Tom and

14   Robin that Bob did not want to sign the letter of

15   recommendation.  He went --

16   Q.      Alright.  And Jeff Pagano's first communication

17   to me was in July of 2019; isn't that right?

18   A.      I don't recall the date that you and Jeff

19   Pagano spoke.

20   Q.      I was at Tumbled Down in Burlington Vermont

21   with my daughter going to see Twiddle.  And I got a

22   voicemail, hey Laurent, it's Jeff Pagano.  It was the

23   end of July of 2019, so you knew in June --

24   A.      I don't know if it was that --

25   Q.      I didn't finish the question.  I didn't finish

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     the question.  My point is, you knew in June before Jeff

3     Pagano reached out to me that Bob was not going to sign

4     that letter, didn't you?

5     A.     Bob went through with his threat on not giving

6     me -- of giving me a bad recommendation or giving me no

7     recommendation at all.  He went through with his threat.

8     Q.     He went through with his threat, I'll adopt

9     your words, not to give you a bad recommendation if you

10    left him in the lurch, which is exactly what you did.

11    So he stayed true to form?

12    A.     I would say that's incorrect--

13    Q.     Okay.  Got it.

14    A.     --I don't recall him using the word lurch.  And

15    also I was in the middle of transition with Tom and

16    working with Tom to facilitate a transition, so I didn't

17    really leave him in the lurch.  I said let me know what

18    you need and I'll put it together.  So I don't see

19    that -- you know, I disagree with your --

20    Q.     That's fine.  You can disagree with me.  Now

21    this was a part-time Masters program that you were

22    applying for, right?

23    A.     LSE was not a part-time Masters program, it

24    was -- yes, it was a part-time Masters program.  It

25    was --

Page 198

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      Had you taken the GMAT?

3   A.      Yes.

4   Q.      How many times?

5   A.      I had taken it once before.

6   Q.      When did you take it?

7   A.      I can't recall the year.  I think it was, like,

8   a couple of years before 2019.

9   Q.      Alright.  So it was while you were employed at

10  Canal?

11  A.      Yes.

12  Q.      Now was this program -- this was a -- so you

13  described it, it's a Masters program with classes every

14  couple of months; isn't that right?

15  A.      I can't recall off the top of my head.  It was

16  --

17  Q.      It wasn't full-time, was it?

18  A.      I can't recall off the top of my head, I can't.

19  --

20  Q.      Now was this an application or was it just

21  enrollment?

22  A.      It was an application.

23  Q.      Did you ever wind up applying?

24  A.      Yes, I did.

25  Q.      So you applied without the recommendation

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     letter?

3     A.      Without Bob's recommendation letter, yes.

4     Q.      And the recommendation letter that you wrote

5     for Bob to sign, did it accurately recount what you had

6     done at Canal?

7     A.      I would need to reread it again, but I believe

8     it did.

9     Q.      I mean this is a letter you were going to have

10    him sign and it was going to be sent in support of your

11    application; isn't that right?

12    A.      It was a draft of something that he could

13    change or do what he wanted.  I laid out --

14    Q.      But what you laid out was truthful and

15    accurate; isn't that so?

16    A.      Yes.

17    Q.      And why did you think that you would get in?

18    A.      I think that when you -- I think with the work

19    that I had done, the resume that I had done, um,

20    personal statements, everything, I was hoping that I

21    would get in.

22    Q.      Okay.  What was the acceptance rate into the

23    program?

24    A.      I can't recall.

25    Q.      Now were you going to live and work in London

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     while you were at school, was that the plan?

3     A.      Um, the plan was to work on my own production

4     company, development, projects and attend -- this was a

5     stepping stone for me applying for my MBA.  I had --

6     because of the timing of when I left -- okay, I'm not

7     going to continue then.

8     Q.      Yeah, please.  So it's fair to say then that

9     you didn't know actually what income you were going to

10    have, while you were doing this production business;

11    isn't that true?

12    A.      I wouldn't say that that's true.  I wouldn't

13    also characterize it in that way.

14    Q.      Well, this was essentially a startup that you

15    were going to be heading.  What income would you have?

16    A.      I would have my savings and money that I had,

17    you know, put toward one day starting a production

18    company.

19    Q.      Right.  But I'm not talking about that.  I'm

20    talking about income, where somebody is paying you money

21    for what you're doing for them.  You went into this

22    without a guarantee of income; isn't that true?

23    A.      I mean I suppose, yes.

24    Q.      Alright.  Now Tom Harvey actually told you the

25    reason that Bob was refusing to sign the letter, didn't

Page 201

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    he?

3    A.      Um --

4    Q.      Yes or no.

5    A.      He gave me some -- like he gave me something

6    that --

7    Q.      Yes or no.  I know what he said.  The question

8    is just whether Tom told you the reason that Bob was

9    refusing to sign it?

10   A.      Yes, he alluded to something.  Yes.

11   Q.      Okay.  Did Tom allude to the fact that Bob said

12   that you were not authorized to transfer sky miles from

13   his account into your personal account?

14   A.      No, that's not how it was phrased.

15   Q.      Okay.  How do you remember it being phrased?

16   A.      Bob was upset with something about sky miles

17   being transferred.  It was --

18                    MR. DROGIN:  Okay.  7229 at 5 minutes

19            and 15 seconds.

20                    (Whereupon, the recording was played at

21            this time as follows:

22                    MR. HARVEY:  I had a very brief

23            conversation with him and he's like, I'm not

24            signing it.  And part of the problem or part of

25            his thing is there were air miles that you

```
 1           GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2           transferred out of an account that he didn't
 3           approve it.
 4                     MS. ROBINSON:  That's not true.
 5                     MR. HARVEY:  What isn't true?
 6                     MS. ROBINSON:  That's not true.
 7                     MR. HARVEY:  Well, that he didn't
 8           approve it or you didn't do it?
 9                     MS. ROBINSON:  No, he approved it.
10           It's been a staple thing for over 11 years.
11                     MR. HARVEY:  Well, I'm just telling
12           you, in his mind transferring -- he knew you
13           used them, but he didn't know you were
14           transferring them out.  I mean, there are like
15           four million miles according to him.)
16   Q.      Does that refresh your recollection about what
17   Tom Harvey told you?
18   A.      Yes.
19   Q.      Now you refer to this as a staple thing for
20   over 11 years.  Did you hear yourself say that?
21   A.      Yes.
22   Q.      The staple thing over 11 years was your ability
23   to use sky miles for business and personal travel; is
24   that right?
25   A.      Bob and I had different agreements about using
```

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    the miles for -- for my travel, yes.

3    Q.     Okay.  The travel though that we're talking

4    about is during your employment; isn't that right?

5    A.     Um, the travel during my employment -- yes, it

6    was when I was employed at Canal Productions.

7    Q.     Alright.  So the four million miles though,

8    that were moved -- what he's referring to as the four

9    million, I think it's actually closer to five -- but

10   those miles you moved into your account during your

11   employment in 2019; isn't that right?

12   A.     There were some transfers that were made in

13   2019 to my account.

14   Q.     And then when you left, they remained in your

15   account, correct?

16   A.     Some of them had been used during my employment

17   at Canal and others were transferred and there were

18   other trips that I had spoken to Bob and Bob had

19   approved of.

20   Q.     I'm talking about the miles that you

21   transferred to your account in 2019 in the months

22   leading up to your resignation, that's what I'm talking

23   about.

24   A.     Some of them.

25   Q.     Alright.  Now this call with Tom where he told

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    you this, that was before the end of July of 2018; isn't

3    that right?  2019, sorry.

4    A.     I can't recall specifically the date.

5    Q.     So you then are unclear whether Tom had made

6    you aware of this before or after Mr. Pagano had

7    contacted Canal's counsel?

8    A.     Can you say your question again, I was just --

9              MR. DROGIN:  No, it's fine.  It just

10          occurred to me, if you were represented by

11          counsel, Tom wouldn't have been talking to you.

12   Q.     Alright.  Now at some point did you call to

13   find out how many sky miles you could transfer within a

14   24-hour period?

15   A.     I recall in like, 2017 or '18 um --

16   Q.     Okay.  And were you aware that you could only

17   transfer 999,000 miles in a 24-hour period?

18   A.     Not in a 24-hour period, but in each phone

19   call, was my understanding of it.  And then I think I

20   found out that, at some point that it was -- it had to

21   be done -- it was only, like, per day.

22   Q.     Per day.  And a day is 24 hours, right?

23   A.     Yes.

24   Q.     Okay.  So of the miles that you had in your

25   account when you left, did you use any of those after

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    you left?  Have you used them?

3    A.     I don't know specifically if Canal's miles were

4    used.

5    Q.     Alright.  Now the deal that you had with Bob

6    about the use of the sky miles, when was that deal

7    reached?

8    A.     There were many, many, discussions about the

9    sky miles over the decade plus that I worked for Bob.

10   Q.     Was there any written memorialization of what

11   the agreement was, your permission to use these miles?

12   A.     I don't recall specifically if it was written.

13   I think that there were some e-mails back and forth

14   about the use of the miles, the transfer of the --

15   Q.     Not what I'm asking you.  Did you have to get

16   approval from him before you transferred miles?

17   A.     No.

18   Q.     Did you tell him in advance that you were going

19   to be transferring miles at any point when you had this

20   arrangement with him?

21   A.     In 2015 he and I had discussed the flexibility

22   and using the miles and with his term, "perk" that they

23   became a perk to me so I could transfer them and use

24   them as I wanted to.

25   Q.     Right.  What was the deal, if there was one,

 1                 GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    when you left?  Had that been discussed?

 3    A.     We had never discussed -- from what I can

 4    recall, I can't recall us discussing if I left what

 5    would happen to the miles.  Again, when I --

 6                    MR. DROGIN:  That's fine.  If you can't

 7              recall, you can't recall.  Can we go to Exhibit

 8              D.  Actually can we take a five-minute break.

 9              Make it 4:15.  Can we come back at 4:15, I just

10              want to see how we're doing on time.

11                    THE VIDEOGRAPHER:  Okay.  We are off

12              video record.  The time is 4:03 p.m.

13                    (Whereupon, a short break was taken at

14              this time.)

15                    THE VIDEOGRAPHER:  We are back on the

16              video record.  The time is 4:17 p.m.

17    Q.     Alright.  Just to go back for a little bit, Ms.

18    Robinson, you were talking about a document that you

19    were preparing and working on with Tom as part of the

20    transition.  Do you recall giving that testimony?

21    A.     I recall discussing, yes, the document that I

22    was working on.

23    Q.     Isn't it true that you actually never sent that

24    document to Tom?

25    A.     We had never finished transition, so I don't

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    believe that it had been.

3    Q.     So you never sent the document to Tom?

4    A.     I can't recall sending the document to Tom.

5                   MR. DROGIN:  Alright.  Let's go to

6              Exhibit D, please and thank you.

7                   MR. BENNETT:  Hold on just a moment

8              Laurent, my apologies for the delay.

9                   MR. DROGIN:  Should we go off the

10             record?

11                  MR. BENNETT:  Yes, for a moment please.

12                  THE VIDEOGRAPHER:  We're off the video

13             record.  It's 4:18 p.m.

14              (Whereupon, a discussion was held off the

15    record.)

16                  THE VIDEOGRAPHER:  We are back on the

17             video record.  The time is 4:23 p.m.

18    Q.     Alright.  And we put up on display the document

19    previously marked as Exhibit D of day one of the

20    deposition, which is the July 11, 2019 letter from Tom

21    Harvey to the Plaintiff.

22         Ms. Robinson, you received this letter on July

23    11th; is that right?

24    A.     Yes.

25    Q.     You read it at that time?

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.     Yes.

3     Q.     After you read the letter, why didn't you

4     return any of the property as Tom had suggested or

5     requested?

6     A.     When I left Canal Productions, I assumed there

7     would be an orderly transition of documents and

8     information.  I had been in touch with Tom regarding

9     this transition and before any transition had been

10    finalized or anything had been returned, I received this

11    threatening -- this threatening letter.

12    Q.     So on July 11, 2019 when you received and read

13    this threatening letter, same question, why didn't you

14    return Canal's stuff like he had asked?

15    A.     Again, there would be an organized transition

16    and everything or documents and Canal filed their

17    lawsuit and when that was filed, again, there would be

18    an appropriate time or orderly transition to this.

19    Q.     I'm just trying to find out, when you get a

20    letter from an attorney and it says please return the

21    property, why you thought there was going to be any

22    further discussion about this and why you didn't just

23    return it?

24    A.     Because there was going to be an orderly

25    transition to return the property.  Canal filed their

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     lawsuit and during that -- during that period, again,

3     there would be the correct time to --

4     Q.      No, no, no, no, no.  I'm not up to that.  Why

5     wasn't the correct time when the request was made.  Why

6     wasn't that the correct time?

7     A.      I assumed that there was going to be an orderly

8     transition of -- of these documents and then Canal filed

9     the lawsuit.  We --

10                   MR. DROGIN:  Well, Canal filed the

11              lawsuit more than two months later.  I'm sorry,

12              more than a month later.  Okay.  We have your

13              answer.

14    Q.      When you received Mr. Harvey's letter, did you

15    discuss with anyone other than an attorney whether or

16    not you should return any of this property?

17    A.      I don't -- I don't recall discussing that.  I

18    think that what was discussed was the other contents of

19    the -- of the letter.  Like that's what -- it's not that

20    it was discussed.  It's that it was sort of the -- the

21    focus was the -- knowing these false allegations and --

22    Q.      I have no idea what you're talking about.  My

23    question was whether or not you discussed with anyone

24    other than an attorney -- other than an attorney whether

25    you should be returning the property as you were asked

Page 210

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    to do, yes or no?

3    A.      Not that I can recall.

4    Q.      And did you discuss it with Mr. Pagano?

5              MS. HARWIN:  Objection.  And she's not

6              to discuss during the deposition anything she

7              discussed with her counsel.

8              MR. DROGIN:  I'm not asking for the

9              substance of the communications.  I'm simply

10             asking whether or not you discussed returning

11             the property with him.

12             MS. HARWIN:  I direct her not to

13             answer.

14   Q.      Okay.  Did you ever discuss the returning of

15   the property with your current counsel?

16             MS. HARWIN:  Direct her not to answer.

17             MR. DROGIN:  I'm not asking for the

18             substance of the communications.  I'm asking

19             whether the communications ever took place.

20             MS. HARWIN:  Directing her not to

21             answer.

22   Q.      Why did you retain Canal's property after the

23   lawsuit had been filed?

24   A.      There would be an orderly transition to

25   returning the documents.  At first ESI was the focus.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Eventually the judge sent the deadline for documents and

3    they were returned at that point, you know, by the

4    deadline.

5    Q.     The deadline meaning the last day of discovery,

6    that's when the documents were produced, right?

7    A.     I can't -- for some reason, I can't recall

8    that.

9    Q.     How did you send them, by the way to Mr.

10   Bennett's office?

11   A.     They were picked up by a car and brought to

12   Greg office.

13   Q.     So they traveled by car?

14   A.     Yes, the characterization of truck delivery is

15   incorrect.

16   Q.     Okay.  So the problem here is they traveled by

17   car not truck, right, we have that wrong?

18   A.     Yes.

19   Q.     Okay.  Got it.  Did an attorney tell you that

20   you should not return this property?

21               MS. HARWIN:  Objection.  And again I'm

22          directing her not to reveal any attorney/client

23          communications.

24               MR. DROGIN:  Are you directing her not

25          to answer the question?

Page 212

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2                    MS. HARWIN:  Yes, I just stated that.

3    Q.      Did you ever have a discussion with anyone

4    other than an attorney about whether or not they thought

5    you should return some of this stuff?

6    A.      Not that I can recall because it was always the

7    intention for this stuff to be returned.  I preserved it

8    during my transition, packaged up the petty cash.

9    Q.      You're going too far.  I mean your mother lives

10   with you, right?

11   A.      At times, she does.

12   Q.      Alright.  So was there ever a conversation

13   between you and her in sum and substance, Chase, when

14   can we get all this crap out of the apartment?  Was

15   there ever such a conversation?

16   A.      There was never a conversation where we

17   discussed getting any crap out of the apartment.

18   Q.      Well, I don't mean verbatim.  But all this

19   stuff that you had, nine boxes, was there ever a

20   discussion with your mother about when it could be

21   removed?

22   A.      I don't recall ever speaking to my mother about

23   items that I had here.  Again, I preserved them and was

24   waiting for an orderly transition of this.

25   Q.      Okay.  How come you didn't send it to your

Page 213

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   attorney's office?

3                MS. HARWIN:  Objection.  And to the

4          extent discussions about that would necessarily

5          implicate communications with her attorneys I

6          would direct her not to answer.

7   Q.     Alright.  Is there a reason you didn't send

8   them to your attorneys?

9                MS. HARWIN:  Same direction.

10               MR. DROGIN:  Hmm.

11  Q.     When you started your lawsuit against Mr. De

12  Niro and Canal, had you made your attorneys aware that

13  you were in possession of this property that you

14  subsequently returned?

15               MS. HARWIN:  Again, all of this

16          impinges on attorney/client communications.  I

17          direct her not to answer.

18               MR. DROGIN:  That's factual.  How is

19          that privileged?  It's simply, did you make

20          your attorneys aware of it.

21               MS. HARWIN:  Direct her not to answer.

22               MR. DROGIN:  Alright.  Well, we're

23          going to preserve this line of questioning

24          because I do intend to pursue it.  I think

25          you're wrong, but I'm not going to burn my time

Page 214

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              if you're going to keep directing her not to

3              answer.  So we'll just note that in the record.

4              Now can we pull up Exhibit OO, which are the

5              Pagano e-mails?

6                  MS. LAZZARO:  It should already be in

7              the chat, I think I uploaded it again.

8                  (Whereupon, the Pagano e-mails were

9              marked as Exhibit OO, for identification, as of

10             this date.)

11    Q.     In Exhibit OO, I'm hoping we have just e-mails.

12    Now in his first e-mail to me, which is a three-page

13    document, his first e-mail is page -- oh, I see, sorry,

14    my bad.  This is just the 13th e-mail.

15         Tom's letter actually told you that you would

16    be sued if you did not return the property, didn't he --

17    didn't it?

18    A.     I can't recall the exact line at this moment

19    that was in.

20    Q.     So the last line was, please return the sky

21    miles immediately to avoid legal action.

22         Do you see that?

23    A.     That's what the line says.

24    Q.     Now in Mr. Pagano's e-mails, he actually never

25    made any mention of returning the sky miles, did he?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   A.      Let me read it.

3                  MS. HARWIN:  Counsel, can you clarify

4          which e-mail or e-mails from Mr. Pagano you're

5          referring to.

6                  MR. DROGIN:  I'll withdraw the question

7          because I don't want to take the time.  I'll

8          make a representation that there's nothing in

9          the Pagano e-mails about returning any of the

10         property that had been requested.

11  Q.      Now, wasn't the real purpose here of Jeff

12  Pagano sending these e-mails, wasn't it intended to

13  scare Bob so he wouldn't sue you?

14  A.      No.

15  Q.      Isn't that what you're trying to do, trying to

16  throw up all these allegations so Bob wouldn't sue you;

17  isn't that what this is all about?

18  A.      No.

19  Q.      All right.  Now had you told Pagano about the

20  difference between Riverside, Tribeca Productions,

21  Tribeca Film Center, Tribeca Enterprises and Tribeca

22  Film Institute?

23                 MS. HARWIN:  Objection.  I direct her

24         not to answer.

25  Q.      Did you tell him that you worked for any of

Page 216

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     those entities?

3                  MS. HARWIN:  Objection and I direct her

4           not to answer.

5     Q.    Any idea why he mentioned those entities in his

6     e-mails?

7                  MS. HARWIN:  Which e-mails are you

8           referring to, Counsel?

9                  MR. DROGIN:  The e-mails that you're

10          directing her not to answer about where he

11          talked about suing those entities.

12                 MS. HARWIN:  The direction not to

13          answer has to do with attorney/client

14          communications.  If you're asking a question

15          about the e-mail, please identify the e-mail.

16                 MR. DROGIN:  Okay.  I'll move on.

17          Again, if you don't know the answer, you don't

18          know the answer.

19    Q.    If you take a look at the last sentence of Mr.

20    Pagano's e-mails that we have in front of us, OO.  I'm

21    sorry, it's the last paragraph -- the second to last

22    paragraph, not the last sentence.  Three lines up from

23    the bottom, he says, "unfortunately based on the false

24    statements set forth in Mr. Harvey's letter, false

25    statements made by Mr. De Niro to co employees among

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    other person's in the industry, Ms. Robinson's future

3    opportunities are very narrow at this time and she may

4    have few options."  Do you see that?

5    A.      I'm sorry, let me -- I'm just trying to make

6    this bigger.  For some reason it's so small.  Um, yeah,

7    I see that.

8    Q.      Okay.  What false statements did Bob make?

9    A.      The knowingly false allegations of stealing, of

10   sky miles, of everything that was in Tom Harvey's

11   letter.

12   Q.      Right.  But I'm looking at the part where it

13   says "false statements made by Mr. De Niro to

14   co-employees among other persons in the industry".

15          What false statements are you aware of made by

16   Mr. De Niro to co-employees among other persons in the

17   industry?  What false statements?

18   A.      That --

19               MR. DROGIN:  Why don't we leave it

20          blank and you can fill it out.

21          (INSERT)_____.

22   REQUEST NOTED

23   Q.      Did you believe at that time August 13, 2019

24   that your future opportunities were at that time "very

25   narrow" and that you may have "few options"?  Did you

Page 218

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   believe that to be true?

3   A.      Yes, with the false allegations and also Bob

4   um, going through with his threat on giving me a bad

5   recommendation.  The industry itself is based on

6   networking and recommendations.  Bob giving me a bad

7   recommendation would limit my future and my options.

8   Q.      Yeah, in August actually there was no one that

9   you were seeking a recommendation for, right?

10  A.      I was seeking a recommendation to further my

11  education.

12  Q.      Alright.  So just to be clear, as of August

13  13th, 2019, you felt that your future opportunities were

14  very narrow and that you may have few options; is that

15  right?

16  A.      Yes.

17  Q.      And just so we're clear that was before Canal's

18  lawsuit against you was ever filed, correct?

19  A.      That was before Canal's lawsuit was filed.

20  Q.      When did you decide to bring your lawsuit

21  against Canal and Mr. De Niro?

22              MS. HARWIN:  And let me clarify that

23          you're not to disclose attorney/client

24          communications.

25  Q.      At some point you decided to bring a lawsuit

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    against Canal and Mr. De Niro, correct?

3    A.     Yes.

4    Q.     Was that before or after Canal had sued you?

5    A.     Before.

6    Q.     And do you know when Bob or Canal first

7    contacted the New York County District Attorney's

8    office?

9    A.     I can't recall.

10   Q.     Okay.  Do you know whether it was before or

11   after you had brought your lawsuit against Canal and Mr.

12   De Niro?

13   A.     I don't recall.

14              MR. DROGIN:  Alright.  Can we go to

15         Exhibit PP.

16              MS. LAZZARO:  It's dropped in the chat.

17              (Whereupon, a document entitled TH

18         Communications with DA was marked as Exhibit

19         PP, for identification, as of this date.)

20              MS. HARWIN:  It appears that these are

21         multiple separate documents that are not Bates

22         labelled.

23              MR. BENNETT:  These were certainly

24         produced in discovery as one compilation as

25         you're seeing it now.  I will find out the

Page 220

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              Bates numbers and ensure that they are properly

3              inserted into the record.

4                  MS. HARWIN:  Thank you.

5    Q.      Alright.  So I'm looking at a text message, hi

6    Tom, this is Kelly Thomas from the District Attorney's

7    office, if you could e-mail me at -- and then there's an

8    e-mail address -- with the details of the meeting that

9    we're planning to have Monday, September 16th at noon

10   that would be greatly appreciated.  Thanks so much again

11   for your help coordinating.  Do you see that?

12   A.      Yes.

13   Q.      Alright.  And the text message indicates it was

14   sent September 12, 2019 at 12:49 p.m., correct?

15   A.      Yes, that's correct.

16   Q.      And your lawsuit was filed on October 3, 2019;

17   isn't that right?

18   A.      Yes, I believe so.

19   Q.      So before your lawsuit was filed, there are

20   communications here between Mr. Harvey and the New York

21   County District Attorney's office; isn't that correct?

22   A.      Yes.

23   Q.      In Paragraph 39 of your Complaint, you indicate

24   that an investigation into you or into your activities

25   began after you resigned.

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2                   MR. DROGIN:  Can we pull up that -- I

 3              think it's J.

 4                   MS. HARWIN:  And while you're bringing

 5              up that additional exhibit, I would just note

 6              for the record, I don't believe this e-mail

 7              referenced in this series of text messages that

 8              Mr. Harvey said he would be e-mailing in 30

 9              minute was ever produced to us.  So we would

10              request the production of the document.

11                   MR. DROGIN:  I actually didn't hear

12              what you said, but okay.

13                   MS. HARWIN:  I said we would request

14              the production of the document, the e-mail

15              referenced in this series of text messages,

16              which I don't believe has been produced to us.

17                   MR. BENNETT:  To the extent it exists,

18              I'll look into it.  But, I mean, as far as I

19              understand it, we've produced all

20              communications.

21    Q.    Do you believe that the investigation into your

22    alleged wrongdoing began after you resigned?

23    A.    I'm sorry am I looking at J?

24    Q.    Yeah, Paragraph 39.

25    A.    Sorry, one second.
```

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   Q.      Can you see it?

3   A.      Yes, can you repeat your question.

4   Q.      Why do you believe the investigation began

5   after you resigned?

6   A.      I wasn't aware of any investigation prior to

7   departing Canal.  And I believe Tom Harvey's letter also

8   says that an investigation was initiated after I

9   resigned or after I left.

10  Q.      I understand what you're saying.  What was the

11  heightened scrutiny that you're talking about?

12  A.      I believe I had been subjected to -- to -- I

13  had never witnessed any employee departing and having

14  investigation in -- in like the way that they did with

15  me.  I was also -- it was an investigation that was -- I

16  was targeted, I was targeted for my protected activity.

17  There was -- the way -- the false allegations of Tom

18  Harvey's thing was --

19  Q.      I have no idea what you're talking about or

20  what you just said.  So can you just tell me what the

21  heightened scrutiny was?

22  A.      Looking into all my expenses, to having Canal

23  employees um, look through my expenses, it had never --

24  there had never been um, anything like this before.

25  Q.      Right.  Is there any document that indicates

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    how many vacation days you're supposed to get?

3    A.      As a general policy or in --

4    Q.      How do you know how many vacation days you're

5    supposed to get?

6    A.      I believe I was given that information when I

7    first um, became employed at Canal Productions and was

8    told that there was one additional day per year that you

9    had worked at Canal.

10   Q.      Alright.  And you're -- I think you testified

11   earlier that you never really had a vacation; is that

12   true?

13   A.      I never really got a vacation day, day off.

14   Q.      Okay.  So why do you think that you were

15   entitled to be paid for days that you never took?

16   A.      That vacation pay back was a policy at Canal

17   Productions prior to my employment.  And each year,

18   regarding my vacation pay, I would speak to Bob and go

19   over my travel, the days that I was away, the days that

20   I was working while I was away, the holidays in which I

21   worked, such as Labor Day or through Christmas and Bob

22   and I would discuss and he would approve of the days

23   prior to me sending them to Berdon and CCing him on

24   them.

25   Q.      So in other words, you wouldn't take any

Page 224

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    vacation, but then you would sit down with Bob and

3    discuss how many vacations days you had taken, is

4    that --

5    A.       I wouldn't -- let me clarify.  It's not

6    vacation days, it's working while away.  Vacation was a

7    misnomer because I was required to be available for Bob

8    and I worked while I was away.  I also worked on

9    holidays and that was a discussion and in consideration

10   of what Bob and I discussed when we discussed the

11   vacation pay each year.

12   Q.       Alright.  So it was really a discussion at the

13   end of the year about how much additional money you were

14   going to be paid; is that you're telling us?

15   A.       On what vacation time I didn't get and then in

16   addition, you know, what holidays that are holidays that

17   I worked through or times that the office were closed

18   that was a discussion between Bob and I.  Because I was

19   never able to take vacation because I was required to be

20   available for Bob while I was away.  So it wasn't

21   vacation days.  It was working while away, even though

22   the words can get -- can be interchanged at times, it

23   really -- it was working while away and that's what Bob

24   and I had agreed.

25   Q.       So if you wrote an e-mail to someone saying my

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2   vacation was fun, that was actually a misnomer because

3   you weren't on vacation, is that what you're saying?

4   A.      I couldn't take a hypothetical, I would need an

5   example of that, but --

6   Q.      Alright.  That's fine.  Let's talk about

7   Netflix now.  I know you're dying to tell us the story

8   here.

9           Canal had a Netflix account, didn't it?

10  A.      Yes.

11  Q.      You had access to it?

12  A.      Yes.

13  Q.      Kap had access to?

14  A.      Yes.

15  Q.      Do you know if anyone else had access to it?

16  A.      Yes.

17  Q.      Who else had access to it?

18  A.      Bob had access to it.  Anybody in the Canal

19  office when the password was listed in the contacts had

20  access to it.  Anybody who was able to log into the

21  Canal Productions computer had access to it.

22  Q.      Okay.  And you would use that account, wouldn't

23  you?

24  A.      At times, yes, I would.

25  Q.      Sometimes you would use it while you were on

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2      vacation -- I'm sorry, sometimes you would use it when

3      you were not in the office or your home office; isn't

4      that right?

5      A.      When I wasn't in my home office or my office,

6      so while I was working while away, is that what you're

7      asking?

8      Q.      Yes.

9      A.      I believe at time, yes.

10     Q.      And sometimes you would use it while you were

11     working; isn't that right?

12     A.      Very rarely would I have something playing in

13     the background.  Very, very, rarely.  There was only one

14     time that I can recall.

15     Q.      So you've seen because we produced the Netflix

16     viewing logs from the Canal account.

17             Have you had an opportunity to see them?

18     A.      Yes, but I think -- I don't recall like, all of

19     the information on them.

20     Q.      Just asking if you've seen them.  Yes?

21     A.      Yes.

22     Q.      Okay.  Did you spend long periods of time binge

23     watching certain shows on Netflix?

24     A.      No.

25     Q.      And do you have any idea who had access to

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Canal's account who might have been doing that?

3    A.      I don't know who would have been -- who would

4    binge watch on Canal Productions Netflix account.

5    Q.      Alright.  So when you're in the office -- and I

6    think you said you were in the office couple of times a

7    week in 2018 and 2019 -- did you ever see anybody

8    watching movies -- sorry, shows or movies in the office?

9    A.      2018 or 2019 is what you're asking?

10   Q.      Yes.

11   A.      Does that include Bob's children, his daughter

12   or --

13   Q.      Any -- I'm talking about a Canal employee,

14   let's limit it to that.

15   A.      Canal employee, um, Michael Kaplan used to have

16   a sports game playing in the background while he worked

17   on petty cash receipts.

18   Q.      On Netflix?

19   A.      Oh, specifically on Netflix --

20   Q.      Just talking about Netflix.  So since you were

21   coming into the office several times a week, I'm just

22   wondering if you ever observed other Canal -- any other

23   Canal employees watching shows on Netflix while you were

24   there?

25   A.      Not that I can recall.

1           GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.      Was there a policy -- did Canal have a policy

3    about when Ubers or taxis could be charged to the

4    company's account?

5    A.      Or -- just to clarify, or reimbursed?

6    Q.      Or reimbursed.

7    A.      Yes, there was a general policy in the office.

8    Q.      Okay.  Was that a written policy?

9    A.      I don't recall it being written.

10   Q.      Who administered the policy?

11   A.      Can you clarify administer.

12   Q.      Ensured that it was being followed.

13   A.      People who reviewed the Amex card or the petty

14   cash, Mike Tasch, people at Berdon, Bob himself who met

15   with Berdon about Canal expenses.

16   Q.      Who role, if any, did you have in administering

17   that policy?

18   A.      I reviewed Amex bills with Michael Kaplan.

19   Q.      Anything else?

20   A.      I had spoken -- I probably had spoken -- no, I

21   had spoken to Bob and gone over Amex bills with him at

22   times.  That's what I can recall at this moment.

23              MR. DROGIN:  Okay.  Can we go to RR.

24              (Whereupon, a document Bate Stamped

25              Robinson 00002100-01 was marked as Exhibit RR,

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2          for identification, as of this date.)

3    Q.    It's a two-page document you produced as

4    Robinson 2100 and 2101.  Do you see it?

5    A.    Yes, let me read it.

6                MR. DROGIN:  Why don't we go off the

7          record.  Because I don't want to run out of

8          time.  Let's go off the record, please.

9                THE VIDEOGRAPHER:  Okay.  We're off the

10         video record.  The time is 4:55 p.m.

11         (Whereupon, a discussion was held off the

12    record.)

13               THE VIDEOGRAPHER:  We are back on the

14         video record.  It is 4:57 p.m.

15   Q.    We're looking at Exhibit RR.  Is this a

16   document you prepared, Ms. Robinson?

17   A.    This is a document of my notes.

18   Q.    Is this a document that you prepared?

19   A.    It is a document that I typed up.

20   Q.    Alright.  And why did you type it up?

21   A.    They were notes and thoughts about office

22   protocols and I was always looking to sort of improve or

23   discuss with Bob items.  These were some of the points

24   of issues that were in the office and things that, you

25   know, either should be changed -- you know it's just --

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     it was a rolling list of my thoughts on things.

3     Q.      Were any of these every implemented?

4     A.      Michael Kaplan has always been in charge of

5     petty cash for one.

6     Q.      When you said he was in charge of petty cash,

7     you were actually managing the office, weren't you?

8     A.      At times managing the office, but I wasn't

9     managing petty cash.  That was Michael Kaplan since the

10    beginning of my employment he was always in charge of

11    petty cash and spoke to Berdon about petty cash --

12    Q.      My only question was whether you were managing

13    the office and you answered it.

14            Did you discuss any of these policies with Bob?

15    A.      Yes, at times we had -- Bob and I had many

16    conversations about office expenses and issues in the

17    office over the years.

18    Q.      He would discuss those office issues with you?

19    A.      It would be a combination --

20    Q.      It's a yes or no.

21    A.      I was one of the people, yes.  I would speak to

22    him about them.

23    Q.      And was this a depiction of how you wanted

24    things to function in the office?

25    A.      I think there were certain things on here that

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    I would have liked or I thought made logical sense.

3    Q.      And therefore, you could have brought them to

4    Bob's attention and see if he would support your

5    implementing them; is that right?

6    A.      Um, can you repeat your question.  Sorry, I

7    want to --

8    Q.      Sure.  This is things that you could have

9    spoken with Bob about to see if he would agree that you

10   implement them; isn't that right?

11   A.      It's correct that i would have to speak to Bob

12   to implement anything along the lines of this.  There

13   were many discussions I had with Bob about --

14   Q.      I'm not asking about that.  I'm just asking

15   you, isn't it true that you could have spoken with him

16   about these things to see whether or not he wanted you

17   to implement them, yes or no?

18   A.      I mean I could have spoken to him about this,

19   yes.

20   Q.      Alright.  Marianna Shafran is a publicist; is

21   that right?

22   A.      Uh, yes.  Or I believe so.

23   Q.      She previously worked with Stan Rosenfield?

24   A.      Yes.

25   Q.      Stan is Bob's long-time publicist?

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      Yes.

3    Q.      And you e-mailed her in June of 2019 about the

4    production company that you had started; is that right?

5    A.      Um, I -- I had e-mailed I --

6                    MR. DROGIN:  I'll help you.  Exhibit

7            SS.

8                    (Whereupon, a document Bate Stamped

9            Robinson 00005231 was marked as Exhibit SS, for

10           identification, as of this date.)

11                   THE WITNESS:  I had e-mailed her about

12           a bio.

13   Q.      Well, the last paragraph it says, "currently

14   Chase has started her own production company with the

15   objective of developing features and series that focus

16   on social interests, such as women's rights, inequality,

17   immigration and corruption.  Do you see that?

18   A.      Yes.

19   Q.      What production company had you started as of

20   June 13, 2019?

21   A.      I had Chase Robinson Productions.

22   Q.      And was that a legal entity or was it just a

23   doing business as name?

24   A.      It was an LLC.

25   Q.      When was the LLC formed?

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2    A.       Sometime in 2017.
 3    Q.       So during your employment with Canal, you
 4    formed a separate business entity; is that right?
 5    A.       I formed an LLC, it's something that I did
 6    discuss with Bob and he was aware of.
 7    Q.       I'm not suggesting otherwise.  I'm just looking
 8    to confirm the facts.
 9              Okay.  So in June of 2019 when you sent this
10    e-mail to Ms. Shafran, had you in fact begun doing any
11    work under your production company name?
12    A.       I had -- yes.
13    Q.       And since then in June of 2019, has your
14    production company generated any income?
15    A.       No.
16    Q.       Is it still in operation?
17    A.       The LLC is still open.
18    Q.       Are you currently attempting to work through
19    your LLC?
20    A.       No, not at this moment.
21    Q.       Now Marianna Shafran, is that someone you
22    vacationed with in the past?
23    A.       It's somebody I took trips with.
24    Q.       When you say trips, do you mean business trips
25    or non-business trips?
```

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.       Working while away.  For example, the Christmas

3    holiday when the office was closed for two weeks.

4    Q.       So when the office was closed for two weeks,

5    you would take a non-vacation with her?

6    A.       I would take a trip while I -- was working

7    while I was away and Marianna and I had taken a couple

8    of trips together.

9    Q.       During your employment with Canal?

10   A.       Some of them during my employment with Canal.

11   Q.       So the office was closed when?  At the end of

12   the year?

13   A.       Typically it was closed for two weeks, the two

14   last weeks of December.

15   Q.       And that -- and during that period of time when

16   the office closed, that would be your non-vacation

17   period, when you would be working?

18   A.       I would still be working as Bob wanted me to be

19   on call and available for him 24/7.  I still worked, but

20   I --

21   Q.       But you obviously -- you did have the

22   opportunity to go away at that time, right, during that

23   two-week period?

24   A.       Yes.

25   Q.       Did you go to Hawaii with Marianna Shafran?

1              GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      No.

3    Q.      Did you go to London with Marianna Shafran?

4    A.      I've been to London with Marianna.

5    Q.      How many times?

6    A.      During my employment with Canal?

7    Q.      Yes.

8    A.      I believe once or twice.

9    Q.      Were you a co-manager on Canal's Amex account?

10   A.      Co-manager?

11   Q.      Yes.

12   A.      Co account manager?  Yes.  For a small period.

13   Q.      Yes is fine.  Yes is fine.  Did you ever use

14   the Amex card, the Canal Amex card to pay for personal

15   expenses?

16   A.      Unless it was approved, I can't recall ever

17   using the card -- actually you know what, let me

18   clarify, I -- unless it was approved where it was a gift

19   from Bob or something like that, the Canal Amex would be

20   used.  But other than if it was a mistake, which we

21   already discussed in my last deposition, I would pay

22   back or reverse the charge, so no.

23   Q.      And in tracking this, would you in any way mark

24   or designate personal expenses in some way on the

25   receipts or on the invoices?

1                GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    A.      It was very rare.  There were only a small

3    handful and they were -- they were -- the charge was

4    reversed, either before it even hit the bill or right

5    after it did and it showed the charge being put back on

6    the credit card or I paid Canal for their mistake, which

7    would have been in record with Berdon.

8    Q.      And you're -- the deal at Canal was that if you

9    were in the office, the company would pay for lunch and

10   coffee; is that right?

11   A.      That is not correct.

12   Q.      What was the deal with meals in the office?

13   A.      The general policy at Canal was if you were

14   working, your meals were paid for, coffee and lunch.

15   Employees had about $10 for lunch, $20 -- I'm sorry, $10

16   for breakfast, $20 for lunch, 30 for dinner.  Whereas I

17   had spoken to Bob about having $20 for breakfast, $30

18   for lunch and $50 for dinner due to traveling and that I

19   had a title.  So he and I -- he approved of that.

20   Q.      So that was a perk that you had?

21   A.      I had a little extra of a perk there.  But

22   again, it was during working hours when I was working

23   and I often worked from before breakfast until way -- by

24   the time -- like, in going to bed, that's when I

25   stopped.

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     Q.      So is it fair to say then that you frequently

3     charged Canal up to $100 a day for meals?

4     A.      I wouldn't say that is necessarily correct.

5     Q.      But your allowance as you're telling us was

6     $100 a day, 20, 30 and 50; is that right?

7     A.      If I was working during those meals.  I wasn't

8     always working.  I didn't always charge Canal for things

9     and sometimes I didn't even eat.

10    Q.      Okay.  And would that also extend to groceries?

11    So if you didn't want to, let's say order in or pick up,

12    that you could go to, let's say, Dean and Deluca or

13    Whole Foods or something like that and just buy

14    groceries?

15    A.      I wouldn't characterize --

16    Q.      I'm not asking you to characterize it.  We're

17    talking about a meal reimbursement policy and what I'm

18    ask is, in leu of a meal, could you buy groceries at a

19    supermarket and bill it to Canal as a meal?

20    A.      Well, I mean you're referencing Dean and Deluca

21    and Whole Foods both have prepared food there.  There

22    wasn't any policy that you couldn't buy the contents of,

23    like a salad and make a salad.  At times, you know, I

24    picked up items for snack, like, fruit or something for

25    ████   I --

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    Q.     Okay.  So there are -- we've seen charges on

3    the Amex card for Dean and Deluca, Whole Foods, Paolas;

4    P-A-O-L-A-S.

5           Is it your testimony that these expenses were

6    all related to author -- meals that you were authorized

7    to charge to the company?

8    A.     Yes.

9    Q.     And is that -- is that policy memorialized in

10   any writing?

11   A.     I can't recall a specific -- a specific

12   document where it's written.

13   Q.     Alright.  And did um -- Canal had a policy

14   where employees could charge a gym membership; is that

15   right, a monthly amount?

16   A.     I wouldn't characterize it that way.  It --

17   Q.     That's okay.  Did you ever charge Pilates

18   classes on the company Amex card?

19   A.     No, I was given a gift --

20   Q.     No, is fine, dog's getting upset.  Did you ever

21   charge a dog sitter?

22   A.     No, I've never --

23                   MR. DROGIN:  Stop.

24   Q.     Keep going dry cleaning is next.  What about

25   dry cleaning?  Was that part of the deal where you could

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     charge dry cleaning on the company Amex card?

3     A.     I can't recall a time where I've ever charged

4     dry cleaning to a Canal card and I also cannot recall a

5     time where I charged dog sitting on the Canal Amex card.

6     If you referring to the petty cash, then I can answer

7     that question.

8     Q.     Let's limit it then to the petty cash.  You can

9     answer the question.

10    A.     Yes, Bob approved of me for a short period of

11    time charging dog sitting when I had to find his ████

12    apartment and my dog was dying of cancer.

13    Q.     When was that?

14    A.     Um, 2018.

15    Q.     I'm sorry.

16    A.     2018.

17               MR. DROGIN:  Alright.  Can we go to QQ

18          please.  Just about done here, we're almost out

19          of time.  Hey Britt, this particular page here

20          that you wanted me to reference, just to save

21          time, just point me to it?

22               MS. LAZZARO:  I mean it's just a

23          collection of over the years and a separate

24          breakdown for unused and used vacation days.

25          It's already marked and I over zealously tossed

```
 1              GRAHAM CHASE ROBINSON-CONFIDENTIAL
 2              it in the chat so --
 3                      MR. DROGIN:  Alright.  We'll just mark
 4              it as QQ as you've done.
 5                      (Whereupon, a document Bate Stamped
 6              Robinson 799 was marked as Exhibit QQ, for
 7              identification, as of this date.)
 8   Q.    So Ms. Robinson, take a look at QQ.  And really
 9   the only question is are these the e-mails that you sent
10   between 2011 and 2018 memorializing the number of
11   vacation days that you did or didn't use for a
12   particular year, that's my only question?
13   A.    Well, I'm looking.
14   Q.    Yeah.  I'm just asking for you to confirm that
15   those are the e-mails that you sent, just so we
16   understand how many vacation days you did or didn't take
17   according to your testimony?  Ready?
18   A.    I'm on 2016.  I'm almost done.
19                      MS. HARWIN:  And Counsel, I believe you
20              have five minutes left.
21                      MR. DROGIN:  We can go off the record
22              then if she wants.
23                      THE WITNESS:  I believe that these are
24              some of them.  I don't know if it's all of
25              them.
```

```
 1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

 2    Q.      Okay.  In March of 2018, you took a trip to

 3    California and you met with Amelia Brain; is that right?

 4    A.      It wasn't the purpose of the trip, but yes, I

 5    met at the time with Amelia Brain.

 6    Q.      Okay.  You rented a car?

 7    A.      Yes, I had a car rental.

 8    Q.      Okay.  And you took Ubers --

 9                 MS. HARWIN:  And Counsel, I believe

10            you're out of time at this point.  The

11            videographer can confirm.

12                 MR. DROGIN:  Alright.  I'd ask for a

13            three-minute grace period.  What do you think?

14                 MS. HARWIN:  We'll give you a

15            one-minute grace period.

16                 MR. DROGIN:  Two.  How about two?

17                 MS. HARWIN:  We'll give you 90 seconds.

18    Q.      What was the purpose of that trip?

19    A.      The primary purpose of that trip was going to

20    look at hotels for Bob -- sorry for Toukie Smith for the

21    possibility of her ████████████████████████

22    Q.      Right.  Now Toukie Smith stayed in the J.W.

23    Marriot in Santa Monica, didn't she?  I mean that was

24    her hotel of choice?

25    A.      It was like low mark -- like I can't recall
```

1            GRAHAM CHASE ROBINSON-CONFIDENTIAL

2    what the hotel was, but there was hotel that Bob and I

3    discussed when I was in LA that that was really the only

4    place that she would stay --

5    Q.    I'm not asking about that.  Isn't it true that

6    that hotel had already been booked for Toukie Smith two

7    days before you left for California?

8    A.    I don't recall when it was put on hold, but I

9    did put it on hold just in case that that was the place

10   that she might stay.

11   Q.    And while you were there with Amelia, you took

12   her and some friends to Nobu for lunch; is that right?

13   A.    For lunch, no.

14   Q.    Dinner?

15   A.    We had dinner at Nobu.

16   Q.    With her and some of her friends?

17   A.    I believe it was one or two friends.

18              MS. HARWIN:  Okay.  Counsel we're past

19         time.

20   Q.    Was it her birthday?

21              MS. HARWIN:  Counsel, we're past time.

22              MR. DROGIN:  One more question, one

23         more question.  Last question.

24   Q.    During that trip, you stayed at the Montage in

25   Beverly Hills; isn't that right?

Page 243

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2     A.      Yes.

3                    MR. DROGIN:  Okay.  Your Counsel says

4          I'm done.  Alright.  So we will review the

5          transcript, and if there's any reason that we

6          feel we need more time, we'll meet and confer

7          with you and we'll work it out from there.  I'm

8          not suggesting that there is, I'm just

9          documenting it.

10                   MR. BENNETT:  Just to fill in the

11         record Ally, on that one recording, 7174, it

12         ended -- it went from one minute, 18 seconds --

13         excuse me, one hour, 18 minutes 25 seconds to

14         one hour 19 minutes 25 seconds.  Brooke, if you

15         have any questions about that, which exhibit it

16         is, just let me know and I'll clarify it.

17                   MS. HARWIN:  Well, Counsel none of the

18         recordings that were used were labeled as

19         exhibits.  So all of those need to be -- you

20         know the excerpts need to be provided, you

21         know, so that they are included with the

22         deposition transcript.

23                   I would note that plaintiff reserves

24         the right to review and provide corrections to

25         her deposition transcript pursuant to rule 30 E

Page 244

1          GRAHAM CHASE ROBINSON-CONFIDENTIAL

2              and I'd also note to everyone that pursuant to

3              the confidentiality order in this case, that

4              the deposition shall be treated as confidential

5              for a period of 30 days so that plaintiff may

6              provide that confidentiality designation.  And

7              I believe with that we can close for today.

8                      THE VIDEOGRAPHER:  Okay.  We're going

9              off the video record.  The time is 5:19 p.m.

10             and that concludes our deposition.

11                     (Time Noted:  5:19 p.m.)

12

13                                 GRAHAM CHASE ROBINSON

14

15     Subscribed and sworn to before me

16     this      day of           2022.

17

18

19          Notary Public

20

21

22

23

24

25

Page 245

```
 1                          INDEX
 2
 3   WITNESS               EXAMINATION BY              PAGE
 4   Graham Chase          Laurent Drogin             5
 5   Robinson
 6
 7                         EXHIBITS
 8   DEFENDANT'S           DESCRIPTION                PAGE
     E                     Court's Decision Dated 1/26/22   7
 9
     F                     Robinson 16396 and 16397   12
10
     G                     Bates Numbered Robinson 00003284   22
11
     H                     Bates Number Canal 0045968-69   24
12
     I                     Bate Stamp Number Robinson   27
13                         00002607
     J                     Complaint                  29
14
     K                     Bate Stamped Robinson 00002608   55
15
     L                     Bate Stampcanal 23017-20   58
16
     M                     Bate Stamp Robinson 00002141-42   61
17
     N                     Bate Stamp Robinson 00004642   63
18
     P                     Bate Stamp Robinson 00005160   73
19
     Q                     Bate Stamp  Canal 2793-99   76
20
     R                     Bate Stamp Canal 36322-23   76
21
     S                     Bate Stamped Canal 44293-94   77
22
     T                     Bate Stamp Canal 45967-69   84
23
     U                     Bate Stamp Robinson 00004504   94
24
     V                     Bate Stamp Canal 46029-30   97
25
```

W                     Bate Stamp Robinson 00000008   102

Page 246

| | | | |
|---|---|---|---|
| X | Bate Stamp Robinson 00004642 | 114 |
| Y | Bate Stamp Robinson 00004648 | 117 |
| Z | Bate Stamp Robinson 00005155 | 119 |
| AA | Bate Stamp Robinson 00001602 | 133 |
| BB | Bate Stamp Robinson 00007976 | 146 |
| CC | Bate Stamp Robinson 00001347-49 | 153 |
| TT | Bate Stamp Robinson 8921 | 157 |
| DD | Bate Stamp Canal 34641-4 | 160 |
| EE | Bate Stamp Robinson 6484 | 163 |
| FF | Bate Stamp Robinson 1641 | 164 |
| GG | Bate Stamp Robinson 1383 | 169 |
| HH | Bate Stamp Canal 44560 | 177 |
| II | Bate Stamp Robinson 1667 | 182 |
| JJ | Bate Stamp Robinson 1655 | 183 |
| KK | Bate Stamp Robinson 4874 | 184 |
| LL | Bate Stamp Robinson 00005128 | 193 |
| MM | Bate Stamp Canal 49267-71 | 194 |
| NN | Bate Stamp Robinson 1669 | 194 |
| OO | Pagano E-Mails | 214 |
| PP | Th Communications With Da | 219 |
| QQ | Bate Stamp Robinson 799 | 240 |
| RR | Bate Stamp Robinson 00002100-01 | 228 |
| SS | Bate Stamp Robinson 00005231 | 232 |

Page 247

1

2                                    INSERTS

3   INDEX TEXT                                                    PAGE

    HIS HOME ADDRESS                                                8

4   HIS CELL PHONE NUMBER                                          9

    WHAT, IF ANYTHING, DID YOU LEARN ABOUT HIS DUTIES THAT        21

5   YOU DIDN'T KNOW BEFORE THE DEPOSITION

    WHAT FALSE STATEMENTS                                        217

6

7         (Exhibits retained by Counsel.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 248

```
 1                 C E R T I F I C A T E

 2           I, BROOKE E. PERRY, hereby certify that the

 3      Examination Before Trial of GRAHAM CHASE ROBINSON was

 4      held before me on the 9th day of February, 2022; that

 5      said witness was duly sworn before the commencement of

 6      her testimony; that the testimony was taken

 7      stenographically by myself and then transcribed by

 8      myself; that the party was represented by counsel as

 9      appears herein;                    That the within

10      transcript is a true record of the Examination Before

11      Trial of said witness;

12           That I am not connected by blood or marriage

13      with any of the parties; that I am not interested

14      directly or indirectly in the outcome of this matter;

15      that I am not in the employ of any of the counsel.

16           IN WITNESS WHEREOF, I have hereunto set my

17      hand this 9th day of February, 2022.

18

19                    Brooke E. Perry

20                    BROOKE E. PERRY

21

22

23

24

25
```

Page 249

1                           ERRATA SHEET

2        CASE NAME:  GRAHAM CHASE ROBINSON  v. ROBERT DE NIRO

3        AND CANAL PRODUCTIONS, INC.,

4        DATE OF DEPOSITION:  February 9, 2022

5        WITNESS'S NAME:    GRAHAM CHASE ROBINSON

6        PAGE   LINE (S)    CHANGE          REASON

7        ____|_____|_____|_____

8        ____|_____|_____|_____

9        ____|_____|_____|_____

10       ____|_____|_____|_____

11       ____|_____|_____|_____

12       ____|_____|_____|_____

13       ____|_____|_____|_____

14       ____|_____|_____|_____

15       ____|_____|_____|_____

16       ____|_____|_____|_____

17       ____|_____|_____|_____

18

19

20                                      GRAHAM CHASE ROBINSON

21       SUBSCRIBED AND SWORN TO BEFORE ME

22       THIS ____ DAY OF _____, 20__.

23       _____      _____

24       (NOTARY PUBLIC)      MY COMMISSION EXPIRES:

25