UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

GRAHAM CHASE ROBINSON

                  Plaintiff,

      -against-

             Case No. 1:19-cv-09156(LJL)(KHP)

ROBERT DE NIRO AND CANAL PRODUCTIONS, INC.,

                  Defendants.

----------------------------------------x

        EXAMINATION BEFORE TRIAL of DANIEL HARVEY,
taken by the Plaintiff, pursuant to Notice, held via
REMOTE PROCEEDINGS, on January 5, 2022, at 1:03 p.m.,
before a Notary Public of the State of New York.

      *********************************************



```
 1   A P P E A R A N C E S:
 2     SANFORD HEISLER SHARP, LLP
                 Attorneys for Plaintiff
 3               1350 Avenue of the Americas, 31st Floor
                 New York, New York 10019
 4
       BY:     ANNIE SLOAN, ESQ.
 5             JEREMY HEISLER, ESQ.
               ALEXANDRA HARWIN, ESQ.
 6             KATE MACMULLIN, ESQ.
               SIMON SCHAITKIN
 7
 8
       TRAUB, LIEBERMAN, STRAUS & SHREWSBERRY LLP
 9             Attorneys for Defendants
               ROBERT DE NIRO & CANAL PRODUCTIONS, INC.
10             Seven Skyline Drive
               Hawthorne, New York 10532
11
       BY:     GREGORY R. BENNETT, ESQ.
12
13
14     TARTER KRINSKY & DROGIN LLP
               Attorneys for Defendant
15             CANAL PRODUCTIONS, INC.
               1350 Broadway
16             New York, New York 10018
17     BY:     LAURENT S. DROGIN, ESQ.
               BRITTANY K. LAZZARO, ESQ.
18
19
20
       ALSO PRESENT:
21
       ROBIN SKIDMORE-Videographer
22                     Magna Legal Services
23     THOMAS HARVEY, ESQ.-for Robert De Niro
24     GRAHAM CHASE ROBINSON-Plaintiff
25
```



```
 1              S T I P U L A T I O N S:
 2    IT IS STIPULATED AND AGREED by and between the attorneys
      for the respective parties herein, and in compliance
 3    with Rule 221 of the Uniform Rules for the Trial Courts:
 4    THAT the parties recognize the provision of Rule 3115
      subdivisions (b), (c) and/or (d).  All objections made
 5    at a deposition shall be noted by the officer before
      whom the deposition is taken, and the answer shall be
 6    given and the deposition shall proceed subject to the
      objections and to the right of a person to apply for
 7    appropriate relief pursuant to Article 31 of the CPLR;
 8    THAT every objection raised during a deposition shall be
      stated succinctly and framed so as not to suggest an
 9    answer to the deponent and, at the request of the
      questioning attorney, shall include a clear statement as
10    to any defect in form or other basis of error or
      irregularity. Except to the extent permitted by CPLR
11    Rule 3115 or by this rule, during the course of the
      examination persons in attendance shall not make
12    statements or comments that interfere with the
      questioning.
13
      THAT a deponent shall answer all questions at a
14    deposition, except (i) to preserve a privilege or right
      of confidentiality, (ii) to enforce a limitation set
15    forth in an order of a court, or (iii) when the question
      is plainly improper and would, if answered, cause
16    significant prejudice to any person. An attorney shall
      not direct a deponent not to answer except as provided
17    in CPLR Rule 3115 or this subdivision. Any refusal to
      answer or direction not to answer shall be accompanied
18    by a succinct and clear statement on the basis
      therefore. If the deponent does not answer a question,
19    the examining party shall have the right to complete the
      remainder of the deposition.
20
      THAT an attorney shall not interrupt the deposition for
21    the purpose of communicating
22    with the deponent unless all parties consent or the
      communication is made for the purpose of determining
23    whether the question should not be answered on the
      grounds set forth in Section
24    221.2 of these rules, and, in such event, the reason for
      the communication shall be stated for the record
25    succinctly and clearly.
```



Page 4

1   THAT the failure to object to any question or to move to
    strike any testimony at this examination shall not be a
2   bar or waiver to make such objection or motion at the
    time of the trial of this action, and is hereby
3   reserved; and
4   THAT this examination may be signed and sworn to by the
    witness examined herein before any Notary Public, but
5   the failure to do so or to return the original of the
    examination to the attorney on whose behalf the
6   examination is taken, shall not be deemed a waiver of
    the rights provided by Rule 3116 and 3117 of the CPLR,
7   and shall be controlled thereby; and
8   THAT the certification and filing of the original of
    this examination are hereby waived; and
9
    THAT the questioning attorney shall provide counsel for
10  the witness examined herein with a copy of this
    examination at no charge.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 5

```
 1                    DANIEL HARVEY
 2               MS. SLOAN:  Thank you for being here
 3          today for your deposition.  Just before we
 4          begin, I'm going to explain to you some of the
 5          ground rules for your deposition.
 6               THE VIDEOGRAPHER:  Excuse me, just a
 7          second.
 8               MS. SLOAN:  Okay.  I thought we were on
 9          the record.
10               THE VIDEOGRAPHER:  We are on the
11          record.  There's just a little bit of
12          information that I have to just read through
13          and then you guys can get started, if that's
14          okay.
15               MS. SLOAN:  Thank you, Robin.
16               THE VIDEOGRAPHER:  No problem.  We are
17          now on record, and this begins videotape number
18          one in the deposition of Dan Harvey in the
19          matter of Graham Chase Robinson versus Robert
20          De Niro and Canal Productions.  Today is
21          Wednesday January 5, 2022, and the time is 1:03
22          p.m. eastern standard time.  This deposition is
23          being taken at a remote location at the request
24          of Sanford Heisler Sharp.  The videographer is
25          Robin Skidmore of Magna Legal Services.  The
```



Page 6

1                    DANIEL HARVEY

2          court reporter is Brooke Perry of Magna Legal

3          Services.  Will counsel and all parties present

4          state their appearances and whom they

5          represent.

6                    MS. SLOAN:  This is Annie Sloan from

7          Sanford Heisler Sharp on behalf of the

8          Plaintiff.

9                    MS. HARWIN:  This is Alexandra Harwin

10         from Sanford Heisler Sharp on behalf of the

11         Plaintiff.

12                   MR. HEISLER:  Jeremy Heisler on behalf

13         of Sanford Heisler Sharp for the Plaintiff.

14                   MS. MACMULLIN:  Kate MacMullin from

15         Sanford Heisler Sharp on behalf of the

16         Plaintiff.

17                   MR. SCHAITKIN:  Simon Schaitkin from

18         Sanford Heisler Sharp on behalf of the

19         Plaintiff.

20                   MR. BENNETT:  Gregory Bennett on behalf

21         of all Defendants.  Traub Lieberman Straus and

22         Shrewsberry.

23                   MR. DROGIN:  And on behalf of Canal

24         Productions, Laurent Drogin from Tarter Krinsky

25         and Drogin.



Page 7

```
 1                    DANIEL HARVEY
 2               MS. LAZZARO:  Also on behalf of Canal
 3          Productions, Brittany Lazzaro from Tarter
 4          Krinsky and Drogin.
 5               THE VIDEOGRAPHER:  Okay.  Will the
 6          court reporter please swear in the witness.
 7   D A N I E L   H A R V E Y,  the witness herein, having
 8   been first duly sworn by a Notary Public of the State of
 9   New York, was examined and testified as follows:
10   EXAMINATION BY
11   MS. SLOAN:
12   Q.    State your name for the record, please.
13   A.    Daniel Joseph Harvey.
14   Q.    Please state your address again for the record.
15   A.    ████████████████████████████████████
16   ████ ██████████████████████.
17               MR. DROGIN:  Can I just ask that Ms.
18          MacMullin, Ms. Robinson, Mr. Heisler and Mr.
19          Schaitkin turn on their video?
20               MS. SLOAN:  Did you say turn on their
21          video?
22               MR. DROGIN:  On their video, yes, I
23          did.
24               MS. SLOAN:  I would prefer for the
25          folks who are not speaking to have their camera
```



Page 8

```
 1                      DANIEL HARVEY
 2           off as well.
 3                      MR. DROGIN:  Well, paragraph 4 of the
 4           order in this case, says each person attending
 5           the deposition shall be visible to all other
 6           participants.  Their statements shall be
 7           audible to all participants and they should
 8           each strive to ensure their environment is free
 9           from noise and distractions.  So if you're not
10           going to show your face, then you need to
11           leave.
12                      MS. SLOAN:  Okay.  In that case,
13           individuals can put on their cameras.
14                      MR. DROGIN:  Or leave.
15   Q.      Okay.  Thank you for being here today for your
16   deposition.  And just before we begin, I'm going to
17   explain to you some of the ground rules.  I will ask you
18   questions and both my questions and your answers will be
19   recorded by the court reporter.  Both of us need to
20   speak up and speak clearly and slowly so that the court
21   reporter can record everything.  Do you understand that?
22   A.      Yes.
23                      MR. DROGIN:  Objection to the form.
24           Compound.
25   Q.      If you don't understand my question for any
```



Page 9

1                         DANIEL HARVEY

2   reason, don't answer it and ask for clarification.  If

3   you answer the question, however, we will assume that

4   you understood the question.  Do you understand that?

5   A.      I do.

6   Q.      And you must answer verbally, because the court

7   reporter cannot record a nod or shake of the head.  Do

8   you understand that?

9   A.      Yes.

10  Q.      And please wait until I finish my question

11  before you start answering.  If you need a break at any

12  time or for any reason, you should tell me and we will

13  finish your answer if you're in the middle of it and

14  then take a break.  The only time you can't take a break

15  is if a question is pending.  Do you understand that?

16  A.      Yes.

17  Q.      Your attorney will object from time to time,

18  but unless he instructs you not to answer, you must

19  answer the question.  Do you understand that?

20  A.      Yes.

21                  MR. DROGIN:  Objection to the

22          characterization that we'll be objecting from

23          time to time.

24  Q.      If you answer a question and later on you

25  remember some additional information or you'd like to



```
                         DANIEL HARVEY
 1
 2   clarify an earlier response, please tell me that you
 3   would like to add something to an earlier answer and I
 4   will give you the opportunity to do that.  Do you
 5   understand that?
 6   A.     Yes.
 7   Q.     If I use a term or abbreviation incorrectly,
 8   please correct my usage so that we can make sure that we
 9   all have the same understanding of what the record
10   means.  Do you understand that?
11                 MR. DROGIN:  Objection to the form.
12         You can answer.
13   A.     Yes.
14   Q.     When I refer to Canal, I'm referring to Canal
15   Productions.  If you are unsure about what I mean by any
16   term, please let me know.  Is there any instruction I
17   provided that you do not understand or do not agree
18   with?
19                 MR. DROGIN:  Objection to the form.
20         Compound.
21   A.     No.
22   Q.     This testimony is under oath, just as if you
23   were in a court of law.  This testimony may be used as
24   evidence in this case.  Do you understand that?
25   A.     Yes.
```



                          DANIEL HARVEY

1

2  Q.     Do you have any electronic screens or

3  communication devices with you in the room that you're

4  in right now?

5  A.     My iPhone.

6  Q.     Okay.  I'd like to ask to make sure that all

7  devices with you, including your iPhone, that you're not

8  using them during the deposition; is that okay?

9              MR. DROGIN:  Objection.  I think he's

10             on his iPhone.  How can he be deposed if he's

11             not using it?

12             MS. SLOAN:  Okay.  Let me clarify.

13  Q.     Are you using your iPhone as a video to take

14  this -- for this deposition?

15  A.     No.  I'm on a laptop.

16  Q.     Okay.  So then I will go back and say that it's

17  important that all devices are off and that you're not

18  using them during the deposition other than the laptop

19  that you're using the video for; is that okay?

20  A.     Yes.

21  Q.     Is your iPhone off right now?

22  A.     It is on silent.

23  Q.     Could you please turn your iPhone off?

24  A.     Sure.  It is off.

25  Q.     Okay.  Thank you.  And are there any other



1                    DANIEL HARVEY

2   electronic devices besides the laptop that you're using

3   and the iPhone that you just turned off in the room with

4   you?

5   A.      No.

6   Q.      Is there anyone in the room with you today?

7   A.      No.

8   Q.      Do you understand your obligation to provide

9   testimony that is truthful and complete?

10  A.      Yes.

11  Q.      Do you consider yourself an honest person?

12  A.      Yes.

13  Q.      Do you consider it important to tell the truth?

14  A.      Yes.

15  Q.      Do you consider it important to tell the truth

16  even though you might suffer adverse consequences as a

17  result?

18  A.      Yes.

19  Q.      What is your date of birth?

20  A.      ███████████████

21  Q.      How long have you resided at your current home

22  address?

23  A.      Since May 2021.

24  Q.      Where was your residence prior to May 2021?

25  A.      It was Calabasas, California.


MAGNA ▶
LEGAL SERVICES

1                        DANIEL HARVEY

2     Q.      And what was the address?

3     A.      You know what, I don't remember.  It was █████
       █ ████████████████████████████████████ I was only
5     there for a few months.  I can't remember that.

6     Q.      And where were you prior to that address?

7     A.      I was at ████████████████████████████
       █ ██████████████

9     Q.      How long did you leave at █████████████████
       █ █████████████████████████

11    A.      Since, approximately December of 2007.  Since

12    December 2007, approximately.

13    Q.      And what was the reason for your most recent

14    move?

15    A.      I sold my home, my house.

16    Q.      Why did you sell your house?

17    A.      To be closer to my son's school.

18    Q.      Do you suffer from any condition that affects

19    your memory?

20    A.      Not that I know of.

21    Q.      Have you consumed any substances that affect

22    your memory or ability to communicate today?

23    A.      No.

24    Q.      Is there any reason physically or mentally that

25    you're not able to testify today truthfully and



```
 1                    DANIEL HARVEY
 2   completely?
 3   A.     No.
 4   Q.     Have you been married?
 5   A.     Yes.
 6   Q.     When were you married?
 7               MR. DROGIN:  Objection.  Relevance.
 8   Q.     You can answer.  When were you married?
 9   A.     June of 2004.
10   Q.     To whom were you married?
11               MR. DROGIN:  Objection.  Relevance.
12   Q.     You can answer.  To whom were you married?
13   A.     Meredith Harvey.
14   Q.     Are you still married to Meredith Harvey?
15               MR. DROGIN:  Objection.  Relevance.
16   A.     Yes.
17   Q.     Have you had any children?
18               MR. DROGIN:  Objection to the form and
19          to the relevance.  If you have, we'd like to
20          alert the media.
21   Q.     Have you had any children?
22   A.     Yes.
23   Q.     How many children have you had?
24               MR. DROGIN:  Objection to the form and
25          the relevance.
```



Page 15

1                        DANIEL HARVEY

2    Q.      How many children have you had?

3                        MR. DROGIN:  Same objection.

4    A.      Two.

5    Q.      I'm sorry, I didn't hear that.

6    A.      Two.

7    Q.      What are their names?

8                        MR. DROGIN:  Objection.  I'm going to

9            direct the witness not to answer at this time.

10                       MS. SLOAN:  Why?  For what reason,

11           Counselor?

12                       MR. DROGIN:  This is a question that is

13           entirely irrelevant and it's designed to

14           harass, intimidate or embarrass the witness.

15           It has absolutely nothing to do with the case.

16           If you'd like to explain to me why it does, I'm

17           happy to listen.

18                       MS. SLOAN:  It's an inappropriate

19           direction, Counselor, and I'm going to repeat

20           the question.

21                       MR. DROGIN:  You can repeat it.  I'm

22           just going to give the same direction and we

23           can ask the Judge if she thinks it's

24           appropriate to ask this witness about his

25           children.



```
 1                 DANIEL HARVEY
 2            MS. SLOAN:  We are entitled to ask
 3       background information to the witness.
 4            MR. DROGIN:  Background information is
 5       one thing.  Information about his children is
 6       another.  It's too far into the background.  If
 7       you want to check with the Judge, that's fine.
 8            MS. SLOAN:  Counselor, you're impeding
 9       the deposition at this time.  I'm going to ask
10       the question again.
11            MR. DROGIN:  I disagree with the
12       statement.  You can ask it 15 times.  I think
13       let's call the Judge and let's find out right
14       now if the Judge thinks it's appropriate to ask
15       Mr. Harvey -- we all know why Mr. Harvey is
16       here.  You want to know about his wife, you
17       want to know about his children, that's not
18       what this case is about.
19            MS. SLOAN:  Counselor, you're impeding
20       the deposition.
21            MR. DROGIN:  You've said that.  We're
22       going in circles.  We're either going to call
23       the Judge or you're going to move on.  You can
24       mark it for a ruling too.  That's fine.
25            MS. SLOAN:  Let the record reflect that
```



Page 17

                              DANIEL HARVEY

1

2         we have been prevented from receiving an answer

3         to the question, and I'm going to move on with

4         the next question.

5              MR. DROGIN:  The record is well

6         preserved.

7    Q.   What year was your first child born?

8              MR. DROGIN:  Objection.  Same objection

9         and same direction.  Can you make a

10        representation as to what the relevance is to

11        this case, because I'm getting ready to end the

12        deposition and then we can go to the Judge and

13        you can explain it to her.  This is absurd.

14             MS. SLOAN:  Okay.  Let the record

15        reflect that the witness has been directed not

16        to answer the question again.

17             MR. DROGIN:  You have it by the court

18        reporter and you have it by video.  You don't

19        need to let the record reflect.

20             MS. SLOAN:  Counselor, don't make

21        speaking objections.

22             MR. DROGIN:  It's not an objection.

23        It's not a speaking objection.  I'm correcting

24        the record that you're trying to establish

25        because it's already there.  If you'd like to



```
 1                     DANIEL HARVEY
 2          mark it for a ruling --
 3                     MS. SLOAN:  Okay.  Counselor, you're
 4          impeding the deposition.  So I'm going to move
 5          on.
 6   Q.     What year was your second child born?
 7                     MR. DROGIN:  Same objection and same
 8          direction.  If you're not prepared to explain
 9          to me the relevance, I'm going to stand by my
10          objection.
11                     MS. SLOAN:  Mr. Drogin, I'm entitled to
12          receive background information and I'm going to
13          move on to the next question.
14                     MR. DROGIN:  But I disagree.  I
15          disagree that this is relevant background
16          information.
17                     MS. SLOAN:  Well, this is an
18          inappropriate time to have a debate.
19                     MR. DROGIN:  I'll be sure to ask Ms.
20          Robinson all about her mother and her father.
21                     MS. SLOAN:  Counselor, I'm going to
22          move onto the next question.
23                     MR. DROGIN:  Thank you.
24   Q.     What does your wife do professionally?
25   A.     Currently?  Give me a timeframe.
```



```
 1                    DANIEL HARVEY
 2   Q.      What does your wife do professionally
 3   currently?
 4   A.      She's a housewife and mother.
 5   Q.      And for how long has your wife not worked?
 6               MR. DROGIN:  Objection to the form.
 7           And objection, mischaracterizes the witness's
 8           testimony.
 9   Q.      You can answer the question.
10   A.      She's a housewife.
11   Q.      How long has she been a housewife?
12   A.      17 years.
13   Q.      Besides working as a mother and housewife, has
14   your wife done -- in the past 17 years, has she done
15   anything else professionally?
16   A.      Yes.
17   Q.      What has your wife done professionally?
18   A.      Visual merchandise director.
19   Q.      Can you repeat that?  What's the first word
20   that you said?
21   A.      Visual.
22   Q.      And what years was your wife a visual
23   merchandise director?
24   A.      Since I met her, from 200 -- let me see.  For
25   as long as I've known her until approximately --
```



Page 20

```
 1                   DANIEL HARVEY
 2   Q.     To the best of your recollection.
 3   A.     2008, '10, something like that.  I don't know.
 4   Q.     Okay.  Thank you.  During your employment at
 5   Canal, have you been the primary earner for your family?
 6   A.     Yes.
 7   Q.     Have you ever been a party to any kind of
 8   lawsuit, whether it involved a court arbitration or
 9   administrative proceeding?
10   A.     Yes.
11   Q.     Were you the plaintiff in that -- were you a
12   plaintiff?
13               MR. DROGIN:  Objection to the form.  Go
14          ahead and answer.  It's a yes or no question,
15          if you can answer.
16   A.     Yes.
17   Q.     What was the nature of that lawsuit?
18   A.     It was a ███████████████████.
19   Q.     What were the names of the parties involved in
20   the lawsuit?
21               MR. DROGIN:  Objection to the form.
22          You can answer.
23   A.     ███████████████████████████████.
24   Q.     How was the lawsuit resolved?
25               MR. DROGIN:  Objection to the form.
```



```
 1                        DANIEL HARVEY
 2             You can answer.
 3   A.        What was the question again?  Repeat, please.
 4   Q.        How was the lawsuit resolved?
 5   A.        With a decision by the Court.
 6   Q.        And where did that legal proceeding take place?
 7   A.        ████████████████████████
 8   Q.        And what was the decision by the Court?
 9   A.        The decision was that ████████████████████
10   ██  ████████████████████████████.
11   Q.        And during that lawsuit, did you testify under
12   oath?
13   A.        I did.
14   Q.        Did you testify during a trial?
15             MR. DROGIN:  Objection to the form.
16             There's been no testimony that there was a
17             trial.
18   Q.        My question was did you testify during a trial?
19             MR. DROGIN:  A trial or the trial?
20             MS. SLOAN:  Let me rephrase the
21             question.
22   Q.        Did you testify during a trial during that
23   lawsuit?
24             MR. DROGIN:  Objection to form.  The
25             witness has not been asked if there was a
```



Page 22

```
 1                    DANIEL HARVEY

 2          trial.  You're assuming facts not in evidence.

 3                    MS. SLOAN:  If the witness understands

 4          the question, the witness can answer.

 5                    MR. DROGIN:  The lawyer doesn't

 6          understand the question.  You're assuming facts

 7          not in evidence.  I can't adequately represent

 8          him if I --

 9                    MS. SLOAN:  Counselor, I understand

10          your objection.

11   Q.     Was there a trial during the lawsuit that you

12   had?

13   A.     Yes.

14   Q.     Did you testify during the trial?

15   A.     Yes.

16   Q.     Did you testify at any other point during that

17   lawsuit?

18   A.     I don't understand the question.

19   Q.     Did you testify during deposition in that

20   lawsuit?

21   A.     I did.

22   Q.     Do you recall the date of the trial?

23                    MR. DROGIN:  It's a yes or no question.

24   A.     Repeat the question, please.

25                    MR. DROGIN:  Do you recall the date of
```



```
 1                        DANIEL HARVEY
 2              the trial?
 3                   THE WITNESS:  I do not.
 4   Q.      Do you recall the general year of the trial?
 5                   MR. DROGIN:  It's a yes or no question.
 6   A.      No.
 7   Q.      Okay.  Is there a general timeframe that you
 8   could recall when the trial occurred?
 9   A.      Maybe ████████  █████
10   Q.      Okay.  Thank you.  Besides that lawsuit, have
11   you been a party to any other kind of lawsuit?
12   A.      No.
13   Q.      Have you been a witness to any other kind of
14   lawsuit?
15   A.      No.
16   Q.      Okay.  One more question about the testimony
17   that you provided at trial.  During that testimony, did
18   you discuss your role at Canal?
19   A.      I don't recall.
20   Q.      During the deposition of that lawsuit, did you
21   discuss your role at Canal?
22                   MR. DROGIN:  Objection to the form.
23              Assumes a fact not in evidence.  I believe you
24              know Canal was formed in 2001.  So if we're
25              talking about 1996 to 1997, which was the
```



```
 1                      DANIEL HARVEY
 2           witness's guess, I'm going to object.
 3  Q.      During the deposition or the trial in that
 4  lawsuit, did you discuss -- did you testify about your
 5  role working for Mr. De Niro or your role working for
 6  Canal?
 7                      MR. DROGIN:  Objection to the form.
 8           It's compound.
 9  Q.      You can answer.
10  A.      I can't remember.
11  Q.      Besides those -- the two testimonies that you
12  just described, have you ever testified under oath?
13  A.      I don't think so, no.  That's it.
14  Q.      Have you ever provided a sworn statement,
15  declaration or affidavit relating to any lawsuit,
16  whether it involved a court, arbitration or
17  administrative proceeding?
18                      MR. DROGIN:  Objection to the form of
19           all nine compound questions.  So it's
20           certification, declaration, affidavit in any
21           one of those three different types of
22           proceedings?  Nine different combinations.
23                      MS. SLOAN:  Okay, Counselor, please
24           stop interrupting.
25                      MR. DROGIN:  I'll just object to the
```



Page 25

                           DANIEL HARVEY

1

2           form.  It's a yes or no question.

3    Q.     Mr. Harvey, if Mr. Drogin objects to the form,

4    you should still respond to my question.

5                      MR. DROGIN:  That is correct.

6    A.     Please repeat the question.

7    Q.     Yes.  Have you ever provided a sworn statement,

8    declaration or affidavit relating to any lawsuit,

9    whether it involved a court, arbitration or

10   administrative proceeding?

11                     MR. DROGIN:  Objection to the form.

12   A.     No.

13   Q.     Have you ever provided any testimony or any

14   sworn statement in a case involving Canal Productions?

15   A.     No.

16   Q.     Have you ever provided any testimony or any

17   sworn statement in a case involving Mr. De Niro?

18   A.     No.

19   Q.     Have you provided any sworn statement,

20   declaration or affidavit relating to the lawsuit brought

21   by Graham Chase Robinson or the counterclaims against

22   her?

23                     MR. DROGIN:  Objection to the form.

24          You can answer.

25   A.     No.



1                    DANIEL HARVEY

2    Q.      Have you ever been convicted of a criminal

3    offense?

4    A.      No.

5    Q.      Have you ever been charged or arrested in

6    connection with a criminal offense?

7                    MR. DROGIN:  Objection.  I'm going to

8          direct the witness not to answer the question.

9                    MS. SLOAN:  This is a -- we're entitled

10         to ask questions about Mr. Harvey's background,

11         but I'll move on.

12                   MR. DROGIN:  Convictions are one thing;

13         arrests are another.

14   Q.      Have you ever been accused of making any false

15   statement?

16   A.      No.

17   Q.      You're represented by Mr. Laurent Drogin in

18   this proceeding; is that correct?

19                   MR. DROGIN:  Objection to the form.

20         Counsel have noted their appearances.

21   Q.      You can answer the question.

22   A.      Yes.

23   Q.      You're also represented by Mr. Greg Bennett; is

24   that correct?

25   A.      Yes.



Page 27

1                      DANIEL HARVEY

2    Q.      Have you been represented by any other attorney

3    in connection with the lawsuit brought by Ms. Robinson

4    against Mr. De Niro and Canal Productions or in the

5    countersuit against Ms. Robinson?

6    A.      No.

7    Q.      When did you first come to be represented by

8    Mr. Bennett and his firm, Traub Lieberman?

9    A.      I'm not sure.

10   Q.      When did you first come to be represented by

11   Mr. Drogin and his firm, Tarter Krinsky and Drogin?

12   A.      I'm not sure exactly when.

13   Q.      Was it in the past week?

14                      MR. DROGIN:  Objection to the form.  He

15             just answered your question that he doesn't

16             know.  He doesn't remember.

17   Q.      Was it -- so can you -- Mr. Harvey, can you

18   please answer my question.  Did you become represented

19   by these law firms in the past week?

20   A.      I don't know.

21   Q.      You don't remember if you became represented in

22   the last week or previously?

23                      MR. DROGIN:  Objection to the form.

24   A.      That is correct.

25   Q.      What have you done to prepare for today's



1                    DANIEL HARVEY

2    deposition?

3    A.      Briefly spoke to my attorneys about what was

4    happening today, that was about it.

5    Q.      Who were the attorneys that you communicated

6    with?

7    A.      Greg and Mr. Laurent.

8    Q.      Have you spoken to your brother Tom Harvey

9    about this case?

10   A.      Excuse me?  What was that?

11   Q.      Have you spoken to Tom Harvey about this case?

12   A.      In general, yes.

13   Q.      Have you spoken to Tom Harvey about your

14   deposition today?

15   A.      No.

16   Q.      Is Tom Harvey your brother?

17   A.      Yes.

18   Q.      Has Tom Harvey provided you with legal advice

19   about this case?

20              MR. DROGIN:  Objection.  Can I hear it

21         again?  Actually I heard it.  You can answer.

22   A.      No.

23   Q.      Describe for me your conversations with Tom

24   Harvey about this case.

25              MR. DROGIN:  Objection calls for an



Page 29

```
 1                         DANIEL HARVEY
 2          open-ended narrative.  Just to be clear, every
 3          single conversation?
 4                    MS. SLOAN:  No speaking objections,
 5          Counselor.
 6                    MR. DROGIN:  It's not a speaking
 7          objection.  It's an objection on the basis that
 8          it calls for a narrative, which is not
 9          appropriate.  It's a proper objection.
10   Q.     You can answer the question, Mr. Harvey.
11                    MR. DROGIN:  Can we hear it back again?
12          (Whereupon, the record was read by the
13   reporter.)
14                    MR. DROGIN:  Same objection and
15          objection to the form.
16   Q.     You can answer the question, Mr. Harvey.
17   A.     Just general questions, that you're going to be
18   deposed and the basic premise what everyone knows in the
19   news, that's about it.  The general, that I'm going to
20   be deposed, what's going to happen, so-and-so is going
21   to speak to you on behalf of Canal Productions and they
22   are going to represent you.
23   Q.     When did these conversations happen?
24   A.     I don't know.  A few months ago.
25                    MR. DROGIN:  I instruct the witness not
```



1                     DANIEL HARVEY

2          to guess.

3    Q.     On approximately how many occasions have you

4    spoken about this case with Tom Harvey?

5    A.     A few, approximately.

6    Q.     What does a few mean?  You've spoken to more

7    than --

8    A.     Repeat the question.  Talk about?  Be more

9    specific.  I don't understand talk about.

10   Q.     I'm just asking about times that you have

11   discussed this lawsuit with Tom Harvey.  So if you know,

12   is that more than 10 times?  Have you spoken with Tom

13   Harvey more than 10 times about this case?

14                   MR. DROGIN:  Objection to the form.

15   A.     I have not.  If you're -- yeah.  No.

16   Q.     Okay.  So you've spoken with Tom Harvey about

17   this case less than 10 times; is that correct?

18   A.     Yes.

19   Q.     When did you speak with your attorneys about

20   this case?

21   A.     Maybe a month or two ago.  I'm not sure.

22   Q.     Have you only spoken to them one time about

23   this case?

24                   MR. DROGIN:  Objection to the form.

25   A.     Once, maybe twice.



Page 31

1                          DANIEL HARVEY

2    Q.      How long did you speak with your attorneys

3    about this case?

4                     MR. DROGIN:  Objection to the form.

5    A.      30 minutes possibly -- I'm not sure.

6    Approximately 30, 45 minutes.

7    Q.      Were there any non-attorneys present?

8    A.      Not that I know of.

9    Q.      And to your knowledge, could anyone overhear

10   your conversation with your attorneys?

11   A.      They could not.

12   Q.      Have you and Tom Harvey ever communicated about

13   why Canal was filing a lawsuit against Ms. Robinson?

14   A.      No.

15   Q.      Have you spoken to anyone else about your

16   deposition today?

17   A.      No.

18   Q.      Have you spoken with Canal employees about your

19   deposition?

20   A.      No.

21   Q.      Have you spoken with Mr. De Niro about your

22   deposition?

23   A.      No.

24   Q.      Have you spoken with your family about this

25   deposition?



Page 32

                        DANIEL HARVEY

1

2    A.       No.  Just to be clear, my family knows I'm

3    being deposed.  I haven't spoken to them about the case.

4    Q.       Okay.  Thank you.  Did you speak to them about

5    the deposition beyond the fact that you were being

6    deposed?

7    A.       No.

8    Q.       Have you reviewed any documents in preparation

9    for this testimony?

10   A.       No.

11   Q.       Have you reviewed the complaint in this case?

12   A.       Never seen it.

13   Q.       Have you reviewed the answer and the

14   counterclaims in this case?

15   A.       Never seen them.

16   Q.       Do you have any documents in the room with you

17   today relating to this case?

18   A.       None.

19   Q.       Please describe your educational history.

20   A.       Graduated University of Maryland, liberal arts

21   degree.

22   Q.       What year did you graduate from the University

23   of Maryland?

24   A.       Spring of 1983.

25   Q.       And what degree did you receive from University



```
 1                      DANIEL HARVEY
 2   of Maryland?
 3   A.      A bachelor's degree in liberal arts.
 4   Q.      Was it in a specific subject area?
 5   A.      It was not.
 6   Q.      Do you have a graduate degree?
 7   A.      I do not.
 8   Q.      Do you have any professional certifications?
 9   A.      Currently, no.
10   Q.      In the past, have you had any professional
11   certifications?
12   A.      Yes.
13   Q.      What professional certifications have you had
14   in the past?
15   A.      Certificate from the Sports Training Institute
16   of New York City.
17   Q.      And when did you receive that certificate?
18   A.      Approximately 1984, '85.
19   Q.      What was involved in getting that certificate?
20   A.      Just being trained, educated by sports training
21   institute staff in regards to personal fitness training
22   and nutrition.
23   Q.      And when did that certification lapse?
24   A.      I'm not sure.
25   Q.      You haven't had any certifications since 1984,
```



Page 34

                          DANIEL HARVEY
1    1985; is that correct?
2                    MR. DROGIN:   Objection to the form.
3    Q.      Is that correct?
4    A.      I may have had one -- I believe I had one in
5    1986 or '87 from the Fitness Institute, it's called
6    IDEA, it's health and fitness association.  It's called
7    IDEA, I-D-E-A.
8    Q.      And how many hours of education were required
9    to get this certification that you received in 1984 or
10   '85?
11   A.      I can't recall.
12   Q.      Do you have any degrees or certifications in
13   the field of personal training?
14   A.      As I said, not currently.
15   Q.      But other than what you've already discussed,
16   you have no degrees or certifications in the field of
17   personal training?
18   A.      Correct.
19   Q.      Do you have any degrees or certifications in
20   the field of nutrition?
21   A.      No.
22   Q.      Do you have any degrees or certifications in
23   any field relating to health or wellness?
24   A.      No.



```
 1                     DANIEL HARVEY

 2   Q.      Do you have any professional licenses?

 3   A.      No.

 4   Q.      So you haven't had any professional

 5   certifications in the last 30 years; is that correct?

 6                     MR. DROGIN:  Objection to the form.

 7   A.      No.

 8                     MR. DROGIN:  Counsel, just I pointed

 9           out, it was a double negative.  If you hear the

10           question back.

11   Q.      Let me rephrase the question.  Have you had any

12   professional certifications in the last 30 years?

13                     MR. DROGIN:  Objection to the form.

14   A.      Not that I can recall right now.

15   Q.      Who is your current employer?

16   A.      Canal Productions.

17   Q.      How long have you been employed by Canal

18   Productions?

19   A.      So long as it's -- I don't know.  Whenever it

20   was formed.

21   Q.      And to the best of your recollection, what year

22   was Canal Productions formed?

23   A.      I don't remember.

24   Q.      Was it in the early '90's?  Let me rephrase.

25   Was Canal Productions formed in the early '90's to the
```



```
 1                    DANIEL HARVEY
 2  best of your recollection?
 3  A.      I don't -- I don't have any idea.
 4  Q.      And how long have you been employed by Mr. De
 5  Niro?
 6                    MR. DROGIN:  Objection to the form.
 7  A.      Since February of 1984, I believe.
 8  Q.      When you were first hired by Mr. De Niro, did
 9  you work for him on a full-time basis?
10  A.      No.
11  Q.      Do you currently work for Mr. De Niro on a
12  full-time basis?
13                    MR. DROGIN:  Objection to the form.
14            Are you using Canal and Mr. De Niro
15            interchangeably?  If not, you should please
16            separate it out.
17  Q.      When I refer to Mr. De Niro, I'm referring to
18  Mr. De Niro and Canal.  So -- but I'll clarify.  Do you
19  work for Mr. De Niro and Canal Productions on a
20  full-time basis currently?
21  A.      I do.
22  Q.      And when did you start working for Canal on a
23  full-time basis?
24  A.      I can't give you an exact time.
25  Q.      Okay.  Was it soon after you started working
```



1                   DANIEL HARVEY

2    for Mr. De Niro?  Was it in 1984?

3    A.      It was not.

4    Q.      To the best of your recollection, how many

5    years did you work for Mr. De Niro on a not full-time

6    basis?

7    A.      Define full-time basis.

8    Q.      What is your understanding -- I mean, as far as

9    you're aware, how long have you worked for Canal on a

10   full-time basis?

11   A.      Canal or Mr. De Niro?

12   Q.      For Canal or Mr. De Niro.  Thank you for

13   clarifying.

14               MR. DROGIN:  Hold on.  Objection to the

15               form.  You asked the witness to tell you if he

16               doesn't understand something.

17               MS. SLOAN:  Counselor, he was answering

18               the question.  You're now interrupting the

19               witness's answer.

20   A.      As far as I'm concerned I've worked for him

21   full-time.  If you want to define full-time as working

22   for him on a weekly, yearly basis, I have been working

23   for him full-time since February of 1984.  I was with

24   him 330 days out of 365 days a year.  That's full -- I

25   was full-time.



1                     DANIEL HARVEY

2    Q.       So you have worked for Mr. De Niro full-time

3    since he hired you in February of 1984?

4    A.       That is correct.

5    Q.       Have you continuously worked for Mr. De Niro

6    since you were first hired in February of 1984?

7    A.       Repeat the question.

8    Q.       Have you continuously worked for Mr. De Niro

9    since you were first hired in February 1984?

10   A.       Yes.

11   Q.       Since February 1984, have you had any other

12   employment besides working for Mr. De Niro?

13   A.       Yes.

14   Q.       What other employment have you had since you

15   started your employment with Mr. De Niro?

16   A.       What's the time period?  Since I started

17   working?

18   Q.       Let's start with over the past decade.  Over

19   the last decade, have you had any other sources of

20   income besides Mr. De Niro or Canal?

21   A.       Repeat that question again.

22               MS. SLOAN:  Ms. Court Reporter, can you

23          please read it.

24          (Whereupon, the record was read by the

25   reporter.)



Page 39

1                      DANIEL HARVEY

2      A.      Yes.

3      Q.      What sources of income have you had over the

4      last decade besides Mr. De Niro or Canal?

5      A.      If I recall, possibly some private clients on

6      the side.  I'm employed by -- overseeing the gym at the

7      Greenwich Hotel in New York City.  Working for some

8      freelance jobs on the side.  Nothing -- something like

9      that, possibly.  I can't recall.

10     Q.      What types of freelance work on the side?

11     A.      Designing gyms for people's homes.

12     Q.      And over the last decade, has your income from

13     Canal been your primary source of income?

14     A.      Yes.

15     Q.      Over the last decade, would you say your income

16     from Canal is more than 90 percent of your total income?

17                      MR. DROGIN:  Objection to the form.

18     A.      Yes.

19     Q.      What was your job history before you began

20     working for Mr. De Niro?

21     A.      I was working as a personal trainer at the

22     Sports Training Institute in New York City.

23     Q.      How did you first come to know Mr. De Niro?

24     A.      He came to the Sports Training Institute

25     looking for a personal trainer.



Page 40

1                         DANIEL HARVEY

2    Q.       And approximately when did you meet Mr. De

3    Niro?

4    A.       Very early, 1984.

5    Q.       And how did you come to work for Mr. De Niro?

6    A.       He interviewed me at the Sports Training

7    Institute and then hired me.

8    Q.       Did Mr. De Niro hire you to work for Canal

9    Productions?

10                       MR. DROGIN:  Can we hear the question

11                read back?

12   Q.       Let me clarify.  So Mr. De Niro hired you to

13   work for him in 1984, but later on when Canal

14   Productions was formed, did Mr. De Niro hire you to work

15   for Canal?

16   A.       No.

17   Q.       Who hired you to work for Canal?

18   A.       No one hired me to work for Canal.

19   Q.       Okay.  Earlier you testified that your employer

20   was Canal Productions.  Can you clarify what you mean by

21   no one hired you to work for Canal?

22   A.       As I understand it -- I guess at some point

23   they hired -- I don't know how it works out, but they

24   um, there was never an official date.  I guess when he

25   transferred over, when I was working for him,



Page 41

1                    DANIEL HARVEY

2    transferred over directly -- I'm not sure how it came

3    about.

4    Q.      But it was Mr. De Niro's decision to have you

5    work for Canal, correct?

6    A.      100 percent, yes.

7    Q.      At any point during your employment at Canal,

8    were you given a formal job title?

9    A.      No.

10   Q.      So to your knowledge, there aren't any internal

11   Canal documents that identify your job title; is that

12   correct?

13               MR. DROGIN:  Objection to the form.

14          Just to be clear, you're going back how many

15          years?  You want him to have knowledge of every

16          single document?

17               MS. SLOAN:  I'm asking what his

18          knowledge of this is, so you can answer.

19   A.      I have no idea.

20   Q.      Do you have business cards?

21   A.      I have.

22   Q.      Is there a job title listed on your business

23   card?

24   A.      Personal fitness trainer.

25   Q.      Did you create that business card?



Page 42

DANIEL HARVEY

1

2  A.       Yeah, years ago.  Yes.

3  Q.       So that business card is not issued by Canal;

4  is that correct?

5  A.       That's correct.

6  Q.       At any point, have you had an employment

7  contract with Mr. De Niro or Canal Productions?

8  A.       No.

9  Q.       At any point, did you receive any offer letter

10 from Mr. De Niro for Canal Productions?

11 A.       No.

12 Q.       Have you ever had a title at Canal?

13 A.       Not that I know of.

14 Q.       Do you have any documentation setting forth

15 your job duties for Mr. De Niro or Canal Productions?

16 A.       Not that I know of.

17 Q.       Are you aware of any document at all that

18 describes any of the responsibilities that you performed

19 for Mr. De Niro?

20 A.       No.

21 Q.       To the best of your recollection, what was your

22 salary when you first started working for Mr. De Niro?

23              MR. DROGIN:  Objection to the form.  It

24       assumes a fact not in evidence.

25 A.       Repeat the question, please.



 1                    DANIEL HARVEY

 2   Q.      To the best of your recollection, what was your

 3   salary when you first started working for Mr. De Niro?

 4                    MR. DROGIN:  Same objection.  It

 5              assumes he was paid a salary.

 6   Q.      You can answer the question.

 7   A.      I was not paid a salary.

 8   Q.      To the best of your recollection, how was your

 9   pay set by Mr. De Niro?

10   A.      Per my recollection, per hour or per session.

11   Q.      So when you first started working for Mr. De

12   Niro, you were paid hourly or per training session; is

13   that correct?

14   A.      To the best of my recollection, yes.

15   Q.      How is it decided what your original pay would

16   be for each session?

17   A.      I don't recall.

18   Q.      And what was your compensation structure when

19   you were first hired by Canal?

20                    MR. DROGIN:  Objection to the form.

21              You can answer.

22   A.      I have no idea.

23   Q.      Were you paid on a salary basis when you were

24   first hired by Canal?

25   A.      I cannot recall.



Page 44

                         DANIEL HARVEY

1

2    Q.     Are you currently paid on a salary basis by

3    Canal?

4    A.     Yes.

5    Q.     Over the past decade, have you been paid on a

6    salary basis every single year?

7    A.     I believe, yes.

8    Q.     When was the first year that you started to

9    receive a salary from Canal or from Mr. De Niro?

10   A.     I cannot recall.

11              MR. DROGIN:  Counsel, can we take a

12         five-minute break or so, at a logical breaking

13         point?

14              MS. SLOAN:  Yes, that's works for me.

15              MR. DROGIN:  We don't have to do it

16         now.  We can do it whenever you want.

17              MS. SLOAN:  This is a fine time to take

18         a break.  So we'll take a break now.  How about

19         we come back at 2:05 Eastern time?

20              THE VIDEOGRAPHER:  The time is now 1:58

21         p.m. and we are going off the record.

22         (Whereupon, a short break was taken.)

23              THE VIDEOGRAPHER:  The time is now 2:07

24         p.m. and we are back on the record.

25   Q.     Mr. Harvey, tell me about all forms of



```
 1                    DANIEL HARVEY
 2    compensation that you received from Canal over the last
 3    decade.
 4                    MR. DROGIN:  Objection to the form.
 5             Use of the word compensation is ambiguous.  You
 6             can answer.
 7    A.       Compensation?  Define compensation.
 8    Q.       You're asking me to define compensation?  So
 9    any sort of compensation to the best of your knowledge
10    that you've received from Canal over the past 10 years.
11                    MR. DROGIN:  Objection to the form.
12             You're defining the word compensation by using
13             the word compensation.
14                    MS. SLOAN:  Yes.  His understanding of
15             his compensation over the past 10 years from
16             Canal.  That's my question.
17    A.       My salary.
18    Q.       Other than your salary, have you received any
19    forms of pay or benefits from Canal over the last
20    decade?
21    A.       For instance?  Give me an example.
22    Q.       Did you receive bonuses from Canal over the
23    last 10 years?
24    A.       I believe a standard bonus.  There was a
25    standard bonus of a birthday, a week's birthday salary,
```


MAGNA
LEGAL SERVICES

1                    DANIEL HARVEY

2    I believe.  And an additional week's salary for your

3    birthdays.  I believe as well.  For a period of time.

4    I'm not sure if it was the last 10 years, but there was

5    a period in there, yes.

6    Q.      So there was a period over the last 10 years

7    where it was typical for you to receive a bonus around

8    your birthday and a bonus around the end of the year, is

9    that correct?

10   A.      Yes.

11   Q.      Have you received any other bonuses from Canal

12   over the past 10 years?

13   A.      Nope.  No.  Not that I recall.

14   Q.      You testified that the birthday bonus was

15   typically a week's salary?

16   A.      Yes.

17   Q.      And what was the typical end of year bonus?

18   A.      Same.

19   Q.      Other than salary and bonuses, what other

20   compensation, other forms of pay or benefits have you

21   received from Canal?

22                    MR. DROGIN:  Objection to the form.

23   A.      None that I'm aware.

24   Q.      I'm asking you to think of other compensation

25   or benefits that you've received from Canal like medical



Page 47

```
 1                    DANIEL HARVEY
 2   benefits or expense reimbursement.  So I'll just repeat
 3   the question.
 4               Other than salary and bonuses, what other forms
 5   of pay or benefits have you received from Canal?
 6                    MR. DROGIN:  Objection to the form.
 7               You just want to ask him, do you receive
 8               medical benefits, do you receive vision
 9               benefits, dental benefits, retirement?
10                    MS. SLOAN:  Counsel, please refrain
11               from --
12                    MR. DROGIN:  Helping you.
13   A.      Apparently I have health insurance through
14   Canal, which I pay a portion of that comes out of my
15   salary, I get benefits for that, but I put into it.  I
16   get my travel expenses for work are reimbursed or taken
17   care of.  Other than that --
18   Q.      Does Canal make any contributions to a
19   retirement account for you?
20   A.      They may have at one point, but they do not
21   now.  I do not believe that they do now.
22   Q.      Other than travel expenses, does Canal pay for
23   any other expenses that you incur?
24   A.      Um, sometimes living expenses if I'm working
25   out of town, yes.
```



Page 48

1                    DANIEL HARVEY

2    Q.      What do you mean by living expenses?

3    A.      Travel to and from wherever location Mr. De

4    Niro would like to train.

5    Q.      Does living expenses become this other type of

6    cost?  Does Canal pay for any of your meals?

7                    MR. DROGIN:  Objection to form.  You

8            can answer.

9    A.      Yes, sometimes.

10   Q.      Are there other types of living expenses that

11   Canal pays for?

12   A.      Sometimes housing when I'm on location, yes.

13   Q.      What does housing mean?  Are you referring to

14   hotels?

15   A.      Hotels, yes.

16   Q.      Does Canal pay for any other housing besides

17   hotels?  I'm just trying to figure out what you mean by

18   housing.

19   A.      Yeah, housing.  Like a place to -- yeah,

20   hotels.  Basically hotels, yes.

21   Q.      When you travel from California to New York,

22   does Canal pay for your housing?

23   A.      Not always.

24   Q.      Sometimes -- does Canal sometimes pay for your

25   housing when you are in New York?



Page 49

1                    DANIEL HARVEY

2    A.      Yes.

3    Q.      Other than travel, meals and housing, what

4    other living expenses has Canal paid for on your behalf?

5                    MR. DROGIN:  Objection to the form.

6    A.      I'm not aware of any that I can recall right

7    now.

8    Q.      And when does Canal pay for your housing in New

9    York?

10   A.      It varies.  When I'm on a production or when

11   it's necessary for his convenience.

12   Q.      For "his" meaning Mr. De Niro?

13   A.      Yes.

14   Q.      On how many occasions over the past decade has

15   Canal paid for your housing in New York?

16   A.      Repeat the question.

17   Q.      Over the past decade, on how many occasions

18   approximately has Canal paid for your housing in New

19   York?

20   A.      Several maybe, several.  I can't recall

21   exactly.

22   Q.      More than 10 times?

23   A.      I don't know.

24   Q.      Over the last five years, on how many occasions

25   has Canal paid for your housing when you're in New York?



```
 1                   DANIEL HARVEY
 2   Excuse me.
 3   A.       I couldn't give you an exact number.
 4   Q.       And where in New York -- excuse me.  Let me
 5   rephrase.  Does Canal pay for a hotel in New York when
 6   they pay for your housing?
 7   A.       Sometimes.  I'm not exactly sure who pays it,
 8   but yes, somebody pays for it.  Sometimes Canal pays,
 9   sometimes someone else pays at other times, depending on
10   where it is.
11   Q.       Is there a particular hotel that you stay at?
12   A.       During what time period?
13   Q.       Over the last decade, when Canal is paying for
14   your housing in New York?
15   A.       Generally it's the Greenwich Hotel.
16   Q.       Okay.  Thank you.  Over the past 10 years have
17   you charged expenses to any Canal credit card?
18   A.       Yes.
19   Q.       Over the past 10 years have you been reimbursed
20   by Canal for expenses that you paid for?
21   A.       Yes.
22   Q.       So just to summarize, over the past decade
23   Canal has paid you a salary, a birthday bonus, an
24   end-of-year holiday bonus, contributed to your health
25   insurance and paid for your travel, and various meals
```



```
                                                      Page 51
  1                    DANIEL HARVEY
  2   and housing.  Is that --
  3                    MR. DROGIN:  Objection to the form of
  4            every one of those questions.  Objection.
  5                    MS. SLOAN:  Counsel, please do not
  6            interrupt and make speeches.
  7                    MR. DROGIN:  I'm objecting.  I'm
  8            allowed to object.  I'm objecting to the form
  9            of question.
 10                    MS. SLOAN:  And your objection is
 11            noted.
 12                    MR. DROGIN:  I'm objecting because it's
 13            compound, and I'm objecting because it
 14            mischaracterizes the witness's testimony.  It
 15            assumes facts that are not in evidence.
 16   Q.      Mr. Harvey, can you please answer the question?
 17                    MR. DROGIN:  Hold on, there was one
 18            more, and I forgot it now.
 19                    MS. SLOAN:  The objection is noted,
 20            Counselor.
 21                    MR. DROGIN:  Give me a second.  I'm
 22            asking for a minute.  I want to place a proper
 23            objection.  We don't have any stipulations on
 24            the record.  I'm entitled to lodge all of my
 25            objections.  Please let me do so.  There's no
```



Page 52

```
                        DANIEL HARVEY
 1
 2          Federal stipulations here, you didn't propose
 3          them, I'm entitled to make my record.  I want
 4          to preserve the objection.
 5                  MS. SLOAN:  Counsel, please stop making
 6          speeches.
 7                  MR. DROGIN:  I'm not making a speech,
 8          I'm interacting with you.  I'm having a
 9          dialogue with you.  You've asked a question --
10          oh, asked and answered.  Asked and answered.
11          You're summarizing the witness's testimony.
12          It's asked and answered.  You have the answers
13          to those questions.
14                  MS. SLOAN:  Okay, Counsel.
15  Q.      Could you please answer the question, Mr.
16  Harvey?
17                  THE WITNESS:  Repeat the question.
18                  MS. SLOAN:  Brooke, could you please
19          repeat the question?  Thank you.
20          (Whereupon, the record was read by the
21  reporter.)
22  Q.      Is that correct?
23                  MR. DROGIN:  Same objection.
24                  MS. SLOAN:  We understand your
25          objection, Counsel.
```



Page 53

```
 1                    DANIEL HARVEY
 2   Q.     Could you please answer the question, Mr.
 3   Harvey?
 4                    MR. DROGIN:  I want to add misleading
 5            to it as well.  It's a completely inappropriate
 6            question, and I'm on the verge of telling him
 7            not to answer, but it's such a bad question I
 8            will let him answer.  Go ahead.  Answer to the
 9            best of your ability.
10   A.     That is not a true statement.  You're assuming
11   that I had housing paid for the entire time.  That is
12   not the case.  It's a really bad question, I have to
13   say.  It's just ridiculous.
14   Q.     Okay, Mr. Harvey.
15   A.     You're putting words in my mouth and it's
16   really ridiculous.
17   Q.     Okay.  We'll break it down.  So over the past
18   decade, Canal has paid you a salary, correct?
19   A.     Yes.
20   Q.     Over the past decade Canal has paid you a
21   birthday bonus, correct?
22   A.     Not the last two years, no.
23                    MR. DROGIN:  See, that's why I
24            objected.
25   A.     So you're assuming all these things and you
```



Page 54

                         DANIEL HARVEY

1       asked me six questions.  You know what --

2   Q.      Mr. Harvey, if you don't understand a question,

3   then I'm happy to clarify.

4   A.      And that's why I'm asking you to clarify it.

5   Q.      And that's what I'm doing, thank you.

6           So over the past decade you typically have

7   received a holiday end-of-the-year bonus, is that fair?

8   A.      Not over the past decade.

9   Q.      Have you ever received a holiday bonus over the

10  past decade?

11  A.      Yes.

12  Q.      From 2013 to 2019 did you typically receive a

13  holiday bonus?

14              MR. DROGIN:  Objection to the form.

15  A.      I believe so.

16  Q.      From 2013 to 2019 did Canal contribute to your

17  health insurance?

18  A.      Yes.

19  Q.      From 2013 to 2019 did Canal typically pay for

20  your travel?

21              MR. DROGIN:  Objection to the form.

22  A.      Yes.

23  Q.      From 2013 to 2019, did Canal typically pay for

24  various meals that you ate?



Page 55

1                         DANIEL HARVEY

2                         MR. DROGIN:  Objection to the form.

3    A.      No.

4    Q.      From 2013 to 2019, did Canal sometimes pay for

5    your meals?

6                         MR. DROGIN:  Objection to the form.  Do

7            you mean while he was working?  Objection to

8            the form.  Go ahead and answer.

9    A.      A small -- I can't -- a portion.

10   Q.      From 2013 to 2019, did Canal sometimes pay for

11   your housing?

12   A.      Yes.

13   Q.      And just to go back, from 2013 to 2019, did

14   Canal typically pay a birthday bonus?

15                        MR. DROGIN:  Objection to the form.

16   A.      Not in 2019.

17   Q.      Okay.  From 2013 to 2018, did Canal pay a

18   birthday bonus?

19   A.      I believe so.

20   Q.      What is your current base salary?

21   A.      Approximately -- currently approximately --

22   approximately $187,000 a year.

23   Q.      How long has that been your base salary?

24   A.      I believe since March 2019.

25   Q.      What was your base salary prior to March 2019?



```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  Objection to the form.
 3          It's an open-ended question.  You may want to
 4          break it down into specific time periods -- or
 5          not.
 6   Q.     Before your salary was changed in March 2019,
 7   what had your salary been?
 8   A.     Repeat that question.
 9   Q.     Your testimony is that your base salary has
10   been $187,000 since March 2019; that is correct?
11   A.     Yes.
12   Q.     Before your salary was changed to that amount,
13   what was your salary?
14   A.     I believe it was $375,000 a year.
15   Q.     What was your base salary in 2018?
16   A.     Excuse me?
17   Q.     In 2018 was your base salary $375,000 a year?
18   A.     I'm pretty sure, yes.
19   Q.     And what was your base salary in 2017?
20   A.     That I'm not 100 percent sure.
21   Q.     Okay.  Was it less than $375,000?
22   A.     I believe it was less that year, possibly, or
23   the year before, yes.
24   Q.     I'm going to run through a few years and you
25   can let me know, to the best of your recollection, if
```



Page 57

                           DANIEL HARVEY

1

2    you remember what your base salary was.  In 2016, do you

3    recall what your base salary was?

4    A.      No.

5    Q.      In 2015, do you remember what your base salary

6    was?

7    A.      I have no idea.

8    Q.      In 2014, do you remember what your base salary

9    was?

10   A.      No.

11   Q.      And in 2013, do you remember what your base

12   salary was?

13   A.      No.

14   Q.      Was there a time when your base salary was

15   $250,000?

16   A.      I believe there was a time period, yes.

17   Q.      Do you have an idea of when that was?

18   A.      I do not.

19   Q.      What bonuses did you receive in 2019?

20   A.      I don't believe I received any.

21   Q.      Other than the birthday bonuses and the

22   end-of-year bonuses that we discussed, did you receive

23   any bonuses in 2018?

24              MR. DROGIN:  Objection to the form.

25   A.      Repeat that question again, please.



Page 58

1                     DANIEL HARVEY

2    Q.     Other than the birthday bonus and the

3    end-of-year bonus that we previously discussed, did you

4    receive any other bonuses in 2018?

5                     MR. DROGIN:  Objection to the form.

6          You can answer.

7    A.     Not that I know of or recall.

8    Q.     What about in 2017?

9                     MR. DROGIN:  Objection to the form.

10   A.     Same.

11   Q.     2016?

12                    MR. DROGIN:  Same objection.

13   A.     Same answer, no.

14   Q.     2015?

15                    MR. DROGIN:  Same objection.

16   A.     No.

17   Q.     2014?

18                    MR. DROGIN:  Same objection.

19   A.     Not that I recall.

20   Q.     And 2013?

21   A.     Not that I recall.

22   Q.     What was the reason that your salary was

23   decreased in 2019?

24   A.     The pandemic basically, you know, and -- yes.

25   Q.     Your salary decreased in 2019 because of the



```
 1                    DANIEL HARVEY
 2  pandemic?
 3  A.      Yes.
 4  Q.      Which pandemic are you referring to?
 5  A.      The pandemic that started in 2019.
 6  Q.      Did somebody tell you that your salary was
 7  going to be decreased?
 8  A.      Yes.
 9  Q.      Who told you that your salary was going to be
10  decreased?
11  A.      Michael Tasch at Berdon Accounting, Bob's
12  accountant, financial advisor told me.
13  Q.      The coronavirus pandemic began in 2020 --
14  A.      2020 then.  I stand corrected, I'm sorry.  I
15  don't know why I said '19.  You're right.  You're right.
16  2020.
17  Q.      So let's just go back to some of your other
18  testimony, then.
19  A.      Yeah, I don't know why I -- yeah, 2020, yes.
20  Excuse me.  I stand corrected.
21  Q.      That's okay.  Just to clarify some things on
22  the record, we're just going to go back and talk about
23  some of your salary.  You testified that your current
24  base salary is $187,000; is that correct?
25  A.      Yes.
```



Page 60

                         DANIEL HARVEY

1

2    Q.    And how long has that been your base salary?

3    A.    Since actually -- I stand corrected.  Since

4    early March of 2020.

5    Q.    So prior to -- directly prior to March 2020,

6    you were making -- how much were you making?

7    A.    The 375.

8    Q.    So what was your base salary in 2019?

9    A.    In 2019, I believe it was the 375.  I stand

10   corrected, yes.  I apologize.

11   Q.    And you testified that you haven't received

12   bonuses in the past two years.  What is the reason for

13   that?

14             MR. DROGIN:  Objection to the form.

15   A.    I don't know.  You'd have to ask Canal.

16   Q.    Did anyone tell you that you wouldn't be

17   receiving bonuses for the past two years?

18   A.    No.

19   Q.    So you just didn't see any bonuses come in; is

20   that correct?

21   A.    That is correct.

22   Q.    Okay.  Who has been responsible for setting

23   your pay at Canal?

24             MR. DROGIN:  Objection to the form.

25             You can answer it.



Page 61

1                    DANIEL HARVEY

2    A.      Who is responsible for setting my pay?  I

3    believe Michael Tasch at -- but, yes, that's who I

4    believe.

5    Q.      What's the basis for that belief?

6    A.      He's Bob's financial advisor.  Mr. De Niro's

7    financial advisor.

8    Q.      What is Michael Tasch's role with respect to

9    Canal?

10                   MR. DROGIN:  Objection to the form.

11           You can answer it.

12   A.      I don't know.  You'd have to ask Michael Tasch.

13   Q.      What's your understanding of his role at Canal?

14   A.      I don't have an understanding of his role.

15   Q.      You've had discussions with Mr. De Niro over

16   the years about your compensation; is that correct?

17   A.      Yes.

18   Q.      On how many occasions over the past decade have

19   you discussed your compensation with Mr. De Niro?

20                   MR. DROGIN:  Objection to the form.

21   A.      Once or twice.

22   Q.      When did those conversations occur?

23   A.      One about three years ago, I believe, to the

24   best of my recollection.  And maybe the other about 10

25   years ago.



1                    DANIEL HARVEY

2    Q.      In the conversation about three years ago, what

3    did Mr. De Niro say to you about your compensation?

4    A.      He said to call his financial advisors.

5    Q.      Why did he tell you to call his financial

6    advisors?

7    A.      I don't know.  You'll have to ask him.

8    Q.      Did you call his financial advisors?

9    A.      I did.

10   Q.      And what was said in that conversation?

11   A.      I asked for some more compensation for my job.

12   Q.      Okay.  So about three years ago, when you had a

13   conversation with Mr. De Niro, did you ask Mr. De Niro

14   for a raise?

15   A.      I do not -- I can't recall.

16   Q.      What did you say to Mr. De Niro in your

17   conversation three years ago?

18   A.      I can't recall.

19   Q.      What was the general topic of the discussion

20   with regards to your compensation in the conversation

21   with Mr. De Niro three years ago?

22   A.      The general conversation was that I was 35

23   years into my job and that I have a lot of

24   responsibilities and I felt like I needed a -- to

25   discuss a possible -- to discuss the situation, because



Page 63

1                      DANIEL HARVEY

2    I don't think I was detailed in saying I want a raise.

3    It was just that it was -- there was a lot of years that

4    I already put in.

5    Q.       To discuss the situation with regards to your

6    compensation?

7    A.       Yes.

8    Q.       Okay.  What were your job responsibilities when

9    you discussed your compensation with Mr. De Niro?

10   A.       Can you repeat the question?

11   Q.       Yes.  What were your job responsibilities when

12   you discussed your compensation with Mr. De Niro three

13   years ago?

14   A.       My responsibilities, did you say?  I'm sorry.

15   Q.       Yes.  You mentioned that you had a lot of

16   responsibilities.  So my question is, what were your job

17   responsibilities during the time that you discussed your

18   compensation with Mr. De Niro?

19   A.       My job responsibilities were to train him on a

20   -- personally train him physically fitness-wise, six to

21   seven days a week, and get him prepared for his movie

22   projects, which entailed another job, which would be

23   running dialogue with him, six to seven days a week,

24   two, three, four, five, sometimes five hours a day.

25   Working on preparing him for his role, in whatever role



```
 1                    DANIEL HARVEY
 2    he was doing, in whatever project he was on.
 3    Q.      What project was he on at that time?
 4    A.      I have no idea.  I can't remember.
 5    Q.      Did you have any other job responsibilities at
 6    that time?
 7    A.      Most likely, yes.
 8    Q.      What types of other job responsibilities did
 9    you have?
10    A.      Depending on the timeframe, it could have been
11    being aware of what scenes would be coming up in a
12    project he'd be working on on a daily and weekly basis,
13    preparing a fitness room on location or a location that
14    we might be headed to, and making sure he's got
15    adequate -- his equipment that we're used to working
16    with, to make sure that he's got equipment at his
17    Montauk house, exercise equipment, making sure he --
18    that I'm aware of what weeks we're shooting the movie,
19    how many weeks we have preparation for the movie,
20    certain things like that, depending on what project we
21    were on.
22    Q.      Approximately 10 years ago when you had a
23    conversation with Mr. De Niro, can you tell me what you
24    said to him in that conversation?
25    A.      Yes.  Basically he wanted to lower my salary
```



Page 65

1                        DANIEL HARVEY

2    because things were -- it was a slow period for him.

3    And I said I couldn't do it.

4    Q.      Did Mr. De Niro lower your salary at that

5    point?

6    A.      He did not.

7    Q.      And what did you say to Mr. De Niro in response

8    to his suggestion of lowering your salary?

9    A.      Repeat the question, please.

10   Q.      What did you say to Mr. De Niro during that

11   conversation?

12   A.      I said that's not going to work for me.

13   Q.      And did you provide any more information about

14   why that wouldn't work for you?

15   A.      Yes.

16   Q.      What did you say?

17   A.      That I have a wife and three kids and a home

18   and -- yes.

19   Q.      And what did he respond to you when you

20   mentioned your wife and three kids?

21   A.      He said he understood.

22   Q.      Did you say anything else in that conversation?

23   A.      That's all.

24   Q.      Did he say anything else to you in that

25   conversation?



```
 1                    DANIEL HARVEY

 2   A.      Yes.

 3   Q.      What else did he say to you?

 4   A.      He said, don't worry about it, I'll have -- at

 5   the time Mark Boswick call you who was with Berdon as

 6   well as with Michael Tasch.

 7                    MR. DROGIN:   B-O-S-W-I-C-K.

 8   Q.      After you talked to Mr. De Niro about your

 9   family, he decided to keep your salary the same; is

10   that's correct?

11   A.      As I recall, yes.

12   Q.      And what was your base salary at that time?

13   A.      I have no idea.

14   Q.      Have there been other times that you've talked

15   to Mr. De Niro about your family?

16   A.      In what regard.

17   Q.      Generally?

18   A.      Sure, yes.

19   Q.      Have there been other times that you've talked

20   to Mr. De Niro about your family in relation to your

21   compensation?

22   A.      No, I don't believe so.

23   Q.      When you discussed your salary with Mr. De Niro

24   approximately three years ago, did you discuss your

25   family in that conversation?
```



Page 67

1                    DANIEL HARVEY

2    A.      No.

3    Q.      Just to clarify, did he bring up your family

4    during that conversation?

5    A.      No.

6    Q.      Okay.  So neither of you spoke about your

7    family in that conversation; is that correct?

8    A.      That is correct.

9    Q.      From 2013 to 2019, was your base salary the

10   same?

11   A.      I don't think so.

12   Q.      Have you received regular salary reviews during

13   your employment at Canal?

14   A.      No.

15   Q.      Have you received regular salary increases

16   during your employment at Canal?

17   A.      No.

18   Q.      Did you receive a raise when your first child

19   was born?

20   A.      No.

21   Q.      Did you receive a raise when your second child

22   was born?

23   A.      No.

24   Q.      Over the past decade, approximately how many

25   raises have you received?



1                     DANIEL HARVEY

2    A.       Possibly two.

3    Q.       When did those raises occur?

4    A.       I have no idea.  One, three or four years ago,

5    I'm not sure, approximately.  And then I don't know when

6    before that.

7    Q.       So the one three or four years ago, is that in

8    connection with the conversation that you had with Mr.

9    De Niro?

10   A.       Which conversation?

11   Q.       The one where you discussed your compensation

12   with Mr. De Niro three to four years ago and he directed

13   you to call his financial advisor.

14   A.       Yes.

15   Q.       So you did receive a raise after that

16   conversation, correct?

17   A.       I did, yes.

18   Q.       Do you recall when the other raise that

19   occurred over the past 10 years?

20   A.       I do not.

21   Q.       What, if anything, has Mr. De Niro explained to

22   you about how he sets your salary?

23   A.       Nothing.

24   Q.       Has Mr. De Niro ever identified to you any

25   factors that go into setting your pay?



Page 69

1                          DANIEL HARVEY

2   A.      No.

3   Q.      What prompted the salary raise that you

4   received?  So you received one around three to four

5   years ago after you spoke to Mr. De Niro.  The other

6   salary raise that you received, what prompted that?

7                    MR. DROGIN:  Objection to the form.

8            You can answer it.

9   A.      I don't remember.

10  Q.      You didn't approach Mr. De Niro asking for a

11  raise in that instance?

12                   MR. DROGIN:  Objection to form.

13  A.      No.

14  Q.      Did Mr. De Niro identify any specific factors

15  that went into his decision to give you a salary

16  increase?

17  A.      Repeat the question, please.

18  Q.      Did Mr. De Niro identify any specific factors

19  that went into his decision to give you a salary

20  increase?

21  A.      No.

22  Q.      During your employment, has Canal had any kind

23  of formal system for setting employee compensation?

24  A.      Not that I'm aware of.

25  Q.      As far as you know, does Canal have any kind of



1                          DANIEL HARVEY

2      system for setting your pay?

3      A.      I have no idea.

4      Q.      As far as you're aware, Canal has not employed

5      any kind of seniority system to set your pay, correct?

6      A.      I have no idea.

7      Q.      As far as you're aware, Canal has not tied your

8      pay to the number of years you have been employed at

9      Canal, correct?

10     A.      Repeat the question.

11     Q.      As far as you're aware, Canal has not tied your

12     pay to the number of years you've been employed at

13     Canal, correct?

14     A.      I wouldn't say that's correct.  That is

15     actually not correct.

16     Q.      Could you please explain why that's not

17     correct?

18     A.      Because I know personally Mr. De Niro knows how

19     long I have been working for him, and that's why -- he

20     knows at certain points -- I believe that's why I get

21     those raises, because of my loyalty and my tender, you

22     know, my longevity.

23     Q.      As far as you're aware, Canal doesn't have a

24     system of pay that ties the number of years that a Canal

25     employee has been employed at Canal?



Page 71

                          DANIEL HARVEY

1

2    A.      Canal, no, not that I'm aware of.

3                    MS. SLOAN:  Can we please take a

4            five-minute break.  Does that work for

5            everyone?  Does that work for you, Counsel?

6                    MR. DROGIN:  That's fine.

7                    MS. SLOAN:  We'll come back around

8            2:55.

9                    THE VIDEOGRAPHER:  The time is now 2:48

10           p.m. and we are going off the record.

11           (Whereupon, a short break was taken.)

12                   THE VIDEOGRAPHER:  The time is now 2:56

13           p.m. and we're back on the record.

14   Q.      Mr. Harvey, during your employment at Canal,

15   you have always reported directly to Mr. De Niro; is

16   that correct?

17   A.      Yes.  Counsel, can I just backtrack?  You said

18   earlier that if I had to readdress something, it was

19   okay?

20   Q.      Yes.

21   A.      So I just wanted to backtrack with regard to

22   Canal paying for my housing while I was in New York.

23   Q.      Okay.  In what way would you like to clarify

24   that?

25   A.      I would like to really clarify that a little



MAGNA ▶
LEGAL SERVICES

1                    DANIEL HARVEY

2    bit because that is not always necessarily true.  Very

3    rarely -- because usually when my housing was covered in

4    New York, it was during a production of a movie, and

5    Canal would be reimbursed for all my -- the standard

6    procedure was the production company, if I was on a

7    movie working with Mr. De Niro, the production company

8    would pay for my housing while I was in New York and

9    Canal would either pay for it directly and get

10   reimbursed or the production company would pay for it.

11   And I would also receive per diem, some of the time,

12   depending on the project, from the production company

13   for my meals.  At the majority of the time in the last

14   decade, while in New York, I was living in my mother's

15   house on Long Island for the majority of that time, a

16   good portion of that time, unless I was on a movie

17   project.  There was sometimes when I traveled for Mr. De

18   Niro, upstate, where I needed a hotel near his home

19   upstate or if he needed me specifically in New York to

20   be, you know, for a specific reason, then he would pay

21   housing out of his own pocket.  But generally speaking,

22   he did not pay for my housing while I was in New York.

23   Q.     Okay.  Thank you.  Over the past decade your

24   primary residence was in California, correct?

25   A.     Yes.



```
                              DANIEL HARVEY
 1
 2    Q.       I may have follow-up questions about that, for
 3    that clarification later, but thank you for providing
 4    that.
 5    A.       Of course.
 6    Q.       During your employment at Canal you've always
 7    reported directly to Mr. De Niro, correct?
 8    A.       Yes.
 9    Q.       And during your employment, Mr. De Niro is the
10    person at Canal who directed your job duties, correct?
11    A.       Yes.
12    Q.       Mr. De Niro is the person you considered to be
13    your boss, correct?
14    A.       Yes.
15    Q.       During the period from 2013 to 2019, you worked
16    for Mr. De Niro on a full-time basis, correct?
17                    MR. DROGIN:  Objection.  Asked and
18               answered.
19    Q.       You can answer.
20    A.       Yes.
21    Q.       During the period from 2013 to 2019, in a
22    typical week, how many days of the week would you be in
23    contact with Mr. De Niro?
24    A.       Seven days a week.
25    Q.       Between 2013 and 2019, what was your main
```



Page 74

```
 1                    DANIEL HARVEY
 2  method of communicating with Mr. De Niro?
 3  A.      Majority of the time directly.
 4  Q.      Directly meaning in person?
 5  A.      Phone call, text, majority of the time.
 6  Occasional e-mail.
 7  Q.      So you -- between 2013 and 2019, your primary
 8  method of communication was via phone calls or text; is
 9  that correct?
10                    MR. DROGIN:  Objection to the form.
11           Asked and answered.  Mischaracterizes the
12           witnesses's testimony, and compound.
13  Q.      You can answer.
14  A.      That's a long timeframe.  2013 -- sometimes
15  through the office, his office, but the majority of the
16  time, directly.  Either he would call me, text, or
17  e-mail directly.  Or I saw him in person and he said
18  I'll see you tomorrow, and he gave me the schedule.  It
19  varied.
20  Q.      I'm sorry.  Can you clarify what you just said?
21  A.      It's never cut and dry.  Of course there was
22  times that it would vary, you know, but for the majority
23  of the time, yes.
24  Q.      Okay.  From 2013 to 2019, what was your primary
25  method of communicating directly with Mr. De Niro?
```



```
 1                    DANIEL HARVEY

 2                    MR. DROGIN:  Objection.

 3   A.     I don't know what the primary was.  I have no

 4   idea.  I have no idea.

 5   Q.     Between 2013 and 2019, on average, how many

 6   days a week would you meet with Mr. De Niro in person?

 7   A.     On average at least six days a week.

 8                    MR. DROGIN:  You really don't want to

 9            withdraw this claim, right?

10                    THE WITNESS:  Excuse me?  Its --

11                    MR. DROGIN:  I wasn't directing my

12            comment to you.

13                    THE WITNESS:  It's just a vague

14            question.

15                    MR. DROGIN:  You've answered it.

16                    THE WITNESS:  Okay.  Thank you.

17   Q.     Over what period would you meet with Mr. De

18   Niro at least six days a week?

19                    MR. DROGIN:  Objection to the form.

20   A.     What period?  What you do mean?

21   Q.     On a typical -- most weeks a year between 2013

22   and 2019, would you meet with Mr. De Niro six days a

23   week in person?

24   A.     Six to seven.  If we were on a project, seven

25   days a week, in the mornings, usually in the morning,
```



Page 76

 1                    DANIEL HARVEY

 2  unless he was filming at night and he had to do

 3  something differently.

 4  Q.    If you weren't on location with Mr. De Niro,

 5  would you see him six to seven days a week?

 6  A.    Yes.

 7  Q.    Where is Mr. De Niro's primary residence?

 8              MR. DROGIN:  Objection to the form.

 9        You're talking about now?

10  Q.    Between 2013 and 2019, where was Mr. De Niro's

11  primary residence?

12              MR. DROGIN:  Objection to the form.  Go

13        ahead.

14  A.    New York.

15  Q.    I'm sorry.  Did you answer?

16  A.    I did.  New York.

17  Q.    I'm sorry, I didn't hear.  Thank you.  And

18  between 2013 and 2019 your primary residence was in

19  California, correct?

20  A.    Yes.

21  Q.    So between 2013 and 2019, you were away from

22  your family six or seven days a week to meet with Mr. De

23  Niro in person?

24              MR. DROGIN:  Objection to the form.

25  A.    Just repeat that question again.



                        DANIEL HARVEY

1

2    Q.      During the period from 2013 to 2019, you were

3    away from your family for six to seven days a week every

4    year to meet with Mr. De Niro in person?

5                    MR. DROGIN:  Objection to the form.

6            You can answer.

7    A.      No.

8    Q.      Did your family travel with you?

9    A.      Sometimes.

10   Q.      On how many occasions between 2013 and 2019 did

11   your family travel with you?

12                   MR. DROGIN:  Objection.  Go ahead.

13   A.      Few times a year.

14   Q.      So how many -- so during the period from 2013

15   to 2019, how many days a week would you meet with Mr. De

16   Niro in person?

17                   MR. DROGIN:  Objection.  Asked and

18           answered.  You can answer it again.

19   A.      When he was in New York, five to seven days a

20   week, if he wasn't on a movie.  Approximately six days a

21   week, if he wasn't on a project.  And I'd have various

22   times off for holidays, if that's what you're getting

23   at.  Holidays or whenever he had business out of town, I

24   would go back and see my family.

25   Q.      So you -- so you saw your family -- between



Page 78

1                    DANIEL HARVEY

2    2015 and 2019, you saw your family during holidays and

3    when Mr. De Niro went on vacation without you; is that

4    correct?

5                    MR. DROGIN:  Objection to the form.  It

6              assumes facts not in evidence, and misstates

7              the witness's testimony.

8    Q.       You can answer.

9                    MR. DROGIN:  Can I hear the question

10             read back again, please.

11                   MS. SLOAN:  Brooke, can you read the

12             question back, please.

13                   MR. DROGIN:  Thanks, Brooke.

14         (Whereupon, the record was read by the

15   reporter.)

16   A.       For the most part.

17   Q.       And those were the only times that you saw your

18   family between 2013 and 2019?

19   A.       No.

20                   MR. BENNETT:  Just to clarify, the last

21             question was 2015.  I'm just clarifying the

22             record.  Brooke just read it back, in case you

23             want to go back.

24                   MS. SLOAN:  Sorry, Counsel, I'm not

25             sure what you're clarifying.  The question I



Page 79

```
 1                   DANIEL HARVEY
 2        had asked was between 2013 and 2019.
 3                   MR. DROGIN:  And then you said between
 4        2015 and '19.
 5                   MR. BENNETT:  What Brooke read back was
 6        2015.  That's all I'm trying to do is clarify
 7        the record.
 8                   MS. SLOAN:  Thank you, Mr. Bennett.
 9        Okay, yes.  I intended to ask the question
10        about between 2013 and 2019.
11   Q.    But regardless, between 2013 and 2019, did all
12   of your meetings with Mr. De Niro take place in a gym?
13                   MR. DROGIN:  Objection to the form.
14   A.    All of our meetings take place in a gym?  For
15   work, the majority of them, yes, almost all of them.  I
16   worked alone with Mr. De Niro in a gym, whether it was
17   in his home, his house in Montauk, on location or
18   whatever city we were in, his upstate house.  I worked
19   with Mr. De Niro in a gym, alone on his dialogue,
20   helping him prepare for his movies, getting him in shape
21   for a movie.  That's why I said, I'm a personal trainer
22   who worked with him.  He taught me how to run lines with
23   him, so he could memorize his script, prepare for his
24   movies, educated me on how -- educated me personally on
25   how he wanted to prepare for the movies.  And I took
```



```
 1                    DANIEL HARVEY
 2   that education and I worked for him and I utilized it
 3   with him wherever he is.  It's just he and I in a gym.
 4   Yes.
 5   Q.      Okay.  So between 2013 and 2019, you never met
 6   with Mr. De Niro in a place outside of a gym?
 7                    MR. DROGIN:  Objection.  That's total
 8              and complete mischaracterization of what he
 9              said.  Why are you doing that?
10                    MS. SLOAN:  Please do not impede the
11              deposition, Counsel.
12                    MR. DROGIN:  It's just the opposite.
13              I'm trying to allow it to flow, but you're
14              misstating what the witness said.
15                    MS. SLOAN:  Counsel, please.
16   Q.      Between 2013 and 2019, besides a gym, where
17   were the various places that you would meet with Mr. De
18   Niro?
19   A.      Meet to do what?  Be more specific.
20   Q.      The question is, you know, where were the
21   various places that you would meet with Mr. De Niro?
22   Did you meet with him in places that were not a gym
23   between 2013 and 2019?
24   A.      Possibly maybe at a premiere.  Yeah, there
25   could be -- yes, I've known him 38 years.  I've met him,
```



```
 1                    DANIEL HARVEY
 2   family functions, parties, birthday occasionally, yes,
 3   there could be -- there's thousands.
 4   Q.      Mr. Harvey, I'm asking about the period between
 5   2013 and 2019.
 6   A.      Yeah, I could have met him in a hotel lobby, I
 7   met him at a place for dinner, we were on location,
 8   we're going to eat together.  There's a million places I
 9   could have met him.  This is freaking ridiculous.  Come
10   on.
11   Q.      Do you have a recollection of places that you
12   did meet Mr. Harvey between 2013 and 2019 other than the
13   gym?
14                    MR. DROGIN:  Mr. De Niro.
15                    MS. SLOAN:  Yes, excuse me.  Thank you.
16   Q.      Did you meet --
17   A.      I met him at a restaurant on location.
18   Q.      Okay.  Did you go -- between 2013 and 2019, did
19   you go to premieres with Mr. De Niro?
20   A.      Very, very, rarely.
21   Q.      Besides gyms and restaurants, between 2013 and
22   2019, are there other places that you went with Mr. De
23   Niro for any reason in relation to your work?
24   A.      In relation to --
25   Q.      In relation to your work.
```



Page 82

```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  I'm sorry, I just have
 3            wine delivery.  If you want to take over for
 4            me.  Just give me a standing objection to every
 5            question.  I'll be back in two minutes.
 6    A.      You're going to have to repeat the question,
 7    I'm sorry.
 8    Q.      No problem.  Between 2013 and 2019, besides
 9    gyms and restaurants, what places would you meet with
10    Mr. De Niro for anything related to your work?
11    A.      Anything related to my work?  Maybe at a
12    doctor's visit, maybe at -- there's -- maybe at a
13    premiere, if I went to a premiere.  I'd very seldom go.
14    Maybe at a family function.  It wasn't work related --
15    if it was work-related, it was possibly a doctor's
16    appointment if he had an orthopedic problem that would
17    interfere with his training or needed to look -- a
18    health issue, possibly.
19    Q.      Between 2013 and 2019, on average how often
20    would you speak with Mr. De Niro on the phone?
21    A.      On average, at most, once a day, if that.  At
22    most, once a day.
23    Q.      Were there some days that you didn't talk to
24    Mr. De Niro on the phone at all?
25    A.      Yes.
```



Page 83

```
 1                      DANIEL HARVEY
 2    Q.      What phone numbers did you use to communicate
 3    with Mr. De Niro?
 4    A.      Whatever his iPhone number is.
 5                      MR. DROGIN:  His own or whose?
 6    Q.      Mr. De Niro's phones, thank you.  Did you
 7    communicate with Mr. De Niro on a phone ending in
```

```
 8    And again, this is Mr. De Niro's phone number.
 9    A.      I'm sorry.  I would have to look that up on my
10    phone and my phone is off.
11    Q.      No problem.  Do you ever recall communicating
12    with Mr. De Niro on a phone ending in
```

```
13    A.      I do remember that number.
14    Q.      Between 2013 and 2019, on average, how often
15    would you communicate with Mr. De Niro over e-mail?
16    A.      I have no idea.
17    Q.      Would you communicate with him once a week over
18    e-mail on average between that time period?
19    A.      What was the time period?  What was on average
20    weekly, did you say or month?
21    Q.      The question was between 2013 and 2019, on
22    average, how often would you communicate with Mr. De
23    Niro over e-mail?  You said you didn't know, and so I
24    asked if you communicated with him every week between
25    2013 and 2019 over e-mail?
```



Page 84

```
 1                    DANIEL HARVEY
 2    A.      Possibly a couple of times a week, it was just
 3    a what time to meet.
 4    Q.      And between 2013 and 2019, on average, how
 5    often would you communicate with Mr. De Niro over text?
 6    A.      I'm not sure.  More than e-mail possibly.
 7    Q.      At times during the period from 2013 to 2019,
 8    did you generally work for Mr. De Niro on weekends?
 9                    MR. DROGIN:  Objection.  You can
10                answer.
11    A.      I generally worked with him, yes, on weekends
12    too.
13    Q.      And how many weekends did you work for Mr. De
14    Niro in a typical year between 2013 and 2019?
15    A.      I don't know.  A lot.  A lot.
16    Q.      Does a lot mean more than 50 percent of the
17    weekends you worked for Mr. De Niro?
18    A.      I would say probably more than 50 percent,
19    yeah.
20    Q.      And was text message Mr. De Niro's main way of
21    communicating in writing?
22                    MR. DROGIN:  Objection.
23    A.      I have no idea.  You have to ask him.
24    Q.      Was text message Mr. De Niro's main way of
25    communicating to you in writing?
```



Page 85

```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  Objection.
 3    A.      I don't know.
 4    Q.      Sir, you can answer the question.
 5    A.      I have no idea.
 6                    MR. DROGIN:  He did.
 7    Q.      During the period from 2013 to 2019,
 8    approximately how many hours would you work for Mr. De
 9    Niro in a typical week?
10    A.      All relative.  Can't answer that question.
11    Q.      From 2013 to 2019, what was the minimum number
12    of hours that you would work in a week?
13                    MR. DROGIN:  Objection.  Asked and
14                answered.  You can still answer the question.
15    A.      All relative.  Cannot answer that; I'm sorry.
16    Q.      During the period from 2013 to 2019, what was
17    the maximum number of hours that you would work in a
18    week?
19    A.      I have no idea.
20    Q.      Can you provide me your best estimate?
21    A.      I cannot.  It's too vague, and I did so many --
22    on a movie -- it's too vague.  I can't answer something
23    like that.  I'm sorry.
24    Q.      Okay.  Let's see if we can kind of narrow it
25    down.  During the period of 2013 to 2019, approximately
```



1                     DANIEL HARVEY

2    how many hours would you work for Mr. De Niro in a

3    typical week when you were on location with him?  You

4    can just provide your best estimate.

5                     MR. DROGIN:  You want the witness to

6            guess, in other words?

7    A.     You know, when I'm on location, I'm -- I

8    consider it working the whole time.  I'm away from my

9    family, I'm on location, my life stops.  I consider it

10   I'm on call full-time.

11   Q.     So when you're away from your family, you

12   consider every minute as a work minute; is that your

13   testimony?

14                     MR. DROGIN:  Objection.  You have his

15           testimony.  If you want to hear his testimony,

16           ask her to read back the answer.  Why do you do

17           that?

18   Q.     You can answer the question.

19                     MR. DROGIN:  Can you read back his

20           answer, please.

21       (Whereupon, the record was read by the

22   reporter.)

23                     THE WITNESS:  That's my answer.

24   Q.     During the period from 2013 to 2019,

25   approximately how many hours would you work for Mr. De



Page 87

1                    DANIEL HARVEY

2    Niro in a typical week when you were in New York with

3    him.

4    A.       35 hours a week.

5    Q.       And during the period from 2013 to 2019

6    approximately how many hours would you work for Mr. De

7    Niro when you were at your home in California?

8    A.       That depends.

9    Q.       What did it depend on?

10   A.       Sometimes he was in California.

11   Q.       When he wasn't in California and you were in

12   California, did you sometimes still work for Mr. De

13   Niro?

14   A.       Sometimes, yes.  If there was some -- yes.

15   Q.       And were there weeks at a time when you were in

16   California and Mr. De Niro was not in California between

17   2013 and 2019?

18   A.       Possibly, yes.

19   Q.       And during those weeks approximately how many

20   hours were you working for Mr. De Niro?

21   A.       I couldn't say.

22   Q.       Okay.  I'll come back to that.  Describe for me

23   all of the job duties you performed for Mr. De Niro and

24   Canal during the period from 2013 to 2019?

25                    MR. BENNETT:  Objection.  He explained



Page 88

```
 1                     DANIEL HARVEY
 2            his job duties long ago.  You're asking him to
 3            explain what his duties were over the course of
 4            a six-year period of time.  He's already
 5            answered that question.
 6   Q.       You can answer.
 7   A.       I did answer this question.  So my duties were
 8   to fitness train Mr. De Niro, look over his overall
 9   health and conditioning, in his home or wherever he was.
10   Either one of his homes or on location.  In addition to,
11   when he was on a project or getting prepared for a
12   project, I would read the script, highlight the script
13   for him, I would highlight every scene that he was in in
14   the script, get the shooting schedule, divide the script
15   up into weeks, days, date every day that he was going to
16   be filming and then I would bring it to him and we'd go
17   over every scene that was coming up, sometimes we'd
18   start two, three, months ahead of a project and we'd
19   work on it for three, four, months straight even before
20   we begin the project.  And then I would prepare -- if
21   we're going out of town on location, I would figure out
22   what equipment we needed and where we could rent it or
23   purchase it for a location and make sure he was --
24   everything was equipped upon our arrival so we could
25   continue our work, our fitness training and our running
```



Page 89

```
 1                     DANIEL HARVEY
 2    of the dialogue so he's prepared to film on the set.  If
 3    he had to lose weight for a specific role, gain weight
 4    for a specific role, I would help him with that.  Yeah,
 5    that's majority of it right there.
 6    Q.     Okay.  Describe to me all of the job duties you
 7    performed for Mr. De Niro relating to personal training?
 8    A.     Design a workout, meeting him at his apartment
 9    or fitness facility, usually putting him through a
10    workout session.
11    Q.     Describe a typical exercise session with Mr. De
12    Niro during the period from 2013 to 2019?
13    A.     Repeat the question.
14                     MR. BENNETT:  Objection.  It's a
15              six-year time period.
16                     MR. DROGIN:  Can we take two minutes
17              time period.  I don't know whether I'm going to
18              laugh or cry right now.  But this is so surreal
19              that you guys are maintaining this claim.
20                     THE WITNESS:  I have to say something,
21              ma'am, I swear, you know what, I worked 38
22              years for this, doing this.  I'm 62 years old
23              in March.  I don't appreciate this.  I worked
24              really hard and you know what, I have better
25              things to do right now than this nonsense,
```



Page 90

```
1                      DANIEL HARVEY
2          okay?  So you better get it together.  Because
3          you know what, I want to be left alone.  I
4          didn't bother anybody, I did my job.  I don't
5          know why I'm even here.
6                      MS. SLOAN:  Mr. Harvey, I'm going to
7          just --
8                      THE WITNESS:  No, you listen to me now.
9          I don't even know why I'm here.  This is
10         getting ridiculous.  I don't deserve this.  Get
11         it together or do something.  Let's take a
12         two-minute break.  Because this is ridiculous.
13         This is absurd.  I have better things to do
14         with my life.  Okay?  I want to be left alone.
15         This is nonsense.  Figure it out, quickly.
16                     MR. DROGIN:  The witness is asking for
17         a two-minute break.  See everybody back in two
18         minutes.
19                     THE VIDEOGRAPHER:  The time is now 3:24
20         p.m.  We are going off the record.
21           (Whereupon, a discussion was held off the
22    record.)
23                     THE VIDEOGRAPHER:  The time is now 3:29
24         p.m. and we are back on the record.
25    Q.    During the period from 2013 to 2019, what was
```



Page 91

1                        DANIEL HARVEY

2      the typical exercise session with Mr. De Niro like?

3      A.      I don't know.  We had a few different routines.

4      So all depending on the project and his needs.  It

5      wasn't atypical.

6      Q.      What types of physical exercises did Mr. De

7      Niro do during the typical exercise session?

8                        MR. BENNETT:  What time period?

9                        MS. SLOAN:  Between 2013 and 2019,

10           thank you.

11     A.      Pushups, say, bench pressing.  Stretching,

12     biking, running, stepper, rows, curls, upright rows, lat

13     pull downs.  Is that good enough for you?

14     Q.      When Mr. De Niro was stretching, describe for

15     me what you would be doing?

16     A.      All depending on what the stretch was.

17     Q.      Describe for me generally what you were doing

18     during Mr. De Niro's training sessions?

19     A.      Either I was stretching with him to show him

20     how to do it or I was manually stretching the back of

21     his legs, say.

22     Q.      Can you walk me through a typical routine with

23     Mr. De Niro when he wasn't working on a film project?

24                        MR. DROGIN:  No.  We're done.  We're

25           done.



Page 92

```
 1                    DANIEL HARVEY
 2                    THE WITNESS:  This is absurd.
 3                    MR. DROGIN:  Stop, stop, stop.  Let me
 4          put the objection on the record.  No, I'm
 5          directing the witness not to answer.  If you'd
 6          like to call the Judge, we can.  Moreover, I
 7          want an expedited copy of the transcript,
 8          because this and the video is going to the
 9          Court with a Rule 11 motion.
10                    Guys, you have 24 hours to withdraw
11          this claim.  This is the biggest fraud on the
12          court that I've seen in 32 years of practice.
13          You have 24 hours to withdraw this claim.  He's
14          not answering that question.  Go to the Judge.
15          We'll get on the phone with the Judge right now
16          and you explain how your client has anything to
17          do with an exercise routine with his personal
18          trainer.  This is fraud.  The Judge called you
19          out on it in the first conference, and it's
20          time.  The chickens are home, and they're
21          roosting and we're going to fry them now.
22          We're not talking about his exercise routine.
23          We're talking about duties and
24          responsibilities.
25                    MS. SLOAN:  Counsel, you're impeding
```



Page 93

```
 1                     DANIEL HARVEY
 2          the deposition.
 3                     MR. DROGIN:  You're right.  I am.  I'm
 4          impeding it.  I'm saving us.  I am saving us.
 5          I am your savior.
 6                     MS. SLOAN:  Are you directing the
 7          witness to not answer the question?
 8                     MR. DROGIN:  I have already directed
 9          the witness not to answer the question.  I have
10          offered to get the Judge on the phone so you
11          can explain to the court what this has to do
12          with your client's equal pay claim.  Because if
13          you have to go this far, there is something
14          materially wrong.
15                     MS. SLOAN:  Counsel, please stop.
16                     MR. DROGIN:  Yes, ma'am, I'll stop.  Do
17          you want to call the Judge or do you want to
18          move onto another line of questioning?
19                     MS. SLOAN:  I'm going to move onto the
20          next question.
21                     MR. DROGIN:  Thank you.
22     Q.    Mr. Harvey during the period of 2013 to 2019,
23   how many minutes on average was an exercise session with
24   Mr. De Niro?
25     A.    Three hours on average, possibly.
```



Page 94

1                      DANIEL HARVEY

2    Q.      Did Mr. De Niro sometimes work out by himself

3    without you present?

4                      MR. DROGIN:  Objection to the form.

5            Use your Jedi mind tricks to answer that

6            question.

7                      MS. SLOAN:  Let me just clarify that

8            I'm talking about the years between 2013 and

9            2019.

10                     MR. DROGIN:  So limited.  Use your

11           clairvoyant powers to answer that question.

12           How can he possibly answer that question?

13   Q.      Please answer the question, Mr. Harvey.

14   A.      You'd have to ask him.

15   Q.      To your knowledge, did Mr. De Niro sometimes

16   work out by himself during the period of 2013 to 2019?

17   A.      Possibly.

18   Q.      To your knowledge, how often did Mr. De Niro

19   work out without you present during the period 2013 to

20   2019?

21   A.      I have no idea.  You can ask him that.

22   Q.      You weren't involved with his exercising when

23   you weren't present physically with him; is that

24   correct?

25                     MR. BENNETT:  Objection.



Page 95

1                       DANIEL HARVEY

2                       MR. DROGIN:  Objection to the form.

3            Double objection to the form.

4    Q.      Please answer the question, Mr. Harvey.

5    A.      You couldn't say I wasn't involved.  I wouldn't

6    say that.

7    Q.      In what ways were you involved with Mr. De

8    Niro's exercising when you weren't physically present

9    with him during the period of 2013 to 2019?

10                      MR. DROGIN:  Objection.

11           Mischaracterizes the witness's testimony.

12   A.      I taught him the routine, and sometimes he

13   would ask me what he should do and I would convey that

14   and he would convey back to me what he did.

15   Q.      During 2013 to 2019, how many hours a week

16   would you spend with Mr. De Niro when he was exercising?

17   A.      Didn't I just answer this question?

18                      MR. BENNETT:  He answered that.

19   Q.      So to summarize, from 2013 to 2019, Mr. De Niro

20   would work out --

21                      MR. DROGIN:  Objection.  Direct the

22           witness not to answer.  I'm directing him not

23           to answer.  You're not going to encapsulate and

24           summarize his testimony.  You have it.  You

25           don't need to summarize it.  You're not going



Page 96

                         DANIEL HARVEY

1

2            to botch it by putting together a summary of

3            what you think he said.  You have it on the

4            record, you have it on video.  This is

5            improper.  We don't need a summary.

6                    MS. SLOAN:  Counsel, stop.

7    Q.    Have you documented in writing any of the

8    exercise routines that you've prepared in relation to

9    exercise sessions with Mr. De Niro?

10                   MR. BENNETT:  Same time period?

11                   MS. SLOAN:  Yes, thank you.  Same time

12           period of 2013 to 2019.

13   A.    Yes, I have at times, yes.

14   Q.    Did you provide these documents to Mr. De Niro?

15   A.    Yes.

16   Q.    Did you e-mail them to Mr. De Niro?

17   A.    No.  Listen, I've been working with him for 38

18   years, you understand that?  So --

19                   MR. DROGIN:  Excuse me, excuse me.

20           You're here to answer questions, not make

21           speeches.

22                   MR. BENNETT:  There's no pending

23           question.

24                   THE WITNESS:  This is ridiculous.

25                   MR. DROGIN:  Just the sooner the



Page 97

                    DANIEL HARVEY

1

2        better.   Just let her ask questions.

3                    THE WITNESS:   Sorry.

4    Q.      That's okay.   You did not travel with Mr. De

5    Niro every time he was traveling outside of New York; is

6    that correct?

7    A.      That's correct.

8    Q.      And during the period from 2013 to 2019 when

9    Mr. De Niro traveled without you, he wouldn't meet you

10   for exercise sessions; is that correct?

11                   MR. DROGIN:   Objection to the form.

12   A.      Can you repeat the question, please?

13   Q.      During the period from 2013 to 2019, when Mr.

14   De Niro traveled without you, he wouldn't meet you for

15   any exercise sessions, correct?

16                   MR. DROGIN:   Objection to the form.

17                   MR. BENNETT:   Objection.

18                   MR. DROGIN:   I think only one of us

19           should object.

20                   MR. BENNETT:   That's fine.

21                   MR. DROGIN:   Are you accounting for the

22           possibility that they traveled separately and

23           then met at the destination because maybe they

24           took different flights?

25                   MS. SLOAN:   Counsel, stop.   I'm asking



Page 98

```
 1                    DANIEL HARVEY
 2          Mr. Harvey to answer the question as he
 3          understands it.
 4                    MR. DROGIN:  I'm just pointing out the
 5          fallacy of the question.
 6   A.     I don't understand the question, to tell you
 7   the truth.
 8   Q.     For most of the period from 2013 to 2019, Mr.
 9   De Niro was in his 70's, correct?
10   A.     Mr. De Niro was where?  I'm sorry.
11   Q.     In his 70's, is that correct?
12   A.     What time period?
13   Q.     The period of 2013 to 2019.
14   A.     I believe that's correct.
15                    MR. DROGIN:  You can propose -- do you
16          want to propose a stipulation?
17   Q.     During your employment for Mr. De Niro, as Mr.
18   De Niro got older, did the frequency of your personal
19   training sessions with Mr. De Niro decrease?
20   A.     No.
21   Q.     As Mr. De Niro got older, did the amount of
22   time you spent exercising with him decrease?
23   A.     No.
24   Q.     As Mr. De Niro got older, did the intensity of
25   Mr. De Niro's workouts decrease?
```



```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  Objection to the form.
 3    A.      I can't say that -- I can't answer that yes or
 4    no.
 5    Q.      How would you describe Mr. De Niro's health
 6    during the period from 2013 to 2019?
 7                    MR. DROGIN:  Objection to the form.
 8    A.      Good.
 9    Q.      Did Mr. De Niro have any health problems during
10    the period from 2013 to 2019?
11                    MR. DROGIN:  Objection to the form.
12    A.      ████████████████████████  ████████
      ██  ████████████████████████████████
14    Q.      Tell me every health condition that you do
15    recall Mr. De Niro experiencing over the time period
16    from 2013 to 2019.
17                    MR. DROGIN:  I'm going to object and
18                    direct the witness not to answer.  You can ask
19                    Mr. De Niro.  You don't need to ask Mr. Harvey
20                    about his knowledge of another human being's
21                    health condition.  Ask Mr. De Niro, he would
22                    know.
23                    MS. SLOAN:  I'm going to ask another
24                    question, Counsel.
25                    MR. DROGIN:  Great.  Okay.
```



**MAGNA ▶**
**LEGAL SERVICES**

Page 100

1                    DANIEL HARVEY

2    Q.      Over the past decade did Mr. De Niro have any

3    health problems that limited how much exercise he could

4    perform?

5    A.      ████████    ████████████████████

6    Q.      Would you and Mr. De Niro watch TV during your

7    exercise sessions?

8                    MR. DROGIN:  Objection to the form.

9    A.      The TV was on.  The TV was on.  I don't know if

10   we were watching it.  We were working.

11                   MR. DROGIN:  Please ask if they watched

12           Netflix.  Please ask if they watched Netflix.

13   Q.      Between 2013 and 2019, would you chat with Mr.

14   De Niro during exercise sessions with him?

15   A.      I would talk to him, yes.

16   Q.      Would you talk with him about the TV show that

17   was on?

18   A.      Sporadically -- there was always news on and --

19   sporadically about the news that was possibly

20   highlighted on, yes.

21   Q.      Between -- sorry.  Did you have more to say?

22   A.      That's all.  There was nothing -- the TV was

23   on, it was on a news station.

24   Q.      But the TV was always on while you were working

25   out?



```
 1                    DANIEL HARVEY
 2    A.        Not always, but the majority of the time, it
 3    was on the news station.  He liked to have the news in
 4    case there was any breaking news when he was training.
 5    That's what he liked to do.
 6    Q.        What other topics would you and Mr. De Niro
 7    generally talk about during exercise sessions?
 8    A.        Generally we were pretty busy.  So the majority
 9    of the time -- and I would say the majority of the time,
10    we would get right down to business.  He's a serious guy
11    whose got a lot of responsibilities and a lot of
12    pressure on him, and I'd walk in, and literally he would
13    start doing the dialogue as he walked in the door.
14    Wouldn't give me a second to breathe.  If I was there
15    ahead of him -- I was always there ahead of him waiting,
16    and he would walk in the door and he would start the
17    first scene that he had memorized and he would start his
18    dialogue and I would kick it right in.  And if I didn't
19    have the pages ready to go, he would be annoyed.  And we
20    would work every minute as fast as I could turn those
21    pages, he wanted to do the next scene, the next day's
22    scene, the next week's scene.  And it was nonstop,
23    sometimes for three, four hours where I couldn't even go
24    to the bathroom.  So we were working.  And it was
25    nonstop.  It wasn't a lot of chitchat, so I'll just be
```



Page 102

1                          DANIEL HARVEY

2     clear about that.

3     Q.      What were you physically doing during the

4     exercise sessions?

5     A.      Well, when I was holding the script, when he

6     was exercising -- we'd do our exercise routine and when

7     I needed to spot him or engage with him physically, I

8     would do that, put the script down or the pages that I

9     was holding down, spot him or protect him from --

10    correct his exercise routine.  And then as soon as he

11    was done, I would pick up the pages, he'd get on the

12    treadmill, we'd do like a cross-training and he would go

13    right back to the dialogue.  Sometimes he would do it

14    almost immediately after his last repetition, and that's

15    how fanatical he was about getting as much out of our

16    time as possible.  It was very intense, to say the

17    least, and it still is.

18    Q.      During the period from 2013 to 2019, personal

19    training wasn't the only job responsibility you had for

20    Mr. De Niro, correct?

21                      MR. DROGIN:  Objection.  Have you been

22            listening?  I mean, is that a real question?

23            Go off script.  He just told you what he's been

24            doing.

25    Q.      Please answer the question, Mr. Harvey.



Page 103

1                      DANIEL HARVEY

2    A.       Please repeat that.

3    Q.       It was a yes-or-no question.  During the period

4    from 2013 to 2019, personal training wasn't the only job

5    responsibility you had for Mr. De Niro, correct?

6    A.       Correct.

7    Q.       Besides what you've already discussed, what job

8    responsibilities did you have for Mr. De Niro when he

9    was filming?

10   A.       I thought we went over this.  I'll repeat it

11   again.

12   Q.       Mr. Harvey, my question is besides what we've

13   already discussed, are there other job responsibilities

14   that you had for Mr. De Niro when he was filming?

15   A.       Besides what I've already told you about the

16   dialogue and the preparing the scenes and that; is that

17   the question?

18   Q.       Yes, that's the question.  But why don't you

19   describe for me a typical workday for Mr. De Niro when

20   Mr. De Niro was filming?

21   A.       Typical workday, maybe getting up at typically

22   about 3:00, 3:15 in the morning.  Meeting him at 4:00,

23   4:15 and working till six say is pickup, which would be

24   6:45, 7:00 in the morning, and working on the dialogue

25   and our exercise routine.



Page 104

1                      DANIEL HARVEY

2    Q.       For how many hours would you do that?

3                      MR. DROGIN:  Objection.  Asked and

4            answered.

5    Q.       Please answer the question.

6    A.       Approximately four hours.

7    Q.       So when that ended, what did you do?

8    A.       It all depends.  Sometimes I would go to the

9    movie set and sometimes I would stay at the hotel where

10   we were.

11   Q.       And if you went to the movie set, what would

12   you do on set?

13   A.       I would see if he needed anything.  Otherwise,

14   I would basically listen to dialogue, to get some idea

15   where the project was going.

16   Q.       And what are types of things that Mr. De Niro

17   would need from you?

18   A.       Oh, nothing in particular.  Maybe some pages

19   that we left at the hotel or get the rewrites that were

20   at set that the writers rewrote and highlight them and

21   add them to our script.  Get the new shooting schedule.

22   Get the next day's call pickup time, general stuff.

23   Q.       And if you went back to the hotel, what would

24   you do for Mr. De Niro?

25   A.       Nothing in particular.  Some days he'd need me



Page 105

1                    DANIEL HARVEY

2    to do something.  Majority of the time I didn't have to.

3    Q.      Okay.  So he might need you to do something

4    similar to what you just described?

5    A.      Yes.  Yes.

6    Q.      Are there any other work assignments that Mr.

7    De Niro would give you when you were on set?

8                    MR. DROGIN:  Objection to the form.

9          You can answer.

10   A.      Not that I can recall right now.

11   Q.      Can you now please describe for me a typical

12   workday for you when Mr. De Niro was not filming?

13                   MR. DROGIN:  Objection to the form.

14   A.      When he's not filming, meet him at the location

15   of his preference, get ready for the workout, work him

16   out, work on the dialogue, whatever he was preparing

17   for.  Just because we weren't -- the majority of the

18   time he's got something in the works, so we're

19   preparing.  So I'd have a script, like I do now, I have

20   a script that we're preparing for.  And so we'd spend a

21   few hours working on it.

22   Q.      There were sometimes when Mr. De Niro wasn't

23   preparing for a film; is that correct?

24   A.      Yes, that's correct.  Of course.

25   Q.      During the period from 2013 to 2019, how many



Page 106

1                          DANIEL HARVEY

2    weeks on year per average would you say that Mr. De Niro

3    was not filming or preparing for a film?

4    A.      Every year is different.  It's hard to say.

5    Q.      How about 2019, if you can recall?

6    A.      It's going to be hard for me to recall, sorry.

7    Q.      During the period from 2013 to 2019, would you

8    run errands for Mr. De Niro?

9    A.      No.

10   Q.      You never ran errands for Mr. De Niro from 2013

11   to 2019?

12                   MR. DROGIN:  Objection to the form.

13           Asked and answered.  Please define errands.

14   Q.      Please answer my question, Mr. Harvey.

15   A.      First of all, I never said never.  I may have

16   run a couple of errands here and there, but very, very,

17   very rarely, I could tell you that.  No, I would say on

18   -- what's an errand -- no, I didn't run errands for Mr.

19   De Niro.  I did not.

20   Q.      So I'm just going to re-ask the question.

21   During the period from 2013 to 2019, you never ran

22   errands for Mr. De Niro?

23                   MR. DROGIN:  Objection to the form.

24           Asked and answered.  And he already told you,

25           no, the answer is not correct.  How do you



Page 107

1                          DANIEL HARVEY

2            start a question with, I'm going to ask you the

3            question again?

4    Q.      Mr. Harvey, can you please answer my question.

5    A.      Occasionally over the last six -- occasionally

6    from 2013 to 2019, I may have occasionally run an errand

7    for him, probably a couple in that timeframe.  It wasn't

8    my job.  He may occasion -- I can't remember.  I can't

9    say never, because it's possible he asked me to run an

10   errand a couple of times.  It's a long period.

11   Q.      What types of errands do you recall him asking

12   you to run during that period?

13   A.      Define errands, please.

14   Q.      Would you pick up coffee for Mr. De Niro

15   between 2013 and 2019?

16   A.      I can honestly say I don't think I ever picked

17   up a coffee for him.

18   Q.      Would you bring Mr. De Niro newspapers during

19   the period of 2013 to 2019?

20   A.      Occasionally, possibly.  I can't remember.

21   Occasionally, I would probably bring him a newspaper if

22   we're on location or something, yes.

23   Q.      Would you buy food for Mr. De Niro during the

24   period from 2013 to 2019?

25   A.      Yes; if we were on location, sometimes, yes, I



Page 108

```
 1                     DANIEL HARVEY
 2   would buy him food.
 3   Q.      Would you buy him groceries between 2013 and
 4   2019?
 5   A.      Possibly if it was needed on location.
 6   Q.      During the period from 2013 to 2019, did you
 7   perform work with respect to Mr. De Niro's apartment?
 8   A.      I don't believe so.
 9                     MR. DROGIN:  Just define apartment,
10             what you're talking about.
11   Q.      Mr. De Niro's residence between 2013 and 2019.
12   Did you set up the gym at Mr. De Niro's apartment on
13   ███████████████████
14                     MR. DROGIN:  Just for clarification,
15             that's not an apartment.  That's I think the
16             confusion.  If you're referring to █████ we all
17             know what you're talking about.
18   A.      Repeat specifically the question again.  I'm
19   sorry.
20   Q.      Well I'll go back to my original question which
21   was during the period of 2013 to 2019, did you perform
22   work with respect to Mr. De Niro's place of residence?
23   A.      Me personally, no.
24   Q.      Were you involved at all with the work that was
25   being done with respect to Mr. De Niro's place of
```



Page 109

1                    DANIEL HARVEY

2     residence?

3     A.      Yes.

4     Q.      In what ways were you involved?

5     A.      I ordered the fitness equipment that he

6     required or of his wishes, and I had a company install

7     it.

8     Q.      Did you do anything else?  Were you involved in

9     any other way?

10    A.      Directing where I wanted it.

11    Q.      Did you lay out the furniture in Mr. De Niro's

12    place of residence?

13    A.      I did not.

14    Q.      Did you direct how the furniture should be laid

15    out?

16    A.      I did not.

17    Q.      During the period from 2013 to 2019, would you

18    attend meetings with Mr. De Niro?

19    A.      Possibly a few times.

20    Q.      What types of meetings would you attend with

21    Mr. De Niro during the period of 2013 to 2019?

22    A.      I remember a meeting with maybe a politician or

23    two in his office, just maybe some friends.  Just --

24    yeah, that's all can I recall.

25    Q.      Would you attend meetings with Mr. De Niro at



Page 110

```
 1                     DANIEL HARVEY
 2   least a couple of times a year?
 3                     MR. DROGIN:  Objection to the form.
 4   A.      I'd have to say no.
 5   Q.      During the period from 2013 to 2019, would you
 6   attend events with Mr. De Niro?
 7   A.      I think I went over this.  Occasionally.
 8   Q.      Occasionally premieres; is that what you're
 9   referring to?
10   A.      Yeah, we went through that, right?  I rarely
11   did it.  I've been doing this a long time.  I rarely do
12   it.  If it was necessary or I felt like I wanted to see
13   something, I would go.
14   Q.      During the period from 2013 to 2019, would you
15   arrange meetings or appointments for Mr. De Niro?
16   A.      I'm sure there was some in there, yeah.
17   Q.      What types of meetings did you arrange for Mr.
18   De Niro between 2013 and 2019?
19   A.      Possibly to meet a doctor or meet a friend that
20   I thought might have a project that he might be
21   interested in.  Random stuff.
22   Q.      How often would you arrange meetings or
23   appointments for Mr. De Niro?
24   A.      Not very often.  Not very often.  Rarely.
25                     MR. DROGIN:  I need to jump onto a
```



Page 111

                        DANIEL HARVEY

1

2          court conference.  I should be back.  I don't

3          know how much longer, Annie, you think you

4          have.

5                    MS. SLOAN:  How much record time has

6          there been?  I have at least another hour.

7                    MR. DROGIN:  All right.  Let me make a

8          suggestion:  If we could just take a 20-minute

9          break.  I'll try to join in 20 minutes.  And if

10         not, just proceed without me.  It's an

11         evidentiary issue I've got to resolve.  Is that

12         okay?  I've got to jump -- I'll be back.

13                   THE VIDEOGRAPHER:  So are we going off

14         the record?

15                   MR. BENNETT:  To the extent that,

16         Annie, you're willing to wait for 20 minutes,

17         I'd prefer that my Co-Counsel be on the line

18         when we're conducting the questioning.  If

19         that's an issue, we can talk it through.  But

20         that would be my preference, with respect.

21                   MS. SLOAN:  That's fine with me.

22                   MR. BENNETT:  I certainly

23         acknowledge --

24                   MS. SLOAN:  I'd like to confer with the

25         other attorneys at Sanford Heisler before --



Page 112

                            DANIEL HARVEY

1

2                    MR. BENNETT:  Yeah, that's totally

3           fine.  I think what Laurent suggested was that

4           we just defer until 4:20, and if he's not back

5           on, we'll just resume then.  But again, I'll

6           wait to hear back from you.

7                    MS. SLOAN:  Okay.  That's fine.  4:20

8           is fine.  Thanks very much.

9                    MR. BENNETT:  Thank you very much.

10                    THE VIDEOGRAPHER:  The time is 4:00

11           p.m. we're going off the record.

12           (Whereupon, a short break was taken.)

13                    THE VIDEOGRAPHER:  The time is now 4:21

14           p.m. and we're back on the record.

15    Q.     Mr. Harvey, during your employment at Canal,

16    have you had reason to work with Ms. Chase Robinson?

17    A.     Repeat the question, please.

18    Q.     During your employment at Canal, have you had

19    reason to work with Ms. Chase Robinson?

20    A.     What do you mean reason?

21    Q.     Okay.  I'll rephrase the question for you.

22    During your employment at Canal, have you worked with

23    Ms. Robinson?

24    A.     I don't understand that.  Work with.  With on

25    what?



1                  DANIEL HARVEY

2    Q.     Are there any aspects of your work for Mr. De

3    Niro with which you worked with Ms. Robinson?

4    A.     We had some interactions.  I didn't work with

5    her.

6    Q.     What were those interactions like?  What were

7    those interactions about?

8                  MR. BENNETT:  Objection.  You can

9           answer.

10   A.     General stuff.  Travel, time periods of travel,

11   location, places we have to be, travel plans, itinerary

12   stuff.

13   Q.     Did you coordinate with Ms. Robinson to assist

14   Mr. De Niro regarding his health?

15   A.     No.

16   Q.     Did you and Ms. Robinson communicate with the

17   same doctors about Mr. De Niro's health?

18                 MR. BENNETT:  Objection.  You can

19          answer.

20   A.     I don't know.

21   Q.     Did you and Ms. Robinson communicate with each

22   other about Mr. De Niro's health?

23   A.     Not about his health.  Maybe an appointment.

24   Q.     A medical appointment?

25   A.     Yes.



Page 114

1                    DANIEL HARVEY

2    Q.      You mentioned that you interacted with Ms.

3    Robinson about travel.  What types of travel did you

4    interact with her about?

5    A.      Airline travel, car service travel, location

6    travel.

7    Q.      You coordinated with Ms. Robinson about the

8    hotels that you and Mr. De Niro stayed in on location

9    for films; is that correct?

10   A.      Coordinated?  I -- about time -- coordinate, I

11   don't understand the question.

12   Q.      Did you communicate with Ms. Robinson about the

13   hotels that you and Mr. De Niro stayed in on location

14   for films?

15   A.      He coordinated it with her and then they would

16   let me know.  Chase Robinson or Mr. De Niro would let me

17   know which hotels he preferred.

18   Q.      Did you work with Ms. Robinson to arrange Mr.

19   De Niro's travel?

20                   MR. BENNETT:  Objection.  You can

21          answer.

22   A.      No.

23   Q.      Did you work with Ms. Robinson to arrange any

24   of the hotels that you stayed at -- that you or Mr. De

25   Niro stayed at on location?



Page 115

1                    DANIEL HARVEY

2                    MR. BENNETT:  Objection.  You can

3          answer.

4    A.     I don't know what you mean, did I work with.

5    What do you mean work with?

6    Q.     Did you communicate with Ms. Robinson about

7    these things and work with her on them?  If you don't

8    know -- I'm just asking as far as you're aware, did you

9    work with Ms. Robinson to arrange the hotels?

10                   MR. BENNETT:  Objection.  You can

11         answer.

12   A.     I can't answer.  I don't understand what you

13   mean by work with her.  I didn't have -- I was -- Mr. De

14   Niro worked with her and I went along.

15   Q.     Ms. Robinson was one of your colleagues,

16   correct?

17                   MR. BENNETT:  Objection to the form.

18   A.     She was not one of my colleagues.

19   Q.     Ms. Robinson worked for Canal; is that correct?

20   A.     Yes.

21   Q.     You also worked for Canal; is that correct?

22   A.     Yes.

23   Q.     So both of you were employees of Canal at the

24   same time period, correct?

25   A.     Yes.



Page 116

```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  Objection to the form.
 3          You know that's not true.  So it's a misleading
 4          question.
 5    Q.    Did you both work together to support Mr. De
 6    Niro?
 7                    MR. DROGIN:  Objection to the form.
 8    A.    I don't know -- I can't tell you what she did
 9    for -- how she supported him.  You'd have to ask her.
10    Q.    During the period from 2013 to 2019, would you
11    use a Canal credit card to pay for various expenses?
12    A.    I don't know if it was that time.  I don't know
13    the time period.  I don't know.
14    Q.    In 2015 did Canal issue a credit card to you
15    under your name?
16    A.    I'm not sure.
17    Q.    At some point in the past decade, did Canal
18    issue a credit card to you under your name?
19    A.    Yes.
20    Q.    Prior to obtaining a Canal American Express
21    card in your name, would you charge expenses to a Canal
22    American Express in someone else's name?
23                    MR. DROGIN:  Objection to the form.
24    A.    No, I don't believe so.
25    Q.    Okay.  So prior to receiving a credit card in
```



Page 117

1                          DANIEL HARVEY

2    your name, did you ever make charges using a Canal

3    American Express?

4    A.      Not that I'm aware of.

5    Q.      So the first time that you charged things to a

6    Canal American Express was when you received one in your

7    name; is that what you're saying?

8                          MR. BENNETT:  Objection to the form.

9    A.      To the best of my knowledge.

10   Q.      To your knowledge, did Canal have a policy that

11   specified what expenses employees could charge to a

12   Canal credit card?

13   A.      I have no idea.

14   Q.      To your knowledge, did Canal have a policy that

15   specified what expenses you could charge to a Canal

16   credit card?

17   A.      I have no idea.

18   Q.      What was your understanding of what types of

19   expenses could be charged by a Canal employee to a Canal

20   credit card?

21   A.      I do not know.

22   Q.      Did you and Mr. De Niro ever communicate about

23   what types of expenses you could charge to Canal?

24   A.      No.

25   Q.      How did you know what expenses you were allowed



Page 118

```
 1                    DANIEL HARVEY
 2   to charge on a Canal credit card?
 3                    MR. BENNETT:  Objection to the form.
 4   A.      Work-related or I would ask.
 5   Q.      How do you define work-related?
 6   A.      I don't know.  You define it.  You tell me.
 7   Q.      Mr. Harvey, you said that you would use the
 8   card -- you knew that you could charge the card if the
 9   item was work-related.  So I'm just trying to clarify,
10   what you mean by work-related, so --
11   A.      Travel, business travel, hotel stays.
12   Q.      You said that if you didn't know, you would
13   ask.  Who would you ask?
14   A.      I would ask his financial advisor.
15   Q.      And who is that?  You're referring to a
16   specific individual?
17   A.      Either -- mostly Michael Tasch.
18   Q.      Have you ever spoken to Mr. De Niro about what
19   you could charge to the Canal credit card?
20                    MR. DROGIN:  Objection to the form.
21              You're talking about a general policy or you're
22              talking about a specific instance?  I'm just
23              not clear.
24   Q.      Okay.  Please answer the question, Mr. Harvey.
25   A.      Can you repeat the question, please.
```



Page 119

```
 1                    DANIEL HARVEY
 2                    MS. SLOAN:  Brooke, could you please
 3          read back the question.
 4           (Whereupon, the record was read by the
 5      reporter.)
 6                    MR. DROGIN:  Objection to the form.
 7                    THE WITNESS:  I can't remember.
 8      Q.     Mr. De Niro did not specifically approve every
 9      charge that you made on a Canal credit card; is that
10      correct?
11                    MR. DROGIN:  Objection to the form.
12      A.     The question again?  I'm sorry.
13      Q.     Mr. De Niro did not specifically approve of
14      every charge that you made on a Canal credit card; is
15      that correct?
16      A.     Yes.
17      Q.     Since getting a Canal credit card in your name,
18      on how many occasions have you made charges to the
19      credit card?
20      A.     I have no idea.  All depends.
21      Q.     Do you typically make charges on the Canal
22      credit card at least once a week or between 2015 and
23      2019, did you typically make charges on a Canal credit
24      card at least once a week?
25      A.     I don't remember.
```



Page 120

1                          DANIEL HARVEY

2    Q.       Did you ever use the Canal American Express

3    without clearing the expense with Mr. De Niro first?

4    A.       Yes.

5    Q.       Was it your regular practice to make charges on

6    the Canal American Express without clearing it with Mr.

7    De Niro first?

8    A.       I told you, I cleared it with his financial

9    advisor, Michael Tasch.

10   Q.       Okay.  But not with Mr. De Niro?

11   A.       No.

12   Q.       And so would you clear it with Mr. -- every

13   charge that you spent on a Canal credit card with Mr.

14   Tasch?

15   A.       No.

16   Q.       How often would you clear a -- did you have a

17   practice of providing your credit card receipts to

18   anyone at Canal?

19   A.       No.

20   Q.       Is there a general type of expense that you

21   would charge to a Canal credit card without discussing

22   it with Mr. Tasch?

23   A.       Repeat the question, please.

24   Q.       Was there a specific type of expense that you

25   would charge to a Canal credit card without discussing



Page 121

1                          DANIEL HARVEY

2     it with Mr. Tasch?

3     A.      Yes.

4     Q.      What was that specific type of expense?

5     A.      Travel expense or hotel expense possibly.

6     Q.      Between 2013 and 2019, would Canal pay for your

7     flights?

8     A.      Some.

9     Q.      To your knowledge, did Canal have a practice of

10    paying for any of its employees' flights?

11                      MR. DROGIN:  Objection to the form.

12              Are you talking about business-related or are

13              you just talking in general, or do you not

14              care?

15    Q.      Please answer the question, Mr. Harvey.

16                      MR. DROGIN:  I'll object to the form.

17    A.      Repeat the question, please.

18    Q.      To your knowledge, did Canal have a practice of

19    paying for its employees' flights?

20                      MR. DROGIN:  Objection to the form.

21    A.      I have no idea.

22    Q.      And to your knowledge, did Canal have a

23    practice of paying for your flights?

24    A.      Yes.

25    Q.      Would Canal pay for all of your travel between



Page 122

```
 1                      DANIEL HARVEY
 2   California and New York?
 3   A.      No.
 4   Q.      When would Canal pay for your travel, pay for
 5   your flights?
 6                  MR. DROGIN:  Objection to the form.
 7                  MR. BENNETT:  Just to clarify, this is
 8          still 2013 to 2019 or is it a more specific
 9          time period?
10                  MS. SLOAN:  Yes.  And if I don't say
11          otherwise, you can assume that the time period
12          I'm speaking about is 2013 to 2019.
13   A.      Production would reimburse Canal periodically
14   on my flights when I was on working projects, and my
15   travel.
16   Q.      Did Mr. De Niro authorize you to book the
17   flights using a Canal credit card?
18   A.      Yes, I was authorized.  Yes.
19   Q.      By Mr. De Niro?
20   A.      By his financial advisors.
21   Q.      Okay.  So every time that you booked a flight
22   using a Canal credit card, Mr. Tasch would specifically
23   authorize that purchase, is that --
24                  MR. DROGIN:  Objection to the form.
25          You can answer.
```



Page 123

1                        DANIEL HARVEY

2    Q.       -- is that correct?

3    A.       No.

4    Q.       Can you please explain?

5    A.       What's the question?

6    Q.       When would you speak with Mr. Tasch in relation

7    to the flights that you purchased using a Canal credit

8    card?  Just trying to get a sense of when you had the

9    approval from Mr. Tasch.

10   A.       When it was work-related.

11   Q.       Okay.  And so when -- can you explain what

12   work-related means to you in this context?

13   A.       Yes, when Mr. De Niro wanted me to work, it was

14   work-related.  I would come in and see him.

15   Q.       When you would book flights -- sorry.  When you

16   would go onto location, would you book flights using a

17   Canal credit card?

18   A.       When I would book flights?  Excuse me, what was

19   the first part?

20   Q.       To a film location?

21   A.       Sometimes.  Rarely.

22   Q.       Do you at sometimes book flights to a film

23   location and pay for your own flights?

24   A.       Most of the time I would go with him private or

25   whatever or, yeah.



Page 124

                        DANIEL HARVEY

1

2    Q.      Understood.  Prior to having a credit card in

3    your own name in 2015, how did you book your

4    work-related flights?

5    A.      I can't remember.  I have no idea.

6    Q.      Did Canal assistants typically book flights for

7    you?

8    A.      There was a period that they assisted.  I can't

9    remember what the time frame was.

10   Q.      You would book flights on Canal's credit card

11   without first speaking to Mr. De Niro or Mr. Tasch,

12   correct?

13                   MR. DROGIN:  Objection to the form.

14           You're doing it again.  So I'll object to the

15           form of the question.  It's compound.  It

16           misstates the witness's testimony.

17   Q.      Please answer the question, Mr. Harvey.

18                   MR. DROGIN:  Subject to the objection,

19           you can answer.

20   A.      Sometimes, yes.

21   Q.      To your knowledge, is there any written record

22   of Mr. De Niro and Mr. Tasch authorizing you to pay for

23   your flights using a Canal credit card?

24   A.      To my knowledge, I have no idea.

25   Q.      Communications with Mr. De Niro concerning



Page 125

                         DANIEL HARVEY

1

2    expenses primarily took place orally rather than over

3    e-mail; is that correct?

4                  MR. DROGIN:  Objection to the form.

5              I'm sorry.  Was the word primarily?  Is that

6              the word you used?

7                  MS. SLOAN:  Yes.

8                  MR. DROGIN:  Objection to the form.

9    A.        I couldn't say either way.  I don't know.

10   Q.        You would book hotels on Canal's credit card

11   without first speaking to Mr. De Niro or Mr. Tasch; is

12   that correct?

13                 MR. DROGIN:  Objection to the form.

14   A.        They were aware I was working with him.  They

15   were aware of it.  I don't know if I actually spoke to

16   them.  Yes, they knew I was -- yes, they were aware of

17   it, let's put it that way.  I was on location or in his

18   place on Montauk or Upstate.  They were aware of it.

19   Q.        My question is, you would book hotels on

20   Canal's credit card without first speaking to Mr. De

21   Niro or Mr. Tasch?

22   A.        Yes.

23                 MR. DROGIN:  Objection to the form.

24             You're assuming that there ever needed to be a

25             conversation.  These questions are



```
 1                     DANIEL HARVEY
 2            objectionable.  You're assuming facts that
 3            aren't in evidence.  I understand what you want
 4            him to say, but you can't put the words in his
 5            mouth.  You're just making assumptions.
 6   Q.       Mr. Harvey, would you charge meals to Canal's
 7   credit card?
 8   A.       Yes.
 9   Q.       And you would charge those meals on Canal's
10   credit card without first speaking to Mr. De Niro or Mr.
11   Tasch; is that correct?
12                 MR. DROGIN:  Objection to the form.
13            Are you talking about personal meals?  Are you
14            talking about business meals?  Are you assuming
15            that they don't know what he's doing?  I
16            understand you want a blanket statement, but
17            I'm objecting to all of these questions.
18   Q.       Mr. Harvey, can you please answer the question?
19                 MR. DROGIN:  I'm just pointing out the
20            flaw in your line of questioning, so if you
21            ever try to use this, it's very clear you're
22            misleading the witness.  You're not
23            differentiating between relevant factors.
24   A.       They were aware -- I was on location, I was out
25   of town, it's a business expense.  When you go out of
```



Page 127

1                    DANIEL HARVEY

2   town, it was a business expense.  They understood that I

3   was away from home and my meals were covered.

4   Q.      Okay.  So you would book -- you said you would

5   pay for meals on Canal's credit card without first

6   speaking to Mr. De Niro or Mr. Tasch, correct?

7                    MR. DROGIN:  Objection.  Objection.

8           Same objection.  You've asked him the question

9           and now you're rephrasing it in a misleading

10          way.  You have his testimony.

11  Q.      Please answer the question.

12                   MR. DROGIN:  I'm not going to let you

13          do that.  You're not going to put this in your

14          words.  You're asking the witness questions.

15          There's no need to summarize it or twist it,

16          turn it around.  We all know what he's saying

17          and we all see what you're trying to do.

18  Q.      Please answer the question.

19  A.      As I said, it was a business expense.  That's

20  understood.  I was out of town, on location or out of

21  town on business.

22  Q.      What other expenses would you charge to Canal

23  American Express?

24  A.      Business expenses.  Whatever came.  Basically

25  that's it.  Exercise equipment that he needed.



Page 128

                    DANIEL HARVEY

1

2    Q.      Please explain what else you mean by business

3    expenses?

4    A.      Gas, when I'm on location.  Exercise equipment

5    that he needed to work out with.  Basically it.

6    Q.      What about a rental car?

7                    MR. DROGIN:  Objection to form.

8    A.      No.  Usually a rental car was provided for me

9    by a production company when I was on location.  A

10   production company would provide me with a rental car.

11   Q.      What about ground transportation, like, taxis

12   or Ubers or Lyfts?

13   A.      I would need a taxi service to and from the

14   airports.  Business-related.

15   Q.      So you would charge the taxis to and from the

16   airport to the Canal credit card when it was

17   business-related; is that correct?

18   A.      Yes, that's correct.

19   Q.      During the period -- and you would, you know,

20   charge the taxis to Canal's credit card without speaking

21   to Mr. De Niro or Mr. Tasch first, correct?

22                   MR. DROGIN:  Objection to the form.

23                   Misstates the witness's testimony.  You're

24                   assuming that it ever would have been

25                   necessary.



Page 129

```
 1                     DANIEL HARVEY
 2                MS. SLOAN:  Counsel, please stop.
 3                MR. DROGIN:  Well, please stop doing
 4           what you're doing.  You're trying to rewrite --
 5   Q.      Please answer the question, Mr. Harvey.
 6                MR. DROGIN:  You're asking it in a way
 7           that misstates his testimony, that's the
 8           problem.
 9   Q.      Answer the question, Mr. Harvey.
10                MR. DROGIN:  Well, let me object.
11           You're assuming a fact that is not in evidence
12           that that was what was required or necessary or
13           should have been done.
14   Q.      Answer the question, Mr. Harvey.
15   A.      Can you please repeat it?
16                MR. DROGIN:  Subject to the objection,
17           you can answer.
18                MS. SLOAN:  Brooke, can you please
19           repeat the question.  Thank you.
20                (Whereupon, the record was read by the
21           reporter.)
22                MR. DROGIN:  My objection is noted.
23   A.      They were aware I was traveling on business and
24   that was protocol for me.
25   Q.      During the period from 2013 to 2019, would you
```



Page 130

```
 1                    DANIEL HARVEY
 2   ever seek expense reimbursement from Canal for charges
 3   that you incurred?
 4   A.      I can't remember.  Possibly.
 5   Q.      For what types of expenses would you seek
 6   reimbursement from Canal --
 7                    MR. DROGIN:  Objection.  He just told
 8            you he doesn't remember.  Which part of that
 9            don't you get?  If he doesn't remember, how can
10            he possibly tell you?  Are you listening to
11            these questions, because we are.  I'm sorry,
12            this is absurd.
13   Q.      Mr. Harvey, let me repeat the question.
14                    MR. DROGIN:  You don't have to repeat
15            it.  Listen to your prior question.  He said I
16            don't remember and now you're asking for an
17            example.  Okay?
18                    MS. SLOAN:  Counsel, please stop.
19                    MR. DROGIN:  Tell me what different
20            types of rock that are on the moon and then I
21            want to ask you about them.
22                    MS. SLOAN:  Counsel.
23   Q.      For what types of expenses did you seek
24   reimbursement from Canal during the period from 2013 to
25   2019?
```



```
 1                    DANIEL HARVEY
 2                    MR. DROGIN:  Objection.  I note that
 3          the witness has already told you that he
 4          doesn't remember.  So you're assuming a fact
 5          that you know is not in evidence.
 6   A.     Yeah.  I can't remember, I'm sorry.
 7   Q.     To your knowledge, did Canal have a
 8   reimbursement policy that specified what expenses
 9   employees could be reimbursed for?
10   A.     I don't know.
11   Q.     To your knowledge, did Canal have a
12   reimbursement policy that specified what expenses you
13   could be reimbursed for?
14   A.     I don't know.
15   Q.     Can you recall the Canal reimbursement process
16   between 2013 and 2019?
17   A.     I cannot.
18   Q.     During the period from 2013 to 2019, how often
19   would Canal pay for your stay at the Greenwich Hotel?
20   A.     I have no idea.  I told you, they were
21   reimbursed by production companies that paid for the
22   hotel the majority of the time.  Canal very rarely, I
23   believe, paid for it, if at all.
24   Q.     What was the standard protocol for what charges
25   could or could not be charged to a Canal American
```



```
 1                    DANIEL HARVEY
 2   Express?
 3                    MR. DROGIN:  Objection.  Do you know if
 4           there was a standard protocol?  You're assuming
 5           a fact not in evidence.  You ask, do you know
 6           if there was a standard protocol?  The answer
 7           is yes.  You ask what it was.  You don't assume
 8           that something exists.  I object to the form.
 9           I object to what you're doing here.  It assumes
10           a fact not in evidence.
11                    MS. SLOAN:  Counsel stop.
12                    MR. DROGIN:  I'm allowed to make my
13           objections.  We did not --
14                    MS. SLOAN:  Your objection is noted.
15   Q.      Mr. Harvey, please answer the question.
16   A.      I have no idea.
17   Q.      Okay.  Thank you.  Has Mr. De Niro ever spoken
18   to you about expenses that he did not approve of?
19                    MR. DROGIN:  With regard to him or
20           other people?
21   Q.      Start with regard to you.  Has Mr. De Niro ever
22   spoken to you about expenses that he did not approve of
23   with regard to yourself?
24   A.      Not that I can recall.
25   Q.      Has Mr. De Niro ever spoken to you about
```



Page 133

1                    DANIEL HARVEY

2  expenses that he did not approve of from any other Canal

3  employee?

4  A.      I have no idea.

5  Q.      Over the years, what positive things has Mr. De

6  Niro said about Ms. Robinson?

7                  MR. DROGIN:  Objection to the form.

8  A.      I don't know.

9  Q.      Based on your observations, was Ms. Robinson a

10 hard worker?

11                 MR. DROGIN:  Objection to the form.

12         You can answer it.

13 A.      No.

14 Q.      Over the years, what positive things has Tom

15 Harvey said about Ms. Robinson?

16 A.      Repeat the question.

17 Q.      Let me withdraw that question and I'll come

18 back to it in a second.  So I asked based on your

19 observation was Ms. Robinson a hard worker.  What was

20 the basis for your response?

21 A.      Basis for my response was that um, she was away

22 a lot while we were on location working.  And then just

23 from my observation calling -- anything he needed she

24 would call the office in New York and tell them to do it

25 while she was away, basically, yeah.



Page 134

```
 1                    DANIEL HARVEY

 2   Q.       How often did you observe Ms. Robinson when she

 3   was working for Mr. De Niro?

 4                    MR. DROGIN:  Objection to the form.

 5   A.       Physically?  How do you mean?

 6   Q.       You responded based on your observations.  So

 7   I'm asking about how often you had those observations.

 8   A.       Well, we were on location a lot and it seemed

 9   to be that every time we were on -- Mr. De Niro worked a

10   lot of time out of town, we were on location a lot of

11   times, he does a lot of movies a year.  And every time

12   it seemed we were on location, she would go to Europe or

13   somewhere and we'd be working for months at a time and

14   you know, I'm in his presence and she's out of town and

15   he's requesting something for her to do and then

16   apparently she's just calling the office in New York and

17   telling the girls in the office to do it and she's away.

18   That's my observations.  Those are my observations.

19   Q.       What do you think of Ms. Robinson?

20                    MR. DROGIN:  Stand back for this one.

21   A.       What do I think?  I think she's manipulative,

22   bully.  Not a pleasant person, not a team player, not

23   someone I really would ever want to work with.

24                    MR. DROGIN:  Can you read that back,

25            please.  I just want to hear it again.
```



Page 135

                         DANIEL HARVEY

 1

 2              (Whereupon, the record was read by the

 3    reporter.)

 4    Q.      Please explain.

 5                    MR. DROGIN:  Objection to the form.

 6              Can you break it down?  Manipulative, bully,

 7              not a team player, not a pleasant person, not

 8              someone I want to work with.

 9                    MS. SLOAN:  Counsel, please stop.

10                    MR. DROGIN:  Well, I just want to make

11              sure that he answers all five questions.  Let's

12              start with manipulative.

13                    MS. SLOAN:  Counsel, please stop.

14                    MR. DROGIN:  I'm going to direct him

15              not to answer the question if you're going to

16              ask him to summarize five different things that

17              he just said into one.  If you want to find out

18              why he think she's manipulative, ask him.

19                    MS. SLOAN:  Counsel, I'm going to --

20                    MR. DROGIN:  If you want to find out

21              why he thinks she's a bully, ask him.

22    Q.      Mr. Harvey, please explain.

23                    MR. DROGIN:  Where are we starting?

24    A.      This is like -- really, where are we starting?

25                    MR. DROGIN:  Sometimes when you open



Page 136

1                    DANIEL HARVEY

2            the door, a train rolls you over.  Now we're

3            going to have the train.  The question I

4            suppose is, why do you believe she's

5            manipulative?

6    Q.      Please explain the basis for your statements

7    about Ms. Robinson?

8    A.       For instance, she tried to dictate to me my per

9    diem on a couple of projects, telling me that -- what I

10   was entitled to on location when it was none of her

11   business at all.  And when I was entitled to per diem

12   from the production company and she decided that she was

13   going to be the one to claim the per diem through Canal

14   and then dictate to me how much per meal I could get on

15   location in New Orleans, Louisiana and told me that I

16   needed to get a receipt for every piece of food or drink

17   I purchased.  And anything I didn't use over a certain

18   limit, I was not going to get reimbursed with, and if I

19   didn't have all the receipts to her by three days before

20   the project ended, that I wouldn't get any

21   reimbursements.  And I told my boss this at the end of

22   the project.  And I said, I don't want any

23   reimbursement.  I'm entitled from the movie company to

24   have my meals paid for when I'm out of town on location

25   working, and I am not going to ask you for anything.  I



1                    DANIEL HARVEY

2  cannot work under these conditions again.  I don't want

3  to ever have this woman, Chase Robinson ever e-mail or

4  text me again or I am not working for you any longer.

5  And he took care of the situation for me.  And that was

6  the last and only time I really had to answer to her,

7  ever.

8  Q.     And when was this?

9  A.     I don't know.  Five, six, years ago, seven

10  years ago, somewhere.  Does it really matter?

11  Q.     Are you aware of Mr. De Niro ever calling any

12  female employees names?

13               MR. DROGIN:  Objection to the form.

14  A.     I am not.

15  Q.     Are you aware of Mr. De Niro ever using curse

16  words to talk about any female employees?

17  A.     Am I aware of?  Possibly, I don't know.  I have

18  no idea.  Has he cursed in my presence?  Possibly.  I've

19  been working with him a long time.  Am I aware of it?

20  It may have happened.  I can't remember.

21  Q.     Do you recall Mr. De Niro referring to Ms.

22  Robinson as one of the girls?

23  A.     No.

24  Q.     At times Mr. De Niro used curse words to talk

25  about Ms. Robinson?



Page 138

1                    DANIEL HARVEY

2    A.      You're stating that or is that a question?

3    Q.      That's a question.  At times did Mr. De Niro

4    use curse words to talk about Ms. Robinson?

5    A.      Never to me.

6    Q.      Do you recall Mr. De Niro referring to other

7    female employees as the girls?

8    A.      I don't recall that.

9    Q.      Returning to your testimony that Mr. De Niro

10   took care of it, please explain how Mr. De Niro took

11   care of it?

12   A.      He called his financial advisors and they spoke

13   to me and they said don't worry, anything -- you just

14   deal with us directly, Dan.  You don't work for Chase.

15   And Bob does not want you to have to deal with her.

16   Q.      And you're referring to Mr. Tasch?

17   A.      At the time it was Mr. Boswick.

18   Q.      Did you ever observe or overhear Mr. De Niro

19   yelling at Ms. Robinson?

20   A.      Repeat the question.

21   Q.      Did you ever observe or overhear Mr. De Niro

22   yelling at Ms. Robinson?

23   A.      I never heard him yell at her when we were in

24   his presence.  Possibly over the phone.  Possibly.  I

25   don't know who he's talking to, but I assume that there



Page 139

1                    DANIEL HARVEY

2    could have been a time.  You know, I don't know.  I

3    can't say definitively.

4    Q.      There may have been a time that you overheard

5    him over the phone, but you don't --

6    A.      He would get upset with the office from time to

7    time.  I don't know who he was speaking to in the

8    office, but he would get upset with the office from time

9    to time if something wasn't done.

10   Q.      You're aware that Ms. Robinson's employment at

11   Canal ended in April 2019, correct?

12   A.      If that's when it was, yes.  Approximately I do

13   know that, yes.

14   Q.      How did you become aware that Ms. Robinson's

15   employment at Canal ended?

16   A.      I couldn't tell you.  I don't remember

17   specifically how I found out.

18   Q.      Do you recall Mr. De Niro's reaction to Ms.

19   Robinson's departure from Canal?

20   A.      I do not.  I do not.

21   Q.      Was Mr. De Niro angry about Ms. Robinson's

22   departure from Canal?

23                    MR. DROGIN:  Objection to the form.  He

24         just told you he doesn't remember.

25   Q.      Please answer the question, Mr. Harvey.



1                    DANIEL HARVEY

2    A.      I just said I don't know what his reactions or

3    his feelings were.

4    Q.      Since Ms. Robinson's employment at Canal ended,

5    have you ever discussed Ms. Robinson with Mr. De Niro?

6    A.      Yes.

7    Q.      On how many occasions since Ms. Robinson's

8    employment at Canal ended have you discussed Ms.

9    Robinson with Mr. De Niro?

10   A.      A handful of times.  He actually brought up,

11   now, I understand, Dan, why you were so upset, and I'm

12   sorry that I put you through this.  I should have known

13   better.  And then we didn't want to talk about it much

14   more than that because we didn't want to waste any more

15   of our time, like we're presently doing.

16   Q.      Do you remember when that conversation

17   occurred?

18   A.      I do not.

19   Q.      What else did Mr. De Niro say about Ms.

20   Robinson in that conversation?

21   A.      Nothing.  Just generally how disappointed he

22   was in general terms.

23   Q.      And did he say why he was disappointed?

24   A.      He did not.

25   Q.      Do you have any other recollection of other



Page 141

1                    DANIEL HARVEY

2    conversations that you had with Mr. De Niro about Ms.

3    Robinson since her employment at Canal ended?

4    A.      No, I can't recall.  It's not something we

5    discussed really.

6    Q.      And how did Mr. De Niro express his

7    disappointment to you in that conversation?

8    A.      That he was embarrassed that he trusted me for

9    so long and my loyalty and that she put me through so

10   much heartache over the years.  And yeah, he felt bad

11   about that.  Because I gave him a lot of years of my

12   life, and he felt disappointed in himself that I had to

13   go through that period of time where it was really an

14   uncomfortable working environment.  Let's say that.

15   Q.      Can you tell me anything else you remember

16   about that conversation with Mr. De Niro?

17   A.      No, it was just very brief.  No, that's all I

18   could recall.  It was brief.

19   Q.      Since Ms. Robinson's employment at Canal ended,

20   other than the conversation you just described, did you

21   have discussions with Mr. De Niro in which he spoke

22   negatively about Ms. Robinson?

23   A.      I can't remember.  I don't believe so.

24   Q.      Did Mr. De Niro --

25   A.      Just to go back there, I just told you earlier,



Page 142

1                    DANIEL HARVEY

2   it's not a subject we discussed.  We moved on.  So it's

3   not even I don't remember.  We don't discuss it.  We've

4   moved on.  I'm sorry, I'm just -- it's not something

5   that I discussed.  We were working.

6   Q.      Did Mr. De Niro ever express the view that Ms.

7   Robinson was disloyal?

8   A.      I told you, he didn't discuss it with me.  From

9   just what I told you earlier, that's all.

10  Q.      When did you first become aware that Mr. De

11  Niro was concerned that Ms. Robinson was going to bring

12  a lawsuit against him?

13                  MR. DROGIN:  Objection to form.

14          Assumes facts not in evidence.

15  A.      That ridiculous.  I don't know.  That's his

16  business, not my business.  I have nothing to do with

17  that.  I have a job to do for him and I don't discuss

18  any of that.  It's not something -- no, nothing.

19  Q.      So just to clarify, did Mr. De Niro talk to you

20  about his plans to bring a lawsuit against Ms. Robinson?

21  A.      He did not, to be perfectly clear.  No.

22  Q.      You are aware that Canal brought a lawsuit

23  against Ms. Robinson, right?

24  A.      You know what, since you're telling me, yes, I

25  do know.  I don't know who -- to tell you the truth, I



```
 1                     DANIEL HARVEY
 2   didn't know who brought a lawsuit against who.  I do my
 3   gig.  So now that you're telling me that he did, okay.
 4   I'm assuming what you're telling me is fact, and if
 5   that's the case, then I now do.
 6   Q.      Before this moment, were you aware that Canal
 7   brought a lawsuit against Ms. Robinson?
 8   A.      You know what, I really didn't give it much
 9   thought.  I know there was a lawsuit, I didn't know who
10   bought what against who.  That's all I know.  I know
11   there was a lawsuit.  I don't know who brought it upon
12   who.  I'm sorry, that's all I can tell you.  I stay out
13   of it.  Not my business.  And that's the truth.
14   Q.      Did anyone else at Canal discuss with you Mr.
15   De Niro and Canal's plan to bring a lawsuit against Ms.
16   Robinson?
17   A.      I didn't even know they were bringing a lawsuit
18   against her, so no.
19                     MR. DROGIN:  Just check the running
20            time.  How long have we been on the record?
21                     THE VIDEOGRAPHER:  At 5:11 it will be
22            three and a half hours.
23                     MR. DROGIN:  Okay.  So that would be
24            half a day.  I have no objection.  Take as long
25            as you want.
```



Page 144

```
 1                     DANIEL HARVEY
 2   Q.      Did your brother --
 3                     MR. DROGIN:  You can take another three
 4           hours, if you'd like.
 5   Q.      Did your brother, Tom Harvey, speak to you
 6   about Canal's plans to bring a lawsuit against Ms.
 7   Robinson?
 8   A.      No.
 9   Q.      Did Tiffany Chen speak to you about Canal's
10   plans to bring a lawsuit against Ms. Robinson?
11   A.      I don't think anybody did.  If they did, I
12   don't remember because I'm not paying attention to it.
13   Q.      Did you speak to Tom Harvey about the
14   litigation between Ms. Robinson and Mr. De Niro?
15                     MR. DROGIN:  Objection to the form.
16   A.      Answer the question?  No, I did not.  Did I
17   speak to him, no.
18   Q.      Did you speak to Tiffany Chen about the
19   litigation between Ms. Robinson and Mr. De Niro?
20   A.      No, I don't -- no.
21   Q.      Did you speak to Mr. De Niro about the
22   litigation between Ms. Robinson and Mr. De Niro?
23                     MR. DROGIN:  Objection to the form.
24           We've been over this, but --
25   A.      No.
```



Page 145

1                      DANIEL HARVEY

2    Q.       You said no; is that correct?

3    A.       I said no.

4    Q.       And did you speak to any other Canal employee

5    or anyone associated with Canal about the litigation

6    between Ms. Robinson and Mr. De Niro?

7    A.       No.

8    Q.       Mr. De Niro ███████████████████████; is that

9    correct?

10                      MR. DROGIN:  Objection to the form.  I

11            don't know how -- I'm going to object to the

12            form.  I don't know how he could know what

13            another person ███████████████.  I ████████████

██           ████████████.  Did you know that?

15   Q.       Please answer the question, Mr. Harvey?

16   A.       I can't answer that.  I'm not a professional.

17   I can't answer that correctly.  You'd have to ask a

18   professional about that.  I can't.

19   Q.       To your knowledge, does Mr. De Niro ██████████

██   ███████████████████

21                      MR. DROGIN:  Objection to the form.

22            You can answer.

23   A.       I don't know.  That's assuming that ███████████

██   ██████████████.  I have no idea.  I can't answer that

25   question.  It's impossible.



Page 146

```
                              DANIEL HARVEY
 1
 2    Q.      As far as you know, does Mr. De Niro consider
 3    himself ████████████████
 4    A.      As far as I know, I don't think he does.  I
 5    don't know.  You'd have to ask him.  I have no idea.  No
 6    one has labeled -- I don't know.  I can't answer that.
 7    Q.      Do you know of a term that Mr. De Niro uses to
 8    describe any ██████████████████████████████████████
 9    A.      No.
10    Q.      Have you ever -- to your knowledge, does Mr. De
11    Niro ████████████████████████
12                   MR. DROGIN:  Objection to the form.
13                   Can you narrow it down to a particular night?
14                   I don't know what that means.
15    Q.      Please answer the question, Mr. Harvey.
16                   MR. DROGIN:  Can you repeat it again?
17    Q.      To your knowledge, does Mr. De Niro ████████
      ██ ██████████████?
19                   MR. DROGIN:  I'm going to direct him
20                   not to answer the question.  I think that's an
21                   inappropriate question.  Are you talking about
22                   today?  Are you talking about in one night?  I
23                   have no idea what that question even means.
24                   MS. SLOAN:  That's an improper
25                   instruction.
```



Page 147

1                          DANIEL HARVEY

2                          MR. DROGIN:  I don't agree with you.

3    Q.        To your knowledge, does Mr. De Niro ███████
4    ██████████████████?

5    A.        Repeat that question, please.

6    Q.        To your knowledge, does Mr. De Niro ████████
7    ██████████████████?

8    A.        ███████████████

9    Q.        As far as you know, how frequently was Mr. De
10   Niro ██████████████ in 2018?

11                         MR. DROGIN:  Objection to the form.

12   A.        I cannot answer that question.  Impossible.

13   Q.        As far as you know, how frequently was Mr. De
14   Niro ██████████████ in 2019?

15                         MR. DROGIN:  Objection to the form.

16   A.        I have no idea.

17   Q.        As far as you know, how frequently was Mr. De
18   Niro ██████████████ in 2020?

19                         MR. DROGIN:  Objection to the form.

20   A.        I have no idea.

21   Q.        And as far as you know, how frequently was Mr.
22   De Niro ████████████████ in 2021?

23                         MR. DROGIN:  Same objection.

24   A.        I have no idea.

25   Q.        Did you observe Mr. De Niro ███████ daily when


MAGNA
LEGAL SERVICES

Page 148

```
 1                        DANIEL HARVEY
 2    you were on set with him?
 3                    MR. DROGIN:  Objection to the form.
 4             Over 34 years?  38 years?
 5    Q.      In the last five years, have you observed Mr.
 6    De Niro ▇▇▇▇ daily when you were on set with him?
 7    A.      I wasn't on set with him very often.
 8    Q.      Over the last five years, you haven't been on
 9    set with him very often; is that what your testimony is?
10    A.      I don't go to set very often.
11    Q.      When you're on any sort of film location with
12    him, have you observed him ▇▇▇▇▇▇ daily?
13                    MR. DROGIN:  Objection to the form.
14    Q.      In the last five years, when you've been on any
15    sort of film location with him, have you observed him
16    ▇▇▇▇▇▇▇▇ daily?
17    A.      No.
18    Q.      How often would you observe Mr. De Niro ▇▇▇▇
19    on location during the last five years?
20                    MR. DROGIN:  Objection to the form.
21             Can you just clarify, is on location the same
22             as on set?  Are you talking about if they have
23             ▇▇▇▇ at dinner?  I don't know what you're
24             asking.  Can you clarify?
25                    MS. SLOAN:  If Mr. Harvey wants a
```



Page 149

```
 1                      DANIEL HARVEY
 2           clarification, I'm happy to provide.
 3   A.      I don't know where you're speaking about.
 4   Q.      If you're on location with Mr. De Niro at any
 5   point, you know, during the days or weeks that you're on
 6   location with him filming, have you observed Mr. De Niro
 7   ████████████) on a daily basis?
 8   A.      No, not on a daily basis.  No.
 9   Q.      So how often did you observe Mr. De Niro
10   ████████████████) when you were --
11                      MR. DROGIN:  Objection to the form.
12   Q.      -- on location with him at any point, you know,
13   during those days or weeks?
14   A.      During a five-year period?
15   Q.      Yes.
16   A.      Occasionally.  I worked with him in the
17   morning.  I did not see him, I couldn't tell you.  So
18   occasionally.
19   Q.      Can you please explain what occasionally means?
20   A.      The last five years, I don't know.
21   Occasionally means occasionally.  I wasn't in his
22   presence.  I was in his presence in the morning when I
23   was working with him one on one directly in a room and
24   for three, four hours in the early part of the day.
25   Occasionally I would see him at dinner, he does his own
```



```
 1                      DANIEL HARVEY

 2    thing for dinner and I would be in my hotel getting

 3    ready to go in the bed and get up at 3:00 in the morning

 4    to go to work.  So occasionally means occasionally, if

 5    there was a dinner and that I see him possibly ███████
                                                     ON
      █ ████████ you know.  I didn't go out with him.

 7    Q.     Did it happen several times a week?

 8                    MR. DROGIN:  Did what happen several

 9           times a week?

10    Q.     Did you have dinner with Mr. De Niro when you

11    observed Mr. De Niro ███████████████ several times a

12    week?

13                    MR. DROGIN:  Objection to the form.

14    A.     I already said rarely, I would rarely see him.

15    So it can't be -- it was a working relationship.  I

16    didn't frequently have -- no, so rarely.  Rarely.  I

17    worked for him I said.  Rarely.

18    Q.     You've had occasion to observe Mr. De Niro

19    ███████ is that correct?

20    A.     I can't say I can definitively say that.

21    Q.     What is Mr. De Niro like when ████████████████?

22                    MR. DROGIN:  Objection.  I'm going to

23           direct the witness not to answer.  Happy to

24           have you call the Judge on that one.

25    Q.     Mr. Harvey, are you refusing to answer the
```



Page 151

1                    DANIEL HARVEY

2    question?

3    A.       Repeat the question again.

4    Q.       What is Mr. De Niro like when he is drinking?

5                    MR. DROGIN:  And my direction to you is

6            not to answer the question.  So you can either

7            accept the legal advice and not answer the

8            question or you can answer it over my

9            direction.  So she's asking now are you going

10           to answer the question over your attorney's

11           direction, yes or no?

12                   THE WITNESS:  I am not.

13   Q.       Did you ever see Mr. De Niro when he had ████

14   ██████████████████████?

15   A.       I don't know what ██████ would be.  What is

16   ██████ to you?  ██████████ could be different for

17   everybody.  How do I know what is ██████████ to him?

18   Q.       Based on your own understandings, did you ever

19   observe him ████████████████?

20   A.       I couldn't say it's definitively just the

21   ████████  It could just be ██████████  So I couldn't

22   definitively say I've seen him.  ██████████████████

██   ██████.  He works himself hard.  ██████████████████

██   ████████████████████████████████  ██████████████████

██   ██████████████████████  ██████████████████████████████



Page 152

```
                        DANIEL HARVEY
 1
 2      ██████████████████████████████████████
 3      Q.     What was Mr. De Niro's demeanor like when he
 4      may have been -- ████████████████████████████████?
 5                    MR. DROGIN:  Objection.  With the same
 6             direction.  I'm going to direct him not to
 7             answer.
 8      Q.     Mr. Harvey, are you refusing not to answer that
 9      question?
10      A.     Yeah, I'm not going to answer that question.
11      Thank you.
12                    MS. SLOAN:  That's an improper
13             direction.
14                    MR. DROGIN:  I don't agree.  I don't
15             agree with your assessment.  I think you're
16             wrong.  I think it's an improper question on
17             multiple levels and it has absolutely nothing
18             to do with this case.  This is a witness who is
19             supposed to be here because of an equal pay
20             claim.
21                    MS. SLOAN:  Counsel, stop.
22      Q.     Mr. Harvey, have you ever observed Mr. De Niro
23      ████████████████
24                    MR. DROGIN:  Objection to the form.
25             You can answer it.
```



```
 1                    DANIEL HARVEY
 2   A.       Possibly.  I couldn't tell definitively.
 3   Possibly, like I said.
 4   Q.       What is Mr. De Niro like when he is
 5   ██████████████
 6                    MR. DROGIN:  Same direction, not to
 7            answer.  I'm kind of about ready to pull the
 8            plug on the deposition at this point.  You're
 9            over on time and this is just really absurd.
10   Q.       Mr. Harvey, did you ever call Ms. Robinson and
11   express concern about ████████████████████
12   A.       Possibly, yes.
13   Q.       When did that happen?
14                    MR. DROGIN:  Objection to the form.  He
15            said possibly.
16   Q.       To the best of your recollection, when did you
17   call Ms. Robinson?
18                    MR. DROGIN:  Same objection.
19   A.       I have no idea.
20   Q.       Do you recall what you said to Ms. Robinson
21   when you called her to ██████████████████████
     ██  ██████████████████
23                    MR. DROGIN:  Objection to the form.
24   A.       I do not remember any of it, no.
25   Q.       Did you observe ████████████████████████
```



Page 154

1                        DANIEL HARVEY

2        ██████████

3    A.      I observed -- did I observe Mr. De Niro ██████
                                                    ON
     █  █████████████████

     █  ████  ████████████████████████

6    A.      Not that I know of.

7    Q.      Have you observed times when Mr. De Niro

8    ██████████████████

9                        MR. DROGIN:  Please say I don't

10              remember.  Because that would just be

11              hysterical on the transcript.

12   A.      You know what, I don't remember.  How am I

13   supposed to diagnose ████████████

14   Q.      Are you aware of times when Mr. De Niro has

15   been forgetful?

16   A.      There may have been times, yeah.  We're all

17   forgetful.  I forget things.  Yes, we're forgetful.

18   He's got a lot of things on his plate.  He'll forget

19   things, yes.  So, yes.

20   Q.      Is it a common occurrence for Mr. De Niro to

21   forget things?

22                        MR. DROGIN:  Objection to the form.

23              Can you please explain what you mean by common.

24                        MS. SLOAN:  I'll withdraw the question.

25   Q.      Have you ever collected Mr. De Niro after he



Page 155

```
 1                    DANIEL HARVEY
 2        ████████████████████████████
 3    A.        ████████    What do you mean ████████ him?
 4    What's ████████ him?
 5    Q.        Have you ever ████████████████████████████
 █   ████████████████████████?
 7                    MR. DROGIN:  Objection to the form.
 8    A.        No, I didn't -- never ████████████████████████
 █   ████████████████████████
10    Q.        Have you ever ████████████████████████████████
 █   ████████████████████
12    A.        ████████ him?  What do you mean ████████ him?
13    I don't understand that.
14    Q.        Have you ever ████████████████████████████████
 █   ██████████████████████████████
 █   █   ████████████████████
 █   █   ████████████████████████████  ████████████
 █   ████████████████████████████████████████████████
 █   ████████████
20                    MR. DROGIN:  Objection.
21    A.    Not that I'm aware of, no.
22                    MS. SLOAN:  Can we take a five-minute
23        break?  Is that good for everyone?
24                    MR. DROGIN:  Sure.
25                    MR. BENNETT:  No objection.
```



Page 156

 1                    DANIEL HARVEY

 2                    THE VIDEOGRAPHER:  The time is now 5:25

 3          p.m.  We are going off the record.

 4           (Whereupon, a short break was taken.)

 5                    THE VIDEOGRAPHER:  The time is now 5:33

 6          p.m. and we are back on the record.

 7     Q.    Has anyone at Canal discussed Mr. De Niro's

 8     ███████████ with you?

 9                    MR. DROGIN:  Objection to the form.

10          Direct the witness not to answer.

11     Q.    Are you refusing to answer the question, Mr.

12     Harvey?

13                    MR. DROGIN:  What ███████████ are

14          you putting into evidence without foundation?

15     Q.    Have you ever discussed with anyone at Canal

16     Mr. De Niro's ████████████

17     A.    Possibly.

18     Q.    How -- to your knowledge, has Mr. De Niro been

19     ████████████████

20     A.    To my knowledge, I'm not sure what it was for.

21     Q.    Has Mr. De Niro been ████████

22     A.    I'm not sure.  I'm not sure if ████████.

23     Q.    Did you ever assist Mr. De Niro when he ██████
                                                      ON
24     ██  ██████

25     A.    Did I ever assist him?  What do you mean assist



```
1                       DANIEL HARVEY
2    him?
3    Q.      Did you ever provide assistance to Mr. De Niro
4    when ████████████████████
5    A.      What type of assistance?
6    Q.      Any type of assistance.  Have you ever provided
7    assistance to Mr. De Niro when ████████████████
8    A.      You're assuming ████████████.  I don't know
9    if ████████████████████.  I totally don't know if
10   ████████████████████ ██████████████████████.  I
11   have no idea.
12   Q.      You physically ████████████████████████
13   didn't you?
14   A.      I dropped Mr. De Niro off ████████████████.
15   I have no idea what it was for.
16   Q.      What's your understanding of ████████████████
17   ████ ████████
18   A.      My understanding, ██████████████████████████
19   Q.      Do you know what ████████████████
20   A.      I don't know what ████████████████████, no.
21   Q.      Do you know what ████████████████
22   A.      Not specifically, no.
23   Q.      Do you know what ████████████████
24   ███ ████████████
25   A.      Yeah.  ██████████████████████████████
```



Page 158

1                        DANIEL HARVEY

2       ████████

██  ██     ████████████ ████████████

██  ██     ████████████████████   ████████████

█     ████████████████████

6       Q.      So you have no idea why you ████████████

█     ████████████████

8       A.      No idea, you know what, I'd say I have --

9       because we -- that I felt that ████████████

██    ████████████

11      Q.      What type of ████████████████

12      A.      I don't know.  You'd have to ask him.

13      Q.      What problems was Mr. De Niro having when ██
ACT
ION

██    ████████████████████████

15      A.      He was going through a divorce.

16      Q.      Was it your understanding that ████████████

17      that he was brought to ████████████████

██    ████████████

19      A.      I don't know ████████████████

20      Q.      You participated in ████████████████

██    ████████████████

22      A.      Yes, I did.

23      Q.      Can you describe what ████████████████

24      A.      It was -- yes.  Sure.  It was ████████████

██    ████████████████████████



Page 159

                    DANIEL HARVEY

1

2    Q.       And why did you ████████████████████

3    █  ██████████████

4    A.       Because he was having trouble with the divorce

5    and felt that he needed to get away.

6    Q.       Was he ██████████████████████████

7    A.       I'm not sure.

8                    MR. DROGIN:  Objection to the form.

9            What time are you talking about?

10                   MS. SLOAN:  During the divorce that Mr.

11           Harvey was talking about.  But that leads me to

12           the next question.

13   Q.       When was this, Mr. Harvey?

14   A.       I don't know.  A few years ago, three or four

15   years ago.  I'm not sure.

16   Q.       When did you take Mr. De Niro ██████████████

17   ██  ████████

18   A.       I told you, I don't remember.  A few years ago.

19   Q.       And when was ████████████████

20   A.       That same period.

21   Q.       How long was the period?

22   A.       I don't remember.

23                   MR. DROGIN:  Counsel, unless you're

24           going to link this to Chase Robinson in some

25           way, I'm going to direct him to stop answering



Page 160

```
 1                    DANIEL HARVEY
 2          this line of questions.  So I'm giving you fair
 3          warning.  You know, if we're not going to talk
 4          about Chase here, we're done.  This is really
 5          improper abuse.  I'm letting you do this just
 6          to create my sanctions record, just so you know
 7          that given time to depose this witness, this is
 8          what you want to talk about.
 9   Q.     As part of your job, did you communicate with
10   █████████████████████████████████████████████████
11   ██  █████████████?
12                    MR. DROGIN:  Objection to the form.
13   A.     Repeat the question, please.  Sorry.
14   Q.     As part of your job, did you communicate with
15   █████████████████████████████████████████████████
16   ██  █████████████
17                    MR. DROGIN:  Same objection to the
18          form.
19   A.     No.
20   Q.     Can you repeat your answer, please.
21   A.     No, that's not part of my job.
22   Q.     Did you have any other job duties when Mr. De
23   Niro █████████████████████████
24   A.     My job was to train him, personal training.
25   Q.     And part of your job was ██████████████████████
```



Page 161

                          DANIEL HARVEY

1

2    ████████████████████████?

3    A.        No, that's not -- no.

4    Q.        Is there any other time that you ████████████

5    ██  ███████████████████████████████████████████████████

6    ██  ████████████

7                     MR. DROGIN:  Objection to form.

8    A.        No.  Not that I can recall.  Not that I would

9    remember.

10   Q.        Your job was to do whatever Mr. De Niro asked

11   you to do, wasn't it?

12                    MR. DROGIN:  Objection to the form.  Is

13        that like the old, if your friends told you to

14        jump off the bridge would you?

15   A.        I told you earlier what my job descriptions

16   were.  So that's what I was.  I was not asked to do

17   other than what my specific skill set was for, and I

18   told you those two jobs.

19   Q.        Okay.  I'm going to ask you to turn your phone

20   on so that you can identify the two phone numbers that

21   you communicated with Mr. De Niro.

22   A.        You know what, I have the one.  During the

23   break I figured out the number that I communicated with

24   Mr. De Niro is.  On a break I pulled it up.  It's

25   ████████████      That's the one that I communicate with



Page 162

1                    DANIEL HARVEY

2   him.

3   Q.      Okay.  That was the one ending in ▓▓▓▓  So did

4   you ever communicate with Mr. De Niro on a phone ending

5   in ▓▓▓▓

6   A.      Not that I can remember.  This is the one I've

7   been using for quite some time.

8   Q.      Did you take notes during this deposition?

9   A.      No, I did not.

10                  MR. DROGIN:  I'm sorry.  What was the

11              question?

12                  MS. SLOAN:  Did you take notes during

13              this deposition.

14  A.      No, just doodling.  Why?

15                  MS. SLOAN:  This concludes our

16              questioning for today.  Defense Counsel has

17              repeatedly impeded the deposition, made

18              inappropriate speaking objections, engaged in

19              inappropriate commentary on the record and

20              directed the witness not to answer questions.

21              We reserve all rights to take appropriate

22              relief from the Court.

23                  MR. DROGIN:  Now it's my turn to ask

24              some questions.  And I will refrain from

25              characterizing what you've done in this



Page 163

1                          DANIEL HARVEY

2           deposition.  You can read about it in our

3           sanctions motion.

4    EXAMINATION BY

5    MR. DROGIN:

6    Q.      Dan, when you would interact with Chase

7    Robinson by phone, what kind of things would you and she

8    discuss?

9    A.      Logistics, travel.

10   Q.      Which was more frequent, you would call her or

11   she would call you?

12                      MS. SLOAN:  Objection to form.

13   A.      If I was told -- more frequent, probably she

14   called me, I wouldn't know.  I tried to limit my

15   interactions with Chase Robinson to the bare minimum

16   unless we had to.

17   Q.      Did Canal ever pay for you to take a personal

18   vacation?

19   A.      Never.

20   Q.      You testified earlier that you thought Chase

21   was manipulative.  What do you mean by that?

22                      MS. SLOAN:  Objection to form.

23   A.      Making herself -- making it seem like she was

24   doing all the work and that everyone -- that she was in

25   charge of everyone and that -- I can't put it into



Page 164

1                    DANIEL HARVEY

2    words, I'm sorry.

3    Q.     You said that there was a "uncomfortable

4    working environment".  Do you remember using those

5    words?

6    A.     I do.

7    Q.     What do you mean by that?  What was

8    uncomfortable about the working environment?

9    A.     I think everyone that I came into acquaintance

10   at Canal and myself were fearful of Chase Robinson

11   because she was a bully and she would try to make you

12   look bad at any point possible to make herself feel more

13   important.  And it was a very unfriendly working

14   environment and very uncomfortable, yes.

15   Q.     This is based on observations that you've made

16   or something else?

17                    MS. SLOAN:  Objection to form.

18   A.     Observations I made.

19   Q.     What was ███████████████████

██   █  ████████████████████████████████████████

██   █  ██████████████████████████████████

22   Q.     Is that a ███████████

23   A.     It is a ███████████

24   Q.     Did he move there after he got back from

25   ███████



Page 165

                              DANIEL HARVEY

1

2                    MS. SLOAN:  Objection to form.

3    A.       I believe he did.

4    Q.       Came back from ▮▮▮▮▮, spent the rest of the

5    summer in the Hamptons; is that right?

6                    MS. SLOAN:  Objection to form.

7    A.       Yes, that's correct.

8    Q.       And then he moved into ▮▮▮▮ is that correct?

9    A.       That is correct, yes.

10   Q.       And you had occasion to be in ▮▮▮▮ a few times,

11   right?

12   A.       What's the time -- yes, I have.

13   Q.       Well, all right.  That's fair enough.  From

14   let's say the summer of 2018 to April of 2019 when Chase

15   resigned.

16   A.       Yes.

17   Q.       Were you ever there with Chase?

18   A.       One time, I believe.

19   Q.       Tell us about what happened.

20                   MS. SLOAN:  Objection to form.

21                   MR. DROGIN:  What's wrong with the

22            form?

23                   MS. SLOAN:  Tell us about what

24            happened?

25                   MR. DROGIN:  Yeah.



Page 166

1                    DANIEL HARVEY

2                    MS. SLOAN:  Vague.

3                    MR. DROGIN:  I didn't know that was a

4          good objection.  I would have used that too.

5          Go ahead.

6     A.      What happened -- nothing -- I was just in there

7     for a few minutes, just to get an idea of the space that

8     Mr. De Niro wanted his gym in, his exercise equipment in

9     and was waiting on Mr. De Niro and Chase Robinson was

10    there and was going to move a couple of plants.  They

11    were very large and she was having trouble.  And I asked

12    if she needed help and I moved a couple of them for her.

13    Q.      Were any other Canal employees there at that

14    time?

15    A.      Any other --

16    Q.      Canal employees there at the time?

17    A.      I'm not sure.  Possibly Michael Kaplan, but I

18    can't say for sure.

19    Q.      Have you ever received any production credits

20    on Mr. De Niro's films?

21    A.      Yes, I have.

22    Q.      Do you know about how many?

23    A.      I don't know.  Early on I -- I don't know, I

24    worked on possibly up to 100 movies with him now.  So

25    maybe the first 10 years I used to make sure I got the



Page 167

1                          DANIEL HARVEY

2    movie credit, they would give me the movie credits, so I

3    don't know, possibly 10 or so.

4    Q.      So you worked with him as personal trainer on

5    many of his more famous films; isn't that true?

6                     MS. SLOAN:   Objection to form.

7    A.      Yes.

8    Q.      Cape Fear being one of them?

9    A.      Yes.

10   Q.      Goodfellas?

11   A.      Yes.

12   Q.      The Irishman?

13   A.      Yes.

14   Q.      List a few more.

15   A.      Casino, Silver Linings Playbook, Awakenings,

16   Heat, Midnight Run.

17   Q.      Charles Grodin?

18   A.      Charles Grodin.  Falling in Love.  So I mean,

19   you name it.  I worked with him on every one.

20   Q.      Do you know if Chase Robinson was ever credited

21   on any of those movies?

22   A.      I do not know.

23   Q.      What did you understand Chase Robinson's job

24   was?  And I'll use the same window that Ms. Sloan used.

25   Let's say 2013 to 2019.  What did you understand her job



Page 168

1                     DANIEL HARVEY

2   was?

3   A.      I understood her job as being one of Bob's

4   assistants.  Mr. De Niro's assistants, excuse me.

5   Q.      Did you ever know her to be vice-president of

6   production and finance?

7   A.      No.

8   Q.      Your interactions, other than the ones you just

9   testified about, do you recall any other type of

10  interaction you ever had with her that was work related?

11  A.      I don't recall, no.

12  Q.      Okay.  You were asked really about three

13  different parts of your job, one being the physical

14  exercise and then the second about running lines, and

15  then there's like this third extra component you were

16  asked about, for example, you know, getting him coffee

17  or things like that.  Do you understand what I'm talking

18  about, the different components; is that fair?

19                     MS. SLOAN:  Objection.

20  A.      Yes.

21  Q.      Is that fair, there were three different

22  components?

23  A.      No, that's not true.

24  Q.      Okay.  How many different components are there?

25  A.      There are components.  I had two jobs; I'm a



Page 169

 1                    DANIEL HARVEY

 2    personal trainer that I told you and I would help him

 3    prepare for movies with regards to memorizing the

 4    scripts thoroughly and making sure that he was prepared

 5    physically for whatever character he was playing,

 6    whether he had to put on weight, lose weight or just

 7    look healthier.  So that was my job description.  He

 8    respected that and it wasn't like I was running errands

 9    for him.

10    Q.     That's what I was going to ask you.  You were

11    asked about running errands and stuff like that.  What

12    percentage of your job was not related to the physical

13    fitness portion or the running lines portion?

14                    MS. SLOAN:  Objection to form.

15                    MR. DROGIN:  What's the objection?

16                    MS. SLOAN:  It's a compound question.

17           Objection to form.

18                    MR. DROGIN:  Can I hear the question

19           read back.

20            (Whereupon, the record was read by the

21    reporter.)

22                    MR. DROGIN:  I don't think it's

23           compound.

24    Q.     So if we were to take a pie, for example, and

25    we were to allocate, one portion to the physical fitness



Page 170

1                     DANIEL HARVEY

2    and another portion to the running lines and then a

3    third portion for anything else, how much is that

4    anything else, like the running errands and stuff, what

5    percentage?

6                     MS. SLOAN:  Objection to form.

7    A.       Let's put it this way:  I've been working for

8    him for a long time.  We have a lot of respect for each

9    other.  He respects me very much.  Obviously he's got a

10   lot of responsibilities and it's gotten -- it's gotten

11   more stressful to stay on top as he gets older.  We

12   work -- 99 percent of the time, it's all work.  Yes, you

13   do someone a favor you've been with so long.  He never

14   asks -- he would never ask me to get coffee.  He just

15   respects me too much.  It's not that kind of thing.

16   Obviously, you're going to do favors for people that

17   you're friendly with.  He's not asking me to do errands.

18   That was never part of my job.  If anything, he'd say

19   call the office.  That was not part of -- he's --

20   there's just too much mutual respect.

21                     MR. DROGIN:  I don't have any further

22             questions.  Ms. Sloan, any further from you?

23                     MS. SLOAN:  Nothing further from me.

24             Thank you for appearing here today, Mr. Harvey.

25                     MR. BENNETT:  Before we close the



Page 171

1                    DANIEL HARVEY
2          record, the witness would like to read and
3          sign.  If I could just have that reflected in
4          the record, please.
5                    MS. SLOAN:  Sorry.  I didn't actually
6          hear you, Greg.
7                    THE REPORTER:  I did.  He said, "the
8          witness would like to read and sign".
9                    MR. BENNETT:  Thank you, Brooke.  Yes.
10                   THE REPORTER:  No problem.  And just on
11         the record, Mr. Drogin, you asked for an
12         expedite earlier.  Do you still want an
13         expedite?
14                   MR. DROGIN:  What's the regular turn
15         around and what's the rough time?
16                   THE REPORTER:  10 days is for a regular
17         turn around.  A rough draft would be by
18         tomorrow and a daily would be by tomorrow.  A
19         rough draft is only -- it's not going to give
20         you the full transcript.  It will give you the
21         full transcript, but you know, not completely
22         edited.  Okay.
23                   MR. DROGIN:  Okay.  Do we have your
24         contact information somewhere?
25                   THE REPORTER:  Yeah.  Mr. Bennett has



Page 172

```
 1                    DANIEL HARVEY
 2          my e-mail.
 3                    MR. DROGIN:  Okay.  We certainly don't
 4          need a rough.
 5                    THE REPORTER:  Okay.
 6                    MR. DROGIN:  I'm sorry, we certainly
 7          don't need rush.  I'm inclined to get the rough
 8          just so we can start to put everything
 9          together.
10                    THE REPORTER:  Okay.
11                    MR. BENNETT:  Thank you, Brooke.  And
12          on top of that Robin, when it comes to a copy
13          of the recording, how do we obtain that?
14                    THE VIDEOGRAPHER:  Well, you can let me
15          know and I will have it sent.
16                    MR. BENNETT:  Great.  I would like you
17          to note me down for one please, yes.
18                    THE VIDEOGRAPHER:  Okay.  And that is
19          Mr. Drogin, right?
20                    MR. BENNETT:  Sorry, no, no, no.
21          Sorry.  Mr. Bennett.  If you give me your
22          e-mail I'll e-mail you just so you have my
23          contact info.
24                    MS. HARWIN:  And I would note for the
25          record that at some point Mr. Tom Harvey joined
```



Page 173

```
 1                    DANIEL HARVEY
 2        the deposition, but I don't believe his
 3        appearance or presence was noted for the
 4        record.  And so Robin, if you could coordinate
 5        with Brooke, just to advise us as to when Mr.
 6        Tom Harvey joined so that that's clear for the
 7        record.
 8                    MS. SLOAN:  And we will follow up with
 9        you, Brooke, as well.
10                    THE REPORTER:  Okay.  And so Ms. Sloan,
11        you would like a copy --
12                    MS. SLOAN:  We'll follow up with you
13        about the copy.
14                    (Continued on next page to accommodate
15        jurat.)
16
17
18
19
20
21
22
23
24
25
```



Page 174

1                  DANIEL HARVEY

2                  THE REPORTER:  Okay.

3                  THE VIDEOGRAPHER:  The time is now 5:58

4         p.m. this concludes our deposition and we are

5         going off the record.

6                  (Time Noted:  5:58 p.m.)

7

8                                      DANIEL HARVEY

9

10   Subscribed and sworn to before me

11   this      day of          2022.

12

13

14         Notary Public

15

16

17

18

19

20

21

22

23

24

25



Page 175

```
 1                          INDEX

 2

 3    WITNESS              EXAMINATION BY              PAGE

 4    Daniel Harvey        Annie Sloan                 7

 5    Daniel Harvey        Laurent Drogin             163

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 176

```
 1                  C E R T I F I C A T E

 2

 3              I, BROOKE E. PERRY, hereby certify that the

 4      Examination Before Trial of DANIEL HARVEY was held

 5      before me on the 5th day of January, 2022; that said

 6      witness was duly sworn before the commencement of his

 7      testimony; that the testimony was taken stenographically

 8      by myself and then transcribed by myself; that the party

 9      was represented by counsel as appears herein;

10      That the within transcript is a true record of the

11      Examination Before Trial of said witness;

12              That I am not connected by blood or marriage

13      with any of the parties; that I am not interested

14      directly or indirectly in the outcome of this matter;

15      that I am not in the employ of any of the counsel.

16              IN WITNESS WHEREOF, I have hereunto set my

17      hand this 5th day of January, 2022.

18

19                         Brooke E. Perry

20                      BROOKE E. PERRY

21

22

23

24

25
```



Page 177

1                                ERRATA SHEET

2        CASE NAME:            ROBINSON v. DE NIRO, et al.

3        DATE OF DEPOSITION:   January 5, 2022

4        WITNESS'S NAME:       Daniel Harvey

5        PAGE   LINE (S)     CHANGE          REASON

6        ____|_____|_____|_____

7        ____|_____|_____|_____

8        ____|_____|_____|_____

9        ____|_____|_____|_____

10       ____|_____|_____|_____

11       ____|_____|_____|_____

12       ____|_____|_____|_____

13       ____|_____|_____|_____

14       ____|_____|_____|_____

15       ____|_____|_____|_____

16       ____|_____|_____|_____

17

18

19                                   DANIEL HARVEY

20       SUBSCRIBED AND SWORN TO BEFORE ME

21       THIS _____ DAY OF _____, 20__.

22       _____      _____

23       (NOTARY PUBLIC)         MY COMMISSION EXPIRES:

24

25

