UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

GRAHAM CHASE ROBINSON


                    Plaintiff,


          -against-

                    Case No. 1:19-cv-09156(LJL)(KHP)



ROBERT DE NIRO AND CANAL PRODUCTIONS, INC.,


                    Defendants.

----------------------------------------x

          EXAMINATION BEFORE TRIAL of ROBIN CHAMBERS,
taken by the Plaintiff, pursuant to Notice, held via
REMOTE PROCEEDINGS, on January 13, 2022, at 9:35 p.m.,
before a Notary Public of the State of New York.


     **********************************************



Page 2

```
 1   A P P E A R A N C E S:
 2     SANFORD HEISLER SHARP, LLP
               Attorneys for Plaintiff
 3             1350 Avenue of the Americas, 31st Floor
               New York, New York 10019
 4
       BY:    ALEXANDRA HARWIN, ESQ.
 5             JEREMY HEISLER, ESQ.
               ANNIE SLOAN, ESQ.
 6             KATE MACMULLIN, ESQ.
               LEOR ROSEN
 7
 8
       TRAUB, LIEBERMAN, STRAUS & SHREWSBERRY LLP
 9             Attorneys for Defendants
               ROBERT DE NIRO & CANAL PRODUCTIONS, INC.
10             Seven Skyline Drive
               Hawthorne, New York 10532
11
       BY:    GREGORY R. BENNETT, ESQ.
12
13
14     TARTER KRINSKY & DROGIN LLP
               Attorneys for Defendant
15             CANAL PRODUCTIONS, INC.
               1350 Broadway
16             New York, New York 10018
17     BY:    LAURENT S. DROGIN, ESQ.
               BRITTANY K. LAZZARO, ESQ.
18
19
20
       ALSO PRESENT:
21
       MIGUEL BANUELOS-Videographer
22                     Magna Legal Services
23     THOMAS HARVEY, ESQ.-for Robert De Niro
24     GRAHAM CHASE ROBINSON-Plaintiff
25
```



```
 1              S T I P U L A T I O N S:
 2   IT IS STIPULATED AND AGREED by and between the attorneys
     for the respective parties herein, and in compliance
 3   with Rule 221 of the Uniform Rules for the Trial Courts:
 4   THAT the parties recognize the provision of Rule 3115
     subdivisions (b), (c) and/or (d).  All objections made
 5   at a deposition shall be noted by the officer before
     whom the deposition is taken, and the answer shall be
 6   given and the deposition shall proceed subject to the
     objections and to the right of a person to apply for
 7   appropriate relief pursuant to Article 31 of the CPLR;
 8   THAT every objection raised during a deposition shall be
     stated succinctly and framed so as not to suggest an
 9   answer to the deponent and, at the request of the
     questioning attorney, shall include a clear statement as
10   to any defect in form or other basis of error or
     irregularity. Except to the extent permitted by CPLR
11   Rule 3115 or by this rule, during the course of the
     examination persons in attendance shall not make
12   statements or comments that interfere with the
     questioning.
13
     THAT a deponent shall answer all questions at a
14   deposition, except (i) to preserve a privilege or right
     of confidentiality, (ii) to enforce a limitation set
15   forth in an order of a court, or (iii) when the question
     is plainly improper and would, if answered, cause
16   significant prejudice to any person. An attorney shall
     not direct a deponent not to answer except as provided
17   in CPLR Rule 3115 or this subdivision. Any refusal to
     answer or direction not to answer shall be accompanied
18   by a succinct and clear statement on the basis
     therefore. If the deponent does not answer a question,
19   the examining party shall have the right to complete the
     remainder of the deposition.
20
     THAT an attorney shall not interrupt the deposition for
21   the purpose of communicating
22   with the deponent unless all parties consent or the
     communication is made for the purpose of determining
23   whether the question should not be answered on the
     grounds set forth in Section
24   221.2 of these rules, and, in such event, the reason for
     the communication shall be stated for the record
25   succinctly and clearly.
```



Page 4

1   THAT the failure to object to any question or to move to
    strike any testimony at this examination shall not be a

2   bar or waiver to make such objection or motion at the
    time of the trial of this action, and is hereby

3   reserved; and

4   THAT this examination may be signed and sworn to by the
    witness examined herein before any Notary Public, but

5   the failure to do so or to return the original of the
    examination to the attorney on whose behalf the

6   examination is taken, shall not be deemed a waiver of
    the rights provided by Rule 3116 and 3117 of the CPLR,

7   and shall be controlled thereby; and

8   THAT the certification and filing of the original of
    this examination are hereby waived; and

9
    THAT the questioning attorney shall provide counsel for

10  the witness examined herein with a copy of this
    examination at no charge.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 5

```
 1                  ROBIN CHAMBERS
 2               THE VIDEOGRAPHER:  We are now on the
 3       record.  This is the beginning of videotape
 4       number one in the deposition of Robin Chambers
 5       in the matter of Graham Chase Robinson versus
 6       Robert De Niro and Canal Productions, Inc.
 7       Today is January 13, 2022 and the time is 9:35
 8       a.m.
 9               This deposition is being taken
10       virtually at the request of Sanford Heisler
11       Sharp, LLP.  The videographer is Miguel
12       Banuelos of Magna Legal Services and the court
13       reporter is Brooke Perry of Magna Legal
14       Services.
15               Will counsel and all parties present
16       state their appearances and who they represent.
17               MS. HARWIN:  My name is Alexandra
18       Harwin, I'm from Sanford, Heisler, Sharp and I
19       represent the Plaintiff, Graham Chase Robinson.
20               MR. HEISLER:  Jeremy Heisler for
21       Sanford, Heisler, Sharp and Plaintiff.
22               MS. MACMULLIN:  My name is Kate
23       MacMullin.  I'm also from Sanford, Heisler,
24       Sharp on behalf of the Plaintiff, Graham Chase
25       Robinson.
```



1                         ROBIN CHAMBERS

2                         MS. SLOAN:  Annie Sloan from Sanford,

3            Heisler, Sharp on behalf of the Plaintiff,

4            Graham Chase Robinson.

5                         MS. ROSEN:  Leor Rosen from Sanford,

6            Heisler, Sharp on behalf of the Plaintiff,

7            Graham Chase Robinson.

8                         MR. BENNETT:  Gregory Bennett, Traub,

9            Lieberman, Straus and Shrewsberry for all

10           Defendants.

11                        MS. LAZZARO:  Brittany Lazzaro from

12           Tarter, Krinsky and Drogin on behalf of

13           Defendant, Canal Productions.

14                        MR. DROGIN:  Laurent Drogin from

15           Tarter, Krinsky and Drogin on behalf of

16           Defendant, Canal Productions.

17                        MR. HARVEY:  And Tom Harvey on behalf

18           of Defendants.

19                        THE VIDEOGRAPHER:  Will the court

20           reporter please swear in the witness.

21     R O B I N   C H A M B E R S, the witness herein, having

22     been first duly sworn by a Notary Public of the State of

23     New York, was examined and testified as follows:

24     EXAMINATION BY

25     MS. HARWIN:



Page 7

```
 1                    ROBIN CHAMBERS
 2   Q.      State your name for the record, please.
 3   A.      Robin Chambers.
 4   Q.      State your address for the record, please.
 5   A.      ████████████████████████████████████████
 6   Q.      Thank you Ms. Chambers for being here today.
 7   I'm Alexandra Harwin.  I'm an attorney for the Plaintiff
 8   in this litigation, Graham Chase Robinson and I'm going
 9   to be asking questions today.
10           Before we get started, have you ever been
11   deposed before?
12   A.      Have you ever --
13   Q.      Have you ever been deposed before?
14   A.      No, no.
15   Q.      Okay.  So I'm going to take a few minutes to
16   talk about the ground rules for deposition just to make
17   sure that we have a smooth day today and a clean record
18   for this case.  So a lot of these reminders are pretty
19   basic, but I hope that they'll help us all as we go
20   through questioning today.  The first thing that I would
21   like to say is that it's important that you speak loudly
22   and clearly.  The court reporter needs to take down
23   everything that I said and everything that you say, so
24   it's important that we both speak up and speak clearly,
25   and slowly so that the court reporter can take down what
```



1                    ROBIN CHAMBERS

2    we're saying.

3            Do you understand that?

4    A.    Yes.

5    Q.    Okay.  It's important that you answer my

6    questions verbally because the court reporter can't

7    record a nod or a shrug or other gestures.

8            Do you understand that?

9    A.    Yes, I do.

10   Q.    This is an important one:  Please wait until I

11   finish my question before you start answering.  Even if

12   you feel very confident, you know where I'm going with

13   my questions it's still important for there to be a

14   clear record of what the question was before you answer.

15           Do you understand that?

16   A.    Yes.

17   Q.    Okay.  If you don't understand my question for

18   any reason, ask for clarification.  Don't answer the

19   question if you don't understand it.  If you do answer

20   the question though, we're all going to assume that you

21   understood the question.

22           Does that make sense?

23   A.    Yes.

24   Q.    Okay.  If you need a break at any point, let us

25   know and we'll find a good stopping point at some point.



1                       ROBIN CHAMBERS

2    If you get hungry, if you need to go to the bathroom,

3    that's totally fine in a normal deposition to take

4    breaks from time to time.  So just let us know if you

5    need a break, the only thing is if we're in the middle

6    of a question, we can't take a break until the answer

7    has been given.

8             Do you understand that?

9    A.      Yes.

10   Q.      Okay.  Are you represented by an attorney at

11   this deposition today?

12   A.      No.

13   Q.      Okay.  The attorneys for Canal and Mr. De Niro

14   may object from time to time, that's a normal part of

15   depositions, but regardless of their objections you're

16   still going to be required to answer the question.

17            Do you understand that?

18   A.      Yeah.

19   Q.      If you answer a question and later on remember

20   something else or you believe that an answer that you

21   provided was not accurate, let me know and we'll give

22   you the opportunity to correct your prior answer or

23   supplement your prior answer.  If there's a term I use

24   or an abbreviation that you think I've used incorrectly

25   or doesn't make sense to you, please let me know so I



```
 1                  ROBIN CHAMBERS
 2   can correct my usage and we have a clear record and
 3   everyone has the same understanding about what the
 4   record means.  Okay?
 5   A.      Okay.
 6   Q.      If I refer to Canal, I'm referring to Canal
 7   Productions Inc., okay.
 8           Is there any instruction I provided you that
 9   you don't understand or agree with today?
10   A.      No.
11   Q.      This testimony is under oath, just as if you
12   were in a court of law.  The testimony that you provide
13   can be used as evidence in a case.
14           Do you understand that?
15   A.      I do.
16   Q.      Okay.  Are you taking -- are you doing this
17   deposition on a computer today?
18   A.      Yes.
19   Q.      Okay.  Do you have any other devices besides
20   your computer?
21   A.      Just my cell phone.
22   Q.      Okay.  Could I ask you to turn your cell phone
23   off just during the deposition so we don't have any --
24   A.      Muted or just completely power it down?
25   Q.      If you could power it down, we'd appreciate it.
```



Page 11

1                    ROBIN CHAMBERS

2    You can turn it on during breaks, but just so there's no

3    communications going on during the questioning, we'd

4    appreciate that.

5    A.      Okay.  Off.

6    Q.      Thank you.  Okay.  Is there anyone in the room

7    with you today?

8    A.      Not human, no.

9    Q.      Do you have a furry friend with you today?

10   A.      Yes, I do.

11   Q.      Okay.  You understand that you have an

12   obligation today to provide testimony that's truthful

13   and complete; is that right?

14   A.      Yes.

15   Q.      And you understand that you must provide

16   testimony that's truthful and complete even if it can be

17   hurtful to Mr. De Niro; do you understand that?

18   A.      I do.

19   Q.      Do you consider it important to tell the truth?

20   A.      Of course, yes.

21   Q.      So let's begin our questioning.  Tell me what's

22   your full name?

23   A.      Robin Elaine Chambers.

24   Q.      Have you ever gone by any other name?

25   A.      No.



```
 1                    ROBIN CHAMBERS
 2    Q.      What's your date of birth?
 3    A.      Well, can I go back one second for that?  I was
 4    married, so -- but went back to my maiden name.
 5    Q.      Okay.  What was the married name that you used?
 6    A.      The first marriage was Vassilakis.
 7    Q.      How do you spell that?
 8    A.      V-A-S-S-I-L-A-K-I-S.
 9    Q.      And did you go by Robin Elaine Vassilakis?
10    A.      Yes, I did.
11    Q.      And you've previously provided your home
12    address.  How long have you resided at your present
13    address?
14    A.      About almost eight years.
15    Q.      Does anyone live with you?
16    A.      No.
17    Q.      Are you presently married?
18    A.      No.
19    Q.      Do you have any dependents?
20    A.      No.
21    Q.      Do you suffer from any condition that affects
22    your memory?
23    A.      No.
24    Q.      Have you consumed any substances that might
25    affect your memory or your ability to communicate today?
```



```
 1                    ROBIN CHAMBERS
 2   A.       No.
 3   Q.       Is there any reason physically or mentally that
 4   you're not able to testify truthfully and completely
 5   today?
 6   A.       No.
 7   Q.       Have you ever been arrested or charged in
 8   connection with a criminal offense?
 9   A.       No.
10   Q.       Have you ever been convicted of a criminal
11   offense?
12   A.       No.
13   Q.       Have you ever been accused of making any false
14   statement?
15   A.       No.
16   Q.       Other than being deposed in this case today,
17   have you ever been involved in any other lawsuit or
18   legal proceeding, whether it's a court proceeding, an
19   arbitration, administration proceeding as a witness?
20   A.       No, no.
21   Q.       Okay.  Have you ever been a party to any legal
22   proceeding such as a lawsuit, an arbitration, an
23   administration proceeding or any kind of legal
24   proceeding?
25   A.       No.
```


MAGNA
LEGAL SERVICES

Page 14

```
 1                    ROBIN CHAMBERS
 2   Q.      Okay.  Have you ever testified under oath
 3   before?
 4   A.      I don't think so.  I don't think so.
 5   Q.      Is there something you're thinking of that
 6   you're not sure whether it was testimony as a --
 7   A.      Well, you know, I think there was -- as Tom may
 8   remember this, I came back from a trip with Bob to Japan
 9   and I brought some things inadvertently that were
10   flammable, like, souvenir matches.  And the State
11   Department, they confiscated it, the State Department.
12   So I had to, I guess, be under oath saying I didn't
13   intend it.  You know, it turned out to be a much bigger
14   deal, I didn't have to go to court or anything.  But I
15   think I had to tell them I didn't do this on purpose.
16   It was a thing.
17   Q.      About how long ago was that?
18   A.      Oh my God, 25, 26, 27 years ago.
19   Q.      Okay.  Have you ever provided any kind of
20   testimony or sworn statement other than concerning the
21   flammable materials in any matter involving Canal
22   Productions or Mr. De Niro?
23   A.      No.  Not that I remember, no.  No.
24   Q.      Have you ever provided any sworn statement,
25   declaration or affidavit in connection with this
```



Page 15

```
 1                  ROBIN CHAMBERS
 2   litigation?
 3   A.      No.
 4   Q.      Okay.  Are you aware of Mr. De Niro ever being
 5   arrested?
 6   A.      No.
 7                  MR. BENNETT:  Objection.
 8   Q.      Are you aware of Mr. De Niro ever having a
 9   run-in with law enforcement?
10                  MR. BENNETT:  Objection.
11   A.      No.
12   Q.      As far as you know, have you ever been
13   represented by an attorney in connection with this
14   lawsuit brought by Ms. Robinson or by the litigation
15   that Canal brought against Ms. Robinson?
16                  MR. BENNETT:  Objection.
17   A.      Can you ask that again, Alexandra.
18   Q.      Absolutely.  Absolutely.  As far as you know,
19   have you been represented by a lawyer in connection with
20   either the lawsuit that Ms. Robinson brought against
21   Canal and Mr. De Niro or in the litigation that Canal
22   brought against Ms. Robinson?
23                  MR. BENNETT:  Objection.
24   A.      No.
25   Q.      Has Tom Harvey ever represented you as a
```



```
 1                    ROBIN CHAMBERS
 2   lawyer?
 3                    MR. BENNETT:  Objection.
 4   A.      You know, I don't know if -- I think when I was
 5   working for Bob, I think -- I believe that instance, he
 6   helped take care of it.  I don't -- right now, I don't
 7   remember anything legally, no.
 8   Q.      Okay.  As far as you recall, in the last 20
 9   years, have you ever sought or received legal advice
10   from Tom Harvey?
11                    MR. BENNETT:  Objection.
12   A.      I might have as a friend asked for legal
13   advice, but nothing more than that, you know, he -- you
14   know, I worked with him for a long, long, time.  So, you
15   know, I could ask a legal question for a friend or
16   something like that, but nothing of any significance.
17   Q.      Got it.  In the last 20 years, you haven't
18   sought or received legal advice from Tom Harvey on any
19   matter related to your employment; is that correct?
20                    MR. BENNETT:  Objection.
21   A.      No, not that I remember.  No.  No.
22   Q.      Meaning that's correct?
23   A.      Yes, I don't believe I have regarding my
24   employment, no.
25   Q.      All right.  Have you done anything to prepare
```



1                    ROBIN CHAMBERS

2    for today's deposition?

3    A.      No, I had a tech meeting.  My tech guy showed

4    me how to do this so I would be prepared.  I went online

5    and Googled about depositions and things like that, to

6    familiarize myself, but no.

7    Q.      Is there anyone you've spoken to about your

8    deposition other than the tech person who was helping

9    you set up?

10   A.      No.  I mean friends.  Friends that, you know,

11   called me today; this is what I'm doing.

12   Q.      Have you spoken to anyone about how you feel

13   about being deposed?

14   A.      Yeah, I'm sure it's -- I'm really nervous, it's

15   very emotional because of the parties involved, so

16   that's really hard for me.  And um, yeah, I'm just

17   really nervous and I hate it.

18   Q.      Well, we appreciate your being here today.  We,

19   you know, certainly appreciate that this is emotional.

20           Can you say more about that?  I mean, what

21   makes this an emotional experience for you?

22                    MR. BENNETT:  Objection.

23   A.      Well, because I care about the parties involved

24   in this.  I knew them and I worked with them for years,

25   so that's the hard part, you know.



Page 18

```
 1                      ROBIN CHAMBERS

 2   Q.      Yeah.  Are you currently employed?

 3   A.      No.

 4   Q.      You previously worked for Mr. De Niro at Canal

 5   Productions Inc.; is that right?

 6   A.      Yes.

 7   Q.      When did you first come to work for Robert De

 8   Niro?

 9   A.      1989.

10   Q.      Wow.  How did you first come to be employed by

11   Mr. De Niro?

12                      MR. BENNETT:  Objection.

13   A.      I had been in the business, I was in LA where I

14   lived and I moved to New York and was doing freelance

15   work, working on a movie, working with this person and

16   that person.  But I wanted to kind of um, have a

17   permanent job with benefits at that point.  So um, I ran

18   into a mutual friend and he said that Bob was looking

19   for an assistant, so I interviewed for that job.

20   Q.      You interviewed with Mr. De Niro?

21   A.      Yes.

22   Q.      And what was your job when you were first hired

23   by Mr. De Niro?

24   A.      Assistant to Bob.

25   Q.      And were you employed by Mr. De Niro personally
```



```
 1                      ROBIN CHAMBERS
 2    or by an entity that he owned?
 3                      MR. BENNETT:  Objection.
 4    A.      Yes, I don't remember if it was Canal back than
 5    or if it was just Bob.  It could have been.  I don't
 6    know for sure.
 7    Q.      At some point, you came to be employed by Canal
 8    Productions?
 9    A.      Yes.
10    Q.      Okay.  And was that around the time of the
11    founding of Canal Productions?
12                      MS. LAZZARO:  Objection.
13    A.      I think so, it could have existed before then,
14    I just don't remember.  You know, it could have been
15    Canal -- yeah.
16    Q.      Have you ever had any formal employment
17    agreement either with Mr. De Niro or with Canal?
18                      MR. BENNETT:  Objection.
19    A.      I don't think so, no.  I don't remember if
20    there was.
21    Q.      Do you ever receiving -- do you -- let me
22    restate that question.
23            Do you remember ever receiving an offer letter
24    or -- let me restate that question again.
25            Did you ever receive an offer letter from Canal
```



Page 20

                         ROBIN CHAMBERS

1
2    or from Mr. De Niro?
3    A.      No.
4    Q.      Have you ever had a confidentiality agreement
5    with Canal or Mr. De Niro?
6                    MR. BENNETT:  Objection.
7    A.      You know, I don't think so.  I don't remember.
8    It was so long ago when I started, that that wasn't a
9    thing then.  At some point it became a thing.  But I
10   don't remember when and I don't remember if I ever -- if
11   I ever signed one.  I tend to think not, but I don't
12   know for sure.
13   Q.      Okay.  So sitting here today, you're not aware
14   of having any confidentiality agreement?
15   A.      Exactly, yes.
16   Q.      And even if there were a confidentiality
17   agreement, you would have an obligation to testify here
18   today completely and truthfully regardless of anything
19   in a confidentiality agreement.  Do you understand that?
20                   MR. BENNETT:  Objection.
21   A.      I do.
22   Q.      When were you employed by Canal Productions?
23   A.      Pardon me?
24   Q.      When were you employed by Canal Productions?
25   A.      Well, I think when I started at the end of



Page 21

```
 1                    ROBIN CHAMBERS
 2    1989.
 3    Q.      And for how long were you employed by Canal
 4    Productions?
 5    A.      This is such an odd thing.  I worked straight
 6    through as his assistant, as Bob's assistant, from then
 7    until 2003 and then I left the job as his assistant.
 8    But I continued to work for him in other capacities on
 9    his archives.  And so for those ensuing years until --
10    until recently, I worked on his archives, I worked on
11    getting his -- just his archives, I think that's -- you
12    know, but not as his assistant in the office since 2003.
13    Q.      Okay.  So from approximately 1989 until
14    approximately 2003, you worked as an assistant for Mr.
15    De Niro in his office; is that correct?
16    A.      Yes.  Yes.
17    Q.      And around 2003, your employment situation with
18    Mr. De Niro changed; is that correct?
19    A.      Yes.
20    Q.      What prompted the change in your employment
21    relationship with Mr. De Niro around 2003?
22                    MR. BENNETT:  Objection.
23    A.      Um, um, I left my job -- I was asked to leave
24    my job because my boss um, was, I think it was --
```



Page 22

```
 1                        ROBIN CHAMBERS
 2      ████████████████████████████████████████
 █      ██████████████████████████████████████████████
 █      ██████████████████  So that's how that ended.
 5      Q.     So Mr. De Niro terminated your employment
 6      around 2003?
 7      A.     Yes.
 8                        MR. BENNETT:  Objection.
 9      Q.     ████████████████████████████████████
 █      ██████████████████████████████████████████████
 █      ███████████████████████
 █      ████    ████████
13                        MR. BENNETT:  Objection.  She already
14              testified to this.
15      Q.     And what role did Ms. Hightower-De Niro play at
16      Canal?
17                        MR. BENNETT:  Objection.
18      A.     Well, I don't think she played a role in Canal
19      -- I mean she -- you know, it was just -- I had a little
20      history with her and Bob naturally.  And so when they
21      got back together and remarried, I guess she just didn't
22      want me there, you know, as I guess a lot of people
23      would, in that they want to start fresh with people that
24      were loyal to them.  So it was not just me, there were a
25      few people and um, and it was -- yeah.
```



Page 23

```
 1                    ROBIN CHAMBERS
 2  Q.      What did Mr. De Niro tell you about why he was
 3  ending your employment around 2003?
 4                    MS. LAZZARO:  Objection.
 5                    MR. BENNETT:  Objection.
 6  A.      Well, it was -- I think it was August.  I
 7  remember this pretty clearly because it was such a shock
 8  and it was like losing a job that I loved, having done
 9  nothing wrong, you know.  But he was enormously kind, it
10  was enormously emotional for both of us.  It was hard on
11  him.  It was just the situation.  And he was very kind
12  to me at that point about the job ending and it was not.
13  It was not unkind at all.  That's all -- you know, he
14  was just really kind and decent and honest and sad, we
15  were both very sad.
16  Q.      What did he say about the reason that he was
17  ending your employment?
18                    MR. BENNETT:  Objection.
19  A.      Well, as I remember, it's like, you know, Bob
20  -- it was -- it's like I knew before he got the words
21  out.  It's like we -- as assistants, we know what he's
22  going to say before he says it.  You can see -- you
23  know, I knew him so well, and so he just said, look,
24  this is what's happening, but gee's, and he stumbled
25  around as Bob does, and you know, it was hard for him to
```



Page 24

```
 1                    ROBIN CHAMBERS
 2    say, it was hard for me to hear, but it kind of went
 3    like that.  There was nothing unkind about it.
 4    Q.       What did Mr. De Niro say that led you to
 5    understand that the decision had to do with his wife?
 6                    MS. LAZZARO:  Objection.
 7    A.       I believe he said Grace, you know, I knew her
 8    by then.  I knew who she was for several years
 9    obviously.  And so I think basically he said, Grace, you
10    know, on a condition of our getting back together -- I
11    don't think he quite said it like that, but I got it
12    very clearly, that that was a condition.  So --
13    Q.       Did you understand why Mr. De Niro's wife
14    didn't want you working for her?
15                    MS. LAZZARO:  Objection.
16                    MR. BENNETT:  Objection.
17    A.       Sure, yes.
18    Q.       Please explain.
19    A.       Well, I just believe this, that during the
20    first custody battle and divorce, I was in court with
21    him every day.  You know, I think she knew my loyalties
22    were with Bob and -- and -- which was true.  And
23    sometimes when people like Bob marry people like Grace,
24    they want to start fresh.  They want people loyal to
25    them.  I get it.  I get that.  My objection was, was
```



1                    ROBIN CHAMBERS

2    that in the way it was handled.  You know, it just --

3    yeah, of course you have a right to clean house so to

4    speak and get people who are loyal to you.  It was just

5    hard at that age, you know, I think I was like 57 or 58

6    then and so it's hard to be out of a job and to lose my

7    salary and stuff.  So that was hard.  That was really

8    hard.  But Bob was generous and kind, so it ended up

9    being okay.

10   Q.      What were you earning from Canal around the

11   time that your employment ended in 2003?

12   A.      I think it was probably about 225 a year, 250.

13   Q.      Around 2003, you were earning approximately 225

14   --

15   A.      250.  Yeah, somewhere in there and then bonuses

16   and stuff.

17   Q.      Let me clarify.  Your -- around 2003, as an

18   assistant to Mr. De Niro, you were earning a base salary

19   of approximately 225,000 to $250,000 a year?

20   A.      Yes.

21   Q.      In addition to that base salary, you were also

22   receiving bonuses; is that correct?

23   A.      Yes, it was a very generous, you know, bonuses

24   and yeah, it was -- yeah.  He was working a lot.  We

25   were busy.  You know, it was a busy job.  A lot of great



Page 26

```
1                    ROBIN CHAMBERS
2   perks.
3   Q.      Mm-hmm.  What were the great perks?
4                    MR. BENNETT:  Objection.
5   A.      For me then, travel, lunches in the office for
6   all of us in the office travel expenses when we worked
7   -- at that point, my job was traveling with him
8   everywhere, you know, as his assistant.  And so it was,
9   you know, great travel.  And Bob was really generous
10  that way, first class travel and he never said you have
11  to stay in this place while I stay at -- he was not like
12  that at all.  So --
13  Q.      Mm-hmm.
14  A.      He was very generous and inclusive.
15  Q.      Mm-hmm, mm-hmm.  What --
16                   MR. DROGIN:  Excuse me Counsel, I don't
17                   mean to interrupt, but I've noticed that a
18                   number of times you're making nonverbal
19                   comments, you're saying uh-huh or things like
20                   that.  I'm just not sure that the transcript
21                   can get those down.
22  Q.      Ms. Chambers, what was your bonus structure
23  when you were an executive assistant -- let me restate
24  that question.
25                   Ms. Chambers, what was your bonus structure
```



```
 1                    ROBIN CHAMBERS
 2   when you were an assistant to Mr. De Niro?
 3                    MS. LAZZARO:  Objection.
 4                    MR. BENNETT:  Objection.
 5   A.      I don't know that there was any structure.  It
 6   was never -- nothing was ever formal.  It was -- it just
 7   wasn't that way, you know.  And yeah, I don't know.  But
 8   I would imagine I would get 10, 15,000 at Christmas plus
 9   gifts.  But it was never formal.  It was just, yeah, and
10   -- not just me, there were other people in the office,
11   people who were my assistants at that point, and Chase
12   had them, sure.  And he would take care of them too, he
13   was very generous that way.
14   Q.      Mm-hmm.
15   A.      Look, you know, we never got overtime, so those
16   things were thank you for a lot of work.
17   Q.      You previously mentioned lunches.  What ah --
18   what was Canal's practice with respect to paying for
19   employee lunches?
20                    MS. LAZZARO:  Objection.
21   A.      The way I ran the office then was -- and this
22   changed.  It wasn't always this way since 1989, but
23   especially after we moved from 110 Hudson working out of
24   an apartment there, and moved to the Tribeca Film Center
25   and he formed Tribeca Films and Nobu was there and the
```



Page 28

1                    ROBIN CHAMBERS

2    Tribeca Grill, we got to order from the Grill or from

3    Nobu.  And if it was an especially crazy time, like

4    during Christmas, you know, you'd treat the employees to

5    a good meal, a good meal and many times dinner if we

6    worked straight through.  Because we a lot of times

7    never left that office, never, never.  So it was very

8    busy.

9    Q.     Mr. De Niro had a practice of paying for

10   lunches every day for employees of Canal; is that

11   correct?

12   A.     Yes, yes.

13   Q.     Mr. De Niro had a practice of paying for

14   employees' dinners if employees were working through

15   dinner; is that correct?

16                    MS. LAZZARO:  Objection.

17                    MR. BENNETT:  Objection.

18   A.     Yes.

19   Q.     Mr. De Niro also had a practice of paying for

20   employees' coffee; is that correct?

21                    MS. LAZZARO:  Objection.

22   A.     Employees' coffees?  I don't -- I mean, yeah,

23   in a way, like we would take it out of petty cash.

24   Q.     Employees were authorized to use petty cash to

25   pay for coffee?



```
 1                    ROBIN CHAMBERS
 2   A.      Sure.  If we would order it and we were working
 3   absolutely or if we sent a runner out to get something,
 4   absolutely, yes.
 5   Q.      What travel expenses were perks of your
 6   employment?
 7                    MR. BENNETT:  Objection.
 8                    MS. LAZZARO:  Objection.
 9   A.      Again, it was nothing formal, but -- and I
10   happened to live right next door to Bob at a certain
11   point on Hudson and a block away from the Film Center,
12   so I didn't have much travel.  But I had a company car
13   that I would drive, you know, that I could go upstate
14   with.  Car and driver if we needed it.  You know, yeah,
15   I guess, cars and drivers and town cars and drivers and
16   stuff.  It was -- yeah.  It was -- yeah.  And cabs, you
17   know.
18   Q.      Did there come a time after 2003 when you
19   resumed your work for Canal?
20   A.      Yes.
21   Q.      When after 2003 did your work for Canal resume?
22   A.      Almost immediately.  Because I had to wind up
23   things.  I physically -- I remember, Alexandra, that Bob
24   and I spoke in July, August, somewhere around there.
25   But I physically didn't leave the office until the end
```



Page 30

1                    ROBIN CHAMBERS

2    of that year, right.  And then I -- at that point, my

3    salary was drastically reduced.  But I moved over to --

4    back to 110 Hudson where we -- where I went -- during

5    the years I was working for him and before I met him,

6    Bob had a pretty big body of work.  And all his wardrobe

7    and his paper materials, his scripts, his documents, his

8    props, his -- all of that had just been put into

9    storage.  So I moved over -- it was kind of under the

10   radar of Grace Hightower, but it was stuff that he

11   needed done.  And there was no hours, I just did it on

12   my own when I could.  I worked with a couple of guys

13   from the office at that point.  And we went through

14   everything and we found a home for it at an archive in

15   Texas at University of Texas.  And so that was years of

16   work.  And that was very gratifying work, I -- yeah, it

17   was like securing his legacy and things weren't molding

18   somewhere.  It was -- you know, found a home, so --

19   Q.    After your work for Canal resumed after 2003,

20   describe for me the full scope of job responsibilities

21   that you had with respect to Mr. De Niro and Canal?

22              MR. BENNETT:  Objection.

23              MS. LAZZARO:  Objection.

24   A.    Well, you know, it changed from 2003 until last

25   year.  It changed all the time and wound itself down.



Page 31

1                    ROBIN CHAMBERS
2    But the first years were pretty intense and pretty busy.
3    Because I had this massive job of unearthing all this
4    stuff and getting it to the right place and that was a
5    big, big, big, big job.  It was like, you know, 30 some
6    movies and props and materials that had to be gone
7    through and redacted and all that stuff.  But then over
8    the years it wound itself down.  I moved to Florida with
9    my husband, I flew back and forth once in a while to do
10   things.  I'd go to Texas to have meetings once a year,
11   which is where all his items were and that was my focus.
12   But it stopped being a full-time thing, oh gosh,
13   probably two or three years, maybe 2006, 2007 and then I
14   would just be in and out, answer questions, do what I
15   could to help whoever was in the office at that point
16   and then, okay, I guess -- sorry, I'm just rambling,
17   sorry.
18   Q.      That's okay.  Continue.
19   A.      Oh, so basically my husband died when we were
20   in Florida.  He passed away, and so then I moved back to
21   New York.  I guess, yeah, about eight years ago, eight
22   or nine years ago.  And -- but I'd always kept in touch
23   with Bob.  We always talked.  And he knew my husband and
24   I was close with his kids.  You know, it was like years
25   of working for somebody, right?  So we never really lost



ROBIN CHAMBERS

1

2    touch, but it was sporadic payments, it was sporadic

3    work.  But I knew what I had to do.  He didn't know what

4    I had to do.  I knew what needed to be done, so I just

5    did it.  And then when I moved back to New York, which

6    was great to come home, you know, things -- yeah, I just

7    started to do little things for him, but nothing major.

8    It was kind of like -- when I worked with Chase, it was

9    like sometimes it was really, really, busy, two or three

10   days a week, sometimes once every two weeks.  You know,

11   it was -- it just changed.  I was -- in a way, at my age

12   it worked out really, really, well.  Because it wasn't

13   the intenseness of her job or my old job which I

14   couldn't have done physically, right, at my age.  So it

15   worked out really well.  I got a chance to work with

16   people I liked and cared about and do work that I found

17   meaningful.  But it was very sporadic and sometimes,

18   like I said, sometimes it was really busy, Chase and I

19   did a lot of stuff on the phone.  It was a lot of phone

20   stuff, so -- and that was good too.  Because I lived two

21   and a half hours outside -- I could take the jitney in

22   and out, so --

23   Q.    You returned to New York around 2014; is that

24   correct?

25   A.    I think so.  I think so, yeah.  I could tell



```
                      ROBIN CHAMBERS
 1
 2    you.  I have it -- let me see, yes, 2014, yeah.
 3    Q.     Okay.  So from 2014 onward, describe for me
 4    what your role was with respect to Canal's office?
 5                  MR. BENNETT:  Objection.
 6    A.     Well, I wasn't in the office.  I kind of was
 7    the one -- kind of a creepy thing to do was, I kind of
 8    said to myself, after I left in 2003, that I'd never go
 9    back to that office again.  So I didn't.  I maybe once
10    stepped foot in the office.  But I worked out a block
11    away.  I worked with Chase and Michael Kaplan a block
12    away and that was -- you know, we had an office set up
13    and archives and personal things and stuff like that
14    that I worked out of.
15    Q.     From 2014 onward what was your role in
16    supporting the Canal employees who worked for Mr. De
17    Niro?
18                  MS. LAZZARO:  Objection.
19                  MR. BENNETT:  Objection.
20    A.     Well, I don't think I supported anybody.  I
21    didn't know anybody in the office, with the exception of
22    Chase and she was -- she ran the office and she was the
23    person I worked with most.  She was the one that Bob
24    wanted me to work with.  And so we eventually did.  At
25    first we didn't and then we got to know each other and
```



Page 34

                        ROBIN CHAMBERS

1

2    things, you know -- just there were a lot of things that

3    came up.  Sometimes it was busy, sometimes it wasn't.

4    But I had a working relationship with her and a

5    relationship as we got to know each other more and more.

6    Q.      Mm-hmm.  How often would you interact with Ms.

7    Robinson when the two of you were working for Canal?

8                    MR. BENNETT:  Objection.

9    A.      Oh, I think in the beginning, slightly yeah,

10   not as much, but as -- again, I think towards the end,

11   the last two or three years, it was pretty intense.

12   Yeah.  Yeah.

13   Q.      From 2014 until Ms. Robinson's employment ended

14   in 2019, how often would you speak to Ms. Robinson on

15   the phone during a typical week?

16                   MR. BENNETT:  Objection.

17   A.      In the beginning not so much.  Can I just take

18   a drink of water please?

19   Q.      Absolutely.

20   A.      In the beginning not so much because we didn't

21   know each other that well.  But Bob, towards the end,

22   the last two or three years, Chase, right?  Maybe we --

23   like a lot, a lot, a lot, a lot.  We were on the phone

24   all the time.  I felt -- we had one thing that Bob

25   assigned to us that took a lot of phone calling and a



Page 35

                          ROBIN CHAMBERS
1
2    lot of consultations.  So sometimes it was multiple
3    times a day and stuff, yes.
4    Q.      So from 2016 through the end of Ms. Robinson's
5    employment in 2019, you would speak to Ms. Robinson
6    typically at least once a day?
7                    MR. BENNETT:  Objection.
8    A.      Yes, I think that's fair.
9    Q.      And during the period from 2016 until Ms.
10   Robinson's employment ended in 2019, you would also
11   speak to Ms. Robinson multiple times a day; is that
12   correct?
13   A.      Yes.
14                   MR. BENNETT:  Objection.
15                   MS. LAZZARO:  Objection.
16   Q.      How often would you interact with Ms. Robinson
17   in person in a typical week during the period from 2016
18   until the end of her employment in 2019?
19                   MS. LAZZARO:  Objection.
20                   MR. BENNETT:  Objection.
21   A.      Well, you know, I don't know how to -- I'm not
22   exactly certain.  But when I would come into the City,
23   we'd inevitably -- because I would have to leave my
24   house, like, at 7:00 a.m.  So usually we'd meet, grab a
25   sandwich talk about whatever was needed to be talked



Page 36

1                        ROBIN CHAMBERS

2    about, pass information back and forth and I would go

3    off or she would come to the seventh floor.  If she was

4    working from her house, I would go up there.  She had an

5    office I guess, in her house, her dining room.  And so I

6    would go up there sometimes if it was nuts so --

7    Q.      Mm-hmm.  Mr. De Niro authorized Ms. Robinson to

8    work from her home; is that correct?

9                        MS. LAZZARO:  Objection.

10                       MR. BENNETT:  Objection.

11   A.      Authorized.  I mean yeah, we all -- he went up

12   there, I went up there, yeah.  I mean I don't know if

13   authorized -- I don't know if there was ever a formal,

14   this is where I'm going to work sometimes.  But yeah, he

15   would go up there, I would go up there, yeah.  But I

16   don't know if it was, like, authorized.  I don't know if

17   they ever had that conversation, a formal conversation.

18   Q.      But it was understood by everyone that Ms.

19   Robinson worked primarily from her home, correct?

20                       MS. LAZZARO:  Objection.

21   A.      She worked both places.  She worked both places

22   as far as I know.

23   Q.      During the period from 2016 to 2019, you

24   observed Ms. Robinson working out of Canal's main office

25   and at her home, correct?



Page 37

1                    ROBIN CHAMBERS

2    A.      Yes.

3    Q.      On what subjects would you interact with Ms.

4    Robinson when the two of you were working together?

5                    MS. LAZZARO:  Objection.

6    A.      Well, just everything Bob.  Everything.

7    Everything.  Travel.  I'd like to think that I was an

8    advisor, a sounding board at points when you -- you

9    know, Bob is not the -- I worked with a very lot of high

10   profile people over my career, and maybe you got a

11   handful of people you can be totally honest with and

12   talk to.  Because everything is so private and so -- you

13   know what I mean?  You can't talk to your family, your

14   kids, your parents, your husband.  You know, you talk to

15   people you trust.  So a lot about business.  She would

16   give me advice, I would give her advice.  We'd discuss

17   things that came up in the stuff that I was working on.

18   I'd like to think that I gave her good advice, if she

19   had -- what do you think about this?  And should we do

20   this?  And then, you know, Bob, he came out here and I

21   met him for lunch and he asked me to help him about a

22   long-time friend, you know, and so that required me

23   working really, really, closely with Chase.  It was a

24   massive job and it was a lot of moving pieces and both

25   of us were new to it so that was an intense period of



Page 38

```
 1                    ROBIN CHAMBERS
 2    work.
 3    Q.      You and Ms. Robinson were working together to
 4    assist Toukie Smith; is that what you're referring to?
 5                    MR. BENNETT:  Objection.
 6    A.      Yes, yes, yes.
 7    Q.      And what did Mr. De Niro -- let me restart that
 8    question.
 9            What job responsibilities did Mr. De Niro
10    assign Ms. Robinson in relation to Toukie Smith?
11                    MS. LAZZARO:  Objection.
12    A.      Well, it -- I don't remember exactly how it
13    went.  I remember -- I remember having lunch with him
14    out here, his sons, his two twin boys were worried about
15    their mom, Bob thought I could help, thought Chase and I
16    could help.  And so I -- I don't know if he spoke with
17    you, Chase, about it or not or if I brought it to you.
18    I don't remember how that went.  But that was a big
19    thing and it became a lot more once we both were digging
20    into it.  She had, I don't know, how much detail -- am I
21    just talking too much?  I don't know how much detail you
22    want, so -- so that was a big job.
23    Q.      Mm-hmm, mm-hmm.  How many hours a week do you
24    estimate that Ms. Robinson was working on matters
25    relating to assisting Toukie Smith?
```



Page 39

1                    ROBIN CHAMBERS

2                    MS. LAZZARO:  Objection.

3                    MR. BENNETT:  Objection.

4    A.      Boy, that's hard to say.  This was never -- I

5    know my job when I was his assistant and when she was

6    his assistant and later on when she became -- you know,

7    was doing other things as well as assisting, there were

8    no hours.  You just -- if you need to make a phone call

9    at night, you made a phone call at night.  So I don't

10   know.  I don't know.

11   Q.      Besides Ms. Robinson, which other employees of

12   Canal did you have regular interactions with during the

13   period from 2014 until the end of your employment at

14   Canal?

15                   MS. LAZZARO:  Objection.

16                   MR. BENNETT:  Objection.

17   A.      I would think -- I mean the people that I

18   talked to when his original accountants were there, Ira

19   Yohalem, I spoke with them a lot because I knew them for

20   decades or a lot of years, 20 years, 16.  Tom Harvey of

21   course, Michael Kaplan, who worked with Chase and, you

22   know, worked over there.  And early on it was Michael

23   Weber sporadically for a couple of years.  Anna

24   Novacovic, Bob's old housekeeper who wasn't working

25   anymore, but who I kept in touch with.  I think those



Page 40

                    ROBIN CHAMBERS

1

2    kind of -- not, yeah, those -- yeah, those are the

3    people I talked to most.

4    Q.      What was Michael Kaplan's job function at

5    Canal?

6                    MS. LAZZARO:  Objection.

7                    MR. BENNETT:  Objection.

8    A.      I'm not really sure.  I actually don't know.

9    He worked with me a lot on the Texas stuff towards the

10   end of that.  He worked with me a lot on that.  So that

11   was what he did.  But I don't know what his -- I don't

12   know.

13   Q.      Did Mr. Kaplan have a job title at Canal as far

14   as you know?

15   A.      I don't know.  I think I -- I think I hired

16   him.  I think he was working when I left.  He was a very

17   dear friend of Michael Weber, who I adored.  And I think

18   that's how Michael came into that sphere.  But I don't

19   think I worked with him too many -- I don't think I

20   worked with him too -- you know, in the office.  It was

21   only after I came back to New York, I think.  Although I

22   knew him obviously when I was away, so yeah.

23   Q.      And during the period from 2014 through the end

24   of your employment at Canal, how frequently were you in

25   communication with Mr. Kaplan?



```
                                                        Page 41

                        ROBIN CHAMBERS
  1

  2                     MS. LAZZARO:  Objection.

  3  A.      We talked a lot.  We texted.  And I worked with

  4  him, yeah, yeah.  I would take him to Texas with me and

  5  you know, I brought -- yeah.

  6  Q.      And would you be in communication with Mr.

  7  Kaplan at least once a week during the period from 2014

  8  until the end of your employment?

  9  A.      Oh, sure.  From 2003?

 10  Q.      2014 until the end of your employment.

 11  A.      I think so.  I think that's fair to say.

 12  Sometimes more, sometimes no, right?  So yeah.

 13  Q.      And would you text with Mr. Kaplan at least

 14  once a week?

 15  A.      I think so, I think that could be right.

 16  Q.      Were there times when you were in communication

 17  with Michael Kaplan daily?

 18  A.      Yes.

 19                     MR. BENNETT:  Objection.

 20  Q.      Did you text regularly with Ms. Robinson as

 21  well?

 22                     MR. BENNETT:  Objection.

 23  A.      Yes.

 24  Q.      How often would you text with Ms. Robinson?

 25                     MS. LAZZARO:  Objection.
```



Page 42

1                    ROBIN CHAMBERS

2                    MR. DROGIN:  Objection.

3  A.      Oh gosh, a lot.  Sometimes we'd talk a lot,

4  sometimes we'd text a lot.  Not so many e-mails I don't

5  think because I'm not that great with the computer.  But

6  I think mostly a lot of consultation.  Sometimes you

7  just can't have a conversation with a text or I can't so

8  --

9  Q.      Would Ms. Robinson seek your guidance on

10  matters concerning Mr. De Niro?

11                    MS. LAZZARO:  Objection.

12                    MR. BENNETT:  Objection.

13  A.      I think she'd ask for my opinion, as I would

14  her.  You know, you need someone that you can tell stuff

15  to that you can't -- it's such a -- I don't know how to

16  explain it, but my whole career has been keeping

17  people's secrets and not letting things get out.  So

18  when you have people that you trust around someone like

19  Bob, yeah, you want a second opinion.  You want to make

20  sure you're making the right decision.  Yeah, of course.

21  Yeah, I think that's fair to say.  I mean she knew what

22  she was doing, she didn't need me to okay it.  But you

23  know, like I -- yeah, sure -- I think, yeah.

24  Q.      Turning back to Michael Kaplan, what was your

25  understanding of what his job responsibilities were



Page 43

```
 1                    ROBIN CHAMBERS
 2   during the period from 2014 to 2019?
 3                    MS. LAZZARO:  Objection.
 4                    MR. BENNETT:  Objection.
 5   A.      I think I always thought Michael just did
 6   everything and anything.  I hate -- hesitate to use
 7   runner or something like that because he was definitely
 8   more than that.  But I don't know exactly because I
 9   wasn't in the office.  But he was a great -- he was a
10   great help to me with all the Texas stuff, we worked
11   really well together -- I worked really well with both
12   of these people and loved working with both of them.
13   And Kap, was just -- you know, he was just -- yeah, he's
14   easy to work with.  I know -- I think he did a lot of
15   computer stuff.  He'd been there a while, so just to
16   have that longevity, you know so much, you absorb so
17   much.  So Kap had a wealth of knowledge, he knew people,
18   like, I didn't know a lot of the people because I wasn't
19   physically in the office.  So I didn't know, you know, a
20   lot.  But I knew those first 15, 16, 17, 18, years and
21   then he knew the more current stuff.  And he would
22   explain to me who this -- that was, and you know, but
23   yeah, I think he just was able to do everything.  He did
24   a lot of whatever was asked, yes.
25   Q.      Explain why you loved working with Ms.
```



Page 44

```
 1                    ROBIN CHAMBERS
 2   Robinson.
 3                    MS. LAZZARO:  Objection.
 4                    MR. BENNETT:  Objection.
 5   A.      Well, we just got a long well.  You know, Bob
 6   his type, he told both of us we reminded him of each
 7   other.  You know, we were -- I think it just she was
 8   easy for me to work with.  And I trusted her and I think
 9   she trusted me and um -- and we did the right thing for
10   Bob, I believe that I did.  You know it was -- it was --
11   I think -- yeah, and Kap too, and Kap too.  He's
12   incredibly loyal, and -- yeah.
13   Q.      How would you describe Ms. Robinson as an
14   employee?
15                    MR. BENNETT:  Objection.
16   A.      Well, again, I don't know, because -- as an
17   employee.  I think she worked really hard.  I think she
18   did over and above.  She did very much what I did when I
19   was the assistant in the office who ran the show.  She
20   paid attention to things that younger assistants don't
21   do or newer, you know, she paid -- she and I, I
22   believe -- I think this is okay to say, we both dealt
23   with lawyers and agents and contracts and bonuses and
24   salaries and just all kinds of stuff like that.  You
25   know, I remember that I took care of his children's
```



Page 45

```
 1                    ROBIN CHAMBERS
 2   tuition and things like that.  Things that you just
 3   normally don't think of.  You know things have changed,
 4   so I don't know if that's going on in the office.  But
 5   just those kinds of things that I think she was very
 6   much like me.  We paid attention to all of it.  I did, I
 7   remember, I think it's fair to say, and I think she did
 8   too, and I know she did because I worked with her and
 9   certainly with that big thing with Toukie, you know,
10   selling apartments, getting rid of cars that were being
11   housed and, you know, garages that were being paid for
12   that went off the radar.  And you know, just saved him
13   money and watched -- you know, that kind of stuff.
14   Q.      Did you find Ms. Robinson to be diligent as an
15   employee?
16                    MS. LAZZARO:  Objection.
17                    MR. BENNETT:  Objection.
18   A.      I'm not sure what diligent means.  I think she
19   did the work, she did what had to be done, yes.  Yeah.
20   Yeah.
21   Q.      You found Ms. Robinson to be attentive to
22   detail; is that right?
23   A.      Yes, definitely.
24   Q.      Do you believe Ms. Robinson cared about Mr. De
25   Niro?
```



Page 46

                        ROBIN CHAMBERS
1
2    A.       Absolutely.
3    Q.       Do you feel like Ms. Robinson looked out for
4    Mr. De Niro's best interest?
5                   MR. BENNETT:  Objection.
6    A.       In my opinion absolutely, and -- yeah,
7    absolutely.
8    Q.       Do you believe that Ms. Robinson is a person of
9    integrity?
10                  MS. LAZZARO:  Objection.
11   A.       Yes.  I worked with her -- you know, again,
12   I -- I know how important she was to Bob.  I do.  He
13   told me.  So yeah, I do.
14   Q.       Well, what did Mr. De Niro tell you about how
15   important Ms. Robinson was to him?
16                  MR. BENNETT:  Objection.
17                  MS. LAZZARO:  Objection.
18   A.       He literally said she's important to me.
19   Q.       When did Mr. De Niro say that to you?
20   A.       Probably maybe 2018, I think it's the same
21   conversation where he said she reminds me of you or you
22   remind me of her or however, he termed it, you know.
23   Q.       Was that a conversation just between you and
24   Mr. De Niro?
25   A.       Yes.



Page 47

```
 1                    ROBIN CHAMBERS
 2   Q.     Tell me everything you remember about that
 3   conversation.
 4                    MR. BENNETT:  Objection.
 5   A.     I don't remember how it came up, why it came up
 6   or how it ended.  I just remember that I got a message
 7   very clearly that she was important to him and I --
 8   yeah, absolutely.  He cared about her very much.  And I
 9   think vice versa.
10   Q.     Working for Mr. De Niro was not a 9:00 to 5:00
11   job for Ms. Robinson, right?
12                    MR. BENNETT:  Objection.
13                    MS. LAZZARO:  Objection.
14   A.     No.
15   Q.     Just so that the record is clear, am I correct
16   that working for Mr. De Niro was never a 9:00 to 5:00
17   job for Ms. Robinson?
18                    MR. BENNETT:  Objection.
19   A.     No.
20   Q.     Meaning correct?
21   A.     Oh correct, yes.  I'm sorry.
22   Q.     It was common that Ms. Robinson would have to
23   perform work for Mr. De Niro in the evenings; is that
24   correct?
25                    MR. BENNETT:  Objection.
```



Page 48

```
 1                 ROBIN CHAMBERS
 2   A.      Yes, correct.
 3   Q.      And it was a common occurrence that Ms.
 4   Robinson would have to work for Mr. De Niro during the
 5   weekends, correct?
 6                 MR. BENNETT:  Objection.
 7                 MS. LAZZARO:  Objection.
 8   A.      Correct.
 9   Q.      It was a common occurrence that Ms. Robinson
10   would have to work for Mr. De Niro even if she was on
11   vacation, correct?
12                 MR. BENNETT:  Objection.
13                 MS. LAZZARO:  Objection.
14   A.      Correct.
15   Q.      Mr. De Niro expected Ms. Robinson to be
16   available to him around the clock, right?
17                 MR. BENNETT:  Objection.
18                 MS. LAZZARO:  Objection.
19   A.      Could you repeat that.
20   Q.      Absolutely.  Mr. De Niro expected Ms. Robinson
21   to be available to him around the clock, right?
22   A.      Yes.
23                 MR. BENNETT:  Objection.
24   Q.      Mr. De Niro expected Ms. Robinson to be
25   available to him at all hours of the day, correct?
```



Page 49

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3                    MS. LAZZARO:  Objection.
 4    A.      Yes.
 5    Q.      Mr. De Niro expected Ms. Robinson to be on call
 6    at all hours of the day, correct?
 7                    MR. BENNETT:  Objection.
 8                    MS. LAZZARO:  Objection.
 9    A.      Yes.
10    Q.      Are you aware of Mr. De Niro ever getting angry
11    if Ms. Robinson was not available to him?
12                    MS. LAZZARO:  Objection.
13    A.      Yes.
14    Q.      Describe for me how Mr. De Niro would react if
15    Ms. Robinson was not available to him.
16                    MR. BENNETT:  Objection.
17    A.      I mean that's hard to say, because I wasn't
18    privy to those -- you know, I wasn't in the office.  I
19    didn't overhear anything or anything.  But Chase would
20    tell me and, you know, I'd tell her -- you know, I just
21    tried to help.  I tried to be Switzerland.  I tried to
22    be a mediator.  I tried to convince her not to leave.
23    Q.      Ms. Robinson would confide in you about times
24    when Mr. De Niro would get angry at her if she wasn't
25    available at a given moment?
```



Page 50

                      ROBIN CHAMBERS
1
2    A.      Sure, sure.  Yes.
3    Q.      Turning your attention to the period from 2013
4    to 2019, as far as you know, did Ms. Robinson have any
5    fixed job duties during that period?
6                    MR. BENNETT:  Objection.
7                    MS. LAZZARO:  Objection.
8    A.      No, I wouldn't know that.  Yeah, I wouldn't --
9    just everything.  So I wouldn't know that.  I have no
10   knowledge of that.
11   Q.      When you say "everything", describe for me what
12   you understood Ms. Robinson's job responsibilities to
13   include during the period from 2013 to 2019?
14                   MR. BENNETT:  Objection.
15                   MS. LAZZARO:  Objection.
16                   MS. HARWIN:  Let me rephrase that
17          question.
18   Q.      You used the word "everything", what did you
19   mean by that?
20                   MR. BENNETT:  Objection.
21   A.      She did that position, her job, I think, as far
22   as I could tell, was to do everything that needed to be
23   done with family, with friends, for him, everything
24   surrounding this man's life.  You know, as I did, as
25   that assistant position, that even, when she changed job



Page 51

                    ROBIN CHAMBERS

1

2    titles it still -- she still did -- you know, you

3    oversee everything.  Because no matter -- when I was in

4    the office, no matter what went wrong, it was my fault.

5    I don't care how many people let the ball drop, it comes

6    back to you.  So you have to be responsible for

7    everything.  Because that's what it is.

8    Q.     Ms. Robinson's job was ensuring that everything

9    that needed to get done for Mr. De Niro got done for Mr.

10   De Niro, correct?

11                  MR. BENNETT:  Objection.

12   A.     Yes.

13   Q.     And if anything went wrong, Ms. Robinson was

14   the one who ultimately was held responsible; is that

15   correct?

16                  MS. LAZZARO:  Objection.

17                  MR. BENNETT:  Objection.

18   A.     For the most part I believe so, yes.

19   Q.     During the period from 2013 to 2019 what role

20   did Ms. Robinson play in facilitating Mr. De Niro's

21   travel?

22                  MS. LAZZARO:  Objection.

23                  MR. BENNETT:  Objection.

24   A.     Well, I -- you know, kind of she oversaw

25   everything, I believe.  I believe.  Again, I wasn't



Page 52

         1                    ROBIN CHAMBERS

         2    physically in the office.  But what I know about the job

         3    and our conversations and how that job is for films, for

         4    personal, it was her working with Bob and his family and

         5    the travel agent or whoever she worked with, yeah.  She

         6    knew about everything, she scheduled everything, she

         7    okayed everything.

         8    Q.     Was coordinating Mr. De Niro's travel a

         9    significant part of Ms. Robinson's role?

        10                    MS. LAZZARO:  Objection.

        11                    MR. BENNETT:  Objection.

        12    A.     I would think so.  Again, I don't know for

        13    sure, but it was a big headache for me when I worked in

        14    that position.  It was tense.  It was -- yeah, every --

        15    you know, there are a lot of moving parts to his travel.

        16    So everything has to go seamlessly.  You want it to go

        17    seamlessly.  That was our job to make his life easier

        18    and better so --

        19    Q.     You always reported directly to Mr. De Niro,

        20    correct?

        21                    MS. LAZZARO:  Objection.

        22    A.     When I worked for him in the office, yes.

        23    Q.     And throughout your time working for Canal, you

        24    reported directly to Mr. De Niro?

        25    A.     Yes.



Page 53

```
 1                    ROBIN CHAMBERS
 2   Q.      Mr. De Niro was the person who directed your
 3   job duties, correct?
 4                MS. LAZZARO:  Objection.
 5   A.      Yes.
 6   Q.      Mr. De Niro was the person who was your boss,
 7   correct?
 8                MR. BENNETT:  Objection.
 9   A.      Yes.
10   Q.      How closely did you work with Mr. De Niro
11   during the period from 2014 until the end of your
12   employment at Canal?
13                MR. BENNETT:  Objection.
14   A.      You know, I didn't see him all the time.
15   Michael Kaplan and I would work -- sometimes he'd come
16   to the seventh floor and we'd sit there together and do
17   things that he wanted to do.  We'd go over documents or
18   pictures and stuff like that.  And Michael and I would
19   sit with him.  Sometimes Chase did that with me.
20   Because I knew who all the older people were in the
21   pictures and these new guys didn't.  But, so sometimes I
22   saw him a lot, we talked a lot and sometimes not at all.
23   Sometimes I texted, sometimes I wouldn't speak with him.
24   But by this point, Alexandra, I knew what had to be
25   done, I knew what needed to be done.  He didn't know --
```



Page 54

                         ROBIN CHAMBERS

1

2     you know what I mean?  So I was kind of self-sufficient

3     in one area.  But when I was working with Chase and

4     actually Michael, I consulted with them all the time as

5     I think they did with me to make everything run smooth

6     and happen.  Yeah.  Yeah.  But he -- sometimes I would

7     not talk to him for weeks.  Sometimes I would just send

8     him a text or leave a voicemail saying this is what we

9     did.  This is done.  This is done.  Chase and I are

10    doing this, Michael and I are doing this, thanks bye.

11    Q.      Were there stretches where you would be

12    speaking to Mr. De Niro daily?

13                    MS. LAZZARO:  Objection.

14                    MR. BENNETT:  Objection.

15    A.      Not often.  If I was going to speak with him

16    that much, a lot of it was through Chase.  Because she

17    had direct access to him.  Well, we both did.  But yeah,

18    I tried not to bother him.  I don't know.  I don't think

19    so.  No, I don't think I talked to him like I would talk

20    to Chase or Michael.  No.

21    Q.      So it was common for you to speak to Ms.

22    Robinson daily?

23    A.      Yes, more so.

24                    MR. BENNETT:  Objection.

25    Q.      What phone numbers would you use to communicate



Page 55

                        ROBIN CHAMBERS
1
2    with Mr. De Niro?

3    A.      Um, his phone numbers.  His cell phone.

4    Q.      Did you communicate with Mr. De Niro on a phone

5    that ended 750-7142?

6    A.      I was just going to look at my phone.  I don't

7    know.

8    Q.      How about I follow up on those questions after

9    the break so you can look at your phone.  Would you

10   typically be in contact with Mr. De Niro once a week?

11                   MR. BENNETT:  Objection.

12                   MS. LAZZARO:  Objection.

13   A.      I think so.  Mostly it was to let him know what

14   we were doing, certainly in regards to Toukie Smith,

15   what we were doing with her apartments or her cars or

16   banks and safe deposits and medical care, blah, blah,

17   blah.

18   Q.      Mm-hmm, mm-hmm.

19   A.      Mostly it was just passing information on and

20   reassuring him that we were on it.  We were doing it.

21   Chase was doing it.  Kap was doing it.

22   Q.      Mm-hmm.  You would update Mr. De Niro on, you

23   know, work that you and Ms. Robinson were performing

24   together?

25   A.      I think so.  And usually I think I coordinated



Page 56

                    ROBIN CHAMBERS
1
2    that with Chase and with Kap, I would -- because you
3    don't want to bombard him, you know, I would say, okay,
4    I'm going to call Bob and let him know this that and the
5    other.  Or Kap I'm going to call Bob or would you call
6    him or would you let him know.  So we coordinated so he
7    wouldn't be getting the same message from all of us,
8    right.
9    Q.     Mm-hmm, mm-hmm.  You previously referenced
10   communications with Tom Harvey.  What was Mr. Harvey's
11   role at Canal?
12                 MR. BENNETT:  Objection.
13   A.     I think Tom just did everything for Bob.  He
14   was the trusted person who did -- we all went to, you
15   know, we all went to with questions or things like that,
16   and yeah.  It was part of that inner group of people
17   that you trusted.
18   Q.     Mm-hmm.  What did Mr. Harvey do to help manage
19   Canal?
20                 MR. BENNETT:  Objection.
21   A.     Kind of everything.  I mean he gave out advice
22   if you asked for advice or run something by him.
23   Nothing specific, just, sometimes not just even legal
24   stuff, just as someone who knew Bob well and somebody
25   you trusted.  So you could say things and know that you



Page 57

1                    ROBIN CHAMBERS
2    were never going to read about it in a newspaper or
3    something.  Using that small circle.
4    Q.      Mm-hmm, mm-hmm.  During the period from 2013 to
5    2019, what role did Ms. Robinson play in scheduling
6    appointments for Mr. De Niro?
7                    MS. LAZZARO:  Objection.
8                    MR. BENNETT:  Objection.
9    A.      Well, I think a lot.  But I think she delegated
10   some out to her assistants.  But she oversaw the
11   schedule.  I think it's fair to say, I think.  I'm not
12   for sure, because I wasn't there.  But I got the
13   impression that she oversaw -- you know, you work out of
14   one office, you could say, set this up for this time or
15   that she oversaw it.  So maybe she didn't physically
16   make the appointment, but she knew that it was happening
17   and she physically oversaw his schedule, I think.
18   Q.      Ms. Robinson made certain appointments for Mr.
19   De Niro; is that right?
20                    MR. BENNETT:  Objection.
21                    MS. LAZZARO:  Objection.
22   A.      I don't -- any appointment.
23   Q.      Hmm.
24   A.      Any appointment.  I think she did.  She kind of
25   oversaw his schedule.



Page 58

1                    ROBIN CHAMBERS

2    Q.     And Ms. Robinson would schedule calls for Mr.

3    De Niro?

4                    MR. BENNETT:  Objection.

5    A.     I think so, yes.  The important ones, I think

6    so.  Yes.  Yes.

7    Q.     Ms. Robinson scheduled meetings for Mr. De

8    Niro?

9                    MR. BENNETT:  Objection.

10   A.     Yes.

11   Q.     Ms. Robinson ran errands for Mr. De Niro?

12                   MR. BENNETT:  Objection.

13                   MS. LAZZARO:  Objection.

14   A.     I'm sure the personal ones, yeah, that she

15   wouldn't give to -- like I didn't, you wouldn't give to

16   somebody else in the office, if it was of a more -- do

17   you know what I mean?  I think that -- yeah.

18   Q.     What types of sensitive personal errands would

19   Ms. Robinson personally run for Mr. De Niro?

20                   MR. BENNETT:  Objection.

21                   MS. LAZZARO:  Objection.

22   A.     Well, off the top of my head, I can't think of

23   anything.  Maybe in the realm of certain doctors

24   appointments, maybe in the realm of -- you know, things

25   like that, I think, yeah, I don't know actually exactly.



                              ROBIN CHAMBERS
1
2    But if -- I kind of based it on the things that I did
3    for him.
4    Q.       Mm-hmm.  Ms. Robinson would at times attend
5    doctors appointments with Mr. De Niro, correct?
6                     MR. BENNETT:  Objection.
7    A.       Yes.
8    Q.       And Ms. Robinson would pick up prescriptions
9    for Mr. De Niro?
10                    MR. BENNETT:  Objection.
11   A.       Yeah, we all did.  That what was part of my
12   job, also, sure yeah.
13   Q.       Ms. Robinson assisted Mr. De Niro in selecting
14   gifts for people in his life?
15                    MR. BENNETT:  Objection.
16   A.       That was a big part of the job, yeah.
17   Q.       Mr. De Niro would provide gifts sometimes to
18   former employees, correct?
19   A.       Former employees.  Like me, when I like --
20   yeah, she would -- yes.  I mean I kind of was still
21   working, but not -- it was a weird thing, right.  So
22   former employees -- yeah, mostly to friends and family
23   and people important to him, other actors, actor's wrap
24   gifts, other actors that he worked with, things like
25   that.



Page 60

```
 1                    ROBIN CHAMBERS
 2   Q.      Was one of Ms. Robinson's responsibilities
 3   assisting Mr. De Niro with his home?
 4                MR. BENNETT:  Objection.
 5                MS. LAZZARO:  Objection.
 6   A.      Yeah, like, not when -- as far as I know, not
 7   when he was married so much, perhaps.  But when he got
 8   his own home, yes.
 9   Q.      Are you referring to the apartment located --
10   let me restate the question.
11           Are you referring to the home located at 117A
12   East 65th Street?
13   A.      I think so.  If that's the apartment that Chase
14   shopped for and they looked -- yeah.  Yeah.  If that's
15   that one, yes, the one he's living in I think so.  I'm
16   not sure where he's living now, but I think so.
17   Q.      What role did Ms. Robinson play in setting up
18   Mr. De Niro's home at 117A East 65th Street?
19                MR. BENNETT:  Objection.
20   A.      She found it.  She saw a lot of apartments, she
21   went through a lot of realtors using, I think, not his
22   name as you do and she -- that was a busy crazy time for
23   her, I know that.  I didn't have much to do with it
24   other than I went to see it.  She ran stuff by me, come
25   see it, what do you think, you know, blah, blah, blah.
```


MAGNA
LEGAL SERVICES

Page 61

1                      ROBIN CHAMBERS

2    She ran it by him.  She set it up.  She and Michael --

3    that was a crazy time.  She and Michael set it up for

4    him.  I think it was a big apartment, I think it was

5    like, three bedrooms or something, three floors and it

6    was empty.  So it was a big job.

7    Q.      What did Ms. -- let me restate the question.

8            What was Ms. Robinson responsible for doing to

9    set up Mr. De Niro's home, once the home was selected?

10                   MR. BENNETT:  Objection.

11                   MS. LAZZARO:  Objection.

12   A.      Well, if I remember correctly, she, you know,

13   furnished it.  She made it a home.  She made it a home.

14   She -- you know, of course, with his input and stuff,

15   but she filled it with furniture, dishes.  It was

16   completely empty.  So you could imagine the work.  The

17   shopping and the buying and the deliveries and this and

18   that.  Yeah, it was a big deal.  I don't think I saw her

19   or Kap very much during that period of time.  They were

20   pretty busy.

21   Q.      What role did Ms. Robinson play in assisting

22   Mr. De Niro with his health?

23                   MS. LAZZARO:  Objection.

24                   MR. BENNETT:  Objection.

25   A.      With his?



Page 62

1                    ROBIN CHAMBERS

2    Q.      Health.

3    A.      Health.  I don't know.  I don't think I know

4    that.

5    Q.      What role did Ms. Robinson play in

6    communicating with Mr. De Niro's children?

7                    MS. LAZZARO:  Objection.

8                    MR. BENNETT:  Objection.

9    A.      Yeah, she worked with all of his children and

10   family, extended family, yes.

11   Q.      And what did Ms. Robinson do in connection with

12   Mr. De Niro's children and extended family?

13                   MR. BENNETT:  Objection.

14   A.      What did she do?

15   Q.      Yes.

16   A.      I don't know if -- I mean the kinds of things

17   that I think -- but I think I would be just guessing

18   because I don't know for sure -- but if he had a

19   birthday party or it was a Christmas celebration, she'd

20   coordinate with them, she'd help with gifts for them,

21   she'd help with problems for them.  She'd help with, you

22   know, just whatever needed to be done.  She would help

23   facilitate with the kids.  Some were small, some were

24   grown, but they all had different needs and I think that

25   the same goes for Tom and everybody who worked -- who



Page 63

```
 1                    ROBIN CHAMBERS
 2    works for someone like Bob.  Not even just Bob, but it's
 3    anything that needs to be done.  A lot of times it would
 4    be just as simple as find my dad and connect me to him.
 5    You know, he's not answering.  Or okay, he's here.
 6    Don't worry, he'll call you back.  It was that kind of
 7    thing too.
 8    Q.      Mm-hmm.  Mm-hmm.  What were Ms. Robinson's
 9    responsibilities when it came to Mr. De Niro's former
10    partner Toukie Smith?
11                    MR. BENNETT:  Objection.
12                    MS. LAZZARO:  Objection.
13    A.      You know, obviously she dealt with Toukie on
14    day-to-day stuff, whatever she would need, whatever his
15    son's would need.  And Bob was very caring and very --
16    had a good sense of responsibility about people in his
17    life like Toukie.  And she was the mother of two of his
18    boys.  So that -- it's natural.  But it really ramped up
19    when she became, you know, ███.  She had ████████
      ██ ██████████████████████████  And that's when we
21    got involved, when the kids were worried and Bob spoke
22    to me and then I spoke to Chase.  And we -- we dealt
23    with a lot of stuff for her.  And I think we did a
24    really good job in bringing her life to a more
25    manageable thing.  She neglect -- I think because of her
```



Page 64

                        ROBIN CHAMBERS

1

2    challenges, she neglected a lot.  So there was a lot of

3    cleaning up to do and a lot saving him thousands of

4    dollars, you know, just nobody had -- Toukie was very

5    independent, kept -- she was very private.  I've known

6    Toukie for 30 some years.  But as we all do, when we get

7    older, she neglected things.  She had storage units that

8    she was paying for, but didn't know what was in them.

9    She had cars that were -- and I think Tom worked on this

10   too -- cars that hadn't run in five years, but we're

11   paying an exorbitant amount to be housed in a garage in

12   the City, you couldn't drive them out of there.  So a

13   lot of things like that we cleaned up.  And that was a

14   very busy time for her and not -- me too, but you know,

15   it was a lot.  But that was very satisfying.  Because I

16   felt like we did something really great for her.

17   Q.     When did the job responsibilities relating to

18   Toukie Smith ramp up for Ms. Robinson?

19               MS. LAZZARO:  Objection.

20               MR. BENNETT:  Objection.

21   A.     I don't remember when we started that kind of

22   digging in and finding out what needed to be done.  I

23   don't remember Alexandra, I'm sorry.  I just don't

24   remember.  But I remember it was a lot and -- that was a

25   lot.



Page 65

                         ROBIN CHAMBERS

1

2    Q.      During the period from 2016 to 2019 was that a

3    period when there was a lot of work relating to Toukie

4    Smith for Ms. Robinson to perform?

5                    MR. BENNETT:  Objection.

6                    MS. LAZZARO:  Objection.

7    A.      Maybe 2017.  Maybe Tom would know more of the

8    dates, but I think so.  I think so.  That seems about

9    right.

10   Q.      Was it one of Ms. Robinson's job

11   responsibilities decorating for parties that Mr. De Niro

12   hosted?

13                   MS. LAZZARO:  Objection.

14                   MR. BENNETT:  Objection.

15   A.      I don't know if it was a responsibility.  I

16   know she did it.

17   Q.      Mm-hmm.

18   A.      I mean I don't know if it was a job

19   description, but I know at one point she did do that, in

20   this new place.  Again, not when he, you know, was

21   married and living with his --

22   Q.      Mm-hmm.

23   A.      But I think at one point she helped out, yes.

24   Q.      One of Ms. Robinson's job responsibilities was

25   assisting Mr. De Niro with his divorce; is that right?



Page 66

```
 1                    ROBIN CHAMBERS
 2             MS. LAZZARO:  Objection.
 3             MR. BENNETT:  Objection.
 4    A.      Assisting -- I don't know what that means,
 5    assisting with the divorce.  I'm not sure.
 6    Q.      Are you aware of Ms. Robinson performing any
 7    responsibilities to assist Mr. De Niro on issues
 8    relating to the custody of his children?
 9             MR. BENNETT:  Objection.
10    A.      She might have.  I don't know about that.  I
11    just -- I don't know about that.  I don't know one way
12    or the other about that.  What do you mean?  Is it like,
13    scheduling, things like -- I mean, scheduling visits
14    with the younger kids, that, certainly.  But I don't
15    know as it regards to the divorce.  I don't know if she
16    did or not.
17    Q.      Ms. Robinson helped schedule Mr. De Niro's
18    visits with his children?
19             MS. LAZZARO:  Objection.
20             MR. BENNETT:  Objection.
21    A.      Sure.  I think so.  I think they worked
22    together on it.  He would say this is what I'm getting
23    them, and I think she -- yeah, I think so.  I'm not for
24    certain, but I believe so.
25             MS. HARWIN:  I think this is a good
```



Page 67

                     ROBIN CHAMBERS
1
2        time to take a break.  Ms. Chambers, how much
3        time would you like for a break?  We can take
4        10 minutes.  15 minutes.  What would be
5        preferable for you?
6                 THE WITNESS:  I don't know.  I'll just
7        have a little coffee.  So whenever -- whatever
8        you guys want is fine with me.
9                 MS. HARWIN:  Okay.  So why don't we --
10                MR. BENNETT:  Ally, before we break,
11       sorry to interrupt.
12                MS. HARWIN:  That's okay.
13                MR. BENNETT:  Do you want to -- we have
14       no stipulation as to objections, you can think
15       about it and let me know, but I'd just like to
16       know if you want to enter into the usual
17       stipulations for a deposition or not.
18                MS. HARWIN:  Alright.  We can pick that
19       up after the break.  Okay.  So why don't we
20       plan to resume at 11:15?
21                THE WITNESS:  So then I turn -- now
22       should I turn off -- my tech guys said to turn
23       off the mute and the video; is that correct?
24                MS. HARWIN:  I think that's right.  So
25       you can go on mute and turn off your video so



Page 68

```
 1                   ROBIN CHAMBERS
 2        that you have some privacy, while we're on
 3        break and then you can turn it back on at
 4        11:15.
 5                   THE WITNESS:  Okie doke, thank you.
 6                   MS. HARWIN:  Absolutely.
 7                   THE VIDEOGRAPHER:  Going off the record
 8        at 11:04 a.m.
 9         (Whereupon, a short break was taken.)
10                   THE VIDEOGRAPHER:  Back on the record
11        11:16 a.m.  Go ahead.
12                   MR. BENNETT:  Ally, can we just talk
13        about the objections if you don't mind, the
14        stipulations?
15                   MS. HARWIN:  So what's your requested
16        stipulation?
17                   MR. BENNETT:  The usual Federal
18        stipulations, that all objections as to any
19        questions are reserved until trial except as to
20        the form of the question.
21                   MS. HARWIN:  We agree that all
22        objections except as to form are reserved for
23        trial.
24                   MR. BENNETT:  Thank you.
25                   MS. HARWIN:  All right, Madam Court
```



Page 69

ROBIN CHAMBERS

1

2        Reporter, are we ready to -- are we back on the

3        record?

4                    THE REPORTER:  Yes.

5                    MS. HARWIN:  Okay.  Thank you.

6   Q.        Ms. Chambers, do you understand you're still

7   under oath?

8   A.        Yes.

9   Q.        What were the circumstances that led to then

10  end of your employment at Canal?

11                   MR. BENNETT:  Objection.

12                   MS. LAZZARO:  Objection.

13  A.        This last time?  The ending now?

14  Q.        Yeah.

15  A.        Um, oh gosh.  Um, this is so hard.  This is

16  just really hard.  I've only been texting with my ex

17  boss.  I haven't spoken to him and I'm hoping to speak

18  to him in the new year.  So -- but -- I don't know.  I

19  don't know.  It just -- you know, I don't know.  It's --

20  it's really.  I just -- my group -- basically towards

21  the end, I -- over the last couple of years since COVID

22  and since Chase left, things have changed a lot, again,

23  as they would in anybody's life, not only his, all of

24  our lives.  And things got a little bit more difficult

25  for me.  And so as this whole thing went on, I did not



MAGNA
LEGAL SERVICES

```
 1                    ROBIN CHAMBERS
 2   work that whole first year of COVID, as nobody did.  I
 3   did things on the phone, but minor stuff.  There was,
 4   certainly no charge to Bob, I wouldn't, you know,
 5   anyway.  But this last bit, was -- so basically because
 6   of COVID, Bob wanted to ramp back up and start working
 7   with me on a few things.  That never happened because of
 8   COVID and all this.  But I made an agreement with him
 9   that I would be working for my group insurance and a car
10   and driver back and forth.  Because I didn't want to get
11   on a jitney because of my age and ██████████████
     ██████████████.  So I wanted to be especially careful.  And
13   he agreed and I found this amazing guy that would drive
14   me into Manhattan -- pick me up, drive me into
15   Manhattan, wait and then bring me back for, like, $400,
16   which is kind of unheard of.  And I got no other salary,
17   but I did get my medical insurance, which I was really
18   grateful for.  So for the last umpteen months or
19   whatever that's how it was going.  And then I -- all of
20   a sudden, I went to the doctor in December, I found out
21   that I was uninsured and it was crazy.  I've been
22   insured since 1989 or 1990 or something like that,
23   whenever they had insurance.  And so in digging around a
24   little bit more, I learned that I wasn't insured, but I
25   hadn't been insured for a month and a half prior to that
```



1                    ROBIN CHAMBERS

2    and with no knowledge, no phone call, nothing, I just

3    didn't know.  And granted, Bob did not know this.  But

4    when I let him know by text, you know, he said, look it

5    was a mistake and I'm going to reinstate it and stuff,

6    and I do understand the accountants -- it's very

7    layered.  Because one part of me understands why I can't

8    be on group insurance if I'm not on salary, that makes

9    perfect sense.  And I'm -- I turn ██ in December, so I'm

10   very qualified to go on Medicare.  I think the problem

11   with that for me was that I was uninsured during COVID

12   for a month and a half and I didn't know it and nobody

13   told me.  And so that was -- I was really upset.

14   Really, really, really, upset.  And Bob did not know, he

15   said, I and believe him -- he doesn't, you know -- but

16   um, so basically I -- I was working for nothing anyway,

17   I just -- I just didn't want to work there anymore.

18   That was the last straw for me.  And even though he

19   didn't know it, the culture -- because when I worked for

20   Bob, I knew who was important to him, and I knew who

21   wasn't important to him.  And for somebody to make that

22   decision not to tell me, just to take me off group

23   insurance was -- I just didn't want to work there

24   anymore.  So I hope to speak with Bob, but that was for

25   me, after 32, 33 years that was more than -- and I'm



Page 72

```
1                    ROBIN CHAMBERS
2    old, you know, it's time.  So that was what happened.
3    But he -- I believe he didn't know about it.  It wasn't
4    at his direction, let's say that.
5    Q.    Are you aware of who made the decision to
6    discontinue your health insurance?
7                    MR. BENNETT:  Objection.
8    A.    Yes.
9    Q.    Who made that decision?
10                   MR. BENNETT:  Objection.
11   A.    I believe I was told and I spoke to the
12   gentleman, that it was Michael Tasch who was his
13   accountant who works with Bob.  And it was -- yeah, he
14   made the phone call to take me off group insurance.
15   Again, which I understand, you can't keep, right, I get
16   it, I get that part.  It's just not giving me a chance
17   to get myself covered, that -- so I don't know what it
18   was but --
19   Q.    After you were taken off Canal's group health
20   insurance plan, you resigned your employment; is that
21   correct?
22   A.    Yeah, I said that this is more -- that's it.
23   The damage is done and that's it.  I'm done.  I'm done.
24   So it was hard.  It was hard.  It's hard stuff, you
25   know, after that many years to have it end like that, so
```



Page 73

```
 1                    ROBIN CHAMBERS
 2    --
 3    Q.      During the period from 2014 until COVID, what
 4    salary were you receiving from Canal?
 5                    MR. BENNETT:  Objection.
 6    A.      Well, I -- I just -- that I don't know.  It
 7    changed so much.  I talked with both Tom and Chase and
 8    Michael Tasch and it changed so often.  There was, you
 9    know, sometimes I got paid an hourly, sometimes they put
10    me on salary.  I don't -- it was so convoluted and so
11    nuts that, you know, I would keep -- charge them for
12    travel, the two or three hours.  I would charge them for
13    two hours each way, $60 an hour, going back and forth
14    from Sag even though it was mostly three hours.  It just
15    -- there was no set thing.  It was minimal.  Believe me,
16    it was minimal money.
17    Q.      So during the period from 2014 to 2019, how you
18    were paid varied; is that fair to say?
19    A.      Yes, it changed all the time.  And it was just,
20    like I said, it was just -- yeah.
21    Q.      There was a period where you did receive a
22    salary; is that correct?
23    A.      I think so.  I think Tom and Michael Tasch
24    would know about that.  You know, I just -- it was so
25    weird.  You know, it just -- and I didn't -- I don't
```



Page 74

```
 1                    ROBIN CHAMBERS
 2   think I came right back the minute I moved back too.  It
 3   was very sporadic and I worked hourly.  And sometimes
 4   you know, I'd give Chase -- I'd give my hours to Kap, he
 5   would give it to Chase, and then I'd give them directly
 6   to Chase as we started working more closely together.
 7   And then I'd get them petty cash and obviously they'd
 8   give that to Michael Tasch.  So -- but I don't think it
 9   was on -- I would have liked to have been, but it was on
10   and off.  I just don't remember, I'm sorry.  I don't
11   remember.
12   Q.      Were you paid through a payroll system?
13                    MR. BENNETT:  Objection.
14                    MS. LAZZARO:  Objection.
15   A.      For a while I was.  For a while I was, I think.
16   I'm sorry.
17   Q.      During the period 2014, through the end of your
18   employment at Canal, did you receive any compensation
19   through anything other than payroll?
20                    MS. LAZZARO:  Objection.
21   A.      Like I just got paid for the work I did,
22   whether it was on payroll or petty cash or whatever.
23   And I got reimbursed for -- I had animals and dogs and
24   so I got reimbursed because when I was gone all day, I
25   had to have dog care.  So things like that, which, you
```



Page 75

                         ROBIN CHAMBERS
1
2    know, Bob, we spoke about.  And he was generous in that
3    way, and I got reimbursed for that stuff.  And I felt,
4    you know, grateful.  I loved my job, I loved what I did
5    with Michael and Chase in Texas and stuff.  And so I
6    felt grateful.  You know it was just -- it was -- yeah,
7    I was really grateful.  So that's why I think I didn't
8    make a lot of money.  Money wasn't the entire goal at
9    that point in my life, so --
10   Q.     Mr. De Niro approved payroll for your pet
11   sitting expenses?
12                MS. LAZZARO:  Objection.
13   A.     Yeah, I was very honest with Bob.  I told him
14   -- he knew about everything.  Yeah, absolutely sure.
15   Q.     Were all of the payments you received from
16   Canal during the period from 2014 through the end of
17   your employment made into your bank account?
18                MS. LAZZARO:  Objection.
19   A.     I don't -- no.  I don't know.  I don't know.  I
20   think maybe some.  I may have even asked Michael to make
21   a deposit for me or something.  Because there's no
22   Citibank -- I kept my Citibank on Hudson Street where I
23   lived 20 years ago for some crazy reason.  And there's
24   no Citibank out here, so I may have done that.  I may
25   have asked Chase if she wouldn't have minded if I got a



1                    ROBIN CHAMBERS
2    check.  But a lot of times it was just reimbursable by
3    cash.  Because it was a nominal amount, you know.  It
4    was like, for the jitney, $30 each way on the jitney.  A
5    cab to the jitney, another $35.  You know, so it was
6    not, like, thousands.
7    Q.        Mm-hmm.  So part of the compensation you
8    received during the period from 2014 through the end of
9    your employment was in cash; is that correct?
10                   MS. LAZZARO:  Objection.
11   A.        Yeah, I think some of it was reimbursed.
12   Reimbursed the cash I laid out and I was on such a tight
13   budget that I couldn't do that and, like, use that kind
14   of cash, which is why Michael and Chase would do that.
15   Because I couldn't go and, like, bill every three months
16   and say, okay, you owe me $5,000 for this that and the
17   other.  So yeah, it was pretty -- it was -- you know --
18   yeah.
19   Q.        Michael Kaplan was the employee who was in
20   charge of petty cash?
21                   MR. BENNETT:  Objection.
22                   MS. LAZZARO:  Objection.
23   A.        I think he had -- I don't know for sure.  I
24   think he had petty cash and Chase had a petty cash, I
25   think.  Or he could have worked out of her petty cash or



Page 77

1                      ROBIN CHAMBERS
2    the office petty cash so to speak.  I'm not sure.
3    Q.      So you would coordinate with Michael Kaplan
4    with respect to petty cash?
5                      MR. BENNETT:  Objection.
6    A.      Usually both of them.  Usually both people.
7    And maybe in the beginning just Michael, but then when
8    Chase and I started working together more and knew each
9    other and began to trust each other and had a
10   relationship, then I felt comfortable going to her or
11   to -- frankly to both of them.  We all -- the three of
12   us communicated, I think, pretty darn well.
13   Q.      Did you ever have access to a Canal bank
14   account that you were authorized to withdraw money from?
15                     MS. LAZZARO:  Objection.
16   A.      I did, years and years ago, yes, yes.  And I
17   had it forever as well as credit cards and stuff like
18   that, yeah.
19   Q.      When did you have Canal credit cards?
20   A.      When I worked for him in the office I had a
21   Canal credit card and I had a Canal checkbook and bank
22   account for years.  And we -- we stopped it because I
23   think Citibank -- and maybe Tom, and certainly Michael
24   Tasch will know, but because Citibank -- there was a
25   very little amount in it.  But Citibank -- I think it



```
 1                    ROBIN CHAMBERS
 2   was becoming against the law or there was something.  So
 3   we shut it down because I never used it anymore, so --
 4   but Michael Tasch would know about that.
 5   Q.     Did Canal issue tax documentation in connection
 6   with the works that you performed?
 7                    MS. LAZZARO:  Objection.
 8                    MR. BENNETT:  Objection.
 9   A.     Yeah, I think I got some -- yeah, sure.  I
10   think I got a W-2 or a W something, sporadically.  It
11   was --
12   Q.     Mm-hmm?
13   A.     Yeah, yeah.  Yeah.  Yeah, they did.  Yes.  And
14   then they, if it was cash, he would give me a 1099 --
15   Q.     Mm-hmm.
16   A.     Maybe, something like that.  Yep, and I would
17   give it to the person that helped me with my taxes, yes.
18   Q.     And did Canal report all of the payments that
19   it made to you on a W-2 or a 1099?
20                    MR. BENNETT:  Objection.
21                    MS. LAZZARO:  Objection.
22   A.     I would think so.  I have no reason to believe
23   that they wouldn't.
24   Q.     During the period from 2014 through 2019, what
25   were the perks of your work for Canal?
```



1               ROBIN CHAMBERS

2               MS. LAZZARO:  Objection.

3    A.     Well, I didn't -- I don't think I got any perks

4    other than really wonderful Christmas gifts as thank you

5    from Bob and family.  Chase knew how hard people -- she

6    functioned in the same way as I did many years ago that

7    we knew who was loyal, who we could trust, who worked

8    hard, who deserved that extra bonus or because of this

9    job that they did.  And so I was always the gauge of

10   that.  And I think Chase did that for me as well the

11   other employees there.  I think she -- if it was an

12   especially -- a lot of work that we did or something,

13   she made sure that we got really nice gifts or bonuses

14   which -- you know, even though Bob of course okayed

15   everything, it was Chase that went to him to say, okay,

16   this, this, this and this.  And I think she did that, as

17   I did, and this is why you should do this.  Someone to

18   say, this is the right thing to do at this period of

19   time because of the work performed.

20   Q.     Mm-hmm.  Ms. Robinson would meet with Mr. De

21   Niro to talk with what the annual bonuses would be?

22               MR. BENNETT:  Objection.

23   A.     Yeah, I don't know if they met or she would

24   talk to him on the phone, I don't know, but yeah.

25   Q.     But ultimately Bob was the final decisionmaker



Page 80

```
 1                    ROBIN CHAMBERS
 2    on the amount of bonuses, correct?
 3                    MR. BENNETT:  Objection.
 4    A.      Oh yeah.  Yeah, she would -- yeah, because
 5    Michael -- and then his accountants would have to get
 6    involved.  So yeah.  So I don't know how they worked it,
 7    but, I've always assumed -- I made that assumption
 8    that -- yeah, no, I know it.  Because she would say, he
 9    okayed this for Kap or he okayed this.  Yeah, so that's
10    what she told me.  So I remember that.  So yeah.
11                    THE REPORTER:  One second before you --
12            Ms. Chambers, if you could just wait a minute
13            before you respond --
14                    THE WITNESS:  Sure.
15                    THE REPORTER:  Just give a chance for
16            the attorneys to object in between because you
17            guys are talking over each other.  Thank you.
18                    THE WITNESS:  I'm sorry.
19                    THE REPORTER:  It's okay.
20    Q.      Canal did not have a lot of written policies;
21    is that correct?
22                    MR. BENNETT:  Objection.
23                    MS. LAZZARO:  Objection.
24    A.      Not when I was there.  Not when I was in the
25    office, no.  It was a different time.
```



Page 81

1                    ROBIN CHAMBERS

2    Q.      And during the period from 2008 through 2019,

3    Canal still didn't have a lot of written policies as far

4    as you knew, correct?

5                    MR. BENNETT:  Objection.

6                    MS. LAZZARO:  Objection.

7    A.      As far as I know, no.

8    Q.      Meaning correct?

9    A.      Correct.

10   Q.      To your knowledge, during the period from 2008

11   through 2019, did Canal have any written policy that

12   specified what expenses employees could get reimbursed

13   for?

14                   MS. LAZZARO:  Objection.

15                   MR. BENNETT:  Objection.

16   A.      I don't believe so.  It just was never -- I

17   don't believe so.

18   Q.      To your knowledge, during the period from 2008

19   to 2019, did Canal have any written policy that

20   specified what expenses employees could charge on

21   Canal's credit cards?

22                   MR. BENNETT:  Objection.

23                   MS. LAZZARO:  Objection.

24   A.      As far as I know, no.

25   Q.      To your knowledge, during the period from 2008



Page 82

```
 1                    ROBIN CHAMBERS
 2    to 2019, did Canal have a written policy that specified
 3    what expenses employees could use petty cash for?
 4                    MR. BENNETT:  Objection.
 5                    MS. LAZZARO:  Objection.
 6    A.       No.
 7    Q.       In your experience, communications with Mr. De
 8    Niro concerning expenses primarily took place orally
 9    rather than in writing; is that correct?
10                    MR. BENNETT:  Objection.
11                    MS. LAZZARO:  Objection.
12    A.       In my experience, yes.
13    Q.       Mr. De Niro was aware that employees would seek
14    reimbursements for expenses from Canal, correct?
15                    MR. BENNETT:  Objection.
16                    MS. LAZZARO:  Objection.
17    A.       Yeah.  Yes.  Yeah.
18    Q.       And Mr. De Niro was aware that employees would
19    charge items to Canal's credit cards, correct?
20                    MS. LAZZARO:  Objection.
21                    MR. BENNETT:  Objection.
22    A.       Yes.  That's what it was for.
23    Q.       Mr. De Niro was generous as a boss, correct?
24                    MS. LAZZARO:  Objection.
25    A.       Very.  Very generous guy, yes.
```



Page 83

```
 1                    ROBIN CHAMBERS
 2   Q.    Mr. De Niro was generous in providing perks for
 3   employees, correct?
 4             MR. BENNETT:  Objection.
 5   A.    Yeah, I believe so.  I always thought of him as
 6   the most generous of bosses and he knew how hard people
 7   worked.  He expected a lot.  And that's why people
 8   stayed a long time, you know.  You worked hard, but you
 9   were rewarded, so yeah.  Yeah.
10   Q.    Did Mr. De Niro have different arrangements
11   with different employees about what expenses he would
12   pay for for them?
13             MS. LAZZARO:  Objection.
14             MR. BENNETT:  Objection.
15   A.    I don't know.  I tend to think not, but I don't
16   know what happened.  During my time as being in the
17   office, no.  But I don't know after that.  I tend to
18   think not.
19   Q.    Did you have any arrangement with Mr. De Niro
20   concerning what kinds of expenses Canal would pay for or
21   reimburse you for?
22             MS. LAZZARO:  Objection.
23   A.    No.  I think he trusted me and trusted that I
24   would do the right thing and be honest and put in a
25   receipt or a reason and I could back up anything.  I
```



Page 84

1                    ROBIN CHAMBERS

2   used to -- I used to go up to the accountants and I

3   don't know -- I think Chase did this.  But yeah, I'm

4   sure Chase did this, and Michael, but go over my credit

5   card statement, work with a bookkeeper and put, like,

6   you know, $150 worth of flowers for Tita Cahn in LA.  Or

7   I would go through -- I knew everything that was on

8   that.  Very seldom did I have to call the company to say

9   what was that for because we knew, you know.  So I would

10  do that every month, every two months, we'd go up and

11  just sit there, I'd go up to Yohalem Gillman and just

12  sit there and write in business, personal, who it was,

13  that sort of thing.  So -- and I believe that Chase and

14  maybe Kap did that too on their statements.  I remember

15  she was always dealing with Amex statements, so --

16  Q.      Mm-hmm, mm-hmm.  What types of expenses would

17  Canal pay for and reimburse you for during your

18  employment from 2014 onward?

19                    MS. LAZZARO:  Objection.

20  A.      Me?

21  Q.      Yes.

22  A.      Me, nothing.  Because I didn't spend any money.

23  I didn't have petty cash or a credit card or a bank

24  account.  And anything that I did -- they would

25  reimburse me cash when I took cash out of my own pocket



Page 85

                    ROBIN CHAMBERS

1   to pay for a jitney, to pay for cabs.  But she always

2   bought us lunch, we always had a sandwich together.  Kap

3   always bought lunch which was simple stuff.  We'd

4   usually grab something and bring it back to the seventh

5   floor where we worked and eat and talk and catch up on

6   things and then work, so -- because I'd usually get in

7   around noon, 11:30 by the time I got downtown, so --

8   Q.      Mm-hmm.

9   A.      But I didn't get reimbursed except for my

10  output.

11  Q.      So on days that you were working for Canal,

12  Canal would pay for your lunches, correct?

13                  MR. BENNETT:  Objection.

14  A.      Yes.

15  Q.      On days you were working for Canal, Canal would

16  pay for your transportation to and from Canal's offices?

17  A.      Yes.

18                  MR. BENNETT:  Objection.

19  Q.      On days you were working for Canal, Canal would

20  pay for your transportation if you were performing tasks

21  for Mr. De Niro, correct?

22                  MS. LAZZARO:  Objection.

23                  MR. BENNETT:  Objection.

24  A.      Yes.



Page 86

                      ROBIN CHAMBERS

1

2   Q.      During days when you were working for Canal,

3   Canal would pay for your pet sitting, correct?

4                 MS. LAZZARO:  Objection.

5                 MR. BENNETT:  Objection.

6   A.      Yes, if I was gone all day, yeah, sure.

7   Q.      Were there any other types of expenses that

8   Canal would pay for during the days you were working for

9   Canal?

10                MR. BENNETT:  Objection.

11  A.      For me, no.  And I lost both -- I just have

12  kitties now.  So that stopped about three years ago.  I

13  lost both my dogs.  So the cats are much easier, you

14  know, it's not that.  So -- but no, just cabs and jitney

15  and lunch and that's -- I think that's it.  I don't

16  remember anything else.  There is no -- yeah.  Pretty

17  cut and dry.

18  Q.      Did you ever have any conversations with Mr. De

19  Niro about Canal paying for meal expenses?

20                MR. BENNETT:  Objection.

21                MS. LAZZARO:  Objection.

22  A.      No.  No.  It's what -- and I believe that --

23  and you know, I've been in the business a long time, but

24  I believe that's pretty standard or was pretty standard

25  through -- because most people don't walk out of the



Page 87

1                    ROBIN CHAMBERS

2    office for an hour of lunch break.  You don't just shut

3    down the phones to -- you know what I mean?  And if I

4    would go out to lunch with Chase and Kap, it was harder

5    to sit in a restaurant because you can't talk, you have

6    to be quiet, you can't mention names.  You know, Bob is

7    very security conscious.  So I was raised that way so to

8    speak.  So it was always easier just to eat in.

9    Q.      Was it your understanding that Ms. Robinson

10   also would eat in while working during the day?

11                   MS. LAZZARO:  Objection.

12   A.      Yes.

13   Q.      How did you come to understand that Canal had a

14   policy of paying for its employees working lunches?

15                   MR. BENNETT:  Objection.

16   A.      It was just always that way from maybe 1990 on.

17   It was just what we did.  I think most production

18   companies -- all my production companies in LA, I worked

19   for Nicholson and Bowie.  All these people, they did the

20   same thing.  You sat at your desk, you didn't leave, you

21   didn't turn off your -- there were no cell phones then,

22   but you didn't walk away and put everything on hold.

23   And you ate at your desk.  And those were good perks,

24   you know.  Sometimes you ate really well, and sometimes

25   you just had a sandwich, sometimes you just had pizza.



Page 88

ROBIN CHAMBERS

1

2     Sometimes you got Nobu.  But you know, depending.  It

3     wasn't always fabulous lunches, but it was food at your

4     desk.

5     Q.     Mr. De Niro owns Nobu; is that correct?

6     A.     I believe so, with partners.  Yes.

7     Q.     When Canal employees would have meals at Nobu

8     is that something Mr. De Niro would pay for?

9                  MR. BENNETT:  Objection.

10    A.     Yes.  Yes.

11    Q.     Did you ever have communications with Mr. De

12    Niro about Canal paying for your transportation expenses

13    in connection with your work?

14                 MS. LAZZARO:  Objection.

15                 MR. BENNETT:  Objection.

16    A.     I just knew he knew.  There was no secret.

17    I've spoken with Tasch about it.  I spoke with Chase

18    about it.  Kap knew.  I was not a secret, you know at

19    that point.  So yeah, I was pretty open about it.  And

20    yeah, there was -- yeah, it would be expected, of

21    course.

22    Q.     How did you come to have the understanding that

23    Canal would pay for your transportation to and from the

24    office?

25                 MS. LAZZARO:  Objection.



MAGNA
LEGAL SERVICES

Page 89

1                    ROBIN CHAMBERS

2                    MR. BENNETT:  Objection.

3    A.     You know, I don't -- I don't remember a

4    specific conversation but, if -- but I know that Bob

5    knew.  I know that Michael Tasch knew.  I know that

6    Chase knew.  I know that Michael Kaplan knew that.

7    Yeah, between the jitney and the cabs to and from and,

8    you know, at one point they -- yeah, it was just common

9    knowledge, yeah.  Exactly.

10   Q.     And it was common knowledge that Canal would

11   pay for transportation expenses in connection with

12   specific assignments from Mr. De Niro; is that right?

13                    MS. LAZZARO:  Objection.

14                    MR. BENNETT:  Can you clarify the time

15        period?  She's been there since, like, 1983.  I

16        don't know where we are in the timeline here.

17                    THE WITNESS:  '89.

18                    MR. BENNETT:  Excuse me.  Thank you,

19        Ms. Chambers.

20   A.     It seems to me it's always been that way.  It's

21   always been that way.  But not just with Bob, just with

22   other jobs that I've worked.  It's kind of a standard

23   thing in that film entertainment industry.  You know, I

24   guess, like, Citibank would pay for a car service for

25   its employees who lived in Westchester or something.  It



Page 90

                         ROBIN CHAMBERS

1

2    was that kind of thing, I think.  It just always was,

3    you know, just, yeah.  But a lot of times I didn't have

4    to take advantage of that because I lived during --

5    from, you know, in 2003 and before, I lived right there,

6    so I just walked.  So sometimes it wasn't necessary.

7    But certainly when I lived out here, yeah.  And like I

8    said, it wasn't -- it was pretty basic knowledge, yeah,

9    everybody knew.

10   Q.     What was your understanding of the types of

11   expenses that Mr. De Niro agreed to pay for for Ms.

12   Robinson?

13                 MR. BENNETT:  Objection.

14                 MS. LAZZARO:  Objection.

15   A.     I don't know -- yeah, I don't know for sure

16   anything.  But I know that it would have been similar

17   and from talking to her and Kap, it would have been

18   similar for her and them as it was for me.  It just is

19   that way at Canal or it was that way, you know.

20   Q.     Mm-mm mm-hmm.  Yeah.  To your knowledge, Canal

21   had a practice of paying for Ms. Robinson's working

22   meals, correct?

23                 MS. LAZZARO:  Objection.

24                 MR. BENNETT:  Objection.

25   A.     Yes.



Page 91

```
 1                      ROBIN CHAMBERS
 2   Q.      To your knowledge, Canal had a practice of
 3   paying for Mr. Kaplan's working meals, correct?
 4                  MS. LAZZARO:  Objection.
 5                  MR. BENNETT:  Objection.
 6   A.      Yes.
 7   Q.      To your knowledge, Canal had a practice of
 8   paying for Ms. Robinson's transportation to and from
 9   work, correct?
10                  MS. LAZZARO:  Objection.
11                  MR. BENNETT:  Objection.
12   A.      Can you say that again, I'm sorry.
13   Q.      To your knowledge, Canal had a practice of
14   paying for Ms. Robinson's transportation to and from
15   work, correct?
16                  MR. BENNETT:  Objection.
17   A.      Yes, yes.
18   Q.      To your knowledge, Canal had a practice of
19   paying for Ms. Robinson's transportation costs when she
20   was performing tasks for Mr. De Niro, correct?
21                  MS. LAZZARO:  Objection.
22                  MR. BENNETT:  Objection.
23   A.      Sure.  Yes.
24   Q.      Are you aware of Mr. De Niro ever disputing
25   that Ms. Robinson was authorized to charge for her
```


MAGNA
LEGAL SERVICES

Page 92

                              ROBIN CHAMBERS

1
2    working meals to Canal?
3                   MS. LAZZARO:  Objection.
4                   MR. BENNETT:  Objection.
5    A.      Not that I know of, no.
6    Q.      Are you aware of Mr. De Niro ever disputing
7    that Ms. Robinson was authorized to charge her
8    transportation costs to and from work to Canal?
9                   MS. LAZZARO:  Objection.
10                   MR. BENNETT:  Objection.
11   A.      Not that I know of, no.
12   Q.      Are you aware of Mr. De Niro ever disputing
13   that Ms. Robinson was authorized to charge her
14   transportation costs to Canal when she was performing
15   errands and other assignments for Mr. De Niro?
16                   MR. BENNETT:  Objection.
17                   MS. LAZZARO:  Objection.
18   A.      Not that I know of, no.
19   Q.      Are you aware of what kind of expenses Ms.
20   Robinson was allowed to -- well, let me restate that
21   question.
22           As far as you're aware there are certain types
23   of expenses that Ms. Robinson was allowed to charge to a
24   Canal credit card without having a conversation with Mr.
25   De Niro first; is that correct?



Page 93

```
 1                    ROBIN CHAMBERS

 2                    MS. LAZZARO:  Objection.

 3                    MR. BENNETT:  Objection.

 4   A.      Yes, I think that -- I think -- I believe this

 5   to be true that Bob trusted me, trusted her -- trusted

 6   me when I worked there, he never questioned.  And I

 7   justified it with the accountants and -- at the end.  So

 8   it was -- I had access to everything and I was a trusted

 9   employee.  But I also had oversight and that were his

10   accountants who I worked with closely.  A lot of times,

11   I would work with them even more than Bob.  I trusted

12   myself to do always the right thing.  And so I believe

13   the same thing carried on with -- in that part, Bob

14   hires people he trusts; his accountants, his lawyers,

15   his assistants, his housekeepers, whoever.  And he gives

16   them a lot of autonomy.  He trusts -- you know, he

17   trusts.  So yeah, yeah, you have integrity, and you know

18   what you're spending it for, and he can spend.  He's got

19   a big life and a big family.  So sure, sometimes it was

20   more than others, but yes.  You trust people.

21   Q.      Canal didn't have anyone inhouse who served as

22   a comptroller or chief financial officer; is that

23   correct?

24                    MR. BENNETT:  Objection.

25   A.      No, it was me when I worked and it was Chase
```



                         ROBIN CHAMBERS
1
2    when she worked.  We oversaw petty cashes.  And I know
3    that for -- I do know that part.  And I don't know a lot
4    about her office because I was never there.  But I do
5    know that it all fell on me.  If something went missing,
6    if something happened, it was all on me.  I had to
7    account for it with everybody, so --
8    Q.      And during the period from 2014 through 2019,
9    Canal employed Berdon LLP as its financial advisor and
10   accountant?
11   A.      Yes, yes.  I don't know when they came in
12   exactly, but, yes.
13   Q.      And Berdon would review bills and statements
14   for Canal; is that correct?
15                   MS. LAZZARO:  Objection.
16                   MR. BENNETT:  Objection.
17   A.      As far as I know.  I don't know for sure, but
18   yes, I would think that -- of course, that was their
19   job.  Yes.
20   Q.      Are you aware of Ms. Robinson ever using a
21   Canal credit card to purchase flowers for Mr. De Niro or
22   the office?
23                   MR. BENNETT:  Objection.
24   A.      Yeah, I think that's the card that was on file
25   everywhere in her name as it was in either Michael's



Page 95

```
 1                    ROBIN CHAMBERS
 2  name or my name or whoever is -- you know, it was never
 3  in his name for privacy reasons obviously, so sure.
 4  Q.      Mm-hmm.  For privacy reasons, the credit card
 5  in Ms. Robinson's name was used to charge various
 6  expenses for Mr. De Niro, correct?
 7                    MS. LAZZARO:  Objection.
 8                    MR. BENNETT:  Objection.
 9  A.      Yes.
10  Q.      And it was common for items to be delivered to
11  Ms. Robinson's home and then for her to bring them to
12  Mr. De Niro, correct?
13                    MR. BENNETT:  Objection.
14                    MS. LAZZARO:  Objection.
15  A.      That I'm not sure of.  But it sure made sense
16  to me.  Because things -- I would do things like that
17  too.  Do you know what I mean?  Just for convenience
18  sake or if something had to be delivered after hours or
19  whatever, yeah.  Not always, obviously, because they had
20  an office and security there, but that doesn't seem
21  unreasonable that that -- yeah.
22  Q.      Are you aware of Ms. Robinson bringing flowers
23  that had been delivered to her home to Mr. De Niro's
24  home?
25                    MS. LAZZARO:  Objection.
```



Page 96

1                         ROBIN CHAMBERS

2   A.        I remember especially -- I don't -- I remember,

3   I believe, not when he was with his wife, but after he

4   was separated and she was setting up that home, yeah,

5   yes.  Yeah.  Because he did -- I don't believe his

6   apartment -- I know his apartment wasn't a doorman

7   building or -- you know what I mean?  There was no --

8   and she lived uptown, I think, like, within 30 blocks or

9   25 blocks of him.  So sometimes, I think for expediency,

10  I remember she would have it and she could just walk it

11  over, cab it over or whatever.  Not just flowers, just

12  stuff when he was -- she was setting up that place.

13  Q.        When Ms. Robinson was bringing deliveries to

14  Mr. De Niro's home, she was entitled to charge those

15  transportation expenses to Canal, correct?

16                   MR. BENNETT:  Objection.

17                   MS. LAZZARO:  Objection.

18  A.        Yes.  I mean I didn't set the rules or

19  anything, but I would absolutely say yes.

20  Q.        At times you would take Ubers with Ms. Robinson

21  in connection with your work together, correct?

22  A.        Yes.

23                   MS. LAZZARO:  Objection.

24                   THE WITNESS:  Cabs, Ubers, yes.

25  Q.        And when you and Ms. Robinson would take cabs



Page 97

                    ROBIN CHAMBERS
1
2    or Ubers she would charge those to Canal's credit card,
3    correct?
4    A.      Yes, I would think so, yeah.  If we had to run
5    errands like -- yeah, we would Uber it or cab it, if
6    there were a lot of stops, yeah.
7    Q.      And there was nothing improper about Ms.
8    Robinson charging to Canal Ubers and taxis that the two
9    of you were taking when you were running errands or
10   doing assignments for Mr. De Niro, correct?
11                  MS. LAZZARO:  Objection.
12                  MR. BENNETT:  Objection.
13   A.      No, it wasn't.  It wasn't that often.  I mean,
14   it's not like -- mostly we would work on the seventh
15   floor and that's where we worked unless I worked up with
16   her at her house if we were doing stuff.  So, like
17   during the holidays, you know, stuff like that, when it
18   was crazy busy, sometimes yes.  But it wasn't -- I don't
19   remember it being that frequent that we would do --
20   mostly I was on the seventh floor doing stuff, so --
21   Q.      Mm-hmm.  When Ms. Robinson was working on
22   setting up Mr. De Niro's apartment at 117A East 65th
23   Street, she had to travel back and forth from that
24   apartment frequently, correct?
25                  MS. LAZZARO:  Objection.



Page 98

                        ROBIN CHAMBERS

1                        MR. BENNETT:  Objection.

2    A.       Yeah, again I -- they -- she and Michael.

3    Michael Kaplan would know more about that.  Because they

4    worked -- I was on the phone with them.  There was not

5    much I could do with that.  They were crazy busy.  They

6    had a dead -- it was crazy.  And I was kind of out of

7    that.  I was here listening to it by phone, going, no,

8    try that.  It was -- they were hustling to get that set

9    up for him.

10   Q.       Are you aware of Ms. Robinson taking a trip to

11   Los Angeles in March 2018?

12   A.       Taking a what?

13   Q.       A trip to Los Angeles in March 2018?

14   A.       I'm sure, yeah.

15   Q.       Are you aware of a specific trip to Los Angeles

16   in March 2018 in which Ms. Robinson was -- let me

17   restate that question.

18            Are you aware of Mr. De Niro ever directing Ms.

19   Robinson to go to Los Angeles to look at hotels for

20   Toukie Smith?

21                        MS. LAZZARO:  Objection.

22   A.       I don't know if it was for Toukie, but to look

23   at homes, hotels all over the U.S. and Europe.  Yeah, it

24   wasn't just Los Angeles.  So I don't know, if it was



Page 99

1                    ROBIN CHAMBERS
2    just -- I don't know if Toukie -- but yeah, that was
3    pretty commonplace for my job way back in the day as
4    well as hers.
5    Q.      Was there a time when Toukie Smith was
6    contemplating undergoing treatment for ███████
     ███████ in Los Angeles?
8                    MR. BENNETT:  Objection.
9                    MS. LAZZARO:  Objection.
10   A.      Yes, I had forgotten about that.  I had -- wow,
11   yeah.
12   Q.      In connection with Toukie Smith undergoing
13   treatment for ████████████ in Los Angeles, did Ms.
14   Robinson get tasked with scouting out hotels for Ms.
15   Smith?
16                   MR. BENNETT:  Objection.
17   A.      I believe so, yes.  I do remember that.  I had
18   forgotten about that.  But yes, there were some doctors
19   that, one of his health advisors recommended.  I believe
20   -- yes.  Oh gosh, yes.  And she wanted something in
21   Santa Monica, right?  Yes, yeah.  She wanted -- yeah,
22   yeah.  I do remember that, yeah.
23   Q.      When Ms. Robinson traveled to Los Angeles in
24   March of 2018, that was a trip that Mr. De Niro wanted
25   her to make to look at hotels for Ms. Smith; is that



Page 100

1                    ROBIN CHAMBERS
2    correct?
3                    MS. LAZZARO:  Objection.
4                    MR. BENNETT:  Objection.
5    A.      Yes.
6    Q.      And as part of that trip, Ms. Robinson tacked
7    on a plan to deliver books related to the movie Taxi
8    Driver; is that correct?
9    A.      Yes, I remember that now.  Yes.  Yeah.
10   Q.      But the primary purpose of that trip had to do
11   with Toukie Smith, correct?
12                   MR. BENNETT:  Objection.
13                   MS. LAZZARO:  Objection.
14   A.      I think so, and the books were like, oh, good,
15   can you take these out and get them signed by everybody.
16   And I think that was it for Bob for gifts.  But I
17   believe so.  I believe so, yes.
18   Q.      Were you in communication with Ms. Robinson in
19   connection with her trip to Los Angeles in March 2018?
20                   MS. LAZZARO:  Objection.
21   A.      I'm sure we were.  I'm sure we spoke once in a
22   while and if not every day, I'm sure, about what the
23   books were or what the hotel looked like.
24   Q.      Do you recall informing Ms. Robinson that there
25   was a snowstorm that was going to hit New York City?



Page 101

1                    ROBIN CHAMBERS

2     A.      I don't remember that, no.

3     Q.      Do you recall texting with Ms. Robinson about a

4     snowstorm that was coming in?

5     A.      I don't remember, but I would have, of course.

6     Q.      Do you recall telling Ms. Robinson to play it

7     safe and leave Los Angeles early?

8     A.      I don't remember that.

9     Q.      Do you recall whether Ms. Robinson had to

10    change her travel plans in connection with that trip to

11    Los Angeles?

12                    MR. BENNETT:  Objection.

13    A.      I'm sorry, I don't.

14    Q.      Do you remember whether Ms. Robinson wanted to

15    be in Los Angeles for that trip?

16                    MS. LAZZARO:  Objection.

17                    MR. BENNETT:  Objection.

18    A.      I don't.  I don't.  I think it was just part of

19    the job.  You know, I don't -- you know, she traveled a

20    lot.  Bob traveled a lot, I traveled a lot.  It was

21    just, you traveled.  That was part of it, so --

22    Q.      At times Canal would pay for certain employee's

23    air travel using sky miles; is that correct?

24                    MR. BENNETT:  Objection.

25                    MS. LAZZARO:  Objection.



1                    ROBIN CHAMBERS

2     A.       When I was working, no.  When -- from what I

3     remember overhearing from Chase or Kap, sometimes they

4     -- I remember she wanted to use them.  But sometimes it

5     made it very difficult.  You couldn't like -- like you

6     couldn't make a -- Bob or Grace or family couldn't use

7     them because you can't change so easily with miles.

8     It's a whole different weird thing.  So you know, a lot

9     of times we would turn the miles into cash, like, Amex

10    miles and then you could spend that in stores for

11    Christmas shopping for him.  So they weren't just -- you

12    know what I mean?  That was the easier thing to -- but I

13    don't think he could travel by miles or his family.

14    Employees could, I guess, but it was too hard, you

15    couldn't change, it was weird.

16    Q.       So sky miles weren't used for Mr. De Niro's

17    travel; is that correct?

18                    MR. BENNETT:  Objection.

19    A.       Again, I don't know for sure, but I wouldn't.

20    I would never -- because I'm not -- you know, no.  You

21    have to be able to change on a dime in a minute.  So oh

22    my gosh, yes.  I don't know for sure, but I tend to

23    think not.

24    Q.       Because of the hassles of using sky miles it's

25    your understanding that sky miles weren't used for the



Page 103

```
 1                    ROBIN CHAMBERS
 2   travel of Mr. De Niro or for his family, correct?
 3                    MS. LAZZARO:  Objection.
 4                    MR. BENNETT:  Objection.
 5   A.      Again, I don't know for sure, but I don't think
 6   so.  I think it would have been almost an impossibility,
 7   I just don't know how.
 8   Q.      When Ms. Robinson traveled it was a frequent
 9   occurrence that she would need to change her travel
10   plans to accommodate Mr. De Niro, correct?
11                    MS. LAZZARO:  Objection.
12                    MR. BENNETT:  Objection.
13   A.      I think so.  It was that way with me.
14   Everything -- that's who we worked for.  That's whose
15   life had -- you know, he was our boss, he was my boss,
16   in that everything was -- you know, everything was
17   around his schedule.
18   Q.      Ms. Robinson arranged for travel around Mr. De
19   Niro's schedule, right?
20                    MR. BENNETT:  Objection.
21                    MS. LAZZARO:  Objection.
22   A.      I know that if you're saying, like, did she,
23   like, take vacations or go away, like, at set times, no
24   you don't get to do that.  So you work it out with him,
25   this is when I'd like to go, this is when I need a
```



                         ROBIN CHAMBERS

1
2    break, this is when I'm going to go.  But you have to be
3    able to change if he needs you.
4    Q.      And Ms. Robinson would communicate directly
5    with Mr. De Niro to get approval for her travel, right?
6                    MR. BENNETT:  Objection.
7    A.      As far as I know, sure, she would have to.
8    Q.      She couldn't travel without getting Mr. De Niro
9    for his approval, right?
10                   MR. BENNETT:  Objection.
11   A.      Yes.  I would think so, yeah, yeah, yeah.  She
12   wouldn't leave -- she had to accommodate his schedule as
13   I did as any personal assistant would for any boss.
14   Q.      Did there come a time when Mr. De Niro and Ms.
15   Robinson agreed to an arrangement that allowed her to
16   book her travel using sky miles?
17                   MS. LAZZARO:  Objection.
18                   MR. BENNETT:  Objection.
19   A.      I don't know if it was an arrangement.  But I
20   know -- let me see.  Let me think.  I would -- I don't
21   know for sure.  I don't know that for sure.  But I would
22   think that maybe if it was, like, a Christmas present,
23   or a birthday present, she might use miles to offset --
24   you know, to get a ticket.  Because it was easier for --
25   do you know what I mean?  It was something like that.



Page 105

```
 1                    ROBIN CHAMBERS
 2    But I don't know if it was a formal thing or not.  That
 3    would be between them, I just don't know.
 4    Q.     One perk of Ms. Robinson's employment was being
 5    able to book her traveling using sky miles, correct?
 6                    MS. LAZZARO:  Objection.
 7                    MR. BENNETT:  Objection.
 8    A.     I don't know.  I honestly don't know.  I don't
 9    know that.  Because -- yeah, I don't know if it was
10    business it would not be -- I don't know.  If it was
11    business, the studio would pay.  If it was business, Bob
12    would pay.  If she wanted to go look at houses in LA or
13    hotels in New Mexico.  I just don't know for sure, I'm
14    sorry.  But I think she would have tried, like, even
15    everybody tried to save him money.  So they would maybe
16    try to use miles.  But it's not as easy as -- I don't
17    think -- yeah.  I don't know for sure, no.
18    Q.     Was it your understanding that Mr. De Niro
19    allowed Ms. Robinson to use Canal sky miles to book her
20    travel?
21                    MR. BENNETT:  Objection.
22                    MS. LAZZARO:  Objection.
23    A.     Yeah, I would think so.  It would make sense to
24    me.  And I vaguely remember her saying that, you know,
25    she was going to try to use miles.  It would make sense
```



1                        ROBIN CHAMBERS

2      to me.  But again, I don't remember, I don't know for

3      sure.

4      Q.      Did you ever have discussions with Ms. Robinson

5      about her being able to use sky miles generated by

6      Canal's credit cards for her travel?

7                        MS. LAZZARO:  Objection.

8      A.      We may have, I don't remember.  But it wouldn't

9      be out of the ordinary.  That stuff was -- I mean it --

10     that would not have been out of the ordinary.

11     Q.      And you knew that Chase was allowed to use

12     miles to book her flights, correct?

13                       MS. LAZZARO:  Objection.

14                       MR. BENNETT:  Objection.

15     A.      Yeah, I was -- yeah.  Yeah, if he would -- if

16     she was -- the only way I could say it -- and again --

17     if he knew she wanted -- if he -- if she -- if he wanted

18     her to go somewhere, to do something, to pick up

19     something, to look at something, a hotel or houses and

20     she was there for a quick in and out, two days, three

21     days, yeah, she would -- it would make sense that she

22     would try to use the miles, if she could, which would

23     save him cash, that's the only thing.  But I dont know

24     the exact arrangement between them.  But I would think

25     there would be -- of course, isn't it better than cash



Page 107

                        ROBIN CHAMBERS

1
2    if you can use miles?
3    Q.      Hmm.  At some point you talked to Ms. Robinson
4    about sky miles as being a great perk for her.
5            What did you mean by that?
6                    MS. LAZZARO:  Objection.
7                    MR. BENNETT:  Objection.
8    A.      Well, I don't remember exactly, except that
9    maybe, that that was a great perk.  There are great
10   perks in that job.  I had them, we all had them, you
11   know, and it was -- yeah, it was really great.  But I
12   don't remember that exactly, but yeah, I mean, I would
13   think, yeah.  I mean, I think so, yeah.
14   Q.      At some point in a conversation with Ms.
15   Robinson, you characterized her being able to travel on
16   sky miles as a big gift from Mr. De Niro; is that right?
17                   MS. LAZZARO:  Objection.
18                   MR. BENNETT:  Objection.
19   A.      Like for her personal travel, like, for her
20   vacations and stuff, yeah.  And usually I remember
21   conversations -- the thing that I do be remember,
22   because I don't know that arrangement between them.  But
23   I do remember her saying, like, she would -- you know,
24   he could never surprise her with a gift or something.
25   She could surprise everybody else, but she had to deal



Page 108

ROBIN CHAMBERS

1       ROBIN CHAMBERS

2 with Bob directly about what she wanted or what -- we'd

3 try to help and give him hints and stuff.  But I think

4 that would be part of it, yeah, you'll pay for my trip

5 like when she was going back and forth to Europe or to

6 stay, yes, this will be my Christmas present a back and

7 forth ticket.  Yeah.  I think -- yeah, that I remember.

8 That I do remember.

9 Q.  And are you aware of Ms. Robinson having

10 discussions with Mr. De Niro around 2015 about

11 flexibility in connection with her work?

12     MS. LAZZARO:  Objection.

13 A.  I know that was always an issue between them.

14 I know that was always an issue.  It was -- I do know

15 that.  I don't remember in 2015.  But she demanded it

16 and she wanted it and I think they worked that out

17 together.  I mean there was some -- I'm sure there was

18 arguing back and forth and why I should be able to work

19 here.  I mean that that's just part of it, sure.

20 Q.  Mr. De Niro wanted Ms. Robinson to live in New

21 York rather than Los Angeles; is that right?

22     MR. BENNETT:  Objection.

23 A.  Yes, I think that's fair.

24 Q.  And Ms. Robinson agreed to move back to New

25 York to work for Mr. De Niro, correct?



Page 109

                         ROBIN CHAMBERS

1

2                        MR. BENNETT:  Objection.

3    A.      I don't think she ever left.  I mean, I

4    think -- I think, I'm not sure.  Because I wasn't around

5    when she first started, right or I wasn't close with

6    her, so I didn't have a lot of contact.  But I think she

7    lived in New York, I believed she did.  I could be

8    wrong.  But I don't think she ever moved for the job in

9    the beginning.  I don't know that for sure.  But I

10   thought she lived in New York when she got the job and

11   then I think she wanted to live elsewhere and --

12   Q.      Ms. Robinson started working for Canal in New

13   York, right?

14   A.      I believe so, yes.  Again, I wasn't right there

15   so --

16   Q.      And at some point, she was living in Los

17   Angeles while working for Canal?

18   A.      I remember that for a while, yeah.  Not too

19   terribly long, I don't think.

20   Q.      And then Mr. De Niro wanted her to move back to

21   New York to continue working for Canal; is that right?

22                       MS. LAZZARO:  Objection.

23                       MR. BENNETT:  Objection.

24   A.      I think they budded heads on that, and that was

25   between them and I wasn't as -- I was close to Chase



Page 110

```
1                    ROBIN CHAMBERS
2    because I do remember, but not perhaps that close.  So I
3    don't know the interaction with them.  But yeah, it was
4    like, you know, a tussle between them.  I was living
5    here, no you can't.  It was that kind of thing, but that
6    was between them, so I don't know.
7    Q.      Was it your understanding that Mr. De Niro
8    provided Ms. Robinson with some additional flexibility
9    after she had reached her return to New York City?
10                   MR. BENNETT:  Objection.
11                   MS. LAZZARO:  Objection.
12   A.      I believe so.
13                   MS. LAZZARO:  Can you please specify
14           when you ask questions of the deponent, whether
15           this is based on her personal knowledge.  A lot
16           of her answers are her guessing, surmising and
17           just kind of speculating rather than what she
18           may be aware of.  If you could just directly
19           ask her questions.
20                   MS. HARWIN:  Well, I'm going to ask my
21           questions and if you have any further questions
22           on redirect, you can ask.
23                   MS. LAZZARO:  Sure.
24   Q.      Are you aware of any discussions between Ms.
25   Robinson and Mr. De Niro around 2015 concerning expenses
```



```
 1                     ROBIN CHAMBERS
 2   that Canal would pay for for Ms. Robinson?
 3                     MR. BENNETT:  Objection.
 4   A.        I don't know.
 5   Q.        Are you aware of Mr. De Niro authorizing Ms.
 6   Robinson to travel on Canal's sky miles as a way to
 7   provide her with additional flexibility?
 8                     MR. BENNETT:  Objection.
 9   A.        I believe so.  I believe so.
10   Q.        How long are you aware of Mr. De Niro allowing
11   Ms. Robinson to travel on Canal's sky miles?
12                     MR. BENNETT:  Objection.
13   A.        Can you say that again, please.
14   Q.        Sure.  To your knowledge, for how many years
15   did Mr. De Niro allow Ms. Robinson to travel on Canal's
16   sky miles?
17                     MS. LAZZARO:  Objection.
18                     MR. BENNETT:  Objection.
19   A.        I don't -- I don't really know.  I don't really
20   know.  I don't really know.  But I don't think -- the
21   truth of the matter is, is that Bob didn't care about
22   the sky miles at that point.  I think we tried to use
23   them for Dan Harvey, we tried to use them -- she, not
24   we.  She tried to use them whenever she could.  Again, I
25   just think it was a way to save money, we thought,
```



Page 112

1                    ROBIN CHAMBERS
2    right, that it wasn't cash.  Because they had such big
3    bills at that point, so -- but, I don't know for sure.
4    Q.    So it was your understanding that for years Ms.
5    Robinson had been allowed to use sky miles for her
6    travel; is that correct?
7                    MS. LAZZARO:  Objection.
8                    MR. BENNETT:  Objection.
9    A.    Again, I don't know.  But it would make sense,
10   yeah.  I mean we had control of that stuff, when you're
11   in the office.  And if you can't use it for family, it
12   just sits there.  But I don't know what went on, you
13   know.  But it would make -- can I say this?  It would
14   make sense to me that he would say, yeah, use them
15   whenever you could.  And if she made it a part of a gift
16   to, you know, a part of her birthday or Christmas,
17   because she had to deal with him kind of directly on her
18   own gifts and stuff for the most part.  But again, I do
19   not know for sure.
20           Could I say something?  I don't believe that if
21   she didn't have a conversation -- I find it hard to
22   believe that she would just do it without a
23   conversation.  I don't think any of us would have.
24   We're pretty careful with Bob in that respect, you know.
25   We have to -- you know.  That's why I'm hesitating,



Page 113

1                    ROBIN CHAMBERS

2   because I don't know for sure.  But that's my educated

3   guess, I'm sorry.

4   Q.      Based on your years of working with Ms.

5   Robinson, she was careful about Canal's finances,

6   correct?

7                    MR. BENNETT:  Objection.

8   A.      I believe so.  I believe so.  We had a lot of

9   -- I remember a lot of her digging into finances and --

10  yeah, I do remember that a lot and saving money and --

11  yeah, I do remember.  So some really good stuff in that

12  respect.  But I know that the -- in this situation,

13  these miles are a thing and I'm just not that sure.  I

14  just don't know for sure.

15  Q.      Based on everything you know about Mr. De Niro,

16  it wouldn't surprise you if Mr. De Niro had authorized

17  Ms. Robinson to use Canal's sky miles, correct?

18                    MR. BENNETT:  Objection.

19                    MS. LAZZARO:  Objection.

20  A.      Not at all.  Not at all.

21  Q.      Meaning correct?

22  A.      Yes, correct.

23  Q.      And based on everything you know about Ms.

24  Robinson, it is your expectation that she would have run

25  any travel plans that she had by Mr. De Niro before



Page 114

```
 1                    ROBIN CHAMBERS
 2   making a transfer, correct?
 3                    MR. BENNETT:  Objection.
 4                    MS. LAZZARO:  Objection.  You're asking
 5           Ms. Chambers to speculate and guess as to what
 6           she thinks may make sense or surmise what may
 7           have happened.  The questions should be direct
 8           in what she has first-hand knowledge on.
 9                    MS. HARWIN:  Counsel, there are no
10           speaking objections.  You can make your
11           objection as to form.
12                    MR. BENNETT:  Right.  On that point
13           though, Ally, I mean, I'll just follow up a
14           little bit.  Otherwise, the way you're phrasing
15           the questions and allowing the witness to
16           respond, you're basically putting it on the
17           Defendants to clarify the foundational basis
18           for all of these issues.  And that's just --
19           from an efficiency standpoint, it doesn't make
20           sense.  That's all I'm saying.
21   Q.      Based on your observations of Ms. Robinson, she
22   would run significant expenses by Mr. De Niro before
23   incurring them, correct?
24                    MR. BENNETT:  Objection.
25   A.      Yes.  And I know that firsthand because we
```



Page 115

```
 1                    ROBIN CHAMBERS
 2   would have those conversations.  I asked Bob.  Bob said
 3   I could do this.  It was just a matter of course, I do
 4   know that.
 5   Q.      And those conversations would typically happen
 6   in person or on the phone, correct?
 7                    MR. BENNETT:  Objection.
 8                    MS. LAZZARO:  Objection.
 9   A.      Lots on the phone.  Sometimes -- mostly on the
10   phone if it was happening in the moment.  And it usually
11   was around gifts, you know, Christmas presents or
12   birthdays, that sort of thing.
13   Q.      After Ms. Robinson's employment at Canal ended,
14   did a misunderstanding arise concerning her use of sky
15   miles?
16                    MR. BENNETT:  Objection.
17   A.      That became a thing, but I don't know anything
18   about it.  That thing that is in the papers that I read
19   and stuff, I don't know anything about that.  That was a
20   shock.
21   Q.      What made it a shock?
22   A.      Just the fact that I read that, um -- I don't
23   think I spoke with anybody about it.  I may have had
24   passing, but, you know, I think it got weird after she
25   left for me.  It was just weird and I was shocked.  I
```



Page 116

                    ROBIN CHAMBERS
1

2   mean, what I read that -- yeah, it was just a shock,

3   that's all.  It was not -- again, I was never in the

4   office and everything I heard and talked about was on

5   the seventh floor with Michael Kaplan my coworker and

6   Chase as a coworker.  But that was nothing I was --

7   yeah, that was -- I had no knowledge of that.  That was

8   a shock.

9   Q.      Did you speak to Mr. De Niro about Ms.

10  Robinson's use of sky miles?

11                  MR. BENNETT:  Objection.

12  A.      After she left?

13  Q.      At any point?

14  A.      No.

15  Q.      Did you speak to Mr. De Niro about Ms.

16  Robinson's use of the sky miles before she left?

17                  MR. BENNETT:  Objection.

18  A.      No.  But may I say something?  After she left,

19  I think he might have mentioned, I can't believe this.

20  It was in that kind of thing or I'm shocked, this is

21  crazy, how did this happen, blah, blah, blah.  But

22  nothing more than.

23  Q.      Tell me everything you recall Mr. De Niro

24  saying about Mr. Robinson's use of sky miles?

25                  MR. BENNETT:  Objection.



Page 117

                        ROBIN CHAMBERS
1

2    A.       Just that he was shocked.  That he -- you know,

3    I don't think it was the use.  I think it was the

4    transfer of a big chunk of sky miles.  I think that was

5    in context.  I think that was the problem that he was,

6    like, shocked so --

7    Q.       In your communications with Mr. De Niro, he was

8    not disputing that Ms. Robinson was authorized to travel

9    using Canal's sky miles; is that right?

10                   MR. BENNETT:  Objection.

11   A.       We didn't have those kinds of conversations.

12   She -- you know, she had her own relationship with Bob

13   and I had a completely different relationship.  But no,

14   we never talked about anything like that.  No, no.

15   Q.       In the conversation you had with Mr. De Niro

16   where he was talking about the transfer of sky miles,

17   did Mr. De Niro dispute that Ms. Robinson was authorized

18   to travel using Canal's sky miles?

19                   MR. BENNETT:  Objection.

20   A.       No, and it wasn't a long conversation.  It was

21   just this happened and I read it and I can't believe it

22   and that's it and on to something else.  It was not a

23   discussion of Chase and sky miles or anything.  I didn't

24   discuss -- he had lawyers and stuff for that.  So I was

25   not a party to that at all.



Page 118

1                    ROBIN CHAMBERS

2    Q.      To your knowledge, was there a period of time

3    when there was a problem with Canal's sky miles that

4    prevented miles from being transferred to Ms. Robinson?

5                    MR. BENNETT:  Objection.

6    A.      Yeah, it got really weird and sticky, I

7    remember that -- it got really weird because there were

8    so -- I think there were -- if I remember correctly, she

9    was complaining and I think Kaplan may know about this.

10   There was a lot of difficulty -- yeah, there were so

11   many accounts in different names -- it was just a weird

12   thing, yes, yes.  I do remember that.  It was a hassle.

13   That's what I remember.  It was a hassle.

14   Q.      There was a period of time when one of the

15   American Express cards became linked to your name and

16   your social security number; is that right?

17   A.      Yes.  Which was so bizarre.  Yeah, I guess my

18   name was on there from, like, 20 years ago.  That was so

19   scary.  The minute I got -- I got -- oh, my god, I got

20   like, a huge influx of sky miles and I called Chase and

21   Kap immediately.  I went, oh my God, what happened?  I

22   had all these miles.  And that's when she had to get

23   those miles -- I don't even use my American Express

24   card, but yeah, I think it was like, 300,000, miles just

25   showed up on it in my name, which would have been really



Page 119

                        ROBIN CHAMBERS
1
2    nice, believe me.  But I called them, I don't know what
3    happened, get it out of here.  So I think she had to get
4    into that.  It got so confusing with my name from a
5    gazillion years ago.
6    Q.      So for a period all of the miles that were
7    being generated by this credit card were going into an
8    account associated with your name, correct?
9    A.      I don't -- that I don't know.  Because I
10   remember just getting one weird statement with, like, a
11   little under 300,000 miles, calling them and going oh my
12   God, what is this?  So I don't know how long it was --
13   and it was only one statement.  Because I don't use
14   my -- I haven't used my American Express green card in a
15   thousand years.  I have it, but I don't use it.  So I
16   just don't -- I don't -- it wasn't going on for months
17   or anything like that.  No.  It was one thing, called
18   them and said get it off, don't know how it happened.
19   But that was a weird hassle I remember.
20   Q.      Are you aware of Mr. De Niro being aware of
21   this problem?
22   A.      No, I don't even know why we would have told
23   him.  Because it was -- you know, I got them, I called
24   them, and it disappeared, probably within a couple of
25   weeks, so it was a nothing.  So I don't even know why



Page 120

```
 1                    ROBIN CHAMBERS
 2   anybody would have told him.  I didn't.  I didn't think
 3   it was important.
 4   Q.      During this period when the American Express
 5   card became linked to your name, Ms. Robinson couldn't
 6   transfer sky miles, correct?
 7                    MR. BENNETT:  Objection.
 8   A.      I don't know.
 9   Q.      And you don't recall -- let me restate the
10   question.
11           Ultimately, Michael Tasch was involved to
12   resolve this issue with the American Express sky miles,
13   correct?
14                    MR. BENNETT:  Objection.
15   A.      I think so, yes.  If I remember correctly, yes.
16   He had to get involved.
17   Q.      And it's -- it took Mr. Tasch months to resolve
18   this issue with the American Express rewards points
19   going to your account; is that right?
20   A.      I don't remember.  But I only remember getting
21   one statement and that's it, with those miles there.  I
22   don't know how long it took, but --
23   Q.      To your knowledge, which Canal employees were
24   aware that Ms. Robinson was allowed to use sky miles for
25   travel?
```



Page 121

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3                    MS. LAZZARO:  Objection.
 4    A.      Can you say that again, I'm sorry.
 5    Q.      Sure.  To your knowledge, which Canal employees
 6    were aware that Ms. Robinson was allowed to use sky
 7    miles for travel?
 8                    MR. BENNETT:  Objection.
 9    A.      I don't know.
10    Q.      In a conversation with Ms. Robinson, you told
11    her that, we all know, when it came to her use of sky
12    miles.  Who did you mean by "we all"?
13                    MR. BENNETT:  Objection.
14    A.      I don't know because I don't know what the
15    conversation was about.  We all know.  I don't know why
16    I would say that unless -- I mean, I don't know what
17    context it is.  But she was pretty open with me, you
18    know, when she was -- you know, it just -- it was never
19    that big of a deal, it just came up, I'm using miles for
20    this, I'm going over, I'm trying to use miles for that.
21    It was not a, guess what, I'm going to use miles.  It
22    was not like that.  It was just -- it just came up in
23    conversation.
24    Q.      Over what time period, was it, you know, part
25    of a conversation that Ms. Robinson would be using miles
```



Page 122

```
 1                    ROBIN CHAMBERS
 2    for travel?
 3                    MR. BENNETT:  Objection.
 4    A.      I don't know for sure.  But, you know, when she
 5    would travel, we became friends, too, you know, I felt
 6    that we were friends.  Even though there's this
 7    generational gap and we didn't hang out at night
 8    together, but we were friends and I cared about her.  So
 9    these conversations just happened.  Okay, I'm going here
10    for Christmas, I'm going to do this or this is what I'm
11    getting for my Christmas present, so it was just very
12    casual, it was just like that.  It was never -- it was
13    never like a big deal about miles.  It was -- just at
14    that point.
15    Q.      Mm-hmm.  To your knowledge, was Michael Kaplan
16    aware that Ms. Robinson was authorized to use sky miles
17    to book travel?
18                    MR. BENNETT:  Objection.
19    A.      Again, I don't know for sure, but I would
20    imagine that he would know something.  But I do not know
21    for sure.  I don't think Michael and I discussed it
22    until, you know, after everything.  And then again, I
23    didn't know.  I don't think he would have had -- I don't
24    know.
25    Q.      During Ms. Robinson's employment at Canal, you
```



Page 123

```
                           ROBIN CHAMBERS
 1
 2   never heard Mr. De Niro take issue about any of her
 3   expenses; is that correct?
 4                    MR. BENNETT:  Objection.
 5                    MS. LAZZARO:  Objection.
 6   A.       No.
 7   Q.       Meaning correct?
 8   A.       Correct.
 9                    MS. HARWIN:  This is probably another
10            good time for a break.  Ms. Chambers would you
11            like to take a lunch break?
12                    THE WITNESS:  Well, I was going to ask
13            you guys, if -- do you think we could stop, at
14            like, 2:30 3:00ish, and then do -- is it
15            possible then to do, if there's more, it may
16            not even have to go that long.  Otherwise I'd
17            rather work just straight through.  Because I
18            just -- you know -- I'd like to stop then for
19            personal reasons.  But if you can't or if it's
20            not the thing to ask, that's what I'd like to
21            do.  But so if working straight through with a
22            five-minute break or 10-minute break, that
23            would be preferable to me to get done earlier.
24            Or I could do it at another day finish up.
25            That's up to you.
```



Page 124

```
1                    ROBIN CHAMBERS
2                    MS. HARWIN:  Unfortunately, I would
3          anticipate having questions that would go past
4          then.  But I'm happy to keep going and take
5          just shorter breaks to try to, you know, finish
6          earlier.
7                    THE WITNESS:  Okay.  I'd like to take a
8          break then, a good maybe a lunch break, if it
9          works for everybody else around 2:30, 3:00,
10         would that be okay?
11                   MS. HARWIN:  Sure, absolutely.
12                   THE WITNESS:  I mean if everybody else
13         can do that, I don't know.
14                   MS. HARWIN:  Madam Court Reporter, is
15         that alright with you?
16                   THE REPORTER:  Yes.  As long as we can
17         take a quick break now, that's fine.
18                   MS. HARWIN:  Sure.  Why don't we pick
19         it up at 12:45.
20                   THE VIDEOGRAPHER:  Going off the record
21         officially 12:36 p.m.
22                   (Whereupon, a short break was taken.)
23                   THE VIDEOGRAPHER:  Back on the record
24         the time is 12:49 p.m.
25                   MR. BENNETT:  The defendants would like
```



```
 1                    ROBIN CHAMBERS
 2          to place a brief statement on the record.  At
 3          this point up until now, we think that the
 4          questions that are being put to the witness
 5          have been inappropriate in that they are
 6          designed to elicit or are at least suggestive
 7          in terms of eliciting information or responses
 8          that is not based on personal knowledge.
 9                    With that on the record, we would like
10          to inquire, Ally, whether or not you will
11          instruct the witness to respond to questions
12          based solely on personal knowledge.
13  Q.      Ms. Chambers, let me clarify for you, that
14  you're here as a witness and I'm asking questions based
15  on what you know and what you observed.  And so when I
16  ask questions about what you're aware of, you're to
17  answer from your personal knowledge.
18  A.      Yes, okay.
19  Q.      Is there any answer that you've provided today
20  that was not based on your personal knowledge?
21                    MR. BENNETT:  Objection.
22                    MR. DROGIN:  Can we have them all read
23          back?
24                    MR. BENNETT:  It's like 400 questions.
25                    MS. HARWIN:  Counsel, please refrain
```



from speaking.

A. I don't remember. I don't know.

Q. Sitting here today or sitting here right now, do you recall providing any answer that wasn't based on your personal knowledge?

MR. BENNETT: Objection.

A. No, I don't recall. I think I said I'm not sure or something. I think I clarified it in that way. But I understand what you're getting at now and I will try and keep that uppermost in my mind. I think I understand the problem, so --

MS. HARWIN: Okay. And you know, for the record I'll state that we disagree with the comments made by Mr. Bennett on the record, but we'll continue.

Q. Ms. Chambers you understand you're still under oath?

A. Yes.

MS. HARWIN: We're going to drop into the chat documents that are Bates numbered Robinson 00011009 and 00011010 I'm going to mark those as Exhibit 9.

(Whereupon, Bates numbered Robinson 00011009 and 00011010 were marked as Exhibit 9,

1                    ROBIN CHAMBERS

2          for identification, as of this date.)

3    Q.     Now Ms. Chambers, if you go to the chat, you

4    can open those files.

5    A.     Where is that?

6    Q.     It's at the bottom.

7    A.     Oh, where it says chat.

8    Q.     Yep.

9    A.     Okay.  Got it.  And click on it.

10   Q.     Exactly.  So you can click on the first

11   document and then click on the second document.  And

12   take the time you need to review both of those documents

13   and then let me know when you've completed your review.

14   A.     So the top one says voicemail and then it says

15   LR -- L -- time on the record so -- oh, sorry, that's

16   something else.  Time on the record so far two hours and

17   48 minutes.  Below that it says -- so I just click on

18   that.  Sorry.  I'm sorry.

19   Q.     Just click on those two PDF's, exactly.  No

20   problem.

21   A.     Okay.  I'm going to click on the first one,

22   right?

23   Q.     You got it.  Click on the first one and you can

24   also click on the second one.  Because together those

25   two are both what are Exhibit 9.



Page 128

                    ROBIN CHAMBERS

1

2   A.      Okay, click to open.  Okay.  Okay.  I see it.

3   It just jumped up, right.

4   Q.      You got it.  Do you recognize this document as

5   a series of text messages between you and Ms. Robinson?

6   A.      I don't remember them.

7   Q.      Why don't you take the time to review them and

8   see if that refreshes your recollection.

9   A.      Okay.  It only goes so far.

10  Q.      That's right.  And can you click on the second

11  document?

12  A.      Okay.  Do I get rid of this screen, click it

13  off?  Okay.  I get it.  I got it.  Sorry, sorry.  Okay.

14  Q.      No problem.

15  A.      Okay.  Got it.  Okay.

16  Q.      Have you had a chance to review these

17  documents?

18  A.      I just looked at them.

19  Q.      Okay.  And these are text messages that you

20  exchanged with Ms. Robinson in March of 2018?

21  A.      Yes.  I don't remember them, but it's a type of

22  conversation we would have, yes.

23  Q.      Do you recall these as being text messages that

24  were exchanged in connection with her trip to Los

25  Angeles in March of 2018?



Page 129

                         ROBIN CHAMBERS

1

2                         MR. BENNETT:  Objection.

3    A.       I believe so.

4    Q.       And do you recall your telling her about a

5    snowstorm that was contemplated in New York?

6    A.       I don't remember that, but I see that I texted

7    it.  So it's obviously yes.

8    Q.       And to your knowledge, Ms. Robinson changed her

9    travel plans based on the weather; is that right?

10                        MR. BENNETT:  Objection.

11                        MS. LAZZARO:  Objection.

12   A.       Yes.

13   Q.       That completed my questioning on the exhibits.

14   So feel free to take that down if it is cluttering your

15   screen.

16   A.       How do I get rid of it?  Just hit that little

17   close?

18   Q.       The little green --

19   A.       Got it.  I get it.  I got it.

20   Q.       To your knowledge, were there any types of

21   tasks that Mr. De Niro would assign to his female

22   employees that he do not assign to Michael Kaplan?

23                        MS. LAZZARO:  Objection.

24                        MR. BENNETT:  Objection.

25   A.       Could you say that again, please.



Page 130

                    ROBIN CHAMBERS

1

2   Q.      Sure.  To your knowledge, were there any tasks

3   that Mr. De Niro would assign to his female employees

4   that he did not assign to Michael Kaplan?

5                   MR. BENNETT:  Objection.

6   A.      Yes.

7   Q.      Please explain.

8                   MR. BENNETT:  Objection.

9   A.      Well, I believe -- I know that Bob was very,

10  very, comfortable with his female employees and trusted

11  them.  He trusted Chase, he trusted me, he trusted a

12  small group of people.  And not that he didn't trust

13  Michael Kaplan, but I think, my experience is that he

14  felt more comfortable.  I know he trusted Chase because

15  he told me.  So, yes.

16  Q.      What types of work would Mr. De Niro assign to

17  Ms. Robinson that he wouldn't assign to Mr. Kaplan?

18                  MR. BENNETT:  Objection.

19  A.      Kind of everything.  Everything.  I mean, I

20  think -- I got the impression from viewing them and

21  viewing that work relationship, that Bob, yes, would

22  call Michael Kaplan to do something with phones or

23  something.  But mostly I watched him -- I know that he

24  would call her, Chase, to call Michael Kaplan to have

25  Michael do this.  In other words, it was easier for Bob



Page 131

```
                         ROBIN CHAMBERS
 1
 2    to have one phone number in his head and that was her or
 3    me or whoever was the assistant at that time, that's who
 4    he called and that's who disseminated things.  Bob wants
 5    this, Bob wants that, Bob wants -- you know.  So that's
 6    how it worked I believe.
 7    Q.      During the period that you were working
 8    alongside Ms. Robinson from 2016 until the end of her
 9    employment in 2019 she functioned as the lead -- let me
10    restate that question.
11            When you worked alongside Ms. Robinson from
12    2016 until the end of her employment in 2019, she
13    functioned as the lead assistant for Mr. De Niro,
14    correct?
15                    MR. BENNETT:  Objection.
16    A.      Absolutely.  I went to her -- I went to her,
17    everybody went to her.  Everybody.
18    Q.      Do you think that the workplace at Canal was
19    any different for male employees than female employees?
20                    MR. BENNETT:  Objection.
21    A.      I don't know how it was during the time that I
22    worked with Chase and Michael this part.
23    Q.      Mm-hmm.  Based on your interactions with Mr. De
24    Niro, are you aware of him treating male employees any
25    different from female employees?
```



Page 132

1                    ROBIN CHAMBERS

2                    MS. LAZZARO:  Objection.

3                    MR. BENNETT:  Objection.

4    A.      No.

5    Q.      What were your impressions of Mr. De Niro as a

6    boss during the period from 2016 to 2019?

7                    MR. BENNETT:  Objection.

8                    MS. LAZZARO:  Objection.

9    A.      As my boss, he was who he's always been for 30

10   years.  I've known him that well.  So I'm very

11   comfortable with him.  I think he's comfortable with me.

12   We didn't have a big relationship, we didn't talk like

13   it was when I was in the office.  But I had a good

14   relationship with him, I believe.  But it was pretty

15   minimal.  And it was always about work.  Our

16   relationship was based on work and work that I was doing

17   with him or for him.  So that's how it was.  We -- yeah.

18   Q.      Did you ever perceive any aspects of the

19   workplace at Canal to be hostile?

20                   MR. BENNETT:  Objection.

21   A.      When I worked for him as a assistant and ran

22   the office or when Chase worked for him and ran the

23   office?

24   Q.      During the period from 2014 to 2019, did you

25   ever perceive aspects of the workplace at Canal to be



Page 133

                        ROBIN CHAMBERS

1
2   hostile?
3                   MR. BENNETT:  Objection.
4   A.      You know I'm not sure what you mean by hostile,
5   Alexandra, I'm sorry.  I -- you know, I don't know what
6   that means.  I didn't view anything in the office
7   because I wasn't there when Chase was there.  I never
8   went to that building.  I don't know what that hostile
9   means exactly.
10  Q.      Were there any aspects of the Canal work
11  environment that you found to be problematic during the
12  period from 2014 to 2019?
13                  MR. BENNETT:  Objection.
14  A.      God that's really difficult to answer, because
15  again, I wasn't there.  But, let me think.  I don't
16  think you could describe it as hostile.  No, I would not
17  describe it as hostile, what I witnessed.  Can I add on
18  to that?
19  Q.      Mm-hmm.
20  A.      I think it was a good place to work, a lot of
21  freedom, a lot of hard work.  But were there arguments,
22  were there pushback, yes.  But hostile as far as people
23  being mean to each other or this kind of constant spat,
24  no.  Did people argue?  Did I argue with Chase?  Many
25  times we disagreed.  Did I argue with Kap?  Yes.  Did I



Page 134

```
 1                    ROBIN CHAMBERS
 2   argue with Bob?  Yes.  But I don't consider that
 3   hostile.  That's just, you know, you -- some -- you
 4   clash over an idea or something.  But I don't think
 5   that's -- I wouldn't -- but I'm a different generation
 6   too so --
 7   Q.     Are you aware of Mr. De Niro ever making any
 8   off-color remarks about any one female?
 9                    MS. LAZZARO:  Objection.
10                    MR. BENNETT:  Objection.
11   A.     Not to me, no.
12   Q.     Did you ever hear of Mr. De Niro making any
13   off-color remarks about any one?
14                    MR. BENNETT:  Objection.
15                    MS. LAZZARO:  Objection.
16   A.     No, not to me.  I don't recall.
17   Q.     Did Mr. De Niro yell?
18   A.     Yes.
19                    MR. BENNETT:  Objection.
20                    MS. LAZZARO:  Objection.
21                    MR. BENNETT:  When?
22   Q.     How common was it for Mr. De Niro to yell?
23                    MR. BENNETT:  Objection.
24                    MS. LAZZARO:  Objection.
25   A.     I can speak from when I was working for him
```



Page 135

ROBIN CHAMBERS

1

2  that, over those 16 years in -- physically in the

3  office, yeah, he yelled.  That was part of it.  I also

4  got to yell back, you know, we argued.  If I did --

5  screwed up royally, I'd apologize, but he'd yell, but he

6  didn't hold a grudge, we'd get over it.  He'd apologize,

7  I'd apologize.  But yeah, he could yell.  Yeah, he sure

8  could.

9  Q.      Is it a fairly common occurrence for Mr. De

10 Niro to yell?

11                  MR. BENNETT:  Objection.

12                  MS. LAZZARO:  Objection.

13 A.      No, no, it the wasn't -- no.  Not with me, I'm

14 speaking about when I was in the office.

15 Q.      Returning to the period from 2014 to 2019, are

16 you aware of Mr. De Niro yelling at employees during

17 that period?

18 A.      I heard from the employees, yes.

19                  MR. BENNETT:  Objection.

20                  MS. LAZZARO:  Objection.

21 Q.      Which employees did you hear from about Mr. De

22 Niro yelling?

23                  MR. BENNETT:  Objection.

24 A.      From Michael Kaplan and from Chase, the only

25 two people I worked with.



1                          ROBIN CHAMBERS

2     Q.      Mm-hmm.  Mr. De Niro would yell at Ms.

3     Robinson, correct?

4                 MR. BENNETT:  Objection.

5     A.      Yes.  According to her, yes.

6     Q.      And Mr. De Niro would berate Ms. Robinson at

7     times?

8                 MR. BENNETT:  Objection.

9     A.      I don't know if she ever used that word.

10    Q.      To your knowledge, would Mr. De Niro ever speak

11    to Ms. Robinson in ways that Ms. Robinson characterized

12    as demeaning?

13                MR. BENNETT:  Objection.

14                MS. LAZZARO:  Objection.

15    A.      Yes.  According to Chase, yes.  She would call

16    me upset and I would try and talk her off the ledge.

17    Um, if he would scream at Kaplan about something, Kaplan

18    was a different kind of human being.  He would just let

19    it roll off his back and -- yeah.

20    Q.      What kinds of comments or conduct do you recall

21    Ms. Robinson coming to you about?

22                MR. BENNETT:  Objection.

23                MS. LAZZARO:  Objection.

24                MS. HARWIN:  Let me rephrase that

25          question.



1                    ROBIN CHAMBERS

2   Q.      What comments from Mr. De Niro do you recall

3   Ms. Robinson coming to you upset about?

4                    MR. BENNETT:  Objection.

5                    MS. LAZZARO:  Objection.

6   A.      I remember more the emotion than the actual

7   incidences.  But there were -- and -- there were, but I

8   remember the emotion more and the upsettedness.  It was

9   very upsetting to get into a fight with somebody you

10  work with and Bob especially.  And still, you know, it's

11  just -- when you care about somebody and somebody

12  screams at you, it hurts.  So I remember the emotion,

13  but that's -- I don't remember specifically.  I know

14  there was some -- some -- some -- yeah, some stuff at

15  the apartment when she was setting up.  She was working

16  crazy hours along with Michael, but I don't remember

17  specifically.

18  Q.      What was Ms. Robinson's emotional state like

19  when she would call you upset about Mr. De Niro yelling

20  at her?

21                   MR. BENNETT:  Objection.

22                   MS. LAZZARO:  Objection.

23  A.      You know, it just hurt and just not

24  understanding, you know, being tired and working hard

25  and feeling unappreciated.  And just normal stuff like



Page 138

                    ROBIN CHAMBERS
1
2    that.  Feeling unappreciated and it's just emotional.
3    That's it.  I don't -- I don't -- it happens, it
4    happens, you know.  And I would try and console her and
5    tell her what I knew to be the truth, that Bob cared
6    about her very much and she shouldn't leave or she --
7    you know, think about it, take a breath.  And I'd try
8    and just tamp everything down.  Because I know him so
9    well, and I know, he doesn't hold grudges.  If he blows
10   up at you, the good thing is, you can yell right back.
11   And I know -- but still, even when you're having a
12   yelling argument, it's emotional and it hurts, you know.
13   He's Bob and he can be tough, but he doesn't hold
14   grudges, and I knew for a fact that he cared about her
15   and I know because he told me.  He needs her, he cares
16   about her, you know.  As a compliment, I believe she
17   reminds me of you, she's very similar, you know, we get
18   into these -- we dig deep into things.  So yeah, just
19   that hurt.
20   Q.     What did Mr. De Niro tell you that he valued in
21   Ms. Robinson?
22              MR. BENNETT:  Objection.
23   A.     She's always there.  I remember him saying that
24   to me.  She's always there.  And that means a lot to
25   him.  Somebody that he could count on.



Page 139

1                    ROBIN CHAMBERS
2    Q.      Are you aware of Mr. De Niro ever bullying Ms.
3    Robinson in any way?
4                    MS. LAZZARO:  Objection.
5                    MR. BENNETT:  Objection.
6    A.      Only -- I don't -- again, I don't remember
7    specifics and I wasn't necessarily a witness, an
8    eyewitness or on a phone or in the same room except
9    maybe once.  But I would hear from her, I don't know if
10   bullying, if that's the word.  But I know again --
11   again, she would be upset and I would try and, you know,
12   just make things better and -- because I believed what I
13   told her.  I wasn't lying to her.  I'd say he'd do
14   anything for you, he cares.  Which is all true.  So I
15   don't remember that word and I wasn't in the room for
16   that.  But I do remember her being upset quite a few
17   times over the period of a few years.  Not all the time,
18   it wasn't --
19   Q.      Mm-hmm, mm-hmm.  Are you aware of Mr. De Niro
20   ever making any derogatory comments about Ms. Robinson?
21                   MR. BENNETT:  Objection.
22                   MS. LAZZARO:  Objection.
23   A.      Yeah, he made derogatory comments about me.
24   But nothing that he, you know, meant.  If he's upset
25   with someone -- with anybody -- I've heard him make



Page 140

1                        ROBIN CHAMBERS

2   derogatory comments like I would make, what a pain in

3   the ass or she's driving me crazy or he's driving me

4   crazy.  But nothing -- nothing to me that I heard that I

5   would take -- nothing so disgusting or awful, that I

6   would go woah, not true.  Nothing like that.  Just when

7   you're mad at somebody, you can't reach somebody on the

8   phone or, you know.  But nothing major like that, no.

9   Q.       What do you recall Mr. De Niro saying about Ms.

10  Robinson when he was mad at her?

11                   MS. LAZZARO:  Objection.

12                   MR. BENNETT:  Objection.

13  A.       He would say -- like one specific instance,

14  when they got in an argument we were -- the three of us

15  were on the seventh floor and they got in an argue.  I

16  don't even remember what started it, and they argued and

17  it was really awkward.  And she got very upset and he

18  was upset.  And then it calmed down.  But, you know, he

19  was -- his attitude is -- I remember him saying, because

20  I was physically there, you know, I'm so good to her, I

21  let her go here and there, I let her work out of Spain

22  or wherever she was and, you know -- and why can't she

23  do this for me?  Or it was that kind of thing.  But I

24  don't -- to me Alexandra, I don't think there's anything

25  wrong with that.  That's just human nature when you work



Page 141

                          ROBIN CHAMBERS

1

2    24/7 for someone like Bob.  That's not a bad thing that

3    they would argue or that I argue with him, you know.  I

4    just -- and maybe again, it could be my age, it could be

5    a generational thing, it's -- I don't hold grudges, I

6    don't think she does and I know he -- he didn't.  So it

7    was never -- it was never -- I don't remember ever

8    hearing him say anything personal.  And that's the one

9    thing I want to say about Bob.  He could be angry, but

10   he never got personal with me or anybody in front of me.

11   He might -- I don't believe so.  I don't believe so.  I

12   believe it was always about the job or the mistake or

13   the something -- or how could you do that to me or why

14   don't you do that for -- but it was never ugly or

15   personal in my experience.

16   Q.      Are you aware of anyone referring to Ms.

17   Robinson as Mr. De Niro's office wife?

18                   MR. BENNETT:  Objection.

19   A.      I don't remember.  But that's a common phrase

20   that's used, but I don't remember -- I don't remember

21   who would, but somehow I've heard it.

22   Q.      Mm-hmm?

23   A.      My friends used to use that about me, which was

24   neither here nor there.  It didn't bother me.  I didn't

25   think it was a big deal.  But again, I'm a generation --



Page 142

ROBIN CHAMBERS

1

2    I'm a couple of generations apart.  But I remember

3    hearing it, but I don't remember who.

4    Q.      Based on your observations did Ms. Robinson

5    function as Mr. De Niro's office wife?

6                  MR. BENNETT:  Objection.

7    A.      I don't use that phrase, but she was everything

8    to him.  She did everything for him.  He trusted her

9    explicitly to do everything and she did.  And she was

10   there -- that was the center of everything, I remember,

11   at a certain point and everything went through there,

12   accountants, lawyers, agents, actors, friends, family,

13   everything was ran out of there, and -- yeah.

14   Q.      Mr. De Niro would refer to his assistants as

15   the girls; is that right?

16                 MR. BENNETT:  Objection.

17   A.      Give me two seconds.  Let me hear him.  Um,

18   maybe once in a while he would say the office, call the

19   office, call the girls, he'd use their names.  But a lot

20   of times he would just say call the office, unless he

21   was -- mostly it was call Chase.

22   Q.      Are you aware of Mr. De Niro ever using any

23   off-color language to refer to any females?

24                 MS. LAZZARO:  Objection.

25                 MR. BENNETT:  Objection.  That's been



Page 143

1                    ROBIN CHAMBERS

2          asked and answered.

3    A.      I don't know exactly what you mean.  If you're

4    talking about someone in particular or just females in

5    general.  Females in general, I don't believe so, no,

6    unless he was really mad.  But it's not awful.  It's not

7    -- but no, not generally, not in regular conversation

8    would he refer to a female like that.  That's not who he

9    is, I don't believe.

10   Q.      Are you aware of Mr. De Niro ever using the

11   word bitch to describe Ms. Robinson?

12                    MR. BENNETT:  Objection.

13                    MS. LAZZARO:  Objection.

14   A.      Maybe.  I'm not sure.

15   Q.      Are you aware of --

16   A.      You know, but not calling someone that or Chase

17   that.  It was more general.  It was just a generalized

18   anger, you know what I mean?  Not -- I just -- I don't

19   know for sure.

20   Q.      How would Mr. De Niro use the word bitch?

21                    MR. BENNETT:  Objection.

22                    MS. LAZZARO:  Objection.

23   A.      That's really hard because I don't -- I can't

24   -- I'm trying to think of incidences that he's used it

25   about someone, and I can't -- I can't for sure come up



Page 144

```
 1                    ROBIN CHAMBERS
 2   with it.  I don't know.  He might say, what a bitch or
 3   she was being a bitch or -- it's mostly not him, I don't
 4   believe it.  Or if he's mad at Grace or something like
 5   that, he might have said, especially when emotions were
 6   high and it was about his children or custody, then he
 7   would get very emotional if it was about his children.
 8   But I don't know how to explain it -- but he's -- I
 9   don't believe -- somehow when Bob says things like that,
10   it's not -- this is going to sound so weird.  I don't --
11   it's -- he's not scary with it.  There's not an ugly
12   intention behind it.  I think that's what I'm trying to
13   -- he can use -- he can say something like that, but the
14   intention behind is it not like, oh God, eww.  He's not,
15   you know -- I don't know if I'm explaining myself
16   clearly, but --
17   Q.      Did Ms. Robinson confide in you about struggles
18   that she experienced working for Mr. De Niro?
19   A.      Yes.
20                    MR. BENNETT:  Objection.
21                    MS. LAZZARO:  Objection.
22   Q.      What did Ms. Robinson confide in you about when
23   it came to struggles she experienced working for Mr. De
24   Niro?
25                    MR. BENNETT:  Objection.
```



Page 145

1                    ROBIN CHAMBERS

2               MS. LAZZARO:  Objection.

3    A.      You know, just the hard stuff, the same stuff

4    that I would complain about, that anybody would complain

5    about.  He called me at 6:30 a.m.  But I don't know if

6    it's so much complaining as just having someone you

7    trust, who you know is not going to go anywhere, to take

8    it in, to help you unload and decompress.  He called me

9    at 6:30, he called me at 10 o'clock at night to meet him

10   for coffee or to meet him for a drink.  So I had to get

11   up and get dressed and go, you know.  It was like, oh

12   God, uh, but that's the kind of thing I remember

13   hearing, that kind of stuff.  Which -- you know, being

14   on call, it had to do with being on call and it going

15   into the early wee hours of the morning or really late

16   at night and -- or I had to run something up to him or I

17   had -- you know, I had to get a cab and take a car and

18   get a script up to him.  Stuff like that.  But I don't

19   remember it being all the time to be really tragedy or

20   something hideous.  Although towards the end, it got

21   really rough.  It got really rough.  And then it was

22   painful.  But a lot of it was just unloading like

23   anybody would do about a job.

24   Q.      Did Ms. Robinson ever express concerns to you

25   about harassment or discrimination?



Page 146

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3                    MS. LAZZARO:  Objection.
 4    A.      Yes, towards the very, very, very, end I would
 5    think, in the last months.  If I remember correctly,
 6    towards the last months she was struggling.
 7    Q.      What concerns did Ms. Robinson express to you
 8    about harassment or discrimination?
 9                    MR. BENNETT:  Objection.
10    A.      I think there were incidences of maybe, like --
11    like, this has to do with that apartment, that she set
12    up for Bob, that house and going up there and being
13    asked to clean or buy things for a dinner party or
14    vacuum or fix things or things -- you know, it would
15    upset her.  She'd do them and, you know, I'd say or I'd
16    recount or I remember one time, I had to iron a shirt
17    for him.  And I'm less bothered by things like that
18    because, I guess, a different generation.  I keep saying
19    it ad nauseam, but you know, I got her, I understood.
20    And there were other people involved.  It wasn't just
21    Bob.  And so it made it even more difficult, you know.
22    So that -- that -- that was painful for her.  I remember
23    it was really painful and, you know, she wanted to -- a
24    different thing out of it.  And it devolved into that,
25    towards the end.  Not all the time, but there were just
```



Page 147

                         ROBIN CHAMBERS
1
2    a couple of incidences like that that I remember.
3    Q.      What else do you recall Ms. Robinson expressing
4    to you about harassment or discrimination?
5                    MS. LAZZARO:  Objection.
6                    MR. BENNETT:  Objection.
7    A.      Nothing offhand.  If you gave me incidences, I
8    might remember them.  But I don't remember them offhand.
9    Like I said, I remember a lot of emotion, but not
10   necessarily what caused it or what sparked it.  But I
11   might remember if you told me or somebody -- you know, I
12   could remember it then, but I think that was the biggest
13   thing, yeah.
14   Q.      Did Ms. Robinson ever speak to you about a
15   conversation she had with Mr. De Niro in early 2019
16   about her salary?
17                    MR. BENNETT:  Objection.
18                    MS. LAZZARO:  Objection.
19   A.      Yes.  Yes, but I don't remember details.  But
20   yes.  She was pretty open about that.  We were -- I
21   believe for my part -- I'm not speaking for her -- that
22   we felt friends, we argued, there's things that she did,
23   that I'd disagree with, we'd argue about stuff.  But she
24   was open with me about stuff like that and I tried to
25   give her good counseling, you know.  I tried to give her



MAGNA
LEGAL SERVICES

Page 148

                    ROBIN CHAMBERS

1

2    good advice and good counseling.  Not just for her, but

3    for Bob because Bob needed her and that's -- he made

4    that very clear to me, that's why I keep saying it.

5    Yeah, so um -- but not at her expense or his expense.  I

6    tried to just tamp things down when the emotions got too

7    high.  And it wasn't all the time.  I felt I did.

8    Q.      Are you aware of Ms. Robinson seeking pay

9    parity with a male Canal employee?

10   A.      Yes.

11                   MR. BENNETT:  Yes.

12   Q.      What do you recall about Ms. Robinson seeking

13   pay parity with the male employee?

14                   MR. BENNETT:  Objection.

15   A.      I believe that somehow she knew what this other

16   employee was making and she felt like -- and she felt

17   like she should be making that amount, if not more.

18   That that didn't seem fair.  I remember that, yeah.

19   Yeah.

20   Q.      Are you aware of Ms. Robinson speaking to Mr.

21   De Niro about the issue of pay parity?

22   A.      I know she did, yes.

23                   MR. BENNETT:  Objection.

24                   MS. LAZZARO:  Objection.

25                   THE WITNESS:  But I don't remember



Page 149

```
 1                    ROBIN CHAMBERS
 2        details.
 3   Q.      Did you provide any guidance to Ms. Robinson
 4   about how to raise the issue of pay parity with Mr. De
 5   Niro?
 6                    MR. BENNETT:  Objection.
 7   A.      Yeah, I would have said just talk to him.  You
 8   know, they had a very good relationship, she could talk
 9   to him about anything, for the most part, as I remember
10   and just discuss it with him.  She stuck up for herself
11   too with Bob, you know, she fought back.  She wasn't --
12   she stood up for what was right, and she would argue if
13   he disagreed, but that, they had that -- that I think
14   was a good part of their relationship.  Listen, you
15   know, nobody is all bad or all good.  You know, every --
16   they would go toe to toe, head to head.  She did a lot
17   of things that I disagreed with.  He did a lot of things
18   that I disagreed with.  But as far as that goes, I know
19   she could talk to him about stuff like that, yes.
20   Q.      Do you recall Ms. Robinson being upset about
21   what Mr. De Niro said in her conversation about pay
22   parity?
23                    MR. BENNETT:  Objection.
24                    MS. LAZZARO:  Objection.
25   A.      I don't remember.
```



1                    ROBIN CHAMBERS

2    Q.      Do you recall Ms. Robinson conveying to you

3    that Mr. De Niro had said that she doesn't have kids as

4    part of a reason for her not to be paid as much?

5                    MR. BENNETT:  Objection.

6    A.      I remember her saying that to me and that was

7    -- I remember that clearly, and that was very -- she --

8    I heard it from her, she was really upset.

9    Q.      Tell me everything you recall Ms. Robinson

10   conveying to you about that discussion with Mr. De Niro.

11                   MR. BENNETT:  Objection.

12   A.      Again, I remember that that she didn't have a

13   family.  She didn't have kids.  She didn't -- you know,

14   I guess that responsibility was what he was trying to

15   get at and I remember saying that was really inartful

16   the way he said it, you know, don't -- he doesn't mean

17   it like that.  But she wouldn't be -- but it was really

18   upsetting to her.  Stuff like that doesn't bother me,

19   and again, I go back to the same thing, it just

20   wouldn't -- I'd go, don't be ridiculous.  What does that

21   mean?  That means nothing.  You just said nothing.  You

22   know, but it was very upsetting to her.  And I remember

23   saying he -- I know him, it came out really badly, but I

24   can't believe that he meant that.  But yes, she was

25   really upset about that.



Page 151

                         ROBIN CHAMBERS

1

2    Q.      And she perceived that comment by Mr. De Niro

3    as sexist, correct?

4                  MR. BENNETT:  Objection.

5                  MS. LAZZARO:  Objection.

6    A.      Yes, she did.  She did.

7    Q.      And you communicated to Ms. Robinson that Mr.

8    De Niro's comment was sexist, correct?

9                  MR. BENNETT:  Objection.

10                 MS. LAZZARO:  Objection.

11   A.      I may -- yeah, I don't remember.  But let me

12   think -- yeah, I don't use that word sexist.  I would

13   have said, it really sucked that he said that, I don't

14   believe he meant that.  He's an idiot for saying that.

15   That's more like what I would say.  He doesn't mean it,

16   he just -- you know -- but she was upset, I do remember

17   that.

18   Q.      And Ms. Robinson communicated to you about this

19   conversation with Mr. De Niro the same day it happened,

20   right?

21                 MR. BENNETT:  Objection.

22                 MS. LAZZARO:  Objection.

23   A.      Yeah, yeah, yeah.

24   Q.      Did Ms. Robinson -- well, let me restate that

25   question.



Page 152

ROBIN CHAMBERS

1

2          What did Ms. Robinson express concerns to you

3     about when it came to harassment?

4                    MR. BENNETT:  Objection.

5                    MS. LAZZARO:  Objection.

6     A.      She didn't use those words with me.  I don't

7     remember her ever using those words with me.  It just

8     hurt her.  It just hurt her.  That's what I remember.

9     It hurt her.  Which is why she would call me in tears.

10    And he hurt her by saying that.  And I would say, that's

11    not his intentions -- he didn't -- I know him and he

12    doesn't mean it like that.  But it really meant

13    something to her, whereas it might not have meant that

14    to me.  I would have said -- but she was -- her emotions

15    were genuine.

16    Q.      Did Ms. Robinson ever express concerns about

17    being targeted by Mr. De Niro's girlfriend?

18                    MR. BENNETT:  Objection.

19                    MS. LAZZARO:  Objection.

20    A.      I just hate this so much.  Yes.

21    Q.      Tell me what Ms. Robinson conveyed to you about

22    that?

23                    MS. LAZZARO:  Objection.

24    A.      She knew that her job was going to end because

25    of his girlfriend.  And I said, you're being ridiculous,



Page 153

1                     ROBIN CHAMBERS

2    that's not true.  That's not true.  She told me this

3    months before it happened.

4    Q.     Why was Ms. Robinson concerned that her job

5    would end because of Mr. De Niro's girlfriend?

6                     MS. LAZZARO:  Objection.

7                     MR. BENNETT:  Objection.

8    A.     Because I believe his girlfriend didn't like

9    her and I tried to tell her -- sometimes this is just

10   what happens.  This was not a secret.  This was common

11   knowledge.  This was not a secret so --

12   Q.     Not a secret that Mr. De Niro's girlfriend did

13   not like Ms. Robinson?

14                    MS. LAZZARO:  Objection.

15   A.     Yeah or a few people, myself included, so this

16   was -- yeah.

17   Q.     Mr. De Niro's girlfriend was suspicious that

18   Ms. Robinson wanted a romantic relationship with Mr. De

19   Niro; is that right?

20                    MR. BENNETT:  Objection.

21                    MS. LAZZARO:  Objection.

22   A.     I believe I heard that.  I don't know from her

23   or Bob himself or I don't -- I don't -- I don't

24   remember.

25   Q.     What did Mr. De Niro say to you about why his



Page 154

```
 1                    ROBIN CHAMBERS
 2    girlfriend was treating Ms. Robinson in the way that she
 3    was?
 4                    MR. BENNETT:  Objection.
 5                    MS. LAZZARO:  Objection.
 6    A.       He did not.  He did not.  I don't remember him
 7    talking to me about it, because his girlfriend didn't
 8    like me either when I finally met her.  I met her months
 9    after Chase met her.  And so, you know it was -- and I'd
10    been through this before, so it was less of a shock to
11    me.  But I don't think he discussed it with me.  This is
12    not -- you know, this happens in this business, in this
13    thing, people -- the new people, the new wives or the
14    girlfriends who come in, they want to get their own
15    people, their own loyal people.  So to a certain extent,
16    it's really understandable how anybody he brings into
17    his life would want -- but sometimes it's the way in
18    which you do it.  And that is always the problem, I
19    think.
20    Q.       Did you attend a meeting with Mr. De Niro and
21    Ms. Robinson in December of 2018?
22    A.       I might have.  Was it on the seventh floor?
23    Her and me and him, there was one meeting, but I don't
24    remember when on the seventh floor.
25    Q.       What do you recall of the meeting that you and
```



Page 155

                    ROBIN CHAMBERS

1

2   Mr. De Niro and Ms. Robinson had on the seventh floor?

3   A.       I remember it got very upsetting for both of

4   them.  Both of them were very upset.  I don't remember

5   what started it and I remember -- I don't remember what

6   started it, but I remember they were both really upset

7   and then I tried to, you know -- I tried to help.  But I

8   don't know.

9   Q.       What was the topic of that meeting?

10  A.       I don't remember.  I really don't remember.  I

11  just -- again, I remember this highly, they were -- both

12  of them were very upset.

13  Q.       Do you recall Ms. Robinson talking about

14  considering leaving Canal?

15                  MS. LAZZARO:  Objection.

16  A.       Yes.

17  Q.       What do you recall Mr. -- or let me restate

18  that question.

19                  What do you recall Mr. Robinson telling Mr. De

20  Niro about considering leaving Canal?

21                  MR. BENNETT:  Objection.

22                  MS. LAZZARO:  Objection.

23  A.       I don't remember exactly, but when you said it,

24  I remembered that that was a thing that might have come

25  up.  I don't think it was as clearcut as I'm leaving.



Page 156

1                    ROBIN CHAMBERS

2   It wasn't like that, if, I remember.  I just -- again, I

3   just don't remember.  I remember the emotion and that's

4   what started it.  It was really upsetting.

5   Q.     Do you recall Ms. Robinson talking about

6   needing her working conditions to improve?

7                    MS. LAZZARO:  Objection.

8                    MR. BENNETT:  Objection.

9   A.     It sounds right, but I don't remember exactly.

10  Q.     What do you recall Ms. Robinson saying during

11  that meeting?

12  A.     I don't recall her saying -- I remember that

13  she was incredibly upset, he was incredibly upset.  She

14  walked out of the room in another room, I tried to tamp

15  it down, as best I could.  I wasn't all powerful, I

16  knew, it's like, you know -- I don't know how to explain

17  it, but it was emotional because they cared about each

18  other.  Maybe she wanted changes, she said something,

19  all he heard was I'm leaving and he went crazy, but to

20  me that's natural, they were both upset because they

21  cared so --

22  Q.     Ms. Robinson was crying during that meeting; is

23  that right?

24  A.     Yeah, I remember that very clearly.  And she --

25  I don't remember her crying maybe once or twice



Page 157

```
 1                    ROBIN CHAMBERS
 2   before -- I don't remember ever -- she was very upset.
 3   Q.      Mr. De Niro was angry at the possibility of Ms.
 4   Robinson leaving, correct?
 5                    MR. BENNETT:  Objection.
 6   A.      Sure.
 7   Q.      What did Mr. De Niro say during the meeting?
 8                    MS. LAZZARO:  Objection.
 9   A.      I remember his -- you know, I remember him
10   yelling.  I remember him being upset.  I don't remember
11   exactly -- knowing -- you know, I think that's kind of a
12   really awful thing to say to Bob, for some reason,
13   losing somebody is really hard for him.  And I think he
14   was really hurt and I think she was really hurt, which
15   got all this emotion going.  They were yelling at each
16   other.  She walked out of the room.  She came back more
17   composed.  It calmed down, not completely, but I
18   remember her leaving then the room.  I don't remember
19   how it was resolved, I'm sorry.  I don't.
20   Q.      Do you recall Mr. De Niro saying that he
21   wouldn't provide a good recommendation to Ms. Robinson?
22                    MR. BENNETT:  Objection.
23   A.      Yes, I do.  But Bob says that, you know.  And
24   this is what I try and tell people, I do, but I've heard
25   him say that.  He never does that.  He never follows
```



1                    ROBIN CHAMBERS

2    through on that.  He's not unkind in that way.  That was

3    his way of fighting back.  He was hurt, he wanted to

4    hurt back.  But for me, for knowing him all those years,

5    I know that he -- I've never seen him follow through

6    with that, unless somebody has done something really

7    egregious.  I don't remember.  But I remember she took

8    it very seriously, I do remember that, yeah.

9    Q.     Ms. Robinson was scared about leaving her

10   employment without a good recommendation, right?

11                  MS. LAZZARO:  Objection.

12                  MR. BENNETT:  Objection.

13   A.     I don't know for sure.  But I would think so.

14   But you're not asking that.  Did she ever say, I'm

15   scared without -- no.

16   Q.     But she took seriously the threat that he would

17   give her a bad recommendation, correct?

18                  MR. BENNETT:  Objection.

19                  MS. LAZZARO:  Objection.

20   A.     She did, I didn't at that point.  At that

21   point.  She did and I didn't.

22   Q.     Did Ms. Robinson ever express to you that she

23   was concerned about retaliation from Mr. De Niro?

24                  MS. LAZZARO:  Objection.

25                  MR. BENNETT:  Objection.



Page 159

```
 1                    ROBIN CHAMBERS
 2   A.      I don't remember.
 3   Q.      At any point during that meeting in 2018, was
 4   there a discussion about what Ms. Robinson's role would
 5   look like moving forward?
 6                    MS. LAZZARO:  Objection.
 7                    MR. BENNETT:  Objection.
 8   A.      I don't remember how it was resolved, I'm
 9   sorry.
10   Q.      During the meeting in December 2018, did Ms.
11   Robinson express concerns about her role?
12                    MS. LAZZARO:  Objection.
13                    MR. BENNETT:  Objection.
14   A.      Yeah, absolutely.
15   Q.      What concerns did Ms. Robinson express about
16   her role?
17                    MS. LAZZARO:  Objection.
18                    MR. BENNETT:  Objection.
19   A.      Well, yeah, what I remember, the biggest thing
20   that I remember was, it was a really hard job.  She had
21   done it for like, 10 or 11 years at that point, I think,
22   9, 10, 11 years.  It was really hard.  It was getting
23   harder and she just didn't know if she could do it
24   anymore.  That's what I remember.  Those are the
25   conversations, you know.  That's what I remember.  And
```



1                          ROBIN CHAMBERS

2    then with the complication of somebody else in the

3    picture, somebody else to work for, that probably added

4    to it.  But it was just getting hard, and you know,

5    that's what I remember.  That's the kind of

6    conversation.

7    Q.       Did Mr. De Niro agree to take any steps to try

8    to improve the work environment for Ms. Robinson?

9                    MR. BENNETT:  Objection.

10   A.       I don't remember.  I can almost bet that they

11   made up and talked about it.  You know, not talked about

12   it, but made up because they both have a temper and

13   nobody holds grudges.  But I think at that point, she

14   just -- it was really getting hard for her to be there

15   and to do her job.  That's what I recall.  But I think

16   things definitely calmed down and, you know.

17   Q.       Following that meeting with Ms. Robinson and

18   Mr. De Niro, Ms. Robinson continued to work for Canal?

19   A.       Yes.

20   Q.       Turning to the beginning of 2019, what impact

21   did you observe that working for Mr. De Niro was having

22   on Ms. Robinson?

23                    MR. BENNETT:  Objection.

24   A.       I was getting concerned that she was going to

25   leave.  And I was worried because I knew how much he



Page 161

1                    ROBIN CHAMBERS

2    depended on her.  My belief was that he depended on her

3    greatly and that she watched out for a lot of things for

4    him and, you know, kept everybody in line so to speak.

5    I was under that impression.  And I'm not saying she was

6    perfect because she was not, you know, nobody is.  But

7    she was not and so -- but I knew that he really counted

8    on her and I knew that it would be really hard on him if

9    she left.  And caring about him and that job, but also

10   for myself, for my purely selfish reasons, I enjoyed

11   working with her.  We worked hard and we had fund and we

12   had laughs.  And it was really good stuff.  And she was

13   kind of the voice -- and I would say this to Bob, she

14   was the voice that knew what people were doing and how

15   to reward them for that.  What a special gift or a thank

16   you or she would tell Bob when my kids and grand kids

17   came into town and she would give me for Christmas,

18   like, a dinner at Nobu.  She knew -- she made -- which

19   is kind of the way I functioned when I was in the

20   office.  She was -- Bob always did the right thing --

21   Bob -- in my past history with him, he always kind of

22   did the right thing, if somebody told him to do the

23   right thing.  He's got a big life and he might not know

24   that so and so did this for him.  He'd go yeah, yeah,

25   yeah, oh do that, do that.  But she was the voice who'd



Page 162

                         ROBIN CHAMBERS
1
2    say, don't you forget, so and so did this for you, why
3    don't you -- or Michael Kaplan just had a baby or just
4    had a second baby, let's get him a crib.  She was that
5    person, or let's give him a piece of his dad's art.  So
6    that's -- you know, she functioned in that respect,
7    which -- so for purely selfish reasons, I didn't want
8    her to leave.  For purely selfish reasons, I knew how
9    hard it would be for him.  So I tried whatever I could
10   do to kind of keep it going as long as I can.  And yeah,
11   there were, you know, plenty of stuff.  He didn't like
12   her going away.  He didn't like her, you know, living
13   somewhere else and working.  But people do that now,
14   people work remotely.  So -- it was a lot of that.  It
15   was a lot of that.
16   Q.      Did you sense a change in Ms. Robinson during
17   the last month of her employment at Canal?
18                    MS. LAZZARO:  Objection.
19                    MR. BENNETT:  Objection.
20   A.      Yes.
21   Q.      What changes did you observe in Ms. Robinson
22   during the last month of her employment at Canal?
23                    MR. BENNETT:  Objection.
24   A.      I think she was depressed.  I think she was
25   really sad and she stopped, kind of talking to me so



Page 163

1                     ROBIN CHAMBERS

2    much and that really concerned me.  She pulled back.

3    She -- you know, I haven't spoken to Chase -- I mean the

4    day that she left I think I must have left maybe a text

5    or two or a voicemail, call me, are you -- you know, and

6    I heard nothing.  I haven't seen her until today and had

7    no contact with her until today.  And so she stopped

8    confiding.  She stopped talking.  She stopped staying in

9    touch definitely during those last weeks and days and

10   that month or so, yeah.  It was odd.  It was odd.  I

11   actually didn't -- in my mind, it could be repaired that

12   she wasn't going to leave.  I didn't believe it.  I

13   really didn't believe it.

14   Q.      During the last weeks and days of Ms.

15   Robinson's employment at Canal, did you observe that Ms.

16   Robinson had lost her spark?

17                   MR. BENNETT:  Objection.

18                   MS. LAZZARO:  Objection.

19   A.      Oh definitely.

20   Q.      How so?

21   A.      Well, as I said, she pulled back, she pulled

22   away, she was cocooning.  I don't know.  Because I

23   started -- you know, she just was not being forthcoming

24   and I kind of knew what was going on.  And I knew that

25   there was a lot of tension with Bob and that house up



Page 164

1                    ROBIN CHAMBERS

2    there and the job and it was all coming to a head.  So I

3    didn't know exact details, but I could tell that it was,

4    yeah --

5    Q.      Were you concerned about Ms. Robinson's health

6    during the last month of her employment at Canal?

7                    MR. BENNETT:  Objection.

8    A.      Not her physical health, no.  I was concerned

9    about her emotionally, because I know she cared about

10   him.  And you know, leaving a job like this, it was

11   definitely emotional for me.  So I made the assumption

12   from what she said and stuff that it would be really

13   painful for her too.  Even if you're really, really

14   angry at someone -- like, even if you're getting a

15   divorce and you really hate somebody, it's still

16   painful.  It's still history.  You have history with

17   someone.  So that's what I sensed.

18   Q.      What was the toll that you observed on Ms.

19   Robinson's emotional health during the last month of her

20   employment?

21                   MR. BENNETT:  Objection.

22   A.      I didn't observe it, because I didn't see her.

23   And I don't remember talking to her a lot.  And if I did

24   talk to her, it was mostly me talking to her and her not

25   giving out a lot.  She wasn't talking a lot.  She was --



1                    ROBIN CHAMBERS

2    it wasn't the same.  It wasn't the same.  Something

3    changed.  And maybe, you know, maybe -- and I don't

4    know, maybe she didn't trust me at that point.  Maybe

5    she thought that I would go back to Bob or something or

6    I don't know.  But I felt that she was pulling back.

7    And she did, we did not talk that much.  She wasn't --

8    you know -- which I understand, it's painful.  You know,

9    when I left this past December, I didn't talk to anybody

10   because it's painful.  No matter what happens, you need

11   time to regroup.  So I wanted to give her that, but I

12   just never expected it to be -- like to go the way it

13   went, just a thing, so --

14   Q.      Ms. Robinson --

15   A.      And you know, but I understand -- what I'm

16   saying -- I'm sorry, I do understand, and you bounce

17   back because you don't hold grudges, you just say what

18   you have to say.  But that I did not -- she was pulling

19   back, so I didn't talk to her a lot at all.

20   Q.      When you did communicate with Ms. Robinson in

21   the last month of her employment, did you perceive her

22   as anxious?

23                    MR. BENNETT:  Objection.

24   A.      Absolutely.  Absolutely in the times that I

25   talked to her, I was very concerned about her sadness.



Page 166

                              ROBIN CHAMBERS

1
2    I wasn't worried that she was going to jump or do
3    anything, that kind of worried.  But when you have a
4    friend or someone who's upset, it's upsetting.  You want
5    to help them.  You know, it's no different with Bob, if
6    he's upset with something over, the kids or Grace or a
7    divorce or whatever is going on, you know, you worry,
8    you think about it, you feel bad, you want to help.  You
9    want to help.  And that's what I felt with her.  You
10   know, but, yeah, at that point there was no consoling.
11   There was no repairing.  I think I -- looking back, I
12   believe and I'm guessing, that she made up her mind she
13   knew she had to leave and she wasn't telling me, you
14   know, for whatever her reasons were.
15   Q.     During that last month of Ms. Robinson's
16   employment she described, you know, having stress levels
17   that were unlike anything she had ever experienced; is
18   that right?
19                MS. LAZZARO:  Objection.
20                MR. BENNETT:  Objection.
21   A.     Yes, I believe that true.  Yes.
22   Q.     And is that consistent with your observations
23   of her, that her stress was far greater than you had
24   ever seen her experience during her employment?
25                MR. BENNETT:  Objection.



```
 1                      ROBIN CHAMBERS

 2                      MS. LAZZARO:  Objection.

 3   A.      Yes, that's true.

 4   Q.      Are you aware of Ms. Robinson experiencing

 5   panic prior to the end of her employment?

 6                      MS. LAZZARO:  Objection.

 7                      MR. BENNETT:  Objection.

 8   A.      No, I'm not aware of that.

 9   Q.      Did there come a time when Ms. Robinson's

10   employment at Canal ended?

11   A.      Yes.

12   Q.      Prior to this, were you aware of Mr. De Niro's

13   girlfriend instructing Canal employees not to

14   communicate with Ms. Robinson?

15                      MR. BENNETT:  Objection.

16   A.      Yes.

17   Q.      Prior to Ms. Robinson's employment at Canal

18   ending, are you aware of her trying to meet with Mr. De

19   Niro to discuss the work situation?

20                      MR. BENNETT:  Objection.

21                      MS. LAZZARO:  Objection.

22   A.      Yes, I am.  I am aware.

23   Q.      Are you aware why Mr. De Niro wouldn't meet

24   with Ms. Robinson prior to the end of her employment?

25                      MS. LAZZARO:  Objection.
```



Page 168

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3   A.      I don't know specific reasons.  I don't know.
 4   I could guess, but I'm not here to guess, so I don't
 5   know.
 6   Q.      Did Mr. De Niro ever tell you why he wouldn't
 7   meet with Ms. Robinson?
 8                    MR. BENNETT:  Objection.
 9                    MS. LAZZARO:  Objection.
10   A.      No, he didn't.
11   Q.      Did Ms. Robinson convey to you being upset
12   about Mr. De Niro not meeting with her?
13                    MR. BENNETT:  Objection.
14                    MS. LAZZARO:  Objection.
15   A.      Yes.
16   Q.      What did Ms. Robinson convey to you about Mr.
17   De Niro's refusing to meet with her?
18                    MR. BENNETT:  Objection.
19                    MS. LAZZARO:  Objection.
20   A.      It was just her disbelief, you know, that he
21   wouldn't answer phones or texts or e-mails or
22   voicemails, or -- it was very, very, very upsetting to
23   her.  It was upsetting, the whole thing was upsetting.
24   At that point I was not talking to him, I was talking to
25   her, I was hearing her side of it.  But yeah, I remember
```



Page 169

```
 1                    ROBIN CHAMBERS
 2    that it was just -- she was very upset of course.
 3    Q.      You recall that Ms. Robinson was -- let me
 4    restate the question.  You resigned -- let me try a
 5    third time.
 6            You recall that Ms. Robinson's employment ended
 7    in early April of 2019; is that right?
 8    A.      I think so.  I don't know the date or anything,
 9    but yeah, that sounds right.
10    Q.      What was your understanding of what Ms.
11    Robinson's work situation was like in early April 2019?
12                    MR. BENNETT:  Objection.
13    A.      I don't know up until the time that he stopped,
14    you know, responding to her.  It got -- I think it got
15    pretty rough on her emotionally.  I don't remember what
16    precipitated the -- you know, I just don't.  But it was
17    very upsetting for her and I don't remember having a lot
18    of communication with Bob then, so I can't speak to him,
19    but I don't --
20    Q.      When Mr. De Niro would not respond to Ms.
21    Robinson, she became distraught; is that right?
22    A.      Yes, that's very true.
23                    MS. LAZZARO:  Objection.
24                    MR. BENNETT:  Objection.
25    Q.      As far as you know, was Ms. Robinson able to do
```



Page 170

```
 1                    ROBIN CHAMBERS
 2   her job if Mr. De Niro would not communicate with her?
 3                    MR. BENNETT:  Objection.
 4                    MS. LAZZARO:  Objection.
 5   A.      No, that was really hard for her.  She tried
 6   to -- I remember trying to get answers from him.  It
 7   started -- I think, if I remember correctly, it started
 8   off that she would say, that she sent him an e-mail --
 9   she couldn't get an answer from him for certain things
10   so it really hampered her.  I remember him -- again,
11   from Chase, I remember her saying that, yeah, he's going
12   -- I guess, maybe the one communication he might have
13   said, give it to the girls in the office, probably
14   naming their names.  And so he kind of, like, cut her
15   out that way and was dealing directly with the women in
16   his office.  I remember that happening.  And that was --
17   that was, I think, very, very, disturbing for her and
18   very upsetting.
19   Q.      How did Mr. De Niro react to Ms. Robinson's
20   employment ending?
21                    MR. BENNETT:  Objection.
22                    MS. LAZZARO:  Objection.
23   A.      I think he was angry at that time, but I also
24   think he was very hurt at that time.  You know, it was
25   complicated, I think for him too.  He trusted her, he
```



Page 171

                          ROBIN CHAMBERS

1
2    counted on her.  He was used to her.  They were -- they
3    -- you know, it was -- they had a good -- for a long
4    time, I believe had a very good working relationship,
5    way before I came back and kind of was met her and
6    started to work.  So I know it was hard on him, because
7    I know any time there's a change like that in his office
8    it's hard on him.  I do know that for a fact.  But for
9    whatever reason, it happened this way.  And I don't
10   know, I'd be guessing if I said I knew why he stopped
11   talking.
12   Q.     Did Mr. De Niro tell you how he felt about Ms.
13   Robinson's employment ending?
14                MR. BENNETT:  Objection.
15   A.     I don't remember anything specific.  I don't.
16   I couldn't say for sure.  I don't remember anything
17   specific at that moment, the moment that it actually
18   ended.  I don't remember.  I don't remember.  And it's
19   like I don't think I wanted to talk to him too much
20   about it either, I just wanted to -- you know, it's --
21   it was rough.  And I know it was rough on him.  He might
22   have been pissed off, but I know it was rough on him
23   too, so --
24   Q.     Did you wish that Mr. De Niro handled the
25   situation differently with Ms. Robinson?



Page 172

```
 1                    ROBIN CHAMBERS
 2    A.       I do.
 3                    MR. BENNETT:  Objection.
 4                    THE WITNESS:  Yes, I do.
 5    Q.       What do you think that Mr. De Niro could have
 6    done differently?
 7                    MS. LAZZARO:  Objection.
 8                    MR. BENNETT:  Objection.
 9    A.       My whole contention was, is it should have
10    never gotten this far.  Should never have gotten this
11    far.  I think it should have never have gotten this far.
12    And I wish I could have done something about it.  I wish
13    I could have helped.  I wish there was somebody who
14    would have stepped in and gone, wait a minute.  But
15    nobody did.  It should never -- Bob has never been in a
16    thing like this.  I'm sure she's never been in a thing
17    like this.  Somehow this got this far.  It's not who he
18    is, it's not who she is, so I don't know.  But I wish --
19    I'm pissed off about that actually.  I've been angry
20    about that, that nothing could have been done.  This is
21    so unnecessary.  It just was unnecessary.  I don't -- at
22    that point -- because I don't know about all the
23    allegations, I don't know -- because I don't know what
24    is true and what's not true.  But at that point, nobody
25    was so egregious that it couldn't have been solved from
```



Page 173

```
 1                    ROBIN CHAMBERS
 2   my point of view, from what I knew.  Did he do stuff
 3   wrong?  Yes.  Did she do stuff wrong?  Yes.  Were people
 4   -- yes.  But nothing to get to this point.  So that's
 5   bothered me for several years now.  I just felt bad.  I
 6   just felt bad.  And I bet, if you asked -- they can't go
 7   back to grab that emotion again, you know what I mean?
 8   I guess of course you can, because you're in the middle
 9   of a lawsuit, but -- sorry.
10   Q.      Did there come a time when you became aware
11   that Mr. De Niro was refusing to provide Ms. Robinson
12   with a recommendation letter?
13                    MS. LAZZARO:  Objection.
14                    MR. BENNETT:  Objection.
15   A.      I almost forgot about that.  What I think I
16   remember is she did a draft of something, sent it to him
17   and he did not respond to it.  That's what I think I
18   remember and there was school, maybe, that she -- it was
19   something like that that I remember and I don't think he
20   said no, but I don't think he said yes.  I don't
21   remember what happened.  But I think she was asking for
22   something.  I think Tom would -- yeah, I think Tom would
23   remember those things, because it might have gone
24   through Tom.  I don't remember.  But yeah, I remember
25   that, but I don't remember --
```



Page 174

                          ROBIN CHAMBERS

1

2    Q.      Do you recall Ms. Robinson wanting to go to

3    business school?

4    A.      Yes, that was it.  Yes.

5    Q.      And Ms. Robinson sought a letter of

6    recommendation from Mr. De Niro, correct?

7                     MR. BENNETT:  Objection.

8                     MS. LAZZARO:  Objection.

9    A.      Yes.

10   Q.      And did you ever review a draft of the

11   recommendation letter that Ms. Robinson prepared for Mr.

12   De Niro to review?

13   A.      I might have.

14                    MS. LAZZARO:  Objection.

15                    THE WITNESS:  I might have, I can't say

16           for sure.

17   Q.      Did you ever discuss the draft recommendation

18   letter with anyone at Canal?

19                    MR. BENNETT:  Objection.

20   A.      I don't remember.  If anybody -- I would have

21   thought it would have been with Tom or something, but I

22   don't remember.  At that point, she had left, right?

23   This was after she left -- yeah, I don't remember.  I

24   don't remember.

25   Q.      Did you ever speak to Mr. De Niro about why he



Page 175

```
 1                    ROBIN CHAMBERS
 2   was not providing a recommendation for Ms. Robinson?
 3                   MS. LAZZARO:  Objection.
 4                   MR. BENNETT:  Objection.
 5   A.      No, no.  Um, no.  He was angry, she was angry.
 6   He was -- no, I don't remember any specific
 7   conversations, I just knew that he was angry and that
 8   was that.  Because you can, you know, talk him out of it
 9   when he's --
10   Q.      Did you ever communicate with Tom Harvey about
11   why Mr. De Niro was not providing a recommendation for
12   Ms. Robinson?
13                   MR. BENNETT:  Objection.
14   A.      I may have.  I may have, you know.  I think --
15   yeah, we may have talked about it.  We may have, you
16   know -- at that point, I don't think any of the other
17   stuff had come out in the press or anything, so I think
18   at that point we might have discussed it, but I don't
19   remember what, I think Tom -- you know, probably Bob
20   would have passed it on or maybe she sent it -- I just
21   don't remember.  But it wouldn't have been anything, you
22   know -- listen, everybody was still working for Bob at
23   that point, you know.  So I don't know how much we would
24   have discussed it at that point anyway.  Do you know
25   what I mean?  It was --
```



1                    ROBIN CHAMBERS

2   Q.      Did there come a time when you became aware

3   that Ms. Robinson had retained a lawyer?

4   A.      Yes.  And I think that's -- yeah, I think when

5   it became public knowledge.  I think.  I might have

6   heard about it before, but when it became -- when it was

7   in the papers.

8   Q.      When did you first become aware that Ms.

9   Robinson was threatening legal action against Mr. De

10  Niro?

11                  MR. BENNETT:  Objection.

12  A.      I think maybe -- I don't remember who or how,

13  but I think maybe before she filed an action or

14  something I might have heard it from -- I don't know

15  who; either Michael or Tom or Bob.  You know, I just

16  don't remember, but I was vaguely aware of it.  I was

17  surprised.

18                  MR. BENNETT:  Ally, can we please

19           reiterate the instruction that you gave the

20           witness at the opening of this section, we're

21           looking for personal knowledge.  It's just

22           going to make the deposition go far more

23           quickly.

24                  THE WITNESS:  I heard about it, but I

25           don't remember from who.  Is that better?



Page 177

```
 1                    ROBIN CHAMBERS
 2          Sorry.
 3    Q.    How did Mr. De Niro react to Ms. Robinson's
 4    threat to bring a lawsuit?
 5                    MR. BENNETT:  Objection.
 6    A.    He was upset.
 7    Q.    What, if anything, do you recall Mr. De Niro
 8    saying in response to Ms. Robinson's threat to bring a
 9    lawsuit?
10                    MR. BENNETT:  Objection.
11    A.    I don't remember anything specific, I just,
12    again, I remember him being upset and just, you know,
13    couldn't believe it.  That's what I remember.
14                    MR. DROGIN:  Can I just find out what
15             period of time we're talking about here or
16             should we just leave it completely open-ended
17             on the record so no one can tell?
18    Q.    Did you have an understanding --
19                    MR. DROGIN:  I'd ask that you ask the
20             witness to clarify the time period because it's
21             completely open-ended.  If you don't want to,
22             that's fine.  It should just be noted on the
23             record that you have an ambiguous question with
24             an ambiguous answer and you're not correcting
25             it.
```



```
                         ROBIN CHAMBERS
 1
 2    Q.     Ms. Chambers, is it your understanding that --
 3    let me restart that question.
 4           Was it your understanding that it was after Ms.
 5    Robinson's employment ended that she threatened legal
 6    action?
 7                  MR. BENNETT:  Objection.
 8    A.     It's my understanding, yes.
 9    Q.     What, if anything, were you told about the type
10    of lawsuit that Ms. Robinson was threatening?
11                  MR. BENNETT:  Objection.
12    A.     I don't remember being told it was anything
13    other than it was -- I might have talked to Tom, I might
14    have talked to Kaplan, somebody -- I don't remember.
15    Maybe Bob himself, but I don't remember what legal
16    action or what it was about.
17    Q.     Were you in communications with Tom Harvey
18    about Ms. Robinson's threat of legal action?
19                  MR. BENNETT:  Objection.
20    A.     I remember discussing it, but not at length.
21    He's pretty closed mouth about that stuff, you know,
22    even after all these years and it was just -- I think
23    what happened was that we -- this became public
24    knowledge -- not public knowledge yet, that she was
25    going to file a lawsuit, and so that's about the extent
```



Page 179

                        ROBIN CHAMBERS

1

2   of it, because nobody knew any more than that.  And

3   certainly after it became public -- I hadn't had much

4   contact -- I haven't had much contact with Tom for quite

5   a few years.  But I know -- I think we discussed that,

6   I'm pretty sure we did.  But briefly and not in any

7   detail, because I don't think anybody had any details at

8   that point.

9   Q.      Are you aware of Tom Harvey putting together a

10  letter to Ms. Robinson after her employment ended?

11  A.      Vaguely.

12  Q.      Did you ever read the letter that Mr. Harvey

13  sent to Ms. Robinson?

14              MR. BENNETT:  Objection.

15  A.      I don't remember if I did.  I'm sorry, I don't

16  remember.

17  Q.      I'm going to put into the chat a document

18  that's Bate stamped Robinson 00005297 through 5299.

19              Are you able to see that in the chat?

20  A.      I am.

21  Q.      Can you open that document, please?

22  A.      All three of them?

23  Q.      Hold on, let me --

24  A.      Oh, I'm still on storm watch here.

25  Q.      The last PDF.



Page 180

```
 1                    ROBIN CHAMBERS
 2   A.      Okay.  Yes.
 3                    MS. HARWIN:  I'm going to mark that as
 4           Exhibit 10.
 5                    (Whereupon, a document Bate Stamped
 6           Robinson 00005297-5299 was marked as Exhibit
 7           10, for identification, as of this date.)
 8                    THE WITNESS:  Okay yes.
 9   Q.      Do you see that document?
10   A.      I do.
11   Q.      Take the time you need to review the document
12   and when you've completed your review, just let me know.
13           Ms. Chambers, just let us know when you've --
14   A.      Okay, yeah, I'm just on the --
15   Q.      No problem, take the time you need.
16   A.      Okay got it.  I've skimmed through it.
17   Q.      Prior to this deposition, have you ever read
18   this letter before?
19   A.      I may have.  I may have seen a version of it.
20   Or -- again I'm not sure.
21   Q.      Were you shown a version of this letter before
22   it was sent to Ms. Robinson?
23   A.      I don't remember.
24   Q.      Were you shown any drafts of this letter?
25                    MR. BENNETT:  Objection.
```



Page 181

                    ROBIN CHAMBERS

1

2    A.      Could have been, but I just don't remember.

3    You know maybe I'm confusing it with being told about it

4    or told about what was in it.  I just don't know.  I

5    just don't know, I'm sorry.

6    Q.      Okay.  Did anyone interview you in order to get

7    your opinion about the allegations made in this letter?

8                    MR. BENNETT:  Objection.

9                    MS. LAZZARO:  Objection.

10   A.      I do not remember if they did.  Like, who,

11   Alexandra, I'm sorry?  I don't believe like anybody -- I

12   just -- like a lawyer or something like that, no, I

13   don't believe so.  I don't believe I talked to anybody,

14   not even Bob in great extent about this, you know, not

15   -- I was pretty gone myself after this, you know, I

16   haven't --

17   Q.      Are you -- let me restart that question.

18           Did anyone communicate with you about whether

19   the allegations contained in this letter dated July 11,

20   2019 were accurate or not?

21                   MR. BENNETT:  Objection.

22                   MS. LAZZARO:  Objection.

23   A.      Maybe, I don't know.  I don't remember.  But

24   maybe somebody would have said; is this right?  But

25   again, I wouldn't have known about a lot of it.  And I



Page 182

1                    ROBIN CHAMBERS
2   do know that -- I wouldn't have known about a lot of it.
3   I do know that miles and stuff, I don't know if they
4   were gifts from Bob.  I remember having conversations
5   with Chase about gifts of plane tickets and stuff like
6   that or trips because that's what she wanted.  She
7   didn't want things, you know.  Bob would get me things
8   or Kap things or maybe other employees things.  But she
9   -- travel, you know is what she wanted.  So I just don't
10  know what was authorized or not authorized.  But I --
11  yeah, I just don't remember.  I just don't remember.
12          I mean as it reads, it's awful.  As it reads,
13  it's like, wow, but there is, you know, layers to this
14  stuff too, so I don't know.  I don't know.
15  Q.     What do you mean by that?
16              MR. BENNETT:  Objection.
17  A.     Well, I mean --
18              MR. DROGIN:  By what?  By I don't know?
19          You're asking what she means by I don't know?
20              MS. HARWIN:  Mr. Drogin, you can make
21          your objection.
22              MR. DROGIN:  I just did.  I'm asking
23          you to clarify, when she says, I don't know, if
24          that's what you're asking her.
25              THE WITNESS:  If I was to read it --



Page 183

```
 1                      ROBIN CHAMBERS
 2              what I want to say is, if I were to read it as
 3              a layperson who just came in, I'd go wow,
 4              that's a lucky person.  But knowing what I know
 5              about the job that she had and that I had
 6              before her, a lot of it is understandable.  But
 7              I just don't want to come down on either side
 8              of that.  Because I don't know for sure.  I'm
 9              kind of caught, that's why I'm being so
10              wishy-washy about it.  You know, I know how
11              generous he can be and certainly was with me.
12              And there's a lot of things I didn't like about
13              the job, you know, so that's why I can't say.
14              Looking at it like that, if I were to hand it
15              to my neighbor or something, they would go, oh,
16              that's amazing, but -- but, so I can't -- I
17              just don't know.
18      Q.      Are there aspects of this letter that you
19      perceive as misleading?
20                      MR. BENNETT:  Objection.
21                      MS. LAZZARO:  Objection.
22      A.      No, I don't know enough to know that.  I don't
23      know enough to know that.
24      Q.      Are you aware of Ms. Robinson ever engaging in
25      unauthorized transactions during her employment?
```



Page 184

```
1                       ROBIN CHAMBERS
2                       MR. BENNETT:  Objection.
3                       MS. LAZZARO:  Objection.
4    A.      No.
5    Q.      Are you aware of Ms. Robinson ever abusing Mr.
6    De Niro's trust?
7                       MR. BENNETT:  Objection.
8                       MS. LAZZARO:  Objection.
9    A.      No.
10   Q.      Are you aware of Ms. Robinson ever taking
11   advantage of Mr. De Niro?
12                      MR. BENNETT:  Objection.
13                      MS. LAZZARO:  Objection.
14   A.      No, not -- every -- when I -- I got a bit
15   jealous, you know, he would say, oh, I sent her to Spain
16   or something like that.  I'd go that's great, but in my
17   head I was going darn, why couldn't -- you know.  But
18   no.  You know, if you look at it, it's like this:  If
19   you're an employee, let's use me for instance, and
20   you're looking at her jetting off to these places and
21   Bob has okayed it as a Christmas gift or whatever or
22   just okayed it, then it's like great, but what about me?
23   You know, it's that kind of thing.  But in that, you'd
24   go, wow, she's really lucky.  But taking advantage?  I
25   don't know.  I don't know.  As far as I heard from
```


MAGNA
LEGAL SERVICES

Page 185

```
 1                    ROBIN CHAMBERS
 2   Chase, Bob okayed this.  And I never spoke to Bob about
 3   it, so I can't say he did or did not.  So I'm not that
 4   -- you know, does that make sense?
 5                  MR. DROGIN:  Next question.
 6                  MR. BENNETT:  Counsel, please, please,
 7           please, issue a clarifying instruction with
 8           respect to the questions and personal
 9           knowledge.  That was an incredibly -- that was
10           a response that contained a lot of narratives
11           ultimately ending in an answer with I don't
12           know.
13                  MS. HARWIN:  There's a clarification,
14           and there's no need for further clarification
15           at this point.
16                  MR. DROGIN:  We disagree and we think
17           it should also be known that Defense Counsel
18           will have quite a few questions for the witness
19           as well.  So the shorter the answers, the
20           sooner we're done.  I know you want to take a
21           break at 2:30, we promised the court reporter a
22           break at 2:30, we have quite a few questions as
23           well.  So it's your witness, but it's going to
24           be an extremely long evening.
25   Q.      Ms. Chambers, turning your attention to the
```



Page 186

                        ROBIN CHAMBERS

1    second page of this exhibit, you can see a paragraph

2    that begins, "interestingly", referring to the trip that

3    Ms. Robinson took to Los Angeles.

4    A.      Is that back in that chat?

5    Q.      Yes.  Same document.

6    A.      Okay.  Second paragraph?

7    Q.      On the second page, the paragraph

8    "interestingly".

9    A.      Yes, I see it.

10   Q.      Based on your knowledge, does this paragraph

11   tell the full story concerning the trip that Ms.

12   Robinson took to Los Angeles in March 2018?

13                   MR. BENNETT:  Objection.

14   A.      I don't know.  I don't know.

15   Q.      Based on what you recall about this trip to Los

16   Angeles in March 2018, does this letter tell the full

17   story about that trip Ms. Robinson took?

18                   MR. BENNETT:  Objection.

19                   MS. LAZZARO:  Objection.

20   A.      Let's see.  You know, can I close it now so --

21   Q.      Sure.

22   A.      What I remember from that was that we all --

23   that was very exciting to have everybody sign these taxi

24   books.  I don't remember the details of whether they



Page 187

```
                        ROBIN CHAMBERS
 1
 2   were out or not.  I don't remember if she took them out,
 3   if we mailed them too her.  Michael Kaplan might know
 4   that.  And I don't -- yeah, I have no knowledge of that.
 5   I don't know for sure anything about that, I was
 6   separated enough from that.
 7                  MS. HARWIN:  Okay.  Well, this could be
 8           a good time for us to start our break and then,
 9           Ms. Chambers when would you like to come back?
10                  THE WITNESS:  Well, is an hour too
11           much?  45 minutes?  What do you usually do?  I
12           can use as much time as I can get, I have
13           animals to take care of, I'm so sorry.
14                  MR. BENNETT:  Just so everyone
15           understands, defendants probably has an hour
16           and a half to two hours of questions, just so
17           everyone is aware of that.
18                  THE WITNESS:  Can I ask you, would it
19           have to be this evening?
20                  MR. BENNETT:  Unfortunately yes.
21           Because we have -- we're operating under a
22           deadline to complete it.  We can take as much
23           time as you'd like, this is Counsel's
24           deposition.
25                  MS. HARWIN:  I'm happy to take 45
```



Page 188

```
 1                    ROBIN CHAMBERS
 2          minutes to an hour, whatever you prefer, Ms.
 3          Chambers.
 4                    THE WITNESS:  Why don't we -- why don't
 5          we try this, I'm trying -- you know, I'm the
 6          only one here.  I tried to get somebody to help
 7          me do what I need to do, but I couldn't find
 8          anybody.  So that's why I'm in a bit of crunch.
 9          So why don't we do a half an hour now and then
10          could we do like a half an hour at 4:30?
11                    MS. HARWIN:  That's fine with me.
12                    THE WITNESS:  Is that -- I know it's --
13          I'm sorry, but --
14                    MS. HARWIN:  So why don't we return at
15          3 o'clock.
16                    THE WITNESS:  3 o'clock and then maybe
17          at 4:00, 4:30, that would be okay?
18                    MS. HARWIN:  Sure.
19                    MR. DROGIN:  Ally, do you have a sense
20          as to how much more you have?
21                    MS. HARWIN:  I don't right now.
22                    MR. DROGIN:  Will you get back to us by
23          tomorrow?
24                    MS. HARWIN:  By tomorrow?
25                    MR. DROGIN:  I'm kidding.  It's an
```



Page 189

```
                          ROBIN CHAMBERS
 1
 2          inside joke, with you Ally.  Because you always
 3          need extra time.  It always seems like you need
 4          a long time to get back with a simple -- you
 5          know, a simple answer.
 6                    MS. HARWIN:  Yeah, I got that.
 7          Alright, okay, well, we're off the record.
 8                    THE WITNESS:  Okay.  We're back at
 9          3:00.
10                    MS. HARWIN:  Sounds good.  Thank you.
11                    THE VIDEOGRAPHER:  Going off the record
12          at 2:27 p.m.
13            (Whereupon, a short break was taken.)
14                    THE VIDEOGRAPHER:  Back on the record
15          3:02 p.m.  Go ahead.
16   Q.     Ms. Chambers, you understand you're still under
17   oath?
18   A.     Yes, I do.
19   Q.     In 2018 or 2019, did you communicate with Tom
20   Harvey about any of the concerns that Ms. Robinson was
21   raising to you about her experiences at Canal?
22                    MR. BENNETT:  Objection.
23                    MS. LAZZARO:  Objection.
24   A.     I'm sure I did, but I just don't remember.  I
25   just don't remember that.
```



Page 190

1                    ROBIN CHAMBERS

2    Q.      Do you recall ever speaking to Tom Harvey about

3    Ms. Robinson's concerns about harassment?

4                    MR. BENNETT:  Objection.

5                    MS. LAZZARO:  Objection.

6    A.      I don't -- I don't think I would have had that

7    conversation, but I don't remember.  Tom might.

8    Q.      Turning back to a question that I had raised

9    before, do you recall what phone numbers you used to

10   communicate with Mr. De Niro?

11   A.      Just probably only his cell phone.  And

12   probably -- he's got two now.  And I used the 209 one.

13   But there was another one before that.  So I can look if

14   you'd like.  I just powered down so --

15   Q.      The second cell phone that Mr. De Niro had was

16   the 750 number?

17   A.      I think that's the one, but I will double

18   check.  So, yes, the 750-7142.  But mostly lately, for

19   like a year or more, maybe two years, I've used the 209,

20   which is the better way to reach him now, for me.

21   Q.      Okay.  So prior to 2020, you would -- you would

22   also be using the 750 phone number for Mr. De Niro?

23                    MR. BENNETT:  Objection.

24   A.      I believe so, yes.

25   Q.      Thank you.  You can power down your phone



Page 191

```
 1                    ROBIN CHAMBERS
 2  again.
 3  A.      I did, I did.
 4  Q.      Oh, you're ahead of the game.
 5          After Ms. Robinson threatened legal action
 6  against Canal, are you aware of Canal undertaking an
 7  investigation into Ms. Robinson?
 8                    MR. BENNETT:  Objection.
 9  A.      No.  No, I don't believe so.  No.
10  Q.      Did there ever come a time when you learned
11  that Ms. Robinson was being investigated?
12                    MS. LAZZARO:  Objection.
13                    MR. BENNETT:  Objection.
14  A.      I don't remember ever knowing that, other than
15  maybe internal stuff, you know.  But an outside thing,
16  no.  I don't think -- I'm sure -- I remember at some
17  point, they were saying, save e-mails, save, that kind
18  of thing.  But nothing beyond that.
19  Q.      Did there come a time when you learned that Ms.
20  Robinson was under internal investigation at Canal?
21                    MR. BENNETT:  Objection.
22                    MS. LAZZARO:  Objection.
23  A.      I knew that they were asking me and everybody
24  else to save e-mails and stuff at some point way later
25  on.  But I'm -- my computer is not a Canal computer.  I
```



Page 192

                              ROBIN CHAMBERS
1
2    never had a -- long ago, an old Canal voicemail.  So I
3    never saved anything, which I guess became problematic
4    for people.  But that's the only time I heard.  But when
5    it came to me, when they asked me and I was like, I
6    don't save anything.  So --
7    Q.    Did anyone associated with Mr. De Niro or Canal
8    ask you questions about Ms. Robinson's expenses?
9                         MS. LAZZARO:  Objection.
10                        MR. BENNETT:  Objection.
11   A.    I don't remember if they did or not, but I
12   wouldn't have known exactly.  I wasn't in that close.
13   In theory -- but you guys don't like me to answer in
14   that way.  So no, I don't remember that.  No.
15   Q.    Do you remember -- let me ask it a different
16   way.
17         Did Tom Harvey ever interview you concerning
18   any matters relating to Ms. Robinson?
19                        MS. LAZZARO:  Objection.
20                        MR. BENNETT:  Objection.
21   A.    He never interviewed me like that, Alexandra,
22   it wasn't formal with us.  I've known him for so long,
23   and it might have been conversations.  But no, no.  No
24   interview.  No, no.  Maybe a question.  Maybe do you
25   remember this?  Did this happen?  Yes, no, yes.  I don't



Page 193

                          ROBIN CHAMBERS

1

2      remember.  Something like that, yes, I remember.  Did

3      you know about this?  He might have -- I recall him

4      asking me about the mileage, but I didn't know about it.

5      Whether Bob said, here this is a gift or not.  I had no

6      knowledge of that, which I told him.  So he would ask me

7      quick questions.  But he never, like, interviewed me or

8      grilled me or -- you know.

9      Q.      Mm-hmm, mm-hmm.  Were you aware that Michael

10     Kaplan was compiling information concerning Ms.

11     Robinson?

12                     MR. BENNETT:  Objection.

13                     MS. LAZZARO:  Objection.

14     A.      Yes.

15     Q.      What information did you understand Mr. Kaplan

16     was compiling concerning Ms. Robinson?

17                     MR. BENNETT:  Objection.

18     A.      Michael told me that he was asked to go through

19     e-mails and stuff like that and he was doing it, which,

20     I think everybody had to do.  I had to do it.  So that

21     was how I heard about it.  But again, that was -- you

22     know, I didn't see anything, he didn't send me anything

23     and show me anything.  He just said they're asking me to

24     do this, to get all this stuff, so --

25     Q.      And when was this that you were asked to look



Page 194

```
 1                    ROBIN CHAMBERS
 2   into your e-mails concerning Ms. Robinson?
 3                    MS. LAZZARO:  Objection.
 4                    MR. BENNETT:  Objection.
 5   A.      I think maybe before COVID.  Yes, before COVID.
 6   Yeah, yeah, before COVID definitely.
 7   Q.      During the summer of 2019, after Ms. Robinson's
 8   employment ended, were you asked to review any records
 9   relating to Ms. Robinson?
10                    MS. LAZZARO:  Objection.
11   A.      No, I don't remember anybody asking me or
12   showing me anything.  No.
13   Q.      What was your understanding of the purpose of
14   the investigation that Canal conducted into Ms.
15   Robinson?
16                    MR. BENNETT:  Objection.
17   A.      I don't know if I knew if there was any.  I
18   just knew that they wanted e-mails and texts.  But I
19   don't know what they were looking -- I just don't.  I
20   just don't.  I don't know what they wanted out of mine,
21   you know.  I don't know.
22   Q.      Mm-hmm.  Do you have any understanding as to
23   why Canal began investigating Ms. Robinson?
24                    MR. BENNETT:  Objection.
25   A.      No -- well, I -- no.
```



Page 195

```
 1                    ROBIN CHAMBERS
 2   Q.      Do you have any understanding as to who
 3   participated in Canal's investigation into Ms. Robinson?
 4                  MS. LAZZARO:  Objection.
 5                  MR. BENNETT:  Objection.
 6   A.      As it was explained to me, I had to give them
 7   my computer and whatever records or that, because it was
 8   a business thing even though, you know, I didn't want to
 9   argue the point, but we had nothing -- I had nothing to
10   hide.  So I assumed -- I made the assumption that it was
11   because of this lawsuit.
12   Q.      Mm-hmm.
13   A.      But no one told me specifically.  They just
14   wanted to look at my stuff.
15   Q.      Mm-hmm.  Did there come a time when you became
16   aware that Mr. De Niro was planning a lawsuit against
17   Ms. Robinson?
18                  MS. LAZZARO:  Objection.
19                  MR. BENNETT:  Objection.
20   A.      Yes.
21   Q.      When did you become aware that Mr. De Niro was
22   planning a lawsuit against Ms. Robinson?
23                  MS. LAZZARO:  Objection.
24                  MR. BENNETT:  Objection.
25   A.      I do not remember, Alexandra, I'm sorry.
```



Page 196

```
                        ROBIN CHAMBERS
1
2   Q.      Were you informed in advance that Mr. De Niro
3   would be filing a lawsuit against Ms. Robinson?
4                   MR. BENNETT:  Objection.
5                   MS. LAZZARO:  Objection.
6   A.      I don't remember.  I just don't know.
7   Q.      How did you learn that a lawsuit had been filed
8   against Ms. Robinson?
9   A.      I may have -- I don't know.  I would be
10  guessing and that's what you don't want me to do.  I
11  wasn't communicating with too many people then, I never
12  really did.  It was Chase, Kap and Tom.  But no, nobody
13  ever formally came to me and said guess what, I just
14  knew it.  It just became knowledge.
15  Q.      Did you learn about the lawsuit against Ms.
16  Robinson by reading the papers?
17  A.      I think I heard about it before, but I don't
18  remember by who or when.
19  Q.      Did you ever speak to Mr. De Niro before the
20  lawsuit was filed about the plan to file a lawsuit
21  against Ms. Robinson?
22                  MS. LAZZARO:  Objection.
23                  MR. BENNETT:  Objection.
24  A.      Not really, no.
25  Q.      Did you speak to him at all about the
```



Page 197

                         ROBIN CHAMBERS
1
2    contemplated litigation?
3                   MS. LAZZARO:  Objection.
4    A.      Yeah, but I wasn't communicating with him in
5    that respect.  And to be perfectly honest, it was really
6    rough.  It was a rough time for everyone around this
7    whole situation, so -- and I don't have that kind of
8    relationship with him anymore.  I used to, I don't
9    anymore.  And I knew how he felt, and I knew the
10   emotions behind it.  So it's nothing that I would have
11   brought up to him.  You know, I would not have said, so
12   what you are doing or why -- it would not have been that
13   at all.  It just was -- you know, you just step back
14   from it, try and keep your head down, do your work and
15   it just --
16   Q.      Before Canal filed its lawsuit against Ms.
17   Robinson, did anyone speak with you to confirm whether
18   the allegations in the lawsuit were accurate?
19                   MS. LAZZARO:  Objection.
20                   MR. BENNETT:  Objection.
21   A.      I don't believe so, no.  And you know, it was
22   Tom who called to ask a quick question, but it was
23   literally, do you remember this?  No, okay, bye.  That
24   was it.  It was no conversations.  No tell us what you
25   know.  Nothing like this that we're doing today, so --



Page 198

```
 1                    ROBIN CHAMBERS
 2   Q.      Do you have an understanding about when Mr. De
 3   Niro made up his mind to bring a lawsuit against Ms.
 4   Robinson?
 5                    MR. BENNETT:  Objection.
 6   A.      I don't.
 7   Q.      Do you have any understanding of how Canal came
 8   up with the allegations that it put in the lawsuit
 9   against Ms. Robinson?
10                    MR. BENNETT:  Objection.
11                    MS. LAZZARO:  Objection.
12   A.      I don't.  I was not -- again, I wasn't in the
13   office, so I don't know who they spoke to or -- they
14   didn't speak to me.
15   Q.      What was your reaction to learning that Mr. De
16   Niro was planning to file a lawsuit against Ms.
17   Robinson?
18                    MS. LAZZARO:  Objection.
19                    MR. BENNETT:  Objection.  She didn't
20            testify to that.
21   A.      For me, I was -- yeah, I was really sad about
22   it.  I -- you know, I was really sad about it.  It's
23   just a double-edged sword, like I said, I know both of
24   these parties and it was hard and no matter -- I don't
25   know.  I understand the anger on one hand on everybody's
```



Page 199

                         ROBIN CHAMBERS
1
2    side and I just -- again, I hate that it got this far.
3    So -- it just -- it made me sad and I was so deeply far
4    away from it at that point, because I wasn't talking to
5    Chase anymore.  And it was just -- they handled it
6    within Canal and I was not a part of Canal.  I was a
7    separate thing, you know.
8    Q.     Did you ever become aware that Canal's
9    allegations were brought to the Manhattan District
10   Attorney's office?
11                  MR. BENNETT:  Objection.
12                  MS. LAZZARO:  Objection.
13   A.     I remember hearing about that, yes, I do.  But
14   I don't remember who or when.
15   Q.     How did you come to learn that Canal had
16   brought its allegations to the Manhattan District
17   Attorney's office?
18                  MR. BENNETT:  Objection.
19   A.     I don't remember.  Sorry, I don't remember.
20   Q.     Did you ever speak to Mr. De Niro about Canal's
21   allegations going to the Manhattan District Attorney's
22   office?
23                  MR. BENNETT:  Objection.
24   A.     I don't remember.
25   Q.     Do you have any understanding about whether Mr.



Page 200

```
 1                    ROBIN CHAMBERS
 2  De Niro wanted Ms. Robinson to be criminally prosecuted?
 3                    MR. BENNETT:  Objection.
 4                    MS. LAZZARO:  Objection.
 5  A.      I don't know that.  I wouldn't know that.
 6  Q.      Do you have any understanding about why Mr. De
 7  Niro wanted to bring his allegations to prosecutors?
 8                    MR. BENNETT:  Objection.
 9                    MS. LAZZARO:  Objection.
10  A.      No, I have no idea.
11  Q.      How did you react to learning about Canal
12  bringing its allegations against Ms. Robinson to
13  criminal prosecutors?
14                    MR. BENNETT:  Objection.
15                    MS. LAZZARO:  Objection.
16  A.      I think the same -- it's how I feel today.
17  It's still very sad to me.  You know, the allegations
18  that were made are sad.  Yeah, that was my reaction.
19  That was my reaction.  And -- well, yeah.
20  Q.      Are you aware of what media strategy Mr. De
21  Niro had when he brought a lawsuit against Ms. Robinson?
22                    MS. LAZZARO:  Objection.
23                    MR. BENNETT:  Objection.
24  A.      No.
25  Q.      Are you aware of any of the media outrage
```



Page 201

```
 1                    ROBIN CHAMBERS
 2   relating to Canal's lawsuit against Ms. Robinson?
 3   A.       No.
 4                    MS. LAZZARO:  Objection.
 5                    MR. BENNETT:  Objection.
 6   Q.       Did you ever communicate with Mr. De Niro about
 7   any media coverage of this lawsuit?
 8   A.       Never.
 9                    MR. BENNETT:  Objection.
10   Q.       Do you consider Mr. De Niro to be savvy when it
11   came to interacting with the media?
12                    MS. LAZZARO:  Objection.
13                    MR. BENNETT:  Objection.
14   A.       Do I consider him savvy when interacting --
15   yeah, he doesn't interact with them very much, so, yeah.
16   Q.       Mr. De Niro would be fairly limited in his
17   interactions with the media?
18   A.       When I was around, he was much more private
19   and -- yeah.  Yes.
20   Q.       Are you aware of Mr. De Niro ever using the
21   media for his benefit?
22                    MR. BENNETT:  Objection.
23   A.       No, I don't believe that's his style.  I don't
24   believe so, no.
25   Q.       Looking back to the time before Ms. Robinson's
```

Page 202 of 318

Page 202

```
 1                    ROBIN CHAMBERS
 2   employment at Canal ended, what qualities did Mr. De
 3   Niro value in Ms. Robinson?
 4                    MR. BENNETT:  Objection.
 5   A.     I think all of the things that would drive
 6   everybody else crazy, which is her relentlessness, and
 7   you know, going after something, it would drive
 8   everybody crazy, but he liked it.  You know, he valued
 9   that.  Like when she dealt with Canal's insurance,
10   things like that, she was pretty into that, if I
11   remember.  And trying to do good things.  And so I think
12   he really liked that.  I think he trusted her, her
13   loyalty.  I know that because he said it to me, and he
14   counted on her.  So I guess -- and she was smart and she
15   did -- you know, dealt with a lot of the lawyers, not
16   just Tom Harvey, but before that other lawyers and
17   agents, I think, and she took a lot off his plate and
18   took it on her own, and I think he really valued that
19   until, you know, it started to break down however it did
20   so --
21   Q.     Did Mr. De Niro -- let me restart my question.
22          Did you know Ms. Robinson to be an honest
23   person?
24   A.     From what I knew, I absolutely believed -- she
25   had no reason to lie to me, so I did believe her.  I
```



Page 203

```
 1                    ROBIN CHAMBERS
 2   believed her on everything.  She was very forthcoming
 3   with me.  So I had a good relationship with her, I
 4   thought, for my part.  Like I said, there was such an
 5   age difference, we weren't best friends, but I think we
 6   got along really well, and -- you know, so, yeah.
 7   Q.       Did you know Ms. Robinson to be honest in her
 8   dealings with Mr. De Niro?
 9                    MR. BENNETT:  Objection.
10   A.       Yes.  From -- yeah, I always -- you know, yeah.
11   She would tell me, okay, I told Bob this, we're doing
12   this, I'm doing that.  So I had no reason to believe
13   that she would lie to me about it.
14   Q.       What qualities did you value in Ms. Robinson
15   when you worked with her?
16                    MR. BENNETT:  Objection.
17   A.       I think it's -- I think the fact that she was
18   really detail-oriented and I really enjoyed working with
19   her to help Toukie Smith.  That got really intense for a
20   while and it was so much stuff we uncovered and we were
21   so proud of ourselves that we discovered cars in a
22   garage for years that was costing them thousands that
23   nobody knew about, that there was apartments she never
24   went to, there were storage places, there were bank
25   accounts.  There were -- you know, I remember -- how, I
```



Page 204

```
  1                    ROBIN CHAMBERS
  2    don't know she did it.  But she got Toukie a passport
  3    without Toukie having to go anywhere.  It just -- you
  4    know, there was a lot -- that I value, because again,
  5    I've known Toukie for many years and, you know, through
  6    Bob, of course through my job.  And I cared about her,
  7    and I knew she was going through a really -- it was a
  8    really challenging time in her life, her health and
  9    everything else.  So I really got to see Chase do really
 10    good stuff there.  Where Chase and I disagreed, was
 11    there was a health advisor who I absolutely put my faith
 12    in, who I just was -- who Bob introduced me to, who was
 13    amazing, Chase didn't trust her.  So Chase and I would
 14    butt heads on that, you know, I would say no, no, no
 15    you're wrong, she did this and this.  And Chase would go
 16    no, no you're wrong.  But I liked the way she worked
 17    like that, because it was very similar to what I did.  I
 18    cared about the details.
 19    Q.      Mr. De Niro struggles with ████████is that
 20    right?
 21                    MR. BENNETT:  Objection.
 22    A.      Yes.
 23    Q.      To your knowledge, has Mr. De Niro struggled
 24    with any ███████████████████
 25                    MR. BENNETT:  Objection.
```



Page 205

                        ROBIN CHAMBERS

1    A.      No.

2    Q.      Are you aware of Mr. De Niro ever ███████████
     █████████

5               MR. BENNETT:  Objection.

6    A.      No, not when I was there.  Not in my -- no.

7    Q.      To your knowledge, for how long had Mr. De Niro

8    struggled with ████████

9               MR. BENNETT:  Objection.

10   A.      I think, you know, it's a -- ███████████████
     █████████████████.  Bob helped me get ████ in that

12   job, so I love him and will always love him for that.

13   ███████████████████████████  And so I

14   have and enormous amount of compassion for ████████████
     ███████████████████████████  You

16   know, so I think Bob is so functioning and so well

17   functioning.  But I think for a long time, as I did,

18   █████████████, you know.  But when I was working for

19   him, ██ didn't impact him a lot.  It impacted -- ██
     ██████████ impacted me a lot more than ██ impacted ████

21   But again, he was very generous and you know, when I

22   said I want to go to a ██████ he goes -- the joke was,

23   he goes, well, can you wait a couple of years.  And we

24   laughed and I went in a few months, you know.  So I'm

25   forever grateful for that.  But sure, it's a progressive



```
                                                         Page 206
 1                     ROBIN CHAMBERS
 2   thing.  So as we get older and have it longer it's
 3   tougher.
 4   Q.        Has Mr. De Niro struggled with ████████
 5   throughout the time that you've worked for him?
 6                  MS. LAZZARO:  Objection.
 7                  MR. BENNETT:  Objection.
 8   A.        There were probably years where I didn't know
 9   it was a ██████ or not because ██ was ████████  You
10   know what I mean?  So I can't speak to that.  But --
11   it's so hard for me to get inside his mind.  You know,
12   he was -- I don't think that -- I'm sure there were
13   problems, but not that I remember.  He was younger, you
14   know, it's just -- I think it was common knowledge when
15   he divorced Grace Hightower the first time there were
16   big allegations of that in the papers.  So I'm not
17   speaking out of school or taking his inventory or
18   anything, but I think he -- I don't know if he
19   struggled, but I'm sure he was aware of it.
20   Q.        Mm-hmm.  As far as you know, Mr. De Niro was
21   dealing with ████████ during the last 20 years; is
22   that correct?
23                  MR. BENNETT:  Objection.
24   A.        I don't know if dealing is the right word.  I
25   don't know.  I don't know -- because you got it so
```



Page 207

```
 1                    ROBIN CHAMBERS
 2    obviously you're dealing with it, you know.  But I don't
 3    know, we weren't that close.  I don't know if he was
 4    ███████   I don't know any of that stuff, any of that.
 5    Q.     As far as you know, does Mr. De Niro consider
 6    himself to be an ████████████
 7                    MR. BENNETT:  Objection.
 8                    MS. LAZZARO:  Objection.
 9    A.     I don't know.  You know he's pretty -- no, we
10    don't have that conversation.  He certainly knows my
11    history because he's been through it with me, but um, he
12    uh, no, it's just something that -- that -- it's not
13    something that we discussed, not now.  We used to, but
14    not now.  You know, years and years and years ago, in my
15    early ████████  he was always very curious.
16    Q.     Do you recall Mr. De Niro using any particular
17    terminology to describe his █████████████████████
      ██ ██████████
19                    MS. LAZZARO:  Objection.
20                    MR. BENNETT:  Objection.
21    A.     No.
22    Q.     Since you've known Mr. De Niro, how many times
23    has he been in ███████████████████?
24                    MR. BENNETT:  Objection.
25    A.     ██████████████████████
```



Page 208

```
 1                    ROBIN CHAMBERS
 2    Q.        ██████████████████████████████
      ██    ████████████
 4                    MR. BENNETT:  Objection.
 5    A.        It was not too many years ago, right -- around
 6    Chase was involved then.  And Chase -- I wasn't
 7    involved.  A lot of people knew, I didn't.  Chase knew,
 8    but never told me.  Maybe Tom knew.  But I never knew
 9    until his ██████-- he was quite into it there.  You
10    know, I didn't know about ████████████████ or anything.
11    I wasn't a part of that.  So it was pretty kept -- as it
12    should have been -- pretty private.  And um, yeah, and
13    then I never discussed it with him.
14    Q.        Have you ever observed Mr. De Niro ██████
15                    MS. LAZZARO:  Objection.
16    A.        I suppose so, yeah, I'm sure.  Yeah.  Yes.
17    Q.        And what is your recollection of Mr. De Niro's
18    behavior when he's ██████
19                    MS. LAZZARO:  Objection.
20                    MR. BENNETT:  Objection.
21    A.        ████████████████████████  ██████████████████
      ██   ████████   ██████████████████████████████████████
23    Q.        Are you aware of Mr. De Niro ever becoming --
24    A.        But this is years ago, because I'm not around
25    him like that.  I was with him 24/7 up until 2003.  I
```



```
                           ROBIN CHAMBERS
 1
 2     was on every plane, every car, I was there, so I got
 3     to -- but nothing since then.  It's not been the same
 4     job.  In fact -- yeah, it was not the same job.  I
 5     wasn't around him.  I just did what I did because I knew
 6     it had to be done.  So --
 7     Q.      Mm-hmm.
 8     A.      I didn't have any supervision from him.
 9     Q.      Are you aware of Mr. De Niro's ████████████
       ████████████████████████?
11                  MS. LAZZARO:  Objection.
12                  MR. BENNETT:  Objection.
13     A.      It's so hard for me to comment on that.  You
14     know, I'm sure, but I don't know for sure.  I'm not a
15     doctor, I'm not -- that's hard for me.  That's hard.
16     Q.      Have there ever been times where you had to
17     remind Mr. De Niro of conversations you've had with him
18     when he was ███████
19     A.      Yes, yes.
20                  MR. BENNETT:  Objection.
21                  MS. LAZZARO:  Objection.
22     Q.      At times Mr. De Niro has ████████████
       ████████████████████████████████████████████████████
       ███████████, correct?
25                  MS. LAZZARO:  Objection.
```



Page 210

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3    A.      Yes, I've had to remind him of things that he
 4    said yes or no to when he was ███████████████████
      ██████████████████.  He's so crazy busy, there's so
 6    much that goes on, you know, that -- yeah, but I'd go
 7    no, no, you said this.  Or he'd go, oh, yeah, yeah,
 8    yeah.  But that had nothing to do with ████████  There
 9    was a million questions when I worked for him as an
10    assistant that I would ask him on one phone call, so --
11    Q.      Mr. De Niro was dealing with a lot of different
12    things at any given time; is that fair to say?
13    A.      When I worked for him, yes.  In Chase's
14    capacity, yes.
15    Q.      And during the period from 2016 to 2019, when
16    you were working with Mr. De Niro, he was often dealing
17    with a lot of things at once; is that fair to say?
18    A.      No, I wasn't working with him.  I was working
19    with Chase and Kap and Tom and Michael Tasch and the
20    periphery people.  I wasn't working with him, except
21    when he wanted to sit down and do one specific task on
22    the seventh floor.  We'd go over stuff that he would
23    have to label, things that I couldn't remember who was
24    who, he'd come over, we would work for a couple of
25    hours.  That was a specific thing.  I didn't know about
```



Page 211

```
                           ROBIN CHAMBERS
 1
 2   his movies, his life, anything like that, unless he
 3   chose to tell me.  I met, you know, the girlfriend and
 4   stuff like that, but only just because he wanted me to.
 5   But I did not work with him like that at all.
 6   Q.      Okay.  It was a fairly common occurrence that
 7   you would need to remind Mr. De Niro of things that you
 8   would discuss with him before; is that fair to say?
 9                   MS. LAZZARO:  Objection.
10                   MR. BENNETT:  Objection.
11   A.      Not all the time.  Because he has also -- by
12   the same token, he's got a memory like an elephant.  So
13   it's that weird thing, you know, he can remember stuff
14   like, 30 years ago, which I completely forgot, but yet,
15   he can, like -- here's a very good example:  I had to
16   borrow ███████ from Bob, and Chase helped me, it was my
17   grandson who had to go to -- blah, blah, blah.  I ended
18   up paying him back, I told him I paid him back.  He
19   forgot I paid him back.  I had to have everybody
20   around -- you know, everybody said, no, no, he gave it
21   to you, it was a gift.  And I said, no, no, I don't
22   care, I'm paying him back and I paid him back.  He
23   didn't remember that and I had a huge argument with him
24   about that.  So it's that kind of thing.  And that was
25   within a couple of years, but he can, you know, he can
```



MAGNA ▶
LEGAL SERVICES

Page 212

1                    ROBIN CHAMBERS

2   remember something -- he can forget what I tell him.  If

3   I run a list by him, I used to be able to run a list by

4   him, he'd forget those things and I'd have to remind

5   him, so it's kind of weird.

6   Q.      After Ms. Robinson brought her lawsuit against

7   Mr. De Niro, did you have any conversations with Mr. De

8   Niro about it?

9                    MR. BENNETT:  Objection.

10  A.      I'm sure I did, I know I did, but we never

11  discussed the legal aspects.  It was always the

12  emotional part of it.  You know, he would just -- I

13  remember him saying -- and God, I hope this is okay.  I

14  remember him saying, I don't want a lawsuit, I don't

15  want to do this.  I remember him saying that, you know,

16  he just -- I just -- you know, but we never talked about

17  the legal stuff of it or we never got into it like that.

18  It just was all the emotional components.  And briefly.

19  Like, ah, I feel bad or I'm pissed or I'm still pissed,

20  but just a remark.  There was no in depth conversation.

21  Q.      Who was Mr. De Niro pissed off about?

22                   MR. BENNETT:  Objection.

23                   MS. LAZZARO:  Objection.

24  A.      I don't remember.  I don't remember.  Just the

25  whole thing, I guess.  Just the whole thing, you know.



Page 213

```
 1                    ROBIN CHAMBERS
 2              MR. DROGIN:  Just ask the witness not
 3         to guess.  Each time you use the word guess,
 4         the answer is meaningless.
 5              THE WITNESS:  Sorry, sorry.
 6              MR. DROGIN:  Would you agree, Ms.
 7         Harwin?  Each time the witness uses the word
 8         guess the answer is meaningless, because we're
 9         not here to play guessing games, yes?
10              MS. HARWIN:  This is not the time for a
11         colloquy.
12              MR. DROGIN:  I'm just trying to keep it
13         short.
14 Q.      Ms. Chambers, when Mr. De Niro said he didn't
15 want a lawsuit, what more was said on that topic?
16              MR. BENNETT:  Objection.
17              MS. LAZZARO:  Objection.
18 A.      That is just about it.  It was like, you know,
19 it was on a day where that's how he felt, you know, it's
20 like -- this is not what he likes to do and I know that
21 for a fact.  It's -- you know, he's not -- he's not that
22 kind of a guy, I don't think.  He just -- you know, he
23 doesn't hold grudges.  He gets mad and that's what I
24 believe, but -- I haven't been around him in that
25 respect in a long time, so --
```



Page 214

                         ROBIN CHAMBERS

1

2    Q.      So what, if anything, did Mr. De Niro say about

3    why he was pursuing a lawsuit against Ms. Robinson?

4                    MS. LAZZARO:  Objection.

5                    MR. BENNETT:  Objection.

6    A.      He didn't -- I don't remember that.

7    Q.      He never explained why he was bringing the

8    litigation against Ms. Robinson?

9                    MR. BENNETT:  Objection.

10                   MS. LAZZARO:  Objection.

11   A.      No, not to me.  I mean, I don't -- no.

12   Q.      After Ms. Robinson's employment at Canal ended,

13   are you aware of Canal investigating anyone other than

14   Ms. Robinson?

15                   MR. BENNETT:  Objection.

16                   MS. LAZZARO:  Objection.

17   A.      No.

18   Q.      Are you aware of Canal looking into any issues

19   concerning Michael Kaplan?

20   A.      No.

21   Q.      Are you aware of Canal looking into any issues

22   concerning you?

23   A.      No.

24   Q.      As far as you're aware, did Michael Kaplan's

25   job responsibilities change in any way after Ms.



Page 215

                         ROBIN CHAMBERS
1
2    Robinson's employment ended?
3    A.      I don't think so.  I don't think so, no.
4    Q.      Did there come a time when Mr. Kaplan stopped
5    being employed at Canal?
6    A.      Did there -- right now, I don't know if he's
7    employed or not.  I don't know the terms.  Things have
8    changed so much, Alexandra, I don't know for sure.
9    Yeah, there were problems.  There was a lot of upheaval,
10   the whole thing got -- I think made everybody
11   distrustful.  So I know there was a lot of back and
12   forth, and I think perhaps people were worried, there
13   were changes in the office.  People were coming in,
14   people I didn't know.  So yeah, there was a lot of
15   upheaval, but I don't know of any investigations, no.
16   Q.      Are you aware of Mr. De Niro's girlfriend,
17   Tiffany Chen having any inquiry into any issues
18   concerning Michael Kaplan?
19                   MR. BENNETT:  Objection.
20                   MS. LAZZARO:  Objection.
21   A.      Yes.
22   Q.      What was your understanding as to what Ms. Chen
23   was looking into concerning Mr. Kaplan?
24                   MS. LAZZARO:  Objection.
25   A.      She didn't trust him.



Page 216

                    ROBIN CHAMBERS

1

2    Q.      Can you explain more?

3    A.      Just that she -- she didn't trust him.  There

4    were things that happened that she -- when she -- she

5    just didn't trust him and I don't know why.  I don't

6    know why.

7    Q.      What's your understanding as to the results of

8    that investigation into Michael Kaplan?

9                   MR. BENNETT:  Objection.

10   A.      I don't know if there was any results at all.

11   Everything just kept going on the way it kept going on.

12   So as far as I'm concerned, and I don't know for sure,

13   he's still there.  When I left I said I didn't want to

14   talk to anybody.  I just wanted to, you know -- because

15   I was in the process of letting go of a lot of stuff.

16   So I don't know.

17   Q.      Can you recall any investigation into you that

18   Mr. De Niro's girlfriend initiated?

19                   MS. LAZZARO:  Objection.

20   A.      I don't know for sure, no.

21   Q.      Did Ms. Chen raise any questions about you?

22                   MR. BENNETT:  Objection.

23   A.      Most definitely.

24   Q.      And are you aware of Mr. De Niro's girlfriend

25   making any kinds of false accusations?



Page 217

1                    ROBIN CHAMBERS

2                    MS. LAZZARO:  Objection.

3    A.        Yeah, yes.  Yes.

4    Q.        What false accusations are you aware of Mr. De

5    Niro's girlfriend making?

6    A.        She -- this is so hard.  She was looking for

7    things to discredit any number of people that she didn't

8    like or wanted to separate Bob from.  I think it's

9    control.  I think it's power.  Whatever it is, I was the

10   target of some of it and it was rough.  It was really

11   rough.

12   Q.        What kinds of false accusations did Ms. Chen

13   make about you?

14   A.        It was all about money.  It was about cars and

15   for -- there was a film festival thing and somehow -- I

16   think Michael Kaplan told me this, that she -- oh,

17   Michael told her that I used a car for a dog or

18   something, which is totally untrue and the night that I

19   went to this event at the film festival, I was with a

20   friend who came in from LA who was speaking, doing a

21   forum and it was their town car, I didn't even have a

22   car.  It was like, so crazy.  It got so ludicrous.  It

23   was things like that.  It was like, me charging too much

24   or -- it was just all ludicrous.  It was all crap.  And

25   it was frustrating and to have to defend yourself about



Page 218

1                      ROBIN CHAMBERS

2    a jitney ride or defend yourself about -- it just, at

3    this point it was really hard to deal with, really hard

4    to deal with.  And it was -- yeah.  It's a lot of stuff

5    like that.  She -- it was yeah, yeah.  She accused me of

6    charging for every phone call I made to Toukie or was on

7    the phone about with Toukie, and yeah, if I'm on the

8    phone for four hours at home dealing with Toukie Smith's

9    stuff, yes, I'm going to charge for it.  It was just all

10   accusations that never panned out, so then she would

11   attack personally.  But none of the criminal stuff that

12   she was looking for ever -- I didn't handle money.  I

13   just -- I get so upset when I think about it.  To even

14   be accused of something like this, is just so -- it's

15   just aggravating.

16   Q.      Are you aware of Ms. Chen making any false

17   accusations against Ms. Robinson?

18   A.      Yeah.  Yeah, of course.

19   Q.      What false accusations are you aware of Ms.

20   Chen making against Ms. Robinson?

21   A.      I don't remember specifically, but I remember

22   they were a lot and they were petty and that's what I

23   remember.  And it started -- it was with all of us.  I

24   don't know the reason.  I barely knew her.  I was the

25   last -- Bob insisted that I meet her.  I was the last of



Page 219

                    ROBIN CHAMBERS
1
2   the group to meet her.  And I ended up meeting her out
3   here, they came to lunch in Sag.  And she seemed really
4   nice, I really liked her after that first meeting.  I
5   thought, boy she's got a great spirit.  She's -- but
6   she -- you know, boy was I fooled.
7   Q.      Did you observe Ms. Chen trying to discredit
8   Ms. Robinson?
9   A.      Yes, everybody.
10                  MR. BENNETT:  Objection.
11  Q.      Are you aware -- let me restate that question.
12          Can you provide examples of false accusations
13  that Ms. Chen made against Ms. Robinson?
14                  MS. LAZZARO:  Objection.
15  A.      I guess it was a lot to do with the apartment
16  because that's the only thing she had a grip on, you
17  know, that was the only thing.  Nobody -- I think she'd
18  been around for a while, from what I know from Bob, but
19  she didn't come into everybody's -- on everybody's
20  radar -- we weren't introduced, I wasn't introduced, I
21  was the last of the group.  Chase, I believe, if I
22  remember, met her in LA and I don't remember if Chase
23  thought fondly of her then or not because it was those
24  quick brief meetings.  But again, I don't remember
25  exactly.  But they were a lot and they were petty.  It



Page 220

                          ROBIN CHAMBERS
1
2    was like looking for something, when you look for
3    something, you can find anything against anybody.  You
4    know, you can turn the most innocent remark into a
5    weapon, and that's just uh --
6    Q.      Was Mr. De Niro aware that Ms. Chen was making
7    false accusations against Ms. Robinson?
8                    MR. BENNETT:  Objection.
9    A.      I don't know.  But knowing that I know Bob, if
10   he thought something was false, he would not agree with
11   it, so you know, he -- you tend to believe the
12   relationship you're in.  You know, you tend to believe
13   your partner, so --
14   Q.      Ms. Chen didn't have an understanding about
15   Canal's policies and practices, correct?
16                   MS. LAZZARO:  Objection.
17                   MR. BENNETT:  Objection.
18   A.      Not that I know of.
19   Q.      Did you have an understanding as to why Ms.
20   Chen was looking to discredit Ms. Robinson?
21                   MS. LAZZARO:  Objection.
22                   MR. BENNETT:  Objection.
23   A.      I do not know.
24   Q.      Are you aware of Ms. Chen making any false
25   accusations involving Michael Kaplan?



Page 221

```
 1                    ROBIN CHAMBERS
 2                    MR. BENNETT:  Objection.
 3   A.      Yeah, I believe so.  Taking a small thing and
 4   turning it into an overt act of evil or -- but you know,
 5   I'm not saying it well, but just taking a small thing
 6   and blowing it up and getting Bob -- winding him up so
 7   to speak when most people around him, we try and keep
 8   everything calm or calm him down.  Or -- so that's what
 9   I know.  Yeah, she did make false claims against Michael
10   Kaplan.
11   Q.      What false accusations are you aware of Ms.
12   Chen making against Michael Kaplan?
13   A.      Well, that he was lazy.  I remember her saying
14   that he -- like she didn't -- he always handled the tech
15   stuff for Bob in Canal and phones and stuff and that he
16   didn't know anything about tech, he just would Google
17   it, those kinds of petty small things, that's what I
18   know.
19   Q.      You're aware that Canal accused Ms. Robinson of
20   loafing and binge watching television; is that something
21   you're aware of?
22   A.      Yes, I saw that in the papers.
23                    MS. LAZZARO:  Objection.
24                    MR. BENNETT:  Objection, just so it's
25           noted.
```



Page 222

                    ROBIN CHAMBERS

1

2   Q.      Is that consistent with the Chase Robinson that

3   you knew?

4              MR. BENNETT:  Objection.

5              MS. LAZZARO:  Objection.

6   A.      No, I don't think anybody could say that.  No.

7   I mean it just -- when I work at home, I always keep CNN

8   on or MSNBC or something -- it just runs so that's --

9   you know, again I -- because I did her job and I -- you

10  know, that's -- I don't know, because I didn't see the

11  bills.  So I'm not privy to any of that.  And so -- but

12  that's -- no, because I wasn't around that much.  I

13  wasn't -- we always used to have a TV in the office, I

14  believe they still did, but I don't know.  I don't know.

15  But that's -- you know, that's what I bring to it.  But

16  I do not know her to do that.

17  Q.      You never observed -- let me restate that.

18          You never observed Ms. Robinson loafing around;

19  is that correct?

20  A.      No.

21  Q.      Meaning correct?

22  A.      Correct, yes.

23  Q.      Are you aware of Mr. De Niro allowing his

24  girlfriend to influence personnel decisions at Canal?

25              MR. BENNETT:  Objection.



Page 223

```
 1                    ROBIN CHAMBERS
 2   A.      It would be a guess, an educated guess.  I do
 3   not know for sure.
 4              MS. HARWIN:  I think this is probably a
 5          good time for a break.  I know that we're ahead
 6          of 4:30, but if you'd like to take a longer
 7          break, Ms. Chambers, this could be a good time.
 8              MR. DROGIN:  Do you have an idea of how
 9          much more you have?
10              MS. HARWIN:  I don't anticipate
11          significant additional questioning.  So you
12          know, I would anticipate if you have redirect,
13          after we return from break, you could probably
14          proceed to it fairly quickly.
15              THE WITNESS:  So do you want to wait an
16          extra half hour and see if we can muscle
17          through or do you want to --
18              MS. HARWIN:  I'm happy to take a short,
19          just five-minute break and then --
20              THE WITNESS:  Okay.  So five minutes?
21              MR. BENNETT:  How about seven?  Can we
22          do seven and come back on at 4:00?  Would that
23          work?
24              MS. HARWIN:  We can do seven.  Thank
25          you.
```



Page 224

```
 1                    ROBIN CHAMBERS
 2                    THE WITNESS:  Thank you so much.
 3                    THE VIDEOGRAPHER:  Going off the
 4          record, 3:54 p.m.
 5                    (Whereupon, a short break was taken.)
 6                    THE VIDEOGRAPHER:  Back on the record
 7          officially 4:02 p.m.  Go ahead.
 8                    MS. HARWIN:  All right, Ms. Chambers,
 9          that concludes my questioning for now.  So I
10          understand that some -- another of the lawyers
11          may have some questions for you, so I'm going
12          to turn it over to them.
13                    MR. BENNETT:  Thank you, Ally.
14     EXAMINATION BY
15     MR. BENNETT:
16     Q.    Good afternoon, Ms. Chambers.  My name is
17     Gregory Bennett.  I'm representing Canal and Mr. De Niro
18     in this action.
19     A.    Oh, we texted, right?
20     Q.    Yes, a couple of times a while ago.
21     A.    Yes, hi.  Hi Greg.
22     Q.    A pleasure to finally meet you, at least by
23     videoconference.
24     A.    Yes.
25     Q.    I'm going to take you through a few questions,
```



Page 225

```
 1                    ROBIN CHAMBERS
 2   because I'm on cross-examine it's probably not
 3   chronological.  I'm going to jump around a little bit.
 4   Okay?
 5   A.      Okay.
 6   Q.      Who is Dan Harvey?
 7   A.      Bob's trainer, script person, friend.  Family
 8   at this point.
 9   Q.      Okay.  Did he work at Canal before you
10   joined -- before you began working with Bob?
11   A.      He did, yes.
12   Q.      And throughout your time period when you were
13   working alongside Bob and then through Canal, did Dan
14   Harvey perform any other jobs other than trainer and
15   script reader or acting as a friend?
16                    MS. HARWIN:  Objection to form.
17   A.      Those things changed after I left a lot.  Dan
18   traveled with us on a few things, sometimes on location,
19   sometimes not.  Like in Europe, maybe not.  Sometimes
20   yes, sometimes no.  But after I left because I traveled
21   with him everywhere, I think -- I don't want this to
22   sound weird or anything, but I think Dan fulfilled a lot
23   of that.  And he's always been close with Bob, but more
24   so after I left, I believe.  Because Grace didn't want,
25   you know, a female assistant around.
```



Page 226

ROBIN CHAMBERS

1

2  Q.      When you say fulfilled all that, do you mean

3  Dan began traveling with Bob regularly?

4              MS. HARWIN:  Objection to form.

5  A.      Yeah, you know, I think, I'm just guessing at

6  that part, so I know you don't want me to do that, but I

7  know that he picked up with traveling and his duties

8  perhaps picked up a lot more after I was gone.

9  Q.      Okay, thank you.  And you raise a good point, I

10  just want to touch upon it quickly.  I know this is an

11  unusual circumstance for you being at a deposition.

12  What we're looking for today is direct personal

13  knowledge that you have about the questions.  So just

14  try -- and again, I appreciate it's unique and it's

15  difficult to apply, but when I ask you a question, just

16  let me know if you have personal knowledge as to the

17  information.  Okay?

18  A.      Okay.

19  Q.      Do you understand?

20  A.      I do.

21              MS. HARWIN:  Objection to form.

22  Q.      Before you left in, I think it was 2003 from

23  Canal, did everyone who worked alongside you know what

24  Dan Harvey did?

25              MS. HARWIN:  Objection to form.



1                    ROBIN CHAMBERS

2    A.      Yeah.  Yes.

3    Q.      Okay.  There was no question as to what his

4    duties were, correct?

5    A.      No.

6    Q.      Okay.  Can you take me through a little bit

7    your educational history.  Did you graduate from high

8    school?

9    A.      No, I did not.

10   Q.      What is the -- what is the highest grade level

11   in high school that you achieved?

12   A.      Like my early senior year.

13   Q.      And as far as formal medical training goes, do

14   you have any of that sort of training?

15              MS. HARWIN:  Objection to form.

16   A.      Taught myself how to type, I have no training

17   whatsoever.  I'm an unskilled laborer.

18   Q.      I believe you testified earlier that you've

19   been to Canal's office once since 2003; is that correct?

20   A.      Once.

21   Q.      So as far as the activities and the personnel

22   in Canal's office, tell me if I'm wrong, any testimony

23   you've provided today would be through information you

24   obtained from either Chase or Kap; is that correct?

25              MS. HARWIN:  Objection to form.



Page 228

                        ROBIN CHAMBERS

1

2    A.      Yes.

3    Q.      Okay.  Thank you.  And in 2018 and 2019, did

4    you trust Chase?

5                MS. HARWIN:  Objection to form.

6    A.      2018, yes.

7    Q.      And 2019?

8    A.      I believe so.  I believe so.  It was on my --

9    based on my relationship with her, yes, yes.

10   Q.      That's what I'm looking for, your personal

11   knowledge.

12   A.      Yes.

13   Q.      For those years, and I'll separate them -- for

14   2018, did you regard her as an honest person?

15   A.      Yes, I believe so.  Yes.

16   Q.      And in 2019, did you also regard her as an

17   honest person?

18   A.      Yes, you know -- yes.

19   Q.      If she told you something, you would assume

20   that it was truthful; is that fair?

21   A.      Yeah, absolutely.

22                MS. HARWIN:  Objection to form.

23                THE WITNESS:  Yes.

24   Q.      Do you know of any situation where she was

25   dishonest with you?



Page 229

1                    ROBIN CHAMBERS

2                    MS. HARWIN:  Objection to form.

3   A.     I don't remember her ever being dishonest with

4   me.

5   Q.     And to your knowledge, did she ever violate

6   your trust?

7                    MS. HARWIN:  Objection to form.

8   A.     Not that I remember, no.  I trusted her.

9   Q.     Did you believe that she had integrity?

10  A.     I did, yes.

11  Q.     Did Chase confide things in you, personal

12  things?

13                   MS. HARWIN:  Objection to form.

14  A.     Yes, yes.

15  Q.     And did you confide personal issues or

16  information to Chase?

17  A.     Yes.

18  Q.     Okay.  And in 2018 on a weekly basis to the

19  best you're able to approximate it, how frequently would

20  you speak with Chase by phone?

21  A.     We talked a lot, about work, about everything,

22  yeah, work, text, all of it.  It's a lot of work, yeah.

23  Q.     Okay.  And the same question for January

24  February, March and April of 2019, would you

25  characterize the frequency that you spoke with Chase on



Page 230

```
 1                    ROBIN CHAMBERS
 2   a weekly basis the same?
 3   A.      Was that towards -- that was towards the end of
 4   her job?
 5   Q.      Yes, so I'll represent to you that Chase
 6   resigned in April of 2019.
 7   A.      Okay.  After she resigned?
 8   Q.      No, I'm focusing just on the months of 2019 up
 9   to the date of resignation.
10   A.      Yes, yes, yes.  We talked a lot.  But like I
11   said, that last two or three weeks, Greg, it got sparser
12   and sparser and sparser, and then she stopped
13   communicating, which was hurtful to me.  I didn't -- you
14   know, I thought I could help maybe, but I couldn't --
15   Q.      And over the course of all of 2018 and the
16   couple of few months before she resigned in 2019, would
17   you typically initiate phone calls to her or would Chase
18   initiate phone calls to you?
19                    MS. HARWIN:  Objection to form.
20   A.      I think both.  I think both, I would call or
21   text, she would call or text.
22   Q.      And would they typically be scheduled calls or
23   just when either of you had a moment to pick up the
24   phone and call each other?
25                    MS. HARWIN:  Objection to form.
```



Page 231

```
                       ROBIN CHAMBERS
 1
 2    A.       Well, some could be both, but sometimes if I
 3    knew it was a crazy busy day with Bob, I would text can
 4    you talk.
 5    Q.       Okay.  And did you ever have a phone call with
 6    Chase where she told you that she was going to come up
 7    with a fake story about a personal emergency for a
 8    friend or her mother in order to get a break from
 9    Tiffany?
10              MS. HARWIN:  Objection to form.
11    A.       I don't remember that.
12    Q.       While on a phone call in early 2019, did you
13    warn Kaplan and Chase not to become buddies with
14    Tiffany?
15              MS. HARWIN:  Objection to form.
16    A.       I'm sure I did, but I think I was warned by
17    them first.  Because I was the last to meet her.  But
18    she's got a pattern.
19    Q.       Okay.  But do you recall suggesting --
20    A.       Yeah, no, I think I do.  Especially Kap who was
21    vulnerable.  And I just said, be really careful, don't
22    confide.  Just watch your -- just be very careful, yeah,
23    sure.  Not so much as Chase though, Greg, because she
24    knew her a long time before me.  So I didn't have --
25    there was no -- you know what I mean?  I think it was
```



Page 232

```
 1                    ROBIN CHAMBERS
 2  Kap that I was concerned about because I had experience
 3  of my own with her by then, so --
 4  Q.      And while on a phone call in early 2019, did
 5  Chase tell you that she thought Bob was going to fire
 6  her?
 7                   MS. HARWIN:  Objection to form.
 8  A.      I think I do remember that, yes.  She was
 9  concerned.
10  Q.      And did you ever mention to Chase that you
11  thought Michael Tasch should be fired?
12  A.      Oh, probably.
13  Q.      In early 2019, your grandson was looking at
14  colleges; is that correct?
15  A.      Yeah, yeah, yeah.  No, he was going -- he had
16  an -- he was ███████████████████████████  and Bob
17  recommended this wonderful woman and she found a
18  ███████████████████████  for him to go to and it was
19  incredibly expensive.  And so I was raising the money.
20  And oddly that's the story that I just told.  I
21  borrowed, through Chase, with her help, I asked Bob and
22  I think Chase got involved and talked to Bob and he said
23  yes.  And then I worked for a year and a half.  I wrote
24  down the date that I started working just for expenses
25  only, basically no salary, just for the jitney and the
```



Page 233

                    ROBIN CHAMBERS

1

2    taxi.  Chase said, no.  I remember this, she said no,

3    this was a gift from him to you.  And I said no, I know

4    Bob I'm going to pay him back and I did.  And that was a

5    huge argument.  Somehow Tiffany found out about it and

6    told Bob that I never paid -- I don't know how it

7    happened, but that was a massive argument that Bob and I

8    got in together, him believing that I didn't pay him

9    back when I did.

10   Q.      Okay.  Thank you.  I understand.  In 2019, you

11   had a dog I may mispronounce it, unintentionally named

12   Dioge?

13   A.      Dioge, yes.

14   Q.      And he passed away in 2018 is it or 2019?

15   A.      Yeah, yeah.

16   Q.      Do you recall speaking with Chase on the phone

17   in 2019 about that?

18   A.      I'm sure.  We're both animal lovers and she

19   lost an animal and -- the whole group was animal lovers.

20   Q.      Okay.  And were you aware that in 2019 Chase

21   was recording phone calls between the two of you?

22              MS. HARWIN:  Objection to form.

23   A.      No, I did not know that and that breaks my

24   heart.

25   Q.      Were you aware that audio recording of those



Page 234

                    ROBIN CHAMBERS
1
2    phone calls have been turned over as evidence in this
3    litigation?
4    A.      No, I have no -- I suspected that when I heard
5    that.  But yeah, no.  I never -- it's like, you know
6    how -- like -- like, when I would get mad at Bob I'd go
7    fine, I'm writing a book.  You know, you say things, but
8    you never do.  And I just, that was like, I hate that,
9    that she would do that.  I hate that.
10   Q.      All right.  We're going to listen to a couple
11   of them right now.
12   A.      Oh no.
13   Q.      I'm just going to play them.
14   A.      Oh god.
15               MR. BENNETT:  For the record, it's
16               going to be at least for this deposition, it's
17               Defendant's Exhibit 1 it's Bate stamped
18               Robinson 7179.
19               MR. DROGIN:  Stop that.  I'm so sorry.
20               I'm yelling at my dog, sorry about that.
21               MR. BENNETT:  Just so everyone knows,
22               Ms. Chambers, for your benefit and Counsel's as
23               well, I'm going to let this play for four
24               minutes, okay and then I'm going to ask you a
25               question.



Page 235

```
 1                      ROBIN CHAMBERS
 2                  (Whereupon, a voice recording Bate
 3          Stamped Robinson 71719, was marked as
 4          Defendant's Exhibit 1 and played as follows:
 5                  MS. ROBINSON:  I'm so upset right now,
 6          so upset.
 7                  MS. CHAMBERS:  Why?  Did you talk to
 8          him?  What happened?)
 9                  MR. BENNETT:  Sorry, give me one sec.
10                  MS. HARWIN:  And Greg, for clarity of
11          the record, are you planning to play the entire
12          recording or a portion of it?
13                  MR. BENNETT:  I'm going to play a
14          portion of it.  And I'll note when I stop and
15          when I begin, okay.
16                  MS. HARWIN:  Thank you.  Appreciate it.
17                  MR. BENNETT:  So for this one, I'm not
18          sure if I described it for the record
19          correctly, it's Robinson 7179, I'm going to
20          start from the beginning.
21                  (Whereupon, the recording was played at
22          this time as follows:
23                  MS. CHAMBERS:  Hey, sorry.
24                  MS. ROBINSON:  Hey, no worries.  No
25          worries.  Um --
```



Page 236

```
 1                ROBIN CHAMBERS
 2                MS. CHAMBERS:  Yeah, I just don't want
 3           to you be afraid of this Chase.  I want you to
 4           see this as a positive.  Because that's what
 5           you are trying to initiate with the e-mail --
 6           so don't --
 7                MS. ROBINSON:  Yeah, but there's a
 8           difference because he said -- he said to me, he
 9           was like, when am I going to see you face to
10           face next?
11                MS. CHAMBERS:  He said that this
12      morning?
13                MS. ROBINSON:  Yeah.
14                MS. CHAMBERS:  Okay.
15                MS. ROBINSON:  When am I going to see
16           you face to face?  And it was like, well, you
17           have Irishman, so probably tomorrow.
18                MS. CHAMBERS:  Right, cause usually we
19           see each other a lot, but it's like such a
20           weird thing, but okay.
21                MS. ROBINSON:  I was like, do want to
22           go over the vantage point benefits thing, he
23           was like, yeah, we can go over that.  I have to
24           sort of figure that stuff out.  And then he's
25           like --
```



Page 237

1                    ROBIN CHAMBERS

2               MS. CHAMBERS:  So maybe it's nothing.

3          Maybe it's --

4               MS. ROBINSON:  No, and then he says --

5          and I said, is there anything else you want to

6          go over.  And then he said, I just want to talk

7          to you.

8               MS. CHAMBERS:  Okay.  So then it sounds

9          to me like it's going to include a Tiffany

10         talk, which is okay.  You know, if he starts

11         it, just say, look, before you start, this is

12         what I was going to give you, do you want to

13         take a second to read it, it will take you two

14         seconds.  I don't think that can hurt unless

15         you want to alter it in some way.  But this is

16         what we want to say, I'm glad we're talking.

17         You know, you've got a solution.  You know what

18         you want out of this.

19              MS. ROBINSON:  He just wrote back and

20         said -- he just wrote back and said dinner is

21         at 7:30.  He said, later it will be when we can

22         do.

23              MS. CHAMBERS:  What?

24              MS. ROBINSON:  He said later it will be

25         when we can do.



Page 238

```
 1                    ROBIN CHAMBERS
 2                    MS. CHAMBERS:  Okay.  I don't know what
 3          that is, but --
 4                    MS. ROBINSON:  He goes directly from
 5          valma (sic) --
 6                    MS. CHAMBERS:  He what?
 7                    MS. ROBINSON:  I just -- I don't want
 8          him to ever suggest that we needed the house.
 9          Like how do I get out of that?  That's the most
10          uncomfortable, like, thing.
11                    MS. CHAMBERS:  Yeah.  Uh, well, you can
12          just say I don't want to.  You can just say I
13          don't want to.  Right?  You can just say I
14          don't want to.
15                    MS. ROBINSON:  Yeah.
16                    MS. CHAMBERS:  I have something -- you
17          can say, I really want to talk to you too you
18          can say -- you know, right?
19                    MS. ROBINSON:  Mm-hmm.
20                    MS. CHAMBERS:  That's what I would do.
21          That's what I would do.
22                    MS. ROBINSON:  I don't like him saying,
23          I want -- like, face to face I want to talk to
24          you.  It's almost like --
25                    MS. CHAMBERS:  Well, then you know what
```



Page 239

```
 1                    ROBIN CHAMBERS
 2        it's about.  But that's okay.  That's what I'm
 3        saying, I don't want you to be afraid of it,
 4        right?
 5              MS. ROBINSON:  Well, I would be
 6        (inaudible) if he brought it up this way, it's
 7        not as if, you know, we discussed.
 8              MS. CHAMBERS:  Yeah, yeah, no, I -- no,
 9        I think this is good.  He wants to discuss
10        what's going on, what's been happening for
11        weeks now, those hideous e-mails that he
12        ignored.  He's ready to talk about it now, and
13        that's what you want.  So remember you both
14        have the same goals.
15              MS. ROBINSON:  It is, but Robin, like
16        I -- like, I have a feeling that, like, it's
17        going to be one of those conversations, like,
18        Tiffany is -- you know, doesn't want -- and Bob
19        is not -- Bob has not had the power in any way
20        to, you know, to stop any of this stuff, you
21        know what I mean?  Like he didn't (inaudible)
22        --
23              MS. CHAMBERS:  This is how Bob has
24        always been, Chase, I think, pretty much with
25        the women in his life.  Yes, he may be weaker
```



Page 240

1                    ROBIN CHAMBERS

2           now, like you say, because he's older, but he's

3           always given his power away to the women in his

4           life.  And they've usually, as you and I know,

5           not been great women.  But the fact of the

6           matter is, whether you talk or not, that's not

7           going to change that.  So I think -- and I

8           don't think he's going to fire you.  I think

9           what he may -- )

10                    MR. BENNETT:  I'm going to stop it for

11          the record at 4 minutes and 11 seconds.

12    Q.     Ms. Chambers, are you aware that there are

13    about 60 of these types of recordings that have been

14    produced?

15                    MS. HARWIN:  Objection to form.

16    A.     No.  I'm very upset.

17    Q.     Have you ever listened to any of these -- I'm

18    sorry, I didn't mean to interrupt you.

19    A.     I'm sorry, I said, it's just upsetting, you

20    know, it's upsetting.

21    Q.     Have you ever listened to any of these audio

22    recordings before today?

23    A.     No.

24    Q.     Okay.  After listening to the first, roughly

25    four minutes of that recording, did it give you a sense



Page 241

                    ROBIN CHAMBERS

1    as to the time period when the recording was taking

2    place?

3

4                    MS. HARWIN:  Objection to form.

5    A.      Obviously in the time period that Tiffany was

6    back in New York with him.

7    Q.      Do you think it's fair to say that it's between

8    February and April of 2019 that the recording took

9    place?

10                   MS. HARWIN:  Objection to form.

11   A.      When did they come back?

12   Q.      Well, I can represent to you that Ms. Robinson

13   resigned in April of 2019?

14   A.      Right.  And we went through a Christmas with

15   Tiffany and they must have come back from LA in October,

16   maybe.  So I think it would have been earlier than that,

17   but yeah, I guess around that time.  It was getting

18   pretty bad then.

19   Q.      At the time this conversation was going on, do

20   you recall where you were geographically?

21   A.      Probably here at home.

22   Q.      Okay.  Did you know that that phone call was

23   being recorded?

24   A.      Oh my God, no.  I've never recorded anybody in

25   my life.  I've never -- I don't understand that



Page 242

1                    ROBIN CHAMBERS

2   thinking.  That is upsetting to me because I -- no, no,

3   I didn't know.

4   Q.     At that time just when I stopped the recording,

5   why did you believe that Bob did not intend to terminate

6   Chase's employment?

7                    MS. HARWIN:  Objection to form.

8   A.     Because I knew how much she did for him and I

9   knew how much he liked her and I didn't think that

10  Tiffany had that much power then to turn him against her

11  or to bring up things or if Chase in fact did things or

12  whatever went on that I wasn't aware of -- I didn't

13  think -- I didn't know of it, so I didn't believe it.  I

14  didn't believe it.

15  Q.     And since you -- have you ever asked Ms.

16  Robinson why she made the recordings?

17  A.     I haven't spoken to her.  I didn't know that

18  these existed until -- until -- I don't know when.  But

19  certainly like I said, I haven't spoken to her or

20  communicated with her since before she left.

21                    MR. BENNETT:  Okay.  I'm going to just

22         move on to the next excerpt from this

23         recording.  We're going to skip ahead to five

24         minutes and 44 seconds.

25                    (Whereupon, the recording was played at



Page 243

```
 1                    ROBIN CHAMBERS
 2         this time as follows:
 3                    MS. ROBINSON:  The suggestion or the
 4         thought that, like, I would actually prefer
 5         that Fords (sic) didn't move the art it was the
 6         art people.
 7                    MS. CHAMBERS:  So you think it's just
 8         possible that he's going to tell you -- you
 9         think he's going to tell you -- you think he's
10         going to tell you, just don't work at the
11         house?
12                    MS. ROBINSON:  No, I think he's going
13         to tell me, you know, this isn't working, you
14         know, anymore and therefore I need you to, you
15         know, wrap things up.
16                    MS. CHAMBERS:  But that's kind of what
17         you want to do anyway, except you want to do it
18         in your timeline.
19                    MS. ROBINSON:  Yeah, but we had agreed
20         to the timeline but I don't think --
21                    MS. CHAMBERS:  That's right.
22                    MS. ROBINSON:  But I don't think we
23         agreed --)
24    Q.   When you said "that's right" in response to
25    Chase mentioning an agreed upon timeline, what was that
```



Page 244

1                    ROBIN CHAMBERS

2    in reference to?

3                    MS. HARWIN:  Objection to form.

4    A.      I think at that point, if I remember correctly,

5    Greg, Chase had talked to Bob at some point in the

6    future leaving or -- I don't exactly remember.  But they

7    were in talks.  This was all one big mishy mash.  I

8    personally never believed her or him.  I thought this

9    was just what they were going through and they would get

10   over it.  I never -- I never believed she would leave.

11   I never believed he would let her go and then it

12   happened.  Because I would think that way too when I

13   worked for him, I'm done, I'm finished, I'm burnt out.

14   Bloom.  I never believed it.

15   Q.      Were you ever part of a conversation between

16   Chase, Bob and yourself where some type of two-year

17   arrangement was discussed?

18                   MS. HARWIN:  Objection to form.

19   A.      Yes, that sounds very familiar.  Yes.

20   Q.      And would that have been -- when did that

21   meeting occur?

22   A.      Maybe that was the meeting that they both got

23   so upset, maybe it was that meeting.  Because then we

24   were physically together too.

25   Q.      No, but I'm only looking for your personal



Page 245

```
 1                    ROBIN CHAMBERS
 2   knowledge.
 3   A.      Yes, yes, yes.  I think that precipitated that
 4   whole thing, yes.
 5                    MR. BENNETT:  And now we're going to
 6           move on to 8 minutes and 55 seconds of the same
 7           recording.
 8                    (Whereupon, the recording was played at
 9           this time as follows:
10                    MS. CHAMBERS:  First of all, you don't
11           know what it is and you can tell -- you can
12           give him that e-mail, that's what I'm saying.
13           I don't think it's -- that's what I mean, I
14           don't think it's going to be like me.  I was
15           just telling you, I don't think it's going to
16           be like that.  He knows you've got the two
17           years, right?  I'm sure he does or it will take
18           a quick reminder and he'll deal with that.
19           That's what you want, Chase?  You want to have
20           your power cut out and stay there for two
21           years?  No.
22                    MS. ROBINSON:  No, but I don't -- I
23           also, like, you have to understand from my
24           perspective is that we made this agreement, I
25           gave up something and then two months later all
```



Page 246

                              ROBIN CHAMBERS

1

2           hell shit breaks loose none of which is my --)

3      Q.   What did Chase give up?

4      A.   I don't remember, but it's coming back to me.

5                     MS. HARWIN:  Objection to form.

6                     THE WITNESS:  I don't remember

7           specifically.  She -- oh God.  I don't

8           remember, I'm sorry.

9                     MR. BENNETT:  That's alright.  We're

10          going to introduce a new recording.  This is

11          Bate stamped Robinson 7230, and for the record,

12          I'm going to play the first three minutes and

13          seven seconds.

14                    (Whereupon, a voice recording Bate

15          Stamped Robinson 7230 was marked as Defendant's

16          Exhibit 2 and played as follows:

17                    MS. CHAMBERS:  Hey, sorry, I was just

18          outside.

19                    MS. ROBINSON:  I'm so upset right now,

20          so upset.

21                    MS. CHAMBERS:  Why?  Did you talk to

22          him?  What happened?

23                    MS. ROBINSON:  I talked to Tom and he

24          uh -- he said that Bob won't sign it.

25                    MS. CHAMBERS:  Right.


MAGNA
LEGAL SERVICES

Page 247

```
 1                    ROBIN CHAMBERS
 2               MS. ROBINSON:  I said, you know, I need
 3          Bob to sign it, because you know, I just -- I
 4          need him to.
 5               MS. CHAMBERS:  Or yeah, is there a
 6          version that he would sign?
 7               MS. ROBINSON:  It doesn't matter.  He's
 8          going --)
 9   Q.     That's the recommendation letter you think?
10               MS. HARWIN:  Objection to form.
11   A.     I think that might be, yes.  It could be the
12   business school one.
13   Q.     After Chase resigned?
14               MS. HARWIN:  Objection to form.
15   A.     I don't know.  I think so.
16               (Whereupon, the voice recording was
17          played as follows:
18               MS. ROBINSON:  --to meet with Bob on
19          Monday.  And Tom says, one of the reasons why
20          he doesn't want to sign it is because of the
21          four million miles that you transferred into
22          your account or something like that.  And I go
23          wait, what?
24               MS. CHAMBERS:  What?
25               MS. ROBINSON:  I go wait, what?  I go,
```



Page 248

```
1                     ROBIN CHAMBERS
2          that's not true.  You know or he said that you
3          did it without his consent or knowledge.  I go,
4          what are you talking about, that's not true.
5          He goes, which one is not true, that you didn't
6          do it or that Bob didn't approve it?  And I
7          said, Tom, for 11 years that's been the deal
8          between Bob and I.  I use the mileage to fly
9          back and forth from LA.
10              MS. CHAMBERS:  Yeah, but not 5 million.
11         You wouldn't take -- you would give them back
12         if you left, if you took five million -- I mean
13         that's -- where is the five million?
14              MS. ROBINSON:  That's the deal that we
15         had.  That's the deal that we had.  It's not
16         five million.  That's the deal that we had.
17              MS. CHAMBERS:  Tell me the deal.  I
18         thought you -- okay, just so you know, when you
19         flew, I knew of course he let you use --
20              MS. ROBINSON:  Use the miles.
21              MS. CHAMBERS:  Yeah, but I thought you
22         just took them when you needed them.
23              MS. ROBINSON:  Well, they are part of
24         the Amex thing and you transfer them -- they
25         transfer them.  Kap used to transfer the black
```



Page 249

1                    ROBIN CHAMBERS
2        card to Bob's account to use for staff, the
3        Canal one went to mine.  The stuff was
4        transferred --
5                MS. CHAMBERS:  Oh.
6                MS. ROBINSON:  I didn't leave and then
7        transfer something.  I transferred them before.
8        You know, I didn't -- I didn't plan -- I didn't
9        preplan on fucking quitting this job.  I don't
10        know what to -- I am so fucking pissed.
11                MS. CHAMBERS:  So this is easy to clear
12        up.  Wait a minute, wait --
13                MS. ROBINSON:  It's not -- it's not --
14        Tom was like one of the things is, so there's
15        other stuff.  And this is the deal that Bob and
16        I had.  This is the deal that Bob and I had.
17        So I don't know -- I'm so livid --
18                MS. CHAMBERS:  How many miles are in
19        your account?
20                MS. ROBINSON:  I don't know.  I don't
21        know, Robin.  I really don't.  This is the deal
22        that he and I had, I mean --
23                MS. CHAMBERS:  But for each trip, not
24        to take them.  Like if -- okay, if you have a
25        computer, here's what I'm thinking, this is how



Page 250

1                        ROBIN CHAMBERS
2           it looks, right?  If you have -- if he said,
3           yes, of course he -- we all know that you flew
4           on his miles, which was really amazing, right?
5           You got to go back and forth.  That's great.
6           That was part of your perks for your job.  He
7           agreed.  You asked, he said yes.)
8    Q.     Ms. Chambers, how did you know that that --
9    what you just referred to was part of Chase's perk
10   package?
11                   MS. HARWIN:  Objection to form.
12   Q.     What is it from Chase that you acquired that
13   knowledge or from Bob?
14                   MS. HARWIN:  Objection to form.
15   A.     I think both.  Chase told me and Bob says
16   things like, I let her fly back and forth on my miles,
17   that's Bob.  So yes, from both of them.
18   Q.     And do you recall -- during that conversation
19   you had with Bob, do you recall him mentioning anything
20   else or disclosing any additional information about
21   Chase's use of sky miles?
22   A.     From my conversations with Bob it never became
23   an issue until it became an issue.  It was just a given
24   that, you know, anybody, not just -- it wasn't just
25   Chase, it was, like, you know, any --



```
                         ROBIN CHAMBERS
 1
 2   Q.      During their employment?
 3   A.      Yeah, during their employment.  Like Dan -- I
 4   think it was, they tried to get Dan Harvey to use miles,
 5   but because he had to change so much his schedule for
 6   Bob's schedule, he couldn't.  It was just -- you can't
 7   do it.  So it was kind of not, it was for everybody who
 8   had to do a thing and sometimes he would give it as
 9   gifts.
10              MR. BENNETT:  I'm going to pick up in
11          the same recording.
12              (Whereupon, the voice recording was
13          played as follows:
14              MS. CHAMBERS:  So the question, so I
15          guess -- so what?  So -- so does Bob think --
16              MS. ROBINSON:  He thinks I stole from
17          him.  He thinks I stole from him.  That was our
18          deal.  What is going on here, Robin?  What is
19          going on here?  What is going on here?  What is
20          going on?  I feel like I'm now being attacked.
21              MS. CHAMBERS:  Okay.  I'm trying to
22          understand this.
23              MS. ROBINSON:  I just -- I'm so -- I'm
24          so -- I'm so livid -- I'm so livid, right now,
25          I don't want to talk.  I'm so livid that this
```



Page 252

1                    ROBIN CHAMBERS

2          is --

3                    MS. CHAMBERS:  So this has been going

4          on for years that Kap transferred money into

5          your account.  So Kap did the transfer; is that

6          correct?

7                    MS. ROBINSON:  No, no, no, no.  This is

8          the deal, Robin.  This is --

9                    MS. CHAMBERS:  So explain it to me,

10         because you're not explaining it to me.  I --

11         when -- you get to use his miles, that we all

12         agree.  You did, he agreed, that was it.  What

13         is the fight?  Why is it -- didn't you take it

14         out of his account?  In other words --)

15                   MR. BENNETT:  I'm going to stop it at

16         4:08.

17    Q.    You're pretty confused at this point Ms.

18    Chambers; is that correct?

19                   MS. HARWIN:  Objection to form.

20    Q.    Did you understand the explanation that Chase

21    was offering you as to why the --

22    A.    No, I think I was trying to, but she was

23    visibly upset.  And I don't -- but see the thing that's

24    confusing me is I never talked to her after she left, so

25    this couldn't have been after she left.



Page 253

```
 1                    ROBIN CHAMBERS
 2   Q.      What makes you think you didn't speak to her
 3   after Chase resigned?
 4   A.      Because in my memory --
 5                 MS. HARWIN:  Objection to form.
 6                 THE WITNESS:  Well, first of all, Bob
 7            kept asking me, Tom kept asking me, have you
 8            talked to Chase?  No, I didn't.  So it was like
 9            that.  I was getting frustrated with them.  But
10            if I remember correctly -- I remember when he
11            would not -- maybe I did.  I don't think so --
12            I don't -- somehow I don't think we did.  I
13            just thought she never returned my phone calls
14            when he was not returning her phone calls.  And
15            I was trying to go are you okay, trying to be a
16            friend.  And I think she was so upset.
17   Q.      Did you ever obtain understanding from Chase as
18   to why she did not return any of Bob's sky miles that
19   were in her account after she resigned?
20                 MS. HARWIN:  Objection to form.
21   A.      We never discussed it.
22   Q.      You testified previously something along the
23   lines of you were an advisor for her and offered her
24   advice, do you recall that testimony?
25                 MS. HARWIN:  Objection to form.
```



Page 254

                        ROBIN CHAMBERS

1

2    A.      I do, yeah, at some point I functioned as that

3    to everybody there.  To Kap, to Bob, to everybody.

4    Q.      Did you ever counsel Chase to return the miles?

5              MS. HARWIN:  Objection to form.

6    A.      Greg, it didn't come up.  I never talked to her

7    about -- what I just heard, I don't think that was -- I

8    mean I don't -- that day -- I don't know how to explain

9    this.  No, I didn't, I don't think, because I didn't

10   think it was a problem.  I thought they were still

11   working this out.  Do you know what I mean?  It didn't

12   seem to be -- at that point I'm trying to grasp what

13   happened, you know, with the miles.

14   Q.      And in that recording that you just listened

15   to, do you recall where you were geographically at the

16   time?

17             MS. HARWIN:  Objection to form.

18   A.      Probably here at home.

19   Q.      Okay.  And since you were not aware of the

20   recording, I assume you did not consent to the

21   recording?

22             MS. HARWIN:  Objection to form.

23   A.      I have -- no, I am stunned that I was recorded.

24   Q.      Okay.  Do you recall texting Ms. Robinson on

25   June 9, 2019 in reference to Bob that, "Chase he isn't



```
 1                    ROBIN CHAMBERS
 2   disputing you flying on his miles.  It's the transfer of
 3   millions.  If this is what you always did, you have to
 4   tell him.  You have to clear this up."
 5            Do you recall sending that text?
 6                 MS. HARWIN:  Objection to form.
 7   A.      Don't remember.
 8   Q.      Does that sound consistent with some advice you
 9   would offer Chase?
10   A.      Sure --
11                 MS. HARWIN:  Objection to form.
12   Q.      I didn't get the answer, Ms. Chambers, I'm
13   sorry.
14   A.      Yeah, yes, yes, yes, yes.  It sounds like
15   something I would advise her to if it got to that point.
16   Of course.  Of course.  Of course.
17                 MS. HARWIN:  Greg, I'm sorry, can I
18            just make a just reminder for everyone to slow
19            down a little bit so that Ms. Smith-Chambers,
20            Greg can complete his question, I can object if
21            I'm going to object, and that your answer is
22            clear so that no one is speaking over one
23            another.
24                 THE WITNESS:  Yes.
25                 MR. BENNETT:  Certainly.
```



Page 256

```
 1                    ROBIN CHAMBERS
 2   Q.     Where did you obtain the information that Bob
 3   was not disputing that Chase flew on her miles during
 4   her employment?
 5              MS. HARWIN:  Objection to form.
 6   A.     Can you say that again Greg, I'm sorry.
 7   Q.     Sure.  In the text that you sent to Chase in
 8   June of 2019, you say, "he isn't disputing you flying on
 9   his miles".  And I'm just wondering where you obtained
10   that information from?
11              MS. HARWIN:  Objection to form.
12   A.     I don't know.  I don't know.
13   Q.     Do you recall speaking with Chase after you
14   sent that text on June 9, 2019 about the sky miles
15   issue?
16   A.     No, I don't recall.
17   Q.     And you testified earlier about a situation
18   where you learned that approximately 300,000 miles
19   showed up in your Amex account; is that right?
20   A.     Yeah.
21   Q.     Who did you call when that happened?
22   A.     I called Michael Kaplan, Chase and they had to
23   go through -- I tried to do it on the phone myself
24   first.  I tried to go wait a minute, this is an old
25   card, I don't think I even have that -- it was so weird.
```



Page 257

```
 1                    ROBIN CHAMBERS
 2   I don't know how it happened.  I remember --
 3   Q.      And you --
 4              MS. HARWIN:  Objection.  Greg, I
 5           would -- Greg, let her finish her answers
 6           before you interject.
 7   Q.      Go on Ms. Chambers.
 8   A.      I remember, Greg, it freaked me out because I
 9   know people can get paranoid about this stuff, and I
10   worked around there long enough, you have to be squeaky
11   clean, otherwise people, you know, it just gets weird,
12   and maybe that's every job.  So I'm so ethical.  Listen
13   I belong to a program that demands rigorous honesty.
14   The minute that showed up, I was like, what, and I
15   called everybody.  I tried to switch it out on my own,
16   but I didn't have an ID number or some bizarre thing, so
17   it was -- but I called Chase and she worked on it
18   diligently along with Michael, I think, to help -- it
19   was very confusing and difficult.
20   Q.      The purpose of your efforts was to return the
21   miles, correct?
22   A.      Oh yeah, which happened.
23   Q.      Okay.  And the two recordings that we just
24   listened to, was that your voice on the recordings?
25   A.      Yes.
```



Page 258

                         ROBIN CHAMBERS

1

2    Q.      Okay.  I'm going to flip around a little bit

3    just in terms of the timeline, my apologies for any

4    confusion I'll try to clear it up.

5            When you left Canal in 2003, were there any

6    male employees were working there?

7    A.      Yes.

8    Q.      Weber was one of them, wasn't he?

9                  MS. HARWIN:  Objection to form.

10   A.      Yes.

11   Q.      And Kap was there as well or was that later?

12                 MS. HARWIN:  Objection to form.

13   A.      Yes, Weber brought in Kap.  They'd been best

14   friends since Syracuse, and that's how I met Kap.  But

15   mostly I loved Weber then, I counted on Weber.

16   Q.      And at the time, did you have knowledge about

17   the salary that Weber was making?

18   A.      I don't remember, but I'm sure I did.

19   Q.      As far as you can recall, back then, at the

20   time that you left Canal, would your salary have been

21   significantly higher than Weber's?

22   A.      Yes.

23   Q.      Okay.  And why was that?  Why was your salary

24   so much higher?

25                 MS. HARWIN:  Objection to form.



Page 259

1                   ROBIN CHAMBERS

2    A.      Because I had been working there for a long --

3    many, many, years.  Because I took on more and more

4    responsibility.  Because I was a valued, trusted, loyal

5    employee.  And he was working a lot and, you know, it

6    was a different world.  It was a different time then, it

7    was a different business.

8    Q.      And not trying to put words in your mouth,

9    ultimately back then, the buck stopped with you if there

10   was a problem; is that fair?

11   A.      Yes.

12   Q.      You were with Bob when 9/11 occurred; is that

13   right?

14   A.      Yes.

15   Q.      Okay.  And between 9/11 and 2019, you remained

16   involved with Bob to some degree; is that correct?

17                   MS. HARWIN:  Objection to form.

18   A.      Yes.

19   Q.      Would you agree that Bob's business interests

20   expanded significantly following 9/11?

21                   MS. HARWIN:  Objection to form.

22   A.      Yes.

23   Q.      Restaurants?

24                   MS. HARWIN:  Objection to form.

25   A.      Restaurants were -- quite a few restaurants



Page 260

1                         ROBIN CHAMBERS

2    were there.

3    Q.      What about hotels?

4                  MS. HARWIN:  Objection to form.

5    A.      Hotels definitely expanded since I left.

6    Q.      What about TFI?

7                  MS. HARWIN:  Objection to the form.

8    A.      It was just beginning, but yeah, everything

9    kind of blew up after I left in that respect.  Yes.

10   Q.      And at that time, Bob was still doing films,

11   correct?

12                 MS. HARWIN:  Objection to form.

13   A.      Yes.

14   Q.      And based on your lengthy history with Bob, do

15   you think he values loyalty?

16                 MS. HARWIN:  Objection to form.

17   A.      Absolutely.

18   Q.      Based on your lengthy history with Bob, do you

19   think he is not particularly pleased if he finds out

20   that he is being taken advantage of?

21                 MS. HARWIN:  Objection to form.

22   A.      Yes.

23   Q.      Do you think Bob's concern about being taken

24   advantage of and the premium he places on loyalty has to

25   do in part at least with his busy schedule?



Page 261

```
 1                    ROBIN CHAMBERS
 2                    MS. HARWIN:  Objection to form.
 3   A.      Could you say that again, please.
 4   Q.      Sure.  Do you think that Bob's busy schedule
 5   plays into why he places a premium on loyalty when it
 6   comes to employees?
 7                    MS. HARWIN:  Objection to form.
 8   A.      I don't think one -- I just think he
 9   appreciates, in friends and employees and children -- I
10   think it's just an important quality for him.  That's
11   been my impression.
12   Q.      Because of his status as a celebrity, do you
13   think he places a value on privacy?
14   A.      Absolutely.
15   Q.      And do you think over the course of Kaplan's
16   tenure within Canal that Bob relied on Kaplan for his
17   discretion and to preserve his privacy?
18                    MS. HARWIN:  Objection to form.
19   A.      Yes.
20                    MS. HARWIN:  And again, let me just
21             remind you, just slow down a little bit so
22             there's time to complete the question and any
23             objection.
24                    THE WITNESS:  Okay.  Sorry.
25   Q.      You testified in response to some questions
```



Page 262

                         ROBIN CHAMBERS

1

2    from Counsel earlier towards the beginning of the

3    deposition that Chase ran the office.

4            Do you recall that?

5                 MS. HARWIN:  Objection to form.

6    A.      Yes.

7    Q.      Did Chase talk to you about managing the

8    office?

9                 MS. HARWIN:  Objection to form.

10   A.      We would talk about personality things or you

11   know, conflicts that came up or the good things that

12   happened just daily in mention.  But she ran it on her

13   own.  She didn't need my help.  Sometimes I would be a

14   sounding board, that's all.

15   Q.      But she discussed management-related issues

16   with you; is that right?

17                MS. HARWIN:  Objection to form.

18   A.      Sometimes.

19   Q.      Did she ever discuss employee morale with you?

20                MS. HARWIN:  Objection to form.

21   A.      Sometimes.

22   Q.      Was Chase your supervisor?

23                MS. HARWIN:  Objection to form.

24   A.      I didn't think of her as my supervisor because

25   we did completely separate things and some things



Page 263

1                    ROBIN CHAMBERS

2    together.  But I would consult her.  She was -- she was

3    the person -- she -- she mostly had Bob's ear and I

4    always tried to be inclusive in anything I was doing

5    after I got to know her and trust her, as well as

6    Michael Kaplan, to keep them all informed.  I tried to

7    let them both know where I was, what I was doing.  You

8    know, I was pretty open like that because I knew Bob

9    could get paranoid.  And when Tiffany came in, the

10   paranoia ramped up even more.  So I was trying to be

11   very open with everybody, Michael Tasch, here's where I

12   am, here's what I'm doing, here's what I spent, here's

13   the jitney.  It's like -- it got so petty and stupid.  I

14   hate that I put up with it for so long.  Sorry.

15   Q.      That's okay.  Ms. Chambers, I'm going to try to

16   streamline the questions a little bit if we can for

17   efficiency standpoint.

18           Did you regard yourself as Chase's supervisor?

19                MS. HARWIN:  Objection to form.

20   A.      No.

21   Q.      Did you regard yourself as the supervisor for

22   anyone in Canal's office after you left in 2003?

23                MS. HARWIN:  Objection to form.

24   A.      Maybe a little with Kaplan because we worked

25   together so much on that stuff and he would usually take



Page 264

```
 1                     ROBIN CHAMBERS
 2   my lead because that was my area of expertise.  But that
 3   being said, Kaplan knew more about the office and stuff
 4   like that, that I didn't know about.  So in areas that I
 5   knew about, I felt that he assisted me.  And in other
 6   areas, I felt like I assisted him or Chase, depending on
 7   what we were working on.
 8   Q.      If Chase testified that you were her
 9   supervisor, would she have been lying?
10                MS. HARWIN:  Objection to form.
11   A.      Could you say that again.
12   Q.      Sure.  If Chase testified in this litigation
13   that you were her supervisor, would that have been a
14   lie?
15                MS. HARWIN:  Objection to form.
16   A.      Yes, I think so.  I -- yeah.  Yes.  But I hate
17   to put it like that.
18   Q.      Aside from what Chase may have herself told
19   you, you don't have any personal knowledge about Chase's
20   financial arrangements with Bob, do you?
21                MS. HARWIN:  Objection to form.
22   A.      No.
23   Q.      Okay.  And would that include perks and expense
24   reimbursements?
25                MS. HARWIN:  Objection to form.
```



Page 265

                    ROBIN CHAMBERS
1
2   A.      I'm going to qualify that because sometimes Bob
3   would say to me, you know, I'm letting her go -- or I'm
4   letting her go here, she's going to be gone here.  That
5   would be in passing.  So I took that as to confirming
6   what she would do.  Did I have any direct knowledge of
7   that?  No, mostly it was what Chase told me, little bits
8   from Bob, but not that much.
9   Q.      And as we're sitting here today, what
10  specifically do you recall Bob telling you that would
11  confirm something Chase mentioned to you about either
12  perks or some type of expense reimbursement issue?
13              MS. HARWIN:  Objection to form.
14  A.      Well, I know that like, when she went to London
15  I know she met him there.  I know she did some work
16  there with him, stuff like that.  I know about that
17  thing in LA with the books and a friend or another
18  coworker who was there.  I mean, you know, I went to
19  Texas this past year to do some work for Bob and because
20  it was my choice and my timing, I timed it when my son
21  was there, so I got to have two meals with him and so
22  that --
23  Q.      Ms. Chambers, I understand and I'm not trying
24  to interrupt you.  But I'm just trying to confirm what
25  specifically you spoke to Bob about in terms of Chase's



Page 266

```
                            ROBIN CHAMBERS
 1
 2      perks or expense reimbursement?
 3                      MS. HARWIN:  Objection to form.
 4      A.      I don't remember.
 5                      MR. BENNETT:  I'd like to take a
 6              10-minute break if we can.  If we can log back
 7              on at 5:00, if that's alright.
 8                      THE WITNESS:  Will it be -- could I
 9              just get an idea of how -- if you know, how
10              much longer, ballpark?
11                      MR. BENNETT:  I would say at least an
12              hour.  Hopefully that will be it.
13                      THE VIDEOGRAPHER:  We're going off the
14              record, 4:49 p.m.
15              (Whereupon, a short break was taken.)
16                      THE VIDEOGRAPHER:  Back on the record
17              officially 5:02 p.m.  Go ahead.
18      Q.      Thank you.  Ms. Chambers, I'm going to try to
19      streamline the questioning a little bit.  Before we went
20      on the record, you apologized.  There's certainly no
21      apology necessary, but try, if you're able to, to the
22      extent you're able to, please try to respond to only the
23      question that's asked with your personal knowledge and
24      try to be as concise as you can be.  Okay?
25                      Can you hear me Ms. Chambers?
```



Page 267

```
 1                    ROBIN CHAMBERS
 2    A.      Yes.
 3    Q.      Okay.  I can't see you for some reason.
 4    A.      I know, I have very little light in this house.
 5    Q.      Oh, I see.  Now I can.  Thank you.  In 2019,
 6    what did Dan Harvey do for Canal?
 7                    MS. HARWIN:  Objection to form.
 8    A.      As far as I knew, he was Bob's trainer of many
 9    years.
10    Q.      In 2019, what did Chase do?
11                    MS. HARWIN:  Objection to form.
12    A.      Chase was Bob's assistant and had another
13    title, which I don't recall at this moment.  She was
14    doing different things, but she was around the office.
15    Q.      Okay.  And if Chase testified that she did not
16    know what Dan Harvey did for Bob, would she have been
17    lying?
18                    MS. HARWIN:  Objection to form.
19    A.      I guess I'd have to say yes to that.  Yes.
20    Q.      And as far as you understood their respective
21    job duties as of 2019, Chase did not perform any duties
22    that Dan Harvey performed; is that correct?
23                    MS. HARWIN:  Objection to form.
24    A.      I believe that's correct.
25    Q.      And if that's what Chase testified to, that
```



Page 268

1                      ROBIN CHAMBERS
2   they perform the same job duties, would that also have
3   been a lie?
4                      MS. HARWIN:  Objection to form.  And
5            Counsel is repeatedly mischaracterizing the
6            testimony that there's been so far.
7                      MR. BENNETT:  That is replete in this
8            record.
9   A.       I believe, yes.
10  Q.       Shifting topics a little bit, do you know why
11  Chase was recording phone calls in 2019?
12                     MS. HARWIN:  Objection to form.
13  A.       I do not.
14  Q.       Okay.  Do you think that people who have
15  integrity generally record phone calls?
16                     MS. HARWIN:  Objection to form.
17  A.       I'd have to say no.  I don't get that, I don't.
18  Q.       Did you regard that as a breach of your trust?
19                     MS. HARWIN:  Objection to form.
20  A.       Yes.
21  Q.       It was your expectation that the conversations
22  you were having with Chase were private; is that right?
23                     MS. HARWIN:  Objection to form.
24  A.       Yes.
25  Q.       I asked you a question previously about whether



Page 269

```
 1                    ROBIN CHAMBERS
 2   or not you perceived Chase as having integrity, do you
 3   recall that?
 4   A.      Yes.
 5   Q.      Would you like to change that answer?
 6                   MS. HARWIN:  Objection to form.
 7   Q.      We're going to get into 2019, Ms. Chambers.
 8   Would you like to change the answer?
 9                   MS. HARWIN:  Objection to form.
10   A.      Yeah, I -- I guess, yes.  I guess, yes.
11   Q.      And now that you know that your conversations
12   were recorded, you do not think that Chase had integrity
13   as of 2019; is that correct?
14                   MS. HARWIN:  Objection to form.
15   A.      I guess.
16                   MR. DROGIN:  Please don't guess.
17                   THE WITNESS:  Yes.  Yes.
18   Q.      Thank you.  On the second recording that we
19   listened to, you counseled Chase to return the miles, do
20   you recall that?
21                   MS. HARWIN:  Objection to form.
22   A.      I don't.
23   Q.      I'm sorry, I didn't hear your answer.
24   A.      I don't remember, but yeah.
25   Q.      Okay.  When the miles showed up in your account
```



Page 270

                          ROBIN CHAMBERS

1

2    as we talked about before, you picked up the phone to

3    rectify the situation and return the miles, correct?

4    A.       Yeah, because I'm paranoid like that knowing

5    Bob like I do.  So yeah, I was like, Jesus, how did this

6    happen?  I was freaked out.

7    Q.       Do you recall the year that that happened?

8    A.       I do not.

9    Q.       Do you believe it happened before 2019?

10   A.       Yes, I believe so.  Yes, I believe so.

11   Q.       And at that point, would you agree that you had

12   built up decades worth of trust with Bob?

13                  MS. HARWIN:  Objection to form.

14   A.       I like to think so, yes.

15   Q.       And by picking up the phone and returning the

16   miles, would you agree with me that that was what Bob's

17   expectations would have been?

18                  MS. HARWIN:  Objection to form.

19   A.       Yes, I wasn't working for him then.  I mean, I

20   was, but I wasn't.  I wasn't on salary per se, so it was

21   a totally different thing.  But yeah, I would expect

22   that he would think that if something -- a thousand

23   dollars were delivered to my house by accident, that I

24   would go, okay, accident, this goes to there.  Yes, yes.

25   Q.       Because it was not your property, right?



Page 271

```
 1                     ROBIN CHAMBERS
 2   A.       Correct.
 3   Q.       As we're sitting here today, do you have any
 4   idea as to why Chase has not returned the sky miles to
 5   Bob?
 6                 MS. HARWIN:  Objection to form.
 7   A.       I do not know.
 8   Q.       And would you regard her retention of the sky
 9   miles that belong to Bob as lacking in integrity?
10                 MS. HARWIN:  Objection to form.
11   A.       This is -- yes.
12   Q.       Counsel asked you some questions about Bob's
13   reaction in certain circumstances where Chase would not
14   be available if he needed her, do you recall that?
15                 MS. HARWIN:  Objection to form.
16   A.       Yes.
17   Q.       And correct me if I'm wrong, your testimony in
18   that topic came -- the source of that information came
19   from Chase herself; is that right?
20                 MS. HARWIN:  Objection to form.
21   A.       No, that came from Bob too.  It was many
22   occasions, so that could come from Bob too.  You know, I
23   can't reach her, you know, that kind of thing.  But
24   that's natural.
25   Q.       Okay.  Back before 2003, you had petty cash
```



Page 272

```
1                    ROBIN CHAMBERS
2    when you were working with Bob, correct?
3    A.      Yes.
4    Q.      Did you ever take any petty cash home with you?
5    A.      I had it with me all the time, yes and a credit
6    card and a checkbook.
7    Q.      And did you regard those as your personal piggy
8    bank or did you know that you would always need to
9    account to Bob or Berdon or someone else?
10                   MS. HARWIN:  Objection to form.
11   A.      No.  Yes.  Yes.
12   Q.      Between 2013 and 2019, do you recall being part
13   of any conversations that involved yourself, Bob and
14   Chase regarding Chase's work duties?
15   A.      I think -- I don't recall all together.  I
16   remember them separately hearing from Chase and hearing
17   from Bob and just me believing that I automatically knew
18   what she did, because I did it and I knew what he
19   required.  So I would hear it from him.  We had
20   conversations in the same conversation where he would
21   say, she's important to me, you know, and this is why
22   and they weren't long --
23   Q.      Let me just stop you there.  We're getting a
24   little bit lost.  So unless I misunderstood your
25   testimony, the question was, between 2013 and 2019, were
```



Page 273

1                    ROBIN CHAMBERS

2   you part of any meetings involving yourself, Bob, and

3   Chase regarding Chase's work duties, and it sounds like

4   the answer is no.

5                    MS. HARWIN:  Objection to form.

6   A.      Not that I remember.  No.

7   Q.      With respect to conversations you had with Bob

8   directly regarding Chase's work duties, what

9   specifically do you recall from those conversations?

10                   MS. HARWIN:  Objection to form.

11  A.      Just -- you know, it was never a formal

12  conversation on the phone or it was a conversation when

13  we were working on the seventh floor, but just what he

14  expected.  And usually it was complimentary, and you

15  know -- yeah, just that she did everything.  That's when

16  he would say things like -- and sometimes he'll repeat

17  himself and he'll say that she reminds me of you, you

18  know.  So it was in that -- but nothing specific and it

19  wasn't a long drawn out thing.

20  Q.      Do you recall anything else from those

21  conversations as far as Chase's work duties go?

22  A.      No.

23  Q.      Thank you.  Tom Harvey, over the course of your

24  employment with Canal up to 2003, would you have

25  regarded him as a confidant?



Page 274

1                    ROBIN CHAMBERS

2                    MS. HARWIN:  Objection to form.

3    A.     Yes.

4    Q.     What about the time period after you formally

5    left Canal in 2003 up until 2020--

6                    MS. HARWIN:  Objection to form.

7    Q.     --would you have regarded Tom Harvey as a

8    confidant during that time period?

9    A.     I think so, yes.  I trusted him.  I disagreed

10   with him a lot.  But I was pretty -- had the

11   relationship, I believe, that I could say I disagreed.

12   Sometimes I'd listen, not say anything, but disagree.

13   But I trusted that if I said something like, I hate Bob,

14   I'm so angry, he did this, he said this, that Tom knew

15   enough not to go running back, that it was in the

16   moment.  So I trusted him in that respect, but I also

17   have to say that I disagreed with Tom and sometimes the

18   things that he'd -- he tell me and I would absolutely

19   fight him on it.  So we had -- I believe -- I believed I

20   could speak honestly to him.

21   Q.     So despite whatever arguments you may have had

22   occasionally, you still regarded him as a confidant over

23   that period of time?

24   A.     I think so, yes.  But I didn't have much to do

25   with him during a lot of portion of that time.  Like



Page 275

1                    ROBIN CHAMBERS

2   years I didn't talk to him, I think.

3   Q.     Over the course of today, you've been asked a

4   lot of questions about the types of duties that Chase

5   did or did not perform over the course of 2013 to 2019,

6   do you recall that?

7   A.     Yes.

8   Q.     Okay.  Aside from what you just explained to me

9   that derived from conversations between you and Bob

10  about Chase's work duties, correct me if I'm wrong, the

11  information that you obtained about what Chase was doing

12  derived from Chase or Kaplan; is that correct?

13                    MS. HARWIN:  Objection to form.

14  A.     Yes.  And to also what I saw and worked with

15  her on.  I had firsthand knowledge of some of the

16  things, obviously not everything.  But the things that I

17  worked on with her, I knew about that.

18  Q.     That's a fair point.  Let me clarify.  With

19  respect to the operations of Canal's office and the

20  personnel inside Canal's office, that information, what

21  you learned was from Chase or Kaplan; is that correct?

22                    MS. HARWIN:  Objection to form.

23  A.     Yes.

24  Q.     And with respect to Chase's work on the

25  townhouse, is it correct that your knowledge about what



```
                          ROBIN CHAMBERS
 1
 2    Chase performed on the townhouse is from Chase herself?
 3                 MS. HARWIN:  Objection to form.
 4    A.      I was a witness because I saw.  I heard.  I
 5    helped what I could do on the phone, which is very
 6    little at that point.  But between Kap and Chase and
 7    other people that they had to bring in to get stuff
 8    delivered up there, I knew it was a shit show, frankly.
 9    Sorry.
10    Q.      Before Chase resigned, what did you observe
11    directly as far as what Chase was doing in the
12    townhouse?
13                 MS. HARWIN:  Objection to form.
14    A.      Could you say that again, please.
15    Q.      Sure.  Up to the date that Chase resigned, what
16    did you directly observe Chase doing with respect to the
17    work on the townhouse?
18                 MS. HARWIN:  Objection to form.
19    A.      When Bob and Tiffany moved in, then my
20    knowledge was gone because she was gone.  I just mostly
21    had knowledge and saw with my own eyes, I think, maybe
22    once or a couple of times -- yeah, maybe two or three
23    times, the amount of work that was being done there.
24    But after Bob moved in with his girlfriend, then I
25    didn't have any knowledge except what Kap or Chase would
```



Page 277

                        ROBIN CHAMBERS

1    tell me.

2    Q.     Okay.  And didn't Chase mention to you at some

3    point that she agreed to perform work on the townhouse

4    as a favor to Bob because of what he had been going

5    through in his life?

6              MS. HARWIN:  Objection to form.

7    A.     Could you say that again.

8    Q.     Sure.  Didn't Chase mention to you that she

9    agreed to work on the townhouse for Bob as a favor to

10   Bob because of what he had been going through at that

11   time in his life?

12             MS. HARWIN:  Objection to form.

13   A.     It sounds familiar.  Because I know she was

14   worried about him.  So that sounds familiar, but I can't

15   say for sure.

16   Q.     Okay.  When it comes to the time period of 2013

17   to 2019, would you agree that Bob was pretty busy,

18   whether it was on films or his other business interests?

19   A.     Yes.

20             MS. HARWIN:  Objection to form.

21   Q.     He wasn't managing the day to day operations of

22   Canal's office was he?

23             MS. HARWIN:  Objection to form.

24   A.     No.



Page 278

1                    ROBIN CHAMBERS

2    Q.       Chase was, correct?

3                    MS. HARWIN:  Objection to form.

4    A.       Yes.

5    Q.       And you testified earlier that Grace was

6    looking for people who would be loyal to both her and

7    Bob, do you recall that testimony?

8                    MS. HARWIN:  Objection to form.

9    A.       I think she's looking for people who are going

10   to be loyal to her.

11   Q.       And was it your understanding that Tiffany had

12   the same mentality?

13   A.       I think she was trying to be a hero to Bob and

14   I think it was the same mentality, maybe a little bit

15   worse.

16   Q.       Okay.  And just to clarify, your daughter is

17   named Tiffany too, correct?

18   A.       Yes.

19   Q.       I was referring to Tiffany Chen, just to ensure

20   there was no confusion.

21   A.       No.

22   Q.       With respect to what Chase was allowed to

23   charge on Canal's credit card and receive reimbursement

24   for, your understanding is limited solely to what Chase

25   conveyed to you on that topic; is that right?



Page 279

```
 1                    ROBIN CHAMBERS
 2                    MS. HARWIN:  Objection to form.
 3    A.      I don't think it's a conversation we ever had,
 4    because -- I just -- it's not a conversation we ever had
 5    because she knew what could be reimbursed and so did I.
 6    And I had -- if we went to lunch, it was during the day
 7    it was a working lunch, we -- you know, I don't think it
 8    was ever really a discussion.  She just knew by that
 9    time, she had been there a chunk of time by then.
10    Q.      And correct me if I'm wrong, but your
11    understanding -- as opposed to Chase's -- your
12    understanding was based on your lengthy employment which
13    ended in 2003; is that right?
14                    MS. HARWIN:  Objection to form.
15    A.      Yes.  And that Chase would -- it's just not a
16    specific conversation, but we would say, like, I mean
17    you just -- you know Greg, when you -- you just kind of
18    automatically know what can be paid for by Canal and
19    what can't be, what's business related and what's Bob
20    related.  It's just an -- you just kind of know it, it's
21    like a no-brainer at that point.
22    Q.      Thank you.  You were asked some questions
23    earlier about a trip that Chase took to Los Angeles in
24    March of 2018, do you recall that?
25    A.      Yes.
```



Page 280

                          ROBIN CHAMBERS

1

2    Q.      Okay.  Have you ever spoken to anyone other

3    than Chase about that trip or the taxi driver books?

4                MS. HARWIN:  Objection to form.

5    A.      Yes.

6    Q.      Kaplan would be the other person you spoke to

7    about that?

8                MS. HARWIN:  Objection to form.

9    A.      That's true.

10   Q.      Other than Kaplan and Chase, is there anyone

11   else you spoke to about those two concepts?

12   A.      No.

13   Q.      And over the course of today's testimony you

14   were asked a few questions about the use of sky miles by

15   Canal employees.

16           Do you generally recall those questions?

17                MS. HARWIN:  Objection to form.

18   A.      Yes.

19   Q.      And focusing on the time period following your

20   formal departure from Canal in 2003, your understanding

21   of that issue is based solely on information that either

22   Chase or Kaplan conveyed to you; is that right?

23                MS. HARWIN:  Objection to form.

24   A.      Yes, mostly.

25   Q.      What else is there?  Who else would have



Page 281

1                          ROBIN CHAMBERS

2    conveyed information to you about either Canal or --

3    A.      Like, Bob.  Like Bob would say, you know, I let

4    them use my miles or something like that, I remember him

5    saying.  It was a throw away line, part of a larger

6    something.

7    Q.      Did you ever have a conversation with Bob about

8    a Canal employee's entitlement to retain sky miles after

9    they left Canal's employment?

10                   MS. HARWIN:  Objection to form.

11   A.      No.

12   Q.      Have you ever had a conversation with Berdon

13   about that topic?

14                   MS. HARWIN:  Objection to form.

15   A.      No.

16   Q.      To clarify, I'll just mention that that would

17   include Mark Boswick or Michael Tasch?

18   A.      No.

19   Q.      What about Tom Harvey?  Have you discussed that

20   topic with Tom Harvey?

21                   MS. HARWIN:  Objection to form.

22   A.      Not maybe, you know, until the issue arose.

23   But certainly not before then because he wouldn't have

24   been involved.  But nothing --

25   Q.      And when you say when the issue arose, that



Page 282

1                    ROBIN CHAMBERS

2  would have been after Chase's resignation; is that

3  right?

4  A.      Yes.

5  Q.      Other than Chase, you have not spoken to anyone

6  else about that topic; is that right?

7  A.      No.  I mean Michael Kaplan and I might have had

8  a conversation, he has one viewpoint, I have another.

9  You know, but nothing of any substance.  You know, no.

10 But that's the only person.  I don't discuss can it with

11 outside people.

12 Q.      Right.  But the conversation you just mentioned

13 to me about Kaplan, tell me if I'm wrong, would have

14 occurred after Chase's resignation, correct?

15                    MS. HARWIN:  Objection to form.

16 A.      Yes.

17 Q.      Okay.  You testified earlier, and I'm not

18 trying to mischaracterize your testimony that Chase was

19 the person who would disseminate or convey Bob's

20 directions.

21         Does that sound fair and consistent with your

22 prior testimony?

23                    MS. HARWIN:  Objection to form.

24 A.      Yes.

25                    MR. BENNETT:  Ms. Chambers you can --



Page 283

ROBIN CHAMBERS

2      okay.  Thank you.

3  Q.      Was that because he trusted Chase more than

4  other employees?

5              MS. HARWIN:  Objection to form.

6  A.      It was easier for him, you know, to have one

7  number, one person to deal with that he was very

8  comfortable in doing that.  And it made it easier on

9  him.  It was an easier, more expedient way of dealing

10  with things.  And it made more sense -- made more sense,

11  because if you kept telling everybody in the office a

12  different thing, it gets all -- one person has to know

13  everything.

14  Q.      When it came to ensuring that directions would

15  be carried out or executed, did you have a sense as to

16  whether Bob trusted Chase to do such things more than

17  Kaplan?

18              MS. HARWIN:  Objection to form.

19  A.      Yes.

20  Q.      He would have trusted Chase more on those

21  topics; is that right?

22  A.      Yes.

23  Q.      You observed Bob yelling at Kaplan; is that

24  right?

25  A.      Yes.



Page 284

1                    ROBIN CHAMBERS

2   Q.      What about Tom Harvey?  Have you observed

3   directly Bob yelling at Tom Harvey on occasion?

4   A.      Yeah, on the phone.  If I'm with him on the

5   phone yelling or Tom would say, I just got yelled at or

6   something, you know.

7   Q.      And Michael Tasch, what about him?  Have you

8   ever observed or been near Bob when he was yelling at

9   Michael Tasch?

10                   MS. HARWIN:  Objection to form.

11  A.      I know that Bob would say, I screamed at

12  Michael Tasch or I just yelled at Michael Tasch, so

13  yeah.

14  Q.      Okay.  And going back to the townhouse a little

15  bit, before Chase resigned, was it your understanding

16  that Kaplan was also doing work on the townhouse?

17  A.      I think they both worked very, very, hard on it

18  together and it was a big undertaking in a short amount

19  of time.

20  Q.      Did you ever have any direct conversations with

21  Kaplan about the specifics of what he did on the town

22  house?

23  A.      I don't remember.  Just that it was a lot of

24  work.  It was a lot of work.  Both of them were so busy

25  during that time, I remember not having much contact



1                    ROBIN CHAMBERS

2   with either one of them.  Literally it was crazy, that's

3   what I remember.

4   Q.      And you testified earlier about overhearing

5   some derogatory comments that Bob may have made on

6   occasion, do you recall that?

7   A.      Yes.

8   Q.      Okay.  Have you ever observed Bob mention or

9   direct a derogatory comment at Kaplan or about him?

10                   MS. HARWIN:  Objection to form.

11  A.      No, nothing more than just complaining or you

12  know, I can't reach him or he's not there, what's he

13  doing or you know, but nothing -- I don't know -- I

14  don't know if that's derogatory or not, probably not

15  what you're looking for.

16  Q.      Well, no, anything critical of what Bob wanted

17  Michael to do for his job for Canal?

18                   MS. HARWIN:  Objection to form.

19  A.      Oh, sure.  Yes, Bob was that way about me.  He

20  would complain to people about me.  He just -- you know,

21  you took it with a grain -- I took it with a grain of

22  salt.  Like if he complained about Chase or Kaplan or

23  Tom or his kids, I wouldn't think anything of it because

24  I knew how he felt about them.  So I would let it just

25  go.  I wouldn't take it to somebody and say guess what



Page 286

                    ROBIN CHAMBERS
1
2    he said about you and worry somebody, unless it was --
3    you know what I'm saying?  It was not in that mean -- I
4    didn't -- I didn't think so, no.  It was annoyed, he
5    gets annoyed but -- he gets annoyed with me.  It was
6    kind of just --
7    Q.     With respect to any critical or derogatory
8    comments that Bob may have made about Kaplan, did you
9    notice that there were any different types of comments
10   or the frequency of the comments that were different
11   when Bob would mention them about Chase?
12                   MS. HARWIN:  Objection to form.
13   A.     Could you just repeat that.
14   Q.     Sure, I'll actually rephrase it.  You explained
15   to me that you observed Bob making critical or
16   derogatory comments when it comes to the performance of
17   Kaplan's job duties, right?
18   A.     Once in a while, yes.
19   Q.     And you observed Bob making similar comments
20   about Chase's work performance, correct?
21                   MS. HARWIN:  Objection to form.
22   A.     Yes, yes.
23   Q.     And in terms of the frequency that -- if you're
24   comparing Kaplan with Chase, the comments that Bob made
25   about either of them, would you say it's about equal?



Page 287

```
 1                     ROBIN CHAMBERS
 2                     MS. HARWIN:  Objection to form.
 3    A.      I would think so.  It was just he would be
 4    annoyed that he couldn't -- mostly couldn't reach
 5    somebody on the phone and he might make a comment to me,
 6    but that was mostly it.
 7    Q.      Based on your experience working over the
 8    course of your entire life, would you agree that
 9    workplaces are occasionally filled with conflict?
10                     MS. HARWIN:  Objection to form.
11    A.      Yes.
12    Q.      Okay.  You were asked a couple of questions
13    about whether Chase ever complained to you about
14    "discrimination".  Do you recall that testimony?
15                     MS. HARWIN:  Objection to form.
16    A.      Yes, I do.
17    Q.      What is your understanding of the word
18    discrimination?  What does that mean?
19                     MS. HARWIN:  Objection to form.
20    A.      Treating people unequally.  Different rules
21    apply for different people depends on what kind of --
22    sexual discrimination, gender discrimination, race
23    discrimination, it just depends.
24    Q.      Okay.  And you mentioned to everybody earlier
25    that you and Chase would both have conversations
```



Page 288

```
 1                    ROBIN CHAMBERS
 2   throughout 2017 and 2018 and 2019 about various
 3   work-related issues, fair?
 4                  MS. HARWIN:  Objection to form.
 5   A.     Yes.
 6   Q.     Okay.  And did Chase ever use the word
 7   discrimination when she had a conversation with you?
 8                  MS. HARWIN:  Objection to form.
 9   A.     I don't recall her ever using that word.  She
10   could have, but I don't recall it.  But --
11   Q.     Did she ever articulate or describe to you why
12   she perceived any person react or treat her in a
13   particular manner?
14   A.     Can you say that again.
15   Q.     Sure.  Did Chase ever articulate to you her
16   perception as to the reason that a particular person
17   treated her a certain way or reacted to her in a
18   particular fashion?
19                  MS. HARWIN:  Objection to form.
20   A.     I don't remember.  I don't remember.
21   Q.     Counsel asked you a few questions involving the
22   term pay parity, do you recall that?
23   A.     Yes.
24   Q.     And if I understood your testimony correctly,
25   it sounded as though Chase mentioned this term to you
```



Page 289

1                    ROBIN CHAMBERS

2    during the course of one or more conversations; is that

3    correct?

4                    MS. HARWIN:  Objection to form.

5    A.      I don't remember it being a big thing.  I mean,

6    I remember it, but it wasn't a big thing.  I remember --

7    you know, yeah.  I do remember that, yeah.  I do

8    remember, yeah.

9    Q.      And do you recall being a part of any meeting

10   with yourself, Chase and Bob where that specific term

11   was used?

12                   MS. HARWIN:  Objection to form.

13   A.      Pay parity?

14   Q.      Yes.

15   A.      I don't remember, but it could have been.

16   Q.      You mentioned during another point in your

17   testimony that Chase articulated to you that she felt as

18   though Tiffany were targeting her, do you recall that?

19   A.      Yes.

20   Q.      Okay.  Did she ever explain to you or describe

21   to you why she felt Tiffany was targeting her?

22   A.      I think there was a lot of e-mails and texts

23   that kind of made it clear and there were a lot of --

24   I've seen this happen and I don't want to gang up on

25   anybody, but I've seen that with my own eyes and I know



Page 290

```
 1                    ROBIN CHAMBERS
 2   what she was talking about because I saw some of the
 3   texts and e-mails that were sent to her from Tiffany.
 4   And so it was pretty -- there was a problem there, yeah.
 5   Q.      And did Chase ever explain to you why she felt
 6   Tiffany was targeting her?
 7                    MS. HARWIN:  Objection to form.
 8   A.      I think it was anybody's guess.  I think Chase
 9   really tried in the beginning -- according to Chase,
10   Chase really tried in the beginning when they were in LA
11   and you know, she tried to do the right thing and my --
12   oh gosh, this is -- I think that it was anybody's guess.
13   I think she was trying to figure that out.
14   Q.      But as far as you can recall, as we're sitting
15   here today, did she ever articulate her perception as to
16   why Tiffany was targeting her?
17                    MS. HARWIN:  Objection to form.
18   A.      Yes, I believe we both -- both Chase and I came
19   and I probably, I know, put in my two cents because of
20   what I had been through at a different time, different
21   woman, but the same situation.  And again, it's -- I
22   know that we had those kind of philosophical
23   conversations about there's kind of nothing you could do
24   about it when Bob at this point brings a new person and
25   the new person decides they want you gone.  You know,
```



Page 291

                        ROBIN CHAMBERS
1
2    it's just evident, there's no one particular thing, it's
3    just everything and was trying to help out with that.
4    It's a rough thing.  It's a rough thing.  Because you
5    think you can please somebody or get to know them and it
6    doesn't work sometimes with people.  So yeah, we had --
7    I remember those conversations but nobody really knew
8    for sure.  But it was just us going, maybe this or maybe
9    that or I don't know or --
10   Q.      And do you know if those conversations are part
11   of the recordings that have been produced in this
12   litigation?
13           MS. HARWIN:  Objection to form.
14   A.      Yeah, they very well might be.  Because --
15   yeah, of course they very well might be, yeah.
16   Q.      And you testified at another point that with
17   respect to a recommendation letter that Chase had wanted
18   Bob to sign, that he has said things like that before
19   that he never followed through with, do you recall that?
20   A.      Yeah, it's like, I hope I can explain it right.
21   But it was like -- it's like you say -- you know, an
22   example, if you're talking about a member of your
23   family, I'm so mad I want to strangle them, it's that
24   kind of a thing, I believed, in my experience with him.
25   It's nothing -- he's not an unkind man.



Page 292

                    ROBIN CHAMBERS

1

2    Q.      Right.  But have you ever observed or learned

3    about Bob mentioning previously that he was not going to

4    give a particular Canal employee a recommendation

5    letter?

6    A.      Yeah, he would say that, but he never follows

7    through.  And I don't remember who, but he never does

8    that.  It's just he -- he gets angry if somebody does

9    something that's probably deserving of that, you know.

10   Q.      And do you recall if it was more than one

11   person or just one person?

12                    MS. HARWIN:  Objection to form.

13   A.      Like one or two people.  We went through a lot

14   of people during my 16 years there so -- it was when I

15   was working, not when Chase was -- you know, I didn't

16   know anything then, but sure.

17   Q.      And before Chase resigned, had you ever met

18   Sabrina Weeks-Britain?

19   A.      I may have met her once, I don't know.  And

20   maybe a couple of times after.

21   Q.      And before Chase resigned, had you ever met

22   Gillian Spear?

23   A.      Don't remember if I met them or not.  I've seen

24   them maybe three times in my life.

25   Q.      And that would have been after --



Page 293

```
 1                    ROBIN CHAMBERS
 2   A.      Definitely after she resigned, but then they
 3   left so --
 4   Q.      And have you ever met Lulu White?
 5   A.      No, no.  I don't believe --
 6   Q.      Does that name ring a bell?
 7   A.      Maybe once, yeah, yeah.  Maybe once.
 8   Q.      Who is that?
 9   A.      I think that was somebody that Chase hired in
10   the office, a third person in the office, if I remember
11   correctly, I think.
12   Q.      Do you know if Lulu was Chase's assistant?
13                    MS. HARWIN:  Objection to form.
14   A.      Yes, I believe she was Chase's assistant,
15   but --
16   Q.      Thank you.
17                    MS. HARWIN:  I'm sorry, can you repeat
18           your answer, I didn't hear the end of it.
19                    THE WITNESS:  Yes, I believe she was
20           Chase's assistant, I remember that clearly.
21           But I also believe that she did stuff in the
22           office too, so I don't know if she was maybe
23           between -- I don't know, but she was called
24           Chase's assistant, yes.
25   Q.      You testified earlier that Chase reacted quite
```



Page 294

1                     ROBIN CHAMBERS

2    strongly to Bob's reference to the recommendation letter

3    during that meeting, do you recall that?

4                     MS. HARWIN:  Objection to form.

5    A.        No.

6    Q.        Do you recall Chase's reaction to Bob's mention

7    that he allegedly might not give a positive

8    recommendation letter to Chase?

9    A.        Oh, yes, I was there for that.

10   Q.        Okay.  At that time was it your perception that

11   Chase had overreacted in response to Bob's statement?

12                    MS. HARWIN:  Objection to form.

13   A.        No, she was hurt and he was angry.  But I

14   believed that it would have never have happened and that

15   I could have smoothed it over and it would have smoothed

16   out.  That's what I really truly believed and hoped for.

17   Q.        Do you think that Chase decided to resign

18   before March 2019?

19                    MS. HARWIN:  Objection to form.

20   A.        I don't know.  I don't remember.  I don't

21   remember.

22   Q.        When it came to Chase's anxiety level, based on

23   your direct observations of her throughout the

24   relationship you've had with her while she worked at

25   Canal, would you say that she was generally a fairly



Page 295

                         ROBIN CHAMBERS

1   anxious person?

2                    MS. HARWIN:  Objection to form.

3   A.       No.

4   Q.       You testified earlier that Ms. Chen instructed

5   Canal employees not to speak with Chase towards the end

6   of her employment, do you recall that?

7   A.       Yes.

8   Q.       Who told you that?

9                    MS. HARWIN:  Objection to form.

10  A.       I believe Michael Kaplan.

11  Q.       After Chase resigned or before?

12  A.       I think it was -- I don't know.

13  Q.       But Bob never told you that, correct?

14                   MS. HARWIN:  Objection to form.

15  A.       No.

16  Q.       Before Chase had resigned, were you aware

17  whether or not Canal or Ms. Chen were questioning

18  certain expenses that Chase had made?

19                   MS. HARWIN:  Objection to form.

20  A.       Yes, but it was not just Chase.  It was me,

21  Kap, it was everybody so --

22  Q.       Kaplan as well, correct?

23  A.       Yes, I believe so.  Yes.

24  Q.       And when it comes to your earlier testimony



Page 296

1                    ROBIN CHAMBERS

2    that Bob stopped speaking with Chase or e-mailing him,

3    correct me if I'm wrong, your knowledge on that topic

4    comes solely from Chase; is that right?

5                    MS. HARWIN:  Objection to form.

6    A.       Yes and Bob.

7    Q.       What did Bob tell you about that?

8    A.       I remember trying to say why aren't you calling

9    back.  Just have a conversation.  No, I'm not calling,

10   I'm not doing that.  I do remember that.  I tried to

11   help, but I was powerless and he was getting mad at me

12   so --

13   Q.       Do you recall anything else that Bob said on

14   this conversation?

15   A.       No, he just cut me off and it was a very

16   upsetting time.  Kap was upset, I was -- everybody was

17   upset so --

18   Q.       And was Bob not speaking with Kaplan either?

19                    MS. HARWIN:  Objection to form.

20   A.       I think he was talking to Kap, but he never had

21   a whole lot of -- I don't remember that.  It was usually

22   very specific, when he would call Kap it was for a

23   specific reason.  Like every once in a while -- do you

24   know what I mean?  It would be for a specific reason, it

25   wasn't a long chat or anything, normally.  But I think



Page 297

                         ROBIN CHAMBERS

1

2      he never stopped talking to Kap as far as I remember.

3      Q.      Do you know how many lawsuits involving Canal,

4      Bob and Chase were filed?

5                        MS. HARWIN:  Objection to form.

6      A.      I believe there are two.

7      Q.      Do you know who filed the first suit?

8      A.      I believe Bob.

9      Q.      Canal?

10     A.      Canal.

11     Q.      Do you know when it was filed?

12     A.      I do not.

13     Q.      Do you know when Chase's lawsuit was filed?

14     A.      I don't.

15     Q.      Okay.  And counsel took you through a few

16     questions about Bob's reaction to Chase's threat of

17     bringing a lawsuit.  Do you recall that question?

18     A.      Yes.

19     Q.      And as we're sitting here today, do you

20     specifically recall someone telling you that Chase had

21     threatened to file a lawsuit?

22     A.      Yes.

23     Q.      Okay.  Who told you that?

24     A.      I think it could have been Kap or Tom.

25     Q.      I'm not looking for guesses though.



Page 298

                              ROBIN CHAMBERS

1

2    A.      Oh, yeah, I don't know.

3    Q.      Do you know when you learned of that

4    information?

5    A.      I do not.

6    Q.      You were asked some questions about an

7    investigation that Canal conducted.  Do you recall those

8    questions?

9    A.      Yes, I do.

10   Q.      And some of your testimony referred to Canal

11   wanting to collect e-mails, do you recall that

12   testimony?

13   A.      Yes.

14   Q.      Okay.  And as we're sitting here today, do you

15   know or have a recollection as to the time period when

16   investigation was going on versus when Canal was

17   engaging in preservation efforts after Chase had sued?

18               MS. HARWIN:  Objection to the form.

19   A.      I have no idea.

20               MS. HARWIN:  Counsel, I would note that

21          the questioning has been going on for, I

22          believe over an hour and a half now.  Do you

23          have an estimate as to when you'll be done.

24               MR. BENNETT:  We can take a break right

25          now, to be honest, I think I only have five



Page 299

```
 1                    ROBIN CHAMBERS

 2        minutes, maybe 10 at most.

 3                    MS. HARWIN:  You can keep going, that's

 4        okay.  I just wanted to --

 5                    MR. BENNETT:  I'd like to actually, if

 6        you don't mind, even a five-minute break it's

 7        5:46 now, we can come back at 5:51.  I'll be

 8        done max 10 minutes after that.

 9                    THE WITNESS:  Well, let's just do it,

10        right?  I'm okay, whatever you guys want.

11                    MR. BENNETT:  Yeah, I'd like to take a

12        break if it's alright Ms. Chambers.

13                    THE WITNESS:  Oh, oh, oh okay.

14                    MR. BENNETT:  We'll come back on at

15        5:51.

16                    MS. HARWIN:  Sounds good.

17                    THE WITNESS:  Okay.

18                    THE VIDEOGRAPHER:  Going off the record

19        5:46 p.m.

20                    (Whereupon, a short break was taken.)

21                    THE VIDEOGRAPHER:  Back on the record

22        5:53 p.m.  Go ahead.

23   Q.    Thank you.  Ms. Chambers, I still have a few

24   more questions for you, okay?

25                    Based on your interactions with Tiffany Chen,
```



Page 300

```
 1                    ROBIN CHAMBERS
 2   would you agree that Tiffany trusted Chase?
 3                    MS. HARWIN:  Objection to form.
 4   A.      No.
 5   Q.      Your daughter, whose name is also Tiffany, is
 6   an interior decorator; is that right?
 7   A.      Yes.
 8   Q.      She's been pretty successful in that industry;
 9   is that correct?
10   A.      She's okay, she's okay.  Yeah, she's doing
11   well.
12   Q.      Did she convey an interest to you to try and
13   work on the townhouse for Bob and Tiffany Chen?
14   A.      Bob -- it came through Bob.  Bob wanted her, as
15   my daughter did his upstate house which I found for him
16   and gardener and she worked on the pool barn and the
17   guest house and she was an assistant then and then she
18   went out on her own and then Bob brought up to me that
19   he'd like her to do the Montauk house and possibly, I
20   remember her talking briefly about the apartment,
21   yeah --
22   Q.      And when it came to -- the townhouse, is that
23   what you said?
24   A.      Yeah, and the Montauk house.
25   Q.      And when it came to the townhouse, did Bob
```



Page 301

```
 1                    ROBIN CHAMBERS
 2    refer you and suggest that Tiffany should reach out to
 3    Chase about that?
 4                 MS. HARWIN:  Objection to form.
 5    A.      Yes, I remember that.  I think that's right.  I
 6    think that's right.
 7    Q.      And do you recall learning if your daughter did
 8    reach out to Chase?
 9                 MS. HARWIN:  Objection to form.
10    A.      I believe she did.  She might have, yes.  I
11    believe that's the way it happened, it didn't work out.
12    Q.      Right.  Do you know why it didn't work out?
13    A.      Well, my perception was is that Chase could do
14    it, Chase could handle it and it might have gotten
15    complicated because Tiff was my daughter.  And so I
16    understood that, I think I felt bad because it would
17    have been nice, because Bob knew her and was comfortable
18    with her, but I understand that dynamic, just as I
19    understand Tiffany Chen not wanting my daughter to work
20    on their house.  Because she's my daughter and the
21    dynamic and she has history with Bob.  So I might have
22    been sad about it, because it would have been a
23    wonderful job for my kid, but I understood Chase's and I
24    understood Tiffany's difficulty with that.  So I'm like
25    caught in the middle of this, but I do understand that.
```



Page 302

1                         ROBIN CHAMBERS

2    Q.       And a different interior decorator was

3    ultimately retained; is that right?

4    A.       Yes, Chase had a friend that she wanted to work

5    with, I remember that now.  And then Bob and Tiffany

6    found a company that they wanted to work with in

7    Montauk, yes.

8    Q.       And did you ever learn that the person that

9    Chase hired for the interior decorating work was a

10   friend of hers instead of your daughter?

11                   MS. HARWIN:  Objection to form.

12   A.       I knew that.

13   Q.       What was her name, do you recall?

14   A.       Huh?

15   Q.       Do you recall her name?

16   A.       I don't remember her name, but I knew that

17   Chase knew her and was comfortable with her and -- yeah.

18   Q.       And this is a yes or no answer, but does it

19   sound accurate if your W-2 from Canal in 2018 reflected

20   an income of ██████████

21                   MS. HARWIN:  Objection to form.

22   A.       Yeah, that makes sense.

23   Q.       And for 2017, your W-2 is ██████████

24   A.       Yeah, that makes sense.

25   Q.       And for 2016, it was ██████████



Page 303

1                    ROBIN CHAMBERS

2    A.       Yeah, that makes sense.  It was not 250,000 a

3    year though.

4    Q.       Would you ever agree that at any point Chase

5    was paranoid about Tiffany's actions or motives?

6                    MS. HARWIN:  Objection to form.

7    A.       No.

8    Q.       Do you agree that Chase conveyed to you that

9    she thought it would be better if Bob broke up with

10   Tiffany?

11                   MS. HARWIN:  Objection to form.

12   A.       I think it was a wish.  I don't think she

13   conveyed it like it was going to be a real thing, no.

14   But it was like we wished he had somebody that everybody

15   liked.  It wasn't just us.  That everybody liked and

16   wanted him to have a good life with someone.  But he's

17   -- you know, I think we both agree it was like, okay,

18   it's his choice there's nothing we can do about it.  We

19   deal with it.  That was the attitude.

20   Q.       Would you agree that Chase tried to create a

21   silo so that she was the sole person communicating with

22   Bob?

23                   MS. HARWIN:  Objection to form.

24   A.       Not with me, not that I would have knowledge of

25   in the office, but, you know --



Page 304

                         ROBIN CHAMBERS
1
2    Q.      In the course of your conversations with
3    Kaplan, did that concept ever come up during those
4    discussions?
5                MS. HARWIN:  Objection to form.
6    A.      No, but Kap worked in a different way and he
7    and Chase butted heads on occasions.  So I would listen
8    to Kap and I would be his sounding board which I was
9    happy to do and I was listen to Chase and I would keep
10   it in and I would try and smooth it over, I mean they
11   worked many years together.  But I don't remember him
12   ever saying, she's not letting me talk to Bob, if that's
13   the question, no, I don't remember, that.  I don't
14   remember him saying that to me and he was pretty open,
15   so --
16   Q.      What about Berdon or Jane or anything like
17   that?
18                MS. HARWIN:  Objection to form.
19   A.      Them not talking to Bob?
20   Q.      About Chase acting as sort of the sole funnel
21   that would essentially act as the repository for
22   information from either Berdon or TFI or Jane so that
23   Chase would be the one that would update Bob those types
24   of issues?
25                MS. HARWIN:  Objection to form.



1                    ROBIN CHAMBERS

2     A.      Yeah, I think that's the only way to run that

3     office, it was the way I worked it.  And everybody

4     trusted me and knew that talking to me was easier than

5     getting to Bob and they'd get things done if they were

6     talking to me.  That kind of control is almost

7     necessary, and it used to be in a certain extent to

8     maintain a flow of information.  And again, it just --

9     it can work really, really, well that way.  It's not --

10    Q.      And you say that just based on your employment

11    which ended in 2003?

12                    MS. HARWIN:  Objection to form.

13    A.      Yes.

14    Q.      Did Chase ever mention to you that she brought

15    various property of Canal's home to her office such as

16    iPhone's or computers or other types of devices?

17                    MS. HARWIN:  Objection to form.

18    A.      Yes.

19    Q.      She did.  And when she quit, she should have

20    returned that equipment and those belongings to Canal,

21    correct?

22                    MS. HARWIN:  Objection to form.

23    A.      If quitting were under -- yeah, I would have

24    done that if quitting were normal circumstances.  I

25    don't know what happened up there, but, yeah, you would



Page 306

```
1                    ROBIN CHAMBERS
2    return things.
3    Q.      And counsel introduced a letter to you
4    previously that, if you recall, referred to certain
5    belongings and property of Canal's, that Tom Harvey
6    asked Chase to return, do you recall that?
7    A.      Yes, I saw that in that letter, yes.
8    Q.      And are you aware that the lawsuit that Canal
9    commenced against Chase partly related to those types of
10   belongings and property?
11                  MS. HARWIN:  Objection to form.
12   A.      No.
13   Q.      Would it surprise you to learn that Chase just
14   returned that property and those materials in November
15   of 2021?
16                  MS. HARWIN:  Objection to form.
17   A.      No.
18   Q.      And do you ever recall conveying to Ms.
19   Robinson that Berdon, so that would be Tasch and
20   Boswick, didn't like Chase because she pointed out
21   errors that they had allegedly committed?
22   A.      Yeah, we talked about that.  Because it was --
23   yeah, it was true, in the specific things that we were
24   talking about.
25                  MR. BENNETT:  Ms. Chambers, thank you
```



Page 307

ROBIN CHAMBERS

1
2      for your time.  The defendants have no further
3      questions.
4  CONTINUED EXAMINATION BY
5  MS. HARWIN:
6  Q.      Ms. Chambers, I have just a handful of
7  questions and I hope that we'll be done in five minutes.
8  A.      Okay.  I'm getting stupider as the night goes
9  on.
10  Q.      We will endeavor to wrap this up quickly.  Your
11  understanding about Ms. Robinson's role at Canal was not
12  based solely on what Ms. Robinson or Mr. Kaplan told
13  you; is that correct?
14              MR. BENNETT:  Objection.
15  A.      It was what I gleaned from everybody, they were
16  the main people that I got my information from, but from
17  Bob and from Bob and not so much Michael Tasch or Tom
18  Harvey, but you know, it was them and Bob, the three of
19  us.  Those are the people I was mostly in contact with,
20  I believe.
21  Q.      And you directly observed Ms. Robinson's work
22  through working with her, correct?
23              MR. BENNETT:  Objection.
24  A.      Yes.
25  Q.      And you spoke to Mr. De Niro about Ms.



Page 308

```
 1                    ROBIN CHAMBERS
 2   Robinson, correct?
 3                    MS. LAZZARO:  Objection.
 4   A.      Yes.
 5   Q.      Your knowledge of the expenses that Canal
 6   authorized was not limited to what Ms. Robinson told
 7   you, correct?
 8                    MS. LAZZARO:  Objection.
 9                    MR. BENNETT:  Objection.
10   A.      I don't quite understand that.
11   Q.      Let me state the question again.  Your
12   knowledge of the expenses that Canal authorized for
13   employees was not limited to what Ms. Robinson told you,
14   correct?
15                    MS. LAZZARO:  Same objection.
16                    MR. BENNETT:  Objection.
17   A.      No, my opinion was based on years and knowing
18   how everything worked and I've known him continuously
19   for that period of time.  If I wasn't working directly
20   with him, I'd know nothings changed.  I knew the group
21   before Chase also.  And I had a lot more to do with them
22   than I did with the girls in Chase's office, the
23   assistants that she hired or that Bob and Chase hired.
24   So it was the same with the group before in between me,
25   there were like three or four assistants after me before
```



Page 309

1                     ROBIN CHAMBERS

2    Chase, if I remember correctly, and it was the same

3    then.  So I just knew.

4    Q.     Canal had generally applicable practices

5    concerning paying for working meals that extended

6    through decades, correct?

7                     MS. LAZZARO:  Objection.

8                     MR. BENNETT:  Objection.

9    A.     Yes.  And you know, and in working with other

10   people like Bob, it was the same too.  I think it's kind

11   of an industry thing, maybe.

12   Q.     Canal had generally applicable practices

13   concerning paying for work-related transportation that

14   extended for decades, correct?

15                    MS. LAZZARO:  Objection.

16                    MR. BENNETT:  Objection.

17   A.     Yes.  Bob was generous, thoughtful.

18   Q.     Are you aware of whether there were any

19   restrictions on Ms. Robinson's ability to transfer back

20   sky miles once they had been transferred?

21                    MS. LAZZARO:  Objection.

22                    MR. BENNETT:  Objection.

23   A.     I don't know.  I would not know.  I would not

24   know.  I just know that chunk that came to me was a

25   freaking nightmare for everybody.  Michael Tasch, Kap,



Page 310

                         ROBIN CHAMBERS

1

2    Chase.  I was out of it.  I was like here, it's your

3    thing.  I didn't touch it, I didn't ask for it, here.

4    Q.       You don't have any information either way about

5    whether Ms. Robinson had the ability to transfer back

6    sky miles to Mr. De Niro, correct?

7                    MS. LAZZARO:  Objection.

8    A.       I do not know that, correct.

9    Q.       When Ms. Robinson was complaining to you about

10   what she was experiencing at Canal, she did use the word

11   harassment, correct?

12                   MS. LAZZARO:  Objection.

13                   MR. BENNETT:  Objection.  Asked and

14            answered.

15   A.       I don't remember if she used that word, but the

16   meaning can still be the same without using that word.

17   Q.       You understood Ms. Robinson to be complaining

18   to you about harassment at Canal; is that right?

19                   MS. LAZZARO:  Objection.

20   A.       Not Canal in general, it was usually a specific

21   thing or purpose or -- you know what I mean?  It wasn't

22   just in general.

23   Q.       Ms. Robinson complained to you about specific

24   instances of what she characterized as harassment; is

25   that correct?



Page 311

                         ROBIN CHAMBERS

1                        ROBIN CHAMBERS

2                        MS. LAZZARO:  Objection.

3                        MR. BENNETT:  Objection.

4    A.      Yeah, I'd feel better if you were asking me if

5    it came from a specific person.  If she complained about

6    so and so giving her a hard time or Tiffany or Bob or me

7    or Kap.  But in general, it was more specific than that,

8    it wasn't -- it was, you know, a general

9    dissatisfaction, it was a thing.

10   Q.      In conversations with you, Ms. Robinson

11   complained that she was being harassed by Mr. De Niro's

12   girlfriend; is that correct?

13                       MS. LAZZARO:  Objection.

14                       MR. BENNETT:  Objection.

15   A.      Not harassed, but I think the word is targeted

16   maybe.  She was being singled out.  She was being

17   insulted.  She was being -- it was, like, somebody was

18   trying to force her to leave.

19   Q.      Mm-hmm.  Ms. Robinson did use the word sexism

20   when she complained to you about some of Mr. De Niro's

21   comments; is that correct?

22                       MS. LAZZARO:  Objection.

23                       MR. BENNETT:  Objection.

24   A.      I don't remember exactly, but I remember it was

25   about that, yeah, yeah, like -- yeah, he wouldn't ask



Page 312

```
 1                    ROBIN CHAMBERS
 2   somebody else to do this or something like that, if I
 3   remember correctly.  But that was only at the very,
 4   very, end as, you know, things got really crazy.
 5                    MS. HARWIN:  Ms. Chambers, I believe
 6             that brings us to the end of my questions this
 7             evening.  Thank you for being here.
 8                    MR. BENNETT:  Sorry, I actually have a
 9             couple of more.
10   CONTINUED EXAMINATION BY
11   MR. BENNETT:
12   Q.      Ms. Chambers this is somewhat torture for you.
13   My apologies, I'll try to keep it brief.  I didn't mean
14   to come back.  I don't have many.
15           When it comes to your understanding of Canal's
16   reimbursement policies, would you have thought it would
17   have been acceptable to take a helicopter from Sag
18   Harbor to Manhattan?
19                    MS. HARWIN:  Objection to form.
20   A.      If it's phrased like that, no.  But I myself
21   took a private plane back to New York from Canada to
22   pick up a piece of luggage.  No, I had an assistant --
23   we chartered a private plane for her to bring a piece of
24   luggage that I forgot with Bob and bring it to Canada.
25   So if it's Bob related, yes, I understand it.  If it's
```



Page 313

                        ROBIN CHAMBERS

1

2   bring the assistant by a private plane to Canada for no

3   purpose, no.  But if it's Bob related, yeah, we got him

4   what he needed when he needed it.

5   Q.      And that was for Canada that instance?

6   A.      Yeah, yeah, yeah, yeah.  I was in trouble.

7   Q.      And would you regard -- when it came to the

8   expense reimbursement policy, you mentioned earlier that

9   there were occasions when a Canal employee could obtain

10  reimbursement for dinner if they were working at night.

11          Do you recall that testimony?

12  A.      Oh sure, yes.

13  Q.      And do you think that it would be proper to

14  seek reimbursement for dinner if you sent one e-mail

15  that night?

16              MS. HARWIN:  Objection to form.

17  A.      If it was just exactly as you stated it, no.

18  Q.      Okay.  Thank you.  And when counsel just talked

19  to you about Chase's use of the word sexist or sexism,

20  do you recall specifically what it was that Chase was

21  referring to when that term may have come up?

22  A.      I think I remember the thing that upset her

23  somehow sticks clearly in my mind, because she was very

24  upset was that remark about you don't have kids, you

25  don't have a family.  That was something that she



Page 314

```
 1                    ROBIN CHAMBERS
 2    really, you know, again, that she was really, really,
 3    really, upset.  I believe that was it and yeah.
 4                    MR. BENNETT:  Thank you, Ms. Chambers,
 5          I have no further questions.
 6                    MS. HARWIN:  Ms. Chambers you'll be
 7          glad to here I have no further questions either
 8          and so this concludes your deposition.  Thank
 9          you for being here today, we know it's a long
10          day and we really appreciate the time you've
11          taken to provide testimony.  Thank you very
12          much.
13                    THE REPORTER:  Before we close the
14          deposition, Mr. -- Greg, sorry, would you like
15          a copy of the transcript?
16                    MR. BENNETT:  Yes, please.
17                    THE WITNESS:  Okay.  I'm leaving.
18                    MS. HARWIN:  Thank you Ms. Chambers.
19                    MR. BENNETT:  Thank you Ms. Chambers.
20                    THE VIDEOGRAPHER:  Can we go off the
21          record?
22                    (Continued on next page to accommodate
23          jurat.)
24
25
```



Page 315

1                    ROBIN CHAMBERS

2                    MS. HARWIN:  Hmm.

3                    THE VIDEOGRAPHER:  Can we go off the

4         record?

5                    MS. HARWIN:  Yes, we're off the record.

6                    THE VIDEOGRAPHER:  Okay.  Going off the

7         record 6:13 p.m.

8                    (Time Noted:  6:13 p.m.)

9

10                              ROBIN CHAMBERS

11    Subscribed and sworn to before me

12    this     day of         2022.

13

14         Notary Public

15

16

17

18

19

20

21

22

23

24

25



Page 316

1                       INDEX
2
3   WITNESS            EXAMINATION BY                PAGE
4   Robin Chambers     Alexandra Harwin             6;307
5   Robin Chambers     Gregory Bennett            224;312
6
7
8
9                     EXHIBITS
10  EXHIBIT            DESCRIPTION                   PAGE
    Defendant's 1      Voice Recording Bate Stamped  235
11                     Robinson 71719
    Defendant's 2      Bate Stamp Robinson 7230      246
12
    Plaintiff's 9      Bates Number 00011009 and     126
13                     00011010
    Plaintiff's 10     Bate Stamped Robinson         180
14                     00005297-5299
15
                  (Exhibits retained by Counsel.)
16
17
18
19
20
21
22
23
24
25



Page 317

1                C E R T I F I C A T E

2          I, BROOKE E. PERRY, hereby certify that the

3     Examination Before Trial of ROBIN CHAMBERS was held

4     before me on the 13th day of January, 2022; that said

5     witness was duly sworn before the commencement of her

6     testimony; that the testimony was taken stenographically

7     by myself and then transcribed by myself; that the party

8     was represented by counsel as appears herein;

9     That the within transcript is a true record of the

10    Examination Before Trial of said witness;

11          That I am not connected by blood or marriage

12    with any of the parties; that I am not interested

13    directly or indirectly in the outcome of this matter;

14    that I am not in the employ of any of the counsel.

15          IN WITNESS WHEREOF, I have hereunto set my

16    hand this 13th day of January, 2022.

17

18                 *Brooke E. Perry*

19                 BROOKE E. PERRY

20

21

22

23

24

25



```
                                                           Page 318
 1                         ERRATA SHEET

 2      CASE NAME:         ROBINSON v. CANAL PRODUCTIONS

 3      DATE OF DEPOSITION:  January 13, 2022

 4      WITNESS'S NAME:    Robin Chambers

 5      PAGE   LINE (S)    CHANGE           REASON

 6      ____|_____|_____|_____

 7      ____|_____|_____|_____

 8      ____|_____|_____|_____

 9      ____|_____|_____|_____

10      ____|_____|_____|_____

11      ____|_____|_____|_____

12      ____|_____|_____|_____

13      ____|_____|_____|_____

14      ____|_____|_____|_____

15      ____|_____|_____|_____

16      ____|_____|_____|_____

17

18

19                              ROBIN CHAMBERS

20      SUBSCRIBED AND SWORN TO BEFORE ME

21      THIS ____ DAY OF _____, 20__.

22      _____      _____

23      (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

24

25
```

