UNITED STATES SOUTHERN DISTRICT

SOUTHERN DISTRICT OF NEW YORK

GRAHAM CHASE ROBINSON,

No. 1:19-CV-09156 (LTS) (KHP)

Plaintiff,

vs.

ROBERT DE NIRO AND CANAL PRODUCTIONS, INC.,

Defendants.

________________________________

REMOTE VIDEOTAPED DEPOSITION OF SABRINA WEEKS-BRITTAN

JANUARY 10, 2022

8:36 a.m.

Beverly Hills, California

Diana Janniere, CSR-10034

Magna Legal Services

866-624-6221

www.MagnaLS.com

REMOTE APPEARANCES OF COUNSEL

For the Plaintiff:

SANFORD HEISLER SHARP, LLP
KATE MacMULLIN, ESQ.
JEREMY HEISLER, ESQ.
ANNIE SLOAN, ESQ.
ALEXANDRA HARWIN, ESQ.
JEREMEY MARGOLIS, SENIOR LEGAL ASSISTANT
1350 AVENUE OF THE AMERICAS, 31ST FLOOR
NEW YORK, NEW YORK 10019
646.402.5650
kmacmullin@sanfordheisler.com
jheisler@sanfordheisler.com
asloan@sanfordheisler.com
aharwin@sanfordheisler.com
jmargolis@sanfordheisler.com

For the Defendant:

TRAUB LIEBERMAN STRAUS & SHREWSBERRY
GREGORY BENNETT, ESQ.
SEVEN SKYLINE DRIVE
HAWTHORNE, NEW YORK 10532
914.347.2600
gbennett@tlsslaw.com

TARTER KRINSKY & DROGIN, LLP
BRITTANY K. LAZZARO, ESQ.
LAURENT DROGIN, ESQ.
1350 BROADWAY
NEW YORK, NEW YORK 10018
212.216.8000
blazzaro@tarterkrinsky.com
ldrogin@tarterkrinsky.com

REMOTE APPEARANCES OF COUNSEL

The Videographer:

DAN HONEGGER

Also Present:

TOM HARVEY,
CANAL PRODUCTIONS
GRAHAM CHASE ROBINSON

INDEX OF EXAMINATION

WITNESS: SABRINA WEEKS-BRITTAN

| EXAMINATION | PAGE |
|---|---|
| By Ms. MacMullin | 7 |
| By Mr. Bennett | 261 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Draft Recommendation Letter drafted by Ms. Robinson | 83 |
| 2 | Chat: 116 messages between Gillian Spear, Michael Kaplan, and Sabrina; Bates stamped CANAL_0047395 | 105 |
| 3 | 23 messages between Gillian Spear, Kevin Rivas, Sabrina Weeks-Brittan and Tiffany Chen; Bates stamped CANAL_0048976 | 148 |
| 4 | Ms. Robinson's AMEX and some flower receipts; Bates stamped ROBINSON00006712 | 221 |
| 5 | Flower receipts; Bates stamped ROBINSON00006719 | 231 |
| 6 | Breakdown of Ms. Robinson's Uber Trips; Bates stamped ROBINSON00006770 | 235 |
| 7 | Ms. Robinson's use of Bob's Delta SkyMiles | 245 |
| 8 | Ms. Robinson's petty cash; Bates stamped ROBINSON00006741 | 248 |

(Original Exhibits 1 - 8 are attached hereto.)

REMOTE VIDEOTAPED DEPOSITION OF SABRINA WEEKS-BRITTAN

JANUARY 10, 2022

THE VIDEOGRAPHER: All right. We are now on the record.

This begins videotape No. 1 in the deposition of Sabrina Weeks-Brittan, in the matter of "Graham Chase Robinson versus Robert De Niro and Canal Productions, Incorporated."

Today is January 10th, 2022, and the time is 8:36 a.m. Pacific Standard Time. This deposition is being taken remotely via Zoom at the request of Sanford Heisler Sharp, LLP.

The videographer is Dan Honegger of Magna Legal Services and the court reporter -- court reporter is Diana Janniere of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

MS. MACMULLIN: My name is Kate MacMullin. I'm an attorney from Sanford Heisler Sharp and I represent the plaintiff, Graham Chase Robinson.

MS. HARWIN: Alexandra Harwin, attorney from Sanford Heisler Sharp, also on behalf of plaintiff, Graham Chase Robinson.

MR. HEISLER: Jeremy Heisler, an attorney

with Sanford Heisler Sharp, on behalf of plaintiff, Graham Chase Robinson.

MS. SLOAN: This is Annie Sloan, an attorney from Sanford Heisler Sharp, also on behalf of the plaintiff, Graham Chase Robinson.

MR. MARGOLIS: This is Jeremy Margolis, a legal assistant at Sanford Heisler Sharp, also on behalf of the plaintiff, Graham Chase Robinson.

MR. BENNETT: Gregory Bennett on behalf of all defendants; Traub Lieberman Straus & Shrewsberry.

MR. HARVEY: Tom Harvey for Canal Productions, Inc. and Robert De Niro.

MS. LAZZARO: Brittany Lazzaro from Tarter Krinsky & Drogin, on behalf of Defendant Canal Productions.

MR. DROGIN: Laurent Drogin from Tarter Krinsky & Drogin on behalf of Canal Productions.

MS. MACMULLIN: Good morning, Ms. Weeks-Brittan. My name is Kate MacMullin. I'm an attorney from Sanford Heisler Sharp and I represent the plaintiff, Graham Chase Robinson. Thank you for being here today for your deposition.

Before we begin, I'm going to explain to you some of the ground rules for your deposition.

THE REPORTER: Hold on. I need to swear in

the witness.

MS. MACMULLIN: Oh, I'm sorry.

THE REPORTER: That's okay.

SABRINA WEEKS-BRITTAN,

having been first duly sworn, testifies as follows:

EXAMINATION

BY MS. MACMULLIN:

Q Okay. So I will walk through some of the ground rules for your deposition. I will ask you questions. And both my questions and your answers will be recorded by the court reporter.

Both of us need to speak up and speak clearly, and slowly, so that the court reporter can record everything.

Do you understand that?

A I do.

Q Also, you must answer verbally because the court reporter cannot record a nod or a shake of the head.

Do you understand that?

A I do.

Q Please wait until I finish my question before you start answering. If you don't understand

my question for any reason, don't answer it, and instead, please ask me for clarification.

If you do answer the question, however, we will assume that you understood the question.

Do you understand that?

A Yes.

Q Also, if you need a break at any time or for any reason, you should tell me and we'll finish your answer if we're in the middle of it, and then take a break.

The only time you can't take a break is if a question is pending.

Do you understand that?

A Yes.

Q Your attorney may object from time to time, but unless he or she instructs you not to answer, you should answer my question.

Do you understand that?

A Yes.

Q If you answer a question and later on you remember some additional information or you would like to clarify your earlier response, please tell me that you would like to add something to an earlier answer, and I'll give you the opportunity to do that.

Do you understand that?

A Yes.

Q If I use a term or abbreviation incorrectly, please correct my usage, so that we can make sure that we all have the same understanding of what the record means.

Do you understand that?

A Yes.

Q When I refer to "Canal," I'm referring to Canal Productions, Incorporated. And if you're -- if you're unsure about what I mean by any term, please let me know.

A Okay.

Q Is there -- is there any instruction I have provided that you do not understand or do not agree with?

A No, I'm clear.

Q This testimony is under oath just as if you were in a court of law. This testimony may be used as evidence in this case.

Do you understand that?

A Yes.

Q Do you have any electronic screens or communication devices with you in the room that you're in right now?

A No, just the laptop I'm on.

Q Is there anyone else in the room with you today?
A No.
Q Do you understand your obligation to provide testimony that is truthful and complete?
A I do.
Q Do you consider yourself an honest person?
A I do.
Q Do you consider it important to tell the truth?
A I do.
Q Do you understand that you're required to tell the truth here today even if it might be hurtful to Mr. De Niro?
A I understand.
Q What is your full name?
A Sabrina Tipton Weeks-Brittan.
Q Have you ever gone by another name?
A No.
Q And do you go by Ms. Weeks-Brittan, Ms. Weeks, or anything else?
A Ms. Weeks-Brittan.
Q What is your date of birth?
A [redacted]
Q What is your home address?

A [redacted]

[redacted]

Q How long have you resided at that address?

A About a year.

Q Do you live alone?

A No.

Q Who lives with you?

A A roommate.

Q Are you married?

A No.

Q Do you have any children?

A No.

Q Do you suffer from any condition that affects your memory?

A Nope.

Q Have you consumed any substances that affect your memory or ability to communicate today?

A No.

Q Is there any reason physically or mentally that you are not able to testify today truthfully and completely?

A No reason.

Q Other than this case, have you ever been involved in any other lawsuit or any other judicial, arbitral, or administrative proceeding either as a

party or a witness?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Not as a party or a witness, but I interned at the U.S. Attorney's Office for the Southern District in college.

BY MS. MACMULLIN:

Q Have you ever testified under oath before?

A I don't believe so, but I was almost on jury duty a few years ago. And I'm not sure if I was under oath or not.

Q Have you ever provided a sworn statement, declaration, or affidavit related to any lawsuit or any other judicial, arbitral, or administrative proceeding?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't think so. I'm not sure if I've already signed anything for this, but I don't think so.

BY MS. MACMULLIN:

Q Do you recall providing any testimony or any sworn statement in this case?

MR. BENNETT: I'm going to object to the extent that, Ms. Weeks-Brittan, you don't need to

provide any information responsive to that question if it relates to conversations you had with legal counsel. Otherwise, you can answer the question.

THE WITNESS: Okay. Then, I think the answer is no.

BY MS. MACMULLIN:

Q Have you ever provided any testimony -- let me rephrase.

Have you provided a sworn statement, regardless of whether it was to counsel or not?

MR. BENNETT: Objection.

THE REPORTER: This is the reporter. I didn't hear the answer.

THE WITNESS: I said no.

BY MS. MACMULLIN:

Q Have you ever been convicted of a criminal offense?

A No.

Q Have you ever been charged or arrested in connection with a criminal offense?

MR. BENNETT: Objection.

THE WITNESS: No.

MR. BENNETT: You can go ahead and answer.

BY MS. MACMULLIN:

Q Have you ever been accused of making any

false statement?

A No.

Q You are represented by Traub Lieberman, and Tarter, Krinsky & Drogin in this deposition; is that correct?

A Correct.

Q Have you been represented by any other attorney in connection with the lawsuit brought by Ms. Robinson against Mr. De Niro and Canal or in Canal's lawsuit or counterclaims against Ms. Robinson?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't know if Tom Harvey is part of either of those firms.

BY MS. MACMULLIN:

Q Does Tom Harvey represent you?

A Canal Productions.

Q Tom Harvey represents Canal Productions?

A Correct.

Q When did you first come to be represented by Traub Lieberman?

A I don't understand. Like, at the start of this case or right now? I haven't sought their services other than for this.

Q And when you say, "other than for this," do

you mean for this deposition today?
A Yes.
Q When did you first speak to an attorney from Traub Lieberman?
A Maybe E-mail correspondence with Greg probably since 2019.
Q On how many occasions have you spoken to an attorney from Traub Lieberman?
MR. BENNETT: Objection.
You can answer.
THE WITNESS: Spoken in person, maybe one to two times. Some E-mails back and forth, a handful.
BY MS. MACMULLIN:
Q When did you first come to be represented by Tarter Krinsky & Drogin?
A I don't really know. I was just under the assumption they were representing Canal Productions.
Q When did you first speak to an attorney from Tarter Krinsky & Drogin?
A Can you --
MR. BENNETT: Objection.
THE WITNESS: -- rephrase?
MR. BENNETT: With respect to this -- with respect to this case or -- or otherwise? If you could just clarify that, please.

BY MS. MACMULLIN:

Q When is the first time that you spoke to an attorney from Tarter Krinsky & Drogin in general?

A I'm not 100 percent sure which attorneys are from Tarter Krinsky & Drogin. I've spoken to Greg Bennett and Tom Harvey in relation to this deposition.

Q Understood.

Have you spoke to Laurent Drogin at any point?

A I don't believe so.

Q Have you ever sought or received legal advice from Tom Harvey?

A Yes.

Q What have you done to prepare for today's deposition?

MR. BENNETT: Objection.

Don't reveal anything you discussed with counsel, Sabrina. Otherwise, you can answer the question.

THE WITNESS: I have spoken to the two attorneys I mentioned in the previous question, Greg Bennett and Tom Harvey. And I've also just generally spoken to my parents, who are lawyers.

BY MS. MACMULLIN:

Q When did you speak with Greg Bennett and Tom

Harvey?

A Last week, Thursday.

Q Was it just one conversation on Thursday?

A It was one conversation, and then I just called Greg one time since.

Q And did the first conversation take place by video or by phone?

A By phone.

Q And approximately how long did you speak with Tom Harvey and Greg Bennett for on Thursday?

A Maybe three hours.

Q And about how long was your follow-up call with Mr. Bennett?

A Thirty seconds.

Q Were there any non-attorneys present during either of those conversations?

A No.

Q Could anyone overhear your conversations with Mr. Harvey or Mr. Bennett?

A No.

MR. BENNETT: Objection.

You can answer.

BY MS. MACMULLIN:

Q And you mentioned that you spoke with your parents about the deposition. Did you tell your

parents anything beyond the fact that you were having your deposition taken today?
A What qualifies as "beyond the fact"?
Q Tell me everything you discussed with your parents about your deposition today.
A I just asked them for general advice. I've never been in a deposition before.
Q What advice did they give you?
A Just to listen to the question. Really respond to the question at hand. Make sure I'm clear on the question.
Q Have you spoken -- oh, was there anything else?
A No.
Q Have you spoken with Mr. De Niro regarding your deposition today?
A No.
Q Have you spoken with any Canal employees regarding your deposition today?
A No.
Q Have you reviewed any documents in preparation for your deposition?
A No.
Q Have you reviewed the Complaint in this case?

A Not for a while.

Q But did you review it at some point?

A At some point, yes, but I don't believe it was in the last year.

Q Approximately when did you review it?

A Maybe late 2019, early 2020. I reviewed it when it was initially made and then I haven't gone back.

Q Did anything you saw in the Complaint come as a surprise to you?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: You can answer.

MS. LAZZARO: Can you just -- can you just clarify which Complaint you're speaking about?

MS. MACMULLIN: Sure.

BY MS. MACMULLIN:

Q I'm speaking about the Complaint filed by Ms. Robinson in this litigation, "Robinson versus De Niro and Canal Productions."

A I just want to -- I'm not 100 percent sure I'm thinking of the right thing. I was generally surprised by this case.

Q That's what I'm asking about. I'm asking about if I have it right, when you reviewed the

Complaint that our law firm filed on behalf of Chase Robinson, was there anything in there that you were surprised by?

A Can you briefly summarize it for me? And then, I'll let you know if I was surprised by certain things.

Q Well, based on your understanding of what this case is about, was there anything that surprised you?

MR. BENNETT: Objection.

THE WITNESS: Can I answer?

MR. BENNETT: Yes. To the best of your ability, yes.

THE WITNESS: I was generally surprised by all of it.

BY MS. MACMULLIN:

Q Is there -- please explain what you mean by that.

A Can -- can you be more specific in the question?

Q I'm asking you to explain -- when you say that you were "generally surprised by all of it," I'm asking what you meant by that.

A I just don't remember the Complaint well enough, but I was surprised that Chase was bring any

sort of claim against Bob.

Q Why were you surprised that Ms. Robinson was bringing a claim against Bob?

A From my memory of what the Complaint was, I didn't see much validity to the claims. It wasn't my personal experience. So I was just surprised because I wasn't aware of any of those claims at the time.

Q Was there anything in the case that you thought might be valid?

MR. BENNETT: Objection. Case meaning Complaint?

MS. MACMULLIN: Case meaning Complaint, or Ms. Weeks-Brittan's understanding of the claims that are at issue in this lawsuit.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Can -- can you tell me the claims that are at issue? I just -- I haven't looked at the Complaint in a bit. You know, there's a lot of just like gossip articles as well. I don't want to be mixing things up that aren't in the Complaint. So any clarity would be helpful.

BY MS. MACMULLIN:

Q This case involves claims about gender discrimination, retaliation, overtime pay; and other

matters. So I'm asking if there's anything in those categories of claims that you think might be valid.

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

You can answer.

THE REPORTER: There was a female voice. I don't know who said, "Objection." Can you state -- was that you, Brittany?

MS. LAZZARO: That was me. Thank you.

THE REPORTER: Thank you.

THE WITNESS: I was surprised. I never experienced gender discrimination from Bob. I have never -- I didn't see any discrimination towards Chase from him.

I submitted my expenses and overtime to Chase. I didn't believe Chase was overtime eligible at the time due to her salary and her managerial position over me. A lot of that just was a surprise to me.

BY MS. MACMULLIN:

Q Have -- what expenses did you submit to Ms. Robinson?

A Petty cash. Petty cash expenses. General.

If I paid for something that was work-related for Bob or was asked to go somewhere, and

take an Uber, I would submit that.

Q Are there any other kinds of work-related expenses that you recall submitting to Ms. Robinson?

A A wide variety of work-related expenses that I paid out-of-pocket, I detailed in an Excel. She would approve it. I would assume it would be sent to cash and then I would be reimbursed; or I would receive petty cash directly from Chase.

Q Have you reviewed the answer and counterclaims that were filed in this case?

A I don't think so.

Q Did you bring any documents with you today relating to this case?

A No.

Q Please describe your educational history.

A I have a Bachelor's Degree from University of Michigan in political science.

Q Did you graduate from high school?

A I did.

Q When did you graduate from high school?

A 2011.

Q And what high school did you graduate from?

A Latin School of Chicago.

Q And then, you just mentioned that you have a Bachelor's Degree in political science from the

University of Michigan. When did you receive that degree?

A 2015.

Q Do you have any post-college higher education?

A No.

Q Who is your current employer?

A Canal Productions.

Q And how long have you been employed by Canal?

A Mid-July 2018.

Q To the present?

A To the present.

Q And have you worked continuously for Canal from mid-July 2018 to the present?

MR. BENNETT: Objection.

THE WITNESS: I have.

BY MS. MACMULLIN:

Q What was your job history before you began working at Canal?

A After Michigan, I was hired by Oracle Corporation. I worked in Boston for a year. Promoted to Oracle's New York office in marketing and financial consulting. And then immediately following Oracle, I interviewed and received this job.

Q How did you come to work for Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I applied via a friend of a friend, and Chase Robinson interviewed me a handful of times; occasionally, with Michael Kaplan as well.

BY MS. MACMULLIN:

Q Why did you want to work for Mr. De Niro?

A I was eager to switch my career and pivot into entertainment. That's really what I'm passionate about. And I was looking for New York-based entertainment opportunities.

Q Did Mr. De Niro hire you to work for Canal?

A No, I never interviewed with him. Chase hired me, to be clear.

Q Have you had any formal employment agreement with Canal?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yes, I received a formal offer letter, a wage notice, an NDA; all from Chase when I received the job.

BY MS. MACMULLIN:

Q And when you say, "an NDA," is that a Confidentiality Agreement with Canal?

A It is. Standard for the industry.

Q Do you understand that you're required to testify here completely and truthfully regardless of that Confidentiality Agreement?

A I understand that.

Q And do you understand that you cannot withhold information at this deposition based on that agreement?

A Absolutely.

Q You began your employment at Canal as an executive assistant to Mr. De Niro; correct?

A Correct.

Q And in your role as executive assistant to Mr. De Niro, you reported directly to Mr. De Niro; is that right?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I reported directly to Chase.

BY MS. MACMULLIN:

Q Mr. De Niro is the person at Canal, who directed your job duties; is that right?

A Both --

MR. BENNETT: Objection.

You can answer.

THE WITNESS: -- Bob and Chase. And I

believe it's actually spelled out in my offer letter that anything given by, directed by Chase Robinson or Robert De Niro was in my purview.

BY MS. MACMULLIN:

Q Did you consider Mr. De Niro to be your boss?

A I considered him to be my overall boss, yes.

Q Tell me everything that you would do for Mr. De Niro as his executive assistant.

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: Pretty much anything asked of me in an executive assistant capacity. Anything asked of me by Chase as well. I considered her my direct manager.

Bob oversaw the team. If he asked me to get his agent, to get his publicist, connect you on calls; schedule something; buy him a book that he wanted; highlight a script; stuff like that.

And directives also came from Chase, like putting together travel itineraries, sending her a schedule of things, sending Bob a schedule of things once Chase approved that it was correct.

Especially at the beginning when I was new, a lot of the checks were done by Chase to make sure I

could then send to Bob.

BY MS. MACMULLIN:

Q Tell me all the job responsibilities that executive assistants at Canal performed during your employment.

MS. LAZZARO: Objection to form.

MR. BENNETT: Objection. Just -- just to be clear -- and I'm sorry, I don't mean to interrupt the questioning.

But there's a 30(b)(6) deposition that's contemplated with respect to policies and practices within Canal. Ms. Weeks-Brittan can testify as to her personal knowledge, but the question was phrased such that it -- I think it borders on that topic.

Could -- could we possibly read the question back, please?

THE REPORTER: Hold on.

(Whereupon, the question was read back as follows:

"Q Tell me everything that you would do for Mr. De Niro as his executive assistant.")

THE WITNESS: I think it involved all executive assistant duties.

Was there a follow-up question?

MR. BENNETT: Yeah, I think there was a second question there.

THE REPORTER: Let me look. Hold on. Yeah, you are correct.

(Whereupon, the question was read back as follows:

"Q Tell me all the job responsibilities that executive assistants at Canal performed during your employment.")

MR. BENNETT: I'm not trying to disrupt the questioning, but I'll object to the extent that the 30(b)(6) is contemplated; but Ms. Weeks-Brittan can certainly testify as to her personal knowledge.

You can go ahead and answer, Sabrina.

THE WITNESS: My personal knowledge is that as mentioned, when I was hired and I specified the job description, since I came from a very corporate situation and from -- at Oracle and moved to this, I asked for the job description to be spelled out.

And it was vaguely just directives given by Chase Robinson and Robert De Niro.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive

assistants facilitate Mr. De Niro's travel?

A Speaking of my own experience, I would help facilitate his travel, along with travel agents, a charter contact. I would run everything by Chase.

She would review travel itineraries before going to Bob. And then, I would send it along to Bob. Or at the time, Gillian Spear would as well.

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants schedule appointments for Mr. De Niro?

A Yes.

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants schedule calls for Mr. De Niro?

A I would schedule calls. I can't -- yes, I would schedule calls depending on the person. Chase would schedule her own calls and Bob's calls at the higher level. Like, maybe his entertainment lawyer if it was reviewing a contract.

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants schedule meetings for Mr. De Niro?

A I would schedule meetings for Mr. De Niro, as would Chase. She would probably schedule different meetings, but I can't speak to that. I would and

Gillian would also schedule meetings.

Q Ms. Weeks-Brittan, you're generally aware of the job duties of executive assistants, correct?

MR. BENNETT: Objection.

MS. LAZZARO: Objection to the form.

MR. BENNETT: You can answer.

THE WITNESS: I think there's a wide array of job duties within this industry. I know my own from being an executive assistant does include meetings, appointments, travel.

BY MS. MACMULLIN:

Q And you're generally aware of the job duties of executive assistants at Canal; correct?

MR. BENNETT: Objection.

THE WITNESS: Correct.

BY MS. MACMULLIN:

Q Okay. During the time when you and Ms. Robinson were both employed at Canal, would executive assistants respond to E-mails directed to Mr. De Niro?

MR. BENNETT: Objection.

THE WITNESS: Everyone would respond to E-mails occasionally directed towards Bob. Bob would respond to his own E-mails. Chase would respond depending on the level of person we were discussing.

Gillian and I would respond at the more nitty-gritty scheduling level as executive assistants.

MS. LAZZARO: Kate, I -- I don't mean to interrupt, but can you specify or define executive assistants that you're referring to?

Are those just Canal executive assistants or generally in the entertainment industry?

MS. MACMULLIN: I'm referring to executive assistants employed by Canal during the time that both Ms. Weeks-Brittan and Ms. Robinson were employed by Canal.

MR. BENNETT: Right, but on top of that, it might help to clarify specifically whom you're referring to.

Is it Gillian Spear and that's it, or is it someone else? Otherwise, I mean, there's going to be an objection to every one of these questions.

THE WITNESS: I was discussing just Gillian and myself, but more myself, since I know what I responded to.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants run errands for Mr. De Niro?

MR. BENNETT: Objection.

THE WITNESS: Not just Gillian or myself as the executive assistants would run errands. Michael Kaplan, who was not an executive assistant, would run errands frequently. Chase would also frequently run errands and was not an executive assistant.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants make reservations for Mr. De Niro?

MR. BENNETT: Objection.

THE WITNESS: I made reservations.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants assist Mr. De Niro in selecting birthday gifts?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: We would refer to a birthday list that Chase showed me early in my job. And we would double check with Chase and with Bob if we were kind of in the right wheelhouse.

Like, if someone deserved flowers or warranted a more personalized gift, we would clarify that, depending on the person, with Chase and/or Bob.

 BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants assist Mr. De Niro in selecting holiday gifts?

MR. BENNETT: Objection.

THE WITNESS: I only worked at Canal with Chase for one holiday season and I assisted her a lot with holiday gifts, as did Gillian.

All of it was in an effort to handle both Bob's Christmas gifts, Greenwich Hotel staff gifts, building gifts; business acquaintances. It wasn't necessarily all of Bob's personal things, but people in his orbit and in Canal Production's orbit that we wanted to make sure received holiday gifts.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants assist Mr. De Niro in selecting anniversary gifts?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: I did not -- I was hired after Bob and Grace were no longer living together. I believe he maybe still sent Grace flowers. Like,

maybe on her birthday as a courtesy, but I wasn't part of selecting anniversary gifts since there wasn't an anniversary.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants assist Mr. De Niro with his home?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: When I started, maybe a month or so later, Chase brought me into this home project when Bob was moving. And Chase and I would go around the city to stores and purchase things for the home.

She had me create, like, furniture outlines and would move them around the room accordingly to see where things would go in the space.

MS. LAZZARO: Kate, I'm sorry, can you just specify the address and the specific home that you're speaking about?

MS. MACMULLIN: Sure. I'm speaking about Mr. De Niro's home at [redacted].

MS. LAZZARO: Thank you.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive

assistants assist Mr. De Niro with his health?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: Like, booking a doctor's appointment, yes, but not -- I'm not a medical professional. I didn't assist with his health in any way other than booking appointments.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants communicate with Mr. De Niro's children?

MR. BENNETT: Objection.

THE WITNESS: Yes, they -- they would call the office. Whoever picked up the phone would speak to his children. They came to office holiday parties and would pop in and out, as they mostly all live local to New York.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants communicate with Mr. De Niro's girlfriend, Tiffany Chen?

MR. BENNETT: Objection.

THE WITNESS: Did you ask when Chase and I were both employees?

BY MS. MACMULLIN:

Q Yes.

A I don't think I spoke to Tiffany -- maybe early 2019 one time, but not frequently when Chase and I were both employees of Canal.

Q After Ms. Robinson's employment at Canal ended, how frequently would you speak with Ms. Chen?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: It became more frequently when we became more well-acquainted. We just weren't -- I didn't meet her until later in 2019. And then as things came up, either for Bob or their own travel, I communicated with her more frequently to schedule stuff like that.

BY MS. MACMULLIN:

Q After Ms. Robinson's employment at Canal ended, how frequently would you speak with Ms. Chen?

MR. BENNETT: Objection.

THE WITNESS: It -- it ramped up based on when I got to know her. Like, it started out infrequent. Now, I do talk or text with her more. She sends pictures of dogs. Not -- not all asks or anything, just I -- I know her better now as it's been a few years.

 BY MS. MACMULLIN:

Q Please quantify how frequently you would speak to Ms. Chen in a typical week.

A I'm in a different job capacity now and I live in Los Angeles. So I can't quantify it. It's much less frequently now that I'm not in New York.

Q During the second half of 2019, how frequently would you speak with Ms. Chen?

MR. BENNETT: Per week, Kate?

BY MS. MACMULLIN:

Q Per week?

A Completely a guess, but one to two times per week.

MR. BENNETT: Don't guess.

THE WITNESS: I don't remember.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants communicate with Mr. De Niro's former partner, Toukie Smith?

MR. BENNETT: Objection.

THE WITNESS: Toukie would occasionally call the office. She's not great at technology. So never E-mail or text asks. She would occasionally call.

She lives in a building with Bob's twin

sons, her sons, and she's friendly.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants decorate for Mr. De Niro's parties?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: For the Christmas party that year, we all helped decorate a Christmas tree, wrapped the gifts going to Bob's family, and to any acquaintances; mailed them out; left some in the office; stuff like that. Occasionally, we'd bring in balloons to the party room.

BY MS. MACMULLIN:

Q During the time when you and Ms. Robinson were both employed at Canal, would executive assistants make sure that Mr. De Niro's needs were met?

MR. BENNETT: Objection.

THE WITNESS: Yeah, I mean, he would E-mail us his asks or call, and we would handle the asks that came up.

BY MS. MACMULLIN:

Q During your employment, what were the working hours like for executive assistants at Canal?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: The working hours set by Chase initially when we were both Canal employees were about -- one of us would work 9:00 to 6:00. The other work would 10:00 to 7:00. So that we had a longer span of time collectively on the phones in the office; but it certainly extends into after hours as well.

And we had an after-hours phone that Gillian and I, as executive assistants, would work out between ourselves and transfer heavily through the week.

Obviously, with Covid and remote work, the hours have been different and on call, but not as much in the office.

I'm now in L.A. My team hours are different due to the time difference and the team I'm on.

It was much more desk in the office focused during the time I worked with Chase. She was very particular about the hours we were in the office and on the phones; and would call; and check to make sure I was at my desk by a certain time. It became more relaxed after Chase left.

BY MS. MACMULLIN:

Q And Ms. Weeks-Brittan you testified that your job title changed at a certain point. What did

it change to?

A It changed to manager of production and development. I work under Berry Welsh, who is president, the EVP of our production development team out in L.A.

I still work for Canal Productions and Bob, but I'm in a sort of hybrid role now doing production and development work.

Q Is Berry Welsh an employee of Canal?

A No. He's an employee of Tribeca.

Q And are you still an employee of Canal?

A I'm still an employee of Canal.

Q Are you also an employee of Tribeca Enterprises?

A I have a Tribeca E-mail, but my payroll is through Canal.

Q And when did your job change to manager of production and development?

A About a year ago when I moved to L.A.

Q Was becoming manager of production and development a promotion for you?

A It was.

Q Did you request that promotion?

A I did. I was planning on moving to L.A. and thought that I would need to leave the company because

our L.A. office is very small. And I wasn't sure if there was budget here to hire.

I spoke with Bob a number of times about ideally wanting to stay at Tribeca and being interested in production and development work, not knowing if there was a path or if I would need to quit.

I gave him a heads-up and said we should hire a new executive assistant. So that when I do quit and/or move, you are supported. He agreed.

And after a couple of months of talking, I spoke to Bob. I spoke to Berry. I spoke to Jane Rosenthal.

After multiple conversations, Bob agreed that it was possible to promote me and that I could work on both teams, as long as I oversaw the executive assistants that we hired; and just made sure that the historic knowledge remained there for Canal.

And the executive assistants could reach out to me at any time. And I would pick up the phone, call them, you know, clarify anything, make sure stuff was handled; but that I would effectively be on Berry's team.

Q Who is Jane Rosenthal?

A She's head producer and co-CEO to Bob with

Tribeca.

Q One of your job responsibilities at Canal is to supervise the executive assistants at Canal?

A No, it's --

MS. LAZZARO: Objection to form.

BY MS. MACMULLIN:

Q What, if anything, did Mr. De Niro say to you about why he was granting you the promotion?

A We have a good working relationship. I think he didn't want to lose me. I explained my career goals. And it was nice and appreciated that he enabled me to physically move and move up in the company.

Q What are your career goals?

A Production and development work. That's where my interests lay.

Q What is your career goal in production and development?

A I would like to move up where possible, become a producer or oversee a production and development slate; generally rise in the career path I'm currently on.

Q And apologies if I'm retreading on ground that we already covered, but what are your responsibilities in your job today?

 MR. BENNETT: Objection. She has gone through that, but go ahead.

THE WITNESS: Still the Canal Productions responsibilities. I oversee two executive assistants with Gabby and Francis now. I am a resource to them and still occasionally on call for Bob to give them, you know, time off over the holidays, stuff like that.

Within the Berry and Jane team, it's a lot of script reading, development work, calls with writers; things that are slated for the year; rereads and edits; and making sure that we're able to sell and pitch things mainly to Netflix.

BY MS. MACMULLIN:

Q And when you mentioned Gabby and Francis, those are executive assistants to Mr. De Niro?

A They are.

Q What's Gabby's full name?

A Gabrielle Laurendine.

Q And when was Ms. Laurendine hired?

A She was hired last November. So I'm sorry, 20 -- was it 2020? Yeah, it's been -- it's just over a year.

Q And what's Francis' full name?

A Francis Bogan. And he was hired November of 2021. So he's very new.

Q Which job responsibilities did you perform as an executive assistant that you continue to perform now that you're manager of production and development?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: As I mentioned, like for the holidays, I was on call to allow Gabby some vacation time. Francis isn't fully up to speed yet since it's been just over a month.

So I'm still performing some executive assistant duties that I'm ramping down as Francis ramps up, if that makes sense.

BY MS. MACMULLIN:

Q Describe for me what your compensation was at Canal when you were an executive assistant.

MR. BENNETT: Objection.

THE WITNESS: Under Chase -- under Chase, I was hired at [REDACTED]. I had made more in my previous salary at Oracle. And I asked Chase if Canal would match that. This was when she hired me. She said no and that compensation is what it was.

After Chase left, probably a couple months later, maybe around when this complaint was filed, Bob asked Gillian and I, generally, like a pulse check on our happiness, where we were at, kind of a check-in

now that we were working directly for him with no in between.

I mentioned to Bob that I was brought in at [redacted], but my salary was higher in my previous role. At this point, I had been working for about -- over a year with Bob.

And I told him I would definitely appreciate a raise to the salary I was at before. And if he thought I was doing a good job, that would very much be appreciated. I was raised as a result of that conversation to [redacted].

BY MS. MACMULLIN:

Q And what is your base salary from Canal currently?

A [redacted].

Q Since you started working at Canal, have you had any other forms of employment?

A Like, second jobs?

Q Yes.

A I mean, I now view my job as a second hybrid on two teams as maybe I'm working on another team, but not payroll-wise, I haven't worked any other job other than Canal.

Q Since you've started working at Canal, have you had any other sources of income?

A No.

Q Going back to when you were an executive assistant, other than base salary, what other forms of compensation and benefits did you receive from Canal?

A Over Christmastime, I remember Chase gave me one-week bonus -- one-week salary bonus.

I also received some gifts from both Chase and Bob over the holidays. Like, Lululemon outfits, a candle, stuff like that.

Q Did you receive health benefits in your role as an executive assistant?

A I did. I -- I think health benefits kicked in after 90 days.

Q Since you started working at Canal, have you had any other sources of income?

A I think you asked that, but no.

Q During the time you were an executive assistant, who were the male employees at Canal?

A Michael Kaplan. We briefly hired a male executive assistant named Ben Pitts at the start of 2021. He was furloughed as a result of the pandemic and he was not rehired. In November, I hired Francis Bogan.

Q What was Michael Kaplan's role when you were an executive assistant?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I remember when Michael and Chase interviewed me, and I asked their roles. Michael mentioned he was some sort of like special ops, kind of like made a joke.

He, in my mind, did tasks outside of the office more. He ran a lot of errands. He worked on archiving some of Bob's on set stuff, some of Bob's father's stuff.

I don't know. He was kind of a jack of all trades. He filled in where necessary. He did more of the out-of-office stuff. Gillian and I stayed at our desks largely.

BY MS. MACMULLIN:

Q Did Michael Kaplan have a title at Canal?

A He -- I think it was something like special ops because I remember looking at his LinkedIn. I don't remember the exact, but it was kind of like a vague funny title, and he was a comedian on the side.

Q What kinds of errands would Michael Kaplan run for Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

MS. LAZZARO: Objection.

THE WITNESS: Just from, like, specific ones in my knowledge, I don't know what Michael would say, but he would like run to the Apple store and grab -- like, if we hired a new person, he'd pick stuff up. He'd like run uptown to Bob's place if something needed to be grabbed.

I know when Chase had me in the apartment a little more, working in Bob's ████ place in the beginning, Michael was occasionally there running errands around the house; helping us as well with purchases and returns; kind of bopped around.

He'd go to, like, the art storage facility and, like, where the archiving project was. He was around the city much more.

BY MS. MACMULLIN:

Q As far as you're aware, did Mr. Kaplan's job responsibilities change in any way after Ms. Robinson's employment ended?

MR. BENNETT: Objection.

MS. LAZZARO: Objection to form.

MR. BENNETT: You can answer.

THE WITNESS: No, not really. Gillian and I took on a bit more responsibility. Michael stayed in a similar archiving and running errand type of role.

BY MS. MACMULLIN:
Q To your knowledge, has any Canal employee made a complaint about Mr. Kaplan?
MR. BENNETT: Objection.
THE WITNESS: I don't know if Chase did. I don't know if that was part of her Complaint, but I don't think any other Chase -- or Canal employee has.
BY MS. MACMULLIN:
Q Is Mr. Kaplan presently employed at Canal?
A I don't think so.
Q Are you aware of when he stopped being employed at Canal?
A No, not exactly because he kind of phased down his responsibilities around the time of the pandemic since there was less need, one, for him to be, like, physically running around the city. And I think he was slowly ramping down regardless.
So maybe he stayed on to help with certain archiving components, but it was not in a full-time capacity, to my knowledge.
Q To your knowledge, was it Mr. Kaplan's decision to phase down his responsibilities?
A I believe it was both his decision and Bob's decision to phase him down.
Q During the time you were an executive

assistant, who were the female employees at Canal?

A Chase, Gillian, and now, Gabby Laurendine.

Q Was Robin Chambers an employee at Canal during the time you were an executive assistant?

A I -- I don't think so, but maybe in the archiving capacity that Kaplan was kept on at.

Q What were Gillian Spear's job responsibilities during your time as an executive assistant?

MS. LAZZARO: Objection.

THE WITNESS: It seemed from my perspective to be similar to my job responsibilities as executive assistant.

BY MS. MACMULLIN:

Q Did there come a time when Ms. Spear stopped being employed at Canal?

A Yes, she no longer works at Canal.

Q Approximately when did she stop being employed at Canal?

A She told Bob that she was planning on quitting and wanted to pursue another job well before she actually left. I want to say maybe November of 2019, she alerted him of the fact that she wanted to pursue a job outside of Canal and Tribeca.

I think due to the pandemic and issues with

hiring elsewhere in general, she did stay on as his executive assistant for almost a full other year beyond that. So she remained an executive assistant until maybe March of 2021. And then, now, she works for Jon Stewart.

Q Are you aware of why Ms. Spear wanted to leave Canal?

A I think she just didn't want to be an executive assistant anymore. She was burned out. The lifestyle, being on call is fairly draining. She wanted to pursue opportunities elsewhere.

Q And, Ms. Weeks-Brittan, I apologize, I'm forgetting whether we listed Lulu White as a female employee at Canal.

A Oh, sorry. I forgot Lulu. I didn't list her, but yeah, she was employed. She was Chase's assistant maybe August of 2019 until -- 2018, I'm sorry. She started about a month after I started.

I don't know when -- when she left Canal. Maybe early months or March, April of 2020. Less than a year.

Q Did she leave in 2019 or 2020?

A Sorry, sorry, sorry. She started in 2018. She left in 2019 around when Chase did.

Q And what were Ms. White's job

responsibilities during your time as an executive assistant?

A She was Chase's assistant. So I think she maybe scheduled meetings for Chase, calls. She took over the apartment project from me and I went back to the office. I was working there with Gillian.

Q And to your knowledge, why did Ms. White's employment at Canal end?

A To my knowledge, without Chase, Lulu didn't have an employer directly and we didn't need an extra assistant for Bob.

Q Did Robin -- oh, was -- sorry.

To rephrase my question, was Ms. White terminated from Canal?

A I think so, but I didn't speak directly to -- to her or anyone about it.

Q Did Robin Chambers perform work for Canal during your employment?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Like I said, I don't know what her payroll structure, if she was a Canal employee or is a Canal employee; but she would do, like, one-off archiving stuff with Michael Kaplan.

I think she lives maybe out on Long Island.

So she'd like come in for a project or two here and there doing the archiving.

BY MS. MACMULLIN:

Q And what was your understanding of Robin Chambers' role at Canal?

A I don't --

MR. BENNETT: Objection.

THE WITNESS: -- think she had a role at Canal. I thought that she works or worked part-time doing archiving with Michael Kaplan. I didn't meet her until after Chase left.

And I want to say I had, like, maybe four or five interactions with her in the three-and-a-half years that I've worked here.

BY MS. MACMULLIN:

Q And what do you mean by "archiving"?

A Like I said, like Bob -- you know, clothes that Bob gets from being on set. He keeps a lot of the wardrobe. Archiving like videos and images from Bob's dad's life. His dad was a painter. Artworks involved.

As you can imagine, just a lot, a lot, a lot of stuff spanning decades. So Kaplan and Robin would track that and archive it, and store it somewhere.

Q To your knowledge, is Ms. Chambers still performing work for Canal?
A I don't really know. I don't know if she gets -- is paid part time or if she does one-offs; but Francis Bogan is taking over archiving.
Q When was the last time that you've interacted with Robin Chambers as part of your job?
A Maybe over the summer around the Tribeca Film Festival when I was in New York, but I didn't see her. There was just, like, a debate of if she would come in and do some archiving in the city or not.
Q How closely did you work with Robert De Niro when you were an executive assistant at Canal?
MR. BENNETT: Objection.
You can answer.
THE WITNESS: Closely. Definitely closer after Chase left. Started a more open line of communication.
BY MS. MACMULLIN:
Q How often do you interact with Robert De Niro when you were an executive assistant at Canal?
A Almost daily. Probably daily, at least by phone, and E-mail, or in person.
Q How often would you speak with Mr. De Niro on the phone during a typical day when you were an

executive assistant?

A Did you say how many times in one day?

Q Yes.

A Definitely frequently during the work week. Bob's got meetings and appointments. And he likes to be like called and reminded ahead of joining a call. I often would connect him to the call. So dozens of times.

Q How often would you E-mail with Mr. De Niro on a typical day when you were an executive assistant?

MR. BENNETT: Objection.

THE WITNESS: Also, a dozen times a day probably. Send him, like, reminders ahead of meetings, his schedule, some -- whoever's birthday it was that day; little stuff like that.

BY MS. MACMULLIN:

Q How often would you text with Mr. De Niro on a typical day when you were an executive assistant?

MR. BENNETT: Objection.

THE WITNESS: Very infrequently. He's better, in my opinion, over the phone or in E-mail, quicker to respond. He doesn't tend to read text messages as frequently.

BY MS. MACMULLIN:

Q How often would you interact with

Mr. De Niro in person in a typical week when you were an executive assistant?

MR. BENNETT: Objection.

THE WITNESS: If he was -- if he was in New York, he'd often come into the office, maybe three times a week or maybe two.

And we'd try to schedule meetings back to back on those days, so that we could run through the in-person stuff on the days that he physically came in.

BY MS. MACMULLIN:

Q How close --

A (Inaudible.) Like, the year that it was the pandemic, and I didn't see him or go into the office.

Q How closely did you work with Chase Robinson when the two of you were employed at Canal?

A Closely. Like I said, we'd -- I'd send her stuff, especially when I started and wasn't allowed on the phones initially until I was ramped up.

So I didn't talk to Bob a lot the first couple months I started. I would do what was assigned to me and send stuff to Chase for approval; and then send off to Bob, like, travel itineraries. I'd send her a time sheet and meet -- meet my petty cash expenses.

Q How often would you speak with Ms. Robinson on the phone during a typical day when you were -- when the two of you were employed at Canal?

A Hard to say. She'd call and check in when Gillian and I were in the office. And she'd maybe like delegate something to us or tell us to connect Bob to someone. Maybe three times a day. And we'd E-mail as well.

Q How often would you E-mail with Ms. Robinson on a typical day when the two of you were both employed at Canal?

A Like, if she wasn't in the office, a couple times a day to run things by her.

Q How often would you text with Ms. Robinson on a typical day when the two of you were both employed at Canal?

A I feel like we more just texted to like meet up and decide on times like when I was working with her in the apartment. Maybe she'd text me or I'd text her, like what time tomorrow? Okay. Should we meet there? Should we meet at Bloomingdale's? General coordination stuff.

Otherwise, it was more like cc'ing on work E-mails and stuff for visibility.

Q And how often would you interact with

Ms. Robinson in person in a typical week when the two of you were both employed at Canal?

A It definitely ebbed and flowed. More frequently in person when I was helping her with the apartment since I'd be physically there with her. Less frequently once Lulu started.

Chase and Lulu would not be in the office as much. Gillian and I were kind of the ones holding down the fort there. Kap with Bob between.

Q On what subjects would you interact with Ms. Robinson when the two of you were employed at Canal?

MR. BENNETT: Objection.

MS. LAZZARO: Objection to form.

THE WITNESS: Can I answer?

MR. BENNETT: Yes. Sorry. Yes.

THE WITNESS: Time sheets, petty cash, sending her stuff for approval; confirming that we scheduled calls that she had called us about to make sure we set.

General just like checking that everything is being handled by the executive assistants in that capacity.

BY MS. MACMULLIN:

Q On what tasks for Mr. De Niro would you

interact with Ms. Robinson when the two of you were employed at Canal?

MS. LAZZARO: Objection to form.

MR. BENNETT: Objection.

You can answer. You can answer.

THE WITNESS: Same kind of stuff. Like the -- the travel itinerary, going back to, was the most kind of applicable to the both, fairly detailed.

Like, we put the departure time, passengers, weather in the area he was going; hotels; restaurants in the area he was going.

Chase sent me a bunch of template examples that I could build off those when I started because I hadn't done travel things before in my other job.

Any like -- anything that came up. If he needed to speak to his agent or his publicist or Chase met with him or talked to him about something; maybe she'd send or call Gillian and myself and say, okay, Bob's gotta do this, this, and this.

Or reminder, the film festival is coming up. We need to make we're in touch with the festival people. I'll go -- Chase would, like, go over the festival list with Bob and his asks; and just general things, like reminders for Bob.

BY MS. MACMULLIN:

Q Would Ms. Robinson convey messages to you from Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yeah, like, if she was physically with him or if they spoke, but it was something that was more, like, in our purview as assistants, then she'd send us or call us and tell us, you know, do this; make sure you're scheduling this appointment a few months out. Make sure, like, this is top of mind. She'd put it on the reminders or the call lists, stuff like that.

BY MS. MACMULLIN:

Q Would Ms. Robinson convey assignments from Mr. De Niro to you?

MR. BENNETT: Objection.

THE WITNESS: Yes.

MR. BENNETT: You can answer.

THE WITNESS: His travel itinerary.

BY MS. MACMULLIN:

Q Would Ms. Robinson convey times that you needed to be available to answer calls for Mr. De Niro?

A Yes. It was an on-call job. So if I was on

call, Chase would ensure that I was actually on call and that my phone was on loud.

And sometimes she'd call and check in the morning to make sure earlier when I was ramping up, hey, are you on call? Hey, are you in the office?

She was more strict on where we physically were in answering the phones than Bob himself.

Q Would Ms. Robinson convey Mr. De Niro's priorities to you?

MS. LAZZARO: Objection.

THE WITNESS: Kind of hard to say because he and Chase were all sort of in the mindset of like everything's priority. Like, it all gets handled. Nothing should slip through the cracks.

Obviously, if he needed to call someone important that day, she would certainly say, like, make sure he gets Josh today, something like that.

BY MS. MACMULLIN:

Q Would Ms. Robinson convey Mr. De Niro's feedback on tasks to you?

A Not really. Or I don't recall, but --

Q Did Ms. -- did you observe all of the job responsibilities that Ms. Robinson performed for Mr. De Niro?

MR. BENNETT: Objection.

THE WITNESS: No, because she wasn't in the office as much as Gillian and me, so I didn't have visibility.

BY MS. MACMULLIN:

Q During the time when you were both employed at Canal, what was Chase Robinson's role at Canal?

A VP of Finance and Production.

Q During the time when you were both employed at Canal, what were Chase Robinson's job responsibilities at Canal?

A I viewed her as a manager. Someone that I would submit stuff to and make sure it was okay before sending off to Bob, who I viewed as our overall manager.

She, obviously, had a lot of historic knowledge, such a long working relationship with Bob. So I viewed her as a resource in that capacity.

I couldn't tell what she was handling like from a production standpoint because I wasn't really cc'ed on those E-mails largely. So I wasn't quite sure.

Finance stuff, like I said, I'd submit petty cash and expenses to her. She'd approve and forward on my timecard. She approved my vacation time and stuff like that.

Q During the time when you were both employed at Canal, what job duties did you observe Chase Robinson perform?

A Phone calls. General maybe production stuff. But like I said, I didn't really see that. She took over the apartment project. I think she was busy with that a lot of the early months that I was hired. She did a lot of the Christmas shopping, bought toys and stuff for, like, the holiday drive at Tribeca.

Q Anything else?

A Generally, like calls and meetings, setting stuff like that; but I didn't always have oversight into that. Like, Gillian and I would cc her.

But other maybe higher level stuff or stuff that she didn't want us to have visibility into, she wouldn't cc us. So I just saw less.

Q During the time when you were both employed at Canal, was one of Ms. Robinson's job responsibilities facilitating Mr. De Niro's travel?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I would say she oversaw the facilitating of it. Gillian and I would E-mail either the travel agents for commercial travel or our charter

contact for private air travel. Like I said, I'd send her the travel itineraries I made. Gillian would send her the travel itineraries she made.

She'd approve those and be cc'ed on E-mails of the actual day of the flight. Gillian or I would be on call the day of the flight. We'd check in with the pilot, check in with the driver, make sure it was seamless; and we'd cc Chase for oversight.

BY MS. MACMULLIN:

Q During the time when you were both employed at Canal, one of Ms. Robinson's job responsibilities was overseeing the scheduling of Mr. De Niro's travel; correct?

MR. BENNETT: Objection.

THE WITNESS: Yes. Directly, she'd -- she generally oversaw a lot of what we did and made sure it was a smooth-running office.

BY MS. MACMULLIN:

Q During the time when you were both employed at Canal, was one of Ms. Robinson's job responsibilities scheduling appointments for Mr. De Niro?

A I'm sure she did schedule appointments, but I didn't necessarily see that. Like I said, I would cc her, but she wouldn't always cc us.

Q During the time when you were both employed at Canal, was one of Ms. Robinson's job responsibilities scheduling calls for Mr. De Niro?

A I guess, yeah, like if he -- if he needed to take the calls of his entertainment lawyer, she would on occasion remind us to make sure he called that person.

She would often just loop me and Gillian in, though, if it wasn't someone super important. And she'd say, the girls will handle. And then, she'd plus us in and then we'd schedule a call. So she would, I would say, delegate to us on occasion, but maybe schedule her own as well.

Q Was one of Ms. Robinson's job responsibilities scheduling meetings for Mr. De Niro?

A Same thing. She'd plus us in if we were to schedule them. Otherwise, we wouldn't have visibility and be watching.

Q Was one of Ms. Robinson's job responsibilities responding to E-mails directed to Mr. De Niro?

A I guess, but I don't have a lot of visibility. I didn't see a ton of E-mails that she sent.

Q Ms. Robinson would oversee the scheduling of

meetings or she would schedule them herself?

A Very dependent on the meeting. I don't know how to -- like, there's a hierarchy.

She would respond to her own stuff or to Bob's meetings that were of a level of importance or perceived importance. She'd add Gillian and me in to schedule other things.

Q Was one of Ms. Robinson's job responsibilities running errands for Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I guess, but I believed Kap was more of an errand person. And Chase would definitely -- she definitely shopped for the apartment project, but that seemed more like project based and less errand based.

Kap would kind of run around the city more for like pick-ups and printing photos, and random errands like that.

BY MS. MACMULLIN:

Q So one of Ms. Robinson's job responsibilities was shopping for Bob's apartment?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: It's just hard for me to

answer these because even when I was hired, the job responsibilities were not provided clearly like this because there's just like a level of vague uncertainty in things that come up.

So that's why I said when she hired me, she said, anything that I ask you or Bob asks you is pretty much in the purview of your job.

So I imagine Chase had similarly vague job responsibilities that involved a number of things as they came up.

BY MS. MACMULLIN:

Q Your understanding is that Ms. Robinson's job responsibilities were not defined; is that correct?

A Correct.

MR. BENNETT: Object.

BY MS. MACMULLIN:

Q Was one of Ms. Robinson's job responsibilities making reservations for Mr. De Niro?

A I don't think so, but maybe if it came up or if he directly asked her and she did something that I was not part of on the E-mail chain; or on the call, then maybe she did; but I don't know.

Q Was one of Ms. Robinson's job responsibilities assisting Mr. De Niro in selecting

birthday gifts?

MR. BENNETT: Objection.

THE WITNESS: She definitely took gifts and holiday stuff like under her wing, and had a hand in the decision-making process; or would make suggestions to Bob on what he -- she felt he should get for certain people.

BY MS. MACMULLIN:

Q Did Mr. De Niro solicit her input on what to get as gifts for specific people?

MS. LAZZARO: Objection.

THE WITNESS: My understanding, at the time, I felt she was more inserting her opinion on input. I -- I have no firsthand knowledge of him asking her or her asking him for -- I -- I don't know.

BY MS. MACMULLIN:

Q Was one of Ms. Robinson's job responsibilities assisting with Mr. De Niro's home at [redacted]

A When I started on that project, I similarly felt that she voluntarily involved herself and enjoyed and took over some of the design components of the house. And she personally brought me into that project.

Q Was one of Ms. Robinson's job

responsibilities assisting with Mr. De Niro's home at [REDACTED]

MR. BENNETT: Objection.

THE WITNESS: I -- I don't have firsthand knowledge if that was a job responsibility or if that was a project that Chase took on. I don't think the job responsibilities for her were spelled out. I don't know.

BY MS. MACMULLIN:

Q But the two of you performed work together at the [REDACTED] home; is that correct?

A Yes. Chase involved me in that.

Q Was one of Ms. Robinson's job responsibilities communicating with Mr. De Niro's girlfriend, Tiffany Chen?

A I have no firsthand knowledge of that. Because, like I mentioned, I didn't know or meet Tiffany Chen until I want to say, maybe March. Maybe February of 2019.

So I had not met Tiffany in person until after Chase left. I don't know what directives she may have given.

Q Was one of Ms. Robinson's job responsibilities communicating with Mr. De Niro's children?

A I don't know if it was a job responsibility or something that just came up when you work for someone who has a large life both professionally and personally.

I know she had conversations with Bob's kids, as did I, as did Gillian. I don't know beyond that.

Q Was one of Ms. Robinson's job responsibilities communicating with Mr. De Niro's former partner, Toukie Smith?

A Yes. I don't know if it was a job responsibility, but I know Chase did help Toukie. And financially, she did involve cash if Toukie needed some things. Toukie has ██ and requires a bit more care and oversight.

Q Was one of Ms. Robinson's job responsibilities decorating for Mr. De Niro's parties?

A For his what?

MS. LAZZARO: Objection.

BY MS. MACMULLIN:

Q Decorating for Mr. De Niro's parties.

A I don't think it was a job responsibility. She didn't come to the holiday party.

I know she did decorate the Christmas tree in his office that year of Christmas. I don't know if

it was a responsibility or not.

Q Was one of Ms. Robinson's job responsibilities making sure that Mr. De Niro's needs were met?

MR. BENNETT: Objection.

THE WITNESS: I guess, yes.

BY MS. MACMULLIN:

Q Working for Mr. De Niro is not a nine to five job; is it?

MS. LAZZARO: Objection.

THE WITNESS: Correct.

BY MS. MACMULLIN:

Q I'm sorry. I didn't hear your answer.

A Correct. The executive assistants are expected to be on call beyond standard work hours.

Q Which employees did Mr. De Niro expect would be available to him beyond standard work hours?

MR. BENNETT: Just to clarify, can you specify a time period?

MS. MACMULLIN: Sure.

BY MS. MACMULLIN:

Q During the time that you were an executive assistant, which employees did Mr. De Niro -- excuse me, expect would be available to him beyond standard work hours?

MR. BENNETT: Objection.

THE WITNESS: At the bare minimum, at least whichever executive assistant was on call. Gillian and I would alternate.

So, let's say, I was off that weekend, he wouldn't expect me to be on call if Gillian was on call. He'd expect to reach one of us. I guess that he did expect to reach Chase, but I don't know what they discussed about when she was not on call; but when she was expected to answer her phone and when she wasn't, I'm -- I'm not sure.

He'd expect to call Kaplan, but would not get Kaplan as much because he was a little less responsible with his phone. I don't know.

BY MS. MACMULLIN:

Q What did it mean for an executive assistant to be on call?

A When I worked with Chase, we had physical after-hours phone. It was a different phone number that Gillian and I would physically pass between us. And that phone was always on loud. And if Bob called or if Chase called, we answered.

Q And what were the job responsibilities for an executive assistant who was on call?

MS. LAZZARO: Object.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: The same as normal responsibilities if something happened after hours. So if something was messed up with the flight or there was a big delay, and whoever was on call would handle weekend stuff and after-hours stuff.

BY MS. MACMULLIN:

Q It was a common occurrence that work would have to be performed for Mr. De Niro in the evenings; is that correct?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: If on call, yes.

BY MS. MACMULLIN:

Q And you performed work for Mr. De Niro in the evenings when you were on call; is that correct?

A When I was on call, as -- as work came up, yes. Not necessarily always. If there was something to do, yes.

Q Did you always receive overtime pay for the work that you performed for Mr. De Niro in the evenings?

A Yes, I submitted my time sheets to Chase when I had overtime. And she would approve them and

send them to, I believe, Michael Tasch.

Q Ms. Robinson performed work for Mr. De Niro in the evenings during the time that you were both employed at Canal; correct?

MS. LAZZARO: Objection.

THE WITNESS: On occasion, I believe so.

BY MS. MACMULLIN:

Q It was a common occurrence that work would have to be performed for Mr. De Niro during weekends; is that correct?

MR. BENNETT: Objection.

You can answer.

MS. LAZZARO: Object.

THE WITNESS: For the after-hours person when work arose, then yes.

BY MS. MACMULLIN:

Q And you performed work for Mr. De Niro during weekends; is that correct?

A When on call, if something came up, yes.

Q Did you always receive overtime pay for the work you performed for Mr. De Niro during weekends?

A I think you just asked me that.

Q My prior question was about work during the evenings and this is about during weekends.

A Oh. If and when I had overtime, I added it

to my time sheet for the week, sent it to Chase. And it was approved and then I was paid overtime.

Q And Ms. Robinson performed work for Mr. De Niro during weekends; is that correct?

MS. LAZZARO: Objection.

THE WITNESS: On occasion, I would guess so, yes.

BY MS. MACMULLIN:

Q Was there an expectation that Ms. Robinson would be available to Mr. De Niro around the clock?

MR. BENNETT: Objection.

THE WITNESS: I don't know what the two of them discussed as being expectations. Chase to us as an -- like, to the executive assistants, would be reachable if something came up and I'd ask her. She was often on her work phone.

BY MS. MACMULLIN:

Q To your knowledge, was Ms. Robinson generally available to Mr. De Niro?

A I think so, yeah.

Q Was there ever a concern at Canal about paying any employees overtime?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: Concern by Ms. Week --

Weeks-Brittan or someone else?

BY MS. MACMULLIN:

Q To your knowledge, was there ever a concern at Canal about paying employees overtime?

A Not until I became aware this -- that Chase felt she had overtime. I believed that Chase was overtime exempt when she was at Canal. So I wasn't aware.

That was, going back to the beginning, a surprise of this case.

Q Are you aware of any Canal employee not billing overtime for hours during which he or she would be entitled to overtime pay?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I think that if someone was to get overtime, like the executive assistants who received overtime, we would submit the time sheets to Chase; and then we'd receive overtime.

Gillian and I didn't complain to one another about not getting paid overtime when due.

BY MS. MACMULLIN:

Q Did Mr. De Niro ever express any concern about paying employees overtime?

MS. LAZZARO: Objection.

 THE WITNESS: Not to me. I don't have knowledge of that.

BY MS. MACMULLIN:

Q Are you aware of Mr. De Niro expressing any concerns about paying employees overtime?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: To the extent that any information that you might provide in response to that question comes from legal counsel for Canal, I'm going to direct you not to answer. Otherwise, you can answer the question.

THE WITNESS: Not to my knowledge. Like I said, if I had overtime, I submitted it to Chase and it was general -- generally approved and paid out. So I had no complaints there.

BY MS. MACMULLIN:

Q Mr. De Niro's needs changed from time to time; is that correct?

MS. LAZZARO: Object.

MR. BENNETT: Objection.

THE WITNESS: I feel like any -- any person's needs change day to day, time to time.

BY MS. MACMULLIN:

Q And employees' responsibilities at Canal

would shift to ensure that Mr. De Niro's needs were met; correct?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: You can answer.

THE WITNESS: Yeah, like the -- as vague as the responsibilities of my job were, it was to predict and address needs, and issues, or expectations as they popped up.

BY MS. MACMULLIN:

Q In late 2018 and early 2019, one important need for Mr. De Niro was dealing with his divorce from Grace Hightower De Niro; is that correct?

A Correct.

MR. BENNETT: Objection.

BY MS. MACMULLIN:

Q What work did Ms. Robinson perform in connection with Mr. De Niro's divorce?

MS. LAZZARO: Objection.

THE WITNESS: I remembered the time we were making sure that the calendar was very updated to show specific pick-up and drop-off times with his kids and weekend time spent with them.

You know, Chase asked us to make sure we were tracking that very precisely.

I think she also pulled those dates from the calendar. So there was a clear record of like after-school activities he was going to do with them, days that he was with them, and what they did. That was very precisely recorded by the office.

BY MS. MACMULLIN:

Q And who was working on this project?

A Gillian, me, and Chase.

Q To your knowledge, was dealing with Mr. De Niro's divorce a substantial part of Ms. Robinson's job from late 2018 to early 2019?

MR. BENNETT: Objection.

MS. LAZZARO: Object.

THE WITNESS: I have no way to know if it was a substantial part of what she was doing day-to-day. It was part of what she was doing.

BY MS. MACMULLIN:

Q In late 2018 and early 2019, one important need for Mr. De Niro was setting up his new home at [REDACTED]; correct?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yes, the apartment project that I was brought into and then Lulu was brought into with Chase.

BY MS. MACMULLIN:

Q What work did Ms. Robinson perform in connection with setting up Mr. De Niro's new home?

MR. BENNETT: Objection. Beyond what she's already testified to?

BY MS. MACMULLIN:

Q Please answer my question.

A Shopping. We'd go to Bloomingdale's together. We'd go to Sur La Table shopping for things for the home.

Like I said, I'd like helped out, furniture dimensions, and she'd move them around the living room. She brought in, like, a friend designer, pretty much when I was ramping down because Lulu came on.

And then I went to the office. I think the person's name was Rachel. Yeah, a lot of shopping and making sure the house was filled.

Q To your knowledge, was helping Mr. De Niro set up his new home at [REDACTED] [REDACTED] a substantial part of Ms. Robinson's job from late 2018 to early 2019?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: It definitely appeared like she was very busy with the home project, but like I

said, I don't know if that was an expectation of her or if she took that on.

BY MS. MACMULLIN:

Q Did you review a draft recommendation letter that Ms. Robinson drafted for Mr. De Niro to review?

A A what? Can you repeat that?

Q Did you review a draft recommendation letter that Ms. Robinson drafted for Mr. De Niro to review?

A Like, a recommendation for Chase?

Q Yes.

A I do think I've seen it. I didn't review it and Bob didn't show it to me. We didn't discuss that, but I do feel like that rings a bell.

Q We're going to share in the chat a document that's been Bates stamped ROBINSON0001662. And once you see it in the chat, Ms. Weeks-Brittan, you can open it.

A Okay.

THE REPORTER: Are you marking this as an exhibit?

MS. MACMULLIN: Yes. Thank you. I'm marking it as Plaintiff's Exhibit 1.

THE WITNESS: I see it here. I'm reading it.

(Whereupon, Exhibit 1 is marked for identification and is attached hereto.)

BY MS. MACMULLIN:

Q Okay.

A Just to clarify, it's like marked on Canal letterhead, but it was written by Chase; right?

You're not saying to me that Bob wrote that; right?

MR. BENNETT: No -- no question pending, Sabrina. Just wait for the -- for a question.

THE WITNESS: Oh, okay. Yeah, I read it.

BY MS. MACMULLIN:

Q Okay. Do you recognize this document?

A Yeah, I think I saw it at the time, but not from Bob.

Q Do you recall --

A And not from Chase.

Q Do you recall that this was a draft recommendation letter that Ms. Robinson drafted for Mr. De Niro to review?

A I'm pretty sure I saw it after the fact, but I -- yeah, I recall it around the time of Chase's exit.

Q Who showed it to you?

A I don't know. Definitely sent maybe internally or -- I don't know. Maybe Gillian. I don't know.

There was quite a lot of just, like, gossip and random fallout of the Chase exit. It definitely got to me, but I don't know how.

Q Did you discuss this draft recommendation letter with anyone at Canal?

A If anyone, Gillian, but I don't remember specifics.

Q On how many occasions did you discuss it with Gillian?

A I don't know. Maybe like one occasion where we both looked at it and then immediately talked.

Q Did you discuss it with Mr. De Niro?

A No.

Q Did you discuss it with Tiffany Chen?

A Maybe. She may have discussed it with me, but I -- I don't really remember.

Q What do you recall Ms. Chen saying, if anything, during that discussion?

A It's just hard to pinpoint if I spoke to her or if I heard stuff through the grapevine. I vaguely remember that she found it a little ridiculous, but I don't know if I was directly talking to her or if it

was just kind of gossipy around the office.

Q What aspects of the letter did Ms. Chen characterize as ridiculous?

A I just don't --

MS. LAZZARO: Objection.

THE WITNESS: I don't -- I don't know. I mean, my general sense at the time, I felt Chase left on bad terms and there was some evidence of petty cash theft, time theft.

It seemed like asking for a letter of recommendation after the fallout of what I viewed as a bad exit was ill timed. So to speak so highly of their relationship when there was a lot of just, like, financial things that were viewed as incorrect, people generally said was ridiculous. I -- maybe one of those people was Tiffany.

Q And what financial things were viewed as incorrect?

A I think it came to light after Chase left, but it seems to me like she used the corporate card a lot for personal meals, for vacation trips. She purchased a lot of stuff for that house project.

I think there was a lot of shopping and a lot of excess in the office in general. A lot of that stuff was kept at Chase's house, like gift cards,

things for Bob's home project.

It came to light to me afterwards, in trying to review Chase's E-mails to make sure the office was running properly, that she claimed she used zero vacation days during the year and got reimbursed for those when I have a bunch of E-mails with Chase or Chase to Bob E-mails requesting vacation days.

She would turn down vacation day requests for me and Gillian, and went to Spain, and London during her time. I viewed those as vacations. So certain things that seemed like they didn't line up.

Q Did you discuss this draft recommendation letter with Tom Harvey?

A I have no idea. I don't think so because Tom and I usually just discussed things that pertain to us or if he needs to connect to Bob.

Q Is there anything that Ms. Robinson describes in the draft recommendation letter that you believe was not a part of her job responsibilities when the two of you worked at Canal?

MR. BENNETT: Sabrina, review the letter.

THE WITNESS: Yeah, I'm going to look back at it now.

Can you reask the question now that I've read it?

MS. MACMULLIN: Could the court reporter read my question back?

(Whereupon, the question was read back as follows:

"Q Is there anything that Ms. Robinson describes in the draft recommendation letter that you believe was not a part of her job responsibilities when the two of you worked in Canal?")

THE WITNESS: The bettering of morale for the employees at Canal is comical because morale was extremely low when we worked for Chase and has been much higher since.

Other than that, I think that everything else she did do at some level, but it's embellished a bit making it seem like she did more important things.

BY MS. MACMULLIN:

Q In what regard do you believe that the letter makes it appear that Ms. Robinson's job responsibilities were more important than they really were?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: That's not what I was saying

or what I meant. I just think that the way she worded certain things is an exaggerated way to word stuff that she did do.

Like, let's see, Chase was able to identify areas of vulnerability and implement new systems not only for financial matters, but in the areas of compliance and employee benefits.

Like I just think that's an exaggerated way of saying she tracked our petty cash and submitted our time cards.

The morale -- let's see.

"The result was seen in the restructured system in the morale of the employees that worked so hard for me."

That I feel is a lie.

Wherever it said production stuff. Yeah, I just -- I mean, when I came on and was hired, and Chase said she was VP of Finance and Production, I definitely thought she had more of a hand in production -- actual production work versus like talking to producers, and lawyers to set Bob's schedule or his contract.

She wasn't doing production work on script reading or developing projects. That -- that stuff

falls really under Jane and Berry; but I just feel that there were some exaggerations made in that; but that she touched on the things that she mentioned.

BY MS. MACMULLIN:

Q Were there any other job duties that Ms. Robinson included in the draft recommendation letter that you did not observe her performing?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I mean, I didn't observe her implement a new system for financial matters. I -- I did observe her working with lawyers and agents on deals and contracts.

Yeah, I mean, I observed her advise on certain things, including a nonprofit like TFI.

"Her ability to see the big picture has moved my company in a better direction," I did not observe.

I think we were in a very bad place because of her and have since moved in a better direction.

Yeah, it's just exaggerated. Like, I don't think she was an invaluable asset because no one was hired to replace her. We took over general responsibilities. That I do some of the stuff that's spelled out in that, but not to the exaggerated

effect.

BY MS. MACMULLIN:

Q Is there anything else in the draft recommendation letter that you disagree with?

A I think I spelled out most of my disagreements. Her leadership and how she managed a team, I very much disagree with that.

Q Anything else?

A I think I mentioned everything.

Q During your employment, what role has Michael Tasch played at Canal?

A Accountant to Canal.

Q Has Michael Tasch been a financial advisor for Canal?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't know what he's advised or not. I know he's our accountant. I haven't had financial advising meetings with him.

BY MS. MACMULLIN:

Q What are his responsibilities as Canal's accountant?

MS. LAZZARO: Objection.

THE WITNESS: To be our accountant, to set up payroll for new employees, be Bob's accountant. I

don't -- I don't have a ton of visibility into the nitty gritty of the accountant job.

BY MS. MACMULLIN:

Q Has Michael Tasch overseen Canal's financial affairs?

A He collected our timecards and petty cash expenses.

Q Has Michael Tasch received the bills for Canal?

MS. LAZZARO: Objection.

THE WITNESS: Yeah.

MR. BENNETT: Objection.

THE WITNESS: Some bills went straight to Berdon. Some bills went to Canal or to Chase, and then, sometimes we would send him the bills from there.

BY MS. MACMULLIN:

Q Is it correct that bills that went directly to Canal were remitted to Berdon?

MR. BENNETT: I would just add to you that, again, I think we're encroaching on the 30(b)(6) issue. This witness is here to testify about personal knowledge. So if she can rephrase the question to inquire as to the -- her personal knowledge, then that's fine.

But, otherwise, I think we're -- we're getting hanged up on the 30(b)(6).

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, you can please answer the question.

A Can you repeat it?

MS. MACMULLIN: Can the court reporter please read my question back?

(Whereupon, the question was read back as follows:

"Q Is it correct that bills that went directly to Canal were remitted to Berdon?")

MR. BENNETT: Same objection.

You can answer.

THE WITNESS: I can't say if that's 100 percent correct. I would say I have sent bills that we had received to Berdon. There were separate bills under Chase's name. I don't know where those went.

BY MS. MACMULLIN:

Q Has Michael Tasch --

MR. BENNETT: Sorry to interrupt.

Whenever -- whenever there's an opportunity on your end -- I don't mean to interrupt your line of

questioning. If we could take a brief restroom break, I would appreciate it.

MS. MACMULLIN: Absolutely. Yeah, I think we're coming up on a good place for a break in just a little bit.

BY MS. MACMULLIN:

Q Has Michael Tasch received credit card statements for Canal?

A Yes. To my knowledge, yes.

Q Has Michael Tasch been a resource for Canal employees?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Same -- the same 30(b)(6) issue we're encroaching on.

Go ahead.

THE WITNESS: To me, he has been a resource when it came to hiring new assistants for the office. I've had direct conversations with him about that and compensation.

BY MS. MACMULLIN:

Q On what types of matters would employees go to Michael Tasch for guidance?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Same 30(b)(6) issue.

THE WITNESS: I would go to Michael Tasch for guidance and did go to him when I mentioned I got a raise after Chase left. I spoke to Bob about it. Bob told me to speak to Michael Tasch about it.

I had a conversation with Michael Tasch and Bosswick. Matters like that are why I would go to Tasch.

BY MS. MACMULLIN:

Q Based on your observation, how often would personnel at Canal interact with Michael Tasch during a typical week?

MR. BENNETT: Objection.

THE WITNESS: I interact with Michael Tasch in relation to Bob a fair amount, too. Bob will speak with Tasch maybe once a week. Maybe Tasch will need something signed and we'll speak about that. And I'll print it and have Bob sign it.

Personally, I go to Tasch when I have questions about financial stuff in relation to myself and my job.

BY MS. MACMULLIN:

Q Are you aware of Michael Tasch ever providing direction to Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: I was never privy. I didn't

witness their direct conversations. I didn't hear them. I know Chase spoke with him, but I don't know what was discussed.

BY MS. MACMULLIN:

Q During your employment, what role has Mark Bosswick played at Canal?

MR. BENNETT: Objection.

THE WITNESS: I speak with --

MR. BENNETT: You can answer.

THE WITNESS: Speak with him much less frequently than Tasch. But as I mentioned, I did talk to both him and Tasch when I asked for a raise.

Occasionally, Bob will speak to him in -- in -- to my knowledge, less frequently than Bob speaks to Tasch; less frequently than I speak to Tasch; but he is also around.

BY MS. MACMULLIN:

Q And what role does Mark Bosswick play at Canal?

MR. BENNETT: Same objection about the 30(b)(6).

You can answer.

THE WITNESS: I think he's also an accountant.

BY MS. MACMULLIN:

Q Can you explain the difference between the role performed by Michael Tasch versus Mark Bosswick for Canal?

MR. BENNETT: Same objection.

THE WITNESS: I have no visibility into their jobs.

BY MS. MACMULLIN:

Q During your employment, what role has Tom Harvey played at Canal?

MR. BENNETT: Same objection.

THE WITNESS: Lawyer to Canal.

BY MS. MACMULLIN:

Q What role has Tom Harvey played in overseeing Canal's operations?

MR. BENNETT: Same objection.

MS. LAZZARO: Objection.

THE WITNESS: I don't know if he and Bob discuss Canal operations. Sometimes I discuss Canal operations with Tom, but I don't feel like he weighs in heavily on our structure or anything like that, unless Bob asks him something direct.

BY MS. MACMULLIN:

Q So you're not aware of the full scope of Tom Harvey's role with respect to Canal?

MR. BENNETT: Objection.

THE WITNESS: To me, his full role is a lawyer to us. I don't see what he does beyond the call I have with him or beyond connecting him to Bob.

BY MS. MACMULLIN:

Q During your employment, what role has Tarter Krinsky & Drogin played for Canal?

MR. BENNETT: Same objection.

THE WITNESS: I really don't know. I -- like I said, I don't -- I don't think I spoke to them before this.

BY MS. MACMULLIN:

Q During your employment, has Canal ever had an HR Department?

MR. BENNETT: Objection.

THE WITNESS: Chase had us sign something that said if we -- we were being harassed, report the harassment to her.

Beyond that, I have utilized Tribeca's in-office HR. Whether or not that is my HR, they've been helpful.

BY MS. MACMULLIN:

Q And who at Tribeca Enterprises served as an HR resource for you?

A A woman named Elfe, who just recently

left -- left last month. And there is a new HR -- head of HR named Katherine.

Q And what's Elfe's full name?

A I'd have to look. It's like Cimitara maybe.

Q Is it Elfe Cimicata?

A Sounds right.

Q Okay. During your employment, has Canal ever employed anyone in-house to perform HR functions?

MS. LAZZARO: Objection.

MR. BENNETT: Objection on 30(b)(6) basis.

But you can answer.

THE WITNESS: I think someone named Laurent, the last name starts with an L, is an HR lawyer that has helped Canal.

BY MS. MACMULLIN:

Q Do you know the firm that he works for?

A I'd have to look. I just don't pay a lot of attention to that.

MS. MACMULLIN: Okay. I think this is a good stopping point. So we can come back on the record at 1:55 p.m.

MR. BENNETT: Before we go off the record, I'm just curious. Could you just let me know --

THE VIDEOGRAPHER: It's 10:40. We're going off the record.

MS. MACMULLIN: Thank you.

(Recess.)

THE VIDEOGRAPHER: It is 10:57 a.m. and we're back on the record.

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, during the period where you and Ms. Robinson worked together, what were your general impressions of Canal as a workplace?

A My general impressions of Canal when Chase and I worked together, it was a little bit more of a chained to your desk type of culture for me. I was stressed a lot. I was new to the job and the on-call nature made me nervous.

I was nervous to ask Chase for vacation days because I felt I couldn't always take them, even if Gillian agreed to cover me and vice versa. It was just more intense all around than it is now.

Q During the period where you and Ms. Robinson worked together, describe for me the atmosphere during a typical working day.

MS. LAZZARO: Objection to form.

MR. BENNETT: Objection.

THE WITNESS: Hard to say, typical day, but Gillian or I would get in. One of us at nine. One of us at ten. We'd answered the phones all day,

depending on the on-call person, respond to E-mail asks; make sure the day's schedule was moving ahead.

If I was on call that evening, I would make sure to stay in cell service. Chase made it clear that I couldn't like drop out of cell service. That I had always had to be reachable. She would sometimes call me.

Bob would call the after-hours phone if something came up and I'd respond to whichever -- what needed to be handled at the time.

BY MS. MACMULLIN:

Q How many days a week were you on call during the time when you and Ms. Robinson were both employed?

A Not as much at the beginning since I was ramping up. And like I said, I was told not to answer the phone if Bob called for at least the first month because I was learning from Gillian; making sure I was up to speed.

And then as soon as I began on call, I would guess probably a month in, Gillian and I would alternate: One of us three times a week. One of us four, and then we'd switch the next week.

Q Sorry for my heating noise. This is coming on. I hope that's not, too, distracting, but let me know if it is.

During the period where you and Ms. Robinson worked together, would the TV ever be on in the background while Canal employees worked?

A In the office?

Chase wasn't always with us in the office. If Bob was in his office watching the news. There was not a TV in our direct office where Gillian and I worked.

Q Would Netflix ever be on in the background while Canal employees worked?

A No.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Never in the office. Bob -- Bob only watched the news when he was in. Otherwise, we had no TV on.

BY MS. MACMULLIN:

Q (Inaudible.) -- watch the news while he worked?

THE REPORTER: My apologies.

MR. BENNETT: Yeah, you broke up a little bit, Kate, there.

MS. MACMULLIN: Yeah. Oh, sorry. Can you hear me now?

THE REPORTER: Yeah.

 BY MS. MACMULLIN:

Q Okay. Would Mr. De Niro typically keep the TV on in the background while he worked?

A Sorry, wrong pipe.

Bob, if he was in the office between meetings, would have the news on a lot. He wasn't like doing active work. It was when he had downtime.

Q Take the time that you need. We've all been there.

Would music ever be on in the background while Canal employees worked?

A No. It was -- it's a very quiet office.

Q What are your general impressions of Mr. De Niro as a boss?

A He has been a great --

MR. BENNETT: Objection.

You can answer.

THE WITNESS: He's been a great boss to me. When I started the role, like I said, I was hired and I hadn't met him. So I was definitely nervous, both wanting to impress. And because I think on screen, he seems so intimidating.

I got the very pleasant work experience. He's very casual, chill, goes by Bob. He's not a man of many words, but you can always just call him up and

ask him something. He's very reachable on his phone, which I appreciate it, since he does expect us to be reachable on ours.

Like I said, when I mentioned I thought I was going to be quitting when I wanted to move to L.A., I had given up my lease in New York. He was very receptive of that. I suggested the timeline for when we hire, so that he was always left supported. He appreciated that.

Made sure -- check in on if I was happy and, you know, why I wanted to leave. And I was like, I -- I don't want to leave Tribeca. I want to stay at Tribeca, but I do want to move to L.A. And I don't know if that's feasible. Like I said, he worked with me. Helped me promote.

I told him over the summer when things started to get busy in office again that I felt we needed a second person to assist with Gabby in the office in New York since she was swamped.

He was receptive and open to that as well. And that's why we hired Francis.

BY MS. MACMULLIN:

Q Did you ever perceive the workplace at Canal to be hostile?

A I perceived Chase to be hostile.

Q Did you ever perceive the workplace at Canal to be hostile?

A As a result --

MR. BENNETT: Objection.

THE WITNESS: -- of her hostility in the workplace, yes. Not due to Bob.

BY MS. MACMULLIN:

Q Did you ever believe that Tiffany Chen created a hostile work environment?

A We don't work for Tiffany Chen. So, no, I felt in office hostility only from Chase.

Q Do you believe that Ms. Chen ever contributed to hostility in the workplace?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I think it's a weird nature of being an executive assistant to someone that does include their personal life bleeding in. She's had asks that have made us busier and stuff like that. Or asks like on Bob's behalf or he'll ask something on her behalf.

Adding her to travel, adding catering for her, stuff like that, that definitely adds to the workload. It doesn't add to my perceived -- any perceived hostility in the workplace.

Also, I've never physically been in the office with Tiffany. She doesn't come to the office.

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, we're going to share an exhibit in the chat. It's Bates stamped CANAL_0047395, and I'll mark this as Plaintiff's Exhibit 2. And you can open it once you see it.

A Okay. I'm opening it.

(Whereupon, Exhibit 2 is marked for identification and is attached hereto.)

THE WITNESS: Should I read it first or you summarizing it?

BY MS. MACMULLIN:

Q Just give me one second. I'm getting it open, too.

A Okay.

Q So this is a document that has been produced by defendants in this action. If you look at the first page, do you see where it says, "Conversations: 1. Total messages: 116"?

A Yes. It's kind of slow to load. I see that first page.

Q Take the time that you need when reviewing it.

A Okay.

Q Do you see on that first page where it says: "Chat: 116 messages between Gillian Spear, Michael Kaplan, and Sabrina"?

A I do.

Q Okay. And then, if you can turn to Page 7 of this PDF.

A Okay. It appears blank to me.

Q Okay. It shouldn't --

A Oh, it's load -- yeah. Yeah, I see. It's loading slowly.

Okay. I see a bunch of black chunks, but I see my own texts.

Q Right. So the -- this is the page that has the Bates stamp at the bottom right-hand corner CANAL_007 -- or excuse me, 0047401.

Do you see that?

A Yeah, on Bates number.

Q Okay. And do you see your message from 4:16 p.m. in the middle of the page?

A Yeah.

I see: "We can't have a hostile workplace where she decides who to trust one week and then switches

the next. Makes us all beyond stressed."

I see that.

THE REPORTER: When you're reading, Sabrina, if you could slow down for me, I'd appreciate it.

THE WITNESS: Oh, sorry. Should I read it again?

THE REPORTER: Sure, why not.

THE WITNESS: "We can't have a hostile workplace where she decides who she trusts one week and then switches the next. Makes us all beyond stressed."

BY MS. MACMULLIN:

Q And we actually have a version of this that defendants have produced without these redactions. So if you'll just sit here with me, we're going to give you a different version of this document.

A Okay. Is it in the chat?

Q Not yet.

A Okay.

Q Sorry, we're just having some trouble with the exhibits, so let's continue with the questioning.

Are you aware of Mr. De Niro referring to any female employees as "girls"?

A Yes. I think sometimes in E-mail, and Chase would also call us "the girls" in the E-mail and add us in.

Bob would sometimes also say, "the girls, the office, Gillian/Sabrina." I have been called "the girls" by both Chase and Bob.

Q How often would Mr. De Niro refer to any female employees as "girls"?

MR. BENNETT: Through the course of her entire employment, just to clarify?

MS. MACMULLIN: Yes.

BY MS. MACMULLIN:

Q During the course of your employment, how often would Mr. De Niro refer to any female employees as "girls"?

A Not frequently, to my knowledge. He does try to say, "the office." Also, now, one of his assistants is a male, so it doesn't apply.

I do remember some E-mail chains that may be earlier on, 2018, 2019, Chase would say, "adding the girls." Bob would say, "check with the girls." It was a little more common then as a phrase. I haven't heard it from him in a while.

Q Mr. De Niro would refer to you and Ms. Spear as "the girls"; is that correct?

A Not often and not the only way. But like I said, occasionally, in E-mail, I think I recall, "adding the girls" or "check with the office, check with the girls" from Chase, too.

Q At times Mr. De Niro referred to you and Ms. Spear as "the girls"?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: At times both Bob and Chase referred to us as "the girls."

BY MS. MACMULLIN:

Q Please listen to my question.

At times Mr. De Niro referred to you and Ms. Spear as "the girls"; is that correct?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. She's answered the question.

You can answer.

THE WITNESS: At times.

BY MS. MACMULLIN:

Q How did you feel when Mr. De Niro referred to female employees as "girls"?

A I know Gillian took more bother to it than I did. And she told Chase via E-mail to no longer call us "the girls." She told Chase that she didn't like

being called that, and that she had wanted her to stop calling us that.

Gillian and I discussed it being more offensive coming from Chase herself. Since Chase has left, I don't think Bob has called us or me "the girls" at all.

Q Did you ever find it inappropriate for Mr. De Niro to call women "girls"?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I didn't find it inappropriate. I felt like it was slightly more acceptable of an older man of his generation. Not great.

But once we alerted both Chase and Bob that we didn't appreciate that, Bob has been very good at using our names or "the office."

BY MS. MACMULLIN:

Q When did you alert Mr. De Niro that you did not appreciate that?

MS. LAZZARO: Objection.

THE WITNESS: I think it was -- I think it was later in -- maybe in the conversation where I asked for a raise. Bob was asking my general happiness at the company.

I explained that Chase made us feel a certain way and belittled us, and would use demeanative terms like "the girls" or adding in Bob's assistants, which is a fine way to term us -- term us/them in that regard. But she would put us down in slights like that.

I explained we didn't like that. Didn't like being called "the girls." Bob agreed.

BY MS. MACMULLIN:

Q During your time as an executive assistant, are you aware of Mr. De Niro yelling at Ms. Robinson?

A I --

MR. BENNETT: Objection.

THE WITNESS: I heard -- yeah, I was going to say I've since heard like that recording that was made public. That wasn't during my time.

It's hard to say because I was not often -- they were not often in the office like talking in front of me. Probably behind like in -- in his office, which Gillian and I sat outside, if that makes sense.

I do probably remember sometimes where I definitely heard a loud voice from Bob, maybe a yell, but we couldn't hear what they were saying.

BY MS. MACMULLIN:

Q How often do you recall overhearing Mr. De Niro yell at Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: Not frequently, which doesn't mean it didn't happen. I'm just saying I wasn't there, so I can't really weigh in.

Like now, maybe once every couple months in front of me, but like I said, I didn't hear direct what was being discussed.

BY MS. MACMULLIN:

Q During your time as an executive assistant, are you aware of Mr. De Niro yelling at any other female employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I know he yelled at Kap. Kap isn't so good at note taking. And sometimes he'd lose track of stuff. I heard him raise his voice with him.

I heard him raise his voice -- both he and Gillian yelled at each other one time when they had a disagreement. She had accidentally sent him to the wrong location for a meeting and he got mad about that. And she escalated and raised her voice, too.

That's it.

He doesn't yell at me. I do, I think, a good job at also deescalating things. If I've done something wrong, I say, "oh, sorry, I made a mistake. It won't happen again." And that's worked very well for me in this job.

BY MS. MACMULLIN:

Q During your time as an executive assistant, are you aware of Mr. De Niro cursing at Ms. Robinson?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I just didn't hear their direct conversations. So, I mean, I heard that recording that's made public, but that's the time I've heard him cursing at her.

BY MS. MACMULLIN:

Q During your time as an executive assistant, did Mr. De Niro ever curse at Ms. Robinson?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I just couldn't hear them when they were in his office. So like maybe. It would be a guess.

MR. BENNETT: Don't guess.

THE WITNESS: Okay. I can say, like, from

my own knowledge, sometimes if Bob's annoyed about something not related to me, he would be like, "Ah, that's fucking stupid." Sorry, pardon my French.

I didn't hear him like direct things at Chase and I wasn't around for their direct conversations. It was often Chase would close the sliding door between our office and Bob's.

BY MS. MACMULLIN:

Q During your time as an executive assistant, are you aware of Mr. De Niro cursing at any other female employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I wouldn't say I've heard of anything at them. Like I said, I've heard him curse like generally, but not like directed at somebody.

BY MS. MACMULLIN:

Q During your time as an executive assistant, are you aware of Mr. De Niro insulting Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: Since -- after Chase left, I heard Bob insult Chase. And that was after everyone was made aware of a lot of her spending. Yeah, he did insult her at the time. But when I worked with Chase,

I -- I never heard Bob insult her.

BY MS. MACMULLIN:

Q And what did Mr. De Niro say that was insulting towards Ms. Robinson?

MS. LAZZARO: Objection.

Can you specify the time period that you're speaking about, Kate?

MS. MACMULLIN: I'm speaking about the time that the witness has just testified she heard Mr. De Niro insult Ms. Robinson.

MS. LAZZARO: Just to clarify, so after Chase's resignation.

BY MS. MACMULLIN:

Q Please answer the question, Ms. Weeks-Brittan.

A After Chase's resignation, I heard Bob insult her and the situation.

Q And what did Mr. De Niro say?

A I -- I don't remember verbatim, but -- let me check -- might -- it might have been the same conversation that I had about the raise, too, when we were like pulse checking the office.

He went into this like speech about trust and how he trusts people until they break his trust. And Chase broke his trust.

He was like -- you know like, "she's fucking ridiculous. She's stupid. This is stupid. I can't" -- sorry, pardon my French. "Don't fuck with me." Like, "you know, I trust people until I don't." And like -- "but are you happy here?"

Like is -- you know, what -- like, he went into that. Like, I knew he was angry about the situation and he swore; but I -- I can't say more specifically than that.

Q When did that conversation take place?

A I want to say October 2019. I think it was probably after this was filed.

Q Are you aware of Mr. De Niro insulting any other female employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: The only other person I've heard him insult was Kaplan, but that wasn't your question.

BY MS. MACMULLIN:

Q And just to circle back, when you said after this was filed, you were referring to after

Ms. Robinson filed her lawsuit?

A Yeah.

Q During your time as an executive assistant, are you aware of Mr. De Niro saying anything derogatory to Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: Not of anything that I heard other than that one voicemail that I feel the world has heard.

BY MS. MACMULLIN:

Q Are you aware of Mr. De Niro ever using the word "bitch"?

A He might have called Chase a bitch post this lawsuit. I -- I don't remember what his language was exactly, but I never heard him call her a bitch when she was an employee.

Q Tell me what you recall about Mr. De Niro referring to Ms. Robinson as a bitch?

A I just don't remember the conversation. I mean, he -- like I said, the October conversation probably after this was filed. This was also at the same time Gillian told him that she was probably quitting.

He brought me in, asked me for a pulse check, mentioned trust; and how everyone has his trust

until they don't. Like, he was saying like, "This is fucking ridiculous" or that like -- he's not a man of many words. So he'll like make -- just like -- he'll, like, say some claim, like, "Oh, this is ridiculous." He doesn't say like this lawsuit or Chase.

I was nodding. He's like, "Sorry."

Like, "How was it working for her?"

Like, "I can't believe I didn't see this sooner."

Like, he was mad at himself.

I was like, "It wasn't great." And this is when I mentioned that I made more in my previous job. I had asked for Chase to match my salary. She said no.

He was like, "I never" -- like, "She didn't ask me."

And I was like, "I know. She said no when I asked her at the time we were face-to-face. She said no right off the cuff. That being said, I would appreciate a raise. I've worked here for over a year. I think I'm doing a great job."

The conversation, like, was a very productive one, but he definitely started out mad, and

annoyed at the lawsuit and the situation.

Q Are you aware of anyone referring to Ms. Robinson as Mr. De Niro's office wife?

A I feel like Chase maybe jokingly said that once in front of me, like in the home, like "ha, ha, I'm basically his office wife," but he never liked used that term to her around me at least. I can't speak beyond that.

Q When was that conversation with Ms. Robinson?

A In general, late August, early September, whenever I was working in the apartment.

Q Are you aware of Ms. Chen expressing concerns about Ms. Robinson's relationship with Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: After Chase left, yes, because I just didn't talk a lot to Tiffany before that time.

BY MS. MACMULLIN:

Q What concerns did Ms. Chen express?

A She thought that Chase was a thief. She thought she was in love with Bob. She thought she inserted herself in the home project. She thought she wasn't good at her job. Lots of thoughts.

Q What was the basis for Ms. Chen's supposition that Ms. Robinson was in love with Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't know that there was any basis beyond her being gossipy or Chase always being in their home and -- she didn't like give me specific examples of anything. She just would make statements. I never thought Chase was in love with Bob.

BY MS. MACMULLIN:

Q Did Ms. Chen express concerns about any other female employees having feelings for Mr. De Niro?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: No other Canal employees.

BY MS. MACMULLIN:

Q Did Mr. De Niro ever touch you in a way that made you feel uncomfortable?

A Never.

Q Did Mr. De Niro ever give you a hug that was unwanted?

A No.

Q Are you aware of Mr. De Niro ever touching any female in a -- any female employees in a way that he did not touch male employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: From what I saw, he's just not a very touchy or talkative guy, so no.

BY MS. MACMULLIN:

Q During your employment as an executive assistant at Canal, what types of perks would Canal provide for its employees?

MS. LAZZARO: Objection.

THE WITNESS: Can I answer?

MS. LAZZARO: You can answer.

MR. BENNETT: Yes.

THE WITNESS: When I was hired and I asked Chase to spell out benefits and vacation days and stuff.

I think she mentioned that like Canal employees received MetroCard and gym reimbursement up to $100. When I started the job, she mentioned that we receive lunch in the office included as well.

BY MS. MACMULLIN:

Q One of the perks of your employment was Canal paying for your lunches on workdays; is that

correct?

A Correct, when we were in the office.

Q During your time as an executive assistant, would you ever seek expense reimbursement from Canal for charges that you incurred?

A Yeah, like the petty cash document that I submitted to Chase.

Q For what types of expenses, did you seek reimbursement?

A I'd have to look through them, but MetroCard, gym. Like the things that are spelled out. If I needed to like Uber anywhere like for a work reason, I'd seek reimbursement for that.

I asked Chase to reimburse an Uber once that wasn't fully approved. That was the only time I didn't fully get approval on things.

General -- yeah, I'm pretty sure it was just like Ubers. Anything we bought for Bob maybe. Like, if he needed, like, a newspaper. I know sometimes he asked for, like, books and we'd like run to the store. Stuff like that would get reimbursed.

Q Since Ms. Robinson's employment ended, have you sought preapproval from anyone for charging Ubers to Canal?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I asked Tasch after Chase left how we should do certain things to make sure we were aboveboard. I had a conversation with him about Ubers once because I had accidentally charged the corporate card. Like it was listed as my personal and business.

And I sent him a bunch of screenshots to correct that. And I swapped it in the app, so I paid onto the correct card. I told him of that mistake.

Other than that, no, but I would only Uber to and from work. Like, if I was running an errand, I'd go back to the office, if I was leaving work. The Greenwich was always the location.

BY MS. MACMULLIN:

Q Since Ms. Robinson's employment ended, would you charge Ubers to Canal if they were to or from work?

MR. BENNETT: Objection.

THE WITNESS: Yeah, if there's a reason I had to Uber, like if I had to Uber documents from work to Bob's house to get him to sign them, so sure.

BY MS. MACMULLIN:

Q To your knowledge, did Canal have a reimbursement policy that specified what expenses employees could be reimbursed for?

MS. LAZZARO: Objection.

THE WITNESS: The only time it was really specified was the gym reimbursement, MetroCard reimbursement, and then, like, work-related Ubers.

I think maybe one -- one time -- our corporate card is an AMEX. One time we paid something that didn't accept AMEX and I used my personal card. And I sought reimbursement for that.

BY MS. MACMULLIN:

Q To your knowledge, did Canal have a reimbursement policy that specified what expenses you could be reimbursed for?

MR. BENNETT: Objection. We're sort of hitting the 30(b)(6) issue.

But you can answer.

THE WITNESS: Well, I just submitted my reimbursement. Like, petty class -- petty cash claims to Chase. So she would approve them, or on one instance, she didn't approve one. And that was sort of how -- like, the policy wasn't like written anywhere.

BY MS. MACMULLIN:

Q Describe the process for receiving reimbursement during your time as an executive assistant.

MR. BENNETT: Objection. That relates directly to the 30(b)(6) deposition.

Sabrina, you can answer in your own personal experience.

THE WITNESS: I filled out a petty cash Excel sheet that I was provided with. I updated it with the date, the charge, and a note saying what it was for. And then I sent that to Chase. And then, she'd give me cash.

BY MS. MACMULLIN:

Q Were there categories of expenses that you charged to Canal without filling out a petty cash spreadsheet?

MR. BENNETT: Same objection.

You can answer.

THE WITNESS: What do you mean? Like, I -- I would have wanted to submit the petty cash, so that I would get my own money back.

BY MS. MACMULLIN:

Q Were there categories of expenses that you charged to Canal without filling out a petty cash spreadsheet?

A That would just be like the corporate card, like for paying for Bob's plane or like Bob's hotel. That -- that stuff. Like no -- no one paid that in

petty cash because Bob's expenses are on the corporate card.

I would have sought all my own expenses back via petty cash because I would have wanted to be paid back if I had charged.

Q To your knowledge, did Canal have a practice of paying for its employees' working meals?

MR. BENNETT: Objection.

THE WITNESS: Like I said, lunch at the office.

BY MS. MACMULLIN:

Q To your knowledge, did Canal pay for Michael Kaplan's meals?

A Lunch at the office.

Q So --

A Oh, and coffee. Coffee, sorry.

Q So, to your knowledge, did Canal pay for Michael Kaplan's lunches in the office and coffee?

A Yeah, we'd often order lunch together.

Q To your knowledge, did Canal pay for Gillian Spear's lunches in the office and coffee?

A Yeah. Gillian and I almost always ordered together.

Q To your knowledge, did Canal pay for Lulu White's lunches in the office and coffee?

A When Lulu was in the office with us, yes. We'd all order a group lunch, but Lulu was often with Chase uptown. So they probably did their own thing, but I don't want to speculate.

Q Do Canal -- or let me rephrase my question.

Did Canal office employees pay for lunches using a Canal credit card?

A We were logged into a Caviar account on our work computers. So the card was already in there. And we could order lunch, like, from one place to the office on Caviar, which we did.

Q And Caviar is a food delivery service; is that correct?

A Yeah.

Q So meals for Canal employees that were ordered through Caviar were paid for directly by Canal without the need to submit a petty cash sheet; is that correct?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Lunches, yeah.

BY MS. MACMULLIN:

Q So lunches for Canal employees that were ordered through Caviar were paid for directly by Canal without the need to submit a petty cash sheet; is that

 correct?

A Yeah.

MS. LAZZARO: Objection.

BY MS. MACMULLIN:

Q What, if anything, were you told about Canal paying for employee meal expenses?

A I was told that Canal paid for lunch in the office and that we should order from one place. Like not one -- like, Gillian and I would order together. Not like I'd get a lunch, she'd get a lunch.

Q Did you ever discuss your meal expenses with Mr. De Niro?

A I don't think so.

Q Did Canal ever play -- ever pay for employee dinners if you were working late?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yeah, I think maybe once or twice around Christmas when it was really busy, we had food sent up from the grill downstairs in our building.

Locanda Verde is also in our office building. So same thing. If we were there really late, we'd probably get one of the two of those.

BY MS. MACMULLIN:

Q And Locanda Verde is a restaurant that Mr. De Niro owns; is that correct?

A Yeah.

Q And when you're referring to the grill, what restaurant is that?

A The Tribeca Grill. It's in the downstairs of the New York office.

Q During your time as an executive assistant, were there any limits on the meals that Canal paid for on behalf of employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't think I was ever told of a limit, just beyond, like, a reasonable lunch expense. I don't know. We'd do like 20, 30 a person.

No, I mean, in -- that Chase was, like, looking at the account, so we -- we didn't like go absurd. Sometimes we'd have -- go really nice.

I think Chase took me and Kap to Nobu when I started as a new welcome lunch. Those were, obviously, like, more expensive meals.

BY MS. MACMULLIN:

Q During your time as an executive assistant, would Canal pay for any of your car transportation,

such as taxies, Ubers, or Lyfts?

A Yeah, I mentioned the times like Ubers to and from work, if I caught a cab instead, something (phonetic), I'd put that on my petty cash, date it, and submit the report.

Q To your knowledge, did Canal have a practice of paying for its employees car transportation?

MR. BENNETT: Objection. It specifically asks for a practice which is a 30(b)(6) topic.

Limit your answer to your personal knowledge, and go ahead.

THE WITNESS: MetroCard reimbursement was spelled out to me. And Ubers were only, like, if I was running something up to Bob, if I had to pick something up, if anything was asked of me.

And I couldn't take the subway for some reason, then I'd take an Uber, or a taxicab, and submit a petty cash report.

BY MS. MACMULLIN:

Q What Ubers, taxies, or Lyfts would Canal pay for for Canal employees?

MR. BENNETT: Same objection.

THE WITNESS: Yeah, I mean, not like -- clearly, not all of them. I -- I -- once coming home from Thanksgiving to New York, I was caught in a snow

storm. I couldn't get back to New York. Chicago airport canceled all flights.

I asked Chase and told her and Kap, like, hey, I don't know if I can make it in in the morning. I'm stuck in Chicago. Chase told me I had to open the office, to figure it out.

I took the only flight I could from Chicago to D.C. It landed at, like, 12 or 1:00 a.m. I asked Chase to pay for that Uber. It was a three-hour Uber from D.C. to New York in the middle of the night.

She said that Canal would only reimburse half. And she paid me back half of, like, a $400 Uber.

That was the time -- like, I guess, it wasn't to work, but it was to get me back to work during a weird circumstance. And it was not paid for fully, so --

BY MS. MACMULLIN:

Q Did you ever charge transportation expenses directly to a Canal credit card?

A Like Bob's?

Q Like any Canal credit card without submitting a petty cash sheet.

A Like -- you mean, like, Bob's travel or, like, what do you mean?

Q Did you ever charge transportation expenses directly to any Canal credit card?

A I'm asking you, whose transportation? I charged a lot of Bob's transportation expenses direct to Canal credit card.

Q Did you ever charge your own transportation expenses directly to any Canal credit card?

A No. We now have a Canal Uber account that, like, some of Grace's employees use as well. But when I worked with Chase, I just sought petty cash reimbursement.

Q When did Canal set up a Canal Uber account?

A Fairly recently. Elliot, Bob's son, has like companions that take him out in the city because Elliot has [redacted] And they were constantly asking us to order Ubers for them, which is just like logistically challenging because I didn't know exactly where they were and stuff.

So we thought it would be easy to do that. I told Tasch we were doing that. And, now, the two employees have access to that as well.

Q Now, that Canal has an Uber account, is it correct that you no longer need to submit petty cash sheets to have your Ubers paid for by Canal?

MR. BENNETT: Objection, on the basis of the

30(b)(6) topics. And from this point forward, and with respect to the questions previously put to the witness, the defendants will take the position that they have waived the right to request information on that topic from the 30(b)(6) deposition.

With that objection on the record, Sabrina, you can testify as to your personal knowledge.

THE WITNESS: The account that Elliot's companions used goes directly to Tasch for oversight. I work in L.A. now and -- and no longer get reimbursed or seek reimbursement for my travel. I have a car I drive to work. I don't Uber.

BY MS. MACMULLIN:

Q During your employment, Mr. De Niro generally bought gifts for Canal employees on their birthdays; is that correct?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Not really anymore. Like I definitely got gifts. I've gotten, like, Christmas gifts and stuff. Chase -- Chase was big in gifts.

Like this year, Bob wished me happy birthday. I didn't get a gift. I got a bonus at Christmas.

BY MS. MACMULLIN:

Q Prior to the end of Ms. Robinson's employment, Mr. De Niro generally bought gifts for Canal employees on their birthdays; is that right?

MR. BENNETT: 30(b)(6) objection.

You can answer.

THE WITNESS: I don't think Bob bought people gifts. I think Chase maybe checked and like got approval for certain gifts, but I actually didn't celebrate my birthday in the time that I worked there before Chase left, so I'm not sure.

BY MS. MACMULLIN:

Q To your knowledge, Mr. De Niro also sometimes bought gifts for former Canal employees; correct?

MR. BENNETT: 30(b)(6) objection.

You can answer.

THE WITNESS: I -- I feel like Robin got a gift, but I didn't know much about Robin until post Chase. I think Chase got approval.

Like on the birthday list, it would say like "Chase handles" for people like Robin and Michael Kaplan; and Chase would handle it.

MS. MACMULLIN: I'd like to take a ten-minute break here. So we can come back at 3:00

p.m. Eastern.

MR. BENNETT: Okay.

MS. MACMULLIN: Okay.

THE VIDEOGRAPHER: It is 11:50 and we're going off the record.

(Recess.)

THE VIDEOGRAPHER: It is 12:01 p.m. and we are back on the record.

BY MS. MACMULLIN:

Q Before Ms. Robinson's employment ended, Canal maintained an -- an American Express card with Ms. Robinson's name on it; right?

A Correct.

Q And during your employment, tell me everyone who was allowed to use the Canal American Express card under Ms. Robinson's name.

MS. LAZZARO: Objection.

MR. BENNETT: Objection as to the 30(b)(6).

But you can answer, based on your knowledge.

THE WITNESS: Gillian and I could use it on Bob's expenses. Like, if we were paying for a plane or flight, his travel agents, the charter person, they have access.

BY MS. MACMULLIN:

Q Couldn't Ms. Robinson use the American

Express card?

A Oh, yeah. I -- I thought you meant someone who wasn't named on the card.

Q Could anyone else use the American Express card with Ms. Robinson's name on it?

MR. BENNETT: 30(b)(6) objection.

You can answer.

THE WITNESS: I think anyone getting anything for Bob, but I thought Kaplan had his own cards; but I don't know if he used hers.

Maybe Lulu but -- if Chase gave her permission. I don't know.

BY MS. MACMULLIN:

Q Were all Canal employees allowed to use the American Express card under Ms. Robinson's name?

MR. BENNETT: Same objection on the basis of 30(b)(6).

You can answer, just in your own personal knowledge.

THE WITNESS: My personal knowledge is that Gillian or I could use it to give to people who were paying for Bob's expenses. I would send it to the travel agent or the charter person. I couldn't use her card, like, on my own.

BY MS. MACMULLIN:

Q The card number and credentials for the American Express card under Ms. Robinson's name were accessible to people in the office; correct?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yeah, Gillian and I had the card number.

BY MS. MACMULLIN:

Q The card number and credentials for the American Express card under Ms. Robinson's name were saved as a contact in Canal's system; is that correct?

A I don't actually know if it was Chase's card or Michael Kaplan's card; but one of their cards was saved as the AMEX credit card that we could use for Bob charges.

Q And a scan of the front and back of the American Express card was provided to everyone who worked in Canal's office; is that correct?

MR. BENNETT: Ms. Robinson's card, Kate? Her answer referenced two cards. I just want to clarify.

BY MS. MACMULLIN:

Q A scan of the front and -- and back of the American Express card under Ms. Robinson's name was

provided to everyone who worked in Canal's office; is that correct?

A I don't think so, actually. I think it was Michael's card. Chase was more protective of hers. And we had Michael's license, too, that we'd send along if somebody needed that.

Q A scan of both cards was provided to everyone who worked in Canal's office; is that correct?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. She answered the question.

THE WITNESS: I don't think I had a scan of Chase's. And I'm only talking about myself and Gillian. I don't know how -- who you're saying is an employee beyond us, but we had Michael's AMEX credit card and his license.

BY MS. MACMULLIN:

Q The card number and credentials for the Canal American Express card under Ms. Robinson's name and the Canal American Express card under Mr. Kaplan's name were both provided to Canal office employees; correct?

A I'm disagreeing. I don't think that I had --

MR. BENNETT: Objection.

THE WITNESS: Chase's.

MR. BENNETT: That's the third time you've asked the question. It's the same answer.

THE WITNESS: I don't doubt that I had her numbers, but it was Michael Kaplan's card front and back pictured; and his license that we had access to.

BY MS. MACMULLIN:

Q What do you mean when you say, you had her numbers?

A Like maybe she put them in an E-mail that I was on to a travel agent. Like, I didn't store them anywhere. Maybe they were, like, recorded somewhere; but the card that we had the credentials for and the license was Kaplan's.

Q You don't recall having a contact in your phone containing the Canal card under Ms. Robinson's name?

MR. BENNETT: Objection. It's been asked and answered multiple times.

THE WITNESS: I recall having a card in my phone, but I recall that card being Michael's. Maybe Chase was listed there as well, but the credentials we had were for Kaplan's.

BY MS. MACMULLIN:

Q Is that card still saved as a contact in your phone?

A I don't think so, but do you want me to check?

Q You don't need to check right now.

A I know Chase's card is not -- not active anymore. We canceled it.

Q Um-hmm. Did Ms. Robinson ever lend anyone at Canal the physical card for the Canal American Express card under her name?

MS. LAZZARO: Objection.

THE WITNESS: Can I answer?

MR. BENNETT: Based on your personal experience, yes.

THE WITNESS: I think -- I think once or twice during the apartment project, she lent it physically to me to use for taxies.

BY MS. MACMULLIN:

Q Do you recall any other occasions on which Ms. Robinson lent her physical card to you?

A I think it was just during that time during the apartment project. I know -- I'm pretty sure Michael Kaplan's card we used to keep in the office, like where we filed the mail and stuff. Yeah, I think

it was his.

Q To your knowledge, did Ms. Robinson ever lend anyone else at Canal the physical card for the Canal American Express under her name?

A I don't have direct knowledge of her handing it to anyone else.

Q Tell me everything that you recall the Canal American Express card under Ms. Robinson's name being used for.

MR. BENNETT: Objection.

THE WITNESS: I don't --

MR. BENNETT: You can answer.

THE WITNESS: -- know how to answer that. I -- I mean, we would send it to either hers or Michael's to book Bob's travel, to pay for hotels. I -- I really think it was Michael's card, though. I don't -- I don't know.

BY MS. MACMULLIN:

Q What categories of expenses were charged on the Canal credit card in Ms. Robinson's name versus the one in Mr. Kaplan's name?

MS. LAZZARO: Objection.

MR. BENNETT: Objection based on the 30(b)(6) issue.

You can testify about personal knowledge.

THE WITNESS: There was some, like, weird distinction. I am trying to remember. There was some distinction. I don't -- whether it was, like, Bob business or Bob personal on -- on one card or the other, and we would decide whose to use for that. I don't -- I don't remember which was applied to which.

BY MS. MACMULLIN:

Q What did you under -- okay. Let me rephrase my question.

The Canal American Express card under Ms. Robinson's name was used for meals for the office; is that correct?

MR. BENNETT: Objection 30(b)(6).

You can answer.

THE WITNESS: I -- I would have to check. Like, it was probably the one she put in the Caviar account.

BY MS. MACMULLIN:

Q Do you recall the credit card in Ms. Robinson's name being used for employee meal expenses?

MS. LAZZARO: Objection.

THE WITNESS: There was, like, six months of time-ish when I worked with Chase, and then her card was canceled. And then, it was Michael's card. So I

just don't know if it was always Michael's card. Maybe -- it was probably Chase's at that time.

I know there were rules. I don't know if it was, like, business travel on Chase and something else on Michael; but I viewed those as being very arbitrary at the time and no reason for the difference.

And after she left and we canceled her card, it -- it was just, like, not ever split like that again. So I'm -- I don't remember.

BY MS. MACMULLIN:

Q The Canal American Express card under Ms. Robinson's name was used for meals for Mr. De Niro; is that correct?

MS. LAZZARO: Objection.

THE WITNESS: That's not correct.

MR. BENNETT: Objection. 30 --

BY MS. MACMULLIN:

Q Sorry, I missed your answer.

A Bob has his own credit card now. I don't think Chase was buying him meals.

Q The Canal American Express card under Ms. Robinson's name was used for groceries for the office; is that correct?

MR. BENNETT: 30(b)(6) objection.

You can answer, subject to that objection.

THE WITNESS: It was probably the card that was in the Instacart.

BY MS. MACMULLIN:

Q The Canal American Express card under Ms. Robinson's name was used for groceries for Mr. De Niro; is that correct?

MR. BENNETT: Same objection.

THE WITNESS: I don't think so. I don't know. If Chase ordered him groceries, maybe.

BY MS. MACMULLIN:

Q The Canal American Express card under Ms. Robinson's name was used for Ubers for people other than Ms. Robinson; is that correct?

MR. BENNETT: Same objection.

THE WITNESS: I don't think so.

BY MS. MACMULLIN:

Q The Canal --

A Petty cashed our Ubers, like I said, and then I would bill back for it.

Q The Canal American Express card under Ms. Robinson's name was used for Lyfts for people other than Ms. Robinson; is that correct?

MR. BENNETT: Same objection.

THE WITNESS: I have no idea. I mean, like I said, how Elliot's companions require Uber and Lyft,

maybe Chase did that as well for them; but I don't know.

BY MS. MACMULLIN:

Q What expenses for Mr. De Niro's family do you recall being placed on the credit card in Ms. Robinson's name?

MS. LAZZARO: Objection.

THE WITNESS: Probably the holiday gifts that Chase bought.

MR. BENNETT: Don't guess.

THE WITNESS: Yeah, I don't know. I'm guessing. I mean, this is, like, years ago, you know. I -- I don't -- the cards look exactly the same on the outside. They're -- doesn't even say the name on the front of the card. It says on the back AMEX. I wasn't like paying hyper-close attention.

BY MS. MACMULLIN:

Q Do you have an understanding as to under what circumstances Ms. Robinson was authorized to use SkyMiles to book travel -- to book her travel? Excuse me.

A I never heard of the SkyMiles --

MR. BENNETT: Objection.

THE WITNESS: -- until after this when I found out that she had transferred them to her

account. I didn't -- I was not aware of it at the time.

BY MS. MACMULLIN:

Q You're not aware of what conversations Ms. Robinson may have had with Mr. De Niro concerning her SkyMiles usage; is that correct?

A I'm not aware of their direct conversation.

Q After Ms. Robinson's employment with Canal ended, were any changes made to Canal's policies concerning expenses?

MR. BENNETT: Objection on the basis of 30(b)(6). The question specifically calls for her to opine about the topic of the 30(b)(6).

Subject to that objection, Sabrina, within your own personal knowledge, if you can respond to the question, go ahead.

THE WITNESS: After Chase left, we worked more closely and directly with Tasch to understand how to streamline things. We got rid of her card. We got rid of Kaplan's card. Everything Bob related goes direct on an AMEX that Tasch oversees.

We no longer get gym reimbursement. The office assistants do still get lunch on Caviar.

BY MS. MACMULLIN:

Q Was any explanation offered for why those

changes were being made?

A For oversight to prevent someone from running rampant with the corporate card again.

Q Did there come a time when you became aware that Ms. Robinson was threatening legal action against Mr. De Niro?

A I think I became aware of it when it was taken, when legal action was taken.

Q Meaning the filing of this lawsuit in October 2019?

A Yeah.

MR. BENNETT: Objection.

THE WITNESS: I think that's when I first became aware of it.

BY MS. MACMULLIN:

Q Weren't you informed in advance that Ms. Robinson was threatening legal action?

MS. LAZZARO: Objection to form.

MR. BENNETT: Objection.

To the extent that any information that might be responsive to that comes from an attorney on behalf of Canal, you should not answer the question.

If you're able to answer the question otherwise, go right ahead.

THE WITNESS: I do not remember the time

line of if I was given a heads-up or if I just found out, and then it had already been taken.

BY MS. MACMULLIN:

Q Okay. We're going to put a document in the chat, which is Bates stamped CANAL_0048976, which I'll mark as Plaintiff's Exhibit 3.

(Whereupon, Exhibit 3 is marked for identification and is attached hereto.)

THE WITNESS: I think you may have frozen, Kate.

MS. MACMULLIN: Am I back?

MS. LAZZARO: You still look frozen on my end, too.

THE WITNESS: But I did get the document.

THE VIDEOGRAPHER: You guys want to go off the record here?

MS. MACMULLIN: Sure. I can -- I can see myself frozen.

THE VIDEOGRAPHER: All right. It is 12:21 and we're going off the record.

(Recess.)

THE VIDEOGRAPHER: It is 12:23 and we're -- oh, hold on. It is 12:23 and we're back on the record.

BY MS. MACMULLIN:

Q Okay. Ms. Weeks-Brittan, were you able to open the document that's been marked as Plaintiff's Exhibit 3?

A I was.

Q Okay. And do you see on the first page of the document where it says, "23 messages between Gillian Spear, Kevin Rivas, Sabrina Weeks-Brittan, and Tiffany Chen"?

A I see.

Q Who is Tiffany Chen?

A Bob's girlfriend.

Q What is Ms. Chen's relationship with Mr. De Niro?

A Bob's girlfriend.

Q What is Ms. Chen's relationship to Canal?

A She's Bob's girlfriend.

Q During the time you were an executive assistant, what was Ms. Chen's involvement in the operations of Canal?

A Not involved in the operations. She'd ask us for things or ask -- relay things from Bob. She didn't like have office oversight or anything.

Q What is Ms. Chen's present involvement in the operations of Canal?

A About the same, but less chummy. She's taken a bit of a step back. Still no, like, direct office involvement. She'll, like, ask us for things or -- like catering that relates to their travel and stuff like that.

Q Who is Kevin Rivas?

A He is Tiffany's assistant.

Q And does Mr. Rivas have any relationship to Canal?

A No. He'll just relay, like, oh, Tiffany wants this catering. Tiffany wants XYZ.

Q And if I can turn your attention to the second page of the document, do you see the message from Tiffany Chen around the middle of the page at 8:49 p.m. that says, "Well, I'm one-third living at the moment"?

A Yeah.

Q And could you read aloud the last line of that message that begins, "And Chase"?

A "And Chase got a lawyer and
they are threatening to sue unless
Bob gives into her demands," koala
face.

Q Is this text message from Tiffany Chen the first time you learned that Ms. Robinson was

threatening legal action against Mr. De Niro?

MR. BENNETT: Objection.

You can --

THE WITNESS: Probably. I just -- like, he sued her first. I don't -- I don't, like, know -- remember the exact timeline. That probably is when I was made aware of it.

BY MS. MACMULLIN:

Q After you received the text message from Ms. Chen that Ms. Robinson was threatening a lawsuit, did you have any discussions with anyone affiliated at Canal about Ms. Robinson's threat to bring a lawsuit?

A I'm sure Gillian at the time because we were probably both sitting in the office when we got that text.

Q Do you recall what was discussed during that conversation with Gillian?

A We thought -- this is a -- I'm, like, muddling together what I imagine were multiple conversations because I don't remember specific instance. This was years ago.

So just, like, general timeline. We thought that her lawsuit was not valid. We thought it was more like her name was dragged through the mud a bit with Bob. So it seemed like it was kind of a petty

rhetoric.

Gillian and I both did not have a great working relationship with Chase and were happy when she left. So I think a -- a lot of people, including in the office, it was just like a gossipy time of, oh, my God, Chase is suing -- (Inaudible.) It's like the most traumatic thing that's happened in my employment ever.

So there was just a lot of gossip. I don't remember exact conversations.

Q This text message from Ms. Chen informing you that Ms. Robinson was threatening to bring a lawsuit was sent before Canal brought its lawsuit against Ms. Robinson; is that correct?

MR. BENNETT: Objection.

THE WITNESS: I don't know the timeline. If you tell me that it's before, then sure.

BY MS. MACMULLIN:

Q What, if anything, were you told about the nature of the lawsuit that Ms. Robinson was threatening?

MR. BENNETT: Objection.

Again, to reiterate, don't disclose information you discussed with Canal's legal counsel. Otherwise, you can answer.

THE WITNESS: I really don't -- I mean, maybe you'll have to prove me otherwise, but I really don't recall learning of the nature of it until I read the claims.

Like, maybe speculation of stuff, but I don't -- I was surprised by the claims. So I don't think that I was aware of what she was going to sue on.

BY MS. MACMULLIN:

Q After you received the text message from Ms. Chen, did you speak with Ms. Chen concerning Ms. Robinson's threat to bring a lawsuit?

A I generally spoke to her at the time, like around that time, but I don't know if it was specific to the lawsuit or just, like, general fallout post Chase.

I don't remember like a specific instance if that's what you're -- what you're asking.

Q How did Ms. Chen react to the news that Ms. Robinson was threatening legal action?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I think, like, off the text, it seems, like, she thought it was comical.

BY MS. MACMULLIN:

Q Tell me everything that Ms. Chen told you about Ms. Robinson's threat to bring a lawsuit.

A I don't remember specific conversations. I guess -- like just at the time, I think she generally thought it was ridiculous. It was unfounded. She thought Chase didn't have a case and that it was obvious that Chase stole. And it was absurd and it was funny and whatever. Bring it on type of mentality.

Q To your knowledge, how did Mr. De Niro react to the news that Ms. Robinson was threatening a lawsuit?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't think I spoke with him about it until that conversation in October when the lawsuit was actually upon us.

BY MS. MACMULLIN:

Q After you received the text message from Tiffany Chen, did you speak to anyone at Berdon about Ms. Robinson's threat to bring a lawsuit?

A I don't --

MS. LAZZARO: Objection.

THE WITNESS: -- think so. Like, maybe

Tasch and -- I know there was a period of time where Tasch, like, asked for a lot of, like, our receipts and petty cash; and time cards; and stuff to be sent.

Maybe it was the same time period as this, but I don't think he was -- like, we didn't have a conversation about what each of us felt about the lawsuit. I think he was maybe just asking me to produce certain things.

BY MS. MACMULLIN:

Q What did Mr. Tasch ask you to produce?

MR. BENNETT: Unless you can answer this without referring to information disclosed to you by legal counsel from Canal, then don't answer the question.

But if you're, otherwise, able to answer the question, you -- you may do so.

THE WITNESS: I don't really think I can answer it beyond what I already said of, like, records of my time cards and petty cash, and certain E-mails I had sent to Chase that I produced.

BY MS. MACMULLIN:

Q What documents did Mr. Tasch ask you to provide?

MR. BENNETT: Same instruction, Sabrina.

THE WITNESS: I don't -- I mean, I'd have to

look back in E-mail, but I -- I think I just sent him, like, expenses and petty cash stuff.

BY MS. MACMULLIN:

Q Do you recall any conversations with anyone else before Canal filed its lawsuit against Ms. Robinson about the fact that she had threatened legal action?

MS. LAZZARO: Objection.

THE WITNESS: Can you just remind me of when -- what that timeline was, so I can think back?

BY MS. MACMULLIN:

Q Canal's lawsuit was filed on August 17th, 2019, and Chase's lawsuit was filed on October 3rd, 2019.

But the question is about any conversations before Canal filed its lawsuit on August 17th, 2019, about the fact that Ms. Robinson had threatened legal action.

A It was just, like, a gossipy time. I mean like, a lot of people in the building, I don't think liked Chase very much. They were definitely, like, a lot of, oh, my God, like, finally, she's gone.

I don't know that it was specific to the threat of legal action. If per those texts with Tiffany, maybe that came in July and August, I still

think it was probably just a lot of gossipy talk of, oh, this is unwarranted. Sure, let her try.

Q What action did Canal take in response to the news that Ms. Robinson was threatening a lawsuit?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. It goes directly to a 30(b)(6) topic.

Sabrina, if you can answer the question within your own personal knowledge, go ahead.

THE WITNESS: Like, what action did Canal take?

BY MS. MACMULLIN:

Q Yes.

A I don't know. Like, just E-mails that I sent Tasch with petty cash and stuff, and like -- I don't -- like stuff like that.

BY MS. MACMULLIN:

Q After Ms. Robinson threatened a lawsuit, did Canal undertake an investigation into Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Same -- the same 30(b)(6) objection.

If you're aware of --

THE WITNESS: I thought that Canal --

MR. BENNETT: -- based on personal

 knowledge, you can go ahead.

THE WITNESS: Yeah. On personal knowledge, I thought Canal was investigating Ms. Robinson in general for, like, the SkyMiles fraud and over expenses on the corporate card.

Like, I think there was, like, a general audit of that. I -- I just can't say if it came directly from their knowledge of the lawsuit or if it was prior. I don't remember.

MS. MACMULLIN: Can we just take a five-minute break here and, then, we can be back on the record at 3:43 p.m. Eastern?

MR. BENNETT: Can we do 3:45?

MS. MACMULLIN: Yes, we can.

MR. BENNETT: Okay.

MS. MACMULLIN: Yes.

MR. BENNETT: All right. Thank you.

THE VIDEOGRAPHER: 12:38 and we are going off the record.

(Recess.)

THE VIDEOGRAPHER: It is 12:47 and we are back on the record.

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, at some point, Canal undertook an investigation into Ms. Robinson; is that

correct?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Goes to the 30(b)(6).

You can, otherwise, answer based on personal knowledge.

MS. MACMULLIN: Greg, the existence of a contemplated 30(b)(6) deposition places no limits on the discoverability of the information that a fact witness can provide.

MR. BENNETT: That's fine, but we're going to take the position moving forward since you're asking questions of this witness in -- the questions are phrased such that you're seeking information based on Canal's general knowledge.

Ms. Weeks-Brittan is here as a -- as an individual witness, as an employee of Canal, and not as a representative. So we will take the position that the plaintiff has waived any further questions when it comes to the 30(b)(6) deposition as to that particular topic.

So Ms. Weeks-Brittan can only testify based on her personal knowledge. You can ask -- you can continue asking the questions, but that will be the defendants' position moving forward.

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, please answer my question.

A Can you repeat it, please?

Q At some point, Canal undertook an investigation into Ms. Robinson; is that correct?

MR. BENNETT: Same objection.

THE WITNESS: I think so, yeah. Audited the finances and stuff like that.

BY MS. MACMULLIN:

Q As far as you know, who initiated the investigation into Ms. Robinson?

MR. BENNETT: Same objection.

You can answer.

THE WITNESS: I -- I don't know who directly initiated it.

BY MS. MACMULLIN:

Q Was it Mr. De Niro who initiated the investigation into Ms. Robinson?

A I don't know.

MR. BENNETT: Same objection.

MS. LAZZARO: Objection.

BY MS. MACMULLIN:

Q As far as you're aware, did Mr. De Niro direct the investigation into Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: I'm not aware.

BY MS. MACMULLIN:

Q Was there anyone else at Canal besides Mr. De Niro who had the authority to direct Canal employees to investigate Ms. Robinson?

MR. BENNETT: Objection. Goes to the 30(b)(6).

If you know personal -- have personal knowledge to respond to that question, Sabrina, go ahead.

THE WITNESS: I just don't really understand what you're asking.

BY MS. MACMULLIN:

Q Tell me all of the individuals with whom you've communicated concerning the investigation into Ms. Robinson.

MR. BENNETT: Same objection.

THE WITNESS: Everyone I've communicated with in general or, like, at Canal?

BY MS. MACMULLIN:

Q You can start with everyone you've communicated with at Canal.

A I mean, Gillian and I talked about it. Kaplan also talked about the invest -- we talked about

the investigation a lot. Tiffany, obviously, talked about it, but isn't at Canal.

Bob asked me in that instance, the promotion October talk. We talked about the investigation a lot. Tasch asked me to send, like, those petty cash and timecards stuff; but he's also not at Canal.

Q How often did you and Mr. De Niro discuss the investigation?

A Not often.

MR. BENNETT: Objection.

BY MS. MACMULLIN:

Q How often did you and Michael Tasch discuss the investigation?

A Not often.

Q And turning back to Mr. De Niro, when you say -- how often did you discuss the investigation with Mr. De Niro?

MR. BENNETT: I think that was asked and answered, but objection.

THE WITNESS: Like, probably I can count on one hand. Like, we -- it just wasn't something -- like, we addressed it at the time, but -- but Bob's not gossipy at all. It was like said and that we left it at that. Like, I didn't continue to talk to Bob about it.

BY MS. MACMULLIN:

Q Tell me everything you recall Mr. De Niro saying about the investigation.

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

If that conversation occurred in the course -- in the -- within a meeting that involved Canal's legal counsel, don't answer the question. Otherwise, you can go ahead and answer it.

THE WITNESS: Pretty much that time in October that I keep relating to. Maybe when she was actually fired to -- well, I guess, that doesn't have to do with the investigation, just when she left.

I think there was a general, like, oh, can you and Gillian handle the office asks? And we really can. We can handle them. And that was that.

BY MS. MACMULLIN:

Q When Ms. Robinson left town, what did Mr. De Niro say about her departure?

MS. LAZZARO: Objection.

THE WITNESS: I think I heard from just about everyone besides Bob initially. I think -- I know Chase E-mailed me and Gillian that she was leaving effective immediately.

I had wished her luck. I didn't know where

she was going yet. I think -- I'm sure Tiffany probably said something, too. I think Kap told us that Chase had left.

I didn't speak to Bob about it right away. I think he more just asked if, like, the office could carry on and pick up the slack without her.

And Gillian and I said, for sure.

BY MS. MACMULLIN:

Q What did Mr. -- Mr. De Niro say about Ms. Robinson's departure?

MR. BENNETT: Objection.

THE WITNESS: I know -- I don't remember if it was this conversation or the October one because it was just so long ago; but I know he was apologetic of how long the bad behavior had been going on from Chase.

And Gillian certainly told him that she was unhappy in the office as a result of that. So he apologized to me, saying he didn't realize that Chase was putting that undue pressure on us. And he was, I mean, regretful.

He was like, I wish I knew sooner. Now everybody's telling me that they didn't like Chase, but, you know, I didn't realize it at the time. Yeah, I think he was just regretful.

BY MS. MACMULLIN:

Q And going back to Michael Tasch, how often would you discuss the investigation into Ms. Robinson with Michael Tasch?

A It wasn't, like, a discussion of the investigation. That's where I think I'm, like, bumping. Like, he -- he would just, like, ask for things occasionally to be sent, as was like our working relationship.

He'd be like, oh, what's the access to this? What's the timecard from this period? Like, we weren't like gossiping. Like, ooh, this happened. I don't have that relationship with him.

Q How often were you in communication with Mr. Tasch in regard to the investigation into Ms. Robinson?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I mean, I speak to Michael probably, like, once a week. And maybe it was closer to, like, two or three times a week, like, in the immediate fallout of this.

BY MS. MACMULLIN:

Q Beginning -- let me rephrase my question.

At what time did it start that you and

Mr. Tasch were in touch two to three times a week about the investigation into Ms. Robinson?

A See, like, I'm just -- it wasn't, like, specific to an investigation. Like, Michael wasn't like, we're here to discuss the Chase investigation. We just, like, have a normal business working relationship and he'd ask for like something.

I -- it's just like -- there's not, like, a quantifiable time in my mind where it was, like, now we're bracketing for an investigation chat with Michael. Like, it wasn't like that at all.

Q When did Mr. Tasch -- sorry, you can finish your answer.

A I was going to say, I recall, like, over summer in general, like, early, early summer, June, July, focusing a little bit more on, like, an audit of Chase's finances and, like, what was Chase versus what was Bob and Canal.

Q Around June or July 2019, Mr. Tasch was requesting materials from you concerning Ms. Robinson?

A I think so, but, like, right when she left, we were looking at things as well because we, like, changed a lot of passwords. Like, he canceled her credit card. Like, a lot was done right at the time, so I'm just like having a hard time separating.

Like, Gillian and I were largely responsible for, like, changing passwords, changing user names, like, updating everything.

Like, Chase had set my own E-mail password for me and, like, my phone password. Like, I changed that stuff immediately after as I'm able to.

Like, in my mind, I viewed that whole period following as, like, an investigation into Chase; but I think that's where our definitions aren't matching 'cause it wasn't, like, a formal investigation.

Q Was there ever a formal investigation into Ms. Robinson?

MR. BENNETT: Objection. Goes to the 30(b)(6).

Subject to that, you can answer based on personal knowledge.

THE WITNESS: Yeah, I believe so, but just my problem is, like, it was hard -- I can't pinpoint when it moved from just, like, looking into what she had done versus when it became formal.

Like, I -- I know there was a point. I just like -- you'd have to tell me when that was.

BY MS. MACMULLIN:

Q What was your understanding of when the formal investigation into Ms. Robinson began?

A Summer.

MR. BENNETT: Same objection.

BY MS. MACMULLIN:

Q Okay. And I'm sorry, that's summer of 2019?

A Summer of 2019.

Q What was your understanding of why Canal was investigating Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: Just my personal understanding was that she had spent beyond the scope. She had spent on personal things. She used the corporate card for her own trips. She paid off a lot of her meals, like her dinners and stuff. I thought that Canal was investigating fraud and theft by Chase.

BY MS. MACMULLIN:

Q As far as you know, what was the goal in investigating Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: Just quantifying, like, the dollar value of what she spent that she wasn't authorized to, and time, and money; and, like, vacation days that she got paid back for that she had used.

And, like, I just thought we were trying to, like, gain the entire scope of everything she did.

BY MS. MACMULLIN:

Q Who was involved in investigating Ms. Robinson?

MR. BENNETT: Same objection.

MS. LAZZARO: Objection.

THE WITNESS: Like, at Canal or, like, in general?

BY MS. MACMULLIN:

Q In general.

A I think probably Tasch, Tom, Gillian; me; Michael Kaplan.

Q Anyone else?

A Then, Greg. I'm not exactly sure when Greg came in, but I know we E-mailed in maybe 2019 or 2020.

Q Was Tiffany Chen involved in the investigation of Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: I don't know. Like, she gossipped about Chase, but I don't think she was, like, formally involved.

Tiffany, I think, definitely spotted some of the spending concerns and alerted Bob; but that -- that would have been before Chase fired -- countersued.

I don't -- I mean, I don't know. Maybe

Tiffany was doing her own investigation. I'm just -- like, again, a just formal investigation versus, like, generally people trying to gauge what Chase did is confusing to me.

BY MS. MACMULLIN:

Q Based on your understanding, who was in charge of the investigation into Ms. Robinson?

MR. BENNETT: Same objection.

If you can answer based on personal knowledge, go ahead.

THE WITNESS: I thought mainly, like, Tom and Tasch.

BY MS. MACMULLIN:

Q Who would you say knows the most about the investigation into Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: Well, now, I feel probably, like, the law firms here. Greg's firm I'm sure everyone's done, like, due diligence.

BY MS. MACMULLIN:

Q Who at Canal would you say knows the most about the investigation into Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: I mean, I -- like, I thought I knew a fair amount of the investigation, but now I

don't feel that way since I'm confused on general things.

So maybe -- I mean, Tom's not picking out, but maybe Tom. Maybe Michael, just having worked with Chase for way longer.

BY MS. MACMULLIN:

Q And when you say "Michael," are you referring to Michael Tasch or Michael Kaplan?

A Yeah. Yeah.

MR. BENNETT: Which one was that; Kaplan or Tasch, just for the record?

THE WITNESS: Kaplan. I don't think he like -- I -- I'm sure all the lawyers know more now as they prepped, but I think probably at the time Kaplan knew a fair amount.

BY MS. MACMULLIN:

Q What role did Michael Kaplan play in investigating Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: I don't know. Like, I'm -- he probably sent stuff for changed passwords and things as well.

BY MS. MACMULLIN:

Q As far as you know, what role did Michael Kaplan play in investigating Ms. Robinson?

 MR. BENNETT: Same objection.

THE WITNESS: Yeah, that's, like, what I know. I think Kap just helped, like, look through spending and generally try to flag stuff. Like, I think he was helpful where he could be.

BY MS. MACMULLIN:

Q As far as you know, what role did Gillian Spear play in investigating Ms. Robinson?

MR. BENNETT: Same objection.

THE WITNESS: As for as I know, like, about the same role that I played. Like, looking through E-mails, sending her own, like, petty cash and E-mails; and, you know, things that.

Like, time stamped certain -- like, I -- I think Gillian and I did about the same. And we worked together a lot, so we were, like, talking throughout.

BY MS. MACMULLIN:

Q What types of documents did Canal employees review in connection with the investigation?

MS. LAZZARO: Objection.

MR. BENNETT: Same -- same objection.

If you have personal knowledge, go ahead and answer the question.

THE WITNESS: I reviewed petty cash excels. Chase's, as well. I think we had access to her

E-mail.

That's how I learned of the fact that she got paid back for all her vacation days when I viewed her as taking vacation.

I think Tasch sent us screenshots of like the AMEX bills, and I -- I think I flagged like when Bob was away. And it would have been him at a hotel in London versus Chase at a hotel in London. Like, stuff like that.

I cross-referenced our calendar a lot to see where Bob was to go along with where the spending was.

BY MS. MACMULLIN:

Q Were you the person who came up with the allegation that Ms. Robinson improperly sought reimbursement for vacation days?

MR. BENNETT: Same objection.

And to the extent that that information came from legal counsel, I will instruct you not to answer, Sabrina.

THE WITNESS: I didn't weigh in on anything. I just sent things on. Me now weighing in on it is my own opinion of the fact that she took vacation and got paid back for days that she took.

BY MS. MACMULLIN:

Q You're not aware of Ms. Robinson's

communications with Mr. De Niro concerning vacation day reimbursement; is that correct?

A I'm aware only of E-mails that I've since seen where she told Bob she was on vacation. And she'd say, like, I'm going to be in the air. I'll check E-mail when I land, going on vacation, stuff like that.

Q As far as you're aware, Ms. Robinson informed Mr. De Niro of her travel plans; correct?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: She informed him of her vacation. I don't think she informed him of her spending or charging the corporate card on those.

BY MS. MACMULLIN:

Q Besides the E-mails you've reviewed, you're not aware of Ms. Robinson's communications with Mr. De Niro concerning vacation day reimbursement; correct?

A Besides what I reviewed, hmm-um. Not aware.

Q Did Canal review -- excuse me.

Did Canal employees review all of Ms. Robinson's E-mails in connection with the investigation?

MR. BENNETT: Goes to the 30(b)(6). I think

that goes into work product. So, actually, I will --

If you have personal knowledge of -- of that question, Sabrina, go ahead. Otherwise, don't answer the question.

THE WITNESS: I definitely wouldn't say all of her E-mails. Gillian and I both made sure we weren't missing anything and monitored the E-mails for a bit to make sure there weren't things going directly to Chase that would cause, like, fallout that our office wasn't handling. We reviewed E-mails of hers.

BY MS. MACMULLIN:

Q To your knowledge, what specific tasks were Canal employees directed to perform in order to investigate Ms. Robinson?

MR. BENNETT: Goes to the 30(b)(6) directly.

To the extent you have personal knowledge about an instruction you were given to look for particular things, go ahead.

THE WITNESS: Yeah, I was -- I was asked to gather, like, what I -- like, cross-referencing in his calendar where he was against AMEX charges.

I put together, like, a general list of his full whereabouts for the last, like, year, I guess, or at least around when Chase departed.

I was asked to, like, get bills from

vendors. Like, invoices to make sure we had all invoices dated and where they were sent and stuff for, like, flower arrangements; wine; stuff like that.

Q And who asked you to gather that info?

A Either Tom or Tasch.

Q How did it come about that Canal began reviewing the Canal Netflix account in connection with the investigation?

MS. LAZZARO: Objection.

MR. BENNETT: Same objection for 30(b)(6).

Unless that was -- if -- excuse me, if -- if the request came from Attorney Harvey or any other legal counsel on Canal's behalf, I would instruct you not to answer. Otherwise, you can go ahead and answer the question.

THE WITNESS: I don't think that I had anything to do with the Netflix. I think that maybe Kaplan alerted someone of it, but I'm not sure. That was my understanding at the time.

BY MS. MACMULLIN:

Q Do you recall approximately when Mr. Kaplan alerted someone of it?

MR. BENNETT: Objection.

THE WITNESS: No.

MR. BENNETT: You can answer.

THE WITNESS: I'm not -- I'm not even 100 percent sure that it was Michael. I just -- I wasn't really aware of a company Netflix in general, and then became aware.

And then, I saw articles and stuff after that were published, but --

BY MS. MACMULLIN:

Q What role, if any, did Ms. Chen play in investigating Ms. Robinson?

MR. BENNETT: 30(b)(6) objection.

Otherwise, you can answer.

THE WITNESS: I don't think that she was like part of any formal investigating. I think Tiffany had her speculations and saw some of the spending as it related to their apartment.

And I think she flagged some of that spending concerns, but I don't think Tiffany had access to, like, any of Chase's stuff after the fact for formal investigation. I might be wrong, but I don't think she did.

BY MS. MACMULLIN:

Q At what stage of the investigation did Ms. Chen become involved?

MR. BENNETT: Objection.

THE WITNESS: I have no idea. I -- I don't

know.

BY MS. MACMULLIN:

Q What role, if any, did a -- did Canal's accountants play in investigating Ms. Robinson?

MR. BENNETT: Beyond what she's already testified to? Same objection.

THE WITNESS: Yeah, the same things from Tasch, just, like, looking through the AMEX and kind of, like, highlighting what was Bob, and what wasn't type of stuff.

BY MS. MACMULLIN:

Q And at what stage of the investigation, did Berdon become involved?

MR. BENNETT: Same objections.

THE WITNESS: I thought it was pretty much right away because right -- there were, like, a bunch of things we needed to change immediately after Chase left since she had set up, like, the passwords to everything and had a credit card.

So I thought that Berdon was immediately looking into all of that and making changes.

BY MS. MACMULLIN:

Q Ms. Weeks-Brittan, I'm not asking about the changing of passwords. I'm asking about the investigation and at what stage Berdon became involved

in the investigation into Ms. Robinson.

MR. BENNETT: Same objections.

THE WITNESS: (Inaudible.)

MR. BENNETT: (Inaudible.)

(The parties are talking at the same time.)

THE WITNESS: I just thought it was right away.

THE REPORTER: Hold -- hold on.

MR. BENNETT: She's already testified that she's not clear as to where it begins. I mean -- so I don't know how you can ask that question.

But go ahead, Sabrina, answer to the extent -- (Inaudible.)

(The parties are talking at the same time.)

THE WITNESS: I thought that right when Chase left, Tasch was aware that -- of sending concerns. And I -- I thought it was immediate that they started looking into the AMEX charges, but maybe it was closer to early June.

MS. LAZZARO: Don't guess.

THE WITNESS: I'm guessing. I don't want to guess. Sorry.

MR. BENNETT: Don't guess.

THE WITNESS: It felt immediate.

BY MS. MACMULLIN:

Q Which Berdon employees played a role in investigating Ms. Robinson?

A I don't know beyond Tasch.

MR. BENNETT: 30(b)(6) objection.

Go ahead.

THE WITNESS: I spoke to Tasch.

THE REPORTER: Ms. Weeks-Brittan --

BY MS. MACMULLIN:

Q What role --

THE REPORTER: Hold on a second.

Ms. Weeks-Brittan, when your attorney makes an objection, you're speaking over him. So I cannot get two people talking at the same time.

So if you -- if he does that, I know you're not doing it on purpose, just repeat your answer, so I can get it. Okay? Thanks.

THE WITNESS: Okay.

MR. BENNETT: Sorry.

THE REPORTER: No, it's not -- it's okay.

BY MS. MACMULLIN:

Q What role, if any, did Tom Harvey play in investigating Ms. Robinson?

MR. BENNETT: 30(b)(6) objection.

And to the -- don't reveal any information

that Attorney Harvey disclosed to you, as it related to any investigation you performed. Otherwise, you can answer.

THE WITNESS: I guess, I don't exactly know what that means. Like, a -- if he was disclosing it to me or if he was just asking me something.

I guess, I'll -- I might be overstepping, but yeah, like -- like, Tasch, Tom generally asked for a sense of what was Bob spending versus what was Chase's, and why she would have spent something versus another.

BY MS. MACMULLIN:

Q As far as you know, were any written memoranda or summaries prepared reflecting any findings made during the investigation?

MR. BENNETT: 30(b)(6) objection.

Otherwise, you can answer.

THE WITNESS: Were any written or what?

BY MS. MACMULLIN:

Q Memoranda or summaries.

Were any written memoranda or summaries prepared reflecting any findings made during the investigation?

MR. BENNETT: Same objection.

THE WITNESS: Like, receipts and stuff or

like E-mails? Like, I printed out receipts and E-mails that I felt applied; but I didn't like --

BY MS. MACMULLIN:

Q I'm talking --

A Sorry.

Q Were there any written memoranda or summaries prepared that reflected findings that were made during the investigation?

MR. BENNETT: Same objection.

THE WITNESS: I don't think I'm aware of summaries. Like I said, I printed receipts and travel and calendar clarification stuff that was, like, organized by category of, like, travel expenses; flower expenses; like, Netflix logs.

There's not, like, a summary or at -- I don't know. I didn't see a summary. I didn't summarize.

BY MS. MACMULLIN:

Q So you printed out receipts with respect to flowers?

A Yeah, I printed out a lot of receipts off Chase's cards and vendors. And I -- I double-checked invoices and stuff.

Q What other categories of receipts did you print out?

MR. BENNETT: When is this?

MS. MACMULLIN: During the investigation into Ms. Robinson.

THE WITNESS: I printed, like, Netflix logs, like, user data, like, what was watched; and where the location pinged.

I printed out E-mails, like, saying I'm on vacation. I printed out, like, trips. I think, like, maybe some tickets. Just general, like, calendar dates of where Chase was, where Bob was.

BY MS. MACMULLIN:

Q Is there anything else you recall printing out?

A Oh, maybe Ubers. Oh, restaurant receipts, too.

Q Did the records you accessed from Netflix state the times that the Netflix shows were accessed?

A I think so, but I have not looked in years.

Q Were you the person responsible for calculating the amounts that Canal claimed to be seeking in its lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: 30(b)(6) objection.

You can answer.

THE WITNESS: No.

BY MS. MACMULLIN:

Q As far as you know, were there any aspects of Ms. Robinson's conduct that were investigated and where a conclusion was reached that there hadn't been any wrongdoing?

MR. BENNETT: 30(b)(6) objection and objection to the form.

You can answer.

THE WITNESS: No. I thought the general consensus was that there had been wrongdoing, but I'm not trying to say, like, every single thing. Like, I'm sure there were, like, an Uber to work that was valid. Like, a flight for Bob that was valid; but overall, the consensus was, there was wrongdoing.

BY MS. MACMULLIN:

Q How did Canal employees react to the fact that Ms. Robinson was being investigated?

MR. BENNETT: Objection.

THE WITNESS: Gillian and I were happy. Kaplan was amused. Beyond that, I can't say what they felt.

BY MS. MACMULLIN:

Q Why were you happy?

A Chase made the job so much worse and stressful, and strange; and nervous pressure. It was

really hard to work with her. And Gillian more so than I beared the brunt of it.

But it -- it was a very tense, not warm environment before. There was no flexibility or understanding if things came up, which was very stressful. It was like a -- I felt chained to my desk by Chase.

Post Chase, aside from the pandemic, we established a much more comfortable remote way of doing things. If Bob was out of town, the assistants could be home, too, as long as someone was on the phone. That was not the case before. She required us to be in the office.

Like I said, that Thanksgiving, I almost couldn't get back to New York. And I showed up -- I got to New York at three-something a.m. I asked her if I could open the work door at 10:00 a.m. And she wrote, "9:30 period."

I was there at 9:30. And she called my desk at 9:30 to make sure I got there. Like, that was an immense amount of pressure.

And all Bob cares about is just the job is done and you answer your phone. He doesn't care where you are. He didn't care that I was there the Monday after Thanksgiving. He wasn't in town. It -- it was

just very stressful and rigid when it didn't need to be.

BY MS. MACMULLIN:

Q What, if anything, did Mr. Kaplan express to you about why he was amused that Ms. Robinson was being investigated?

MS. LAZZARO: Objection.

THE WITNESS: I don't know. I think maybe ask Kap, but I think their -- they had a -- like, a longer working relationship.

And I think, from my experience, Chase was pretty mean and demanding of Michael as well. So while she respected him a bit more than she respected me and Gillian, and she didn't refer to Michael as "the girls" or anything demeaning, I think that he felt put down by her.

And she'd ask him to run errands. And they started around the same time. That probably doesn't feel great.

BY MS. MACMULLIN:

Q To your knowledge, were any other Canal employees investigated?

A Like, what do you mean? In this type of formal --

MS. LAZZARO: Can you define the time

period?

BY MS. MACMULLIN:

Q At any point after Ms. Robinson's employment ended, were any other Canal employees investigated, to your knowledge?

MR. BENNETT: Objection. Object -- I'm sorry. I didn't mean to interrupt, Kate. Objection.

You can answer.

THE WITNESS: I don't think, like, formally investigated. I think, generally, there was talk of whether or not Kaplan was doing enough or pulling his weight post Chase. And he's a great guy.

He's not the most organized or best worker, and I think there was a sense that he was lazy and not totally doing everything that was asked of him; but not any, like, investigation investigation.

BY MS. MACMULLIN:

Q To your knowledge, after Ms. Robinson's employment ended, was anyone other than Ms. Robinson accused of stealing?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Maybe Kap. Maybe Kap, to my knowledge, but I don't think a lot was investigated.

BY MS. MACMULLIN:

Q By whom was he accused of stealing?

A I think Bob maybe asked him. Maybe Tiffany told Bob, but I -- I'm speculating a lot here.

BY MS. MACMULLIN:

Q What, if anything, was Mr. Kaplan accused of stealing?

A I don't know. Maybe dinners or Uber. I'm not sure.

Q Was Mr. Kaplan accused of improperly receiving reimbursement for vacation days?

A No.

MR. BENNETT: Objection.

THE WITNESS: I don't think so. I think Chase submitted days that Kaplan used or didn't use to Tasch.

And post -- post Chase, I don't think anyone gets reimbursed for vacation days that -- unused vacation days, I mean. I -- I don't think that's a thing. That seemed to only apply to Chase and Michael at the time.

BY MS. MACMULLIN:

Q To your knowledge, was Michael Kaplan required to return any funds to Canal?

A I have no idea.

Q To your knowledge, was Mr. Kaplan disciplined in any way in connection with any accusations of stealing?

MS. LAZZARO: Objection.

THE WITNESS: I have no idea. I mean, he was, like, phased down, but I think he -- to my knowledge, he left in -- on fairly good terms.

It was more of a, you know, you're not doing as much for me as maybe you should have been or, like, could have been doing and is this really the right job for you now? Like, what -- what are you doing here?

BY MS. MACMULLIN:

Q To your knowledge, was Robin Chambers accused of stealing?

A I don't know. I don't think so.

Q Are you aware of Ms. Chen making false accusations against Canal employees?

MS. LAZZARO: Objection.

THE WITNESS: I don't know if I can say false. I think Tiffany makes a lot of claims, but I can't say she wasn't necessarily wrong about Chase.

BY MS. MACMULLIN:

Q What kinds of claims has Ms. Chen made about Canal employees?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I mean, she claimed that Chase was stealing.

Like, just the claims, I said that -- I guess the one that I personally view as false is I think she claimed that Chase was in love with Bob or wanted his approval/validation. I didn't witness that. So I can't say one way or the other.

I mean, she claimed that Kaplan was lazy and not great at his job. Michael may admit to, occasionally, being lazy. I don't think that's a false claim. Was she harsh in saying that? Probably, but --

BY MS. MACMULLIN:

Q To your knowledge, what claims has Ms. Chen made against other Canal employees other than those that you've just described?

MS. LAZZARO: Objection.

THE WITNESS: I mean, I don't really know. Like, if you're pointing to something you want to ask me, but I think she and Gillian got along fine.

I think she probably claimed that Lulu wasn't needed and was, like, a young kid out of college. And, then, Lulu was subsequently let go when Chase left because she worked for Chase.

BY MS. MACMULLIN:

Q To your knowledge, has Mr. De Niro been aware that any of the accusations Ms. Chen has made were false?

MR. BENNETT: Objection.

THE WITNESS: What are you saying was false?

BY MS. MACMULLIN:

Q Based on your prior testimony, I'm asking whether Mr. De Niro was aware that any accusations Ms. Chen was making were false?

A I'm asking which -- because I -- my testimony, I don't really think they were false. Maybe the being in love with him, but that was Tiffany's personal feeling, I think, of Chase being in their home. It could have been wrong, but you can't, like, unequivocally say that's false.

Q Did there come a time when you became aware of Mr. De Niro's plan to file a lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: We went through this.

THE WITNESS: Yeah. I mean, you gave me the dates that the lawsuits were filed and the text of Tiffany telling us in July.

BY MS. MACMULLIN:

Q Did there come a time when you became aware of Mr. De Niro's plan to file a lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: Similar to what I said before, but I thought the stuff that I was putting together and asked to flag on the AMEXes, like, early in when Chase left, I thought that that might be used in a lawsuit; but I also thought that Tasch was auditing spending and properly looking into valid concerns.

I -- I'm just like -- I don't know when it moved to formal investigation, but I was aware that people were investigating Chase's spending for sure.

BY MS. MACMULLIN:

Q Do you recall a time when you became aware of a plan to file a lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: I definitely became aware there was a lawsuit. I just -- it was, like, very dramatic period of time. And, like, I don't remember -- it wasn't like it was quiet and then suddenly, someone was like we're filing a lawsuit.

Like, there was a lot of gossip surrounding Chase's exit in general and a lot of things were being looked into. So it's just, like, hard for me to pinpoint when I became aware exactly.

BY MS. MACMULLIN:

Q What made it a dramatic period of time?

A I mean, Chase -- like I said, I think a lot of people who have worked for Chase and for Bob had terrible interactions with Chase. There was, like, literally a party thrown when she quit.

Like, heads of the company came to assistants that are, like, well into their adult lives doing high-powered jobs showed up. Like, people celebrated it. So it was a dramatic time.

Chase worked there for over a decade. She rubbed a lot of people the wrong way. People were happy.

And as a result, there was a lot of drama surrounding it when it came to light that there were a lot of things that were question marks in terms of her spending and her travel. People were happy about that, frankly.

BY MS. MACMULLIN:

Q Tell me everyone who celebrated Ms. Robinson's departure from Canal.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Well, that E-mail chain that I'm sure you have would help because there were people who I never worked with who came.

But like directly, me, Gillian, Morgan, the assistant that predated me; Kaplan; Jane Rosenthal; Berry Welsh; and then like a lot of the assistants in previous years. I would need to reference that E-mail to know.

BY MS. MACMULLIN:

Q Which assistants from previous years celebrated Ms. Robinson's departure other than Morgan Billington?

A I honestly don't remember many of their names. I would have to look back. I feel like there is a Katherine.

Q Katherine Renett (phonetic).

A Probably, yeah. I would just need to look at the E-mail.

Q As far as you know, how did Canal come up with the allegations that it put in the lawsuit that it filed against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: As far as I know, they just looked at the spending and the E-mails, and drew conclusions.

BY MS. MACMULLIN:

Q What role did Mr. De Niro play in developing the allegations in the lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

THE WITNESS: I have no idea what he spoke to the lawyers about.

BY MS. MACMULLIN:

Q Did he ever speak to you about the allegations in the lawsuit?

A Not beyond what I've mentioned, just like he apologized for her poor treatment and general like I trust people until they break my trust type of stuff.

Q What role, if any, did Canal -- Canal's accountants play in developing the allegations in the lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: Like I said, I sent receipts and stuff to Tasch. I have no idea what -- with it what he did.

BY MS. MACMULLIN:

Q What role, if any, did Ms. Chen play in

developing the allegations in the lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: I have no idea beyond what I've said of, like, things that she gossipped on or things that she's flagged.

I don't believe she had a hand in any of the formal investigative stuff, but I'm not sure.

BY MS. MACMULLIN:

Q Were there any discussions about the timing of filing the lawsuit against Ms. Robinson?

MR. BENNETT: Objection. That you were --

THE WITNESS: None that I was aware of.

MR. BENNETT: Objection.

BY MS. MACMULLIN:

Q As far as you know, what was Mr. De Niro hoping to achieve in bringing the lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

MS. LAZZARO: Object.

THE WITNESS: I can't say what he was hoping to achieve. I don't know how he felt. My understanding of the lawsuit was just to get back on what was owed and what was stolen.

BY MS. MACMULLIN:

Q Nothing that you had reviewed indicated that Ms. Robinson had stolen millions of dollars; is that correct?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: I disagree.

BY MS. MACMULLIN:

Q Please explain what you mean by that.

A I looked over her AMEX charges and flights and stuff. And it seemed to me, like, a lot of her spending was personal and not business spending.

Q But nothing you reviewed indicated that Ms. Robinson had stolen millions of dollars; isn't that right?

MR. BENNETT: Objection.

THE WITNESS: She spent a lot of money on the corporate cards. Some of the spending was for Bob. Some of the spending was for Chase.

I didn't, like, take a calculator and add up an amount; but it seemed to me that over 10 years, she charged quite a few things that were personal for herself and trips that cost thousands and thousands of dollars.

So I didn't hear that number and think it

was a crazy number. I didn't come up with it myself, but it seems to me in line with the spending that I saw.

BY MS. MACMULLIN:

Q Did anyone take a calculator and calculate that she stole millions of dollars?

MS. LAZZARO: Objection.

MR. BENNETT: 30(b)(6) objection.

You can answer based on personal knowledge.

THE WITNESS: How would I know that I --

BY MS. MACMULLIN:

Q So you don't know whether anyone took a calculator and calculated that she stolen millions of dollars?

MR. BENNETT: Objection.

MS. LAZZARO: Objection. Asked and answered.

THE WITNESS: I would guess that accountants did.

MR. BENNETT: Don't guess.

THE WITNESS: Okay. Then, I -- I have no firsthand knowledge of it.

BY MS. MACMULLIN:

Q Did you ever see a calculation that Ms. Robinson stole over $1 million?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Objection.

If information was provided to you by Attorney Harvey on behalf of Canal, I will recommend that you not answer the question. Otherwise, you can answer.

THE WITNESS: I think combined with her spending that I saw, vacation days that were paid back, her way higher salary then what called for; given she wasn't replaced; and a number of other things; time wasted I think over 10 years, in my mind does amount to some million dollars.

I never was given anything by anyone that could properly quantify everything, but from me looking through it directly, I -- I feel there was a lot of time misuse; a lot of credit card misuse.

BY MS. MACMULLIN:

Q I'm not asking you to speculate. I'm asking whether you ever saw a calculation that indicated that Ms. Robinson stole over $1 million?

MS. LAZZARO: Objection.

MR. BENNETT: Same objections.

THE WITNESS: I feel I've spoken to that, but I also think the theft involved more than the stealing of money and also the stealing of time.

BY MS. MACMULLIN:

Q It's really a yes or no question about whether you -- you've ever seen a calculation that broke down and supported the fact that Ms. Robinson stole over $1 million.

MR. BENNETT: I think the witness has answered the question.

But, Sabrina, go ahead if you'd like to respond again.

THE WITNESS: I don't think so beyond my own calculations as I went, not formal written summaries or with calculators.

BY MS. MACMULLIN:

Q As far as you know, how did Canal come up with the allegation that Ms. Robinson charged hundreds of thousands of dollars in personal expenses on Canal's American Express card?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

Don't reveal any information that was conveyed to you by legal counsel.

THE WITNESS: From looking at her American Express card and flagging what was charged by Bob, what was correctly charged by Chase; and what was incorrectly charged by Chase.

BY MS. MACMULLIN:

Q Were any other documents reviewed besides the AMEX bills and E-mails in support of that allegation?

MR. BENNETT: Which allegation?

MS. MACMULLIN: The allegation that Ms. Robinson charged hundreds of thousands of dollars in personal expenses on Canal's American Express card.

MR. BENNETT: Okay. 30(b)(6) objection.

You can, otherwise, answer.

THE WITNESS: I think I saw a petty cash sheet that she had that charged for a Louis Vuitton bag and the laptop, flower expenses; invoices from other places beyond the credit card.

BY MS. MACMULLIN:

Q What documents were reviewed to prepare the compilation of Uber expenses that Canal accused Ms. Robinson of improperly charging?

MR. BENNETT: Objection.

THE WITNESS: Gillian and I had --

MR. BENNETT: When --

THE WITNESS: -- looked at Uber charges.

Should I keep going?

BY MS. MACMULLIN:

Q What documents --

MR. BENNETT: I'm not clear as to what the question was.

MS. MACMULLIN: I'll rephrase the question.

BY MS. MACMULLIN:

Q What documents were reviewed to prepare the compilation of Uber expenses that Canal accused Ms. Robinson of improperly charging?

MR. BENNETT: In the Complaint?

MS. MACMULLIN: Yes.

MR. BENNETT: Objection.

If -- if you have personal knowledge independent of any information conveyed to you outside -- from someone other than Canal's legal counsel, you can answer.

THE WITNESS: I have no idea what was put in the Complaint, but I know that I looked at her Uber charges and flagged if any were to and from the office; if any were around Bob's apartment for apartment stuff; and when they were just separate unrelated Uber charges.

BY MS. MACMULLIN:

Q And when you say that you looked at her Uber charges, what documents were you reviewing?

MR. BENNETT: Objection.

THE WITNESS: Like, the date and time stamp,

I think, of the Ubers on the AMEX bill, and, like, where they were taken from; where the rides were.

BY MS. MACMULLIN:

Q The AMEX bill didn't show the location of the Uber rides; is that correct?

A I don't think so.

MR. BENNETT: Objection.

THE WITNESS: I think it was probably the Uber account that showed that; like an invoice that was sent to, like, maybe receipts at canalproductions.com. It sends you a summary of your ride.

BY MS. MACMULLIN:

Q You didn't have access to Ms. Robinson's personal Uber receipts; did you?

MR. BENNETT: Objection.

THE WITNESS: Just the personal ones she took on the corporate card.

BY MS. MACMULLIN:

Q As far as you know, how did Canal come up with the allegation that Ms. Robinson used and converted millions of Canal's frequent flyer miles for her personal use?

MR. BENNETT: Objection. I think she's already testified she has no idea about anything in

the Complaint.

But go ahead. If you have independent knowledge, you can answer the question.

THE WITNESS: Like I said, I was unaware of SkyMiles being a thing at all. I want to say maybe Kaplan looked into that.

I don't think that Bob has much of an understanding of how you can convert AMEX points into anything. He's not wildly tech savvy.

I -- after Chase left, I became aware that SkyMiles had been transferred to her. I don't -- I don't know why or why I wasn't privy to any of those conversations.

BY MS. MACMULLIN:

Q Okay. So you're not aware of how Canal came up with the allegation that Ms. Robinson used and converted millions of Canal's frequent flyer miles for her personal use?

MS. LAZZARO: Objection.

THE WITNESS: My -- I think they came up for -- by looking at the SkyMiles transfer. And I think that Michael Kaplan alerted them or found that.

BY MS. MACMULLIN:

Q As far as you know, how did Canal come up with the allegation that Ms. Robinson reimbursed

herself from Canal's petty cash account for personal and luxury items?

MR. BENNETT: Objection.

THE WITNESS: As far as I know, there were certain petty cash Excel sheets submitted that showed the spending of those things and the reimbursement.

BY MS. MACMULLIN:

Q As far as you know, how did Canal come up with the allegation that Ms. Robinson submitted false information in order to be paid for unused vacation time?

MR. BENNETT: Objection.

THE WITNESS: I saw an E-mail to Tasch year after year saying she used zero vacation days. And I saw other E-mails Chase saying I'm going on vacation.

In fact, when I was hired, she was going on vacation and I heard from her the following week. I was aware of when Chase went on vacation. And then I saw that she submitted zero days for vacation for the year.

BY MS. MACMULLIN:

Q You weren't aware of all the work that Ms. Robinson performed while she was away from New York; is that right?

A Now, that I've seen into her E-mail, I have

more of a sense of it.

Q So you're aware of all the work that Ms. Robinson performed while she was away from New York?

A I didn't say that. I have more of a sense of it now that I've seen E-mails that she sent, but prior to that, no.

Q So you weren't a --

MS. LAZZARO: I'm sorry to interrupt. Can you specify what time away from New York that you're specifically speaking about?

MS. MACMULLIN: I'm talking about the time period that is at issue in Canal's lawsuit concerning Ms. Robinson's seeking reimbursement for unused vacation days.

MS. LAZZARO: Can you identify the time period for Sabrina?

MS. MACMULLIN: I can do so after a break.

BY MS. MACMULLIN:

Q As far as you know, how did Canal come up with the allegation that Ms. Robinson was binge watching Netflix?

MR. BENNETT: Objection.

THE WITNESS: I mentioned all I know on that, which I think maybe was Michael Kaplan and then

later seeing Netflix.

BY MS. MACMULLIN:

Q From Ms. Robinson's E-mails, you're aware that Ms. Robinson performed work for Mr. De Niro while she was away from New York; isn't that right?

MS. LAZZARO: Objection.

THE WITNESS: Correct. As I occasionally respond to E-mails when I'm on vacation as well, but it's still a vacation day for me, and I don't seek reimbursement for it. I'm just doing my job.

BY MS. MACMULLIN:

Q As far as you know, was anyone uncomfortable with the plan to file a lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: As far as I know, no.

BY MS. MACMULLIN:

Q As far as you know, did anyone raise any questions about the plan to file a lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: As far as I know, no.

BY MS. MACMULLIN:

Q As far as you know, did anyone express

reluctance about the plan to file a lawsuit against Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: I don't think they expressed it to me. I didn't -- I don't think I heard of any.

BY MS. MACMULLIN:

Q What was your reaction to learning that Mr. De Niro had filed a lawsuit against Ms. Robinson?

MR. BENNETT: We covered that. Objection.

THE WITNESS: At the time and still now, I thought it was warranted, and he was trying to get back what was owed to him.

BY MS. MACMULLIN:

Q As far as you know, was a media strategy devised before bringing litigation against Ms. Robinson?

MR. BENNETT: Objection.

THE WITNESS: If there was, I was not any part of it. So I can't say. I have no idea.

BY MS. MACMULLIN:

Q Do you have any knowledge at all about what Canal's media strategy was, if any, concerning the lawsuit?

MS. LAZZARO: Objection.

MR. BENNETT: Just clarify, that's the Canal lawsuit, Kate?

MS. MACMULLIN: Yes.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I didn't think there was a media strategy or I'm not aware of one.

BY MS. MACMULLIN:

Q Are you of -- are you aware of anyone who was involved in reaching out to the media with respect to Canal's lawsuit against Ms. Robinson?

MR. BENNETT: Objection.

THE WITNESS: I would guess maybe Bob's publicist would handle it.

MS. LAZZARO: Don't guess.

THE WITNESS: I don't -- nothing. I'm just guessing at the appropriate person that would seem to handle that, but I have no idea.

MS. LAZZARO: Don't guess.

BY MS. MACMULLIN:

Q And who is Bob's publicist?

A Stan Rosenfield.

Q Did you ever discuss with Mr. De Niro any of the media coverage of his lawsuit against Ms. Robinson?

A No.

MS. LAZZARO: Objection.

MS. MACMULLIN: I think now is a good time for a break. So maybe we can come back at 5:10.

MR. BENNETT: Works for me.

MS. MACMULLIN: Great. Thank you.

THE VIDEOGRAPHER: It is 1:58 and we're going off the record.

(Recess.)

THE VIDEOGRAPHER: All right. It is 2:12 and we are back on the record.

BY MS. MACMULLIN:

Q So, Ms. Weeks-Brittan, before the break, we were discussing your review of Ms. Robinson's Uber charges.

And I wanted to -- did you cross-reference each charge -- each Uber charge on the American Express bill against an Uber receipt?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I think so. I haven't looked back on any of this in years, though. So I'd have to double-check.

BY MS. MACMULLIN:

Q Where were the Uber receipts found?

A In E-mail.

Q What E-mail address did the Uber receipts go to?

A I think either Chase's Canal E-mail or the receipts@canalproductions E-mail that we have, that we had receipts sent to.

Q So any Uber receipts that you reviewed would have been found in one of those two accounts?

A I think so. There's another random E-mail canal@canalproductions sometimes captured receipts; but definitely, an @canal E-mail, yeah.

Q And, Ms. Weeks-Brittan, I'm just going to just turn your attention back for a moment to one of the exhibits that I marked prior to the deposition, which was the second exhibit. It's Bates stamped CANAL0 -- CANAL_0047395.

A Um-hmm.

Q It should still be in the chat. So let me know if you're able to get it up.

A Yeah, I have it.

Q Okay. Great. So if you can turn to Page 7 of that document.

A Um-hmm.

Q And you were messaged at 4:16 p.m., which says -- if you can just read the second line of that

message, please.

A "We can't have a hostile
workplace where she decides who to
trust one week and then switches
the next. Makes us all beyond
stressed."

Q Why did you perceive the workplace at Canal to be hostile?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't remember what exactly that was in relation to, but I think post Chase, Tiffany was validated in her paranoia and was very, like, stressful in general to making sure that none of the same stuff was still happening. She tried to involve herself in the office much more after that.

And then, thankfully, had to take a step back and wasn't really allowed, like, within the office and kind of have a sense of -- she became less involved in, like, what Gillian and I were doing day-to-day. I think she momentarily tried to involve herself more after Chase in an effort to sniff out more of this.

BY MS. MACMULLIN:

Q About what kinds of things would Ms. Chen be

paranoid?

A Well, said, how she momentarily, I think, thought that Kap was maybe also being lazy and stealing resources.

She, I think, maybe felt validated that Chase was caught and then wanted to make sure she was of use and catching similar things. So she became, like, momentarily way, too, involved, and it was stressful.

And thankfully, she wasn't allowed to remain involved in the office. And she's not an employee and she shouldn't be involved in managing me in any way or Gillian. So that certainly helped.

Q What, if anything, did Mr. De Niro do that contributed to the hostile workplace?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I don't feel like he added to any hostility. I felt the hostility came externally either from Chase or from Gillian -- sorry, not Gillian, from Tiffany.

BY MS. MACMULLIN:

Q What, if anything, did Mr. De Niro allow Ms. Chen to do that contributed to the hostile workplace?

MR. BENNETT: Objection.

THE WITNESS: I don't really think he allowed her to do anything. I think it was a weird like -- like, how I mentioned, it's kind of a strange job when you, like, have to also help out, like, peripheral, like, a girlfriend of your boss.

It's weird that would fall into expectations, but occasionally it does. Like, if they're traveling and I need to order catering for her.

I think it was kind of weird growing pains of when she finally, like, met us in the office and became a little bit more public facing with Bob.

I think that she tried to kind of, like, you know, have a -- have a handle on the office and have a handle on the house; and make sure that she was running things smoothly. And I think she got pushed back and realized like, hey, you don't get to have a handle on the office. You can handle the house all you want, but don't overstep. And I'm glad those boundaries were set.

BY MS. MACMULLIN:

Q Did there come a time when you became aware that the Manhattan District Attorney's Office was contacted about Canal's claims against Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: I'm, like, vaguely aware that both claims were filed in different courts. I'm not sure which was filed with Manhattan. So, like, I'm not sure exactly what you're talking about.

BY MS. MACMULLIN:

Q Do you -- do you recall when you became aware that any kind of contact had been made to the Manhattan District Attorney's Office by someone at Canal about claims against Ms. Robinson?

A Like, are you saying, like, maybe when Canal submitted their suit?

Q I'm asking about Canal contacting the Manhattan District Attorney, not the civil lawsuit that was filed by Canal.

MS. LAZZARO: Objection --

MR. BENNETT: Objection.

MS. LAZZARO: -- to the extent that it covers the 30(b)(6) topics.

THE WITNESS: Yeah, I don't know what you're referring to.

BY MS. MACMULLIN:

Q Do you know what the Manhattan District Attorney's Office is?

A Yes, but I don't know how it relates to this

or where everything was filed by Bob or by Chase.

Q The Manhattan District Attorney's Office handles criminal prosecutions; is that correct?

MR. BENNETT: Objection.

THE WITNESS: If you're telling me it's correct, then sure.

BY MS. MACMULLIN:

Q Were you aware that Canal contacted the Manhattan District Attorney's Office with claims against Ms. Robinson?

MR. BENNETT: I think that's been asked and answered; but objection.

You can answer, if you understand.

THE WITNESS: I'm not aware that Canal contacted them. I don't know how that worked linearly, who contacted who, how that happened.

BY MS. MACMULLIN:

Q You're aware of Canal being in talks with the Manhattan District Attorney's Office?

MR. BENNETT: Objection. That wasn't her testimony.

You can answer.

THE WITNESS: I think so, but I guess I'm just not aware of how this differs from where Bob's suit was filed.

BY MS. MACMULLIN:

Q Are you aware of Canal seeking to have Ms. Robinson criminally prosecuted?

A Yeah, I think so. It's where the suit was filed; right?

Q The lawsuit filed against Ms. Robinson in New York State Supreme Court is a civil lawsuit. I'm asking now about Canal contacting the Manhattan District Attorney's Office which handles criminal prosecutions.

MR. BENNETT: What's the question? I'm sorry.

BY MS. MACMULLIN:

Q The question is whether, Ms. Weeks-Brittan, you're aware of Canal seeking to have Ms. Robinson criminally prosecuted?

MR. BENNETT: Objection.

THE WITNESS: I was, like, generally aware that it was in criminal court at some point. I don't know who reached out to who. I didn't think much into that or where the suit was placed because I'm not a lawyer.

BY MS. MACMULLIN:

Q How did you become aware of Canal's claims against Ms. Robinson becoming a criminal matter?

MS. LAZZARO: Objection.

THE WITNESS: I don't know or can't -- I don't know when it wasn't a criminal matter and when it was.

BY MS. MACMULLIN:

Q How did you become aware of Canal's claims against Ms. Robinson becoming a criminal matter?

MR. BENNETT: It's the same question. Objection.

You can answer, if you understand.

THE WITNESS: All right. I guess, I just don't understand.

BY MS. MACMULLIN:

Q Do you recall communicating with Kelly Thomas from the Manhattan District Attorney's Office?

A I spoke to someone once. It was probably her. I don't -- I -- I didn't pay much attention. I kind of, like, show up where asked in this. Like today.

Q When did you speak to Ms. Thomas?

A I'd have to look. Maybe -- let's see. Probably wasn't 2020 because of the pandemic. So 2019.

Q Did you meet with Ms. Thomas in person?

A Yeah, I went there.

Q And who attended that meeting?

A I don't remember who else was on her side, but Tom was with me.

Q Did you bring anything with you to that meeting?

A I think like a purse, my phones.

Q Did you bring any documents with you to that meeting?

A I don't remember. I think they might have had documents already.

Q What was the purpose of your meeting with Kelly Thomas?

MR. BENNETT: Objection. I think that goes to the 30(b)(6).

To the extent you have independent personal knowledge, go ahead.

THE WITNESS: I think they just asked me a lot of things in relation to this Chase case, and I answered them.

BY MS. MACMULLIN:

Q What do you recall being asked about?

A Spending, documents, kind of what I explained to you that I've looked over at. I went over them. Hopefully, had a better sense of them at the time since it was way closer to when this actually

happened; but E-mails, Ubers, Netflix; that kind of stuff.

Q Tell me everything you recall Ms. Thomas asking you during that meeting.

MS. LAZZARO: Objection.

THE WITNESS: I really don't remember that well. Like, she asked me about Chase. I mean, I can't like -- it was similar -- what?

Yeah, I mean, it's just, like, about Chase, about working with her, about spending my time at Canal. Similar to everything we've discussed today.

BY MS. MACMULLIN:

Q What did you tell Ms. Thomas about Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: I guess similar to what I've told you, I think. How it was a stressful workplace working with her, my view of her spending, just everything that was opinion based or what I saw directly.

BY MS. MACMULLIN:

Q Did you go over any documents with Ms. Thomas?

A I think so.

Q What documents did you go over with her?

A Probably the AMEX charges and everything relevant in this.

Q And were the documents that you went over with her documents that you had prepared?

A I don't know. I mean, I don't remember if they had their own, like, binder of evidence or if I just, like, looked at their stuff or if I looked at receipts and things I printed. I'm not sure. I kind of feel they had stuff they showed me, but --

Q Ms. Weeks-Brittan, we're going to share a document in the chat that's Bates stamped ROBINSON00006712, and I'm going to mark that as Plaintiff's Exhibit 4.

(Whereupon, Exhibit 4 is marked for identification and is attached hereto.)

BY MS. MACMULLIN:

Q This is a document that's produced in this litigation. Do you recognize this document?

A Yeah, it's all the stuff I printed.

Q Is that your handwriting on the first page of the document?

A Hang on.

Yeah, it is.

Q What is this document?

A It looks like the Chase AMEX and some flower receipts.

Q Why was this document prepared?

A What do you mean? This was --

MR. BENNETT: Objection.

Go ahead.

THE WITNESS: (Inaudible.) I printed out, like, invoices from the flower shop and the AMEX.

BY MS. MACMULLIN:

Q What was your understanding of why you were preparing this document?

MS. LAZZARO: Objection.

THE WITNESS: To gauge what Chase spent on that wasn't work appropriate.

BY MS. MACMULLIN:

Q Does this document reflect grocery store charges that Canal claims that Ms. Robinson improperly charged?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Hang on. I'm just looking back. Yeah, I mean, I see a lot of, like, Whole Foods and Dean & DeLuca. We don't buy Bob's groceries. He has home staff. So that seems like a fair assumption.

Q Does this document reflect grocery store

charges for which Canal sought to have Ms. Robinson criminally prosecuted?

MS. LAZZARO: Objection.

MR. BENNETT: Objection. Goes to 30(b)(6).

If you have any knowledge, you can answer.

THE WITNESS: I think this was one receipt showing charges that weren't work charges.

BY MS. MACMULLIN:

Q Was this document requested by the Manhattan District Attorney's Office?

A Right. Not, like, directly to me. I -- I don't know. This was like -- Tasch would ask me for receipts and to go through stuff. Tom, too. This is, like, what I printed and found.

Q What instructions did Michael Tasch give you in order to prepare this document?

A Print receipts and invoices --

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Flag Bob legitimate charges and illegitimate charges.

BY MS. MACMULLIN:

Q Did Michael Tasch give you any instructions as -- as to how to identify what was a legitimate charge versus an illegitimate charge?

A I think maybe he asked for, like, general buckets of stuff. Like, what was Uber, what was groceries, what was flowers; but I think, like, Gillian or I would know that better than Tasch because Bob doesn't grocery shop or go to Dean & DeLuca.

Like, it's -- it's easier for us to flag if, like, Chase was in a hotel or if Bob was in a hotel because we have records of where Bob was.

Q Within each category of expenses you just mentioned, what effort did you make to ascertain what was a legitimate charge versus an illegitimate charge?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Like, for Ubers that were surrounding the apartment project, was it going to stores, going to Bob's, going to stores; going to Chase's? Was it just like a random Uber on a night that Chase wasn't going to Bob's or work or stores? That kind of stuff.

Was it lunch on Caviar that we all got together? Was it dinner, a random dinner expense? Groceries? We don't buy Bob's groceries. Was it like the morning coffee or was it inexpensive Dean & DeLuca grocery shopping trip?

BY MS. MACMULLIN:

Q Ubers surrounding the apartment project were considered a legitimate expense that could be charged to Canal; is that right?

A Um-hmm. Similar to --

MR. BENNETT: Objection. Goes to 30(b)(6).

You can answer.

THE WITNESS: Similar to, like, if I was going to or from work, to or from Bob's apartment, too, counts.

BY MS. MACMULLIN:

Q So the answer is yes?

A Yeah.

Q How were you able to ascertain whether a meal expense charged by Ms. Robinson was for lunch or dinner?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Like, restaurants she went to, like Paola's, like places that were open only for dinner. We got group lunch in the office. If Chase wasn't there, she would get her own lunch either on -- often on Caviar. When I was with her at the apartment, she ordered on Caviar.

So random grocery trips were not lunch or

dinner if there was a Caviar charge on the same day.

BY MS. MACMULLIN:

Q Paola's was open for lunch; is that correct?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

THE WITNESS: I don't know Paola's hours, but I know Chase went there for dinner often.

BY MS. MACMULLIN:

Q Mr. De Niro also dined at Paola's; isn't that correct?

A Yes. So I would cross-reference dates Bob dined at Paola's with dates he didn't.

Q How did you cross-reference dates Bob dined at Paola's?

A Because Gillian and I made the reservation for him, and we were aware of where he dined.

Q Were you aware of every single dinner reservation Mr. De Niro had during the time that you were an executive assistant at Canal?

A 95 percent of them. Yeah, I had the calls to make them. He doesn't really just walk in anywhere. He likes a certain table.

Q What records do you have of when Mr. De Niro dined at Paola's?

A Little notes in the calendar, dinner with

the kids at Paola's on schedule, same.

Q Is that a physical calendar or an electronic calendar?

A Electronic.

Q What records do you -- oh, sorry.

A I was just going to say Bob doesn't swipe Chase's AMEX when he dines at Paola's. He swipes his own.

Q What records do you have of Mr. De Niro dining at Paola's that preceded your employment?

A I don't, but Gillian would have access to the calendar and also went through and did this.

Q And when did Gillian's employment begin, approximately?

A I think a year and a half before mine.

Q So going back to the compilation of grocery store expenses, what instructions were you given in order to prepare this document?

MR. BENNETT: Objection. I thought we covered that.

MS. LAZZARO: She also said she didn't prepare this document. Her testimony was that she printed receipts.

THE WITNESS: Printed these receipts, yeah. This is just a printout of AMEX charges and flower

invoices.

BY MS. MACMULLIN:

Q So, then, who prepared this document?

A This is what I was saying I printed. I printed AMEX document -- AMEX charges and flower receipts, and Uber charges from E-mail.

Q Who prepared this document?

A I printed this document. I didn't give it to the District Attorney or whoever you mentioned. I don't know what was done with it after I printed it.

Q On the first page, do you see the $8,923.20 figure?

A Um-hmm.

Q How did you arrive at that figure?

A I went through and highlighted legitimate Bob charges on those dates versus not. I think I flagged flower arrangements that went directly to Chase's house that weren't when the office received flowers, when Bob's house received flowers; or when birthdays who got sent that -- flowers direct to them.

Q Is there any record that exists of what expenses you flagged as legitimate versus illegitimate?

A I'm not sure. A lot of it was highlighted. I imagine maybe the lawyers would have access to that.

Q And if I could just turn your attention to the last page of this PDF, 7, which has a Bates number at the bottom right-hand corner of ROBINSON00006718.

I know the font is small, but do you see that $8,923.20 figure on that last page?

A Um-hmm. Yeah.

Q Did you include all charges from Whole Foods on the Canal American Express card under Ms. Robinson's name from May 25th, 2017 to April 6, 2019 to arrive at that figure?

A I think I included all of the ones that weren't done days where she also had Canal lunch on Caviar.

Q Did you include all charges from Dean & DeLuca on the Canal American Express card under Ms. Robinson's name from May 25th, 2017 to April 6, 2019?

A Same as with Whole Foods. If she did eat lunch that day, I kept the grocery charge on.

Q So a grocery store charge was authorized if she didn't also charge lunch on the same day; is that correct?

A Not that it was authorized. Like, Chase authorized -- like, if she ate lunch on Caviar, then she shouldn't double charge for another meal.

Q Was that policy written down anywhere?

MR. BENNETT: Objection. 30(b)(6).

But you can answer, as far as you know.

THE WITNESS: As far as I know, no. We were just told you get lunch and you get coffee.

BY MS. MACMULLIN:

Q Were there any charges for Whole Foods on the Canal AMEX between May 25th, 2016 and April 6, 2019, that you did not include in this compilation?

A Yeah. Like what I said, days that she didn't have lunch.

Q As far as you know, were any interviews conducted with Canal employees in order to ascertain which expenses from Whole Foods to include on the compilation?

MR. BENNETT: 30(b)(6) objection.

Otherwise, you can answer.

THE WITNESS: Gillian and I just split work and we'd occasionally go over each other's and vice versa; but we were just together in the office printing the stuff out, discussing what was valid, and what wasn't valid.

BY MS. MACMULLIN:

Q I'm going to share another document in the chat, which is Bates stamped ROBINSON00006719, which I

believe will be marked as Plaintiff's Exhibit 5, if my math is right.

(Whereupon, Exhibit 5 is marked for identification and is attached hereto.)

BY MS. MACMULLIN:

Q Let me know when you have it up, Ms. Weeks-Brittan.

A I have it up.

Q Okay. Do you recognize this document?

A Um-hmm.

Q What is it?

A Flower receipts.

Q Is that your handwriting on the first page of this document?

A It is.

Q Why was this document prepared?

A Because I was asked to print flower receipts and flag ones that weren't office-related flower receipts.

Q Who asked you to print flower receipts and flag ones that weren't office-related receipts?

A Tom or Tasch. I don't remember who.

Q Does this document reflect flower charges that Canal claimed that Ms. Robinson improperly

charged?

A I think so.

MR. BENNETT: Objection.

BY MS. MACMULLIN:

Q Did you prepare this document?

A Yeah.

Q What instructions were you given in order to prepare this document?

A Remove charges that were valid to Bob's business contacts or birthdays that we had sent flowers to as an office, flowers that would be received at the office, or flowers that Bob received at his home.

So these were arrangements that went to Chase's home or went to -- like, I think maybe Chase had sent flowers to Amelia. Someone who used to work for her at Canal. She kept a lot of orchids around. A lot of them ended up in her home.

Q Were those instructions given to you orally or in writing?

A Over the phone.

Q And by whom were they given to you?

A Tom or Tasch, like I said.

Q How did you arrive at this $17,119.27 figure that's on the first page of this document?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: I am just getting back to it, but it's just the total of flowers once the valid ones were removed.

BY MS. MACMULLIN:

Q As far as you understand, were there any differences between the calculations that were presented to the -- with respect to flowers and the calculations with respect to flowers that were included in Canal's lawsuit?

MR. BENNETT: Objection.

THE WITNESS: Can you repeat that?

BY MS. MACMULLIN:

Q Sure. As far as you understand, were there any differences between the calculations presented to the DA's Office with respect to flowers, and the cal -- and the calculations with respect to flowers that served as the basis for Canal's lawsuit?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: I don't think so, but I don't know what went into both or either.

BY MS. MACMULLIN:

Q Did you include all charges from Flowers By

Philip on the Canal American Express card under Ms. Robinson's name from June 28th, 2017 to April 10th, 2019 in this compilation?

MR. BENNETT: Objection.

THE WITNESS: Do you --

MR. BENNETT: She testified already about this.

THE WITNESS: Yeah, I flagged the ones that went to the office, like it says at the top.

BY MS. MACMULLIN:

Q As far as you know, were any interviews conducted with Canal employees in order to ascertain which expenses from Flowers By Philip to include on the compilation?

MR. BENNETT: Objection. 30(b)(6).

You can answer.

THE WITNESS: I guess I just, like, don't view conversations that I had as interviews.

BY MS. MACMULLIN:

Q What conversations did you have about flowers?

A I guess Tasch called me and said get the flower invoices and flag, which ones Chase then didn't bring to the office, brought to her home; or which ones delivered straight to her. Flag that versus when

you received office flower deliveries or when flowers were sent out for birthdays.

Q At times flowers were delivered to Ms. Robinson's home and then she would bring them to a recipient on behalf of Mr. De Niro; is that correct?

A I don't know, but I don't think that she brought them anywhere, but the office or the home. And there would be separate deliveries for those.

Q Ms. Robinson would bring flowers herself to Mr. De Niro's [REDACTED] home; correct?

A Maybe a handful of times at the beginning, and then, she hired landscapers.

Q We're going to share another document in the chat that is Bates stamped ROBINSON00006770, which I'll mark as Plaintiff's Exhibit No. 6.

(Whereupon, Exhibit 6 is marked for identification and is attached hereto.)

BY MS. MACMULLIN:

Q Do you recognize this document?

A It's still downloading. One second.

Q Oh, of course. Take your time.

A Yup. Ubers, car services, and taxies that were charged, not included in petty cash.

Q Is that your handwriting on the first page

of this document?

A It is.

Q What is this document?

A It's a breakdown of Chase's Uber trips aside from the ones that she reimbursed herself for on petty cash.

Q Who prepared this document?

A Gillian or I, but I definitely wrote that at the top.

Q Why was this document prepared?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: My understanding was that Chase took a lot of Ubers and didn't have permission to, and booked car services for herself; and took them all around.

BY MS. MACMULLIN:

Q What instructions were you given in order to prepare this document?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Flag Ubers that Chase took and car services that Chase took, aside from what she paid herself back for on petty cash, which were the ones that were going to and from the office.

BY MS. MACMULLIN:

Q And who gave you those instructions?

A Tom or Tasch. I don't remember who.

Q And were those instructions given orally or in writing?

A Sorry. Sorry, one second.

Q No problem.

THE VIDEOGRAPHER: Should we go off the record?

MR. BENNETT: I assume it might be a battery issue, but --

MS. MACMULLIN: Or a doorbell.

MS. LAZZARO: I heard a sound. I thought it was a bell.

THE WITNESS: Yeah, sorry. Sorry. I have a package being delivered.

The question -- can you just repeat it again?

MS. MACMULLIN: Could I have the court reporter read it back, please?

(Whereupon, the question was read back as follows:

"Q And were those instructions given orally or in writing?")

THE WITNESS: I think the same conversation

when one of them just asked over the phone to flag stuff that was valid Bob office and flag stuff that was personal Chase.

BY MS. MACMULLIN:

Q So this was all during one-single conversation with either Mr. Harvey or Mr. Tasch?

A I just can't distinguish between. They're both like pretty short on the phone. Like, print Uber receipts, print some AMEX stuff, go through and flag. It could have been multiple, but it wasn't, like, a long-winded conversation.

Q How did you arrive at the $31,814.17 figure listed next to Uber/taxi total?

A I'm just looking at it. I think it's just -- it's all of her Uber charges, plus car services, plus taxies. And then, I'm just trying to see if the petty cash ones were also added to this.

Because petty cash would have meant she charged it on her personal phone ideal -- or her personal card ideally. Of course, she wouldn't need reimbursements since this is her corporate card.

Yeah, it's all the taxi, car service, Uber; Lyft charges from that period.

Q How did you arrive at $5,513.05 figure listed next to car service total?

A The car service company that we used is separate. I think it must have just -- paying this like a different note and I separated those.

I don't remember what it's called, but there was a car service that she would occasionally use or that around the holidays she, like, filled with gifts and took it around.

Q Did you include all Uber charges on the Canal American Express card under Ms. Robinson's name from May 20, 2017 to April 5th, 2019 in this compilation?

A I think so, but I'm not sure.

Q Did you include all taxi charges that had the word taxi in the vendor name on the Canal American Express card under Ms. Robinson's name from May 24th, 2017 to April 5th, 2019 in this compilation?

A Yeah, I think so.

Q As far as you know, were any interviews conducted with Canal employees in order to ascertain which Uber charges to include on the compilation?

MR. BENNETT: Objection. 30(b)(6).

You can answer.

THE WITNESS: Not, like, interviews, but conversations. And, again, Chase would petty cash the times that she took Ubers to and from work, and get

reimbursed for that on her personal card.

So at least to me, it seemed that this was in way excess of our policy to reimburse MetroCard travel.

BY MS. MACMULLIN:

Q What conversations took place with respect to the Uber charges included on this compilation?

A I don't remember exactly, but probably, oh, this is a ridiculous amount of Ubers. The rest of us aren't charging Ubers.

Chase is getting paid back for her other Ubers via petty cash. So this an absurd amount of Ubers given Bob doesn't Uber.

Q And who participated in those conversations?

A In the office, probably me, Gillian, and Michael. Maybe to Tasch and Tom when sending these receipts and invoices to them.

Q As far as you know, were any interviews conducted with Canal employees in order to ascertain which taxi charges to include on the compilation?

A I guess I don't get that beyond --

MR. BENNETT: Objection.

You can --

THE WITNESS: She paid back herself for taxies via petty cash that she paid for out-of-pocket.

This was a lot of taxies.

BY MS. MACMULLIN:

Q Were any communications -- were there any communications between Canal employees about which taxi charges to include on the compilation?

MS. LAZZARO: Objection.

THE WITNESS: Probably -- probably me and Gillian.

BY MS. MACMULLIN:

Q And what did you and Ms. Spear discuss during those communications?

A Just that she was very hard on us for our petty cash. Like I said, she only paid back half of my $400 Uber to make it back to the city in the middle of the night.

And seeing the sheer volume of Ubers, taxies, and car services she took herself was pretty eye opening.

Q Over what period of time was petty cash used for reimbursing Ms. Robinson for Ubers or taxies?

A I can only --

MR. BENNETT: Focusing on this document?

MS. MACMULLIN: Focusing --

MR. BENNETT: I just have a quick --

BY MS. MACMULLIN:

Q To your knowledge, over what period of time was petty cash used for reimbursing Ms. Robinson for Ubers or taxies?

MR. BENNETT: Objection. 30(b)(6).

THE WITNESS: Yeah, just the ones that either Gillian or I found the Excel petty cash documents in -- in her E-mail or in her sent.

BY MS. MACMULLIN:

Q As far as you know, did anyone express concern about sending a compilation to the District Attorney's Office that included all Uber charges?

MS. LAZZARO: Objection.

THE WITNESS: No one said anything to me.

BY MS. MACMULLIN:

Q Did you have any concern about sending a compilation to the District Attorney's Office that included all Uber charges?

MS. LAZZARO: Objection.

THE WITNESS: I didn't -- I didn't send the compilation to the District Attorney's Office. I sent a compilation to Tom and Tasch.

BY MS. MACMULLIN:

Q Prior to preparing the compilation of Uber charges, did you communicate with Mr. De Niro to

ascertain what Ms. Robinson was authorized to charge?

A I didn't speak to Bob. I think maybe Tom and Tasch did.

Q Prior to preparing the compilation of taxi charges, did you communicate with Mr. De Niro to ascertain what Ms. Robinson was authorized to charge?

A I didn't speak to Bob about it. My understanding was she was authorized to charge the ones that she petty cash charged that were to and from the office or his home.

Q What was the basis for that understanding?

A That was the policy we had in place, to submit petty cash expense reports of our charges to and from work on Ubers if we needed.

If we needed to run something uptown, put that in petty cash, submit it to Chase, get reimbursed. Same for the MetroCard. Same for the gym reimbursement with receipt.

Q You weren't aware as to whether Ms. Robinson had a different agreement with Mr. De Niro as to Uber reimbursement; is that correct?

A I'm not aware.

Q You weren't aware as to whether Ms. Robinson had a different agreement with Mr. De Niro as to taxi reimbursement; is that correct?

A Not aware. I just printed what I was asked.

Q Prior to preparing the compilation of flower charges, did you communicate with Mr. De Niro to ascertain what Ms. Robinson was authorized to charge?

A Nope, just went to Tom and Tasch.

Q Prior to preparing the compilation of grocery charges, did you communicate with Mr. De Niro to ascertain what Ms. Robinson was authorized to charge?

A Nope. I was told she was authorized to charge lunch, and that's why I checked Caviar against dates she made other purchases.

Q Did Mr. De Niro tell you that she was authorized to charge lunch?

A No. I only spoke to Tom and Tasch.

Q Ms. Robinson wasn't only allowed to charge lunch to Caviar; is that right?

A Correct.

Q "Correct," meaning she was not only allowed to charge lunch to Caviar?

A Yeah, according to what he said. That's why we cross-referenced it against days that she made Caviar lunch purchases.

Q But Ms. Robinson -- (Inaudible.)

A She was allowed to charge elsewhere. She

wasn't allowed to charge multiple meals in the same day all over the place.

Q Prior to preparing the compilation of Paola's charges, did you communicate with Mr. De Niro to ascertain what Ms. Robinson was authorized to charge?

A No, I don't think so. He seemed surprised that she dined at Paola's as much, but, again, I cross-referenced that with dates that he was at Paola's.

Q Ms. Weeks-Brittan, we're sharing a document in the chat that is Bates stamped ROBINSON00006728, and I'm marking this document as Plaintiff's Exhibit 6. Let me know when you have it up.

A Yeah, I see SkyMiles.

Q I'm sorry, we might be at Plaintiff's Exhibit 7, so if that's the case, this is Plaintiff's --

MS. MACMULLIN: Or, Madam Court Reporter, could you let me know what exhibit we're on?

MR. BENNETT: I think it is 7.

MS. MACMULLIN: Okay. So, then, I'll mark this as Plaintiff's Exhibit 7. Thank you.

(Whereupon, Exhibit 7 is marked for identification and is attached

hereto.)

BY MS. MACMULLIN:

Q Is that your handwriting on the first page of this document, Ms. Weeks-Brittan?

A Yes. I -- I wrote this, but I didn't put together the SkyMiles. Like, I wrote once everything was organized, too. So Michael Kaplan and Gillian were also producing all this stuff. It's just my handwriting.

Q What is this document?

A Chase's use of Bob's Delta SkyMiles.

Q Why was this document prepared?

MS. LAZZARO: Objection.

THE WITNESS: Same reason as the rest. Tom or Tasch asked and none of us thought that Chase was allowed to use Bob's SkyMiles in this way. And I think Kap put this together.

BY MS. MACMULLIN:

Q You weren't aware as to whether Ms. Robinson had an agreement with Mr. De Niro as to her use of SkyMiles; is that correct?

A I learned that he was shocked that she used his SkyMiles. So I -- I don't know if she feels they had an agreement prior, but he seemed surprised and unaware of his AMEX points being transferred into

SkyMiles. It took multiple people explaining to him what SkyMiles were and explain where his AMEX points went.

Q What did Mr. De Niro communicate to you about the SkyMiles?

A He was confused just about what they were. And he had conversations I think with Tom and Tasch and with Michael Kaplan about exactly what Chase used, and how they were his AMEX points. Just he was a little confused by like the SkyMiles, what they are.

Q Does this document reflect SkyMiles that Canal claimed that Ms. Robinson improperly used or transferred?

MR. BENNETT: Objection. Goes to the 30(b)(6).

To the extent you understand, have knowledge of it, you can answer.

THE WITNESS: Yeah, I mean, I viewed them as improper personally.

BY MS. MACMULLIN:

Q What instructions were you given in order to prepare this document to the extent that --

MR. BENNETT: Objection.

MS. MACMULLIN: I can rephrase my question.

MR. BENNETT: Sorry.

BY MS. MACMULLIN:

Q What, if any, instructions were you given in order to complete your role in preparing this document?

A I didn't prepare this one. I wrote at the top, but if you scroll down to Page 4, where it very poorly says "Cancelled" in scribble, I think that's Kap's handwriting.

And then down, yeah, the next page, "Amelia?" Kap -- Kap prepared this document. I just, like, wrote a header when I stuck everything in a binder.

Q You prepared a binder that included these documents?

A I put everything that I printed, yeah, in a binder.

Q And for whom was the binder prepared?

A Tom and Tasch.

Q Ms. Weeks-Brittan, we're sharing a document in the chat, which is Bates stamped ROBINSON00006741. I'm marking it as Plaintiff's Exhibit 8.

(Whereupon, Exhibit 8 is marked for identification and is attached hereto.)

BY MS. MACMULLIN:

Q Let me know when you are able to open it.

A Yup, I opened it.

Q Do you recognize this document?

A Yeah. It's Chase's petty cash.

Q Is that your handwriting on the first page of this document?

A Yeah.

Q And if you turn to Page 13 of this document, which has -- if you'll give me one second -- a Bates stamp in the bottom right-hand corner --

A I see the --

Q -- of ROBINSON -- um-hmm. I'll just say the Bates stamp for the record. It's ROBINSON00006753.

Is that your handwriting on this --

A It is.

Q -- page of the document?

A I wrote matters, but I didn't do the whole thing, to clarify that again.

Q Who prepared this document?

A I think Gillian and I both did. Yeah, I think so.

Q Why was this document prepared?

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Same reason as all the others. Find valid versus non-valid charges.

BY MS. MACMULLIN:

Q You weren't employed at Canal when the so-called Taxi Driver trip took place; correct?

A Correct. Gillian just told me about that.

Q Did you speak with Mr. De Niro about the so-called Taxi Driver trip?

A No.

MR. BENNETT: Objection.

THE WITNESS: Gillian did that part. She was there at the time.

BY MS. MACMULLIN:

Q What instructions were you given in order to prepare this document?

MR. BENNETT: Objection. She didn't testify that she prepared the whole thing.

BY MS. MACMULLIN:

Q You can answer the question.

A It's the same. I was asked to flag improper, invalid charges. This document at least is cross-referencing her work trips with vacation and personal travel. Yeah.

BY MS. MACMULLIN:

Q Did you have any direct communications with

Mr. De Niro concerning the criminal investigation into Ms. Robinson?

MR. BENNETT: Objection. Went through the --

THE WITNESS: No, I don't think so.

BY MS. MACMULLIN:

Q Did you have any direct communications with Tom Harvey concerning the criminal investigation into Ms. Robinson?

A Yeah.

MR. BENNETT: Objection.

You can answer.

THE WITNESS: Yes.

BY MS. MACMULLIN:

Q Did you have any direct communications with lawyers at Tarter Krinsky & Drogin concerning the criminal investigation into Ms. Robinson?

A I don't think so because I only talked to Greg, who is not at that firm, if I'm correct.

Q And did you have direct communications with Mr. Tasch concerning the criminal investigation into Ms. Robinson?

A Yeah.

Q Other than the meeting in person with Ms. Thomas to which you testified previously,

Ms. Thomas reached out to you, and Mr. Kaplan to ask for contact information for former Canal employees over E-mail; is that correct?

A I think that rings a bell, yeah.

Q Other than the in-person meeting and that E-mail, did you have any other communications with Ms. Thomas concerning Ms. Robinson?

A I don't think so, but I'd have to look through my E-mails.

Q As far as you know, was anyone concerned that bringing the allegations against Ms. Robinson to the Manhattan District Attorney's Office was taking things too far?

MR. BENNETT: Objection.

MS. LAZZARO: Objection.

MR. BENNETT: You can answer.

THE WITNESS: No one relayed that sentiment to me at all. It was kind of the opposite sentiment. That people thought it was appropriate.

BY MS. MACMULLIN:

Q Which people expressed to you that it was appropriate?

MR. BENNETT: I'm just going to instruct you insofar as it relates to Attorney Harvey's comments, don't disclose those. Otherwise, you can answer the

question.

THE WITNESS: Oh, yeah. No, I just mean, like, Gillian and Michael. Like, we'd talk talked at the office. Probably Tiffany definitely thought it was appropriate.

BY MS. MACMULLIN:

Q What was Gillian Spear's reaction to the fact that Ms. Robinson was being investigated by the Manhattan District Attorney's Office?

A I think she was pleased, but I'd have to let her speak for herself.

Q Did she express anything to you about why she was pleased?

A She, like, had panic attacks from Chase. She really hated working for her and was extremely stressed, and largely burned out from the years under her. So she had some pleasure from the fact that Chase was getting what she felt she deserved.

Q How did Michael Kaplan react to the fact that Ms. Robinson was being investigated by the Manhattan District Attorney's Office?

MR. BENNETT: Objection. She testified to that.

BY MS. MACMULLIN:

Q You can answer.

A I think he was less, like, overtly enthusiastic than Gillian, but I think he never expressed to me that he felt it was, too, far. He felt it was fair.

Q Did Mr. De Niro ever convey to you that he wanted to have Ms. Robinson prosecuted?

A No. We just had that conversation where he learned of everything and told me that he didn't trust her; and that I had his trust until I broke it.

Q And what reaction did Tiffany Chen have to the fact that Ms. Robinson was being investigated by the Manhattan District Attorney's Office?

A I think that she was pleased.

Q Did she express to you why she was pleased?

A I don't remember specifically. She didn't like Chase and she felt that she stole and did a number of things; so similar getting what she deserved type of thing.

Q Did she ever say to you that she thought Ms. Robinson should be jailed?

A Well, you showed me that text that pretty much said that, but I remember it. But based on that, yeah. Yes.

Q Did there come a time where you learned that the Manhattan District Attorney's Office would not be

bringing criminal charges against Ms. Robinson?

A Not really 'cause I was just not -- like I didn't understand the differences in where these claims were submitted. I knew Bob sued Chase and I wasn't like following exactly where that was.

Q As far as you know, did Kelly Thomas or anyone else from the Manhattan District Attorney's Office present questions about Ms. Robinson that Canal was unable to answer?

MS. LAZZARO: Objection.

THE WITNESS: I don't know what Canal was unable to answer to them.

BY MS. MACMULLIN:

Q Are you aware of anything that Canal was unable to answer to them?

A No, I don't think I'd be privy to it.

Q As far as you know, did Kelly Thomas or anyone else from the Manhattan District Attorney's Office ever express any view about the allegations that Canal was making against Ms. Robinson?

A I remember when I was physically sitting down with them, there were moments of shock and surprise at her treatment of people.

Q As far as you know, did Kelly Thomas or anyone else from the Manhattan District Attorney's

Office ever express skepticism about the claims that Canal was making against Ms. Robinson?

MS. LAZZARO: Objection.

THE WITNESS: Not to me, they didn't express that.

BY MS. MACMULLIN:

Q Looking back to the time before Ms. Robinson's employment at Canal ended, what qualities did Mr. De Niro value in Ms. Robinson?

MS. LAZZARO: Objection.

MR. BENNETT: Objection.

THE WITNESS: I can't --

THE REPORTER: Hold on.

THE WITNESS: -- say for sure because he didn't verbalize them to me. Based on our trust conversation and my own experience with him, I think he values having trusted people with historic knowledge, who have his best interests at heart. He says that he values that to me, but he didn't discuss what he valued about Chase with me.

THE REPORTER: On that last objection, it was -- was that you, Brittany?

MS. LAZZARO: Yes, it was.

THE REPORTER: Okay, thanks.

MS. LAZZARO: Thanks, Diana.

THE REPORTER: Sure.

BY MS. MACMULLIN:

Q Looking back to the time before Ms. Robinson's employment at Canal ended, to your knowledge, what positive things did Mr. De Niro say about Ms. Robinson?

A He said she got stuff done. We didn't have loads of long-winded conversations before she left because I submitted stuff to her. She was sort of gatekeeper between us.

I talk to Bob more frequently now, but in the moment, we didn't have a relationship to go much further in how he felt about her.

Q What other positive things did Mr. De Niro say about Ms. Robinson before her employment ended?

A Not stuff that I had heard directly other than that he thought that she was effective at getting stuff done. He, before she resigned, asked me if he thought the office could function without her.

And I was nervous to say one way or the other because I like disliked working with Chase. I didn't want to say something and then have Chase stick around and be mean to me as a result of that.

All I said was like, yes, the office can definitely get by without Chase. He was like okay.

It was no longer than that.

Q When did that conversation take place?

A Early April maybe. I think he asked me, Gillian, and Michael what we thought of her. I worked with her for the least amount of time. So, like I said, I was short and just said we -- we'd be fine without her and left it at that.

Q And this is early April 2019?

A Yeah.

Q Over the course of your employment, what positive things do you recall people at Canal saying about Ms. Robinson?

A Very little.

Q Do you recall any positive things that people at Canal said about Ms. Robinson over the course of your employment?

A You know, that Peter Grant entertainment lawyer, who is not in Canal, so this is beyond your question; but he thought that Chase was very good. No one at Canal liked her or told me positive things about her.

Q To your knowledge, what positive things did Tom Harvey say about Ms. Robinson?

A He didn't tell me any positive things about her.

Q You didn't like Ms. Robinson; is that correct?
A Correct.
MS. MACMULLIN: Can we take a five-minute break, Madam Court Reporter? I know I'm very close to wrapping up here. So if we could just take five minutes and then, we'll come back at 6:35 Eastern, that would be great.
THE REPORTER: Okay.
THE VIDEOGRAPHER: All right. It's --
MS. MACMULLIN: Thank you.
THE VIDEOGRAPHER: -- 3:25 --
MR. BENNETT: Just -- Kate, before we log off.
MS. MACMULLIN: Yes.
MR. BENNETT: Only because the court reporter mentioned maybe needing more of a break.
MS. MACMULLIN: I'm very much almost done, Greg.
MR. BENNETT: Right, but -- but I'm going to have some questions, too, and I was going to ask for a break.
MS. MACMULLIN: Okay.
MR. BENNETT: So I wonder if it might just make sense, be more efficient for everyone, and if you

don't want to --

MS. MACMULLIN: To do a longer break? Yeah, what -- what are you thinking?

MR. BENNETT: 6:45; is that all right?

MS. MACMULLIN: That's fine with me.

MR. BENNETT: Okay. It allows everyone to take a little breather.

MS. MACMULLIN: Great.

MR. BENNETT: Okay. Thank you.

THE VIDEOGRAPHER: It is 3:30 and we're going off the record.

(Lunch recess.)

THE VIDEOGRAPHER: All right. It is 3:48 and we are back on the record.

MS. MACMULLIN: Ms. Weeks-Brittan, I have no further questions at this time. I understand that your lawyer wants to ask you some further questions.

THE WITNESS: Thanks.

MR. BENNETT: Thank you, Kate.

Thank you, Sabrina. I will try to keep this as brief as possible.

I'd just like to note for the record that the witness would like to read and sign the transcript, if that could be noted, please.

///

EXAMINATION

BY MR. BENNETT:

Q Sabrina, do you know who Dan Harvey is?

A I do.

Q What were his job duties?

A He's Bob's personal trainer and he runs lines with him.

Q Were his job duties in any way similar to Ms. Robinson's job duties as far as you're aware?

A No. She was VP of Production and Finance.

Q And you were hired in July of 2018; is that correct?

A Correct.

Q Okay. Lulu White is not -- hired in August of 2018; does that sound about right?

A Yeah.

Q And who is Amelia Brain?

A I think she was Chase's old assistant, who either moved to L.A. or now, lives in L.A. But she did used to work for Chase.

Q Okay. And is -- do you recall any time period around or following the time that you commenced employment at Canal where Amelia Brain returned to Canal in any capacity?

MS. MACMULLIN: Objection to the form of the

question.

THE WITNESS: Can I answer?

BY MR. BENNETT:

Q Yes.

A She came to Bob's apartment one time when I was there with Chase and Lulu. I was going back to the office to do office duties.

And Lulu, my understanding, was brought in to work for Chase and on the apartment project. And my understanding Chase brought in Amelia to help at that time as well in the apartment.

Q And as far as you recall or were aware of back then, did Amelia pay for her plane ticket to fly in from California?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: I wasn't aware at the time, but looking over everything, I realized that she did not pay for her flight.

BY MR. BENNETT:

Q How was it paid for?

A Chase AMEXed her SkyMiles.

Q Okay. And in reviewing the records after Ms. Robinson resigned from Canal, did you come across any information indicating that Amelia had been

provided with petty cash during her trip?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: I did find that she received petty cash during the trip.

BY MR. BENNETT:

Q Okay. And generally, over the course of your employment with Canal before you moved out west, were there valuables maintained inside Canal's office?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: Yeah, there is a safe. And just, generally, a lot of Bob's stuff is valuable.

BY MR. BENNETT:

Q And when you refer to Bob's stuff, is that paraphernalia or souvenirs, or things; or props that were used on movie sets?

MS. MACMULLIN: Objection.

THE WITNESS: Yeah. And, like, awards and, you know, expensive technology, expensive bottles of wine that are sent to him; gifts that are sent to him; paintings; stuff like that.

BY MR. BENNETT:

Q Okay. And over the course of this same time period, throughout your employment with Canal before

you moved out west, was there any type of written policy that existed that said you should not take valuables home to your -- to your home from the office?

MS. MACMULLIN: Objection to form. Objection to form.

THE WITNESS: No, it was just, like, morally normal thing to not take stuff home.

BY MR. BENNETT:

Q It's common sense; right?

A Yeah.

Q Okay. Were you employed at Canal when Morgan Billington was employed?

A No. I was hired to replace her.

Q Do you know if Ms. Robinson ever conveyed to anyone other than yourself any disparaging comments about Morgan Billington?

MS. MACMULLIN: Objection to form.

THE WITNESS: Gillian, when we became closer, and Gillian is good friends with Morgan, told me that she felt that Chase was particularly hard on Morgan. She didn't like that Bob liked Morgan more than her. She squeezed Morgan out. And that she didn't like that Morgan was black and made Morgan feel uncomfortable.

BY MR. BENNETT:

Q Okay. How was it that you learned what job duties Ms. Robinson performed at Canal when you started there?

MS. MACMULLIN: Objection to form.

THE WITNESS: I asked her when she interviewed me what her job was. I asked Kaplan what his job was, too, and then just working with her and around her.

BY MR. BENNETT:

Q And did Chase ever call you in the middle of the night to make sure your phone was on during the occasions when you were on call?

MS. MACMULLIN: Objection --

THE WITNESS: Yes.

MS. MACMULLIN: -- to form.

THE WITNESS: And like I mentioned, how I came in after the middle of the night snow storm situation, she constantly would call pretty much to the minute of when we were expected to be sitting at our desks to make sure that we had the phone on. That -- that someone was there.

Chase wasn't in the office. I think she was actually in New York at the time when I raced back and took a middle of the night Uber that I mostly paid for

out of my own pocket.

She would -- she called me once over the Christmas holiday. I was on vacation, but on call. Mind you, I didn't get my vacation day paid back, but I had the phone on.

She called me at, like, 2:00 or 3:00 a.m. the week of Christmas to check that the phone ringer was on.

She constantly called early and late to make sure that we were doing our duties of being on the phone. Where the phone's on loud, if Bob calls me, I pick it up. You know, that's that.

If he calls me at 7:00 a.m., he apologizes for calling early and gets on with his ask; but it's never middle of the night like that.

Q Thank you.

Other than Ms. Robinson, over the course of your time period at Canal, was there anyone else responsible for checking the time sheets that you completed, and when you noted your hours worked for each particular week?

MS. MACMULLIN: Objection to form.

THE WITNESS: We all submitted them -- Gillian and I submitted them to Chase. I believe that Chase sent them to Tasch and told Tasch, like, okay to

pay us the overtime approved, that kind of stuff.

BY MR. BENNETT:

Q Do you ever recall an instance where Ms. Robinson noted that you may have made a mistake in a time sheet and she asked you to correct it?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah, she would send me back notes and say, "Oh, correct this." Or, you know, sometimes it would be errors like with a.m./p.m. and she would review them; and send them back to me to remedy. And then, I'd send her the completed version.

BY MR. BENNETT:

Q And did you ever review anyone else's time sheets?

A No.

Q Okay. After Ms. Robinson resigned, was there a period of time where you and Gillian worked together to ensure that nothing would fall through the cracks with respect to Bob's schedule at the time?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yes. And that was something that Bob had asked me, you know, make sure nothing falls through the cracks.

Like, can you do this without Chase? Gillian and I, that's why we were looking at her

E-mails as well, make sure we weren't missing anything. Make sure everything -- like, there was no loose slack anywhere.

We were later told by Bob that we were doing a good job and nothing slipped.

BY MR. BENNETT:

Q Okay. And in the course of conducting that review to ensure nothing fell through the cracks, did you come across any expenditures or expense-related issues that you questioned?

MS. MACMULLIN: Objection to form.

THE WITNESS: Gillian and I spoke a fair amount about Chase. And, you know, it -- it was gossipy, but bound in reality, too. And we saw her expenses. We saw how she lived her life. She tended to overspend at places that Bob would spend at.

Gillian and I guessed was the way to conceal her own habits, but she'd go to a nice hotel maybe that Bob would go to; and that -- that somehow justified her staying there in a luxury place, as if Bob cared or wanted us to check his hotels. He has travel agents. We talked about that stuff a fair bit.

BY MR. BENNETT:

Q And did you ever convey -- did you or Gillian ever convey any of the expense-related

questions or questionable entries you came upon to anyone else within or --

MS. MACMULLIN: Objection --

BY MR. BENNETT:

Q -- outside of Canal?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah, I think we flagged stuff for Tom and Tasch, too, post Chase. Because for years people complained about Chase and nothing happened.

So at least with Gillian, she was pretty certain that it would be a lot of the same this time, and that Chase wouldn't actually go anywhere.

So we were hesitant -- more hesitant when Chase was working there to report things because we didn't want to be like -- you know, Chase found out and then, like, especially mean to us or chain us to our desks even more.

So we -- we were both -- the flood gates opened after she left and we realized we could actually flag little things we had noticed over time.

BY MR. BENNETT:

Q Okay. And as far as you recall, I appreciate it goes back several years, in early April 2019 when Ms. Robinson resigned, was the -- the Tribeca Film Festival about to occur, on the horizon?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah, I think it was end of April that year, early May.

BY MR. BENNETT:

Q And do you recall whether or not Ms. Robinson had plans to attend the festival?

A Yeah, she had tickets to certain events and she ran through the schedule with Bob and flagged with him, like, which things he was speaking at; events he was attending.

Divvied up his friends and family tickets like accordingly, with some for herself. She gave Gillian and I a few tickets to send -- attend certain things.

Q And around the same time period, early April 2019 before Ms. Robinson resigned, do you recall whether or not Ms. Robinson had been trying to arrange for everyone to get together for a dinner?

And by "everyone," I mean yourself, Gillian, Lulu, and Kaplan.

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah. She had been -- I want to say the night -- the week that she left, she had texted us about doing an in-office dinner. I think we had looked even at a few restaurants. And then, it

didn't get scheduled and she ended up resigning.

BY MS. MACMULLIN:

Q Do you recall if Ms. Robinson ever explained the rationale or the reasoning why she wanted to get together for dinner?

MS. MACMULLIN: Objection to form.

THE WITNESS: I want -- she used to plan them -- like, we'd do an office dinner around the holidays or around a Canal employee's birthday.

I don't -- I mean, it might have been for her birthday which I think was in February, that we hadn't ended up doing a dinner for. Maybe we did.

But it was a kind of let's boost your office spirits dinner and it was -- they were always kind of awkward. We didn't love going or socializing beyond work hours.

BY MS. MACMULLIN:

Q Okay. And with respect to the work that you just testified about to ensure that nothing fell through the cracks with respect to Bob's schedule, at some point, unless I misunderstood your testimony, an investigation began following that work; is that fair?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah. That's what I was trying to convey why it was confusing to me. Because

when Chase left, we were aware, and -- and Kaplan as well, improper behaviors.

That's why we were really quick to change the password and credit card cancellations because it was tense; and Chase had control of everything.

Like I said, she set my computer password and E-mail password, and told me I couldn't change it. So she had full reign over the office stuff. We were swift in that.

And looking through her E-mails, we found, you know, confirmation that she was charging quite a lot that me, Michael, and Gillian didn't perceive as within the job.

BY MR. BENNETT:

Q And with respect to the investigation that Ms. Robinson's counsel took you through throughout the course of today, you don't know precisely when the investigation began; is that right?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah, I didn't -- that's what I was trying to convey, too. Like, I just -- we were all looking into it. Tasch, too. He was auditing the finances. Like, we were concerned.

His -- everyone separately was aware she had been doing things. And then, when, finally, we could

talk about it upon her exit and we weren't afraid that she would hate us for the rest of our employment, retaliate against us in any way, then we all talked to each other; and everyone noticed what was happening.

And in my mind, like, an informal investigation started right away, which is why I didn't -- I can't pinpoint when it became a formal investigation. I just thought I was gathering and generally adding to an audit of Chase's behavior.

BY MR. BENNETT:

Q And you and Gillian are both working as executive assistants at the time Ms. Robinson resigns; is that right?

A Correct.

Q Following her resignation, at any point, have you learned what Ms. Robinson was earning from -- as a salary from Canal --

MS. MACMULLIN: Objection --

BY MR. BENNETT:

Q -- at the time?

MS. MACMULLIN: Objection to form.

THE WITNESS: No. Like, we didn't -- she wasn't replaced. So when we were alerted of her salary, we were, obviously, quite shocked.

And she made quite a bit more than Michael

Kaplan, who had been there the same amount of time as her. So it was a jarring number when it broke.

BY MR. BENNETT:

Q And would it surprise you if Ms. Robinson had testified that you, Gillian -- you, Gillian, and Kaplan, essentially, performed all of the same duties?

MS. MACMULLIN: Objection to form.

THE WITNESS: It wouldn't surprise me if she said that Gillian and I performed the same duties.

Are you saying she would say --

BY MR. BENNETT:

Q That she herself performed the same duties as all of you.

MS. MACMULLIN: Objection --

THE WITNESS: (Inaudible.)

MS. MACMULLIN: -- to the form.

THE WITNESS: She managed. That's why I had to submit things through her, like my timecard and petty cash. And I would submit the travel itineraries for her approval before I was able to send them on to Bob. She was an in-between.

BY MR. BENNETT:

Q When it came to vacation scheduling, what would you do? How would you -- how would you obtain approval to take vacation?

MS. MACMULLIN: Objection to form.

THE WITNESS: We -- Gillian and I would first talk to each other to make sure there was sufficient after-hours phone coverage.

So if I wanted a weekend next month, I'd say, "Hey," you know, before I'd go to Chase, "will you cover me this weekend next month?"

Gillian says, "Sure. I have nothing going on that weekend."

And I would E-mail or text Chase and say, "Gillian has agreed to cover me. Can I request these days off?"

She'd say yes or no. And if Bob was in town, she'd say like, "No, I don't think an assistant should take time off right now where Bob's in town." Something like that. And then, that was that.

Since then, I E-mail Bob directly with my vacation requests.

BY MR. BENNETT:

Q Have you ever taken or transferred to your own account SkyMiles that belong to Mr. De Niro?

MS. MACMULLIN: Objection --

THE WITNESS: No.

MS. MACMULLIN: -- to form.

BY MS. MACMULLIN:

Q As far as you're aware, has Gillian done that?

MS. MACMULLIN: Objection to form.

THE WITNESS: No.

BY MR. BENNETT:

Q As far as you're aware, has Michael Kaplan done that?

A That one I'm not sure.

Q Okay. With respect to Canal's payment of lunches for Canal personnel, is it correct that Canal paid for lunches because the assumption was that you would be staying in the office and working?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yes, it was a working lunch. Gillian and I sat at our desks and ate. We were to always be near the phones. It was a very far from remote comfortable job before the pandemic and before Chase left.

And after she left, we made changes, got rid of the after-hours phone. Gillian and I would split work accordingly just by transferring the phones online, which was far, far, far easier than being at our desks 24/7.

BY MR. BENNETT:

Q I know I'm jumping around quite a bit. Have you ever seen Bob curse at Kaplan?

A Maybe, like, a "That's so fucking stupid." Something like that.

Q Bob on occasion -- well, I'll withdraw the question.

When you started with Canal, Bob wasn't around at all; is that right?

MS. MACMULLIN: Objection to form.

THE WITNESS: Correct. He didn't interview me and I didn't meet him for a couple of weeks.

BY MR. BENNETT:

Q Okay. For those first couple of weeks, who's -- who's assigning you work? Ms. Robinson?

MS. MACMULLIN: Objection to form.

THE WITNESS: Chase, yeah. And I couldn't answer Bob's calls at first, as well for, like, at least a month.

BY MR. BENNETT:

Q Okay. Did you ever observe Ms. Robinson yelling at Bob?

A Yeah. I mean, I'd hear their voices raised, but like I said, I -- I wouldn't hear, like, exact specifics to what they were yelling about.

Q Okay. Did Ms. Chen ever comment to you that she was concerned that a man might have a romantic interest in Bob?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yes. Bob's straight male driver, Claude, who has since been fired.

BY MR. BENNETT:

Q So I -- you've been asked a lot of questions today. I realize it's a long day. I'm -- I'm close to finishing up.

Near the beginning, you were asked a lot of questions, which referred to the title of executive assistant.

Do you recall that?

A Yes.

Q Okay. At any time when a question included a reference to that title, executive assistant, did you ever interpret that to include Chase Robinson?

A No, I was only speaking based on myself and Gillian.

Q Because you never regarded Ms. Robinson as an executive assistant; is that right?

MS. MACMULLIN: Objection --

THE WITNESS: (Inaudible.)

MS. MACMULLIN: -- to form.

THE WITNESS: Even though Kap ran errands and I was vaguely unclear of his title, there was an office distinction of Gillian and I were the executive assistants.

Michael was in a random -- like, he'd do errand and events and archiving. And Chase was VP of Production and Finance.

BY MR. BENNETT:

Q And did you, Gillian, or Kaplan ever have an assistant like Lulu was with respect to Ms. Robinson?

MS. MACMULLIN: Objection to form.

THE WITNESS: No.

BY MR. BENNETT:

Q Okay. Have you ever heard a recording of a voicemail -- excuse me.

Have you ever heard a recording involving Ms. Robinson yelling at Amelia?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yeah, I did.

BY MR. BENNETT:

Q Okay. And did Ms. Robinson's language or the tone she used on that recording that you listened to surprise you?

MS. MACMULLIN: Objection to form.

THE WITNESS: No. She could be very, very

mean. And she had certain specific expectations that weren't always or often warranted. And whether -- you just had to match her or like that was that. She was very critical.

BY MR. BENNETT:

Q Was it your perception that Ms. Robinson tried to minimize the amount of people who would need to communicate with Bob?

MS. MACMULLIN: Objection to form.

THE WITNESS: Yes. And that's actually something I've been attempting to tear down in the wake of Chase. She very much siloed Canal Productions. She prevented Bob from speaking to Jane, his co-CEO, head of his company. She would tell us not to share information between our office and Jane's office.

She had -- like I said, Gillian and I sent a lot of our work through her. She'd check it. She'd send it on to Bob.

When she left, Bob was genuinely surprised that Gillian and I knew how to create his shooting schedules in relation to his kid calendar. He was like, "You -- you know how to do this?"

We were like, "Yeah, of course. We've been doing it for the last couple movies."

He's like, "What? Like I -- Chase told me she was doing this."

So she submitted our work as her own as well, which is I think why Bob thought she was so effective, and why we didn't need to replace her when she left.

Jane's office and Jane were wildly pleased. And Jane is extremely happy to have more open communication now with Bob. It's just -- all around, like, we are now part of Tribeca again, when we were very, very siloed previously.

BY MR. BENNETT:

Q Jane Rosenthal has high standards; would you agree?

A Yes.

MS. MACMULLIN: Objection to form.

BY MR. BENNETT:

Q Have you ever developed a perception, whether as to yourself or anyone else, that Ms. Rosenthal treated women adversely because they were female?

MS. MACMULLIN: Objection to form.

THE WITNESS: No, not at all. I think that Jane has high standards and she expects a lot of everyone who works for her.

Tribeca is, like, 52 percent women. All of the execs besides Bob are women.

Jane helped quite a bit with my promotion, too. Since I'm doing development work, that falls under her purview. She's been very supportive. She just really disliked Chase and was happy when Chase left.

BY MR. BENNETT:

Q And Ms. Robinson's counsel took you through a text message involving Ms. Chen earlier. And you referred to some hostility that -- what I think you attributed to Ms. Chen. Do you recall that?

A Um-hmm.

Q Okay. Any of the hostility that you've ever felt involving Ms. Chen or from Ms. Chen, did you ever perceive that her behavior or conduct towards you which contributed to that hostility was based on the fact that you were a woman?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: No, not at all. Like I explained earlier, she was, like, a bit vindicated that she spotted Chase's -- everything in the Chase situation that she flagged and was correct that she felt Chase was a thief. So for a period of time, she

was paranoid.

And also, you know, like I said, you know, thought -- thought Michael was potentially stealing or improperly using SkyMiles. She was suspicious of people, which was why that period of time was particularly tense; and weird because she was trying to get herself involved in office dynamics. Thankfully, she didn't and that died down.

But there was a period where she came for Michael a bit, came for Bob's driver, Claude.

MS. MACMULLIN: Greg.

THE WITNESS: And thought people were taking advantage.

MR. BENNETT: I -- I have two questions and I'm done. Two questions --

MS. MACMULLIN: Okay.

MR. BENNETT: -- I'm done. All right?

BY MR. BENNETT:

Q Do you recall learning whether Ms. Robinson tried to charge flowers to her American -- to her Canal American Express and have them delivered to her mother's apartment on the day she resigned or the following day?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: Yeah, I mean, it's something that, like, Kaplan and Gillian and I laughed about and found just generally ironic and weird.

BY MR. BENNETT:

Q And the payment was rejected; is that right?

MS. MACMULLIN: Objection --

THE WITNESS: Yeah.

MS. MACMULLIN: -- to form.

THE WITNESS: We canceled -- like I said, we were really quick to change everything.

BY MR. BENNETT:

Q Did you ever come across an E-mail where you noticed that she -- Ms. Robinson had received Mr. De Niro's permission to take a particular plane or incur a particular expense?

MS. MACMULLIN: Objection to the form of the question.

THE WITNESS: I don't think so. I mean, I still have vaca -- like, vacation request E-mails from her where he said like, "Yes, please enjoy."

I don't know -- the Taxi Driver thing would more be Gillian's since she was around at that time; but I think there was a work trip. This is what Gillian told me, where Chase was to take all these Taxi Driver books that were signed to L.A., hand them

out to colleagues over there.

We ended up finding that she spent time in L.A. before the books arrived. And I want to say, like, took Amelia to Malibu -- or to Nobu during this time. And they had -- it was -- might have been around Amelia's birthday, there were some dinners; but it predated the actual Taxi Driver books going to L.A., which from Gillian's understanding was the point of Chase's work trip.

BY MR. BENNETT:

Q Thank you.

And, finally, as we're sitting here today, is there any doubt in your mind that Ms. Robinson stole from Canal?

A There's no doubt --

MS. MACMULLIN: Objection to the form of the question.

THE REPORTER: Can you repeat your answer?

BY MR. BENNETT:

Q Can you repeat your answer, --

THE REPORTER: Yeah.

BY MR. BENNETT:

Q -- Sabrina?

A There is no doubt in my mind that she stole from Canal.

MR. BENNETT: I have no further questions. Thank you.

MS. LAZZARO: Thank you, Ms. Weeks-Brittan for appearing today. This concludes your deposition.

Madam Court Reporter, we will follow-up with you with regards to the transcript.

THE WITNESS: Thanks, everyone.

MR. BENNETT: Diane -- Diana, I'm sorry to -- (Inaudible.)

THE REPORTER: Hold on. I need --

MR. BENNETT: Thank you, everyone, for your help.

THE REPORTER: Hold on. I need Dan for us to take us off.

(The remote videotaped deposition concluded at 4:16 p.m.)

* * *

REPORTER'S CERTIFICATION

I, Diana Janniere, a Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me remotely duly sworn; that the remote deposition was then taken before me at the time and place herein set forth; that the remote testimony and remote proceedings were reported stenographically by me and later transcribed into typewriting under my direction; and that the foregoing is a true record of the remote testimony and remote proceedings taken at that time.

IN WITNESS WHEREOF, I subscribed my name this 21st day of January, 2022.

Diana Janniere

Diana Janniere, CSR No. 10034

DECLARATION ERRATA SHEET

Our Assignment No. 782023

Case Caption: GRAHAM CHASE ROBINSON vs. ROBERT DE NIRO, ET AL.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the foregoing transcript of my remote deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _______ day of ______________________________, 2022.

___________________________

SABRINA WEEKS-BRITTAN