

**Sanford Heisler Sharp, LLP**
1350 Avenue of the Americas, Floor 31
New York, NY 10019
Telephone: (646) 402-5650
Fax: (646) 402-5651
www.sanfordheisler.com

*Alexandra Harwin*, Partner
Executive Chair of Discrimination and Harassment Practice Group
(646) 401-0475
aharwin@sanfordheisler.com           New York | Washington D.C. | San Francisco | San Diego | Nashville | Baltimore

September 9, 2022

**VIA ECF**
The Honorable Katharine H. Parker
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:  *Robinson v. De Niro and Canal Productions, Inc.*, No. 1:19-cv-09156 (LJL) (KHP)

Dear Judge Parker:

    This firm represents Plaintiff Graham Chase Robinson. This joint status letter is submitted on behalf of all parties as directed in the Court's Order of August 18, 2022 (Dkt. No. 252) and provides an update on various discovery issues, including those specified in the Court's Order. (Plaintiff advised Defendants of the page limitations that the Court set for this joint status letter, but Defendants declined to shorten their position statements listed below.)

**Mediation.** The Parties have agreed to retain a private mediator to assist in efforts to resolve this litigation. The mediator jointly selected has agreed to accept the retention. The Parties are in the process of scheduling the mediation, which we expect will occur in November.

**Close of Discovery.** Plaintiff will depose Defendants' psychiatric expert on September 12, 2022, and complete Mr. De Niro's deposition on October 14, 2022. Discovery is scheduled to close on September 16, 2022, consistent with the Court's prior Order.

**Authenticity of Audio Recordings and Text Messages.** Defendants and Plaintiff have sought stipulations from each other as to the authenticity of the audio recordings Plaintiff produced and text messages Defendants produced in discovery. On September 2, 2022, Defendants proposed a stipulation relating to the audio recordings, which Plaintiff is in the process of reviewing, and Plaintiff will present Defendants with a proposed stipulation as to text messages.

**Defendants' Expert's Testimony List.** Defendants' vocational expert provided a list of his prior trial and deposition testimony that did not identify the courts or administrative agencies where the cases were brought. Defendants are in the process of obtaining and providing this information.

## Pending Disputed Items

### Stipulation as to the General Ledger

Plaintiff's Position: Plaintiff has repeatedly communicated with Defendants to try to reach a stipulation concerning Canal's accountants' classification of the expenses at issue, but Canal has refused to stipulate to what it already represented to the Court was not in dispute. Specifically, the Court suggested, "[W]hy don't you . . . just stipulate that they were treated as business expenses, all of these were treated as business expenses . . . by the accountant," and Canal's counsel confirmed, "That's not a problem" and "That's fine." Dkt. No. 232 at 27:3-11. Subsequently, the Court explained that the stipulation should confirm that "the expenses were classified as business expenses by the accountant," and Canal's counsel agreed, "that's not in dispute." Dkt. No. 254 at 20:10-14. The Court's subsequent Order confirms that the matter to be stipulated is "whether the expenses at issue were marked in the general ledger as 'business expenses' by Canal's accountants." Dkt. No. 252. Accordingly, Plaintiff has proposed a stipulation that, "The expenses at issue in Canal's claims against Ms. Robinson were classified as business expenses by Canal's accountants." But Canal has rejected this stipulation, despite its prior representations to the Court. In so doing, Canal has misrepresented the process by which Canal's accountants classified expenses for tax and accounting purposes; Canal's Rule 30(b)(6) testimony makes clear that the accountants classified credit card expenses independently, without input from Ms. Robinson.

Defendants' Position: The Court determined Plaintiff's request for Canal's general ledger is disproportionate. Transcript, Aug. 18, 2022 (ECF #254), at 11-20. Though Plaintiff quotes selectively from the Transcript of our May conference, the concept has never been disputed: Items presented to Canal's accountants as business expenses were treated as such on the general ledger. That is a matter of undisputed fact, making a stipulation unnecessary. To resolve the matter Defendants proposed: "Canal's accountants maintained a general ledger. Items that were reported by Canal as business expenses were categorized as such on its general ledger." Plaintiff rejected this. Plaintiff wants stipulation making it appear that IF her misuse of Canal's funds was regarded as a business expense THEN they must have been legitimate. That is not factually correct as it was Plaintiff who determined whether to report her spending as being on legitimate business expenses. If a stipulation cannot be limited to facts, we return to the Court's prior determination that production of the general ledger is disproportionate. It will show only that which we do not dispute: If Chase Robinson reported something as a business expense, Canal's accountants trusted her, relied on her representations, and treated it as such.

### Disputes Concerning Rule 30(b)(6) Testimony

Plaintiff's Position: Plaintiff has identified to Defendants topics on which Mr. Harvey failed to provide adequate testimony during Canal's continued Rule 30(b)(6) deposition. On September 7, 2022, Defendants provided a declaration confirming Canal is unable to provide more specific answers concerning various topics. Canal has not yet advised whether it will provide supplemental responses concerning other topics identified by Plaintiff as inadequately addressed by Canal's 30(b)(6) testimony, including the dates when Canal claims Ms. Robinson was on vacation and the dates when Canal contends Ms. Robinson binge watched Netflix during working hours.

Hon. Katharine H. Parker
September 9, 2022
Page 3 of 7

Defendants' Position: In addition to receiving tens of thousands of documents from Defendants, Plaintiff has taken three 30(b)(6) depositions. There is no possible way to satisfy their insatiable appetite for minutiae. Not every question that can be conceived has an answer. This is where we are: Following Mr. Harvey's second 30(b)(6) deposition, Plaintiff's counsel presented a list of questions they did not feel were adequately answered. We disagreed but made the decision to answer as best Canal could by way of Declaration simply to put this matter to rest. Still, this was not enough. As an example, Canal explained that it was unable to answer with more precision questions such as "how much time was spent discussing the petty cash charges that served as the basis for the lawsuit against Ms. Robinson with Mr. De Niro?" This assumes, incorrectly, that someone was tracking the amount of time, and it is somehow probative in this case. The two items identified above, Plaintiff's vacation dates and dates of watching Netflix during working hours, are trick questions where, again, Plaintiff assumes certain concealed facts. Canal has explained Plaintiff improperly paid herself for so-called unused vacation time. She seeks to know the precise dates it contends she was on vacation. She misses the point. Canal employees were not reimbursed for unused vacation time. It does not matter when or if she was on "vacation" because she had no right to pay herself for any unused days. It has also been explained that Canal's information comes from Plaintiff's own emails where she references herself being on vacation. Plaintiff appears to define "vacation" as any day when she did not work. Thus, if she was skiing but took a work call, it was no longer a vacation day. Similar is Plaintiff's position on her Netflix usage. Her two stories cannot be harmonized. In one she claims to have always been on-call and entitled to overtime pay. If true, then ANY Netflix usage was on working time. If she is walking-back her position, it remains Canal's position that Plaintiff's Netflix usage was so excessive, having spanned multiple workdays, that it is further evidence of her systemic abuses. Documents from the record illustrate this.[1] Canal's position remains that it has complied with its obligations under Rule 30(b)(6).

**Defendants' Fourth Set of Document Requests**

Plaintiff's Position: Contrary to the Court's Order, which authorized Defendants to "serve upon Plaintiff *a tailored* document request seeking documents relating to paid or unpaid screenwriting and producing work performed by Plaintiff during the relevant period" (Dkt. No. 227) (emphasis added), Defendants served multiple requests, containing multiple subparts, seeking "all documents" concerning extremely broad topics covering a period in excess of fourteen years. While Defendants agreed to withdraw some requests, they have refused to tailor their remaining request, which broadly seeks "All Documents [from January 1, 2008 through the date of trial of this action] concerning Plaintiff's engagement in activities relating to screenwriting, producing and/or production work for film, television and/or advertising opportunities or projects," with multiple specific subparts. Defendants' request is disproportionate. First, the request violates the Court's admonition against document requests seeking "all documents" concerning broad topics. Dkt. No. 16. Second, Defendants did not make this request for these documents until long after the parties agreed upon, and completed, ESI searches. Third, such a sweeping document request is not

---

[1] In March 2019 Plaintiff kept "timesheets" summarizing what she did each day. Many entries are vague (e.g., "Amex," "Office"). For each day she lists a start and end time (rounded to the nearest ½ hour) and showing a total number of hours for the day. For example, on Tuesday March 26 she claims to have worked 15.5 hours from 7:30 am until 11:00 pm. The Netflix records show 14 episodes of "Arrested Development" and 2 episodes of "Schitt's Creek" were viewed.

justified given the limited relevance that Defendants claim; Defendants have acknowledged that "[n]either Canal nor Mr. De Niro dispute that Plaintiff was permitted to pursue [her production work]" while employed by Canal, and Defendants represented to the Court that "the issue is relevant because of the nature of the jobs that she claims to have been seeking post-employment." Dkt. No. 254 at 30:11-13. Defendants' sweeping document request is disproportionate at this stage of the litigation and unwarranted by Defendants' proffered justifications. Moreover, documents concerning Plaintiff's job duties relating to production have been produced (there is no issue in the case relating to screenwriting), and Defendants' own vocational expert has already concluded: "Ms. Robinson's former employment conformed with job titles such as . . . assistant producer . . ." and the documents Defendants seek are not relevant to Plaintiff's psychiatric diagnosis.

Defendants' Position: New facts and evidence since our May conference necessitate a further and deeper analysis of discovery relating to Plaintiff's side-work and qualifications as a "producer." Defendants' psychiatric expert has located a Rosetta Stone that explains a great deal about Plaintiff's behavior. Plaintiff now stands in the way of our attempts to obtain discovery on these topics. Plaintiff had no duties or responsibilities reasonably related to "production" as the term is used in the film industry. Plaintiff claims otherwise, and this is important for three reasons.

*Plaintiff's side-work.* In December 2017, well before resigning from Canal, Plaintiff formed an LLC. At one point, Plaintiff described that LLC as a vehicle for her to develop features and series that focused on social interests, such as women's rights, inequality, immigration, and corruption. Neither Canal nor Mr. De Niro dispute that Plaintiff was permitted to pursue such activities, and it appears she did. Several questions emerge, among them the extent and amount of time Plaintiff spent on these side projects; none of which would have been "working time" for Canal.

Three months before she resigned, in a January 4, 2019 email entirely unrelated to Canal, Plaintiff wrote to Christopher Young at Youngs Films on the Isle of Skye: "I'm getting back into the swing of things with my project. I'll look into both of your suggestions – thank you for sending them and for sending Olivia's script. I'll take a look at it next week. I'm hoping to hire someone once we get through the second draft of the treatment which if we can stay on schedule should be in the next month or two. I'll send you a copy if you'd like to read it."

What did she send to Mr. Young? What project? What suggestions did he offer? What is Olivia's script? Who is Ms. Robinson hiring? What schedule? Throughout this litigation Plaintiff has claimed to have worked exorbitant hours for Canal and Mr. De Niro leaving her with no time for vacation, pleasure, or pastimes. Documents relating to Plaintiff's side-projects undermine those contentions. Likewise, if Plaintiff was lying to Mr. Young – or grossly embellishing - it undermines her credibility in general and ties into her post-resignation misrepresentations made in connection with her trip to the Isle of Skye that summer.

*Plaintiff mentors on the Isle of Skye.* Plaintiff's communications with Mr. Young continued. On day she resigned (April 6, 2019), he invited her to serve as a mentor for a residency he was running on the Isle of Skye that summer. As he explained: "Most of our mentors are producers, writers and directors - …. It would be great for our participants to hear the perspective of someone who manages a huge talent but also wants to produce." (Emphasis added). He excluded Plaintiff from falling within the producer category and recognized her as one who "wants" to produce.

Plaintiff accepted his description and assented, provided he was interested "in having [her] mentor/talk about the details of what [her] job was managing a huge talent and where [her] future lies in production, development and producing." She explained she had left Canal and was "in the process of transitioning to [her] own film projects." She has provided no documents relating to her then-ongoing "film projects." These are relevant again to the amount of time Plaintiff spent on and her efforts to mitigate damages. If there were no such projects, her lie again undermines her credibility. If there were, Defendants should be entitled to obtain information about them.

It is not disputed that Plaintiff traveled to the residency that summer. The residency requested a bio and Plaintiff provided one that stated in relevant part: "As VP of Production & Finance at Canal Productions, Chase was <u>a vital part of De Niro's production team</u>, handling budgets, contracts, negotiation and production for Robert De Niro. During her tenure at Canal Productions, Chase <u>worked on over 30 films</u> such as the upcoming Irishman, Silver Linings Playbook, Joy, Hands of Stone, The Comedian and the Intern. She also had the opportunity to work with such filmmakers as Martin Scorsese, David O. Russell, Nancy Meyers, Kirk Jones and Bradley Cooper. <u>Currently, Chase is in the process of launching her own production company</u> with the objective of developing features and series that focus on social issues such as women's rights, inequality, immigration and corruption. (Emphasis added)."

Plaintiff was credited on <u>none</u> of those films. <u>Nothing</u> in discovery mentions anything about those movie industry personalities, other than her claiming to have helped set up for a birthday party honoring Mr. Scorsese. Is Plaintiff lying or embellishing the truth?[2]

The depiction of her duties at Canal is contrary to her pleadings and undermines her claim to be a non-exempt employee. Her efforts to "launch her own production company" – relevant to mitigation – remain shrouded in mystery as Plaintiff has produced no documentation pertaining to those efforts. If she was lying about that to Mr. Young, Defendants are entitled to know.

Defendants seek documents regarding Plaintiff's attendance at the residency, specifically those which reflect her communications with anyone running the residency, her travel arrangements, and any materials disseminated that contain information about her work at Canal. Defendant further seek discovery relating to her side-business (including with Mr. Young) after she left Isle of Skye.

*Relevance to Mitigation.* After resigning and taking a year off before starting her job search, Plaintiff claims to have "applied" for hundreds of jobs but has received no offers. Since our May 2022 conference, we have now learned that when Plaintiff claims to have "applied" for a job, she means only that she uploaded the same unchanged resume each time. Critically, Defendants will demonstrate Plaintiff's minimalist efforts to obtain positions for which she was not qualified call into question the *bona fides* of her mitigation efforts.

*Relevance to Damages.* Plaintiff's economics expert created damages calculations, in part, assuming Plaintiff would have worked as a producer. Documents reflecting whether she was qualified as such based on her side-business are directly relevant to Plaintiff's claimed damages.

---

[2] As an example, Plaintiff claimed to have turned down a job in London to remain with Canal in 2019. We now know that was a lie. Plaintiff now admits there was no such job offer.

*Efforts to resolve the dispute.* Matters relating to Plaintiff's side-work and the emails quoted above were raised to the Court briefly at our May 18 conference when we read portions of the emails into the record. The Court stated: "Okay, well, so make a tailored document request, very tailored, as to work that she performed either on a volunteer basis, self-employed basis or employed basis, as a producer or screenwriter, if you're -- and she'll produce that." Tr. 51:15-19.

A document request was served. We received objections and no documents. Disagreement existed as to the scope of what Defendants could obtain. Defendants read the Court's words consistent with the totality and spirit of the record. Plaintiff read the record narrowly. To avoid a dispute, we narrowed the request, asking Plaintiff to produce *only that which she understood the Court was directing*. We would be able to reevaluate our position. Counsel refused and has produced nothing.

*New Importance.* Since our May conference these issues have taken on more significance now that we have the benefit of reports from the psychiatrists who examined Plaintiff. Plaintiff's behavior regarding her claiming to be a "producer" aligns with what we now understand to be her "cognitive distortions" based on narcissistic traits and tendencies of grandiosity. Her behavior is a symptom that presents impediments and has nothing to do with her employment while at Canal or thereafter. A jury should understand the flaws in the lens through which she views the world and why she responds the way she does. This behavior also ties to Plaintiff's peculiar behavior and statements on the surreptitious audio recordings she made in the weeks before (and after) she resigned.

Defendants ought to be able to develop information as to how Plaintiff's psychology manifested, and this includes her side-work. In part, this is directly demonstrated by her pretending to be something she was not, be it at work, on the Isle of Skye, on her resume, and in her job search. We ask that the Court direct Plaintiff to respond to the document demands Defendants served, and to remind Plaintiff of her obligations to respond to discovery expansively. Once we have responsive documents, we will be in a better position to evaluate whether any further information is sought.

**Stipulation as to Mr. De Niro's Net Worth and Canal's Annual Revenue**

Plaintiff's Position: Defendants have agreed to stipulate to Canal's annual revenues for 2017 through 2019 and to a *minimum* number for Mr. De Niro's net worth, but Defendants have not provided information to enable Plaintiff to ascertain whether Defendants are understating Mr. De Niro's net worth. Mr. De Niro's net worth is relevant to punitive damages, but Defendants' proposed stipulation cites a number for Mr. De Niro's net worth that is *less* than what Defendants acknowledge below. Thus, to enable Plaintiff to assess Defendants' proposed stipulation, Plaintiff has requested that Defendants advise what Mr. De Niro's net worth is to the nearest $10 million.

Defendants' Position: We provided Canal's annual revenue for 2017-2019. It is unclear why it needs mention here. Mr. De Niro's net worth has already been discussed on the record. Transcript, April 21, 2022 (ECF #215) 25-27. There is no claim of inability to pay. There is no basis to believe there will be an award of punitive damages. Multiple publicly available websites report this number as between $200 million and $520 million. Why is precision to the nearest $10 million necessary or proportionate here and now?

Hon. Katharine H. Parker
September 9, 2022
Page 7 of 7

Respectfully submitted,

*Alexandra Harwin*

Alexandra Harwin