**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**GRAHAM CHASE ROBINSON**

*Plaintiff,*

v.

**ROBERT DE NIRO and**
**CANAL PRODUCTIONS, INC.,**

*Defendants.*

---

**Case No.  1:19-cv-09156-LJL-KHP**

<u>**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**ON DEFENDANT CANAL'S COUNTERCLAIMS**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF MATERIAL FACTS ........................................................... 5

  A.  Overview of Ms. Robinson's Employment and Canal's Operating Procedures ................ 5

  B.  Before Canal Asserted Claims Against Her, Ms. Robinson Repeatedly Engaged in Protected Activity .............................................................................................. 7

  C.  Mr. De Niro Was Enraged by Ms. Robinson's Protected Activity, so Canal Initiated a Retaliatory Lawsuit against Her ...................................................................... 9

  D.  Canal Has Admitted that its Claims Were Retaliatory and Groundless ........................... 10

  E.  Canal's Baseless Allegations Against Ms. Robinson ..................................................... 10

    i.    Canal's Falsehoods About Its Investigation ................................................... 10

    ii.   Allegations of Improper Credit Card Charges for Transportation (Taxis and Ubers) and Food (Paola's, Whole Foods, and Dean & Deluca) ............................................. 12

    iii.  Allegations of Improper Payments for Unused Vacation Days ..................... 13

    iv.   Allegations of "Binge Watching" Netflix ..................................................... 15

    v.    Allegations Concerning Los Angeles Trip ..................................................... 15

    vi.   Allegations Concerning SkyMiles ................................................................. 16

    vii.  Abandoned Allegations Regarding Flowers and Petty Cash ......................... 18

III.  LEGAL STANDARD ........................................................................................ 18

  A.  Summary Judgment ........................................................................................................ 18

  B.  Key Elements of Canal's Counterclaims ...................................................................... 20

    i.    Breach of Fiduciary Duty ............................................................................... 20

    ii.   Breach of the Duty of Loyalty (or "Faithless Servant" Claim) ..................... 20

    iii.  Conversion ..................................................................................................... 21

IV.   ARGUMENT ..................................................................................................... 22

  A.  Canal's Twin "Breach of Duty" Counterclaims Should be Dismissed, as These Causes of Action Do Not Fit the Conduct Alleged and Are Duplicative ................................................. 22

    i.    Canal's Breach of Fiduciary Duty and Faithless Servant Counterclaims Fail Because These Claims Are Not Actionable Based on the Types of Conduct Alleged in this Case .... 22

    ii.   Canal's "Breach of Duty" Counterclaims Should Be Dismissed Because They Are Wholly Duplicative of Its Conversion Claim ........................................................................ 24

    iii.  Canal's "Breach of Duty" Counterclaims are Duplicative of Each Other ................... 25

B.   Regardless of How Canal's Counterclaims Are Titled, Summary Judgment Must Be Granted for Plaintiff on All Three Counterclaims, Because the Undisputed Facts Establish that Defendants Authorized and Consented to the Alleged Transactions and Activities ................ 27

    i.   Credit Card Charges for Taxis and Ubers Were Authorized ......................................... 29

    ii.   Credit Card Charges for Paola's, Whole Foods, and Dean & Deluca Were Authorized 30

    iii.   Ms. Robinson Was Properly Paid for Unused Vacation Days ....................................... 31

    iv.   Canal Concedes that It Cannot Prove Its Netflix Allegations ....................................... 32

    v.   The Los Angeles Trip Was Directed and Expressly Authorized by Mr. De Niro ......... 33

    vi.   Mr. De Niro Gave Ms. Robinson Broad Authorization to Use SkyMiles ..................... 34

C.   Ms. Robinson Is Entitled to Summary Judgment on All Claims Because Canal Ratified and Acquiesced in All the Alleged Conduct at Issue ................................................................ 36

    i.   Legal Standard for Ratification and Acquiescence ........................................................ 36

    ii.   Canal Ratified and Acquiesced in All the Transactions and Activities at Issue ............ 38

    a.   Canal Ratified and Acquiesced in Credit Card Charges for Taxis, Ubers, Paola's Restaurant, Whole Foods, Dean & Deluca, and the Los Angeles Trip ................................. 38

    b.   Canal Ratified and Acquiesced in Payments for Unused Vacation Days ...................... 39

    c.   Canal Ratified and Acquiesced in Netflix Viewing on Shared Account ....................... 39

    d.   Canal Ratified and Acquiesced in SkyMiles Transfers ................................................. 40

V.   CONCLUSION .......................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*87 Mezz Member LLC v. German Am. Capital Corp.*,

    81 N.Y.S.3d 1 (1st Dep't 2018) ............................................................................... 27

*Abramson v. Dry Goods Refolding Co.*,

    166 N.Y.S. 771 (1st Dep't 1917) ............................................................................. 21

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242 (1986) ........................................................................................... 18, 19

*B&C Realty, Co. v. 159 Emmut Props. LLC*,

    966 N.Y.S.2d 402 (1st Dep't 2013) ......................................................................... 27

*Babbitt v. Koeppel Nissan, Inc.*,

    18-CV-5242 (NGG) (CLP), 2020 WL 3183895 (E.D.N.Y. June 15, 2020) ............................ 26

*Band v. First Bankcard Ctr.*,

    644 So. 2d 211 (La. Ct. App. 1994) ........................................................................ 28

*Brady v. Town of Colchester*,

    863 F.2d 205 (2d Cir. 1988) .................................................................................... 19

*Bravin v. Fashion Wk., Inc.*,

    342 N.Y.S.2d 971 (Civ. Ct. N.Y. Cty. 1973) ............................................................. 37

*CBS Corp. v Dumsday*,

    702 N.Y.S. 248 (1st Dep't 2000) ............................................................................. 23

*Cerciello v. Admiral Ins. Brokerage Corp.*,

    936 N.Y.S.2d 224 (2d Dep't 2011) .......................................................................... 22

*City of Binghamton v. Whalen*,

    32 N.Y.S.3d 727 (3d Dep't 2016) ............................................................................ 26

*Dardashtian v. Gitman*,

    17-CV-4327 (LLS) (RWL), 2021 WL 746133 (S.D.N.Y. Feb. 16, 2021)............................. 18

*Doe v. Solera Cap. LLC*,

    18 CIV. 1769 (ER), 2019 WL 1437520 (S.D.N.Y. Mar. 31, 2019)......................................... 23

*Don Buchwald & Assocs. v Rich*,

    723 N.Y.S.2d 8 (1st Dep't 2001) ......................................................................... 23

*Ebel v. G/O Media, Inc.*,

    No. 20 CIV. 7483, 2021 WL 2037867 (S.D.N.Y. May 21, 2021) ...................................... 22, 25

*Farricker v. Penson Dev., Inc.*,

    No. 07 Civ. 11191(DAB), 2010 WL 845983 (S.D.N.Y. Mar. 4, 2010)................................... 37

*Fed. Ins. Co. v. Walker*,

    53 N.Y.2d 24 (1981) ......................................................................................... 37

*G.K. Alan Assoc. v. Lazzari*,

    840 N.Y.S.2d 378 (2d Dep't 2007) ....................................................................... 21

*Gold Sun Shipping Ltd. v. Ionian Transport Inc.*,

    666 N.Y.S.2d 677 (2d Dep't 1997) ....................................................................... 25

*Gomez v Bicknell*,

    756 N.Y.S.2d 209 (2d Dep't 2002) ....................................................................... 23

*Gottlieb v. Cnty. of Orange*,

    84 F.3d 511 (2d Cir. 1996) ................................................................................. 19

*Grewal v. Cuneo*,

    No. 13-CV-6836-RA, 2016 WL 308803 (S.D.N.Y. Jan. 25, 2016)...................................... 22, 23

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*,

    No. 007536/2005, 2010 WL 669241 (Sup. Ct. Nassau Cnty. Feb. 16, 2010)........................... 21

*Harper v. Adams*,

    18 N.Y.S. 896 (2d Dep't 1892) ............................................................................ 36

*Hellman v. Hoenig & Co.*,

    244 A.D.2d 529 (2d Dep't 1997) .......................................................................... 24

*Hernandez v. Cnty. of Nassau*,

    17-CV-1646, 2022 WL 513929 (E.D.N.Y. Feb. 20, 2022) ...................................................... 18

*Hicks v. Baines*,

    593 F.3d 159 (2d Cir. 2010) ..................................................................................................... 19

*Holcomb v. Iona Coll.*,

    521 F.3d 130 (2d Cir. 2008) ..................................................................................................... 19

*In re Adelphia Recovery Tr.*,

    634 F.3d 678 (2d Cir. 2011) ..................................................................................................... 36

*In re Prudential Lines, Inc.*,

    209 B.R. 621 (S.D.N.Y. 1997) ................................................................................................. 36

*In re Refco Inc. Sec. Litig.*,

    No. 07-MD-1902 (JSR), 2013 WL 12191891 (S.D.N.Y. Mar. 11, 2013) ......................... 20, 27

*In re Scott*,

    572 B.R. 492 (Bankr. S.D.N.Y. 2017) ........................................................................ 22, 27, 36

*In re Wolfson*,

    152 B.R. 830 (S.D.N.Y. 1993) ................................................................................................. 28

*Jackson v. Fed. Exp.*,

    766 F.3d 189 (2d Cir. 2014) ..................................................................................................... 18

*Jaramillo v. Weyerhaeuser Co.*,

    536 F.3d 140 (2d Cir. 2008) ..................................................................................................... 19

*Kapernekas v. Brandhorst*,

    638 F.Supp.2d 426 (S.D.N.Y. 2009) ....................................................................................... 25

*Kent v. Quicksilver Min. Co.*,

    78 N.Y. 159 (1879) ................................................................................................................... 36

*Leary v. Al-Mubaraki*,

    No. 18-CV-0048-LTS-HBP, 2019 WL 4805849 (S.D.N.Y. Sept. 30, 2019) ...................... 23, 37

*Linder v. Innovative Com. Sys. LLC*,

    No. 105528/2010, 2013 WL 5663173 (Sup. Ct. N.Y. Cty. Oct. 16, 2013), *aff'd*, 8 N.Y.S.3d 191

    (1st Dep't 2015) ......................................................................................................... 21, 23

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

    475 U.S. 574 (1986) ........................................................................................................ 19

*Mendez v. MCSS Rest. Corp.*,

    564 F. Supp. 3d 195 (E.D.N.Y. 2021) ............................................................................ 32

*Mercer Health & Benefits LLC v. DiGregorio*,

    307 F. Supp. 3d 326 (S.D.N.Y. 2018) ............................................................................ 23

*Messiah's Covenant Cmty. Church v. Weinbaum*,

    905 N.Y.S.2d 209 (2d Dep't 2010) ................................................................................ 22

*Miller v. Levi & Korsinsky, LLP*,

    No. 20 Civ. 1390 (LAP), 2021 WL 535599 (S.D.N.Y. Feb. 12, 2021) .......................... 37

*Nicholsen v. Feeding Tree Style, Inc.*,

    No. 12 Civ. 6236(JPO), 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014) .............................. 26

*Niosi v. Niosi*,

    641 N.Y.S.2d 93 (2d Dep't 1996) .................................................................................. 36

*Pac. R.R. of Missouri v. Missouri Pac. Ry. Co.*,

    111 U.S. 505 (1884) ........................................................................................................ 38

*Panagatos v. Petsmart, Inc.*,

    No. 18CV5032SJFAKT, 2020 WL 7343409 (E.D.N.Y. Dec. 14, 2020) .......................... 19

*Perrone v. Amato*,

    2010 WL 11629624, at *16 (E.D.N.Y. Aug. 30, 2010) .................................................. 27

*Phansalkar v. Andersen Weinroth & Co., L.P.*,

    344 F.3d 184 (2d Cir. 2003) ........................................................................................... 21

*Reilly v. Freeman*,

37 N.Y.S. 570 (1st Dep't 1896) ................................................................ 37

*RLI Ins. Co. v. Athan Contracting Corp.*,

    667 F.Supp.2d 229 (E.D.N.Y. 2009)..................................................... 36

*Robin v. Robin*,

    No. 02 C 8181, 2004 WL 170318 (N.D. Ill. Jan. 21, 2004)...................... 28

*Saborit v. Harlem Hosp. Ctr. Auxiliary, Inc.*,

    19-cv-4686 (LJL), 2021 WL 1063241 (S.D.N.Y. Mar. 19, 2021). .......................... 19

*Salus Cap. Partners, LLC v. Moser*,

    289 F.Supp.3d 468 (S.D.N.Y. 2018) ...................................................... 27

*Samuels v. Greenberg*,

    No. 14-CV-04401 (DLI)(VMS), 2015 WL 5657565 (E.D.N.Y. Sept. 23, 2015) ..................... 25

*Sanders v. Madison Square Garden, L.P.*,

    No. 06 CIV 589(GEL), 2007 WL 1933933 (S.D.N.Y. July 2, 2007) ................................ 21, 23

*Schanfield v. Sojitz Corp. of Am.*,

    663 F. Supp. 2d 305 (S.D.N.Y. 2009) .................................................... 21

*Schanker & Hochberg*, P.C. v. Berkley Assurance Co.,

    2:20-cv-5361 (DRH)(ARL), 2022 WL 657540 (E.D.N.Y. Mar. 4, 2022) ................................ 20

*Schering Corp. v. Home Ins. Co.*,

    712 F.2d 4 (2d Cir. 1983) ..................................................................... 19

*SCR Joint Venture L.P. v. Warshawsky*,

    559 F.3d 133 (2d Cir. 2009) ................................................................. 18

*Skokan v. Peredo*,

    58 N.Y.S.3d 110 (2d Dep't 2017) ........................................................ 27

*Stefanovic v. Old Heidelberg Corp.*,

    No. 18-CV-2093-LTS-JEW, 2022 WL 3928370 (S.D.N.Y. Aug. 31, 2022)............... 22, 23, 25

*Supreme Showroom, Inc. v. Branded Apparel Grp.*,

   16 Civ. 5211 (PAE), 2018 WL 3148357 (S.D.N.Y. June 27, 2018) .................................. 24, 25

*Tenay v. Culinary Teachers Ass'n of Hyde Park*,

   281 F. App'x 11 (2d Cir. 2008) ................................................................................ 19

*Torres v. Gristede's Operating Corp.*,

   628 F. Supp. 2d 447 (S.D.N.Y. 2008) ................................................................. 21, 22

*Tropic Film Corp. v. Paramount Pictures Corp.*,

   319 F.Supp. 1247 (S.D.N.Y. 1970) ........................................................................ 37

*Turner v. Kouwenhoven*,

   100 N.Y. 115 (1885) .............................................................................................. 21

*U.S. Fire Ins. Co. v. Raia*,

   942 N.Y.S.2d 543 (2d Dep't 2012) ....................................................................... 20

*Wright v. Goord*,

   554 F.3d 255 (2d Cir. 2009) ................................................................................. 19

*WWBITV, Inc. v. Vill. of Rouses Point*,

   589 F.3d 46 (2d Cir. 2009) ................................................................................... 18

*Yukos Cap. S.A.R.L. v. Feldman*,

   977 F.3d 216 (2d Cir. 2020) .................................................................... 20, 21, 25

**Statutes**

New York Labor Law § 195(4) ................................................................................ 32

**Rules**

Fed. R. Civ. P. 56 ......................................................................................... passim

**Other Authorities**

2A N.Y. Jur. 2d Agency § 192 ................................................................................ 36

New York Pattern Jury Instructions 3:10 .............................................................. 22

## I.      INTRODUCTION

Plaintiff Graham Chase Robinson ("Ms. Robinson") worked for Defendant Robert De Niro ("Mr. De Niro") for over eleven (11) years as the famous actor's "head assistant," through his company Defendant Canal Productions, Inc. ("Canal").   She brought this discrimination and retaliation lawsuit against Mr. De Niro and Canal, and Canal is asserting counterclaims that accuse Ms. Robinson of conversion, breach of fiduciary duty, and breach of the duty of loyalty.[1]

Canal's counterclaims against Ms. Robinson originate in a retaliatory state court lawsuit that Canal filed preemptively against her because she was threatening employment claims against Mr. De Niro.  Mr. De Niro was enraged by Ms. Robinson's protected activity, writing, "[t]he balls, the nerve, the chutzpah, . . . how dare her!", and he issued a directive to "go after her" and "file whatever."   As another Canal employee explained, "she was threatening to sue bob [*i.e.*, Mr. De Niro] so they wanted to ruin her first," "she was threatening to sue [] [s]o this was [the] plan to strike first," and the monetary damages claimed by Canal were "just a random number [] [t]o humiliate her."   After Ms. Robinson brought the instant lawsuit, Canal's lawsuit against her was stayed, and Canal asserted its same baseless causes of action as counterclaims in this case.

The Court should grant summary judgment to Plaintiff on all of Canal's counterclaims.

First, summary judgment should be granted on Canal's twin counterclaims for breach of fiduciary duty and breach of the duty of loyalty (often called a "faithless servant" claim).  These torts require types of misconduct that Canal does not even allege (and cannot prove).  In addition, these two claims are duplicative of Canal's cause of action for conversion.  The gravamen of Canal's allegations is that Ms. Robinson stole from Canal.  This sounds in conversion, and well-settled law requires that Canal's other overlapping claims be dismissed as duplicative, because

---

[1] Canal initially asserted an additional counterclaim for fraud but has since withdrawn that counterclaim.

they are based on the same alleged conduct and seek the same relief.

Second, whatever the counterclaims are labelled, summary judgment should be granted as to all three of them because Canal cannot establish a genuine dispute as to essential elements of those claims: lack of authorization (required to prove conversion), misconduct (required for breach of fiduciary duty), and substantial disloyalty permeating the employment relationship (required for breach of the duty of loyalty).  Testimony from Mr. De Niro and Canal establishes that they gave Ms. Robinson broad authorization to engage in all of the transactions and activities at issue in the counterclaims.  But when bringing its claims, Canal did little more than add up entire categories of transactions (most of which appeared on shared accounts available to Canal's entire office), without making any real effort to ascertain whether Ms. Robinson had actually done anything improper.  In reality, all her transactions and activities were fully authorized.

- A major part of Ms. Robinson's job was running errands for Mr. De Niro and Canal, but Canal alleges that every taxi or Uber charged to a shared corporate credit card was improper spending by Ms. Robinson.  In reality, Canal's policy was to pay for any taxi or Uber used by an employee for a work-related reason, and in the absence of a written policy or guidelines, Mr. De Niro testified that he left the specifics for such charges to Ms. Robinson's discretion.  But when bringing its claims, Canal did not evaluate the work Ms. Robinson was performing at the time of each charge and cannot dispute Ms. Robinson's testimony that all her charges were work-related.

- Canal alleges that every single charge on a shared corporate credit card for Paola's (a restaurant patronized by Mr. De Niro), Whole Foods, and Dean & Deluca was improper spending by Ms. Robinson.  But Canal's policy was to pay for its employees' meals while they were working or on call, and in the absence of a written policy or guidelines, Mr. De Niro left the specifics for such charges up to Ms. Robinson's discretion.  Moreover, the credit card was also

used to purchase items for Mr. De Niro himself from these establishments.  But when bringing its claims, Canal again did not evaluate the work that Ms. Robinson was performing at the time of each charge and cannot dispute Ms. Robinson's testimony that all her charges were work-related.

- Canal alleges that Ms. Robinson should not have been paid for any unused vacation days.  But Ms. Robinson routinely worked for Canal during trips and so-called "vacations," and Mr. De Niro agreed that she should be paid just as much if she worked for him on a trip or "vacation" as if she had been in New York.  Thus, Mr. De Niro authorized payments to her for her unused vacation days after discussing them with her each year.  Yet when bringing its claims, Canal again did not evaluate the work that Ms. Robinson performed on the dates at issue and cannot dispute that Ms. Robinson worked on each of the days for which she was paid.

- Canal accuses Ms. Robinson of "binge watching" Netflix during work hours.  But when bringing this claim, Canal simply added together all Netflix viewing, including on weekends and after hours, on a shared account available to Canal's entire office.  In reality, the vast majority of Netflix playback occurred outside of work hours.  In any event, Mr. De Niro has admitted that he did not care if Ms. Robinson played Netflix in the background while working, and Canal concedes it cannot prove that Ms. Robinson was not working at times when Netflix was accessed.

- Canal accuses Ms. Robinson of taking an unauthorized trip to Los Angeles in March 2018, but the evidence establishes that this was a work trip directed by Mr. De Niro for a totally different purpose than what Canal has claimed.

- Canal accuses Ms. Robinson of transferring SkyMiles without authorization in 2019 and in connection with the Los Angeles trip.[2]  But Mr. De Niro gave Ms. Robinson broad authorization to use Canal's SkyMiles at her discretion as a perk of her employment, and he

---

[2] Canal is no longer pursuing recovery as to any pre-2019 transfers of SkyMiles except as to the Los Angeles trip.

repeatedly took steps to facilitate her use of SkyMiles, including making her an account co-manager.  As Mr. De Niro testified, he told Ms. Robinson, "[G]o ahead," "You do what you think is right." and "[O]kay.  That sounds good."  Mr. De Niro also confirmed in his testimony that he had multiple discussions with Ms. Robinson in 2019 in which he approved trips for which she sought to use SkyMiles.  Canal cannot dispute that the SkyMiles transfers were authorized.

Third, even if there were any genuine dispute over authorization (there is not), summary judgment should be granted on all three of Canal's counterclaims because Canal ratified and acquiesced in all the transactions and activities at issue. The doctrines of ratification and acquiescence recognize the fundamental unfairness of allowing a party to pursue claims based on conduct it has knowingly accepted.  That is exactly what happened here: neither Mr. De Niro nor Canal's accountants raised any concerns whatsoever during Ms. Robinson's more than eleven (11) years of employment.  Canal cannot now come back and claim that her conduct was all improper.

- With respect to credit card charges (covering taxis, Ubers, Paola's, Whole Foods, Dean & Deluca, and the Los Angeles trip of March 2018), Canal's accountants reviewed, approved, and paid the credit card bills as they came in, considered the types of charges at issue to be "typical stuff," and classified them as business expenses in Canal's general ledger. Canal then claimed tax deductions in which it treated those charges as legitimate business expenses.

- With respect to vacation days, all "vacation day payback" requests were discussed with Mr. De Niro and then submitted to both Mr. De Niro and Canal's accountants.  Mr. De Niro was aware of Ms. Robinson's travels and had every opportunity to object to the payments or further inquire, but he never disputed the payments to Ms. Robinson and instead chose to approve them.

- With respect to SkyMiles, it was general knowledge at Canal that Ms. Robinson used Canal's SkyMiles, and any transfers were clearly visible on the same credit card bills that

Canal's accountants reviewed as they came in.  Canal's accountants never raised any concern about SkyMiles, and Mr. De Niro testified that he never told Ms. Robinson that she could not use SkyMiles for any work or personal travel, instead saying, "I was pretty, pretty okay with it."

In sum, Canal's accusations of wrongdoing are baseless and certainly do not present any genuine issue of material fact.  Given the extensive evidence that Canal and Mr. De Niro vested Ms. Robinson with broad authority to engage in all the transactions and activities at issue (and then continually ratified and acquiesced in them), Canal cannot manufacture a genuine dispute of fact that Ms. Robinson lacked authorization (required for conversion), engaged in misconduct (required for breach of fiduciary duty), or demonstrated substantial disloyalty permeating the employment relationship (required for breach of the duty of loyalty).

Thus, the Court should grant summary judgment to Plaintiff on all of Canal's counterclaims, or, in the alternative, streamline this action by granting partial summary judgment to Plaintiff as to all claims, transactions, and activities about which there is no genuine fact dispute.

## II.      STATEMENT OF MATERIAL FACTS

### A.      Overview of Ms. Robinson's Employment and Canal's Operating Procedures

For over eleven (11) years, Ms. Robinson worked for Robert De Niro, the world-famous actor, producer, and director, through Canal Productions, Inc., an entity wholly owned and run by Mr. De Niro (*compare* Dkt. No. 1 at ¶¶ 12, 14, *with* Dkt. No. 73 at ¶¶ 12, 14; *see* Ex. 1 at 29:1-11; Ex. 4 at 194:3-6).[3]  Ms. Robinson functioned as Mr. De Niro's "head assistant" or "point person," as he put it (Ex. 1 at 91:12-22), and her role was to ensure that whatever needed to be done in Mr. De Niro's life got done (Ex. 7 at 50:21-24, 51:8-12), including running an array of errands for him

---

[3] Unless otherwise stated, all exhibits cited to herein are exhibits to the accompanying Declaration of Alexandra Harwin, Esq. ("Harwin Decl."). "Robinson Decl." refers to the accompanying Declaration of Graham Chase Robinson, and "Schaitkin Decl." refers to the accompanying Declaration of Simon Schaitkin.

and Canal (Ex. 1 at 159:3-7, 97:12-98:19, 159:24-160:3, 161:3-8, 162:4-21, 167:16-24).

Mr. De Niro expected Ms. Robinson to be available "around the clock," and she delivered (Ex. 7 at 48:20-22; Ex. 1 at 88:15-21, 208:12-14). Mr. De Niro and those in his orbit repeatedly commended her for "always. . . get[ting] the job done" (Ex. 8 at 43:9-14); going "over and above" (Ex. 7 at 44:13-18); "set[ting] a great example of hard work" (Ex. 16 at ROBINSON00005067); and "being willing [to] drop everything no matter the time when needed" (*id*.).

As part of Ms. Robinson's job, Canal provided her with a Canal corporate American Express card (Ex. 9 at 135:10-13) and, at Mr. De Niro's direction, she was eventually made co-manager of that account (Ex. 4 at 180:13-17). Mr. De Niro described himself as "generous" with the expenses he paid for Ms. Robinson (Ex. 3 at 459:16-18), and Canal's standard policy was to pay for a broad array of employee expenses, including paying for employees' meals while they were working or on call and paying for any taxi or Uber that an employee used for a work-related reason (Ex. 4 at 340:6-13, 341:13-18; Ex. 3 at 568:25-569:10). Canal did not maintain any written policies setting parameters for employee spending, such as the use of corporate credit cards and petty cash (Ex. 1 at 29:12-15; Ex. 6 at 88:9-15; Ex. 4 at 343:25-344:16). Instead, Mr. De Niro generally authorized Ms. Robinson to make spending decisions based on her "common sense" (Ex. 2 at 277:8-21). By his own admission, Mr. De Niro did not "nitpick" Ms. Robinson's spending (Ex. 2 at 297:15-20) and left various expenditures "up to her" (*id*. at 275:23-276:5, 275:13-16).

Canal had external accountants who provided "checks and balances," meaning "if they sense something that is out of whack or improper, they'[d] draw [Mr. De Niro's] attention to it" (Ex. 3 at 490:12-23). The accountants were responsible for contemporaneously reviewing Canal's expenditures and paying Canal's bills, including all the credit card bills (Ex. 4 at 63:9-14, 65:2-10, 65:19-22). Before paying the bills, Canal's accountants would timely raise any questions that

arose about any particular expense (*id.* at 66:22-67:6).  But throughout Ms. Robinson's eleven (11) years of employment, Canal's accountants never once reported a concern to Mr. De Niro or anyone else about the transactions at issue in Canal's counterclaims (*id.* at 151:5-10, 150:9-16, 153:12-17, 171:18-25, 366:9-14).  In addition, on its annual tax returns, Canal treated charges at issue in the counterclaims as legitimate business expenses and claimed tax deductions for them (*id.* at 225:21-226:3, 228:7-13). Tellingly, Canal has never amended its tax returns to disclaim the tax deductions it received based on Ms. Robinson's charges (*id.* at 242:19-21, 243:11-23).

    **B.**    **Before Canal Asserted Claims Against Her, Ms. Robinson Repeatedly Engaged in Protected Activity**

During Ms. Robinson's employment, Mr. De Niro communicated in a sexist, hostile, and demeaning manner with Ms. Robinson based on her gender, including repeatedly calling her a "bitch" and "brat," joking to her about his Viagra prescription, and directing her to imagine him on the toilet (*see, e.g.*, Ex. 11 at 48:7-21; Ex. 1 at 75:16-18; Ex.12 at 36:19-37:2, 37:6-37:20, 31:8-24, 35:3-36:8).  In addition, during her last months at Canal, Mr. De Niro allowed his girlfriend, Tiffany Chen, to target Ms. Robinson based on gender.  Suspicious of Ms. Robinson as a female who worked closely with her boyfriend, Ms. Chen claimed baselessly to Mr. De Niro that Ms. Robinson "thinks she's your wife," "wants to be the 'lady of the house,'" and has "imaginary intimacy . . . with you" (Ex. 17 at CANAL_0048685).  Further, Ms. Chen repeatedly called Ms. Robinson a "bitch" (*see, e.g.*, Ex. 18 at CANAL_0048635; Ex. 10 at 244:9-16), including telling Mr. De Niro, "[t]his Bitch needs to get put in her fucking place" (Ex. 21 at CANAL_0034641) and promising, "I'm gonna fucking give this Bitch what she deserves" (Ex. 22 at CANAL_0047507).

Near the end of her employment at Canal, Ms. Robinson repeatedly complained about harassment.  Among her complaints, Ms. Robinson complained to Canal's long-time General Counsel, Tom Harvey, on March 7, 2019, that she was facing "down right harassment" (Ex. 27)

and on March 27, 2019, that she felt "constantly. . . harassed" (Ex. 28 at 2:19).  Instead of offering

help, Mr. Harvey told Ms. Robinson to "just ignore it" (*id.* at 2:4).  Ms. Robinson also reported to

Mr. De Niro directly that she was being harassed (Ex. 12 at 45:13-46:19, 48:5-12).

Ms. Robinson repeatedly reached out to Mr. De Niro to try to improve the work situation

by emailing him on March 27, 2019, and April 2, 2019 (Ex. 24 at ROBINSON00001347; Ex. 25),

but he did not provide any substantive response (Ex. 11 at 104:2-18; Ex. 26 at CANAL_0046685).

Then, on April 6, 2019, Ms. Robinson was suddenly removed from projects assigned to her, and

various Canal employees were directed not to communicate with her (Ex. 12 at 164:8-22, 170:22-

171:4); in addition, Canal took away an assistant who had reported to her (*id.* at 132:22-133:3).

With her job duties being taken away and Mr. De Niro not speaking to her, Ms. Robinson reached

her breaking point and had no choice but to involuntarily resign that day (Ex. 11 at 104:4-18).

After her employment ended, Ms. Robinson continued to assert her claims against Canal

and Mr. De Niro, including gender discrimination claims.  Among these complaints, on July 31,

2019, Ms. Robinson, through counsel, asserted claims of "sex discrimination, sexual stereotyping,

hostile work environment and retaliation" under applicable law (Ex. 36 at CANAL_0049394-5).

On August 1, 2019, Ms. Robinson, through counsel, complained about inappropriate "comments,

actions and duties assigned to Ms. Robinson . . . in the workplace" including his statements that,

"'women can have a baby whenever they want;' 'go get sperm from [her coworker] Mike Kaplan.

. . . ;' [and] 'you don't have kids so I don't need to pay you the same as [a male employee]'" (*id.*

at CANAL_0049393).  On August 13, 2019, Ms. Robinson, through counsel, complained about

"a completely sexist work environment sponsored and created by Mr. De Niro" and a "hostile

work environment, which also constitutes sexual discrimination, as a matter of law in New York"

(*id.* at CANAL_0049391-2).

### C.     Mr. De Niro Was Enraged by Ms. Robinson's Protected Activity, so Canal Initiated a Retaliatory Lawsuit against Her

Mr. De Niro was enraged by Ms. Robinson's protected activity.  After learning that she threatened legal action, Mr. De Niro texted, "Can you believe chase [Robinson]. As I said to Tom [Harvey]: who the fuck does she think she is?!?!" and "The balls, the nerve, the chutzpah, the sense of entitlement, how dare her!" (Ex. 33 at CANAL_0048629).  In his deposition, Mr. De Niro expressed anger at Ms. Robinson's protected activity, admitting he was "very angry" and "upset" that she asserted employment claims and threatened a lawsuit (Ex. 2 at 423:16-25, 419:7-12).  He described being "subjected to this kind of thing" as "a low point in my life" (Ex. 1 at 48:7-8).

So, Mr. De Niro went on the offensive against Ms. Robinson, issuing a directive to "go after her" and "file whatever" (Ex. 2 at 424:22-425:7).  Thus, just *days* after Ms. Robinson's complaint of August 13, 2019, about the "completely sexist work environment sponsored and created by Mr. De Niro" (*see* Ex. 36 at CANAL_0049391-2), Canal rushed to file a preemptive lawsuit against Ms. Robinson in New York Supreme Court on August 17, 2019 (Ex. 39).  In it, Canal accused Ms. Robinson of breach of fiduciary duty, breach of the duty of loyalty, conversion, and fraud (*id.* at ¶ 64-85).  Canal sought $6 million in damages (*id.* at Prayer for Relief), even though Mr. De Niro has admitted he did not believe that Ms. Robinson purportedly stole anything close to that amount (Ex. 2 at 429:18-430:23).  Canal's lawsuit generated extensive media coverage,[4] and Canal employees delighted in the negative press about Ms. Robinson (Ex. 41 at CANAL_0049480; Ex. 44 at CANAL_0047980-82; Ex. 45 at CANAL_0047795).

---

[4] *See, e.g.*, Yohana Desta, *Robert De Niro's Company Files $6 Million Suit Against Ex-V.P. Who Binged 55 Episodes of* Friends *on the Job*, VANITY FAIR (Aug. 20, 2019), https://www.vanityfair.com/hollywood/2019/08/robert-de-niro-lawsuit-friends-binge; Mike Cherico, *Robert DeNiro Suing Former Assistant for $6 Million After Wild "Friends" Binge*, FOX BUSINESS (Aug. 20, 2019), https://www.foxbusiness.com/media/robert-deniro-suing-assistant-6-million-dollars-friends-binge; Alfred Joyner, *Robert De Niro's Company Files $6 Million Lawsuit Against Former Employee who Binge-Watched 55 Episodes of 'Friends' in Four Days*, NEWSWEEK (Aug. 20, 2019), https://www.newsweek.com/robert-de-niro-6-million-lawsuit-chaserobinson-friends-netflix-1455182.

As part of their retaliation against Ms. Robinson, Defendants even attempted to have Ms. Robinson criminally prosecuted.  On or about September 16, 2019, Mr. De Niro and Mr. Harvey met with prosecutors from the Manhattan District Attorney's Office to convince them to bring charges against Ms. Robinson (Ex. 6 at 286:2-6).  After reviewing Canal's documents purportedly supporting its claims (*id.* at 290:5-16), and after interviewing Mr. De Niro, Mr. Harvey, and the other Canal employees who "investigated" Ms. Robinson (Ex. 5 at 405:25-407:3), the Manhattan District Attorney's Office declined to prosecute Ms. Robinson (*id.* at 411:5-412:6).  In explaining its decision not to prosecute, the Manhattan District Attorney's Office cited the fact that Mr. De Niro had authorized Ms. Robinson to engage in the transactions and activities at issue (*id.*).

### D.    Canal Has Admitted that its Claims Were Retaliatory and Groundless

A series of smoking gun text messages obtained in discovery confess that Canal's claims against Ms. Robinson were retaliatory and groundless.

Canal had tasked several of its employees with "investigating" Ms. Robinson, including long-time employee Michael Kaplan. In a text message discussing Canal's lawsuit, Mr. Kaplan explained, "**she was threatening to sue bob** [Mr. De Niro] **so they wanted to ruin her first**" (Ex. 41 at CANAL_0049481).[5]  In another text message, Mr. Kaplan recounted, "she was threatening to sue. . . so this was to[m']s [Tom Harvey's] plan to strike first" (Ex. 42 at CANAL_0049481). When asked about the millions of dollars in damages Canal was seeking, Mr. Kaplan confirmed, "**it's just a random number [] [t]o humiliate her**" (Ex. 42 at CANAL_0047781).

### E.    Canal's Baseless Allegations Against Ms. Robinson

### i.    Canal's Falsehoods About Its Investigation

Ms. Robinson subsequently filed this lawsuit and obtained a stay of Canal's retaliatory,

---

[5] All bolding in quoted material is added.

preemptive lawsuit in New York Supreme Court.  Then, Canal repurposed its retaliatory causes of action as counterclaims in this litigation, though it dropped its baseless $6 million demand (*compare* Ex. 39, *with* Dkt. No. 73 (omitting monetary demand)).[6]

Canal's counterclaims as pled are filled with falsehood after falsehood.  In its pleading, Canal indicated that it was Canal's accountants who identified purported wrongdoing by Ms. Robinson, stating that its "accountants initiated a review of various books and records" (Dkt. No. 73 at ¶ 155).  But discovery revealed that Canal's accountants did not initiate the investigation (Ex. 4 at 380:22-24), did not investigate the transactions at issue (*id.* at 404:20-408:16), did not evaluate whether the allegations in Canal's lawsuit were accurate (*id.* at 295:3-8), and "absolutely [did] not" conclude that Ms. Robinson had engaged in any wrongdoing (*id.* at 390:22-391:2).  To the contrary, the undisputed evidence establishes that throughout Ms. Robinson's employment, Canal's accountants contemporaneously reviewed all of the spending at issue (Ex. 4 at 63:9-14, 65:2-10, 65:19-22, 66:22-67:6), considered Ms. Robinson's charges to be legitimate business expenses, logged them as standard business expenses on Canal's general ledger (*id.* at 220:15-23, 248:17-23, 249:23-251:20; Dkt. No. 232 at 27:5-11; Dkt. No. 254 at 20:8-20), and claimed tax deductions for Canal based on them (Ex. 4 at 225:21-226:3, 228:7-13).

In reality, it was Canal's General Counsel, Tom Harvey, to whom Ms. Robinson had repeatedly complained of harassment, who initiated Canal's investigation into her (Ex. 4 at 380:22-24).  He directed long-time Canal employee Michael Kaplan to "spend 24/7 thinking of crazy chase [Robinson] shit and write it down" (Ex. 32 at CANAL_0047443).  Instead of bringing in Canal's accountants, a forensic accountant, or a professional investigator to investigate (Ex. 4 at 404:20-408:16; Ex. 6 at 51:24-52:20), Mr. Harvey relied on Mr. Kaplan and two other Canal

---

[6] Canal later abandoned various allegations (Ex. 57; Ex. 58 at No. 8(iii)(d)) and its entire fraud claim (Dkt. No. 268).

employees (Ex. 6 at 17:7-16, 55:8-56:10) who, by Mr. Kaplan's own characterization, were "just three idiots sitting in front of a computer" (Ex. 10 at 296:7-8). When tasked with investigating credit card charges, these employees did nothing more than add up the amount of money spent in entire categories of expenses without making any effort to ascertain what the charges were for and whether they were proper expenses (*id.* at Ex. 10 at 310:5-23, 313:23-315:2). Thus, shortly before filing Canal's claims against Ms. Robinson, Canal's General Counsel, Mr. Harvey, openly acknowledged that "he had 'literally no evidence'" to bring to court (Ex. 38 at CANAL_0052576).

ii.     **Allegations of Improper Credit Card Charges for Transportation (Taxis and Ubers) and Food (Paola's, Whole Foods, and Dean & Deluca)**

As Canal's Rule 30(b)(6) witness testified, Canal's policy was to pay for *any* taxi and Uber used by an employee for any work-related reason (Ex. 4 at 341:13-18), and Mr. De Niro testified that he was aware that Ms. Robinson *often* took taxis and Ubers in connection with her work (Ex. 2 at 280:20-281:1); this was to be expected since a major part of Ms. Robinson's job was running errands for Mr. De Niro and Canal (Ex. 1 at 159:3-7; *see also id.* at 97:12-98:19, 159:24-160:3, 161:3-8, 162:4-21, 167:16-24). In addition, Canal's Rule 30(b)(6) witness explained that Canal's policy was to pay for employees' meals while they were working or on call for Mr. De Niro (Ex. 4 at 340:6-13), something that Mr. De Niro considered to be "common sense" (Ex. 2 at 279:14-21). Further, Mr. De Niro acknowledged that Ms. Robinson would use the credit card in her name to pay for meals for *him* (*id.* at 331:5-8). Thus, employee meal and transportation charges were all "typical stuff" that appeared on Canal's credit cards (Ex. 4 at 105:13-22, 113:23-114:4), were logged as standard business expenses on Canal's general ledger (*id.* at 220:15-23, 248:17-23, 249:23-251:20; Dkt. No. 232 at 27:5-11; Dkt. No. 254 at 20:8-20), and were claimed on Canal's tax returns as deductions (Ex. 4 at 225:21-226:3).

Despite all this, Canal's counterclaims allege that *every single expense* that appeared on a

Canal corporate credit card for taxis, Ubers, Whole Foods, Dean & Deluca, and one of the restaurants Mr. De Niro patronized (Paola's) was improper personal spending by Ms. Robinson (*compare* Dkt. No. 73 at ¶¶ 190, 187-189, 182-184, *with* Schaitkin Decl. at ¶ 2(a)-(c)).  But the credit card at issue was used for Canal's entire office (Ex. 5 at 180:23-181:6, 179:19-180:13; *see also* Ex. 4 at 105:13-22; Ex. 10 at 203:18-24), and there is no evidence that Ms. Robinson placed all of the charges.  Moreover, Canal merely *added up* the *total* dollar amount of all charges made for taxis, Ubers, Dean & Deluca, Whole Foods, and Paola's without making any effort to determine whether the specific charges were improper (Ex. 10 at 310:5-23, 313:23-315:2).  Mr. De Niro has conceded that he would "need to review each individual charge in detail to ascertain whether the charge was proper or improper" (Ex. 2 at 341:23-342:7).  But this is something that he never did (*compare* Ex. 2 at 343:7-12, *with* Ex. 3 at 457:20-22, 470:19-24).  Instead, Canal simply treated every charge as improper (Ex. 6 at 118:10-17, 119:11-120:5, 120:10-121:13).

In sum, Ms. Robinson had broad authorization under Canal's policies to place charges on Canal's corporate credit card for taxis, Ubers, Dean & Deluca, Whole Foods, and Paola's.  These charges were all "typical stuff" that routinely appeared on Canal's corporate credit card and that Canal's accountants categorized contemporaneously as legitimate business expenses.  Canal did not evaluate the work that Ms. Robinson was performing at the time of each charge and has presented no evidence that these charges were improper personal spending by Ms. Robinson.

### iii.    Allegations of Improper Payments for Unused Vacation Days

As Canal's Rule 30(b)(6) witness confirmed, Canal had a policy of paying various employees for their unused vacation days (Ex. 4 at 352:8-11).  The specifics of this policy were not written down (*id.* at 371:24-372:4; Ex. 6 at 254:8-16), and Mr. De Niro did not spell out the circumstances when employees would be paid for unused vacation days (*id.* at 255:13-20).  But Mr. De Niro agreed that Ms. Robinson should be paid for days that she worked on vacation or trips

13

(Ex. 3 at 501:11-20, 506:7-16); indeed, for Mr. De Niro, the very concept of "vacation day payback" was that he would pay Ms. Robinson for days she had worked on vacation (Ex. 3 at 513:12-18). Thus, at the end of each year, the two of them would discuss Ms. Robinson's unused vacation days, he could ask whatever questions he had, and he authorized her to be paid for all the unused vacation days that she identified (*id.* at 514:19-24, 515:20-516:12, 517:5-9, 589:16-24).

As Canal well knew, Ms. Robinson could not take true "vacations"; Mr. De Niro expected her to work "around the clock" (Ex. 7 at 48:9-22), and he had the "absolute understanding" that she would still be on call and working for him even if she was out of town on a so-called "vacation" (Ex. 1 at 96:9-24). In fact, Mr. De Niro testified that he viewed himself as "accommodating" Ms. Robinson by letting her work when she was out of town (*id.* at 75:21-23; *see also id.* at 77:11-24, 95:8-21). Despite Ms. Robinson's longstanding practice of working for Mr. De Niro during her trips, Canal used emails that merely mentioned Ms. Robinson being on "flights" or "vacation" as purported evidence that she should not have been paid (*see, e.g.*, Ex. 49 at CANAL_0052806-08, CANAL_0052814-17). But Canal did not examine the (extensive) work that Ms. Robinson performed for Mr. De Niro during those trips (Ex. 6 at 228:13-229:9). In fact, documents show Ms. Robinson working on every single day (sometimes over 10 hours per day) for which she was paid for unused vacation and also working on dozens of additional holidays and weekend days when Canal's office was closed (*see* Robinson Decl. ¶ 3; Robinson Decl. Exs. A-D; Ex. 50-52).

In sum, Ms. Robinson was fully authorized to be paid for all the unused vacation days at issue. There is extensive evidence that Ms. Robinson worked on the days that Canal now claims she was on vacation, and Mr. De Niro agreed that she should be paid whenever she worked while she was on vacation or trips. Before Ms. Robinson engaged in protected activity, Mr. De Niro never disputed that Ms. Robinson had accurately reported her unused vacation days.

### iv.    Allegations of "Binge Watching" Netflix

Ms. Robinson was known for always being willing to drop everything for Mr. De Niro and for getting the job done.  Accordingly, Mr. De Niro testified that he did not care if she had Netflix playing in the background while she worked (Ex. 2 at 391:4-23).   Despite this, Canal's counterclaims accuse Ms. Robinson of "theft of time" by purportedly spending "astronomical amounts of time" binge-watching Netflix during work hours (Dkt. No. 73 at ¶¶ 201-211).

This allegation is baseless.  In its counterclaims, Canal lumped together *all* of the Netflix viewing that occurred *at any time of day* on a shared Netflix account *available to the entire office* (Ex. 12 at 225:9-21).  Canal had no evidence that the many Netflix videos it accused Ms. Robinson of watching were actually accessed *during work hours* (Ex. 5 at 293:22-294:5), and it knew that she routinely put on Netflix at night when she went to sleep (Ex. 47 at CANAL_0049182).  In reality, records show that the vast majority of Netflix playback occurred outside of Canal's business hours (Schaitkin Decl. at ¶ 4(i)).  Moreover, Canal now concedes that it does not assert "that [Ms. Robinson] was sitting there staring at a screen doing nothing else" (Ex. 5 at 285:9-13), that it cannot prove what Ms. Robinson was doing while the Netflix account was accessed (*id.* at 285:13-15), and that Ms. Robinson "could have always been working" (Ex. 6 at 271:6-10).

In sum, Canal's allegation that Ms. Robinson engaged in "theft of time" by "binge watching" Netflix during work hours is meritless.  Mr. De Niro testified that he did not care if Ms. Robinson watched TV while she was working, timestamped records show the vast majority of Netflix playback occurred outside of work hours, and Canal has conceded that regardless of whether Netflix was on, Ms. Robinson "could have always been working."

### v.    Allegations Concerning Los Angeles Trip

Canal's counterclaims allege that Ms. Robinson initiated a trip to Los Angeles in March 2018 under the false pretense that she would be delivering books autographed by Mr. De Niro

based on his film "Taxi Driver" (Dkt. No. 73 at ¶¶ 171-181).  But at deposition, Mr. De Niro was

unable to back up these allegations; he could not recall any specifics from his discussions with Ms.

Robinson about the trip (Ex. 3 at 592:6-14).  In reality, the trip was directed by Mr. De Niro and

for a completely different purpose.  Mr. De Niro sent Ms. Robinson to Los Angeles to scout hotels

for his former partner, whom he was encouraging to undergo medical treatment there (Robinson

Decl. at ¶ 4; Ex. 7 at 99:12-100:5).  Since Ms. Robinson would already be in Los Angeles on this

trip working for Mr. De Niro, she also suggested, as an add-on to the trip, that she could accept

delivery of "Taxi Driver" books that were being delivered to Los Angeles for Mr. De Niro

(Robinson Decl. at ¶ 4; Ex. 7 at 100:6-17).  After she arrived in Los Angeles, however, Ms.

Robinson had to shorten her stay due to an impending snowstorm in New York, and Mr. De Niro

approved her returning early to New York before the books arrived (Robinson Decl. at ¶ 4).

In sum, the evidence establishes that the Los Angeles trip of March 2018 was directed by

Mr. De Niro, and Canal's counterclaims misrepresent the origins and purpose of the trip.

### vi.    Allegations Concerning SkyMiles

In this litigation, Canal has abandoned most of its accusations as to Delta SkyMiles and is

pursuing recovery only as to SkyMiles transfers made in 2019 (as well as SkyMiles transfers

relating to the March 2018 trip to Los Angeles discussed above) (*compare* Dkt. No. 73 at ¶¶ 191-

194, *with* Ex. 57).  This is because Canal cannot dispute that Mr. De Niro authorized Ms. Robinson

to transfer all those earlier SkyMiles.  The remaining transfers were also fully authorized, just like

the ones that Canal is no longer contesting.

By way of background, Canal's credit cards generated Delta SkyMiles that could be used

for travel (Ex. 11 at 288:17-23). But Mr. De Niro – who preferred to fly on private jets (Ex. 3 at

467:20-24) – rarely flew Delta (*id.* at 468:24-469:4, 468:12-17), generally did not use SkyMiles

(Ex. 2 at 358:17-23), and did not care about SkyMiles (Ex. 7 at 111:20-22).  Thus, for years, Mr.

De Niro authorized Ms. Robinson to use Canal's SkyMiles for her own travel, and it was generally known at Canal that Ms. Robinson was permitted to use Canal's SkyMiles as a "perk" of her employment (Ex. 10 at 225:12-226:12; Ex. 53 at 2:2-8; *see also* Ex. 7 at 107:3-20, 250:8-17).

Mr. De Niro confirmed in testimony that he continually gave Ms. Robinson broad authorization to use Canal's SkyMiles.  As he testified: (i) "She said 'Can I just tack some miles on for me when I need them?' I said 'Yes, well, whatever you need,'" (Ex. 2 at 366:8-11); (ii) "She told me I would like to put some of them [*i.e.*, SkyMiles] on to mine [*i.e.*, her account]. She said I need them. I said okay. I trust you. You do what you think is right'. That's how I left it." (*id.* at 386:8-19); (iii) "[S]he said 'Look, there's a lot of sky miles' . . . ['] that I should put into my thing [*i.e.*, account] in case I need it and so on.['] And I said, 'Well, if you think that's what you should do, go ahead.'" (Ex. 3 at 589:1-7); and (iv) "[S]he brought it up to me to use sky miles and I said, 'Okay. That sounds good.'" (Ex. 3 at 588:7-12).   As Mr. De Niro testified, he never communicated to Ms. Robinson any limits on where she could travel on the SkyMiles or how many SkyMiles she could use, saying that was "not for me to do," and "I don't know a million miles from two million miles" (Ex. 2 at 380:22-381:4, 379:21-380:3).

Beyond approving Ms. Robinson's use of SkyMiles, Mr. De Niro repeatedly took steps to ensure that she could transfer SkyMiles for her use.  In early 2018, Mr. De Niro directed his accountant to make her an account co-manager for Canal's American Express account, which gave her "full authority to do whatever she wanted" with SkyMiles (Ex. 4 at 180:13-17, 181:16-24, 160:22-161:9).  When problems arose with the American Express account that prevented Ms. Robinson from transferring SkyMiles, Mr. De Niro instructed Canal's accountant to resolve this issue so that she could resume transfers (Ex. 55 at CANAL_0001433; Robinson Decl. at ¶ 5).

In sum, Ms. Robinson's transferring of SkyMiles was continually authorized and facilitated

by Mr. De Niro during her employment.  Mr. De Niro repeatedly approved Ms. Robinson's broad authority to use SkyMiles at her discretion, without communicating any limitations to Ms. Robinson on where she could travel on SkyMiles or how many SkyMiles she could use.

### vii.    Abandoned Allegations Regarding Flowers and Petty Cash

Originally, Canal's counterclaims accused Ms. Robinson of improperly charging Canal for flower expenses (Dkt. No. 73 at ¶¶ 185-186). But as Mr. De Niro confirmed at deposition, Ms. Robinson's job at Canal involved purchasing flowers and plants on his behalf (Ex. 1 at 158:16-18, 162:10-18).  Canal is no longer seeking reimbursement for any flower expenses (Ex. 57).

Canal also initially alleged that Ms. Robinson had "improperly. . . 'reimbursed' herself from Canal's petty cash account for personal and luxury items" (Dkt. No. 73 at ¶¶ 125, 169-170). In reality, the charges at issue were standard business expenses, such as iPhones used for work (Ex. 4 at 345:11-21), or were otherwise approved.   Again, Canal is no longer seeking reimbursement for any petty cash (Ex. 58 at 8(iii)(d)).[7]

## III.    LEGAL STANDARD

### A.    Summary Judgment

The standard for summary judgment is well established. As this Court has explained:

> Summary judgment under Fed. R. Civ. P. 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

---

[7] The Court should grant summary judgment as to Canal's allegations concerning flowers and petty cash.  Summary judgment is routinely granted on claims or allegations that a party has abandoned.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (affirming grant of summary judgment on claims found to be abandoned); *Dardashtian v. Gitman*, 17-CV-4327 (LLS) (RWL), 2021 WL 746133, at *33 (S.D.N.Y. Feb. 16, 2021) (granting summary judgment on claim deemed abandoned); *Hernandez v. Cnty. of Nassau*, 17-CV-1646, 2022 WL 513929, at *18 (E.D.N.Y. Feb. 20, 2022) (dismissing plaintiff's claim on summary judgment as abandoned).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983).

*Saborit v. Harlem Hosp. Ctr. Auxiliary, Inc.*, 19-cv-4686 (LJL), 2021 WL 1063241, at *2 (S.D.N.Y. Mar. 19, 2021).

Critically, the nonmovant must do more than just identify a factual dispute and supportive evidence: it must "come forward with **persuasive evidence** that [its] claim is not 'implausible.'" *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988); *see also Anderson*, 477 U.S. 249-50 (summary judgment may be granted "[i]f the evidence is merely colorable, or is not significantly probative") (citation omitted).   "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if [she] can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Panagatos v. Petsmart, Inc.*, No. 18-CV-5032 (SJF) (AKT), 2020 WL 7343409, at *3 (E.D.N.Y. Dec. 14, 2020) (quoting *Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 13 (2d Cir. 2008)).

The Court may also enter partial summary judgment as to particular claims and issues.

Courts may grant partial summary judgment on any "part of each claim or defense" on which there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a).  Further, "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . .  that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).  Partial summary judgment can serve to "promote efficiency and narrow the scope of a trial to the issues that are reasonably disputed."  *In re Refco Inc. Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12191891, at *3 (S.D.N.Y. Mar. 11, 2013); *Schanker & Hochberg*, *P.C. v. Berkley Assurance Co.*, 2:20-cv-5361 (DRH)(ARL), 2022 WL 657540, at *12 (E.D.N.Y. Mar. 4, 2022) (same).

### B.      Key Elements of Canal's Counterclaims

After withdrawing its fraud claim (Dkt. No. 268), Canal continues to pursue three counterclaims against Ms. Robinson.  The key components of each claim are set forth here.

#### i.      Breach of Fiduciary Duty

Canal's first counterclaim is for breach of fiduciary duty (Dkt. No. 73 at ¶¶ 212-216). Under New York law, such a claim requires proof of: "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (quoting *U.S. Fire Ins. Co. v. Raia*, 942 N.Y.S.2d 543, 545 (2d Dep't 2012)).

#### ii.      Breach of the Duty of Loyalty (or "Faithless Servant" Claim)

Canal's second counterclaim is for breach of the duty of loyalty under New York's faithless servant doctrine (Dkt. No. 73 at ¶¶ 217-224).  This is a sparingly applied doctrine that provides for the disgorgement of compensation from "servants" who were disloyal in performing their fiduciary duties.   "While the phrasing of the rule may imply a broad proposition, courts apply the rule relatively narrowly." *Linder v. Innovative Com. Sys. LLC*, No. 105528/2010, 2013 WL 5663173,

at *5 (Sup. Ct. N.Y. Cty. Oct. 16, 2013), *aff'd*, 8 N.Y.S.3d 191 (1st Dep't 2015).

Because "[t]he remedies of the faithless servant doctrine are drastic," the doctrine is appropriate only in instances of serious misconduct. *Sanders v. Madison Square Garden, L.P.*, No. 06 CIV 589(GEL), 2007 WL 1933933, at *6 (S.D.N.Y. July 2, 2007). While New York law is unsettled on the liability standard for these claims, the majority of courts, including the Second Circuit in the recent *Yukos* decision, have applied what is referred to as the *Turner* standard: "[a] disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness . . . substantially violates the contract of service.'" *Yukos Cap. S.A.R.L.*, 977 F.3d at 237 (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 201 (2d Cir. 2003)) (citing *Turner v. Kouwenhoven*, 100 N.Y. 115, 120 (1885)); *see also Yukos Cap. S.A.R.L.*, 977 F.3d at 238 (upholding jury instructions based on the *Turner* standard, observing that "numerous New York courts have relied on the *Turner* standard in recent years" and citing *G.K. Alan Assoc. v. Lazzari*, 840 N.Y.S.2d 378, 386 (2d Dep't 2007); *Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, No. 007536/2005, 2010 WL 669241, at *3 (Sup. Ct. Nassau Cnty. Feb. 16, 2010); *Sanders*, 2007 WL 1933933, at *3; *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009); and *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 466 (S.D.N.Y. 2008)).

Under the *Turner* standard, the disloyalty must "permeate[] the employee's service in its most material and substantial part," and there is no claim "where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Phansalkar*, 344 F.3d 201-202 (quoting *Abramson v. Dry Goods Refolding Co.*, 166 N.Y.S. 771, 773 (1st Dep't 1917)).

### iii.   Conversion

Canal's last remaining counterclaim is for conversion (Dkt. No. 73 at ¶¶ 225-29). Conversion occurs when a person "without authority, intentionally exercises control over the property of another person and thereby interferes with the other person's right of possession."

New York Pattern Jury Instructions 3:10.  For conversion, Canal must prove that Ms. Robinson held "unauthorized dominion over the thing in question."  *Messiah's Covenant Cmty. Church v. Weinbaum*, 905 N.Y.S.2d 209, 212 (2d Dep't 2010).  "Under New York law, 'actual consent or acquiescence' is a complete defense to a claim of conversion."  *In re Scott*, 572 B.R. 492, 527 (Bankr. S.D.N.Y. 2017) (citation omitted).

IV.     **ARGUMENT**

A.     **Canal's Twin "Breach of Duty" Counterclaims Should be Dismissed, as These Causes of Action Do Not Fit the Conduct Alleged and Are Duplicative**

i.     **Canal's Breach of Fiduciary Duty and Faithless Servant Counterclaims Fail Because These Claims Are Not Actionable Based on the Types of Conduct Alleged in this Case**

The Court should dismiss Canal's breach of fiduciary duty and faithless servant claims as a matter of law because these torts concern types of misconduct that Canal does not allege.

As for Canal's breach of the duty of loyalty or faithless servant claim, "[t]he duty of loyalty has been limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks."  *Stefanovic v. Old Heidelberg Corp.*, No. 18-CV-2093-LTS-JEW, 2022 WL 3928370, at *7 (S.D.N.Y. Aug. 31, 2022) (quoting *Grewal v. Cuneo*, No. 13-CV-6836(RA), 2016 WL 308803, at *7 (S.D.N.Y. Jan. 25, 2016)).  "[M]isuse of the employer's resources **to compete** with the employer is generally required."  *Ebel v. G/O Media, Inc.*, No. 20 CIV. 7483, 2021 WL 2037867, at *5 (S.D.N.Y. May 21, 2021) (quoting *Cerciello v. Admiral Ins. Brokerage Corp.*, 936 N.Y.S.2d 224, 226 (2d Dep't 2011)).

Thus, a broad array of conduct, such as alleged credit card fraud and theft from an employer, does not raise faithless servant claims.  *See Torres*, 628 F. Supp. 2d at 470 (rejecting claim based on credit card fraud); *Doe v. Solera Cap. LLC*, 18 CIV. 1769(ER), 2019 WL 1437520,

at *10 (S.D.N.Y. Mar. 31, 2019) (rejecting claim based on "garden-variety, petty pilfering"); *Stefanovic*, 2022 WL 3928370 at *7 (rejecting claim based on "petty pilfering"); *see also Sanders*, 2007 WL 1933933 (S.D.N.Y. July 2, 2007) (rejecting claim based on employee committing tax fraud, or alternatively, secretly operating an unauthorized business); *Linder*, 2013 WL 5663173 (rejecting claim based on employee failing to pursue sales); *Leary v. Al-Mubaraki*, No. 18-CV-0048-LTS-HBP, 2019 WL 4805849, at *4 (S.D.N.Y. Sept. 30, 2019) (rejecting claim based on on-the-job consumption of alcohol and improper use of company email and confidential information); *Grewal* 2016 WL 308803, at *8 (rejecting claim based on, *inter alia*, an attorney representing parties without firm authorization, disparaging members of the firm, and lying). Canal's allegations against Ms. Robinson are akin to those that courts hold do not raise faithless servant claims – and are fundamentally dissimilar from those in cases where the doctrine is applied.

As for Canal's breach of fiduciary duty claim, such claims in the employment context also characteristically involve competition with the employer or similar self-dealing. *See, e.g.*, *Don Buchwald & Assocs. v Rich*, 723 N.Y.S.2d 8, 9 (1st Dep't 2001) (diverting assets to a secretly created competitive organization); *CBS Corp. v Dumsday*, 702 N.Y.S. 248, 250 (1st Dep't 2000) (disclosing confidential information to a competitor who uses the information to divert business to itself); *Gomez v Bicknell*, 756 N.Y.S.2d 209, 213 (2d Dep't 2002) (diverting a prospective client); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326 at 354 (S.D.N.Y. 2018) (using plaintiff's "proprietary . . . information to pitch current and prospective . . . clients about whom they had confidential information from [plaintiff]").

Thus, Canal's allegations against Ms. Robinson – which are all essentially allegations of theft – bear none of the hallmarks of traditional claims for breach of fiduciary duty or breach of the duty of loyalty ("faithless servant"). Accordingly, those counterclaims should be dismissed.

ii.     Canal's "Breach of Duty" Counterclaims Should Be Dismissed Because They
        Are Wholly Duplicative of Its Conversion Claim

The Court should also dismiss Canal's claims for breach of the duty of loyalty and breach of fiduciary duty because they are wholly duplicative of its claim for conversion.  "A court may dismiss a claim as duplicative if relying on the same alleged acts, the claim simply seeks the same damages or other relief already claimed in a companion cause of action."  *Supreme Showroom, Inc. v. Branded Apparel Grp.*, 16 Civ. 5211(PAE), 2018 WL 3148357, at *12 n.14 (S.D.N.Y. June 27, 2018) (quotation and internal quotation marks omitted).  The inquiry looks to the "essence" of the claim.  *See Hellman v. Hoenig & Co.*, 244 A.D.2d 529, 530 (2d Dep't 1997) (instructing courts to "look to the essence of the claim" in determining whether to dismiss duplicative claims).

Here, Canal has taken the same course of alleged conduct and pled three overlapping claims. As set forth in its Amended Answer, the gravamen of Canal's counterclaims is that Ms. Robinson stole from Canal.  Canal's core accusation for *all* of its counterclaims is that she "misappropriate[d] her employer's funds and property for her personal gain."  Dkt. No. 73 at ¶ 124; *see also id.* at ¶ 125 (summarizing Canal's allegations).  The facts and allegations that Canal relies on in support of all three claims are identical.  Each of the counterclaims incorporates by reference all of Canal's allegations (*id.* at ¶¶ 212, 217, 225), and the counterclaims all refer generally to all of "Ms. Robinson's aforesaid conduct" or to all of "Ms. Robinson's acts" (*id.* at ¶¶ 215, 221, 227).

Canal also seeks the same relief on each counterclaim.  *See id.* at ¶¶ 216, 224, 229 (all seeking damages for financial loss, loss of good will and reputation, compensatory and special damages).  While at the outset of litigation Canal sought an additional category of damages for its faithless servant claim – disgorgement of Ms. Robinson's compensation (*id.* at ¶ 224) – Canal has since disavowed this relief.  When asked at deposition whether Ms. Robinson should be ordered

to pay back any of the salary or bonuses paid to her, Canal's sole owner Mr. De Niro made clear that he is not seeking to recoup Ms. Robinson's pay (Ex. 2 at 431:24-432:4; Ex. 3 at 587:24-588:4).

Thus, assuming *arguendo* that Canal's claims merited any relief at all, "the legal remedy for conversion would [afford Canal] full and complete relief." *Gold Sun Shipping Ltd. v. Ionian Transport Inc.*, 666 N.Y.S.2d 677, 678 (2d Dep't 1997) (affirming grant of summary judgment dismissing breach of fiduciary duty claim as duplicative of claim for conversion where action "in reality[] sounded in conversion"). Thus, this Court should dismiss Canal's counterclaims for breach of fiduciary duty and breach of the duty of loyalty as duplicative of Canal's conversion counterclaim. *See Kapernekas v. Brandhorst*, 638 F.Supp.2d 426, 428-29 (S.D.N.Y. 2009) (on summary judgment, claims of breach of fiduciary duty dismissed among others, where duplicative of claims of conversion and replevin); *Samuels v. Greenberg*, No. 14-CV-04401 (DLI)(VMS), 2015 WL 5657565, at *8 (E.D.N.Y. Sept. 23, 2015) ("Insofar as the gravamen of Plaintiffs' claim for breach of fiduciary duty is that Defendants violated a duty by wrongfully converting the [allegedly stolen item], that claim actually sounds in conversion or replevin.").

### iii.    Canal's "Breach of Duty" Counterclaims are Duplicative of Each Other

Summary judgment should also be granted because Canal's twin "breach of duty" claims are duplicative of one another. The Second Circuit has observed that many New York courts "do not . . . distinguish" between fiduciary duty and faithless servant claims, and instead treat them as "essentially the same." *Yukos Cap. S.A.R.L.*, 977 F.3d at 242; *see also Ebel*, 2021 WL 2037867, at *4 (treating claim for "breach of fiduciary duty of loyalty/faithless servant" as a single claim for breach of the duty of loyalty) (quotation omitted); *Stefanovic*, 2022 WL 3928370, at *7 (referring to a claim for "breach of fiduciary duty under New York's faithless servant doctrine"); *Supreme Showroom, Inc.*, 2018 WL 3148357, at *11 (explaining that "faithless servant defense and breach of fiduciary duty counterclaim are both premised on a fiduciary duty of loyalty . . . .");

*City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728 (3d Dep't 2016) (explaining that plaintiff had brought an "action sounding in breach of fiduciary duty seeking to recover all compensation paid to defendant . . . [as] damages under the faithless servant doctrine.").

Here, Canal's claim under the faithless servant doctrine is wholly duplicative of its claim for breach of fiduciary duty. Again, Canal relies on all the same facts and allegations in support of both claims. *See* Dkt. No. 73 at ¶¶ 212, 215, 217, 221 (incorporating by reference all previous allegations in the counterclaims and referring generally to Ms. Robinson's "aforesaid conduct"). Moreover, Canal is seeking the same remedy for both claims, since Canal is no longer seeking disgorgement of Ms. Robinson's compensation under the faithless servant doctrine; as noted above, Canal's sole owner Mr. De Niro made clear at deposition that he is not seeking to recoup Ms. Robinson's pay (Ex. 2 at 431:24-432:4; Ex. 3 at 587:24-588:4). The remaining damages sought are identical for both claims. *See* Dkt. No. 73. at ¶¶ 216, 224 (seeking damages for financial loss, loss of good will and reputation, compensatory and special damages).

Accordingly, nothing remains to distinguish the claims, and Canal's breach of the duty of loyalty claim under the faithless servant doctrine should therefore be dismissed as duplicative of Canal's claim for breach of fiduciary duty. *See Nicholsen v. Feeding Tree Style, Inc.*, No. 12 Civ. 6236(JPO), 2014 WL 476355, at *4 (S.D.N.Y. Feb. 6, 2014) (dismissing claim for breach of the duty of loyalty as duplicative of claim for breach of fiduciary duty); *Babbitt v. Koeppel Nissan, Inc.*, 18-CV-5242(NGG) (CLP), 2020 WL 3183895, at *5 (E.D.N.Y. June 15, 2020) (same).[8]

---

[8] In her Order on Canal's Motion for Leave to Amend Its Answer, Judge Parker declined to hold that Canal's claims for breach of fiduciary duty and faithless servant liability were duplicative based on the conclusion that "Defendants seek additional, and different, relief pursuant to the faithless servant doctrine in the form of 'the return of all wages, bonuses and other compensation paid to Plaintiff.'" Dkt. No. 72 at 9. Since then, however, Canal, through its sole owner Mr. De Niro's testimony, has admitted that it does not seek the return of Ms. Robinson's pay, as described above. Thus, Canal is no longer "claiming separate remedies," and the claims are now wholly duplicative. *See id.*

**B.** **Regardless of How Canal's Counterclaims Are Titled, Summary Judgment Must Be Granted for Plaintiff on All Three Counterclaims, Because the Undisputed Facts Establish that Defendants Authorized and Consented to the Alleged Transactions and Activities**

Where one party *authorizes* another party to engage in a certain act and that party does so, it is axiomatic that no claim can lie for conversion, breach of fiduciary duty, or breach of the duty of loyalty.  Under New York law, consent is a "complete defense."  *Scott*, 572 B.R. at 527.  *See, e.g.*, *B&C Realty, Co. v. 159 Emmut Props. LLC*, 966 N.Y.S.2d 402, 405-06 (1st Dep't 2013) (dismissing conversion claim where complaint "tacitly concedes that possession [of the allegedly converted property] was authorized"); *87 Mezz Member LLC v. German Am. Capital Corp.*, 81 N.Y.S.3d 1, 2 (1st Dep't 2018) (affirming dismissal of conversion claim where possession was "not 'unauthorized'") (citation omitted); *Perrone v. Amato*, 2010 WL 11629624, at *16 (E.D.N.Y. Aug. 30, 2010) (noting that defendant "could defend against" the claim of a breach of fiduciary duty "by demonstrating that [she was] authorized" to engage in the conduct in question); *Skokan v. Peredo*, 58 N.Y.S.3d 110, 111 (2d Dep't 2017) (noting that a claim of breach of fiduciary duty can be defeated by evidence that "plaintiff consented" to the disputed actions); *In re Refco Inc. Sec. Litig.*, 2012 WL 996910, at *11 n.12 (S.D.N.Y. Jan. 17, 2012) (noting that claims of breach of fiduciary duty and breach of the duty of loyalty can be defeated by a showing of authorization); *Salus Cap. Partners, LLC v. Moser*, 289 F.Supp.3d 468, 474 n.1 (S.D.N.Y. 2018) (noting approvingly that arbitrator did not order disgorgement on claim for breach of the duty of loyalty where the company's "CFO had approved the transaction").

It is the claimant's burden to prove that the transactions and activities at issue were unauthorized, and merely presenting a tabulation of charges will not suffice.  *See, e.g.*, *Baldeo v. Majeed*, 55 N.Y.S.3d 340, 344-45 (2d Dep't 2017) (granting summary judgment against employer who alleged that a former employee had stolen from the company, holding that "[t]he purported

27

financial reports submitted by the plaintiffs failed to raise a triable issue of fact with respect to conversion, as the documents do not indicate to whom disbursements were made, or for what purposes" and failed to dispute employee's uncontroverted affidavit that he "never engaged in any unauthorized withdrawals or disbursements."); *In re Wolfson*, 152 B.R. 830, 836 (S.D.N.Y. 1993) (granting summary judgment and rejecting the non-movant's conclusory claim that certain items had been stolen, where the non-movant failed provide "specifics with respect to the [allegedly stolen items]" or "make any effort to itemize or describe the [things] which [the alleged thief] took" and simply claimed that the alleged thief "stole everything"); *see Robin v. Robin*, No. 02 C 8181, 2004 WL 170318, at *8, *15 (N.D. Ill. Jan. 21, 2004) *report and recommendation adopted*, 2004 WL 1381131 (N.D. Ill. May 7, 2004) (where general authority had been granted and the non-movant had no evidence that he "carve[d] out an exception" to that authority, non-movant failed to meet his burden to rebut the presumption that his agent had the authority at issue); *Band v. First Bankcard Ctr.*, 644 So. 2d 211, 218 (La. Ct. App. 1994), *writ granted in part and remanded on other grounds*, 650 So. 2d 738 (La. 1995) (holding that "[t]here is no authentic evidence to support [the] claims . . . that any specific amount charged on the corporate account was unauthorized. The testimony and the markings on the statements are at times contradictory. Charges . . . , for example, were deemed authorized in the earlier months as office expenses, but are marked unauthorized and fraudulent in later months, without a supporting explanation[.])"

In a typical case of conversion, breach of fiduciary duty, or breach of the duty of loyalty, there is no serious dispute that the claimed transactions were unauthorized, such as when a credit card is stolen or trade secrets are divulged. But here, as detailed herein, Ms. Robinson was given broad authority and substantial discretion to engage in all of the transactions and activities that Canal now challenges. On these facts, Canal's counterclaims cannot survive summary judgment.

28

### i.       Credit Card Charges for Taxis and Ubers Were Authorized

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to taxis or Ubers.  Canal's Rule 30(b)(6) testimony establishes that Canal's policy was to pay for any taxi and Uber used by an employee for a work-related reason (Ex. 4 at 341:13-18).  Thus, Ms. Robinson was authorized to charge Canal for any taxi or Uber she needed to take for any work-related reason (Ex. 5 at 224:6-15).  Further, Mr. De Niro left it "up to her" to determine the circumstances when Canal would be charged for a taxi or Uber (Ex. 2 at 275:23-276:5), and Mr. De Niro did not "nitpick" when it came to these charges (*id.* at 297:8-20).  Ms. Robinson has confirmed under oath that all of the credit card charges she placed for taxis or Ubers were work-related and therefore authorized (Robinson Decl. at ¶ 2; *see also* Ex. 11 at 288:5-12).

Given Canal's policy permitting broad use of taxis and Ubers for work-related transportation and the discretion that Mr. De Niro afforded to Ms. Robinson concerning these charges, Canal cannot demonstrate a genuine issue of material fact concerning taxis or Ubers.  Canal merely added up *every single* taxi and Uber charge that appeared on a shared Canal credit card and summarily treated all the charges as improper spending by Ms. Robinson (Ex. 10 at 310:5-13; Ex. 6 at 118:10-17; Ex. 5 at 180:23-181:6; *compare* Dkt. No. 73 at ¶ 190, *with* Schaitkin Decl. at ¶ 2(c)).  Canal made no effort to determine whether the credit card charges for taxis or Ubers were actually improper (Ex. 10 at 310:5-13).  Canal did not cross-check each taxi or Uber charge to determine whether Ms. Robinson was performing work for Canal or Mr. De Niro at the time of the charges; in fact, Canal did not review the times when each taxi or Uber was taken or review pick-up and drop-off locations of each Uber (Ex. 6 at 129:25-130:9, 131:25-132:8, 134:3-8).

Thus, Canal has not identified evidence that the taxi and Uber charges were unauthorized spending by Ms. Robinson.  This is insufficient to create a genuine dispute of material fact.

ii.     **Credit Card Charges for Paola's, Whole Foods, and Dean & Deluca Were Authorized**

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to charges at Paola's (a restaurant Mr. De Niro patronized), Whole Foods, and Dean & Deluca. Canal's Rule 30(b)(6) testimony establishes that Canal's policy was to pay for employees' meals if they were working or on call for Mr. De Niro (Ex. 4 at 340:6-13).  Mr. De Niro left it "up to Chase [Robinson] and common sense" to determine what meal charges were appropriate (Ex. 2 at 275:13-16).  In addition, Ms. Robinson used the Canal credit card to make purchases *for Mr. De Niro* from Paola's and Whole Foods (*id.* at 331:5-14, 334:16-19).  Ms. Robinson has confirmed in testimony that all credit card charges she placed for Paola's (the restaurant Mr. De Niro patronized), Whole Foods, and Dean & Deluca were authorized (Ex. 12 at 238:2-8).

Given Canal's policy permitting charges for work-related meals, Mr. De Niro's admissions that Ms. Robinson purchased items for him at these establishments, and the discretion that Mr. De Niro afforded to Ms. Robinson concerning these charges, Canal cannot carry its burden of showing that there is a genuine issue of material fact as to charges at Paola's, Whole Foods, or Dean & Deluca.  Canal merely added up *every single* charge for Paola's, Whole Foods, or Dean & Deluca that appeared on a shared Canal credit card and summarily treated them all as improper spending by Ms. Robinson (Ex. 10 at 310:14-23, 313:23-315:2; Ex. 6 at 120:24-121:3; Ex. 5 at 180:23-181:6; *compare* Dkt. No. 73 at ¶¶ 190, 187-189, 182-184, *with* Schaitkin Decl. at ¶ 2(a)-(b)).  Canal made no effort to determine whether these charges were actually improper (Ex. 10 at 310:14-23, 312:3-12, 314:18-315:2), such as reviewing when items were charged, what was purchased, and what work Ms. Robinson was performing at the time of the charges (Ex. 6 at 154:3-17, 149:12-150:22, 161:5-16, 170:21-171:6; Ex. 5 at 199:22-200:10).

Once again, Canal has not identified evidence that the charges were unauthorized spending

30

by Ms. Robinson.  Again, this is insufficient to create a genuine dispute of material fact.

### iii.  Ms. Robinson Was Properly Paid for Unused Vacation Days

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to payments Ms. Robinson received for unused vacation days.  Canal's Rule 30(b)(6) testimony establishes that Canal had a policy of paying certain employees, including Ms. Robinson, for their unused vacation days (Ex. 4 at 352:8-11), and if an employee was working remotely during a trip, she was considered to be working, not on vacation (Ex. 6 at 243:16-18, 233:22-234:3).  Mr. De Niro agreed that if Ms. Robinson worked while she was on vacation or on a trip, he would pay her just as much as if she had been working in New York (Ex. 3 at 501:11-20, 506:7-16).  Indeed, as Mr. De Niro testified, the very concept of "vacation day payback" was that he would pay Ms. Robinson for days she had worked on vacation (Ex. 3 at 513:12-18).

Even when Ms. Robinson went on a so-called "vacation," Mr. De Niro had the "absolute understanding" that she would still be working for him (Ex. 1 at 96:9-24).  Indeed, the documents produced in discovery confirm that Ms. Robinson worked extensively for Mr. De Niro during her trips, so-called "vacation[s]," and holidays (*see* Robinson Decl. ¶ 3; Robinson Decl. Exs. A-C; Exs. 50-52).  Thus, at the end of each year, Ms. Robinson and Mr. De Niro would meet to discuss her unused vacation days, and he could ask any questions. (Ex. 3 at 514:8-24, 515:20-516:12, 517:5-9).  Mr. De Niro testified that he authorized Ms. Robinson to be paid for all unused vacation days that she identified, and only after receiving his approval did Ms. Robinson email Mr. De Niro and Canal's accountant confirming the amounts to be paid (*id.* at 589:16-24, 514:8-18; Ex. 48).

Given Canal's practice of paying Ms. Robinson for days when she worked while on vacations or trips, along with Mr. De Niro's expectation that she work throughout her travels, Canal cannot carry its burden of showing that there is a genuine dispute of material fact concerning payments for unused vacation days.  First, while Canal's counterclaims allege that Ms. Robinson

was improperly paid for ninety-six (96) days of purported vacation (Dkt. No. 73 at ¶ 125), Canal's Rule 30(b)(6) witness identified substantially fewer workdays when Canal claims Ms. Robinson was on vacation (*compare* Ex. 6 at 227:13-23, 223:21-224:19, 216:12-217:3, 214:20-215:7, 200:9-203:4, 196:23-197:11, 194:22-196:8, *with* Harwin Decl. ¶ 52, Robinson Decl. Ex. D).  Second, as an employer, Canal had the non-delegable duty to maintain accurate payroll records of its employees' hours, but Canal has produced no such payroll records substantiating its claims about when Ms. Robinson was on vacation; this alone should be dispositive of this allegation.  *See* N.Y.L.L. § 195(4); *Mendez v. MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 209 (E.D.N.Y. 2021) ("[T]he NYLL places the responsibility on an employer to maintain time records.").  Without such payroll records, Canal relies on a hodgepodge of emails that Ms. Robinson sent or received containing offhand references to flights, hotels, or so-called "vacation" or "semi-vacation" (*see generally* Ex. 49).  Third, Canal failed to review the work Ms. Robinson was performing for Canal or Mr. De Niro on the days when Canal claimed Ms. Robinson was on vacation (Ex. 6 at 228:13-229:9).  In fact, there is voluminous documentation showing Ms. Robinson working on every single day (sometimes over 10 hours per day) for which she was paid for unused vacation and also working on dozens of additional holidays and weekend days when Canal's office was closed (*see* Robinson Decl. ¶ 3; Robinson Decl. Exs. A-D; Exs. 50-52).

In sum, Mr. De Niro expressly authorized Ms. Robinson to be paid for her unused vacation days when she worked during trips and vacations, and Canal has presented no accurate payroll records or other competent evidence establishing that Ms. Robinson was not working on the days it claims she was on vacation.  Again, Canal cannot establish a genuine dispute of material fact.

### iv.  Canal Concedes that It Cannot Prove Its Netflix Allegations

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to purported Netflix viewing.  Mr. De Niro has testified that he did not care if Ms. Robinson had

Netflix on while working (Ex. 2 at 391:4-23), and Canal concedes that it cannot prove what Ms. Robinson was doing while the Netflix account was accessed (Ex. 5 at 285:13-15).  Indeed, Canal admits that Ms. Robinson "could have always been working" (Ex. 6 at 271:6-10) and that it does not assert "that [Ms. Robinson] was sitting there staring at a screen doing nothing else" (Ex. 5 at 285:9-13).  In any event, records show that the vast majority of Netflix playback occurred outside of work hours (Schaitkin Decl. at ¶ 4(i)).  Netflix was accessed for only modest amounts of time during work hours – an average of less than an hour per work day (Schaitkin Decl. at ¶ 4(ii)), at a time when Ms. Robinson was working an average of 64 hours per week (Harwin Decl. at ¶ 49).

Given Mr. De Niro's admission that he did not care if Ms. Robinson watched Netflix and Canal's concession that it has no idea what Ms. Robinson was actually doing while Netflix was accessed, not to mention the limited times Netflix was accessed during work hours, Canal cannot establish a genuine issue of material fact concerning Netflix viewing.

### v.      The Los Angeles Trip Was Directed and Expressly Authorized by Mr. De Niro

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to the trip Ms. Robinson took to Los Angeles in March 2018.  Mr. De Niro was unable to recall specifics of his discussions with Ms. Robinson about the trip (Ex. 3 at 592:6-18), and there is no competent evidence that it was Ms. Robinson who requested the trip.  Rather, the evidence shows that Mr. De Niro directed Ms. Robinson to take this trip for purposes entirely different from what Canal alleges.  As Ms. Robinson has averred and a fellow employee has corroborated in testimony, she traveled to Los Angeles at Mr. De Niro's request to assist Mr. De Niro's former partner (Robinson Decl. at ¶ 4; Ex. 7 at 99:5-100:17).  Then, Mr. De Niro permitted Ms. Robinson to cut the trip short before any "Taxi Driver" books arrived due to inclement weather (Robinson Decl. at ¶ 4).  In connection with this work trip that Mr. De Niro directed, Ms. Robinson was entitled to have Canal pay for her food, transportation, and lodging (Ex. 3 at 587:15-23).

Given Mr. De Niro's lack of memory and Ms. Robinson's sworn declaration, not to mention the corroborating testimony from another Canal employee, Canal cannot establish a genuine issue of material fact concerning the Los Angeles trip.

### vi.   Mr. De Niro Gave Ms. Robinson Broad Authorization to Use SkyMiles

Canal cannot establish any lack of authorization, breach of duty, or disloyalty with respect to SkyMiles.   For years, Mr. De Niro authorized Ms. Robinson to use Canal's SkyMiles for her own travel, and it was generally known at Canal that Ms. Robinson was permitted to use Canal's SkyMiles as a "perk" of her employment (Ex. 10 at 225:12-226:12; Ex. 53 at 2:2-8; *see also* Ex. 7 at 107:3-20, 250:3-17).   By abandoning its allegations as to virtually all SkyMiles used before 2019 (Ex. 57), Canal tacitly concedes that Ms. Robinson was authorized to transfer SkyMiles.   The remaining transfers were also fully authorized, just like the ones that Canal is no longer contesting.

Mr. De Niro confirmed in testimony that Ms. Robinson sought his permission to use Canal's SkyMiles for her personal travel and that he continually agreed and vested her with broad authority to use the SkyMiles.   As Mr. De Niro testified, (i) "She said 'Can I just tack some miles on for me when I need them?' I said 'Yes, well, whatever you need'" (Ex. 2 at 366:8-11); (ii) "She said 'I would like to put some of them [*i.e.*, SkyMiles] on to mine [*i.e.*, her account]. She said I need them. I said okay. I trust you. You do what you think is right'. That's how I left it." (*id.* at 386:8-19); (iii) "[S]he said '[l]ook, there's a lot of sky miles' . . . [']that I should put into my thing [*i.e.*, account] in case I need it and so on.['] And I said, 'well, if you think that's what you should do, go ahead.'" (Ex. 3 at 589:1-7); and (iv) "[S]he brought it up to me to use sky miles and I said, 'Okay. That sounds good.'" (Ex. 3.at 588:7-12).   Further, Mr. De Niro confirmed in his testimony that he had multiple conversations with Ms. Robinson in 2019 in which he approved trips for which she planned to use SkyMiles (Ex. 3 at 572:23-573:11, 574:21-575:16, 576:5-25, 590:2-591:8).

As Mr. De Niro also testified, he never communicated to Ms. Robinson any limits on where

she could travel on the SkyMiles or how many SkyMiles she could use, saying that was "not for me to do," and "I don't know a million miles from two million miles" (Ex. 2 at 380:22-381:4, 379:21-380:3).  When asked if there was ever a time where Ms. Robinson asked to take a trip for work or personal reasons for which he told her she could not use Canal's SkyMiles, Mr. De Niro said, "Not that I remember.  I was pretty, pretty okay with it" (Ex. 3 at 460:21-461:2).

In addition to conferring this broad authority on Ms. Robinson, Mr. De Niro took affirmative steps to ensure that Ms. Robinson could transfer SkyMiles to herself.  Mr. De Niro directed his accountant to make Ms. Robinson an American Express account co-manager so she could "do whatever she wanted" with SkyMiles (Ex. 4 at 180:13-17, 181:16-24, 160:22-161:9), and when issues arose from time to time that prevented her from transferring SkyMiles, Mr. De Niro directed his accountant to communicate with American Express to resolve the issues so that Ms. Robinson could resume using SkyMiles (Ex. 55 at CANAL_0001433; Robinson Decl. at ¶ 5).

Given Mr. De Niro's admissions that he permitted Ms. Robinson to use Canal's SkyMiles for her personal travel, the discretion that he afforded to her concerning SkyMiles, the affirmative steps he took to facilitate her SkyMiles transfers, and the approval he gave for specific trips, Canal cannot establish a genuine dispute of fact concerning SkyMiles.

*      *      *

In sum, Canal cannot meet its burden of identifying triable facts and coming forward with affirmative, persuasive evidence of unauthorized conduct by Ms. Robinson.  The record is replete with evidence that the transactions and activities at issue were authorized (and, indeed, "typical stuff") and is void of competent, much less persuasive, evidence to the contrary.  No reasonable jury could find for Canal on its claims.  Summary judgment for Plaintiff is proper on all claims.

### C.   Ms. Robinson Is Entitled to Summary Judgment on All Claims Because Canal Ratified and Acquiesced in All the Alleged Conduct at Issue

#### i.   Legal Standard for Ratification and Acquiescence

"Ratification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another." *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F.Supp.2d 229, 235 (E.D.N.Y. 2009) (quotation omitted).   Under New York law, "[r]atification may be express or implied, or may result from silence or inaction." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011) (quotation omitted).   New York takes the following approach to ratification: "Failure to object may constitute a manifestation of ratification when the person has notice that others are likely to draw such an inference from silence." 2A N.Y. Jur. 2d Agency § 192.   Among the ways a party may ratify is by accepting tax benefits from the transaction.   *See Niosi v. Niosi*, 641 N.Y.S.2d 93, 94 (2d Dep't 1996) (because plaintiff made payments according to an agreement and "accepted tax benefits under the agreement . . . , his acts ratified the separation agreement").

Relatedly, acquiescence is "to give an implied consent to a transaction, to the accrual of a right, or to any act, by one's mere silence, or without express assent or acknowledgment."   *In re Prudential Lines, Inc.*, 209 B.R. 621, 625 (S.D.N.Y. 1997), *aff'd*, 158 F.3d 65 (2d Cir. 1998) (quotation omitted); *see also Harper v. Adams*, 18 N.Y.S. 896, 897 (2d Dep't 1892) ("Any person who sleeps upon his right so long [three years] must be held to some acquiescence in the conduct of the opposing party."); *Kent v. Quicksilver Min. Co.*, 78 N.Y. 159, 159-60 (1879) ("When [a plaintiff] neglect[ed] to promptly and actively condemn the unauthorized act, and to seek judicial relief after knowledge of the committal of it, this will be deemed an acquiescence in it.").

"[A]cquiescence is a complete defense to a claim of conversion." *Scott*, 572 B.R. at 527 (quotation omitted).   Likewise, a faithless servant claim cannot survive where the employer was aware of the conduct at issue and took no action to address it.   *See, e.g.*, *Miller v. Levi & Korsinsky,*

*LLP*, No. 20 Civ. 1390(LAP), 2021 WL 535599, at *6-7 (S.D.N.Y. Feb. 12, 2021) (dismissing faithless servant claim where employer "knew of and tolerated [plaintiff's] purported faithless behavior" and "does not allege that it took disciplinary action against [plaintiff] or even raised a concern that her actions were disloyal or improperly motivated."); *Leary*, 2019 WL 4805849, at *4 (dismissing counterclaim where defendants tolerated plaintiff's years-long consumption of alcohol at work and did not specify any occasion, other than plaintiff's termination, where defendants took corrective action); *Farricker v. Penson Dev., Inc.*, No. 07 Civ. 11191(DAB), 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010) (counterclaim for breaches of good faith and loyalty "simply does not make sense" where plaintiff was not terminated after his alleged misconduct was discovered); *Bravin v. Fashion Wk., Inc.*, 342 N.Y.S.2d 971, 973 (Civ. Ct. N.Y. Cty. 1973) (no substantial violation of contract of service, and no forfeiture, where employer continued to employ a person who allegedly was insubordinate, made threats, and sent obscene writings).

The principles of ratification and acquiescence are based on the fundamental unfairness of allowing a party to pursue a claim when it slept on its rights and remained silent in the face of the complained of conduct. *See, e.g.*, *Fed. Ins. Co. v. Walker*, 53 N.Y.2d 24, 35 (1981) (finding it would be "particularly inequitable" to order a defendant to pay for damages that were caused by the plaintiff's own silence and ratification, "since [plaintiff] was fully aware of and, in fact, acquiesced" in the course of conduct); *Tropic Film Corp. v. Paramount Pictures Corp.*, 319 F.Supp. 1247, 1248 n.1 (S.D.N.Y. 1970) (recognizing "that it would be inequitable to enjoin the defendants from pursing a course of action which [the plaintiff] knowingly allowed to occur," where the plaintiff "knowingly acquiesced" in that course of action); *Reilly v. Freeman*, 37 N.Y.S. 570, 574 (1st Dep't 1896) (recognizing that "[i]t would be inequitable now to allow [plaintiff's] claim . . . after years of acquiescence" in defendant's conduct); *Pac. R.R. of Missouri v. Missouri*

*Pac. Ry. Co.*, 111 U.S. 505, 521 (1884) (noting that "ratification . . . would make it inequitable to permit what has been done to be set aside").

### ii.    Canal Ratified and Acquiesced in All the Transactions and Activities at Issue

Critically, all the alleged transactions and activities at issue in Canal's counterclaims were readily visible to Canal in real-time.  But during Ms. Robinson's over eleven (11) years of employment, Canal never complained about any of those alleged transactions or activities; to the contrary, Canal accepted them for years.  Moreover, Canal's accountants contemporaneously characterized the financial transactions at issue as legitimate business expenses and even claimed tax deductions based on these charges.  Thus, even assuming *arguendo* that any matter at issue may not have been authorized at the time it occurred, summary judgment should still be granted because Canal subsequently ratified and acquiesced in all of the transactions and activities.

### a.    Canal Ratified and Acquiesced in Credit Card Charges for Taxis, Ubers, Paola's Restaurant, Whole Foods, Dean & Deluca, and the Los Angeles Trip

The undisputed facts show that Canal ratified and acquiesced in all charges for taxis, Ubers, Paola's restaurant, Whole Foods, Dean & Deluca, and the Los Angeles trip at issue in this case. Critically, these charges were no secret.  To the contrary, Canal had accountants provide "checks and balances," meaning "if they sense something that is out of whack or improper, they'[d] draw [Mr. De Niro's] attention to it" (Ex. 3 at 490:12-23).  These accountants received, reviewed, and paid Canal's credit card bills as they came in (Ex. 4 at 63:9-14, 65:2-10, 65:19-22) and would raise any questions about them before paying them (*id.* at 66:22-67:6).  At no point during Ms. Robinson's over eleven (11) years of employment did Canal's accountants or Mr. De Niro raise concerns about *any* credit card charges by Ms. Robinson (*id.* at 151:5-10; Ex. 3 at 492:23-493:3). Instead, after reviewing the expenses at issue, Canal's accountants contemporaneously classified them as business expenses in their general ledger (*id.* at 220:15-23, 248:17-23, 249:23-251:20;

Dkt. No. 232 at 27:5-11; Dkt. No. 252 at 20:8-20), and Canal claimed tax deductions in which it treated those charges as legitimate business expenses (Ex. 4 at 225:21-226:3, 243:7-13).

By failing to dispute these charges for years and even claiming tax benefits based on them, Canal ratified and acquiesced in the charges for taxis, Ubers, Paola's restaurant, Whole Foods, Dean & Deluca, and the Los Angeles trip of March 2018.

**b.    Canal Ratified and Acquiesced in Payments for Unused Vacation Days**

The undisputed facts show that Canal ratified and acquiesced in paying Ms. Robinson for unused vacation days.  Again, Ms. Robinson's requests for payment for her unused vacation days were no secret; all the requests were discussed with Mr. De Niro and then sent to both Mr. De Niro and Canal's accountants (Ex. 3 at 514:19-516:12; Ex. 48).  Mr. De Niro's testimony establishes that he was fully aware of all of Ms. Robinson's travels (Ex. 2 at 357:21-24, 385:22-386:7), and if he disagreed with Ms. Robinson's characterizations of her unused vacation days, he had every opportunity to challenge them at the time and direct his accountants not to make payment (Ex. 3 at 517:5-9, 519:11-16).  But during Ms. Robinson's employment, neither Mr. De Niro nor Canal's accountants raised any concerns about the vacation day payments that Canal now challenges (Ex. 3 at 518:12-23; Ex. 4 at 366:2-14), and Mr. De Niro affirmatively approved payment (*id.* at 589:16-24).  Since Canal approved these charges for years with full knowledge of Ms. Robinson's travels, Canal thereby ratified and acquiesced in all of the vacation day payments at issue.

**c.    Canal Ratified and Acquiesced in Netflix Viewing on Shared Account**

The undisputed facts also show that Canal ratified and acquiesced in any Netflix viewing by Ms. Robinson.  The purported Netflix viewing at issue occurred on a shared account available to Canal's entire office (Ex. 12 at 225:9-21), and therefore the viewing history on that account was available in real-time to anyone at Canal who cared to look.  But at no point in Ms. Robinson's years of employment did anyone raise any concern to Ms. Robinson about viewing Netflix – to

the contrary, Mr. De Niro simply did not care (Ex. 2 at 391:4-23).

      **d.**     **Canal Ratified and Acquiesced in SkyMiles Transfers**

The undisputed facts show that Canal ratified and acquiesced in the SkyMiles transfers at issue in Canal's counterclaims. Again, these transfers were no secret. It was general knowledge at Canal that Ms. Robinson flew on Canal's SkyMiles (Ex. 10 at 225:12-226:12; Ex. 53 at 2:2-8). Any transfers were clearly visible on the very same credit card bills that Canal's accountants received, reviewed, and promptly raised questions about (Ex. 4 at 63:2-14, 65:2-6, 65:18-22). At no point during Ms. Robinson's employment, including in 2019, did Mr. De Niro or Canal's accountants convey any objection to Ms. Robinson's use of SkyMiles (Ex. 3 at 460:13-461:2, 588:7-12; Ex. 4 at 171:18-24), and Canal's accountants never reported concerns about any SkyMiles transfers by Ms. Robinson (Ex. 4 at 171:18-25). To the contrary, Mr. De Niro repeatedly took action to ensure that she could "do whatever she wanted" with SkyMiles (Ex. 4 at 180:13-17, 181:16-24; *see also* Ex. 55 at CANAL_0001433; Robinson Decl. at ¶ 5).

For years Canal knew that Ms. Robinson was using SkyMiles and never told her that she could not do so, and thereby ratified and acquiesced in all SkyMiles transfers.

**V.**     **CONCLUSION**

The gravamen of Canal's counterclaims is that Ms. Robinson stole from Canal. This is a claim sounding in conversion. The Court should grant summary judgment against Canal on its twin "breach of duty" claims – for breach of fiduciary duty and breach of the duty of loyalty – because these causes of action exist to address fundamentally different types of misconduct and because they are duplicative of Canal's conversion claim (and each other).

Whatever Canal's counterclaims are called, they hinge on Canal proving that it never authorized or consented to the transactions or activities. But Canal cannot manufacture a genuine dispute of fact on this matter. The undisputed testimony from Canal and Mr. De Niro establishes

that Canal both gave Ms. Robinson broad authority *ex ante* and then ratified or acquiesced in all the transactions and activities after the fact.  Canal *authorized* Ms. Robinson to use the Canal credit card for work-related transportation and meals; *authorized* Ms. Robinson to be paid for her unused vacation whenever she worked on her trips; *authorized* Ms. Robinson to travel to Los Angeles and to bill those expenses to Canal (in fact, Mr. De Niro *directed* Ms. Robinson to take the trip); *authorized* Ms. Robinson to watch Netflix while working if she wanted to; and *authorized* Ms. Robinson to transfer Canal's SkyMiles to herself for her use.  Canal maintained no written policies about any of these matters and instead gave Ms. Robinson plenary authority to make decisions concerning the credit card, vacation days, Netflix, and SkyMiles at her discretion and in accordance with her "common sense."  Moreover, Canal ratified and acquiesced in the transactions and activities; none of the transactions or activities were hidden or kept secret, and Canal and Mr. De Niro never disputed them during the many years of Ms. Robinson's employment.

Canal's claims were all brought in bad faith: Mr. De Niro was enraged by Ms. Robinson's protected activity, and he simply wanted to "go after her" and "file whatever."  Canal's retaliatory motives were openly professed.  As one of the employees who "investigated" Ms. Robinson explained, "she was threatening to sue bob [Mr. De Niro] so they wanted to ruin her first."

Now, Canal's burden is to come forward with persuasive evidence supporting its claims. It has no such evidence, and no reasonable jury could find for Canal on these facts.  Summary judgment should be granted to Plaintiff on all claims, or, in the alternative, at a minimum, as to each claim and type of transaction or activity that does not present a genuine issue of material fact.

Dated: October 30, 2022

Respectfully submitted:

Alexandra Harwin (AH-3111)
David Sanford (5695671)
Jeremy Heisler (JH-0145)
Kate MacMullin (5693882)
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
aharwin@sanfordheisler.com
dsanford@sanfordheisler.com
jheisler@sanfordheisler.com
kmacmullin@sanfordheisler.com

Michael Lockman (5485156)
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
mlockman@sanfordheisler.com

*Counsel for Plaintiff Graham Chase Robinson*