# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,


                    Plaintiff,


              - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x



          ZOOM VIDEOCONFERENCE DEPOSITION OF

                 ROBERT DE NIRO

                 April 4, 2022



          MAGNA LEGAL SERVICES

             (866) 624-6221
             www.MagnaLS.com



```
 1          Q.   What is Canal Productions?
 2          A.   It is a production company that I
 3   started many years ago.
 4          Q.   And what's your role at Canal
 5   Productions?
 6          A.   They loaned me out to other film
 7   companies when I'm working as an actor or
 8   director or whatever.
 9          Q.   Is it fair to say that you run Canal
10   Productions?
11          A.   You could say that, yes, of course.
12          Q.   Have there ever been any written
13   policies at Canal?
14          A.   I don't think so, but there might
15   have been.  I don't really think so.
16          Q.   Have you ever been interviewed by
17   the police or any other law enforcement
18   personnel?
19               MR. DROGIN:  Objection to the
20          form.
21               Go ahead and answer.
22          A.   Something here or there, yes.
23   BY MR. SANFORD:
24          Q.   Something here or there, what is
25   that?
```



Page 48

1   deposition?

2           A.   Nothing.   Nobody feels like talking

3   about it.   It is just like -- it is like talking

4   about something where you really -- it is sort

5   of unsavory and so kind of low that you just say

6   let's just move on.

7                It is a low point in my life of

8   having to be subjected to this kind of thing.

9   If I deserve it, I deserve it, and I would be

10  the first to say it.

11               If I don't deserve it, you can't

12  blame me for feeling a little annoyed by all of

13  this.

14               I tried to do the best thing for

15  Chase.   I do what you call the honor system.   Do

16  the right thing by me; I do the right thing by

17  you.   Don't shake me down, don't threaten me,

18  try to intimidate me.

19               This is to me a pathetic situation

20  that we're all going through and a lot of -- and

21  a big waste of time and money.

22               So you can't blame me for being

23  annoyed.

24           Q.   Do you know that Dan Harvey was

25  deposed in this matter?



Page 75

```
 1                    MR. SANFORD:  Can we do that,
 2           please.
 3                         (Whereupon, an audio
 4               recording was played.)
 5                    MR. SANFORD:  For the record, we
 6           began playing the recording at the time
 7           stamp of 118, and we're marking the
 8           document as Plaintiff's Exhibit 110.
 9                         (Recording was marked as
10               Plaintiff's Exhibit 110 for
11               identification, as of this date.)
12   BY MR. SANFORD:
13           Q.   Mr. De Niro, do you recognize your
14   voice on that recording?
15           A.   Yes, I do.
16           Q.   Would you consider yourself hostile
17   on the recording?
18           A.   I was angry, yes, I was angry.
19           Q.   Why did you say what you said in
20   that voice-mail?
21           A.   Because that's what she did.  I was
22   accommodating her.  She's living in Spain.  She
23   lives in London.  She works from there.  She
24   does this and that.  Then I hear later that
25   she's using Ubers and staying in hotels, my
```



1   here.

2              I knew she would keep that thing and

3   use it today and I would be sitting in the

4   situation I am right now hearing that.  I knew

5   that, but I was so angry.

6              I said listen, fuck it.  I'm going

7   to say this.  You were wrong.  You know, you

8   claim that you work so hard.  You do all this,

9   you do all that.  I started questioning whether

10  she really did do as much as she said she did.

11         Q.   You approved her work from Spain,

12  didn't you?

13         A.   Well, I -- listen, I wanted to make

14  her happy.  I figured if she wants to go there,

15  she has a reason.  If she can do it with the

16  internet and so on, I'm okay with that.

17              I'm not the kind of boss, if you

18  will, that says you have to stay here 9 to 5,

19  all that stuff.  I believe in letting people do

20  what they want to do as long as they do their

21  job.

22              And if they don't do their job,

23  then, look what happens.  I mean, I was -- even

24  then I forgive them.

25              I said, "Just don't do it again.



Page 78

1    Thank you for copping to not doing what you

2    should not have done."  That's all.  That's all

3    I ask.  Be honest about what you did wrong.  You

4    screwed up.  Fine, say it, and then we move on.

5    People make mistakes.

6              And that's how, that's how you

7    create loyalty with people.  By understanding

8    that it is okay if you make a mistake.

9              But what I don't like is what this

10   woman is doing to me right now.  She tried to

11   shake me down for $600,000.  She wrote a fake

12   letter to the London School of Economics which

13   couldn't have been used for any kind of job, and

14   I knew that and I was not going to sign it.

15             I do the right thing by my

16   employees.  You have spoken to other ones.  I

17   don't -- the most I ever get is annoyed by

18   something.  I don't abuse them.  I don't do

19   anything.  I don't curse at them.  I don't do

20   anything.

21             MR. DROGIN:  Can we move on with

22        the questions?

23        A.   I have my trainer.  Dan Harvey is

24   with me almost 40 years.  I have other people

25   working with me for long periods of time.



Page 88

```
 1          Q.   I asked you what qualities you

 2     valued in Ms. Robinson.  You talked about

 3     arrogance and petulance and bullying.

 4              I'm wondering if those are the

 5     qualities that you, in fact, valued?

 6          A.   No, I didn't, no, I didn't.  I

 7     didn't value -- you mean -- I'm not

 8     understanding.  You're saying I valued?

 9          Q.   Valued.  Do you know what it means

10     to value a quality?

11          A.   No, I didn't value those qualities

12     if she had them.  And I saw them later on.  I

13     tolerated them.

14          Q.   Okay.

15              So what qualities did you value of

16     Ms. Robinson?

17          A.   I thought she was a good worker.

18     She kept saying she was a good worker.  She kept

19     doing that.  When I called her and asked her to

20     do something, she had it done.  She knew she had

21     to have it done.  That was all fine.

22              As time went on, she would get --

23     you know, she would take liberties with doing

24     this or choosing something.  You don't need

25     that.  I'll take this.
```



MAGNA ►
LEGAL SERVICES

1            And I would say that's a little -- I

2    don't know, it is a little forward, but I'll let

3    it go because, you know, people get their

4    little -- they get a little eccentric, a little

5    crazy.

6            You have to tolerate people's

7    foibles.  That's okay.  That's life.  You can't

8    get rid of them for that.  You know, that's

9    okay.  They have good qualities that outweigh

10   those qualities.  I'll tolerate those.

11        Q.   What are the qualities --

12        A.   She led me to believe she was doing

13   everything that I asked her to do.  A lot of

14   times she hired good people.  She interviewed

15   them and then we would get them.  They were the

16   people I have now.  Sabrina especially is

17   terrific.

18            So Chase did that.  She does good

19   things.  I was not, I -- in fact, I was so busy

20   that I wasn't, you know -- just do what it is

21   and no problem.  Let's move on.

22            There's no -- I wasn't asking her to

23   do things that were hard or so hard.  And she

24   ran the office.  She was the point person.  I

25   need this, so she'll delegate to whomever it



Page 91

1    said no, no, they need them first.  I rather pay

2    for her.  Then let the kids -- whatever is the

3    best.  But I didn't want all the air miles to be

4    used by her, and I didn't even know how many air

5    miles I had.

6              But I trusted her to allot to

7    herself the amount of air miles she would need

8    for her work.

9         Q.   We're going to talk about that.

10   We're going to talk about air miles.  Let me ask

11   you this.

12              You say that she was your point

13   person.  What does it mean to be your point

14   person?

15        A.   Do you have a head person in your

16   office --

17        Q.   My question --

18        A.   -- who does everything?

19              Listen, okay.  A point person is

20   your main person with you who does -- maybe it

21   is the lead assistant or -- she is my head

22   assistant.

23              She is the person that delegates all

24   the things to be done in the office and doles

25   out, if you will, the assignments for certain



Page 92

1    things so I don't have to go to each person and

2    say you do this, you do that.

3              That is what that was.  She had a

4    lot of control.

5         Q.   So she controlled delegating

6    assignments and she was that point person

7    throughout the time she had worked for you?

8         A.   Yes, pretty much, yes.

9         Q.   All right.

10             During her employment -- during

11   Ms. Robinson's employment at Canal, how many

12   times would you communicate with her during an

13   average day?

14             MR. DROGIN:  Objection to form.

15        A.   A few times.

16             THE WITNESS:  Sorry.

17             MR. DROGIN:  Objection to the

18        form.

19             You can answer.

20   BY MR. SANFORD:

21        Q.   You can answer.

22        A.   I would be talking to her a lot

23   during the day.  How is this?  How is that?  She

24   would call me, e-mail.  This is being done, dah,

25   dah, dah.  You know, it was just the usual



 1  stuff.

 2          Q.   How frequently would you text

 3  Ms. Robinson during an average day?

 4          A.   I don't remember.  You know, I don't

 5  remember.

 6          Q.   How often would you meet with

 7  Ms. Robinson in a typical day?

 8          A.    It could be once a day.  Sometimes

 9  not for a day or two or three if I'm busy doing

10  something other than just being out of town.

11          Q.    During Ms. Robinson's employment at

12  Canal, Ms. Robinson generally kept you apprised

13  of where she was throughout the course of a day,

14  didn't she?

15               MR. BENNETT:  Objection.

16          A.   I think she probably did, but I'm

17  not a hundred percent sure.  Sometimes she

18  didn't.  But I would just rely on her.  I would

19  call her or say call me and that would be that.

20  BY MR. SANFORD:

21          Q.   It was common for you and

22  Ms. Robinson to speak early in the morning

23  before 9:00 a.m., right?

24          A.   I think yes --

25               MR. BENNETT:  Objection.



1          A.   I think in the beginning of the day,

2    yes.

3    BY MR. SANFORD:

4          Q.   And it was common for Ms. Robinson

5    to do work for you early in the morning as well,

6    right?

7               MR. BENNETT:  Objection.

8          A.   At times.

9    BY MR. SANFORD:

10         Q.   And it was common for you and

11   Ms. Robinson to speak late at night until 8:00

12   o'clock or later, right?

13              MR. BENNETT:  Objection.

14         A.   It could be.

15              THE WITNESS:  I'm sorry, should I

16          not answer?  Or are you saying

17          objection?

18              MR. BENNETT:  It's okay, Bob, go

19          ahead.  I'll be very clear if I don't

20          want you to answer.

21   BY MR. SANFORD:

22         Q.   And it was common for you and

23   Ms. Robinson or Ms. Robinson to speak with you

24   and do work on the weekends, right?

25              MR. BENNETT:  Objection.



1         A.   Yes, if need be, yes.

2    BY MR. SANFORD:

3         Q.   And it was common for you and

4    Ms. Robinson to speak on holidays, right?

5              MR. BENNETT:  Objection.

6         A.   If need be, yes.

7    BY MR. SANFORD:

8         Q.   And during Ms. Robinson's employment

9    at Canal, Ms. Robinson kept you apprised if she

10   was going to be away from New York, right?

11             MR. BENNETT:  Objection.

12        A.   Yes, she said she would like to go

13   to Spain or London and do this, and I -- you

14   know, with the internet and technology these

15   days, I said okay.  Even phones, okay.

16   That's -- I want to accommodate her.  I want to

17   make her happy.  I just -- that's how I am.

18             If people want to do something, they

19   need to do it that way.  I'll say okay.  I'm

20   okay with that as long as you do what you need

21   to have done.

22   BY MR. SANFORD:

23        Q.   Ms. Robinson checked with you before

24   traveling from New York, going outside of New

25   York, right?



Page 96

```
 1                    MR. BENNETT:  Objection.

 2                    MR. DROGIN:  Objection to the

 3          form.

 4                    You can answer.

 5          A.   Well, she had to tell me that she is

 6    going out.  You know, that would be -- of course

 7    she would have to tell me.

 8    BY MR. SANFORD:

 9          Q.   And even if Ms. Robinson was

10    traveling away from New York, Ms. Robinson was

11    still available to work for you, right?

12                    MR. BENNETT:  Objection.

13                    MR. DROGIN:  Objection to the

14          form.

15                    You can answer.

16    BY MR. SANFORD:

17          Q.   I couldn't hear.

18          A.   That was the understanding.  That is

19    the absolute understanding.  Not when she's

20    traveling.  Maybe even then, you know, if she

21    had WiFi on the plane or something and I need to

22    get her a message before she landed say

23    wherever, in London, or whatever, if there was

24    WiFi on an international flight.  Rarely that

25    would happen.  You know, whatever.
```



Page 97

1          Q.   And you would get upset if

2   Ms. Robinson was not available when you called

3   her, wouldn't you?

4          A.   No, I wouldn't get upset.  Only if

5   she was supposed to be available.

6                This wasn't a regular occurrence.

7   What happened on that recording was not a

8   regular occurrence.  She did get back to me.

9   She knew that she had to, that I needed to do

10  something.  So, you know, there was no, you

11  know --

12         Q.   Can you describe for me the types of

13  things that Ms. Robinson did to assist you and

14  your family while she was employed at Canal?

15               MR. DROGIN:  Objection to the

16       form.

17               You can answer.

18         A.   Well, she would help me get

19  presents.  We would go to stores, pick out this

20  with a list; this for this child, this for that,

21  this relative.  You know, everything, just to

22  try and cover all that.  She would go with me

23  and we would do all that.

24               You know, that stuff she would do

25  and stuff with the family.  I need this or that.



Page 98

1    Yes, she is a personal assistant.  She also was

2    very important as far as helping me with those

3    things.

4    BY MR. SANFORD:

5         Q.    So besides getting presents and

6    going to stores, what else would she do?

7         A.    Well, you know, whatever,

8    whatever -- she helped me with the house.  She

9    pulled in a friend of hers.  I said fine, an

10   interior designer.

11              We would go to the design center or

12   here and there, look for furniture.  Order

13   furniture to certain specifications.  She helped

14   me with this, a piece of furniture.  Be there

15   waiting when it would come in, or somebody --

16   she would have Michael there waiting for when it

17   would come in.

18              You know, it was anything.  Anything

19   and everything.

20         Q.    Okay.

21              Ms. Robinson's titles changed at

22   various times during her employment at Canal,

23   didn't they?

24         A.    At her request.

25              MR. SANFORD:  We are sharing a



1    what there is.  And at the expense of the people

2    who have been with me for years.

3              And as I say, if people do things

4    with me and they make mistakes and they're not

5    perfect.  That's okay.  That's life.  That's how

6    you create loyalty by people.  When they're

7    down, you help them and you forgive them and you

8    let it go because everybody finds themselves in

9    that situation.  And that is -- so that's okay.

10             But she was always pushing for this,

11   pushing for this.  But I said okay, I'll listen.

12             Let me read the second part.

13        Q.   Well, let me ask you a question

14   about that part.

15             So Ms. Robinson is requesting a

16   raise in 2018, right?

17        A.   Yes.

18        Q.   She wants --

19        A.   She's comparing herself to Dan

20   Harvey.  She's comparing herself to Jane.  I

21   mean, that's ludicrous.

22        Q.   All right.

23             I understand.  I understand.  I'm

24   not asking about that.

25        A.   She's getting paid pretty well,



Page 136

1    little over three years ago.  Say if it was last

2    fall, that would be three years from last fall,

3    I suppose, would be the time.

4            Q.   Did Ms. Chen ever tell you that in

5    her opinion, Ms. Robinson is a bitch?

6            A.   Not that I remember, but she could

7    have.

8            Q.   Did Ms. Chen ever tell you that from

9    her perspective, Ms. Robinson was hysterical?

10           A.   She could have.

11           Q.   Did Ms. Chen ever tell you from her

12   perspective, Ms. Robinson was emotionally

13   disturbed?

14           A.   I'm not sure I would remember that,

15   but, you know, it could be.

16           Q.   Did Ms. Chen ever tell you that from

17   her perspective, Ms. Robinson was crazy?

18           A.   I don't know if -- I don't know.  I

19   don't remember.

20           Q.   Did Ms. Chen ever tell you that from

21   her perspective, Ms. Robinson was in love with

22   you?

23           A.   There was some talk about that.

24           Q.   What was the talk?

25           A.   That she thought that maybe she was



Page 137

1  because of certain things she bought in the

2  house and stuff like that and that she was so

3  territorial about it.

4            And I never -- I mean, I was like

5  dumbfounded.  I just didn't even know how to

6  react to that.

7       Q.   Would you and Ms. Chen fight about

8  that issue?

9       A.   No.

10      Q.   Did Ms. Chen ever tell you that from

11 her perspective, Ms. Robinson wanted to be

12 married to you?

13      A.   I don't remember that.

14      Q.   Did Ms. Chen ever tell you that from

15 her perspective, Ms. Robinson wanted to move in

16 with you?

17      A.   Yes, there was a little of that

18 wondering.

19      Q.   What, to your best recollection, was

20 said?

21      A.   It was just that, that simple.

22      Q.   That Ms. Robinson wanted to move in

23 with you?

24      A.   Yes.

25      Q.   Did you ever think Ms. Robinson



Page 158

1          A.   She wouldn't remind me.  I knew.

2     She would refill my medicine.  She didn't do

3     that.  See, right now these are questions like

4     she is a wife or something or my assistant.  I

5     don't know what this is.  What this implies.

6     But it is creepy.

7          Q.   Ms. Robinson would routinely

8     communicate with your doctors; wouldn't she?

9          A.   No.

10               MR. DROGIN:  Objection to the

11          form.

12     BY MR. SANFORD:

13          Q.   Ms. Robinson would arrange furniture

14     deliveries for you; wouldn't she?

15          A.   That, yes, she would do.

16          Q.   Ms. Robinson would routinely arrange

17     flower deliveries for you; wouldn't she?

18          A.   That, she could do.

19          Q.   Ms. Robinson would help organize and

20     decorate parties for you; wouldn't she?

21          A.   That, she could do.

22          Q.   Ms. Robinson would arrange your

23     travel via private jet; wouldn't she?

24          A.   That, she could do.

25          Q.   Ms. Robinson -- and when you say she



1  could do, she did do it, right?

2       A.   She did.

3       Q.   Ms. Robinson would routinely run

4  errands for the Canal office and for you and

5  your family; wouldn't she?

6            MR. BENNETT:   Objection.

7       A.   Yes.

8  BY MR. SANFORD:

9       Q.   Ms. Robinson would RSVP to events on

10  your behalf; wouldn't she?

11      A.   Yes.

12      Q.   Ms. Robinson would at times field

13  media requests on your behalf; wouldn't she?

14           MR. BENNETT:   Objection.

15      A.   Yes.

16  BY MR. SANFORD:

17      Q.   Ms. Robinson would generally remind

18  you to pick out gifts; wouldn't she?

19      A.   She could.  Her job was to remind

20  me.  I say remind me, there's a list, I have to

21  get these particular gifts for certain people

22  for their birthday, for Christmas, whatever,

23  yes.

24      Q.   Ms. Robinson often accompanied you

25  while you picked out gifts for family and close



Page 160

1    familiar friends; wouldn't she?

2              MR. DROGIN:  Objection to form.

3         A.   Yes.

4    BY MR. SANFORD:

5         Q.   Ms. Robinson would generally help

6    manage your contacts list; wouldn't she?

7              MR. BENNETT:  Objection.

8         A.   Yes.

9    BY MR. SANFORD:

10        Q.   Ms. Robinson would coordinate your

11   award show votes; wouldn't she?

12        A.   My award show what?

13        Q.   Votes.

14        A.   Well, help set it up for me and then

15   I would do my own voting.  It wasn't like she

16   was part of.

17        Q.   And by that, I mean the Oscar votes,

18   right?

19              MR. BENNETT:  Objection.

20        A.   Yes, but that's in the computer.

21   Not -- that's all she did.

22   BY MR. SANFORD:

23        Q.   Ms. Robinson would often look up

24   restaurants for you; wouldn't she?

25        A.   Yes.



Page 161

```
 1          Q.   I'm sorry?
 2          A.   Yes, she did.
 3          Q.   Ms. Robinson would vet vacation
 4   rentals for you; wouldn't she?
 5          A.   Yes, she did.
 6          Q.   Ms. Robinson vetted home rentals for
 7   you; wouldn't she?
 8          A.   Yes, she did.
 9          Q.   Ms. Robinson researched potential
10   schools for your son; didn't she?
11          A.   She might have done some, yes.
12          Q.   Ms. Robinson assisted with your
13   pets; didn't she?
14          A.   She might have.
15          Q.   When you say might have, you're
16   saying "yes"?
17          A.   I don't know because I have pets.
18   We had pets.  Tiffany had pets.  I don't know.
19   That was the overlap.  So I don't know.
20          Q.   Ms. Robinson scouted hotels all over
21   the world for you; didn't she?
22          A.   Not all -- wherever I had to go on
23   location she did go.  I trusted her to go do
24   that.
25          Q.   Ms. Robinson researched options for
```



Page 162

1    the purchase of your bed; didn't she?

2          A.    The purchase of my bed?  Yes.  My

3    furniture.  All my furniture, yes.

4          Q.    Ms. Robinson helped buy furnishings

5    for your home; didn't she?

6          A.    She did, yes.

7          Q.    Ms. Robinson vetted housekeepers for

8    you; didn't she?

9          A.    Yes.

10         Q.    Ms. Robinson researched options for

11   planters and pots for your plants; didn't she?

12         A.    Yes.

13         Q.    Ms. Robinson assisted with the

14   delivery of your plants; didn't she?

15         A.    Yes.

16         Q.    Ms. Robinson went plant shopping

17   with you; didn't she?

18         A.    Yes, yes.

19         Q.    Ms. Robinson went antique shopping

20   with you?

21         A.    Yes, she did.

22                THE VIDEOGRAPHER:  The time is

23          12:41.  We are going off the record for

24          technical reasons.

25                      (Whereupon, at 12:41 o'clock



1   that and my children resented her doing that.

2   Trying to, you know.

3        Q.   You had Ms. Robinson coordinate your

4   schedule so that you could spend time with your

5   children over spring break; didn't you?

6        A.   Yes, she coordinated all of that

7   stuff, yes.

8        Q.   You had Ms. Robinson assist with

9   various items related to your former partner

10  ████████████, didn't you?

11       A.   Say that again.

12       Q.   You had Ms. Robinson assist with

13  various things related to your former partner?

14       A.   There was a point that she did that

15  briefly and that was it.

16       Q.   What point was that?

17       A.   Somewhere a couple years ago where

18  she was -- I asked her and Robin to do

19  something, but it didn't go very long.

20       Q.   What did you ask Ms. Robinson to do

21  with respect to --

22       A.   To help her with certain things.

23  Just it didn't --

24       Q.   And this was about 2018, 2019,

25  correct?



```
 1  say she could have.  So that's it.
 2          Q.   Well, you don't dispute that Ms.
 3  Robinson collected evidence to help you in your
 4  divorce, right?
 5          A.   Yes, I think she did.  I'll say that
 6  like that.
 7          Q.   All right.
 8               You asked Ms. Robinson to
 9  communicate with your divorce attorney; didn't
10  you?
11          A.   I might have.
12          Q.   Is that a "yes"?
13          A.   That's all I can say, is I might
14  have.  You have the e-mails, so you have them.
15  So you know.
16          Q.   On two occasions you asked Ms.
17  Robinson to accompany you to the emergency room,
18  didn't you?
19          A.   Yes.
20          Q.   Ms. Robinson on several occasions
21  accompanied you to doctors; didn't she?
22          A.   Yes.  I went to the emergency room
23  and maybe another doctor.  I can't remember
24  specifically, yes.
25          Q.   So a significant part of Ms.
```



Page 188

1    BY MR. SANFORD:

2         Q.   So, there's -- Ms. Chen writes in

3    part that, you know, what is happening here is

4    manipulative and nasty.

5              What do you understand to be

6    manipulative?

7         A.   Just, it is just what she was doing.

8    She was not responding.  I think you have a

9    better answer.  I was not aware of this stuff

10   and the minutia of it and so on.  I just don't

11   even remember.  She just was not in general, not

12   doing what was right, Chase.

13        Q.   What was nasty?

14        A.   I don't know.  Tiffany told you.  I

15   don't remember.  She told you.  I know you have

16   all these answers.  So you have it.

17        Q.   Did you ever tell Ms. Chen not to

18   refer to Ms. Robinson as a bitch?

19        A.   No.  I didn't say anything.

20        Q.   When you saw this in an e-mail and

21   I'm quoting here "This bitch needs to get put in

22   her fucking place," how did you react?

23        A.   I saw that she was upset, you know.

24        Q.   Did you ever, did you ever

25   communicate with Ms. Chen about being respectful



Page 189

1    towards Ms. Robinson?

2                 MR. BENNETT:  Objection.

3         A.   Mr. Chen didn't have to.  She told

4    me how disrespectful she was.  And everybody

5    knew that.  Chase had a reputation among not

6    just with the way she treated Tiffany, but the

7    way she treated everybody.  They all hated her.

8    She thought she was being nice or take them to

9    dinner on my dime at Nobu.  I said fine.  And

10   stuff like that.  But she was -- they hated her.

11   They all rejoiced when she left.  I had no idea

12   that this was all going on.

13   BY MR. SANFORD:

14        Q.   Well, when you read Ms. Chen's

15   e-mail to you when she writes "This bitch needs

16   to get put in her fucking place," did you agree

17   with that?

18        A.   No, no, I'm just listening.  I'm

19   just saying "Oh, here we go".  Now I've got to

20   see what I'm going to talk to Chase.  I don't

21   know.  I might have said something to Chase.

22   Maybe and maybe she should stay away from the

23   house and I think that's what we finally agreed

24   to.

25        Q.   Do you think Ms. Chen was jealous of



```
 1                And she could have said at any time
 2    "Listen, I can't do that.  Can we give it to
 3    Jillian or this person or that or Sabrina".  I
 4    think she was trying to control everything and
 5    it was really hard.
 6          Q.   Can you think of any other good
 7    things that Ms. Robinson did that you valued?
 8                MR. DROGIN:  Objection to the
 9           form.
10          A.   Well, she kept telling me all the
11    good things she did and all the hard work she
12    did.  And she was available to me when I needed
13    or I told her I needed this and she did these
14    things.  So, yes, I mean, she was good in many
15    ways.  I can't think offhand, but she would do
16    what I asked her to do and I guess but a lot of
17    other people weren't feeling that way.  And I
18    don't know.  I don't know how she interacts at
19    the office.  I know I don't want to get in this
20    situation ever again.
21    BY MR. SANFORD:
22          Q.   Okay.
23                I'm sharing a document with you in
24    the chat.
25          A.   I would like to make sure that
```



Page 225

 1    BY MR. SANFORD:

 2         Q.   Mr. De Niro, have you had an

 3    opportunity to review what's been marked as

 4    Exhibit 121?

 5         A.   Yes, I did.

 6         Q.   What is that Exhibit 121?

 7         A.   I did.  Yes, I did.

 8         Q.   Okay.

 9              And what is the document you

10    reviewed?

11         A.   It is the one where I say to Chase

12    "That's fine.  Certain things have to be

13    finished out.  I want as little as possible done

14    by you.  That certain things might just have to

15    be resolved and only by you.  You'll be let

16    known what they are.  Thanks, Bob".

17              She goes on with the e-mail she sent

18    the other time.

19         Q.   Okay.

20              And Ms. Robinson was never informed

21    of what she needed to do to facilitate the

22    transition; isn't that right?

23         A.   Well, that only might have been

24    because she started other things that put me on

25    the defensive and I didn't know what to do and I



Page 226

1   also, like as knowing that she had taken things

2   like air miles and other things, things were

3   missing.  And now, this is something else.  I

4   was surprised, frankly, to hear that.

5              If anything, I thought she would

6   just be honorable, correct.  Do the right thing.

7   None of this would -- disputes happen with

8   people.  That's okay.  That's life.  But to take

9   because you think you're entitled to it.  I gave

10  you enough -- when we talked, I gave you, I said

11  the 60 or 80 or 70,000 for the next few months

12  after -- through the holidays to help me is one

13  thing.  I don't remember guaranteeing her two

14  years for that.  I just don't remember doing

15  that.  I wouldn't do that.

16       Q.   As far as you know, no one at Canal

17  ever reached out to Ms. Robinson to coordinate

18  the logistics of the transition, right?

19       A.   No, but I knew there was going to be

20  legal problems.  I did sense that and I told Tom

21  "I have a feeling we're going to have a problem,

22  but let's just see.  Hopefully it works out

23  nicely and there's no problem".  I don't want to

24  have problems.  I don't want to go through all

25  this.



Page 248

1                         ERRATA SHEET

2

3     PAGE      LINE#      CHANGE                          REASON

4     91        1          insert "would" after            Clarification
                           "they"

5     132       8          Change "allision" to "illusion"  Transcription error

6     189       3          change "Mr." to "Ms."           Transcription error

7     214       7          insert "and" before "Hackett"    Clarification

8     229       18         Change "principal" to "principle"  Incorrect word

9     339       16         Change "phone number" to "credit  Clarification
                           card number"

10    342       8          Change "phone number" to "credit  Clarification
                           card number"

11    352       24         Change "Montague" to "Montoye"   Transcription error

12    353       1          Change "Montague" to "Montoye"   Transcription error

13    386       20         Change to "That she can          Transcription error
                           abuse it? No."

14    420       2          insert "her" instead of "the"    Transcription error

15    422       11         insert "was" before "just"       Clarification

16    427       17         Insert "Say" after "can"         Clarification

17    224       1          Change "Samuel Hevn"            Correction of
                           to "Sandy O'Heaven"             name

18    ____      ____       _____              _____

19    ____      ____       _____              _____

20    ____      ____       _____              _____

21    ____      ____       _____              _____

22    ____      ____       _____              _____

23    ____      ____       _____              _____

24    ____      ____       _____              _____

25    ____      ____       _____              _____



1                    SIGNATURE PAGE

2                         OF

3                  ROBERT DE NIRO

4

5        I hereby acknowledge that I have read the

6   foregoing deposition, dated April 4, 2022, and

7   that the same is a true and correct transcription

8   of the answers given by me to the questions

9   propounded, except for the changes, if any, noted

10  on the attached errata sheet.

11

12  SIGNATURE: _____

13

14  WITNESSED BY: _____

15

16  DATE: _____5/11/22_____

17          THOMAS A. HARVEY
            Notary Public, State of New York
18             No. 02HA6051878
            Qualified in Westchester County
19      Commission Expires December 4, 20 22

20

21

22

23

24

25


MAGNA ▶