# EXHIBIT 2

Page 251

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,


                    Plaintiff,


              - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME II

ZOOM VIDEOCONFERENCE DEPOSITION OF

ROBERT DE NIRO

April 5, 2022



MAGNA LEGAL SERVICES

(866) 624-6221
www.MagnaLS.com




Page 270

```
 1            A.   I don't see that.

 2            Q.   In the fifth paragraph.

 3            A.   In the fifth paragraph.  Oh, yes,

 4      okay.  I see it.

 5            Q.   Okay.

 6                 As of December 2018, what were the

 7      other perks that Ms. Robinson received in

 8      addition to her base salary, do you know?

 9            A.   I don't know.  I don't remember or

10      don't know really.

11            Q.   All right.

12                 And in late 2018, can you describe

13      for me all the expenses that Ms. Robinson was

14      authorized to charge to Canal?

15            A.   No, I can't.  I don't remember

16      really.

17            Q.   Okay.  All right.

18                 You testified yesterday that Canal

19      has never had written policies, correct?

20                 MR. DROGIN:  Objection to form.

21            A.   What?

22                 MR. DROGIN:  You can answer.

23      BY MR. SANFORD:

24            Q.   You testified yesterday, did you

25      not, that Canal has never had written policies,
```



Page 271

1    correct?

2          A.    Yes.  I guess I did, yes.

3          Q.    And that's true, correct?

4          A.    Yes.

5          Q.    Okay.

6                You generally had conversations with

7    employees concerning expenses orally rather than

8    in writing?

9          A.    Right.

10         Q.    Is that right?

11         A.    Yes.

12         Q.    And do you remember during

13   Ms. Robinson's employment what Canal's practices

14   were concerning employee expenses?

15         A.    No, I don't know those specifics.

16         Q.    Do you remember during

17   Ms. Robinson's employment what Canal's standard

18   operating procedure was with respect to employee

19   reimbursements?

20         A.    No.  Oh, I mean I would know if

21   something was spent and charged to me where it

22   shouldn't be.  Of course, I would.

23         Q.    And how would you know if something

24   was charged to you that shouldn't be?

25         A.    Well, it would be brought to my



1   what was being done by, by her, Chase.

2   BY MR. SANFORD:

3        Q.   During Ms. Robinson's employment, if

4   an employee was working through dinner, Canal

5   would pay for that dinner, right?

6        A.   Can you repeat that?

7        Q.   Sure.

8             During Ms. Robinson's employment, if

9   an employee was working through dinner, Canal

10  would pay for that dinner, right?

11       A.   It would seem that that would be

12  what should be done, of course.

13       Q.   And did you place any limits on meal

14  expenses Canal paid for its employees?

15       A.   I left that up to Chase and common

16  sense by everybody.

17       Q.   And during the period of 2008 to

18  2019, as far as you were aware, what other food

19  or drink expenses would Canal pay for on behalf

20  of its employees?

21       A.   I can't -- I don't really have an

22  answer.  I don't know.

23       Q.   During the period of 2008 to 2019,

24  there were various circumstances where Canal

25  would pay for employees to take taxis and Ubers



Page 276

1    and Lyfts, correct?

2         A.   I don't even know that.  But again,

3    that was up to her.  So, I again say it was up

4    to her to do what was right, ethical, and it is

5    that simple.

6         Q.   What were the circumstances when

7    Canal would pay for employees to take taxis,

8    Ubers or Lyfts?

9         A.   It would only be if it was at night

10   or some time which is not normal work hours.

11   That's what I would expect, you know.  Again,

12   common sense.

13        Q.   Did you ever say that to anybody?

14        A.   They knew that's how I felt, and I

15   had said it, I know it, from time to time to

16   Chase.

17        Q.   Who did you tell?

18        A.   I said it to her.

19        Q.   And Chase would apply those

20   guidelines to her assistants and the employees

21   at Canal?

22             MR. DROGIN:  Objection to the

23        form.

24             THE WITNESS:  I'm sorry.

25             MR. DROGIN:  Objection to the



1           form.

2                    You can answer.  Go ahead.

3           A.   I relied on her judgment about those

4      things.

5      BY MR. SANFORD:

6           Q.   Do you remember any conversation?

7           A.   No, not specifically.

8           Q.   Describe for me what you told

9      Ms. Robinson over the years about what expenses

10     she was generally authorized to be reimbursed

11     for Canal.

12                   Do you remember any conversation?

13          A.   It is not like I had any -- she knew

14     and I didn't have to go into detail.  It was

15     common sense.

16                   If she brought something to my

17     attention about it, I would say, "Well, you

18     know, use your best judgment about that.  But

19     let's not, let's not waste -- let's not

20     overindulge and, you know, use common sense.

21     Period.  I rely on you to do that."

22          Q.   Ms. Robinson was authorized to

23     charge more types of expenses to Canal than your

24     other executive assistants were, correct?

25                   MR. DROGIN:  Objection to the



Page 279

```
 1    was working, correct?
 2                   MR. DROGIN:  Objection to the
 3         form.
 4                   You can answer.
 5         A.   Yes, I don't know.  I don't know.  I
 6    can't even answer.  I expected that she worked
 7    that out with my business people as to what
 8    would be appropriate.
 9                   And if there was something that was
10    inappropriate or something was flagged, they
11    would make me aware of it or I expected her
12    before that to make me aware of it.
13    BY MR. SANFORD:
14         Q.   Ms. Robinson was generally
15    authorized to charge dinners to Canal while she
16    was working; isn't that right?
17                   MR. DROGIN:  Objection to the
18         form.
19         A.   Again, it is common sense.  If
20    you're working, you could charge for dinner, of
21    course.
22    BY MR. SANFORD:
23         Q.   And your business people never
24    flagged a concern about Ms. Robinson's meal
25    expenses prior to her resignation; isn't that
```



Page 280

1   right?

2         A.   I can't remember.  I don't know.

3         Q.   Do you recall what you, what you

4   authorized Ms. Robinson to charge Canal for

5   regarding meals and coffees?

6         A.   Say that again.

7              MR. SANFORD:  Strike that.  It

8          was a poorly phrased question.  Let me

9          strike that.

10  BY MR. SANFORD:

11        Q.   Do you recall conversations you had

12  with Ms. Robinson over the years about the

13  circumstances when she was authorized to charge

14  Canal for her meals and coffees?

15        A.   Well, like I said, everything I just

16  said about common sense and so on.  And if

17  there's something, she can deal with my

18  accountants or my lawyer -- one of my lawyers on

19  it.

20        Q.   Well, you know that Ms. Robinson

21  often used taxis and Ubers in connection with

22  work for you, correct?

23              MR. DROGIN:  Objection.

24          Objection to the form.

25              Go ahead.



Page 281

 1          A.   I was aware of it.

 2   BY MR. SANFORD:

 3          Q.   And you can say for certain, or

 4   can't you say for certain, that any of the taxi

 5   and Uber charges that appeared on the Canal

 6   American Express under Ms. Robinson's name were

 7   not made in connection with work Ms. Robinson

 8   was doing for you?

 9               MR. DROGIN:   Same objection to

10        the form.

11               Go ahead.

12          A.   Well, I later learned that she was

13   charging Ubers while she was in London to me.  I

14   don't know, even in LA.  That was not something

15   she ever brought up and asked my approval for.

16               She also had rented a car when she

17   was in LA, but also using Ubers, I was told.

18   That was not appropriate.  That was not right.

19   That was not ethical.  Period.

20   BY MR. SANFORD:

21          Q.   Well, let me, let me break down what

22   you just said for a second here.

23               When you say that Ms. Robinson was

24   in LA and had rented a car, this is a work trip

25   in LA, correct, you're referring to?



Page 297

1          Q.   I'm going to get into all of that, I

2     promise you.

3          A.   Well, be my guest.

4          Q.   We're going to spend a lot of time

5     together, Mr. De Niro.

6          A.   Good.

7          Q.   We're just getting started.

8               But I'm asking you right now with

9     respect to taxis and Ubers and Lyfts, whether

10    you looked at any line item at any time on any

11    credit card and asked yourself was she doing

12    work for me.

13              Did you ever do that?

14         A.   I don't look at line items.  Excuse

15    me.  Again, it goes back to trust.  I don't

16    nitpick and go over every day.  After everything

17    she did with me, what cab did she take?  What

18    did she do?  What did she spend?

19              I don't do that.  My accountants do

20    that.

21         Q.   So you never satisfied yourself that

22    she did anything improper by looking at any line

23    item?

24         A.   The satisfaction is feeling that I

25    can trust her.  If she has broken the trust, it



Page 331

1            You don't dispute that Canal credit

2    card under Ms. Robinson's name was on file at

3    Paola's, right?

4         A.   No, no, I don't.

5         Q.   And at times, meals that you had at

6    Paola's were charged to the Canal credit card

7    under Ms. Robinson's name; isn't that right?

8         A.   When I would ask her to get

9    something to have it delivered to the house or

10   something like that.  Normally I paid for it

11   with my own credit card when I go there, which

12   was most of the time.

13            I didn't order take-out that much

14   from there, but I did at times.

15            MR. SANFORD:  All right.

16            Let's take a look at ROBINSON

17         5720, and this is exhibit -- what's the

18         next exhibit here, 126.

19               (Document bearing Bates

20         stamp Nos. ROBINSON 5720 was marked

21         as Plaintiff's Exhibit 126 for

22         identification, as of this date.)

23            MR. SANFORD:  And let's go off

24         the record.

25               THE VIDEOGRAPHER:  The time is



 1          A.   No, but you're saying I paid for

 2     them for meals that I had.

 3          Q.   Well, we have already established

 4     that.

 5          A.   Now you're going to say she did work

 6     and therefore she charged these meals to her.

 7          Q.   Right.

 8          A.   That's fine.  I never authorized

 9     those.  She never -- if she asked me, I might

10     have said yes.

11               But I don't even see what those

12     meals are.  She might have had friends, for all

13     I know.  Let me see what the amount is.  Let me

14     see who it is for.

15          Q.   All right.

16               At times Ms. Robinson would pick up

17     food and supplies for you from Whole Foods,

18     right?

19          A.   I think from time to time, yes.

20          Q.   And at times Ms. Robinson would pick

21     up food for you from Dean & DeLuca, right?

22          A.   I'm not so sure about Dean & DeLuca

23     unless I just forgot.

24          Q.   Ms. Robinson was authorized to

25     charge working meals from Whole Foods to the



Page 341

 1   years.

 2              You haven't done that, have you?

 3        A.   No, I haven't.  But what are you

 4   saying?  What are you saying for Chase Robinson?

 5   I don't understand what the point of all this

 6   is.

 7        Q.   Are you saying you need to review

 8   each individual charge in detail to ascertain

 9   whether -- let me finish.

10              Mr. De Niro, you're doing that thing

11   again.

12        A.   Oh, go ahead.

13        Q.   You're doing that thing again.  I'm

14   going to ask you to be respectful of the court

15   reporter.

16              MR. DROGIN:  Well, in fairness,

17         you're both talking over each other.

18              MR. SANFORD:  Well, I was in the

19         middle of talking and he interrupted me.

20        A.   Okay.  You finish and I will say

21   what I have to say.

22   BY MR. SANFORD:

23        Q.   Is it your testimony, sir, that you

24   need to review each individual charge in detail

25   to ascertain whether the charge was proper or



Page 342

 1    improper?

 2          A.   Well, now that you --

 3                MR. DROGIN:   Objection.

 4           Objection to the form.

 5          A.   Now that you have brought it up in

 6    this way, yes, I would want to see because I

 7    don't know what the point of showing me this.

 8                It is my phone number, my name, me.

 9    That could be anybody.  It is not even Chase

10    Robinson.  I don't know -- there's not even a

11    credit card.  There's nothing.  So I don't know

12    what the point is.

13    BY MR. SANFORD:

14          Q.   Can I get your commitment that

15    sometime over the course of the next days

16    between now and the next deposition we're going

17    to have together, you'll review all the charges

18    and come prepared to answer questions?

19          A.   I'll tell you this, my accountants

20    --

21                MR. DROGIN:   Hold on.  Hold on.

22           Stop.  Stop.  He's not going to direct

23           what you're going to do after the

24           deposition.

25                MR. SANFORD:   I didn't direct



Page 343

```
 1              anything.  I asked him a question.
 2                   MR. DROGIN:  You're asking for
 3              his commitment.  You're not going to get
 4              his commitment because he's going to
 5              confer with counsel.
 6   BY MR. SANFORD:
 7        Q.   Well, Mr. De Niro, I'm just asking
 8   you whether it is something you would be willing
 9   to do, look at the charges and then come
10   prepared to answer questions about the charges
11   at the next deposition?
12        A.   Yes, absolutely.  You know what I
13   would do is my accountants would look at them
14   and they would pick out the ones that are
15   questionable or -- not even questionable; that
16   they want an answer from me about.
17                   And I would say, "Okay, that's okay.
18   That I don't understand.  Why is this there?
19   That maybe."
20                   That I'm entitled to, right, since
21   you're bringing the subject up in the first
22   place, like she did something.
23                   All you're saying -- yes, we know
24   she paid for things for me.  That we know.  But
25   now we want to see what she paid for or did she
```



Page 346

1           Q.   All right.

2           ████████████ is your former romantic

3     partner and the mother of your twins, right?

4           A.   Yes.

5           Q.   Can you describe for me all the work

6     that Ms. Robinson performed to assist ██████

7     in 2018 and 2019?

8           A.   No, I can't describe all that.  She

9     did certain things and then it just sort of

10    didn't continue anymore.

11          Q.   Do you remember what those certain

12    things were?  Do you remember any of them?

13          A.   ████████████████████████

14    ████████████████████████████

15    ████████████████████████

16    ██████

17          Q.   ██████████████████████

18    ██████

19          A.   ████████████████

20          Q.   And Ms. Robinson ████████████

21    ██████, is that what your testimony is?

22          A.   In some way.  I don't know the

23    details.  That was a vague thing.  I just said

24    see if you can help in this way.  I think with

25    Robin Chambers too.



1    after she returned to New York City?

2         A.   I don't.

3         Q.   Ms. Robinson generally arranged her

4    travel around your schedule, didn't she?

5         A.   Pretty much, except when she wanted

6    to go to Spain or England or something like

7    that, you know.

8         Q.   I'm sorry?

9         A.   Kidding.  I'm joking.  I'm half

10   joking.

11        Q.   Well, she generally arranged her

12   travel around your schedule, right?

13        A.   That's -- that should have been what

14   it is, what the situation is.

15        Q.   That's, in fact, what it was,

16   correct?

17        A.   I, I -- yes, I guess.

18        Q.   Ms. Robinson at times had to change

19   or cancel her trips due to your schedule, right?

20        A.   That could be, yes.

21        Q.   Ms. Robinson had a general practice

22   of keeping you informed of her travel plans;

23   isn't that fair to say?

24        A.   She had to, yes, of course.

25        Q.   And at times Canal would pay for its



Page 358

```
 1    employees' air travel by using SkyMiles --
 2         A.   Yes.
 3         Q.   -- generally provided by corporate
 4    credit cards, correct?
 5         A.   Right.
 6         Q.   Do you remember which employees' air
 7    travel that Canal would pay for using SkyMiles?
 8         A.   No, I don't, other than Robinson's.
 9    I don't know who else.
10         Q.   But Robinson for sure, yes?
11         A.   Yes.
12         Q.   You didn't generally use SkyMiles to
13    book your own flights, right?
14         A.   Well, I might have even had to use
15    it once or twice.  I don't know.  I don't
16    remember.
17         Q.   But you didn't generally use
18    SkyMiles to book flights for you or your family,
19    right?
20         A.   No.
21         Q.   When you say no, you mean it is
22    correct what I'm saying?
23         A.   Yes.
24         Q.   Okay.
25              And it was common for you to charter
```



Page 366

1     during her employment when it came to using the

2     SkyMiles?

3            A.   Well, once she asked me if she could

4     --

5                 MR. DROGIN:  Objection to the

6          form.

7                 Go ahead.

8            A.   One time she asked me if she could

9     put some mileage on.  She said "Can I just tack

10    some miles on for me when I need them?"  I said

11    "Yes, well, whatever you need".  And then, lo

12    and behold I see later and before she quit, she

13    tacked on a couple million miles to her account.

14    So can she explain that?

15    BY MR. SANFORD:

16           Q.   Beginning in 2015, you gave Ms.

17    Robinson use of the SkyMiles for personal travel

18    as a perk of her position at Canal; didn't you?

19           A.   I don't remember that, no.

20           Q.   It could have happened, you just

21    don't remember?

22           A.   I don't care.  That's maybe what she

23    told you.  I don't remember it.

24           Q.   You don't remember it one way or

25    another, correct?



Page 379

 1   answer.

 2          Q.   All right.

 3               During Ms. Robinson's employment --

 4               MR. DROGIN:  Counsel, if you

 5          don't want the would have, could have,

 6          should have, please don't ask him

 7          anymore about what happens if she

 8          testifies at trial.

 9               I agree with you it is

10          inappropriate.

11   BY MR. SANFORD:

12          Q.   During Ms. Robinson's employment,

13   Mr. Tasch never raised any concerns to you about

14   Ms. Robinson's use of SkyMiles, did he?

15          A.   I don't remember, but he was

16   definitely on -- I don't know if you could say

17   on point, but he never conveyed this to me, but

18   I knew, because he knew what she was doing --

19   constantly trying to question everything, even

20   him, Berdon, everybody.  So...

21          Q.   You never placed any limit on the

22   amount of reward points or miles Ms. Robinson

23   could use?

24          A.   That's not for me to do.  I don't

25   know a million miles from two million miles,



1  though I know three or four million miles is too

2  much.  She is stealing.  She is taking which she

3  did.  So what are we talking about?

4         Q.   You never placed any limit on where

5  Ms. Robinson could travel by using Canal reward

6  points --

7         A.   No, no, I would.  She's not going to

8  travel to China or to some other part on the

9  other side of the world or Australia and I need

10 to know why and then I need to know how many air

11 miles will be used in that.

12        Q.   And did you ever communicate any

13 restriction to Ms. Robinson on her use of Canal

14 reward points?

15        A.   I didn't have to communicate --

16        Q.   You're doing that thing.  You're

17 doing that thing again.

18        A.   Okay.  No, no.  This case -- no pun

19 intended.

20        Q.   Mr. De Niro, we have to just get a

21 clean record.

22             So my question is:  You never

23 communicated any limits on where Ms. Robinson

24 could travel using Canal's reward points or

25 miles, did you?



Page 381

```
 1          A.   I never --
 2              MR. DROGIN:  Objection to form.
 3          A.   I never, I never communicated that
 4     because I trusted her.  So, but she had to tell
 5     me if she was intending to go say to Australia,
 6     are you going for business for me or are you
 7     going to look for a hotel.  If that was the
 8     case, if I was doing a movie there, which I
 9     wasn't, or are you going there for own private
10     thing.
11              Then you say well, can I use the air
12     miles.  How many air miles is that and what does
13     it cost me because I want my kids to be able to
14     use them.  Well, it would be this.  Well, that's
15     dipping into my kids' things.  So I you better
16     just -- well, I think you can take part and
17     that's it.
18              No, we would and could negotiate
19     like that.  So I trusted her, though, but she
20     knew she had to tell me where she's going,
21     what's she is doing.  I'm sorry, she might have
22     thought she could just do whatever she wanted.
23     But she damn well couldn't and Michael Tasch was
24     going to be the backup for that.  The back stop,
25     as he should have been and should be.
```



Page 385

```
 1              speaking objection and there are a
 2              couple on the record because they're
 3              appropriate.
 4                   You are mischaracterizing what
 5              the witness is saying in search of a
 6              sound bite.
 7                   MR. SANFORD:  Do you know the
 8              purpose of the federal rule about
 9              objections and form?  The purpose of the
10              rule is to prevent exactly what you're
11              doing now.
12                   THE WITNESS:  I don't know who
13              you're talking to.
14                   MR. SANFORD:  No, I was talking
15              to your counsel who was misbehaving.
16                   THE WITNESS:  Are you saying that
17              my counsel --
18                   MR. DROGIN:  We can show the
19              transcript to the court and the court
20              will decide.
21    BY MR. SANFORD:
22         Q.   Mr. De Niro, you expected Ms.
23    Robinson to keep you informed of her travel
24    plans, right?
25         A.   That's the least she could have done
```



Page 386

```
1    and should have done.
2         Q.   And she needed to tell you when and
3    where she would be traveling, right?
4         A.   Yes, she did.
5         Q.   In fact, Ms. Robinson did keep you
6    informed of her travel plans; didn't she?
7         A.   As far as I recall, she did.
8         Q.   And other than expecting Ms.
9    Robinson to keep you informed of her upcoming
10   travel plans, you didn't place any specific
11   restrictions on Ms. Robinson's transferring
12   SkyMiles, right?
13              MR. DROGIN:  Objection to the
14         form.
15        A.   No, I told her -- let me explain to
16   you.  I told her, she said "I would like to put
17   some of them on to mine.  She said I need them.
18   I said okay.  I trust you.  You do what you
19   think is right".  That's how I left it.  What
20   does that mean?  That she can abuse it, no.
21   BY MR. SANFORD:
22        Q.   Prior to Ms. Robinson's resignation,
23   you approved a trip Ms. Robinson planned to take
24   to LA in 2019, right?
25        A.   What was the trip for?
```



Page 388

```
 1          Q.   2019.
 2          A.   What time of year?
 3          Q.   I don't know the specific date.  It
 4     was in 2019.
 5          A.   You don't know that?  You've got to
 6     know that.
 7          Q.   I don't know it offhand.  I'll get
 8     it for you after we take a break, but I'm
 9     telling you I don't know right now.
10          A.   All right.
11          Q.   Do you remember, do you remember,
12     though, that trip though that she took to
13     Scotland apparently in --
14          A.   I'll know -- I'll remember it
15     better, if I remember it at all, if you give me
16     the date when she went and it was tied into when
17     I had to go to England then for this Warburton
18     thing and another thing I did in Europe.  I
19     think it was going to the Moroccan Film
20     Festival, I think.
21          Q.   And Ms. Robinson was authorized to
22     use Canal SkyMiles for that trip, wasn't she?
23          A.   I'm not sure.
24          Q.   Prior to Ms. Robinson's resignation,
25     you approved multiple trips that Ms. Robinson
```



Page 389

1    planned to take to London in 2019, right?

2         A.    I don't know if I -- I don't see

3    myself approving multiple trips.  You mean she

4    went multiple times?

5         Q.    There were plans to go more than

6    once to London in 2019, do you remember that?

7         A.    And what happened, did she go?

8         Q.    You don't remember is the answer?

9         A.    I don't remember.  You could tell me

10   and I can tell you whether I remember it or not.

11        Q.    And, therefore, you don't remember

12   whether she was authorized to use Canal SkyMiles

13   for the trip to London?

14              MR. DROGIN:  Objection to the

15         form.

16        A.    I guess I'm going to have to say I

17   don't remember.

18              MR. SANFORD:  All right.

19              Let's take a break.  Back in five

20         minutes.

21              THE WITNESS:  Okay.

22              THE VIDEOGRAPHER:  The time is

23         1:06.  We're going off the record.

24                   (Whereupon, at 1:06 o'clock

25            p.m., a recess was taken until 1:22



Page 391

1          Q.   Right.  I understand.  I understand.
2     I'm just trying to get a simple question, simple
3     answers.
4               As long as Ms. Robinson got her work
5     done, you did not care if she put on the TV
6     during the day, yes or no?
7                    MR. DROGIN:  Objection to the
8           form.
9                    You can answer.
10         A.   No, I don't, I don't even know how
11    to answer that question.
12    BY MR. SANFORD:
13         Q.   The main thing was Ms. Robinson had
14    work to do and you wanted her to do it, right?
15         A.   Yes.
16         Q.   Whether she had Beethoven's 9th
17    Symphony in the background or NetFlix in the
18    background, you really didn't care as long as
19    she got her work done, right?
20                   MR. DROGIN:  Objection to the
21          form.
22                   You can answer.
23         A.   Yes.
24    BY MR. SANFORD:
25         Q.   Is that a "yes"?



Page 419

```
 1              A.    Yes.

 2              Q.    And then Tiffany responds, Tiffany

 3    Chen responds "Tom will get her".

 4                    Do you see that?

 5              A.    Yes.

 6              Q.    All right.  All right.

 7                    It is fair to say that you were

 8    upset that Ms. Robinson was threatening legal

 9    action, right?

10                    MR. DROGIN:  Objection to the

11         form.

12              A.    Yes.

13    BY MR. SANFORD:

14              Q.    I'm sorry, your answer is?

15              A.    Yes.

16              Q.    And fair to say, too, that you

17    considered Ms. Robinson's legal claims to be

18    disloyal, is that fair?

19                    MR. DROGIN:  Objection to the

20         form.

21              A.    Yes, I mean, I don't -- I guess

22    she's threatening legal action if she does not

23    get a response by the 12th.  I don't know what

24    that was sent before.  What letter was sent?

25    Was it that I had to sign that thing that she
```



Page 423

```
 1           A.   No, I don't remember that.
 2                MR. DROGIN:  Objection to the
 3            form.  Objection to the form.
 4                Go ahead.
 5           A.   No, I don't remember that, no.
 6   BY MR. SANFORD:
 7           Q.   You don't remember that?
 8           A.   No.
 9           Q.   It could have happened, you just
10   don't remember?
11                MR. DROGIN:  Objection to the
12            form.
13           A.   I don't remember.  I was, you
14   know -- I was -- that's it.
15   BY MR. SANFORD:
16           Q.   You reviewed correspondence from Ms.
17   Robinson's lawyers asserting claims of
18   discrimination, retaliation and wage and hour
19   violations, didn't you?
20                MR. DROGIN:  Objection to form.
21           A.   I don't even know that I saw that.
22   I was just very angry about what the game she is
23   playing.  What she has done.  The whole thing.
24   And I'm ready to go after her.  I have no reason
25   to wait.
```



Page 424

```
 1   BY MR. SANFORD:

 2        Q.   Okay.

 3             And you wanted to go after her,

 4   right?

 5        A.   Of course I wanted to.  I wanted her

 6   to return the stuff.  Do what's right.  She

 7   handled it all in the wrong way and, you know,

 8   she is sneaky.  I don't want to even call names.

 9   The whole thing is so sad and pathetic that I

10   don't know, you know.

11        Q.   You are the person who decided to

12   file a lawsuit against Ms. Robinson, right?

13        A.   Yes, I guess so, yes.

14        Q.   And did you review the lawsuit that

15   you decided to file against Ms. Robinson before

16   it was filed?

17        A.   I was aware basically what it was,

18   the gist of it.

19        Q.   What does that mean?

20        A.   I was aware of the gist of it.

21        Q.   Answer my question.

22             My question was:  Did you review it,

23   did you read the lawsuit before it was filed?

24                  MR. DROGIN:  Objection to the

25        form.
```



Page 425

```
 1          A.   I don't know if I read it.  I don't
 2    know if I read it.  I just say okay.  Go after
 3    her.  Period.
 4    BY MR. SANFORD:
 5          Q.   You said go after her, file whatever
 6    you want to file?
 7          A.   Yes.
 8               MR. DROGIN:  Objection to the
 9          form.
10               That's not what the witness said.
11    BY MR. SANFORD:
12          Q.   Did you review any documentary
13    evidence before Canal filed a lawsuit against
14    Ms. Robinson?
15          A.   I was aware of things she had done,
16    yes.
17          Q.   Why did you decide to seek millions
18    of dollars in damages against Ms. Robinson?
19               MR. DROGIN:  Objection to the
20          form.
21               And I note that there was a
22          30(b)(6) witness that has already been
23          questioned about this and that --
24               MR. SANFORD:  I know, but I'm
25          asking this witness who decided to file
```



1    away.  We let this thing just die and I'll be

2    very happy.

3         Q.   Do you think you have destroyed her

4    life?

5         A.   I have not destroyed her life.  She

6    destroyed her own life, if she destroyed it.

7         Q.   You think she destroyed her own life

8    and you had nothing to do with it?

9         A.   She has to cop to what she did.  She

10   has to, you know, maybe ask for forgiveness from

11   people because she has done things that you just

12   don't do.  She's very unprofessional.  I tried

13   to be as lenient as I could.  I tried to do the

14   right thing.  It is very simple.  The honor

15   system.  I trust you.  I assume that everything

16   you're going to do is for the right reasons.

17   I'm sorry, that's the way I am.

18        Q.   You think Ms. Robinson stole $6

19   million from you?

20        A.   No, she didn't steal $6 million.

21        Q.   Why are you asking for 6 million?

22             MR. DROGIN:  Objection to the

23        form.

24        A.   They had a reason.  I mean, that's

25   something -- whatever.  But they had a reason



1    and maybe it is a reason because in order to

2    even get what we get now or what we're doing.  I

3    don't know.

4    BY MR. SANFORD:

5            Q.   You don't think she stole $5

6    million, do you?

7            A.   No, no.

8            Q.   No.

9                 And you don't think she stole $4

10   million, do you?

11           A.   No.

12           Q.   You don't think she stole $3

13   million, do you?

14           A.   Well, no.

15           Q.   You don't think she stole $2

16   million, do you?

17           A.   Well, I'm not sure.

18           Q.   You're not sure.

19                You think she might have stolen $2

20   million?

21           A.   I don't know what she did.  She took

22   certain things and that number obviously is for

23   a reason.

24           Q.   You think there's a reason, you

25   think there's a good reason for $6 million,



Page 431

 1    really?

 2           A.   Let me, let me, yes, I will look in

 3    it.

 4           Q.   You look into it.  I would ask you

 5    to look into that one.

 6                Do you think she stole more than $1

 7    million from you?

 8           A.   She could have, I guess.

 9                MR. DROGIN:  Can you just clarify

10           in these numbers you're counting the

11           cash that she already returned and the

12           gift cards that she already returned?

13           It is just not clear.

14                MR. SANFORD:  I know you like to

15           do the speaking thing, Mr. Drogin, but

16           again, it is against the rules and it is

17           against our stipulation.  So I would ask

18           you not to do that.

19                I'm asking the witness questions

20           and he's giving answers.  He's giving

21           answers to the best of his ability, I

22           believe.

23    BY MR. SANFORD:

24           Q.   Mr. De Niro, do you think Ms.

25    Robinson should be ordered to pay back any of



Page 432

```
 1    the salary that you paid her over the years?
 2                   MR. DROGIN:  Objection to the
 3             form.
 4             A.   No.
 5    BY MR. SANFORD:
 6             Q.   Okay.  All right.
 7                   MR. SANFORD:  Let's take a
 8             five-minute break.
 9                   Off the record.
10                   THE WITNESS:  Okay.
11                   THE VIDEOGRAPHER:  The time is
12             2:20.  We are going off the record.
13                       (Whereupon, at 2:20 o'clock
14                 p.m., a recess was taken until 2:26
15                 o'clock p.m.)
16                   THE VIDEOGRAPHER:  The time is
17             2:26.  We are back on record.
18    BY MR. SANFORD:
19             Q.   All right.
20                   Mr. De Niro, you know you're still
21    under oath?
22             A.   Yes.
23             Q.   Who is Dan Harvey?
24             A.   He's my trainer.
25             Q.   And can you describe the types of
```



Page 248

1                           ERRATA SHEET

2

3     PAGE      LINE#       CHANGE                    REASON

4     91        1           insert "word" after       Clarification
                            "they"

5     132       8           Change "allusion" to "illusion"   Transcription error

6     189       3           change "Mr." to "Ms."     Transcription error

7     214       7           insert "and" before "Hackett"   Clarification

8     229       18          Change "principal" to "principle"   Incorrect word

9     339       16          Change "phone number" to "credit card number"   Clarification

10    342       8           Change "phone number" to "credit card number"   Clarification

11    352       24          Change "Montague" to "Montage"   Transcription error

12    353       1           Change "Montigue" to "Montage"   Transcription error

13    386       20          Change to " That she can abuse it? No."   Transcription error

14    420       2           Insert "her" instead of "the"   Transcription error

15    422       11          Insert "was" before "just"   Clarification

16    427       17          Insert "Say" after "ken"   Clarification

17    224       1           Change "Samuel Hevn"      Correction of
18                          to "Samdy O'Heaven"       name

19    ____      ____        _____          _____

20    ____      ____        _____          _____

21    ____      ____        _____          _____

22    ____      ____        _____          _____

23    ____      ____        _____          _____

24    ____      ____        _____          _____

25    ____      ____        _____          _____



Page 443

1                    SIGNATURE PAGE

2                          OF

3                    ROBERT DE NIRO

4

5          I hereby acknowledge that I have read the

6    foregoing deposition, dated April 5, 2022, and

7    that the same is a true and correct transcription

8    of the answers given by me to the questions

9    propounded, except for the changes, if any, noted

10   on the attached errata sheet.

11

12

13   SIGNATURE: _____

14   WITNESSED BY: _____

15

16   DATE: _____5/11/22_____

17

18                THOMAS A. HARVEY
                  Notary Public, State of New York
19                      No. 02HA6051678
                  Qualified in Westchester County
                  Commission Expires December 4, 2022
20

21

22

23

24

25



MAGNA