# EXHIBIT 3

Page 445

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,

              Plaintiff,

          - against -

ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME III

ZOOM VIDEOCONFERENCE DEPOSITION OF

ROBERT DE NIRO

October 21, 2022

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 457

1    That's it.

2          Q.    Okay.

3                And who did you speak with?

4          A.    Tom Harvey and Greg and Laurent.

5          Q.    And how long did you speak?

6          A.    Forty-five minutes, half an hour.

7          Q.    And when was that?

8          A.    Yesterday.

9          Q.    Any other time did you speak with

10   those individuals or anyone else about this

11   deposition today?

12         A.    A little, a week or two or three

13   ago.  Tom Harvey for a few minutes.  That was

14   it.  That's it.

15         Q.    Did you speak with anyone about your

16   last deposition since the time we were last

17   together until today?

18         A.    No.

19         Q.    Okay.

20               Have you read any materials in

21   preparation for today's deposition?

22         A.    No.

23         Q.    All right.

24               We're going to share, to start

25   today, a document with you in the chat that's



Page 458

1   Bates stamped CANAL 1844.  We previously
2   identified this document as Plaintiff's Exhibit
3   122.
4              Can you see that?
5         A.   I don't see it yet.
6         Q.   Okay.
7              We'll get it for you.
8                MR. DROGIN:  Do you want to
9          screen share?
10               MR. SANFORD:  It is not open.
11        All right.  We'll get back to that.
12               How about that?
13   BY MR. SANFORD:
14        Q.   Let me ask you some questions
15   instead before we review a document.
16               Mr. DeNiro, do you believe that you
17   were generous with Ms. Robinson?
18        A.   Yes.
19        Q.   In what ways?
20        A.   I gave her what she wanted, even
21   titles that she was pressuring me about which I
22   thought were -- in the one sense really
23   meaningless because they were not real titles,
24   but she wanted them.
25               And so, I said okay, if you



Page 459

```
 1   really -- after a lot of pressuring, I said
 2   okay.  It really didn't mean anything, but I
 3   gave them to her.
 4          Q.   Were there any other ways in which
 5   you were generous to Ms. Robinson?
 6          A.   I paid her well.
 7          Q.   Anything else?
 8          A.   I was pretty trusting with
 9   everything.  You know, she would say "Look, this
10   is it, that I need this or that."
11               I would say, "Okay, if you say so,
12   if you think that's -- go ahead."
13               As I say, for me it was the honor
14   system.  You do the right thing.  That's it.
15   Okay.  Fine.
16          Q.   Were you generous to Ms. Robinson
17   when it came to expenses you paid for?
18          A.   Yes, I think I was.
19          Q.   Were you generous to Ms. Robinson
20   when it came to her travel?
21          A.   Yes.
22          Q.   Were you generous to Ms. Robinson in
23   allowing her to work outside of New York?
24          A.   Yes.
25          Q.   How so?
```



Page 460

1           A.   She told me she wanted to move to
2   work from Spain, from England.  There might have
3   been one other place.  LA.  And I said as long
4   as you can get things done, fine, you know.
5           Q.   Were you generous to Ms. Robinson
6   with respect to sky miles?
7           A.   Well, to a point.  She used the sky
8   miles.  I would say to her be careful because my
9   kids need them at times, so I want to make sure
10  that they're available for the kids who will
11  possibly need to travel somewhere.
12          Q.   Sorry.
13               Was there ever a time in
14  Ms. Robinson's employment when you told her that
15  she was not authorized to use Canal sky miles?
16          A.   I don't remember.  I pretty much
17  left that up to her in the way that she would do
18  it.  Again, I was totally trusting in that
19  regard.  I just didn't have a reason not to
20  trust her.
21          Q.   Was there ever a time when
22  Ms. Robinson asked to take a trip for work or
23  for personal reasons that you told her she could
24  not use Canal sky miles?
25          A.   Not that I remember.  I was pretty,



Page 461

1   pretty okay with it.  She would give me a reason

2   and I would say okay.

3          Q.   So during Ms. Robinson's employment,

4   who besides you and Ms. Robinson knew the

5   specifics of what expenses Ms. Robinson was

6   authorized to charge to Canal?

7                  MR. DROGIN:  Objection to the

8          form.

9                  Go ahead.

10  BY MR. SANFORD:

11         Q.   Was there anyone else?  You can

12  answer the question if you understand.  But

13  basically the question is, was there anyone else

14  besides you and Ms. Robinson who knew the

15  specifics of what expenses Ms. Robinson was

16  authorized?

17                 MR. DROGIN:  Same objection to

18         the form.

19                 Go right ahead.

20         A.   Well, I mean, not that I would -- it

21  would be her and that would be it.  Unless my

22  accountants would have to be aware of something

23  that I would then assume, which I shouldn't

24  have, that she would apprise them of whatever

25  needed to -- whatever they needed to be apprised


MAGNA
LEGAL SERVICES

Page 467

```
 1          A.    Not really, no.  Specifically, no.
 2          Q.    What is your best understanding of
 3   what the value is of sky miles?
 4          A.    Well, I understand that they're
 5   valuable and I was given the equivalent, I
 6   guess, in terms of dollars at one point, but
 7   I've forgotten.  But they were valuable and they
 8   were taken from me when they shouldn't have been
 9   and that's not right.
10          Q.    So, I mean, do you have any sense at
11   all like what one sky mile is worth?  Is it
12   worth pennies?
13          A.    No, I don't.
14          Q.    Is it worth a dollar?  Do you have
15   any idea at all?
16          A.    No, I don't know.  I guess you would
17   translate the miles and traveling and what class
18   you're going under.  You could break it down, I
19   suppose, yes.
20          Q.    You generally preferred to fly
21   private, right, not commercial?  Is that a
22   fair --
23          A.    When I can.  Not always, but when I
24   can.
25          Q.    And when you, when you fly
```



Page 468

1    commercial, do you have a preferred airlines you

2    like?

3           A.    No.   I mean, we might have because

4    of the sky miles, Chase could have said, "Well,

5    we're going to ████████ or we should go

6    ████████.  We have the sky miles."

7                  So I would go ████████.

8           Q.    And you liked ████████ because

9    ████████ has first class and you like to travel

10   first class?

11          A.    Yes, that could be, yes, that's it.

12          Q.    And you understand and have

13   understood that ██████ doesn't have first class,

14   right?

15          A.    Yes, it has a good business class,

16   but not first class.   I mean, I have flown ████████

17   a few times.

18          Q.    And you preferred the first class

19   over the business class; is that a fair

20   statement?

21          A.    If I have to get somewhere and I

22   don't have a first class and I would have to

23   take a ██████ business, I'll take it.

24          Q.    Right.   I understand.

25                  But my question is rather, you



Page 469

1  prefer first class over business class.  That's
2  a fair statement, right?
3          A.   In general you could say that, yes,
4  yes.
5          Q.   Mr. DeNiro, at the last deposition,
6  you agreed to look at the individual charges
7  that Canal accused Ms. Robinson of improperly
8  charging and come prepared today to answer
9  questions about the charges.
10              Have you done that, sir?
11              MR. DROGIN:  Objection.
12          Objection to the form.
13              This deposition is being
14          conducted pursuant to a specific court
15          order.  So whatever the witness may have
16          agreed to you with is not binding on him
17          here today, and you don't make deals
18          with the witnesses as to what -- witness
19          as to what he's going to do.
20              So I'm going to object to that
21          question, and whether we direct him not
22          to answer and call the court will depend
23          on how you comport yourself.
24              MR. SANFORD:  Thank you for that
25          speech, Laurent.



1                  MR. DROGIN:  You're welcome.

2  BY MR. SANFORD:

3       Q.   My question, Mr. DeNiro, is you

4  agreed to look at individual charges.

5            Have you done so?

6       A.   I have at one point.  I can't

7  remember the last time I did it, but in

8  preparation for the last deposition, I did look

9  at them.

10           I had to look and get a fair idea

11 and before that just to know what was taken from

12 me.

13      Q.   And were you able to identify a

14 single charge that you contend was improper?

15      A.   There were.  I can't at this moment

16 get specific.  I know she did take things that

17 very clearly she shouldn't have.

18      Q.   Right.

19           But in the last deposition you

20 couldn't get specific either, and that's why I

21 asked if you would be so kind as to review the

22 charges and come prepared to discuss them.

23           You're not prepared to do that?

24      A.   No, I'm not.

25      Q.   Because you don't know of any



Page 490

1    trusting her again a hundred percent.  You say

2    so, then you do it.  I know you're going to do

3    the right thing.

4              She didn't.  She took a lot more

5    miles, sky miles.  She shouldn't have done that.

6    All I can say is, you know, shame on her.

7         Q.   You have used the term checks and

8    balances in reference to your accountants.  Can

9    you explain what checks and balances your

10   accountants provided for Canal Productions?

11        A.   Can you be more specific?

12        Q.   Well, in the last deposition, you

13   referenced checks and balances; that your

14   accountants served as basically a check and a

15   balance on the system.

16             And I'm just wondering, you know,

17   what kind of checks and balances your

18   accountants provided for Canal.

19        A.   Well, checks and balances are the

20   people -- there are other people in this whole

21   situation who, if they sense something that is

22   out of whack or improper, they'll draw my

23   attention to it.

24             I gave Chase a lot of power in a

25   way, and I didn't know that she would abuse it.



Page 492

1   time.  I mean, she did good things.  She

2   bamboozled me.  She had an angle that I'm sorry

3   that she did.  She would still be working for

4   me.

5         Q.   And you're just a bad judge of

6   character then, aren't you?

7         A.   Sometimes I am.  And sometimes I

8   trust people even though I know they're going to

9   probably, they're probably going to do something

10  that's not nice and I give them -- I give them

11  the benefit of the doubt.

12        Q.   And you're just a victim here as you

13  view yourself?

14        A.   I am a victim.  You're damn right

15  I'm a victim.

16        Q.   And you feel victimized, don't you?

17        A.   I sure do.  And I'm not a person

18  that likes to whine that I'm being victimized,

19  but I am being victimized at this time.

20        Q.   Do you think you're whining?

21        A.   I'm not whining.  Not at all.

22        Q.   You're just victimized.

23             Did you ever express any concern to

24  Ms. Robinson or anyone else about her spending

25  before her employment at Canal ended?



Page 493

 1                    MR. DROGIN:  Objection to the
 2           form.
 3           A.   I don't remember that.  No.
 4    BY MR. SANFORD:
 5           Q.   Did you ever express any concern to
 6    Ms. Robinson about use of sky miles before her
 7    employment at Canal ended?
 8                    MR. DROGIN:  Objection to the
 9           form.
10           A.   Yes, I can't remember.
11    BY MR. SANFORD:
12           Q.   Before Ms. Robinson's employment at
13    Canal ended, did your accountants ever bring to
14    your attention any concern about Ms. Robinson's
15    spending?
16           A.   I don't remember.  They might have.
17    You know, I was so trusting with her that she
18    questioned everything about every person I
19    worked with.
20                    And I said, well, if you question
21    it, then let me just see.  Maybe there is
22    something.  Foolishly, you know, I bought into a
23    little of that.
24                    And so, they might have been a
25    little afraid because I gave her a certain



Page 494

1  amount of power that was -- that I shouldn't

2  have, and she abused it.  And people were wary

3  of her.  And I'm sorry that I did that, and I've

4  apologized to some of my people who work for me

5  because, you know, it shouldn't have happened.

6          Q.    Before Ms. Robinson's employment at

7  Canal ended, did your accountant ever bring to

8  your attention any concern about Ms. Robinson's

9  use of sky miles?

10                MR. DROGIN:  Objection to the

11           form.

12                You can answer it.

13          A.    Well, all I remember is that after

14  she resigned, I was made aware that she had

15  taken a lot of sky miles that she was not

16  entitled to.  I never gave her permission to

17  take them.  She just helped herself.

18  BY MR. SANFORD:

19          Q.    Do you still employ Berdon LLP as

20  your accountants?

21          A.    Yes.

22          Q.    Do you still employ Berdon LLP as

23  the accountants for Canal Productions?

24          A.    Yes.

25          Q.    How long has Tom Harvey been general



Page 495

1    counsel for Canal?

2          A.   It has been many years.  I can't

3    remember.  Twenty or more.

4          Q.   During Ms. Robinson's employment at

5    Canal, Ms. Robinson performed work for you while

6    she was away from New York, correct?

7          A.   Right, yes.

8          Q.   And it didn't make a difference to

9    you whether she was in London, Spain, Los

10   Angeles or anywhere else as long as she got her

11   job done, right?

12         A.   It made a difference and I allowed

13   it because I allowed her to go there as long as

14   she felt she could do the work from those

15   places.

16              I guess most employers wouldn't

17   even -- this was before the pandemic.  Most

18   employers would have said, look, that's not

19   going to fly with me.  Some do, maybe.

20              And I was very, very loose with her.

21   I let her do it.  I didn't, you know -- I said

22   "As long as you're there, as long as you take

23   care of business, I'm fine with it.  I'm not

24   sure about it, but if you say so, I'm going to

25   trust you on that."



Page 501

```
 1              o'clock a.m.)
 2                  THE VIDEOGRAPHER:  The time is
 3          11:56 a.m.
 4                  We are back on the record.
 5  BY MR. SANFORD:
 6          Q.   Okay.
 7                  Mr. DeNiro, you understand you're
 8  still under oath?
 9          A.   Yes.
10          Q.   All right.
11                  If Ms. Robinson performed work for
12  you while she was in London or Spain or Los
13  Angeles or anywhere else in the world, for that
14  matter, she would be paid just as much as if she
15  had been working in New York, correct?
16          A.   Yes.
17          Q.   And you would pay Ms. Robinson for
18  days she worked for you regardless of where she
19  performed the work, right?
20          A.   Yes.
21          Q.   And there were times when
22  Ms. Robinson performed errands for you in
23  London, right?
24          A.   Yes.
25          Q.   And if you knew Ms. Robinson was
```



Page 506

1    BY MR. SANFORD:

2         Q.   All right.

3              Mr. DeNiro, you understand you're

4    still under oath?

5         A.   Yes.

6         Q.   All right.

7              If Ms. Robinson ended up working on

8    a day that she was supposed to be on vacation,

9    would you treat that as a working day or a

10   vacation day?

11                  MR. DROGIN:  Objection to the

12            form.

13        A.   I would -- if she said it was a

14   vacation day and she is working, I would say

15   "Okay.  Then you know what you do.  You charge

16   me for the time that you're working."

17              She -- what I have always noticed is

18   that she was always working, always working,

19   doing this, doing that, always kind of

20   intimating to everybody how hard she worked.

21              I said okay.  She was charging me.

22   I paid her well.  Probably more than I should

23   have, but I said okay.

24              So what can I say?  If she tells me

25   she is working or she claims she is working, I



Page 508

1   top of it, so I'm owed a vacation day."

2           She, to me, as I learned as time

3   went on, finagled a little bit, schemed a

4   little.  Okay.  You know, even that I will

5   allow.

6           But there is a point where you just

7   are doing too much.  You're overreaching too

8   much, taking advantage too much.  And you get

9   tired of it.  That's all.  So that's why I was

10  relieved when she, she resigned.

11      Q.   But if she wound up working on a day

12  she was supposed to be on vacation, and working

13  as you understood work to be, you would not

14  require her to --

15      A.   She rarely told me that, "Oh, I

16  should be on vacation today, but I'll work now

17  that you asked me to do this or that."

18           I left it up to her totally.  She

19  decided her work hours.  She decided everything.

20  And I trusted her.  Do you understand?  Do you

21  understand what that means?

22      Q.   Mr. DeNiro -- and I trust you to be

23  faithful to this process and that means --

24      A.   Yes, I'm being faithful.  I'm

25  answering your question.  What more do you want?



Page 513

```
 1          A.    Can you slow down a little, please?
 2                All right.  These are what?
 3          Q.    And so, it says "Hi, Michael.  Below
 4    are the bonuses and vacation payback numbers for
 5    this year."
 6          A.    We're going back a couple of years,
 7    each one.  Now this is 2017.
 8          Q.    '17.
 9          A.    Okay.  Let me just read this.
10    Sorry.
11          Q.    So, let's stop here.
12                You have vacation day payback.  What
13    does that term mean, vacation day payback?
14          A.    Well, what it means to me is that
15    she wanted payback for days that she worked on
16    her vacation, which I totally believed her on.
17    I had no reason to not believe her.  I trusted
18    her.
19          Q.    Okay.  All right.
20                Keep going down.  Keep going down.
21    All right.
22                Did you ever --
23          A.    I don't -- I mean --
24          Q.    Okay.
25                Generally speaking, these are
```



Page 514

1    e-mails that you received from Ms. Robinson at
2    year's end discussing the bonuses and other
3    year-end pay that Canal employees would be
4    receiving, right?
5         A.    Uh-hum.
6         Q.    Is that yes?
7         A.    Say that again, I'm sorry.
8         Q.    These are e-mails that you received
9    from Ms. Robinson at the year's end discussing
10   the bonuses and any other year-end pay that
11   Canal employees would be receiving, right?
12        A.    Right, right.
13        Q.    And before you received these
14   e-mails from Ms. Robinson, you and Ms. Robinson
15   would go over the bonuses and other year-end pay
16   that Canal employees would be receiving, right?
17   You would meet with her to discuss it?
18        A.    Yes.
19        Q.    And at the end of each year, you and
20   Ms. Robinson would have a phone call or
21   in-person meeting to go over bonuses and
22   vacation payback that Canal employees would be
23   receiving for the year, right?
24        A.    Right.
25        Q.    Can you describe for me the



Page 515

1   discussions you and Ms. Robinson would have at

2   the end of each year about the bonuses and

3   vacation payback that Canal employees would be

4   receiving?

5          MR. BENNETT:  During a 16-year

6      period of time or what year?

7   BY MR. SANFORD:

8      Q.   Generally speaking, to the extent

9   you remember any of the conversations in any

10  year, you can describe that.

11     A.   There would just be a conversation

12  about who was getting what for Christmas and

13  bonus, this and that, this and that, and that

14  would be it.  And I would say okay, okay.  I

15  might question something here and there.

16          Rarely did I question anything.  I

17  would said okay, it looks okay to me, and that

18  was it.

19     Q.   All right.

20          And during these year-end

21  discussions, Ms. Robinson would walk you through

22  the work she has done through the year during

23  vacations and the holidays, right?

24          MR. DROGIN:  Objection to form.

25     A.   Well, she would say I did this,



Page 516

1   these are the days I want, like it shows here.

2   She didn't go into specifics of each day of what

3   I did on this day or that day; that's why I'm

4   entitled, I don't think.

5           I mean, maybe from time to time she

6   might have, saying "Oh, I worked, you know" -- I

7   don't remember.

8           Basically I just said, "Look, if

9   this is what you did and this is what you're

10  telling me you did, then fine.  I accept that.

11  I might have a question here and there, but I

12  trust you."  Period.

13  BY MR. SANFORD:

14      Q.   All right.

15           During these year-end discussions,

16  you and Ms. Robinson would reach an agreement

17  regarding how many unused vacation days she

18  should be paid out for, right?

19      A.   Well, sort of.

20           MR. DROGIN:  Objection to the

21      form.

22           Go ahead.

23      A.   It was even more loose than that.

24  She would say "These are my unpaid vacation

25  days."



Page 517

1            And I would say "Okay.  That's it.
2    All right.  I'm taking you at your word."
3    Period.
4    BY MR. SANFORD:
5            Q.   Well, during these year-end
6    discussions, you had the opportunity to ask
7    Ms. Robinson any questions you had about her
8    unused vacation days?
9            A.   I had the opportunity and I also --
10   in a job like hers, the main thing is that you
11   can trust the person who works for you in such a
12   position because you don't have time to go over
13   a lot of things.
14            It is the No. 1 thing that that
15   person be trusted and -- that simple.
16   Honorable.  It is assumed that there's nothing
17   to distrust about them.  Period.
18            Q.   During Ms. Robinson's employment,
19   you were able to follow up on any --
20            A.   It is like -- it is like the
21   military guy that carries the suitcase next to
22   the president walking.  You know what I mean?
23   You trust that person.  I'm half kidding, but I
24   trust her to do the right thing.  Period.
25            Q.   During Ms. Robinson's employment,



Page 518

1    you were able to follow up on any of the

2    information Ms. Robinson provided to you about

3    her unused vacation days?

4         A.   I could, I could follow up on it,

5    and if I had to -- if I found there was a

6    discrepancy, of course I would.

7              That's why when she resigned, Tom

8    Harvey went back into looking into the certain

9    things she had claimed and not given back to me

10   and had helped herself to, I guess you could

11   say, and then there was a problem.

12        Q.   And turning your attention back to

13   the e-mails in Exhibit 49 on the screen, during

14   Ms. Robinson's employment, did you ever dispute

15   anything that Ms. Robinson wrote in these

16   e-mails?

17             MR. DROGIN:  Objection.

18        A.   Very little.  Again, I would say it

19   goes back to trust.  I said look, you say this,

20   I'm not going to call it out unless I feel

21   there's something -- I said, wait a minute.  I

22   don't remember.  That's not what I was going to

23   do.

24             I needed her total support.  I

25   needed to trust her totally.  That's the whole



Page 519

1  point with a position like this.  Period.

2  BY MR. SANFORD:

3      Q.   And after Ms. Robinson sent these

4  e-mails, did you follow up with her in any way

5  about her vacation days?

6      A.   No, I didn't.  I again trusted her.

7  I said "This is what you say.  This is what I am

8  assuming that you have done.  I have no reason

9  not to trust you and say what you say you have

10  done."

11      Q.   And if you had disagreed with

12  anything in this Exhibit 49 in these e-mails,

13  you could have directed your accountant not to

14  issue payments, right?

15      A.   I could have done that, but I don't

16  get into that kind of minutia type thing.  We

17  have worked it out.  I trust her.  She is in

18  that position, and when she tells me something

19  like that, I expect that it is going to be

20  honorable.  It is going to be just.  It is going

21  to be right.  She is going to do the right

22  thing.  I can trust her.  Again, back to trust.

23  It is built into the relationship.

24      Q.   When Ms. Robinson wrote in 2015 that

25  she had used one vacation day, you were aware



Page 528

1    other employees of mine and so on, and I don't

2    think any of them would ever say -- would go

3    along with what she is claiming because I just,

4    you know -- what can I say?  I'm not -- I don't

5    know.

6          Q.    So when Ms. Robinson accused you of

7    discrimination it made you angry, right?

8          A.    Yes, right.  She accused me of --

9    well, it would make me angry.  If I did get

10   angry if she accused me of discrimination.  I

11   personally think that she has mental -- I don't

12   want to go so far as to say mental issues, but

13   she has psychological issues and a sense of

14   entitlement and a blown-up sense of self that

15   makes her feel that she has been put upon in

16   some way and, therefore, she feels that she is

17   kind of like a victim.

18              And, I'm sorry, she wasn't a victim.

19   She victimized a lot of the other employees

20   because they resented her and overstepped.

21              But again, my fault.  I apologized

22   to them for not keeping my eyes open to that

23   situation, and I hope to never have that again

24   ever with an employee.

25          Q.    When Ms. Robinson accused you of



Page 529

1   discrimination and other violations of

2   employment laws, did that cross a line for you?

3        A.   Well, yes, it would cross a line

4   because it is not true.

5        Q.   Are you aware of any aspects of

6   Canal's investigation into Ms. Robinson that

7   Canal employee Michael Kaplan was not involved

8   with?

9             MR. DROGIN:  Objection to the

10        form.

11        A.   I'm not, I'm not clear what you're

12   asking.

13   BY MR. SANFORD:

14        Q.   Was Michael Kaplan involved in all

15   aspects of Canal's investigation into

16   Ms. Robinson, to your knowledge?

17        A.   I don't know that.  I don't have

18   that answer.

19        Q.   Was Sabrina Weeks-Brittan involved

20   in all aspects of Canal's investigation into

21   Ms. Robinson?

22        A.   Well, she was asked to find stuff

23   and go through all the e-mails and stuff like

24   that, as far as I know.

25             And Sabrina is quite, quite a



Page 544

1    improperly charge to Canal, to your knowledge?

2         A.    I'm not sure.  I'm not sure.

3         Q.    And do you know, had Michael Kaplan

4    been taking money from petty cash for personal

5    use?  Does this refresh your recollection?

6         A.    I don't know specifically, but I

7    know he had charged petty cash.  So there was,

8    you know, some thought, well, what's happening

9    with that?

10              This is all a gray area that I

11   didn't -- again, if people are doing the right

12   thing, even if they're doing something that's

13   not quite a hundred percent kosher, I'll let it

14   slide.

15              Do something here -- you buy

16   something for yourself or lunch or do certain

17   things -- if you're outright stealing, that's a

18   problem.

19              I could never determine that.  I was

20   never sure.  I was never sure whether people

21   were helping themselves.  I just was not -- I

22   didn't know.  I never got anything from anyone

23   that could corroborate that.  So it is where it

24   was.

25        Q.    All right.



Page 568

1          A.   Would you have a little advice for

2    your daughter?  "Don't do what Chase Robinson

3    did.  I'm a lawyer.  I'm representing her, but

4    don't do that.  Let me tell you on the side, me

5    and you, honey."

6               Okay.

7          Q.   So there's no, so there's no written

8    policy about $1,000 --

9          A.   This is a lot of bullshit.  No,

10   there's no written policy.  No, the policy is

11   trust.  Trust.

12         Q.   And you never communicated to

13   Ms. Robinson in any way orally or in writing

14   that she couldn't stay in a $1,000 hotel?

15         A.   She knew she couldn't do that and

16   abuse that.  She knew it.

17         Q.   How did she know it?

18         A.   I don't have to tell her.  And maybe

19   I did tell her.  Maybe I said, you know, stay in

20   a -- that's part of working for the situation

21   she was in.  Trust.  You do the right thing.

22              Sabrina would not do that.  Sabrina

23   would know.  And if she had anything, she would

24   ask me.  She would never dare do that.

25         Q.    When Ms. Robinson took a work trip



Page 569

1   for Canal, Canal would pay for her travel, her

2   lodging, and food expenses on the trip, right?

3           A.    What?

4           Q.    When Ms. Robinson took a work trip

5   for Canal, Canal would pay for her --

6           A.    Listen, I trusted her to do the

7   work --

8                 MR. DROGIN:  It is just a "yes"

9            or "no" question.

10          A.    Yes.

11                MR. DROGIN:  Factually, is that

12           correct?

13          A.    Expenses were paid with common

14   sense.  That's the job.  You understand that you

15   were supposed to behave responsibly, not abuse

16   the privilege.

17                MR. DROGIN:  No, the question

18           is -- the question is simple.  He's

19           simply asking that if she took a

20           work-related trip, those types of

21           expenses would be paid just as a matter

22           of fact.

23          A.    No, not those type.  Reasonable

24   expenses would be paid.  Reasonable expenses

25   would be paid.



Page 571

1    February 2019 to assist with items for your
2    townhouse?
3          A.    I don't remember that.  Oh now she's
4    saying that I made her come back from London
5    from work to come here to my townhouse to help
6    me do stuff which she should do.  Give me a
7    break.
8                What's the question?
9          Q.    Do you recall Ms. Robinson speaking
10   to you about returning to London around April of
11   2019?
12         A.    That's about the time she gave me
13   her resignation.
14         Q.    Before then obviously, but --
15         A.    That was about the time because if
16   that was the time, that was when I was starting
17   to get fed up with her behavior.  She said she
18   had stuff to do.
19                I'm trying to accommodate her going
20   back to London to go to work for me when I need
21   stuff in New York, and I was starting to be a
22   little -- starting to get a little agitated;
23   started to feel I'm being taken advantage of.
24         Q.    All right.
25                Ms. Robinson sought your approval to



Page 572

1    return to London around --
2          A.    And I gave it to her.
3          Q.    Okay.
4          A.    Because I like to do the things for
5    people who work for me especially to be right
6    because I wanted them to be happy.  I don't want
7    to be abused.  I don't want to be taken
8    advantage of.
9          Q.    And in 2019, you were going to be
10   shooting a film called The Comeback Trail,
11   right?
12         A.    Yes, I guess it was.
13         Q.    And do you recall Ms. Robinson
14   speaking to you about traveling to London
15   sometime between May and July of 2019 when you
16   were expected to be on set shooting The Comeback
17   Trail?
18         A.    I don't remember.  Whatever, I
19   guess.  Who knows.
20         Q.    Well, you were planning -- the film
21   was going to be shot out of New York, right?
22         A.    Yes.
23         Q.    And so, do you remember approving
24   Ms. Robinson's plan to travel to London between
25   say around May and July of 2019 while you were



Page 573

1   on set?

2          A.    What's the point?   What are you

3   asking?   I'm not understanding what you are

4   asking.

5          Q.    You approved Ms. Robinson being out

6   of New York while you were shooting a film?

7          A.    I could have, yes.   I could have.

8          Q.    And you didn't ask Ms. Robinson for

9   the details about how many sky miles the trip to

10  London would cost, right?

11         A.    I trusted her.

12         Q.    So, is that a "no"?

13         A.    T-r-u-s-t.   Trust.

14         Q.    Is that a "no"?

15         A.    Do you have an assistant who you

16  trust?

17              MR. DROGIN:   It is just a simple

18         "yes" or "no" question.

19              MR. SANFORD:   Thank you, Laurent.

20  BY MR. SANFORD:

21         Q.    Sometimes your attorney and I are

22  all on the same page.

23         A.    Well, that's nice.   That's nice to

24  hear.

25         Q.    It is a nice thing, right?



Page 574

1          A.    He's not in my position.  Even my

2     attorney is not in my position being asked, as

3     far as I'm concerned, idiotic questions, but go

4     ahead.

5          Q.    All right.

6                Well, I'm asking a simple "yes" or

7     "no" to my question.

8          A.    It is more complicated than that.  I

9     said it is trust.

10         Q.    Well, I understand you said that.

11    Now that you said that, can you answer my

12    question?

13               Which is, you didn't ask

14    Ms. Robinson for the details about how many sky

15    miles the trip to London would cost?

16         A.    I didn't have to.  I didn't have to.

17    That's up to her to say, listen, I take so many

18    sky miles to go to London.  That's what I do.  I

19    do it honorably, and I take so many to come

20    back.  Period.  So in that sense, I say yes.

21         Q.    Do you recall Ms. Robinson speaking

22    to you about a friend's wedding that she wanted

23    to go to that would take place in Los Angeles in

24    June 2019?

25         A.    Somewhere I remember that, yes.



Page 575

1          Q.   And in February 2019, Ms. Robinson
2    sought your approval to travel to her friend's
3    wedding that would take place in June of 2019,
4    right?
5          A.   Uh-hum.
6          Q.   Is that a "yes"?
7          A.   So what are you saying?  That I said
8    yes, she should go to that wedding?  Probably I
9    did.
10         Q.   Did you approve --
11         A.   I didn't have to.  I could have said
12   I'm not going to pay for you to go to that
13   wedding.  She went on air miles, yes.
14         Q.   And you didn't ask Ms. Robinson for
15   the details about how many sky miles --
16         A.   No.
17         Q.   -- to Los Angeles would cost?
18         A.   No.  Trust.  Trust.
19         Q.   Do you recall Ms. Robinson speaking
20   to you about wanting to take a trip to London
21   and Scotland in the summer of 2019?
22              MR. DROGIN:  Objection.
23         Objection to the form.  I think there's
24         just an ambiguity as to the dates.
25         You're talking about when she asked?


MAGNA
LEGAL SERVICES

Page 576

1             MR. SANFORD:  Okay.

2             Thank you.  I'll try to be

3         clearer.

4    BY MR. SANFORD:

5         Q.   Do you recall, Mr. DeNiro, speaking

6    with Ms. Robinson at any time about her wanting

7    to take a trip to London and Scotland, a trip

8    that was going to be in the summer of 2019?

9         A.   I could have, yes.

10        Q.   Okay.

11             And do you remember Ms. Robinson

12   explaining to you that she wanted to visit

13   family on the Isle of Lewis?

14        A.   She might have.

15        Q.   And Ms. Robinson sought your

16   approval in advance to take a trip to London and

17   Scotland in the summer of 2019, didn't she?

18        A.   Could have been.  What is it, she

19   was going for vacation or she was asking me to

20   pay for it?

21        Q.   Well, you didn't ask Ms. Robinson

22   for the details about how many sky miles the

23   trip to London and Scotland would cost, right?

24        A.   No, I didn't.  I didn't.  I left it

25   up to her to determine that.  That's her job.



Page 587

```
 1                    The time is 1:36 p.m.  We are
 2          going off the record.
 3                         (Whereupon, at 1:36 o'clock
 4                p.m., a recess was taken until 1:50
 5                o'clock p.m.)
 6                    THE VIDEOGRAPHER:  The time is
 7             1:50 p.m.
 8                    We are back on the record.
 9   BY MR. SANFORD:
10          Q.   All right.
11               Mr. DeNiro, you understand you're
12   still under oath?
13          A.   Yes.
14          Q.   All right.
15               If Ms. Robinson was traveling
16   somewhere on a trip that you directed her to
17   take, she was authorized to be reimbursed for
18   her transportation, lodging and food on that
19   work trip, right?
20          A.   Yes, if it is a work trip.  And,
21   again, it is up to her to responsibly determine
22   what she should pay for certain things.  That's
23   all.
24          Q.   Do you believe that Ms. Robinson
25   should be ordered to pay back any of the bonuses
```



Page 588

1    you paid her during her employment?

2         A.   I don't -- I don't care about that.

3    Let's move on.  You know, let her enjoy whatever

4    bonuses I gave her.  Good luck, you know.

5    Period.

6         Q.   All right.

7              During Ms. Robinson's employment,

8    you could have told her that she couldn't use

9    sky miles but you didn't do that, right?

10        A.   No, she brought it up to me to use

11   sky miles and I said, "Okay.  That sounds good.

12   We can use the sky miles from American Express."

13             And the only time I questioned

14   anything about it, I said one of my kids was

15   saying they wanted to use sky miles and they

16   felt that they were being usurped or something.

17   I don't know whether it was a competitive thing

18   or they just felt that they looked into it

19   through somebody else in the office or Chase

20   said there was so much left.  They said we don't

21   have sky miles.

22             And I said "Well, wait a minute.  I

23   said, Chase, I want to make sure we have enough

24   for the kids."  And I forget what her answer

25   was.



Page 589

```
 1              And then, of course, later she said
 2   "Look, there's a lot of sky miles."  This is
 3   like a year later -- sky miles that I should put
 4   into my thing in case I need it and so on.
 5              And I said, "Well, if you think
 6   that's what you should do, go ahead."  Again,
 7   trust.
 8        Q.   Let's go back to Exhibit 49 for a
 9   minute.
10              MR. SANFORD:  And once you have
11         that up, Simon, let me know.
12              MR. SCHAITKIN:  It is on the
13         screen.
14              MR. SANFORD:  Okay.  Good.
15   BY MR. SANFORD:
16        Q.   So my question, Mr. DeNiro, is you
17   authorized that Ms. Robinson be paid for all
18   unused vacation days that she identified in
19   these e-mails before you in Exhibit 49, right?
20              MR. DROGIN:  Objection to the
21         form.
22        A.   If she asked me to do it and I
23   looked at it, then I would have done it.  I
24   said, you know, yes.
25
```



Page 590

1    BY MR. SANFORD:

2         Q.    Approximately how many conversations

3    do you remember having with Ms. Robinson in 2019

4    about her upcoming travel for the calendar year

5    2019?

6         A.    I don't know.  She just made me

7    aware she was going to go to London.  And so,

8    that was something she was planning, and I

9    didn't oppose it.  I don't know if I asked much

10   about it.  I forget, if anything, and that was

11   it.

12        Q.    And with respect to those

13   conversations you had with Ms. Robinson in 2019

14   about her travel in 2019, you didn't ask her

15   details about how many sky miles she would need

16   to transfer for the trip she was planning, did

17   you?

18        A.    No, I don't ask.  I just -- again,

19   trust.

20        Q.    And is it fair to say you don't

21   remember the details of the conversations you

22   had with Ms. Robinson about her travel in 2019?

23        A.    I mean --

24             MR. DROGIN:  Objection to the

25        form.



Page 591

 1          A.   Vaguely.  I mean, I remember that
 2    she asked or she said "Look, I want to go and I
 3    said okay.  You know, that's fine, as long as it
 4    is done.  I don't even have to say it, as long
 5    as you do it responsibly."
 6               Could I have said that one time,
 7    maybe.  But, you know, it is just like we know
 8    what it is.  Just do the right thing.  Period.
 9    BY MR. SANFORD:
10          Q.   All right.
11               Is there anything else you remember
12    about those conversations you had with
13    Ms. Robinson about her travel in 2019?
14          A.   Not, not offhand, no.
15          Q.   Thinking back to your conversations
16    directly with Ms. Robinson, tell me everything
17    you remember saying and everything Ms. Robinson
18    said about the trip she took to Los Angeles in
19    March of 2018.
20               MR. DROGIN:  Objection.  We have
21          been over this.  We're going backwards.
22               MR. SANFORD:  It is the last
23          question I have on this topic, Laurent.
24          A.   I didn't ask her anything.
25               MR. DROGIN:  Can you read the



Page 592

1          question back?

2                    MR. SANFORD:  Sure.

3                    MR. DROGIN:  Tell me everything

4          you remember.

5     BY MR. SANFORD:

6          Q.   Well, thinking back to the

7     conversations you had with Ms. Robinson, I'm

8     asking if you can tell me everything you

9     remember about what you said to her and what she

10    said to you about the trip she took to

11    Los Angeles in March of 2018.

12                    MR. DROGIN:  Objection to the

13         form.

14         A.   I don't remember much.  That was the

15    trip to California.  For what reason was she

16    going then?

17    BY MR. SANFORD:

18         Q.   So you don't remember much.

19              All right.

20                    MR. DROGIN:  Objection to the

21         form.

22    BY MR. SANFORD:

23         Q.   So let's share a document with you

24    in the chat.  It is Bates stamped CANAL 46701,

25    which is an April 6, 2019 e-mail from Tiffany

