**TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP**
*Attorneys for Defendants Robert De Niro and Canal Productions Inc.*
Gregory Ross Bennett
7 Skyline Drive
Hawthorne, New York 10532
Tel.: (914) 347-8898
Email: gbennett@tsslaw.com

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendant Canal Productions, Inc.*
Laurent Scott Drogin
Brittany Kate Lazzaro
1350 Broadway, 11th Fl.
New York, New York 10018
Telephone: 212-216-8000
Email: ldrogin@tarterkrinsky.com
Email: blazzaro@tarterkrinsky.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRAHAM CHASE ROBINSON,<br><br>    *Plaintiff*,<br><br> - against -<br><br>ROBERT DE NIRO and<br>CANAL PRODUCTIONS, INC.,<br><br>    *Defendants*. | Case No. 1:19-cv-09156-LJL-KHP |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY........................................................................................1

STATEMENT OF THE FACTS ................................................................................2

ARGUMENT ...........................................................................................................2

    I.    Plaintiff's FLSA And NYLL Retaliation Claims Should Be Dismissed Because No Reasonable Factfinder Could Conclude She Engaged In FLSA Or NYLL-Related Protected Activity, Or Experienced Any Causally Connected Adverse Employment Action..................................................................................2

        A.  Legal Standard for Retaliation Claims Under the FLSA...............................2
        B.  NYLL Retaliation Claims are Analyzed Under the Same (FLSA) Standard..............................................................................2
        C.  Plaintiff Did Not Engage in Protected Activity Under the FLSA or NYLL When Reminding Mr. DeNiro of the Need to Pay Overtime ..........................................................................3

            1.  Plaintiff's Reminder was not a Wage Complaint ...................................3
            2.  Even if Plaintiff did Complain, it was not Protected Activity Because She was Acting Within the Scope of Her Job Duties .................................................................7

        D.  Plaintiff did Not Engage in Post-Employment Protected Activity in Her July 2, 2019 Email or the Emails from Her Attorney Later That Month...................................................8

            1.  Plaintiff's June 11 and July 2 emails were not protected activity under the FLSA and NYLL ......................................8
            2.  The Pagano Emails Were Not Protected Activity ...................................9

        E.  Plaintiff's Lawsuit As Protected Activity....................................................12

        F.  Plaintiff Points To No Adverse Employment Action Causatively Linked To Any Protected Activity............................................12

            1.  Declining to Provide a Recommendation Letter is not an Adverse Action ................................................................13

2.  Even if the Refusal to Provide Ms. Robinson with a
    Recommendation Letter was an Adverse Action,
    Defendants have Articulated Unrefuted Legitimate,
    Non-discriminatory Reasons for their Decision ....................................15
3.  The State Court Action Cannot be Retaliatory Because
    it was Neither Frivolous nor Baseless, and Sought the
    Return of SkyMiles, Cash and Other Property, Some
    of Which Was Returned More than Two Years Later ...........................16

    a.  The Harvey Letter Placed Plaintiff on Notice of
        Canal's Claims Before the State Court Action was
        Filed ...................................................................................17
    b.  Mr. DeNiro Felt Bamboozled ...........................................17

4.  Canal's Presenting Evidence to the District Attorney's
    Office Cannot be an Adverse Employment Action ...............................18

G.  If the FLSA Retaliation Claim is Dismissed, the Court
    Should Decline to Exercise Jurisdiction of any Remaining
    Claims ................................................................................................20

II.   Defendants Are Entitled To Summary Judgment On 20
      Question of Whether Plaintiff Was Constructively
      Discharged ..............................................................................................20

      A.  The Legal Standard in Constructive Discharge Claims..............................20
      B.  Plaintiff Admits the Work Conditions Were Not
          Intolerable, and She Resigned When Given What She
          Asked For.........................................................................................21

III.  The NYCHRL Gender And Retaliation Claims Should Be
      Dismissed As There Is No Direct Evidence Of
      Discrimination; No Male Comparator Was Treated More
      Favorably; No Protected Activity And No Adverse Action
      Causally Related To Plaintiff's Gender ...............................................28

      A.  The Legal Standards Under the NYCHRL .................................................28
      B.  No Evidence of Gender Discrimination.......................................................29

          1.  "Hostile, abusive, and intimidating" comments .....................................29
          2.  Gendered Tasks.....................................................................................30
          3.  No evidence of male comparators being treated more
              favorably or gender-animus ...................................................................32

2

C. The Evidence is Insufficient to Support a NYCHRL Retaliation Claim Because there was no Protected Activity ........................................................................................33

D. Post-employment Protected Activity ...........................................................36

CONCLUSION...........................................................................................................37

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aflalo v. Cantor Fitzgerald Secs., Inc.*,
   298 F. Supp. 3d 688 (S.D.N.Y. 2018)...................................................................................7, 8

*Albunio v. City of N.Y.*,
   16 N.Y.3d 472 (2011) ...................................................................................................33

*Benzinger v. Lukoil Pan Americas, LLC*,
   447 F. Supp. 3d 99 (S.D.N.Y. 2020)..................................................................................3

*Burns v. Medgar Evers Coll. of City Univer. of N.Y.*,
   No. 19-cv-1211, 2019 WL 3805089 (E.D.N.Y. Aug. 12, 2019) .............................................33

*Cayemittes v. City of N.Y. Dept. of Hous. Pres. & Dev.*,
   974 F. Supp. 2d 240 (S.D.N.Y. 2013), *aff'd,* 641 Fed. Appx. 60 (2d Cir. 2016) ...................15

*Chen v. City Univ. of N.Y.*,
   805 F. 3d 59 (2d Cir. 2015).............................................................................................28

*Chertkova v. Conn. Gen. Life Ins. Co.*,
   92 F.3d 81 (2d Cir. 1996)................................................................................................20

*DeLuca v. Sirius XM Radio, Inc.*,
   No. 12-cv-8239, 2017 WL 3671038 (S.D.N.Y. Aug. 7, 2017)................................................3

*Dressler v. NYC Dept. of Educ.*,
   No. 10-cv-3769, 2012 WL 1038600 (S.D.N.Y. Mar. 29, 2012).............................................32

*Eng-Hatcher v. Sprint Nextel Corp.*,
   No. 07-cv-7350, 2008 WL 4865194 (S.D.N.Y. Oct. 31, 2008)..............................................17

*Ferraro v. N.Y.C. Dept. of Educ.*,
   404 F. Supp. 3d 691 (E.D.N.Y. 2017) ...............................................................................32

*Fincher v. Depository Tr. & Clearing Corp.*,
   604 F.3d 712 (2d Cir. 2010)............................................................................................21

*Gaidasz v. Genesee Valley Bd. of Coop. Educ. Sys.*,
   791 F. Supp. 2d 332 (N.D.N.Y. 2011) ..............................................................................14

*Giarrizzo v. Holder*,
    07-cv-0801, 2011 WL 4964945 (S.D.N.Y. Oct. 19, 2011).....................................................14

*Greathouse v. JHS Sec. Inc.*,
    784 F.3d 105 (2d Cir. 2015)......................................................................................... *passim*

*Harris v. N.Y. State Dept. of Corr. Serv.*,
    616 Fed. Appx. 453 (2d Cir. 2015)...................................................................................29

*Heron v. Medrite Testing, LLC*,
    No. 21-cv-09471, 2022 WL 1214179 (S.D.N.Y. Apr. 25, 2022) ....................................15, 29

*Hornig v. Trs. of Colum. Univ. of City of N.Y.*,
    17-cv-3602, 2022 WL 976267 (S.D.N.Y. Mar. 31, 2022).................................................33

*Jackson-Lipscomb v. City of N.Y.*,
    No. 17-10093, 2022 WL 953048 (S.D.N.Y. Mar. 30, 2022)..............................................32

*Johnson v. Summit Acquisitions, LLC*,
    No. 5:15-cv-1193, 2019 WL 1427273 (N.D.N.Y. Mar. 23, 2019) .........................................17

*Kassman v. KPMG LLP*,
    925 F. Supp. 2d 453 (S.D.N.Y. 2013).................................................................................3

*Kasten v. Saint Gobain Performance Plastics Corp.*,
    563 U.S. 1 (2011)............................................................................................... *passim*

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013).....................................................................................34, 35

*Kim v. Lee*,
    576 F. Supp. 3d 14 (S.D.N.Y. 2021)...........................................................................2, 16, 17

*Leroy v. Delta Air Lines*,
    No. 21-267-cv, 2022 WL 12144507 (2d Cir. Oct. 27, 2022) ...................................................35

*Marchuk v. Faruqi & Faruqi, LLP*,
    100 F. Supp. 3d 302 (S.D.N.Y. 2015)..................................................................................18

*Matias v. Montefiore Med. Ctr.*,
    No. 20-2849, 2022 WL 4448585 (S.D.N.Y. Sept. 23, 2022) ...........................................32, 33

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973).........................................................................................2, 3, 36

*McIntosh v. Dept. of Educ. of the City of N.Y.*,
    202 A.D. 3d 481 (1st Dept. 2022)........................................................................................32

*McKenzie v. Renberg's Inc.*,
   94 F.3d 1478 (10th Cir. 1996), *cert. denied,* 520 U.S. 1186 (1997)......................................7, 8

*Meagher v. State Univ. Constr. Fund*,
   No. 1:17-cv-0903, 2020 WL 5504011 (N.D.N.Y. Sept. 11, 2020)...........................................28

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
   715 F.3d 102 (2d Cir. 2013)...........................................................................................28, 29

*Nakis v. Potter*,
   No. 01-cv-10047, 2004 WL 2903718 (S.D.N.Y. Dec. 15, 2004) ............................................33

*O'Connor v. Smith & Laquercia LLP*,
   No. 08-cv-4559, 2010 WL 3614898 (E.D.N.Y. Sept. 9, 2010) ..............................................18

*Penn. State Police v. Suders*,
   542 U.S. 129 (2004)..............................................................................................................21

*Richards v. Dept. of Educ. of City of N.Y.*,
   No. 21-cv-338, 2022 WL 329226 (S.D.N.Y. Feb. 2, 2022) (Liman, J.).................................33

*Rodriguez v. Ready Pac Produce*,
   No. 13–4634, 2014 WL 1875261 (D.N.J. May 9, 2014) ......................................................7, 8

*Rosas v. Balter Sales Co. Inc.*,
   No. 12-cv-6557, 2015 WL 12915807 (S.D.N.Y. Mar. 30, 2015)...........................................17

*Rossbach v. Montefiore Med. Ctr.*,
   No. 19-5758, 2021 WL 930710 (S.D.N.Y. Mar. 11, 2021)....................................................33

*Sanders v. Madison Square Garden, L.P.*,
   525 F. Supp. 2d 364 (S.D.N.Y. 2007)...................................................................................10

*Santi v. Hot in Here, Inc.*,
   18-cv-03028, 2019 WL 290145 (S.D.N.Y. Jan. 22, 2019) ......................................................3

*Schanfield v. Sojitz Corp. of Am.*,
   663 F. Supp. 2d 305 (S.D.N.Y. 2009)...................................................................................17

*Sherman v. Fivesky, LLC*,
   No. 19-cv-8015, 2020 WL 5105164 (S.D.N.Y. Aug. 31, 2020) (Liman, J.)...........................12

*Shultz v. Congregation Shearith Israel*,
   867 F.3d 298 (2d Cir. 2017)..................................................................................................21

*Spadola v. N.Y.C. Transit Auth.*,
   242 F. Supp. 2d 284 (S.D.N.Y. 2003)...................................................................................11

*Spence v. Maryland Cas. Co.*,
    995 F.2d 1147 (2d Cir.1993).................................................................................21

*Stafford v. N.Y. Presbyterian Hosp.*,
    No. 06-cv-2150, 2011 WL 1131104 (E.D.N.Y. 2011) ..........................................30

*Tang v. Glocap Search LLC*,
    No. 14-cv-1108, 2015 WL 5472929 (S.D.N.Y. Mar. 24, 2015)............................10

*Thompson v. Morris Heights Health Ctr.*,
    No. 09-cv-7239, 2012 WL 1145964 (S.D.N.Y. Apr. 6, 2012) .........................14, 19

*Tihan v. Apollo Mgmt. Holdings, L.P.*,
    201 A.D.3d 557 (1st Dept. 2022).........................................................................32

*Whalley v. Reliance Group Holdings, Inc.*,
    No. 97-cv-4018, 2001 WL 55726 (S.D.N.Y. Jan. 22, 2001) ...........................11, 16

*Wimmer v. Suffolk Cnty. Police Dept.*,
    176 F.3d 125 (2d Cir. 1999).................................................................................34

*Wolf v. Time Warner, Inc.*,
    No. 09-cv-6549, 2011 WL 856264 (S.D.N.Y. Mar. 3, 2011)................................10

*Young v. Westchester Cnty. Dept. of Soc. Servs.*,
    57 Fed. Appx. 492 (2d Cir. 2003)..........................................................................19

**Statutes**

Equal Pay Act ................................................................................................................20

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*......................................................1

FLSA................................................................................................................... *passim*

New York City Human Rights Law, New York City Admin. Code §8-101, *et. seq.*......................1

New York Labor Law § 190, *et seq.*...............................................................................1

NYCHRL ............................................................................................................. *passim*

NYLL .................................................................................................................. *passim*

NYLL: (i) ........................................................................................................................12

Federal Rule of Evidence 408........................................................................................11

Federal Rules of Civil Procedure Rule 56 .......................................................................1

**INTRODUCTION**

Defendants Canal Productions, Inc. ("Canal") and Robert De Niro ("Mr. De Niro" and collectively "Defendants") submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, against all four claims set forth in the Complaint (ECF #1) ("Complaint" or "Compl."). Defendants seek dismissal of Plaintiff Graham Chase Robinson's ("Plaintiff" or "Ms. Robinson") retaliation claims brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*., ("FLSA") and the New York Labor Law § 190, *et seq*. ("NYLL"), and her gender and retaliation claims under the New York City Human Rights Law, New York City Admin. Code §8-101, *et. seq.,* ("NYCHRL"). Summary judgment is also sought on Plaintiff's claim that she was constructively discharged. Plaintiff has voluntarily withdrawn all of her other claims.

If the FLSA claim is dismissed, no federal claims will remain and the Court should decline to exercise and retain jurisdiction over this matter.

**PROCEDURAL HISTORY**

Canal's claims against Ms. Robinson, all brought pursuant to the common law, were originally commenced in New York State Supreme Court on August 17, 2019 (GB Dec., Ex. 12) ("State Court Action"). Mr. De Niro was not a party. In lieu of an Answer, on October 3, 2019 Ms. Robinson filed the instant action against Canal and Mr. De Niro, and sought and obtained a stay of the State Court Action. (NYSCEF Doc. Nos. 5-14). On July 19, 2021, the State Court Action (which remained stayed) was withdrawn and Canal's claims were refiled here as counterclaims. (NYSCEF Doc. No. 50).

## STATEMENT OF THE FACTS

In addition to the facts below, Defendants refer the Court to the Declarations of Mr. De Niro, on behalf of himself and as President of Canal ("De Niro Declaration" or "RDN Dec."); Thomas A. Harvey ("Harvey Declaration" or "TH Dec."); Laurent S. Drogin ("Drogin Declaration" or "LD Dec."); Gregory R. Bennett ("Bennett Declaration" or GB Dec."); and Robin Chambers ("Chambers Declaration" or "RC Dec."), all dated October 30, 2022; as well as the Defendants' Statement of Facts in Support of Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56.1.

The Court's familiarity with Robert De Niro is assumed. Canal is his "loan-out" company. RDN Dec., at ¶ 3. Mr. De Niro's professional services are secured through Canal. *Id.* Canal employed Ms. Robinson is various capacities between 2008 and April 6, 2019, when she resigned without notice. For ease, all dates in this brief are 2019 except where noted.

## ARGUMENT

### I. PLAINTIFF'S FLSA AND NYLL RETALIATION CLAIMS SHOULD BE DISMISSED BECAUSE NO REASONABLE FACTFINDER COULD CONCLUDE SHE ENGAGED IN FLSA OR NYLL-RELATED PROTECTED ACTIVITY, OR EXPERIENCED ANY CAUSALLY CONNECTED ADVERSE EMPLOYMENT ACTION

**A.     Legal Standard for Retaliation Claims Under the FLSA**

The Court's familiarity with the retaliation provisions of the FLSA and application of the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) was recently set forth in *Kim v. Lee,* 576 F. Supp. 3d 14 (S.D.N.Y. 2021).

**B.     NYLL Retaliation Claims are Analyzed Under the Same (FLSA) Standard**

Like FLSA retaliation claims, "[r]etaliation claims brought under [the]. . . NYLL are generally governed by the same *McDonnell Douglas* burden-shifting framework as discrimination

claims." *DeLuca v. Sirius XM Radio, Inc.,* No. 12-cv-8239, 2017 WL 3671038, at \*23 (S.D.N.Y. Aug. 7, 2017). *See* *Benzinger v. Lukoil Pan Americas, LLC,* 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020) (applying *McDonnell Douglas* to FLSA and NYLL retaliation claims). *Accord* *Santi v. Hot in Here, Inc.,* 18-cv-03028, 2019 WL 290145 (S.D.N.Y. Jan. 22, 2019) (same). *See also* *Kassman v. KPMG LLP,* 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (applying same standards for retaliation claims under FLSA and NYLL).

Plaintiff here fails to establish a *prima facie* case under the FLSA and NYLL because she did not engage in protected activity related to those statutes. And even if she did, she cannot present admissible evidence of any causal link between such activity and any "employment action disadvantaging her."

## C.   Plaintiff Did Not Engage in Protected Activity Under the FLSA or NYLL When Reminding Mr. De Niro of the Need to Pay Overtime

To establish a *prima facie* case under the FLSA and NYLL a plaintiff must first demonstrate she engaged in protected activity, such as by bringing a complaint to the attention of the employer. The Supreme Court has held a complaint must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Greathouse v. JHS Sec. Inc.,* 784 F.3d 105, 117 (2d Cir. 2015) (citing *Kasten v. Saint Gobain Performance Plastics Corp.,* 563 U.S. 1 (2011)). Plaintiff fails here for two reasons: First she never made a wage and hour complaint to Mr. De Niro. Second, even if she had, the complaint was within the contours of her job duties and is not protected activity.

### 1.   Plaintiff's Reminder was not a Wage Complaint

Plaintiff alleges in her Complaint that:

De Niro was aware of his legal obligations [to pay overtime] but repeatedly refused to do so. For example, approximately a month before Ms. Robinson resigned [on

April 6], De Niro sought to have his female assistants perform work duties on weekends or otherwise after working hours without any additional pay. Ms. Robinson objected to this unlawful pay practice and told De Niro that he needed to pay his assistants overtime. De Niro refused.

(GB Dec., Ex. 1, ECF #1, Compl., at ¶ 28. *See also id*., at ¶¶ 36, 100-101).[1] This would have occurred in March as Plaintiff resigned on April 6. GB Dec., Ex. 42.

Ms. Robinson explained the situation differently at her deposition, testifying that when Mr. De Niro told her one of Canal's employees should be given a key to be able to "stop by and check on his apartment" when he was away, she:

> *reminded* him that it was something that he would have to pay extra for in overtime, and he got very upset and said I am not going to pay them for the work that they do in checking for his house, that he pays them enough and doesn't want to pay them overtime. I walked out … saying that I wouldn't do anything that was illegal. He had to pay them for the hours that they worked.

GB Dec., Ex. 3, P. Tr. II,[2] 87:21-88:6 (emphasis added).

When asked about the conversation at his deposition, Mr. De Niro did not recall it, but explained: "I'm not sure. But if she said I had to pay them overtime, I don't see why I wouldn't do what she says I have to do." GB Dec., Ex. 91, De Niro Tr. I,[3] at 130:25-131:2.

As part of her job and procedurally, Ms. Robinson collected employee timesheets, checked them for accuracy (including overtime), and sent them to Mr. Tasch, one of Canal's accountants ("Mr. Tasch"). GB Dec., Ex. 2, P. Tr. I,[4] at 250:11-23; Ex. 3, P. Tr. II, at 73:3-11; 84:10-85:16.

---

[1]     This statement is legally incorrect, as overtime would be owed only if these employees worked in excess of forty (40) hours in a workweek as the FLSA and NYLL require. Weekend and after-hours work would not, by definition, require overtime.

[2]     As used herein "P. Tr. II" refers to the second day of the deposition of Plaintiff, taken on December 20, 2021. GB Ex. 3.

[3]     As used herein "De Niro Tr. I" refers to the first day of the deposition of Mr. De Niro, taken on April 4, 2022

[4]     As used herein, "P. Tr. I" refers to the transcript from the first deposition of Plaintiff, taken on December 20, 2021. GB, Ex. 2.

GB Dec., Ex. 94, De Niro Tr. III,[5] at 371-2. Mr. Tasch would pay employees in accordance with Ms. Robinson's instructions. *Id*.

Ms. Robinson does not assert that she ever told Mr. De Niro she was entitled to overtime, that he ever directed her to not report or misreport working time to Mr. Tasch, that she ever failed to report overtime, or that any employee was ever denied overtime. Not only is there no evidence that the Defendants failed to pay overtime, when the "assistants" (referred to in paragraph 28 of the Complaint) were identified in response to requests for admission, it was demonstrated that they were, in fact, paid overtime for the time period in question. GB Dec., Ex. 86 at 74-76; GB Dec., Ex. 14.

Ms. Robinson acknowledged having discussed overtime with Mr. De Niro in the past (GB Dec., Ex. 3, P. Tr. II, 86:16-24), and took credit as part of her job and accomplishments for making Canal compliant with its overtime obligations (GB Dec., Ex. 46), without any quarrel from Mr. De Niro. She also acknowledged that for the time she was employed at Canal she believed Mr. De Niro paid employees for all hours worked (GB Dec., Ex. 3, P. Tr. II, at 88:7-10). She does not contend Canal (or Mr. De Niro) ever intentionally failed to pay proper overtime in the past or that she was advancing a claim made by another employee.

In her own words, this was a reminder. And there is no assertion Canal was anything other than compliant with the law then and going forward. Despite this, Ms. Robinson claims that a litany of adverse actions were taken against her because of her reminding Mr. De Niro about Canal's overtime obligation.

Evidence in this case includes dozens of telephone calls surreptitiously recorded by Plaintiff of her conversations with Canal's attorney, accountant and various employees. One

---

[5]     As used herein, "De Niro Tr. III" refers to the transcript from the third day of the deposition of Mr. De Niro, taken on October 21, 2022. GB, Ex. 94.

employee, Robin Chambers ("Ms. Chambers"), was viewed by Ms. Robinson as a confidante. GB Dec., Ex. 2, P. Tr. I, at 61-62. These recordings capture hours of conversations, in real-time during Plaintiff's employment, of her words and state of mind. Plaintiff began recording phone calls in March, giving us unique pre-resignation and pre-litigation insight into what was really happening. GB Dec., Ex. 2, P. Tr. I, at 51:23-52:6; 57:7-19. They are extremely powerful and persuasive as they minimize the effects of hindsight bias and faded memories.

More to the point, in one recording Ms. Robinson commented on her interactions with Canal's law firm to enable her to ensure Canal was compliant with its wage and hour obligations. GB Dec., Ex. 84, Audio Tr., at 3:14-18 ("The only law I know -- labor law and overtime and that stuff that, you know, the labor laws -- the labor lawyers like told me to implement and what to do, kind of thing")). *See also* GB Dec., Ex. 3, P. Tr. II, 84:10-21.

Plaintiff had unique insight, access and knowledge. She credits herself with making Canal "labor law compliant" (GB Dec., Ex. 3, P. Tr. II, at 84:6-23), and had access to outside employment law counsel (*id.*, at 64:23–65:7). She was the employee responsible for disseminating and implementing Canal's anti-harassment and discrimination policy, which she did in November 2018 (*Id.*, at 197:5-10; 199:10–200:7; 236:5-24; *see also* GB Dec., Ex. 2, P. Tr. I, at 197:5-10; 199:10–200:7; 236:5-24). She even reviewed this policy with Mr. De Niro. GB Dec., Ex. 76 Alleged violations of the policy were supposed to be brought to Ms. Robinson's attention for investigation and resolution. GB Dec., Ex. 3, P. Tr. II, at 65:7-9.

On these undisputed facts, no reasonable factfinder could conclude Ms. Robinson's reminder meets the *Kasten* and *Greathouse* notice standard, and the Court should conclude she did not engage in protected activity under the FLSA and NYLL. Absent such protected activity, Plaintiff cannot establish a *prima facie* case and these two causes of action should be dismissed. If

the FLSA claim is dismissed, there are no remaining federal claims, and the Court should decline to retain jurisdiction.

> ### 2.   Even if Plaintiff Did Complain, it was not Protected Activity Because She was Acting Within the Scope of Her Job Duties

Even if Plaintiff's actions satisfied the *Kasten* and *Greathouse* standards, it would not be protected activity because her job responsibilities included administering the wage and hour laws. *See supra.* This places her in a different stance from other employees. In *Aflalo v. Cantor Fitzgerald Secs., Inc.*, 298 F. Supp. 3d 688 (S.D.N.Y. 2018), Judge Broderick explored the question here, observing:

> No court in this Circuit has decided under what circumstances, if at all, an employee who is not asserting her own rights under the FLSA but who alerts her employer to FLSA violations as part of her job duties engages in 'protected activity' for the purposes of a retaliation claim under the FLSA.

*Aflalo*, 298 F. Supp. 3d at 695.

The facts here are even more remote, as Plaintiff never alerted her employer to an ongoing or perceived violation, or a complaint by an employee. In *Aflalo*, the plaintiff-—a human resources professional—alerted her employer to what she perceived to be issues involving the misclassification of employees. In the absence of caselaw from within this Circuit, Judge Broderick looked elsewhere for guidance. *Aflalo* relied on *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996), *cert. denied,* 520 U.S. 1186 (1997) for its reasoning that:

> [b]ecause the plaintiff in *McKenzie* was 'merely performing her job as a personnel director' and 'never crossed the line … to an employee lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company' and because plaintiff did not initiate any FLSA claims, either on behalf of herself or others, the plaintiff did not establish that she was engaged in protected activity.

*Aflalo*, 298 F. Supp. 3d at 695.

*Aflalo* also followed *Rodriguez v. Ready Pac Produce*, No. 13–4634, 2014 WL 1875261 (D.N.J. May 9, 2014) for its reasoning that:

to engage in protected activity, the employee must step out of his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

*Id.*, at *7 (quoting *McKenzie*, *supra*).

Applying *McKenzie* and *Rodriguez* in *Aflalo*, Judge Broderick held plaintiff had not established a *prima facie* case and dismissed the FLSA retaliation claim, holding - as defendants contended - the claim failed because the plaintiff "was merely fulfilling her job responsibilities when alerting [the employer] to employee misclassification and has thus failed to state a claim for retaliation." *Alflalo*, 298 F. Supp. 3d at 696 (citing and quoting *Kasten*, 563 U.S. at 14 and *Greathouse*, 784 F.3d at 107). Even if the Court assumes Plaintiff did "complain" to Mr. De Niro, her role within Canal should defeat her FLSA and NYLL retaliation claims under *Aflalo*.[6]

### D.    Plaintiff Did Not Engage in Post-Employment Protected Activity in Her July 2, 2019 Email or the Emails from Her Attorney Later That Month

#### 1.    Plaintiff's June 11 and July 2 emails were not protected activity under the FLSA or NYLL

Plaintiff resigned her employment without notice on April 6. GB Dec., Ex. 42. Her post-employment contact with Mr. De Niro was limited. Communications with her on his and Canal's behalf were through their counsel, Tom Harvey ("Mr. Harvey"). On June 11 Mr. Harvey told Plaintiff Mr. De Niro was not going to sign a business school recommendation letter for her. GB Dec., Ex. 2, P. Tr. I, at 195:15-196:15.

That same day, Plaintiff emailed Mr. De Niro and Mr. Harvey laying out terms under which she would agree to sign a release (the "June 11 Email"). GB Dec., Ex. 49. It sought ███████

---

[6]    Judge Broderick noted that the NYLL was worded slightly differently than the FLSA, but declined to exercise jurisdiction over that claim and, therefore, did not opine on whether the different wording would have altered the outcome.

████████████████████████████████████████████████████

████████████████████████████████, even though it had been made clear to her earlier in the day that Mr. De Niro was not going to sign one. *Id*. *See also* GB Dec., Ex. 3, P. Tr. II, at 195:15–196:15.

Incorporated as part of the written economic ask was ████████████ pursuant to an "agreement made January 3[], 2019; 2 Year Employment Deal." GB Dec., Ex. 49. The email made no reference or proposal relating to any FLSA or NYLL claims, either expressly or by implication. The Defendants did not respond to the email. On July 2, Plaintiff sent Mr. De Niro an unsolicited email, copying Mr. Harvey:

> You have not yet responded to my email [of June 11]. Unless this process moves forward appropriately[,] I will have to seek outside counsel to help me resolving this situation and protecting the interests of myself and all concerned. Unless I hear from you by <u>Friday, July 12th</u>, I will assume that you have no interest in amicably resolving this situation.

GB Dec., Ex. 49 (emphasis in original) (the "July 2 Email").

It was unknown what "situation" Ms. Robinson was talking about, as neither email mentioned any claim, express or implied, about wage and hour matters. By their own words the emails appear to be seeking enforcement of a verbal agreement. These emails fail to meet the *Kasten* and *Greathouse* notice standards and cannot be considered post-employment protected activity.

### 2.    The Pagano Emails Were Not Protected Activity

On July 11 Mr. Harvey emailed Plaintiff a letter (the "Harvey Letter") which is instrumental based on its timing, disclosures and the critical points it makes:

- It confirmed that as of July 11 Canal viewed Ms. Robinson as having been "involved in widespread abuses and unauthorized transactions during [her] employment" and detailed them.

9

- It repeated what Mr. Harvey had previously communicated to Ms. Robinson, that she had misappropriated millions of SkyMiles.

- It "strongly suggest[ed] [she] speak to an attorney and return the SkyMiles immediately."

- It disclosed several of the issues that were being investigated into her wrongdoing, as would later be alleged in the State Court Action against her, concluding that her "actions demonstrate a complete breach of trust."

- It "strongly urge[d] [her] to mitigate the damages [she] caused and return the various computers, iPhones, cameras and other property in [her] possession that belongs to Canal."

- She was asked to "[p]lease return the SkyMiles immediately to avoid legal action." GB Dec., Ex. 50 (emphasis added).

Several facts are undisputed: Facing threatened legal action, Ms. Robinson did not return any cash, gift cards or property. She returned nothing until more than two (2) years later, in November 2021, during this litigation. She has never returned the SkyMiles.

Plaintiff never spoke to Mr. Harvey about the Harvey Letter. GB Dec., Ex. 2, P. Tr. I, at 323:2-7. On July 11, the date of the Harvey Letter—before Mr. Pagano surfaced—Ms. Robinson was aware future legal action could be avoided if she returned the SkyMiles and Canal's property. Two weeks after the Harvey Letter was sent, on July 25, Canal's counsel received a voicemail from and spoke with attorney Jeff Pagano ("Mr. Pagano"), who identified himself as representing Ms. Robinson (LD Dec., at ¶ 3).

In an attempt to dissuade Canal from taking legal action Ms. Robinson sought to create the appearance of protected activity so if Canal did so she could claim retaliation. This is not *bona fide* protected activity. This is a set-up. Courts are wise to this tactic.

Courts recognize not all complaints are protected activity. "Thus, if a plaintiff complained, not in good faith, but rather to protect her job or extort money from her employer, the activity is not protected by the statute." *Tang v. Glocap Search LLC*, No. 14-cv-1108, 2015 WL 5472929, at

*2 (S.D.N.Y. Mar. 24, 2015). *See, e.g., Sanders v. Madison Square Garden, L.P.,* 525 F. Supp. 2d 364, 366 (S.D.N.Y. 2007); *see also, e.g., Wolf v. Time Warner, Inc.,* No. 09-cv-6549, 2011 WL 856264, at *8 (S.D.N.Y. Mar. 3, 2011) ("[A] retaliation claim is not a 'tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies.'" (quoting *Spadola v. N.Y.C. Transit Auth.,* 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003)); *Whalley v. Reliance Group Holdings, Inc.,* No. 97-cv-4018, 2001 WL 55726, at *12 (S.D.N.Y. Jan. 22, 2001) ("…a retaliation claim may not be properly used as a vehicle to prevent an employer from exercising his legal rights and engaging in legal advocacy...." (internal citations omitted)).

Between July 31 and August 20, Mr. Pagano exchanged several emails with Canal's counsel (GB Dec., Exs. 51-54, 58) (the "Pagano Emails"). They are chocked with buzzwords presented as legal conclusions; identify entities in which Mr. De Niro has an interest but which never employed Plaintiff, and even contain a threat that unless handled to her satisfaction, Ms. Robinson could secure funds to write a tell-all book about Mr. De Niro. GB Dec., Ex. 52.

Of note, while they invite a settlement dialogue none are identified as settlement communications. That careful omission could enable them for later use if Canal took legal action as indicated in the Harvey Letter.[7]

The insincerity of the Pagano Emails is revealed by what they omit. Absent is any substantive response to the Harvey Letter, other than to call it "utterly without any merit whatsoever." GB Dec., Ex. 52, pp. 4-5; Ex. 51. This makes little sense given Ms. Robinson has still never returned the SkyMiles, and returned $4,510 in cash and $19,425 worth gift cards (GB

---

[7]     If the case proceeds to trial, Defendants will move *in limine* to have them excluded as settlement communications under Federal Rule of Evidence 408. If upon review of the documents, the Court agrees, Defendants request they not be considered in deciding this motion.

Dec., Ex. 67), plus other property in November 2021, more than two years after the filing of the

State Court Action (GB Dec., Ex. 2, P. Tr. I, at 305:24–308:2; 316:17-321:15). When asked why

she did not return it sooner, she invoked the attorney-client privilege. *Id*., at 307:9-25, 310:5-25;

316:17–321:15.

That Canal was undeterred by the Pagano Emails is consistent with this Court's recognition

in *Sherman v. Fivesky, LLC*, No. 19-cv-8015, 2020 WL 5105164 (S.D.N.Y. Aug. 31, 2020)

(Liman, J.), that "no reasonable employee should expect that the employer-defendant would

simply surrender in the face of litigation." *Sherman*, 2020 WL 5105164, at *6.

No reasonable juror could conclude the Pagano Emails were *bona fide* protected activity

under *Kasten* and *Greathouse* or that Canal had to forego proceeding with its claims as identified

in the Harvey Letter. Absent protected activity, there can be no viable retaliation claim.

**E.    Plaintiff's Lawsuit as Protected Activity**

There is no dispute that filing a lawsuit can be protected activity under the FLSA and NYLL

and, for the purposes of this motion, Canal does not claim otherwise. However, Plaintiff can point

to no adverse employment action taken after the State Court Action was filed in August and, even

if there was, it lacked causal connection to FLSA or NYLL protected activity. *See infra.*

**F.    Plaintiff Points to no Adverse Employment Action Causatively Linked to
        any Protected Activity**

Even if the *Kasten* and *Greathouse* standard was met, Plaintiff can point to no specific

adverse action properly equated to any protected activity relating to the FLSA or NYLL. Instead,

she invites speculation about subsequent events, each of which gets more remote in time.[8] She

---

[8]    Plaintiff does not link her April 6 resignation to her claimed wage and hour protected activity. As to temporal proximity, the month or so between the two events was chosen by Plaintiff, not Defendants. Said differently, other than this single interaction, Plaintiff does not allege that

claims three adverse employment actions were caused by her protected activity relating to the FLSA and NYLL: (i) Mr. De Niro's refusal to provide her with a recommendation letter for business school; (ii) Canal filing a lawsuit against her, and (iii) reporting her conduct to the New York County District Attorney's Office.

### 1.   Declining to Provide a Recommendation Letter is not an Adverse Action

It is undisputed Mr. De Niro did not sign the draft recommendation letter Plaintiff presented. GB Dec., Ex. 49. But there is no link between the March reminder and the recommendation letter because—according to Plaintiff—she had already been told months earlier in 2018 what would happen if she resigned without giving notice.

In November 2018 Plaintiff met together with Mr. De Niro and Ms. Chambers. GB Dec., Ex. 3, P. Tr. II, at 102:13-19; Ex. 2, P. Tr. I, at 61:22-62:16. In her pleadings, Plaintiff's lawyers recounted the conversation as: "De Niro also threatened Ms. Robinson, telling her he would give her a 'bad recommendation' if she left." GB Dec., Ex. A, Compl., at ¶ 33 (quotation marks in original). Plaintiff's own recorded voice tells it differently. In one of her recordings with Ms. Chambers, Ms. Robinson recalls: "[W]e sat down -- I mean -- you were there -- sat down. I was in tears at that point --. … -- when Bob and I – were screaming at each other. And Bob's saying, that *if I didn't give him any notice,* that I would -- he would give me a bad recommendation, like, after eleven fucking years." GB Dec., Ex. 73, Audio Tr., at 2:1-3, 5, 8-11 (emphasis added). In a separate recorded call between her and Canal employee Michael Kaplan ("Mr. Kaplan") Ms. Robinson explained: "And because Bob, was just, you know, doing the whole bullying thing and being an asshole and saying, *if you leave me in the lurch* I'll give you a bad recommendation and stuff like

---

she, Mr. De Niro, Canal, or anyone else ever mentioned it before she resigned. There is simply no factual basis to link her resignation to such activity, protected or not.

that." GB Dec., Ex. 3, P. Tr. II., at 105:5-10 (emphasis added). Resigning without notice, leaving Canal in the lurch, is exactly what she did.

Plaintiff's request for a recommendation letter was first made on May 7, a month after her resignation, in an email to Mr. Harvey. Tr. 192:23-193:17. GB Dec., Ex. 45, at pp. 1-2). This is important because post-employment adverse actions are viewed differently for retaliation purposes. Where an alleged adverse action occurs after the employment relationship has ended, courts examine whether it impacts a plaintiff's "job prospects." *Thompson v. Morris Heights Health Ctr.*, No. 09-cv-7239, 2012 WL 1145964, at *6 (S.D.N.Y. Apr. 6, 2012) (collecting cases). *See also Giarrizzo v. Holder*, 07-cv-0801, 2011 WL 4964945 (S.D.N.Y. Oct. 19, 2011) (dismissing retaliation claim because plaintiff had not detailed injury to job prospects from alleged retaliation); *Gaidasz v. Genesee Valley Bd. of Coop. Educ. Sys.*, 791 F. Supp. 2d 332, 336-37 (N.D.N.Y. 2011) (granting defendant's summary judgment motion and finding no adverse action where plaintiff had failed to demonstrate damage to future job prospects).

At the simplest level, it is undisputed that Ms. Robinson was not seeking a recommendation letter for use in obtaining employment. Her self-drafted letter was to be used *expressly* and *exclusively* in support of her application for admission to the London School of Economics.  GB Dec., Ex. 46 (CANAL_49267-49271). In fact, her plan was not to seek new employment but to move to London and work on her own production company while attending school. GB Dec., Ex. 3, P. Tr. I, at 165:8-18; Ex. 4, P. Tr. II, at 100:13-21, 117:22-118:3, 199:25-200:23; 218:8-19. The record is also clear that following her resignation in April Plaintiff did not seek new employment until March 11, 2020, making any link between this unsigned letter and her job prospects remote both in fact and time.

On June 11 Mr. Harvey informed Plaintiff that Mr. De Niro was not going to sign her

14

proposed recommendation letter.  GB Dec., Ex. 3 at 195:15-196:15. It is crucial to recognize that as of June 11, chronologically, the *only* protected activity would have been the reminder conversation and Plaintiff's April 6 resignation. None of the other events now complained of had occurred yet. On these facts, the Court should conclude the refusal to sign the recommendation letter was not an adverse action.

### 2. Even if the Refusal to Provide Ms. Robinson with a Recommendation Letter was an Adverse Action, Defendants have Articulated Unrefuted Legitimate, Non-discriminatory Reasons for Their Decision

Even if the refusal to sign the letter was an adverse employment action, *McDonnell Douglass* next requires an employer to articulate a non-discriminatory reason to explain it, upon which the burden returns to Plaintiff to introduce evidence of pretext.

Non-discriminatory reasons abound. First, an employer is not required to provide an employee or former employee with a recommendation letter. So, the refusal not to provide something otherwise unrequired or unpromised cannot by default be regarded as adverse. Nor is there any evidence that one was ever promised—verbally or otherwise.

Second, if one credits either Ms. Robinson or Ms. Chambers' testimony, Plaintiff knew in 2018 – before engaging in any arguably protected activity - that if she resigned without notice (or leaving him in the lurch), Mr. De Niro would either refuse to provide a recommendation or might give her a bad one. *See supra.* As Judge McMahon has explained: "It is well-settled that an adverse employment action set in motion before a plaintiff engaged in protected activity 'cannot serve as the basis for a retaliation claim.'" *Heron v. Medrite Testing, LLC*, No. 21-cv-09471, 2022 WL 1214179, at *5 (S.D.N.Y. Apr. 25, 2022) (quoting *Cayemittes v. City of N.Y. Dept. of Hous. Pres. & Dev.,* 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013), *aff'd,* 641 Fed. Appx. 60 (2d Cir. 2016) (collecting cases)).

Third, Ms. Robinson knew as early as June 9 that Mr. De Niro was balking at signing her proposed recommendation letter because he was angry that she transferred his SkyMiles to herself. In a call she recorded that day with Mr. Harvey, he explained:

> I had a very brief conversation with him and he's like I'm not [signing] it. And part of the problem – well, part of his thing is[,] there were air miles that you transferred out of an account, and he's convinced that he didn't approve it. * * * Well, I'm just telling you. In his mind uh, transferring, he knew you would use them, but he didn't know you were transferring out; I mean there are like 4 million miles according to him that were transferred out.

GB Dec., Ex. 85, Audio Tr., at 2:18-23. *See also Id*., Ex. 3, Tr. II, at 200:24-202:18.

The burden now shifts back to Ms. Robinson to establish the Defendants' explanations are pretextual. No evidence is offered beyond conjecture, and no rational juror could link Mr. De Niro's refusal to sign the letter back to the reminder conversation. Consequently, Mr. De Niro's refusal to sign a recommendation letter cannot support a claim of FLSA or NYLL retaliation.

### 3. The State Court Action Cannot be Retaliatory Because it was Neither Frivolous nor Baseless, and Sought the Return of SkyMiles, Cash and Other Property, Some of Which Was Returned More than Two Years Later

Plaintiff argues the State Court Action was commenced because she reminded Mr. De Niro about Canal's obligation to pay overtime. This raises the question of when claims brought against a former employee are properly viewed as an adverse employment action, and whether a reasonable juror could conclude that standard has been met.

This Court also wrote extensively on this question in its *Kim* decision, discussed *supra,* noting the need to balance the First Amendment's protection of a citizen's right to file a lawsuit, with the requirement of a plaintiff to demonstrate both that the lawsuit was filed with a retaliatory motive *and* without a reasonable basis in fact or law. *Kim, supra* (collecting and quoting cases). Likewise, "a retaliation claim may not be properly used as a vehicle to prevent an employer from exercising his legal rights and engaging in legal advocacy." *Whalley v. Reliance Group Holdings*,

No. 97-cv-4018, 2001 WL 55726, *12 (S.D.N.Y. Jan. 22, 2001).

The undisputed facts here – the return of cash, gift cards and physical property- lead to the conclusion that the claims in the State Court Action were neither frivolous nor baseless. In addition to *Kim, see also Eng-Hatcher v. Sprint Nextel Corp.,* No. 07-cv-7350, 2008 WL 4865194, at *4 (S.D.N.Y. Oct. 31, 2008) ("where an employer seeks to amend a pleading to assert a compulsory counterclaim … that conduct cannot constitute retaliation, unless the counterclaim is 'totally baseless.'"); *Schanfield v. Sojitz Corp. of Am.,* 663 F. Supp. 2d 305, 342 (S.D.N.Y. 2009) (observing "I can see nothing in Title VII or any other antidiscrimination statute that should prevent an employer from bringing a legitimate claim against a current or former employee simply because that employee has complained about what the employee believes to be discriminatory behavior."); *Rosas v. Balter Sales Co. Inc.,* No. 12-cv-6557, 2015 WL 12915807, at *12 (S.D.N.Y. Mar. 30, 2015) (noting "[t]he filing of counterclaims is only actionable as retaliation where the counterclaims are without any merit."); *Johnson v. Summit Acquisitions, LLC,* No. 5:15-cv-1193, 2019 WL1427273, at *8 (N.D.N.Y. Mar. 23, 2019) (similar).

    a.    The Harvey Letter Placed Plaintiff on Notice of Canal's Claims Before the State Court Action was Filed

Ms. Robinson can state in conclusory fashion that Canal's claims against her are retaliatory, but the undisputed facts coupled with the proper legal standard bar such a conclusion. It is undisputed that the Harvey Letter sought return of the SkyMiles, cash, gift cards and other property. It also made clear that legal action would follow if she did not comply. *See supra.* Consistent with the Harvey Letter (GB Dec., Ex. 50), Canal's lawsuit (*id*., Ex. 55), among other things, sought disgorgement of such property under the faithless servant theory, as well as conversion. If Ms. Robinson sought to avoid legal action, she ought to have returned what she

17

possessed that was not hers, when asked.

  b.   Mr. De Niro Felt Bamboozled

Plaintiff's counsel understood how Mr. De Niro felt. At his deposition, Mr. De Niro concurred with opposing counsel's characterization that he felt bamboozled by Ms. Robinson, and Canal sued her for that reason. GB Dec., Ex. 94, RDN Tr. III, at 491:23-25; 492:2; 558:18; 578:2-4; 582:3-5. Mr. De Niro's position aligns with the employer in *O'Connor v. Smith & Laquercia LLP*, No. 08-cv-4559, 2010 WL 3614898, (E.D.N.Y. Sept. 9, 2010). In *O'Connor*, the defendant filed a fraud counterclaim against a former employee who then amended her complaint to allege the counterclaim was retaliatory. *O'Connor*, 2010 WL 3614898, at *8. Judge Vitaliano explained "[d]efendants thought that they had been taken by a confidante who had falsified her health status[,]" (*id.,* at *9), and "...believed at the time of pleading that she was lying about her medical condition...." (*id.,* at *8).

Thoughtful analysis is also presented in Judge Hellerstein's decision in *Marchuk v. Faruqi & Faruqi, LLP,* 100 F. Supp. 3d 302, 312 (S.D.N.Y. 2015):

> Defendants had a rational basis for bringing their defamation and tortious interference counterclaims against Ms. Marchuk because they believed in good faith that that Ms. Marchuk had disseminated her complaint outside the judicial process.

*Marchuk*, 100 F.3d at 312.

Here, also as in *Marchuk,* Ms. Robinson filed her own lawsuit soon after against Canal, underscoring that Canal's lawsuit did not dissuade her from doing so; just as the Pagano Emails did not dissuade Canal from pursuing its own rights.

  **4.   Canal's Presenting Evidence to the District Attorney's Office Cannot  be an Adverse Employment Action**

Mr. Harvey, on behalf of Canal, presented evidence of Plaintiff's wrongdoing to the New York County District Attorney's Office. The District Attorney's Office met with witnesses, reviewed documents and declined to bring charges. Plaintiff claims the mere act of presenting evidence to the District Attorney's office was an adverse action.

The undisputed evidence reflects Mr. Harvey first contacted the District Attorney's office in early July. GB Dec., Ex. 89, TH Tr.,[9] at 396; Ex. 95 at 279-280.  This was *after* Plaintiff resigned (April 6), *before* the arrival of Mr. Pagano (July 25), and *before* Canal filed its State Court Lawsuit (August 17). Chronologically, this means the only possible protected activity at the time was Plaintiff's "reminder" and resignation. Most important, contact with the District Attorney's office aligns with the Harvey Letter, where Plaintiff was told legal action would follow if she did not return the SkyMiles and Canal's property. GB Dec., Ex. 3, P. Tr. II, at 220:5-22. *See also id*., Ex. 50.

Thus, where Plaintiff claims that the District Attorney's Office was contacted as an act of retaliation because she sued Canal in October, that is chronologically impossible because first contact occurred in July and evidence was presented into September, GB Dec., Ex. 89 at 400-401, 408-409; *Id.*, Ex. 88 at 24, all before Plaintiff sued. "[W]here the adverse action was already ongoing at the time of the protected activity .... logic precludes any inference of causation. *Young v. Westchester Cnty. Dept. of Soc. Servs.*, 57 Fed. Appx. 492, 495 (2d Cir. 2003)[,]" *cert. denied*, 539 U.S. 959 (2003)).

There is no evidence in the record when Plaintiff learned about the District Attorney's investigation or that Canal or Mr. De Niro ever made public or private mention of it. Any "harm" from this investigation stems from Plaintiff's own counsel making it public by disclosing it on the

---

[9]     As used herein "TH Tr." refers to the deposition transcript of Thomas A. Harvey, Esq. taken on March 29, 2022.

record in this lawsuit. (ECF #45). Even if this was a retaliatory act, its occurrence must be viewed from the perspective of whether it impacted Plaintiff's future job prospects. *See Thompson, supra.* That Plaintiff chose to disclose this information on the public docket is no fault of the Defendants. It is also difficult to see how this information could harm Plaintiff's job prospects as her public self-disclosure was that she was not being charged with a crime.

### G.   If the FLSA Retaliation Claim is Dismissed, the Court Should Decline to Exercise Jurisdiction of any Remaining Claims

Canal commenced the State Court Action and, in lieu of an Answer, Ms. Robinson filed the instant action asserting two federal claims—one under the Equal Pay Act and the other being the FLSA retaliation claim—and obtained a stay of the State Court Lawsuit. *See supra.* Canal's position has always been that the federal court claims were brought simply as a means of forum shopping. Ms. Robinson voluntarily withdrew her Equal Pay Act claim soon after Magistrate Judge Parker referred to it and other claims as "extremely weak." (ECF #240, at p. 6).

For the foregoing reasons, the Court should dismiss the FLSA and NYLL retaliation claims. The FLSA retaliation claim is the only federal law cause of action. Its dismissal should cause the Court to decline to retain jurisdiction so the litigation can proceed in State Court.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE QUESTION OF WHETHER PLAINTIFF WAS CONSTRUCTIVELY DISCHARGED

Plaintiff claims her resignation on April 6 was not voluntary, but rather a constructive discharge. The factual inquiry, therefore, is confined to events *prior* to that date. If Ms. Robinson voluntarily resigned, her claims and potential damages shift dramatically as a voluntary resignation is neither protected activity nor an adverse employment action.

### A.  The Legal Standard in Constructive Discharge Claims

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). To prove a constructive discharge claim, a plaintiff must satisfy two requirements. First, the plaintiff must "show[] that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 308 (2d Cir. 2017); *see also Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (holding that this inquiry is "objective"). Second, the employee must produce "evidence of the employer's intent to create an intolerable environment that forces the employee to resign." *Shultz*, 867 F.3d at 308. The standard for a constructive discharge claim "is higher than the standard for establishing a hostile work environment." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010). It is "a demanding one because it 'cannot be proven merely by evidence that an employee ... preferred not to continue working for that employer ... [or that] the employee's working conditions were difficult or unpleasant.'" *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993).

Here, Plaintiff cannot establish that a reasonable person would have found the work conditions so intolerable that she would have felt compelled to resign. We know this for certain because of Plaintiff's *own spoken and written words.*

## B.  Plaintiff Admits the Work Conditions Were Not Intolerable, and She Resigned When Given What She Asked For

In November 2018 Ms. Robinson told Mr. De Niro she was resigning to pursue another opportunity—this being prior to any of the events that subsequently took place in 2019. GB Dec., Ex. 91, RDN Tr. I, at 105–06, 110. She says he begged her to stay (GB Dec., Ex. 77), and asked her to assist him and his girlfriend, Tiffany Chen ("Ms. Chen"), with the design and setting up

21

their home (referred to as the "Townhouse" or "Apartment" or "117A"). GB Dec., Ex. 2, P. Tr. I, 36:2-38:25; 39:7-25. She agreed based on Mr. De Niro's situation at the time and her adoration towards him.[10]

### 1.   January 2019

In early 2019 Ms. Robinson discussed with Mr. De Niro what she describes as a two-year "transition" plan where she would turn her job over to a successor she would train. GB Dec., Ex. 3, P. Tr. II, at 118:4-7; *id*., Ex. 83, Audio Tr., at 2:1-10. Hence, as of January 2019 (*id*., Ex. 3, P. Tr. II, 113:21-23), despite the working conditions negatively depicted by in the pleadings, Plaintiff committed to them for two more years.

As part of the arrangement, Plaintiff received a $100,000 annual raise (*id.* at 98:25-99:11); and agreed to a clearer description of her job duties, which included handling four open items relating to the Townhouse. GB Dec., Ex. 3, P. Tr. II, at 110:18-112:6. To be clear, the Townhouse was new to the scene in 2018 (*id*., at 15:13-19). By the end of February these four items were unresolved (*id.* at 116:4-10), and she was not even thinking about leaving (*id.* at 116:24–117:2). The constructive discharge claim is based entirely on the events from February 25 to April 6.

### 2.   February and March 2019

In an April 2 recording (GB Dec., Ex. 80, Audio Tr., at 2:2–3:3), Ms. Robinson explains that when she returned from London in late February Mr. De Niro had stopped talking to her (*id*.) This coincided with the emergence of a mold issue at the Townhouse (*id*., Audio Tr., at 2:16-17), and Ms. Robinson describing sadness that Mr. De Niro was not calling her as much anymore, (GB Dec., Ex. 77, Audio Tr., at 23:39). As she acknowledged:

> I've, you know, pulled back, you know, for obvious reasons. -- Bob might be pissed at me for, you know, a bunch of different things. Like, I think that he probably is. I

---

[10]   GB Dec., Ex. 77; GB Dec., Ex. 82.

completely -- like the last like couple of months, myself, I've changed because I just -- I'm pulling away -- I am.

*Id.*, Audio Tr., at 3:2-13. At one point her behavior turned odd, as she recorded herself and Mc.

Chambers concocting a lie about a "personal emergency" about a family member's health to make

Mr. De Niro miss her (*id.*, Ex. 75, Audio Tr., at 2:6-10), so he would realize what a "fucking nut

job" Ms. Chen was. Ms. Robinson explained:

> And then, the next day -- because that will be in the late afternoon Wednesday. And then he … -- you know -- ...And then he'll start thinking where is she? Where'd she go? What did she do? [referring to Ms. Robinson's absence].

(*id.*, Ex. 75, Audio Tr., at 3:18–4:1).

***

> think that we have a plan there. ... So I think that this – I do think that this scenario at this moment, if I'm in a good standing with Bob, which I know that I am today – tomorrow – Wednesday, pulling the rug out and – ...and making him wonder, holy shit, four days without her, I'm stuck with -- … -- with this fucking nut job. Oh my God she can't do this. What's going on? Where is she?

(*id.*, Ex. 75, Audio Tr., at 5:2-22).

The record contains ample and undeniable evidence of a very strained interpersonal

relationship between Ms. Robinson and Ms. Chen, whom Ms. Robinson referred to as a

"psychopath" and "psychotic and nuts" (*id.*, Ex. 77, Audio Tr., at 3:13-14); and having her

"wonderful relationship" with Mr. De Niro "being -- destroyed by this goddamned fucking, you

know, psychotic bitch." (*id.*, Ex. 74, Audio Tr., at 2:4-7). *See also* GB Dec., Ex. 74, 2:7 (referring

to Ms. Chen as a "sociopathic bitch."). For her part, when asked at her deposition about her first

impression of Ms. Robinson, Ms. Chen stated: "There is something wrong with her, very seriously

wrong with her." GB Dec., Ex. 90, Chen Tr.,[11] at 35:25–36.3.

Although Ms. Robinson had not been physically present at the Townhouse since December

2018 (GB Dec., Ex. 78, Audio Tr., at 2:1-4, 2:9-10), there was undeniable confusion, inconsistency

---

[11]     The "Chen Tr." as used herein refers to the deposition transcript of Tiffany Chen, taken on March 30, 2022. GB Dec., Ex. 90.

and mixed messaging about the scope and nature of her involvement in the Townhouse by all involved. *See, e.g.,* GB Dec., Ex. 90, Chen Tr., at 77:24–78:22; 79:2-14. This is reflected in hours of Ms. Robinson's recorded phone calls, in emails and text messages and she is not wrong. GB Dec., Ex. 3, P. Tr. II, at 123:13-124:25. Communications among them all were poor. Ms. Robinson explained: "It was the two of them … giving me this additional work that was not something that Bob and I had discussed." *Id.*, at 125:9-22. These issues involved mold and removal of certain paintings. *Id.* at 127:22-128:13.

Ms. Robinson did not want to be involved in the Townhouse at all. GB Dec., Ex. 2, P. Tr. I, at 76:23-77:17. Nor did Ms. Chen want her there. GB Dec., Ex. 90, Chen Tr., at 78:4-9; 105:3-11 and 150. GB Dec., Ex. 73, Audio Tr.; *id.*, Ex. 76, Audio Tr. According to Plaintiff, Ms. Chen made it very clear she did not want Ms. Robinson at the Townhouse.  But other communications reflect that Ms. Chen was, in fact, asking Ms. Robinson for assistance.  GB Dec., Ex. 21.

Despite the apparent conflicts between Ms. Robinson and Ms. Chen, there is absolutely no evidence any of this mess had anything to do with Ms. Robinson's gender. That is a made-for-litigation theory erected atop allegations that Ms. Robinson was forced to perform domestic tasks in the Townhouse. *See generally,* Compl. ¶¶8, 25 (GB Dec., Ex. 1).  Even if true, since she had not been there since December 2018, this would have been for a brief period of time, prior to any protected activity, the Mr. De Niro did not move in to the Townhouse until late-October or early-November 2018.  Ex. 2 at 36; De Niro Dec. ¶8.

The blurred lines defining Ms. Robinson's actual duties was nothing new. She explained her job, like that of other Canal employees was, essentially, to do whatever Mr. De Niro asked her to do. GB Dec., Ex. 2, P. Tr. I, at 23:4-17, 83:23-85:24. This predated Ms. Chen by years. As Ms. Robinson explained when asked about the lack of clarity of her position: "It was headed in the

direction that I had faced on many occasions during my employment at Canal, where the lines were blurred, I was no longer doing the job that was commensurate with my title and at this point..." and her "responsibilities were unclear." *Id*., Ex. 3, P. Tr. II, at 134:17–135:2.

    3.    <u>March 27, 2019</u>

    The contretemps between Ms. Robinson and Ms. Chen erupted late March into early April when Mr. De Niro was on a ski trip out of town with his children. The emails and audio recordings from these days reflect attempts by Ms. Chen to obtain clarity on what Ms. Robinson's actual job was and what she was or was not willing to do. GB Dec., Ex. 21. Ms. Robinson took great umbrage at these emails, characterizing them as demeaning, disrespectful and tied this all into her belief that "towards the last week of [her] employment" Ms. Chen had been "targeting" and was "out for her." GB Dec., Ex. 2, P. Tr. I, at 11–15. Asked at her deposition whether she felt Ms. Chen did not like her, Ms. Robinson explained: "Towards the end of my employment, I began to feel that … existed after March probably March 27[], around March 27[]." *Id*., P. Tr. I, at 76:14–77:11; 88:15-25; 103:23–104:18.

    An email string from that date, March 27, ignited the powder keg. GB Dec., Ex. 21. Ms. Chen was seeking assistance for an issue at the Townhouse and was unclear whether it would be handled by Ms. Robinson or Mr. Kaplan. *Id*., at pp. 2-3. Ms. Chen wrote to Ms. Robinson:

> You've handled this in the past as well as other things where we didn't have to have so much of a definition of what you do and don't do. It's becoming increasingly difficult to understand what do [*sic*] or don't know [*sic*]. What you will do vs what you don't do. Maybe you should make a new guide for both Bob and Myself, this way he and I know what you have determined your job responsibilities to be.

*Id*., Ex. 21, p. 1.

    In a call Ms. Robinson recorded that same day between herself, Mr. Harvey and Mr. Kaplan, she explained: "I mean, I -- at this point, it's just like I feel like I'm constantly like harassed, and I'm constantly -- like she's saying things about me to Bob that aren't true." (GB

Dec., Ex. 76, Audio Tr., at 2:2-5). There is no mention or even allusion to gender. "Harassed" is used as a generic term, and a review of the email to which she was referring, *see* Ex. 21, demonstrates there is nothing gendered or unlawful about it.

      4.    <u>April 2, 2019</u>

Having had no substantive response from Mr. De Niro to her March 27 email, but with a meeting between them to be arranged, on the afternoon of April 2 Ms. Robinson sent a pivotal email. GB Dec., Ex. 31. She explained:

> I'm worried that my presence in the house amongst other things is not working for Tiffany, and therfor [sic] you – and I've felt this way since September/November. It's been very difficult. *** Part of me worrying is thinking about what happened to Robin [Chambers] and Grace [Hightower-De Niro, Mr. De Niro's ex-wife]. And I don't want it to get to that point. I want to be able to finish what we agreed upon and fulfill my commitment to you and to the job.
>
> So I came up with this idea and I hope we can discuss it if you think it has merit. It reminds me of how we dealt with the friction between Grace and me years ago. It's out of sight, out of mind. As you know from our conversation in January, I planned on being based out of New York after I fulfilled our commitments, but I believe this could be the solution and would work for everyone involved. What do you think? Can we discuss.
>
> You know how much I love this job, and even when I was based away from New York I was always there if you needed me. I want to go back to that arrangement. Let me know what you think. Maybe this is a place to start.

*Id.*, at pp. 1-2.

Plaintiff has no quarrel with Mr. De Niro. She identifies her relationship with Ms. Chen and the role relating to the Townhouse as the issue. In a recorded conversation on April 2, 2019, she told Ms. Chambers that she would be "very disappointed if it came to the point where [Mr. De Niro]'s like this isn't working out, and I need you to wrap up." GB Dec., Ex. 79, Audio Tr., at 2:13-16. Most important on April 4, when Ms. Chambers asked Ms. Robinson if she thought Ms. Chen was trying to get her to quit, Ms. Robinson exclaimed: "I'm not quitting. He -- if he -- if he

-- he's going to have to fire me if that's what he wants." *Id*., Ex. 81, Audio Tr., at 4:20-22. This was two (2) days before Ms. Robinson resigned.

     5.     Plaintiff Resigns Abruptly on April 6, When Her Request to Be Relieved of <u>Involvement With the Townhouse is Granted</u>

Ms. Robinson claims she was constructively discharged on April 6. When she woke up that morning, she had no plans to resign that day. GB Dec., Ex. 3, P. Tr. II, at 164:8-10; 168:5-8. Nor did she believe she was about to be fired. *Id.*, at 167:16-18. Yet she resigned without notice. *Id.*, at 165:2-13; Ex. 42. What happened?

At her deposition, Ms. Robinson explained that morning she was speaking with her assistant, Lulu White ("Ms. White"), and had a "gut feeling that there was something going on with [Ms. White]" (*id.*, at 177:6-15), which she also described as a "red flag or a distance...." *Id.* This prompted Ms. Robinson to use her use her administrative credentials to access Ms. White's emails. *Id.*, at 81:8-82:13 (access to emails); *id.*, at 164:11-25.

Around 1:00 p.m. that day (*id.*, at 175:22–176:4), she found and read some emails on which she had not been copied. GB Dec., Ex. 3 at 81, 169-70; Ex. 39.  The emails were to other employees, explaining that (as Ms. Robinson had asked) she would no longer be involved in the Townhouse. *Id.*, at 170. Thus, Ms. Robinson learned through these means that she was being given exactly what she wanted: Relieved of Townhouse-related duties. Rather than being thrilled, relieved and happy, Ms. Robinson resigned at 6:17 p.m. that evening.

According to her pleadings: "the work conditions deteriorated and became so intolerable that no reasonable person would be able to stay" (GB Dec., Ex. 1, ¶ 34), and she "was left with no choice to resign" (*id.*, Ex. 1, ¶ 35). This makes no sense. In fact, two days later, on April 8, she told Mr. Harvey, "I hope Bob knows how much I loved working for him and how much I adore him…." GB Dec., Ex. 3, P. Tr. II, at 56:14–58:2; Ex. 70.

The incongruity between the objective events and Ms. Robinson's reaction were impossible for her to explain at her deposition. *Id*., at 168:5-175:11. She was being relieved of all responsibilities relating to the Townhouse, which is what she wanted. Yet she perceived this to be the taking away of her job, in part because Ms. White was going to continue to assist with the Townhouse. *Id.* This is completely consistent with Ms. Robinson's experience, that Canal employees were to do whatever Mr. De Niro told them do. GB Dec., Ex. 2, P. Tr. I, 23:4-17; 83:23–85:24. Reassignment of duties was not out of the ordinary.

No rational factfinder could harmonize these events and evidence to find an environment in which a reasonable person would have resigned. *Cf. Meagher v. State Univ. Constr. Fund*, No. 1:17-cv-0903, 2020 WL 5504011, at *20 (N.D.N.Y. Sept. 11, 2020) (rejecting plaintiff's retaliation claim, "agree[ing] with Defendants that it is *logically inconsistent* for Plaintiff to argue that Defendants retaliated against her by taking work away from her and diminishing her responsibilities and also argue that defendant had acted in an inappropriate manner by 'loading up her workload' with more work than she could handle....") (emphasis added). There being no way a factfinder could conclude Plaintiff's resignation was a constructive discharge, the Court should grant summary judgment in favor of the Defendants.

**III. THE NYCHRL GENDER AND RETALIATION CLAIMS SHOULD BE DISMISSED AS THERE IS NO DIRECT EVIDENCE OF DISCRIMINATION; NO MALE COMPARATOR WAS TREATED MORE FAVORABLY; NO PROTECTED ACTIVITY AND NO ADVERSE ACTION CAUSALLY RELATED TO PLAINTIFF'S GENDER**

**A.      The Legal Standards Under the NYCHRL**

Gender claims under the NYCHRL are analyzed using a burden-shifting framework akin to those in federal and state law claims. *Chen v. City Univ. of N.Y.*, 805 F. 3d 59 (2d Cir. 2015).

For retaliation claims, "the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was

reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 112 (2d Cir. 2013) (citation omitted). Under the NYCHRL, "a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives." *Id.* at 113.

**B.    No Evidence of Gender Discrimination**

The very first mention of gender by anyone came in the Pagano Emails where it appeared *en masse* with a barrage of threats and conclusory statements, *see supra,* and next by current counsel in scripting the pleadings. At no time during her employment did Ms. Robinson ever equate her treatment to her gender or complain about it as such. *See Heron, supra (*quoting *Harris v. N.Y. State Dept. of Corr. Serv.,* 616 Fed. Appx. 453, 455 (2d Cir. 2015) (recognizing "that while the plaintiff 'asserts that she now holds such a belief,' her 'post-termination insight cannot bear upon whether she engaged in a protected activity before being terminated.'").

Ms. Robinson bases her claim of gender discrimination on allegedly "hostile, abusive, and intimidating" comments, "demeaning" conduct towards her in general, and assignment of "stereotypically female" tasks. But she must show they were all gender-related and cannot.

1.    "Hostile, abusive, and intimidating" comments

As to Ms. Chen, there is not a single piece of evidence that she ever made a gender-based comment to or about Plaintiff. As to Mr. De Niro, the identified comments—"spoiled brat" and the threat "how dare you fucking disrespect me"—are not gender-based. GB Dec., Ex. 1, Compl., ¶ 26. Nor is the general reference by either Mr. De Niro or Ms. Chen to certain other Canal employees as "the girls." *Id.,* at ¶ 19. Ms. Robinson frequently used this term and one employee actually complained to her, asking that she refrain from doing so. GB Dec., Ex. 3, P. Tr. II, at 32:21-34:17.

The Complaint also sets forth a limited number of attention-getting blurbs remote in time and devoid of context that individually and collectively are insufficient to support a hostile work environment theory. GB Dec., Ex. 1, ¶¶ 3, 19, 21, 42-44. For example, in one she says Mr. De Niro asked her to imagine him on the toilet. *Id*., at ¶ 20. It was explained, in context, to be a reference to his describing where a television should be mounted. GB Dec., Ex. 3, P. Tr. II., at 35. Not only is there no allegation Ms. Robinson ever complained about any of this, she makes a point that in January 2019 she agreed to stay on for up to an additional two years.

The use of "vulgar language" is also not evidence of gender-based animus. Although the terms "bitch" and "cunt" have gender-based connotations, Ms. Robinson claims these terms were used sporadically or in contexts that had nothing to do with her. While "verbal comments may constitute evidence of discriminatory intent," a plaintiff must "establish *a nexus* between the alleged discriminatory remarks and the defendant's decision" that resulted in the plaintiff being treated less well than another. *See Stafford v. N.Y. Presbyterian Hosp.*, No. 06-cv-2150, 2011 WL 1131104, at *8 (E.D.N.Y. 2011) ("Put differently, the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination...") (cleaned up).

2.    Gendered Tasks

Also made for this litigation are allegations that during her employment Ms. Robinson was given stereotypical female tasks that caused her to be treated "less well" than other employees. Ms. Robinson managed Canal's office and employees and handled certain personal matters for Mr. De Niro (as she had throughout her entire employment). GB Dec., Ex. 2, P. Tr. I, at 89:20–91:15, 171:3-8; 208:15–209:9; 210:17–211:2. This was nothing new.

Ms. Robinson became employed in 2008 to fill the role of Mr. De Niro's "point person." GB Dec., (GB Dec., Ex. 91, RDN Tr. I, at 83 and Ex. 2, P. Tr. I, at 175. She was expected to run Canal's office. *Id.*, Ex. 91, RDN Tr. I, at 89-92. She also assisted Mr. De Niro with personal tasks, such as obtaining presents for children/friends, helping with his living situation, looking for furniture and related work. *Id.*, at 97–98; Ex. 2, P. Tr. I, at 171–72. He expected he to do "[a]nything and everything." *Id.*, Ex. 91, RDN Tr. I, at 97–98; 167–68 (Mr. De Niro agreeing that a "significant part" of Ms. Robinson's duties entailed assisting him with his "personal life").

Between 2008 and April 2019, Canal had between three and five office employees. De Niro Dec., at ¶ 6. None of their job duties were well-defined because they changed depending on Mr. De Niro's needs. GB Dec., Ex. 86, SWB Tr.,[12] at 67-68, 79; Ex. 88, Kaplan Tr.,[13] at 130. A core duty of Canal employees was to accomplish what Mr. De Niro asked, including running errands, assisting with holiday gifts, scheduling medical appointments and other matters. GB Dec., Ex. 2, P. Tr. I, at 22–23; 83–84; 23:4-17; 83:23-85:24; Ex. 86, SWB Tr., at 32-34, 36; Ex. 88, Kaplan Tr., at 142-43.

The concept of Ms. Robinson being "redirected" in her day-to-day duties, as she alleges, (including personal tasks) was nothing new (*id.*, at 234:10-235:6 (discussing "continuous" redirection of her job duties)), and she explained "from 2015 on I handled more personal projects and items for Bob than I did managing the office" (*id.*, at 242:17-20). Her role was not unique as related to the types of tasks she did for Mr. De Niro: "I think that is the core material responsibility at Canal is to do what Bob directed of you regardless what title or what jobs you might do a little bit more of. It really was what Bob asked you to do. And a lot of times it went outside any title

---

[12]     As used herein "SWB Tr." refers to the deposition transcript of Sabrina Weeks-Brittan taken on January 10, 2022.
[13]     As used herein the "Kaplan Tr." refers to the deposition transcript from the deposition of Michael Kaplan, taken on March 23, 2022.

that any Canal employee would have." *Id*., at 212:24–213:8. Even when she obtained the Vice President of Production & Finance title in 2017, "[her] job in the end did not really change" (*id*., at 258:10–259:24).

This was Ms. Robinson's job, and there is nothing unlawful about it. To the extent Ms. Robinson confines this "gendered treatment" to the brief duration where some of her duties related to the Townhouse, we know they were being removed, as she wanted, the day she resigned.

3.   No evidence of male comparators being treated more favorably or gender-animus

A plaintiff must establish that she had male comparators and that she was treated "less well" than them, and that such treatment was causally related to her gender. *Jackson-Lipscomb v. City of N.Y.*, No. 17-10093, 2022 WL 953048, at *6 (S.D.N.Y. Mar. 30, 2022) (plaintiff could not be treated "less well" than other employees when she had no comparators). *See also McIntosh v. Dept. of Educ. of the City of N.Y.*, 202 A.D.3d 481, 482 (1st Dept. 2022) (holding conclusory statements insufficient under NYCHRL); *Tihan v. Apollo Mgmt. Holdings, L.P.*, 201 A.D.3d 557, 558 (1st Dept. 2022) (it is incumbent upon a plaintiff to show, via admissible evidence, *how* she was treated differently than similarly-situated male employees). Even decidedly unequal treatment is not enough, as it is the plaintiff's burden to affirmatively establish that such treatment was "motivated by discriminatory animus." *Matias v. Montefiore Med. Ctr.*, No. 20-2849, 2022 WL 4448585, at *14 (S.D.N.Y. Sept. 23, 2022) (even unpleasant conduct by an employer, when established, must be linked to a protected characteristic) (citing *Ferraro v. N.Y.C. Dept. of Educ.*, 404 F. Supp. 3d 691, 720 (E.D.N.Y. 2017) (threatening conduct, critical feedback and issuance of false reports insufficient to establish claim under NYCHRL where no link to protected characteristic is established) and *Dressler v. NYC Dept. of Educ.*, No. 10-cv-3769, 2012 WL 1038600, at *15 (S.D.N.Y. Mar. 29, 2012) (granting defendant summary judgment on plaintiff's

NYCHRL hostile work environment claim because "[p]laintiff fails to adduce any evidence of discriminatory intent in the unpleasant conduct alleged")). "Bullying alone, unconnected from the intent to discriminate based on one of these protected categories, is not sufficient to bring a claim for discrimination." *Burns v. Medgar Evers Coll. of City Univer. of N.Y.*, No. 19-cv-1211, 2019 WL 3805089, at *2 (E.D.N.Y. Aug. 12, 2019) (citing *Nakis v. Potter*, No. 01-cv-10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) ("Hostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is not actionable")).

A plaintiff must similarly demonstrate that she "has been treated less well than other employees because of her gender." *Hornig v. Trs. of Colum. Univ. of City of N.Y.*, 17-cv-3602, 2022 WL 976267, at *13 (S.D.N.Y. Mar. 31, 2022). Thus, to overcome a summary judgment motion, a plaintiff must offer evidence that the treatment she endured was "motivated by hostility towards plaintiff's [gender]." *Matias*, 2022 WL 4448585, at *13. In applying the "less well" standard, however, "district courts must be mindful that the NYCHRL is not a 'general civility code.' The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss." *Richards v. Dept. of Educ. of City of N.Y.*, No. 21-cv-338, 2022 WL 329226, at *20 (S.D.N.Y. Feb. 2, 2022) (Liman, J.). None of that exists here.

Even if it could be established, though it is not alleged, that Ms. Chen's was motivated by jealousy of or insecurity about Ms. Robinson's professional relationship with Mr. De Niro, this is not gender-based conduct that can form the basis of a NYCHRL claim. *See, e.g.*, *Rossbach v. Montefiore Med. Ctr.*, No. 19-5758, 2021 WL 930710, at *17 (S.D.N.Y. Mar. 11, 2021).

Having failed to establish unlawful conduct under the NYCHRL, this cause of action should be dismissed.

**C. The Evidence is Insufficient to Support a NYCHRL Retaliation Claim Because there was no Protected Activity**

To prevail on a NYCHRL retaliation claim, Plaintiff must demonstrate she engaged in protected activity relating to her gender. *See Albunio v. City of N.Y.*, 16 N.Y.3d 472, 479 (2011) ("Since [the NYCHRL] claim is limited to retaliation, she can prevail only if she shows that she 'opposed' discrimination."). In *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10 (2d Cir. 2013), the Second Circuit explained "[a] plaintiff's belief... is not reasonable simply because he or she complains of something that appears to be discrimination in some form." *Id.* at 15. *Kelly* echoed an earlier Second Circuit decision where the plaintiff "could not have reasonably believed that he was opposing an employment practice" when "the evidence does not address racial discrimination in an employment practice." *Wimmer v. Suffolk Cnty. Police Dept.*, 176 F.3d 125, 136 (2d Cir. 1999). The first inquiry is whether Ms. Robinson ever made any gender-related protected activity. She did not and cannot establish a *prima facie* case.

Ms. Robinson engaged in no protected activity prior to her April 6 resignation. The closest she came was in a March 27 phone call with Tom Harvey. While reading from Ms. Chen's email questioning Ms. Robinson's actual job duties, she stated "I mean, I -- at this point, it's just like I feel like I'm constantly like harassed, and I'm constantly -- like she's saying things about me to Bob that aren't true." GB Dec., Ex. 76, Audio Tr. (27:52-28:03), at 2:2-5.

When asked at her deposition about the specific complaint—the protected activity—Plaintiff explained she sent a text message to Mr. Harvey: "...that it was downright harassment regarding the Bob and Tiffany harassing me about the apartment items and things that needed to be done in the apartment." GB Dec., Ex. 3, P. Tr. II, at 54:4-13. Attorney Harvey spoke with Ms. Robinson following the text message, and Ms. Robinson did not convey to him that her text message related to any perception she had that Ms. Chen's treatment was due to Ms. Robinson's

34

gender. GB Dec., Ex. 89, TH Tr., at 443-445. Harassment about the Townhouse, not gender, is beyond the reach of the NYCHRL.

"Harassment" here is being used as a wholesale term, for as Ms. Robinson explained at her deposition she had complained about "harassment" from many other people over the years. *Id*., at 45:13–47:7; 55:2-13. This is because Ms. Robinson defines "harassment" in terms such as "harassing me on the apartment work" and "berating me about the items that needed to be done for the apartment"; "refusing to allow me through an entry door." *Id.*, at 45:15–47:7.[14] This concept is intermingled with legal terms such as "toxic work environment" and "hostile" to label them in a way to make them sound authoritative and compelling. *Accord, id.*, at 48:5-49:14.[15]

Absent evidence of *bona fide* protected activity under *Kasten* and *Greathouse*, Plaintiff has failed to make out a *prima facie* case of retaliation.

Even if Plaintiff established a *prima facie* case, another question is whether Defendants can be liable under a retaliation theory for any adverse actions by Ms. Chen who was not a Canal employee. In a recent decision, *Leroy v. Delta Air Lines,* No. 21-267-cv, 2022 WL 12144507 (2d Cir. Oct. 27, 2022), the Second Circuit noted: "No decision of the New York Court of Appeals has held an employer liable under the NYCHRL for the conduct of a non-employee, and the text of the NYCHRL does not appear to impose such liability." *Leroy,* 2022 WL 12144507, fn. 2. But the Court did not answer the question. *See also Kelly*, 716 F.3d at14 ("Our Circuit has long since

---

[14]  *See also* Tr. I, at 97:2-9 ("I think all e-mails and issues of the house and items that she was asking me to do, and was, you know, harassment on the apartment items – house items....."
[15]     When asked what she meant by the term "hostile work environment" as she had been using it in her pleadings at throughout her deposition, Ms. Robinson explained: "An environment where it's very difficult to do one's job, where you're being targeted, where you're being harassed. I mean it's a very, very difficult environment." (*id.*, Tr. II, at 49:15-53:24). These are precisely the type of non-descript allegations that do not implicate the NYCHRL as they are not protected activity.

rejected "paramour preference" claims, which depend on the proposition that "the phrase 'discrimination on the basis of sex' encompasses disparate treatment premised not on one's gender, but rather on a romantic relationship between an employer and a person preferentially [treated]."). This returns us to the question of what adverse actions befell Plaintiff prior to the end of her employment that are causally connected to protected activity and the answer is none. It also remains none if Plaintiff was not constructively discharged but voluntarily resigned.

### D.      Post-employment Protected Activity

As discussed above, Ms. Robinson's post-employment emails relating to her two-year agreement and the recommendation letter made no mention of gender and cannot reasonably be viewed as opposition to an unlawful practice. *See supra.* The Pagano Emails fail to do so for the reasons articulated. *See supra.* If these do not rise to the level of protected activity, then neither Canal's presenting evidence to the District Attorney's office nor the commencement of the State Court Action could have been in response to such protected activity. In that case, there is no adverse action. And even if there was, Defendants have articulated legitimate non-discriminatory reasons to explain their actions, and Plaintiff presents no evidence that they are pretextual under the *McDonnell Douglas* standard. As such, the NYCHRL retaliation claim should be dismissed.

**CONCLUSION**

Defendants request that the Court dismiss Plaintiff's claims and grant their motion for summary judgment, in its entirety, with such other and further relief deemed appropriate.

Dated: Hawthorne, New York
       October 30, 2022

**TRAUB LIEBERMAN STRAUS**
**& SHREWSBERRY LLP**

By:   *Gregory R. Bennett*
       Gregory R. Bennett
       Mid-Westchester Executive Park
       Seven Skyline Drive
       Hawthorne, New York 10532
       Tel.: (914) 347-2600
       Email: gbennett@tsslaw.com
       *Attorneys for Defendants*
       *Canal Productions, Inc. and*
       *Robert De Niro*

Dated:   New York, New York
       October 30, 2022

**TARTER KRINSKY & DROGIN LLP**

By:   *Laurent S. Drogin*
       Laurent S. Drogin
       Brittany K. Lazzaro
       1350 Broadway
       New York, New York 10018
       Tel.: (212) 216-8000
       Email: ldrogin@tarterkrinsky.com
       Email: blazzaro@tarterkrinsky.com
       *Attorneys for Defendant*
       *Canal Productions, Inc.*