**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**GRAHAM CHASE ROBINSON**

*Plaintiff,*

v.

**ROBERT DE NIRO and**
**CANAL PRODUCTIONS, INC.,**

*Defendants.*

**Case No.  1:19-cv-09156-LJL-KHP**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

i

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   COUNTERSTATEMENT OF MATERIAL FACTS............................................2

    A.  Mr. De Niro and Canal Subjected Ms. Robinson to Persistent Gender
        Discrimination Throughout Her Employment ...................................................2

    B.  Ms. Robinson Repeatedly Made Protected Complaints ....................................4

    C.  Defendants Took No Remedial Action and Instead Constructively Discharged Ms.
        Robinson Based on Her Gender and in Retaliation for Her Complaints ...........................5

    D.  Ms. Robinson Continued to Engage in Protected Activity in Connection With and
        Following Her Constructive Discharge ..............................................................6

    E.  Mr. De Niro and Canal Launched a Series of Retaliatory Attacks ...................7

III.  LEGAL STANDARDS .......................................................................................10

    A.  The Standard for Summary Judgment Places a Heavy Burden on Defendants in
        Discrimination and Retaliation Cases, Especially Under the NYCHRL ...........................10

    B.  Direct and Circumstantial Proof of Discrimination, Retaliation, and Pretext ..................11

    C.  Liability for the Discriminatory or Retaliatory Acts of a Non-Employee .......................13

IV.   ARGUMENT ......................................................................................................14

    A.  A Reasonable Jury Could Find That Defendants Subjected Ms. Robinson to
        Persistent Gender Discrimination, Culminating in Constructive Discharge .....................14

        1.  Defendants Subjected Ms. Robinson to Gender Discrimination ...............................14

        2.  Defendants Constructively Discharged Ms. Robinson ................................................17

    B.  A Reasonable Jury Could Conclude That Defendants Retaliated Against Ms.
        Robinson, in Violation of the NYCHRL, the NYLL, and the FLSA ...............................19

        1.  Summary Judgment Should Be Denied on All Claims Because Defendants Fail
            to Address Plaintiff's Complaint of Equal Pay Violations ...........................................19

        2.  Plaintiff Made Protected Complaints Under the NYCHRL, NYLL, and FLSA .........20

            i.   Ms. Robinson's Protected Complaints Under the NYLL and FLSA....................20

            ii.  Plaintiff Engaged in a Series of Protected Activity Under the NYCHRL By
                Making Overt Complaints of Discrimination and Harassment.............................22

            iii. In Connection With and After Her Constructive Discharge, Plaintiff
                Continued to Engage in Protected Activity, Including by Specifically
                Asserting Claims Under the NYCHRL, NYLL, and FLSA ................................25

        3.  Defendants Retaliated Against Plaintiff Because of Her Protected Activity..............28

i.    Post-Employment Retaliation Is Actionable If It Could Deter Complaints ..........28

ii.   Defendants' Adverse Actions Are Retaliatory Under All Relevant Laws ...........29

iii.  Defendants Constructively Discharged Ms. Robinson ...........................................30

iv.   Defendants Retaliated by Refusing to Provide a Reference Letter.......................31

v.    Defendants Further Retaliated Against Ms. Robinson by Launching a Sham
      Investigation, Sending Her a Threatening Letter, Filing a Baseless Lawsuit,
      and Pushing for Her Criminal Prosecution ...........................................................33

vi.   The Record Shows that Retaliatory Animus Motivated the Investigation,
      Threatening Letter, Lawsuit, and Push for Criminal Prosecution ........................36

vii.  There is Extensive Evidence That Canal's Claims Were Baseless.......................38

V.  CONCLUSION....................................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Aflalo v. Cantor Fitzgerald, L.P.*,
    298 F. Supp. 3d 688 (S.D.N.Y. 2018) .......................................................... 20, 21, 22

*Albunio v. City of New York*,
    922 N.Y.S.2d 244 (N.Y. 2011) ................................................................................ 23

*Anagnostakos v. N.Y. State Div. of Hum. Rts.*,
    846 N.Y.S.2d 798 (3d Dep't 2007) ......................................................................... 14

*Back v. Hastings On Hudson Union Free Sch. Dist.*,
    365 F.3d 107 (2d Cir. 2004) .................................................................................... 14

*Bader v. Special Metals Corp.*,
    985 F. Supp. 2d 291 (N.D.N.Y. 2013) .................................................................... 16

*Bear, Stearns Funding v. Interface Group-Nevada*,
    361 F. Supp. 2d 283 (S.D.N.Y. 2005) ..................................................................... 27

*Bennett v. Health Mgt. Sys., Inc.*,
    936 N.Y.S.2d 112 (1st Dep't 2011) ......................................................................... 11

*Bentivegna v. People's United Bank*,
    2017 WL 4277149 (E.D.N.Y. Sept. 25, 2017) .................................................. 33, 34

*Bill Johnson's Rests., Inc.* v. *N.L.R.B.*,
    461 U.S. 731, 740 (1983) .............................................................................. 33, 34, 41

*Bright-Asante v. Saks & Co.*,
    242 F. Supp. 3d 229 (S.D.N.Y. 2017) ..................................................................... 19

*Burlington N. & Santa Fe. Ry. Co. v. White*,
    548 U.S. 53 (2006) ........................................................................................ 28, 31, 34

*Chauca v. Abraham*,
    89 N.E.3d 475 (N.Y. 2017) ..................................................................................... 10

*Chen v. City Univ. of N.Y.*,
    805 F.3d 59 (2d Cir. 2015) ...................................................................................... 11

*Chertkova v. Conn. Gen. Life Ins. Co.*,
    92 F.3d 81, 90 (2d Cir. 1996) .................................................................................. 18

*Chevron Corp. v. Salazar*,
    275 F.R.D. 422 (S.D.N.Y. 2011) ............................................................................ 13

*Coello v. The Riese Org.*,

   2019 WL 2898426 (Sup. Ct. Bronx Cnty. May 21, 2019) ........................................................ 23

*Coker v. Goldberg & Assocs. P.C.*,

   2022 WL 874719 (S.D.N.Y. Mar. 24, 2022) ........................................................................ 21

*Commonwealth v. Bull HN Info. Sys.*,

   16 F. Supp.2d 90 (D. Mass. 1998) ........................................................................................ 34

*Conner v. Schnuck Markets*,

   121 F.3d 1390, 1394 (10th Cir. 1997) .................................................................................. 22

*Cortese v. Skanska Koch, Inc.*,

   544 F. Supp. 3d 456 (S.D.N.Y. 2021) .................................................................................. 21

*Cox v. Onondaga Cty. Sheriff's Dept.*,

   760 F.3d 139, 147 (2d Cir. 2014) ........................................................................................ 33

*Crawford v. Chipotle Mexican Grill*,

   773 F. App'x 822 (6th Cir. 2019) ........................................................................................ 23

*Crawford v. Coram Fire Dist.*,

   2015 WL 10044273 (E.D.N.Y. May 4, 2015) ...................................................................... 34

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,

   555 U.S. 271 (2009) .............................................................................................................. 23

*Cty. of Orange v. Travelers Indem. Co.*,

   2014 WL 1998240 (S.D.N.Y. May 14, 2014) ...................................................................... 39

*Curcio v. Roosevelt Union Free Sch. Dist.*,

   2012 WL 3646935 (E.D.N.Y. Aug. 22, 2012) ...................................................................... 12

*Daddino v. Sanossian*,

   2022 WL 1085542 (E.D.N.Y. Feb. 25, 2022) ...................................................................... 34

*Delville v. Firmenich Inc.*,

   920 F. Supp. 2d 446 (S.D.N.Y. 2013) .................................................................................. 12

*Dillon v. Ned Mgmt.*,

   85 F. Supp. 3d 639 (E.D.N.Y. 2015) .............................................................................. passim

*Dobrich v. Gen. Dynamics Corp., Elec. Boat Div.*,

   40 F. Supp. 2d 90 (D. Conn. 1999) ...................................................................................... 15

*Durham Life Ins. Co. v. Evans*,

   166 F.3d 139 (3rd Cir. 1999) ........................................................................................ 34, 36

*Dutton v. Penske Logistics*,
   2010 WL 2775843 (W.D.N.Y. July 14, 2010) ........................................................ 24

*E.E.O.C. v. Bloomberg L.P.*,
   967 F. Supp. 2d 816 (S.D.N.Y. 2013) .................................................................. 29

*E.E.O.C. v. Ethan Allen, Inc.*,
   44 F.3d 116 (2d Cir. 1994) ............................................................................. 12

*E.E.O.C. v. HBE Corp.*,
   135 F.3d 543 (8th Cir. 1998) ........................................................................... 22

*Eberhardt v. Integrated Design & Const.*,
   167 F.3d 861 (4th Cir. 1999) ........................................................................... 22

*Edwards v. Nicolai*,
   60 N.Y.S.3d 40 (1st Dep't 2017) ...................................................................... 14

*Eldaghar v. City of N.Y. Dept. of Citywide Admin. Servs.*,
   2008 WL 2971467 (S.D.N.Y. July 31, 2008) ...................................................... 11

*Figura v. N. Country Janitorial*,
   37 N.Y.S.3d 697 (Sup. Ct. Warren Cnty. 2016) .................................................. 20

*Fisch v. New Heights Acad. Charter Sch.*,
   2012 WL 4049959 (S.D.N.Y. Sept. 13, 2012) ..................................................... 22

*Fitzgerald v. Henderson*,
   251 F.3d 345, 367 (2d. Cir. 2001) .................................................................... 19

*Gangadharan v. GNS Goods & Servs.*,
   2022 WL 824135 (E.D.N.Y. Mar. 18, 2022) ...................................................... 21

*Gold v. Am. Med. Alert Corp.*,
   2017 WL 663551 (S.D.N.Y. Feb. 16, 2017) ....................................................... 27

*Gonzalez v. Bratton*,
   147 F. Supp. 2d 180 (S.D.N.Y. 2001) ............................................................... 36

*Graham v. Long Island R.R.*,
   230 F.3d 34 (2d Cir. 2000) ............................................................................. 27

*Greathouse v. JHS Sec.*,
   784 F.3d 105 (2d Cir. 2015) ........................................................................... 20

*Greenbaum v. Svenska Handelsbanken*,
   67 F. Supp. 2d 228 (S.D.N.Y. 1999) ................................................................ 11

*Gregory v. Daly*,
   243 F.3d 687 (2d Cir. 2001) ................................................................................. 15

*Gupta v. Al Jazeera Am.*,
   2018 WL 1605571 (S.D.N.Y. Mar. 29, 2018) ....................................................... 27

*Hicks v. Baines*,
   593 F.3d 159 (2d Cir. 2010) ................................................................................. 29

*Holtz v. Rockefeller & Co.*,
   258 F.3d 62 (2d Cir. 2001) ................................................................................... 14

*Housing Works, Inc. v. City of N.Y.*,
   72 F.Supp.2d 402 (S.D.N.Y. 1999) ...................................................................... 29

*Hudson v. Moore Bus. Forms, Inc.*,
   836 F.2d 1156 (9th Cir. 1987) .............................................................................. 35

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009) ................................................................................. 10

*Jacques v. DiMarzio*,
   200 F. Supp. 2d. 151 (E.D.N.Y. 2002) ................................................................. 35

*Jenkins v. General Motors Corp.*,
   164 F.R.D. 318 (N.D.N.Y. 1996) .......................................................................... 13

*Jones v. N.Y.C. Health & Hosp. Corp.*,
   2003 WL 21262087 (S.D.N.Y. May 29, 2003) ..................................................... 19

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
   716 F.3d 10 (2d Cir. 2013) ................................................................................... 23

*Keyes v. School Dist. No. 1, Denver, Colo.*,
   413 U.S. 189 (1973) ............................................................................................. 29

*Khurana v. Wahed Invest LLC*,
   2020 WL 364794 (S.D.N.Y. Jan. 8, 2020) ........................................................... 34

*Kim v. Lee*,
   576 F. Supp. 3d 14, 31 (S.D.N.Y. 2021) ......................................................... 34, 36

*Leberman v. John Blair & Co.*,
   880 F.2d 1555 (2d Cir. 1989) ............................................................................... 27

*Leroy v. Delta Air Lines*,
   2022 WL 12144507 (2d Cir. Oct. 27, 2022) ......................................................... 13

*Littlejohn v. City of N.Y.*,
    795 F.3d 297 (2d Cir. 2015) ................................................................ 22

*Lopez v. Advantage Plumbing & Mech. Corp.*,
    2016 WL 1268274 (S.D.N.Y. Mar. 31, 2016) ........................................ 20

*Lynch v. N.Y. State Urban Dev. Corp.*,
    2018 WL 7918226 (E.D.N.Y Aug 10, 2018) ........................................ 36

*Malena v. Victoria's Secret Direct*,
    *LLC*, 886 F.Supp.2d 349 (S.D.N.Y. 2012) ........................................... 23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .............................................................................. 11

*McKenzie v. Renberg's Inc.*,
    94 F.3d 1478 (10th Cir. 1996) ............................................................. 22

*Mestizo v. H2 Candy & Nuts*,
    2019 WL 2209203 (S.D.N.Y. May 21, 2019) ...................................... 21

*Mihalik v. Credit Agricole Cheuvreux N. Am.*,
    715 F.3d 102 (2d Cir. 2013) ............................................... 11, 14, 23, 34

*Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*,
    2022 WL 10653757 (S.D.N.Y. Oct. 18, 2022) ................................ 10, 11

*Mitchell v. Ceros*,
    2022 WL 748247 (S.D.N.Y. Mar. 10, 2022) .................................... 20, 21

*Mittl v. N.Y. State Div. of Hum. Rts.*,
    794 N.E.2d 660 (N.Y. 2003) ............................................................... 14

*Montana v. First Fed. Sav. & Loan Ass'n*,
    869 F.2d 100 (2d Cir. 1989) ................................................................ 42

*Muniz v. UPS, Inc.*,
    731 F.Supp.2d 961 (N.D. Cal. 2010). .................................................. 22

*Naumovski v. Norris*,
    934 F.3d 200 (2d Cir. 2019) ................................................................ 14

*O'Neal v. State Univ. of N.Y.*,
    2006 WL 3246935 (E.D.N.Y. Nov. 8, 2006) ...................................... 33

*Okoli v. City of Balt.*,
    648 F.3d 216 (4th Cir. 2011) ............................................................... 24

*Olaechea v. City of N.Y.*,
  2019 WL 4805846 (S.D.N.Y. Sept. 30, 2019) .......................................................... 33

*Owens v. N.Y.C. Hous. Auth.*,
  934 F.2d 405 (2d Cir. 1991) ..................................................................................... 11

*Passananti v. Cook Cty.*,
  689 F.3d 655 (7th Cir. 2012) .................................................................................... 15

*Petrosino v. Bell Atl.*,
  385 F.3d 210 (2d Cir. 2004) ..................................................................................... 17

*Pilgrim v. McGraw-Hill Cos.*,
  599 F. Supp. 2d 462 (S.D.N.Y. 2009) ...................................................................... 19

*Pompey-Primus v. Success Acad. Charter Sch.*,
  2022 WL 504541 (S.D.N.Y. Feb. 17, 2022) ............................................................ 17

*Pucino v. Verizon Wireless Commc'ns*,
  618 F.3d 112 (2d Cir. 2010) ..................................................................................... 15

*Quinn v. Green Tree Credit Corp.*,
  159 F.3d 759 (2d Cir. 1998) ..................................................................................... 13

*Quintanilla v. Suffolk Paving Co.*,
  2019 WL 885933 (E.D.N.Y. Feb. 22, 2019) ....................................................... 20, 34

*Raniola v. Bratton*,
  243 F.3d 610 (2d Cir. 2001) ..................................................................................... 12

*Rattigan v. Holder*,
  604 F. Supp.2d 33 (D.D.C. 2009), *aff'd*, 643 F.3d 975 (D.C. Cir. 2011) ................ 34

*Ravina v. Columbia Univ.*,
  2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019) ......................................................... 12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ................................................................................................. 10

*Refermat v. Lancaster Cent. Sch. Dist.*,
  2017 WL 10296874 (W.D.N.Y. Nov. 14, 2017)....................................................... 16

*Rivera v. Rochester Genessee Regional Transp. Auth.*,
  743 F.3d 11 (2d Cir. 2014) ....................................................................................... 34

*Rodriguez v. Nat'l Golf Links of Am.*,
  2020 WL 3051559 (E.D.N.Y. June 8, 2020) ............................................................ 34

*Sanders v. Madison Square Garden, L.P.*,
   525 F.Supp.2d 364 (S.D.N.Y. 2007) ................................................................. 28

*Savor Health, LLC v. Day*,
   2022 WL 912236 (S.D.N.Y. Mar. 29, 2022) ....................................................... 35

*Schanfield v. Sojitz Corp. of Am.*,
   663 F. Supp. 2d 305 (S.D.N.Y. 2009) ................................................................. 29

*Schaper v. Bronx Lebanon Hosp. Ctr.*,
   408 F.Supp.3d 379, 389, 391-92 (S.D.N.Y. 2019) .............................................. 31

*Servello v. N.Y. State Off. of Child. & Family Servs.*,
   2019 WL 974972 (N.D.N.Y. Feb. 28, 2019) ....................................................... 29

*Shultz v. Congregation Shearith Israel of City of N.Y.*,
   867 F.3d 298 (2d Cir. 2017) ............................................................................... 17

*Signer v. Tuffey*,
   66 F. App'x. 232 (2d Cir. 2003) ......................................................................... 13

*Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan*,
   981 N.Y.S.2d 89 (1st Dep't 2014) ....................................................................... 17

*Smith v. Davis*,
   248 F.3d 249 (3d Cir. 2001) ............................................................................... 12

*Sotomayor v. City of N.Y.*,
   862 F. Supp. 2d 226 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) ........... 29

*Spencer v. Int'l Shoppes*,
   2010 WL 1270173 (E.D.N.Y. Mar. 29, 2010) ..................................................... 35

*Spencer v. Int'l Shoppes*,
   902 F. Supp.2d 287 (E.D.N.Y. 2012) ..................................................... 34, 35, 36

*Starnes v. Wallace*,
   849 F.3d 627 (5th Cir. 2017) ........................................................................ 21, 22

*Sumner v. U.S.P.S.*,
   899 F.2d 203 (2d Cir. 1990) ............................................................................... 23

*Torres v. Gristede's Operating Corp.*,
   628 F. Supp. 2d 447 (S.D.N.Y. 2008) ..................................................... 34, 35, 36

*U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*,
   822 N.E.2d 777 (N.Y. 2004) ............................................................................... 39

*Vasquez v. Empress Ambulance Serv., Inc.*,
  835 F. 3d 267 (2d Cir. 2016) ...................................................................... 14

*Walker v. N.Y.C. Dep't of Corr.*,
  2008 WL 4974425 (S.D.N.Y. Nov. 19, 2008) ......................................... 12

*Wanamaker v. Columbian Rope Co.*,
  108 F.3d 462 (2d Cir. 1997) ...................................................................... 31

*Weiss v. JPMorgan Chase & Co.*,
  332 F. App'x 659 (2d Cir. 2009) ............................................................... 12

*Williams v. N.Y.C. Housing Auth.*,
  872 N.Y.S.2d 27 (1st Dep't 2009) ............................................................ 11

*Young v. Graham*,
  2017 WL 1134758 (N.D.N.Y. Mar. 27, 2017) ......................................... 19

*Zann Kwan v. Andalex Grp.*,
  737 F.3d 834 (2d Cir. 2013) ................................................................ 12, 13

*Zuckerman v. GW Acquisition LLC*,
  2021 WL 4267815 (S.D.N.Y. 2021) ......................................................... 26

## Statutes

Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA") ......................................... passim

New York City Human Rights Law, N.Y. Admin. Code § 8-107 ("NYCHRL"). ............... passim

New York Labor Law § 215 ("NYLL") .......................................................... passim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e ........................... passim

## Rules

Federal Rule of Civil Procedure 11 ......................................................... 35

Federal Rule of Evidence 408 ............................................................... 27

## I.      INTRODUCTION

For over 11 years, Plaintiff Graham Chase Robinson worked as Defendant Robert De Niro's "head assistant" through his company, Defendant Canal Productions. During her tenure, Mr. De Niro subjected Ms. Robinson to a barrage of gender discrimination: he repeatedly called her a "bitch," subjected her to sexually charged comments, urinated while talking to her, initiated unwanted physical contact, paid her less than a male employee because she did not have "a family to support," and empowered his girlfriend—whom he made his agent and Ms. Robinson's *de facto* supervisor—to target Ms. Robinson based on her gender. All of this is gender discrimination under the New York City Human Rights Law ("NYCHRL").

Ms. Robinson repeatedly complained about discrimination and other employment law violations. She objected to Mr. De Niro about pay discrimination, wage-and-hour infractions, and harassment, and she reported to Canal's General Counsel that she was being harassed and targeted based on her gender. Her protected activity enraged Mr. De Niro: he sent text messages saying "how dare her!" and "who the fuck does she think she is?!?!"; he testified that he was "very angry" and "ready to go after her"; and a key Canal employee sent text messages admitting that "she was threatening to sue [Mr. De Niro] so they wanted to ruin her first."

Defendants retaliated with a series of drastic acts: they orchestrated Ms. Robinson's ouster from Canal, refused to provide her with a recommendation needed to advance her career, launched a sham investigation into her, sent her a letter threatening legal action, filed a baseless $6 million lawsuit against her, and pushed to have her criminally prosecuted. As detailed in Plaintiff's affirmative summary judgment motion, Defendants assailed her for expenditures that they had fully authorized or ratified. This is quintessential retaliation under the Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), and NYCHRL.

Defendants' summary judgment motion minimizes and distorts their course of conduct. Defendants omit a multitude of crucial facts supporting a verdict against them, including multiple instances of Plaintiff's protected activity and Defendants' retaliation; this alone precludes judgment on the retaliation claims. Defendants also ignore a legion of case law rejecting their arguments, and they improperly invite inferences in their favor. Viewed in the light most favorable to Plaintiff, the record as a whole supports a conclusion that Defendants subjected her to gender discrimination under the NYCHRL and retaliation under the NYCHRL, FLSA, and NYLL. At a minimum, there are extensive factual disputes requiring a jury trial.

## II.    COUNTERSTATEMENT OF MATERIAL FACTS[1]

### A.    Mr. De Niro and Canal Subjected Ms. Robinson to Persistent Gender Discrimination Throughout Her Employment

During Ms. Robinson's employment at Canal, Mr. De Niro directly supervised her and subjected her to a barrage of gender-based comments and mistreatment. He berated her in distinctly gendered terms, repeatedly calling her a "bitch" or a "brat." (Ex. 12 at 31:8-17, 31:20-24.)[2] In conversations with Ms. Robinson, he routinely referred to female employees as "girls" and called his female business partner a "cunt." (*Id.* at 32:21-33:12, 31:25-32:3.) He made sexually charged comments to Ms. Robinson, directing her to "picture me on the toilet," laughing about "mak[ing] a man out of [her]," telling her "you just need to get some sperm," and repeatedly joking about Viagra. (*Id.* at 35:3-36:8, 36:19-37:2, 37:6-20.) He urinated while on the phone with her and subjected her to unwanted physical contact, often behind closed doors, including making her scratch his back. (*Id.* at 39:11-25, 40:17-22, 41:12-19.) Mr. De Niro told her that he did not have

---

[1] Unless otherwise stated, all exhibits cited herein are exhibits to the accompanying Declaration of Kate MacMullin, Esq. ("MacMullin Decl.") "Robinson Decl." refers to the accompanying Declaration of Graham Chase Robinson, and "Mot." refers to Defendants' Motion for Summary Judgment.

[2] Defendants assert that "these terms were used sporadically or in contexts that had nothing to do with her." (Mot. at 30.) This is squarely refuted by Ms. Robinson's testimony. (Ex. 12 at 31:8-23.)

to pay her as much as a male employee because she did not have "a family to support." (Robinson Decl. at ¶ 3; Ex. 7 at 150:2-13.) He gave her stereotypically female duties, like housework, that he did not assign to men. (Ex. 11 at 99:14-100:13, 86:4-87:8, 40:23-41:4, 225:18-226:4.) He also screamed at Ms. Robinson more frequently than his male employees (Robinson Decl. at ¶ 2; Ex. 11 at 49:3-11; Ex. 10 at 484:2-5) and grew more abusive over time (Ex. 11 at 47:12-18, 48:7-17).

In addition, Mr. De Niro empowered his girlfriend, Tiffany Chen, to function as an agent of Canal and as a *de facto* supervisor for Ms. Robinson. Mr. De Niro directed Plaintiff to assist Ms. Chen "with whatever [she] needed" (Ex. 1 at 176:9-17), and, in turn, Ms. Chen communicated regularly with Ms. Robinson, sent her multiple work e-mails and text messages per week, and directed her to perform a host of tasks associated with Mr. De Niro and Ms. Chen's home.[3]

Mr. De Niro permitted Ms. Chen to subject Ms. Robinson to an onslaught of gender-based hostility. Ms. Chen routinely called Plaintiff a "bitch" and castigated her as a "very 'single white female.'" (Ex. 25 at CANAL_0048635; Ex. 28 at CANAL_0034641; Ex. 29 at CANAL_0047507; Ex. 27 at CANAL_0047382.) Ms. Chen seethed with unwarranted suspicion and jealousy because Plaintiff was a woman who worked closely with Mr. De Niro: she baselessly claimed to him that Plaintiff "thinks she's your wife," "wants to be the 'lady of the house,'" and has "imaginary intimacy. . . with you." (Ex. 24 at CANAL_0048685.) Ms. Chen assigned Plaintiff demeaning jobs and continually berated her. (Ex. 11 at 65:2-10, 70:3-4; Ex. 30 at 103-104; Ex. 19.) This was déjà vu: Mr. De Niro's ex-wife had not wanted him to work closely with a woman either, so he terminated his prior head assistant, Robin Chambers, and forced Plaintiff to stay "out of sight, out of mind." (Ex. 7 at 225:24-25, 21:20-22:12; Ex. 12 at 15:23-16:3.)

---

[3] (Ex. 8 at 34:17-35:2, 38:12-20, 38:22-39:5; Ex. 12 at 43:12-19; *see also* Ex. 18; Ex. 19; Ex. 20; Ex. 21 at ROBINSON00014404-05; Ex. 22; Ex. 23.)

### B.       Ms. Robinson Repeatedly Made Protected Complaints

During her last months of employment, Ms. Robinson repeatedly complained, including directly to Mr. De Niro and Canal's General Counsel ("GC") Tom Harvey, about a number of employment violations, including gender discrimination.

In December 2018 and January 2019, Ms. Robinson approached Mr. De Niro to seek "parity" in pay with a male employee who had overlapping job responsibilities with her. (Ex. 11 at 223:10-12, 223:19-224:22; Ex. 33; Robinson Decl. at ¶ 3.) Mr. De Niro openly defended the pay discrepancy on the basis that Ms. Robinson did not have children or a family to support. (Robinson Decl. at ¶ 3; Ex. 15; Ex. 7 Dep at 148:20-22, 150:2-13.) Ms. Robinson immediately protested: "That has no relevance to what you pay me." (Robinson Decl. at ¶ 3)

In or about early March 2019, Ms. Robinson again opposed unlawful treatment: Mr. De Niro's refusal to pay overtime to his female assistants. (Ex. 12 at 87:14-88:6; Robinson Decl. at ¶ 7.) Mr. De Niro directed Plaintiff to provide a key to the "girls on call" so that they could check on his home during off-hours. (Ex. 12 at 87:14-88:6.) When Plaintiff stated that they needed to be paid for their time worked, he insisted that he already paid them enough and would not pay them for this additional work. (*Id.*) In response, she protested that he needed to pay these employees for all hours worked, stated that she would not do anything "illegal," and stormed out (*Id.*)

In March and April 2019, Ms. Robinson repeatedly complained to Mr. De Niro, GC Harvey, and others about the harassment she was enduring at Canal. She reported to Mr. De Niro that she was being harassed (Ex. 12 at 45:13-46:19) and expressed worry about a recurrence of what "happened to Robin [Chambers] with Grace" (Ex. 41)—i.e., when he fired Ms. Chambers because his wife did not want a female assistant around him (Ex. 7 at 225:24-25, 21:20-22:12). Plaintiff told GC Harvey that she was "being targeted base[d] on my gender" (Ex. 12 at 129:19-

21),[4] was facing "down right harassment" (Ex. 36), and felt "constantly. . . harassed." (Ex. 40 at 2:17-19.) She also complained to other colleagues about harassment. (Ex. 16 at 9:3-6; Ex. 37 at 2:7-9, 5:8-10; Ex. 39 at 5:1-5, 8:8-9; *see also id.* at 2:7-8; Ex. 40 at 9:10-10:2.)

### C.   Defendants Took No Remedial Action and Instead Constructively Discharged Ms. Robinson Based on Her Gender and in Retaliation for Her Complaints

According to Canal policy, GC Harvey was required to address Plaintiff's complaints by undertaking a thorough investigation. (Ex. 6 at 298:21-301:22.) But he never did so. (*Compare id.*, *with* Ex. 5 at 420:12-421:3.) Instead, he tried to curtail her complaints, telling her to "just ignore it." (Ex. 40 at 2:3-5.) In desperation, Ms. Robinson repeatedly reached out to Mr. De Niro to address the unbearable work conditions. (Ex. 46 at ROBINSON00001347; Ex. 41; Ex. 49.) But he refused to discuss her concerns, and Defendants took no remedial action. (Ex. 11 at 104:4-18; Ex. 5 at 423:9-16; Ex. 1 at 188:24-189:3.)

Instead, Defendants engaged in retribution. Suspicious of Ms. Robinson and enraged by her complaints, Ms. Chen "made it [a] singular mission" to oust her (Ex. 45 at CANAL_0047901) and threatened to Mr. De Niro, "[i]f you keep [Ms. Robinson], you and I will . . . have problems." (Ex. 26 at CANAL_0048618.) Mr. De Niro recognized that Ms. Robinson's work situation had become untenable. From his perspective, she "should have just said look, I think it is time for me to leave." (Ex. 1 at 191:3-5.) By April 2, 2019, he was "talking . . . to everyone" about her imminent "demise." (Ex. 44 at CANAL_0047797.) On April 5, 2019, Mr. De Niro functionally demoted her by taking away an assistant who reported to her. (Ex. 12 at 132:22-133:3; Ex. 50 at CANAL_0047302.) Then, he approved a flurry of messages sent on April 5 and 6 that alerted people who worked with Canal not to contact Plaintiff and announced that she "is not to be

---

[4] Defendants falsely claim that "[a]t no time during her employment did Ms. Robinson ever equate her treatment to her gender or complain about it as such." (Mot. at 29.) But Ms. Robinson clearly testified that she reported to GC Harvey that she was "being targeted base[d] on my gender." (Ex. 12 at 129:19-22.)

involved with anything going forward" and would no longer be involved with "any of our [Mr. De Niro's and Ms. Chen's] projects"; these messages also instructed that "any emails [and discussions] between us are not to be shared with Chase." (Ex. 50 at CANAL_0047302; Ex. 52; Ex. 51; Ex. 8 at 164:8-12, 166:7-22, 168:21-25; Ex. 55 at 2:4-11.) By April 6, Ms. Robinson had become aware of the crushing messages forecasting her termination. (Ex. 12 at 168:9-14, 169:24-170:3 (discussing Ex. 92).) With her boss refusing to speak to her and her job wrenched away in a humiliating manner, Ms. Robinson reached a breaking point. (Ex. 11 at 104:4-18, 108:3-9.) Left with no choice, she was forced to resign on April 6, 2019. (Ex. 56.)

### D.   Ms. Robinson Continued to Engage in Protected Activity in Connection With and Following Her Constructive Discharge

Contemporaneous with her constructive discharge and for months afterwards, Ms. Robinson engaged in further protected activity. Mr. De Niro grew increasingly enraged.

On April 6, 2019, in her resignation e-mail to Mr. De Niro, Ms. Robinson protested her treatment, "my job has changed to something that wasn't what we agreed on and doesn't work for either of us. I have e-mailed you several times about discussing it but it's obvious you haven't wanted to address it. As a result, I'm not able to do [] my job." (Ex. 56.) The next day, she complained to GC Harvey about her constructive discharge, telling him: "my responsibilities were starting to be taken away. He [Mr. De Niro] wasn't speaking to me"; she described the situation as "untenable." (Ex. 42 at 2:20-3:4, 2:1-2) GC Harvey was dismissive, telling her, "You know how it is. I mean, you just try to stay away. Keep your head down."  (Ex. 42 at 2:11-13.)

On June 11, 2019, Ms. Robinson sent Mr. De Niro and GC Harvey an e-mail complaining yet again about her constructive discharge. As she protested, "I felt forced to resign the way I did – you are very aware of why; there was no choice." In the same e-mail, Ms. Robinson made clear that she was not prepared to sign the proposed release of claims that Canal had presented. (Ex. 58.)

After receiving no reply, Ms. Robinson e-mailed Mr. De Niro and GC Harvey on July 2, 2019; she re-sent her complaint of constructive discharge, indicated her intent to involve a lawyer on her claims, and set a July 12 deadline for a response. (Ex. 60.) Recognizing this e-mail as a continuation of her protected activity, Mr. De Niro was enraged and exclaimed, "Can you believe [C]hase. As I said to Tom [GC Harvey]: who the fuck does she think she is?!?!" and "The balls, the nerve, the chutzpah, the sense of entitlement, how dare her!" (Ex. 32 at CANAL_0048629.)

On July 11, 2019, one day before the July 12, 2019 deadline that Ms. Robinson set for a response to her e-mails complaining of her constructive discharge and advising of her plans to involve a lawyer, GC Harvey sent Ms. Robinson a letter on behalf of Defendants. (Ex. 61.) The letter was riddled with baseless accusations of wrongdoing, warned that she should "speak to an attorney," and threatened "legal action." (*Id.*)

In e-mails from July 31 to August 13, 2019, Ms. Robinson, via counsel, asserted claims against Defendants. In particular, she raised claims of "sex discrimination, sexual stereotyping, hostile work environment and retaliation arising under the NYHRL [and] NYLL" and "claims implicating numerous wage-hour violations arising under NYLL and the FLSA," and she decried the "completely sexist work environment sponsored and created by Mr. De Niro." (Ex. 63.) Mr. De Niro admitted he was "very angry" and "upset" that she levied claims against him. (Ex. 2 at 423:16-25, 419:7-12; Ex. 3 at 528:6-10.)

### E.     Mr. De Niro and Canal Launched a Series of Retaliatory Attacks

In response to Ms. Robinson's continued protected activity, Mr. De Niro and Canal mounted a multi-faceted campaign of retaliation with a singular goal: to "ruin her."

Within hours of Ms. Robinson complaining about her discharge and advising of plans to involve a lawyer, Ms. Chen promised, "Tom [GC Harvey] will get her." (Ex. 32 at CANAL_0048628-9.) The day after Canal heard from Ms. Robinson's lawyer about her claims,

Ms. Chen affirmed that GC Harvey was "to[o] feisty [to] let this go with[out] a few fireworks and big, big BANG!" (*Compare* Dkt. No. 308 at ¶ 6, *with* Ex. 62 at CANAL_0048977.) Thus, after an over 11-year tenure in which Mr. De Niro had never accused Ms. Robinson of wrongdoing, Canal suddenly launched an "investigation" into her. Canal conscripted three employees (self-described as "three idiots in front of a computer") to compile negative information and "spend 24/7 thinking of crazy chase shit and write it down." (Ex. 10 at 296:7-8, 291:11-18; Ex. 59 at CANAL_0047443.)

By his own admission, Mr. De Niro issued a directive to just "go after her" and "file whatever." (Ex. 2 at 424:14-425:7.) So, barely a week after Ms. Robinson indicated her intent to involve counsel, GC Harvey fired off a letter accusing her of wrongdoing and threatening legal action. (Ex. 61.) Then, just four days after her complaint about a "completely sexist work environment," Canal rushed to file a lawsuit against her in New York Supreme Court (Ex. 72.) The suit accused Ms. Robinson of sweeping wrongdoing and sought a staggering $6 million, even though Mr. De Niro has admitted that he did not believe she had stolen $3 million (Ex. 2 at 429:18-430:21); in fact, this demand was over *23 times greater* than the damages Canal itemized in its suit. (*See* Ex. 72, listing damages of $256,495.35.)

Canal's lawsuit advanced outlandishly baseless allegations. Before mounting suit, Canal did little more than add up entire categories of transactions (most of which appeared on shared accounts available to the entire office and were considered "typical stuff" by its accountants), and made no effort to ascertain whether Ms. Robinson had actually done anything wrong. (Ex. 5 at 180:23-181:6; Ex. 4 at 105:13-22, 113:23-114:4; Ex. 10 at 310:5-23, 312:3-12, 313:23-314:10, 314:18-315:2.) Defendants' own policies broadly authorized the transactions at issue (Ex. 4 at 341:13-18, 340:6-13; *also* Ex. 3 at 568:25-569:10), but Defendants ignored these policies and summarily treated each charge as improper. (Ex. 6 at 118:10-17, 119:11-120:5, 120:10-16, 120:24-

121:13.) Mr. De Niro made no attempt to vet the suit's allegations: he spent mere minutes discussing the principal allegations in the case (Ex. 6 at 179:13-24, 245:17-23, 180:18-25; Ex. 5 at 303:15-304:4); he did not review the charges at issue (Ex. 2 at 341:23-342:7, 343:7-12, 344:12-17); and could not testify that he had even read the complaint. (Ex. 2 at 424:22-425:3.) Instead, by his own admission he just issued a directive to "file whatever"—no matter how baseless. (*Id.* at 425:5-7.) It is little wonder, then, that shortly before filing the suit, GC Harvey acknowledged that "he ha[d] 'literally no evidence'" to bring to court. (Ex. 65 at CANAL_0052576.) Driven by vengeful impulses, Canal filed anyway.

In a series of smoking gun text messages, Canal admitted that its claims were retaliatory and groundless. A long-time employee, Michael Kaplan, who had been directed by GC Harvey to think of "crazy chase shit" and was in close contact with him about the suit, could not have been clearer: "**she was threatening to sue bob [Mr. De Niro] so they wanted to ruin her first**" (Ex. 73 at CANAL_0049481) and "**this was [GC Harvey's] plan to strike first**." (Ex. 74 at CANAL_0047781.)[5] When asked about Canal's plea for millions in damages, Mr. Kaplan confirmed that it was meritless: "**it's just a random number [] [t]o humiliate her**." (Ex. 74 at CANAL_0047781.) In fact, before bringing suit, Canal was already coming up with a derogatory headline to publicize its false accusations. (Ex. 75 at CANAL_0048107.) Canal delighted in the negative coverage that the suit unleashed, calling it, "wonderful," "perfect," "hilarious," and "beyond my wildest dreams." (Ex. 76 at CANAL_0047980-82; Ex. 77 at CANAL_0047795.)

Defendants escalated their campaign of retaliation by pushing the Manhattan District Attorney's Office ("DA's Office") to prosecute Ms. Robinson. At Defendants' prompting, the DA's Office commenced a lengthy criminal investigation spanning over 1.5 years. (Ex. 6 at 286:2-

---

[5] All bolding in quoted material is added unless indicated otherwise.

6; Robinson Decl. at ¶ 12.) After reviewing Defendants' so-called "evidence," the DA's Office declined to prosecute. (Ex. 5 at 411:5-412:6.) But the experience was harrowing for Ms. Robinson: when she learned about the investigation, she began suffering "unbearable" levels of "panic and anxiety" and required psychiatric treatment. (Robinson Decl. at ¶ 12; Ex. 11 at 122:14-123:21.)

### III.     LEGAL STANDARDS

#### A.     The Standard for Summary Judgment Places a Heavy Burden on Defendants in Discrimination and Retaliation Cases, Especially Under the NYCHRL

The standard for summary judgment is set forth in this Court's recent decision in *Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*, 2022 WL 10653757, at *5 (S.D.N.Y. Oct. 18, 2022). As the Court pointed out, "In cases involving claims of discrimination or retaliation, 'an extra measure of caution is merited in affirming summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions.'" *Id.* (citation omitted). Moreover, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to the evidence favoring the nonmovant." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

Summary judgment is even more sparingly granted on NYCHRL claims. The NYCHRL "is designed to be more lenient toward plaintiffs than its federal and state equivalents." *Dillon v. Ned Mgmt.*, 85 F. Supp. 3d 639, 654 (E.D.N.Y. 2015); courts must construe the law "broadly in favor of discrimination plaintiffs" and take "the most liberal construction of the statute that is 'reasonably possible,'" even if inconsistent with the application of similar federal and state laws. *Chauca v. Abraham*, 89 N.E.3d 475, 480-81 (N.Y. 2017). The NYCHRL affords "the **strongest possible safeguards** against depriving an alleged victim of discrimination of a full and fair hearing before a jury of her peers by means of summary judgment." *Bennett v. Health Mgt. Sys., Inc.*, 936

N.Y.S.2d 112, 123 (1st Dep't 2011); *see also Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 112 (2d Cir. 2013) ("[A] jury is generally best suited to evaluate the impact of retaliatory conduct."); *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009) (NYCHRL entrusts a jury to decide if "borderline situations" constitute harassment or retaliation).

Thus, under the NYCHRL, an employer is entitled to summary judgment *only* if the record establishes as a matter of law that discrimination or retaliation played *no* role in its actions. *See Mihalik*, 715 F.3d at 110 n.8; *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015). As this Court distilled: "Summary judgment dismissing a claim under the NYCHRL should be granted only if no jury could find [the] defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." *Milord-Francois*, 2022 WL 10653757, at *15. "[N]o challenged conduct may be deemed nonretaliatory unless a jury could not reasonably conclude from the evidence that such conduct was . . . reasonably likely to deter a person from engaging in protected activity." *Mihalik*, 715 F.3d at 112.

### B.      Direct and Circumstantial Proof of Discrimination, Retaliation, and Pretext

There are multiple paths to establish discriminatory or retaliatory intent and pretext under the NYCHRL, NYLL, and FLSA. Courts consider a host of indicia of discrimination and retaliation, any one of which would defeat summary judgment, along with the totality of the circumstances. Examples of these indicia abound in this case and include the following:

First, statements reflecting animus from decisionmakers, or those capable of influencing decisionmakers, are classic ways of demonstrating discriminatory or retaliatory intent. *See, e.g.*, *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (remarks by "individuals with substantial influence over [plaintiff's] employment"); *Eldaghar v. City of N.Y. Dept. of Citywide Admin. Servs.*, 2008 WL 2971467, at *9 (S.D.N.Y. July 31, 2008) (similar); *Greenbaum v. Svenska Handelsbanken*, 67 F. Supp. 2d 228, 254 (S.D.N.Y. 1999) (Sotomayor, J.) ("[C]omments by high-

11

ranking officials . . . are admissible as circumstantial evidence suggesting that there is a particular [discriminatory] corporate atmosphere in which decisions are made."); *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013) ("[E]vidence of an employer's anger at its employee for engaging in a protected activity may well constitute direct causal evidence."); *see also Ravina v. Columbia Univ.*, 2019 WL 1450449, at *7 (S.D.N.Y. Mar. 31, 2019) (e-mails containing "angry and biting language" can "reveal a motive to retaliate, rather than merely to explain or defend").

Second, an employee's performance history can establish that an employer acted from an unlawful motive and that its cited justifications are pretextual. *See, e.g.*, *Smith v. Davis*, 248 F.3d 249, 252 (3d Cir. 2001) (employee "perform[ing] his duties to the apparent satisfaction of his supervisors for over six years" was a factor that created a genuine issue as to pretext); *Curcio v. Roosevelt Union Free Sch. Dist.*, 2012 WL 3646935, at *15 (E.D.N.Y. Aug. 22, 2012) (evidence of a "sudden drop-off" in performance evaluations can raise an inference of retaliation).

Third, belated, weak, implausible, or inconsistent explanations for employer actions can also indicate unlawful motives and demonstrate pretext.[6]

Fourth, comparator evidence reflecting an employer's more favorable treatment of employees outside of the protected class (or who did not engage in protected activity) is yet another way of demonstrating animus, as well as pretext.[7]

Fifth, in a retaliation case, close proximity between the protected activity and the retaliatory conduct establishes not only a prima facie case but also pretext. *See Signer v. Tuffey*, 66 F. App'x. 232, 236 (2d Cir. 2003) (adverse action over six months after last instance of protected activity

---

[6] *See, e.g.*, *Zann Kwan v. Andalex Grp.*, 737 F.3d 834, 846 (2d Cir. 2013); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994); *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009).
[7] *See Walker v. N.Y.C. Dep't of Corr.*, 2008 WL 4974425, at *26 (S.D.N.Y. Nov. 19, 2008) (retaliation can be shown where an employee who engaged in a protected activity "was treated differently from another employee who engaged in similar conduct") (citing *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).

was prima facie evidence of retaliation); *Zann Kwan*, 737 F.3d at 847 (temporal proximity was evidence of pretext); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998) (same).

### C.   Liability for the Discriminatory or Retaliatory Acts of a Non-Employee

Defendants attempt to disclaim any liability for the acts of Mr. De Niro's girlfriend, Ms. Chen. But Defendants are liable for Ms. Chen's conduct under the plain language of the NYCHRL.[8] The law bars discrimination by any "agent" of the employer and imposes liability where 1) the agent "exercised managerial or supervisory responsibility," 2) "[t]he employer knew of the . . . agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action," or 3) "[t]he employer should have known of the . . . agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." N.Y.C. Admin. Code §§ 8-107(1)(a) & (13)(b). NYCHRL's anti-retaliation provision is even broader: it bars retaliation by "any person," imposing strict, vicarious liability, with no requirements concerning the employer's knowledge or actions. *Id.* § 8-107(7).[9]

In addition, under the NYCHRL, NYLL, and FLSA, the "cat's paw" theory of liability entitles a plaintiff to succeed on her discrimination and retaliation claims "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as [an] individual shown to have the impermissible bias played a meaningful role in the [decision-making] process." *Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019). Thus, an employer is liable when it

---

[8] Nor can Defendants disclaim liability for any actions by GC Harvey. It is black letter law that "[l]awyers are agents for their clients." *Chevron Corp. v. Salazar*, 275 F.R.D. 422, 426 (S.D.N.Y. 2011); *Jenkins v. General Motors Corp.*, 164 F.R.D. 318, 320 (N.D.N.Y. 1996) ("The attorney and client stand in a relationship of principal and agent, with the attorney being the agent of the client/principal . . . .").

[9] Moreover, an employer is liable for the conduct of third parties where it has the ability to take appropriate remedial action but fails to do so. *See, e.g.*, *Leroy v. Delta Air Lines*, 2022 WL 12144507, at *3 (2d Cir. Oct. 27, 2022) (assuming that the NYCHRL includes employer liability for the acts of non-employees because Title VII—the floor below which the city law cannot fall—does so).

becomes a conduit, even unwittingly, for someone else's unlawful discriminatory or retaliatory animus. *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F. 3d 267, 272 (2d Cir. 2016).

## IV.    ARGUMENT

### A.    A Reasonable Jury Could Find That Defendants Subjected Ms. Robinson to Persistent Gender Discrimination, Culminating in Constructive Discharge

To prove gender discrimination under the NYCHRL, a plaintiff need only show that she has been treated "less well" at least "in part" because of her gender. *Mihalik*, 715 F.3d at 110.

Notably, such discrimination includes being targeted based on the jealousy or insecurity of an employer's romantic partner. *Mittl v. N.Y. State Div. of Hum. Rts.*, 794 N.E.2d 660, 663 (N.Y. 2003) (termination motivated by unjustified jealousy of employer's spouse); *Edwards v. Nicolai*, 60 N.Y.S.3d 40, 42 (1st Dep't 2017) ("it can be inferred that [employer was] motivated to discharge her by his desire to appease his wife's unjustified jealousy[.]"); *Anagnostakos v. N.Y. State Div. of Hum. Rts.*, 846 N.Y.S.2d 798, 800 (3d Dep't 2007) (where manager's wife was a "de facto supervisor," her insults against plaintiff are imputed to employer under NYSHRL); *Dillon*, 85 F. Supp. 3d at 663 (finding triable facts regarding employer's husband's supervisory role, where he had some "influence" at company and "expected employees to obey his job-related requests").

Further, contrary to Defendants' assertion, there is no requirement that a plaintiff identify any comparators at all. *See, e.g.*, *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 121-22 (2d Cir. 2004) (holding that plaintiff was not required to adduce evidence that similarly situated men were treated differently); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (recognizing that evidence of disparate treatment "is not always necessary . . . [where a] plaintiff may rely on direct evidence of what the defendant did and said").

### 1.    Defendants Subjected Ms. Robinson to Gender Discrimination

Drawing all inferences in Plaintiff's favor, Defendants subjected her to a course of conduct

that constituted gender discrimination. Notably, under the NYCHRL, even "a single comment" can suffice as actionable gender discrimination. *See Dillon*, 85 F. Supp. 3d at 654. Here, Mr. De Niro and Canal inflicted a litany of gendered mistreatment upon Ms. Robinson, each instance of which alone would be enough for a juror to conclude that they treated her "less well" at least "in part" because of her gender. In combination, an inference of discrimination is undeniable.

Mr. De Niro demeaned Ms. Robinson and other women in quintessentially gendered terms, calling her a "bitch" and "brat," referring to female employees as "girls," and calling his business partner a "cunt." (Ex. 12 at 31:8-17, 31:20-32:3, 31:25-32:3.) *See Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 118 (2d Cir. 2010) ("[U]se of [the word 'bitch'] in many contexts reflects . . . hostility [to women]"; *Passananti v. Cook Cty.*, 689 F.3d 655, 665-66 (7th Cir. 2012) ("A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as . . . 'bitch' . . . has been consistently held to constitute harassment based upon sex.").

In addition, Mr. De Niro repeatedly subjected Ms. Robinson to vulgar conduct, including directing her to "picture me on the toilet," laughing about "mak[ing] a man out of [her]", telling her "you just need to get some sperm," joking about Viagra, urinating while talking to her, and initiating unwelcome physical contact. (Ex. 12 at 35:3-36:8, 36:19-37:2, 37:6-20, 39:11-25, 40:17-22,41:12-19.) *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 693 (2d Cir. 2001) (supervisor's "innuendos, vulgar and sexually explicit comments"); *Dobrich v. Gen. Dynamics Corp., Elec. Boat Div.*, 40 F. Supp. 2d 90, 99 (D. Conn. 1999) (reasonable jury could find hostile work environment based in part on vulgar name-calling and men urinating in front of plaintiff).

Mr. De Niro assigned Ms. Robinson stereotypically female tasks that were not given to men and berated her more frequently than he did his male subordinates. (Ex. 11 at 99:14-100:13, 86:4-14, 40:23-41:4, 225:15-226:4; Robinson Decl. at ¶ 2, Ex. 12 at 49:3-11; Ex. 10 at 484:2-5.)

*See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 317 (N.D.N.Y. 2013) (speaking "more abusively to female employees than to male employees" was evidence of gender animus); *Refermat v. Lancaster Cent. Sch. Dist.*, 2017 WL 10296874, at *8 (W.D.N.Y. Nov. 14, 2017) (triable issue of fact on hostile work environment where plaintiff alleged that employees outside of the protected class "were not subject to the same harassing conduct and negative action").

Defendants also paid Plaintiff less than a male employee for sexist reasons, purportedly because he, unlike Plaintiff, had children and "a family to support." (Ex. 15; Ex. 7 at 148:20-22, 150:2-13; Robinson Decl. at ¶ 3.) *Cf. Costa v. Desert Palace*, 299 F.3d 838, 861 (9th Cir. 2002) (remark that plaintiff "did not deserve overtime because she did not have a family to support" could be construed as "directed to her as a woman, indicating that the discriminatory action . . . was based on her not being a male breadwinner").

Contrary to Defendants' unsupported assertions, there is also extensive evidence that Ms. Chen targeted Ms. Robinson based on her gender. Ms. Chen repeatedly called Ms. Robinson a "bitch" and "very 'single white female,'" disparaged her work, and belittled her based on the unfounded, sexist belief that Ms. Robinson wanted to be Mr. De Niro's "wife" and the "lady of the house."[10]

Critically, Defendants present no analysis to escape liability for Ms. Chen's conduct, nor can they. Defendants do not dispute that Ms. Chen functioned as their agent. Ample evidence shows that Ms. Chen was empowered to supervise Ms. Robinson and assign her work, that Defendants knew of her discriminatory conduct but failed to take preventive or corrective action, and that her animus infected Mr. De Niro's decision-making. This is more than sufficient for

---

[10] (Ex. 25 at CANAL_0048635; Ex. 28 at CANAL_0034641; Ex. 29 at CANAL_0047507; Ex. 27 at CANAL_0047382; Ex. 24 at CANAL_0048685; Ex. 11 at 69:24-70:15, 65:2-10; Ex. 30 at CANAL_0047103-04; Ex. 19.)

liability. *See* § III(C) (discussing liability under NYCHRL and the cat's paw theory).

Finally, Defendants constructively discharged Ms. Robinson, as discussed below. In the run-up to her ouster, Mr. De Niro and Ms. Chen exchanged messages laden with gender-based vitriol, including "CHASE [Robinson] is a straight up Nasty Bitch" and "This Bitch needs to get put in her fucking place." (Ex. 28 at CANAL_0034641; Ex. 25 at CANAL_0048635.) Ms. Chen repeated these sentiments to other Canal employees, declaring: "I'm gonna fucking give this Bitch what she deserves." (Ex. 29 at CANAL_0047507.)

Drawing all inferences in Ms. Robinson's favor, a reasonable jury could readily conclude that Defendants subjected her to an overall course of gender discrimination.

### 2. Defendants Constructively Discharged Ms. Robinson

The standard for constructive discharge under the NYCHRL is an "unsettled area[] of state law." *Pompey-Primus v. Success Acad. Charter Sch.*, 2022 WL 504541, at *10 (S.D.N.Y. Feb. 17, 2022). Under Title VII, a floor below which NYCHRL claims cannot fall, constructive discharge is found where (1) "there is evidence of the employer's intent to create an intolerable environment that forces the employee to resign";[11] and (2) "evidence shows that a reasonable person would have found the work conditions so intolerable that he would have felt compelled to resign." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017). But "it should not be assumed that the standards . . . under the City HRL are the same . . . either in . . . the degree of difficulty or unpleasantness of working conditions required to make out the claim or otherwise." *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan*, 981 N.Y.S.2d 89, 92 n.1 (1st Dep't 2014). Rather, the NYCHRL demands an enhanced liberal construction. At a minimum, the Court must

---

[11] A plaintiff does not need to demonstrate that the employer harbored "specific intent." Rather, a showing that the employer's acts were "deliberate and not merely negligent or ineffective" is sufficient. *Petrosino v. Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004) (citation omitted). This test is easily met here.

consider the "cumulative" effect of all "adverse conditions." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996). Here, there is ample evidence of constructive discharge.

First, Defendants intentionally created an intolerable environment that forced Plaintiff to resign. Ms. Chen made this her "singular mission." (Ex. 45 at CANAL_0047901.) Shortly before the resignation, she presented Mr. De Niro with an ultimatum: "[i]f you keep her, you and I will . . . have problems." (Ex. 26 at CANAL_0048618.) Mr. De Niro agreed to oust Ms. Robinson, echoing his prior termination of Ms. Chambers. By April 2, 2019, he was "talking . . . to everyone" about Plaintiff's "demise." (Ex. 44 at CANAL_0047797.) Ms. Robinson expressed concern that she was "going to be fucking fired . . . it's that bad." (Ex. 48 at 2:1-4.) Meanwhile, Mr. De Niro wanted her to resign: as he testified, "she should have just said look, I think it is time for me to leave." (Ex. 1 at 191:3-5.) The writing was on the wall, and Ms. Robinson's resignation in the face of inevitable termination is a classic constructive discharge. *See Bader*, 985 F. Supp. 2d at 310.

Second, Defendants stripped Ms. Robinson of *all* of her job duties. Defendants' argument is that she was removed from working on the townhouse and therefore got what she wanted. (Mot. at 27.) But this profoundly minimizes the reality. Mr. De Niro approved a flurry of messages that divested Ms. Robinson of her entire job; her colleagues were told that she "is not to be involved with anything going forward," would no longer be involved with "any of our projects," and that "*any* emails" from Mr. De Niro were not to be shared with her. (Ex. 50 at CANAL_0047302; Ex. 52; Ex. 51; *see also* Ex. 8 at 164:8-12, 166:7-22, 168:21-25.) This left Ms. Robinson completely unable to function as Mr. De Niro's head assistant. (Ex. 35 at 5:4-8; Ex. 7 at 169:25-170:5; *see also* Ex. 49 at CANAL_0046693.) Any reasonable person in a similar situation would have had no choice but to resign. *See, e.g.*, *Bright-Asante v. Saks & Co.*, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017) (constructive discharge based on "drastic change in employment status or responsibilities");

*Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 492 (S.D.N.Y. 2009) (constructive discharge based on campaign to take away job responsibilities).[12]

On summary judgment, the Court must ignore Defendants' tortured efforts to attribute Plaintiff's ouster to poor communications, "mixed messaging," or "attempts . . . to obtain clarity." (Mot. at 24.) Drawing all inferences in her favor, she was constructively discharged.

**B.      A Reasonable Jury Could Conclude That Defendants Retaliated Against Ms. Robinson, in Violation of the NYCHRL, NYLL, and FLSA**

**1.      Summary Judgment Should Be Denied on All Claims Because Defendants Fail to Address Plaintiff's Complaint of Equal Pay Violations**

Defendants completely fail to address Ms. Robinson's allegation that they retaliated against her for making complaints of equal pay violations, which constituted colorable violations of the NYCHRL and the equal pay provisions of the FLSA and NYLL. (*See* Dkt. No. 1 ¶¶ 29, 64, 92, 100.)[13] Accordingly, the Court must treat it as undisputed that Defendants retaliated against her for those complaints, and Defendants cannot command summary judgment on any of Plaintiff's retaliation claims. *See Young v. Graham*, 2017 WL 1134758, at *5 (N.D.N.Y. Mar. 27, 2017) (if moving party fails to address the merits of a claim in its summary judgment papers, the claim is "not properly before the Court."); *Jones v. N.Y.C. Health & Hosp. Corp.*, 2003 WL 21262087, at *1 (S.D.N.Y. May 29, 2003) (refusing to entertain arguments to dismiss equal pay claim where defendants failed to move on the claim by "not address[ing] the issue explicitly in their motion for summary judgment"). Nevertheless, Plaintiff discusses those complaints below for completeness.

---

[12] In a reflection of intolerable working conditions, Ms. Robinson was "mentally breaking down, and not eating or sleeping because of the incredibly toxic work environment." (Ex. 11 at 104:4-18, 100:25-101:12.) *See Fitzgerald v. Henderson*, 251 F.3d 345, 367 (2d. Cir. 2001) (constructive discharge where abuse "essentially brought on a psychological breakdown, causing [plaintiff] to bec[o]me unable to work at all").
[13] All three retaliation counts in Plaintiff's Complaint (Count II for NYCHRL retaliation, Count VI for NYLL retaliation, and Count VII for FLSA retaliation) assert that Defendants retaliated against Ms. Robinson for her equal pay complaints or her complaints of gender discrimination (the latter of which includes her complaints of gender-based pay discrimination). *See* Dkt. No. 1 at ¶¶ 64, 92, 100.

**2.      Plaintiff Made Protected Complaints Under the NYCHRL, NYLL, and FLSA**

**i.      Ms. Robinson's Protected Complaints Under the NYLL and FLSA**

Under the FLSA, an employee engages in protected activity by raising a complaint of potential wage violations in terms "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Greathouse v. JHS Sec.*, 784 F.3d 105, 107 (2d Cir. 2015) (citation omitted). An employee need not cite a specific statute; rather, the substance of the complaint to the employer must be of a "colorable violation." *Mitchell v. Ceros*, 2022 WL 748247, at *7 (S.D.N.Y. Mar. 10, 2022). While an explicit claim of illegality is not required, it goes a long way to establish that the complaints are protected. *Cf. Lopez v. Advantage Plumbing & Mech. Corp.*, 2016 WL 1268274, at *2 (S.D.N.Y. Mar. 31, 2016). Here, Ms. Robinson's overt opposition to equal pay and overtime violations readily qualifies as protected activity.[14]

First, in communications in late 2018 and early 2019, Ms. Robinson sought pay "parity" with a male employee and objected to Mr. De Niro's sexist rationale for paying a higher salary to her male co-worker, protesting that her familial status: "has no relevance to what you pay me." (Ex. 11 223:10-12; Ex. 33; Robinson Decl. at ¶ 3.) All of this plainly qualifies as protected activity under the equal pay provisions of the FLSA and NYLL, and Defendants do not dispute this.[15]

Second, Ms. Robinson objected to Mr. De Niro's refusal to pay female assistants for off-hours time spent checking on his home. (Robinson Decl. at ¶ 7; Ex. 12 at 87:14-88:6.) Defendants

---

[14] Notably, "[t]he protection afforded to workers under the NYLL retaliatory termination provision [N.Y. Lab. L. § 215] is 'more broadly worded' than in the FLSA." *Quintanilla v. Suffolk Paving Co.*, 2019 WL 885933, at *22 (E.D.N.Y. Feb. 22, 2019); *see also Aflalo v. Cantor Fitzgerald, L.P.*, 298 F. Supp. 3d 688, 698 (S.D.N.Y. 2018). "[A]ll that is required is that the complaint to the employer be of a colorable violation of the statute." *Figura v. N. Country Janitorial*, 37 N.Y.S.3d 697, 701 (Sup. Ct. Warren Cnty. 2016). Thus, the New York statute should be applied at least as expansively as the FLSA.

[15] This Court has already concluded that Ms. Robinson's pay claim raised a colorable violation of the equal pay provisions of both the NYLL (§ 194) and FLSA (29 U.S.C. § 206(d)). Dkt. No. 240 at 17.

invite the Court to infer (improperly) that her complaint was a mere "reminder," but this ignores the content and context: she protested that he needed to pay these employees overtime for their hours; when he erupted in anger and refused, she objected further, insisted she would not participate in "illegal" conduct, and stormed out. (*Id.*)[16] This was a "fairly explicit assertion" of employees' right to overtime—clearly protected activity. *Coker v. Goldberg & Assocs. P.C.*, 2022 WL 874719, at *5 (S.D.N.Y. Mar. 24, 2022) (employee "complained about not receiving overpay despite working long hours in a nonexempt role"); *see also, e.g*., *Starnes v. Wallace*, 849 F.3d 627, 632 (5th Cir. 2017) (assertion that defendant violated the law by not paying overtime). Indeed, courts find protected activity where complaints of wage violations are far less explicit.[17]

As to Ms. Robinson's wage-and-hour complaint (the only NYLL/FLSA protected complaint they address), Defendants contend that Ms. Robinson's wage complaint was not protected because it came within her normal job duties. But Defendants are wrong on the facts and the law. First, Ms. Robinson's job was to be Mr. De Niro's "head assistant"; she was not an HR professional and her role on overtime issues boiled down to facilitating paperwork. (Ex. 1 at 89:23-24, 91:12-92:8; Robinson Decl. at ¶ 6.)[18] At best, the nature and scope of her duties are disputed. *See, e.g*., *Starnes*, 849 F.3d at 633. Second, the Second Circuit has rejected Defendants' proposed

---

[16] Defendants' claims about the legality of their overtime practices are factually unsupported. Contrary to Defendants' assertions, Canal had a history of failing to pay overtime to executive assistants. (Robinson Decl. at ¶ 5.) In any event, it is axiomatic that a plaintiff need not establish an underlying FLSA or NYLL violation to prevail on a retaliation claim: plaintiff's complaint, even if factually or legally mistaken, need only raise conduct within the colorable reach of the statute. *See, e.g.*, *Cortese v. Skanska Koch, Inc*., 544 F. Supp. 3d 456, 471 (S.D.N.Y. 2021).

[17] *See, e.g*., *Mitchell*, 2022 WL 748247, at *7 (standard met when a plaintiff "had begun asking her coworkers whether they were receiving statutorily required overtimes wages") (citing cases); *Gangadharan v. GNS Goods & Servs*., 2022 WL 824135, at *13 (E.D.N.Y. Mar. 18, 2022) (complaint that plaintiff was owed wages for hours worked); *Mestizo v. H2 Candy & Nuts*, 2019 WL 2209203, at *2 (S.D.N.Y. May 21, 2019) (plaintiffs' complaints that their "pay was too low").

[18] Defendants' case *Aflalo* is inapposite since that plaintiff was an HR professional in the HR department.

"manager rule" in the analogous Title VII context, holding that even an employee whose duties involve investigating complaints engages in protected activity when she "actively support[s] other employees in asserting their Title VII rights or personally complain[s] or is critical about the discriminatory employment practices of her employer." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 317 n.16, 318 (2d Cir. 2015).[19] Indeed, a blanket exception for employees with some involvement in wage compliance would undermine the enforcement mechanisms of the FLSA and NYLL, which rely upon employees (including those with purportedly unique knowledge) to report violations. Here, a jury could easily conclude that Plaintiff's protests came well within the *Littlejohn* standard.

Even under the standard Defendants seek to impose, Ms. Robinson's complaint qualifies for protection. Under the "manager rule," courts find protected activity when, for instance, an employee couches complaints in terms of illegality or refuses to go along with alleged unlawful practices.[20] Plaintiff plainly did each of those here. In insisting that Canal pay overtime, she was not carrying out an HR function; she spontaneously protested Mr. De Niro's direction to give workers a key to check on his house without pay. This was "adverse to the company" and a "personal complaint about [its] wage . . . practices." *Conner v. Schnuck Markets*, 121 F.3d 1390, 1394 (10th Cir. 1997); *see also Starnes*, 849 F.3d at 633-34.

Thus, a reasonable jury could conclude that Ms. Robinson engaged in protected activity.

### ii.   Plaintiff Engaged in a Series of Protected Activity Under the NYCHRL By Making Overt Complaints of Discrimination and Harassment

---

[19] *Aflalo*, cited by Defendants, adopts the manager rule from *McKenzie v. Renberg's Inc*., 94 F.3d 1478, 1486 (10th Cir. 1996). *Aflalo's* attempt to distinguish *Littlejohn* (298 F.Supp.3d at 697 n.4) is unconvincing. There is nothing in the language, structure, or purpose of 29 U.S.C. § 215(a)(3) that makes the complaining employee's duties and responsibilities any more central under the FLSA than under Title VII.

[20] *See, e.g.*, *Fisch v. New Heights Acad. Charter Sch.*, 2012 WL 4049959, at *6 (S.D.N.Y. Sept. 13, 2012) (citing *Eberhardt v. Integrated Design & Const.*, 167 F.3d 861, 868-69 (4th Cir. 1999)); *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998); *Muniz v. UPS, Inc*., 731 F. Supp. 2d 961, 970 (N.D. Cal. 2010).

In addition, during her employment, Ms. Robinson repeatedly engaged in protected activity under the NYCRHL by protesting discrimination and harassment.

An employee need not utter any "magic words" to engage in protected activity. *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012)); *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274-76 (2009) (protected activity under more stringent Title VII standard where complaint cited "inappropriate behavior," not "discrimination");[21] *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013) ("[P]articular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint."). Even vague or generalized statements are enough. *See Mihalik*, 715 F.3d at 115 (plaintiff posed question to her manager: "What's not working out[?] Me and you or me at the company?"); *Sumner v. U.S.P.S.*, 899 F.2d 203, 211 (2d Cir. 1990) (reversing summary judgment where plaintiff "might have" made complaints about race discrimination, but supervisor "d[id no]t think [plaintiff] ever said those words"); *Albunio v. City of N.Y.*, 922 N.Y.S.2d 244, 247 (N.Y. 2011) (plaintiff merely stated that she thought her coworker deserved a promotion and "did not say in so many words that [he] was a discrimination victim").[22]

While it is not *necessary* for an employee to mention "discrimination" or "harassment," use of these terms alone can be sufficient to constitute protected activity. *See, e.g.*, *Crawford v. Chipotle Mexican Grill*, 773 F. App'x 822, 827 (6th Cir. 2019) (protected activity where employee complained simply of "discriminat[ion,]" finding it irrelevant that plaintiff did not specify racial

---

[21] The standard to establish protected activity under the NYCHRL is even lower than under the state and federal statutes cited herein. "[I]nterpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's . . . law cannot fall.'" *Dillon*, 85 F. Supp. 3d at 654 (citation omitted).

[22] *See also, e.g.*, *Coello v. The Riese Org.*, 2019 WL 2898426, at *4 (Sup. Ct. Bronx Cnty. May 21, 2019) (protected activity where complaint merely "allude[d] to plaintiff's disapproval of the workplace discrimination," even though he did not "actually us[e] those words"); *Malena*, 886 F. Supp. 2d at 363–64 (sufficient that plaintiff "opposed negative treatment" without mentioning discrimination, because the company might have known that it "may have been motivated by discriminated animus").

discrimination because "[a] jury could appropriately consider the context"); *Okoli v. City of Balt.*, 648 F.3d 216, 224 (4th Cir. 2011) ("it was enough for [plaintiff] to twice complain of 'harassment'" and employer "surely should have known that [plaintiff's] complaints of 'harassment' likely encompassed sexual harassment"); *Dutton v. Penske Logistics*, 2010 WL 2775843, at *5 (W.D.N.Y. July 14, 2010) ("[m]aking a complaint regarding harassment to one's supervisor is 'protected activity'"); *Yazdian v. ConMed Endoscopic Techs.*, 793 F.3d 634, 646 (6th Cir. 2015) ("reasonable jury could conclude that [plaintiff] used and intended the phrase 'hostile work environment' to reference discriminatory treatment").

Here, Ms. Robinson repeatedly engaged in protected activity under the NYCHRL, including making numerous complaints that Defendants fail to address on summary judgment. First, as previously discussed, Defendants do not dispute that Ms. Robinson's complaints of gender-based pay disparities are protected. (Ex. 11 at 223:10-12; Ex. 33.) Second, Ms. Robinson complained to Mr. De Niro himself that she was being harassed (Ex. 12 at 45:13-46:19), and she expressed concern about the analogous situation in which his wife had prompted him to oust his prior lead assistant because she was female. (Ex. 41; Ex. 7 at 225:24-25; 21:20-22:12.) Again, Defendants fail to dispute that these complaints are protected activity.

In addition, Ms. Robinson made a series of harassment complaints to GC Harvey. She explicitly reported that she "was being targeted based on [her] gender" (Ex. 12 at 129:19-22); Defendants' brief completely ignores this invocation of a protected class, which frames the other complaints. Further, Ms. Robinson told GC Harvey that she was experiencing "down right harassment" and felt "constantly . . . harassed." (Ex. 36; Ex. 40 at 2:17-19.)[23] Under Canal's policy,

---

[23] Defendants invite the Court to infer that Ms. Robinson was merely "using 'harassment' as a wholesale term," but such an inference in Defendants' favor is improper and unmoored from the evidence. The record shows that she specifically complained that she was being targeted based on gender, and her repeated references to "harassment" must be understood within this context.

this was all that she needed to do to make a discrimination complaint. (Ex. 6 at 298:21-301:22.)

On summary judgment, the Court cannot accept Defendants' spin that Plaintiff merely complained about "[h]arassment about the Townhouse." (Mot. at 35.) In reality, she overtly complained that she was being targeted based on gender and merely invoked the townhouse as an *example* of a situation where she was being harassed. Defendants clearly recognized Ms. Robinson to be raising concerns about discrimination. In fact, when Ms. Robinson resigned after being targeted by Mr. De Niro's girlfriend, GC Harvey spontaneously acknowledged that she had gone through the same situation with Mr. De Niro's wife (who had not wanted a female assistant around). (Ex. 42 at 2:1-13.) Further, as Mr. De Niro admitted at deposition, he already "knew there was going to be legal problems" at the time she resigned; and soon after her constructive discharge, Canal sent her a release of discrimination claims to sign. (Ex. 1 at 226:16-20; Ex. 57.)

Given the exceedingly broad scope of the NYCHRL, and drawing all inferences in Ms. Robinson's favor, a reasonable jury could readily conclude that she engaged in protected activity.

### iii.  In Connection With and After Her Constructive Discharge, Plaintiff Continued to Engage in Protected Activity, Including by Specifically Asserting Claims Under the NYCHRL, NYLL, and FLSA

After she was forced to resign, Ms. Robinson continued to engage in protected activity, first by invoking her constructive discharge and indicating her intent to pursue legal action and then by specifically asserting claims, through counsel, under the NYCHRL, NYLL, and FLSA.

First, on April 6, 2019, in her e-mail informing Mr. De Niro of her resignation, Ms. Robinson protested her treatment, including her constructive discharge. She stated that she was resigning because her job had "changed to something that wasn't what we agreed on," that she had contacted Mr. De Niro's multiple times to discuss the situation, and that due to Mr. De Niro's refusal to address her concerns, she was no longer able to perform her job. (Ex. 56.) Defendants concede that Ms. Robinson's resignation constituted protected activity. (Mot. at 15.)

25

Second, in an e-mail on June 11, 2019, Ms. Robinson objected to her discharge, telling Mr. De Niro and GC Harvey "I felt forced to resign the way I did – you are very aware of why; there was no choice"; she also made clear that she was not prepared to sign Canal's proposed release of claims. (Ex. 60.) After receiving no response, Ms. Robinson sent a follow-up e-mail on July 2, 2019, resending her constructive discharge complaint and indicating that she would involve a lawyer to protect her interests.[24] (*Id.*) Defendants clearly understood this as a continuation of her prior protected activity: that same day, after Ms. Chen raised to Mr. De Niro that Plaintiff was "threatening legal action," he exclaimed, "Can you believe Chase. As I said to Tom [GC Harvey]: who the fuck does she think she is?!?!" and "The balls, the nerve, the chutzpah, the sense of entitlement, how dare her!" (Ex. 32 at CANAL_0048628-29.) In context, the e-mails are properly understood as further protected activity.

Thereafter, Ms. Robinson, through counsel, asserted claims for violations of the NYCHRL, FLSA, and NYLL. Defendants do not dispute that the substance of these communications constituted protected activity. Nor could they: the e-mails from Ms. Robinson's counsel explicitly asserted claims of "sex discrimination, sexual stereotyping, hostile work environment and retaliation arising under the NYHRL [and] NYLL" and "claims implicating numerous wage-hour violations arising under NYLL and the FLSA," and they expressly objected to the "completely sexist work environment sponsored and created by Mr. De Niro" and the "hostile work environment, which also constitutes sexual discrimination." (Ex. 63.)[25] Indeed, Defendants

---

[24] Especially where Ms. Robinson's e-mails referenced her constructive discharge, the Court cannot draw the inference in Defendants' favor that it was unknown what "situation" she was talking about (Mot. at 9).
[25] It is well established, and Defendants do not dispute, that an employee can engage in protected activity through her attorney's correspondence on her behalf. *See, e.g.*, *Zuckerman v. GW Acquisition LLC*, 2021 WL 4267815, at *19 (S.D.N.Y. 2021) (deeming a letter sent through counsel "a protected activity").

concede that these communications were "chocked with [legal] buzzwords."[26]

With no grounds to challenge the content of this overt protected activity, Defendants speculate about Plaintiff's motives, claiming that her complaints were somehow "insincer[e]," "not *bona fide*," and merely "sought to create the appearance of protected activity." (Mot. at 11, 10.) This assertion is conclusory. Defendants present no evidence whatsoever that Ms. Robinson had any improper motive or lacked good faith, and there is none. In fact, her repeated, spontaneous, and heartfelt complaints demonstrate otherwise, as does the extensive record evidence that she sincerely felt targeted and discriminated against based on her gender, that she found Mr. De Niro's gendered behavior "very upsetting" "inappropriate[]" "disgusting," and "horrif[ying]," and that the circumstances around her constructive discharge were "emotionally distressing" and "traumatic" and left her "depressed," "really sad," "anxious" and "distraught."[27]

In any event, it is inappropriate to grant summary judgment against Plaintiff on the issue of her good faith, which is a triable issue of fact. *See Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989).[28] Hence, courts routinely reject at summary judgment employer arguments premised on a complainant's purported lack of good faith. *See, e.g.*, *Gupta v. Al Jazeera Am.*, 2018 WL 1605571, at *16 n.18 (S.D.N.Y. Mar. 29, 2018) (rejecting argument that complaint was not made in good faith; holding that "at best, it creates a dispute of fact"); *see also Sanders v.*

---

[26] Contrary to Defendants' insinuation, there is no basis under Fed. R. Evid. 408 to exclude these e-mails, which do not contain compromise negotiations, transmit a settlement proposal, or otherwise discuss any consideration for resolution of any claims. These e-mails only evidence Ms. Robinson's protected activity.

[27] *See* Ex. 12 at 138:8-17, 139:20-25; Ex. 7 at 150:2-8, 148:20-22, 168:16-23; Ex. 12 at 35:3-36:8, 37:6-20; Ex. 11 at 104:4-18; Ex. 7 at 162:16-25, 165:20-25, 169:20-22; Ex. 16 at 2:8-10.

[28] *See also, e.g. Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) ("Summary judgment is sparingly used where intent and state of mind are at issue"); *Gold v. Am. Med. Alert Corp.*, 2017 WL 663551, at *5 (S.D.N.Y. Feb. 16, 2017) (whether conduct violated standards of good faith "is a fact-specific determination not readily subject to summary judgment"); *Bear, Stearns Funding v. Interface Group-Nev.*, 361 F. Supp. 2d 283, 294 (S.D.N.Y. 2005) ("Certainly, a party's good faith, which necessitates examination of a state of mind, is not an issue which is readily determinable on a motion for summary judgment.").

*Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 366-67 (S.D.N.Y. 2007) (good faith presents a factual issue, and statutory retaliation protections would be illusory if employer's purported belief that complaints are unfounded, malicious, or extortionate were a proper basis to punish an employee).[29]

Viewing the evidence in the light most favorable to Ms. Robinson, there is ample evidence that she engaged in *bona fide* protected activity both during her employment and after it ended. Defendants' invitation to ignore the explicit content of the complaints at issue and speculate, without evidence, as to Ms. Robinson's underlying motives is plainly improper.

### 3.      Defendants Retaliated Against Plaintiff Because of Her Protected Activity

### i.      Post-Employment Retaliation Is Actionable If It Could Deter Complaints

In evaluating whether employer acts qualify as retaliation, courts do not distinguish between actions during employment and after an employee's job ends. Since *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006), it is now well-settled that prohibited retaliation "extends beyond workplace-related or employment-related retaliatory acts and harm"; the benchmark is simply whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 67-68 (quotations omitted). Defendants' assertion that "post-employment adverse actions are viewed differently for retaliation purposes" is simply not the law, and all of Defendants' cited cases on this point rely on pre-*Burlington* law or cases traceable to such law; none consider how *Burlington* transformed the law on retaliation.

---

[29] Defendants' cases are distinguishable. Only one granted summary judgment to an employer based on the employee's lack of good faith. That outlier is *Spadola v. N.Y.C. Transit Auth.*, 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003), cited only indirectly. There, the plaintiff threatened to file a report of sexual harassment, but his testimony demonstrated that he did not actually believe that he had been harassed and instead "viewed the [] allegation as his own form of intimidation and retaliatory tactic designed to deter [a manager] from instituting disciplinary charges to punish his behavior." Ms. Robinson has made no such admissions, and extensive evidence reflects her genuine concerns about gender discrimination.

The standard for NYCHRL retaliation claims is even more lenient. The NYCHRL expressly covers "any manner" of retaliation against a person who engages in protected activity; such an act need only be "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7). Under the NYCHRL, "[a] decision on whether an action was reasonably likely to deter the plaintiff must be made in light of the City Council's goal of melding **the broadest vision of social justice with the strongest law enforcement deterrent**." *Sotomayor v. City of N.Y.,* 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *see also, e.g.*, *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 343 (S.D.N.Y. 2009) (under "looser" NYCHRL standard, acts like excluding employee from meetings, failing to provide translator, and excessive supervision are actionable).

Critically, an employer's acts are not analyzed in isolation; instead, courts consider their cumulative impact.[30] "In the aggregate, [] even minor acts of retaliation can be sufficiently 'substantial in gross' to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). *See, e.g.*, *Servello v. N.Y. State Off. of Child. & Family Servs.*, 2019 WL 974972, at *8-9 (N.D.N.Y. Feb. 28, 2019) ("in the aggregate, the retaliatory actions alleged by Plaintiff [] constitute materially adverse action"); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 851 (S.D.N.Y. 2013) ("cumulative nature" of alleged incidents); *Dillon*, 85 F. Supp. 3d at 662 (retaliation assessed "with a keen sense" "of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct").

### ii.   Defendants' Adverse Actions Are Retaliatory Under All Relevant Laws

In response to Plaintiff's protected activity, Defendants engaged in a series of retaliatory

---

[30] Similarly, a pattern of conduct is highly relevant to the employer's intent. *See, e.g.*, *Housing Works, Inc. v. City of N.Y.*, 72 F. Supp. 2d 402, 426 (S.D.N.Y. 1999) ("Evidence of a 'pattern of antagonism' or of prior retaliatory conduct may serve as circumstantial evidence of retaliation."); *see also Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 207-208 (1973).

acts against her—including constructively discharging her, refusing to provide her with a recommendation, sending her a threatening letter, "investigating" her to try to manufacture evidence of wrongdoing, bringing a baseless lawsuit against her, and attempting to have her criminally prosecuted. Each of these acts alone is actionable retaliation, and in combination they amply qualify as conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (under the FLSA and NYLL) and that would be "reasonably likely to deter a person from engaging in protected activity" (under the NYCHRL).[31]

### iii. Defendants Constructively Discharged Ms. Robinson

In the wake of Ms. Robinson protected activity, Defendants subjected her to a constructive discharge. There is extensive evidence that this was the result not only of gender discrimination but also retaliatory animus. Enraged by her complaints, Ms. Chen "made it her singular mission" to expel her; demanded "This Bitch needs to get put in her fucking place"; promised, "I'm gonna fucking give this Bitch what she deserves"; told Mr. De Niro that Ms. Robinson "should finish what she is doing for you"; and presented him with an ultimatum: "[i]f you keep her, you and I will . . . have problems." (Ex. 45 at CANAL_0047901; Ex. 28 at CANAL_0034641; Ex. 29 at CANAL_0047507; Ex. 49 at CANAL_0046693; Ex. 26 at CANAL_0048618.) Soon, Mr. De Niro was "talking . . . to everyone" about Ms. Robinson's ouster. (Ex. 44 at CANAL_0047797.)

Second, there is ample evidence for a jury to conclude that Defendants took drastic retaliatory action to compel her resignation. Mr. De Niro functionally demoted her by taking away her assistant, permanently removing her responsibilities, and directing employees not to speak with her. (*See* § II.C *supra*.) Defendants proffer no non-retaliatory explanation for these acts, and a

---

[31] In disputing these claims, Defendants ignore Plaintiff's constructive discharge, the sham investigation, and GC Harvey's threatening letter as retaliatory actions. (*See* Mot. At 13.) Each of these acts, standing alone, is retaliation, and these acts certainly must be considered as part of Defendants' course of retaliation.

reasonable jury could readily conclude that these circumstances, including Ms. Robinson's sudden loss of job responsibilities and stature at Canal, the humiliating manner in which these were communicated, and her foreseeable termination, were actionable retaliation.

### iv.   Defendants Retaliated by Refusing to Provide a Reference Letter

Defendants also retaliated against Ms. Robinson by refusing to provide a recommendation letter. This is well recognized as actionable retaliation. *See, e.g.*, *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("[P]laintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant . . . , if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation.") (citations omitted); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F.Supp.3d 379, 389, 391-92 (S.D.N.Y. 2019) ("an employer's refusal to provide a letter of reference for a former employee constitutes an adverse employment action").

While Defendants claim that this was not an adverse action because the recommendation was for business school, they are again wrong on both the law and the facts. Defendants offer no authority that denying a letter of recommendation to professional school is not an adverse action and merely cite outdated precepts (superseded by *Burlington*) requiring some impact on future "job prospects." As a factual matter, Mr. De Niro broadly refused to provide Ms. Robinson with *any* recommendation, not merely one for business school. (Ex. 5 at 430:20-25; Ex. 1 at 220:20-25.) This torpedoed her career progression; she was denied admission to business school and has spent years unemployed. (Ex. 68; Ex. 11 at 140:21-141:9.) Ultimately, refusing a recommendation for business school can be at least as detrimental to one's long-term career and employment prospects as the denial of a job reference and just as likely to deter protected activity.

Further, there is ample evidence that Defendants' decision to deny a recommendation was motivated by retaliatory animus and that their justifications are pretextual. First, the denial of the

letter came swiftly after Ms. Robinson's protected activity; Mr. De Niro expressed newfound "reservations" about providing a letter barely two months after her repeated complaints about gender-based harassment, including her complaint of constructive discharge, and just months after her protected complaints about equal pay and overtime violations. (Ex. 57.) Second, Mr. De Niro reversed his prior promises to Ms. Robinson; he had assured her, "[a]ll you need is a letter of recommendation from me" and "I would give you the highest recommendation," but he refused to do this after she engaged in protected activity. (Ex. 1 at 85:8-13, 109:10-16.) Third, he treated her worse than other employees who did not engage in protected activity; he was emphatic that he was generally willing to support the careers of former employees, saying "I will write a letter. I will talk to the people," but he refused to do so for her. (*Id.* at 223:12-16.) Fourth, Defendants have offered shifting and implausible explanations for their conduct. They now claim for the first time that Ms. Robinson left Mr. De Niro "in the lurch." (Mot. at 14.) But Mr. De Niro testified that he thought Ms. Robinson *should* have resigned (Ex. 1 at 191:3-5), and when asked why he did not provide her with a reference, he veered between saying "I don't know," "[w]e didn't get to that point" to wildly speculating about his letter somehow being doctored. (*Id.* at 219:19-220:1, 219:6-11.)[32] Defendants' assertion that Mr. De Niro was left "in the lurch" is plainly false; Ms. Robinson reached out to offer her assistance in transitioning her work to other employees, but Defendants never followed up (Ex. 71; Robinson Decl. at ¶ 9), and in any event, nothing slipped through the cracks when other employees took over her duties. (Ex. 9 at 267:21-268:5.)

Drawing all inferences in Plaintiff's favor, there is ample evidence that Defendants denied her a recommendation for retaliatory reasons and that their justifications are pretextual.

---

[32] In June 2019, GC Harvey recited a completely different excuse, baselessly claiming to Ms. Robinson that Mr. De Niro was having "reservations" about signing a letter based on her SkyMiles activity; this is implausible given Mr. De Niro's testimony that he gave her broad authorization to use SkyMiles. (Ex. 57; Ex. 12 at 201:18-202:13; Ex. 2 at 366:8-11, 386:8-19; Ex. 3 at 588:10-12, 589:1-7.)

v. **Defendants Further Retaliated Against Ms. Robinson by Launching a Sham Investigation, Sending Her a Threatening Letter, Filing a Baseless Lawsuit, and Pushing for Her Criminal Prosecution**

In addition to sabotaging Ms. Robinson's career prospects by refusing to provide any references, Defendants retaliated against her by launching a sham "investigation" into her, sending her a letter threatening legal action, mounting a baseless lawsuit against her, and pushing for her criminal prosecution. Each of these actions alone, and certainly any of them in combination, are actionable retaliation in violation of the FLSA, NYLL, and the more protective NYCHRL.

Defendants do not dispute that launching an investigation against an employee can be an adverse action. Indeed, this is a well-established form of retaliation. *See Cox v. Onondaga Cty. Sheriff's Dept.*, 760 F.3d 139, 147 (2d Cir. 2014) ("an employer's investigation may constitute a cognizable retaliatory action . . . if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination'"); *Olaechea v. City of N.Y.*, 2019 WL 4805846, at *7 (S.D.N.Y. Sept. 30, 2019) (the "decision to investigate [plaintiff's] conduct and to bring charges against her may also constitute an adverse employment action"); *O'Neal v. State Univ. of N.Y.*, 2006 WL 3246935, at *13 (E.D.N.Y. Nov. 8, 2006).

Likewise, it is well-established that employer lawsuits or counterclaims are an especially grave form of retaliation. *See Bill Johnson's Rests., Inc.* v. *N.L.R.B.*, 461 U.S. 731, 740 (1983) ("A lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation. . . [B]y suing an employee who files charges . . . or engages in other protected activities, an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit. . . [T]he chilling effect of a . . . lawsuit upon an employee's willingness to engage in protected activity is multiplied where the complaint seeks damages[.]"); *Bentivegna v. People's United Bank*, 2017 WL 4277149, at *4 (E.D.N.Y. Sept. 25, 2017) ("If a reasonable worker believed that he or she might face a lawsuit if they filed a complaint

of discrimination, they might be dissuaded from filing such a complaint."); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008).[33]

Numerous courts have held that claims motivated by retaliatory animus are actionable retaliation, even if they are not frivolous.[34] While this Court has diverged and held, in the narrow context of the FLSA and NYLL, that such claims must also lack a reasonable basis in fact or law, *Kim v. Lee*, 576 F. Supp. 3d 14, 31 (S.D.N.Y. 2021),[35] the Second Circuit has not settled the issue. And *Burlington* supports the more employee-protective view adopted by various courts. Regardless, under the expansive NYCHRL, the baselessness standard cannot apply; any conduct motivated even partly by retaliatory animus is actionable as long as the action is "reasonably likely to deter a person from engaging in protected activity." *Mihalik*, 715 F.3d at 112.

Even when a baselessness standard is applied, however, the plaintiff need not establish that *every* aspect of the employer's case is baseless. This is consistent with the *Burlington* test, which

---

[33] Employer threats to take adverse action against a complaining employee also qualify as retaliatory conduct, as such threats can have as strong a chilling effect as the action itself. *See, e.g., Rivera v. Rochester Genessee Regional Transp. Auth.*, 743 F.3d 11, 26-27 (2d Cir. 2014) (threats of termination); *Commonwealth v. Bull HN Info. Sys.*, 16 F. Supp.2d 90, 108-109 (D. Mass. 1998) ("absurd" to require that employer follow through on threats before employee has actionable retaliation claim); *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52 (D.D.C. 2009) ("whether an action is 'materially adverse' is determined by whether it holds a deterrent **prospect** of harm, and not by whether the harm comes to pass or whether any effects are felt in the present"), *aff'd in relevant part*, 643 F. 3d 975, 986-87 (D.C. Cir. 2011) (emphasis in original). This applies to Defendants' letter threatening to go after Ms. Robinson.

[34] *See, e.g., Daddino v. Sanossian*, 2022 WL 1085542, at *23 (E.D.N.Y. Feb. 25, 2022); *Rodriguez v. Nat'l Golf Links of Am.*, 2020 WL 3051559, at *5 (E.D.N.Y. June 8, 2020); *Khurana v. Wahed Invest.*, 2020 WL 364794, at *14 (S.D.N.Y. Jan. 8, 2020); *Quintanilla*, 2019 WL 885933, at *28-29 (action to recover unpaid debts); *Bentivegna*, 2017 WL 4277149, at *4; *Crawford v. Coram Fire Dist.*, 2015 WL 10044273, at *7 (E.D.N.Y. May 4, 2015); *Spencer v. Int'l Shoppes*, 902 F. Supp.2d 287, 295-97 (E.D.N.Y. 2012); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157-58 (3d Cir. 1999).

[35] The baselessness standard is set forth in *Bill Johnson's*. A claim has a reasonable basis in fact if it raises "a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts[.]" 461 U.S. at 745. It has a reasonable basis in law "if there is any realistic chance that the plaintiff's legal theory might be adopted." *Id.* at 747. Further, an employer's retaliatory suit may be treated as an unfair labor practice under the NLRA if it is "unmeritorious"—that is, "judgment goes against the employer… or if his suit is withdrawn or is otherwise shown to be without merit." *Id.*

centers on the chilling effect of employer acts: a smattering of well-grounded allegations in an otherwise frivolous and onerous suit does not ease that effect. Moreover, it is a basic principle of civil litigation that a pleader must refrain from advancing *any* baseless *contentions*, not just entirely frivolous suits. A litigant must undertake a reasonable inquiry before bringing suit, *all* factual contentions must be supported, or supportable, with evidence, and *all* legal contentions must be warranted by existing law or by nonfrivolous legal argument. Fed. R. Civ. P. 11(b). Thus, even under a baselessness standard, an employer lawsuit may constitute actionable retaliation where *some* aspects of the suit are meritorious. *Cf. Spencer v. Int'l Shoppes*, 902 F. Supp. 2d at 289, 291, 300-301 (E.D.N.Y. 2012) (baselessness criterion would be met even where employer prevailed on one out of eight claims and recovered some monetary damages); *Savor Health, LLC v. Day*, 2022 WL 912236, at *10 (S.D.N.Y. Mar. 29, 2022) (baselessness could be established where employee admitted some of the underlying factual allegations but claimed that the activity was authorized); *Torres*, 628 F. Supp.2d at 472 (baseless *claims*, not just lawsuits, can be actionable retaliation).

For instance, baselessness is readily established where the employer seeks excessive and unjustified damages. *See Spencer*, 902 F. Supp.2d at 289, 300 (demand for $6.5 million, plus punitive damages, supported both baselessness and retaliatory motive); *Spencer v. Int'l Shoppes*, 2010 WL 1270173 at *13 (E.D.N.Y. Mar. 29, 2010) ("Of particular concern, is the 'chilling effect of a state lawsuit upon an employee's willingness to engage in protected activity' where the complainant seeks very large damages, here, over six million dollars."); *Jacques v. DiMarzio*, 200 F. Supp. 2d. 151, 162 (E.D.N.Y. 2002) ("The Court is deeply troubled by DiMarzio's $500,000 counterclaim, which appears to be nothing more than a naked form of retaliation…").[36] In addition,

---

[36] In analagous circumstances, a baselessly inflated demand can establish a Rule 11 violation. *Hudson v. Moore Bus. Forms*, 836 F.2d 1156, 1162-63 (9th Cir. 1987) (excessive, "wholly unsubstantiated" $4 million demand on retaliatory counterclaim by employer; the circumstances suggested a retaliatory motive behind

a grant of summary judgment as to any of the claims or transactions alleged by the employer is sufficient, though certainly not necessary, to establish baselessness. *See Spencer*, 902 F. Supp.2d at 301; *Torres,* 628 F. Supp. 2d at 471-74 (granting affirmative summary judgment to plaintiffs on retaliation claim after granting summary judgment on defendants' counterclaims).

Finally, it is well recognized as retaliation for an employer to "instigate[] government action against a former employee," including by reporting her to criminal authorities. *See, e.g.*, *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 158 (3d Cir. 1999) (collecting cases); *Lynch v. N.Y. State Urban Dev. Corp.*, 2018 WL 7918226, at *8 (E.D.N.Y Aug 10, 2018) ("filing of criminal charges against an employee"); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 196 (S.D.N.Y. 2001) (initiation of disciplinary charges and felony charges). In evaluating a report to criminal authorities, the only consideration is whether the employer's motives were retaliatory; because there is no First Amendment issue of access to the courts, there can be no additional requirement that the allegations lack a reasonable basis in fact or law. *Cf. Kim*, 576 F. Supp. 3d at 31.

### vi.   The Record Shows that Retaliatory Animus Motivated the Investigation, Threatening Letter, Lawsuit, and Push for Criminal Prosecution

There is extensive direct evidence that these acts were motivated by retaliatory animus:

- Mr. De Niro raged against Ms. Robinson's protected activity, exclaiming, "Can you believe chase [Robinson] . . . who the fuck does she think she is?!?!" and "The balls, the nerve, the chutzpah, the sense of entitlement, how dare her!" (Ex. 32 at CANAL_0048629.)

- In deposition, Mr. De Niro admitted his retaliatory animus, stating that he was "very angry" and "upset" that Ms. Robinson asserted employment claims and threatened a lawsuit. (Ex. 2 at 423:16-25, 419:7-12.) As to the lawsuit, he admitted that he issued a directive to "go after her

---

the damages claim, and employer's inability to defend the amount "only serve[s] to support the district court's conclusion that the damage claims were frivolous and brought to harass [employee plaintiff]").

[Ms. Robinson]" and "file whatever"—even if it was frivolous. (Ex. 2 at 424:22-425:7.)

- Long-time Canal employee Michael Kaplan—who "investigated" Ms. Robinson, communicated "plenty of times" with GC Harvey about the lawsuit, and met with criminal prosecutors about Ms. Robinson—sent contemporaneous texts admitting that "she was threatening to sue bob so they wanted to ruin her first" (Ex. 73 at CANAL_0049481), and "this was to[m']s plan to strike first." (Ex. 74 at CANAL_0049481). He admitted that the millions in damages claimed by Canal were "just a random number [] [t]o humiliate her." (Ex. 74 at CANAL_0047781.) This is a plain admission by Canal of both retaliatory animus and baselessness.

- In response to Ms. Robinson's protected activity, Ms. Chen schemed with Mr. De Niro that GC Harvey "will get her" and he was "to[o] feisty [to] let this go with[out] a few fireworks and big, big BANG!" (Ex. 32 at CANAL_0048628-29; Ex. 62 at CANAL_0048977.)

In addition, there is extensive circumstantial evidence that Defendants' acts were motivated by retaliatory animus and that Defendants' justifications are pretextual.

First, Canal dredged up old matters that it had never considered improper before Plaintiff engaged in protected activity. In fact, during her more than 11 years of employment, Canal never raised any concerns about the transactions at issue on its claims. (Ex. 4 at 151:5-10; *see also id.* at 150:9-16, 153:12-17, 171:18-25, 366:9-14; Ex. 3 at 492:23-493:3) In fact, it treated those same transactions as legitimate business expenses for tax purposes. (Ex. 4 at 225:21-226:3, 228:7-13.)

Second, Canal's investigation was patently biased and lacked procedural safeguards and objective guidelines to ensure an accurate result. Instead of using its long-time accountants, a forensic accountant, or a professional investigator (Ex. 4 at 404:20-406:22, 407:18-408:16, 390:9-391:2; Ex. 6 at 51:24-52:20), Canal relied on three employees ("three idiots sitting in front of a computer" (Ex. 10 at 296:7-8; Ex. 6 at 17:7-16, 55:8-56:10)), who were known to dislike Ms.

Robinson. (Ex. 10 at 278:10-22, 466:21-23; Ex. 9 at 152:2-4, 253:7-18, 257:21, 259:1-3). GC Harvey instructed them to compile negative information about her (Ex. 10 at 291:11-18) and spend "spend 24/7 thinking of crazy chase shit and write it down." (Ex. 59 at CANAL_0047443.)

Third, Canal singled out Ms. Robinson for investigation, suit, and criminal prosecution but did not do so to employees who did not engage in protected activity. There were two other Canal employees accused of financial wrongdoing (including theft of petty cash and abuse of Ubers) around the same time as her. (Ex. 10 31:16-32:4; Ex. 7 at 217:12-218:15; Ex. 8 at 195:14-23; Ex. 3 at 558:25-559:14.) However, unlike Ms. Robinson, neither had engaged in protected activity (Ex. 3 at 558:3-6, 561:11-14) and Canal did not launch an investigation into either of them, bring suit against them, or bring them to the attention of criminal prosecutors. (Ex. 3 at 539:7-15, 557:10-12, 561:2-10, 557:21-558:1; Ex. 7 at 216:17-20.)

Fourth, Canal undertook its retaliatory acts shortly after Plaintiff's protected activity. It began its investigation only after she resigned, and the bulk of transactions were not investigated until after she asserted legal claims. (Ex. 69 at 2; Ex. 9 at 167:24-168:5.) Canal sued Ms. Robinson less than 3 weeks after she asserted claims through counsel. (*Compare* Ex. 63 at CANAL_0049395-6, *with* Ex. 72.) As Mr. De Niro testified, "I was just very angry about [] the game she is playing . . . And I'm ready to go after her. I have no reason to wait." (Ex. 2 at 423:21-25.) Likewise, contrary to the timeline in Defendants' motion, Canal's Rule 30(b)(6) witness testified that Canal did not contact prosecutors until "either July or August of [20]19," (Ex. 5 at 396:20-25)—after Ms. Robinson escalated her protected activity. All of Defendants' substantive communications with prosecutors occurred after her complaints through counsel. (Ex. 6 at 286:2-6.)

### vii.   There is Extensive Evidence That Canal's Claims Were Baseless

Notably, Defendants make no serious attempt to argue that the contentions in Canal's lawsuit are grounded in fact or law. Their Motion does not defend Canal's baseless $6 million

demand or *any* of the principal allegations that it leveled in the lawsuit, including the allegations concerning credit card charges, vacation days, Netflix, the Los Angeles trip, or SkyMiles. Thus, Defendants have effectively conceded the baselessness of all those contentions.

There is extensive evidence that Canal knowingly advanced a host of frivolous contentions. (*See generally* Pl.'s S.J. Mot. (Dkt. Nos. 281, 305-309).) Evidence of baselessness includes:

• Shortly before Canal filed its claims, GC Harvey openly admitted that "he ha[d] 'literally no evidence'" to bring to court. (Ex. 65 at CANAL_0052576.)

• Canal demanded $6 million from Plaintiff, but contemporaneous text messages openly admitted that this was **"just a random number" designed solely to "humiliate her**." (Ex. 74 at CANAL_0047781.) Canal never made any effort to substantiate its demand. While it sought $3 million for "the value of the funds and property misappropriated by [Ms. Robinson]," Mr. De Niro admitted that he did not believe she had stolen this amount (Ex. 72 at Prayer for Relief; Ex. 2 at 429:18-430:21), and Canal's suit itemized just $256,495.35 in damages. (*See further* Ex. 72.) Canal also sought $3 million in disgorgement of her pay, but this sum exceeded the total sum paid to Plaintiff during her entire employment. (Robinson Decl. at ¶ 11.) Mr. De Niro conceded that she should not have to return her pay. (Ex. 2 at 431:24-432:4; Ex. 3 at 587:24-588:4.)

• Canal also sought attorneys' fees and costs, even though these forms of relief are unavailable on any of its claims.[37]

• Mr. De Niro was the only person affiliated with Canal who knew the full details of the work he had Ms. Robinson perform and the expenses he authorized (Ex. 3 at 464:23-465:10, 461:13-21, 462:3-463:15, 463:21-464:2), but he made no effort to vet the allegations in the lawsuit.

---

[37] *See U.S. Underwriters Ins. Co. v. City Club Hotel,* 822 N.E.2d 777, 779 (N.Y. 2004) ("[A] prevailing party may not recover attorneys' fees from the losing party except where authorized by statute, agreement, or court rule."); *Cty. of Orange v. Travelers Indem. Co.*, 2014 WL 1998240, at * 4 (S.D.N.Y. May 14, 2014) (striking request for attorneys' fees and costs where no basis for recovery of attorneys' fees was alleged).

In fact, he spent mere minutes discussing the principal allegations in the case. (Ex. 6 at 179:13-24, 245:17-23; 180:18-25; Ex. 5 at 303:15-304:4.) Mr. De Niro conceded that he would "need to review each individual charge in detail to ascertain whether [it] was proper or improper," but he never did so. (Ex. 2 at 341:23-342:7, 343:7-12, 344:12-17; Ex. 3 at 470:19-24, 457:20-22.)

- Canal's lawsuit stated that its "accountants initiated a review of various books and records." (Ex. 72 at ¶ 20.) But the accountants did not initiate the investigation, did not investigate the transactions at issue, and "absolutely [did] not" conclude that Ms. Robinson engaged in any wrongdoing. (Ex. 4 at 380:22-24, 404:20-406:22, 407:18-408:16, 390:22-391:2, 295:3-8.)

- The suit accused Ms. Robinson of improper charges for taxis, Ubers, and meals, even though Canal policy broadly authorized these expenses. (*See* Ex. 72 at ¶ 40-43, 35-37; Ex. 4 at 341:13-18, 340:6-13.) Canal just added the *total* amount of charges on a shared office card, and summarily claimed they were all improper charges by Ms. Robinson. (Ex. 10 at 310:5-23, 312:3-12, 313:23-314:10, 314:18-315:2; Ex. 6 at 118:10-17, 119:11-120:5, 120:10-16, 120:24-121:13.)

- Canal's lawsuit accused Ms. Robinson of "binge watching" Netflix during work. (Ex. 72 at ¶ 2.) But Canal simply added together all Netflix viewing, including viewing that occurred outside business hours, on a shared account available to the entire office. (Ex. 6 at 265:24-268:11, 271:23-272:2; Ex. 12 at 225:9-21; *see also* Ex. 2 at 391:4-23.)

- Canal's policy was to pay Ms. Robinson for unused vacation days if she worked on a trip or so-called "vacation." (Ex. 3 at 506:7-16, 513:12-18.) But Canal's allegations about vacation days are based on e-mails she sent or received containing references to flights, hotels, or so-called "vacation[s]" or "[s]emi [v]acation," and it summarily claimed she should not have been paid without considering the extensive work she performed on those days. (Ex. 6 at 228:13-230:4, 209:9-210:3, 206:24-207:24; *see, e.g.*, Ex. 70 at CANAL_0052808-09, CANAL_0052814-17.)

- Canal accused Ms. Robinson of improperly charging it for flower expenses and improperly reimbursing herself from petty cash when in fact the charges were all approved expenses. Canal has since abandoned these allegations. (Ex. 80; Ex. 81 at No. 8(iii)(d).) Thus, the Court can infer their baselessness. *See Bill Johnson's*, 461 U.S. at 747 (a retaliatory lawsuit is "unmeritorious" where the suit is withdrawn or otherwise shown to be meritless).

- Canal accused Plaintiff of transferring SkyMiles without authorization. But, as Mr. De Niro confirmed, he did not use the miles himself, did not care about them, gave her broad authority to use them, and specifically approved the trips for which she sought to use them. (Ex. 2 at 358:17-23, 366:8-11, 386:8-19, 388:24-389:17, 358:6-11; Ex. 7 at 111:20-22; Ex. 3 at 588:10-12, 589:1-7, 574:21-575:16, 576:5-14, 590:2-7, 571:9-573:11.)

Instead of making any serious attempt to defend its baseless allegations, Defendants only present a series of red herrings that are easily rejected as pretextual:

First, Defendants claim that Ms. Robinson's return of "cash, gift cards, and physical property" from her home office somehow justifies Canal's lawsuit. (Mot. at 17) But Canal's suit focused on completely different allegations. (*See generally* Canal Complaint and *supra* § II(E).) In any event, Ms. Robinson did nothing improper. Canal made no arrangements or requests for the return of these materials for years. Meanwhile, she preserved them and returned the items at an appropriate juncture in litigation. (Robinson Decl. at ¶ 9; Ex. 11 at 317:9-22; Ex. 12 at 210:22-212:4.) This reflects good faith, not an admission of theft.

Second, Defendants claim that GC Harvey's July 11, 2019 letter placed Ms. Robinson on notice of an upcoming suit. But this letter was itself retaliatory, an obvious response to Ms. Robinson continuing her protected activity. *See supra* § IV(B)(3)(v). This is no defense.

Third, Mr. De Niro self-serving statement that he *felt* "bamboozled" is not an appropriate

basis for summary judgment. *See Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir. 1989) ("summary judgment is ordinarily inappropriate where intent and state of mind are at issue.") At a minimum, it highlights that there are genuine issues of material fact. There is ample evidence that Mr. De Niro harbored an improper, retaliatory motive, including his admissions that he was angry, his written communications making that abundantly clear, and his employee's text messages confessing the retaliatory nature of the lawsuit. *See Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 367 (2d Cir. 1980) (affirming denial of summary judgment given evidence "rebutting the appellees' professed innocent motives"); *Higgins v. Artuz*, 1997 WL 466505, at *5 (S.D.N.Y. Aug. 14, 1997) (denying summary judgment despite defense affidavits claiming "lack of retaliatory or discriminatory intent").

Drawing all inferences in Plaintiff's favor, a reasonable jury can readily conclude that Canal's acts were adverse actions, both individually and in the aggregate, and motivated by retaliatory animus. Defendants' admissions confirm the retaliatory animus that drove these actions, and Canal makes no effort to defend the legion of unsupported contentions advanced in its lawsuit.

## V.    CONCLUSION

The record shows that Defendants engaged in a series of outrageous acts against Ms. Robinson that are widely recognized as discrimination and retaliation, certainly when viewed in the aggregate and even when aspects are viewed in isolation. The record contains smoking gun after smoking gun admission exposing Defendants' discriminatory and retaliatory animus. Considering the entire record in the light most favorable to Ms. Robinson, drawing all reasonable inferences in her favor, and disregarding any interpretations of the evidence favorable to Defendants as the moving parties, Defendants' motion must be denied in all respects.

Dated: November 20, 2022                    Respectfully submitted,

Alexandra Harwin (AH-3111)
David Sanford (5695671)
Jeremy Heisler (JH-0145)
Kate MacMullin (5693882)
Melinda Koster (MK-1384)*
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
aharwin@sanfordheisler.com
dsanford@sanfordheisler.com
jheisler@sanfordheisler.com
kmacmullin@sanfordheisler.com
mkoster@sanfordheisler.com

*On The Brief

Michael Lockman (5485156)
SANFORD HEISLER SHARP, LLP
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Telephone: (615) 434-7000
Facsimile: (615) 434-7020
mlockman@sanfordheisler.com

*Counsel for Plaintiff Graham Chase Robinson*