**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendant Canal Productions, Inc.*
Laurent Scott Drogin
Brittany Kate Lazzaro
1350 Broadway
New York, New York 10018
Telephone: 212-216-8000
Email: ldrogin@tarterkrinsky.com
Email: blazzaro@tarterkrinsky.com

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRAHAM CHASE ROBINSON,<br><br>*Plaintiff*,<br><br>- against -<br><br>ROBERT DE NIRO and<br>CANAL PRODUCTIONS, INC.,<br><br>*Defendants*. | Case No. 1:19-cv-09156-LJL-KHP |

### CANAL PRODUCTION, INC.'S MEMORANDUM OF LAW OPPOSING
### <u>MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**INTRODUCTION** ...............................................................................................1

**PROCEDURAL HISTORY** ...............................................................................1

**COUNTERSTATEMENT OF FACTS RELEVANT TO THIS MOTION** .........................1

    Overview ..................................................................................................2

    The Undeniable Retention of Canal's Cash, Gift Cards and Physical Property ..............5

    Canal's Specific Claims ..............................................................................6

    Authorization, Ratification and Consent.......................................................23

    Mischaracterizations About Canal's Investigation ........................................24

**ARGUMENT** ..................................................................................................27

    I.    Canal's Faithless Servant Claim is Entirely Proper Based On Plaintiff's Theft Of Property And Time, And Her Abuse Of Her Position, Privilege, Authority, And Discretion ...............................27

    II.   Canal's Breach Of Fiduciary Duty Claim Is Proper ...............................29

    III.  The Faithless Servant And Fiduciary Duty Claims Are Not Duplicative...............................................................................31

    IV.  Canal's Conversion Claim Is Not Duplicative Of Its Fiduciary Duty And Faithless Servant Claims .......................................34

    V.   Canal Neither Authorized, Ratified, Nor Consented To Ms. Robinson's Actions, As It Lacked Requisite Knowledge....................36

    VI.  Canal Has Not "Abandoned" Any Claims By Deciding Not To Pursue Damages For Flower Charges And Petty Cash.........................38

**CONCLUSION** .................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Group. Inc. v. Johnson,*
    No. 01-cv- 553, 2002 WL 10495 (S.D.N.Y. Jan. 3, 2002) .......................................................30

*Babbitt v. Koeppel Nissan,* Inc.,
    No. 18-cv-5242, 2020 WL 3183895 (E.D.N.Y. June 15, 2020) ...............................................32

*Bombard v. Cent. Hudson Gas & Elec.* Co.,
    205 A.D.2d 1018 (3d Dept. 1994) ...........................................................................................39

*Brightson v. H.B. Claflin* Co.,
    180 N.Y. 76 (1904) .............................................................................................................30, 31

*Buccino v. Continental Assur.* Co.,
    578 F. Supp. 1518 (S.D.N.Y. 1983).........................................................................................31

*Cramer v. Devon Group, Inc.,*
    774 F. Supp. 176 (S.D.N.Y. 1991) ..............................................................................29, 30, 31

*Creative Waste Mgmt., Inc. v. Capitol Envt'l Servs.,* Inc.,
    458 F. Supp.2d 178 (S.D.N.Y. 2006).......................................................................................37

*Doe v. Solera Cap. LLC,*
    No. 18-cv-1769, 2019 WL 1437520 (S.D.N.Y. Mar. 31, 2019).........................................28, 29

*Faiveley Transp. USA, Inc. v. Wabtec Co*rp.,
    758 F. Supp. 2d 211 (S.D.N.Y. 2010)......................................................................................39

*Foley v. D'Agost*ino,
    21 A.D.2d 60 (1st Dept. 1964).................................................................................................30

*Global Mins. & Metals Corp. v. Ho*lme,
    35 A.D.3d 93 (1st Dept. 2006).................................................................................................30

*Gold Sun Shipping Ltd. v. Ionian Transp. Inc.,*
    245 A.D.2d 420 (2d Dept. 1997) ........................................................................................34, 35

*Gortat v. Capala Bros.,* Inc.,
    585 F. Supp. 2d 372 (E.D.N.Y. 2008*), aff'd,* 568 F. App'x 78 (2d Cir. 2014).......................30

*Graves v. Kaltenbach & Steph*ens,
    205 A.D. 110 (1st Dept. 1923*), aff'd,* 237 N.Y. 546 (1923).....................................................31

*Grewal v. Cu*neo,
    No. 13-cv-6836, 2016 WL 308803 (S.D.N.Y. Jan. 1, 2016) ...................................................29

*Haraden Motorcar Corp. v. Bonarr*igo,
     No. 1:19-cv-01079, 2020 WL 1915125 (N.D.N.Y. Apr. 20, 2020)..........................................33

*Helios Int'l S.A.R.L. v. Cantamessa USA,* Inc.,
     No. 12-cv-8205, 2013 WL 3943267 (S.D.N.Y. July 31, 2013)..............................................31

*Holm v. C.M.P. Sheet Metal, I*nc.,
     89 A.D.2d 229 (4th Dept. 1982) ...........................................................................................37

*Hutchinson v. Washb*urn,
     80 A.D. 367 (2d Dept. 1903) ................................................................................................31

*Jefpaul Garage Corp. v. Presbyterian Hosp. in City of* N.Y.,
     61 N.Y.2d 442 (1984) ...........................................................................................................39

*JPMorgan Chase Bank v. Liberty Mut. Ins.* Co.,
     209 F.R.D. 361 (S.D.N.Y. 2002) ..........................................................................................36

*Kapernekas v. Brandho*rst,
     638 F. Supp.2d 426 (S.D.N.Y. 2009)....................................................................................35

*Kocak v Darg*in,
     199 A.D.3d 456 (1st Dept. 2021)..........................................................................................33

*Leary v. Al-Mubar*aki,
     No. 18-cv-0048, 2019 WL 4805849 (S.D.N.Y. Sept. 30, 2019) ...........................................29

*Levy v. Young Adult Inst.,* Inc.,
     103 F. Supp. 3d 426 (S.D.N.Y. 2015)...................................................................................30

*Lipton v. Cnty. of Orange,* NY,
     315 F. Supp. 2d 434 (S.D.N.Y. 2004)...................................................................................39

*Longo v. Keybank Nat'l Ass*'n,
     357 F. Supp. 3d 263 (S.D.N.Y. 2019)...................................................................................33

*McCormack v. IBM*,
     145 F. Supp.3d 258 (S.D.N.Y. 2015)................................................................................... 36

*Meinhard v. Sal*mon,
     249 N.Y. 458 (1928) .............................................................................................................30

*Murphy v. Morl*itz,
     751 F. App'x 28 (2d Cir. 2018) .............................................................................................31

*Murray v. Beard,*
     102 N.Y. 505 (1886) ........................................................................................................27, 28

*NetJets Aviation, Inc. v. LHC Commc'ns,* LLC,
   537 F.3d 168 (2d Cir. 2008)...........................................................................34

*Nicholsen v. Feeding Tree Style,* Inc.,
   No. 12-cv-6236, 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014)...............................32

*Phansalkar v. Andersen Weinroth & Co. L.P.,*
   344 F.3d 184 (2d Cir. 2003)...................................................................27, 28

*Pollitz v. Wabash R.* Co.,
   207 N.Y. 113 (1912) ...................................................................................37

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp,* LLC,
   813 F. Supp. 2d 489 (S.D.N.Y. 2011).............................................................32

*Robinson v. De Niro, et al.,*
   2021 WL 2887702 (S.D.N.Y. Jul. 9, 2021) ................................................33, 35

*Rothschild v. Title Guar. & Trust* Co.,
   204 N.Y. 458 (1912) ...................................................................................37

*S & K Sales Co. v. Nike,* Inc.,
   816 F.2d 843 (2d Cir. 1987)..................................................................29, 30

*Sabin v. Kendr*ick,
   46 A.D. 90 (1st Dept. 1899)........................................................................31

*Salus Capital Partners, LLC v. Moser,*
   289 F. Supp. 3d 468 (S.D.N.Y. 2018).......................................................28, 29

*Samuels v. Greenb*erg,
   No. 14-cv-04401, 2015 WL 5657565 (E.D.N.Y. Sept. 23, 2015) ..........................35

*Sanders v. Madison Square Garden,* L.P.,
   No. 06-cv-589, 2007 WL 1933933 (S.D.N.Y. Jul. 2, 2007).................................29

*Sansum v. Fioratti,*
   128 A.D.3d 420 (1st Dept. 2015)...........................................................28, 29

*Schulhof v. Jac*obs,
   54 Misc.3d 1221(A) (Sup. Ct. N.Y. Co. 2017*), aff'd* 157 A.D.3d 647 (1st
   Dept. 2018).............................................................................................32

*In re Skat Tax Refund Scheme Li*tig.,
   356 F. Supp. 3d 300 (S.D.N.Y. 2019)...........................................................33

*Sokolin LLC v. Cozz*i,
   2012 NY Slip Op. 31410(U) (Sup. Ct. Suffolk Co. 2012)....................................33

*Stahl v. Allert,*
    32 Misc. 93 (App. Term 1900) ........................................................................31

*Stauss v. Title Guar. & Trust Co.,*
    284 N.Y. 41 (1940) ........................................................................................37

*Stefanovic v. Old Heidelberg Corp.,*
    No. 18-cv-2093, 2022 WL 3928370 (S.D.N.Y. Aug. 31, 2022)....................29

*In re Sterling Navigation Co., Ltd.,*
    444 F. Supp. 1043 (S.D.N.Y. 1977)..............................................................38

*Supreme Showroom, Inc. v. Branded Apparel Grp. LLC,*
    No. 16-cv-5211, 2018 WL 3148357 (S.D.N.Y. Jun. 27, 2018)....................34

*Torres v. Gristede's Operating Corp.,*
    628 F. Supp. 2d 447 (S.D.N.Y. 2008).....................................................28, 29

*Trans-Pro Logistic, Inc. v. Coby Electronics Corp.,*
    No. 05-cv-1759, 2009 WL 36824 (E.D.N.Y. Jan. 6, 2009) .........................37

*Trustees of the Am. Fed. of Musicians and Employers' Pension Fund v. Steven*
    *Scott Enters., Inc.,*
    40 F. Supp. 2d 503 (S.D.N.Y. 1999)............................................................37

*Turner v. Kouwenhoven,*
    100 N.Y. 115 (1885) ......................................................................................27

*Vohmann v. Michel,*
    185 N.Y. 420 (1906) ......................................................................................37

*Webb v. RLR Assocs., Ltd.,*
    No. 03-cv-4275, 2004 WL 555699 (S.D.N.Y. Mar. 19, 2004).....................31

*Yukos Cap. S.A.R.L. v. Feldman,*
    977 F.3d 216 (2d Cir. 2020)......................................................27, 28, 32, 33

**Statutes and Other Authorities**

10A Wright, Miller & Kane, Federal Practice and Procedure § 2730 ...........................31

N.Y. Lab. L. § 195 .........................................................................................................14

N.Y. Pattern Jury Instr. Civil 3:59 ................................................................................38

Restatement (Third) of Agency § 4.01 ..........................................................................38

Restatement (Third) of Agency § 8.11 ..........................................................................28

## INTRODUCTION

Defendant Canal Productions, Inc. ("Canal") submits this memorandum of law in opposition to the motion for summary judgment filed by Plaintiff Graham Chase Robinson ("Plaintiff" or "Ms. Robinson").[1] Plaintiff seeks summary judgment on all three counterclaims asserted by Canal in its First Amended Answer with Counterclaims (ECF #73) ("Counterclaims").

## PROCEDURAL HISTORY

Canal's Counterclaims, brought under the common law, were originally filed as affirmative claims in New York State Supreme Court on August 17, 2019 (GB Dec., Ex. 12) ("State Court Action").[2] In lieu of an Answer, on October 3, 2019, Plaintiff filed the instant action against Canal and Robert De Niro ("Mr. De Niro"), and sought and obtained a stay of the State Court Action (NYSCEF Doc. Nos. 5-14). On July 19, 2021, the stayed State Court Action was withdrawn, and Canal's claims were refiled here as the Counterclaims. (NYSCEF Doc. No. 50).

## COUNTERSTATEMENT OF FACTS RELEVANT TO THIS MOTION

In addition to the facts below, and the materials filed in support of Canal and Mr. De Niro's motion for summary judgment (ECF #313-328), Canal submits: (i) a November 20, 2022 Supplemental Declaration of Robert De Niro ("RDN Supp. Dec."); (ii) a November 20, 2022 Supplemental Declaration of Gregory R. Bennett ("GB Supp. Dec."), and; (iii) Canal's Counterstatement to Plaintiff's Statement of Material Facts Pursuant to L. Civ. R. 56.1.

---

[1]    "Plaintiff's Brief" or "P. Br." refers to Plaintiff's memorandum of law supporting her motion for summary judgment. (ECF #282; ECF #305).

[2]    "GB Dec." refers to the Declaration of Gregory R. Bennett, dated October 30, 2022 (ECF #322) and "RDN Dec." refers to the Declaration of Robert De Niro, dated October 30, 2022 (ECF #317).

**Overview**

Canal seeks redress for systemic abuses by Ms. Robinson who converted its property, violated its trust, and abused her authority, all to her personal gain and its detriment. Ms. Robinson's motion papers use, repeat, and rely on phrases like "broad authority" and "substantial discretion" as excuses, and to wrongly imply she had unbounded permission to do and spend whatever she pleased. In its simplest form, Ms. Robinson's motion should be denied in its entirety because for each item where she says: "I was allowed to," Canal responds: "No, you were not" and supports its position with admissible evidence. These fundamental disagreements turn on disputed facts rendering them inappropriate for resolution by summary judgment.

Canal is Mr. De Niro's "loan-out" company. RDN Dec., ¶ 3; RDN Supp. Dec., ¶ 2. It is a small office responsible for various aspects of his professional life and—where they overlap—his personal life. GB Dec., Ex. 91,[3] RDN Tr. I,[4] at 158:13–162:21, 167:25–168:4. While Mr. De Niro owns Canal, RDN Dec., ¶ 3, his travel schedule was such that he was not commonly in its office. RDN Supp. Dec., ¶ 5. He delegated duties and responsibilities to Canal's employees under notions of "common sense" (GB Dec., Ex. 92, RDN Tr. II,[5] at 277:8-21, 277:13-21, 279:19-21, 280:11-19, 338:12-23), trust and honor. Ex. 91, RDN Tr. I, at 35:3–7, 76:22-23, 84:13–85:7, 104:6-9, 196:7-10. He expected people to "[j]ust do the right thing" (*id.*, at 218:22–219:3), "[b]e honest[,]" "[b]e straightforward[,]" act in accordance with "the honor system[,]" and "it is that simple" (*id.*, at 85:14-20). *See also* RDN Supp. Dec., ¶¶ 4, 8, 22-24.

---

[3]    For ease of reference for the Court, Canal hyperlinked documents previously filed by Defendants in this matter, all of which are also appended to the GB Supp. Dec.

[4]    "RDN Tr. I" refers to the Day 1 deposition transcript of Robert De Niro taken on April 4, 2022, which is annexed to the GB Dec. as Ex. 91.

[5]    "RDN Tr. II" refers to the Day 2 deposition transcript of Robert De Niro taken on April 5, 2022, which is annexed to the GB Dec. as Ex. 92.

Ms. Robinson was fully aware of these expectations. GB Dec., Ex. 92, RDN Tr. II, at 265:16-19, 276:2–277:21. Her employment spanned 11 years and she ran Canal's office and supervised its handful of staff (RDN Dec., ¶ 6). GB Dec., Ex. 88, Kaplan, Tr., at 85:13-86:20; 98:18-23. *See also* RDN Supp. Dec., ¶¶ 2-3. This case largely focuses on the time period from 2017 through her resignation in April 2019.[6] Beginning in or around 2017, Ms. Robinson was permitted to work from her New York City apartment. RDN Supp. Dec., ¶ 7; GB Dec., Ex. 88, Kaplan Tr., at 421:17-25.

It is undeniable that there was no set work schedule, and evening and weekend work was not uncommon. She diminishes herself, notwithstanding her $300,000 annual salary, by contending that "[a] major part of [her] job was running errands for Mr. De Niro and Canal…." (P. Br., at p. 2). The diminutive reference is emblematic of how the motion warps, distorts and contorts facts into an alternate reality that Canal must refocus through objective evidence. For example, in her self-penned recommendation letter (GB Supp. Dec., Ex. 22, ECF #197-12) supporting her application to the London School of Economics, she depicted herself differently:

> So much of what Chase contributed to [Canal] was visible not only in her leadership and how she managed a team, but in her analytical abilities. Chase was able to identify areas of vulnerability and implement new systems not only for financial matters but in the areas of compliance and employee benefits. She also excelled at handling the production work for [Mr. De Niro's] films. Chase was instrumental in working closely with [his] lawyers and agents on deals and contracts. At times she negotiated directly with studios and producers and oversaw the budgets on [his] projects. In addition, Chase helped advise [him] on several of my other companies including a non-profit.

GB Supp. Dec., Ex. 22. (ECF #197-12). In campaigning for a change in title and a salary increase, she told Mr. De Niro that her job responsibilities ranged from "managing the office (oversight,

---

[6]     The Court should be mindful of this date range. Plaintiff's Brief often ignores it and wrongly creates the appearance that things were constant between 2008 and 2019.

finance, salaries/bonuses, HR, operational) to finance (cash flow in the office, personal & canal finances … budgets ….)[.]" *Id.* Ex. 23, ECF #197-9 (Plaintiff indicating that her title change to "VP, Production & Finance" was "…to reflect the work [she] d[id] for [Mr. De Niro]"). We use these and other examples to show how Ms. Robinson's perspective and motion papers do not reliably present, or represent, the evidence.

It is also important to recognize Canal is the Plaintiff here, and Robert De Niro has <u>never</u> sued Ms. Robinson. Her lawsuit against him (and Canal) is intended to draw attention away from Canal's claims, makes wild accusations, remote in time, that stand in stark contrast to her own written words. For example, she acknowledged in her deposition that she viewed Mr. De Niro as a father figure. GB Dec., Ex. 2, P. Tr. I., at 28:21–30:23. She gushed in a July 18, 2017, email to him: "You know how much I love my job and adore you." GB Supp. Dec., Ex. 24 (ECF #197-7). And in a surreptitiously recorded telephone call with her confidante, former Canal employee Robin Chambers ("Ms. Chambers"), she explained while referencing Mr. De Niro's girlfriend, Tiffany Chen: "…I'm just sad, Robin, is what I am. I just saw like this wonderful relationship that I have with Bob just being --…destroyed by this goddamn fucking, you know, psychotic bitch." GB Dec., Ex. 74. (ECF #322-74). Even after she resigned, Ms. Robinson recorded a call with Canal's attorney, Tom Harvey, saying: "I hope that Bob knows you, that, how much I loved working for him and how much I adore him, I mean I don't know you know if …."[7] GB Supp. Dec., Ex. 32.

---

[7]     As the Court is aware, Plaintiff claims the State Court Action was retaliatory. Canal and Mr. De Niro have moved for summary judgment on the retaliation claims, and Plaintiff's opposition is due at the same time as this brief is being filed. Pages 7 through 11 of Plaintiff's Brief include a narrative in her rendition of the facts that has no bearing on the merits of the Counterclaims, only the motivation for bringing them. This is addressed in Canal's motion for summary judgment and will be further discussed in its forthcoming reply supporting its motion.

Ms. Robinson's motion reads like an old-style ransom note, cutting and pasting sentence fragments from depositions, and snippets from documents, depriving them of context and then attributing conclusory self-servings meanings to them. For one example, in the context of Plaintiff's Netflix usage, the affirmative statement "Canal … knew that [Plaintiff] routinely put on Netflix at night when she went to sleep." P. Br., at p. 15 (citing ECF #307-53) is sourced and spun from a former employee's snarky text comment: "I'm pretty sure [Plaintiff] plays [Netflix] while she sleeps too." Similarly, a text by one of Canal's then-employees, Michael Kaplan ("Mr. Kaplan"), is said to be a "smoking gun" (P. Br., at p. 5). But at his deposition, Ms. Robinson's counsel chose *not to ask a single question about it*. In response to a question by Canal's counsel, he gave it context, explaining: "So if anything when a – when you are sending a text message – it is not always – it is taking some liberties to try to be amusing." GB Dec., Ex. 88, Kaplan Tr., at 464:4-465:10.[8] More importantly, as to the content, he explained he "wasn't privy to the like [*sic*] we are making a decision to file a suit". *Id.* at Tr., at 348:19-349:13. There also remains a question about whether this text is admissible, to be addressed in a motion *in limine*.

### The Undeniable Retention of Canal's Cash, Gift Cards and Physical Property

There is a glaring omission from the moving papers that ignores a completely undisputed set of facts that provide both a backdrop for Canal's lawsuit and a singular basis to deny Plaintiff's motion. On July 11, 2019, Tom Harvey ("Mr. Harvey") Canal's attorney, sent Ms. Robinson a letter demanding that she return Canal's SkyMiles, cash, gift cards and physical property (the "Harvey Letter"). GB Dec., Ex. 50. If she did not, the letter explained she would face legal action. *Id.* She kept everything, returned nothing, and Canal filed the State Court Action.

---

[8]     "Kaplan Tr." refers to the deposition transcript of Michael Kaplan, taken on March 23, 2022, a copy is annexed to the GB Dec. as Ex. 88.

Ms. Robinson never denied possession of, and never claimed rights to, the cash, gift cards or physical property, yet when asked at her deposition why she did not return them, she struggled to explain and invoked the attorney-client privilege. GB Dec., Ex. 2, P. Tr. I., at 306:2-307:25, 316:17–321:15. On November 5, 2021, more than two years after Canal commenced the State Court Action, Ms. Robinson surrendered $4,510 in cash; $19,425 in gift cards (GB Dec., Ex. 66), and a trove of property including cameras, phones, a safe with keys, a credit card, hard drive, four bankers boxes of receipts and hard copy files, along with other miscellaneous items (*id.*).[9] *See also* GB Dec., Ex. 2, P. Tr. I, at 305:24–308:2; 316:17-321:15. Nowhere are these undisputed facts mentioned in Ms. Robinson's motion papers.

As to the SkyMiles Ms. Robinson was on notice from a call she recorded between herself and Mr. Harvey on June 9, 2019, that Canal disputed her right to retain them. GB Dec., Ex. 85. She has yet to return those and is the architect of her own legal troubles.

For each instance Canal claims wrongdoing, Ms. Robinson's defense turns on a trier of fact believing her "Yes, I could," in the face of Canal's evidence: "No, you couldn't." The Court's role is not to decide who to believe. That is for a jury and why summary judgment is improper.

### **Canal's Specific Claims**

<u>Delta SkyMiles</u>

Delta "SkyMiles" were generated each time Ms. Robinson charged items to Canal's American Express ("Amex") card. Canal had two Amex cards. One was issued to Ms. Robinson and the other to Canal employee Mr. Kaplan. *See infra.* All "Amex" references in this brief are to Ms. Robinson's Amex, unless otherwise indicated.

---

[9]     On February 26, 2022, Defendants' counsel also coordinated with Plaintiff's counsel to pick up *two* of Canal's Apple laptops that Plaintiff had never returned. (GB Dec., ¶ 73).

Canal accuses Ms. Robinson of engaging in two acts of wrongdoing related to the SkyMiles. First, during the ten (10) weeks before resigning, she transferred 4,995,000 SkyMiles to her own personal account from Canal's, (GB Supp. Dec., Ex. 25, pp. 9-16) refused to return them after she resigned and has still not done so. RDN Supp. Dec., ¶¶ 19-21. These facts are undenied and undisputed by Ms. Robinson.

Second, in March 2018 she used 327,500 SkyMiles under false pretenses. GB Supp. Dec., Ex. 26, pp. 1, 2-5, 7-9, 12. Ms. Robinson denies this, claiming they were used in conjunction with business purposes. The details of the 2018 transfer are discussed below in Canal's explanation of the "Taxi Driver" book trip.

Plaintiff explains her conduct by saying she had "broad authorization to use Canal's SkyMiles at her discretion as a perk of her employment ...." (P. Br., at p. 3). There are three components here: (1) Was she permitted to take nearly 5 million SkyMiles while employed? (2) Was she permitted to keep them *after* she resigned? (3) Was she permitted to use 327,500 SkyMiles in 2018 for what turned out to be a weekend jaunt? Canal answers all three questions: "No."

Plaintiff made five (5) 999,000 transfers to her personal account in 2019: January 28, February 6, March 7, 12 and 18. GB Supp. Dec., Ex. 25, pp. 9-16. She resigned on April 6, keeping them all. She insists that her "broad authority" (P. Br., at p. 18) included her ability to use Canal's SkyMiles as she saw fit, including taking and keeping them when she resigned. Canal disputes this. At its Rule 30(b)(6) deposition, Canal explained: "So after [Berdon (Canal's accountants)] found out the miles were taken, we asked Mr. De Niro if he authorized that she take those miles, and he said, 'Absolutely not.'" GB Dec., Ex. 93, Tasch Tr., at 410–11. *See also* RDN Supp. Dec., ¶¶ 19-21. Her right to transfer and retain these SkyMiles is a disputed fact that precludes summary judgment.

On page 34 of her brief Ms. Robinson uses deposition fragments to create the false appearance that she could do whatever she pleased with Canal's SkyMiles; that they were essentially hers. She supports the notion that she had "broad authority" to use SkyMiles with *part* of an answer Mr. De Niro gave at his deposition: "Yes, well, whatever you need." Bennett Dec., Ex. 92, RDN Tr. II,[10] at 366:11. However, the full exchange shows the context, as well as Mr. De Niro's dispute about the extent of her authority:

> *One time* she asked me if she could put some mileage on. She said[,] 'Can I just tack some miles on for me when I need them?' I said 'Yes, well, whatever you need'. And then, lo and behold I see later and before she quit, she tacked on a couple million miles to her account. So can she explain that?"

*Id.,* RDN Tr. II, at 366:9–14 (emphasis added). Further deposition testimony drove the point home definitively:

> Q:     I'm asking you whether you there came a time after 2014, when you no longer required Ms. Robinson to run by you each individual flight she was purchasing with SkyMiles?
>
> A.     Well, if she's taking a trip she would have to run that by me. And if it is with SkyMiles, I have to kind of know what's going on.
>
> Q.     What do you mean you would have to kind of know? You told her you had to kind of know?
>
> A.     Yes, however you want to interpret kind of know. It is I want to know what's happening. *It is her obligation to explain to me that she's going to go here or there and how she is paying for it or how I'm paying for it.*

*Id.* RDN Tr. II, at 365:16-23 (emphasis added).

There is no evidence Ms. Robinson ever requested or received approval to perform five (5) serial transfers of SkyMiles in the first place, much less that she had permission to keep them after her employment ended. RDN Supp. Dec., ¶¶ 19-21, 25.

---

[10]     "RDN II Tr." refers to the Day 2 deposition transcript of Robert De Niro taken on April 5, 2022, a copy of which is annexed to the GB Dec. as Ex. 92.

At her deposition, Ms. Robinson admitted that she never discussed with Mr. De Niro whether she could retain any SkyMiles that remained in her account should her employment end. GB Dec., Ex. 2, P. Tr. I, at 297:21–298:3. Even her confidante, former Canal employee Robin Chambers ("Ms. Chambers") understood and tried to explain the difference to Ms. Robinson that an employee who leaves a job is not assumed to be able to keep an employer's property, equating this to the use of an employer's computer. When Ms. Chambers pointed this out to Plaintiff in a recorded phone call, Ms. Robinson became enraged and hung up on her. GB Supp. Dec., Ex. 27.

Ms. Robinson was aware as early as June 9, 2019, that Canal contested her right to the SkyMiles. GB Dec., Ex. 85. Also, in her email of June 11, 2019, she sought to retain them, and on July 11 was told in the Harvey Letter that if she did not return them legal action would follow. This all occurred weeks before her attorney surfaced on July 25. Drogin Dec.,[11] ¶ 3, and Ex. A.

She says she could. Canal says she couldn't. Factual disputes preclude summary judgment on the SkyMiles claim.

Taxi Driver Books

Arguably, one of Mr. De Niro's most significant roles was his portrayal of Travis Bickle in the 1976 film "Taxi Driver." In February 2018 Canal purchased several limited-edition books titled "Taxi Driver" that were going to be autographed by Mr. De Niro and others involved in the film, which were to be donated to charity or given as gifts. RDN Supp. Dec., ¶¶ 12-13.

By the end of February, the books had been autographed by individuals in New York and were to be flown to Los Angeles where additional autographs could be obtained. *Id.*, at ¶¶ 13-14. As a courtesy, a private carrier agreed to transport the books when they had a flight traveling to

---

[11]    "Drogin Dec." refers to the Declaration of Laurent S. Drogin, dated October 30, 2022 (ECF #314), with its corresponding Exhibit A (ECF #314-1).

Los Angeles. *Id.* at ¶ 14. There was no pressing deadline. *Id.*, at ¶¶ 12-15.

Ms. Robinson maintains Mr. De Niro "directed" her to go to Los Angeles to "scout" hotels for a future stay and she offered to accept delivery of the books as an "add-on" to the mission. Robinson Dec.,[12] at ¶ 4. This is demonstrably false, and the objective evidence emerges as a vignette of Ms. Robinson's deception and what Canal's case is about. RDN Supp. Dec., ¶¶ 16-17.

On March 5, Ms. Robinson booked herself round trip tickets to Los Angeles, scheduling herself to leave New York on Friday, March 9 and to return via a red eye on Monday night, March 13 (meaning she would be back in New York on March 14). GB Supp. Dec., Ex. 26, p. 11. On March 9, she changed her return flight, such that she would be leaving a day earlier, on the red eye departing on March 12. *Id.*, at p. 10. She used 327,500 of Canal's SkyMiles for these flights. *Id.*

While she says she was "directed" to "scout" hotels, there was no need for Mr. De Niro to make such a request (Robinson Dec., at ¶ 4), or for Ms. Robinson to do so. The usual hotel, the JW Marriott in Santa Monica, was already booked on March 8, as reflected in an email *sent by Ms. Robinson* on March 9 (discussing reservation dates for April). GB Supp. Dec., Ex. 28. *See also* GB Dec., Ex. 88, Kaplan Tr., at 484:20-485:16. RDN Supp. Dec., ¶¶ 16-17. No scouting trip was necessary. The hotel was booked, and Ms. Robinson knew that before she flew to Los Angeles.

As his deposition, Mr. Kaplan explained that "scouting hotels" like this is not something Canal employees had done and, more importantly, he and others were aware that the weekend coincided with the birthday of former Canal employee Amelia Brain ("Ms. Brain") (GB Dec., Ex. 86, SWB Tr., at 261:17-20) who lived in California. *See* GB Dec., Ex. 86, SWB Tr., at 232:14-18, 285:2-9; Ex. 88, Kaplan Tr., at 339:24–340:11. *See also* GB Supp. Dec., Exs. 18 and 20 (2017 and

---

[12]     "Robinson Dec." refers to the Declaration of Graham Chase Robinson, dated October 30, 2022 (ECF #286; ECF #308), and its Exhibits A-D (ECF #308-1, 308-2, 308-3, and 308-4).

2019 receipts showing Ms. Robinson sent birthday flowers to Ms. Brain, paid with Canal's Amex).

On March 8, 2018, just before leaving for LA, Ms. Robinson sent $249.09 of flowers to Ms. Marianna Shafran (GB Supp. Dec., Ex. 19), whose birthday also appears to be in March and who lived in California (*id*.). Ms. Shafran was a friend of Ms. Robinson's, who was a former employee of Mr. De Niro's publicist, and with whom Ms. Robinson had travelled socially to London. GB Dec., Ex. 3, P. Tr. II, at 233–234. The flowers were charged by Ms. Robinson to her Canal Amex. GB Dec., Ex. 86, SWB Tr., at 262:12–25.

Ms. Robinson flew to Los Angeles as scheduled on Friday, March 9. Rather than staying at the JW Marriott for "scouting" purposes (RDN Supp. Dec., ¶ 16), she booked herself three nights at the Montage Hotel in Beverly Hills, for $2,608.86 and rented a BMW SUV for $729.28. GB Supp. Dec., Exs. 29, at 6 ($729.28), 30. Both were charged on Canal's Amex. *Id*., Ex. 31, at 17 ($2,608.86). *See also* GB Dec., Ex. 92, RDN Tr. II, at 281:12–19 ("I later learned that [Plaintiff] was charging Ubers … even in LA. That was not something she ever brought up and asked my approval for. She also had rented a car when she was in LA, but also using Ubers, I was told. That was not appropriate. That was not right. That was not ethical. Period.").

Upon arrival on March 9, Ms. Robinson dined at Nobu in Los Angeles (perhaps celebrating Ms. Brain and Ms. Shafran's birthdays), charging Canal's Amex $604.51. GB Supp. Dec., Ex. 31, at 16 ($604.51). For that same day, her "contemporaneous time records" (discussed below) say she worked 14 hours, including *13.5 hours straight* from 9:00 a.m. to 10:30 p.m. Robinson Dec., Ex. A, at p. 13. Presumably this "working time" included her flight, and dinner at Nobu. (GB Dec., Ex. 88, Kaplan Tr., at 117:12-15). *See also* GB Dec., Ex. 86, SWB Tr., at 285:2-9 (noting how it was later discovered that Chase took Ms. Brain to Nobu around the time of her birthday); *Id*., Ex. 92, RDN Tr. II., at 282:6-17 ("It was a supposed work trip, though I later learned that it was not a

work trip really…" "she was going to a birthday of somebody who also worked for me."). *See also* GB Dec., Ex. 88, Kaplan Tr., at 342:21-343:19 (describing his conversations with Ms. Brain about meals at Nobu and the rental car on that weekend).

The Taxi Driver books were scheduled to arrive on Monday, March 12 around 2:30 p.m. GB Supp. Dec., Ex. 33. But Ms. Robinson's return flight, Delta 1362, *id.,* at Ex. 26, at p. 9, was scheduled to depart at 11:55 p.m.[13]  If the books were arriving at 6:30 p.m. and Ms. Robinson was departing on the red-eye, five hours later, one is left to wonder what she intended to do with them and, for that matter, since she already knew her 11:55 p.m. departure time and their 6:30 p.m. arrival time on March 9, why she involved herself at all. In other words, Ms. Robinson knew on March 9 that the books would not be arriving in California until 6:30 p.m. on March 12, and she was scheduled to fly back to New York that same evening.

One might assume since Ms. Robinson was scheduled to fly back to New York on March 12, she might have completed any "scouting" assignment on March 10 or 11. But that was not the case. Nothing in the record gives any indication she ever left Beverly Hills or set foot in any hotel other than the Montage.

This turned out not to matter as Ms. Robinson left California a day early, on March 11, and it does not appear she canceled the third night she had booked at the Montage. She claims Mr. De Niro "authorized [her] to return to New York that day [March 11] even though it meant [she] would not be able to complete the projects that [she] anticipated completing while in Los Angeles." Robinson Dec., at ¶ 4. This was supposedly because on March 11 she learned "that a snowstorm was expected to hit New York on March 12." *Id.*

---

[13]     https://www.transtats.bts.gov/ontime/departures.aspx (U.S., Dept. of Transportation, Bureau of Transportation Statistics) (visited on November 17, 2022).

No snowstorm was expected for March 12. The storm was expected on March 13. This is reflected in an email Ms. Robinson received from American Airlines on March 11 relating to Mr. De Niro's flight (on American Airlines) from New York to Los Angeles. GB Supp. Dec., Ex. 34; RDN Supp. Dec., ¶ 18. Ms. Robinson changed her reservation and flew back on to New York on the March 11 red eye (a day early), having completed nothing work-related in Los Angeles. Before leaving LA that evening, she charged another $156.05 at Nobu. RDN Supp. Dec., ¶ 17. Between March 9 and March 12, more than $200 was charged to her Canal Amex for Ubers. GB Dec., Ex. 31.

<u>Unused Vacation Days</u>

There is no dispute Ms. Robinson was entitled to paid vacation time each year. However, no policy entitled Canal employees to be paid for so-called "unused" vacation. That is, until Ms. Robinson unilaterally instituted one for herself and Mr. Kaplan. GB Dec., Ex. 88, Kaplan Tr., at 185:6-12; 188:16-21. *See* GB Dec., Ex. 93, Tasch Tr., at 373. As Mr. Kaplan explained, this was essentially a bonus or "bump" at year-end, governed by the "honor system" in that you said how many unused days you had, and you were paid for them. GB Dec., Ex. 88, Kaplan Tr., at 185:6-12; 188:16-21; 444:6-445:21.

The record reflects that at year-end Ms. Robinson would inform Mr. De Niro how many vacation days she had not used, and she would be paid for those days. The problem is that her representations were false as she equated *any* work performed on vacation as negating it as a vacation day. Hence, a phone call made or taken, or an email read or responded to meant, to her, that she was not on vacation. Likewise, without regard to being asked or expected to do any work, it appears she could just decide to do something work-related—in Hawaii for example—and voila, it was no longer vacation. There is a dispute as to what amount of "work" performed on vacation

13

would entitle Ms. Robinson to seek additional pay for that day; and, in fact, whether she accurately reported her working time. It must also be remembered that as an exempt employee Ms. Robinson was being paid for the day. She would receive her salary without regard to whether she worked or not. This additional payment would have been over and above her salary.

The deposition testimony excerpted in the moving papers sheds no light whatsoever on how much "work" entitled her to regard the day as a "non-vacation" day. But Canal employee Sabrina Weeks-Brittan, who did not benefit from this policy, understood the common-sense approach expected by Mr. De Niro: "[] I occasionally respond to E-mails when I am on vacation as well but it's still a vacation day for me, and I don't seek reimbursement for it. I'm just doing my job." GB Dec., Ex. 86, SWB Tr., at 207:7-10. *See also* GB Dec., Ex. 88, Kaplan, Tr., 452:10-454:4 (describing the lack of clarity).

Nor can Plaintiff profit from faulting Canal for not producing "accurate payroll records of its employees' hours … substantiating its claims about when Ms. Robinson was on vacation…." (P. Br., at p. 32). First, Ms. Robinson was responsible for handling payroll matters. GB Dec., Ex. 2, P. Tr. I,[14] at 250:11-21, Ex. 3, P. Tr. II,[15] at 64:23-65:13, 72:10-73:10, 84:22-88:10. *See also* GB Dec. Ex. 84, (ECF #322-84). Second, as an exempt employee, Canal was not required to maintain a record of her hours. N.Y. Lab. L. § 195(3), (4).

In her motion papers, Mr. De Niro's deposition testimony is surgically excised to create the illusion that he had knowledge of how Ms. Robinson was determining whether a vacation day was "used" or not. Discovery bears out her dishonesty.

---

[14]     "P. Tr. I" refers to the deposition transcript from Day 1 of Plaintiff's deposition, taken on December 20, 2021, a copy of which is annexed to the GB Dec as Ex. 2.

[15]     "P. Tr. II" refers to the deposition transcript from Day 2 of Plaintiff's deposition, taken on February 9, 2022, a copy of which is annexed to the GB Dec as Ex. 3.

In Ms. Robinson's December 12, 2016, email she claims to have taken "0 of 19 Days" associated with her "Vacation Day Payback." (ECF #322-57, at p. 6). Based on this representation, she was paid for 19 "unused" days for 2016. *Id.*

Ms. Robinson's time records (discussed below) reflect that *while on holiday in London and Lisbon* between Monday, December 26 and Friday, December 30, 2016, she "worked" a total of two hours (one hour each on December 26 and December 29). Robinson Dec., Ex. C, p. 22. And by her own admission—her time records—she did no work while on vacation on December 27, 28, or 30. *Id.*

On December 12 she emailed Mr. De Niro she had used no vacation time and was paid for 19 days. But during the last week of December, she used five vacation days. For 2017 Ms. Robinson claims to have used zero of 20 vacation days, meaning she cannot say she deducted her December 2016 vacation from her 2017 allotment.

The time records identify other dates in 2016 where Ms. Robinson shows them as vacation/holiday. For example, October 16 (1 hour of work while on vacation in LA); and October 17 (vacation in LA and 1.5 hours of "calls throughout the day"). Robinson Dec., Ex. C, p. 12-13. Similarly, 30 minutes tending to emails while on holiday in Madrid on November 24. *Id.*, at p. 18. These are three more examples showing how she falsely claimed to have "never" used a vacation day in 2016, bringing the total to 8 days of paid vacation from October 16 to December 31 alone.

If you count the number of days (excluding weekends) that Ms. Robinson self-identifies as either vacation or holiday, between September 1 and December 31, 2016, the number is 22 (*id.*, at pp. 5-22). In other words, Ms. Robinson self-reported 22 vacation days in the last 4 months of 2016 alone, claims to have done some work on 19 of them, but was paid as though she took not a single day. *Id.*, at pp. 7-24. *See also* GB Dec., Ex. 86, SWB Tr., at 86:2-11 ("she claimed she used

zero vacation days during the year and got reimbursed for those when I have a bunch of E-mails with Chase or Chase to Bob E-mails requesting vacation days"). Ms. Robinson did not produce time records for the earlier part of 2016, so we are unable to provide computations for the first 8 months of the year. Similar fudging accounts for additional vacation days taken by Ms. Robinson in other years, and which were misrepresented to Mr. De Niro so she could secure payment.

<u>Netflix Usage</u>

Nowhere in her motion does Ms. Robinson deny that she was actively using Canal's Netflix account between September 2017 (when the records begin) and her April 2019 resignation. If Ms. Robinson is going to depict herself as being subject to grueling hours, with no time off, always on call, then circumstantially and in connection with the other evidence in this case, a jury can conclude she could not have been faithfully performing her duties on those days when those excessive hours were coupled with extensive Netflix usage and meal expenses. There were simply too few hours in the day.

Only she and Mr. Kaplan used Canal's Netflix account (GB Dec., Ex. 88, Kaplan Tr., at 318:5-12), which, as he explained, was used by his minor children from time to time as they viewed age-appropriate programming. *Id.*, Kaplan Tr., at 19:17-23; 319:9-321:12; 322:8-324:2. There is no evidence anyone else ever used this account, and the fact is that the employee with oversight to ensure there was no abuse was Ms. Robinson.  At her deposition, Ms. Weeks-Brittan explained she was unaware there was a Canal Netflix account, that this was a quiet office and Netflix was never on in the background. GB Dec., Ex. 86, SWB Tr., at 101:9-16; 177:1-4.

For Ms. Robinson to say Mr. De Niro "simply did not care" (P. Br., p. 15 (citing ECF #307-2)), about Netflix usage assumes incorrectly that he had knowledge of the abuse. The gist of Ms. Robinson's defense seems to be that Canal cannot prove that her viewing occurred "*during*

*working hours*" (P. Br., at p. 15 (emphasis in original)), it took place "outside of Canal's *business* hours" and she "routinely put on Netflix at night when she went to sleep" (*Id*., at p. 15). (ECF # 307-53, at p. 2).

Mr. Kaplan testified about one occasion when he went to Ms. Robinson's apartment during the day and recalled she had "30 Rock" on Netflix. GB Dec., Ex. 88, Kaplan Tr., at 329:6-330:6. If this happened to be Wednesday, September 27, 2017, on that day 19 episodes of 30 Rock were accessed, and Ms. Robinson claims to have worked 14 hours. GB Supp. Dec., Ex. 38, at p. 32 (Netflix log); Robinson Dec., Ex. B, p. 14.

The circumstantial evidence also suggests otherwise.  As explained by Mr. Kaplan, (GB Dec., Ex. 88, Kaplan, 328:8-329:12), and as the Court can take judicial notice, Netflix prompts a viewer to confirm they are still watching "[a]fter watching 3 episodes of a TV show in a row without using any video player controls, or [a]fter 90 minutes of uninterrupted watching."[16] Netflix is part and evidence of the systemic abuses that permeated Ms. Robinson's employment.

Her counsel's statistical "analysis" of the Netflix viewing data is misleading, pointless and probative of nothing. To say that Netflix playback time was "on average approximately 55 minutes per day" on days Canal's office was open, and that "82% … occurred outside business hours" (Schaitkin Dec.,[17] at ¶ 4), has no bearing on an employee who claims to work well beyond business hours and without regard to whether the office was open.[18]

---

[16] https://help.netflix.com/en/node/114059#:~:text=Netflix%20asks%2C%20%22Are%20you%20still,90%20minutes%20of%20uninterrupted%20watching

[17]     The "Schaitkin Declaration" or "Schaitkin Dec." refers to the Declaration of Simon Shaitkin, dated October 30, 2022, filed in support of Plaintiff's motion for summary judgment (ECF #309).

[18]     Nothing in the record supports Ms. Robinson's assertion that "Canal simply added together all Netflix viewing, including on weekends and after hours…." P. Br., at p. 3. There is no such tabulation.

Averages also do not account for binging. For example, on Wednesday, November 7, 2018, Ms. Robinson says she worked from 8:30 a.m. to 8:00 p.m., the same day 28 episodes of Arrested Development were accessed. If you assume the 22-minute episodes[19] were on back-to-back for over 10 hours (with the "prompt" feature turned off), they would have ended at 6:00 a.m. the next morning, a day Ms. Robinson's claims she began work at 7:00 a.m. Robinson Dec., Ex. A, at p. 51.

This lawsuit is not about an employee who occasionally watched Netflix. It is about a management employee who misstated working hours and activities, took property and improperly charged meals to her employer. Netflix is part of a story as it is part of an overall picture.

Plaintiff accompanied her motion with a ream of what she describes as "contemporaneous time records" (Robinson Dec., at ¶ 3). To the extent Plaintiff includes them to show she worked on various things, that is not disputed. But if they are submitted for accuracy, they are hotly disputed. The daily entries are exceptionally vague, and "block billed." *See generally* Robinson Dec., Exs. A, B, C, D. They begin and end on either the hour or half hour, making it impossible to tell the actual amount of time spent on the task(s) depicted (*id*.). One cannot tell what she did, or how long she did it. For example, an entry might indicate work was done from 9:00 a.m. until 9:00 p.m. and be supported with only general remarks such as "Emails," "Phones," "Time Sheets," "Amex," "Office items," and "Files" (*see, e.g., id*., at Exs. A, B, C, D).

In some entries, Plaintiff notes "Call with RC" (former Canal employee Robin Chambers) (*see, e.g., id*., Ex. A). Some dates align with the surreptitious recordings made by Plaintiff. This is evidence Plaintiff is treating as working time her calls with Ms. Chambers on topics including her personal life, dislike of Tiffany Chen, ponderings about Mr. De Niro and general "water cooler"

---

[19]     https://en.wikipedia.org/wiki/Arrested_Development

chat. None of this was work, yet she regarded it as such, permitting a juror to conclude that the time records are not only inaccurate as to the number of hours worked, but also evidence that Plaintiff was not working during these times. Comparing the time records, the length of the audio calls, the Netflix viewing, and meal charges, paints an even clearer picture of the abuse.

This table shows some extreme examples of the hours Plaintiff claims to have worked on a particular day, the corresponding Netflix usage, and the amount charged at Paola's (**P**) restaurant or Whole Foods (**W**). "RC 1:38" corresponds to the one our thirty-eight-minute recorded phone call with Ms. Chambers.

| **Day** | **Date** | **Claimed Hrs.** | **No. Episodes** | **Show(s)** | **Meals** |
|---|---|---|---|---|---|
| MON | 1/8/18 | 13.00 | 38 | Frasier | - |
| TUE | 1/9/18 | 11.00 | 34 | Frasier | 29.84 (W) |
| WED | 1/10/18 | 13.00 | 20 | Frasier | - |
| FRI | 1/12/18 | 8.50 | 27 | Frasier | - |
| WED | 1/31/18 | 12.50 | 29 | 21 x The Office; 4 x Kimmy Schmidt; 4 x Cosmos | 76.99 (W) |
| FRI | 8/2/18 | 13.00 | 11 | Death in Paradise | 48.10 (P) |
| TUE | 8/14/18 | 13.00 | 26 | 25 x Shameless; 1 x Death in Paradise | 65.50 (P) |
| TUE | 8/21/18 | 13.00 | 11 | Death in Paradise | - |
| MON | 10/22/18 | 14.00 | 14 | Arrested Development | 52.70 (P) |
| WED | 11/7/18 | 11.50 | 28 | Arrested Development | 85.10 (P) |
| WED | 1/9/19 | 11.00 | 14 | Friends | 68.80 (P) |
| FRI | 1/11/19 | 10.50 | 19 | Friends | 98.24 (P) |
| SAT | 1/12/19 | 0.00 | 32 | Friends | 69.93 (W) |
| SUN | 1/13/19 | 3.00 | 9 | Friends | 66.20 (P) |
| MON | 1/14/19 | 10.00 | 27 | Friends | 50.36 (W) |
| TUE | 1/15/19 | 10.00 | 15 | Friends | 98.20 (P) |
| SUN | 3/24/19 | 2.00 | 9 | 6 x Arrested Development; 3 x Schitt's Creek | 50.25 (W) |
| MON | 3/25/19 | 15.50 | 6 | Arrested Development | 131.94 (P) |
| TUE | 3/26/19 | 15.50 | 16 | 14 x Arrested Development; 2 x Schitt's Creek | 70.97 (P) |
| THU | 3/28/19 | 13.00 | 8 | 6 x Schitt's Creek; 2 x A Series of Unfortunate Events | **RC 1:38** |

The table was prepared by taking the claimed hours from Ms. Robinson's time records and matching them to the corresponding dates on the Netflix viewing logs, and the list of charges on her Amex card for Whole Foods and Paola's. *See generally* GB Supp. Dec., Exs. 31, 37, 38.

19

The table shows examples of several distinct types of abuses:

- Excessive Netflix usage on workdays where a large number of working hours are claimed and meals were charged (January 9 and 31, 2018) (August 14, 2018, and January 14, 2019).
- Weekend work for little or no time, Netflix usage and meals charged (January 11 and 12, 2019) (March 24, 2019).
- March 28, 2019 reflects 8 episodes of Netflix on a day where Ms. Robinson claims to have worked 13 hours, however, an audio recording (ECF #322-77) indicates that she spent 1 hour and 38 minutes recording her conversation with Ms. Chambers, claiming it as working time. As that call is recorded, it is obvious Netflix is not audibly playing in the background. In fact, streaming content is never heard on any of the recorded calls.

Spending

Ms. Robinson writes: "Canal alleges that every single charge on a shared corporate credit card for Paola's … Whole Foods, and Dean & Deluca was improper spending by Ms. Robinson. P. Br., at p. 2. *See id.* at 12-13 (same). That is untrue and, again, the evidence is misrepresented.

Canal's office used two American Express cards. GB Dec., Ex. 88, Kaplan Tr., at 67:6-68:12. One was issued to Mr. Kaplan, to be used for Mr. De Niro's personal expenses, and the other, bearing Ms. Robinson's name, was supposed to be used for business expenses. *Id.*, at 67:6-68:24. Michael Tasch ("Mr. Tasch") was the partner at Canal's accounting firm, Berdon, LLP ("Berdon"). As he explained at his deposition: "Chase and I had had a conversation that she thought it would be easier if we kept the business on one card and the personal on the other so when we book the expenses it would be easier for us." GB Dec., Ex. 93, Tasch Tr.,[20] at 106.

This way, if an item was charged on Ms. Robinson's card it was to be viewed as a business expense she placed there. GB Dec., Ex. 88, Kaplan Tr., at 67:14-70:14. Some exceptions existed, such as office lunches ordered from caviar.com (a delivery website) and Canal has not claimed

---

[20]    "Tasch Tr." refers to deposition transcript of Michael Tasch, held on April 7, 2022, a copy is annexed to the GB Dec. as Ex. 93.

and is not claiming that those charges were improper. In fact, Ms. Robinson wrongly claims that all charges on the card were indiscriminately viewed as being improper. However, Ms. Robinson kept possession of the American Express card, and most charges were hers, and by her. GB Dec., Ex. 86, SWB Tr.,[21] at 136-141. Other employees did noy use the American Express card. They would spend their own money and be reimbursed for petty cash. GB Dec., Ex. 88, Kaplan Tr., at 69:19-70:14. Logically, this made it easy to narrow things down, as employees would not charge items like Ubers to Ms. Robinson's card.

In ascertaining improper transportation charges, Ms. Weeks-Brittan, a Canal employee, was instructed to "[f]lag Ubers that Chase took and car services that Chase took, aside from what she paid herself back for on petty cash, which were the ones that were going to and from the office." GB Dec., Ex. 86, SWB Tr., at 236:18-25. *See also, id.*, SWB Tr., at 239:18-240:13 (explaining Mr. De Niro did not use Uber, Ms. Robinson was reimbursed for Ubers she took if she commuted to or from her home and office, thus, identifying other Uber charges as excessive).

The very clear office policy was that when an employee was working in the office, lunch could be ordered, and Canal would pay for it. *Id.*, at 121-122. Canal paid for lunch when they were in the office (*id.*, SWB Tr., at 126-128). Canal paid for such "working lunches" based on the assumption that the employee(s) would be at their desk working. *Id.*, at 276: 10-19. *See also* RDN Supp. Dec., ¶ 9. GB Dec., Ex. 88, Kaplan Tr., 67:6-25. There is no evidence such policy extended to employees who worked from and ate lunch at *home*. RDN Supp. Dec., ¶ 10.

Lunches were usually charged to caviar.com. *Id.*, Kaplan Tr., at 67:6-25. Ms. Robinson did not abide by this rule. Instead, it appears that since beginning in 2017 when she was permitted

---

[21]     "SWB Tr." refers to the transcript of the deposition of Sabrina Weeks-Brittan, held on January 10, 2022, a copy is annexed to the GB Dec. as Ex. 86.

to work from home, she just charged Canal for her meals whenever she chose. RDN Supp. Dec., ¶ 7-8. Canal has not claimed that any of the caviar.com charges were improper. Rather its claims focus on charges to Dean & DeLuca, Whole Foods, and Paola's—a restaurant near Ms. Robinson's home on Park Avenue. No policy existed permitting employees to charge Canal for dinners, absent rare exception. GB Dec., Ex. 86, SWB Tr., at 128:5–19:22, 168:9-14, 225:14–227; Ex. 88, Kaplan Tr., at 98:22–99:15; 108:4–109:25. *See also* RDN Supp. Dec., ¶¶ 7-10.

When asked about why the Dean & Deluca and Whole Foods charges on Ms. Robinson's Amex were viewed as improper, Ms. Week-Brittan explained: "We don't buy Bob's groceries. He has home staff. So that seems like a fair assumption." GB Dec., Ex. 86, SWB Tr., at 222:16-24; *See also id.*, SWB Tr., at 224:1-5. In reviewing the charges, she excluded days Ms. Robinson ordered from caviar.com, explaining "if she ate lunch on Caviar, then she shouldn't double charge for another meal." *Id.*, at 229:7–220:11.

She also explained that if Mr. De Niro dined at Paola's, he would use his own credit card. *Id.*, at 227:6-8. Where there is a charge to Paola's on Ms. Robinson's credit card, this is circumstantial evidence that she was charging meals for herself. Her American Express card shows 90 charges to Paola's between May 2017 and April 2019, amounting to $12,696.65. Likewise, $8,923.20 was charged to Dean & DeLuca and Whole Foods on Ms. Robinson's Amex. Notably, these were only Amex charges. As Mr. Kaplan explained, Ms. Robinson would also submit meal receipts for which she was reimbursed in cash. GB Dec., Ex. 88, Kaplan Tr., at 106:3-23.

Mr. De Niro explained at his deposition he expected employees would take public transportation when logical to do so, and they did. Except Ms. Robinson apparently never saw the need to take the subway and charged $31,814.17 in Ubers/taxis and $5,513.05 in car service on her Amex card. This is not to say that every charge was improper. It is, however, to say that these

excessive charges, both in frequency and amount, reflect systemic abuse by an employee, who exploited and exceeded the bounds of her authority. GB Dec., Ex. 86, SWB Tr., at 224–27.

**<u>Authorization, Ratification and Consent</u>**

Much of Plaintiff's motion is dedicated to disputing Canal's claims that she was not authorized to act as she did. She tries to do so by claiming "yes I was," and offers to prove it by blaming others for not catching her, and deliberately misstating how Canal gathered and interpreted its evidence against her.

<u>Ms. Robinson completely lies about the role of Canal's accountants</u>

Ms. Robinson uses carefully pruned deposition excerpts to imply that Canal's accountants performed an oversight role charged with sniffing out and investigating wrongdoing. The record does not support that narrative because it is factually false. Ms. Robinson was responsible for oversight, in terms of aggregating Canal's expenses and presenting them to the accountants. She spoke of her oversight role in advocating for her change of title, by identifying her duties and responsibilities as including "oversight" and "personal & canal finances" and she "insured [sic] nothing is overlooked. GB Supp. Dec., Ex. 23, ECF #197-9. It was she who had the role of properly categorizing these charges for the accountants. Thus, the accountants we not tasked with verifying every independent charge authorized by Ms. Robinson. That was her job.

On page 6 of Plaintiff's Brief, Ms. Robinson asserts that Canal's accountants, Berdon, LLP:

provided "checks and balances," meaning "if they sense something that is out of whack or improper, they'[d] draw [Mr. De Niro's] attention to it" and that they were "responsible for contemporaneously reviewing Canal's expenditures and paying Canal's bills, including the credit card bills. Before paying the bills, Canal's accountants would timely raise any questions that arose about any particular expense.

P. Br., at p. 6. This is false and another example about how Plaintiff misstates the record.

Plaintiff claims that Berdon provided "checks and balances" a term Mr. Tasch (the Berdon

partner handling Canal) testified he never heard used by Mr. De Niro. GB Dec., Ex. 93, Tasch Tr., at 71-73. While Mr. De Niro used the phrase his deposition (GB Dec., Ex. 92, RDN Tr. II, at 377:3-10), Mr. Tasch explained he did not understand the context of Mr. De Niro's answer. GB Dec., Ex. 93, Tasch Tr., at 72. Thus, Mr. De Niro used a phrase unfamiliar to Mr. Tasch out of context, yet in her motion Plaintiff melds the testimony into an unsupported affirmative statement.

Literary license is liberally used to conform Mr. Tasch's actual testimony to fit unsupported sweeping statements. For example, Plaintiff maintains "the undisputed evidence establishes that throughout Ms. Robinson's employment, Canal's accountants contemporaneously reviewed all of the spending at issue." P. Br., p. 11. But the cited portions of Mr. Tasch's testimony says only that: Berdon pays some of Canal's bills; would generally review the bills before they were paid; and as to what "review" meant:

> We would look at the bill to see if it added up to what the total would be. If need be, if we   had any questions, we would ask questions on it.  But generally, when the bills came in, we just made sure they added up correctly, it was a timely bill, and we paid it.

GB Dec., Ex. 93, Tasch Tr., at 66-67, 111-112. *See also id.* at 115 (they never got receipts, only bills). This is a far cry from being "undisputed evidence" that Berdon "reviewed all of the spending at issue." P. Br., p. 11.

Omitted from Plaintiff's Brief is the explanation that Berdon's role was not oversight or to make sure Ms. Robinson—who had processed the bills for Berdon by identifying business expenses—had been done in a manner where Ms. Robinson was passing along expenses that she was not supposed to be incurring. Said differently, Berdon relied on Ms. Robinson to present them with invoices that she had vetted for accuracy.

### Mischaracterizations About Canal's Investigation

Ms. Robinson also faults Canal for its pre-litigation investigation into her wrongdoing,

insinuating that any charge on Canal's Amex was attributed to her and assumed to be a misuse of the card. This is incorrect, as described *supra*.

More fundamentally, Ms. Robinson suggests that Canal's investigation began close in time to when the State Court Action was filed, creating an appearance of temporal proximity to support her retaliation claims. Documentary evidence, together with Mr. Kaplan's testimony, demonstrates that as early as early as April 13—one week after Ms. Robinson quit—Mr. De Niro was "on a war path for all incriminating shit" on Ms. Robinson (GB Dec., Ex. 88, Kaplan, 281:19-284:21 (addressing the kind of information Canal was seeking just after Ms. Robinson quit)). *See also id,* Kaplan Tr., at 290:6-292:11 (explaining the context of what was being done with the information that had been surfacing about Ms. Robinson's pre-resignation behavior that, he explained, was some "crazy shit" that made her look bad; not that they had been instructed to dig up such information). C*f.* P. Br., at p. 11 (citing Ex. 32) *with* GB Dec., Ex. 88, Kaplan Tr., at 296:13-297:7 (describing himself, Ms. Weeks-Brittan, and Canal employee Gillian Spear as "three idiots sitting in front of a computer" who were successfully gathering evidence). *See also id*., Kaplan Tr., at 486:10-488:15 (explaining the investigation: "[I]t started…in the weeks leading up to her resignation looking into certain things, and it accelerated after she resigned.").

At her deposition, Ms. Weeks-Brittan explained the methodology utilized to distinguish charges on Plaintiff's Amex card that were legitimate from those that appeared to be improper. GB Dec., Ex. 86, SWB Tr., at 172:18-179:19, 192:7-238:7. This analysis is also clearly visible on the color-coded markings on the documents that were analyzed, and which Plaintiff conveniently makes no mention of in her motion. GB Supp. Dec., Ex. 37.

In some instances, however, it was clear because the charges would only have been made by Plaintiff for herself. For example, Ms. Robinson chides Canal for adding up all the Uber/taxi

charges for the period in question, totaling $31,814.17, and $5,513.05 for car service. GB Supp. Dec., Ex. 36. *See also* GB Dec., Ex. 86, SWB Tr., at 238:12-239:7, 240:6-13. Any suggestion that someone "else" might have used the Amex for an Uber charge was easily ruled out, as Ms. Robinson was the only person whose card was charged. When other employees used Uber, they paid for it themselves and were reimbursed through petty cash. GB Dec., Ex. 86, SWB Tr., at 243:4-18. Other employees routinely took the subway, making it easier to identify with certainty which charges were Ms. Robinson's. GB Dec., Ex. 88, Kaplan Tr., at 171:12-176:20; 183:17-184:6.

Similarly, the Paola's charges were attributed to Ms. Robinson because the office did not order meals from there, it is near Ms. Robinson's apartment and when Mr. De Niro dined there, he used his own Amex card. GB Dec., Ex. 86, SWB Tr., at 227:6-9. RDN Supp. Dec., ¶ 11. Ms. Weeks-Brittan explained how, in determining which charges were improper she cross-referenced the charges with the dates Mr. De Niro ate there. *Id*., at 245:3-10. These were Ms. Robinson's meals, paid for by Canal under a policy she implemented to benefit herself. *Id*., at 22:21-23:8, 122:8-21.

The Whole Foods and Dean & DeLuca charges were also attributed to her because the office did not order food from there, and Mr. De Niro had a house staff who did grocery shopping for him. GB Dec., Ex. 86, SWB Tr., at 222:16-24.

On page 11 of Plaintiff's Brief, she fudges Mr. Tasch's deposition testimony *Cf*. P. Br., p. 11 *with* GB Dec., Ex. 93, Tasch Tr., at 46-48. The insinuation is that Berdon conducted the investigation for Canal and "absolutely [did] not" conclude that Ms. Robinson had engaged in any wrongdoing. Berdon was never tasked with making such determinations. *Id*., Tasch Tr., at 50-67 (scope of services Berdon performs). Extensive testimony was given over hours of deposition

testimony by Ms. Weeks-Brittan, Mr. Kaplan and Ms. Chambers, as to how Canal went about determining the extent and amount of Ms. Robinson's wrongdoing.

In short, Canal employees who were familiar with its procedures gathered evidence and turned them over to Mr. Harvey.

## ARGUMENT

**I.   CANAL'S FAITHLESS SERVANT CLAIM IS ENTIRELY PROPER BASED ON PLAINTIFF'S THEFT OF PROPERTY AND TIME, AND HER ABUSE OF HER POSITION, PRIVILEGE, AUTHORITY, AND DISCRETION**

Plaintiff suggests that Canal is unable to maintain its faithless servant claim against her, essentially because her misdeeds do not squarely align with their selected caselaw. They are mistaken. The faithless servant doctrine was recently and extensively examined by the Second Circuit in *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 242 (2d Cir. 2020). There, the Court noted the two standards, articulated in *Turner v. Kouwenhoven,* 100 N.Y. 115, 120 (1885) (and its progeny) and *Murray v. Beard,* 102 N.Y. 505, 508 (1886) (and its progeny). Both remain viable and applied, perhaps inconsistently by courts, leaving open the question of which standard is correct. Neither *Yukos* nor the Second Circuit's decision in *Phansalkar v. Andersen Weinroth & Co. L.P.*, 344 F.3d 184 (2d Cir. 2003), resolves the question.

As the *Yukos* court explained: "The distinction between the two regards whether a servant's breach of fiduciary duty must be 'substantial.'" *Yukos*, 977 F.3d at 237.  Under the *Turner* standard, which appears to be the more popular and accepted approach, courts "have found disloyalty not be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Phansalkar*, 344 F.3d at 201-02 (citing *Turner*, 100 N.Y. 115, 120). Here, the allegations of wrongdoing span years and multiple acts, and a genuine issue of material fact exists as to whether Canal, either through Mr. De Niro or its agents, "knew of and tolerated

the behavior."

Likewise, the conduct must "permeate[] the employee's service in its most material and substantial part." *Phansalkar*, 344 F.3d at 201. The *Murray* standard is more lenient, requiring only "that misconduct by an employee…rises to the level of a breach of the duty of loyalty or good faith is sufficient to warrant forfeiture." *Yukos*, 977 F.3d at 237 (quoting *Murray*, 102 N.Y. at 508). This is an offshoot of the concept that an employee is "required to make truthful and complete disclosures to those to whom a fiduciary duty is owed" (PJI 3:59; *see* Restatement [Third] of Agency § 8.11). False statements, such as those relating to hours worked and unused vacation days contravene this obligation.

*None* of the cases cited by Plaintiff reject application of the faithless servant doctrine under circumstances such as this, where an employee so frequently and extensively exceeds the bounds of their authority. The cases included on pages 22 and 23 of Plaintiff's Brief are factually dissimilar and readily distinguishable from the facts and circumstances underlying Canal's claim. *See, e.g.,* P's Br., at pp. 22-23 (citing *Doe v. Solera Cap. LLC*, 18-cv-1769, 2019 WL 1437520, at *10 (S.D.N.Y. Mar. 31, 2019) ("the improper use of the firm's credit card for a *total* of $ 224.20, and the alleged snooping of admittedly sensitive information, cannot be said to rise to the level of substantial disloyalty that was present where courts have found a violation of the doctrine.") (emphasis added)[22]; *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447 (S.D.N.Y. 2008) (proposed counterclaims based on sexual harassment and misuse of a customer's credit card were described by the court as "small beer," and noted "[n]or can it be ... that every routine termination

---

[22]     *Doe* goes so far as to contrast nominal instance cases to those with more serious conduct where the faithless servant doctrine was breached. *See Doe*, 2019 WL 1437520, at *10 (citing *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 481 (S.D.N.Y. 2018) (employee's manipulation of roughly $100,000 in invoices was misconduct that substantially violated his contract); *Sansum v. Fioratti*, 128 A.D.3d 420, 421 (1st Dept. 2015) (violation of faithless servant doctrine where defendant embezzled from employer over two years). The facts here align with these types of cases.

for sexual harassment or credit card fraud necessarily raises faithless servant claims"); *Stefanovic v. Old Heidelberg Corp.*, No. 18-cv-2093, 2022 WL 3928370, at *8 (S.D.N.Y. Aug. 31, 2022) (plaintiff admits to altering tips from customers approximately 12 times over 2 years. The court highlights that "Defendants do not allege a total dollar amount stolen" and "while [plaintiff's] misconduct is certainly improper, even considering this misconduct in the light most favorable to the Defendants, the Court concludes that it is, on the record before the Court, far more akin to the 'petty pilfering' identified in *Doe* and *Torres* than to the large-scale fraud considered in *Moser* or *Sansum*."); *Sanders v. Madison Square Garden, L.P.*, No. 06-cv-589, 2007 WL 1933933, at *4 (S.D.N.Y. July 2, 2007) (no evidence of wrongdoing directly related to employee's employment; wrongful conduct was separate); *Leary v. Al-Mubaraki*, No. 18-cv-0048, 2019 WL 4805849 (S.D.N.Y. Sept. 30, 2019) (holding defendant's "counterclaims are devoid of any allegation that [plaintiff] ... engage[d] in financially advantageous self-dealing." Instead, defendant claims that "misuse of confidential information *alone* constitutes a breach of fiduciary duty[.]") (emphasis added); and *Grewal v. Cuneo*, No. 13-cv-6836, 2016 WL 308803, at *6 (S.D.N.Y. Jan. 1, 2016) (dismissing breach of fiduciary duty claim premised on different types of wrongdoing and noting the absence of any "facts establishing that Plaintiff misappropriated the firm's time or resources..." which is squarely alleged here). These cases are all distinguishable.

## II. CANAL'S BREACH OF FIDUCIARY DUTY CLAIM IS PROPER

To establish a cause of action for a breach of a fiduciary duty, a party must show that (i) the parties had a fiduciary relationship, and (ii) the fiduciary duty has been breached, which includes situations of misconduct, self-dealing, or personal interest conflicts. *Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991) (denying summary judgment on breach of fiduciary duty claim). *See also Birnbaum v. Birnbaum*, 73 NY.2d 461 (1989); *S & K Sales Co. v. Nike, Inc.*, 816

F.2d 843, 847-48 (2d Cir. 1987). "As explained by then Chief Judge Cardozo, fiduciary duty involves 'something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.'" *Cramer,* 774 F. Supp., at 184-85 (citing *Meinhard v. Salmon*, 249 N.Y. 458 (1928)). Indeed, "the gravamen of fiduciary duty is 'undivided and undiluted loyalty,' ... barring self-dealing, use of confidential information, and other conflicts of interest." *Gortat v. Capala Bros., Inc.*, 585 F. Supp. 2d 372, 377 (E.D.N.Y. 2008), *aff'd*, 568 F. App'x 78 (2d Cir. 2014) (citations omitted). *See also Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 436 (S.D.N.Y. 2015) (upholding counterclaims where employer alleged that, "through influence and manipulation of [employer's] compensation process and mismanagement of [employer's] finances," employee facilitated "excessive compensation for [himself]" among other things). Plaintiff's attempt to characterize and improperly limit breach of fiduciary duty claims to only those involving competition with the employer is unavailing. P. Br., at p. 23. While such diverting business and working with a competitor can support such claims, Plaintiff improperly tries to limit breach of fiduciary claims to those instances solely.

Plenty of cases going back to the turn of the 20th century recognize breach of fiduciary duty claims beyond the narrow margins depicted by Plaintiff. *See, e.g., Foley v. D'Agostino*, 21 A.D.2d 60, 66-67 (1st Dept. 1964) (an officer breaches his fiduciary duties when he profits personally at the expense of the corporation); *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 98 (1st Dept. 2006) (requirement of fidelity bars not only blatant self-dealing but also requires avoiding situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty); *Alpine Group. Inc. v. Johnson*, No. 01-cv- 553, 2002 WL 10495, at *3 (S.D.N.Y. Jan. 3, 2002) (employer states valid claim for breach fiduciary duty where employee met with potential takeover target to enrich himself at employer's expense); *Brightson v. H.B. Claflin Co.*,

180 N.Y. 76 (1904) (inaccurate inventory; employee rightfully discharged only if inaccuracy was either fraudulent or negligent); *Graves v. Kaltenbach & Stephens*, 205 A.D. 110 (1st Dept. 1923), *aff'd*, 237 N.Y. 546 (1923) (personal use of employer's funds); *Hutchinson v. Washburn*, 80 A.D. 367 (2d Dept. 1903) (failing to give employer credit in an expense account for discount given the employee from regular hotel charges); *Stahl v. Allert*, 32 Misc. 93 (App. Term 1900) (submitting false bills for goods alleged to have been furnished to the employer); *Sabin v. Kendrick*, 46 A.D. 90 (1st Dept. 1899) (selling below authorized prices and attempting to deceive).

Moreover, as the Court cautioned in *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1524 (S.D.N.Y. 1983), such an assessment "will often turn on the fact-finder's evaluation of the parties states of mind, *an evaluation particularly ill-suited to a motion for summary judgment*." (citing 10A Wright, Miller & Kane, Federal Practice and Procedure § 2730) (emphasis added). "It is beyond dispute that comparison of a party's conduct with the fiduciary standard of care is a question of fact. It is also clear that on a summary judgment motion a court's only role is to determine if a genuine issue of fact exists: it cannot assume the role of the jury on a sensitive factual issue like fiduciary duty." *Cramer*, 744 F. Supp. at 185 (internal citations omitted).

## III.   THE FAITHLESS SERVANT AND FIDUCIARY DUTY CLAIMS ARE NOT DUPLICATIVE

A breach of fiduciary duty is a common law tort claim that allows an injured party in an agency relationship to recover for that agent's misconduct and is not enforceable unless and until damages are sustained. *Cf. Murphy v. Morlitz*, 751 F. App'x 28, 30 (2d Cir. 2018) (citation omitted); *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12-cv-8205, 2013 WL 3943267, at *11 (S.D.N.Y. July 31, 2013). By contrast, the faithless servant doctrine functions as an alternative cause of action that is designed to compensate a principal for the faithless actions of his agent, even when the principal has suffered no injury. *See generally Webb v. RLR Assocs., Ltd.*, No. 03-

cv-4275, 2004 WL 555699, at *2 (S.D.N.Y. Mar. 19, 2004).

Plaintiff argues "Canal's twin 'breach of duty' claims should be dismissed because they are "duplicative of one another." P. Br., at p. 25. Logically, even if the claims were duplicative, which they are not, the proper remedy would be to treat them as a single claim, not to dismiss them both. Or, at worst, dismiss one but not the other.

This is of no moment as Plaintiff's legal argument is flawed. Plaintiff rightly cites the Second Circuit's recent decision in *Yukos*, 977 F.3d at 242, for its observation that "[a] disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness . . . substantially violates the contract of service.'" P. Br., at p. 21 (citing *id.*). But *Yukos* did not go on to dismiss one or both claims as duplicative, nor did any of the decisions cited on pages 25 and 26 of Plaintiff's Brief.  In fact, in *Yukos*, the Second Circuit explained: that "some lower New York courts and some federal courts treat breach of fiduciary duty claims and claims based on the faithless servant doctrine as doctrinally distinct." *Yukos*, 977 F.3d at 242 (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524–25 (S.D.N.Y. 2011)). *See also Schulhof v. Jacobs*, 54 Misc.3d 1221(A) (Sup. Ct. N.Y. Co. 2017), *aff'd* 157 A.D.3d 647 (1st Dept. 2018).[23]

---

[23]    Similarly misleading are the citations on page 26 to *Nicholsen v. Feeding Tree Style, Inc.*, No. 12-cv-6236, 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014), and *Babbitt v. Koeppel Nissan, Inc.*, No. 18-cv-5242, 2020 WL 3183895 (E.D.N.Y. Jun. 15, 2020). P. Br., at p. 26. In *Babbitt*, the plaintiff brought three claims: fiduciary duty, loyalty and faithless servant. The Court dismissed the fiduciary duty and duty of loyalty claims as duplicative, citing *Nicholsen*, but engaging in entirely separate analysis of the faithless servant claim. *Id.*, at *5. *Nicholsen* itself did not even contain a faithless servant claim, rendering it inapposite here. Moreover, in *Nicholsen*, the duty of loyalty claim was dismissed as duplicative while the breach of fiduciary duty claim was dismissed due to defendant's failure to state a claim since defendants' counterclaim "simply alleges that [plaintiff] stole a ledger he knew to be valuable" but there was no allegation that the theft took place while plaintiff was employed nor was there an allegation that the theft was a violation of any ongoing fiduciary duty following plaintiff's termination. *Nicholsen*, 2014 WL 476355, at *5. And in *Babbitt*, dismissal of the faithless servant claim rested not on a "duplicative" theory, but rather because the defendant "failed to adequately plead such a claim" holding it "fails for substantially the same reason as its fiduciary duty claim." *Id.*, at *6.

As Judge Parker held in her July Decision in this case,[24] and contrary to Plaintiff's reliance on *Yukos*, 977 F.3d at 242, the New York Court of Appeals has not clarified whether such claims are indeed duplicative since *Yukos*, and Plaintiff cites no authority that dispositively supports her arguments in this regard.

The Counterclaims are also not "duplicative" because they arise from different facets of Plaintiff's dishonest actions and the relief sought under each claim varies. This was, in essence, the basis for the Court's July Decision. *See Haraden Motorcar Corp. v. Bonarrigo*, No. 1:19-cv-01079, 2020 WL 1915125, *12 (N.D.N.Y. Apr. 20, 2020) (holding that a party's claim for breach of fiduciary duty was not duplicative of its faithless servant claim because "[p]laintiff seeks different relief... for the faithless servant claim than it does for its breach of fiduciary duty claim"); *see also Longo v. Keybank Nat'l Ass'n*, 357 F. Supp. 3d 263, 275, n.11 (S.D.N.Y. 2019) (holding that claims are not duplicative when "the potential damages under each claim is different"); *Kocak v Dargin*, 199 A.D.3d 456, 456-58 (1st Dept. 2021) (same); *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019) ("A plaintiff may not plead the same claim more than once, which would constitute a duplicative claim, but *may* plead claims that provide alternative bases for relief") (emphasis added).

New York courts have consistently sustained multiple causes of action based on facts like those asserted by Canal. *See Haraden*, 2020 WL 1915125, *12 (opining that the fiduciary duty and faithless servant claims causes of action were not duplicative because the damages under each were distinct); *Sokolin LLC v. Cozzi*, 2012 NY Slip Op. 31410(U), at *24 (Sup. Ct. Suffolk Co. 2012) (allowing plaintiff's claims of, *inter alia*, conversion, breach of loyalty, breach of fiduciary

---

[24]    By Decision and Order, dated July 9, 2021 (ECF #72), Judge Parker held Defendants are "claiming separate remedies under the two causes of action" and since "the New York Court of Appeals has not definitively held that they are duplicative," this Court permitted such claims to br maintained. *See Robinson v. De Niro, et al.*, 2021 WL 2887702, at *4 (S.D.N.Y. Jul. 9, 2021) (the "July Decision").

duty, and fraud to survive a motion for summary judgment). These cases are consistent with the Second Circuit's recognition that when "a claimant is entitled to a particular category of damages on one claim but not the other, the claims are not duplicative." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008). Here, while the Counterclaims are premised on similar facts, the relief sought is distinct and, therefore, not duplicative. The faithless servant claim seeks disgorgement, a remedy unavailable under the breach of fiduciary duty and conversion claims.

## IV.   CANAL'S CONVERSION CLAIM IS NOT DUPLICATIVE OF ITS FIDUCIARY DUTY AND FAITHLESS SERVANT CLAIMS

Plaintiff argues that Canal's fiduciary duty and faithless servant claims should be dismissed because they are duplicative of the conversion claim (P. Br., p. 24). Their case law is inapposite. The footnote cited in the *Supreme Showroom, Inc. v. Branded Apparel Grp. LLC*, No. 16-cv-5211, 2018 WL 3148357, n. 14 (S.D.N.Y. Jun. 27, 2018), a case in which this law firm was involved, made clear that claims were not duplicative where—as here—they sought differing relief. Moreover, Canal's conversion claim differs from the other two claims because there is no requirement that Ms. Robinson owed Canal a fiduciary duty.

Plaintiff also cites *Gold Sun Shipping Ltd. v. Ionian Transp. Inc.*, 245 A.D.2d 420, 421 (2d Dept. 1997), and misrepresents its holding in a parenthetical (P. Br., p. 25). In *Gold Sun Shipping*, the court dismissed several claims (including breach of fiduciary duty) as *untimely*, applying "the three-year Statute of Limitations applicable to conversion, because the legal remedy for conversion would have afforded the plaintiffs full and complete relief." *Id*. That is, the allegations there were subject to conversion's three-year limitations period because they "sounded in conversion." *Id*. The court further explained that a claim "merely incidental to the conversion cause of action" cannot be claimed where the "only purpose ... is to avoid the Statute of

Limitations." *Id*. Contrary to Plaintiff's argument, which either misconstrues the holding of the case or blindly misrepresents it, the case does *not* hold that a breach of fiduciary duty claim should necessarily be dismissed as duplicative of conversion. *Id*.

Plaintiff's misplaced reliance on other cases in support of her argument is likewise unavailing. Similar to *Gold Sun Shipping*, in *Kapernekas v. Brandhorst*, 638 F.Supp.2d 426, 428-29 (S.D.N.Y. 2009), (P. Br., p. 25), the court held claims for a breach of fiduciary duty, breach of a bailment contract, unjust enrichment, and constructive trust, "must … be dismissed as an attempt to plead around the conversion and replevin time limitations with what are really duplicative claims." In *Kapernekas*, the Court continued and clarified that there was "no indication that the remedy afforded by [claimant's] conversion and replevin claims would be in any way inadequate." *Id*., at 428.

Plaintiff engages in a pattern of relying upon cases that are factually and procedurally dissimilar, and to cite them for a proposition that does not otherwise exist. *See also* P. Br., p. 25 (citing *Samuels v. Greenberg*, No. 14-cv-04401, 2015 WL 5657565, at *8 (E.D.N.Y. Sept. 23, 2015) (dismissing the breach of fiduciary duty claim, as it is premised on the allegation that defendants "violated a duty by wrongfully converting the Bible" which sounds in conversion or replevin and the "three-year statute of limitations applicable to conversion and replevin applies")).

As a fallback, Plaintiff attempts to argue around Judge Parker's earlier decision by arguing that Canal has waived its right to seek disgorgement under its faithless servant claim, thereby neutering it into a fiduciary duty claim.

The argument is entirely absurd, and involves—again—abusive use of deposition testimony:

> Q:     Mr. De Niro, do you think Ms. Robinson should be ordered to pay back any of the salary that you paid her over the years?

MR. DROGIN:  Objection to the form.

A:        No.

P. Br., p. 26 (citing Ex. 2, RDN Tr. II, at  431:24–432:4 and Ex. 3, RDN Tr. III, at 587:24–588:4).

*See also* GB Supp. Dec., Ex. 3, RDN Tr. III., at 588:2-5 (Mr. De Niro stating "I don't care about that. Let's move on.  You know, let her enjoy whatever bonuses I gave her" when asked the same question about bonuses).

According to her moving papers, Mr. De Niro, who was *not* testifying as a Rule 30(b)(6) witness, "made clear" that Canal was not seeking disgorgement as permitted under the faithless servant doctrine and somehow Canal waived its claim. P. Br., at p. 25. Among other things, waivers of claims must be clear, knowing, and voluntary. *McCormack v. IBM*, 145 F. Supp.3d 258 (S.D.N.Y. 2015) (issue of whether waiver was knowingly and voluntarily could not be resolved on motion for judgment on the pleadings). Whether Mr. De Niro "thinks" something ought to occur is meaningless unless he has a full understanding of Canal's rights. *See JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 363 (S.D.N.Y. 2002) (quashing a 30(b)(6) deposition topic because, "[u]nder the guise of requesting 'facts[,'] ... plaintiff [wa]s really requesting defendants' mental impressions, conclusions, opinions, and legal theory").

Canal formally requests that the Court sustain the objection to the form of the question and disregard the answer altogether. The same request applies to the question and answer relating to the payment of bonuses. GB Supp. Dec., Ex. 3, RDN Tr. III., at 587:24–588:5. For these reasons, the "fallback position" should fail, and summary judgment should be denied.

## V.     CANAL NEITHER AUTHORIZED, RATIFIED, NOR CONSENTE TO MS. ROBINSON'S ACTIONS, AS IT LACKED REQUISITE KNOWLEDGE

Ms. Robinson claims she is entitled to summary judgment because Canal acquiesced and ratified her behavior. The seminal case concerning the concept of ratification is *Rothschild v. Title Guar. & Trust Co.*, 204 N.Y. 458 (1912), where the New York Court of Appeals held:

> When a party with full knowledge, or with sufficient notice of his rights *and of all the material facts*, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable. [emphasis added]. *Vohmann v. Michel*, 185 N.Y. 420, 78 N.E. 156, 113 Am. St. Rep. 921; 2 Pomeroy's Equity Jurisprudence (3d Ed.) §§816-821, 965.

*Id.*, at 464 (emphasis added).

Her argument ignores the "full knowledge, or with sufficient notice of his rights and all of the material facts" components. "Ratification must be performed *with full knowledge of the material facts* relating to the transaction, and *the assent must be clearly established* and may not be inferred from doubtful or equivocal acts or language." *Trans-Pro Logistic, Inc. v. Coby Electronics Corp.*, No. 05-cv-1759, 2009 WL 36824, at *7 (E.D.N.Y. Jan. 6, 2009) (emphasis added). Indeed, ratification occurs when a principal, with full knowledge of material facts, "takes some action to affirm the agent's actions." *Trustees of the Am. Fed. of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) (citation omitted). Courts have strictly enforced this standard. *Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 233 (4th Dept. 1982) ("The act of ratification, whether express or implied, must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."). *See also Stauss v. Title Guar. & Trust Co.*, 284 N.Y. 41, 45-47 (1940); *Pollitz v. Wabash R. Co.*, 207 N.Y. 113, 129-130 (1912).

Plaintiff must offer evidence that reflects a knowing and informed consent to each of the improper actions and misdeeds set forth in the Counterclaims. Plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." *Creative Waste Mgmt., Inc. v. Capitol Envt'l Servs., Inc.*, 458 F. Supp.2d 178, 185 (S.D.N.Y. 2006) (cleaned up). She does

not. In fact, nothing in the record indicates *knowledge* of the material facts underlying the Counterclaims. Plaintiff was single-handedly responsible, in her supervisory role, to oversee spending, payroll, administering overtime pay, petty cash, bookkeeping, and similar functions (GB Dec., Ex. 2, P. Tr. I., at 250:11-21; Ex. 3, P. Tr. II., at 64:23-65:13, 72:10-73:10, 84:22-88:10; Ex. 84, (ECF #322-84); *see also* GB Supp. Dec. Ex. 35; Ex. 86, SWB Tr., at 57:20–58:8, 59:10-20, 69:3-7). She cannot "effect a corporate ratification of h[er] own unauthorized act by further action of h[er] own, unknown to the company[.]" *In re Sterling Navigation Co., Ltd.*, 444 F. Supp. 1043 (S.D.N.Y. 1977).

As described above, Canal's knowledge of her wrongdoing was learned after the fact, upon and at which time, Canal pursued its rights. GB Dec., Ex. 50, Harvey Letter; Ex. 55, State Court Action. Plaintiff's attempt to shift blame to Canal for her misconduct and improper acts strains credulity.[25] The incantation of the words "approval" and "ratification" throughout Plaintiff's Brief cannot obscure the hotly disputed facts presented. *See also* Restatement (Third) of Agency § 4.01 ("It is a question of fact whether conduct is sufficient to indicate consent… For example, a principal's failure to terminate or reprimand an employee by itself is not likely to ratify the employee's unauthorized action because the employer may have varied reasons for failing to take action adverse to an employee.).

## VI. CANAL HAS NOT "ABANDONED" ANY CLAIMS BY DECIDING NOT TO PURSUE DAMAGES FOR FLOWER CHARGES AND PETTY CASH

Ms. Robinson conflates Canal's decision not to seek damages with the wholesale intention of abandoning underlying claims. She wrongly asserts Canal has abandoned some of its

---

[25]     Plaintiff attempts to attribute cherry-picked deposition testimony from parties and witnesses, who were not Canal's Rule 30(b)(6) witnesses, to support the incredulous notion that Canal had knowledge of and "affirmatively approved" her misconduct (P. Br., at p. 39).

"allegations" and extrapolates this to seek summary judgment against part of Canal's "claims." P. Br., at p. 18. Canal has done nothing other than to indicate it is not seeking *damages* for Ms. Robinson's alleged misuse of petty cash and florist charges. Evidence of that wrongdoing remains part of Canal's faithless servant and fiduciary duty claims, entitling it to disgorgement of her compensation.

Under New York law, to support a finding of abandonment or waiver, Plaintiff needs to prove that Canal failed to pursue or respond to an argument it raised (for the former) (*Lipton v. Cnty. of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)), or that Canal clearly, unmistakably, and unambiguously relinquished a legal right (for the latter) (*see Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 217 (S.D.N.Y. 2010)). Plaintiff has proven neither, nor could she prove either. Abandonment will be found in two situations: (i) where a party raises a claim and then fails to pursue it, or (ii) where a party fails to respond to an argument raised by an adversary. *See, e.g., Bombard v. Cent. Hudson Gas & Elec. Co.*, 205 A.D.2d 1018, 1020 (3d Dept. 1994); *Lipton*, 315 F. Supp. 2d at 446. Waiver, on the other hand, requires a clear, unmistakable, and unambiguous intent to relinquish a legal right. *Faiveley Transp.*, 758 F. Supp. 2d at 217. waiver is "the voluntary abandonment of a known right. It is essentially a matter of intent which must be proved." *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of N.Y.*, 61 N.Y.2d 442, 446 (1984) (waiver is "the voluntary abandonment of a known right. It is essentially a matter of intent which must be proved."). Nowhere has Canal indicated expressly or impliedly its intent to abandon allegations or claims. Here, neither situation exists.

Plaintiff's Brief cites three cases (P. Br., at 18, n.7), all of which talk about summary judgment in the context of failing to respond or where, by implication, a court can fairly conclude that a claim is being abandoned. None of those cases support the argument being made here, that

the decision not to seek damages from a set of facts that is part of a broader claim somehow compels summary judgment on the overlying claims.

## **CONCLUSION**

Canal requests that the Court deny Plaintiff's motion for summary judgment, in its entirety, and grant it such other and further relief deemed just and proper.

Dated:  New York, New York
November 20, 2022

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendant Canal Productions, Inc.*

By:___*Laurent S. Drogin*_____
Laurent S. Drogin
Brittany K. Lazzaro
1350 Broadway
New York, New York 10018
Tel.: (212) 216-8000
Email: ldrogin@tarterkrinsky.com
Email: blazzaro@tarterkrinsky.com