# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,


           Plaintiff,


      - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x



       ZOOM VIDEOCONFERENCE DEPOSITION OF

            ROBERT DE NIRO

           April 4, 2022



        MAGNA LEGAL SERVICES

         (866) 624-6221
         www.MagnaLS.com



| | Page 2 | | Page 3 |
|---|---|---|---|

**Page 2**

1        ZOOM VIDEOCONFERENCE ORAL DEPOSITION OF
2 ROBERT DE NIRO, taken pursuant to Notice,
3 commencing April 4, 2022, at 10:07 a.m., on the
4 above date, before Catherine M. Donahue, a
5 Certified Court Reporter and Notary Public in the
6 State of New Jersey.
7
8 Magna Job No. 814688
9
10
11
12
13
14
15       MAGNA LEGAL SERVICES
16         (866) 624-6221
         www.MagnaLS.com
17
18
19
20
21
22
23
24
25

**Page 3**

1      A P P E A R A N C E S:
2 (All parties present via Zoom Remote)
3
4 SANFORD HEISLER SHARP, LLP
5 BY: DAVID SANFORD, ESQ.
6   JEREMY HEISLER, ESQ.
7   ALEXANDRA HARWIN, ESQ.
8   KATE MAC MULLIN, ESQ.
9 1350 6th Avenue, 31st Floor
10 New York, New York 10019
11 (646) 402-5650
12 dsanford@sanfordheisler.com
13 jheisler@sanfordheisler.com
14 aharwin@sanfordheisler.com
15 Attorneys for Plaintiff
16
17
18
19
20
21
22
23
24
25

**Page 4**

1 A P P E A R A N C E S: (Cont'd)
2 (All parties present via Zoom Remote)
3
4 TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
5 BY: GREGORY R. BENNETT, ESQ.
6 Mid-Westchester Executive Park
7 Seven Skyline Drive
8 Hawthorne, New York 10532
9 (914) 347-2600
10 gbennett@tlsslaw.com
11 Attorneys for Defendant Robert De Niro
12
13 TARTER KRINSKY & DROGIN LLP
14 BY: LAURENT S. DROGIN, ESQ.
15   BRITTANY K. LAZZARO, ESQ.
16 1350 Broadway
17 New York, New York 10018
18 (212) 216-8000
19 ldrogin@tarterkrinsky.com
20 blazzaro@tarterkrinsky.com
21 Attorneys for Defendant Canal Productions, Inc.
22
23
24
25

**Page 5**

1 A P P E A R A N C E S: (Cont'd)
2 (All parties present via Zoom Remote)
3
4 ALSO PRESENT:
5   Chris Allen, Magna Videographer/Tech
6   Annie Sloan, Sanford Heisler Sharp, LLP
7   Jeremy Margolis, Sanford Heisler Sharp, LLP
8   Leor Rosen, Sanford Heisler Sharp, LLP
9   Simon Schaitkin, Sanford Heisler Sharp, LLP
10   Graham Chase Robinson
11   Tom Harvey, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 6

```
1                FEDERAL STIPULATIONS
2
3          IT IS HEREBY STIPULATED AND AGREED by and between
4      the attorneys for the respective parties herein,
5      that the filing and sealing be and the same are
6      hereby waived.
7
8          IT IS FURTHER STIPULATED AND AGREED that all
9      objections except as to the form of the question
10     shall be reserved until the time of trial.
11
12         IT IS FURTHER STIPULATED AND AGREED that the
13     within deposition may be sworn to and signed
14     before any officer authorized to administer an
15     oath, with the same force and effect as if signed
16     and sworn to before this Court.
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                    I N D E X
2
3      Witness:                        Page
4      ROBERT DE NIRO
5       Examination by Mr. Sanford............... 12
6
7
8
9
10
11
12
13
14
15
16
17
18
19     April 4, 2022
20
21
22
23
24
25
```

Page 8

```
1                  E X H I B I T S
2      Exhibit Name    Description       Page No.
3
4      110      Recording            75
5      113      Document bearing Bates stamp    99
                Nos. CANAL 45910
6
        115      Document bearing Bates stamp    114
7               Nos. CANAL 46031 through 46032
8      116      Document bearing Bates stamp    121
                Nos. CANAL 46038
9
       117      Document bearing Bates stamp    133
10              Nos. CANAL 9189 through 9190
11     118      Two-page document bearing       180
                Bates stamp Nos. CANAL 46685
12              through 46686
13     119      Document bearing Bates stamp    194
                Nos. ROBINSON 1602
14
       120      Document bearing Bates stamp    212
15              Nos. CANAL 47109 through
                47111, an April 6, 2019 e-mail
16              exchange between Tiffany Chen
                and Robert De Niro
17
       121      Document bearing Bates stamp    224
18              Nos. CANAL 49253 through 49254
19
20
21              (Exhibits retained by counsel.)
22
23
24
25
```

Page 9

```
1               DEPOSITION SUPPORT INDEX
2
3           Instruction To Witness Not To Answer
4              PAGE      LINE
5               34        15
6               35        15
7               36        1
8               53        6
9               55        5
10              58        2
11              61        1, 23
12              67        19
13              69        16
14              73        6
15             144        4
16             243        20
17          Request for Production of Documents
18              PAGE      LINE
19              None Marked
20
21              Marked Text
22              PAGE      LINE
23              None Marked
24
25
```



1     THE VIDEOGRAPHER:  We are now on
2 the record.  This begins video No. 1 in
3 the deposition of Robert De Niro, in the
4 matter of Graham Chase Robinson versus
5 Robert De Niro and Canal Productions,
6 Incorporated.
7     Today is Monday, April 4, 2022,
8 and the time is 10:07 a.m.  This
9 deposition is being taken remotely via
10 video conferencing software at the
11 request of Sanford Heisler Sharp.
12     The videographer is Chris Allen
13 of Magna Legal Services and the court
14 reporter is Catherine Donahue also of
15 Magna Legal Services.
16     At this time, will counsel and
17 all parties present state their
18 appearances and whom they represent.
19     MR. SANFORD:  David Sanford of
20 Sanford Heisler Sharp representing Chase
21 Robinson, the plaintiff.
22     MR. HEISLER:  Jeremy Heisler of
23 Sanford Heisler Sharp representing
24 plaintiff Chase Robinson.
25     MS. HARWIN:  Alexandra Harwin

1 from Sanford Heisler Sharp, also
2 representing plaintiff Graham Chase
3 Robinson.
4     MS. MAC MULLIN:  Kate Mac Mullin
5 from Sanford Heisler Sharp, also
6 representing plaintiff Graham Chase
7 Robinson.
8     MS. SLOAN:  Annie Sloan, Sanford
9 Heisler Sharp for the plaintiff Graham
10 Chase Robinson.
11     MR. SCHAITKIN:  Simon Schaitkin
12 from Sanford Heisler Sharp for the
13 plaintiff Graham Chase Robinson.
14     MR. MARGOLIS:  Jeremy Margolis
15 from Sanford Heisler Sharp for plaintiff
16 Graham Chase Robinson.
17     MS. ROSEN:  Leor Rosen for
18 Sanford Heisler Sharp for plaintiff
19 Graham Chase Robinson.
20     MR. BENNETT:  Gregory Bennett,
21 Traub Lieberman Straus & Shrewsberry,
22 counsel for defendant.
23     MR. DROGIN:  Laurent Drogin,
24 Tarter Krinsky & Drogin for defendant
25 Canal Productions, Inc.

1     MS. LAZZARO:  Brittany Lazzaro
2 from Tarter Krinsky & Drogin for Canal
3 Productions, Inc.
4     MR. HARVEY:  Tom Harvey for the
5 defendant.
6     THE WITNESS:  I don't have a
7 mouse that works on this computer.  I'm
8 trying to get it.
9     MR. SANFORD:  Let's go off the
10 record while we fix this.
11     THE VIDEOGRAPHER:  The time is
12 10:09 a.m.
13     (Whereupon, at 10:09 o'clock
14 a.m., a recess was taken until 10:10
15 o'clock a.m.)
16     THE VIDEOGRAPHER:  The time is
17 10:10 and we are back on the record.
18     At this time, will the court
19 reporter please swear in the witness.
20     (The witness is sworn by the
21 court reporter.)
22 R O B E R T   D e N I R O, called as a witness
23 by (Plaintiff), having been first duly
24 sworn by Catherine M. Donahue, a Notary
25 Public within and for the State of New

1 Jersey, was examined and testified as
2 follows:
3 EXAMINATION BY MR. SANFORD:
4     Q.  My name is David Sanford and I'm an
5 attorney at Sanford Heisler Sharp, and I
6 represent plaintiff Graham Chase Robinson in
7 this lawsuit.
8     It is a pleasure to meet you,
9 Mr. De Niro, although I'm sorry it is under
10 those circumstances.
11     A.  Thank you.  So am I.
12     Q.  Thank you for being here today.
13     Before we begin, I'm going to
14 explain to you some ground rules for your
15 deposition.  I'm going to ask you questions, and
16 both my questions and your answers will be
17 recorded by the court reporter.  Both of us need
18 to speak up and speak clearly and slowly so that
19 the court reporter can record everything.
20     You understand that, right?
21     A.  Uh-hum.  Yes.
22     Q.  Also, you must answer verbally
23 because the court reporter cannot record a nod
24 or a shake of the head.  And even though we're
25 on video, it is important to have a clean



Page 14

```
 1   transcript.
 2        Okay?
 3        A.  Okay.
 4        Q.  And until I finish my question, I
 5   would ask you to wait before you start
 6   answering.
 7        If you need a break at any time or
 8   for any reason, let me know.  And you'll finish
 9   your answer if I have a pending question.  If
10   we're in the middle of that question, I'll ask
11   you to answer and then you can take your break.
12        A.  Okay.
13        Q.  And your attorney will object from
14   time to time, but unless he instructs you not to
15   answer the question, you should answer my
16   question.
17        You understand that, right?
18        A.  If he instructs me not to answer, I
19   should answer anyway?
20        Q.  No.  If he instructs you not to
21   answer, you won't answer.
22        A.  Oh, I see.
23        Q.  But if he just objects, you're still
24   expected to answer the question.
25        A.  Okay.
```

Page 15

```
 1        Q.  If you answer a question and later
 2   on you remember some additional information or
 3   would like to clarify something, please let me
 4   know that you would like to add something or
 5   clarify something and I'll give you the
 6   opportunity to do so.
 7        A.  Okay.
 8        Q.  When I refer to Canal, I'm referring
 9   to Canal Productions.  If you're unsure about
10   what I mean by any term that I use throughout
11   the day and tomorrow, please let me know.
12        A.  Okay.
13        Q.  The testimony you're about to give
14   is under oath, just as if you were in a court of
15   law.  The testimony may be used as evidence in
16   this case.
17        You understand that, right?
18        A.  Yes.
19        Q.  Do you have any electronic screens
20   or communication devices with you in the room
21   you're in right now?
22        A.  No.  I have my iPhone, but I'm
23   not -- it is just there.
24        Q.  Okay.
25        Is your iPhone off?
```

Page 16

```
 1        A.  Yes, I'll turn it to mute.
 2        Q.  Thank you.
 3        Do you ever use an earpiece?
 4        A.  Sometimes.
 5        Q.  Do you have an earpiece in either or
 6   both of your ears at this point?
 7        A.  No.
 8        Q.  If you use an earpiece at any time
 9   during this deposition, would you please let me
10   know?
11        A.  Sure.  Well, you can see if I'm
12   using one.
13        Q.  Well, it is hard to see.  It is a
14   little shaded.  Good ear pieces you can't see
15   anyway, right?
16        A.  That's right.
17        Q.  Is there anyone in the room with you
18   today?
19        A.  No.
20        Q.  And you understand your obligation
21   is to provide testimony that is truthful and
22   complete, right?
23        A.  Yes.
24        MR. SANFORD:  Will your counsel
25        adhere today to agree to reserve all
```

Page 17

```
 1   objections as to the form for trial?
 2        MR. DROGIN:  For Canal
 3   Productions, yes.
 4        MR. BENNETT:  Yes, for defendant.
 5        MR. SANFORD:  And will you agree
 6   to have a standing objection to all
 7   questions I pose identical to the
 8   standing objection agreement we entered
 9   into this case with respect to Chase
10   Robinson's deposition?
11        A.  Sorry, you're asking me?
12        MR. SANFORD:  No, counsel.
13        MR. DROGIN:  I'm sorry, can you
14   repeat it?
15        MR. SANFORD:  Would you agree to
16   have a standing objection to all the
17   questions I pose just for efficiency
18   sake so we can have a clean record and
19   be efficient here?
20        You entered into a stipulation
21   with respect to during the Chase
22   Robinson deposition, to have a standing
23   objection to all objections as to form.
24        I'm just wondering if you would
25   do the same here.
```



1      MR. DROGIN:  Okay, I mean from my
2  perspective, let's see how it goes and
3  then counsel can confer and let you
4  know.
5      So we'll take it under
6  advisement.
7      MR. SANFORD:  That's fine.
8  BY MR. SANFORD:
9  Q.  All right.
10     Mr. De Niro, back to you.  What is
11  your full name?
12  A.  Robert Anthony De Niro.
13  Q.  Have you ever gone by any other
14  name?
15  A.  No.
16  Q.  What is your date of birth?
17  A.  ▓▓▓▓▓
18  Q.  What is your home address?
19  A.  Can I do my office address?
20  Q.  You don't have home address?
21  A.  I have, but I don't like -- I don't
22  know.  I have some privacy -- or does it matter?
23  Q.  You're expected to answer all my
24  questions.  And if your counsel thinks that
25  there's some issue about confidentiality that he

1  would like to take up with the court, he is free
2  to do so.
3      MR. BENNETT:  We will designate
4  this part of the deposition as
5  confidential, Bob.
6  A.  Okay.  ▓▓▓▓▓▓▓▓▓▓▓▓
7  BY MR. SANFORD:
8  Q.  How long have you resided at that
9  address?
10  A.  A few years.
11  Q.  By a few, you mean how many?
12  A.  About, I would say, three, three
13  something.
14  Q.  Do you remember when you moved into
15  that address?
16  A.  Three, three and a half years ago.
17  I can't remember exactly.  Something around that
18  time.
19  Q.  What is your educational background?
20  A.  I didn't graduate high school.  Went
21  to acting school.  That's it.
22  Q.  Do you live alone?
23  A.  I live with someone.
24  Q.  Who do you live with?
25      THE WITNESS:  Is that necessary

1      for me to tell them this?
2      MR. DROGIN:  Yes.
3  BY MR. SANFORD:
4  Q.  You're expected to answer my
5  question, sir.
6  A.  I know that, but I still want to
7  question -- you're not on my side, so I don't
8  expect you to ask me any question that will be
9  in my favor.
10     Tiffany Chen.
11  Q.  What is your relationship with
12  Ms. Chen?
13  A.  She's my girlfriend.
14  Q.  And when did Ms. Chen begin living
15  with you?
16  A.  A few years ago.  About the same
17  time that I moved in.
18  Q.  At the time that she moved in, were
19  you married?
20  A.  Yes.
21  Q.  To whom?
22  A.  Going through a divorce.
23  Q.  You were going through a divorce at
24  the time Ms. Chen moved in?
25  A.  Uh-hum.

1  Q.  Is that a "yes"?
2  A.  That's a "yes".
3  Q.  And how many times have you been
4  married?
5  A.  This -- three.
6  Q.  Who was your first marriage?
7  A.  To Diahnne Abbott.
8  Q.  When did you marry Ms. Abbott?
9  A.  That was 46 years ago.
10  Q.  How long were you married to
11  Ms. Abbott?
12  A.  We were married about 10, 12, 13, 14
13  years.  But we had split up earlier.  But we
14  finally got divorced.
15  Q.  And who was your second wife?
16  A.  Grace Hightower.
17  Q.  When did you marry her?
18  A.  Maybe about 26 years, 27 years ago.
19  Q.  How long were you married to
20  Ms. Hightower?
21  A.  I was married for a few years and
22  then I got divorced.  Then I remarried Hightower
23  a few years later.
24  Q.  And are you still married to
25  Ms. Hightower at this point?

6  (Pages 18 to 21)





Page 22

```
 1         A.  Technically I am, but I am going
 2    through a divorce.
 3         Q.  And when did you become -- when did
 4    Ms. Chen become your girlfriend?
 5         A.  A few years ago.  Three or four
 6    years ago.
 7         Q.  Do you have any children?
 8         A.  Yes.
 9         Q.  What are their names?
10         A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11
12
13
14
15
16
17
18
19
20
21
22
23
24         Q.  Do you suffer from any condition
25    that affects your memory?
```

Page 23

```
 1         A.  No.
 2         Q.  Have you consumed any alcohol or
 3    drugs, including prescription drugs, in the last
 4    48 hours?
 5         A.  No.
 6         Q.  Do you typically take ▮▮▮▮▮▮▮
 7         A.  Yes, that I do from time to time.
 8         Q.  Did you take ▮▮▮▮ within the last
 9    48 hours?
10         A.  No.
11         Q.  Do you typically take ▮▮▮▮▮▮?
12         A.  No.
13         Q.  ▮▮▮▮▮▮▮
14         A.  No.
15         Q.  ▮▮▮▮▮▮▮▮▮
16         A.  No.
17         Q.  ▮▮▮▮▮▮▮
18         A.  From time to time.  Rarely.
19         Q.  Did you take it within the last 48
20    hours?
21         A.  No.
22         Q.  Have you consumed any substances at
23    all that may affect your memory or ability to
24    communicate today?
25         A.  No.
```

Page 24

```
 1         Q.  Is there any reason physically or
 2    mentally that you are not able to testify today
 3    truthfully and completely?
 4         A.  No.
 5         Q.  Other than this case, have you ever
 6    been involved in any other lawsuit or any other
 7    judicial arbitral or administrative proceeding
 8    as a party or a witness?
 9         A.  Oh, I'm forgetting, there was one --
10    which one.  There was one with Tom Harvey many,
11    many years ago.
12              Someone tried to shake me down and
13    they lost that -- I don't know what you call
14    it -- attempt to at the time to shake me down.
15    I can't remember.  There's nothing, nothing that
16    I can remember, but maybe somebody can remind
17    me.  I just don't.
18         Q.  Do you remember, do you remember the
19    name of the person who tried to shake you down?
20         A.  No.
21         Q.  Do you remember the circumstances of
22    that shakedown?
23         A.  They said that I had hit them when I
24    told them not to take a video of me, and I
25    didn't hit them.  I held their camera and they
```

Page 25

```
 1    bent over the hood of a car, and then the next
 2    morning they somehow issued -- said that -- I
 3    don't know what it is called, but the police
 4    were looking for me and someone called me and
 5    said they're looking for you.
 6              And so, I got a hold of Tom Harvey
 7    and went down and did what I had to do with this
 8    person and that it was it.  I didn't do
 9    anything.  It was just that they did that, so I
10    had to go along with it.
11         Q.  Was that a case that was filed in
12    court, do you know?  Was a lawsuit filed against
13    you?
14         A.  Tom Harvey can give you more details
15    about that.  I don't think it went that far.
16         Q.  Well, you know, today I'm asking you
17    questions, not Tom Harvey.  And I just want to
18    know to the best of --
19         A.  I don't have the answer to that.
20    All I know is that the photographer was
21    embarrassed because they tried to shake me down.
22              They went to see the DA.  The DA
23    said, "Are you withdrawing charges?"  They said
24    yes.  That was after they had just been given a
25    couple hundred thousand dollars to drop the
```



MAGNA
LEGAL SERVICES

1   case.
2           So the rest you can figure out for
3   yourself.
4       Q.   So you paid, you paid the
5   photographer a couple hundred thousand dollars?
6       A.   I attempted to pay and he attempted
7   to take it, and so -- and it was videotaped.
8       Q.   And so, what was the ultimate
9   resolution of that case?  How did it end?
10      A.   My feeling is that he was told if he
11  does this -- does anything else, blah, blah,
12  blah, he will be, you know -- we have this on
13  record, extortion, what he tried to do, and
14  things will happen accordingly.
15      Q.   You never testified in that case, to
16  your recollection?
17      A.   No, no.
18      Q.   Were you involved in any other
19  matter, legal matter that involved you as a
20  witness or as a party?
21      A.   Well, there was a guy, an art dealer
22  of my father's named Larry Salander, who was
23  trying to -- who was starting to get -- I was
24  hearing that he was stealing and taking
25  paintings, double selling them.  Sort of ripping

1   off other clients who had art with him, dealers
2   in Italy.
3           And I had asked him about it, I
4   think, and he denied it, of course.  And then, I
5   didn't want to get involved.
6           And then finally, they were -- the
7   police were asking if I would do a grand jury
8   testimony and I said -- I was resisting it.  I
9   just felt bad about the whole thing.  I didn't
10  want to be, you know...
11          But then, they showed me so much
12  sort of evidence, things that he had done that I
13  felt it was my obligation to go before the grand
14  jury, which I did.
15      Q.   Okay.
16          Any other matters involving you as a
17  witness or a party to a lawsuit?
18      A.   I can't remember.  I just can't
19  remember.
20      Q.   You were a party to a lawsuit in
21  your divorce, right?
22      A.   A lawsuit in my divorce, you mean?
23      Q.   Your divorce is a judicial
24  proceeding, right, and you're a party --
25      A.   If that's a lawsuit, then I guess I

1   am, yes.
2       Q.   You're a party in that, right?
3       A.   I'm a party, yes.
4       Q.   And did you testify in your divorce
5   proceedings with Ms. Hightower?
6       A.   I didn't testify.  We had, we had
7   meetings with the judge in his chambers.  I
8   might have made a few, like, "Do you promise to
9   tell the truth" and swore an oath and blah,
10  blah, blah.
11          There was nothing else that I
12  remember.  There was no big court proceeding
13  other than trying to, I guess, work things out
14  privately because children were involved, are
15  involved.
16      Q.   Have you ever provided any testimony
17  or given any sworn statements in a case
18  involving Canal Productions?
19      A.   I don't remember.
20      Q.   You might have; you're not sure?
21      A.   I don't know.  I just don't
22  remember.  There might have been some -- if it
23  was, it would be some minor technical type thing
24  that they need me to -- and I'm not even sure of
25  that.

1       Q.   What is Canal Productions?
2       A.   It is a production company that I
3   started many years ago.
4       Q.   And what's your role at Canal
5   Productions?
6       A.   They loaned me out to other film
7   companies when I'm working as an actor or
8   director or whatever.
9       Q.   Is it fair to say that you run Canal
10  Productions?
11      A.   You could say that, yes, of course.
12      Q.   Have there ever been any written
13  policies at Canal?
14      A.   I don't think so, but there might
15  have been.  I don't really think so.
16      Q.   Have you ever been interviewed by
17  the police or any other law enforcement
18  personnel?
19          MR. DROGIN:  Objection to the
20      form.
21          Go ahead and answer.
22      A.   Something here or there, yes.
23  BY MR. SANFORD:
24      Q.   Something here or there, what is
25  that?







**Page 30**

1    A.  That means I was interviewed by some
2  people about a person involved in a film that I
3  was involved with.  They were trying to make a
4  connection so that they were -- some, somehow
5  doing things that were not appropriate, not
6  proper, not kosher, shady.
7        And in that case, I told them there
8  was nothing that this person did that was
9  inappropriate.
10    Q.  When was this?
11    A.  This is about, oh, God, 20 years
12  ago, 25 years ago, 22 years ago.  Over 20 years
13  ago.
14    Q.  Have you ever, have you ever been
15  interviewed by the police in any other context?
16    A.  Here and there, yes.
17    Q.  Well, to the best of your
18  recollection, can you list every time you have
19  been interviewed by the police?
20    A.

**Page 31**

1    So that's it.  But they were brief,
2  very brief.
3    Q.  When you say your wife, which wife?
4    A.  My wife that I'm currently
5  divorcing.
6    Q.  That's Ms. Hightower?
7    A.  Yes.
8    Q.
9    A.  I don't know.  Years ago.
10    Q.  Was that only one time?
11    A.  It was twice.
12    Q.  Okay.
13
14    A.  She called because she knew that
15  would -- I mean, it was something she really
16  shouldn't have done.
17        Though, I don't expect you to
18  understand that, but if you were there, you
19  would see that it was just wrong.
20
21        And so, that's --              And the other time,
23  the same thing.
24    Q.  Did she claim -- talking about the
25  first time, did she claim that you were

**Page 32**

1
2    A.  No, not that I remember.
3    Q.
4
5    A.  I don't remember.  We were arguing.
6    Q.  What were you arguing about?
7    A.  I don't know remember what.  Pick an
8  argument you have with your wife and then go
9  from there.
10    Q.
11    A.  She might have, but that's not so.
12  But I don't expect you to even understand that.
13        But the whole thing was a joke, but
14  she had to -- it was, to me, just totally wrong,
15  but she did it.
16    Q.  Did she claim --
17    A.  I'm not with her anymore.
18    Q.
19
20    A.  I forget what she -- whatever.  I
21  mean, I even forget what it was about.
22    Q.
23
24    A.  I don't think she could say that I
25  was being           , but I don't know what she

**Page 33**

1  said.
2    Q.  So sitting here today, you have no
3  recollection as to why Ms. Hightower, with whom
4  you're currently married but are getting a
5  divorce,
6        You have no idea?
7        MR. DROGIN:  Objection.
8    A.  No, I have an idea.  We had an
9  argument.             I said, "Please
10  don't do that.  There's no reason to do that."
11  And she did it.
12        And, you know, if you do that,
13                                   No pun intended.
15  And so, unfortunately, that's what happened.
16  BY MR. SANFORD:
17    Q.  Well, you remember you
18
19
20  Take the first time or the second time.
21    A.  No, it was an argument.  We had
22  argued about something.  I don't remember the
23  details.
24    Q.  Well, I'm not interested in the
25  details, sir.  I'm just wondering whether or not



Page 34

```
 1   she ███████████████████████████
 2   █
 3        Do you remember that?
 4        MR. DROGIN:  Counsel -- hold on,
 5   Bob.
 6        Counsel, objection to the form,
 7   and I'm going to direct him not to
 8   answer.
 9        We have given you a tremendous
10   amount of leeway here, but you're now
11   asking questions about a pending civil
12   litigation that involves █████████████
13   So he's not going to answer
14   further questions about that matter.
15        (Whereupon, the transcript
16        was marked for a direction not to
17        answer.)
18   A.  I have a question.  I wonder why you
19   guys even have this case, because, I mean, I
20   know lawyers have ethics, some ethics.
21        I know you defend people.  You
22   represent them.  I guess you felt this one was
23   where you could just take a shot.
24        You know, I know Chase Robinson is
25   not paying you anything.  Pro bono.  Maybe
```

Page 35

```
 1   you'll get lucky with me and I'll give in or
 2   you'll find something and good luck, you know.
 3        But this is such a waste of time for
 4   me, my life, my family.  What I did for Chase
 5   Robinson.  I trusted her, and this is what I
 6   get.  So I'll take it, you know.  You think
 7   you'll make a score with me.
 8   BY MR. SANFORD:
 9   Q.  ████████████████████████████████████████
10        MR. DROGIN:  Objection.
11        Direct the witness not to answer.
12   He's not going to answer that question.
13   He's not going to answer further
14   questions about pending litigation.
15        (Whereupon, the transcript
16        was marked for a direction not to
17        answer.)
18   BY MR. SANFORD:
19   Q.  █████████████████████████████████████████
20   █
21   ██████████████████████████████████████████████
22        MR. DROGIN:  Same objection.
23   Hold on.  Direct the witness not to
24   answer.  We're done answering questions
25   about Ms. Hightower.
```

Page 36

```
 1        (Whereupon, the transcript
 2        was marked for a direction not to
 3        answer.)
 4   BY MR. SANFORD:
 5   Q.  Mr. De Niro, are you going to follow
 6   your lawyer's instruction not to answer the
 7   question?
 8   A.  Yes, I am.
 9   Q.  Do you have something to hide with
10   respect to Ms. Hightower?
11   A.  I have nothing to hide, but it is
12   none of your business and it is not relevant to
13   what we're talking about this whole case.
14   Q.  Well, actually it is, but that's for
15   another day.
16   A.  Really, I would like to see you
17   connect it.
18        MR. DROGIN:  All right.
19        Let's move forward with questions
20   and answers.
21        MR. SANFORD:  Okay.
22        For the record, Mr. Drogin, it is
23   not a proper objection to direct the
24   witness not to answer a question like
25   that.  You know that.  I know that.  And
```

Page 37

```
 1   that's going to be subject to a future
 2   motion.
 3        But you and I will discuss --
 4        MR. BENNETT:  Well, let's dispute
 5   it right now.
 6        MR. DROGIN:  The judge is
 7   standing by.  The judge has been alerted
 8   that there may be directions not to
 9   answer, so if you want to get it
10   resolved now, we can get it resolved
11   now.
12        If you don't want to get it
13   resolved now, our position is that you
14   have waived it.
15        MR. SANFORD:  I understand.
16   Well, you can take that position.
17        MR. DROGIN:  I am.
18   BY MR. SANFORD:
19   Q.  Mr. De Niro, have you ever been
20   convicted of a criminal offense?
21   A.  No.
22        MR. DROGIN:  That, you can
23   answer.
24        Go ahead.
25
```



Page 38

```
 1   BY MR. SANFORD:
 2        Q.  Have you ever been charged or
 3   arrested in correction with a criminal offense?
 4             MR. BENNETT:  Objection to form.
 5        You can answer.
 6        A.  No.
 7   BY MR. SANFORD:
 8        Q.  Have you ever been investigated by
 9   any domestic or foreign tribunal for wrongdoing?
10        A.  No.
11             MR. DROGIN:  Objection to the
12        form.
13        Go ahead.
14   BY MR. SANFORD:
15        Q.  Your testimony is you have never
16   been investigated by a foreign tribunal for any
17   wrongdoing?
18             MR. BENNETT:  Objection to form.
19             You can answer the question.
20        A.  No.
21   BY MR. SANFORD:
22        Q.  Were you ever asked questions in
23   France about potential wrongdoing?
24             MR. BENNETT:  Objection.
25        A.  Yes, that -- I was asked questions.
```

Page 39

```
 1        And again, your job is to get me on
 2   something.  There was nothing.  It never should
 3   have happened, but that's what you would expect
 4   me to say.  But it happens to be the truth,
 5   so...
 6   BY MR. SANFORD:
 7        Q.  So when I asked you whether you had
 8   ever been investigated by any domestic or
 9   foreign tribunal for wrongdoing and you answered
10   no, you forgot --
11        A.  Yes, I did answer no.  My apologies.
12        Q.  May I finish?  May I finish just so
13   we have a clear record?
14        When I asked you have you ever been
15   investigated by any domestic or foreign
16   tribunal for wrongdoing, and you answered no,
17   you forgot about the event in Paris, in France?
18        A.  I did forget about it.  It was such
19   a non-event for me that I forgot about it.  If
20   you brought it up -- yes, you reminded me.
21   Thank you.
22        Q.  All right.
23        So now that I have reminded you and
24   you remember, tell me about that.
25        A.  They were trying to connect me to
```

Page 40

```
 1   some people who had been doing things that I
 2   knew nothing about.
 3        And it was -- as far as I am
 4   concerned, was concerned, it was almost to
 5   harass me or -- I don't know what it was, but
 6   there was nothing there because if there was, I
 7   would have been -- something would have happened
 8   to me.  But there was nothing there so.  That's
 9   it.  Zero.
10        Q.  What were the -- was this the police
11   in France trying to connect you with things?
12        A.  Yes.
13        Q.  What were they trying to connect you
14   with?
15        A.  I don't know. ████████
16   ███████████ But I think after
17   many hours of questioning, they saw that I
18   didn't know anything about that.
19        Q.  I don't know what that means.
20   ████████████████████████
21   ██
22        A.  That's my -- and then I talked to a
23   judge then who oddly had his own scandal, which
24   I find -- I found ironic.
25        But in any case, I don't know.  At
```

Page 41

```
 1   the end of the day, there was nothing there.
 2   There wasn't anything specific that they -- I
 3   don't know what it was all about, because all it
 4   was about, was that I was pulled in, asked
 5   questions and let go and that was it.
 6        Q.  What were the questions you were
 7   asked?
 8        A.  I forget the questions.  If I knew
 9   this person or that person.
10        Q.  What does it mean to be questioned
11   about a -- about ████████████████████
12   ██   ███████████████████████████
13             A.  I don't know.
14             MR. DROGIN:  Objection.
15        Objection to the form.
16             You can answer.
17   BY MR. SANFORD:
18        Q.  You don't know?
19             MR. DROGIN:  You can answer.
20        A.  No, I don't know what it was.  I
21   don't know specifically exactly because I didn't
22   know what they were really -- I knew nothing
23   about it.
24   BY MR. SANFORD:
25        Q.  Well, but you said there were ████
```

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

1    █████████ I'm wondering what that means.
2    Was that a ███████████████
3    you're talking about?
4        A.  I don't know if it was a
5    ████████████████████████
6    ████████████  But again, I did not know anything
7    about it, so...
8        Q.  What was the result of that
9    investigation?
10   investigation?
11       A.  Nothing.
12       Q.  I'm sorry?
13       A.  Nothing, as far as I know.
14       Q.  Have you ever shot yourself in the
15   hand with your own gun?
16       A.  No.
17       Q.  Who is your counsel in this matter?
18       A.  In which matter?
19       Q.  In the matter of Chase Robinson
20   versus you.
21           MR. DROGIN:  Objection to the
22   form.
23           You can answer.
24       A.  Who is the counsel what?
25

Page 43

1    BY MR. SANFORD:
2        Q.  Who is the attorney who represents
3    you in the matter of Chase Robinson against you?
4            MR. DROGIN:  Same objection to
5        the form.
6            Go ahead and answer.
7        A.  I don't understand the question.
8    BY MR. SANFORD:
9        Q.  Well, you know you're here in
10   connection with a lawsuit, correct?
11       A.  Yes.
12       Q.  And you know that lawsuit involves
13   claims brought by Ms. Robinson against you,
14   correct?
15       A.  Yes.
16       Q.  And you know that you're represented
17   in that matter, correct?
18       A.  Yes.
19       Q.  Who represents you?
20       A.  Tom Harvey.  My attorney, Laurent.
21       Q.  Can you give me his full name,
22   please?
23       A.  I don't know his full name.
24           MR. DROGIN:  The record should
25       reflect that it is displayed on the

Page 44

1        screen.
2    BY MR. SANFORD:
3        Q.  You don't, you don't know your
4    lawyer's name?
5        A.  No, I don't know his full name.
6        Q.  Is Tom Harvey your lawyer in this
7    lawsuit and other matters or just for this
8    lawsuit, do you know?
9        A.  In other matters.
10       Q.  And is Laurent, whose last name you
11   don't remember, your attorney in this lawsuit
12   and other matters or just this matter?
13       A.  In other matters, too.
14       Q.  What other matters?
15       A.  He knows that better than I do.  It
16   may be labor, or this and that.  And I suppose
17   that's why he's in this, because of Chase
18   Robinson.
19       Q.  So you don't know for sure why
20   Laurent, whose last name you don't know, is
21   representing you in this matter?
22       A.  No, I know he's representing me
23   because he's protecting me from the likes of
24   you, Chase Robinson, who must have given you a
25   good story about how she was picked upon and how

Page 45

1    she was this and that and which is really, you
2    know -- I don't know.  It is just pathetic.
3            But you guys took the case and you
4    want to prove something.  You want to nail me on
5    something so that you can say -- and that's just
6    not going to happen because there's nothing
7    there.
8        Q.  Has anyone --
9        A.  Fire away.  Fire away.
10       Q.  Has anyone besides Chase Robinson
11   ever accused you of -- or Canal of any
12   wrongdoing?
13           MR. BENNETT:  Objection.
14       A.  I don't think so.  There is people
15   who are always complaining, but not that I know
16   of who work for me or worked for me.
17   BY MR. SANFORD:
18       Q.  What have you done to prepare for
19   today's deposition?
20       A.  I talked to my lawyers.
21       Q.  When you say you talked to your
22   lawyers, who did you speak with?
23       A.  I spoke to Tom Harvey and Laurent a
24   little bit.
25       Q.  Okay.



Page 46

```
 1            When did you speak with Mr. Harvey
 2  about this deposition?
 3       A.  When?
 4       Q.  When.
 5       A.  A couple times.  He reminds me,
 6  tells me that this, you know, is coming up.
 7       Q.  And when you say a couple times, you
 8  mean two?
 9       A.  Two, three, yes.  You know, it is
10  coming up.  You know, everybody knows, so...
11       Q.  And how much time have you spent
12  with Mr. Harvey in total preparing for this
13  deposition?
14       A.  Not a lot.
15       Q.  Can you estimate how many hours?
16       A.  An hour, maybe.  An hour and maybe
17  15 minutes.
18       Q.  And what about Laurent, whose last
19  name you don't know, how much time have you
20  spent with him?
21       A.  That's about it, what I just said.
22       Q.  So you met with them together?
23       A.  Yes.
24            MR. BENNETT:  Objection.
25
```

Page 47

```
 1  BY MR. SANFORD:
 2       Q.  Was anyone else present when you met
 3  with them or were you just with the two lawyers?
 4       A.  Just them.
 5       Q.  Did you meet in person or was this
 6  by phone?
 7       A.  We met on Zoom.
 8       Q.  Have you spoken with anyone else
 9  regarding your deposition?
10       A.  No.
11       Q.  Have you spoken with Tom Harvey
12  about your deposition?
13       A.  Yes, I just told you I spoke with
14  him about i.
15       Q.  Have you spoken with any other Canal
16  employee about your deposition?
17       A.  It is not worthy of talking about.
18       Q.  Do you know that Tiffany Chen was
19  deposed in this matter?
20       A.  I do.
21       Q.  Have you communicated with her since
22  her deposition?
23       A.  Well, she said she was deposed.  You
24  know, she can tell me that.  That's it.
25       Q.  What did she say about her
```

Page 48

```
 1  deposition?
 2       A.  Nothing.  Nobody feels like talking
 3  about it.  It is just like -- it is like talking
 4  about something where you really -- it is sort
 5  of unsavory and so kind of low that you just say
 6  let's just move on.
 7            It is a low point in my life of
 8  having to be subjected to this kind of thing.
 9  If I deserve it, I deserve it, and I would be
10  the first to say it.
11            If I don't deserve it, you can't
12  blame me for feeling a little annoyed by all of
13  this.
14            I tried to do the best thing for
15  Chase.  I do what you call the honor system.  Do
16  the right thing by me; I do the right thing by
17  you.  Don't shake me down, don't threaten me,
18  try to intimidate me.
19            This is to me a pathetic situation
20  that we're all going through and a lot of -- and
21  a big waste of time and money.
22            So you can't blame me for being
23  annoyed.
24       Q.  Do you know that Dan Harvey was
25  deposed in this matter?
```

Page 49

```
 1       A.  Yes, I do.
 2       Q.  Did you speak with him about his
 3  deposition?
 4       A.  A little bit, but not much because
 5  you're not supposed to.
 6       Q.  Well, when you say a little bit,
 7  what do you remember talking about?
 8       A.  He said "I got deposed."
 9       Q.  What else?
10       A.  That's it.
11       Q.  What did you say?
12       A.  I said, "Yes, well, okay.  So let's
13  move on and do the work we're supposed to be
14  doing."
15       Q.  And that was the extent of the
16  conversation?  He said "I got deposed" and you
17  said okay?
18       A.  There's not much to say.  And he's
19  not going to say it.  He's told not to say
20  anything, as I'm told not to say anything.
21            It is not worth it.  It is
22  uncomfortable.  This is all like, it is like it
23  is all -- I feel like I want to take a shower
24  after this whole thing.
25       Q.  Do you know that Michael Kaplan was
```

13  (Pages 46 to 49)


MAGNA
LEGAL SERVICES

Page 50

```
 1   deposed in this matter?
 2        A.  Yes, I heard that too.
 3        Q.  Did you talk with him about it?
 4        A.  No, I didn't.
 5        Q.  Do you know that Sabrina
 6   Weeks-Britain was deposed in this matter?
 7        A.  I heard she was.
 8        Q.  Did you talk to her about it?
 9        A.  No.
10        Q.  Do you know that Robin Chambers was
11   deposed in this matter?
12        A.  I heard.
13        Q.  Did you talk with her about it?
14        A.  No.
15        Q.  Is that a "no"?
16        A.  Huh?
17        Q.  Is that a "no"?  I'm sorry.
18        A.  Who?
19        Q.  Robin Chambers.  Did you say no, you
20   haven't spoken with her?
21        A.  I said no, yes.
22        Q.  Have you reviewed any documents in
23   preparation for your deposition?
24        A.  Very few.
25        Q.  What documents do you recall
```

Page 51

```
 1   reviewing?
 2        A.  I can't remember.
 3        Q.  When you say very few, how many
 4   documents were there?
 5        A.  Three, four, if that.
 6        Q.  And of the three or four, you have
 7   no idea what they were?
 8        A.  I can't remember.  I'll tell you, it
 9   is like so -- the whole thing is so absurd.
10   Just ask me the questions and I'll give you the
11   answers.  Because whether I look at documents,
12   I'm going to give you the same answer.
13        Q.  I know, but I get to ask questions
14   and you get to give answers.
15        A.  You can do whatever you want.
16        Q.  Thank you.
17            My question simply, sir, is do you
18   remember anything at all about any of the
19   documents --
20        A.  No, I don't.
21        Q.  -- that you reviewed?
22            How long ago did you review the
23   documents?
24        A.  A couple days ago.
25        Q.  So you reviewed a few documents a
```

Page 52

```
 1   couple of days ago, and sitting here today a few
 2   days later, you have no idea what those
 3   documents were about?
 4        A.  Believe it or not, I cannot recall
 5   specifically what those documents were about.
 6   They basically were about that she said this and
 7   you said that.  Dah, dah, dah.
 8            You ask me questions in certain
 9   ways, I'll give you the answers.
10        Q.  Your counsel indicated that you had
11   parenting obligations that affected the
12   scheduling of the deposition.
13        A.  Yes.
14        Q.  What parenting obligations were
15   they?
16        A.  They don't have to do with this
17   deposition.
18            MR. DROGIN:  He's not going to
19   answer that.
20            MR. BENNETT:  It relates to the
21   same topic.
22            To the extent you would like to
23   contact Judge Parker's chambers, the
24   defendant, Mr. De Niro, specifically,
25   will seek relief under Rule 30(b)3.
```

Page 53

```
 1            If not, I suggest you move on to
 2   another topic.  And you can seek that
 3   relief following the deposition after
 4   the party's counsel have had a chance to
 5   meet and confer.
 6            (Whereupon, the transcript
 7            was marked for a direction not to
 8            answer.)
 9   BY MR. SANFORD:
10        Q.  So, did you have parenting
11   obligations that prevented you, sir, from
12   spending a full day in your deposition?
13        A.  Yes, yes, I did.
14        Q.  Did you attempt to hire a
15   baby-sitter or get any other help to assist with
16   those obligations?
17        A.  I did what I had to do in order to
18   get my kids treated the proper way, taken care
19   of the proper way.  The proper way has resulted
20   in the way we're doing it today and tomorrow.
21        Q.  I'm sorry, you broke up a little bit
22   there.
23            You're saying you were trying to get
24   treatment and do something in the proper way?
25            MR. BENNETT:  That wasn't his
```



| | Page 54 |
|---|---|

```
 1        testimony.
 2            Bob, Bob, hold on.
 3        A.  As a parent --
 4            MR. SANFORD:  I can't hear
 5        Mr. De Niro speak with the noise in the
 6        background.
 7            MR. BENNETT:  Okay.
 8            Can Catherine read back the
 9        testimony, because I think that question
10        was answered?
11            MR. SANFORD:  I don't want the
12        last question read back.
13            Thank you.
14     BY MR. SANFORD:
15        Q.  My question is:  You had childcare
16     obligations.  Were you able to get a baby-sitter
17     to handle those obligations?
18        A.  I need more than a baby-sitter, my
19     friend.  And I need to do it in such a way to
20     take care of my kids properly.  So this is the
21     way I could do it.
22        Q.  Was there any other issue besides
23     what you have already testified about here today
24     that prevented you from starting today's
25     deposition at 1:00 p.m. Eastern?
```

| | Page 55 |
|---|---|

```
 1            MR. DROGIN:  Objection.  The
 2        witness is not going to answer that
 3        question.
 4            Do not answer the question.
 5            (Whereupon, the transcript
 6        was marked for a direction not to
 7        answer.)
 8            MR. SANFORD:  Are you directing
 9        the witness not to answer that question?
10            MR. DROGIN:  I am.
11     BY MR. SANFORD:
12        Q.  Mr. De Niro, are you accepting your
13     counsel's recommendation?
14        A.  I sure am.  I sure am.
15            MR. DROGIN:  And as before, we're
16        prepared to go to Magistrate Judge
17        Parker now for a ruling.
18     BY MR. SANFORD:
19        Q.  Mr. De Niro, can you start
20     tomorrow's deposition later than 10:00 a.m.?
21        A.  I have to finish at a certain point
22     because I have to get my kids.
23        Q.  Can you end tomorrow's deposition
24     later than 2:30 p.m.?
25        A.  Is there a problem with that?
```

| | Page 56 |
|---|---|

```
 1        Q.  Well, we're trying to get as much
 2     testimony in as possible here and trying to make
 3     it efficient.  I'm just wondering if you can
 4     stay later than 2:30, if necessary.
 5            MR. DROGIN:  Okay, Counsel, the
 6        witness will confer with counsel.
 7        A.  Yes.
 8            MR. SANFORD:  I understand that.
 9     BY MR. SANFORD:
10        Q.  Sitting here today, is there any
11     reason you know of that would prevent you from
12     staying later than 2:30?
13            MR. DROGIN:  Hold on.  Hold on.
14            THE WITNESS:  He's speaking.
15            MR. DROGIN:  Sorry.  We're going
16        to object and we're going to direct the
17        witness not to answer.
18            You have been advised there is an
19        ongoing litigation.  There is an ongoing
20        legal matter.  Mr. De Niro is
21        represented by counsel.  You are
22        deposing Mr. De Niro pursuant to a
23        notice where you yourself have agreed to
24        the times of the depositions.
25            If you want to talk about
```

| | Page 57 |
|---|---|

```
 1     modifying the times for the
 2        deposition --
 3            THE WITNESS:  I'll give you less
 4        time, if you would like.
 5            MR. DROGIN:  Let me finish.
 6            MR. SANFORD:  Mr. De Niro is
 7        willing to be accommodating here, is
 8        what I'm hearing.
 9     BY MR. SANFORD:
10        Q.  Mr. De Niro, are you willing to stay
11     later than 2:30 tomorrow?
12            MR. DROGIN:  Mr. De Niro is not
13        going to answer that question because
14        Mr. De Niro has the right to confer with
15        counsel about the scheduling of his
16        deposition.
17            Counsel, you're not going to
18        negotiate with our client who's
19        represented by counsel.  If you want to
20        direct a question to counsel on a break,
21        we'll go back to Mr. De Niro and confer
22        with him.
23            MR. SANFORD:  Are you directing
24        him not to answer?
25            MR. DROGIN:  I think we have been
```




Page 58

```
 1          very clear that we are.
 2              (Whereupon, the transcript
 3          was marked for a direction not to
 4          answer.)
 5    BY MR. SANFORD:
 6          Q.  All right.
 7              Mr. De Niro, are you accepting your
 8    counsel's recommendation?
 9          A.  Yes, I am.
10          Q.  Mr. De Niro, have you ever had an
11    anger management problem?
12              MR. BENNETT:  Objection.
13          A.  No.
14    BY MR. SANFORD:
15          Q.  Has anyone ever suggested that you
16    have an anger management problem?
17          A.  No.  It might appear that I have one
18    because of my hostility to you, but don't you
19    understand -- you could understand why I am so
20    hostile and so resentful of this treatment
21    because it is totally absurd that I was being
22    put through this for what I did for Chase
23    Robinson.
24              To be put through this by this -- I
25    don't want to say -- she's not -- I don't think
```

Page 59

```
 1    she's all there because this is crazy.  Just so
 2    you know that, this is crazy.
 3          Q.  Well, you called her a bitch before.
 4          A.  What's wrong with calling someone a
 5    bitch?  Though, I didn't call her a bitch.  You
 6    said I called her a bitch.  She is -- I think
 7    that, but I won't call her that, because she
 8    knows what she did.
 9              And I know I treated her very, very,
10    very, very well, but still she felt entitled,
11    like some people who feel entitled to do these
12    kinds of things.  It just baffles my mind that
13    this person would do this.
14          Q.  Well, Ms. Chen called her an
15    asshole.  Do you think she is an asshole?
16          A.  What's wrong with that?  Oh, come
17    on.  Don't ask me a stupid question like that.
18              When people are mad they say those
19    things.  What's wrong with that?  You haven't
20    called anybody you know an asshole?  Give me a
21    break.
22          Q.  Are you mad right now?
23          A.  Yes, I am annoyed, yes.  Because I
24    have real problems in my life, and what you
25    people are putting me through is ridiculous.
```

Page 60

```
 1              And you're doing your job, and maybe
 2    you're hoping that you'll hit a home run by
 3    getting me to do something or say something that
 4    will then win something for her, but nothing
 5    will be won for her.
 6              I did everything right by her all
 7    the time, all the time.  And this is no good
 8    deed goes unpunished.  You know that one?  Well,
 9    that's what this is.  Of course I'm upset.
10          Q.  ████████████████████████████
11    ████████████████████████████████████████
12    ████████████
13              MR. BENNETT:  Objection.
14    BY MR. SANFORD:
15          Q.  For what reason?
16              MR. BENNETT:  Objection.
17          A.  ██████████████████████████████
18    ██████████████████
19    ████████
20    BY MR. SANFORD:
21          Q.  █████████████████
22              MR. DROGIN:  Objection.
23          A.  That's none of your business.
24              MR. DROGIN:  Direct the witness
25    not to answer.
```

Page 61

```
 1              (Whereupon, the transcript
 2          was marked for a direction not to
 3          answer.)
 4              MR. BENNETT:  Objection.
 5              MR. SANFORD:  You're going to
 6          direct the witness not to answer that
 7          question.
 8    BY MR. SANFORD:
 9          Q.  Mr. De Niro, are you going to accept
10    your counsel's recommendation?
11          A.  Yes, I am.
12          Q.  ███████████████████████████████
13    ███████████████████████████████████
14    ██████████████████?
15              MR. DROGIN:  Objection.
16    Objection.
17              MR. BENNETT:  Objection.
18              MR. DROGIN:  Hold on.  Hold on.
19    Objection to the question, and I direct
20    the witness not to answer.
21              Mr. De Niro has not put his
22    mental state at issue in this case.
23              (Whereupon, the transcript
24          was marked for a direction not to
25          answer.)
```

16 (Pages 58 to 61)



Page 62

```
 1         A.  You're creating my mental state and
 2    you know it.  And you're trying to antagonize
 3    me, harass me, embarrass me.
 4         So take your best shot, okay.
 5    That's what this is all about.
 6    BY MR. SANFORD:
 7         Q.  ████████████████████████
 8    ████ ████████████████████████████████
 9    █
10         Q.  When was that?
11         A.  ████████.
12         Q.  When was that?
13         A.  ████
14    ████████████████████████████████████
15    █
16         Q.  Any other times?
17         A.  No.
18         Q.  Has anyone ever told you that you
19    were abusive?
20             MR. DROGIN:  Objection to the
21         form.
22             You can answer.
23         A.  No.
24    BY MR. SANFORD:
25         Q.  Has your anger created problems in
```

Page 63

```
 1    your personal life?
 2             MR. DROGIN:  Objection to the
 3         form.
 4             MR. BENNETT:  Objection.
 5             MR. DROGIN:  You can answer.
 6         A.  Do I get angry?  Of course.  People
 7    get angry about things.  And you have to, you
 8    know, manage that when you feel you don't want
 9    to get out of control.
10             And I might look to you like I get
11    out of control, but I am very much in control
12    many and most of the time, and -- but I'm
13    entitled to be annoyed at this whole process.
14             With everything in my life that
15    means something to me, I have to sit here and be
16    humiliated -- not humiliated, not humiliated --
17    with the attempt to humiliate and embarrass me
18    and see what they can find.
19             What you can find, the senior
20    lawyer.  I'm sorry I am annoyed.  It is a waste
21    of time.
22             How old are you?  Can I ask you
23    that?
24    BY MR. SANFORD:
25         Q.  Is the answer to my question "yes"?
```

Page 64

```
 1         A.  That's my answer.
 2             And I'm asking you, how old are you?
 3         Q.  We don't have a conversation --
 4         A.  I think I'm older than you.  You
 5    have a lot going on in your life, I'm sure.  So
 6    do I.  Going through this is a ridiculous joke.
 7         Q.  I ask questions and you give
 8    answers.
 9             Has your anger created problems in
10    your personal life?  That was my question.
11         A.  No.
12             MR. DROGIN:  Objection to the
13         form.
14         A.  Believe it or not, no.
15    BY MR. SANFORD:
16         Q.  Has your anger created problems in
17    your professional life?
18             MR. BENNETT:  Objection.
19         A.  No.
20    BY MR. SANFORD:
21         Q.  Have you drunk alcohol at any time
22    in your life?
23         A.  Sometimes.
24         Q.  And when you would drink alcohol,
25    would you get easily enraged?
```

Page 65

```
 1             MR. DROGIN:  Objection to the
 2         form.
 3         A.  No.
 4    BY MR. SANFORD:
 5         Q.  Would you become argumentative?
 6             MR. DROGIN:  Objection to the
 7         form.
 8         A.  When and if the time I have a drink,
 9    I was a happy person.
10    BY MR. SANFORD:
11         Q.  So you would drink and get happy?
12         A.  In my experience.
13         Q.  Were you more likely to raise your
14    voice when you would drink?
15             MR. BENNETT:  Objection.
16         A.  I'm not going to answer that.
17             MR. DROGIN:  Objection to the
18         form.
19    BY MR. SANFORD:
20         Q.  I'm sorry, I couldn't hear the
21    answer.
22         A.  I'm not going to answer that.
23         Q.  Why not?
24         A.  Because it is a silly question.
25         Q.  What makes it silly?
```





MAGNA
LEGAL SERVICES

Page 66

```
 1        A.  It is silly and you know it, and it
 2  has nothing to do with this case.
 3        Q.  Did you feel -- would you feel freer
 4  to curse when you would drink?
 5             MR. BENNETT:  Objection.
 6        A.  I feel like cursing right now, but
 7  I'm not going to, of course.
 8  BY MR. SANFORD:
 9        Q.  You can curse if you would like.
10        A.  No, I don't want to.  I feel it is
11  beneath me to curse, believe it or not.
12        Q.  So do you feel freer to abuse people
13  when you drink?
14             MR. BENNETT:  Objection.
15        A.  No, I don't.  And this to me is --
16  let's just -- just keep asking me questions.
17  Let's move on, please.
18  BY MR. SANFORD:
19        Q.  Has your drinking affected your
20  memory?
21             MR. DROGIN:  Objection to the
22  form.
23        A.  No.
24  BY MR. SANFORD:
25        Q.  Have you ever blacked out from
```

Page 67

```
 1  drinking?
 2             MR. DROGIN:  Objection to the
 3  form.
 4        A.  No.
 5  BY MR. SANFORD:
 6        Q.  Was there ever a time when you
 7  passed out from drinking near the Greenwich
 8  Hotel where a bellhop found you on the street?
 9             MR. DROGIN:  Objection, and
10  direct the witness not to answer any
11  further questions about the use of
12  alcohol.  This has nothing to do with
13  this case.
14             If you would like to mark it for
15  a ruling, you can mark it for a ruling.
16  If you want to take it to the judge
17  right now, we can take it to the judge
18  right now.
19             (Whereupon, the transcript
20  was marked for a direction not to
21  answer.)
22             MR. SANFORD:  I can assure you
23  we're marking for rulings a lot of
24  what's happening here, Mr. Drogin.
25             MR. DROGIN:  That's fine.
```

Page 68

```
 1             MR. SANFORD:  Are you directing
 2  the witness not to answer my question?
 3             MR. DROGIN:  Yes, and I suggest
 4  you move on to what this lawsuit is
 5  about.  You have a client who's waiting.
 6             MR. SANFORD:  You understand
 7  these are improper directions not to
 8  answer, right?
 9             You understand, you understand
10  the rules of federal -- Federal Rules of
11  Civil Procedure?  You understand that
12  there are only certain limited
13  circumstances in which you get to direct
14  the witness not to answer.  You
15  understand that, right?
16             MR. DROGIN:  Are you questioning
17  me?
18             MR. SANFORD:  Yes.  You're
19  directing the witness not to answer, and
20  I'm asking if you understand the rules.
21             MR. DROGIN:  I understand that
22  your law firm is currently in the
23  process of responding to a Rule 11
24  motion because of the two baseless
25  claims that you have brought.
```

Page 69

```
 1             I also understand that you are
 2  not permitted to ask questions that are
 3  intended to harass, intimidate or
 4  threaten the witness.
 5             This case, this case -- you have
 6  been questioning the witness for almost
 7  an hour and you have yet to touch on the
 8  subject matter of this litigation.
 9  BY MR. SANFORD:
10        Q.  ████████████████████████████
11  ██
12             MR. DROGIN:  Objection, and
13  direct the witness not to answer.
14             Why don't we just call the judge.
15  Maybe you're right.
16             (Whereupon, the transcript
17  was marked for a direction not to
18  answer.)
19             MR. SANFORD:  We're wasting a lot
20  of time, Mr. Drogin.  If you want to
21  direct not to answer, please state it
22  for the record and let's move on.
23  BY MR. SANFORD:
24        Q.  Mr. De Niro, are you following your
25  counsel's direction?
```







**Page 70**

```
1          A.  Yes, I am.
2          MR. DROGIN:  I don't understand
3     why -- if you think I'm wrong, let's
4     take it to the judge.  And then, if
5     you're right, he can answer it.
6  BY MR. SANFORD:
7     Q.  Mr. De Niro, did anyone ever accuse
8  you of being an alcoholic?
9     A.  No.
10    Q.  ████████████████
      ████████████
13    Q.  When was that?
14    A.  A couple years ago.
15    Q.  By that, you mean what year?
16    A.  I guess it was, oh, three years ago
17  sometime.  Whatever year that was.  '19.
18    Q.  ████████████████████
    ████████████████████████
    ████████████████
    ████████████████████████
    ████████████
```

**Page 71**

```
1  ██████████████████████████
   ██████████████████████████
   ██████████████████████████
   ██████████████████████████
10    Q.  And when you say they didn't allow
11  you to have any -- sorry?
12    A.  Yes, they might do other things, but
13  that's what was for me for what I was doing.
14    Q.  And when you say they didn't allow
15  you ████████████████████████
   ██████████████████████████
   ██████████████████████████
   ██████████████████████████
   ██████████████████████████
25    Q.  And when you say your son felt that
```

**Page 72**

```
1  ████████████  which son was that?
2     A.  My oldest son, ████████████
   ████████████████████████
5          MR. DROGIN:  Objection to the
6     form.
7     A.  I don't know that.
8  BY MR. SANFORD:
9     Q.  You don't know?
10    A.  No.
11    Q.  ████████████████████
   ████████████████████
14          MR. BENNETT:  Objection.
15    A.  I'm not sure.
16  BY MR. SANFORD:
17    Q.  ████████████████████
   ████████████████████████
   ████████████████
   ████████████████████████
   ████████████████
```

**Page 73**

```
1          MR. BENNETT:  Objection.
2     Don't answer the question, Bob.
3     That's not something that has any
4     remote connection to the controversy at
5     issue in this action.
6          (Whereupon, the transcript
7     was marked for a direction not to
8     answer.)
9  BY MR. SANFORD:
10    Q.  ████████████████████████
   ████████████
12    A.  No.
13    Q.  You didn't have a glass of wine with
14  Chase Robinson in London at La Fromagerie?
15    A.  Yes, I did with her that one time,
16  yes.
17    Q.  ████████████████████████
   ████████████████████
   ████████████████
24    Q.  And besides that instance, were
25  there other instances when you had alcohol since
```

19 (Pages 70 to 73)





Page 74

2     A.
5     A. That was one time that I was being
honored in a film festival in Africa, and I
picked up the thing and she made a big thing out
of it.

16    A. No.
17    Q. --
19    A. No.
20    Q.
22    A. Yes.
23    Q. All right.
24          We're going to play a recording for
25    you that has been Bates stamped ROBINSON 7147.

Page 75

1          MR. SANFORD: Can we do that,
2     please.
3              (Whereupon, an audio
4          recording was played.)
5          MR. SANFORD: For the record, we
6     began playing the recording at the time
7     stamp of 118, and we're marking the
8     document as Plaintiff's Exhibit 110.
9              (Recording was marked as
10         Plaintiff's Exhibit 110 for
11         identification, as of this date.)
12    BY MR. SANFORD:
13    Q. Mr. De Niro, do you recognize your
14    voice on that recording?
15    A. Yes, I do.
16    Q. Would you consider yourself hostile
17    on the recording?
18    A. I was angry, yes, I was angry.
19    Q. Why did you say what you said in
20    that voice-mail?
21    A. Because that's what she did. I was
22    accommodating her. She's living in Spain. She
23    lives in London. She works from there. She
24    does this and that. Then I hear later that
25    she's using Ubers and staying in hotels, my

Page 76

1     expense. Air miles.
2          I mean, this is later I hear this,
3     but then she knew I had to be woken up and it
4     was her responsibility. I never get mad like
5     that with her, with her.
6          But I've got to say, I was so
7     resentful and angry at what she had done. She
8     couldn't even -- it was an important meeting and
9     she just blew it off. I don't know what she
10    did. Maybe she forgot about it.
11         Whatever the reason, with all her
12    things, and she is such a great worker and all
13    this. Now I hear that a lot of things she gave
14    to other people to do. She wasn't even doing
15    it.
16         I don't know what kind of delusion
17    this woman is in or has about how she worked and
18    how hard she worked. She was hated by
19    everybody. I didn't know that. Nobody told me.
20    They had a celebration after she left, which I
21    didn't go to.
22         But this is the kind of -- I'm
23    trusting her to do the right thing. I say go to
24    Spain if that's going to be easier for you. Go
25    to Spain and you can do work from there, go

Page 77

1     here.
2          I knew she would keep that thing and
3     use it today and I would be sitting in the
4     situation I am right now hearing that. I knew
5     that, but I was so angry.
6          I said listen, fuck it. I'm going
7     to say this. You were wrong. You know, you
8     claim that you work so hard. You do all this,
9     you do all that. I started questioning whether
10    she really did do as much as she said she did.
11    Q. You approved her work from Spain,
12    didn't you?
13    A. Well, I -- listen, I wanted to make
14    her happy. I figured if she wants to go there,
15    she has a reason. If she can do it with the
16    internet and so on, I'm okay with that.
17         I'm not the kind of boss, if you
18    will, that says you have to stay here 9 to 5,
19    all that stuff. I believe in letting people do
20    what they want to do as long as they do their
21    job.
22         And if they don't do their job,
23    then, look what happens. I mean, I was -- even
24    then I forgive them.
25         I said, "Just don't do it again.

20  (Pages 74 to 77)


MAGNA
LEGAL SERVICES

1  Thank you for copping to not doing what you
2  should not have done." That's all. That's all
3  I ask. Be honest about what you did wrong. You
4  screwed up. Fine, say it, and then we move on.
5  People make mistakes.
6          And that's how, that's how you
7  create loyalty with people. By understanding
8  that it is okay if you make a mistake.
9          But what I don't like is what this
10  woman is doing to me right now. She tried to
11  shake me down for $600,000. She wrote a fake
12  letter to the London School of Economics which
13  couldn't have been used for any kind of job, and
14  I knew that and I was not going to sign it.
15          I do the right thing by my
16  employees. You have spoken to other ones. I
17  don't -- the most I ever get is annoyed by
18  something. I don't abuse them. I don't do
19  anything. I don't curse at them. I don't do
20  anything.
21          MR. DROGIN: Can we move on with
22      the questions?
23      A. I have my trainer. Dan Harvey is
24  with me almost 40 years. I have other people
25  working with me for long periods of time.

1          You have to really do something
2  egregious to stay, well, you know, I guess you
3  shouldn't be here.
4          MR. DROGIN: Can we just move on
5      with the questioning, please?
6  BY MR. SANFORD:
7      Q. Are you finished, Mr. De Niro?
8      A. I'm finished.
9      Q. Are you ashamed of yourself for
10  having left the voice-mail message you did?
11          MR. DROGIN: Objection.
12      A. No, I'm not ashamed. No, I'm not
13  ashamed. People get mad. They say things. I
14  wasn't abusive. I was yelling, yes, but I was
15  yelling at what she had not done.
16          I was not calling her names or this
17  or that or being abusive in a way which is not
18  acceptable. I was mad about the situation.
19          And it was important to me, so, yes,
20  I was mad. You never got mad at anybody in your
21  office? Huh? Sir, come on.
22          MR. DROGIN: He's not here to
23      answer questions.
24      A. He's not answering questions.
25          MR. DROGIN: Hold on. He's not

1      here to answer questions. Let's move
2      on. You can Google him and read all
3      about him.
4          Go ahead.
5  BY MR. SANFORD:
6      Q. Mr. De Niro, you yelled at
7  Ms. Robinson a number of times throughout her
8  employment, didn't you?
9      A. What?
10      Q. You yelled at Ms. Robinson a number
11  of times throughout her employment?
12      A. No, I didn't yell at her a number of
13  times.
14      Q. This was the only time you ever did?
15      A. I could have gotten upset, but I
16  didn't yell at her a number of times. That's
17  wrong. I did not do that.
18      Q. Did you, did you apologize to
19  Ms. Robinson for having left that voice-mail
20  message?
21      A. I could have because I know that
22  even though I was entitled to leave that
23  message, I apologized to her for just being so
24  upset. I could very well have done that. Did
25  she record that too?

1      Q. Well, I'm not asking if you could
2  have. I'm asking if you remember having done
3  so.
4      A. No, I don't remember. But knowing
5  myself, I could have.
6      Q. Had you been drinking prior to
7  leaving Ms. Robinson that voice-mail message?
8          MR. BENNETT: Objection.
9      A. I don't remember. I don't remember.
10  BY MR. SANFORD:
11      Q. You might have been; you just don't
12  know?
13      A. I don't know.
14      Q. Were you more likely to yell at
15  Ms. Robinson when you had been drinking alcohol?
16          MR. BENNETT: Objection.
17          MR. DROGIN: Objection to the
18      form.
19      A. No.
20  BY MR. SANFORD:
21      Q. You can answer.
22      A. No, no. It was -- she had done
23  something that was just -- anyway, you know what
24  it is. I just was very upset by it.
25      Q. Were you more likely to curse at



Page 82

```
1     Ms. Robinson when you had been drinking alcohol?
2              MR. BENNETT:  Objection.
3              MR. DROGIN:  Objection to the
4         form.
5         A.  I'm not answering that.
6              MR. DROGIN:  You can answer.
7              THE WITNESS:  I'm not answering
8         him.
9         A.  I don't curse anymore at her if I
10   had been drinking.  I just didn't -- you know, I
11   was mad at her.  I might have acted the same way
12   if I was drinking.  I don't know.
13             That was my reaction to her at that
14   time.  I was tired.  I had been traveling.  I
15   came from back East.  It was a three-hour
16   difference.  I was on a later time schedule.
17   BY MR. SANFORD:
18        Q.  ████████████████████
19        A.  No.
20             MR. BENNETT:  Objection.
21        A.  ████████████████
22   ████████████████████████
23   BY MR. SANFORD:
24        Q.  When did you first meet
25   Ms. Robinson?
```

Page 83

```
1         A.  I don't know.  By now it is 13 years
2    ago, maybe longer.
3         Q.  Did you interview Ms. Robinson
4    before she joined Canal?
5         A.  Yes.
6         Q.  What were your first impressions of
7    her?
8         A.  She seemed okay.  And as I say to
9    any new perspective employee that really -- I
10   can describe certain things of what the job is.
11   I get a sense of the person.
12             But the real -- the people who give
13   the real day-to-day sense of what the operation
14   would be, what their job would be, would be
15   people like Chase and the other people in the
16   office.
17             I said talk to them.  They'll tell
18   you what it really is and then you decide if you
19   want to do it.  That's the job.  That will be
20   pretty much what the job will be.
21        Q.  Did you offer Ms. Robinson a
22   position?
23        A.  She was applying for the position of
24   my head -- my point person, if you will.
25        Q.  Did you offer her that position?
```

Page 84

```
1         A.  Huh?
2         Q.  Did you offer her that position?
3         A.  That was what she was applying for.
4    If she was applying for it, then that's what I
5    was offering her.
6         Q.  What were the qualities you valued
7    in Ms. Robinson as an employee?
8              MR. BENNETT:  Objection.
9              MR. DROGIN:  Objection to the
10        form.
11        A.  Well --
12             MR. DROGIN:  You can answer.
13        A.  She was fine.  You can't really
14   tell.  People say I work so hard.  I did this or
15   that.  Then you start hearing that she delegated
16   stuff to other people in the office on the
17   seventh floor in TriBeCa.
18             So she didn't really quite do so
19   much.  She would say she is doing certain
20   things.  I didn't know.  I trusted her.  I said,
21   listen, what you say is what I believe.  I don't
22   want to be around a person who lies to me.  Just
23   say what you do and what you can't do, and we'll
24   figure a way to do it if you can't do it.  Then
25   we'll figure to get someone else to do it.  Just
```

Page 85

```
1    say what it is.
2              But I saw that she wanted to control
3    everything.  And what -- that's a problem when
4    people want to control everything.  They don't
5    realize that you just have to use the best of
6    what the people have.  Respect them and you will
7    get a lot further.
8              She had ideas about wanting to be an
9    executive and this and that, wanting me to give
10   her all kinds of titles.  I said the only thing
11   you need from me -- you don't need those titles.
12   They mean nothing.  All you need is a letter of
13   recommendation from me, and that's it.
14             And I didn't even say do your job.
15   What I was thinking is just do your job.  Do the
16   right thing.  Be honest.  Be straightforward.
17   You'll always come out ahead.
18             That's all I ask.  It is the honor
19   system.  You do the right thing, you get repaid
20   accordingly.  It is that simple.
21   BY MR. SANFORD:
22        Q.  Do you remember my question?
23        A.  You can repeat it if you want.
24        Q.  Do you remember it?
25             MR. DROGIN:  Note the objection
```

22  (Pages 82 to 85)



## Page 86

```
 1        to the form of the question.
 2   BY MR. SANFORD:
 3        Q.  Do you remember my question?
 4        A.  I don't remember.  Why don't you
 5   just repeat it and I'll answer in a better way.
 6        Q.  I'm happy to do it.
 7            What were the qualities you valued
 8   in Ms. Robinson as an employee?
 9        A.  You know, I'm not sure.  In the
10   beginning, she -- there were things about her
11   that were kind of arrogant, a little petulant.
12   As years went on, she felt more entitled to act
13   that way.
14            I defended her with somebody who was
15   working with us; my wife, who I am currently
16   divorcing; with a guy who's running the
17   household thing and I felt he was being too much
18   of a bully with her.
19            And I -- and I told him -- I told my
20   wife and him to back off from her.  I felt she
21   was being bullied and I didn't like it.  And
22   that's it.
23            So all I want is people to get
24   along, do the right thing, do their job and, you
25   know, do it to the best of your ability.  If
```

## Page 87

```
 1   there's a complaint or something and you come
 2   tell me, I'll try and fix it, hopefully.  That's
 3   all I can do.
 4        Q.  Do you remember the question I
 5   asked?
 6        A.  No, tell me again.
 7        Q.  I asked --
 8        A.  Or whether she has good qualities.
 9   I just told you.  That's how I can answer that
10   question.
11        Q.  Well, I asked you if there were
12   qualities you valued.  You talked about
13   arrogance and petulance.
14        A.  Yes --
15        Q.  May I finish?
16        A.  -- but I can't, you know --
17        Q.  Mr. De Niro, in order to have a
18   clean record --
19        A.  Yes.
20        Q.  I know it is difficult on the
21   screen, so I'm not criticizing you.  I'm just
22   saying that it is going to be important for us
23   not to talk over one another.  Let me just
24   finish my question.
25        A.  Okay.
```

## Page 88

```
 1        Q.  I asked you what qualities you
 2   valued in Ms. Robinson.  You talked about
 3   arrogance and petulance and bullying.
 4            I'm wondering if those are the
 5   qualities that you, in fact, valued?
 6        A.  No, I didn't, no, I didn't.  I
 7   didn't value -- you mean -- I'm not
 8   understanding.  You're saying I valued?
 9        Q.  Valued.  Do you know what it means
10   to value a quality?
11        A.  No, I didn't value those qualities
12   if she had them.  And I saw them later on.  I
13   tolerated them.
14        Q.  Okay.
15            So what qualities did you value of
16   Ms. Robinson?
17        A.  I thought she was a good worker.
18   She kept saying she was a good worker.  She kept
19   doing that.  When I called her and asked her to
20   do something, she had it done.  She knew she had
21   to have it done.  That was all fine.
22            As time went on, she would get --
23   you know, she would take liberties with doing
24   this or choosing something.  You don't need
25   that.  I'll take this.
```

## Page 89

```
 1            And I would say that's a little -- I
 2   don't know, it is a little forward, but I'll let
 3   it go because, you know, people get their
 4   little -- they get a little eccentric, a little
 5   crazy.
 6            You have to tolerate people's
 7   foibles.  That's okay.  That's life.  You can't
 8   get rid of them for that.  You know, that's
 9   okay.  They have good qualities that outweigh
10   those qualities.  I'll tolerate those.
11        Q.  What are the qualities --
12        A.  She led me to believe she was doing
13   everything that I asked her to.  A lot of
14   times she hired good people.  She interviewed
15   them and then we would get them.  They were the
16   people I have now.  Sabrina especially is
17   terrific.
18            So Chase did that.  She does good
19   things.  I was not, I -- in fact, I was so busy
20   that I wasn't, you know -- just do what it is
21   and no problem.  Let's move on.
22            There's no -- I wasn't asking her to
23   do things that were hard or so hard.  And she
24   ran the office.  She was the point person.  I
25   need this, so she'll delegate to whomever it
```



Page 90

```
 1   would be.
 2          And I would say, you know, fine.  I
 3   just want to get it done.
 4          I don't know if I'm answering your
 5   question.
 6          So she led me to believe that she
 7   had good qualities.  But as time went on and now
 8   in this, this situation, I realize she didn't.
 9          And she had nefarious, devious
10   qualities.  She would take my calls.  She cloned
11   my phone.  She used my air miles.  She took Uber
12   in Europe when she shouldn't have.  I never gave
13   her permission.  She did things in LA where she
14   shouldn't have.  She spent money.
15          I don't know whether she just felt
16   she was entitled.  I don't know what that is.
17   That is not good.  That's stealing.  She stole
18   from me.  That, I don't accept.
19          You can tell me, look, she said "I
20   want to take some air miles.  Can I do that?"
21          And I said "Sure.  Don't take too
22   many."
23          I just want to make sure my kids can
24   use them if they need them.  Because one of my
25   kids was complaining about the air miles.  I
```

Page 91

```
 1   said no, no, they need them first.  I rather pay
 2   for her.  Then let the kids -- whatever is the
 3   best.  But I didn't want all the air miles to be
 4   used by her, and I didn't even know how many air
 5   miles I had.
 6          But I trusted her to allot to
 7   herself the amount of air miles she would need
 8   for her work.
 9          Q.  We're going to talk about that.
10   We're going to talk about air miles.  Let me ask
11   you this.
12          You say that she was your point
13   person.  What does it mean to be your point
14   person?
15          A.  Do you have a head person in your
16   office --
17          Q.  My question --
18          A.  -- who does everything?
19          Listen, okay.  A point person is
20   your main person with you who does -- maybe it
21   is the lead assistant or -- she is my head
22   assistant.
23          She is the person that delegates all
24   the things to be done in the office and doles
25   out, if you will, the assignments for certain
```

Page 92

```
 1   things so I don't have to go to each person and
 2   say you do this, you do that.
 3          That is what that was.  She had a
 4   lot of control.
 5          Q.  So she controlled delegating
 6   assignments and she was that point person
 7   throughout the time she had worked for you?
 8          A.  Yes, pretty much, yes.
 9          Q.  All right.
10          During her employment -- during
11   Ms. Robinson's employment at Canal, how many
12   times would you communicate with her during an
13   average day?
14          MR. DROGIN:  Objection to form.
15          A.  A few times.
16          THE WITNESS:  Sorry.
17          MR. DROGIN:  Objection to the
18   form.
19          You can answer.
20   BY MR. SANFORD:
21          Q.  You can answer.
22          A.  I would be talking to her a lot
23   during the day.  How is this?  How is that?  She
24   would call me, e-mail.  This is being done, dah,
25   dah, dah.  You know, it was just the usual
```

Page 93

```
 1   stuff.
 2          Q.  How frequently would you text
 3   Ms. Robinson during an average day?
 4          A.  I don't remember.  You know, I don't
 5   remember.
 6          Q.  How often would you meet with
 7   Ms. Robinson in a typical day?
 8          A.  It could be once a day.  Sometimes
 9   not for a day or two or three if I'm busy doing
10   something other than just being out of town.
11          Q.  During Ms. Robinson's employment at
12   Canal, Ms. Robinson generally kept you apprised
13   of where she was throughout the course of a day,
14   didn't she?
15          MR. BENNETT:  Objection.
16          A.  I think she probably did, but I'm
17   not a hundred percent sure.  Sometimes she
18   didn't.  But I would just rely on her.  I would
19   call her or say call me and that would be that.
20   BY MR. SANFORD:
21          Q.  It was common for you and
22   Ms. Robinson to speak early in the morning
23   before 9:00 a.m., right?
24          A.  I think yes --
25          MR. BENNETT:  Objection.
```





Page 94

```
 1        A.  I think in the beginning of the day,
 2  yes.
 3  BY MR. SANFORD:
 4        Q.  And it was common for Ms. Robinson
 5  to do work for you early in the morning as well,
 6  right?
 7            MR. BENNETT:  Objection.
 8        A.  At times.
 9  BY MR. SANFORD:
10        Q.  And it was common for you and
11  Ms. Robinson to speak late at night until 8:00
12  o'clock or later, right?
13            MR. BENNETT:  Objection.
14        A.  It could be.
15            THE WITNESS:  I'm sorry, should I
16        not answer?  Or are you saying
17        objection?
18            MR. BENNETT:  It's okay, Bob, go
19        ahead.  I'll be very clear if I don't
20        want you to answer.
21  BY MR. SANFORD:
22        Q.  And it was common for you and
23  Ms. Robinson or Ms. Robinson to speak with you
24  and do work on the weekends, right?
25            MR. BENNETT:  Objection.
```

Page 95

```
 1        A.  Yes, if need be, yes.
 2  BY MR. SANFORD:
 3        Q.  And it was common for you and
 4  Ms. Robinson to speak on holidays, right?
 5            MR. BENNETT:  Objection.
 6        A.  If need be, yes.
 7  BY MR. SANFORD:
 8        Q.  And during Ms. Robinson's employment
 9  at Canal, Ms. Robinson kept you apprised if she
10  was going to be away from New York, right?
11            MR. BENNETT:  Objection.
12        A.  Yes, she said she would like to go
13  to Spain or London and do this, and I -- you
14  know, with the internet and technology these
15  days, I said okay.  Even phones, okay.
16  That's -- I want to accommodate her.  I want to
17  make her happy.  I just -- that's how I am.
18        If people want to do something, they
19  need to do it that way.  I'll say okay.  I'm
20  okay with that as long as you do what you need
21  to have done.
22  BY MR. SANFORD:
23        Q.  Ms. Robinson checked with you before
24  traveling from New York, going outside of New
25  York, right?
```

Page 96

```
 1            MR. BENNETT:  Objection.
 2            MR. DROGIN:  Objection to the
 3        form.
 4            You can answer.
 5        A.  Well, she had to tell me that she is
 6  going out.  You know, that would be -- of course
 7  she would have to tell me.
 8  BY MR. SANFORD:
 9        Q.  And even if Ms. Robinson was
10  traveling away from New York, Ms. Robinson was
11  still available to work for you, right?
12            MR. BENNETT:  Objection.
13            MR. DROGIN:  Objection to the
14        form.
15            You can answer.
16  BY MR. SANFORD:
17        Q.  I couldn't hear.
18        A.  That was the understanding.  That is
19  the absolute understanding.  Not when she's
20  traveling.  Maybe even then, you know, if she
21  had WiFi on the plane or something and I need to
22  get her a message before she landed say
23  wherever, in London, or whatever, if there was
24  WiFi on an international flight.  Rarely that
25  would happen.  You know, whatever.
```

Page 97

```
 1        Q.  And you would get upset if
 2  Ms. Robinson was not available when you called
 3  her, wouldn't you?
 4        A.  No, I wouldn't get upset.  Only if
 5  she was supposed to be available.
 6            This wasn't a regular occurrence.
 7  What happened on that recording was not a
 8  regular occurrence.  She did get back to me.
 9  She knew that she had to, that I needed to do
10  something.  So, you know, there was no, you
11  know --
12        Q.  Can you describe for me the types of
13  things that Ms. Robinson did to assist you and
14  your family while she was employed at Canal?
15            MR. DROGIN:  Objection to the
16        form.
17            You can answer.
18        A.  Well, she would help me get
19  presents.  We would go to stores, pick out this
20  with a list; this for this child, this for that,
21  this relative.  You know, everything, just to
22  try and cover all that.  She would go with me
23  and we would do all that.
24            You know, that stuff she would do
25  and stuff with the family.  I need this or that.
```

25  (Pages 94 to 97)





| Page 98 |
| --- |

1 Yes, she is a personal assistant. She also was
2 very important as far as helping me with those
3 things.
4 BY MR. SANFORD:
5     Q. So besides getting presents and
6 going to stores, what else would she do?
7     A. Well, you know, whatever,
8 whatever -- she helped me with the house. She
9 pulled in a friend of hers. I said fine, an
10 interior designer.
11     We would go to the design center or
12 here and there, look for furniture. Order
13 furniture to certain specifications. She helped
14 me with this, a piece of furniture. Be there
15 waiting when it would come in, or somebody --
16 she would have Michael there waiting for when it
17 would come in.
18     You know, it was anything. Anything
19 and everything.
20     Q. Okay.
21     Ms. Robinson's titles changed at
22 various times during her employment at Canal,
23 didn't they?
24     A. At her request.
25     MR. SANFORD: We are sharing a

| Page 99 |
| --- |

1 document with you in the chat that is
2 Bates CANAL 45910, which is a July 18,
3 2017 e-mail from Ms. Robinson to you.
4 And we're marking the document as
5 Plaintiff's Exhibit 113.
6     (Document bearing Bates
7     stamp Nos. CANAL 45910 was marked as
8     Plaintiff's Exhibit 113 for
9     identification, as of this date.)
10     MR. BENNETT: Bob, are you able
11 to see the chat?
12     THE WITNESS: I'm not seeing it.
13     MR. BENNETT: Put your mouse
14 towards the bottom.
15     THE WITNESS: Yes. Press that?
16     MR. BENNETT: See where it says
17 chat?
18     THE WITNESS: Okay.
19     So it is on the right?
20     MR. BENNETT: Down in the middle
21 in the center.
22     THE WITNESS: I don't see
23 anything. It says click the download.
24 Should I do that?
25     MR. BENNETT: Yes, go right

| Page 100 |
| --- |

1 ahead.
2     THE WITNESS: Do it?
3     MR. BENNETT: Yes.
4     THE WITNESS: Click to open.
5     All right.
6     A. So, yes, I read this. What are you
7 wanting to ask me?
8     MR. BENNETT: Bob, make sure you
9 read through it.
10 BY MR. SANFORD:
11     Q. Do you see the document in front of
12 you?
13     A. I see it. I read it.
14     Q. Okay.
15     And do you recognize the document?
16     A. I don't recognize it, but it sounds
17 like -- it looks like one she sent. You know,
18 vaguely familiar possibly.
19     Q. And what -- can you describe what
20 that document is in front of you?
21     A. I don't know. What is she asking
22 for a raise?
23     Q. Well, it is an e-mail from Chase
24 Robinson to you, correct?
25     A. Yes.

| Page 101 |
| --- |

1     Q. And it is dated July 18, 2017,
2 correct?
3     A. Right.
4     Q. Okay.
5     And it seems to reflect that you and
6 Ms. Robinson had a conversation about giving
7 Ms. Robinson a raise and additional expenses,
8 correct?
9     A. Yes, this is -- she is appealing to
10 me for that.
11     Q. Okay.
12     And do you remember having a
13 discussion with Ms. Robinson in July of 2017
14 concerning her pay and expenses?
15     A. I don't. But if you want to remind
16 me what it is, I'll tell you how accurate it is.
17     Q. As of 2017, can you describe the
18 various types of expenses Ms. Robinson was
19 entitled to charge to Canal?
20     MR. BENNETT: Objection.
21     MR. DROGIN: Objection to the
22     form.
23     A. I don't know what charge -- say that
24 again.
25




Page 102

1  BY MR. SANFORD:
2      Q.  Can you describe the types of
3  expenses that Ms. Robinson was entitled to
4  charge to Canal in around 2017?
5      A.  Well, for petty cash.  Stuff like
6  that.  I'm not, you know -- petty cash.  She's
7  in charge of taking -- paying certain bills.
8          I'm not, I'm not understanding
9  really what your question is.
10     Q.  Well --
11     A.  Hello?
12     Q.  I'm trying to think of a way to ask
13 you as simply as I can.
14     A.  You're trying to think of a way to
15 ask me where I can incriminate myself in some
16 way where I say something that I --
17     Q.  Mr. De Niro, I can assure you, I'm
18 not trying to trick you.  I'm just trying to get
19 information.
20     A.  Okay.  Okay.  Okay.  Good.
21     Q.  I'm trying to ask you simple
22 questions.
23     A.  Go ahead, I'm listening.
24         I don't understand the intent of the
25 letter other than that when it comes down to

Page 103

1  it -- I have to look at reality for me and how I
2  accomplish a balance, the past two years have
3  been difficult, the raise and expenses to help
4  me.
5          Again, she is asking for a raise.
6  Again, I stress, it is for the next two years
7  and then we can discuss what's best for you and
8  how I can help or how things can change.  I
9  completely understand where you're coming from.
10 She says nice things.
11         So what is the upshot?  A
12 conversation after this which I don't remember
13 unless you remind me.
14     Q.  There are certain expenses that
15 Ms. Robinson incurred that she was entitled to
16 seek reimbursement for from Canal, right?
17         MR. BENNETT:  Objection.
18     A.  Well, but she doesn't specify them
19 here.
20 BY MR. SANFORD:
21     Q.  Well, I'm asking what are those kind
22 of expenses?
23     A.  I don't know what they would be.  If
24 she laid out money on her own, she's entitled to
25 be reimbursed.

Page 104

1          If she spends money on even buying
2  me sandwiches at a place near where she lives
3  and where my daughter's school is that she
4  introduced me to, then she gives me that and she
5  pulls that out of petty cash.
6          You know, I trust her to do that.  I
7  trust her to pull the amount out if it is 15 or
8  20 or $25, not 50 or 100 or $150.  Not that I'm
9  saying she does that.
10         But according to other things, it
11 seems that she might have been prone to doing
12 that kind of thing, though I'm not saying that.
13 But there's something not quite kosher here.
14         In any case, I don't know what we're
15 referring to here.  If she says this is what I
16 did, this is what I did, I'll say yes or no to
17 those, to whatever she says.
18     Q.  Do you know whether the expenses
19 that Ms. Robinson was authorized to charge to
20 Canal changed over time?
21     A.  That's a general question I don't
22 understand.
23         Changed over time to buy furniture
24 for the townhouse, yes.  To get this, to do
25 that, to hire Rachel, to get Berdon to pay for

Page 105

1  her -- whatever her reimbursements or whatever,
2  that kind of stuff.
3          Things always change and shift if
4  that's what you're asking.
5      Q.  Well, there were expenses that
6  Ms. Robinson was authorized to charge to Canal
7  that were different from other executive
8  assistants, right?
9          MR. BENNETT:  Objection.
10     A.  Like, for example?  Please, if you
11 can tell me.
12 BY MR. SANFORD:
13     Q.  I'm asking you if you recall.
14     A.  I don't know.  I can't tell unless
15 you tell me and I'll say it is true or not true.
16     Q.  Did you ever discuss giving
17 Ms. Robinson a raise?
18     A.  I discussed giving her a raise, yes,
19 and I thought it was -- she -- I remember where
20 we were.  We were right ███████████████
   ████████████████████████████████
23         And she said -- it was November or
24 something, I think, or late November or
25 December.





1    And I said, listen, this probably --
2  she said she is going to leave.  I don't know --
3  she said she had an offer or what -- I don't
4  know.  She had to leave.
5      And then I said "Well, this is
6  really a bad time".  I said, "Is there any way
7  you can stay past the holidays?  I'm moving into
8  this new house.  I'm going through a divorce.
9  It would help a lot if you could stay past this
10 time until I get over this hump."
11     And she said, "Yes, well, I'll need
12 $60,000."
13     So I said "Okay".  So that's what I
14 remember.  It might have been more, but it was
15 at least 60,000.
16     Q.  And do you remember what she was
17 making at the time in 2017 when you had this
18 conversation?
19     A.  It was a lot.
20         MR. BENNETT:  Objection.
21 BY MR. SANFORD:
22     Q.  It was a lot.  And by "a lot," you
23 mean how much?
24     A.  I think it was 200,000.  Close to
25 it.

1      Q.  Do you remember discussing expenses
2  with her in that conversation?
3      A.  I could have discussed expenses, but
4  I don't know what you mean.  I don't know what
5  you mean.
6      Q.  Well, do you remember talking to
7  Ms. Robinson about expenses such as Ubers and
8  taxis?
9          MR. BENNETT:  Objection.
10     A.  No, I don't remember talking about
11 that.
12 BY MR. SANFORD:
13     Q.  Do you remember talking with
14 Ms. Robinson about working meals and expensing
15 costs associated with working meals?
16     A.  No, I don't remember that.  If you
17 get specific, maybe I can.  But I don't remember
18 that.
19     I mean, in general you talk about
20 meals for the office, for the people working
21 there.  You know, stuff like that.  I don't
22 remember the focus at that meeting.
23     Q.  You had many meetings with
24 Ms. Robinson throughout the latter half of
25 2017 --

1      A.  Yes.
2      Q.  -- continuing into 2018 concerning
3  her title and compensation, didn't you?
4      A.  Yes, she was always worried about
5  her title and her compensation.
6      We went -- as I just said, we went
7  into a higher pay, to a pay raise because I
8  needed -- this was not the time for her to be
9  leaving.
10     At the end of the day, if she had to
11 leave, she had to leave.  I was not going to
12 stop her, but I was saying, "Could you stay
13 longer?"
14     And she said, "Well, I'll need this
15 and that and the money naturally."
16     So I said "Okay".  I thought to
17 myself it is worth it to me to do this.  I
18 always worried about spending and how much and
19 this and that, but I said I have to --
20 considering the circumstances, I think I have to
21 bite the bullet and go and do this.
22     Q.  So can you tell me everything you
23 remember about those conversations in --
24     A.  No, the -- I don't remember much.  I
25 only remember her asking me about the title and

1  saying how about -- she kept coming back with
2  different titles and that was head of finance.
3      So I said okay.  I mean, I was so
4  tired of her asking for this and I thought to
5  myself, well, this is what people do and certain
6  people want.  They want some raise in their
7  stature in the company.  So the company will
8  give them a title.  That way they don't have to
9  give them as much money.
10     In my case, I gave her money and the
11 title, but the title meant nothing.  I said at
12 the end of the day, it is just what you do for
13 me, what you do, what you do for the company
14 is -- and do it honorably, there's nothing, you
15 know -- I would give you the highest
16 recommendation.
17     And if you had to go to another
18 company because you got a better offer, more
19 power to you.  I would never stop anybody.  I
20 would encourage people, especially if they're
21 younger.
22     They might -- the job -- what is
23 good for them is for a while, but they want to
24 move on.  So, fine, I want to help you.  I'm not
25 going to stop you.



Page 110

```
 1              The only thing you have to do is you
 2    have to be honorable.  Do the right thing.  Be
 3    honest and there's no problem.
 4         Q.   You met with Ms. Robinson on
 5    November 9, 2018 when Ms. Robinson informed you
 6    that she would be resigning.
 7              Do you remember that?
 8         A.   Yes, well, I think that's the time
 9    when I met her, like I said, near my daughter's
10    school.
11         Q.   And tell me, tell me, if you would,
12    everything you remember about that meeting.
13         A.   I can't remember much.  The only
14    things I do remember, as I said, is the title
15    thing and the money sitting there and, you know,
16    and agreeing to that, because I was relieved
17    that I didn't have to worry about her now for
18    these next few months and that I could -- you
19    know, we could get things done the way I was
20    trying to get them done, you know, to get over
21    this hump.
22         Q.   You did not want Ms. Robinson to
23    resign; isn't that fair to say?
24         A.   I did not, I did not, not want
25    her -- as I say, if she wanted to resign, she
```

Page 111

```
 1    had the right to resign.
 2              I wouldn't threaten her, if that's
 3    what you're trying to imply.  I just don't do
 4    that.  I would say, you know, let's try -- can
 5    we try to work this out.
 6              I don't even know if I would say
 7    that.  She knew she wanted more money.  That's a
 8    thing for her.  Got it.  She wanted a title.
 9    Got it.  So I said I'll help you.  Okay.  I'll
10    pay the money.  We'll do this.
11              I need -- I didn't want to let her
12    go.  But if I had to let her go -- listen,
13    life -- everybody is dispensable, including
14    myself.  So that's, you know -- you just got to
15    learn to let go at a certain point.  And you let
16    go and you move on and things are fine.
17         Q.   Why do you think you're dispensable?
18         A.   We're all dispensable.  We don't
19    want to get into philosophy about life.  But,
20    you know, if I'm up for a movie and I'm doing a
21    movie and all of the sudden something, God
22    forbid, happens to me, they'll find somebody
23    else.
24         Q.   There's no one else quite like you;
25    wouldn't you thing that's fair to say?
```

Page 112

```
 1         A.   Yes, but they'll find somebody else
 2    if they want to make the movie, if the project
 3    is bigger than the -- the sum of the parts is
 4    bigger than the one, whatever you want to call
 5    it.
 6              That's life.  That's okay, you know.
 7         Q.   You met with Ms. Robinson and Canal
 8    employee Robin Chambers in December of 2018 --
 9         A.   Right.
10         Q.   -- during which you threatened to
11    give Ms. Robinson a bad recommendation if she
12    left Canal, correct?
13         A.   No, I didn't threaten to give her a
14    bad reputation.  I would never do that ever.
15         Q.   Recommendation.
16         A.   Huh?
17         Q.   A bad recommendation.
18         A.   A bad recommendation.  I would not
19    do that.  I would not do that.  I think maybe
20    whatever Robin said, but I just wouldn't do
21    that.
22         Q.   Tell me what you remember about the
23    meeting with Ms. Robinson and Robin Chambers in
24    that December 2018 meeting.
25         A.   I felt there was a bit of a
```

Page 113

```
 1    schmooze.  She was getting Robin in to talk.
 2    And she was emotional and this and that.  I said
 3    whatever.
 4              We talked, dah, dah, dah, dah.  But
 5    I'm not, you know -- I had nothing -- I was
 6    treating her well, I felt.
 7              And so, she was getting emotional
 8    about certain things.  I just -- do the work, do
 9    your job.  That's all.  I'm not, you know --
10    I'll try to accommodate you to a point, and then
11    you and I know both it would become ridiculous.
12              I didn't say that.  But I'm not
13    going to say if you leave me, I'm going to get
14    you.  I don't do that.  That's not my style.  I
15    don't do it.  I don't have the right to do it.
16    I would never do it.
17         Q.   All right.
18              MR. SANFORD:  We're sharing a
19         document with you in the chat that's
20         Bates stamped CANAL 46031.  It is a
21         two-page document.  It goes to 46032.
22         And we're going to mark it for
23         identification as Plaintiff's Exhibit
24         115.
25              (Document bearing Bates
```



```
 1          stamp Nos. CANAL 46031 through 46032
 2      was marked as Plaintiff's Exhibit
 3      115 for identification, as of this
 4      date.)
 5          THE WITNESS:  I'm sorry.  I'm
 6      still looking at this one letter from
 7      Chase.
 8          How do I change that or how do
 9      you remount it or whatever?
10          MR. BENNETT:  You close that
11      file.  In the top left-hand corner,
12      there should be a red button.  Just
13      click out of that.
14          THE WITNESS:  I don't see any.
15      Top right you mean?  On my side it is
16      the right.
17          MR. BENNETT:  Right.
18  BY MR. SANFORD:
19      Q.  You know, if it is too much of a
20  bother --
21      A.  I think I have it.  I think we have
22  it.
23          "Can we please finalize this?  Not
24  having this resolved has been stressful to me.
25  I really appreciate it.  Thank you so much."
```

```
 1          Now, this is when?  When is this
 2      letter?  It is the 18th.
 3          MR. BENNETT:  Bob, go down.
 4      There's another e-mail.
 5          THE WITNESS:  Sorry, it is an
 6      e-mail.
 7          MR. BENNETT:  Look below that.
 8      There's another e-mail.
 9          THE WITNESS:  I'm sorry?
10          MR. BENNETT:  Look below what you
11      just read.  On the same page, there's
12      another e-mail from Chase to you.
13          THE WITNESS:  Yes, I'm reading
14      it.
15  BY MR. SANFORD:
16      Q.  So do you see the December 18th
17  e-mail?
18      A.  I'm looking at it now.  Can I take a
19  minute to read it?
20      Q.  Absolutely.
21      A.  I need a minute.
22          Well, reading the first page already
23  comparing herself to Dan -- comparing herself to
24  Jane Rosenthal is ludicrous.
25          MR. BENNETT:  Bob, just wait for
```

```
 1      the question.
 2          Okay?
 3  BY MR. SANFORD:
 4      Q.  What makes that ludicrous,
 5  Mr. De Niro?
 6      A.  She does not do what Jane does and
 7  she does not do what Dan does.  They're totally
 8  separate.
 9          And I always felt with her that she
10  was trying to find cracks in the structure that
11  she could, in a way, undermine.  And I tolerated
12  that and I thought maybe she has some points.
13          Let me see.  Let me look a little
14  bit.  I have not looked.  I don't want to look.
15  I don't want to find bad things.  I don't --
16  things are going okay.  Let me not deal.
17          And then, but she is -- so I'm
18  saying maybe I owe it to myself to look, at
19  least.  Doesn't mean I would make any decisions
20  about it.
21          So this is what she is saying.  And
22  to me, in hindsight, again this is classic -- I
23  was kind of aware of it then what she's trying
24  to do.  And I'm even allowing her to like do a
25  little of it to see, to delve, to explore to see
```

```
 1  what there is.  And at the expense of the people
 2  who have been with me for years.
 3          And as I say, if people do things
 4  with me and they make mistakes and they're not
 5  perfect.  That's okay.  That's life.  That's how
 6  you create loyalty by people.  When they're
 7  down, you help them and you forgive them and you
 8  let it go because everybody finds themselves in
 9  that situation.  And that is -- so that's okay.
10          But she was always pushing for this,
11  pushing for this.  But I said okay, I'll listen.
12          Let me read the second part.
13      Q.  Well, let me ask you a question
14  about that part.
15          So Ms. Robinson is requesting a
16  raise in 2018, right?
17      A.  Yes.
18      Q.  She wants --
19      A.  She's comparing herself to Dan
20  Harvey.  She's comparing herself to Jane.  I
21  mean, that's ludicrous.
22      Q.  All right.
23          I understand.  I understand.  I'm
24  not asking about that.
25      A.  She's getting paid pretty well,
```



Page 118

```
 1  isn't she?
 2      Q.  I'm not asking about that.
 3      A.  You know she is getting paid well.
 4      Q.  Sir, I'm asking --
 5      A.  I know you're not supposed to
 6  answer.  But you know that and I know that.  We
 7  all know that.
 8      Q.  All right.
 9          I'm asking a question and you're
10  giving an answer.
11      A.  Yes.
12      Q.  My question is, she is asking for a
13  change in base salary.
14          Did you and Ms. Robinson discuss --
15  do you remember discussing a change to her
16  compensation in late 2018?
17      A.  You mean based on this letter?
18      Q.  Based on anything you remember.  I'm
19  showing you a document to help you remember.
20      A.  I don't, I don't know.  We -- I'm
21  not saying I did, but there's a good chance I
22  could have because if she sent this letter, I
23  have to address it.
24      Q.  I'm showing you a document, sir, I'm
25  showing you a document to help refresh your
```

Page 119

```
 1  memory about what happened.
 2      A.  All right, can I just -- can I just
 3  read the second part for a second?
 4      Q.  Sure, go ahead.
 5      A.  Please don't go to Berdon for advice
 6  on this.  It would be like me asking Trump for
 7  advice on a raise for Mueller for all his hard
 8  work.  Give me a fucking break.
 9          Even this I looked past because she
10  is setting me up in a way.  Let's do it between
11  me and you.  Because I know that I'll get you to
12  agree to it, or she thinks she can.
13          And I really should involve my, my
14  business people, my business manager in this,
15  Berdon and so on.  I should.  That's procedure
16  for me, and I probably did.  I'm not sure.
17  They'll tell you.  I'm not sure.
18          Let me read the second part.
19          Please call Robin for fair advice.
20  Robin, now Robin has been kibbitzing with her a
21  lot all this time, which I learned.  I think
22  that's interesting.  And Robin, you know -- I
23  feel bad for her because she shouldn't have
24  gotten herself involved with this person who
25  lured her into this lair of nonsense.
```

Page 120

```
 1          Let me finish.  While she is not --
 2  she figured she could get Robin to convince me
 3  that I should pay her more than -- let me
 4  finish.  Sorry.
 5          She is saying Robin has my best
 6  interests.  She does.  But sometimes she is
 7  naive, and I love Robin.
 8          And then she says divert -- delete
 9  it so Kap doesn't see it.  Well, you know, it is
10  a little -- it is a little -- to me, a little, a
11  little shady, but, you know...
12      Q.  Bottom line is you spoke with
13  Ms. Robinson about changing her compensation,
14  correct?
15      A.  Yes.  I had to, I guess, after that.
16      Q.  All right.
17          MR. SANFORD:  I'm going to share
18      with you a document in the chat that is
19      Bates stamped CANAL 46038.  And we're
20      going to mark it for identification as
21      Exhibit 116.
22          (Document bearing Bates
23      stamp Nos. CANAL 46038 was marked as
24      Plaintiff's Exhibit 116 for
25      identification, as of this date.)
```

Page 121

```
 1  BY MR. SANFORD:
 2      Q.  And I'm going to give you an
 3  opportunity to read it.
 4          MR. SANFORD:  Let's go off the
 5      record while you're doing it because I
 6      don't want to take time on the record.
 7          MR. DROGIN:  Can we extend that
 8      to like just a five-minute restroom
 9      break or come back at noon maybe?
10          MR. SANFORD:  Let's do it.
11          THE VIDEOGRAPHER:  The time is
12      11:51 and we're going off the record.
13          (Whereupon, at 11:51 o'clock
14      a.m., a recess was taken until 12:03
15      o'clock p.m.)
16          THE VIDEOGRAPHER:  The time is
17      12:03.  We are back on the record.
18  BY MR. SANFORD:
19      Q.  We're back on the record.  You
20  understand, Mr. De Niro, you're still under
21  oath?
22      A.  Yes.
23      Q.  And you've had a chance to read
24  what's been marked as CANAL 46038, the
25  January 3, 2019 e-mail from Ms. Robinson to you,
```

31 (Pages 118 to 121)



Page 122

```
 1   correct?
 2       A.  Yes.
 3       Q.  All right.
 4           Do you recognize that document?
 5       A.  I don't recognize it, but I know she
 6   must have sent it to me, obviously.
 7       Q.  All right.
 8           Having reviewed the document, does
 9   it help you recall a conversation you and
10   Ms. Robinson had during that January 3rd
11   meeting?
12       A.  Was it on the 3rd of January that we
13   had that meeting?
14       Q.  Well, I apologize.  Let me correct
15   that.
16           I don't know when that meeting was.
17   I'll just ask you do you remember having a
18   meeting sometime in early January?
19       A.  This is the one with Robin and
20   Chase, you mean?
21       Q.  Any meeting which I think was
22   January 3rd between you and Ms. Robinson
23   discussing issues concerning her compensation.
24       A.  I'm just reading it again.
25           Yes, I mean, I don't know what it
```

Page 123

```
 1   means.  We didn't conclude anything.  It seems
 2   we talked about something, I guess about that,
 3   but it wasn't resolved.  Maybe I'm wrong, but it
 4   doesn't seem like it was.
 5       Q.  Well, let me just ask you then.
 6           Do you remember discussing any
 7   changes to Ms. Robinson's compensation in early
 8   January of 2018?
 9       A.  I don't, unless the conversation
10   that I had that I was talking about where we
11   went to the place around the corner from the
12   upper school of my daughter's school, that's
13   where we had that.
14           But, no, it couldn't have been then
15   because this was before the holidays and I was
16   telling her how I needed, you know, to get over
17   this hump with everything; the divorce, the
18   house, the holidays.
19           So, this I don't remember.  If you
20   can refresh my memory.  I don't remember.  I
21   don't remember this.
22       Q.  Well, do you remember telling
23   Ms. Robinson that Dan Harvey needed to be paid
24   more than Ms. Robinson because Mr. Harvey had a
25   family to support?
```

Page 124

```
 1       A.  No.
 2       Q.  You don't remember ever saying that?
 3       A.  No, no.
 4       Q.  You might have said it; you just
 5   don't remember?
 6           MR. BENNETT:  Objection.
 7       A.  I don't know.  I don't remember.
 8   BY MR. SANFORD:
 9       Q.  All right.
10           Do you remember Ms. Robinson telling
11   you during the meeting in early January 2019
12   that she no longer wanted to be involved in the
13   townhouse?
14       A.  I must -- if you have an e-mail or
15   something, I'll read it and I'm sure I'll say
16   okay.
17       Q.  Do you remember telling Ms. Robinson
18   during that early January 2019 meeting that she
19   should complete several more items regarding the
20   townhouse?
21       A.  You mean on January 3rd, telling her
22   this or later?
23       Q.  Around January 3rd.
24       A.  I don't remember, but I might have.
25   I don't remember.
```

Page 125

```
 1       Q.  And by townhouse, I'm referring to
 2   ████
 3       A.  Yes.
 4       Q.  Right.
 5           Do you remember discussing with
 6   Ms. Robinson at this early January 2019 meeting
 7   any change to her job responsibilities?
 8       A.  No.
 9       Q.  Do you remember promising
10   Ms. Robinson during this early January 2019
11   meeting that her work conditions would improve?
12       A.  Well, I don't know what the work
13   conditions were that were bad in the first
14   place.
15       Q.  So is the answer "no"?
16       A.  I guess it is a no because I don't
17   know what she, you know -- other than making her
18   feel good and just consoling her because she was
19   feeling, I don't know what, you know.  I don't
20   know.
21       Q.  So is the answer "yes"?
22       A.  I don't know.  I don't know what to
23   answer to that because I don't know what -- yes,
24   I just don't know.
25       Q.  So just to be clear on the record,
```



Page 126

```
 1    you don't know whether you promised Ms. Robinson
 2    that her work conditions would improve during
 3    the meeting with her in early January 2019?
 4              MR. DROGIN:  Objection to the
 5    form.
 6              You can answer, Bob.
 7         A.  I can't -- I don't know what she's
 8    talking about.  If she said you promised me
 9    this, you promised me that, you promised me
10    this, I'd say well, I did promise you that, but
11    not this and not that.
12              But I don't see any of that here.  I
13    don't know what she is talking about.
14    BY MR. SANFORD:
15         Q.  All right.
16              You were the final decision maker
17    when it came to employee salaries at Canal,
18    right?
19         A.  Yes.
20         Q.  Ms. Robinson could not set employee
21    salaries without your approval, right?
22         A.  Yes.
23              MR. BENNETT:  Objection.
24    BY MR. SANFORD:
25         Q.  You were the final decision maker
```

Page 127

```
 1    when it came to employee bonuses at Canal,
 2    right?
 3         A.  I was made aware and then I would
 4    say okay.
 5         Q.  Ms. Robinson could not set employee
 6    bonuses without your approval, correct?
 7         A.  Yes, I mean, she should -- I mean,
 8    the only thing I think of is after a couple of
 9    years is she knew this would be the norm.  We do
10    the same as last year.  That's the only thing.
11              But if anything was changing or
12    anything was up or this and that, she was
13    obligated to make me aware of that.
14         Q.  You were the final decision maker
15    when it came to hiring employees at Canal,
16    correct?
17         A.  Yes.
18         Q.  Ms. Robinson could not make an offer
19    of employment without your approval, right?
20         A.  Yes, but I don't know what -- you're
21    asking me a question that I'm waiting for some
22    kind of curve ball to come and say -- yes.
23         Q.  There's no curve ball, Mr. De Niro.
24    I'm just asking a simple question and asking for
25    simple answers.
```

Page 128

```
 1         A.  To you guys, I don't know.  But
 2    anyway.
 3         Q.  So the answer to my question --
 4    Ms. Robinson could not make an offer of
 5    employment without your approval, right?
 6         A.  That's probably, yes.
 7         Q.  All right.
 8              You were the final decision maker --
 9         A.  Sorry, go ahead.
10         Q.  I'm sorry?
11         A.  At face value what it said, I could
12    say yes.
13         Q.  Okay.
14              You were the final decision maker
15    when it came to terminating employees at Canal,
16    correct?
17         A.  Yes, yes.
18         Q.  Ms. Robinson could not terminate an
19    employee without your approval, right?
20         A.  No.
21         Q.  That is to say she could not
22    terminate?
23         A.  No, she couldn't.  The people in the
24    office, in my immediate office, that's all, the
25    only jurisdiction she would have.  And she would
```

Page 129

```
 1    have to run that by me, yes.
 2         Q.  Okay.
 3              You were the final decision maker
 4    when it came to Canal's policies, correct?
 5         A.  Yes.
 6         Q.  And Ms. Robinson could not implement
 7    an office policy of significance without your
 8    approval, right?
 9              MR. BENNETT:  Objection.
10         A.  She couldn't, but we don't know -- I
11    don't know what she did in my name and said that
12    I approved it.  I wouldn't at this point put
13    things past her knowing what she has done.
14              So I have to think about that and
15    know exactly what she did or what was done that
16    I got my approval or not.
17    BY MR. SANFORD:
18         Q.  I'm not asking what, in fact,
19    happened.  I'm just saying as a matter of
20    policy, you needed to approve, you know --
21         A.  As a matter of policy that is honest
22    and transparent and well-meaning and positive,
23    yes.
24         Q.  Okay.
25              You were the final decision maker
```

33 (Pages 126 to 129)



Page 130

```
1    when it came to how many vacation days employees
2    at Canal received, right?
3        A.  Yes.  I didn't look at that closely
4    sometimes and I didn't look at it closely with
5    her at times.  Again, it was the honor system.
6    I relied on her to do the right thing.
7        Q.  Did you ever seek to have your
8    employees perform work without paying them
9    overtime?
10       A.  No.
11       Q.  Approximately one month before her
12   resignation, did Ms. Robinson tell you that you
13   needed to pay your female executive assistants
14   overtime if they performed work for you over the
15   weekend?
16       A.  Can you repeat that?  I'm sorry.
17       Q.  Sure.
18           Approximately one month before her
19   resignation, did Ms. Robinson tell you that you
20   needed to pay your female executive assistants
21   overtime if they performed work for you over the
22   weekend?
23       A.  Do I remember her saying that to me?
24       Q.  Yes.  Do you remember that?
25       A.  I'm not sure.  But if she said I had
```

Page 131

```
1    to pay them overtime, I don't see why I wouldn't
2    do what she says I have to do.
3        Q.  You don't dispute that at times you
4    called Ms. Robinson a bitch, right?
5        A.  No, I never called her a bitch,
6    never.  Never, never, never, ever, ever, ever to
7    her face.
8            And if I called her a bitch, it
9    would never be to her face.  And I didn't call
10   her a bitch not to her face.  So she can't pull
11   that one.
12       Q.  Have you ever called anyone a bitch?
13       A.  What do you think?  That's a stupid
14   question.
15           Of course I called people bitches -
16   but not her - and I do it when it is appropriate
17   and when you're venting.  But not to a person to
18   insult them and degrade them.  I would never do
19   that.
20       Q.  You don't dispute that at times you
21   called Ms. Robinson a brat, do you?
22       A.  I might have said that.  I don't
23   remember, but I might have.
24       Q.  Who is Jane Rosenthal?
25       A.  She is my partner at TriBeCa.
```

Page 132

```
1        Q.  And at times you described
2    Ms. Rosenthal as a cunt to Ms. Robinson?
3        A.  No, no, I have never done that.  I
4    would never, ever, ever say anything like that
5    to Chase Robinson.  Never ever.
6            That's the kind of thing she would
7    want to hear me say.  That's in her mind.
8    That's an allusion.  Never ever would I do that.
9        Q.  Well, did you call Ms. Rosenthal a
10   cunt to anyone else besides Ms. Robinson?
11       A.  No, no, no, no.
12       Q.  Have you called any other woman a
13   cunt?
14       A.  That's none of your business.
15           MR. SANFORD:  We're sharing a
16       document with you in the chat that is
17       Bates stamped CANAL 9189 through 9190,
18       which is a February 13, 2019 e-mail
19       exchange between Tiffany Chen and Robert
20       De Niro and Chase Robinson.  And I'm
21       going to mark for identification this
22       document as Exhibit 117.
23           (Document bearing Bates
24       stamp Nos. CANAL 9189 through 9190
25       was marked as Plaintiff's Exhibit
```

Page 133

```
1        117 for identification, as of this
2        date.)
3            MR. SANFORD:  Let's go off the
4        record for a minute while Mr. De Niro
5        has a chance to review the document.
6            THE VIDEOGRAPHER:  The time is
7        12:14 and we are going off the record.
8            (Whereupon, at 12:14 o'clock
9        p.m., a recess was taken until 12:16
10       o'clock p.m.)
11           THE VIDEOGRAPHER:  The time is
12       12:16.  We are back on the record.
13   BY MR. SANFORD:
14       Q.  Mr. De Niro, you have before you
15   what has been marked as CANAL 9189 to 9190,
16   which is a February 13, 2019 e-mail exchange.
17           Have you had an opportunity to
18   review it?
19       A.  Yes.
20       Q.  Do you remember it?
21       A.  Not -- I don't know.  What's the
22   point of everything in this e-mail?
23       Q.  Well, if you look at the top of the
24   page, do you see where you write "I'm getting
25   them when meet one of the girls from office at
```

34 (Pages 130 to 133)



```
 1   NBC?"
 2          Do you see that?
 3      A.  Yes.
 4      Q.  Who are you referring to when you
 5   talk about the girls?
 6      A.  I'm not sure.
 7      Q.  You don't remember?
 8      A.  No, I'm not sure.  I don't know what
 9   it is, NBC.  NBC the network.  NBC a design
10   place.  I'm not sure.
11      Q.  All right.
12          At times you joked with Ms. Robinson
13   about your ███████ didn't you?
14      A.  I don't joke about that.  I
15   trusted her enough to get it and I don't joke
16   about it.
17          And if there was ever a little joke
18   of a certain thing totally within proper bounds
19   maybe, and I don't think I would ever do that.
20   I didn't do those kinds of things.
21          And the fact that she would say that
22   makes me wonder about her even more.  I mean,
23   this is nuts.
24      Q.  On one occasion --
25      A.  I get them and I don't talk about my
```

```
 1   Viagra thing.  I don't talk about it.  It is
 2   private.
 3          It is bad enough that I have to have
 4   them get it for me.  I'm going to start joking
 5   about it?  What is this?  What is she telling
 6   you?
 7      Q.  On one occasion you told
 8   Ms. Robinson that manual labor would make a man
 9   out of her, didn't you?
10      A.  Oh, I don't know if I did.  But if I
11   did, what's wrong with saying that?
12      Q.  On one occasion you told
13   Ms. Robinson that she could use Michael Kaplan's
14   sperm to get pregnant; didn't you?
15      A.  No, I didn't say that.  I never said
16   that.
17      Q.  So if Ms. Robinson testifies under
18   oath that you did, would she be lying?
19      A.  She would be lying.
20      Q.  When did Ms. Robinson begin to have
21   interactions with your girlfriend, Tiffany Chen?
22      A.  I don't know.  It was the beginning
23   of when I first -- after I first introduced her,
24   and I forget the time.
25          Maybe the fall of -- maybe it was a
```

```
 1   little over three years ago.  Say if it was last
 2   fall, that would be three years from last fall,
 3   I suppose, would be the time.
 4      Q.  Did Ms. Chen ever tell you that in
 5   her opinion, Ms. Robinson is a bitch?
 6      A.  Not that I remember, but she could
 7   have.
 8      Q.  Did Ms. Chen ever tell you that from
 9   her perspective, Ms. Robinson was hysterical?
10      A.  She could have.
11      Q.  Did Ms. Chen ever tell you from her
12   perspective, Ms. Robinson was emotionally
13   disturbed?
14      A.  I'm not sure I would remember that,
15   but, you know, it could be.
16      Q.  Did Ms. Chen ever tell you that from
17   her perspective, Ms. Robinson was crazy?
18      A.  I don't know if -- I don't know.  I
19   don't remember.
20      Q.  Did Ms. Chen ever tell you that from
21   her perspective, Ms. Robinson was in love with
22   you?
23      A.  There was some talk about that.
24      Q.  What was the talk?
25      A.  That she thought that maybe she was
```

```
 1   because of certain things she bought in the
 2   house and stuff like that and that she was so
 3   territorial about it.
 4          And I never -- I mean, I was like
 5   dumbfounded.  I just didn't even know how to
 6   react to that.
 7      Q.  Would you and Ms. Chen fight about
 8   that issue?
 9      A.  No.
10      Q.  Did Ms. Chen ever tell you that from
11   her perspective, Ms. Robinson wanted to be
12   married to you?
13      A.  I don't remember that.
14      Q.  Did Ms. Chen ever tell you that from
15   her perspective, Ms. Robinson wanted to move in
16   with you?
17      A.  Yes, there was a little of that
18   wondering.
19      Q.  What, to your best recollection, was
20   said?
21      A.  It was just that, that simple.
22      Q.  That Ms. Robinson wanted to move in
23   with you?
24      A.  Yes.
25      Q.  Did you ever think Ms. Robinson
```





Page 138

1  wanted to move in with you?
2      A.  I don't know anymore.  She acted
3  like sometimes a little petulant.  Like a
4  little, maybe the brat thing, too, whatever I
5  said but where she would say no, he doesn't want
6  that.  He'll do this.  He'll do that.
7          And she would do that with Tiffany
8  and it was inappropriate.  She should have just
9  said this is what you want, of course.  It is
10 not for her.  But she was getting territorial
11 and being disrespectful and being disrespectful
12 to me.
13         But I tolerated it because she did
14 it to me.  I said I don't mind.  She's really
15 very good once she works.  She does it.  And so,
16 this is what it was.
17     Q.  Did you ever perceive that
18 Ms. Robinson wanted to be married to you?
19     A.  I don't know.  I don't --
20     Q.  Did you ever think that Ms. Robinson
21 was in love with you?
22     A.  I don't know.
23     Q.  Did you ever think Ms. Robinson was
24 crazy?
25     A.  A little.

Page 139

1      Q.  Why do you say that?
2      A.  I think she's delusional.  She
3  wants, she wants an important position.  She
4  doesn't know how to get it.  She pushed with
5  silly things like a title.
6          She didn't know that do your job, be
7  straight, be honest, be forthcoming, be
8  transparent.  Just do the thing.  Don't make
9  assumptions that you know my taste.  Don't say
10 he doesn't like that, he likes this.  That was
11 not for her to do.  I tolerated it.
12         But, you know, at one point it can
13 be annoying to me and to other people who are
14 close to me.  It is not for her to do that.  And
15 I think that was childish of her to do it.  And
16 she had no right to do it.
17         What can I say?  You know, I
18 tolerated it.  You know, it is what she does.
19 But, you know, it is not really right.
20     Q.  Did you ever think Ms. Robinson was
21 emotionally disturbed?
22     A.  That crossed my mind.
23     Q.  When did it first cross your mind?
24     A.  I don't remember.  Just, I don't
25 know, just -- if not emotionally disturbed, just

Page 140

1  very neurotic.
2      Q.  When did that first cross your mind
3  that Ms. Robinson was neurotic?
4      A.  I don't know.  Just she made -- she
5  just made stress and duress for people that
6  really she didn't -- if she was smart, she
7  shouldn't have done that.
8      Q.  Did you ever think that Ms. Robinson
9  was hysterical?
10     A.  I don't know.  There could be times.
11 Borderline.  She wouldn't show it to me, but I
12 have a feeling she would show it to other
13 people.
14     Q.  Did you ever think that Ms. Robinson
15 was a terrible person?
16     A.  I can't say she is a terrible
17 person.  She is not a terrible person.  I think
18 she is confused and feels that she is entitled
19 to things that she's not entitled.
20         When she was questioning the motives
21 and the salaries and the positions of people
22 like Jane Rosenthal, of Berdon, of Dan Harvey,
23 yes, I started wondering.
24         At the same time, you know, like
25 someone whispers in your ear you kind of half

Page 141

1  listen because you never know.  And I thought,
2  she reminds me of that woman Elizabeth Holmes of
3  Theranos.  They tell you that they're pretty.
4  They tell you -- they tell you certain things.
5  Everybody bought into her con.
6          And Chase in a way felt entitled and
7  would say these things.  And maybe you guys as
8  her lawyers have also bought into her nonsense
9  and finally just following through because you
10 have to.  But, that's what I feel about her.
11     Q.  What do you feel Ms. Robinson was
12 entitled to?
13         MR. DROGIN:  Objection to the
14     form.
15     A.  Huh?
16 BY MR. SANFORD:
17     Q.  You testified moments ago that you
18 felt that Ms. Robinson was entitled.
19         My question is:  What was she
20 entitled to?
21     A.  She was entitled to be the boss.
22 She wanted to control my situation if she could
23 have.  If she could have controlled all my
24 finances.  Jane Rosenthal would have been out on
25 the street.  Dan Harvey wouldn't have been

MAGNA
LEGAL SERVICES

Page 142

```
 1   training me anymore.  And I suppose she would
 2   have done it.  So there you go.  She was jealous
 3   of Dan Harvey.  She was jealous of everybody
 4   that I began to see.
 5        Q.  Ms. Robinson was your employee for
 6   approximately 11 years, correct?
 7        A.  Correct.
 8        Q.  Ms. Robinson knew more about your
 9   life personal and professional than anyone else;
10   isn't that right?
11        A.  She knew a lot.  She didn't know
12   everything, but she knew a lot.
13        Q.  She knew more about your personal
14   life and your professional life than anyone else
15   in your life; isn't that correct?
16        MR. DROGIN:  Objection to the
17   form.
18        A.  No.
19   BY MR. SANFORD:
20        Q.  Who knew more than Ms. Robinson?
21        A.  That's none of your business.
22        MR. DROGIN:  Objection.
23   BY MR. SANFORD:
24        Q.  I get -- hold on a second, Counsel.
25   I get to ask the question and you get to answer
```

Page 143

```
 1   my question.
 2        A.  I answered it.  I answered it.  What
 3   the hell does that have to do with anything?
 4   But just trying to harass me and embarrass me.
 5        Q.  I'm asking you a simple question.
 6        A.  You're asking a devious question.
 7   You ought to be ashamed of yourself.
 8        MR. DROGIN:  Okay.
 9        In that respect, since the
10   witness indicates he feels harassed, I'm
11   going to direct him not to answer your
12   question.
13        THE WITNESS:  Period.
14        MR. SANFORD:  So any time -- on
15   your view you get to direct not to
16   answer when a witness feels harassed, is
17   that your view of the rules?
18        MR. DROGIN:  If the witness is
19   telling you that you're harassing him,
20   then I'm going to agree with the
21   witness.
22        MR. SANFORD:  Then your view of
23   the rules is that you can direct not to
24   answer under conditions of harassment?
25        MR. DROGIN:  My view of the
```

Page 144

```
 1   rules, sir, is that you don't bring
 2   frivolous claims, but that's exactly
 3   what you have done.
 4        (Whereupon, the transcript
 5        was marked for a direction not to
 6        answer.)
 7   BY MR. SANFORD:
 8        Q.  All right.
 9        Mr. De Niro, I'm going to ask you
10   again, was there anyone besides Ms. Robinson who
11   knew more about your personal and professional
12   life during the 11 years that she served as your
13   employee?
14        A.  That is none of your business.
15        MR. DROGIN:  I'll also object to
16   the form.
17   BY MR. SANFORD:
18        Q.  Well, let me ask you this, Mr. De
19   Niro:  Is there anyone, I'm not asking you who,
20   but is there any one besides Ms. Robinson, other
21   than Ms. Robinson --
22        A.  What's the point of that question?
23   I'm not going to answer that question.
24        Q.  Can I ask, would you give me the
25   respect, sir, of allowing me to finish?
```

Page 145

```
 1        A.  I'm giving you give the respect.
 2   You give me the respect.  I'm not answering that
 3   question.
 4        Q.  Can you give me the respect, sir, of
 5   allowing me to finish my question before you
 6   answer?
 7        Will you give me that respect?
 8        A.  I know where you're going.  Excuse
 9   me.
10        Q.  Will you give me that respect
11   because I would like to have a clean record.  It
12   is in your interest and everyone's interest.
13        A.  You have a clean record and you have
14   a clean answer.  What does it have to do with
15   Chase Robinson?  And you're trying to say at the
16   end of the day, oh, nobody knew him better than
17   her and this and that.  No, no, I'm sorry.
18   You're going into places you shouldn't go.  It
19   is none of your business.
20        Q.  I'm not going anywhere.  I just want
21   to know --
22        A.  You're not, huh?  I'm sorry, you
23   are.
24        Q.  My question is:  Is there anyone
25   other than Ms. Robinson who knew more than Ms.
```




| Page 146 |
| --- |

```
 1   Robinson about your personal and professional
 2   life during the 11 years in which she was
 3   employed by you?
 4           MR. DROGIN:  Objection to the
 5   form.
 6       A.  I, I can't even answer that.
 7   BY MR. SANFORD:
 8       Q.  You can't answer it because you
 9   don't know?
10       A.  Yes, because --
11           MR. DROGIN:  Objection to the
12   form.
13       A.  I'll give you that answer.  How is
14   that?
15           MR. DROGIN:  Do you want to
16   suggest a metric or do you just want to
17   leave it as vague and ambiguous?
18   Because it is a trick question.
19           THE WITNESS:  Of course it is.
20           MR. SANFORD:  Counsel, we have a
21   stipulation on the record that you will
22   object to form.
23           If you want to have a speaking
24   objection, which is improper, that's
25   another thing we can talk about with the
```

| Page 147 |
| --- |

```
 1   court, which we will.
 2           Right now my question is --
 3           MR. DROGIN:  It is on the record
 4   and there have been very few speaking
 5   objections.  So I think every now and
 6   then a speaking objection is okay,
 7   especially when it is in this line of
 8   questioning and it is very, very clear
 9   what's happening.
10           MR. SANFORD:  There aren't
11   exceptions to stipulations that I know
12   of that we entered.
13           MR. DROGIN:  Any time you want to
14   call the judge we're willing to do so.
15   BY MR. SANFORD:
16       Q.  Mr. De Niro, so you're not going to
17   answer my question; is that right?
18       A.  No, I'm not going to answer it.
19       Q.  All right.
20           You understand that if I go to the
21   court and the court allows me to get back on the
22   record with you to ask these questions again,
23   you're going to be compelled to answer; you
24   understand that?
25       A.  I will answer it in the way that I
```

| Page 148 |
| --- |

```
 1   answer.  I'm not going to answer it if it has no
 2   relevance to this.  And you're trying to set me
 3   up in a way that I just won't go along with.
 4       Q.  At times you urinated during your
 5   telephone calls with Ms. Robinson; didn't you?
 6       A.  That -- I'm in the bathroom.  What
 7   are you trying to say with a question like that?
 8       Q.  I'm just asking you a question.
 9       A.  Aren't you ashamed of yourself to
10   ask a question like that?  Can't you go to the
11   bathroom and be on the phone and if somebody
12   hears you urinating by mistake that's not -- I
13   didn't do it, I didn't do it intentionally, if I
14   did it.
15           Please, are we getting a little --
16   are we not going a little too low now?
17       Q.  So the answer is "yes"?
18       A.  No, this is nonsense.
19       Q.  So the answer is "yes"?
20       A.  I'll say yes, I might have.  But
21   you're making it like I did it as some kind of
22   lewd sort of weird thing.
23       Q.  At times you met Ms. Robinson
24   wearing your pajamas, right?
25       A.  No.  And if I -- I can't even answer
```

| Page 149 |
| --- |

```
 1   these questions.
 2       Q.  You don't remember?
 3       A.  I don't remember.
 4       Q.  At times you met Ms. Robinson
 5   wearing a bathrobe; didn't you?
 6           MR. DROGIN:  Objection to the
 7   form.
 8       A.  Yes, this is nonsense.
 9           MR. DROGIN:  I'm sorry, who is
10   wearing the bathrobe?  Listen to the
11   question.
12           Who's wearing the bathrobe?
13   BY MR. SANFORD:
14       Q.  Mr. De Niro, you wore a bathrobe at
15   times when you met Ms. Robinson, correct?
16       A.  What's, what's the reason for the
17   question?
18       Q.  Are you going to answer my question?
19       A.  No, I'm not.  What's the reason for
20   the question?  Are you implying that I wore a
21   bathrobe and, therefore, I was doing something
22   improper with her?
23           MR. DROGIN:  Mr. Sanford --
24   BY MR. SANFORD:
25       Q.  Mr. De Niro, I ask you questions to
```



1  you.
2        A.  Yes, and I'm answering them.  You're
3  not going to, you're not going to make me look
4  like an idiot and embarrass me and humiliate me.
5  Excuse me.
6        Q.  So the answer is "yes" or "no"?
7        A.  No.
8        Q.  You did not wear a bathrobe with Ms.
9  Robinson?
10       A.  No.
11            MR. DROGIN:  Mr. Sanford, if you
12       would like, we will go off the record
13       and explain to Mr. De Niro what the
14       rules are about answering your
15       questions.
16            MR. SANFORD:  Well, you can tell
17       him on the record.  We can do that right
18       now.
19       A.  No, you're implying that by wearing
20  a bathrobe there's something going on.  There's
21  some impropriety.  That you shouldn't do.
22  That's bullshit and you know it.
23            MR. DROGIN:  Listen --
24       A.  And you're grabbing for straws.  And
25  how can I not be upset?

1  BY MR. SANFORD:
2        Q.  Mr. De Niro, at times you asked Ms.
3  Robinson to come into your bedroom to wake you
4  up; didn't you?
5        A.  No, I didn't.  Never.  Never.
6  Never.  Never.  Period.
7        Q.  All right.
8            At times you asked Ms. Robinson to
9  meet with you alone in your apartment; didn't
10  you?
11       A.  No.  I didn't ask her.  She came
12  over because I had to talk to her.
13       Q.  At times you asked Ms. Robinson to
14  meet with you alone to help you --
15       A.  What's the implication by having her
16  meet in my apartment?  What are you trying to
17  say?  What do you think I'm stupid?  This is
18  ridiculous.
19       Q.  Mr. De Niro, at times you asked Ms.
20  Robinson to meet with you alone in a hotel
21  suite; didn't you?
22       A.  She works for me.  She booked the
23  hotel rooms for me when I would go on location.
24       Q.  At times you asked Ms. Robinson to
25  scratch your back; didn't you?

1        A.  Listen -- no.
2        Q.  At times you asked Ms. Robinson to
3  button your shirts; didn't you?
4        A.  No.
5        Q.  At times you asked Ms. Robinson to
6  fix your collars; didn't you?
7        A.  No.
8        Q.  At times you asked Ms. Robinson to
9  tie your ties; didn't you?
10       A.  I tied my tie.  I asked her which
11  tie should I wear, this one or this one.  When
12  I'm in the office, the door is open to the
13  other.  And I'm just saying, I've got to go down
14  and do an interview.  What do you think, this
15  tie or that tie?
16       Q.  Do you recall an instance in which
17  Harvey Keitel slapped Ms. Robinson --
18       A.  No, he wouldn't do that.
19       Q.  Let me finish my question, sir.
20  Please give me that respect.
21       A.  Don't you feel ashamed of yourself?
22  Don't you feel ashamed of yourself?  You go home
23  and tell your kids these are the kinds of
24  questions you asked me.
25       Q.  Mr. De Niro, I would ask for --

1        A.  You ought to be ashamed of yourself.
2  Period.
3        Q.  I would ask you to respect me enough
4  to --
5        A.  You're not respecting me by asking
6  these questions.  I know you're doing your job
7  but you're not respecting me.
8        Q.  My question, sir, is do you recall
9  an instance in which Harvey Keitel slapped Ms.
10  Robinson on her buttocks?
11       A.  No, I don't.
12       Q.  Ms. Robinson put your boxers in
13  drawers in your bedroom in your townhouse;
14  didn't she?
15            MR. DROGIN:  Objection to the
16       form.
17       A.  No, that's a, that's an inane
18  question.
19  BY MR. SANFORD:
20       Q.  Is that a "no"?
21       A.  Yes, it would have to be a "no".
22       Q.  Ms. Robinson hung up your clothes in
23  your townhouse; didn't she?
24            MR. DROGIN:  Objection to the
25       form.



1     You can answer it.
2     A.  Yes, she might have put the stuff in
3  when she got the closets, some of the stuff that
4  was part of her, even Sabrina, she had gotten in
5  once or twice.  This girl Lulu who worked for
6  her.  I don't know, Lulu where she is now.
7  Other people.  You know, even Michael Kaplan
8  could have hung something up for me.
9  BY MR. SANFORD:
10     Q.  Who is Robin Chambers?
11     A.  She is a person who used to work for
12  me.  She was my old assistant.
13     Q.  She is an honorable person; isn't
14  she?
15     A.  I think so.
16     Q.  You don't think she would lie under
17  oath, do you?
18         MR. DROGIN:  Objection to the
19      form.
20     A.  I don't know.  I don't know that.  I
21  mean, I just don't know.
22  BY MR. SANFORD:
23     Q.  You wouldn't dispute Ms. Chambers'
24  sworn testimony that Ms. Robinson ironed your
25  shirts, would you?

1         MR. DROGIN:  Objection to the
2      form.
3     A.  This is nonsense.  This is like
4  bottom feeding.  Get away from me.  You've got
5  to be kidding me.
6  BY MR. SANFORD:
7     Q.  Is that a "yes"?
8     A.  No.
9     Q.  That's a "no"?
10     A.  No.
11     Q.  Ms. Robinson at times washed your
12  sheets and towels; didn't she?
13     A.  If she did, yes, so what.  I don't
14  even remember if she did.
15     Q.  Ms. Robinson would at times vacuum
16  your house; wouldn't she?
17     A.  I don't know that.
18     Q.  She might have, you don't remember?
19     A.  I don't know that.  That was not her
20  job.  So if she did that, she did it maybe once
21  in all the years I knew her and I don't even
22  remember if she did that.
23     Q.  Ms. Robinson would at times set the
24  table at your home; wouldn't she?
25         MR. DROGIN:  Objection to the

1      form.
2         You can answer.
3     A.  I don't remember.
4  BY MR. SANFORD:
5     Q.  Is that right?
6     A.  I don't remember that.
7     Q.  Do you remember Martin Scorsese's
8  birthday party at your house?
9     A.  No.  I don't even remember.  When
10  was that?  How long ago was that?
11     Q.  I'm asking you.
12         Do you remember it at all?
13     A.  I don't remember.
14     Q.  Do you remember having a birthday
15  party at your house for Martin Scorsese?
16     A.  When, what year was this?
17     Q.  Any year you can remember.
18     A.  I can't remember it.
19     Q.  Ms. Robinson would at times mend
20  your clothing, correct?
21     A.  No, she wouldn't.
22     Q.  Ms. Robinson would at times select
23  gifts for your children; wouldn't she?
24     A.  That might be so, yes.
25     Q.  Okay.

1     A.  With me.
2     Q.  It is not that it might be so, you
3  have already testified that it is so?
4         MR. BENNETT:  Objection.
5     A.  Well, then it is.  Whatever.  That's
6  fine.
7  BY MR. SANFORD:
8     Q.  Ms. Robinson would at times make
9  your bed; wouldn't she?
10     A.  No.
11     Q.  Ms. Robinson would at times --
12     A.  Is she trying to say that she used
13  to make my bed?  This is nonsense.
14     Q.  Ms. Robinson would at times
15  organize your closets; wouldn't she?
16     A.  That, she did a little of, yes,
17  because she ordered the closet.  California
18  Closets.  And she did it wrong too, by the way.
19     Q.  Okay.
20         Ms. Robinson would routinely
21  throughout her tenure at Canal oversee your
22  schedule; wouldn't she?
23     A.  Yes.
24     Q.  Ms. Robinson would remind you to
25  take and refill your medicine; wouldn't she?





Page 158

```
1          A.  She wouldn't remind me.  I knew.
2     She would refill my medicine.  She didn't do
3     that.  See, right now these are questions like
4     she is a wife or something or my assistant.  I
5     don't know what this is.  What this implies.
6     But it is creepy.
7          Q.  Ms. Robinson would routinely
8     communicate with your doctors; wouldn't she?
9          A.  No.
10              MR. DROGIN:  Objection to the
11          form.
12     BY MR. SANFORD:
13          Q.  Ms. Robinson would arrange furniture
14     deliveries for you; wouldn't she?
15          A.  That, yes, she would do.
16          Q.  Ms. Robinson would routinely arrange
17     flower deliveries for you; wouldn't she?
18          A.  That, she could do.
19          Q.  Ms. Robinson would help organize and
20     decorate parties for you; wouldn't she?
21          A.  That, she could do.
22          Q.  Ms. Robinson would arrange your
23     travel via private jet; wouldn't she?
24          A.  That, she could do.
25          Q.  Ms. Robinson -- and when you say she
```

Page 159

```
1     could do, she did do it, right?
2          A.  She did.
3          Q.  Ms. Robinson would routinely run
4     errands for the Canal office and for you and
5     your family; wouldn't she?
6              MR. BENNETT:  Objection.
7          A.  Yes.
8     BY MR. SANFORD:
9          Q.  Ms. Robinson would RSVP to events on
10     your behalf; wouldn't she?
11          A.  Yes.
12          Q.  Ms. Robinson would at times field
13     media requests on your behalf; wouldn't she?
14              MR. BENNETT:  Objection.
15          A.  Yes.
16     BY MR. SANFORD:
17          Q.  Ms. Robinson would generally remind
18     you to pick out gifts; wouldn't she?
19          A.  She could.  Her job was to remind
20     me.  I say remind me, there's a list, I have to
21     get these particular gifts for certain people
22     for their birthday, for Christmas, whatever,
23     yes.
24          Q.  Ms. Robinson often accompanied you
25     while you picked out gifts for family and close
```

Page 160

```
1     familiar friends; wouldn't she?
2              MR. DROGIN:  Objection to form.
3          A.  Yes.
4     BY MR. SANFORD:
5          Q.  Ms. Robinson would generally help
6     manage your contacts list; wouldn't she?
7              MR. BENNETT:  Objection.
8          A.  Yes.
9     BY MR. SANFORD:
10          Q.  Ms. Robinson would coordinate your
11     award show votes; wouldn't she?
12          A.  My award show what?
13          Q.  Votes.
14          A.  Well, help set it up for me and then
15     I would do my own voting.  It wasn't like she
16     was part of.
17          Q.  And by that, I mean the Oscar votes,
18     right?
19              MR. BENNETT:  Objection.
20          A.  Yes, but that's in the computer.
21     Not -- that's all she did.
22     BY MR. SANFORD:
23          Q.  Ms. Robinson would often look up
24     restaurants for you; wouldn't she?
25          A.  Yes.
```

Page 161

```
1          Q.  I'm sorry?
2          A.  Yes, she did.
3          Q.  Ms. Robinson would vet vacation
4     rentals for you; wouldn't she?
5          A.  Yes, she did.
6          Q.  Ms. Robinson vetted home rentals for
7     you; wouldn't she?
8          A.  Yes, she did.
9          Q.  Ms. Robinson researched potential
10     schools for your son; didn't she?
11          A.  She might have done some, yes.
12          Q.  Ms. Robinson assisted with your
13     pets; didn't she?
14          A.  She might have.
15          Q.  When you say might have, you're
16     saying "yes"?
17          A.  I don't know because I have pets.
18     We had pets.  Tiffany had pets.  I don't know.
19     That was the overlap.  So I don't know.
20          Q.  Ms. Robinson scouted hotels all over
21     the world for you; didn't she?
22          A.  Not all -- wherever I had to go on
23     location she did go.  I trusted her to go do
24     that.
25          Q.  Ms. Robinson researched options for
```



## Page 162

1    the purchase of your bed; didn't she?
2        A.   The purchase of my bed?  Yes.  My
3    furniture.  All my furniture, yes.
4        Q.   Ms. Robinson helped buy furnishings
5    for your home; didn't she?
6        A.   She did, yes.
7        Q.   Ms. Robinson vetted housekeepers for
8    you; didn't she?
9        A.   Yes.
10       Q.   Ms. Robinson researched options for
11   planters and pots for your plants; didn't she?
12       A.   Yes.
13       Q.   Ms. Robinson assisted with the
14   delivery of your plants; didn't she?
15       A.   Yes.
16       Q.   Ms. Robinson went plant shopping
17   with you; didn't she?
18       A.   Yes, yes.
19       Q.   Ms. Robinson went antique shopping
20   with you?
21       A.   Yes, she did.
22           THE VIDEOGRAPHER:  The time is
23       12:41.  We are going off the record for
24       technical reasons.
25               (Whereupon, at 12:41 o'clock

## Page 163

1            p.m., a recess was taken until 12:43
2        o'clock p.m.)
3            THE VIDEOGRAPHER:  The time is
4        1243.  We are back on record.
5    BY MR. SANFORD:
6        Q.   Mr. De Niro, you understand you're
7    still under oath?
8        A.   Yes.
9        Q.   All right.
10           Ms. Robinson collected photo options
11   to be framed for your home; didn't she?
12       A.   What was that again?
13       Q.   Ms. Robinson collected photo options
14   to be framed for your home, correct?
15       A.   Yes, uh-hum.
16       Q.   Ms. Robinson researched options for
17   talents; didn't she?
18       A.   Yes, I think so.
19       Q.   Ms. Robinson bought vacuums for your
20   home; didn't she?
21       A.   Yes.
22       Q.   Ms. Robinson reminded you to speak
23   with your children; didn't she?
24       A.   No, she didn't remind me to speak
25   with my children.  She was trying to do some of

## Page 164

1    that and my children resented her doing that.
2    Trying to, you know.
3        Q.   You had Ms. Robinson coordinate your
4    schedule so that you could spend time with your
5    children over spring break; didn't you?
6        A.   Yes, she coordinated all of that
7    stuff, yes.
8        Q.   You had Ms. Robinson assist with
9    various items related to your former partner
10   Toukie Smith, didn't you?
11       A.   Say that again.
12       Q.   You had Ms. Robinson assist with
13   various things related to your former partner?
14       A.   There was a point that she did that
15   briefly and that was it.
16       Q.   What point was that?
17       A.   Somewhere a couple years ago where
18   she was -- I asked her and Robin to do
19   something, but it didn't go very long.
20       Q.   What did you ask Ms. Robinson to do
21   with respect to --
22       A.   To help her with certain things.
23   Just it didn't --
24       Q.   And this was about 2018, 2019,
25   correct?

## Page 165

1        A.   Yes, around there, yes.
2        Q.   And do you remember what you asked
3    Ms. Robinson to do with respect to Toukie Smith?
4        A.   To help her out with certain things.
5    There was a nurse involved in getting and so on
6    and make sure she was okay.
7        Q.   And who is Toukie Smith?
8        A.   She is the mother of my twins.
9        Q.   And, specifically, what did you ask
10   Ms. Robinson to do?
11       A.   I don't remember specifically other
12   than to help out with Toukie and what she needed
13   with whatever it was at that time.  I'm
14   forgetting.
15       Q.   You asked Ms. Robinson to assist
16   with your divorce; didn't you?
17       A.   In what way?
18       Q.   Any way that you can remember.
19       A.   No, she didn't assist in my divorce
20   other than helping me find a place.  You know,
21   that was the townhouse.
22       Q.   Do you remember if Ms. Robinson
23   pulled text messages and e-mails from Grace
24   Hightower?
25       A.   She pulled what she could have, yes.

42 (Pages 162 to 165)



Page 166

```
 1        Q.  And that assisted you in your
 2   divorce; didn't it?
 3        A.  I guess if it was related to that,
 4   yes.
 5        Q.  And she reviewed Black Amex card
 6   statements regarding charges concerning your
 7   kids; didn't she?
 8        A.  I don't remember.  She could have.
 9        Q.  She basically collected evidence for
10   you to use in your divorce proceedings, isn't
11   that right?
12        A.  She could have.
13        Q.  When you say she could have, do you
14   mean "yes"?
15        A.  I'm saying she could have.  I don't
16   remember a hundred percent.
17        Q.  Well, you would have no reason to
18   say that Ms. Robinson is lying under oath if she
19   testified to that?
20        A.  Well, I think some things she's
21   not -- she's delusional.  What can I say?
22   There were things that she did pull.  I just,
23   I'm worried because when I say one thing and
24   then it is made into a positive there's a
25   condition somewhere in the middle there.  So I
```

Page 167

```
 1   say she could have.  So that's it.
 2        Q.  Well, you don't dispute that Ms.
 3   Robinson collected evidence to help you in your
 4   divorce, right?
 5        A.  Yes, I think she did.  I'll say that
 6   like that.
 7        Q.  All right.
 8            You asked Ms. Robinson to
 9   communicate with your divorce attorney; didn't
10   you?
11        A.  I might have.
12        Q.  Is that a "yes"?
13        A.  That's all I can say, is I might
14   have.  You have the e-mails, so you have them.
15   So you know.
16        Q.  On two occasions you asked Ms.
17   Robinson to accompany you to the emergency room,
18   didn't you?
19        A.  Yes.
20        Q.  Ms. Robinson on several occasions
21   accompanied you to doctors; didn't she?
22        A.  Yes.  I went to the emergency room
23   and maybe another doctor.  I can't remember
24   specifically, yes.
25        Q.  So a significant part of Ms.
```

Page 168

```
 1   Robinson's work for you at Canal involved
 2   assisting you with your personal life; fair to
 3   say?
 4        A.  Yes.
 5            MR. DROGIN:  Objection to the
 6        form.
 7            You can answer.
 8   BY MR. SANFORD:
 9        Q.  What's the answer, sir?
10        A.  Yes.
11        Q.  Okay.
12            Ms. Robinson would create a list and
13   research your supplements for you; didn't she?
14        A.  I don't know if she did that.  I had
15   some supplements.  She wouldn't research them.
16   She would get what I asked her to get me.
17        Q.  Ms. Robinson would help you
18   understand the instructions before your
19   ████████████ didn't she?
20        A.  No, no, no.  She might have -- no.
21        Q.  She might have what?
22        A.  Nothing.  I know what the
23   instructions are.  She might have read them once
24   and now all the sudden she's helping me with
25   instructions for my ██████.  No, I did that
```

Page 169

```
 1   many times.  I knew how to do it.  I knew what
 2   the procedure was.
 3        Q.  Ms. Robinson filled out medical
 4   forms for you; didn't she?
 5        A.  She might have.
 6        Q.  Ms. Robinson was listed as your
 7   emergency contact on medical forms; wasn't she?
 8        A.  Might have been if I thought she was
 9   the fastest person to get because then she would
10   know who to get.
11        Q.  When you say might have been, you're
12   saying "yes"?
13        A.  Yes, that I'm saying "yes".
14        Q.  Ms. Robinson would tour some of the
15   potential apartment rentals with you in person;
16   wouldn't she?
17        A.  Yes.
18        Q.  Ms. Robinson would tour some of the
19   potential apartment rentals with you on
20   FaceTime; wouldn't she?
21        A.  Yes.
22        Q.  Ms. Robinson would put the utility
23   accounts for the townhouse under her name if she
24   was unable to list them under a company name;
25   isn't that right?
```



1      A.   She might have, yes.
2      Q.   Ms. Robinson used her cell phone
3  number as the emergency contact for your ADT
4  system at your townhouse; didn't she?
5      A.   She might have.  And there was
6  something about she did that instead of giving
7  it to us or giving it to Tiffany.  She was,
8  again, possessive my understanding was about
9  that.
10      Q.   Ms. Robinson, in fact, gave you the
11  information regarding the ADT system; didn't she
12  or do you not remember?
13      A.   I'm not sure.  She might have given
14  it to me or Tiffany.
15      Q.   You told Ms. Robinson that working
16  on the design and townhouse project was a good
17  skill for Ms. Robinson to have; didn't you?
18      A.   I don't know if I said that.  And if
19  I did so what?  What does that mean?
20      Q.   You asked Ms. Robinson to buy
21  interior design magazines and go over ideas with
22  you for the townhouse; didn't you?
23      A.   I could have, yes.
24      Q.   You asked Ms. Robinson to organize
25  your suits and shirts for you; didn't you?

1      A.   I don't know if I did that.  She did
2  the closet.  So when I had stuff, I asked her to
3  put it in the closet.
4      Q.   Well, she helped you unpack when you
5  moved in to ██████ right?
6      A.   That's what she does.  That's what
7  she was supposed to do, yes.  I mean, help me or
8  get somebody else to do it or she would, you
9  know, do it.
10      Q.   You asked Ms. Robinson to go --
11      A.   I don't, you know this is all crazy,
12  yes, okay.
13      Q.   You asked Ms. Robinson to go to the
14  Decoration and Design and New York Design
15  Center, otherwise known as the D&D Building?
16      A.   Yes.
17      Q.   Sorry, Mr. De Niro, I need to finish
18  --
19      A.   Rachel.  The person she found, her
20  friend.
21      Q.   I just have to finish my question so
22  we have a record.
23      A.   Okay.
24      Q.   You asked Ms. Robinson to go to the
25  Decoration and Design and New York Design Center

1  otherwise known as the D&D Building with you;
2  didn't you?
3      A.   Yes.
4      Q.   You looked at furnishings with Ms.
5  Robinson at those buildings, right?
6      A.   Yes.
7      Q.   And you looked at furnishings at
8  other outlets like Restoration Hardware, right?
9      A.   Yes.
10      Q.   And Ms. Robinson helped plan and
11  design room layouts in your townhouse, correct?
12      A.   She helped with that, yes, to some
13  degree.
14      Q.   And she helped pick out paint colors
15  for your townhouse; didn't she?
16      A.   Yes.
17      Q.   And Ms. Robinson helped you picked
18  out fabric options for your townhouse; didn't
19  she?
20      A.   Yes.
21      Q.   Ms. Robinson picked out a Christmas
22  tree for your townhouse in 2018; didn't she?
23      A.   She did.
24      Q.   Ms. Robinson went to art stores and
25  picked out art from your father for your

1  townhouse in 2018 and 2019; didn't she?
2      A.   She could have, yes.
3      Q.   Ms. Robinson helped coordinate in
4  2018 childproofing for your townhouse windows,
5  didn't she?
6      A.   Yes.
7      Q.   Ms. Robinson would display purchases
8  for the townhouse like blankets and lamps for
9  you to confirm what you liked or did not like,
10  correct?
11      A.   Yes.
12      Q.   Ms. Robinson designed and put an
13  anniversary photo album together as a gift for
14  your former wife Grace De Niro, correct?
15      A.   Uh-hum.  Yes.
16      Q.   And she put together -- Ms. Robinson
17  put together photo albums for your children's
18  big birthdays, right?
19      A.   Yes.
20      Q.   Ms. Robinson met you at Blue Tree to
21  shop for gifts?
22      A.   Yes.
23      Q.   Ms. Robinson met you at the MoMA
24  store to shop for holiday gifts?
25      A.   She had a couple times, yes.



Page 174

```
 1        Q.  Ms. Robinson met you at the Neue
 2   Galerie to shop for gifts?
 3        A.  Yes.
 4        Q.  Ms. Robinson made a photo card for
 5   your former wife for Valentine's Day?
 6        A.  She, she was very good at making
 7   those cards.
 8        Q.  Is that a "yes"?
 9        A.  That's a "yes".
10        Q.  You had Ms. Robinson help your
11   former wife with decorating and planning Lucy
12   Damon's baby shower?
13        A.  I don't know.  She might have.  I
14   don't, I don't know.
15        Q.  You had Ms. Robinson help your
16   former wife schedule appointments for your
17   daughter's Helen's school search?
18        A.  Could be.  Yes.
19        Q.  You had Ms. Robinson speak to your
20   former wife about the research she did for your
21   son Elliot's school search?
22        A.  Say that again.
23        Q.  You had Ms. Robinson speak to your
24   former wife about the research Ms. Robinson did
25   for your son Elliot's school search?
```

Page 175

```
 1        A.  I'm sorry, just repeat that one more
 2   time.  I don't know why.
 3        Q.  Sure.
 4             You had Ms. Robinson speak to your
 5   former wife about the research she did relating
 6   to Elliot's school search?
 7        A.  Okay.  I could have, yes.
 8        Q.  And you had Ms. Robinson assist your
 9   former wife with whatever your former wife
10   needed, correct?
11             MR. DROGIN:  Objection to the
12        form.
13             You can answer it.
14   BY MR. SANFORD:
15        Q.  Is that a "yes"?
16        A.  What's the question again, sorry?
17        Q.  You had Ms. Robinson assist your
18   former wife with whatever she needed?
19             MR. DROGIN:  Objection to the
20        form.
21        A.  Yes, that's too general.
22   BY MR. SANFORD:
23        Q.  You had Ms. Robinson speak to your
24   current girlfriend Tiffany Chen and coordinate
25   what time she could come to your townhouse in
```

Page 176

```
 1   order to avoid detection by others, correct?
 2        A.  No, no.
 3        Q.  That never happened?
 4        A.  No, I don't know what the point of
 5   that question is either.
 6        Q.  You asked Ms. Robinson to find
 7   Tiffany Chen medical insurance; didn't you?
 8        A.  I could have.
 9        Q.  You had Ms. Robinson assist Tiffany
10   Chen what with whatever Ms. Chen needed; didn't
11   you?
12             MR. DROGIN:  Objection to the
13        form.
14        A.  I could have.
15   BY MR. SANFORD:
16        Q.  I'm sorry, the answer is?
17        A.  Probably I could have, yes.
18        Q.  You asked Ms. Robinson to review
19   your son Julian's ████████ when he was
20   about 16 years old; didn't you?
21        A.  I don't know if I would have asked
22   her to review his ████████
23        Q.  You might have, you just don't
24   remember?
25        A.  Huh?
```

Page 177

```
 1        Q.  You might have, you just don't
 2   remember?
 3        A.  I don't remember.  I don't know if I
 4   would have done that.
 5        Q.  You had Ms. Robinson meet with your
 6   son ████████ to check in with him to help
 7   him in various ways, correct?
 8        A.  I can't remember, but I might have.
 9        Q.  You had Ms. Robinson coordinate with
10   your son ████████ and your son ██████ support
11   staff, right?
12        A.  Yes, and that's where it didn't go
13   quite right.  So it happened, but it didn't
14   happen for long.
15        Q.  You asked Ms. Robinson to have your
16   grandson ████████ intern for Ms. Robinson,
17   correct?
18        A.  I might have at one point.  I don't
19   remember.  I might have.
20        Q.  And when ████ worked as an intern, he
21   would typically take an Uber from the office,
22   correct?
23        A.  That, I don't know.
24             MR. DROGIN:  Objection to the
25        form.
```



Page 178

```
1           A.  That I don't know and she should
2   have stopped him if he did.
3   BY MR. SANFORD:
4           Q.  Why should she have stopped him?
5           A.  Because she should have stopped him
6   or she should have told me about it because I
7   would have said take the subway.  He's a kid.
8           Q.  Kids should take subways and not
9   Ubers?
10          A.  Come on.  Don't be a -- give me a
11  break.
12          Q.  Well, I'm asking you a question.
13          A.  I'm saying they take the subway,
14  yes.  Certain kids at a certain age take the
15  subway or they jump in a cab.  Unless there's a
16  specific reason for taking an Uber where you
17  want them to be in that kind of situation, but
18  otherwise, no.
19          Q.  Don't you think Ubers are safer than
20  subways?
21              MR. BENNETT:  Objection.
22          A.  Yes, but he is a New York kid and he
23  has to learn to travel on the subways.  That's
24  normal.
25
```

Page 179

```
1   BY MR. SANFORD:
2           Q.  But you do agree Ubers are safer
3   than subways?
4           A.  I do too, but they cost a little
5   bit.  And kids have to learn if you take the
6   subway that's the fastest mode of transportation
7   through the city.
8           Q.  You asked Ms. Robinson to research
9   land easements for your ███████ property;
10  didn't you?
11          A.  I don't remember that.
12          Q.  You wanted to save money by
13  designating your property as a land easement and
14  she did some research with respect to that;
15  didn't she?
16          A.  I don't remember that.
17          Q.  You asked Ms. Robinson to go to your
18  Montauk house to assess what you should keep
19  prior to the house being demolished; didn't you?
20          A.  I could have.
21          Q.  Is that a "yes"?
22          A.  I don't know.  I can't remember.
23          Q.  All right.
24              MR. SANFORD:  Let's go off the
25  record for five minutes, please.
```

Page 180

```
1               THE VIDEOGRAPHER:  The time is
2   12:58.  We are going off the record.
3               (Whereupon, at 12:58 o'clock
4       p.m., a recess was taken until 1:20
5       o'clock p.m.)
6               THE VIDEOGRAPHER:  The time is
7   1:20.  We are back on the record.
8   BY MR. SANFORD:
9           Q.  Mr. De Niro, you understand you're
10  still under oath?
11          A.  Uh-hum.  Yes.  Yes.
12          Q.  Okay.  All right.
13              MR. SANFORD:  We're sharing a
14      document with you in the chat that is
15      Bates stamped CANAL 46685 to 46686.  A
16      two-page document and we're going to
17      mark this as Exhibit 115.
18              (Two-page document bearing
19          Bates stamp Nos. CANAL 46685 through
20          46686 was marked as Plaintiff's
21          Exhibit 118 for identification, as
22          of this date.)
23              MR. DROGIN:  115, did you say?
24              MR. SANFORD:  I think you already
25              MR. DROGIN:  I think you already
```

Page 181

```
1   marked 46031 to 32 as 115.
2               MR. SANFORD:  Well, if that's the
3   case, we'll mark this as 116.
4               MR. DROGIN:  You marked 46038 as
5   116.
6               MR. SANFORD:  All right.
7               Well, whoever is keeping track of
8   the documents, what are we on here?
9               MR. DROGIN:  If you do 118, that
10  will work.
11              MR. SANFORD:  Let's do 118.
12              See how cooperative we can be,
13  Laurent?
14              MR. BENNETT:  I don't see the
15  document.
16              MR. DROGIN:  Listen, this is the
17  first deposition that my dog hasn't
18  barked.
19              All right.
20              MR. SANFORD:  That is a good
21  thing.  And my daughter is not here.  I
22  have an eight-year old daughter who is
23  usually on when I'm critical points she
24  always shows up.
25              MR. DROGIN:  She doesn't bark.
```

46 (Pages 178 to 181)





| Page 182 |
| --- |

1          MR. SANFORD:  She doesn't bark.
2    I have a dog too, but she doesn't bark.
3    My daughter on the other hand, she talks
4    a lot.
5          MR. DROGIN:  It gets very
6    expensive on the transcript when the dog
7    barks and the court reporter writes it
8    down, dog barking.
9          Does everybody have the document?
10         MR. SANFORD:  All right.
11         Does everyone have it up, 118?
12         Thank you for that correction.
13         MR. DROGIN:  Yes.
14   BY MR. SANFORD:
15        Q.  So, Mr. De Niro, you have what has
16   been marked as CANAL 46685, 46686.  It is an
17   e-mail exchange, April 2, 2019 between Tiffany
18   Chen and you.
19        Do you see that?
20        A.  No, let me look for it.  How do I
21   pull?  Oh, view.  Okay.  Let me see.  No, I
22   don't know how to -- oh, share screen.  No, not
23   that.
24        What is it?
25        MR. DROGIN:  In the chat.

| Page 183 |
| --- |

1          THE WITNESS:  Chat.  Sorry.  I
2    went to the wrong thing.  I see.
3          Okay.
4          MR. SANFORD:  Let's go off the
5    record while Mr. De Niro has an
6    opportunity to review the document so we
7    don't waste time.
8          THE VIDEOGRAPHER:  The time is
9    1:23.  We are going off the record.
10         (Whereupon, at 1:23 o'clock
11   p.m., a recess was taken until 1:24
12   o'clock p.m.)
13         THE VIDEOGRAPHER:  Counsel the
14   time is 1:24.  We are back on record.
15   BY MR. SANFORD:
16        Q.  Mr. De Niro, did you have an
17   opportunity to review what has been marked as
18   document 118, the April 2nd e-mail, 2019?
19        A.  Yes.
20        Q.  Okay.
21        So what is that document, first of
22   all?
23        A.  What is it?
24        Q.  Yes.
25        What did you just read?

| Page 184 |
| --- |

1         A.  It is an e-mail.
2         Q.  All right.
3         And it is an e-mail between?
4         A.  Me and Tiffany.
5         Q.  Okay.
6         And what was your reaction when you
7    received the e-mail?
8         A.  Well, I was upset because I didn't
9    want to have to go, have to be dealing with this
10   kind of thing.  And I was -- you know, just a
11   hassle.  And I know that Tiffany was bending
12   over backwards to try and be nice to Chase.  And
13   I think Chase, you know, she can pull that stuff
14   with me.  And I would say let it go.  This and
15   that.  You know, I don't have time for it.
16   Blah, blah, blah.
17        But when she did it to Tiffany, then
18   you know, she's creating a problem.  Trying to
19   do something that she just shouldn't do.  And I
20   was trying to still fix it.
21        Q.  Well, when you say you were dealing,
22   you were upset dealing with this kind of thing,
23   what kind of thing?
24        What do you mean by that?
25        A.  Well, she wasn't, she wasn't --

| Page 185 |
| --- |

1    Chase is supposed to -- she was threatened by
2    her obviously.  And she was not being
3    respectful.  I know Tiffany.  She is very
4    respectful and tries to be nice.  And was
5    bending over backwards.  But with Chase it was,
6    just, it was -- she wasn't helping the
7    situation.
8         Q.  So you agree with Ms. Robinson's
9    statement that her presence in the house was not
10   working for Tiffany and, therefore, you, right?
11        MR. BENNETT:  Objection.
12        A.  Well, at this point, especially if
13   she was listening, reading all my e-mails
14   because she cloned my phone, it is even more,
15   more obscene and egregious.  It is just -- I
16   don't even know where to begin when I hear that.
17   So...
18   BY MR. SANFORD:
19        Q.  What do you mean by that?  I don't
20   understand.
21        A.  You know what I mean by it.  She,
22   she, Chase had been aware of all these exchanges
23   and so she is just acting like a spy.  She is
24   just acting on what she knows.  It is unethical
25   what she did to say the least.  And, you know --



1    Q.  What is unethical?
2    A.  What do you mean what is unethical?
3  Unethical is what she did.  Cloned my phone and
4  read my e-mails and read my exchanges.
5    Q.  So you agree with Ms. Robinson's
6  statement that Ms. Robinson's presence in the
7  house was not working for Tiffany and, therefore
8  you?
9        MR. BENNETT:  Objection.
10    A.  No.  I don't know how it would have
11  been if she hadn't read the exchanges.  She
12  might have had another thing.  Is there anything
13  that I have done.  I don't know what she would
14  have said.  And then maybe there could have
15  been.  But she was starting to behave in a way
16  that was not good.  And I still was trying to
17  make this all work, though.
18  BY MR. SANFORD:
19    Q.  When Tiffany responds by saying, and
20  I quote "This shit really pisses me off," what
21  was she referring to, do you know?
22    A.  The disrespect that Chase was, was
23  doing.
24    Q.  And the disrespect was what exactly?
25    A.  She just wasn't responding to

1  anything that Tiffany would want.  I don't know.
2  Tiffany told you in her deposition I'm sure
3  about the things that Chase had done.  And so,
4  you know, she told you what she had done, better
5  than I can.
6    Q.  What did Ms. Robinson say in the
7  e-mail that was disrespectful, do you know?
8        MR. BENNETT:  Objection to the
9   form.
10    A.  Well, there's nothing speculative in
11  the e-mail.  It is all very rationale and
12  reasonable.  But it is what she does in ways
13  that are counter to the way she should behave
14  with Tiffany and even me in some instances.
15        You know, I don't know what
16  transference that she had about that I'm her
17  father, her mother, her mother, her father, who
18  the hell knows.  Or her husband to be.  Whatever
19  it is, it has nothing -- the job is to be done
20  the way her person Rachel did the job.  The way
21  I thought Lulu did the job.  The way Sabrina did
22  the job.
23        This was not her -- she was acting
24  entitled.  She was doing things that were not
25  really right.  Not helping the situation.

1  BY MR. SANFORD:
2    Q.  So, there's -- Ms. Chen writes in
3  part that, you know, what is happening here is
4  manipulative and nasty.
5        What do you understand to be
6  manipulative?
7    A.  Just, it is just what she was doing.
8  She was not responding.  I think you have a
9  better answer.  I was not aware of this stuff
10  and the minutia of it and so on.  I just don't
11  even remember.  She just was not in general, not
12  doing what was right, Chase.
13    Q.  What was nasty?
14    A.  I don't know.  Tiffany told you.  I
15  don't remember.  She told you.  I know you have
16  all these answers.  So you have it.
17    Q.  Did you ever tell Ms. Chen not to
18  refer to Ms. Robinson as a bitch?
19    A.  No.  I didn't say anything.
20    Q.  When you saw this in an e-mail and
21  I'm quoting here "This bitch needs to get put in
22  her fucking place," how did you react?
23    A.  I saw that she was upset, you know.
24    Q.  Did you ever, did you ever
25  communicate with Ms. Chen about being respectful

1  towards Ms. Robinson?
2        MR. BENNETT:  Objection.
3    A.  Mr. Chen didn't have to.  She told
4  me how disrespectful she was.  And everybody
5  knew that.  Chase had a reputation among not
6  just with the way she treated Tiffany, but the
7  way she treated everybody.  They all hated her.
8  She thought she was being nice or take them to
9  dinner on my dime at Nobu.  I said fine.  And
10  stuff like that.  But she was -- they hated her.
11  They all rejoiced when she left.  I had no idea
12  that this was all going on.
13  BY MR. SANFORD:
14    Q.  Well, when you read Ms. Chen's
15  e-mail to you when she writes "This bitch needs
16  to get put in her fucking place," did you agree
17  with that?
18    A.  No, no, I'm just listening.  I'm
19  just saying "Oh, here we go".  Now I've got to
20  see what I'm going to talk to Chase.  I don't
21  know.  I might have said something to Chase.
22  Maybe and maybe she should stay away from the
23  house and I think that's what we finally agreed
24  to.
25    Q.  Do you think Ms. Chen was jealous of



Page 190

```
 1    Ms. Robinson?
 2         A.  No.
 3              MR. DROGIN:  Objection to the
 4     form.
 5         A.  No, she wasn't.
 6    BY MR. SANFORD:
 7         Q.  You don't think she was ever jealous
 8    of Ms. Robinson?
 9         A.  No.
10         Q.  You don't think that she felt that
11    Ms. Robinson had a place in your life that she,
12    Ms. Chen wanted to have in your life?
13              MR. DROGIN:  Objection to the
14     form.
15         A.  No.  You mean that Ms. Robinson was
16    jealous?
17    BY MR. SANFORD:
18         Q.  No.
19              That Ms. Chen was jealous of Ms.
20    Robinson's intimate place in your life?
21         A.  No, no, she wasn't jealous.  She was
22    angry and annoyed because she wasn't being
23    treated properly by somebody who worked for me.
24    And I guess she is saying here, you know, I'll
25    be able to finish the job and she'll go off and
```

Page 191

```
 1    it helps her to go off to some other country,
 2    some other city and I'll still be paying her.
 3              I mean, it is all, in hindsight I
 4    guess she should have just said look, I think it
 5    is time for me to leave.  And she also had the
 6    actual e-mails because she cloned my phone,
 7    which in itself is just, that in itself is a
 8    sin, just beyond.
 9              I never -- you just don't do that.
10    And maybe her reaction would have been different
11    if she just was acting off the vibe she was
12    getting from Tiffany, but Tiffany was trying to
13    be nice to her.  But, you know, you have to --
14    at some point if somebody is being nasty and
15    snappy and snippety and petulant and a brat,
16    yes, I mean, she could do that with me because I
17    didn't pay attention to her.
18              But you can't do it to my
19    girlfriend.  You can't do it.  You can't do it
20    to my children.  You can't do it.  You can't be
21    dismissive.  You can't do it.  And she --
22         Q.  You keep referring to your phone as
23    being cloned.  Your phone was cloned to assist
24    you in compiling evidence for your divorce,
25    right?
```

Page 192

```
 1         A.  No, I'm not understanding it like
 2    that.  And if it was cloned to assist me in
 3    evidence -- I don't think so.  This was after.
 4    Somehow that doesn't make sense.  I don't have
 5    my -- can my attorneys jump in on this?
 6         Q.  Your attorneys can't testify for
 7    you.  I'm just asking you factually what you
 8    understand to be the case.
 9              Is it your understanding that your
10    clone -- your phone wasn't cloned in order to
11    assist you in your divorce?
12         A.  I don't remember that I would let
13    her clone my phone to assist in my divorce.  Not
14    going forward.  From the past, yes.  Maybe, but
15    not going forward.
16         Q.  Well, what do you understand to be a
17    clone of your phone?  You're talking about a
18    backup?
19         A.  I understand that she has e-mails of
20    mine that she shouldn't have been privy to.
21    Period.  It is none of her business.  I might
22    have said clone in the back, to go back to stuff
23    because of the historical stuff that we had
24    between my wife and myself and I forget even
25    what the reason for that would have been, but
```

Page 193

```
 1    definitely not going forward.
 2         Q.  The clone of your phone was a backup
 3    of your phone.  It wasn't something that Ms.
 4    Robinson could use to spy on your e-mails going
 5    forward, it was a backup?
 6         A.  Didn't she?
 7         Q.  It was a backup to assist you?
 8         A.  No, no, no, don't twist it around.
 9    She did it, she did it for that reason, but she
10    also had access to other stuff going on up to
11    and currently and going forward, which I didn't
12    realize.
13         Q.  All right.
14              MR. SANFORD:  We are sharing a
15    document with you in the chat that's
16    Bates stamped ROBINSON 1602.  Oh, wait a
17    second, hold on, yes, 1602, which is an
18    e-mail from Ms. Robinson to you on April
19    4, 2019.
20              We're going to share that and
21    we'll go off the record while you have
22    an opportunity to read it.
23              THE VIDEOGRAPHER:  The time is
24    1:36.  We are going off the record.
25              (Whereupon, at 1:36 o'clock
```



1            p.m., a recess was taken until 1:37
2       o'clock p.m.)
3            THE VIDEOGRAPHER:  The time is
4       1:37 and we are back on record.
5  BY MR. SANFORD:
6       Q.  Okay.
7            So you have before you, Mr. De Niro,
8  1602, which we can identify as 119, is that
9  right.
10           MR. SANFORD:  Is that where we
11      are, Exhibit 119?
12           (Document bearing Bates
13      stamp Nos. ROBINSON 1602 was marked
14      as Plaintiff's Exhibit 119 for
15      identification, as of this date.)
16  BY MR. SANFORD:
17      Q.  Have you had a chance to review this
18  document?
19      A.  Yes.  I see it.
20      Q.  All right.
21           What is it?
22      A.  Yes, I don't --
23      Q.  What is the document?
24      A.  It is the one from Chase Robinson
25  saying I worked for you for 11 years.  Bent over

1  backwards.
2       Q.  What was your reaction, what was
3  your reaction?
4       A.  I don't know what I did in reaction
5  to this.  I don't remember.  I think two days
6  later she quit.  I don't know what I answered.
7       Q.  Well, do you recall clarifying Ms.
8  Robinson's responsibilities in January of 2019?
9       A.  I recall that she, her
10  responsibilities -- I don't even remember what
11  we clarified other than what she was doing
12  already.
13      Q.  Do you know what Ms. Robinson is
14  referring to when she refers to unfounded and
15  untrue accusations regarding missing pots and
16  pans and missing from Kraft catering?
17      A.  Well, so says she.  But then she
18  just returned to me two months ago or something,
19  a bunch of stuff without even apologizing or
20  saying I did have this.  I'm sorry.  Stuff that
21  she kept.  She has not returned my air miles.
22  She has returned the stuff, as I say, without an
23  apology.
24           She still owes me the air miles.  I
25  did not give her -- I gave her so much air miles

1  just for her to use appropriately in relation to
2  her work.  Not to take millions of air miles.
3  So, I don't even know.  With her, even something
4  like this is suspect because knowing that she
5  also was privy to my e-mail exchanges, she's --
6  I don't know, it is like weird.
7            I don't trust her anymore.  I mean,
8  I trusted her to do everything.  And now she is
9  just playing games and setting me up to do what
10  she's doing right now.
11      Q.  How is she setting you up?
12      A.  You know how she is doing it.  She
13  is setting up to do this.  And then, you know,
14  you guys are showing me this e-mail.  She had it
15  planned and set up in some way to do what she's
16  doing now because she also might have felt that
17  her time was limited.  It was not, in fact,
18  limited.  I didn't do anything.  But she felt,
19  you know, this is going to be a problem maybe
20  and so she started doing -- and then finally
21  sent me that resignation two days later.
22      Q.  Did you ever meet with Ms. Robinson
23  after receiving her e-mail of April 4, 2019?
24      A.  I don't remember.  I don't remember
25  if we talked or whatever.

1       Q.  Did you ever offer Ms. Robinson a
2  meeting after receiving her e-mail of April 4,
3  2019?
4       A.  I don't remember.
5       Q.  Did you ever offer Ms. Robinson any
6  options to address the concerns she was
7  expressing before she resigned from Canal?
8            MR. DROGIN:  Objection to the
9       form.
10           MR. BENNETT:  Objection.
11      A.  I don't remember.
12           MR. SANFORD:  I'm sharing a
13      document with you in the chat.  It is
14      Bates stamped CANAL 36475.  And we're
15      going to go off the record giving you an
16      opportunity to review it.  When you're
17      ready, let me know.
18           THE WITNESS:  Okay.
19           THE VIDEOGRAPHER:  The time is
20      1:41.  We're going off the record.
21           (Whereupon, at 1:41 o'clock
22      p.m., a recess was taken until 1:42
23      o'clock p.m.)
24           THE VIDEOGRAPHER:  The time is
25      142.  We are back on record.





| Page 198 | Page 199 |
|---|---|

**Page 198**

1 BY MR. SANFORD:
2 Q. Before, Mr. De Niro, we discuss that
3 document, just one final question about what we
4 were talking about a moment ago.
5 Sitting here today you don't recall
6 doing anything to address the concerns
7 referenced in Ms. Robinson's e-mail of April 4,
8 2019, the e-mail you read before?
9 MR. DROGIN: Objection to the
10 form.
11 You can answer.
12 A. I don't know. I don't know whether
13 I was just so tired with all this that I just
14 let it go. I don't -- yes, I don't know.
15 BY MR. SANFORD:
16 Q. All right.
17 A. No, I don't.
18 Q. That's fine.
19 Is that your testimony, I didn't
20 mean to interrupt you.
21 A. No, no, that's it. I just, you
22 know, I mean, my thought is that if, if Chase
23 had the access to this, you know, she thinks she
24 better act before, I don't know why. I don't
25 know why, but, you know, that's all.

**Page 199**

1 Q. All right.
2 You had a chance to review before we
3 went off the record a document CANAL 36475,
4 which has been identified as Exhibit 90.
5 Do you recognize that document?
6 A. Which is Exhibit 90? I don't know
7 which that is.
8 Q. The last thing you were in. It is
9 one-page document, it is an April 6, 2019 e-mail
10 from Ms. Chen to Lulu White and cc'ing a bunch
11 of people.
12 A. Right.
13 Q. All right.
14 So this is an e-mail from Tiffany
15 Chen to Lulu White, cc'ing Jillian Spears,
16 Sabrina Weeks-Britain and you, right?
17 A. Right.
18 Q. All right.
19 And the e-mail in part has Tiffany
20 tell Lulu that, and I'm quoting here "Chase is
21 no longer involved with anything regarding the
22 townhouse or the twins. You are not to discuss
23 anything with her that you discuss with us. Any
24 e-mails between us are not to be shared with
25 Chase".

| Page 200 | Page 201 |
|---|---|

**Page 200**

1 Do you remember that e-mail?
2 A. Well, I don't know if I do actually.
3 I'm not included in it. So...
4 Q. Well, you're copied on it, right?
5 A. I am copied. Okay.
6 MR. BENNETT: Objection.
7 A. I am.
8 BY MR. SANFORD:
9 Q. Being copied on it you are included
10 on it, right?
11 MR. BENNETT: Objection.
12 A. I am included, yes.
13 Okay.
14 BY MR. SANFORD:
15 Q. All right.
16 But this is an e-mail from Tiffany
17 directly to Lulu White.
18 Who is Lulu White?
19 A. She worked -- Chase brought her in.
20 I don't know. We were trying to find her. I
21 don't know where she is.
22 Q. What was her position?
23 A. Sorry?
24 Q. What was her role? What was her
25 title?

**Page 201**

1 A. I don't -- she was helping us
2 with -- she had her help with the townhouse and
3 brought her in. I don't know why she didn't
4 have Sabrina or Jillian come into it. She had
5 at one point Sabrina, but I don't know.
6 Q. Was Lulu White an employee at Canal?
7 A. Chase brought her in. I don't know
8 what happened to her. We were trying to find
9 her through all of this.
10 Q. Well, when you use phrases like
11 "brought her in," I don't know what that means.
12 Do you know whether Lulu White was
13 an employee at Canal?
14 A. I don't know that technically. For
15 all I know, Chase brought her in to be loyal to
16 her, I'm sure. And I obviously had to pay for
17 it, but I don't know how it was done. This is
18 something you should ask my lawyers or ask
19 Berdon.
20 Q. All right.
21 Who is Jillian Spear?
22 A. Jillian worked for me too.
23 Q. As what?
24 A. She was in the same capacity as
25 Sabrina.



1     Q.  Which was what?
2     A.  An assistant at the office.
3     Q.  Assistant at Canal?
4     A.  Yes.
5     Q.  An assistant assisting whom?
6     A.  Me, and you know, doing the work in
7 the office.
8     Q.  And did you --
9     A.  And she was being told what to do by
10 Chase.
11     Q.  Had you reviewed the e-mail Ms. Chen
12 sent before she sent it, Exhibit 90, the one
13 page e-mail that you have in front of you?
14     A.  Did I see it before?
15     Q.  Yes.
16     A.  I don't know if I did.
17     Q.  Did you approve it in any way
18 orally?
19        Do you remember speaking with Ms.
20 Chen about it?
21     A.  I don't know. I don't remember. I
22 really don't know. She put Bobby. Is that how
23 she is cc'ing me?
24     Q.  Well, let me ask you this.
25     A.  In other words, I'm not cc'd.

1     Q.  It says "Chase is no longer involved
2 with anything regarding the townhouse or the
3 twins"?
4     A.  Right.
5     Q.  Was that, was that your desire?
6     A.  That could have been my agreement
7 with her, that that's it, yes. It could have
8 been.
9     Q.  And were you not to discuss anything
10 with her, being Ms. Robinson, that you discussed
11 with us, was that your desire?
12     A.  I could have said that. That would
13 have been the simplest way to handle it. She's
14 just not involved with the townhouse. It is too
15 complicated. We have other things to do.
16     Q.  And "Any e-mails between us are not
17 to be shared with Chase," was that your desire?
18     A.  I don't know whether I would say not
19 to be shared, but that's, that's fine. If it
20 wasn't, I don't know.
21     Q.  So what prompted you to decide that
22 Ms. Robinson was not to be involved with
23 anything going forward?
24     MR. BENNETT: Objection.
25     MR. DROGIN: Objection to the

1 form.
2     That's not what the e-mail says.
3     A.  Yes, I saw that there was, there was
4 this problem. And I saw that, just that's
5 probably the best way to handle it.
6 BY MR. SANFORD:
7     Q.  You wanted Ms. Robinson fired;
8 didn't you?
9     A.  No, I didn't want her fired. I
10 wasn't going to fire her.
11     Q.  Well, what responsibilities was Ms.
12 Robinson to have?
13     A.  She had the responsibilities at the
14 office. She left the house. That's Tiffany and
15 me and my domain. The other people who work and
16 do what we ask, there's no problem. If there's
17 a territorial thing with Chase, she can't be
18 there. I can't have it. There's plenty of
19 other things to do.
20     Q.  Was there a territorial thing
21 between Ms. Chen and Ms. Robinson?
22     MR. DROGIN: Objection.
23     A.  Well, all I know is that people --
24 there was, there was discord. And we were
25 trying to get the place done. And I know

1 Tiffany, she doesn't care too much about the
2 stuff that I care about. So the little things
3 that she asked were not a lot. And Chase was
4 giving her a hard time about it. I needed this
5 like I needed a hole in the head. Chase is
6 supposed to be above that or just say "Okay,
7 what do you want? Or at worse, check with me,
8 at most she checked with me and say "Tiffany
9 said this. I just want to check, are you okay
10 with that?" That's all. It can't be, it can't
11 be this big tug of war, you know.
12 BY MR. SANFORD:
13     Q.  Well, you were responsible for the
14 tug of war; weren't you?
15     A.  What?
16     MR. DROGIN: Objection to the
17 form.
18     A.  I was responsible for the tug of
19 war?
20 BY MR. SANFORD:
21     Q.  Yes, you allowed it to happen?
22     A.  That is a loaded question. What are
23 you doing? What are you doing? You've got to
24 be kidding me.
25     Q.  You didn't allow it?



| Page 206 | Page 207 |
|---|---|

**Page 206**

1      A.  You've got to be kidding me.
2      Q.  You didn't allow it to occur?
3      A.  I allowed it to occur?  Get out of
4 here.  You ain't got your own domestic problems?
5 Get out of here.  Don't be so -- don't be
6 idiotic.  I mean, I'm just tired and excuse me
7 for being a little irate, but give me a break.
8 You've got to be kidding me.
9      You ask a question like that, I know
10 I'm going to get annoyed.  You're right, I am
11 annoyed.  Give me a break.  You have discord in
12 your own household when somebody comes in and
13 creates problems or whatever or does this.  That
14 sometimes -- there's no way around it.  You have
15 to deal with it.  You have to say "Okay, I have
16 to remove this person and put them over here".
17 I didn't fire them.  There was no thought of
18 firing.
19      Q.  And that's because you really valued
20 Ms. Robinson's work, didn't you?
21      A.  I valued it in many ways and I just
22 was not even thinking of firing her.  I was
23 getting annoyed with her, but I wasn't thinking
24 of firing her.
25      Q.  Why did you value Ms. Robinson's

**Page 207**

1 work in many ways, what ways did you value?
2      A.  Well, she did good things in certain
3 ways and not good in others.  She, she had this
4 emotional thing that was getting, you know,
5 getting in the way.  So what can I do?
6      Q.  Well, I know you focused a lot on
7 the negative, but I'm asking about the positive.
8      What were the good things that she
9 did, as you say, in certain ways?
10      A.  Well, I would like to think they
11 were good things.  I don't know after I had so
12 much -- such a strong reaction after she left
13 with the people who worked under her.  I'm
14 feeling that maybe she wasn't so positive.  She
15 always made it look like she was dying for me
16 and working so hard and 80, 90 hours a week and
17 this and that and this and that.
18      And I said "Okay, I take you at your
19 word.  Okay, you're doing this and that.  And I
20 believe you do this, you do that".  But then I
21 also heard that she was delegating, relegating
22 -- delegating work to other people, you know,
23 even on the seventh floor who were -- I don't
24 know, I just thought she was doing it all.  I
25 mean, it was a lot.

| Page 208 | Page 209 |
|---|---|

**Page 208**

1      And she could have said at any time
2 "Listen, I can't do that.  Can we give it to
3 Jillian or this person or that or Sabrina".  I
4 think she was trying to control everything and
5 it was really hard.
6      Q.  Can you think of any other good
7 things that Ms. Robinson did that you valued?
8      MR. DROGIN:  Objection to the
9      form.
10      A.  Well, she kept telling me all the
11 good things she did and all the hard work she
12 did.  And she was available to me when I needed
13 or I told her I needed this and she did these
14 things.  So, yes, I mean, she was good in many
15 ways.  I can't think offhand, but she would do
16 what I asked her to do and I guess but a lot of
17 other people weren't feeling that way.  And I
18 don't know.  I don't know how she interacts at
19 the office.  I know I don't want to get in this
20 situation ever again.
21 BY MR. SANFORD:
22      Q.  Okay.
23      I'm sharing a document with you in
24 the chat.
25      A.  I would like to make sure that

**Page 209**

1 whoever works for me again has access to all my
2 documents all the time like Chase did because I
3 think that's an honorable thing that she did.
4 And, you know, it's just, I'm so -- I admire
5 that so much.  She went in like a fucking spy
6 and took everything of mine and looked at it and
7 was privy to personal things in my life that I
8 just, I'm stunned by.  And you guys represent
9 her.  It is so nice of you.  Maybe you'll make a
10 few points.
11      MR. DROGIN:  What's the document
12      number?
13      THE WITNESS:  You're asking me?
14      MR. DROGIN:  No, sir.  I'm asking
15 Mr. Sanford.
16      MR. SANFORD:  Am I still frozen?
17      MR. DROGIN:  No, you thawed.
18      MR. SANFORD:  I'm back?
19      MR. DROGIN:  Yes.
20      MR. SANFORD:  All right.
21 BY MR. SANFORD:
22      Q.  Mr. De Niro, we're sharing a
23 document with you in the chat that is Bates
24 stamped CANAL 46709 to 46710.  A two-page
25 document, it is an April 6, 2019 e-mail between



| Page 210 |
| --- |

```
 1   Tiffany Chen and you.  Previously identified as
 2   93, Exhibit 93.
 3           MR. SANFORD:  We'll go off the
 4       record and give you an opportunity to
 5       review it and let me know when you're
 6       ready.
 7           THE VIDEOGRAPHER:  The time is
 8       1:55.  We are going off the record.
 9           (Whereupon, at 1:55 o'clock
10        p.m., a recess is taken until 1:56
11        o'clock p.m.)
12           THE VIDEOGRAPHER:  The time is
13       1:56.  We are back on record.
14   BY MR. SANFORD:
15       Q.  All right.
16           Mr. De Niro, you understand you're
17   still under oath?
18       A.  Yes.
19       Q.  You've had an opportunity to review
20   the April 6, 2019 e-mail between Ms. Chen and
21   you, correct?
22       A.  Yes.
23       Q.  All right.
24           What is that document, what is that
25   e-mail about?
```

| Page 211 |
| --- |

```
 1       A.  She says, again, I can't help
 2   thinking that kind of knew our exchanges.
 3   So she wrote this.  So, you know, what can I
 4   say?  She is saying she quit.  She resigned.
 5       Q.  Well, Ms. Chen writes that, and I'm
 6   quoting here "I think she knows what was coming
 7   and none of it was going to be in her favor".
 8           What did Ms. Chen mean by that, do
 9   you think?
10           MR. DROGIN:  Objection to the
11       form.
12           MR. BENNETT:  Objection.
13       A.  Yes, you should ask her.  I don't
14   know what she meant, but she knew I wouldn't be
15   happy with what Chase was doing.  This whole
16   situation that was created.  The best thing is
17   she should have just stayed in the office.  We
18   would have figured it out.  She even could have
19   gone to London and all that.  And I did kind of
20   resent that she is now going to London.  I'm
21   interrupting her trip.  She's delayed her trip.
22   Isn't that nice of her?  To go to London that I
23   paid for.  God knows what she pays for.  And she
24   took more air miles as it was.  I don't know if
25   it was at this point, but she took them.  And
```

| Page 212 |
| --- |

```
 1   if she took them after, it is even worse because
 2   she had quit.  So, now -- anyway, I'm just, what
 3   was I saying?
 4           MR. BENNETT:  You answered the
 5       question, Bob.
 6           THE WITNESS:  Yes, I answered the
 7       question.
 8   BY MR. SANFORD:
 9       Q.  All right.
10           MR. SANFORD:  I'm going to show
11       you another document in the chat that's
12       Bates stamped CANAL 47109 to 47111,
13       which an April 6, 2019 e-mail exchange
14       between Ms. Chen and you.  And this is
15       going to be Exhibit 120.
16           (Document bearing Bates
17        stamp Nos. CANAL 47109 through
18        47111, an April 6, 2019 e-mail
19        exchange between Tiffany Chen and
20        Robert De Niro was marked as
21        Plaintiff's Exhibit 120 for
22        identification, as of this date.)
23           MR. SANFORD:  Let's go off the
24       record while you have an opportunity to
25       read that.
```

| Page 213 |
| --- |

```
 1           THE VIDEOGRAPHER:  The time is
 2       1:59.  We are going off the record.
 3           (Whereupon, at 1:59 o'clock
 4        p.m., a recess was taken until 1:59
 5        o'clock p.m.)
 6           THE VIDEOGRAPHER:  The time is
 7       1:59.  We are back on record.
 8           THE WITNESS:  Yes.  Hello?
 9           MR. SANFORD:  Okay.
10           Back on the record.
11   BY MR. SANFORD:
12       Q.  You can hear me?
13       A.  Yes.
14       Q.  All right.
15           Sorry, Mr. De Niro, for the
16   technical hiccup here.
17           You had an opportunity to review the
18   April 6, 2019 e-mail --
19       A.  Yes.
20       Q.  -- between Ms. Chen and you, which
21   is Exhibit 120, correct?
22       A.  Yes.
23       Q.  Yes?
24       A.  Yes, I did.
25       Q.  Okay.
```


MAGNA
LEGAL SERVICES

| | |
|---|---|
| Page 214 | Page 215 |

**Page 214**

1    And do you recognize the document?
2    A.  Yes.
3    Q.  What is it?  What is that e-mail
4  exchange about?
5    A.  Well, it is about, you know, Chase
6  sends her resignation.  I forwarded it to Tom, I
7  guess, and who else, Michael Hackett.  I forget
8  whoever it is here.  And then Tiffany.  And then
9  she says, you know, what she says.
10    And I say "I know, but I'll do
11  what's right".  And that is what I would have
12  done and what I have been trying to do, but I
13  knew that Chase would do what she is doing
14  exactly now.  So here we are.
15    Q.  What did you think was right when
16  you said "I'll do what's right"?
17    A.  Well, what was right is proper
18  severance pay, giving me back the things that
19  she took.  Though, I'm not sure whether I knew
20  at that time.  I found out right after that that
21  things were taken.  And even then, give the
22  things back.  You're late or you're this or some
23  lies here and there.  I just would have said
24  "Look, pay her the right thing".  Not a
25  shakedown, what she wanted $600,000.  Not a

**Page 215**

1  letter to the London School of Economics because
2  that's a shakedown and that letter could have
3  been used in any way with a prospective
4  employer.  She knew that.  That's why she
5  composed it in that way.  That is absolutely
6  wrong.  I could not, I could not go along with
7  that.
8    Q.  Well, I'm going to ask you about
9  that in a second.
10    What did you think -- you said she
11  was, she was asking for about 600,000 severance,
12  what did you think the proper severance pay
13  should have been?
14    A.  It wasn't 600,000.  And I never
15  agreed to two years of that amount of money.
16    Q.  What would it have been in your
17  view, the amount of severance?
18    A.  I don't know.  We would have figured
19  it out, but it would have been fair.  I'm not
20  going to -- I don't fuck around with that stuff,
21  you know.  I try to do what's right.  But don't
22  take advantage and don't do what is she's doing.
23  That's not right.  That's wrong.
24    Q.  You don't think, you don't think an
25  11-year employee making $300,000 a year at that

| | |
|---|---|
| Page 216 | Page 217 |

**Page 216**

1  point would have been --
2    A.  No, I don't.  No, I don't.  Not with
3  the egregious behavior that she has exhibited.
4  Absolutely not.  You know that.
5    Q.  Mr. De Niro, I'm sorry, in order to
6  have a record, I have to be able to finish my
7  question.
8    My question, sir, is this:  You
9  didn't think that an employee who worked with
10  you and for you for 11 years was entitled to two
11  years of pay upon her departure, is that your
12  testimony?
13    A.  Absolutely.  Not with what she had
14  done, no.  Especially in hindsight learning what
15  she did.  Absolutely not.  That would be -- I
16  mean, what she did is criminal and that's why I
17  wanted my stuff back.
18    Q.  You think one year of pay would have
19  been a proper severance?
20    A.  I'm not going to say.  You know, I'm
21  not going to say what it is.  After what she put
22  me through now, I don't know what will happen.
23    Q.  But I'm asking you not now.  I'm
24  asking you at the time, you said you thought she
25  deserved a proper severance package.  May I

**Page 217**

1  finish?
2    A.  Yes, I can give you the answer.  You
3  don't have to waste your time questioning and
4  lead up --
5    Q.  Well, I do have --
6    A.  -- and try to trap me.  I'll give it
7  to you straight.
8    Q.  Mr. De Niro, I do have to waste my
9  time and your words because I need a clean
10  record.
11    A.  You're making money and hoping to
12  make a score off of this type of thing.
13  Anyway...
14    Q.  I understand you're --
15    A.  Shame on you.
16    Q.  I understand you're angry.
17    A.  You're damn right I'm angry.
18    Q.  All right.
19    I understand you're angry and I'm
20  just trying to get a clean record despite you're
21  angry.
22    My question, my question is:  You
23  wrote "I'll do what's right"?
24    A.  Yes.
25    Q.  What did you think was right?



MAGNA
LEGAL SERVICES

1     A.  I don't know.  I would have found
2  out.  I would do right, what's right after
3  talking to her.  After we would negotiate.  That
4  she wouldn't pull nonsense that she did.  To
5  write a fake letter to take, steal my stuff,
6  steal my mileage.  Try to shake me down and say
7  I want $600,000.  What could she expect?  And
8  then after learning the things that she did that
9  she was privy to my e-mails.  Come on.
10    Q.  Well, did you ever think that it
11 would be nice to sit down and talk with her
12 about what's right?
13    A.  I would have talked with her in time
14 or I would have had her lawyer talk to my
15 lawyer.  But I would have -- we would have come
16 to, we would have come to a -- but the more
17 important thing about what she did -- and she
18 did it to herself, is that when you do things
19 like that to a person, you're hurting yourself.
20 You don't play by the rules.  You don't play by
21 the law.  Then you're going to, you're going to
22 hurt yourself because I would have done -- I
23 always trusted her.  The honor system.  Do what
24 you've got to do.  Take care of yourself when
25 you go to London or Spain.  Do what you need to

1  do when you go to California.  Just do the right
2  thing.  Pride yourself on doing the right thing
3  by me, to me and there would be no problem.
4     Q.  You mentioned a letter to the London
5  School of Economics.
6        Why were you unwilling to sign that
7  letter?
8     A.  Oh, come on.  Come on.  Look at that
9  letter.  Look at that letter.  It is so easy for
10 her to doctor it in a certain way and say -- and
11 then I never know about.  She would just give it
12 to somebody else and say this is what he said
13 about me.  I couldn't do that.  I can't in good
14 conscious do that.  She can't rely on me to just
15 give her a recommendation.  If I give one and
16 she does what she did to me to them, they're
17 going to come back at me.  I can't do that.
18 Under no circumstances.  That's, that's wrong.
19    Q.  Why didn't you write your own letter
20 for her?
21    A.  I don't know.  At this point my
22 letter might not -- I always like to talk to the
23 prospective employer.  I give the pros and cons
24 of somebody who worked for me so they know.  I
25 don't write letters.  I could have written a

1  letter.  We didn't get to that point.
2     Q.  You didn't offer it, did you?
3     A.  No, we didn't get to the point of
4  offering it.  She said you owe this.  You
5  give me this.  You do this.  There was a lot of
6  contention.
7     Q.  Why didn't you just tell her "Look,
8  I'll write a letter.  I can't write that one,
9  but I'll write a different one"?
10    A.  Because she had done other things.
11 I don't know which came first, learning about
12 the mileage, learning about the equipment that
13 she finally returned and didn't say a thing
14 about it.  Just returned it.  She stole from me.
15 Period.
16    Q.  We're going to talk about that.  We
17 have plenty of time to talk about that.
18    A.  Plenty of time.  You know, be my
19 guest.
20    Q.  But I'm wondering right now, I just
21 want to get clear.  You will refuse to sign the
22 letter that she drafted and you never offered to
23 write any letter or to give her a
24 recommendation; isn't that true?
25    A.  No, we didn't get to that point.  We

1  didn't get to that point.
2     Q.  Why didn't you get to point?
3     A.  We just didn't.  Sometimes those
4  things take a little more time.  I don't know.
5  My lawyers found out that this was missing, that
6  was missing.  Air miles, dah, dah, dah.  I said
7  "Wait a minute, I knew there was going to be
8  something with her".  I knew it.  I knew that
9  this is the kind of person -- I suspected
10 that -- I couldn't act on it.  That wouldn't be
11 proper.  I just have to wait and see what comes
12 and what I saw came was not good.
13    Q.  Do you think there's a possibility
14 that you may be mistaken about Ms. Robinson --
15    A.  No, no.
16    Q.  Mr. De Niro --
17    A.  I don't think so.
18    Q.  Mr. De Niro, may I finish?  May I
19 finish?
20    A.  Go ahead.
21    Q.  Thank you.
22        Is it possible that you may be
23 mistaken about your view that Ms. Robinson stole
24 from you?
25    A.  You know, you're like the guy who



1    gets caught cheating with his wife.  His wife
2    comes in -- with another woman.  The wife comes
3    in and he says "Did you believe me or your lying
4    eyes"?  Give me a break.  Come on.
5        Q.   So your answer is?
6        A.   That's my answer.
7        Q.   It is "yes" or "no", do you believe
8    you may be mistaken?
9        A.   No, I'm not mistaken.  If I was
10   mistaken I'm the first to say "Look, maybe I'm
11   mistaken.  I apologize.  This and that.  Let's
12   meet somewhere in the middle".  That's not the
13   case.
14       Q.   I understand you think you're right.
15   I'm just asking you a different question.
16       A.   No, I don't think I'm right.
17       Q.   I'm not asking you whether you think
18   you're right.
19       A.   The facts say what it is.  And you
20   know it.
21       Q.   Mr. De Niro --
22       A.   You're the lawyer representing
23   someone like her and that's your job.  Go ahead.
24   You know.
25       Q.   Mr. De Niro, I'm not asking you

1    whether you think you're right.  I'm asking you
2    whether is possible you may be mistaken?
3        A.   No, it's not possible.  I see what
4    she did.
5        Q.   It is not possible.
6            Are there any other Canal employees
7    that you have refused to provide recommendations
8    for?
9        A.   Not that I know of.
10       Q.   Are there any other Canal employees
11   --
12       A.   I encourage employees who work for
13   me to go get other jobs if it is better for them
14   than the one they have with me.  I encourage
15   them.  I will write a letter.  I will talk to
16   the people.  Go, do it.  I encourage that.
17   There's no reason for anybody to stay with me if
18   they have a better opportunity.
19       Q.   Have you given recommendations to
20   former Canal employees?
21       A.   Some people, yes, I have.  I mean,
22   maybe you spoke to some of the former Canal
23   employees or TriBeCa employees.  You know,
24   there's never a problem that I know of.  She was
25   trying to undermine everybody.  Jane Rosenthal.

1    Samuel Hern.  Berdon.  Everybody.  She was
2    trying to undermine everybody.  Every situation.
3        Q.   All right.
4            MR. SANFORD:  We're sharing a
5    document with you in the chat that is
6    Bates stamped CANAL 49253 to 49254, an
7    April 6, 2019 e-mail exchange between
8    you and Ms. Robinson with Tom Harvey,
9    Michael Tasch, John Hackett and Mark
10   Bosswick copied.  And this is going to
11   be Exhibit 121, marked as 121.
12           Let's go off the record giving
13   you an opportunity to take a look.
14           (Document bearing Bates
15       stamp Nos. CANAL 49253 through 49254
16       was marked as Plaintiff's Exhibit
17       121 for identification, as of this
18       date.)
19           THE VIDEOGRAPHER:  The time is
20   2:11.  We're going off the record.
21           (Whereupon, at 2:11 o'clock
22       p.m., a recess was taken until 2:13
23       o'clock p.m.)
24           THE VIDEOGRAPHER:  The time is
25   2:13 and we are back on record.

1    BY MR. SANFORD:
2        Q.   Mr. De Niro, have you had an
3    opportunity to review what's been marked as
4    Exhibit 121?
5        A.   Yes, I did.
6        Q.   What is that Exhibit 121?
7        A.   I did.  Yes, I did.
8        Q.   Okay.
9            And what is the document you
10   reviewed?
11       A.   It is the one where I say to Chase
12   "That's fine.  Certain things have to be
13   finished out.  I want as little as possible done
14   by you.  That certain things might just have to
15   be resolved and only by you.  You'll be let
16   known what they are.  Thanks, Bob".
17           She goes on with the e-mail she sent
18   the other time.
19       Q.   Okay.
20           And Ms. Robinson was never informed
21   of what she needed to do to facilitate the
22   transition; isn't that right?
23       A.   Well, that only might have been
24   because she started other things that put me on
25   the defensive and I didn't know what to do and I



MAGNA
LEGAL SERVICES

| Page 226 | Page 227 |
|---|---|
| 1   also, like as knowing that she had taken things<br>2   like air miles and other things, things were<br>3   missing.  And now, this is something else.  I<br>4   was surprised, frankly, to hear that.<br>5         If anything, I thought she would<br>6   just be honorable, correct.  Do the right thing.<br>7   None of this would -- disputes happen with<br>8   people.  That's okay.  That's life.  But to take<br>9   because you think you're entitled to it.  I gave<br>10  you enough -- when we talked, I gave you, I said<br>11  the 60 or 80 or 70,000 for the next few months<br>12  after -- through the holidays to help me is one<br>13  thing.  I don't remember guaranteeing her two<br>14  years for that.  I just don't remember doing<br>15  that.  I wouldn't do that.<br>16     Q.  As far as you know, no one at Canal<br>17  ever reached out to Ms. Robinson to coordinate<br>18  the logistics of the transition, right?<br>19     A.  No, but I knew there was going to be<br>20  legal problems.  I did sense that and I told Tom<br>21  "I have a feeling we're going to have a problem,<br>22  but let's just see.  Hopefully it works out<br>23  nicely and there's no problem".  I don't want to<br>24  have problems.  I don't want to go through all<br>25  this. | 1        And the irony of it, if she had done<br>2  the right thing, I'm the first person to say<br>3  look, even if I disagree with this and that, I<br>4  cannot -- I'm not going to penalize you.  I'm<br>5  not going to punish you.  I'm not that kind<br>6  of -- I don't do those things.  I like to do the<br>7  right thing.  You do the right thing even if the<br>8  other people don't do the right thing.  You do<br>9  the right thing.  That's the way you deal with<br>10  things.  The way you handle it.  That's my way.<br>11  Period.<br>12     Q.  As far as you know, no one at Canal<br>13  ever reached out to Ms. Robinson to coordinate<br>14  the logistics of returning the --<br>15     A.  No, but we were getting into legal<br>16  problems then.  Excuse me, we were into, we were<br>17  getting into legal problems, sir.<br>18     Q.  Mr. De Niro, you're doing that thing<br>19  again that you do.<br>20     A.  What thing is that?<br>21     Q.  Interrupting me.<br>22     A.  I'm sorry.<br>23     Q.  My question is:  As far as you know,<br>24  no one at Canal ever reached out to Ms. Robinson<br>25  to coordinate the logistics of returning |

| Page 228 | Page 229 |
|---|---|
| 1   materials to Canal, correct?<br>2        MR. BENNETT:  Objection.<br>3     A.  She knew how to reach out to the<br>4  people and send it right back.  She didn't need<br>5  to know -- she knew who to get in touch with<br>6  immediately.  That should have been sent the<br>7  next day.  That was a Saturday I think she<br>8  resigned.  She should have sent it on Monday.<br>9  BY MR. SANFORD:<br>10     Q.  Mr. De Niro, let's, let's talk about<br>11  your financial status.<br>12        How would you approximate your net<br>13  worth in dollars?<br>14     A.  I'm not telling you.  It's none of<br>15  your business.<br>16     Q.  You're obligated to answer my<br>17  question.<br>18     A.  I'm sorry.  Ask my lawyer.  I don't<br>19  know what to tell you.  I'm not going to do<br>20  that.<br>21     Q.  You know --<br>22     A.  I'm sorry, this is harassment.  I'm<br>23  sorry, you can't do this.<br>24        MR. SANFORD:  Mr. Drogin, do you<br>25     want to take a break with your client to | 1   inform him of what the ground rules are<br>2  here?<br>3        MR. DROGIN:  No, that's okay.  If<br>4  he's refusing to answer the question,<br>5  he's refusing to answer the question.<br>6        MR. SANFORD:  Well, he doesn't<br>7  get to refuse to answer the question and<br>8  you know that.  So it is your obligation<br>9  to inform him and educate him of what<br>10  his obligations are here.<br>11     Can you do that, please?<br>12       THE WITNESS:  I'm not --<br>13       MR. SANFORD:  We'll go off the<br>14  record.  We'll go off the record.<br>15       THE WITNESS:  You're going to say<br>16  you had this money, therefore, can't you<br>17  afford to give her that?  No, I'm sorry,<br>18  it's the principal of the thing.<br>19  BY MR. SANFORD:<br>20     Q.  All right.<br>21       Well, the principal of the thing is<br>22  going to be resolved by the court who is going<br>23  to direct you to answer the question.<br>24       You understand that?<br>25     A.  Well, then I'll wait for the court |





## Page 230

```
1    to direct me and I gladly will do it.  I feel
2    you're just trying to harass me or get cheap
3    answers or ask cheap answers.  And I'm sorry, I
4    don't like it.
5         Q.  This is standard questions, though
6    Mr. De Niro.  Nothing unusual.
7         A.  Well --
8              MR. DROGIN:  Look, rather than
9         going back and forth or arguing with the
10        witness, he's told you that he's not
11        going to answer the question.  I cannot
12        force him to answer the question.  So I
13        suggest we move on.
14             MR. SANFORD:  I'm not asking you
15        to force him to do anything.  I'm asking
16        you to educate your client as to what
17        his obligations are in this deposition.
18        If you're unwilling to do it, that's
19        fine, but that's your obligation as his
20        counsel.
21             MR. DROGIN:  I don't take
22        direction from you on how I practice.
23        If you have a problem with the witness
24        that he doesn't want to answer the
25        question, you'll take it up with the
```

## Page 231

```
1         court and you can explain why you need
2         to know the answer to that question,
3         assuming the witness even knows the
4         answer to that question.
5    BY MR. SANFORD:
6         Q.  Mr. De Niro, your annual salary
7    fluctuates based on how your businesses perform
8    and how many film productions you're involved
9    in, correct?
10        A.  Yes.
11        Q.  Do you know what you earned in 2021?
12        A.  No.
13        Q.  Do you know what you earned in 2020?
14        A.  No.
15        Q.  You filed for divorce from your
16   ex-wife in 2018, correct?
17        A.  Yes.
18        Q.  Sorry?
19        A.  Yes, I think that's when it was,
20   yes.
21        Q.  And in the divorce proceedings your
22   former wife's lawyer or I guess your current
23   wife's lawyer, Ms. Hightower, her lawyer told
24   the judge that you had a net worth of about ███
25   ███ ████.
```

## Page 232

```
1              Do you remember that?
2         A.  I wish, I wish.  That's what I mean,
3    you're asking me -- from one cheap situation to
4    another cheap situation.  I wish.  So you keep,
5    you keep deluding yourself with that.  You can
6    say that.  Okay.
7              MR. DROGIN:  The question is
8         simply if you know what her lawyer said.
9              THE WITNESS:  I know he said
10        something like that.  It was ridiculous.
11             MR. DROGIN:  Okay.
12   BY MR. SANFORD:
13        Q.  All right.
14             Do you remember when her lawyer said
15   that you had admitted that you had a net worth
16   of ████████?
17        A.  No, I never admitted that.
18        Q.  Your divorce lawyer reported in
19   April of 2021 that you owe 18.25 million in
20   income tax from 2018 to 2019, is that correct?
21        A.  ████████████████?
22
23        Q.  What did you represent in your
24   divorce proceedings was your net worth?
25        A.  I don't know.  They did it.  And I
```

## Page 233

```
1    don't -- I'm not -- I don't remember
2    specifically.
3         Q.  Was it more than a hundred million?
4         A.  No.  A hundred million, no.
5         Q.  It was less than a hundred million?
6         A.  I don't even know.  I let them deal
7    with that.  I don't know.
8         Q.  You don't want to answer the
9    question, do you?
10        A.  I don't want to answer, yes, because
11   I feel like you're harassing me and you're
12   trying to make a point, which I think is a cheap
13   shot, yes.
14        Q.  But you understand you're obliged to
15   tell the truth --
16        A.  Yes, and I will.  When the judge
17   tells me, I will.  And then if I have to, of
18   course, I will.
19        Q.  And my question is simply:  Was your
20   net worth more than a hundred million as
21   represented in your divorce proceedings?
22             MR. BENNETT:  Objection.
23             MR. DROGIN:  He said he doesn't
24        recall.
25        A.  Yes, I don't recall.
```



## Page 234

BY MR. SANFORD:
1
2  Q.  You don't know, you don't know?
3  A.  No.
4  Q.  No, you have no idea what it is?
5  A.  No, no.
6  Q.  Was it more than ████████
7  A.  Are you saying my net worth?
8  Q.  Yes.
9  A.  It is more than ████████
10 Q.  More than ████████?
11 A.  I'm not going any further.
12 Q.  Somewhere between ████████████?
13 A.  I can't remember.
14 Q.  You have no idea?
15 A.  I have no idea.
16    MR. DROGIN:  Objection to the
17 form.
18 BY MR. SANFORD:
19 Q.  And I'm not asking you what your net
20 worth is right now, just to be clear.  I'm
21 asking what you represented in your divorce
22 proceedings what your net worth is, right.
23    Do you know what your net worth is?
24 A.  No, I don't know what they said.  I
25 don't know what they stated finally, no.

## Page 235

1  Q.  Okay.
2     And you don't know what it is in
3  fact right now?
4  A.  No.
5  Q.  You don't know whether it is more
6  than a ████████
7  A.  No.
8  Q.  And you don't know whether it is
9  more than ████████
10 A.  No.
11 Q.  You own Canal Productions, right?
12 A.  Yes.
13 Q.  You have 100 percent ownership stake
14 in Canal Productions?
15 A.  Yes, I think I do, but I might have
16 another partner, but I'm not sure.  It's been so
17 long since we worked out the details of
18 everything.
19 Q.  Do you know how much money Canal
20 made last year?
21 A.  No.
22 Q.  No idea?
23 A.  Nope.
24 Q.  Do you know how much you profit each
25 year from your ownership in Canal?

## Page 236

1  A.  No.
2  Q.  Do you own most of Nobu Hospitality?
3  A.  ████████████████████
4  ████████████████████
5  Q.  What's your percentage interest in
6  Nobu?
7  A.  That's --
8     MR. BENNETT:  Objection.
9  A.  I'm sorry, I'm not going to answer
10 that.
11 BY MR. SANFORD:
12 Q.  You're not going to answer it why?
13 A.  Because it is harassment.  You're
14 just trying to, you know, find a way.  I'm
15 sorry, I'm sorry.
16    MR. BENNETT:  It is information
17 designed to -- that question is designed
18 to elicit has absolutely no bearing on
19 this litigation.
20 A.  Yes, no bearing on this case.
21 BY MR. SANFORD:
22 Q.  It actually does.
23 A.  No, even I as a layman know that.
24 Q.  All right.
25    We'll find out what the judge

## Page 237

1  thinks.
2  A.  Right.
3  Q.  You own most of TriBeCa Enterprises,
4  right?
5     MR. BENNETT:  Let's call the
6  judge now.
7  BY MR. SANFORD:
8  Q.  You own most of TriBeCa Enterprises?
9  A.  ████████████████████
10 ████████
11 Q.  What percentage interest do you own
12 of TriBeCa Enterprises?
13 A.  I don't know.
14 Q.  You have no idea?
15 A.  No.
16 Q.  What other companies do you own or
17 have a controlling interest in?
18    MR. DROGIN:  Objection to the
19 form.
20    MR. BENNETT:  Objection.
21 A.  Yes.
22 BY MR. SANFORD:
23 Q.  What other companies do you own or
24 have a controlling interest in?
25 A.  Well, I don't have a controlling



Page 238

```
1   interest. ████████████
2       Q.  Anything else?
3       A.  That's it.
4       Q.  TriBeCa?
5       A.  TriBeCa.
6       Q.  Anything else?
7       A.  That's it.
8       Q.  Do you own or control any companies
9   located outside of the United States?
10      A.  No.
11      Q.  You signed a pre-nup agreement with
12  your former wife, right?
13          MR. BENNETT:  Objection.
14      A.
15  BY MR. SANFORD:
16      Q.  Is that correct?
17      A.
██
██
██
22          MR. BENNETT:  Objection.
23      A.  ████
24  BY MR. SANFORD:
25      Q.  ████████████████
```

Page 239

```
1   ████████████████
2       A.  I don't even remember exactly.
3   There's certain details.
4       Q.  So you don't know what you wound up
5   giving your former wife as a result of the
6   divorce?
7       A.  I'm, I'm working that out now.
8       Q.  How much real estate do you own?
9           MR. DROGIN:  Objection to the
10      form.
11      A.  Yes, things here and there.  What's
12  the point of the question?
13  BY MR. SANFORD:
14      Q.  I just want to know if you own any
15  real estate and what they are?
16      A.  I don't know.
17      Q.  You don't know if you own real
18  estate?
19      A.  I have some real estate in TriBeCa.
20  A country house -- a house in Long Island and a
21  house upstate.  That's it.
22      Q.  You have a house in Long Island, a
23  house upstate and what was the first thing you
24  mentioned?
25      A.  ████████████████
```

Page 240

```
1   ████████████.
2       Q.  Do you know the value of those
3   floors in TriBeCa?
4       A.  No, I don't.
5       Q.  Do you know the value of your house
6   in Long Island?
7       A.  No.
8       Q.  Do you know the value of the house
9   in upstate New York?
10      A.  No, I don't.
11      Q.  You're an investor in numerous
12  businesses, aren't you?
13          MR. BENNETT:  Objection.
14      A.  ████████████████
15
16  BY MR. SANFORD:
17      Q.  Do you have an investment in the
18  Greenwich Hotel?
19      A.  ████████████████
██
██
██
██
██
```

Page 241

```
1   ████████████████
██
3       Q.  What other companies have you
4   invested in?
5       A.  That's it.  I don't have any others
6   that I can see, that I know of.
7       Q.  Do you own any stocks or mutual
8   funds or bonds?
9       A.  No, no, no, no.
10      Q.  Do you know how much money you have
11  on hand in cash in your bank accounts?
12      A.  No.
13      Q.  Do you know approximately how much?
14      A.  No.
15          MR. DROGIN:  Do you want to know
16      how much he has in his wallet?
17      A.  Yes, I think I have $200 in my
18  pocket.
19  BY MR. SANFORD:
20      Q.  Do you own any gold or precious
21  metals?
22      A.  No.
23      Q.  Do you have any safety deposit
24  boxes?
25      A.  No.
```



61 (Pages 238 to 241)



```
1        Q.  Do you own any cars?
2        A.  Not really.  I lease them.
3        Q.  You don't have any ownership
4   interest in any car?
5        A.  No.
6        Q.  How many cars do you lease?
7        A.  A couple.  I have one car maybe that
8   I own.  It is a Telluride.
9        Q.  Do you own any boats?
10       A.  No.
11       Q.  Any airplanes?
12       A.  No.
13       Q.  Helicopters?
14       A.  No.
15       Q.  Do you have any loans outstanding?
16       A.  Not that I know of.
17       Q.  Do you know how much money you gave
18  to charity last year?
19       A.  I don't remember that either.
20       Q.  No idea how much?
21       A.  I don't think that's any of your
22  business.
23          MR. DROGIN:  It's fine.  He has
24       seven hours of questioning.  If he wants
25       to ask these types of questions.  They
```

```
1        have nothing to do with the case.
2        They're not objectionable.  Let him
3        waste his time.
4           Just answer them, please.
5   BY MR. SANFORD:
6        Q.  Did we get an answer?
7           MR. DROGIN:  I'm sorry, we
8        couldn't hear you.
9   BY MR. SANFORD:
10       Q.  I'm not sure we got an answer.
11       A.  What was the question?
12       Q.  If you gave any money to charity
13  last year?
14       A.  I did, but I feel that's personal.
15       Q.  So you're not going to answer the
16  question as to how much --
17          MR. BENNETT:  I'm going to direct
18       him not to answer the question,
19       actually.
20          (Whereupon, the transcript
21       was marked for a direction not to
22       answer.)
23          MR. SANFORD:  You're going to
24       direct him not to answer that question?
25          MR. BENNETT:  Yes.
```

```
1   BY MR. SANFORD:
2        Q.  Are you going to follow your
3   counsel's direction, Mr. De Niro?
4        A.  Yes.
5        Q.  You're going to follow your
6   counsel's direction?
7        A.  Yes, I am.
8        Q.  Okay.
9           MR. SANFORD:  Mr. De Niro, it is
10       now 2:27 --
11          THE WITNESS:  Yes.
12          MR. SANFORD:  -- and as an
13       accommodation, I'm going to tell you
14       something here that you may or may not
15       know.
16          As an accommodation to you and
17       given the request of your counsel, I
18       have agreed to do something I normally
19       don't do, which is to split your
20       deposition in two days.  So I understand
21       you have some personal issues to attend
22       to.
23          THE WITNESS:  Yes, I do.
24          MR. SANFORD:  I'm going to
25       respect that commitment that you have
```

```
1   and end today's deposition.  We're
2   scheduled to come back tomorrow at 10:00
3   a.m. in the morning and we're scheduled
4   to do again until 2:30 tomorrow.
5       And at that point we'll take
6   stock and see where we are and see if a
7   third day may be necessary.  I don't
8   know if it will or won't.  I try to be
9   efficient and I try to get through the
10  material that is good for everyone.
11      So I thank you for showing up
12  today.  I look forward to seeing you
13  tomorrow.  I wish you well with your
14  commitments this afternoon.
15         THE WITNESS:  Okay.
16         Thank you.
17         MR. BENNETT:  Bob, you can log
18      out.
19         MR. DROGIN:  Can we just get a
20      running time on the record, total time
21      on, please?
22         THE VIDEOGRAPHER:  Yes, I'll have
23      to tally it, though, give me one minute.
24         MR. DROGIN:  All right.
25      Bob, you can, you can sign off.
```




Page 246

```
 1              THE WITNESS:  Thank you.  Thank
 2    you.
 3              MS. HARWIN:  Chris, have you
 4    taken us off the record?
 5              THE VIDEOGRAPHER:  The time is
 6    2:29.  We are going off the record.
 7              THE COURT REPORTER:  Counsel,
 8    would you like to order a copy of the
 9    transcript?
10              MR. BENNETT:  Yes, please.
11              (Whereupon, at 2:29 o'clock
12            p.m., the deposition was adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 247

```
 1          INSTRUCTIONS TO WITNESS
 2
 3       Read your deposition over carefully.  It is
 4    your right to read your deposition and make
 5    changes in form or substance.  You should assign a
 6    reason in the appropriate column on the errata
 7    sheet for any change made.
 8       After making any change in the form or
 9    substance, and which have been noted on the
10    following errata sheet, along with the reason for
11    any change, sign your name on the errata sheet and
12    date it.
13       Then sign your deposition at the end of your
14    testimony in the space provided.  You are signing
15    it subject to the changes you have made in the
16    errata sheet, which will be attached to the
17    deposition before filing.  You must sign it in
18    front of a notary public.  Any competent adult may
19    witness your signature.
20       Return the original errata sheet to the court
21    reporter promptly.  Court rules require filing
22    within 30 days after you receive deposition.
23
24
25
```

Page 248

```
 1              ERRATA SHEET
 2
 3    PAGE  LINE#  CHANGE      REASON
 4    ____  ____  _____  _____
 5    ____  ____  _____  _____
 6    ____  ____  _____  _____
 7    ____  ____  _____  _____
 8    ____  ____  _____  _____
 9    ____  ____  _____  _____
10    ____  ____  _____  _____
11    ____  ____  _____  _____
12    ____  ____  _____  _____
13    ____  ____  _____  _____
14    ____  ____  _____  _____
15    ____  ____  _____  _____
16    ____  ____  _____  _____
17    ____  ____  _____  _____
18    ____  ____  _____  _____
19    ____  ____  _____  _____
20    ____  ____  _____  _____
21    ____  ____  _____  _____
22    ____  ____  _____  _____
23    ____  ____  _____  _____
24    ____  ____  _____  _____
25    ____  ____  _____  _____
```

Page 249

```
 1            SIGNATURE PAGE
 2                  OF
 3            ROBERT DE NIRO
 4
 5       I hereby acknowledge that I have read the
 6    foregoing deposition, dated April 4, 2022, and
 7    that the same is a true and correct transcription
 8    of the answers given by me to the questions
 9    propounded, except for the changes, if any, noted
10    on the attached errata sheet.
11
12
13    SIGNATURE: _____
14    WITNESSED BY: _____
15    DATE: _____
16
17
18
19
20
21
22
23
24
25
```

63 (Pages 246 to 249)



Page 250

```
 1              C E R T I F I C A T E
 2     STATE OF NEW JERSEY)
 3              )SS:
 4     COUNTY OF MONMOUTH )
 5
 6         I, CATHERINE M. DONAHUE, a Certified Court
 7     Reporter and Notary Public within and for the
 8     State of New Jersey, do hereby certify:
 9         That the witness whose deposition is
10     hereinbefore set forth was duly sworn by me and
11     that such deposition is a true record of the
12     testimony given by such witness.
13         I further certify that I am not related to
14     any of the parties to this action by blood or
15     marriage, and that I am in no way interested in
16     the outcome of this matter.
17         IN WITNESS WHEREOF, I have hereunto set my
18     hand this 5th day of April, 2022.
19
20     _____
       CATHERINE M. DONAHUE, CCR
21     License No. 30X100223700
22
23
24
25
```

64 (Page 250)




```
 1                    SIGNATURE PAGE

 2                          OF

 3                    ROBERT DE NIRO

 4

 5        I hereby acknowledge that I have read the

 6     foregoing deposition, dated April 4, 2022, and

 7     that the same is a true and correct transcription

 8     of the answers given by me to the questions

 9     propounded, except for the changes, if any, noted

10     on the attached errata sheet.

11

12     SIGNATURE:

13

14     WITNESSED BY:

15     DATE:

16

17              THOMAS A. HARVEY
             Notary Public, State of New York
18                 No. 02HA6051878
             Qualified in Westchester County
19         Commission Expires December 4, 20 22

20

21

22

23

24

25
```

