# Exhibit 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,


               Plaintiff,


        - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

               VOLUME II

     ZOOM VIDEOCONFERENCE DEPOSITION OF

           ROBERT DE NIRO

         April 5, 2022



       MAGNA LEGAL SERVICES

        (866) 624-6221
        www.MagnaLS.com



Page 252

```
 1              VOLUME II
 2       CONTINUED ZOOM VIDEOCONFERENCE ORAL
 3   DEPOSITION OF ROBERT DE NIRO, taken pursuant to
 4   Notice, commencing April 5, 2022, at 10:06 a.m.,
 5   on the above date, before Catherine M. Donahue, a
 6   Certified Court Reporter and Notary Public in the
 7   State of New Jersey.
 8
 9   Magna Job No. 814689
10
11
12
13
14
15
16          MAGNA LEGAL SERVICES
17             (866) 624-6221
                www.MagnaLS.com
18
19
20
21
22
23
24
25
```

Page 253

```
 1   A P P E A R A N C E S:
 2   (All parties present via Zoom Remote)
 3
 4   SANFORD HEISLER SHARP, LLP
 5   BY:  DAVID SANFORD, ESQ.
 6       JEREMY HEISLER, ESQ.
 7       ALEXANDRA HARWIN, ESQ.
 8       KATE MAC MULLIN, ESQ.
 9   1350 6th Avenue, 31st Floor
10   New York, New York 10019
11   (646) 402-5650
12   dsanford@sanfordheisler.com
13   jheisler@sanfordheisler.com
14   aharwin@sanfordheisler.com
15   Attorneys for Plaintiff
16
17
18
19
20
21
22
23
24
25
```

Page 254

```
 1   A P P E A R A N C E S: (Cont'd)
 2   (All parties present via Zoom Remote)
 3
 4   TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
 5   BY:  GREGORY R. BENNETT, ESQ.
 6   Mid-Westchester Executive Park
 7   Seven Skyline Drive
 8   Hawthorne, New York 10532
 9   (914) 347-2600
10   gbennett@tlsslaw.com
11   Attorneys for Defendant Robert De Niro
12
13   TARTER KRINSKY & DROGIN LLP
14   BY:  LAURENT S. DROGIN, ESQ.
15       BRITTANY K. LAZZARO, ESQ.
16   1350 Broadway
17   New York, New York 10018
18   (212) 216-8000
19   ldrogin@tarterkrinsky.com
20   blazzaro@tarterkrinsky.com
21   Attorneys for Defendant Canal Productions, Inc.
22
23
24
25
```

Page 255

```
 1   A P P E A R A N C E S: (Cont'd)
 2   (All parties present via Zoom Remote)
 3
 4   ALSO PRESENT:
 5       Chris Allen, Magna Videographer/Tech
 6       Annie Sloan, Sanford Heisler Sharp, LLP
 7       Jeremy Margolis, Sanford Heisler Sharp, LLP
 8       Leor Rosen, Sanford Heisler Sharp, LLP
 9       Simon Schaitkin, Sanford Heisler Sharp, LLP
10       Graham Chase Robinson
11       Tom Harvey, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 256

```
 1                FEDERAL STIPULATIONS
 2
 3     IT IS HEREBY STIPULATED AND AGREED by and between
 4     the attorneys for the respective parties herein,
 5     that the filing and sealing be and the same are
 6     hereby waived.
 7
 8     IT IS FURTHER STIPULATED AND AGREED that all
 9     objections except as to the form of the question
10     shall be reserved until the time of trial.
11
12     IT IS FURTHER STIPULATED AND AGREED that the
13     within deposition may be sworn to and signed
14     before any officer authorized to administer an
15     oath, with the same force and effect as if signed
16     and sworn to before this Court.
17
18
19
20
21
22
23
24
25
```

Page 257

```
 1                  I N D E X
 2
 3     Witness:                    Page
 4     ROBERT DE NIRO
 5      Examination by Mr. Sanford.............  262
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19     April 5, 2022
20
21
22
23
24
25
```

Page 258

```
 1            E X H I B I T S
 2     Exhibit Name    Description       Page No.
 3
 4     122    Document bearing Bates stamp    266
               Nos. CANAL 1844
 5
 6     123    Document bearing Bates stamp    303
               Nos. ROBINSON 6826
 7     124    Video                   321
 8     125    Document bearing Bates stamp    330
               Nos. ROBINSON 5475 through
 9             5476
10     126    Document bearing Bates stamp    331
               Nos. ROBINSON 5720
11
12     127    Document bearing Bates stamp    361
               No. CANAL 38698
13     128    Document bearing Bates stamp    369
               Nos. CANAL 1433 through 1437
14
       129    Document bearing Bates stamp    398
15             Nos. CANAL 46698
16     130    Document bearing Bates stamp    411
               Nos. CANAL 46015
17
       131    Document bearing Bates stamped  416
18             CANAL 48627 to 48630
19
20
21          (Exhibits retained by counsel.)
22
23
24
25
```

Page 259

```
 1            DEPOSITION SUPPORT INDEX
 2
 3     Instruction To Witness Not To Answer
 4          PAGE      LINE
 5          None Marked
 6
 7     Request for Production of Documents
 8          PAGE      LINE
 9          None Marked
10
11          Marked Text
12          PAGE      LINE
13          None Marked
14
15
16
17
18
19
20
21
22
23
24
25
```



| Page 260 | Page 261 |
|---|---|

**Page 260**

1 THE VIDEOGRAPHER: We are now on
2 the record.
3 This begins video No. 1 of day 2
4 in the deposition of Robert De Niro, in
5 the matter of Graham Chase Robinson
6 versus Robert De Niro and Canal
7 Productions.
8 Today is Tuesday, April 5, 2022,
9 and the time is 10:06 a.m.
10 This deposition is being taken
11 remotely via video conferencing software
12 at the request of Sanford Heisler Sharp.
13 The videographer is Chris Allen
14 of Magna Legal Services, and the court
15 reporter is Catherine Donahue of Magna
16 Legal Services.
17 Will counsel and all parties
18 present state their appearances and whom
19 they represent.
20 MR. SANFORD: David Sanford of
21 Sanford Heisler Sharp representing Chase
22 Robinson, the plaintiff in this matter.
23 MR. HEISLER: Jeremy Heisler of
24 Sanford Heisler Sharp representing
25 Graham Robinson, the plaintiff in this

**Page 261**

1 lawsuit.
2 MS. HARWIN: Alexandra Harwin
3 from Sanford Heisler Sharp, also on
4 behalf of plaintiff Graham Chase
5 Robinson.
6 MS. MAC MULLIN: Kate Mac Mullin
7 from Sanford Heisler Sharp, also on
8 behalf of the plaintiff Graham Chase
9 Robinson.
10 MS. SLOAN: Annie Sloan from
11 Sanford Heisler Sharp for the plaintiff
12 Graham Chase Robinson.
13 MR. SCHAITKIN: Simon Schaitkin
14 from Sanford Heisler Sharp on behalf of
15 the plaintiff Graham Chase Robinson.
16 MR. MARGOLIS: Jeremy Margolis
17 from Sanford Heisler Sharp for plaintiff
18 Graham Chase Robinson.
19 MS. ROSEN: Leor Rosen from
20 Sanford Heisler Sharp on behalf of
21 plaintiff Graham Chase Robinson.
22 MR. BENNETT: Gregory Bennett of
23 Traub Lieberman Straus & Shrewsberry for
24 defendants.
25 MR. DROGIN: Laurent Drogin,

**Page 262**

1 Tarter Krinsky & Drogin, for Canal
2 Productions, Inc.
3 MS. LAZZARO: Brittany Lazzaro
4 from Tarter Krinsky & Drogin on behalf
5 of defendant Canal Productions, Inc.
6 MR. HARVEY: Tom Harvey for the
7 defendants.
8 THE VIDEOGRAPHER: Thank you.
9 Will the court reporter please
10 swear in the witness.
11 (The witness is sworn by the
12 court reporter.)
13 R O B E R T  D e N I R O, recalled as a
14 witness by (Plaintiff), having been first
15 duly sworn by Catherine M. Donahue, a
16 Notary Public within and for the State of
17 New Jersey, was examined and testified
18 further as follows:
19 FURTHER EXAMINATION BY MR. SANFORD: (Cont'd)
20 Q. Mr. De Niro, welcome back to the
21 second day of your deposition.
22 I want to remind you what I said
23 yesterday. Just as a courtesy to you and your
24 attorney, I have agreed to do something I
25 typically don't agree to do, which is to split

**Page 263**

1 your deposition into two days. This is the
2 second day of your deposition.
3 I also have agreed as a courtesy to
4 you, given certain personal matters that you're
5 attending to, that we will stop the deposition
6 today at 2:30.
7 I will do my very best, and we all
8 will try to finish your deposition today.
9 There are outstanding issues that
10 we're going to have to take up with the court
11 regarding your counsel's direction not to answer
12 13 different questions yesterday and your
13 refusal to answer 7 questions on your own
14 yesterday.
15 We'll seek the court's for it's
16 guidance here and ask the court to direct you
17 back to have a third day with respect to at
18 least those questions, if not more. So I just
19 wanted to let you know that that's where we
20 stand.
21 MR. SANFORD: Okay.
22 I would like to revisit an
23 exhibit Bates stamped CANAL 45910, if we
24 could get that in the chat.
25 And what exhibit is that? Could

| Page 264 | Page 265 |
|---|---|
| 1     someone help me out there? | 1      As of July 2017, can you please |
| 2        MR. SCHAITKIN:  113. | 2  describe for me the various types of expenses |
| 3        MR. SANFORD:  All right. | 3  that Ms. Robinson was authorized to charge |
| 4  Exhibit 113. | 4  Canal? |
| 5      And let's go off the record while | 5     A.  Well, I left her in charge of |
| 6  you have an opportunity to review that | 6  whatever needed to be done.  So, that was it. |
| 7  e-mail, Mr. De Niro. | 7     Q.  Did the expenses that Ms. Robinson |
| 8        THE VIDEOGRAPHER:  The time is | 8  was authorized to charge to Canal change over |
| 9     10:10.  We are going off the record. | 9  time? |
| 10       (Whereupon, at 10:10 o'clock | 10     A.  I don't remember specifically, but |
| 11     a.m., a recess was taken until 10:14 | 11  it could have. |
| 12     o'clock a.m.) | 12     Q.  There were more expenses that |
| 13        THE VIDEOGRAPHER:  The time is | 13  Ms. Robinson was authorized to charge to Canal |
| 14     10:14.  We are back on record. | 14  than what other executive assistants could |
| 15  BY MR. SANFORD: | 15  charge, right? |
| 16     Q.  Okay. | 16     A.  Yes.  She was in charge of the |
| 17      Mr. De Niro, we're back on the | 17  expenses and I left it up to her to handle it |
| 18  record. | 18  appropriately, correctly, ethically, blah, blah, |
| 19      You understand you're still under | 19  blah. |
| 20  oath, correct? | 20     Q.  And do you remember what additional |
| 21     A.  Yes. | 21  types of authorized expenses you discussed with |
| 22     Q.  Did you have an opportunity to | 22  Ms. Robinson at that time? |
| 23  review Exhibit 113? | 23     A.  I can't remember specifically.  You |
| 24     A.  Yes. | 24  can tell me and I'll say yes or no. |
| 25     Q.  All right. | 25     Q.  All right. |

| Page 266 | Page 267 |
|---|---|
| 1       MR. SANFORD:  Let me share a | 1  exhibit number, but you have the Bates stamp. |
| 2  document with you in the chat.  It is | 2     Do you recognize that document? |
| 3  Bates stamped CANAL 1844, which will be | 3     A.  I don't, but, yes. |
| 4  Exhibit 122. | 4     Q.  Okay. |
| 5      (Document bearing Bates | 5     Do you see where it says - and I'm |
| 6     stamp Nos. CANAL 1844 was marked as | 6  quoting here - "We will be reimbursing her for |
| 7     Plaintiff's Exhibit 122 for | 7  some out-of-pocket business expenses"? |
| 8     identification, as of this date.) | 8     A.  Uh-hum. |
| 9       MR. SANFORD:  And let's go off | 9     Q.  Is that a "yes"? |
| 10  the record while you have an opportunity | 10     A.  Yes. |
| 11  to review this document. | 11     Q.  And does this help you remember what |
| 12       THE VIDEOGRAPHER:  The time is | 12  additional out-of-pocket business expenses you |
| 13     10:15.  We are going off the record. | 13  agreed to reimburse Ms. Robinson as of July |
| 14       (Whereupon, at 10:15 o'clock | 14  2017? |
| 15     a.m., a recess was taken until 10:16 | 15     A.  I don't remember specifically, no. |
| 16     o'clock a.m.) | 16     Q.  Okay. |
| 17       THE VIDEOGRAPHER:  The time is | 17       MR. SANFORD:  Let me show you |
| 18     10:16.  We are back on record. | 18  another document that's Bates stamped |
| 19  BY MR. SANFORD: | 19  CANAL 46031 to 46032. |
| 20     Q.  All right. | 20     And does anyone have a sense as |
| 21      Mr. De Niro, you understand you're | 21  to what exhibit number that is because I |
| 22  still under oath? | 22  don't want to make another mistake? |
| 23     A.  Yes. | 23       MR. DROGIN:  I think, I think |
| 24     Q.  You had an opportunity to review | 24  that you were right that the last one |
| 25  document CANAL 1844.  And we're discussing the | 25  was 122.  And this one is 123. |



Page 268

```
 1            Brittany, I'm not sure why you
 2    think otherwise. Two of the exhibits
 3    that were used yesterday had actually
 4    been previously marked, so I think
 5    that's where your numbers may be off.
 6            I would concur that this is 123,
 7    or whatever you just uploaded. 123.
 8            MR. SANFORD: Apparently, this
 9    exhibit before Mr. De Niro was
10    previously marked as 115.
11            So while you have an opportunity
12    to look at that, let's go off the
13    record.
14            MR. DROGIN: So are we remarking
15    it?
16            MR. SANFORD: Well, I mean, it
17    should have been marked as 115.
18            MR. DROGIN: Okay.
19            So we're not marking this as 123?
20            MR. SANFORD: Right.
21            MR. DROGIN: Okay.
22            THE VIDEOGRAPHER: The time is
23    10:18. We are going off the record.
24            (Whereupon, at 10:18 o'clock
25    a.m., a recess was taken until 10:20
```

Page 269

```
 1    o'clock a.m.)
 2            THE VIDEOGRAPHER: The time is
 3    10:20. We are back on record.
 4    BY MR. SANFORD:
 5        Q. All right.
 6            Mr. De Niro, you understand you're
 7    still under oath?
 8        A. Yes.
 9        Q. You've had an opportunity to review
10    what's been marked as Plaintiff's Exhibit 115,
11    right?
12        A. Yes.
13        Q. Looking at Ms. Robinson's
14    December 18, 2018, e-mail, I direct your
15    attention to the fifth paragraph where she
16    writes - and I'm quoting here - "This is a
17    change in base salary. All other items do not
18    need to be adjusted."
19            Do you see that?
20        A. Yes. I mean, you're quoting her
21    saying this is a change in base salary.
22            You're saying that or is she saying
23    that?
24        Q. I'm taking the quote from the
25    e-mail.
```

Page 270

```
 1        A. I don't see that.
 2        Q. In the fifth paragraph.
 3        A. In the fifth paragraph. Oh, yes,
 4    okay. I see it.
 5        Q. Okay.
 6            As of December 2018, what were the
 7    other perks that Ms. Robinson received in
 8    addition to her base salary, do you know?
 9        A. I don't know. I don't remember or
10    don't know really.
11        Q. All right.
12            And in late 2018, can you describe
13    for me all the expenses that Ms. Robinson was
14    authorized to charge to Canal?
15        A. No, I can't. I don't remember
16    really.
17        Q. Okay. All right.
18            You testified yesterday that Canal
19    has never had written policies, correct?
20            MR. DROGIN: Objection to form.
21        A. What?
22            MR. DROGIN: You can answer.
23    BY MR. SANFORD:
24        Q. You testified yesterday, did you
25    not, that Canal has never had written policies,
```

Page 271

```
 1    correct?
 2        A. Yes. I guess I did, yes.
 3        Q. And that's true, correct?
 4        A. Yes.
 5        Q. Okay.
 6            You generally had conversations with
 7    employees concerning expenses orally rather than
 8    in writing?
 9        A. Right.
10        Q. Is that right?
11        A. Yes.
12        Q. And do you remember during
13    Ms. Robinson's employment what Canal's practices
14    were concerning employee expenses?
15        A. No, I don't know those specifics.
16        Q. Do you remember during
17    Ms. Robinson's employment what Canal's standard
18    operating procedure was with respect to employee
19    reimbursements?
20        A. No. Oh, I mean I would know if
21    something was spent and charged to me where it
22    shouldn't be. Of course, I would.
23        Q. And how would you know if something
24    was charged to you that shouldn't be?
25        A. Well, it would be brought to my
```

1  attention.  It should be brought to my attention
2  by Chase Robinson or it will be brought to me by
3  my accountant that this expense seems strange or
4  whatever.
5      Q.  And what would be strange about an
6  expense to you?
7      A.  Well, if something was -- money was
8  spent that shouldn't have been spent by me but
9  by even Chase Robinson or any of the other
10 people who work for me at the time.
11     Q.  What would be an example of
12 something that shouldn't have been expensed that
13 was to you?
14     A.  I don't know.  Taking, taking maybe
15 cars or something when they really shouldn't
16 have or should have checked with me first or
17 with her.
18     Q.  Okay.
19         And Ms. -- I'm going to return to
20 this in a minute, but let me just figure this.
21         During Ms. Robinson's employment,
22 what were Canal's standard operating procedures
23 concerning the use of credit cards?
24     A.  I can't really remember
25 specifically, but my accountants know that.  My

1  lawyers know that.
2      Q.  During Ms. Robinson's employment,
3  what were Canal's standard operating procedures
4  concerning petty cash?
5      A.  Again, my accountant would know that
6  and my lawyers would know that.
7      Q.  During Ms. Robinson's employment,
8  how often were suspicious expenses brought to
9  your attention?
10     A.  They were brought from time to time.
11 It was more from her with other people who work
12 for me.  Though, in hindsight, I should have not
13 even addressed them and let them be handled by
14 my accountant -- referred to my accountant, even
15 my lawyer.
16     Q.  Okay.
17         When you say they were brought by
18 her, are you talking about Ms. Robinson?
19     A.  Yes, by Ms. Robinson.
20     Q.  So Ms. Robinson would bring to your
21 attention itemized expenses by other employees
22 that she thought were suspicious?
23     A.  She thought were, she thought were
24 inappropriate and -- yes.
25     Q.  And what would be an example, to

1  your best recollection, what Ms. Robinson
2  brought to you as an inappropriate expense made
3  by a staff member?
4      A.  Small things like per diem petty
5  cash for, for certain employees and stuff like
6  that.
7      Q.  And how often would she bring those
8  questions --
9      A.  From time to time.
10     Q.  How often would she bring those
11 questionable expenses to you?
12     A.  From time to time.
13     Q.  And what does that mean?
14     A.  I don't know.  Every couple of
15 months, here and there.  You know, those
16 specifics I don't really know.
17     Q.  Okay.
18         During Ms. Robinson's employment,
19 Canal had a practice of paying for employees'
20 lunches every workday, right?
21         MR. DROGIN:  Objection to the
22 form.
23         You can answer.
24     A.  Yes, I don't know.  I don't even
25 know if I can answer that.  But again, I trusted

1  what was being done by, by her, Chase.
2  BY MR. SANFORD:
3      Q.  During Ms. Robinson's employment, if
4  an employee was working through dinner, Canal
5  would pay for that dinner, right?
6      A.  Can you repeat that?
7      Q.  Sure.
8          During Ms. Robinson's employment, if
9  an employee was working through dinner, Canal
10 would pay for that dinner, right?
11     A.  It would seem that that would be
12 what should be done, of course.
13     Q.  And did you place any limits on meal
14 expenses Canal paid for its employees?
15     A.  I left that up to Chase and common
16 sense by everybody.
17     Q.  And during the period of 2008 to
18 2019, as far as you were aware, what other food
19 or drink expenses would Canal pay for on behalf
20 of its employees?
21     A.  I can't -- I don't really have an
22 answer.  I don't know.
23     Q.  During the period of 2008 to 2019,
24 there were various circumstances where Canal
25 would pay for employees to take taxis and Ubers



## Page 276

```
1    and Lyfts, correct?
2        A.  I don't even know that.  But again,
3    that was up to her.  So, I again say it was up
4    to her to do what was right, ethical, and it is
5    that simple.
6        Q.  What were the circumstances when
7    Canal would pay for employees to take taxis,
8    Ubers or Lyfts?
9        A.  It would only be if it was at night
10   or some time which is not normal work hours.
11   That's what I would expect, you know.  Again,
12   common sense.
13       Q.  Did you ever say that to anybody?
14       A.  They knew that's how I felt, and I
15   had said it, I know it, from time to time to
16   Chase.
17       Q.  Who did you tell?
18       A.  I said it to her.
19       Q.  And Chase would apply those
20   guidelines to her assistants and the employees
21   at Canal?
22       MR. DROGIN:  Objection to the
23   form.
24       THE WITNESS:  I'm sorry.
25       MR. DROGIN:  Objection to the
```

## Page 277

```
1    form.
2        You can answer.  Go ahead.
3        A.  I relied on her judgment about those
4    things.
5    BY MR. SANFORD:
6        Q.  Do you remember any conversation?
7        A.  No, not specifically.
8        Q.  Describe for me what you told
9    Ms. Robinson over the years about what expenses
10   she was generally authorized to be reimbursed
11   for Canal.
12       Do you remember any conversation?
13       A.  It is not like I had any -- she knew
14   and I didn't have to go into detail.  It was
15   common sense.
16       If she brought something to my
17   attention about it, I would say, "Well, you
18   know, use your best judgment about that.  But
19   let's not, let's not waste -- let's not
20   overindulge and, you know, use common sense.
21   Period.  I rely on you to do that."
22       Q.  Ms. Robinson was authorized to
23   charge more types of expenses to Canal than your
24   other executive assistants were, correct?
25       MR. DROGIN:  Objection to the
```

## Page 278

```
1    form.
2        You can answer.
3        A.  Yes, I'm not sure what you mean by
4    other executive assistants.  When?  Before her
5    or during or what?
6    BY MR. SANFORD:
7        Q.  At any time during the Canal
8    operation.
9        A.  Well, I mean, she might because she
10   was the last person working and things generally
11   go up.  Inflation, this and that.  So, you know,
12   that's all that I could say.
13       Q.  Do you recall conversations with
14   Ms. Robinson at times in which she requested
15   authorization to charge certain one-off expenses
16   to Canal?
17       A.  Can you give me an example?
18       Q.  Anything that you can remember.
19       A.  I can't remember other than that she
20   had at times would say I want to take some of
21   the staff to a dinner or a lunch here and there,
22   I would say, at Nobu and I would say that's
23   okay.
24       Q.  Ms. Robinson was generally
25   authorized to charge lunches to Canal while she
```

## Page 279

```
1    was working, correct?
2        MR. DROGIN:  Objection to the
3    form.
4        You can answer.
5        A.  Yes, I don't know.  I don't know.  I
6    can't answer.  I expected that she worked
7    that out with my business people as to what
8    would be appropriate.
9        And if there was something that was
10   inappropriate or something was flagged, they
11   would make me aware of it or I expected her
12   before that to make me aware of it.
13   BY MR. SANFORD:
14       Q.  Ms. Robinson was generally
15   authorized to charge dinners to Canal while she
16   was working; isn't that right?
17       MR. DROGIN:  Objection to the
18   form.
19       A.  Again, it is common sense.  If
20   you're working, you could charge for dinner, of
21   course.
22   BY MR. SANFORD:
23       Q.  And your business people never
24   flagged a concern about Ms. Robinson's meal
25   expenses prior to her resignation; isn't that
```



Page 280

```
 1  right?
 2       A.  I can't remember.  I don't know.
 3       Q.  Do you recall what you, what you
 4  authorized Ms. Robinson to charge Canal for
 5  regarding meals and coffees?
 6       A.  Say that again.
 7          MR. SANFORD:  Strike that.  It
 8       was a poorly phrased question.  Let me
 9       strike that.
10  BY MR. SANFORD:
11       Q.  Do you recall conversations you had
12  with Ms. Robinson over the years about the
13  circumstances when she was authorized to charge
14  Canal for her meals and coffees?
15       A.  Well, like I said, everything I just
16  said about common sense and so on.  And if
17  there's something, she can deal with my
18  accountants or my lawyer -- one of my lawyers on
19  it.
20       Q.  Well, you know that Ms. Robinson
21  often used taxis and Ubers in connection with
22  work for you, correct?
23          MR. DROGIN:  Objection.
24       Objection to the form.
25       Go ahead.
```

Page 281

```
 1       A.  I was aware of it.
 2  BY MR. SANFORD:
 3       Q.  And you can say for certain, or
 4  can't you say for certain, that any of the taxi
 5  and Uber charges that appeared on the Canal
 6  American Express under Ms. Robinson's name were
 7  not made in connection with work Ms. Robinson
 8  was doing for you?
 9          MR. DROGIN:  Same objection to
10       the form.
11       Go ahead.
12       A.  Well, I later learned that she was
13  charging Ubers while she was in London to me.  I
14  don't know, even in LA.  That was not something
15  she ever brought up and asked my approval for.
16          She also had rented a car when she
17  was in LA, but also using Ubers, I was told.
18  That was not appropriate.  That was not right.
19  That was not ethical.  Period.
20  BY MR. SANFORD:
21       Q.  Well, let me, let me break down what
22  you just said for a second here.
23          When you say that Ms. Robinson was
24  in LA and had rented a car, this is a work trip
25  in LA, correct, you're referring to?
```

Page 282

```
 1       A.  Excuse me?
 2       Q.  This is a work trip in LA
 3  Ms. Robinson took on your behalf, correct?
 4          MR. DROGIN:  Objection to the
 5       form.
 6       A.  It was a supposed work trip, though
 7  I later learned that it was not a work trip
 8  really.
 9          It was a -- she said she was
10  bringing out some books, movie books for gifts
11  to people out there, and then I later learned
12  that she hadn't brought them out.
13          But she took the trip anyway because
14  she was going to a birthday party of somebody
15  who also worked for me.  And I don't know if you
16  deposed her, but I would think it would be a
17  good idea to depose her.
18          Anyway, that's what I know about
19  that.
20  BY MR. SANFORD:
21       Q.  Would it surprise you to learn that
22  Ms. Robinson did not attend the birthday party
23  in LA?
24       A.  Well, what do I know.  All I know is
25  she was doing, taking -- having certain
```

Page 283

```
 1  expenses.  And the reason that I understood was
 2  that she was out there because she was bringing
 3  those books out to the people who I was giving
 4  them to, but she didn't.
 5       Q.  And you don't know when those Taxi
 6  Driver books arrived in LA, do you?
 7       A.  No, I don't know specifically.
 8       Q.  And do you remember having
 9  conversations with Ms. Robinson about Toukie
10  Smith and the point of scouting a hotel for
11  Toukie Smith in LA?
12          Do you recall those conversations?
13       A.  No, I don't.
14       Q.  Okay.  All right.
15          Let me go back to expenses.  If
16  Ms. Robinson testifies at trial that she used
17  the Canal Amex card bearing her name on taxi and
18  Uber rides in connection with work with you, you
19  would have no basis to dispute that, would you?
20          MR. DROGIN:  Objection to the
21       form.
22       You can answer.
23       A.  I would dispute it if she is not
24  doing it for actual work.
25
```



Page 284

1  BY MR. SANFORD:
2      Q.  Right.
3          But if she testifies at trial that
4  she used the taxis and Ubers for work for you,
5  you would have no factual basis to dispute her,
6  would you?
7      A.  Yes, I would.  She has to then be
8  specific as to what she used them for and then I
9  could tell you right away whether it was for
10 work or not.
11     Q.  How would you know on any particular
12 day whether she was working -- if she says she
13 is working on a particular day, going back four
14 years, are you saying you have an independent
15 basis to contest that sworn testimony?
16     A.  I just want to know what she did.
17 And you tell me, she tells me and I'll say,
18 "Well, you're not supposed to be taking an Uber
19 for that."  It is that simple.
20     Q.  Well --
21     A.  You're not supposed to be taking an
22 Uber to have lunch with friends or do this or
23 some social stuff.  That's not work.  Period.
24     Q.  I understand what you have been told
25 by other people apparently regarding a birthday

Page 285

1  party, and I've already asked you if you would
2  be surprised to learn if Ms. Robinson did not
3  attend the birthday party that you have been
4  told by others she attended.
5      A.  It doesn't matter.  She did
6  something in that trip that was not, how shall
7  we say, appropriate, as far as I know.  And --
8  period.
9      Q.  You don't know what she did on that
10 trip that was appropriate or inappropriate, do
11 you?
12     A.  I know I paid for that trip
13 there.  And the reason she was supposed to go
14 out there was to bring the books.  She did not
15 bring the books.  That I have been told.
16     Q.  And you have been told.
17         And who told you?
18     A.  My, my representatives.
19     Q.  Who are your representatives?
20     A.  My lawyers.
21     Q.  Who told you?
22     A.  My lawyers.
23     Q.  Your lawyers told you this?
24     A.  Yes.
25     Q.  And you think your lawyers know what

Page 286

1  she did out there?
2      A.  I think they can find out, yes.
3      Q.  And how would they find out?
4      A.  Because they would find out from my
5  staff who has records of everything and would
6  say, look, no, he didn't or this or that.  They
7  found out and told me.
8      Q.  So you're relying on your lawyers
9  who are relying on staff, none of whom was in LA
10 with Ms. Robinson knowing what she was doing?
11     A.  But I'm relying -- but then you're
12 relying on what she tells you and questioning me
13 like this now.  What's the difference?
14     Q.  All right.
15         So, look, the difference is you're
16 being deposed and I'm not.
17     A.  Yes, maybe you should be deposed.
18     Q.  Well, right now I'm deposing you and
19 I get to ask the questions and you get to give
20 the answers.
21     A.  Okay.
22     Q.  All right.
23         So if Ms. Robinson testifies at
24 trial at times she used the Canal Amex card
25 bearing her name to pay for taxis and Uber rides

Page 287

1  for other Canal employees, you would have no
2  basis to dispute her, would you?
3          MR. DROGIN:  Objection to the
4      form.
5      A.  Can you repeat that question,
6  please?
7  BY MR. SANFORD:
8      Q.  Sure.
9          If Ms. Robinson testifies at trial
10 that at times she used the Canal Amex card
11 bearing her name to pay for taxi and Uber rides
12 for other Canal employees, you would have no
13 basis to dispute her, would you?
14         MR. DROGIN:  Objection.
15     Objection to the form.
16     A.  Well, normally I would have no
17 objection.  But after she quit and I learned of
18 the abuses that she had been doing, I questioned
19 a lot of things that she had done saying that
20 she did it for work when she possibly didn't do
21 it for work.
22         MR. SANFORD:  Can the court
23     reporter read back that response,
24     please?
25         (Record read.)

MAGNA
LEGAL SERVICES

| Page 288 | Page 289 |
|---|---|

**Page 288**

1   BY MR. SANFORD:
2       Q.   Mr. De Niro, can you say for certain
3   that any of the taxi and Uber charges that
4   Ms. Robinson charged to Canal's credit card when
5   she was in New York were not made in connection
6   with work Ms. Robinson was doing for you?
7           MR. DROGIN:  Objection.
8       Objection to the form.
9       Go ahead.
10      A.   I think we can -- I can't
11  specifically say that because that's, as I say,
12  the honor system.  I trusted her.  When she says
13  she is working, she's supposed to be working.
14  When she's not, she's not.  That's her choice
15  how she handles that.
16          So, but then I learned that she was
17  lumping things together.  So specifically taking
18  an Uber from here to there, was it for work,
19  that's for her to say.
20          If you want to tell me, I will tell
21  you whether that's for work.  Who was she going
22  to see?  I'll tell you right away if it is for
23  work or not.  So...
24  BY MR. SANFORD:
25      Q.   Sitting here today, Mr. De Niro, are

**Page 289**

1   you aware of one time specifically that
2   Ms. Robinson -- let me finish.
3       A.   Yes, now you're playing games and
4   you know it.  Go ahead.  Go ahead.
5       Q.   Mr. De Niro, sitting here today, are
6   you aware of one instance, one instance at any
7   time during the entirety of Ms. Robinson's
8   11-year tenure as an employee at Canal where
9   Ms. Robinson used a taxi, an Uber or a Lyft in
10  New York City that was not related to work for
11  you?
12      A.   You're talking about New York City?
13      Q.   Well, I'm starting with New York
14  City, yes.  That's where she worked and that's
15  where most of her time was spent.
16      A.   Again, that was up to her to be
17  honest.  I am not aware specifically that she
18  misused that privilege, but as time went on
19  after she quit, I saw that she had been abusing
20  that privilege.  So, you figure that one out.
21          You know, it is a generalization,
22  but what else am I supposed to do when I see
23  that she has been dishonest?
24      Q.   I understand your view about
25  Ms. Robinson.

| Page 290 | Page 291 |
|---|---|

**Page 290**

1       A.   Well, that's nice of you.
2       Q.   I understand what you believe.
3           My questions are specific about your
4   knowledge, not your belief.  I want to know what
5   you know.  You're here as a fact witness.
6           MR. DROGIN:  Counsel, he
7       explained to you.  It is like any case
8       of fraud.  You find out about it after
9       the fact.
10          MR. SANFORD:  You know,
11      Mr. Drogin, that is so highly
12      inappropriate for you to inject yourself
13      here.  I would ask you to refrain
14      yourself from speaking.
15          MR. DROGIN:  It is not for you to
16      ask a hypothetical question.  He
17      testified that he --
18  BY MR. SANFORD:
19      Q.   Mr. De Niro --
20          MR. SANFORD:  There is nothing
21      hypothetical.
22          MR. DROGIN:  Why don't you pose
23      that at trial.
24  BY MR. SANFORD:
25      Q.   Mr. De Niro --

**Page 291**

1           MR. DROGIN:  That's hypothetical.
2   BY MR. SANFORD:
3       Q.   Tell me, tell me, if you know -- now
4   you're saying that you believe after
5   Ms. Robinson resigned, you came to be aware that
6   she expensed certain items that she shouldn't
7   have expensed.
8           Sitting here today, are you aware of
9   one item, one that Ms. Robinson expensed that
10  she shouldn't have expensed?
11      A.   Let me explain.
12          I became aware of abuses on a bigger
13  scale.  Specifically, I guess I can't say this
14  or that, but I became aware of abuses; stealing
15  my air miles, in London doing things, in LA
16  doing things.
17          New York, maybe she told a lie more
18  because it was New York.  She knew she had to be
19  more respectful of the, what do you want to call
20  it, the rules of her being employed.  She had
21  the responsibility.  She might have been -- but
22  I don't, you know -- anyway...
23      Q.   Was Ms. Robinson with you in London?
24      A.   She was with me in London at some
25  time.  She spent -- I was with her for like a

MAGNA
LEGAL SERVICES

Page 292

1    day or two.
2        Q.  Well, you were with Ms. Robinson in
3    November of 2018 for a Warburton project,
4    weren't you?
5        A.  She was there part of it and then
6    she wasn't there.
7        Q.  Well, you would know what she was
8    doing, she was with you, right?
9        Are you claiming that she did
10   anything in London that she shouldn't have done
11   in 2018 when she was with you?
12       May I finish?  May I finish?
13       A.  Go ahead.
14       Q.  I know it is tempting to get
15   started.  And I'm not criticizing you for it.
16   I'm just trying to be respectful of the court
17   reporter who is trying to get down what I'm
18   saying and what you're saying.  So if you would
19   allow me to finish, please.
20       You knew what she was doing in
21   London because you were with her in London,
22   correct, in 2018?
23       A.  I wouldn't be surprised.  She was
24   with me.  She had certain rights, of course.
25   That's the wrong word, but she was working with

Page 293

1    me, for me.
2        Though, now I wouldn't be surprised
3    if she abused that -- I don't know what you want
4    to call it, privilege or whatever.  But she did
5    work with me there in England when I went there
6    that time.
7        Q.  Well, sitting here today, looking
8    back on that experience in London with
9    Ms. Robinson in 2018, are you aware of any
10   charge that she made in London while she was
11   with you that she shouldn't have made?
12       A.  When she was with me, I'm not aware.
13   But I wasn't supposed to be.  I wasn't supposed
14   to be aware.  I'm not, I'm not looking at every
15   little bill.  I'm trusting her.  Again, it is
16   the honor system.  That simple.
17       Q.  You made a claim moments ago that
18   she did things that were improper in London, and
19   I'm trying to understand what you understand
20   specifically to be improper that she did in
21   London.
22       A.  What I meant was --
23          MR. DROGIN:  Objection.
24       Objection.
25          Hold on.  Hold on.

Page 294

1        Objection to the form.  Just to
2    be clear, you're focused on a trip in
3    November of 2018?
4          MR. SANFORD:  I am.  I'm starting
5    there.  That's correct.
6          MR. DROGIN:  Okay.
7    BY MR. SANFORD:
8        Q.  So, Mr. De Niro, just to finish this
9    trip in London that you were on with
10   Ms. Robinson, is there anything you are aware
11   now or had been aware at any time that would
12   indicate to you that she did something improper?
13       A.  Before I heard that she had done
14   things improper, I never questioned what she
15   did.  Now I question a lot of things.
16       So, I can't say for that particular
17   time in London with her that she did anything
18   improper.  Only she knows that.  Only the
19   records show that.
20       Q.  All right.
21       So sitting here today, you don't
22   know that Ms. Robinson charged anything improper
23   in 2018, right?
24       A.  I'm not the person to answer that
25   question because I don't look at those, that

Page 295

1    minutia.  I don't do that.  I'm not expected to
2    do that.  I expect her to do that for me.
3    That's why she is with me.  That's why I trust
4    her.
5        It is that simple.  You don't do
6    that for me, then there's a big problem and
7    that's why we're here.
8        Q.  Before you start claiming that
9    people are unethical and doing things illegally
10   under oath, don't you think you have an
11   obligation to follow up and satisfy yourself
12   that, in fact, someone did something improper?
13       Don't you think you have that
14   obligation, sir?
15       A.  No, I was told she did something
16   improper.  I don't have an obligation.  I have
17   already been told that.
18       Q.  I see.
19       So you don't believe you have any
20   obligation to follow up --
21       A.  Oh, I do believe I have an
22   obligation.  Of course I do, as she has an
23   obligation to me to do the right thing.  I have
24   an obligation to be a proper employer of hers.
25   But we owe each other the same respect and --

MAGNA
LEGAL SERVICES

| Page 296 | Page 297 |
|---|---|

**Page 296**

1    Q.  And did you follow up on your
2  obligation to satisfy yourself that, in fact,
3  Ms. Robinson did something improper?
4          MR. DROGIN:  Objection to the
5      form.
6          You can answer.
7    A.  Yes, we're playing games here.  This
8  is nonsense.
9  BY MR. SANFORD:
10    Q.  You said you had an obligation to
11  follow up.  I'm asking you, sir, what did you do
12  to follow up to satisfy yourself that
13  Ms. Robinson did something improper?
14    A.  What I did was when she quit, I said
15  to -- I said I feel that there might be
16  something happening with her because I just,
17  something -- I just don't feel right about it.
18          I told my lawyer, and according to
19  what I know - and I could be off on part of
20  this - they went through and saw what she was
21  supposed to return to me, even things that I
22  asked her to tie up loose ends that she was in
23  the middle of to help me to transition to a new
24  person, new situation, and then things were
25  starting to be discovered.

**Page 297**

1    Q.  I'm going to get into all of that, I
2  promise you.
3    A.  Well, be my guest.
4    Q.  We're going to spend a lot of time
5  together, Mr. De Niro.
6    A.  Good.
7    Q.  We're just getting started.
8          But I'm asking you right now with
9  respect to taxis and Ubers and Lyfts, whether
10  you looked at any line item at any time on any
11  credit card and asked yourself was she doing
12  work for me.
13          Did you ever do that?
14    A.  I don't look at line items.  Excuse
15  me.  Again, it goes back to trust.  I don't
16  nitpick and go over every day.  After everything
17  she did with me, what cab did she take?  What
18  did she do?  What did she spend?
19          I don't do that.  My accountants do
20  that.
21    Q.  So you never satisfied yourself that
22  she did anything improper by looking at any line
23  item?
24    A.  The satisfaction is feeling that I
25  can trust her.  If she has broken the trust, it

| Page 298 | Page 299 |
|---|---|

**Page 298**

1  is over.  Period.
2    Q.  All right.
3    A.  There's no trust anymore.
4    Q.  All right.
5    A.  That's not how it works.
6          MR. DROGIN:  I also ask the
7      witness not to discuss any
8      communications with counsel.
9          THE WITNESS:  Excuse me?
10          MR. DROGIN:  Please do not
11      discuss any communications that you had
12      with counsel.
13          THE WITNESS:  Okay.  Okay.
14  BY MR. SANFORD:
15    Q.  And, Mr. De Niro, to be clear, we're
16  having this back and forth here.  I'm never
17  interested in your communications with counsel.
18  I don't care what you say to counsel.  I don't
19  care what counsel says to you.  I just want to
20  know what you know.
21    A.  Yes, and you know I don't know
22  anything, so...
23    Q.  Apparently.
24    A.  Bottom line. I trust.  That's the
25  bottom line.  T-r-u-s-t, trust.

**Page 299**

1    Q.  I think we're establishing you know
2  nothing today.
3    A.  That's right, I know nothing.  I
4  know nothing, and that's why I put my trust in
5  her, in Chase.  Period.
6    Q.  You knew nothing then and you know
7  nothing now, correct?
8          MR. DROGIN:  Objection.
9    A.  I don't know a lot now, but I know I
10  have been hearing that she has not done the
11  right thing.
12    Q.  Okay.
13    A.  Okay.  So we'll find all that out as
14  we go.
15  BY MR. SANFORD:
16    Q.  Yes, we will.
17          So, can you describe for me all of
18  the conversations you recall having with
19  Ms. Robinson regarding charging taxis, Ubers or
20  Lyfts to Canal?
21    A.  I don't have conversations with her
22  about that.  Again, it is trust.  That's her
23  job, to do the right thing.
24          MR. SANFORD:  All right.
25          Let's go off the record for about



Page 300

1      five minutes, please.
2            THE VIDEOGRAPHER:  The time is
3      10:53.  We are going off the record.
4            (Whereupon, at 10:53 o'clock
5      a.m., a recess was taken until 11:10
6      o'clock a.m.)
7            THE VIDEOGRAPHER:  The time is
8      11:10.  We are back on record.
9      BY MR. SANFORD:
10      Q.  All right.
11           Mr. De Niro, you know you're still
12     under oath?
13      A.  Yes.
14      Q.  During Ms. Robinson's employment, it
15     was typical for there to be flowers or plants at
16     Canal's main office; isn't that right?
17      A.  Yes.
18      Q.  And Ms. Robinson purchased flowers
19     and plants for the office, didn't she?
20           MR. DROGIN:  Objection.
21      A.  Yes.
22     BY MR. SANFORD:
23      Q.  And Ms. Robinson was authorized to
24     charge Canal for flowers and plants that were
25     purchased for the Canal office, right?

Page 301

1            MR. DROGIN:  Objection to the
2      form.
3            You can answer.
4      A.  Yes.
5      BY MR. SANFORD:
6      Q.  And during Ms. Robinson's
7      employment, it was typical for there to be
8      flowers or plants at your home, correct?
9      A.  At times, yes.
10      Q.  Ms. Robinson purchased flowers and
11     plants for your home, didn't she?
12           MR. DROGIN:  Objection to the
13     form.
14           You can answer.
15      A.  Yes, at times.
16     BY MR. SANFORD:
17      Q.  Ms. Robinson was authorized to
18     charge Canal for flowers that were for your
19     home; isn't that right?
20      A.  Yes.
21      Q.  During Ms. Robinson's employment, it
22     was typical for there to be flowers or plants at
23     parties that you threw, correct?
24      A.  I didn't have many parties or
25     whatever, you know.

Page 302

1      Q.  Well, to the extent you had parties
2      and to the extent you had --
3      A.  I don't remember what parties she's
4      talking about or any party -- unless something
5      at the TriBeCa we had some parties, Christmas
6      party, this or that, a party for one of the kids
7      or something, or once we hosted a wedding for a
8      friend.
9      Q.  Or holiday parties?
10      A.  Yes.
11      Q.  All right.
12           And at those parties, it was typical
13     to have flowers or plants, right?
14      A.  Yes.
15      Q.  And Ms. Robinson purchased the
16     flowers and plants for those parties, didn't
17     she?
18      A.  Hopefully.  That was what she was
19     supposed to have done.  Either she did it or she
20     had somebody else do it.
21      Q.  All right.
22           And Ms. Robinson was authorized to
23     charge Canal for the flowers that were at those
24     parties, correct?
25      A.  Uh-hum, yes.

Page 303

1      Q.  And if you approved sending flowers
2      or plants to a colleague of yours, that was
3      something that Ms. Robinson was authorized to
4      charge Canal, correct?
5      A.  Yes.
6            MR. SANFORD:  All right.
7            Let's look at ROBINSON, Bates
8      ROBINSON 6826, which is Exhibit 123, and
9      go off the record while Mr. De Niro has
10     an opportunity to review it.
11           (Document bearing Bates
12     stamp Nos. ROBINSON 6826 was marked
13     as Plaintiff's Exhibit 123 for
14     identification, as of this date.)
15           THE VIDEOGRAPHER:  The time is
16     11:12.  We are going off the record.
17           (Whereupon at 11:12 o'clock
18     a.m., a recess was taken until 11:14
19     o'clock a.m.)
20           THE VIDEOGRAPHER:  The time is
21     11:14.  We are back on record.
22     BY MR. SANFORD:
23      Q.  All right.
24           Mr. De Niro, did you have an
25     opportunity to review what's been marked as



1  Exhibit 123?
2      A.  Yes.
3      Q.  Did you request that flowers be sent
4  to Amelia Brain as a starter gift for her work
5  on The Irishman?
6      A.  I might have.
7      Q.  Is that your handwriting on the card
8  reading Amelia B. that can be seen in this
9  photograph?
10     A.  Yes, that's mine.  That's mine, yes.
11     Q.  And you commonly gave starter gifts
12  to fellow cast members on your movies, didn't
13  you?
14     A.  I did a lot of times, yes.
15     Q.  At times you approved sending
16  flowers or plants to your former parter Toukie
17  Smith, isn't that right?
18     A.  I did, yes.
19     Q.  And if you approved sending flowers
20  or plants to your former partner Toukie Smith,
21  that was something that Ms. Robinson was
22  authorized to charge to Canal; isn't that right?
23     A.  As far as I remember, yes.
24     Q.  And you are aware that Ms. Robinson
25  reversed the Flowers by Philip charge for her

1  birthday flowers, right?
2      A.  Say that again.
3      Q.  You are aware that Ms. Robinson
4  reversed the Flowers by Philip charge that was
5  made --
6      A.  What is that?  I'm sorry, I don't
7  know what that is.
8      Q.  Are you aware that Ms. Robinson
9  inadvertently made a charge for flowers for her
10  own birthday?
11     A.  I'm not aware of that.
12     Q.  Okay.
13         So you're not aware that she
14  reversed those charges once she realized it?
15     A.  You're saying she reversed them.
16  I'm not clear what you're saying.
17     Q.  She reversed the charges.  In other
18  words, she paid for them herself.  She didn't
19  charge them for Canal ultimately.
20         Do you understand that?
21     A.  Yes.  You mean, sending flowers to
22  herself, yes.  I mean, she wasn't sending
23  flowers supposedly from me.  She was sending
24  them to herself.
25     Q.  Correct.

1      A.  Who was sending them to looked like
2  an ass.  From herself to herself?
3      Q.  Yes.
4          And when she realized the mistake,
5  she paid for the flowers herself.  Do you
6  realize that today?  Do you realize that today?
7      A.  No, I didn't know that.  I didn't
8  know any of that.
9      Q.  You don't know for certain that any
10  of the flowers paid for on Canal's American
11  Express were actually for Ms. Robinson
12  personally, do you?
13         MR. DROGIN:  Objection to the
14     form.
15         You can answer it.
16     A.  I don't know, but I -- somehow I
17  surmise that there were maybe things where she
18  sent them from me where possibly -- and I could
19  be wrong about this, where I -- it might not
20  have been the right thing to do.
21         I'm not saying that was what
22  happened, but I'm just saying that I had some,
23  something -- somewhere that I was under that
24  possible impression.
25

1  BY MR. SANFORD:
2      Q.  At times you approved sending
3  flowers or plants to your associates, right?
4      A.  Yes.
5      Q.  If you approved sending flowers or
6  plants to your associates, that was something
7  that Ms. Robinson was authorized to charge
8  Canal, right?
9      A.  Yes, if I approved sending to --
10  yes, of course.  She could do that.
11     Q.  And if Ms. Robinson testifies at
12  trial that she used the Canal card bearing her
13  name at a flower shop for flowers and plants for
14  the office or for your townhouse or for your
15  parties or for your associates, you wouldn't
16  have any reason or factual basis to dispute her,
17  would you?
18         MR. DROGIN:  Objection to the
19     form.  Objection to the form.
20         You can answer.
21     A.  No, I shouldn't have any reason to
22  dispute that.
23  BY MR. SANFORD:
24     Q.  Okay.
25         You have dogs, correct?



| Page 308 | Page 309 |
|---|---|

**Page 308**

1　　A.　Yes.
2　　Q.　Do you consider yourself a dog
3　lover?
4　　A.　I like dogs a lot.
5　　Q.　I do too.
6　　　Do you recall a time when
7　Ms. Robinson's dog had cancer?
8　　A.　Yes, I do.
9　　Q.　That was in and around the summer of
10　2018, right?
11　　A.　I think, yes.
12　　Q.　Do you recall that Ms. Robinson was
13　looking for rental homes for you at the time?
14　　A.　It could be, yes.
15　　Q.　Ms. Robinson told you that her dog
16　had cancer, didn't she?
17　　A.　She did, yes.
18　　Q.　And Ms. Robinson told you that her
19　dog couldn't be left alone during that time;
20　isn't that right?
21　　A.　I don't remember that, but --
22　　Q.　Do you remember authorizing
23　Ms. Robinson to get reimbursed for her
24　dog-sitting expenses when her dog was sick with
25　cancer?

**Page 309**

1　　A.　I don't remember that, no.
2　　Q.　You paid for dog-sitting expenses
3　for Robin Chambers at times, didn't you?
4　　A.　I don't remember that, but for some
5　reason that is different.  That's a long time
6　ago.  She shouldn't compare herself to Robin
7　Chambers.
8　　　I don't remember her saying can I
9　pay for dog-sitting.  Can I pay the dog-sitter
10　because I have to do these things for you.  That
11　would have been -- I probably would have said,
12　"Well, of course.  You have to, of course."
13　　　I'm not going to not do it.  But I
14　was not made aware of it.
15　　Q.　There was nothing unusual about an
16　employee charging Canal for an iPhone, correct?
17　　　MR. DROGIN:  Objection to the
18　form.
19　　A.　No.  And I just want to say with the
20　dog, I was not made aware of her charging me for
21　the dog-sitter, if you will.
22　BY MR. SANFORD:
23　　Q.　I'm sorry, say that again.
24　　A.　I was not made aware -- I don't
25　remember her ever saying to me "I'm going to get

**Page 310**

1　a dog-sitter because I need the dog-sitter to be
2　with my dog because of his condition if I do
3　these things that I have to do for you work
4　wise."  I don't remember that.
5　　Q.　Well, you don't remember a
6　conversation with Ms. Robinson then where you
7　approved her being reimbursed for dog-sitting
8　expenses when her dog was sick with cancer?
9　　A.　No, I don't.
10　　Q.　But it happened and you just don't
11　remember?
12　　A.　Sorry.  It could have happened and I
13　might have approved it, but I don't remember her
14　ever asking me.
15　　　I feel, and I know this is -- I
16　don't know what weight this has, but I feel that
17　might have been something she did.  She assumed
18　she could do it; and that she had the right to
19　do it, though I would feel she should tell me
20　that she is going to do it.
21　　　And I don't remember ever hearing
22　her say that to me.
23　　　MR. DROGIN:  I can't hear you,
24　David.
25　　　MR. SANFORD:  Can you hear me

**Page 311**

1　now?
2　　　MR. DROGIN:  Yes.
3　　　MR. SANFORD:  Sorry.  I froze.
4　BY MR. SANFORD:
5　　Q.　Sitting here today, you don't have
6　any reason to dispute that you had a
7　conversation with Ms. Robinson where you
8　approved her being reimbursed for dog-sitting
9　expenses when her dog was sick with cancer,
10　right?
11　　　MR. DROGIN:  Objection to the
12　form.
13　　　You can answer.
14　　A.　I'm sorry, I don't remember that
15　conversation.  I don't remember it in an e-mail.
16　And I think I would have remembered that.
17　That's all I can tell you.
18　BY MR. SANFORD:
19　　Q.　All right.
20　　　There was nothing unusual about an
21　employee charging Canal for an iPhone, correct?
22　　　MR. DROGIN:  Objection to the
23　form.
24　　　You can answer.
25　　A.　If it is a Canal iPhone, yes.



16 (Pages 308 to 311)

Page 312

```
 1   BY MR. SANFORD:
 2      Q.  And Ms. Robinson was authorized to
 3   charge Canal for her work iPhone; isn't that
 4   right?
 5      A.  This is a detail I'm not, I'm not
 6   aware of, but I would expect that that's her job
 7   to make sure that it is done appropriately and
 8   through my accountants and blah, blah, blah.
 9          The same, you know, that kind of --
10   that's the way it should be done -- should have
11   been done.
12      Q.  And if Ms. Robinson's iPhone broke,
13   Canal would replace it for a replacement iPhone;
14   isn't that right?
15      A.  Yes, that would be appropriate.
16      Q.  And do you recall conversations with
17   Ms. Robinson regarding Canal paying for iPhones?
18      A.  No.
19      Q.  Do you remember any conversations
20   you had with Ms. Robinson regarding charging
21   iPhones to Canal?
22      A.  No.
23      Q.  Ms. Robinson also purchased a
24   duplicate iPhone for you to assist with your
25   divorce proceedings; isn't that right?
```

Page 313

```
 1      A.  I don't remember that.  I thought
 2   she was supposed to go over my phone and look at
 3   the past phone records for anything between my
 4   about-to-be-ex-wife and myself.  That's all I
 5   remember.
 6          I don't remember whether I
 7   authorized her to get another phone.
 8      Q.  Well, yesterday you testified that
 9   Ms. Robinson had a clone phone, correct?
10      A.  That's what I heard.  I heard that
11   after, that she cloned -- that she had a clone
12   phone.  I did not know that.  That, if she said
13   I'm going to get a clone phone.
14          So I might have had a phone with
15   that.  I would say why couldn't you just take my
16   phone, take whatever you need to take off for
17   the past year or two or whatever, or my
18   computer, any exchanges between my wife --
19   about-to-be-ex-wife and I, but that's it.
20          To get a clone phone, I don't know
21   if I would be happy with that.
22      Q.  Do you know what a clone phone is?
23      A.  I think it is another phone that is
24   exactly like your phone so everything that goes
25   to my phone goes to that phone.
```

Page 314

```
 1      Q.  You think a clone phone is a working
 2   phone?
 3      A.  That's not really a working phone.
 4   That's a clone phone.  There's a difference.
 5      Q.  So do you know the difference
 6   between a clone phone and a backup?
 7      A.  If it was a backup, it had to be
 8   made -- I had to be made aware that it was a
 9   backup.  I was not made aware, now that we're
10   going into that it is a backup.
11      Q.  Well, do you know whether or not
12   Ms. Robinson made a backup or had a clone phone?
13      A.  I don't know.  I don't know what it
14   was.  All I know --
15      Q.  All right.
16          You don't know.  And do you know --
17      A.  I don't -- I think that having a
18   backup phone that has everything that I have on
19   my phone, I wouldn't be comfortable with.
20      Q.  I'm just saying --
21      A.  Going back over phone records and
22   stuff like that with Grace or texts or e-mails
23   is one thing.
24          Getting a clone phone - you want to
25   call it a work phone, you can - that duplicates
```

Page 315

```
 1   everything that I'm getting up and into the
 2   future makes no sense.
 3      Q.  Do you know the difference between a
 4   clone phone and a backup phone?
 5      A.  Just the semantics, as far as I
 6   know.
 7      Q.  Do you understand that a backup
 8   phone has no sim card?  Do you know what a sim
 9   card is?
10      A.  Yes.
11      Q.  And do you know that a backup phone
12   has no sim card?
13      A.  I'm not, I'm not understanding what
14   that means.  So one sim card on the original
15   phone is being used for the backup phone and my
16   phone.  So that's the same thing as clone phone.
17      Q.  Do you understand that sim card
18   allows your phone to be connected to a mobile
19   network?
20      A.  Yes, to another phone, which is what
21   we're calling a backup phone or a clone phone,
22   whatever you want to call it, or a work phone.
23      Q.  Let me back up myself.  I just
24   want --
25          MR. DROGIN:  Why don't you clone
```



1    yourself.
2         MR. SANFORD:  I would like to
3    clone myself and be --
4         THE WITNESS:  I understand.
5    That's the way I feel.
6  BY MR. SANFORD:
7    Q.  We feel the same way, sir.  We feel
8  the same way.
9    A.  You can clone two people to do this
10  whole thing for us and save ourselves a lot of
11  aggravation.
12   Q.  Yes.
13       Let's start with your understanding
14  because you used this term yesterday, a clone
15  phone, and you were very upset when you talked
16  about it because you thought that Ms. Robinson
17  did something terrible by making this clone
18  phone.
19       And I want to understand, first of
20  all, what your understanding is of what a clone
21  phone is, and I also want to understand whether
22  you have the correct understanding of what a
23  clone phone is.  So that's the point of the
24  questions.
25       Okay.

1    So tell me what you understand to be
2  a clone phone.
3    A.  Well, why don't I just go -- or why
4  don't we just go to what she actually did.
5       If she had a phone that got --
6  intercepted everything that my phone got, going
7  from the present to the future when we were
8  looking to the past, there is something wrong
9  with that.  Period.
10       And I would have said no, we can't
11  do that.  We have to go to the back, to the
12  past, but not continue from the present to the
13  future.  That's something else.
14   Q.  Thank you.
15   A.  That's something else.
16   Q.  Thank you.  Very good.  All right.
17       So, do you know what, in fact,
18  Ms. Robinson did for you with respect to that
19  phone?
20       Did she go back into the past?  Did
21  she go into the future?  What is your
22  understanding of what she did?
23   A.  My understanding is that she went to
24  the past.  She went from the present to the
25  past, which is all she should have done.

1    But taking the liberty or license,
2  or whatever you want to call it, to go into the
3  future from that moment on was not right.
4    Q.  Okay.
5    A.  And she did it.
6    Q.  And do you know if Ms. Robinson did
7  that, going into the future?
8    A.  I was told she -- I don't know if
9  she did that, but she had -- again we get to a
10  clone phone.  It was a clone phone.
11       So I am not saying she did that, but
12  that's the feeling; that she took the liberty to
13  look, to listen or to make herself privy to
14  messages that I had from that present to the
15  future until the time that she quit, yes.
16   Q.  All right.
17       So sitting here today, do you know
18  what Ms. Robinson did with your phone, whether
19  she made something that contained all of the
20  information in the phone in the past or whether
21  she allowed access that she could have to the
22  future?
23       Do you know what she did?
24   A.  Say your question -- repeat that
25  question, please.

1    Q.  Do you know whether or not the
2  phone, the duplicate phone that you asked
3  Ms. Robinson to make in connection with your
4  divorce proceedings actually allowed
5  Ms. Robinson to have access to your future
6  calls?
7       Do you know, do you know the answer
8  to that question?
9    A.  My understanding is that she had
10  access to my future calls.  She had access until
11  the day she left, the day she resigned.
12   Q.  And if Ms. Robinson testifies under
13  oath that you are completely wrong about that,
14  would you have any reason to doubt that?
15   A.  Yes, I would.
16   Q.  And what would the reason be?
17   A.  I, I have my --
18   Q.  Did someone tell you this?
19   A.  Yes, I've been made to understand
20  that she had access and had access to e-mails
21  that I had up until practically the time that
22  she resigned.
23   Q.  And tell me everybody -- I'm not
24  asking about lawyers, but tell me everyone else
25  who told you that.



Page 320

1    A.  Nobody told me.  It came to me one
2  night in a -- I had a dream and it came to me
3  that this is what Chase did.
4    Q.  And in that dream, who told you
5  this?
6    A.  I dreamt that my lawyer found that
7  out.
8    Q.  All right.
9      You dreamt that your lawyer found it
10  out.  All right.
11      Well, if Ms. Robinson testifies that
12  your dream is completely wrong, would you have
13  any other reason to doubt her besides the dream?
14    A.  I don't -- listen, she has done a
15  few things that have put her over the edge.  She
16  has crossed the line.  I don't trust her.  I
17  know -- I'm pretty certain that she did that.
18      She had access to e-mails of mine up
19  until just about when she left or even after
20  that.  Because if I didn't know about it and we
21  didn't find out about it until after she left,
22  obviously, you know, what else am I to expect?
23    Q.  All right.
24      MR. SANFORD:  Mr. De Niro, we're
25    going to show you a video that's Bates

Page 321

1  stamped ROBINSON 14996, and it is
2  exhibit -- what exhibit are we at now,
3  124.
4      MR. DROGIN:  124.
5      MR. SCHAITKIN:  124.
6      (Video was marked as
7    Plaintiff's Exhibit 124 for
8    identification, as of this date.)
9      (Whereupon, a video was
10    played.)
11      THE WITNESS:  You're showing me a
12  video?
13      MR. SANFORD:  That's my
14  understanding.
15      MR. DROGIN:  So this is not going
16  in the chat.  How are you showing the
17  video?
18      MR. SANFORD:  It is loading in
19  the chat.
20      MR. DROGIN:  Oh, okay.
21      MR. SANFORD:  Let's go off the
22  record to allow it to load.  It might
23  take a few minutes.  I don't want to
24  waste time.
25      THE VIDEOGRAPHER:  The time is

Page 322

1  11:32.  We are going off the record.
2      (Whereupon, at 11:32 o'clock
3    a.m., a recess was taken until 11:42
4    o'clock a.m.)
5      THE VIDEOGRAPHER:  The time is
6  11:42.  We are back on record.
7  BY MR. SANFORD:
8    Q.  All right.
9      You understand you're still under
10  oath, Mr. De Niro?
11    A.  Yes.
12    Q.  All right.
13      Do you recall signing the poster as
14  a 30th birthday gift for Amelia Brain?
15    A.  Yes.
16    Q.  Do you recall that part of this
17  birthday gift was also a Louis Vuitton handbag
18  for Ms. Brain?
19    A.  I might have.  I mean, I knew that
20  was the poster was the main gift.  I don't know
21  whether Chase tacked that on because -- me, I'm
22  not into Louis Vuitton, even as a gift to
23  people.  And it is not my thing.
24      So I would have gladly given her the
25  poster.  Whether I would pay -- I'm certain, a

Page 323

1  bit of money for the Louis Vuitton bag -- maybe
2  Chase did that as an added tack on from us, me,
3  maybe even her.
4      I don't know.  I don't remember
5  that.  That has, you know --
6    Q.  Do you remember conversations you
7  had with Ms. Robinson regarding charging a Louis
8  Vuitton handbag to Canal as a birthday gift for
9  Ms. Brain?
10    A.  Can I ask you how much it was?
11    Q.  Well, as these things go, a lot of
12  money, right.  I don't know how much.
13    A.  That's why I feel I would have had a
14  problem with that.  I rather get her a couple of
15  books or something.
16      I mean, Chase might have said "Can I
17  get her a bag.  I know she wants that?"
18      And if it is going to cost a lot of
19  money, I would say, "Well, I'm doing the poster.
20  Let's not go that far."
21      I really don't know.  If you tell me
22  the bag cost $1,500 or $2,000, I'm not going to
23  want to do it.  That's something that Chase
24  could have done, taken the liberty to do, which
25  she shouldn't have if she did.

MAGNA
LEGAL SERVICES

Page 324

```
1          Q.  If Ms. Robinson testifies that she
2   understood that you wanted to give that as a
3   gift to Ms. Brain, she would be authorized to
4   charge it to Canal, correct?
5          MR. DROGIN:  Objection to form.
6          A.  She can testify to anything she
7   wants.  That has nothing to do with anything.
8   BY MR. SANFORD:
9          Q.  I'm asking if you have any reason to
10  doubt the sworn testimony that Ms. Robinson will
11  give concerning your approval of this bag.
12         A.  I do.
13         MR. DROGIN:  Hold on, hold on.
14         Objection to the form.
15  BY MR. SANFORD:
16         Q.  This is a gift.  This has nothing to
17  do with Ms. Robinson.  This is a gift that you
18  are giving, correct?
19         A.  I don't, I don't remember the bag.
20  Signing this poster for Amelia, which I wanted
21  gladly to do, is one thing.
22         Sending her a bag, a Louis Vuitton
23  bag, which I know can be very expensive, I don't
24  know whether I would have gone for that.  I
25  don't think I did it.
```

Page 325

```
1          Q.  When you say very expensive, what is
2   very expensive to you?
3          A.  At least a thousand dollars.
4          Q.  At least a thousand dollars?
5          A.  Yes.
6          Q.  So you're saying you wouldn't have
7   given a gift for a thousand dollars?
8          A.  No, I gave her my gift.  I signed
9   the poster for her.  That's gilding the lily
10  with Amelia.  And I like Amelia very much.
11         But that to me seems like something
12  like Chase could have added on.  I'm not saying
13  she did, but I wouldn't be surprised if she did.
14         Q.  Well, I just want to be clear.
15         This is a gift.  This is not from
16  Ms. Robinson.  This is a gift not from
17  Ms. Robinson but from you to Ms. Brain, correct?
18         A.  I don't recall --
19         MR. DROGIN:  Objection to the
20     form.
21         Which gift are you talking about?
22         MR. SANFORD:  The Louis Vuitton
23     bag.
24         MR. DROGIN:  Objection to the
25     form.
```

Page 326

```
1   BY MR. SANFORD:
2          Q.  You don't remember -- Mr. De Niro,
3   you don't remember one way or another, do you?
4          A.  No, but I do know that I have a -- I
5   kind of have a hiccup if she told me -- I know I
6   had to have asked her what it would cost, and
7   she had to have said to me this is something she
8   really wants because I would never myself offer
9   to get it.  I would rely on Chase to suggest
10  what else she wants.
11         But I felt the poster was, not
12  adequate, but -- yes, adequate in a way.  And if
13  it is a $500 bag, maybe.  Or 750.
14         But a thousand, 1,500, 2,000 --
15  those things are so overpriced and ridiculous to
16  me.  Then I would have had an aversion to it.
17         Q.  Sitting here today, you don't know
18  if the Louis Vuitton bag was $500 or $700?
19         A.  No, I don't.  That's why I'm asking
20  you.  I don't know.
21         Q.  But you don't know one way or
22  another whether you approved the purchase of the
23  bag, correct?
24         A.  No, I don't.
25         MR. DROGIN:  Objection.
```

Page 327

```
1          Hold on.  Hold on.  Hold on.
2          Objection.  Objection to the
3      form.
4          Go ahead.
5   BY MR. SANFORD:
6          Q.  I'm asking you what you know, sir.
7   I'm asking you what you know --
8          A.  I don't know, sir.
9          Q.  Let me finish.  Let me finish.
10         I'm asking you what you remember,
11  what you know.  Not what could have been, what
12  should have been, what might have been, what
13  perhaps was.
14         I'm asking you, sir, what you
15  remember.  Sitting here today, you don't
16  remember either way whether you approved it or
17  not, correct?
18         A.  No, I don't.
19         MR. DROGIN:  Objection to the
20     form.
21         A.  You're right, I don't remember
22  approving a Louis Vuitton bag.
23  BY MR. SANFORD:
24         Q.  Okay.
25         A.  Unless she gives some history behind
```

MAGNA
LEGAL SERVICES

| Page 328 | Page 329 |
|---|---|

**Page 328**

1 it, Chase, otherwise I don't remember that.
2     MR. SANFORD: Okay.
3     Defendant's -- let's see, let me
4 go to a different topic.
5     MR. DROGIN: Can we just note for
6 the record that you showed a video of
7 one minute 52 seconds that shows Amelia
8 opening a wrapped present, which is the
9 signed poster that's been referred to,
10 but I don't see a Louis Vuitton bag in
11 the video.
12     I'm just saying that so the
13 record is clear.
14     MR. SANFORD: I understand.
15     THE WITNESS: I would like to see
16 the Louis Vuitton bag too, actually.
17 BY MR. SANFORD:
18     Q. Okay.
19     Paola's is a restaraunt --
20     A. Chase is walking around with it
21 somewhere, I don't know.
22     Q. Paola's is the restaurant you have
23 eaten at, correct?
24     A. Yes.
25     Q. It is a restaurant you have dined at

**Page 329**

1 from time to time?
2     A. Yes.
3     Q. You have eaten at Paola's numerous
4 times over the years with many different people;
5 isn't that right?
6     A. Not many. Usually the kids or my
7 about-to-be-ex-wife and the kids, yes.
8     Q. And at times Ms. Robinson would pick
9 up food for you from Paola's, correct?
10     A. Yes.
11     MR. SANFORD: Let's show you a
12 document Bates stamped ROBINSON 5475 to
13 5476 -- or actually it is 54755 to
14 54766. And this exhibit is what number?
15     MR. DROGIN: 125.
16     MR. SCHAITKIN: 125.
17     MR. SANFORD: 125. And we'll go
18 off the record while you have an
19 opportunity to take a look.
20     THE VIDEOGRAPHER: The time is
21 11:49 and we are going off the record.
22     (Whereupon, at 11:49 o'clock
23 a.m., a recess was taken until 11:50
24 o'clock a.m.)
25     (Document bearing Bates

**Page 330**

1     stamp Nos. ROBINSON 5475 through
2     5476 was marked as Plaintiff's
3     Exhibit 125 for identification, as
4     of this date.)
5     THE VIDEOGRAPHER: The time is
6 11:49. We are back on record.
7 BY MR. SANFORD:
8     Q. Before you begin, sir, the Bates is
9 ROBINSON 5745 to 5746.
10     Go ahead.
11     A. There's nothing. There's only from
12 me -- my phone number, date. My credit card is
13 on file. That's all I have in these two pages.
14 Nothing else. There's no --
15     Q. All right.
16     A. There's no --
17     Q. Ms. Robinson writes "At Paola's my
18 credit card is on file."
19     Do you see that?
20     A. I don't see anything. It just said
21 from me to my number, Canal, Robert De Niro,
22 date 26/03/17, 11:56 a.m. Message, "my credit
23 card is on file." But there are no expenses
24 here. No nothing.
25     Q. I understand.

**Page 331**

1     You don't dispute that Canal credit
2 card under Ms. Robinson's name was on file at
3 Paola's, right?
4     A. No, no, I don't.
5     Q. And at times, meals that you had at
6 Paola's were charged to the Canal credit card
7 under Ms. Robinson's name; isn't that right?
8     A. When I would ask her to get
9 something to have it delivered to the house or
10 something like that. Normally I paid for it
11 with my own credit card when I go there, which
12 was most of the time.
13     I didn't order take-out that much
14 from there, but I did at times.
15     MR. SANFORD: All right.
16     Let's take a look at ROBINSON
17 5720, and this is exhibit -- what's the
18 next exhibit here, 126.
19     (Document bearing Bates
20     stamp Nos. ROBINSON 5720 was marked
21     as Plaintiff's Exhibit 126 for
22     identification, as of this date.)
23     MR. SANFORD: And let's go off
24 the record.
25     THE VIDEOGRAPHER: The time is

MAGNA
LEGAL SERVICES

Page 332

```
1              11:51 and we are going off the record.
2              (Whereupon, at 11:51 o'clock
3         a.m., a recess was taken until 11:52
4         o'clock a.m.)
5              THE VIDEOGRAPHER:  The time is
6         11:52.  We are back on record.
7    BY MR. SANFORD:
8         Q.  All right.
9              Have you had a chance, Mr. De Niro,
10   to review what's been marked as Exhibit 126?
11        A.  Well, it just says from me again,
12   like the others.  My number, Canal, Robert
13   De Niro, date 9/03/17, 7:13 p.m.  That's another
14   meal at night, dinner time.
15             Message, paid for, paid for Paola's,
16   she says, but there's no -- there's no amount
17   here.  There's nothing.
18        Q.  Okay.
19             So Ms. Robinson paid for your meal
20   at Paola's in that instance, right?
21             MR. DROGIN:  Objection to form.
22        A.  Apparently.
23   BY MR. SANFORD:
24        Q.  I'm sorry, I couldn't hear over your
25   counsel.
```

Page 333

```
1         A.  Apparently she paid for that.  But I
2    don't know what it is.  I don't know what the
3    amount is.
4         Q.  I understand.
5              And Ms. Robinson paid for your meals
6    at Paola's in other cases too, didn't she?
7         A.  Yes, supposedly, yes.
8         Q.  Do you have any factual basis to
9    dispute that some of the Paola's charges that
10   appeared on the Canal card under Ms. Robinson's
11   name were for meals for you and your family?
12        A.  Yes, I somehow had a dream that --
13   no, I was made aware that maybe she paid for
14   meals for herself too.
15             Now, why would I be looking at this
16   thing which has no record of any payments of any
17   kind other than that she paid for it?  There's
18   no number.  There's no amount.  There's no
19   people.  There's no -- there's no nothing.  So
20   what does this say?
21        Q.  Well, Ms. Robinson sometimes worked
22   in the evenings, correct?
23        A.  I could say that at times, yes.
24        Q.  And when she worked in the evenings
25   for you, she ate dinner at times?
```

Page 334

```
1         A.  No, but you're saying I paid for
2    them for meals that I had.
3         Q.  Well, we have already established
4    that.
5         A.  Now you're going to say she did work
6    and therefore she charged these meals to her.
7         Q.  Right.
8         A.  That's fine.  I never authorized
9    those.  She never -- if she asked me, I might
10   have said yes.
11             But I don't even see what those
12   meals are.  She might have had friends, for all
13   I know.  Let me see what the amount is.  Let me
14   see who it is for.
15        Q.  All right.
16             At times Ms. Robinson would pick up
17   food and supplies for you from Whole Foods,
18   right?
19        A.  I think from time to time, yes.
20        Q.  And at times Ms. Robinson would pick
21   up food for you from Dean & DeLuca, right?
22        A.  I'm not so sure about Dean & DeLuca
23   unless I just forgot.
24        Q.  Ms. Robinson was authorized to
25   charge working meals from Whole Foods to the
```

Page 335

```
1    Canal American Express, right?
2              MR. DROGIN:  Objection to the
3         form.
4              You can answer.
5         A.  That's a lunch thing maybe they did.
6    Again, that's something I wasn't aware of; where
7    they get the meals, where they pick them up,
8    this and that.
9              Again, the honor system for her to
10   do the right thing, whatever meals she's
11   ordering for whoever was working in the day or
12   at night, yes.
13   BY MR. SANFORD:
14        Q.  Ms. Robinson was authorized to
15   charge her working meals from Dean & DeLuca to
16   the Canal American Express, right?
17        A.  I don't remember Dean & DeLuca.  I
18   don't remember that, no.
19             But I'm more concerned about these
20   because I don't see any numbers.  I don't see
21   anything here with Paola's.
22             Am I not entitled to see numbers,
23   what she paid for, especially if they're
24   supposed to be for me or even for her?
25        Q.  At the end of the day, it didn't
```

MAGNA
LEGAL SERVICES

Page 336

```
 1   matter to you where a working meal would be
 2   purchased from, right?
 3          MR. DROGIN:  Objection to the
 4      form.
 5          You can answer.
 6      A.  It didn't matter to an extent.  But
 7   she had to be not abusing that.
 8          Again, I was always assuming -- and
 9   I shouldn't maybe have assumed that, but I
10   assumed that she was doing the right thing.
11   BY MR. SANFORD:
12      Q.  What would be the right thing, in
13   your view?
14      A.  Buying meals that are within reason
15   and not ridiculous.  And I'm not saying she did
16   that, but...
17          Again, I just get back to this.  Why
18   am I not seeing anything here specific?  There's
19   nothing.
20      Q.  What is within reason for you?
21      A.  Well, you know, within reason of a
22   meal for dinner, for lunch.  You know, I'm not
23   going to be looking at the bills, what did they
24   do, this and that, unless my accountants bring
25   it to my attention.  "Look, you know, they spent
```

Page 337

```
 1   this for dinner and there were eight people,"
 2   and dah, dah, dah.  "Are you aware of this?"
 3   Then they would point it out to me.
 4          But -- and maybe they had over the
 5   years.  I can't remember that.  But what bothers
 6   me is I see that she put her credit card with
 7   Paola's, but I don't see what she paid for.  Am
 8   I not entitled to see that?
 9      Q.  Sixty dollars was a reasonable
10   dinner, right?
11      A.  Well, you're telling me, but I want
12   to see it.  I want to see it in the receipt.
13      Q.  No, I'm asking you --
14      A.  But isn't she supposed to keep the
15   receipts and keep them on file and turn them in
16   to my accountant?  And I don't see any of that.
17      Q.  Was $60 a reasonable amount for
18   dinner, sir?
19          MR. DROGIN:  Objection to the
20      form.
21      A.  Well, I don't even know that,
22   whatever the reasonable amount would be.  If it
23   is 60 or 50 or even 70 or whatever for one
24   person, I don't know.
25          But what bothers me is I am not
```

Page 338

```
 1   seeing any numbers here.  Why am I not seeing
 2   any numbers?
 3   BY MR. SANFORD:
 4      Q.  All right.
 5          Well, maybe if we have time, we'll
 6   go back and show you some numbers.
 7      A.  I would like to see them.
 8      Q.  I'm showing you what we have.  If we
 9   can dig up --
10      A.  That's not very much.  That's not
11   very much.  It's not anything.
12      Q.  All of your accountants have all of
13   the receipts.  You're free to spend your time
14   looking at every single meal she charged and to
15   determine whether or not you think it is
16   legitimate, but you haven't done that -- let me
17   finish.
18          You haven't done that, have you?
19      A.  No, I haven't.  They're going to
20   have to do that, and I expect them to do that.
21   But I also expect her to send receipts to them
22   for what she paid for.  That's common sense, and
23   we all know that.
24      Q.  Do you have any basis to dispute
25   that some of the charges that appeared on
```

Page 339

```
 1   Canal's American Express from Dean & DeLuca were
 2   charges for your home?
 3      A.  Well, when I'm not shown what they
 4   are, how can I confirm that they're for me or
 5   somebody else?  I don't know what it is.
 6      Q.  You have no idea, right?
 7      A.  No.
 8      Q.  Okay.
 9      A.  I want verification.  I'll verify it
10   or I'll say no, that's not for me.  And I can
11   say yes, it is for somebody who ate a meal,
12   fine, it is within reason, or I can say wait a
13   minute, what is this?  I don't have anything.
14          So I don't know what the point is of
15   showing me her credit card.  Who cares?  It is
16   my phone number.  It is not even her credit
17   card.
18      Q.  Do you have any basis to dispute
19   that some charges on American Express from Dean
20   & DeLuca and Whole Foods were authorized charges
21   for working meals?
22      A.  I possibly could, yes, because I'm
23   not seeing anything.
24      Q.  It's possible.  Again, I'm not
25   asking about would have, could have, should
```

MAGNA
LEGAL SERVICES

1  have.
2       Let me finish, sir.  Again, this is
3  just a matter of respect and courtesy to the
4  court reporter.  Even if you don't respect me.
5  I understand you might be angry.  It is not
6  about me.  It is about the court reporter and
7  allowing her to do her job.  So let's allow her
8  to do her job.
9       My question is:  Do you have any
10 basis to dispute that some charges that appeared
11 on Canal's American Express from Whole Foods and
12 Dean & DeLuca were authorized charges for
13 working meals?
14       MR. DROGIN:  Objection to the
15       form.
16       A.  I would have to say, I would have to
17 say yes.
18 BY MR. SANFORD:
19       Q.  What's your basis to dispute that?
20       A.  Because I'm not seeing anything.
21 I'm not able to verify.
22       Q.  All right.
23       A.  So what does that mean?
24       Q.  But you could have verified with
25 your accountants at any time in the last three

1  years.
2       You haven't done that, have you?
3       A.  No, I haven't.  But what are you
4  saying?  What are you saying for Chase Robinson?
5  I don't understand what the point of all this
6  is.
7       Q.  Are you saying you need to review
8  each individual charge in detail to ascertain
9  whether -- let me finish.
10      Mr. De Niro, you're doing that thing
11 again.
12      A.  Oh, go ahead.
13      Q.  You're doing that thing again.  I'm
14 going to ask you to be respectful of the court
15 reporter.
16      MR. DROGIN:  Well, in fairness,
17      you're both talking over each other.
18      MR. SANFORD:  Well, I was in the
19      middle of talking and he interrupted me.
20      A.  Okay.  You finish and I will say
21 what I have to say.
22 BY MR. SANFORD:
23      Q.  Is it your testimony, sir, that you
24 need to review each individual charge in detail
25 to ascertain whether the charge was proper or

1  improper?
2       A.  Well, now that you --
3       MR. DROGIN:  Objection.
4       Objection to the form.
5       A.  Now that you have brought it up in
6  this way, yes, I would want to see because I
7  don't know what the point of showing me this.
8       It is my phone number, my name, me.
9  That could be anybody.  It is not even Chase
10 Robinson.  I don't know -- there's not even a
11 credit card.  There's nothing.  So I don't know
12 what the point is.
13 BY MR. SANFORD:
14      Q.  Can I get your commitment that
15 sometime over the course of the next days
16 between now and the next depositions we're going
17 to have together, you'll review all the charges
18 and come prepared to answer questions?
19      A.  I'll tell you this, my accountants
20 --
21      MR. DROGIN:  Hold on.  Hold on.
22      Stop.  Stop.  He's not going to direct
23      what you're going to do after the
24      deposition.
25      MR. SANFORD:  I didn't direct

1       anything.  I asked him a question.
2       MR. DROGIN:  You're asking for
3       his commitment.  You're not going to get
4       his commitment because he's going to
5       confer with counsel.
6  BY MR. SANFORD:
7       Q.  Well, Mr. De Niro, I'm just asking
8  you whether it is something you would be willing
9  to do, look at the charges and then come
10 prepared to answer questions about the charges
11 at the next deposition?
12      A.  Yes, absolutely.  You know what I
13 would do is my accountants would look at them
14 and they would pick out the ones that are
15 questionable or -- not even questionable; that
16 they want an answer from me about.
17      And I would say, "Okay, that's okay.
18 That I don't understand.  Why is this there?
19 That maybe."
20      That I'm entitled to, right, since
21 you're bringing the subject up in the first
22 place, like she did something.
23      All you're saying -- yes, we know
24 she paid for things for me.  That we know.  But
25 now we want to see what she paid for or did she



Page 344

```
 1    piggyback something on with herself, which is
 2    not right.
 3         Q.  Yes, but the thing you're committing
 4    to doing in the next few days is not something
 5    you ever did up until now, right, with your
 6    accountants?
 7         A.  You're forcing me --
 8              MR. DROGIN:  Hold on.  Hold on.
 9              Objection to the form.
10              Go ahead.
11    BY MR. SANFORD:
12         Q.  You haven't done -- Mr. De Niro, so
13    you're clear about my question, what you're
14    committing to doing now in the next few days,
15    which I appreciate and I would love you to do,
16    you haven't done up until now, have you?
17         A.  No, I haven't.
18              MR. DROGIN:  Objection to the
19         form.  The witness is not committed to
20         do anything.
21    BY MR. SANFORD:
22         Q.  All right.
23              Let's talk about Taxi Driver.  Not
24    the taxi driver --
25              THE COURT REPORTER:  I'm sorry to
```

Page 345

```
 1    interrupt but we lost Mr. Drogin.
 2              MR. SANFORD:  That's okay.  If we
 3    lost him, that's good.  That's good.
 4    Oh, he's back.
 5              MR. DROGIN:  I'm back.
 6              MR. SANFORD:  All right.
 7              I'm just joking, Laurent.  We'd
 8    love to have you stay with us.
 9              MR. DROGIN:  Thank you.  We can
10    have dinner at Paola's.
11              MR. SANFORD:  I'd like that on
12    Bob De Niro.
13              THE WITNESS:  Listen, if this was
14    resolved in a sensible way, I'll buy
15    everybody dinner.
16              MR. SANFORD:  I look forward to
17    it.  I'm going to keep you to that
18    commitment.
19              THE WITNESS:  Okay.
20    BY MR. SANFORD:
21         Q.  All right.
22              Taxi Driver -- I would like to talk
23    about the movie, but instead, unfortunately,
24    we're going to talk about the book.
25         A.  Okay.
```

Page 346

```
 1         Q.  All right.
 2              Toukie Smith is your former romantic
 3    partner and the mother of your twins, right?
 4         A.  Yes.
 5         Q.  Can you describe for me all the work
 6    that Ms. Robinson performed to assist Ms. Smith
 7    in 2018 and 2019?
 8         A.  No, I can't describe all that.  She
 9    did certain things and then it just sort of
10    didn't continue anymore.
11         Q.  Do you remember what those certain
12    things were?  Do you remember any of them?
13         A.  I was trying to help her out with
14    kind of a nurse and this and that and making
15    sure she was okay because of her medical
16    condition.
17         Q.  What was Ms. Smith's medical
18    condition?
19         A.  ███████████
20         Q.  And Ms. Robinson helped with a
21    nurse, is that what your testimony is?
22         A.  In some way.  I don't know the
23    details.  That was a vague thing.  I just said
24    see if you can help in this way.  I think with
25    Robin Chambers too.
```

Page 347

```
 1         Q.  And what was Ms. Chamber's
 2    condition?
 3         A.  I don't know the details.  I just
 4    said see how you can handle whatever Toukie
 5    needs.
 6         Q.  Okay.
 7              So Ms. Robinson was to assist
 8    Ms. Toukie with her needs?
 9         A.  Yes.
10         Q.  And Ms. Robinson was to assist
11    Ms. Chambers with her needs?
12              MR. DROGIN:  Objection to the
13         form.
14         A.  I'm not a hundred percent sure how
15    it was, but something along those lines.
16    BY MR. SANFORD:
17         Q.  Okay.
18              You directed Ms. Robinson to travel
19    down to Miami to clear out Ms. Smith's apartment
20    to prepare it for sale, didn't you?
21         A.  That part, yes.
22         Q.  Okay.
23              And Ms. Robinson and Ms. Chambers
24    were both helping Ms. Smith with Ms. Smith's
25    needs, right?
```

MAGNA
LEGAL SERVICES

| Page 348 |
| --- |

```
 1         A.  You mean in New York.  Ms. Chambers
 2   didn't go down to Florida, as far as I know.
 3         Q.  No, but just generally in New York.
 4         A.  Yes, for a bit, and that was it.
 5         Q.  And you directed Ms. Robinson to
 6   clear out Ms. Smith's storage units in Miami,
 7   didn't you?
 8         A.  I did, but she couldn't because she
 9   wasn't technically allowed into the storage
10   unit, as far as I remember.
11         Q.  You directed Ms. Robinson to pay
12   bills for Ms. Smith, didn't you?
13         A.  I think that's what she -- I wanted
14   her to do if she could do it.
15         Q.  And you directed Ms. Robinson to
16   locate and collect Ms. Smith's bills, didn't
17   you?
18         A.  I could have.
19         Q.  And you directed Ms. Smith to speak
20   to Ms. Robinson when she had issues with her
21   bills, didn't you?
22         A.  When Robinson had issues with the
23   bills or Toukie had issues with the bills or
24   both of them?
25         Q.  Or both of them.
```

| Page 349 |
| --- |

```
 1         A.  I could have.  Yes.
 2         Q.  Okay.
 3         And you directed Ms. Robinson to
 4   coordinate with Ms. Smith's support staff,
 5   right?
 6         A.  Yes, and Robin Chambers too.
 7         Q.  You directed Ms. Robinson to pay for
 8   Ms. Smith's doctors, didn't you?
 9         A.  I might have.  I don't remember.
10         Q.  You directed Ms. Robinson to check
11   on prescriptions and give insurance information
12   for Ms. Smith, didn't you?
13         A.  I could have, yes.
14         Q.  You directed the Ms. Robinson to vet a
15   full-time housekeeper for Ms. Smith, didn't you?
16         A.  Yes.
17         Q.  You directed Ms. Robinson to help
18   Ms. Smith with her home needs, didn't you?
19         A.  I think I did, yes.
20         Q.  You directed Ms. Robinson to speak
21   with Ms. Smith when she called and to help her
22   with her needs, didn't you?
23         A.  As far as I remember, something
24   along those lines.
25         Q.  You directed Ms. Robinson to
```

| Page 350 |
| --- |

```
 1   purchase flowers and bring them to your former
 2   partner when Ms. Robinson met with her, didn't
 3   you?
 4         A.  I don't remember if I specifically
 5   asked her to do that, but she might have felt
 6   she is going to do it and brought it up to me
 7   and I said yes, that's okay.
 8         Q.  In 2018, Ms. Smith was undergoing
 9   ██████████████████████.
10         A.  Right.
11         Q.  And there was a time in 2018 when
12   Ms. Smith was planning to undergo ████████
13   ██ in Los Angeles, right?
14         A.  There was some talk of it, yes.
15         Q.  And at that time, Ms. Smith was ██
16   ██████████.
17         A.  Part of the time, yes.
18         Q.  Do you remember asking Ms. Robinson
19   to look for hotels in Los Angeles for Ms. Smith?
20         A.  I'm not sure.
21         Q.  In March of 2018, you reached out to
22   Ms. Robinson to identify a hotel that would
23   accommodate Ms. Smith when she undergoing
24   for ████████████.
25         Do you remember that?
```

| Page 351 |
| --- |

```
 1         A.  There's something along the lines
 2   with this -- the logic of this or the sequence
 3   of events where -- and where what she is saying
 4   about looking for a hotel doesn't jive with what
 5   she was actually doing, and it somehow conflicts
 6   with the Taxi Driver stuff.  Something there did
 7   not add up.
 8         Q.  Well, we'll get --
 9         A.  It's like her story changed or
10   something.  Once the Taxi Driver thing --
11         THE VIDEOGRAPHER:  Let's go off
12   the record.  The time is 12:10 and we'll
13   go off the record.
14         (Whereupon, at 12:10 o'clock
15   p.m., a recess was taken until 12:28
16   o'clock p.m.)
17         THE VIDEOGRAPHER:  The time is
18   12:28.  We are back on record.
19   BY MR. SANFORD:
20         Q.  All right.
21         Mr. De Niro, you know you're still
22   under oath?
23         A.  Yes.
24         Q.  All right.
25         In March of 2018, you reached out to
```

MAGNA
LEGAL SERVICES

Page 352

1 Ms. Robinson to identify a hotel that would
2 accommodate Ms. Toukie Smith when she was
3 undergoing ████████████████████████,
4 correct?
5     A. I'm not sure about that.
6     Q. You're not sure because you don't
7 remember?
8     A. I don't remember, but I have, I have
9 some thoughts about it.
10     Q. Well, well, I want to know what you
11 know. Again, this is a deposition about what
12 you know.
13     So I just want to know if you
14 remember having a conversation with Ms. Robinson
15 to identify a hotel that would accommodate
16 Ms. Toukie Smith when she was ██████████
17 ██████████████████████
18     A. Okay. I can tell you what I know.
19     I know that the hotel that Toukie
20 was supposed to go out to was already booked two
21 weeks before Chase had gone to do anything.
22     Chase -- that's the same trip where
23 she was supposed to go out for the Taxi Driver
24 books and stayed at the Montague. Now it is
25 called the Maybourne Hotel.

Page 353

1     She stayed at the Montague in a room
2 for $1,000 a night. She had a rental car and
3 she used Uber. That's what I understand.
4     Q. Okay.
5     A. So I don't know how --
6     Q. So, is your answer "no"?
7     A. My answer is something funny going
8 on, yes.
9     Q. No, so let me repeat the question,
10 sir, because I just want to make sure we have a
11 dialogue that makes sense.
12     All right?
13     A. Yes.
14     Q. In March of 2018, you reached out to
15 Ms. Robinson to identify a hotel that would
16 accommodate Ms. Smith when she was u████████
17 ████████████████████████; isn't that
18 right?
19     MR. DROGIN: Objection to the
20     form. Objection to the form.
21     Go ahead.
22     A. Well, I don't know if I did. I
23 don't remember that.
24 BY MR. SANFORD:
25     Q. Okay.

Page 354

1     You don't remember one way or
2 another?
3     A. No.
4     Q. Okay.
5     You asked Ms. Robinson to travel to
6 Los Angeles to look into hotels for Ms. Smith,
7 didn't you?
8     A. No, I don't remember that because --
9     Q. It might have happened?
10     A. She was supposed to have gone for
11 Taxi Driver. Now all the sudden she is changing
12 it to she went out to look for hotels that I
13 asked her for.
14     Q. Okay.
15     We're going to talk about Taxi
16 Driver in a minute, sir. I just want to know --
17 I'm just focusing on Ms. Smith for a second.
18     Do you recall having a conversation
19 regarding -- with Ms. Robinson regarding her
20 traveling to LA to look into hotels for
21 Ms. Smith?
22     A. No.
23     Q. Okay.
24     Do you recall wanting Ms. Robinson
25 to travel to LA -- strike that.

Page 355

1     Now, let's talk about -- let me ask
2 you this: Can you describe all the
3 communications you had with Ms. Robinson about
4 her trip to Los Angeles in mid-March 2018?
5     A. No.
6     Q. Ms. Robinson hoped to use the trip
7 to LA in March of 2018 to coordinate receiving
8 Taxi Driver books and delivering them to people
9 in Los Angeles -- well, strike that.
10     Let me ask you this: You don't
11 recall Ms. Robinson ever asking you to take a
12 trip to Los Angeles, correct?
13     A. Well, she would have suggested I can
14 go out. She would say -- I'm speaking as if I'm
15 her. "I can go out there and bring the Taxi
16 Driver books out there or send them out ahead of
17 time and then I'll deliver them to the people
18 who they have to be delivered to."
19     Q. Well, the primary purpose of
20 Ms. Robinson's trip to LA in March of '18 had to
21 do with scouting a hotel for Toukie Smith,
22 right?
23     MR. DROGIN: Objection to the
24     form.
25     Go ahead.

**MAGNA** ◗
LEGAL SERVICES

## Page 356

1  A. Not that I remember.
2      MR. DROGIN: Are you going to
3  keep asking that question different ways
4  until you get the answer you want?
5  BY MR. SANFORD:
6  Q. Do you remember speaking with or
7  communicating with Ms. Robinson in any way
8  during her trip to LA in March of '18?
9  A. No.
10 Q. Do you remember Ms. Robinson saying
11 that she had to return early from that trip due
12 to a snowstorm that was coming into the East
13 Coast?
14 A. No.
15 Q. Do you remember approving
16 Ms. Robinson coming back early due to the
17 snowstorm?
18 A. No.
19 Q. You don't recall either way, right?
20 A. No.
21 Q. That is to say you don't recall one
22 way or another?
23 A. No.
24 Q. Do you remember speaking with or
25 communicating with Ms. Robinson about her trip

## Page 357

1  after she returned to New York City?
2  A. I don't.
3  Q. Ms. Robinson generally arranged her
4  travel around your schedule, didn't she?
5  A. Pretty much, except when she wanted
6  to go to Spain or England or something like
7  that, you know.
8  Q. I'm sorry?
9  A. Kidding. I'm joking. I'm half
10 joking.
11 Q. Well, she generally arranged her
12 travel around your schedule, right?
13 A. That's -- that should have been what
14 it is, what the situation is.
15 Q. That's, in fact, what it was,
16 correct?
17 A. I, I -- yes, I guess.
18 Q. Ms. Robinson at times had to change
19 or cancel her trips due to your schedule, right?
20 A. That could be, yes.
21 Q. Ms. Robinson had a general practice
22 of keeping you informed of her travel plans;
23 isn't that fair to say?
24 A. She had to, yes, of course.
25 Q. And at times Canal would pay for its

## Page 358

1  employees' air travel by using SkyMiles --
2  A. Yes.
3  Q. -- generally provided by corporate
4  credit cards, correct?
5  A. Right.
6  Q. Do you remember which employees' air
7  travel that Canal would pay for using SkyMiles?
8  A. No, I don't, other than Robinson's.
9  I don't know who else.
10 Q. But Robinson for sure, yes?
11 A. Yes.
12 Q. You didn't generally use SkyMiles to
13 book your own flights, right?
14 A. Well, I might have even had to use
15 it once or twice. I don't know. I don't
16 remember.
17 Q. But you didn't generally use
18 SkyMiles to book flights for you or your family,
19 right?
20 A. No.
21 Q. When you say no, you mean it is
22 correct what I'm saying?
23 A. Yes.
24 Q. Okay.
25      And it was common for you to charter

## Page 359

1  a private plane for your flights, right?
2  A. Well, I would try, or if I could get
3  someone to pick it up for whatever business
4  thing would be they could justify to do that.
5  Otherwise, you know, sometimes I would pick it
6  up myself, yes.
7  Q. And if you flew commercial, you
8  would typically pay for the tickets rather than
9  using miles, right?
10 A. I don't know about that. No, I
11 think if -- I tried to use miles too. Why
12 shouldn't I?
13 Q. I'm not asking again, should have,
14 would have, could have.
15      I'm asking you to the extent you
16 remember, for the most part when you flew
17 commercial, you would typically pay for the
18 tickets rather than using miles, right?
19      MR. DROGIN: Objection to the
20 form.
21 A. That doesn't rule out that I would
22 have told Robinson that I would use -- let me
23 use some of those air miles.
24      Why should I put this money, pay for
25 these tickets when I can use the air miles?



Page 360

BY MR. SANFORD:
Q. But again, I'm not asking what would have happened as you just said. I'm asking you what did happen.
So if you flew commercial, generally speaking, generally speaking, as a matter of fact, you would typically pay for the tickets rather than using SkyMiles; isn't that right?
A. I don't -- when you say rather than, I wasn't against using SkyMiles.
Q. I'm not, I'm not asking you that.
I'm just asking you, you typically would pay for the tickets?
A. At times, yes, I did pay regularly, but I wasn't against the other. And I just don't remember.
Q. Okay.
MR. SANFORD: I'm going to share a document with you in the chat that is Bates stamped CANAL 38698, and let's go off the record while you have the opportunity to review it.
Are we off the record?
THE VIDEOGRAPHER: The time is 12:38. We are going off the record.

Page 361

(Whereupon at 12:38 o'clock p.m., a recess was taken until 12:39 o'clock p.m.)
THE VIDEOGRAPHER: The time is 12:39. We are back on record.
BY MR. SANFORD:
Q. All right.
You understand you're still under oath, Mr. De Niro?
A. Yes.
Q. All right.
MR. SANFORD: You have been shown CANAL 38698. We can mark that as 127. Exhibit 127.
(Document bearing Bates stamp No. CANAL 38698 was marked as Plaintiff's Exhibit 127 for identification, as of this date.)
BY MR. SANFORD:
Q. Did you have a chance to review that?
A. Yes.
Q. Okay.
Do you know what the document is?
A. What it is, it is an exchange

Page 362

between me and Robinson about flights and air miles, I guess. Yes.
Q. It is dated July 16, 2014?
A. Right.
Q. And here she is clearing her individual flight with you, right?
MR. DROGIN: Objection to the form.
You can answer it.
BY MR. SANFORD:
Q. She's getting your permission?
MR. DROGIN: Same objection.
BY MR. SANFORD:
Q. You can answer.
A. What do you want from me?
Q. Well, I mean, Ms. Robinson is asking -- what is Ms. Robinson doing in this e-mail?
What is she asking you about?
A. She's asking me -- was scheduled so we can plan out the rest of the summer. I'm hoping to not really fly in August as Jackie will be caught up by then. Jaquen, Jaquen. I have a bit more flexibility than Dan.
What I notice is when she says "I would like to be in LA this weekend through

Page 363

Wednesday, would this be okay with you? I would leave Friday for LA". I mean, again, I'm accommodating her. She's asking me. Usually I'm okay with that. Why does she have to be out there that time? Is it something that I asked her to do? She would like to go out there. Again, I'm accommodating her. Is she going out for a party or what? There's nothing in reference to the reason that she's going out there which she's supposed to be for something that I need.
Q. All right.
So she asked you here, she asked you about her plans to LA and you wanted -- you asked her how are you doing tickets, right?
A. Uh-hum.
Q. And she responds by saying "SkyMiles/purchase, depending on what we have and what is the cheapest way to do it. Let me know if you would like to discuss or change dates".
So she's getting, she's getting your guidance here, correct?
A. Right.
Q. Did there come a time when this

MAGNA LEGAL SERVICES

Page 364

```
 1   changed so that Ms. Robinson was not required to
 2   clear each individual flight with you?
 3            MR. DROGIN:  Objection to the
 4        form.
 5        A.  I don't remember.  All I know in
 6   this e-mail exchange is that she, even though
 7   she's asking me, let me know if you would like
 8   to discuss the change date.  She is saying I
 9   would like to be -- I would think it would be,
10   what is the best time for me to be in there for
11   what we have to do.
12   BY MR. SANFORD:
13        Q.  Well, there came a time, didn't
14   there, when you know longer required Ms.
15   Robinson to run by you each individual flight
16   she was purchasing with SkyMiles; isn't that
17   fair to say?
18        A.  But she is running it by me now.
19   She said I would like to be in LA this
20   Wednesday.
21            MR. DROGIN:  Objection to form.
22   BY MR. SANFORD:
23        Q.  I'm sorry?
24        A.  She is running it by me now.  She
25   said "I would like to be in LA this weekend
```

Page 365

```
 1   through Wednesday".
 2        Q.  Right.
 3            That's July 16, 2014.
 4            I'm asking you whether you there
 5   came a time after 2014, when you no longer
 6   required Ms. Robinson to run by you each
 7   individual flight she was purchasing with
 8   SkyMiles?
 9            MR. DROGIN:  Objection to the
10        form.
11        A.  Well, if she's taking a trip she
12   would have to run that by me.  And if it is with
13   SkyMiles, I have to kind of know what's going
14   on.
15   BY MR. SANFORD:
16        Q.  What do you mean you would have to
17   kind of know?  You told her you had to kind of
18   know?
19        A.  Yes, however you want to interpret
20   kind of know.  It is I want to know what's
21   happening.  It is her obligation to explain to
22   me that she's going to go here or there and how
23   she is paying for it or how I'm paying for it.
24        Q.  Can you tell me everything you
25   recall discussing with Ms. Robinson at any time
```

Page 366

```
 1   during her employment when it came to using the
 2   SkyMiles?
 3        A.  Well, once she asked me if she could
 4   --
 5            MR. DROGIN:  Objection to the
 6        form.
 7            Go ahead.
 8        A.  One time she asked me if she could
 9   put some mileage on.  She said "Can I just tack
10   some miles on for me when I need them?"  I said
11   "Yes, well, whatever you need".  And then, lo
12   and behold I see later and before she quit, she
13   tacked on a couple million miles to her account.
14   So can she explain that?
15   BY MR. SANFORD:
16        Q.  Beginning in 2015, you gave Ms.
17   Robinson use of the SkyMiles for personal travel
18   as a perk of her position at Canal; didn't you?
19        A.  I don't remember that, no.
20        Q.  It could have happened, you just
21   don't remember?
22        A.  I don't care.  That's maybe what she
23   told you.  I don't remember it.
24        Q.  You don't remember it one way or
25   another, correct?
```

Page 367

```
 1        A.  I don't remember that she took that
 2   as a perk.  I don't remember.  If she can prove
 3   it, fine.  I don't remember it.
 4        Q.  It could have happened, you just
 5   don't remember one way or another, right?
 6        A.  If I say could have, then it is
 7   leaving it open for something else.  I would say
 8   I don't remember.
 9        Q.  I just want to understand what your
10   testimony is.
11        A.  I'm saying I am suspect, suspect of
12   this kind or suspecting of this, this -- I don't
13   know whatever you're saying, but this request.
14   I didn't just let her go.  I told you she said
15   let me have some mileage so I can make these
16   trips.  I said okay.  That doesn't mean she
17   doesn't tell me what she's doing.  She has to
18   tell me.  She says it later just before she quit
19   that I have to go to London.  I cut off my trip
20   to London because of us and you dah, dah, dah.
21   So she has to tell me what she's doing.
22        Q.  During her deposition, Ms. Chambers
23   testified that Ms. Robinson's ability to use
24   SkyMiles was a great perk for her.
25            You have no basis -- let me finish.
```

MAGNA
LEGAL SERVICES

| Page 368 | Page 369 |
|---|---|
| 1         You have no basis to dispute Ms. | 1         Let's go off the record while you have |
| 2   Chamber's testimony, do you? | 2   an opportunity to review. |
| 3      A.  No. | 3         THE WITNESS:  Okay. |
| 4         MR. DROGIN:  Objection to the | 4         (Document bearing Bates |
| 5     form. | 5     stamp Nos. CANAL 1433 through 1437 |
| 6      A.  That's what Chase Robinson told her. | 6     was marked as Plaintiff's Exhibit |
| 7   Robin Chambers didn't verify that with me. | 7     128 for identification, as of this |
| 8   Maybe she should have and called me and said by | 8     date.) |
| 9   the way, I just want you to know, because she | 9         THE VIDEOGRAPHER:  The time is |
| 10   was sort of quarterbacking this whole thing with | 10   12:46.  We are going off the record. |
| 11   Chase -- kibbitzing with her instead of maybe | 11         (Whereupon, at 12:46 o'clock |
| 12   once in a while saying I just want you to know | 12     p.m., a recess was taken until 12:47 |
| 13   that I'm talking.  Is that okay, first of all? | 13     o'clock p.m.) |
| 14   And this is the advice that I'm giving her or | 14         THE VIDEOGRAPHER:  The time is |
| 15   should I stay out of it?  Never did she do | 15   12:47.  We are back on record. |
| 16   anything like that. | 16   BY MR. SANFORD: |
| 17   BY MR. SANFORD: | 17      Q.  All right. |
| 18      Q.  I'm going to show you a document in | 18         Mr. De Niro, you understand you're |
| 19   the chat that's Bates stamped CANAL 1433 through | 19   still under oath? |
| 20   1437. | 20      A.  Yes, sir. |
| 21      A.  Okay. | 21      Q.  You've had an opportunity to review |
| 22         MR. SANFORD:  Which is a March 5, | 22   what's been marked as Exhibit 128? |
| 23     2018 e-mail thread between Ms. Robinson | 23      A.  Yes. |
| 24     and you and Michael Tasch.  And we're | 24      Q.  Do you recognize this document? |
| 25     going to mark that as Exhibit 128. | 25      A.  Yes, I'm just looking at it again. |

| Page 370 | Page 371 |
|---|---|
| 1   Sorry. | 1         THE VIDEOGRAPHER:  The time is |
| 2      Q.  Take your time. | 2   12:49.  We're going off the record. |
| 3      A.  Yes, I see what she's saying. | 3         (Whereupon, at 12:49 o'clock |
| 4         MR. DROGIN:  Wait.  There's no | 4     p.m., a recess was taken until 12:50 |
| 5     question.  Just let him ask a question. | 5     o'clock p.m.) |
| 6      A.  I'm sorry, I didn't realize it was | 6         THE VIDEOGRAPHER:  The time is |
| 7   this long.  I'm still reading. | 7   12:50.  We are back on record. |
| 8   BY MR. SANFORD: | 8   BY MR. SANFORD: |
| 9      Q.  Okay. | 9      Q.  Mr. De Niro, you know you're still |
| 10         I want to give Mr. De Niro an | 10   under oath? |
| 11   opportunity to review the document and he's | 11      A.  Yes. |
| 12   reading it. | 12      Q.  All right. |
| 13         MR. SANFORD:  Why don't we go off | 13         You've had an opportunity to review |
| 14     the record while Mr. De Niro -- | 14   what's been marked as Exhibit 128? |
| 15         THE WITNESS:  All right.  Just | 15      A.  I think that Tasch was just being a |
| 16     give me a minute.  I'm almost done. | 16   little cautious about what was happening and |
| 17         THE VIDEOGRAPHER:  We'll give you | 17   what was requested, as he should be. |
| 18     a few more seconds, otherwise we'll go | 18      Q.  Well, I'm going to ask you |
| 19     off the record. | 19   questions. |
| 20         Why don't we go off the record. | 20         But, first of all, have you had an |
| 21         THE WITNESS:  All right.  I'm | 21   opportunity to review what's been marked as |
| 22   almost done but whatever. | 22   Exhibit 128? |
| 23         MR. SANFORD:  Let's go off the | 23      A.  To the best of my ability, yes.  I'm |
| 24     record.  I want to give you the time you | 24   trying to figure it out. |
| 25     need. | 25      Q.  So Ms. Robinson is communicating |

Page 372

```
1   with Michael Tasch.
2         Michael Tasch is who?
3   A.  My accountant.
4   Q.  Okay.
5         So Ms. Robinson is communicating
6   with your accountant Michael Tasch regarding an
7   issue she's having transferring reward points
8   from the Amex card, correct?
9   A.  Right.
10  Q.  And Michael Tasch -- and then you
11  respond by saying "Michael, why isn't this
12  done?"
13        Right?
14  A.  Right.
15  Q.  Okay.
16        So, when you wrote "Why isn't this
17  done," what were you referring to?
18  A.  Taking care of with her, but what I
19  --
20  Q.  No, I'm just asking the question.
21  A.  And I'm saying, why wasn't it taken
22  care of, but at the same time -- and I trusted
23  her.  She was asking and I thought maybe he was
24  being over protective, but it seemed to me that
25  she wanted to get these, she wanted access --
```

Page 373

```
1   again, I trusted her.  She's asking for this and
2   I'm saying it is okay.  Why don't we do it and I
3   don't know what Michael's final response was,
4   but I was, you know -- she wanted to get it.  I
5   said okay.  Let's get it.  What's the problem?
6   Q.  Okay.
7         Ms. Robinson wanted to get what
8   exactly?
9   A.  "Could you send a pin for my card?
10  Bob's card, as well as Toukie's."  And if she
11  gets the pin, what does that mean, she has
12  access from then on to my card and Toukie's as
13  well?  If it means that, I'm sure he was being
14  cautious.
15  Q.  You said "Michael, why isn't this
16  done?"
17        Why were you referring to?
18  A.  When I said that, he was being
19  cautious.  I don't know what transpired after
20  that with Michael.  So...
21  Q.  The bottom line here, sir, is that
22  you wanted the issue to be resolved so Ms.
23  Robinson could transfer reward points, is that
24  correct?
25  A.  But I wanted it done if it was right
```

Page 374

```
1   and maybe he had a moment that he thought maybe
2   we have to question this a little more.  I don't
3   see further e-mails after this.  I don't see his
4   response to me.  I don't see his response even
5   to her.  I don't see anything.
6         Where is that?
7   Q.  Okay.
8         Can we take it one step at a time so
9   we have a clean record.  I just want to ask you
10  simple questions.
11        The first question, you wanted this
12  issue to be resolved so that Ms. Robinson could
13  transfer reward points to her account, correct?
14  A.  I wanted it resolved, but I didn't
15  want it resolved in a way that was shady.
16  Q.  I didn't ask that.  I'm asking you
17  --
18  A.  I'm telling you.  That's what I was
19  doing.
20  Q.  We'll get to that.
21  A.  Michael doesn't answer or we don't
22  have the record after this, and why shouldn't
23  we, then there's something wrong.
24  Q.  I promise you, I promise you --
25  A.  Maybe you want to show it to me.
```

Page 375

```
1   You're saying why isn't this done.  But he might
2   say listen, I represent you.  I have to cover my
3   ass, too.  I'm not going to do it.  Even though
4   he won't say it here.  I don't know what
5   happened after this.  I have no record.  Where
6   is it?  Even if I'm wrong, I want to see what
7   the answer is.
8   Q.  I'm going to give you every
9   opportunity to talk about shadiness.  Your
10  dreams.  Your dreams about shadiness and
11  everything else.
12  A.  Good.
13  Q.  I'm just asking a question now about
14  this very narrow issue, which is you wanted Ms.
15  Robinson to be able to transfer reward points to
16  her account as reflected in this exchange,
17  correct?
18  A.  Again, let me tell you.  You're
19  being literal.  Yes, I did say that.
20  Q.  All right.
21        And my next question, my next
22  question --
23  A.  Can I finish?  Can I finish?
24        MR. DROGIN:  Let him finish.
25  A.  Can I finish?
```

MAGNA
LEGAL SERVICES

Page 376

```
1    BY MR. SANFORD:
2        Q.  Go ahead, sir.
3        A.  I'm saying, I'm showing her that I'm
4    going through the motions, but I'm also -- he
5    knows, he's saying, he's responding in whatever
6    way that would be.  He has a reason for not
7    doing this, I guess.
8        Q.  All right.
9            And you wanted --
10       A.  It is that simple and I trust him
11   more than I trust her because he's being
12   cautious.
13       Q.  All right.
14           Well, in this exchange you're saying
15   "Michael, why isn't this done?"
16           You wanted it done, right?
17       A.  I literally said that.  But, you
18   know, I'm saying why isn't this done.  I'm not
19   chastising him.  I'm just saying why isn't it
20   done.  We have no answer here.  When you get him
21   deposed maybe he'll give you the answer, but I
22   don't have an answer here.  So I'm saying why
23   isn't it done?  It doesn't mean -- he might have
24   a good reason not to do it and I'll have to
25   listen to him.
```

Page 377

```
1        Q.  You wanted Ms. Robinson to be able
2    to use travel --
3        A.  It doesn't matter.  It doesn't
4    matter.  He has a reason and I respect that.  I
5    trust that more than I trust because he's being
6    cautious.  She just wants what she wants.  And
7    I'm sorry, this is called checks and balances.
8        Q.  You wanted Ms. Robinson --
9        A.  Do you understand?  It is the
10   democratic way.  Checks and balances.
11       Q.  You wanted Ms. Robinson --
12           MR. DROGIN:  Can we please stop?
13           Objection to form.
14   BY MR. SANFORD:
15       Q.  You wanted Mr. Robinson to travel
16   using Canal miles, right?
17           MR. DROGIN:  Objection to the
18       form.
19           We're doing this again.  We're
20       asking the same question all these
21       different ways.
22           MR. SANFORD:  No, I'm asking a
23       different question.  I'm asking a
24       different question.
25
```

Page 378

```
1    BY MR. SANFORD:
2        Q.  You wanted Ms. Robinson to be able
3    to travel using Canal's miles, right?
4            MR. DROGIN:  Objection to form.
5        A.  I wanted her as long as it was
6    proper.  If Michael had a problem with it, I had
7    to listen to him.  He's the back stop.  Period.
8    BY MR. SANFORD:
9        Q.  Well, Michael -- you're saying
10   Michael was being cautious.  He was just being
11   delayed, right?
12       A.  No, I don't know what he was.  But
13   he wasn't doing it and I'm asking him in a
14   generic -- I don't know if generic is the word,
15   neutral way as I could "Michael, why isn't this
16   being done?  Or I could have said "Michael, is
17   there any reason why this is not being done?"
18   But I said why isn't this being done.  But he
19   had some reason for not doing it.  And I have to
20   wait on that and respect that.
21       Q.  All right.
22           We don't want the would have, could
23   have and should have.
24       A.  It is not would have, could have,
25   should have.  That's what it is.  That's his
```

Page 379

```
1    answer.
2        Q.  All right.
3            During Ms. Robinson's employment --
4            MR. DROGIN:  Counsel, if you
5        don't want the would have, could have,
6        should have, please don't ask him
7        anymore about what happens if she
8        testifies at trial.
9            I agree with you it is
10       inappropriate.
11   BY MR. SANFORD:
12       Q.  During Ms. Robinson's employment,
13   Mr. Tasch never raised any concerns to you about
14   Ms. Robinson's use of SkyMiles, did he?
15       A.  I don't remember, but he was
16   definitely on -- I don't know if you could say
17   on point, but he never conveyed this to me, but
18   I knew, because he knew what she was doing --
19   constantly trying to question everything, even
20   him, Berdon, everybody.  So...
21       Q.  You never placed any limit on the
22   amount of reward points or miles Ms. Robinson
23   could use?
24       A.  That's not for me to do.  I don't
25   know a million miles from two million miles,
```

Page 380

```
 1    though I know three or four million miles is too
 2    much.  She is stealing.  She is taking which she
 3    did.  So what are we talking about?
 4        Q.   You never placed any limit on where
 5    Ms. Robinson could travel by using Canal reward
 6    points --
 7        A.   No, no, I would.  She's not going to
 8    travel to China or to some other part on the
 9    other side of the world or Australia and I need
10    to know why and then I need to know how many air
11    miles will be used in that.
12        Q.   And did you ever communicate any
13    restriction to Ms. Robinson on her use of Canal
14    reward points?
15        A.   I didn't have to communicate --
16        Q.   You're doing that thing.  You're
17    doing that thing again.
18        A.   Okay.  No, no.  This case -- no pun
19    intended.
20        Q.   Mr. De Niro, we have to just get a
21    clean record.
22        So my question is:  You never
23    communicated any limits on where Ms. Robinson
24    could travel using Canal's reward points or
25    miles, did you?
```

Page 381

```
 1        A.   I never --
 2            MR. DROGIN:  Objection to form.
 3        A.   I never, I never communicated that
 4    because I trusted her.  So, but she had to tell
 5    me if she was intending to go say to Australia,
 6    are you going for business for me or are you
 7    going to look for a hotel.  If that was the
 8    case, if I was doing a movie there, which I
 9    wasn't, or are you going there for own private
10    thing.
11            Then you say well, can I use the air
12    miles.  How many air miles is that and what does
13    it cost me because I want my kids to be able to
14    use them.  Well, it would be this.  Well, that's
15    dipping into my kids' things.  So I you better
16    just -- well, I think you can take part and
17    that's it.
18            No, we would and could negotiate
19    like that.  So I trusted her, though, but she
20    knew she had to tell me where she's going,
21    what's she is doing.  I'm sorry, she might have
22    thought she could just do whatever she wanted.
23    But she damn well couldn't and Michael Tasch was
24    going to be the backup for that.  The back stop,
25    as he should have been and should be.
```

Page 382

```
 1    BY MR. SANFORD:
 2        Q.   Was there a period of time when
 3    there was a problem with Canal's SkyMiles that
 4    prevented miles from being transferred to Ms.
 5    Robinson?
 6        A.   You're just asking me the same
 7    question over now and I gave you the answer.
 8            MR. DROGIN:  No, it is a "yes" or
 9        "no" question.
10        A.   What was the question again?
11    BY MR. SANFORD:
12        Q.   It was a "yes" or "no" question.
13            Was there a period of time when
14    there was a problem with Canal SkyMiles that
15    prevented miles from being transferred to Ms.
16    Robinson?
17        A.   Yes.
18        Q.   And was there a period of time when
19    your Amex credit card became linked to Robin
20    Chamber's name and Social Security number?
21        A.   Yes, and if I did that, I did it
22    again out of trust.  T-r-u-s-t, trust.
23        Q.   Okay.
24        A.   She abused that privilege, that's
25    what we're here for.
```

Page 383

```
 1        Q.   And at that time, just to be clear,
 2    Amex points generated by Canal Amex cards were
 3    going to an account associated with Robin
 4    Chamber's name, right?
 5            Do you know that?
 6        A.   Say that again, I'm sorry.
 7        Q.   Amex points generated by Canal Amex
 8    credit cards were going to an account associated
 9    with Robin Chamber's name, right?
10            Do you remember that?
11        A.   I'm not following.  I'm sorry, maybe
12    just tell me again.  I'm not following.
13        Q.   At some point in time, Amex points,
14    which were generated by Canal's Amex credit
15    cards, the points associated with the credit
16    cards, were somehow going to an account
17    associated with Robin Chamber's name.
18            Do you recall that?
19        A.   I don't, I don't remember that.  I
20    don't know that.
21        Q.   All right.
22        A.   Robin hadn't --
23        Q.   If you don't remember, you don't
24    remember.  It's okay.
25        A.   I don't remember.
```

MAGNA
LEGAL SERVICES

Q. There came a time when you and Ms. Robinson generally agreed that Ms. Robinson could book her travel using Canal SkyMiles, right?
MR. DROGIN: Objection to the form.
A. Yes, she could do it if it related to the business for me, for what I'm doing for Canal.
BY MR. SANFORD:
Q. When did you first authorize Ms. Robinson to use SkyMiles generated by a Canal credit card to book her travel, do you know?
MR. DROGIN: Objection.
A. I don't remember. All I remember is that I thought I could trust her.
MR. DROGIN: Hold on. You're misstating. You're carrying a page from the Allie Harwin playbook of putting words in the witness' mouth that he hasn't said. You misstated his testimony.
MR. SANFORD: Is this another way of you're saying "Objection to form"?
MR. DROGIN: No, it is actually a

speaking objection and there are a couple on the record because they're appropriate.
You are mischaracterizing what the witness is saying in search of a sound bite.
MR. SANFORD: Do you know the purpose of the federal rule about objections and form? The purpose of the rule is to prevent exactly what you're doing now.
THE WITNESS: I don't know who you're talking to.
MR. SANFORD: No, I was talking to your counsel who was misbehaving.
THE WITNESS: Are you saying that my counsel --
MR. DROGIN: We can show the transcript to the court and the court will decide.
BY MR. SANFORD:
Q. Mr. De Niro, you expected Ms. Robinson to keep you informed of her travel plans, right?
A. That's the least she could have done

and should have done.
Q. And she needed to tell you when and where she would be traveling, right?
A. Yes, she did.
Q. In fact, Ms. Robinson did keep you informed of her travel plans; didn't she?
A. As far as I recall, she did.
Q. And other than expecting Ms. Robinson to keep you informed of her upcoming travel plans, you didn't place any specific restrictions on Ms. Robinson's transferring SkyMiles, right?
MR. DROGIN: Objection to the form.
A. No, I told her -- let me explain to you. I told her, she said "I would like to put some of them on to mine. She said I need them. I said okay. I trust you. You do what you think is right". That's how I left it. What does that mean? That she can abuse it, no.
BY MR. SANFORD:
Q. Prior to Ms. Robinson's resignation, you approved a trip Ms. Robinson planned to take to LA in 2019, right?
A. What was the trip for?

Q. Do you remember a trip that --
A. I'm asking you, what was the trip for? Very simple. Can you give me an answer?
Q. I don't know. I'm asking you the question.
A. I'm asking you. You tell me. Remind me. I don't know. I forgot.
Q. All right.
MR. DROGIN: The answer was "I forgot".
THE WITNESS: What?
MR. DROGIN: The answer was "I forgot".
BY MR. SANFORD:
Q. Prior to Ms. Robinson's resignation, you approved a trip Ms. Robinson planned to take to Scotland in 2019, right?
A. It was a vacation, I think, on her part before she went to London, I think. I don't remember the specifics.
Q. And Ms. Robinson discussed that trip with you, didn't she?
A. That, I think she did. And then she went to Scotland then went to London. What's the date on that?

MAGNA LEGAL SERVICES

---

Page 388

1    Q.  2019.
2    A.  What time of year?
3    Q.  I don't know the specific date.  It
4  was in 2019.
5    A.  You don't know that?  You've got to
6  know that.
7    Q.  I don't know it offhand.  I'll get
8  it for you after we take a break, but I'm
9  telling you I don't know right now.
10   A.  All right.
11   Q.  Do you remember, do you remember,
12 though, that trip though that she took to
13 Scotland apparently in --
14   A.  I'll know -- I'll remember it
15 better, if I remember it at all, if you give me
16 the date when she went and it was tied into when
17 I had to go to England then for this Warburton
18 thing and another thing I did in Europe.  I
19 think it was going to the Moroccan Film
20 Festival, I think.
21   Q.  And Ms. Robinson was authorized to
22 use Canal SkyMiles for that trip, wasn't she?
23   A.  I'm not sure.
24   Q.  Prior to Ms. Robinson's resignation,
25 you approved multiple trips that Ms. Robinson

---

Page 389

1  planned to take to London in 2019, right?
2    A.  I don't know if I -- I don't see
3  myself approving multiple trips.  You mean she
4  went multiple times?
5    Q.  There were plans to go more than
6  once to London in 2019, do you remember that?
7    A.  And what happened, did she go?
8    Q.  You don't remember is the answer?
9    A.  I don't remember.  You could tell me
10 and I can tell you whether I remember it or not.
11   Q.  And, therefore, you don't remember
12 whether she was authorized to use Canal SkyMiles
13 for the trip to London?
14       MR. DROGIN:  Objection to the
15     form.
16   A.  I guess I'm going to have to say I
17 don't remember.
18       MR. SANFORD:  All right.
19       Let's take a break.  Back in five
20     minutes.
21       THE WITNESS:  Okay.
22       THE VIDEOGRAPHER:  The time is
23     1:06.  We're going off the record.
24       (Whereupon, at 1:06 o'clock
25     p.m., a recess was taken until 1:22

---

Page 390

1      o'clock p.m.)
2        THE VIDEOGRAPHER:  The time is
3      1:22.  We are back on the record.
4  BY MR. SANFORD:
5    Q.  All right.
6        Welcome back, Mr. De Niro.  You know
7  you're still under oath?
8    A.  Yes.
9    Q.  Okay.
10       You never had any problem with Ms.
11 Robinson signing on to Canal's NetFlix account,
12 did you?
13   A.  I didn't as long as she did the
14 right thing.
15   Q.  As long as Ms. Robinson got her work
16 done, right?
17   A.  And did the right thing.  Yes,
18 whatever that would be because I don't know much
19 about all that and, you know, everything should
20 have been done on the up and up.
21   Q.  As long as Ms. Robinson got her work
22 done, you didn't care if she --
23   A.  It is more important that it is not
24 entitlement to something that she's not entitled
25 to, whatever that may be.

---

Page 391

1    Q.  Right.  I understand.  I understand.
2  I'm just trying to get a simple question, simple
3  answers.
4        As long as Ms. Robinson got her work
5  done, you did not care if she put on the TV
6  during the day, yes or no?
7        MR. DROGIN:  Objection to the
8      form.
9        You can answer.
10   A.  No, I don't, I don't even know how
11 to answer that question.
12 BY MR. SANFORD:
13   Q.  The main thing was Ms. Robinson had
14 work to do and you wanted her to do it, right?
15   A.  Yes.
16   Q.  Whether she had Beethoven's 9th
17 Symphony in the background or NetFlix in the
18 background, you really didn't care as long as
19 she got her work done, right?
20       MR. DROGIN:  Objection to the
21     form.
22       You can answer.
23   A.  Yes.
24 BY MR. SANFORD:
25   Q.  Is that a "yes"?

---



36 (Pages 388 to 391)

Page 392

1    A.  You're trying to say because she was
2  accused of looking at hours and hours of some TV
3  program that that's okay for her to do that.  I
4  really don't have an answer to that.  Only she
5  does.
6    Q.  Mr. De Niro, rather than speculate
7  --
8    A.  She took my money and everything and
9  my time and she's claiming that she is working
10  so hard and looking at hours and hours of that
11  and that affects my, whatever, whatever result
12  of her working for me does in a negative, it is
13  not -- I don't like that.
14    Q.  Mr. De Niro, rather than speculating
15  on my motive and going off into loop de doop
16  into Mars, I just want you to focus on my
17  question.
18    My question is, sir, as long as Ms.
19  Robinson got her work done, you did not care if
20  she had Beethoven's Symphony in the background
21  or NetFlix in the background, correct?
22    MR. DROGIN:  Objection to the
23  form.
24    It is asked and answered.
25    MR. SANFORD:  It wasn't answered.

Page 393

1    That's why I'm asking it again.
2    MR. DROGIN:  It was.  Read it
3  back.
4  BY MR. SANFORD:
5    Q.  Mr. De Niro, what's the answer, yes
6  or no, as long as she got her work done, you
7  didn't care, right?
8    A.  Mr. Drogin, did I give the correct
9  answer?
10    Q.  The correct answer is the truthful
11  answer.
12    As long as Ms. Robinson got her
13  done, you didn't care what else was in the
14  background, correct?
15    MR. DROGIN:  Objection to the
16  form.
17    He answered that.  You just
18  didn't like the answer.
19  BY MR. SANFORD:
20    Q.  Mr. De Niro, the answer is a simple
21  yes or no.
22    Is it correct that you didn't care
23  what was in the background as long as she got
24  her work done?
25    A.  Well, you're trying to tag it to

Page 394

1  this thing that she was accused of and the two
2  things are separate.  And I, I will answer that
3  I don't care in those ways as long as she got
4  her work done and as long as they're not
5  interfering with other people's work, yes.
6    Q.  Okay.
7    Now, Canal has received
8  documentation from NetFlix that refutes Canal's
9  claim that Ms. Robinson was spending her days
10  binge watching NETFLIX.
11    Have you received any of that
12  documentation from NetFlix?
13    A.  No.
14    MR. DROGIN:  Objection.
15  Objection to the form and your
16  characterization as to what it does or
17  doesn't do.
18  BY MR. SANFORD:
19    Q.  Mr. De Niro, are you curious to see
20  the documentation from NetFlix which shows when
21  Ms. Robinson was watching NetFlix shows?
22    A.  No, I don't care to see them.
23    Q.  You wouldn't care to see that.
24    It doesn't matter to you?
25    MR. DROGIN:  Objection to the

Page 395

1    form.
2    A.  It matters, but I don't want to get
3  into this pishy caca stuff for what she did.  It
4  is a deflection.  It's looking over there, so we
5  can't see over here.  Fine, but I don't want to
6  see it.  No, I don't care.
7  BY MR. SANFORD:
8    Q.  Do you view the facts in this case
9  as pishy caca stuff?
10    A.  Yes, it's pishy caca.
11    MR. DROGIN:  Objection to the
12  form.
13    A.  That's all your job, as we all know.
14  So no problem.
15  BY MR. SANFORD:
16    Q.  So the relevant facts in this case
17  are pishy caca to you?
18    MR. DROGIN:  Objection to the
19  form.
20    A.  No, the relevant facts are very
21  important relevant facts.  There are others not
22  so relevant, but you're taking things out of
23  context, which is what you're expected to.  No
24  problem.  You know, just keep asking me
25  questions and I'll try and answer them the best

MAGNA
LEGAL SERVICES

Page 396

1 I can.
2 BY MR. SANFORD:
3     Q. Sir, I'm not taking anything out of
4 context. I just want to know if you reviewed
5 the relevant NetFlix documents?
6     A. No.
7     Q. Okay.
8        Good. That's all I needed to know.
9        If Ms. Robinson testifies at trial
10 that she had NetFlix shows playing in the
11 background while she slept, you would have no
12 basis to dispute her, would you?
13        MR. DROGIN: Objection.
14     Objection to the form.
15        It is okay for you to ask the
16     who's, the what's and the what ifs and
17     could have, it is okay for you to ask
18     it, but it is not okay for the witness
19     to inquire about it.
20        Is that the position? You want
21     him to speculate?
22 BY MR. SANFORD:
23     Q. Mr. De Niro, you can't testify under
24 oath that Ms. Robinson spent working hours
25 watching NetFlix instead of performing her job

Page 397

1 duties, can you?
2     A. Say that again.
3     Q. You can't testify under oath that
4 Ms. Robinson spent working hours watching
5 NetFlix instead of performing her job duties for
6 you, can you?
7     A. No, I can't. But I've heard that's
8 it. But that's whatever. Whatever.
9     Q. All right.
10        Ms. Robinson always kept you
11 informed of her travel plans, didn't she?
12        MR. DROGIN: Objection to the
13     form.
14        We're going back to this again
15     for the third time?
16        Objection to the form.
17        MR. SANFORD: Actually, you know
18     what, I'm not going to go back to ask
19     him questions about that right now.
20     We're going to skip over that whole line
21     of questioning because I want to get to
22     something else.
23 BY MR. SANFORD:
24     Q. Mr. De Niro, at a certain point,
25 your girlfriend Ms. Chen began looking into Ms.

Page 398

1 Robinson's spending on the townhouse, isn't that
2 right?
3     A. I'm not sure. I don't know.
4     Q. All right.
5        MR. SANFORD: Then I'm going to
6     show you something, a document CANAL
7     46698, an April 4, 2019 e-mail from
8     Tiffany Chen to Michael Tasch, with you
9     cc'd. This is going to be Exhibit 129.
10        (Document bearing Bates
11        stamp Nos. CANAL 46698 was marked as
12        Plaintiff's Exhibit 129 for
13        identification, as of this date.)
14        MR. SANFORD: And while you're
15     looking at it we're going to go off the
16     record.
17        THE VIDEOGRAPHER: The time is
18     1:30. We are going off the record.
19        (Whereupon, at 1:30 o'clock
20        p.m., a recess was taken until 1:31
21        o'clock p.m.)
22        THE VIDEOGRAPHER: The time is
23     1:31. We are back on record.
24 BY MR. SANFORD:
25     Q. All right.

Page 399

1        MR. SANFORD: We're going to
2     identify this as what number, Simon?
3        MR. SCHAITKIN: 129.
4        MR. SANFORD: All right.
5 BY MR. SANFORD:
6     Q. So, you just had an opportunity, Mr.
7 De Niro, to review CANAL 46698, what's been
8 marked as Exhibit 129, correct?
9     A. Yes.
10     Q. All right.
11        What is that document?
12     A. It is an exchange, Tiffany Chen
13 requesting some information from Tasch about
14 what Chase had spent and just some records of
15 that, of what was spent and that I wanted to
16 know.
17     Q. All right.
18        So this is an April 4, 2019 e-mail,
19 right?
20     A. This says April 5th, the top one.
21     Q. The top one is April 5th.
22        Do you see the bottom?
23     A. Right. Okay, yes.
24     Q. And do you see where it says "This
25 is a direct request from Bob. He wants this

Page 400

```
1   info ASAP"?
2       A.  Uh-hum.
3       Q.  Is that a "yes"?
4       A.  That's a yes.
5       Q.  Okay.
6           Why did you want information --
7   well, what information did you want ASAP, first
8   of all?
9           MR. DROGIN:  Objection to the
10      form.
11      A.  I don't know, but it must have been
12  something about -- their was a question as to
13  what was being spent and I just wanted to verify
14  what it was and see for myself.
15  BY MR. SANFORD:
16      Q.  So you wanted Amex bills for the
17  spending, right?
18      A.  Yes.
19      Q.  An the spending, in particular,
20  during the setting up of the townhouse, correct?
21      A.  Yes, certain aspects of it, I guess,
22  yes.
23      Q.  All right.
24          You were looking to find purchases
25  and returns made in connection with the -- with
```

Page 401

```
1   your townhouse, right?
2       A.  Yes.
3       Q.  All right.
4           And this is information you wanted
5   ASAP, right?
6       A.  Yes.
7       Q.  All right.
8           And why did you want it ASAP?
9       A.  I don't know why it was said ASAP.
10  I just wanted to make sure that we got to it,
11  that I looked at to see what it was.  That's
12  all.
13      Q.  What prompted you to request that
14  information?
15      A.  There might have been a question
16  about it.  Maybe Tiffany felt that there was
17  something that she wanted me to look at, which I
18  have a right to do.  And again, I trust totally.
19  So if she is saying look at this, I'm going to
20  look at it.  The way Chase would ask me to look
21  at something and I would look at that, you know.
22      Q.  Well, I'm not asking you about might
23  have been or could have been or should have
24  been.
25      A.  That's not might have.  That's what
```

Page 402

```
1   I did.  That's what I would do.
2       Q.  You said there might have been a
3   question.  I'm asking you --
4       A.  There might have been a question.  I
5   don't know the specifics of it.  There was
6   obviously a question.  You want me to use
7   obviously instead of might have, okay.
8       Q.  No, I don't want you to do anything.
9   I just want you to tell me what you know and
10  what you remember.
11      A.  That's what I know.
12      Q.  Well, you know that there might have
13  been a question.
14          I'm asking you was there anything
15  that you remember sitting here today that
16  prompted you to request this information into
17  the spending into your townhouse?
18      A.  No, I don't remember what
19  specifically it was.
20      Q.  When you started this investigation
21  into the spending, did you have a concern that
22  Ms. Robinson was spending a lot on your
23  townhouse?
24      A.  I don't know.  All I know is I
25  trusted her.  Again, if there was something to
```

Page 403

```
1   be questioned, I had the right to do that.
2   That's all.
3       Q.  When the investigation began, do you
4   recall -- sitting here today -- if you don't
5   know, you don't know, but sitting here today, do
6   you recall whether you had a concern that Ms.
7   Robinson was returning and giving away items
8   purchased for the townhouse?
9       A.  Somehow that, that came in somewhere
10  along the lines.
11      Q.  What do you mean somehow that came
12  in, what does that mean?
13      A.  That's all I can remember.  I had a
14  feeling about something that was being returned
15  and not returned and gotten money back to give
16  back to me or Canal.  There was something else.
17  Just checking.  That's all.
18      Q.  You had a feeling.  What was the
19  feeling based on?
20      A.  That, that something might not be a
21  hundred percent right, so I have to check it.
22      Q.  Why did you have that feeling?
23      A.  God, I don't remember why, but I
24  did.
25      Q.  All right.
```

MAGNA
LEGAL SERVICES

Page 404

```
 1          The claims that Ms. Robinson had a
 2    pattern of giving away items rather than
 3    returning them were never substantiated, isn't
 4    that right?
 5          A.  Well, then why did she keep the
 6    stuff and finally return like a couple years
 7    later and never even apologize and say oops, I
 8    had it here.  I forgot it.  Here, it is all
 9    back.  Here you are.  Why then?
10          Once you break the trust, someone
11    like her does what she does, feels entitled,
12    yes, I don't trust.  And I feel that now, we
13    have to examine certain things.  That's why
14    we're going through this whole process because
15    of what she did.  If she had just done the right
16    thing, she would be on her way on another job, I
17    suppose.  And good luck to her.  More power to
18    her, but no, we're here going through all this
19    nonsense.
20          Q.  What did she do -- you just
21    testified about she returned items years later.
22          What items did she return years
23    later?
24          A.  She returned cameras.  What else?
25    My lawyers will tell you.  I don't know.  I was
```

Page 405

```
 1    told she returned a lot of stuff to the office.
 2          Q.  Do you give me permission to depose
 3    your lawyers?
 4          A.  Whatever, whatever the proper thing
 5    to do is.
 6              MR. DROGIN:  We can stipulate she
 7          returned nearly $20,000 in cash, $15,000
 8          in gift cards, cameras.
 9              MR. SANFORD:  I'm not asking you.
10          A.  You're getting your answer.  What do
11    you want?  You're getting your answer.
12              MR. SANFORD:  I'm not asking your
13          lawyer.  I'm asking you.
14              MR. DROGIN:  You don't have to
15          depose us.  We can stipulate or you can
16          ask your own client what was returned
17          three years after she was asked to
18          return it.
19              MR. SANFORD:  I'll ask your
20          lawyer, I'll ask you lawyer when we're
21          done with the deposition, Mr. De Niro.
22    BY MR. SANFORD:
23          Q.  I'm asking you if you know now,
24    looking back, whether there are any items that
25    Ms. Robinson returned that you felt was
```

Page 406

```
 1    improper?
 2          A.  Yes.
 3              MR. DROGIN:  Objection to the
 4          form.
 5          A.  She took the things and finally
 6    returned them.  That was improper.  And I think
 7    she still has my air miles or some of them.
 8    BY MR. SANFORD:
 9          Q.  You think she has your air miles.
10          Why do you think that?
11          A.  Yes, I do.  That's my understanding.
12          Q.  What's your understanding based on?
13          A.  It is based on what I have been
14    told.
15          Q.  You haven't looked at any documents
16    to satisfy yourself --
17          A.  I don't look at documents.  I'm told
18    by people who looked at documents.
19          Q.  You're not a document man?
20          A.  No, I'm not.
21          Q.  When you make serious allegations
22    about someone's character and you bring claims
23    about someone's doing things that you claim to
24    be illegal and unethical, don't you think you
25    have an obligation to satisfy yourself that
```

Page 407

```
 1    those claims are based on facts rather than what
 2    you were told?
 3              MR. DROGIN:  Objection to the
 4          form.
 5          A.  They are based on facts and I trust
 6    the people that work for me.  Not like Chase
 7    Robinson, who I don't trust, who breached that
 8    trust, broke that trust.  So I trust them.  I
 9    know they're going to do the right thing.  And
10    what I have been told is she has taken a lot of
11    stuff.  She has returned some.  She hasn't
12    others.
13          Come on, who are we kidding?  What
14    are we joking about here?  What are we doing?
15    What is all this?
16    BY MR. SANFORD:
17          Q.  We're talking about SkyMiles, is
18    what we're talking about.
19          A.  We're talking about SkyMiles that
20    have been taken and not given back.
21          Q.  You're obsessed about the SkyMiles,
22    aren't you?
23          A.  I'm not obsessed about anything.
24    All I want is what is mine sent back, given back
25    to me properly as it should be.  That's the way
```

MAGNA
LEGAL SERVICES

| Page 408 | Page 409 |
|---|---|
| 1  you do things in the right way.  The standup way<br>2  and she has not done that.  Period.<br>3      Q.  All right.<br>4          MR. SANFORD:  Let's look at CANAL<br>5  46715 and while you're reviewing it<br>6  let's go off the record.<br>7          THE VIDEOGRAPHER:  The time is<br>8      1:40.  We are going off the record.<br>9          (Whereupon, at 1:40 o'clock<br>10      p.m., a recess was taken until 1:40<br>11      o'clock p.m.)<br>12          THE VIDEOGRAPHER:  The time is<br>13      1:40.  We are back on record.<br>14  BY MR. SANFORD:<br>15      Q.  Mr. De Niro, you've had an<br>16  opportunity to review CANAL 46715, which is<br>17  marked as Exhibit 98.<br>18      A.  Yes.<br>19      Q.  All right.<br>20          And what is that document?<br>21      A.  It says that Tiffany Chen is asking<br>22  for all of Chase's charges and expenses.<br>23  Everything she has been spending.  Lulu is to be<br>24  terminated today without severance please give<br>25  me a call ASAP. | 1      Q.  This is an e-mail April 8, 2019 from<br>2  Tiffany Chen to your accountant Michael Tasch<br>3  and you are copied, correct?<br>4      A.  Yes.<br>5      Q.  And in part, Tiffany writes that<br>6  "Bob wants all of Chase's charges and expenses<br>7  everything she has been spending," correct?<br>8      A.  Yes.<br>9      Q.  And did you approve Ms. Chen sending<br>10  this message?<br>11      A.  I don't know if I did.  I don't<br>12  remember.<br>13      Q.  What do you think Ms. Chen meant<br>14  when she writes "Bob wants all of Chase's<br>15  charges and expenses," what does that mean?<br>16      A.  I want, I want to tally everything<br>17  and see what's up.<br>18      Q.  And why did you want that?<br>19      A.  Because I wanted to make sure<br>20  everything is kosher.<br>21      Q.  Had you ever requested all charges<br>22  and expenses for another employee?<br>23      A.  If need be, I would do that, of<br>24  course.  There's nothing wrong with that.  I'm<br>25  entitled to that. |

| Page 410 | Page 411 |
|---|---|
| 1      Q.  I'm not asking about what you would<br>2  do.  I'm asking you, if you, in fact, ever did<br>3  request?<br>4      A.  I could have.  I could have.  If I<br>5  get wind of something that's not right, I have<br>6  to tally it all up to make sure that I'm not<br>7  getting taken advantage of.<br>8      Q.  Okay.<br>9          Well, I'm asking you not whether you<br>10  would have or could have.  But you just<br>11  testified you would have and could have.<br>12          I'm asking you, in fact, whether you<br>13  remember ever doing it?<br>14      A.  I don't remember.<br>15      Q.  Okay.<br>16          MR. SANFORD:  Let me share a<br>17      document with you in the chat that's<br>18      Bates stamped CANAL 46051.<br>19          Let's go off the record while<br>20      you're reviewing it.<br>21          THE VIDEOGRAPHER:  The time is<br>22      1:42.  We are going off the record.<br>23          (Whereupon, at 1:42 o'clock<br>24      p.m., a recess was taken until 1:43<br>25      o'clock p.m.) | 1          THE VIDEOGRAPHER:  The time is<br>2      1:43.  We are back on record.<br>3  BY MR. SANFORD:<br>4      Q.  All right.<br>5          Mr. De Niro, you know you are still<br>6  under oath?<br>7      A.  Yes.<br>8      Q.  All right.<br>9          MR. SANFORD:  Let's mark this as<br>10      Exhibit 130, CANAL 46015.<br>11          (Document bearing Bates<br>12      stamp Nos. CANAL 46015 was marked as<br>13      Plaintiff's Exhibit 130 for<br>14      identification, as of this date.)<br>15  BY MR. SANFORD:<br>16      Q.  Mr. De Niro, this is an e-mail<br>17  January 10, 2019 from Ms. Chen to Ms. Robinson<br>18  with you're being copied about a lack of<br>19  catering on a flight from Antigua.<br>20          Do you see that?<br>21      A.  Yes.<br>22      Q.  Did you ever receive any information<br>23  to substantiate Ms. Chen's suspicion that Ms.<br>24  Robinson was behind the lack of catering on the<br>25  flight? |

MAGNA
LEGAL SERVICES

Page 412

```
1              MR. DROGIN:  Objection to the
2       form.
3              You can answer.
4       A.  I don't know.  Are they saying that
5  there is no catering at all even from the hotel?
6  BY MR. SANFORD:
7       Q.  You don't remember this, do you?
8       A.  No.
9       Q.  All right.
10             Can you identify everyone who was
11  involved in investigating Ms. Robinson?
12      A.  Well, I guess it would be my office.
13  People in my office after she left and I don't
14  know whoever else would be looking at past bills
15  and stuff like that.
16      Q.  Do you have names of people you can
17  cite?
18      A.  No, the people like Berdon.  My
19  lawyers, whoever, I don't know.  I don't know.
20      Q.  You don't know anyone in particular
21  by name?
22      A.  No.
23      Q.  What would you do to direct the
24  investigation into Ms. Robinson, if anything?
25      A.  I just told Tom Harvey I want what
```

Page 413

```
1  she took from me.  I want it back.  That's all.
2       Q.  Did you say anything else?
3       A.  Not that I remember.
4       Q.  Did you hire a private investigator
5  into Ms. Robinson?
6       A.  I don't know that.
7       Q.  You don't know whether you hired a
8  private investigator?
9       A.  I don't know that.
10      Q.  Well, if you hired a private
11  investigator you would know that, wouldn't you?
12      A.  No, I wouldn't.  People might hire
13  them and not tell me.
14      Q.  So someone might have hired a
15  private investigator and they didn't tell you
16  about it?
17      A.  I have not heard anything about it.
18      Q.  So you have no reason to believe one
19  way or another whether a private investigator
20  was hired into looking into Ms. Robinson?
21      A.  No, I have no idea.  I don't know.
22      Q.  Did you communicate with your
23  accountant Michael Tasch about the investigation
24  into Ms. Robinson?
25      A.  Did you say Michael Cash or Michael
```

Page 414

```
1  Tasch?
2       Q.  Tasch.  Tasch.  T.
3       A.  T.  I'm sorry, can you say that
4  again?
5       Q.  Did you communicate with Michael
6  Tasch regarding the investigation into Ms.
7  Robinson?
8       A.  I don't remember.
9       Q.  Did you communicate with Michael
10  Kaplan regarding the investigation into Ms.
11  Robinson?
12      A.  I don't recall.  I don't think so,
13  but I don't remember.
14      Q.  Did you communicate with Sabrina
15  Weeks-Britain regarding the investigation into
16  Ms. Robinson?
17      A.  No, no.
18      Q.  Did you communicate with Jillian
19  Spear about the investigation of Ms. Robinson?
20      A.  No, no.
21      Q.  Did you communicate with Tom Harvey
22  about the investigation into Ms. Robinson?
23      A.  Probably.  Probably, yes.
24      Q.  You don't remember one way or
25  another?
```

Page 415

```
1       A.  Well, I probably spoke to him.  I
2  didn't say an investigation.  I said I want my
3  stuff back.
4       Q.  Okay.
5              Did you ever review any documents
6  compiled during the investigation?
7       A.  I don't remember.
8       Q.  You might have, you just don't know?
9       A.  Really, I don't remember.
10      Q.  Okay.
11             MR. SANFORD:  Let's go off the
12      record for five minutes, please.
13             THE VIDEOGRAPHER:  The time is
14      1:47.  We are going off the record.
15             (Whereupon, at 1:47 o'clock
16      p.m., a recess was taken until 2:05
17      o'clock p.m.)
18             THE VIDEOGRAPHER:  It is time
19      2:05.  We are back on record.
20  BY MR. SANFORD:
21      Q.  Okay.
22             Mr. De Niro, you know you're still
23  under oath?
24      A.  Yes.
25      Q.  We have 25 minutes left today.  So
```

| Page 416 | Page 417 |
|---|---|
| 1   I'll try to be as efficient as I can be.  We'll<br>2   likely be back, we, of course, have to be back a<br>3   third day to finish up your deposition.<br>4       MR. SANFORD:  We're sharing a<br>5   document with you in the chat that is<br>6   Bates stamped CANAL 48627 to 48630.<br>7   We'll mark it as 131 and go off the<br>8   record while you have a chance to review<br>9   it.<br>10      (Document bearing Bates<br>11      stamped CANAL 48627 to 48630 was<br>12      marked as Plaintiff's Exhibit 131<br>13      for identification, as of this<br>14      date.)<br>15      THE VIDEOGRAPHER:  The time is<br>16   2:06.  We are going off the record.<br>17      (Whereupon, at 2:06 o'clock<br>18      p.m., a recess was taken until 2:07<br>19      o'clock p.m.)<br>20      THE VIDEOGRAPHER:  The time is<br>21   207.  We are back on record.<br>22 BY MR. SANFORD:<br>23    Q.  All right.<br>24      Mr. De Niro, you know you're still<br>25 under oath? | 1    A.  Yes.<br>2    Q.  You have been shown what's been<br>3 marked as Exhibit 131, CANAL 48627 to 48630.<br>4      You've had an opportunity to review<br>5 that, correct?<br>6    A.  I'm looking at this, but I'm seeing<br>7 these black boxes.  I don't know if there's<br>8 supposed to be something in them.<br>9    Q.  Well, I mean, you have reviewed what<br>10 you can review based on what you have been<br>11 shown, correct?<br>12    A.  Yes.<br>13    Q.  All right.<br>14      And this is a text conversation<br>15 dated July 2019 between Tiffany and Robert De<br>16 Niro.<br>17      Do you see that?<br>18    A.  Yes.<br>19    Q.  And the black boxes, you know, for<br>20 the record, are redactions that your lawyer<br>21 added.<br>22      Do you understand that?<br>23    A.  Oh, okay.  Okay.<br>24    Q.  Okay.<br>25      Yes, and on page 2, do you see where |

| Page 418 | Page 419 |
|---|---|
| 1   Tiffany Chen writes, and I'm quoting "Chase<br>2 e-mailed.  She's threatening legal action if she<br>3 does not get a response by the 12th.  Tom is<br>4 getting ready to hit her hard with his letter".<br>5      Do you see that?<br>6    A.  Yes.<br>7    Q.  And who is Tom here?<br>8    A.  My lawyer.<br>9    Q.  What's the last name?<br>10    A.  Harvey.<br>11    Q.  And on page 3, Bob responds, you<br>12 respond "Can you believe, as I said to Tom, who<br>13 the fuck does she think she is?"  And then --<br>14      Do you see that?<br>15    A.  I'm just looking at something.<br>16      Yes.<br>17    Q.  And then, Ms. Chen responds.  And<br>18 I'm quoting "She thought she was your wife.  I<br>19 saw it from the beginning.  I told you".<br>20      Do you see that?<br>21    A.  Yes.<br>22    Q.  And then you respond "The balls, the<br>23 nerve, the chutzpah, the sense of entitlement.<br>24 How dare her".<br>25      Do you see that? | 1    A.  Yes.<br>2    Q.  And then Tiffany responds, Tiffany<br>3 Chen responds "Tom will get her".<br>4      Do you see that?<br>5    A.  Yes.<br>6    Q.  All right.  All right.<br>7      It is fair to say that you were<br>8 upset that Ms. Robinson was threatening legal<br>9 action, right?<br>10      MR. DROGIN:  Objection to the<br>11   form.<br>12    A.  Yes.<br>13 BY MR. SANFORD:<br>14    Q.  I'm sorry, your answer is?<br>15    A.  Yes.<br>16    Q.  And fair to say, too, that you<br>17 considered Ms. Robinson's legal claims to be<br>18 disloyal, is that fair?<br>19      MR. DROGIN:  Objection to the<br>20   form.<br>21    A.  Yes, I mean, I don't -- I guess<br>22 she's threatening legal action if she does not<br>23 get a response by the 12th.  I don't know what<br>24 that was sent before.  What letter was sent?<br>25 Was it that I had to sign that thing that she |

MAGNA
LEGAL SERVICES

Page 420

```
1    wanted to send to the London School of
2    Economics?  Was it the claiming she wants
3    $600,000?  I don't know which or was it both.
4    BY MR. SANFORD:
5        Q.  Well, let's just stick with the text
6    in front of you, the document 131 --
7        A.  Yes.
8        Q.  -- where Ms. Chen writes "She's
9    threatening legal action if she does not get a
10   response"".
11            I mean, you view that as a form of a
12   breach of trust, shall we say, to use your words
13   earlier, right?
14            MR. DROGIN:  Objection to the
15        form.
16        A.  Yes.
17   BY MR. SANFORD:
18        Q.  Okay.
19            Let's talk about the lawsuit against
20   Ms. Robinson.
21            Your lawsuit against Ms. Robinson
22   was filed on August 17, 2019.
23            Do you remember that?
24        A.  Yes.
25        Q.  And you would know that date, in
```

Page 421

```
1    particular, as a memorable date, wouldn't you?
2        A.  Sure.
3        Q.  Why would it be memorable for you?
4        A.  Because that's a date I -- it is my
5    birthday.
6        Q.  Right.
7            And is there a reason you had the
8    lawsuit filed against Ms. Robinson on your
9    birthday?
10       A.  No, no reason at all.
11       Q.  That was just a coincidence?
12       A.  Just pure coincidence.
13       Q.  It wasn't done as a birthday present
14   to you?
15       A.  No.
16       Q.  And how soon before the filing of
17   the lawsuit did you make the final decision to
18   file a lawsuit against Ms. Robinson?
19            MR. DROGIN:  Objection to the
20        form.
21       A.  I don't know.  I don't know.
22   BY MR. SANFORD:
23       Q.  Okay.
24            Was it important to you that Canal
25   bring its lawsuit against Ms. Robinson before
```

Page 422

```
1    Ms. Robinson filed suit against you?
2            MR. DROGIN:  Objection to the
3        form.
4            Hold on.  Hold on.
5            Objection to the form.
6        A.  Okay, sorry.
7            MR. DROGIN:  Go ahead.
8    BY MR. SANFORD:
9        Q.  Go ahead.
10           You can answer.
11       A.  No, it just the way it timed out.  I
12   said, no, I'm going to -- you know, I want my
13   stuff back and she has done these things.  She
14   has breached my trust.  She hasn't acted in good
15   faith.  I mean, I mean, she was scheming all the
16   time and this was a scheme.
17           And now looking back and what I know
18   now, yes, she typed -- she taped many hours of
19   conversations with Robin.  She was listening and
20   was privy to my e-mails, texts, my phone
21   conversations, if you will.
22       Q.  Before you brought Canal's lawsuit,
23   you were aware Ms. Robinson asserted claims of
24   discrimination, retaliation and wage and hour
25   violations, right?
```

Page 423

```
1        A.  No, I don't remember that.
2            MR. DROGIN:  Objection to the
3        form.  Objection to the form.
4            Go ahead.
5        A.  No, I don't remember that, no.
6    BY MR. SANFORD:
7        Q.  You don't remember that?
8        A.  No.
9        Q.  It could have happened, you just
10   don't remember?
11            MR. DROGIN:  Objection to the
12        form.
13       A.  I don't remember.  I was, you
14   know -- I was -- that's it.
15   BY MR. SANFORD:
16       Q.  You reviewed correspondence from Ms.
17   Robinson's lawyers asserting claims of
18   discrimination, retaliation and wage and hour
19   violations, didn't you?
20            MR. DROGIN:  Objection to form.
21       A.  I don't even know that I saw that.
22   I was just very angry about what the game she is
23   playing.  What she has done.  The whole thing.
24   And I'm ready to go after her.  I have no reason
25   to wait.
```

MAGNA
LEGAL SERVICES

Page 424

```
 1   BY MR. SANFORD:
 2        Q.  Okay.
 3            And you wanted to go after her,
 4   right?
 5        A.  Of course I wanted to.  I wanted her
 6   to return the stuff.  Do what's right.  She
 7   handled it all in the wrong way and, you know,
 8   she is sneaky.  I don't want to even call names.
 9   The whole thing is so sad and pathetic that I
10   don't know, you know.
11        Q.  You are the person who decided to
12   file a lawsuit against Ms. Robinson, right?
13        A.  Yes, I guess so, yes.
14        Q.  And did you review the lawsuit that
15   you decided to file against Ms. Robinson before
16   it was filed?
17        A.  I was aware basically what it was,
18   the gist of it.
19        Q.  What does that mean?
20        A.  I was aware of the gist of it.
21        Q.  Answer my question.
22            My question was:  Did you review it,
23   did you read the lawsuit before it was filed?
24            MR. DROGIN:  Objection to the
25        form.
```

Page 425

```
 1        A.  I don't know if I read it.  I don't
 2   know if I read it.  I just say okay.  Go after
 3   her.  Period.
 4   BY MR. SANFORD:
 5        Q.  You said go after her, file whatever
 6   you want to file?
 7        A.  Yes.
 8            MR. DROGIN:  Objection to the
 9        form.
10            That's not what the witness said.
11   BY MR. SANFORD:
12        Q.  Did you review any documentary
13   evidence before Canal filed a lawsuit against
14   Ms. Robinson?
15        A.  I was aware of things she had done,
16   yes.
17        Q.  Why did you decide to seek millions
18   of dollars in damages against Ms. Robinson?
19            MR. DROGIN:  Objection to the
20        form.
21            And I note that there was a
22        30(b)(6) witness that has already been
23        questioned about this and that --
24            MR. SANFORD:  I know, but I'm
25        asking this witness who decided to file
```

Page 426

```
 1        the lawsuit and seek millions of
 2        damages.
 3   BY MR. SANFORD:
 4        Q.  Why did you decide to seek millions
 5   of damages against Ms. Robinson?
 6            MR. DROGIN:  Objection to the
 7        form.
 8        A.  I don't know.
 9   BY MR. SANFORD:
10        Q.  You don't know that there were
11   millions of dollars sought?
12            MR. DROGIN:  Objection to the
13        form.
14        A.  My feeling is whatever, whatever was
15   being put into it was justified at this point.
16   BY MR. SANFORD:
17        Q.  Right.
18            So, sitting here today, do you know
19   how many millions of dollars you are seeking to
20   get from Ms. Robinson?
21        A.  No, do you want to tell me?
22        Q.  You don't know?
23        A.  Do you want to tell me?
24        Q.  I will tell you in a second.  I'm
25   asking first if you know?
```

Page 427

```
 1        A.  I don't know, no.
 2        Q.  All right.
 3            Well, I'll represent to you that you
 4   are seeking $6 million to get from Ms. Robinson.
 5            Do you think that's a fair sum?
 6            MR. DROGIN:  Objection to the
 7        form.
 8            Can you just clarify the you --
 9        A.  There must have been a reason.
10            MR. DROGIN:  Can you just clarify
11        --
12   BY MR. SANFORD:
13        Q.  Sitting here today you don't know
14   what that reason is, do you?
15            MR. DROGIN:  Objection to the
16        form.
17        A.  I don't know.  All I can is there
18   must have been a reason.
19            MR. DROGIN:  Can you clarify that
20        you is Canal and not Mr. De Niro is not
21        suing Ms. Robinson?
22            THE WITNESS:  Sorry?
23   BY MR. SANFORD:
24        Q.  Canal is suing Ms. Robinson at your
25   direction, Mr. De Niro, correct?
```

MAGNA
LEGAL SERVICES

## Page 428

```
 1        A.  Yes.
 2        Q.  And, but sitting here today, you're
 3   finding out for the first time, is your
 4   testimony, that Canal is seeking $6 million from
 5   Ms. Robinson?
 6        A.   That must have been -- there was a
 7   reason for it.
 8        Q.  But you don't know what the reason
 9   is?
10        A.  I trust my -- well, I know there's
11   something.  I trusted my attorneys to do this.
12        Q.  Do you think that $6 million is a
13   number that would fairly compensate you for what
14   you claim to be Ms. Robinson's wrong doing?
15           MR. DROGIN:  Objection to the
16        form.
17        A.   Again, I can only say that I -- if
18   it was $6 million, there must have been a reason
19   for it.
20   BY MR. SANFORD:
21        Q.  You really would like to destroy Ms.
22   Robinson, wouldn't you?
23        A.   No, I don't want to destroy her.  I
24   don't want to have anything to do with her.  I
25   just want her to go away.  She goes away.  We go
```

## Page 429

```
 1   away.  We let this thing just die and I'll be
 2   very happy.
 3        Q.  Do you think you have destroyed her
 4   life?
 5        A.  I have not destroyed her life.  She
 6   destroyed her own life, if she destroyed it.
 7        Q.  You think she destroyed her own life
 8   and you had nothing to do with it?
 9        A.  She has to cop to what she did.  She
10   has to, you know, maybe ask for forgiveness from
11   people because she has done things that you just
12   don't do.  She's very unprofessional.  I tried
13   to be as lenient as I could.  I tried to do the
14   right thing.  It is very simple.  The honor
15   system.  I trust you.  I assume that everything
16   you're going to do is for the right reasons.
17   I'm sorry, that's the way I am.
18        Q.  You think Ms. Robinson stole $6
19   million from you?
20        A.  No, she didn't steal $6 million.
21        Q.  Why are you asking for 6 million?
22           MR. DROGIN:  Objection to the
23        form.
24        A.   They had a reason.  I mean, that's
25   something -- whatever.  But they had a reason
```

## Page 430

```
 1   and maybe it is a reason because in order to
 2   even get what we get now or what we're doing.  I
 3   don't know.
 4   BY MR. SANFORD:
 5        Q.  You don't think she stole $5
 6   million, do you?
 7        A.  No, no.
 8        Q.  No.
 9           And you don't think she stole $4
10   million, do you?
11        A.  No.
12        Q.  You don't think she stole $3
13   million, do you?
14        A.  Well, no.
15        Q.  You don't think she stole $2
16   million, do you?
17        A.  Well, I'm not sure.
18        Q.  You're not sure.
19           You think she might have stolen $2
20   million?
21        A.   I don't know what she did.  She took
22   certain things and that number obviously is for
23   a reason.
24        Q.  You think there's a reason, you
25   think there's a good reason for $6 million,
```

## Page 431

```
 1   really?
 2        A.  Let me, let me, yes, I will look in
 3   it.
 4        Q.  You look into it.  I would ask you
 5   to look into that one.
 6           Do you think she stole more than $1
 7   million from you?
 8        A.  She could have, I guess.
 9           MR. DROGIN:  Can you just clarify
10        in these numbers you're counting the
11        cash that she already returned and the
12        gift cards that she already returned?
13        It is just not clear.
14           MR. SANFORD:  I know you like to
15        do the speaking thing, Mr. Drogin, but
16        again, it is against the rules and it is
17        against our stipulation.  So I would ask
18        you not to do that.
19           I'm asking the witness questions
20        and he's giving answers.  He's giving
21        answers to the best of his ability, I
22        believe.
23   BY MR. SANFORD:
24        Q.  Mr. De Niro, do you think Ms.
25   Robinson should be ordered to pay back any of
```

**MAGNA** ►
**LEGAL SERVICES**

Page 432

```
1    the salary that you paid her over the years?
2          MR. DROGIN:  Objection to the
3    form.
4          A.  No.
5    BY MR. SANFORD:
6          Q.  Okay.  All right.
7          MR. SANFORD:  Let's take a
8    five-minute break.
9          Off the record.
10         THE WITNESS:  Okay.
11         THE VIDEOGRAPHER:  The time is
12   2:20.  We are going off the record.
13         (Whereupon, at 2:20 o'clock
14   p.m., a recess was taken until 2:26
15   o'clock p.m.)
16         THE VIDEOGRAPHER:  The time is
17   2:26.  We are back on record.
18   BY MR. SANFORD:
19         Q.  All right.
20         Mr. De Niro, you know you're still
21   under oath?
22         A.  Yes.
23         Q.  Who is Dan Harvey?
24         A.  He's my trainer.
25         Q.  And can you describe the types of
```

Page 433

```
1    assignments that you gave Mr. Harvey that were
2    not related to personal training?
3          A.  Nothing really.  He was my, he is my
4    trainer.  It is pretty simple.  He travels with
5    me when I go to locations.  When we workout, I
6    work on lines with him and that's it.  I keep
7    that as consistent as I can and that's it.
8          Q.  If Robin Chambers testified that
9    after she left Canal, Mr. Harvey fulfilled a lot
10   of Ms. Chamber's former job responsibilities,
11   such as traveling with you, do you have any
12   basis to dispute her testimony?
13         A.  No.
14         MR. DROGIN:  Objection to the
15   form.
16         A.  I'm sorry.
17   BY MR. SANFORD:
18         Q.  Go ahead.
19         A.  There is a whole thing that Chase
20   Robinson feels, I guess I could call it jealous
21   or envious of Dan's position.  They do not do
22   the same thing under any circumstances in this
23   world, in this universe.  He does what he does
24   for me very clearly, very specifically.  She
25   does what she does.
```

Page 434

```
1          Again, it is an example of envy and
2    jealousy.  That's all I can think of.  Why waste
3    your time being envious of him, trying to
4    undermine him, put him down, bring him down.
5    Leave it alone.  Leave him alone.  Work on your
6    own thing.  Don't get in the way of everybody
7    else and that's what she did.
8          Q.  All right.
9          At times Mr. Harvey ran errands for
10   you, right?
11         A.  No, to get something that's related
12   to what we do.  It is all, it is all very tight
13   what he does.
14         Q.  He didn't run errands?
15         A.  You can't compare the two.  You
16   can't compare them.  Don't even try.  Don't even
17   try.
18         Q.  Mr. De Niro, you're doing another
19   thing you do a lot, which is thinking about what
20   I'm thinking about.
21         I'm just asking --
22         A.  No, I know that's what you're
23   thinking.  Sorry, I know in some ways I
24   shouldn't, but I know that's what you're
25   thinking.
```

Page 435

```
1          Q.  I know you're very smart man and
2    very accomplished person, but you don't know
3    what I'm thinking, in fact.
4          I'm asking, I'm asking you a
5    question.
6          A.  Go ahead.
7          Q.  Mr. Harvey at times ran errands for
8    you?
9          A.  You're trying to say what he did is
10   what Chase did.  Nothing -- will the tween,
11   never will the two meet.
12         Q.  Mr. Harvey would pick up coffee for
13   you from time to time, wouldn't he?
14         A.  So rarely did he ever pick up coffee
15   for me that it is a joke to even ask the
16   question.
17         Q.  He would buy you food, wouldn't he?
18         A.  So rarely did he ever buy food for
19   me when he's getting some for his own that it
20   doesn't even warrant wasting a few seconds to
21   talk about it.
22         Q.  So the answer is yes sometimes he
23   did?
24         A.  So rarely, in over 35, 36, 37, 38
25   years that he's been -- that we have been
```

MAGNA
LEGAL SERVICES

Page 436

```
1   working together.  This is a nonsense question.
2       Q.  Mr. Harvey picked up items for you
3   from Whole Foods at times, didn't he?
4       A.  Oooh, he did?  Ut oh.  You mean, now
5   it is Chase and him.  Oh, my God.  I didn't talk
6   about it.  Ut oh.  Jesus.  Oh, no.  You caught
7   me.  You caught Dan.  You've got a case.
8       Q.  Is that a "yes"?
9       A.  You caught Dan.  She thought she had
10  a case.  Boy, oh boy.  Little did I know.  Whole
11  Foods.  I should have known.  I would have kept
12  my mouth shout.
13      Q.  Is that a "yes"?
14      A.  What do I know where he goes.  If he
15  is near a deli, he'll go to a deli.  What do I
16  know where he goes.
17      Q.  Mr. Harvey would bring you
18  newspapers, wouldn't he?
19      A.  Oh, my God, yes, he brought me a
20  paper.  Jesus, oh, another one.  Oh, my God a
21  paper.  Oh, no.  He shouldn't have done that.  A
22  paper cost 50 cents.  Oh, no.
23      Q.  Mr. Harvey drove you to ███
24  didn't he?
25      A.  Oh, my God, another one.  Oh, Jesus,
```

Page 437

```
1   another thing.  Oh, no.  What are all these
2   things?  Amazing.  I didn't know that Dan was in
3   competition for Chase's job and Chase was in
4   competition for Dan's job.  I didn't know that
5   because I could have hired one and I didn't have
6   to pay all the extra money.
7       Q.  At times Mr. Harvey spoke with your
8   doctors, didn't he?
9       A.  Oh, another thing.  He can't talk to
10  my -- but she can.  He can't.  He's my trainer.
11  That's what he's supposed to do.
12      Q.  So he spoke with your doctors, yes
13  or no?
14          MR. DROGIN:  Just so the record
15      is clear, the witness is smiling and
16      laughing.  The paper record is going to
17      make it appear that he's testifying
18      directly and with a straight face.
19          MR. SANFORD:  That's the kind of
20      thing that --
21          THE WITNESS:  Let me do it with a
22      straight face.  Ask me the questions
23      again and I'll do it with a straight
24      face.
25          MR. DROGIN:  Hold on.  Hold on.
```

Page 438

```
1           The paper record should be clear
2   that he's calling bullshit.
3           THE WITNESS:  It's bullshit.
4   It's called bullshit.  Can I say that?
5           MR. DROGIN:  It is 2:30.  It is
6   2:30.
7           THE WITNESS:  It's bullshit.
8           MR. DROGIN:  It is 2:30 and we're
9   done.
10          MR. SANFORD:  All right.
11          Well, you know what, let's be
12  done.  We've got more questions.
13          Mr. De Niro, I thank you --
14          MR. DROGIN:  You said at the
15  beginning that you were going to stop at
16  2:30.
17          MR. SANFORD:  Yes, I'm stopping.
18  I'm stopping.
19          Can you give me the courtesy of
20  one minute?
21          MR. DROGIN:  You can have 90
22  seconds.
23          MR. SANFORD:  Thank you.
24          MR. DROGIN:  That's what Ms.
25  Harwin gave me.
```

Page 439

```
1           MR. SANFORD:  Mr. De Niro --
2           THE WITNESS:  Yes.
3           MR. SANFORD:  -- I want to thank
4   you, sir --
5           THE WITNESS:  Thank you.
6           MR. SANFORD:  -- for your time,
7   for your good humor, for all your
8   patience.  I know this is not an easy
9   thing for anyone.  I mean that
10  sincerely.
11          THE WITNESS:  That's for sure.
12          MR. SANFORD:  It is not an easy
13  thing and I appreciate that.
14          THE WITNESS:  Well, thank you.
15  Thank you for saying that.  Thank you.
16  Thank you.
17          MR. SANFORD:  I do.  And I wish
18  you well, with your commitments as I
19  said to you yesterday.  Your counsel and
20  I need to talk about reconvening.  We're
21  leaving the deposition open.  And we're
22  going to get back here to finish the
23  deposition because we are entitled to a
24  certain amount of time and we have not
25  completed that amount of time.
```

MAGNA
LEGAL SERVICES

Page 440

```
1              We're going to seek more time
2       from the court and we'll resolve that.
3       The court will resolve that ultimately,
4       but I look forward to seeing you again.
5       Hopefully next week.  In the meantime,
6       be well?
7              THE WITNESS:  Okay.
8       Thank you.  You too.  Thank you.
9              THE VIDEOGRAPHER:  The time is
10      2:32.  We are going off the record.
11             THE COURT REPORTER:  Counsel,
12      would you like to order a copy of the
13      transcript?
14             MR. BENNETT:  Yes.
15             (Whereupon, at 2:32 o'clock
16         p.m., the deposition was adjourned.)
17
18
19
20
21
22
23
24
25
```

Page 441

```
1              INSTRUCTIONS TO WITNESS
2
3              Read your deposition over carefully.  It is
4       your right to read your deposition and make
5       changes in form or substance.  You should assign a
6       reason in the appropriate column on the errata
7       sheet for any change made.
8              After making any change in the form or
9       substance, and which have been noted on the
10      following errata sheet, along with the reason for
11      any change, sign your name on the errata sheet and
12      date it.
13             Then sign your deposition at the end of your
14      testimony in the space provided.  You are signing
15      it subject to the changes you have made in the
16      errata sheet, which will be attached to the
17      deposition before filing.  You must sign it in
18      front of a notary public.  Any competent adult may
19      witness your signature.
20             Return the original errata sheet to the court
21      reporter promptly.  Court rules require filing
22      within 30 days after you receive deposition.
23
24
25
```

Page 442

```
1              ERRATA SHEET
2
3       PAGE   LINE#   CHANGE        REASON
4       ____   ____   _____   _____
5       ____   ____   _____   _____
6       ____   ____   _____   _____
7       ____   ____   _____   _____
8       ____   ____   _____   _____
9       ____   ____   _____   _____
10      ____   ____   _____   _____
11      ____   ____   _____   _____
12      ____   ____   _____   _____
13      ____   ____   _____   _____
14      ____   ____   _____   _____
15      ____   ____   _____   _____
16      ____   ____   _____   _____
17      ____   ____   _____   _____
18      ____   ____   _____   _____
19      ____   ____   _____   _____
20      ____   ____   _____   _____
21      ____   ____   _____   _____
22      ____   ____   _____   _____
23      ____   ____   _____   _____
24      ____   ____   _____   _____
25      ____   ____   _____   _____
```

Page 443

```
1              SIGNATURE PAGE
2                    OF
3              ROBERT DE NIRO
4
5              I hereby acknowledge that I have read the
6       foregoing deposition, dated April 5, 2022, and
7       that the same is a true and correct transcription
8       of the answers given by me to the questions
9       propounded, except for the changes, if any, noted
10      on the attached errata sheet.
11
12

        SIGNATURE:  _____

13
14      WITNESSED BY:  _____
15
16      DATE:  _____
17
18
19
20
21
22
23
24
25
```



Page 444

```
 1              C E R T I F I C A T E
 2    STATE OF NEW JERSEY)
 3                )SS:
 4    COUNTY OF MONMOUTH )
 5
 6        I, CATHERINE M. DONAHUE, a Certified Court
 7    Reporter and Notary Public within and for the
 8    State of New Jersey, do hereby certify:
 9        That the witness whose deposition is
10    hereinbefore set forth was duly sworn by me and
11    that such deposition is a true record of the
12    testimony given by such witness.
13        I further certify that I am not related to
14    any of the parties to this action by blood or
15    marriage, and that I am in no way interested in
16    the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto set my
18    hand this 5th day of April, 2022.
19
20        _____
          CATHERINE M. DONAHUE, CCR
21        License No. 30X100223700
22
23
24
25
```



1                     SIGNATURE PAGE

2                          OF

3                    ROBERT DE NIRO

4

5     I hereby acknowledge that I have read the

6  foregoing deposition, dated April 5, 2022, and

7  that the same is a true and correct transcription

8  of the answers given by me to the questions

9  propounded, except for the changes, if any, noted

10  on the attached errata sheet.

11

12  SIGNATURE: _____

13

14  WITNESSED BY: _____

15  DATE: _____5/11/22_____

16

17

18             THOMAS A. HARVEY
           Notary Public, State of New York

19             No. 02HA6051678
          Qualified in Westchester County

20        Commission Expires December 4, 20___

21

22

23

24

25


MAGNA