# Exhibit 3

Page 445

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 1:19-CV-09156 (LTS) (KHP)

- - - - - - - - - - - - - - - - - - - - - - - - - x

GRAHAM CHASE ROBINSON,

                    Plaintiff,


          - against -


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME III

ZOOM VIDEOCONFERENCE DEPOSITION OF

ROBERT DE NIRO

October 21, 2022



MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 446

1                    VOLUME III

2          CONTINUED ZOOM VIDEOCONFERENCE ORAL

3    DEPOSITION OF ROBERT DE NIRO, taken pursuant to

4    Notice, commencing October 21, 2022, at 11:03

5    a.m., on the above date, before Catherine M.

6    Donahue, a Certified Court Reporter and Notary

7    Public in the State of New Jersey.

8

9    Magna Job No. 886211

10

11

12

13

14

15

16              MAGNA LEGAL SERVICES

17                (866) 624-6221

                www.MagnaLS.com

18

19

20

21

22

23

24

25



Page 447

```
 1   A P P E A R A N C E S:

 2   (All parties present via Zoom Remote)

 3

 4   SANFORD HEISLER SHARP, LLP

 5   BY:  DAVID SANFORD, ESQ.

 6        JEREMY HEISLER, ESQ.

 7        ALEXANDRA HARWIN, ESQ.

 8        KATE MacMULLIN, ESQ.

 9        SIMON SCHAITKIN, ESQ.

10        MICHAEL LOCKMAN, ESQ.

11        LEOR ROSEN, ESQ.

12        JAMILA BEESLEY, ESQ.

13   1350 6th Avenue, 31st Floor

14   New York, New York 10019

15   (646) 402-5650

16   dsanford@sanfordheisler.com

17   jheisler@sanfordheisler.com

18   aharwin@sanfordheisler.com

19   kmacmullin@sanfordheisler.com

20   sschaitkin@sanfordheisler.com

21   mlockman@sanfordheisler.com

22   lrosen@sanfordheisler.com

23   jbeesley@sanfordheisler.com

24   Attorneys for Plaintiff

25
```



```
 1    A P P E A R A N C E S: (Cont'd)
 2    (All parties present via Zoom Remote)
 3
 4    TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
 5    BY:  GREGORY R. BENNETT, ESQ.
 6    Mid-Westchester Executive Park
 7    Seven Skyline Drive
 8    Hawthorne, New York 10532
 9    (914) 347-2600
10    gbennett@tlsslaw.com
11    Attorneys for Defendant Robert DeNiro
12
13    TARTER KRINSKY & DROGIN LLP
14    BY:  LAURENT S. DROGIN, ESQ.
15    1350 Broadway
16    New York, New York 10018
17    (212) 216-8000
18    ldrogin@tarterkrinsky.com
19    Attorneys for Defendant Canal Productions, Inc.
20
21
22
23
24
25
```



```
 1   A P P E A R A N C E S: (Cont'd)

 2   (All parties present via Zoom Remote)

 3   ALSO PRESENT:

 4          Eric Yumet, Magna Videographer

 5          Graham Chase Robinson

 6          Tom Harvey, Esq.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 450

<pre>
 1                   FEDERAL STIPULATIONS

 2

 3    IT IS HEREBY STIPULATED AND AGREED by and between

 4    the attorneys for the respective parties herein,

 5    that the filing and sealing be and the same are

 6    hereby waived.

 7

 8    IT IS FURTHER STIPULATED AND AGREED that all

 9    objections except as to the form of the question

10    shall be reserved until the time of trial.

11

12    IT IS FURTHER STIPULATED AND AGREED that the

13    within deposition may be sworn to and signed

14    before any officer authorized to administer an

15    oath, with the same force and effect as if signed

16    and sworn to before this Court.

17

18

19

20

21

22

23

24

25
</pre>



Page 451

1                    I N D E X

2

3  Witness:                              Page

4  ROBERT DE NIRO

5    Examination by Mr. Sanford............... 456

6

7

8

9

10

11

12

13

14

15

16

17

18

19  October 21, 2022

20

21

22

23

24

25



Page 452

```
 1                    E X H I B I T S
 2   Exhibit Name        Description              Page No.
 3
 4   139           Document bearing Bates stamp      527
                   ROBINSON 9966 through 9967
 5
     140           Document bearing Bates stamp      545
 6                 CANAL 48805 through 48807
 7   141           Document bearing Bates stamp      549
                   CANAL 47972 through 47974
 8
     142           Document bearing Bates stamp      549
 9                 CANAL 48009 through 48011
10   143           Document bearing Bates stamp      552
                   CANAL 49768 through 49773
11
     144           Document bearing Bates stamp      578
12                 CANAL 48017 through 48019
13   145           Document bearing Bates stamp      578
                   ROBINSON 1347 through 1349
14
     146           Document bearing Bates stamp      586
15                 ROBINSON 1533
16
17
18
19         (Exhibits attached with transcript.)
20
21
22
23
24
25
```



Page 453

```
 1                DEPOSITION SUPPORT INDEX

 2

 3          Instruction To Witness Not To Answer

 4                    PAGE        LINE

 5                    476           5

 6                    487           8

 7                    503          19

 8

 9          Request for Production of Documents

10                    PAGE        LINE

11                  None Marked

12

13                  Marked Text

14                  PAGE        LINE

15                  None Marked

16

17

18

19

20

21

22

23

24

25
```



Page 454

```
 1              THE VIDEOGRAPHER:  We are now on
 2       the record.  This begins videotape No. 1
 3       in the deposition of Robert DeNiro in
 4       the matter of Graham Chase Robinson
 5       versus Robert DeNiro and Canal
 6       Productions, Incorporated.
 7              Today is October 21, 2022 and the
 8       time is 11:03 a.m.  This deposition is
 9       being taken remotely at the request of
10       Sanford Heisler Sharp, LLP.
11              The videographer is Eric Yumet
12       and the court reporter is Catherine
13       Donahue both of Magna Legal Services.
14              MR. DROGIN:  Bob, can you hear
15       us?
16              THE WITNESS:  Yes, I can hear
17       you.
18              THE VIDEOGRAPHER:  Will counsel
19       and all parties present please state
20       their appearances and whom they
21       represent.
22              MR. SANFORD:  David Sanford of
23       Sanford Heisler Sharp for the plaintiff
24       Chase Robinson.
25              MS. HARWIN:  Alexandra Harwin
```



```
 1        from Sanford Heisler Sharp on behalf of
 2        the plaintiff Graham Chase Robinson.
 3               MR. SANFORD:  Jeremy, you're on
 4        mute.
 5               MR. HEISLER:  Jeremy Heisler at
 6        Sanford Heisler Sharp for the plaintiff
 7        Graham Chase Robinson.
 8               MS. MacMULLIN:  Kate MacMullin
 9        from Sanford Heisler Sharp for the
10        plaintiff Graham Chase Robinson.
11               MR. LOCKMAN:  Michael Lockman
12        with Sanford Heisler Sharp for the
13        plaintiff.
14               MR. SCHAITKIN:  Simon Schaitkin
15        with Sanford Heisler Sharp for the
16        plaintiff Graham Chase Robinson.
17               MR. BENNETT:  Gregory Bennett,
18        Traub Lieberman Straus & Shrewsberry for
19        defendants.
20               MR. DROGIN:  Laurent Drogin,
21        Tarter Krinsky & Drogin for Canal.
22               MR. HARVEY:  Tom Harvey for
23        Robert DeNiro and Canal.
24               THE COURT REPORTER:  Did we get
25        everybody?
```



Page 456

```
 1                THE VIDEOGRAPHER:  Is that
 2          everyone?
 3                MS. HARWIN:  Also from Sanford
 4          Heisler Sharp we have Leor Rosen and
 5          Jamila Beesley present.
 6                THE VIDEOGRAPHER:  Okay.
 7                Will the court reporter please
 8          swear in the witness.
 9                     (The witness is sworn by the
10              court reporter.)
11  R O B E R T    D e N I R O,  recalled as a
12          witness by (Plaintiff), having been first
13          duly sworn by Catherine M. Donahue, a
14          Notary Public within and for the State of
15          New Jersey, was examined and testified
16          further as follows:
17  FURTHER EXAMINATION BY MR. SANFORD: (Cont'd)
18          Q.   Mr. DeNiro, it is good to see you
19  again.
20          A.   How you doing?
21          Q.   Good.
22               Could you tell me what you did, if
23  anything, to prepare for today's deposition?
24          A.   Talked about what would be -- what
25  we would be possibly, I guess, talking about.
```



Page 457

```
 1    That's it.
 2          Q.    Okay.
 3                And who did you speak with?
 4          A.    Tom Harvey and Greg and Laurent.
 5          Q.    And how long did you speak?
 6          A.    Forty-five minutes, half an hour.
 7          Q.    And when was that?
 8          A.    Yesterday.
 9          Q.    Any other time did you speak with
10    those individuals or anyone else about this
11    deposition today?
12          A.    A little, a week or two or three
13    ago.  Tom Harvey for a few minutes.  That was
14    it.  That's it.
15          Q.    Did you speak with anyone about your
16    last deposition since the time we were last
17    together until today?
18          A.    No.
19          Q.    Okay.
20                Have you read any materials in
21    preparation for today's deposition?
22          A.    No.
23          Q.    All right.
24                We're going to share, to start
25    today, a document with you in the chat that's
```



Page 458

1    Bates stamped CANAL 1844.  We previously

2    identified this document as Plaintiff's Exhibit

3    122.

4              Can you see that?

5         A.   I don't see it yet.

6         Q.   Okay.

7              We'll get it for you.

8                  MR. DROGIN:  Do you want to

9          screen share?

10                 MR. SANFORD:  It is not open.

11        All right.  We'll get back to that.

12                 How about that?

13   BY MR. SANFORD:

14        Q.   Let me ask you some questions

15   instead before we review a document.

16              Mr. DeNiro, do you believe that you

17   were generous with Ms. Robinson?

18        A.   Yes.

19        Q.   In what ways?

20        A.   I gave her what she wanted, even

21   titles that she was pressuring me about which I

22   thought were -- in the one sense really

23   meaningless because they were not real titles,

24   but she wanted them.

25                 And so, I said okay, if you



1  really -- after a lot of pressuring, I said

2  okay.  It really didn't mean anything, but I

3  gave them to her.

4        Q.   Were there any other ways in which

5  you were generous to Ms. Robinson?

6        A.   I paid her well.

7        Q.   Anything else?

8        A.   I was pretty trusting with

9  everything.  You know, she would say "Look, this

10 is it, that I need this or that."

11             I would say, "Okay, if you say so,

12 if you think that's -- go ahead."

13             As I say, for me it was the honor

14 system.  You do the right thing.  That's it.

15 Okay.  Fine.

16       Q.   Were you generous to Ms. Robinson

17 when it came to expenses you paid for?

18       A.   Yes, I think I was.

19       Q.   Were you generous to Ms. Robinson

20 when it came to her travel?

21       A.   Yes.

22       Q.   Were you generous to Ms. Robinson in

23 allowing her to work outside of New York?

24       A.   Yes.

25       Q.   How so?



```
 1          A.    She told me she wanted to move to
 2   work from Spain, from England.  There might have
 3   been one other place.  LA.  And I said as long
 4   as you can get things done, fine, you know.
 5          Q.    Were you generous to Ms. Robinson
 6   with respect to sky miles?
 7          A.    Well, to a point.  She used the sky
 8   miles.  I would say to her be careful because my
 9   kids need them at times, so I want to make sure
10   that they're available for the kids who will
11   possibly need to travel somewhere.
12          Q.    Sorry.
13                Was there ever a time in
14   Ms. Robinson's employment when you told her that
15   she was not authorized to use Canal sky miles?
16          A.    I don't remember.  I pretty much
17   left that up to her in the way that she would do
18   it.  Again, I was totally trusting in that
19   regard.  I just didn't have a reason not to
20   trust her.
21          Q.    Was there ever a time when
22   Ms. Robinson asked to take a trip for work or
23   for personal reasons that you told her she could
24   not use Canal sky miles?
25          A.    Not that I remember.  I was pretty,
```



Page 461

```
 1   pretty okay with it.  She would give me a reason
 2   and I would say okay.
 3        Q.   So during Ms. Robinson's employment,
 4   who besides you and Ms. Robinson knew the
 5   specifics of what expenses Ms. Robinson was
 6   authorized to charge to Canal?
 7              MR. DROGIN:  Objection to the
 8        form.
 9              Go ahead.
10   BY MR. SANFORD:
11        Q.   Was there anyone else?  You can
12   answer the question if you understand.  But
13   basically the question is, was there anyone else
14   besides you and Ms. Robinson who knew the
15   specifics of what expenses Ms. Robinson was
16   authorized?
17              MR. DROGIN:  Same objection to
18        the form.
19              Go right ahead.
20        A.   Well, I mean, not that I would -- it
21   would be her and that would be it.  Unless my
22   accountants would have to be aware of something
23   that I would then assume, which I shouldn't
24   have, that she would apprise them of whatever
25   needed to -- whatever they needed to be apprised
```



Page 462

```
 1   of, you know, and that was it.
 2   BY MR. SANFORD:
 3        Q.   Was there anyone besides you and
 4   Ms. Robinson who knew of the specifics of what
 5   sky miles Ms. Robinson was authorized to use or
 6   to transfer?
 7             MR. DROGIN:  Objection to the
 8        form.  Objection to the form.
 9             Go ahead.
10        A.   I don't know if there were other
11   people who knew or were aware, even who she
12   might have told.  But for me, I didn't say
13   anything.  I took what she said as what it was
14   and that was it.
15   BY MR. SANFORD:
16        Q.   Canal's general counsel, Tom Harvey,
17   did not participate in discussions between you
18   and Ms. Robinson over the years when you
19   discussed what expenses Ms. Robinson was
20   authorized to charge, right?
21        A.   No, no.
22        Q.   And other Canal employees didn't
23   participate in discussions between you and
24   Ms. Robinson over the years where you discussed
25   the specifics of what expenses Ms. Robinson was
```



Page 463

1  authorized to charge, right?

2          MR. DROGIN:  Objection to the

3     form.

4          I note it is a double negative.

5  BY MR. SANFORD:

6      Q.    You can answer.

7      A.    Why would I -- why would I, you

8  know, unless they brought it up for some reason?

9  But otherwise, no.

10      Q.    And Canal's general counsel, Tom

11  Harvey, did not participate in discussions

12  between you and Ms. Robinson over the years when

13  you discussed what sky miles she was authorized

14  to transfer, right?

15      A.    We didn't discuss it.  There was no

16  reason to discuss it.  Only after I found out

17  all the miles she had taken.

18      Q.    And that was after Ms. Robinson

19  resigned?

20      A.    Yes.

21      Q.    And Canal employees Michael Kaplan,

22  Sabrina Weeks-Brittan and Gillian Spear didn't

23  participate in discussions between you and

24  Ms. Robinson over the years when you discussed

25  what sky miles she was authorized to transfer,



Page 464

```
 1   correct?
 2          A.   No, not that I know.
 3          Q.   And during --
 4          A.   Ut-oh.  You froze.
 5               MS. HARWIN:  It looks like we're
 6          frozen, so why don't we go off the
 7          record and try to troubleshoot.
 8               THE VIDEOGRAPHER:  Absolutely.
 9               The time is 11:14 a.m. and we're
10          going off the record.
11                  (Whereupon, at 11:14 o'clock
12          a.m., a recess was taken until 11:14
13          o'clock a.m.)
14               THE VIDEOGRAPHER:  The time is
15          11:14 a.m.
16               And we are back on the record.
17   BY MR. SANFORD:
18          Q.   I'm sorry, I froze, Mr. DeNiro.
19               Can you repeat the answer to my
20   question?
21          A.   Can you ask me it again?
22          Q.   Sure.
23               During Ms. Robinson's employment,
24   Canal's general counsel, Tom Harvey, wasn't
25   privy to the details about all the day-to-day
```



Page 465

1   work that you had Ms. Robinson perform, correct?

2       A.   No, I don't think so.  There wasn't

3   any reason.

4       Q.   And during Ms. Robinson's

5   employment, the other Canal employees weren't

6   privy to the details about all the day-to-day

7   work that you had Ms. Robinson perform; isn't

8   that right?

9       A.   They could have been, but I didn't

10  know about it.  Maybe there was some spillover

11  for whatever reason having them do something

12  that she delegated to them.  It could have been

13  something in relation to air miles.  I don't

14  know.

15      Q.   Okay.

16           How much time did you spend

17  discussing with Tom Harvey or anyone else, for

18  that matter, the sky miles transactions that

19  serve the basis for Canal's claims against

20  Ms. Robinson?

21           MR. DROGIN:  Objection to the

22       form.

23      A.   I don't remember specifically, but

24  it was the amount of time that was needed in

25  order for me to understand what had happened and



1  then that's it.

2  BY MR. SANFORD:

3         Q.    Okay.

4               How much time did you spend with

5  Mr. Harvey, to the best of your recollection?

6         A.    You mean the very first time I heard

7  about it?

8         Q.    Well, let's start there.

9         A.    You know, not that long, but long

10  enough to know that this is what has happened;

11  this is the situation.

12        Q.    The sky miles at issue in Canal's

13  claims against Ms. Robinson were generated by

14  Canal's American Express card, right?

15        A.    Yes, as far as I know, yes.  That's

16  all that it was, yes.

17        Q.    So setting aside the sky miles that

18  were generated by Canal's American Express

19  credit card, at any point in the last decade,

20  have you or Canal ever purchased sky miles?

21        A.    I don't think we had to.  We had

22  enough from the American Express card, the way I

23  understood it.

24        Q.    Do you have -- do you have any idea

25  sitting here today what sky miles are worth?



Page 467

```
 1            A.    Not really, no.  Specifically, no.
 2            Q.    What is your best understanding of
 3     what the value is of sky miles?
 4            A.    Well, I understand that they're
 5     valuable and I was given the equivalent, I
 6     guess, in terms of dollars at one point, but
 7     I've forgotten.  But they were valuable and they
 8     were taken from me when they shouldn't have been
 9     and that's not right.
10            Q.    So, I mean, do you have any sense at
11     all like what one sky mile is worth?  Is it
12     worth pennies?
13            A.    No, I don't.
14            Q.    Is it worth a dollar?  Do you have
15     any idea at all?
16            A.    No, I don't know.  I guess you would
17     translate the miles and traveling and what class
18     you're going under.  You could break it down, I
19     suppose, yes.
20            Q.    You generally preferred to fly
21     private, right, not commercial?  Is that a
22     fair --
23            A.    When I can.  Not always, but when I
24     can.
25            Q.    And when you, when you fly
```



Page 468

```
 1   commercial, do you have a preferred airlines you

 2   like?

 3          A.   No.  I mean, we might have because

 4   of the sky miles, Chase could have said, "Well,

 5   we're going to American or we should go

 6   American.  We have the sky miles."

 7               So I would go American.

 8          Q.   And you liked ████████ because

 9   ████████ has first class and you like to travel

10   first class?

11          A.   Yes, that could be, yes, that's it.

12          Q.   And you understand and have

13   understood that ████ doesn't have first class,

14   right?

15          A.   Yes, it has a good business class,

16   but not first class.  I mean, I have flown ████

17   a few times.

18          Q.   And you preferred the first class

19   over the business class; is that a fair

20   statement?

21          A.   If I have to get somewhere and I

22   don't have a first class and I would have to

23   take a Delta business, I'll take it.

24          Q.   Right.  I understand.

25               But my question is rather, you
```



Page 469

```
 1   prefer first class over business class.  That's
 2   a fair statement, right?
 3        A.    In general you could say that, yes,
 4   yes.
 5        Q.    Mr. DeNiro, at the last deposition,
 6   you agreed to look at the individual charges
 7   that Canal accused Ms. Robinson of improperly
 8   charging and come prepared today to answer
 9   questions about the charges.
10              Have you done that, sir?
11              MR. DROGIN:  Objection.
12         Objection to the form.
13              This deposition is being
14         conducted pursuant to a specific court
15         order.  So whatever the witness may have
16         agreed to you with is not binding on him
17         here today, and you don't make deals
18         with the witnesses as to what -- witness
19         as to what he's going to do.
20              So I'm going to object to that
21         question, and whether we direct him not
22         to answer and call the court will depend
23         on how you comport yourself.
24              MR. SANFORD:  Thank you for that
25         speech, Laurent.
```



```
 1                    MR. DROGIN:  You're welcome.
 2   BY MR. SANFORD:
 3        Q.   My question, Mr. DeNiro, is you
 4   agreed to look at individual charges.
 5             Have you done so?
 6        A.   I have at one point.  I can't
 7   remember the last time I did it, but in
 8   preparation for the last deposition, I did look
 9   at them.
10             I had to look and get a fair idea
11   and before that just to know what was taken from
12   me.
13        Q.   And were you able to identify a
14   single charge that you contend was improper?
15        A.   There were.  I can't at this moment
16   get specific.  I know she did take things that
17   very clearly she shouldn't have.
18        Q.   Right.
19             But in the last deposition you
20   couldn't get specific either, and that's why I
21   asked if you would be so kind as to review the
22   charges and come prepared to discuss them.
23             You're not prepared to do that?
24        A.   No, I'm not.
25        Q.   Because you don't know of any
```



1  offhand of any specific charges that you would

2  view as improper?

3          MR. DROGIN:  Objection to the

4      form.

5      A.  I know there are improper.  We

6  wouldn't be here if there wasn't what you would

7  call misdeeds or maldeeds or whatever you want

8  to call them.  The thing is inappropriate

9  behavior on Chase Robinson's part.

10 BY MR. SANFORD:

11     Q.  At any point before or after Canal

12 brought its lawsuit against Ms. Robinson, have

13 you ever reviewed the specific sky mile

14 transfers that Canal has said were improper?

15     A.  I'm sure I did.  I can't remember

16 now offhand, but to be made aware of that, yes.

17     Q.  You're sure you did, but you don't

18 remember specifically --

19     A.  Yes.

20     Q.  -- reviewing them?

21     A.  Yes.

22     Q.  Is that a fair statement?

23     A.  I guess, yes.

24     Q.  So when I ask you questions, and I

25 said this last time, I'm asking you as a fact



Page 472

 1   witness, right?

 2              So I want to know what you remember.

 3   If you don't remember, feel free to say you

 4   don't remember.

 5              But sitting here today, to the best

 6   of your recollection, do you know a time when

 7   you reviewed specific sky miles that you viewed

 8   were improper?

 9        A.   I remember I had done that and then

10   it was explained to me why those should not have

11   been taken from me.  Chase Robinson did not have

12   the right to take them.  She overreached, dipped

13   in way, way, way too far.  And that's it, if I

14   remember.

15        Q.   Who explained that to you?

16        A.   Tom Harvey.

17        Q.   And did you ask Mr. Harvey any

18   questions about it?

19        A.   At the time I might have asked this

20   or that.  But it basically was pretty simple,

21   you know.  We can get complicated, but it was

22   pretty simple.

23        Q.   Was there anyone else present when

24   Mr. Harvey explained this?

25        A.   I don't remember.



Page 473

```
 1          Q.   Do you remember when that
 2    conversation occurred?
 3          A.   Oh, a couple years ago.
 4          Q.   Do you remember how many
 5    conversations you had?
 6          A.   It might have been two before all
 7    this stuff and in my deciding, you know, that's
 8    it; I'm pissed.  She did the wrong thing.
 9               I tried to do right by her.  She
10    just -- and, you know, all the other underhanded
11    things she did like tape recording people and so
12    on.  She was up to something.
13               And it is a shame because if she had
14    just done what she was supposed to do, we
15    wouldn't all be here and we all wouldn't be -- I
16    wouldn't be having to spend money in this whole
17    ridiculous situation.
18          Q.   You really don't like Ms. Robinson,
19    do you?
20          A.   I don't like her.  I trusted her and
21    I did like her, but after what she did, there's
22    not much to like.
23          Q.   And it is fair to say you hate her,
24    don't you?
25          A.   I don't hate her.  I feel sorry for
```



MAGNA
LEGAL SERVICES

1    her.

2        Q.    You feel sorry for her.  Why do you

3    feel sorry for her?

4        A.    Because she did -- because I think

5    the moves that she made were pathetic.  She had

6    such a sense of self-importance.  That if she

7    had just done the work that say the people --

8    and some of them she hired.  I hired them at her

9    recommendation to do the work and are terrific.

10            So she just for some reason had this

11   thing, this entitled feeling and also distrust

12   of me, people, the situation.

13            And I don't know what, what

14   frequency she was operating on, but it wasn't

15   the right frequency.  Because if it was the

16   right frequency, we wouldn't be in this

17   situation.  And the right frequency is just to

18   do the right thing, be honest, straight.  You

19   make a mistake, you apologize.  We move on.

20            But what she did was underhanded.

21   She kept moving forward, looking to accumulate

22   evidence against me and others and people who

23   trusted her like me.

24            And, you know, I know you're her

25   lawyer and you're doing your thing and that's



1   fine, but that's the bottom line with her and we

2   know that.

3        Q.   You would like to see her in jail,

4   wouldn't you?

5        A.   I don't even want to see her in

6   jail.  I don't have time.  She's not a criminal

7   felon.  She is just somebody -- she might have

8   done things that maybe are bordering on felony.

9   I don't know.  But she is, she -- maybe she

10  needs help, but I don't want to see her put in

11  jail.

12            I just want my stuff back and good

13  riddance; I'm out of here.  I don't want her to

14  come after me after everything I have done for

15  her.  On top of adding insult to injury, she

16  comes after me.  This is crazy.

17       Q.   Well, when you went to the DA, you

18  understood that in bringing charges against her,

19  she could wind up in jail, right?

20       A.   What are you trying to ask me?  That

21  I'm a bad guy?  You really want to put her in

22  jail.  I don't want to put her in jail.  I want

23  her to be, I want her to be accountable for what

24  she did.  So whatever that is.

25       Q.   You understood by going to the DA



 1   she would be potentially going to jail?

 2            MR. DROGIN:  Counsel, I'm going

 3        to stop you and I'm going to direct him

 4        not to answer the question.

 5                (Whereupon, the transcript

 6            was marked for a direction not to

 7            answer.)

 8            THE WITNESS:  Okay.

 9            MR. SANFORD:  On what basis?

10            MR. DROGIN:  Well, I have already

11        said that I'm not going to permit any

12        more questions into marital issues,

13        family issues, health issues, alcohol

14        issues, the deponent's emotions at a

15        particular time.

16            This is not -- this is neither

17        here nor there at the bottom line for

18        this case.  So those questions are off.

19        There's enough of those questions.

20            So I will allow the plaintiff two

21        more questions -- two more hours to

22        complete, and I'm going to advise you to

23        focus on what's really needed for the

24        claims.  That's what the court

25        instructed you to --



Page 477

1           MR. SANFORD:  I am well aware.
2      What does that have to do with my
3      questions about going to the DA which is
4      very relevant, front and center in this
5      case?
6           MR. DROGIN:  His emotions or what
7      he wanted are completely contrary to the
8      warning the court has given you.
9           If you want to know what he said
10     to the DA, which is what the court said
11     you could ask, then by all means, go
12     ahead.
13          MR. SANFORD:  Mr. DeNiro's intent
14     in this case throughout is relevant and
15     will be relevant at trial.  There's
16     nothing that really could be more
17     material.  So I totally disagree with
18     your characterization.
19          Are you going to stand by your
20     direction to Mr. DeNiro on this issue,
21     really?
22          MR. DROGIN:  I'm concerned that
23     you're going to continue to abuse this,
24     and we have a clear direction from the
25     court as to what the proper topics are



Page 478

```
 1              today.

 2                   You represented to the court in

 3              open court and you put it in writing as

 4              to the topics that you said you needed

 5              additional time for.  So you're limited

 6              to those topics.

 7                   MR. SANFORD:  All right.

 8                   You're wasting time.

 9    BY MR. SANFORD:

10         Q.   Mr. DeNiro, without having gone

11    through and looked at individual charges, are

12    you able to provide sworn testimony today that

13    any specific credit card charges that Canal

14    includes in its claims against Ms. Robinson were

15    improper?

16                   Are there any specific credit card

17    charges you are aware of that you would contend

18    are improper?

19                   MR. DROGIN:  Objection to the

20              form.

21         A.   Yes, there were, yes.  I can't get

22    specific now, but there were.

23    BY MR. SANFORD:

24         Q.   So you know of no specifics sitting

25    here today?
```



Page 479

```
 1        A.    No, but there were.
 2        Q.    Are you aware of any specific
 3   charges that you would contend are improper with
 4   respect to charges made for Paola's --
 5        A.    Sorry.
 6        Q.    -- Paola's restaurant?
 7        A.    Yes.  She charged for meals for
 8   herself where she never asked me and she charged
 9   them for herself, as I say.  That's, that's not
10   kosher.  That's not right.
11        Q.    And you know for a fact sitting here
12   today under sworn testimony that Ms. Robinson
13   was not working during the time in question at
14   Paola's?  You know for a fact that she was not
15   working?
16              MR. DROGIN:  Objection to the
17         form.
18        A.    Not working for what?
19   BY MR. SANFORD:
20        Q.    For you.  Doing something related to
21   work.  You know for a fact that she wasn't?
22        A.    Yes, she was not.  She was -- my
23   understanding is that she was charging meals to
24   herself, for herself.  She was not entitled to
25   do that.
```



```
 1              If she was doing that, she should
 2    have made me aware of it and let me decide
 3    whether that's right or wrong or that she should
 4    do it.  So, yes.
 5         Q.    What is your understanding based on?
 6         A.    My understanding is based on what I
 7    heard that she charged.  She charged meals to
 8    her, for her -- to me for her.
 9         Q.    My question, sir, is do you know for
10    a fact that she wasn't working while she was at
11    Paola's, that it wasn't a work meal?  That's the
12    question.
13         A.    You know, she could say she was
14    working.  She has done other things where she
15    said she is working so that entitles her to get
16    a meal.
17              Now we're just playing games.  She
18    overcharged me.  Period.  That's my answer.
19         Q.    Mr. DeNiro, you don't know for a
20    fact sitting here today --
21         A.    I know.
22         Q.    Let me finish, just so we have a
23    clear record.  I'll let you finish.  Please let
24    me finish.
25              My question is, you don't know for a
```



```
 1   fact, do you, that the charges with respect to
 2   Paola's weren't in connection with work?  You
 3   don't know that for a fact, do you?
 4          A.   But I was charged as if she was
 5   working because -- so she was working.  That's
 6   what she is saying.  You're saying she might
 7   have been working and I don't know that.
 8          Q.   You don't know, right?  It's true
 9   you don't know?  It is true you don't know that?
10          A.   Well, no, I don't know whether she's
11   working.
12          Q.   That's my question.
13          A.   She claims to have been working in
14   order to be able to charge like that.
15          Q.   That's my question.
16          A.   But there's something in all of this
17   that we went through before that doesn't add up.
18          Q.   All right.
19               So you don't know for a fact that
20   she was working.
21               Here is my next question.  Without
22   having gone through and looked at the individual
23   charges yourself, are you able to say for sure
24   that any of the specific charges Ms. Robinson
25   made for Ubers or taxis were unauthorized?
```



Page 482

1            In other words, do you know for a
2    fact?
3            A.   Yes, if we broke it all down and I
4    was asked trip by trip, I would say she had no
5    right to do this.  She had no right to do that.
6    She had no right to do that.  She took it upon
7    herself.
8            Yes, if you want to break it down
9    with me, we'll break it down.  If you want to
10   nitpick like that, let's do it.  I'll take the
11   time.
12           Okay.
13           Q.   Under oath sitting here today, you
14   don't know for a fact that Ms. Robinson wasn't
15   working on any of the trips that she took by
16   Uber or taxi, do you?
17           A.   I know for a fact that she was
18   overusing Uber, using it when she shouldn't
19   have; been in rooms in LA -- in hotels when she
20   shouldn't have been doing it.
21           My lawyers told me that.  And I have
22   no more specific answer than that, but I trust
23   my lawyers what they say.  And, I'm sorry,
24   that's it.
25           Q.   What's the basis of your knowledge?



```
 1          A.    I don't want to nitpick with you.
 2          Q.    What's the basis of your knowledge
 3    that Ms. Robinson --
 4          A.    The basis is that I have been told
 5    by my attorneys that she took -- she did things
 6    when she shouldn't have.  It made no sense for
 7    her to charge me for things.  It made no sense.
 8                Again, if you want to go over each
 9    item, I will do that.
10          Q.    I'm not asking --
11          A.    If you want to waste our time, I
12    will.
13          Q.    I'm not asking you what your lawyers
14    told you.
15          A.    Okay.
16          Q.    I know you have a lot of faith in
17    your great lawyers.
18          A.    You're just making it is a
19    technicality and I don't like the question.
20    I'm sorry.
21          Q.    You have faith in your great
22    lawyers.  I appreciate that.  They are good
23    lawyers --
24          A.    You should watch it about yourself,
25    buddy, you know, calling them great.  I'm a
```

Page 484

1    little ashamed for you that you are even having
2    to do a case like this.
3            Q.    I'm glad --
4            A.    Because it is beneath you, buddy.
5    It is beneath you.  This whole thing is a joke.
6                  MR. DROGIN:  Guys, this is --
7    BY MR. SANFORD:
8            Q.    Can I just ask a question,
9    Mr. DeNiro?
10                 My question simply is, apart from
11   what your lawyers told you -- and you have faith
12   in your lawyers -- and that's one thing --
13           A.    Yes, I do.
14           Q.    I'm not asking about that.  I'm not
15   asking about what they told you.
16                 I'm asking, do you, as a fact
17   witness in this case -- the lawyers are not fact
18   witnesses.  You're the fact witness.  You're
19   going to be at trial testifying.  You're
20   testifying right now under oath.
21           A.    Yes.
22           Q.    My question is, do you have any
23   personal knowledge to say that Ms. Robinson took
24   unauthorized Uber trips or unauthorized --
25           A.    Yes, I do.  When I was told about it



Page 485

1    at the time, I said this is not right.  This

2    shouldn't have happened.  That's inappropriate.

3    That's wrong.

4              I don't have it specifically now,

5    but I had it and I remember it from then.

6    That's the best that I can do.  If you want to,

7    if you want, we will pull them all out and go

8    over them again and I will show you.

9         Q.   And you will know for a fact that

10   she wasn't working --

11        A.   Yes, I will, absolutely.

12        Q.   All right.

13             And without having gone through and

14   looked at individual charges, are you able to

15   say for sure that any of the specific charges

16   Ms. Robinson made for Whole Foods or Dean &

17   DeLuca were unauthorized?

18             MR. DROGIN:  Objection.

19          Objection to the form.

20        A.   I will be able to find unauthorized

21   charges.  Yes, I will.

22   BY MR. SANFORD:

23        Q.   Sitting here today, are you aware of

24   any trip that you know for a fact wasn't

25   connected -- sorry.  Strike that.



```
 1          A.    Yes, she did.  She --
 2          Q.    Are you aware of any charge with
 3   respect to Dean & DeLuca or Whole Foods --
 4          A.    She went to California under the
 5   pretext of one thing, that she had to take some
 6   Taxi Driver books or something back to me.  She
 7   didn't do that.
 8              She went for Amelia - I'm forgetting
 9   her last name - birthday party.  She's done
10   other things.  She's stayed in hotels where she
11   shouldn't.  She charged me.  I never knew about
12   it.  She never asked me if she could charge me
13   for that.
14              I'm sorry, if you want to go over
15   all these expenses, we will.  We will waste our
16   time and I will point it out to you specifically
17   where she was not entitled to charge me for
18   those things.
19          Q.    Do you remember having any
20   conversation over the years with Ms. Robinson
21   about circumstances where she could charge Canal
22   for food?
23          A.    There are times she could --
24              MR. DROGIN:  Objection to the
25          form.
```



```
 1              Excuse me, hold on.  Hold on.
 2         Bob, excuse me.
 3              I'm objecting and I'm directing
 4         the witness not to answer.  This line of
 5         questioning was covered on pages 334,
 6         335, 336 and so on in the prior
 7         deposition.
 8                   (Whereupon, the transcript
 9              was marked for a direction not to
10              answer.)
11              MR. DROGIN:  Let's go back to the
12         judge now and tell her what you're
13         asking about now, and then we can show
14         how you are just wasting time here,
15         David, and you're going over stuff
16         you've already covered.
17              You were permitted two hours and
18         38 minutes of questioning; not to rehash
19         the same questions, but to move forward.
20         You gave specific topics about what you
21         felt you needed to question on.  You
22         shouldn't have to go back over the same
23         ground.
24              Shall we call the judge?  Shall
25         we call the judge, or are we going to
```



```
 1          move on?
 2               MR. SANFORD:  I don't believe I
 3          asked that question, Laurent.  I did not
 4          ask that specific question.
 5               But we can move on.
 6  BY MR. SANFORD:
 7          Q.   Mr. DeNiro, you're a part owner of
 8  Nobu, right?
 9          A.   Yes.
10          Q.   If a Canal employee went to Nobu, is
11  that something you would pay for?
12          A.   If they told me about it, I may be
13  aware of it.  It wasn't a hard and fast rule
14  across the board that any person who worked for
15  me could go to Nobu and charge and get a meal
16  and that I would pay for it.
17               That was something that was asked.
18  They would ask and do it.  Sometimes Chase did
19  say, look, I want to take some people from the
20  company there for whatever celebration they were
21  doing.  I would say it is okay.
22               But it seems there are times that
23  she has not told me that and just felt she was
24  entitled to do that and she wasn't.
25          Q.   So you authorized Ms. Robinson to
```



1   take Canal employees out for meals at Nobu?

2        A.   Rarely.  From time to time when she

3   told me.

4        Q.   And at times you authorized

5   Ms. Robinson to take Amelia Brain for dinner at

6   Nobu?

7        A.   I might have.

8        Q.   What have you told Ms. Robinson over

9   the years about the circumstances when she could

10  charge Canal for her Ubers and taxis?

11       A.   I don't remember, but I know that

12  there were times.  To say it again for the

13  hundredth time, she was not authorized to use

14  Uber in the ways that she has because I didn't

15  give her the permission to do that.  I didn't

16  say she could, and she took it upon herself to

17  do it anyway.

18       Q.   At any point during Ms. Robinson's

19  employment, did you ever tell her that any sky

20  mile transfers that she made were improper?

21       A.   I didn't tell her at the time.  She

22  told me once she was doing some sky -- she said

23  "Let me just transfer.  She said I think it is

24  better if we have them over here."

25         I said "Okay, if you say so,"



Page 490

```
 1    trusting her again a hundred percent.  You say
 2    so, then you do it.  I know you're going to do
 3    the right thing.
 4               She didn't.  She took a lot more
 5    miles, sky miles.  She shouldn't have done that.
 6    All I can say is, you know, shame on her.
 7          Q.    You have used the term checks and
 8    balances in reference to your accountants.  Can
 9    you explain what checks and balances your
10    accountants provided for Canal Productions?
11          A.    Can you be more specific?
12          Q.    Well, in the last deposition, you
13    referenced checks and balances; that your
14    accountants served as basically a check and a
15    balance on the system.
16               And I'm just wondering, you know,
17    what kind of checks and balances your
18    accountants provided for Canal.
19          A.    Well, checks and balances are the
20    people -- there are other people in this whole
21    situation who, if they sense something that is
22    out of whack or improper, they'll draw my
23    attention to it.
24               I gave Chase a lot of power in a
25    way, and I didn't know that she would abuse it.
```



1   And she did.  She just foolishly abused

2   something that if she had been honorable, we

3   wouldn't, as I say, be in this situation.  It

4   would never happen.  Chase would be working

5   somewhere else.  And more power to her; that

6   would be great.

7           But, you know, she has done -- she

8   is not -- unfortunately, she thought -- you

9   know, I have encountered people in my life who

10  think of doing things -- they can't think of

11  doing it in a proper way.  They have to do it

12  with a little bit of larceny in their heart.

13          And I'm not saying she is that way,

14  but in a way she kind of didn't do it the way

15  she should have done it.  She is presenting it

16  to you guys and how she has been wronged and all

17  this.

18          But the bottom line is she has not

19  done the right thing.  Because if she did the

20  right thing -- because nobody was more trusting

21  than I was, and there was no reason for her to

22  do that.  So...

23      Q.   So you were just bamboozled for ten

24  years, weren't you?

25      A.    I was bamboozled -- not all the



1   time.  I mean, she did good things.  She

2   bamboozled me.  She had an angle that I'm sorry

3   that she did.  She would still be working for

4   me.

5        Q.   And you're just a bad judge of

6   character then, aren't you?

7        A.   Sometimes I am.  And sometimes I

8   trust people even though I know they're going to

9   probably, they're probably going to do something

10   that's not nice and I give them -- I give them

11   the benefit of the doubt.

12        Q.   And you're just a victim here as you

13   view yourself?

14        A.   I am a victim.  You're damn right

15   I'm a victim.

16        Q.   And you feel victimized, don't you?

17        A.   I sure do.  And I'm not a person

18   that likes to whine that I'm being victimized,

19   but I am being victimized at this time.

20        Q.   Do you think you're whining?

21        A.   I'm not whining.  Not at all.

22        Q.   You're just victimized.

23        Did you ever express any concern to

24   Ms. Robinson or anyone else about her spending

25   before her employment at Canal ended?



Page 493

1           MR. DROGIN:  Objection to the
2       form.
3           A.   I don't remember that.  No.
4   BY MR. SANFORD:
5           Q.   Did you ever express any concern to
6   Ms. Robinson about use of sky miles before her
7   employment at Canal ended?
8           MR. DROGIN:  Objection to the
9       form.
10          A.   Yes, I can't remember.
11  BY MR. SANFORD:
12          Q.   Before Ms. Robinson's employment at
13  Canal ended, did your accountants ever bring to
14  your attention any concern about Ms. Robinson's
15  spending?
16          A.   I don't remember.  They might have.
17  You know, I was so trusting with her that she
18  questioned everything about every person I
19  worked with.
20          And I said, well, if you question
21  it, then let me just see.  Maybe there is
22  something.  Foolishly, you know, I bought into a
23  little of that.
24          And so, they might have been a
25  little afraid because I gave her a certain



Page 494

1  amount of power that was -- that I shouldn't

2  have, and she abused it.  And people were wary

3  of her.  And I'm sorry that I did that, and I've

4  apologized to some of my people who work for me

5  because, you know, it shouldn't have happened.

6        Q.    Before Ms. Robinson's employment at

7  Canal ended, did your accountant ever bring to

8  your attention any concern about Ms. Robinson's

9  use of sky miles?

10              MR. DROGIN:  Objection to the

11          form.

12              You can answer it.

13        A.    Well, all I remember is that after

14  she resigned, I was made aware that she had

15  taken a lot of sky miles that she was not

16  entitled to.  I never gave her permission to

17  take them.  She just helped herself.

18  BY MR. SANFORD:

19        Q.    Do you still employ Berdon LLP as

20  your accountants?

21        A.    Yes.

22        Q.    Do you still employ Berdon LLP as

23  the accountants for Canal Productions?

24        A.    Yes.

25        Q.    How long has Tom Harvey been general



1    counsel for Canal?

2         A.   It has been many years.  I can't

3    remember.  Twenty or more.

4         Q.   During Ms. Robinson's employment at

5    Canal, Ms. Robinson performed work for you while

6    she was away from New York, correct?

7         A.   Right, yes.

8         Q.   And it didn't make a difference to

9    you whether she was in London, Spain, Los

10   Angeles or anywhere else as long as she got her

11   job done, right?

12        A.   It made a difference and I allowed

13   it because I allowed her to go there as long as

14   she felt she could do the work from those

15   places.

16             I guess most employers wouldn't

17   even -- this was before the pandemic.  Most

18   employers would have said, look, that's not

19   going to fly with me.  Some do, maybe.

20             And I was very, very loose with her.

21   I let her do it.  I didn't, you know -- I said

22   "As long as you're there, as long as you take

23   care of business, I'm fine with it.  I'm not

24   sure about it, but if you say so, I'm going to

25   trust you on that."



1          Q.    And she took care of business,
2    didn't she?
3               MR. DROGIN:   Objection to the
4          form.
5          A.    In some ways she did and others she
6    didn't.
7    BY MR. SANFORD:
8          Q.    In what ways didn't she?
9          A.    Well, the time when I got upset with
10   her when she didn't wake me up when I had to
11   have that meeting.  The time when she abused the
12   things like use of Uber or the hotel and stuff
13   like that and other things that I can't remember
14   right now, but we can even, if you want to go
15   over bit by bit each item, we can do that.  You
16   know, be my guest.
17         Q.    She didn't wake you up once.
18   Anything else that you can recall that she
19   didn't do that she should have done?
20         A.    My lawyers have pointed out things
21   she has done other than sky miles, other than
22   using Uber, other than staying in hotels and
23   expensive rooms that she shouldn't have and
24   never asked me about it.  So, yes.
25         Q.    My question is, did she ever fail on



1    the job for you.  I'm not asking what your

2    lawyers told you.  I'm asking you if she ever

3    failed on the job for you, not for the lawyers.

4           A.    That's -- she did okay, but to do

5    okay is fine.  That's what she is supposed to

6    do.

7           When you take advantage of me the

8    way she did, no.  She is not doing her job.  And

9    God knows how she misrepresented herself with me

10   as the person working for me.  Only she knows

11   that.

12          And other people maybe just don't

13   want to get involved and say, well, all I know

14   is there were a lot of parties at my office in

15   TriBeCa when she was gone.

16       Q.    And so, can you recall a single

17   vacation that Ms. Robinson took when she didn't

18   work for you?

19              MR. DROGIN:  Objection to the

20        form.

21   BY MR. SANFORD:

22       Q.    Was there ever a vacation -- do you

23   understand the question?  Was there ever a

24   vacation that Ms. Robinson took where she

25   didn't, in fact, work on the vacation, to your



Page 498

1   knowledge?

2             MR. DROGIN:  Objection to the

3        form.

4        A.   There was one time --

5             MR. DROGIN:  You can answer.

6        A.   She told me in London that she went

7   to England or something and, in fact, even sent

8   me photos of some inn she was staying at.

9             And I don't know -- and I don't know

10  if my lawyers have found anything even on those

11  times that she felt entitled to take an Uber or

12  this or that or, you know, put some of those

13  expenses -- made me pay for some of those

14  things.  I don't know that.

15            Maybe we will find that if we have

16  to look, and maybe we will have to look to just,

17  you know, to add on to the things that she has

18  already done.

19  BY MR. SANFORD:

20       Q.   I'm asking you, sir, as the key fact

21  witness here in this case, whether you are aware

22  of a single time when Ms. Robinson took a

23  vacation in about ten years of employment where

24  she didn't, in fact, work on the vacation for

25  you?



```
 1              MR. DROGIN:  Objection to the
 2         form.
 3              You can answer.
 4        A.   Yes, you're saying that she always
 5    worked.  That's what she says.  And then we hear
 6    that she did other things too.
 7              Listen, again, it is the honor
 8    system.  You say you're working; I believe you.
 9    You say you're entitled to something; I believe
10    you.  If you go too far, I say, "Well, wait a
11    minute.  Let's negotiate."
12              But just don't overstep.  She has
13    overstepped.  She has overstepped quite a few
14    times unfortunately.  So that's all I can tell
15    you.
16    BY MR. SANFORD:
17        Q.   She was always working for you;
18    isn't that a fact?
19        A.   That's what her claim was.  That was
20    always what her claim was.  And then I hear that
21    she delegated a lot of things to other people in
22    my office, and you have testimony from them.
23              And if you want, we'll go back and
24    get their testimony again.
25        Q.   Do you even remember when her
```



Page 500

1  grandmother died?

2       A.   I don't have to remember when her

3  grandmother died.  That's not --

4       Q.   No, do you remember?  My question is

5  yes or no.

6       A.   No, I don't.

7       Q.   So you don't remember calling her

8  twice during the funeral despite knowing that

9  she was at a funeral for her grandmother?  You

10  don't remember that?

11      A.   No, I don't.

12      Q.   Okay.

13           MR. DROGIN:  Counsel, can we go

14      back now to the topics that you

15      represented to the court that you wanted

16      to cover during this deposition?

17           MR. SANFORD:  Yes, why don't we

18      take a five-minute break, if that's

19      okay.

20           MR. DROGIN:  Sure.

21           THE VIDEOGRAPHER:  Sure.

22           The time is 11:48 a.m.  We are

23      going off the record.

24                (Whereupon, at 11:48 o'clock

25           a.m., a recess was taken until 11:56



Page 501

1              o'clock a.m.)

2                   THE VIDEOGRAPHER:  The time is

3           11:56 a.m.

4                   We are back on the record.

5    BY MR. SANFORD:

6           Q.    Okay.

7                   Mr. DeNiro, you understand you're

8    still under oath?

9           A.    Yes.

10          Q.    All right.

11                 If Ms. Robinson performed work for

12   you while she was in London or Spain or Los

13   Angeles or anywhere else in the world, for that

14   matter, she would be paid just as much as if she

15   had been working in New York, correct?

16          A.    Yes.

17          Q.    And you would pay Ms. Robinson for

18   days she worked for you regardless of where she

19   performed the work, right?

20          A.    Yes.

21          Q.    And there were times when

22   Ms. Robinson performed errands for you in

23   London, right?

24          A.    Yes.

25          Q.    And if you knew Ms. Robinson was



Page 502

1  going to be in London, were there specific kinds

2  of errands you had her run for you while she was

3  there?

4         A.    I don't know.   There were things

5  that she would do that -- you know, there was a

6  writer who was writing a book and wanted to

7  write a book about one of my films, and I met

8  him.

9              And we had that -- she brought him

10  to the hotel and we spoke, and that relationship

11  started.   That was stuff she was supposed to do

12  and she did, yes.

13         Q.    And in London, Ms. Robinson scouted

14  antique stores for you, didn't she?

15         A.    She did, yes.

16         Q.    And while in London, Ms. Robinson

17  picked up items at antique stores for you,

18  didn't she?

19         A.    She probably did, yes.

20         Q.    At this point, you don't have any

21  ability to remember whether or not Ms. Robinson

22  was working on a particular day in 2014, do you?

23         A.    No.   I don't even know what your

24  question is.   About a particular day in 2014?

25  What does that mean?



Page 503

1          Q.   I mean if Ms. Robinson said she was
2    working on May 1, 2014, you wouldn't be able to
3    say yes or no to that sitting here today?
4          A.   Well, one, unless something is
5    described to me to help jog my memory.
6          Q.   Right.
7               If Ms. Robinson ended up working on
8    a day that she was supposed to be on vacation,
9    would you treat that as a working day or a
10   vacation day?
11                   MR. DROGIN:  Objection to the
12            form.
13                   I'm going to direct the witness
14            not to answer.
15                   I'm going to ask counsel to stick
16            to the topics that he represented to the
17            court that he needed additional time to
18            cover.
19                        (Whereupon, the transcript
20                   was marked for a direction not to
21                   answer.)
22                   MR. SANFORD:  The court has
23            clearly -- we can go off the record,
24            Laurent, and talk about what the court
25            did and what the court order is and what



1      topics are still out there.

2             The court ordered that we not

3      cover certain topics, which I'm not

4      doing.  But that doesn't mean you get to

5      direct not to answer any questions you

6      don't like.

7             MR. DROGIN:  Let's find out from

8      the court because you made

9      representations both in your letter and

10     verbally as to what you felt you didn't

11     have time to cover, and you limited it.

12            You said the fraud claim, which

13     is withdrawn.  You said communications

14     with the Manhattan District Attorney's

15     Office, which you asked one or two

16     questions.

17            MR. SANFORD:  Laurent, Laurent, I

18     don't want to take time in this

19     deposition to do this.  Why don't we go

20     off the record and have a conversation.

21            MR. DROGIN:  Well, why don't we

22     call the court and we can talk about

23     clarification.  I don't want to go off

24     the record because we are going to waste

25     time.



Page 505

```
 1                    MR. SANFORD:  It is my
 2           deposition, so we're going off the
 3           record right now.  So let's go off the
 4           record.  I'm happy to have a
 5           conversation with you.  You're not going
 6           to eat up time in my deposition.  You're
 7           not doing it.
 8                    We are going off the record.
 9                    MR. DROGIN:  You are taking up
10           time by going off the record.  Let's
11           call the court.  We're clearly off the
12           record.
13                    MR. SANFORD:  You're just talking
14           over me.
15                    We're going off the record now.
16                    THE VIDEOGRAPHER:  The time is
17           12:00 o'clock p.m.
18                    We are going off the record.
19                         (Whereupon, at 12:00 o'clock
20             p.m., a recess was taken until 12:07
21             o'clock p.m.)
22                    THE VIDEOGRAPHER:  The time is
23           12:07 p.m.
24                    We are back on the record.
25
```



Page 506

```
 1   BY MR. SANFORD:
 2         Q.    All right.
 3               Mr. DeNiro, you understand you're
 4   still under oath?
 5         A.    Yes.
 6         Q.    All right.
 7               If Ms. Robinson ended up working on
 8   a day that she was supposed to be on vacation,
 9   would you treat that as a working day or a
10   vacation day?
11                   MR. DROGIN:  Objection to the
12            form.
13         A.    I would -- if she said it was a
14   vacation day and she is working, I would say
15   "Okay.  Then you know what you do.  You charge
16   me for the time that you're working."
17               She -- what I have always noticed is
18   that she was always working, always working,
19   doing this, doing that, always kind of
20   intimating to everybody how hard she worked.
21               I said okay.  She was charging me.
22   I paid her well.  Probably more than I should
23   have, but I said okay.
24               So what can I say?  If she tells me
25   she is working or she claims she is working, I
```



1   take her at her word.  I'm not going to say "I
2   don't believe you and I'm not going to pay you."
3           I'm not going to haggle with her.
4   This is the honor system.  I trust her.  The
5   whole point is you have somebody in her
6   position, you have to trust her.
7   BY MR. SANFORD:
8       Q.   So if Ms. Robinson ended up working
9   on a day that she was supposed to be on
10  vacation, you would not require her to use up
11  one of her vacation days, would you?
12          MR. DROGIN:  Objection to the
13      form.  Objection to the form.
14          Can you define what you mean by
15      working?
16  BY MR. SANFORD:
17      Q.   Do you understand the concept of
18  what it means to work, Mr. DeNiro?
19      A.   I do.  But she claimed a lot of
20  vacation days that she gave up that she was
21  always working.  So, I mean, I don't know what
22  she did.
23          Again, I trusted her.  She could
24  have done a couple of things and said "I was
25  working today.  I gave up my vacation today on



1  top of it, so I'm owed a vacation day."

2         She, to me, as I learned as time

3  went on, finagled a little bit, schemed a

4  little.  Okay.  You know, even that I will

5  allow.

6         But there is a point where you just

7  are doing too much.  You're overreaching too

8  much, taking advantage too much.  And you get

9  tired of it.  That's all.  So that's why I was

10  relieved when she, she resigned.

11        Q.   But if she wound up working on a day

12  she was supposed to be on vacation, and working

13  as you understood work to be, you would not

14  require her to --

15        A.   She rarely told me that, "Oh, I

16  should be on vacation today, but I'll work now

17  that you asked me to do this or that."

18        I left it up to her totally.  She

19  decided her work hours.  She decided everything.

20  And I trusted her.  Do you understand?  Do you

21  understand what that means?

22        Q.   Mr. DeNiro -- and I trust you to be

23  faithful to this process and that means --

24        A.   Yes, I'm being faithful.  I'm

25  answering your question.  What more do you want?



```
 1          Q.   That means -- well, what I want is
 2     for you not to interrupt me.  That's really what
 3     I want.
 4          A.   Oh, sorry.
 5          Q.   No, and you know what, I don't even
 6     care if you interrupt me.  If we were just out
 7     for dinner and you kept interrupting me, I would
 8     be okay with that.
 9               But here is what I'm not okay with.
10     If you're interrupting me, the court reporter
11     can't get a clear record and we're going to have
12     a mishmash in the record.
13          A.   Okay.
14          Q.   I'm just trying to do this for the
15     process.
16               Okay.
17               So let me just finish my question.
18               If Ms. Robinson ended up working on
19     a day she was supposed to be on vacation, you
20     would not require her to use up one of her
21     vacation days?
22                    MR. DROGIN:  Objection to the
23               form.
24          A.   I'm sorry.  If she said she was
25     working and that it was now -- and was working
```



Page 510

```
 1   on her vacation day, as I said, I would say
 2   okay, you're the one -- you decide.  You tell
 3   me.  Period.
 4              MR. SANFORD:  All right.
 5              Can we show Exhibit 49?
 6              MR. BENNETT:  Bob, it is going to
 7         be in the chat.
 8              THE WITNESS:  So what do I do?
 9              MR. BENNETT:  If you can, on your
10         screen, there should be a way to access
11         the chat and then you'll see a document
12         show up in there.
13              THE WITNESS:  I don't know.
14         Which symbol is the chat?  Let's see.  I
15         don't see it.
16              MR. DROGIN:  Here, let's move
17         forward.  Here it is.
18              MR. SANFORD:  All right.
19              You're screen sharing?
20              MR. DROGIN:  Bob, can you see
21         that?
22              THE WITNESS:  Yes.
23   BY MR. SANFORD:
24         Q.   All right.
25              There you go.
```



 1            Can you just take a look at that and
 2     when you're done, let me know and I've got a
 3     couple questions.
 4          A.    Well, I guess this is a bonus for
 5     Kaplan, Gillian, I guess.  I'm not sure what
 6     these are.   Lulu.
 7               MR. DROGIN:  There's no question,
 8          actually.
 9          A.    Yes, I don't know.  This is what it
10     looks like it would be, I guess.  I don't know.
11     I don't see the bottom of it.
12     BY MR. SANFORD:
13          Q.    We have to scroll.  Are you
14     scrolling down there?
15          A.    Yes, okay.
16               Okay.  All right.
17               These look like, I guess, things
18     that would be for Christmas, I guess.  It is
19     around that time, so yes.  So what do I do?
20          Q.    All right.
21               So Exhibit 49, this is Exhibit 49,
22     contains e-mails that you received from
23     Ms. Robinson, correct?
24               MR. BENNETT:  Bob, he has only
25          looked at page one.  So, Bob, it is an



```
 1          eight-page document.  Laurent will flip
 2          through the rest of the pages.
 3                  THE WITNESS:  Oh, these are eight
 4          pages?  Wait a second.
 5                  MR. SANFORD:  Simon, why don't
 6          you screen share.
 7                  Laurent, if you can take yours
 8          off, please.
 9                  MR. DROGIN:  Yes, sure thing.
10                  MR. SANFORD:  So we can better
11          orchestrate this for efficiency.  I
12          thought Simon was doing it.
13  BY MR. SANFORD:
14          Q.   All right.
15               Now, let's go down.  All right.
16               Can you scroll down here?
17          A.   Can you slow up now?  This is
18  starting to be the pages that I haven't seen.
19          Q.   All right.
20               Scroll down because I'm going to ask
21  you questions about it.
22          A.   Okay.
23               Scroll down.  Let me take a minute.
24               Okay.  Keep going.
25          Q.   Keep going down.  Keep going down.
```



```
 1          A.    Can you slow down a little, please?
 2                All right.  These are what?
 3          Q.    And so, it says "Hi, Michael.  Below
 4    are the bonuses and vacation payback numbers for
 5    this year."
 6          A.    We're going back a couple of years,
 7    each one.  Now this is 2017.
 8          Q.    '17.
 9          A.    Okay.  Let me just read this.
10    Sorry.
11          Q.    So, let's stop here.
12                You have vacation day payback.  What
13    does that term mean, vacation day payback?
14          A.    Well, what it means to me is that
15    she wanted payback for days that she worked on
16    her vacation, which I totally believed her on.
17    I had no reason to not believe her.  I trusted
18    her.
19          Q.    Okay.  All right.
20                Keep going down.  Keep going down.
21    All right.
22                Did you ever --
23          A.    I don't -- I mean --
24          Q.    Okay.
25                Generally speaking, these are
```



1    e-mails that you received from Ms. Robinson at

2    year's end discussing the bonuses and other

3    year-end pay that Canal employees would be

4    receiving, right?

5           A.    Uh-hum.

6           Q.    Is that yes?

7           A.    Say that again, I'm sorry.

8           Q.    These are e-mails that you received

9    from Ms. Robinson at the year's end discussing

10   the bonuses and any other year-end pay that

11   Canal employees would be receiving, right?

12          A.    Right, right.

13          Q.    And before you received these

14   e-mails from Ms. Robinson, you and Ms. Robinson

15   would go over the bonuses and other year-end pay

16   that Canal employees would be receiving, right?

17   You would meet with her to discuss it?

18          A.    Yes.

19          Q.    And at the end of each year, you and

20   Ms. Robinson would have a phone call or

21   in-person meeting to go over bonuses and

22   vacation payback that Canal employees would be

23   receiving for the year, right?

24          A.    Right.

25          Q.    Can you describe for me the



Page 515

 1   discussions you and Ms. Robinson would have at

 2   the end of each year about the bonuses and

 3   vacation payback that Canal employees would be

 4   receiving?

 5              MR. BENNETT:  During a 16-year

 6          period of time or what year?

 7   BY MR. SANFORD:

 8        Q.   Generally speaking, to the extent

 9   you remember any of the conversations in any

10   year, you can describe that.

11        A.   There would just be a conversation

12   about who was getting what for Christmas and

13   bonus, this and that, this and that, and that

14   would be it.  And I would say okay, okay.  I

15   might question something here and there.

16              Rarely did I question anything.  I

17   would said okay, it looks okay to me, and that

18   was it.

19        Q.   All right.

20              And during these year-end

21   discussions, Ms. Robinson would walk you through

22   the work she has done through the year during

23   vacations and the holidays, right?

24              MR. DROGIN:  Objection to form.

25        A.   Well, she would say I did this,



1 these are the days I want, like it shows here.

2 She didn't go into specifics of each day of what

3 I did on this day or that day; that's why I'm

4 entitled, I don't think.

5           I mean, maybe from time to time she

6 might have, saying "Oh, I worked, you know" -- I

7 don't remember.

8           Basically I just said, "Look, if

9 this is what you did and this is what you're

10 telling me you did, then fine.  I accept that.

11 I might have a question here and there, but I

12 trust you."  Period.

13 BY MR. SANFORD:

14      Q.   All right.

15           During these year-end discussions,

16 you and Ms. Robinson would reach an agreement

17 regarding how many unused vacation days she

18 should be paid out for, right?

19      A.   Well, sort of.

20           MR. DROGIN:  Objection to the

21      form.

22           Go ahead.

23      A.    It was even more loose than that.

24 She would say "These are my unpaid vacation

25 days."



1          And I would say "Okay.  That's it.

2    All right.  I'm taking you at your word."

3    Period.

4    BY MR. SANFORD:

5          Q.   Well, during these year-end

6    discussions, you had the opportunity to ask

7    Ms. Robinson any questions you had about her

8    unused vacation days?

9          A.   I had the opportunity and I also --

10   in a job like hers, the main thing is that you

11   can trust the person who works for you in such a

12   position because you don't have time to go over

13   a lot of things.

14          It is the No. 1 thing that that

15   person be trusted and -- that simple.

16   Honorable.  It is assumed that there's nothing

17   to distrust about them.  Period.

18          Q.   During Ms. Robinson's employment,

19   you were able to follow up on any --

20          A.   It is like -- it is like the

21   military guy that carries the suitcase next to

22   the president walking.  You know what I mean?

23   You trust that person.  I'm half kidding, but I

24   trust her to do the right thing.  Period.

25          Q.   During Ms. Robinson's employment,



1  you were able to follow up on any of the

2  information Ms. Robinson provided to you about

3  her unused vacation days?

4          A.   I could, I could follow up on it,

5  and if I had to -- if I found there was a

6  discrepancy, of course I would.

7              That's why when she resigned, Tom

8  Harvey went back into looking into the certain

9  things she had claimed and not given back to me

10  and had helped herself to, I guess you could

11  say, and then there was a problem.

12          Q.   And turning your attention back to

13  the e-mails in Exhibit 49 on the screen, during

14  Ms. Robinson's employment, did you ever dispute

15  anything that Ms. Robinson wrote in these

16  e-mails?

17              MR. DROGIN:  Objection.

18          A.   Very little.  Again, I would say it

19  goes back to trust.  I said look, you say this,

20  I'm not going to call it out unless I feel

21  there's something -- I said, wait a minute.  I

22  don't remember.  That's not what I was going to

23  do.

24              I needed her total support.  I

25  needed to trust her totally.  That's the whole



1   point with a position like this.  Period.

2   BY MR. SANFORD:

3        Q.   And after Ms. Robinson sent these

4   e-mails, did you follow up with her in any way

5   about her vacation days?

6        A.   No, I didn't.  I again trusted her.

7   I said "This is what you say.  This is what I am

8   assuming that you have done.  I have no reason

9   not to trust you and say what you say you have

10  done."

11       Q.   And if you had disagreed with

12  anything in this Exhibit 49 in these e-mails,

13  you could have directed your accountant not to

14  issue payments, right?

15       A.   I could have done that, but I don't

16  get into that kind of minutia type thing.  We

17  have worked it out.  I trust her.  She is in

18  that position, and when she tells me something

19  like that, I expect that it is going to be

20  honorable.  It is going to be just.  It is going

21  to be right.  She is going to do the right

22  thing.  I can trust her.  Again, back to trust.

23  It is built into the relationship.

24       Q.   When Ms. Robinson wrote in 2015 that

25  she had used one vacation day, you were aware



Page 520

1    that Ms. Robinson had traveled outside of New

2    York that year, right?

3            A.    Uh-hum.

4            Q.    Is that a "yes"?

5            A.    Yes, she had traveled.  I don't know

6    what you're trying to say or what you were

7    trying to ask.

8            Q.    Well, you were aware that

9    Ms. Robinson had performed work for you when she

10   had been away from New York that year, right?

11           A.    Again, I always trusted that she is

12   going out.  She's working for me.  She's doing

13   things that even though she is out of the city,

14   she is working for me.  I don't know, unless

15   you're saying she wanted to work in Spain or

16   London or in California.

17               So basically she -- whatever days

18   she took off were up to her.  She knew the time

19   she had to work for me was basically the

20   weekdays.  If she did something on the

21   weekend -- however she did it, I trusted her.  I

22   said "Okay, you tell me."

23           Q.    All right.

24               Likewise, when Ms. Robinson wrote in

25   2014 that she had used three vacation days, you



1   were aware that Ms. Robinson had traveled

2   outside of New York that year, right?

3          A.   I don't know what you're asking.  So

4   she went outside of New York.  So what?  She

5   went outside supposedly to work for me.

6          Q.   And you were aware that Ms. Robinson

7   had, in fact, performed work for you when she

8   had been away from New York that year; is that

9   right?

10         A.   There were times when she said she

11  was going on vacation, and she sent me

12  photographs of an inn she went to, as I say,

13  outside of London and that was a vacation.  She

14  didn't work for me, as far as I remember, on

15  those days.  She sent me pictures where she was,

16  but that was it.

17              I don't know whether she charged me

18  for those days.  She could have.  I don't know.

19  Again, it is the trust factor.  I just assumed

20  that she is doing what she should be doing.  She

21  should be charging me when she is working,

22  telling me when she is not working or that she

23  is working on a day that she shouldn't be

24  working and, therefore, I should be paid for it.

25  That's all.



Page 522

```
 1                    I don't even ask her that sometimes.
 2      I trust her inherently to do the right thing.
 3      Period.
 4           Q.    Right.
 5                    And so, you trusted her when she
 6      told you she was working on certain days, you
 7      trusted, in fact, that she was working on those
 8      days?
 9           A.    I took her at her word, yes.
10                    MR. DROGIN:  Objection to the
11             form.
12                    Go ahead.
13      BY MR. SANFORD:
14           Q.    Is that yes, Mr. DeNiro?
15           A.    I took her at her word.
16           Q.    And you have no reason to believe
17      and you never had any reason to believe that she
18      lied about working when she said she was
19      working, correct?
20                    MR. DROGIN:  Objection to the
21             form.
22           A.    Listen, only she knows that.  I
23      can't say.  Whether she lied or not is her
24      business.  Even if she fudged it on a day, I
25      said "You say it; I honor it."  Period.
```



Page 523

1    BY MR. SANFORD:

2         Q.   And so, likewise, when Ms. Robinson

3    wrote in 2016 that she had used zero vacation

4    days, you were aware that Ms. Robinson had

5    traveled outside of New York that year, right?

6         A.   Of course I was aware.  If she went

7    out, she went out.  She told me.  I don't know

8    what the question is.

9         Q.   All right.

10              And you were aware that Ms. Robinson

11   had performed work for you when she had been

12   away from New York that year, right?

13        A.   What year are we talking about?

14        Q.   2016.

15        A.   If she is away and she is working

16   and she has to be working for me -- she is away.

17   I don't know where she was that time;

18   California, Spain, England, wherever.

19        Q.   I'm just saying when she said she

20   was working, you have no reason to doubt it?

21        A.   No, I have no reason to doubt.

22        Q.   Okay.

23              And when Ms. Robinson wrote in 2017

24   that she had used zero vacation days, you were

25   aware that Ms. Robinson had traveled outside of



1 New York that year, right?

2       A.   Yes, I'm always aware she is out.  I

3 don't understand what the question is.

4       Q.   Well, you were aware that

5 Ms. Robinson had performed work for you when she

6 had been away from New York that year?

7       A.   She was always claiming to work for

8 me when she was away.  She asked if she could go

9 away and she could do the work just as well from

10 overseas or in California as if she would be at

11 my house or at my office.  So I said okay.

12       Q.   And likewise, you had no reason to

13 doubt her when she claimed that she was working

14 during the times that she was outside of New

15 York?

16       A.   No, I had no reason to doubt her.

17 Again, the honor system.

18       Q.   And when Ms. Robinson wrote in 2018

19 that she had used zero vacation days, you were

20 aware that Ms. Robinson had traveled outside of

21 New York that year, right?

22       A.   I'm not understanding what you're

23 saying.  Of course I am aware she has traveled

24 outside.

25       Q.   Okay.



Page 525

```
 1              And you were aware that Ms. Robinson
 2    had performed work for you when she had been
 3    away from New York in 2018?
 4         A.   Yes, but she is going away, doing
 5    stuff.  I'm taking her at her word.  Is there a
 6    day or two or here or there that she does
 7    something for herself and it is not work?
 8    That's okay.  She just has to discern what is
 9    work and what isn't, even if it is broken up in
10    a day.  I don't know that.
11              Again, it goes back to my taking her
12    at her word.  So she traveled.  She asked me if
13    she could.  I said "Okay, as long as you can do
14    the work you can do for me."
15              She says now "I took zero days off."
16    So she went over there and worked.  I'm taking
17    her at her word she worked every day and never
18    took a vacation though she was in a place that
19    is kind of a working vacation.  But I accepted
20    that.
21              I said "Fine, you know, go over
22    there.  Just as long as I get what I need from
23    you, I'm fine," even though, you know, it is a
24    little -- you could question it.
25              But I wasn't questioning it.  I was
```



1    not.  I just said "If you have to go there to do

2    it, fine.  And you tell me what the working

3    hours are."  Period.

4          Q.    And you had no reason to believe

5    that when she claimed she was, in fact, working

6    in 2018 outside of New York, that she was, in

7    fact, working?  You had no reason to doubt her?

8          A.    No, I had no reason not to believe

9    her at all.  Yes.

10         Q.    Okay.

11         A.    Again, the trust factor.

12               MR. SANFORD:  Yes, we're sharing

13          a document with you in the chat that's

14          Bates stamped ROBINSON 9966 to 9967.

15          This is Exhibit 139.

16               So do we have that up on the

17          screen share, Simon?  Yes, we do.

18               All right.  Good.

19               Can you make that bigger so we

20          all can see?  I don't know about

21          Mr. DeNiro's eyes but ...

22               THE WITNESS:  Yes, I can see it.

23               (Document bearing Bates

24          stamp ROBINSON 9966 through 9967 was

25          marked as Plaintiff's Exhibit 139



Page 527

1              for identification, as of this

2              date.)

3    BY MR. SANFORD:

4         Q.    Okay.  All right.

5         A.    So what are you saying on this?

6         Q.    Let's scroll down so you have an

7    opportunity to see what it is.

8         A.    Yes, I see, yes.

9         Q.    And what is this document marked as

10   Plaintiff's Exhibit 139?

11        A.    Well, again, she is claiming she

12   used zero of 23 vacation days.  Again, I take

13   her at her word.

14             MR. SANFORD:  Okay.

15             All right.  We can take that

16         down.

17   BY MR. SANFORD:

18        Q.    When Ms. Robinson accused you of

19   discrimination and other violations of

20   employment laws, did that break your trust?

21        A.    It doesn't break my trust.  It just

22   makes me wonder because it seems like it is a

23   way of claiming something that is really not, as

24   far as I'm concerned, the case.

25             And I know you have interviewed



```
 1   other employees of mine and so on, and I don't
 2   think any of them would ever say -- would go
 3   along with what she is claiming because I just,
 4   you know -- what can I say?  I'm not -- I don't
 5   know.
 6         Q.   So when Ms. Robinson accused you of
 7   discrimination it made you angry, right?
 8         A.   Yes, right.  She accused me of --
 9   well, it would make me angry.  If I did get
10   angry if she accused me of discrimination.  I
11   personally think that she has mental -- I don't
12   want to go so far as to say mental issues, but
13   she has psychological issues and a sense of
14   entitlement and a blown-up sense of self that
15   makes her feel that she has been put upon in
16   some way and, therefore, she feels that she is
17   kind of like a victim.
18              And, I'm sorry, she wasn't a victim.
19   She victimized a lot of the other employees
20   because they resented her and overstepped.
21              But again, my fault.  I apologized
22   to them for not keeping my eyes open to that
23   situation, and I hope to never have that again
24   ever with an employee.
25         Q.   When Ms. Robinson accused you of
```

Page 529

1   discrimination and other violations of
2   employment laws, did that cross a line for you?
3        A.   Well, yes, it would cross a line
4   because it is not true.
5        Q.   Are you aware of any aspects of
6   Canal's investigation into Ms. Robinson that
7   Canal employee Michael Kaplan was not involved
8   with?
9             MR. DROGIN:  Objection to the
10            form.
11       A.   I'm not, I'm not clear what you're
12   asking.
13   BY MR. SANFORD:
14       Q.   Was Michael Kaplan involved in all
15   aspects of Canal's investigation into
16   Ms. Robinson, to your knowledge?
17       A.   I don't know that.  I don't have
18   that answer.
19       Q.   Was Sabrina Weeks-Brittan involved
20   in all aspects of Canal's investigation into
21   Ms. Robinson?
22       A.   Well, she was asked to find stuff
23   and go through all the e-mails and stuff like
24   that, as far as I know.
25             And Sabrina is quite, quite a



Page 530

1  special person and very thorough.  She doesn't

2  ask for much.  She does things and she is good.

3        Q.    So, to your knowledge, Sabrina

4  Weeks-Brittan was involved in all aspects of the

5  investigation?

6        A.    Well, you say involved.  They asked

7  her to look up things.  Since they worked for

8  the company, she was the person who would be

9  asked to do that.

10        Q.    And was Gillian Spear also involved

11  in all aspects of Ms. Robinson's investigation?

12        A.    She could have been involved.

13        Q.    Just so we're clear on the record,

14  was Gillian Spear involved in all aspects of the

15  investigation?

16        A.    I don't know all aspects.  I don't

17  know that.  But she could have been enlisted to

18  look up old e-mails that needed to be found,

19  yes.

20        Q.    Do you know how it came to be that

21  Canal employees, Kaplan and Spear and

22  Weeks-Brittan came to review all of the charges

23  on the Canal American Express in Ms. Robinson's

24  name?

25              MR. DROGIN:  Objection to the



Page 531

```
 1              form.
 2              A.   Well, what's wrong with that?  If
 3    I'm being accused of something by her -- she has
 4    stolen from me.  I am going to enlist their
 5    services, they work for me, to find out and to
 6    comb through all the e-mails and present them to
 7    my lawyers so they can look for what they should
 8    be looking for that.  What's wrong with that?
 9    BY MR. SANFORD:
10              Q.   I'm not making any comment about
11    right or wrong.
12              A.   I don't know what's wrong with that.
13              Q.   I'm just asking questions.
14              So, did you direct them to review --
15    did you direct Kaplan and Spear and
16    Weeks-Brittan to review all of the charges on
17    the American Express --
18              Mr. DeNiro, just for the record, I'm
19    sorry, we just have to keep a clean record.
20              Did you direct Kaplan and Spear and
21    Weeks-Brittan to review all the charges on the
22    Canal American Express in Ms. Robinson's name?
23              MR. DROGIN:  Objection.
24         Objection to the form.
25              Go ahead.
```



Page 532

```
 1          A.   My attorneys enlisted their services
 2  because they're the people that know.  I'm not
 3  going to go through every e-mail.  But they
 4  will, and that's what they do.  And they sent --
 5  some of those e-mails are sent by them.  They're
 6  involved.  They're the people who should be
 7  looking through them and giving us what we need.
 8  BY MR. SANFORD:
 9          Q.   As part of Canal's investigation
10  into Ms. Robinson, no one communicated with you
11  to determine what work Ms. Robinson was doing
12  for Canal at the time of each credit card
13  charge, right?
14               MR. DROGIN:  Objection to the
15        form.
16          A.   Say that again.
17               MR. DROGIN:  Objection to the
18        form.
19  BY MR. SANFORD:
20          Q.   As part of Canal's investigation
21  into Ms. Robinson, no one communicated with you
22  to determine what work Ms. Robinson was doing
23  for Canal at the time of each credit card
24  charge, right?
25               MR. DROGIN:  Same objection.
```



Page 533

 1  BY MR. SANFORD:

 2        Q.   The idea is that there is a credit

 3  card charge and there's work that is being done

 4  by Ms. Robinson, and my question relates to the

 5  work and the credit card charge, right.

 6             No one communicated with you to

 7  determine what work, if any, Ms. Robinson was

 8  doing with respect to any given credit card

 9  charge.  You didn't have conversations about

10  that, did you?

11        A.   Well, no, I wouldn't.  Again, if

12  Chase Robinson had done this and said this is

13  what she is doing it for, I would say, "Okay, I

14  take you at your word."

15        Q.   And you didn't have conversations

16  with anyone about what work, if anything -- if

17  any work, Ms. Robinson was doing on her vacation

18  days, correct?

19             MR. DROGIN:  Objection to the

20        form.

21        A.   Can you ask that again?  I'm sorry,

22  I don't understand.

23  BY MR. SANFORD:

24        Q.   Did you talk to anyone at all about

25  whether or not Ms. Robinson was working on



Page 534

```
 1   vacation days when Ms. Robinson said she was
 2   working on vacation days?
 3         A.   No, I wasn't -- if you're saying was
 4   I checking up on her to see if she was telling
 5   the truth about that, no.  No.
 6              Again, I trusted Chase Robinson,
 7   what she said.  You say it, I'm okay with it.
 8         Q.   And you didn't talk to anyone about
 9   the work Ms. Robinson was doing during the
10   so-called binge watching of NetFlix, right?
11         A.   Say that again.
12         Q.   You allege that Ms. Robinson was
13   binge watching NetFlix.
14         A.   Well, that's what I heard.  That's
15   what I heard, yes.
16         Q.   Who did you hear that from?
17         A.   I forget who told me.  Somehow it
18   came out.  Maybe it was on the records that she
19   had watched all this stuff that came out in some
20   of the account stuff and maybe that account --
21   whatever it was, maybe I paid for that.
22              So I -- so they were making me aware
23   that you paid for 20 hours or 15 hours or
24   whatever she did watching that show.
25              Look, I'll even go so far as to say
```



Page 535

1    maybe she was watching the show while she was
2    doing work for me.  What can I say?  But there
3    are other things that she did much worse than
4    that.  That's whatever it is.
5              My point is get the job done, do
6    whatever you want.  You can jump from building
7    to building around the city.  As long as you get
8    the work done for me, fine.
9         Q.   Did you speak with anyone about what
10   travel you authorized Ms. Robinson to take in
11   2019?
12        A.   I didn't speak to other people in
13   the office about it.
14        Q.   As part of Canal's investigation
15   into Ms. Robinson, what information did you
16   provide concerning Ms. Robinson's trip to
17   Los Angeles in March of 2018?
18        A.   I didn't have the information.
19   She -- in the paper trail and the credit card
20   stuff and all that, the information was
21   documented.  I didn't have any information.
22             I'm just -- again, I'm working on
23   trust.  She is taking care of all that stuff,
24   and the other kids in the office, but basically
25   her.  She is the point person.  So I'm relying



Page 536

1    on her to tell the truth.  Period.

2         Q.    Did Canal employee Michael Kaplan

3    ever steal from Canal?

4         A.    I'm not sure.

5         Q.    Did Michael Kaplan ever engage in

6    any financial wrongdoing at Canal?

7         A.    I don't know that.

8         Q.    Were there any allegations that

9    Mr. Kaplan engaged in financial wrongdoing?

10        A.    I have -- there were like thoughts,

11   but I don't really know.  I could never prove it

12   and I don't know.

13        Q.    Who had the thoughts?

14        A.    What?

15        Q.    Who thought it?

16        A.    I thought it.

17        Q.    Why did you think it?

18        A.    I just felt with he and Chase, there

19   was some gray areas of stuff that I wasn't sure.

20   I was never given a straight answer even by

21   them, and I just -- you know, fine.

22        Q.    Did anyone ever raise concerns about

23   what they did?

24        A.    Only they know what they did and

25   what they did or didn't get away with.  I don't



Page 537

1    know that.  Everything is fine but, you know, I

2    don't know.

3         Q.   Did anyone ever raise concerns about

4    Michael Kaplan's financial wrongdoing to you?

5         A.   It was thought of mainly by me.  I

6    was, I was just concerned.

7         Q.   And why were you concerned?  What

8    gave rise to a concern for you?  What happened?

9         A.   I don't know.  I just was not -- I

10   just was not -- I just -- I don't know why.

11   Michael has always not done things the way I was

12   most happy with.  He was good in some areas and

13   not in others.  Took his time.

14            Again, he was another person that I

15   trusted.  He didn't always do when I needed it

16   or how I needed it, and after a while I just got

17   tired of that.

18        Q.   When you say it was mainly by you,

19   who else had concerns about Mr. Kaplan?

20                 MR. DROGIN:  Objection to the

21             form.

22                 Can we talk about a time period?

23   BY MR. SANFORD:

24        Q.   At any time during Mr. Kaplan's

25   employ at Canal.



Page 538

```
 1          A.    Well, we had -- my girlfriend
 2   Tiffany had a question about that.  She thought
 3   there were some things -- she looked at things
 4   and felt that there was -- she said, "Well, you
 5   know, I'm not sure, but I'm wondering about
 6   this."
 7          Q.    What did Tiffany, your girlfriend,
 8   look at to give rise to concerns?
 9          A.    I forget what sort of things he was
10   supposed to do and then said well, if you were
11   supposed to do this, why didn't you do this or
12   somehow things don't add up.
13          Q.    Was there an allegation that
14   Mr. Kaplan, for example, was dipping into the
15   petty cash?
16          A.    I wouldn't go so far as to say that.
17   I can't say that.
18          Q.    And was there any investigation that
19   you or anyone conducted into these allegations
20   about wrongdoing by Mr. Kaplan?
21               MR. DROGIN:  Objection to the
22           form.
23               You can answer.
24          A.    Listen, that I won't know about.
25   You know, I don't know.  I don't even know with
```



Page 539

1    Chase what certain liberties were taken.  But,

2    you know --

3    BY MR. SANFORD:

4         Q.   I'm just talking about

5    investigations.  I'm not talking about

6    liberties.

7              Was there any investigation, to your

8    knowledge, into allegations of wrongdoing by

9    Mr. Kaplan?

10        A.   I don't know if there was an

11   investigation, if it went that far.  I don't

12   think he was the target of any investigation.

13   Just a general looking at everything and asking.

14             But there was never, as far as I

15   know, anything like that.

16        Q.   Besides conversations you had with

17   Tiffany about Mr. Kaplan's wrongdoing, did you

18   have conversations with anyone else about

19   Mr. Kaplan?

20             MR. DROGIN:  Objection to the

21        form.

22             Can you read the question back,

23        please?

24   BY MR. SANFORD:

25        Q.   Yes, sorry.  That was -- let me be



Page 540

1    as clear as I can be.  Thank you.

2              Did you speak with anyone else

3    besides Tiffany about allegations of wrongdoing

4    relating to Mr. Kaplan?

5        A.    I spoke to -- possibly I spoke to

6    Michael Tasch about it and Tom Harvey and said,

7    you know, if there was ever any wrongdoing, all

8    I want to know is what happened, what it was.

9    I'm not going to do anything.  I just want to

10   know the truth and that's it.

11             I never got -- I never got an answer

12   or straight answer or anything.  So that was

13   that.  I said okay.

14       Q.    You asked them to find out what went

15   on and you never got a straight answer?

16       A.    I never really got a clear answer,

17   no.

18       Q.    Were you satisfied with that?

19       A.    No, not really.

20       Q.    What did you do about it?

21       A.    Nothing, really.

22       Q.    To your knowledge, did anyone at

23   Canal attempt to identify the period of time

24   when Mr. Kaplan engaged in financial wrongdoing?

25             MR. DROGIN:  Objection to the



Page 541

```
 1              form of the question.
 2         A.   No, I don't, I don't know.
 3  BY MR. SANFORD:
 4         Q.   Did anyone at Canal attempt to
 5  calculate the total amount that Mr. Kaplan
 6  improperly obtained from Canal?
 7              MR. DROGIN:  Objection to the
 8         form.
 9              This is absolutely absurd.  This
10         is not what --
11              MR. SANFORD:  I'm moving on.  I
12         just wanted to get an answer.  You
13         interrupted the witness.  So, you can
14         lodge your objection, but please let the
15         witness answer.
16              MR. DROGIN:  There's no
17         foundation for your questions.  And
18         you're attempting to imply wrongdoing
19         when the witness hasn't indicated there
20         is any.  So you're just making stuff up
21         now.
22              You can try to use, this, you can
23         try to use this in your motion all you
24         want, but it is a completely
25         inappropriate line of questioning
```



Page 542

```
 1              because there's no foundation.  You're
 2              putting words in the witness's mouth
 3              when he's not putting it forward.
 4                   MR. SANFORD:  I'm asking
 5              Mr. DeNiro a question.
 6                   Let's share a document with
 7              Mr. DeNiro in the chat that's Bates
 8              stamped CANAL 48784 to 48787, and we
 9              have previously identified this document
10              as Plaintiff's Exhibit 99.
11                   For the record, this is a May 18,
12              2019 text conversation between Tiffany
13              Chen and Robert DeNiro.
14                   And let's go to page 4.  Can you
15              bring that up?
16    BY MR. SANFORD:
17         Q.   Can you read that, Mr. DeNiro?
18         A.   Yes, I can read it.
19         Q.   Okay.
20              Let me know when you're done,
21    Mr. DeNiro, if you would.
22         A.   Okay.
23              Who is this from?
24         Q.   All right.
25              Well, do you recognize this
```



Page 543

1    document?

2         A.   I don't, but that doesn't mean that

3    I didn't read it at the time, so...

4                   MR. SANFORD:  All right.

5                   So Mr. DeNiro can see the chain

6              who is this from, can you go up to

7              identify that so we're clear?

8    BY MR. SANFORD:

9         Q.   ████████████████████

10        A.   Okay.

11        Q.   -- so whose number is that?

12        A.   That's Tiffany's.

13        Q.   All right.

14             So this is Tiffany Chen to you,

15   correct?

16        A.   Yes.

17        Q.   All right.

18             And so, if we could go back to the

19   document and highlight the bottom part starting

20   with "I know he has been dipping into the petty

21   cash."

22        A.   Uh-hum.

23        Q.   Just doing this to refresh your

24   recollection about the issue.

25             What type of expenses did Mr. Kaplan



Page 544

```
1    improperly charge to Canal, to your knowledge?

2            A.   I'm not sure.  I'm not sure.

3            Q.   And do you know, had Michael Kaplan

4    been taking money from petty cash for personal

5    use?  Does this refresh your recollection?

6            A.   I don't know specifically, but I

7    know he had charged petty cash.  So there was,

8    you know, some thought, well, what's happening

9    with that?

10           This is all a gray area that I

11   didn't -- again, if people are doing the right

12   thing, even if they're doing something that's

13   not quite a hundred percent kosher, I'll let it

14   slide.

15           Do something here -- you buy

16   something for yourself or lunch or do certain

17   things -- if you're outright stealing, that's a

18   problem.

19           I could never determine that.  I was

20   never sure.  I was never sure whether people

21   were helping themselves.  I just was not -- I

22   didn't know.  I never got anything from anyone

23   that could corroborate that.  So it is where it

24   was.

25           Q.   All right.
```



Page 545

```
 1                    MR. SANFORD:  We're sharing a
 2           document with you in the chat that's
 3           Bates stamped CANAL 48805 to 48807.
 4                    What exhibit is this, Simon, do
 5           we know?
 6                    MR. SCHAITKIN:  This will be 140.
 7                        (Document bearing Bates
 8               stamp CANAL 48805 through 48807 was
 9               marked as Plaintiff's Exhibit 140
10               for identification, as of this
11               date.)
12                    MR. SANFORD:  All right.
13           Exhibit 140.
14   BY MR. SANFORD:
15           Q.   And this is, you know, again, a text
16   conversation between Tiffany and you.
17                    Can we corroborate that with the
18   number there, Mr. DeNiro?
19           A.   Okay.  Yes.
20           Q.   Is that right, a text between
21   Tiffany Chen and you?
22           A.   Yes.
23           Q.   And if we can go down to page 3, if
24   we can highlight the section where Tiffany
25   writes at 7:23 p.m. "I'm looking over the petty
```



Page 546

1  cash.  It's very off.  He is one hundred percent
2  not at all honest with what's going on here."
3          Do you remember that e-mail?
4      A.   I don't -- I remember somewhat.  It
5  is not unfamiliar to me.
6      Q.   And this is Tiffany Chen writing to
7  you about problems with the petty cash and
8  Kaplan, correct?
9      A.   Uh-hum, yes.
10          MR. DROGIN:  Objection to the
11        form.
12 BY MR. SANFORD:
13      Q.   And do you remember how you
14  responded to that e-mail?
15      A.   I don't remember how I responded.
16  Do you have the response from me?
17      Q.   I don't believe we do.  I'm not
18  sure.  But I'm not trying to trick you here.
19  I'm just asking.  I don't believe you --
20          MR. DROGIN:  You are.  Can you
21        lay a foundation that she is talking
22        about him and not Chase since this is
23        when the investigation was going on?
24          MR. SANFORD:  Well, let's do
25        that.  I mean, what are we talking about



```
 1            here?  Are we talking about Kaplan or
 2            anyone else?
 3  BY MR. SANFORD:
 4       Q.   You understand this is about Michael
 5  Kaplan, correct?
 6                 MR. DROGIN:  Objection to the
 7            form.
 8       A.   Yes.
 9  BY MR. SANFORD:
10       Q.   I'm sorry?
11       A.   I said yes.
12       Q.   Yes.  Okay.  All right.
13            Let's go to CANAL 4 -- we're going
14  to use this backup document just to make things
15  clear, CANAL 47972 to 47974.
16            And let's take a look at the number
17  there, Tiffany Chen.  This is a message from
18  Tiffany Chen.  This is Sabrina Weeks.  So this
19  is a text conversation between Tiffany Chen and
20  Sabrina Weeks-Brittan.
21            Do you see that, Mr. DeNiro?
22       A.   I don't.  Yes, I see the numbers,
23  but I don't see any text or any e-mail.
24       Q.   Let's go down and look at the text.
25       A.   Yes.
```



Page 548

```
 1          Q.   Let's scroll down.  I just want to
 2    make sure you can see the document, the whole
 3    document.
 4          A.   Yes.
 5          Q.   Keep going down.  Keep going down.
 6          A.   Hold on.  Wait.
 7          Q.   I'm sorry.  I'm sorry.
 8          A.   Go back a little further if you
 9    could.  Yes.  Sorry.
10               Okay.
11          Q.   And go down.
12               All right.
13          A.   Let me finish.  I'm sorry.
14          Q.   Sure.
15               Go ahead and let me know when you're
16    done.
17          A.   Yes.
18          Q.   Does this refresh your memory a
19    little bit about what was going on with
20    Mr. Kaplan?
21          A.   Yes.
22          Q.   All right.
23               And having had a chance to read this
24    document, what are your thoughts?
25          A.   I don't know.  I still don't know.
```



```
 1          Q.   You don't know, you don't know what
 2    to think?
 3          A.   I don't know what to think, no.
 4          Q.   Okay.
 5               MR. SANFORD:  If we can look at
 6          CANAL 48009 to 48011.
 7               MR. SCHAITKIN:  This is Exhibit
 8          142, and the previous exhibit is 141.
 9                    (Document bearing Bates
10               stamp CANAL 47972 through 47974 was
11               marked as Plaintiff's Exhibit 141
12               for identification, as of this
13               date.)
14                    (Document bearing Bates
15               stamp CANAL 48009 through 48011 was
16               marked as Plaintiff's Exhibit 142
17               for identification, as of this
18               date.)
19    BY MR. SANFORD:
20          Q.   This is a text exchange between
21    Tiffany Chen and Sabrina Weeks-Brittan, correct,
22    Mr. DeNiro?
23          A.   Yes.
24          Q.   Okay.
25               If we can go down and take a look at
```



Page 550

```
 1    it.  If you can highlight that, "Kap has
 2    actually admitted to cashing in on vacation
 3    days" from Tiffany.
 4              Do you see where Tiffany writes "Kap
 5    has actually admitted to cashing in on vacation
 6    days, claiming he has never taken a vacation,
 7    just like Chase for the past few years"?
 8         A.    Uh-hum.
 9         Q.    Do you see that?
10         A.    Yes.
11         Q.    7/10/2019 at 11:10 p.m.
12         A.    Yes.
13         Q.    What are your thoughts on that, if
14    any?
15         A.    It is interesting.
16         Q.    Why do you find it interesting?
17         A.    You know why I find it interesting.
18    Because it is interesting.  It is something that
19    I have not gotten a clear answer on.
20         Q.    Well, that doesn't make it
21    interesting.  I mean, what makes it interesting?
22         A.    Well, because it might not have
23    been --
24              MR. DROGIN:  Objection to the
25         form.
```



Page 551

```
 1        A.   It is interesting because I would be
 2   very disappointed if Kap had done the things
 3   that Chase had done.  And he might have and I
 4   don't know that and I can't prove anything, so
 5   that's it.
 6   BY MR. SANFORD:
 7        Q.   Did, to your knowledge, Michael
 8   Kaplan ever mismanage Canal's money?
 9        A.   I don't know.  Again, it is the
10   trust factor.  I don't -- I expect people to do
11   the right thing and that's it.
12        Q.   Let's look at CANAL 49768.  This is
13   an e-mail from Tiffany Chen, Friday, June 7,
14   2019 at 4:18 p.m. to Michael Tasch, Harvey and
15   cc'ing Bobby.
16             That would be you, correct,
17   Mr. DeNiro?
18        A.   I'm sorry, I don't see that.
19        Q.   You don't see that cc'ing Bobby?
20   You see on the top right there?
21        A.   Okay.
22        Q.   And that would be you?
23        A.   I guess, yes.
24        Q.   All right.
25             So let's take a look at this
```



Page 552

```
 1   document.
 2               MR. SANFORD:  You can scroll down
 3         a little bit.  There you go.
 4               All right.
 5               MR. SCHAITKIN:  This is
 6         Exhibit 143.
 7                   (Document bearing Bates
 8               stamp CANAL 49768 through 49773 was
 9               marked as Plaintiff's Exhibit 143
10               for identification, as of this
11               date.)
12   BY MR. SANFORD:
13         Q.   Exhibit 143, all right.
14         A.   Okay.
15         Q.   Keep going down.
16              Okay.
17              I don't want to take up too much
18   time because this is a long document, but based
19   on what you have read thus far, do you have any
20   reaction, any thoughts at all?
21         A.   Hold on.  Let me finish it.
22         Q.   Okay.
23              Go ahead.
24         A.   Hold on, hold on.  Don't go any
25   further.  Don't move it, please.  Let me finish
```



Page 553

```
 1   it.
 2                Who is this e-mail from?
 3        Q.    Well, we have an exchange between --
 4        A.    With Kaplan.  Okay.
 5                Let me -- okay.  Can I just go back?
 6        Q.    I'm going to draw your attention to
 7   a couple of points.
 8        A.    Okay.
 9        Q.    Can we highlight the section that
10   says "Kaplan's answers are an impetus to change
11   the combinations on the safe in the office so
12   that only Sabrina and Gillian have access."
13                Do you see that?
14        A.    Yes.
15        Q.    Do you have any thoughts about that
16   at all?  I'm just going to ask you open
17   questions here.  Any thoughts at all?
18        A.    No, other than, okay, that's what we
19   should do.
20        Q.    Okay.
21                Do you think it is a good idea to do
22   that?
23        A.    I did.
24        Q.    Why?
25        A.    Just to be safe.
```


MAGNA
LEGAL SERVICES

Page 554

1          Q.    Safe from what?

2          A.    From any -- just to make sure

3    nothing, nothing unkosher happens.

4          Q.    Because you were concerned about

5    things being unkosher?

6          A.    Possibly.

7                MR. SANFORD:  Okay.

8                Can we highlight the section

9          about a very clear accounting on what

10         he's spending on, that quote?  Can we

11         find that?

12               MR. SCHAITKIN:  David, that's in

13         another document.  Would you like me to

14         open that document?

15               MR. SANFORD:  Oh, I'm sorry.  We

16         haven't gotten to that one yet.

17               All right.  Let's do that.  Let's

18         go down to 48017 to 48019, a May 17,

19         2019 text exchange between Tiffany Chen,

20         Gillian Spear and Sabrina Weeks-Brittan.

21    BY MR. SANFORD:

22         Q.    You see this document and you see

23    Sabrina Weeks-Brittan, Tiffany Chen and Gillian

24    Spear.

25               Do you see that, Mr. DeNiro?



```
 1          A.    Yes.

 2          Q.    There you go, the text exchange.

 3          A.    Yes.

 4          Q.    All right.

 5                And on page 2, at 10:34 a.m. on

 6   May 17, 2019, Tiffany Chen suggests that Sabrina

 7   should oversee the handling of petty cash and

 8   have Michael Kaplan give her a, quote "a very

 9   clear accounting on what he is spending on."

10                Do you see that?

11          A.    Okay.  Uh-hum.

12          Q.    Do you have any thoughts about that

13   at all?

14          A.    I think that was okay.

15          Q.    Why do you think it was okay to do?

16          A.    Because I wanted it that way.

17          Q.    Because you had doubts about

18   Mr. Kaplan?

19          A.    I wasn't sure, but, you know --

20          Q.    Was Mr. Kaplan ever required to

21   provide an accounting on what he had spent money

22   on?

23          A.    Again, it goes back to full trust.

24   You do, you do what you say you're doing and

25   that's it.
```



1      Q.    But you stopped trusting him here so

2  --

3      A.    Yes, I did.

4      Q.    Right.

5            So once -- right.  So once you

6  stopped trusting him, did you ever expect him to

7  give a clear accounting on what he's spending

8  on?

9      A.    I guess so.  I mean, I just -- I

10 said let me just stop this and that's it.

11     Q.    Did he ever give you an accounting

12 on what he was spending?

13     A.    Can I ask you what is this about?

14 What does it have to do with Chase?

15     Q.    I get to ask the questions.  I'm

16 just asking a simple question; which is, did he

17 ever give you an accounting on what he was

18 spending on?

19            MR. DROGIN:  Objection to the

20         form.

21     A.    I'm not even sure.  He gave an

22 accounting, but I just was not, I was not sure.

23 BY MR. SANFORD:

24     Q.    You were not sure of what?

25     A.    I was not sure what was going on.  I



1   was starting to get a little worried.

2        Q.   Did Michael Kaplan ever return any

3   money or property to Canal, to your knowledge?

4        A.   No, I don't know if he did.

5        Q.   Did anyone ever ask Michael Kaplan

6   to return any money or property to Canal or --

7   property to Canal, to your knowledge?

8        A.   That's, that's for my lawyers.  I

9   don't think he was asked to.

10       Q.   Canal never filed a lawsuit against

11  Michael Kaplan, right?

12       A.   No.

13       Q.   Why not?

14       A.   I don't know.  Because we couldn't

15  prove anything.  We couldn't find anything.  It

16  was a very gray area.  Nobody did anything.

17  There was nothing that I could do.  Not that I

18  was looking, but I was curious.  I just wanted

19  to know what was going on, if anything was going

20  on.

21       Q.   Well, Canal never brought concerns

22  against Michael Kaplan to criminal prosecutors,

23  did it?

24            MR. DROGIN:  Objection to the

25       form.



Page 558

```
 1          A.    No.
 2   BY MR. SANFORD:
 3          Q.    And Michael Kaplan never accused
 4   Canal or you of violating any employment laws,
 5   right?
 6          A.    No.
 7          Q.    Was Robin Chambers accused of
 8   wrongdoing at any point?
 9          A.    Not officially in any way.  There
10   was some question.  Again, like with her and
11   Kap, but that was it.
12          Q.    What types of wrongdoing did
13   Ms. Chambers engage in, to your knowledge?
14          A.    I don't know.  My feeling is that it
15   never went anywhere and so I left it.  I have a
16   relationship with Robin Chambers.  She has done
17   things for me for many years.  So, you know --
18          Q.    Do you think she ever bamboozled
19   you?
20          A.    I can't say for sure.  I don't know
21   whether people interpret it as just saying well,
22   let me just here and there something was taken.
23   Sometimes I don't even mind that.  It depends on
24   what it is.  It is a gray area.
25          Q.    Did anyone ever identify concerns
```



1   about Ms. Chambers to you?

2           MR. DROGIN:  Objection to the

3       form.

4       A.   Well, Tiffany did about her too,

5   yes.

6   BY MR. SANFORD:

7       Q.   And what kind of concerns did

8   Tiffany raise?

9       A.   There was something about payment or

10  this or that, that I guess are in these e-mails

11  too or somewhere.

12      Q.   Was there concern about spending on

13  dog care and taking Ubers and --

14      A.   There could have been, yes, yes.

15      Q.   Did anyone at Canal attempt to

16  identify the period of time when Ms. Chambers

17  engaged in financial wrongdoing?

18      A.   No.  Not that I know of.

19      Q.   Why not?

20      A.   I don't think they saw that there

21  was anything.

22      Q.   Do you know that?

23          MR. DROGIN:  Objection to the

24      form.

25      A.   Yes, I mean, my -- Tom and Tasch and



Page 560

1  everybody would have said if there was something
2  that they felt they should look into and we just
3  never went there.
4  BY MR. SANFORD:
5       Q.   So, to your knowledge, no one at
6  Canal ever attempted to calculate the total
7  amount that Ms. Chambers improperly obtained
8  from Canal, right?
9            MR. DROGIN:   Objection to the
10       form.
11       A.   Because I don't know whether she
12  did.
13            MR. DROGIN:   Thank you.
14  BY MR. SANFORD:
15       Q.   Did Robin Chambers ever return any
16  money or property to Canal?
17       A.   She wasn't accused of doing
18  anything.  It was never a clear issue and I to
19  this day don't know that.
20       Q.   So no one ever asked Robin Chambers
21  to return any money or property to Canal?
22            MR. DROGIN:   Objection to the
23       form.
24       A.   No, there wasn't anything that we
25  could find that she should return.



Page 561

BY MR. SANFORD:

2      Q.   So, therefore, Canal never filed a
3  lawsuit against Robin Chambers, right?

4      A.   No, they didn't have what -- they
5  had no evidence, if you will, like there was
6  against Chase Robinson.

7      Q.   And so, Canal never brought concerns
8  against Robin Chambers to criminal prosecutors,
9  right?

10     A.   No, they didn't have to.

11     Q.   Robin Chambers never accused Canal
12  or you of violating any employment laws, did
13  she?

14     A.   No, she didn't.

15     Q.   Did you and Ms. Chen hold a meeting
16  with Mr. Kaplan and Ms. Chambers to discuss the
17  wrongdoing you ever accused them of?

18          MR. DROGIN:   Objection to the
19           form.

20     A.   Yes, we did.

21  BY MR. SANFORD:

22     Q.   And when did that meeting occur?

23     A.   It was -- I can't remember exactly.

24     Q.   Who was present at the meeting?

25     A.   Me, Tiffany, Robin, Michael.  I



 1    don't know if anybody else -- if Tasch or Mark

 2    Berdon.

 3         Q.    And, to the best of your

 4    recollection, what was said at that meeting?

 5         A.    There were certain things that

 6    Tiffany felt that they were doing, and they were

 7    saying no, they didn't, and we left it at that.

 8         Q.    What did Tiffany say at the meeting

 9    that they were doing that was improper?

10         A.    It might have been related to some

11    of the stuff we just have seen in the e-mails,

12    but I can't remember specifically at this point.

13    She just felt there were things that were

14    unanswered and questionable.  But again, you

15    know --

16         Q.    Did you speak at the meeting?

17         A.    I could have.  I can't remember.

18         Q.    Did Mr. Kaplan have a chance to give

19    his side of the story during the meeting?

20         A.    In a way he did.

21         Q.    And did Ms. Chambers have a chance

22    to give her side of the story at the meeting?

23         A.    Yes, in a way she did too.

24         Q.    After Ms. Robinson's employment

25    ended, she asked to meet with you, correct?



Page 563

```
 1          A.    I don't remember.
 2          Q.    Well, you remember -- you remember
 3    that you never did meet with her after
 4    Ms. Robinson resigned, right?
 5          A.    I don't think I did meet with her.
 6    There was no reason to.
 7          Q.    Well, one reason might have been
 8    that Ms. Robinson could have given you her side
 9    of the story, right?
10          A.    Come on.
11                MR. DROGIN:  Objection to the
12           form.
13          A.    Come on.  She always had a story.
14    She always had an angle and yet she taped
15    people, recorded their conversations.  Come on.
16    BY MR. SANFORD:
17          Q.    So you never provided Ms. Robinson
18    with a chance to give her side of the story,
19    right?
20          A.    Give me a break.
21          Q.    Is that fair to say?  Yes or no?
22                MR. DROGIN:  Objection to the
23           form.
24          A.    That's -- I didn't not give her a
25    chance.  She had many chances.  She did what she
```



1    did.  Period.

2              This is kind of disgusting the way

3    you finagle it and twist it and fuck it around.

4    You can do that, but I'm telling you, Chase

5    Robinson did things that she shouldn't have done

6    and we all know that and that's all I can say.

7    BY MR. SANFORD:

8         Q.   So you never gave Ms. Robinson an

9    opportunity to tell her side of the story?

10        A.   She never wanted an opportunity.

11   You know the opportunity, she sent me a letter.

12   You sign this or else.  Basically, that's what

13   it was.  Sign this letter to the London School

14   of Economics or else.

15             It could have been used for any job

16   application, and I knew that.  I was not going

17   to sign that letter.

18             And then things started happening

19   because she tried to shake me down.  And you

20   know that.  Shame on you.  I think you're

21   probably a good lawyer, but I don't understand

22   this.  It is pretty kind of, you know -- but go

23   ahead.  Fire away.  Ask me what you want to ask.

24        Q.   Sitting here today, after years of

25   litigation and years of history, do you even



Page 565

1    know Ms. Robinson's side of the story?

2         A.   Come on.  She -- everybody has a

3    story and everybody has their reasons.  And she

4    had hers, but they were not in line with mine or

5    my family or anybody.  They were in line with

6    her.  She was out to get me.

7              And I treated her very fairly.

8    That's all I can say.  And you know it.

9         Q.   So you do know or you don't know her

10   side of the story?

11        A.   After all these months she has given

12   her side of the story.

13             MR. DROGIN:  Objection to the

14        form.  Hold on.  Can you just clarify

15        what story?

16        A.   Yes, what is her side?

17             MR. DROGIN:  What story are you

18        talking about?

19   BY MR. SANFORD:

20        Q.   Well, any aspect of her employment

21   that's in question in this litigation.

22             Do you understand what her side is?

23   Have you read her Complaint?  Have you read

24   deposition transcripts?  Do you understand what

25   she is trying to communicate?



```
 1          A.    I understand that she feels she's
 2    been wronged.  She is trying to make a case.  As
 3    I said, if she had done the right thing from the
 4    beginning, we wouldn't be here.
 5               I did nothing to her but trust her
 6    to do the right thing.  I gave her a lot of
 7    power.  More than I ever should have.  She
 8    abused it.
 9               I'm sorry.  I have nothing else to
10    say.  This whole proceeding is what she wants to
11    say about it.  And if there was anything that
12    was valid, I would give her credit for it.  And
13    I give her credit for certain things; finding
14    Sabrina, finding certain people who work for me.
15               But she is making her statement.
16    Her side of her story is what you're presenting
17    right now.  And all it is, is coming at me to
18    try and make a case that I discriminated against
19    her in some way, which is a lot of nonsense.
20    But go ahead.
21          Q.   When you approved Ms. Robinson
22    taking a trip, did you place any limitations on
23    what class she could fly?
24          A.    I expected -- well, I didn't expect
25    her to fly first class.  And she might have.
```



Page 567

```
 1   Because I might not have been looking.
 2         Q.    Well, you approved business class
 3   travel for her; didn't you?
 4         A.    Fine.  I could have approved
 5   business class.
 6         Q.    And when you approved Ms. Robinson
 7   taking a work trip, did you place any
 8   limitations on what type of hotel she could stay
 9   in?
10         A.    She knew that she couldn't stay in a
11   $1,000 night setup.  That she knew.  Though she
12   has done that in LA, I hear from my lawyers.
13         Q.    How does she know that?
14         A.    How did I know it?
15         Q.    No, you said she knew that she
16   couldn't stay in a $1,000 a night hotel.
17         A.    Common sense.  You work for me.
18   Certain things you don't abuse the privilege of
19   my trust.
20         Q.    There's no written policy about a
21   $1,000 hotel?
22         A.    Now you're being technical.  That's
23   common sense.  Would your like daughter, if you
24   have a daughter to act the way Chase acted?
25         Q.    I have a daughter.
```



1        A.   Would you have a little advice for

2   your daughter?  "Don't do what Chase Robinson

3   did.  I'm a lawyer.  I'm representing her, but

4   don't do that.  Let me tell you on the side, me

5   and you, honey."

6             Okay.

7        Q.   So there's no, so there's no written

8   policy about $1,000 --

9        A.   This is a lot of bullshit.  No,

10  there's no written policy.  No, the policy is

11  trust.  Trust.

12       Q.   And you never communicated to

13  Ms. Robinson in any way orally or in writing

14  that she couldn't stay in a $1,000 hotel?

15       A.   She knew she couldn't do that and

16  abuse that.  She knew it.

17       Q.   How did she know it?

18       A.   I don't have to tell her.  And maybe

19  I did tell her.  Maybe I said, you know, stay in

20  a -- that's part of working for the situation

21  she was in.  Trust.  You do the right thing.

22            Sabrina would not do that.  Sabrina

23  would know.  And if she had anything, she would

24  ask me.  She would never dare do that.

25       Q.    When Ms. Robinson took a work trip



1    for Canal, Canal would pay for her travel, her
2    lodging, and food expenses on the trip, right?
3          A.    What?
4          Q.    When Ms. Robinson took a work trip
5    for Canal, Canal would pay for her --
6          A.    Listen, I trusted her to do the
7    work --
8                MR. DROGIN:  It is just a "yes"
9          or "no" question.
10         A.    Yes.
11               MR. DROGIN:  Factually, is that
12         correct?
13         A.    Expenses were paid with common
14   sense.  That's the job.  You understand that you
15   were supposed to behave responsibly, not abuse
16   the privilege.
17               MR. DROGIN:  No, the question
18         is -- the question is simple.  He's
19         simply asking that if she took a
20         work-related trip, those types of
21         expenses would be paid just as a matter
22         of fact.
23         A.    No, not those type.  Reasonable
24   expenses would be paid.  Reasonable expenses
25   would be paid.



```
 1    BY MR. SANFORD:
 2         Q.   All right.
 3              And did you ever discuss with
 4    Ms. Robinson what you understood to be
 5    reasonable?
 6         A.   I might have, but she is smart
 7    enough to know what's reasonable.
 8         Q.   But sitting here today, you don't
 9    recall --
10         A.   No, no, no, that's nonsense.  You
11    know that.  That's nonsense.  I trust you, you
12    use common sense.  If you come back with a huge
13    bill, you come back after taking all my air
14    miles or after taking Ubers when you shouldn't
15    have or spending money at Paola's when you
16    shouldn't have, I'm going to see this after the
17    fact and say "You know what, I trusted you and
18    look what you did."
19              That's how I work.  I don't have to
20    spell it out for her.  If I had to spell it out
21    for her, she shouldn't be working for me.  But
22    she created the idea that she was trustworthy
23    and she wasn't.
24         Q.   Do you recall asking Ms. Robinson to
25    travel back early from a trip to London in
```



```
 1   February 2019 to assist with items for your
 2   townhouse?
 3        A.   I don't remember that.  Oh now she's
 4   saying that I made her come back from London
 5   from work to come here to my townhouse to help
 6   me do stuff which she should do.  Give me a
 7   break.
 8             What's the question?
 9        Q.   Do you recall Ms. Robinson speaking
10   to you about returning to London around April of
11   2019?
12        A.   That's about the time she gave me
13   her resignation.
14        Q.   Before then obviously, but --
15        A.   That was about the time because if
16   that was the time, that was when I was starting
17   to get fed up with her behavior.  She said she
18   had stuff to do.
19             I'm trying to accommodate her going
20   back to London to go to work for me when I need
21   stuff in New York, and I was starting to be a
22   little -- starting to get a little agitated;
23   started to feel I'm being taken advantage of.
24        Q.   All right.
25             Ms. Robinson sought your approval to
```



Page 572

```
 1   return to London around --
 2          A.    And I gave it to her.
 3          Q.    Okay.
 4          A.    Because I like to do the things for
 5   people who work for me especially to be right
 6   because I wanted them to be happy.  I don't want
 7   to be abused.  I don't want to be taken
 8   advantage of.
 9          Q.    And in 2019, you were going to be
10   shooting a film called The Comeback Trail,
11   right?
12          A.    Yes, I guess it was.
13          Q.    And do you recall Ms. Robinson
14   speaking to you about traveling to London
15   sometime between May and July of 2019 when you
16   were expected to be on set shooting The Comeback
17   Trail?
18          A.    I don't remember.  Whatever, I
19   guess.  Who knows.
20          Q.    Well, you were planning -- the film
21   was going to be shot out of New York, right?
22          A.    Yes.
23          Q.    And so, do you remember approving
24   Ms. Robinson's plan to travel to London between
25   say around May and July of 2019 while you were
```



Page 573

1    on set?

2        A.    What's the point?  What are you

3    asking?  I'm not understanding what you are

4    asking.

5        Q.    You approved Ms. Robinson being out

6    of New York while you were shooting a film?

7        A.    I could have, yes.  I could have.

8        Q.    And you didn't ask Ms. Robinson for

9    the details about how many sky miles the trip to

10   London would cost, right?

11       A.    I trusted her.

12       Q.    So, is that a "no"?

13       A.    T-r-u-s-t.  Trust.

14       Q.    Is that a "no"?

15       A.    Do you have an assistant who you

16   trust?

17            MR. DROGIN:  It is just a simple

18        "yes" or "no" question.

19            MR. SANFORD:  Thank you, Laurent.

20   BY MR. SANFORD:

21       Q.    Sometimes your attorney and I are

22   all on the same page.

23       A.    Well, that's nice.  That's nice to

24   hear.

25       Q.    It is a nice thing, right?



```
 1          A.    He's not in my position.  Even my
 2  attorney is not in my position being asked, as
 3  far as I'm concerned, idiotic questions, but go
 4  ahead.
 5          Q.    All right.
 6                Well, I'm asking a simple "yes" or
 7  "no" to my question.
 8          A.    It is more complicated than that.  I
 9  said it is trust.
10          Q.    Well, I understand you said that.
11  Now that you said that, can you answer my
12  question?
13                Which is, you didn't ask
14  Ms. Robinson for the details about how many sky
15  miles the trip to London would cost?
16          A.    I didn't have to.  I didn't have to.
17  That's up to her to say, listen, I take so many
18  sky miles to go to London.  That's what I do.  I
19  do it honorably, and I take so many to come
20  back.  Period.  So in that sense, I say yes.
21          Q.    Do you recall Ms. Robinson speaking
22  to you about a friend's wedding that she wanted
23  to go to that would take place in Los Angeles in
24  June 2019?
25          A.    Somewhere I remember that, yes.
```



Page 575

```
 1          Q.    And in February 2019, Ms. Robinson
 2    sought your approval to travel to her friend's
 3    wedding that would take place in June of 2019,
 4    right?
 5          A.    Uh-hum.
 6          Q.    Is that a "yes"?
 7          A.    So what are you saying?  That I said
 8    yes, she should go to that wedding?  Probably I
 9    did.
10          Q.    Did you approve --
11          A.    I didn't have to.  I could have said
12    I'm not going to pay for you to go to that
13    wedding.  She went on air miles, yes.
14          Q.    And you didn't ask Ms. Robinson for
15    the details about how many sky miles --
16          A.    No.
17          Q.    -- to Los Angeles would cost?
18          A.    No.  Trust.  Trust.
19          Q.    Do you recall Ms. Robinson speaking
20    to you about wanting to take a trip to London
21    and Scotland in the summer of 2019?
22                MR. DROGIN:  Objection.
23           Objection to the form.  I think there's
24           just an ambiguity as to the dates.
25           You're talking about when she asked?
```



Page 576

1          MR. SANFORD:  Okay.

2          Thank you.  I'll try to be

3      clearer.

4  BY MR. SANFORD:

5      Q.   Do you recall, Mr. DeNiro, speaking

6  with Ms. Robinson at any time about her wanting

7  to take a trip to London and Scotland, a trip

8  that was going to be in the summer of 2019?

9      A.   I could have, yes.

10     Q.   Okay.

11          And do you remember Ms. Robinson

12 explaining to you that she wanted to visit

13 family on the Isle of Lewis?

14     A.   She might have.

15     Q.   And Ms. Robinson sought your

16 approval in advance to take a trip to London and

17 Scotland in the summer of 2019, didn't she?

18     A.   Could have been.  What is it, she

19 was going for vacation or she was asking me to

20 pay for it?

21     Q.   Well, you didn't ask Ms. Robinson

22 for the details about how many sky miles the

23 trip to London and Scotland would cost, right?

24     A.   No, I didn't.  I didn't.  I left it

25 up to her to determine that.  That's her job.



 1    To do it honorably.

 2          Q.    Other than you and Ms. Robinson, did

 3    anyone participate in the conversations that you

 4    and Ms. Robinson had about her travel using sky

 5    miles in 2019?

 6          A.    No, there was no reason to talk to

 7    anybody else unless there were things being done

 8    that were untoward, which happened and I found

 9    out later.

10          Q.    And other than you and Ms. Robinson,

11    did anyone participate in the conversations that

12    you and Ms. Robinson had about her travel more

13    generally in 2019?

14          A.    No.  Maybe I should have talked to

15    other people like Sabrina and other people to

16    find out what's going on, but I didn't.  I

17    trusted her.  Period.

18          Q.    Did you communicate with anyone

19    besides Ms. Robinson and Robin Chambers about

20    the trip that Ms. Robinson took to Los Angeles

21    in March of 2019?

22          A.    I didn't have to.  Trust.  In

23    hindsight, I should have said even to Tom Harvey

24    or Michael Tasch, "This is what she is doing.

25    Can you check this out for me?  I'm not sure."



```
                                              Page 578
 1   But I trusted her.
 2        Q.   But you were bamboozled, weren't
 3   you?
 4        A.   I was bamboozled, yes.
 5        Q.   We're sharing a document with you in
 6   the chat that's Bates stamped ROBINSON 1347 to
 7   1349.
 8             MR. SCHAITKIN:  This is
 9        Exhibit 145, and the previous one was
10        144.
11              (Document bearing Bates
12        stamp CANAL 48017 through 48019 was
13        marked as Plaintiff's Exhibit 144
14        for identification, as of this
15        date.)
16              (Document bearing Bates
17        stamp ROBINSON 1347 through 1349 was
18        marked as Plaintiff's Exhibit 145
19        for identification, as of this
20        date.)
21         MR. SANFORD:  Let's scroll down a
22        little bit.
23   A.   Listen --
24         MR. DROGIN:  Wait a second.
25        There's no question.
```



Page 579

```
 1                    THE WITNESS:  Yes.
 2                    MR. SANFORD:  You can scroll
 3          down.
 4          A.    Wait, wait.  Sorry, you're going too
 5     fast.
 6                    Okay.  You can go up more.
 7                    Okay.  Sorry.  Maybe scroll down a
 8     little so I can see the last -- good.
 9                    Okay.  You can go up.  Okay.  Not
10     too far.  Not too far.  Okay.
11                    Can you scroll up?  Good.  Okay.
12     Okay.  Okay.
13                    Hold on.  Hold on.  Let me see.
14     Okay.  Slow down.  Yes, okay.  Okay.  Okay.
15     Okay.  Okay.
16                    MR. SANFORD:  Okay.
17                    Can we go back up and highlight
18            the section where Chase Robinson writes
19            to Mr. DeNiro "It has been pretty
20            obvious for a while that there is an
21            issue with me working for you."
22     BY MR. SANFORD:
23          Q.    All right.
24                    Do you recall this e-mail chain?
25                    MR. SANFORD:  This is marked as
```



```
 1              Plaintiff's what, Simon?  What exhibit?
 2                   MR. SCHAITKIN:  This is 145.
 3   BY MR. SANFORD:
 4         Q.   So Plaintiff's Exhibit 145, you've
 5   had a chance to look at the e-mail chain.
 6              Do you recall this e-mail chain,
 7   Mr. DeNiro?
 8         A.   Somewhat.
 9         Q.   Okay.
10              Do you see where Chase Robinson
11   writes to you "It has been pretty obvious for a
12   while that there is an issue with me working for
13   you.  And I've tried really hard without
14   bothering you to get out of the middle and out
15   of your home and get back to my job.  It's not
16   working."
17              That's the first part of that e-mail
18   to you.
19              What was your reaction when you
20   received this e-mail from Ms. Robinson?
21         A.   I, I, you know -- again, if she had
22   just done the job and done what Tiffany had
23   asked and been part of the team, there would
24   have been no problem.
25              But she was doing things and acting
```



```
 1    a certain way that were creating problems --
 2    that was creating problems.  She says one thing
 3    and she does another and she says another and
 4    she does this.
 5              She is working for me.  This is what
 6    she had to do.  I wasn't a slave driver.  I
 7    wasn't anything.  She was helping me with
 8    getting my place fixed up, and now it is not
 9    working.
10              It is not working because now I have
11    a girlfriend and she is not happy about that and
12    she doesn't want to take any orders from anybody
13    else.  So that is the problem.  So -- but she is
14    claiming that she was asked to do things that
15    she was not supposed to be doing; that she is
16    the executive or whatever the titles were that
17    she coerced me into giving which have no meaning
18    whatsoever.  And I was trying to be nice to her
19    and go along with it, and finally I did.  It
20    made no sense.
21              Now she is leaving because she's not
22    happy because she feels she's being
23    disrespected.  But maybe she was just being
24    called out a little bit for the nonsense because
25    she shouldn't have been taking any of this
```



Page 582

1    personally.  She should have said let me jump in

2    and help get the job done.  But, no, she didn't.

3            Q.    And you were bamboozled into giving

4    her the title that she wanted?

5            A.    Absolutely bamboozled, yes, I was.

6    I was coerced.  I said, "Look, it is very

7    simple.  When you move on to another job, I talk

8    to the people.  I tell them what I think about."

9    You don't need all these titles.  They don't

10   need anything.

11              That's my fault.  I gave her the

12   titles.  I allowed them.  She created them.

13   They were nonsense.  That's my fault.  I gave

14   her more money so she would stay through

15   Christmas.  Maybe I should have said, look,

16   maybe it is time to call it off.

17              But this is all nonsense because

18   this -- she along this whole way was planning to

19   do exactly what she is doing now, whether

20   Tiffany came into the picture or anybody.  She

21   was planning a backup program in case it didn't

22   work out.

23              And she certainly was helping to

24   make it not work out, but I hung in there with

25   her and wouldn't fire her or anything.  She



1  finally did.

2           And then, the final thing is when

3  she says -- gives me a letter to sign.  I'm not

4  going to sign a letter like that.  I couldn't

5  sign a letter like that that she could use

6  anywhere and she works for somebody else and

7  pulls the same thing she pulls on me and then

8  I'm responsible to those people.

9           They say "What happened?  You

10 recommended her."  I can't do that.  I gave her

11 every opportunity, every chance, everything.  I

12 do it with everybody who works for me.  Just

13 talk to any of the other people who work in my

14 office.

15      Q.   So you agreed with Ms. Robinson's

16 statement that there was an issue with her

17 working there?

18      A.   Well, she made it an issue.  It

19 would have been just yes, let me do it.  You

20 know, the most she could say, "I'm uncomfortable

21 maybe with something."  I don't know.  Can I

22 do -- I said, "Okay, I got it.  Let's try to

23 work together but let's try to do what we ask

24 you to do, even what Tiffany is asking.  Don't

25 make it an ego thing with her.  You're not in



1    that position.  You're my assistant, not my

2    girlfriend.  You're not anybody but my

3    assistant.  You work for me.  You are a

4    professional, supposedly.  You do your work

5    professionally."

6         Q.    You didn't provide Ms. Robinson with

7    any options that would get her out of your home?

8         A.    Really?  I didn't provide her with

9    any options?  Maybe you should ask the other

10   people in my office.

11        Q.    What options did you provide?

12        A.    She had many options, but to say she

13   worked for me there -- and that was okay.  There

14   was nothing wrong with what she was doing.

15        And she keeps making it like she is

16   a victim, she was put upon.  That's a lot of

17   nonsense.

18        Q.    What were the options you gave her?

19        A.    She could have -- I didn't give

20   her -- she could have said to me, look, you

21   know, I want to do this or that.  I wasn't

22   stopping her.  Even if she said "Maybe I'll go

23   to the office more and do that," I would have

24   said, "Okay, we'll find it.  But I do need this,

25   so what do we do?  Let's get somebody else."



 1              And we had people who she
 2    recommended, like Rachel and Lulu, and then
 3    Sabrina came and helped with some things and
 4    there was no problem.  Come on.
 5         Q.    After you received this e-mail,
 6    March 27, 2019 e-mail from Ms. Robinson --
 7         A.    Yes, she was getting ready to quit.
 8         Q.    -- did you ever speak with
 9    Ms. Robinson to discuss her concerns afterwards?
10         A.    We might have.  But, you know what?
11    With her, to be honest, it was double talk.  It
12    was not going her way.  She's self absorbed.  I
13    would say narcissistic and feeling entitled.
14    And I think she got on the wrong track and
15    thought she was going to get some position of
16    importance that she just didn't get because she
17    didn't know how to get it.
18              But if she just did her job, she
19    would be where she should be.  I didn't do
20    anything to her except help her and just be
21    supportive and paid her enough and gave her the
22    titles.  I didn't know what else to do.
23              I can't, I can't help her with her
24    feeling like she is a victim.  That's not --
25    that's not for me.  I mean, I have things I



Page 586

```
 1    need.  And she is my assistant; my first
 2    assistant, my personal assistant.  I don't know
 3    what else I could have done.
 4         Q.   So let's share a document with you
 5    in the chat that's Bates stamped ROBINSON 1533,
 6    which is an April 2, 2019 e-mail from Chase
 7    Robinson to Mr. DeNiro.
 8              MR. SCHAITKIN:  This is
 9         Exhibit 146.
10              (Document bearing Bates
11         stamp ROBINSON 1533 was marked as
12         Plaintiff's Exhibit 146 for
13         identification, as of this date.)
14    BY MR. SANFORD:
15         Q.   All right.
16              Let's take a look --
17              MR. LOCKMAN:  David, it looks
18         like we lost Allie.  Maybe we can take a
19         quick break or see if she can reconnect.
20              MR. SANFORD:  Let's see what's
21         happening with her.
22              Let's take a break while you have
23         an opportunity to take a look at this
24         document, Mr. DeNiro.
25              THE VIDEOGRAPHER:  Okay.
```



Page 587

```
 1                    The time is 1:36 p.m.  We are
 2          going off the record.
 3                         (Whereupon, at 1:36 o'clock
 4              p.m., a recess was taken until 1:50
 5              o'clock p.m.)
 6                    THE VIDEOGRAPHER:  The time is
 7            1:50 p.m.
 8                    We are back on the record.
 9   BY MR. SANFORD:
10        Q.   All right.
11             Mr. DeNiro, you understand you're
12   still under oath?
13        A.   Yes.
14        Q.   All right.
15             If Ms. Robinson was traveling
16   somewhere on a trip that you directed her to
17   take, she was authorized to be reimbursed for
18   her transportation, lodging and food on that
19   work trip, right?
20        A.   Yes, if it is a work trip.  And,
21   again, it is up to her to responsibly determine
22   what she should pay for certain things.  That's
23   all.
24        Q.   Do you believe that Ms. Robinson
25   should be ordered to pay back any of the bonuses
```



1  you paid her during her employment?

2       A.   I don't -- I don't care about that.

3  Let's move on.  You know, let her enjoy whatever

4  bonuses I gave her.  Good luck, you know.

5  Period.

6       Q.   All right.

7            During Ms. Robinson's employment,

8  you could have told her that she couldn't use

9  sky miles but you didn't do that, right?

10      A.   No, she brought it up to me to use

11 sky miles and I said, "Okay.  That sounds good.

12 We can use the sky miles from American Express."

13           And the only time I questioned

14 anything about it, I said one of my kids was

15 saying they wanted to use sky miles and they

16 felt that they were being usurped or something.

17 I don't know whether it was a competitive thing

18 or they just felt that they looked into it

19 through somebody else in the office or Chase

20 said there was so much left.  They said we don't

21 have sky miles.

22           And I said "Well, wait a minute.  I

23 said, Chase, I want to make sure we have enough

24 for the kids."  And I forget what her answer

25 was.



Page 589

```
 1              And then, of course, later she said
 2    "Look, there's a lot of sky miles."  This is
 3    like a year later -- sky miles that I should put
 4    into my thing in case I need it and so on.
 5              And I said, "Well, if you think
 6    that's what you should do, go ahead."  Again,
 7    trust.
 8         Q.   Let's go back to Exhibit 49 for a
 9    minute.
10              MR. SANFORD:  And once you have
11         that up, Simon, let me know.
12              MR. SCHAITKIN:  It is on the
13         screen.
14              MR. SANFORD:  Okay.  Good.
15    BY MR. SANFORD:
16         Q.   So my question, Mr. DeNiro, is you
17    authorized that Ms. Robinson be paid for all
18    unused vacation days that she identified in
19    these e-mails before you in Exhibit 49, right?
20              MR. DROGIN:  Objection to the
21         form.
22         A.   If she asked me to do it and I
23    looked at it, then I would have done it.  I
24    said, you know, yes.
25
```



1    BY MR. SANFORD:

2         Q.    Approximately how many conversations

3    do you remember having with Ms. Robinson in 2019

4    about her upcoming travel for the calendar year

5    2019?

6         A.    I don't know.  She just made me

7    aware she was going to go to London.  And so,

8    that was something she was planning, and I

9    didn't oppose it.  I don't know if I asked much

10   about it.  I forget, if anything, and that was

11   it.

12        Q.    And with respect to those

13   conversations you had with Ms. Robinson in 2019

14   about her travel in 2019, you didn't ask her

15   details about how many sky miles she would need

16   to transfer for the trip she was planning, did

17   you?

18        A.    No, I don't ask.  I just -- again,

19   trust.

20        Q.    And is it fair to say you don't

21   remember the details of the conversations you

22   had with Ms. Robinson about her travel in 2019?

23        A.    I mean --

24             MR. DROGIN:  Objection to the

25        form.



```
 1        A.   Vaguely.  I mean, I remember that
 2   she asked or she said "Look, I want to go and I
 3   said okay.  You know, that's fine, as long as it
 4   is done.  I don't even have to say it, as long
 5   as you do it responsibly."
 6            Could I have said that one time,
 7   maybe.  But, you know, it is just like we know
 8   what it is.  Just do the right thing.  Period.
 9   BY MR. SANFORD:
10        Q.   All right.
11            Is there anything else you remember
12   about those conversations you had with
13   Ms. Robinson about her travel in 2019?
14        A.   Not, not offhand, no.
15        Q.   Thinking back to your conversations
16   directly with Ms. Robinson, tell me everything
17   you remember saying and everything Ms. Robinson
18   said about the trip she took to Los Angeles in
19   March of 2018.
20            MR. DROGIN:  Objection.  We have
21         been over this.  We're going backwards.
22            MR. SANFORD:  It is the last
23         question I have on this topic, Laurent.
24        A.   I didn't ask her anything.
25            MR. DROGIN:  Can you read the
```



Page 592

```
 1        question back?
 2                MR. SANFORD:  Sure.
 3                MR. DROGIN:  Tell me everything
 4        you remember.
 5   BY MR. SANFORD:
 6        Q.   Well, thinking back to the
 7   conversations you had with Ms. Robinson, I'm
 8   asking if you can tell me everything you
 9   remember about what you said to her and what she
10   said to you about the trip she took to
11   Los Angeles in March of 2018.
12                MR. DROGIN:  Objection to the
13        form.
14        A.   I don't remember much.  That was the
15   trip to California.  For what reason was she
16   going then?
17   BY MR. SANFORD:
18        Q.   So you don't remember much.
19             All right.
20                MR. DROGIN:  Objection to the
21        form.
22   BY MR. SANFORD:
23        Q.   So let's share a document with you
24   in the chat.  It is Bates stamped CANAL 46701,
25   which is an April 6, 2019 e-mail from Tiffany
```



Page 593

 1   Chen to Rachel Humphreys, copying you,

 2   Mr. DeNiro.  Let's take a look at that.

 3                MR. SCHAITKIN:  This is

 4         Exhibit 147.

 5         A.   Can you scroll?  Is there any more?

 6                Okay.  That's good.  Thanks.

 7                MR. SCHAITKIN:  I misspoke, this

 8         was previously identified as Plaintiff's

 9         Exhibit 91.

10         A.   Now, who is this to?

11   BY MR. SANFORD:

12         Q.   This is an e-mail from Tiffany Chen

13   to Rachel Humphreys, copying you.

14         A.   And Rachel was the -- I think she

15   was the interior designer that was a friend of

16   Chase's, who wasn't a friend of Chase's.

17         Q.   Okay.

18                Do you see where she writes "Bob and

19   I would like to inform you" --

20                MR. SANFORD:  Where do we have

21         that?  Can you highlight that, Simon?

22                All right.

23         A.   Okay.  What's the date on that?

24   BY MR. SANFORD:

25         Q.   April 6, 2019.



1          A.    When did Chase resign?

2          Q.    Well, it was after that, wasn't it?

3          A.    It was right after that on that day.

4              MR. DROGIN:  Correct.

5 BY MR. SANFORD:

6          Q.    Do you recognize this document?

7          A.    Yes, I read it.

8          Q.    All right.

9               What is the document?

10         A.    What is it?

11         Q.    Yes.

12         A.    It is basically saying that we're

13 not to work with Chase anymore.  Listen, Tiffany

14 tried to be nice to her.  She kept complaining,

15 you know, "Look, I do this.  I'm feeling" --

16             I said "Chase, she is a little --

17 you know, she is a little annoying.  She gets,

18 you know, bossy and stuff.  It is just the way

19 she is.  Let it go."

20             And she kept saying "Well, she does

21 this now; she does that.  And I'm saying just

22 tolerate it, please, you know."

23             And so, finally it just hit a point

24 where it was just no longer able to be -- no

25 longer viable, if you will.



```
 1          Q.    Did you approve of Ms. Chen sending
 2    this e-mail?
 3          A.    She sent it.  I didn't disapprove of
 4    it.
 5          Q.    Did you know she was going to send
 6    it?
 7          A.    I don't remember that.  This wasn't
 8    meaning that Chase was fired by any means.  This
 9    meant that she would not work on the project.
10    It just went another direction.  It is not
11    working, so we do other things.
12          Q.    Well, what exactly prompted you to
13    decide that Ms. Robinson was no longer involved
14    in any of the projects?
15          A.    There were not -- not just this
16    thing.  Because it was too -- she was doing
17    things for Tiffany, not cooperating, not doing
18    this, not just doing what she was asked.
19                Tiffany gets along with people.  She
20    is easy.  She has fun.  This was like not
21    working.  It just, you know -- there was too
22    much stress for Tiffany.  Eventually Tiffany was
23    saying, "Wait a minute.  I'm not doing anything
24    but I'm getting a lot of resistance from her.
25    She's not nice to me.  She's dismissive," blah,
```



1 blah, blah.

2          What am I going to do?  I don't want

3 to see this kind of situation, but it happens.

4          And then, Chase by all means took it

5 where she took it.  But, you know --

6      Q.   Was it true that you didn't want

7 anything to be discussed with Ms. Robinson after

8 April 6, 2019, as it says --

9      A.   About the house.  We had other

10 things to do.  It wasn't just the house.  She

11 would not be involved in the house anymore.

12 That's all.

13      Q.   So what did you understand

14 Ms. Robinson's job responsibilities to be going

15 forward after April 6, 2019?

16          MR. DROGIN:  Objection to the

17      form.

18      A.   Everything with the office.  There's

19 always stuff in relation to the office.  Just

20 things I can't think of off the top of my head,

21 but there was always stuff and that -- what was

22 I going to say?

23          Yes, it was just, there was

24 always -- there were always things to be done.

25 It just shifted.  And it shouldn't have been, it



Page 597

1  shouldn't have been a real problem.  I wanted

2  her there.  She brought her friend Rachel in.

3  She was part of the project, and now it is

4  becoming difficult.  I just had no idea this

5  would happen.

6            So, you know, what am I going to do?

7  She could have easily have been very cooperative

8  with Tiffany and done things with me and the

9  three of us could have worked.

10           Could it have been -- she was

11  obviously possessive about things, territorial,

12  and that became an issue.  Ad instead of being

13  respectful to the situation, she was not.  And

14  disrespectful of anything.  Who needed this?

15           But I didn't -- I said fine.  It got

16  to that point, we'll do other stuff.  I wasn't

17  in any way thinking of firing her.

18 BY MR. SANFORD:

19      Q.   At any point since Ms. Robinson's

20 employment ended, have you ever provided

21 Ms. Robinson with a written recommendation?

22      A.   No, we never got to that point.

23      Q.   At any point since Ms. Robinson's

24 employment ended, have you provided Ms. Robinson

25 with an oral recommendation?



```
 1          A.    No, it wasn't necessary.
 2          Q.    Well, has anyone called you to
 3   inquire about Ms. Robinson for a recommendation?
 4          A.    No, no one has ever called me, had
 5   ever called me.
 6          Q.    Has anyone ever called anyone on
 7   your staff, to your knowledge, about
 8   Ms. Robinson?
 9          A.    That, I wouldn't know.  That's
10   something else.
11          Q.    Bottom line is you haven't offered
12   to write a recommendation for Ms. Robinson,
13   right?
14          A.    Well, you know, I wasn't -- I was,
15   you know -- she was a little -- you know, if she
16   had written a letter to a prospective employer
17   that made sense, I would have said okay.  I
18   would have talked to her about it.  I would have
19   said well, okay, I just want to change this or
20   that and I want to talk to that person because I
21   do -- I would want to give them the full
22   picture, not just in a letter, because it is my
23   responsibility to make sure whoever Chase goes
24   to, since she worked for me for 11 years, that
25   that person gets the proper picture of who would
```



Page 599

1    be working for them so they can't say to me,
2    "Well, you didn't tell me this or that."
3                So things change no matter how good
4    a recommendation you give somebody.
5        Q.    Well, that wouldn't be known as a
6    recommendation, would it?
7        A.    Yes, it would.  Yes, it would.
8        Q.    But you wouldn't be recommending her
9    for the job.  You would be doing the opposite,
10   wouldn't you?
11       A.    No, I was just saying what her
12   qualifications, what her strong points are and
13   the other ones just to be aware of.  That's all.
14   That's my responsibility.
15       Q.    Yes, abut you have alleged in this
16   case that Ms. Robinson stole from you.  So would
17   you say to a prospective --
18       A.    I'm talking about before I learned
19   that she stole from me.
20                MR. DROGIN:  Your question didn't
21           narrow it down to time.  You just asked
22           an open-ended question.
23   BY MR. SANFORD:
24       Q.    All right.
25                So before -- so before, you know,



1    all of this blew up, you would have given

2    Ms. Robinson a recommendation.

3            What would be the strong points you

4    would have said to a prospective employer?

5                MR. DROGIN:  Objection.

6          Objection to the form.

7          A.   Well, I would have said she takes

8    care of business.  She tries to be thorough.

9    She is conscientious about what she does in what

10   I could see.  She had strong points about

11   things.

12           She had found an e-mail that someone

13   who I knew wrote that kind of falsified

14   something, and she found a letter or two that

15   detected that this -- the falsification and the

16   root of it, if you will.  And so, that kind of

17   stuff she was good at.

18           She had good points.  I think she

19   just had other points that are not -- she was

20   envious.  She wanted other people's positions.

21   She was always finding criticisms of other

22   people who worked for me for decades and not

23   sensitive to their situation or position.

24           And I think she was ambitious in the

25   wrong place.  Not in what I had.  I had people



```
 1    who -- if you want to say loyal or worked with
 2    me for years.  And they weren't -- and they're
 3    not -- and, you know, there was a way that we
 4    did things.
 5                 And she was trying to find faults
 6    with a lot of things; with my partner, with my
 7    accountants, and even -- I would let her look
 8    here and there.  You know, it was -- I thought
 9    maybe she has a point.  I just trusted her.
10                 And then, look, she was not what she
11    cracked herself up to be.  She did disappointing
12    things.  Not so much in the job, but after
13    learning all these other things that she did.  I
14    mean, while she was on the job, in the job, it
15    was okay.
16                 I was annoyed with her about certain
17    things.  If she had done certain things right, I
18    don't think she would have quit or she would
19    have -- I would have written a recommendation
20    letter but one that would have been accurate and
21    not bullshit and a positive thing.
22                 But she did things that I cannot --
23    in all fairness, I can't -- I can't endorse
24    certain things and I can't -- I can't have the
25    person I recommend her to because there would be
```



1  somebody who, you know, would expect me to --

2  they're taking my word for it. I have a

3  responsibility.

4          MR. SANFORD: Could I ask the

5          court reporter to read back my question,

6          please.

7                  (Record read.)

8          A.  I said she's efficient in certain

9  ways, technologically with computers and all

10 that. She follows through on certain things.

11         I don't like that she was recording

12 my conversations, Robin Chambers' conversations,

13 Tom Harvey's conversations. That's not right.

14 You don't do that.

15         And when that comes to light, you

16 know, people are not going to think highly of

17 you that you would go that route, you know.

18 Period.

19         So she did things she shouldn't have

20 done. If she was on the up and up, she would

21 have just done the right thing.

22 BY MR. SANFORD:

23         Q.  So, Mr. DeNiro, since your last

24 deposition the last time we were together, have

25 you testified in any matter?



Page 603

```
 1          A.    Sorry?
 2          Q.    Have you testified in any matter
 3    since we were last together?
 4          A.    Testified how, you mean?
 5          Q.    Well, have you been deposed in
 6    connection with your ███████████████
 7    proceeding?
 8          A.    Very -- very little.  A little bit
 9    but not much.
10          Q.    When did that happen?
11          A.    Well, one was about a week or ten
12    days ago.  Another time a few weeks before that.
13    But actually I was just there to listen, not say
14    anything.
15          Q.    Did you testify?  Were you under
16    oath testifying?
17          A.    Not really.
18          Q.    Well, you were or you weren't,
19    right?
20          A.    Technically I wasn't.
21          Q.    Okay.
22                Have you testified in court in
23    connection with your ████████████████
24    proceeding?
25          A.    No.
```



Page 604

```
 1        Q.   Are your ███████████████
 2  proceedings against Ms. Hightower still ongoing?
 3        A.   Yes.
 4             MR. SANFORD:  All right.
 5             Let's take a break.  How much
 6        time do we have left on the record?
 7             Mr. DeNiro, whatever it is, we
 8        have very little time.  So we're almost
 9        done with this process.
10             THE VIDEOGRAPHER:  Okay.
11             The time is now 2:10 p.m., and
12        we're going off -- oh, sorry.
13             MR. BENNETT:  That's all right.
14        We're just trying to get a gauge on
15        timing.
16             David, do you have any idea as to
17        how long --
18             MR. DROGIN:  If we're going off
19        at 2:10, then I think we have eight
20        minutes left.
21             THE VIDEOGRAPHER:  Okay.
22             The time is 2:10 and we're going
23        off the record.
24             MR. SANFORD:  So many questions;
25        so little time.
```



Page 605

```
 1              THE VIDEOGRAPHER:  The time is
 2        2:10.  We're going off the record.
 3                     (Whereupon, at 2:10 o'clock
 4              p.m., a recess was taken until 2:15
 5              o'clock p.m.)
 6                     THE VIDEOGRAPHER:  The time is
 7        2:15 p.m.
 8                     We are back on the record.
 9   BY MR. SANFORD:
10        Q.    All right.
11              Mr. DeNiro, we have about eight
12   minutes left.
13              Do you understand you're still under
14   oath?
15        A.    Yes, yes.
16        Q.    Okay.
17              Would you agree that in preparing
18   for your film roles you often find ways to live
19   as the characters you're attempting to portray?
20        A.    Everything is different.  Not
21   necessarily.  Not live the way they -- do
22   certain things that they would do possibly in
23   certain situations, behave certain ways
24   possibly.  Every situation is different.
25        Q.    Well, you're quoted as saying at one
```


MAGNA
LEGAL SERVICES

1 point you like to totally submerge yourself into

2 a character, right?

3          A.   Well, that's what I like to do.

4 That isn't what I always do.  Don't always

5 believe what you read.

6               What?

7          Q.   Well, when you said that or when you

8 sometimes do that, what does it mean to totally

9 submerge yourself into a character?

10         A.   You can't totally submerge yourself

11 into a character.  You can get tastes of it,

12 bits of it, moments of it.

13               And it depends on what the character

14 is; whether it is a physical thing, whether it

15 is a physical, mental and certain things that

16 you can only get, get to by working on it and

17 practice in a certain way.

18               It is called muscle memory or

19 whatever.  You do certain things; something with

20 the back, something with the leg or an ailment

21 or some character thing in the face or in the

22 body or whatever.

23               So that's a physical thing and how

24 that affects you mentally, and then what you do,

25 how you, again, practice, practice what that is,



1  what those movements are so they're more second

2  nature.  They're not just something you learned

3  on the day, which you sometimes can do and

4  you'll be all right.

5            It depends on really what it is.  So

6  I don't submerge myself in a character where I'm

7  living in that character as that character in a

8  room, though that's possible.

9            And there are some actors who might

10  do that, and that's valid as long as you don't

11  hurt yourself or anybody else.  That's fine.

12  That's a very viable way of working on

13  something.

14       Q.   Have you ever found that portraying

15  certain characters in a film affects your

16  personality off screen?

17       A.   No, not really.  I mean, when you're

18  in that, you're in it and you're out.  And

19  there's a difference and there's a relief that

20  you're out.

21            There are times that you have

22  elements of it or residual, residual things come

23  through at the end of the day or something, but

24  it is not -- that's about it.  Voice things,

25  something like that if you're doing a particular



1    accent.

2              But that's really -- in my

3    experience.  Listen, there are other actors and

4    I can't speak for them.

5         Q.   Can you think of a time when in

6    which you portrayed a character in film where it

7    affected your personality off screen?

8         A.   Not to a point where it really is

9    anything of any importance.  Let's put it that

10   way.

11        Q.   There was a piece in Vanity Fair,

12   June Guterman, your assistant in Raging Bull,

13   who was quoted in that piece as saying, and I

14   quote "You never break character even when

15   filming stops."

16             Do you agree with that?

17        A.   Well, in that situation I might have

18   kept -- tried to keep in character to a degree,

19   of course.  But at the same time, that's only

20   when you can.  Other times you can't.  You're

21   interacting with people.

22             Maybe you try to keep to yourself

23   more so you don't have to break certain things.

24   Not necessarily breaking character.  It is

25   breaking concentration and distractions that are



1  unnecessary -- that, yes, yes.

2        Q.   Have you ever found yourself

3  continuing to behave like one of your characters

4  after filming stopped?

5             MR. DROGIN:  Objection to the

6        form.

7        A.   No, no.  There was a movie, I forget

8  who was in it, somebody was telling me the

9  actor -- you know, he's so caught up in the

10  characters he plays.  It was like in the '30s.

11  It was a pretty well-known movie that he did all

12  that.

13             But I have not -- I've not had that.

14  But, look, there could be actors who, you know,

15  do it.  To a degree.  Some you do a little more

16  or a little less depending on the character.

17  Some scenes you get more into practicing certain

18  things that this character would do in that

19  scene, behavioral, this or that.  But never to

20  the point where you're into their reality when

21  you're out of -- when you're not shooting, if

22  you will.

23  BY MR. SANFORD:

24        Q.   All right.

25             We're just about out of time.  I'm



Page 610

```
 1    just going to give you an open question or two
 2    and then we're done.
 3             A.    Okay.
 4             Q.    When you look back at what's
 5    happened here, this is a bit of a mess.
 6             A.    Yes.
 7             Q.    A messy situation.  I appreciate
 8    that.  You appreciate that.  It is difficult for
 9    everybody.
10             When you think back on it, do you
11    have any regrets about anything?
12                  MR. DROGIN:  Objection to the
13              form.
14             A.    I don't -- you know, I regret that
15    maybe I should have -- maybe should have let
16    Chase go before that Christmas.  She had me in a
17    position where I needed her for the holidays
18    with everything with the kids and the family and
19    this and that.
20             She said -- I thought she intimated
21    she had another offer.  I'm not sure.  I could
22    be wrong.  I said okay, let's -- so we came up
23    where I think I offered or she asked for $60,000
24    more a year and I said okay.  Maybe -- and when
25    those titles were being asked of me, I should
```



Page 611

1    have said, "Look, you have to find a job where

2    you feel that you're getting more.  Maybe you're

3    just not getting what you need from the

4    situation with me.  I will write you a

5    recommendation.  I will help you get that."

6              At that time I might have been more

7    disposed to it in doing an accurate

8    recommendation for her.  That's first and

9    foremost because -- not negative.  It is just

10   what a person is so that they know what they

11   have.

12             It is not negative.  It is just the

13   mild pros and cons, if you will.  That, you

14   know, that would have been maybe another way to

15   go.  Just say there's going to be trouble here.

16   I didn't, and here we are.

17             So that's it.  I regret it.  I

18   don't, I don't wish Chase bad or anything.  I

19   just want to move on.  She should move on.  Good

20   luck.  Whatever.  That's all I care about.

21   BY MR. SANFORD:

22        Q.   Well, that gets to my next

23   open-ended question.  The first was looking

24   back.  The second is looking forward.

25             What would you like to see happen



Page 612

1  going forward?

2        A.   You mean for me?

3        Q.   Yes.

4             Well, for you and this whole case,

5  this whole situation we're in.

6        A.   I would just like it to go away.  I

7  think there is a lot of, a lot of wasted time.

8  And I don't usually ever find myself in this

9  type of situation, other than my divorce now and

10  ███████  certain issues.

11            I don't like to be in this

12  situation, and I'm sorry that I was dragged into

13  this.  But here I am in it, and we have to go

14  through it and come out the other side and move

15  on.  That's all.

16            I have too many other things in my

17  life to worry about; too many other real things

18  that I have to worry about, as we all do, as we

19  get older especially.

20        Q.   I understand.

21            Well, Mr. DeNiro, I'm sorry about

22  the circumstances of our time together.  I know

23  it is difficult for everyone, you included.

24        A.   Thank you.

25        Q.   Yes.  We'll see what happens going



```
 1   forward.
 2              MR. SANFORD:  I think I'm done --
 3              THE WITNESS:  Okay.
 4              MR. SANFORD:  -- for today.
 5        We'll see you at trial.
 6              THE WITNESS:  Okay.
 7              Thank you.
 8              MR. SANFORD:  Thank you.
 9              THE WITNESS:  Bye.
10              MR. BENNETT:  Bob, you can close
11        out.
12              THE VIDEOGRAPHER:  Are we ending
13        for the day?
14              All right.
15              The time is 2:24 p.m.
16              Off the record.
17                  (Whereupon, at 2:25 o'clock
18            p.m., the deposition was concluded.)
19
20
21
22
23
24
25
```



Page 614

1            INSTRUCTIONS TO WITNESS

2

3        Read your deposition over carefully.  It is

4    your right to read your deposition and make

5    changes in form or substance.  You should assign a

6    reason in the appropriate column on the errata

7    sheet for any change made.

8        After making any change in the form or

9    substance, and which have been noted on the

10   following errata sheet, along with the reason for

11   any change, sign your name on the errata sheet and

12   date it.

13       Then sign your deposition at the end of your

14   testimony in the space provided.  You are signing

15   it subject to the changes you have made in the

16   errata sheet, which will be attached to the

17   deposition before filing.  You must sign it in

18   front of a notary public.  Any competent adult may

19   witness your signature.

20       Return the original errata sheet to the court

21   reporter promptly.  Court rules require filing

22   within 30 days after you receive deposition.

23

24

25



1                          ERRATA SHEET

2

3      PAGE       LINE#     CHANGE              REASON

4      _____      _____     _____   _____

5      _____      _____     _____   _____

6      _____      _____     _____   _____

7      _____      _____     _____   _____

8      _____      _____     _____   _____

9      _____      _____     _____   _____

10     _____      _____     _____   _____

11     _____      _____     _____   _____

12     _____      _____     _____   _____

13     _____      _____     _____   _____

14     _____      _____     _____   _____

15     _____      _____     _____   _____

16     _____      _____     _____   _____

17     _____      _____     _____   _____

18     _____      _____     _____   _____

19     _____      _____     _____   _____

20     _____      _____     _____   _____

21     _____      _____     _____   _____

22     _____      _____     _____   _____

23     _____      _____     _____   _____

24     _____      _____     _____   _____

25     _____      _____     _____   _____



1                    SIGNATURE PAGE

2                          OF

3                    ROBERT DE NIRO

4

5          I hereby acknowledge that I have read the

6    foregoing deposition, dated October 21, 2022, and

7    that the same is a true and correct transcription

8    of the answers given by me to the questions

9    propounded, except for the changes, if any, noted

10   on the attached errata sheet.

11

12

     SIGNATURE: _____

13

14   WITNESSED BY: _____

15

     DATE: _____

16

17

18

19

20

21

22

23

24

25



Page 617

```
 1                C E R T I F I C A T E
 2   STATE OF NEW JERSEY)
 3                      )SS:
 4   COUNTY OF MONMOUTH )
 5
 6        I, CATHERINE M. DONAHUE, a Certified Court
 7   Reporter and Notary Public within and for the
 8   State of New Jersey, do hereby certify:
 9        That the witness whose deposition is
10   hereinbefore set forth was duly sworn by me and
11   that such deposition is a true record of the
12   testimony given by such witness.
13        I further certify that I am not related to
14   any of the parties to this action by blood or
15   marriage, and that I am in no way interested in
16   the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto set my
18   hand this 23rd day of October, 2022.
19
20        __Catherine Donahue_____
          CATHERINE M. DONAHUE, CCR
21        License No. 30X100223700
22
23
24
25
```

