# Exhibit 8

UNITED STATES SOUTHERN DISTRICT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
GRAHAM CHASE ROBINSON,

                    Plaintiff,

          -against-        Case No:
                          1:19-cv-09156 (LTS) (KHP


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,

                    Defendants.
---------------------------------------------x
DEPOSITION TAKEN VIA ZOOM

March 23, 2022
9:03 a.m.


      VIDEOTAPED DEPOSITION of MICHAEL KAPLAN, held

at the above-mentioned time, before, PAIGE HAYDEN, a

Court Reporter and Notary Public of the State of New

York.
      ---------------------------------------------X


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
 1   A P P E A R A N C E S:

 2     SANFORD HEISLER SHARP, LLP
                 Attorneys for Plaintiff
 3               1350 6th Avenue 31st floor
                 New York, New York 10019
 4
       BY:     ALEXANDRA HARWIN, ESQ.
 5

 6

 7     TRAUB LIEBERMAN
                 Attorneys for Defendant
 8               Seven Skyline Drive
                 HAWTHORNE, NEW YORK 10532
 9
       BY:     GREGORY BENNETT, ESQ.
10

11

12     TARTER KRINSKY & DROGIN LLP
                 Attorneys for Defendant
13               1350 Broadway
                 New York, New York 10018
14
       BY:     LAURENT DROGIN, ESQ.
15

16

17   ALSO PRESENT:

18   KEVIN SHOVER, VIDEOGRAPHER, MAGNA LEGAL SERVICES

19   KATE MACMULLIN, SANFORD HEISLER SHARP, LLP
     ANNIE SLOAN, SANFORD HEISLER SHARP, LLP
20   JEREMY HEISLER, SANFORD HEISLER SHARP, LLP
     SIMON SCHAITKIN, SANFORD HEISLER SHARP, LLP
21
     CHASE GRAHAM ROBINSON, PLAINTIFF
22   BRITTANY K. LAZZARO, TARTER KRINSKY & DROGIN LLP
     TOM HARVEY
23

24

25
```



Page 3

1                    FEDERAL STIPULATIONS

2

3    IT IS HEREBY STIPULATED AND AGREED by and between the

4    attorneys for the respective parties herein, that filing

5    and sealing be and the same are hereby waived.

6

7    IT IS FURTHER STIPULATED AND AGREED that all objections,

8    except as to form of the question, shall be reserved to

9    the time of the trial.

10

11   IT IS FURTHER STIPULATED AND AGREED that the within

12   deposition may be sworn to and signed before any officer

13   authorized to administer an oath, with the same force

14   and effect as if signed and sworn to before this Court.

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1

 2

 3        THE VIDEOGRAPHER:  We are

 4   now on the record.  This

 5   begins video tape number one

 6   in the deposition of Michael

 7   Kaplan, in the matter of

 8   Graham Chase Robinson v

 9   Robert De Niro and Canal

10   Productions, Inc.

11        Today is March 23, 2022,

12   and the time is now 9:03 a.m.

13   Eastern.

14        This deposition is being

15   held remotely via Zoom.  The

16   videographer is Kevin Shover,

17   and the court reporter is

18   Paige Hayden both of Magna

19   Legal Services.

20        Will counsel and all

21   parties present state their

22   appearances and whom they

23   represent?

24        MS. HARWIN:  My name is

25   Alexandra Harwin.  I am from
```



1

2  Sanford Heisler Sharp, and I

3  represent the Plaintiff,

4  Graham Chase Robinson.

5      MR. HEISLER:  Jeremy

6  Heisler from Sanford Heisler

7  Sharp, for the Plaintiff

8  Chase Robinson.

9      MS. MACMULLIN:  Kate

10  Macmullin from Sanford

11  Heisler Sharp for the

12  Plaintiff, Graham Chase

13  Robinson.

14      MS. SLOAN:  Annie Sloan,

15  from Sanford Heisler Sharp on

16  behalf of the Plaintiff

17  Graham Chase Robinson.

18      MR. SCHAITKIN:  Simon

19  Schaitkin from Sanford

20  Heisler Sharp, on behalf of

21  the Plaintiff, Graham Chase

22  Robinson.

23      MR. BENNETT:  Gregory

24  Bennett, Traub Lieberman for

25  all Defendants.



 1

 2      MR. DROGIN:  Laurent

 3   Drogin, Tarter Krinsky &

 4   Drogin, for Canal

 5   Productions.

 6      MS. LAZZARO:  Brittany

 7   Lazzaro from Tarter Krinsky &

 8   Drogin, for Canal

 9   Productions.

10      MR. HARVEY:  Tom Harvey

11   for the Defendants.

12      THE VIDEOGRAPHER:  Will

13   the court reporter please

14   swear in the witness?

15

16

17

18

19

20

21

22

23

24

25



1

2       MICHAEL KAPLAN, the WITNESS

3       herein, having been first

4       duly sworn by a Notary Public

5       of the State of New York, was

6       examined and testified as

7       follows:

8       EXAMINATION BY

9       MS. HARWIN:

10      Q.    State your name for the

11   record, please.

12      A.    Michael Ira Kaplan.

13      Q.    State your address for the

14   record, please.

15      ███      █████████████████

   ██  ████████████████████████████████

   ██  ███████████████

18          MR. DROGIN:  Ms. Harwin,

19      you want to proceed under the

20      usual Federal Stipulations?

21          MS. HARWIN:  We stipulate

22      that objections not as to

23      form are preserved for trial,

24      but objections as to form

25      must be made during the



```
 1                M. KAPLAN
 2     course of the deposition.
 3          MR. DROGIN:  Any other
 4     Federal Stipulations?
 5          MS. HARWIN:  I am not
 6     aware of any other
 7     stipulations to which we are
 8     agreeing.
 9          MR. DROGIN:  Can we ask
10     the court reporter to read
11     them, please, and then you
12     can decide?
13          THE COURT REPORTER:
14          (Whereupon, the requested
15     portion was read by the
16     reporter:
17          "It is hereby stipulated
18     and agreed by and between the
19     attorneys for the respective
20     parties herein, that filing
21     and sealing be and the same
22     are hereby waived.
23          It is further stipulated
24     and agreed that all
25     objections, except as to form
```



1              M. KAPLAN

2      of the question, shall be

3      reserved to the time of the

4      trial.

5          It is further stipulated

6      and agreed that the within

7      deposition may be sworn to

8      and signed before any officer

9      authorized to administer an

10     oath, with the same force and

11     effect as if signed and sworn

12     to before this Court."

13         MR. DROGIN:  Are those

14     acceptable?

15         MS. HARWIN:  The first

16     stipulation, I believe,

17     doesn't actually apply to

18     federal cases, and is

19     actually a New York State

20     procedural stipulation.

21         But as to the second two,

22     we do stipulate.

23         And please confirm on

24     behalf of the Defendant that

25     you so stipulate.



Page 10

```
 1                M. KAPLAN

 2          MR. DROGIN:  Sure.  For

 3     Canal, yes.

 4          MR. BENNETT:  Confirm for

 5     Defendants.

 6     Q.    Okay.

 7          Mr. Kaplan, my name is

 8  Alexandra Harwin.  I am an attorney

 9  for Graham Chase Robinson.  I am

10  going to be asking you questions

11  today, a deposition.

12          Have you ever been deposed

13  before?

14     A.    I have not had the pleasure

15  before.

16     Q.    Okay.

17          Have you ever testified

18  under oath before?

19     A.    No.  First for everything.

20     Q.    Okay.

21          Well then, let me take a

22  few minutes and I'm going to go over

23  some ground rules for a deposition

24  that should make everything run more

25  smoothly today.
```



```
 1              M. KAPLAN
 2         I am going to ask you
 3    questions and both my questions and
 4    your answers will be recorded by the
 5    court reporter.
 6         Both of us need to speak up
 7    and speak clearly and slowly so that
 8    the court reporter can record
 9    everything that we say.
10         Do you understand that?
11    A.    Uh-huh.
12    Q.    Okay.
13         So that is actually a great
14    lead into my next ground rule, which
15    is that you need to answer in a
16    verbal manner.  So a court reporter
17    cannot record a shrug, or a nod, or
18    an uh-huh.  You are going to need to
19    answer, yes, or correct, or no, so
20    that is clear what your answer is.
21         Do you understand that?
22    A.    Yes, I do.
23    Q.    Please make sure to wait
24    until I finish my question before
25    you start answering, even if you
```



```
 1                M. KAPLAN
 2   know where I am going with my
 3   question.  It is important that
 4   there is a clear record of what it
 5   is that you are answering.  So
 6   please make sure to wait until I
 7   finish my question before you start
 8   answering.
 9           Do you understand that?
10   A.    Yes.
11   Q.    Okay.
12           If you don't understand my
13   question for whatever reason, don't
14   answer it.  Just ask for
15   clarification.
16           If you answer the question,
17   however, it will be assumed that you
18   understood the question.
19           Do you understand that?
20   A.    Yes.
21   Q.    It is going to be a long
22   day.  If you need a break, let me
23   know, and we will finish your
24   answer.  If you are in the middle of
25   it, it is a fine time to take a
```



```
 1                    M. KAPLAN
 2   break, but you can't take a break if
 3   there is a question pending.
 4            Do you understand that?
 5   A.    If there is another
 6   question coming after or in the
 7   middle of the question you mean?
 8   Q.    If you are in the middle of
 9   the question.
10   A.    Okay.
11   Q.    So If I have asked a
12   question, you can't take a break
13   before answering that question.
14            Do you understand that?
15   A.    Yes.
16   Q.    Okay.
17            Are you represented by
18   counsel in this deposition?
19   A.    No.
20   Q.    Okay.
21            There may be objections
22   from time to time from the lawyers
23   for the Defendants.  But regardless
24   of any objections they state, you
25   are required to answer my questions.
```



Page 14

```
 1                    M. KAPLAN
 2           Do you understand that?
 3   A.    Yes.
 4   Q.    Okay.
 5           If you answer a question
 6   and later on remember some
 7   additional information or want to
 8   clarify your earlier response, tell
 9   me that, and we will give you an
10   opportunity to do that.
11           Do you understand?
12   A.    Yes.
13   Q.    Okay.
14           If I use a term or a
15   abbreviation incorrectly, please
16   correct my usage so that we can make
17   sure we have the same understanding
18   of what the record means.
19           Do you understand that?
20   A.    Yes.
21   Q.    When I refer to Canal, I am
22   referring to Canal Productions, Inc.
23           Do you understand that?
24   A.    Yes.
25   Q.    If -- is there any
```



Page 15

```
 1                    M. KAPLAN
 2    instructions that I have provided so
 3    far that you don't understand or
 4    agree with?
 5       A.    No.
 6       Q.    Okay.
 7             Your testimony today is
 8    under oath, just as if you were in a
 9    court of law, and providing false
10    testimony subjects you to liability
11    of perjury.
12             Do you understand that?
13       A.    Yes.
14       Q.    This testimony that you
15    provide may be used as evidence in
16    this case.
17             Do you understand that?
18       A.    Yes.
19       Q.    Are you doing this
20    deposition on a computer?
21       A.    Yes.
22       Q.    Okay.
23             Do you have any other
24    electronic devices that are on in
25    the room that you are in right now?
```



```
 1                M. KAPLAN
 2    A.    I mean, I have my phone,
 3  but it is over there (indicating).
 4    Q.    Okay.
 5    A.    But I need to leave it on
 6  in case -- I don't know.  Do I have
 7  to turn my phone on [sic]?  Is that
 8  what you are saying?  Off?
 9    Q.    Yes.  During -- while the
10  examination is going on, I would
11  like you to turn your phone off so
12  that there is no communications
13  coming to or from you other than the
14  answering of questions during the
15  deposition.
16    A.    Okay.  I will just need
17  breaks to check for --
18    Q.    We will be taking breaks
19  from time to time.  So you will have
20  the opportunity to do that.
21        MR. DROGIN:  Hold on.  I
22     object to that.  You can't
23     direct the witness to turn
24     off a telephone.  You can
25     direct the witness not to
```



Page 17

```
 1                M. KAPLAN

 2      receive or transmit during a

 3      deposition.  But if there is

 4      an emergency with one of his

 5      children, why can't he have

 6      his phone on?

 7           MS. HARWIN:  Your

 8      objection is noted.

 9      Q.    Mr. Kaplan, can you turn

10  off your phone?

11      A.    Sure.  Okay.

12      Q.    Thank you.

13           Is there anyone in the room

14  with you today?

15      A.    Just my dog.

16      Q.    Okay.

17           Is there anyone in the

18  place where you are doing this

19  deposition, are you -- let me

20  restate that.

21           Are you at your home for

22  this deposition?

23      A.    Yeah.  But if this goes

24  long enough, there might be children

25  here later.  But at the moment there
```



```
 1                  M. KAPLAN
 2   is no one here.
 3     Q.    Same for me.  Okay.
 4           Do you understand your
 5   obligation to provide testimony
 6   today that is truthful and complete?
 7     A.    Yes.
 8     Q.    Do you understand that you
 9   must provide testimony that is
10   truthful and complete even if it
11   might be hurtful to Mr. De Niro?
12     A.    Sure, yes.
13     Q.    And you understand that you
14   must provide testimony that is
15   truthful and complete even if it may
16   not be favorable for you, do you
17   understand that?
18     A.    Sure.  Yes.
19     Q.    What is your date of birth?
20   ███      ████████████████
21     Q.    Have you gone by any other
22   name other than Michael Ira Kaplan?
23     A.    No.
24     Q.    How long have you resided
25   at your present address?
```



Page 19

```
 1                 M. KAPLAN
 2     A.    About -- about six and a
 3  half years.
 4     Q.    Where did you reside before
 5  that?
 6     ███      ████████████████
    ██ ████████████████████████
    ██ █████████████
 9     Q.    Are you married?
10     A.    Yes.
11     Q.    Okay.
12           And what is the name of
13  your spouse?
14     A.    Randi Kaplan.
15     Q.    And when were you married?
16     ██    ███████████████
17     Q.    Do you have any children?
18     A.    Two.
19     Q.    How old are your children?
20     A.    Nine and seven.  Nine and
21  eight.  Sorry.  Birthday last week.
22     Q.    Happy birthday.
23     A.    Thank you.
24     Q.    Do you suffer from any
25  condition that affects your memory?
```



Page 20

```
 1                M. KAPLAN
 2    A.    Not that I am aware of, no.
 3    Q.    Have you consumed any
 4  substances that affect your memory?
 5    A.    No.
 6    Q.    Have you consumed any
 7  substances that affect your ability
 8  to communicate today?
 9    A.    No.
10    Q.    Is there any reason
11  physically or mentally that you are
12  not able to testify truthfully
13  today?
14    A.    No.
15    Q.    Have you ever been involved
16  in any lawsuit other than this one
17  as a witness?
18    A.    No.
19    Q.    Have you ever been a
20  witness in any other kind of legal
21  proceeding, whether is it a
22  judicial, arbitral or administrative
23  proceeding?
24    A.    No.
25    Q.    Have you ever been a party
```



Page 21

```
 1                M. KAPLAN
 2   in any lawsuit?
 3     A.    A party to any lawsuit?
 4   No.
 5     Q.    Have you ever been a party
 6   in any other kind of legal
 7   proceeding, whether it is judicial,
 8   arbitral or administrative
 9   proceeding?
10     A.    No.
11     Q.    Is there something that you
12   are thinking?
13     A.    You mean a courtroom thing?
14   Like going to court to -- I am not
15   understanding.
16     Q.    Sure.  Thank you for asking
17   for clarification.
18           Is there a kind of
19   proceeding that you are thinking of
20   that you are not sure whether it
21   counts?
22     A.    I mean, I -- I was a -- I
23   was interview as a -- as part of an
24   investigation to somebody in a
25   financial thing, but it wasn't -- I
```



```
 1              M. KAPLAN
 2   wasn't a witness.  I don't know what
 3   -- I don't know the difference
 4   between witness I guess.  It was in
 5   a courtroom.  Yeah.
 6      Q.    What was the -- what was
 7   the nature of the matter that you
 8   were interviewed in connection with?
 9      A.    I was interviewed in
10   connection with an insider trading
11   thing that somebody I knew was
12   involved or was accused of.  That is
13   all I know.  They are still being --
14   they are still being investigated so
15   that is why I don't know.
16      Q.    Did you provide information
17   to law enforcement?
18      A.    Did I provide -- yeah.
19      Q.    Okay.
20            Were you interviewed by
21   anyone other than law enforcement?
22      A.    No.
23      Q.    Have you ever provided a --
24   a statement, declaration, or
25   affidavit relating to any kind of
```



```
 1                M. KAPLAN
 2   legal matter?
 3     A.    No.
 4     Q.    Have you ever provided a
 5   statement, declaration, or affidavit
 6   relating to this legal matter?
 7     A.    Not that I am aware of, no.
 8     Q.    Have you ever provided any
 9   kind of statement in any case
10   involving Canal Productions or
11   Robert De Niro?
12     A.    No.
13     Q.    Have you ever been charged
14   or arrested in connection with a
15   criminal offense?
16     A.    No.
17     Q.    You have never been
18   convicted of a criminal offense?
19     A.    No.
20     Q.    Have you ever communicated
21   with the police or anyone in law
22   enforcement concerning Robert De
23   Niro?
24          MR. DROGIN:  Objection to
25       the form.  You can answer.
```



Page 24

```
 1                M. KAPLAN
 2     A.    No.  I -- I communicated
 3  with the District Attorney's Office
 4  about -- about this case basically.
 5     Q.    Okay.
 6           And when --
 7     A.    I was interviewed.
 8     Q.    When were you interviewed
 9  by the District Attorney's Office in
10  connection with this case?
11     A.    I honestly don't remember
12  the exact date.  It was sometime in
13  2019.  I think in the fall maybe, or
14  late summer.  But I don't know.  I
15  don't remember when exactly.
16     Q.    Who did you speak to in the
17  District Attorney's Office about Ms.
18  Robinson?
19     A.    I don't remember the name
20  of the -- I spoke to two different
21  agents, but I don't remember the --
22  their name.
23     Q.    Was one of them Kelly
24  Thomas?
25     A.    Yeah.  That sounds -- I
```



Page 25

```
 1                    M. KAPLAN
 2   think so.  That sounds familiar.
 3      Q.    Do you recall the name of
 4   the other person that you spoke to
 5   from the District Attorney's Office?
 6      A.    If you said it, I might
 7   recall it, but no, I don't recall
 8   it.
 9      Q.    How long did your meeting
10   with the District Attorney's Office
11   last?
12      A.    I don't remember exactly
13   how long, but I would say maybe an
14   hour, hour and a half, something in
15   that ballpark.
16      Q.    Did you communicate with
17   the District Attorney's Office on
18   any other occasion other than that
19   interview?
20      A.    I believe there was some
21   follow up -- there might have been a
22   follow up e-mail that -- questions,
23   but I don't think -- I only met with
24   them once.
25      Q.    What did you tell them
```



Page 26

```
 1                M. KAPLAN
 2   during that meeting?
 3     A.    They asked -- I don't
 4   remember that specific, but they
 5   asked a series of questions
 6   regarding how the office functions,
 7   how money situations worked, things
 8   of that nature.  But I don't
 9   remember like exactly what I told
10   them specifically.
11     Q.    What do you recall telling
12   them about how the office
13   functioned?
14     A.    I mean, I literally don't
15   remember anything that I said.  It
16   was three years ago.  I don't
17   remember the conversation, but I
18   would have answered the questions
19   just like I am going to do today
20   about specific questions that they
21   had.
22     Q.    Do you recall any questions
23   that they asked you about how the
24   office operated?
25     A.    I do -- I do not, no.
```



Page 27

```
 1                    M. KAPLAN
 2     Q.     Is there anything that you
 3  remember at all from that interview?
 4     A.     I just remember going --
 5  no.  I just remember speaking to
 6  them and talking about, you know,
 7  generally how Canal worked, and how
 8  the situation with the miles, and
 9  things of that nature.  But I didn't
10  -- I don't remember specific things
11  I said or specifically what they
12  asked me, no.
13     Q.     Have you ever made false
14  statements in connection with your
15  work?
16          MR. DROGIN:  Objection to
17     the form.
18     A.     I don't understand.  What
19  you do you mean by false statements
20  in connection with my work?
21     Q.     In connection with your
22  work at Canal, have you ever made
23  any statements that were untruthful?
24          MR. DROGIN:  Objection to
25     the form.  You can answer.
```


MAGNA
LEGAL SERVICES

```
 1                 M. KAPLAN
 2    A.    I don't know.  Maybe.  I
 3  have no idea.  I have no idea.  So
 4  sorry, I can't help you there.  It
 5  is possible.
 6    Q.    It is possible that you
 7  have made statements?
 8    A.    I don't know what you mean
 9  by false statement, so I don't know.
10  I mean, I don't -- I don't remember
11  making any false statements, but I
12  don't know what the definition of a
13  false statement is in this case, so.
14    Q.    Mr. Kaplan, let me just
15  remind you that it is very important
16  that I finish my question and you
17  finish your answer.  So if I am in
18  the middle of speaking, just let me
19  finish so that there is a clear
20  record.  Okay?  I will give you the
21  opportunity to say whatever you want
22  to say.  I just want to make sure it
23  is clear for the court reporter.
24          Have you ever made
25  statements that were untruthful in
```



Page 29

```
 1                M. KAPLAN
 2   connection with your work at Canal?
 3           MR. DROGIN:  Objection to
 4     the form.
 5     A.    I don't know if I have ever
 6   made statements that are untruthful
 7   so -- in connection with Canal.
 8     Q.    It is possible that you
 9   have made statements that were
10   untruthful in connection with your
11   work at Canal, but you don't recall,
12   is that correct?
13           MR. DROGIN:  Objection to
14     the form.
15     A.    It is -- it is possible
16   that in a -- it is possible that I
17   could have exaggerated something or
18   I could -- yeah.  I could see
19   something that would be considered
20   technically false, but I wouldn't
21   haven't outright lied anything about
22   in connection with Canal.  I think
23   I'm just -- I'm not really sure what
24   you are asking, but it is possible.
25   Sure.
```



Page 30

```
 1                M. KAPLAN
 2    Q.    Have you ever made false
 3    statements to qualify for any public
 4    benefits?
 5    A.    No.
 6          MR. DROGIN:  Objection to
 7     the form.
 8    Q.    Have you ever made any
 9    statements that were untruthful to
10    qualify for housing benefits?
11          MR. DROGIN:  Objection to
12     the form.
13    A.    No, I have not.  No.
14    Q.    Have you ever been accused
15    of making any kind of false or
16    untruthful statements?
17    A.    No.
18    Q.    Have you ever been accused
19    by anyone affiliated with Mr. De
20    Niro or Canal of making any
21    statements that were untruthful?
22          MR. DROGIN:  Objection to
23     the form.
24    A.    With -- affiliated with
25    Canal or by Mr. De Niro?
```



Page 31

```
 1                    M. KAPLAN
 2     Q.     Anyone associated with Mr.
 3   De Niro or Canal?
 4          MR. DROGIN:  Objection to
 5      the form.  You can answer.
 6     A.     I have not been accused by
 7   anybody who is officially associated
 8   with Canal of making false
 9   statements.
10     Q.     Have you been accused by
11   Tiffany Chen of making false
12   statements?
13          MR. DROGIN:  Objection to
14      the form.
15     A.     Yes, you can say that.
16     Q.     What -- what did Ms. Chen
17   accuse you of?
18     A.     Ms. Chen accused me of --
19   let's see, a variety of things, but
20   mainly, stealing petty cash, and
21   lying about -- a -- a lamp that I
22   was supposed to -- got ordered.
23   Lying about -- his father's art
24   studio, a leak situation.  And --
25   I'm trying to keep track because,
```



Page 32

```
 1                M. KAPLAN
 2   again, this is three years ago.
 3   Trying to move on from that, but --
 4   but yeah, things of that nature.
 5        MR. DROGIN:  Just let the
 6     record reflect that Mr.
 7     Kaplan is male.
 8        THE WITNESS:  I am.
 9        MS. HARWIN:  Counsel, you
10     can make objections on the
11     record, but you can't
12     interject information on the
13     record.
14   Q.    Mr. Kaplan, have you done
15   anything to prepare for today's
16   deposition?
17   A.    I spoke with the lawyers
18   for the Defendants present yesterday
19   just to go over sort of the
20   framework of what I could expect for
21   today.
22   Q.    Okay.
23   A.    But I haven't -- that is
24   about it.
25   Q.    Which lawyers did you
```



Page 33

```
 1                 M. KAPLAN
 2  communicate with yesterday?
 3     A.    With Mr. Bennett, and Mr.
 4  Harvey, and Laurent.
 5     Q.    How long did you spend
 6  communicating with them?
 7     A.    About an hour or so.  Hour
 8  and a half.
 9     Q.    Did you review any
10  documents in preparation for your
11  deposition?
12     A.    Any documents, no.
13     Q.    Were you presented with any
14  documents to review?
15     A.    I was presented with a
16  couple of text messages that I have
17  -- I have sent.
18     Q.    Okay.
19           What specific text messages
20  did you review?
21           MR. DROGIN:  Objection to
22     the form.
23           Can you just clarify
24     whether the witness was shown
25     the documents?
```



Page 34

```
 1                M. KAPLAN
 2          MS. HARWIN:  I am asking
 3     which text messages he
 4     reviewed.
 5   A.    I was not shown.
 6          MR. BENNETT:  I think
 7     Laurent's point is something
 8     that should be clarified
 9     because one is a document,
10     and one is the information
11     that is conveyed by legal
12     counsel to somebody else.  So
13     I think that should be asked.
14          MS. HARWIN:  I am not --
15     I am not following what the
16     distinction is that you are
17     drawing.
18          MR. DROGIN:  We will
19     represent to you that we did
20     not show him any of the text
21     messages that he is
22     describing.
23          MS. HARWIN:  Okay.
24   Q.    So Mr. Kaplan, what text
25   messages did you review?
```



Page 35

```
 1                M. KAPLAN
 2    A.    I was told that I had sent
 3   some text messages where I used the
 4   word -- like the words that we were
 5   trying to humiliate Chase, and I
 6   said something about a random
 7   number, things of that nature.  But
 8   yeah, I didn't see them specifically
 9   if that is what you are talking
10   about.  But I did -- I did hear,
11   just to prepare myself mentally that
12   this is the type of thing that you
13   are going to probably be bringing
14   up, so --
15    Q.    Were there any other topics
16   that you prepared yourself mentally
17   for us to bring up today?
18        MR. BENNETT:  Objection.
19     Don't reveal any privileged
20     information that you
21     discussed with counsel.
22        MS. HARWIN:  Counsel, Mr.
23     Kaplan has already testified
24     that he is not represented by
25     counsel in connection with
```



```
 1              M. KAPLAN
 2    this deposition.
 3        MR. BENNETT:  As a former
 4    employee of Canal, we are --
 5    we are entitled to make
 6    objections on behalf of Canal
 7    employees whether former or
 8    present.  That is what I am
 9    doing.
10        MS. HARWIN:  You are
11    entitled to make objections,
12    but there is no privileged
13    relationship as far as I
14    understand.
15  Q.    So Mr. --
16        MR. DROGIN:  I don't
17    believe that is -- I don't
18    believe that is correct.
19    This is a Canal employee who
20    has met with Canal's counsel.
21  Q.    Mr. Kaplan, are you
22  presently employed by Canal?
23  A.    I'm not -- I am presently
24  -- I still do work for Canal as far
25  as like on a consulting basis.  I am
```



Page 37

```
 1                    M. KAPLAN
 2   still on the benefit plan, but I am
 3   not -- I am not on a regular -- like
 4   a 1099 or W-2 relationship at the
 5   moment.
 6      Q.    When did your full-time
 7   employment at Canal end?
 8      A.    In April, I believe, of
 9   2020.
10      Q.    And what were the
11   circumstances that led to the end of
12   your full-time employment at Canal?
13      A.    My full-time employment
14   ended when -- well, we had had a --
15   the circumstances officially were
16   that there was a pandemic, as you
17   are aware, and there was no office
18   or anything to go to.  So I went on
19   the furlough -- I was furloughed
20   officially.  But yeah, if you are
21   getting at before that, I had --
22   Tiffany and I butted heads on some
23   things, and I was -- I wasn't
24   officially -- I still worked for
25   Canal though up until the pandemic,
```



```
 1                    M. KAPLAN
 2    so there was -- I was looking to
 3    leave but I hadn't -- I hadn't -- I
 4    hadn't left Canal when the pandemic
 5    started, but we had discussed -- I
 6    had discussed with Bob -- it was
 7    basically brought to -- you know, it
 8    was going to be best for everybody
 9    if I left.  So I was probably going
10    to leave that summer, or early
11    spring, or like May, or so, but we
12    never got to that point because of
13    the pandemic.
14        Q.    Mr. De Niro asked you to
15    leave your employment, is that
16    correct?
17        A.    Yes.  In -- I believe in
18    January of 2020.
19        Q.    And did Mr. De Niro explain
20    to you why he wanted you to leave
21    your employment?
22        A.    Well, I mean, in so many
23    words it was -- it was both myself
24    and -- Tiffany did not want us
25    working there.  We had a meeting
```



```
 1                M. KAPLAN
 2   earlier about this, I believe, I
 3   want so say October -- no.  It was
 4   later than that.  November or
 5   December of 2019.  I don't remember
 6   the date, but we had had a meeting
 7   and after the meeting I -- it seemed
 8   like I was going to be around for a
 9   bit, but then I am gathering, I am
10   speculating that she just sort of
11   impressed upon him that she wanted
12   me out.  So we talked, and he sort
13   of conveyed to me that he was going
14   to move on eventually.  We had hired
15   somebody new in the office and they
16   would eventually be doing my duties,
17   but that it wasn't like a -- there
18   was no like end date officially, but
19   just to start, you know -- you know,
20   start moving towards that direction.
21      Q.   You continue to be on a
22   benefit plan administered by Canal
23   Productions, is that right?
24      A.    Not at the moment.  At the
25   moment I am not anymore.  But I mean
```



```
 1              M. KAPLAN
 2   I am on the -- I was for the -- for
 3   the entire time I was on
 4   unemployment.  I was like furloughed
 5   so -- yeah.  So I was on the benefit
 6   plan.
 7     Q.    Did -- did there come a
 8   time when you ceased to be on any
 9   Canal benefits?
10     A.    No, because now I am on the
11   Cobra plan.
12     Q.    Cobra?
13     A.    Yes.
14     Q.    Okay.
15           When did -- well, let me
16   ask a separate question.
17           Are you currently employed?
18     A.    No.  Currently I am doing
19   some, like I said, some freelance
20   consulting type work with Canal.  I
21   do a podcast, I do some standup
22   comedy, and I am a stay-at-home dad.
23   That is my primary employment at the
24   moment.
25     Q.    How much income do you
```



Page 41

```
 1                M. KAPLAN
 2   receive from Canal for your
 3   consulting work?
 4     A.    It is hourly so it really
 5   depends.  It is -- I am doing work
 6   with a project it is -- involving
 7   Texas, an event they are doing in
 8   Texas.  And I still -- things have
 9   come up, questions.  If there is a
10   question for me I answer it.  So it
11   depends.  So months -- there was
12   some months where it is only a few
13   hours.  There is some months where
14   it is 50 hours.  It just depended on
15   -- it depends on what is going on.
16   I was doing some work with Robin at
17   some point.  I was doing some work
18   with the new people in the office to
19   show them things, art related, to
20   his father's artwork, things of that
21   nature.  But I don't anticipate it
22   being, you know, much longer, but I
23   don't -- who knows.
24     Q.    Do you get compensated for
25   time that you are here being
```



MAGNA
LEGAL SERVICES

Page 42

```
 1              M. KAPLAN
 2   deposed?
 3      A.    I don't think so.  But if
 4   they want to pay me -- I am just
 5   kidding.  No.
 6      Q.    Have you ever been
 7   compensated for any time that you
 8   have spent in communication with
 9   Canal's lawyers?
10      A.    No.
11      Q.    When did you first come to
12   work for Canal?
13      A.    I started to work for Canal
14   in -- part-time basis in 2003,
15   February.  And I worked a full-time
16   basis in, I believe, 2006, January
17   or so.
18      Q.    What was your educational
19   background prior to joining Canal?
20      A.    I went to Syracuse
21   University, and I have a
22   television/radio/film degree, New
23   House School of Communications.  Go
24   Orange.  And I -- that is it.
25   Bachelor's.
```



Page 43

```
 1              M. KAPLAN
 2    Q.    What -- what was your role
 3   at Canal when you were employed
 4   there?
 5    A.    In the beginning you mean
 6   or --
 7         MR. DROGIN:  Objection to
 8     the form.
 9    Q.    Did your role change during
10   the course of your employment at
11   Canal?
12    A.    Yeah.  It changed a little
13   bit.  I started mainly helping with
14   storage, helping somebody else who
15   was in the office with organizing
16   things with storage, running
17   errands.  Over time I started to do
18   -- we would work with all the
19   properties that he owned as far as
20   if they needed maintenance or
21   someone to sit there and supervise.
22   We did -- the storage project turned
23   into what ended up becoming like the
24   archiving project for stuff that
25   ended up going to the University of
```



Page 44

```
 1              M. KAPLAN

 2    Texas.  And then -- and then over

 3    time I started to doing more and

 4    more work with his father's artwork

 5    as far as showing people the studio,

 6    organizing the things that we had in

 7    storage, or if anything came up with

 8    the artwork.  And from the beginning

 9    pretty much I would also videotape

10    like birthday parties and things of

11    that nature for him, holiday

12    parties, take pictures.

13           Can I have one moment just

14    to refill my coffee?

15    Q.    Absolutely.  Let's take a

16    break.

17           MS. HARWIN:  We can go

18       off the record.

19           Could the videographer

20       take us off the record?

21           THE VIDEOGRAPHER:  Sorry.

22       The time is 9:37 a.m.  We are

23       going off the record.

24           (Whereupon, a recess was

25       taken at this time.)
```



Page 45

```
 1                M. KAPLAN
 2           THE VIDEOGRAPHER:  The
 3      time is now 9:38 a.m.  We are
 4      back on the record.
 5    Q.    Mr. Kaplan, what titles did
 6   you hold during your employment at
 7   Canal?
 8    A.    I never -- honestly like
 9   titles, I never really -- I was an
10   assistant -- you know, I don't -- I
11   don't really know.  I didn't really
12   have a title.  I was an assistant to
13   Mr. De Niro, sort of a
14   jack-of-all-trades, sort of -- but I
15   didn't have a title.  I did a bunch
16   of different things, but any title
17   that was used would have been more
18   of a joking matter.
19    Q.    What titles did you use as
20   a joke to characterize your
21   employment at Canal?
22    A.    We called it super places
23   because I was at the -- the ███
24   ██████ property would be very
25   secretive.  He would be very
```



Page 46

1                    M. KAPLAN

2    secretive about it.  Secret places

3    administrator.  Secret -- at one

4    point Michael Weber had a title that

5    he was president of awesome or

6    something.  I was assistant awesome

7    to -- I can't think of a title that

8    wasn't a joke.  So that is --

9        Q.    Did you characterize

10   yourself as secret project manager?

11       A.    At some point, possibly.

12       Q.    Okay.

13       A.    That might have been a

14   LinkedIn or something at some point.

15       Q.    And what duties did you

16   perform for Mr. De Niro that led you

17   to characterize yourself as a secret

18   projects manager for Canal?

19       A.    It was more of a -- because

20   he had -- he has his office located

21   in Tribeca, and around the block is

22   an apartment that we would sort of

23   work out of with archiving stuff.

24   And for a long time he was very

25   secretive about keeping certain



Page 47

```
 1                M. KAPLAN
 2   things there.  It wasn't really a
 3   logical reason for this, but that is
 4   just how he was.  So it was kind of
 5   a joke that we would go to secret
 6   places and take things to secret
 7   places, so secret places -- whatever
 8   I said.  But it was literally just
 9   like movie props, movie -- movie
10   scripts, um, photos, old photos,
11   things of that nature.
12     Q.    Did -- did there come a
13   time when you characterized yourself
14   as the SVP secret ops for Canal?
15     A.     Probably, yes.  Because
16   everybody -- that might be more
17   towards the later year because as I
18   think -- I think it was a joke that
19   like Netflix or some company.  I
20   think they had like 7,000 senior
21   vice presidents so I thought we
22   should have some.
23     Q.    And what -- what role did
24   you -- let me restate that question.
25         What duties did you perform
```



Page 48

```
 1                 M. KAPLAN
 2    for Mr. De Niro that -- that led you
 3    to characterize yourself as SVP
 4    secret ops for Canal?
 5       A.    Again, it is the same
 6    thing.  It is literally -- it is
 7    photos, it is -- it is old home
 8    movies, it is just anything that he
 9    kept.  Weird chotskies that he would
10    keep over in -- they would pick up
11    from places.  Calendars that he made
12    for -- you know, just like personal
13    stuff that we would sort of oversee.
14    But it was not a -- it was not a day
15    where things got secreter [sic] so
16    it just was what it was.
17       Q.    Did you assist Mr. De Niro
18    with respect to any of his divorce
19    proceedings?
20       A.    With his divorce
21    proceedings?  Um, yes.  I helped
22    with -- I did -- I don't remember
23    specifically what we did, but yeah,
24    things with like looking up --
25    helping with -- I helped find an
```



Page 49

```
 1              M. KAPLAN
 2    ████████████████████████████
 3    that was the name.  Yeah.  I think
 4    ██████████████████████
 5 ██ ██████████████████████████
 6    I think Bob had -- you know, it was
 7    like helping him find something that
 8    he had sent to himself.  Things like
 9    that.  That is the one that stands
10    out.  That is something that I
11    remember vividly telling Chase about
12    because it was the day before I
13    almost dropped dead so anyway.
14       Q.   Do you recall any other
15    project that you worked on with Mr.
16    De Niro that he wanted to keep a
17    secret?
18          MR. BENNETT:  Objection.
19       You can answer.
20       A.   Any projects that he wanted
21    to keep secret?  Off the top of my
22    head I don't really remember what --
23    what -- what was actually secret or
24    what wasn't, but no -- so --
25       Q.   Have you ever signed any
```


MAGNA
LEGAL SERVICES

Page 50

```
 1                M. KAPLAN
 2    kind of formal employment agreement
 3    with Canal?
 4      A.    What do you mean by that?
 5      Q.    Have you ever had a
 6    contract for employment with Canal?
 7      A.    No.
 8      Q.    Have you ever signed a
 9    confidentiality agreement with Canal
10    like a nondisclosure agreement?
11      A.    I have signed --- I have
12    signed nondisclosure for specific
13    family functions, where there was
14    nondisclosure agreements for staff
15    members.  But I have not as an
16    overall, no.  Not for a time
17    certain.
18      Q.    What specific events did
19    you sign nondisclosures for?
20      A.    I remember when there was
21    like some holiday parties or
22    birthday parties where there would
23    be -- it would be agreements to get
24    the staff to sign, like the DJ or
25    whatever.  There was one -- I think
```



Page 51

```
 1                M. KAPLAN
 2    his birthday party.  There was once
 3    -- I think the 70th birthday party
 4    where I think there might have been
 5    one -- might have been one I signed.
 6    I actually don't remember to be
 7    honest.  But I know that I -- I know
 8    I signed it at one point, but I
 9    don't remember which event.  So
10    clearly it is not very binding if I
11    don't remember.
12       Q.    At this deposition today,
13    you are not permitted to withhold
14    information based on any
15    nondisclosure agreement that you
16    have signed.
17            Do you understand that?
18       A.    Yes.
19       Q.    When you were working at
20    Canal, did you have any other forms
21    of employment?
22       A.    Yeah.  Yes.  In the
23    beginning I worked also at Fair
24    Trial Publications in the IT
25    department.  That was for the first
```


MAGNA
LEGAL SERVICES

Page 52

```
 1              M. KAPLAN

 2   three -- three years or so and then

 3   -- other than that, no.

 4     Q.    Did you do any other kind

 5   of work during your employment at

 6   Canal?

 7          MR. DROGIN:  Objection to

 8     the form.

 9     A.    Not -- no.  Not that I was

10   paid for.

11     Q.    Okay.

12          Did you do any kind of work

13   that you weren't paid for during

14   your employment with Canal?

15          MR. DROGIN:  Objection to

16     the form.  Just a second.

17     Objection to the form.  Go

18     ahead.

19     A.    I mean, I worked -- I did

20   like a podcast, you know, if that is

21   what you are -- I don't know if that

22   is what you are asking.  But that

23   wasn't something I was making money

24   on at the time.

25     Q.    And what was the podcast
```



```
 1                M. KAPLAN
 2   that you hosted during your
 3   employment with Canal?
 4      A.    It is called Lost in
 5   America.
 6      Q.    And how many hours a week
 7   would you spend on that podcast?
 8      A.    It was a one hour -- a one
 9   hour a week podcast.
10      Q.    Did you spend any other
11   time preparing for the podcast?
12      A.    Yeah, probably about --
13   like say another hour preparing for
14   each episode or so.  So that is two
15   hours, and maybe some time sharing
16   things on social media.  So maybe
17   that will get us up to three hours
18   perhaps.
19      Q.    Okay.
20            And during -- let me
21   restate that.
22            Did you do work in
23   connection with your podcast during
24   working hours?
25      A.    Not very often, but
```

Page 54

```
 1                  M. KAPLAN

 2    probably sometimes.  It depended on

 3    -- you know, I don't know what you

 4    mean about working hours because we

 5    had -- you were always working sort

 6    of kind of mentality.  During the

 7    9:00 to 5:00 if that is what you

 8    mean.  Usually not, usually we

 9    recorded after 5:00.  But there

10    probably were some examples just

11    because of our guests or whatever we

12    would record during the day back

13    when we did things in person.

14       Q.    During your employment at

15    Canal, how closely did you work with

16    Mr. De Niro?

17            MR. DROGIN:  Objection to

18       the form.

19       A.    I -- I don't know what you

20    mean by closely.  But I -- I worked

21    -- I would -- we had -- one of the

22    other things that I didn't mention

23    earlier was I would go to a lot of

24    events with him so that would be the

25    time I would see him the most.
```



```
 1                M. KAPLAN
 2   Other than that, I didn't really
 3   work that closely with him.  He was
 4   -- we did things for him, but, you
 5   know.  I -- I wasn't like -- I don't
 6   know what you mean by closely.  But
 7   we didn't speak that often.
 8      Q.    How often did you
 9   communicate with Mr. De Niro?
10          MR. DROGIN:  Objection to
11      the form.  You can answer.
12      A.    It just depended.  It
13   depended on what was going on.  That
14   was the type of job it was.  So if
15   he need -- if there was a specific
16   thing that you know I would -- it
17   was like if I had to get a bike seat
18   for his daughter, and it had to be
19   designed then during that time
20   period I would communicate with him
21   a lot because we were going back and
22   forth on everything.  If there was a
23   specific thing with his phone, or if
24   it was a specific thing I was
25   communicating with him a lot, but if
```



Page 56

```
 1                    M. KAPLAN
 2   there wasn't, then I wouldn't talk
 3   to him a lot because I didn't -- I
 4   didn't regularly have like a -- a
 5   daily reason to talk to him.
 6     Q.    Okay.
 7           Mr. De Niro would tell you
 8   what he needed done and you would do
 9   it, is that correct?
10     A.    That -- that is -- yeah.
11   Definitely.
12     Q.    During your employment at
13   Canal, Mr. De Niro was the person
14   you considered to be your boss, is
15   that correct?
16           MR. DROGIN:  Objection to
17     the form.
18     A.    Yes.  I would consider him
19   my boss.
20     Q.    During your employment at
21   Canal, what was your role with
22   respect to petty cash?
23     A.    When I started at the
24   office there was -- I had nothing to
25   do with petty cash, but after
```



Page 57

```
 1                M. KAPLAN
 2    Michael Weber left, I started to be
 3    the person to tabulate the petty
 4    cash each time it would be finished
 5    and send it to the accountants.  It
 6    was started -- before it was Berdon,
 7    it was a different -- it was a
 8    different accounting firm, but -- so
 9    that was my -- I wasn't in charge of
10    -- I wasn't in charge of reimbursing
11    anybody else, but I would tabulate
12    everybody's receipts, make sure we
13    were relatively even, and then send
14    the breakdowns.  I would do
15    breakdowns of what we spent on
16    meals, and transportation, and
17    office supplies, and tips, stuff
18    like that, and send it off to them.
19        Q.    What were the years when
20    you were in charge of reviewing and
21    tabulating petty cash for Canal?
22        A.    I believe probably starting
23    in 2009 or 2010, up to 2019.
24        Q.    What were the different
25    types of petty cash used at Canal?
```



```
 1                  M. KAPLAN
 2     A.    What do you mean?
 3     Q.    Were there different --
 4  were there different categories of
 5  petty cash at Canal?
 6     A.    You mean do we get cash for
 7  different reasons or -- I don't
 8  understand.
 9     Q.    Yes.
10           Were there -- thank you for
11  asking for clarification.
12           Were there different
13  categorizations of the type of petty
14  cash that were used by Canal?
15     A.    Not -- I don't -- my way of
16  understanding it, I am not a
17  financial person, was it didn't
18  matter to the accountant, because to
19  them it was petty cash.  There was
20  different types in the sense that
21  there was petty cash that went
22  directly to Bob or directly money
23  to, you know give him or his family.
24  There was petty -- there was a petty
25  cash that came to the office, which
```



Page 59

```
 1                M. KAPLAN
 2   was the only petty cash I had
 3   anything to do with.  And there was
 4   petty cash for specific events
 5   sometimes, a party or something, or
 6   -- and -- the cases of the apartment
 7   later, that sometimes I did actually
 8   deal directly with.  Sometimes Chase
 9   or -- if it was a party, we might --
10   there might be a time that he gave
11   the cash to Bob's wife to give the
12   kids or something, but, yeah in most
13   cases it was the office petty cash.
14   It was just the office petty cash.
15   It wasn't really differentiating.
16      Q.    During the period where you
17   were in charge of the office petty
18   cash, you received petty cash sheets
19   for all Canal employees, is that
20   right?
21      A.    No.  Um, I wasn't in charge
22   of the petty cash.  That is not how
23   I would categorize it.  I was the --
24   I would sort of -- I would sort of
25   -- I would tabulate -- I would
```



1                M. KAPLAN

2  receive them at the end, yes.  But

3  they would -- when we had the sheet

4  system -- the way I remember it is

5  the people in the office would

6  usually go to Chase to get

7  reimbursed with their sheets and

8  then she would give them to me or --

9  it depends.  If she was not in town,

10  she might say reimburse them, and I

11  would reimburse them.  Because we

12  had the money in a safe, but -- and

13  then -- and then Chase would give me

14  her sheet, she would reimburse

15  herself, and she would give me her

16  sheet, and I would punch all the

17  numbers into the spreadsheet along

18  with my own, and that is how we got

19  the totals.  It was not, you know, I

20  don't know.  I guess it wasn't -- it

21  wasn't the most -- I don't know what

22  the word is system.  But that is how

23  it was.

24    Q.    During the period where you

25  were in charge of reviewing and



Page 61

```
 1                    M. KAPLAN
 2    tabulating the petty cash
 3    submissions, you received petty cash
 4    sheets for all Canal employees, is
 5    that right?
 6            MR. DROGIN:  Objection to
 7      the form.
 8      A.    I would eventually see them
 9    all, yes.  All the forms.  All the
10    sheets.
11      Q.    Ms. Robinson submitted her
12    petty cash sheets to you, is that
13    correct?
14      A.    She did, but it wasn't -- I
15    would see her forms, yes.  But it
16    was, like I said, she was -- I
17    didn't give her them.  We didn't --
18    it wasn't like I said you authorize
19    this, you authorize it.  She gave me
20    the forms afterwards and I would put
21    them in.
22      Q.    Ms. Robinson would submit
23    her petty cash sheets to you,
24    correct?
25            MR. DROGIN:  Objection to
```



Page 62

```
 1              M. KAPLAN
 2    the form.  You can answer.
 3    A.    Again, yes.  I would see
 4  her petty cash sheets, yes.  But
 5  there was no -- nothing to do with
 6  exchange of money, I just saw her
 7  forms.
 8    Q.    I am asking a question
 9  about the sheets.  Okay?
10    A.    Yes.
11    Q.    So I just want to get a
12  clear answer on that.
13         Ms. Robinson submitted her
14  petty cash sheets to you, correct?
15         MR. BENNETT:  Objection
16    to the form.  He answered the
17    question.  You are now trying
18    to mislead the witness.  He
19    explained to you.
20         MS. HARWIN:  Counsel, no
21    speaking objection.
22         MR. DROGIN:  It is not a
23    speaking objection.  You are
24    trying to get the witness to
25    agree with you on something
```



Page 63

```
 1                M. KAPLAN
 2     he has already explained that
 3     is different from the words
 4     you are trying to put in his
 5     mouth.
 6          MS. HARWIN:  Counsel, it
 7     is an inappropriate speaking
 8     objection.  Please.
 9          MR. DROGIN:  I am not
10     making a speaking objection.
11     I am objecting to the fact
12     that you are attempting to
13     mislead the witness.
14          MS. HARWIN:  Counsel,
15      please stop.
16     Q.   Mr. Kaplan --
17          MR. DROGIN:  Objection to
18      the form.
19     Q.   Ms. Robinson submitted her
20    petty cash sheets to you, is that
21    correct?
22          MR. DROGIN:  Objection --
23      objection to the form.
24     A.   She submitted -- she
25    e-mailed her forms to me after she
```



Page 64

```
 1                M. KAPLAN
 2    had already reimbursed herself, yes.
 3     Q.    Okay.
 4           For what types of expenses
 5    would employees be eligible to use
 6    petty cash for or to obtain
 7    reimbursement for petty cash?
 8           MR. DROGIN:  Objection to
 9        the form.  Are you talking
10        about every employee since
11        2003?  That is my objection.
12        Go ahead and answer it.
13     Q.    Let me restate the
14    question.
15           During the period when you
16    were in charge of reviewing and
17    tabulating Canal's petty cash --
18           MR. DROGIN:  Objection to
19        the form.  You are misstating
20        what the witness has said.
21           MS. HARWIN:  You can
22        state the objection, but not
23        while I am in the middle of
24        question.  Okay, counsel?
25     Q.    Mr. Kaplan, during the
```



Page 65

```
 1                 M. KAPLAN
 2    period when you were in charge of
 3    reviewing and tabulating Canal's
 4    petty cash sheets, what types of
 5    expenses were Canal employees
 6    eligible to use petty cash for or to
 7    obtain reimbursement from petty
 8    cash?
 9         MR. DROGIN:  Objection to
10     the form of the question.
11    A.    Am I supposed to speak?
12    Q.    Yes.
13         MR. DROGIN:  You can
14     answer to the extent that you
15     understand it.  If you want
16     to hear it read back, you can
17     ask to have it read back.
18     You can clarify --
19         (Simultaneous speaking)
20    A.    My understanding is while
21    the time I worked there employees
22    would be okay to get reimbursed for
23    travel expenses as far as to work,
24    like to -- subway fare, MTA cards,
25    taxis, if it was, you know, working
```



Page 66

```
 1                  M. KAPLAN
 2    late, or running an errand with --
 3    or it was time -- it made sense
 4    time-wise or carrying something
 5    valuable, or if Bob needed to reach
 6    you and you needed to have your cell
 7    phone, you know be on the phone.
 8    And then lunches we would be
 9    reimbursed for, and coffees during
10    the day.  And if it was like working
11    late, or like a weekend, you can be
12    reimbursed for your meals, but it
13    was not -- it wasn't really a
14    spelled out thing by anybody so I
15    can't speak for any official policy.
16    That was just the way that I
17    understood it.  But it was not
18    applied to -- I would say the
19    assistants in the office, they --
20    they -- they -- how it was explained
21    to them, through Chase, would be
22    more literally like they had to get
23    her approval to sign off on
24    anything.  So they didn't -- you
25    know, it was like -- they probably
```



```
 1                    M. KAPLAN
 2    didn't expense as many things -- it
 3    wasn't as much as -- as the way I
 4    just described it, it sounds like it
 5    could be more than I think it was.
 6       Q.    The same categories that
 7    you just described as authorized
 8    uses of petty cash, were also
 9    categories of charges that were
10    approved to be put on Canal's credit
11    card, is that correct?
12             MR. DROGIN:  Objection to
13        the form.
14       A.    The -- the only things that
15    were approved to go on Canal's
16    credit card -- Canal's credit cards
17    were -- the only things that were
18    approved would be like business --
19    the lunches.  The office would go to
20    lunches, it would be Caviar usually
21    towards the end.  The old fashioned
22    phone calls and putting your credit
23    card number down on Chase's credit
24    card.  But that was just because she
25    -- her credit card, she wanted it to
```



Page 68

```
 1                M. KAPLAN
 2   be for business expenses.  My credit
 3   card was for Bob's personal
 4   expenses.  So my credit card
 5   wouldn't be those things, and I
 6   didn't use it for those things other
 7   than if I had to because I didn't
 8   have cash or there had to be a
 9   reason.  But yeah.  Those were --
10   that is the only thing that would be
11   on the Canal credit card from the
12   office.
13      Q.   The Canal credit card under
14   your name was used primarily for
15   personal expenses for Mr. De Niro,
16   is that correct?
17      A.   It was used -- that was the
18   split.  I don't remember the --
19   Chase wanted it to be that way.
20   That was her -- she wanted to have a
21   split so that all the business
22   expenses would be on her card, yeah,
23   and the all personal ones would be
24   on my card.
25      Q.   So off -- so let me restate
```



Page 69

1                    M. KAPLAN

2    that.

3            Expenses that were for the

4    Canal office would be put on the

5    Canal credit card under Ms.

6    Robinson' name, is that correct?

7      A.    Expenses that were for the

8    -- if -- if they were things that

9    were considered business expenses,

10   like things -- yeah, if it was like

11   a printer for the office, or

12   something like that nature, then

13   yes.  Or if it was the lunch --

14   lunch was -- I don't remember

15   exactly -- you know, if it was like

16   putting -- if the De Niro family was

17   going on a trip somewhere, that

18   would go on my credit card.

19     Q.    And if it was working meals

20   for Canal employees, that would go

21   on the credit card under Ms.

22   Robinson's name, correct?

23     A.    Only lunches because nobody

24   else had -- they didn't have -- they

25   didn't physically have the card, so



```
 1                    M. KAPLAN
 2   yeah.  It would -- they could order
 3   lunches on her -- on her card, the
 4   lunches.  But nobody had the card so
 5   they wouldn't be -- if somebody was
 6   working late or taking a taxi
 7   somewhere, they would have to get
 8   reimbursed through petty cash
 9   because they didn't have access.  We
10   didn't have like an Uber or anything
11   like that for the company at the
12   time, so it was all old fashioned
13   getting a taxi or getting an Uber
14   yourself and getting reimbursed.
15      Q.    The card number and
16   credentials for the Canal American
17   Express under Ms. Robinson's name
18   were saved as a contact for Canal
19   employees, correct?
20      A.    You mean the contacts like
21   in the -- in the Canal contacts?
22      Q.    Yes.
23      A.    I think so.  I don't know
24   if it is accurate because that
25   contact thing has -- if you went on
```



Page 71

```
 1                  M. KAPLAN
 2    it right now, I am sure you would
 3    see Bob's credit card from 1999 on
 4    there, so I don't know if it was up
 5    to date.  Yeah, theoretically, it is
 6    the contacts.  But I don't know -- I
 7    can't be sure because card numbers
 8    change over time so --
 9    Q.    There was a contact called
10    AMEX credit card that provided the
11    card number and credentials to all
12    Canal's employees for the Canal's
13    American Express were under Ms.
14    Robinson's name, correct?
15          MR. DROGIN:  Objection to
16      the form.  You can answer.
17    A.    I don't know honestly.  I
18    mean, maybe.  I think probably there
19    was an AMEX contact.  I don't know.
20    It probably had my name and it
21    probably had Chase's name and the
22    card numbers.  But I don't -- I'm
23    not positive it had all that
24    information.
25    Q.    You don't have any basis to
```



Page 72

```
 1                    M. KAPLAN
 2      dispute that there was a contact
 3      provided to Canal employees that
 4      contained the card number and
 5      credentials for the credit cards
 6      under Ms. Robinson's name and under
 7      your name, correct?
 8              MR. DROGIN:  Objection to
 9         the form.  Asking the witness
10         to prove a negative.
11      A.    No, I don't -- I believe it
12      was in the contacts, but I just
13      don't know.  Like I said, I don't
14      know how up to date it is I guess.
15      Q.    A scan of the front and
16      back of the American Express card
17      under Ms. Robinson's name was also
18      provided to people who worked in
19      Canal's office, correct?
20      A.    I don't -- I don't
21      remember.  I never saw a scan.
22      There would be a scan of my card
23      because they would use it for like
24      hotel stuff for Bob, but I don't
25      remember -- I don't remember if
```



Page 73

```
 1                   M. KAPLAN
 2    there was or not.
 3     Q.    Okay.
 4           So you don't remember
 5    either way, whether there was a scan
 6    of the American Express card in Ms.
 7    Robinson's name provided to Canal
 8    office staff?
 9           MR. DROGIN:  Objection to
10      the form.  Mischaracterizes
11      the witness' testimony.
12     A.    Yeah, I don't remember if
13    there was a scan.  I know that --
14    like I said, that they had access to
15    the Caviar account, and that is what
16    they used the card for, and they
17    would use it for the Amazon card,
18    things of that nature.  But I don't
19    know how much -- I don't know how
20    much access they had otherwise.
21     Q.    And from time to time Ms.
22    Robinson would lend the physical
23    card to Canal employees -- actually,
24    let me restate that.
25     A.    Not to my knowledge, no.
```



Page 74

```
 1                 M. KAPLAN
 2     Q.    Do you -- let me -- let me
 3   restate that.
 4          Do you recall either way
 5   whether Ms. Robinson would lend the
 6   physical card under her name to
 7   Canal employees from time to time?
 8     A.    I don't think she ever did
 9   to be honest.  I mean, look, this is
10   the type of thing where I would lend
11   my card to her because when
12   Christmas time would come up, and
13   that is personal shopping so she
14   would want to have my card.  This
15   office could be a very inefficient
16   operation sometimes.  And one of the
17   times would be during -- when she
18   would physically have two cards with
19   her, and nobody else had a card to
20   buy actual things they needed to buy
21   for Bob.  So I don't think -- I
22   don't think she gave -- maybe it is
23   possible, but I don't remember her
24   ever giving her credit card to
25   anybody.  I never had it that I can
```



Page 75

```
 1                 M. KAPLAN
 2   remember.  Maybe for short term, but
 3   not very often.
 4     Q.    Do you recall Ms. Robinson
 5   ever lending the physical card under
 6   her name to another Canal employee
 7   for short-term use, for a specific
 8   purchase?
 9            MR. DROGIN:  Objection to
10       the form.  You can answer.
11     A.    I don't remember, no.  I
12   don't recall that.
13     Q.    The credit card in Ms.
14   Robinson's name was on file for
15   various businesses, is that correct?
16     A.    It was on file, like I
17   said, for Amazon, for the FedEx
18   bill, for Caviar.  I don't know what
19   else.  Most of the stuff that I did
20   would -- was -- I -- I would use my
21   own card or -- I didn't -- I don't
22   know exactly what else they would
23   possibly have the card for, but --
24     Q.    Do you recall any other
25   places that the Canal credit card
```



Page 76

```
 1                M. KAPLAN
 2   under Ms. Robinson's name was on
 3   file at?
 4     A.    No.  Maybe the pharmacy,
 5   but that might have been -- I think
 6   that was my card, so no.
 7     Q.    Do you have pictures of the
 8   Canal credit card in Ms. Robinson's
 9   name on your phone?
10     A.    I don't think so.  So I --
11   I don't believe so, no.  Look, I
12   don't want to say never because it
13   is possible there was a reason for a
14   specific reason at some point that I
15   can't remember.  But, you know, we
16   would try to -- she would try to
17   keep this perfect business/personal
18   thing.  It didn't always work
19   because sometimes you didn't have a
20   -- you know to get -- you know what?
21   I am going to correct something.  I
22   do remember especially because her
23   name was actually on the card
24   Graham, it was a neutral name, she
25   would give it sometimes to go to
```



Page 77

```
 1                M. KAPLAN
 2    like the Apple store because she
 3    wanted it to be on her card because
 4    that was a business thing, and often
 5    I would be putting stuff on my card
 6    for the office type things.  But
 7    that is the only thing I can think
 8    of.
 9           MR. DROGIN:  Can we take
10        a five-minute break at some
11        point?
12           MS. HARWIN:  Sure.
13        Actually, this is a fine time
14        to take a five-minute break.
15        We can go off the record.
16           THE VIDEOGRAPHER:  The
17        time is 10:10, and we are off
18        the record.
19           (Whereupon, a recess was
20        taken at this time.)
21           THE VIDEOGRAPHER:  The
22        time is now 10:20 a.m.  We
23        are back on the record.
24    Q.    During the period from 2009
25    to 2019, describe for me what your
```



MAGNA
LEGAL SERVICES

Page 78

```
 1                  M. KAPLAN
 2    process of reviewing petty cash
 3    sheets entailed?
 4      A.     There was -- I mean, Chase
 5    reviewed the petty cash sheets from
 6    the employees in the office, and, I
 7    mean, Chase -- there was no real
 8    process because Chase was basically
 9    in charge of the finances, and she,
10    you know, she expensed for herself
11    that was -- that was just, you know,
12    how it was.  And I -- I -- the
13    people -- the other people in the
14    office usually she reimbursed them,
15    sometimes I would reimburse them.
16    But their sheets were always very
17    simple.  Meals, you know, you would
18    see the things.  It wasn't that
19    complicated, and they would always
20    note what things were for, and --
21    yeah.  So it wasn't that complicated
22    of a process because it -- in the
23    grand scheme of how much money was
24    being spent on the credit cards, you
25    know, the petty cash was a lot of
```



```
 1                  M. KAPLAN
 2    money, but it didn't seem like it
 3    was -- you know, we spent -- the
 4    office spent a lot more money on the
 5    credit cards than the petty cash so
 6    it wasn't a main focus.
 7       Q.    When you received petty
 8    cash sheets and receipts from Canal
 9    employees, what did you do to review
10    those submissions?
11          MR. DROGIN:  Objection to
12       the form.  The witness has
13        already explained that.
14       A.    Yeah.  I did -- I didn't do
15    anything other than I took the
16    receipts and I put them together
17    because they had already been
18    reviewed.  Chase had reviewed them
19    from other employees, so I was
20    taking hers, theirs, everyone's,
21    putting them together into
22    categories, that I don't know where
23    they went.  They went to the
24    accountant, and I don't know what
25    their process is once they got it,
```



Page 80

```
 1                   M. KAPLAN
 2    but that is far as I went as far as
 3    reviewing things.  I would ask
 4    questions when I didn't know what a
 5    certain thing like, you know, we
 6    bought blah-blah blah, but why did
 7    we buy blah-blah blah.  Mostly it
 8    was a gift for someone, is this a
 9    professional gift or is this like a
10    research for Bob for a movie role,
11    like a book.  But other than that, I
12    didn't -- it was more of just making
13    sure.  And then if the petty cash
14    was off, it was trying to figure out
15    like are we missing a receipt for
16    something.  That was mostly my
17    concern.
18       Q.    When you received petty
19    cash spreadsheets, you would review
20    the expenses that were on the
21    spreadsheets, correct?
22            MR. DROGIN:  Objection to
23        the form.
24       A.    I --
25            MR. DROGIN:  For the
```



Page 81

```
 1              M. KAPLAN
 2    fourth time --  for the
 3    fourth time you are
 4    mischaracterizing the
 5    witness' testimony.
 6       MS. HARWIN:  I am asking
 7    a question.  I am not
 8    characterizing anything, and
 9    please refrain from the
10    speaking objections.
11       MR. DROGIN:  I want the
12    record -- I want the record
13    to reflect --
14       MS. HARWIN:  That is not
15    the purpose of a deposition.
16    We already stipulated that
17    it's just objection to form.
18    It is not a matter of putting
19    your opinions on record.
20       MR. DROGIN:  It is not
21    the form of the question.  It
22    is not the form of the
23    question.  You are
24    deliberately misleading the
25    witness.  This is the fourth
```



Page 82

```
 1              M. KAPLAN
 2   time you have put --
 3        MS. HARWIN:  Put your
 4   objection on the record.
 5        MR. DROGIN:  It is not --
 6   it is not an objection.
 7        MS. HARWIN:  Then there
 8   is nothing to state on the
 9   record.
10        MR. DROGIN:  There is.  I
11   am asking you as an officer
12   of the court to stop
13   attempting to mislead the
14   witness.  You have gone
15   through this, this is the
16   fourth time.  You do not like
17   his answer and you keep
18   trying to put words in his
19   mouth that are yours and not
20   his.  Accept it and move on.
21        MS. HARWIN:  Counsel, I
22   am conducting the deposition.
23   Refrain from these speeches.
24        MR. DROGIN:  You are not
25   permitted to --
```



Page 83

```
 1                M. KAPLAN
 2           MS. HARWIN:  Counsel,
 3      stop.
 4      Q.    Mr. Kaplan --
 5           MR. DROGIN:  Counsel,
 6      stop.
 7      Q.    -- I am trying to
 8   understand from beginning to end
 9   what happened when you received
10   petty cash spreadsheets.  So let's
11   just walk through that process.
12           When you received a petty
13   cash spreadsheet, did you receive
14   any other documentation in
15   connection with the petty cash?
16      A.    I would receive petty cash
17   spreadsheets from Chase of the
18   employees in the office, basically
19   saying like approved, like she had
20   reimbursed them.  And now I can take
21   the information and do --
22      Q.    Mr. Kaplan, that wasn't my
23   question.  So I asked did you
24   receive any other documentation in
25   connection with --
```



Page 84

```
 1                M. KAPLAN
 2    A.    There was receipts.
 3    Q.    Okay.
 4          So you received
 5  spreadsheets with petty cash
 6  expenses along with receipts,
 7  correct?
 8    A.    Yes.
 9    Q.    Okay.
10          And what did you do, if
11  anything, to review the receipts?
12    A.    I don't -- how do you
13  review a receipt?  I don't follow.
14    Q.    Did you look at the
15  receipt?
16    A.    I looked at the receipts.
17  They had already been approved is my
18  point.  So I took the receipts, and
19  when I would add up how much, like
20  say the petty cash was $5,000, I
21  would break it down and put the
22  receipts together.  Like these are
23  all the meals from this X employee,
24  Y employee, this employee, put them
25  together and add it up and give them
```



Page 85

```
 1                    M. KAPLAN
 2    a form because to my understanding
 3    the most important things for the
 4    accountants was knowing what things
 5    were -- the categories because then
 6    they knew what was business and what
 7    was personal on their end for tax
 8    reasons.  But I didn't -- no, I
 9    didn't review.  There was no reason
10    to review the receipt.  It was
11    already reviewed by Chase so I don't
12    -- didn't -- that is -- that is it.
13      Q.    Did you review the -- let
14    me restate that question.
15           During -- you have -- you
16    have testified about things being
17    approved by Ms. Robinson.  In what
18    period are you referring to?
19      A.    Pretty much the entire time
20    -- Chase was in charge of the office
21    the entire time I worked there.  The
22    entire time I worked there with
23    Chase.  The entire time when I
24    worked there with Chase.  Not when
25    she first started but from like 2000
```



Page 86

```
 1                M. KAPLAN
 2   and -- I don't know late, 2008 and
 3   onward she was basically in charge
 4   of the office.  So from that period,
 5   2009 to 2019.
 6      Q.    So from right after she
 7   joined Canal she was in charge of
 8   the office, is that your testimony?
 9      A.    Yeah, when she joined the
10   office, there was another employee,
11   the other employee quit a few months
12   after Chase started.  And then Chase
13   was the only -- it was her, and I,
14   and Michael Weber who was part-time,
15   and I was -- that was the entire
16   office for several -- several
17   months.  And when she hired somebody
18   else, that person was on a lower
19   level and Chase was her superior, so
20   yes.
21      Q.    It was Mr. De Niro's
22   decision that you were the person
23   who would tabulate petty cash, is
24   that correct?
25            MR. DROGIN:  Objection to
```



Page 87

```
 1              M. KAPLAN
 2     the form.
 3     A.    No.  Mr. De Niro had no --
 4  he didn't know -- he didn't have any
 5  idea of how -- he didn't know petty
 6  cash what that even means, so no.
 7     Q.    Okay.
 8          Who -- how did it come
 9  about that you came to be the person
10  who reviewed and tabulated the petty
11  cash?
12          MR. DROGIN:  Objection.
13      I am directing him not to
14      answer.  Let's go to the
15      judge.
16          MS. HARWIN:  Counsel, you
17      can't --
18          MR. DROGIN:  Let's go to
19      the judge.  His testimony was
20      that it was already reviewed
21      by Chase.  That is his
22      testimony.  If you are going
23      to mischaracterize his
24      testimony, let's bring it to
25      the judge right now.
```



Page 88

```
 1              M. KAPLAN
 2         MS. HARWIN:  Counselor,
 3     you can -- he is not your
 4     client.  You cannot direct
 5     him not to answer and you
 6     direct under those
 7     circumstances in any event,
 8     so please --
 9         MR. DROGIN:  We are
10     officers -- we are officers
11     of the court.  The witness
12     has testified --
13         MS. HARWIN:  Counselor,
14     stop.
15         MR. DROGIN:  No, you
16     stop.
17         MS. HARWIN:  Ms. Hayden,
18     can you read what the pending
19     question is?
20         (Whereupon, the requested
21     portion was read back by the
22     reporter:
23         Q:  How did it come about
24     that you came to be the
25     person who reviewed and
```



Page 89

```
 1                    M. KAPLAN
 2      tabulated the petty cash?)
 3          MR. DROGIN:  Objection
 4      and I direct the witness not
 5      to answer the question.
 6          MS. HARWIN:  There is
 7      nothing inappropriate.  This
 8      is using the words that the
 9      witness provided, and I am
10      asking how that came about.
11          MR. DROGIN:  The witness
12      did not provide them.  You
13      provided them.  His quote was
14      that they were already
15      reviewed by Chase.
16          MS. HARWIN:  Counselor,
17      this was something that was
18      testified about an hour ago,
19      that he was the person who
20      tabulated these expenses.
21      Stop.
22          MR. DROGIN:  You are not
23      asking about tabulating.  You
24      said reviewed and tabulated.
25          MS. HARWIN:  Counselor.
```



Page 90

```
 1                    M. KAPLAN
 2     Q.    So how did it come about
 3   that you became the person that
 4   tabulated the petty cash expenses?
 5     A.    Like I said earlier, the
 6   tabulation was done before me by
 7   Michael Weber.  And when he left, I
 8   started doing it.  I did not review
 9   -- he didn't review as far as
10   authorized -- he wasn't authorized
11   any more so than I was to review
12   actually what people were spending
13   the money on.
14     Q.    Okay.
15           But if you saw an expense
16   on a petty cash sheet that seemed
17   outside of the ordinary, you would
18   raise a request with it -- about it,
19   correct?
20           MR. DROGIN:  Objection to
21     the form.  You can answer.
22     A.    These other -- the
23   assistants who worked in the office
24   were -- to a fault, very ethical
25   people, and there was no -- there
```



Page 91

                    M. KAPLAN

1    was just no -- there was never a

2    situation like that.  They didn't

3    expense things that were not -- that

4    were un-Kosher, so to speak.  Yes,

5    of course, if I saw something that I

6    personally thought I would -- I

7    would ask for clarification I'm

8    sure.  But I didn't -- I can't even

9    think of one off the top of my head

10   because people were -- I mean, Chase

11   had to authorize it also so they

12   were scared of her, so they didn't

13   want to -- they -- they only -- they

14   only submitted things that they knew

15   she would approve.

16   Q.    We are going to share a

17   document in the chat, which you can

18   download, Mr. Kaplan.  This is a

19   document that I am marking as

20   Plaintiff's Exhibit 11, which is

21   Bates Stamped Canal 0022626.

22           Can you open that document,

23   please?

24           (Whereupon, Plaintiff's



Page 92

```
 1                M. KAPLAN
 2      Exhibit 11, Canal 0022626,
 3      was marked for
 4      identification, as of this
 5      date.)
 6   A.    Sure.  Give me a moment.
 7   Q.    If you go in the chat.
 8   A.    I saw it, but it took me to
 9  a webpage.  Magna Legal Services.
10   Q.    If you click on it, you
11  should be able to download it to
12  your desktop.
13   A.    Hold on.  Let me -- now I
14  am not in -- hold on.  Let me try
15  this one more time.
16   Q.    Take your time.
17   A.    Yes, I see it.  It is a
18  petty cash.
19        MR. DROGIN:  This is a
20      three-tab spreadsheet, is
21      that right, in Excel?
22        MS. HARWIN:  That is
23      correct.
24        MR. DROGIN:  Okay.  Go
25      ahead.
```



Page 93

```
1               M. KAPLAN
2     Q.    Mr. Kaplan, is the form of
3  this petty cash spreadsheet
4  consistent with the petty cash
5  spreadsheets that you received
6  during your employment with Canal?
7     A.    Yes, but I will stipulate
8  that -- or I don't know if that is
9  the term.  I don't know.  But this
10  is something that Chase came up with
11  at some point.  We didn't have this
12  the entire form.  These forms, this
13  is like her design and everything.
14  I don't know what year she started
15  this, but this is consistent with
16  once we started that -- that the
17  forms that -- that -- yeah, that
18  people would do often.
19     Q.    You can see in this Excel
20  spreadsheet tabs for 2017, 2018, and
21  2019.  Is this consistent with the
22  form in which petty cash forms were
23  prepared at Canal from at least 2017
24  onward?
25     A.    Yeah.  I think that is
```



```
  1              M. KAPLAN
  2   actually to the year.  That answers
  3   the question that I just raised.  I
  4   think 2017 onward is when -- or May
  5   -- or April of 2017 is when these
  6   forms began.
  7      Q.    Okay.
  8            And it is your testimony
  9   that Ms. Robinson designed the form
 10   of this spreadsheet for petty cash
 11   submissions, is that correct?
 12      A.    It is, yes.
 13      Q.    Prior to 2017, in what form
 14   were petty cash submissions
 15   submitted?
 16      A.    I don't remember.  I don't
 17   remember.  Yeah, I don't know if
 18   there was an official form.  I think
 19   it was more of a situation where
 20   there was like an envelope, you
 21   would put your receipts in, and
 22   employees would get -- in the same
 23   manner, the employees would get
 24   reimbursed by Chase, or sometimes
 25   myself if Chase wasn't around, with
```



Page 95

```
 1                 M. KAPLAN
 2    like a total.  But it wasn't as
 3    official.  You know, the receipts
 4    would go in and this was -- this was
 5    an attempt to make it more
 6    organized.  It -- it is obviously on
 7    paper organized.  I don't know if it
 8    actually made the process any
 9    different, but --
10       Q.    The items that were not
11    highlighted were ones for which you
12    were provided receipts, is that
13    correct?
14       A.    I don't know if that is --
15    I don't know what the highlighting
16    is.  That is a Chase thing.  I don't
17    think there is receipts for like an
18    iTune store app looking at this.  I
19    don't why -- I don't know why -- I
20    don't know why there is highlights.
21       Q.    Okay.
22             Sitting here today, you
23    don't recall what the highlights
24    mean on this spreadsheet, is that
25    correct?
```



Page 96

```
 1                  M. KAPLAN
 2    A.    No, I do not.
 3    Q.    Okay.
 4          When Ms. Robinson provided
 5    her petty cash receipts -- let me
 6    restate that question.
 7          When Ms. Robinson provided
 8    her petty cash sheets to you, she
 9    also provided you with receipts, is
10    that correct?
11    A.    There were receipts for --
12    yeah.  I don't know if it was for
13    everything.  But there was receipts
14    for certain items for sure, yes.
15    Q.    What did you do with the
16    petty cash sheets and receipts that
17    you received from Ms. Robinson for
18    her petty cash expenses?
19    A.    I put them with all the
20    other petty cash situations, and
21    just like everyone else, you
22    tabulate them all together, and sent
23    them off to the accountants.
24    Q.    Did you tabulate petty cash
25    expenses by category?
```



Page 97

1                    M. KAPLAN

2     A.    Yes.  There was -- like I

3   said, meals, transportation,

4   supplies, personal, research, things

5   of that nature.

6     Q.    With respect to these petty

7   cash expenses on Ms. Robinson's

8   spreadsheet from 2017 to 2019, were

9   any of the -- let me restate that

10  question.

11        Turning the petty cash

12  spreadsheet that has been marked as

13  Exhibit 11, which petty cash charges

14  on this sheet were typical types of

15  expenses for Canal employees?

16        MR. DROGIN:  Objection to

17    the form.

18    A.    Which of these are typical?

19  They are all -- I mean, they are

20  typical with the exception is that

21  the working dinner was not something

22  that other employees did.  Apps, I

23  am just looking at this, was not

24  something that employees would

25  expense the same way with the



Page 98

```
 1                M. KAPLAN
 2   latitude.  I mean, Chase had --
 3   there was more -- it is a different
 4   -- her forms were different because
 5   she traveled, and she -- there is --
 6   I see there is like -- I see,
 7   looking at this -- I mean, there is
 8   tips I see here.  I see a flight
 9   change fee is not something someone
10   else would be.  I see Bob's lottery
11   tickets somewhere I saw here, Power
12   Ball.  RC -- there was a -- hers
13   were different because they are -- I
14   mean, some -- you know, the lunch,
15   coffee, those would be the types of
16   things that could be on other
17   people's forms.
18      Q.    Did you have any reason to
19   believe that Ms. Robinson was not
20   authorized to charge working dinners
21   to Canal?
22      A.    I don't -- Ms. -- she was
23   in charge of the office.  So, I
24   mean, if she thought she could
25   charge working dinners to Canal, who
```



1                M. KAPLAN

2   was I to say she wasn't allowed to

3   do that?  But I don't -- I didn't --

4   there was no policy that anybody

5   said to us that you could charge

6   dinners.  In fact, the whole idea of

7   expensing meals when you are working

8   late really started, as when I came

9   in, I understood the concept more to

10  the lower end people who weren't

11  making a lot of money, and it was

12  sort of flipped on its head here

13  where the person making the most

14  money was charging the most dinners,

15  but yeah.

16     Q.    Did any of the charges on

17  Ms. Robinson's petty cash sheets

18  raise a red flag for you prior to

19  the time her employment ended?

20        MR. DROGIN:  Objection to

21     the form.  Are you -- can you

22     just clarifying, are you

23     talking about this document

24     or in general?

25        MS. HARWIN:  Paige, can



```
 1                  M. KAPLAN
 2      you read back the question?
 3           (Whereupon, the requested
 4      portion was read back by the
 5      reporter:
 6           Q:  Did any of the
 7      charges on Ms. Robinson's
 8      petty cash sheets raise a red
 9      flag for you prior to the
10      time her employment ended?)
11           MS. HARWIN:  That
12      question pertains to this
13      petty cash sheet that has
14      been marked as Exhibit 11.
15           MR. DROGIN:  Just for
16      clarification, we are looking
17      at the 2017 tab or all three
18      tabs?
19           MS. HARWIN:  All three
20      tabs.
21      A.    Prior to -- I mean, you
22  know, she would charge things that
23  sometimes, you know, I don't
24  remember in my state of mind.  So LA
25  trip tips is an example.  To me, I
```



```
 1              M. KAPLAN
 2    don't know.  Sometimes these trips
 3    were personal/a little bit of
 4    personal tips that you are tipping.
 5    Like I said, ultimately, she was in
 6    charge, so it wasn't really -- you
 7    know, I wasn't really -- who was I
 8    questioning this to exactly?  Like
 9    it was like this is her system, and
10    I was just part of it.
11      Q.    So that -- that didn't
12    answer my question.  I am going to
13    remind you of what I am asking.
14          Before Ms. Robinson's
15    employment at Canal ended, did any
16    of the petty cash charges on Ms.
17    Robinson's petty cash sheet marked
18    as Exhibit 11 raise any red flags
19    for you?
20          MR. DROGIN:  Objection to
21      the form.
22      A.    I -- I -- I did not raise
23    -- I didn't raise any red flags with
24    anybody else as far as reporting any
25    of these things, so I guess you
```


MAGNA
LEGAL SERVICES

 1                    M. KAPLAN
 2    could say no.  But it wasn't -- it
 3    wasn't -- like I said, I wasn't
 4    thinking of it that way.  I was
 5    thinking of it more as this is what
 6    we are spending money on, these are
 7    the categories, sending it off to
 8    Berdon.  I wasn't there to supervise
 9    how she was spending the money, that
10    wasn't my job title.
11        Q.    What did you do with the
12    receipts that Ms. Robinson provided
13    to you in connection with her petty
14    cash sheets?
15        A.    They went -- like I said,
16    they went with everybody else's
17    receipts in the office, you know,
18    and it was by category.  So her
19    receipts -- you know, looking at the
20    this form, if she had receipt for Le
21    Pain, and Whole Foods, and Shake
22    Shack, those would all go to meals,
23    and boots would go into supplies and
24    yeah, I don't know.  It was receipts
25    for things like Delta flight change



```
 1                M. KAPLAN
 2   fee, but like, I would probably mark
 3   that is a miscellaneous business
 4   expense or something.  And the
 5   iPhone would go in to electronics.
 6   The receipts would just go like
 7   everybody else's.  They would go
 8   together, put them in a thing, and
 9   periodically send them to Berdon to
10   whatever they do with them.  Put
11   them in giant file somewhere, I
12   don't know.
13      Q.    Did you scan the receipts
14   prior to providing them to Berdon?
15      A.    I did not, no.  Nobody ever
16   instructed us to do that.  So we did
17   not do that.
18      Q.    Did you ever throw away
19   receipts?
20      A.    No.  Only if it was
21   redundant.  Only if it was like a
22   copy of a receipt we already had.
23      Q.    Did you throw away any of
24   the receipts that Ms. Robinson
25   submitted?
```



Page 104

1                    M. KAPLAN

2      A.    No.

3      Q.    Did you ever generate

4  receipts to submit extra receipts to

5  try to square the numbers for petty

6  cash?

7      A.    Did I ever generate the

8  receipts?  I don't understand what

9  -- I mean, there is -- you know, we

10  would tip -- with meals and stuff,

11  so we would round up on the tips to

12  try to make the number -- yeah, to

13  try to make it, you know, the number

14  -- it just wouldn't come out always

15  close to the number so we would try

16  to make it fit.  Or sometimes there

17  would be, you know, a question of

18  did we forget, you know, a tip for

19  so and so.  But not generating a

20  receipt, I didn't have a -- that

21  wasn't part of the operation.

22      Q.    Okay.

23            From time to time you would

24  adjust the content of the petty

25  cashes to make sure that the numbers



Page 105

```
 1                 M. KAPLAN
 2   worked, is that correct?
 3      A.    No.  What I am saying is
 4   that, you know, people would submit
 5   their receipts for like a -- a
 6   coffee and just or a meal, and they
 7   would -- nobody would ever put the
 8   tips on there.  So often or they
 9   would submit -- it just -- the
10   numbers -- or you -- people would
11   take an even number, but the receipt
12   for -- there was no change.  So
13   sometimes we would adjust -- I would
14   just write a tip on it to get the
15   number to -- to be a -- because we
16   didn't have -- there was no like
17   handing back the change, you know,
18   but I don't have a -- I mean, I
19   don't remember exactly like, you
20   know, each receipt, like each one of
21   these, what we did for each one, but
22   --
23      Q.    Can you turn to the 2018
24   tab of the spreadsheet marked as
25   Exhibit 11?
```



Page 106

```
 1              M. KAPLAN
 2    A.    Uh-huh.
 3    Q.    Paolas is one of the main
 4  places that Ms. Robinson ordered her
 5  working meals from, is that correct?
 6    A.    Yes, she seemed to like
 7  that place a lot.  I think she got a
 8  Ceaser salad and something often.
 9  Something with pasta.
10    Q.    As far as you know, Ms.
11  Robinson ordered delivery from
12  Paolas rather than dining in there,
13  correct?
14    A.    I don't know.  The receipts
15  that were in the petty cash, yes, as
16  far as I know, the -- those were
17  delivered receipts to her house, but
18  I don't -- I don't know what she did
19  other -- she might have eaten there,
20  too.  The ones that I had seen were
21  usually -- seemed like they had her
22  address on it, so yes, they were
23  delivered.
24    Q.    And as far as you
25  understood at the time, there was
```



Page 107

```
 1                M. KAPLAN
 2    nothing improper in Ms. Robinson
 3    ordering a working lunch or working
 4    dinner from Paolas, correct?
 5         MR. DROGIN:  Objection to
 6      the form.
 7      A.    We had had conversations
 8    about price, you know, she had over
 9    the years wanted to institute a kind
10    of price cap on meals and like
11    $25.00.  I sort of just -- I didn't
12    want to penalize the people that
13    didn't expense often.  I see a lot
14    of $60.00.  I don't know if that was
15    for -- she would go over what was
16    considered like the working one
17    person thing, but other than that,
18    yeah.  If she was working, it was
19    understood you could, you know --
20    but, you know, you could expense
21    things, but I would add that the
22    people who were working -- there was
23    always somebody in the office who
24    had a phone and they were not --
25    they would not regularly expensing
```



Page 108

```
 1                M. KAPLAN
 2   their dinners as they were not told
 3   they were allowed to do that.
 4     Q.    As you understood it, if
 5   Ms. Robinson was working through
 6   lunch or through dinner, she was
 7   entitled to charge Canal for those
 8   meals, is that correct?
 9          MR. DROGIN:  Objection to
10      the form.  You can answer.
11     A.    As I understood it, if you
12   were working through lunch, you
13   could charge it.  Dinner was
14   supposed to be if you were working
15   late at the office or working late
16   at a thing.  It really wasn't
17   working from home on something,
18   because, like I said, the people in
19   the office who had the phones and
20   Bob was calling at night were not
21   expensing meals.  So that was
22   supposed to be more of like a if you
23   work a -- were in the office late
24   wrapping gifts, or there is an
25   event, or a film festival, something
```



Page 109

```
 1                M. KAPLAN
 2   like that.  It wasn't supposed to
 3   just be like (inaudible) I can
 4   expense dinner, that is not how I
 5   understood it.  But, you know, I
 6   wasn't in charge of any kind of
 7   policy either, so --
 8     Q.    Whole Foods was a place
 9   that Ms. Robinson would pick up
10   working meals from, correct?
11         MR. DROGIN:  Objection to
12      the form.
13     A.    I see it on here, Whole
14   Foods, yes.
15     Q.    There was nothing improper
16   in Ms. Robinson charging Canal for
17   working lunch or dinner from Whole
18   Foods, correct?
19         MR. DROGIN:  Objection to
20      the form.
21     A.    Like I said, there is not
22   improper about -- based on how we
23   did it as far as lunch.  The dinner
24   was not in the spirit of the rules,
25   per se, but --
```



```
 1               M. KAPLAN
 2    Q.    Have you charged Canal for
 3  working meals that you purchased in
 4  Whole Foods?
 5    A.    Whole Foods, I didn't
 6  regularly eat at Whole Foods, but I
 7  did go to the Whole Foods by Bob's
 8  old apartment in Columbus Circle, I
 9  believe, when I would be there.
10  That would -- so yes, but not -- it
11  wasn't a regular place of mine, but
12  yes.
13    Q.    Dean & DeLuca was also a
14  place that Ms. Robinson would pick
15  up working meals from, correct?
16          MR. DROGIN:  Objection to
17     the form.
18    A.    I believe so.  It seems
19  that way from -- it wasn't her
20  number one place, but she did, yes.
21    Q.    And there was nothing
22  improper in Ms. Robinson charging
23  Canal for a working meal from Dean &
24  DeLuca, correct?
25          MR. DROGIN:  Objection to
```



```
 1                M. KAPLAN
 2      the form.
 3      A.    Like I said, if she was
 4   working, there was, you know,
 5   nothing improper about charging a
 6   lunch or coffee from Dean & DeLuca.
 7      Q.    There were times when Ms.
 8   Robinson purchased iPhones for work
 9   using petty cash, is that correct --
10   let me rephrase the question.
11            There were times when Ms.
12   Robinson was reimbursed from petty
13   cash for iPhones that were purchased
14   for work, is that correct?
15            MR. DROGIN:  Objection to
16      the form.
17      A.    Yes.  She used petty cash
18   for some iPhones.
19      Q.    There was nothing improper
20   in charging petty cash iPhones that
21   were purchased for work, correct?
22            MR. DROGIN:  Objection to
23      the form.
24      A.    No, but it was strange
25   because nobody -- everybody else
```



Page 112

```
 1               M. KAPLAN
 2   used the credit card -- everybody
 3   else was on the phone bill.  She was
 4   the only one that would use petty
 5   cash for iPhone purchases.
 6     Q.    But there was nothing
 7   improper in charging to petty cash
 8   an iPhone for work, correct?
 9            MR. DROGIN:  Objection to
10     the form.
11     A.    I don't know why she used
12   petty cash for an iPhone, but if it
13   was a work phone, then it is, of
14   course, allowed to have a work
15   phone.
16     Q.    Do you recall a time when
17   Ms. Robinson's dog had cancer?
18     A.    Yes.  I remember her dog
19   being sick.  I don't remember the
20   specifics.
21     Q.    Do you recall that Ms.
22   Robinson was scouting out homes for
23   Mr. De Niro while her dog was sick?
24     A.    No, because I wasn't aware
25   -- I don't think I was aware she was
```



```
 1                M. KAPLAN
 2   scouting out homes until after she
 3   scouted out homes, but if you say
 4   so, then sure.
 5          MR. DROGIN:  Objection.
 6      I would ask the witness not
 7      to guess or speculate.  If
 8      you want to take a break,
 9      please ask for one, but
10      please don't speculate.  Just
11      answer the question that you
12      are asked.
13      A.    I don't recall.  I don't
14   know the timeline of when her dog
15   was sick, so I don't know if that
16   was when she was scouting out homes.
17      Q.    Do you recall Ms. Robinson
18   being approved to use petty cash for
19   dog sitting during the short period
20   when her dog was sick?
21      A.    No, I don't recall ever
22   having a conversation about that.
23      Q.    You received the petty cash
24   sheets showing dog sitting expenses,
25   correct?
```



```
 1                M. KAPLAN
 2     A.     Yes.
 3     Q.     And at the time you
 4  received those petty cash sheets,
 5  you understood what that dog sitting
 6  expense had referred to, correct?
 7          MR. DROGIN:  Objection to
 8      the form.
 9     A.     Yes.  I understood -- look,
10  the -- my understanding of it was
11  that Robin had expensed for dog --
12  dog -- when she would travel into
13  the city for her dogs being watched,
14  so, you know, I wasn't going to --
15  again, Chase was in charge of all
16  this stuff.  If I was going to be
17  object to anything Chase did, it
18  wasn't going to be her dog -- her
19  sick dog -- taking care of her sick
20  dog.  I mean, it was not a -- it is
21  a strange charge for a business to
22  pay for, but it is also not a -- it
23  is not really something that I was
24  appalled by or anything at the time.
25     Q.     It wasn't outside the norm
```



Page 115

```
 1                M. KAPLAN
 2    for Mr. De Niro to approve dog
 3    sitting expenses at certain times
 4    for certain employees?
 5           MR. DROGIN:  Objection to
 6      the form.
 7      A.    Bob didn't know -- it
 8    wasn't like he approved it because
 9    he didn't -- he didn't -- he wasn't
10    in charge of these financial things.
11    So would he have approved it,
12    probably, knowing Bob, he is a -- he
13    can be a very generous person.  So I
14    don't think he would be against it,
15    but I highly doubt it was asked of
16    him, but I don't know for sure.
17      Q.    143 in the 2018 tab?
18      A.    I don't have it numbered.
19    What --
20      Q.    If you look on the left
21    margin, you will see numbers for
22    each cell.
23           MR. BENNETT:  Mine are
24      not numbered either.
25      Q.    If you look on 2018 tab,
```



Page 116

```
 1                    M. KAPLAN
 2    there is a charge dated July 26th,
 3    2018.  Can you go down to July 26th,
 4    2018, and let us know when you are
 5    there?
 6    A.    Yes.
 7    Q.    Okay.
 8          Do you see there Ms.
 9    Robinson recorded a payment and gift
10    from Louis Vuitton?
11    A.    Yes.
12    Q.    What was your understanding
13    at the time of the purchase -- let
14    me restate that.
15          What was your understanding
16    at the time of the purpose of this
17    purchase?
18    A.    I don't remember what I
19    thought when I saw this.  So I don't
20    -- I have no recollection.
21    Q.    Do you recall this being a
22    gift to Amelia Brain?
23    A.    No.  I heard that later
24    somewhere, but I -- I don't remember
25    -- I don't remember what I thought
```



Page 117

```
 1                M. KAPLAN
 2   at the time.
 3      Q.    But you never asked anyone
 4   about this --
 5      A.    No, I might have asked.  I
 6   don't remember if I asked is what I
 7   am trying to say.  I don't remember.
 8   She might have told me it was for
 9   Amelia.  She might had not told me.
10   I might have asked.  I don't
11   remember.
12      Q.    Who is Amelia Brain?
13      A.    Amelia Brain worked for
14   Canal for several years as primarily
15   Chase's assistant.
16      Q.    When did Ms. Brain's
17   employment at Canal end?
18      A.    I believe in 2015 or so,
19   but maybe I am off, but maybe 2017.
20   I don't remember.  She worked for
21   about fives years or so, six years,
22   and then she went to Los Angeles,
23   and then she came back to help in 20
24   -- 2019, the summer a little bit.
25      Q.    After Ms. Brain's
```



```
 1                    M. KAPLAN
 2    employment at Canal ended, she
 3    continued to perform work for Canal
 4    and Mr. De Niro from time to time,
 5    is that right?
 6      A.    She continued to perform
 7    work?  Um, no.  She -- she -- Chase
 8    had her help her with a few things
 9    from time to time.  But I don't -- I
10    don't know if I would call it for
11    Canal.  I don't know what it was
12    specifically.
13      Q.    After Ms. Brain's
14    employment at Canal ended, from time
15    to time she would assist on items
16    for Mr. De Niro, is that right?
17      A.    I believe she -- Chase had
18    her -- after her employment ended,
19    she came back -- I think she came
20    back to New York twice.  Once was to
21    help train this new person Lu Lu.  I
22    don't recall what the other time was
23    for, if there was another time.  In
24    my head I think there was two times,
25    but maybe I am wrong.  It was more
```



```
 1              M. KAPLAN
 2   to help Chase with things.  I don't
 3   think she helped Mr. De Niro with
 4   things.
 5     Q.    Okay.
 6           Ms. Brain was an actress in
 7   one of Mr. De Niro's movie, is that
 8   right?
 9     A.    I believe she was in two of
10   his movies.  The Irishman and the
11   fine film Dirty Grandpa.
12     Q.    Did anyone review your
13   petty cash expenses?
14     A.    No.  Chase -- I did these
15   sheets early on, but I just found
16   that I didn't like the form.  So she
17   might have reviewed a few of them,
18   but then only Berdon, I guess, would
19   have reviewed the whole petty cash.
20     Q.    Did you ever use petty cash
21   to buy dinner for your wife and
22   kids?
23     A.    For my wife and kids, no.
24   I used it to buy dinner if I was
25   working -- if there was an event.  I
```



```
 1               M. KAPLAN

 2    worked a lot of events, so I worked

 3    a lot of late nights and often I

 4    didn't eat at those events, so I

 5    would buy dinner.  So those nights,

 6    sometimes at a bodega or something,

 7    sometimes something -- it depends on

 8    where it was.  So I did buy dinners

 9    from time to time.  But it wasn't

10    like going out to dinner with the

11    family on Bob's -- it was more like

12    leaving a thing.

13    Q.    You would use petty cash

14    for working dinners when you were

15    working for Canal and Mr. De Niro,

16    correct?

17         MR. DROGIN:  Objection to

18     the form.

19    A.    I used petty cash for work,

20    yes.  But, you know, like I said

21    working dinners, to define it, was

22    if I was working late for whatever

23    reason or working on a weekend then

24    yes.  I used petty cash mainly

25    because I just wanted the points on
```



Page 121

```
 1                M. KAPLAN
 2   my credit card.  And also my card
 3   was supposed to be for personal
 4   stuff, not for business stuff.
 5   There was two reasons I didn't use
 6   my work card for those things.
 7      Q.    Okay.
 8            As part of your job, did
 9   you review bills that Canal
10   received?
11      A.    Which -- what bills do you
12   mean?
13      Q.    As part of your job, did
14   you review any types of bills that
15   Canal received?
16      A.    No, not really.  I would --
17   okay.  I will rephrase that.  I did
18   review -- Force Transfer would send
19   invoices that I would either send to
20   Berdon to pay, or pay directly with
21   the credit card.  They were the
22   moving company that we used.  I
23   reviewed those because I worked with
24   them the most.  And then -- no.  I
25   mean, only things that I actually
```



Page 122

```
 1                  M. KAPLAN
 2    had like a plumber who came to a
 3    property, they would send a bill, I
 4    would send it off to the accountants
 5    to pay it.  I am vouching for this
 6    plumber, stuff like that, but I
 7    didn't review his billing.  I can't
 8    think of what else you mean, so no.
 9       Q.    As part of your job, did
10    you review any of the credit card
11    statements that Canal received?
12       A.    No.
13       Q.    You never reviewed credit
14    card statements that Canal received?
15       A.    I saw them, but it wasn't
16    part of my job.  Chase would get the
17    credit card bills from Berdon.  She
18    would send them to me, and as part
19    of the job Chase was -- Chase would
20    go through all the credit cards, and
21    want all the receipts, and try to
22    match them up.  I think that was
23    something she was very interested in
24    but I didn't regularly review the
25    credit cards other than -- other
```



Page 123

```
 1              M. KAPLAN
 2   than if there was a reason to.  I
 3   don't know why I would.  I didn't
 4   even review my own credit cards.  So
 5   I don't know, but go on.
 6     Q.    I'm sorry.  Say that again?
 7     A.    I said, "I don't even
 8   review my own credit cards, but
 9   sorry, go on."
10     Q.    Did you communicate with
11   personnel at Berdon, LLP, during
12   your employment at Canal?
13     A.    Yes.
14     Q.    On what topics would you
15   communicate with personnel at
16   Berdon?
17     A.    About -- I mean, about
18   petty cash, that we needed to get
19   petty cash, about paying things that
20   they should pay, about benefits.
21   About mainly it was paying for
22   things that we needed money for, or
23   if we needed -- or bills they had to
24   pay.  Or they would -- they would --
25   they would -- so if you are asking
```



                        M. KAPLAN

1
2    to -- to get back to the credit card
3    receipt thing, they would contact me
4    about charges sometimes that were in
5    my credit card because it was in my
6    name, and I would often direct them
7    to the office because I didn't know,
8    you know, a lot of these hotels and
9    stuff were for Bob's family and I
10   didn't know.  I assumed it was
11   legitimate because it was a crazy
12   hotel in France or something, but I
13   didn't know for sure so I would
14   direct them to the person in the
15   office, or I would, myself, ask a
16   person in the office to confirm it.
17      Q.    What was Burden's role with
18   respect to petty cash?
19      A.    Pay -- their role was they
20   wanted us to -- we e-mailed them
21   when we needed it, they sent it
22   down, and then they took, you know,
23   as I said earlier, we sent them the
24   receipts and the breakdowns when it
25   was over.  They wanted to have the



```
 1                M. KAPLAN
 2    breakdowns I think for tax purposes.
 3    They set up the -- the breakdown
 4    thing was a thing they set up
 5    originally like as a format to use.
 6      Q.    And the petty cash
 7    spreadsheet that was marked as
 8    Exhibit 11 employed the categories
 9    that Berdon wanted to use, is that
10    correct?
11      A.    The thing I am looking at
12    right now with the three tabs?
13      Q.    Yes.
14      A.    Yeah.  I mean, I see --
15    because Chase wrote like lunches,
16    dinners, and she wrote personal.
17    She sort of had that in mind, I
18    guess, yeah.  To an extent I see
19    that.  But it is -- sometimes I
20    would have to like decide like
21    what --
22          MR. DROGIN:  Just ask the
23       witness please not to guess.
24          THE WITNESS:  Sorry.
25          MS. HARWIN:  Counsel,
```



```
 1                M. KAPLAN
 2     don't interrupt while the
 3     witness is speaking.
 4     A.    Sometimes I would have to
 5   decide like based on what notes that
 6   she left, if something was personal
 7   or not.  My sense of Berdon is they
 8   -- they just wanted -- they wanted
 9   to have the numbers.  This was not
10   -- the amount of money was a big tax
11   thing either way, so they just
12   wanted to have the numbers to use so
13   we provided them to them.
14     Q.    How often would you send
15   over tabulations of petty cash to
16   Berdon?
17     A.    I mean, they would receive
18   them for every petty cash they got.
19   But how often, it depended on --
20   often times I would say closer, you
21   know, to tax season they would say
22   we need all the ones.  I would send
23   them then.  I don't remember how --
24   how frequently.  Sometimes I would
25   send them more regularly depending
```



```
 1              M. KAPLAN
 2   on how busy I was with other things.
 3      Q.    Typically petty cash
 4   tabulations would be sent to Berdon
 5   at last a few times a year, is that
 6   correct?
 7      A.    Yeah, I would say a few
 8   times a year.
 9      Q.    Did you go over petty cash
10   tabulations with personnel at
11   Berdon?
12      A.    No, not that I can
13   remember.
14      Q.    Did you have any
15   involvement working with Berdon as
16   Berdon prepared Canal's taxes?
17      A.    No.  Other than just to
18   answer questions they might have
19   about charges as far as on the
20   credit cards.  But that is not
21   really a tax thing, so, no, sorry.
22      Q.    During your employment at
23   Canal, how closely did you work with
24   Chase Robinson?
25      A.    How closely?  I talked to
```



Page 128

```
 1                M. KAPLAN
 2    Chase several times a day usually.
 3    She -- I don't know.  You know, like
 4    a lot of the office policies and
 5    things she wanted to do we would
 6    discuss ahead of time.  And I sort
 7    -- she started -- she wanted to know
 8    what I was up to.  Sorry.  My other
 9    phone.  Sorry.  She wanted to know
10    what I was up to, and I -- I don't
11    know.  I mean, we would speak
12    several times a day usually about
13    office things or Bob things.
14       Q.    And on what topics would
15    you and Ms. Robinson interact when
16    would you communicate on a regular
17    day?
18       A.    Um, like I don't know.  It
19    depended on what was going on, but
20    like it would be whatever I was
21    going to with Bob, you know, going
22    over things.  It could be if she
23    wanted to discuss the health benefit
24    plan, it could be -- it could be art
25    stuff.  If she wanted -- you know,
```



Page 129

```
 1                    M. KAPLAN
 2   giving a gift to somebody.  It could
 3   be -- you know, it was like she -- a
 4   lot times she had -- she had a lot
 5   of ideas, so she kind of bounced
 6   them off of me sometimes.  You know,
 7   it really depended though because
 8   sometimes when she was like in --
 9   you know, traveling or something, I
10   didn't speak to her as frequently.
11   But -- so yeah.  I don't know.  I
12   don't have an estimate for how many
13   times during the day or anything
14   like that, but depending on the
15   situation.
16       Q.   Do you recall circumstances
17   in which Mr. De Niro ever rejected
18   ideas that Ms. Robinson presented?
19       A.    Rejected ideas?  I mean
20   usually what she presented she got
21   him to do.  He did -- she wanted him
22   at one point -- she wanted him to
23   basically hire this third-party
24   benefits program company, which was
25   something that he did end up
```



Page 130

```
 1              M. KAPLAN
 2   ultimately rejecting.
 3      Q.    Do you recall any other
 4   circumstances in which Mr. De Niro
 5   rejected ideas that Ms. Robinson
 6   conducted?
 7      A.    I mean, there would be
 8   things that -- with the -- with the
 9   Tribeca Film Festival, events and
10   things that she might (inaudible)
11   that he would go to.  That is not
12   really an idea.  I can't recall off
13   the top of my head a specific -- she
14   also talked to Bob a lot more
15   frequently than I did about --
16   sometimes I wasn't aware of things
17   that she talked about.  I am sure
18   there are examples, but I don't know
19   them off the top of my head.
20      Q.    Working for Mr. De Niro was
21   not just a 9:00 to 5:00 job for Ms.
22   Robinson, was it?
23      A.    It wasn't a 9:00 to 5:00
24   job for anybody that worked for Mr.
25   De Niro.  It was a unique job.
```



MAGNA

LEGAL SERVICES

Page 131

```
 1                M. KAPLAN
 2    Q.    Focusing on Ms. Robinson,
 3   Mr. De Niro expected Ms. Robinson to
 4   be available to him at all hours of
 5   the day and night, correct?
 6              MR. DROGIN:  Objection to
 7       the form.  You can answer.
 8    A.    I don't know if he expected
 9   her to be available at all hours of
10   the day.  I know that -- that she
11   impressed upon him that the people
12   in the office needed breaks -- there
13   should be times when they weren't
14   available.  It wasn't reasonable and
15   that he could always call her.  She
16   always would say -- she made it
17   clear that she was the one person
18   that was always available.  But I --
19   I -- I don't know what Bob's
20   expectations were as far as actual
21   hours.
22    Q.    It was a common occurrence
23   for Ms. Robinson to perform work for
24   Mr. De Niro in the evenings,
25   correct?
```



Page 132

```
 1                M. KAPLAN
 2    A.    No.  I mean, I -- she --
 3   not -- there was not -- I don't
 4   really know what she did that had to
 5   be done in the evenings other than
 6   if he called her.  But I don't know
 7   how often he called her.  I have no
 8   knowledge.
 9    Q.    You don't know how often
10   Ms. Robinson and Mr. De Niro would
11   speak on evenings and weekends, is
12   that right?
13    A.    No.
14    Q.    Meaning, correct?
15    A.    Yeah, I don't know how
16   often they spoke.
17    Q.    As far as you are aware,
18   did Canal ever record phone calls on
19   any of its systems?
20    A.    No.
21    Q.    As far as you are aware,
22   were there any cameras in the Canal
23   office?
24    A.    No.
25              MS. HARWIN:  We are going
```



Page 133

```
 1              M. KAPLAN
 2      to share another document in
 3      the chat, which we are going
 4      to mark as Plaintiff's
 5      Exhibit 12.
 6          (Whereupon, Plaintiff's
 7      Exhibit 12, an e-mail, was
 8      marked for identification, as
 9      of this date.)
10   A.    I have to figure out how to
11   get back -- I can close this other
12   one down?
13   Q.    You can close the other
14   one, yes.
15   A.    Oh, wait.  What did I do to
16   get back to the chart?  Hold on.
17   Okay.  There it is.
18          MR. DROGIN:  This is 12.
19   A.    Hold on.  I need to find
20   where it is on my computer.  Oh,
21   boy.  Okay.  Yeah.
22   Q.    Do you recognize this
23   e-mail as an e-mail you sent to Ms.
24   Robinson after her employment at
25   Canal ended?
```



Page 134

```
 1                    M. KAPLAN
 2      A.    Yes.
 3      Q.    Turning your attention to
 4   the fourth paragraph, the second
 5   sentence of that paragraph, you
 6   wrote, "You set a great example of
 7   hard work being willing to drop
 8   everything no matter the time when
 9   needed?"
10      A.    Yes.
11            (Simultaneous speaking)
12      A.    Sorry.
13      Q.    Was that truthful?
14      A.    Look, this e-mail was
15   written -- I -- I wrote this -- this
16   is on April 22nd, she had just left.
17   She sent me an e-mail, a very nice
18   e-mail before that, as you can see.
19   And I essentially replied to this
20   e-mail like line by line of her
21   e-mail.  I remember sort of -- look,
22   I felt bad -- I felt that Chase for
23   -- all of her -- look, she drove --
24   she drove a lot of people in the
25   world crazy, and she made a lot of
```



```
 1                M. KAPLAN
 2    people's lives miserable, and she --
 3    she made -- she gave me a lot of
 4    stress.  All of these things were
 5    true, but I did -- I did feel bad
 6    for her because I thought -- I knew
 7    how much the job meant to her.  So I
 8    was trying to, you know, basically
 9    reply to her e-mail with a similar
10    tone.  You set a great example of
11    hard work.  I mean, that is true in
12    the sense that she did drop -- she
13    was willing to drop -- she didn't
14    really have any -- if she was in New
15    York, she would -- like she was
16    willing to drop everything for Bob,
17    that was true, and -- and -- and I
18    said (inaudible) which, you know, to
19    me, myself and Chase were on -- you
20    know, this level in Bob's head
21    because we were the two people he
22    could trust the most, you know, with
23    his privacy and everything, which is
24    the most important thing to him
25    because of his nature.  So, you
```



MAGNA
LEGAL SERVICES

1           M. KAPLAN

2   know, that is why -- why we are here

3   now.  We are doing this right now is

4   not -- obviously if I knew that I

5   wouldn't have written that because

6   clearly his privacy was not first

7   and foremost.  But at the time I

8   thought it was.  I thought -- yeah.

9   So -- I don't know.  That is the --

10  irony of the whole thing is that we

11  were told constantly not to trust

12  the people in the office below us,

13  but -- and nobody else was -- I have

14  never been testifying for anybody

15  else before so --

16      Q.    Based on what you observed

17  in working with Ms. Robinson, Ms.

18  Robinson did set a great example of

19  hard work, is that correct?

20      A.    I wouldn't say she set a

21  great example of hard work.  I would

22  say she set -- she set an example,

23  in my opinion, if -- one element to

24  being a great executive assistant,

25  chief of staff, whatever you want to



```
 1              M. KAPLAN
 2    call it, of a person like Bob De
 3    Niro, is almost like a willingness
 4    that your life -- their life is
 5    everything.  Whatever is going on in
 6    your life, I am available.  Which I
 7    -- you know, always in different way
 8    felt that I did, too.  So yeah.  I
 9    think a lot of people come and go,
10    they don't -- they are not there
11    long enough to -- to -- they are not
12    going to do that as someone that has
13    been there a long time because they
14    know -- so yeah.  In that respect,
15    yeah.  She set a -- I thought she
16    did set a good example of what
17    element of what makes the job -- or
18    what you need for the job.
19        Q.    Did you find Ms. Robinson
20    to be proactive on behalf of Mr. De
21    Niro?
22        A.    Did I find her to be -- she
23    -- I don't know what you mean.  I
24    mean, she was proactive in the sense
25    that she was aware of what his
```


MAGNA
LEGAL SERVICES

1              M. KAPLAN

2    normal life was like, and was

3    looking out for things up on the

4    horizon that everyone needed to be

5    aware of that were coming up.

6      Q.    Was Ms. Robinson protective

7    of Mr. De Niro?

8      A.    Yes, to a point.  Like I

9    said, she, you know, we went -- the

10   people in the office went to -- she

11   didn't want them even connecting

12   phone calls using their iPhones

13   because they could be listening in.

14   She, you know, got it in his head

15   that she was not only protective,

16   but she was the most protective.

17     Q.    Ms. Robinson was protective

18   of Mr. De Niro's family as well,

19   correct?

20     A.    I don't know how so.  I am

21   not saying she wasn't protective,

22   but I don't know what you mean by

23   that.

24     Q.    Did you observe Ms.

25   Robinson looking out for Mr. De



MAGNA
LEGAL SERVICES

```
 1                M. KAPLAN
 2   Niro's best interest?
 3          MR. DROGIN:  Objection to
 4      the form.
 5      A.    I don't -- in -- in her
 6   mind, yes.  I don't know.  I don't
 7   know what his best interests were.
 8      Q.    Did Mr. De Niro ever
 9   communicate to you what he valued in
10   Ms. Robinson's work?
11      A.    Yes.  That she was -- he
12   communicated to me that -- that she
13   was -- like she was -- you know, she
14   made sure things ran -- got done.
15   She made sure that she got things
16   done.  That is what he said to me.
17   She made sure she got things done.
18   That was his opinion of her at some
19   point.  I don't know what year that
20   was though.
21      Q.    Mr. De Niro also conveyed
22   that he valued that Ms. Robinson was
23   available to him, correct?
24      A.    I don't think he ever, in
25   so many words, said that to me.
```



Page 140

```
 1                M. KAPLAN
 2    Q.    Was that the message that
 3  you got though?
 4    A.    It was implied that he
 5  valued that she -- it was a little
 6  bit of smoke and mirrors to it, but
 7  that she -- that she would get --
 8  that she was aware of everything.
 9  She had been around so long.  She
10  knew all of the names, knew all the
11  lingo, knew all the people.  And he
12  definitely thought she -- he didn't
13  have a complete trust in the people
14  in the office to know -- in a --
15  when push came to shove, he thought
16  Chase was a better enforcer.  She
17  could be tougher with people.  She
18  could get what he wanted, better
19  than others could.
20    Q.    During her employment with
21  Canal, Ms. Robinson's day-to-day
22  work varied depending on what Mr. De
23  Niro's needs were at the time, is
24  that right?
25              MR. DROGIN:  Objection to
```



MAGNA
LEGAL SERVICES

```
 1                M. KAPLAN
 2      the form.
 3      A.    Yeah.  I mean, her -- her
 4  day-to-day job was, you know, it
 5  depended -- yes, if he had a movie
 6  in production, if there was a big
 7  birthday coming up, something --
 8  stuff like that.  Obviously the
 9  apartment was a unique situation.
10      Q.    During her employment at
11  Canal, Ms. Robinson handled a broad
12  range of personal tasks for Mr. De
13  Niro, is that right?
14      A.    Yes.
15      Q.    Describe the personal tasks
16  that Ms. Robinson would handle for
17  Mr. De Niro as far as you knew?
18      A.    Personal tasks that she
19  would -- well, obviously she looked
20  for the apartment for him.
21  Basically I know that she -- she did
22  a lot photo projects, for -- for his
23  family members, which would be like
24  taking photos, putting them in a
25  fancy binder, making up a nice --
```



```
 1                M. KAPLAN
 2   you know, for someone's -- an
 3   anniversary or a big birthday.  She
 4   did -- she picked up prescriptions
 5   for him, as did I.  She would --
 6   there are other examples I am sure,
 7   but I can't think of what is
 8   personal.
 9     Q.    During Ms. Robinson's
10   employment at Canal, what kinds of
11   errands do you recall Ms. Robinson
12   performing for Mr. De Niro?
13     A.    Um, I don't really recall
14   her running a lot of errands for Mr.
15   De Niro other than prescriptions,
16   or, you know, sometimes she would
17   run by like if he was filming or
18   something, she would bring these
19   sandwiches from this place that he
20   liked, stuff like that, but I don't
21   really recall her -- I don't think
22   -- she wasn't -- he would tell her
23   things, but then she would give it
24   to the office, or give it to her
25   assistant, or give it to me, as far
```



Page 143

```
 1              M. KAPLAN
 2   as running an errand.  I don't
 3   recall her running many errands.
 4   Except I will say she did --
 5   Christmas is the other thing
 6   personal I guess you could call it.
 7   It is personal and business, but a
 8   lot of gifts for his family and
 9   stuff like that.
10     Q.   Ms. Robinson assisted Mr.
11   De Niro in selecting gifts for
12   people in his life?
13     A.   Yeah.  I mean, she -- the
14   whole Christmas operation would
15   start in like October or November.
16   And part of the operation would be
17   gifts for, you know, she would go
18   with him to stores.  She -- you
19   know, like -- I think she liked
20   that.  She would make sure he was
21   aware, and she would try to find
22   time.  But she -- yeah, she would go
23   with him to the stores and give him
24   ideas for gifts for different family
25   members.
```



MAGNA
LEGAL SERVICES

```
 1                    M. KAPLAN
 2     Q.    Ms. Robinson would assist
 3   Mr. De Niro in matters relating to
 4   his former partner, Toukie Smith, is
 5   that right?
 6     A.    Later, yes.  Yes, she
 7   assisted in -- Toukie's helper
 8   wasn't so great, and she was helping
 9   her sort of manager her -- manage
10   her life.
11     Q.    Ms. Robinson would help Mr.
12   De Niro in finding vacation homes,
13   is that right?
14     A.    I don't recall that being
15   -- maybe she did that once or twice,
16   but I don't recall that.
17     Q.    During her employment with
18   Canal, what household matters did
19   Ms. Robinson assist Mr. De Niro
20   with, as far as you knew?
21     A.    Household matters, I mean,
22   she never -- Bob had a household
23   staff for most of the time.  It was
24   only the apartment, setting up the
25   apartment that would be a household
```



```
 1              M. KAPLAN
 2    matter.  Other than that, I don't
 3    recall any household matters.
 4          Actually, can I take a
 5    five-minute break here to use the --
 6    Q.    Sure.
 7          MS. HARWIN:  Why don't we
 8      resume at 11:32?
 9          THE VIDEOGRAPHER:  The
10      time is now 11:27 a.m., and
11      we are off the record.
12          (Whereupon, a recess was
13      taken at this time.)
14          THE VIDEOGRAPHER:  The
15      time is 11:34 a.m.  We are
16      back on the record.
17    Q.    As far as you knew, what
18    were Ms. Robinson's job
19    responsibilities when it came to Mr.
20    De Niro's home at ███████████████
██    ████████
22    A.    She was sort of the
23    overseer of the entire move-in
24    operation.  So, you know, she --
25    part interior design, part just
```



Page 146

```
 1                   M. KAPLAN
 2   making sure everything got moved in
 3   that he was -- he sort of started it
 4   from scratch.  He was sort of buying
 5   furniture, TVs, hanging up new
 6   artwork, getting framed, all things
 7   were happening, and she was sort of
 8   in charge of the whole thing.
 9      Q.    Setting up Mr. De Niro's
10   new home at ████ became a large
11   project, is that right?
12      A.    Yes.  It was a big -- big
13   undertaking.
14      Q.    For a while setting up Mr.
15   De Niro's home at ████ became a
16   dominant part of Ms. Robinson' job,
17   is that right?
18      A.    Yes.
19      Q.    Did Ms. Robinson express to
20   you how she felt about having to
21   assist Mr. De Niro in setting up his
22   home at ████?
23           MR. DROGIN:  Objection to
24      the form.
25           Can we hear the question
```



```
 1                M. KAPLAN
 2     back, please?
 3          (Whereupon, the requested
 4     portion was read back by the
 5     reporter:
 6          Q:  Did Ms. Robinson
 7     express to you how she felt
 8     about having to assist Mr. De
 9     Niro in setting up his home
10     at ████████)
11          MR. DROGIN:  Objection to
12      the form.
13     A.    I don't remember anything
14   that she expressed about it.
15     Q.    Do you recall Ms. Robinson
16   telling you that she was pissed at
17   all of this apartment stuff?
18     A.    I mean, no.  I recall -- I
19   can recall her venting about things,
20   but more just in general, a notion
21   of venting about, you know, the job
22   in general.  I don't -- I don't
23   recall specific instances of -- you
24   know, she seemed to -- my
25   observation was she seemed to sort
```



```
 1                M. KAPLAN
 2   of relish in the -- you know, it was
 3   a very important job, it seemed, as
 4   far as where Bob was in his life at
 5   that moment.  So I think she
 6   relished -- it seemed to me, that
 7   she relished in the opportunity to
 8   do a good job with it.
 9        MS. HARWIN:  We are going
10     to drop in the chat what is
11     being marked as Plaintiff's
12     Exhibit 13, Bates stamped
13     Canal 0049058.
14        (Whereupon, Plaintiff's
15     Exhibit 13, Canal 0049058,
16     was marked for
17     identification, as of this
18     date.)
19   A.    Uh-huh.
20   Q.    Turning your attention to
21   the second page of that document?
22   A.    Okay.
23   Q.    Do you see where Ms.
24   Robinson wrote, at 9:28 p.m., "I am
25   just fucking going over there now.
```



Page 149

```
 1              M. KAPLAN
 2   I am so pissed at all this apartment
 3   stuff."
 4          Do you see that?
 5    A.    Yes.
 6    Q.    Does this refresh your
 7   recollection as to anything that Ms.
 8   Robinson expressed to you about how
 9   she felt about working on setting up
10   Mr. De Niro's home?
11    A.    Well, yeah.  I was talking
12   more about the idea of setting up
13   the apartment.  This now is more, we
14   move to the area of he is living
15   there, and asking -- it was like he
16   didn't have a -- he didn't have a
17   house staff, so things that we had
18   never done for him before, like
19   getting plants, or I don't know
20   exactly what this is about, because
21   I feel like I remember going over
22   there at some point about plants.
23   And I remember going there about
24   garbage one night on a Sunday night.
25   I don't know if that is what this
```



```
 1              M. KAPLAN
 2    is, but yeah.  We definitely had
 3    some conversations of venting about,
 4    oh, yeah.  She says here, "I don't
 5    have a fucking key."  I need -- I
 6    don't know -- I don't know which --
 7    I don't know if that is with the
 8    garbage thing or not, but we had
 9    some conversations about some
10    ridiculous asks about like or it
11    seemed to us, plants, garbage,
12    Christmas tree getting rid of, stuff
13    like that that had not -- that she
14    didn't like.  Yes, that is true.
15      Q.    Describe for me what you
16    characterized as ridiculous acts
17    that Ms. Robinson had to perform in
18    connection with Mr. De Niro's home
19    at ▮▮▮▮▮
20      A.    Well, I mean, I am thinking
21    off the top of my head of when he
22    called on a Sunday, or there was a
23    weekend where it was like the
24    garbage -- it was like a
25    misunderstanding that he thought he
```



```
 1                M. KAPLAN
 2    was going to get fined or something
 3    if the garbage didn't go out.  I
 4    don't exactly know if I am getting
 5    that right.  And it made no sense,
 6    the garbage could have gone out
 7    during the week when someone was
 8    there.  And he -- I know he yelled
 9    at her about it.  I know because he
10    yelled at me about it, too.  And
11    that is an example that I actually
12    went over there that night, on a
13    Sunday night to take the garbage
14    out.  But I am seeing her -- I said
15    plants because I saw that on this.
16    Take the plants inside today.  I
17    remember there was like a plant
18    outside, and I think it got knocked
19    over or something.  Like some sort
20    of kids doing something stupid.  And
21    there just wasn't any -- there
22    wasn't any house staff.  So it was
23    like us basically because we had
24    this time where the office wasn't
25    really involved.  I think partially
```



1                    M. KAPLAN

2    because Chase was keeping them at a

3    distance, but -- so it was just us.

4    I can't remember.  I don't remember

5    exactly the other examples.  But,

6    yeah, it was like -- there were

7    situations that it was going to be

8    like -- you know, with moving things

9    out because there was mold, or to

10   get everything off the walls and put

11   it back on the walls.  There was a

12   lot of back and forth that was not

13   as -- I think Chase -- personally,

14   it seemed like moving into the

15   apartment she was -- that was more

16   of an enjoyable project than once he

17   was there.

18       Q.   Once Mr. De Niro was moved

19   into the home at ████ when there

20   wasn't household staff, Ms. Robinson

21   was one of the people who was

22   filling that role of handling

23   household matters, is that right?

24       A.   Well, I wouldn't go so far

25   as to say that.  I would just say



```
 1                M. KAPLAN
 2   there wasn't nobody to -- you know,
 3   Bob is pretty low maintenance on his
 4   own as far as he didn't need a -- it
 5   was just a different kind of living.
 6   So it just wasn't a person there.
 7   So while I did stuff, she did stuff,
 8   Lu Lu did stuff until they started
 9   hiring people to work in the
10   apartment.
11      Q.    Until Mr. De Niro hired
12   household staff, Ms. Robinson was
13   one of the people who was assisting
14   Mr. De Niro on day-to-day items
15   around his home, is that right?
16      A.    Yeah, when she was there.
17   I know there was a time when she was
18   away during that, too.  But when she
19   was there, she would -- you know, I
20   don't remember the division of
21   labor, but it was sort of like all
22   hands on deck.  I would do things,
23   Lu Lu would do a lot of things, who
24   was her assistant, Chase would do
25   things.
```



Page 154

```
 1                 M. KAPLAN
 2         MS. HARWIN:  I am sharing
 3     another document in the chat
 4     that is being marked as
 5     Plaintiff's Exhibit 14.  It
 6     is Bates stamped Canal
 7     0047918 through 923.
 8         (Whereupon, Plaintiff's
 9     Exhibit 14, Canal 0047918
10     through 923, was marked for
11     identification, as of this
12     date.)
13     A.    You just shared it?  I see
14  it.  Okay.  Hold on.
15     Q.    I would like to turn your
16  attention the middle of the page,
17  marked as 47920, on the bottom.
18     A.    Okay.  You mean that page
19  below it -- above it --
20     Q.    So the page that on the
21  bottom is marked 47920.  In the
22  middle of that page, at 2:32 p.m.,
23  did you write, "My main thing is
24  Chase's job is mostly pointless?"
25     A.    At this point, this is in
```



```
 1                M. KAPLAN
 2   April now.  This is when we were
 3   talking -- when Tiffany was talking
 4   to the office as far as what
 5   everyone did.  This is not -- yeah.
 6   I guess that I wrote that.  Sure.
 7   That is my cell phone.
 8      Q.    What was -- what was it
 9   that made Ms. Robinson's job
10   pointless from your perspective?
11      A.    Well, I think what I was
12   referring to was that we had a
13   situation where she sort of oversaw
14   everybody, but she didn't actually
15   do a lot of things.  So -- and after
16   she was gone -- there was like kind
17   of a discussion of replacing Chase.
18   If Chase needed to be replaced, who
19   would be able to do all of these
20   things?  So they needed like -- I --
21   you know, we had good people.  We
22   had people who -- we had a bunch of
23   people working in the office.  It
24   wasn't that she -- she did things,
25   but there was a lot of redundancy.
```



```
 1              M. KAPLAN
 2    There was like two assistants doing
 3    the exact same job, where they could
 4    have divided it.  There was four
 5    different people on every e-mail.
 6    There wasn't -- she delegated a lot.
 7    That type of job.
 8      Q.    Based on your observations,
 9    did the title of VP of
10    Production/Finance reflect the
11    substance of the work that Ms.
12    Robinson performed for Mr. De Niro?
13      A.    No.
14      Q.    Based on your observations,
15    did the title of Director of
16    Production reflect the substance of
17    the actual work that Ms. Robinson
18    performed for my Mr. De Niro?
19      A.    I mean, like I said in the
20    beginning when you asked me, I am
21    not a big titles guy.  I don't know
22    what -- I don't know what it -- the
23    thing that you have to understand is
24    that Canal Productions is a personal
25    company that doesn't produce
```



Page 157

```
 1                    M. KAPLAN
 2    anything.  So, you know, I laugh
 3    when I see the articles in the news
 4    about this case when it talks about
 5    she rose to the ranks of production,
 6    because it makes it seem like -- I
 7    wish Canal Productions produced
 8    things.  I would have had a cooler
 9    title, too.  But -- so no.  I -- she
10    -- it was like she was -- the most
11    fitting title would have been chief
12    of staff, I guess, is the way I
13    envision the chief of staff is the
14    person -- the is the face, answers
15    the questions to the boss, but
16    delegates all the other people to
17    actually -- that is what I would
18    know, not that I know what titles
19    mean.
20    Q.    During the time that you
21    were employed at Canal, Canal had a
22    practice of paying for employee's
23    lunches every workday, is that
24    right?
25    A.    Yes.
```



1              M. KAPLAN

2    Q.    And if an employee was

3    working through dinner, there were

4    circumstances where Canal would pay

5    for that dinner as well, is that

6    right?

7    A.    I mean, I thought we

8    already discussed this, but, yes,

9    there were circumstances.

10    Q.    During your time at Canal,

11    were you aware of any limits on the

12    meals expenses that Canal paid for

13    employees?

14         MR. DROGIN:  Objection to

15     the form.

16    A.    There was a time when Chase

17    and I, as I said earlier, discussed

18    the idea of -- she wanted at one

19    point to give people like a per diem

20    of like 20/$25.00 a meal for lunch.

21    There was an idea that like that is

22    how much you should spend, but it

23    was not something that was in

24    writing.  It was more of a general

25    idea.  On dinners, no.  Again, I



Page 159

```
1                    M. KAPLAN
2    wasn't aware of a policy, but there
3    was none that was given to us either
4    by anyone else.
5           MS. HARWIN:  I'm going to
6        put into the chat what is
7        being marked as Plaintiff's
8        Exhibit 16 -- I'm sorry.  15.
9        Bates stamped beginning at
10       Canal 0030926.
11              (Whereupon, Plaintiff's
12       Exhibit 15, Canal 0030926,
13       was marked for
14       identification, as of this
15       date.)
16   A.    Hold on.  I screwed this
17   up.  Okay.
18   Q.    If you can pull up that
19   document, and let us know when you
20   have it.
21   A.    Right, okay.
22           MR. DROGIN:  Wait for the
23       question.
24   Q.    Okay.
25              If you see the sentence in
```



```
 1                M. KAPLAN
 2   the first paragraph you wrote that
 3   begins, "Just pay."  Can you read
 4   that sentence and the following
 5   sentence aloud?
 6      A.    Starting where?
 7      Q.    "Just pay?"
 8      A.    "Just pay the same way we
 9   pay for other restaurants on the
10   business credit card if you can.
11   Pay cash if there is some reason you
12   can't use the card.  And please
13   order more reasonably from his
14   restaurants than you might from
15   outside sources."  Yeah.  I -- I
16   don't remember.  Like, this seems to
17   me.
18      Q.    Wait.  Right now I just
19   asked you to read it out loud, okay?
20      A.    Okay.
21      Q.    Okay.
22            So can you explain what you
23   meant when you wrote, "Just pay the
24   same way we pay for other
25   restaurants on the business credit
```



Page 161

```
 1                M. KAPLAN
 2   card if you can.  Petty cash if
 3   there is some reason that you can't
 4   use the card?"
 5        MR. DROGIN:  Objection to
 6     the form.
 7     A.    What I meant when I wrote
 8   this e-mail was that Chase had --
 9   clearly was upset that the office
10   was -- was ordering from (inaudible)
11   Verde (ph) a lot, and wanted to
12   address it.  And I addressed it
13   because I can do it in the best way
14   to not piss everyone off who would
15   look at the hypocrisy that she did
16   whatever she wanted.  When I say,
17   "Just pay the same way that you pay
18   for other restaurants," I mean, I
19   think it is pretty self-explanatory
20   actually.  On the business credit
21   card, which is Chase's credit card,
22   again, because that way Chase would
23   have more oversight because she
24   looked at her credit cards every
25   month and she aligned the receipts.
```



```
 1              M. KAPLAN
 2   And like I said earlier, petty cash
 3   was only used if there was a reason
 4   that you can't use the card.
 5     Q.    So from the time you wrote
 6   this e-mail, in April 13, 2015,
 7   onward, was it standard practice for
 8   employees to put their working meals
 9   on the credit card in Ms. Robinson's
10   name when they could, and put the
11   meals on petty cash if for some
12   reason they couldn't use the credit
13   card in Ms. Robinson's name?
14           MR. DROGIN:  Objection to
15     the form.  You can answer.
16     A.    From the time -- this
17   e-mail is regardless.  Like I said
18   earlier, from the time -- it was
19   standard practice to order lunch on
20   -- almost every day they ordered
21   lunch on the Caviar account, which
22   was tied to Chase's credit card.
23   The petty cash was -- was something
24   they did very rarely, but, yes, if
25   there was a reason.  And nothing
```



Page 163

```
 1                M. KAPLAN
 2    really -- this e-mail is -- I mean,
 3    people ordered lunches from
 4    (inaudible) in Tribeca after this
 5    e-mail went out, but I think Chase
 6    wanted me to write this e-mail so I
 7    did.
 8            MS. HARWIN:  Can you read
 9        back the question?
10            (Whereupon, the requested
11        portion was read back by the
12        reporter:
13            Q:  So from the time you
14        wrote this e-mail, in April
15        13, 2015, onward, was it
16        standard practice for
17        employees to put their
18        working meals on the credit
19        card in Ms. Robinson's name
20        when they could, and put the
21        meals on petty cash if for
22        some reason they couldn't use
23        the credit card in Ms.
24        Robinson's name?)
25            MR. DROGIN:  And there
```



Page 164

M. KAPLAN

1

2      was an objection to the form.

3      A.    I mean, I already -- I said

4    this like 17 times.  Yes, for lunch,

5    I would stipulate for lunch.  They

6    didn't have access to her credit

7    card for dinner.

8      Q.    It was preferable, from

9    Canal's perspective, that employees

10   charge their working meals directly

11   to the Canal credit card under Ms.

12   Robinson's name rather than

13   processing it through petty cash, is

14   that correct?

15         MR. DROGIN:  Objection to

16      the form.  You are asking him

17      about Canal's process?  You

18      have a 30(b)(6) witness.  He

19      is not going to answer on

20      behalf of Canal.

21   Q.    You can answer.

22         MR. DROGIN:  No, you

23      can't.  Not on behalf of

24      Canal.  If you want to --

25         MS. HARWIN:  Counsel, he



```
 1                M. KAPLAN
 2    is a fact witness and he can
 3    answer the question.
 4         MR. DROGIN:  You asking
 5    him about Canal -- the way
 6    you --
 7         MS. HARWIN:  He can
 8    observe.
 9         MR. DROGIN:  Then you ask
10    him what his observation was.
11    He cannot bind Canal.  You
12    have a 30(b)(6) for that.
13         MS. HARWIN:  Counsel,
14    please stop interjecting.
15         MR. DROGIN:  No, I am not
16    going to stop.  Please stop
17    asking improper questions.
18    You have a 30(b)(6).  We have
19    designated a witness.  It is
20    not him.
21         MS. HARWIN:  Counsel,
22    stop interrupting this
23    deposition.
24         MR. DROGIN:  Counsel,
25    please stop doing what you
```



Page 166

```
 1                M. KAPLAN
 2      are doing.  Your continuing
 3      to say, "Counsel, please
 4      stop" is not going to change
 5      my answer.  You need to
 6      pay --
 7          MS. HARWIN:  You are not
 8      providing any answers.  You
 9      are disrupting the
10      deposition.  Put your
11      objection on the record as to
12      form and stop.
13          MR. DROGIN:  He is not
14      going to answer questions
15      about Canal.  He will answer
16      on his own on behalf.  Not on
17      behalf of Canal.
18          MS. HARWIN:  Mrs. Hayden,
19      can you repeat the question?
20          MR. DROGIN:  Please read
21      it back.
22          (Whereupon, the requested
23      portion was read back by the
24      reporter:
25          Q:  It was preferable,
```



Page 167

```
 1                    M. KAPLAN
 2      from Canal's perspective,
 3      that employees charge their
 4      working meals directly to the
 5      Canal credit card under Ms.
 6      Robinson's name rather than
 7      processing it through petty
 8      cash, is that correct?)
 9           MR. DROGIN:  Same
10      objection.  He is not here
11      testifying on behalf of
12      Canal.
13   A.    I will state for myself,
14   that is not true.  Canal didn't
15   care.  Nobody at Canal, in my
16   opinion, did this.  This is Chase's
17   policy.  Chase wanted it on her
18   credit card.  That is my -- my -- my
19   -- because she wanted to have
20   oversight.
21   Q.    The standard practice was
22   for employees to put any
23   reimbursable meals on the Canal
24   credit card in Ms. Robinson's name
25   when it was available, is that
```



```
 1                    M. KAPLAN
 2    right?
 3             MR. DROGIN:   Objection to
 4       the form.  What a muddled
 5       mess of a record you are
 6       making.  What an
 7       embarrassment.
 8    A.     Like I said, the standard
 9    practice was to order lunches on her
10    credit card, yes.  That is -- that
11    is --
12    Q.    That is not what I -- that
13    is not my question.
14    A.     I can't answer for a
15    standard practice because I don't
16    have a -- I don't know what people
17    did for every single meal.  I just
18    know the standard practice was when
19    they ordered lunch, yes, to use her
20    credit card.  That was a practice
21    she designed, and they followed when
22    they could.
23    Q.    When -- when was that
24    practice implemented as far as you
25    understand, that employee's lunches
```



```
 1                M. KAPLAN
 2    would be paid through the Canal
 3    credit card under Ms. Robinson's
 4    name?
 5      A.    I don't remember when that
 6    started because we used to -- if you
 7    remember in the old days, we used to
 8    call up and pay in cash for things
 9    because it was not as normal to put
10    a credit card over the phone, but I
11    don't remember when.
12      Q.    Do you have any sense at
13    all of approximately when that --
14      A.    No, no.  I mean, it
15    probably -- I don't know.  2013, but
16    I am really just guessing.  I really
17    don't know.
18      Q.    So it was a long-time
19    practice in excess of, you know,
20    five years before Ms. Robinson's
21    employment ended, is that right?
22          MR. DROGIN:  Objection to
23       the form.  He has just told
24       you that he is guessing.
25      A.    It was -- yeah, it was a
```



Page 170

```
 1                M. KAPLAN

 2   practice for several years.  I don't

 3   know the exact year that -- to use

 4   her card for business purchases in

 5   which the office lunches were

 6   considered.

 7     Q.    Did you ever speak to Mr.

 8   De Niro directly about Canal paying

 9   for any meals for employees?

10     A.    No.

11     Q.    During your employment at

12   Canal, what were the circumstances

13   when Canal would pay for employees

14   to take taxis, Uber, or Lyfts?

15          MR. DROGIN:  Objection to

16      the form.

17     A.    My understanding was that

18   when I started, basically the person

19   who was the -- who had the -- we

20   called it the batch fund (ph) back

21   then, which was the phone that Bob

22   would call when he need something,

23   they took taxis everybody because

24   you subway -- you couldn't use a

25   cell phone on the subway.  In the
```



```
 1                M. KAPLAN
 2   later years it became a thing where
 3   you could do it if -- again, like I
 4   said earlier, like I would -- if it
 5   was the fastest way to get somewhere
 6   that we needed to go, if you were
 7   carrying anything valuable, if it
 8   was late at night, you could -- you
 9   could expense a taxi or an Uber.
10   But reasonable that you had to
11   replace it.
12      Q.    If a Canal employees was
13   taking a taxi, Uber or Lyft to or
14   from Mr. De Niro's home, Canal would
15   pay for that taxi, Uber or Lyft,
16   correct?
17      A.    Well, if it was -- not if
18   it was during a workdays.  I mean, I
19   think that a lot times people would
20   take the subway to go to the home.
21   I took the subway plenty of times to
22   go to his own.  There had to be a
23   reason.  If it was a nighttime, or
24   bringing something, again, like
25   valuable to his home, then yes, of
```



Page 172

```
 1                    M. KAPLAN
 2    course.  It depended on the
 3    situation.  But Chase didn't -- she
 4    didn't ride the subway, so I knew
 5    that a lot of the trips were hers.
 6      Q.    Did you understand the
 7    reason why Ms. Robinson would take
 8    taxis, Ubers, or Lyfts rather than
 9    taking the subway?
10           MR. DROGIN:  Objection to
11       the form.
12      A.    My understanding was she
13    did you not ride the subway for
14    anything.  Let alone the -- workday
15    or not a workday.
16      Q.    If a Canal employees was
17    taking a taxi, Uber, or Lyft to or
18    from a meeting with Mr. De Niro,
19    Canal would pay for that
20    transportation, is that right?
21      A.    Again, there is no -- if
22    you are going to meet with Mr. De
23    Niro, there was no like policy you
24    get to take a taxi now.  There was
25    -- you know, you took the subway if
```



Page 173

```
 1                    M. KAPLAN
 2   it was during the workday, unless,
 3   again, unless you were bringing
 4   something like a script or something
 5   that had to -- I always took
 6   whatever I thought was fastest.  I
 7   rode the subway many, many times
 8   during the office day.  It was
 9   faster to get to the Upper West Side
10   in a taxi.  But some people might
11   have taken taxis, I am sure,
12   sometimes, of course.
13      Q.    And if a Canal employee
14   needed a taxi, Uber, or Lyft to run
15   an errand for Mr. De Niro, Canal
16   would pay for that taxi Uber, Lyft,
17   is that right?
18           MR. DROGIN:  Objection to
19       the form.
20      A.    If they needed a taxi,
21   Uber, or Lyft, yes.  It was rarer
22   and rarer as the years went on
23   because of the Internet to run an
24   errand.  But yes, Canal would pay
25   for it if it was -- if it was
```



```
 1                    M. KAPLAN
 2    deemed.  Obviously, if there was a
 3    reason.
 4       Q.    If a Canal employee needed
 5    to take a taxi, Uber, Lyft to meet
 6    with Mr. De Niro, Canal would pay
 7    for that taxi, Uber, Lyft, is that
 8    right?
 9            MR. DROGIN:  Objection to
10      the form.
11       A.    I feel like you keep asking
12    the same question.
13            If a Canal employee had a
14    reason to take the taxi for this
15    meeting, then they would pay for it.
16    That was my understanding of the
17    policy.  Not just for meeting with
18    him, no.
19       Q.    The circumstances in which
20    a Canal employee, you know, was
21    permitted to charge a taxi, Uber, or
22    Lyft was not limited to meeting in
23    person with Mr. De Niro, is that
24    right?
25            MR. DROGIN:  Objection to
```



Page 175

```
 1                    M. KAPLAN
 2       the form.
 3       A.     Right.  It wasn't -- right.
 4       Q.     At times you took taxis and
 5  Ubers with Ms. Robinson, correct?
 6       A.     Yes.
 7       Q.     And taxis and Ubers that
 8  you took with Ms. Robinson, in
 9  connection with your work at Canal,
10  were charged to Canal's credit
11  cards, correct?
12       A.     Yes.  But again, I would --
13       Q.     That is -- that is --
14       A.     I would take the subway.  I
15  was with her so we took a taxi.
16       Q.     I understand.
17            So the question is, when
18  you would take taxis or Ubers with
19  Ms. Robinson for your work at Canal,
20  that would be charged to a Canal
21  credit card, correct?
22            MR. DROGIN:  Objection to
23       the form.
24       A.     Yes.
25            MR. DROGIN:  And you cut
```



```
 1                  M. KAPLAN
 2      the witness off in the middle
 3      of his answer.  Just so the
 4      record is clear that he was
 5      continuing to elaborate and
 6      you stopped him.  Do you want
 7      him to finish his answer?
 8         MS. HARWIN:  The witness
 9      has stopped talking so I
10      understand the answer is
11      complete.
12   A.    I -- I -- I -- I rode a
13   taxi when I was with Chase.  It was
14   implied.  She was always going to
15   take a taxi somewhere.  So, yes, of
16   course you are not going to turn
17   down a taxi ride to take the subway
18   if someone is telling you to take a
19   taxi.  So, yes, we rode the taxi
20   together.
21   Q.    Did you ever have
22   discussions with Mr. De Niro about
23   Canal paying for employees'
24   transportation?
25   A.    No.
```



```
 1                M. KAPLAN
 2    Q.    Okay.
 3          MS. HARWIN:  We are
 4    sharing a document that we
 5    are marking as Plaintiff's
 6    Exhibit 16.
 7          (Whereupon, Plaintiff's
 8    Exhibit 16, Canal 0048105
 9    0048109, was marked for
10    identification, as of this
11    date.)
12          MR. DROGIN:  Can we hear
13    the last question read back,
14    please?
15          (Whereupon, the requested
16    portion was read back by the
17    reporter:
18          Q:  Did you ever have
19    discussions with Mr. De Niro
20    about Canal paying for
21    employees' transportation?)
22          MR. DROGIN:  By
23    transportation, just for
24    clarification, you are
25    including any method of
```



Page 178

```
 1                M. KAPLAN

 2      transportation, is that

 3      right?

 4           MS. HARWIN:  Yes.

 5      Q.    Mr. Kaplan, if you turn

 6   your attention to the page of the

 7   exhibit that is marked as Canal

 8   00481, and let us know when you are

 9   there.

10      A.    Yeah.

11      Q.    Okay.

12            Can you read out loud the

13   message that you wrote at 8:02 p.m.?

14      A.    8:02 p.m.?

15      Q.    It is at the top of that --

16   yes.  8:02 p.m.

17      A.    "Tammie already bragging to

18   me that she is keeping her corporate

19   card as long as she is a consultant

20   so she can go for dinner sometime (I

21   will delay this forever) — This is

22   why the Chase thing is tricky what

23   she did isn't abnormal it's just she

24   took it to such an insane degree."

25      Q.    Your phone number is
```



```
 1                M. KAPLAN
 2    646-872-4897, is that right?
 3    A.    That is correct.
 4    Q.    Is this a text conversation
 5    between you, Sabrina Weeks-Britain
 6    and Gillian Spear?
 7    A.    It appears to be, yes.
 8    Q.    When you wrote about quote,
 9    "The Chase thing," unquote, what did
10    you mean?
11    A.    What did I mean?  Again,
12    this a text I wrote almost three
13    years ago, 2019.  Yeah, two and a
14    half years ago.  I don't know what I
15    meant, but, you know, her credit
16    card -- Chase -- it probably this
17    case, right?  Is that what I meant?
18    I don't know.  Probably.  But I
19    can't tell you for sure what I meant
20    because it was a few years ago.
21    Q.    When you wrote, "The Chase
22    thing is tricky.  What she did isn't
23    abnormal," what did Ms. Robinson do
24    that wasn't abnormal?
25    A.    I am talking to Sabrina and
```



Page 180

```
 1                M. KAPLAN
 2    Gillian here who were like under --
 3    like they were appalled more so than
 4    I was at how much Chase spent on
 5    things because they were under such
 6    tight lock and key.  So --
 7      Q.   Mr. Kaplan, I just want you
 8    to focus on my question.
 9      A.   I am answering your
10    question.
11      Q.   I appreciate it.  Because
12    we do have limited time, I just want
13    to make sure that we focus on the
14    question that is asked.
15         MS. HARWIN:  Madam Court
16      reporter, can you read again
17      what the question is?
18      Q.   And Mr. Kaplan, just listen
19    closely to what the question is, and
20    just focus your answer on that.
21         (Whereupon, the requested
22      portion was read back by the
23      reporter:
24         Q:  When you wrote, "The
25      Chase thing is tricky.  What
```



```
 1                 M. KAPLAN
 2      she did isn't abnormal," what
 3      did Ms. Robinson do that
 4      wasn't abnormal?)
 5      A.    Using your company credit
 6   card, to, you know, she would take
 7   go to these meals at Cappa Bosso
 8   (ph) and other places where she
 9   spent -- you know drop a thousand
10   dollars at a time, $1,500, whatever
11   it was.  My point was it is not
12   abnormal in the business world, in
13   my observation for people to enjoy
14   the perks of having a corporate card
15   and having dinners.  Chase just, you
16   know, did it more so than most that
17   I -- than people I know.  I believe
18   that is what I mean here.
19      Q.    What types of expenses did
20   Ms. Robinson charge that were not
21   abnormal?
22      A.    That were not abnormal?
23   What do you mean?
24         MR. DROGIN:  Objection to
25      the form.
```



Page 182

```
 1                 M. KAPLAN
 2     A.    You mean what things were
 3   normal?  Is that what we are asking?
 4     Q.    Yes.
 5           What categories of expenses
 6   did Ms. Robinson charge to Canal
 7   that were normal for Canal
 8   employees?
 9           MR. DROGIN:  Objection to
10     the form.
11     A.    I mean, I don't -- again, I
12   didn't have -- like look over her
13   credit card every month, but she --
14   her -- she charged her phone bill.
15   She wasn't on our phone bill, but I
16   guess that is still -- that is not
17   totally normal, but it was an
18   expense that everyone was paid for.
19   She charged, you know, like we said,
20   coffee, and lunches, that was --
21   that was okay -- considered okay.
22   And I don't know what -- I don't
23   really know what she spent her
24   credit card on so I don't know.  We
25   didn't have an official policy like
```



```
 1              M. KAPLAN
 2   we discussed.  So I don't know
 3   exactly, you know -- a lot of the
 4   things on her credit cards were
 5   bills, like AT&T bills.  Like they
 6   were just like business expenses.
 7   So I -- yeah, those would be the
 8   normal things.
 9      Q.    And transportation was also
10   a normal expense, is that right?
11          MR. DROGIN:  Objection to
12       the form.  Can you define
13       transportation?
14          MS. HARWIN:  Let me limit
15       it to taxis, Ubers, and
16       Lyfts.
17      Q.    Charging taxis, Ubers, and
18   Lyfts is not abnormal at Canal, is
19   that right?
20          MR. DROGIN:  Objection to
21       the form.
22      A.    Right.  It was not
23   abnormal.  It was just that --
24   again, it was like -- as I wrote
25   here, Chase would take a lot more
```



```
 1                M. KAPLAN
 2   taxis and a lot more Ubers.  It was
 3   she had -- her number -- it was
 4   abnormal to a degree, not in what
 5   she was doing I guess is how I
 6   looked at it.
 7     Q.    To your knowledge, did
 8   Canal have a practice of paying
 9   certain employees for their unused
10   vacation days?
11          MR. DROGIN:  Objection.
12       If you want him to answer
13       this question about Canal's
14       practices, my position is we
15       are not going to produce a
16       30(b)(6) witness.  So you
17       ought to clarify.  I will
18       give you the opportunity.  If
19       you want it from his mouth,
20       and you want him to bind
21       Canal.  If not, I suggest you
22       save this for the 30(b)(6).
23          MS. HARWIN:  Counsel, I
24       am allowed to ask him this
25       question.
```



MAGNA
LEGAL SERVICES

Page 185

```
 1                 M. KAPLAN
 2           MR. DROGIN:  You are
 3      allowed to ask him questions
 4      about his experience, not
 5      Canal.
 6      Q.    During your employment at
 7   Canal, Mr. Kaplan, did Canal have a
 8   practice of paying certain employees
 9   for their unused vacation days?
10      A.    That was a practice that
11   Chase created at Canal during my
12   time that affected her and me.
13      Q.    When was -- when was the
14   practice of paying for your unused
15   vacation days implemented?
16      A.    I don't -- I would -- I
17   don't know the exact year.  It was
18   at some point during my time.  I
19   don't know which year.  I am sure
20   that Berdon can tell you that, but I
21   don't know.
22      Q.    You were paid for your
23   unused vacation days beginning in
24   2008, is that right?
25      A.    I said I don't know.  So I
```



Page 186

```
 1              M. KAPLAN
 2  don't know.  Maybe.  I don't know.
 3     Q.    It was a long-time practice
 4  during your employment for Canal to
 5  pay --
 6     A.    I don't think in 2008.
 7  Because -- again, this is something
 8  that Chase -- that is an idea that
 9  Chase came up with to sort of --
10  Chase was good with coming up with
11  ideas to sort of like, well, you are
12  not getting a raise, but, and this
13  is one of the ideas that she came up
14  with.  Which obviously I am not
15  going to object to getting paid more
16  money as most people wouldn't.  I
17  don't remember it being exact 2008,
18  but if you are telling me it was
19  2008, I don't know what year it was.
20     Q.    So describe for me
21  everything you were told about being
22  paid for unused vacation days?
23     A.    Chase would call me up, and
24  say, "I need to know how many
25  vacation days you didn't use ASAP."
```



Page 187

                    M. KAPLAN

1

2    And I would figure it out.  I would

3    go through my calendar and figure

4    out when I was on vacation, when I

5    was away.  And then she would give

6    the information to Michael Tasch, at

7    Berdon, and then when the paychecks

8    would come around Christmas time,

9    there would be like -- that would be

10   like a bonus to get paid more in one

11   paycheck for a day rate based on how

12   much your salary was.

13      Q.    Describe for me everything

14   you were told about when this policy

15   of paying for unused vacation days

16   was implemented?

17           MR. DROGIN:  Objection to

18     the form.

19      A.    What I just told you.  I

20   don't know -- there was no

21   conversation about the policy other

22   than what I just told you.  That was

23   it.

24      Q.    You previously testified

25   about this benefit being provided in



```
 1              M. KAPLAN
 2   lieu of a raise.  So tell me
 3   everything that you were told about
 4   the policy of paying for your unused
 5   vacation days?
 6          MR. DROGIN:  Objection to
 7      the form.  Go ahead.
 8   A.    I don't remember a specific
 9   conversation we had.  I just
10   remember at some point Chase had
11   this idea that we were working all
12   the time and missed out on vacation,
13   so -- but I don't remember the
14   specifics of how this policy came to
15   be.
16   Q.    As far as you knew, Canal
17   paid you and Ms. Robinson for your
18   unused vacation days, is that right?
19   A.    Yes.  As far as -- but
20   based on what we said were unused
21   vacation days.
22   Q.    If you ended up working
23   through a holiday, or a day when you
24   were traveling, were you entitled to
25   be paid back for that vacation day?
```



```
 1                M. KAPLAN
 2     A.    Canal had no policy or
 3  anything of that nature, so that was
 4  -- no.  Not to my knowledge.  I
 5  worked many -- I can remember -- I
 6  worked many Saturdays for parties
 7  and whatnot, and it was not
 8  considered -- you know, get like a
 9  day back.  So if -- the vacation
10  days, it was more literally how many
11  times did you go on vacation, days
12  off you took for personal reasons or
13  whatever, and then subtract that
14  from -- we would have discussions
15  where Chase would say that she was
16  -- I think what we are going to do
17  is based on how many years you are
18  going to extend your -- like each
19  year we had a vacation day.  So the
20  total went up from like, I don't
21  know, 14 to like 20 or something of
22  how many vacation days we got.  But
23  that is all -- but I don't remember
24  that -- that is the best way I can
25  answer it.
```



Page 190

```
 1                M. KAPLAN
 2    Q.    As far as you recall, Ms.
 3  Robinson would travel abroad from
 4  time to time, is that right?
 5    A.    Yes, she traveled abroad
 6  pretty -- fairy frequently.
 7    Q.    Okay.
 8          And as far as you know, Ms.
 9  Robinson would arrange her travel
10  around Mr. De Niro's schedule, is
11  that what you recall?
12          MR. DROGIN:  Objection to
13    the form.
14    A.    No.  I don't recall it that
15  way.
16    Q.    Okay.
17          Do you recall any
18  circumstances where Ms. Robinson
19  would arrange her travel around Mr.
20  De Niro's schedule?
21    A.    I recall with Christmas she
22  would want to know when he was going
23  on his trips, but there were times
24  where she left before him, too, so
25  that didn't always even matter, but
```



Page 191

```
 1              M. KAPLAN
 2   yeah.
 3      Q.    Do you recall circumstances
 4   where Ms. Robinson would change her
 5   flight plans to accommodate Mr. De
 6   Niro?
 7      A.    I recall circumstances
 8   where she would change her flight
 9   plan.  I don't recall to specific
10   reasons of why she would change her
11   flight plans.
12           MS. HARWIN:  I am going
13       to drop in the chat Exhibit
14       17, which is Canal 0050288
15       through 29 -- through 89.
16       Apologies.
17           (Whereupon, Plaintiff's
18       Exhibit 17, Canal 0050288
19       through 89, was marked for
20       identification, as of this
21       date.)
22      Q.    Do you see the paragraph at
23   the bottom of the e-mail where you
24   say, "As for e-mails?"
25      A.    Yes.
```



Page 192

```
 1              M. KAPLAN
 2    Q.    Can you read out loud the
 3  first two sentences of that
 4  paragraph?
 5    A.    "As for e-mails she did
 6  send some during Xmas break but not
 7  sure how important.  Do you want me
 8  to get Bob's phone records to show
 9  all the outgoing calls he made to
10  her over vacations?"
11    Q.    Did you ever access Mr. De
12  Niro's phone records from the times
13  when Ms. Robinson had been
14  traveling?
15    A.    I believe I got the phone
16  records.  I don't believe they were
17  very informative because I don't
18  believe there were a lot calls, but
19  I don't -- I don't remember that
20  well.  This was a while ago.  And I
21  don't know if I got them for that
22  specific time period.  I had some
23  phone records, but --
24        MS. HARWIN:  Counsel we
25     would request the production
```



Page 193

```
 1                M. KAPLAN
 2      of the phone records that
 3      were used as part of Canal's
 4      investigation into Ms.
 5      Robinson.
 6      Q.    As far as you were aware,
 7   when Ms. Robinson was traveling, she
 8   would typically continue to have
 9   daily phone calls with Mr. De Niro,
10   is that right?
11          MR. DROGIN:  Objection to
12      the form.
13      A.    As far as I was aware, she
14   still talked to him depending --
15   yes.  But I don't know how
16   frequently.
17      Q.    And when Ms. Robinson was
18   traveling, she would still be
19   e-mailing daily with Canal
20   employees, is that right?
21          MR. DROGIN:  Objection to
22      the form.
23      A.    She would be sending out
24   e-mails, yes.  But it is -- it
25   wasn't -- people would not be
```



Page 194

```
 1                M. KAPLAN
 2    e-mailing her if they knew she was
 3    -- unless there was something, I
 4    mean, I imagine, urgent, so --
 5      Q.   Do you recall trips Ms.
 6    Robinson would take where she would
 7    continue to work New York hours even
 8    if she was abroad in a different
 9    time zone?
10      A.   Yeah.  I remember when she
11    used to go to Spain, I believe, she
12    liked that she would -- because she
13    could get up and do a run, and
14    whatever.  And then she -- it was
15    like she was available.  But --
16    because she was there for like a
17    month or long time.  It wasn't like
18    a -- so, yeah.  She was available as
19    far as she would answer her phone
20    usually or reply to e-mails
21    eventually.  She was available.  She
22    had Internet.  It wasn't like she
23    wasn't available.  But you know,
24    again, when I would go on vacation,
25    I would still -- things would come
```



```
 1                M. KAPLAN

 2    up.  I would be available as well.

 3      Q.    Who at Canal was aware of

 4    the policy of Canal paying you and

 5    Ms. Robinson for your unused

 6    vacation days?

 7      A.    I don't know if anybody was

 8    aware of it until I believe this was

 9    a source -- this might have been a

10    source of contention between myself

11    and members of the office after

12    Chase left because I don't think

13    they were aware of that previously,

14    but I -- I could be remembering that

15    wrong.

16      Q.    Were you ever told that it

17    was improper for you to be paid back

18    for any of your unused vacation

19    days?

20      A.    No.

21      Q.    If Ms. Robinson worked

22    through a day when she was traveling

23    abroad, was there anything improper

24    for her to be reimbursed for that

25    vacation day?
```



Page 196

```
 1                  M. KAPLAN
 2           MR. DROGIN:  Objection to
 3      the form.
 4      A.    I don't -- I don't think I
 5  am qualified to answer if she is --
 6  I don't know what defines a vacation
 7  day.  I am not a -- an expert in
 8  these things.  But she -- it -- it
 9  struck me as the cost -- it was like
10  great to get the nine days, or six
11  days, or whatever I got.  It is like
12  you don't get mad at somebody else
13  getting more.  Did I find it a
14  little ridiculous that she was
15  saying no, that she took no vacation
16  days all year, yes.  But I am not,
17  again -- it is not -- it is like you
18  -- she created a policy.  So it is
19  not -- again, this was not a thing
20  that I argued with because I don't
21  know what defines a vacation day.
22      Q.    From your perspective,
23  there wasn't anything improper about
24  Ms. Robinson being reimbursed for a
25  vacation day if she was away, but
```



Page 197

```
 1              M. KAPLAN
 2   ended up working the entire day, is
 3   that right?
 4         MR. DROGIN:  Objection to
 5      the form.  Speaking on behalf
 6      of yourself else.
 7      A.    Yeah.  I -- I mean, I don't
 8   think she was working all day.  So I
 9   don't know how to answer that.  I'm
10   not -- I'm not -- I don't know how
11   to answer that.  I'm sorry.  I have
12   no opinion.
13      Q.    Have you ever returned any
14   money to Canal for vacation days
15   that you were paid for?
16      A.    Have I?  No.
17      Q.    Have you ever been asked to
18   return any money to Canal for
19   vacation days that you were paid
20   for?
21      A.    I have not been asked.  I
22   also made a lot less money than
23   Chase.
24      Q.    When -- has anyone raised
25   any concerns to you about you being
```



Page 198

```
 1              M. KAPLAN
 2   reimbursed for your vacation days?
 3     A.    I believe Tiffany might
 4   have at that meeting that we talked
 5   about earlier.  But I -- I didn't
 6   actually -- but I don't -- again, I
 7   don't want to -- I don't know for
 8   sure.  But that was after the fact
 9   and -- I never was reimbursed again
10   for vacation days after Chase left.
11     Q.    Did you have any concerns
12   about Canal including in its lawsuit
13   against Ms. Robinson claims relating
14   to her being repaid for vacation
15   days?
16     A.    Did I have -- no, because
17   she -- I mean, I was asked things
18   that I knew if they were true or
19   not, and she had been reimbursed for
20   all of these days.  I knew that.
21   And she -- I am not -- again, like I
22   don't know what defines a vacation
23   day.  I just know she went away a
24   lot.  So it seems justified.
25     Q.    Describe for me all the
```



MAGNA
LEGAL SERVICES

Page 199

```
 1              M. KAPLAN
 2   types of expenses for Canal
 3   employees that would be placed on
 4   the Canal American Express card
 5   under Ms. Robinson's name?
 6         MR. DROGIN:  Objection to
 7      the form.  I think we are
 8      done.  I think we are done.
 9      I think we ought to take a
10      break and call the Court at
11      this point.
12         MS. HARWIN:  Counsel,
13      please stop.
14         MR. DROGIN:  We are
15      leaving.  Okay?  We are going
16      to take a break.
17         MS. HARWIN:  Counsel,
18      stop.
19         MR. DROGIN:  I am asking
20      -- I am asking -- I am asking
21      you to stop the deposition.
22      I want a ruling from the
23      Court.  I want a ruling on
24      the Court.
25         MS. HARWIN:  You are
```



Page 200

```
 1                M. KAPLAN
 2     interrupting the deposition.
 3         MR. DROGIN:  I am
 4     stopping the deposition.  I
 5     am not interrupting.  I am
 6     stopping it, and I am asking
 7     that we get a ruling from the
 8     Court.
 9         MS. HARWIN:  I would like
10     to complete this line of
11     questioning.  Thank you.
12         MR. DROGIN:  You have
13     completed it eight times
14     already.  You have completed
15     it eight times.  You are
16     asking the same question
17     over, and over, and over
18     again.  You have had three or
19     four passes at it.  It is the
20     same question.
21     Q.    Mr. Kaplan, other than
22   meals and transportation expenses,
23   were there any other categories of
24   expenses for Canal employees that
25   were placed on the Canal American
```



Page 201

```
 1                M. KAPLAN
 2   Express card under Ms. Robinson's
 3   name?
 4           MR. DROGIN:  Objection to
 5       the form.  Do you want him to
 6       look at the document that
 7       answers your question or is
 8       this a quiz?  Do you just
 9       want to test his memory?
10           MS. HARWIN:  No document
11       to look at.  I am asking a
12       question.
13           MR. DROGIN:  You showed
14       him -- you showed him a
15       three-page spreadsheet.
16           MS. HARWIN:  That was not
17       -- that was the petty cash
18       spreadsheet.  That wasn't
19       this.
20           MR. DROGIN:  Then you
21       don't understand where the
22       petty cash came from.  But go
23       ahead.
24           MS. HARWIN:  Counsel,
25       please stop.
```



Page 202

```
1              M. KAPLAN
2    A.    So the question is did --
3  what types of things did the
4  employees put on the business credit
5  card?
6    Q.    What types of expenses,
7  other than meals and transportation,
8  for Canal employees, were charged on
9  the Canal credit card?
10         MR. DROGIN:  Objection to
11    the form.
12         MS. HARWIN:  Let me
13    rephrase that.
14    Q.    What expenses for Canal
15  employees, other than meals and
16  transportation, were placed on the
17  Canal American Express in Ms.
18  Robinson's name?
19    A.    There would only be -- for
20  Canal employees, on her credit card,
21  there would be if there was gifts
22  purchased for birthdays or
23  Christmas.  Other than that, there
24  wouldn't be anything.  I mean, there
25  be -- I can't think of what you
```



MAGNA
LEGAL SERVICES

Page 203

```
 1              M. KAPLAN
 2   would use the credit card for.  I
 3   mean, like I said, bills and stuff.
 4   But that -- if they have a phone on,
 5   but I think that is it.
 6      Q.    Did Canal's office stock
 7   any food or drinks for employees
 8   during the day?
 9      A.    Just like water bottles.
10   We have Fiji water bottles.
11   Occasionally we would have some
12   snacks.  But usually it was more of
13   like people would get, you know,
14   someone would run out and get coffee
15   and maybe get some cookies or
16   something from some place.  That
17   type of thing.
18      Q.    And food or snacks for the
19   Canal office was a category of
20   expenses that would go on the credit
21   card in Ms. Robinson's name, is that
22   correct?
23      A.    Yes.  I am counting that as
24   meals, but yes, in my mind.
25      Q.    From time to time you were
```



Page 204

```
 1                 M. KAPLAN
 2    sent copies of Canal's American
 3    Express cards bills, is that right?
 4      A.    Yes.
 5      Q.    And what were you supposed
 6    to do when it came to looking over
 7    Canal's American Express bills?
 8      A.    I didn't -- I don't think
 9    there was a real role other than
10    just you have a copy of it in case
11    you need to go over anything.
12      Q.    Can you repeat that answer?
13      A.    I said, I didn't do
14    anything with the information other
15    than if we needed to go over
16    anything I had copy.  But we -- I
17    don't -- I didn't have a specific
18    thing to do when I got the credit
19    card bill.
20      Q.    Mr. De Niro didn't have a
21    doorman at his home at █████, is that
22    right?
23      A.    That is right.
24      Q.    Did Mr. De Niro ever have
25    items delivered to Ms. Robinson's
```



MAGNA
LEGAL SERVICES

Page 205

```
 1                    M. KAPLAN
 2   home instead of his home?
 3      A.    I have no -- I have no way
 4   of knowing.
 5      Q.    Okay.
 6      A.    I mean, she -- she would
 7   order things to be delivered.  I
 8   would imagine she had things
 9   delivered that she would then bring
10   to the apartment, if that is what
11   you are asking, yes.  But Mr. De
12   Niro didn't.  She did.
13      Q.    It was common for items to
14   be delivered to Ms. Robinson's home
15   and then brought to Mr. De Niro's
16   home, is that right?
17           MR. DROGIN:  Objection to
18       the form.
19      A.    I don't know how common it
20   was, but I imagine that was done,
21   yes.
22      Q.    Did Mr. De Niro typically
23   have flowers in his home?
24      A.    Not that I can remember.
25   He had plants.  I don't know if
```


MAGNA
LEGAL SERVICES

Page 206

```
 1                M. KAPLAN
 2   plants count as flowers.
 3      Q.    Let me rephrase.
 4           Did Mr. De Niro typically
 5   have plants in his home?
 6      A.    He had plants in his home,
 7   yes.
 8      Q.    Do you recall Ms. Robinson
 9   ever ordering flowers or plants that
10   would be picked up and brought to
11   Mr. De Niro's home?
12      A.    I don't remember how they
13   got there.  I remember we had these
14   plants that Chase was -- she liked.
15   So she picked out for his home, that
16   were complicated to order, if I
17   remember correctly.  But I don't
18   think flowers.  I think it was just
19   plants.
20      Q.    Do you recall Ms. Robinson
21   ever bringing flowers or plants to
22   Mr. De Niro's home?
23      A.    Like I said, I remember
24   plants coming to the home.  I don't
25   remember if she brought them.  I am
```



Page 207

```
 1                    M. KAPLAN
 2    sure she ordered them.  I don't know
 3    how they got there.  We had plants
 4    outside, planters that got knocked
 5    over.  We had plants in this big
 6    thing inside.  They might have been
 7    -- I think they were delivered
 8    though because they were big.  But
 9    she ordered them or her or Lu Lu,
10    her assistant, would have ordered
11    them.
12       Q.    Do you recall Ms. Robinson
13    ever bringing plants or flowers to
14    Canal's office?
15       A.    Yes.  I recall her --
16    again, not bringing.  I recall
17    delivered.  We had plants in the
18    office.  Flowers would only be if it
19    was like someone's birthday or
20    something.  But, you know, she might
21    have gotten flowers for -- if it was
22    Gillian or Sabrina's birthday.  It
23    sounds like something that she would
24    have done from Bob.  But -- but we
25    had plants in the office, you know,
```



Page 208

```
 1              M. KAPLAN
 2    it was like a one-time purchase and
 3    someone would water them, and they
 4    would die, and we would get them
 5    again.
 6      Q.    Can you explain for me what
 7    role Berdon, LLP, played with
 8    respect to Canal's finances?
 9            MR. DROGIN:  Objection to
10       the form.  Limited to your
11       own person knowledge.
12      A.    To my knowledge, they -- I
13    mean, they were his -- whatever you
14    call it, financial managers,
15    accountants, they did his taxes,
16    they paid -- they had access to the
17    checking.  We didn't have any access
18    to the checking account, so if it
19    was a bill that had to be paid, they
20    paid all the bills.  Chase tried to
21    minimize them by paying anything
22    that we could pay on the credit card
23    we would do.  But, you know, they
24    were involved in everything.
25    Anything that was like a charity,
```



Page 209

```
 1                M. KAPLAN
 2   anything that was -- anything tax
 3   related obviously.
 4      Q.    Did there come a time when
 5   Ms. Robinson began regularly working
 6   out of her home for Canal?
 7      A.    She -- at some point, I
 8   don't remember when.  She -- when
 9   she was in New York she would
10   regularly work out -- yes, of her
11   home.  I don't -- I can't -- you can
12   tell me the day, but I don't know
13   when that was.
14      Q.    Are you aware of Mr. De
15   Niro ever allowing Ms. Robinson to
16   use the reward points generated by
17   Canal's credit cards to purchase her
18   flights?
19      A.    I was aware that she had
20   she could use the miles.  I never
21   had a conversation with him about
22   it, but yes.  She used his miles for
23   flights.
24      Q.    Over what period are you
25   aware of her using the reward points
```



Page 210

```
 1                M. KAPLAN
 2    generated by Mr. De Niro's -- I'm
 3    sorry.
 4            Over what period are you
 5    aware of Ms. Robinson using the
 6    reward points generated by Canal's
 7    credit card to book flights?
 8    A.      The way I remember is from
 9    I wanted to say at some point early
10    on in her tenure she had because Bob
11    had a lot of points that no one had
12    ever used.  I believe -- the way I
13    recall it, was that around 2013 when
14    somebody was fired named Olivia, she
15    made -- she basically told Bob it is
16    ridiculous what was going on with
17    the miles.  In my mind, there was --
18    there was a gap where Chase didn't
19    use the miles, and then she started
20    using them again, maybe a year or so
21    later.  She used them up until she
22    left.  I never -- but I don't have
23    any sort of -- like we never had a
24    -- there was no -- there was no
25    office policy on miles other than
```


MAGNA
LEGAL SERVICES

```
 1                M. KAPLAN
 2   the fact that she used them in most
 3   cases.  But I don't -- we didn't --
 4   I don't know exactly the dates.
 5      Q.    Turning to your testimony
 6   about Olivia Jampol, can you clarify
 7   what it is that you understand
 8   Olivia Jampol speaking to Mr. De
 9   Niro about, in 2013, with respect to
10   the miles?
11      A.    I believe she, you know,
12   said that there is a bunch of
13   ridiculous things going on here.
14   And my -- my understanding of it is
15   that -- he told her to stop using
16   the miles at that point and she
17   stopped using them.  At some point
18   she started using them again.  So I
19   don't know if she had another
20   conversation with him.  I really
21   don't know, but it was a --
22   definitely implied that she did, but
23   I don't know for sure.  I never
24   talked to him about it.
25      Q.    Okay.
```



Page 212

```
  1                M. KAPLAN

  2        So you never spoke to Ms.

  3   Robinson or Mr. De Niro about

  4   whatever arrangement there was with

  5   respect to Ms. Robinson using the

  6   reward points generated by Canal's

  7   credit card to purchase frights, is

  8   that right?

  9   A.    That is right.  He -- he

 10   would not have a clear understanding

 11   of what we were talking about I

 12   don't think.

 13        MS. HARWIN:  I am going

 14     to drop into the chat what I

 15     am going to mark as

 16     Plaintiff's Exhibit 18, which

 17     is Bates stamped Canal

 18     0055358.

 19        (Whereupon, Plaintiff's

 20     Exhibit 18, Canal 0055358,

 21     was marked for

 22     identification, as of this

 23     date.)

 24   Q.    Let us know when you have

 25   been able to open that?
```



Page 213

```
 1                M. KAPLAN
 2    A.    Yes.
 3    Q.    Do you recall this as an
 4    e-mail that you wrote on January
 5    2nd, 2018?
 6    A.    Yes.
 7    Q.    In this e-mail, you wrote,
 8    "I now have no idea if she is still
 9    using Bob's miles for herself."
10          Do you see where you wrote
11    that?
12    A.    Right, because what I was
13    referring to, yes.  I see where I
14    wrote that, yes.
15    Q.    And you are referring to
16    Ms. Robinson, is that right?
17    A.    Yes.
18    Q.    Okay.
19          What did you mean by "still
20    uses Mr. De Niro's miles?"
21    A.    Well, because she was still
22    traveling but -- in the early days
23    she would ask me to call American
24    Express and basically pretend to be
25    Bob.  And you know, or just -- or
```


MAGNA
LEGAL SERVICES

```
 1                 M. KAPLAN
 2    not pretend to be Bob, but just call
 3    them as, you know, my name is --
 4    they don't know who you are.  But
 5    they changed their thing, you
 6    couldn't do that anymore.  But she
 7    was still traveling.  So I realized
 8    -- I think -- you know -- oh yeah,
 9    because Michael Tasch she had her
10    own account.  You know, there was
11    another miles account that was
12    coming.  Because there was two
13    credit cards.  When I say Bob's, I
14    am talking about he had a black
15    credit card AMEX that went straight
16    to his Delta card -- to his Delta
17    account, and then she -- there was a
18    miles from the office cards.  Her
19    name, and my name, and Dan Harvey,
20    and Toukie Smith.  It was all
21    connected I believe.  And I believe
22    at some point she was able to
23    transfer them directly to her Delta
24    account, which was not something --
25    because we went a long way.  Then I
```



Page 215

```
 1                    M. KAPLAN
 2    did transfer miles again to her down
 3    the road after this e-mail I know,
 4    but --
 5      Q.    So what was your
 6    understanding of the circumstances
 7    when Ms. Robinson was authorized to
 8    use the reward points generated by
 9    Canal's credit card to purchase
10    flights?
11         MR. DROGIN:  Objection.
12       Trick question.  He never
13       testified that.
14         MS. HARWIN:  Counsel,
15       just object to form.
16      A.    I don't -- yeah, there was
17    no -- it was not -- the closest I
18    ever had to having a conversations
19    about this with Chase was that early
20    on when she started doing this, she
21    said, "Oh, you should use the miles,
22    too."  And then she never followed
23    up on that I think because she flew
24    first class and used a lot miles at
25    a time.  But she never -- we didn't
```



Page 216

```
 1              M. KAPLAN
 2   discuss it.  She would just say like
 3   I am going blah-blah blah, and I
 4   need the miles transferred.  So
 5   there was no like, I talk to Bob
 6   about it, or you should talk to Bob
 7   about it.  That didn't happen, so I
 8   don't have any sort of -- I don't
 9   know if there is an arrangement.  I
10   can't speak to it all.  I have no
11   idea.
12      Q.   So sitting here today, you
13   don't know either way whether or not
14   there was circumstances in which Ms.
15   Robinson was authorized to use
16   rewards points generated by Canal's
17   credit cards to purchase flights, is
18   that correct?
19      A.    I have no idea if she --
20   no.
21           MS. HARWIN:  We are going
22      to put into the chat a
23      document that was marked as
24      Plaintiff's Exhibit 19, Bates
25      Stamped beginning Canal
```



Page 217

```
 1                  M. KAPLAN
 2      0094010.
 3           (Whereupon, Plaintiff's
 4      Exhibit 19, Canal 0094010,
 5      was marked for
 6      identification, as of this
 7      date.)
 8      Q.    Do you have that document?
 9      A.    Uh-huh.
10      Q.    Okay.
11           Do you recall exchanging
12  this series of text messages with
13  Ms. Robinson, dated June 17, 2018?
14      A.    I don't recall the text,
15  but I remember this situation, yes.
16      Q.    Okay.
17           Describe for me the
18  situation that you and Ms. Robinson
19  where communicating about here?
20      A.    Robin Chamber, which is
21  where it says, "RC."  She had a -- a
22  Delta account.  Somehow at some
23  point like she received a statement
24  that she had miles.  And Chase was
25  mad about this I think because or
```



Page 218

```
 1                M. KAPLAN
 2   aware of this because she was trying
 3   to access the miles.  For some
 4   reason some of the miles went --
 5   this is -- yeah.  For some reason,
 6   some of the miles ended up on
 7   Robin's from like years ago.  And I
 8   remember Robin trying to get them to
 9   transfer them, and they - they
10   couldn't do it.  I don't know.  It
11   was like a one-time thing where we
12   used the miles when we went to Texas
13   but Robin can better speak to that
14   actually.  I shouldn't say that, but
15   I think we should.  It was a whole
16   mess.  It was like a Delta thing
17   where Robin called, and she was
18   online with them, Chase called.  But
19   I think it was a one off thing.  For
20   some reason, there was like 100,000
21   miles or something that was like on
22   Robin's account and somehow they
23   were linked.
24      Q.    As far as you understand,
25   this issue prevented Ms. Robinson
```



Page 219

```
 1               M. KAPLAN
 2   from being able to transfer SkyMiles
 3   to her account, is that right?
 4        MR. DROGIN:  Objection to
 5     the form.
 6     A.    I don't remember what the
 7   issue exactly was.  I just remember
 8   it was like -- I don't know if --
 9   no.  I don't think it was keeping
10   her.  I just think it was something
11   that Chase noticed when she was
12   transferring that there were miles
13   that were like not -- they were
14   outside of the normal -- they were
15   on like another card.  And they were
16   not retrievable for whatever reason.
17   I don't know.  We never actually
18   figured out why that happened to my
19   knowledge.
20     Q.    Do you recall who was
21   involved in trying to get this
22   situation resolved?
23     A.    Robin I know called AMEX,
24   and I know we had a conversation, I
25   believe, with the -- even the travel
```


MAGNA
LEGAL SERVICES

Page 220

```
 1                M. KAPLAN
 2   agent at one point.  But I think
 3   they just -- they were like there is
 4   nothing we can do about it, because
 5   for what reason it was like listed.
 6   I don't know.  I don't know.  Yeah.
 7      Q.    Do you recall Berdon
 8   becoming involved in trying to
 9   resolve this issue with the
10   SkyMiles?
11      A.    I don't recall.
12           MR. DROGIN:  Objection to
13      the form.  It is not clear
14      which SkyMiles you are
15      talking about.
16      Q.    Can you repeat your answer?
17      A.    I don't remember how it was
18   resolved.  It was like a one off
19   thing where there was like 100,000
20   miles or something where it was like
21   permanently on Robin's Delta
22   account.  It never happened again,
23   so I don't know why -- it was
24   something in the Delta system or the
25   AMEX system.  I don't remember if
```



Page 221

1              M. KAPLAN
2    Berdon was involved.  Berdon had the
3    -- they had the chief authority on
4    the AMEX until -- I do remember at
5    one point Chase involved Bob in
6    making them give her authority to
7    transfer miles or to have authority
8    on the account, which I think was so
9    she could transfer miles.  But I
10   don't -- this situation was just
11   like outside -- it was just like a
12   mess that I don't think even had a
13   resolution other than just using the
14   miles.
15     Q.    What was your circumstances
16   -- I'm sorry.  Let me restart that.
17          What was your understanding
18   of the communications between Ms.
19   Robinson and Mr. De Niro to enable
20   Ms. Robinson to transfer miles?
21     A.    Like I said, I don't -- I
22   have no knowledge of the
23   conversations that they had about
24   that.
25          MS. HARWIN:  I am



MAGNA
LEGAL SERVICES

```
 1                  M. KAPLAN
 2       dropping into the chat what
 3       we are marking as Exhibit 20,
 4       which is Canal 0049210.
 5    Q.    Which is a series of text
 6    messages between you and Amelia
 7    Brain.
 8            (Whereupon, Plaintiff's
 9       Exhibit 20, Canal 0049210,
10       was marked for
11       identification, as of this
12       date.)
13    Q.    Let us know when you have
14    that.
15    A.    Yeah.
16    Q.    Okay.
17            Do you see at the bottom of
18    this series of text messages where
19    Ms. Brain writes, "Like I know he
20    knew she used miles.  But did he
21    know know?"
22    A.    Yeah.
23    Q.    What was your understanding
24    of Mr. De Niro's knowledge of Ms.
25    Robinson using miles generated by
```



Page 223

```
 1                M. KAPLAN
 2    Canal?
 3         MR. DROGIN:  Objection to
 4      the form.
 5      A.    What was my understanding
 6    or Amelia's understanding?
 7      Q.    What was your
 8    understanding?
 9      A.    My understanding is that
10    she said, "Oh, I can use your miles.
11    It won't cost you anything."  And he
12    said, "Oh, great."  But like I
13    wasn't there for the conversation.
14    I feel like that is sort of how it
15    went.  He didn't really understand
16    where the miles present -- you can
17    trade it for other things and all of
18    those things.  But again, like I
19    don't -- she talked to him a lot in
20    private.  So I don't know what was
21    said.  And yeah.  So like, again,
22    like sort of what Amelia says here,
23    is probably how I think a lot of us
24    viewed it.  Like maybe he knew,
25    probably knew, does he know know.
```



Page 224

```
 1                M. KAPLAN
 2   The miles she took ahead of time,
 3   but that is something that I don't
 4   think anybody knew.  It was more
 5   like a mile for a trip, a specific
 6   trip.  Not just take a bunch of
 7   miles on the way out of the door.
 8   That was -- that was a little
 9   shocking to us.
10     Q.    Who were the employees at
11   Canal that were aware of Ms.
12   Robinson using SkyMiles to book
13   travel?
14          MR. DROGIN:  Objection to
15      the form.
16     A.    I don't know who was aware.
17   I think -- it wasn't like Chase told
18   people when they started, "Oh, I
19   travel all the time on his miles."
20   I think she said that I travel all
21   the time for work is how she would
22   phrase it.  They might have only
23   known about the miles from -- you
24   know, once they were around long
25   enough, it was -- just came up.
```



```
 1              M. KAPLAN
 2         Again, it was not something
 3    -- Bob never said, "Chase is using
 4    my miles for this."  Like Bob was
 5    completely -- we had no idea.  Like
 6    he never said the word miles.  He
 7    never said, "Let's use the miles for
 8    anything."  So it wasn't like -- I
 9    don't know how much he even
10    understands what a frequent flyer
11    mile is.  So --
12      Q.    It was general knowledge in
13    the Canal office that Ms. Robinson
14    would travel on SkyMiles generated
15    by Canal's credit cards, correct?
16         MR. DROGIN:  Objection to
17       the form of the question.
18       General knowledge?  Like the
19       plants knew?  I mean it is a
20       ridiculous question.  But go
21       ahead and answer.
22      A.    It was -- everybody knew
23    that Bob paid like for her travel in
24    some way, and I think most people
25    knew there was miles.  I don't know
```



Page 226

```
 1                M. KAPLAN
 2  -- like I said, I just said, I don't
 3  know how they know.  I don't know if
 4  it was told at the beginning or they
 5  heard it through the grapevine, or
 6  -- I don't remember that.  But --
 7  yes.  It was knowledge that -- I
 8  don't know if it was general
 9  knowledge that she flew first class.
10  I mean, how many miles did she use,
11  but it was general knowledge she
12  used miles.
13     Q.    When Mr. De Niro traveled
14  by plane, would he typically fly on
15  commercial planes or private planes?
16        MR. DROGIN:  Objection to
17     the form.
18     A.    He flew both.  I don't know
19  what is typical.  He flew commercial
20  planes sometimes and he flew private
21  planes sometimes.
22     Q.    Okay.
23        When booking flights for
24  Mr. De Niro, SkyMiles weren't
25  typically used, is that correct?
```



Page 227

```
 1              M. KAPLAN
 2         MR. DROGIN:  Objection to
 3      the form.
 4      A.    SkyMiles were never used
 5   because she told the office not to
 6   use the SkyMiles for anything.
 7      Q.    So when Mr. De Niro
 8   traveled on commercial airlines, as
 9   far as you know, Mr. De Niro did not
10   use SkyMiles for his travel,
11   correct?
12      A.    Correct.
13      Q.    As far as you are aware,
14   Mr. De Niro did not use SkyMiles for
15   his family's travel either, correct?
16      A.    I believe there was a few
17   examples years ago where they might
18   have used it for some staff members.
19   But on a regular -- on a regular
20   basis, his family did not use the
21   miles, no.
22      Q.    Can you recall any time
23   when someone booked a flight for Mr.
24   De Niro or his family using
25   SkyMiles?
```



Page 228

```
 1                  M. KAPLAN
 2    A.    Yeah.  That is why I said
 3  earlier I remember somebody did book
 4  a flight for maybe staff members, or
 5  Dan Harvey.  I'm not sure who it
 6  was.  I don't remember.  Maybe his
 7  daughter.  I don't know who it was.
 8  But they used miles and Chase got
 9  mad at that.  I remember that, but I
10  think that was maybe 2015 or
11  something.  It was a while ago.  I
12  don't know.  I can't recall the
13  specifics of -- or even if they used
14  them, maybe they were just going to
15  use that.  I don't remember how the
16  conversation came up.
17    Q.    Okay.
18          MS. HARWIN:  I think this
19     is a good time for a lunch
20     break.  We can go off the
21     record now.
22    Q.    Mr. Kaplan, how long would
23  you like for lunch?  Well, let me
24  let the videographer take us off the
25  record.
```



Page 229

```
 1                    M. KAPLAN

 2              THE VIDEOGRAPHER:  The

 3        time is now 12:53 p.m., and

 4        we are off the record.

 5              (Whereupon, a recess was

 6        taken at this time.)

 7              THE VIDEOGRAPHER:  The

 8        time is now 1:32 p.m.  We are

 9        back on the record.

10     Q.    Mr. Kaplan, you understand

11   that you are still under oath?

12     A.    Yes.

13     Q.    You previously testified

14   about a person name Tiffany Chen.

15   Who is Tiffany Chen?

16     A.    She is Mr. De Niro's

17   girlfriend.

18     Q.    When did you first have

19   interactions with Tiffany Chen?

20     A.    I don't remember the exact

21   date, but probably around -- I think

22   it was right after Thanksgiving of

23   2018 I guess.  I believe she was at

24   the apartment when I came over one

25   day around -- sometime around then.
```



Page 230

```
 1               M. KAPLAN
 2    Q.    As far as you know, when
 3  did Ms. Robinson begin having
 4  regular interactions with Tiffany
 5  Chen?
 6    A.    She had them earlier.  I
 7  don't know exactly when.  I mean,
 8  she told me she did.  But I don't --
 9  I think she met with her when they
10  were staying in a hotel nearby.  I
11  don't remember exactly when that
12  was.
13    Q.    As far as you understand,
14  for much of the fall of 2018, and
15  the winter and early spring of 2019,
16  Ms. Robinson had regular
17  interactions with Tiffany Chen, is
18  that right?
19    A.    You said the fall of 2018,
20  to winter of 2019?  Yes.  I believe
21  so.
22    Q.    Did there come a time when
23  you became a confidante for Tiffany
24  Chen?
25    A.    Yeah.  So I had █████
```



```
 1                M. KAPLAN
 2    ████████ in January of that year, of
 3    2019.  I was out, away for about six
 4    weeks.  When I returned to go into
 5    the apartment, Tiffany started to
 6    really talk to me a lot.  So I would
 7    say from like March of that month --
 8    March/April I guess.
 9      Q.    You began -- let me -- let
10    me restate that.
11            It was in -- in March
12    2019/April 2019, when Ms. Chen began
13    confiding in you, is that right?
14      A.    Yeah.  I mean -- she -- I
15    don't remember the exact like -- I
16    have trouble remembering if I ever
17    said I -- clearly things in January
18    of 2019 are a little blurry.  It is
19    possible she was confiding in me a
20    little bit in January or a more -- a
21    more subtle scale.  She was talked
22    -- once we were there, I would be
23    sitting around on Bob's computer, or
24    whatever, she would talk to me a
25    lot.  But as far as like -- she was
```


MAGNA
LEGAL SERVICES

Page 232

```
 1                M. KAPLAN
 2   always friendly to me from the
 3   beginning, but as far as like
 4   talking about the office, Chase in
 5   particular, any of those things, she
 6   might have started -- I don't
 7   remember.  She might have started a
 8   little bit in January, but it was
 9   mostly when I got back the way that
10   I remember it.
11      Q.    And turning to the period
12   that preceded the end of Ms.
13   Robinson's employment at Canal, what
14   did Tiffany Chen speak to you about
15   when it came to Ms. Robinson?
16      A.    She just -- she didn't
17   understand why, you know, more
18   people from the office couldn't be
19   helping her, helping the apartment.
20   She had her -- I don't remember
21   specifics, so to speak, but she
22   would talk about some things she
23   heard about Chase, as far as, you
24   know, like inefficiencies that she
25   perceived, or just the way she would
```



Page 233

```
 1                    M. KAPLAN
 2    get mad about some things were being
 3    done in the apartment.  But I don't
 4    remember -- I don't really remember
 5    like point blank specifics of our
 6    conversations.
 7      Q.    Did there come a time when
 8    Ms. Chen began to express concern
 9    that Ms. Robinson wanted to have a
10    romantic relationship with Mr. De
11    Niro?
12      A.    No.  If she did, it would
13    be tongue and cheek.  I think it was
14    more like she thought -- she sort of
15    expressed that like -- that she
16    thought Chase was -- was crazy, and
17    like wanted to like have an office
18    or something in the house, or really
19    wanted to be like too involved in
20    their lives for her liking.  But I
21    don't think she said anything to me
22    about a romantic relationship.
23      Q.    I am going to show you
24    Exhibit 21, which is Canal 0047380.
25            (Whereupon, Plaintiff's
```



Page 234

```
 1                    M. KAPLAN
 2        Exhibit 21, Canal 0047380,
 3        was marked for
 4        identification, as of this
 5        date.)
 6     Q.    Turning your attention to
 7  the page ending in 382, do you see
 8  the message that is time stamped
 9  11:57, on April 1, 2019?
10     A.    11:57, you said?
11     Q.    Yes.
12     A.    Time stamped.  The -- yeah,
13  she thought they were getting
14  married, the way she hates me, and
15  the way she is -- yeah.  I mean,
16  that is -- again --
17     Q.    Give me an opportunity to
18  ask the question and then you can
19  answer.  Okay?
20     A.    Okay.
21     Q.    Is this a series of text
22  message that you exchanged with
23  Tiffany Chen?
24     A.    Yes.
25     Q.    Okay.
```



Page 235

```
 1                    M. KAPLAN
 2            And do you see where Ms.
 3    Chen texts, "She thought they were
 4    getting married?"
 5       A.    I see that.
 6       Q.    Was that a reference to Ms.
 7    Robinson?
 8       A.    Yeah, I see that.  Yes.
 9       Q.    And does that refresh your
10    recollection as to whether Ms. Chen
11    ever expressed concerns about
12    whether Ms. Robinson wanted to have
13    a romantic relationship with Mr. De
14    Niro?
15       A.    I mean, clearly in this
16    text message she is making that
17    reference.  I don't remember that.
18    But I mean, she -- I see this.  I
19    remember -- I say -- she definitely
20    talked to Claude who was the driver
21    a lot about Chase.  But it is --
22    yeah.  It is a kind of the thing
23    where I am -- Tiffany is not
24    necessarily a reliable narrator in
25    that sense, but she kind of -- like
```


MAGNA
LEGAL SERVICES

Page 236

```
 1                M. KAPLAN
 2    Claude might have said something to
 3    her that she wanted to hear, and
 4    then she is running with it.
 5    Whether -- where she ever said that
 6    to me other than this text, I don't
 7    think so, but maybe she did, I don't
 8    remember.
 9       Q.    Do you recall Ms. Chen ever
10    expressing that Ms. Robinson was in
11    love with Mr. De Niro?
12       A.    Well, I mean, this text you
13    are showing here, that sort of
14    implies that, but I don't remember
15    her saying it that way.  I just
16    remember her sort of saying like
17    this girl, whatever word she used
18    for her, is -- you know, like --
19    just like obsessed with us, kind of
20    thing.  But like in a -- more of
21    like a father figure kind of way is
22    how I remember it.  But I guess she
23    could have said this as well.
24       Q.    Let me show you what is
25    being marked as Exhibit 22, which is
```



Page 237

```
 1                M. KAPLAN
 2   Canal 0047508.
 3           (Whereupon, Plaintiff's
 4      Exhibit 22, Canal 0047503
 5      through 509, was marked for
 6      identification, as of this
 7      date.)
 8           MS. HARWIN:  I'm sorry
 9      503 through 509.
10   Q.    You can turn to the second
11   to last page, which is on the page
12   marked 47508.
13   A.    47?  Which one, 508?
14   Q.    Uh-huh.
15   A.    Okay.
16   Q.    So turning your attention
17   to that page, do you see the message
18   from Ms. Chen, to you, at 5:40 p.m.,
19   where she writes, "Yo.  I hope you
20   all speak about how Chase acted when
21   she was moving in here.  This bitch
22   is ridiculous."
23           Do you see that?
24   A.    I see that.  Yes.
25   Q.    Is this message from Ms.
```



Page 238

```
 1                M. KAPLAN
 2   Chen consistent with the kinds of
 3   things that Ms. Chen was saying to
 4   you in the period before Ms.
 5   Robinson's employment ended?
 6          MR. DROGIN:  Objection to
 7     the form.
 8     A.    Is this -- you mean, like
 9   the tone, is that what you are
10   asking?
11     Q.    Yes.
12     A.    I mean, that is how Tiffany
13   talks in general about people, so it
14   is consistent with how she talks.
15   It is very -- I don't know how you
16   say it.  So yes, consistent.  But
17   she didn't say -- I mean -- do you
18   mean like the -- acted like she was
19   moving in here?  That is what I mean
20   when I say like she thought -- you
21   know, she would talk how she is
22   going to be working out of here and
23   running things out of here.  That I
24   recall her saying, yes.
25          MR. DROGIN:  Please let
```



MAGNA
LEGAL SERVICES

```
 1              M. KAPLAN
 2     the record reflect that the
 3     image before that text that
 4     you just referenced is a
 5     screen shot of a text where
 6     Chase said, "You know how
 7     much I love this job, and
 8     even when I was based away
 9     from New York, I was always
10     there if you needed me.  I
11     want to go back to that
12     arrangement."
13         MS. HARWIN:  Counsel, the
14     exhibit is the exhibit.
15         MR. DROGIN:  I know, but
16     you have a habit of ignoring
17     context.
18         MS. HARWIN:  Counsel, I
19     had -- I had -- I had one
20     section that I had questions
21     about.
22         MR. DROGIN:  You asked
23     line.
24         (Simultaneous speaking)
25         MR. DROGIN:  She told me
```



Page 240

```
 1                M. KAPLAN
 2      to stop and I said that she
 3      needs to put it into context
 4      which she refuses to do.  Go
 5      ahead.
 6           MS. HARWIN:  Counselor,
 7      you are not asking the
 8      questions.  If you have
 9      questions for the witness
10      later, you can ask them.
11           MR. DROGIN:  Thank you.
12      Q.    We are now moving on to
13   Plaintiff's Exhibit 22, which is
14   Bates stamped Canal 0047833.
15           (Whereupon, Plaintiff's
16      Exhibit 23, Canal 0047833,
17      was marked for
18      identification, as of this
19      date.)
20           MS. HARWIN:  I'm sorry.
21      Exhibit 23.
22      A.    033?
23      Q.    It is coming in the chat in
24   a moment.  It is going be to Exhibit
25   23, which is Canal 0047833.  I'm
```



MAGNA
LEGAL SERVICES

```
 1                  M. KAPLAN
 2   sorry 829.  That is the start of the
 3   Bates range.  Let me know when you
 4   have that document up.
 5      A.    Uh-huh.
 6      Q.    So turning to page 47833,
 7   do you see your message, on April
 8   1st, 2019, at 12:07 a.m.?
 9      A.    I am paging down.
10      Q.    Take your time.
11      A.    Yes, I see that.
12      Q.    Can you read aloud your
13   message?
14      A.    "I offered token push back
15   on her she's in love with him idea
16   and that's what triggered that so
17   yea it's unsustainable."  Yes, I see
18   that.
19      Q.    When you wrote, "Her she's
20   in love with him idea," what were
21   you referring to?
22      A.    I am clearly now at this
23   point referring to a conversation
24   that I had with Tiffany in person
25   where she said that Chase is in love
```



```
 1              M. KAPLAN
 2    with him to me.  I don't -- but you
 3    are asking me to remember things
 4    from a few years.  But now that I am
 5    reading it, that is what I'm
 6    referring to.
 7      Q.    Okay.
 8            You had a conversation in
 9    person with Tiffany Chen in which
10    Tiffany Chen expressed the belief
11    that Ms. Robinson was in love with
12    Mr. De Niro, is that right?
13      A.    Based on reading my text
14    message, yes, it appears I did.
15      Q.    And what did you do to push
16    back on Ms. Chen's claim that Ms.
17    Robinson was in love with Mr. De
18    Niro?
19      A.    I don't remember the
20    conversation, so I don't know what I
21    did to push back.
22      Q.    As far as you can tell,
23    there was no basis for Ms. Chen's
24    suspicion that Ms. Robinson wanted a
25    romantic relationship with Mr. De
```



```
 1                M. KAPLAN
 2  Niro, correct?
 3     A.    No.  I never thought she
 4  wanted a romantic relationship with
 5  Mr. De Niro.  That was never
 6  something I -- I would have said or
 7  agreed with, you know.
 8     Q.    In her communications with
 9  you, Ms. Chen often referred to Ms.
10  Robinson as a bitch, correct?
11     A.    I don't know if it was
12  often.  She did at times.  That is
13  again how she talks.  She has a way
14  of talking that way.  She called a
15  lot of people bitches, including
16  Chase.
17     Q.    It was common for Ms. Chen
18  to call Ms. Robinson a bitch,
19  correct?
20          MR. DROGIN:  Objection to
21     the form.
22          THE WITNESS:  Sorry.
23          MR. DROGIN:  I am
24     objecting to the form of the
25     question.  If you understand
```



MAGNA
LEGAL SERVICES

Page 244

```
 1                    M. KAPLAN
 2      what the word common means,
 3       go right ahead and answer.
 4      A.    Yeah, I don't know how
 5   often she referred to so I can't say
 6   common.  She definitely referred to
 7   her at some point with that
 8   language.
 9      Q.    Ms. Chen called Ms.
10   Robinson a bitch multiple times in
11   your communications with her,
12   correct?
13      A.    Again, I don't remember,
14   but I would guess more than one
15   time.  So yes, multiple.  You can
16   say multiple.
17      Q.    Ms. Chen complained to you
18   that Ms. Robinson was such a white
19   girl, right?
20      A.    I don't remember that, but
21   if that is in a text -- I don't
22   remember that.
23      Q.    Ms. Chen disparaged Ms.
24   Robinson's behavior being very
25   quote, "single white female,"
```



Page 245

1                 M. KAPLAN
2    correct?
3        A.    Again, I don't remember any
4    of these conversations verbatim.  If
5    she said that in a text I would
6    believe it, but I don't remember her
7    saying that.
8        Q.    I am going to mark Exhibit
9    24, which is Canal 0047829.
10               (Whereupon, Plaintiff's
11        Exhibit 23, Canal 0047829,
12        was marked for
13        identification, as of this
14        date.)
15       A.    It looks like the same
16   thing was just sent.
17       Q.    It may have been dropped in
18   twice.  Can you turn to the page
19   that is the last page of that
20   exhibit?
21       A.    Sure.  Page six?
22       Q.    Yes.  Well it is the last
23   page of it, the one ending 47834.
24       A.    Uh-huh.
25       Q.    Turning to your message at



Page 246

```
 1                M. KAPLAN
 2   1:14 p.m., on April 1st, 2019, were
 3   you sharing with Gillian Spear a
 4   message that Tiffany Chen sent to
 5   you?
 6      A.    Was I sharing what?  I
 7   didn't hear you.
 8      Q.    Were you sharing with
 9   Gillian Spear a message that Chase
10   -- I'm sorry.  A message that
11   Tiffany Chen had sent to you?
12      A.    Well, looking at it this
13   way, yeah.  It looks like a copy and
14   paste.  Yeah.
15      Q.    Did you ever communicate
16   with Ms. Chen about her
17   characterization of the situation as
18   very, quote, "single white female?"
19      A.    I -- I -- I think it is
20   clear that Tiffany conveyed that
21   message to me.  So I don't know if
22   we had a conversation as well, but
23   that is how she felt.
24      Q.    What are all the epithets
25   that you recall Ms. Chen using to
```



```
 1              M. KAPLAN
 2   describe Ms. Robinson?
 3     A.    I don't recall the
 4   specifics, but I -- yeah, it doesn't
 5   surprise me when you say bitch.
 6   That doesn't surprise me.  Single --
 7   the white female thing, I mean, she
 8   definitely -- it was like Chase was
 9   a -- you know, there was -- I don't
10   remember.  I am trying to think.  I
11   don't remember anything specific.
12   Like I said, this was -- the
13   specifics of these conversations,
14   that is asking a lot of my brain.
15     Q.    Do you recall Ms. Chen
16   treating Ms. Robinson with
17   hostility?
18     A.    No.  In person, she didn't
19   treat her with hostility.  It was
20   kind of both ways.  Chase didn't
21   really talk to her.  Was kind of icy
22   around her.  Something that I
23   noticed from the beginning.  And
24   Tiffany sort of -- if you want to
25   call it phony or whatever.  But she
```



Page 248

```
 1                M. KAPLAN
 2   -- when I was -- my recollection is
 3   she was sort of just like short with
 4   her, but not like hostile in person.
 5      Q.    The next exhibit I would
 6   like to share is Bates stamped Canal
 7   0047643 through 44.  I believe that
 8   is Exhibit 24.
 9           (Whereupon, Plaintiff's
10       Exhibit 24, Canal 0047643
11       through 44, was marked for
12       identification, as of this
13       date.)
14      Q.    Let me know when you have
15   that open.
16      A.    Yeah, I have it open.
17      Q.    Did you see the text
18   message that you sent at March -- on
19   March 29, 2019, at 3:32 p.m.?
20      A.    Yes.
21      Q.    Okay.
22           This is a series of texts
23   that you exchanged with Nellie
24   Norden, is that right?
25      A.    Yes.
```



Page 249

```
 1               M. KAPLAN
 2   Q.    Who is Nellie Norden?
 3   A.    Nellie Norden works for
 4  Tribeca, but used to work for Bob as
 5  an assistant.  And was -- the last
 6  time before this that Bob had
 7  decided that he was going to get rid
 8  of Chase, he was going to make
 9  Nellie his -- his new -- he was
10  going to promote Nellie so to speak
11  and then he didn't do it.  So that
12  is why I say, "Survives this time"
13  because he changed his mind the time
14  before.
15   Q.    Okay.
16         When you wrote, "Shit is
17  going to go down next week when Bob
18  is back.  Not sure if she survived
19  this time," what did you understand
20  --
21   A.    My understanding.  Sorry,
22  go ahead.
23   Q.    That is okay.
24         What did you understand was
25  going to happen to Ms. Robinson?
```



```
 1              M. KAPLAN
 2     A.    My understanding was that
 3  Tiffany was going to try to organize
 4  a lot of different people to talk to
 5  Bob directly to try to -- almost
 6  like an intervention type
 7  atmosphere.  I think she even wanted
 8  to do it possibly with Chase -- I
 9  don't remember if it was Chase there
10  or not, or just have a lot of people
11  talk to Bob, and yeah.  I was
12  stressed about the idea of this, but
13  I do remember that.
14     Q.    At that point Ms. Chen had
15  conveyed that she wanted Mr. De Niro
16  to fire Ms. Robinson, is that right?
17     A.    She did.  And my
18  understanding was that he was sort
19  of going back and forth on the idea.
20     Q.    What did Ms. Chen say about
21  wanting Mr. De Niro to fire Ms.
22  Robinson?
23     A.    What do you mean, what did
24  she say?  She -- I don't remember
25  specific things that she said.  It
```



Page 251

```
 1              M. KAPLAN
 2    was the type of thing where she was
 3    constantly talking to different
 4    people who -- in his life and
 5    basically talking to Bob and saying
 6    you need to talk to blah-blah blah.
 7    And that kind of thing about Chase.
 8    To know what is really going on.
 9      Q.    But this point in late --
10    late March 2019, was it generally
11    known that Ms. Chen wanted Ms.
12    Robinson to be fired?
13           MR. DROGIN:  Objection to
14       the form.
15      A.    Generally, it was known
16    that she didn't like her.  That was
17    known.  I don't know about -- you
18    have to understand that like people
19    -- there is so many people who are
20    -- I am sure if you are going to
21    keep showing me text messages that I
22    had with who were all invested in
23    the story line in a way, but nobody
24    had ever believed Chase was ever
25    going to be fired.  Chase had always
```



Page 252

```
 1                M. KAPLAN
 2   -- had been there so long.  Nobody
 3   really believed that was going to
 4   happen.  But Tiffany -- you know,
 5   she is this new person that talks a
 6   big game that seemed to have the
 7   most -- she just kept talking about
 8   it and talking about it.  It was
 9   like she was -- she was very
10   interested in this and talking to
11   people about it.  Whether -- I don't
12   know if we believed -- I don't think
13   most people believed she was going
14   to be fired though because Bob -- I
15   don't think many people thought Bob
16   was going to fire her.
17      Q.    What was Ms. Chen doing to
18   try to take down Ms. Robinson?
19           MR. DROGIN:  Objection to
20        the form.
21      A.    I mean, take down is a
22   strange way of putting it.  She was
23   just trying to get examples of
24   things that she didn't think Bob was
25   aware of, you know, have Bob really
```



Page 253

```
 1                M. KAPLAN
 2    think about it, like how much
 3    different money -- the way she spent
 4    money, the way she used miles, the
 5    way she would demean people.  She
 6    just tried to overlook like Bob you
 7    never thought about all of these
 8    good people in your life who are all
 9    -- they all say the same exact thing
10    about this person.  She just tried
11    to like -- no one had ever done that
12    before, just try to like put it all
13    together like a case.  But, you
14    know, I don't know if she ever --
15    did I think she was going to fire
16    Chase?  I don't know.  I don't know
17    if that is really what she thought
18    was going to happen or not.  I have
19    no idea.
20      Q.    I am going to put into the
21    chat Exhibit 25 Bates stamped Canal
22    04641 through 42.
23            (Whereupon, Plaintiff's
24      Exhibit 25, Canal 04641
25      through 42, was marked for
```



```
 1                  M. KAPLAN
 2     identification, as of this
 3     date.)
 4     A.    I don't have it.
 5     Q.    Okay.  Just give it a
 6  moment.  Hopefully it will
 7  materialize soon.  There we go.  It
 8  should be in there now.
 9     A.    Yes.
10     Q.    Okay.
11           So turning your attention
12  to the second page of this document,
13  as you -- this is a series of text
14  message that you exchanged with
15  Michael Tasch, is that correct?
16     A.    It appears that way, yes.
17     Q.    Turning your attention to
18  the bottom, second page, can you
19  read what you wrote at 7:07 p.m.?
20     A.    "I heard Tiff e-mailed you
21  about apartment expenses.  We should
22  strategize on this.  She's trying to
23  take down Chase of course."  Yes.
24     Q.    Okay.
25     A.    That was -- I -- Michael
```



Page 255

```
 1                M. KAPLAN
 2    Tasch was one of the people that she
 3    talked to.  I'm sorry.  Go ahead.
 4    She talked to a lot of people.
 5       Q.    When you say that she
 6    talked to a lot of different people
 7    --
 8            (Simultaneous speaking)
 9       Q.    You were saying that Mr.
10    Tasch was one of the people that Ms.
11    Chen was speaking to.  Mr. Tasch was
12    one of the people that Ms. Chen was
13    speaking to about what?
14       A.    About examples to show Bob
15    or to -- of people, you know, that
16    -- of Chase's financial misdeeds.  I
17    believe Mr. Tasch's example to show
18    Bob -- she was -- the apartment
19    expenses specifically was -- I
20    believe was all the things we had
21    purchased, she wanted a list of
22    literally everything purchased for
23    the apartment.  Like a giant like
24    stack of Amazon bills everything to
25    -- she wanted Michael Tasch to come
```



```
 1                  M. KAPLAN
 2   and go over it with Bob I believe
 3   the next week.
 4    Q.    Okay.
 5          And you understood this to
 6   be part of Ms. Chen's effort to have
 7   Ms. Robinson fired?
 8    A.    Yes.  I -- like I said, she
 9   was hitting -- she was trying like
10   all different areas.
11    Q.    Okay.
12          I would like to turn to
13   what is being marked as Exhibit 26
14   which begins at Canal 0034641.
15          (Whereupon, Plaintiff's
16     Exhibit 26, Canal 0034641,
17     was marked for
18     identification, as of this
19     date.)
20    Q.    Do you recognize this as an
21   e-mail Mr. De Niro forwarded to you
22   on April 2, 2019?
23    A.    Yes.
24    Q.    Did you ever communicate
25   with Mr. De Niro about this e-mail
```



Page 257

1                M. KAPLAN

2    exchange?

3        A.    I don't remember.  Did I

4    reply?  I don't -- um -- I think the

5    reason it is forwarded is because

6    she wanted me to see -- I think

7    Tiffany wanted me to see the -- you

8    know, is this Chase's -- what is

9    this?  Oh, this is her -- oh, no.

10   This is something different.  No, I

11   don't remember.  I don't really

12   remember.  I remember seeing this,

13   but I don't remember the -- the --

14   communicating about it.

15       Q.    Did you have any

16   communications with Mr. De Niro

17   about Ms. Robinson's employment

18   status in late March or early April

19   of 2019?

20       A.    She -- Tiffany asked me to

21   speak to Bob.  I was -- you know, I

22   -- of all the people that spoke to

23   Bob, I probably had the least to say

24   because I think -- I think it was --

25   it was Saturday Night Live, but it



Page 258

```
 1                M. KAPLAN
 2   was sort of just a general -- I
 3   don't remember what was said too
 4   much, but I don't -- I really was
 5   not comfortable at that point.  She
 6   was really trying to push me to like
 7   really talk to Bob about all of
 8   these things, and I was a little
 9   hesitant the first time around, so
10   it was sort of just a general I know
11   a lot people are talking, and, you
12   know, the office is good -- I think
13   I basically expressed that the
14   office could handle things.  I
15   thought maybe bringing one more
16   person in something to that nature
17   on a lower level, but, yeah.  I
18   remember that she wanted -- she
19   definitely wanted me to talk to him
20   again because it wasn't a long
21   conversation.
22      Q.    How long did your
23   conversation with Mr. De Niro last?
24      A.    It was -- I don't remember.
25   But I don't -- I remember it was
```



Page 259

```
 1               M. KAPLAN
 2   maybe like five to ten minutes.  It
 3   was not a long conversation.  It was
 4   more of a general I know this is
 5   what people -- she has been talking
 6   to you.  I -- you know, I do feel
 7   comfortable that you have a good --
 8   other good people in your office if
 9   you want to go this direction, but
10   it was not a -- we did not get into
11   a lot of details is how I remember
12   it.
13     Q.    You didn't push Mr. De Niro
14   to fire Ms. Robinson, is that right?
15        MR. DROGIN:  Objection to
16     the form.
17     A.    No, I didn't push him to
18   fire Ms. Robinson.  I was conflicted
19   to because I have -- it seemed like
20   knowing how the wind was blowing it
21   was going to get uglier, and I
22   personally -- as I said, the whole
23   thing was stressing me out.  I was
24   regretting coming back to work after
25   the ███████████   So resolution
```



Page 260

```
 1                M. KAPLAN
 2   would be good, but I didn't want --
 3   the firing would have been -- would
 4   have involved a meeting -- another
 5   meeting -- a lot of meetings.  I
 6   didn't really want this to happen.
 7   I was trying to delay those off
 8   until at least after the festival so
 9   yeah, I didn't -- I didn't push him
10   hard for her to be fired.
11      Q.    Did Mr. De Niro communicate
12   to you about what he was planning to
13   do with respect to Ms. Robinson?
14      A.    No.  He said he is -- you
15   know, I think -- I remember him like
16   -- he was sort of like thinking it
17   over -- you know, because we had had
18   a -- you know, he was sort of like I
19   know people have been talking,
20   Tiffany wants me to talk to you,
21   maybe we could have another
22   conversation.  He didn't -- he
23   didn't -- I didn't get the
24   impression that when I spoke to him
25   at any point that he was about to
```



```
 1              M. KAPLAN
 2    fire her at that moment in time.
 3    But I -- I -- you know, it was -- it
 4    was a tricky situation because it
 5    was a lot -- it was -- it was
 6    intense obviously.
 7       Q.    Did you have any other
 8    conversations with Mr. De Niro
 9    before Ms. Robinson's employment at
10    Canal ended in which there was a
11    discussion about her?
12       A.    Um, I don't remember -- no.
13    I had had this one conversation with
14    him and it was talk of us having
15    another, but I don't think we had it
16    because she quit before that would
17    have happened.
18       Q.    Are you aware of Mr. De
19    Niro telling anyone that he wanted
20    to be done with Ms. Robinson soon?
21       A.    No.  I don't remember him
22    saying that to anybody that I am
23    aware of.
24       Q.    We are going to drop into
25    the chat the next exhibit, which I
```



Page 262

```
 1                    M. KAPLAN
 2    understand is Exhibit 27, and that
 3    is the document that begins Canal
 4    0047796.
 5             (Whereupon, Plaintiff's
 6        Exhibit 27, Canal 0047796,
 7        was marked for
 8        identification, as of this
 9        date.)
10    A.    So much intrigue with these
11    downloads.  What blast from the past
12    am I going to read next?  Okay.
13    Q.    Okay.
14             So looking at your message
15    at 4:51 p.m., on April 2nd, do you
16    see where you say, "Oh, wow.  Yeah.
17    He is talking about it to everyone?"
18             MR. DROGIN:  Objection to
19        the form.  That is not what
20        it says at 4:51.  There is a
21        --
22    A.    Yeah, I see that.
23             MR. DROGIN:  One of them
24        is President Obama announcing
25        Osama Bin Laden.  Do you want
```



Page 263

```
 1              M. KAPLAN
 2      to ask him why he equated
 3      Chase Robinson to Osama Bin
 4      Laden or should we do that on
 5      redirect?
 6          MS. HARWIN:  Counsel --
 7          (Simultaneous speaking)
 8      A.    I guess she is (inaudible)
 9  that we saw from the other text, but
10  yeah.
11      Q.    So, Mr. Kaplan, can you
12  read aloud the last text message
13  that you sent on April 2, 2019, at
14  4:51 p.m.?
15      A.    Yeah.  I said, "Oh, wow.
16  He is talking about it to everyone."
17      Q.    What were you referring to
18  there?
19      A.    Well, so this is Morgan who
20  used to work for Bob, and I am
21  referring to obviously talking --
22  because earlier in this conversation
23  I asked if she didn't want to work
24  with Chase.  I had a conversation
25  with Tiffany, I remember, where she
```


MAGNA
LEGAL SERVICES

```
 1                    M. KAPLAN
 2    brought up this idea of Morgan.  Do
 3    you think Morgan would want to come
 4    back to work?  So I think he -- I
 5    don't know if that is a typo, I
 6    meant to say she or if -- I don't
 7    remember talking -- like I said, I
 8    don't remember talking a lot about
 9    it so I don't know.  But I guess he
10    might have been talking to Drena I
11    see her.  Oh, yeah.  Oh, right
12    because she says -- Morgan had a
13    relationship with Drena because she
14    still worked for her at the time,
15    Bob's daughter.  So I guess he had
16    talked to Drena about it.  And that
17    is why I said, "Oh, wow.  He is
18    talking to everyone about it."  I am
19    saying, I didn't -- I don't remember
20    it like -- like, I mean, talking
21    about it to everyone here is Drena,
22    his daughter.  That is -- you know,
23    if I -- you know, that means
24    everyone, but -- but, yeah, I see
25    what you are saying.
```



```
 1                    M. KAPLAN
 2     Q.    When you wrote, "He is
 3   talking about it to everyone," what
 4   specifically was Mr. De Niro talking
 5   about that you were referring to?
 6     A.    Well, I am referring to him
 7   replacing or getting rid of Chase.
 8   But I am saying -- when I say,
 9   "everyone," it is because she told
10   Drena and I am just referring to
11   that.  She already heard about this
12   from Drena.
13            (Whereupon, Plaintiff's
14       Exhibit 28, Canal 0047511,
15       was marked for
16       identification, as of this
17       date.)
18     Q.    I am going to show you
19   Exhibit 28, which is Canal 0047511.
20   I would like to turn your attention
21   to the page that is 47515, and the
22   text messages that were exchanged on
23   April 5th, 2019, between 2:43 p.m.
24   and 2:44 p.m.
25            MR. DROGIN:  Sorry, what
```



MAGNA
LEGAL SERVICES

Page 266

```
 1                  M. KAPLAN
 2     page are you on?
 3          MS. HARWIN:  The one that
 4     is 47515.
 5     A.    Which page?  What am I
 6  supposed to be looking at though?
 7     Q.    If you look at the text
 8  messages between 2:43 p.m. and 2:44
 9  p.m.
10          MR. DROGIN:  So just to
11     be clear, this is an
12     eight-page exhibit, and you
13     are directing the witness to
14     a single line?
15          MS. HARWIN:  No, that is
16     not correct.
17          MR. DROGIN:  I am -- it
18     starts with -- hold on.  It
19     starts with 47511?
20          MS. HARWIN:  That is the
21     start of the text exchange.
22     Q.    Mr. Kaplan --
23          MR. DROGIN:  Hold on.  I
24     have that as an eight-page
25     exhibit, is that wrong?
```



Page 267

1            M. KAPLAN

2        MS. HARWIN:  I don't know

3    that that is wrong, but your

4    characterization that I am

5    directing him to a single

6    line is not accurate.

7        MR. DROGIN:  I am trying

8    to understand because it is

9    an eight-page and there are

10   98 messages.  Which one or

11   ones are you referring him

12   to?

13       MS. HARWIN:  The one that

14   I previously identified now

15   multiple times.  The one

16   between 2:43 and 2:44 p.m.

17       MR. DROGIN:  I had a

18   problem opening it.  So give

19   me a second to get there.

20   Just a second.

21       MS. HARWIN:  Counsel, you

22   can find the document --

23       MR. DROGIN:  I know I

24   can.  Excuse me.  I know I

25   can.  That is why I need a



Page 268

```
 1                  M. KAPLAN
 2      minute to do it.  Just give
 3      me a minute, and I would like
 4      to read it before you start
 5      questioning the witness.
 6      You --
 7           MS. HARWIN:  Why don't we
 8      go off the record so you can
 9      find your place and come
10      back?  So why don't we take a
11      two-minute break and then
12      hopefully then you will be
13      able to find where you are.
14      Let's come back at 2:15.
15           THE VIDEOGRAPHER:  The
16      time is 2:13 p.m. and we are
17      now off the record.
18           (Whereupon, a recess was
19      taken at this time.)
20           THE VIDEOGRAPHER:  The
21      time now 2:15 p.m.  We are
22      back on the record.
23      Q.   Mr. Kaplan, I would like to
24   direct you back to the series of
25   text messages beginning at 2:43
```



```
 1                M. KAPLAN
 2   p.m., on April 5th, 2019.
 3           Do you see where Gillian
 4   Spear writes, "Can we get an update
 5   on how wide this circle of people in
 6   the know is now?"
 7   A.    Yes.
 8   Q.    And do you see where you
 9   follow up and identify a list of
10   names?
11   A.    Yes.
12   Q.    Okay.
13           When you and Ms. Spear were
14   communicating with people in the
15   know, what specifically did these
16   people all know about?
17   A.    These are the people who
18   Tiffany had been talking to about
19   the idea of -- of getting rid of
20   Chase.
21   Q.    So as far as you knew, the
22   people that Ms. Chen had spoken to
23   about getting rid of Chase Robinson
24   included Dan Harvey, Tom Harvey,
25   Drena De Niro, Rafael De Niro, you,
```



Page 270

                    M. KAPLAN

1

2   Michael Kaplan, Gillian Spear,

3   Sabrina Weeks-Britain, Berdon, and

4   Mary Beth.  Is that right?

5     A.    Yes.

6     Q.    Who is Mary Beth?

7     A.    She was -- used to be the

8   person that was involved in the

9   project that Tiffany had gotten

10  friendly with because she would

11  travel.  I think she went down there

12  sometimes and --

13           (Whereupon, Plaintiff's

14      Exhibit 29, Canal 0047798,

15      was marked for

16      identification, as of this

17      date.)

18    Q.    We are going to turn to

19  another exhibit, which is Exhibit

20  29, and that is a text exchange

21  beginning Canal 0047798.

22           And I would like to turn

23  your attention to the text messages

24  exchange at 11:06 p.m. and 11:11

25  p.m.



Page 271

```
 1                M. KAPLAN

 2           Is this a text exchange

 3    between you and Morgan Billington?

 4    A.     Yes.

 5    Q.     Okay.

 6           Do you see where you wrote

 7    -- well, actually I am going to

 8    allow you to read it out loud.  Can

 9    you read out loud your text message

10    at 11.11 p.m., on April 6, 2019?

11    A.     I wrote, "Tiff was going to

12    have her fired this week and Chase

13    must have realized it."

14           I also would like to

15    stipulate that if we are going to

16    discuss this chain I was very

17    intoxicated this night for the

18    record.

19    Q.     When you wrote to Ms.

20    Billington that Ms. Chen was going

21    to have Ms. Robinson fired, what was

22    your basis for stating that?

23    A.     It must have been referring

24    to everything that we just discussed

25    as far as she wanted to have a lot
```



```
 1                 M. KAPLAN
 2    of people talk to Bob the following
 3    week about all of the things that
 4    she was talking to him directly
 5    about.  But me saying she was going
 6    to have her fired is me sort of
 7    taking a step extra and like saying
 8    she was going to be successful.  I
 9    don't know if she would have been
10    successful.
11             (Whereupon, Plaintiff's
12        Exhibit 30, Canal 0047485,
13        was marked for
14        identification, as of this
15        date.)
16    Q.    The next exhibit I am going
17    to show you is Exhibit 30 beginning
18    at Bates stamp Canal 0047900.  I'm
19    sorry.  I misstated that.  It is
20    Canal 0047485.  So the one that just
21    dropped in, you can click on.
22             Is this a series of text
23    exchanges between you and Christina
24    O'Leary?
25    A.    Yes.
```



MAGNA
LEGAL SERVICES

```
 1                    M. KAPLAN
 2     Q.    Who was Christina O'Leary?
 3     A.    She was -- she worked for
 4  Bob.  She is one of every -- many --
 5  all of these people who worked for
 6  Bob couldn't stand working for
 7  Chase.
 8     Q.    Turning your attention to
 9  the text message from Ms.  O'Leary
10  at 7:47 a.m., where she wrote, "Also
11  Bob's divorce.  What the heck?"  And
12  then you followed up at 7:50 a.m.,
13  and you said, "The two are related."
14           What do you mean by that?
15     A.    Look, I clearly meant that
16  Bob's divorce is related -- the new
17  girlfriend is related to Chase
18  resigning.
19           (Whereupon, Plaintiff's
20     Exhibit 31, Canal 47900, was
21     marked for identification, as
22     of this date.)
23     Q.    I would like to turn your
24  attention to Exhibit 31, which is
25  the -- the document that was dropped
```



Page 274

```
 1                  M. KAPLAN
 2   in the chat just before the last
 3   one, so the one that is 47900.
 4     A.    So we are back to that one?
 5   Okay.
 6     Q.    Exactly.  Thank you.
 7     A.    Uh-huh.
 8     Q.    So turning your attention
 9   to what you wrote on April 7, 2019,
10   at 7:51 a.m., can you -- actually,
11   you know what?  Let's turn to the
12   series of messages starting at 7:50
13   a.m.  Can you read out loud the
14   messages that you exchanged with
15   Alexandra Winogora between 7:50 a.m.
16   and 7:51 a.m.?
17     A.    I wrote "Resigned last
18   night was likely to be fired this
19   week."  Alexandra wrote, "What
20   finally did her in?"  I said, "Bob's
21   new girlfriend made it her singular
22   mission."  Do I need to keep
23   reading, or --
24     Q.    Yeah.  Why don't you keep
25   reading until 7:53 a.m.?
```



Page 275

```
 1              M. KAPLAN
 2    A.    She writes, "why?"  She
 3  adds, "That is so interesting."
 4  Then she says, "Did Chase wrong
 5  her?"  I write, "She felt Chase was
 6  in love and psycho."
 7    Q.    Ms. Chen conveyed to you
 8  that she felt Chase was in love with
 9  Mr. De Niro, correct?
10          MR. DROGIN:  Objection to
11    the form.
12    A.    I think we established
13  that, but yes.
14    Q.    Based on your observations,
15  Ms. Chen made it her singular
16  mission to end Ms. Robinson's
17  employment?
18          MR. DROGIN:  Objection to
19    the form.
20    A.    I mean, she -- if it was a
21  future -- making it her singular
22  mission to end other people's
23  employment, including my own, so it
24  is not that -- it is not that --
25    Q.    I want you to just make
```



Page 276

```
 1                  M. KAPLAN
 2    sure to answer my question.  So I'm
 3    going to have the court reporter
 4    read it again.
 5          MR. DROGIN:  He was
 6       answering your question, but
 7       again, you cut him off when
 8       you don't like the answer.
 9       Let him finish his answer.
10    A.    She -- based on my
11    observations of those two weeks, she
12    made it her singular mission, yes,
13    if that is what you are asking.
14    Q.    So I just want to make sure
15    we have a clear record.
16          In the last two weeks of
17    Ms. Robinson's employment, you
18    observed that Ms. Chen made it her
19    singular mission to end Ms.
20    Robinson's employment, is that
21    right?
22          MR. DROGIN:  Objection to
23       the form.
24    A.    Yeah.  I -- I would say it
25    was -- it was her focus of her -- of
```



Page 277

```
 1                M. KAPLAN
 2    what she was doing at that time.
 3         MS. HARWIN:  Why don't we
 4      take a five-minute break and
 5      we can pick it up at 2:29 or
 6      2:30?
 7         THE VIDEOGRAPHER:  The
 8      time is now 2:24 p.m. and we
 9      are now off the record.
10         (Whereupon, a recess was
11      taken at this time.)
12         THE VIDEOGRAPHER:  The
13      time is now 2:32 p.m. and we
14      are back on the record.
15    Q.    There came a -- I'm sorry.
16    Go ahead.
17    A.    I said that I see you now.
18    Okay.
19    Q.    There came a time when Ms.
20    Robinson resigned from employment at
21    Canal, is that right?
22    A.    Yes, of course.
23    Q.    How did Mr. De Niro react
24    to Ms. Robinson resigning her
25    employment from Canal?
```



1           M. KAPLAN

2           MR. DROGIN:  Objection to

3      the form.  You can answer.

4    A.    I don't -- I wasn't there

5    when he got the news officially.

6    But he seemed pretty -- is relieved

7    the right word?  I don't know.  He

8    seemed like, you know, move on.  He

9    moves on quickly.

10    Q.    After Ms. Robinson's

11    employment ended, you organized a

12    party, is that right?

13    A.    Yes, that was the result of

14    -- I was the arm chair therapist for

15    so many people through the years who

16    spent -- who just were tortured by

17    her that the idea sprang up that

18    maybe I shouldn't have done because

19    now I have to talk about it here,

20    but at the time it seemed funny to

21    do that.  It seemed like a fun idea,

22    so we did that.

23    Q.    Did you take any videos

24    during the party that you organized

25    after Ms. Robinson's departure?



Page 279

1                   M. KAPLAN

2     A.    We took -- there was a --

3  there was a picture/video that we

4  were asked to take and sent to Bob

5  and Tiffany, yes.

6     Q.    Okay.

7          MS. HARWIN:  Counsel,

8     that video should be produced

9     to us.

10    Q.    Did Mr. De Niro --

11         MR. BENNETT:  I am not

12    aware of any such video.  As

13    far as I know it has been

14    produced.

15    A.    It was in the -- I -- it

16  was texted so if it is so that --

17  that is how I remember it.  So I

18  don't know what you are -- if there

19  is a video.

20    Q.    Did Mr. De Niro record and

21  send a video for the party that you

22  organized after Ms. Robinson's

23  employment ended?

24    A.    No, not that I remember.

25    Q.    After Ms. Robinson's



1                    M. KAPLAN

2    employment at Canal ended, Ms. Chen

3    continued to want to investigate Ms.

4    Robinson, that is correct?

5       A.    She -- well, she wanted --

6    I think she wanted Bob to know the

7    -- you know, basically she really

8    wanted him to see like what -- all

9    the stuff -- the stuff with the

10   miles specifically, and there were

11   some e-mails I remember.

12   Specifically I remember she really

13   wanted to -- there was an e-mail

14   where Chase had supposedly doctored

15   it to take credit for something.

16   And I remember Tiffany was really

17   adamant at trying to find it after

18   Chase resigned.

19      Q.    But there was no e-mail

20   that Ms. Robinson had doctored,

21   correct?

22      A.    Well, it was hard to find

23   because -- yeah, it was hard to find

24   because the person who was -- their

25   e-mail inbox no longer existed so it



Page 281

```
 1                    M. KAPLAN
 2     was -- it was -- we had to -- you
 3     know, it was hard to find because I
 4     didn't even know what I was looking
 5     for or where.  I can't page through
 6     700,000 e-mails to figure this out.
 7     So it might exist but I don't -- I
 8     heard about it, but I never found it
 9     per se.
10              (Whereupon, Plaintiff's
11        Exhibit 32, Canal 0047848,
12        was marked for
13        identification, as of this
14        date.)
15     Q.    I'm going to show you what
16     has been marked as Exhibit 32
17     beginning Canal 0047848.
18     A.    I see it.  Yes.
19     Q.    Turning your attention to
20     the e-mail that you wrote on April
21     13th, 2019 -- I'm sorry.  The text
22     message that you wrote.  Let me
23     restart that.
24              Turning your attention to
25     the text message that you wrote at
```



```
 1                M. KAPLAN

 2    9:24 p.m., on April 13th, 2019, do

 3    you see where you write, "He is on a

 4    war path for all incriminating shit

 5    on her now?"

 6      A.    Yes.  This is what I just

 7    was talking about.  Robin had

 8    mentioned to Bob and Tiffany that

 9    there was this e-mail that -- he

10    said that I showed her years ago.  I

11    don't remember -- I didn't remember

12    the specifics about it.  And that

13    was why I was asking Olivia who was

14    the person who had told us about it

15    and showed it to me to -- if she

16    could remember it.  And I wrote --

17    yes.  I guess wrote, "He is on a war

18    path."

19      Q.    When you wrote that Mr. De

20    Niro was on a war path for all

21    incriminating shit on Ms. Robinson,

22    what was the basis for your saying

23    that?

24          MR. DROGIN:  Objection to

25      the form.
```



```
 1              M. KAPLAN
 2     A.    Like it is -- the basis is
 3   what -- is that essentially they --
 4   they were very -- they really wanted
 5   a list of all of the miles, how they
 6   were used, and they really -- this
 7   -- there was this specific e-mail
 8   they really wanted to see and they
 9   didn't seem like they were -- when I
10   say yes -- they kept bringing it up,
11   so I kept trying to find it, but --
12   and as Olivia -- Olivia was somebody
13   that -- like when she was fired by
14   Chase, she had created all of this
15   information as she references here
16   about -- you know, she wrote a whole
17   memorandum I remember.  But, you
18   know, it was going on because she
19   didn't keep that computer and she
20   didn't -- I had actually deleted her
21   e-mail address because I thought why
22   are we paying for this e-mail
23   address?  So there was no way of you
24   know -- there was no way of finding
25   that if it existed.
```



```
 1                M. KAPLAN
 2    Q.    So what was your
 3  understanding of what incriminating
 4  shit was being looked for?
 5    A.    It was Bob really wanted to
 6  know -- he really wanted to know why
 7  -- like how much Chase had spent on
 8  cars, how much she had -- how many
 9  mile had been used.  And these
10  stories he was hearing about her
11  just being a bully, and like all
12  these things he was hearing, he
13  wanted to still see -- I think he
14  felt bad about it going on so long,
15  and he so sort of just wanted to see
16  it at all and wrap his head around
17  it, I guess, is the best way to put
18  it.  I don't know war path, that is
19  -- again, this is an e-mail written
20  at 9:24 at night.  I don't know if I
21  had a few in me or not, but --
22            (Whereupon, Plaintiff's
23        Exhibit 33, Canal 0047441,
24        was marked for
25        identification, as of this
```



Page 285

```
 1                M. KAPLAN
 2      date.)
 3      Q.    The next exhibit, Exhibit
 4   33 begins at Bates Canal 0047441.
 5          MR. DROGIN:  Six-page
 6       exhibit containing 86 total
 7       messages.
 8      Q.    So Mr. Kaplan turning your
 9   attention to the message that you
10   sent at 9:06 a.m., on June 12th,
11   2019.  Do you see where you write,
12   "Wait.  I talked to Tom?"
13      A.    Yes.
14      Q.    And then at 9:07 a.m. you
15   wrote, "He told me he wants me to
16   spend 24/7 thinking of crazy Chase
17   shit and writing it down," is that
18   right?
19      A.    I see that, yes.
20      Q.    Okay.
21          Tell me about the
22   conversation that you had with Tom
23   Harvey in which he told you this?
24      A.    I don't remember the
25   conversation.  I remember -- I
```



Page 286

```
 1              M. KAPLAN
 2   remember hearing about this 300,000
 3   for two years idea in the press
 4   release now that I am reading it.
 5   But I don't remember the
 6   conversation.  That was, again, a
 7   few years ago now.
 8     Q.    When you refer to that you
 9   understood that to be the severance
10   that Ms. Robinson was proposing?
11           MR. DROGIN:  Objection to
12      the form.
13     A.    Yes, she was -- my
14   recollection is, you know, it was --
15   it was outrageous to us because we
16   thought Chase had a good run.  She
17   (inaudible).
18           Yes, it was very shocking
19   for us to hear this us because she
20   wanted to what was say a severance
21   package to us who made 80 -- $70,000
22   a year.  And yeah.  So that was --
23   that is something that stuck out to
24   me, but, you know, she had a great
25   run is what I was saying.  I thought
```



Page 287

```
 1              M. KAPLAN
 2  she should leave it at that and move
 3  on.
 4    Q.    So after Ms. Robinson
 5  proposed a severance in exchange for
 6  the release that Canal wanted, what
 7  instructions did Tom Harvey provide
 8  to Canal employees about looking for
 9  crazy Chase shit as you put it?
10        MR. DROGIN:  Objection to
11     the form.  There is no
12     testimony that there was a
13     release.  You are making that
14     up.  If you want to ask the
15     witness what he knows about
16     it, that is fine.  You are
17     suggesting something there is
18     no foundation for it.
19    A.    Yeah.  I was going to say I
20  don't know anything about a release.
21  But I -- there was a press release
22  that she wanted, but yeah.  I --
23  when you say -- when Tom said crazy
24  shit idea, look -- we had -- as you
25  mentioned earlier, right after --
```



Page 288

```
 1                M. KAPLAN
 2   before she left and right after she
 3   left, there had been a lot of
 4   compiling of stuff about her, and
 5   then we sort of let (inaudible)
 6   because we were moving on with life
 7   and try to -- and then, you know,
 8   now that we were -- it was sort of
 9   like a -- my understanding is -- my
10   remembering is we got -- we had all
11   of the stuff that we had found in
12   her e-mails.  We had to go through
13   the e-mails because we needed
14   passwords for things, we needed to
15   change things and sort of putting it
16   all together.  We already had it.
17   It wasn't like -- I dont remember --
18   I don't recall in June of 2019
19   having to go through a lot of stuff.
20   I feel like we had already done this
21   earlier in April, but I don't know.
22        MS. HARWIN:  Can you
23     repeat what the question was?
24        (Whereupon, the requested
25     portion was read back by the
```



Page 289

```
 1                M. KAPLAN
 2      reporter:
 3           Q:  So after Ms. Robinson
 4      proposed a severance in
 5      exchange for the release that
 6      Canal wanted, what
 7      instructions did Tom Harvey
 8      provide to Canal employees
 9      about looking for crazy Chase
10      shit as you put it?)
11      Q.    Mr. Kaplan, after Ms.
12      Robinson sought a severance, what
13      instructions did Tom Harvey provide
14      to Canal employees?
15           MR. DROGIN:  Objection to
16       the form.  You can answer.
17      A.    Yeah.  My only -- my
18      recollection -- I don't remember
19      specific conversations, but I
20      remember us gathering all of the
21      things on Tom's orders that had been
22      already gathered, sort of putting it
23      all together into like a binder or
24      whatever, just so it is in one
25      place.  So yeah.  That is how I
```



```
 1              M. KAPLAN
 2   remember that.  I don't remember any
 3   specific conversations for him
 4   directly.  It was just something we
 5   were all doing.
 6     Q.    Canal employees were
 7   supposed to compile negative
 8   information about Ms. Robinson, is
 9   that right?
10         MR. DROGIN:  Objection to
11      the form.
12     A.    We were supposed to put
13   into one place stuff that we had
14   basically -- that had been already
15   seen by Tiffany and Bob back in
16   March and April, and in those coming
17   -- following weeks.  And things we
18   learned that people didn't know
19   until they started having regular
20   access to her e-mail address and
21   whatnot.
22         MS. HARWIN:  Can you read
23      back the question?
24         (Whereupon, the requested
25      portion was read back by the
```



```
 1                M. KAPLAN
 2      reporter:
 3           Q:  Canal employees were
 4      supposed to compile negative
 5      information about Ms.
 6      Robinson, is that right?)
 7      Q.    I want you to just answer
 8   the question.  Okay?
 9           MR. DROGIN:  So it is a
10       yes or no?
11      Q.    Tom Harvey instructed Canal
12   employees to compile negative
13   information about Ms. Robinson,
14   correct?
15           MR. DROGIN:  Objection to
16        the form.  You can answer.
17        Yes-or-no question.
18      A.    Yes.
19      Q.    Mr. Harvey instructed Canal
20   employees to compile information
21   that would make Ms. Robinson look
22   bad, correct?
23           MR. DROGIN:  Objection to
24        the form.  It is a yes-or-no
25        question.
```



```
  1                M. KAPLAN
  2    A.    I would say no.  No, not
  3  look bad, just things she had done.
  4    Q.    When you refer to "crazy
  5  Chase shit," that was stuff that
  6  would make Ms. Robinson look bad,
  7  right?
  8         MR. DROGIN:  Objection.
  9    A.    Yes.  She did a lot of
 10  crazy shit, so it would make her
 11  look bad.
 12         (Whereupon, Plaintiff's
 13    Exhibit 34, Canal 0049479,
 14    was marked for
 15    identification, as of this
 16    date.)
 17    Q.    I am going to show you what
 18  is Exhibit 34, which is beginning
 19  Canal 0049479.  So this is a series
 20  of text messages between you and a
 21  person identified there as Mercedes.
 22         What is Mercedes' full
 23  name?
 24    A.    Mercedes' full name is
 25  Tahir.  T-A -- T-A-H-I-R.  She is a
```



Page 293

```
 1               M. KAPLAN
 2   former Tribeca intern.
 3      Q.    Do you see the second to
 4   last text message that you write to
 5   Mercedes Tahir, can you please read
 6   out loud that text message?
 7      A.    "I put a lot of work into
 8   this as she was threatening to sue
 9   Bob so they wanted to ruin her
10   first."
11      Q.    When did you first become
12   aware that Ms. Robinson was
13   threatening legal action against Mr.
14   De Niro?
15      A.    I don't remember the dates.
16   These dates all blend together, but
17   sometime that summer I guess.
18      Q.    Did you communicate with
19   Mr. De Niro at all about Ms.
20   Robinson's threat of legal action?
21      A.    No.
22      Q.    Did you speak with Tiffany
23   Chen at all concerning Ms.
24   Robinson's threat of legal action?
25      A.    No, because by this point
```



Page 294

                    M. KAPLAN

1

2    Ms. Chen and I were not on the best

3    of terms I don't believe.

4      Q.    Did you have any

5    communications with Mr. De Niro

6    during the summer of 2019 about Ms.

7    Robinson?

8          MR. DROGIN:  Objection to

9      the form.

10     A.    I don't remember.  I don't

11   remember.  It is possible.  I don't

12   remember.  I don't think -- I don't

13   remember any.

14     Q.    Did you have any

15   communications with Mr. De Niro --

16   actually, let me -- let me ask a

17   different question.

18          Turning to the

19   investigation into Ms. Robinson,

20   please identify for me everyone who

21   was involved in investigating Ms.

22   Robinson during the summer of 2019

23   including yourself?

24          MR. DROGIN:  Objection to

25      the form.  And only to the



```
 1              M. KAPLAN
 2      best of your knowledge.
 3      A.    To the best of my knowledge
 4   the people investigating her were --
 5   well, yeah, myself, Gillian Spear,
 6   Sabrina Weeks.  It was mainly us as
 7   far as we had access to the -- you
 8   know -- I guess Michael Tasch, you
 9   know, was asked for financial
10   things.  And obviously I am sure,
11   you know, lawyers were involved but
12   yeah.  I don't --
13      Q.    The Canal employees who
14   were involved in investigating Ms.
15   Robinson were you, Sabrina
16   Weeks-Britain, and Gillian Spear, is
17   that right?
18      A.    Yes.
19      Q.    How did you, Ms.
20   Weeks-Britain, and Gillian Spear
21   divvy up your work with respect to
22   the investigation?
23      A.    I don't recall divvying up
24   things.  It was more of like -- it
25   was just -- I think it was just sort
```



1                    M. KAPLAN

2    of, you know, if you had an idea.

3    Oh, I remember that thing, or let's

4    look at that.  It was things that I

5    don't -- you know, it wasn't, you

6    know, deep private investigative

7    firm here.  We are just three idiots

8    sitting in front of a computer.  We

9    were just downloading, you know, her

10   Netflix account, and her car service

11   bills, and going -- you know, there

12   was things that we would contact

13   travel people to get like things

14   about her travel and stuff like

15   that.  But it wasn't -- I don't

16   remember a process of -- a divvying

17   up process.  It was just sort of

18   people did what they did.

19   Q.    So there were no specific

20   subjects that any one individual at

21   Canal was more in charge of than

22   others, is that correct?

23           MR. DROGIN:  Objection to

24    the form.

25   A.    Yeah.  I mean, I think that



```
 1              M. KAPLAN
 2    Gillian and -- and Sabrina probably
 3    did the most of the digging into her
 4    e-mails, and -- to my knowledge, to
 5    my memory.  Especially Gillian, I
 6    believe.  But other than that, there
 7    was no real specialization, no.
 8       Q.    Who were the people who
 9    were involved in reviewing the
10    credit card bills for the American
11    Express under Ms. Robinson's name?
12           MR. DROGIN:  If you know.
13           THE WITNESS:  What is
14      that?
15           MR. DROGIN:  If you know.
16       A.    You mean during the legal
17    part of this?  The investigation?
18    Who reviewed her credit card bills?
19       Q.    During the investigation
20    into Ms. Robinson in the summer of
21    2019, who was involved in reviewing
22    the American Express bills for the
23    Canal credit card under Ms.
24    Robinson's name?
25       A.    I think it was sort of a --
```



```
 1                  M. KAPLAN
 2    if we thought of things -- like I
 3    think Gillian looked through a lot
 4    of it.  I don't remember.  I just
 5    don't remember the exact who did
 6    what, but I think, you know, if it
 7    was like -- the amount of car
 8    services, that is like a specific
 9    thing.  You get the credit card
10    bill, and you search -- I think
11    Michael -- Berdon still had access
12    to all the credit cards.  So I think
13    they did a lot looking up like
14    breakdowns.  I feel like I remember
15    Sabrina having like a specific like
16    this was how much money was spent on
17    -- at Paola's or something.  She did
18    a lot of like -- in an Excel sheet
19    like adding.  But -- yeah.  I don't
20    remember specifically the actual
21    credit card bills if anybody did
22    that.
23          MR. DROGIN:  Counsel, so
24       the record is clear, I just
25       want to state that Canal
```



```
 1                M. KAPLAN
 2    reserves the right to object
 3    to any questions at the
 4    30(b)(6) that overlap these
 5    topics since you are choosing
 6    to question this witness
 7    about it.
 8        MS. HARWIN:  Obviously we
 9    object to that instruction,
10    and we are allowed to ask
11    this question -- these
12    questions to this witness
13    prior to the 30(b)(6) to
14    inform the 30(b)(6).
15        MR. DROGIN:  You can, but
16    I am telling you that you are
17    asking a witness who is not
18    speaking on behalf of Canal.
19    So it should be understood
20    that these answers are simply
21    to the best of his knowledge
22    and you are choosing to waive
23    the right to ask the 30(b)(6)
24    about them.
25        MS. HARWIN:  We are not
```



Page 300

```
 1              M. KAPLAN
 2      waiving the right to ask the
 3      30(b)(6) witness questions
 4      within the 30(b)(6) topics.
 5           MR. DROGIN:  We will get
 6      a ruling from the judge on it
 7      then, because I don't think
 8      you are.  And you are wasting
 9      our time at this deposition.
10           MS. HARWIN:  Counsel,
11      please stop.
12    Q.    Mr. Kaplan, the -- all
13  three of you Canal employees, Ms.
14  Spear, Ms. Weeks-Britain, and
15  yourself, you were all involved in
16  reviewing the credit card records,
17  is that correct?
18    A.    In some capacity I believe,
19  yes.
20    Q.    Who provided instructions
21  to you, Ms. Spear and Ms.
22  Weeks-Britain with respect to the
23  investigation into Ms. Robinson?
24    A.    I don't recall any
25  instructions.  It was more of, you
```



1                    M. KAPLAN

2    know, what -- what did -- what did

3    she do that, you know, that is on

4    the credit cards?

5        Q.    Who were you in touch with

6    as you were continuing to look into

7    Ms. Robinson's activities?

8        A.    I mean, it would be -- you

9    know, Tom was the lawyer who we --

10   who would ask us questions about

11   things.  And off his questions we

12   would look up things sometimes I

13   guess is the best way to put it.

14       Q.    Did you provide any updates

15   to Mr. De Niro about your

16   investigation?

17       A.    I don't remember doing

18   that, no.

19       Q.    During your employment at

20   Canal, did Canal ever investigate

21   any other employee who resigned

22   besides Ms. Robinson?

23       A.    Did Canal ever investigate

24   any employee who resigned?  No.

25   There was never anybody that



1                M. KAPLAN

2    resigned in the manner that she

3    resigned, so no.

4       Q.    How much of your work and

5    time during the summer of 2009 was

6    spent investigating Ms. Robinson?

7       A.    2019?

8       Q.    I'm sorry.  Let me restate

9    that.  Yes.

10           During the summer of 2019,

11   how much of your working time was

12   spent investigating Ms. Robinson?

13      A.    I mean, I have no idea how

14   much time we spent.  Because, again,

15   a lot of was stuff we already had

16   done and we were kind of combining

17   it, or getting a little bit more of

18   the same thing so I don't -- I don't

19   know.

20      Q.    Can you provide an estimate

21   of the time that you spent during

22   the summer of 2019 --

23      A.    No.

24      Q.    Remember, you have to let

25   me finish the question and then you



Page 303

```
 1                M. KAPLAN
 2   can provide your answer.  Okay?
 3          During the summer of 2019,
 4   can you provide an estimate as to
 5   approximately how much your work and
 6   time you were spending on matters
 7   concerning Ms. Robinson?
 8     A.    I cannot, no.  I would say
 9   I have no -- no idea, no memory of
10   how much time was spent.
11          (Whereupon, Plaintiff's
12     Exhibit 35, Canal 0047951,
13     was marked for
14     identification, as of this
15     date.)
16     Q.    I am going put another
17   exhibit in the chat, which is number
18   35 I believe, beginning Canal
19   0047951.
20          Do you have that?
21     A.    Uh-huh.
22     Q.    Okay.
23          So turning your attention
24   to the chat that -- I'm sorry.  The
25   text that Gillian Spear sent you at
```



```
 1                M. KAPLAN
 2    12:49 p.m., on June 12th, 2019, do
 3    you see where she writes, "Are you
 4    still avoiding telling Tom about
 5    Chase's PC sheet or can I?"
 6       A.    Yes, I see that.
 7       Q.    Why were you avoiding
 8    speaking to Tom Harvey about Ms.
 9    Robinson's petty cash --
10       A.    I have -- sorry.  I have no
11    idea what that is about.
12       Q.    Were you concerned about
13    sharing information about Ms.
14    Robinson's petty cash sheet with Tom
15    Harvey?
16       A.    No, I don't think so.  I
17    just think -- yeah.  I don't know if
18    this avoiding means like because it
19    is going to be good, or I don't
20    really know what she is referring to
21    there to be honest.
22       Q.    Okay.
23             As part of the
24    investigation into Ms. Robinson, you
25    investigated Ms. Robinson's taxi and
```



Page 305

```
 1              M. KAPLAN
 2   Uber expenses, is that right?
 3      A.     Yes.
 4      Q.     The allegation that Ms.
 5   Robinson had improperly charged taxi
 6   and Uber expenses was based on your
 7   review of the Canal's American
 8   Express card statements, is that
 9   right?
10          MR. DROGIN:  Objection to
11       the form.
12      A.     It was a combination of --
13          MR. DROGIN:  I object.
14       That is a question for Canal
15       to answer.  But again, if you
16       are going to ask him about
17       it, our position is you will
18       not be asking the 30(b)(6)
19       about it.  So go right ahead.
20      A.     Her taxi expenses were
21   gathered through credit cards,
22   through the petty cash, and through
23   car service bills through the
24   citywide company that, you know,
25   were car services she had taken.
```



```
 1                M. KAPLAN
 2   That is how I remember it.
 3     Q.    Are you aware of Canal
 4   employees reviewing any other
 5   documents to conclude that Ms.
 6   Robinson had improperly charged taxi
 7   and Uber expenses?
 8           MR. DROGIN:  Objection
 9       and same comment that this
10       waives the 30(b)(6).  This is
11       a witness who has not been
12       asked to testify about this
13       -- designated rather.
14           MS. HARWIN:  He is
15       testifying as a fact witness
16       about what he understands
17       Canal employees to have
18       reviewed.  It is a perfect
19       question.  Go ahead.
20           MR. DROGIN:  Yes.  But
21       you are going beyond what he
22       understands they reviewed to
23       how Canal -- with Canal did
24       with the information.
25           MS. HARWIN:  If you
```



Page 307

```
1              M. KAPLAN
2    listen to the question back
3    that is not the case.
4        MR. DROGIN:  Why don't we
5    have the question read back?
6        (Whereupon, the requested
7    portion was read back by the
8    reporter:
9        Q:  Are you aware of
10   Canal employees reviewing any
11   other documents to conclude
12   that Ms. Robinson had
13   improperly charged taxi and
14   Uber expenses?)
15       MR. DROGIN:  Who is
16   concluding there, Canal or
17   the individuals?  If it is
18   the individuals, that is
19   fine.
20       MS. HARWIN:  It says,
21   "Canal employees," Counsel.
22       MR. DROGIN:  Yes.  And
23   you are talking about a
24   conclusion.  So if
25   individuals conclude
```



```
 1              M. KAPLAN
 2    something, that is fine.  If
 3    you are -- let's make sure
 4    that you are not talking
 5    about --
 6         MS. HARWIN:  Counsel, the
 7    question is clear.
 8         MR. DROGIN:  It is not.
 9    It is not, and I want to make
10    sure it is clear that his
11    answer is not binding on
12    Canal.
13         MS. HARWIN:  Counselor,
14    you said that many times that
15    he is not your 30(b)(6)
16    witness.
17         MR. DROGIN:  Okay.  Then
18    I will take a standing
19    objection to anything where
20    this witness is being
21    questioned in a way where you
22    are going to attempt to use
23    his answers to bind Canal, to
24    a topic that you designated
25    for questioning under a
```



Page 309

```
 1              M. KAPLAN
 2     30(b)(6).  Go right ahead.
 3     Q.    You can answer the
 4  question.
 5     A.    The question is am I aware
 6  of any other uses -- ways to --
 7          MS. HARWIN:  Madam Court
 8       Reporter, can you read back
 9       the question?
10          (Whereupon, the requested
11       portion was read back by the
12       reporter:
13          Q:  Are you aware of
14       Canal employees reviewing any
15       other documents to conclude
16       that Ms. Robinson had
17       improperly charged taxi and
18       Uber expenses?)
19     A.    No, because Canal
20  employees, we were reviewing to find
21  out the total she had spent.  We
22  weren't -- we weren't reviewing to
23  see which improper.  That wasn't --
24  that wasn't what we were tasked
25  with.  So, it was like, you know, it
```



1                M. KAPLAN

2    was like this is how much car

3    services she spent.  That is not --

4    that is what we were doing.

5       Q.    So when Canal employees

6    tabulated Ms. Robinson's taxi and

7    Uber expenses, Canal employees

8    weren't expressing any opinion as to

9    whether those charges were proper or

10   improper, is that correct?

11      A.    Yeah, that is correct.  We

12   were just tabulating the total of

13   how much she spent a year.

14      Q.    When Canal employees were

15   tabulating Ms. Robinson's charges at

16   Paola's restaurant, Canal employees

17   weren't reaching any conclusion as

18   to whether or not the expenses were

19   proper or improper, correct?

20      A.    Correct.  We were just

21   showing the total.  This is how much

22   she spent here, and this is how much

23   she spent there.

24      Q.    When Canal employees

25   identified flower expenses from --



```
 1              M. KAPLAN
 2   let me restate that.
 3         When Canal employees
 4   tabulated expenses from Flowers by
 5   Phillip, Canal employees didn't
 6   reach any conclusion as to whether
 7   those charges were proper or
 8   improper, is that correct?
 9         MR. DROGIN:  Objection to
10     the form.  You can answer it.
11     A.    Speak -- I am speaking for
12   myself, but I -- I believe that that
13   -- in that situation Gillian
14   specifically was deciding it was --
15   she thought it was improper because
16   she had found evidence that it was
17   stuff that was going to Chase's home
18   so we knew it wasn't going to the
19   office when it came to flowers.  But
20   that is how I remember that.  But
21   again, we were -- again, we were
22   just showing -- we were just
23   accumulating evidence of
24   improprieties, but without -- yeah.
25   We weren't specifically saying
```



Page 312

```
 1                M. KAPLAN
 2    anything about any of them.
 3      Q.    When Canal employees
 4    investigated Ms. Robinson's expenses
 5    from Whole Foods, Canal employees
 6    didn't reach any conclusion as to
 7    whether the charges were proper or
 8    improper, correct?
 9           MR. DROGIN:  Objection to
10      the form.  You can answer.
11      A.    Yeah, we just found the
12    total she spent at Whole Foods, yes.
13      Q.    When Canal employees
14    investigated Ms. Robinson's charges
15    at Dean & DeLuca, Canal employees
16    didn't reach any conclusion as to
17    whether the charges were proper or
18    improper, correct?
19           MR. DROGIN:  Objection to
20      the form.  You are asking him
21      about other witnesses.  You
22      are asking about all Canal
23      employees.  You are doing it
24      again.  It is a trick
25      question.  You are asking him
```



```
 1                  M. KAPLAN
 2      about his knowledge, not what
 3      other people concluded.  It
 4      is a trick question.
 5           MS. HARWIN:  Counselor,
 6      please refrain.
 7      Q.   Mr. Kaplan, please answer
 8   the question.
 9           MR. DROGIN:  Please
10      refrain from misleading the
11      witness.
12      A.   I will say -- Canal
13   employees, you are talking to me,
14   Gillian, and Sabrina, so I don't
15   know if we would have the same exact
16   opinion on what was -- you know,
17   because they weren't allowed to buy
18   all of the stuff at all these places
19   that we are talking about here on
20   their own.  So they would say it was
21   improper.  Our job was -- we were
22   tasked to give a total, so yes.
23      Q.   And when you evaluated the
24   charges at Whole Foods that were
25   charged on Ms. Robinson's card, you
```



Page 314

```
 1                M. KAPLAN
 2   didn't reach a conclusion as to
 3   whether all of the charges were
 4   proper or improper, is that correct?
 5          MR. DROGIN:  Objection to
 6     the form.
 7     A.    It was -- again, like -- I
 8   wasn't -- my job at that point
 9   wasn't to reach a conclusion on what
10   I thought was proper or improper.  I
11   thought it was excessive, but, yeah.
12   I didn't -- I didn't -- again, I
13   didn't -- I don't remember going
14   through it restaurant by restaurant
15   and being like Whole Foods, this,
16   that.  It was more like this is how
17   much money she spent on food.
18     Q.    And you didn't reach any
19   conclusion as to whether the charges
20   at Dean & DeLuca that appeared on
21   Ms. Robinson's credit card were
22   proper or improper, correct?
23          MR. DROGIN:  Objection to
24     the form.
25     A.    I didn't reach any
```



```
 1              M. KAPLAN
 2  conclusions myself personally.
 3    Q.    Were you involved in
 4  investigating any issues concerning
 5  Ms. Robinson being reimbursed for
 6  unused vacation days?
 7    A.    No.
 8    Q.    Who was involved in
 9  investigating that issue?
10    A.    I don't -- I don't know
11  what you mean by investigating that
12  issue.  I mean, it was an e-mail.  I
13  think Gillian found an e-mail that
14  she had sent that I mentioned
15  earlier with all the vacation
16  situation.  And then if I was
17  involved it would be in showing when
18  she was on vacation, like when she
19  was traveling and stuff like that.
20    Q.    Did you track down e-mails
21  to identify work that Ms. Robinson
22  was performing on those days when
23  she was away?
24    A.    Did I -- I don't remember
25  if we -- if I went that far or not.
```



```
 1                M. KAPLAN
 2   I don't recall.
 3     Q.    Were you involved in
 4   investigating Ms. Robinson's use of
 5   petty cash?
 6     A.    Yes, because we were -- we
 7   had the total so we were using the
 8   petty cash -- you know, it was the
 9   same as credit card bill.  It is
10   like this is what she spent money
11   on, so there is petty cash and there
12   is credit card.
13     Q.    And when it came to petty
14   cash expenses, as far as you know,
15   Canal employees didn't reach any
16   determination as to whether the
17   charges that you flagged were proper
18   or improper, is that correct?
19         MR. DROGIN:  Objection to
20      the form.
21     A.    The petty cash, in my
22   opinion, there was definitely a
23   sense that some of these things were
24   not proper as far as some of the
25   charges that we looked at earlier.
```



```
 1                M. KAPLAN
 2    The dog you mentioned, and then some
 3    of the tips and whatnot.  But I
 4    don't -- I don't recall like -- it
 5    wasn't like a -- again, I am just
 6    speaking for myself.  So people in
 7    the office didn't think it was
 8    proper.
 9       Q.    Did you reach any
10    conclusion as to whether the petty
11    cash expenses that were flagged by
12    Canal employees were proper or
13    improper?
14       A.    In 2019, I did not -- no.
15    I didn't -- I didn't reach any
16    conclusion.
17       Q.    As far as you know, did
18    anyone review receipts that Ms.
19    Robinson had submitted for the petty
20    cash charges that were flagged?
21       A.    I -- I -- like I said, the
22    receipts all went to Berdon.  I
23    don't know what their review process
24    was, so I don't know.
25       Q.    Were any receipts provided
```


MAGNA
LEGAL SERVICES

Page 318

```
 1                M. KAPLAN
 2   back to Canal employees for review?
 3      A.    During that time period, I
 4   don't remember that happening, no.
 5      Q.    When you were employed by
 6   Canal, you had a profile on Canal's
 7   Netflix account, is that right?
 8      A.    Yes.
 9      Q.    And Ms. Robinson also had a
10   profile on Canal's Netflix account,
11   isn't that right?
12      A.    Yes.
13      Q.    As far as you are aware,
14   were there any restrictions or
15   limitations on your or Ms.
16   Robinson's ability to access
17   Netflix?
18      A.    What do you mean by
19   restrictions?  If you have a
20   password, you can access Netflix.
21      Q.    Were there any rules
22   regarding when you or Ms. Robinson
23   were allowed to use Netflix?
24      A.    There was no -- I mean, the
25   Netflix -- it started -- she had a
```



Page 319

```
 1                M. KAPLAN
 2   -- we had a Netflix account for
 3   gifts one year, and we had a huge
 4   credit, and it was on the contract.
 5   And no, there was no rules as far as
 6   like the official rules.  I am not
 7   -- it was just a Netflix account
 8   that we both had access to.
 9     Q.    And you regularly used that
10   Netflix account that you had access
11   to, right?
12          MR. DROGIN:  Objection to
13     the form.
14     A.    I -- my children watched a
15   lot of -- especially in the kid's
16   profile.  There is three profiles on
17   the Netflix account.  There might
18   have been four because there was --
19   - well, I don't know the timeline.
20   But yeah, there was a kids, there
21   was Chase, and there was me.  My
22   kids watched a lot of Netflix shows,
23   yes.  I very rarely because I don't
24   watch a lot of that -- that -- I did
25   occasionally maybe, but not very
```



Page 320

```
 1                M. KAPLAN
 2    often.
 3           (Whereupon, Plaintiff's
 4      Exhibit 36, Canal 0010215,
 5      was marked for
 6      identification, as of this
 7      date.)
 8      Q.    I am going to show you
 9    Exhibit 36, which is beginning at
10    Canal 0010215.  Let me know when you
11    have that.
12      A.    Okay.
13      Q.    What is this document?
14      A.    It is still opening.
15           MR. DROGIN:  It is still
16      loading.
17      A.    It is the Netflix account
18    where I crossed off things that I --
19    that I didn't believe Chase had
20    watched.
21      Q.    When you crossed off things
22    that you didn't believe Chase had
23    watched, what was the basis for you
24    crossing off those items?
25      A.    Because When They See Us
```



```
 1              M. KAPLAN
 2   was a -- I think that was
 3   essentially Tribeca related or I
 4   don't know.  Maybe I must have seen
 5   that myself or I don't know what.
 6   But the rest is all kids stuff, as
 7   you can see, Barbie, and Miraculous
 8   and Chicken Little.  And I don't
 9   know what the last thing is because
10   it is crossed off.  I can't read it.
11   But yeah -- things that I knew my
12   kids had watched.
13       Q.    So these were videos that
14   had been accessed through Ms.
15   Robinson's Canal viewing profile,
16   but that you knew hadn't been
17   watched by Ms. Robinson, correct?
18       A.    No, because when you look
19   at Netflix it doesn't show you -- in
20   this form, at least back then, it
21   didn't show you, I don't think by
22   profile.  I think it showed you it
23   was all together.  The whole
24   account, I believe.  I could be
25   wrong, but either way I knew it was
```



Page 322

1                    M. KAPLAN

2    not -- I knew those items were

3    definitely not Chase's.  Also, they

4    were -- they were actually after she

5    stopped working as well, so maybe

6    that is why I crossed them all off,

7    too.

8       Q.    And if you turn through the

9    viewing history, there are shows

10   accessed by numerous people as far

11   as you can tell, is that right?

12           MR. DROGIN:  Objection to

13      the form.

14      A.    No.  I don't think so

15   actually.  I think it was -- there

16   was -- there might have been

17   occasion -- very small occasion to a

18   specific movie Bob had watched on

19   Netflix.  But most of it was -- it

20   was either Chase or my children and

21   -- in most cases.  And occasionally

22   I used it too for things.  But back

23   then especially, pre-pandemic, I

24   didn't watch a lot of Netflix.  I am

25   pretty sure that when you go on it,



Page 323

```
 1                 M. KAPLAN
 2   it just kind of combines.  At least
 3   in 2019 when we did this.  Maybe now
 4   it separates it up.  I think it
 5   combined it one thing, or maybe this
 6   is just her profile.  Because, you
 7   know what it is, we changed the
 8   password, that is what it is.  When
 9   you change the password, we change
10   the profile so it became a different
11   -- so all the things that are --
12   whatever her old account became,
13   those are watched on, so I --
14   obviously she didn't watch them.
15     Q.    Looking at this document,
16   you can't tell who accessed which
17   shows on Netflix, is that correct?
18     A.    I mean, if you don't know
19   anything about any of the people
20   involved, then yes, you can't tell
21   who watched them.
22     Q.    There is nothing in this
23   document that identifies who watched
24   what, is that correct?
25     A.    In this specific document
```



Page 324

```
 1              M. KAPLAN
 2   you are showing me, no.
 3     Q.    And this Netflix viewing
 4   history doesn't show the times that
 5   any videos were accessed, is that
 6   correct?
 7     A.    That is correct.  But there
 8   is a lot of shows that are watched
 9   all day long.  But yes, that is true
10   that it doesn't show the times.
11     Q.    So were there any records
12   that Canal employees compiled, as
13   far as you know, that identified
14   what times the videos were watched
15   on these days?
16     A.    Well, we would receive
17   e-mail to the -- the only thing we
18   knew -- well, first of all, you have
19   a time because you know if it is
20   like -- if it the show is on all day
21   long, or most of the day, but we
22   knew that -- this all started
23   because we knew -- we had one of the
24   e-mail addresses in the office, the
25   Canal Productions -- I think had
```



```
 1                M. KAPLAN
 2    received -- would receive e-mails
 3    when Chase would be out of the
 4    country, and get -- like, when you
 5    sign into Netflix from another
 6    country they tell you, to make sure
 7    it is not fraud.  So that was
 8    something that we are like, oh.  So,
 9    you know, people knew when she was
10    watching Netflix in London, per se,
11    because they got an e-mail about it.
12    That is -- that is -- that is it.
13    It doesn't tell obviously when you
14    are in America.  So it wasn't --
15     Q.    So Canal employees didn't
16    have any records of the times when
17    Ms. Robinson accessed Netflix when
18    she was in New York, is that
19    correct?
20         MR. DROGIN:  Objection to
21      the form.
22     A.    There might be another form
23    that has times.  I don't know how
24    the Netflix account works.  But to
25    my memory, no it is just like does
```



Page 326

```
 1              M. KAPLAN
 2   this, and I believe there is a page
 3   that would show -- that showed like
 4   if it was a TV or a Mac.  But it
 5   doesn't say on the Netflix account
 6   specifically time or --
 7     Q.    There was nothing improper
 8   about Ms. Robinson watching Netflix
 9   at night, right?
10          MR. DROGIN:  Objection to
11      the form.
12     A.    No.  If -- no, of course
13   not.
14     Q.    And there is nothing
15   improper about Ms. Robinson watching
16   Netflix on a day that she wasn't
17   working, correct?
18     A.    On a day that she wasn't
19   working, um, no.
20     Q.    Meaning, correct?
21     A.    Sure.  Correct.
22     Q.    Are you aware if Ms.
23   Robinson ever falling asleep with
24   Netflix on in the background?
25     A.    Am I aware of her falling
```



```
1                     M. KAPLAN
2    asleep with Netflix on in the
3    background?  No.  I wouldn't have
4    knowledge of that.
5       Q.    You don't have knowledge of
6    that either way, whether she would
7    put on Netflix at night when she was
8    falling asleep?
9       A.    No.  Of course not.
10      Q.    Okay.
11            So looking at the Netflix
12   viewing history that you compiled,
13   you have no way of knowing whether
14   the videos here were accessed during
15   the day or at night, is that
16   correct?
17            MR. DROGIN:  Objection to
18       the form.
19      A.    Looking at this specific
20   thing, I have no way of knowing.  I
21   don't -- yeah.
22      Q.    Okay.
23            As far as you are aware,
24   did Canal employees have any
25   documentation that allowed for
```



Page 328

```
 1                M. KAPLAN
 2    anyone to conclude whether the
 3    Netflix shows that were being viewed
 4    were accessed at night or during the
 5    day?
 6            MR. DROGIN:  Objection to
 7         the form.
 8      A.    Well, all I am aware of is
 9    that some of these -- like binges so
10    to speak, are on weekdays.  And
11    there is so many of them that I
12    mean, it would have to be literally
13    on all night.  And I think Netflix
14    goes to sleep on you if you are
15    asleep at some point.  Just common
16    -- just reasoning, it just led us to
17    believe that a lot of this was on
18    during the day because it just has
19    to be.  And I think -- I don't know
20    if you go on the website, on
21    Netflix, you can still see that, but
22    this was the original first time we
23    looked at it.
24      Q.    But that was your
25    assumption that these were watched
```



```
 1              M. KAPLAN
 2   during the day, you didn't have
 3   anything to prove that, correct?
 4        MR. DROGIN:  Objection to
 5     the form.
 6    A.    There is just so many
 7   episodes on so it has to cover the
 8   day and the night because there is
 9   23 -- whatever episodes in the day.
10   Just -- I don't firsthand know, if
11   that is what you are asking, when
12   she was watching television.
13    Q.    I'm going to drop into the
14   chat --
15    A.    Actually, I will say.  Can
16   I say one other thing?  I also was
17   aware -- because I had been to her
18   apartment where she had a computer
19   screen that had Netflix -- that had
20   like shows running.  I knew like she
21   had -- she had it on during the day
22   also firsthand.  I had been there a
23   couple of times.  I believe 30 Rock
24   might have been on.  So yeah, that
25   is another reason why I was like I
```



Page 330

1                    M. KAPLAN

2    am aware that she was watching TV

3    during the day.  I am not even

4    making a -- I am not saying how much

5    she watched during the day, but I

6    knew she did.

7    Q.    There were times while Ms.

8    Robinson had it on as background

9    noise while she was doing, you know,

10   mindless tasks?

11         MR. DROGIN:  Objection.

12      Unless mindless tasks is

13      (inaudible).  I object.

14   A.    I don't know what she was

15   doing.  I mean, when she had on

16   because, you know, we -- if she had

17   it on because usually you would

18   pause it when someone comes in to

19   talk or whatever.  So I don't know

20   if it was -- I would be guessing

21   what she was doing.  I wasn't there

22   so -- because I didn't ask her

23   either way.

24         (Whereupon, Plaintiff's

25      Exhibit 37, Canal 0049181,



```
 1              M. KAPLAN
 2      was marked for
 3      identification, as of this
 4      date.)
 5    Q.    So for Exhibit 37, that is
 6   Bates stamped beginning Canal
 7   0049181.
 8           MR. DROGIN:  Is this a
 9      new exhibit?
10           MS. HARWIN:  I believe it
11      is.
12           MR. DROGIN:  I'm sorry.
13      What was the number?
14           MS. HARWIN:  37.
15           MR. DROGIN:  00?
16    A.    I do have to run in a few
17   minutes if it makes a difference.
18           MR. DROGIN:  What is the
19      Bates number?  Can you just
20      identify the document again?
21           MS. HARWIN:  It is Canal
22      0049181 through 182.
23    Q.    Do you recognize this as a
24   text exchange that you had with
25   Amelia Brain on July 11, 2019?
```



```
 1                M. KAPLAN

 2    A.    Yes.

 3    Q.    Ms. Brain had worked

 4  directly with Ms. Robinson when she

 5  had been at Canal, is that right?

 6    A.    She had -- yeah.  Yes.

 7    Q.    You wrote, "OMG.  We just

 8  stumbled upon her Netflix viewing

 9  history."

10          Who was it that stumbled

11  upon Ms. Robinson's Netflix viewing

12  history?

13    A.    It was the office because

14  it was the idea that we -- the

15  e-mail, you know, had come --

16  thinking like oh, right, you get the

17  e-mail when she was abroad.  So it

18  was like let's look at the history.

19    Q.    Ms. Brain wrote that Ms.

20  Robinson, quote, "Never actually

21  watches anything.  She just needs

22  noise 24/7."

23          Do you see that?

24    A.    Yes, I do see that.

25    Q.    Is there anything improper
```



```
 1                M. KAPLAN
 2   about having Netflix on as
 3   background noise while Ms. Robinson
 4   was doing work?
 5      A.    I am not -- I don't -- I
 6   don't -- I am not one to judge what
 7   is proper or not.  I don't know how
 8   you want me to answer that.  That is
 9   a matter of opinion.  If you are in
10   an office, you wouldn't have it on,
11   but if you are at home, I guess it
12   is fine if you are --
13      Q.    Ms. Brain also wrote, "I am
14   pretty sure she plays them while she
15   sleeps, too."
16          Did you have any reason to
17   dispute what Ms. Brain was telling
18   you that Ms. Robinson would play
19   Netflix while she was sleeping?
20      A.    No.  I just -- I could be
21   wrong because I don't do it while I
22   sleep, but I thought if you don't
23   touch if for a while it sort of like
24   dies on you, but maybe I am wrong
25   about that.  That is how I remember
```



MAGNA
LEGAL SERVICES

```
 1                M. KAPLAN
 2   thinking.  No, I don't know.  Amelia
 3   would know better than I, so if she
 4   says that, she says that.
 5      Q.    I know you need to take a
 6   break, Mr. Kaplan.  So I think this
 7   is probably a good time for it.
 8   When -- when are you -- let's go off
 9   the record and you can tell us when
10   we can resume.
11           THE VIDEOGRAPHER:  The
12      time is now 3:26 p.m.  We are
13      off the record.
14           (Whereupon, a recess was
15      taken at this time.)
16           THE VIDEOGRAPHER:  Time
17      is now 4:16 p.m.  We are back
18      on the record.
19      Q.    Mr. Kaplan, you understand
20   that you are still under oath?
21      A.    Yes.
22      Q.    Did you have any
23   involvement in investigating for
24   Canal Ms. Robinson's trip to Los
25   Angeles from March of 2018?
```



Page 335

```
 1                M. KAPLAN
 2    A.    Investigate -- in compiling
 3  the information?  Yes.  I was
 4  involved in that.
 5    Q.    Were any other Canal
 6  employees involved in investigating
 7  the issues concerning the March
 8  2018 trip to Los Angeles?
 9         MR. DROGIN:  I'm sorry.
10    Did you start questioning the
11    witness?
12         MS. HARWIN:  Yeah.  I
13    understood we were ready to
14    go.
15         MR. DROGIN:  Was that
16    your first question?
17         MS. HARWIN:  I believe it
18    was.
19         MR. DROGIN:  Could I hear
20    the questions that resumed
21    after the break?  I just
22    logged on.
23         (Whereupon, the requested
24    portion was read back by the
25    reporter:
```



Page 336

```
 1              M. KAPLAN
 2         Q:  Mr. Kaplan, you
 3    understand that you are still
 4    under oath?
 5         A:  Yes.
 6         Q:  Did you have any
 7    involvement in investigating
 8    for Canal Ms. Robinson's trip
 9    to Los Angeles from March of
10    2018.
11         A:  Investigate -- in
12    compiling the information?
13    Yes.  I was involved in that.
14         Q:  Were any other Canal
15    employees involved in
16    investigating the issues
17    concerning the March
18    2018 trip to Los Angeles?)
19         MR. DROGIN:  I have no
20    idea why you started the
21    questions without me, but --
22         MS. HARWIN:  We asked
23    whether we were ready to
24    proceed.  No one indicated --
25    I apologize if there was any
```


MAGNA
LEGAL SERVICES

Page 337

```
 1              M. KAPLAN
 2    confusion.
 3         MR. DROGIN:  What did I
 4    say since I wasn't on?
 5         MS. HARWIN:  Counsel, I
 6    didn't realize you weren't
 7    on, and no else on the
 8    defense side indicated that
 9    we weren't ready to proceed.
10    Q.    Mr. Kaplan was anyone else
11  from Canal involved in investigating
12  issues concerning Ms. Robinson's
13  trip to Los Angeles of March of
14  2018?
15    A.    Yeah.  I believe the office
16  -- Gillian Spear and Sabrina were
17  involved in that as well.
18    Q.    And as part of Canal's
19  investigation, Canal employees
20  tabulated expenses relating to Ms.
21  Robinson's trip to Los Angeles, from
22  March of 2018, is that correct?
23    A.    Yes.  From whatever dates
24  she was there, yes.
25    Q.    And did you or any other
```



Page 338

```
 1                 M. KAPLAN
 2    Canal employees reach any
 3    conclusions as to whether the
 4    charges associated with Ms.
 5    Robinson's trip to Los Angeles of
 6    March of 2018 were proper or
 7    improper?
 8              MR. DROGIN:  Objection to
 9       the form.  You can answer.
10    A.     We, as an office, thought
11    they were improper in the sense that
12    they seemed like a trip that wasn't
13    necessary to be a trip.  But --
14    yeah.
15    Q.    Ms. Robinson worked closely
16    with Robin Chambers on matters
17    concerning Mr. De Niro's former
18    partner Toukie Smith, is that
19    correct?
20              MR. DROGIN:  Objection to
21       the form.  You can answer.
22    A.     Yes.  Robin was -- Ms.
23    Chambers was working -- my remember
24    - I remember she was working with
25    Toukie when her health was
```



Page 339

```
 1                M. KAPLAN
 2   deteriorating, and then Chase came
 3   in and sort of took over with that
 4   operation with Robin and myself
 5   still helping her.
 6      Q.    Ms. Chambers and Ms.
 7   Robinson were the people at Canal
 8   who were primarily involved in
 9   handling matters involving Toukie
10   Smith, is that right?
11      A.    Ms. Chambers -- yeah.
12   Chase, Robin, and myself.  But Chase
13   would -- it would be the primarily
14   -- the people who were handling it,
15   yes.
16      Q.    Ms. Chambers testified that
17   the primary purpose of Ms.
18   Robinson's trip to Los Angeles, in
19   March 2018, had to do with scouting
20   out hotels for Toukie Smith, and not
21   the delivery of Taxi Driver books.
22          Do you have any basis to
23   dispute Ms. Chambers' testimony?
24      A.    Look, I did not at any
25   point remember being involved in a
```



```
 1              M. KAPLAN
 2   discussion about that being the
 3   reason.  To scout hotels is not
 4   something we ever did.  I don't
 5   dispute it.  If Robin said it, that
 6   is different.  But my recollection
 7   was -- at the time, was that she was
 8   going out there to bring the Taxi
 9   Driver books, which -- to get
10   signed.  And we also knew it was
11   Amelia's birthday that week.
12      Q.    Does hearing about Ms.
13   Chambers' testimony, about the March
14   2018 trip, change your understanding
15   of any aspects relating to that
16   trip?
17      A.    No.  Because I don't -- I
18   don't -- I don't know why anybody
19   would be scouting a hotel for Toukie
20   Smith.  That is not something we
21   ever would have done, to my
22   knowledge any of us did before.  You
23   know, they have Internet, they can
24   show pictures, I don't -- I don't --
25   I don't personally believe that is
```



Page 341

```
 1               M. KAPLAN
 2    the type of thing Bob would want --
 3    would authorize because obviously it
 4    is different for him, but for
 5    Toukie, his ex, staying in Los
 6    Angeles.  I am not saying I know for
 7    a fact.  I am saying it didn't even
 8    dawn on me that that was the reason
 9    at the time because it seemed odd.
10       Q.    Do you recall -- do you
11    recall that Ms. Smith was undergoing
12    ██████████████████████████████
13    Los Angeles?
14       A.    Yes.
15       Q.    Okay.
16             And Ms. Robinson was
17    involved in identifying hotels for
18    her when she would undergo that
19    treatment, is that right?
20       A.    That is news to me.  I
21    wasn't aware she was even involved
22    in that because we would book hotels
23    for Toukie -- Ms. Smith, when she
24    was doing things with the kids.  But
25    as far as scouting or asking a
```



Page 342

```
 1                 M. KAPLAN
 2    travel agent on advice for a hotel,
 3    that I could see doing.  But going
 4    and actually staying at a hotel,
 5    looking at a hotel, that is not
 6    something I was aware of.
 7      Q.    Okay.
 8            Did you not have any
 9    communications with Mr. De Niro
10    about Ms. Robinson's trip to Los
11    Angeles, in March of 2018, is that
12    right?
13      A.    No.
14            MR. DROGIN:  Objection to
15      the form.
16      Q.    And you didn't speak to
17    Robin Chambers about the March 2018
18    trip to Los Angeles, correct?
19      A.    I don't remember if I spoke
20    to her or not.
21      Q.    Did you speak to Amelia
22    Brain about the March 2018 trip to
23    Los Angeles?
24      A.    Yes, at some point she --
25    she told me about the -- the weekend
```



```
 1                 M. KAPLAN
 2   there.
 3     Q.    Okay.
 4           And what -- what did Ms.
 5   Brain tell you about the trip to Los
 6   Angeles in March of 2018?
 7     A.    I recall her mentioning
 8   that -- that there was multiple Nobu
 9   meals, that they rented a car, but
10   Amelia did a lot of the driving
11   anyway, that the books -- she didn't
12   even end up getting the books
13   because of some delay until later or
14   they didn't arrive.  And I don't
15   recall anything about hotel
16   scouting.  That is why it is news to
17   me.  You know?  All I know is what I
18   remember.  I don't remember her
19   mentioning that at all.
20           (Whereupon, Plaintiff's
21     Exhibit 38, Canal 0049200,
22     was marked for
23     identification, as of this
24     date.)
25     Q.    I am going to share a
```



Page 344

```
 1              M. KAPLAN
 2   document which is Exhibit 38, and
 3   that is Bates stamped Canal 0049200.
 4   That is the start of the Bates
 5   range.
 6   A.    Yes, I see it.
 7   Q.    Do you recognize this as a
 8   text messages that you exchanged
 9   with Amelia Brain?
10   A.    Yes.
11   Q.    Now Ms. Brain texted you
12   that she was feeling kind of uneasy
13   and confused about yesterday's
14   convo.
15          Do you see where she writes
16   that?
17   A.    Yes.
18   Q.    Do you recall the
19   conversation Ms. Brain was referring
20   to?
21   A.    I believe it was a
22   conversation that was about when
23   Chase came to visit her in Los
24   Angeles after she had resigned.
25   Q.    Okay.
```



MAGNA
LEGAL SERVICES

Page 345

```
 1                M. KAPLAN
 2          And --
 3    A.    Which Amelia told me, among
 4  other things, that somehow magically
 5  Chase had seen my e-mail about the
 6  party you had referenced earlier.
 7  But I don't think it was about the
 8  trip if that is what you are asking.
 9    Q.    What conversation did --
10  let me restate that question.
11          Did Ms. Brain communicate
12  to you what had left her feeling
13  uneasy?
14    A.    I don't remember this --
15  this -- the text message exchange.
16  I just remember having a long
17  conversation with her where she told
18  me the whole sort of story of after
19  Chase had left, and come to LA, I
20  think twice.  Once staying with her,
21  and once, I think, staying in the
22  Four Seasons.  I don't know if she
23  was -- I think she was uneasy --
24  Amelia was generally uneasy about
25  being involved in anything like this
```



```
 1                M. KAPLAN
 2  basically.  She did not want -- she
 3  did not want to be involved in -- I
 4  mean, now she is involved I guess.
 5  I'm sorry, Amelia.  But she didn't
 6  want her name mentioned in this.
 7  She really was nervous about her
 8  career as an actress and everything
 9  so.
10     Q.    Did -- as far as you know,
11  did Ms. Brain communicate with Tom
12  Harvey about any issues concerning
13  Ms. Robinson?
14     A.    I don't think she ever
15  spoke to him.  If she did, I don't
16  remember it.  But I don't believe
17  she spoke to Tom Harvey.
18     Q.    Any information that was
19  conveyed to Tom Harvey about Ms.
20  Robinson's trip to Los Angeles, in
21  March of 2018, came from you, is
22  that correct?
23     A.    It was -- she had given me
24  information at the time that is why
25  it was like -- like -- you know,
```



Page 347

```
 1                 M. KAPLAN
 2   like sort of a -- a -- we had spoken
 3   earlier about it, about what a crazy
 4   week it was or weekend.  But, yeah,
 5   I don't believe we spoke about it
 6   after in 2019, but maybe we did.
 7   Maybe she refreshed my memory, I
 8   don't know.  But the primary
 9   conversation I remember having with
10   her was -- was her telling me about
11   after the fact that she sort of
12   wanted to warn me about this e-mail
13   that Chase had seen somehow.  Never
14   really explained how, but somehow.
15        MS. HARWIN:  Can you
16     repeat the question?
17          (Whereupon, the requested
18     portion was read back by the
19     reporter:
20          Q:  Any information that
21     was conveyed to Tom Harvey
22     about Ms. Robinson's trip to
23     Los Angeles, in March of
24     2018, came from you, is that
25     correct?)
```



Page 348

```
 1                M. KAPLAN
 2    Q.   Can you answer that
 3  question?
 4    A.   I don't know.  I can't
 5  answer that because I don't know if
 6  Amelia spoke to them.  I know -- I
 7  don't know.  I don't know for sure.
 8    Q.   As far as you know, when
 9  was the final decision made to bring
10  a lawsuit against Ms. Robinson?
11    A.   I don't know the exact date
12  of when that was made.
13    Q.   How soon before the lawsuit
14  was filed was it -- was a final
15  decision made to bring suit against
16  Ms. Robinson?
17    A.   Again, I don't remember.  I
18  don't remember.
19    Q.   Can you provide some sense
20  of the amount of time that elapsed
21  between when a final decision was
22  made to bring suit against Ms.
23  Robinson and when the suit was
24  actually filed?
25          MR. DROGIN:  Objection to
```



Page 349

```
 1              M. KAPLAN
 2     the form.
 3     A.    I don't -- as I said, I
 4  don't remember a decision.  I don't
 5  know when the decision was made.  So
 6  I wasn't -- I wasn't privy to the
 7  like we are making a decision to
 8  file a suit.  I was privy to the --
 9  as you mentioned earlier, the
10  gathering of information.  But as
11  far as filing a suit, timing, all of
12  that stuff, I had nothing to do with
13  that.
14     Q.    As far as you know, who
15  came up with the idea to seek
16  millions of dollars from Ms.
17  Robinson in the lawsuit filed
18  against her?
19     A.    I have no idea how that
20  number would come up.  To me, the
21  whole thing -- both sides to this
22  whole mess are ridiculous in some
23  different ways, but Chase filing a
24  lawsuit is insane to me.  The
25  numbers, I don't know how -- I don't
```



```
 1                 M. KAPLAN
 2   know how it was -- I don't know how
 3   it was gathered.  You know, like it
 4   is -- it is impossible to put a
 5   number on some of these things.  So
 6   to me it was just -- that is -- you
 7   know, if I said it was a random
 8   number at some point because I
 9   literally had no concept of how you
10   would come up with a number in a
11   lawsuit like this, so I don't know.
12      Q.    No one who was a Canal
13   employee came up with a tabulation
14   that Ms. Robinson owed $3 million or
15   $6 million in damages, correct?
16           MR. DROGIN:  Objection to
17      the form.
18      A.    No.  Canal employees, like
19   I said earlier, we came up with a
20   tabulation of how much she spent on
21   certain things, how many miles were
22   missing and so forth.  But we didn't
23   add it all together and come up with
24   some grand number that was not our
25   -- our business.
```



Page 351

```
 1                 M. KAPLAN

 2    Q.    I am dropping into -- well,

 3   actually, before I go there.  Let me

 4   just ask the question.

 5         How -- how often were you

 6   in communication with Tom Harvey

 7   about Canal's investigation into and

 8   then plans to file a lawsuit against

 9   Ms. Robinson?

10         MR. DROGIN:  Objection to

11     the form.

12    A.    I don't -- again, I don't

13   remember specifics.  I know we

14   talked -- you know, Tom would call

15   the office during the summer, you

16   know, fairly regularly to just touch

17   -- to touch in on our things as

18   well.  It wasn't like this was the

19   only thing going on in Bob's life.

20   So I spoke to Tom plenty of times.

21   But as far as just about this, I

22   don't know, probably, you know, a

23   couple of times a week or something

24   we would -- talked briefly about

25   different things, but I don't have a
```



Page 352

```
 1                M. KAPLAN
 2   -- I have no idea.
 3      Q.    We are going to share in
 4   the chat a document that is being
 5   marked as Plaintiff's Exhibit 39,
 6   which is Bates stamp beginning at
 7   Canal 050122.
 8           (Whereupon, Plaintiff's
 9       Exhibit 39, Canal 050122, was
10       marked for identification, as
11       of this date.)
12      Q.    I would like to direct your
13   attention to the first message in
14   that series.  Do you see where
15   Sabrina Weeks-Britain writes, "So
16   much for notice, but Tom needs Chase
17   evidence for a court proceeding
18   Monday morning?"
19      A.    Uh-huh.
20      Q.    Tell me everything that you
21   were told about a court proceeding
22   that was supposed to occur on Monday
23   morning, August 5, 2019?
24      A.    I don't -- I mean, I don't
25   recall anything about it, you know,
```



Page 353

```
 1                    M. KAPLAN

 2    a court proceeding on August 5th,

 3    2019.  I don't -- I don't remember

 4    that.

 5       Q.    Did you have conversations

 6    with Tom Harvey about what this

 7    proceeding would be?

 8       A.    No.  If we talked about it,

 9    it would have been, you know, in

10    layman's terms of like -- something

11    like we are starting whatever.  But

12    no, I don't know what -- I have no

13    idea what this court proceeding was.

14    I don't know where -- anything about

15    it really.

16          MS. HARWIN:  I am going

17       to drop into the chat what is

18       being marked as Exhibit 40,

19       which is Bates stamp

20       beginning at Canal 050127.

21          (Whereupon, Plaintiff's

22       Exhibit 40, Canal 050127, was

23       marked for identification, as

24       of this date.)

25       Q.    Turning your attention to
```



Page 354

```
 1                M. KAPLAN
 2   the message that you sent at 10:33
 3   a.m., Can you read out loud what you
 4   wrote at 10:33?
 5     A.    At 10:33?
 6     Q.    Yes.
 7     A.    "OMG.  I spoke to Tom.  One
 8   of the accusations I need to share,
 9   but it's hard to stomach the drive
10   to put what she said in writing."
11     Q.    Tell me everything that you
12   and Mr. Harvey discussed on August
13   2, 2019?
14     A.    Again, I don't know.  I
15   mean, I know that the accusation
16   that is -- I recall the one we are
17   talking about, I believe.  I see it
18   here because that is not something
19   that you forget.  But I don't
20   remember the actual conversation at
21   all.
22     Q.    What is the -- what is the
23   accusation that -- that Ms. Robinson
24   made that Mr. Harvey shared with you
25   on August 2, 2019?
```



Page 355

```
 1                 M. KAPLAN
 2      A.    It is this one.  It says --
 3   well, I can read my writing here.
 4   "She claims Bob once said to her
 5   something like women can have babies
 6   at any age.  Get someone to give you
 7   their sperm to hold onto.  I'm sure
 8   Kaplan will do it for free."
 9           But that is -- I mean, that
10   whole thing was like -- I don't -- I
11   don't believe Bob would have said
12   that, personally, but, you know,
13   what do I know?
14      Q.    So what -- what did Mr.
15   Harvey tell you about this
16   accusation?
17      A.    I don't remember other than
18   if he probably just asked if I knew
19   -- if I had heard it before.  I
20   don't -- I don't -- you know, or
21   just told me to meet -- you know,
22   this was all a little humorous
23   including that.  It is a little
24   gross, but it is also a little
25   humorous.  He probably just thought
```



Page 356

```
 1                 M. KAPLAN
 2   that I would like to know that my
 3   name was out there.
 4     Q.     What action was Tom Harvey
 5   taking in the wake of Ms. Robinson
 6   sharing this accusation?
 7          MR. DROGIN:  Objection to
 8     the form.
 9     A.    I don't -- I don't
10   understand what -- he was having --
11   I don't know what you are asking.
12     Q.     After Ms. Robinson shared
13   this accusation against Mr. De Niro,
14   what action was Tom Harvey taking at
15   that time?
16          MR. DROGIN:  Objection to
17     the form.
18     A.    I don't know what action he
19   was taking specifically.
20     Q.     In your text message, at
21   11:38 p.m., you wrote, "Should we
22   include some sort of calculation of
23   her Netflix viewing during work
24   hours so she knows we are aware?"
25          Do you see that?
```



1                M. KAPLAN
2    A.    Yes.
3    Q.    But, ultimately, you didn't
4    have any data showing her Netflix
5    viewing during working hours,
6    correct?
7    A.    Again, I don't remember how
8    Netflix viewing -- I would have to
9    go into their account and look up
10   how they show it.  But if we didn't
11   submit it, maybe we don't have it.
12   I don't know.  I don't know how the
13   time stamp --
14   Q.    As you sit here today, you
15   don't recall ever being able to
16   prepare any kind of compilation
17   showing Ms. Robinson's viewing
18   Netflix viewing during work hours,
19   correct?
20   A.    No.  I remember seeing like
21   how many times it was viewed, you
22   know, in a foreign country.  But --
23   so knowing obviously it was her, but
24   I don't remember having a time
25   stamp.  I don't think Netflix -- I


MAGNA
LEGAL SERVICES

1                    M. KAPLAN

2      don't know.  I don't remember.

3        Q.    So, meaning correct?

4        A.    Sure.  Correct.

5        Q.    Who is Stan Rosenfield?

6        A.    That is Bob's publicist.

7        Q.    Were you in touch with Stan

8      Rosenfield before the lawsuit was

9      filed against Ms. Robinson to

10     discuss media issues?

11       A.    Um, I don't know.  It is

12     possible that -- I am assuming -- I

13     would guess if somebody told Stan it

14     was happening before because it was

15     going to be in the papers and --

16     that is Stan's job to know what

17     things are going to be in the papers

18     so --

19            MR. DROGIN:  I would ask

20        the witness not to guess.  If

21        you know, you know.  If you

22        don't, you don't.  Please

23        don't guess.

24       A.    I don't know for sure.

25       Q.    Did you have communications



```
 1              M. KAPLAN
 2   with Stan Rosenfield before Canal
 3   filed its lawsuit against Ms.
 4   Robinson?
 5     A.    Did I -- I talked to Stan
 6   all the time.  Stan is a friend of
 7   mine, so I am sure.  Yes, I have
 8   communication with Stan.  Did I talk
 9   about the lawsuit?  I mean, if you
10   have text messages showing I did, I
11   did, but I don't remember talking to
12   him about it.
13     Q.    What was your understanding
14   of Canal's plan with respect to
15   media when it came to its lawsuit?
16     A.    I wasn't involved in -- in
17   a media aspect of it.  You know, my
18   understanding was that, you know,
19   the only thing I could say is that I
20   understood that the Netflix aspect
21   of it was kind of a -- it was funny.
22   So that was my understanding.  The
23   rest of it I have no -- I had no --
24   I have no -- like I am not in the
25   media game as far as publicity and
```



Page 360

```
 1                M. KAPLAN
 2   stuff like that.  I don't know what
 3   they were planning.
 4     Q.    When Canal filed its
 5   lawsuit against Ms. Robinson, it was
 6   your expectation that the Netflix
 7   allegations would get media
 8   attention, is that fair to say?
 9          MR. DROGIN:  Objection to
10      the form.
11     A.    Yeah.  I don't know what I
12   expected to be honest.  The whole
13   thing is surreal -- still surreal
14   every time I see it in the news.  So
15   I don't know what I actually
16   expected if it would be a big story,
17   small story.  I don't remember.
18     Q.    Are you aware of anyone who
19   was affiliated with Canal or who
20   worked for Mr. De Niro who reached
21   out to the media concerning Canal's
22   lawsuit against Ms. Robinson?
23     A.    There was discussions among
24   ex-assistants who wanted to reach
25   out -- who wanted to reach out to
```



```
 1                    M. KAPLAN
 2    the media, who talked to me about
 3    it, about releasing like a comment
 4    letter of support with Bob.  But I
 5    am not aware of anything official.
 6    That was unofficial.  That was done
 7    -- that was ex-employees.  I am not
 8    aware of any -- I don't know what --
 9    what anybody who officially worked
10    for Canal did.  I didn't talk to
11    anybody in the media.
12       Q.    As far as you know, was any
13    statements from ex-employees that
14    were released to the media
15    concerning Ms. Robinson?
16       A.    No.  We didn't do that.  I
17    don't remember the reasoning.  There
18    was a lot of people who wanted to
19    sign on it, but we didn't end up
20    going forward with it.
21       Q.    I am going to show you
22    Exhibit 41, which is Bates stamp
23    beginning Canal 0047423.
24            (Whereupon, Plaintiff's
25       Exhibit 41, Canal 0047423,
```

1              M. KAPLAN

2       was marked for

3       identification, as of this

4       date.)

5       Q.    Turning your attention to

6    the text message that was sent at

7    7:17 p.m., on October 6, 2019, you

8    wrote, "He wanted to get petty shit

9    from Amelia earlier to embarrass her

10   more."

11           Is that a reference to Tom

12   Harvey?

13       A.    Where did I write that?

14   Oh, I see.  I don't know what that

15   is a reference to.

16       Q.    Let me turn your attention

17   back to what you wrote at 7:16 on

18   that same day.  Do you see on the

19   prior page where you write, "Right?

20   See that is the type of stuff Tom

21   wants to release?"

22       A.    7:16?  Wait.  Right.  Yes,

23   I see that.

24       Q.    Okay.

25           Explain to me the kinds of



Page 363

```
 1              M. KAPLAN
 2   information that Tom Harvey wanted
 3   to release publicly about Ms.
 4   Robinson?
 5       MR. DROGIN:  Objection to
 6     the form.  It assumes a fact
 7     that is not in evidence.
 8   A.    Yeah, I don't remember.
 9   This is a conversation with -- with
10   the people that I was just talking
11   about that wanted to write like a
12   giant letter.  And I think that my
13   -- what I was getting at was -- Tom
14   wasn't saying yes or no to it.  But
15   I think it was -- we thought at the
16   time that it would be -- that it
17   would be good for Bob obviously to
18   list a bunch of crazy stuff that
19   Chase had done to all these
20   different people.  But at the time
21   -- but I don't remember -- like I
22   don't remember specifically saying
23   like -- or anybody saying like go
24   get this information and get that.
25   It was more of what do you know or
```



Page 364

```
 1              M. KAPLAN
 2    what is the truth.
 3      Q.    What were you referring to
 4    when you talked about the, quote,
 5    "Type of stuff Tom wants to
 6    release?"
 7      A.    I am referring to -- I
 8    mean, I am reading my e-mail.  I
 9    don't remember the conversation.  I
10    see that Nellie had said -- I think
11    I am replying to -- this is all --
12    the context of this is an article on
13    page six that lists her as living in
14    Park Avenue, which Nellie replies,
15    "It is petty, but it kills me to..."
16    (inaudible).  So I -- now I am
17    completely speaking not for Tom -- I
18    say Tom, but it is not like Tom is
19    in on the conversation.  That is
20    just me -- that is me, you know,
21    taking liberties.
22      Q.    In this communication, you
23    talk about, quote, "The type of
24    stuff Tom wants to release."  And
25    also on the following page, Tom
```



```
 1                    M. KAPLAN
 2   wanting to get, quote, "petty shit,"
 3   to embarrass Ms. Robinson.
 4         What information was Tom
 5   Harvey looking to gather to release
 6   about Ms. Robinson?
 7         MR. DROGIN:  Objection to
 8      the form.  Can you just tell
 9      us where you are reading
10      from?  Are you looking at the
11      7:14 quote, where he says,
12      "Tom is providing no real
13      direction on this," or
14      something else?
15         MS. HARWIN:  We are
16      looking at the same 7:16/7:17
17      quotes that we have gone
18      over.
19         MR. DROGIN:  So you don't
20      want to go back into the
21      context?
22         MS. HARWIN:  We're --
23      counsel --
24      A.    Yeah, the -- essentially,
25   this is -- everyone was going to
```



Page 366

```
 1                    M. KAPLAN
 2    write a letter and Tom was
 3    basically, in my recollection,
 4    looking at this text message, he was
 5    saying, I am not endorsing it, but
 6    if you want to release petty shit on
 7    your own, have fun with it.  That
 8    was not -- that was -- he wasn't
 9    telling me to release petty shit.
10    So there is nothing he was
11    specifically referring to because he
12    wasn't telling me to do that.
13         MR. DROGIN:  This is the
14      problem when you don't put
15      something in context and when
16      you do --
17         MS. HARWIN:  Counsel --
18      Counsel, this is not an
19      opportunity for you to
20      provide a speech.
21         MR. DROGIN:  You are
22      right.  I will question the
23      witness later.  That's fine.
24    Q.    As far as you know, what
25    was Mr. De Niro's reaction to the
```



Page 367

```
 1                    M. KAPLAN
 2   media coverage of the lawsuit that
 3   Canal brought against Ms. Robinson?
 4     A.    I have no recollection or
 5   knowledge of what his reaction was.
 6     Q.    You previously testified
 7   about speaking with the Manhattan
 8   District Attorney's Office about Ms.
 9   Robinson.
10          Do you recall that?
11     A.    Yes.
12     Q.    Okay.
13          When you communicated with
14   the Manhattan District Attorney's
15   Office, was anyone else present with
16   you?
17     A.    No.
18     Q.    Who else from Canal
19   communicated with the Manhattan
20   District Attorney's Office about Ms.
21   Robinson?
22     A.    Everybody in the office
23   communicated at some point with her,
24   but separately.
25     Q.    Okay.
```



Page 368

```
 1                M. KAPLAN

 2           The Manhattan District

 3    Attorney's Office conducted separate

 4    interviews with you, with Ms.

 5    Sabrina Weeks-Britain, and with Mr.

 6    Gillian Spear, is that correct?

 7    A.     Yes.  Yes.  That is

 8    correct.

 9    Q.     Did the Manhattan District

10    Attorney's Office conduct separate

11    interviews with Mr. De Niro?

12    A.     I don't -- I don't remember

13    if they talked to him.  I don't -- I

14    don't -- I don't remember.

15    Q.     What did you do to prepare

16    to meet with the Manhattan District

17    Attorney's Office?

18    A.     I don't think I did

19    anything other than just, you know,

20    this is all pretty fresh at the

21    time.  Fresher than it is now.

22    Q.     What was your understanding

23    as to why Mr. De Niro was in touch

24    with the Manhattan District

25    Attorney's Office about Ms.
```



1                M. KAPLAN

2    Robinson?

3        A.    My impression was they were

4    exploring avenues.  You know, I

5    don't think -- he got very -- once

6    he saw how much she had spent on

7    things and all these things, he got

8    mad.  He got angrier.  After, as

9    time went on, and I think they

10   wanted to, you know, see if there

11   was -- if it was anything officially

12   -- you know, that they could press

13   charges on.  That was the impression

14   on otherwise why were they talking

15   to the District Attorney?

16       Q.    Who gave you that

17   impression that you just described?

18       A.    If you are talking to the

19   District Attorney's Office about a

20   person, you get the impression that

21   they had to go to them.  There

22   wasn't like the District Attorney's

23   Office was following Chase around.

24   So obviously they went to them with

25   this, and obviously the District



```
 1                M. KAPLAN
 2   Attorney's Office thought there was
 3   something worth looking into, and so
 4   we cooperated -- I cooperated and
 5   everyone cooperated to answer their
 6   questions.
 7      Q.    But you didn't speak to Mr.
 8   De Niro or Tom Harvey about what the
 9   goal was in reaching out to the
10   Manhattan District Attorney's Office
11   about Ms. Robinson, is that correct?
12      A.    The goal?  I don't remember
13   having a conversation with anybody
14   about the goal.
15      Q.    Okay.
16           What questions did the
17   attorneys with the Manhattan
18   District Attorney's Office ask you
19   about Canal's operating procedures?
20      A.    I thought we talked about
21   this, but they asked about -- they
22   asked like for us to sort of walk us
23   through how things worked, walked
24   them through what Chase had access
25   to, any information we had that they
```



Page 371

1           M. KAPLAN

2  could, you know -- that would help

3  them dig into certain financial

4  things.  But I don't remember

5  specifics of -- I just remember

6  generalizations.  It was more of a

7  general like explaining this highly

8  unusual office situation to the

9  district attorneys.

10    Q.    Are you aware of whether

11  Canal's accountants were interviewed

12  by the Manhattan District Attorney's

13  Office as part of its investigation?

14    A.    I don't remember.  I don't

15  know.

16    Q.    Did you share any materials

17  with the Manhattan District

18  Attorney's Office when you met with

19  them?

20    A.    I don't remember what I

21  shared with them, or if I did share

22  anything with them.

23    Q.    Did there come a time when

24  you learned that the Manhattan

25  District Attorney's Office would not



Page 372

```
 1                   M. KAPLAN
 2    be bringing charges against Ms.
 3    Robinson?
 4      A.    Yes, I don't remember when
 5    that was.  But I do -- I remember at
 6    some point being told that they
 7    weren't going forward with it.
 8      Q.    And what were you told
 9    about why the Manhattan District
10    Attorney's Office would not be
11    bringing criminal charges against
12    Ms. Robinson?
13      A.    I don't remember what I was
14    told.
15      Q.    Did anyone explain to you
16    the reasons why the Manhattan
17    District Attorney's Office would not
18    bring criminal charges against Ms.
19    Robinson?
20      A.    If they did, I forgot it.
21    No, I don't remember that.
22      Q.    Do you remember ever being
23    told how the Manhattan District
24    Attorney's Office viewed the
25    allegations against Ms. Robinson?
```



```
 1                    M. KAPLAN
 2      A.     I don't think I was told
 3    that.  I don't recall that.
 4      Q.     At some point after Ms.
 5    Robinson's employment at Canal
 6    ended, you were the subject of
 7    investigation as well, correct?
 8      A.     You could say, yes.  An
 9    investigation, I don't know how you
10    phrase it, but yes -- I was
11    questioned.
12      Q.     Who questioned you?
13      A.     Tiffany Chen mainly.
14      Q.     And what was the nature of
15    the subjects on which you were
16    questioned by Tiffany Chen?
17      A.     I think I said this
18    earlier, but we were -- I talked
19    about some specifics with petty
20    cash, with tipping to a guy named
21    Danny who was a maintenance guy.
22    She questioned -- she thought I was
23    making up numbers.  I was questioned
24    about her -- her his father's
25    apartment, a leak.  I was questioned
```



```
 1                  M. KAPLAN
 2    about a lamp that I had forgot to
 3    buy, something to that nature or
 4    effect.  And yeah, it was not a very
 5    -- it wasn't a -- I wasn't -- I
 6    wasn't presented with rationale
 7    evidence-based examination.  I was
 8    presented with a bunch of wild
 9    accusations that I tried to shoot
10    down the best that I could.
11       Q.    Ms. Chen accused you of
12    stealing, is that right?
13       A.    She accused me of stealing
14    or lying about tips basically to
15    people that -- cleaning people, and
16    such, and movers.  People of that
17    nature.
18       Q.    Were you accused of
19    misappropriating petty cash funds?
20       A.    Um, I don't know if it was
21    a specific as to say
22    misappropriating.  It was more of
23    she questioned tips that I had ran
24    down and gave to people and she
25    didn't believe I really gave them to
```



```
 1                M. KAPLAN
 2   people.
 3     Q.    Did you ever lose track of
 4   petty cash?
 5          MR. DROGIN:  Objection to
 6      the form.
 7     A.    Did I lose track of petty
 8   cash?  Look, there is a lot of money
 9   involved and mistakes get made
10   sometimes.  But we did a pretty good
11   job of keeping track of everything.
12   I didn't -- I didn't -- you know,
13   the accusations that she was
14   accusing me of, some of them
15   occurred during the timeframe when I
16   was out of the office when Chase had
17   control of the petty cash, when I
18   was having a ███████████.  It was
19   very -- it was very haphazard
20   accusations.  So it wasn't -- it
21   wasn't -- there wasn't any truth to
22   it.
23     Q.    Did you deny the
24   allegations against you?
25     A.    Yes.
```



```
 1                M. KAPLAN
 2     Q.    Did Canal ever bring suit
 3   against you?
 4     A.    No.
 5     Q.    Did you ever accuse Canal
 6   of discrimination or retaliation?
 7     A.    Did I accuse -- no.  I
 8   didn't accuse Canal of
 9   discrimination.
10     Q.    Did you ever accuse Canal
11   of violations of labor laws?
12     A.    I did not.
13     Q.    Did you communicate with
14   Mr. De Niro directly about any of
15   Ms. Chen's accusations against you?
16     A.    Yeah.  I told him they
17   were, for lack of a better word,
18   bullshit.  So -- but yeah.  But
19   yeah.  I knew at the end of the day
20   that she -- she -- it didn't -- it
21   wasn't the same as the Chase
22   situation in the sense that she
23   didn't -- that was a whole sit down
24   meeting of clearing of the air which
25   is not something that happened with
```



Page 377

```
 1                M. KAPLAN
 2    Chase.  So we cleared the air, and
 3    we moved on from it.
 4       Q.    Mr. De Niro conveyed a
 5    meeting where you had the
 6    opportunity to clear the air with
 7    him and Ms. Chen, is that right?
 8       A.    Yes.
 9       Q.    At some point Ms. Chen was
10    concerned that you were lumping
11    petty cash charges and moving
12    numbers around to make them look
13    better, is that correct?
14       A.    That sounds like something
15    she said, yes.
16       Q.    And did you ever lump
17    charges together or move numbers
18    around to make them look better?
19       A.    No.
20       Q.    You never lumped together
21    numbers to make them book letter?
22       A.    She was referring -- she
23    was referring to a specific
24    situation where we prepared -- I
25    prepared a different petty cash form
```


MAGNA
LEGAL SERVICES

```
 1                M. KAPLAN
 2   for her to look at it.  So it wasn't
 3   the same ones that we were doing in
 4   the office.  It was more to show her
 5   what the office had been spending
 6   money on.  So in a way it was lumped
 7   together, but not in the sense that
 8   it was anything undue about it.  It
 9   was more of just the way I did it
10   thinking -- I thought it was a
11   making it easier, but she took it
12   the wrong way.  But no, the petty
13   cash was -- you know, sometimes, as
14   I said earlier, we would be missing
15   a receipt, and I would try to figure
16   it out.  And sometimes we would have
17   to round up on tips just to make the
18   meals numbers to -- for the
19   receipts, like just change, that
20   type of thing, but not anything
21   else.
22      Q.    At some point you lost
23   track of six or $7,000 of petty
24   cash, correct?
25      A.    No.  I don't know what you
```



Page 379

```
 1              M. KAPLAN
 2   are referring to.
 3     Q.    As our next exhibit, I am
 4   going to show you what is stamped
 5   beginning at Robinson 00008022,
 6   which is being marked as Exhibit 42.
 7           (Whereupon, Plaintiff's
 8     Exhibit 42, Robinson
 9     00008022, was marked for
10     identification, as of this
11     date.)
12     A.    This is from 2013.  I do
13   not remember this.
14           MS. HARWIN:  So let me
15     have the court reporter read
16     back the question then you
17     can answer it.
18           (Whereupon, the requested
19     portion was read back by the
20     reporter:
21           Q:  At some point you
22     lost track of six or $7,000
23     of petty cash, correct?)
24     Q.    I can restate that question
25   for you.
```



Page 380

```
 1                M. KAPLAN
 2           Was there a time when you
 3      misplaced six or $7,000 of petty
 4      cash?
 5           MR. DROGIN:  Objection to
 6        the form.
 7      A.    We -- no.  It was not
 8      misplaced.  It was in the safe, and
 9      we -- when we were figuring out our
10      totals, neither Chase nor I, at this
11      point, I think we both totally
12      forgot about that.  But yes, that is
13      correct that it was a six or $7,000
14      petty cash we were off, and we
15      didn't realize the money was in the
16      safe.  That is correct.
17      Q.    Robin Chambers was also
18      wrongfully accused by Tiffany Chen
19      from your perspective?
20      A.    Yes.  In -- in a less --
21      she was at the same meeting I was
22      at.  We were both being accused at
23      the same time of different things.
24      Q.    And both you and Ms.
25      Chambers were given the opportunity
```



Page 381

```
 1              M. KAPLAN
 2   to clear the air with Mr. De Niro
 3   and Ms. Chen, correct?
 4      A.    Yeah.  I mean -- Bob, you
 5   know, Ms. Chen had been on him about
 6   a specific thing, and it just -- we
 7   had a whole like back and forth like
 8   screaming match the three of us.
 9   And then he said, "Let's just all
10   talk.  Let's go to Berdon.  We will
11   talk.  We will clear the air."
12           But then the meeting was
13   mostly about me.  It was a little
14   bit about her as well.
15      Q.    And what was the nature of
16   the accusations against Robin
17   Chambers?
18      A.    I don't remember what -- it
19   was a little bit -- I remember
20   myself.  I don't remember what she
21   was accused of to be honest.  That
22   was a few years ago now.
23      Q.    Why did Gillian Spear's
24   employment at Canal end?
25      A.    She had been there for a
```



MAGNA
LEGAL SERVICES

Page 382

```
 1                M. KAPLAN
 2   few years, and she moved on -- she
 3   found another job working for Chad
 4   Stewart.
 5      Q.    I'm showing you what has
 6   been marked as Exhibit 42, which is
 7   Bates stamp Canal 0049169 through
 8   171.
 9            (Whereupon, Plaintiff's
10      Exhibit 43, Canal 0049169
11      through 171, was marked for
12      identification, as of this
13      date.)
14      Q.    Do you see, at 3:43 a.m.,
15   where you write "I know.  And I
16   don't -- I am not Chase after all.
17   She would get so depressed when he
18   was mean to her."
19            Do you see that?
20      A.    I see that, yes.
21      Q.    Okay.
22            When you wrote, "She would
23   get so depressed when he was mean to
24   her," were you referring to Ms.
25   Robinson?
```



Page 383

```
1                M. KAPLAN
2     A.    Yes.
3     Q.    And when you referred to
4  he, you were referring to Mr. De
5  Niro?
6     A.    Yes.
7     Q.    Describe for me how Mr. De
8  Niro would behave when he was being
9  mean to Ms. Robinson?
10         MR. DROGIN:  Objection to
11    the form.
12    A.    I don't know what -- what
13 do you mean when he was being mean
14 to Ms. Robinson?  What do you mean?
15    Q.    You wrote, "She would get
16 so depressed when he was mean to
17 her."
18         My question is, describe
19 for me Mr. De Niro's behavior when
20 he was being mean to Ms. Robinson?
21    A.    So in this situation I am
22 -- this is -- I know because the
23 time and everything, I was in Los
24 Angeles, and he basically -- he was
25 basically -- when Bob was mean to
```



MAGNA
LEGAL SERVICES

Page 384

```
 1              M. KAPLAN
 2    you, he basically wasn't talking to
 3    you.  So when he wasn't talking to
 4    her, when he was ignoring her
 5    e-mails and calls, she would get
 6    like -- she once asked me to check
 7    his junk mailbox folder to see if
 8    they were going to junk.  She would
 9    get like physically -- this was --
10    it was very -- her job was her life
11    so she was very, you know -- I was
12    -- I actually -- I am
13    overcompensating.  I was a little
14    depressed, too.  It was a horrible
15    week in my life, but I wasn't -- I
16    had other things going on.  I don't
17    know how he treated her.  To go back
18    to your question, I don't know what
19    that even means.  He yells at
20    people.  He yelled at me.  He yelled
21    -- he yelled at everyone who has
22    ever worked for him at some point
23    and --
24       Q.   What is name of the person
25    who had the phone number that you
```



Page 385

```
 1                M. KAPLAN
 2  were texting with 917-414-1916?
 3      A.    I think this is Drena,
 4  but --
 5      Q.    Drena De Niro?
 6      A.    I would have to check my
 7  contacts to confirm that, but --
 8      Q.    When --
 9      A.    Because she was in Los
10  Angeles with me when this whole
11  thing was happening.
12      Q.    When you say, "When this
13  whole thing was happening," what are
14  you referring to?
15      A.    This is what -- this was
16  the -- the start of what led to the
17  meeting that we had.  There was a
18  leak that -- that she -- Tiffany
19  basically invented a leak in his
20  dad's apartment and blamed it on me
21  because I was in charge of the
22  apartment so it was like her reason
23  to -- for Bob be mad at me.
24      Q.    So Drena wrote, "Well, that
25  is what I feel like.  It seems like
```



Page 386

```
 1                    M. KAPLAN
 2   she is abusive to him and everybody,
 3   and then he gets abusive."
 4         Was that a discussion about
 5   Tiffany Chen being abusive to Mr. De
 6   Niro and everybody, and then Mr. De
 7   Niro gets abusive?
 8      A.    Yes, I think that is what
 9   she was saying.
10      Q.    When she wrote, "Just like
11   G," was that a reference to Mr. De
12   Niro's former wife?
13      A.    Yes.
14      Q.    Describe for me what Mr. De
15   Niro was like when he was being
16   abusive towards Ms. Robinson?
17         MR. DROGIN:  Objection to
18      the form.  He already
19      answered that.  She would get
20      depressed when he didn't
21      contact her.  Do you want to
22      hear it again?
23         MS. HARWIN:  Counsel,
24      please let the witness answer
25      the question.
```



Page 387

```
 1                 M. KAPLAN
 2     A.    I don't know like -- I
 3  don't know.  I don't have an example
 4  of him being abusive to her.  So I
 5  don't know.  All I know is when he
 6  would ignore you.  But I didn't --
 7  she would tell me secondhand when he
 8  would yell at her, but I never saw
 9  him yell at her.
10     Q.    And Ms. Robinson would come
11  to you upset when Mr. De Niro would
12  yell at her, is that right?
13          MR. DROGIN:  Objection to
14      the form.
15     A.    She would call and vent
16  sometimes, yes.
17     Q.    I am going to show you
18  Exhibit 44, which is Canal 0047953
19  through 34.  This is 44 and I think
20  what I labeled as the last exhibit
21  should be 43.  I think I may have
22  mistakenly said 42.
23          (Whereupon, Plaintiff's
24      Exhibit 44, Canal 0047953
25      through 54, was marked for
```



Page 388

```
 1              M. KAPLAN
 2      identification, as of this
 3      date.)
 4          MR. DROGIN:  41969 is 43
 5      and 47953 is 44.  Got it.
 6          MS. HARWIN:  Thank you.
 7      It is easier with stickers.
 8      Q.   Do you have that document?
 9      A.   Yes.
10      Q.   Do you see where you wrote,
11      "Bob was being super dismissive of
12      Chase' ideas tonight.  It was
13      great?"
14      A.   I see that, yeah.  I don't
15      know what that is a reference to.
16      Q.   Do you recall which of Ms.
17      Robinson's ideas Mr. De Niro was
18      being dismissive of?
19      A.   I do not recall what this
20      is about.
21      Q.   Was there anything unusual
22      about this instance where Mr. De
23      Niro was dismissive of Chase's
24      ideas?
25          MR. DROGIN:  Objection to
```



Page 389

```
 1                    M. KAPLAN
 2      the form.
 3      A.    I don't recall what this is
 4  about so I don't know if it was
 5  unusual.
 6      Q.    When you joined Canal, at
 7  that time did Mr. De Niro employ any
 8  female executive assistants?
 9      A.    When I joined Canal?  Robin
10  Chambers was working for him still.
11      Q.    When you joined Canal, did
12  Mr. De Niro employ any female
13  executive assistants?
14      A.    Yes.
15      Q.    And at that time that you
16  joined Canal, Mr. De Niro would
17  refer to his female executive
18  assistants as "The Girls," correct?
19      A.    No.  That is not correct.
20      Q.    Did you ever hear Mr. De
21  Niro refer to his female executive
22  assistants as "The Girls?"
23      A.    I heard Chase refer to his
24  assistants at "The Girls" many,
25  many, many times.  So many times
```



```
 1                    M. KAPLAN
 2     that --
 3       Q.    Mr. Kaplan, that is not my
 4     question.  So I just want you to
 5     answer the question that has been
 6     asked.
 7            MS. HARWIN:  Madam Court
 8        Reporter, can you please read
 9        back the question?
10            (Whereupon, the requested
11        portion was read back by the
12        reporter:
13            Q:  Did you ever hear Mr.
14        De Niro refer to his female
15        executive assistants as "The
16        Girls?")
17       A.    I heard Mr. De Niro
18     rephrase to them as "The Girls" but
19     so did Chase say that many, many
20     times.
21       Q.    That is not my question.
22     So, Mr. Kaplan, I just want you to
23     focus on the question that --
24            (Simultaneous speaking).
25       A.    They would complain -- they
```



Page 391

```
  1              M. KAPLAN
  2   would complain to me about it and
  3   they even took it up with her.  Like
  4   they took up an e-mail about please
  5   stop referring to us as "The Girls."
  6      Q.    Mr. Kaplan, I just want you
  7   to answer the question that is
  8   asked.  Okay?
  9      A.    Okay.  Just getting that on
 10   the record.  It is just a gotcha
 11   thing.  That is what it is.  I don't
 12   like to be put in that position.
 13      Q.    Mr. Kaplan, the question
 14   is, are you aware of Mr. De Niro
 15   ever referring to his female
 16   executive assistants as "The Girls?"
 17         MR. DROGIN:  You have his
 18      answer.  Why don't we read it
 19      back?
 20         MS. HARWIN:  As the court
 21      reporter said, we didn't get
 22      his answer because there was
 23      cross talk so --
 24         MR. DROGIN:  There wasn't
 25      cross talk.  You are
```



```
 1              M. KAPLAN
 2      interrupting him.  You
 3      interrupted him.
 4          MS. HARWIN:  Counselor,
 5      we just want to have a clear
 6      record.
 7      A.    Yes.
 8          (Whereupon, a discussion
 9      was held off the record.)
10      Q.    And you would use the term
11   "The Girls" to refer to Mr. De
12   Niro's executive assistants,
13   correct?
14      A.    I don't know if I ever used
15   that term.  If I did, I probably
16   tried to stop doing it when they
17   said not to use it.
18      Q.    Okay.
19      A.    And Chase used it, and I
20   never -- he never referred to Chase
21   as "The Girls."
22      Q.    Are you aware of Mr. De
23   Niro ever using the word bitch to
24   describe Ms. Robinson?
25      A.    Um, not to me, no.
```



Page 393

```
 1                M. KAPLAN

 2     Q.     Are you aware of Mr. De

 3   Niro using the term bitch to

 4   describe Ms. Robinson to anyone

 5   else?

 6     A.     I am not aware of it is

 7   what I am saying, no.

 8     Q.     Are you aware of Mr. De

 9   Niro ever using the word brat to

10   describe Ms. Robinson?

11     A.     Well, I am aware because I

12   have heard the message that has been

13   in the media, so -- the voicemail,

14   if that is what you are getting at.

15     Q.     Are you aware of any other

16   instances in which Mr. De Niro

17   referred to Ms. Robinson as a brat?

18     A.     I am not.

19     Q.     I am going to show you what

20   we will mark as Exhibit 45, which is

21   Bates stamped beginning at Canal

22   0047668.  Let me know when you have

23   that.

24           (Whereupon, Plaintiff's

25      Exhibit 45, Canal 0047668,
```



Page 394

```
 1               M. KAPLAN
 2      was marked for
 3      identification, as of this
 4      date.)
 5      A.    Uh-huh.
 6      Q.    Turning your attention to
 7  the messages that were sent on
 8  January 6, 2019, at 7:09 p.m. and
 9  7:13 p.m., do you see the message
10  from Ms. Robinson that says, "I have
11  several angry voice mails on my
12  phone when I was downstairs with the
13  PT guy," do you see that?
14      A.    Yes.
15      Q.    And do you see you
16  following up and writing, "I talked
17  to Bob.  He is drunk?"
18      A.    Yes.  As was I, there was
19  an Eagles game going on, but --
20      Q.    How often would Mr. De Niro
21  become drunk?
22          MR. DROGIN:  Objection to
23      the form.
24      A.    I don't know how often he
25  was drunk.  I am not an expert.
```



```
 1                M. KAPLAN
 2    Q.    How common an occurrence
 3  was it for you to hear from Mr. De
 4  Niro when he was drunk?
 5    A.    How common?  I mean, if --
 6  I don't know how often he was drunk,
 7  so I don't know.  I mean, there was
 8  -- there was occasions where I would
 9  ████████████████████████████████████
10  sure.  But I can think of, you know,
11  a handful of times when he got -- I
12  got an angry phone call or e-mail
13  from him that I sort of chocked up
14  to him over reacting to something
15  ████████████████████████
16    Q.    And describe what Mr. De
17  Niro -- I'm sorry.  Let me restate
18  that.
19          Describe what Mr. De Niro
20  would be like when he was drunk?
21          MR. DROGIN:  Objection to
22      the form.
23    A.    He was not -- I don't know
24  what that -- what that would mean,
25  would he would be like?  Because he
```



Page 396

```
 1                 M. KAPLAN
 2    would often be very -- when he would
 3    drink -- I saw him drink socially,
 4    and he would be very -- you know,
 5    like anybody else he would be -- he
 6    would be fine.  So I don't -- I
 7    don't -- sometimes he would get
 8    angry, but those very rare.  I don't
 9    know -- I can't -- there is not that
10    many examples that I have to think
11    of.
12       Q.    Were there instances that
13    you recall when Mr. De Niro would
14    become aggressive or angry when he
15    was drunk?
16            MR. DROGIN:  Objection to
17       the form.
18       A.    Angry, not aggressive.
19    Just like letting off steam kind of
20    and then he hangs up.
21       Q.    Do you recall instances
22    when Mr. De Niro would yell when he
23    was drunk?
24       A.    I recall a couple of
25    instances, yes, over the span of
```



Page 397

```
 1                 M. KAPLAN
 2   over 15, 16 years.
 3      Q.    Since you have known Mr. De
 4   ████████████████████████████████
 █   ██████████████████
 6           MR. DROGIN:  Objection to
 7       the form.
 8       ██      ████████████████████
 █   ████████████████████████████
10      Q.    And when was the one time
11   that you were aware of when Mr. De
12   ████████████████████████████████
13      A.    In the summer of 2018.
14   ████      ████████████████████
 █   ██████████████████████████
 █   ██████████████████████████████
17      A.    I don't have any -- I don't
18   have -- anybody -- like anybody else
19   when they drink.  I don't understand
20   what that -- as far as I observed,
21   nothing that -- I am not an expert.
22      Q.    Were there times when you
23   had to remind Mr. De Niro of
24   conversations that you had with him
25   when he was drunk?
```



Page 398

1                M. KAPLAN

2          MR. DROGIN:  Objection to

3       the form.  It is a -- it is

4       an inarticulate question the

5       way you phrased it.

6    A.    I had times that I had to

7    -- I had times that I had to remind

8    him of occasions, but not

9    necessarily whether he was drunk or

10   not.  That wasn't really relevant.

11   Q.    What kind of things did Mr.

12   De Niro forget?

13         MR. DROGIN:  Objection to

14      the form.

15   A.    I mean, he -- sometimes he

16   would forget about -- I don't know

17   anything else.  He had a lot going

18   on in his life.  Sometimes he would

19   forget something he wanted to go

20   over or something he told him, or --

21   but not -- you know, being drunk or

22   not, I always thought he had a very

23   -- he retains things.  Like so he

24   would remember a lot of things that

25   happened.  If we had events at



Page 399

```
 1                M. KAPLAN
 2   night, he would have a few drinks,
 3   but he would still remember a lot of
 4   things.  Things -- you know, it
 5   wasn't -- he would forget -- to put
 6   it another way, I don't think it was
 7   related to alcohol or not alcohol.
 8      Q.    I am going to show you what
 9   we are marking as Exhibit 46, which
10   begins Bates stamped Canal 0047716.
11             (Whereupon, Plaintiff's
12       Exhibit 46, Canal 0047716,
13       was marked for
14       identification, as of this
15       date.)
16      Q.    I would like to turn your
17   attention to the last three e-mails
18   in that exchange.
19      A.    Hold on.  It is still
20   loading.
21      Q.    Take your time.
22      A.    Yeah.
23      Q.    Do you see in the text
24   messages beginning at 10:52 a.m.
25   that read, "It is all so sad what is
```



1           M. KAPLAN

2   Bob's mind."

3         Do you see those text

4   messages?

5         MR. BENNETT:  Michael,

6      you can review the entire

7      text message if you would

8      like.

9   A.    I see this.  And yeah, I am

10  just referring to him forgetting

11  that he had sort of, you know, was

12  going to promote Nellie and years

13  ago had this idea I believe, but --

14  I am also -- I take -- you can't

15  hold me to everything that I write

16  in the text messages, because I am

17  just trying to be funny.  So it is a

18  long day.

19  Q.    When you wrote, "It is all

20  so sad," and then clarified that you

21  were referring to Bob's mind, what

22  -- what was it that was so sad about

23  Mr. De Niro's mind?

24  A.    I am referring to the idea

25  that it was very -- from the night



```
 1            M. KAPLAN
 2   before, that Bob had apparently had
 3   said to me -- that Bob had said to
 4   Nellie that he didn't -- he saw her
 5   and he told her, "Oh, I didn't
 6   realize that you left because of
 7   Chase."  And apologized to her,
 8   which was -- it is a reference to
 9   the fact that Nellie was very clear
10   and to Bob, like if you keep Chase
11   here, I am leaving.  And Bob chose
12   to keep Chase there.  And he, I
13   guess, had forgotten about that.  It
14   was only a couple of years earlier.
15   That is what I am referring to.
16      Q.    So what specifically was so
17   sad about Mr. De Niro's mind; was it
18   him forgetting about a prior
19   conversation?
20      A.    I am referring to the -- we
21   had had -- he had had, you know, a
22   month of back and forth with Nellie
23   about her being promoted, and then
24   her leaving, and I guess, you know,
25   I am making kind of a joke about it.
```



```
 1                M. KAPLAN
 2   But two years later basically -- two
 3   or three years later, I don't know
 4   exactly, but he had basically forgot
 5   that it happened apparently.
 6     Q.    Do you believe that Tiffany
 7   Chen is a credible person?
 8         MR. DROGIN:  Objection to
 9      the form.
10     A.    Look, I am the wrong person
11   to -- I mean, personally, I -- I
12   don't -- I am not a big fan of
13   Tiffany Chen.  That is my
14   personal -- it doesn't mean she is
15   always wrong about everything, but
16   --
17     Q.    As a general matter, do you
18   find Ms. Chen to not be a credible
19   person?
20         MR. DROGIN:  Objection to
21      the form.
22     A.    As a general matter, I -- I
23   -- I -- I don't know what the -- the
24   credible, but I don't find her -- I
25   find her to be someone who -- who
```



```
 1                M. KAPLAN
 2   mis-remembers [sic] things.  So I
 3   guess I would call her not credible.
 4     Q.    And you understood Ms. Chen
 5   to raise concerns that were
 6   unfounded, correct?
 7           MR. DROGIN:  Objection to
 8       the form.  You can answer.
 9     A.    When I talked to Tiffany
10   Chen in March, April, January of
11   2019, I didn't see her that way at
12   all.  She is -- you know, it was as
13   time went on, and I -- I -- she went
14   after me and several other people
15   and sort of took things out of
16   context, I started to think --
17   realize that she -- you know, it was
18   not someone that I considered
19   credible anymore.
20           MS. HARWIN:  I think this
21       is a good time to pause and
22       we can take a five-minute
23       break.  Counsel, I anticipate
24       being done shortly and so if
25       you are anticipating any
```



Page 404

```
 1              M. KAPLAN
 2    redirect, you can expect to
 3    begin after the break.
 4         MR. DROGIN:  Can we get a
 5    count on the time, please?
 6         THE VIDEOGRAPHER:  The
 7    time is now 5:27 p.m., and we
 8    are going off the record.
 9         (Whereupon, a recess was
10    taken at this time.)
11         THE VIDEOGRAPHER:  The
12    time is now 5:39 p.m.  We are
13    back on the record.
14    Q.   So you previously testified
15    about not being represented by
16    counsel at this deposition.
17         When you spoke yesterday to
18    Mr. De Niro and Mr. Drogin, were you
19    provided with tips on how to answer
20    questions at a deposition?
21    A.   No.  It was just a general
22    -- like they explained to me how it
23    would work, what a deposition even
24    is.  You know, just told me to tell
25    the truth and answer the questions.
```



Page 405

```
 1                 M. KAPLAN
 2     Q.    Were you given any guidance
 3   on how to answer questions?
 4     A.    No.   Just -- the only
 5   guidance would be to tell the truth,
 6   and if you don't know something, say
 7   that you don't know.   That is it.
 8   It was not a -- you know, that was
 9   it.
10     Q.    Okay.
11           And did you have any
12   communications with Mr. Drogin, Mr.
13   Bennett or Mr. Harvey during today's
14   deposition?
15     A.    I have not.
16     Q.    Okay.
17           MS. HARWIN:  So at this
18       particular time, you know,
19       there are still outstanding
20       documents that bear upon Mr.
21       Kaplan's testimony that we
22       have not received, and so we
23       will note that for the
24       record, and that we reserve
25       the right to recall Mr.
```



Page 406

```
 1              M. KAPLAN
 2      Kaplan.  But that concludes
 3      our questioning for today
 4      pending the redirect from Mr.
 5      Drogin.  So Mr. Kaplan, I am
 6      going to turn you over to Mr.
 7      Drogin who I understand has
 8      some questions.
 9           And Mr. Drogin, can you
10      estimate approximately how
11      long you anticipate going?
12           MR. DROGIN:  I don't
13      really know.  It depends how
14      the witness answers my
15      questions.
16           MS. HARWIN:  Can you give
17      an order of magnitude?
18           MR. DROGIN:  Less than an
19      hour for sure.
20      EXAMINATION
21      BY MR. DROGIN:
22      Q.    Mr. Kaplan, I am going to
23  jump around a bit, so I will try to
24  orient you as much as I can.  Some
25  of these things may come at you from
```



```
 1                M. KAPLAN
 2    all angles because I am hopping
 3    around a bit.
 4            Was Chase Robinson ever
 5    referred to as Debra?
 6      A.    Yeah.  She was a referred
 7    to as Debra by the film crew, people
 8    -- everyone on Bob's film -- the
 9    same crew, the hair/makeup, the
10    trailer, all the people -- they just
11    -- it was like a code word that they
12    used to talk about her.
13      Q.    Why did they need a code
14    word to talk about her?
15            MS. HARWIN:  Objection to
16      the form.  And objection on
17      the grounds that this falls
18      outside the scope of direct
19      examination.
20      A.    Should I answer?
21      Q.    Yes.
22      A.    Well, I think -- they were
23    -- I think they were -- they
24    explained to -- to -- they would
25    talk about her a lot like onset, and
```



Case 1:19-cv-09156-LJL-KHP   Document 322-8   Filed 11/20/22   Page 408 of 505

1                    M. KAPLAN

2    I think it annoyed Bob to -- he just

3    got sick of it.  So they would say

4    Debra.  So they would talk about

5    Debra, as like a -- so Bob wouldn't

6    even know they were talking about

7    her.

8       Q.    And you -- you testified

9    earlier that Mr. De Niro was the

10   boss.  Was -- did you supervise

11   Chase Robinson?

12      A.    No.

13      Q.    Did you have a supervisor?

14      A.    So --

15            MS. HARWIN:  Objection to

16       the form.

17      A.    I mean, the way I would

18   explain it as that my boss was

19   Robert De Niro.  When it came to all

20   matters of the office though, you

21   know, we talked a lot about petty

22   cash earlier, and I had some -- I

23   would say that I collected it all,

24   but on all matters of policy and how

25   we did things, and pretty much



Page 409

```
 1                  M. KAPLAN
 2    everything we did, Chase was in
 3    charge.  Vacations, and all of that
 4    stuff.
 5       Q.    So would she give you
 6    instructions?
 7       A.    On certain things, yes.
 8       Q.    You -- you mentioned there
 9    was a petty cash safe, is that
10    correct?
11       A.    We had a safe in the office
12    where we kept some items, and then
13    at some point Chase got a second
14    safe to -- where we kept other items
15    that I think only her and I had the
16    combo to, and that is where we kept
17    the petty cash.
18       Q.    And she would reimburse
19    herself cash from that safe, is that
20    right?
21          MS. HARWIN:  Objection to
22       the form.
23       A.    Yes, she would reimburse
24    herself, and I would reimburse
25    myself when we had petty cash --
```



```
 1                M. KAPLAN

 2    when we had receipts to go through.

 3       Q.    Did she have to approve the

 4    amount of petty cash that you would

 5    remove from the safe?

 6       A.    No.  She would -- a lot of

 7    times she would ask Berdon to get

 8    petty cash because she had a trip,

 9    or she had a big thing, or the

10    apartment with Toukie.  But she

11    didn't -- she didn't have to approve

12    if I was -- that is what I was

13    saying earlier.  That is the one

14    area where I had -- I wouldn't say

15    she was a supervisor on that.  But

16    on everything else she was.

17       Q.    She would approve her own

18    petty cash, is that correct?

19       A.    Yes.

20       Q.    And at the time that you

21    received the expense reports from

22    her, regarding her spending, she had

23    already approved her own expenses,

24    is that correct?

25            MS. HARWIN:  Objection to
```



Page 411

                    M. KAPLAN
1
2      the form.
3      A.    Yes, she had already --
4   yeah, approved them, yes.
5      Q.    So for example, if she was
6   reimbursing herself for purchases at
7   Whole Foods, would you have anyway
8   of knowing what she purchased at
9   Whole Foods?
10          MS. HARWIN:  Objection to
11      the form.
12     A.    No.  Other than -- if there
13  is a receipt, if you look at the
14  receipt, you can see what was
15  purchased.  But on the sheet itself,
16  it just would say lunch or whatever.
17     Q.    Did you ever review the
18  receipts to determine what, in fact,
19  she had purchased from Whole Foods?
20     A.    No, that wasn't standard
21  practice.
22     Q.    Okay.
23          What about from Dean &
24  DeLuca, did you review receipts from
25  Dean & DeLuca?



Page 412

```
 1              M. KAPLAN
 2    A.    No.
 3    Q.    So is it fair to say that
 4 you don't know exactly what she
 5 would be purchasing at those stores?
 6    A.    It is -- yes, fair to say
 7 that.
 8    Q.    So, for example, she could
 9 have been purchasing toiletries,
10 correct?
11    A.    She could have purchased
12 anything that they would sell there.
13 Yeah.  I wouldn't have.
14    Q.    And then she would approve
15 those expenses and remove the cash
16 from the safe, is that right?
17    A.    Yes.
18    Q.    How many iPhones did Canal
19 purchase for your use between
20 approximately -- between 2013 and
21 2019?
22    A.    For my use?
23    Q.    Yes.
24    A.    I don't know.  Probably --
25 you know, I -- a couple, not too
```



```
 1                M. KAPLAN
 2   many.  I mean, I didn't get one
 3   every time there was a new one.  I
 4   got -- sometimes I would get them,
 5   you know, for -- at one point I got
 6   one for free from Apple, but I don't
 7   know.  A couple.  I don't know
 8   exactly.  I don't have a number.
 9      Q.    Do you have knowledge as to
10   approximately how many phones Chase
11   purchased through Canal for her
12   personal use?
13           MS. HARWIN:  Objection to
14      the form.
15      A.    I don't remember the
16   number, but I remember back a few
17   years ago that she had purchased
18   several -- she had purchased more
19   phones than the average person, for
20   sure I know during that time period.
21   I think she broke a phone and just
22   would get a new phone, buy another
23   -- break a phone and get a new
24   phone, but I don't remember exactly
25   how many.
```



Page 414

```
 1                 M. KAPLAN
 2     Q.    When you say, "break a
 3   phone," what do you mean?
 4     A.    Well, I mean, if a phone
 5   broke on her or wasn't working well,
 6   I think she would just get another
 7   one.  It was a few years ago now, so
 8   I don't remember the specifics.  But
 9   I know she definitely got new
10   phones.  Like every time there was a
11   new phone, she got a new phone for
12   sure.
13     Q.    And that is something that
14   Canal would pay for?
15     A.    Yes.
16     Q.    You said earlier that
17   privacy is important to Bob, is that
18   correct?
19     A.    Yeah.  I would say that is
20   one of his -- the number one thing
21   he is looking for in people who work
22   around him is, you know, he is -- he
23   tries to keep things -- he tries to
24   be private.
25     Q.    What about honesty?
```



Page 415

```
 1                 M. KAPLAN
 2            MS. HARWIN:  Objection to
 3      the form.
 4      A.    Yeah.  He looks for people
 5   that are loyal, that are honest, and
 6   that -- yeah.  He wants things to
 7   get done, you know, these are the
 8   things that he looks for, and -- but
 9   yeah.  He trusts -- in the privacy,
10   it is like he does -- if somebody is
11   the person that handles something,
12   he just wants them to be the person
13   that handles it because he thinks
14   like, you know, why mess up the
15   system kind of thing.
16      Q.    From your perspective, did
17   Chase attempt to control access to
18   him?
19            MS. HARWIN:  Objection to
20      the form.
21      A.    Yeah.  She -- I would say
22   she -- she didn't want the
23   assistants -- the other assistants
24   to get -- she didn't want them to
25   get too close to him.  She -- you
```



Page 416

```
 1                M. KAPLAN
 2    know, we had a situation where there
 3    was a -- we mentioned earlier
 4    someone named Olivia Jampol.  She
 5    was the only assistant, so she was
 6    working -- you know, I think she was
 7    closer to Bob than Chase would have
 8    liked in some ways.  So after that
 9    it was sort of like we had two
10    assistants so they were all kind of
11    replaceable and can do the exact
12    same work.  And like I mentioned
13    earlier, she didn't want them, you
14    know, connecting phone calls on
15    their iPhones.  She didn't really
16    want them going to events.  And
17    yeah, so I think she wanted it to be
18    like I sort of was grandfathered in,
19    or I was the person that did that,
20    or whatever you want to say.  But
21    she didn't really want them being
22    too close to the family or anything
23    like that.
24       Q.    This is based on your own
25    personal observations of her
```



Page 417

```
 1                M. KAPLAN
 2   interaction with the office staff,
 3   is that right?
 4        MS. HARWIN:  Objection to
 5     the form.
 6     A.    Well, she set the rules for
 7   how like they would -- what they
 8   would -- their exact rules were, so,
 9   you know, that is my observation.
10     Q.    You testified earlier about
11   certain duties and responsibilities
12   that she had.  Were there any office
13   duties and responsibilities that
14   remained constant irrespective of
15   what may have been going on in Bob's
16   life?
17        MS. HARWIN:  Objection to
18     the form.
19     Q.    Do you understand my
20   question?
21     A.    For Chase, yes.  So --
22   yeah.  So she was the -- her
23   constant role was she was always the
24   person who he had this, you know,
25   the perk budget of like when he was
```



```
 1                    M. KAPLAN
 2    on a movie, she would sort of manage
 3    that.  That is why I said earlier --
 4    you asked me the question about the
 5    Debra thing.  She sort of like --
 6    you know, these people who worked on
 7    the set, like it was their like
 8    livelihood was at stake, and she
 9    would sort of like dole out, like,
10    okay, I got you your money.  It was
11    kind of like she was in charge of
12    getting them all their deals when he
13    did movies, and she was -- she did
14    the -- I think she did a lot of -- I
15    think she had some oversight on his
16    travel as far as like planes.  And I
17    think generally just office manager
18    was her main -- her main thing about
19    what was going on.  She was in
20    charge of Bob's office and policies.
21    She would set the policies.  She
22    e-mailed him if she was changing
23    something about vacation, about
24    holidays, about, you know, people --
25    what they were paid, if they were
```



```
 1                M. KAPLAN
 2   raises, things of that nature.
 3      Q.    Was she doing those types
 4   of things irrespective of whether or
 5   not he was filming a movie for
 6   example?
 7      A.    Yeah.  That was her -- you
 8   know, day to day was sort of
 9   overseeing, you know, so that -- if
10   we had a new employees that we -- so
11   if we were hiring employees, if we
12   wouldn't needed to hire somebody,
13   that would fall under that.  If she
14   was of -- she was sort of -- she was
15   sort of in and out of like how much
16   she was involved in some of his
17   day-to-day stuff.  It didn't really
18   matter.  If he was shooting a movie
19   or not, it was sort of like that was
20   the more day-to-day job.  And when
21   he was shooting a movie, once the
22   movie was settled, she wasn't really
23   doing so much because everything was
24   sort of settled.  It was -- you
25   know, unless there was things on the
```



Page 420

```
 1                    M. KAPLAN
 2    weekends that he had to travel back
 3    and forth or something like that.
 4       Q.    You testified that you
 5    would sometimes get prescriptions
 6    for Bob, is that right?
 7       A.    Yes.
 8       Q.    How frequently would you do
 9    that?
10       A.    Often.  I mean, that is --
11    you asked me about access.  I think
12    that was one of the things where she
13    didn't want -- she was changing
14    policies a lot.  But the way I
15    remember it was that there was
16    definitely a long stretch that she
17    didn't want the assistants getting
18    the prescriptions because she wanted
19    it either her or I, or someone she
20    could trust with his information.
21    So I would often, and it was -- you
22    know, we would get them in the
23    office in Tribeca, and have to get
24    them to his apartment somehow,
25    whether the driver or go take them
```



```
 1              M. KAPLAN
 2   up yourself.  So I did that fairly
 3   often, and then -- I mean, she did
 4   it, too, when she was Downtown.
 5      Q.    So when you say when she
 6   was Downtown, is that differentiated
 7   from the time when she was working
 8   from out of the office?
 9          MS. HARWIN:  Objection to
10       the form.
11      A.    Sorry.  I mean, the office.
12   The office is in Tribeca.  And the
13   pharmacy would be across the street
14   from the office, so you couldn't get
15   him a prescription if you weren't in
16   Tribeca.
17      Q.    And then there was just --
18   to, again, orient you, there was a
19   period of time where you said that
20   she would commonly be working from
21   home, is that right?
22      A.    Yes.  There was a period of
23   time towards her later years
24   especially where she worked a lot
25   from home.
```



Page 422

```
 1                M. KAPLAN
 2    Q.    And we are talking about
 3  your picking up prescriptions.  How
 4  frequently is that something that
 5  you would do, let's say from 2017 to
 6  the time when she resigned?
 7    A.    I mean, I remember a couple
 8  of different medications, and I am
 9  sure they are all about once a
10  month.  So, you know, maybe a few
11  times a month.
12    Q.    Alright.
13        Do you consider that a big
14  part your job?
15    A.    No.  It was sort of a --
16  you know, this was one of the things
17  that used to be -- like earlier on
18  this was just something that like
19  anybody did, and then became a thing
20  that we had to be very secretive
21  about, which is why, again, this is
22  amazing we are doing this -- we are
23  having a public lawsuit and
24  everything.  But it was like her and
25  I were the only people that could be
```



Page 423

```
 1                M. KAPLAN
 2   trusted with information kind of
 3   thing.  I didn't consider it a big
 4   part of the job, it was just
 5   something to do.
 6     Q.    Are his medications, for
 7   example, something that you
 8   understood that he would want to be
 9   kept private?
10     A.    Of course.  I mean, I think
11   anybody would want them to be kept
12   private.
13     Q.    What about his relationship
14   with Tiffany Chen, did you have an
15   understanding as to whether or not
16   he wanted that kept private?
17     A.    Yes.  The first time I -- I
18   mean, it was -- I sort of knew of
19   her before I saw her because she had
20   some stuff in the apartment and her
21   name was on stuff that she may have
22   had sent there.  But the first time
23   I met her, he said to me, like sort
24   of awkwardly pulled me aside and was
25   like, "This is my friend, you know,
```



Page 424

```
 1              M. KAPLAN
 2   just don't mention it to anybody."
 3   And I didn't mention it to -- you
 4   know, until it became more -- it was
 5   -- it was actually a secret for a
 6   long time shockingly.
 7   Q.    Alright.
 8         I want to talk about
 9   Christmas time in the office.
10         When did preparation for
11   Christmas in Canal Productions
12   actually begin?
13   A.    I would say it began -- I
14   would say early November usually as
15   I remember it.  There is a process.
16   There was a picking out of what the
17   mass gift would be for all of the
18   employees -- like a gift -- a gift
19   -- you know it would go to like all
20   the -- all the Tribeca people and
21   people in the -- other companies we
22   dealt -- did business with.  And
23   then there would be specific, nicer
24   gifts for important people in his
25   life, lawyers, other people, and
```



Page 425

```
 1                M. KAPLAN
 2    family members of course was the
 3    most important.  There was a holiday
 4    party in early December.  So it was
 5    always very hectic in the office.
 6    It really heated up after
 7    Thanksgiving because that is when
 8    the holiday party would happen and
 9    the getting into stuff all over New
10    York City it would happen.
11       Q.    Did this involve more than
12    one Canal employee?
13       A.    This was always sort of an
14    all hands on deck sort of thing.
15    Chase was very much in charge of it,
16    but it involved, you know, certain
17    people wrapping gifts, certain
18    people delivering gifts, certain
19    people working a holiday part, the
20    travel, you know, going and
21    videotaping him opening the gifts,
22    the kids opening the gifts, all of
23    that.  We all -- we all had
24    different -- we all were involved in
25    it, yes.
```



Page 426

                    M. KAPLAN

1

2    Q.    And you said Chase was in

3    charge of this, is that correct?

4    A.    She definitely would send

5    out an e-mail every year, sort of a

6    -- you know, this is -- we have to

7    get on top of all these different

8    things, and she gave me the idea for

9    the mass gifts.  We would talk about

10   ideas for the gift, and she would do

11   the shopping with him, and sort of

12   tell the office like -- or, you

13   know, tell -- that -- this is what

14   Bob bought for this, bought for this

15   person.  She was very much -- very

16   much involved in all of those

17   decisions.

18   Q.    Would she delegate some of

19   the tasks that needed to be done to

20   other Canal employees?

21   A.    She would delegate -- yes.

22   Like pick up gift cards for people,

23   and picking up things that -- you

24   know, bottles of wine, things of his

25   -- definitely some of the more



Page 427

```
 1                M. KAPLAN
 2   personal things were delegated.  The
 3   wrapping of -- she wrapped a lot of
 4   the gifts for the family, but a lot
 5   of the wrapping for the other people
 6   she definitely delegated.  Did
 7   delivering.  I mean, it was -- this
 8   is the type of thing that not one
 9   person could do.  It was kind of a
10   -- in the pre-pandemic world when
11   everyone was in offices, everyone
12   got gifts, and it was kind of a big
13   operation.  But she -- and she would
14   keep people -- people would say --
15   there was definitely like a week or
16   so where people would work -- like
17   she would keep people in the office
18   because she wouldn't like make
19   decisions on things until like the
20   last second.  So a lot of this
21   wrapping would happen literally a
22   few days before people were going on
23   break, and they are there until 2:00
24   in the morning or I don't know how
25   late.
```



```
 1                M. KAPLAN
 2    Q.    Moving along to the
 3    ███████████████    Did I hear you
 4    right that you describe her as the
 5    overseer?
 6          MS. HARWIN:  Objection to
 7      the form.
 8    A.    I don't -- yeah.  I don't
 9    remember what word I used, but she
10    was the -- she sort of -- she was
11    the -- she was in charge of the
12    operation.  I mean, it -- every
13    detail she wanted -- she want -- she
14    authorized.  I once put the Con Ed
15    bill in my name, and she called me
16    and screamed at me, and told me that
17    I had to call Con Ed and put it in
18    her name.  She was involved in
19    pretty much every aspect.  It was --
20    from the summer -- from the time the
21    lease was signed, until we -- you
22    know, until later in the fall.
23    Q.    Was there a time that the
24    ████████████████████
25    A.    It -- it changed over time
```



```
 1                M. KAPLAN
 2   obviously because he -- he got
 3   involved -- you know, he moved in.
 4   Once he moved in it was a little
 5   different than when he wasn't living
 6   there.  It seemed to be going -- he
 7   -- he -- there was no interior
 8   designer hired or anybody that had a
 9   -- you know, there wasn't a very
10   streamlined process.  It was a lot
11   of -- it was a lot of things that
12   were happening, you know, it would
13   be like ordering this piece of
14   furniture that wasn't going to come
15   for three months, or this table he
16   wanted to get from Upstate.  It was
17   all sorts of moving parts, so it was
18   still going on up until -- in some
19   capacity it was still going on even
20   I think when she resigned there was
21   still work to be done.
22     Q.    Alright.  Alright.
23           Did she ever express to
24   you -- you used the word relish.
25   Let me withdraw the question.
```



Page 430

```
 1              M. KAPLAN
 2         You said she seemed to
 3    relish the job.  What do you mean by
 4    that?
 5         MS. HARWIN:  Objection to
 6      the form.
 7      A.    I inter -- my impression
 8    was that she -- it was the type of
 9    thing that she would complain about
10    it, but I think she also liked it.
11    Because it was the type of thing
12    where we would be there for no
13    reason.  You know, like Bob could
14    come see the apartment at -- he
15    couldn't be there until like 8:00
16    9:00 at night to see it, what we had
17    had that day, and she wanted us all
18    to stay there, and she wanted to
19    show him everything.  And we had
20    talked about Robin's daughter is an
21    interior designer.  She offered to
22    help, and I don't think Chase liked
23    that idea very much.  The idea of
24    bringing in some outside person just
25    wasn't something she wanted to do.
```



```
 1                M. KAPLAN
 2   She said that Bob didn't want to pay
 3   for it.  But my impression was she
 4   -- for a while really it was like
 5   kind of a -- a crazy, fun project
 6   that she seemed to yeah, relish.
 7        Q.    Let's break that down into
 8   a couple of different pieces.  There
 9   was an interior designer that was
10   brought in to help, is that right?
11        A.    Yes.  There was an interior
12   designer that was a friend of hers,
13   Rachel, who was brought in to help.
14   But she was a -- it was -- Chase,
15   and Bob, and her would make
16   decisions together and she was --
17   yes.
18        Q.    You said, "a friend of
19   hers," whose friend was she?
20        A.    She was Chase's friend.
21        Q.    You are saying Chase
22   brought her in?
23        A.    Uh-huh.
24        Q.    Yes?
25        A.    Yes.  Yes.  Sorry.
```



Page 432

1              M. KAPLAN

2     Q.    Did it appear to you that

3   Chase was enjoying parts of this

4   product -- project?

5           MS. HARWIN:  Objection to

6     the form.

7     A.    Yes.  I think she -- it was

8   -- this kind of -- she sort of

9   enjoyed like we would order food to

10  the house.  It was like this big,

11  crazy house that we would work out

12  of all day, run around, and buy

13  things.  We constantly were buying

14  things.  It was this massive

15  undertaking.  It was like a

16  three-floor townhouse that had

17  nothing in it.  So it was starting

18  from scratch, and it was constantly

19  things coming up with the -- with

20  the landlord, and -- it just --

21  yeah.  It seemed to me that she

22  wanted to retain control of this

23  project the entire way.

24    Q.    Well, what made you think

25  or feel that she wanted to retain



```
 1                M. KAPLAN
 2   control of the project as you just
 3   said?
 4      A.    Well, the idea that she
 5   brought in her friend to be, you
 6   know, we could have -- in the
 7   beginning found either Robin's
 8   daughter -- Robin Chamber's daughter
 9   was an interior designer, or we
10   could have found somebody through
11   any one of his number of -- a hotel
12   or -- many different ways we could
13   have found somebody to sort of
14   oversee this operation.  And I don't
15   know, I just got the impression that
16   she wanted, you know, she wanted to
17   be the one making the decisions, and
18   wanted to be the one -- this was
19   like, you know, she -- when she
20   would complain about it, it would be
21   more about because Bob didn't like
22   something or whatever because Bob
23   was being indecisive, but it wasn't
24   -- she wasn't complaining about the
25   idea of us doing this job, at least
```



Page 434

1                    M. KAPLAN
2    not -- I complained about it, but it
3    was --
4       Q.    Okay.
5             At that time, was that a
6    project that all Canal employees
7    were involved in?
8       A.    No.  She did not want the
9    office, Sabrina or Gillian, to even
10   -- to be involved in at all.  I
11   don't think they ever visited for
12   that -- for months because she
13   wanted, you know, they shouldn't be
14   involved, it was a secretive thing.
15   She hired an assistant to help with
16   the project.  We hired the interior
17   decorator, but it was us.  It was
18   the four of us were involved and the
19   office was kept at arm's length.
20   She didn't want them to be --
21      Q.    Who is Lu Lu White?
22      A.    She was hired to be Chase's
23   assistant.  And yeah, that summer,
24   and brought in to just help organize
25   Chase -- be basically Chase's



Page 435

                    M. KAPLAN

1  assistant on this project mainly

2  because this was the main thing we

3  were doing, until -- at least until

4  Christmas came about.

5    Q.    When you say, "the summer,"

6  is that the summer of 2018?

7    A.    Yeah.  I don't remember

8  when she started, but it was, I

9  believe, in August.  I could be

10  wrong, but I think around December

11  of 2018 sounds about right to me.

12    Q.    And do you know who hired

13  Lu Lu White?

14        MS. HARWIN:  Objection to

15    the form.

16    A.    Yeah.  We hired -- I was --

17  I was involved in meeting with her,

18  but the way I remember it, I think,

19  we might have -- we were just

20  getting -- earlier in the summer we

21  hired Sabrina to work in the office

22  through an agency.  And I believe Lu

23  Lu came through the same agency, and

24  Chase saw her as like a perfect



Page 436

```
 1                    M. KAPLAN
 2   assistant to hire for herself.
 3      Q.    So who -- who, if you
 4   recall, who put forward the offer to
 5   Lu Lu White?
 6      A.    Chase would have.
 7      Q.    When you say Chase would
 8   have --
 9      A.    Chase put forward the
10   offer, sorry.
11      Q.    Okay.
12            Did you ever make an offer
13   of employment to any Canal employee?
14      A.    No.
15      Q.    Who -- who made the
16   decisions -- withdrawn.
17            Who made offers of
18   employment for -- for Canal
19   Productions?
20            MS. HARWIN:  Objection to
21       the form.
22      A.    The official offers would
23   always come through Chase.
24      Q.    And are you familiar with
25   something called The Office of Chase
```



```
 1                  M. KAPLAN
 2   Robinson?
 3          MS. HARWIN:  Objection to
 4      form.
 5      A.    Yes.  That was -- that was
 6   Lu Lu's e-mail signature that said,
 7   "The Office of Chase Robinson."
 8      Q.    Do you know what that was?
 9      A.    It was never discussed why
10   that was her signature other than
11   that must have been the decision
12   Chase made to tell her to make it
13   her e-mail signature that she worked
14   for her.
15      Q.    During the period of time
16   that the ████ project was ongoing,
17   did Chase's duties and
18   responsibilities regarding the
19   office stop?
20          MS. HARWIN:  Objection to
21      the form.
22      A.    No.  No.
23      Q.    Alright.
24          And you mentioned that you
25   had a ██████████, I believe, it
```



Page 438

```
 1                M. KAPLAN
 2   was in January of 2019?
 3    A.    I did.  January 26th.  I
 4   believe.
 5    Q.    Okay.
 6          And were you out of work,
 7   physically, out of work for a period
 8   of time?
 9    A.    I was physically out of
10   work for about five weeks, yes.
11    Q.    And do you know who, if
12   anyone, filled in for your role
13   while you were out?
14    A.    I think everybody filled in
15   a little bit.  I think Chase did
16   most of it in that she just sort of
17   -- she would ask me some questions
18   sometimes.  But, yeah.  It was
19   mostly things -- I think some things
20   that I had been doing just like went
21   on pause I guess.  And then other
22   things -- there were some things
23   that the office could help --
24   computer-wise, help Bob with, and
25   Chase I am sure she did some things
```



Page 439

```
 1                M. KAPLAN
 2   while I was out.  I don't remember
 3   specifically, but, yeah.
 4     Q.    Who, if anyone, would set
 5   office policies regarding vacation?
 6          MS. HARWIN:  Objection to
 7      the form.  I will note to the
 8      witness that that is not
 9      something that you should
10      speculate on.
11          MR. DROGIN:  You asked
12      him to speculate all day.  I
13      mean, I am just asking if he
14      knows.
15     Q.    Who would set policies on
16   vacation?
17     A.    Chase would set the
18   vacation policy.  She would -- you
19   know, look at what, you know, how
20   many days or what days Tribeca was
21   off for like holidays.  And I think
22   generally follow that for the
23   holiday schedule.  But for the
24   amount of vacation days, she would
25   set that policy.
```



Page 440

```
 1                M. KAPLAN
 2     Q.    When you say she would set
 3   that policy, would she, to your
 4   knowledge, determine the number of
 5   vacation days that Canal employees
 6   would be entitled to take each year?
 7         MS. HARWIN:  Objection to
 8     the form.
 9     A.    Yes.
10     Q.    Do you know whether Canal
11   employees were required to get her
12   approval to take certain days off
13   for vacation?
14     A.    Yes.
15         MS. HARWIN:  Objection to
16     the form.  And counsel, can
17     you clarify what period you
18     are talking about?
19         MR. DROGIN:  Yes.  From
20     -- we will talk about from
21     2015, on, until she quit.
22     A.    From 2015, to 2019, if
23   somebody in the office wanted to
24   take a vacation day, they would
25   e-mail Chase asking if it is okay,
```


MAGNA
LEGAL SERVICES

```
 1              M. KAPLAN
 2   and take blah-blah blah days off for
 3   this reason, and she would approve
 4   of it or disapprove of it.
 5      Q.    How do you know that?
 6      A.    I believe I was CCed on
 7   e-mails sometimes.  Otherwise, I
 8   would have seen the e-mails when we
 9   went through her e-mail address.  I
10   don't remember.  But I know -- I
11   know people would ask -- I know
12   people would ask her directly.  I
13   mean, they would ask each other.
14   They would make sure the other
15   people in the office were around
16   those days.  Generally that was the
17   policy that you couldn't just take
18   off if someone else was taking off.
19      Q.    Did Canal employees receive
20   bonuses?
21      A.    Yes, at Christmas time.
22      Q.    Let's talk about Christmas
23   bonuses.
24          Do you know how it was
25   determined the amount that Canal
```



```
 1                M. KAPLAN
 2   employees would receive for
 3   Christmas bonus?
 4      A.    Yeah.  They would receive
 5   -- I received a standard bonus that
 6   was part of what I negotiated during
 7   my last raise, 1,000 years ago.  But
 8   they would receive -- Chase had --
 9   she would -- at one point they were
10   getting I think like a 2,500 -- at
11   one point when we hired people Chase
12   had the idea that they would get a
13   2,500 bonus at Christmas, and a
14   2,500 birthday bonus.  And then I
15   think she got -- I think somebody
16   might have quit soon after the
17   Christmas or the birthday, but at
18   some point she changed that.  We
19   would talk about these ideas, but
20   her idea was she wanted to bring the
21   bonuses down as far as showing Bob
22   that we were spending less money in
23   the office.  And generally, she had
24   decided, you know, based on how long
25   -- I think it was like a week's pay
```



Page 443

```
 1                M. KAPLAN
 2    for maybe -- I don't remember if it
 3    was a little bit more for people
 4    that were there a little bit longer,
 5    but it was definitely less than what
 6    it used to be.  She would say to
 7    Bob, "This is what we are giving for
 8    bonuses" in an e-mail with Michael
 9    Tasch probably on it.  And he would
10    say -- you know, he disagreed --
11    with anything she said, he agreed
12    to.
13       Q.    Can you repeat that part,
14    he would agree to or would not?
15       A.    He would -- he deferred to
16    her on stuff like that.  So if she
17    said, "I think we should give so and
18    so a raise," he would say, "Okay."
19    I don't remember a situation where
20    he would say no to that.  And the
21    bonus we are doing for this year,
22    and he would sign off on it.  And he
23    would let Michael Tasch know at
24    Berdon.
25       Q.    You testified earlier that
```



```
 1              M. KAPLAN
 2    Chase came up with some ideas, and
 3    you said, quote, "You are not
 4    getting a raise, but," and then you
 5    broke off your answer.
 6              Do you remember giving that
 7    testimony?
 8              MS. HARWIN:  Objection to
 9       the form.
10    A.    Yeah.  I mean, that is --
11    you know, she would -- that is the
12    type of thing -- I think she said to
13    me at some point, you know, it was
14    like sort of like, well, it is
15    easier to get Bob -- Bob will get
16    mad about if you make this much
17    money, but he would agree to this
18    bonus type of thing.  That is
19    actually why -- I think that is why
20    my bonus was put in there the way it
21    was.  So the vacation pay was a
22    similar kind of consent.  It is like
23    oh, look, you are getting -- you
24    know, this many days this year of
25    vacation pay.  So that was a nice
```



Page 445

```
 1                   M. KAPLAN
 2   little bump at the end of year.
 3      Q.    Now the unused vacations,
 4   was that an honor system?
 5           MS. HARWIN:  Objection to
 6       the form.
 7      A.    Yeah.  She would call me
 8   and ask me to -- how many days I
 9   didn't use.  Sometimes -- I think
10   there was one or two years where she
11   had a number, and I would try to
12   double check it off the top of my
13   head, but it was pretty much based
14   on like an honor system because I
15   didn't -- I didn't -- yeah.  He just
16   sort of -- that is just the numbers.
17   I went to Florida for five days, I
18   went to California for five days.  I
19   took two random days here or there.
20   That is 12 days I took vacation,
21   that type of thing.
22      Q.    How -- how did you know how
23   many vacation days you were entitled
24   to each year?
25      A.    We would -- somehow we
```



Page 446

```
 1              M. KAPLAN

 2    talked about -- I don't know what

 3    year.  Tribeca would give people I

 4    think 14 or 15 days a year.  So I

 5    think 14 was the starting point with

 6    new employees I believe.  And Chase

 7    had it that we should just add -- at

 8    some point it was like an added days

 9    for service kind of thing.  But

10    there was nobody really like --

11    there was nobody really that was --

12    it was discussed with other than

13    running this idea.  It was like okay

14    sure, that seems like a reasonable

15    number.

16      Q.    I'm sorry, who is making

17    that decision to increase the days?

18    It is not clear?

19           MS. HARWIN:  Objection to

20      form.

21      A.    It was a type of thing that

22    Chase would have an idea, and

23    present it to me, and I would say,

24    "Okay.  That sounds great."  That

25    type of thing.
```



```
 1                M. KAPLAN
 2    Q.    And this was just to you
 3  and her or this was for everyone?
 4    A.    It was things we would have
 5  discussions over, yes.
 6    Q.    But for a new hire,
 7  additional vacation days, do you
 8  have any knowledge as to how that
 9  was communicated to them?
10    A.    I think there was a
11  contract sort of when they signed
12  it, that they listed -- I recall an
13  offer sheet that was listed for how
14  many vacation days.  And I don't
15  believe it was communicated to them
16  that there would be an increase if
17  they stayed longer.  I think that
18  was more of something that, you
19  know, there was never -- she never
20  made a compensation for the fact
21  that what if somebody actually
22  stayed for years like we have been
23  doing.  So I don't think we ever got
24  to that point.
25    Q.    You are talking about a
```



```
 1                M. KAPLAN
 2  contract.
 3          Are you familiar with any
 4  employees who were given a contract?
 5     A.    I think that all of the
 6  recent employees were given
 7  contracts, Morgan, Gillian, Sabrina,
 8  I don't know what year.  You would
 9  know better than me.  I don't know
10  what year that started.  I don't
11  believe in the early -- many years
12  ago we used to do that.
13     Q.    Why would I know better?
14     A.    Well, I meant you in the
15  general, like as lawyers for Mr. De
16  Niro that you would have -- somebody
17  created the contract.  Chase didn't
18  create it.  She just discussed what
19  she wanted in it.
20     Q.    Okay.
21          And what role, if any, to
22  your knowledge, did Chase have in
23  the onboarding process with new
24  hires?
25     A.    Chase decided sort of the
```



Page 449

```
 1               M. KAPLAN
 2    speed at which the new hires would
 3    matriculate into the Canal orbit so
 4    to speak.  Like she -- you know,
 5    they would start, and they wouldn't
 6    -- they often wouldn't be allowed to
 7    answer the phone for a while, a
 8    couple of weeks usually.  Or they
 9    would sort of -- they would sit
10    there and observe, and she would
11    come in and sort of tell them
12    stories about people.  It wasn't
13    really -- I would give them a tour.
14    She wanted me to give them a tour of
15    Tribeca always.  It was sort of like
16    -- they learned on e-mails for a
17    while.  And then they are allowed to
18    answer the phone, if it is not a
19    private call.  If it was a private
20    number it could be Bob or Grace.
21    And then eventually she would sort
22    of decide when they were able to
23    start talking to, you know, Bob
24    directly and answering the phone at
25    night.
```



Page 450

```
 1                  M. KAPLAN
 2     Q.    I am going to back to
 3  something a little bit more
 4  fundamental.
 5          When employees started,
 6  were they given paperwork to review,
 7  fill out, and sign?
 8     A.    Yes.
 9     Q.    Who would give them that
10  paperwork, if you know?
11     A.    I think it was Chase.  I am
12  not positive, but I think she would
13  get the paperwork from -- I don't
14  know if she got it from Berdon.  I
15  don't know where she got it.  But
16  she would then give it to them in an
17  e-mail or in person.  I don't
18  remember.
19     Q.    Do you know whether Canal
20  had a written policy regarding
21  harassment and discrimination?
22          MS. HARWIN:  This is very
23      far afield from the scope of
24      the direct examination.  To
25      the extent you are doing
```



Page 451

```
 1                M. KAPLAN
 2     redirect or
 3     cross-examination, please
 4     constrain yourself to the
 5     scope of the directions.
 6          MR. DROGIN:  I don't
 7     agree.  I think what you did
 8     was you turned the telescope
 9     around and you gave a very --
10     you focused on the -- it is
11     irrelevant, and I am actually
12     trying to broaden the scope
13     so we can actually see what
14     your client did.  So I
15     disagree with you.
16     Q.    Do you understand the
17  question?
18     A.    It was about a policy on
19  harassment?
20     Q.    Yes.
21     A.    I don't believe Canal had
22  its own policy.  I believe the -- at
23  some point we were instructed on
24  Tribeca -- I think Tribeca came in
25  and there was like a harassment
```



Page 452

```
 1              M. KAPLAN
 2    seminar they did at some point
 3    unless it was online.  I -- I can
 4    recall attending one.  I don't
 5    believe Chase attended it, but,
 6    yeah.
 7       Q.    Okay.
 8       A.    Or we had someone come to
 9    our office, yeah.
10       Q.    Do you know whether Chase
11    ever actually took vacation?
12             MS. HARWIN:  Objection to
13        the form.
14       A.    I mean it is back to what I
15    was saying earlier of the definition
16    to what a vacation is.  I know she
17    traveled a lot around the world and
18    Los Angeles.  And I know there was
19    pockets of time where I wouldn't
20    hear from her and no one would hear
21    from her when she was traveling.
22    And she -- there was one or two
23    trips where she specifically said
24    this is a vacation I don't want, you
25    know, please don't, you know,
```



```
 1                    M. KAPLAN
 2    hopefully don't bother type of
 3    thing.
 4        Q.    While she was away, say out
 5    of the country, did she ever inject
 6    herself into the office by Skype?
 7        A.    Yeah.  She -- I think when
 8    she used to go to Spain, we had --
 9    at that time we had like a -- it was
10    like a computer in the office, like
11    a -- like a general desktop.  And
12    she would -- I think it was a
13    desktop.  But anyway.  Yeah -- she
14    would say to Amelia -- that was back
15    a long time ago when like Amelia and
16    Olivia were in the office, and she
17    would essentially like Skype in.
18    And like they -- and she would just
19    sort of hang out, and you would come
20    into the office and just there would
21    just be this giant screen, and, you
22    know, where like there is people on
23    this call that aren't talking at
24    all.  It would be that situation
25    where she was just like there, like
```



Page 454

```
 1                    M. KAPLAN
 2   on a supervisor status when she was
 3   in an apartment in Spain doing
 4   whatever.
 5     Q.    You mentioned Olivia.
 6           That is Olivia Jampol,
 7   J-A-M-P-O-L?
 8     A.    Uh-huh.
 9     Q.    Yes.
10     A.    Yes.
11     Q.    How did Olivia's employment
12   end?
13     A.    Chase talked Bob into
14   agreeing that she wanted to fire her
15   because she was saying she was being
16   insubordinate to her, and just had
17   her -- just had her fired one day in
18   the office.  I don't remember.  I
19   don't remember who exactly -- I
20   think she did it along with someone
21   from HR from Tribeca, if I remember
22   correctly.
23     Q.    Have you ever met Chase's
24   mother?
25     A.    I believe I -- yes.  I did
```



Page 455

```
 1                M. KAPLAN
 2   meet her once or twice.
 3      Q.    Did certain candidates from
 4   employment get referred from Chase's
 5   mother?
 6      A.    Yes.  Olivia, actually, I
 7   believe came from Chase's mother,
 8   Christine.  Or Christine was a
 9   friend of her sister.  I don't know
10   if it was Chase's mother.  She was
11   like a childhood friend or something
12   like that.  There was -- I am trying
13   to think of the list of all of our
14   ex-employees, where they all came
15   from off the top of my head.  There
16   was some interns that came I think
17   were family friends.  This guy named
18   Ross, some girl named Daisy, I
19   believe.
20      Q.    One other question about
21   Spain.  To your knowledge, when she
22   was in Spain, was she paid her full
23   salary?
24      A.    Yes.
25      Q.    I want to ask you about
```



Page 456

```
 1                M. KAPLAN
 2    your perception of Chase's
 3    relationship with Bob.
 4            Did there appear to be
 5    anything odd about her relationship
 6    with him?
 7            MS. HARWIN:  Objection to
 8       the form.
 9       A.    She just was like -- it was
10    one of those things that everybody
11    in Bob's world thought Chase was
12    nuts, and yet, it was like -- it
13    didn't seem like Bob thought Chase
14    was nuts sort of thing.  So they --
15    you know, she was very like -- you
16    know, she would sign her e-mail
17    signature C, and he would sign it B,
18    and I don't know -- there was like
19    little things that she would copy
20    things that he did I think that is
21    how I remember it.  They would --
22    she would go through like these
23    walks outside of Bob's kids' school
24    at one point, which was near where
25    she lived.  She would meet him up
```



```
 1                M. KAPLAN
 2   there and get coffee.  So she
 3   definitely spoke to him a lot, and
 4   it would change over time depending
 5   on what was going on.  But I don't
 6   know -- I am nobody to judge what is
 7   odd or not odd.  But he definitely
 8   trusted her -- he trusted her on
 9   things that he didn't trust really
10   anybody else with through her
11   telling him, "don't trust anybody
12   else on these things."
13      Q.    Okay.
14            Did Tiffany ever tell you
15   that she wanted Chase fired?
16      A.    She wanted Chase out of the
17   picture.  So I don't know if she
18   ever said the words, "I want to fire
19   Chase."  She definitely -- she
20   definitely, you know, wanted Bob to
21   -- she definitely wanted Chase to go
22   away.
23      Q.    Did she tell you that she
24   wanted Chase to go away because
25   Chase was female?
```



Page 458

                    M. KAPLAN

 1
 2    A.    No.  She just thought she
 3  was nuts.
 4    Q.    Okay.
 5          Did Tiffany Chen ever lead
 6  you to believe that she wanted Chase
 7  out of the picture because Chase was
 8  female?
 9          MS. HARWIN:  Objection to
10     the form.
11    A.    No.  She -- she just more
12  or less would -- it was, you know --
13  she didn't like -- she very much
14  liked Sabrina when Sabrina started
15  to come up to deal with the office.
16  And she wanted her to be involved in
17  things, and she thought it wasn't
18  fair that Chase was doing all of
19  these things, and she wanted -- I
20  think she wanted to have more, you
21  know, say in the matter, too.  But
22  she didn't -- it wasn't about female
23  or male as there is plenty of males
24  she didn't like, myself included.
25    Q.    What other males didn't she



```
 1                M. KAPLAN
 2   like?
 3     A.    She didn't like Bob's
 4   driver, Claude.  She had him
 5   removed.  She didn't like -- there
 6   was a -- I know there was a chef or
 7   two that she had fired.
 8     Q.    Were the chefs male or
 9   female?
10     A.    Male, male.
11     Q.    Both?
12     A.    I don't know how many.  But
13   there was at least one chef that was
14   male that she didn't like and got
15   rid of.
16     Q.    How long had Claude been a
17   driver for Mr. De Niro?
18     A.    Many years he had been the
19   driver -- I don't remember exactly,
20   but several, several years.
21     Q.    Alright.
22           From your experience and
23   observations, was Chase generally
24   liked by other coworkers?
25           MS. HARWIN:  Objection to
```



Page 460

```
 1              M. KAPLAN
 2     the form.
 3     A.    No.  Like I said earlier, I
 4  was sort of the like arm chair --
 5  like therapist to try to keep people
 6  from jumping off the ledge and
 7  quitting because they couldn't stand
 8  working with her.  Pretty much every
 9  single person who worked in our
10  office would break down and just
11  rude her -- rude her presence so to
12  speak.
13     Q.    From your perspective, why
14  was that?
15     A.    She was very -- it was like
16  -- for starters, she was very
17  controlling.  Everyone had to do
18  things a certain way that often
19  seemed inefficient, that often
20  seemed like the goal was to work in
21  the office more.  They had to be
22  chained to their desks, they weren't
23  allowed to go to any events.  They
24  weren't allowed really any perks.
25  And she would scream at people
```



```
 1                M. KAPLAN
 2   often.  She was abusive to people
 3   often.  And she would make -- there
 4   would be, you know, there would be
 5   nights where she would keep people
 6   in the office for -- until after
 7   midnight to like go through photos
 8   for a calendar -- to make calendars.
 9   Things of that -- things that just
10   weren't important that were treated
11   as if they were so important that
12   they had to -- and, you know, she --
13   that type of thing.  She had control
14   and she used it to sort of like
15   terrorize people.
16      Q.   After Chase quit, you
17   organized a get together to
18   celebrate, did you not?
19      A.   Yes, as I discussed
20   earlier.
21      Q.   Okay.
22           Why did you do that?
23      A.   I think it wasn't my idea.
24   I think the e-mail was my idea
25   because that is just -- I try to be
```



Page 462

```
 1                  M. KAPLAN
 2    a funny guy when I am writing
 3    e-mails, not always thinking of
 4    legal consequences down the road.
 5    But the idea was -- I don't remember
 6    whose idea it was to sort of like --
 7    like get all the people from like
 8    this life of like misery to get them
 9    all in a room.  Because originally
10    it was telling everybody who had
11    been like tortured, "Did you hear
12    the news?"  Because nobody -- nobody
13    believed -- nobody who wasn't there
14    would have believed -- like people
15    thought Chase would literally never
16    leave.  Bob doesn't see it.  All
17    these people thought she was
18    abusive, and wasting his money, and
19    getting paid so much money to do --
20    to not even be in New York City.
21    All these lists -- laundry lists of
22    things that people thought were
23    nuts, Bob didn't see.  They thought
24    she would never leave, and they were
25    very -- everyone was sort of excited
```



```
 1                    M. KAPLAN
 2    by the idea of getting together and
 3    just -- and the getting together
 4    wasn't about Chase, it was more like
 5    it is good to see everybody and all
 6    of these people that sort of hated
 7    that job, hated working for Bob
 8    because she had ruined their lives.
 9    Some of the people she fired.
10    Andrea Cutler was another person she
11    had fired on like a Saturday I
12    believe and made cry.  And Olivia
13    was there, and then -- yeah.  So it
14    was -- it was just -- it was just an
15    idea that at the moment sounded like
16    a great idea, maybe -- a fun idea,
17    maybe it wasn't.
18        Q.    You said that you tried to
19    be funny in e-mails.  Do you recall
20    just saying that?
21        A.    Yes.  That is -- that is my
22    MO for my whole life.
23        Q.    Okay.
24              Does that extend to text
25    messages, too?
```



Page 464

```
 1                M. KAPLAN
 2            MS. HARWIN:  Objection to
 3      the form.
 4      A.    Certainly.  If anything a
 5  text message is less I thought, in
 6  my mind, is less permanent than an
 7  e-mail.  So if anything when a --
 8  when you are sending a text
 9  message -- it is not always -- it is
10  taking some liberties to try to be
11  amusing.
12      Q.    And you do standup comedy?
13      A.    I do sometimes.  I should
14  do it more often.
15      Q.    You use exaggeration?
16      A.    Yes.  As my mom doesn't
17  understand, I exaggerate stories all
18  the time, both on the podcast and in
19  standup comedy.
20      Q.    Are you a bit of a wise
21  ass?
22      A.    Sure.
23      Q.    A little bit of a class
24  clown?
25      A.    Yes.  That has always been
```



1                    M. KAPLAN

2    my problem, yes.

3        Q.    Got unsatisfactory in shows

4    self control in elementary school?

5        A.    Pretty much, yes.  Luckily

6    my children are well -- much better

7    behaved than I was.

8        Q.    You are -- you try to be a

9    funny guy, is that fair?

10       A.    Yes.

11       Q.    In Plaintiff's Exhibit 42,

12   which is Robinson 8022 --

13             MS. HARWIN:  Can you drop

14        into the chat the exhibit?

15       A.    It is the petty cash one?

16       Q.    No.  It is this one.

17             Do you see that?

18       A.    The one that you -- which

19   one --

20       Q.    Can you see -- can you see

21   the e-mail that is up on the screen?

22       A.    Yes, about the -- about the

23   petty cash.

24       Q.    Right.

25             Okay.  So it is back --



Page 466

```
 1                  M. KAPLAN
 2     A.    Yeah.
 3     Q.    What did you find buried in
 4  your backyard?
 5     A.    Right.  That is a joke
 6  about finding, you know, as I see
 7  here, unmarked bills, obviously is a
 8  joke.
 9     Q.    Wait, wait, wait.  Let's
10  break this down.
11          Did you find anything in
12  your backyard?
13     A.    No.  I don't have a
14  backyard.
15     Q.    Okay.
16          What -- did you find money
17  in unmarked bills?
18     A.    No.  I did not find money
19  in unmarked bills.
20     Q.    Okay.
21          When Chase left, were you
22  glad to see her go?
23     A.    Yes, I was.  Look, I had
24  the -- I didn't have the same
25  relationship with her that other
```



```
 1                M. KAPLAN
 2    people had, in that she and I -- she
 3    made my life miserable sometimes,
 4    but also was not -- she wasn't -- we
 5    had a different relationship than
 6    everyone else.  So I didn't -- I
 7    wasn't like -- I was like more in a
 8    state of shock.  I had been used to
 9    this one thing for so long that it
10    was like I was going to have so much
11    less stress in my life.  I had just
12    had a ███████████ that possibly she
13    was partly responsible for -- who
14    knows.  I don't -- so I was happy,
15    the short of it was I was happy that
16    there was a resolution.  I was not
17    looking forward to the week of -- of
18    continuous --
19       Q.    My only question -- my only
20    question was were you glad to see
21    her go?
22       A.    Yes.  Short answer.  Sorry.
23       Q.    Okay.
24             Back in -- sorry.
25             After she left, as you were
```



Page 468

```
 1                M. KAPLAN
 2    shown by counsel, there were a whole
 3    bunch of texts that you had with
 4    former employees.
 5            Is that correct?
 6    A.    Right.  Yes.  I saw them.
 7    Q.    And in one of them if you
 8    recall -- I can pull it up, there
 9    was -- you copy and pasted a video
10    of then President Obama announcing
11    the capture and death of Osama Bin
12    Laden.
13            Do you remember that?
14    A.    Yeah.  I mean, I think
15    somebody sent that to me and I
16    repasted, but I see that I did that.
17    Q.    What was the message that
18    you were trying to convey?
19    A.    You know, we -- it was like
20    this idea that for years she was
21    sort of like -- it seemed like the
22    same shock the nation felt when
23    Osama Bin Laden was killed, like we
24    finally got him.  It was like the
25    sense of like relief.  Everybody who
```



Page 469

```
 1               M. KAPLAN
 2    is here -- it was obviously she was
 3    not -- not literal, but it was --
 4    and she is obviously alive, but it
 5    was more of a tongue in cheek it has
 6    finally happened moment.  Like it
 7    was very -- at the time it was very
 8    fresh in American psyche, so --
 9       Q.   Okay.
10            Who is Morgan?
11       A.   Morgan Billington worked
12    for Bob as an assistant and then
13    worked for his daughter, Drena, for
14    a bit.
15       Q.   Okay.
16            And is Morgan black?
17       A.   Yes.
18       Q.   Did Chase ever make any
19    comments about the fact that Morgan
20    was black?
21            MS. HARWIN:  Objection to
22      the form.
23       A.   She -- yeah.  Well, there
24    was a time when -- when we
25    interviewed Morgan -- I don't know
```



```
 1              M. KAPLAN
 2    if we talked about this earlier, but
 3    we would often meet at coffee shops
 4    and didn't do it in the office.  The
 5    first time we had met with Morgan
 6    who was very -- she had a very --
 7    she was perfect for the job really I
 8    thought, and when she left the first
 9    thing Chase said was, "No.  She is
10    too much Jacquen."
11       Q.    J-A-C-Q-U-E-N?
12       A.    Yeah.  She reminds me too
13    -- she is too similar.  And Jacquen
14    had been an assistant earlier -- a
15    little earlier who was not -- I
16    loved Jacquen, but she was not the
17    best assistant.  And she happened to
18    be black, too.  That is the only
19    thing these two people had in
20    common.  Jacquen was like -- she is
21    a writer now and she is -- more
22    (inaudible) than me than Morgan
23    would be.  Morgan is very serious
24    and very professional.  And there
25    was literally nothing -- they were
```



Page 471

```
 1                M. KAPLAN
 2   both women, they were both black.
 3   That is all they had in common.
 4    Q.    Did Chase ever make any
 5   derogatory comments when you would
 6   order a salad?
 7        MS. HARWIN:  Objection to
 8     the form.
 9    A.    Yeah.  I -- there was --
10   derogatory, I don't know.  It was a
11   joke, but she would say -- we
12   referred to it as I was gay for
13   having gay salads after my ████
     ███████.  It was a joke, but -- it
15   was -- we weren't a very PC
16   environment.  She wasn't -- it was
17   the one thing that I think we had
18   most in common was neither one of
19   was very politically correct.
20    Q.    That is what I am getting
21   into.
22        Can you give some other
23   examples of how, in your opinion,
24   Chase was not politically correct?
25        MS. HARWIN:  Objection to
```



```
 1                M. KAPLAN
 2      the form.
 3      A.    Some other examples.  She
 4  -- I don't know off the top of my
 5  head, but I just -- I would say she
 6  -- she definitely did not, you know
 7  -- she definitely was like the whole
 8  -- like Me Too stuff, she was not
 9  really -- she -- she kind of -- she
10  just sort of like didn't want the
11  younger employees who wanted to be
12  -- you know, she thought it was
13  ridiculous -- like I was saying
14  earlier, the whole thing with "The
15  Girls," that was something she would
16  say, and would think it was
17  ridiculous that they were upset by
18  that.  But it bothered Gillian and
19  Sabrina who were younger, I think a
20  different generation.  We would talk
21  about this generational thing of
22  like office that you get -- you
23  know, when she first started we
24  would just barely -- the office was
25  more like bantering than I think
```



Page 473

```
 1                    M. KAPLAN

 2    over time it -- the world has

 3    changed so she didn't like that.

 4       Q.    We need to back this up.

 5    And sort of replay it because there

 6    is some important things here.  We

 7    need to get an understanding as to

 8    how Chase acted in your presence in

 9    the office.  Okay?

10            So when you are talking

11    about -- just confining your answer

12    to generational differences, explain

13    what you mean?

14            MS. HARWIN:  Objection to

15       the form.

16       A.    What I mean is that Chase

17    would express opinions about, you

18    know, things political, or jokes

19    about sex, or whatnot that were -- I

20    wasn't offended personally, but we

21    are not -- we are not how I would

22    talk if I was in the office now all

23    the time.

24       Q.    So you are saying that she

25    would tell jokes of a sexual nature
```



Page 474

```
 1                M. KAPLAN
 2   to you?
 3     A.    Yeah.
 4           MS. HARWIN:  Objection to
 5      the form.
 6     A.    We would have conversation
 7   or make fun of -- you know, I would
 8   tell stories.  She liked to hear
 9   stories about things with -- she
10   once -- we once were at -- we once
11   were out for an office dinner and
12   she thought it was funny to like put
13   my phone number on all the bingo
14   cards at this bar so that people
15   were always calling.  It said like,
16   "For a good time call Michael
17   Kaplan" at this number.  You know, I
18   -- I -- I, personally, you know, it
19   is not something that bothers me,
20   but that was the kind of atmosphere
21   we had in the -- a long time ago.
22     Q.    And you mentioned something
23   about her view on the Me Too
24   movement.
25           Can you explain what you
```



Page 475

```
 1                M. KAPLAN
 2   understood her view to be?
 3        MS. HARWIN:  Objection to
 4    the form.
 5   A.    Yeah, I don't want to dig
 6   too far into like -- I just meant
 7   like she -- she sort of had the sort
 8   of like, you know -- I don't know.
 9   I mean like Harvey once he was in
10   our building for instance, and I
11   think like we would make jokes about
12   -- that is not the right example.
13        It was just -- the way I
14   understood it she sort of wasn't as
15   offended by little things the way --
16   the way now it is like you have to
17   tip toe.  That is the idea of you
18   have to tip toe around things.  I
19   don't want to go too far into this
20   because I don't really have an
21   example.  It was sort of a sense
22   that I remember.
23   Q.    Okay.
24        Did you ever hear Bob refer
25   to Jane as a cunt?
```



Page 476

```
 1                M. KAPLAN
 2     A.    No.
 3     Q.    And did Chase use profanity
 4  in the office?
 5          MS. HARWIN:  Objection to
 6     the form.
 7     A.    When Chase would get really
 8  mad she would definitely use
 9  profanity in the office, yes.
10     Q.    About how frequently would
11  she get really mad?
12          MS. HARWIN:  Objection to
13     the form.
14     A.    You know, it was -- she --
15  if -- there had to be like a reason
16  that would set her off.  She would
17  storm into the bathroom and slam the
18  door, and be on the phone with
19  someone, or she would be screaming
20  at -- her and Olivia.  She would
21  scream at Olivia all the time.  I
22  don't know how often, because she
23  wasn't in the office that often, but
24  she definitely could like go to like
25  zero to 60 quickly.  She had that
```


MAGNA
LEGAL SERVICES

```
 1                    M. KAPLAN
 2    type of personality.
 3      Q.    Did she ever scream at you?
 4      A.    She screamed at me -- yes.
 5    There was a time when I -- I spoke
 6    to Bob directly about helping him
 7    out I think on Saturday Night Live
 8    when he was hosting, because it was
 9    something that my predecessor had
10    done.  And she just lost it because
11    I spoke to him directly.  I should
12    be talking to her.  She was
13    screaming at me.  She -- you know,
14    wanted me back in the office helping
15    out with something.  She lost it
16    about -- when I asked Amelia once to
17    help me with an event for his
18    father's art gallery, I think I
19    asked her to print some labels, that
20    time she screamed at me on Skype I
21    believe.  But there was -- she
22    definitely lost it a few times on me
23    about -- like I mentioned, the Con
24    Ed bill.  I don't know if she
25    cursed.  I don't know what word she
```



1           M. KAPLAN

2   used exactly but she -- she could --

3   she could have -- she had a temper.

4     Q.    Do you know whether Chase

5   had a housekeeper?

6     A.    Chase's mom had a

7   housekeeper, yeah.  And cleaning

8   person.

9     Q.    Yes, okay.

10          And do you know whether

11  Chase's mom's housekeeper ever

12  provided any services to Mr. De

13  Niro?

14    A.    I think that she -- I think

15  that during the apartment there was

16  some times when she would bring like

17  sheets or something back to the

18  apartment to get pressed by the

19  housekeeper I believe.  It was like

20  -- as I said earlier, there wasn't

21  really staff at the house, and she

22  wanted everything at the house to

23  seem like it was a maintained Upper

24  East Side home.  So I believe she

25  brought her in because I don't think



Page 479

```
 1                   M. KAPLAN
 2    anyone -- that is how I remember it.
 3       Q.    Who is -- who is the she in
 4    that sentence?
 5       A.    Chase.  I remember -- we
 6    had a laundry machine there, and I
 7    remember me noticing -- I would go
 8    around and take the -- take the lint
 9    out because I don't think she even
10    knew to take lint out of the dryer,
11    so I would have to take it out so we
12    didn't burn the place down.  But so
13    I don't -- if -- I don't think she
14    was pressing sheets, but they would
15    get done somehow.  So I believe she
16    would take them to her housekeeper.
17       Q.    Going to Netflix viewing
18    for a couple of questions there.
19    What -- withdrawn.
20           Did Chase ever discuss with
21    you the types of shows she liked to
22    watch?
23       A.    Yeah, we both -- we both --
24    would talk Arrested Development.  We
25    both watched that, and she would try
```



```
 1                M. KAPLAN
 2   to get me to watch The League.  She
 3   would try to get me to watch
 4   Schitt's Creek.  She would tell me I
 5   would like them.  I never did watch
 6   them.  So we would talk -- we both
 7   liked It Is Always Sunny in
 8   Philadelphia.  We would talk about
 9   that.
10          MS. HARWIN:  Counsel, we
11      have been going for over an
12      hour, can you advise
13      approximately how much time
14      you anticipate?
15          MR. DROGIN:  Yeah.  Five
16      minutes.  We are really right
17      near the end.
18   Q.    You were shown Plaintiff's
19   Exhibit 34.
20   A.    Which one is that?
21   Q.    49479?
22          MS. HARWIN:  Can you drop
23      in chat the exhibit or put it
24      on your screen?
25          MR. DROGIN:  Yeah, I am
```



```
 1                M. KAPLAN
 2     trying.
 3     A.    Is it the one about -- the
 4   one with Mercedes?  Is that the one
 5   we are talking about?
 6     Q.    Yep.  Yep.  Okay.
 7           Let me just screen share
 8   here.  I think I got it.  Is that
 9   it?
10     A.    I just lost it.  I see --
11   yes, I see it.
12     Q.    So you -- you -- there is a
13   text that you wrote here, August
14   20th.  It says -- you say, "I put a
15   lot of work into this as she was
16   threatening to sue Bob so they
17   wanted to ruin her first."
18           Do you see that?
19     A.    Yes.
20     Q.    Where did you come up with
21   this idea or notion that they --
22   whoever they is, wanted to ruin her
23   first?
24           MS. HARWIN:  Objection to
25     the form.
```



```
 1                    M. KAPLAN
 2     A.    I -- I don't -- as I said
 3   earlier, I don't remember a lot of
 4   the text message specifics.  I -- I
 5   had -- all I could say is I had the
 6   idea in my head that, you know, that
 7   timing -- it was essentially both --
 8   you know, ruin, I don't know why --
 9   I don't know where I got the word
10   ruined from.  I am kind of just -- I
11   am kind of just trying to -- to --
12   what is the word?  It sounded good I
13   guess.  But -- because Mercedes here
14   is e-mailing me about the article
15   and so yeah, I am just.
16     Q.    Let me ask you directly.
17           Did anyone tell you that
18   Canal Productions wanted to sue
19   Canal -- sue Chase first because she
20   was threatening to sue.  Did anyone
21   tell you that?
22           MS. HARWIN:  Objection to
23      the form.
24     A.    No.  It wasn't told to me
25   specifically by anybody, no.
```



Page 483

```
 1              M. KAPLAN
 2   Q.    Okay.
 3         Did Bob ever yell at you?
 4   A.    Yes.
 5   Q.    Can you remember some of
 6   the circumstances that caused him to
 7   yell at you?
 8   A.    Yeah.  He -- once we went
 9   to his father's studio, and it
10   wasn't -- he just showed up there
11   unannounced, and he wanted to go in,
12   and we went in, and it wasn't like
13   -- it was like dusty, and he went
14   nuts on me about that.  Once -- once
15   I was on -- there was a time when
16   Chase and Nellie went to the opera,
17   and I was using the -- I was on the
18   phone and a bag got misplaced, and I
19   had no -- like nothing to do with.
20   And he called and he started
21   screaming at me about this bag, and
22   I had to get it together kid and he
23   was very mad.  And so, yeah.  He
24   definitely yelled at me.  I didn't
25   speak to him as frequently
```



Page 484

```
 1                M. KAPLAN
 2    especially as some people.  So I
 3    probably didn't get yelled at as
 4    much as other people, but I
 5    definitely got yelled at.
 6            MR. DROGIN:  Can we take
 7        a five-minute break, please?
 8        I am winding down, but I want
 9        to confer with Mr. Bennett,
10        and Mr. Harvey, and Ms.
11        Lazzaro.
12            THE VIDEOGRAPHER:  The
13        time is 6:52 p.m., and we are
14        off the record.
15            (Wherefore, a recess was
16        taken at this time.)
17            THE VIDEOGRAPHER:  The
18        time is now 6:57 p.m.  We are
19        back on the record.
20    Q.    To your knowledge, didn't
21    Toukie Smith have a preferred hotel
22    that she stayed at in Los Angeles?
23    A.    Yes.  She had stayed -- she
24    had gone out to LA --I mean, she
25    knew LA pretty well I think.  She
```


MAGNA
LEGAL SERVICES

Page 485

```
 1                M. KAPLAN
 2   had been there plenty of times.
 3   Yeah, she stayed at the Marriott,
 4   the one in Santa Monica, the famous
 5   one.
 6     Q.    Does it make any sense to
 7   you that Chase would have had to go
 8   out to Los Angeles to scout out a
 9   hotel for Toukie?
10     A.    As I said earlier, it
11   didn't make sense because there was
12   specific rooms that she needed for
13   her medical, they could have sent
14   those.  So it was never something
15   that I was aware of as a
16   possibility.
17     Q.    Alright.
18          Chase resigned abruptly, is
19   that correct?
20     A.    Yeah.  She was -- we were
21   discussing work the night before and
22   then she resigned within 24 hours.
23     Q.    How did her abrupt
24   resignation impact the office?
25     A.    Well, we -- you know, there
```



```
 1                M. KAPLAN
 2   was -- it was sort of -- we had to
 3   -- we didn't have a lot information
 4   that she had with regards to
 5   passwords with computers in the
 6   office and things of that nature.
 7   So it was a lot of like trying to
 8   figure out where we were with some
 9   things.
10     Q.    Okay.
11           And in the course of trying
12   to figure out where you were with
13   those things, was certain
14   information uncovered that was --
15   then formed the basis for the
16   investigation that you testified
17   about earlier?
18           MS. HARWIN:  Objection to
19     the form.
20     A.    Yeah.  A lot of the --
21   there was a lot of things that were
22   uncovered in Chase's e-mails
23   specifically that were things that
24   people weren't aware of to the full
25   extent I guess.
```



Page 487

```
 1              M. KAPLAN
 2    Q.    And as those things were
 3  uncovered, is that when you began to
 4  look into them in greater detail?
 5         MS. HARWIN:  Objection to
 6    the form.
 7    A.    Yeah.  Like before that, I
 8  had been looking into miles, but
 9  other things as -- as we -- you
10  know, especially -- I mean, Gillian
11  and Sabrina were -- you know, would
12  see, they would use her e-mail for
13  work reasons and they would see
14  other things and be like, what?
15  What is going on here?
16    Q.    But just for clarification,
17  you -- this look into her e-mails,
18  that began immediately after she
19  resigned, isn't that right?
20         MS. HARWIN:  Objection to
21    the form.
22    A.    Yeah.  There was a time
23  when we were asking, I -- you know,
24  I tried to get some passwords from
25  her, and --
```



```
 1                M. KAPLAN
 2    Q.    We want to finish.
 3          My only point is, I am
 4    trying to pinpoint when the
 5    investigation that you have been
 6    testifying about actually started?
 7    A.    It started -- yeah.
 8    Q.    It started when?
 9          MS. HARWIN:  Objection to
10     the form.
11    A.    It started -- you know, in
12    the weeks leading up to her
13    resignation looking into certain
14    things, and it accelerated after she
15    resigned.
16    Q.    And the SkyMiles, what
17    role, if any, did you play in
18    determining how many SkyMiles Chase
19    Robinson had used?
20    A.    I was -- you know, able to
21    -- I had access to the Delta
22    account.  I knew -- you know, we had
23    the log-in information so I was the
24    one who sort of saw all the trips.
25    I knew from history which ones were
```



Page 489

```
 1                  M. KAPLAN
 2   ones she had gone on, and then knew
 3   also, you know, other trips.  I
 4   didn't know how many Delta miles she
 5   had used of her own stuff.  I just
 6   knew the ones she used from Bob's
 7   because I had access to that.
 8     Q.    Did you analyze the
 9   SkyMiles records to determine which
10   trips she had taken?
11     A.    Yes.  I could tell from
12   looking at the records which trips
13   were hers.
14     Q.    And when you -- when you
15   made that determination, who did you
16   give that information to?
17     A.    That information went to
18   Tom Harvey.
19     Q.    Okay.
20         MR. DROGIN:  I don't have
21      any further questions.  Greg,
22      I don't know if you do, but I
23      am done.
24         MR. BENNETT:  I do not.
25      Thank you.
```



Page 490

```
 1              M. KAPLAN
 2         MS. HARWIN:  I have some
 3     follow-up questions and we
 4     will try to keep this quick
 5     and let you go for the
 6     evening.  Okay?
 7         THE WITNESS:  Sure.
 8     EXAMINATION
 9     BY MS. HARWIN:
10     Q.    You weren't involved in all
11 the communications between Mr. De
12 Niro and Ms. Robinson about
13 employees' salaries, is that
14 correct?
15     A.    You said I was or wasn't
16 involved?
17     Q.    You were not involved in
18 all the communications between Mr.
19 De Niro and Ms. Robinson about
20 employees' salaries, correct?
21     A.    Not all of them, no.
22     Q.    Okay.
23         So correct?
24     A.    Correct.
25     Q.    Mr. De Niro was the final
```



```
 1              M. KAPLAN
 2   decision maker when it came to
 3   employees' salaries at Canal,
 4   correct?
 5      A.    No.  I wouldn't say that
 6   this is correct.
 7      Q.    Ms. Robinson could not
 8   implement employees' salaries
 9   without first obtaining Mr. De
10   Niro's approval, correct?
11      A.    That is correct, yes.
12      Q.    You weren't involved in all
13   of the communications between Mr. De
14   Niro and Ms. Robinson about employee
15   bonuses, correct?
16      A.    Correct.
17      Q.    Ms. Robinson could not
18   implement bonuses without first
19   obtaining Mr. De Niro's approval,
20   correct?
21      A.    Correct.
22      Q.    Ms. Robinson could not
23   implement a termination decision
24   without first obtaining Mr. De
25   Niro's approval, correct?
```



1                   M. KAPLAN

2     A.    Define -- yes.  She would

3   need his approval, correct.

4     Q.    And you weren't involved in

5   all of the communications between

6   Mr. De Niro and Ms. Robinson about

7   terminating employees at Canal,

8   correct?

9     A.    I don't know if I was

10  involved.  No, not all of them.  No.

11  Correct.

12    Q.    Tribeca Enterprises had a

13  human resources department, correct?

14    A.    Correct.

15    Q.    Canal borrowed a lot of

16  policies from Tribeca Enterprises,

17  correct?

18         MR. DROGIN:  Objection to

19    the form.  You can answer it.

20    A.    Canal borrowed some of the

21  -- yes.  I guess.  Correct, I guess.

22         MR. DROGIN:  Please don't

23    guess.

24    A.    I don't really know what

25  Canal borrowed from Tribeca.  I



Page 493

1                    M. KAPLAN

2    haven't looked at Tribeca's policy

3    closely.

4      Q.    It was your understanding

5    that Canal borrowed a number of

6    policies from Tribeca, correct?

7            MR. BENNETT:  Objection

8      to the form.

9      A.    It was -- correct.  It was

10   my understanding that legally

11   Tribeca and Canal were similar.  So

12   correct.

13     Q.    When policies were

14   implemented at Canal, you weren't

15   involved in all of the discussions

16   that took place between Ms. Robinson

17   and Mr. De Niro before the policies

18   were implemented, correct?

19     A.    Correct.

20     Q.    When policies were

21   implemented at Canal, you didn't

22   have personal knowledge of whatever

23   discussions took place between Mr.

24   De Niro and Ms. Robinson about those

25   policies, correct?



```
 1                M. KAPLAN

 2           MR. DROGIN:  Objection to

 3     the form.  You can answer.

 4     A.    Correct.

 5     Q.    When new policies were

 6   implemented at Canal, you didn't

 7   always have an understanding of

 8   where the new policies came from,

 9   correct?

10     A.    That is not correct.  We

11   would have discussed it.

12     Q.    Okay.

13           It is your testimony that

14   -- that you had an understanding as

15   to where every single policy at

16   Canal came from?

17     A.    Every single policy?  I

18   don't know what policies you are

19   talking about, so no.

20     Q.    Okay.

21           So whenever new policies

22   were implemented at Canal, you

23   didn't always have an understanding

24   of where those policies came from,

25   correct?
```



Page 495

```
1              M. KAPLAN
2     A.    Sure.  Correct.  I don't
3  know what we are talking about.
4     Q.    When Ms. Robinson wanted to
5  change Canal's health benefit
6  provider, Mr. De Niro wouldn't
7  permit her to do that, correct?
8     A.    When Canal -- she wanted to
9  change the -- she didn't -- it
10 wasn't that she wanted to change the
11 health care provider.  She wanted to
12 change the benefit's company.
13    Q.    Right.
14          When Ms. Robinson wanted to
15 change Canal's health benefit
16 provider, Mr. De Niro wouldn't
17 permit her to implement the change,
18 correct?
19    A.    Correct.
20    Q.    Do you recall Ms. Robinson
21 ever implementing any office policy
22 of significance without Mr. De
23 Niro's approval?
24          MR. DROGIN:  Objection to
25     the form.
```



1                M. KAPLAN

2      A.    I don't know.  I don't know

3    what he -- what he knew about it or

4    what he didn't, so I don't know.  I

5    can't answer that.

6      Q.    Okay.

7            You weren't involved in the

8    communications between Mr. De Niro

9    and Ms. Robinson about employees'

10   vacation days, correct?

11     A.    Correct.

12     Q.    Ms. Robinson could not

13   implement changes to the number of

14   vacation days that employees

15   received without first obtaining Mr.

16   De Niro's approval, correct?

17     A.    I don't know that she --

18   that he was involved in that either.

19     Q.    You don't know either way?

20     A.    I don't know either way.  I

21   don't think it is something that he

22   would have been involved in, but I

23   don't know.

24     Q.    Ms. Robinson never

25   expressed to you that she enjoyed



Page 497

```
 1                M. KAPLAN
 2    working on Mr. De Niro's home at
 3    ███████████████████
 4      A.    Never expressed that she
 5    enjoyed working, I don't -- I don't
 6    recollect expressing any of those
 7    words, no.  Correct.
 8      Q.    Ms. Robinson expressed
 9    complaints to you about working at
10    Mr. De Niro's home at ███, correct?
11      A.    Not correct.  No.  Not
12    really.
13      Q.    Well, you testified
14    previously about complaints that she
15    expressed?
16      A.    She expressed in -- yeah.
17    Correct in a sense that it is a job.
18    She complained about the job in
19    general.  Correct.  Yes.
20      Q.    When you testified about
21    Ms. Robinson relishing working at
22    Mr. De Niro's home at ███, that is
23    the opposite of what Ms. Robinson
24    communicated to you, correct?
25      A.    No, that's not correct.
```



```
 1              M. KAPLAN
 2    There was examples of her being
 3    frustrated as she communicated to
 4    me.  But as an overall feeling, she
 5    didn't communicate that on a daily
 6    basis.  That is not correct.
 7    Q.    Okay.
 8          But when you testified
 9    about Ms. Robinson purportedly
10    relishing working on Mr. De Niro's
11    home at ████, that is a conclusion
12    that you reached, but that is not
13    something that she told you,
14    correct?
15    A.    Correct.
16          MS. HARWIN:  I believe
17       that can conclude our
18       questioning.
19          Thank you for being here
20       for your deposition, Mr.
21       Kaplan.  I appreciate the
22       time you have taken and we
23       wish you a good evening.
24          THE WITNESS:  Thank you
25       very much.  You too.
```



Page 499

```
 1
 2          THE VIDEOGRAPHER:  The
 3     time is 7:10 p.m.  We are now
 4     off the record.
 5          (Time Noted:  7:10 p.m.)
 6
 7          MICHAEL KAPLAN
 8
 9     Subscribed and sworn to
10     before me this   day of
11          2022.
12
13
14          Notary Public
15
16
17
18
19
20
21
22
23
24
25
```



1

2                    I N D E X

3

WITNESS              EXAMINATION BY   PAGE

4
Michael Kaplan

5                    Ms. Harwin         7

6                    Mr. Drogin        406

7                    Ms. Harwin        490

8

9

10                   EXHIBITS

11

PLAINTIFF'S   DESCRIPTION          PAGE

12
    11        Canal 0022626         92

13
    12        an e-mail            133

14
    13        Canal 0049058        148

15
    14        Canal 0047918        154
16            through 923

17  15        Canal 0030926        159

18  16        Canal 0048105        177
              0048109
19
    17        Canal 0050288        191
20            through 89

21  18        Canal 0055358        212

22  19        Canal 0094010        217

23  20        Canal 0049210        222

24  21        Canal 0047380        234

25



1

2        I N D E X   C O N T I N U E D

3                  EXHIBITS

4      PLAINTIFF'S   DESCRIPTION          PAGE

5
       22            Canal 0047503        237
6                    through 509

7      23            Canal 0047829        240

8      24            Canal 0047643        248
                     through 44
9
       25            Canal 04641          253
10                   through 42

11     26            Canal 0034641        256

12     27            Canal 0047796        262

13     28            Canal 0047511        265

14     29            Canal 0047798        270

15     30            Canal 0047485        272

16     31            Canal 47900          273

17     32            Canal 0047848        281

18     33            Canal 0047441        284

19     34            Canal 0049479        292

20     35            Canal 0047951        303

21     36            Canal 0010215        320

22     37            Canal 0049181        330

23     38            Canal 0049200        343

24     39            Canal 050122         352

25



Page 502

1

2         I N D E X   C O N T I N U E D

3              EXHIBITS

4     PLAINTIFF'S   DESCRIPTION        PAGE

5
      40            Canal 050127       353
6
      41            Canal 0047423      361
7
      42            Robinson 00008022  379
8
      43            Canal 0049169      382
9                   through 171

10    44            Canal 0047953      387
                    through 54
11
      45            Canal 0047668      393
12
      46            Canal 0047716      399
13

14

15

16

17

18

19

20

21

22

23

24

25



Page 503

```
 1                   C E R T I F I C A T E

 2

 3           I, PAIGE HAYDEN, hereby certify that the

 4    Examination Before Trial of MICHAEL KAPLAN was held

 5    before me on the 23rd day of March, 2022; that said

 6    witness was duly sworn before the commencement of his

 7    testimony; that the testimony was taken stenographically

 8    by myself and then transcribed by myself; that the party

 9    was represented by counsel as appears herein;

10           That the within transcript is a true record of

11    the Examination Before Trial of said witness;

12           That I am not connected by blood or marriage

13    to any of the parties; that I am not interested directly

14    or indirectly in the outcome of this matter; that I am

15    not in the employ of any of the counsel.

16           IN WITNESS WHEREOF, I have hereunto set my

17    hand this 23rd day of March, 2022.

18

19                    Paige Hayden

20                    PAIGE HAYDEN

21

22

23

24

25
```



```
1                        ERRATA SHEET

2

3     PAGE   LINE (S)     CHANGE          REASON

4     ____|_____|_____|_____

5     ____|_____|_____|_____

6     ____|_____|_____|_____

7     ____|_____|_____|_____

8     ____|_____|_____|_____

9     ____|_____|_____|_____

10    ____|_____|_____|_____

11    ____|_____|_____|_____

12    ____|_____|_____|_____

13    ____|_____|_____|_____

14    ____|_____|_____|_____

15

16

17                            MICHAEL KAPLAN

18    SUBSCRIBED AND SWORN TO BEFORE ME

19    THIS _____ DAY OF _____, 20__.

20    _____      _____

21    (NOTARY PUBLIC)        MY COMMISSION EXPIRES:

22

23

24

25
```

