# Exhibit 14

UNITED STATES SOUTHERN DISTRICT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
GRAHAM CHASE ROBINSON,

      Plaintiff,


   -against-   Case No:
         1:19-cv-09156 (LTS) (KHP)



ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,

     Defendants.
---------------------------------------------x
   DEPOSITION TAKEN VIA ZOOM

   April 7, 2022
   9:30 a.m.


   VIDEOTAPED DEPOSITION of MICHAEL TASCH, held
at the above-mentioned time, before, PAIGE HAYDEN, a
Court Reporter and Notary Public of the State of New
York.
   ---------------------------------------------X






MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



```
                                                         Page 2
 1    A P P E A R A N C E S:

 2     KLEIN ZELMAN ROTHERMEL JACOBS & SCHESS, LLP
                Attorneys for Michael Tasch
 3              485 Madison Avenue
                New York, New York 10022
 4
       BY:     JANE JACOBS, ESQ.
 5

 6
       SANFORD HEISLER SHARP, LLP
 7              Attorneys for Plaintiff
                1350 6th Avenue 31st floor
 8              New York, New York 10019

 9     BY:     ANNIE SLOAN, ESQ.

10

11     TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
                Attorneys for Defendant
12              Seven Skyline Drive
                HAWTHORNE, NEW YORK 10532
13
       BY:     GREGORY BENNETT, ESQ.
14

15
       TARTER KRINSKY & DROGIN, LLP
16              Attorneys for Defendant
                1350 Broadway
17              New York, New York 10018

18     BY:     LAURENT DROGIN, ESQ.

19

20     ALSO PRESENT:

21     HARRY BERGENFIELD, VIDEOGRAPHER, MAGNA LEGAL SERVICES

22     KATE MACMULLIN, SANFORD HEISLER SHARP, LLP
       ALEXANDRA HARWIN, SANFORD HEISLER SHARP, LLP
23     JEREMY HEISLER, SANFORD HEISLER SHARP, LLP
       JEREMY MARGOLIS, SANFORD HEISLER SHARP, LLP
24
       CHASE GRAHAM ROBINSON, PLAINTIFF
25     BRITTANY K. LAZZARO, TARTER KRINSKY & DROGIN LLP
```



Page 3

1                    FEDERAL STIPULATIONS

2

3    IT IS HEREBY STIPULATED AND AGREED by and between the

4    attorneys for the respective parties herein, that filing

5    and sealing be and the same are hereby waived.

6

7    IT IS FURTHER STIPULATED AND AGREED that all objections,

8    except as to form of the question, shall be reserved to

9    the time of the trial.

10

11   IT IS FURTHER STIPULATED AND AGREED that the within

12   deposition may be sworn to and signed before any officer

13   authorized to administer an oath, with the same force

14   and effect as if signed and sworn to before this Court.

15

16

17

18

19

20

21

22

23

24

25



Page 4

1

2          THE VIDEOGRAPHER:  We are

3     now on the record.  This

4     begins video number one in

5     the deposition of Michael

6     Tasch, in the matter of

7     Graham Chase Robinson versus

8     Robert De Niro and Canal

9     Productions, Incorporated.

10          Today is Thursday, April

11     7, 2022.  The time is now

12     9:31 a.m.

13          Counsel and all parties

14     present will be noted on the

15     stenographic record.

16          Will the court reporter

17     please swear in the witness?

18

19

20

21

22

23

24

25



Page 5

```
 1
 2      MICHAEL TASCH, the WITNESS
 3      herein, having been first
 4      duly sworn by a Notary Public
 5      of the State of New York, was
 6      examined and testified as
 7      follows:
 8      EXAMINATION BY
 9      MS. SLOAN:
10    Q.    State your name for the
11  record, please.
12    A.    Michael P. Tasch.
13    Q.    State your address for the
14  record, please.
15    A.    570 Pontiac Road, East
16  Meadow, New York 11554.
17          MS. SLOAN:  We can
18      announce our appearances on
19      the record.
20          I am Anne Sloan from
21      Sanford Heisler Sharp on
22      behalf the Plaintiff, Graham
23      Chase Robinson.
24          MR. HEISLER:  Jeremy
25      Heisler of Sanford Heisler
```



Page 6

```
 1                M. TASCH
 2      Sharp, for the Plaintiff,
 3      Graham Chase Robinson.
 4        MS. HARWIN:  Alexandra
 5      Harwin from Sanford Heisler
 6      Sharp also on behalf of
 7      Plaintiff, Graham Chase
 8      Robinson.
 9        MS. MACMULLIN:  I am Kate
10      Macmullin from Sanford
11      Heisler Sharp also on behalf
12      of Plaintiff, Graham Chase
13      Robinson.
14        MR. MARGOLIS:  Jeremy
15      Margolis from Sanford Heisler
16      Sharp on behalf of the
17      Plaintiff, Graham Chase
18      Robinson.
19        MR. BENNETT:  Gregory
20      Bennett for Defendants,
21      Traub, Lieberman Straus &
22      Shrewsberry.
23        MR. DROGIN:  Laurent
24      Drogin, Tarter Krinsky &
25      Drogin, for Canal Productions
```



Page 7

```
 1                  M. TASCH
 2      Inc.
 3           MS. LAZZARO:  Brittany
 4      Lazzaro from Tarter Krinsky &
 5      Drogin, for Canal Productions
 6      Inc.
 7           MS. JACOBS:  Jane Jacobs,
 8      Klein Zelman Rothermel Jacobs
 9      & Schess on behalf of Mr.
10      Tasch and Berdon, LLP.
11           MS. SLOAN:  Okay.
12      Wonderful.
13      Q.   Mr. Tasch, thank you for
14   being here today.  My name is Annie
15   Sloan.  I am going to be questioning
16   you today.
17           Before we begin, I am going
18   to take a few minutes to go over
19   some ground rules for today's
20   deposition just to make sure that we
21   get everything clear on the record
22   and things go smoothly.
23           First of all, I am going to
24   ask you questions, and both my
25   questions and your answers will be
```



Page 8

```
 1                 M. TASCH
 2  recorded by the court reporter.
 3  Both of us need to speak clearly so
 4  the court reporter can record
 5  everything.
 6         Do you understand that?
 7   A.    Yes.
 8   Q.    And you also must answer
 9  verbally because the court reporter
10  cannot record a nod or a shake of
11  the head.
12         Do you understand that?
13   A.    Yes.
14   Q.    Okay.
15         And please wait until I
16  finish my question before you start
17  answering.
18         If you don't understand my
19  question for any reason, don't
20  answer, and ask for clarification.
21  If you answer the question, however,
22  we will assume that you understood
23  the question.
24         Do you understand that?
25   A.    Yes.
```


MAGNA
LEGAL SERVICES

```
 1                   M. TASCH
 2     Q.    If you need a break at any
 3   time, and for any reason, tell me,
 4   and we will finish your answer if we
 5   are in the middle of it and then
 6   take break.  The only time you can't
 7   take a break is if a question is
 8   pending.
 9          Do you understand that?
10     A.    Yes.
11     Q.    Your attorney will object
12   from time to time.  But unless she
13   instructs you not to answer, you
14   should still answer my question.
15          Do you understand that?
16     A.    Yes.
17     Q.    If you answer a question
18   and then later on you remember some
19   additional information or would like
20   to clarify an earlier answer that
21   you gave, please tell me that you
22   would like to add something to an
23   earlier answer and I will give you
24   the opportunity to do that.
25          Do you understand that?
```



```
 1              M. TASCH
 2    A.    Yes.
 3    Q.    If I use a term or
 4  abbreviation incorrectly, please
 5  correct my usage so we can make sure
 6  we all have the same understanding
 7  or what the record means.
 8         When I refer to Canal, I am
 9  referring to Canal Productions, Inc.
10         If you aren't sure about
11  what I mean by any term, please let
12  me know.
13         Is there any instruction I
14  have provided that you do not
15  understand or do not agree with?
16    A.    No.
17    Q.    This testimony is under
18  oath just as if you were in a court
19  of law.  This testimony may be used
20  as evidence in this case.
21         Do you understand that?
22    A.    Yes.
23    Q.    Are you on a computer right
24  now, is that how you are viewing the
25  Zoom?
```



```
 1                 M. TASCH

 2     A.     Yes.

 3     Q.     Other than the computer

 4  that you are on right now, do you

 5  have any electronic screens or

 6  communication devices with you in

 7  the room that you are in?

 8     A.     My cell phone is here.

 9     Q.     Okay.

10            We want to make sure that

11  all devices are off, and that you

12  are not using them during the

13  deposition.  It is important that

14  when you are testifying that you do

15  not look at any other device and

16  that you cannot use your phone to

17  communicate during the deposition.

18  Is your phone off right now?

19     A.     It is not and I am not

20  turning it off.

21     Q.     Would you please turn it on

22  silent and keep it away from you and

23  not communicate on it during the

24  deposition?

25     A.     I can't keep it on silent.
```



Page 12

```
 1                  M. TASCH
 2   My mom is not feeling well, and if I
 3   get a call from her, I have to take
 4   it.
 5     Q.    Okay.
 6          Do you agree not to
 7   communicate using the phone during
 8   the deposition?
 9     A.    Yes.  It is over to the
10   side there, so it is really away
11   from me.  That is the only concern I
12   have.
13     Q.    Okay.
14          Is there anyone in the room
15   with you today?
16          MS. JACOBS:  I'm sorry.
17      I had to unmute.  If he wants
18      to confer with me, he has the
19      right to do that during the
20      deposition.
21          MS. SLOAN:  He can -- on
22      a break.  Are you talking
23      about on a break?
24          MS. JACOBS:  Yes.
25          MS. SLOAN:  Yes.
```



Page 13

```
 1                    M. TASCH
 2     Q.     Okay.
 3            Is there anyone in the room
 4   with you today?
 5     A.     No.
 6     Q.     And do you understand that
 7   you are obligated to provide
 8   testimony that is truthful and
 9   complete?
10     A.     Yes.
11     Q.     Do you understand that you
12   must provide testimony that is
13   truthful and complete even if it
14   might be hurtful to Mr. De Niro?
15     A.     Yes.
16     Q.     Do you understand that you
17   must provide testimony that is
18   truthful and complete even if it
19   might be hurtful to Canal?
20     A.     Yes.
21     Q.     And do you understand that
22   you must provide testimony that is
23   truthful and complete even if it
24   might be hurtful to yourself?
25     A.     Yes.
```



```
 1                M. TASCH

 2    Q.    Okay.

 3          What is your full name?

 4    A.    Michael P. Tasch.

 5    Q.    Do you have -- is your

 6    middle name P or is that a middle

 7    initial?

 8    A.    It is a middle initial.

 9    Q.    What is your middle name?

10    A.    Philip.

11    Q.    Have you gone by any other

12    name?

13    A.    No.

14    Q.    What is your date of birth?

15    A.    11/14/54.

16    Q.    And what is your home

17    address?

18    A.    ████████████████████

      ██  ███████████████████

20    Q.    And how long have you

21    resided at that address?

22    A.    Since -- about 36 years.

23    Q.    Does anyone live with you?

24    A.    Yes, my wife.

25    Q.    Okay.
```



Page 15

```
 1                   M. TASCH
 2          And what is your wife's
 3    name?
 4          THE WITNESS:  Jane, do I
 5       have to provide that
 6       information?
 7          MS. SLOAN:  It looks like
 8       you are muted.
 9          MS. JACOBS:  Yes.  Please
10       answer, Michael.
11    A.    Judy Tasch.
12    Q.    And how long have you been
13    married to Ms. Judy Tasch?
14    A.    40 years.
15    Q.    Do you suffer from any
16    condition that affects your memory?
17    A.    Not that I know of.
18    Q.    Have you consumed any
19    substances that affect your memory
20    or ability to communicate today?
21    A.    No.
22    Q.    Is there any reason,
23    physically or mentally, that you are
24    not able to testify today truthfully
25    and completely?
```



Page 16

```
 1                M. TASCH
 2     A.     No.
 3     Q.     Have you ever been
 4  convicted of a criminal offense?
 5     A.     No.
 6     Q.     Have you ever been charged
 7  or arrested in connection with a
 8  criminal offense?
 9     A.     No.
10     Q.     Have you ever been subject
11  to discipline as an accountant?
12     A.     No.
13     Q.     Have you ever been accused
14  of making any false statement?
15     A.     No.
16     Q.     Other than this case, have
17  you ever been involved in any other
18  lawsuit or any other judicial,
19  arbitral, or administrative
20  proceeding as a party or as a
21  witness?
22     A.     Yes.
23     Q.     Were you a party?  Are you
24  thinking of an instance when you
25  were a party?
```



Page 17

```
  1                M. TASCH
  2    A.    My firm was a party.
  3    Q.    Okay.
  4          And was -- was this a -- a
  5  lawsuit?
  6    A.    Yes.
  7    Q.    Okay.
  8          Was this a judicial
  9  proceeding?
 10    A.    Yes.
 11    Q.    Okay.
 12          What was the nature of that
 13  judicial proceeding?
 14    A.    The nature was we had a
 15  client that was involved in Madoff,
 16  and ████████████████████████
     ████████████████████████████████
     ███████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     █████████████████████████
 22    Q.    What were the names of the
 23  parties involved in the lawsuit?
 24    A.    The client's name was
 25  ███████████
```



Page 18

```
 1                  M. TASCH
 2    Q.    Okay.
 3          How was that case resolved?
 4    A.    Well, it went away, but I
 5  am not positive how it was resolved.
 6    Q.    And when was that case?
 7    A.    I am not totally sure.  So
 8  if you want an educated guess I will
 9  give you one, but it was many years
10  ago.
11    Q.    I am not asking you to
12  guess today, but do you think it was
13  more than ten years?
14    A.    Around that time.
15    Q.    Okay.
16          Around a decade ago?
17    A.    Yes.
18    Q.    And where was the case
19  filed?
20    A.    It was filed -- you know
21  what?  I am not -- I am not totally
22  positive.  I know -- listen, I
23  testified in Florida, so obviously
24  part of it was in Florida.  I just
25  don't remember if it was also in New
```



```
 1                    M. TASCH
 2    York.
 3      Q.    So you provided testimony
 4    in that case?
 5      A.    I did.
 6      Q.    Did you testify at a
 7    deposition?
 8      A.    I did.
 9      Q.    And did you also testify at
10    a trial?
11      A.    I did.
12      Q.    Okay.
13            Were you accused of any
14    wrongdoings in the case?
15      A.    No.
16      Q.    Other than that case, have
17    you been a witness or a party in any
18    lawsuit or judicial, arbitral, or
19    administrative proceeding?
20      A.    No.
21      Q.    Okay.
22            And just to circle back
23    really quick, what was your
24    involvement in the case that you
25    were --
```



Page 20

```
 1                    M. TASCH
 2      A.    I'm sorry?
 3      Q.    In the case that we were
 4   just discussing, from over a decade
 5   ago, in which you testified at a
 6   deposition and trial, what was your
 7   involvement in that case?
 8      A.    I'm not sure I understand
 9   the question.
10      Q.    So you provided testimony
11   at a deposition and at trial,
12   correct?
13      A.    Correct.
14      Q.    Okay.
15            Why did you testify?
16      A.    I was one of the
17   accountants on the account.
18      Q.    Okay.
19            So other than the testimony
20   that you provided at a deposition
21   and at a trial in the case that we
22   just discussed, have you testified
23   under oath before?
24      A.    No.
25      Q.    Have you ever provided a
```


MAGNA
LEGAL SERVICES

Page 21

```
1                  M. TASCH
2    statement, declaration or affidavit
3    relating to any lawsuit or any other
4    judicial, arbitral, or
5    administrative proceeding?
6    A.    Not that I can recall.
7    Q.    Have you ever provided any
8    testimony or any sworn statement in
9    a case involving Canal Productions?
10   A.    I'm sorry.  Repeat the
11   question, please?
12   Q.    Have you ever provided any
13   testimony or any sworn statement in
14   a case involving Canal Productions?
15   A.    No.
16   Q.    Have you ever provided any
17   testimony or any statements in a
18   case involving Robert De Niro?
19   A.    No.
20   Q.    Have you provided any
21   statement, declaration, or affidavit
22   relating to the lawsuit brought by
23   Chase Robinson?
24   A.    Repeat the question,
25   please?
```



Page 22

```
1                M. TASCH

2    Q.    Have you provided any

3  statement, declaration, or affidavit

4  relating to the lawsuit brought by

5  Chase Robinson?

6    A.    I don't understand the

7  question.

8    Q.    Okay.

9          You understand that Chase

10  Robinson filed a lawsuit against

11  Canal Productions and Mr. De Niro,

12  correct?

13    A.    Yes.

14    Q.    Have you provided any

15  statement, declaration, or affidavit

16  relating to that lawsuit?

17    A.    I still don't understand

18  the question.

19          MS. JACOBS:  I am going

20    to object to the form with

21    respect to the word

22    statement.

23          MR. DROGIN:  Same

24    objection from Canal.

25    Q.    Any --
```



```
 1                M. TASCH
 2          MR. DROGIN:  I was muted.
 3     Sorry.
 4          MS. SLOAN:  Okay.
 5     Q.    Have you provided any
 6   written --
 7          MR. DROGIN:  We are
 8     thinking alike because I was
 9     muted, and I was going to do
10     the same objection to the
11     form since you asked it and
12     the witness still doesn't
13     understand it.
14          MS. SLOAN:  Noted, Mr.
15     Drogin.  Thank you.
16          MR. DROGIN:  You are
17     welcome.
18     Q.    Have you provided any
19   witness statement, declaration, or
20   affidavit related to the lawsuit
21   brought by Ms. Robinson?
22          MS. JACOBS:  Same
23     objection.
24          MR. DROGIN:  If you break
25     it down into three different
```


MAGNA
LEGAL SERVICES

Page 24

```
 1                 M. TASCH
 2      pieces and define what you
 3      mean by statement, you will
 4      probably get three answers to
 5      the compound question.
 6   Q.    Mr. Tasch, have you
 7  provided any written statement in
 8  the lawsuit -- relating to the
 9  lawsuit brought by Chase Robinson?
10       MR. DROGIN:  Objection to
11     the form.
12       MS. JACOBS:  Join.
13   Q.    You should still answer
14  when your attorney objects, please?
15   A.    I don't understand the
16  question.
17   Q.    Have you ever been provided
18  any written statement relating to
19  the lawsuit brought by Chase
20  Robinson?
21       MR. DROGIN:  Objection to
22     the form.
23       MS. JACOBS:  Same
24     objection.
25       MR. DROGIN:  Objection to
```



Page 25

```
 1                M. TASCH
 2      the form and asked and
 3      answered.
 4   A.     I don't understand the
 5   question.
 6           MR. DROGIN:  By the way,
 7      can we agree you will provide
 8      the witness with a copy of
 9      the transcript so he can
10      review and sign it?
11           MS. SLOAN:  Yes.
12           MR. DROGIN:  Also, since
13      he is appearing as a fact
14      witness and as 30(b)(6)
15      witness, can you please
16      clarify which questions are
17      intended for 30(b)(6)?
18           MS. SLOAN:  I am about to
19      get to that, Mr. Drogin.
20      Thank you.
21           MR. DROGIN:  That is if
22      you will ever get over hurdle
23      or --
24           MS. SLOAN:  I am going to
25      move on.  I am going to move
```


MAGNA
LEGAL SERVICES

Page 26

```
 1                  M. TASCH

 2     on.  Alright?

 3              MR. DROGIN:  Okay.

 4     Q.    Mr. Tasch, do you have a

 5     lawyer representing you in this

 6     proceeding today?

 7     A.    I do.

 8     Q.    Okay.

 9              Is that Jane Jacobs from

10     Klein Zelman?

11     A.    It is.

12     Q.    Okay.

13              When did you first come to

14     be represented by the firm Klein

15     Zelman?

16     A.    Within the last month or

17     two.

18     Q.    Okay.

19              Do you recall an exact

20     date?

21     A.    Do not.

22     Q.    And Mr. Tasch, you

23     understand that you have been called

24     today to be a fact witness at this

25     deposition, correct?
```



```
1                M. TASCH
2    A.    Correct.
3    Q.    And Mr. Tasch, we are going
4  to share a document in the chat that
5  was previously marked as Plaintiff's
6  Exhibit 47.  So let me know and
7  hopefully you will be able to see a
8  PDF document appear in the chat.
9  And are you able to open that
10 document?
11   A.    Do I have to --
12        MR. DROGIN:  Can I just
13    ask, while the witness is
14    opening it, can you give us a
15    time of how long we have been
16    on the record?
17        THE VIDEOGRAPHER:  This
18    is the videographer.  I can't
19    give you an exact time right
20    now because unlike a camera
21    the Zoom doesn't have a
22    counter, but when we go off
23    the record I can give you a
24    number.
25        MR. DROGIN:  A number up
```



Page 28

```
 1                M. TASCH

 2     to this point?

 3          THE VIDEOGRAPHER:  Yes.

 4     Q.    Mr. Tasch, are you able to

 5   see the PDF?

 6          MS. JACOBS:  I am not.

 7     A.    When I open it, it has a

 8   bunch of files in there.

 9          MS. JACOBS:  I am getting

10        a file called System 32 and a

11        bunch of folders and what

12        appears to be some --

13          MS. SLOAN:  That is not

14        what you should be seeing.

15        So can we go off the record

16        so we can make sure that

17        everyone can see the correct

18        exhibit?

19          MR. DROGIN:  And can we

20        also get the running time

21        when we come back on so we

22        can --

23          THE VIDEOGRAPHER:  The

24        time is 9:49 a.m.  We are

25        going off the record.
```



Page 29

```
 1                M. TASCH
 2           (Whereupon, a recess was
 3      taken at this time.)
 4           THE VIDEOGRAPHER:  The
 5      time is 9:52 a.m.  We are
 6      back on the record.
 7    Q.   Okay.  Great.  Okay.
 8           So can you see on the
 9   screen --
10           MS. SLOAN:  Jeremy, can
11      you scroll down a little bit
12      just so we can see the title
13      of the document?
14    Q.   Do you see the Second
15   Amended Notice of Deposition, Mr.
16   Tasch?
17    A.   Where am I looking?
18    Q.   Do you see on your screen a
19   document that is entitled,
20   "Plaintiff's Second Amended Notice
21   of Deposition?"
22    A.   I do.  Yes, I do.
23    Q.   Do you recognize this
24   document?
25    A.   I do not.
```



Page 30

```
 1              M. TASCH

 2    Q.    Okay.

 3          MS. SLOAN:  And just for

 4     the record, this is a

 5     document that is previously

 6     marked as Plaintiff's Exhibit

 7     47.

 8    Q.    Mr. Tasch, do you

 9  understand that in addition to your

10  testimony as a fact witness, Canal

11  has designated you as a 30(b)(6)

12  witness?

13          MS. JACOBS:  I am going

14     to objection to the form, but

15     answer it if you can.

16    A.    Sorry, what is the

17  question?

18    Q.    Let me repeat it for you.

19          Do you understand Canal has

20  designated you as a 30(b)(6)

21  witness?

22    A.    Yes.

23    Q.    To satisfy rules of the

24  30(b)(6), you understand that you

25  must give complete, knowledgeable,
```



Page 31

```
 1                    M. TASCH

 2    and binding answers on Canal's

 3    behalf, correct?

 4      A.    Yes.

 5      Q.    As a Rule 30(b)(6) witness,

 6    you have an obligation to prepare to

 7    provide official testimony on behalf

 8    of Robert De Niro's company, Canal

 9    Productions, Inc., correct?

10      A.    Yes.

11      Q.    Okay.

12            MS. SLOAN:  Can you

13      please scroll down?

14      Q.    Have you ever read this

15    document before?

16      A.    (No verbal response.)

17      Q.    Mr. Tasch, now that I have

18    scrolled down a bit, do you

19    recognize this document?

20      A.    I recognize one and two.

21      Q.    Okay.

22            So -- and you are Canal's

23    official witness, correct?

24            THE VIDEOGRAPHER:  The

25      time is 9:55 a.m.  We are off
```



Page 32

```
 1                  M. TASCH
 2      the record.
 3            (Whereupon, a recess was
 4      taken at this time.)
 5            THE VIDEOGRAPHER:  The
 6      time is 9:55 a.m.  We are
 7      back on the record.
 8   Q.    Mr. Tasch, you are Canal's
 9   official witness on Topics 1 and 2,
10   correct?
11   A.    Yes.
12   Q.    Okay.
13         Tell me everything that you
14   did to prepare to testify for your
15   deposition today with respect to the
16   following topic, "Canal's policies,
17   procedures, and protocols concerns
18   discrimination, harassment,
19   retaliation and employee
20   investigation, employee
21   compensation, perquisites, and
22   benefits, and employee expenses and
23   reimbursements, including use of the
24   Canal's American Express card, petty
25   cash, and expenses that Canal paid
```



Page 33

```
 1                M. TASCH
 2  for employees?"
 3     A.    I had spoken to my
 4  attorneys over the last two days to
 5  go over topics that might be asked
 6  at this deposition.
 7     Q.    Okay.
 8           And who did you speak with?
 9     A.    Laurent Drogin, Tom Harvey,
10  Greg Bennett, Jane Jacobs, and
11  Brittany Lazzaro, if I am
12  pronouncing her name correctly.
13     Q.    And how many hours did you
14  spend with your attorneys discussing
15  this topic?
16     A.    Approximately four.
17     Q.    Okay.
18           And when did you speak with
19  these attorneys?
20     A.    Some on Tuesday and some on
21  Wednesday of this week.
22     Q.    Okay.
23           So prior to Tuesday of this
24  week, you hadn't spoken with your
25  attorneys about this topic?
```



Page 34

```
 1                M. TASCH

 2     A.    I don't recall.

 3           MR. DROGIN:  Objection to

 4      the form.

 5     Q.    Were there any -- were

 6  there any non-attorneys present in

 7  that meeting or in those meetings?

 8     A.    I believe not.

 9     Q.    Okay.

10           And was Jane Jacobs present

11  in all of those conversations?

12     A.    Yes.

13     Q.    Okay.

14           Tell me everything that you

15  did to prepare to testify for the

16  deposition today with respect to the

17  following topic, "Any investigation

18  concerning Plaintiff undertaken by

19  Canal, or anyone acting on its

20  behalf, including any investigation

21  serving as the basis for Canal's

22  State Court lawsuit against

23  Plaintiff or Canal's counterclaims

24  in this lawsuit?"

25     A.    I don't understand the
```



Page 35

```
 1                 M. TASCH
 2   question.
 3    Q.    It is the same question
 4   that I asked previously.  It is just
 5   about this topic.  Tell me
 6   everything that you did to prepare
 7   to testify for your deposition today
 8   with respect to Topic Number 2?
 9    A.    That is not the same
10   question you just asked a minute
11   ago.
12    Q.    Well, let's focus on this
13   question then.
14         MR. DROGIN:  Are you just
15      trying to say -- are you just
16      trying to say with regard to
17      Paragraph 2, would your
18      answers be the same to the
19      questions I just asked about
20      Paragraph 1?
21    Q.    Mr. Tasch, tell me
22   everything that you did to prepare
23   to testify for your deposition today
24   with respect to Topic 2?
25    A.    Paragraph 2, is that what
```



Page 36

```
 1                M. TASCH
 2   you are suggesting?
 3      Q.    Yes.
 4      A.    I spoke to my attorneys
 5   over the last two days for
 6   approximately four hours.
 7      Q.    Okay.  Thank you.
 8            Did you interview anyone in
 9   order to prepare to testify today on
10   behalf of Canal?
11      A.    No.
12      Q.    And Tom Harvey is not your
13   attorney, correct?
14      A.    Correct.
15      Q.    And Laurent Drogin is not
16   your attorney, correct?
17      A.    Correct.
18      Q.    Greg Bennett is not your
19   attorney, correct?
20      A.    Correct.
21      Q.    Brittany Lazaro is not your
22   attorney, correct?
23      A.    Correct.
24      Q.    What documents, if any, did
25   you review in order to prepare to
```



```
 1                M. TASCH
 2  testify at today's deposition?
 3     A.    They showed me one or two
 4  e-mails and an audio recording.
 5     Q.    Who showed you one or two
 6  e-mails?
 7     A.    I just don't recall which
 8  attorney it was.
 9     Q.    Okay.
10           What e-mails were you
11  shown?
12     A.    One e-mail on policies and
13  procedures, and an e-mail when we
14  were trying to get Chase on as
15  co-manager of the AMEX account.
16     Q.    And when you refer to
17  policies and procedures, what
18  policies and procedures are you
19  referring to?
20     A.    I'm not sure because it was
21  an e-mail that Chase made up about
22  the policies and procedures.
23     Q.    About what policies and
24  procedures in particular, do you
25  remember?
```



Page 38

```
 1                    M. TASCH
 2     A.    No, it was policy -- all I
 3   know it was policies and procedures
 4   for Canal.
 5     Q.    Okay.
 6           And do you remember the
 7   approximate date of either of those
 8   e-mails?
 9     A.    The approximate date of the
10   policies and procedures I believe
11   was in '15, and the AMEX was early
12   '18, I believe.
13     Q.    So sometime in 2015?
14     A.    Yes.
15     Q.    Okay.
16           And then what audio
17   recording was played for you?
18     A.    A recording of Chase taping
19   me, unbeknown to me, talking about
20   the problem she was having with
21   Tiffany, and the mold problem that
22   was going on.
23     Q.    Okay.
24           And besides that audio
25   recording and those two e-mails, did
```



Page 39

1              M. TASCH

2    you review any other documents in

3    order to prepare to testify at

4    today's deposition?

5      A.    Not that I recall.

6      Q.    Did you review any

7    deposition transcripts from previous

8    depositions in this case?

9      A.    No.

10     Q.    Did you review any

11   pleadings in this case?

12     A.    No.

13     Q.    Did you bring any documents

14   with you today relating to the case,

15   or do you have any with you --

16     A.    I do not.

17     Q.    Did you review any

18   documents compiled as part of the

19   investigation into Ms. Robinson?

20     A.    I don't understand the

21   question.

22          MR. DROGIN:  Objection to

23     the form.

24          MS. JACOBS:  Join.

25     Q.    Did you review any



Page 40

```
 1                M. TASCH
 2    documents that were compiled by
 3    anyone associated with Canal in
 4    connection to the investigation with
 5    -- into Ms. Robinson?
 6          MR. DROGIN:  Objection to
 7       the form.
 8          MS. JACOBS:  Join.
 9          MS. SLOAN:  Let me try
10       again.  Also please, Mr.
11       Drogin, if you can wait until
12       I finish asking the question
13       to object.  Thank you.
14    Q.    Did you review any
15    documents from the investigation
16    into Ms. Robinson prior to your
17    deposition today?
18          MR. DROGIN:  Objection to
19       the form.
20          MS. JACOBS:  Join.
21          MR. DROGIN:  Are you
22       asking to prepare for the
23       deposition?
24    Q.    To prepare for today's
25    deposition, did you review any
```



Page 41

```
 1                M. TASCH
 2   documents related to the
 3   investigation into Ms. Robinson?
 4      A.    I don't understand the
 5   question.
 6      Q.    To prepare for today's
 7   deposition, did you review any
 8   documents, at all, that related to
 9   Canal's investigation into Ms.
10   Robinson?
11      A.    I don't understand the
12   question.
13      Q.    Other than what you have
14   already described, was there
15   anything else that you did to
16   prepare to testify today, either as
17   a fact witness or a 30(b)(6)
18   witness?
19      A.    No.
20      Q.    Have you spoken with anyone
21   else regarding your deposition
22   besides the attorneys that you
23   mentioned previously?
24      A.    No.
25      Q.    Have you spoken with Mr. De
```



Page 42

```
 1                    M. TASCH
 2    Niro about this deposition?
 3      A.    Absolutely not.
 4      Q.    Have you spoken with anyone
 5    else from Berdon about that
 6    deposition?
 7      A.    I'm not sure I understand
 8    the question.
 9      Q.    What part of the question
10    don't you understand?
11      A.    I don't understand the
12    question.
13      Q.    Have you spoken with any
14    other employee at your accounting
15    firm, Berdon, about this deposition?
16      A.    Still don't understand.
17      Q.    Have you spoken with anyone
18    that works with Berdon, LLP, about
19    your deposition today?
20      A.    Still don't understand the
21    question.
22      Q.    What part don't you
23    understand?
24      A.    I don't understand the
25    question.
```



Page 43

```
 1                M. TASCH

 2     Q.    Have you spoken with any

 3   Canal employees about this

 4   deposition?

 5     A.    No.

 6     Q.    What part of the question

 7   is unclear when I ask about anyone

 8   that works at Berdon?

 9     A.    I don't understand the

10   question.

11     Q.    I understand that, sir.  I

12   am just trying to help you --

13     A.    You can't help me.  You

14   have to ask the correct question.

15     Q.    I would like to.  I would

16   like to understand what part you

17   don't understand of the question.

18     A.    I don't understand the

19   question.

20     Q.    Please tell me what part of

21   the question is unclear?

22     A.    I don't understand the

23   whole question.

24     Q.    I have asked you that

25   question in relation to Mr. De Niro
```



Page 44

                    M. TASCH

1

2   and Canal employees.  So I am just

3   trying to figure out what part is

4   unclear when I ask it in relation to

5   Berdon, LLP?

6     A.    Same.

7     Q.    To keep things straight on

8   the record, I will begin my

9   questions -- I will begin by

10  questioning in your capacity as a

11  fact witness.  Later, I will make

12  clear on the record when I begin

13  questioning you as a 30(b)(6)

14  witness on behalf of Canal.

15         Do you understand that your

16  testimony during this beginning

17  portion of the deposition will be

18  given in your capacity as a fact

19  witness?

20    A.    Yes.

21    Q.    Okay.

22         Please describe your

23  educational history?

24    A.    I went to college for

25  accounting, graduated in four years,



Page 45

```
 1              M. TASCH
 2   went to work for a CPA firm where I
 3   worked on and off over 40 years.  I
 4   obtained my CPA certificate while
 5   working in the field, and I am a
 6   member of the AICPA and New York
 7   State Society of CPAs.
 8      Q.    When did you graduate from
 9   college?
10      A.    1976.
11      Q.    And what college did you
12   graduate from?
13      A.    CW Post.
14      Q.    And you said that you
15   received a degree in accounting?
16      A.    Yes.
17      Q.    Do you have any
18   post-college higher education?
19      A.    I do not.
20      Q.    And when were you certified
21   as a CPA?
22      A.    I think somewhere around
23   1986.
24      Q.    Do you have any
25   certifications or training as a
```



Page 46

                         M. TASCH
1    forensic accountant?

2    A.    Please repeat the question?

3    Q.    Do you have any

4    certifications or training as a

5    forensic accountant?

6    A.    No.

7    Q.    Do you hold an active CPA

8    license?

9    A.    Yes.

10   Q.    Do you complete any

11   continuing education to maintain

12   your active CPA license?

13   A.    I do.

14   Q.    Are you a certified tax

15   return preparer?

16   A.    I don't even know what that

17   means.

18   Q.    Who is your current

19   employer?

20   A.    Berdon, LLP.

21   Q.    What is your title at

22   Berdon?

23   A.    Partner.

24   Q.    How long have you been



Page 47

```
 1                   M. TASCH
 2   employed by Berdon?
 3     A.    Since 1996.
 4     Q.    And have you worked
 5   continuously for Berdon from 1996 to
 6   the present?
 7     A.    Yes.
 8     Q.    What type of company is
 9   Berdon?
10     A.    Berdon is a public
11   accounting firm.
12     Q.    Okay.
13           Mr. De Niro is a client of
14   Berdon, correct?
15     A.    I'm sorry.  I missed the
16   end of your question.
17     Q.    Let me strike that.
18           What type of services does
19   Berdon provide?
20     A.    Berdon provides an array of
21   services.
22     Q.    And what types of services
23   does Berdon provide?
24     A.    We provide tax services,
25   accounting services, consulting
```



Page 48

```
 1                M. TASCH
 2   services.
 3     Q.    Okay.
 4           What type of services do
 5   you provide for Berdon?
 6     A.    Accounting and tax
 7   services.
 8     Q.    Mr. De Niro is a client of
 9   Berdon, correct?
10     A.    You broke up a little bit
11   there.
12     Q.    Mr. De Niro is a client of
13   Berdon, correct?
14     A.    That is correct.  That is
15   correct.  Yes.
16     Q.    Does Berdon have an
17   engagement or retainer agreement
18   with Mr. De Niro?
19     A.    We do.
20     Q.    And does -- does that
21   agreement lay out the scope of
22   services that Berdon performs for
23   Mr. De Niro?
24     A.    Yes.
25           MR. DROGIN:  Objection.
```



Page 49

```
 1                    M. TASCH

 2     Q.    And what -- and when was

 3   that agreement entered into?

 4     A.    December 2008.

 5     Q.    December 2008?

 6     A.    Yes.

 7     Q.    Is that when Mr. De Niro

 8   became a client of Berdon?

 9     A.    Yes.

10     Q.    Okay.

11            And what -- what does that

12   agreement say as to the scope of

13   services that Berdon will perform

14   for Mr. De Niro?

15            MR. DROGIN:  Objection.

16      Are you deposing Berdon here

17      or this witness?

18     Q.    Mr. Tasch, you should

19   answer the question.

20            THE WITNESS:  Jane?

21            MS. JACOBS:  Can you

22      repeat the question, please?

23            (Whereupon, the requested

24      portion was read back by the

25      reporter:
```



Page 50

```
 1              M. TASCH
 2        Q:  And what -- what does
 3    that agreement say as to the
 4    scope of services that Berdon
 5    will perform for Mr. De
 6    Niro?)
 7        MS. JACOBS:  Answer it if
 8    you can, Michael.
 9        MR. DROGIN:  I want to
10    note an objection for the
11    record that the witness in
12    his individual capacity is
13    being asked the contents of
14    the document signed 13 years
15    ago that he has not testified
16    he has ever seen.
17        MS. SLOAN:  Thank you,
18    Mr. Drogin.
19    Q.    Please answer the question,
20   Mr. Tasch?
21    A.    The agreement stated we
22   would provide tax services, bill
23   paying services, and consulting
24   services.
25    Q.    Okay.
```



Page 51

```
 1                M. TASCH
 2         Describe for me all of the
 3    services that Berdon has performed
 4    for Mr. De Niro over the past
 5    decade?
 6         MR. DROGIN:  Objection.
 7       You can -- you can -- you can
 8       answer if you have personal
 9       knowledge of every single
10       service that Berdon has
11       provided.
12    A.    The services provided were
13    just as I just said a minute ago.
14    We provide consulting services, tax
15    services, and bill paying services
16    to Mr. De Niro.
17    Q.    And what type of consulting
18    services do you provide to Mr. De
19    Niro?
20    A.    It could be on a -- some
21    estate planning we do for him,
22    personal income tax planning, we
23    talk about investments from time to
24    time.
25    Q.    Does Berdon prepare tax
```



Page 52

```
 1                    M. TASCH
 2   returns for Mr. De Niro?
 3      A.    We do.
 4      Q.    Does Berdon manage accounts
 5   owned by Mr. De Niro?
 6           MS. JACOBS:  I couldn't
 7      hear the question.
 8      A.    I don't understand the
 9   question.
10      Q.    Does Berdon manage accounts
11   owned by Mr. De Niro?
12      A.    I don't understand the
13   question.
14      Q.    Does Berdon manage any bank
15   accounts owned by Mr. De Niro?
16      A.    We do.
17           MS. JACOBS:  Objection to
18      the form.
19      Q.    Sorry, Mr. Tasch, did you
20   answer that question?  You were
21   talking at the same time as your
22   attorney.
23           THE WITNESS:  Jane?
24           MS. JACOBS:  You can
25      answer.
```



Page 53

```
 1                  M. TASCH
 2      A.    I'm sorry.  Repeat the
 3  question, please?
 4      Q.    Does Berdon manage any bank
 5  accounts owned by Mr. De Niro?
 6      A.    I don't understand the
 7  question.
 8      Q.    Does Berdon manage any of
 9  Mr. De Niro's bank accounts?
10      A.    That is the question that
11  you just asked which I don't
12  understand the question.
13      Q.    I did rephrase the
14  question, Mr. Tasch.
15      A.    It is the same question.
16      Q.    Okay.
17            Does Berdon monitor any of
18  Mr. De Niro's accounts?
19      A.    Yes.
20      Q.    What types of accounts does
21  Berdon monitor?
22      A.    Bank accounts.
23      Q.    Does Berdon manage those
24  bank accounts?
25      A.    I don't understand the
```



Page 54

```
 1                M. TASCH
 2   question.
 3         MS. JACOBS:  I am going
 4      to delayed object to the
 5      form.
 6   Q.    Does Berdon monitor any of
 7   Mr. De Niro's other accounts?
 8         MS. JACOBS:  Objection to
 9      the form.
10   Q.    Mr. Tasch, you understand
11   that when your attorney objects to
12   the form, you should still answer
13   the question.
14   A.    I don't understand the
15   question.
16   Q.    Okay.
17         If you don't understand the
18   question, that is fine, just please
19   let me know verbally.  Thank you.
20         Other than bank accounts,
21   does Berdon monitor any other
22   accounts for Mr. De Niro?
23   A.    No.
24   Q.    Does Berdon pay bills for
25   Mr. De Niro?
```



Page 55

```
 1                    M. TASCH
 2     A.    Yes.
 3     Q.    What type of bills does
 4   Berdon pay for Mr. De Niro?
 5     A.    Pay personal bills,
 6   business bills.
 7     Q.    Berdon provides financial
 8   advising for Mr. De Niro, correct?
 9     A.    I'm sorry.  I couldn't hear
10   the end of the question.  I'm sorry.
11     Q.    Let me rephrase it.
12           Does Berdon provide
13   financial advising for Mr. De Niro?
14     A.    I'm not sure what that
15   questions means.
16     Q.    You testified that --
17           (Technical interference)
18           You testified that Berdon
19   provides consulting services for Mr.
20   De Niro, correct?
21     A.    Yes.
22     Q.    So does Berdon provide
23   financial consulting and advising
24   for Mr. De Niro?
25     A.    Still not sure what the
```



Page 56

```
 1                M. TASCH
 2  question means.
 3     Q.    On what subjects does
 4  Berdon provide advising for Mr. De
 5  Niro?
 6     A.    Estate planning, tax
 7  planning.
 8         (Whereupon, a discussion
 9     was held off the record.)
10         MS. SLOAN:  Can you read
11     back Mr. Tasch's answer?
12         (Whereupon, the requested
13     portion was read back by the
14     reporter:
15         A:  Estate planning, tax
16     planning.)
17     Q.    Have there been any
18  material changes in the last decade
19  as to the services that Berdon
20  performs for Mr. De Niro?
21     A.    There has been a slight
22  change, yes.
23     Q.    And what change -- when did
24  that change occur?
25     A.    I'm not sure.
```



```
 1                    M. TASCH

 2     Q.    Did it occur within the

 3   last -- did it occur since 2019?

 4     A.    No.

 5     Q.    Did it occur since 2015?

 6     A.    You know what?  I am just

 7   not sure of the date.

 8     Q.    Okay.

 9           And what change occurred?

10     A.    We -- it got more work from

11   Mr. De Niro.

12     Q.    You testified that you --

13   you are saying that you got more

14   work from Mr. De Niro?

15     A.    More work, yes.

16     Q.    And did that occur within

17   the last decade?

18     A.    Yes.

19     Q.    Do you have an

20   understanding of why that change

21   occurred?

22     A.    I'm sorry?

23     Q.    Do you have an

24   understanding of why that change

25   occurred?
```



Page 58

1                    M. TASCH

2     A.    I don't understand the

3  question.

4     Q.    What additional work did

5  you receive from Mr. De Niro?

6     A.    We got some audit work and

7  tax work.

8     Q.    Canal Productions is a

9  client of Berdon, correct?

10    A.    Yes.

11    Q.    Does Berdon have an

12 engagement or retainer agreement

13 with Canal?

14    A.    Yes.

15    Q.    And does that agreement lay

16 out the scope of services that

17 Berdon provides for Canal?

18    A.    Yes.

19    Q.    And when was that agreement

20 entered into?

21    A.    The first one was entered

22 into also in '08.

23    Q.    Okay.

24          And was there an -- a

25 subsequent agreement entered into


MAGNA
LEGAL SERVICES

Page 59

```
 1                    M. TASCH
 2    after '08?
 3      A.    Same agreement.
 4      Q.    Okay.
 5            You said that the first one
 6    was entered into -- in 2008.  Was
 7    there a second agreement entered
 8    into?
 9      A.    The one that you just asked
10    about for Canal.
11      Q.    Okay.
12            So for Canal Productions --
13    there was one agreement entered into
14    between Berdon and Canal, in
15    December of 2008, correct?
16      A.    Yes.  Yes.
17      Q.    And what -- what did that
18    agreement -- agreement lay out as to
19    the scope of services that Berdon
20    would perform for Canal?
21            MR. DROGIN:  Objection to
22      the form.
23            MS. JACOBS:  Join.  You
24      can answer.
25      A.    Okay.  I think we discussed
```



Page 60

```
 1                M. TASCH
 2   this already.  It was the same thing
 3   that I answered before about bill
 4   paying, tax returns.
 5     Q.    So -- sorry to interrupt.
 6           So is the agreement that
 7   was entered into with Canal the
 8   exact same agreement that was
 9   entered into with Mr. De Niro?
10     A.    Yes.
11     Q.    Okay.
12           What is Canal Productions?
13     A.    It is a loan out for his
14   services.
15     Q.    For Mr. De Niro's services?
16     A.    Yes.
17     Q.    And what has Mr. De Niro's
18   role at Canal Productions been?
19     A.    I'm not sure I understand
20   the question.
21     Q.    What is Mr. De Niro's role
22   at Canal Productions?
23     A.    Mr. De Niro is the
24   president of the company.
25     Q.    Okay.
```



Page 61

```
 1                M. TASCH
 2           Canal's lawyers have
 3      described Berdon as essentially
 4      serving as Mr. De Niro's and Canal's
 5      chief financial officer.
 6              Is that description
 7      accurate?
 8        A.    No, it is not.
 9        Q.    How would you describe
10      Berdon's role?
11        A.    We are Mr. De Niro's and
12      Canal's accountants.
13        Q.    Okay.
14              And Mr. De Niro is the
15      owner of the Canal Productions,
16      correct?
17        A.    Correct.
18        Q.    Describe for me all of the
19      services that Berdon has performed
20      for Canal over the past decade?
21              MR. DROGIN:  Objection to
22        the form.  You can answer.
23        A.    I am saying same services
24      we discussed; tax return prep, bill
25      paying, and consulting.
```



Page 62

```
 1                    M. TASCH
 2     Q.    So Berdon provides the same
 3   services for Canal as it does for
 4   Mr. De Niro, correct?
 5     A.    That is correct.
 6     Q.    Okay.
 7           And what type of consulting
 8   services does Berdon perform for
 9   Canal?
10     A.    Again, Canal -- we get
11   involved in -- we have been involved
12   in the contract, tax planning,
13   things like that.
14     Q.    Okay.
15           And Berdon prepares tax
16   returns for Canal, correct?
17     A.    Correct.
18     Q.    Does Berdon monitor Canal's
19   accounts?
20     A.    I'm not sure I understand
21   the question.
22     Q.    Does Berdon review Canal's
23   expenditures?
24     A.    I don't understand the
25   question.
```



MAGNA
LEGAL SERVICES

Page 63

```
 1                  M. TASCH
 2    Q.    Does Berdon pay bills for
 3   Canal?
 4    A.    We do.
 5    Q.    What bills does Berdon pay
 6   for Canal?
 7          MS. JACOBS:  I'm sorry.
 8     I couldn't hear you.
 9    Q.    What types of bills does
10   Berdon pay for Canal?
11    A.    We pay all the professional
12   fees, we pay the AMEX bills, we pay
13   the office bills, not all of them,
14   but some of them.
15    Q.    What office bills does
16   Berdon not pay for?
17    A.    I don't remember
18   particularly, but there are always a
19   few along the way that were paid by
20   Canal, itself, usually via credit
21   card.
22    Q.    And when you say, "Canal,
23   itself," what do you mean, someone
24   in the Canal office?
25    A.    Chase.
```



Page 64

```
1                    M. TASCH
2     Q.     Berdon pays the bulk of
3   bills for Canal, correct?
4     A.     Today we do, yes.
5     Q.     And how long -- for how
6   long has Berdon paid the bulk of
7   bills for Canal?
8     A.     Probably most of the time
9   we have been involved.
10    Q.     Okay.
11           What were Berdon's
12  responsibilities with respect to
13  Canal's bills?
14    A.     I'm not sure I understand
15  the question.
16    Q.     Would Berdon personnel
17  regularly review Canal's bills?
18           MR. BENNETT:  Annie, what
19    is the time period?
20    Q.     Over the past decade, would
21  Berdon personnel regularly review
22  Canal's bills?
23    A.     That is a long time to be
24  answering that question.
25    Q.     Okay.
```



Page 65

```
 1                M. TASCH
 2          Over the past five years,
 3   would Berdon personnel regularly
 4   review Canal's bills?
 5     A.    We would generally review
 6   every bill that we pay.
 7     Q.    Okay.
 8          Is that -- was that true
 9   over the past decade?
10     A.    Yes.
11     Q.    Okay.
12          How frequently would Berdon
13   -- over the past decade, how
14   frequently would Berdon personnel
15   review Canal's bills?
16     A.    That question was just
17   answered.
18     Q.    You -- you -- would you
19   review -- would Berdon review bills
20   as they came in?
21     A.    We reviewed the bills as we
22   paid them.
23     Q.    Okay.
24          How frequently would Berdon
25   pay Canal's bills?
```



Page 66

```
 1                   M. TASCH
 2     A.    It could be daily, it could
 3   be monthly, whatever bills came into
 4   the office or got forwarded by
 5   Canal, we got them and paid them.
 6   We might pay them the day it came
 7   in, a day later, a week later.
 8     Q.    And you testified that
 9   Berdon would review all of Canal's
10   bills?
11     A.    I didn't say that.
12         MS. JACOBS:  Is there a
13    question pending?
14     Q.    Sorry.  Mr. Tasch, can you
15   wait until I finish the question
16   before you jump in?
17         What review would Berdon
18   undertake with respect to Canal's
19   bills?
20     A.    I don't understand the
21   question.
22     Q.    So you have testified that
23   Berdon would review Canal's bills,
24   and I am just asking what review --
25   what would that review look like?
```



Page 67

```
    1                    M. TASCH

    2    A.    We would look at the bill

    3    to see if it added up to what the

    4    total would be.  If need be, if we

    5    had any questions, we would ask

    6    questions on it.  But generally when

    7    the bills came in, we just made sure

    8    they added up correctly, it was a

    9    timely bill, and we paid it.

   10    Q.    Okay.

   11          And how much time would

   12    Berdon spend reviewing the bills?

   13    A.    I do not know the answer to

   14    that question.

   15    Q.    How many Berdon employees

   16    were involved in reviewing Canal's

   17    bills?

   18          MR. DROGIN:  Objection to

   19      the form.  I do want to note

   20      for the record that Berdon is

   21      not testifying here.  To be

   22      clear, you are asking Mr.

   23      Tasch as a fact witness.

   24      This is not Berdon's

   25      testimony.  Please proceed.
```



Page 68

```
 1                  M. TASCH
 2    Q.    Mr. Tasch, how many Berdon
 3  employees were involved in reviewing
 4  Canal's bills?
 5          MR. DROGIN:  Objection to
 6    the form.
 7    A.    Generally two or three.
 8    Q.    Okay.
 9          And were -- are you one of
10  the people that would be involved in
11  reviewing Canal's bills?
12    A.    Yes.
13    Q.    And who are the other
14  Berdon employees who were involved
15  in reviewing Canal's bills?
16    A.    They changed over time.
17    Q.    Who -- how many in the past
18  decade would you say --
19    A.    I have no idea.
20    Q.    Okay.
21          How many in the past five
22  years?
23    A.    I'm not sure about that
24  either.
25    Q.    Okay.
```



Page 69

```
 1                  M. TASCH

 2          Is there -- are there any

 3   Berdon employees that you can think

 4   of now, that were involved in --

 5   A.    Yes.

 6   Q.    Okay.

 7          Who are those employees?

 8          THE WITNESS:  Jane?

 9          MS. JACOBS:  You can

10     answer it.

11   A.    Okay.  You want their

12   names?

13   Q.    Yes, please.  Their full

14   name?

15   A.    Lindsay Palazzo (ph) and I

16   -- and Eileen Axelrod (ph).

17   Q.    And if you recall, what

18   years were those employees involved

19   in reviewing Canal's bills?

20   A.    Over the last three years.

21   Q.    Are there any other Berdon

22   employees that you can recall that

23   would review Canal's bills?

24   A.    No.

25   Q.    Did Berdon have a method to
```



Page 70

```
 1                   M. TASCH
 2   organize Canal's bills?
 3       A.     I'm not sure what that
 4   means.
 5       Q.     Is there any organization
 6   method that Berdon would employ when
 7   reviewing Canal's bills?
 8               MS. JACOBS:  I am going
 9        to object to the form of the
10        question.
11       A.     I don't even understand the
12   question.
13       Q.     Is there any system that
14   Berdon has in place to keep track of
15   and save Canal's bills?
16               MR. DROGIN:  Objection to
17        the form.  Hold on.
18        Objection to the form.
19               MS. JACOBS:  Join.
20               MR. DROGIN:  Among other
21        things, it is a compound
22        question.
23       Q.     Over the last decade, has
24   Berdon had any system to keep track
25   of and save Canal's bills?
```



Page 71

```
 1                M. TASCH
 2    A.    I can't answer that.
 3          MR. DROGIN:  Objection to
 4     the form.
 5    Q.    Over the last decade, has
 6   Berdon had any system to keep track
 7   of Canal's bills?
 8          MR. DROGIN:  Objection to
 9     the form.
10          MS. JACOBS:  Join.
11    Q.    Mr. Tasch, if you could
12   please respond verbally to the
13   question.
14    A.    I don't understand the
15   question.
16    Q.    Again, if you don't
17   understand the question, just say
18   so.
19          What part of -- well --
20          Would Berdon -- Berdon
21   would provide financial advising for
22   Canal, correct?
23    A.    I don't understand the
24   question.
25    Q.    Mr. De Niro has testified
```



1                    M. TASCH

2    that Berdon helped provide checks

3    and balances for Canal.  In what

4    ways does Berdon do this?

5       A.    I don't understand the

6    context of his answer.

7       Q.    Have there been any

8    material changes in the last decade

9    as to the services that Berdon

10   performs for Canal?

11      A.    No.

12      Q.    Did Mr. De Niro ever

13   discuss with you Berdon providing

14   checks and balances for Canal?

15      A.    I don't understand that

16   question.

17      Q.    Did Mr. De Niro ever

18   discuss with you idea of Berdon

19   providing checks and balances for

20   Canal?

21      A.    You are asking the same

22   question four times and I don't

23   understand the question.

24      Q.    So is that a term that --

25   is checks and balances a term that


MAGNA
LEGAL SERVICES

```
 1                M. TASCH
 2   Mr. De Niro has ever used with you?
 3     A.    No.
 4     Q.    Are there any -- are there
 5   any entities owned or operated by
 6   Mr. De Niro for which Berdon
 7   provides financial services?
 8     A.    Yes.
 9     Q.    And which ones?
10     A.    We have ███████████
     ██████████████████████████████
     ██████████████████████████████
     ████████████████████ph), and
14   there is a few other small ones that
15   I just can't recall off the top of
16   my head.
17     Q.    Does Berdon provide
18   financial services for any members
19   of Mr. De Niro's family?
20     A.    I don't understand the
21   question.
22     Q.    Does Berdon provide any
23   services at all for any members of
24   Mr. De Niro's family?
25          MR. DROGIN:  Objection.
```



Page 74

```
 1                  M. TASCH

 2     What is the relevance of this

 3     question?

 4     Q.    Mr. Tasch, you should

 5   answer the question.

 6     A.    I don't understand the

 7   question.

 8          MR. DROGIN:  I am

 9     objecting on the grounds of

10     relevance.

11          MS. SLOAN:  Not a proper

12     objection.

13          MR. DROGIN:  It is when

14     you don't stipulate that all

15     objections other than to form

16     are preserved for trial.  How

17     is it all related to what

18     Berdon does for a member of

19     Mr. De Niro's family?

20     Whatever family --

21     Q.    Mr. Tasch, so you are --

22   you are one of Berdon's accountants

23   who handles Mr. De Niro's account,

24   correct?

25     A.    Yes.
```



Page 75

                    M. TASCH

1

2    Q.    Does Berdon have any

3    retainer or engagement agreements

4    with any members of Mr. De Niro's

5    family?

6          MR. DROGIN:  Objection to

7     the form.

8    A.    No.

9    Q.    How long have you known Mr.

10   De Niro?

11   A.    Approximately 14 years.

12   Q.    And did you meet him around

13   the same time that Berdon began

14   providing services for him?

15   A.    Almost the same time,

16   probably about three weeks to a

17   month afterwards.

18   Q.    Okay.

19          And have you been on Mr. De

20   Niro's account since December of

21   2008?

22   A.    January of '09.

23   Q.    And is -- did you begin

24   providing services for Canal in

25   January of 2009 as well?



Page 76

```
 1                M. TASCH

 2     A.    Yes.

 3     Q.    Mr. De Niro at his

 4  deposition referred to Berdon as a

 5  business manager.  For how long has

 6  Berdon acted as Mr. De Niro's

 7  business manager?

 8          MR. DROGIN:  Objection to

 9    the form.

10          MS. JACOBS:  Objection to

11    the form.  You can answer.

12     Q.    Did you provide a response?

13     A.    I don't understand the

14  question.

15     Q.    Has Mr. De Niro ever

16  referred to Berdon as a business

17  manager?

18          MR. DROGIN:  Objection to

19    the form.

20     Q.    In conversations with you?

21     A.    Not that I recall.

22     Q.    How much of your working

23  time is spent servicing Canal, Mr.

24  De Niro, or his other businesses?

25          MR. DROGIN:  Objection to
```



Page 77

```
 1                M. TASCH
 2     the form of those questions.
 3     Can you give a metric?
 4     Q.   Mr. Tasch, you should
 5   answer the question.
 6     A.    I don't understand the
 7   question.
 8          MR. DROGIN:  I mean,
 9      really, it is a horrible
10      question.
11     Q.    Are Mr. De Niro and his
12   entities your biggest clients?
13          MR. DROGIN:  Objection to
14      the form.  There has been no
15      testimony that it is his
16      client.  Do you mean Berdon's
17      client?
18     Q.    Mr. Tasch, again, if you
19   don't understand the question,
20   please let me know so I know that
21   you are not thinking and I can ask a
22   new question or rephrase the
23   question.
24     A.    I don't understand the
25   question.
```



Page 78

```
 1                    M. TASCH

 2              MR. DROGIN:  I'm sorry.

 3         Did you just tell him that

 4         you don't want him to think?

 5              MS. SLOAN:  No.  That is

 6         why I am waiting to see if he

 7         is thinking --

 8    A.    I don't understand the

 9    question.

10    Q.    Do you spend most of your

11    working time servicing Canal, Mr. De

12    Niro, or his other businesses?

13              MR. DROGIN:  Objection to

14         the form.

15              MS. JACOBS:  You can

16         answer if you can, Michael.

17    A.    I'm not sure I understand

18    the question so it is hard for me to

19    answer.

20    Q.    Are -- okay.

21              Is your compensation from

22    Berdon tied in any way to the work

23    that you perform for Mr. De Niro and

24    his entities?

25    A.    No.
```


MAGNA
LEGAL SERVICES

Page 79

```
 1                 M. TASCH

 2    Q.    You testified earlier about

 3  Lindsay Palazzo and Eileen Axelrod

 4  reviewing Canal bills.  Over the

 5  past decade, are there other Berdon

 6  employees that you can recall

 7  performing services for Canal or Mr.

 8  De Niro?

 9    A.    Yes.  Two employees in

10  particular, Francis Camiso (ph), and

11  Victoria Devincenzo (ph).

12    Q.    And what was Francis

13  Camiso's role at Berdon?

14    A.    Francis was a bookkeeper.

15    Q.    And what was her role with

16  respect to Canal?

17    A.    She would pay the bills,

18  and if we had to do wires, she would

19  prepare wires.

20    Q.    Okay.

21          And sorry, what was the

22  second person that you name, was

23  that Victoria --

24    A.    Devincenzo.

25    Q.    What was her role at
```



Page 80

```
 1                 M. TASCH
 2   Berdon?
 3     A.    Same as Francesca's.
 4     Q.    So she performed the same
 5   role with respect to Canal?
 6     A.    Yes.
 7     Q.    Over the past decade which
 8   Berdon partner has the been the lead
 9   for Mr. De Niro?
10     A.    Mark Bosswick.
11     Q.    Over the past decade, which
12   Berdon partner has been the lead for
13   Canal, was that Mark Bosswick as
14   well?
15     A.    Mark is the lead partner so
16   to speak.  I'm not sure what you
17   mean by partner or accountant.  He
18   is not and never has been involved
19   in the day to day.
20     Q.    The day to day with respect
21   to the Canal account?
22     A.    Yes.
23     Q.    Okay.
24           And who has been the main
25   Berdon employee who has been
```



Page 81

```
 1                  M. TASCH
 2    involved in the day to day for
 3    Canal's account?
 4      A.    I have.
 5      Q.    And when did you become
 6    that main primary person?
 7      A.    January of '09.
 8      Q.    So since January 2009, you
 9    have been the lead person at Berdon
10    that was staffed on handling matters
11    for Mr. De Niro and his entities?
12           MR. DROGIN:  Objection to
13       the form.
14      Q.    Is that correct?
15      A.    For the most part.
16      Q.    And you have been the main
17    person who is staffed in handling
18    matters for Canal over the past
19    decade, correct?
20           MR. DROGIN:  Objection to
21       the form.
22      A.    For the most part, yes.
23      Q.    Over the past decade, which
24    Canal employees would you have
25    direct interaction with?
```



Page 82

1                    M. TASCH

2      A.    I don't recall when I

3    started, more recently, Michael

4    Kaplan, Chase, when she was there,

5    Sabrina, Jillian.  There have been a

6    few others there, but their names

7    escape me at this particular moment.

8      Q.    How often would you

9    interact with Mr. Kaplan?

10          MR. DROGIN:  Objection to

11     the form.  Can you please

12      give a time period?

13     Q.    Over the past decade, when

14   Mr. Kaplan was at Canal, how often

15   would you interact with Mr. Kaplan?

16          MR. DROGIN:  Objection to

17     the form.

18     A.    I can't possibly answer

19   that question.

20     Q.    Okay.

21          During -- how often would

22   you interact with Mr. Kaplan during

23   a typical week?

24          MR. DROGIN:  Objection to

25     the form.



Page 83

```
1                  M. TASCH

2    A.    Not that often.

3    Q.    And what does that mean;

4  would you interact with him at least

5  once a week?

6    A.    Every day and every week is

7  different.

8         MR. DROGIN:  Objection to

9    the form.

10   Q.    Was it -- was it typical

11  for you to not interact with Mr.

12  Kaplan during --

13        MR. DROGIN:  Objection to

14    the form.

15        MS. SLOAN:  Mr. Drogin,

16    can you please just wait --

17    if you could wait until --

18        MR. DROGIN:  I will try,

19    but it is hard not to react

20    when the question is poorly

21    drafted right in the middle.

22    I would also ask that you

23    differentiate between the

24    time that Chase was there and

25    Chase not there.  I think you
```



MAGNA
LEGAL SERVICES

Page 84

```
 1                M. TASCH

 2     would have a much cleaner

 3     record.

 4          MS. SLOAN:  Okay.  Noted.

 5     Q.    During the a typical week,

 6   was it -- was it common for you to

 7   not interact with Mr. Kaplan?

 8          MR. DROGIN:  Objection to

 9      the form.

10          MS. JACOBS:  Objection to

11      the form.  Use of the word

12      typical and common.

13     Q.    Mr. Tasch, again, you can

14   answer when your attorney objects.

15     A.    Okay.  I don't even

16   understand question.

17     Q.    During Ms. Robinson's

18   employment, how often would you

19   interact with Mr. Kaplan in a

20   typical month?

21          MS. JACOBS:  Objection to

22      the form.

23     A.    I can't answer that

24   question.

25     Q.    During Ms. Robinson's
```



Page 85

```
 1                  M. TASCH
 2   employment, how often would you
 3   interact with any of the Canal
 4   employees in a typical month?
 5      A.    I can't answer that
 6   question either.
 7      Q.    On what subjects would
 8   Canal employees consult with you?
 9      A.    It could be -- if they had
10   a question about a particular
11   subject, or occasionally in
12   Michael's case if he had a question
13   about the phone bill, or maybe some
14   petty cash, things like that.
15           MS. SLOAN:  I would like
16      to take a five-minute break,
17      please.
18           THE VIDEOGRAPHER:  The
19      time is 10:44 a.m.  We are
20      off the record.
21           (Whereupon, a recess was
22      taken at this time.)
23           THE VIDEOGRAPHER:  The
24      time is 10:15 a.m.  We are
25      back on the record.
```



Page 86

```
1                    M. TASCH

2      Q.    Mr. Tasch, you understand

3   that you are still under oath,

4   correct?

5      A.    Correct.

6      Q.    During Ms. Robinson's

7   employment at Canal, how often would

8   you speak with Mr. De Niro?

9      A.    Not very often.

10     Q.    Would you speak with him

11  weekly?

12     A.    Not all the time.

13     Q.    Would you speak with him at

14  least once a month?

15     A.    Yes.

16     Q.    And during Ms. Robinson's

17  employment at Canal, how often would

18  you -- would you communicate with

19  Mr. De Niro?

20     A.    Could you repeat that?

21     Q.    During Ms. Robinson's

22  employment at Canal, would you

23  communicate with Mr. De Niro in any

24  way?

25     A.    We just discussed that.  I
```



Page 87

1                    M. TASCH

2    told you that I spoke to him at

3    least once a month.

4      Q.    On what subjects would you

5    communicate with Mr. De Niro?

6      A.    It could be on various

7    subjects.  Whatever he had on his

8    mind or if I had a particular

9    question about something.

10     Q.    Would you communicate with

11   Mr. De Niro -- what -- excuse me.

12   Strike that.

13          What types of questions

14   would you have that you would

15   communicate with Mr. De Niro about?

16     A.    It would be many things.

17     Q.    What is an example of

18   something that you would have a

19   question about that you would speak

20   to Mr. De Niro?

21     A.    Well, sometimes we would

22   talk about the tax returns and how

23   we might be preparing them, we could

24   talk about if he was making a movie,

25   what money was coming in, stuff like



```
 1                M. TASCH
 2    that.
 3      Q.    Would you communicate with
 4    Mr. De Niro about Canal's
 5    financials?
 6      A.    I'm not sure I understand
 7    the question.
 8      Q.    What types of questions
 9    pertaining to Canal would you raise
10    with Mr. De Niro?
11      A.    We just went over this a
12    second ago.
13      Q.    We discussed the topics
14    that you would discuss with him.  I
15    am asking now what types of
16    questions pertaining to Canal would
17    you discuss with Mr. De Niro?
18      A.    I didn't really have
19    questions for Mr. De Niro.  If he
20    was making a movie, we went over
21    what he was going to make on the
22    movie, or if I had a particular cash
23    flow problem, I would discuss that
24    with him, or I would discuss taxes
25    with him.
```

MAGNA
LEGAL SERVICES

Page 89

1               M. TASCH

2     Q.    Would you communicate with

3   Mr. De Niro about Canal's bank

4   accounts?

5     A.    I don't understand the

6   question.

7     Q.    Would you communicate with

8   Mr. De Niro about Canal's spending?

9     A.    I missed the last part.

10  You came in and out a little bit.

11    Q.    Would you communicate with

12  Mr. De Niro about Canal's spending?

13    A.    Not generally.

14    Q.    You would monitor Canal's

15  cash flow, correct?

16    A.    I don't understand the

17  question.

18    Q.    You would communicate with

19  Mr. De Niro about Canal's cash flow?

20    A.    Occasionally, we would talk

21  about cash flow.

22    Q.    Would you communicate with

23  Mr. De Niro about payroll?

24    A.    Generally not.

25    Q.    Would you communicate with



Page 90

```
 1                M. TASCH
 2   Mr. De Niro about salaries?
 3     A.    Generally not.
 4     Q.    Would you communicate with
 5   Mr. De Niro about Canal bonuses?
 6     A.    Generally not.  That was
 7   all Chase's job.
 8     Q.    Okay.
 9           Did Berdon process payroll
10   for Canal?
11     A.    No.
12     Q.    What was Berdon's role with
13   respect to Canal's payroll?
14     A.    I don't even understand
15   that question.
16     Q.    Would -- did Berdon have
17   any role regarding Canal's payroll?
18     A.    The only role we had was
19   when Chase would tell us there was
20   overtime involved for some of the
21   employees, we would call it in.
22     Q.    So since -- you currently
23   -- Berdon currently has no role
24   regarding Canal's payroll?
25     A.    I just explained my role.
```



Page 91

```
 1                M. TASCH
 2   Q.    Did Berdon communicate with
 3   Mr. De Niro about the expenses that
 4   Canal employees were authorized to
 5   charge to Canal?
 6        MR. DROGIN:  Objection.
 7     Hold on.  You are asking the
 8     witness about what Berdon did
 9     or what he did?  You are
10     doing this again.  We are --
11     you are -- you haven't
12     subpoenaed Berdon.
13   Q.    Mr. Tasch, would you
14   communicate with Mr. De Niro about
15   the expenses that Canal employees
16   were authorized to charge to Canal?
17        MR. DROGIN:  Objection to
18     the form.
19   A.    I don't recall that.
20        THE WITNESS:  Sorry.
21        MR. DROGIN:  That is
22     okay.
23   Q.    During Ms. Robinson's
24   employment, would Berdon review
25   Canal's finances with Mr. De Niro on
```



Page 92

```
 1                M. TASCH
 2   a regular basis?
 3      A.    I don't even know what that
 4   means.
 5      Q.    When -- when Ms. Robinson
 6   was employed at Canal, how often
 7   would Berdon communicate with Mr. De
 8   Niro about Canal's finances?
 9      A.    I don't understand the
10   question.
11      Q.    When Ms. Robinson was
12   employed at Canal, how often would
13   you communicate with Mr. De Niro
14   about anything to do with Canal's
15   finances?
16      A.    Still don't understand the
17   question.
18      Q.    Well, what part of the
19   question don't you understand?
20      A.    I don't understand the
21   question.
22      Q.    Is there a word -- is there
23   a specific word that you don't
24   understand in the question?
25      A.    It is not my job to tell
```



Page 93

```
 1                  M. TASCH
 2    you what I don't understand.
 3       Q.    Mr. Tasch, if there is a
 4    specific word that you don't
 5    understand?
 6       A.    I don't understand the
 7    question.
 8       Q.    When Ms. Robinson was
 9    employed at Canal, how often would
10    Berdon communicate with Mr. De Niro
11    about any aspect of Canal's
12    spending?
13            MR. DROGIN:  Objection to
14       the form.  And again, to the
15       fact that you are asking him
16       about Berdon, opposed to
17       himself.  He is here as a
18       fact witness in this case.
19       Q.    Mr. Tasch, are you thinking
20    or do you not understand the
21    question?
22       A.    Can you repeat it, please?
23       Q.    Did you have meetings with
24    Mr. De Niro to go over aspects of
25    Canal's finances?
```



Page 94

```
 1                 M. TASCH
 2    A.    We occasionally had
 3  meetings, yes.
 4    Q.    How often would you have
 5  meetings with Mr. De Niro?
 6    A.    Not that often, maybe --
 7  maybe twice a year.
 8    Q.    And what would you discuss
 9  in those meetings?
10         MR. DROGIN:  Objection to
11    the form.
12    A.    Repeat the question,
13  please?
14    Q.    What would you discuss in
15  those meetings?
16    A.    General finances.
17    Q.    How long would those
18  meetings typically last?
19         MR. DROGIN:  Objection to
20    the form.
21    A.    Half hour, 45 minutes.
22    Q.    Can you walk me through
23  what would happen at a typical
24  meeting with Mr. De Niro?
25    A.    I don't even understand
```



Page 95

1                M. TASCH

2    what that means.

3        Q.    You have testified that you

4    would meet with Mr. De Niro to go

5    over Canal's finances about twice a

6    year, correct?

7        A.    Yes.

8        Q.    Can you walk me through

9    what would happen at those meetings?

10            MR. DROGIN:  Objection to

11       the form.

12       A.    We would discuss finances,

13    generally, for Canal, for him.

14       Q.    Would you walk him through

15    the state of Canal's finances?

16            MR. DROGIN:  Objection to

17       the form.

18       A.    In totality, we went over

19    things.  Never anything really

20    specific.

21       Q.    Would you bring documents

22    to the meeting?

23       A.    We had -- we had some

24    documents, yes.

25       Q.    What types of documents



Page 96

```
 1                  M. TASCH
 2   would you bring to the meetings?
 3      A.    Generally -- generally a
 4   cash flow statement.
 5      Q.    And would you review that
 6   cash flow statement with Mr. De Niro
 7   in the meeting?
 8      A.    Yes.
 9      Q.    Would you discuss with Mr.
10   De Niro Canal's expenditures?
11      A.    We touched on the topic.
12      Q.    And what would you do to
13   prepare the cash flow statements
14   that you brought to the meeting?
15      A.    I'm not sure I understand
16   the question.
17      Q.    You brought cash flow
18   statements to the meetings and you
19   reviewed those statements with Mr.
20   De Niro, correct?
21      A.    Correct.  Yes.
22      Q.    What would you do to
23   prepare those statements?
24      A.    We would look at the cash
25   in the bank, look at prospective
```



Page 97

```
 1                    M. TASCH
 2   cash coming in, whether it was
 3   movies or other, and then we took an
 4   average of monthly expenses.
 5      Q.    What would you tell Mr. De
 6   Niro about Canal's expenditures?
 7      A.    Nothing in particular.
 8            MR. DROGIN:  Objection to
 9      the form.
10      Q.    Nothing in particular.
11            You would discuss with him
12   Canal's expenditures, correct?
13      A.    There were many discussions
14   in those meetings.
15      Q.    What would you say to him
16   about the expenditures?
17      A.    If we thought they were in
18   line, we didn't have really a
19   discussion about it.  If we thought
20   something might be high, or if there
21   was prospective expenditure coming
22   up, we might discuss things like
23   that.
24      Q.    Would he ask you questions
25   about the expenditures?
```



MAGNA ▶
LEGAL SERVICES

Page 98

```
 1                M. TASCH
 2    A.    For the most part, no.
 3    Q.    Would you flag any concerns
 4  about Canal expenditures?
 5          MR. DROGIN:  Objection to
 6     the form.
 7    A.    Generally not.
 8    Q.    So you mostly would just
 9  summarize the status of Canal's
10  expenditures?
11    A.    I would say that is
12  correct.
13    Q.    What would -- what did you
14  review to summarize the Canal
15  expenditures?
16    A.    I'm sorry?
17    Q.    What would you review in
18  order to summarize Canal's
19  expenditures?
20    A.    I don't understand the
21  question.
22    Q.    In order to discuss the
23  summary of Canal's expenditures with
24  Mr. De Niro, would you review
25  anything in advance of the meeting?
```



Page 99

                    M. TASCH

 1

 2    A.    No.

 3    Q.    Okay.

 4          How would those meetings

 5    with Mr. De Niro end?

 6          MR. DROGIN:  Objection.

 7      Are you serious?  You mean

 8      like with a handshake or a

 9      goodbye?

10    A.    Did I give him a kiss?  I

11    don't understand the question.

12          MR. DROGIN:  I mean, how

13      would a meeting end?

14    Q.    You were familiar enough

15    with Canal's spending that you

16    didn't need to review anything in

17    particular to summarize for Mr. De

18    Niro Canal's spending?

19          MR. DROGIN:  Objection.

20      It is a leading question and

21      it is putting words into the

22      witness' mouth that he did

23      not utter.  Objection.

24      Leading.

25          MS. SLOAN:  Paige, can



Page 100

```
 1                    M. TASCH
 2      you read back the question,
 3      please?
 4           (Whereupon, the requested
 5      portion was read back by the
 6      reporter:
 7           Q:  You were familiar
 8      enough with Canal's spending
 9      that you didn't need to
10      review anything in particular
11      to summarize for Mr. De Niro
12      Canal's spending?)
13           MR. DROGIN:  Same
14      objection.
15      A.    It doesn't appear to be a
16    question at all.  It is a statement.
17      Q.    Is that correct?
18      A.    I don't know what you are
19    asking.
20      Q.    I will restate the question
21    with -- so that it is clear it is a
22    question.
23           Is it correct that you were
24    familiar enough -- strike that.
25           Were you familiar enough
```



```
 1              M. TASCH
 2   with Canal's spending that you
 3   didn't need to review anything in
 4   particular to summarize for Mr. De
 5   Niro Canal's spending?
 6     A.    I don't understand the
 7   question.
 8     Q.    You testified that you
 9   didn't need to review anything in
10   order to discuss the summary of
11   Canal's expenditures with Mr. De
12   Niro, correct?
13     A.    I'm sorry.  Repeat the
14   question, please?
15     Q.    You testified earlier that
16   you did not need to review anything
17   in order to discuss the summary of
18   Canal's expenditures with Mr. De
19   Niro, correct?
20     A.    Sometimes.
21     Q.    Okay.
22           So you sometimes would
23   review things?
24     A.    Yes.
25     Q.    And when you did review
```



     1                    M. TASCH

     2    things, what would you review?

     3       A.    Whatever expenses I deemed

     4    to be looked into.

     5       Q.    And what -- what would --

     6    can you describe that for me?

     7       A.    I don't recall which

     8    particular ones.

     9       Q.    How would you decide?

    10       A.    Usually looking at maybe

    11    the average over a period of time.

    12    Is there still a question about how

    13    the meeting ended?

    14       Q.    No.  We have moved on.

    15       A.    We are done with that?

    16    Okay.

    17       Q.    What documents would you

    18    review to identify an average?

    19       A.    If I had to review, I would

    20    look at the bills.

    21       Q.    Okay.

    22             Is there anything you would

    23    look at besides bills?

    24       A.    No.

    25       Q.    During Ms. Robinson's



Page 103

```
 1              M. TASCH

 2    employment, which Canal's employees

 3    had Canal American Express credit

 4    cards under their names?

 5      A.    As far as I knew, every one

 6    of them.

 7      Q.    Every single Canal employee

 8    had their own credit card under

 9    their name?

10      A.    As far as I remember, yes.

11      Q.    The Canal credit card in

12    Michael Kaplan's name was primarily

13    used for expenses that were personal

14    for Mr. De Niro or his family,

15    correct?

16          MR. DROGIN:  Objection to

17       the form.

18      A.    I just don't recall that.

19    I know Chase and I talked about

20    that.  We used one of the cards for

21    business and one of the cards for

22    personal.  I just don't remember

23    which one was what.

24      Q.    Do you recall a time when

25    the only -- there were only credit
```



Page 104

```
 1                M. TASCH

 2   cards in Ms. Robinson, Mr. Kaplan

 3   and Mr. Harvey's name?

 4     A.    Can you repeat that,

 5   please?

 6     Q.    Wasn't there a time when

 7   there were only Canal credit cards

 8   in the name of Ms. Robinson, Mr.

 9   Kaplan and Mr. Dan Harvey?

10     A.    No, I don't recall that.  I

11   thought there was one for Sabrina

12   and Jillian as well.

13     Q.    The Canal credit card in

14   Ms. Robinson's name -- so you

15   testified that there was a credit

16   card that was primarily used for

17   personal expense and one for

18   business expense?

19     A.    Yes, and I just don't

20   remember which one was which.

21     Q.    During Ms. Robinson's

22   employment, there wasn't a credit

23   card for Mr. Sabrina Weeks-Britain

24   or Jillian Spear, correct?

25           MR. DROGIN:  Objection to
```



Page 105

```
 1                M. TASCH
 2    the form.  You can answer.
 3    A.    Can you repeat that,
 4 please?
 5    Q.    When Ms. Robinson was
 6 employed at Canal, there wasn't a
 7 credit card for Ms. Sabrina
 8 Weeks-Britain or Ms. Jillian Spear,
 9 correct?
10    A.    Listen, I am not positive.
11 I thought there was.  I could be
12 mistaken, but I thought there was.
13    Q.    What types of expenses
14 would typically be put on the Canal
15 American Express that were meant for
16 business or operational business
17 expenses?
18         MR. DROGIN:  Objection to
19    the form.
20    A.    There could be some -- it
21 was meals, Ubers, business gifts,
22 typical stuff like that.
23    Q.    Okay.
24         And what was the reason for
25 the distinction in the types of
```



Page 106

```
 1                M. TASCH

 2    expense that appeared on the credit

 3    card in Ms. Robinson's name versus

 4    the credit card in Mr. Kaplan's

 5    name?

 6      A.    Chase and I had had a

 7    conversation that she thought it

 8    would be easier if we kept the

 9    business on one card and the

10    personal on the other so when we

11    book the expenses it would be easier

12    for us.

13      Q.    Sorry, when you what the

14    expenses?

15      A.    Book.

16      Q.    Okay.

17            And it would be easier from

18    things -- the accounting

19    prospective, correct?

20      A.    Yes.

21      Q.    Throughout the past decade,

22    the credit cards statements for the

23    Canal American Express cards have

24    been sent to Berdon, correct?

25      A.    I am not positive about
```



```
 1                M. TASCH
 2    that.
 3      Q.    Berdon would pay the credit
 4    card statements -- would pay the
 5    credit cards bills, correct?
 6      A.    Yes.
 7            MR. DROGIN:  Objection to
 8       the form.
 9            THE WITNESS:  Sorry.
10            MR. DROGIN:  That is
11       okay.
12      Q.    During Ms. Robinson's
13    employment, the credit cards
14    statements for the Canal American
15    Express were sent to Berdon, is that
16    correct?
17      A.    I am not sure.
18      Q.    Would Berdon review Canal's
19    credit cards statements before
20    paying the credit card bills?
21      A.    We would look at them, yes.
22      Q.    And what would -- what
23    would you do -- what review process
24    would you undertake with respect to
25    those statements?
```



```
 1                M. TASCH
 2     A.    I don't understand the
 3  question.
 4     Q.    So you said that you would
 5  look at the statements.  What type
 6  of review would you be employing
 7  when you were looking at them?
 8     A.    I don't understand the
 9  question.
10     Q.    Would you look through
11  every single page of the statement?
12     A.    We would.
13     Q.    Would you look at every
14  single line -- line item of each
15  statement?
16     A.    Generally not.
17     Q.    Okay.
18          So what -- just generally,
19  what would you do to review the
20  bills?
21     A.    You just asked and I just
22  answered.
23     Q.    Well, what were you looking
24  at when you were looking at the
25  bills?
```



```
 1                    M. TASCH
 2     A.    We were looking to see what
 3   possible expenditures were, mostly
 4   large amounts.
 5     Q.    Okay.
 6           So you would look at the
 7   line items of the large amounts?
 8     A.    (Witness nods head).
 9           MR. DROGIN:  The witness
10    is nodding.
11     A.    Yes, I apologize.  Yes, we
12   would.
13     Q.    How much time would you
14   spend reviewing Canal's credit card
15   statements each month?
16           MR. DROGIN:  Objection to
17    the form.
18     A.    I don't know.  The -- the
19   bookkeepers usually reviewed it, so
20   I don't know how much time they
21   spent.
22     Q.    But you would review the
23   credit card statements as well,
24   correct?
25     A.    I would generally just take
```



Page 110

```
 1                  M. TASCH
 2    a quick peek.  If they had
 3    particular questions we would
 4    discuss it before.  I trusted both
 5    of them to do it, so --
 6      Q.    And which bookkeepers?
 7      A.    Mostly talking about the
 8    current ones.  Eileen -- Lindsay who
 9    was the bookkeeper and Eileen who
10    was the manager on the account.
11      Q.    During Ms. Robinson's
12    employment, which bookkeepers would
13    review the bills, the statements?
14      A.    Same.  Francesca who we
15    discussed before and Victoria.
16      Q.    And what -- okay.
17            What instructions were
18    given to Berdon's bookkeepers with
19    respect to their review of
20    Canal's --
21            MR. DROGIN:  Objection.
22        Assumes facts not in
23        evidence.  You have not
24        established that instructions
25        were given.
```



```
 1                M. TASCH
 2     Q.    Mr. Tasch, were
 3   instructions given to Berdon's
 4   bookkeepers with respect to their
 5   review of Canals' bills?
 6     A.    I don't understand the
 7   question.
 8     Q.    Did Canal's bookkeepers
 9   receive any instruction at all from
10   you about what they -- about their
11   review with respect to Canal's
12   bills?
13     A.    Generally not.
14     Q.    Did you have a method to
15   organize Canal's credit card
16   statements?
17     A.    I don't understand that
18   question at all.
19     Q.    So what were the
20   bookkeepers supposed to be looking
21   for when they were reviewing Canal's
22   credit card bills?
23     A.    Well, mostly when we look
24   at bills we make sure it is correct
25   on its face, totals are correct,
```



Page 112

```
1                M. TASCH
2    there aren't duplicate charges, per
3    se.  If there are, we check them out
4    with the client to see if that is --
5    if that is correct.  There may have
6    been credits on the bills that we
7    wanted to check out and maybe we
8    would ask the client also.  Things
9    like that.
10        The first thing we do when
11   we look at a bill, even though it is
12   an electronically done, is we just
13   do a quick check to make sure it is
14   correct.
15   Q.    So the bookkeepers would
16   look at every single line in
17   reviewing?
18   A.    As we established before
19   that, we wouldn't look at every
20   single line.
21   Q.    Okay.
22        You would scan all of the
23   charges to see --
24   A.    Yes.
25   Q.    Were there types of
```



Page 113

```
 1              M. TASCH
 2   expenses that the bookkeepers didn't
 3   scrutinize line by line?
 4         MR. DROGIN:  Objection to
 5     the form.
 6   A.    I don't recall.
 7   Q.    And you were generally
 8   familiar with the charges being made
 9   to the Canal American Express card
10   for --
11   A.    Yes.  Once we were on the
12   account for a little while, we got
13   used to what was being charged.
14   Q.    And what -- so when would
15   you say that you got used to what
16   was charged?
17   A.    I would -- I don't know.  I
18   would say probably within a year or
19   so.
20   Q.    And so that would be, you
21   know, by 2010?
22   A.    Maybe.
23   Q.    And so what were typical
24   expenses that appeared on the Canal
25   American Express credit card under
```



```
 1                    M. TASCH
 2    Ms. Robinson's name?
 3       A.    Ubers, Lyfts, business
 4    gifts.
 5       Q.    Okay.
 6             Anything else?
 7       A.    I don't recall.
 8       Q.    What would you do if you
 9    identified a suspicious charge on
10    the credit card statement?
11       A.    We would speak to Chase
12    about that.
13       Q.    Okay.
14             Were -- were meals also a
15    typical charge on the -- that you
16    would see on the Canal American
17    Express credit card under Ms.
18    Robinson's name?
19       A.    I think that was asked and
20    answered already.
21             MR. DROGIN:  I don't
22       think it was.  Just go ahead.
23             THE WITNESS:  She asked
24       me what typical expenses are
25       on the Canal credit card.  I
```



Page 115

```
 1                M. TASCH
 2      said it was Ubers, Lyfts,
 3      meals, business gifts.
 4           MR. DROGIN:  I don't
 5      think you said meals, but go
 6      ahead.
 7      Q.    Okay.
 8           Would you review receipts
 9  reflecting charges made on the Canal
10  credit cards?
11           MR. DROGIN:  Objection.
12      It assumes a fact not in
13      evidence.  You haven't asked
14      about receipts.  You asked
15      about statements.
16      Q.    You should still answer,
17  Mr. Tasch?
18      A.    What is the question?
19      Q.    Would you receive receipts
20  reflecting charges --
21      A.    We never got receipts.
22      Q.    Would -- so the bookkeepers
23  wouldn't review receipts reflecting
24  charges made on the Canal?
25      A.    We never got receipts.
```



Page 116

```
 1                M. TASCH
 2    Q.    Would -- did you ever ask
 3  for receipts?
 4    A.    Generally on the credit
 5  cards statement for all clients we
 6  never asked for receipts.
 7    Q.    So you never asked for
 8  receipts from Canal?
 9          MR. DROGIN:  Objection to
10    the form.
11    A.    No.
12    Q.    Would you ever review
13  expenses on the credit card
14  statements with Mr. De Niro?
15    A.    Generally not.
16    Q.    Were there times that you
17  did?
18    A.    Not that I recall.
19    Q.    Would you ever review
20  expenses on the credit card
21  statements with anyone who works for
22  Canal?
23    A.    As I said a few minutes
24  ago, if there were charges that had
25  be looked at, we would discuss it
```



Page 117

```
 1                  M. TASCH
 2    with Chase.
 3      Q.    And why didn't you review
 4    any of the expenses on the credit
 5    cards statements with Mr. De Niro?
 6      A.    I didn't feel it was
 7    necessary to do.
 8      Q.    Okay.
 9            During the time when Ms.
10    Robinson was employed by Canal, did
11    you ever identify any suspicious
12    expenditures by Ms. Robinson?
13      A.    Can you repeat the
14    question, please?
15      Q.    During the time when Ms.
16    Robinson was employed by Canal, did
17    you ever identify any suspicious
18    expenditures by Ms. Robinson?
19      A.    Are you asking a question
20    if Chase used the card improperly?
21      Q.    No.
22            I am asking during the time
23    when Ms. Robinson was employed by
24    Canal, did you ever identify any
25    suspicious expenditures by Ms.
```



```
 1                M. TASCH
 2   Robinson?
 3          MR. DROGIN:  Objection to
 4     the form.
 5     A.    Are you asking if she --
 6     Q.    Did you ever --
 7          MR. DROGIN:  Objection to
 8     the form.
 9     Q.    The question is, did you --
10   did you ever identify any suspicious
11   expenditures by Ms. Robinson?
12     A.    Are you asking if she used
13   the card improperly?
14     Q.    I am asking about what, if
15   anything, you identified during Ms.
16   Robinson's employment?
17     A.    You are asking me if she
18   used the card improperly?
19     Q.    No.  That is not my
20   question.
21     A.    Then what is your question?
22     Q.    Okay.
23          During the time when Ms.
24   Robinson was employed by Canal, did
25   you ever identify any suspicious
```



Page 119

```
 1                    M. TASCH
 2    expenditures by Ms. Robinson?
 3       A.    Are you asking if she used
 4    the card improperly?
 5       Q.    I am asking about your --
 6    did you ever flag or identify any
 7    suspicious expenditures?
 8       A.    What you are asking is if
 9    she --
10       Q.    That is not what I am
11    asking.
12       A.    That is exactly what you
13    are asking.  That is exactly what
14    you are asking.
15       Q.    It is certainly not.
16       A.    It certainly is.
17            MR. DROGIN:  Rather than
18        arguing, which gets us
19        nowhere --
20            MS. SLOAN:  I will move
21        on, and I will --
22            MR. DROGIN:  The witness
23        can answer to the best of his
24        ability.  If he is unable, he
25        is unable.
```



```
 1                  M. TASCH
 2          MS. SLOAN:  That is
 3      right.
 4      Q.    I am just asking you to
 5   think back to the time when Ms.
 6   Robinson was employed at Canal.
 7          Did you ever identify any
 8   suspicious expenditures by Ms.
 9   Robinson?
10      A.    I am going to make the
11   statement I just made a minute ago.
12   You are asking me if she used the
13   card improperly.
14      Q.    That is not what I am
15   asking.
16      A.    It certainly is what you
17   are asking.
18          MR. DROGIN:  Do you just
19      want him to answer that
20      question?
21          MS. SLOAN:  Yes -- no.  I
22      am asking him to answer the
23      question that I am asking.
24          MR. DROGIN:  You don't
25      want him to answer the
```



Page 121

```
 1              M. TASCH
 2   question that he is prepared
 3   to answer?  Just so the
 4   record is clear.  You don't
 5   want him to --
 6        MS. SLOAN:  I am asking
 7   him to answer what I am
 8   asking, which is what happens
 9   in a deposition.
10        (Simultaneous speaking)
11        MR. DROGIN:  It is clear
12   that he is resisting.  He is
13   proposing another question,
14   and it sounds like he is
15   prepared to answer the
16   question if you adopt it.  So
17   the record should just be
18   clear what the witness is
19   proposing to answer and that
20   you do not want to hear the
21   answer to that question, or
22   else you would adopt it and
23   ask it.
24        MS. SLOAN:  I am asking a
25   different question.
```



Page 122

```
 1                 M. TASCH
 2          MS. JACOBS:  I just want
 3      to note.  I just realized I
 4      have been muted.  I have been
 5      objecting to questions using
 6      the word suspicious.  I would
 7      like to state that on the
 8      record.
 9    Q.    So Mr. Tasch, I am asking
10   you to think through the times that
11   Ms. Robinson was employed at Canal,
12   okay?  I am asking about what you
13   identified.
14          I am asking did you ever
15   identify to Mr. De Niro, or anyone
16   else, any suspicious expenditures by
17   Ms. Robinson?
18          MS. JACOBS:  Objection to
19      the form.
20    A.    Are you asking if she used
21   the card improperly?
22    Q.    Before Ms. Robinson's
23   employment ended, did you identify
24   to Mr. De Niro or anyone else
25   expenditures that you deemed
```



Page 123

```
 1                 M. TASCH
 2   suspicious?
 3     A.    So you are asking if she
 4   used the card improperly?
 5     Q.    That is not what I am
 6   asking.
 7           MR. DROGIN:  Why don't we
 8       just mark that and either
 9       come back to it or we will
10       raise it with the Court?  It
11       seems silly that we are going
12       in circles here.
13     Q.    I am asking about -- just
14   to be clear, Mr. Tasch, I am asking
15   about communications that you had
16   before Ms. Robinson's employment
17   ended.  And it is a -- it is a
18   simple yes or no.
19           Did you ever identify to
20   Mr. De Niro or anyone else any
21   suspicious expenditures by Ms.
22   Robinson?
23     A.    You are asking me if she
24   used the card improperly.  Is that
25   the question?
```



Page 124

```
 1               M. TASCH
 2    Q.    The question is about
 3 communications that you may or may
 4 not have made before Ms. Robinson's
 5 employment ended?
 6    A.    Well, I don't understand
 7 the question.
 8         MR. DROGIN:  Can you
 9    rephrase the question,
10    perhaps?
11         MS. SLOAN:  Well, I have
12    rephrased the question a
13    couple of times now.
14    Q.    I'm asking if you
15 communicated -- before Ms.
16 Robinson's employment ended, did you
17 communicate with Mr. De Niro about
18 any concerning expenditures by Ms.
19 Robinson?
20    A.    You are asking if I spoke
21 to Mr. De Niro about the improper
22 use of a credit card by Chase?
23    Q.    Before Ms. Robinson's
24 employment -- Ms. Robinson's
25 employment ended?
```



Page 125

```
 1                  M. TASCH
 2    A.    You are asking me if she
 3  used the credit card improperly?
 4    Q.    Sir, I am asking about
 5  communications -- if you had any
 6  communications with Mr. De Niro
 7  about concerns --
 8    A.    About the improper use of
 9  Chase's credit card spending?
10    Q.    About concerns that you had
11  about --
12    A.    You are asking me --
13          (Simultaneous speaking)
14          MS. SLOAN:  Ms. Jacobs,
15    do you want to take a break
16    so you can explain the
17    question to your client?
18    A.    I don't need the question
19  explained to me.
20    Q.    At this time it seems like
21  a willful refusal to answer the
22  question.
23    A.    I think you are asking an
24  improper question.
25          MR. DROGIN:  Why don't
```


MAGNA
LEGAL SERVICES

Page 126

```
 1                M. TASCH
 2      you just let him answer the
 3      question that he is posing?
 4      Isn't that relevant?
 5          MS. SLOAN:  I am asking a
 6      different question.
 7          MR. DROGIN:  But you are
 8      avoiding --
 9          MS. SLOAN:  And he is
10      required to answer the
11      questions that I am asking,
12      not the question that he is
13      --
14          MR. DROGIN:  But you are
15      avoiding the central question
16      in this case.  Why don't
17      you --
18          MS. SLOAN:  Mr. Drogin,
19      it is not your determination
20      to make.  And it is not Mr.
21      Tasch's decision to decide
22      which questions he can
23      answer.
24          MR. DROGIN:  Yes, but you
25      are avoiding.  You are making
```



Page 127

```
 1                M. TASCH
 2    a record here that shows you
 3    are unable or unwilling to
 4    ask him that question.
 5        MS. SLOAN:  Counsel,
 6    stop.  I am asking the
 7    questions in this deposition.
 8    The witness is required to
 9    answer the questions that I
10    am asking.
11        MR. DROGIN:  It doesn't
12    work when Ms. Harwin says,
13    "Counsel, stop," and it is
14    not going to stop here.  It
15    is not going to stop us here.
16    We are making a record.
17        MS. SLOAN:  Exactly.  And
18    I am asking the questions in
19    the deposition, and the
20    witness is required to answer
21    the questions that I am
22    asking.
23        MR. DROGIN:  And if he
24    willfully refuses, you have
25    your recourse.
```



Page 128

```
 1              M. TASCH
 2         MS. SLOAN:  Okay.  For
 3     the record, Mr. Tasch is
 4     willfully refusing to answer
 5     the question.
 6   A.    No.  I am not refusing.  I
 7   don't understand the question.
 8         MR. DROGIN:  Now the
 9     witness has told you that he
10     doesn't understand the
11     question.  And the witness
12     has posed a question that he
13     is willing to answer.
14         MS. SLOAN:  Counsel,
15     stop.
16         MR. DROGIN:  When you
17     say, "Counsel, stop," I am
18     not going to stop because I
19     am creating and I want this
20     preserved for the record so
21     the Court can see that you
22     want a question answered that
23     the witness says he doesn't
24     understand, and he is
25     prepared to adopt and answer
```



Page 129

```
 1              M. TASCH
 2      a question that is central to
 3      Canal's affirmative claims
 4      and destroys your retaliation
 5      claim.  So the Court should
 6      see what you guys are doing
 7      here.  Do you want him to
 8      answer that question or no?
 9      The question that he is
10      prepared to answer.  Yes or
11      no?
12          MS. SLOAN:  The witness
13      should answer the question
14      that I have asked him.
15          MR. DROGIN:  Why don't we
16      take a two-day break?
17      Because it seems like we are
18      going to be here for 48 hours
19      arguing over this point.  If
20      you want to mark it for a
21      ruling, we can mark it for a
22      ruling and come back to it.
23      It is not productive anymore
24      to keep going in circles.  He
25      can't answer your question
```



Page 130

```
 1                M. TASCH
 2     and you don't want him to
 3     answer a question that is
 4     material to the case, so why
 5     don't we just move forward or
 6     we can take this to the judge
 7     or you can, if you so choose?
 8          MS. SLOAN:  Okay.  That
 9     is fine.  The record is clear
10     on his failure to answer the
11     question that I asked.
12          MR. DROGIN:  I am sorry.
13     I didn't hear you.  I am
14     sorry.  I didn't hear you.
15     Could you just repeat what
16     you said?
17          MS. SLOAN:  I said that
18     the record is clear that he
19     has failed to answer the
20     question that I have asked.
21     A.    I don't understand the
22   question that you asked.  So there
23   is no failure to answer.
24          MS. JACOBS:  Can I make a
25     suggestion?
```



MAGNA
LEGAL SERVICES

Page 131

```
 1                  M. TASCH
 2          MS. SLOAN:  Sure.
 3          MS. JACOBS:  Why don't
 4     you ask him whether he ever
 5     reported to Mr. De Niro any
 6     charge that he questioned?
 7     My problem is the word
 8     suspicious.
 9          MS. SLOAN:  To be clear,
10     in one of the questions I
11     asked, I focused on -- I took
12     out the word suspicious.  The
13     record will show that he has
14     refused to answer multiple
15     versions of this question.
16          (Simultaneous speaking)
17     Q.    Mr. Tasch, did you report
18  to Mr. De Niro any concerns about
19  Ms. Robinson's expenditures before
20  her employment ended?
21     A.    I don't understand the
22  question.
23     Q.    Okay.
24          MS. SLOAN:  The record is
25     clear.
```



Page 132

```
 1                 M. TASCH
 2    Q.    During the past decade --
 3   actually, strike that.
 4         During the past decade,
 5   would Berdon review Canal's petty
 6   cash records?
 7    A.    I don't understand the
 8   question.
 9    Q.    During Ms. Robinson's
10   employment, would Berdon review
11   Canal's -- excuse me.  Let me
12   rephrase that.
13         During Ms. Robinson's
14   employment, were petty cash records
15   submitted to Berdon?
16    A.    Yes.
17    Q.    Would -- during Ms.
18   Robinson's employment, would Berdon
19   review those petty cash records?
20         MR. DROGIN:  Objection to
21      the form.  Again, and I want
22      it noted, every time you ask
23      a question about Berdon, you
24      are exceeding the scope of
25      the purpose of this
```



Page 133

```
 1                    M. TASCH
 2     deposition.  He was brought
 3     here to testify based on his
 4     personal knowledge.  He can
 5     not bind Berdon.
 6     Q.    During Ms. Robinson's
 7   employment, would you review Canal's
 8   -- Canal's petty cash records?
 9     A.    I don't understand the
10   question.
11     Q.    So you just testified that
12   petty cash records would be
13   submitted to Berdon during Ms.
14   Robinson's employment.  And my
15   question is, would you review those
16   records?
17     A.    I don't understand the
18   question.
19     Q.    What part of the question
20   don't you understand?
21     A.    That is for you to figure
22   out.
23          MR. DROGIN:  Can I -- Ms.
24     Sloan --
25          MS. SLOAN:  Mr. Drogin,
```


MAGNA
LEGAL SERVICES

Page 134

```
 1              M. TASCH
 2     please.
 3         MR. DROGIN:  I am trying
 4     to help by suggesting that we
 5     take a five-minute break
 6     because this is not helpful.
 7     And none of us want to see
 8     time wasted here.  Let's try
 9     to straighten this out.
10         MS. SLOAN:  That is fine.
11     Let's take a five-minute
12     break.
13         THE VIDEOGRAPHER:  The
14     time is 11:35 a.m.  We are
15     off the record.
16         (Whereupon, a recess was
17     taken at this time.)
18         THE VIDEOGRAPHER:  The
19     time is 11:44.  We are back
20     on the record.
21         MS. JACOBS:  First of
22     all, and I don't want to
23     forget this because I forgot
24     it after the last break, Mr.
25     Tasch has remembered another
```



Page 135

```
1                 M. TASCH
2      case that he was a witness in
3      or he gave testimony and he
4      didn't include that in his
5      earlier answer so he is
6      prepared to talk about that.
7           The problem that I think
8      we are having now is that we
9      have got questions that
10     reflect a term of art to an
11     accountant.  Review,
12     statement.  Statement means
13     different things from a
14     lawyer to an accountant, as
15     just one example.  And so
16     while Mr. Tasch keeps saying
17     he doesn't understand the
18     question, he really cannot
19     answer until he understands
20     what -- whether you mean the
21     term of art, or whether you
22     mean it in the vernacular.
23     He is becoming very
24     frustrated, obviously,
25     because of that.  I am going
```


MAGNA
LEGAL SERVICES

Page 136

```
 1                M. TASCH
 2      to suggest that to the extent
 3      the questions can be as clear
 4      as possible, I think you will
 5      get better answers than you
 6      have been getting, or more
 7      useful answers.  But they --
 8      they need to be -- they need
 9      to be crafted carefully so he
10      knows what you are asking.
11           MS. SLOAN:  Okay.  Thank
12      you, Ms. Jacobs.  And the
13      term review, is intended in
14      its plain meaning, and not
15      based on any term of art in
16      accounting.
17           MS. JACOBS:  Thank you.
18      Q.    Mr. Tasch, during Ms.
19  Robinson's employment, what did
20  Berdon do with the petty cash sheets
21  that it received from Canal?
22      A.    When we received the
23  sheets, we would look at them.  They
24  were rarely timely, so it didn't
25  have a lot of meaning at the end of
```



Page 137

1                    M. TASCH

2    the day.  But mostly it was used for

3    when we were booking the journal

4    entries for the American Express or

5    the -- the petty cash receipts, it

6    just gave us a better general idea

7    of where to book the expenses.

8            So to give you an example,

9    if we gave them $100.00, they would

10   send receipts for $100.00, and we

11   would book the $100.00 according to

12   the receipt that they sent.

13   Q.    What is the journal entry

14   you are referring to?

15   A.    In other words, if we gave

16   generally -- I don't know who is

17   going to understand, but I will tell

18   you how it works.  So you credit the

19   bank account for $100.00, you debit

20   petty cash.  We are never going to

21   put that on a tax return because it

22   is not, quote unquote, "a legitimate

23   expense."  So we just leave it on

24   the P&L, and when we got the

25   receipts -- and I will make it up.



```
 1                 M. TASCH
 2   We got $100.00 for office expenses,
 3   we credit petty cash, wipe out the
 4   word petty cash, and then we would
 5   put it into office expense.
 6     Q.    Okay.
 7           And who from Canal would
 8   submit the petty cash sheets?
 9     A.    Michael Kaplan.
10     Q.    Okay.
11           And would Michael Kaplan
12   also submit receipts with the petty
13   cash sheets?
14     A.    When he could.
15     Q.    How often would you receive
16   the petty cash sheets from Mr.
17   Kaplan?
18     A.    Generally, we almost all
19   the time got it after the year end,
20   usually maybe February or March of
21   the following year.
22     Q.    So in February or March of
23   the following year, you would
24   receive the petty cash sheets and
25   receipts for the entire prior
```



Page 139

```
 1                 M. TASCH
 2    calendar year?
 3      A.    Generally correct.
 4      Q.    And Mr. Kaplan was the
 5    point of contact at Canal with
 6    respect to petty cash?
 7      A.    Yes.
 8      Q.    And he was the employee at
 9    Canal who managed Canal's petty
10    cash, correct?
11      A.    I'm not sure I understand
12    the question.
13      Q.    He was the employee at
14    Canal who oversaw Canal's petty
15    cash, correct?
16           MR. DROGIN:  Objection to
17       the form.
18      A.    Again, the question --
19    listen, I understand where you are
20    going.  The terminology is a little
21    incorrect in my mind.
22      Q.    And what term would you
23    use?
24      A.    Well, you say did he manage
25    the petty cash?  I am just not sure
```



Page 140

```
 1                    M. TASCH
 2   what that means that you are asking.
 3     Q.    What was Michael Kaplan's
 4   role with petty cash -- with respect
 5   to petty cash?
 6     A.    His general role was to ask
 7   for petty cash.  I would get an
 8   e-mail generally, "Hey, Michael, can
 9   you send out 2,000 or 2,500 for
10   petty cash?  We need it around the
11   office."
12     Q.    Okay.
13     A.    Once it got there, I am not
14   sure who managed it or who did what
15   with it.
16     Q.    Okay.
17           But he was the person that
18   submitted all the sheets and
19   receipts to, you, correct?
20     A.    Generally correct, yes.
21     Q.    So that was another part of
22   his role, correct?
23     A.    Yes.
24     Q.    And did you understand how
25   he came to be the person with those
```



Page 141

```
 1                 M. TASCH
 2   sheets and receipts?
 3      A.    No.  I think when we got
 4   Mr. De Niro as an account, I think
 5   either he just got into the role or
 6   he was already in the role.
 7      Q.    Okay.
 8            And so what review process
 9   would you undertake with respect to
10   the petty cash sheets and receipts?
11      A.    Again, just for the record,
12   you are using the word review, and
13   it has a different terminology to me
14   than --
15      Q.    Understood.
16      A.    It is hard for me to answer
17   the question.
18      Q.    I understand, Mr. Tasch.
19            I am using the word
20   generally according to its plain
21   meaning.  So when you -- when you
22   would receive the petty cash sheets
23   and receipts, what exactly did you
24   do with them?
25      A.    Well, again, we looked at
```



Page 142

```
 1                M. TASCH
 2    them obviously because we were
 3    trying to do a journal entry, so we
 4    needed to know what categories to
 5    place the expenses in.
 6      Q.    And how much time would you
 7    spend looking at them?
 8      A.    You know what, I really
 9    don't know because the bookkeepers
10    really took care of that -- that
11    part.
12      Q.    Okay.
13            And did you give the
14    bookkeepers any instructions on what
15    to do when they were looking at the
16    petty cash sheets and receipts?
17      A.    Generally, no.
18      Q.    Does Berdon have a record
19    of how it categorized petty cash
20    expenses?
21            MR. DROGIN:  Objection to
22      the form.  You can answer it.
23      A.    Okay.  I am just not sure
24    what you mean by a record.  As I
25    explained to you, we got the
```



Page 143

```
 1                  M. TASCH
 2    receipts and we made a journal
 3    entry.
 4       Q.    And besides the journal
 5    entry, was there any other way that
 6    you recorded the categories of
 7    expenses?
 8       A.    No.
 9       Q.    Okay.
10             So the journal entry is the
11    record?
12       A.    Yes.
13       Q.    And you were generally
14    familiar with Canal's petty cash
15    expenditures, correct?
16             MR. DROGIN:  Objection to
17       the form.
18             MS. SLOAN:  Let me
19       rephrase because it sounds
20       like --
21       Q.    You were generally familiar
22    with the expenses that appeared on
23    Canal's petty cash sheets, correct?
24       A.    Again, kindly, I am going
25    to ask that I am not understanding
```



Page 144

```
 1                   M. TASCH
 2   the question, per se.
 3   Q.    Okay.
 4        You were generally familiar
 5   with the items and the -- that would
 6   -- that would appear on the petty
 7   cash sheets that you received from
 8   Canal?
 9   A.    When you say, "familiar,"
10   once the petty cash went to Canal,
11   they used it for what they saw fit,
12   and they gave us the receipts and we
13   booked a journal entry.  That is the
14   nature of the transaction.
15   Q.    But -- okay.
16        Did you review the receipts
17   that corresponded with the petty
18   cash sheets?
19   A.    Did I personally review the
20   receipts?
21   Q.    Yes.
22   A.    No.
23   Q.    And when -- can you
24   describe the petty cash sheets that
25   we are talking about?
```



```
 1                M. TASCH
 2      A.     I believe generally Michael
 3  would send an Excel spreadsheet.
 4      Q.     And what did that Excel
 5  spreadsheet show?
 6      A.     It showed the petty cash
 7  receipts.
 8      Q.     Okay.
 9             So did it show a list of
10  expenses that were --
11      A.     Yes.
12      Q.     Okay.
13             And so you would review --
14  you would look at the Excel
15  spreadsheet, correct?
16      A.     Correct.
17      Q.     And so from looking at that
18  Excel spreadsheet, you were familiar
19  with the types of expenses that
20  Canal employees would use petty cash
21  to buy, correct?
22      A.     Well, again, when you say,
23  "familiar," as far as I am concerned
24  with the petty cash, it was used for
25  expenditures around the office.  I
```



Page 146

```
 1                M. TASCH

 2   -- it is hard for me to say who

 3   really designated or approved it.  I

 4   don't know if it was Michael in some

 5   cases or Chase in some cases.  But

 6   as far as I knew, the other

 7   employees were not allowed to go in

 8   unless they were requested to do so.

 9           So in other words, if they

10   had to run out for something and

11   needed $20.00 or $15.00, I would

12   think -- I thought that they would

13   ask permission.

14   Q.    And to your knowledge, what

15   types of expenses generally appeared

16   on Canal's petty cash sheets?

17   A.    It could have been office,

18   it could have been meals, coffee,

19   sometimes supplies, stuff like that.

20   Q.    Did -- did Berdon -- excuse

21   me.

22           Did Berdon maintain records

23   of the petty cash receipts that were

24   submitted to it?

25           MR. DROGIN:  Objection to
```



```
 1                M. TASCH
 2      the form.
 3      A.    Again, I'm not sure of the
 4  question or what you are asking.
 5      Q.    What would Berdon do --
 6      A.    Did we keep the back up?
 7      Q.    What would Berdon do with
 8  the petty cash receipts that it
 9  received?
10      A.    It became part of the books
11  and records.
12      Q.    And so the petty cash
13  receipts that were submitted to
14  Berdon, Berdon still has those
15  receipts?
16          MR. DROGIN:  Objection to
17      the form.
18      A.    We have some.  We -- you
19  know, we only keep a certain level
20  of years for records.  So I'm not
21  sure how far it would go back.
22      Q.    Do you have a sense of how
23  far you keep the records -- the
24  receipts for?
25      A.    I think -- I think our
```



```
 1                M. TASCH
 2    policy might be seven years.
 3       Q.    Would you ever review any
 4    -- any petty cash expenses with Mr.
 5    De Niro?
 6       A.    Generally not.
 7       Q.    Would you ever review petty
 8    cash expenses with Mr. De Niro?
 9       A.    Not to my knowledge.
10       Q.    And would you ever review
11    the petty cash expenses with anyone
12    that worked for Canal or for Mr. De
13    Niro?
14       A.    We would speak to Michael
15    about those for the most part.  If
16    we had questions or maybe Michael
17    didn't know, then we would speak to
18    Chase.
19       Q.    What types of questions
20    would you have about the petty cash
21    records?
22       A.    Well -- did somebody say
23    something?
24       Q.    I just said -- I will
25    rephrase.  You can answer the
```



```
 1                M. TASCH
 2  question.
 3      A.    Would you mind restating --
 4  re-asking it again?
 5      Q.    That is fine.
 6            I said what type of
 7  questions would you have about the
 8  petty cash expenses?
 9      A.    Probably a general question
10  if my recollection is -- is correct
11  is -- a lot of -- there were times
12  that there might have been expenses
13  that were personal and not business.
14  Not for the employees, but maybe for
15  Mr. De Niro.  I maybe needed more
16  clarification on that, as to whether
17  to book it on Canal's books or as a
18  personal expense to Mr. De Niro.
19      Q.    Okay.
20            During the time when Ms.
21  Robinson was employed by Canal, did
22  you ever report a concern to Mr. De
23  Niro or anyone else about any petty
24  cash charges by Ms. Robinson?
25            MR. DROGIN:  Objection to
```



Page 150

```
 1                   M. TASCH
 2      the form.  Can we hear the
 3      question back?
 4          MS. SLOAN:  Paige, can
 5      you repeat it?
 6           (Whereupon, the requested
 7      portion was read back by the
 8      reporter:
 9          Q:  During the time when
10      Ms. Robinson was employed by
11      Canal, did you ever report a
12      concern to Mr. De Niro or
13      anyone else about any petty
14      cash charges by Ms.
15      Robinson?)
16      A.    Not that I recall.
17      Q.    Okay.
18           Would Berdon review --
19   would Berdon review any other
20   financial records of Canal?
21          MR. DROGIN:  Objection to
22       the form.
23      A.    I don't understand that
24   question.
25      Q.    Okay.
```



Page 151

```
 1                 M. TASCH
 2          I will strike that
 3   question.
 4      A.    Okay.
 5      Q.    During the time when Ms.
 6   Robinson was employed by Canal, did
 7   you ever report a concern to Mr. De
 8   Niro or anyone else about any credit
 9   card charges by Ms. Robinson?
10      A.    Not that I recall.
11      Q.    Did Berdon process payroll
12   for Canal?
13          MR. DROGIN:  Objection to
14      the form.
15      A.    I think we went through
16   this already, no?
17      Q.    We did discuss some aspects
18   of Berdon's role with respect to
19   payroll.
20      A.    But you did ask
21   specifically if we processed payroll
22   before.
23      Q.    I apologize.  Can you
24   answer the question again?
25      A.    The question is -- the
```



Page 152

```
 1                M. TASCH

 2    answer is no.  But let me just take

 3    a step back.  You have to define for

 4    me process.  We don't process

 5    payroll for Canal.  That is done by

 6    a payroll company.

 7       Q.    And did -- when Ms.

 8    Robinson was employed by Canal, did

 9    Berdon have any role with respect to

10    the processing of Canal's payroll?

11       A.    Well, again, I will help

12    you out here because I don't think

13    you are asking the right question.

14    But as we discussed this morning,

15    Chase would send -- when the

16    employees would work overtime, she

17    would send me an e-mail saying they

18    worked overtime, and we did call in

19    to payroll the overtime.

20       Q.    Okay.

21            Did Berdon -- when Ms.

22    Robinson was employed by Canal, did

23    Berdon oversee payroll expenses?

24            MR. DROGIN:  Objection to

25       the form.
```


MAGNA
LEGAL SERVICES

Page 153

```
 1                    M. TASCH

 2     A.    Ms. Sloan, I am not sure I

 3  understand the question.

 4     Q.    Did -- okay.

 5          Did -- when Ms. Robinson

 6  was employed by Canal, did Berdon

 7  monitor amounts paid to employees

 8  through the payroll?

 9          MR. DROGIN:  Objection to

10     the form.

11     A.    The answer is no.

12     Q.    During the time when Ms.

13  Robinson was employed by Canal, did

14  you ever report a concern to Mr. De

15  Niro or anyone else about any

16  payroll payments to Ms. Robinson?

17     A.    No.

18     Q.    Okay.

19          Mr. Tasch, we are going to

20  share another document in the chat.

21  And let's see if this time it works

22  for everyone to open it in the chat.

23  This document was previously marked

24  as Plaintiff's Exhibit 122.  It is

25  Bates stamped Canal 0001844.  It
```



Page 154

```
 1                M. TASCH
 2   should come up shortly.
 3     A.    It did it again.  The same
 4   thing comes up as what came up
 5   before.
 6           MS. JACOBS:  Yeah.  Same.
 7           MS. SLOAN:  Do you have
 8       an option to save it to your
 9       computer?
10           MS. JACOBS:  It is a
11       whole file.  It is like a
12       system file.  System 32.  It
13       is large.
14           MS. SLOAN:  Let's go --
15           MS. JACOBS:  None --
16           MS. SLOAN:  Let's go off
17       the record while we
18       troubleshoot this, please.
19           THE VIDEOGRAPHER:  The
20       time is 12:03 p.m.  We are
21       off the record.
22           (Whereupon, a recess was
23       taken at this time.)
24           THE VIDEOGRAPHER:  The
25       time is 12:13 p.m.  We are
```



Page 155

```
 1                M. TASCH
 2      back on the record.
 3      Q.    This was previously marked
 4   as Plaintiff's Exhibit 122.  And Mr.
 5   Tasch, if you could please look --
 6   read through this e-mail on the
 7   screen.  You can see it, correct?
 8      A.    Yes, I can see it.
 9            MS. JACOBS:  I just also
10       messengered it to you,
11       Michael, if that helps.
12            THE WITNESS:  I did hear
13       a click on my phone.
14            MR. DROGIN:  It is a good
15       thing your phone is on.
16            THE WITNESS:  Exactly.
17      Q.    Mr. Tasch, do you recognize
18   this e-mail?
19      A.    I recognize it now.
20      Q.    In this e-mail, Mark
21   Bosswick wrote, "We will be
22   reimbursing her for some
23   out-of-pocket business expenses.  I
24   have discussed this with Bob."  And
25   the her he says, he is referring to
```


MAGNA
LEGAL SERVICES

Page 156

```
 1                  M. TASCH
 2    Ms. Robinson, correct?
 3    A.     Yes.
 4    Q.     Prior to July 2017, what
 5    out-of-pocket business expenses was
 6    Ms. Robinson authorized to be
 7    reimbursed for?
 8    A.     None that I know of.
 9    Q.     From July 2017 onward, what
10    out-of-pocket business expenses was
11    Ms. Robinson authorized to be
12    reimbursed for?
13    A.     I don't recall.
14    Q.     So the -- in the e-mail
15    when it refers to some out-of-pocket
16    business expenses, do you know what
17    that -- what business expenses that
18    is referring to?
19    A.     Do not.
20    Q.     Did Mr. Bosswick
21    communicate to you what expenses Ms.
22    Robinson was authorized to be
23    reimbursed for?
24    A.     Not that I recall.
25           MR. DROGIN:  Just so the
```


MAGNA
LEGAL SERVICES

Page 157

```
 1                M. TASCH
 2     record is clear, the word
 3     authorize does not appear
 4     anywhere here.
 5     Q.    So he may have discussed
 6  with you, but you don't recall
 7  either way?
 8     A.    He might have discussed
 9  that with me.
10     Q.    The out-of-pocket business
11  expenses that Ms. Robinson was
12  entitled to?
13     A.    I don't recall.
14     Q.    Okay.
15          During Ms. Robinson's
16  employment, was it your
17  understanding that Mr. De Niro
18  allowed Ms. Robinson to travel using
19  SkyMiles generated by Canal's credit
20  card?
21     A.    I don't recall that at all.
22     Q.    What -- what
23  communications, if any, did Mr. De
24  Niro have with you about Ms.
25  Robinson using SkyMiles generated by
```



MAGNA
LEGAL SERVICES

Page 158

```
 1                M. TASCH
 2  Canal's credit card?
 3     A.    I don't recall having a
 4  conversation with Bob about that.
 5     Q.    Okay.
 6           For a long time though,
 7  Berdon would transfer SkyMiles to
 8  Ms. Robinson from time to time for
 9  her to use for travel, correct?
10           MS. JACOBS:  Objection to
11     the form.  Go ahead.
12     A.    I do know there were miles
13  transferred.  I don't remember if
14  they were transferred to Chase to
15  use, or to Bob's account to use.
16     Q.    But you do recall miles
17  being transferred out of one account
18  into another account that Berdon was
19  involved with, correct?
20     A.    When you say, "Berdon was
21  involved with," I don't understand
22  that.
23     Q.    Okay.  Let me rephrase.
24           Tell me everything that you
25  recall about miles transfers?
```



```
 1                M. TASCH

 2    A.    You have to be more

 3   specific.  You are asking a general

 4   question.

 5    Q.    You -- you remember that

 6   Berdon would transfer miles to

 7   another account, correct?

 8    A.    Okay.  Let's be clear.  You

 9   keep using the word Berdon.  Okay?

10   We don't make these decisions.  They

11   are made for us.

12    Q.    I am not asking about the

13   making --

14    A.    You asked if Berdon did

15   this.  That is a direct question

16   about Berdon.

17    Q.    Yes.  Okay.

18          Did -- did you or any

19   Berdon employee transfer miles?

20    A.    Can you be more specific?

21    Q.    During Ms. Robinson's

22   employment, Berdon employees would

23   transfer SkyMiles to Ms. Robinson's

24   account from time to time, correct?

25    A.    I don't know that to be
```



Page 160

```
 1                   M. TASCH
 2    correct.
 3      Q.    Okay.
 4            So what do you know about
 5    miles transfers that Berdon
 6    employees would -- would do during
 7    Ms. Robinson's employment?
 8      A.    What is the specific
 9    question?
10      Q.    I am asking about your
11    recollection about during Ms.
12    Robinson's employment, about Berdon
13    employee's involvement in
14    transferring miles?
15      A.    Could you be more specific,
16    please?
17      Q.    Are there specific miles
18    transfers that you are thinking of
19    right now?
20      A.    You need to be more
21    specific.
22      Q.    Did there come a time when
23    Berdon employees took steps so that
24    Ms. Robinson could transfer points
25    herself, so that she could book
```



Page 161

```
 1                M. TASCH
 2   flights using SkyMiles?
 3      A.    Ms. Robinson, when she
 4   became co-manager of the American
 5   Express account, had full authority
 6   to do whatever she wanted.
 7      Q.    And when was that?
 8      A.    To my -- if my recollection
 9   is correct, maybe early '18.
10      Q.    How often would miles be
11   transferred for Canal's account?
12      A.    I don't recall.
13            MS. SLOAN:  And Mr.
14      Drogin, you can stop screen
15      sharing.  Thank you.
16      Q.    Do you recall a period of
17   time when there was an issue that
18   prevented Canal's American Express
19   SkyMiles from being transferred to
20   Ms. Robinson's account?
21      A.    I don't remember that.
22      Q.    Okay.
23            We are going to share --
24   okay.  Well --
25            MS. SLOAN:  Jeremy, have
```



Page 162

```
 1                M. TASCH
 2     you e-mailed the exhibits or
 3     is this --
 4        MR. MARGOLIS:  Jane, did
 5     you receive the subsequent
 6     exhibit that I sent you?
 7        MS. JACOBS:  Yeah.  I
 8     just opened it.  Five
 9     documents?
10        MR. MARGOLIS:  Yes.
11        MS. JACOBS:  Michael, I
12     got an auto reply from you
13     saying that I --
14        THE WITNESS:  An auto
15     reply?
16        MS. SLOAN:  Let's go off
17     the record.
18        THE VIDEOGRAPHER:  The
19     time is 12:21 p.m.  We are
20     going off the record.
21        (Whereupon, a recess was
22     taken at this time.)
23        THE VIDEOGRAPHER:  The
24     time is now 12:32 p.m.  We
25     are back on the record.
```



Page 163

```
 1                    M. TASCH
 2    Q.    Mr. Tasch, we shared in the
 3  chat Plaintiff's Exhibit 133, which
 4  is Bates stamped Canal 20631.
 5          Do you see this e-mail?
 6    A.    I do.
 7    Q.    Dated January 19, 2018?
 8    A.    I do.
 9    Q.    Do you recognize this
10  e-mail?
11    A.    I recognize it now.
12    Q.    In January of 2018, Ms.
13  Robinson was unable to transfer
14  points generated by Canal credit
15  cards into her SkyMiles account, is
16  that correct?
17    A.    That is what the e-mail
18  says.
19    Q.    Do you recall that
20  happening?
21    A.    Nope.
22    Q.    So you don't recall what
23  the problem was that prevented her
24  from transferring points?
25    A.    I do not.
```



Page 164

```
 1                  M. TASCH
 2     Q.    Do you recall if Mr. De
 3   Niro was informed about this issue?
 4     A.    He was not informed by me.
 5     Q.    Do you recall if he was
 6   informed by anyone about this issue?
 7     A.    I can't answer that
 8   question.
 9     Q.    Well, to your knowledge, do
10   you -- did you -- let me rephrase.
11           Did you ever communicate
12   with Mr. De Niro about this issue?
13     A.    No.  Well, let me just
14   rephrase myself.  I don't recall
15   that I did.
16     Q.    Okay.
17           So you -- do you recall any
18   discussions that you had with Mr. De
19   Niro about Ms. Robinson accessing
20   SkyMiles?
21     A.    Not that I recall.
22     Q.    We are going to share in
23   the chat another document.  That was
24   --
25     A.    Can I get out of this one?
```



Page 165

```
 1              M. TASCH

 2    Q.    Yes.  You can X out of

 3  that, and Jeremy is going to share

 4  another document.  This was

 5  previously marked as Plaintiff's

 6  Exhibit 18.  This is Canal 0045358

 7  through 45360.  And he hasn't sent

 8  it yet, but I will tell you when you

 9  should be able to see it.  Okay.

10  You should be able to see that.

11    A.    Okay.  Looks like a new one

12  just came through.

13    Q.    Perfect.  If you could save

14  that one, like you did the last one,

15  and open it up.

16    A.    So that screen appears with

17  the desktop, so I assume if I just

18  hit save again I should get the same

19  result?

20         MS. JACOBS:  Yes.  Except

21     that it didn't pop up.  I am

22     going to my desktop now to

23     find it.

24         MS. SLOAN:  We will

25     probably give it a few more
```



Page 166

```
 1                    M. TASCH
 2      seconds, and if not we can go
 3       off the record.
 4      Q.    But, Mr. Tasch, do you see
 5    the exhibit?
 6      A.    I see an exhibit.
 7      Q.    Let's see.  It is an
 8    e-mailed, dated January 22, 2018?
 9      A.    It is from Michael Kaplan?
10      Q.    Yes.
11      A.    Okay.
12      Q.    Okay.
13            MS. JACOBS:  Give me one
14       second, please.
15            MS. SLOAN:  Okay.  No
16       problem.
17            MS. JACOBS:  Okay.  Thank
18       you.
19      Q.    Okay.
20            Do you recognize this
21    e-mail or this exchange of e-mails?
22      A.    I really don't recall.  It
23    is the same answer.  I recognize it
24    now.  I don't recall it from back
25    then now.
```



Page 167

```
 1                M. TASCH
 2    Q.    And in this e-mail, do you
 3  see that on January 22, 2018, you
 4  wrote, "She told me she had the
 5  Delta account that she wanted the
 6  miles transferred to?"
 7    A.    Yes.
 8    Q.    And do you see that Mr.
 9  Kaplan responded, in part, that he
10  had no idea if she still uses Bob's
11  miles for herself.
12          Do you see that?
13    A.    I do see that, yes.
14    Q.    And this e-mail is about
15  Ms. Robinson, correct?
16          MR. DROGIN:  Objection to
17      the form.  The e-mail speaks
18      for itself.  You can answer
19      it, Michael.
20    A.    Okay.  Listen, I am going
21  to make an assumption here.  Her
22  name is not here, but --
23    Q.    But you think this is about
24  Ms. Robinson, correct?
25    A.    I do.
```



Page 168

```
 1                M. TASCH
 2    Q.    Okay.
 3          And these e-mails were sent
 4   during the time in which Ms.
 5   Robinson was unable to transfer
 6   points, is that correct?
 7          MR. DROGIN:  Objection.
 8     You can answer.
 9    A.    It appears so.
10    Q.    Okay.
11          Did you understand what Mr.
12   Kaplan meant when he said that she
13   still uses Bob's miles?
14    A.    No, not at the time.
15    Q.    What did -- do you recall
16   what you thought at the time Mr.
17   Kaplan meant when he said, "She
18   still uses Bob's miles?"
19    A.    I don't recall.
20    Q.    Did you subsequently come
21   to an understanding about Ms.
22   Robinson's use of SkyMiles?
23    A.    I don't recall.
24    Q.    Did -- Canal employees
25   understood that Ms. Robinson was
```



Page 169

```
 1                M. TASCH
 2    authorized to use reward points
 3    generated by the Canal credit card,
 4    correct?
 5            MR. DROGIN:  Objection.
 6       You are asking if he knows
 7       what other people understood?
 8       Can we just clarify that?
 9            MS. SLOAN:  Okay.  I will
10       clarify.
11            MR. DROGIN:  Okay.  Thank
12        you.
13       Q.    Was it your understanding
14    that Ms. Robinson was authorized to
15    use reward points generated by Canal
16    credit cards to purchase flights?
17       A.    That I was -- I had no
18    understanding of that at all.
19       Q.    I think you cut out.
20       A.    I had no understanding of
21    that at all.
22       Q.    The Canal American Express
23    credit card statements that Berdon
24    employees reviewed each month showed
25    when points had been transferred,
```



Page 170

```
 1                 M. TASCH
 2   correct?
 3     A.    I don't recall.  And again,
 4   I am objecting to the word review.
 5     Q.    Did you have any
 6   understanding either way about
 7   whether Ms. Robinson was authorized
 8   to use reward points generated by
 9   Canal credit cards to generate
10   points?
11     A.    I did not.  I'm sorry, you
12   didn't finish.  So if you didn't
13   hear me, I did not.
14     Q.    Thank you.
15          The Canal American Express
16   credit card statements that Berdon
17   looked at showed when flights were
18   booked, correct?
19     A.    If they were used -- if the
20   American Express card was used, yes,
21   it would show that.
22     Q.    And the American Express
23   credit card statement that Berdon
24   looked at showed when points had
25   been transferred, correct?
```



Page 171

1              M. TASCH

2    A.    That, I don't recall.

3    Q.    Were you generally aware of

4    when points were transferred to Ms.

5    Robinson's account?

6         MR. DROGIN:  Objection to

7      the form.

8         MS. JACOBS:  Join.

9    A.    I don't --

10        THE WITNESS:  I'm sorry.

11     Is somebody speaking?

12        MS. JACOBS:  I just said,

13     "join."  Sorry.

14    A.    I do not recall.  Sorry.

15    Q.    You don't recall, correct?

16    A.    I don't recall.

17    Q.    Okay.

18         During the time when Ms.

19    Robinson was employed by Canal, did

20    you ever report a concern to Mr. De

21    Niro or anyone else about any

22    transfer or usage of American

23    Express points or Delta SkyMiles by

24    Ms. Robinson?

25    A.    Not that I recall.


MAGNA
LEGAL SERVICES

Page 172

```
 1                M. TASCH

 2    Q.    Did you have any

 3  understanding of why Mr. De Niro

 4  wanted Ms. Robinson to have approval

 5  to transfer points?

 6         MS. JACOBS:  Objection to

 7    the form.

 8    A.    That one I am going to ask

 9  you, I don't really understand the

10  question.

11    Q.    Okay.

12         We are going to share in

13  the chat a previously marked

14  exhibit, Exhibit 128.

15    A.    Can I get out of this one?

16    Q.    Yeah.  You can get out of

17  this one.

18         Which is Bates stamped

19  Canal 0001433 to 1437.

20         THE WITNESS:  Jeremy, you

21    are sending this now?

22         MS. JACOBS:  It is going

23    to show up in the chat I

24    think.

25         MS. SLOAN:  Yeah, he will
```



Page 173

```
 1                M. TASCH
 2    send it momentarily.
 3    A.    I am just saying because I
 4  see it on the right side.
 5    Q.    I see it so it should be
 6  sending soon?
 7    A.    Let's see.  Something just
 8  came through.  Let's see if that is
 9  it.
10    Q.    Do you see this -- are you
11  looking at -- the top is an e-mail
12  sent on March 5, 2018?
13    A.    Yes.
14    Q.    Okay.  Great.
15          Do you recall Mr. De Niro
16  communicating to you about wanting
17  Ms. Robinson to be able to transfer
18  points?
19    A.    Do not.
20    Q.    You don't recall?
21    A.    Nope.
22    Q.    Okay.
23          Do you recognize this
24  e-mail -- this thread of e-mails?
25    A.    I do now.
```



Page 174

```
 1                 M. TASCH
 2    Q.    If you scroll down to the
 3  -- so does this refresh your
 4  recollection about whether Mr. De
 5  Niro communicated to you about
 6  wanting Ms. Robinson to be able to
 7  transfer points?
 8    A.    Well, Bob is asking a
 9  question, "Michael, why isn't this
10  done?"  I am not sure what that
11  relates to, so --
12    Q.    Let's --
13        MR. DROGIN:  So the
14    record is clear, this is an
15    e-mail from Mr. De Niro to
16    Chase Robinson, not to
17    Michael Tasch.
18        THE WITNESS:  Thank you,
19    Laurent.
20    Q.    Let's scroll down to the
21  bottom of page one, which is Bates
22  stamped 1433.  And do you see an
23  e-mail that Ms. Robinson sent you
24  and CC'd Mr. De Niro, on March 5th,
25  2018, in which she states, "I called
```



1                    M. TASCH

2    AMEX, and they have told me I am

3    still not authorized to transfer

4    reward points?"

5        A.    The one that says,

6    "Michael, I just tried you in the

7    office?"

8        Q.    Correct.  Underneath that

9    it says what I just stated.  And it

10   continues, "This has been several

11   months of going back and forth with

12   this issue."

13            So you were trying to help

14   Ms. Robinson so that she could

15   transfer reward points to her

16   account, correct?

17       A.    I'm not sure what that is

18   relating to.

19       Q.    Okay.

20            If you -- did Mr. De Niro

21   instruct you to fix this problem so

22   that Ms. Robinson could transfer

23   points generated by Canal credit

24   cards to purchase her flights?

25       A.    Not that I recall.


MAGNA
LEGAL SERVICES

Page 176

```
 1                  M. TASCH
 2    Q.    As you scroll up on the top
 3 of the page one?
 4    A.    Yes.
 5    Q.    You referred to it
 6 previously, you see that Mr. De Niro
 7 sent an e-mail saying, "Michael, why
 8 isn't this done?"
 9    A.    This is an e-mail to Chase?
10    Q.    That is correct.
11    A.    So I didn't get this
12 e-mail, and I had no knowledge of
13 it.
14    Q.    Okay.
15          Did you ever speak -- did
16 Mr. De Niro ever speak with you
17 about fixing the problem so that --
18    A.    Not that I recall.
19          MS. JACOBS:  Let her
20    finish.
21    Q.    Do you recall speaking with
22 Ms. Robinson for a period of weeks
23 and months about fixing this issue?
24    A.    I heard her whining about
25 this for weeks and months.
```



Page 177

```
 1                M. TASCH
 2    Q.    And later, in 2018, do you
 3  recall another problem that
 4  prevented Ms. Robinson from using
 5  points generated by Canal's credit
 6  card?
 7    A.    Do not recall.
 8    Q.    Okay.
 9          And so when you -- when Ms.
10  Robinson was speaking with you about
11  this issue, over weeks and months,
12  what -- you communicated with her
13  about the issue, sorry.  Let met
14  strike that.
15          What did you -- what were
16  your discussions with Ms. Robinson
17  with respect to the issue that was
18  preventing her from transferring
19  points?
20    A.    I don't recall.
21    Q.    So you remember that you
22  spoke with her over a period of
23  weeks and months, but you don't
24  recall what occurred in those
25  discussions?
```



Page 178

```
 1                M. TASCH
 2    A.    First of all, I'm not sure
 3  it is weeks and months because I
 4  don't recall that at all, and I knew
 5  we were having a problem getting her
 6  to be co-manager.  That is the
 7  extent of what I remember.
 8         MR. DROGIN:  Counsel, can
 9      I just make what I think is a
10      helpful observation?  I think
11      we are caught in a very
12      narrow rut, and if you ask
13      about co-manager I think you
14      will get into the area that
15      you want.
16         MS. SLOAN:  Okay.
17         MR. DROGIN:  There is a
18      differentiation between
19      transferring miles and being
20      a co-manager on the account.
21      I think that is what the
22      witness has just alluded to
23      or not.
24    Q.    What were your discussions
25  with Ms. Robinson about becoming a
```



Page 179

```
 1                M. TASCH
 2  co-manager on the account?
 3    A.    Well, it wasn't much a
 4  discussion.  She wanted to become
 5  co-manager to take control of Bob's
 6  finances.  So she persuaded him to
 7  get on the account and he asked me.
 8    Q.    Okay.
 9    A.    Excuse me.  Can I finish?
10    Q.    Yes.  Sorry.
11    A.    And he asked me to get it
12  done.
13    Q.    And did you discuss with
14  her the transfer of points, the
15  issue of her --
16    A.    I really don't recall.
17    Q.    Sometime in June --
18    A.    I can't hear you.
19    Q.    You are fine.  I -- I
20  stopped my question and I was
21  thinking.
22    A.    Okay.
23          MR. DROGIN:  Just to
24     close the loop so we don't
25     get lost, I believe if you
```



Page 180

```
 1                 M. TASCH
 2      ask him whether the
 3      co-manager of the account has
 4      the authority to transfer
 5      miles, you will link the two,
 6      because that is what happened
 7      here.  Co-manager could do
 8      that.  You are treating them
 9      separately, but if you focus
10      on co-manager, you will get
11      into the question of
12      transferring SkyMiles.
13      Q.    So Mr. De Niro asked you to
14  make Ms. Robinson a co-manager of
15  the American Express account,
16  correct?
17      A.    He did.
18      Q.    And when did that occur?
19      A.    Again, I thought the
20  conversation started in early '18.
21  I don't remember the exact date when
22  she got on as co-manager.
23      Q.    Okay.
24            And Mr. De Niro understood
25  that this would enable Ms. Robinson
```



Page 181

```
 1                 M. TASCH
 2    to transfer reward points to
 3    herself, correct?
 4            MR. DROGIN:  Objection.
 5      A.    You keep using --
 6            MR. DROGIN:  Objection to
 7        the form as to how he --
 8            (Simultaneous speaking)
 9      Q.    As far as you were aware,
10    Mr. De Niro understood that this
11    would enable Ms. Robinson to
12    transfer reward points to herself?
13      A.    I don't understand -- I
14    don't know what Mr. De Niro
15    understood.
16      Q.    But you understood at that
17    time that when Ms. Robinson became a
18    co-account manager she would -- that
19    would enable her to transfer points
20    to herself, correct?
21      A.    So you keep sticking on the
22    same matter.  When she became
23    co-manager, she could do whatever
24    she wanted on that account.
25      Q.    And that -- and you were --
```



Page 182

```
 1                 M. TASCH
 2  okay.
 3     A.    There is nothing more to
 4  say.  That is the answer.
 5     Q.    Okay.  Thank you.
 6           Sometime in June or July of
 7  2018, did an issue arise involving
 8  the Canal American Express account
 9  being mistakenly linked to Robin
10  Chambers' Social Security number?
11     A.    I don't recall that.
12     Q.    We are going to share a new
13  exhibit in the -- in the chat.  That
14  will be Plaintiff's Exhibit 134.
15           (Whereupon, Plaintiff's
16     Exhibit 134, Canal 3324 and
17     Canal 3331 through 3333, was
18     marked for identification, as
19     of this date.)
20     A.    Can I get out of this one?
21     Q.    Yes, you can.
22     A.    Okay.
23     Q.    Okay.
24           MS. SLOAN:  This one is
25     -- well, let's see when
```



```
 1                M. TASCH
 2      Jeremy sends it.  It looks
 3      like we are still -- oh, here
 4      we go.  There is a new
 5      exhibit in the -- in the
 6      chat.  This is Exhibit 134.
 7      This is comprised of Canal
 8      3324 and Canal 3331 through
 9      3333 I believe.
10    Q.    If you could just sort of
11   scroll through the e-mail.  Do you
12   have them up?
13    A.    I do.  Do you want me to
14   start all the way at the bottom or
15   is there any particular one that you
16   are more concerned with?
17         MS. JACOBS:  Read the
18      whole thing.
19         THE WITNESS:  Read the
20      whole thing?  Okay.
21    Q.    The last page is actually
22   -- there is nothing on it.  It looks
23   like the first page is November 27,
24   2018, and then that is one e-mail
25   exchange, and the next one it is a
```



Page 184

1                    M. TASCH

2    different e-mail exchange.  To be

3    clear, that ranges from November

4    28th through January 4th.

5       A.    Got it.  Okay.

6       Q.    Okay.  So you read it.

7             So do you recognize -- do

8    you recognize these e-mails?

9       A.    I do remember them.  My

10   belief is that they -- we no longer,

11   I believe, had points I think

12   associated with the card because

13   they, excuse my language, F'd it up.

14      Q.    When you say, "They F'd it

15   up," who are you referring to?

16      A.    American Express.

17      Q.    So are these e-mails

18   between you and Ms. Robinson

19   detailing efforts to, you know, fix

20   problems with the American Express

21   accounts?

22      A.    Yes.  Yes.

23      Q.    Okay.

24            And are these -- did these

25   problems include the issue that



Page 185

```
 1              M. TASCH
 2  prevented Ms. Robinson from
 3  transferring points to her account?
 4    A.    I don't know the answer to
 5  that.  It would have to be an
 6  assumption, which I don't like to
 7  make.
 8    Q.    You spent a lot of time
 9  trying to fix this problem, correct?
10    A.    Yes.
11    Q.    You made a lot of phone
12  calls to American Express trying to
13  fix this problem?
14    A.    Correct.
15    Q.    Did you communicate with
16  Mr. De Niro about getting this
17  problem resolved?
18    A.    I don't recall.
19    Q.    Do you recall when this
20  problem was eventually resolved?
21    A.    I do not.
22    Q.    Could it have been around
23  January 4th or early January of 2019
24  when these -- when the last e-mails
25  in this --
```



Page 186

                    M. TASCH

1

2    A.    Well, looking at the last

3    e-mail here that -- between Chase

4    and I, again, you are asking

5    potentially for me to make an

6    assumption, I could say it did get

7    fixed eventually after this date.

8    Q.    And did this e-mail refresh

9    your recollection about the issue

10   where Ms. Chambers' Social Security

11   number was attached --

12   A.    It does not.

13   Q.    On page two it references

14   Robin's Social Security number?

15   A.    Yes.

16   Q.    During the time -- during

17   -- when this issue was occurring,

18   and when you were having to deal

19   with the problems with the American

20   Express account, substantial points

21   were generated that Ms. Robinson had

22   been unable to transfer to her

23   account, right?

24   A.    I'm not sure if I

25   understand the question.



Page 187

```
 1                M. TASCH

 2    Q.    Were you aware that Ms.

 3  Robinson would resume transferring

 4  the points to her account once this

 5  was resolved?

 6    A.    Later on that year, I knew

 7  she transferred miles to her

 8  account.

 9    Q.    Okay.

10          But during the time period

11  of these e-mails, did you -- were

12  you aware that she would resume

13  transferring points once it was

14  resolved?

15    A.    I don't recall.

16    Q.    Okay.

17          We are going to share

18  another document in the chat and

19  this is previously introduced as

20  Exhibit 100.  This is comprised of

21  Bates stamp Canal 0030806 through

22  07.  Let me know -- that has been

23  sent, so let me know when you can

24  open it and you can X out of the

25  other one that you were in.  Let me
```



Page 188

1                   M. TASCH

2    know when you are ready.

3       A.    Okay.  I do have it open.

4       Q.    Okay.

5             And you see this is an

6    e-mail from Michael Kaplan, on June

7    3, 2019, in which you are CC'd?

8       A.    Yes.

9       Q.    Okay.

10            So this is an e-mail --

11   let's see, do you see how -- have

12   you read the e-mail?  Have you

13   reviewed it?

14      A.    I am reading it now.

15      Q.    I am really just going to

16   focus on the sixth paragraph here,

17   that begins with, "Perhaps Michael

18   Tasch."  Do you see that paragraph?

19      A.    Yeah, I do.

20      Q.    Okay.

21            So Ms. Chen asked you to

22   help them better understand what

23   employee expenses actually are.  And

24   asked you to tell them what should

25   constitute employee expenses.



Page 189

```
 1                   M. TASCH
 2           Do you see that?
 3           MR. DROGIN:  Objection to
 4      the form.
 5      A.    I do.
 6      Q.    Did you have a
 7   conversations with Mr. Chen about
 8   employee expenses after this e-mail?
 9      A.    I do not recall.
10      Q.    Did you have a conversation
11   with anyone in the -- anyone in the
12   Canal office about employee expenses
13   after this point?
14      A.    I don't recall.
15      Q.    Did you have a conversation
16   with anyone at all about employee
17   expenses after this point?
18      A.    I don't recall.
19      Q.    What were the types of
20   expenses that Canal employees were
21   generally authorized to charge in
22   2019?
23           MR. DROGIN:  Objection to
24      the form.
25           MR. BENNETT:  This isn't
```



Page 190

```
 1                 M. TASCH
 2     the (b)(6) part, right?  This
 3     is still the fact witness
 4     part?
 5          MS. SLOAN:  That is
 6     correct.
 7     A.    Can you repeat the
 8  question, please?
 9     Q.    Did you ask to repeat the
10  question?
11     A.    Yes.
12          MS. SLOAN:  Paige, can
13     you repeat that?
14          (Whereupon, the requested
15     portion was read back by the
16     reporter:
17          Q:  What were the types
18     of expenses that Canal
19     employees were generally
20     authorized to charge in
21     2019?)
22     A.    In 2019?
23     Q.    Yes.  At this point -- at
24  the point of this e-mail?
25     A.    In June of 2019?
```



```
 1              M. TASCH
 2     Q.    Yes.
 3     A.    You know what, I will be
 4  honest with you, I'm not sure.  I
 5  know we had conversations at some
 6  point in time just generally over
 7  new procedures and authorizations
 8  that we might want to put in place
 9  than was there before.  We wanted
10  more -- we wanted people to get
11  permission to use the credit cards.
12  And at one point also, and I am
13  going into another area just for a
14  second, we really wanted to stop the
15  petty cash expense thing.
16     Q.    What do you mean by, "the
17  petty cash expense thing?"
18     A.    I didn't want any petty
19  cash going to Canal at all anymore.
20     Q.    But before Ms. Robinson's
21  employment ended, employees did not
22  require specific permission to
23  charge Canal's credit card, is that
24  correct?
25     A.    They -- you would have to
```



Page 192

```
 1                M. TASCH
 2   ask Chase that question.
 3   Q.    Okay.
 4         MS. SLOAN:  I think that
 5      now is a good time to take a
 6      break for lunch.  It is 1:01.
 7      Does reconvening at 1:30 work
 8      for everyone?
 9         MR. DROGIN:  It is good
10      with me.  I just ask that we
11      get a report on the amount of
12      time that we have been on the
13      record.
14         THE VIDEOGRAPHER:  The
15      time is 1:01 p.m.  We are off
16      the record.
17         (Whereupon, a recess was
18      taken at this time.)
19         THE VIDEOGRAPHER:  The
20      time is now 1:33.  We are
21      back on the record.
22   Q.    Mr. Tasch, does Berdon
23   maintain Canal's accounting records
24   on an accounting software?
25   A.    Yes.
```



Page 193

1               M. TASCH

2     Q.    And what is the name of

3  that software?

4     A.    You have to tell me what

5  you are asking me a question about.

6     Q.    Are there multiple

7  softwares that Berdon maintains

8  Canal's accounting records on?

9     A.    Yes.

10     Q.    What are the names of all

11  of the softwares?

12     A.    It is two things,

13  QuickBooks and CCH.

14     Q.    What is QuickBooks used

15  for?

16     A.    That is for the books and

17  records, paying bills, keeping a

18  ledger, and CCH is the tax program.

19     Q.    Okay.  Thank you.

20           What percentage equity

21  interest does Mr. De Niro hold in

22  Canal?

23     A.    I'm sorry.  Can you --

24  excuse me.  Can you repeat that,

25  please?



Page 194

```
 1              M. TASCH
 2    Q.    Yeah.
 3          What percentage equity
 4    interest does Mr. De Niro hold in
 5    Canal?
 6    A.    One hundred percent.
 7    Q.    How has Canal generated its
 8    income over the last decade?
 9    A.    From Mr. De Niro's acting
10    services.
11    Q.    What are Canal's sources of
12    revenue that it receives on a
13    regular basis each year?
14    A.    Income from his acting
15    services.
16    Q.    And would that include
17    commercials, movies, and other types
18    of -- let me strike that.
19          What types of acting
20    services does that include?
21    A.    It is commercials and
22    movies.
23    Q.    Okay.
24          How much money does Canal
25    make each year?
```



Page 195

```
 1              M. TASCH

 2         MR. DROGIN:  Objection to

 3    the form.

 4    A.    I don't understand the

 5    question.

 6    Q.    How much money did Canal

 7    make in 2019?

 8    A.    I don't understand the

 9    question.

10         MR. DROGIN:  Objection to

11    the form.

12    Q.    What was Canal's income in

13    2021?

14         MR. DROGIN:  Objection to

15    the form.

16    A.    I dot not know the answer

17    to that question today.

18    Q.    Sorry.  Did you say that

19    you do not know the answer to the

20    question today?

21    A.    I do not know the answer,

22    correct.

23    Q.    Do you know Canal's income

24    in 2020?

25    A.    No.
```



Page 196

```
 1                M. TASCH
 2            MR. DROGIN:  Objection to
 3       the form.
 4            (Whereupon, a discussion
 5       was held off the record.)
 6            MR. DROGIN:  Can you
 7       define what you mean by
 8       income?
 9    Q.   Was Canal's -- is this
10    better for everyone?
11    A.   Yes.
12            MR. DROGIN:  Depends what
13       you are going to say?
14    Q.   Was Canal's gross income in
15    2020 ████████████████
   █    █     ████████████
17    Q.   Was Canal's gross income in
18    2020 ████████████████
19    A.   I didn't hear the last
20    number.
21    Q.   ████████████████████
   █    █     ███████████
   █    █     ██████
24    A.   No.
25    Q.   Was Canal's -- so income --
```



Page 197

```
 1              M. TASCH
 2   gross income in 2020 more than $20
 3   million?
 4     A.    I'm not sure.
 5     Q.    Okay.
 6           So more than $10 million,
 7   maybe more than $20 million,
 8   correct?
 9     A.    You didn't ask me about $10
10   million.  You asked me about $10
11   million for '20.
12     Q.    Let's make sure we are on
13   the same page.
14           In 2020, was Canal's gross
15   income more than $15 million?
16     A.    I don't recall.
17     Q.    Okay.
18           And just to -- I am going
19   to circle back to a question that I
20   already asked.
21           MR. DROGIN:  Asked and
22     answered.
23     Q.    Mr. Tasch, in 2020, was
24   Canal's gross income ███████████
     ██  ████████
```



```
 1                  M. TASCH
 2     A.    Yes.
 3     Q.    How much does Mr. De Niro
 4   profit each year from his ownership
 5   in Canal?
 6          MR. DROGIN:  Objection to
 7      the form.
 8     A.    I don't recall.
 9     Q.    In 2019, was Canal's gross
10   income more than $10 million?
11     A.    I don't recall.
12          MR. DROGIN:  Objection to
13      the form.
14          MR. BENNETT:  Objection.
15          MR. DROGIN:  Can you
16      clarify?  I am assuming that
17      you are talking about a
18      calendar year basis?  The
19      corporation may be on a
20      different tax year.  But you
21      are talking on calendar year,
22      correct?
23          MS. SLOAN:  Yes.
24     Q.    In 2018, was Canal's gross
25   income more than $10 million?
```



Page 199

```
 1                  M. TASCH
 2    A.    I don't recall.
 3           MR. DROGIN:  Can we put
 4     on the record whether the
 5     calendar year is the same as
 6     the tax year for the
 7     corporation or should we
 8     leave that open?
 9    Q.    Do you recall the gross --
10    if Canal's gross income was  ████
      ██  ████████████████  for any year prior
12    to 2020?
13           MR. DROGIN:  Objection to
14     the form.
15    A.    Repeat please?
16    Q.    Sorry, Mr. Tasch?
17    A.    Repeat please.
18           MS. SLOAN:  Paige, can
19     you repeat the question.
20           (Whereupon, the requested
21     portion was read back by the
22     reporter:
23           Q:  Do you recall the
24     gross -- if Canal's gross
25     income was more than $10
```



```
 1                    M. TASCH
 2      million for any year prior to
 3      2020?)
 4      A.    I'm not sure I understand
 5   the question.
 6      Q.    You testified that in 2020
 7   Canal's gross income was more than
 8   do you recall the gross -- if
 9   Canal's gross income was ████████
    ██    ███████████  for any year prior to
11   2020?, correct?
12      A.    Correct.
13      Q.    Okay.
14           So then -- and then you
15   said that you didn't recall for 2019
16   or 2018.
17           Do you -- I will keep
18   running through the years then.
19           To your recollection, was
20   Canal's gross income less than do
21   you recall the gross -- if Canal's
22   gross income was more than $10
23   million for any year prior to 2020?
24   In any year in the last decade?
25      A.    I don't recall.
```



Page 201

```
 1                    M. TASCH
 2     Q.    To your recollection, was
 3  Canal's gross income generally more
 4  than do you recall the gross -- if
 5  Canal's gross income was more than
 6  $10 million for any year prior to
 7  2020?  In the last -- in -- in the
 8  last decade?
 9          MR. DROGIN:  Objection to
10     the form.
11          MS. SLOAN:  Let me make
12      sure -- I'm not sure I made
13       that clear.
14     Q.    To your recollection, was
15  Canal's gross income generally more
16  than $10 million per year in the
17  last decade?
18     A.    I don't recall.
19     Q.    What method of accounting
20  does Canal employ?
21     A.    Cash method.
22     Q.    Over the past decade, has
23  Berdon prepared Canal's tax returns
24  every year?
25     A.    And what is the timeframe?
```



Page 202

```
 1                    M. TASCH

 2     Q.    Over the past decade?

 3     A.    So from 2012 on?

 4     Q.    Yes.

 5     A.    Yes.

 6     Q.    Over the past decade, would

 7   you, personally, prepare Canal's tax

 8   returns?

 9     A.    No.

10     Q.    Which Berdon employees were

11   involved in preparing Canal's tax

12   returns?

13     A.    There were multiple

14   employees.

15     Q.    And are they -- do you have

16   any names in mind?

17     A.    Do you really need to know

18   any name that worked on his account?

19     Q.    We will focus on --

20     A.    If you have a direct

21   question, why don't you ask it?

22     Q.    Did you have any

23   involvement in preparing Canal's tax

24   returns?

25     A.    What does that mean?
```


MAGNA
LEGAL SERVICES

Page 203

                    M. TASCH

1

2    Q.    Did you -- were you

3    involved, in any way, in the

4    preparation of Canal's tax returns?

5    A.    No.

6    Q.    Was Mark Bosswick involved

7    in preparing Canal's tax returns?

8    A.    No.

9    Q.    Were the Berdon employees

10   that we spoke about earlier in this

11   deposition involved in the

12   preparation of Canal's tax returns?

13         MR. DROGIN:  Objection to

14    the form.  Vague.

15   Q.    You should still answer.

16   A.    I don't know who you are

17   referring to.

18   Q.    You mentioned four

19   employees earlier.  But I will just

20   -- I will -- I will rephrase the

21   question.

22         Who at Berdon prepared Mr.

23   De Niro's -- sorry.  Excuse me.

24         Who at Berdon prepared

25   Canal's tax returns?



Page 204

```
 1                    M. TASCH

 2    A.     There are various employees

 3    that do that.  Why is that needed to

 4    know?  I don't understand.  What

 5    does that have to do with anything?

 6    Q.     Okay.

 7           Could you please name the

 8    Berdon employees who were involved?

 9    A.     I am not going back over

10    ten years to name employees.

11    Q.     So between 2017 and 2019 --

12    since 2017, so over the past five

13    years we will say, who are the

14    employees at Berdon who prepared

15    Canal's tax returns?

16    A.     I don't recall.

17    Q.     You don't recall any of the

18    Berdon employees over the last five

19    years who prepared --

20           (Simultaneous speaking)

21    A.     I only recall one person

22    right now.

23    Q.     And who is that?

24    A.     You need to know that why?

25           MR. DROGIN:  It is okay.
```



Page 205

```
 1                    M. TASCH
 2      You can answer the question.
 3      A.    Fine.  Sarah Berstein (ph).
 4      Q.    And how long has Sarah
 5  Berstein prepared Canal's tax
 6  returns?
 7      A.    I believe this is the
 8  second year.
 9      Q.    Since you began in 2021?
10      A.    Probably '20.
11      Q.    Have you ever been involved
12  in preparing Canal's tax returns?
13      A.    You asked me that question
14  already and the answer was no.
15      Q.    Who was involved in
16  preparing Canal's tax returns from
17  2017 to 2019?
18      A.    I don't recall.
19      Q.    Did you review Canal's tax
20  returns?
21      A.    Yes.
22      Q.    And have you reviewed
23  Canal's tax returns over the past
24  decade?
25      A.    I'm not sure I understand
```


MAGNA
LEGAL SERVICES

Page 206

```
 1                 M. TASCH
 2    the question.
 3        Q.    Have you reviewed Canal's
 4    tax returns in every year in the
 5    past decade?
 6        A.    I don't understand the
 7    question.
 8        Q.    What did you do to review
 9    Canal's tax returns?
10        A.    I don't understand that
11    question either.
12        Q.    You testified that you
13    reviewed Canal's tax returns.  So I
14    am asking what did that review
15    entail?
16        A.    So I need an explanation
17    what the word review you are
18    referring to means.
19        Q.    I mean it in the general
20    plain sense of the word.  And I mean
21    it in the way that I asked if you
22    reviewed Canal's tax returns, and
23    you answered yes to that question.
24            So using that, your
25    understanding answering that
```



Page 207

```
 1                M. TASCH
 2   question, what did you do to review
 3   Canal's tax returns?
 4     A.    Well, you know what?  I
 5   made a mistake in saying that I
 6   reviewed.  I need to know what you
 7   exactly mean by that terminology.
 8     Q.    Would you look at Canal's
 9   tax returns?
10     A.    I don't understand the
11   question.
12          MR. DROGIN:  What is it
13     that you want to know?
14     Q.    Have you -- what part of
15   the question don't you understand,
16   Mr. Tasch?
17     A.    I would like to know -- I
18   really would like know what you are
19   asking.  If you have a real question
20   that you want an answer to, ask a
21   real question.
22     Q.    Have you seen Canal's tax
23   returns?
24     A.    I have seen Canal's tax
25   returns.
```



```
 1                M. TASCH
 2    Q.    And have you looked at
 3  backup documentation to use to
 4  prepare the tax returns?
 5    A.    I have looked at some.
 6          MR. DROGIN:  Objection to
 7    the form.  He testified that
 8    he did not prepare the tax
 9    returns, so it assumes not
10    only a fact that is not in
11    evidence, it assumes a fact
12    that you are --
13          (Simultaneous speaking)
14          MS. SLOAN:  Counsel stop.
15    Q.    What types of --
16          MR. DROGIN:  Counsel
17    stop.  Counsel stop.  Counsel
18    stop.  Counsel stop.  Counsel
19    stop.
20    Q.    What types of documents --
21          MR. DROGIN:  Counsel
22    stop.
23    Q.    -- would you look at --
24          MR. DROGIN:  Counsel stop.
25    Q.    -- what type?
```



Page 209

```
 1                M. TASCH
 2           MS. SLOAN:  Are you done?
 3      Q.    What types of backup
 4   documentation would you look at, Mr.
 5   Tasch?
 6      A.    I would look at the general
 7   ledger.
 8      Q.    And what were you looking
 9   at in the general ledger?
10      A.    Various expenses and
11   income.
12      Q.    Did any Berdon employees
13   consult with you about reviewing
14   Canal's tax returns?
15      A.    Yes.
16      Q.    What would they consult
17   with you about?
18      A.    If they had a question on
19   where to put an item or if we had to
20   discuss anything maybe on the bank
21   accounts, or anything on the balance
22   sheet, sort of questions like that.
23      Q.    And who -- who would
24   consult with you?
25      A.    You want the 2010?  What
```



Page 210

```
 1                 M. TASCH
 2  year do you want?
 3    Q.    2017 through 2019?
 4    A.    2017 through 2019, I don't
 5  remember.
 6    Q.    What about 2020?
 7    A.    You know that Sarah
 8  Berstein prepared it, so she would
 9  be the person.
10    Q.    Whoever prepared it was the
11  person that -- that would consult
12  with you?
13    A.    Yes.
14    Q.    Did those people -- did
15  Berdon employees ask you questions
16  about deductions?
17    A.    In some cases, yes.
18    Q.    Did you provide information
19  to anyone at Berdon to assist them
20  in preparing Canal's tax returns?
21    A.    I don't even know what that
22  means.
23    Q.    Okay.
24          Are you generally familiar
25  with Berdon's process of preparing
```


MAGNA
LEGAL SERVICES

Page 211

```
 1                  M. TASCH
 2   Canal's tax returns?
 3     A.    Why would that matter to
 4   this?
 5           MS. JACOBS:  Michael.
 6     Q.    You should answer the
 7   question.
 8     A.    You are talking about
 9   Berdon's procedures.  We are not a
10   party to this action.
11     Q.    Are you generally familiar
12   with Berdon's process of preparing
13   Canal's?
14           MR. DROGIN:  Objection.
15      He is not here testifying for
16      Berdon.  Can you relate this
17      to anything having to do with
18      this case, please?  Please.
19      I mean, it is your
20      deposition.  I thought we
21      were here to answer --
22           (Simultaneous speaking)
23     Q.    Mr. Tasch, answer the
24   question, please?
25     A.    I am not going to answer
```



Page 212

```
 1                M. TASCH

 2    the question.  You are asking about

 3    Berdon's policies, which have

 4    nothing to do with this action.

 5       Q.    You are required to answer

 6    the questions here today.  So I will

 7    ask it again.

 8            Are you generally familiar

 9    with Berdon's process of preparing

10    Canal's tax returns?

11       A.    I don't recall.

12       Q.    And just to be clear, I am

13    just asking about your familiarity

14    with that process?

15       A.    I don't recall.

16            MR. DROGIN:  Hold on.

17       Just a second.  There is a

18       difference between I don't

19       recall and I am not going to

20       answer.  If you are not going to

21       to answer, then please just

22       state you are not going to

23       answer and let the attorneys

24       work it out.

25            THE WITNESS:  So, fine.
```



Page 213

```
 1              M. TASCH
 2     I am going to take a break,
 3     and I want to speak to my
 4     attorney.
 5          MS. SLOAN:  We will take
 6     a five-minute break.
 7          THE VIDEOGRAPHER:  The
 8     time is 1:51 p.m.  We are off
 9     the record.
10          (Whereupon, a recess was
11     taken at this time.)
12          THE VIDEOGRAPHER:  The
13     time is 1:57 p.m.  We are
14     back on the record.
15   Q.    Mr. Tasch, as far as you
16  know, what was Berdon's process of
17  gathering and evaluating information
18  when it came time to prepare Canal's
19  tax returns?
20          MR. DROGIN:  Objection.
21     Absolutely irrelevant to this
22     litigation.  (Inaudible) and
23     this is not necessarily a
24     witness who has that
25     information.  He is here to
```



Page 214

```
 1                M. TASCH
 2      testify about his personal
 3      knowledge in this litigation,
 4      Canal's affirmative claims,
 5      and your counterclaims.
 6      Q.    Mr. Tasch, you should
 7   answer the question.
 8           MR. DROGIN:  And our
 9      valid counterclaims.
10           MR. HEISLER:  We had a
11      frozen moment for like 20
12      seconds.
13           MS. SLOAN:  Jeremy, you
14      should mute yourself.
15      Q.    Mr. Tasch, you should
16   answer the question.
17      A.    Repeat the question,
18   please?
19      Q.    As far as you know, what
20   was Berdon's process of gathering
21   and evaluating information when it
22   came time to prepare Canal's tax
23   returns?
24      A.    The information we had, so
25   I didn't have to gather it.  And I
```



Page 215

```
 1                   M. TASCH

 2    don't understand the other part of

 3    your question.

 4      Q.    And what information did

 5    you have?

 6      A.    You just asked me about the

 7    information.

 8           MR. DROGIN:  Could I be

 9       clear?  Are you really saying

10       Mr. Tasch, can you walk me

11       through Berdon's process in

12       how it prepares tax returns

13       for a client?  Is that a fair

14       restatement of your question?

15       I just want to understand

16       exactly what you are asking.

17      Q.    So by the time that it came

18    time -- when it came time to prepare

19    Canal's tax returns, Berdon already

20    had the information necessary to

21    calculate deductions for Canal's tax

22    returns, is that fair?

23      A.    That is fair.  Did you say

24    fair?  Your last word?

25      Q.    Is that correct?
```



Page 216

1                    M. TASCH

2       A.    Okay.  I thought you said

3    fair, but it is correct and it is

4    fair.

5       Q.    Okay.  Thank you.

6              Prior to filing Canal's tax

7    returns, would anyone at Berdon

8    interview Mr. De Niro?

9       A.    No.

10      Q.    Would anyone -- prior to

11   filing Canal's tax returns, would

12   anyone meet with Mr. De Niro -- at

13   Berdon meet with Mr. De Niro?

14             MR. DROGIN:  Objection to

15       the form.

16      A.    Generally not.

17      Q.    Over the past decade,

18   sometimes would Berdon meet with Mr.

19   De Niro prior to filing tax returns?

20             MR. DROGIN:  Objection to

21       the form.  Are you asking in

22       connection with the tax

23       returns or are you just

24       asking in general?  These

25       questions are so vague and



1                  M. TASCH

2       unclear.

3       Q.    You could answer, Mr.

4    Tasch.

5            MR. DROGIN:  It is like

6        you can't put -- whatever.

7            Can I also ask that you

8        recheck the time on the

9        record?  We started at 9:30.

10       We don't understand how at

11       1:30 we have only been on the

12       record for three hours.  Can

13       I just ask that you check

14       that when we take the break?

15       Please and thank you.

16           THE VIDEOGRAPHER:

17       Absolutely, counsel.

18           MS. SLOAN:  I think we

19       lost track of the question

20       here.  Let me pose another

21       question to Mr. Tasch.

22    A.    Sure.

23    Q.    What documents would Berdon

24    look at in order to calculate

25    deductions that would be claimed on



Page 218

```
 1                M. TASCH
 2   Canal's tax returns?
 3      A.    Repeat that, please?
 4      Q.    What documents would Berdon
 5   look at or would Berdon employees
 6   look at in order to calculate
 7   deductions that would be claimed on
 8   Canal's tax returns?
 9      A.    It would be all the bills
10   that we paid.  That is how we would
11   generate the deductions.
12      Q.    Would Berdon look at
13   Canal's credit card statements?
14      A.    I think we have already
15   established that we looked at the
16   credit card statements.
17      Q.    Let me clarify my question.
18          Before filing Canal's tax
19   returns, would Berdon look at
20   Canal's credit card statements?
21      A.    I think we clarified that.
22   You asked that earlier on in the
23   deposition.
24      Q.    Okay.
25      A.    Review the AMEX statements.
```



Page 219

1                  M. TASCH

2     Q.    And would Berdon employees

3   do that when preparing Canal's tax

4   returns?

5     A.    It was already done.

6     Q.    Okay.

7           So Berdon would review the

8   AMEX statements when they received

9   them and paid them, correct?

10    A.    I'm sorry.  Can you repeat

11  that, please?

12    Q.    Berdon would review the

13  credit card AMEX statements when it

14  paid them?

15    A.    Correct.

16    Q.    And that is the only review

17  that Berdon would undergo?

18    A.    (Witness nods head).

19          MR. BENNETT:  Can you

20     read that back?

21          (Whereupon, the requested

22     portion was read back by the

23     reporter:

24          Q:  And that is the only

25     review that Berdon would



Page 220

```
 1                M. TASCH
 2      undergo?)
 3      Q.    Would Berdon categorize tax
 4   deductible expenses on an ongoing
 5   basis throughout the year?
 6          MR. DROGIN:  Objection to
 7      the form.
 8   A.    Yes.
 9          THE WITNESS:  Sorry.
10          MR. DROGIN:  It is okay.
11      Q.    Where would it put that
12   categorization?
13      A.    I don't even understand
14   that question.
15      Q.    How would it keep track of
16   categorizing the tax deductible
17   expenses?
18      A.    You asked that question
19   when you asked if we review the
20   bills, the AMEX, and all the other
21   bills.  As we did that, we review
22   and booked it in the general ledger,
23   and that is how we would do it.
24      Q.    Okay.  Thank you.
25          So that -- the general
```



Page 221

```
 1                M. TASCH
 2   ledger would keep a notation as to
 3   which expenses were tax deductible?
 4     A.    No.
 5     Q.    Is that correct?
 6     A.    No.  That is not correct.
 7     Q.    Okay.
 8           Where was a record
 9   maintained of which expense was
10   considered tax deductible?
11     A.    I believe we answered this
12   question already.
13     Q.    What is your -- can you
14   please clarify?
15     A.    I am not sure I need to
16   clarify.  We already talked about
17   the general ledger.  That is where
18   all the records are maintained.
19     Q.    In the general ledger,
20   there was no notation as to which
21   expenses were considered tax
22   deductible, correct?
23     A.    No.
24     Q.    Okay.
25           When preparing -- is there
```



Page 222

```
 1                    M. TASCH

 2   anywhere where Berdon kept a record

 3   of which expenses were considered

 4   tax deductible?

 5     A.    I don't understand that

 6   question.

 7     Q.    Is there any place -- or

 8   any document -- let me try again.

 9           Is there anywhere where

10   Berdon kept any sort of record of

11   which expenses it considered tax

12   deductible?

13     A.    Ms. Sloan, we have talked

14   about this for the last five

15   minutes.  And once again, I am

16   telling you we have a general ledger

17   where everything is kept.

18     Q.    Okay.

19           I understand that you have

20   a general ledger and so how -- in

21   the general ledger -- we will stick

22   to that.

23           In the general ledger, how

24   were the expenses that were tax

25   deductible identified?
```



Page 223

```
 1                M. TASCH
 2    A.    We prepare his tax return
 3  as accountants, we know what is
 4  deductible.  I'm not sure how to
 5  answer your question, but that is
 6  the best I can give you.
 7    Q.    Okay.
 8          So does the general ledger
 9  include anything about any
10  organization or any notations about
11  tax deductions?
12    A.    I don't even understand
13  that question.
14    Q.    Are there any spreadsheets
15  or other documents reflecting
16  Berdon's calculation of which
17  expenses were considered tax
18  deductible?
19    A.    I don't understand that
20  question either.
21          MR. DROGIN:  Michael, do
22     you like running?  Do you
23     run?
24          THE WITNESS:  I don't.
25     Why?
```



Page 224

```
 1                  M. TASCH

 2            MR. DROGIN:  Inside joke.

 3     Q.    When Ms. Robinson was

 4   employed at Canal, were any Canal

 5   employees involved at all in

 6   assisting Berdon as it prepared

 7   Canal's tax returns?

 8            MR. DROGIN:  Objection.

 9       You asked this 11 pages ago

10       in your outline.  You asked

11       it, and he said 2017 to 2019

12       he didn't remember, and then

13       in 2020 he identified --

14            (Simultaneous speaking)

15     Q.    Let me repeat the question

16   so that it is clear.

17     A.    No, no.

18            THE WITNESS:  Laurent, I

19       do want to be fair to Ms.

20       Sloan.  You are talking about

21       Berdon employees, and she is

22       talking about Canal

23       employees, I believe.

24     A.    Right, Ms. Sloan?

25     Q.    That is correct.
```



Page 225

```
 1                    M. TASCH
 2    A.    I was clear on that.
 3    Q.    Thank you, Mr. Tasch.
 4    A.    Not a problem.
 5          So repeat the question you
 6    want answered.
 7    Q.    Yes.  I am not sure I got
 8    your response.
 9          When Ms. Robinson was
10    employed at Canal, were any Canal
11    employees involved at all in
12    assisting Berdon as it prepared
13    Canal's tax returns?
14    A.    No.
15    Q.    In connection with Canal's
16    tax returns, at any time would you
17    communicate with Mr. De Niro about
18    what employee expenses were claimed
19    as tax deductions?
20    A.    No.
21    Q.    List for me the types of
22    employee expenses that Canal would
23    claim deductions for on Canal's
24    annual tax returns when Ms. Robinson
25    was employed at Canal?
```


MAGNA
LEGAL SERVICES

Page 226

```
 1                  M. TASCH
 2    A.    Meals, and entertainment,
 3   car expenses, taxi expenses.
 4    Q.    Okay.
 5         For -- what was your
 6   understanding of the type of meals
 7   expenses that Canal authorized to
 8   deduct?
 9    A.    I had no understanding of
10   what they authorized.  That was
11   Chase's job.
12    Q.    Apart from the items that
13   you just named, were there other
14   types of employee expenses that
15   Canal would claim deductions for on
16   Canal's annual tax returns?
17    A.    I don't recall.
18    Q.    Was it Canal's general
19   practice to claim tax deductions for
20   meal expenses that it paid for?
21    A.    Repeat the question,
22   please.
23    Q.    Was it Canal's general
24   practice to claim tax deductions for
25   meal expenses that it paid for
```



Page 227

```
 1                M. TASCH
 2   employees?
 3      A.    I don't understand the
 4   question.
 5      Q.    Was it Canal's general
 6   practice to claim tax deductions for
 7   all of the employee meal expenses
 8   that were charged to Canal's credit
 9   card?
10      A.    That is the question that
11   you just asked, which I don't
12   understand the question.
13           Are you asking about
14   policies and procedures of Canal?
15      Q.    I am asking about the tax
16   deductions.  And I did --
17      A.    No, you asked specifically
18   about what Canal allowed.  You are
19   now getting into policies and
20   procedures.  So are you asking me
21   about policies and procedures?
22      Q.    I am actually asking about
23   Canal's claimed tax deductions.
24      A.    You asked me if Canal
25   allowed meal deductions.  That is
```



Page 228

```
 1                M. TASCH

 2   what you said.  That gets into

 3   policies and procedures of Canal.

 4     Q.    I actually didn't use the

 5   word allowed.  I will repeat the

 6   question.

 7          Did Canal claim tax

 8   deduction for all of the employee

 9   meal expenses that were charged to

10   Canal's credit card?

11          MR. DROGIN:  Objection to

12     the form.

13     A.    Yes.

14     Q.    Did -- did Canal claim tax

15   deductions for all of the charges at

16   Paola's restaurant that appeared on

17   the Canal American Express under Ms.

18   Robinson's name?

19          MR. DROGIN:  Objection to

20     the form.  Go head.

21     A.    I don't recall.

22     Q.    Did Canal claim tax

23   deductions for all of the charges at

24   Whole Foods that appeared on the

25   Canal American Express under Ms.
```



```
 1                 M. TASCH

 2   Robinson's name?

 3     A.    I don't recall.

 4     Q.    Did Canal claim deductions

 5   for all the charges at Dean & DeLuca

 6   that appeared on the Canal American

 7   Express under Ms. Robinson's name?

 8     A.    I don't recall.

 9     Q.    What document would you

10   need to review to answer those

11   questions?

12     A.    No idea.  You are asking

13   about the preparation of a tax

14   return?  There is a zillion things

15   that go into the preparation of a

16   tax return.  And why would I need to

17   review anything for those particular

18   three things?

19     Q.    I am asking about the

20   claimed tax deductions.

21     A.    I understand what you are

22   asking about.  You are asking about

23   three particular items.  Why would I

24   need backup for those particular

25   three items?  You asked about three
```



Page 230

```
 1                    M. TASCH
 2    particular items.
 3       Q.     What documents would you
 4    need --
 5             (Simultaneous speaking)
 6       A.     -- deductions for hundreds
 7    of items.  You asked about three.
 8    So why would I need the backup for
 9    those three?
10       Q.     What documents would you
11    need to review to ascertain whether
12    charges at Paola's, Whole Foods, and
13    Dean & DeLuca were claimed as
14    deductions?
15       A.     I don't recall.
16       Q.     At any time has Canal filed
17    amended tax returns -- okay.  Let me
18    actually -- let me withdraw that
19    part of the question.
20             Would Canal claim a
21    deduction for employee's lodging
22    expenses?
23       A.     I'm sorry?
24       Q.     Let's -- let's stick with
25    the Paola's, and Whole Foods, and
```



Page 231

```
 1                M. TASCH
 2    Dean & DeLuca while we are here.
 3           Do you have any reason to
 4    doubt that Canal claimed tax
 5    deductions for all of the charges at
 6    Paola's, Whole Foods, and Dean &
 7    DeLuca that appear --
 8      A.    I don't recall.
 9      Q.    Okay.  Let me finish --
10      A.    Okay.  Yes.  I apologize.
11    You can finish.
12      Q.    -- that appeared on Canal's
13    credit card under Ms. Robinson's
14    name?
15      A.    I don't recall.
16      Q.    Okay.
17           My question -- listen to my
18    question, please, Mr. Tasch.
19           Do you have any reason to
20    doubt that Canal claimed tax
21    deductions for all of the charges at
22    Paola's, Dean & DeLuca, and Whole
23    Foods that appeared on Canal's
24    credit cards under Ms. Robinson's
25    name?
```



Page 232

```
 1                M. TASCH
 2         MR. DROGIN:  Objection.
 3    It assumes a fact not in
 4    evidence.  He told you that
 5    he doesn't recall, and now
 6    you are asking him whether or
 7    not he has any reason he
 8    doubt something that he told
 9    you, that he either doesn't
10    understand the question or he
11    doesn't recall.  This is
12    persistently what you guys do
13    in this case.  You make up
14    facts, you put them in the
15    witness' mouth, and then you
16    ask him to agree with you.  I
17    mean, this is nonsense.  What
18    you are doing?
19         MS. SLOAN:  Paige, can
20    you repeat the question,
21    please?
22         (Whereupon, the requested
23    portion was read back by the
24    reporter:
25         Q:  Do you have any
```



Page 233

```
 1                M. TASCH
 2      reason to doubt that Canal
 3      claimed tax deductions for
 4      all of the charges at
 5      Paola's, Dean & DeLuca, and
 6      Whole Foods that appeared on
 7      Canal's credit cards under
 8      Ms. Robinson's name?)
 9   A.    Thank you.  I don't recall.
10   Q.    Did Canal claim tax
11 deductions for all of the employee
12 transportation expenses that were
13 charged to Canal's credit card?
14      MR. DROGIN:  Objection to
15      the form.  Just so we are
16      clear, we are talking about
17      the entire period of time
18      since 2009 I assume, right?
19      You haven't -- you haven't
20      narrowed it down.
21   Q.    If it would be helpful Mr.
22 Tasch, I can narrow the timeframe.
23   A.    Would you like me just to
24 answer?
25   Q.    If it would help you
```



Page 234

```
 1                  M. TASCH
 2   recall, I can provide a timeframe.
 3   A.    It will not help.
 4   Q.    Okay.  Then I would like to
 5   you to answer the question?
 6   A.    I don't recall.
 7   Q.    Did Canal claim tax
 8   deductions for all of the employee
 9   transportation expenses that were
10   charged to petty cash?
11         MR. DROGIN:  Objection to
12     the form.
13   A.    I don't recall.
14   Q.    Mr. Tasch, could you please
15   explain how Berdon would determine
16   which transportation expenses to
17   claim a tax deduction for?
18         MR. DROGIN:  Objection to
19     the form.  The witness is not
20     here testifying on behalf of
21     Berdon.
22         MS. JACOBS:  Join.
23   Q.    I am asking about your
24   understanding.
25   A.    I'm not sure I understand
```



Page 235

```
 1                    M. TASCH
 2   the question.
 3     Q.     Okay.
 4            As far as you are aware,
 5   what was Berdon -- how did Berdon
 6   determine which transportation
 7   expenses to claim a tax deduction
 8   for?
 9            MR. DROGIN:  Same
10      objection.
11     A.     Still don't understand your
12   question.
13     Q.     Were there certain
14   transportation -- transportation
15   expenses that Berdon would not claim
16   tax deductions for?
17     A.     You came in and out a
18   little bit there.  I didn't catch
19   the whole question.
20     Q.     Were there certain
21   transportation expenses by Canal
22   employees that Berdon did not claim
23   tax deductions for?
24     A.     I don't recall.
25            MR. DROGIN:  Objection to
```



Page 236

```
 1                  M. TASCH
 2     the form.
 3     Q.    Okay.
 4           As a general matter, Canal
 5   would claim a tax deduction for any
 6   Uber, taxi, or Lyft charges for
 7   Canal employees, correct?
 8           MR. DROGIN:  Objection to
 9     the form.
10           MS. JACOBS:  Objection to
11     the form.
12     A.    I don't understand the
13   question.
14     Q.    Okay.  Let's see here.  As
15   a general matter, Uber, taxi, and
16   Lyft charges for Canal employees
17   were considered tax deductible
18   expenses, correct?
19           MR. DROGIN:  Objection to
20     the form.
21           MS. JACOBS:  Join.
22     A.    I don't know.
23     Q.    Would Canal claim a tax
24   deduction for any Uber, taxi, or
25   Lyft charge for Canal employees?
```



Page 237

```
 1                  M. TASCH
 2    A.    I don't recall.
 3          MR. DROGIN:  I'm sorry.
 4      Did you say every or any?
 5          THE WITNESS:  She first
 6      said every, and then she said
 7      any.
 8          MS. SLOAN:  I said any in
 9      that last question.
10          MR. DROGIN:  Thank you
11      for clarifying.  Same
12      objection.
13    Q.    Were there circumstances
14   where Canal would claim a tax
15   deduction for flower or plant
16   charges that appeared on the Canal
17   credit card?
18          MS. JACOBS:  I'm sorry.
19      Flower or what charges?
20          MS. SLOAN:  Plant.
21    A.    I will be honest with you,
22   I don't recall.  I mean, I will give
23   you a general answer, Ms. Sloan, is
24   if we -- if they were business
25   gifts, absolutely.
```


MAGNA
LEGAL SERVICES

```
1                    M. TASCH
2     Q.    Okay.
3           And how would you determine
4     if they were business gifts?
5     A.    Sometimes through
6     conversations with employees maybe
7     Michael, Chase, maybe Sabrina or
8     Jillian.
9     Q.    So when you saw flower
10    charges appear on the American
11    Express credit card, for example,
12    you would -- you would sometimes
13    reach out to Canal employees to
14    determine the purpose of that
15    charge?
16    A.    It really depends.  I will
17    give you an example.  If it was
18    $50.00, I will make it up.  I really
19    wasn't worried about it.  If it
20    maybe was $2,000, we would ask.
21    Q.    Okay.  And if you didn't
22    ask, would you -- how would you
23    characterize that expense?
24    A.    As a business gift.
25    Q.    Okay.  So it would assume
```



MAGNA
LEGAL SERVICES

Page 239

```
 1                   M. TASCH
 2   to be a business gift.
 3           Did you -- did you do that
 4   same process with employee
 5   transportation?
 6     A.    Not -- to be honest with
 7   you, I don't recall.
 8     Q.    Okay.
 9           Did you do that same
10   process with respect to meal
11   expenses?
12     A.    I think if we considered
13   the amount immaterial, probably not.
14           Again, the same example,
15   Ms. Sloan, if it was $50.00, maybe
16   we wouldn't care.  If it was $1,000,
17   we would ask.
18     Q.    Okay.
19           But if you -- if there was
20   a -- what you considered a
21   reasonable price, you would count
22   that as a business expense?
23     A.    Again -- depending on the
24   thing.  Again, I gave you an example
25   of $50.00, maybe if it was 150 I may
```



Page 240

```
 1                M. TASCH
 2   not ask for that either.  But,
 3   again, if it was $500,000 or
 4   something like that, we would
 5   probably ask.
 6   Q.    Okay.
 7         And that same process for
 8   transportation expenses?
 9   A.    I don't remember any big
10   transportation expenses off the top
11   of my head.  So I am not sure if we
12   did the same thing.  But in general,
13   with any expense, it doesn't matter
14   if the ones that you are talking
15   about or not, if we felt it was a
16   big amount, and it had to be
17   questioned, we would question it.
18   Q.    Okay.
19         Did Canal claim a business
20   deduction for iPhones that employees
21   charged on Canal's credit card or
22   used petty cash to purchase?
23   A.    You know what?  I honestly
24   don't remember so I am going to say
25   that I don't recall.
```



Page 241

```
 1              M. TASCH
 2    Q.    Okay.
 3          Did Canal claim a business
 4    deduction for a Louis Vuitton bag
 5    that was charged on Ms. Robinson's
 6    petty cash sheet?
 7    A.    I don't recall that at all.
 8    Q.    And what would you need to
 9    look at to -- to be able to that
10    question -- those two questions?
11    A.    I'm not sure if I looked at
12    something it would jog my memory
13    anyway.  If it was there on a
14    statement, and it wasn't a lot of
15    money, then we might have deducted
16    it.  I don't know as a business --
17    if it was a large enough amount, I
18    would have hoped we would have
19    questioned it, but I am not
20    positive.
21    Q.    Over the past decade, has
22    Mr. De Niro ever amended his tax
23    returns?
24    A.    I don't recall.
25    Q.    What is your understanding
```



Page 242

```
 1                  M. TASCH
 2    of the circumstances in which Mr. De
 3    Niro would be obligated to file tax
 4    returns?
 5            MR. DROGIN:  Objection to
 6      the form.
 7      A.    I don't even understand
 8    that question.
 9      Q.    Okay.  I will ask a new
10    one.
11            Over the past decade has
12    Canal amended its tax returns?
13      A.    Didn't you just ask that
14    question?
15      Q.    I asked about Mr. DeNiro
16    previously, and now I am asking
17    about Canal.
18      A.    I don't recall.
19      Q.    In the past three years,
20    has Canal amended its tax returns?
21      A.    No.
22      Q.    At any time has Canal filed
23    amended tax returns disclaiming
24    deductions based on Ms. Robinson's
25    expenses?
```



Page 243

```
 1                M. TASCH
 2          MR. DROGIN:  Objection to
 3      the form.
 4          MS. JACOBS:  Did you say,
 5      "disclaiming?"
 6          MS. SLOAN:  Yes.
 7   A.    I don't understand that
 8   question at all.
 9          MR. DROGIN:  Want me to
10      explain it to him?
11   Q.    At any time has Canal filed
12   amended tax returns, in which it no
13   longer claimed deductions based on
14   Ms. Robinson's expenses?
15          MR. DROGIN:  Objection.
16      Assumes facts not in evidence
17      and to the form of the
18      question.
19   A.    You already asked the
20   question twice already.  You asked
21   in the last three years, and I told
22   you no, and before that I don't
23   recall.
24   Q.    So to be clear the answer
25   is no, correct?
```



Page 244

```
 1                M. TASCH

 2          MR. DROGIN:  Objection.

 3    A.    I just gave you the answer.

 4    Q.    And that answer was no,

 5  correct?

 6          MR. DROGIN:  To which

 7    question?

 8    A.    Let me repeat it for you.

 9  Let me repeat it for you.  You asked

10  in the last three years if they

11  filed amended returns, and I said,

12  no.  And before that, I said that I

13  don't recall.  Do you remember that?

14    Q.    I do, Mr. Tasch.

15    A.    Thank you.

16    Q.    Did Canal review its filed

17  tax returns or any of its backup tax

18  documentation during its

19  investigation into Ms. Robinson?

20          MR. DROGIN:  Objection to

21    the form.

22    A.    I do not understand the

23  question.

24    Q.    Would Berdon retain

25  documentation in the event of an
```


MAGNA
LEGAL SERVICES

Page 245

```
 1                M. TASCH
 2   audit?
 3     A.    I'm sorry.  Can you repeat
 4   that?  I didn't hear the whole
 5   thing.
 6     Q.    Would Berdon retain
 7   documentation in the event of an
 8   audit?
 9     A.    We are required to keep at
10   least three year's worth of records.
11     Q.    Over the past decade -- let
12   me strike that.
13          What backup tax
14   documentation does Berdon maintain
15   concerning its claimed tax
16   deductions?
17          MR. DROGIN:  Objection to
18       -- Berdon claimed tax
19       deduction?
20          MS. SLOAN:  Let me
21       clarify.
22     Q.    What backup tax
23   documentation does Berdon maintain
24   concerning Canal's claimed tax
25   deductions?
```



Page 246

```
 1                 M. TASCH

 2     A.    Whatever documentation is

 3   required.

 4     Q.    You cut out.

 5     A.    Whatever documentation is

 6   required.

 7     Q.    And what documentation is

 8   required, Mr. Tasch?

 9     A.    General ledger, bills.

10   That is all the stuff.

11     Q.    Is there any kind of

12   spreadsheet or list showing which

13   specific expenses are claimed for

14   tax deductions?

15     A.    We went through this

16   already.

17     Q.    So the answer is no?

18     A.    Ms. Sloan, I am trying to

19   help you out here.  You are asking

20   the same question ten different ways

21   and ten different times.  If I am

22   not explaining it, or you don't

23   understand, please let me know.

24     Q.    Thank you.  I appreciate

25   that.
```



Page 247

                         M. TASCH

1

2     A.     Generally, I don't like to

3  repeat myself.

4     Q.     To be clear, the answer is

5  no, is that right?

6     A.     Repeat the question?

7            MS. SLOAN:  Paige, could

8       you read it back?

9            (Whereupon, the requested

10       portion was read back by the

11       reporter:

12            Q:  Is there any kind of

13       spreadsheet or list showing

14       which specific expenses are

15       claimed for tax deductions?)

16     A.     As I said, as least ten

17  times already, we have the general

18  ledger, which has all the

19  information in it.

20     Q.     Okay.

21     A.     You did hear me say that,

22  right?

23     Q.     I heard you say that

24  earlier.

25            In order to calculate


MAGNA
LEGAL SERVICES

```
 1                  M. TASCH
 2   claimed tax deductions Berdon adds
 3   up certain categories of employee
 4   expenses at Canal, correct?
 5      A.    I don't even know what that
 6   means.
 7      Q.    So in order to calculate
 8   the claimed tax deductions, Berdon
 9   has to look at the certain
10   categories of employee expenses at
11   Canal, and add up those numbers,
12   correct?
13      A.    As I will explain to you
14   once again, so you understand, since
15   you don't understand.
16      Q.    Thank you.
17      A.    We have a general ledger,
18   we get receipts from petty cash, we
19   get bills, we get statements from
20   AMEX.  Some go in automatically when
21   we pay the check, some we do journal
22   entries by, and that is where all
23   the deductions come from.
24          Am I clear?
25      Q.    For now.
```

Page 249

```
 1                    M. TASCH
 2     A.    For now.  Okay.  Until the
 3   next question I guess.
 4     Q.    Exactly.
 5          What categories are listed
 6   in the general ledger?
 7     A.    I don't understand the
 8   question.
 9     Q.    So I am going to focus on
10   the general ledger, okay?
11     A.    Congratulations.
12     Q.    So if you could just kind
13   of walk me through the general
14   ledger, what categories of employee
15   expenses, you know --
16     A.    I am not going to walk you
17   through a 500 page general ledger.
18     Q.    Okay.
19     A.    If you have a question to
20   ask --
21     Q.    Mr. Tasch, enough.  Let me
22   ask a specific question about it.
23          Does a general ledger
24   identify expenses by category?
25     A.    Yes.
```



Page 250

```
 1                  M. TASCH

 2    Q.    Okay.

 3          And so my question is, what

 4    are those categories?

 5    A.    There is a 500-page general

 6    ledger.  I am not going to repeat

 7    every category.  Do you have a

 8    specific question I can answer for

 9    you?

10    Q.    What are the types of

11    categories?  How many categories are

12    there Mr. Tasch?

13    A.    Many.  What -- why don't

14    you make it easy?  What categories

15    are you looking for?

16    Q.    Is meals expenses a

17    category?

18    A.    It is.

19    Q.    Is transportation expenses

20    a category?

21    A.    It is.

22    Q.    Are business gifts a

23    category?

24    A.    Yes.

25    Q.    Would flowers or plants
```



MAGNA
LEGAL SERVICES

Page 251

```
 1              M. TASCH
 2    fall under business gifts?
 3       A.    For the most part, yes.
 4       Q.    What -- what other
 5    categories would flower or plants
 6    fall under?
 7       A.    I'm not sure.  Listen, we
 8    are not perfect in the posting it.
 9    Some of it could be an office
10    expense, or something like that.  I
11    think your question is irrelevant
12    since I just gave you the major
13    categories, which you seem to be
14    focusing on and if you would just
15    ask that question, I would answer
16    it.
17       Q.    Well, we are here now.
18             Are lodging expenses a
19    category?
20       A.    Yes.
21             MR. DROGIN:  Ms. Sloan,
22       can we just find out whether
23       Canal is an S Corp. or a C
24       Corp.?  Can we ask that
25       question or should we wait
```



MAGNA
LEGAL SERVICES

Page 252

```
 1                  M. TASCH
 2     until redirect?
 3          MS. SLOAN:  Sure.  We can
 4      ask that.
 5     Q.    Is Canal a S Corp. or a C
 6    Corp., Mr. Tasch?
 7     A.    It is an S Corp.
 8     Q.    Thank you.
 9          And what does that mean?
10     A.    What is the question?
11     Q.    What does -- what does that
12    mean?
13     A.    Not understanding your
14    question.
15     Q.    Okay.
16          Okay.  I will be more
17    specific.
18          Can you explain the
19    difference between a C Corp. and a S
20    Corp.?
21     A.    Okay.  A S Corp. -- a C
22    Corp. files its own tax returns, as
23    an S Corp. does, but a C Corp. would
24    pay its own taxes.  An S Corp. does
25    not pay taxes at the federal level
```



Page 253

```
 1                    M. TASCH
 2    because everything passes out to the
 3    individual shareholder and that is
 4    the main difference between the two.
 5    Just to make it even easier for you,
 6    if, Ms. Sloan, had your own C. Corp.
 7    and you earned $100.00, and it was
 8    taxable, I will make it up, the
 9    entity would pay $50.00.  If -- Ms.
10    Sloan, if you had an S Corp., the
11    $100.00 profit would come out to via
12    AK1, and then you would pay the tax
13    on your personal return.
14       Q.    Okay.
15            To clarify, the deductions
16    are being claimed by Mr. De Niro on
17    his personal return or by Canal on
18    its -- let me -- sorry.  Strike
19    that.  Excuse me.
20            Are the deductions being
21    claimed by Mr. De Niro -- the
22    deductions being claimed by Mr. De
23    Niro -- let me try this again.
24            Mr. Tasch, are the tax
25    deductions concerning Canal's
```



Page 254

```
1                M. TASCH
2    employee expenses being claimed on
3    Canal's tax returns or on Mr. De
4    Niro's personal tax returns?
5            MR. DROGIN:  Objection to
6      the form.
7      A.    Is there a particular
8    reason you are just asking about
9    employee business expenses as
10   opposed to overall deductions on the
11   Canal return?  They are all
12   deductions.  It is irrelevant what
13   they are.
14     Q.    Okay.  You should answer
15   the question.
16     A.    I did.
17     Q.    Can you clarify, please?
18     A.    I don't understand what you
19   need clarification on.
20     Q.    The question is about where
21   the deductions are claimed.
22            Are the tax deductions
23   concerning Canal's employee expenses
24   being claimed on Canal's tax returns
25   or on Mr. De Niro's personal tax
```



```
 1                    M. TASCH
 2   returns?
 3       A.    All tax deductions are
 4   claimed on Canal's return.
 5       Q.    Okay.  Thank you, Mr.
 6   Tasch.
 7             Over the past decade, has
 8   Mr. De Niro been audited?
 9       A.    Not that I recall.
10       Q.    And over the past decade,
11   has Canal been audited?
12       A.    Not that I recall.
13       Q.    Have you prepared personal
14   financial statements for Mr. De
15   Niro?
16       A.    Not that I recall.
17       Q.    What do you approximate Mr.
18   De Niro's net worth to be in
19   dollars?
20       A.    Couldn't even begin to
21   guess.
22       Q.    Mr. -- did you prepare any
23   documentation of Mr. De Niro's
24   income or net worth in connection
25   with his divorce proceedings?
```



```
 1                    M. TASCH
 2      A.    I'm sorry.  Repeat the
 3   question, please?
 4          MS. SLOAN:  Paige, can
 5      you read it back?
 6          (Whereupon, the requested
 7      portion was read back by the
 8      reporter:
 9          Q:  Mr. -- did you
10      prepare any documentation of
11      Mr. De Niro's income or net
12      worth in connection with his
13      divorce proceedings?)
14      A.    I don't understand the
15   question.
16      Q.    You are aware of Mr. De
17   Niro going through a divorce,
18   correct?
19      A.    No.  That is news to me.
20      Q.    You are not aware of Mr. De
21   Niro going through a divorce?
22      A.    I am.  I apologize for my
23   little joke.
24      Q.    I just want to make it
25   clear on record.
```



Page 257

```
 1                M. TASCH
 2    A.    Yes, it is clear on the
 3  record.  Yes, it is clear on the
 4  record.  I am -- absolutely know he
 5  is getting a divorce.
 6    Q.    Okay.  Thank you.
 7          And are you aware that Mr.
 8  De Niro's -- let me start over.
 9          To assist in his divorce,
10  did you prepare any kind of
11  documents concerning Mr. De Niro's
12  income or net worth?
13    A.    I don't understand the
14  question.
15    Q.    To assist in his divorce,
16  did you put together any sort of
17  document concerning his income or
18  net worth?
19    A.    What does put together
20  mean?
21    Q.    Whatever it means to you.
22  I mean, did you --
23    A.    I am asking you because you
24  are asking the questions.
25    Q.    Okay.
```



Page 258

```
 1                  M. TASCH
 2           Did you prepare in any way
 3    any type of document that related to
 4    Mr. De Niro's income or net worth?
 5              MR. DROGIN:  Objection.
 6       The question is so overbroad
 7       and irrelevant that I don't
 8       know --
 9           (Simultaneous speaking)
10    Q.    Mr. Tasch, you should
11    answer the question.
12    A.    I don't recall.
13    Q.    To assist in his divorce,
14    did you look at any documents
15    concerning his income or net worth?
16    A.    I don't understand the
17    question.
18    Q.    What do you approximate Mr.
19    De Niro's annual income is?
20              MR. DROGIN:  Objection to
21       the form.  For any year in
22       particular?
23              THE WITNESS:  Laurent,
24       let me just answer in
25       general.
```



Page 259

                    M. TASCH

1

2      Q.    Every year stands -- Ms.

3    Sloan, every year stands on its own.

4      A.    Okay.

5      Q.    What was -- what would you

6    approximate Mr. De Niro's annual

7    income in 2021?

8      A.    I don't recall.

9      Q.    What do you approximate Mr.

10   De Niro's annual income in 2019?

11     A.    I don't recall.

12     Q.    Do you recall his -- Mr. De

13   Niro's annual income in 2018?

14     A.    I don't recall.

15     Q.    2017?

16     A.    I don't recall.

17     Q.    Does Mr. De Niro receive

18   any passive income such as

19   royalties?

20          MR. BENNETT:  I am going

21      to object to the form.

22     A.    As far as I remember, he

23   does not receive royalties.

24     Q.    Mr. De Niro's divorce

25   lawyer reported in April of 2021



Page 260

```
 1                  M. TASCH
 2    that Mr. De Niro owed $18.25 million
 3    in income tax from 2018 to 2019, is
 4    that correct?
 5         MR. DROGIN:  Objection to
 6      the form.  Hold on.  To be
 7      clear, the question is
 8      whether or not that is what
 9      the attorney said?  That is a
10      yes-or-no question if you
11      know.  It is -- objection to
12      the form.  It is two
13      questions.
14    A.    Repeat the question,
15    please?
16    Q.    I will withdraw the
17    question.
18    A.    Okay.
19         MR. DROGIN:  Even better.
20    Q.    Besides Canal, what other
21    companies does Mr. De Niro own or
22    have a controlling interest?
23    A.    I believe you asked this
24    question already and I already
25    answered it way back.
```



Page 261

```
1              M. TASCH
2    Q.    Okay.
3          It was a slightly different
4    question earlier, Mr. Tasch.
5    A.    It was the same question.
6    Q.    Does Mr. De Niro -- does
7    Mr. De Niro own any stocks, mutual
8    funds, bonds, or similar
9    investments?
10         MR. BENNETT:  Objection.
11     What is the purpose?
12   A.    Not -- he doesn't own
13   individually, no.
14   Q.    Does Mr. De Niro own any
15   investment brokerage or retirement
16   accounts?
17   A.    Yes.
18   Q.    At what institutions?
19   A.    I don't recall.
20   Q.    What is the value of the
21   investment, brokerage, or retirement
22   accounts owned by Mr. De Niro?
23         MR. DROGIN:  Objection to
24     the form.
25   A.    I don't recall.  Sorry.
```



Page 262

```
 1                    M. TASCH
 2    Q.    If you could wait a second
 3  to give the attorneys a chance to
 4  object for the --
 5    A.    My apologies.
 6    Q.    More than $10 million?
 7    A.    I don't recall.
 8          MR. DROGIN:  Objection to
 9     the form.
10          THE WITNESS:  Again,
11     sorry.
12          MR. DROGIN:  You are
13     asking about -- an open-ended
14     question about a number that
15     fluctuates every single day.
16    Q.    When Ms. Robinson was
17  employed at Canal, how often would
18  you interact with her?
19    A.    With Chase?
20    Q.    Yes.
21    A.    Fairly often I would think.
22    Q.    At least once a week?
23    A.    I would say at least that.
24    Q.    Did you sometimes interact
25  with her every day?
```



Page 263

                        M. TASCH

1

2     A.    There could have been

3     instances where we were talking to

4     each other every day, yes.

5     Q.    On what subjects would you

6     interact with Ms. Robinson?

7     A.    Generally, it was her call,

8     so it could be anything that was on

9     her mind.

10    Q.    What would she call you

11    about?

12    A.    Well, you can see obviously

13    from before, we had conversations

14    about the American Express.  I don't

15    remember specifically, per se.  You

16    know, there were times we would

17    speak often.  I just don't remember

18    the subject matter.  But generally

19    -- generally related to Canal.

20    Q.    Would you speak about Canal

21    expenses?

22    A.    I don't remember,

23    specifically, to be honest with you,

24    but I am sure we did along the way.

25    Q.    What topics with respect to



Page 264

```
 1              M. TASCH
 2   Canal's financials or expenses would
 3   you talk about?
 4      A.    I don't recall
 5   specifically.
 6      Q.    Ms. Robinson would flag
 7   concerns to you about Canal
 8   expenses, correct?
 9      A.    I'm sorry, say that again,
10   please?
11      Q.    Ms. Robinson would flag
12   concerns about Canal expenses?  She
13   would bring concerns about Canal
14   expenses to your attention, correct?
15      A.    I don't recall.
16      Q.    When Ms. Robinson was
17   employed by Canal, you were not
18   generally involved in the minutia of
19   Ms. Robinson's day-to-day work, with
20   Mr. De Niro, correct?
21      A.    Correct.
22      Q.    And you weren't generally
23   involved in the day-to-day
24   interactions between Ms. Robinson
25   and Mr. De Niro, correct?
```



Page 265

                    M. TASCH

1

2    A.    Didn't you just ask that?

3    Q.    No.  It was -- it was a

4    different question.

5    A.    Minutia and day to day is

6    different?

7    Q.    The -- I will ask it again.

8          You weren't involved in the

9    day-to-day interactions between Ms.

10   Robinson and Mr. De Niro, correct?

11   A.    That is correct.

12   Q.    In December of 2018, did

13   you have a meeting with Mr. De Niro

14   and Ms. Robinson?

15   A.    December of '18?  I

16   honestly don't recall.

17   Q.    Do you recall a meeting in

18   December of 2018 with Mr. De Niro

19   and Ms. Robinson, during which Mr.

20   De Niro discussed your working

21   relationship with Ms. Robinson?

22   A.    I don't recall.

23   Q.    There came a time when Ms.

24   Robinson's employment at Canal came

25   to an end, correct?



Page 266

```
 1              M. TASCH
 2    A.    That is correct.
 3    Q.    During the last couple of
 4  months of Ms. Robinson's employment,
 5  did you observe that Ms. Robinson
 6  appeared to be experiencing
 7  distress?
 8    A.    I am not capable of
 9  answering that question about
10  distress.  But I will be honest, I
11  know there was certain situations
12  regarding the townhouse that was --
13  I don't want to use the word
14  distress.  I guess I will use this
15  word for lack of a better word, that
16  gave Chase a lot of anxiety.
17    Q.    And what exactly did you
18  observe about -- can you describe
19  the situation that you understand
20  was giving Ms. Robinson anxiety?
21    A.    I think the events that
22  were giving her anxiety was their
23  apartment at ██████  Apparently, and
24  as it turned out to be later true,
25  there was mold in the apartment.
```



Page 267

```
 1              M. TASCH
 2    Tiffany was getting sick, we were --
 3    we, or Chase, me, we were trying to
 4    find out where it was coming from.
 5    I think that was probably the
 6    biggest factor in that situation.
 7       Q.    Did you observe Ms.
 8    Robinson experience more anxiety in
 9    the last week of her employment?
10       A.    I didn't hear the last
11    piece.
12       Q.    Did you observe Ms.
13    Robinson experiencing increased
14    anxiety in the last weeks of her
15    employment?
16       A.    I don't recall that.
17       Q.    Did Ms. Robinson discuss
18    with you the anxiety that she was
19    experiencing towards the end of her
20    employment?
21       A.    Well, again, it was the
22    situation with the mold.  We had
23    conversations.  I just don't
24    remember whether it was the last
25    week, or maybe it was the last few
```



Page 268

```
 1              M. TASCH
 2   weeks, maybe a month before.  I
 3   don't remember the date.
 4     Q.    And what do you recall Ms.
 5   Robinson saying to you about her
 6   anxiety?
 7     A.    Well, she didn't use those
 8   words either.  But she used -- she
 9   needed to get me involved or wanted
10   me to be involved in the mold
11   situation.  Tiffany was complaining
12   quite often about the mold.  So I
13   certainly wasn't sure, and I am not
14   sure if Chase was sure herself if
15   what Tiffany was saying was true at
16   the time, but it was sort of rapid
17   fire.  You know, could we get
18   somebody in to test, get the
19   reports.  There was a few chance
20   instances before I think the last
21   few weeks where there was mold, if
22   my memory serves me correctly.  We
23   had RTK come in.  I think there was
24   some cleaning of air-conditioners
25   and stuff like.  But it seemed to a
```



Page 269

                    M. TASCH

1

2    persistent problem, for a few months

3    at least if my memory serves me

4    correctly.  And it sort of

5    intensified towards the end because

6    Tiffany was not getting better, and

7    the mold appeared not to be going

8    away.  So we were checking -- they

9    wanted us to check the doctor's

10   office, which was not for us to do

11   because we have a rental apartment,

12   and the doctor's office is not part

13   of that.  We did try to do that, I

14   am just not sure of the outcome at

15   the time.  But generally, that --

16   that was what was going on.

17     Q.    Okay.

18           And you mentioned Tiffany

19   Chen.  That is Mr. De Niro's

20   girlfriend, correct?

21     A.    Yes.

22     Q.    And during the last few

23   weeks of Ms. Robinson's employment,

24   do you recall Ms. Robinson

25   complaining to you that Ms. Chen was



Page 270

```
 1                 M. TASCH
 2   targeting her?
 3     A.    I do.
 4     Q.    And what exactly did Ms.
 5   Robinson express to you about Ms.
 6   Chen targeting her?
 7     A.    I think just as we are
 8   talking about now, I think she was
 9   expecting Chase/me, or both of us,
10   or one of us at a time, to -- to try
11   to rid this problem.  We weren't
12   getting back to her, she felt,
13   quickly enough.  Sort of stuff like
14   that.
15     Q.    How did you respond to Ms.
16   Robinson's complaint that Ms. Chen
17   was targeting her?
18           MR. DROGIN:  Objection to
19      the form.
20     A.    I am not sure I understand
21   the question.
22     Q.    Ms. Robinson also
23   complained to you that she was being
24   harassed by Ms. Chen?
25           MR. DROGIN:  Objection to
```



Page 271

1                 M. TASCH

2      the form.  You can answer.

3      A.    I believe those were

4   Chase's words.

5      Q.    How did you respond to Ms.

6   Robinson's complaint that Ms. Chen

7   was harassing her?

8      A.    I don't actually remember.

9   I was trying to placate Chase

10   because I know she was in a tough

11   spot, but, you know, I don't know

12   anything about harassment.  It is

13   not my area of expertise.

14          I do know two things, and

15   again, it may not apply here, it

16   may.  Tiffany felt we weren't doing

17   our job so she was putting the

18   pressure on.

19          And secondarily, if you are

20   an employee and work for an

21   employer, you are responsible for

22   taking care of things and doing

23   things.  Just as myself, as an

24   accountant, to a client, if they ask

25   me to do things, I am expected to do



Page 272

```
 1                  M. TASCH
 2    them.  If I can't do them, I would
 3    let them know.  And if I didn't let
 4    them know, than that would be my
 5    error.
 6       Q.    So did you tell anyone
 7    associated with Canal about Ms.
 8    Robinson's complaint that she was
 9    being harassed?
10          MR. DROGIN:  Objection to
11        the form.
12       A.    Listen, I can make an
13    educated guess, which I hate to do.
14    You know, I might have spoken to Tom
15    Harvey about it.  Tom Harvey and I
16    were speaking a lot at that time.
17    If I did, he would be the only one.
18       Q.    Okay.
19          And besides possibly
20    talking to Tom Harvey, you didn't
21    take any other action to address Ms.
22    Robinson's complaint about being
23    harassed, correct?
24       A.    No.
25          MR. DROGIN:  Matter
```



Page 273

```
 1                    M. TASCH
 2      objection to the form.
 3           THE WITNESS:  I'm sorry.
 4      I'm sorry, Laurent.
 5           MR. DROGIN:  No, that is
 6      okay.  I will ask you later
 7      what you understood the term
 8      harassment to mean since she
 9      was asking it.
10      A.    I'm sorry, Ms. Sloan.  Can
11   you repeat the question, please?
12      Q.    I think that you have
13   answered it.
14      A.    I have answered it?  Okay.
15      Q.    And you agreed with Ms.
16   Robinson that Ms. Chen's behavior
17   towards Ms. Robinson was harassment,
18   right?
19           MR. DROGIN:  Can you just
20      clarify, are you asking for a
21      legal conclusion or are you
22      asking --
23           MS. SLOAN:  I am asking
24      --
25           MR. DROGIN:  Let me
```



Page 274

```
 1                  M. TASCH
 2     finish.  Or the generic term
 3     of harassment.  Because it is
 4     misleading, and you are doing
 5     it deliberately, so the
 6     record should be clear.
 7         Ask him what he
 8     understood the harassment to
 9     be or to mean.  As opposed to
10     just trying to get him to
11     agree with you, and then
12     claim it means something
13     other than what he
14     understands.  There is an
15     ambiguity.  Why don't you
16     clear it up or I will on
17     redirect?
18     Q.    You conveyed to Ms.
19     Robinson that you agreed that Mr.
20     Chen's behavior was harassment,
21     correct?
22     A.    I did not agree with
23     anything about harassment and what
24     she said.  As I told you three
25     minutes ago, whatever I said, and I
```



Page 275

```
 1                M. TASCH
 2    don't remember, per se, I was
 3    placating her.  I was trying to make
 4    her feel better.  I know nothing
 5    about harassment from Tiffany, if
 6    there was.  I don't even know what
 7    the word means, and I am not
 8    qualified to understand that.
 9        Q.    Towards the end of Ms.
10    Robinson's employment at Canal, had
11    you become concerned that Ms. Chen
12    was falsely accusing Ms. Robinson of
13    having an affair with Mr. De Niro?
14        A.    I don't understand that
15    question at all.
16        Q.    Let me -- let me ask it
17    again, and I will ask it a little
18    bit slower and see if you understand
19    it, and if not then we will --
20        A.    I can understand it.  You
21    don't have to ask it slower.  I
22    don't understand the question.
23        Q.    Towards the end of Ms.
24    Robinson's employment at Canal, had
25    you become concerned that Ms. Chen
```



MAGNA
LEGAL SERVICES

Page 276

```
 1                M. TASCH
 2   felt Ms. Robinson wanted to marry
 3   Mr. De Niro?
 4      A.    I don't even know what that
 5   means.
 6      Q.    You referred to Fatal
 7   Attraction when describing Ms. Chen
 8   in a conversation with Ms. Robinson,
 9   correct?
10      A.    I don't recall.  But if you
11   say I did, then maybe I did.
12      Q.    Do you know what you --
13   what you would have meant by the
14   reference to Fatal Attraction?
15          MS. JACOBS:  Objection.
16      A.    No idea.
17          MR. DROGIN:  So the
18       record is clear, Fatal
19       Attraction is the movie with
20       the insane woman who boiled
21       the bunny and tried to
22       (inaudible) and kill a family
23       with a knife.
24      Q.    What did Ms. Chen do that
25   reminded you of the film Fatal
```


MAGNA
LEGAL SERVICES

Page 277

```
 1                M. TASCH
 2   Attraction?
 3      A.    I have no idea.
 4      Q.    Did Ms. Chen express
 5   jealousy or anger towards Ms.
 6   Robinson?
 7      A.    To whom?
 8      Q.    Did you observe Ms. Chen
 9   expressing jealousy or anger towards
10   Ms. Robinson?
11      A.    Observe?  Was she standing
12   in front of me and doing that?
13      Q.    Sure.  We will start with
14   that.
15      A.    No.
16      Q.    Had you heard of -- from
17   another person of Ms. Chen
18   expressing jealousy or anger towards
19   Ms. Robinson?
20      A.    Not that I recall.
21      Q.    Did you ever observe --
22   okay.  Let's -- we are going to
23   share another exhibit, so that will
24   appear in the chat.  This was
25   previously marked as Plaintiff's
```



Page 278

```
 1                M. TASCH
 2   Exhibit 25.
 3      A.    The same way?  Jeremy is
 4   sending it and I will save it?
 5      Q.    Yes, that is exactly
 6   correct.  And he just shared it, so
 7   hopefully you can see that.
 8      A.    It just popped up.
 9      Q.    So this is -- do you see it
10   on your screen, Mr. Tasch?
11      A.    Yes.
12      Q.    Okay.
13            Let me know when you see
14   it?
15            MS. JACOBS:  Are these
16      text messages?
17            MS. SLOAN:  Yes.
18      Q.    Do you see it Mr. Tasch?
19   The first page says, "Short Message
20   Report" on the -- at the top?
21      A.    Yes, I do.  Yes.
22      Q.    Okay.  Great.
23            So do you see on the first
24   page where it says there are 20
25   messages on April 4th, 2019, between
```



Page 279

```
 1                M. TASCH
 2   Michael Kaplan and yourself?
 3     A.    I do.
 4     Q.    Okay.  Great.
 5           This is a text thread
 6   between you and Mr. Michael Kaplan.
 7   If you could scroll to the second
 8   page, and at the very bottom of the
 9   second page, 47463.
10     A.    Could you -- Ms. Sloan,
11   could you give me the time?  It is
12   easier for me to do it by the time
13   on the right.
14     Q.    Absolutely.
15           The time is 7:07 p.m. on
16   the right.
17     A.    7:07 p.m.  I'm sorry.
18   Let's go up.
19     Q.    It is at the bottom of page
20   two.
21     A.    Got you.
22     Q.    ON April 4th?
23     A.    It is from Kaplan to me?
24     Q.    That is correct.
25           And Kaplan texted, "I heard
```



Page 280

```
 1                   M. TASCH
 2    Tiff e-mailed you about apartment
 3    expenses.  We should strategize on
 4    this.  She is trying to take down
 5    Chase of course."
 6            And you responded, "We
 7    should."
 8    A.    I'm sorry.  Okay, so yes.
 9    I read that.  What was the next
10    question?
11    Q.    Okay.
12            So you read that -- those
13    couple of texts?
14    A.    The 7:07 one?
15    Q.    Yes.  And could you read
16    the one at 7:35, your response to
17    Mr. Kaplan at 7:35?
18    A.    "We should.  What time can
19    I call you in the morning?"  Yes.
20    Q.    And you can also read the
21    last -- the next one on the top of
22    the third page at 7:39?
23    A.    "Did you hear it from Bob,"
24    is that what you want me to read?
25    Q.    Yes.  Thank you.
```



Page 281

```
 1                    M. TASCH

 2            MR. DROGIN:  Can you ask

 3      him to read the next one,

 4      too?

 5      Q.    Sure.

 6            You can read the next two

 7   texts.

 8      A.    "Can I call you at 8:45 and

 9   speak to you then?"

10      Q.    Great.  Perfect.

11            Do you recall what prompted

12   the communication between you and

13   Mr. Kaplan about Ms. Chen's efforts

14   to take down Ms. Robinson?

15      A.    I really don't recall.

16      Q.    Do you recall if you ended

17   up having a discussion with Mr.

18   Kaplan about Ms. Chen's efforts to

19   try to take down Ms. Robinson?

20      A.    I will be very honest with

21   you, I just don't recall.

22            MR. DROGIN:  Objection to

23      the form.

24            THE WITNESS:  I'm sorry.

25      A.    Did you hear my answer?  Do
```


MAGNA
LEGAL SERVICES

Page 282

```
 1              M. TASCH
 2    you want me to repeat it?
 3      Q.    I heard it.  I don't
 4    recall.
 5            You have described Ms. Chen
 6    as a psychopath, correct?
 7      A.    If you tell me I have,
 8    okay.  I don't remember that.
 9      Q.    And why did you
10    characterize -- why would you
11    characterize Ms. Chen as a
12    psychopath?
13            MR. DROGIN:  Objection to
14       the form.
15            MS. JACOBS:  Same.
16      A.    I will be honest with you,
17    I am just not sure, you know, when
18    -- when -- when I found out Tiffany
19    was around, so to speak, I don't
20    mean that in a bad way, you know,
21    very -- very protective of Bob is
22    really, you know, I feel part of my
23    job.  Just in general, when he is
24    meeting people, he meets people, or
25    people get involved in his life, I
```



Page 283

```
 1                 M. TASCH
 2    try to be very careful myself
 3    because of who he is.  And, you
 4    know, people do try to take
 5    advantage of him or want to get in
 6    his life, or do business with him.
 7    So I didn't know Tiffany, and, you
 8    know, after what had happened with
 9    Grace, and, again, without
10    knowing -- because I did not know
11    Tiffany.  But I really didn't want
12    to have a repeat potentially of --
13        Q.    What was the end of that?
14        A.    I'm sorry.
15        Q.    You said -- I heard repeat.
16    Was that the end of your sentence?
17        A.    Of the Grace situation.
18        Q.    What was the Grace
19    situation?
20        A.    Well, obviously they were
21    getting divorced, a complaint had
22    been filed, you know, he wasn't in a
23    good place with her, and she wasn't
24    a good person quite frankly, and he
25    deserved better.
```


MAGNA
LEGAL SERVICES

Page 284

```
 1                M. TASCH

 2     Q.    What specifically did you

 3   observe that prompted you to call

 4   Ms. Chen a psychopath?

 5     A.    Again, you keep saying

 6   psychopath, and that may be true, I

 7   might have said it.  I am just not

 8   sure back in the timing.  I think

 9   frustration set in for us, in that

10   short period of time, which I

11   described with the mold and so

12   forth, and the demands that were

13   going on.  You know, it just made it

14   tough.  And again, if I did said

15   that word, I don't know why I would

16   have used it.  It just came out.

17   She was a little hyper I would say

18   for sure with -- with the e-mails

19   going back and forth, and the

20   promptness that she wanted, which we

21   tried to do.  And sometimes you

22   can't please everybody.

23     Q.    Do you recall describing

24   Ms. Chen as a nut job?

25     A.    I don't, but it certainly,
```



Page 285

```
 1                M. TASCH
 2   at that time, would be possible.
 3    Q.    For some of the same
 4   reasons that you just described?
 5    A.    Yes.
 6          MS. JACOBS:  When you
 7      reach a natural stopping
 8      point, can we take a break?
 9          MS. SLOAN:  Yes.  Let me
10      see.  This is actually a fine
11      time for a break.  This
12      works.
13          MS. JACOBS:  A few
14      minutes?
15          MS. SLOAN:  Five-minute
16      break.
17          THE VIDEOGRAPHER:  The
18      time is 3:10 p.m.  We are off
19      the record.
20          (Whereupon, a recess was
21      taken at this time.)
22          THE VIDEOGRAPHER:  The
23      time is 3:22 p.m.  We are
24      back on the record.
25    Q.    Mr. Tasch, when exactly did
```



Page 286

```
 1                M. TASCH
 2  you become aware that Mr. De Niro
 3  planned to have Canal file a lawsuit
 4  against Ms. Robinson?
 5     A.    When did I become aware?  I
 6  became aware at some point that they
 7  were contemplating filing a lawsuit
 8  probably -- I mean, I am guessing at
 9  this point, but, you know, maybe May
10  or something like that.
11           MS. SLOAN:  Let's go off
12     the record.
13           THE VIDEOGRAPHER:  The
14     time is 3:23 p.m.  We are off
15     the record.
16           (Whereupon, a recess was
17     taken at this time.)
18           THE VIDEOGRAPHER:  The
19     time is now 3:25 p.m.  We are
20     back on the record.
21     Q.    So you don't recall exactly
22  when you became aware Mr. -- that
23  Mr. De Niro was contemplating having
24  Canal file a lawsuit?
25     A.    I think I answered that I
```



Page 287

```
 1                M. TASCH

 2   think I first heard about it I think

 3   in May.

 4     Q.    And how did you become

 5   aware?

 6     A.    Through Mr. Harvey.

 7     Q.    Mr. Tom Harvey?

 8     A.    Yes.

 9     Q.    And what do you recall

10   being discussed with him?

11     A.    I don't remember a lot, per

12   se, just the fact that they were

13   thinking of doing it.  He thought

14   that there was some improprieties.

15   That is about it.

16     Q.    When was the final decision

17   made to bring suit against Ms.

18   Robinson?

19     A.    I don't recall that at all.

20     Q.    Were you involved in any

21   way in the decision by Canal to

22   bring suit against Ms. Robinson?

23     A.    Absolutely not.

24     Q.    Did Mr. De Niro or anyone

25   else consult with you about the
```



Page 288

```
 1                M. TASCH

 2  decision to bring suit against Ms.

 3  Robinson?

 4     A.    Absolutely not.

 5     Q.    Did you provide any input

 6  to Mr. De Niro or anyone else

 7  concerning the decision to bring

 8  suit against Ms. Robinson?

 9     A.    I'm not sure that I

10  understand the question.

11     Q.    Did you give any input to

12  Mr. De Niro about his decision to

13  bring suit against Ms. Robinson?

14     A.    That is the same question

15  that you just asked, and I don't

16  understand it.

17     Q.    Did you advise Mr. De Niro

18  or anyone else about the decision to

19  bring suit against Ms. Robinson?

20     A.    No.

21     Q.    How many times did you

22  communicate with Mr. De Niro about

23  the plan to file a lawsuit against

24  Ms. Robinson?

25     A.    I don't recall ever talking
```



Page 289

```
 1                M. TASCH
 2   to him about that.  It is not my
 3   purview.
 4     Q.    How many times did you
 5   communicate with any Canal employees
 6   about the plan to file a lawsuit
 7   against Ms. Robinson?
 8     A.    I don't recall ever
 9   speaking to Canal employees about
10   it.
11     Q.    Do you recall ever speaking
12   or communicating with any Canal
13   attorneys about the plan to file a
14   lawsuit against Ms. Robinson?
15          MR. DROGIN:  Objection to
16     the form.  It is a yes-or-no
17     question.
18     A.    Yes.
19     Q.    How many times did you have
20   communications with any Canal
21   attorneys about the plan to file a
22   lawsuit against Ms. Robinson?
23     A.    Sorry.  I didn't let you
24   finish.  I apologize.
25     Q.    That is okay.
```



Page 290

```
 1                M. TASCH
 2   A.    Are you done?
 3   Q.    Yes.
 4   A.    Okay.  I don't recall.
 5   Q.    Was it more than once?
 6   A.    Yes.
 7   Q.    More than three times?
 8   A.    I am not going to guess at
 9   this point.
10   Q.    When did you communicate
11   with any Canal attorneys about the
12   plan to file a lawsuit against Ms.
13   Robinson?
14         MR. DROGIN:  Objection to
15     the form.  You can answer it.
16   A.    Okay.  I don't recall.
17   Q.    Describe all conversations
18   that you had with any Canal attorney
19   about the plan to file a lawsuit
20   against Ms. Robinson?
21   A.    I don't recall.
22   Q.    You don't recall anything
23   that was said in any of the
24   conversations that you had with
25   Canal attorneys?
```



```
 1                M. TASCH

 2   A.    I don't understand the

 3  question.

 4        MR. DROGIN:  Are you

 5     specifically -- I am sort of

 6     letting this go.  Are you

 7     specifically asking him to

 8     reveal to you the

 9     communications that he had

10     with Canal's employees [sic]

11     about facts or about a

12     decision to bring a lawsuit.

13     One is objectionable and the

14     other is not.  I just want to

15     be clear.

16        MR. BENNETT:  Can you

17     read the question back?

18        (Whereupon, the requested

19     portion was read back by the

20     reporter:

21     Q:  You don't recall

22     anything that was said in any

23     of the conversations that you

24     had with Canal attorneys?)

25        MR. BENNETT:  That is
```



Page 292

```
 1                M. TASCH
 2      privileged.
 3           MR. DROGIN:  I think only
 4      because it is based on the
 5      premises of filing the
 6      lawsuit.  If it is factual,
 7      just conveying facts, I don't
 8      know that I have a problem
 9      with that.  But that hasn't
10      been -- hasn't been asked.
11      Q.    You saw a copy of the
12  Complaint before it was filed,
13  correct?
14      A.    I don't recall.
15      Q.    What role did you play in
16  developing the allegations in
17  Canal's lawsuit against Ms.
18  Robinson?
19      A.    I didn't play a role in any
20  allegations against Ms. Robinson.
21      Q.    What role did you play in
22  verifying the allegations in Canal's
23  lawsuit against Ms. Robinson?
24      A.    I don't understand the
25  question.  Do you have a particular
```


MAGNA
LEGAL SERVICES

Page 293

```
 1                  M. TASCH
 2  question that you want to ask?
 3     Q.    Well, this is the
 4  particular question.
 5     A.    It is a general question.
 6  It is not a particular question.
 7     Q.    Did you play any role in
 8  verifying whether any of the
 9  allegations in Canal's lawsuit
10  against Ms. Robinson were accurate?
11          MR. DROGIN:  Objection to
12     the form.
13     A.    I am going to say that I am
14  not sure that I understand the
15  question.
16     Q.    Were you consulted on
17  verifying whether any of the
18  allegations in Canal's lawsuit were
19  accurate?
20          MR. DROGIN:  Same
21     objection to the form.
22     A.    I was consulted about one
23  particular thing.
24     Q.    And what particular thing
25  were you consulted about?
```



Page 294

```
 1                 M. TASCH
 2    A.    About the air miles that
 3   she stole.
 4    Q.    Okay.
 5          Besides the air miles, did
 6   you play any role in verifying
 7   whether any of the allegations in
 8   Canal's lawsuit were accurate?
 9    A.    No.
10          MR. DROGIN:  Objection to
11     the form.
12          THE WITNESS:  Sorry,
13     Laurent.
14          MR. DROGIN:  Don't worry
15     about it.
16    Q.    Just to confirm, your
17   answer was no, correct?
18    A.    Can you just repeat the
19   question again so I can be sure?
20          MS. SLOAN:  Paige, can
21     you read it back?
22          THE WITNESS:  Paige, can
23     you read it back?
24          (Whereupon, the requested
25     portion was read back by the
```



Page 295

```
 1              M. TASCH

 2    reporter:

 3         Q:  Besides the air

 4    miles, did you play any role

 5    in verifying whether any of

 6    the allegations in Canal's

 7    lawsuit were accurate?)

 8   A.    I did not.

 9   Q.    What specifically were you

10  consulted about with respect to the

11  air miles?

12   A.    They asked me to check if

13  she took air miles and I verified it

14  with American Express.

15   Q.    What, specifically, did you

16  verify?

17   A.    You just asked me.  We are

18  talking about the air miles.

19   Q.    Did you -- you verified

20  that -- can you just please describe

21  what you did to verify the air

22  miles?

23   A.    I spoke to American

24  Express.

25   Q.    And you just verified the
```



Page 296

```
 1                M. TASCH
 2  dates and the amount of transfers?
 3    A.    Yes.  Correct.
 4    Q.    Okay.
 5         To your knowledge, did any
 6  Berdon employee play a role in
 7  developing the allegations in
 8  Canal's lawsuit against Ms.
 9  Robinson?
10    A.    No.
11         MS. JACOBS:  Objection to
12     the form.
13    Q.    Can you answer the
14  question?
15    A.    No.
16    Q.    To your knowledge, did any
17  Berdon employee do anything to
18  evaluate whether any of the
19  allegations in Canal's lawsuit were
20  accurate?
21    A.    No.
22    Q.    As far as you know, who
23  prepared the calculations set forth
24  in the Canal lawsuit against Ms.
25  Robinson?
```



Page 297

```
 1                  M. TASCH
 2     A.    I don't understand what
 3  calculation you are talking about.
 4     Q.    As far as you know, who
 5  prepared the damage number set forth
 6  in the Canal lawsuit against Ms.
 7  Robinson?
 8     A.    Wasn't that the same
 9  question that you just asked me?
10  Calculate damages, same thing.  And
11  the answer was no.
12     Q.    Well, just to be clear, I
13  am asking who prepared it, and so --
14     A.    You asked the same question
15  twice and the answer is no to both.
16     Q.    Canal's lawsuit contained a
17  lot of numbers about alleged
18  expenditures, correct?
19          MR. DROGIN:  Objection to
20      the form.  Can I just -- can
21      you just read that back
22      because I may want to see
23      that written out and tape it
24      to the wall?  Can you reread
25      that?
```



Page 298

1                  M. TASCH

2           (Whereupon, the requested

3      portion was read back by the

4      reporter:

5           Q:  Canal's lawsuit

6      contained a lot of numbers

7      about alleged expenditures,

8      correct?)

9           MR. DROGIN:  This is the

10      Complaint that he testified

11      that he didn't see?

12   Q.    Mr. Tasch --

13   A.    He just asked a question.

14   Is somebody going to answer him?

15   Q.    No.  I asked the question

16   and I am waiting for your response.

17   A.    Ask the question again.

18   Q.    Canal's lawsuit contained

19   different numbers about alleged

20   expenditures, correct?

21   A.    Not sure.

22   Q.    So as far as you know, do

23   you have any idea about who prepared

24   the numbers set forth in Canal's

25   lawsuit?



Page 299

```
 1                M. TASCH
 2     A.    I do not.
 3     Q.    To your knowledge, did any
 4  Berdon employee have any involvement
 5  in preparing the numbers that
 6  appeared in Canal's lawsuit against
 7  Ms. Robinson?
 8     A.    I think you just asked that
 9  question a minute ago.
10     Q.    And to be clear, the answer
11  was no, correct?
12     A.    Yes.  Yes, it is correct
13  that the answer is no.
14     Q.    Thank you.
15           To your knowledge, did any
16  Berdon employee have any involvement
17  in Canal's decision to seek $6
18  million from Ms. Robinson?
19     A.    No.
20     Q.    Do you have any knowledge
21  of how Canal came up with the number
22  $6 million in its request for
23  damages in the State Court lawsuit?
24     A.    No.
25     Q.    Did there come a time when
```



Page 300

```
 1                M. TASCH
 2   you became aware that Mr. De Niro
 3   planned to have contact -- planned
 4   to contact the Manhattan District
 5   Attorney's Office about Ms.
 6   Robinson?
 7      A.   I don't understand the
 8   question.
 9      Q.   Did there come a time when
10   you became aware that Mr. De Niro --
11      A.   You came in and out on the
12   beginning, please.  Can you start
13   again?
14      Q.   Let me start over.
15           Did there come a time when
16   you became aware that Mr. De Niro
17   wanted to contact the Manhattan
18   District Attorney's Office about Ms.
19   Robinson?
20      A.   I don't understand the
21   question.  You just asked the same
22   question again.
23      Q.   I rephrased it slightly,
24   but let me back up.
25           Are you aware that Mr. De
```



Page 301

```
 1                M. TASCH
 2   Niro contacted the Manhattan
 3   District Attorney's Office about Ms.
 4   Robinson?
 5     A.    I don't recall that, no.
 6     Q.    You weren't involved at all
 7   in Mr. De Niro's decision to contact
 8   the Manhattan District Attorney's
 9   Office, is that correct?
10     A.    That is correct.
11     Q.    Do you recall any -- having
12   any communications with Mr. De Niro
13   about the Manhattan District
14   Attorney's Office with respect to
15   Ms. Robinson?
16     A.    I did not.
17     Q.    And you didn't provide any
18   input to Mr. De Niro or anyone else
19   concerning the decision to contact
20   the Manhattan District Attorney's
21   Office about Ms. Robinson?
22     A.    That is correct.
23     Q.    Did the Manhattan District
24   Attorney's Office reach out to
25   Berdon concerning the allegations
```



Page 302

```
 1                    M. TASCH
 2   against Ms. Robinson?
 3      A.     Yes, they did.
 4      Q.     And do you recall when that
 5   happened?
 6      A.     I do not recall the
 7   timeframe.
 8      Q.     And who reached out to
 9   Berdon?
10      A.     An assistant district
11   attorney.
12      Q.     Do you remember their name?
13      A.     It was a young lady.  I
14   know that for sure.  I'm not sure of
15   the name.
16      Q.     Was it Kelly Thomas?
17      A.     That name does sound
18   familiar, yes.
19      Q.     And how did Ms. Thomas
20   reach out to Berdon?
21      A.     You are asking me if she
22   called me or e-mailed me, is that
23   the question?
24      Q.     Yes.
25      A.     You know what, I will be
```



Page 303

```
 1                M. TASCH
 2    honest with you, I am not positive.
 3    I believe she reached out by phone.
 4      Q.    Okay.
 5            What did she say?
 6      A.    She left me a message that
 7    she wanted to speak to me about the
 8    De Niro case.
 9      Q.    And so she reached out to
10    you directly?
11      A.    She did.
12      Q.    Okay.
13            And had you known that
14    anyone associated with Canal had
15    been in touch with the Manhattan
16    District Attorney's Office prior to
17    receiving that voicemail?
18      A.    I'm not sure I understand
19    the question.
20      Q.    When you received that
21    voicemail from Ms. Thomas, was that
22    the first time that you heard of the
23    Manhattan District Attorney's Office
24    involvement with Ms. Robinson and
25    Mr. De Niro?
```



Page 304

```
 1                M. TASCH
 2    A.    Sorry.  I will be very
 3  honest with you, I don't recall.
 4    Q.    Okay.
 5          And what did Ms. Thomas
 6  communicate to you?
 7    A.    I will be honest with you,
 8  also, I just don't recall.
 9    Q.    Did you call Ms. Thomas
10  back?
11    A.    I eventually did call her
12  back, yes.
13    Q.    And did you reach Ms.
14  Thomas?
15    A.    I eventually did reach Ms.
16  Thomas, yes.
17    Q.    And in the voicemail, did
18  she convey what she was looking for?
19    A.    I don't recall.
20    Q.    Okay.
21          And when you reached Ms.
22  Thomas, what -- what did you
23  discuss?
24    A.    I'm not sure, being honest,
25  that I discussed anything.  I think
```



Page 305

1                    M. TASCH

2     at that point once I called her back

3     I believe she wanted to meet.

4     Q.    Okay.

5           And do you recall when you

6     called her back, what -- what month

7     and year that was?

8     A.    I do not.  It was certainly

9     a few weeks or more after she called

10    me.

11    Q.    Okay.

12          Did you end up meeting with

13    Ms. Thomas?

14    A.    I did go down to the DA's

15    office.  I think we met with her.

16    We might have met with somebody

17    first.  There was somebody else we

18    did meet with I think before we met

19    with her, or maybe in a combination

20    meeting.  I just don't remember, per

21    se.

22    Q.    Who else was with you

23    during that meeting?

24    A.    Tom Harvey.

25    Q.    And is that all?



Page 306

```
 1                    M. TASCH
 2      A.    Yes.
 3      Q.    Okay.
 4            And how many people from
 5      the Manhattan District Attorney's
 6      Office did you meet with?
 7      A.    I believe we -- we might
 8      have met with Kelly Thomas' boss at
 9      first, and it might have been the
10      four of us.  I think he left, and
11      then it was just the three of us.
12      Q.    Okay.
13            And how long did that
14      meeting last?
15      A.    I will give you an educated
16      guess, maybe an hour, hour and 15
17      minutes.
18      Q.    Okay.
19            Did you bring any documents
20      to that meeting?
21      A.    Not that I recall.
22      Q.    Do you recall if you looked
23      at documents in advance of going to
24      that meeting?
25      A.    Not that I recall.
```



Page 307

```
 1              M. TASCH
 2    Q.    Did the Manhattan District
 3  Attorney's Office Subpoena any
 4  records from Berdon?
 5    A.    You know, again, honestly
 6  educated answer, I believe either
 7  they were -- maybe they gently asked
 8  us to provide information, and if we
 9  didn't provide it, they were going
10  to subpoena.  So I don't know if
11  they actually did subpoena.
12    Q.    Did you provide information
13  to the Manhattan District Attorney's
14  Office?
15    A.    I -- you know, honestly, I
16  don't want to answer incorrectly, so
17  I honestly don't recall.
18    Q.    Just to be clear, you don't
19  recall if you provided any records
20  --
21    A.    I just don't recall.
22  Sorry.
23    Q.    I just want to make sure
24  that you don't recall if Berdon
25  provided any documents or any
```



```
 1                    M. TASCH
 2   records of any type to the Manhattan
 3   District Attorney's Office?
 4       A.    I just don't recall.  I
 5   really don't.
 6       Q.    And do you recall what the
 7   Manhattan District Attorney's Office
 8   -- what type of information they
 9   asked from you?
10       A.    If my memory serves me
11   correctly, I think it was about, you
12   know, some of the allegations in the
13   lawsuit I believe.
14       Q.    Do you remember which
15   specific allegations?
16       A.    I don't.  I would only be
17   guessing at this point.
18       Q.    Okay.
19             To your knowledge -- okay.
20             Can you walk me through
21   everything that was said during that
22   meeting with Ms. Thomas and Mr.
23   Harvey?
24       A.    I don't recall.
25       Q.    Did Ms. Thomas ask you
```



Page 309

```
 1                M. TASCH
 2   questions about the allegations
 3   against Ms. Robinson?
 4     A.    I don't recall.
 5     Q.    Do you recall anything at
 6   all that Ms. Thomas said?
 7     A.    I do not.
 8     Q.    Do you recall anything at
 9   all that you said at that meeting?
10     A.    I do not.
11     Q.    Do you recall anything at
12   all that Tom Harvey said in that
13   meeting?
14     A.    I do not.
15     Q.    Do you recall anything at
16   all that Ms. Thomas' boss might have
17   said in that meeting?
18     A.    Clearly not there.
19     Q.    Is that the only time that
20   you met with anyone from the
21   Manhattan District Attorney's
22   Office?
23     A.    I believe in person that
24   was the only time.
25     Q.    Okay.
```



Page 310

```
 1                 M. TASCH
 2          So we discussed one phone
 3   call that you had with Ms. Thomas,
 4   and in that phone call you set up
 5   this meeting, is that correct?  The
 6   meeting that we were just talking --
 7   discussing?
 8     A.    Yes.  Again, she had called
 9   me and left a message, I eventually
10   got back to her, and then she wanted
11   to have a meeting.
12     Q.    Okay.
13          So then you had this
14   meeting.  Were there other
15   communications that you had with Ms.
16   Thomas either over the phone or over
17   e-mail?
18     A.    Definitely not over the
19   phone, and I don't recall about the
20   e-mail.
21     Q.    Okay.
22          So after the meeting that
23   you just described, with Mr. Tom
24   Harvey, you may have had further
25   communications over e-mail with Ms.
```



Page 311

```
 1                M. TASCH
 2   Thomas, but you don't recall?
 3     A.    I just don't recall.
 4     Q.    When you had the meeting
 5   with Ms. Thomas and Mr. Harvey, do
 6   you know if Ms. Thomas had
 7   previously met with Canal employees?
 8     A.    I don't know the answer to
 9   that question.
10     Q.    Do you know if Ms. Thomas
11   had previously met with Mr. De Niro
12   at that point?
13     A.    My belief is she did not
14   meet with Mr. De Niro.
15     Q.    To your knowledge, did you
16   prepare any documents that were --
17   that were eventually shared with the
18   Manhattan District Attorney's
19   Office?
20     A.    You have to explain to me
21   prepare.
22     Q.    Okay.
23           To your knowledge, did you
24   put together any documents or
25   compile any documents that were
```



Page 312

```
 1                M. TASCH
 2    eventually shared with the Manhattan
 3    District Attorney's Office?
 4       A.    The answer to that is that
 5    I could have -- again, I am going to
 6    ask for clarification.  What do you
 7    mean by compiled?
 8       Q.    Well, it -- to your
 9    knowledge, did you compile any
10    information at all that --
11       A.    You are asking about
12    compiled.  I am asking you what you
13    mean by that word.  You can't use
14    the same word again when I am asking
15    you what it means.
16       Q.    To your knowledge, did you
17    pull together any information that
18    was then shared with the -- that was
19    shared at any time with the
20    Manhattan District Attorney's
21    Office?
22       A.    Since I am not positive, I
23    am going to say that I don't recall.
24       Q.    Okay.
25            MS. SLOAN:  I would ask
```



MAGNA
LEGAL SERVICES

Page 313

```
 1                M. TASCH
 2      for a five-minute break now.
 3      Thanks, everyone.
 4           THE VIDEOGRAPHER:  The
 5      time is 3:51 p.m.  We are off
 6      the record.
 7           (Whereupon, a recess was
 8      taken at this time.)
 9           THE VIDEOGRAPHER:  The
10      time is now 4:01 p.m.  We are
11      back on the record.
12           (Whereupon, Plaintiff's
13      Exhibit 135, Canal 0051748
14      through 56, was marked for
15      identification, as of this
16      date.)
17    Q.    Mr. Tasch, we are going to
18   share another document in the chat,
19   and that is going to be marked 135,
20   and this is Bates stamped Canal
21   0051748 through 56.  And once you
22   open that -- you can take a second
23   to open it.
24           Just for the record, I will
25   now begin my questioning you in your
```



Page 314

```
 1                M. TASCH
 2   capacity as Rule 30(b)(6) witness on
 3   behalf of Canal Productions, Inc.
 4        Mr. Tasch, do you
 5   understand that your testimony
 6   during this portion of the
 7   deposition is given in your capacity
 8   as a witness on behalf of Canal?
 9   A.    Yes.
10   Q.    Okay.  Great.  Thank you.
11        So turning back to the
12   document shared in the chat, are you
13   able to open that?
14   A.    I will tell you in a
15   second.
16   Q.    Great.
17   A.    Yes, got it.
18   Q.    Okay.
19        Do you recognize this
20   document?
21   A.    I do not.
22   Q.    Okay.
23        Why don't you scroll
24   through this just to -- for -- you
25   don't have to read every word, but
```



Page 315

```
 1                M. TASCH
 2   just scroll through.  It is a
 3   nine-page document.
 4           Have you ever seen this
 5   document before?
 6    A.    No.
 7    Q.    Is there a policy -- okay.
 8           Have you -- are you aware
 9   of Canal having a discrimination,
10   harassment, and retaliation policy?
11    A.    Repeat the question,
12   please?
13    Q.    Are you aware that Canal
14   had a -- has a nondiscrimination and
15   antiharassment policy?
16    A.    I don't recall.
17    Q.    Okay.
18           And Mr. Tasch, you are here
19   as Canal's official witness
20   concerning Canal's policies,
21   procedures and protocols concerning
22   discrimination, harassment, and
23   retaliation.
24           During Ms. Robinson's
25   employment, what was Canal's policy
```



Page 316

```
 1                M. TASCH
 2    concerning discrimination,
 3    harassment, and retaliation?
 4       A.    Listen, I am not sure about
 5    that because policies and procedures
 6    were not set by me.  They were set
 7    by Canal and Chase.
 8       Q.    You do understand that you
 9    are Canal's designated witness on
10    Canal's policies, procedures, and
11    protocols concerning discrimination,
12    harassment, and retaliation?
13       A.    You just said that to me a
14    minute ago.
15       Q.    Right.
16             Are you aware of that?
17       A.    I am aware that I am here.
18    But let's be clear about their
19    policies and procedures.  They are
20    not set by us.  They are set by
21    Canal and Chase.
22       Q.    As you sit here today, are
23    you able to testify about Canal's
24    policies, and procedures, and
25    protocols concerning discrimination,
```



Page 317

```
 1              M. TASCH
 2   harassment, and retaliation?
 3       MR. DROGIN:  Objection to
 4    the form.  He indicated to
 5    you they were set by Canal
 6    and Chase.
 7       MS. SLOAN:  Paige, can
 8    you read back the question
 9    for Mr. Tasch?
10       (Whereupon, the requested
11    portion was read back by the
12    reporter:
13       Q:  As you sit here
14    today, are you able to
15    testify about Canal's
16    policies, and procedures, and
17    protocols concerning
18    discrimination, harassment,
19    and retaliation?)
20   A.    So the question is, am I
21   prepared to testify on that?
22   Q.    Are you able to testify on
23   that topic?  Yes.
24       MR. DROGIN:  Objection to
25    the form.  You are -- you are
```



Page 318

```
 1                M. TASCH
 2      asking him questions about --
 3      you should also demarcate
 4      that this is now a different
 5      relevant period of time
 6      pursuant to the 30(b)(6)
 7      Notice.  You are confining it
 8      to a period of time when
 9      Chase was employed, correct?
10      I don't have it in front of
11      me.
12   Q.    So Mr. Tasch, do you have
13   an answer for that question?
14   A.    What is the question,
15   again?
16   Q.    I will --
17   A.    You want me to testify on
18   policies that I didn't set?
19   Q.    Sitting here today, are you
20   able to --
21   A.    Do you want me to testify
22   on policies that I didn't --
23        MS. JACOBS:  Michael --
24   Michael, let her --
25        THE WITNESS:  Okay.
```



Page 319

```
 1                  M. TASCH
 2     Q.    Sitting here today, are you
 3   able to testify about Canal's
 4   policies, procedures, and protocols
 5   concerning discrimination,
 6   harassment, and retaliation between
 7   October 3, 2013, and April 6, 2019?
 8     A.    No.
 9          MR. DROGIN:  Will you ask
10     him why not?
11          MS. SLOAN:  If Mr. Tasch
12     is unprepared, he is
13     unprepared.
14          MS. JACOBS:  That is not
15     what he said.
16          MR. DROGIN:  He has
17     explained it to you.  You
18     are, again, evading.  Chase
19     --
20     A.    I am not saying I am not
21   prepared.
22          MR. DROGIN:  Hold on.  He
23     told you Chase set the
24     policies.
25          MS. SLOAN:  Canal is the
```



Page 320

```
 1                    M. TASCH
 2     one who designated Mr. Tasch
 3     as a witness on this topic.
 4          MR. DROGIN:  Then we
 5     would redesignate Chase
 6     Robinson.  We will do that.
 7     We will redesignate Chase
 8     Robinson as the 30(b)(6)
 9     witness and she can explain
10     the policies since she put
11     them all into place and
12     administered them.  Ask him
13     about that.  That is what he
14     is prepared to testify about.
15     You are evading the questions
16     that you want answered.
17          MS. SLOAN:  We are going
18     to move to our next line of
19     questioning.
20     Q.    At Canal, Mr. De Niro is
21     the person who sets employee's
22     compensation, correct?
23     A.    Correct.
24     Q.    At Canal, Mr. De Niro was
25     the person that set Ms. Robinson's
```


MAGNA
LEGAL SERVICES

Page 321

```
 1                M. TASCH
 2   pay, correct?
 3     A.    Correct.
 4     Q.    At Canal, Mr. De Niro is
 5   the person who set Dan Harvey's pay,
 6   correct?
 7     A.    Well, instead of asking
 8   individual questions, why don't we
 9   get to the real question.  He is the
10   president of the company and he sets
11   all the compensations.
12     Q.    That includes Dan Harvey,
13   correct?
14     A.    Well, if I said all the
15   employees, he is an employee of
16   Canal.
17     Q.    During Ms. Robinson's
18   employment with Canal, did Canal
19   have any kind of formal system for
20   setting employee compensation?
21     A.    No.  None that I knew of.
22     Q.    Canal never had any
23   formal performance review system,
24   correct?
25     A.    You would have to ask Chase
```



```
 1                  M. TASCH
 2    that question.
 3    Q.    Are you aware of any formal
 4    performance review system?
 5    A.    You would have to ask Chase
 6    that question.
 7    Q.    I am asking about your
 8    awareness, Mr. Tasch?
 9    A.    I am not aware of anything.
10          MR. DROGIN:  Hold on.
11          (Simultaneous speaking)
12    A.    -- set by Chase.
13    Q.    If you don't know the
14    answer to my question, you can
15    simply say that I don't know.
16          Prior to --
17          MR. DROGIN:  And if Chase
18     is the one who knows the
19     question, you should identify
20     Chase as the one that knows
21     the answer.
22          THE WITNESS:  That is
23     what I am doing.
24    Q.    Prior to 2017 -- I am
25    asking -- okay.
```



MAGNA
LEGAL SERVICES

Page 323

```
 1                M. TASCH
 2         Prior to 2017, Canal's
 3  standard operating procedure was not
 4  to pay any employees overtime,
 5  correct?
 6         MR. DROGIN:  That, I
 7    believe, he can answer.
 8    A.    I would not know about that
 9  policy and procedure.
10    Q.    Mr. Tasch, you are here,
11  again, as an official witness
12  designated by Canal to testify about
13  the policies, procedures, and
14  protocols concerning employee
15  compensation, perks, and benefits.
16         You understand that,
17  correct?
18    A.    Yes.
19    Q.    Okay.  So now I am asking
20  --
21         MS. JACOBS:  I'm sorry.
22    Before you ask the question,
23    can we go off the record for
24    a second?
25         MS. SLOAN:  Sure.  Let's
```



Page 324

```
 1                M. TASCH
 2     go off the record.
 3          THE VIDEOGRAPHER:  The
 4     time is 4:11 p.m.  We are off
 5     the record.
 6          (Whereupon, a recess was
 7     taken at this time.)
 8          THE VIDEOGRAPHER:  The
 9     time is now 4:16 p.m.  We are
10     back on the record.
11     Q.   Mr. Tasch, Canal only
12  started paying certain employees
13  overtime in 2017, is that correct?
14     A.   I don't recall the
15  timeframe, but they were getting
16  paid overtime.
17     Q.   At some point Canal
18  employees began getting paid
19  overtime, is that correct?
20     A.   Well, when you say,
21  "began," I'm not sure.  I got all
22  that information from Chase, and
23  when I was provided with the
24  information on overtime, we paid
25  them overtime.
```



Page 325

1              M. TASCH

2    Q.    So you don't recall if

3    there was a change in overtime

4    practices at some point in the past

5    --

6    A.    I do not.  As far as I

7    knew --  as far as I knew, there

8    should -- there was supposed to be

9    overtime, period.  I never got the

10   information.  As I said, Chase

11   provided it, and when she provided

12   it, we paid them.

13   Q.    What overtime policies or

14   practices, or prior to -- let me

15   rephrase that.

16          Prior to 2017, Canal did

17   not pay any employees overtime?

18   A.    You just asked me that

19   question.

20          MR. DROGIN:  Objection to

21    the form.  You can answer.

22   A.    I'm sorry, Ms. Sloan.  You

23   want to repeat yourself?  I cut

24   Laurent off.

25   Q.    That is okay, Mr. Tasch.



Page 326

```
 1                    M. TASCH
 2           Prior to 2017, Canal did
 3      not pay any employees overtime?
 4           MR. DROGIN:  Objection.
 5           You are mischaracterizing his
 6           testimony.  He explained to
 7           you that if Chase said to pay
 8           overtime, it was paid.  Why
 9           do you keep changing what he
10           said?
11      Q.    Canal never paid Ms.
12      Robinson overtime, is that correct?
13      A.    As far as I know, that is
14      correct.  But she was in control of
15      that.  So if she didn't report it to
16      us, she didn't get paid.
17      Q.    Did there come a time when
18      Canal changed its overtime policies
19      or practices?
20      A.    Not that I know.  As far as
21      I know, overtime was always
22      available.
23      Q.    How did Canal determine
24      which employees were eligible to
25      receive overtime pay?
```



Page 327

```
 1              M. TASCH

 2     A.    That was determined by

 3   Chase.

 4     Q.    And I am asking you.  How

 5   did Canal determine which employees

 6   were eligible to receive overtime?

 7     A.    Canal has their own

 8   policies and practices put in place

 9   by Chase.  You should ask her that

10   question.

11     Q.    Well, Canal has designated

12   you as the official --

13     A.    I understand that.  But I

14   don't know the policies and

15   procedures.  I get the information

16   from her.

17     Q.    Mr. Tasch, you are not

18   prepared to testify about the

19   policies, procedures, and protocols

20   with respect to employee

21   compensation for overtime, is that

22   correct?

23          MR. DROGIN:  Objection.

24     It is leading and it is a

25     misleading question.  The
```



Page 328

```
 1                   M. TASCH
 2      problem we have here is that
 3      your client controlled
 4      everything.  She is the one
 5      who has this information.  I
 6      cannot designate her as a
 7      witness.  So the company does
 8      the best that it can, and it
 9      has presented the person who
10      dealt directly with her on
11      the questions that you are
12      asking about.  That is the
13      best we are going to do.  If
14      you are not happy with it, I
15      will redesignate Chase, and
16      then you can ask your client
17      questions, which I assume you
18      would have done anyway, but
19      maybe you will get honest
20      answers.
21          It is like if someone
22      died, you don't have them
23      available to answer questions
24      so you reconstruct as best as
25      you can.
```



Page 329

```
 1                    M. TASCH
 2            Ask him about all the
 3      other things.
 4      Q.    So the bottom line is that
 5  you are not familiar with the
 6  specifics of Canal's policies and
 7  procedures with respect to overtime
 8  during the period from October 3,
 9  2013, to April 6, 2019, is that
10  correct?
11            MR. DROGIN:  Objection to
12      the form, and it is a leading
13      question.
14      Q.    You can answer the
15  question, Mr. Tasch.
16      A.    I don't even understand the
17  question.
18      Q.    Okay.
19            What part of the question
20  don't you understand, Mr. Tasch?
21      A.    I don't understand the
22  question.
23      Q.    Are you able to testify
24  about the specifics of Canal's
25  policies, procedure, and protocols
```



Page 330

```
 1                M. TASCH
 2   with respect to overtime during the
 3   period from October 3, 2013, to
 4   April 6th, 2019?
 5        MR. DROGIN:  Objection to
 6     the form.  Ask him a question
 7     and you will find out.  You
 8     are asking incredibly broad
 9     questions.  You are
10     challenging him as to whether
11     or not he is prepared to
12     answer a question that --
13        (Simultaneous speaking)
14        MS. SLOAN:  Counsel,
15      please stop.
16   Q.    Mr. Tasch you should answer
17   the question.
18   A.    I don't understand the
19   question.
20        MR. DROGIN:  Do you see
21     the problem?  You haven't
22     asked a question.
23        MS. SLOAN:  I have asked
24     multiple questions.
25        MR. DROGIN:  And you have
```



```
 1                  M. TASCH
 2      gotten answers.
 3      Q.    Mr. Tasch, are you familiar
 4   with the details of Canal's
 5   policies, procedures, and protocols
 6   with respect to overtime during the
 7   period from October 3, 2013, to
 8   April 6, 2019?
 9      A.    I don't understand the
10   question.
11           MR. DROGIN:  And it is
12       asked and answered.
13      Q.    Mr. Tasch, have you
14   discussed overtime pay policies with
15   Mr. De Niro?
16      A.    I have not.
17      Q.    Which employees did Canal
18   pay overtime during the period from
19   October 3, 2013, to April 6, 2019?
20      A.    I am not sure about all the
21   ones.  I can know the ones recently,
22   for example, Sabrina, or Jillian, or
23   Kaplan, if he worked overtime.  But,
24   again, all that information came
25   through Chase.
```



Page 332

```
 1                M. TASCH
 2    Q.    Has Canal faced complaints
 3   of overtime violations?
 4         MR. DROGIN:  This is
 5      during the period of time
 6      identified in the 30(b)(6).
 7    Q.    Mr. Tasch?
 8    A.    Not that I recall.
 9    Q.    Prior to 2017, were any
10   employees paid overtime?
11         MS. JACOBS:  I didn't
12      hear the last word.
13    Q.    Prior to 2017, were any
14   employees paid overtime?
15    A.    I don't recall.
16    Q.    During Ms. Robinson's
17   employment, Canal didn't have a
18   written policy about use of Canal
19   credit cards, correct?
20    A.    Not that I knew of.
21    Q.    During Ms. Robinson's
22   employment, Canal afforded
23   discretion to Ms. Robinson about
24   what charges to place on Canal
25   credit cards, correct?
```



Page 333

```
 1                  M. TASCH
 2     A.    I don't even know what that
 3  question means.
 4     Q.    When Ms. Robinson was
 5  employed by Canal, she was given
 6  discretion about what charges to
 7  place on Canal's credit card,
 8  correct?
 9     A.    I don't know the answer to
10  that question.
11     Q.    During Ms. Robinson's
12  employment, Canal did not
13  communicate any specific limits to
14  Ms. Robinson on what types of
15  expenses she could use a Canal
16  credit card for, correct?
17          MR. DROGIN:  Objection to
18     the form.  Hold on.
19      Objection to the form.
20     Q.    You should answer now, Mr.
21  Tasch.
22     A.    I don't know the answer.
23     Q.    During Ms. Robinson's
24  employment, Canal did not require
25  Ms. Robinson to seek Mr. De Niro's
```


MAGNA
LEGAL SERVICES

Page 334

```
 1                 M. TASCH
 2    specific approval before placing
 3    meal expenses on a Canal credit
 4    card, correct?
 5        A.    I don't have the answer to
 6    that question.
 7        Q.    During Ms. Robinson's
 8    employment, Canal did not require
 9    Ms. Robinson to seek Mr. De Niro's
10    specific approval before placing
11    transportation expenses on a Canal
12    credit card, is that correct?
13        A.    I don't know if that is
14    correct or not.
15        Q.    During Ms. Robinson's
16    employment, Canal didn't have a
17    written policy about the use of
18    petty cash, correct?
19        A.    I'm not sure I understand
20    the question.
21        Q.    During Ms. Robinson's
22    employment, Canal didn't have a
23    written policy about when -- about
24    any use of petty cash or receiving
25    reimbursement through petty cash, is
```



Page 335

1                M. TASCH

2    that correct?

3        A.    That is the same question

4    that you just asked a minute ago,

5    which I don't understand the

6    question.

7        Q.    Canal didn't have any

8    written policy about what charges

9    employees could seek reimbursement

10   from petty cash, correct?

11       A.    I still don't understand

12   the question.

13       Q.    During Ms. Robinson's

14   employment, did Canal have any

15   written policy concerning the

16   circumstances when employees could

17   use petty cash?

18       A.    I don't recall.

19       Q.    During Ms. Robinson's

20   employment, Canal did not

21   communicate any specific limits to

22   Ms. Robinson on what types of

23   expenses she could use petty cash

24   for, correct?

25       A.    I don't know.



MAGNA
LEGAL SERVICES

```
 1                M. TASCH

 2    Q.    During Ms. Robinson's

 3  employment, Canal did not require

 4  Ms. Robinson to seek Mr. De Niro's

 5  specific approval before using petty

 6  cash to buy meals, is that correct?

 7    A.    I don't know.

 8    Q.    During Ms. Robinson's

 9  employment, Canal did not require

10  Ms. Robinson to seek Mr. De Niro's

11  specific approval before using petty

12  cash to -- for transportation

13  charges, is that correct?

14    A.    You just asked that

15  question a minute ago.  I am going

16  to give you the same answer.  I

17  don't know.  You asked me the same

18  question.

19    Q.    To be clear, the previous

20  question was about meal expenses,

21  and this question is about

22  transportation expenses.

23        Do you know for either of

24  those?

25    A.    Repeat the question?
```



Page 337

```
 1                M. TASCH

 2           MS. SLOAN:  Paige, can

 3      you read back the previous

 4      question?

 5           (Whereupon, the requested

 6      portion was read back by the

 7      reporter:

 8           Q:  During Ms. Robinson's

 9      employment, Canal did not

10      require Ms. Robinson to seek

11      Mr. De Niro's specific

12      approval before using petty

13      cash to -- for transportation

14      charges, is that correct?)

15   A.    I do not know the answer to

16   that.

17   Q.    There was a Canal credit

18   card in Ms. Robinson's name,

19   correct?

20   A.    Yes.

21   Q.    The Canal American Express

22   card under Ms. Robinson's name was

23   the main card used for expenses for

24   Canal's office and Canal's office

25   employees, correct?
```


MAGNA
LEGAL SERVICES

Page 338

```
 1                   M. TASCH
 2              MR. DROGIN:  Objection to
 3       the form.  Can you explain
 4       what you mean by main?
 5              MS. SLOAN:  The primary
 6       credit card.
 7              MR. DROGIN:  Still
 8       objection.
 9    A.    I don't understand the
10    question, so it is irrelevant.
11    Q.    Did Berdon employees have
12    access to the Canal credit card that
13    was in Ms. Robinson's name?
14    A.    I don't understand the
15    question.
16    Q.    Would Berdon employees use
17    the Canal credit card that was in
18    Ms. Robinson's name?
19    A.    I don't recall.
20    Q.    During Ms. Robinson's
21    employment, what was the main credit
22    card used for expenses for Canal's
23    office and Canal's office employees?
24              MR. DROGIN:  Objection to
25       the form of the question.
```



Page 339

```
 1              M. TASCH

 2    A.    Again, as we talked about

 3  early on today, with credit cards,

 4  one was used for personal and one

 5  was used for office.  I just don't

 6  know -- and one was in Chase's, I

 7  just don't remember what was used

 8  for each one.

 9    Q.    Okay.

10          And we touched on this a

11  bit earlier today, but was it

12  Berdon's practice to contact Mr. De

13  Niro or Canal employees with any

14  questions that arose out of their

15  review of the credit cards

16  statements?

17          (Simultaneous speaking)

18          MR. BENNETT:  Counsel, is

19     that a 30(b)(6) question or a

20     fact witness?

21          MS. SLOAN:  I will

22     withdraw the question.

23    Q.    Canal paid -- when

24  employees worked -- let me restart.

25          What was Canal's policy
```



```
 1                M. TASCH
 2    when it came to paying for
 3    employees' working meals?
 4      A.    I'm sorry the screen just
 5    moved.  Can you repeat that, please?
 6      Q.    What was Canal's policy
 7    when it came to paying for
 8    employees' working meals?
 9      A.    As far as I know the policy
10    to be, if they were working and
11    especially at night or on call for
12    Mr. De Niro that their meals would
13    be taken care of.
14      Q.    What was Canal's policy
15    when it came to paying for
16    employee's work-related
17    transportation?
18      A.    Originally, if my memory
19    serves me correctly, I think we used
20    to have MTA cards in the day where
21    they -- they would pay for that and
22    they could use the subway.  If it
23    was at night, they were allowed to
24    use cabs/Uber, when Uber came
25    around.  If they were on call.
```



Page 341

```
 1                    M. TASCH

 2     Q.     Is Ms. Robinson was taking

 3   a taxi, Uber, or Lyft for

 4   work-related reason, she was

 5   entitled to charge Canal for that

 6   taxi, Uber, or Lyft, correct?

 7          MR. DROGIN:  Objection to

 8     the form.  Calls for a

 9     hypothetical.  You could ask

10     about policies not

11     hypotheticals.

12          MS. SLOAN:  Okay.

13     Q.     If an employee needed to

14   take a taxi, Uber, or Lyft for a

15   work-related reason, it was Canal's

16   policy that Canal would pay for that

17   taxi, Uber, or Lyft, correct?

18     A.     Correct.

19     Q.     Mr. De Niro testified that

20   certain flowers or plants purchases

21   should be expensed to Canal,

22   including flowers or plants for

23   Canal's office, for Mr. De Niro's

24   townhouse, and for Mr. De Niro's

25   parties, or gifts for Mr. De Niro's
```



Page 342

```
 1                M. TASCH
 2  colleagues, and his former partner.
 3        Does that accurately
 4  describe Canal's standard practice
 5  concerning flowers and plants?
 6        MR. DROGIN:  Objection to
 7    the form.  You can answer.
 8    A.    I'm not sure what the
 9  practice is on plants and flowers.
10  But, again, if it is a business
11  expense, we take a deduction.
12    Q.    Then it would be proper for
13  a Canal employee to charge that to
14  Canal, correct?
15    A.    I'm not sure about that.
16  If that is a request that they
17  needed to get flowers and plants,
18  that would be yes.  If it was a
19  business gift, directed by Mr. De
20  Niro or Chase, who was in charge,
21  then the answer would be yes.
22    Q.    And if it was flowers or
23  plants for the Canal office,
24  correct?
25    A.    I'm not sure what the
```



Page 343

```
 1                M. TASCH
 2  question is there.
 3    Q.    That would be proper for a
 4  Canal employee to charge that to
 5  Canal?
 6    A.    If Mr. De Niro or Chase,
 7  who was in charge, said that was
 8  okay, then it was okay.
 9    Q.    Did Canal allow employees
10  to receive direct payments or to
11  receive reimbursements for certain
12  charges that they incurred?
13         MR. DROGIN:  Objection to
14    the form.
15    A.    If for any reason that they
16  could not use the credit card, or
17  could not use petty cash, and it was
18  for the business, yes, they did get
19  reimbursed.
20    Q.    And Canal also allowed
21  employees to use petty cash for
22  certain charges they incurred,
23  correct?
24    A.    Correct.
25    Q.    During Ms. Robinson's
```



Page 344

```
 1                M. TASCH
 2    employment, what were Canal's
 3    standard operating procedures
 4    concerning petty cash for employee
 5    reimbursements?
 6         MS. JACOBS:  Objection to
 7      the form.
 8    A.    Again, I think I just
 9    answered that question.  If they
10    were getting things for the office
11    or Mr. De Niro, of that (inaudible),
12    they could take petty cash to do so.
13    Q.    There was never a written
14    policy about that, correct?
15    A.    Not that I knew of,
16    correct.
17    Q.    And petty cash could be
18    used for employee meals or
19    transportation, correct?
20    A.    Correct.
21    Q.    And Mr. De Niro was aware
22    that employees were allowed to use
23    petty cash or seek reimbursement for
24    certain charges, correct?
25         MR. DROGIN:  How can he
```



```
 1                M. TASCH
 2      possibly know with the way
 3      that you phrased the
 4      question?  I think the
 5      question is, do you know if
 6      he was aware?
 7      Q.   Canal did not provide
 8   specific guidance to employees about
 9   what expenses -- let me withdraw
10   that and I will move on.
11           It was standard for Canal
12   to pay for iPhones for its
13   employees, correct?
14      A.   Yes.  Let me just -- point
15   time, I'm not sure if it was iPhones
16   or Samsungs at the beginning, but
17   let's call it work phones.
18      Q.   Okay.
19           And that is -- at some
20   point that included iPhones?
21      A.   Yes.
22      Q.    In special circumstances
23   Mr. De Niro would at times authorize
24   dog sitting expenses for employees,
25   correct?
```



Page 346

```
 1                 M. TASCH
 2            MR. DROGIN:  Objection to
 3      the form.  Can you explain
 4      what you mean by special
 5      circumstances?
 6      Q.    In certain circumstances,
 7    Mr. De Niro would at times authorize
 8    dog sitting expenses for employees,
 9    is that correct, Mr. Tasch?
10      A.    I know nothing about that.
11      Q.    How often did Michael
12    Kaplan send petty cash receipts to
13    Berdon?
14      A.    I think we covered this
15    earlier in the morning.
16            MR. DROGIN:  Well, she is
17      asking you now as a 30(b)(6)
18      witness.
19            THE WITNESS:  Sorry.  My
20      apologies.
21            MR. DROGIN:  That is
22      okay.
23      A.    He generally provided -- we
24    would have liked them more, but he
25    generally provided, as I said this
```



Page 347

1                    M. TASCH

2    morning, the petty cash spreadsheet

3    and receipts generally February or

4    March of the following year.

5      Q.    What were the categories

6    that petty cash was broken down

7    into?

8      A.    Business gifts, meals,

9    travel, you know, Ubers, taxis.

10     Q.    Anything else?

11     A.    Not that I recall.

12     Q.    So just to be clear, you

13   would receive the receipts from Mr.

14   Kaplan, correct?

15     A.    Whatever receipts he

16   provided.  We did not always get the

17   receipts.

18     Q.    And you would receive his

19   breakdown tabulation of the petty

20   cash, correct?

21          MR. DROGIN:  Objection to

22     the form of the question.

23     Q.    Is that correct?

24     A.    Yes, that is correct.

25     Q.    Okay.



```
 1                   M. TASCH
 2           And would you receive
 3   anything else from Mr. Kaplan?
 4      A.     Like what?
 5      Q.     Any other petty cash sheets
 6   from other Canal employees?
 7      A.     No.
 8      Q.     Was -- did you review any
 9   of the receipts in connection to Ms.
10   Robinson's petty cash sheets?
11      A.     I will be honest with you,
12   I don't remember getting receipts
13   from her.
14      Q.     Was it your understanding
15   that Mr. Kaplan -- the receipts that
16   you received from Mr. Kaplan
17   included receipts from other Canal
18   employees?
19      A.     I don't know the answer to
20   that.
21      Q.     Did Berdon scan copies of
22   petty cash receipts?
23      A.     I don't recall.
24      Q.     Did Mr. Kaplan e-mail the
25   receipts to you or did he give you
```



Page 349

```
 1                M. TASCH
 2   hard copies?
 3    A.     You know what, I really
 4   don't recall whether it was hand
 5   delivered or whether it was e-mail.
 6    Q.     Okay.
 7           And you said Berdon would
 8   keep those receipts for three years?
 9    A.     We were required to keep
10   them at a minimum of three years for
11   audit purposes and for tax purposes.
12    Q.     And would you keep them for
13   more than three years?
14    A.     I don't recall.
15    Q.     And how were the receipts
16   saved by Berdon?
17           MR. BENNETT:  This is
18      Berdon.  Aren't we -- this is
19      the 30(b)(6) part about
20      Canal, right?
21           MR. DROGIN:  It is fine.
22      Just let it go.
23    Q.     You should answer, Mr.
24   Tasch.
25           MR. DROGIN:  Yes.  Please
```



Page 350

```
 1                  M. TASCH
 2      answer.
 3      A.    Repeat the question,
 4   please?
 5           THE WITNESS:  Or Paige,
 6      can you repeat the question,
 7      please?
 8           (Whereupon, the requested
 9      portion was read back by the
10      reporter:
11           Q:  And how were the
12      receipts saved by Berdon?)
13      A.    Hard copies, and probably
14   over the last few years, scanned.
15      Q.    Sorry.  What was the
16   beginning part of your answer?
17           (Whereupon, the requested
18      portion was read back by the
19      reporter:
20           A:  Hard copies, and
21      probably over the last few
22      years, scanned.)
23      Q.    Do you recall when you
24   started scanning the receipts --
25   when Berdon started doing that?
```



Page 351

```
 1                 M. TASCH

 2    A.    I do not.  I do not.

 3    Q.    Did that occur within the

 4  last five years?

 5    A.    I don't recall.

 6    Q.    And when Berdon received

 7  the tabulation of petty cash

 8  expenses from Mr. Kaplan, would

 9  Berdon do anything to double check

10  that tabulation?

11    A.    No.  If it came in on an

12  Excel spreadsheet it was tabulated

13  by Excel.  We probably -- I am not a

14  great Excel expert, but I am sure

15  there is a way to see if his

16  calculations were correct, and if

17  there was, we probably did that at a

18  minimum.

19    Q.    And so would Berdon double

20  check Michael Kaplan's

21  categorization of petty cash

22  expenses?

23    A.    I would say generally not.

24  It wasn't -- the amounts weren't so

25  large.  I mean, the amounts each
```



Page 352

```
 1                    M. TASCH
 2   month were not large.  I mean, we
 3   would look at them just like we
 4   would look at other stuff just to
 5   make sure at least the categories we
 6   could categorize were correct.  That
 7   would be the extent.
 8     Q.    Canal had a practice of
 9   paying certain employees for unused
10   vacation days, correct?
11     A.    Correct.
12     Q.    Canal paid certain
13   employees back for their unused
14   vacation days going back as far as
15   2008, correct?
16     A.    Going back as far as when?
17     Q.    2008?
18          MR. DROGIN:  Objection.
19      Objection.  Hold on.  If you
20      are asking him about
21      30(b)(6), then you are
22      limited to 2013.  If this is
23      30(b)(6), then the witness
24      should be reminded that there
25      is a timeframe.
```



```
 1              M. TASCH
 2              MS. SLOAN:  Okay.  We
 3     will -- that is fine.
 4     Q.    Canal paid certain
 5  employees for their unused vacation
 6  days going back as far of 2013,
 7  correct?
 8     A.    Correct.
 9              MR. BENNETT:  October
10     2013, just to clarify.
11     Q.    Which Canal employees were
12  paid for their unused vacation days?
13              MR. DROGIN:  Objection to
14     the form.  You can answer.
15     A.    Whatever employees -- Chase
16  sent me the e-mail every year on
17  everybody's unused vacation time.
18     Q.    And what did that e-mail
19  say, what were those e-mails?
20     A.    It told me how many
21  vacation days that people didn't
22  use.
23     Q.    Do you know when Canal
24  started that policy?
25     A.    I don't.  I don't remember
```



Page 354

```
 1                   M. TASCH
 2     when I started receiving the e-mails
 3     from Chase.
 4      Q.    Okay.
 5            We are going to -- I will
 6     wait on that for a second.
 7            Which employees were paid
 8     for their unused vacation days from
 9     October 3rd, 2013, to April 6, 2019?
10      A.    Any employees that worked
11     for the company.
12      Q.    I am showing you a document
13     that is previously marked as
14     Plaintiff's Exhibit 49.
15            MS. SLOAN:   Jeremy, if
16       you could drop that in the
17       chat.
18      Q.    So I will ask you to open
19     that in one second.  Just to be
20     clear, throughout the period from
21     October 3, 2013, through April 6,
22     2019, Canal had a policy of paying
23     Canal employees for their unused
24     vacation days, correct?
25      A.    Yes.
```



Page 355

1          M. TASCH

2     Q.    If you can just open up the

3  document that was shared in the

4  chat.

5     A.    This appears to be all

6  bonuses.  You are talking about

7  vacation pay.

8     Q.    Yes.  So we will walk

9  through these e-mails.

10     A.    What are we talking about

11  here?  We just started talking about

12  overtime and vacation days.  This is

13  an e-mail about bonuses.

14     Q.    Yep.  So if you look at the

15  subject of the first -- let's make

16  sure we are both looking at the same

17  document.

18     A.    We are looking at the same

19  document.

20     Q.    Okay.  Great.

21          So do you see that the

22  subject says, "Canal bonuses and

23  vacation payback?"

24     A.    Okay.  And can you tell me

25  below where it talks about vacation



Page 356

```
 1                  M. TASCH
 2   payback?
 3      Q.    Yes, if you scroll down --
 4   again, this document is from
 5   December 19th --
 6      A.    I'm sorry.  I apologize.  I
 7   didn't see the bottom two.
 8      Q.    Not a problem, Mr. Tasch.
 9            So this document is -- you
10   can scroll through.
11      A.    I don't have to scroll.
12      Q.    Okay.
13            Do you see that Mr. De Niro
14   was included on all of the
15   communications in which Ms. Robinson
16   described the vacation pay that she
17   and Mr. Kaplan should be paid back
18   for?
19      A.    I am not understanding the
20   question.
21      Q.    Alright.  So let's start
22   with the first page.  So you saw
23   that you -- at the bottom it shows
24   the vacation pay for Ms. Robinson
25   and Mr. Kaplan?
```


MAGNA
LEGAL SERVICES

Page 357

```
 1                M. TASCH
 2    A.     Yep.
 3    Q.     Correct?
 4    A.     Yes.
 5    Q.     And as you scroll back up,
 6    you will see that Mr. De Niro was
 7    CC'd on this e-mail, correct?
 8    A.     On this particular e-mail.
 9    Q.     Alright.
10    A.     We are talking about one
11    e-mail in one year, correct?
12    Q.     Well, we are going to walk
13    through them.  Thank you.
14    A.     Walk through what?  You are
15    going to walk through what?
16         MS. JACOBS:  Michael,
17      wait for the question.
18    Q.     Mr. Tasch, we are going to
19    take -- don't jump ahead of me.  We
20    are going to take it, you know, one
21    page at a time.
22         If you would like, we can
23    go off the record so you can review
24    all the documents.
25    A.     I don't have to review
```



```
 1                  M. TASCH
 2   anything.
 3      Q.    This is an eight-page
 4   document.
 5      A.    This is an eight-page
 6   document?
 7      Q.    Yes, there is eight pages
 8   in this document with e-mails for
 9   various years.  So would you like to
10   review all of those -- all of these
11   e-mails?  In which case we can go
12   off the record.
13          MR. BENNETT:  I don't
14      think we need to go off the
15      record.  We will stay on the
16      record.
17      Q.    So can you scroll down to
18   the second page?  Are you able to do
19   that?
20          MS. JACOBS:  What is the
21      Bates number, please?
22          MS. SLOAN:  The Bates
23      number is Robinson 00008625.
24      A.    Page two out of eight?
25      Q.    Yep.
```



Page 359

```
 1                M. TASCH

 2     A.    Okay.

 3     Q.    So this is also from 2018?

 4     A.    Uh-huh.

 5     Q.    And you can see that in the

 6  middle of the page, Ms. Robinson

 7  says, "Let me know what you think.

 8  Need to submit them today."  And Mr.

 9  De Niro said, "Okay."

10          Do you see that?

11     A.    Uh-huh.  I do.

12     Q.    And is this e-mail -- this

13  is familiar to you, right?  You are

14  familiar with these annual e-mails

15  from Ms. Robinson detailing --

16     A.    I'm not -- in these

17  particular ones, I am not.  She sent

18  it to me -- if it was only to me, it

19  was in a different form.  Michael,

20  these -- you know, bonuses and

21  vacation of use have been approved.

22     Q.    So let's scroll down to

23  page three, which is -- excuse me

24  page four, which is Robinson 9969.

25     A.    Okay.
```



Page 360

```
 1                M. TASCH
 2     Q.    Is this the type of e-mail
 3  that you were just describing that
 4  you are familiar with?
 5     A.    Yes.  Correct.  Yes.
 6     Q.    And you received these
 7  e-mails every year, correct?
 8     A.    I did receive them every
 9  year.  Well, as I remember every
10  year.
11     Q.    Okay.
12            And you can see that Mr. De
13  Niro is CC'd on this e-mail,
14  correct?
15     A.    On this particular one I
16  see, yes.
17            MS. SLOAN:  And so this
18      one, for the record, was in
19      2017.
20     Q.    If you scroll down to the
21  fifth page, 9971, you can see -- and
22  it also goes down to the 9972, this
23  is another e-mail.  The same type of
24  thing, correct?  You can see --
25     A.    Which -- I'm sorry?  Which
```



Page 361

```
 1              M. TASCH
 2   page number are you looking at?
 3      Q.    We are looking at 9971 and
 4   9972?
 5      A.    Give me the page numbers,
 6   please.
 7      Q.    Five and six.
 8      A.    Okay.  So I am looking at
 9   five right now.  Do you have a
10   particular question about the one on
11   five?
12      Q.    I am just showing you this
13   is another e-mail that Ms. Robinson
14   sent and Mr. De Niro was CC'd,
15   correct?
16      A.    Well, on the one Chase sent
17   here, she sent it to me and
18   Francesca.
19      Q.    That is correct.  And if
20   you -- forwarded it -- if you scroll
21   down, you will see that Mr. De Niro
22   was CC'd in the middle of the page.
23   BobShepard@iCloud.com?
24      A.    I do see her e-mailing Bob.
25   And I don't see his approval.
```


MAGNA
LEGAL SERVICES

Page 362

```
 1                   M. TASCH
 2     Q.    Was it your understanding
 3   that Ms. Robinson obtained Mr. De
 4   Niro's approval before sending these
 5   year-end e-mails identifying the
 6   amount of vacation days to be paid
 7   to Ms. Robinson and Mr. Kaplan?
 8     A.    On the ones that I saw his
 9   approval, I did.  Not on the ones
10   that I didn't see his approval.
11     Q.    And to be clear, I am not
12   asking about your understanding
13   right now.
14          At the time when you would
15   receive the e-mails, was it your
16   understanding that Ms. Robinson had
17   obtained Mr. De Niro's approval
18   before sending you year-end e-mails
19   identifying --
20     A.    Well, the e-mails generally
21   said she had Bob's approval.
22     Q.    So the answer to my
23   question is yes, correct?
24     A.    I'm not sure what your
25   question is.
```



Page 363

1           M. TASCH

2      Q.    Was it your understanding

3    that Ms. Robinson had communicated

4    with Mr. De Niro about the content

5    of the e-mails before sending them?

6      A.    On the ones where I saw his

7    approval noted, the answer is yes.

8    On the other ones she sent me where

9    I --

10           (Phone ringing)

11     A.    -- on the other ones that

12   she sent, if I didn't see his

13   approval, but Chase she got his

14   approval, I took her word for it.

15     Q.    During Ms. Robinson's

16   employment, did Mr. De Niro ever

17   communicate to you that he did not

18   approve the vacation day

19   reimbursement listed in Ms.

20   Robinson's e-mail?

21     A.    We never had that

22   discussion.

23     Q.    So the answer is no,

24   correct?

25     A.    We never had that



```
 1                  M. TASCH
 2    discussion.
 3       Q.    At any time during Ms.
 4    Robinson's employment, did Mr. De
 5    Niro raise concerns about the
 6    vacation days that Ms. Robinson
 7    sought reimbursement for?
 8            MR. DROGIN:  Objection.
 9        I am just going to assume
10        every time you say at any
11        time during Mr. De Niro's
12        employment -- Ms. Robinson's
13        employment, that that is not
14        a 30(b)(6) question, since
15        you know the specific dates
16        of the 30(b)(6).
17            MS. SLOAN:  Thank you,
18        Mr. Drogin.  I will -- I will
19        clarify for the record.
20       Q.    At any point between
21    October 3, 2013, and April 6, 2019,
22    did Mr. --
23       A.    I'm sorry, Ms. Sloan.  What
24    was the first date?
25       Q.    October 3, 2013, and April
```



Page 365

```
 1                M. TASCH
 2    6, 2019, did Mr. De Niro raise
 3    concerns about vacation days that
 4    Ms. Robinson sought reimbursement
 5    for?
 6          THE WITNESS:  So to
 7       clarify the record, I think
 8       -- Greg, I think you
 9       mentioned the date October
10       20th?
11          MR. BENNETT:  October 3rd
12       is correct.  October 3, 2013,
13       to April 6, 2019.
14          THE WITNESS:  Is correct?
15          MR. BENNETT:  Yes.
16    Q.    I will try to say that
17    timeframe going forward.  So I
18    apologize.
19    A.    No, no.  I'm sorry.  What
20    was the question again, please?
21          MS. SLOAN:  Paige, can
22       you read it back?
23          (Whereupon, the requested
24       portion was read back by the
25       reporter:
```



Page 366

1              M. TASCH

2         Q:   October 3, 2013, and

3     April 6, 2019, did Mr. De

4     Niro raise concerns about

5     vacation days that Ms.

6     Robinson sought reimbursement

7     for?)

8     A.    I don't recall.

9     Q.    From October 3, 2013, to

10   April 6, 2019, did Berdon raise

11   concerns about the vacation days

12   that Ms. Robinson sought

13   reimbursement for?

14    A.    I don't recall.

15    Q.    It was generally understood

16   that if Ms. Robinson ended up

17   working on a holiday or a day when

18   she was traveling, she was

19   authorized to be reimbursed for that

20   vacation day, correct?

21         MR. DROGIN:  Objection to

22     the form.  You can answer.

23    A.    I don't know the answer to

24   that question.

25    Q.    From October 3, 2013, to



```
 1               M. TASCH
 2   April 6, 2019, it was Canal's policy
 3   that if Ms. Robinson ended up
 4   working on a holiday or a day when
 5   she was traveling, she was
 6   authorized to be reimbursed for that
 7   vacation day, is that correct?
 8      A.    If it was a Canal policy,
 9   it should work for all employees.
10   You are just asking about Chase.
11      Q.    The specific question is
12   about Ms. Robinson -- but so --
13      A.    The policies, as you know,
14   it is not go towards one employee.
15   It goes to all the employees.
16      Q.    Okay.
17            Was that a policy that
18   applied to all employees?
19      A.    I don't know.  I just
20   wanted to get on the record the
21   correct terminology.
22      Q.    From October 3, 2013, to
23   April 6, 2019, was it Canal's policy
24   that if -- if an employee ended up
25   working on a holiday or a day when
```



Page 368

```
 1                M. TASCH
 2    she was traveling, he or she would
 3    be authorized to be reimbursed for
 4    that vacation day?
 5          MS. JACOBS:  Objection to
 6       the form.  A travel day or a
 7       holiday isn't a vacation day.
 8          MR. DROGIN:  The whole
 9       record is completely screwed
10       up.  It is like a plane
11       crash, but that is okay.
12          Do you have much more,
13       counsel?
14          MS. SLOAN:  I am not
15       exactly sure how much longer.
16          MR. DROGIN:  Can we take
17       a two-minute break and just
18       find out --
19          MS. SLOAN:  In a few
20       minutes we can take a break.
21       It will be a good stopping
22       point soon.
23    Q.    On trips during which an
24    employee was working, it was Canal's
25    policy that they were permitted to
```



Page 369

```
 1                M. TASCH
 2  charge food, lodging, and
 3  transportation to Canal, correct?
 4          MR. DROGIN:  Objection to
 5    the form.
 6    A.    I don't understand the
 7  question.
 8    Q.    Sorry, Mr. Tasch.  I didn't
 9  hear you.
10    A.    I don't understand the
11  question.
12    Q.    Going back, from October 3,
13  2013, through April 6, 2019, was it
14  Canal's policy that if an employee
15  ended up working on a holiday or
16  vacation, she was authorized to be
17  reimbursed for that vacation day?
18          MR. DROGIN:  Objection to
19    the form.
20          MS. JACOBS:  Join.
21    A.    Are you talking about all
22  employees?
23    Q.    I am asking --
24          MS. SLOAN:  Paige, can
25    you read back the question?
```



1                 M. TASCH

2     A.    You asked the question is

3    she entitled.

4     Q.    The question is about, in

5    general, a Canal employee.  So she

6    or he.

7     A.    And what is the question

8    again?

9     Q.    From October 3, 2013, to

10   April 6, 2019, was it Canal's policy

11   that if an employee ended up working

12   on a holiday or a vacation, he or

13   she was authorized to be reimbursed

14   for that vacation day?

15        MR. DROGIN:  Objection to

16     the form.

17        MS. JACOBS:  Objection to

18     the form.  It is also a very

19     different question than the

20     one you were just asking.

21        MR. DROGIN:  So if an

22     employee worked on January

23     1st, which is a holiday, your

24     question is were they --

25        MS. SLOAN:  Mr. Drogin,



Page 371

```
 1              M. TASCH
 2      the question is for the
 3      witness, Mr. Tasch.
 4          MR. DROGIN:  I am just
 5      trying to point out the error
 6      in the question so you can
 7      correct it, but I won't,
 8      since you are protesting.
 9   Q.    Mr. Tasch, you should
10   answer the question.
11   A.    I don't understand the
12   question.  So I can't answer it.
13   Q.    Let's try this one more
14   time, alright?
15          From October 3, 2013, to
16   April 6, 2019, if an employee ended
17   up working on a holiday or a
18   vacation, under Canal's policy, was
19   that employee authorized to be
20   reimbursed for the day when they
21   worked?
22   A.    I don't understand the
23   question.
24   Q.    The specifics of Canal's
25   policy of paying back employees for
```



Page 372

```
 1                  M. TASCH
 2  unused vacation days were not
 3  written down anywhere, correct?
 4    A.    Not that I know of.
 5          MS. SLOAN:  Let's take a
 6      five -- a five-minute break.
 7          MR. DROGIN:  Can we also
 8      get the run time after we get
 9      back from the five minutes?
10          THE VIDEOGRAPHER:  The
11      time is 5:05 p.m.  We are now
12      off the record.
13          (Whereupon, a recess was
14      taken at this time.)
15          THE VIDEOGRAPHER:  The
16      time is now 5:16 p.m.  We are
17      back on the record.
18    Q.    Mr. Tasch, we are going to
19  try this one more time.
20          If a Canal employee ended
21  up working on a holiday or a
22  vacation day, Canal had a policy of
23  paying that employee back for that
24  holiday or vacation when the
25  employee worked, right?
```



MAGNA
LEGAL SERVICES

Page 373

```
1                M. TASCH
2            MR. DROGIN:  Same
3      objection.  Go ahead.
4      A.   I don't know the answer to
5    that question.  That is not proper
6    procedure.
7      Q.   As Canal's Rule 30(b)(6)
8    witness, explain to me what was
9    Canal's policy when it came to
10   paying back employees for unused
11   vacation days?
12     A.   At one point it wasn't a
13   policy.  The policy that Chase had
14   was the e-mail at the end of the
15   year to get them paid for unused
16   vacation days.  That is a policy she
17   made up.
18     Q.   Okay.
19          And to be clear, I am not
20   asking a written policy in
21   particular.  You testified --
22     A.   You are asking about the
23   policy.  There is a policy.
24     Q.   Explain to me what were the
25   circumstances in which Canal
```


MAGNA
LEGAL SERVICES

Page 374

1                    M. TASCH

2    employees were authorized to be paid

3    back for unused vacation days?

4    A.    I am not sure there was an

5    authorized policy.

6    Q.    Mr. Tasch, there came a

7    time when Canal began investigating

8    Ms. Robinson, correct?

9    A.    Say it again?  I'm sorry.

10   Q.    There came a time when

11   Canal began investigating Ms.

12   Robinson, correct?

13   A.    I don't understand the

14   question.

15   Q.    Did there come a time when

16   Canal began investigating Ms.

17   Robinson?

18   A.    You just asked the same

19   question.  I just told you that I

20   don't understand the question, now

21   you asked it again.

22   Q.    I rephrased it slightly,

23   sir.

24         Were you -- are you aware

25   of Canal investigating Ms. Robinson?



Page 375

```
 1                M. TASCH
 2     A.    I don't understand the
 3  question.
 4     Q.    Did there come a time when
 5  Mr. De Niro began investigating Ms.
 6  Robinson?
 7     A.    I don't understand the
 8  question.
 9     Q.    Mr. Tasch, you are the
10  30(b)(6) witness on the topic of any
11  investigations concerning Ms.
12  Robinson undertaken by Canal or
13  anyone acting on its behalf.
14        MR. DROGIN:  Now you
15     understand why it is so
16     confusing.  Ask about anyone
17     acting on its behalf by
18     attorneys, and you will get
19     answers.
20     Q.    Did there come a time when
21  Canal or anyone acting on its behalf
22  began investigating Ms. Robinson?
23     A.    I don't understand the
24  question.
25        MR. DROGIN:  If you want,
```



Page 376

```
 1                M. TASCH
 2      we will stipulate that after
 3      she resigned Counsel became
 4      involved in an investigation
 5      if that helps move it along
 6      or -- (inaudible).  However
 7      you choose to characterize
 8      it.
 9      Q.    What part of the question
10 don't you understand, Mr. Tasch?
11      A.    Any of it.
12      Q.    Are you aware of Canal or
13 anyone acting on Canal's behalf
14 investigating Ms. Robinson?
15      A.    I don't understand the
16 question.  You keep asking the same
17 question, and I am telling you that
18 I don't understand.
19      Q.    Sorry to interrupt, Mr.
20 Tasch.  You are Canal's Rule
21 30(b)(6) witness.
22      A.    I understand that.  If you
23 asked a proper question, I could
24 give you a proper answer.
25      Q.    The Rule 30(b)(6) topic is
```



Page 377

```
 1                M. TASCH
 2    about any investigation concerning
 3    Ms. Robinson undertaken by Canal or
 4    anyone acting on its behalf, you
 5    understand that, correct?
 6            THE WITNESS:  Jane, I
 7        need a clarification here.
 8        I'm sorry.
 9            MS. SLOAN:  You are
10        muted, Ms. Jacobs.
11            THE WITNESS:  You are
12        muted, Jane.
13            MS. JACOBS:  He is not
14        saying that he doesn't know.
15        He is saying that he doesn't
16        understand your question.
17    Q.    I am explaining to you the
18    Rule 30(b)(6) topic.
19            MS. JACOBS:  Doesn't mean
20        that it is clear either.
21    Q.    I am asking are you aware
22    of any investigation?
23    A.    Listen, you could ask all
24    you want, and I am going to give you
25    the same answer.  I don't understand
```



1                    M. TASCH

2     your question.

3         Q.    So you are not aware of any

4     such investigation --

5         A.    I don't understand your

6     question.

7              MS. SLOAN:  Ms. Jacob, is

8         it possible for you to confer

9         with Mr. Tasch?

10             MS. JACOBS:  Yes.

11        Michael just mute and --

12             MS. SLOAN:  I just want

13        to move this along.  Thanks.

14             THE VIDEOGRAPHER:  The

15        time is 5:21 p.m.  We are off

16        the record.

17             (Whereupon, a recess was

18        taken at this time.)

19             THE VIDEOGRAPHER:  The

20        time is now 5:27 p.m.  We are

21        back on the record.

22             MS. JACOBS:  I think we

23        have cleared up Mr. Tasch's

24        confusion.  Before we go

25        back, can we get some read on



Page 379

```
 1                    M. TASCH
 2      how much you think you have
 3      left?  I am just trying to
 4      figure out a personal issue.
 5           MS. SLOAN:  I would say
 6      an hour or so.
 7           MS. JACOBS:  Okay.
 8      Q.    Mr. Tasch, at any time
 9    between October 3, 2013, and today,
10    did Canal ever investigate Ms.
11    Robinson?
12      A.    Including today's date?
13      Q.    Yes.
14      A.    Yes.
15      Q.    And when --
16           MR. BENNETT:  I'm sorry,
17      just to clarify, I want to
18      understand.  Are we still
19      sticking with the 30(b)(6)
20      timeframe or are we going
21      after that?
22           MS. SLOAN:  My
23      understanding of the Topic 2
24      is that there was no end
25      date.
```


MAGNA
LEGAL SERVICES

Page 380

```
 1                 M. TASCH
 2          MR. BENNETT:  Because
 3     that wasn't in the Notice,
 4     but okay.
 5          MR. DROGIN:  I think it
 6     was.
 7          MS. SLOAN:  It was in the
 8     Notice.
 9          MR. BENNETT:  My fault.
10     My fault.
11     Q.    When did that investigation
12     begin, Mr. Tasch?
13     A.    As far as my memory, I
14     believe it started either late April
15     or early May.
16     Q.    Of what year?
17     A.    '19.
18     Q.    And who initiated the
19     investigation into Ms. Robinson?
20     A.    I'm sorry.  I missed the
21     first part of the question.
22     Q.    Who initiated the
23     investigation into Ms. Robinson?
24     A.    Tom Harvey.
25     Q.    And who was in charge of
```


MAGNA
LEGAL SERVICES

Page 381

```
1                M. TASCH
2    the investigation into Ms. Robinson?
3    A.    I'm not sure about that.
4    Q.    Who was involved in
5    investigating Ms. Robinson?
6         MR. DROGIN:  Objection.
7    Hold on.  Just -- just --
8    just want to be careful here
9    because I think you are about
10   to put your foot into work
11   product.  You are talking now
12   about an attorney
13   investigating a former
14   employee.  Factually, it is
15   fine.  I just want to be
16   aware.  So are you asking who
17   Mr. Harvey interviewed?
18        MS. SLOAN:  That wasn't
19   my question.  Let me ask a
20   new question.
21   Q.    Was Berdon in charge of the
22   investigation into Ms. Robinson?
23   A.    No.
24   Q.    How frequently was Mr. De
25   Niro being updated on the status of
```



Page 382

```
 1                 M. TASCH
 2   the investigation?
 3     A.    You would have to ask him
 4   that.
 5     Q.    And who participated in the
 6   investigation into Ms. Robinson?
 7          MR. DROGIN:  Objection to
 8      the form.  You can answer.
 9     A.    I really don't know.  I
10   know Tom was.  I'm not sure about
11   anybody else.
12     Q.    Did Canal employees
13   participate in the investigation
14   into Ms. Robinson?
15          MR. DROGIN:  Objection to
16      the form.  You can answer.
17          THE WITNESS:  Okay.
18     A.    I don't recall.
19     Q.    Did Berdon employees
20   participate in the investigation
21   into Ms. Robinson?
22     A.    I will need clarification
23   on the question.
24     Q.    Did you participate in the
25   investigation into Ms. Robinson?
```



Page 383

```
 1                 M. TASCH
 2     A.    I need clarification.
 3     Q.    Were you involved in any
 4   way in the investigation into Ms.
 5   Robinson?
 6          MR. DROGIN:  Objection to
 7      the form.  Other than what
 8      has already been testified
 9      to.
10     A.    Okay.  So I will try to
11   make it easy for you.  When you say,
12   "involved," what does that mean?
13     Q.    What was your involvement
14   in the investigation --
15     A.    I just asked you what you
16   mean by involvement, so please
17   explain it to me.
18     Q.    Did you have any role at
19   all in the investigation into Ms.
20   Robinson?
21     A.    Again, what particular
22   role?
23     Q.    That is what I am asking
24   you, Mr. Tasch.
25     A.    Well, I am trying to
```



Page 384

```
 1                    M. TASCH
 2    understand your question so I am
 3    trying to --
 4       Q.    I understand, and I am just
 5    trying to figure out if you had any
 6    role at all --
 7       A.    I am not sure what -- I'm
 8    sorry, Ms. Sloan.  Go ahead.
 9       Q.    That's okay.
10            I am not asking about any
11    specific role.  I am asking if you
12    had any role in the investigation
13    into Ms. Robinson?
14       A.    And all I am trying to get
15    out of you is what does that mean.
16            MR. DROGIN:  Did you
17       speak with Mr. Harvey as part
18       of the investigation?
19            THE WITNESS:  I did.
20       Yes.
21            MR. DROGIN:  Okay.
22       Q.    When did you first speak to
23    Mr. Harvey about the investigation?
24       A.    I am not positive of the
25    date, but again, I think it was that
```



Page 385

                    M. TASCH

1

2    end of April/early May period.

3    Q.    Did you communicate with

4    anyone else as part of the

5    investigation?

6    A.    When you say, "communicate

7    with anybody else," whom?

8    Q.    Anyone else?

9    A.    So I am not sure of the

10   question, Ms. Sloan.  Is your

11   question did I tell anybody about

12   the investigation?

13   Q.    No.  Let's see.

14         Did you communicate with

15   anyone else associated with Canal in

16   connection with the investigation

17   into Ms. Robinson?

18   A.    Specifically with Canal?

19   Q.    Anyone associated with

20   Canal?

21   A.    I honestly don't recall.  I

22   think the answer would be no, but I

23   don't recall.

24   Q.    Canal never hired a

25   professional investigator to



Page 386

```
 1              M. TASCH
 2   investigate Ms. Robinson, correct?
 3     A.    I don't know the answer to
 4   that question.
 5     Q.    Mr. De Niro never hired a
 6   professional investigator to
 7   investigate Ms. Robinson, correct?
 8     A.    I don't know the answer to
 9   that question.
10     Q.    Do you know if anyone on
11   behalf of Canal or Mr. De Niro ever
12   hired a professional investigator to
13   investigate Ms. Robinson?
14         MR. DROGIN:  Objection.
15      Clarify other than counsel
16      who has been identified?
17     Q.    Mr. Tasch, what was your
18   answer?
19     A.    Can you please --
20         THE WITNESS:  Paige, can
21      you please repeat the
22      question?
23         (Whereupon, the requested
24      portion was read back by the
25      reporter:
```



Page 387

```
 1                M. TASCH
 2          Q:  Do you know if anyone
 3      on behalf of Canal or Mr. De
 4      Niro ever hired a
 5      professional investigator to
 6      investigate Ms. Robinson?)
 7      A.    Not that I know of.
 8      Q.    Did Jim Harkins (ph)
 9   perform any work with respect to the
10   investigation?
11      A.    Not that I recall.
12      Q.    Did Canal's accountants
13   initiate any review of books and
14   records, such as Canal's American
15   Express card, petty cash, or
16   frequent flyer miles?
17      A.    Again, what do you mean by
18   review?
19      Q.    I mean it in the general
20   plain meaning sense.
21      A.    Well, I still don't
22   understand what that means, but I
23   will answer your question this way.
24          We were asked to produce
25   documents to Mr. Harvey.
```



Page 388

                    M. TASCH

1

2      Q.    What documents were you

3   asked to produce to Mr. Harvey?

4      A.    American Express

5   statements.

6      Q.    Anything else?

7      A.    He did ask for e-mails on

8   petty cash.

9      Q.    What types of e-mails on

10   petty cash?

11      A.    Whatever e-mails I had.  He

12   requested petty cash.  Basically

13   requests petty cash, both from

14   Kaplan and Chase.

15      Q.    What other documents were

16   you asked to produce?

17      A.    I don't recall anything

18   else.

19      Q.    You were asked to produce

20   these documents to Tom Harvey?

21      A.    Correct.

22      Q.    And when did Tom Harvey ask

23   you to produce these documents?

24      A.    Again, I think it is in

25   that late April/early May timeframe.



Page 389

```
 1                    M. TASCH

 2    Q.    Describe for me everything

 3    that Berdon employees did with

 4    respect to the investigation into

 5    Ms. Robinson?

 6          MR. DROGIN:  Objection.

 7    A.    I don't understand the

 8    question.

 9    Q.    Describe for me everything

10    that -- let me rephrase it.

11          What did Berdon employees

12    do with respect to the investigation

13    into Ms. Robinson?

14          MR. DROGIN:  Objection to

15      the form.  This is as a

16      30(b)(6) or is this not as a

17      30(b)(6)?

18          MS. SLOAN:  This is the

19      30(b)(6) portion of the

20      deposition, yes.

21          MR. DROGIN:  So you want

22      to know from Canal what

23      employees of other entities

24      may have done?

25    Q.    Mr. Tasch, can you answer
```


MAGNA
LEGAL SERVICES

Page 390

```
 1                M. TASCH
 2   the question?
 3   A.    Repeat it, please?
 4        MS. SLOAN:  Paige, can
 5    you read it back?
 6        (Whereupon, the requested
 7    portion was read back by the
 8    reporter:
 9        Q:  What did Berdon
10    employees do with respect to
11    the investigation into Ms.
12    Robinson?)
13   A.    The only thing we did was
14   produce statements and some e-mails.
15   Q.    Which Berdon employees were
16   involved in producing those
17   documents?
18   A.    I don't recall.
19   Q.    Did Berdon employees reach
20   any conclusion as to -- engaged in
21   any --
22        Did Berdon employees reach
23   any conclusions as to whether Ms.
24   Robinson had engaged in any
25   wrongdoings?
```



Page 391

```
 1                  M. TASCH
 2     A.    Absolutely not.
 3     Q.    In the course of Canal's
 4   investigation, Canal employees
 5   tabulated that the total amount
 6   charged for Ubers and taxis on the
 7   Canal credit card, under Ms.
 8   Robinson's name, from May 2017, to
 9   April 2019, was $31,814.17.
10          After receiving that
11   tabulation, did Canal or anyone
12   acting on behalf of Canal do
13   anything to further investigate the
14   Uber and taxi charges that appeared
15   on the Canal American Express in Ms.
16   Robinson's name?
17          MR. DROGIN:  Objection.
18       Hold on.  It is completely --
19       you are asking for work
20       product.  Other than work
21       product and other than
22       attorney communications,
23       please go ahead and answer
24       the question.  Canal is not
25       waiving the privilege.
```



Page 392

```
 1                M. TASCH
 2    Q.    Mr. Tasch, can you answer
 3    --
 4    A.    I don't know the answer to
 5    the question anyway, so --
 6          MS. SLOAN:  And I am just
 7       asking about factual
 8       information about the
 9       investigation.
10          MR. DROGIN:  Actually,
11       that is not true.  You are
12       asking for procedure.  You
13       are asking for details about
14       what was done by the
15       attorney.  It is not correct.
16       You are misrepresenting your
17       own question.
18    Q.    Describe for me everything
19    that was done to investigate the
20    allegation that Ms. Robinson had
21    improperly charged expenses for
22    Ubers, taxis, and Lyft charges?
23    A.    No idea.
24    Q.    Describe for me everything
25    that was done to investigate the
```



Page 393

```
 1              M. TASCH
 2  allegation that Ms. Robinson had
 3  improperly made charges at Paola's
 4  restaurant?
 5         MR. DROGIN:  Same
 6     objection to all of these
 7     questions where you are
 8     calling for work product.  It
 9     is plain to you that an
10     attorney was conducting the
11     investigation.
12  Q.    Mr. Tasch, you can answer.
13         MS. JACOBS:  I don't
14     think he can because it is an
15     objection on privileged
16     grounds.
17         THE WITNESS:  Thank you.
18         MS. SLOAN:  I am asking
19     about the factual information
20     about the investigation.
21         MR. DROGIN:  Can we hear
22     back the question, please?
23         (Whereupon, the requested
24     portion was read back by the
25     reporter:
```



Page 394

```
 1                M. TASCH
 2        Q:  Describe for me
 3   everything that was done to
 4   investigate the allegation
 5   that Ms. Robinson had
 6   improperly made charges at
 7   Paola's restaurant?)
 8        MR. DROGIN:  That is not
 9   factual.  You are saying
10   describe everything that was
11   done.  You are asking for
12   what was done as part of the
13   investigation being conducted
14   by the attorney.  It is work
15   product.
16        MS. SLOAN:  Mr. Tasch is
17   the Rule 30(b)(6) witness on
18   any investigation concerning
19   Plaintiff, by Canal.
20        MR. DROGIN:  Right.  But
21   that doesn't mean that you
22   get to pierce the
23   attorney-client privilege.
24        MS. SLOAN:  And I am not
25   seeking to.
```



```
 1                 M. TASCH
 2    Q.    So Mr. Tasch, did you
 3  answer that question?  Are you
 4  refusing to answer that question?
 5          THE WITNESS:  Jane?
 6          MS. JACOBS:  I am telling
 7     him not to answer the
 8     question.
 9    Q.    In the course of Canal's
10  investigation, Canal employees
11  tabulated that the total amount
12  charged for Paola's restaurant on
13  the Canal credit card under Ms.
14  Robinson's name, from May 2017, to
15  April 2019, was $12,696.65.
16          After receiving that
17  tabulation, did Canal or anyone
18  acting on behalf of Canal do
19  anything to further investigate the
20  Paola's restaurant charges that
21  appeared on the Canal's American
22  Express in Ms. Robinson's name?
23          MR. DROGIN:  Same
24     objection.  If you are asking
25     about Canal employees there
```



Page 396

1              M. TASCH

2      is no objection.  If you are

3      opening it to up what the

4      attorneys may have done, that

5      is a different story.

6          MS. SLOAN:  My question

7      is did Canal or anyone acting

8      on behalf of Canal.  That is

9      my question to Mr. Tasch.

10         MR. DROGIN:  That is the

11     problem with it.  So

12     excluding work product, he

13     can answer it.  But you are

14     not limiting it.

15  Q.    Mr. Tasch, can you answer

16  the question?

17         MS. JACOBS:  No, he may

18     not.

19  Q.    Excluding work product, can

20  you please answer the question?

21         MS. JACOBS:  Now you can

22     answer if you can.

23  A.    Repeat the question,

24  please?

25         (Whereupon, the requested



```
 1                    M. TASCH
 2      portion was read back by the
 3      reporter:
 4          Q:  After receiving that
 5      tabulation, did Canal or
 6      anyone acting on behalf of
 7      Canal do anything to further
 8      investigate the Paola's
 9      restaurant charges that
10      appeared on the Canal's
11      American Express in Ms.
12      Robinson's name?)
13          MS. JACOBS:  Other than
14      counsel.  You can answer,
15      other than counsel.
16          THE WITNESS:  Well, can I
17      answer?  She didn't ask other
18      than counsel.
19      Q.   Other than --
20          MS. JACOBS:  I am telling
21      you --
22      Q.   Other than counsel, please
23   answer the question, Mr. Tasch?
24          THE WITNESS:  Jane, I can
25      answer?
```



1            M. TASCH

2            MS. JACOBS:  Yes.

3     A.    I don't know the answer.

4            MR. DROGIN:  The record

5      should reflect that other

6      witnesses were already asked

7      these questions.

8     Q.    Describe for me everything

9  done to investigate the alleged

10  improper expenses from Ms. Robinson

11  at Whole Foods or Dean & DeLuca

12  apart from any actions by counsel?

13            THE WITNESS:  Jane, good?

14            MS. JACOBS:  Yes.  You

15      are good.

16     A.    I don't know the answer.

17     Q.    So in the course of Canal's

18  investigation, Canal employees

19  tabulated a total amount of charges

20  at Whole Foods and Dean & DeLuca.

21            After receiving that

22  tabulation, did Canal or anyone

23  acting on behalf of Canal, other

24  than counsel, do anything to further

25  investigate the Whole Foods or Dean



Page 399

```
 1                 M. TASCH
 2    & DeLuca charges that appeared on
 3    the American Express in Ms.
 4    Robinson's name?
 5            THE WITNESS:  Jane?
 6            MS. JACOBS:  Other than
 7      counsel, you are good.
 8    A.    Okay.  Don't know the
 9    answer.
10    Q.    Describe for me everything
11    that was done to investigate the
12    allegation that Ms. Robinson had
13    improperly charged expenses for
14    flowers and plants, and it is going
15    to exclude counsel as well?
16    A.    I don't know the answer.
17    Q.    After receiving the total
18    tabulation of charges for flowers
19    and plants on the Canal credit card,
20    what did Canal or anyone acting on
21    behalf of Canal, other than counsel,
22    do to further investigate the
23    expenses from flower stores that
24    appeared on the American Express in
25    Ms. Robinson's name?
```



Page 400

```
 1                  M. TASCH
 2    A.    I don't know the answer.
 3    Q.    With respect to Canal's
 4  investigation into Ms. Robinson, did
 5  Canal do anything to weed out
 6  authorized credit card charges?
 7         MR. DROGIN:  Objection to
 8    the form.  Weed out?
 9         THE WITNESS:  Jane?
10         MS. JACOBS:  If you can
11    answer, go ahead.
12         THE WITNESS:  I just want
13    to make sure it is okay.
14    A.    I don't know.
15    Q.    In the course of Canal's
16  investigation, what, if anything,
17  did Canal do to ascertain which
18  petty cash charges were authorized?
19         MR. DROGIN:  Objection.
20         THE WITNESS:  I'm sorry.
21         MR. DROGIN:  Other than
22    through counsel, is that your
23    question?  Other than
24    counsel?
25         MS. SLOAN:  Let me
```



Page 401

```
 1                    M. TASCH
 2      rephrase the question with
 3      other than counsel.
 4      Q.    In the course of Canal's
 5   investigation, what, if anything,
 6   did Canal or anyone acting on behalf
 7   of Canal, other than counsel, do to
 8   ascertain which petty cash charges
 9   were authorized?
10      A.    I don't know.
11      Q.    In the course of Canal's
12   investigation, what, if anything,
13   did Canal or anyone acting on behalf
14   of Canal, other than counsel, do to
15   ascertain the purpose of Ms.
16   Robinson's trip to Los Angeles in
17   March of 2018?
18      A.    I don't know.
19      Q.    In the course of Canal's
20   investigation, what, if anything,
21   did Canal or anyone acting on behalf
22   of Canal, other than counsel, do to
23   -- to ascertain whether Ms. Robinson
24   was accessing Netflix when she was
25   working?
```



Page 402

1              M. TASCH

2    A.    I don't know the answer to

3    that.

4          MS. SLOAN:  I would like

5       to take a five-minute break.

6          THE VIDEOGRAPHER:  The

7       time is 5:49 p.m.  We are off

8       the record.

9          (Whereupon, a recess was

10      taken at this time.)

11         THE VIDEOGRAPHER:  The

12      time is 6:03 p.m.  We are

13      back on the record.

14   Q.    Mr. Tasch, identify for me

15   all documents that Berdon reviewed

16   as part of Canal's investigation

17   into Ms. Robinson?

18         MR. DROGIN:  Objection.

19         THE WITNESS:  Jane?

20         MS. JACOBS:  Read it

21      again?  I'm sorry.

22         (Whereupon, the requested

23      portion was read back by the

24      reporter:

25         Q:  Mr. Tasch, identify



Page 403

                    M. TASCH

1

2      for me all documents that

3      Berdon reviewed as part of

4      Canal's investigation into

5      Ms. Robinson?)

6           MS. JACOBS:  You can

7       answer it if you can.

8      A.    Okay.  We didn't review any

9    documents.

10     Q.    Identify for me all

11   documents provided by Berdon as part

12   of the investigation into Ms.

13   Robinson?

14          MR. DROGIN:  Objection to

15      the form.

16     A.    As I stated before, we

17   turned over some e-mails regarding

18   petty cash and American Express

19   statements.

20     Q.    Was Canal's general ledger

21   reviewed as part of Canal's

22   investigation?

23          MR. DROGIN:  Objection.

24      That is work product.

25      Reviewed by who?



Page 404

```
 1                 M. TASCH
 2          MS. JACOBS:  Right.
 3    Q.    Was -- were Canal's tax
 4  returns reviewed as part of Canal's
 5  investigation?
 6          MR. DROGIN:  Same
 7     objection.
 8          THE WITNESS:  Jane?
 9          MS. JACOBS:  You can
10     answer.
11    A.    I don't recall.
12    Q.    Were Canal's petty cash
13  receipts reviewed as part of Canal's
14  investigation?
15          MR. DROGIN:  Same
16     objection.
17          MS. JACOBS:  You can
18     answer.
19    A.    I don't know.
20    Q.    Did Berdon employees do
21  anything to investigate the Paola's
22  restaurant charges that appeared on
23  the Canal American Express in Ms.
24  Robinson's name?
25    A.    No.
```



Page 405

1                M. TASCH

2    Q.    Did Berdon employees do

3  anything to evaluate whether the

4  Paola's charge on Canal's American

5  Express were authorized expenses?

6    A.    No.

7    Q.    Did Berdon employees do

8  anything to investigate Whole Foods

9  or Dean & DeLuca charges that

10  appeared on the Canal American

11  Express in Ms. Robinson's name?

12    A.    No.

13    Q.    Did Berdon employees do

14  anything to evaluate whether Whole

15  Foods Dean & DeLuca charges on

16  Canal's American Express were

17  authorized expenses?

18    A.    No.

19    Q.    Did Berdon employees do

20  anything to investigate the Uber,

21  taxi, and Lyft charges that appeared

22  on the Canal American Express in Ms.

23  Robinson's name?

24    A.    No.

25            MR. DROGIN:   Same



```
 1                M. TASCH
 2     objections.
 3     Q.    Did Berdon employees do
 4  anything to evaluate whether Uber,
 5  taxi, and Lyft charges, charged by
 6  Ms. Robinson, were authorized
 7  expenses?
 8          MR. DROGIN:  Objection to
 9     the form.
10     A.    No.
11     Q.    Did Berdon employees do
12  anything to investigate the Flowers
13  by Philip charges that appeared on
14  the Canal American Express in Ms.
15  Robinson's name?
16     A.    No.
17     Q.    Did Berdon employees do
18  anything to evaluate whether the
19  Flowers by Philip charges on Canal's
20  American Express were authorized
21  expenses?
22     A.    No.
23     Q.    Did Berdon employees do
24  anything to investigate the petty
25  cash charges under Ms. Robinson's
```



                    M. TASCH

1

2   name?

3       A.      Repeat the question,

4   please?

5       Q.      Did Berdon employees do

6   anything to investigate Ms.

7   Robinson's petty cash expenses?

8       A.      Can you explain to me what

9   you mean by do anything?

10      Q.      Did Berdon employees

11  investigate -- did Berdon employees

12  take any action related to the

13  investigation into Ms. Robinson with

14  respect to Ms. Robinson's petty cash

15  charges?

16      A.      Can you explain what

17  action?

18      Q.      What did Berdon employees

19  do with respect to Ms. Robinson's

20  petty cash charges when Canal was

21  investigating Ms. Robinson?

22      A.      Well, Berdon didn't do

23  anything.

24      Q.      Did Berdon employees do

25  anything to evaluate whether Ms.



Page 408

```
 1                    M. TASCH
 2     Robinson's petty cash charges were
 3     authorized expenses?
 4       A.     No.
 5       Q.     Did Berdon employees do
 6     anything to investigate the March
 7     2018 trip taken by Ms. Robinson to
 8     Los Angeles?
 9       A.     No.
10       Q.     Did Berdon employees do
11     anything to evaluate whether charges
12     associated with the March 2018 trip
13     to Los Angeles were proper expenses?
14             MR. DROGIN:  Objection to
15        the form.
16       Q.     Did Berdon employees do
17     anything to evaluate whether
18     SkyMiles transfers by Ms. Robinson
19     were authorized?
20       A.     Are you talking about the
21     last bunch of miles that she took
22     before she left?
23       Q.     Any of the transfers?
24       A.     Repeat the question,
25     please?
```



Page 409

```
 1                  M. TASCH
 2          (Whereupon, the requested
 3      portion was read back by the
 4      reporter:
 5          Q:  Did Berdon employees
 6      do anything to evaluate
 7      whether SkyMiles transfers by
 8      Ms. Robinson were
 9      authorized?)
10   A.    At the time?  I need a --
11   you got to rephrase or give me a
12   timeline or something.
13   Q.    In the context of Canal's
14   investigation --
15   A.    I'm not sure what that
16   means.
17   Q.    -- into Ms. Robinson?
18   A.    I'm not sure with that
19   means.
20   Q.    At any point during Canal's
21   investigation into Ms. Robinson, did
22   Berdon employees do anything to
23   evaluate whether SkyMiles usage by
24   Ms. Robinson was authorized?
25   A.    Again, when you say any
```



Page 410

```
 1                  M. TASCH
 2   time, any time until when?
 3   Q.    Until today?
 4         THE WITNESS:  Jane?
 5         MS. JACOBS:  Say it
 6     again.  Read it again,
 7     please.
 8         (Whereupon, the requested
 9     portion was read back by the
10     reporter:
11         Q:  At any point during
12     Canal's investigation into
13     Ms. Robinson, did Berdon
14     employees do anything to
15     evaluate whether SkyMiles
16     usage by Ms. Robinson was
17     authorized?)
18         MS. JACOBS:  You can
19     answer it.
20   A.    So it is through today,
21   correct?
22   Q.    Yes.
23   A.    So after we found out the
24   miles were taken, we asked Mr. De
25   Niro if he authorized that she could
```



Page 411

```
 1                M. TASCH

 2    take those miles, and he said,

 3    "Absolutely not."

 4      Q.    Does Canal have practices

 5    or policies concerning

 6    investigations into employee

 7    expenses?

 8          MR. DROGIN:  Objection.

 9      Can you clarify the time

10      period?  You said have.

11      Q.    Has Canal -- well -- okay.

12    I will ask about it right now.

13          Let me rephrase.

14          So this is about October 3,

15    2013, through April 6, 2019.

16      A.    I didn't understand the

17    last part of what you said.

18          MS. SLOAN:  Thank you,

19      Laurent, for pointing out the

20      time.  I will rephrase the

21      question with the time in it.

22      Q.    Between October 3, 2013, to

23    April 6, 2019, did Canal have

24    practices or policies concerning

25    investigations into employee
```



Page 412

```
 1                M. TASCH
 2   expenses?
 3    A.    Not that I know of.
 4    Q.    Besides Ms. Robinson, were
 5   any other Canal employees
 6   investigated after their employment
 7   with Canal ended?
 8         MR. DROGIN:  Objection to
 9      the form.
10         THE WITNESS:  Jane?
11         MS. JACOBS:  You can
12      answer.
13         THE WITNESS:  I am just
14      making sure.
15    A.    Not that I am aware of.
16    Q.    Do you believe that Ms.
17   Robinson inflicted $6 million of
18   damages on Canal?
19         MS. JACOBS:  Are you
20      asking for his opinion?
21         MS. SLOAN:  We can move
22      it back to a fact witness.
23         MS. JACOBS:  Even so, are
24      you asking his opinion?
25         MS. SLOAN:  Yes.  Based
```



Page 413

```
 1              M. TASCH
 2      on everything Mr. Tasch
 3      knows.
 4    Q.    Do you believe Ms. Robinson
 5   inflicted $6 million of damages on
 6   Canal?
 7         MR. BENNETT:  For the
 8      record, I want to understand,
 9      are we stopping the 30(b)(6)
10      or are you going to go back
11      to again?
12         MS. SLOAN:  No.  I don't
13      anticipate going back to the
14      30(b)(6).
15         MR. BENNETT:  Thank you.
16    Q.    Mr. Tasch, can you answer?
17         THE WITNESS:  Jane?
18         MS. JACOBS:  If you can
19      answer.
20    A.    I can't possibly answer
21   that question.
22    Q.    Okay.
23         MS. SLOAN:  We are going
24      to take a break, and I
25      anticipate being done shortly
```



Page 414

```
 1                M. TASCH
 2     after the break or -- yeah.
 3          MS. JACOBS:  Where are we
 4     with respect to the seven
 5     hours?
 6          THE VIDEOGRAPHER:  The
 7     time is 6:14 p.m.  We are off
 8     the record.
 9          (Whereupon, a recess was
10     taken at this time.)
11          THE VIDEOGRAPHER:  The
12     time is 6:21 p.m.  We are
13     back on the record.
14          MS. SLOAN:  That
15     concludes my questioning
16     today.  We will leave the
17     deposition open as Mr. Tasch
18     was wholly unable to provide
19     testimony on a host of topics
20     within the scope of the Rule
21     30(b)(6) topics.  And a
22     number of documents bearing
23     on his testimony still
24     haven't been produced to
25     plaintiff.
```



Page 415

```
 1              M. TASCH

 2         With that, I will turn it

 3     over to Mr. Drogin for

 4     redirect.

 5         MR. DROGIN:  Alright.

 6     Well, obviously we disagree

 7     with pretty much everything

 8     you said.

 9     EXAMINATION

10     BY MR. DROGIN:

11     Q.    Michael, you talked about

12     Chase being the co-manager of

13     American Express.  What does that

14     mean?

15     A.    That means for any credit

16     card account, it doesn't have to be

17     AMEX in particular, but if you --

18     has to be in charge.  You can always

19     add people on, if the main person

20     approves.  So in this case, Bob was

21     the main person.  So I was the

22     manager and he wanted Chase to be

23     the co-manager, so we got her on as

24     the co-manager.  What that really

25     means is that either one of us,
```



Page 416

```
 1                M. TASCH
 2    solely, can go in and do anything
 3    you want on the card.
 4           For example, moving miles
 5    to personal accounts, or anywhere
 6    else, and doing basically anything
 7    that you want.
 8    Q.    Alright.
 9           Did you have a conversation
10    with Mr. De Niro about his
11    instruction to make Chase co-manager
12    of the American Express?
13    A.    Numerous amounts of times.
14    Q.    Can you recount for us the
15    sum and substance of those
16    conversations?
17    A.    The substance was you
18    should never put an employee as a
19    co-manager or manager on any credit
20    cards, bank accounts, or anything
21    financial.  It is not proper.  It is
22    unhealthy.  And it possibly could
23    lead to stealing.
24    Q.    Okay.
25           And after having those
```



Page 417

```
 1                 M. TASCH

 2  conversations with him, did he,

 3  nevertheless, instruct you to make

 4  Chase the co-manager?

 5     A.    He did.

 6     Q.    At the time that Chase

 7  resigned, on April 6, 2019, did you

 8  believe that she was an honest

 9  individual?

10     A.    I am really not sure about

11  that.  I'm not sure how to answer

12  the question.  I am not sure if she

13  was dishonest, but I just don't

14  know.

15     Q.    Okay.

16           Did there come a point in

17  time that you did come to believe

18  that she was dishonest?

19     A.    Well, certainly after I

20  found out she stole the miles.

21     Q.    How did you find out that

22  she stole the miles?

23     A.    Once Tom initiated his

24  investigation, he asked me to check

25  with American Express.  We did so,
```



Page 418

```
 1                 M. TASCH
 2   we got a long e-mail from them about
 3   the miles that were transferred by
 4   Chase.
 5     Q.    Okay.
 6           During one of the telephone
 7   calls -- actually, withdrawn.  I
 8   will ask it a different way.
 9           Who ran Canal's office?
10     A.    Chase did.
11     Q.    Who set office policies at
12   Canal?
13           MS. SLOAN:  Objection to
14     the form.
15     A.    Chase did.
16     Q.    How did you know that?
17     A.    How do I know she objected
18   or how do I know that Chase ran the
19   policies?
20     Q.    Well, we all know she
21   objected.
22           How do you know she -- how
23   do you know she ran the office?
24     A.    Because everybody in Canal
25   reported to Chase, except Dan
```



Page 419

```
 1                M. TASCH
 2  Harvey, who reported to Bob.
 3    Q.    How do you know Chase set
 4  office policies?
 5    A.    Well, because everything
 6  had to go through her, she wanted
 7  everybody to report to her.  And
 8  there was an e-mail out there, and I
 9  just didn't remember, but as we
10  alluded to today, in December of
11  '15, that we saw that she did set
12  the policies.
13    Q.    And did you ever
14  communicate with anyone other than
15  Chase about raises to be given to
16  employees?
17        MS. SLOAN:  Objection to
18     the form.  I was actually
19     muted, but I was objecting to
20     form for the past few
21     questions.
22        MR. DROGIN:  Okay.
23     Overruled.  You can answer.
24    A.    I'm sorry.  Laurent, the
25  question again, please?
```



Page 420

```
 1                M. TASCH
 2    Q.    Yeah.
 3          Other than Chase, did you
 4  speak with any other Canal employee
 5  before implementing raises?
 6    A.    No.
 7    Q.    Other than Chase, did you
 8  speak with any other Canal employee
 9  about implementing bonuses?
10          MS. SLOAN:  Objection to
11     the form.
12    A.    No.
13    Q.    The -- the vacation time
14  policy that you testified about, was
15  part of your job to determine
16  whether or not an employee actually
17  worked at a point in time when they
18  said they were on vacation?
19          MS. SLOAN:  Objection to
20     the form.
21    A.    No, that was not.
22    Q.    You can answer it.  You can
23  answer it.
24    A.    Okay.  I'm sorry.
25          Laurent, the question
```



Page 421

```
 1              M. TASCH
 2  again?
 3         MR. DROGIN:  Can we read
 4     it back?
 5         (Whereupon, the requested
 6     portion was read back by the
 7     reporter:
 8         Q:  The -- the vacation
 9     time policy that you
10     testified about, was part of
11     your job to determine whether
12     or not an employee actually
13     worked at a point in time
14     when they said they were on
15     vacation?)
16  A.     No.
17  Q.     On vacation time, would you
18  -- was part of your job to determine
19  whether or not an employee actually
20  had or had not taken vacation time?
21  A.     It was not.
22         MS. SLOAN:  Objection to
23     the form.
24  Q.     Who -- did you rely on
25  Chase for that information?
```



MAGNA
LEGAL SERVICES

```
 1                  M. TASCH
 2    A.    I did.
 3    Q.    Did you attempt to verify
 4  whether or not the information was
 5  accurate?
 6    A.    I did not.
 7          MS. SLOAN:  Objection to
 8      the form.
 9    Q.    When you mentioned that
10  overtime was -- withdrawn.  I will
11  ask it a different way.
12          Other than from Chase, did
13  anyone else give you instruction as
14  to when overtime was to be paid?
15          MS. SLOAN:  Objection to
16      the form.
17    A.    No.
18          MS. SLOAN:  If you could
19      wait to give me time to
20      object so we don't speak over
21      each other.
22          MR. DROGIN:  What's --
23      what's -- what do you find
24      improper about the form of
25      the question?
```



Page 423

```
 1                  M. TASCH
 2          MS. SLOAN:  It was vague
 3      as to -- if you could read it
 4      back.  There was no
 5      parameters.
 6          (Whereupon, the requested
 7      portion was read back by the
 8      reporter:
 9          Q:  Other than from
10      Chase, did anyone else give
11      you instruction as to when
12      overtime was to be paid?)
13      Q.    You can answer it.
14      A.    No.
15      Q.    Did -- during Ms.
16  Robinson's employment, did Canal
17  have any policies about employees
18  setting small fires in wastepaper
19  baskets?
20          MS. SLOAN:  Objection to
21      the form.
22      A.    Not that I know of.
23      Q.    If there was such a policy,
24  do you have an understanding as to
25  who would have been responsible for
```



Page 424

```
 1                 M. TASCH
 2    setting and administering that
 3    policy?
 4      A.    It would have been Chase.
 5      Q.    Do you know whether Canal
 6    had a policy that employees should
 7    wash their hands after using the
 8    restroom?
 9          MS. SLOAN:  Objection to
10       the form.
11      A.    I did not.
12      Q.    Based on your dealings with
13    Canal, if such a policy had, in
14    fact, been put into place, who would
15    have done so, and who would have
16    been responsible for administering
17    it?
18      A.    Chase.
19      Q.    Do you know if Chase had a
20    -- I keep saying Chase, which is
21    ironic (inaudible).
22          Do you know whether Canal
23    had a policy as to whether or not it
24    was okay to go swimming while
25    thinking about work?
```



Page 425

```
 1                 M. TASCH
 2          MS. SLOAN:  Objection to
 3      the form.
 4      A.    I do not.
 5      Q.    Do you know whether Canal
 6   had a policy as to whether or not it
 7   was permitted to go out during the
 8   middle of the workday and go for a
 9   run?
10          MS. SLOAN:  Objection to
11      the form.
12      A.    I did not.
13      Q.    Do you know whether Canal
14   had a policy as to whether or not it
15   was okay to watch Netflix during the
16   workday, having it on in the
17   background?
18          MS. SLOAN:  Objection to
19      the form.
20      A.    It did not.
21      Q.    Do you know whether or not
22   trust is something that is of value
23   to Mr. De Niro when it comes to his
24   employees?
25      A.    Absolutely.
```



Page 426

```
 1                   M. TASCH
 2           MS. SLOAN:  Objection to
 3      the form.
 4           THE WITNESS:  Sorry.
 5           MR. DROGIN:  Would you
 6      like a standing objection to
 7      every one of my questions?
 8      That way it will move faster.
 9           MS. SLOAN:  Yes.
10           MR. DROGIN:  Okay.
11      Great.  So every question
12      that I ask, you have an
13      objection to the form.
14           MS. SLOAN:  To the form.
15      Q.   How did you come to know
16   about Mr. De Niro's views towards
17   trust of employees?
18      A.   Well, Mr. De Niro views in
19   his life, as far as I am concerned,
20   with everybody he is associated
21   with, is trust and loyalty.  That is
22   what he really looks for.
23           Listen, by the way, we all
24   make mistakes when we do this.  It
25   could be friends, it could be family
```



Page 427

```
 1                M. TASCH

 2   it could be whatever.  But he is big

 3   on trust and loyalty.  There is no

 4   question about it.

 5     Q.    At one point Chase was

 6   involved in trying to introduce new

 7   benefits, employee benefits to

 8   Canal, is that correct?

 9     A.    Absolutely.

10     Q.    Can you just give us a

11   narrative about what you remember

12   about that?

13     A.    Well, she tried to get

14   Vantage Point involved.  She didn't

15   like Susan Goodman's company.  She

16   thought she could save Bob money.

17   And as far as I am concerned, and in

18   my opinion, she was looking to take

19   complete control of Bob, his

20   company, and all of his finances.

21     Q.    Okay.

22           Now, to your knowledge, was

23   Chase also responsible for

24   administering benefits at Canal?

25     A.    No.  Chase was not
```



Page 428

```
 1                  M. TASCH
 2   responsible for benefits.  That
 3   usually was with Tribeca.
 4      Q.    To your knowledge, was the
 5   introduction of the Vantage Point
 6   something that anyone asked Chase to
 7   do?
 8      A.    Not that I recall.
 9      Q.    And how did that ultimately
10   turn out, that introduction?
11      A.    Well, she got a proposal
12   from them, she talked to Bob about
13   it.  Since he was only hearing one
14   side of the story from her, he
15   didn't know much about it.  We had a
16   meeting at our office at Berdon, 360
17   Madison Avenue.  There was several
18   people there.  Tom was there, Chase,
19   myself, Mark, Susan Goodman.  I'm
20   not sure about anybody else.  But we
21   went back and forth about the pros
22   and cons, and at the end of the day
23   we stayed with the company we had.
24      Q.    Alright.
25            And after that meeting, was
```



Page 429

```
 1                M. TASCH
 2   there a change in attitude between
 3   -- as to how Chase interacted with
 4   you?
 5     A.    It appeared to me so,
 6   absolutely.
 7     Q.    Tell us what you recall and
 8   observed as to how it changed?
 9     A.    Well, she looked to gain
10   more control with Bob.  She was
11   always whispering in his ear about
12   everything, throwing Berdon, in
13   particularly, under the bus.  And
14   just trying to be in control.  There
15   were times -- I will give you one
16   example for sure.  I would get calls
17   from Bob, "Hey Michael, it is Bob.
18   Can you give me a call?"  And as
19   soon as I called him back, he would
20   give the phone to Chase so she could
21   complain to me about what I wasn't
22   doing.
23     Q.    Did there come a time in
24   2019 where Tiffany Chen began to ask
25   you questions about spending at
```



Page 430

```
 1                  M. TASCH
 2   Canal by Chase Robinson?
 3     A.     Yes.
 4     Q.     Was that before Chase
 5   resigned?
 6     A.     I will be honest with you,
 7   Laurent, I just don't remember the
 8   date.  It was more about AMEX.  Not
 9   really petty cash, per se.  It was
10   about AMEX and particularly
11   returns -- items to be returned.
12   That is where -- where Tiffany's
13   focus was.
14     Q.     Was she asking about
15   whether or not certain Amazon
16   purchases that Chase had made had
17   actually arrived and actually did
18   return?
19     A.     Yes.
20     Q.     Was it your understanding
21   that she was trying to figure out
22   whether Chase had been stealing
23   things?
24     A.     Absolutely correct.
25     Q.     To your knowledge, was she
```



Page 431

```
 1                  M. TASCH
 2   making inquiries to determine
 3   whether or not Chase had, in fact,
 4   given away some of the items rather
 5   than returned them?
 6     A.     Yes.
 7     Q.     This is a conversation you
 8   had with Tiffany about this?
 9     A.     I don't know, Laurent, if
10   it was a conversation, e-mails.  I
11   just don't remember particularly.
12     Q.     Alright.
13            And was she also looking
14   into spending by Michael Kaplan?
15     A.     I don't remember.  His name
16   did come up.  You know, clearly I
17   will relate, and I don't know.  I
18   think it was after Chase resigned,
19   we had a big meeting in the office,
20   me, Bob, Tom Harvey, Robin Chambers,
21   and Michael Kaplan, where Tiffany
22   expressed her dissatisfaction with
23   what Robin was doing and Michael was
24   doing.  In general, there were -- so
25   forth and so on.
```



Page 432

```
 1                  M. TASCH

 2     Q.    Prior to Chase's

 3   resignation, had anybody told you

 4   that she was about to be fired?

 5     A.    I do not recall that.

 6     Q.    Now you identified Dan

 7   Harvey.  Who is Dan Harvey?

 8     A.    Dan Harvey is a Canal

 9   employee.  He is Bob's personal

10   trainer.

11     Q.    And I think you said

12   earlier he reported directly to Bob?

13     A.    He reports to Bob, correct.

14     Q.    To your knowledge, did any

15   other Canal employee, other than

16   Dan, report directly to Bob?

17     A.    No, everybody reported to

18   Chase.

19     Q.    And who did Chase report

20   to?

21     A.    In theory, she reported to

22   Bob.

23     Q.    The -- you testified about

24   this mold issue at ████

25            Was working with Chase to
```



Page 433

```
 1                    M. TASCH
 2    resolve the mold issue, was that
 3    part of your day job?
 4        A.    It really wasn't supposed
 5    to be part of my day job.  Chase got
 6    me involved.  And I will be frank
 7    about it, I did feel a little bit
 8    for her.  Tiffany was pressuring her
 9    to -- to get it done.  It was a hard
10    project, you know, it is not a
11    simple thing where you say hey don't
12    spend, or look at this, or credit
13    cards, or blah-blah.  You have to
14    call people in.  They -- they don't
15    have to be home, you know, Bob and
16    Tiffany.  So it was a little tough
17    project to do.  And for a month or
18    two it was pretty constant, and we
19    just weren't sure if there really
20    was mold.  Eventually, we did find
21    mold maybe once or twice at least.
22    There was also a water leak I think
23    at some point we found.  So at the
24    end of the day, I guess we didn't
25    move as fast she wanted us to.
```



Page 434

1                    M. TASCH

2     Q.    She was annoyed at Chase?

3     A.    She was annoyed at Chase.

4     Q.    She was annoyed at you?

5     A.    I couldn't tell if she was

6    annoyed with me over this particular

7    thing.  She did want it done

8    quickly.  But she did get very

9    annoyed at me on a particular

10   Riverside thing that I did not do.

11   And she told Bob, and Bob called me

12   up to yell at me, and they got Mark

13   involved, and it was a whole

14   mishmash.  And as I said, at some

15   point today, you know, as we have

16   clients or we report to employers,

17   if we are not doing our job, and in

18   this particular case I did not do my

19   job, they have a right to complain.

20    Q.    Going back to the mold

21   issue, I just want to be clear so

22   the record is clear.  How is it that

23   you got involved in working on this

24   mold problem in the first place?

25    A.    Listen, I am not super



Page 435

```
 1                M. TASCH
 2   positive about it.  I think just
 3   Chase felt pressured by Tiffany so
 4   she -- since we were working
 5   together on Canal stuff, per se, and
 6   some 117 stuff along the way, she
 7   enlisted my help.
 8     Q.    So did Bob ask you to get
 9   involved with the mold issue?
10     A.    Did not.
11     Q.    Did Tiffany ask you to get
12   involved with the mold issue?
13     A.    As far as I remember, not
14   at the beginning.
15     Q.    Okay.
16           So Chase got you involved
17   in the mold issue?
18     A.    Yes.  And I think just to
19   be on the record, per se, I believe
20   at some point even before this
21   happened when -- when she was
22   complaining about mold, I think she
23   got me and Tom Harvey also involved.
24     Q.    Okay.
25           As a Berdon employee, do
```



MAGNA
LEGAL SERVICES

Page 436

```
 1                 M. TASCH
 2    you receive annual training on how
 3    to identify different forms of
 4    unlawful harassment and
 5    discrimination?
 6        A.   Well, we have a sexual
 7    harassment seminar I think -- I'm
 8    not sure, Laurent, if it is every
 9    year or every two years, but on this
10    particular topic, yes.
11        Q.   Was that the same in 2019?
12        A.   I believe it was.
13        Q.   Now I want to put the word
14    "harassment" in quotes for a minute.
15    It hasn't been defined for you.  So
16    with the word in quotes, was the
17    "harassment" that you were
18    describing earlier, when Ms. Sloan
19    was questioning, was that type --
20    was the type mentioned by Chase, in
21    describing Tiffany's treatment of
22    her, something that you understood
23    to be unlawful?
24        A.   No.
25        Q.   Was this something in the
```



Page 437

```
 1                    M. TASCH
 2     generic sense and use of the word
 3     "harassment?"
 4       A.    In my opinion, yes.
 5       Q.    Would it be fair to say
 6     that you understood her use of the
 7     word "harassment" to mean, in
 8     substance, she is being a pain in my
 9     ass?
10       A.    Exactly.  Correct.
11       Q.    She is riding me?
12       A.    Yes.
13       Q.    She is pushing me?
14       A.    Yes.
15       Q.    She is breaking my chops?
16       A.    Yes.
17       Q.    Did Chase ever tell you
18     that Tiffany -- she believed Tiffany
19     was treating her that way, because
20     she, that is Chase, was female?
21       A.    I don't remember, per se.
22     So since I don't remember I am -- I
23     am not going to answer.
24       Q.    Okay.
25             You said earlier that Chase
```



Page 438

```
 1                  M. TASCH
 2   wanted to -- I think I wrote -- you
 3   said -- you said that she wanted
 4   complete control.
 5           Do you remember that?
 6    A.    I do.
 7    Q.    What does that mean?
 8    A.    That means she wanted to be
 9   involved in every aspect of Bob's
10   life.  She tried to get into all his
11   business, his personal business, his
12   corporate business, and any other
13   business she can stick her nose
14   into.
15    Q.    Is that an attitude that
16   was already in place when Tiffany
17   arrived on the scene?
18    A.    Yes.
19    Q.    And did that change at all
20   when Tiffany arrived on the scene?
21    A.    No.  Not at the beginning.
22   Towards the end because of the mold
23   and the pressure Chase felt, it
24   absolutely did change at that point.
25    Q.    How did it change?
```



Page 439

```
 1                M. TASCH
 2     A.   My belief is she wanted to
 3  get as far as away from this as
 4  possible.
 5     Q.   When you say, "this," what
 6  do you mean?
 7     A.   Well, specifically the
 8  ████  she didn't want to be involved
 9  in that anymore.  She still wanted
10  to be involved in Canal, but -- but
11  so you had those two areas.  She
12  involved herself in ████, along with
13  her duties with Canal.  Most of her
14  time as far as I knew, from August,
15  September or October of 2018,
16  through '19, was spent at ████
17  decorating, going to stores with
18  Bob.  She needed an assistant Lu Lu,
19  which she hired because she said
20  that she couldn't do it all.  I told
21  Bob that was a bad idea, we are
22  adding to the payroll.  He said,
23  "Let it go."  So we did.  And they
24  went running around the City to buy
25  furniture, et cetera.
```



Page 440

```
 1                M. TASCH
 2    Q.    And the last thing I wanted
 3   to ask you about was ████
 4         Did you have an
 5   understanding as to whether or not
 6   Chase was directed, or ordered, or
 7   forced to become involved in ████
 8    A.    Not as far I know.
 9    Q.    What was your understanding
10   as to how she became involved in
11   ████
12    A.    I think she wanted to be
13   involved in ████    I think she
14   helped find the apartment.  I don't
15   know if she knew Miriam or someone
16   else knew Miriam, but she certainly
17   helped in getting the apartment.
18   And I think she wanted to, you know,
19   sort of help in the interior
20   decorating in the apartment.
21    Q.    Bob had come out of ████
22   in late summer of 2018, is that
23   right?
24    A.    Yes.
25    Q.    And he was in the process
```



Page 441

```
 1              M. TASCH

 2   of getting separated or divorced

 3   from Grace at that point in time?

 4      A.    Yes.  I believe at that

 5   point in time it had already reached

 6   its peak, and it was just a matter

 7   of time before the action was going

 8   to take place.

 9      Q.    To your recollection, was

10   he filming around that time?

11      A.    That, I don't remember

12   Laurent.  Because he has films each

13   time -- you know two or three a

14   year, maybe some years more.  I just

15   don't remember.

16      Q.    I just want to confirm,

17   your recollection is -- or is it

18   your recollection that Chase

19   essentially injected herself into

20   ████████

21      A.    That is my belief.

22      Q.    If you could just elaborate

23   why you have that belief?  I put the

24   words in your mouth.  I just want to

25   make sure.
```



MAGNA
LEGAL SERVICES

Page 442

1              M. TASCH

2    A.    Well, because I don't

3    understand why an employee of a

4    production company would get

5    involved in the interior decoration

6    of somebody's apartment.

7              MR. DROGIN:  What I would

8         like to do is, it is 6:43.  I

9         would like to take a

10        five-minute break, literally

11        just to confer with Mr.

12        Bennett, Ms. Lazzaro, and

13        Mr. Harvey to see whether

14        they would like me to ask any

15        more questions, or if they

16        have any questions of their

17        own, and then if not, I will

18        be done.  I don't have any

19        further questions at this

20        point.  Can we take five?

21             THE VIDEOGRAPHER:  The

22        time is 6:44 p.m.  We are off

23        the record.

24             (Whereupon, a recess was

25        taken at this time.)



Page 443

                    M. TASCH

1
2          THE VIDEOGRAPHER:  The

3      time is 6:48 p.m.  We are

4      back on the record.

5          MR. DROGIN:  We do not

6      have any further redirect at

7      this time.

8      EXAMINATION

9      BY MS. SLOAN:

10     Q.    Mr. Tasch, I just have a

11  few more questions for you.

12          Turning back to your

13  testimony about Ms. Robinson's

14  complaints about the harassment that

15  she was experiencing, didn't you

16  tell Ms. Robinson that she could

17  sue?

18     A.    I did.  Hello?

19     Q.    Yes.

20     A.    Okay.

21     Q.    You said, "I did," correct?

22     A.    Yes.  And I said in the

23  previous testimony, this morning, I

24  was doing that to placate her.

25     Q.    Would Ms. Robinson



Page 444

```
 1                M. TASCH
 2   communicate with you about ideas to
 3   save money for Canal?
 4      A.    Listen, over a ten-year
 5   period, I guess the answer would be
 6   yes.  But the way she was spending,
 7   there was no saving money anywhere.
 8      Q.    Would Ms. Robinson
 9   communicate with you about ideas to
10   save money for Mr. De Niro?
11      A.    That, I don't recall.
12      Q.    During Ms. Robinson's
13   employment, did you find her to be
14   protective of Mr. De Niro's
15   interests?
16      A.    I really can't answer that.
17          MR. DROGIN:  Objection to
18     the form.
19          THE WITNESS:  Sorry.
20          MR. DROGIN:  Go ahead.  I
21     just objected to the form.
22     You can answer.  Go ahead.
23      A.    I can't answer that
24   question.
25      Q.    Is if fair to say that Mr.
```



MAGNA
LEGAL SERVICES

```
 1                M. TASCH
 2   De Niro is an important client of
 3   yours?
 4     A.    I'm not sure what that
 5   means.
 6     Q.    Is it fair to say -- okay.
 7           Approximately how much does
 8   Berdon receive in annual fees for
 9   performing work for Canal, Mr. De
10   Niro's, or Mr. De Niro's other
11   entities?
12           MR. DROGIN:  Objection to
13      the form.
14           THE WITNESS:  Jane?
15           MS. JACOBS:  You can
16      answer if you can.
17     A.    I mean, I don't know for
18   sure, Ms. Sloan.  But it is upwards
19   of ████████████
20     Q.    Approximately how much does
21   Berdon receive in annual fees for
22   performing work for Canal?
23     A.    ███████████████.
24     Q.    ██████████
25     A.    Yes.
```



Page 446

```
 1              M. TASCH
 2    Q.    Mr. Tasch, that concludes
 3  my questioning for today, subject to
 4  leaving the deposition open for the
 5  reasons that I previously stated.
 6  Thank you for being here today, Mr.
 7  Tasch.
 8    A.    Thank you.
 9          THE VIDEOGRAPHER:  The
10      time is 6:51 p.m.  We are
11      going off the record.
12          (Continued on next page
13      to accommodate jurat.)
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 447

```
 1              M. TASCH

 2          MR. BENNETT:  Requesting

 3      a copy of the transcript.

 4          MS. SLOAN:  Requesting an

 5      expedite transcript.

 6          MS. JACOBS:  Requesting a

 7      copy of the transcript.

 8

 9          (Time Noted:  6:51 p.m.)

10

11              MICHAEL TASCH

12

13      Subscribed and sworn to

14      before me this   day of

15              2022.

16

17

18          Notary Public

19

20

21

22

23

24

25
```



Page 448

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4      carefully and make any necessary corrections.

 5      You should state the reason in the appropriate

 6      space on the errata sheet for any corrections

 7      that are made.

 8           After doing so, please sign the errata

 9      sheet and date it.  You are signing same

10      subject to the changes you have noted on the

11      errata sheet, which will be attached to your

12      deposition.

13           It is imperative that you return the

14      original errata sheet to the deposing attorney

15      within thirty (30) days of receipt of the

16      deposition transcript by you.

17           If you fail to do so, the deposition

18      transcript may be deemed to be accurate and may

19      be used in court.

20

21

22

23

24

25
```



Page 449

                    I N D E X

WITNESS              EXAMINATION BY   PAGE

Michael Tasch

                     Ms. Sloan          5

                     Mr. Drogin       415

                     Ms. Sloan        443




                     EXHIBITS


PLAINTIFF'S   DESCRIPTION          PAGE

134           Canal 3324 and      182
              Canal 3331 through
              3333

135           Canal 0051748       313
              through 56



Page 450

                    C E R T I F I C A T E

 1

 2

 3          I, PAIGE HAYDEN, hereby certify that the

 4  Examination Before Trial of MICHAEL TASCH was held

 5  before me on the 7th day of April, 2022; that said

 6  witness was duly sworn before the commencement of his

 7  testimony; that the testimony was taken stenographically

 8  by myself and then transcribed by myself; that the party

 9  was represented by counsel as appears herein;

10          That the within transcript is a true record of

11  the Examination Before Trial of said witness;

12          That I am not connected by blood or marriage

13  to any of the parties; that I am not interested directly

14  or indirectly in the outcome of this matter; that I am

15  not in the employ of any of the counsel.

16          IN WITNESS WHEREOF, I have hereunto set my

17  hand this 7th day of April, 2022.

18

19                    _Paige Hayden_

20                    PAIGE HAYDEN

21

22

23

24

25



```
 1                        ERRATA SHEET

 2

 3       PAGE   LINE (S)    CHANGE          REASON

 4       ____|_____|_____|_____

 5       ____|_____|_____|_____

 6       ____|_____|_____|_____

 7       ____|_____|_____|_____

 8       ____|_____|_____|_____

 9       ____|_____|_____|_____

10       ____|_____|_____|_____

11       ____|_____|_____|_____

12       ____|_____|_____|_____

13       ____|_____|_____|_____

14       ____|_____|_____|_____

15

16

17                              MICHAEL TASCH

18       SUBSCRIBED AND SWORN TO BEFORE ME

19       THIS _____ DAY OF _____, 20__.

20       _____    _____

21       (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

22

23

24

25
```

