# Exhibit 16

UNITED STATES SOUTHERN DISTRICT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
GRAHAM CHASE ROBINSON,

                    Plaintiff,

          -against-      Case No:
                       1:19-cv-09156 (LTS) (KHP)


ROBERT DE NIRO and CANAL PRODUCTIONS, INC.,

                  Defendants.
---------------------------------------------x
         DEPOSITION TAKEN VIA ZOOM

         March 29, 2022
         10:00 a.m.


      VIDEOTAPED DEPOSITION of THOMAS HARVEY, held

at the above-mentioned time, before, PAIGE HAYDEN, a

Court Reporter and Notary Public of the State of New

York.
      ---------------------------------------------X




                MAGNA LEGAL SERVICES
                 (866) 624-6221
                 www.MagnaLS.com



```
 1   A P P E A R A N C E S:

 2    MERINGOLO & ASSOCIATES, P.C.
               Attorneys for Thomas Harvey
 3             375 Greenwich Street
               New York, New York 10013
 4
      BY:    JOHN MERINGOLO, ESQ.
 5

 6

      SANFORD HEISLER SHARP, LLP
 7             Attorneys for Plaintiff
               1350 6th Avenue 31st floor
 8             New York, New York 10019

 9    BY:    ALEXANDRA HARWIN, ESQ.

10

11    TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
               Attorneys for Defendant
12             Seven Skyline Drive
               HAWTHORNE, NEW YORK 10532
13
      BY:    GREGORY BENNETT, ESQ.
14

15

      TARTER KRINSKY & DROGIN LLP
16             Attorneys for Defendant
               1350 Broadway
17             New York, New York 10018

18    BY:    LAURENT DROGIN, ESQ.

19

20    ALSO PRESENT:

21    CHRIS DINYA, VIDEOGRAPHER, MAGNA LEGAL SERVICES

22    KATE MACMULLIN, SANFORD HEISLER SHARP, LLP
      ANNIE SLOAN, SANFORD HEISLER SHARP, LLP
23    JEREMY HEISLER, SANFORD HEISLER SHARP, LLP
      SIMON SCHAITKIN, SANFORD HEISLER SHARP, LLP
24
      CHASE GRAHAM ROBINSON, PLAINTIFF
25    BRITTANY K. LAZZARO, TARTER KRINSKY & DROGIN LLP
```



1               FEDERAL STIPULATIONS

2

3   IT IS HEREBY STIPULATED AND AGREED by and between the

4   attorneys for the respective parties herein, that filing

5   and sealing be and the same are hereby waived.

6

7   IT IS FURTHER STIPULATED AND AGREED that all objections,

8   except as to form of the question, shall be reserved to

9   the time of the trial.

10

11  IT IS FURTHER STIPULATED AND AGREED that the within

12  deposition may be sworn to and signed before any officer

13  authorized to administer an oath, with the same force

14  and effect as if signed and sworn to before this Court.

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1
 2          THE VIDEOGRAPHER:  We are
 3    now on the record.  This
 4    begins video number one in
 5    the deposition of Tom Harvey,
 6    in the matter of Graham Chase
 7    Robinson v Robert De Niro and
 8    Canal Productions, Inc.
 9          Today is Tuesday, March
10    29, 2022, and the time is
11    10:03 a.m.
12          Counsel and all parties
13    present will be noted on the
14    stenographic record.
15          Will the court reporter
16    please swear in the witness?
17
18
19
20
21
22
23
24
25
```



Page 5

```
 1
 2        THOMAS HARVEY, the WITNESS
 3        herein, having been first
 4        duly sworn by a Notary Public
 5        of the State of New York, was
 6        examined and testified as
 7        follows:
 8        EXAMINATION BY
 9        MS. HARWIN:
10     Q.     State your name for the
11   record, please.
12     A.     Thomas Harvey.
13     Q.     State your address for the
14   record, please.
15     A.     9 Pheasant Road, West Pound
16   Ridge, New York 10576.
17     Q.     Good morning, Mr. Harvey.
18   Thank you for being here today.
19          I noted when you were
20   speaking with the court reporter the
21   sound was a little quiet.  If you
22   are able to turn up the volume or
23   speak a little bit louder, we would
24   appreciate it.
25     A.     Sure.
```



```
 1                T. HARVEY

 2    Q.    I know you have been with

 3   us for many depositions at this

 4   point and so the ground rules that I

 5   am going to go over with you I am

 6   sure are very familiar to you, but I

 7   will just briefly remind of you

 8   them.

 9          As you know, I am going to

10   ask you questions.  Both my

11   questions and your answers will be

12   recorded by the court reporter.  I

13   ask you to please speak up and speak

14   clearly so that the court reporter

15   can take down everything that we

16   say.

17          As you know, you must

18   answer questions verbally because

19   the court reporter can't record a

20   shrug or a nod.

21          It is important that you

22   wait until I finish my question

23   before you start answering.  Even if

24   you know what I am getting at,

25   please wait until the question is
```



Page 7

```
 1                    T. HARVEY
 2    complete so that we have a clear
 3    record.
 4             If you don't understand my
 5    question for any reason, or do not
 6    understand any -- any usage included
 7    in my question, please don't answer
 8    the question.  Ask for
 9    clarification.  If you answer the
10    question, it will be understood that
11    you understood the question.
12             As you know, you are
13    represented by counsel here.  Your
14    attorney will object from time to
15    time, but unless you are instructed
16    not to answer on the ground rules of
17    privilege, you must answer my
18    question.
19             Do you understand that?
20    A.    Yes.
21    Q.    Okay.
22         MR. DROGIN:  Counsel,
23     before you begin, can we all
24      note our appearances for the
25      record and can we just
```



Page 8

```
 1                T. HARVEY
 2     clarify which Federal
 3     Stipulations are in place?  I
 4     was actually talking and I
 5     was on mute so you didn't
 6     hear me before.
 7         MS. HARWIN:  Why don't I
 8     finish going over these
 9     ground rules and then we can
10     do that afterward.  I
11     understand that the
12     videographer said that it
13     would be noted on
14     stenographic record.  I
15     believe that Paige has
16     already noted all of the
17     appearances.  But let me just
18     complete this and then we can
19     identify any stipulations.
20     Q.   So Mr. Harvey, if you
21  provided an answer and remember any
22  additional information later on in
23  the course of your deposition, let
24  me know.  We will give you an
25  opportunity to -- to supplement your
```



Page 9

```
 1                    T. HARVEY
 2    prior answer.  If I use a term or
 3    abbreviation that you disagree with,
 4    please correct my usage, so we can
 5    make sure we have the same
 6    understanding of what the record
 7    means.
 8           When I refer to Canal I am
 9    referring to Canal Productions, Inc.
10           Is there any instruction
11    that I have provided so far that you
12    don't understand or don't agree
13    with?
14       A.    No.
15       Q.    This testimony is under
16    oath just as if you were in a court
17    of law.  This testimony that you
18    provide can be used as evidence in
19    this case.
20           Do you understand that?
21       A.    Yes.
22       Q.    Okay.
23           Other than the computer on
24    which you are doing the deposition
25    today, do you have any other
```



Page 10

```
 1                    T. HARVEY
 2    electronic screens or communication
 3    devices with you in the room that
 4    you are in?
 5      A.    Yes.
 6      Q.    Okay.
 7            You are not permitted to
 8    communicate with anyone while you
 9    are being examined at deposition.
10            Can you turn off any
11    communication devices other than of
12    course the computer that you are
13    using while we are in the
14    deposition?
15      A.    No.  I have a computer over
16    here that is closed.  I am leaving
17    my phone on.  I have a client, who
18    is soon to be pronounced dead, Pauly
19    Herman, who I actually am surprised
20    he is not dead yet, but there is an
21    issue with the living will, health
22    care proxy, et cetera.  I expect at
23    some point today I will receive a
24    call and will have to deal with
25    that.
```



```
 1                T. HARVEY
 2    Q.    Other than using your phone
 3  for receiving that other client
 4  call, can you confirm that you will
 5  not be using your phone at any time
 6  during your deposition?
 7    A.    Yes.
 8    Q.    Thank you.
 9          Is there anyone in the room
10  with you today?
11    A.    No.
12    Q.    Okay.
13          MS. HARWIN:  So in terms
14      of stipulations, as
15      previously discussed, we
16      stipulate that objections
17      except as to form are
18      preserved for trial.
19      Objections to form must be
20      made during the course of
21      deposition.  And objections
22      on grounds of privilege,
23      likewise, may be interposed
24      during the course of the
25      deposition.
```



Page 12

```
 1                   T. HARVEY
 2          Counsel, can you confirm
 3      agreement on the -- these
 4      points of stipulation?
 5          MR. DROGIN:  I agree with
 6      that.  Do you want -- if you
 7      are going to ask the witness
 8      to sign the transcript, are
 9      you prepared to stipulate
10      that he can do so in front of
11      any Notary?  I believe that
12      is one of the stipulations.
13          MS. HARWIN:  Yes.  We can
14      -- yes, if the witness elects
15      to sign the transcript, that
16      can be done in front of any
17      Notary.
18          MR. DROGIN:  And as I
19      said, I think it is
20      appropriate since there are a
21      number of attorneys here,
22      there are depositions here
23      subject to really two
24      different Notices.  I think
25      it is important certainly for
```


MAGNA
LEGAL SERVICES

Page 13

```
 1                    T. HARVEY
 2      objection purposes for us to
 3      note who -- who is
 4      representing who and in what
 5      capacity.
 6           MS. HARWIN:  That is
 7      fine.
 8           So Madam Court Reporter
 9      will go ahead and identify
10      representations for the
11      record.
12           My name is Alexandra
13      Harwin.  I am from Sanford
14      Heisler Sharp, and I am here
15      on behalf of the Plaintiff,
16      Graham Chase Robinson.
17           MR. HEISLER:  Jeremy
18      Heisler, Sanford Heisler
19      Sharp, LLP, on behalf of the
20      Plaintiff, Graham Chase
21      Robinson.
22           MS. MACMULLIN:  Kate
23      MacMullin from Sanford
24      Heisler, on behalf of
25      Plaintiff Graham Chase
```



Page 14

```
 1              T. HARVEY
 2      Robinson.
 3          MS. SLOAN:  Annie Sloan
 4      from Sanford Heisler Sharp
 5      for the Plaintiff, Graham
 6      Chase Robinson.
 7          MR. SCHAITKIN:  Simon
 8      Schaitkin from Sanford
 9      Heisler Sharp for the
10      Plaintiff, Graham Chase
11      Robinson.
12          MR. DROGIN:  Laurent
13      Drogin and Brittany Lazzaro
14      for Canal Productions, who is
15      being deposed here today
16      pursuant to Federal Rule
17      30(b)(6).
18          MR. BENNETT:  Gregory
19      Bennett on behalf of all
20      Defendants, Traub, Leiberman,
21      Straus & Shrewsberry.
22          MR. MERINGOLO:  Good
23      morning.  John Meringolo on
24      behalf of Tom Harvey as an
25      individual.
```



```
 1                    T. HARVEY
 2            MS. HARWIN:   Thank you.
 3     Q.     Okay.
 4            Mr. Harvey, what is your
 5     full name?
 6     A.     Thomas Harvey.
 7     Q.     Do you have a middle name?
 8     A.     I do.
 9     Q.     What is your middle name?
10     A.     Alton.
11     Q.     Can you speak up?
12     A.     Yes.
13     Q.     Thank you.
14            What is your middle name?
15     A.     Alton, A-L-T-O-N.
16     Q.     Okay.
17            Have you ever gone by any
18     other name other than Thomas Alton
19     Harvey?
20     A.     Thomas Alton Harvey, Jr.
21     Q.     Have you gone by any other
22     names than Thomas Alton Harvey and
23     Thomas Alton Harvey, Jr.?
24     A.     What do you mean by go by
25     other names?
```



Page 16

```
 1              T. HARVEY
 2    Q.    Have you ever referred to
 3  yourself by any other name other
 4  than those names?
 5    A.    Have I referred to myself
 6  by any other name, is that the
 7  question?
 8    Q.    Yes.
 9    A.    Tommy.
10    Q.    Other than a nickname for
11  the first name, have you ever gone
12  by any other last name?
13    A.    No.
14    Q.    Okay.
15          Have you had any other
16  middle name?
17    A.    No.
18    Q.    Okay.
19          What is your date of birth?
20  ███      ████████
21    Q.    How long have you resided
22  at your present address?
23    A.    About four years.
24    Q.    Are you married?
25    A.    Yes.
```



Page 17

```
 1                  T. HARVEY
 2    Q.    What is the name of your
 3  spouse?
 4    A.    Jan Harvey.
 5    Q.    And how long have you been
 6  married?
 7    A.    A long time.  I don't know.
 8  Since 1986.
 9    Q.    That is a good run.
10          Do you have any children?
11    A.    Two.
12    Q.    Okay.
13          And how old are your
14  children?
15    A.    30 and 21.
16    Q.    Do you suffer from any
17  condition that affects your memory?
18    A.    No.
19    Q.    Have you consumed any
20  substances that affect your memory?
21    A.    No.
22    Q.    Have you consumed any
23  substances that affect your ability
24  to communicate?
25    A.    No.
```



```
 1                    T. HARVEY
 2     Q.    Is there any reason,
 3   physically or mentally, that you are
 4   not able to testify truthfully and
 5   completely today?
 6     A.    No.
 7     Q.    How many times have you
 8   been deposed before?
 9     A.    I don't recall.
10     Q.    Do you recall whether you
11   have been deposed before?
12     A.    I believe I have been.
13     Q.    Approximately how many
14   times have you been deposed before?
15     A.    I don't recall.
16     Q.    Okay.
17           Have you been deposed more
18   than five times?
19     A.    I don't believe so.
20     Q.    Okay.
21           So somewhere between one
22   and five times you believe you have
23   been deposed?
24     A.    Somewhere between zero and
25   five.
```



Page 19

```
 1                  T. HARVEY

 2     Q.    Have you ever been a party

 3   in a lawsuit?

 4     A.    I am sure I have, yes.

 5     Q.    What is the nature of the

 6   lawsuit or lawsuits in which you

 7   have been a party?

 8     A.    I don't recall.

 9     Q.    Just to clarify, I am

10   asking about lawsuits in which you

11   personally were a party, not you

12   appearing as a lawyer.

13          Have you been a party in a

14   litigation?

15     A.    I am sure I have been, yes.

16     Q.    Okay.

17          To the best of your

18   recollection, what types of

19   litigation or type of litigation

20   have you been a party in?

21     A.    Civil litigation.

22     Q.    Okay.

23          Have you been a plaintiff

24   or a defendant in the civil

25   litigation?
```



```
 1                    T. HARVEY
 2     A.     Probably both.
 3     Q.     Where was the civil
 4  litigation brought?
 5     A.     New York, California.
 6     Q.     Okay.
 7            And what type of matter did
 8  the litigation concern?
 9     A.     I don't recall.
10     Q.     Was it a financial matter?
11     A.     Well, all litigations are
12  financial matters.  Aren't they?
13     Q.     Did -- did this involve
14  some financial transaction?
15     A.     When you say, "this," I
16  don't recall.  So I'm not sure what
17  "this" means.
18     Q.     Okay.
19            How long ago were you
20  involved in litigation?
21     A.     Probably 20 years ago or
22  more, maybe 30.
23     Q.     Do you recall being
24  involved in any litigation within
25  the last 20 years?
```



Page 21

                        T. HARVEY

1

2    A.    Not that I recall.

3    Q.    Okay.

4          Have you been deposed

5    within the last 20 years?

6    A.    Not that I recall.

7    Q.    Okay.

8          Have you been a party in

9    any litigation -- I'm sorry.

10         Have you been a witness in

11   litigation in the last 20 years?

12         MR. DROGIN:  Objection to

13    the form.  Go ahead and

14    answer.

15   A.    Not that I recall.  Well,

16   no, not that I recall.

17   Q.    Okay.

18         Have you ever provided any

19   testimony or witness statements in

20   any case involving Canal Productions

21   other than this one?

22   A.    It is possible.  I don't

23   recall.

24   Q.    I couldn't catch that last

25   part.



Page 22

                    T. HARVEY

1

2    A.    It is possible.  I don't

3    recall.

4    Q.    Okay.

5          Have you ever provided any

6    testimony or witness statement in

7    any case involving Robert De Niro?

8    A.    It is possible.  Again, I

9    don't recall.  And it may have been

10   in both of those.  If I submitted

11   affirmations on behalf of Canal

12   and/or Robert De Niro, I would

13   consider that is presumed in your

14   question.

15   Q.    Have you ever been arrested

16   or charged in connection with a

17   criminal offense?

18          MR. DROGIN:  Objection to

19     the form.

20   A.    Not yet.

21   Q.    Have you ever been

22   convicted of a criminal offense?

23   A.    No.

24   Q.    Have you ever been the

25   subject of a bar complaint?



Page 23

```
 1                  T. HARVEY
 2    A.    Not that I am aware of, no.
 3    Q.    Have you ever been
 4  subjected to professional discipline
 5  as a lawyer?
 6    A.    Not that I am aware of.
 7    Q.    Have you ever been accused
 8  in your professional life of making
 9  any false statement?
10         MR. DROGIN:  Objection to
11     the form.
12    A.    No.
13    Q.    What is -- describe for me
14  your educational history?
15    A.    I have a law degree and an
16  MBA.
17    Q.    When did you receive the
18  law degree and from what
19  institution?
20    A.    New York Law School 1997.
21    Q.    And where did you receive
22  your MBA and from what institution?
23    A.    Fordham University, I think
24  '87, '88.
25    Q.    Are you presently employed?
```



Page 24

```
 1                  T. HARVEY
 2    A.    Self employed.
 3    Q.    Okay.
 4          And are you self employed
 5    with an entity?
 6    A.    I'm sorry?
 7    Q.    Are you self employed from
 8    an entity?
 9    A.    Yes.
10    Q.    What is the name of the
11    entity in which you are self
12    employed?
13    A.    The Law Offices of Thomas
14    A. Harvey, PLLC.
15    Q.    Do you have an employment
16    relationship with the firm named
17    Harvey & Hackett?
18    A.    I did.
19    Q.    And when did your
20    relationship with the law firm of
21    Harvey & Hackett end?
22    A.    I don't think I understand
23    the question.  What does that mean,
24    the relationship?
25    Q.    When did you cease to be
```



Page 25

1                        T. HARVEY

2      employed at Harvey & Hackett?

3         A.    When did I cease to be

4      employed at Harvey & Hackett?

5      Harvey & Hackett was dissolved in or

6      about 2020.

7         Q.    Since that time you have

8      been self employed?

9         A.    Yes.

10        Q.    Okay.

11              How long have you known

12     Robert De Niro?

13        A.    I don't know.  Um, probably

14     since 1985 or thereabouts.

15        Q.    And how did you first come

16     to know Mr. De Niro?

17        A.    Socially.

18        Q.    How did you and Mr. De Niro

19     meet?

20        A.    Physically or -- I'm not

21     sure I understand the question.

22        Q.    How did you first come to

23     know Mr. De Niro?

24        A.    Through a social meeting.

25        Q.    Okay.



Page 26

```
 1                    T. HARVEY
 2            And did you and Mr. De Niro
 3    form a social relationship around
 4    that time?
 5      A.    What is a social
 6    relationship?  What is a social
 7    relationship?
 8      Q.    Were you social with Mr. De
 9    Niro beginning around 1985?
10      A.    What do you mean by social?
11      Q.    It is a word that you used.
12      A.    Yes.
13      Q.    When you described coming
14    to know Mr. De Niro, what did you
15    mean by that?
16      A.    Yes.  I was introduced to
17    him by a friend.
18      Q.    Okay.
19            And did you become friends
20    with Mr. De Niro?
21      A.    Did I become friends with
22    him in 1985?  Is that question?
23      Q.    Did there come a time when
24    you became friends with Mr. De Niro?
25      A.    I guess.  I don't know.
```



Page 27

```
 1                  T. HARVEY
 2   What is your definition of a friend?
 3      Q.    Do you consider Mr. De Niro
 4   to be a friend of yours?
 5      A.    A friend and a client, yes.
 6      Q.    When did you form a
 7   friendship with Mr. De Niro?
 8      A.    I don't know.  25, 30 years
 9   ago.
10      Q.    Somewhere in the 1990s?
11      A.    Yes.
12      Q.    Okay.
13            And did there come a time
14   when you became a lawyer for Mr. De
15   Niro?
16      A.    I have represented him,
17   yes.
18      Q.    Okay.
19            When did you become a
20   lawyer for Mr. De Niro?
21      A.    I am going to have to say
22   attorney-client privilege on that
23   one.
24      Q.    The -- the timing of the
25   formation of a -- of an
```



Page 28

```
 1                    T. HARVEY
 2     attorney/client relationship is not
 3     privileged.
 4        A.    Well, sometime in the mid
 5     '90s.
 6        Q.    And -- have you served as a
 7     lawyer for Mr. De Niro since the
 8     1990s?
 9        A.    Have I ever represented him
10     since 1990, yes.
11        Q.    Have you been his lawyer on
12     an ongoing basis since the 1990s?
13        A.    When you say been his
14     lawyer, I have not been his
15     exclusive lawyer since the 1990s,
16     no.
17        Q.    Have you continuously been
18     a lawyer for Mr. De Niro since the
19     1990s?
20             MR. DROGIN:  Objection.
21        A.    I don't know what that
22     means, continuously.  I don't
23     represent him every day.
24        Q.    Okay.
25             What is your relationship
```



Page 29

```
 1                T. HARVEY
 2    to Canal Productions?
 3      A.    I have represented Canal
 4    Productions as a lawyer.
 5      Q.    Do you represent -- have
 6    you represented Canal Productions on
 7    discrete matters or have you
 8    represented Canal on an ongoing
 9    basis?
10           MR. MERINGOLO:  Objection
11       to the form.
12      A.    I don't know what you mean
13    by ongoing.
14      Q.    Have you --
15           MR. MERINGOLO:  Just --
16       just -- I'm sorry.  Just
17       respectfully, and I --
18       discrete matters could be
19       deemed as privileged as well.
20       So if we could do more
21       specifically.
22           MS. HARWIN:  Sure.  I am
23       just trying to understand the
24       nature of the relationship to
25       Canal Productions.
```



Page 30

```
 1                  T. HARVEY
 2     Q.   Do you have any role at
 3  Canal Productions?
 4     A.   Do I have -- I don't have
 5  an office there.  And I can advise
 6  them on legal situations when they
 7  -- they call for it, or request it
 8  or I -- they need it.
 9     Q.   How often do you
10  communicate with Mr. De Niro?
11     A.   Depends on -- I have known
12  the guy 40 years.  You want to be a
13  little bit more specific?
14     Q.   As a general matter, over
15  the last decade, approximately how
16  often have you communicated with Mr.
17  De Niro?
18     A.   It depends on what is going
19  on.
20     Q.   In a typical week, how
21  often do you communicate with Mr. De
22  Niro during the past decade?
23     A.   There is no such thing as a
24  typical week for me or Mr. De Niro.
25     Q.   Can you give a range of
```



Page 31

```
 1                T. HARVEY
 2   approximately how often you would
 3   speak to him during the past decade?
 4      A.    No.
 5      Q.    Do you typically speak to
 6   Mr. De Niro at least once a week?
 7      A.    You keep saying typically.
 8   What timeframe?
 9      Q.    In the last decade, has it
10   been typical for you to speak to Mr.
11   De Niro at least once a week?
12      A.    I don't understand typical.
13   What do you mean by typical?
14      Q.    In an ordinary week?
15      A.    I said there has not been
16   an ordinary week.
17      Q.    Do you recall any weeks in
18   which you have spoken to Mr. De Niro
19   less than once a week?
20      A.    Yes.
21      Q.    Other than when Mr. De Niro
22   is on vacation, do you recall
23   speaking to Mr. De Niro less than
24   once a week?
25      A.    Yes.
```



Page 32

```
 1              T. HARVEY
 2    Q.    Okay.
 3          Are there months that you
 4    go without speaking to Mr. De Niro?
 5    A.    Months?  In the last ten
 6    years I assume --
 7    Q.    Yes.
 8    A.    Months, I don't think that
 9    has occurred, no.
10    Q.    Okay.
11          Have there been weeks when
12    you have spoken to Mr. De Niro
13    multiple times a day?
14    A.    Yes.
15    Q.    Do you receive payment from
16    Canal for the services that you
17    perform?
18    A.    Yes.
19    Q.    Okay.
20          And what is your fee
21    arrangement with Canal Productions?
22    A.    I do work, I get paid.
23    Q.    Do you get paid on an
24    hourly basis?
25    A.    Not necessarily.
```



Page 33

1                    T. HARVEY

2    Q.    So on what basis are you

3    paid by Canal?

4    A.    Negotiated and/or hourly.

5    Q.    So what -- what is -- what

6    has your financial arrangement been

7    with Canal during the past decade?

8          MR. DROGIN:  Objection to

9     the form.

10   A.    I work, I get paid.

11   Q.    And specifically what do

12   you get paid for your work?

13   A.    Depends on what I am doing.

14   Q.    So you have had different

15   arrangements with Canal at different

16   times?

17   A.    Yes.

18   Q.    Do -- have you ever had an

19   annual retainer with Canal?

20   A.    No.

21   Q.    Have you ever had a monthly

22   retainer with Canal?

23   A.    No.

24   Q.    Okay.

25         Have you ever been paid a



Page 34

```
 1                T. HARVEY
 2   salary by Canal?
 3   A.     No.
 4   Q.     Okay.
 5          Have you been paid a flat
 6   fee for certain work that you
 7   performed?
 8   A.     Yes.
 9   Q.     Okay.
10          And for what types of work
11   have you been paid an hourly -- a
12   flat fee?
13   A.     I am going to object on the
14   attorney-client privilege describing
15   the work that I did for a client.
16   Q.     Just describe in general
17   terms, without specifying the
18   specific privileged matter, but just
19   what the nature of the work for
20   which you had a flat-fee structure?
21   A.     Okay.  You are just --
22          MR. MERINGOLO:
23      Respectfully, it would just
24      be for legal services
25      rendered.
```



Page 35

1                    T. HARVEY

2     Q.    What is the distinction

3   between the types of work for which

4   you are paid a flat fee versus an

5   hourly rate?

6     A.    I am not going to go into

7   what work I did with my client.

8     Q.    How much did you receive on

9   an annual basis from Canal in 2021?

10          MR. DROGIN:  Objection to

11      the form.

12    A.    I have no idea.

13    Q.    Were you paid more than

14   $30,000 by Canal in 2021?

15    A.    More than what?

16    Q.    $30,000?

17    A.    Yes.

18    Q.    Were you paid more than

19   $100,000 by Canal in 2021?

20    A.    Maybe.

21    Q.    Were you paid more than

22   $100,000 by Canal in 2020?

23    A.    The short answer is I don't

24   know.

25    Q.    It is possible that you



Page 36

```
 1                  T. HARVEY

 2   were paid more than $100,000 by

 3   Canal in 2020?

 4     A.    I am not going to speculate

 5   as to what I made or -- I don't --

 6   truly don't recall.  But there are

 7   tax records we can get.

 8     Q.    Okay.

 9           And for 2019, approximately

10   how much were you paid by Canal?

11     A.    No idea.

12     Q.    Has there been any

13   significant change in what you have

14   been paid by Canal on an annual

15   basis over the last ten years?

16           MR. DROGIN:  Objection to

17      the form.

18     A.    I guess it depends on what

19   you consider significant, but I

20   wouldn't know.  I don't have any

21   idea what I have been paid in the

22   past ten years by Canal annually.

23     Q.    Do you serve as a lawyer

24   for Mr. De Niro personally?

25     A.    I do.
```



Page 37

```
 1               T. HARVEY
 2    Q.    Okay.
 3          Do you receive additional
 4    payments for Mr. De Niro personally
 5    apart from payments that you receive
 6    from Canal?
 7    A.    You used the word
 8    additional.  I'm not sure I know
 9    what you mean.
10    Q.    You have testified about
11    money that you receive from Canal.
12          Have you received any
13    additional payments from Mr. De Niro
14    personally beyond what is paid from
15    Canal?
16    A.    When you say additional
17    money you are tying it from Canal.
18    If I am working for Mr. De Niro as
19    opposed to Canal Productions, Inc.,
20    there is a distinction.
21    Q.    Yes.
22    A.    It could not be an in
23    addition to.
24          MR. DROGIN:  I think the
25      question -- I think the
```



Page 38

```
 1                  T. HARVEY
 2    question is has Mr. De Niro
 3    paid you for services
 4    provided directly to him.  So
 5    is that what you are asking?
 6           MS. HARWIN:  Yes.
 7    A.    Yes is the answer.
 8    Q.    Okay.
 9           And in 2019, approximately
10   how much were you paid by Mr. De
11   Niro for services that you rendered
12   to him?
13    A.    No idea.
14    Q.    Okay.
15           Was it more than $30,000?
16    A.    I have no idea.
17    Q.    Was it more than $100,000?
18    A.    I have no idea.
19    Q.    Can you provide any
20   estimate as to the amount that you
21   received from Mr. De Niro on an
22   annual basis?
23           MR. DROGIN:  Objection to
24    the form.
25    A.    No.  Ask Berdon.
```



Page 39

```
  1                  T. HARVEY
  2    Q.    I'm sorry.  I couldn't hear
  3  you.
  4    A.    Ask his accountants or I
  5  will have to look at tax forms.
  6    Q.    Do you serve as the lawyer
  7  for any other entities owned or
  8  operated by Mr. De Niro besides
  9  Canal Productions?
 10         MR. DROGIN:  Objection to
 11    the form.
 12    A.    I have served for --
 13         MR. DROGIN:  Can we hear
 14    the question back?
 15         (Whereupon, the requested
 16    portion was read back by the
 17    reporter:
 18         Q:  Do you serve as the
 19    lawyer for any other entities
 20    owned or operated by Mr. De
 21    Niro besides Canal
 22    Productions?)
 23         MR. DROGIN:  Objection to
 24    the form.
 25         MR. BENNETT:  Me as well.
```



Page 40

```
 1                T. HARVEY
 2     A.    I have represented other
 3  entities.
 4     Q.    What other entities owned
 5  or operated by Mr. De Niro have you
 6  served as a lawyer for?
 7          MR. DROGIN:  Objection to
 8     the form.
 9     A.    Riverside Trust, Tribeca
10  Film Center, Tribeca Film something
11  or other.  A number of them.
12     Q.    Have you serve as lawyer
13  for any of Mr. De Niro's family
14  members?
15     A.    Yes.
16     Q.    Okay.
17          Which family members of Mr.
18  De Niro have you served as a lawyer
19  for?
20          MR. DROGIN:  Objection.
21  ██    ███████████████████
    █  █████████████████████
    █  █████████████    █████████
24  it.
25     Q.    Do you spend a majority of
```



Page 41

```
1                    T. HARVEY
2    your working time servicing Mr. De
3    Niro, his businesses, and his
4    family?
5           MR. DROGIN:  Objection to
6      the form.
7    A.    Say that again?
8    Q.    Do you spend a majority of
9    your working time servicing Mr. De
10   Niro, his entities, and his family?
11          MR. DROGIN:  Objection to
12     the form of the question.
13   A.    So in the last 30 years
14   have I spent a majority of my time
15   representing Mr. De Niro, is that
16   it?
17   Q.    During the last ten years,
18   let's ask that question about the
19   last ten years.
20          MR. MERINGOLO:
21     Objection.
22   A.    In the last ten years have
23   I -- what is the question?
24          MS. HARWIN:  Can you
25     repeat the question?
```



Page 42

```
 1                   T. HARVEY
 2           (Whereupon, the requested
 3      portion was read back by the
 4      reporter:
 5           Q:  Do you spend a
 6      majority of your working time
 7      servicing Mr. De Niro, his
 8      entities, and his family?)
 9           MR. DROGIN:  Objection to
10      the form.
11      A.    It depends on what I am
12  doing.
13      Q.    Taking in the last ten
14  years, has a majority of your
15  working time been spent on work
16  pertaining to Mr. De Niro, his
17  entities, and his family?
18           MR. DROGIN:  Objection to
19      the form.
20      A.    I have no idea.  I doubt
21  it, but I don't know.
22      Q.    Okay.
23           Has a majority of your
24  income over the past ten years been
25  derived from work that you performed
```



Page 43

```
 1                 T. HARVEY
 2    for Mr. De Niro, his entities, or
 3    his family?
 4         MR. MERINGOLO:  Objection
 5      to the form.
 6         Can you repeat that?
 7         (Whereupon, the requested
 8      portion was read back by the
 9      reporter:
10         Q:  Has a majority of
11      your income over the past ten
12      years been derived from work
13      that you performed for Mr. De
14      Niro, his entities, or his
15      family?)
16         MR. DROGIN:  Objection to
17      the form.  Are you excluding
18      the law firm?
19         MS. HARWIN:  I am asking
20      about whether the majority of
21      his income has been derived
22      from that work.
23         MR. BENNETT:  I think
24      Laurent's point, and I don't
25      mean to speak on his behalf,
```



Page 44

```
 1                T. HARVEY
 2      was that Attorney Harvey
 3      testified that he was
 4      affiliated with the law firm
 5      until 2020.  So if you can
 6      just clarify if you are
 7      asking about Mr. Harvey's
 8      individual income or the firm
 9      income.
10           MR. DROGIN:  Thank you.
11           MS. HARWIN:  Sure.
12      Q.   Well, let's start with the
13   period since 2020 when you have been
14   self employed.
15           Has a majority of your
16   income been derived from work that
17   you performed for Mr. De Niro, his
18   entities, or his family?
19           MR. BENNETT:  Objection.
20      A.   I don't know.  I don't
21   believe so.
22      Q.   Okay.
23           Mr. Harvey, you understand
24   that you are here both as a fact
25   witness and as a Rule 30(b)(6)
```



Page 45

```
 1                    T. HARVEY
 2   witness, is that correct?
 3     A.    That is correct.
 4     Q.    Okay.
 5           Do you understand --
 6   actually let me -- let me introduce
 7   an exhibit that we are going to drop
 8   into the chat, which is the -- the
 9   Notice of 30(b)(6) Deposition.  This
10   is going to be marked as Plaintiff's
11   Exhibit 47.
12           (Whereupon, Plaintiff's
13      Exhibit 47, Notice of
14      30(b)(6) Deposition, was
15      marked for identification, as
16      of this date.)
17           MR. DROGIN:  Is this the
18      Second Amended Notice that we
19      got yesterday?
20           MS. HARWIN:  Yes.  That
21      is correct.
22     Q.    Mr. Harvey, do you
23   recognize this document?
24     A.    Yes.
25     Q.    Okay.
```



Page 46

```
 1                   T. HARVEY
 2           Have you read this document
 3    before?
 4      A.    Yes.
 5      Q.    Okay.
 6           As you can see the document
 7    is entitled, Plaintiff's Second
 8    Amended Notice of Deposition of
 9    Defendant Canal Productions, Inc.,
10    Pursuant to Federal Rule Civil
11    Procedure 30(b)(6).
12           Do you understand that
13    Canal Productions, Inc., has
14    designated you as a 30(b)(6)
15    witness?
16      A.    I do.
17      Q.    As a Rule 30(b)(6) witness
18    you are providing official testimony
19    on behalf of Robert De Niro's
20    company, Canal Productions, Inc., is
21    that correct?
22      A.    That is correct.
23      Q.    Okay.
24           You understand that to
25    satisfy Rule 30(b)(6) you must give
```



Page 47

```
 1                    T. HARVEY
 2    complete, knowledgeable, and binding
 3    answers on Canal's behalf, correct?
 4          MR. DROGIN:  Objection to
 5       the form.
 6    A.    Yes.
 7    Q.    I couldn't hear your
 8    answer?
 9    A.    Yes.
10    Q.    I would like you to please
11    read aloud the topics on which you
12    are prepared to testify as a Rule
13    30(b)(6) witness on behalf of Canal
14    Productions, Inc.
15          MR. DROGIN:  Objection to
16       the form.  That has already
17       been -- it has already been
18       designated.  You have that --
19          MR. BENNETT:  The lawyers
20       can read that into the
21       record.  I don't see the
22       point of asking Mr. Harvey to
23       read it.
24          MR. DROGIN:  It has
25       already been disclosed.
```



Page 48

```
 1                    T. HARVEY
 2      Q.    I am asking you to read for
 3   the record the topics on which you
 4   are prepared to testify here today
 5   as a Rule 30(b)(6) witness for
 6   Canal?
 7           MR. MERINGOLO:  We would
 8      object to that and just
 9      stipulate to read it in the
10      record.
11      A.    I am prepared to handle
12   Paragraph Number 5, Communications
13   with Law Enforcement or Prosecutors.
14           I am here to answer
15   questions regarding Paragraph 4,
16   Communications with the Media.
17           I am here to handle
18   Paragraph Number 3, and I think -- I
19   can probably handle 2 also.
20           MR. BENNETT:  Just to
21      clarify the record, this is
22      the purpose why I intervened.
23      It has already been
24      designated.  Mr. Harvey is
25      here for topics 3, 4 and 5
```



Page 49

```
 1                  T. HARVEY
 2     per my January 24 e-mail.
 3     Q.    Mr. Harvey, can you read
 4  aloud verbatim topics 3, 4 and 5
 5  that you are prepared to testify
 6  here today on behalf of Canal
 7  Productions?
 8          MR. DROGIN:  Objection to
 9      the form.  It is yes or no
10      the question.
11          The question is, can you
12       read it aloud.
13     A.    I can.
14     Q.    Okay.
15          Please read aloud the
16  topics on which you have been
17  designated, 3, 4 and 5?
18          MR. DROGIN:  Objection.
19      Is this really how we are
20      going to spend our day?
21          MS. HARWIN:  Counsel, if
22      you stop objecting, it would
23      have been read already, so
24      please.
25          (Simultaneous speaking)
```



```
 1                 T. HARVEY
 2     A.    Let me make it very very
 3  simple.  Ask me a question, I will
 4  answer it.  You are not asking me a
 5  question.  You are trying to direct
 6  me to read a document.  I would be
 7  happy to read the document to myself
 8  and then tell you that I understand
 9  the document.  I would be happy to
10  have you -- I am not done.  I would
11  be happy to have you read the
12  document aloud and then I will tell
13  you that I heard it.  Short of that,
14  let's move on.
15     Q.    Counsel, are you prepared
16  to testify on behalf of Canal
17  Productions here today concerning
18  the facts and circumstances leading
19  to the Canal State Court lawsuit
20  against Plaintiff including any
21  charge of expenses, transfers,
22  transactions, payments or
23  reimbursements that Canal contends
24  serve as the basis for its State
25  Court lawsuit against Plaintiff?
```



Page 51

1                T. HARVEY

2      A.    Yes.

3            MR. DROGIN:  We have

4       designated him.

5      Q.    Are you prepared to testify

6   here today as a Rule 30(b)(6)

7   witness on behalf of Canal

8   concerning all communications with

9   the media by Canal or anyone acting

10  on behalf of Canal concerning

11  Plaintiff, Canal's State Court

12  lawsuit against Plaintiff, or this

13  lawsuit?

14     A.    Yes.

15     Q.    Are you prepared to testify

16  as a Rule 30(b)(6) witness on behalf

17  of Canal concerning all

18  communications with law enforcement

19  or prosecutors by Canal or anyone

20  acting on behalf of Canal concerning

21  against Plaintiff, Canal's State

22  Court lawsuit against Plaintiff, or

23  this lawsuit?

24     A.    Yes.

25            MR. DROGIN:  Could you --



Page 52

```
 1                  T. HARVEY
 2      could you repeat that one?
 3      I'm sorry.  Can you repeat
 4      that last one with the
 5      prosecutors?
 6           MS. HARWIN:  Madam Court
 7      Reporter, can you read that
 8      back?
 9           (Whereupon, the requested
10      portion was read back by the
11      reporter:
12           Q:  Are you prepared to
13      testify as a Rule 30(b)(6)
14      witness on behalf of Canal
15      concerning all communications
16      with law enforcement or
17      prosecutors by Canal or
18      anyone acting on behalf of
19      Canal concerning against
20      Plaintiff, Canal's State
21      Court lawsuit against
22      Plaintiff, or this lawsuit?)
23           MR. MERINGOLO:  Just, you
24      know, this potentially could
25      be a breach of if he -- if
```



Page 53

```
 1                  T. HARVEY
 2        Mr. Harvey was actually
 3        speaking to prosecutors or
 4        law enforcement he could
 5        breach the confidence and the
 6        confidentiality of a criminal
 7        investigation.  So I don't
 8        know -- you know, maybe we
 9        can break out during those --
10        those questioning -- the
11        questions that you want to
12        ask because, you know, if
13        there is, in fact, going to
14        be any sort of criminal
15        investigation, and Mr. Harvey
16        was part in parcel of that,
17        he would be, you know,
18        precluded by -- by state
19        criminal law or federal
20        criminal law to that -- for
21        that matter, to actually have
22        any discussions with respect
23        to that.
24            MS. HARWIN:  Just to
25        clarify, Counsel, the
```



Page 54

```
 1              T. HARVEY
 2    criminal investigation has
 3    closed.  So there is no -- it
 4    is no longer an active
 5    investigation.
 6         MR. MERINGOLO:  True.
 7    But certain conversations
 8    with prosecutors, would be
 9    deemed -- I don't believe --
10    and this is exactly what I do
11    for a living.  I don't
12    believe that he can actually
13    talk about those
14    conversations.
15         MS. HARWIN:  Well,
16    counsel, maybe this is
17    something --
18         (Simultaneous speaking)
19         MR. MERINGOLO:  Actually,
20    until the Statute of
21    Limitations on an issue
22    expires, he would be
23    precluded because a criminal
24    investigation, although could
25    be closed today, could be
```



Page 55

```
 1                T. HARVEY

 2      opened at any time.  I will

 3      put it on the record that is

 4      just the way it is.  I am not

 5      making it up.  That is just

 6      the way it is.

 7          MS. HARWIN:  So he has

 8      been designated on this

 9      topic, but we can discuss it

10      during a break.

11          MR. BENNETT:  I would

12      like to -- I'm sorry.

13          MR. MERINGOLO:  I am not

14      trying to be difficult,

15      Ma'am.  I am just saying I am

16      representing Tom Harvey and

17      if he was to disclose certain

18      things that would be, you

19      know -- you know, not nice --

20      you know, for me to allow

21      that to happen.

22          MR. DROGIN:  I also just

23      want to refer to the 30(b)(6)

24      Notice that Canal reserves

25      the right to contest their
```



Page 56

```
 1                 T. HARVEY

 2      questions regarding

 3      paragraphs 1 and paragraphs

 4      2, and the witness answered

 5      those questions, we reserve

 6      the right to have Canal adopt

 7      the answers.

 8           MS. HARWIN:   Okay.

 9      Q.    So as a Rule 30(b)(6)

10   witness, Mr. Harvey, you had an

11   obligation to prepare to provide

12   official testimony on behalf of

13   Canal Productions.

14           Tell me everything that you

15   did to prepare for your deposition

16   today?

17      A.    I spoke to Canal's

18   attorneys and Robert De Niro's

19   attorneys, reviewed e-mails,

20   reviewed documents, and that is --

21   that is it.

22      Q.    Mr. Harvey, it is very

23   difficult to hear you.  Can you

24   speak up or speak closer to the mic?

25      A.    I will try.
```



```
 1                T. HARVEY
 2    Q.    Thank you.
 3    A.    I spoke to attorneys for
 4  Canal Productions, Inc., I spoke to
 5  counsel for Robert De Niro, I
 6  reviewed e-mails, and I reviewed
 7  documents in connection with this
 8  matter.
 9    Q.    What specific documents did
10  you review?
11         MR. DROGIN:  Objection.
12      That is privileged.  That is
13      work product.
14         MS. HARWIN:  Not as to a
15      Rule 30(b)(6) witness.
16         MR. DROGIN:  What is your
17      authority for that?
18         MS. HARWIN:  We are
19      entitled to know the
20      documents reviewed by a
21      30(b)(6) witness for
22      preparing for a deposition.
23         MR. DROGIN:  I don't
24      believe that that is
25      accurate.  You are asking him
```



Page 58

```
 1              T. HARVEY
 2      for a description of work
 3      product, what he has
 4      reviewed.  He is representing
 5      Mr. De Niro.  You know that.
 6      You have also established he
 7      is representing Canal.  Canal
 8      objects to that question.
 9   A.    Let me do it this way, I
10  can tell that you I reviewed
11  hundreds of documents, many of which
12  had been produced to you.  In
13  addition, I reviewed work product
14  that was prepared in connection with
15  this litigation.
16   Q.    What were the nature of the
17  e-mails that you reviewed to prepare
18  for the deposition?
19         MR. DROGIN:  Same
20      objection.  This is work
21      product.
22   A.    I don't know what you mean
23  by nature.
24   Q.    What were the e-mails that
25  you reviewed to prepare for this
```



Page 59

```
 1                 T. HARVEY
 2   deposition?
 3          MR. DROGIN:  Objection to
 4     the form.
 5     A.    I reviewed e-mails that
 6   were produced by both the Plaintiff
 7   and the Defendants in this matter.
 8     Q.    What did the e-mails that
 9   you reviewed concern?
10          MR. DROGIN:  Objection to
11     the form.
12     A.    This matter.
13     Q.    What specific topics did
14   these e-mails that you reviewed
15   concern?
16          MR. DROGIN:  Objection to
17     the form.
18     A.    Oh, gosh.  They -- I should
19   add tape recordings, too.  The
20   question was what did they concern?
21     Q.    Yes.
22     A.    They concerned the
23   Complaint filed against Canal, and
24   De Niro, and the Counterclaims, and
25   the Motions, et cetera.  Concerned
```



Page 60

```
 1                T. HARVEY
 2    all of that.
 3         MR. DROGIN:  Do you want
 4    to propose a concise
 5    stipulation that moves to
 6    this line of questioning?
 7    Because I don't think there
 8    is any dispute about his
 9    involvement.  If you want to
10    get down into the granular
11    detail about particular
12    e-mails, it -- it is going to
13    take a really long time.  But
14    there may be a stipulation
15    available to you that
16    approves or establishes
17    whatever it is that you are
18    trying to get at.
19         MS. HARWIN:  Okay.  I am
20    happy to -- happy to consider
21    a stipulation.  Maybe we can
22    pick that up after the break.
23         MR. DROGIN:  Okay.  Just
24    to be clear, you are aware
25    from the thousands of
```



Page 61

1                    T. HARVEY

2        documents that have been

3        produced that Mr. Harvey has

4        been involved in the

5        underlying facts giving rise

6        to Canal's lawsuit as well as

7        Ms. Robinson's claims against

8        Canal and Mr. De Niro.  He

9        has been actively involved.

10       You know that already.  And

11       it is not denied.  It is not

12       an issue.

13    Q.    Mr. Harvey, how much time

14  did you spend reviewing documents

15  and e-mails to prepare for the

16  deposition?

17           MR. DROGIN:  Objection to

18       the form.

19    A.    I think you would have to

20  be more specific.  I have reviewed

21  every document that has been

22  exchanged for starters.  So I'm not

23  sure how to answer that question.

24    Q.    Well, when did you begin

25  preparing for your deposition in



Page 62

```
 1                 T. HARVEY
 2    this matter?
 3      A.    Well, again, I have been
 4    involved with the matter since day
 5    one.  I would consider that, quote,
 6    preparing for my deposition.
 7      Q.    How many hours have you
 8    spent engaged in work relating to
 9    Mr. De Niro's lawsuit against Ms.
10    Robinson or Ms. Robinson's lawsuit
11    against Mr. De Niro?
12            MR. DROGIN:  Objection.
13        Mr. De Niro does not have a
14        lawsuit against Ms. Robinson.
15            MS. HARWIN:  Let me
16        rephrase.
17      Q.    How much time have you
18    spent working on matters concerning
19    Canal Productions lawsuit against
20    Ms. Robinson, or Ms. Robinson's
21    lawsuit against Canal Productions
22    and Mr. De Niro?
23      A.    I have spent substantial
24    time on the matters.
25      Q.    Hundreds of hours?
```



Page 63

```
 1                  T. HARVEY
 2   A.    I think that is fair.
 3   Q.    I couldn't hear your
 4  answer?
 5   A.    I think that is fair.
 6   Q.    Okay.
 7         Would you estimate more
 8  than 500 hours?
 9   A.    I don't estimate.  I have
10  spent hundreds of hours.
11   Q.    Okay.
12         Did you speak to anyone
13  other than counsel for -- let me
14  restate the question.
15         Other than Mr. Bennett and
16  Mr. Drogin, was there anyone else
17  that you spoke to in order to
18  prepare for your deposition?
19   A.    Yes.
20   Q.    Who?
21   A.    Mr. Meringolo.
22   Q.    Other than Mr. Meringolo,
23  Mr. Bennett, and Mr. Drogin, was
24  there anyone else that you spoke to
25  to prepare for your deposition?
```



Page 64

```
 1                    T. HARVEY
 2      A.     Yes.
 3      Q.     Who?
 4      A.     Brittany.
 5      Q.     Other than Ms. Lazzaro, Mr.
 6   Bennett, Mr. Drogin, and Mr.
 7   Meringolo, was there anyone else
 8   that you spoke to to prepare for
 9   your deposition?
10      A.     Yes.
11      Q.     Who else?
12      A.     Mr. Hackett.
13      Q.     And who is Mr. Hackett?
14      A.     John Hackett.
15      Q.     And why did you speak to
16   Mr. Hackett to prepare for your
17   deposition?
18      A.     I didn't.  I called him.
19   He didn't return my call.
20      Q.     And why did you want to
21   speak to Mr. Hackett about your
22   deposition?
23      A.     I just wanted to see if he
24   had any information that I was
25   missing.
```



Page 65

```
 1                T. HARVEY
 2    Q.    What was Mr. Hackett's
 3  relationship with Mr. De Niro?
 4    A.    He likes me a lot better.
 5    Q.    Mr. Hackett or Mr. De Niro?
 6    A.    Mr. De Niro.  Mr. Hackett
 7  was my partner and represented Mr.
 8  De Niro and various entities
 9  associated with Mr. De Niro over the
10  last 20 years.
11    Q.    Okay.
12          To be clear, I am going to
13  be questioning you about matters
14  within the ambit of your Rule
15  30(b)(6) designation first, starting
16  now, so that that is clear for the
17  record.
18          MS. HARWIN:  We are going
19      to drop into the chat what
20      will be marked as Exhibit 48.
21          (Whereupon, Plaintiff's
22      Exhibit 48, a Complaint in
23      the Supreme Court action, was
24      marked for identification, as
25      of this date.)
```



Page 66

```
 1              T. HARVEY
 2         MR. BENNETT:  If I could,
 3    since you are marking where
 4    you are beginning the
 5    30(b)(6) questions, will you
 6    also be marking the end of
 7    them?
 8         MS. HARWIN:  Yes.
 9         MR. BENNETT:  Thank you.
10         MS. HARWIN:  Of course,
11    if any question arising, you
12    know, feel free to ask.  But
13    yes, we would anticipate
14    identifying the conclusion of
15    those questions.
16         MR. BENNETT:  Thank you.
17    Q.    Mr. Harvey, do you
18  recognize the document that is being
19  marked as Exhibit 48?
20         MR. DROGIN:  I don't
21    think it is in the chat.
22         MR. SCHAITKIN:  Sorry,
23    Allie, I missed -- I couldn't
24    hear what you --
25         MS. HARWIN:  We are going
```



Page 67

```
 1                  T. HARVEY
 2      to identify as Exhibit 48 the
 3      State Court lawsuit filed by
 4      Canal Productions.
 5          MR. DROGIN:  The
 6      Complaint?
 7          MS. HARWIN:  Yes.
 8          MR. DROGIN:  Just give us
 9      a moment to open it.
10          MS. HARWIN:  Take your
11      time.
12      Q.   Mr. Harvey, have you been
13   able to download that document?
14          MR. DROGIN:  15-page
15      document.  It is the
16      Complaint in the Supreme
17      Court action.  Filed under
18      index number 654711 of 2019,
19      at 1:45 p.m., on August 17th,
20      2019.
21      Q.   Mr. Harvey, do you
22   recognize this document?
23      A.   I do.
24      Q.   Are you familiar with
25   Canal's State Court lawsuit against
```



Page 68

```
 1                 T. HARVEY
 2   Ms. Robinson?
 3     A.    I am.
 4     Q.    Are there any substantive
 5   differences between the claims set
 6   forth in Canal's State Court lawsuit
 7   and the claims that Canal continues
 8   to advance against Ms. Robinson as
 9   counterclaim?
10         MR. DROGIN:  Objection.
11       It calls for a legal
12       conclusion and a legal
13       analysis.  I would direct him
14       not to answer that question
15       on behalf of Canal
16       Productions.
17     Q.    Are you refusing to answer
18   that question?
19     A.    On advice of counsel.
20     Q.    Are you familiar with
21   Canal's claim that Ms. Robinson
22   engaged in fraud?
23     A.    Well, are we dealing with
24   the document or are you asking me in
25   general?
```



Page 69

```
 1                    T. HARVEY
 2     Q.    I am asking you in general.
 3  Are you familiar with Canal's claim
 4  that is Ms. Robinson engaged in
 5  fraud?
 6     A.    Again, in general, Canal
 7  Productions believes Graham Chase
 8  Robinson defrauded Canal, yes.
 9     Q.    Identify for me all
10  statements or omissions that Canal
11  contends were made by Ms. Robinson
12  that served as the basis for Canal's
13  fraud claim against her?
14         MR. DROGIN:  Objection.
15      Are you talking about in this
16      document?
17         MS. HARWIN:  He is a Rule
18      30(b)(6) witness concerning
19      the facts and circumstances
20      that led to the commencement
21      of the State Court action.  I
22      am asking about the
23      statements or omissions that
24      Canal contends were made by
25      Ms. Robinson that served as
```



Page 70

```
 1                T. HARVEY
 2     the basis.
 3          MR. DROGIN:  I am asking
 4     if you are confining your
 5     question to the document that
 6     is on file.
 7          MS. HARWIN:  No.
 8          MR. DROGIN:  So you are
 9     -- you are asking the witness
10     to opine for you as to what
11     facts give rise to Canal's
12     legal claims?
13          MS. HARWIN:  I am asking
14     him to identify all
15     statements or omissions that
16     Canal contends were made by
17     Ms. Robinson that serve as
18     the basis for the fraud
19     claims against her?
20          MR. MERINGOLO:
21     Respectfully, that we would
22     object -- object pursuant to
23     Hickman V. Taylor 329 US 495,
24     which the Court -- the High
25     Court says qualified
```



Page 71

```
 1                 T. HARVEY
 2      privilege for certain
 3      materials prepared by an
 4      attorney acting for his
 5      client in anticipation of
 6      litigation is -- is
 7      prohibited.  Just for the
 8      record and then there is
 9      subsequently many cases that
10      follow, but that is the
11      leading case.
12           MS. HARWIN:  Canal has
13      chosen to designate an
14      attorney to testify on this
15      topic.  And so Canal's
16      designation is that he is
17      competent and will testify on
18      this topic and so I don't
19      believe that that privilege
20      objection is a -- a proper
21      one here.  I am asking for an
22      answer to the question which
23      falls within the Rule
24      30(b)(6) designation.
25           MR. MERINGOLO:  There are
```



Page 72

```
 1                    T. HARVEY
 2      probably other facts that he
 3      has shared for the litigation
 4      itself that would be
 5      precluded that the question
 6      is an open-ended question for
 7      all the facts for the fraud.
 8      I mean, facts within --
 9      within the contents of the
10      lawsuit may be different.
11      But to go through all the
12      facts that would be precluded
13      by the High Court and Hickman
14      V Taylor.
15          MR. DROGIN:  That is why
16      I asked whether you are
17      confining your question to
18      what is contained in the
19      Complaint or -- or are you
20      asking beyond that.
21   Q.    Let me repeat what the
22   question is.
23          (Simultaneous speaking)
24          MS. HARWIN:  As you know
25      Canal has designated Mr.
```



Page 73

```
 1                T. HARVEY
 2      Harvey as their official
 3      corporate witness concerning
 4      the facts and circumstances
 5      leading to the commencement
 6      of Canal's State Court action
 7      against Plaintiff, including
 8      any transaction that Canal
 9      contends serve as the basis
10      for the State Court lawsuit
11      against Ms. Robinson.
12   Q.    So I am going to ask you to
13 -- I am starting, you know,
14 concerning the fraud claim.
15        Identify for me all
16 statements or omissions that Canal
17 contends were made by Ms. Robinson
18 that served as the basis for Canal's
19 fraud claim against her?
20        MR. DROGIN:  I am going
21      to object to the form.  I
22      think it calls for a
23      narrative, and I think it is
24      an inappropriate question.
25      If you want to give the
```



Page 74

```
 1                    T. HARVEY
 2      witness some time to gather
 3      his thoughts as he has to go
 4      through every single factual
 5      allegation that supports the
 6      claim when you have the
 7      Complaint in front of you?
 8      Do you want to go through the
 9      Complaint and ask if there
10      are additional facts that
11      substantiate what Canal's
12      stated position already is?
13           MS. HARWIN:  I am asking
14      Mr. Harvey to identify those
15      statements or omissions.
16           MR. MERINGOLO:
17      Statements and omissions by a
18      client would be precluded to
19      Mr. Harvey.  I understand --
20           MS. HARWIN:  These are
21      statements made by Ms.
22      Robinson.  That is -- that is
23      what we are talking about.
24      This is factual information
25      that served as the basis for
```



Page 75

1                   T. HARVEY

2        Canal's fraud claim.  I am

3        going to repeat the question

4        one more time.

5        Q.    Mr. Harvey, please answer

6     the question.

7             Identify for me all

8     statements or omissions that Canal

9     contends were made by Ms. Robinson

10    that served as the basis for Canal's

11    fraud claim against her?

12            MR. DROGIN:  Same

13       objection.

14            MR. MERINGOLO:  Same

15       objection.

16    A.    With respect to the New

17    York State Claim, Ms. Robinson made

18    statements with respect to personal

19    expenses, unauthorized charges on

20    the American Express card, Flowers

21    by Philip, groceries, personal

22    transportation, and various

23    misstatements with respect to air

24    miles and falsification of her

25    vacation time, and generally


MAGNA
LEGAL SERVICES

Page 76

```
 1                  T. HARVEY
 2    statements about doing work when, in
 3    fact, she wasn't doing work, but
 4    rather watching Netflix.  She
 5    basically submitted time sheets at
 6    the end of each year with respect to
 7    vacation time that said she did not
 8    take a vacation, which was a
 9    complete fabrication.  She used air
10    miles belonging to Canal and/or Mr.
11    De Niro that she stated were for
12    business use that were strictly
13    personal use.  She transferred in
14    the last month of her employment
15    approximately 3 million air miles
16    from Mr. De Niro's account without
17    permission from Mr. De Niro.  She
18    lied about that.  She consistently
19    lied about potential transportation,
20    taking Ubers, et cetera, for
21    certainly from 2013 to 2019.  Her
22    last date of employment, on April
23    6th, she charged basically every
24    single meal she ate, breakfast,
25    lunch, dinner, as a business expense
```



Page 77

```
 1                  T. HARVEY
 2   and had Mr. De Niro fund that
 3   lifestyle.  She leased and rented
 4   cars that she said were for work
 5   that weren't.  She stayed at hotels
 6   that she said were for work that
 7   weren't.  She purchased gift cards
 8   with Mr. De Niro and/or Canal's cash
 9   saying they were used for Canal or
10   Mr. De Niro when, in fact, she
11   converted them to her own use.  She
12   ordered flowers from Flowers by
13   Philips and said they were from Mr.
14   De Niro or someone associated to Mr.
15   De Niro, and, in fact, they were
16   related to her.  I am certain that I
17   am missing certain things, but for
18   six years of constant fraud, there
19   was a lot going on.  I think it is
20   easier to ask me the truthful
21   statements made by Ms. Robinson over
22   that time period than to ask me to
23   the false statements that she made.
24         MR. DROGIN:  Canal
25      further directs your
```



```
 1                T. HARVEY
 2     attention to the Complaint
 3     filed in the State Court for
 4     Counterclaims filed in
 5     Federal Court and all
 6     responses to discovery
 7     requests that you have made,
 8     which were already on the
 9     record with Canal's statement
10     and position.  So you have
11     Canal's statement and
12     position and now you have
13     testimony supporting this
14     Canal's statement and
15     position.
16         MS. HARWIN:  Counsel, you
17     can't supplement Mr. Harvey's
18     answer.  Mr. Harvey's answer
19     is Mr. Harvey's answer.
20         MR. DROGIN:  I am just
21     making sure that the record
22     is clear that while the
23     witness is testifying to the
24     best of his knowledge as you
25     explained he should do, there
```



```
 1              T. HARVEY
 2      is far more in the record
 3      than the witness has
 4      testified about.  So it
 5      should not appear that his
 6      answer is limiting on Canal.
 7    Q.    Mr. Harvey, identify for me
 8   all specific statements that Ms.
 9   Robinson made that Canal contends
10   served as the basis for its fraud
11   claim?
12          MR. DROGIN:  Objection to
13      the form.
14    A.    I would need actual
15   documents to look at to refresh my
16   recollection, but off the top of my
17   head, you can start with the annual
18   e-mail that Ms. Robinson sent to Mr.
19   Tasch requesting that she be
20   reimbursed each year for taking zero
21   vacation days.  And the statement
22   was I have taken in sum and
23   substance, at least no vacation this
24   year in 2013, please pay me for
25   unused vacation time.  Canal did not
```



Page 80

```
 1                    T. HARVEY
 2    have a policy for getting reimbursed
 3    for unused vacation time, but Ms.
 4    Robinson apparently did that without
 5    permission.
 6              With respect to 2014, Ms.
 7    Robinson submitted, again, an e-mail
 8    in sum and substance to Mr. Tasch
 9    stating that she had zero used
10    vacation days, and asked to be
11    reimbursed or paid for those quote,
12    "unused vacation days."
13              With respect to 2015, Ms.
14    Robinson sent an e-mail to Michael
15    Tasch at Berdon stating that she had
16    not used any vacation days.  She
17    said she used zero vacation days.
18    And asked to be paid for those
19    quote, "unused vacation days."
20              In 2016, Ms. Robinson,
21    again, sent an e-mail to Mr. Tasch
22    and stated that she had used zero
23    vacation days, and as a result
24    wanted to be paid for the quote,
25    "unused vacation days."
```



Page 81

```
 1                  T. HARVEY
 2          In 2016, Ms. Robinson sent
 3   an e-mail to Mr. Tasch stating that
 4   she had zero in terms of used
 5   vacation days, and asked to be paid
 6   for the unused vacations.
 7          In 2016, she did the same
 8   thing.
 9          In 2017, Ms. Robinson said
10   she sent an e-mail to Mr. Tasch
11   stating that she had not used any
12   vacation days and asked to be paid
13   when she was for all those vacation
14   days.
15          In 2017, Ms. Robinson sent
16   Mr. Tasch an e-mail stating that she
17   had used zero vacation days and
18   asked to be paid for them.
19          In 2018, Ms. Robinson once
20   again sent an e-mail to Mr. Tasch
21   saying that she had used, quote,
22   "zero vacation days" and asked to be
23   paid for them.
24          With respect to Philip's
25   Flowers, Ms. Robinson submitted for
```



Page 82

```
 1                   T. HARVEY
 2     reimbursement charges she made at
 3     the store in New York City, known as
 4     Flowers by Philip, located at 13-11
 5     Lexington Avenue.  She charged for
 6     flowers that she took to her home,
 7     but charged Canal and/or Mr. De Niro
 8     for those flowers.  The statements
 9     that those flowers were business
10     associated expenses were false.
11               With respect to Whole
12     Foods, Dean & DeLuca, and those
13     types of entities, stores that did
14     not have -- are not considered
15     restaurants, but provided takeout
16     food, Ms. Robinson, since 2013,
17     submitted receipts with respect to
18     those types of stores.  I can go
19     through each receipt if necessary.
20     And stated they were a quote,
21     "business expense."  When, in fact,
22     they were for her personal
23     nonbusiness associated food.
24               With respect to
25     restaurants, specifically, for
```



Page 83

```
 1                  T. HARVEY
 2    example, Paola's, Ms. Robinson
 3    consistently submitted bills and was
 4    reimbursed by Canal for dinners that
 5    she had that were not associated
 6    with Canal's business or Mr. De
 7    Niro's business, but were personal.
 8    And Ms. Robinson submitted those --
 9    those statements that they were
10    associated with Canal were false and
11    she received payment for those.
12           With respect to taking a
13    trip to California, she told Mr. De
14    Niro that she had to go to
15    California with respect to getting
16    certain books, specifically Taxi
17    Driver anniversary books signed by
18    certain individuals in California,
19    and that the individuals can sign
20    them, and she would take them to
21    California because it was too
22    difficult or expensive for the books
23    to be shipped, and thereafter
24    brought to the individuals located
25    in California, that was a lie.
```



Page 84

```
 1                    T. HARVEY
 2            Ms. Robinson, thereafter,
 3    flew out on Canal's dime, so to
 4    speak, to California, first class,
 5    of course, and stayed at the Montage
 6    Hotel.  Again, because she told Mr.
 7    De Niro it was work related.  That
 8    statement was false.
 9            Ms. Robinson got into a
10    leased vehicle because she said she
11    needed the vehicle to take around
12    the books, which she didn't have.
13    That statement was false.
14            Thereafter, Ms. Robinson
15    used Ubers and charged them to
16    Canal, even though she had a leased
17    vehicle there, and submitted that
18    expense to Canal representing it was
19    a business expense, which it wasn't.
20            Ms. Robinson then for that
21    night went to Nobu in Los Angeles
22    and charged a substantial dinner
23    taking her friend Amelia Brain out
24    for her birthday dinner, which was
25    the true reason she went to
```



Page 85

1                    T. HARVEY

2    California.

3          Ms. Robinson also lied to

4    Mr. De Niro when she said she was

5    going out to California because one,

6    she didn't have the Taxi Driver

7    books.  Two, her new or latest false

8    claim that she went out for Toukie

9    Smith was also a lie because there

10   is documentation that shows that, in

11   fact, Ms. Smith already had a

12   reservation and had previously

13   stayed at the hotel.

14          With respect to the gift

15   cards, Ms. Robinson has over the

16   course of six years, or thereabouts,

17   spent an incredible sum at

18   Lululemon, Bloomingdale's, Ralph

19   Lauren, and Sony on gift cards.  She

20   told Mr. De Niro and others that she

21   was using those gift cards to give

22   as presents, when, in fact, Ms.

23   Robinson was doing it to enrich

24   herself.  She enjoyed those stores

25   and shopped at those stores all of



Page 86

```
 1                    T. HARVEY
 2    the time.
 3           With respect to electronic
 4    equipment, Ms. Robinson specifically
 5    said she needed various computers,
 6    iPhones, et cetera, and submitted
 7    reimbursement after purchasing them
 8    -- and/or purchasing them directly
 9    on the American Express or other
10    cards of Canal.  The statements that
11    they would be used for Canal were
12    false.  She was actually using them
13    for herself.
14           With respect to camera
15    equipment, again, Ms. Robinson said
16    that camera equipment was needed for
17    Canal, and, in fact, she took the
18    merchandise and used at home.
19    Again, it was a false statement.
20           With respect to the various
21    other trips, Ms. Robinson has
22    consistently and repeatedly made
23    false statements about what she was
24    doing and where she was doing it.
25    Give me a second.  I am sure there
```



Page 87

```
 1                    T. HARVEY
 2    is quite a bit more.  So in terms of
 3    every statement I would have to look
 4    at each Uber receipt, each Flowers
 5    by Philip receipt, each Whole Foods
 6    receipt, Dean & DeLuca receipt, each
 7    airline receipt, each air mile
 8    transfer of air miles receipt.  I
 9    would have to look at a lot more
10    documentation to give you specifics
11    on each transaction because there
12    was hundreds, if not thousands, of
13    false statements and false
14    reimbursements sought and paid by
15    Ms. Robinson.
16              And of course, my favorite,
17    the Netflix.  Ms. Robinson, falsely
18    has testified in this case and
19    certainly told us that she was, in
20    fact, not watching Netflix, when we,
21    in fact, know she was.
22    Q.    I would like to turn to
23    Canal's allegations concerning
24    vacation pay.
25    A.    Sure.
```



```
 1                    T. HARVEY
 2     Q.    The allegations concerning
 3  vacation pay span the years 2014
 4  through 2018.
 5          Is that correct?
 6     A.    Are you talking about in
 7  the Complaint, in the State Court
 8  action, or are you talking about the
 9  Counterclaims in the federal action?
10     Q.    Are there any differences
11  with respect to that issue?
12     A.    I am just asking which one
13  are you referring to?
14     Q.    So the claims that Canal
15  has made against Ms. Robinson
16  concerning vacation pay, span the
17  years 2016 through 2018, is that
18  correct?
19     A.    With respect to what
20  document?
21     Q.    So if -- either in the
22  State Court action or in the
23  Counterclaims, my understanding is
24  that those are the same.
25     A.    Well, I am looking at the
```



Page 89

1          T. HARVEY

2    State Court action, and it says,

3    just so we are clear, "In or about

4    2014 Ms. Robinson submitted the

5    false vacation pay" but it doesn't

6    mean it -- it precluded, but we can

7    have that legal argument with

8    respect to 2013.  I am looking at

9    the Complaint so ask away.

10    Q.    Okay.

11          My question is, Canal's

12    allegations concerning vacation pay

13    span the years 2014 through 2018, is

14    that correct?

15    A.    The document speaks for

16    itself.  I would disagree with your

17    characterization, but we don't have

18    to have that argument.

19    Q.    Identify for me the time

20    period that Canal's allegations

21    concerning vacation pay spans?

22          MR. DROGIN:  If you want

23      we can stipulate to it since

24      it's the in Complaint.

25          MS. HARWIN:  Okay.  So



Page 90

```
 1                T. HARVEY
 2      Counsel, can we stipulate
 3      that Canal's allegations
 4      concerning vacation pay span
 5      the years 2014 through 2018?
 6          MR. DROGIN:  Stipulate to
 7      Paragraph 49 to 54 of the
 8      State Court Complaint.  If
 9      you want to show us the
10      Counterclaims, we can look to
11      the identical paragraphs in
12      the Counterclaims.  For a
13      factual assertion, Paragraph
14      54 of the State Court claim,
15      says, "As a result of the
16      foregoing, Robinson collected
17      in excess of $70,000 by
18      falsely claiming that she had
19      not used 96 vacation days
20      between 2014 and 2018."
21          It is -- we can stipulate
22      to it.  It is already on the
23      record.
24          MS. HARWIN:  Yeah.  This
25      isn't a trick question.  This
```



Page 91

```
 1                 T. HARVEY
 2      is just confirming what is
 3      there.
 4      Q.    Again, you are the 30(b)(6)
 5   witness on the facts and
 6   circumstances that led to the State
 7   Court action.
 8           I just want to confirm when
 9   we are talking about the vacation
10   pay allegations, we are talking
11   about representations in the years
12   2014 to 2018, is that correct?
13      A.    With respect to this
14   Complaint, yes.
15      Q.    Canal paid certain
16   employees back for their unused
17   vacation days going back as far as
18   -- going back as far as 2009,
19   correct?
20      A.    As far as 2009, I couldn't
21   be sure of that.
22      Q.    For how many years was
23   Canal paying back certain employees
24   for their unused vacation days?
25      A.    I can tell you from -- in
```



Page 92

```
 1                T. HARVEY
 2   or about 2013, through April 6,
 3   2019, Canal Productions paid Michael
 4   Kaplan and Graham Chase Robinson for
 5   unused vacation days.
 6            MR. DROGIN:  I would also
 7        point out this is Paragraph 1
 8        of the 30(b)(6).  So the
 9        witness has not been
10        designated as a 30(b)(6)
11        witness for these questions.
12            MS. HARWIN:  This is
13        background facts that speak
14        to the facts and
15        circumstances upon which the
16        State Court lawsuit was
17        based.
18            MR. DROGIN:  That may be
19        so, but this is not what the
20        witness has been designated
21        to answer.  Would you mind if
22        we took a five-minute
23        restroom break?
24            MS. HARWIN: Yes.  Why
25        don't we return at 11:22?
```



Page 93

```
 1                 T. HARVEY
 2            THE VIDEOGRAPHER:  The
 3       time is now 11:17 a.m.  We
 4       are now off the record.
 5            (Whereupon, a recess was
 6       taken at this time.)
 7            THE VIDEOGRAPHER:  The
 8       time is now 11:25 a.m. and we
 9       are back on the record.
10     Q.    Mr. Harvey, please identify
11   the date of each alleged vacation
12   that Canal contends Plaintiff
13   improperly received compensation for
14   on days when Canal contends she did
15   not work?
16     A.    So, for example, you are
17   asking in 2014, when I say that Ms.
18   Robinson submitted reimbursement for
19   to be paid for unused vacation days,
20   you want me to tell you what
21   exactly?
22     Q.    I am asking you to identify
23   the date of each alleged vacation
24   that Canal contends Plaintiff
25   improperly received compensation for
```



Page 94

```
 1                  T. HARVEY
 2    on days when Canal contends she was
 3    not working?
 4         MR. DROGIN:  Objection to
 5      the form.
 6      A.    Yeah.  So Ms. Robinson
 7    would submit basically saying she
 8    took, quote, "zero vacation days."
 9    So there is nothing in that, but you
10    want me to tell you, I think, when
11    she did, in fact, take vacation
12    days, is that it?
13      Q.    Identify the dates when
14    Canal contends that Plaintiff was on
15    vacation, not working, and
16    improperly received compensation
17    for?
18         MR. DROGIN:  Objection.
19      Objection to the form.  Just
20      it is subject to your
21      instruction that this is to
22      the best of the witness's
23      recollection and are you
24      offering to put any documents
25      in front of him?
```



Page 95

```
 1                  T. HARVEY
 2          MS. HARWIN:  Well, he is
 3       the Rule 30(b)(6) witness so
 4       he is -- you know, had an
 5       obligation to prepare for his
 6       testimony.
 7    Q.    If there are any documents,
 8  Mr. Harvey, that you would like to
 9  look at to identify these dates, let
10  us know.
11          MR. DROGIN:  I don't
12       think the idea of a 30(b)(6)
13       witness is to be a memory
14       exam.  If there are documents
15       that he wants to refer to,
16       are you going to provide it
17       to him?
18          MS. HARWIN:  I just
19       offered that.  So if he has
20       any documents that he would
21       like to refer to, let us
22       know.
23    A.    I have plenty of documents
24  that I would like to refer to,
25  specifically, e-mails between Ms.
```



Page 96

```
 1                    T. HARVEY
 2    Robinson as others that state such
 3    things as, "I am going on vacation.
 4    I am having a nice vacation.  My
 5    vacation was very good."  I would
 6    have to start pulling those.
 7       Q.    Prior to Canal filing its
 8    lawsuit, did it identify the dates
 9    of alleged vacations when Ms.
10    Robinson was not working?
11       A.    Yes.
12       Q.    Okay.
13             And so are you able to pull
14    that up now to identify the dates of
15    the alleged vacations when Canal
16    contends Ms. Robinson was not
17    working?
18       A.    Yes.
19             MR. BENNETT:  From the
20        50,000 pages we produced or
21        from elsewhere?
22             MS. HARWIN:  If Mr.
23        Harvey has the ability to
24        pull it up.
25       A.    Yes, I do have the ability.
```



Page 97

```
 1                T. HARVEY
 2    Q.    Okay.
 3          So why don't we take a
 4    break?  Why don't you pull up
 5    whatever document it is that you
 6    need to refer to.
 7          And how long do you need,
 8    Mr. Harvey?
 9    A.    About two hours.
10          MR. DROGIN:  That is what
11     I was going to say, too.
12    Q.    You need two hours to be
13    able to identify the vacation days?
14    A.    Well, I have identified
15    them already.  Now I have to go and
16    search for documents.
17    Q.    Do you have that pulled
18    together in any place?
19    A.    I am sure I have it, quote,
20    "pulled together" in many places.
21    But I am at home, and I don't have
22    necessarily access to all of these
23    documents.  If you had told me, I
24    would have brought them.
25    Q.    Mr. Harvey, you were
```



Page 98

```
 1                    T. HARVEY
 2    designated as the Rule 30(b)(6)
 3    witness on these topics.
 4           MR. BENNETT:  That
 5       doesn't mean that you can
 6       depose somebody and ask them
 7       to pinpoint out of the 65,000
 8       pages of documents that have
 9       been produced, which supports
10       every single nuance of a
11       claim.  That is not a
12       30(b)(6).
13           MS. HARWIN:  I am
14       offering him the opportunity
15       to look at a document if he
16       would like.
17           MR. BENNETT:  He said he
18       needs two hours to do it.
19    Q.    So Mr. Harvey, prior to the
20    filing of the State Court lawsuit,
21    did Canal pull together in a single
22    place a list of dates when Plaintiff
23    was alleged to be on vacation and
24    not working during the years 2014
25    through 2018?
```



```
 1              T. HARVEY
 2          MR. DROGIN:  Objection to
 3      the form.  That is -- that is
 4      -- hold on.  That is
 5      privileged.  That is work
 6      product.  That is pulling
 7      together documents in
 8      anticipation of litigation.
 9      You are asking him what Canal
10      did to prepare its Complaint,
11      and you have the answers to
12      this question.  You have the
13      documents.
14          MS. HARWIN:  So we are
15      entitled to the factual
16      information compiled by
17      Canal.  And so if Canal
18      created a compilation of
19      those alleged dates, we are
20      entitled to know that and we
21      are entitled to see that.
22          MR. DROGIN:  Well, I
23      don't believe --
24          (Simultaneous speaking)
25      A.    You have already been
```



Page 100

```
 1                    T. HARVEY
 2    provided with the, quote, "documents
 3    and information."  You received the
 4    e-mails with respect to either you
 5    already had in your possession or
 6    the documents that Canal had in its
 7    possession, or Mr. De Niro.  And you
 8    certainly have Ms. Robinson's.
 9            In addition, I believe you
10    have in possession documents related
11    to air travel, reimbursements, et
12    cetera.  If in those documents you
13    can find where Ms. Robinson was, for
14    example, when she was in California
15    on her rant with her friend Amelia
16    throwing a birthday party, I would
17    count those as, quote, "vacation
18    days."  That Friday, Saturday Sunday
19    and month would be four days of
20    vacation days that she used and said
21    she didn't use.  I would now have to
22    go get the e-mails where Chase makes
23    the reservation, where she pays the
24    Montage, where she leases the car,
25    where she orders dinner at Nobu,
```



```
 1              T. HARVEY
 2   where she orders a second dinner at
 3   Nobu, where she gets the gift --
 4     Q.    Mr. Harvey, I am simply
 5   asking --
 6     A.    I am not done yet.  I am
 7   not done yet.  Don't speak over me.
 8   You asked a question.  I am
 9   answering it.
10     Q.    Mr. Harvey, do not yell.
11     A.    No.  Don't speak over me.
12     Q.    Mr. Harvey, do not yell.
13     A.    Don't speak over me.  I
14   have to yell because you are
15   interrupting me.  I would have to --
16     Q.    You do not have to yell.
17     A.    Ms., do not speak over me.
18   I would have to go get all of those
19   documents in that one instance to
20   prove those four days.  Now we had
21   them.  I didn't know you wanted me
22   to provide you with my attorney work
23   product.
24          MR. DROGIN:  That is
25     Canal's objection here.  You
```



Page 102

```
 1                    T. HARVEY
 2      are asking him to recreate
 3      the work product.  You have
 4      the documents.
 5           MS. HARWIN:  So we are
 6      entitled to the factual
 7      information that was compiled
 8      as part of purported
 9      investigation into Ms.
10      Robinson.  And I am asking
11      whether there was such a
12      compilation created.  So if
13      the answer is no, that can be
14      the answer.  But we are
15      entitled to know either way.
16      A.    I just told you the answer
17   was yes.  Yes.
18      Q.    Okay.
19           So Canal created a
20   compilation of the dates when Canal
21   contends Ms. Robinson was on
22   vacation and not working, is that
23   correct?
24           MR. DROGIN:  Objection.
25      Q.    Mr. Harvey, can you
```



Page 103

```
 1                    T. HARVEY
 2    continue your answer?
 3          MR. DROGIN:  There is an
 4       objection based on privilege.
 5       A compilation prepared by
 6       Canal at the direction of
 7       Counsel to substantiate a
 8       claim that is brought forward
 9       in a lawsuit is privileged.
10       You said it yourself.  It is
11       a compilation.  You have the
12       underlying documents.  The
13       witness has explained to you
14       what has been done to make
15       that determination.  You are
16       now asking him to do the math
17       again for you.  That is not
18       his job.
19    Q.    Mr. Harvey, there is a
20    compilation Canal prepared of the
21    dates Canal claims Ms. Robinson was
22    on vacation and not working, is that
23    correct?
24          MR. DROGIN:  Objection.
25       You are asking a 30(b)(6)
```



Page 104

```
 1                T. HARVEY
 2      witness to divulge confidence
 3      if Canal prepared it, and if
 4      it was at the direction of
 5      counsel preparing it for a
 6      lawsuit.  You are not
 7      entitled to that.  You are
 8      not even entitled to know
 9      whether or not that existed.
10      It is work product.  It is
11      counsel working with a client
12      to determine whether or not
13      there is a claim.  You are
14      not entitled to that.  You
15      have the underlying document.
16      I thought it was 75,000
17      documents.  It is very --
18          MS. HARWIN:  Counsel,
19      obviously we have a
20      disagreement as to the
21      applicable scope of
22      privilege.  And also, you
23      know, what Mr. Harvey is
24      supposed to be here providing
25      competent testimony on.  So
```



Page 105

```
 1                T. HARVEY
 2     let me -- let me clarify.
 3         MR. MERINGOLO:  I'm
 4     sorry.  Is it possible that
 5     the questions that we are
 6     basically disputing to I
 7     guess mark them or have the
 8     court reporter mark them?  We
 9     can potentially revisit them
10     ourselves, being counsel at
11     the end of the deposition?
12     And, you know, I don't know
13     what would happen thereafter,
14     because to get into the
15     disputes -- listen, we all
16     could be wrong, we could be
17     partly right, all wrong.  I
18     guess we have different
19     analysis on what the
20     privilege is.  So I think if
21     -- if we can do that we will
22     be reasonable.  It is just
23     hard to do the specific
24     things that we believe
25     attorney-client privilege in
```



Page 106

```
 1                 T. HARVEY
 2     real time right now.
 3          MS. HARWIN:  Madam Court
 4     Reporter, are you able to
 5     mark those privileges
 6     disputes on an ongoing basis
 7     so we can return to them
 8     later?
 9          THE COURT REPORTER:
10     Absolutely.  Just one person
11     say to mark it for a ruling
12     and it will be marked.
13     Absolutely.
14          MR. DROGIN:  On behalf of
15     Canal, you can mark whatever
16     you want for a ruling.  I
17     will tell you that our
18     position is on the record.  I
19     am not revisiting at the end
20     of this.  If you want to have
21     a meeting and confer, if you
22     want to get a ruling from the
23     judge, that is your
24     prerogative.  My position is
25     stated on the record right
```



Page 107

```
 1                    T. HARVEY
 2      now.  If you want to discuss
 3      it with counsel, that is
 4      Canal's counsel, afterwards,
 5      you are free to do so.  But I
 6      am not going to --
 7           MS. HARWIN:  We can
 8      discuss it during a break.
 9      Why don't we proceed?
10      Q.   So Mr. Harvey, to the best
11   of your ability, identify all dates
12   for -- all dates when Canal contends
13   Ms. Robinson was on vacation and not
14   working in 2014 to 2018?
15           MR. DROGIN:  Objection to
16        the form.
17      A.   Yeah.  I would have to go
18   through all of the e-mails, all the
19   credit card statements, all of the
20   air miles, et cetera, to show the
21   Court and the jury, which we will,
22   that, for example, she was in London
23   or let's take Hawaii.  She went to
24   Hawaii.  She was supposed to meet a
25   friend there.  The friend didn't
```



Page 108

```
 1                  T. HARVEY
 2    show up.  She was supposed to stay
 3    for a week or ten days, whatever the
 4    documents say.  She left early
 5    because her friend didn't show up
 6    and she charged Canal saying that,
 7    in fact, she wasn't on vacation.  To
 8    pinpoint those exact dates, I would
 9    look at documents.  There is just
10    too much material for me off the top
11    of my head to tell you.
12             But, in general, there are
13    e-mails in your possession and other
14    documents in your possession that
15    show Ms. Robinson sitting in a hotel
16    outside of New York State on
17    vacation each year from 2014 through
18    2018.
19    Q.    Sitting here today, can you
20    identify with any specificity the
21    documents on which Canal based its
22    claim that Ms. Robinson had
23    improperly sought reimbursement for
24    vacation days?
25             MR. DROGIN:  Objection to
```



Page 109

1              T. HARVEY

2      the form.

3      A.    I apologize.  I thought I

4  just answered that.  When you say

5  the documents that we based our

6  claims on, we based our claims on

7  e-mails authored by Ms. Robinson,

8  that said such things as, "Hey,

9  don't forget I am on vacation.  Hey,

10  I am on vacation.  Hey, I had a

11  great vacation.  Hey, I am going to

12  on vacation with such and such."

13  Those e-mails together with hotels

14  often billed back to Canal, together

15  with reimbursements for Ubers, for

16  example, in London when she was on

17  vacation, together with

18  reimbursements for food, I would

19  have to take all those receipts,

20  together with airline tickets and

21  gather them to give them to you,

22  which we will do at trial.  I don't

23  believe at -- off the top of my head

24  I can repeat every date without a

25  stack of documents.



Page 110

```
 1                T. HARVEY
 2    Q.    Other than e-mails of the
 3  type that you just described, was
 4  there any type of document or other
 5  information on which Canal based its
 6  claim that Ms. Robinson had
 7  improperly sought reimbursement for
 8  vacation days?
 9         MR. DROGIN:  Objection to
10    the form.  You can answer.
11    A.    The problem with the
12  question is you are misstating what
13  I said.  Limiting it to e-mails.
14  I'm sorry.  This could be the
15  hospital.
16         MS. HARWIN:  Let's go off
17    the record while Mr. Harvey
18    takes a phone call.
19         THE VIDEOGRAPHER:  The
20    time is 11:40 a.m.  We are
21    off the record.
22         (Whereupon, a recess was
23    taken at this time.)
24         THE VIDEOGRAPHER:  The
25    time is now 11:40 a.m.  We
```



Page 111

```
 1                 T. HARVEY
 2      are back on the record.
 3   A.    Yeah, I am just saying that
 4  --
 5         MR. DROGIN:  Just so that
 6      the record is clear, that was
 7      a break of less than one
 8      minute.
 9   A.    I am saying the way that
10  you proposed the question to me
11  presupposes that I am just talking
12  about e-mails.  I am not just
13  talking about e-mails.
14   Q.    Identify for me all types
15  of documents that Canal based its
16  claim that Ms. Robinson -- I'm
17  sorry.  Let me restate that
18  question.
19         Identify for me all types
20  of document on which Canal based its
21  claims that Ms. Robinson had
22  improperly sought reimbursement for
23  vacation days?
24         MR. DROGIN:  Objection to
25      the form.
```



Page 112

```
 1                    T. HARVEY
 2      A.    Sorry.  Say it again.  All
 3   documents?
 4      Q.    All type of documents on
 5   which Canal based its claim that Ms.
 6   Robinson had improperly sought
 7   reimbursement for vacation days?
 8      A.    Right.  But I -- I will.  I
 9   just want to preface it, it is not
10   only, quote, "documents."  Putting
11   that aside, I -- once again, in
12   addition to e-mails, there would
13   have been submissions in terms of,
14   for example, reimbursement for
15   hotel.  So that is outside of your
16   limitation of it being an e-mail.
17   Receipts for food, receipts for
18   Ubers, receipts for rented cars.
19   There would have been reimbursements
20   for petty cash that shouldn't have
21   been taken.  There would have been
22   airlines tickets or tickets
23   associated with getting airline
24   tickets through Frequent Flyer
25   Miles.  There would have been
```



Page 113

```
 1                  T. HARVEY
 2    telephone bills.  There would have
 3    been Netflix receipts showing
 4    locations of people and what they
 5    were doing during their, quote,
 6    "vacation."  There are a number of
 7    other materials outside the scope
 8    of, quote, "e-mails" that we will
 9    have at trial to show Ms. Robinson
10    committed fraud.
11           MR. DROGIN:  Can we also,
12        Counsel, just to be clear,
13        you have only marked the
14        State Court Complaint, my
15        understanding is you are
16        limiting the question in time
17        to when that Complaint was
18        filed as opposed to the
19        Counterclaims that came later
20        after, for example, more than
21        40 hours' worth of audio
22        recordings.  My understanding
23        is that you are not asking
24        about that additional
25        information you learned in
```



Page 114

```
 1                  T. HARVEY
 2     that gap period.  If that is
 3     wrong, we should clarify the
 4     record.
 5     Q.    Is there any additional
 6   information obtained since Canal
 7   filed its State Court lawsuit on
 8   which it now bases its claim that
 9   Ms. Robinson improperly sought
10   reimbursement for vacation days?
11         MR. DROGIN:  Objection.
12     A.    Yes, we are going to hoist
13   Ms. Robinson on her own petard.  We
14   are going to hoist Ms. Robinson on
15   her own petard.  On her own words in
16   her own tape recordings that she
17   made where she must have forgotten
18   that she was recording herself,
19   talking about vacations.
20     Q.    Other than documents and
21   recordings that you have referenced,
22   was there any other information on
23   which Canal has based its claim that
24   Ms. Robinson improperly sought
25   reimbursement for vacation days?
```



```
 1                T. HARVEY
 2           MR. DROGIN:  Objection to
 3      the form.
 4      A.    Yes.
 5      Q.    What information is that?
 6           MR. DROGIN:  To be clear,
 7      are you talking about
 8      communications with counsel
 9      and witnesses?
10           MS. HARWIN:  I am asking
11      about what other information
12      the claim is based on.
13           MR. DROGIN:  Other than
14      communication between counsel
15      and witness, which obviously
16      would be privileged.
17           MS. HARWIN:  If there
18      were interviews with
19      witnesses, that would be
20      included.
21           MR. DROGIN:  I don't
22      understand that.
23      Q.    Mr. Harvey, identify what
24   other information Canal contends it
25   based its claim that Ms. Robinson
```



Page 116

```
 1                  T. HARVEY
 2   improperly sought reimbursement for
 3   vacation days?
 4     A.    Witness interviews.
 5     Q.    Okay.
 6           Which witnesses were
 7   interviewed concerning Ms.
 8   Robinson's vacation days?
 9     A.    Off the top of my head,
10   Amelia Brain, Michael Kaplan, Robin
11   Chambers, Dan Harvey, Robert De
12   Niro.  I am sure I am missing
13   people.  Anyone associated with
14   Canal during the period 2014 through
15   2019.
16     Q.    Did you take notes of those
17   witness interviews?
18     A.    No.
19     Q.    You interviewed witnesses,
20   but maintained no notes of what they
21   said?
22     A.    Yes.
23     Q.    What did those witnesses
24   say concerning Ms. Robinson's
25   vacation days?
```



Page 117

```
1              T. HARVEY
2         MR. MERINGOLO:  Objection
3    to it is whoever he
4    represented in the past,
5    specifically, Mr. De Niro.
6         MR. DROGIN:  And
7    objection to the form.
8    A.    Well, I can give you in sum
9    and substance because otherwise it
10   -- there is too much cursing.
11        Essentially, in sum and
12   substance, Mr. Kaplan said, yes.
13   Chase Robinson -- excuse me, Graham
14   Chase Robinson took vacation every
15   year.  And he proceeded to tell me
16   looking at documents where she was
17   and who she was with.  Amelia Brain,
18   for example, confirmed that she was
19   in California celebrating Amelia's
20   birthday during this time period.
21   Who else do we have?  Certainly
22   Sabrina and Jillian Spear who work
23   in the office could receive
24   telephone calls from Ms. Robinson
25   when she was on vacation.  Sabrina
```



Page 118

```
 1                  T. HARVEY
 2   vividly remembers Ms. Robinson
 3   gloating about going to London.  I
 4   don't have the date, but it was in
 5   2018 in the -- in the late
 6   summer/early fall.  I would have to
 7   look -- once again, look at the --
 8   each specific trip to tell you off
 9   the top of my head.  Oh, yes.  And
10   of course the day she took off to
11   attend funerals or medical
12   emergencies and apparently didn't
13   charge those or indicate to anyone
14   that they were vacation days.
15     Q.    I'm going to drop into the
16   chat Plaintiff's Exhibit 50, which
17   is comprised of documents Bates
18   stamped Robinson 0009964, 8625,
19   9969, 9971, 8228, and 8096.
20            MR. MERINGOLO:  I think
21       this is 49.
22            MS. HARWIN:  I'm sorry.
23       Thank you, Counsel.  49.
24       That is correct.
25            (Whereupon, Plaintiff's
```



Page 119

```
 1                  T. HARVEY
 2       Exhibit 49, comprised of
 3       documents Bates stamped
 4       Robinson 0009964, 8625, 9969,
 5       9971, 8228, and 8096, was
 6       marked for identification, as
 7       of this date.)
 8    A.    Sorry.  I am having a
 9  problem.
10         MR. BENNETT:  Give us a
11     minute.  It is a large file.
12    A.    I may have to go back on.
13  I can't get the screen back.
14    Q.    It should be in the chat
15  that appears on the bottom of your
16  screen.
17    A.    Yeah.  I don't have the big
18  screen anymore is my problem.
19         MR. MERINGOLO:  Gallery,
20     hit the gallery.
21         THE WITNESS:  I have it
22     down the side, but no other
23     -- hold on.  I think -- I am
24     going to have log off and log
25     right back in.
```



Page 120

```
 1                  T. HARVEY
 2           MS. HARWIN:  We will go
 3      off the record.
 4           THE VIDEOGRAPHER:  The
 5      time is now 11:48 a.m.  We
 6      are off the record.
 7           (Whereupon, a recess was
 8      taken at this time.)
 9           THE VIDEOGRAPHER:  The
10      time is now 11:51 a.m.  We
11      are back on the record.
12      Q.   Mr. Harvey, have you had a
13   chance to download Exhibit 49?
14      A.   You are cutting out.  Say
15   it again.
16      Q.   Have you had a chance to
17   review Exhibit 49?
18      A.   I can see that they are
19   e-mails, but in, quote, "reviewing
20   them," I haven't read them.
21      Q.   Okay.
22           Take a moment to look over
23   this document, and when you have had
24   a chance to review it, let us know.
25   And actually, as you are reviewing,
```



Page 121

```
 1                   T. HARVEY
 2   let me give you one question and
 3   then you can answer it when you are
 4   done reviewing.
 5          Are these the documents
 6   containing Ms. Robinson's alleged
 7   misstatements concerning vacation
 8   pay on which Canal based its
 9   allegations against Ms. Robinson
10   concerning vacation pay?
11          MR. DROGIN:  Objection to
12     the form.
13   A.    When you say, "the
14   documents," I'm not sure I would
15   agree with that statement.  They are
16   some documents that are part of a
17   number of documents.
18   Q.    Are these the documents
19   containing the alleged misstatements
20   by Ms. Robinson concerning vacation
21   days?
22          MR. DROGIN:  Objection.
23     I am not -- I am not clear
24     that that is a question that
25     is appropriate based on the
```



Page 122

```
 1                 T. HARVEY
 2     attorney-client privilege.
 3     You are asking -- you are
 4     asking Canal the documents
 5     upon which its attorneys
 6     determined were sufficient to
 7     state a claim.  I just want
 8     to think that through.  I
 9     think it is privileged.  You
10     are wanting to know what
11     documents the attorneys
12     reviewed, assessed, and
13     determined that there was a
14     colorable claim.
15          MR. HARWIN:  Let met --
16     let me make this easier for
17     everyone.
18     Q.   In Canal's claims against
19   Ms. Robinson, there are specific
20   paragraphs that discuss alleged
21   communications that Ms. Robinson had
22   from 2014 to 2018 concerning
23   vacation pay.
24          My question is, are the
25   documents contained at Exhibit 49
```



Page 123

                    T. HARVEY
1
2     those communications that Canal
3     referenced in its claims against Ms.
4     Robinson concerning vacation days?
5           MR. DROGIN:  We can
6        stipulate they are among the
7        documents.  That is fair.
8        These were reviewed by
9        counsel, and those are among
10       the documents upon which the
11       claims were based, yes.
12    Q.    Are there any documents not
13    contained in exhibit --
14    A.    Hold on.  Hold on one
15    second.  That was Laurent answering
16    not me.
17    Q.    Okay.
18    A.    I'm not sure -- I just want
19    to make sure the record is clear
20    because that was him not me.  But go
21    ahead.
22    Q.    Do you agree with that?
23    A.    I apologize, but it -- what
24    is the question if they don't mind
25    reading it back so I can actually



Page 124

```
 1                  T. HARVEY
 2   answer it?
 3      Q.    Let me sort of -- I think I
 4   can bring us back up to speed.
 5          In Canal's claims against
 6   Ms. Robinson concerning vacation
 7   days, Canal references
 8   communications made by Ms. Robinson
 9   between 2014 and 2018 to Canal's
10   accountant concerning vacation days,
11   is that correct?
12      A.    I would have to look at the
13   Complaint.  I don't have any reason
14   to doubt you, but I would have to
15   read the Complaint right now.  If
16   you want to direct me, I don't want
17   to waste your time.
18      Q.    In paragraphs 49 to 54 that
19   Mr. Drogin referenced previously,
20   there is reference to communications
21   between Ms. Robinson and Canal's
22   counsel, correct?
23      A.    Again, I would have to look
24   at the Complaint unfortunately.  Do
25   you want to put the Complaint up for
```



Page 125

```
 1                T. HARVEY
 2   a second?  Are you waiting on me?
 3     Q.    Yes.
 4     A.    Do you want me to pull up
 5   the Complaint?
 6     Q.    If you need to look at it.
 7     A.    Now I have to figure out
 8   how to get to it.
 9           MR. MERINGOLO:  It is
10      number two in the --
11           MR. DROGIN:  You are
12      asking him a specific
13      question about specific
14      paragraphs in the Complaint?
15           MS. HARWIN:  I'm sorry?
16           MR. DROGIN:  You asked
17      him questions about -- you
18      asked him a question about
19      certain specific paragraphs
20      in the Complaint?
21           MS. HARWIN:  After a lot
22      of the other questions, that
23      is right.
24     A.    I am unfortunately having
25   problems with pulling it up.
```



Page 126

```
 1                T. HARVEY
 2    Q.    Why don't we take a break
 3  and you can pull up whatever
 4  documents you need to look at?
 5    A.    Okay.
 6          THE VIDEOGRAPHER:  The
 7     time is now 11:58 a.m.  We
 8     are off the record.
 9          (Whereupon, a recess was
10     taken at this time.)
11          THE VIDEOGRAPHER:  The
12     time is now 12:08 p.m.  We
13     are back on the record.
14    Q.    Mr. Harvey, turning your
15  attention back to Exhibit 49, are
16  these the e-mails that are
17  referenced in Paragraphs 49 through
18  53 of Canal's Complaint against Ms.
19  Robinson?
20    A.    I would say that -- that
21  the answer is that the e-mails --
22  the e-mails that are referenced in,
23  for example, Paragraph 51, it is
24  referenced in there with respect to
25  the number of pages she submitted to
```



Page 127

```
1              T. HARVEY
2    Mr. Tasch.  I assume Mr. Tasch, but
3    yeah.
4      Q.    Mr. Harvey, can you speak
5    more loudly please?
6      A.    I can.  I am saying that
7    with respect to -- the Complaint
8    saying that Ms. Robinson sent
9    e-mails to -- referencing her number
10   of days, that certainly is part of
11   the e-mails that are being
12   referenced.
13     Q.    Are there any e-mails in
14   which Ms. Robinson claimed
15   reimbursement for vacation days that
16   constitute part of Canal's claims
17   that are not contained in
18   Plaintiff's Exhibit 49?
19           MR. DROGIN:  Objection to
20      the form.
21     A.    You got me on that one.  I
22   don't know what you just said.
23     Q.    Are there any e-mails in
24   which Ms. Robinson claimed vacation
25   days that are part of -- I'm sorry.
```



Page 128

```
 1                 T. HARVEY
 2   Let me -- let me restate that.
 3          Were there any other
 4   communications between 2014 and
 5   2018, in which Ms. Robinson claimed
 6   reimbursement for vacation days that
 7   are not included in Exhibit 49?
 8          MR. DROGIN:  Objection to
 9     the form.
10     A.    I -- I just think the
11   question is convoluted.  There are
12   other e-mails in -- that have been
13   produced and that I have seen in
14   which Ms. Robinson claims that she
15   did not take a vacation.
16          However, were those
17   submitted to Michael Tasch?  I don't
18   know.  In terms of her trying to get
19   reimbursed for unused vacation days.
20   So I'm not sure if that answers your
21   question or not.
22     Q.    Did you -- well, let me ask
23   it differently.
24          You testified about
25   interviewing Mr. De Niro as a
```



Page 129

1              T. HARVEY

2   witness concerning reimbursements to

3   Ms. Robinson for unused vacation

4   days.  Is that correct?

5     A.    Yes.

6     Q.    Tell me everything that Mr.

7   De Niro stated concerning the

8   circumstances in which Ms. Robinson

9   was authorized to be paid for unused

10  vacation days?

11          MR. DROGIN:  Objection to

12      the form.

13          MR. MERINGOLO:  Objection

14      to privilege with the word

15      everything.

16          MR. DROGIN:  Objection to

17      the form.

18    A.    You are asking about my

19  conversations with Mr. De Niro?

20    Q.    Yes.  Concerning this

21  topic.

22          MR. DROGIN:  Objection to

23      the form.

24    A.    In substance, he said,

25  "Chase is full of shit.  She took



Page 130

```
 1                T. HARVEY
 2    vacation."
 3     Q.    What did Mr. De Niro say
 4    about circumstances in which Ms.
 5    Robinson was authorized to be paid
 6    for unused vacation days?
 7          MR. BENNETT:  Objection.
 8      Just to clarify here, are you
 9      asking about questions prior
10      to -- in the -- in the weeks
11      or months preceding
12      commencement of the State
13      Court action, or going back
14      to 2014, 2015, '16, et
15      cetera?
16          MS. HARWIN:  During the
17      course of the purported
18      investigation in the lead up
19      to the State Court action.
20      That is what my question is
21      concerning.
22          MR. DROGIN:  How is this
23      not privileged?
24          MS. HARWIN:  The Court
25      has held that where
```



```
 1                    T. HARVEY
 2      investigation is raised as a
 3      support for counterclaim as
 4      is here, any privilege is
 5      waived as the factual
 6      information uncovered --
 7          (Simultaneous speaking)
 8          MS. HARWIN:  Mr. Harvey
 9      interviewed Mr. De Niro as a
10      fact witness and so we are
11      asking about the facts
12      uncovered.
13          MR. BENNETT:  You are
14      asking his personal lawyer
15      what Mr. De Niro allegedly
16      said to him in so far as it
17      related to seeking legal
18      advice.  So to the extent Mr.
19      De Niro was conveying
20      information in the course of
21      asking for legal advice,
22      which is consistent with the
23      Court's opinion, I direct Mr.
24      Harvey not to answer the
25      question as it relates to Mr.
```



Page 132

```
 1                T. HARVEY
 2      De Niro.
 3           MS. HARWIN:  My question
 4        is about factual information
 5        conveyed by Mr. De Niro
 6        during an interview.
 7      Q.    So tell me everything that
 8   Mr. De Niro stated concerning the
 9   circumstances in which Ms. Robinson
10   was authorized to be paid for unused
11   vacation days?
12           MR. DROGIN:  I join in
13        that --
14           MR. MERINGOLO:  That is a
15        very broad question.
16           MR. BENNETT:  Yeah.
17           MR. MERINGOLO:  We can
18        mark that if this is okay.
19           MS. HARWIN:  Sure.
20           We can mark that.
21           MR. DROGIN:  You can ask
22        Mr. De Niro on what factual
23        basis did you believe...  to
24        ask his attorney what he
25        communicated, you are just
```



Page 133

```
 1                T. HARVEY
 2     asking for communications
 3     between attorney and client.
 4     As opposed to just asking the
 5     client what -- what facts
 6     caused you to believe.
 7     Right?  You don't have to
 8     invade the attorney-client
 9     communications there.
10   Q.    Tell me how long did your
11  interview of Mr. De Niro concerning
12  reimbursement to Ms. Robinson for
13  vacation days last?
14   A.    A minute.
15   Q.    What did Mr. De Niro say in
16  that minute?
17        MR. BENNETT:  Don't
18     reveal privileged
19     information.
20        MR. MERINGOLO:  It is a
21     tough --
22        MR. DROGIN:  Other than
23     what has already been
24     testified that she is full of
25     shit?  He already answered.
```



Page 134

```
 1                T. HARVEY
 2    A.    That sums it up.
 3    Q.    What were Mr. De Niro's
 4   words when you interviewed him about
 5   reimbursement to Ms. Robinson for
 6   vacation days?
 7         MR. MERINGOLO:  We have
 8      to object to that.
 9    Q.    Please answer.
10         MR. BENNETT:  That is --
11      I think that is what we just
12      said we are going to mark for
13      a ruling.  It is the same
14      question.
15         MS. HARWIN:  The Court
16      was clear that where an
17      investigation is raised as
18      support for Counterclaims, as
19      it is here, any privilege is
20      waived as there is factual
21      information uncovered.
22         MR. BENNETT:  That is the
23      factual information.  That is
24      the point.
25    Q.    Let me ask the question in
```



```
 1                T. HARVEY
 2   a different way.
 3          When you interviewed Mr. De
 4   Niro concerning reimbursement to Ms.
 5   Robinson for vacation days, tell me
 6   all factual information that Mr. De
 7   Niro supplied?
 8          MR. DROGIN:  Objection.
 9       Here is the problem.  You are
10       calling this an
11       investigation.  Every single
12       time an attorney speaks with
13       a client to gather
14       information, to make a
15       determination as to whether
16       there is a legal claim, that
17       is -- that is not waiving a
18       privilege.  That is not an
19       investigation.  That is an
20       attorney and a client
21       communicating with one other.
22       What you are presupposing is
23       that his communications are
24       some form of investigation
25       and, therefore, it is the
```



```
                                      Page 136
 1                  T. HARVEY
 2        privilege of.
 3             MS. HARWIN:  Counsel, he
 4        already testified about doing
 5        an interview.
 6             MR. DROGIN:  I understand
 7        that.  I understand that.
 8        But we are not opening doors
 9        here any wider than they have
10        to be.  I also -- there is
11        also something that you are
12        doing here that I find
13        problematic.  The -- when you
14        are saying Canal relying on
15        an investigation, I don't
16        understand what you mean.
17        Canal had an investigation,
18        and brought an affirmative
19        claim, just like any
20        plaintiff does.  You did an
21        investigation with your
22        client before bringing
23        claims.  Can I ask your
24        client about communications
25        that she had with you?  You
```



```
 1               T. HARVEY
 2     would object, just like you
 3     did.  It is the same thing.
 4         MS. HARWIN:  Well,
 5     Counsel, we are not
 6     revisiting the Court's ruling
 7     on this subject.  Okay?
 8         MR. DROGIN:  Actually, I
 9     beg to differ.  I think we
10     have to.
11         MS. HARWIN:  The
12     deposition is not -- you
13     know, if you have something
14     that you want to take up with
15     the Court, you can take it up
16     with the Court.  This is not
17     an opportunity for a colloquy
18     about revisiting the Court's
19     ruling.
20         MR. DROGIN:  It is a
21     problem as to why we keep
22     butting up into the
23     attorney-client privilege
24     because you are assuming that
25     there is some investigation
```



Page 138

```
 1                 T. HARVEY
 2      that we are relying on.
 3      Those are your words.
 4           MR. MERINGOLO:  You know
 5      why -- I'm late to the party.
 6      I am here for Tom.
 7           Was there litigation with
 8      respect to the privilege
 9      itself?
10           MS. HARWIN:  Yes.  There
11      was a Motion to Compel and
12      the Court issued a ruling on
13      that.  So it wasn't about
14      this deposition, but it
15      stated general legal
16      principals.
17           MR. MERINGOLO:  But
18      maybe --
19           MS. HARWIN:  Including
20      language that I quoted.
21           MR. DROGIN:  Documents --
22      A.   Hold on.  There was a
23   one-minute conversation.  I am sure
24   you can frame the question, Ms.
25   Harwin -- I am sure you can frame
```



MAGNA
LEGAL SERVICES

Page 139

```
 1                 T. HARVEY
 2    the question regarding a one-minute
 3    conversation as to the -- the
 4    question.  We can get on with this.
 5         (Technical interference)
 6         MR. MERINGOLO:  You are
 7      frozen, Tom.
 8         MS. HARWIN:  We can't see
 9      you.
10         THE WITNESS:  I am going
11      to try a different --
12         MS. HARWIN:  There we go.
13         THE WITNESS:  Can you
14      hear me now?
15         MR. MERINGOLO:  Yes.
16    A.    I was going to say why
17    don't you just try rephrasing the
18    question and we can get on with
19    this?
20    Q.    Okay.
21         When Mr. De Niro was
22    interviewed, concerning
23    reimbursements to Ms. Robinson for
24    unused vacation days, what factual
25    information did he share?
```



Page 140

```
 1                    T. HARVEY
 2      A.    In our lawsuit we say Ms.
 3   Robinson was unauthorized or not
 4   entitled to do that.  Mr. De Niro
 5   confirmed, as he says in the
 6   lawsuit, that Ms. Robinson was not
 7   allowed to get reimbursed for
 8   vacation days she didn't use because
 9   she actually went on the vacation.
10      Q.    Was Mr. De Niro interviewed
11   about specific conversations that he
12   had with Ms. Robinson about vacation
13   days?
14      A.    You keep asking as if I am,
15   quote, interviewed:  I spoke to him.
16   I wouldn't consider it an interview.
17   But go ahead.
18      Q.    Was Mr. De Niro questioned
19   about conversations he had with Ms.
20   Robinson about vacation days?
21      A.    Mr. De Niro advised me that
22   he knew Chase Robinson had went on
23   vacation.
24      Q.    Okay.
25      A.    And -- he and he will
```



Page 141

```
 1                T. HARVEY
 2  testify to that at trial.
 3    Q.    Okay.
 4          And Mr. De Niro -- when you
 5  say that he testified that he knew
 6  Ms. Robinson -- I'm sorry.
 7          When you -- when you
 8  reference Mr. De Niro knowing that
 9  Ms. Robinson took vacation, when --
10  when did Mr. De Niro say that he had
11  known that?
12    A.    What day?
13          MR. DROGIN:  Objection to
14      the form.
15    Q.    Over what period of time
16  did he know that?
17          MR. DROGIN:  Objection to
18      the form.
19          MR. BENNETT:  I don't
20      understand the question.
21    A.    You completely lost me on
22  that one.
23    Q.    Was -- let me rephrase.
24          Was the information that
25  Ms. Robinson had been on vacation
```



Page 142

```
 1                T. HARVEY

 2    something that was discovered after

 3    her employment ended, or was that

 4    something that Mr. De Niro knew on

 5    an ongoing basis during her

 6    employment?

 7          MR. DROGIN:  Objection to

 8      the form.

 9          MR. BENNETT:  Objection

10      to the form.

11    A.    You can certainly ask Mr.

12    De Niro what he knew.  I will tell

13    you that Ms. Robinson certainly sent

14    those e-mails to Berdon, so Berdon

15    knew.  I can tell you that they

16    should not have been paid, and I

17    certainly didn't know about it.  And

18    I don't believe Mr. De Niro was

19    aware of it.

20    Q.    You don't believe that Mr.

21    De Niro was aware of what?

22    A.    The e-mails that said she

23    is requesting to be paid for

24    vacation days Ms. Robinson actually

25    used.  And the fact that she was
```



Page 143

```
 1                    T. HARVEY
 2    actually paid for them.  He
 3    considered that fraud, or defrauding
 4    him, or stealing from him.
 5       Q.    So turning your attention
 6    to Exhibit 49, these --
 7       A.    I can't hear you.  Say it
 8    again.
 9       Q.    Turning your attention to
10    Exhibit 49, these are e-mails that
11    were sent by Ms. Robinson from 2014
12    to 2018 concerning vacation days.
13    Mr. De Niro was included on all of
14    these e-mails Ms. Robinson sent
15    about vacation pay from 2014 to
16    2018, correct?
17            MR. BENNETT:  Look
18      through them all, Tom.
19       A.    They say what they say.
20    What do you want to know?  What can
21    I answer your question about?
22       Q.    Was the answer yes, Mr. De
23    Niro was included on all of the
24    e-mails that Ms. Robinson sent about
25    vacation pay from 2014 to 2018?
```



Page 144

```
 1                T. HARVEY
 2    A.    I can tell you on the first
 3  document that appears to be Mr. De
 4  Niro's e-mail, on the second
 5  document it appears to be Mr. De
 6  Niro's e-mail, on the third document
 7  it appears to be Mr. De Niro's
 8  e-mail, on the fourth one it appears
 9  that he is not on that e-mail as far
10  as I can see.
11    Q.    If you look down a little
12  bit lower on the page?
13    A.    I see that.  And then the
14  one below that I see his e-mail
15  address, and the one below that I
16  don't see his e-mail address.  Oh, I
17  see his name, but not his address.
18    Q.    Prior to the end of Ms.
19  Robinson's employment, did Mr. De
20  Niro ever dispute Ms. Robinson's
21  characterization of vacation days
22  she was entitled to be paid back
23  for?
24    A.    Dispute the
25  characterization, what does that
```



Page 145

```
 1                 T. HARVEY
 2    mean?
 3        Q.    Did Mr. De Niro ever
 4    dispute Ms. Robinson's
 5    characterization of the number of
 6    vacation days that she was
 7    authorized to be paid back for?
 8        A.    I have no idea what you are
 9    talking about.  Characterization?
10    How is he -- how is anyone
11    characterizing anything?
12        Q.    At any time before Ms.
13    Robinson's employment at Canal
14    ended, did anyone evaluate what Ms.
15    Robinson said about the vacation
16    days that she was entitled to be
17    paid back for?
18        A.    I have no idea what you
19    mean by evaluate.
20        Q.    Did anyone evaluate
21    anything that Ms. Robinson said in
22    the e-mails contained at Exhibit 49
23    before her employment ended?
24        A.    What do you mean by
25    evaluate?
```



Page 146

```
 1                    T. HARVEY
 2    Q.    Did anyone look into what
 3   Ms. Robinson was saying about
 4   vacation days in these e-mails from
 5   2014 to 2018?
 6    A.    Yes.
 7    Q.    Okay.
 8          How so?
 9    A.    How so did they look into
10   them?
11    Q.    Yes.
12    A.    Sure.  We went and checked,
13   and realized she had taken vacation
14   every year and lied about it.
15    Q.    Prior to the end of Ms.
16   Robinson's employment, did anyone do
17   anything to look into what Ms.
18   Robinson wrote in these e-mails
19   prior to issuing payment?
20    A.    Not to my knowledge.
21    Q.    After Ms. Robinson sent
22   these e-mails, from 2014 to 2018,
23   that included Mr. De Niro, did Mr.
24   De Niro ever dispute what Ms.
25   Robinson was saying about the number
```



Page 147

```
 1                    T. HARVEY
 2   of vacation days that she should be
 3   paid for?
 4           MR. DROGIN:  Objection to
 5      the form.
 6      A.    Yes.
 7      Q.    What did he do to dispute
 8   that?
 9      A.    He instructed us to file a
10   lawsuit for her stealing from him.
11      Q.    Prior to the end of Ms.
12   Robinson's employment at Canal, did
13   Mr. De Niro ever dispute what Ms.
14   Robinson had said about the vacation
15   days that she was seeking to be paid
16   back for?
17           MR. DROGIN:  Objection to
18      the form.
19      A.    Say that again?
20           MS. HARWIN:  You know
21      what, Madam Court Reporter,
22      can you read the question
23      that preceded that?
24           (Whereupon, the requested
25      portion was read back by the
```



Page 148

```
 1                    T. HARVEY
 2      reporter:
 3           Q:  What did he do to
 4      dispute that?)
 5           MS. HARWIN:  What was the
 6      question before that?
 7           (Whereupon, the requested
 8      portion was read back by the
 9      reporter:
10           Q:  After Ms. Robinson
11      sent these e-mails, from 2014
12      to 2018, that included Mr. De
13      Niro, did Mr. De Niro ever
14      dispute what Ms. Robinson was
15      saying about the number of
16      vacation days that she should
17      be paid for?)
18           MR. DROGIN:  Same
19      objection to the form.
20      Q.    After Ms. Robinson sent
21      these e-mails, up until the time
22      when her employment at Canal ended,
23      did Mr. De Niro ever dispute what
24      Ms. Robinson was saying about the
25      number of vacation days that she
```



Page 149

```
 1                    T. HARVEY
 2    should be paid back for?
 3            MR. DROGIN:   Objection.
 4    A.      Yes.
 5    Q.      Okay.
 6            How so?
 7    A.      She robbed me.
 8    Q.      When did he say that prior
 9    to the end of her employment?
10    A.      You said at any time,
11    right?
12    Q.      I said at any time after
13    this was sent, until her employment
14    end.
15            MS. HARWIN:   Madam Court
16        Reporter, can you read back
17        the question so the witness
18        can answer?
19            (Whereupon, the requested
20        portion was read back by the
21        reporter:
22            Q:   After Ms. Robinson
23        sent these e-mails, up until
24        the time when her employment
25        at Canal ended, did Mr. De
```



Page 150

```
 1                  T. HARVEY
 2      Niro ever dispute what Ms.
 3      Robinson was saying about the
 4      number of vacation days that
 5      she should be paid back for?)
 6   A.    To the end of the
 7  employment, one, I don't know if
 8  these were sent.  I assume they
 9  were.  I don't know if Bob saw them.
10  I don't think he did.
11         Regardless, he never said
12  anything regarding this to me prior
13  to the end of her employment.
14   Q.    Did Canal do anything to
15  crosscheck the days when Ms.
16  Robinson was supposedly on vacation
17  against the work that Ms. Robinson
18  actually did for Canal on those
19  days?
20   A.    Yes.
21         MR. DROGIN:  Objection to
22      the form.  Can you just
23      clarify if you are talking
24      about before or after her
25      employment ended?
```



Page 151

```
 1                 T. HARVEY
 2            MS. HARWIN:  Prior to --
 3       at any point prior to the
 4       filing of the litigation.
 5            MR. DROGIN:  That is
 6       different.  In other words,
 7       if you are going to go into
 8       beyond her employment, when
 9       you know that they were
10       looking into these things,
11       that is different than the
12       question that you asked
13       before which is whether
14       anybody looked at this before
15       she resigned.
16            MS. HARWIN:  Yes.  This
17       is a different question.
18    Q.    So prior to filing the
19    State Court lawsuit against Ms.
20    Robinson, what did Canal do to
21    crosscheck the dates where Ms.
22    Robinson was supposedly on vacation
23    against the work that she was
24    performing for Canal on those days?
25            MR. DROGIN:  Objection.
```



Page 152

```
 1              T. HARVEY
 2      That -- that is privileged.
 3      That is work product.  If you
 4      are confining it before she
 5      resigned, then there is no
 6      objection.  If you asking
 7      about the gap period between
 8      when she resigned and when
 9      the lawsuit was filed, that
10      is the work product generated
11      by the attorney/client
12      communications to determine
13      whether or not, in fact,
14      there was a viable claim.
15          MS. HARWIN:  This is the
16      information -- what we are
17      looking for is facts
18      uncovered as part of the
19      purported investigation.
20      Something that the Court has
21      held as not privileged.  So
22      -- or that the Court has held
23      that privileged is waived as
24      to that information.
25          MR. DROGIN:  I don't
```



Page 153

```
 1                T. HARVEY
 2      agree with your
 3      characterization.  I don't
 4      agree with your
 5      characterization.  There is
 6      no investigation that is
 7      being relied on as a defense
 8      to your equal pay claims,
 9      your overtime claims, your
10      retaliation claims, or the
11      harassment claims.  All you
12      are doing here is you are
13      invading the attorney-client
14      privilege to find out what
15      the attorneys did with their
16      client to --
17           MS. HARWIN:  Counsel, it
18      was -- it was Canal's choice
19      to designate an attorney as
20      their Rule 30(b)(6) witness.
21      We are entitled to ascertain
22      facts and circumstances that
23      led to the filing of the
24      Complaint.  And the Court has
25      laid out parameters under
```



Page 154

```
 1                  T. HARVEY
 2      which it has held that
 3      privilege has been waived by
 4      Canal.  And so, you know, we
 5      can mark it for a ruling, but
 6      I don't know want to spend
 7      our time on the record with
 8      lengthy debates about what
 9      the Court has already said.
10      I would urge Counsel to
11      review the Court's ruling
12      during a break, because I
13      think it is very clear on
14      aspects that Canal is now
15      claiming or disputing.
16          MR. DROGIN:  Let's --
17      hold on.  Hold on.  Let's do
18      this.
19          First of all, it doesn't
20      matter who Canal designates
21      as the 30(b)(6) witness.  If
22      it is privileged, it is
23      privileged.  We could have
24      Donald Duck there.  I agree
25      with you, let's take a look
```



Page 155

```
 1                 T. HARVEY
 2     at what the Court says.
 3     Maybe you are right.  Maybe
 4     you are wrong.
 5          MS. HARWIN:  So why don't
 6     we do that?  Why don't we
 7     take a break.  And Counsel, I
 8     would refer you to page 22 of
 9     the Court's ruling.  You can
10     look at the entire ruling,
11     but I would refer you, among
12     other things, to page 22.  So
13     why don't we go off the
14     record?  Why don't we -- we
15     --
16          (Simultaneous speaking)
17          MS. HARWIN:  I was going
18     to say, the time is 12:30.
19     Mr. Harvey, you can take a
20     lunch break, and why don't we
21     resume --
22     A.    Listen, I don't need a
23     lunch break.  The -- Pauly Herman
24     who I fully expect to be dead, who
25     is somehow still alive, I can almost
```



Page 156

```
 1                T. HARVEY
 2    guarantee you that in the next three
 3    to four hours he will be dead.  I am
 4    not sure what is going to happen
 5    when that happens, and I don't want
 6    to -- I want to fulfill my
 7    commitment here so I would rather
 8    just keep going.
 9          MS. HARWIN:  So why don't
10       we just take a 15-minute
11       break?  I want to be mindful
12       of the court reporter.  How
13       much time do you need, Paige,
14       for a break?
15          THE COURT REPORTER:
16       Whatever works for you guys.
17          MS. HARWIN:  Okay.  So
18       why don't we resume at 12:50?
19          MR. DROGIN:  Just so we
20       are clear, what is the date
21       of the Decision to which you
22       are referring?
23          MS. HARWIN:  I don't have
24       the date in front of me.
25          MR. MERINGOLO:  Could
```



Page 157

```
 1                   T. HARVEY
 2      somebody send me the
 3      Decision?  So I can read it.
 4           MR. DROGIN:  It is a
 5      decision to Motion to Compel
 6      Production of Documents?
 7           MS. HARWIN:  Yes.  Okay.
 8      Thank you.  Are we off the
 9      record?
10           THE VIDEOGRAPHER:  The
11      time is now 12:34 p.m.  We
12      are off the record.
13           (Whereupon, a recess was
14      taken at this time.)
15           THE VIDEOGRAPHER:  The
16      time is now 12:52 p.m.  We
17      are back on the record.
18           MR. DROGIN:  So we took a
19      short break so that Counsel,
20      or at least myself, could
21      review the opinion referenced
22      by Ms. Harwin regarding the
23      privilege, and to quote Judge
24      Parker, I don't know what you
25      are talking about.
```



Page 158

1                    T. HARVEY

2          On page 22 of her

3     opinion, which is dated March

4     9th, 2022, document 171, at

5     page 22, which is where you

6     directed me, she wrote

7     "Defendants denote five

8     documents that concern their

9     "investigation" regarding

10    Plaintiff's allegations.

11    Although it is true that a

12    fact investigation is

13    conducted at the direction of

14    an attorney for purposes of

15    rendering legal advice, can

16    be protected by the

17    attorney-client privilege,

18    citing first Chicago versus

19    United Exchange Company of 25

20    Federal Rule Decision 55 at

21    56 to 58, Southern District

22    New York 1989, purpose of the

23    fact investigation must be to

24    aid the provision of legal

25    advice.



Page 159

```
 1                 T. HARVEY
 2          However, where an
 3     investigation is raised as a
 4     support for a counterclaim,
 5     as it is here, any privilege
 6     is waived as to the factual
 7     information uncovered.
 8          Communications with
 9     counsel without the factual
10     information, however, would
11     be protected.  Citing Sparrow
12     Fund Management LP versus
13     MiMedx, M-I-M-E-D-X, Group,
14     Inc., 2001 Westlaw 1930294."
15          The decision continues.
16     I don't agree that we are
17     raising an investigation into
18     Court of the counterclaim,
19     but that is not the issue and
20     the basis for the objection
21     here.
22          Factually, we have no
23     problem with your discovering
24     facts.  But when you are
25     asking about, quote,
```



Page 160

```
 1                T. HARVEY
 2      "communications with counsel
 3      about the factual
 4      information..." that would be
 5      protected reading from the
 6      Court's decision.
 7           So we stand by all of our
 8      objections based on privilege
 9      where your inquiry concerns
10      communications between the
11      attorney and the client.  We
12      are prepared to proceed.
13           MS. HARWIN:  Obviously,
14      we have a difference in
15      interpretation as to what the
16      scope is, but we will
17      proceed --
18           (Simultaneous speaking)
19           MR. DROGIN:  Why don't
20      you state your position on
21      the record so that if the
22      Court is presented with the
23      transcript we can understand
24      the basis for your dispute or
25      perhaps -- perhaps even by
```


MAGNA
LEGAL SERVICES

Page 161

```
 1              T. HARVEY
 2     saying it we would have a
 3     dialogue and reverse our
 4     position.
 5         MS. HARWIN:  Okay.  Well,
 6     we are happy to have a
 7     dialogue on break, but right
 8     now we are proceeding with
 9     questioning.
10   Q.   Mr. Harvey --
11         MR. DROGIN:  You have
12     been given the opportunity to
13     explain your client's
14     position on the record to
15     preserve the argument here so
16     the Court can review the
17     transcript, you have
18     declined.  Please proceed.
19         MS. HARWIN:  Counsel,
20     that is not an accurate
21     characterization.  I think we
22     have been clear about what
23     our position is.
24   Q.    Mr. Harvey, the American
25   Express that Canal contends Ms.
```



Page 162

```
 1                  T. HARVEY
 2   Robinson improperly charged personal
 3   expenses on was the Canal credit
 4   card that beared Ms. Robinson's
 5   name, is that correct?
 6       A.    Well, there were other --
 7   you are trying to limit it.  She
 8   used Canal American Express credit
 9   card to defraud Canal and Bob's
10   associated credit cards.  So I just
11   don't want to limit it to the credit
12   card or her credit card.
13       Q.    Well, what specific credit
14   cards does Canal contends Ms.
15   Robinson improperly made charges on?
16       A.    The Canal credit card
17   associated with that, and credit
18   cards associated with Robert De
19   Niro.
20       Q.    What specific credit cards
21   associated with Mr. De Niro are you
22   contending that Ms. Robinson
23   improperly charged personal expenses
24   to?
25       A.    I thought I just told you,
```



Page 163

```
 1                T. HARVEY
 2    but to be more specific there was
 3    several ways Ms. Robinson defrauded.
 4     Q.    Louder?
 5     A.    There are numerous ways
 6    that Ms. Robinson used credit cards
 7    associated with Robert De Niro, and
 8    Canal Productions, Inc., such as,
 9    using air miles associated with
10    those cards, transferring them and
11    using them for herself.
12          In addition, there are
13    credit cards associated with, for
14    example, on file at certain
15    institutions or retailers that she
16    used.  And again, I would have to go
17    through each card and walk you
18    through, but she -- she had her own
19    credit card, which she charged often
20    and the most fraud was coming with
21    credit card, but I don't want to
22    limit it or I am not limiting it to
23    just her specific card.
24     Q.    What specific cards are you
25    alleging were used improperly?
```



Page 164

```
 1                T. HARVEY
 2      A.    I'm sorry.  Are you looking
 3   for credit card numbers?
 4      Q.    Credit card or some -- a
 5   credit card number or some other
 6   identifying characteristic, either
 7   by the name that appeared on the
 8   card, the type of card.  But yes, I
 9   am asking you to identify with some
10   specificity what the specific credit
11   cards are that you contend were used
12   improperly by Ms. Robinson?
13      A.    Yes.  The card issued in
14   her name, the credit card issued in
15   the name of Canal Productions or
16   associated Canal Productions.
17   Robert De Niro's American Express,
18   et cetera.  I don't have the cards
19   in front of me.
20      Q.    Were there any credit cards
21   that are issued in the name of Canal
22   Productions without being issued in
23   the name of an individual?
24      A.    Limited to just Canal
25   Productions, no.  But there were --
```



Page 165

```
 1                T. HARVEY
 2   there is a -- we are splitting hairs
 3   here.
 4           Ms. Robinson had a credit
 5   card issued to her that was billed
 6   to Canal Productions, so I consider
 7   that a Canal Productions credit
 8   card.
 9     Q.    Okay.
10           What specific credit cards
11   were improperly used by Ms. Robinson
12   according to Canal?
13           MR. DROGIN:  Objection to
14     the form.
15     A.    I think you are looking for
16   account numbers.  I would have to go
17   look them up.
18     Q.    Can you identify them in
19   any other way, even if it is not by
20   providing account numbers?  By the
21   name on the card, by the type of
22   card?  Any way so that we can
23   identify what the actual credit
24   cards are that are at issue?
25     A.    No.  The credit cards that
```



Page 166

```
 1                    T. HARVEY
 2    are linked to Robert De Niro and/or
 3    Canal Productions.  They are -- they
 4    are their names.  They are the
 5    ultimate -- Canal Productions.
 6             (Technical interference)
 7    Q.    Can you speak louder,
 8    please?
 9             Mr. Harvey, your -- the
10    sound broke up on your side.
11    A.    Let me just double check my
12    connect.
13    Q.    Is Mr. Harvey frozen?
14    A.    Now am I?  I will try
15    again.  Am I back?
16             MR. MERINGOLO:  Back.
17    A.    Yes.  You are asking me
18    about the actual credit cards and
19    the names on the specific credit
20    cards.  I would have to look at
21    those credit cards.  They all come
22    back to Robert De Niro and/or Canal
23    Productions, Inc.
24    Q.    Okay.
25             I would ask you to look and
```



Page 167

```
 1                    T. HARVEY
 2   identify those for us after -- after
 3   a break.  Would you like to do that
 4   now?
 5      A.     No, I don't have the credit
 6   cards.
 7      Q.     Okay.
 8             What documents would you
 9   need to review in order to ascertain
10   what those credit cards are that
11   Canal claims Ms. Robinson used
12   improperly?
13      A.     Well, the easiest way is to
14   get copies of the credit cards
15   themselves.
16      Q.     Which credit cards?
17      A.     The credit cards we are
18   talking about.  The ones associated
19   with Robert De Niro and/or Canal
20   Productions, Inc.
21      Q.     Okay.
22             As you sit here today, you
23   can't identify with any specificity
24   what Canal credit cards Canal
25   contends Ms. -- let me restate that.
```



Page 168

```
 1                    T. HARVEY
 2            Sitting here today, you
 3   can't identify with any specificity
 4   any credit cards other than the
 5   credit card under Ms. Robinson's
 6   name that Canal contends Ms.
 7   Robinson improperly charge, is that
 8   correct?
 9            MR. DROGIN:  Objection to
10      the form.
11   A.    No, that is not correct.
12   Q.    Okay.
13            Please identify with
14   specificity then what those credit
15   cards are?
16            MR. DROGIN:  Objection to
17      the form.  What do you mean
18      by specificity?  You want the
19      credit card number?
20            MS. HARWIN:  Or some
21      other identifying
22      characteristic.  Whether it
23      is the name of the person
24      under whose name the credit
25      card appears, the type of
```



Page 169

```
 1                T. HARVEY
 2     credit card.
 3     A.    I think we cleared up the
 4  credit card is an American Express.
 5  I think I said, and I will try to be
 6  more specific, that there were
 7  credit cards associated with Robert
 8  De Niro, specifically, American
 9  Express and Canal Productions, Inc.
10  I don't remember off the top of my
11  head the credit card number or
12  account.  It is easy enough to
13  figure out.  I don't have that
14  information with me right now.
15     Q.    Okay.
16           Can you figure out that
17  information on a break and get back
18  to us with the answer later this
19  afternoon?
20     A.    I believe you already have
21  that information.  You are asking me
22  to do your work, no.  We provided
23  you with the credit card statements
24  I believe associated with the theft.
25     Q.    Mr. Harvey, you are the
```



```
 1                T. HARVEY
 2   witness designated by Canal.  And so
 3   we are entitled to ask you these
 4   questions to identify what the
 5   credit cards are that Canal contends
 6   were used improperly?
 7        MR. DROGIN:  He has done
 8      that, and you keep talking
 9      about specificity.  If you
10      want credit card numbers, I
11      guess Canal can give you the
12      credit card numbers.  I don't
13      know why you need to badger
14      the witness about this.
15        MS. HARWIN:  If he can
16      identify in any manner,
17      whether it is the name or the
18      number, that is fine.  Right
19      now we are not getting any
20      information.
21        MR. DROGIN:  He answered
22      that.  This isn't a quiz.  I
23      couldn't tell you my own
24      credit card number.
25        MS. HARWIN:  You could
```



Page 171

```
 1                  T. HARVEY
 2      probably tell me it is under
 3      your name.
 4           MR. DROGIN:  Yeah.  He
 5      already explained whose name
 6      it is under.  And you can
 7      count hundreds of pages of
 8      these credit card receipts,
 9      and --
10           MS. HARWIN:  Counsel --
11      counsel, I am asking Canal's
12      witness.  Okay?
13   Q.   So is there any credit card
14   name or -- let me restate that.
15           Which -- which -- can you
16   identify the names that appeared on
17   the credit cards that you contend
18   Ms. Robinson used improperly?
19   A.    On a credit card you have
20   the credit card statement, you have
21   the cards issued with respect to
22   that account.  Ms. Robinson had a
23   credit card.  I don't know the
24   account number, but that credit card
25   was a Canal Productions, Inc.,
```



MAGNA
LEGAL SERVICES

Page 172

```
 1                 T. HARVEY
 2   credit card.  I don't know that
 3   account number off the top of my
 4   head.  We have supplied you with
 5   hundreds of documents that has the
 6   account number.  I am not done yet.
 7   Thank you.
 8            In addition, I believe
 9   there are instances associated with
10   Mr. De Niro's credit card issued to
11   Robert De Niro, whether it has Bob,
12   Robert, or whatever, I don't know
13   what is on the physical credit card.
14   I know the account numbers not off
15   the top of my head.
16     Q.    What charges does Canal
17   contend Ms. Robinson improperly
18   charged on Mr. De Niro's credit
19   card, meaning, the credit card under
20   Mr. De Niro's name?
21            MR. DROGIN:  Do you want
22        it line by line of every
23        single card?  I want to know
24        if that is what you are
25        really asking for.
```



Page 173

```
 1                T. HARVEY
 2          MS. HARWIN:  I am asking
 3     for an identification.
 4          MR. DROGIN:  You want a
 5     line by line replication of
 6     every -- of every charge that
 7     Canal claims?  Is that what
 8     you are asking for?
 9          MS. HARWIN:  I am asking
10     for a description.
11          MR. DROGIN:  Okay.  A
12     description.  Very clear.
13     Description.
14          MS. HARWIN:  Counsel, if
15     the witness wants to provide
16     it line by line, that is
17     fine.  If there is a general
18     category that can be
19     described, that is fine.  As
20     far as I know, it is news to
21     us that there is any
22     allegation concerning the
23     credit card in Mr. De Niro's
24     name, so I would like an
25     identification of that -- or
```



Page 174

```
 1              T. HARVEY

 2      a description of what that

 3      allegation is.

 4    Q.    So Mr. Harvey, please

 5   proceed.

 6    A.    Yeah.  For example, the air

 7   miles.  I believe there were certain

 8   air miles and other things that are

 9   associated with Mr. De Niro's card.

10   In fact, I would have to look at the

11   transaction sheet to figure that

12   out.

13    Q.    Other than SkyMiles, does

14   Canal contend that Ms. Robinson

15   improperly charged any expenses to

16   the credit card under Mr. De Niro's

17   name?

18    A.    I would have to review

19   thousands of documents in terms of

20   the receipts to make sure what card

21   it was associated with.

22    Q.    The -- the Canal American

23   Express card bearing Ms. Robinson's

24   name was the main credit card used

25   by -- used for expenses for Canal's
```



1              T. HARVEY

2    office and Canal office employees,

3    is that correct?

4        A.    Do we have a time period

5    here?

6        Q.    During the period from 2016

7    to 2019, the Canal American Express

8    under Ms. Robinson's name was the

9    main credit card used for expenses

10   for Canal's office and Canal office

11   employees, correct?

12       A.    I wouldn't necessarily

13   agree with that statement.  Are you

14   asking if that credit card was used

15   more often than the other credit

16   card?  Probably.  But you are trying

17   to make it -- two dimensional

18   question.  It is yay or nay.  The

19   credit card was used by the staff,

20   yes.  But there was another credit

21   card, too, that they used.

22       Q.    What was the other credit

23   card that was used?

24       A.    I would have to look at the

25   credit card.  They charged -- the



Page 176

```
 1                T. HARVEY
 2    way it was supposed to work is one
 3    was for, quote, "business expenses"
 4    and one was, quote, "personal
 5    expenses," all relating to Robert De
 6    Niro.  The idea being that rather
 7    than have the accountant delve into
 8    two different accounts, that they
 9    could split them into one, and
10    segregate it for tax purposes.  At
11    least that was the general idea.
12    Q.    And the -- the Canal
13    American Express under Michael
14    Kaplan's name was used primarily for
15    expenses that were personal to Mr.
16    De Niro and his family, correct?
17            MR. DROGIN:  Objection to
18      the form.
19    A.    I don't necessarily agree
20    with that statement.
21    Q.    What was the credit card
22    that was used primarily for expenses
23    that were personal to Mr. De Niro
24    and his family?
25            MR. DROGIN:  Objection to
```



Page 177

```
 1                T. HARVEY
 2       the form.
 3       A.    You are looking for the
 4   account number?
 5       Q.    I am looking for any
 6   description.
 7       A.    Okay.  You have the Kaplan
 8   credit card, I will describe it as,
 9   the one that Michael Kaplan had
10   access to, and the Chase credit card
11   that Chase generally had access to.
12   And I guess what is your question
13   regarding them?
14       Q.    So you described business
15   expenses being put on one credit
16   card and personal expenses being put
17   on another card.  I am looking to
18   identify the card.  It was the Canal
19   credit card under Michael Kaplan's
20   name that was used primarily for
21   expenses that were personal to Mr.
22   De Niro and his family, correct?
23       A.    No.
24            MR. BENNETT:  He is not
25       here for that purpose.
```



Page 178

```
 1                T. HARVEY

 2    Q.    Go ahead, Mr. Harvey.

 3    A.    I said I wouldn't agree

 4  with that statement.

 5    Q.    Okay.

 6          What was the credit card

 7  that was used for expenses that were

 8  personal to Mr. De Niro and his

 9  family?

10          MR. BENNETT:  Objection

11    to the form.

12    A.    They were both used for

13  various reasons.

14    Q.    Okay.

15          The -- Canal American

16  Express in Ms. Robinson's name was

17  used for various expenses for

18  Canal's office and Canal's office

19  employees, correct?

20    A.    No.

21    Q.    Okay.

22          What about that statement

23  is incorrect?

24    A.    It was used by Chase --

25  Graham Chase Robinson to rob from
```



Page 179

1              T. HARVEY

2    Canal and Robert De Niro.  That is

3    what it was used for primarily in my

4    mind.

5       Q.     What were the uses of the

6    Canal American Express card under

7    Ms. Robinson's name that were

8    charged by other people besides Ms.

9    Robinson?

10           MR. DROGIN:  Objection to

11       the form.

12      A.     During what time period?

13      Q.     During the period from 2016

14   to 2019?

15      A.     They should have been used

16   for office expenses and other issues

17   associated with operating Canal

18   Productions, Inc.

19      Q.     What were all the types of

20   expenses that Canal employees, other

21   than Ms. Robinson, put on the Canal

22   American Express card under Ms.

23   Robinson's name?

24      A.     Legitimate business charges

25   associated with Canal Productions



Page 180

```
 1                    T. HARVEY
 2    and Robert De Niro relating to the
 3    operation of Canal, which is loan
 4    out company for Mr. De Niro.
 5       Q.    What -- what specific types
 6    of expenses?
 7            MR. DROGIN:  Objection to
 8      the form.
 9       A.    Could be anything.
10    Anything associated with -- with
11    getting sheets of paper to print, to
12    paying a porter to do something for
13    them.
14       Q.    Which Canal office
15    employees had access to the credit
16    card under Ms. Robinson's name?
17       A.    When you said, "had
18    access," they all knew about it in
19    timeframe being 2017/'18, you would
20    have to go through each employee
21    prior to that.
22       Q.    Okay.
23            And the card number and
24    credentials for the Canal American
25    Express card in Ms. Robinson's name
```



Page 181

```
 1                T. HARVEY
 2   were provided to the employees who
 3   worked in Canal's office, correct?
 4     A.    When you say, "provided," I
 5   just don't want to mince words.  But
 6   they had access to it.
 7     Q.    Canal's allegations about
 8   Ms. Robinson improperly charging
 9   Canal's credit card were based on
10   reviewing account statements for
11   American Express, is that correct?
12     A.    Some of that is correct.
13     Q.    What aspect is not correct?
14     A.    There were other things we
15   did to verify that, in fact, the
16   expenses charged were not
17   legitimate.
18     Q.    What else was done to
19   verify that expenses charged were
20   purportedly illegitimate?
21     A.    Sure.
22           For example, if Chase
23   purchased meals in London, when we
24   knew she was on vacation, we then
25   had to go check the air miles to
```



Page 182

```
 1                T. HARVEY
 2    make sure she was in London, check
 3    the hotel to make sure she was in
 4    London, check Netflix to make sure
 5    she was in London, and verify what
 6    Bob was doing, and was there any
 7    reason for Chase Robinson or Graham
 8    Robinson being in London to -- to
 9    make sure she wasn't doing something
10    for Mr. De Niro.  So there were
11    numerous crosschecks and ways to
12    show that, in fact, Ms. Robinson --
13    I am just taking one example, went
14    to London for vacation, used that
15    credit card for several purchases
16    that shouldn't have been made.
17      Q.    Are you referring to a trip
18    in December of 2018 in London?
19      A.    I am referring to several
20    trips.  Numerous trips.
21      Q.    I'm going to show you what
22    will be marked as Exhibit 50, which
23    is Bates stamped Canal 0050276 and
24    Canal 0050277.
25            (Whereupon, Plaintiff's
```



Page 183

```
 1                    T. HARVEY
 2        Exhibit 50, Canal 0050276 and
 3        Canal 0050277, was marked for
 4        identification, as of this
 5        date.)
 6     Q.    You will see there are two
 7   -- two documents to click on.
 8     A.    I'm sorry.  276 and 277?
 9     Q.    You got it.
10     A.    And you want -- can we open
11   one at time and deal with one at a
12   time?
13     Q.    Yes.  There is -- one is an
14   e-mail and the other is the
15   attachment to the e-mail.
16     A.    Okay.  I just don't want to
17   lose you again.
18     Q.    No problem.  If you could
19   first open the document ending in
20   276.  Do you recognize this e-mail?
21     A.    I didn't even open it yet.
22   Sorry.
23     Q.    Let me know when you have
24   had a chance to download it.
25     A.    Is it from Sabrina Weeks?
```



Page 184

```
 1                    T. HARVEY
 2     Q.    That is correct.
 3     A.    Got you.
 4     Q.    Okay.
 5           As you can see, this is an
 6     e-mail from Sabrina Weeks-Britain,
 7     dated August 8, 2019, and as you can
 8     see there is on attachment called
 9     "Chase AMEX XLF."
10           Do you see that?
11     A.    I do.
12     Q.    I am going to ask you to
13     open the attachment, which is the
14     next Bates number ending in 277?
15     A.    Uh-huh.
16     Q.    When you have opened that
17     spreadsheet, let me know?
18     A.    Alright.  We are good.
19     Q.    So do you recognize this
20     spreadsheet entitled, "Chase AMEX"
21     and dated August 8, 2019?
22     A.    I do.
23     Q.    Who prepared this
24     spreadsheet?
25     A.    When you say, "prepared," I
```



```
 1                    T. HARVEY
 2    think a number of people worked on
 3    it.
 4      Q.    Okay.
 5            Who worked on this
 6    spreadsheet?
 7      A.    It would have been Sabrina,
 8    Jillian, Kaplan and myself.
 9      Q.    And who directed this
10    spreadsheet be prepared?
11      A.    Directed?  I guess you
12    could say me.
13      Q.    And can you explain to me
14    what the highlighting on this
15    spreadsheet represents?
16      A.    It is just showing you
17    charges that were made by Graham
18    Robinson that she shouldn't have
19    charged.
20      Q.    Okay.
21            This spreadsheet was sent
22    just over a week before Canal filed
23    its lawsuit against Ms. Robinson,
24    correct?
25      A.    This particular version,
```



Page 186

```
 1                  T. HARVEY
 2    probably.  I don't know.  I didn't
 3    see the date.
 4       Q.    Okay.
 5             It was dated August 8,
 6    2019.  So this is approximately a
 7    week before Canal filed its lawsuit,
 8    right?
 9       A.    Okay.
10       Q.    Okay.
11             Were any subsequent
12    versions of this spreadsheet
13    exchanged at any time before Canal's
14    lawsuit was filed?
15       A.    When you say, "exchanged,"
16    what do you mean?
17       Q.    Were there any later
18    iterations of this spreadsheet
19    before Canal's lawsuit was filed?
20       A.    I don't know.
21       Q.    Are the items highlighted
22    in green all of the expenses that
23    Canal contends Ms. Robinson
24    improperly charge at Paola's
25    restaurant?
```



Page 187

```
 1                  T. HARVEY
 2     A.    Say that again.
 3     Q.    Are the items highlighted
 4  in green all of the expenses that
 5  Canal contends Ms. Robinson
 6  improperly charged at Paola's
 7  restaurant?
 8     A.    I don't know.  I would have
 9  to add them up and then go back and
10  look at other receipts.
11     Q.    The sum total of the items
12  highlighted in green, $12,696.65,
13  matches the exact number that Canal
14  claims in its lawsuit that Ms.
15  Robinson improperly charged for
16  food, drinks, and gratuities at
17  Paola's.  Is that right?
18     A.    I would have to look at the
19  Complaint.  If you say so.
20          MR. DROGIN:  If you are
21     representing that, then --
22     then we will agree.
23          MS. HARWIN:  Okay.
24          MR. DROGIN:  We have no
25     no reason to disbelieve you
```


MAGNA
LEGAL SERVICES

Page 188

```
 1                T. HARVEY
 2      as an officer of the Court.
 3          MS. HARWIN:  Thank you,
 4      Counsel.  So yes.  As -- I
 5      can represent that the sum
 6      total of the items
 7      highlighted in green on the
 8      spreadsheet total $12,696.65,
 9      and that matches exactly the
10      number that Canal claims in
11      its lawsuit as improper
12      charges at Paola's.
13    Q.    Are the items highlighted
14  in blue all the expenses that Canal
15  contends Ms. Robinson improperly
16  charged for Ubers and taxis?
17    A.    Again, I would have to do
18  math and then look at the backup.
19    Q.    Well, the sum total of the
20  items highlighted in blue,
21  $31,814.17, corresponds to the
22  figure of approximately 32,000, that
23  is claimed in this lawsuit that Ms.
24  Robinson improperly charged for
25  taxis and Ubers.
```



MAGNA
LEGAL SERVICES

Page 189

```
 1                 T. HARVEY
 2         So does that refresh your
 3    recollection?
 4      A.   No, it doesn't.  But I am
 5    not disputing it.  I mean, it is
 6    common sense.  But, again, I didn't
 7    go through and do this right now.
 8         MR. DROGIN:  Again, if
 9       the numbers add up, as you
10       have indicated, and these are
11       all highlighted, then this
12       would have been how Canal
13       determined the amount that it
14       claims had been improperly
15       charged.  I would also say
16       that some of them appear to
17       be -- you said Ubers and
18       taxis.  Some of them appear
19       to be in England.  I don't
20       know.  I want to make sure we
21       are not limited to travel in
22       the United States.
23      A.   I don't know.
24         MS. HARWIN:  I am not
25       saying anything about the
```



Page 190

```
 1                  T. HARVEY
 2     location.  I am just simply
 3     trying to identify what are
 4     the charges that are claimed
 5     in the lawsuit.
 6          MR. DROGIN:  Yes.
 7     Q.    So the sum total of the
 8  items highlighted in yellow is
 9  $8,923.20, which matches the exact
10  number Canal contends that Ms.
11  Robinson improperly charged at Whole
12  Foods and Dean & DeLuca.
13          Are the items highlighted
14  in yellow all of the expenses that
15  Canal contends Ms. Robinson
16  improperly charged at Whole Foods
17  and Dean & DeLuca?
18     A.    With respect to the Dean &
19  DeLuca, if the two match, and,
20  again, I don't want to slow you down
21  here.  I would say that is where we
22  got the number.  By adding up all of
23  these items.
24     Q.    The sum total of the items
25  highlighted in pink concerning
```



Page 191

```
 1                T. HARVEY
 2   flowers and flowers shop is
 3   $17,119.27.
 4        And that number is
 5   substantially higher than the
 6   approximate $3,000 figure that Canal
 7   cites in its lawsuit for improper
 8   charges for flowers and other items
 9   at Flowers by Philip.
10        What is the exact amount
11   that Canal contends that Ms.
12   Robinson improperly charged for
13   flowers?
14   A.   I would have to look at the
15   Counterclaims federal action.
16   Q.   Well, in this spreadsheet,
17   more than $17,000 in charges are
18   highlighted.  And in the lawsuit
19   brought by Canal and Counterclaims
20   by Canal, they cite a figure of
21   approximately $3,000.
22        So can you clarify what is
23   the amount that Canal contends was
24   improperly spent by Ms. Robinson on
25   flowers?
```



Page 192

```
 1                    T. HARVEY
 2     A.    Looking at this spreadsheet
 3  alone, I cannot tell you why the
 4  numbers are different, no.
 5     Q.    Can you speak louder, sir?
 6     A.    Looking at this spreadsheet
 7  alone, I cannot tell you why there
 8  is a difference between the amount
 9  charged or charges at the flower
10  shop, Flowers by Philip, and the
11  amount that is listed in the
12  Counterclaim in Federal Court.
13     Q.    Well, how much does Canal
14  contend that Ms. Robinson improperly
15  charged for flowers?
16           MR. DROGIN:  Objection.
17     A.    I would have to --
18           MR. DROGIN:  Objection to
19    the form.  You can answer.
20     A.    Yeah.  I would have to look
21  at the Counterclaims in the Federal
22  Complaint or Federal Action I should
23  say.
24           MR. DROGIN:  For the
25    record, it is also clear that
```



Page 193

```
 1                T. HARVEY
 2     some of these -- it is not
 3     just Flowers by Philip.  It
 4     is also Flowers by Michael.
 5     Q.    Does Canal --
 6          MS. HARWIN:  Yes.  Thank
 7      you for clarifying counsel.
 8     Q.    Mr. Harvey, does Canal
 9  contend that Ms. Robinson made any
10  improperly charges to a store called
11  Flowers by Michael?
12     A.    I would have to look at the
13  Federal Complaint, look at the
14  charges, and back them up.
15          MS. HARWIN:  Why don't we
16      drop into the chat Exhibit
17      51, the Federal
18      Counterclaims.
19          (Whereupon, Plaintiff's
20      Exhibit 51, Federal
21      Counterclaims, was marked for
22      identification, as of this
23      date.)
24     Q.    Does looking at the
25  Counterclaims asserted by Canal
```



Page 194

```
 1                 T. HARVEY
 2  refresh your recollection?
 3    A.    I haven't looked at them
 4  yet.
 5    Q.    Let us know when you have
 6  that.
 7    A.    Uh-huh.  Okay I am looking
 8  at it.  What is the question?
 9    Q.    So what is the amount that
10  Canal contends Ms. Robinson
11  improperly charged for flowers?
12    A.    More than $3,000.
13    Q.    So does Canal contend that
14  she charged over 17,000 improperly
15  for flowers or is the amount
16  approximately $3,000?
17    A.    The amount is, and I quote,
18  "Over $3,000."
19    Q.    Is the amount over $5,000?
20        MR. DROGIN:  Objection to
21     the form.
22    A.    The charge with respect to
23  unauthorized purchases of flowers is
24  more than or over $3,000.
25    Q.    I understand that.  But I
```



Page 195

```
 1                    T. HARVEY
 2    am trying to get more specificity.
 3            There is already a
 4    significant disparity between the
 5    sum total of the valued highlighted
 6    in the spreadsheet and the amount
 7    cited in the Complaint.  I am trying
 8    to understand, with greater clarity,
 9    what actually is the amount that
10    Canal contends Ms. Robinson
11    improperly charged for flowers?
12      A.    That is simple.  It is more
13    than $3,000.
14      Q.    Turning your attention back
15    to the spreadsheet, the items that
16    are not highlighted and instead
17    appear in alternating white and grey
18    cells are the expenses that Canal
19    does not claim Ms. Robinson charged
20    improperly, is that right?
21      A.    I am opening the
22    spreadsheet again.  That is not
23    necessarily true.
24      Q.    Okay.
25            Are there any items that
```



Page 196

```
 1                   T. HARVEY
 2   are not highlighted in -- in the
 3   spreadsheet that Canal contends Ms.
 4   Robinson improperly charged?
 5      A.    I would have to look at
 6   more than this.  I think generally
 7   the concept is you are correct, but
 8   there could be the few charges that
 9   are not in this spreadsheet that
10   are, in fact, of the basis for the
11   lawsuit.
12      Q.    I would like to turn to the
13   charges at Paola's restaurant.
14      A.    Uh-huh.  Yes.
15      Q.    What documents did Canal
16   review that served as the basis for
17   its claims concerning charges at
18   Paola's restaurant?
19      A.    We looked at the American
20   Express charges related to Paola's
21   for beginners.
22      Q.    You can continue.
23      A.    I -- I think you are -- you
24   are trying to figure out how do we
25   know it was Graham Robinson, and the
```



Page 197

```
 1                 T. HARVEY
 2   answer is we crosschecked various
 3   items to make sure that, in fact,
 4   she was the one that was at Paola's.
 5   Especially, if Robert De Niro went
 6   there, he would use his own card.
 7   Michael Kaplan never went there, and
 8   certainly Jillian and Sabrina never
 9   went there.  So short of someone
10   stealing the card from Graham
11   Robinson that was never reported to
12   us, it was Graham Robinson.
13      Q.    So what other documents
14   were used to crosscheck these
15   expenses?
16      A.    I would have to look, but
17   you can generally see that there
18   would have been where Bob was, for
19   example.  It is easy enough to
20   figure out, whether he was in town,
21   out of town, those sorts of things.
22   Where the other people were, making
23   sure they didn't steal the card and
24   use it at Paola's.
25      Q.    Did you compile information
```



Page 198

```
 1                  T. HARVEY
 2    on Mr. De Niro's whereabouts
 3    throughout the period from 2017 to
 4    2019, spanning Canal claims?
 5             MR. DROGIN:  Objection.
 6         That is -- that is
 7         privileged.  You are asking
 8         for a compilation by
 9         attorneys.
10    Q.    Does --
11             MR. DROGIN:  Isn't the
12         question here whether it was
13         authorized?  Isn't that
14         really the issue here?
15    Q.    Mr. Harvey, Canal does not
16    have evidence of any charges from
17    Paola's restaurant that appeared on
18    the Canal American Express were from
19    Ms. Robinson dining in at Paola's,
20    is that correct?
21    A.    You are asking me what
22    evidence Canal has?  Is that the
23    question with respect to physically
24    where the food was eaten?
25    Q.    Yes.
```



```
 1                T. HARVEY
 2    A.    Hold on.  So you are
 3  suggesting that all of the orders on
 4  the American Express by Chase
 5  Robinson -- I don't know -- I know
 6  that she ordered the food and paid
 7  for the food.  I don't know one
 8  hundred percent where she ate the
 9  food, if that is the answer to your
10  question.
11    Q.    Canal does not dispute that
12  any meals that Ms. Robinson charged
13  to Paola's were delivered to her
14  home, correct?
15         MR. DROGIN:  Objection to
16     the form.
17    A.    When you say, "dispute,"
18  I'm not sure what you mean because
19  there is no one to dispute it with.
20  We never disputed it with American
21  Express if that is what you mean.
22    Q.    Does Canal dispute in this
23  litigation that any expenses to
24  Paola's that were charged were for
25  items that were delivered to Ms.
```



Page 200

```
 1                T. HARVEY
 2    Robinson's home?
 3         MR. DROGIN:  Objection.
 4    I can represent to you that
 5    it -- it was never looked at
 6    where it was delivered.  What
 7    was looked at was the charge.
 8    It was -- it was on her card,
 9    it was -- it was to a
10    restaurant.
11         MS. HARWIN:  Okay.
12         MR. DROGIN:  The question
13    is who put it there and was
14    it authorized.  I don't know
15    if she had veal parmigiana.
16    I don't know if she had
17    chicken scarpariello.  I have
18    no idea.  It is -- it is the
19    amount.
20    Q.   Did Canal --
21         MR. DROGIN:  Do I have
22    reason to believe that she
23    had?
24    A.   I have to put this
25    objection on the record.
```



Page 201

1                    T. HARVEY

2      Q.    Sir you are not --

3      A.    One second.  Mr. Drogin,

4   please never try to say that Italian

5   meal again.  It hurt our ears.

6      Q.    I will let you get away

7   with that objection.

8      A.    Thank you.

9      Q.    Did Canal review any

10  receipts for the charges at Paola's

11  that appeared on Canal's credit

12  card?

13     A.    Are you talking physically

14  the American Express receipts that

15  would have been given to whoever

16  purchased the food?  Is that what

17  you are referring to?

18     Q.    Not referring to American

19  Express documents.  I am talking

20  about receipts generated from the

21  restaurant Paola's?

22     A.    So receipts issued by

23  Paola's to the person who would have

24  ordered the food, is that it?  Is

25  that correct?



Page 202

```
 1                    T. HARVEY
 2      Q.    Receipts generated by the
 3   restaurant Paola's, was that ever
 4   reviewed by Canal in connection with
 5   bringing its claim?
 6           MR. DROGIN:  Objection.
 7      Objection to the form.  Just
 8      so we are clear, there has
 9      been testimony that she
10      reviewed her own receipts.
11      It is also in her recording
12      she is talking about
13      shredding receipts.  When you
14      say Canal.  She was Canal.
15      If you are talking about post
16      resignation, you just need to
17      clarify because she at one
18      point was approving her own
19      charges.
20           MS. HARWIN:  Following --
21      you know we are -- we are
22      obviously disputing a lot of
23      the characterization.  Let me
24      clarify for this question.
25      Q.    After Ms. Robinson's
```



Page 203

```
 1                T. HARVEY
 2   employment at Canal ended, did Canal
 3   review any of the receipts generated
 4   by Paola's for the charges that
 5   appeared on Canal's American Express
 6   card?
 7             MR. DROGIN:  Objection to
 8      the form.  You can answer.
 9    A.    Yeah.  I don't believe that
10   we have ever seen a receipt
11   generated by Paola's restaurant in
12   this situation.
13    Q.    Okay.
14             Canal doesn't have any
15   evidence that any charges from
16   Paola's restaurant that appeared on
17   Canal's American Express were from
18   Ms. Robinson charging drinks at
19   Paola's, correct?
20             MR. DROGIN:  Objection to
21      the form.
22    A.    I don't know.  I don't
23   recall off the top of my head
24   whether we have the breakdown.
25    Q.    Canal doesn't dispute that
```



Page 204

```
 1                    T. HARVEY
 2   Mr. De Niro would dine at Paola's
 3   from time to time, correct?
 4     A.    Again, I don't want to hold
 5   you up.  Mr. De Niro is familiar
 6   with the restaurant Paola's and has
 7   dined there.  I just don't want to
 8   get into the time period.  But yes,
 9   he has been a patron of that
10   restaurant.
11     Q.    Canal doesn't dispute that
12   Ms. Robinson would bring Mr. De
13   Niro's meals from Paola's from time
14   to time, correct?
15     A.    We would dispute that.
16     Q.    What is the basis for that
17   dispute?
18     A.    You just made a -- a
19   blanket statement that this
20   occurred.  I am saying to you I
21   don't necessarily agree with that
22   statement.
23     Q.    Do you have any basis to
24   dispute that Ms. Robinson would
25   bring Mr. De Niro meals from
```



Page 205

```
 1              T. HARVEY
 2   Paola's?
 3         MR. DROGIN:  Objection to
 4     the form.
 5   A.    Yeah.  I have a basis for
 6   it.
 7   Q.    Okay.
 8         What is the basis?
 9   A.    The basis is Robert De Niro
10   was a grown up and could get his own
11   food or he could order from Paola's
12   or could have a number of people
13   bring it.  Do I know when there was
14   a single time where Chase Robinson
15   delivered food to Robert De Niro?  I
16   don't know that, but I don't know
17   whether you did or did not go to
18   Paola's and deliver it to Robert De
19   Niro.  I have no idea.  I know I
20   didn't.
21   Q.    Does Canal have any
22   evidence that every single charge
23   from Paola's restaurant that
24   appeared on the Canal American
25   Express, from May 2017 to April
```



Page 206

```
 1                T. HARVEY
 2   2019, was actually for Ms. Robinson?
 3            MR. DROGIN:  Objection to
 4       the form.
 5    A.    Yeah, I think we have
 6   plenty of evidence.
 7    Q.    What is that evidence?
 8    A.    There were charges to card
 9   in her name, used by her, during the
10   time period that you reference.
11    Q.    Other than the fact that
12   those charges appeared on a card
13   under Ms. Robinson's name, does
14   Canal have any evidence that every
15   single charge that from May 2017 to
16   April 2019 was actually for Ms.
17   Robinson?
18    A.    Okay.  Take the pen out of
19   your mouth.  It is hard to
20   understand you.
21    Q.    Sorry about that.  Sorry
22   about that.  Let me restate the
23   question.
24            Other than the fact that
25   the charges appeared on a credit
```



Page 207

```
 1                    T. HARVEY
 2     card under Ms. Robinson's name,
 3     Canal does not have any evidence
 4     that every single charge from
 5     Paola's restaurant that appeared on
 6     the Canal American Express from May
 7     2019 to April -- from May 2017 to
 8     April 2019 was actually for Ms.
 9     Robinson, correct?
10            MR. DROGIN:  Objection to
11       the form.  Go ahead.
12     A.    Well, first of all, are we
13     talking about Paola's or every --
14     Q.    Paola's.  We are talking
15     about Paola's.
16     A.    Again, you misstated what I
17     have testified to.  I said there was
18     plenty of other evidence.
19     Q.    What is that evidence?
20     A.    As I said before, we double
21     checked to make sure, in fact, Ms.
22     Robinson was in town and not on
23     vacation.  We then checked to see
24     where Mr. De Niro was.  We then
25     checked to see if there was any
```


MAGNA
LEGAL SERVICES

Page 208

```
 1                  T. HARVEY
 2   Ubers or anything else.  We then
 3   checked e-mails, et cetera, to see
 4   who might have been there with her.
 5   I am sure there were other things,
 6   but that is generally what we did.
 7            MS. HARWIN:  I would note
 8        for the record that documents
 9        reflecting that purported
10        investigation have not been
11        produced and we would request
12        that they be produced.
13   A.    I didn't say documents from
14   an investigation.  I said the
15   e-mails.  The e-mails that we
16   already produced to you and the
17   e-mails that we received.  I don't
18   know what you are talking about.
19   Q.    Does Canal dispute that Ms.
20   Robinson was authorized to charge
21   Canal for lunches when she was
22   working?
23            MR. DROGIN:  Objection to
24        the form.
25   A.    Does Canal dispute -- I can
```



Page 209

```
 1                T. HARVEY
 2   tell you what the policy was, that
 3   if you were in the office at Canal
 4   and stayed in during a lunch hour
 5   you could charge your lunch to
 6   Canal.  That was the general policy.
 7     Q.    And that policy applied to
 8   Ms. Robinson when she was working
 9   from her home office, correct?
10     A.    It is so hard to hear you
11   with the pen in your mouth.
12     Q.    Sorry.  Let me restate
13   that.
14           That policy applied to Ms.
15   Robinson when she was working from
16   her home office, correct?
17     A.    No.  I don't know where you
18   are coming up with that.
19     Q.    So is it Canal's position
20   that the other Canal employees were
21   authorized to charge lunch to Canal,
22   but Ms. Robinson was not?
23           MR. BENNETT:
24      (Inaudible).
25           MR. DROGIN:  Objection to
```



Page 210

```
 1                    T. HARVEY
 2        the form.  Also, you
 3        misstated what he said.  He
 4        said when they were in the
 5        office.
 6        A.    The whole thing is absurd.
 7   If you were in the office, meaning,
 8   if I were in the office working for
 9   Canal, or in this case, Jillian, or
10   Sabrina, or Kaplan and you couldn't
11   leave because you had to cover the
12   phones, you could order a lunch.
13   That was the general idea or if you
14   were working late, like any other
15   normal situation in a small business
16   like this.
17        Q.    What documents did Canal
18   review that served as a basis for
19   its claim that Ms. Robinson
20   improperly charged groceries at
21   Whole Foods and Dean & DeLuca?
22        A.    The American Express
23   receipts for the most part.
24        Q.    What else?
25        A.    Well, we would have looked
```



Page 211

1                    T. HARVEY

2    to make sure there was not, for

3    example, a party or something

4    happening.  So, for example, if

5    there happened to be a party for Tom

6    Harvey because he is such a great

7    guy at the offices of Canal, it is

8    potentially possible that someone

9    would have used Chase's credit card

10   at Whole Foods and brought the food

11   there.  But we figured out that, in

12   fact, she was just using it to buy

13   groceries to take it home.

14      Q.    Does Canal have any

15   evidence that the charges for Whole

16   Foods and Dean & DeLuca that

17   appeared on the Canal American

18   Express were for groceries?

19          MR. DROGIN:  Objection to

20      the form.  You can answer it.

21      A.    Yes, we have -- we have

22   evidence that it was for food,

23   generally.

24      Q.    What is that evidence?

25      A.    The fact that Whole Foods,



Page 212

```
 1              T. HARVEY
 2    et cetera, typically don't sell
 3    Mercedes Benz.  They sell food.
 4      Q.    But Canal doesn't have any
 5    evidence that Ms. Robinson charged
 6    groceries, correct?
 7      A.    No, that is incorrect.
 8      Q.    What is the evidence that
 9    Ms. Robinson placed charges for
10    groceries?
11      A.    The fact that she purchased
12    groceries at Whole Foods.  What more
13    evidence would you like?
14      Q.    What is the evidence that
15    it was groceries that were
16    purchased?
17      A.    I will tell you what.  I am
18    just speculating here, call me
19    crazy, that a jury is going to
20    understand my answer even if you
21    don't.
22           MR. DROGIN:  She would
23       have no reason to buy
24       charcoal, right?  I mean, you
25       are correct.  We don't have
```



Page 213

```
 1                    T. HARVEY
 2      the receipts.  Our
 3      understanding is she took the
 4      receipts and shredded them.
 5      All we had was the American
 6      Express charges, so by
 7      deduction, that this is a
 8      grocery store.  I suppose she
 9      could have been buying
10      candles.  I don't know why
11      she would have charged that
12      to Canal either.
13      Q.    Whole Foods sells prepared
14   foods, correct?
15      A.    I don't know.  Do they?
16      Q.    Do you know what Whole
17   Foods sells?
18           MR. DROGIN:  Canal will
19      stipulate that Whole Foods
20      sells prepared foods.
21           MS. HARWIN:  Okay.
22      Q.    Dean & DeLuca also sells
23   prepared foods, correct?
24      A.    I have no idea.
25           MS. HARWIN:  Can you
```



Page 214

```
 1                  T. HARVEY
 2     confirm, Mr. Drogin, that
 3     Canal will stipulate that
 4     Dean & DeLuca sell prepared
 5     food?
 6          MR. DROGIN:  Are they
 7     still in business?  If they
 8     did -- I assume if they were
 9     in business they did at the
10     time.
11     Q.    So bottom line, Canal
12  doesn't have any documents or other
13  evidence as to what the charges at
14  Whole Foods or Dean & DeLuca were
15  actually for, correct?
16     A.    Bottom line, you are
17  incorrect.  We know exactly what she
18  did.  Chase Robinson used the credit
19  card and bought herself groceries.
20  She bought herself food, seven days
21  a week, 24 hours a day.  She robbed
22  with two hands, and a jury is going
23  to understand that.
24     Q.    Mr. Harvey, does Canal have
25  any evidence as to what specific
```



Page 215

```
 1                    T. HARVEY
 2   items were purchased from Whole
 3   Foods or Dean & DeLuca?
 4        MR. DROGIN:  Hold on.  It
 5     does not.  And it is our
 6     understanding that she had
 7     those receipts and shredded
 8     them.  She is heard on her
 9     audio recording with Robin
10     talking about all the
11     American Express receipts
12     that she had, and she is
13     shredding them.  So she has
14     destroyed that evidence.
15        MS. HARWIN:  Counsel, we
16     dispute that
17     characterization.  Receipts
18     were scanned and provided to
19     Canal as counsel well knows.
20     Q.    Does Canal dispute that at
21   times Ms. Robinson made purchases at
22   Whole Foods for Mr. De Niro or his
23   family?
24     A.    Yes.
25     Q.    What is the basis for Canal
```



Page 216

```
 1                  T. HARVEY
 2   to dispute that?
 3     A.    Because Ms. Robinson was
 4   despised by many of the household
 5   employees that -- that work for Mr.
 6   De Niro.  That Mr. De Niro had
 7   numerous people working in his
 8   household that would go and purchase
 9   any item that he needed.  That Mrs.
10   De Niro's [sic] wife was very good
11   at ordering anything she wanted and
12   having it delivered.  So that is the
13   basis.
14     Q.    Was Mr. De Niro interviewed
15   concerning the charges Ms. Robinson
16   made at Whole Foods or Dean &
17   DeLuca?
18           MR. DROGIN:  I'm sorry.
19     Can you repeat the question?
20     Q.    Was Mr. De Niro interviewed
21   concerning any of the charges that
22   appeared on Canal's credit card at
23   Whole Foods or Dean & DeLuca?
24           MR. DROGIN:  Objection to
25     the form.  Interviewed by
```



Page 217

```
 1                 T. HARVEY
 2      who?
 3            MS. HARWIN:   Anyone.   As
 4       part of Canal's
 5       investigation.
 6            MR. DROGIN:   Objection.
 7      A.    I don't know.   I don't
 8     know.
 9      Q.    I can't hear you?
10      A.    I don't know.
11      Q.    Okay.
12            Ms. Robinson was authorized
13      to charge Canal for coffees that
14      were purchased from Whole Foods or
15      Dean & DeLuca, is that right?
16      A.    No.
17      Q.    Ms. Robinson was authorized
18      to charge Canal's credit card for
19      purchases at Whole Foods that were
20      made for Mr. De Niro or his family,
21      is that right?
22      A.    No.
23      Q.    Okay.
24            So if Mr. De Niro directed
25      Ms. Robinson to buy something for
```



Page 218

```
 1                T. HARVEY
 2   him at Whole Foods, she was not
 3   authorized to charge that to Canal's
 4   credit card?
 5      A.    I didn't say that.
 6      Q.    If Mr. De Niro directed Ms.
 7   Robinson to purchase something for
 8   him or his family at Whole Foods,
 9   Ms. Robinson was authorized to
10   charge Canal's credit card for that,
11   correct?
12      A.    Yes.
13      Q.    If Mr. De Niro directed Ms.
14   Robinson to purchase something for
15   him or his family from Dean &
16   DeLuca, Ms. Robinson was authorized
17   to charge that to Canal's credit
18   card, correct?
19      A.    Again, you are asking for
20   speculation.  I don't believe he
21   ever authorized her or had her do
22   anything like that.  Is it possible
23   that Ms. Robinson once purchased a
24   coffee and gave it to Mr. De Niro?
25   Sure.  Is it possible that she
```



1                T. HARVEY

2    brought four coffees to the office

3    and it was authorized?  Sure.

4    However, the bulk of this is not

5    $2.00.  It is much more and the

6    theft was long ranging and

7    widespread.

8        Q.    If Mr. De Niro wanted a

9    gift basket purchased for an event

10   or associate of his, Ms. Robinson

11   would be authorized to charge

12   Canal's credit card for the gift

13   basket that were purchased at Whole

14   Foods or Dean & DeLuca, correct?

15          MR. DROGIN:  Objection to

16      the form.

17      A.    You keep saying if.  It is

18   speculative.  I can assure you that

19   Robert De Niro did not order gift

20   bags from Whole Foods.

21      Q.    What is the basis for that?

22      A.    Not his style.  You can ask

23   him though.

24          MR. DROGIN:  I think we

25      can stipulate that if there



```
 1                  T. HARVEY
 2      was ever an authorized
 3      purchase that it would have
 4      been authorized to be charged
 5      on the American Express card.
 6      That is why not everything
 7      was viewed as being improper.
 8      When we have two minutes can
 9      we take a restroom break?
10          MS. HARWIN:  Yeah.  I
11      think this is a good time for
12      a -- a break.  So why don't
13      we take five minutes and go
14      off the record?
15          THE VIDEOGRAPHER:  The
16      time is now 1:50 p.m.  We are
17      off the record.
18          (Whereupon, a recess was
19      taken at this time.)
20          THE VIDEOGRAPHER:  The
21      time is now 1:58 p.m.  We are
22      back on the record.
23      Q.    What documents did Canal
24   base its claim that Ms. Robinson
25   improperly charged taxis and Ubers?
```



Page 221

```
 1                   T. HARVEY
 2     A.    Charged what?
 3     Q.    On what documents did Canal
 4  base its claim that Ms. Robinson
 5  improperly charged taxis and Ubers?
 6     A.    I'm not sure.  There would
 7  have been credit card receipts,
 8  petty cash receipts, et cetera.
 9  Wherever she charged something we
10  went to look.  For example, I will
11  give you one small example.  If you
12  say you are in London on vacation,
13  why is Canal paying for your Ubers
14  and taxis?  That is one small
15  example.
16     Q.    What were the dates when
17  Canal contends Ms. Robinson was on
18  vacation in London and charged Ubers
19  and taxis?
20         MR. DROGIN:  Objection to
21     the form.
22     A.    You are asking for specific
23  dates?  I don't have them in front
24  of me.
25     Q.    Any sense at all of when --
```



Page 222

```
 1                T. HARVEY
 2   when that allegedly occurred?
 3     A.    I would have to look at
 4   various notes, documents, et cetera,
 5   and see when she was at a certain
 6   place.  She also took Ubers and
 7   taxis in New York during a workweek
 8   where she was here supposedly
 9   working and used them to go places
10   that had nothing to do with Canal's
11   business.
12     Q.    What evidence does Canal
13   have that taxis and Ubers were
14   charged for things that had nothing
15   to do with Canal's business?
16          (Whereupon, the requested
17       portion was read back by the
18       reporter:
19          Q:   What evidence does
20       Canal have that taxis and
21       Ubers were charged for things
22       that had nothing to do with
23       Canal's business?)
24     A.    E-mail, and documents, et
25   cetera.
```



Page 223

```
 1                T. HARVEY

 2     Q.     What specific e-mails and

 3   documents does Canal contend support

 4   the idea that the taxis and Ubers

 5   charged weren't related to Canal's

 6   business?

 7            MR. DROGIN:   Objection to

 8      the form.

 9     A.     I can't tell you specific

10   documents and dates, but I can tell

11   you that, for example, if Ms.

12   Robinson was going to visit a friend

13   in Brooklyn and took a Uber that had

14   nothing to do with Canal and charged

15   it to us, that would have been the

16   type of thing we looked at.

17     Q.     Does Canal have any

18   evidence that that happened?

19     A.     Whether she went to

20   Brooklyn?  I don't know.  I would

21   have to look at my notes.  I

22   shouldn't say that.  The documents,

23   et cetera.

24     Q.     So that was just an example

25   you were making up, but that is not
```



1                T. HARVEY

2    -- that is not a circumstance that

3    you actually, you know, contend or

4    -- is that correct?

5      A.     That is correct.

6      Q.     If Ms. Robinson was taking

7    a taxi, Uber, Lyft for a

8    work-related reason she was entitled

9    to charge Canal for that taxi, Uber,

10   or Lyft, is that right?

11     A.     Their policy would have

12   been if you were doing something

13   work related that required a taxi or

14   Uber, certainly you were able to do

15   that, yes.

16     Q.     If Ms. Robinson was taking

17   a taxi, Uber, or Lyft to or from Mr.

18   De Niro's home, she was entitled to

19   charge Canal for that taxi, Uber, or

20   Lyft, correct?

21     A.     No, not correct.

22     Q.     Please explain?

23     A.     What do you want me to

24   explain?

25     Q.     Why that is not correct?



Page 225

```
 1                T. HARVEY
 2     A.    Well, if I come to your
 3  house, are you paying for my cab?  I
 4  suppose unless I am working for
 5  Sanford Heisler and it is related to
 6  Sanford Heisler work, you wouldn't.
 7     Q.    Mr. De Niro was Ms.
 8  Robinson's boss, correct?
 9     A.    Ms. Robinson worked for
10  Canal Productions, Inc., that was
11  owned by Robert De Niro, yes.  I
12  don't dispute that.
13     Q.    So if Ms. Robinson needed
14  to take a taxi, Uber, or Lyft to
15  meet with Mr. De Niro, she was
16  entitled to charge Canal for that
17  taxi, Uber, or Lyft, correct?
18     A.    Not correct.
19     Q.    Please explain?
20     A.    What do you want me to
21  explain?
22     Q.    Why is that not correct?
23     A.    Okay.  I will tell you
24  what?  Every associate at Sanford
25  Heisler can take a cab or Uber to
```



Page 226

```
 1                  T. HARVEY
 2    and from work and go visit anyone
 3    they want.  Is that correct?  It is
 4    an absurd question.  You cannot take
 5    unlimited private transportation,
 6    especially in New York City, where
 7    you could have taken a subway or a
 8    bus any particular time of the day.
 9    This is just common sense.  If she
10    had to go at 2:00 in the morning to
11    visit someone work related,
12    certainly Canal would have been
13    responsible for that.  The fact that
14    she treated herself like a queen and
15    robbed with two hands is not
16    allowed.  If you don't understand
17    that, I'm sorry.  I can't explain it
18    any better.
19       Q.    If Ms. Robinson needed to
20    take a taxi, Uber, or Lyft to meet
21    with her boss, she was not entitled
22    to charge that transportation to
23    Canal, is that Canal's position?
24          MR. DROGIN:  Objection to
25       the form.
```



Page 227

```
 1                 T. HARVEY
 2     A.    I don't know what you mean
 3  by position.
 4     Q.    Is that what Canal claims
 5  in this lawsuit?
 6         MR. DROGIN:  Objection to
 7     the form.
 8     A.    Canal claims that you can
 9  only get reimbursed for work-related
10  transportation, et cetera.  You
11  don't get paid to come to the office
12  -- you don't get paid to go stop by
13  the office.  You don't take
14  transportation when you can take
15  public transportation.  And you
16  certainly don't get to charge the
17  company when you are away on
18  vacation for Uber or cabs.
19     Q.    Meeting with Mr. De Niro
20  was work related, right?
21         MR. DROGIN:  Objection to
22     the form.
23     A.    I don't know.  I don't know
24  what you are referring to.  Mr. De
25  Niro was typically traveling or at
```



Page 228

```
 1                  T. HARVEY
 2    his office where Ms. Robinson should
 3    have been.  The fact that she was in
 4    Spain, or London, or Los Angeles
 5    doesn't seem to be Mr. De Niro's
 6    issue.  I don't think she took Ubers
 7    from Spain to visit Mr. De Niro.
 8       Q.    Does Canal have any
 9    evidence that she charged Ubers in
10    Spain to Canal?
11       A.    I don't remember
12    specifically Spain.  Certainly
13    London, California, and other
14    places.
15       Q.    Ms. Robinson had work trips
16    to?
17       A.    (Witness laughing).
18             Listen, Ms. Robinson would
19    go on work trips, that is a fair
20    statement.  And when she did, it was
21    fair to get reimbursed for any
22    charges with that.  Those though,
23    were rare.  When she would go
24    scouting on production if she had to
25    find, for example, her last trip to
```



Page 229

```
 1                T. HARVEY
 2    New Mexico to check out a house,
 3    yes, that is legitimate.  What is
 4    not legitimate is to go to
 5    California, pay for yourself, first
 6    class tickets, Uber, Montage hotels,
 7    stay at Beverly Hills to go to a
 8    girlfriend's birthday.  That is not
 9    allowed.
10      Q.    Does Canal have any
11    evidence that Ms. Robinson was the
12    person who took every single Uber or
13    taxi that appeared on the Canal
14    American Express for May of 2017 to
15    April 2019?
16            MR. DROGIN:  Objection.
17       That is not contention.
18      A.    If you are limiting that
19    question to the amount that we are
20    seeking to get returned to us, then
21    I can answer.
22      Q.    The amount that Canal is
23    seeking to get returned is every
24    single Uber and taxi that appeared
25    on the Canal American Express from
```



Page 230

```
 1                T. HARVEY
 2    May of 2017 to April 2019, correct?
 3            MR. DROGIN:  Objection to
 4      the form.
 5      A.    I don't believe that is
 6    true.
 7      Q.    What is you understanding
 8    of what Canal is seeking?
 9      A.    To get reimbursed for the
10    unauthorized trips.  Or I should say
11    reimbursed for the unauthorized
12    submissions that Ms. Robinson did
13    with respect to the Uber and taxi
14    cabs through -- whether it was the
15    credit card or petty cash.
16      Q.    The sum that Canal cites in
17    its lawsuit is the sum total of
18    every Uber or taxi charge that
19    appeared on Canal's American Express
20    from May of 2017 to April 2019,
21    correct?
22            MR. DROGIN:  Objection.
23      That is not correct.
24      Q.    Isn't that correct, Mr.
25    Harvey?
```



Page 231

```
 1                 T. HARVEY
 2     A.    No, I don't think it is.
 3     Q.    We went over the numbers
 4  before, but please explain why that
 5  is not correct?
 6     A.    Because it is not a correct
 7  statement.
 8     Q.    So is Canal seeking less
 9  than the amount that is cited in the
10  lawsuit?
11     A.    No, we are seeking the
12  amount in the lawsuit.
13     Q.    The amount in the lawsuit
14  corresponds to the total number of
15  charges for Ubers or taxis that
16  appeared on the Canal American
17  Express card from May of 2017 to
18  April of 2019, correct?
19          MR. DROGIN:  Objection to
20       the form.  That is -- that is
21       actually not a question and
22       it is not correct.
23          MS. HARWIN:  What about
24       it is not correct, counsel?
25          MR. BENNETT:  Are you
```



Page 232

```
 1                    T. HARVEY
 2      asking him to testify?
 3           MR. DROGIN:  First of
 4      all, it is not a question.
 5           MS. HARWIN:  I am asking
 6      him to confirm that that is
 7      accurate.
 8           MR. DROGIN:  So there is
 9      a charge on July 12th, 2017,
10      Queens Medallion LEA, Queens
11      Medallion Long Island City,
12      $39.39.  That is not
13      highlighted.
14      Q.    Talking about charges that
15   are taxi charges not car services.
16   Every charge --
17           (Simultaneous speaking)
18      Q.    Uber or taxi that appeared
19   on Canal card from May 2017 to April
20   2019 was included in Canal's claims
21   against Ms. Robinson, correct?
22           MR. DROGIN:  Objection to
23        the form.
24      A.    You are delineating between
25   a car service and a taxi cab and
```



Page 233

```
 1                 T. HARVEY

 2   Uber?

 3     Q.    When Canal asserted that

 4   Ms. Robinson engaged in improper

 5   spending at Canal on Ubers and

 6   taxis, it included every single Uber

 7   charge and every single charge

 8   containing the word taxi that

 9   appeared on Canal's credit card from

10   May 2017, to April 2019, correct?

11     A.    I don't know.  I would have

12   to look, and then I would have to

13   add it up, and then I would have to

14   go confirm that.

15     Q.    Does Canal -- does Canal

16   dispute that Ms. Robinson was

17   authorized to charge Canal's credit

18   card for taxis or Uber when she had

19   to travel to Mr. De Niro's townhouse

20   ███████████

21         MR. DROGIN:  Objection to

22     the form.  You can answer.

23     A.    It would have depended on

24   why she was going there.  Was it the

25   first thing in the morning and she
```



Page 234

```
 1                   T. HARVEY
 2     was going to work from the townhouse
 3     or was she -- whatever she might
 4     have been doing.  Or, in fact,
 5     whether she ordered Uber for one of
 6     her girlfriends.
 7            (Technical interference)
 8            MR. MERINGOLO:  Tom, you
 9       are breaking up.
10            THE WITNESS:  Alright.  I
11       will try again.
12     A.    I said it depends on
13     whether it was first thing in the
14     morning versus whether it was a
15     charge for Ms. Robinson or one of
16     her girlfriend's, like Rachel, who
17     was working on the townhouse versus
18     Amelia Brain when she brought her
19     around versus Lu Lu White who she
20     also brought around.
21     Q.    There were circumstances
22     when Ms. Robinson would be
23     authorized to charge Canal's credit
24     card for an Uber or taxi taken to
25     Mr. De Niro's home, correct?
```



Page 235

```
 1                  T. HARVEY
 2      A.    Can you take that pen out
 3   of your mouth?  But the answer is
 4   yes.  There would have been times --
 5   there would have been times.  Again,
 6   I don't want to speculate.  But if
 7   -- if your question is -- if Ms.
 8   Robinson had to bring a 50-pound bag
 9   from her house to Mr. De Niro's
10   house, work related, of course Mr.
11   De Niro would have happily paid for
12   it, yes.
13      Q.    There were circumstances
14   when Ms. Robinson was running
15   errands for Mr. De Niro where she
16   would be authorized to charge
17   Canal's credit card for a taxi or
18   Uber, correct?
19      A.    Again, you are asking me to
20   speculate.  It is just common sense.
21   Can you have a car wait for you
22   eight hours because you want to shop
23   in Midtown Manhattan?  No.  He would
24   not have approved of that had he
25   known about it.  If you wanted to
```



Page 236

```
 1                   T. HARVEY
 2    take a -- a car Downtown or across
 3    somewhere then perhaps.  As long as
 4    it is work related, and you are not
 5    going to and from your home to the
 6    office, et cetera.
 7       Q.    There were circumstances
 8    where Ms. Robinson was meeting Mr.
 9    De Niro where she would be
10    authorized to charge an Uber or
11    taxi, right?
12       A.    You would have to give me
13    when, where, what was the reason?
14       Q.    There were -- there were
15    circumstances where that would be
16    approved, right?
17       A.    Again.
18            MR. DROGIN:  Objection to
19        the form.
20       A.    You can ask Mr. De Niro.  I
21    think his answer will be that you
22    use common sense.  If Chase Robinson
23    had to go from her house to Mr. De
24    Niro's house on Central Park West,
25    at 9:00 at night, and he requested
```



Page 237

```
 1                  T. HARVEY
 2    her to come there, he certainly
 3    would have reimbursed her for an
 4    Uber.  If we are talking about that
 5    she was a half of block away and
 6    then used that Uber to go somewhere
 7    else, no, he wouldn't have approved
 8    that.
 9       Q.    When Canal brought its
10    lawsuit against Ms. Robinson, it
11    claimed that every single Uber
12    charge and every charge with the
13    word taxi in it on the credit card
14    from May of 2017 to April 2019 was
15    improper, correct?
16            MR. DROGIN:  Objection to
17       the form.
18       A.    Again, there were -- you
19    are presupposed there are not any
20    other Ubers ordered and paid for any
21    other way.  So I don't agree with
22    your statement.  If you are trying
23    to say the amount -- the number of
24    Ubers and the amount of that credit
25    card matches what is in our
```



Page 238

```
 1                  T. HARVEY
 2   Complaint, I will agree with that.
 3   I will grant you that.  If you are
 4   saying that those are the only Ubers
 5   that Ms. Robinson took, I would
 6   disagree with that.
 7     Q.    I would like to turn to the
 8   next exhibit, which is Exhibit 52.
 9   It is a document that is Bates
10   spanned in a range Canal_0010352 to
11   64.
12            (Whereupon, Plaintiff's
13       Exhibit 52, Canal_0010352 to
14       64, was marked for
15       identification, as of this
16       date.)
17          MR. DROGIN:  Did you put
18       it in the --
19          MS. HARWIN:  It should be
20       there.
21          MR. DROGIN:  It just
22       arrived.
23     A.    Okay.
24     Q.    Sir, do you recognize this
25   document?
```



Page 239

```
 1                 T. HARVEY
 2     A.    I do.
 3     Q.    What is this document?
 4     A.     It is a document that
 5   contains charges from American
 6   Express, receipts from Flowers by
 7   Philip.  I can go on describing it,
 8   but I can just tell you it is a
 9   13-page document.  Do you want me to
10   do Bates stamp or do you want me to
11   detail what is in this?
12     Q.    I would like you to
13   describe what this document purports
14   to be?
15         MR. DROGIN:  Objection to
16      the form.
17     A.     It purports to be what it
18   is, which is American Express
19   receipts, and receipts with respect
20   to Flowers by Philip.  And now I
21   will go through it page by page to
22   confirm what I just told you.
23   Flowers by Philip.  Okay.  Yeah.  It
24   is all Flowers by Philip.
25     Q.    Who prepared this document?
```



Page 240

```
 1                    T. HARVEY
 2    A.    When you say, "this
 3  document," I -- I believe it is
 4  either Jillian, Kaplan, or Sabrina's
 5  handwriting on the first page, the
 6  rest of the documents.  I assume the
 7  second page was an American Express
 8  generated document.  And I assume
 9  the pages three, four, five, six,
10  seven, eight, nine, ten, 11, 12, and
11  13 were documents generated by
12  Flowers by Philip.
13    Q.    Is this a compilation that
14  Canal prepared?
15    A.    I can't hear you.
16    Q.    Is this a compilation that
17  Canal prepared?
18         MR. DROGIN:  Objection to
19    the form.
20    A.    Canal didn't prepare these
21  documents, other than the top
22  document.
23    Q.    Is this compilation one
24  that Canal prepared?
25         MR. DROGIN:  Objection to
```



Page 241

```
 1                T. HARVEY
 2      the form and characterization
 3      as to this as a compilation.
 4      You are the one giving it
 5      that title.  The witness is
 6      not.  These are 13 separate
 7      pages that you have -- that
 8      you have put together.  You
 9      -- actually, it is your
10      compilation.
11          MS. HARWIN:  That is not
12       accurate.
13      Q.    That is a compilation that
14   Canal submitted to the Manhattan
15   District Attorney's Office, correct?
16          MR. DROGIN:  Who are you
17       asking?
18          MS. HARWIN:  Mr. Harvey.
19      A.    No idea if this is what was
20   submitted to the New York County
21   District Attorney's Office.
22      Q.    Well, Mr. Harvey, one of
23   your designated topics that you are
24   here to testify about, on behalf of
25   Canal, involves communications with
```



Page 242

```
 1                T. HARVEY
 2    the Manhattan District Attorney's
 3    Office.  So is this a compilation
 4    that Canal provided to the Manhattan
 5    District Attorney's Office?
 6            MR. DROGIN:  Objection to
 7       the form.
 8    A.     And again, I will tell you
 9    -- I will tell that you I don't know
10    because I believe what we submitted
11    to the New York County District
12    Attorney's Office was in a much more
13    hefty compilation, as you say, of
14    documents.  So whether this was
15    taken out of those compilation --
16    that book, I don't know.  It very
17    well could have been.
18    Q.     Did Canal submit these
19    documents to the Manhattan District
20    Attorney's Office in connection with
21    their claims that Ms. Robinson
22    improperly charged Canal for
23    flowers?
24    A.     Canal submitted documents
25    to the New York County District
```



Page 243

1           T. HARVEY

2    Attorney's Office with respect to

3    Ms. Robinson's theft and fraud.

4    These were some of the documents

5    that were submitted.

6      Q.    Is it Canal's contention

7    that every charge that appears on

8    the page marked Canal_00330 -- I'm

9    sorry.  Canal_0010353 was an

10   improper charge by Ms. Robinson?

11        MR. DROGIN:  I couldn't

12     hear your question.

13     Q.    Is it Canal's contention

14   that every charge that appears on

15   Canal_0010353 is an improper charge

16   by Ms. Robinson?

17     A.    You are asking me if I can

18   look at this document and tell you

19   if the -- each charge, I wouldn't --

20   I wouldn't be able to tell just by

21   looking at it.

22     Q.    But Canal presented this to

23   the Manhattan District Attorney's

24   Office.  Was it Canal's contention

25   that every charge on this list was



Page 244

```
 1                    T. HARVEY
 2    improper, or was it Canal's
 3    contention that a subset of charges
 4    on this list were improper?
 5       A.    I would have to double
 6    check or cross reference it.
 7            MR. DROGIN:  Objection to
 8      the form.
 9       A.    I would have to double
10    check.
11       Q.    What would you need to
12    double check?
13       A.    Well, there were a number
14    of charges made by Ms. Robinson with
15    respect to flowers and plants.  Some
16    of those flowers -- for example, she
17    bought flowers for Toukie Smith,
18    $500.00 worth of flowers.  I don't
19    believe those were authorized.
20    Putting that aside, I don't believe
21    we ever sought to be -- brought
22    those documents to the District
23    Attorney.  Also, if she brought
24    plants, for example, for the
25    townhouse, or office, those weren't
```



Page 245

```
 1                 T. HARVEY
 2    submitted.  To tell you the answer,
 3    I would have to go through each
 4    charge to make sure those specifics
 5    were taken out.
 6      Q.    Well, you have a
 7    compilation that you provided to the
 8    Manhattan District Attorney's and it
 9    is followed by a number of receipts.
10          MR. DROGIN:  Objection to
11      the form.
12          MS. HARWIN:  I haven't
13      asked the question yet.
14          MR. DROGIN:  Objection to
15      the word compilation.
16      Q.    Did -- did Canal present a
17    receipt for every charge that it
18    contended was proper for flowers and
19    similar items?
20          MR. DROGIN:  Objection to
21      the form.
22      A.    What do you mean by
23    receipt?
24      Q.    So in -- in this collection
25    of documents that Canal presented to
```



MAGNA
LEGAL SERVICES

Page 246

```
 1                 T. HARVEY
 2     the Manhattan District Attorney's
 3     Office, as you noted before, there
 4     is a tabulation of charges for
 5     American Express, and then there are
 6     a number of receipts that follow.
 7          Correct?
 8     A.   I -- well, I can describe
 9     there seems to be an -- American
10     Express charges on page two, and
11     then a series of receipts or
12     invoices.  I guess they are entitled
13     from Flowers by Philip.  That is
14     what I see.
15     Q.   Now, a receipt wasn't
16     provided for every charge that
17     appeared in the American Express
18     compilation on -- the American
19     Express tabulation on the second
20     page of this exhibit.  So were
21     receipts provided for only those
22     charges that Canal contended were
23     improper?
24          MR. DROGIN:  Objection to
25       the form.
```



Page 247

```
 1                 T. HARVEY
 2     A.    I have -- I have no idea
 3  what you are talking about.  I think
 4  what you are trying to ask me is do
 5  I have a receipt showing these
 6  purchases were made?  Is that what
 7  you are asking me?
 8     Q.    No.
 9     A.    What are you asking?
10     Q.    Let me clarify.
11           As -- on the second page of
12  this exhibit, there are over $17,000
13  in charges that are listed in that
14  American Express tabulation.
15           Do you see that?
16     A.    I do.
17     Q.    Okay.
18           Canal didn't present
19  receipts for $17,000 of charges.  It
20  presented receipts for a subset of
21  charges.
22           My question is, are the
23  subset of charges for which receipts
24  were presented the expenses that
25  Canal contended were improper?
```



Page 248

```
 1                T. HARVEY
 2           MR. DROGIN:  Objection to
 3      the form.  What receipts are
 4      you talking about?  You are
 5      assuming that there is --
 6           MS. HARWIN:  The receipts
 7      --
 8           MR. DROGIN:  You are
 9      making that up.
10           MS. HARWIN:  Counsel,
11      look at the exhibit.  Look at
12      the receipts.  They are in
13      the exhibit.  Okay?
14           MR. DROGIN:  No.  Where
15      is the receipt?  I am looking
16      a 10362.  It says, "Invoice:
17      Delivered to Amelia Brain
18      care of Chase Robinson."
19           MS. HARWIN:  Mr. -- Mr.
20      Harvey used the word receipt.
21      We can use the word invoice.
22           MR. DROGIN:  Here is a
23      carry out on January 20th,
24      2018.
25           MS. HARWIN:  Counsel, I
```



Page 249

```
 1                   T. HARVEY
 2      am not asking you to read the
 3      exhibit aloud.
 4           MR. DROGIN:  Rather than
 5      beating around the bush, why
 6      don't you ask him, was it
 7      appropriate for Chase
 8      Robinson to have flowers
 9      delivered or carry out to her
10      home for --
11           (Simultaneous speaking)
12      Q.    Why don't we take a break,
13   Mr. Harvey, and I would like when we
14   come back -- I would like for you to
15   identify which of the charges on the
16   second page of the exhibit Canal
17   contends were improper?  How much
18   time do you need for a break?
19      A.    I don't want a break.  I
20   would rather keep going.
21      Q.    Okay.
22           So identify for me which of
23   the charges on the second page of
24   this exhibit Canal contends were
25   improper?
```



Page 250

```
 1                T. HARVEY
 2     A.    I don't know by just
 3  looking at this receipt or invoice.
 4  Whatever you want to call it.
 5     Q.    Well, there are pages of
 6  invoices that follow as part of what
 7  Canal provided to the District
 8  Attorney.  So --
 9     A.    You keep -- you keep
10  harping on that.  You keep saying
11  the same thing and beating around
12  the bush.
13     Q.    No beating around the bush,
14  sir.  I am trying to get you to
15  answer the question.
16     A.    I am trying to answer the
17  question.  Excuse me.  Excuse me.  I
18  am trying to answer the question.  I
19  am telling you by simply looking at
20  this, I can't tell.  In the middle
21  of this, hand me this, and say,
22  which is good and which is bad.  I
23  would have to look at a number of
24  things.  For example --
25     Q.    What do you need to look
```



Page 251

```
 1                    T. HARVEY
 2    at?
 3      A.      For example -- for
 4    example -- for example, with Amelia
 5    Brain, Chase ordering flowers for
 6    Amelia Brain, through Canal
 7    Productions, is simply theft.  Out
 8    and out theft.  There is no
 9    justification whatsoever.  Now, the
10    fact that I would have to go through
11    and check out each individual
12    receipt and flower purchase, and
13    then go back to make sure there
14    wasn't a legitimate reason for it,
15    would probably take me three or four
16    hours.  So keep asking questions and
17    we can keep going.
18      Q.      Sitting here today, you
19    don't know which of the charges on
20    Canal 0010353 Canal contends were
21    improper, is that correct?
22      A.      No, that is not correct.
23    You can ask me a dozen different
24    ways.  I am not going to concede to
25    you that I don't know -- excuse me.
```



Page 252

```
 1                 T. HARVEY
 2    Counsel, let me finish my answer so
 3    there is a clear transcript for the
 4    judge.  Okay?  I am telling you that
 5    it would take me time to review
 6    this, item by item.  And you keep
 7    going well, isn't it possible, or
 8    isn't it true, or didn't you say,
 9    well, no.  These are documents we
10    put together based upon other
11    documents that we read because Ms.
12    Robinson made thousands and
13    thousands of dollars of purchases.
14    Some of them were legitimate, some
15    of them were not.  Okay?
16      Q.    Sitting here today --
17            MR. DROGIN:  If you look
18        at 13061, just as example --
19        I am not trying to disrupt
20        you, but maybe it is easier
21        to just look at a particular
22        one.
23            MS. HARWIN:  I am not
24        asking about specific
25        receipts.  Right now I am
```



Page 253

```
 1                    T. HARVEY

 2        just trying to identify what

 3        is the universe of charges

 4        that are claimed to be

 5        improper.

 6     Q.    Mr. Harvey, sitting here

 7   right now, are you prepared to

 8   identify which charges Canal

 9   contends are improper for flowers or

10   not?

11     A.    I would have to start by

12   looking at the Complaint, and then

13   backing into it.  That is the way to

14   do it.  The fact that you are trying

15   to get -- to see if I remember

16   things from two and a half years

17   ago, and thinking that matters, is

18   meaningless to me.  If you want to

19   know how much we assert are related

20   to flowers, I will look at the

21   Complaint, and I will read you the

22   number.

23     Q.    We already did that earlier

24   today, sir.

25              MR. DROGIN:  That is why
```



Page 254

```
 1                   T. HARVEY
 2      I am suggesting that you look
 3      at 10361 because that's a
 4      good example.  It shows
 5      Greenwich, then it shows the
 6      delivery to her home, and
 7      then it shows a tip.  So that
 8      is --
 9           MS. HARWIN:  Counsel.
10           MR. DROGIN:  You are --
11      it is your exhibit and if you
12      want to move forward with it,
13      here is a good example to ask
14      him about.  He answered about
15      Amelia Brain.  You are
16      building up this universe,
17      but you have documents in
18      front of you.  Ask about
19      10361 where there is charges
20      to 375 Greenwich, and then
21      there is charges to her home
22      with delivery charges and a
23      tip.  This is not rocket
24      science.
25           MS. HARWIN:  Counsel, I
```



MAGNA
LEGAL SERVICES

```
 1                T. HARVEY
 2     would appreciate if you
 3     wouldn't take the time to
 4     speak on the record.  I can
 5     ask my questions.  If you
 6     want to ask different
 7     questions, that is fine.  You
 8     can ask questions after.
 9          MR. DROGIN:  No, but it
10     is --
11   Q.    Mr. Harvey, let me --
12          MS. HARWIN:  Counsel.
13   Q.    Let me direct your
14   attention to the third page of this
15   exhibit, which is marked
16   Canal_0010353.
17          Do you recognize this
18   receipt -- this invoice as one that
19   you provided to the District
20   Attorney?
21   A.    I don't recall, but I don't
22   have any reason to dispute that this
23   was submitted to the District
24   Attorney.
25   Q.    This is a charge that was
```



Page 256

```
 1                T. HARVEY
 2   reversed, correct?
 3      A.    I have no idea what you are
 4   talking about.
 5      Q.    Well, wasn't this charge
 6   reversed?
 7      A.    I just told you that I have
 8   no idea what you are talking about.
 9      Q.    We previously went over a
10   spreadsheet with a tabulation of
11   charges that were highlighted in
12   different colors, including pink
13   charges concerning flowers, correct?
14      A.    We went over a spreadsheet
15   that you showed me, that is correct.
16      Q.    And on that spreadsheet it
17   shows that this was a charge that
18   was reversed, correct?
19      A.    I don't know.
20      Q.    Why don't we go back to
21   that spreadsheet?  Why don't you
22   open it up?
23      A.    Okay.  I have the
24   spreadsheet open.
25      Q.    When you go to the very
```



Page 257

```
 1                    T. HARVEY
 2    bottom of that spreadsheet, in Row
 3    5,529, do you see that that charge
 4    is shown as a negative because it
 5    was credited to Canal's account?
 6      A.    5,000 what?
 7      Q.    5,529.
 8      A.    Okay.  Right.
 9      Q.    That charge was reversed,
10    correct?
11      A.    When you say, "that charge
12    was reversed," I don't know.  I know
13    that Canal was given back $1,311.94.
14      Q.    If you turn to the exhibit
15    we were just in, with various
16    invoices that you presented to
17    District Attorney's Office, if you
18    turn to the page marked
19    Canal_0010355, that shows that that
20    charge was refunded.
21            Correct?
22      A.    I am looking.
23            MR. DROGIN:  We will
24       stipulate that it was
25       refunded four days after
```



Page 258

```
 1              T. HARVEY
 2    Chase resigned.
 3    Q.    So the charge that appears
 4  on February 9th, 2019, was refunded
 5  back to Canal, correct?
 6    A.    I would -- again, double
 7  check.  I know that Chase tried to
 8  order flowers for herself the day
 9  before she resigned, or I think it
10  was the actually the day after, and
11  we had a fight with American Express
12  and got our money back eventually.
13  This could be that document.  I
14  don't know one hundred percent.  I
15  would have to go back and look at
16  some other things.
17    Q.    Counsel stipulated that the
18  charge was refunded, right?
19        MR. DROGIN:  Then it was
20     charged again.  This is what
21     I am saying.  It is like you
22     are -- it is like you are
23     trying to pinpoint something
24     without asking the question,
25     and then the very next
```



Page 259

```
 1                    T. HARVEY
 2     document shows it is charged
 3     again.  Yes, it was credited
 4     once, and then recharged.
 5     Q.    Canal contends this was
 6  charged for a second time after Ms.
 7  Robinson's employment ended, is that
 8  Canal's contention?
 9     A.    Again, I would have to look
10  at some more documents, including
11  the American Express bill.
12     Q.    I would like to show you
13  Exhibit 53, which is an invoice,
14  dated January 20th, 2018.
15          (Whereupon, Plaintiff's
16     Exhibit 53, Robinson 0006824,
17     was marked for
18     identification, as of this
19     date.)
20          MR. DROGIN:  Hold on.
21     A.    I didn't get it.
22     Q.    Just let me know when you
23  have it.  It should be there.
24          MR. BENNETT:  This is a
25     new one going into the chat
```



Page 260

```
 1                    T. HARVEY
 2      or are you going back to
 3      Flowers by Philip?
 4          MS. HARWIN:  It is in the
 5      chat now.
 6          MR. DROGIN:  What is the
 7      document number?  Hold on.  I
 8      see it.
 9          MS. HARWIN:  This
10      document is Robinson 0006824.
11      Q.    Amelia Brain worked as an
12   actress on Mr. De Niro's film The
13   Irishman, correct?
14      A.    I don't know what you mean
15   Mr. De Niro's film.  I know Amelia
16   Brain had a part in a movie that Mr.
17   De Niro was in.
18      Q.    The Irishman, correct?
19      A.    I would have to check the
20   credits, but I don't know is the
21   short answer.
22      Q.    Does Canal have any basis
23   to dispute that the $283.08 charge,
24   on January 20, 2018, was a gift from
25   Mr. De Niro to Amelia Brain for her
```



Page 261

```
 1              T. HARVEY
 2   work on the film The Irishman?
 3         MR. DROGIN:  Objection.
 4   A.    Yes.
 5   Q.    What is the basis for that?
 6         MR. DROGIN:  Objection to
 7    the form.  No one, by the
 8    way, has made that claim.
 9    That is fine.
10   A.    What is the question?
11         MS. HARWIN:  Madam Court
12    Reporter, can you read it
13    back?
14         (Whereupon, the requested
15    portion was read back by the
16    reporter:
17         Q:  Does Canal have any
18    basis to dispute that the
19    $283.08 charge, on January
20    20, 2018, was a gift from Mr.
21    De Niro to Amelia Brain for
22    her work on the film The
23    Irishman?)
24         MR. DROGIN:  Objection to
25    the form.
```



Page 262

```
 1                 T. HARVEY
 2     A.    The answer is yes.
 3     Q.    What is the basis for that?
 4     A.    The basis is Robert De Niro
 5  didn't send flowers to Amelia Brain
 6  because she was acting in a movie.
 7     Q.    Mr. De Niro sent gifts to
 8  many of the people that participated
 9  in the film The Irishman, correct?
10          MR. DROGIN:  Objection to
11     the form.
12     A.    Can you stop with the pen
13  in your mouth, please?  It is hard
14  to understand what you are saying.
15     Q.    Mr. De Niro sent gifts to
16  many of the people who worked on the
17  film The Irishman, correct?
18          MR. DROGIN:  Objection to
19     the form.
20     A.    I don't know what you mean
21  by many.  And I don't know what you
22  mean by gifts.
23          MR. DROGIN:  Why don't
24     you just ask Mr. De Niro?
25     Q.    So I am going to turn your
```



Page 263

```
 1                T. HARVEY

 2    attention to the next exhibit, which

 3    is Exhibit 54, Robinson 0006839.

 4           (Whereupon, Plaintiff's

 5      Exhibit 54, Robinson 0006839,

 6      was marked for

 7      identification, as of this

 8      date.)

 9    A.    Is this in the chat?

10    Q.    It should appear shortly.

11    A.    Okay.

12    Q.    Does Canal have any basis

13    to dispute that the $1,217.22

14    charge, on July 19, 2018, was

15    comprised of plants for the Canal

16    office, flowers for assistants,

17    desks in the Canal office, and

18    flowers for Mr. De Niro's former

19    partner, Toukie Smith?

20           MR. DROGIN:  Objection to

21      the form of all three of the

22      questions.  Is someone making

23      that contention?

24    A.    I don't know what you just

25    said.  You asked three different
```



Page 264

```
 1                T. HARVEY
 2   questions in the same sentence.
 3   Q.    Does Canal dispute that the
 4   charge -- it sounds like there is an
 5   echo.
 6           MR. DROGIN:  I know I am
 7     getting a headache.
 8   Q.    Can you hear me?
 9   A.    I can hear you.
10   Q.    Does Canal dispute that the
11   July 19, 2018 charge was for plants
12   and flowers for the Canal office,
13   and flowers for Mr. De Niro's former
14   partner, Toukie Smith?
15           MR. DROGIN:  Objection to
16     the form.
17   A.    I would have to check on
18   the documents.  But as far as Ms.
19   Smith, I thought it was a $500.00 if
20   my memory serves me right.  As far
21   as the other plants, I would have to
22   review some other documents.
23   Q.    Does Canal contend that it
24   was improper to purchase flowers for
25   Mr. De Niro's former partner, Toukie
```



```
 1              T. HARVEY

 2   Smith?

 3          MR. DROGIN:  Objection to

 4     the form.

 5     A.    If the flowers were

 6   delivered as a gift from Mr. De

 7   Niro, I am sure he would raise no

 8   objection to that.  But the flowers

 9   being delivered from Chase Robinson,

10   as a gift from Chase Robinson,

11   should not have been a charge to

12   Canal.

13     Q.    I am going to show you next

14   exhibit, which is 55, and that is

15   Robinson 0006844.

16          (Whereupon, Plaintiff's

17     Exhibit 55, Robinson 0006844,

18     was marked for

19     identification, as of this

20     date.)

21     Q.    As part of Ms. Robinson's

22   work at Canal, she performed work

23   related to Mr. De Niro's former

24   partner, Toukie Smith, correct?

25     A.    She certainly was involved
```



Page 266

```
 1              T. HARVEY
 2   with Toukie Smith.  When you say
 3   performed work, she did things
 4   involving Toukie Smith.
 5      Q.    Is there anything about
 6   this charge, dated July 26, 2018,
 7   that Canal contends was improper?
 8      A.    Again, I don't know.  I
 9   have to look back at the -- first go
10   to the spreadsheet, and then look at
11   a few other documents.
12      Q.    Are there any documents
13   that you want to look at to refresh
14   your recollection?
15      A.    Right now?  No.  You have
16   any?  I will take a look.
17      Q.    You tell me what you need
18   to look at to refresh your
19   recollection.
20      A.    We can start with the
21   Complaint, and then from the
22   Complaint I can start looking at our
23   binder, and from our binder look at
24   some e-mails, et cetera.  So
25   whatever --
```



Page 267

```
 1                 T. HARVEY
 2     Q.    How long would that take?
 3     A.    I don't know.  It is not
 4  quick.
 5     Q.    More than an hour?
 6     A.    I don't know.
 7           MR. DROGIN:  Do you just
 8     want to make a representation
 9     as to what this is, what the
10     contention is?
11           MS. HARWIN:  So these
12     were flowers purchased for
13     Mr. De Niro's former partner,
14     Toukie Smith.
15     Q.    Does Canal dispute that
16  that was a proper expense?
17     A.    I thought I just answered
18  that.  If Robert De Niro wants to
19  send Toukie Smith, you, or me,
20  flowers and plants, it certainly was
21  in his right to do that.
22           If Chase Robinson wants to
23  sends you, me, or Toukie Smith
24  flowers from Chase Robinson, without
25  asking Robert De Niro, that is a no
```



Page 268

```
 1                T. HARVEY
 2   no.
 3     Q.    Do you have any evidence
 4   that Mr. De Niro wasn't asked before
 5   these charges were made?
 6           MR. DROGIN:  Objection to
 7      the form.
 8     A.    Why don't you ask him?
 9     Q.    Can you repeat your answer?
10     A.    Why don't you ask Mr. De
11   Niro when you depose him on Monday
12   and Tuesday, or whenever you are
13   going to depose him?
14     Q.    These are Canal's claims,
15   and I am asking Canal's 30(b)(6)
16   witness concerning these claims.
17     A.    Yes, you are.  And I
18   thought I answered it.  And you said
19   to me do I know whether, in fact,
20   Chase Robinson got permission from
21   Robert De Niro to send flowers to
22   Toukie Smith only in the name of
23   Chase Robinson.
24     Q.    Do you have any evidence
25   this was in the name of Chase
```



Page 269

```
 1                    T. HARVEY
 2    Robinson?
 3      A.     I am sure I do.
 4      Q.     What is that evidence?
 5      A.     I believe there is an
 6    e-mail or something out there.  I
 7    would have to go look for it.
 8            MS. HARWIN:  We request
 9       production of whatever is
10       being referenced here.
11      A.     I am sure a jury is going
12    to understand all of this very
13    clearly.
14      Q.     I am showing you another
15    exhibit, which is Exhibit 56, spans
16    Robinson 0006876 through 77.
17            (Whereupon, Plaintiff's
18       Exhibit 56, Robinson 0006876
19       through 77, was marked for
20       identification, as of this
21       date.)
22      Q.     Do you have any reason to
23    believe that --
24      A.     I don't have the document.
25    I don't have --
```



Page 270

```
  1                  T. HARVEY
  2    Q.   Let me know when you have
  3  it open.
  4         Do you see these invoices
  5  for carryout flowers on February 12,
  6  2019?
  7    A.   I see an invoice that has
  8  order number 423974-1, order
  9  2/1/2019, at 4:29 p.m., Bates stamp
 10  Robinson 6876.
 11         Is that what you are
 12  referring to?
 13    Q.   Yep.  And the following
 14  page as well, 77.
 15         Do you see these charges --
 16  does Canal contend that these were
 17  flowers charged that were improperly
 18  charged by Ms. Robinson?
 19    A.   I would have to go back to
 20  the Complaint, then into the
 21  spreadsheet, look at a few other
 22  things.
 23    Q.   Okay.
 24         Sitting here today, is that
 25  a question you can answer?
```



Page 271

```
 1                T. HARVEY

 2     A.    I thought I just did.  I

 3   would have to go to the Complaint,

 4   back into that number at the

 5   spreadsheet, get that American

 6   Express receipt number, and match it

 7   up to this.  You are just pulling

 8   documents out, and throwing them in

 9   front of me, and saying, 'What is

10   this?'

11     Q.    Does Canal have any basis

12   to dispute that Ms. Robinson was not

13   in New York at the time that this

14   carryout flower order was placed

15   that is shown on Robinson 00006876?

16          MR. DROGIN:  Objection to

17      the form.

18     A.    I would have to go and

19   look.  I don't know.

20     Q.    I am going to show the next

21   exhibit, which is Robinson 0006847.

22          (Whereupon, Plaintiff's

23      Exhibit 57, Robinson 0006847,

24      was marked for

25      identification, as of this
```



Page 272

```
 1                  T. HARVEY
 2     date.)
 3          MR. DROGIN:  6847?
 4          MS. HARWIN:  Yes.
 5     Q.    I am showing you an invoice
 6  for September 22, 2018.
 7          Does Canal have any basis
 8  to dispute --
 9          MR. DROGIN:  Hold on.
10    Let us -- let us open it.
11          MS. HARWIN:  Okay.  Let
12     me know when it is open.
13     A.    What is your question?
14     Q.    Does Canal have any basis
15  to dispute that the flowers
16  reflected on that carryout invoice
17  were brought to Mr. De Niro's home?
18     A.    Yes.
19     Q.    What is basis for that
20  dispute?
21     A.    You are calling it a
22  dispute.  I don't know what that
23  means.  I known that Chase Robinson
24  ordered these.  I know that Chase
25  Robinson picked them up, and I know
```



Page 273

```
 1                 T. HARVEY
 2    that they did not go to Robert De
 3    Niro.  What dispute are you
 4    referring to?
 5        Q.    How do you know they didn't
 6    go to Robert De Niro?
 7        A.    How do I know?  Because
 8    they -- the flowers never arrived at
 9    ███████
10        Q.    How do you know that?
11        A.    From talking to various
12    people.
13        Q.    You specifically discussed
14    this charge of September 22, 2018
15    with people?
16        A.    This particular charge, I
17    am not certain.  But in terms of
18    particular flowers, triple white
19    orchid and the oblong glass, and you
20    have to look back.  The order date
21    is September 22nd, 2018, right?
22        Q.    Yes.
23        A.    Do I have this correct,
24    yeah.  Right.  So the idea, and this
25    is what the jury is going to love,
```



Page 274

```
  1                T. HARVEY
  2    that flowers were delivered to an
  3    empty house in September of 2018.
  4    And if that is your position, that
  5    is fantastic because these flowers
  6    currently were ordered in September
  7    of 2018, when Mr. De Niro did not
  8    really occupy ████   So the idea
  9    that flowers were delivered there, I
 10    think it is an issue of fact that a
 11    jury is going to absolutely love.
 12      Q.    Is your answer no, you
 13    didn't specifically discuss this
 14    charge with anyone?
 15          MR. DROGIN:  Objection to
 16      the form.
 17      A.    No, that is not my answer.
 18      Q.    Let me just get a clear
 19    answer on that question.
 20          Did you specifically
 21    discuss the charge of September 22,
 22    2018 with anyone?
 23          MR. DROGIN:  Objection.
 24      Now we are going back into
 25      the privilege issue again.
```



Page 275

```
 1                 T. HARVEY
 2          MS. HARWIN:   Okay.   Let
 3      me rephrase the question.
 4          (Simultaneous speaking)
 5          MS. HARWIN:   Counsel, I
 6      have rephrased it.
 7      Q.    Did Canal contend any
 8   interviews specifically concerning
 9   the September 22, 2018, charge at
10   Flowers by Philip?
11      A.    Did we conduct any -- an
12   independent investigation into this
13   one invoice?
14      Q.    As part of Canal's
15   investigation, were there any
16   interviews that discussed this
17   invoice?
18      A.    Yes.
19      Q.    Who was interviewed
20   concerning this invoice?
21          MR. DROGIN:   Objection.
22       This is privileged.   You are
23       going into the due diligence
24       that was conducted by the
25       attorney and the client to
```



Page 276

```
 1                  T. HARVEY

 2      form the basis for the good

 3      faith belief that actionable

 4      conduct occurred.  I am

 5      trying to give you a lot of

 6      leeway here.  He has

 7      explained to you why the

 8      conclusion was reached that

 9      this was improper, based on

10      your unsupported suggestion

11      that someone has made a

12      representation that this was

13      delivered to Mr. De Niro's

14      home, which is something that

15      you just suggested.  He

16      explained to you why that is

17      causable.

18   Q.    I believe that was exhibit

19   57, and now let's do Exhibit 58.

20           MR. DROGIN:  Is this a

21      new exhibit going into the

22      chat?

23   Q.    That is right.  This is

24   Robinson 6834.

25           (Whereupon, Plaintiff's
```



Page 277

```
 1                 T. HARVEY
 2      Exhibit 58, Robinson 6834,
 3      was marked for
 4      identification, as of this
 5      date.)
 6   A.    Okay.
 7   Q.    Does Canal have any basis
 8  to dispute that the charge on June
 9  4, 2018, was for replacing plants at
10  Canal's office?
11        MR. DROGIN:  Objection to
12     the form.  You can answer.
13   A.    Yes.
14   Q.    Okay.  Please explain?
15   A.    Explain what?
16   Q.    The basis for the dispute?
17   A.    What dispute?
18   Q.    You just answered yes.  So
19  what is the basis for your answer,
20  sir?
21   A.    Okay.  Chase Robinson order
22  this invoice -- Chase Robinson
23  ordered purple, yellow, all of that
24  stuff, right?  And it was not
25  delivered to the offices of Canal
```



Page 278

```
 1              T. HARVEY
 2   Productions.
 3      Q.    The invoice shows it was
 4   delivered to the offices of Canal
 5   Productions, right?
 6      A.    The invoice says delivered
 7   to Chase Robinson at 375 Greenwich,
 8   and you are going to have to go in
 9   to see whether, in fact, they were
10   delivered.  Because, I believe,
11   again, I would have to go back to
12   the overall Complaint and back to
13   the budget to see if these were part
14   of that, and go back to the e-mails
15   to see if they were then shipped off
16   to Chase.  So just showing me this,
17   doesn't help.
18      Q.    You are familiar with
19   Canal's allegation that Ms. Robinson
20   loafed during working hours by binge
21   watching Netflix?
22      A.    Yes.  Very.
23      Q.    What are the dates when
24   Canal contends that Ms. Robinson
25   loafed during working hours by binge
```



Page 279

```
 1                   T. HARVEY
 2    watching Netflix?
 3       A.     Please stop with the pen.
 4       Q.     Yes.  I have to put down my
 5    pen.
 6              What are the dates when
 7    Canal contends that Ms. Robinson
 8    loafed during working hours by binge
 9    watching Netflix?
10              MR. DROGIN:  Objection to
11        the form.  You have -- you
12        have these documents.  Do you
13        really want him to go through
14        line by line?
15              MS. HARWIN:  I am asking
16        what the dates are.
17       A.     I would have to look at
18    documents.
19       Q.     What documents would you
20    need to look at?
21              MR. DROGIN:  Hold on.
22        This is a range of dates.
23        Okay?  No one can, with
24        certainty, say that Chase
25        Robinson was sitting watching
```



Page 280

```
 1                    T. HARVEY
 2      a show.  What we can say with
 3      certainty is that there is an
 4      extraordinary amount of
 5      Netflix usage on that account
 6      over multiple days, over
 7      multiple hours, leading a
 8      rationale human being to
 9      conclude that someone had
10      that on.  If she was
11      sleeping, or working or in
12      the bathroom, doing whatever.
13      The documents speak for
14      itself.  She has denied it.
15      She denied ever watching it.
16      The question is not whether
17      or not on a particular day
18      she was watching episodes of
19      Friends.  The question is
20      whether or not she was
21      working.
22      Q.   Mr. Harvey, what documents
23   would you need to review in order to
24   answer the question about what are
25   the dates when Canal contends that
```



Page 281

```
 1                  T. HARVEY
 2   Ms. Robinson loafed during working
 3   hours by binge watching Netflix?
 4     A.    I would have to start with
 5   the Canal Productions Netflix
 6   statements that showed various
 7   usage.
 8     Q.    Anything else?
 9     A.    Sure.  For example, I know
10   when she was in London on, quote,
11   "vacation," that she wasn't on
12   vacation, that she was watching
13   Netflix for an incredible amount of
14   time.  So I get Netflix account, I
15   see that this was being viewed in
16   London, I see where everyone else
17   was including Mr. De Niro, Mr.
18   Kaplan, Ms. Spear, Ms. Sabrina
19   Weeks, and making sure that Kaplan's
20   kids didn't go to London by
21   themselves, and I figure out, oh,
22   Chase might have been in London.
23   Then I go get the airline tickets or
24   I should say the air miles, and I
25   see she did purchase a ticket to
```



Page 282

```
 1                    T. HARVEY
 2    London.  Then I look at the e-mails,
 3    and the e-mails say, "I will be in
 4    London on vacation."  Then I go and
 5    I say, okay, during these dates that
 6    Netflix watching shows like Schitt's
 7    Creek, or whatever else, Friends,
 8    for 14 hours in a particular day,
 9    and I deduce that is Chase.  I think
10    a New York jury is going to
11    understand this very clearly.
12       Q.    So does Canal contend it
13    was improper for Ms. Robinson to
14    watch Netflix if she was on
15    vacation?
16       A.    Ms. Robinson was never on
17    vacation.  Right?  We are going to
18    tell the jury that.  You are going
19    to tell the jury that and they are
20    going to burst out laughing and we
21    are going to say --
22            (Simultaneous speaking)
23       Q.    Mr. Harvey?
24       A.    I am not done with my
25    answer.  My contention is that she
```



Page 283

```
 1                  T. HARVEY
 2    was on vacation.  And more
 3    importantly, not only did she watch
 4    Netflix for 14 or 15 hours while she
 5    was in London, or quote, "vacation,"
 6    but she did it at her apartment,
 7    when she was, quote, "working from
 8    home."
 9       Q.    So in Canal's lawsuit
10    against Ms. Robinson, it identifies
11    dates when Ms. Robinson was alleged
12    to have been binge watching Netflix
13    from January 8, to January 11,
14    January 14, and 15, and between
15    March 25th and March 29th.
16              Are those the dates when
17    Canal contends that Ms. Robinson was
18    binge watching Netflix?
19              MR. DROGIN:  Objection to
20        the form.  Which Complaint
21        are you talking about?
22              MS. HARWIN:  The
23        Complaint that Canal brought
24        against Ms. Robinson.
25              MR. BENNETT:  Not --
```



Page 284

```
 1                T. HARVEY
 2           MS. HARWIN:  It is the
 3      same in both.
 4      A.    What is the question?
 5      Q.    Are those the dates when
 6   Canal contends that Ms. Robinson was
 7   loafing during working hours by
 8   binge watching Netflix?
 9           MR. DROGIN:  Objection to
10       the form.
11      A.    The dates in the -- the
12   dates in the Complaint reflect what
13   the Netflix statements and other
14   documents indicated Ms. Robinson was
15   watching Schitt's Creek and other
16   shows.
17      Q.    I have brought into the
18   chat Exhibit 59.
19           MR. DROGIN:  I just want
20       to correct something.  You
21       misspoke and the witness has
22       adopted your statement.
23           Paragraph 57 says, "A
24       review of Canal's Netflix
25       account, to which she had
```



Page 285

```
 1                T. HARVEY
 2     access, indicates that
 3     Robinson spent astronomical
 4     amounts of time accessing
 5     these shows, not only on
 6     weekends and holidays."
 7          I don't want to quibble
 8     with you over accessing
 9     versus watching.  I don't
10     think anybody is contending
11     that she was sitting there
12     staring at a screen doing
13     nothing else.  Nobody can
14     prove what she was actually
15     doing, other than during the
16     working day, if I have
17     Friends on in the background,
18     and I have a hearing loss in
19     one of my ears, I am not
20     paying full attention to my
21     $300,000 a year job.
22     Especially since anybody can
23     call at any time and jump and
24     say how high.  Let's just be
25     clear.  Let's not
```



Page 286

```
 1                T. HARVEY
 2      mischaracterize because that
 3      was carefully drafted.  No
 4      one can prove that she was
 5      sitting watching.  Can I
 6      prove that she loafing by the
 7      excessive amounts of time
 8      that this -- that this was
 9      on?  I think so.  I think so.
10   A.     Are we waiting for a
11  document?
12   Q.     I believe we are.  So the
13  next exhibit is 59, which is Bates
14  stamped Canal 0010215 through 251.
15   A.     I didn't get it yet.
16   Q.     It should pop up soon and I
17  believe it is Exhibit 59.  I'm
18  sorry.  I am wrong about the number.
19  It is previously marked as Exhibit
20  36 so it is not 59.
21        MR. DROGIN:  This is
22     previously marked?
23        MR. BENNETT:  It is 125
24     megs so it is going to take
25     me a moment to download it.
```



Page 287

```
 1                T. HARVEY
 2          MR. DROGIN:  What is it?
 3          MS. HARWIN:   The Netflix
 4     viewing history that was
 5     previously marked.
 6          MR. BENNETT:  Don't wait
 7     for me.  I understand what it
 8     is.
 9     Q.    Mr. Harvey, do you
10   recognize this document?
11     A.    I haven't opened it yet.
12   It is downloading.  I have it open.
13     Q.    Do you recognize this
14   document?
15     A.    Yes.
16     Q.    Is this the Netflix viewing
17   history that served as a basis of
18   Canal's contention that Ms. Robinson
19   loafed during working hours binge
20   watching Netflix?
21          MR. DROGIN:  Objection to
22     the form.
23     A.    It appears to be.
24     Q.    The Netflix viewing history
25   contained at Exhibit 36 does not
```



Page 288

```
 1                    T. HARVEY
 2    identify where videos were accessed,
 3    correct?
 4     A.    This exhibit does not, that
 5    is correct.
 6     Q.    And the Netflix viewing
 7    history contained in Exhibit 36 does
 8    not identify who accessed videos,
 9    correct?
10     A.    This document doesn't,
11    correct.
12     Q.    The Netflix viewing history
13    contained in Exhibit 36 does not
14    show the times that these were
15    accessed, correct?
16          MR. DROGIN:  Objection.
17     A.    Correct, this document
18    doesn't.
19     Q.    Can Canal say, with
20    certainty, Ms. Robinson's accessed
21    any of the Netflix videos referenced
22    in Canal's lawsuit during working
23    hours?
24          MR. DROGIN:  Objection to
25     the form.
```



Page 289

                    T. HARVEY

1

2    A.    Can Canal say with

3    certainty?  What is certainty?

4          MR. DROGIN:  That was my

5      objection to the form.

6    Q.    Does Canal have any

7    evidence that Ms. Robinson accessed

8    any of the videos referenced in

9    Canal's lawsuit during working

10   hours?

11         MR. DROGIN:  Objection to

12     the form.

13   A.    Ladies and gentleman of the

14   jury, you are --

15   Q.    Mr. Harvey, please answer

16   the question.

17   A.    I am certainly answering

18   your question.

19   Q.    Not with a speech.  Please

20   just answer the question.

21   A.    I am not going to argue

22   with you.  Counsel, when you are

23   done speaking, I will answer.  Let

24   me know we you are done.

25         MS. HARWIN:  Madam



Page 290

```
 1                 T. HARVEY
 2      Reporter, can you repeat the
 3      question for Mr. Harvey?
 4           (Whereupon, the requested
 5      portion was read back by the
 6      reporter:
 7           Q:  Does Canal have any
 8      evidence that Ms. Robinson
 9      accessed any of the videos
10      referenced in Canal's lawsuit
11      during working hours?)
12      A.    Yes.
13      Q.    What is that evidence?
14      A.    The evidence that Ms.
15  Robinson was at home and/or in a
16  hotel and she was streaming these
17  shows.
18      Q.    What evidence is there that
19  these shows were accessed during
20  working hours?
21      A.    That is simple.  According
22  to Ms. Robinson, she worked 24/7.
23  So isn't every minute of the day a
24  working hour for her?
25      Q.    So Canal doesn't have any
```



Page 291

```
 1                  T. HARVEY
 2    evidence that any of the videos were
 3    accessed before 5:00 p.m. on the
 4    date that Canal identifies in its
 5    lawsuit, correct?
 6            MR. DROGIN:  Objection to
 7        the form.
 8    A.     Incorrect.
 9    Q.     What is Canal's evidence
10    that the videos that are referenced
11    in Canal's Complaint were accessed
12    prior to 5:00 p.m.?
13    A.     Prior to what?
14    Q.     5:00 p.m.?
15    A.     Yeah.  We are going to have
16    testimony from various individuals.
17    Q.     Which individuals?
18    A.     Michael Kaplan, Amelia
19    Brain, and there may be one other.
20            MR. DROGIN:  Note also
21        that as you are aware there
22        is a Subpoena outstanding to
23        Netflix for additional
24        information about access
25        times.
```



Page 292

```
 1                  T. HARVEY
 2     Q.    What is it that Canal was
 3   told by Amelia Brain concerning Ms.
 4   Robinson's Netflix usage?
 5     A.    I believe she said that
 6   Chase was always watching Netflix.
 7   When we were trying to determine who
 8   was watching Schitt's Creek, for
 9   example, for those number of hours,
10   you had to back into it.  You had to
11   say who else could have possibly
12   watched these shows?  For example,
13   Michael Kaplan had access.  It was
14   pretty simple that his five year old
15   kid probably wasn't watching 14
16   hours of Schitt's Creek on any
17   particular day.  And again, Michael
18   Kaplan had access, so maybe it was
19   him.  He assures me, and we will see
20   what the jury says, that he was not
21   the one that was doing that.  And
22   mentioned the fact that Chase
23   Robinson loved that show.  When I
24   discussed this two years ago,
25   whenever it was with Amelia Brain,
```



Page 293

```
 1                  T. HARVEY
 2    she said, yes, that she had been at
 3    Chase's, or apartment, or mother's
 4    apartment I should say, with Chase
 5    watching these shows.  So that is
 6    how we -- that is the evidence that
 7    we have.  Together with additional
 8    information from Netflix who will be
 9    able to tell us what device and what
10    time -- what time I think they will
11    able to tell us what times these
12    shows were viewed or access -- I
13    should say accessed.
14       Q.    So when Canal brought its
15    lawsuit, it didn't have any
16    documentation as to when Netflix had
17    been accessed, correct?
18           MR. DROGIN:  Objection to
19       the form.
20           MS. HARWIN:  Let me
21       restate.
22       Q.    When Canal brought its
23    lawsuit, it didn't have any
24    documentation as to what time videos
25    had been accessed from Netflix,
```



Page 294

```
 1                T. HARVEY
 2   correct?
 3     A.    We didn't have any
 4   documentary evidence if that is what
 5   you mean.
 6     Q.    I am going to show you
 7   Exhibit 59, which is comprised of
 8   Robinson 0000109 -- sorry.  18091810
 9   and 1821.
10         (Whereupon, Plaintiff's
11      Exhibit 59, Robinson 18091810
12      and 1821, was marked for
13      identification, as of this
14      date.)
15     A.    I have opened it.
16     Q.    Are you aware that Ms.
17   Robinson maintained records at the
18   time she spent working at Canal,
19   since at least August of 2017?
20         MR. DROGIN:  Objection to
21      the form.
22     A.    I am aware that Chase
23   Robinson thinks that she can create
24   documents after she leaves Canal to
25   try to foster her fraudulent
```



Page 295

```
 1                    T. HARVEY
 2   lawsuit.
 3      Q.    Well, documents have been
 4   produced since August 2017, correct?
 5      A.    No, that is not correct.
 6   Documents that say -- some document
 7   that create.  Although, strangely,
 8   bizarrely, there is nothing about
 9   overtime, sexual harassment,
10   bullying, or anything like that in
11   the thousands of pages that she
12   presented.  Just these self-serving
13   statements.  So the documents speak
14   for themselves.
15      Q.    So Canal -- does Canal have
16   any basis to dispute that Ms.
17   Robinson worked the hours reflected
18   on the records contained in Exhibit
19   59?
20      A.    Yes.
21            MR. DROGIN:  Objection to
22       the form.
23      Q.    And what is that basis?
24      A.    These were -- Chase made
25   these up.  They are ridiculous.
```



Page 296

```
 1                 T. HARVEY
 2   Good luck.  Good luck with a jury in
 3   these.  She forget to send them to
 4   anyone else but herself.  She wasn't
 5   up to a scam.  Don't worry about it.
 6   The jury will believe her.
 7             MR. DROGIN:  Just -- come
 8        on.  Just answer the
 9        question.
10     A.    No.  They are absurd.  They
11   are self-serving statements.  They
12   say what they say.
13     Q.    The question is, does Canal
14   have any basis to dispute that Ms.
15   Robinson worked the hours reflected
16   on these records?
17     A.    Yes, is the short answer.
18   I would have to go and get the
19   e-mails from each day to dispute and
20   show you or show a jury.
21     Q.    Sitting here today, you
22   have not done that, is that correct?
23             MR. DROGIN:  Objection to
24        the form that -- that -- that
25        is privilege.
```

Page 297

```
 1                    T. HARVEY
 2              MR. BENNETT:  I'm lost.
 3         What does that have to do
 4         with the 30(b)(6)?  I am
 5         lost.
 6    Q.    Mr. Harvey, can you answer
 7   the pending question?
 8              MR. DROGIN:  Why don't we
 9         hear it back?  I don't even
10         know --
11              (Whereupon, the requested
12         portion was read back by the
13         reporter:
14              Q:  Sitting here today,
15         you have not done that, is
16         that correct?)
17    A.    Done what?
18              (Whereupon, the requested
19         portion was read back by the
20         reporter:
21              Q:  The question is, does
22         Canal have any basis to
23         dispute that Ms. Robinson
24         worked the hours reflected on
25         these records?)
```



Page 298

```
 1                    T. HARVEY
 2            MS. HARWIN:  His answer.
 3            (Whereupon, the requested
 4       portion was read back by the
 5       reporter:
 6            A:  Yes, is the short
 7       answer.  I would have to go
 8       and get the e-mails from each
 9       day to dispute and show you
10       or show a jury.)
11       Q.    You haven't done that,
12   correct?
13       A.    Done what?
14            MR. DROGIN:  Objection.
15       Q.    What you just described?
16       A.    What?
17            MS. HARWIN:  Madam Court
18       Reporter, can you read back
19       his answer one more time?
20            (Whereupon, the requested
21       portion was read back by the
22       reporter:
23            A:  Yes, is the short
24       answer.  I would have to go
25       and get the e-mails from each
```



Page 299

```
 1                 T. HARVEY
 2      day to dispute and show you
 3      or show a jury.)
 4      Q.    You haven't done that,
 5   correct?
 6            MR. DROGIN:  Objection to
 7      the form.
 8      A.    Done what?
 9      Q.    What you described, Mr.
10   Harvey.
11      A.    You can give me the stupid
12   looking face, but the reality is
13   there --
14      Q.    Mr. Harvey --
15      A.    What show what Chase --
16   what show what Chase Robinson was or
17   was not doing on the particular day.
18   I know that -- did I know that you
19   are going to show me a document that
20   Chase Robinson created, apparently,
21   on January 14, 2019, reflecting her
22   time for January 7, 2018, with
23   descriptions she made, and do I have
24   those documents in my back pocket?
25   No.  Sorry.
```



Page 300

```
 1                    T. HARVEY
 2            MR. DROGIN:  I don't want
 3       this to degrade, and I'm
 4       really not sure this is
 5       helpful, but as Canal's
 6       Counsel, to hopefully assist
 7       here, just because you pulled
 8       this document up, if you look
 9       on the time entry that she
10       has made here, for March
11       26th, 2019, which is a
12       Tuesday, she said that she
13       worked from 7:30 a.m. to
14       11:00 p.m., 15 hours and 30
15       minutes.  I don't think
16       anyone can say with
17       certainty --
18            MS. HARWIN:  Which date
19       are you on Counsel?  Or which
20       page?
21            MR. DROGIN:  18 -- 1811
22       -- 1821.  No one can say with
23       certainty whether she
24       accurately reported her hours
25       as working from 7:30 a.m. to
```


MAGNA
LEGAL SERVICES

Page 301

```
 1                    T. HARVEY
 2        11:00 p.m.
 3           Based on date, however, I
 4        am confident that the
 5        likelihood is her call with
 6        Michael Tasch was recorded.
 7        So you are correct that I
 8        can't prove to -- to that an
 9        absolute certainly whether it
10        is accurate or inaccurate.
11           I do know, however, when
12        I look at the Netflix account
13        someone accessed 13 episodes
14        of Schitt's Creek and
15        Arrested Development that
16        day.  So is it conceivably
17        possibly that after working
18        15 and a half hours Chase
19        Robinson slept while those
20        shows were on?  I guess, in
21        theory, it is possible.  But
22        it a theory.  I mean, let's
23        be -- let's be frank, and
24        let's be real about what
25        these documents show.  I
```



Page 302

```
 1                    T. HARVEY
 2      don't think this is really
 3      what -- you can do with this
 4      deposition whatever you want.
 5      Okay?  Is there anything else
 6      that you want as a
 7      representation from Canal on
 8      this point?  It is logic.  It
 9      is preponderance of the
10      evidence.  I guess we could
11      quiz her on Arrested
12      Development to see if she
13      knows the answers.  You can
14      ask her about Schitt's Creek,
15      too.
16          MS. HARWIN:  Bottom line,
17      there is no evidence at all
18      that any videos were accessed
19      during working hours,
20      correct.
21          MR. DROGIN:  That is not
22      true.  That is -- that is a
23      conclusory statement that you
24      have made, and one witness
25      has already testified he was
```



Page 303

```
 1                    T. HARVEY
 2        at her home when he saw it
 3        on.  Just match up -- match
 4        up these hours from this
 5        week, which is the week
 6        leading up to her
 7        resignation, the hours that
 8        she said she worked, and look
 9        at the Netflix viewing
10        history.  This is not a
11        criminal prosecution here.
12            MS. HARWIN:  Okay.
13     Q.   I would like to turn to the
14   March 2018 trip to Los Angeles.
15            Was Mr. De Niro interviewed
16   about Ms. Robinson's trip to Los
17   Angeles in March of 2018?
18            MR. DROGIN:  By whom?
19            MS. HARWIN:  By anyone.
20            MR. DROGIN:  How would he
21      know that?  Objection.
22     A.   I can tell you that I spoke
23   to him about it.
24     Q.   And how long did that
25   conversation last?
```



Page 304

```
 1                T. HARVEY
 2    A.    Briefly.
 3    Q.    How long?
 4    A.    Four minutes.
 5    Q.    What factual information
 6  did Mr. De Niro provide concerning
 7  Ms. Robinson's trip to Los Angeles
 8  in March of 2018?
 9         MR. DROGIN:  Objection.
10    That is privileged.  You know
11    it is privileged.
12         MS. HARWIN:  Canal has
13    designated a witness to
14    testify about the facts and
15    circumstances leading to its
16    State Court lawsuit.  I
17    believe we are entitled to
18    that lawsuit.
19         MR. DROGIN:  Facts and
20    circumstances yes, but
21    according --
22         MS. HARWIN:  Counsel,
23    just -- if you let Mr. Harvey
24    answer this question, you
25    know, we are not taking a
```



Page 305

```
 1                 T. HARVEY
 2     position that that waives
 3     your objection as to other
 4     matters.  I think it would
 5     speed along this deposition
 6     if we can just get that
 7     answer.
 8          MR. MERINGOLO:  Why don't
 9     we just mark it for a later
10     discussion?  I think we are
11     going to have a lot of
12     pushback on this question.
13     If that is okay?
14          MS. HARWIN:  Okay.
15     Q.    Why don't you identify for
16  me everyone that was interviewed
17  about the March 2018 trip to Los
18  Angeles?
19     A.    Well, you keep using the
20  term interviewed.  I spoke with
21  Michael Kaplan, Sabrina, Jillian,
22  Amelia Brain, Peter Temper (ph) I
23  spoke to.  There may have been other
24  people.  That is what I remember off
25  the top of my head.
```



Page 306

```
 1                  T. HARVEY
 2    Q.    You didn't speak to Robin
 3  Chambers about this trip, correct?
 4         MR. DROGIN:  Objection.
 5    A.    About what trip?
 6    Q.    I'm sorry.  I could not
 7  hear the answer?
 8    A.    About what trip?
 9    Q.    The March 2018 trip to Los
10  Angeles?
11    A.    By Chase Robinson to Los
12  Angeles, is that what you are
13  referring to?
14    Q.    Yes.
15    A.    I did not speak to Robin
16  Chambers about it until -- no, I
17  don't think I ever spoke to her
18  about it.
19         MR. DROGIN:  For
20      completeness, I also want to
21      point out that during some of
22      the audio recordings that
23      Chase made with Robin
24      Chambers, they were also
25      during the week of the last
```



Page 307

```
 1                 T. HARVEY
 2      week in March of 2019, and
 3      those are not reflected on
 4      her time sheets.  Some of
 5      them are not.
 6    Q.    At the time Ms. Robinson
 7  traveled to Los Angeles, in March of
 8  2018, are you aware that Toukie
 9  Smith was preparing to undergo
10  treatment for multiple sclerosis in
11  Los Angeles?
12    A.    Oh, I am very well aware of
13  that, yes.
14    Q.    And when was Ms. Smith
15  going to undergo treatment for
16  multiple sclerosis?
17    A.    I would have to look at the
18  reservation that was made two weeks
19  before Chase Robinson went to Los
20  Angeles, after she spoke to Ms.
21  Smith's travel agent and gave her
22  the hotel that Ms. Smith would be
23  traveling to.
24    Q.    Are you aware of subsequent
25  discussions between Ms. Robinson and
```



Page 308

```
 1                    T. HARVEY
 2   Mr. De Niro concerning Toukie Smith
 3   and her treatment of multiple
 4   sclerosis?
 5      A.    Say that again?
 6      Q.    Are you aware of subsequent
 7   conversations that took place
 8   between Mr. De Niro and Ms. Robinson
 9   concerning Toukie Smiths' upcoming
10   treatment for multiple sclerosis?
11      A.    You are saying, "upcoming
12   treatment."  Upcoming from when?
13      Q.    As of March of 2018?
14      A.    Am I aware that Chase spoke
15   to Robert De Niro about Toukie's
16   possibly going to Los Angeles to be
17   treated by a doctor in Los Angeles?
18      Q.    Yes.
19      A.    Yes.
20      Q.    Okay.
21            Robin Chambers testified
22   about the purpose of Ms. Robinson's
23   trip to Los Angeles in March of
24   2018.
25            Do you recall that
```



Page 309

```
 1                    T. HARVEY

 2    testimony?

 3       A.     I do.

 4       Q.     And Ms. Chambers testified

 5    that the primary purpose had to do

 6    with identifying hotels for Toukie

 7    Smith rather than the delivery of

 8    Taxi Driver books.

 9            Does Canal dispute Ms.

10    Chambers' testimony about the

11    primary purpose of Ms. Robinson's

12    trip?

13       A.     When you say, "dispute her

14    testimony," Ms. Chambers got that

15    information from Chase Robinson.

16    She is parroting what Chase told

17    her.  I am disputing that is a

18    ridiculous lie that I will disprove

19    at trial.  I would be happy to

20    explain it to you.

21            You can tell your client

22    that we have her signed signature

23    booking a hotel two weeks before she

24    goes to Los Angeles.  We have

25    communications, I believe, or I can
```



```
 1                  T. HARVEY

 2     get from the travel agent showing

 3     the travel agent saying, "Hey,

 4     Toukie always stays at this hotel."

 5     You will have to explain to me why

 6     Chase Robinson had to go to Los

 7     Angeles, and got Mr. De Niro's

 8     permission to check out a local

 9     hotel that Toukie Smith consistently

10     stayed at.  And the beauty of it,

11     Toukie never went.  Good luck with

12     that one.

13        Q.    Does Canal have any

14     evidence that Ms. Robinson asked to

15     go to Los Angeles in March of 2018?

16        A.    Canal has plenty of

17     evidence.

18        Q.    What is that evidence?

19        A.    Well, there will be

20     testimony from Kaplan, there will be

21     testimony from Jillian, there will

22     be testimony from Sabrina, there

23     will be testimony from Robert De

24     Niro, there will be testimony from

25     Amelia Brain, and I am sure Robin
```



Page 311

1              T. HARVEY

2   Chambers will be happy to come and

3   explain where she came up with this

4   idea that that it was a legitimate

5   trip.  And there may be something on

6   the tapes, the 40 something hours.

7   I think there is something on the

8   tapes.  Chase's own words should do

9   her in.

10     Q.    So it is your testimony

11  that all these people will testify

12  that Ms. Robinson asked to go to Los

13  Angeles in March of 2018?

14     A.    Read back my answer.  It

15  speaks for itself.

16     Q.    My question is, what

17  evidence does Canal have that Ms.

18  Robinson asked to go to Los Angeles

19  in March of 2018?  I would like you

20  to answer that question.

21     A.    You have asked it three

22  times.  I have answered it three

23  times.

24          (Simultaneous speaking)

25     A.    One of us can speak at a



Page 312

```
 1                 T. HARVEY
 2   time.  I don't mean to speak over
 3   you, but evidence can be testimony.
 4   So yes, there will be testimony at
 5   the trial that Ms. Robinson not only
 6   asked, but begged to essentially go.
 7      Q.    Who -- who said that Ms.
 8   Robinson begged to go to Los
 9   Angeles?
10      A.    It would be quicker to say
11   who didn't -- who won't say it.
12   Sabrina Weeks, Jillian Spear,
13   Michael Kaplan, will testify, I
14   believe, that she really wanted to
15   go to Amelia's birthday party.  And
16   other evidence.  You are asking
17   about the other evidence?  It just
18   so happens she went to Nobu twice.
19   It just so happens that she stayed
20   at the hotel -- the Montage Hotel,
21   in Beverly Hills, instead of going
22   to the hotel she is supposedly
23   scouting in Santa Monica.
24           Now that is probably not
25   very strong in your evidence in your
```



Page 313

```
 1                T. HARVEY

 2    mind, but I think a jury is going to

 3    get it.

 4      Q.   Canal doesn't dispute that

 5    there was a delay in when the Taxi

 6    Driver books were delivered to Los

 7    Angeles, right?

 8      A.   What is that?

 9      Q.   Canal doesn't dispute that

10    there was a delay in when the Taxi

11    Driver books were delivered to Los

12    Angeles, correct?

13      A.   What does that mean, a

14    dispute?  What is a dispute?

15           MR. MERINGOLO:  I

16       apologize.  Can we just take

17       a few-minute break?  Maybe

18       bathroom.  And just one

19       question it is no big deal,

20       but do you think this is

21       going to go on much longer?

22           MS. HARWIN:  I think it

23       will go on for a while.

24       Let's just get an answer to

25       that question, and I am happy
```



Page 314

```
 1                T. HARVEY
 2      to get a break.
 3           MR. MERINGOLO:  Sure.
 4       Sure.
 5      Q.    So there was a delay in
 6   when the Taxi Driver books were
 7   delivered to Los Angeles, correct?
 8      A.    No.  You can say it one
 9   thousand times.  Just because you
10   want those to be the facts, aren't
11   the facts.
12      Q.    So Canal disputes there was
13   a delay in when the Taxi Driver
14   books were --
15           MR. DROGIN:  Objection.
16      A.    You keep using -- you keep
17   making up this set of facts and
18   saying we dispute that.  You are not
19   asking a factual question.  You are
20   just making an assertion, a
21   ridiculous one at that.
22           MS. HARWIN:  I'm going to
23       ask one more question and
24        then we can take a break.
25      Q.    Ms. Robinson's return trip
```



Page 315

```
 1                 T. HARVEY
 2    to New York was moved up when there
 3    was a snowstorm coming, is that
 4    right?
 5           MR. DROGIN:  Objection to
 6       the form.
 7      A.    When you say -- no.  Ask me
 8    a factual question.  Ask me what day
 9    she came back.  I don't know if she
10    decided to stay there for ten years
11    or ten minutes.  How would I know if
12    it was quote, "moved up" or moved
13    back, or moved anywhere.
14           MS. HARWIN:  This is a
15       good time for a break.  When,
16       counsel, would you like to
17       return?
18           MR. MERINGOLO:  If we
19       took a ten-minute break.  Do
20       you think you are going to go
21       past 5:00?  Obviously you
22       could.
23           MS. HARWIN:  I -- you
24       know, I do anticipate that we
25       will go past 5:00.
```



Page 316

```
 1                   T. HARVEY
 2              MR. DROGIN:  I would like
 3         to take a 15-minute break.  I
 4         would like to confer with Ms.
 5         Lazzaro and Mr. Bennett.
 6              MS. HARWIN:  That is fine
 7         with us.
 8              THE VIDEOGRAPHER:  The
 9         time is now 3:33 p.m.  We are
10         off the record.
11              (Whereupon, a recess was
12         taken at this time.)
13              THE VIDEOGRAPHER:  The
14         time is 3:50 p.m.  We are
15         back on the record.
16    Q.    Mr. Harvey, turning your
17    attention back to Canal's Complaint
18    against Ms. Robinson, in Paragraph
19    22 and 23 of the Complaint there are
20    allegations made about reimbursement
21    and direct payments that are claimed
22    to be under false pretensions for
23    personal services and items such as
24    iPhones, a Louis Vuitton, and hiring
25    a dog sitter.
```



Page 317

```
 1                    T. HARVEY

 2          Are you familiar with those

 3   allegations?

 4    A.    I am.

 5    Q.    What documents serve as the

 6   basis of these allegations that

 7   Canal made against Ms. Robinson?

 8          MR. DROGIN:  Objection to

 9     the form.  Compound.

10    A.    Are you talking about the

11   allegations in a particular

12   paragraph of the Complaint?

13    Q.    Yes.  That were identified

14   in Paragraph 22 and 23?

15    A.    Of the State Court action?

16    Q.    Yes, sir.

17    A.    Okay.

18          And you want to know what

19   proof I have, for example, that Ms.

20   Robinson had iPhones she bought for

21   herself, and got reimbursed from

22   Canal?

23    Q.    My question was about what

24   documents served for the basis of

25   the allegations?
```



1                    T. HARVEY

2      A.    Sure.  The backup with

3    respect to the purchase for a

4    respective phone, and the fact that

5    it wasn't authorized by Canal.  It

6    was not a legitimate expense.

7      Q.    What -- what backup are you

8    referring to, sir?

9      A.    Well, you would have to go

10   to each item.  Which item would you

11   like?

12     Q.    I am asking about the

13   allegations in Paragraphs 22 and 23

14   in Canal's Complaint, which

15   corresponds to Paragraph 169 and 170

16   in Canal's Counterclaims.

17          What are the documents that

18   serve as basis for the allegations?

19          MR. DROGIN:  Objection to

20     form.

21     A.    I would have to take it to

22   the individual items.

23     Q.    Okay.  Well, I would like

24   you to identify all documents.  If

25   you would like to break it up in



Page 319

```
  1                 T. HARVEY
  2   doing so, that is fine?
  3    A.    With respect to the dog
  4   sitter, Mr. De Niro or Canal did not
  5   authorize Ms. Robinson to use petty
  6   cash or otherwise pay for dog
  7   sitters.
  8         With respect to a Louis
  9   Vuitton handbag, Mr. De Niro didn't
 10   authorize that purchase, I believe
 11   it is on American Express.
 12         (Technical interference)
 13         With respect to the Louis
 14   Vuitton there would be, I believe,
 15   an American Express receipt or
 16   charge with respect to the Louis
 17   Vuitton bag.
 18         And with respect to the
 19   iPhones, there were a number of
 20   iPhones purchased by Ms. Robinson
 21   that were charged to Canal
 22   Productions, which were not
 23   authorized.
 24    Q.    What documents serve as the
 25   basis for these allegations against
```



Page 320

```
 1                T. HARVEY
 2   Ms. Robinson?
 3     A.    Again, you would have to go
 4   through each one.
 5           For the dog sitter I
 6   believe it was petty cash.
 7           For the Louis Vuitton, I
 8   believe it was American Express.
 9           The iPhones I believe there
10   were charges.  I'm not sure off the
11   top of my head whether it was
12   American Express or charged through
13   the Canal phone bill.
14     Q.    Was Ms. Robinson permitted
15   to charge Canal for her work iPhone?
16           MR. DROGIN:  Objection to
17      the form.
18     A.    Everyone was given a phone
19   with respect to work.  The work by
20   Canal certainly since 2013.
21     Q.    So Ms. Robinson was
22   permitted to obtain a phone for her
23   work at Canal, correct?
24     A.    When you say, "obtain," she
25   was given or provided a phone paid
```



Page 321

```
 1                 T. HARVEY
 2   for by Canal certainly between 2013
 3   and until the day she quit, yes.
 4      Q.     And Ms. Robinson also
 5   purchased a duplicate phone for Mr.
 6   De Niro to assist with his divorce
 7   proceedings, is that correct?
 8      A.     No, that is not correct.
 9      Q.     So but Ms. Robinson did
10   have a duplicate phone that was
11   purchased to assist in Mr. De Niro's
12   divorce proceedings, correct?
13      A.     Again.  Not correct.
14      Q.     What part of that is not
15   correct, sir?
16      A.     The whole part.
17      Q.     There wasn't a duplicate
18   phone that was used for Mr. De
19   Niro's divorce proceedings?
20      A.     That was not your question.
21      Q.     You said the whole part is
22   not correct.  I am trying to get at
23   what aspects you disagree with.
24             Was a duplicate iPhone used
25   to assist Mr. De Niro and his lawyer
```



Page 322

```
 1                    T. HARVEY
 2    in his divorce proceedings?
 3           MR. DROGIN:  Objection.
 4       Can I hear that back?
 5           (Whereupon, the requested
 6       portion was read back by the
 7       reporter:
 8           Q:  You said the whole
 9       part is not correct.  I am
10       trying to get at what aspects
11       you disagree with.
12           Was a duplicate iPhone
13       used to assist Mr. De Niro
14       and his lawyer in his divorce
15       proceedings?)
16           MR. DROGIN:  I don't know
17       why that is not privileged
18       either.  But it -- you are
19       talking about --
20       A.    What you are trying to ask
21    is was Chase Robinson provided a
22    phone that she used to go on Bob's
23    e-mails or text messages, that she
24    thereafter used and monitored his
25    e-mails or texts without his
```



Page 323

```
 1                    T. HARVEY
 2    permission.  I think that is your
 3    question.  I think I answered it.
 4      Q.    So that -- that doesn't
 5    answer my question.
 6            Was a duplicate or clone
 7    iPhone used for Mr. De Niro's
 8    divorce proceedings?
 9      A.    I don't know what that
10    means.  Again, a phone was given to
11    Ms. Robinson in which she
12    volunteered to clone Mr. De Niro's
13    phone.  She was supposed to look at
14    it briefly for scheduling.  Instead,
15    she use it to search and basically
16    monitor Mr. De Niro's communication
17    with his girlfriend and everyone
18    else.  Both text messages and
19    communications I believe.
20      Q.    So Ms. Robinson was -- let
21    me restate that.
22            Ms. Robinson was tasked
23    with looking at Mr. De Niro's
24    messages to assist in his divorce
25    schedule, is that correct?
```



Page 324

1                    T. HARVEY

2    A.    No.  That is not correct.

3    Q.    Can you clarify what you

4    meant?

5    ████    ████████    █████████████

     █████████████████████████████████████

     ████████████████████████████████

     ███████████████    ██████████████

9    "Rather than looking at your phone

10   and wasting that time and energy, I

11   will just clone your phone, look at

12   the information, and then give the

13   phone and everything else back."

14   Instead, she chose to use it to

15   monitor him secretly.

16   Q.    The purchase of the clone

17   phone was authorized by Mr. De Niro,

18   correct?

19   A.    I don't know what you mean

20   by when you say, "clone phone."

21   Q.    You were just talking about

22   a clone phone.  So that was an

23   authorized iPhone purchase, correct?

24   A.    I don't believe that was

25   purchased with respect -- that was



Page 325

```
 1                  T. HARVEY
 2   not purchased as far as I know by
 3   Chase Robinson.  I believe it was
 4   already in the office as an extra
 5   phone.
 6     Q.    What specific -- let me ask
 7   a different question.
 8           Is it Canal's contention
 9   that every single iPhone that was
10   purchased by Ms. Robinson and
11   charged to petty cash was not
12   authorized?
13           MR. DROGIN:  Objection to
14     the form.
15     A.    I don't know what time
16   period you are talking about.  I
17   don't know if you are referring to
18   other iPhones that were purchased
19   for other individuals.  You are
20   going to have to narrow it down a
21   little bit.
22     Q.    What iPhones does Canal
23   contend were not authorized for Ms.
24   Robinson to charge to petty cash?
25     A.    You were supposed to have
```



Page 326

```
 1                 T. HARVEY
 2    one work phone that Canal would pay
 3    for.
 4       Q.    Does Canal have any
 5    evidence that Ms. Robinson was
 6    charging Canal for more than one
 7    work phone at a time?
 8       A.    I thought it was four
 9    phones.  Yes, we do.  We have her
10    charges where she charged, I think
11    it was four phones, but I would have
12    to look at everything.
13       Q.    Is it Canal's contention
14    that Ms. Robinson was using four
15    iPhones simultaneously?
16       A.    No.
17       Q.    Does Canal have any
18    evidence that more than one phone
19    was being used at a time?
20       A.    I wasn't with Ms. Robinson
21    when she was using the various
22    phones.  I wouldn't know.
23       Q.    Does Canal have any
24    evidence that the phones purchased
25    were not used for work?
```



Page 327

```
 1                T. HARVEY
 2          MR. DROGIN:  Objection to
 3     the form.  That is not the
 4     contention just so we are
 5     clear.  This is what you are
 6     doing again.  You are making
 7     up facts.  Canal has no
 8     evidence that those iPhones
 9     weren't attached to hot air
10     balloon and sent into the
11     stratosphere either.  But
12     that is not what they are
13     contending.  You are asking
14     about negatives.  We contest
15     something -- we contest
16     something that we never
17     contended.  I don't know how
18     to answer that.
19     A.    You say the phones, and you
20  don't identify the time period, et
21  cetera.  So I don't know what to
22  tell you.  It is a very difficult
23  question to answer because you are
24  not referring or connecting to
25  anything or anybody.
```



Page 328

```
 1                 T. HARVEY
 2     Q.    Identify for me what
 3   specific phones Canal contends Ms.
 4   Robinson improperly charged?
 5     A.    When you say, "charged,"
 6   you mean stole, or purchased, or
 7   however you want to describe it?
 8   You want me to give you the Apple ID
 9   for each phone?  Is that what you
10   are asking me?
11     Q.    I would like for you to
12   identify the phone in some way;
13   whether it is by Apple ID, by date
14   of purchase or some other manner in
15   which we can ascertain what phone it
16   is that Canal contends were
17   improperly obtained?
18          MR. DROGIN:  Objection to
19      the form.
20     A.    I think you are asking me
21   to get our phone bill, or receipt
22   for the phone, or the charge for
23   phone to give to you.  I can show
24   you I think four purchases, whether
25   it is through petty cash, or
```



Page 329

```
 1                   T. HARVEY
 2   whatever, but I don't have that in
 3   front of me.
 4      Q.    So are -- is it Canal's
 5   contention that all four iPhones
 6   were improper charges?
 7      A.    It is Canal's contention
 8   that Ms. Robinson used petty cash
 9   and other means to purchase iPhones
10   that she wasn't entitled to.  That
11   is our contention.
12      Q.    And how many iPhones does
13   Canal contend were improperly
14   charged?
15      A.    I believe it is four.
16      Q.    And over what period?
17      A.    From 2013, to the day she
18   quit.
19      Q.    Were there any other
20   iPhones besides those four that
21   Canal provided to Ms. Robinson
22   during that period?
23      A.    I am not sure.  And I -- I
24   think she actually -- she -- when --
25   she stole all that stuff, we asked
```



T. HARVEY

for it for two years, I think she gave one iPhone back. So I have to check my records to see if that is contained within the four iPhones or not.

Q. Mr. Harvey, I would like you to listen to the question and then answer it.

MS. HARWIN: Madam Court Reporter, can you read back the question?

(Whereupon, the requested portion was read back by the reporter:

Q: Were there any other iPhones besides those four that Canal provided to Ms. Robinson during that period?)

A. Yeah, the one that she returned, I think, when she stole all the stuff and returned it two years later.

Q. That was a fifth phone you are contending?

Page 331

```
 1                T. HARVEY
 2    A.    I am not contending.  You
 3    asked me if there is any other
 4    phones.  I believe that was one.  I
 5    don't believe that is within the
 6    four.
 7    Q.    Under certain circumstances
 8    Mr. De Niro would authorize
 9    employees to charge dog sitting
10    expenses, is that correct?
11         MR. DROGIN:  Objection to
12      the form.
13    A.    If you are suggesting -- I
14    think he -- approved -- he may have
15    approved Robin Chambers' dog sitter
16    when she came into New York
17    occasionally.
18    Q.    And when Ms. Robinson's dog
19    was sick with cancer, and Ms.
20    Robinson was looking for apartments
21    for Mr. De Niro, Mr. De Niro
22    authorized her to be reimbursed for
23    her dog sitting expenses during that
24    period of time, correct?
25         MR. DROGIN:  Objection to
```



```
 1                  T. HARVEY
 2      the form.
 3      A.    I don't think that is
 4   correct, no.
 5      Q.    Why isn't that correct?
 6      A.    I just told you because I
 7   don't think he said that.
 8      Q.    Do you know whether he said
 9   that?
10      A.    I just said I don't believe
11   he said that.  How would I know?  I
12   wasn't there.  If it never happened,
13   how could I know for sure or as you
14   say, how could I dispute that?
15      Q.    Ms. Robinson would submit
16   petty cash receipts and sheets on an
17   ongoing basis, is that correct?
18      A.    Say that?  Who would?
19      Q.    Ms. Robinson?
20      A.    Submit them to who?
21      Q.    To Michael Kaplan?
22      A.    You are using the word
23   submit like she -- would she handle
24   Michael Kaplan petty cash receipts,
25   et cetera?  Yes.  I am sure she did.
```



Page 333

```
 1                  T. HARVEY

 2    Q.    Okay.

 3          And what did Canal do to

 4    evaluate the petty cash sheets and

 5    receipts that were submitted to

 6    Michael Kaplan?

 7          MR. DROGIN:  Objection.

 8     This is -- hold on.  This is

 9     outside the scope of this

10     witness's designation.  I

11     think this is topic one.

12     Policies procedures and

13     protocols concerning employee

14     expenses and reimbursements

15     including use of Canal's

16     American Express cards, petty

17     cash, and expenses that Canal

18     paid for employees.

19          MS. HARWIN:  We can -- we

20     can have Mr. Harvey not

21     answer, or if he would like

22     to answer this question, you

23     know, I -- that is -- that

24     is --

25          MR. DROGIN:  Are you
```



Page 334

```
 1                 T. HARVEY

 2      taking this out of the

 3      30(b)(6), and you asking him

 4      as a fact witness?

 5           MS. HARWIN:  If he can

 6      answer that as a fact

 7      witness, he is welcome to.  I

 8      can also withdraw the

 9      question if you prefer the

10      other 30(b)(6) witness to

11      answer.

12      A.    I think that makes more

13   sense, but --

14      Q.    We are going to put into

15   the chat another exhibit spanning

16   Robinson 0006741 through 52, which I

17   believe is going to be Exhibit 60.

18           (Whereupon, Plaintiff's

19      Exhibit 60, Robinson 0006741

20      through 52, was marked for

21      identification, as of this

22      date.)

23      A.    What is the number?

24      Q.    60.

25      A.    The Bates?
```



Page 335

```
 1                 T. HARVEY
 2      Q.    I'm sorry?
 3            MR. DROGIN:  741 to 6752.
 4            THE WITNESS:  Got it.
 5            MR. DROGIN:  Thank God it
 6       is not more flower receipts.
 7       21-page exhibit with a cover
 8       page, "Petty Cash charges
 9       4/17 to 1/19."
10      Q.    Mr. Harvey, do you
11   recognize this document?
12      A.    Yes, I do.
13      Q.    Okay.
14            What is this document?
15      A.    The document contains petty
16   cash from April 17th to January
17   19th, with respect to Chase Robinson
18   at Canal Productions.
19      Q.    Who prepared this document?
20      A.    Well, when you say,
21   "prepared," we had to go back and
22   look at receipts, et cetera, but it
23   was either Jillian, or Sabrina, I
24   believe, or Michael Kaplan, who
25   actually imputed the information.
```



Page 336

```
 1                    T. HARVEY
 2     Q.    What information was
 3  imputed in this document?
 4     A.    Which information --
 5           MR. DROGIN:  Objection to
 6      the form.  You can answer.
 7     A.    When the document was
 8  created.  I'm not sure what you are
 9  asking.
10     Q.    Who created this document?
11     A.    What is that?
12     Q.    You are saying that certain
13  things were imputed.  What are you
14  referring to?
15     A.    The document.
16     Q.    This petty cash spreadsheet
17  was prepared by Chase Robinson,
18  correct?
19     A.    I don't know.
20     Q.    Turning your attention to
21  the last page of this exhibit, which
22  is Robinson 6752?
23     A.    Uh-huh.
24     Q.    Do you see where it says,
25  "Attaching her petty cash sheet
```



Page 337

```
 1                T. HARVEY
 2   here?"
 3    A.    What page?
 4    Q.    The last page of the
 5   exhibit, which is 6752?
 6          MR. DROGIN:  Actually,
 7      the exhibit goes beyond that.
 8      The exhibit seems to go to
 9      6761.
10          MS. HARWIN:  Oh.  Okay.
11      That -- that is a mistake.
12      This exhibit should go to
13      6752.  Apologies that you are
14      getting an extra document in
15      there.
16    Q.    If you turn to 6752, do you
17   see that message on that page, Mr.
18   Harvey?
19    A.    I am looking.
20    Q.    Okay.  Do you see that
21   message?
22    A.    I am reading it.
23    Q.    Okay.
24    A.    Okay.
25    Q.    Who wrote this message?
```



Page 338

```
 1                   T. HARVEY
 2     A.    I don't know.  You took out
 3   the header so I couldn't tell who
 4   sent it.
 5     Q.    This is a document that was
 6   submitted by Canal to the District
 7   Attorney's Office, correct?
 8     A.    Okay.  I don't know.
 9   Someone left off the header.  It was
10   either Jillian or Sabrina, I assume.
11     Q.    You see where it says, "All
12   of the dog sitting charges I don't
13   know if Bob approved?"
14     A.    Yes.
15     Q.    What was done to evaluate
16   whether the dog sitting charges were
17   an approved charge?
18         MR. DROGIN:  Objection.
19     That is privileged.  That
20     goes into communications with
21     witnesses.  That is not
22     factual.
23     Q.    Was any additional
24   information contained after this
25   message was sent concerning the dog
```



Page 339

```
 1                  T. HARVEY
 2  sitting charges?
 3     A.    What dog sitting charges
 4  are you referring to?
 5     Q.    The ones that are part of
 6  Canal's claims against Ms. Robinson?
 7     A.    Okay.  I didn't know if you
 8  meant Robin Chambers.  What is the
 9  question?
10     Q.    Was any additional
11  information obtained concerning the
12  dog sitting charges after this
13  message was prepared?
14          MR. DROGIN:  Objection to
15      the form.  When was this
16      prepared?
17     A.    That is my problem.  I'm
18  not sure is the short answer.
19     Q.    Turning to Canal's
20  allegations about SkyMiles.  Can you
21  clarify what is the time period over
22  which Canal contends that Ms.
23  Robinson improperly used or
24  transferred SkyMiles?
25          MR. DROGIN:  Objection to
```



Page 340

1                  T. HARVEY

2        the form.

3        A.    Are you referring to the

4    Complaint or are you limiting it to

5    that, or are you opening it to any

6    time she was at Canal?

7        Q.    Well, I am asking about the

8    -- the period that Canal contends

9    Ms. Robinson improperly used or

10   transferred SkyMiles?

11       A.    She used them outside the

12   scope also of the Complaint.  That

13   is why I am asking you.

14       Q.    Well, the -- I would like

15   to ask about the period in which

16   Canal's claims are predicated.

17            So for Canal's claims, what

18   is the period that they concern?

19       A.    I believe it is 2017,

20   thereabouts, until she quit.

21       Q.    Ms. Robinson was authorized

22   to used SkyMiles general by Canal's

23   American Express card for work

24   trips, correct?

25       A.    At certain times, sure.



Page 341

```
 1                T. HARVEY
 2     Q.    Does Canal dispute that Mr.
 3  De Niro allowed Ms. Robinson to use
 4  SkyMiles generated by Canal's
 5  American Express card for personal
 6  trips as well?
 7          MR. DROGIN:  Objection to
 8     the form.
 9     A.    If she took them without
10  asking his permission, absolutely.
11     Q.    Are there any trips that
12  Canal contends that Ms. Robinson
13  took without Mr. De Niro's
14  permission?
15          MR. DROGIN:  Objection to
16     the form.
17     A.    Well, did Mr. De Niro ever
18  object to Chase Robinson taking a
19  trip, is that your question?
20     Q.    You can answer that
21  question.
22     A.    I don't know if he ever
23  objected to her taking a trip.
24     Q.    How did Canal calculate
25  that Ms. Robinson had used
```



Page 342

```
 1                T. HARVEY

 2    approximately three million miles

 3    for personal trips and vacation?

 4       A.    Well, I think you just go

 5    back and you look at the air miles,

 6    and take them, and see that the

 7    number of miles used, and then take

 8    the work trips, and you got a

 9    number.

10       Q.    Which specific transfers of

11    SkyMiles does Canal contend were not

12    used for work trips?

13       A.    I don't know.  I would have

14    to go back and redo the calculation.

15    You are essentially asking me what

16    work trips she could use the air

17    miles for, I believe, right?

18           MS. HARWIN:  Madam Court

19       Reporter, can you read back

20       the question?

21           (Whereupon, the requested

22       portion was read back by the

23       reporter:

24           Q:  Which specific

25       transfers of SkyMiles does
```



Page 343

1                    T. HARVEY

2       Canal contend were not used

3       for work trips?)

4       A.    Again, I think your

5    question is -- read the question

6    again.

7            (Whereupon, the requested

8       portion was read back by the

9       reporter:

10           Q:  Which specific

11      transfers of SkyMiles does

12      Canal contend were not used

13      for work trips?)

14      A.    The three million that we

15   allege in the Complaint or how many

16   million miles we allege in the

17   Complaint.

18      Q.    What did Canal do to

19   ascertain or differentiate between

20   trips that were approved by Mr. De

21   Niro and trips that weren't?

22      A.    If there was a work trip,

23   we would know that it was a work

24   trip by looking at the timing of it,

25   and by looking at the e-mails, et



Page 344

```
 1                   T. HARVEY
 2   cetera, to see if Ms. Robinson had a
 3   legitimate reason to travel versus a
 4   vacation trip or personal trip.
 5           MS. HARWIN:  Can you read
 6      back the answer?
 7           (Whereupon, the requested
 8      portion was read back by the
 9      reporter:
10           A:  If there was a work
11      trip, we would know that it
12      was a work trip by looking at
13      the timing of it, and by
14      looking at the e-mails, et
15      cetera, to see if Ms.
16      Robinson had a legitimate
17      reason to travel versus a
18      vacation trip or personal
19      trip.)
20      Q.   I am going to share another
21   exhibit, which is going to be marked
22   as Exhibit 61.  This one Bates
23   stamped Robinson 00006728 through
24   40.
25           (Whereupon, Plaintiff's
```



Page 345

```
 1                 T. HARVEY

 2        Exhibit 61, Robinson 00006728

 3        through 40, was marked for

 4        identification, as of this

 5        date.)

 6     Q.    Let us know when you have

 7   that document downloaded.

 8     A.     Okay.

 9     Q.     Is this a compilation of

10   documents that Canal provided to the

11   Manhattan District Attorney's Office

12   concerning SkyMiles?

13     A.     If this is the same

14   document that was in the binder,

15   yes.

16     Q.     Is this the document that

17   was provided to the Manhattan

18   District Attorney's Office?

19     A.     Again, we supplied them

20   with a folder of documents.  I don't

21   know off the top of my head if this

22   is the identical document that was

23   in the folder that was supplied to

24   the District Attorney's Office.  It

25   certainly looks like it, but I would
```



Page 346

```
 1                  T. HARVEY
 2   have to compare it.
 3     Q.    I would like to turn your
 4   attention to the second page of this
 5   document, which is Robinson
 6   00006729.
 7     A.    Yeah.
 8     Q.    Does this page reflect all
 9   of the SkyMiles that Canal claimed
10   that Ms. Robinson improperly used in
11   2017 and '18?
12     A.    Well, for example -- I
13   don't know if I can tell which
14   actual miles were used.  Like there
15   is a transfer in January of '18, I
16   don't know what was in the account.
17   It is impossible for me to tell you
18   what was used.  But I see the actual
19   trips, so those are the trips that
20   -- I believe that she used miles and
21   did not have permission to, if that
22   answers your question.
23     Q.    Canal's accusation is Ms.
24   Robinson.
25          Let me ask first.
```



Page 347

```
 1                  T. HARVEY
 2         Canal's accusation is that
 3    Ms. Robinson improperly used 2.92
 4    million miles in 2017 and 2018, is
 5    that the correct number?
 6    A.    That is the correct number
 7    of air miles that Ms. Robinson stole
 8    from Robert De Niro and Canal
 9    Productions, yes.
10    Q.    That number of 2.92 million
11    included multiple flights that were
12    purchased for former Canal employee,
13    Amelia Brain, correct?
14    A.    It includes Chase's theft
15    of the air miles that she used to
16    bring Amelia or fly Amelia
17    somewhere, yes.
18         MS. HARWIN:  Madam Court
19      Reporter, can you read back
20      that answer?  I couldn't hear
21      it.
22         (Whereupon, the requested
23      portion was read back by the
24      reporter:
25            A:  It includes Chase's
```



Page 348

```
 1                    T. HARVEY
 2      theft of the air miles that
 3      she used to bring Amelia or
 4      fly Amelia somewhere, yes.)
 5    Q.    Amelia Brain was assisting
 6  Canal Productions into June of 2018
 7  and -- let me restate that.
 8          Amelia Brain was assisting
 9  Canal Productions in June of 2018,
10  correct?
11    A.    Not correct.
12    Q.    No?
13    A.    No.
14    Q.    Okay.
15          What was -- what was Amelia
16  Brain doing in New York in June of
17  2018?
18    A.    I can't answer that.  I can
19  only tell that you Chase paid for
20  her, apparently out of petty cash,
21  and using Mr. De Niro's miles to
22  bring her to New York.  Why she
23  thought she could do that is beyond
24  me.  But she stole a lot of things,
25  so I don't know what to tell you.
```



Page 349

```
 1                T. HARVEY

 2    Q.    Canal's accusation that Ms.

 3  Robinson improperly used 2.9 million

 4  SkyMiles included a flight from

 5  London, on December 5, 2018, is that

 6  correct?

 7    A.    I can't hear you.  What

 8  date?

 9    Q.    December 5, 2018?

10         MR. DROGIN:  Objection to

11    the form.

12    A.    Okay.

13         And your question is what?

14    Q.    Does Canal's accusation

15  that Ms. Robinson improperly used

16  2.9 SkyMiles include a flight from

17  London on December 5, 2018?

18         MR. DROGIN:  Objection to

19    the form.

20    A.    Yes.

21    Q.    Ms. Robinson had been with

22  Mr. De Niro in London for a shoot,

23  correct?

24    A.    No.

25    Q.    Mr. De Niro hadn't been in
```



Page 350

```
 1                 T. HARVEY
 2   London with Ms. Robinson?
 3      A.    Mr. De Niro may have been
 4   in London, but when you say with Ms.
 5   Robinson, I don't know what that
 6   means.
 7      Q.    Ms. Robinson worked with
 8   Mr. De Niro in London before coming
 9   back on December 5th, 2018, correct?
10      A.    I don't believe that is
11   correct.
12      Q.    Do you have any evidence
13   either way as to whether that is
14   correct or not correct?
15      A.    Whether what is correct or
16   not correct?
17      Q.    That Ms. Robinson was in
18   London with Mr. De Niro, prior to
19   traveling back on December 5th of
20   2018?
21      A.    I can tell you that Mr. De
22   Niro was in London and then traveled
23   outside of London.  I don't believe
24   -- Ms. Robinson may have been in
25   London, but I don't believe traveled
```



Page 351

```
 1              T. HARVEY
 2   with Mr. De Niro.
 3      Q.    Ms. Robinson met with Mr.
 4   De Niro in London, right?
 5      A.    She may have.
 6      Q.    I would like to turn to
 7   2019 and the SkyMiles in that year.
 8           Is it Canal's contention
 9   that it was improper for Ms.
10   Robinson to transfer the SkyMiles in
11   the first place, or is it Canal's
12   contention that it was improper for
13   Ms. Robinson to retain the SkyMiles
14   after her employment ended?
15           MR. DROGIN:  Objection to
16      the form.  Or both?  You got
17      an A or B.  You should give
18      him a third option.
19      A.    Both.
20      Q.    How many SkyMiles were
21   transferred into Ms. Robinson's
22   account?
23      A.    What is the question?
24      Q.    Actually, let me -- let me
25   drop in an exhibit.  Next one will
```



Page 352

```
 1                T. HARVEY
 2   be Exhibit 62.
 3           (Whereupon, Plaintiff's
 4      Exhibit 62, Robinson 00016439
 5      through 57, was marked for
 6      identification, as of this
 7      date.)
 8   Q.    Next one is going to be
 9   Robinson 00016439 through 57.
10           MR. BENNETT:  It is a
11      large document.  Can you give
12       me a moment?
13   Q.    Mr. Harvey, do you have
14   that document?
15   A.    I do.
16   Q.    Okay.
17           So turning to the first
18   page of that document, do you see
19   where it says in number four, "Once
20   you have transferred membership
21   awards points, it cannot be
22   transferred back to your membership
23   rewards account and become subject
24   to the terms and conditions of the
25   Delta SkyMiles program."
```



Page 353

```
 1                    T. HARVEY
 2            Do you see that?
 3     A.    No.
 4     Q.    Okay.
 5            Well turning your attention
 6     to the first page, number four,
 7     okay?
 8     A.    I don't have a number four.
 9     Q.    Under the Terms &
10     Conditions, there is a numbered list
11     on the first page.
12            Do you see that?
13     A.    No.  It has --Terms &
14     Conditions.  I'm sorry.  Go ahead.
15     Q.    Look at number four?
16     A.    Uh-huh.
17     Q.    Do you see where it says,
18     "Once you have transferred
19     membership awards points, it cannot
20     be transferred back to your
21     membership rewards account and
22     become subject to the terms and
23     conditions of the Delta SkyMiles
24     program?"  Do you see that?
25     A.    Yes.
```



Page 354

```
 1                    T. HARVEY
 2      Q.    Canal doesn't dispute that
 3   once reward points were transferred
 4   into Ms. Robinson's account, they
 5   couldn't be transferred back to
 6   Canal, is that correct?
 7            MR. DROGIN:  Objection to
 8        the form.
 9      A.    That is not correct.
10      Q.    Why is that not correct?
11      A.    Because it is not a correct
12   statement as far as I am concerned.
13      Q.    Does Canal have any basis
14   to dispute these terms and
15   conditions that membership rewards
16   points cannot be transferred back?
17            MR. DROGIN:  Objection.
18        That is not what it says.
19        You have a document that
20        looks like it was in printed
21        in October of 2021.  So I
22        don't know that the terms and
23        conditions are the same.
24            Second, it provides a
25        hyperlink for rules and
```



Page 355

```
 1                    T. HARVEY
 2      conditions.  So I think it is
 3      a trick question.
 4      A.    Is there a question
 5  pending?
 6           MS. HARWIN:  Madam Court
 7      Reporter, can you read back
 8      the question?
 9           (Whereupon, the requested
10      portion was read back by the
11      reporter:
12           Q:  Does Canal have any
13      basis to dispute these terms
14      and conditions that
15      membership rewards points
16      cannot be transferred back?)
17      Q.    Can you clarify why Canal
18  -- why you say that is not a correct
19  statement?
20      A.    Because if I called Delta
21  up, or American, or whoever, and I
22  said, "Listen, I have an employee
23  who robbed me, who stole these
24  miles, and I want them back," I
25  believe they would return them to
```



Page 356

```
 1                T. HARVEY
 2    me.
 3      Q.    Have you attempted to do
 4    that?
 5           MR. DROGIN:  Objection.
 6      A.    I don't have access to the
 7    miles.  Ms. Robinson -- Ms. Robinson
 8    won't return or agree to return what
 9    she stole.
10      Q.    Well, the terms and
11    conditions say that they can't be
12    transferred back, right?
13           MR. DROGIN:  Objection to
14      the form.  Are the terms --
15      the printout that follows
16      what you are referring to --
17      is the printout that begins
18      on 16440, are you
19      representing that that is the
20      printout from the hyperlink?
21           MS. HARWIN:  This is
22      American Express Terms &
23      Conditions.
24           MR. DROGIN:  As of
25      October 2021.
```



Page 357

```
 1                    T. HARVEY
 2      Q.    So Mr. Harvey, you are
 3   speculating what American Express
 4   would do if you called them.  Is
 5   that -- I mean, you haven't called
 6   them, correct?
 7      A.    What is your question that
 8   you want me to answer?  That was
 9   compound.  It was two questions.
10      Q.    Why don't you answer both
11   of them?
12      A.    I believe you are
13   speculating.  I don't -- because you
14   show me an agreement that somehow
15   anyone who robs air miles is free
16   and clear.  I don't believe that is
17   a same, or legitimate, or logical
18   assertion.
19      Q.    Do you have any
20   documentation that would contradict
21   the terms and conditions of the
22   transfer of American Express awards
23   points to Delta SkyMiles?
24      A.    Yeah.
25            MR. DROGIN:  Objection to
```



```
 1                T. HARVEY
 2     the form.
 3     A.    Just read the statement.
 4  It says that they can't be
 5  transferred back -- well, it can't
 6  be transferred back to your, meaning
 7  Ms. Robinson.  It wouldn't be asking
 8  and weren't asking for it to be
 9  transferred it back to the thief.
10  We were asking for them to be
11  returned to the rightful owner.
12     Q.    Do you have any evidence at
13  all that -- that SkyMiles can be
14  returned?
15     A.    Yes.
16     Q.    What is that?
17     A.    You heard Ms. Chambers
18  testify, in fact, she did it.
19  Didn't you?  I think you asked her
20  the question.  I think she explained
21  it to you.
22     Q.    That is a different
23  circumstances, isn't it?
24     A.    Right.  She didn't steal
25  them.  That is the difference.
```


MAGNA
LEGAL SERVICES

```
 1                 T. HARVEY
 2    Q.    There was no transfer
 3  there, correct?
 4    A.    I don't know what you are
 5  talking about.  That is not my
 6  understanding.
 7    Q.    Did the Manhattan District
 8  Attorney's Office ever share with
 9  anyone affiliated with Canal any
10  documents that Ms. Robinson had
11  provided to prosecutors?
12           MR. DROGIN:  Objection to
13    the form.
14    A.    No, we -- no.  We have
15  asked for them.  Haven't received
16  them from you.
17    Q.    From who?
18    A.    From Neighborhood
19  Defenders.
20    Q.    I don't think that is
21  accurate, sir.
22    A.    What isn't accurate about
23  that?
24    Q.    The documents have been
25  produced, I understand multiple
```



Page 360

```
 1                T. HARVEY
 2   times now to Canal.
 3   A.     From Neighborhood
 4   Defenders?
 5   Q.     That is my understanding.
 6          MS. HARWIN:  So I am
 7      hearing an echo.  Is that
 8      better?  Still getting an
 9      echo.
10          THE VIDEOGRAPHER:  The
11      time is now 4:35 p.m. and we
12      are off the record.
13          (Whereupon, a recess was
14      taken at this time.)
15          THE VIDEOGRAPHER:  The
16      time is now 4:36 p.m.  We are
17      back on the record.
18   Q.     How did Canal calculate
19   that the SkyMiles it claims were
20   converted by Ms. Robinson were
21   valued at more than $125,000?
22          MR. DROGIN:  Can I hear
23      that again?
24          (Whereupon, the requested
25      portion was read back by the
```



Page 361

```
 1                  T. HARVEY
 2      reporter:
 3           Q:  How did Canal
 4      calculate that the SkyMiles
 5      it claims were converted by
 6      Ms. Robinson were valued at
 7      more than $125,000?)
 8           MR. DROGIN:  Objection.
 9      That -- again, that
10      calculation was done by
11      Counsel as part of the
12      litigation.  This is work
13      product.
14           MS. HARWIN:  I believe we
15      are entitled to the basis for
16      the calculation.
17           MR. DROGIN:  I think you
18      have it as part of our
19      updated Rule 26 Disclosure.
20           MS. HARWIN:  Okay.
21      Q.   Mr. Harvey, how does Canal
22      calculate the value of SkyMiles that
23      it claims Ms. Robinson took?
24           MR. DROGIN:  Was I on
25      mute?
```



Page 362

1              T. HARVEY

2         MS. HARWIN:  Nope.

3         MR. DROGIN:  Then I am

4      still going to object on the

5      ground of privilege.  You

6      have that in the automatic

7      disclosure.

8    Q.    Mr. Harvey, in Canal's

9    statement of damages and

10   computation, it states that

11   documentary evidence in this case

12   revealed 8,750 frequent flyer miles

13   equated to 165.00.

14         What specific documents

15   identify the value of 8,750 frequent

16   flyer miles as equating to $165.00?

17   A.    I don't know I would have

18   to look at the documents to identify

19   them.

20   Q.    Are you aware of any

21   documents that set forth the value

22   of frequent flyer miles?

23   A.    I am aware.

24   Q.    What -- what are those

25   documents?



```
 1                  T. HARVEY

 2    A.    They are going to be third

 3  parties, what they are willing to

 4  pay.  Those sorts of things for air

 5  miles.

 6    Q.    Sitting here today, are you

 7  aware of any specific such documents

 8  compiled by Canal in this case?

 9         MR. DROGIN:  Objection to

10    the form.  Again, the

11    compiled by Canal.

12    A.    Yeah.

13         MR. DROGIN:  Objection to

14    the form.

15    A.    I don't know what -- when

16  you say, "compiled," do you mean

17  generated?  I don't know what you

18  mean compiled.

19    Q.    Does Canal have any

20  documents identifying the value of

21  frequent flyer miles?

22    A.    I am sure our Counsel does

23  and to -- to not be cute about it,

24  and during the time when we found

25  out Ms. Robinson stole the air
```



Page 364

```
 1                  T. HARVEY
 2    miles, we looked it up from a
 3    third-party vendor and figured out
 4    what they were going for.
 5       Q.    Who was the third-party
 6    vendor?
 7       A.    I don't recall.
 8       Q.    Do you have any record of
 9    that information that you obtained?
10       A.    No.
11       Q.    I am going to put into the
12    chat Exhibit 63, which is comprised
13    of Robinson 00016549 through 59 --
14    I'm sorry.  Through 75.
15           (Whereupon, Plaintiff's
16       Exhibit 63, Robinson 00016549
17       through 75, was marked for
18       identification, as of this
19       date.)
20       Q.    Let me know when you have
21    had a chance to open that?
22       A.    Is it Nerd Wallet?
23       Q.    Yes.
24       A.    Okay.
25           MR. DROGIN:  27-page
```



Page 365

```
 1                 T. HARVEY

 2      exhibit, which looks like it

 3      is an advertisement, dated

 4      February 10, 2022.

 5    A.    I am looking at it.  What

 6  can I do for you?

 7    Q.    As you can see, this

 8  article identifies the value of

 9  Delta SkyMiles at being worth about

10  $1.37 each when redeemed for award

11  flights.

12          Does Canal have any basis

13  to dispute that the value of a

14  SkyMiles is approximately $1.37

15  each?

16          MR. DROGIN:  Objection.

17      That is an advertisement.

18          MS. HARWIN:  That is not

19      accurate.  That is not

20      accurate.

21          MR. DROGIN:  It says,

22      "Advertisement Disclosure"

23      right on it.  And this talks

24      about how somebody has

25      calculated something on
```



Page 366

```
 1              T. HARVEY
 2      February 10, 2022.
 3      Presumably they fluctuate
 4      like a stock, for all I know
 5      they were worth $13.00 each
 6      when she stole them.  This is
 7      ridiculous.  Not withstanding
 8      the fact that it is from
 9      something called Nerd Wallet,
10      which speaks for itself.
11      This is an advertisement.
12          MS. HARWIN:  That is not
13      accurate.  The advertisement
14      disclosure is a hyperlink,
15      but that -- that is not an
16      indication that this document
17      is an advertisement.  In any
18      event --
19          MR. DROGIN:  You can tell
20      our expert witness that you
21      are relying on Nerd Wallet.
22  A.    Go ahead.  Ask away.
23          MR. DROGIN:  Yeah.  Go
24      ahead.
25  Q.    Does Canal have any basis
```



Page 367

                        T. HARVEY

1    to dispute that the value of a

2    SkyMile is approximately 4.3 cents

3    each?

4           MR. DROGIN:  Objection.

5       A.    Yes.

6       Q.    What does Canal contend the

7    value of a SkyMile is?

8           MR. DROGIN:  Objection to

9        the form.

10      A.    I would have to look at the

11   Complaint.

12      Q.    The Complaint doesn't set

13   forth a specific value per SkyMile.

14          So what is Canal's

15   contention about what the value of a

16   SkyMile is?

17          MR. DROGIN:  Objection to

18       the form.

19      A.    I thought we had disclosed

20   it, but we basically took the value

21   of those SkyMiles, in 2019,

22   pre-pandemic.  If you notice the air

23   travel has been quite inhibited

24   because of the pandemic, and the



Page 368

```
 1                T. HARVEY
 2   valuation that we got at the time
 3   was pre-pandemic.  At the time she
 4   stole them.
 5      Q.    Do you have any
 6   documentation supporting the value
 7   of the SkyMiles that Canal claims in
 8   its lawsuit?
 9      A.    The value that we got off
10   of a similar website to this, in
11   2019.
12      Q.    Okay.  So the -- Canal
13   based its calculations of the value
14   of SkyMiles on a website like this,
15   this evaluates the value of
16   SkyMiles?
17           MR. DROGIN:  Objection to
18      the form.
19      A.    I think -- I think it was
20   much more -- how should I say?
21   Realistic because it was actually a
22   site where you could trade air
23   miles, and sell air miles, and
24   purchase air miles, et cetera.
25      Q.    Do you know the name of the
```



Page 369

```
 1                  T. HARVEY
 2   website that you are referring to?
 3     A.    Not off the top of my head,
 4   no.
 5     Q.    I am going to put into the
 6   chat Canal's Statement of Damages &
 7   Computations, which will be Exhibit
 8   64.
 9            (Whereupon, Plaintiff's
10       Exhibit 64, Canal's Statement
11       of Damages & Computations,
12       was marked for
13       identification, as of this
14       date.)
15     A.    Okay.
16     Q.    Do you recognize this
17   document?
18     A.    I do.
19     Q.    So turning your attention
20   to the item that is identified as
21   improper use of Canal's American
22   Express card.
23     A.    Yes.
24     Q.    As you see in the damages
25   calculation, it identifies the
```



Page 370

```
 1                  T. HARVEY
 2    approximate/minimum damages amount
 3    as in excess of 60.000.
 4            Do you see that?
 5    A.    I do.
 6    Q.    In Canal's lawsuit against
 7    Ms. Robinson, and the Counterclaims
 8    that it asserts, it claims that Ms.
 9    Robinson improperly charged hundreds
10    of thousands of dollars to Canal's
11    American Express card.
12            Can you explain the
13    disparity between the calculation
14    that appears here in Canal's
15    Statement of Damages and the amount
16    asserted in Canal's lawsuit and
17    Counterclaims against Ms. Robinson?
18            MR. DROGIN:  Objection to
19      the form.  What disparity?
20            MS. HARWIN:  The
21      numerical disparity.
22    A.    I don't know that there is
23    a -- I don't know that there is a
24    numerical disparity.  In excess of
25    60,000, and the claims are for
```



Page 371

```
 1                T. HARVEY
 2   hundreds of thousands.
 3   Q.    Does Canal claim that Ms.
 4   Robinson charged hundreds of
 5   thousands of dollars improperly or
 6   close to 60,000?
 7        MR. DROGIN:  Objection to
 8     the form.
 9   A.    It doesn't say close to
10   60,000.  I don't know where you are
11   getting that from.
12   Q.    I am trying to ascertain
13   what Canal claimed were the improper
14   charges?
15        MR DROGIN:  If you want
16     to stipulate to liability, we
17     will work with you on
18     damages.
19        MS. HARWIN:  Counsel.
20   Q.    Mr. Harvey, can you explain
21   what the -- what the specific amount
22   is that Canal claims were improperly
23   charged on the American Express
24   card?
25   A.    Yes.
```



Page 372

```
 1                 T. HARVEY
 2    Q.    What is that amount?
 3    A.    In excess of $60,000.
 4    Q.    The Complaint and
 5  Counterclaims filed by Canal
 6  identify total charges on the
 7  American Express card of $61,495.35.
 8         Is that the amount that
 9  Canal contends Ms. Robinson
10  improperly charged on Canal's
11  American Express card?
12         MR. DROGIN:  Objection to
13    the form.
14    A.    I would have to look at the
15  Complaint.
16    Q.    Okay.  Well, you can look
17  at the Complaint.
18         While you are looking at
19  the Complaint, I would like to take
20  a bathroom break.  So how long do
21  you need, Mr. Harvey, to answer the
22  question?
23    A.    I am pulling up the
24  Complaint and looking at it.
25    Q.    How long would you like?
```



Page 373

```
 1                T. HARVEY
 2   We can take a break while you are
 3   looking at?  About how long would
 4   you need, sir?
 5     A.    I am ready.  What do you
 6   want to know?
 7          MS. HARWIN:  Madam Court
 8      Reporter, can you read back
 9      my question?
10          (Whereupon, the requested
11      portion was read back by the
12      reporter:
13          Q:  The Complaint and
14      Counterclaims filed by Canal
15      identify total charges on the
16      American Express card of
17      $61,495.35.
18          Is that the amount that
19      Canal contends Ms. Robinson
20      improperly charged on Canal's
21      American Express card?)
22          MR. DROGIN:  Objection to
23      the form.
24     A.    Yeah, I don't see it in the
25   Complaint.  You are insinuating that
```



Page 374

```
 1                 T. HARVEY

 2   that number was in the Complaint, is

 3   that correct?

 4      Q.    When you add up the charges

 5   identified in the Complaint, they

 6   total $61,495.35.  Is that the

 7   amount that Canal contends was

 8   improperly charged by Ms. Robinson

 9   on the Canal American Express card?

10           MR. DROGIN:  Objection to

11       the form.

12      A.    I didn't add them up.  I

13   would have to add them up.

14      Q.    Well, we can give you time

15   to add that up.  Again, I can take a

16   bathroom break.

17      A.    I don't need to.  I can

18   tell you it is in excess of $60,000.

19      Q.    It doesn't add up to over

20   $100,000, correct?

21      A.    I don't know.  I didn't add

22   it up.

23      Q.    We can give you the

24   opportunity to add it up.

25      A.    I am not going to add it
```



Page 375

```
 1                 T. HARVEY
 2   up.  It is what it is.
 3         MR. DROGIN:  This is
 4      unnecessary.
 5         MS. HARWIN:  I am just
 6      trying to identify what it is
 7      that is the scope of the
 8      improper charges that Canal
 9      claims occurred on the credit
10      card.  I would like to
11      confirm what that amount is.
12      And if Mr. Harvey needs time
13      to calculate it, we are happy
14      to provide that.
15         MR. DROGIN:  I don't
16      think there is a mathematical
17      certainty to it.  These are
18      numbers that are in flux.
19      Value of SkyMiles may change.
20         MS. HARWIN:  We are
21      specifically talking about
22      the item that is identified
23      by Canal as improper use of
24      Canal's American Express
25      card.
```



Page 376

```
 1                   T. HARVEY
 2         And Canal's damages
 3    statement identifies that
 4    number as being in excess of
 5    60,000.  And if you add up
 6    the charges that are
 7    identified in the Complaint,
 8    they add up to $61,495.35.  I
 9    would like to confirm, is the
10    value of improper use of
11    Canal's American Express card
12    $61,495.35?
13         MR. DROGIN:  At least
14    that amount, plus interest,
15    yes.
16         MS. HARWIN:  Yes.  When
17    you say, "at least that
18    amount plus interest," is
19    there any other amount that
20    Canal contends was improperly
21    charged to its credit card?
22         MR. DROGIN:  There --
23    there maybe.  It is an
24    ongoing litigation.
25         MS. HARWIN:  I am asking
```



Page 377

```
 1                    T. HARVEY
 2       Mr. Harvey as Canal's
 3       witness.
 4       Q.    Is there any additional
 5   amount?
 6       A.    That I am aware of, right
 7   this moment, no.  But it could be
 8   tomorrow, for example.
 9       Q.    So the total charges that
10   were specified -- well, let me --
11   let me restate that.
12            The total amount of damages
13   that are claimed in Canal's damages
14   statement and computations are in
15   excess of $550,000, correct?
16            MR. DROGIN:  Objection to
17       the form.
18       A.    I would have to look to the
19   form.
20       Q.    You can look.
21            MR. DROGIN:  Are you just
22       adding up the automatic
23       disclosures?
24            MR. MERINGOLO:  Just ask
25       for judicial notice for the
```



Page 378

```
 1                 T. HARVEY
 2    period of time.  I just don't
 3    understand.  I'm sorry to get
 4    frustrated, but this is
 5    madness.
 6    A.    What am I looking at?
 7    Q.    So under the -- under
 8  Canal's statement of damages and
 9  computations, when you add up the
10  amounts listed, it totals
11  approximately or in excess of
12  $550,000, is that correct?
13        MR. DROGIN:  Yes.  We
14    will stipulate when you add
15    -- when you add that up, that
16    is what it says.  And we will
17    stipulate that it says,
18    "Defendant's claim
19    noneconomic damages and any
20    other damages be revealed
21    throughout ongoing discovery
22    and outstanding deposition
23    testimony to be determined by
24    the factfinder."  Yes.
25        MS. HARWIN:  Okay.
```



Page 379

```
 1              T. HARVEY
 2    Q.    So --
 3          MR. DROGIN:  And it also
 4     says on next page that we
 5     (inaudible) all documents
 6     relied upon to reach the
 7     foregoing approximate
 8     damages...  That is the way
 9     it works.
10    Q.    Mr. Harvey, have any facts
11  and circumstances come to light that
12  have caused Canal to reduce its
13  damages calculations since it filed
14  its initial lawsuit?
15          MR. DROGIN:  Objection to
16     the form.
17    A.    Not that I am aware of.
18    Q.    The damages claimed here
19  are the same damages that were known
20  to be claimed by Canal at the time
21  it filed its lawsuit, is that
22  correct?
23          MR. DROGIN:  Objection to
24     the form.
25    A.    I would have to look at the
```



Page 380

```
 1                 T. HARVEY
 2    Counterclaims and the New York State
 3    Claim, but not that I am aware of.
 4         MS. HARWIN:  Madam Court
 5       Reporter, can you just read
 6       back the question and answer?
 7         (Whereupon, the requested
 8       portion was read back by the
 9       reporter:
10         Q:  The damages claimed
11       here are the same damages
12       that were known to be claimed
13       by Canal at the time it filed
14       its lawsuit, is that correct?
15         A:  I would have to look
16       at the Counterclaims and the
17       New York State Claim, but not
18       that I am aware of.)
19         MR. DROGIN:  I have been
20       letting you go on with this,
21       giving you certainly enough
22       rope.  Can you just point me
23       to the 30(b)(6) section that
24       this has to do with?  Because
25       I don't see it.
```



Page 381

1                T. HARVEY

2          MS. HARWIN:  What we are

3     asking about is the basis for

4     the State Court lawsuit.

5          MR. DROGIN:  You are not

6     asking for basis.  You are

7     asking for damages

8     calculations.

9          MS. HARWIN:  Damages are

10    part of the basis for the

11    lawsuit.  Damages were

12    claimed in the lawsuit.

13         MR. DROGIN:  I don't -- I

14    don't agree.  I think if you

15    wanted to explore how Canal

16    calculated damages, then that

17    is something that you could

18    have put in terms -- in your

19    notice as topics of

20    testimony.  I have been

21    trying to let you go on, and

22    on, and on with this because

23    quite honestly it is wasting

24    time.  It is your seven

25    hours, you can do what you



```
 1                    T. HARVEY
 2     want.  I think you are just
 3     badgering the witness, and at
 4     this point I am going to ask
 5     you, and I am going to hold
 6     you to the topics of
 7     testimony in the 30(b)(6)
 8     Notice.  If you want to have
 9     a meet and confer about how
10     we concluded damages, and why
11     the attorneys may have
12     adjusted the amount sought in
13     the damages clause, we can do
14     that.  I just don't know that
15     it is appropriate in a
16     30(b)(6) deposition to
17     question this witness about
18     it, when it has not been
19     designated.
20     Q.    Mr. Harvey, in Canal's
21     State Court lawsuit, what was the
22     amount of damages that were sought?
23          MR. DROGIN:  Did -- was I
24     on mute?  Did you not hear
25     what I just said?  Are you
```



Page 383

```
 1                    T. HARVEY
 2      going right back now to the
 3      same line of questioning that
 4      I have objected to?
 5          MS. HARWIN:  Well, the
 6      State Court lawsuit and the
 7      basis for it was -- is very
 8      twittering within the
 9      30(b)(6) topic.
10          MR. DROGIN:  But you are
11      not asking about the basis.
12      You are asking about
13      calculation and adjustment of
14      damages, which is something
15      done by Counsel.  As was the
16      preparation of the Complaint.
17          Again, I have been
18      letting him answer this.  I
19      have been letting him answer
20      this to the best that he can,
21      but we are beyond -- we are
22      way beyond the scope here,
23      and probably the last 40
24      pages of the transcript will
25      demonstrate that.  I would
```



Page 384

```
 1              T. HARVEY
 2      like you to move onto
 3      something in the 30(b)(6)
 4      because it seems like you
 5      have a lot more ground to
 6      cover here.
 7   Q.    Mr. Harvey, what were the
 8 facts and circumstances that Canal
 9 contends served as the basis for
10 seeking millions of dollars in the
11 State Court lawsuit from Ms.
12 Robinson?
13         MR. DROGIN:  Objection to
14      the form.
15   A.    It is on or before 2013,
16 Ms. Robinson consistently and almost
17 daily robbed Canal Productions,
18 Inc., and Robert De Niro.
19         Specifically, she did it
20 through a systematic looting with
21 respect to petty cash, theft of air
22 miles, ordering unauthorized
23 charges, such as flowers,
24 reimbursing herself for various
25 items she wasn't entitled to, taking
```



Page 385

```
 1                 T. HARVEY
 2    unauthorized Ubers, cabs, et cetera,
 3    reimbursing herself for dog charges
 4    or dog sitting charges, buying
 5    numerous Apple cell phones, taking
 6    petty cash, turning it into gift
 7    cards, and then converting that to
 8    her own use, taking cash through
 9    drawers that were not permitted,
10    paying for people like Amelia Brain
11    to come to New York that wasn't
12    authorized, sending presents to
13    people on Mr. De Niro and/or Canal
14    Productions' account coming from Ms.
15    Robinson that weren't authorized.
16       Q.   Let me clarify my question
17    because I think that --
18       A.   I am not done with my
19    answer.  You asked me a question.  I
20    am answering the question.
21       Q.   I would like to clarify the
22    question because I don't think you
23    are answering what --
24       A.   I am not done with my
25    answer though.
```



Page 386

```
 1                T. HARVEY
 2     Q.    You may finish, but then I
 3   am going to go back and ask the
 4   question that I am going to need an
 5   answer to.
 6     A.    I will make you a deal.  I
 7   will let you go on if you take that
 8   pen out of your hand.
 9     Q.    It is a deal.
10         So my question is
11   quantitative in nature.  What is the
12   basis for seeking what Canal -- let
13   me restate that.
14         What is the quantitative
15   basis for Canal's demands for
16   millions of dollars from Ms.
17   Robinson?
18         MR. DROGIN:  Objection to
19      the form.
20         Can you point me, please,
21      to the section of the
22      30(b)(6) Notice that places
23      Canal and Mr. De Niro on
24      notice that this is a line of
25      questioning that you are
```



Page 387

```
 1                  T. HARVEY
 2      permitted to pursue?
 3          MS. HARWIN:  If you look
 4      at the Rule 30(b)(6)
 5      designation, there is a topic
 6      concerning the facts and
 7      circumstances giving rise to
 8      the State Court lawsuit.
 9      That is what --
10          (Simultaneous speaking)
11          MR. DROGIN:  That is
12      right.  And -- when you are
13      now talking about something
14      that is quantitative, that is
15      not factual.  That is
16      numerical really.
17          MS. HARWIN:  Numbers are
18      facts.
19      A.    I think I can answer your
20  question.
21      Q.    Okay.  Thank you.
22      A.    You are looking for sort of
23  back in the envelope.  You have to
24  calculate since 2013, seven days a
25  week, three meals a day, that is
```



Page 388

```
 1                  T. HARVEY
 2   roughly $80.00, maybe 100.00/120.00
 3   per day.  You would have to take
 4   that, and multiply it, and you come
 5   up with a couple of hundred thousand
 6   dollars.  Then you take the obvious
 7   ones with the flowers and all of
 8   that nonsense, you take the air
 9   miles.  You take the money Ms.
10   Robinson received throughout her
11   employment and that comes out to
12   several hundred thousand dollars.
13   You -- you take the other stuff,
14   like paying Ms. Brain cash, and it
15   adds up.  I would have to take pen
16   to paper to figure it out.  But it
17   is several million dollars in my
18   mind.
19       Q.    Did Mr. De Niro ever
20   communicate with the media about
21   Canal's lawsuit against Ms.
22   Robinson?
23       A.    No, not to my knowledge.
24       Q.    Did Canal or anyone acting
25   on behalf of Canal communicate with
```



Page 389

```
 1                   T. HARVEY
 2   anyone in the media about Canal's
 3   State Court lawsuit against Ms.
 4   Robinson?
 5      A.    Not to my knowledge.
 6      Q.    Did Stan Rosenfield
 7   communicate with the media with
 8   respect to Canal' lawsuit against
 9   Ms. Robinson?
10      A.    Not to my knowledge, no.
11      Q.    Did anyone who serves as a
12   lawyer for Canal reach out to the
13   media with respect to Canal's
14   lawsuit against Ms. Robinson?
15      A.    Are you talking about the
16   State Court action?
17      Q.    Yes.
18      A.    No.  Not my knowledge.
19      Q.    Did you reach out to the
20   daily news or any other media outlet
21   concerning Canal's lawsuit against
22   Ms. Robinson?
23      A.    You are talking about the
24   state lawsuit, right?
25      Q.    Yes.
```



Page 390

1                    T. HARVEY

2      A.     No, not that I recall.

3      Q.     Did any Canal employees

4   reach out the media with respect to

5   Canal's lawsuit against Ms.

6   Robinson?

7      A.     I wouldn't know, but I

8   doubt it.

9      Q.     Did Mr. De Niro communicate

10  with anyone in the media about Ms.

11  Robinson's lawsuit against him?

12     A.     Did he?  No.

13     Q.     Did Canal or anyone acting

14  on behalf of Canal communicate with

15  anyone in the media about Ms.

16  Robinson's lawsuit against Mr. De

17  Niro?

18     A.     Yes.

19     Q.     Who communicated with the

20  media about Ms. Robinson's State

21  Court lawsuit against Mr. De Niro?

22     A.     Well, certainly I did, and

23  I assume that Stan released a

24  statement.

25     Q.     Who did you communicate



Page 391

```
 1              T. HARVEY
 2   with in the media about Ms.
 3   Robinson's lawsuit?
 4     A.    Julia Jacobs.
 5     Q.    Did you communicate with
 6   anyone else in the media other than
 7   Julia Jacobs about Ms. Robinson's
 8   lawsuit?
 9     A.    Not that I recall.  Other
10   than the statement that Stan
11   released.
12     Q.    What statement did Stan
13   Rosenfield release to the media
14   concerning Ms. Robinson's lawsuit
15   against Mr. De Niro?
16     A.    Beyond absurd.
17     Q.    What -- what are you saying
18   there, sir?
19     A.    I am saying, like I said at
20   the time, this lawsuit by Chase
21   Robinson is beyond absurd.
22     Q.    Other than the statement
23   released to the media on your
24   behalf, that -- you call Ms.
25   Robinson's lawsuit absurd, and the
```



Page 392

```
 1                  T. HARVEY
 2    communication you had with Julia
 3    Jacobs, were there any other
 4    communications by Canal or anyone
 5    acting on behalf of Canal, including
 6    Stan Rosenfield concerning Ms.
 7    Robinson?
 8         MR. DROGIN:  Objection to
 9      the form.  You can answer.
10    A.    Yeah, you misstated what I
11    said.  I said beyond absurd.  Not
12    absurd.  More than absurd.  But I am
13    not aware of anyone having
14    communications regarding this
15    lawsuit other than the statement
16    beyond absurd.  And my
17    communications with The New York
18    Times, where you leak a lawsuit
19    before you actually had filed it on
20    paper.  Those were the two
21    communications.
22    Q.    Did Mr. De Niro communicate
23    with the chairman of New York Times
24    about the lawsuit?
25    A.    I don't -- one, I don't
```



```
 1                  T. HARVEY
 2   know for sure.  But if he
 3   communicated it would have been at
 4   -- as a result of me talking about
 5   the unethical behavior by your law
 6   firm to leak a Complaint without
 7   filing it, and without calling us
 8   for comments.  So that is possible.
 9     Q.    Mr. De Niro did communicate
10   with the chairman of The New York
11   Times?
12     A.    I didn't say that.  I said
13   it is possible.  That is what I
14   said.
15     Q.    Is it possible that Mr. De
16   Niro communicated with any other
17   media outlets?
18          MR. DROGIN:  Objection to
19      the form.
20     A.    Not that I am aware of now.
21          MR. DROGIN:  The question
22      is whether it is possible.
23      Anything is possible.
24     Q.    Did you communicate with
25   any Canal employees or former Canal
```



Page 394

```
 1                    T. HARVEY
 2    employees to come up with material
 3    to embarrass Ms. Robinson to the
 4    media?
 5            MR. DROGIN:  Objection to
 6      the form.
 7      A.    No.  She was quite able at
 8    doing that herself.
 9      Q.    When was the decision made
10    by Mr. De Niro to contact the
11    Manhattan District Attorney's Office
12    about Canal's claims against Ms.
13    Robinson?
14      A.    What date did he wake up
15    and say, "I want to talk to the New
16    York County District Attorney's
17    Office?"  I don't know.  I would
18    have to look at the records.
19            He wanted to press charges
20    against Ms. Robinson probably in May
21    or June.
22      Q.    Do you know that or are you
23    --
24      A.    Yes.
25      Q.    -- guessing?
```



Page 395

```
 1                T. HARVEY

 2    A.    I'm not guessing other than

 3  telling you early on Mr. De Niro

 4  wanted to have Ms. Robinson return

 5  the items she stole.  So I am

 6  looking at it -- certainly by June

 7  he was very upset and very angry

 8  that she had stolen all of those

 9  items from him.

10    Q.    When was the Manhattan

11  District Attorney's Office first

12  contacted about Canal's claims

13  against Ms. Robinson?

14    A.    I don't know exactly.  It

15  would have been in the summer of

16  2019.

17    Q.    Do you have any records of

18  when the first contact was made with

19  the Manhattan District Attorney

20  office?

21    A.    No.

22    Q.    Was Manhattan District

23  Attorney's Office contacted in

24  writing or orally?

25    A.    Orally.
```



MAGNA
LEGAL SERVICES

Page 396

```
 1                    T. HARVEY
 2    Q.    And who was first contacted
 3   at the Manhattan District Attorney's
 4   Office?
 5    A.    Kelly Thomas and someone
 6   else.  I forget.  I forget.
 7    Q.    Who was it who initiated
 8   contact with Manhattan District
 9   Attorney's Office?
10    A.    I was there on another
11   matter and speaking to two assistant
12   district attorneys.  That was the
13   initial discussions regarding this
14   case.
15    Q.    So you were the person who
16   first spoke to the Manhattan
17   District Attorney's Office about the
18   claims against Ms. Robinson?
19    A.    I believe so.
20    Q.    And when was it that you
21   spoke to the Manhattan District
22   Attorney's Office first about Ms.
23   Robinson?
24    A.    Either July or August of
25   '19.
```



Page 397

```
 1                T. HARVEY
 2    Q.   Do you have any way of
 3  identifying when it was that you
 4  first spoke to the Manhattan
 5  District Attorney's Office about Ms.
 6  Robinson?
 7    A.   I thought I just did.  I
 8  told you it was either July of
 9  August of '19.
10    Q.   Do you have any way to
11  distinguish between those months?
12    A.   No.
13    Q.   Did you speak to Manhattan
14  District Attorney's Office before
15  Canal filed the lawsuit or after?
16    A.   I'm not sure.
17    Q.   What were dates when Mr. De
18  Niro and any other people affiliated
19  with Canal communicated with the
20  Manhattan District Attorney's
21  Office?
22    A.   I have no idea.
23    Q.   Are there any dates when
24  you are aware of the Manhattan
25  District Attorney's Office having
```



1                    T. HARVEY

2    communications with Mr. De Niro?

3    A.    Yes.

4    Q.    Okay.

5          What dates are you aware of

6    Mr. De Niro communicating with the

7    Manhattan District Attorney's

8    Office?

9    A.    I don't know.  I don't have

10   the documents in front of me that

11   would tell me that.

12   Q.    What documents would you

13   need to review in order to ascertain

14   that?

15   A.    Communications between me

16   and Kelly Thomas regarding the day

17   of the interview for Mr. De Niro.

18         MS. HARWIN:  Can you

19      repeat the answer?

20         (Whereupon, the requested

21      portion was read back by the

22      reporter:

23         A:  Communications

24      between me and Kelly Thomas

25      regarding the day of the



Page 399

```
 1                    T. HARVEY
 2      interview for Mr. De Niro.)
 3      Q.    Were -- did you have a
 4   meeting with Ms. Thomas on September
 5   16, 2019?
 6      A.    I have no idea.
 7      Q.    There was a text message
 8   from Ms. Thomas referring to
 9   arriving at noon on September 16,
10   2019.
11          Does that refresh your
12   recollection?
13      A.    It doesn't, but I assume
14   that is the day.  If she is coming
15   in that day, I have no reason to
16   dispute that text or e-mail.
17      Q.    And did you meet with Ms.
18   Thomas in person at Canal's office?
19      A.    Yes.
20      Q.    Okay.
21          Who else was present for
22   that meeting with Ms. Thomas?
23      A.    Mr. De Niro, and two or
24   three other people, I believe, from
25   the District Attorney's Office.
```



Page 400

```
 1                    T. HARVEY
 2     Whether they were assigned
 3     detectives to the investigative unit
 4     with the District Attorney or cops
 5     assigned to local precinct, I don't
 6     know.
 7        Q.    Other than you and Mr. De
 8     Niro, did anyone else from Canal
 9     meet with Ms. Thomas on or about
10     September 16, 2019?
11        A.    Not that on day, no.
12        Q.    And how long was your
13     initial meeting with Ms. Thomas in
14     September of 2019?
15        A.    It wasn't my initial
16     meeting.
17        Q.    Were you present in that
18     meeting?
19        A.    What meeting?
20        Q.    With Ms. Thomas in
21     September of 2019?
22        A.    Yes.
23        Q.    Okay.
24              How long was the initial
25     meeting between Mr. De Niro and Ms.
```



Page 401

```
 1                T. HARVEY
 2    Thomas on September -- in September
 3    of 2019?
 4      A.    You keep referring to it as
 5    an initial meeting.  Mr. De Niro met
 6    with the District Attorney one time
 7    I believe.
 8      Q.    Okay.
 9            So Mr. De Niro met with the
10    District Attorney one time, is that
11    correct?
12      A.    That is what I just said.
13    Yes, it is correct.
14      Q.    And how long did Mr. De
15    Niro meet with the Manhattan
16    District Attorney for?
17      A.    Approximately an hour.
18      Q.    And tell me everything that
19    was said during that meeting?
20            MR. DROGIN:  Objection to
21      the form.
22            MR. BENNETT:  Objection
23      to the form.
24            MR. DROGIN:  Really?
25      Everything?
```



Page 402

```
 1                    T. HARVEY
 2     A.    I don't recall.
 3     Q.    What do you recall Mr. De
 4  Niro telling the Manhattan District
 5  Attorney's Office?
 6     A.    That Ms. Robinson stole
 7  from him.
 8     Q.    What, specifically, did Mr.
 9  De Niro say?
10     A.    Chase Robinson stole from
11  me.
12     Q.    Did Mr. De Niro say
13  anything else?
14     A.    Sure.
15     Q.    What else did Mr. De Niro
16  say?
17     A.    I don't recall.
18     Q.    What did Mr. De Niro tell
19  the Manhattan District Attorney's
20  Office concerning the use of Canal's
21  credit cards?
22     A.    I don't recall.
23     Q.    What did Mr. De Niro tell
24  the Manhattan District Attorney's
25  Office about Canal's petty cash?
```



Page 403

```
 1                T. HARVEY
 2      A.    I don't recall, again.
 3   Specifically, I don't recall.  I
 4   mean, in general, he didn't
 5   authorize certain transactions,
 6   certain use of the petty cash, et
 7   cetera.  I don't want to look like I
 8   am being evasive, but you are asking
 9   me for specific things that Mr. De
10   Niro said.  He wasn't -- how should
11   I say?  Leading the conversation.
12   He was being asked questions and
13   responding to the same.
14      Q.    What specific questions was
15   Mr. De Niro asked?
16           MR. DROGIN:  Objection to
17      the form.
18      A.    I don't know specific
19   questions.  In general, what
20   occurred, how -- what was Ms.
21   Robinson's position, what was she
22   doing, what was she doing with the
23   petty cash, what was she doing with
24   credit card, what -- generally what
25   were they allowed to use, were there
```



```
 1                  T. HARVEY
 2   any charges that she can charge, did
 3   he approve her to give her car
 4   blanch to use every SkyMile he ever
 5   had, did he allow her just to steal
 6   his cash, did he allow her to take
 7   charge cards and do whatever she
 8   wanted with, did he allow her to
 9   steal from him basically.
10   Q.    What did Mr. De Niro say
11   that Ms. Robinson was authorized to?
12        MR. DROGIN:  Objection to
13    the form.
14   A.    I don't recall exactly what
15   he said.
16   Q.    Mr. De Niro did identify
17   that Ms. Robinson was authorized to
18   charge certain things, correct?
19   A.    When you say charge certain
20   things:  As I have said early today,
21   if there were legitimate business
22   expenses associated with her
23   employment at Canal, such as taking
24   a 50-pound bag to his apartment, she
25   could charge that.  Whether she got
```



Page 405

```
 1                    T. HARVEY
 2    on an airplane and flew to Paris
 3    because he requested she do, she
 4    could charge that and associated
 5    expenses with that.
 6       Q.    Did Mr. De Niro identify
 7    any circumstances in which Ms.
 8    Robinson was authorized to use
 9    SkyMiles?
10       A.    To use SkyMiles, is that
11    what you are saying?
12       Q.    Yes.
13       A.    You promised me you would
14    take that pen away from your face.
15       Q.    Sorry.
16       A.    As I said, if it was
17    associated with business.
18          For example, right before
19    she left she went to New Mexico to
20    look at a house that Mr. De Niro was
21    going to use during the filming of a
22    movie.  She would have been
23    authorized to use that -- those air
24    miles for that situation.
25       Q.    Were there any other
```



Page 406

```
 1                 T. HARVEY
 2    meetings between Canal and the
 3    Manhattan District Attorney's Office
 4    that you attended?
 5      A.    I vaguely remember -- not
 6    one hundred percent sure.  I think I
 7    walked over Michael Kaplan and
 8    Sabrina.  I don't think I stayed for
 9    the Kaplan meeting.  I may have been
10    there for Sabrina's meeting, but I
11    am not even sure on that.
12      Q.    Are you aware of how long
13    the meeting between Sabrina
14    Weeks-Britain and the Manhattan
15    District Attorney's Office lasted?
16      A.    No, I don't.  I assume it
17    was approximately an hour.
18      Q.    Are you aware of whether
19    any other people other than Mr. De
20    Niro, Mr. Kaplan, and Ms.
21    Weeks-Britain met with the Manhattan
22    District Attorney's Office
23    concerning Ms. Robinson?
24      A.    Well, I assume Jillian
25    Spears did, but I have no
```


MAGNA
LEGAL SERVICES

Page 407

```
 1                    T. HARVEY
 2    recollection of that, but she must
 3    have.
 4      Q.   I am going to mark as
 5    Exhibit 65 -- as Exhibit 65 a
 6    document that is Bates stamped Canal
 7    0049482 through 86.
 8           (Whereupon, Plaintiff's
 9      Exhibit 65, 0049482 through
10      86, was marked for
11      identification, as of this
12      date.)
13           MR. DROGIN:  Do you have
14      a sense as to how much more
15      you have?
16           MS. HARWIN:  I don't now,
17      but after we take a break I
18      will probably know, and I can
19      give you an estimate.  Are
20      you anticipating doing any
21      redirect?
22           MR. DROGIN:  At this
23      point, no.
24      Q.   Mr. Harvey, you have -- you
25    have this exhibit?
```



Page 408

```
 1                    T. HARVEY
 2    A.    I don't.
 3    Q.    Okay.  Well, let me know
 4  when you have it.
 5    A.    It this a bunch of text
 6  messages?
 7    Q.    Yes.
 8    A.    Okay.  I have it.
 9    Q.    Do you recognize these text
10  messages?
11    A.    Yes, I do.
12    Q.    Are these text messages
13  that you exchanged with Kelly Thomas
14  from the Manhattan District
15  Attorney's Office?
16    A.    It is.
17    Q.    As you can see in that
18  initial text message, she mentions
19  the meeting on Monday, September
20  16th.
21        Does that refresh your
22  recollection as to whether Mr. De
23  Niro's meeting with the Manhattan
24  District Attorney's Office occurred
25  on September 16, 2019?
```



Page 409

```
 1                    T. HARVEY
 2      A.    I assume it did.  I don't
 3   recall.  But I don't have any reason
 4   to doubt that.
 5      Q.    So you see then on the page
 6   that is Bates number -- go ahead?
 7      A.    I will state that I believe
 8   Mr. De Niro was the last witness
 9   they interviewed, not the first.
10      Q.    At that point you believe
11   that Ms. Weeks-Britain, and Mr.
12   Kaplan had already been interviewed?
13      A.    And possibly Ms. Spear.
14      Q.    Do you know the dates of
15   their interviews?
16      A.    No idea.
17      Q.    Okay.
18            Do you see how then you
19   sent an e-mail on September 1, 2020,
20   to Ms. Thomas?
21      A.    Yes.
22      Q.    Why did you reach out to
23   Ms. Thomas on September 1, 2020?
24      A.    Well, one, I don't know --
25   when you say why did I reach out to
```



Page 410

```
 1                    T. HARVEY
 2   her, I don't know why you are saying
 3   that.
 4      Q.    You sent an e-mail?
 5      A.    I certainly did.
 6      Q.    What prompted you to send
 7   that e-mail on September 1, 2020 to
 8   Ms. Thomas?
 9      A.    I am sure she was asking
10   for a backup, or documents, or
11   information relating to her criminal
12   investigation.
13      Q.    Do you see how you wrote to
14   ADA Thomas, "I am waiting on Bob to
15   call to set a time for the three of
16   us to speak?"
17      A.    Yes.
18      Q.    Was there a follow-up
19   conversation with Ms. Thomas, Mr. De
20   Niro, and yourself?
21      A.    I don't recall.  I assume
22   it was about setting the meeting for
23   September 16th.  And looking at
24   this, I do assume that certainly
25   Kaplan and Sabrina probably went
```



Page 411

```
 1              T. HARVEY
 2   before because she is asking for
 3   backup information and possibly
 4   Sabrina.
 5     Q.    At some point did you
 6   receive a communication from the
 7   Manhattan District Attorney's Office
 8   indicating that they decline to
 9   prosecute this matter?
10     A.    Yes.
11     Q.    Okay.
12            And how was that
13   communicated to you?
14     A.    Orally.
15     Q.    Okay.
16            And what were you told?
17     A.    That they didn't -- because
18   Mr. De Niro had allowed Ms. Robinson
19   to be on his American Express and
20   other accounts, that they didn't
21   think criminally they could prove
22   it.  Specifically, Kelly evaluated
23   it as if the secretaries on the
24   checking account for the boss, and
25   she has authority to write checks
```



Page 412

```
 1                T. HARVEY

 2   and in that situation there is

 3   nothing criminally wrong with that

 4   because the person is giving

 5   authority to the secretary to write

 6   checks.

 7     Q.    Did ADA Thomas provide you

 8   with any other information

 9   concerning the Manhattan District

10   Attorney's Office decision not to

11   bring charges against Ms. Robinson?

12     A.    No.

13         MS. HARWIN:  This is a

14      good stopping point.  Why

15      don't we take a break and we

16      can pick it up in about five

17      minutes?

18         MR. BENNETT:  Can we get

19      a count when we go off the

20      record?

21         THE VIDEOGRAPHER:  The

22      time is now 5:24 p.m.  We are

23      going off the record.

24         (Whereupon, a recess was

25      taken at this time.)
```



Page 413

```
 1                  T. HARVEY
 2           THE VIDEOGRAPHER:  The
 3      time is now 5:31 p.m.  We are
 4      back on the record.
 5    Q.    Mr. Harvey, I would like to
 6  turn your attention back to Exhibit
 7  64, which is the Defendant's
 8  Statement of Damages & Computation.
 9  I have one specific question for
10  you.
11           In that document it
12  identifies March 9th, 2018, as the
13  approximate date when Ms. Robinson
14  is claimed to have breached her duty
15  of loyalty.
16           Can you explain for me what
17  the basis is for Canal's contention
18  that Ms. Robinson breached her duty
19  of loyalty on approximately March 9,
20  2018?
21           MR. DROGIN:  Objection.
22      You are asking for legal
23      analysis.
24           MS. HARWIN:  I am not
25      asking for legal analysis.  I
```



Page 414

```
 1                  T. HARVEY
 2      would like to know what facts
 3      or circumstances serve as the
 4      basis for that contention.
 5           MR. DROGIN:  Read the
 6      Complaint and the 75,000
 7      pages of document that have
 8      been produced.  He is not
 9      going to offer a legal
10      opinion or analysis for you.
11      That is not an appropriate
12      question.
13           MS. HARWIN:  Not asking
14      for a legal analysis.
15      Q.    What -- is there a factual
16  basis for the contention that Ms.
17  Robinson breached her duty of
18  loyalty on or about March 9, 2018?
19      A.    I think she breached it
20  much earlier.  I believe she
21  breached it the entire time with her
22  stealing since 2013.
23      Q.    Are you aware of any
24  factual basis for the contention
25  that the duty of loyalty was
```



Page 415

```
 1                 T. HARVEY

 2   breached on or about March 9, 2018?

 3      A.    Yes.

 4      Q.    What is that?

 5      A.    Ms. Robinson consistently

 6   robbed Mr. De Niro and Canal

 7   Productions through various means

 8   including, but not limited to,

 9   charging things on Mr. De Niro's

10   credit card/Canal's credit card that

11   were not authorized.  She stole air

12   miles, she stole cash, she stole

13   iPhones, she stole all the things

14   that we have been talking about.

15      Q.    Did any event occur on or

16   around March 9, 2018, that Canal

17   contends was the time when Ms.

18   Robinson breached her duty of

19   loyalty?

20      A.    I am sure it did.  I don't

21   know off the top of my head.

22      Q.    I would like to transition

23   from the Rule 30(b)(6) deposition to

24   other questions within your capacity

25   as a fact witness.
```



Page 416

```
  1                    T. HARVEY

  2            So Mr. Harvey, prior to the

  3   end of Ms. Robinson's employment at

  4   Canal, Ms. Robinson complained to

  5   you about harassment that she felt

  6   she was experiencing, is that

  7   correct?

  8      A.     Yes, she claimed harassment

  9   based upon an e-mail that Tiffany

 10   sent to her and Michal Tasch.  They

 11   both complained about it.

 12      Q.     What -- what e-mail is it

 13   that you are referring to?

 14      A.     I don't know.  It is either

 15   March 2nd or March 4th.  Some e-mail

 16   that was directed at both Michael

 17   Tasch and Chase Robinson authorized

 18   by Tiffany Chen.

 19      Q.     Okay.

 20            Let's mark as Exhibit 66

 21   what is Bates stamped Robinson

 22   00014877.

 23            (Whereupon, Plaintiff's

 24      Exhibit 66, Robinson

 25      00014877, was marked for
```



Page 417

1                 T. HARVEY

2       identification, as of this

3       date.)

4       Q.    Do you recognize this as an

5    -- sorry.  Take time to download it.

6       A.    No problem.

7       Q.    Do you recognize this as an

8    exchange of text messages between

9    you and Ms. Robinson on March 5th

10   and 7th, 2019?

11      A.    Wait.  Say that again?

12      Q.    Do you recognize this as an

13   exchange of text messages between

14   you and Ms. Robinson on March 5th

15   and March 7th, 2019?

16      A.    The one -- I have 14877,

17   but it doesn't go down.  I can see

18   the one from March 5th.

19      Q.    Can you also see the text

20   message from March 7th?

21      A.    I can't.

22            MR. DROGIN:  Put the box

23       in the right-hand corner that

24       opens it up.

25      A.    It won't let me go down.  I



Page 418

```
 1                    T. HARVEY

 2    can clearly see 14877.  I can't see

 3    -- it says page one of one.

 4      Q.    It is only one page and in

 5    the middle of the page are texts

 6    from March 7th, 2019?

 7      A.    I see it.  Yes, yes, yes.

 8      Q.    Okay.

 9            So do you recognize these

10    as text messages that you exchanged

11    with Ms. Robinson on March 5th,

12    2019, and March 7th, 2019?

13      A.    I don't, but I don't have

14    any reason to disown them or not

15    suggest in any way they weren't

16    transmitted.  I don't recall them

17    off the top of my head.

18      Q.    And Ms. Robinson complained

19    to you in this text message saying,

20    "This is insanity.  It has got to

21    stop.  It is so uncomfortable and

22    just downright harassment."

23            Did you have any

24    communications with Ms. Robinson

25    about what she was experiencing?
```



```
 1                    T. HARVEY
 2     A.    Well, it -- I believe it
 3   predates this text message where
 4   there was -- I believe there is a
 5   March 4th or March 2nd e-mail, 2019,
 6   that Ms. Robinson and Mr. Tasch took
 7   offense to.  Sent by Tiffany Chen.
 8     Q.    After Ms. Robinson sent you
 9   this text message on March 7th,
10   2019, referencing harassment, did
11   you have any follow-up
12   communications about Ms. Robinson?
13     A.    Oh, sure.  Absolutely.
14     Q.    Describe for me, sir, the
15   communications that you had with Ms.
16   Robinson?
17     A.    Yeah.  I -- I spoke to her
18   and said, "Try to stay away from
19   it."  The e-mail that I am referring
20   to, whether it is March 2nd or March
21   4th from Tiffany Chen was
22   complaining to Michael Tasch and
23   Chase Robinson that they were not
24   following up with things that they
25   were saying or promising to do, and
```



Page 420

```
 1                    T. HARVEY
 2    that she was very upset that they
 3    essentially had dropped the ball on
 4    getting the mold taken care of at
 5    ███████
 6       Q.    After Ms. Robinson
 7    described experiencing what she
 8    characterized as harassment, did you
 9    or anyone else investigate Ms.
10    Robinson's allegation of harassment?
11       A.    Absolutely.
12       Q.    And describe for me
13    everything that you did to
14    investigate Ms. Robinson's
15    allegation of harassment?
16       A.    Sure.  I looked at the
17    e-mail.  Again, I would have to look
18    at it, whether it is dated March 2nd
19    or March 4th, 2019, authored by
20    Tiffany Chen, sent to Chase Robinson
21    and Michael Tasch, and I reviewed
22    the e-mail.  And then saw that in my
23    mind, Ms. Chen was simply asking Mr.
24    Tasch and Ms. Robinson to do their
25    job, and to act professional, and to
```



Page 421

```
 1                    T. HARVEY
 2    return phone calls when they said
 3    they would return the calls.
 4       Q.     Did Ms. Robinson ever
 5    communicate that she felt like she
 6    was being targeted by Mr. De Niro's
 7    girlfriend, Tiffany Chen?
 8       A.     Oh, hell yes.
 9       Q.     And did you interview Ms.
10    Robinson about why she felt she was
11    being targeted by Ms. Chen?
12       A.     You say interview, I spoke
13    to her.  And she felt she was
14    targeted or harassed because Tiffany
15    Chen sent her e-mails requesting
16    that she return her phone calls when
17    she was supposed to.  The e-mails
18    speak for themselves.  I don't have
19    to opine on them.  You can look at
20    the e-mails.  I certainly didn't
21    think that either Michael Tasch or
22    Chase Robinson received any
23    communication from Ms. Chen that
24    wasn't professional.  Perhaps harsh,
25    but had nothing to do with anything
```



Page 422

```
 1                 T. HARVEY
 2   but their failure to act
 3   professional.
 4      Q.    Canal didn't undertake any
 5   kind of remedial action after Ms.
 6   Robinson complained about
 7   harassment, is that right?
 8           MR. DROGIN:  Objection to
 9      the firm.
10   A.    Not correct.
11   Q.    Can you explain?
12   A.    Explain what?
13   Q.    Explain why you think it is
14   not right?
15   A.    Because we did take
16   remedial action.
17   Q.    What was the remedial
18   action that was taken?
19   A.    To tell Chase Robinson to
20   return the phone call if she says
21   she is going to call someone, and
22   that way there wouldn't be an issue.
23   And I said the same thing to Michael
24   Tasch, and told him, "It is okay to
25   admit that you don't know what you
```



Page 423

```
 1                   T. HARVEY
 2    are doing and stop lying to the
 3    client."
 4      Q.    Who is the client you are
 5    referring to?
 6      A.    Robert De Niro.
 7      Q.    So the action that you took
 8    was -- well, let me ask.
 9            After Ms. Robinson
10    complained about harassment, there
11    was no remedial action taken with
12    respect to Tiffany Chen, correct?
13            MR. DROGIN:  Objection.
14      Objection to the form.
15      A.    There was no remedial
16    action.  I don't have any -- well,
17    as far as I was concerned, you can
18    look at the e-mail for yourself, I
19    didn't think it was inappropriate in
20    any way, and I think Ms. Robinson
21    and Mr. Tasch simply let their egos
22    get in the way.  They didn't like
23    being told what to do.
24    Unfortunately, when you work for
25    someone, you should do what they pay
```



Page 424

```
 1                T. HARVEY

 2   you to do.

 3     Q.    Did you have a subsequent

 4   phone call with Ms. Robinson in

 5   which she described to you that she

 6   felt like she was constantly

 7   harassed?

 8     A.    I am sure I did.  But

 9   constantly harassed by who?  There

10   is a tape -- the client tape

11   recorded.  If you want to play me

12   the tape recording, that is fine.

13   She complained about Chen.  I read

14   the e-mails.  You can read the

15   e-mails.  There is nothing

16   inappropriate about it.  I believe

17   your client who will probably was

18   already speaking to counsel is

19   trying to generate a situation where

20   she could use it to try to get out

21   of her job and get two years of

22   compensation.  I don't think

23   anything was the e-mails that were

24   being authored by Ms. Chen.

25     Q.    Did you ever have a
```



Page 425

```
 1                T. HARVEY
 2  discussion with Mr. De Niro about
 3  the communications that Ms. Robinson
 4  was receiving from Mr. De Niro and
 5  Ms. Chen?
 6     A.    I am sure I did.
 7     Q.    Did you recommend that Ms.
 8  Chen or Mr. De Niro in any way
 9  adjust their communications with Ms.
10  Robinson?
11     A.    No.
12     Q.    Did you ever become aware
13  of Ms. Robinson complaining about a
14  discriminatory comment that Mr. De
15  Niro made concerning her pay in
16  2019?
17     A.    Sure.  I have this lawsuit.
18  What do you mean?
19     Q.    Prior to the end of Ms.
20  Robinson's employment at Canal, did
21  you ever become aware of her
22  complaining about a discriminatory
23  comment Mr. De Niro made concerning
24  her pay in 2019?
25     A.    That presupposes --
```



Page 426

```
 1                T. HARVEY
 2           MR. DROGIN:  Objection to
 3      the form.
 4      A.    No.
 5      Q.    Turning to the last week of
 6   Ms. Robinson's employment at Canal,
 7   did you observe that Ms. Robinson
 8   appeared to be experiencing
 9   distress?
10      A.    I don't believe there has
11   been a day that Ms. Robinson hasn't
12   expressed duress.  I think she is
13   mentally ill.
14           MR. DROGIN:  Duress.
15      A.    I don't think she was ever
16   under duress.
17      Q.    The question is not duress.
18   It is about distress.  You have used
19   the term duress, Mr. Harvey.
20           Let me ask the question
21   again so we have a clear record.
22           During the last weeks of
23   Ms. Robinson's employment, did you
24   observe that is Ms. Robinson
25   appeared to be experiencing
```



Page 427

```
 1                T. HARVEY
 2   distress?
 3     A.    And I said to you that I
 4   believe Ms. Robinson certainly
 5   appeared distressed to me from the
 6   first day I met her until the last
 7   day she left Canal.
 8     Q.    During the last weeks of
 9   Ms. Robinson's employment, did you
10   observe that Ms. Robinson appeared
11   to be in more distress than you had
12   previously observed her to be?
13     A.    No.
14     Q.    After Ms. Robinson's
15   employment at Canal ended, did Canal
16   ever send a currier or way to
17   retrieve work-related items from Ms.
18   Robinson?
19     A.    I don't know.
20     Q.    After Ms. Robinson's
21   employment at Canal ended, did Canal
22   ever communicate with Ms. Robinson
23   to coordinate the logistics of
24   retrieving work-related items from
25   her?
```



Page 428

```
 1                 T. HARVEY
 2           MR. DROGIN:  Objection to
 3      the form.
 4      A.    Yes.
 5      Q.    Describe for me those
 6   logistics discussions?
 7      A.    Sure.  I need passwords,
 8   and et cetera, everything back from
 9   you.
10      Q.    Anything else besides that?
11      A.    I know Michael Kaplan had
12   conversations with her, and I
13   believe Jillian and Sabrina.
14      Q.    After Ms. Robinson's
15   employment ended --
16      A.    Hold on.  I'm sorry.  And
17   my -- my infamous letter demanding
18   return of all the items.  That
19   communication, too.
20      Q.    Ms. Robinson sought a
21   letter of recommendation from Mr. De
22   Niro, correct?
23      A.    Certainly.
24      Q.    And did you discuss that
25   letter of recommendation with Mr. De
```



```
1                    T. HARVEY
2    Niro?
3       A.    Yes.
4       Q.    And what were the
5    discussions about the letter of
6    recommendation?
7            MR. BENNETT:  Going to be
8       privileged.  To the extent
9       that you think -- you can
10      answer that without revealing
11      privileged information, Tom,
12      go ahead.  I don't know how
13      that is possible, but if you
14      can you can.
15      A.    Well, I think I -- I told
16   Chase that he was not going to sign
17   it, and one of the reasons was
18   because she stole from him.
19      Q.    You offered to provide a
20   letter of recommendation for Ms.
21   Robinson, is that correct?
22      A.    I said that I would talk to
23   Peter Grant and myself to see if we
24   could get her a letter of
25   recommendation.
```



Page 430

```
 1                    T. HARVEY
 2    Q.    But ultimately no one would
 3  provide a letter of recommendation
 4  for Ms. Robinson, is that correct?
 5            MR. DROGIN:  Objection to
 6     the form.
 7    A.    No.  Not correct.
 8    Q.    Who was -- who -- who was
 9  willing to provide a letter of
10  recommendation for Ms. Robinson?
11            MR. DROGIN:  Objection to
12     the form.
13    A.    Ms. Robinson didn't ask for
14  a letter of recommendation from
15  anyone other than Robert De Niro.
16  She was insistent that the only
17  letter of recommendation she would
18  be interested in receiving was from
19  Robert De Niro.
20    Q.    And Mr. De Niro would not
21  provide a letter of recommendation
22  for Ms. Robinson, correct?
23            MR. DROGIN:  Objection to
24     the form.
25    A.    That is correct.
```



Page 431

```
 1                    T. HARVEY
 2           MS. HARWIN:  Why don't we
 3       take a five-minute break?  I
 4       think we are getting close to
 5       the -- to the end.
 6           THE VIDEOGRAPHER:  The
 7       time is 5:50 p.m.  We are now
 8       off the record.
 9           (Whereupon, a recess was
10       taken at this time.)
11           THE VIDEOGRAPHER:  The
12       time is now 5:56 p.m.  We are
13       back on the record.
14       Q.   Mr. Harvey, when did Canal
15   make a final decision to bring a
16   lawsuit against Ms. Robinson?
17       A.   I don't know what you mean
18   by final decision.
19       Q.   When was the decision made
20   that Canal would definitely bring a
21   lawsuit against Ms. Robinson?
22           MR. DROGIN:  Objection to
23       the form.
24       A.   Again, I don't know how to
25   answer that.  Mr. De Niro certainly
```



Page 432

```
 1                 T. HARVEY
 2   wanted to sue Ms. Robinson and file
 3   a criminal complaint against her
 4   sometime in June or thereabouts.  He
 5   was very upset and very angry.  He
 6   certainly had other things to do,
 7   and it was not on the top of my
 8   list.
 9      Q.    So the lawsuit was filed
10   against Ms. Robinson on August 17,
11   2019, correct?
12      A.    I don't know.  I don't have
13   the -- the file in front of me.
14      Q.    How long before the lawsuit
15   was filed against Ms. Robinson was
16   the final decision made that a
17   lawsuit would be brought against
18   her?
19      A.    You keep saying final
20   decision.
21          MR. DROGIN:  Objection to
22      the form.
23      A.    I don't know what you mean
24   by final decision.
25      Q.    How long before the lawsuit
```



Page 433

```
 1                  T. HARVEY
 2   was filed was it decided that Canal
 3   would definitely bring a lawsuit
 4   against Ms. Robinson?
 5     A.    You keep saying it as
 6   definitely.  Mr. De Niro was very
 7   upset certainly by mid June, and
 8   wanted to sue Ms. Robinson and
 9   wanted to have her arrested for
10   stealing from him.
11            MR. DROGIN:  Are you
12       asking when a representative
13       of Canal authorized the
14       filing of the suit?  Is that
15       what you are getting at other
16       than on the physical day that
17       it was filed?
18     Q.    When was the final go ahead
19   to file the suit against Ms.
20   Robinson?
21     A.    Again, you keep saying
22   final.  Like -- the date it was
23   filed, I would absolutely say it was
24   approved to be filed.
25     Q.    I would like to mark
```



Page 434

```
 1                    T. HARVEY
 2    Exhibit 67, which is Bates stamped
 3    Canal 0050157 through 58.
 4            (Whereupon, Plaintiff's
 5       Exhibit 67, Canal 0050157
 6       through 58, was marked for
 7       identification, as of this
 8       date.)
 9    Q.    Mr. Harvey, do you
10    recognize this document as being an
11    e-mail exchange between you and
12    Jillian Spear?
13    A.    Sure.
14    Q.    Do you see the first line
15    of the e-mail where Ms. Spear
16    writes, "It is not easy to tell what
17    is personal versus things she can
18    say were for work?"
19    A.    I see that, yes.
20    Q.    Okay.
21            Did you follow up with Ms.
22    Spear to get further information
23    about what she wrote, that "It is
24    not easy to tell what is personal
25    versus things she can say were for
```



Page 435

```
 1              T. HARVEY
 2   work?"
 3     A.    I don't know off the top of
 4   my head.  Although, it wasn't my
 5   concern.  By this point July 3rd, I
 6   had a plethora of information,
 7   documentation, e-mails, et cetera.
 8   This is just Jillian Spear telling
 9   me what she thinks, and what was
10   going on.  But I had already looked
11   at a lot of these things.  This is
12   her opinion as to what the evidence
13   is.
14     Q.    So how was it that Canal
15   was able to distinguish between what
16   it claimed was personal versus what
17   was for work?
18          MR. DROGIN:  Objection.
19      Are we going back now into
20      30(b)(6) territory?
21          MS. HARWIN:  Let me ask
22      that question as a 30(b)(6).
23          MR. DROGIN:  Then we
24      would object on the ground of
25      attorney-client privilege.
```



Page 436

```
 1              T. HARVEY
 2         MS. HARWIN:  Can you
 3    repeat the question, Madam
 4    Court Reporter?
 5         (Whereupon, the requested
 6    portion was read back by the
 7    reporter:
 8         Q:  So how was it that
 9    Canal was able to distinguish
10    between what it claimed was
11    personal versus what was for
12    work?)
13         MR. DROGIN:  Same
14    objection.
15         MS. HARWIN:  Are you
16    directing the witness not to
17    answer?
18         MR. DROGIN:  It is a
19    privileged communication.
20    You are asking how Canal made
21    certain determinations.  You
22    are not asking factually.
23         MS. HARWIN:  You are
24    directing the witness not to
25    answer?
```



Page 437

```
 1                    T. HARVEY
 2            MR. MERINGOLO:  Yes, we
 3      are.
 4            MS. HARWIN:  I am just
 5      asking for you to be clear
 6      whether you are directing the
 7      witness not to answer.
 8            MR. MERINGOLO:  We both
 9      are.  Yes.
10      Q.    Going back to your fact
11   testimony, did Canal ever plan to
12   bring a legal proceeding against Ms.
13   Robinson on August 5th, 2019?
14      A.    Again, I don't know what
15   you mean plan.  We were obviously
16   considering filing a lawsuit and
17   going to the Manhattan District
18   Attorney's Office to get the
19   property that she stole returned to
20   us.  Ultimately, culminating in a
21   lawsuit that was actually filed.  So
22   when you say planning, if she had
23   given the -- the material back, and
24   the property back, and the money
25   back, prior to even August, whenever
```



Page 438

```
 1              T. HARVEY
 2    we filed the lawsuit, I assume we
 3    wouldn't have gone forward, but I
 4    don't know.  You would have to ask
 5    Mr. De Niro that question.
 6     Q.    Was there ever a plan to
 7    bring a legal proceeding
 8    specifically on or about August 5th,
 9    2019?
10     A.    Was there what?
11          MR. BENNETT:  It may be
12      easier to introduce the
13      document.
14          MS. HARWIN:  Let us
15      introduce what was previously
16      marked as Exhibit 39.  That
17      will be dropped into the chat
18      for you.
19     Q.    Let us know when you have
20    that.
21     A.    Okay.
22     Q.    So I would like to turn
23    your attention to the second page of
24    Exhibit 39, which is the one marked
25    as Canal_0501.
```



Page 439

```
 1                    T. HARVEY
 2          Do you see at the top of
 3    that e-mail exchange Sabrina
 4    Weeks-Britain writes, "So much for
 5    notice, but Tom needs Chase evidence
 6    for a court proceeding morning."
 7          Do you see where she wrote
 8    that?
 9    A.    Yes.  I see it.
10    Q.    Okay.
11          Did Canal plan to bring a
12    legal proceeding against Ms.
13    Robinson on August 5th, 2019?
14    A.    Again, Canal was discussing
15    suing Ms. Robinson as early as mid
16    June 2019.  So when you say,
17    "planning," there were ongoing
18    discussions regarding filing a
19    criminal Complaint with the legal
20    precinct, filing a Complaint with
21    the New York County District
22    Attorney's Office, and suing Ms.
23    Robinson to get the return of the
24    items she stole.
25    Q.    What was the nature of a
```



Page 440

```
 1                    T. HARVEY
 2    court proceeding for Monday August
 3    5th, 2019?
 4            MR. DROGIN:  Objection to
 5       the form.
 6       A.    I have no idea what they
 7    are discussing.  You would have to
 8    ask them.
 9       Q.    Did you have a discussion
10    with Sabrina Weeks-Britain about
11    some court proceeding that was
12    contemplated to occur on Monday
13    August 5th, 2019?
14       A.    I am sure I had a
15    discussion with her saying that I
16    needed more material.  But in terms
17    of discussing a filing, I don't
18    believe I did, no.
19       Q.    What is your relationship
20    with Dan Harvey?
21       A.    He is my brother.
22       Q.    What communications did you
23    have with Tiffany Chen after -- let
24    me restate that.
25            What conversations --
```



```
 1                    T. HARVEY
 2    sorry.  Third time is a charm.
 3            What conversations did you
 4    have with Tiffany Chen about Ms.
 5    Robinson after Ms. Robinson's
 6    employment at Canal ended?
 7      A.    I don't remember.
 8      Q.    Did Ms. Chen encourage Mr.
 9    De Niro to bring a lawsuit against
10    Ms. Robinson?
11            MR. DROGIN:  Objection to
12       the form.
13      A.    Can you read the question
14    back, please?
15            (Whereupon, the requested
16       portion was read back by the
17       reporter:
18            Q:  Did Ms. Chen
19       encourage Mr. De Niro to
20       bring a lawsuit against Ms.
21       Robinson?)
22      A.    So the record is clear, Mr.
23    De Niro has not brought a lawsuit
24    against Ms. Robinson.  Ms. Robinson
25    has brought a lawsuit against Mr. De
```



Page 442

```
 1                 T. HARVEY

 2    Niro.

 3         MS. HARWIN:  Let me

 4      clarify the question.

 5    Q.    Did Ms. Chen encourage Mr.

 6    De Niro to bring a lawsuit through

 7    his entity, Canal, against Ms.

 8    Robinson?

 9         MR. DROGIN:  Objection to

10      the form.

11    A.    I don't know.  You can ask

12    Ms. Chen or Mr. De Niro.

13    Q.    Did you have any

14    discussions with Ms. Chen about

15    bringing a lawsuit against Ms.

16    Robinson?

17         MR. DROGIN:  Objection to

18      the form.  Who bringing a

19      lawsuit, her?

20    Q.    Canal or Mr. De Niro

21    bringing a lawsuit against Ms.

22    Robinson?

23    A.    I don't know.

24         MR. DROGIN:  Can we get a

25      report on how much time is
```



Page 443

```
 1                   T. HARVEY
 2     elapsed, please, of the seven
 3     hours?
 4          MS. HARWIN:  We are
 5     actually at the end of our
 6     questioning.
 7          MR. DROGIN:  Oh.
 8          MS. HARWIN:  So obviously
 9     there have been disputes
10     today concerning answers that
11     have been provided, but I
12     believe that this concludes
13     our questioning for today.
14          Mr. Drogin, do you have
15     any questions for he witness?
16          MR. DROGIN:  Yeah.  I
17     just have maybe two handfuls.
18     EXAMINATION
19     BY MR. DROGIN:
20     Q.   Mr. Harvey, in any of your
21     communications with Chase Robinson,
22     did she ever tell you or suggest to
23     you that she was being treated a
24     particular way based on her gender?
25     A.   No.
```



Page 444

```
 1                T. HARVEY
 2    Q.    In any text messages that
 3  you received from her, where she
 4  used the word harassment, did she
 5  ever make it clear to you at any
 6  time subsequent to that, that she
 7  believed she was the victim of
 8  gender-based harassment?
 9    A.    No.
10    Q.    Did she ever lead you to
11  believe that she was the victim of
12  sexual harassment?
13    A.    No.
14    Q.    In any phone call that you
15  ever had with Chase Robinson, did
16  she ever tell you that she was the
17  victim of any unlawful harassment
18  based on her gender?
19    A.    No.  The tape recordings
20  (inaudible).
21    Q.    Mr. De Niro's decision not
22  to provide Ms. Robinson with a
23  letter of recommendation, did that
24  occur before July 25, 209?
25    A.    Yes.  And I told Ms.
```



Page 445

```
 1                  T. HARVEY
 2    Robinson it is on one of her tape
 3    recordings of me.  And with Robin,
 4    and she specifically tells Robin
 5    Chambers that she is not getting the
 6    letter of recommendation because she
 7    stole the air miles.
 8            MR. DROGIN:  I don't have
 9        anything further.
10            MS. HARWIN:  We have some
11        follow-up questions.
12        EXAMINATION
13        BY MS. HARWIN:
14        Q.    Mr. Harvey, did you inquire
15    of Ms. Robinson as to why she
16    believed she was being harassed or
17    targeted?
18        A.    Yes.
19        Q.    And did you ask her on --
20    whether she believed she was being
21    targeted on the basis of her gender?
22        A.    You got to take the pen out
23    or your mouth.  What is it?
24        Q.    Did you ask Ms. Robinson if
25    she believed she was being harassed
```



Page 446

```
 1                 T. HARVEY
 2   based on her gender?
 3      A.    No, she told me she was
 4   being harassed based upon the letter
 5   -- the e-mail.  She sent me the
 6   e-mail and said, "This is
 7   harassment."  In the e-mail, if you
 8   pull it up, there is nothing about
 9   sexual harassment.  There is nothing
10   about gender.  There is nothing
11   other than the fact she failed and
12   Michael Tasch failed to return phone
13   calls.  And so both Michael Tasch
14   and Chase Robinson took it as they
15   were being harassed and targeted
16   based on one specific e-mail.
17      Q.    Mr. Harvey, did you ask Ms.
18   Robinson whether she believed she
19   was being harassed based on her
20   gender?
21      A.    No.  She told me she was
22   being harassed as --
23      Q.    It is a yes or no question.
24            Did you ask Ms. Robinson as
25   to whether she believed she was
```



Page 447

```
 1              T. HARVEY
 2   being harassed based on her gender?
 3     A.    Not that I recall.  But --
 4   I will let it go.
 5           MS. HARWIN:  That
 6      concludes our questioning for
 7      today.
 8           MR. DROGIN:  I have a
 9      little bit more.
10      EXAMINATION
11      BY MR. DROGIN:
12     Q.    Did you ask Chase Robinson
13   whether she thought she was being
14   harassed because of her race?
15     A.    No.
16     Q.    What about with regard to
17   her national origin?
18     A.    No.
19     Q.    Her age?
20     A.    Nope.
21     Q.    Her religion?
22     A.    No.
23     Q.    Any disability that she may
24   have had?
25     A.    No.
```



Page 448

```
 1                    T. HARVEY
 2     Q.    Her citizenship?
 3     A.    No.
 4     Q.    Did you inquire of her as
 5  to whether or not she believed
 6  whether or not she was the victim of
 7  any form of harassment or
 8  discrimination based on any
 9  characteristic whatsoever?
10     A.    No.
11          MR. DROGIN:  Nothing
12      further.
13          MS. HARWIN:  Mr. Harvey,
14      thank you for appearing here
15      for your deposition.  As you
16      know there have been a number
17      of issues with privilege
18      disputes where we identified
19      those for potential rulings.
20      It is also our position that
21      testimony wasn't provided
22      that was on topics that the
23      30(b)(6) witness was required
24      to be prepared for.  And so
25      it is our position that the
```



Page 449

```
 1              T. HARVEY
 2    30(b)(6) witness was not
 3    adequately prepared to
 4    prepare testimony here today.
 5    But this isn't something that
 6    we need to go back and forth
 7    on now, and we appreciate you
 8    appearing here.
 9         MR. DROGIN:  We couldn't
10    hear the last part.
11         MS. HARWIN:  I said we
12    appreciate you being here
13    today.
14         Did you hear the
15    preceding the comment?
16         MR. DROGIN:  We would.
17    And we would point out that
18    at no point during this
19    deposition, which began at
20    10:00 this morning, and it is
21    now 6:15 at night, did you
22    ever make a statement on the
23    record that you believe that
24    the 30(b)(6) witness has not
25    been adequately prepared.
```



Page 450

```
 1              T. HARVEY

 2         MS. HARWIN:  I think the

 3    many I don't know answers

 4    speak for themselves in that

 5    regard.  Okay.  Thank you,

 6    everyone.

 7         MR. BENNETT:  Requesting

 8    a copy of the transcript.

 9         THE VIDEOGRAPHER:  It is

10    6:16.  We are off the record.

11

12         (Time Noted:  6:16 p.m.)

13

14         THOMAS HARVEY

15

16    Subscribed and sworn to

17    before me this 28 day of April

18         2022.

19

20

21    Notary Public

22

23

24

25
```

JACKIE HOWELL
Notary Public, State of New York
NO. 01HO6398289
Qualified in Westchester County
Commission Expires 09/23/2023



Page 451

1

2                    I N D E X

3

    WITNESS            EXAMINATION BY   PAGE
4
    Thomas Harvey
5                      Ms. Harwin            5

6                      Mr. Drogin          443

7                      Ms. Harwin          445

8                      Mr. Drogin          447

9

10

11                    EXHIBITS

12
    PLAINTIFF'S   DESCRIPTION          PAGE
13
    47            Notice of 30(b)(6)   45
14                Deposition

15  48            a Complaint in the   65
                  Supreme Court
16                action

17  49            Robinson 0009964,    119
                  8625, 9969, 9971,
18                8228, and 8096

19  50            Canal 0050276 and    183
                  Canal 0050277
20
    51            Federal              193
21                Counterclaims

22  52            Canal_0010352 to     238
                  64
23
    53            Robinson 0006824     259
24
    54            Robinson 0006839     263
25



Page 452

1

2          I N D E X   C O N T I N U E D

3                      EXHIBITS

4     PLAINTIFF'S   DESCRIPTION            PAGE

5
      55            Robinson 0006844      265
6
      56            Robinson 0006876      269
7                   through 77

8     57            Robinson 0006847      271

9     58            Robinson 6834         277

10    59            Robinson 18091810     294
                    and 1821
11
      60            Robinson 0006741      334
12                  through 52

13    61            Robinson 00006728     345
                    through 40
14
      62            Robinson 00016439     352
15                  through 57

16    63            Robinson 00016549     364
                    through 75
17
      64            Canal's Statement     369
18                  of Damages &
                    Computations
19
      65            0049482 through 86    407
20
      66            Robinson 00014877     416
21
      67            Canal 0050157         434
22                  through 58

23

24

25



Page 453

1

2          REQUESTS FOR PRODUCTION

3    DESCRIPTION                    PAGE

4    Production of reference        269

5

6

7                   RULINGS

8    PAGE   LINE   QUESTIONING ATTORNEY

9      132    18   Mr. Meringolo

10     305    14   Mr. Meringolo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 454

                    C E R T I F I C A T E

1

2

3              I, PAIGE HAYDEN, hereby certify that the

4    Examination Before Trial of THOMAS HARVEY was held

5    before me on the 29th day of March, 2022; that said

6    witness was duly sworn before the commencement of his

7    testimony; that the testimony was taken stenographically

8    by myself and then transcribed by myself; that the party

9    was represented by counsel as appears herein;

10             That the within transcript is a true record of

11   the Examination Before Trial of said witness;

12             That I am not connected by blood or marriage

13   to any of the parties; that I am not interested directly

14   or indirectly in the outcome of this matter; that I am

15   not in the employ of any of the counsel.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand this 29th day of March, 2022.

18
                    *Paige Hayden*
19

20                  PAIGE HAYDEN

21

22

23

24

25





1              ERRATA SHEET

2

3      PAGE   LINE (S)      CHANGE          REASON

4
       | 23, Line 20 |    | Change "1997" to |   | Factual accuracy |
5                          | "1990" |

6      | 26, Line 17 |     | Insert "my brother" |  | Factual accuracy |
7                          | in lieu of "a friend" |

8      | 237, Lines 18-19 | | insert "you presuppose" in lieu |  | Clarify phrasing |
9                          | of "you are presupposed" |

10     | 305, Line 22 |    | "Meir Teper" in lieu |  | Misspelling |
11                         | of Peter Temper |

12     | 314, Line 10 |    | Insert "they" before |  | Clarify phrasing |
                           | "aren't" |

13     | 424, Line 13 |    | Inset "Ms." before |   | Correct reference |
14                         | "Chen" |                | to Ms. Chen |

15

16

17                              THOMAS HARVEY

18     SUBSCRIBED AND SWORN TO BEFORE ME

19     THIS 28 DAY OF Apr, l , 2022

20     Jackie Howell              09/23/2023

21     (NOTARY PUBLIC)        MY COMMISSION EXPIRES:

22

23              JACKIE HOWELL
         Notary Public, State of New York
24            NO. 01HO6398289
         Qualified in Westchester County
25       Commission Expires 09/23/2023