```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GRAHAM CHASE ROBINSON,

 4                   Plaintiff,

 5           v.                            19 CV 9156 (LJL)

 6   ROBERT DE NIRO and CANAL
     PRODUCTIONS,
 7
                     Defendants.          Oral Argument
 8   ------------------------------x
                                          New York, N.Y.
 9                                        April 20, 2023
                                          10:10 a.m.
10
     Before:
11
                         HON. LEWIS J. LIMAN,
12
                                          District Judge
13

14                        APPEARANCES

15   SANFORD HEISLER SHARP, LLP
          Attorneys for Plaintiff
16   BY:  ALEXANDRA HARWIN
          MELINDA KOSTER
17        KATE MacMULLIN

18   TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
          Attorneys for Defendant Robert De Niro
19   BY:  GREGORY R. BENNETT

20   TARTER KRINSKY & DROGIN LLP
          Attorneys for Defendant Canal Productions, Inc.
21   BY:  LAURENT S. DROGIN
          BRITTANY K. LAZZARO
22

23

24

25
```

```
 1              (Case called)
 2              MS. HARWIN:  Good morning, your Honor, I'm Alexandra
 3    Harwin from Stanford Heisler Sharp on behalf of plaintiff.
 4              THE COURT:  Good morning.
 5              MS. KOSTER:  Good morning, your Honor, Melinda Koster
 6    on behalf of the plaintiff.
 7              MS. MacMULLIN:  Good morning, your Honor, Kate
 8    MacMullin on behalf of the plaintiff.
 9              MR. BENNETT:  Good morning, your Honor, Gregory
10    Bennett, Traub Lieberman, on behalf of the defendants.
11              MS. LAZZARO:  Good morning, your Honor, Brittany
12    Lazzaro on behalf of defendant Canal Productions, Inc. from
13    Tarter Krinsky & Drogin.
14              MR. DROGIN:  Laurent Drogin from Tarter Krinsky &
15    Drogin for Canal Productions.
16              THE COURT:  Good morning.
17              We are here for oral argument on the competing motions
18    for summary judgment.  I've read the papers.  I'm prepared to
19    hear from counsel.  I think it probably makes sense for
20    plaintiff to start first, unless the parties want to proceed in
21    a different manner.  And I'll hear with respect to both the
22    motion for summary judgment and the opposition to the competing
23    motion for summary judgment.  Then I'll hear from the other
24    side.
25              You may proceed.
```

1          I would ask you just to keep your voice up.  I'm fine

2     if you talk from counsel table or from the podium, whichever

3     you prefer, but I would prefer for you to stand since you are

4     addressing the Court.

5          MS. HARWIN:  Thank you, your Honor.

6          Can you hear me?

7          THE COURT:  Yes.

8          MS. HARWIN:  When Ms. Robinson threatened to bring

9     discrimination and retaliation claims against her longtime

10    boss, the famous actor Robert De Niro, he was enraged and, by

11    his own admission, directed his company, Canal, to go after

12    her, and file whatever against Ms. Robinson.  There are

13    smoking-gun text messages confirming that Canal brought claims

14    against Ms. Robinson to "strike first," "beat her to the

15    punch," and "ruin her."

16         THE COURT:  Why does any of that make a difference.

17    If in fact your client stole from Canal, the fact that they

18    decided only to investigate and to sue after she -- she left

19    their employ.  Let's assume that they decided to do so only

20    after she said she was going to sue them, but she stole.  Why

21    would that make a difference?

22         MS. HARWIN:  Here, that's not the hypothetical.

23         THE COURT:  Why don't we address whether she in fact

24    stole.

25         MS. HARWIN:  That's what I'd like to focus on.

1          THE COURT:  I am using that colloquially because I

2     realize that there is an issue as to whether one can bring a

3     conversion claim and a breach of fiduciary duty claim together.

4     When I say stole, I'm not referring to it specifically as only

5     conversion.

6          MS. HARWIN:  I understand, your Honor.

7          Canal suggests that its claims boil down to a he

8     said/she said about authorization for these charges,

9     essentially the allegations of theft and the overlapping

10    allegations of breach of duty.

11         But Canal has not presented evidence creating a

12    genuine issue of material fact that she engaged in any

13    unauthorized spending or activities.  To the contrary, the

14    evidence from Canal's Rule 30(b)(6) witnesses and Canal's sole

15    owner, Mr. De Niro, established that the company endowed Ms.

16    Robinson with broad authorization on the types of transactions

17    and activities at issue.

18         THE COURT:  Help me with the law on this.  Let me ask

19    a couple of questions about facts and then I'll build up to the

20    law question.  Maybe easiest to start with the SkyMiles.  I

21    assume that there is no dispute that the SkyMiles prior to the

22    time that they were transferred were an asset of Canal's.

23    There is at least evidence that Canal has that the SkyMiles

24    belong to Canal before they were transferred to Ms. Robinson's

25    account, correct?

1          MS. HARWIN:  The SkyMiles were generated by Canal's

2    American Express card.  So it was generated by the activity on

3    Canal's American Express.  Mr. De Niro didn't use those miles

4    and gave Ms. Robinson the authorization to use them.

5          THE COURT:  Let's put aside the authorization for a

6    moment because I understand what -- that that's one of the key

7    issues in the case.

8          I would assume, but correct me if I'm wrong, that

9    there doesn't need to be a written policy in place for an

10    employee of Canal to be prohibited from taking the SkyMiles

11    that belonged to Canal, correct?  You don't need to have

12    written policies in place to say to an employee, you can't take

13    a corporate asset.

14          MS. HARWIN:  It's certainly the case in the absence of

15    authorizations.  You wouldn't need to have a written policy

16    disclaiming that an employee could take company assets for

17    personal use.

18          THE COURT:  All the time I look out the window here

19    and all kind of businesses that don't have written policies in

20    place.  There is something made in the papers of the absence of

21    written policies, but that doesn't empower a company employee

22    to take company assets.

23          MS. HARWIN:  And that wasn't the reason why we pointed

24    out the absence of written policies.  The reason we did that is

25    because Canal had broad policies authorizing transactions, but

1    those weren't written down, so we wanted to clarify for the

2    Court that the broad policies that existed were not written

3    down.

4          THE COURT:  If that's right, does the burden fall --

5    once the counterclaim plaintiff adduces evidence that a company

6    employee took assets belonging to the company, does the burden

7    then fall on the employee to show that her conduct was

8    consented to?

9          MS. HARWIN:  Absolutely not, your Honor.  It is part

10   of Canal's burden to prove a lack of authorization in the first

11   instance.  It's not --

12         THE COURT:  What's the best case for that proposition?

13   Because it strikes me that that's something of an odd

14   proposition of law.  What it seems like you are saying to me is

15   that a company employee can steal and then it's -- the burden

16   is on the company to show that there was a lack of consent.

17         MS. HARWIN:  The central aspect of a conversion claim

18   is a lack of authorization.  It is Canal's burden to prove a

19   lack of authorization and certainly here, where there is no

20   dispute that Ms. Robinson -- that there were circumstances

21   where meals could be charged, where transportation could be

22   charged, where SkyMiles could be used, where Netflix could be

23   accessed, where trips could be taken.

24         THE COURT:  Is that also true with respect to the

25   breach of fiduciary duty?

1          MS. HARWIN:  Yes, your Honor.

2          THE COURT:  Let's assume that you've got a corporation

3   where the CEO is in charge of everything and the CEO just

4   steals the company assets.  But the company didn't have a

5   written policy in place prohibiting the CEO from doing it.  In

6   fact, the company didn't know the CEO was stealing.  The

7   company can't go after the employee in that instance for

8   stealing.

9          MS. HARWIN:  No.  In that instance the company

10   certainly could.  There we are talking about conduct that is

11   not authorized in any way.

12          But here we are talking about where Canal did,

13   according to Mr. De Niro and Canal's 30(b)(6) witnesses, have

14   general policies authorizing these types of transactions, and

15   under those circumstances --

16          THE COURT:  That's really where I'm wondering whether

17   there is a question of fact, because I have to construe the

18   evidence favorably to Canal on your motion, correct?

19          MS. HARWIN:  Yes.

20          THE COURT:  If I construe the evidence favorably to

21   Canal, wouldn't that evidence support the proposition that on

22   particular occasions Ms. Robinson was authorized to take

23   SkyMiles, but that she did not have the blanket authorization

24   to take SkyMiles whenever she wanted to and for whatever

25   reason?

1          MS. HARWIN:  Well, with respect to SkyMiles

2     specifically, what the testimony is from Mr. De Niro is

3     multiple conversations in which he provided Ms. Robinson not

4     with one-off authorization for particular trips only, but also

5     broad latitude.

6          THE COURT:  What's the best evidence that you have

7     from Mr. De Niro that Mr. De Niro said that Ms. Robinson,

8     whenever you want SkyMiles and for whatever purpose, regardless

9     of whether you are still working for us, you can have the

10    SkyMiles?

11         MS. HARWIN:  The best evidence for that, your Honor,

12    is what Mr. De Niro said.

13         THE COURT:  Give me the page and the quote that you

14    have got for that particular proposition.

15         MS. HARWIN:  Sure, your Honor.

16         Among the things that Mr. De Niro said.

17         THE COURT:  Page.

18         MS. HARWIN:  On Exhibit 2, 366, 8 through 11 Mr. De

19    Niro testified.  She said:  Can I just tack on some miles for

20    me when I need them?  I said yes.  Well, whatever you need.

21         THE COURT:  Isn't that best construed, whatever you

22    need, meaning, if you need miles for work purposes while you're

23    working for me, not whatever you want?

24         MS. HARWIN:  Mr. De Niro's testimony is clear that he

25    approved Ms. Robinson using SkyMiles for personal use as well.

1          THE COURT:  Absolutely, while she was an employee.

2     But is the testimony clear that she could take them and keep

3     them after she left, that is, regardless of whether she was an

4     employee, whatever SkyMiles were earned by the company were

5     hers for her taking and to keep.

6          MS. HARWIN:  Authorization is evaluated at the time of

7     the transaction, at the time of all the transfers.

8          THE COURT:  But it has to do with what the scope of

9     the authorization is, right?

10          MS. HARWIN:  Mr. De Niro -- it has been clear, there

11     was never a discussion with Ms. Robinson about what would

12     happen with the SkyMiles in the event her employment ended.

13          But plaintiff has produced evidence showing SkyMiles

14     cannot be returned after they are transferred.  That's very

15     clear under the terms and conditions of the SkyMiles transfer

16     program.  And Canal presents no evidence refuting that, no

17     evidence showing that it is even possible to return SkyMiles.

18          THE COURT:  What your proposition is is that what you

19     are asking me to accept is that she could have, the moment

20     before she sent her resignation letter, taken every SkyMile out

21     of the account and then, right after that, sent the letter of

22     resignation, and she wouldn't have to either return the

23     SkyMiles or compensate Canal for the value of the SkyMiles that

24     she had taken.  That's what you are asking me to accept as a

25     matter of law.

1              MS. HARWIN:  That's not what we are asking you to

2      accept as a matter of law and it's not what happened factually

3      here.  It's their burden to show that the transfers fell

4      outside the scope of the authorization and that's what they

5      don't do.  There is repeated, repeated, repeated testimony from

6      Mr. De Niro, both generally, not just what I cited, but many

7      more conversations, and I can go on, describing them, in which

8      he provided broad authorization for Ms. Robinson to use

9      SkyMiles in her personal account.

10             THE COURT:  Because he trusted her because that's the

11     way actually a lot of businesses run.  Board of directors trust

12     their employees to be open with them and to tell them each

13     instance when they are taking company property.

14             MS. HARWIN:  There was no intent of Ms. Robinson to

15     resign at the time of the transfers.

16             THE COURT:  But nothing in your argument depends on

17     that, right?  Your argument says it's irrelevant whether she

18     intended to leave.

19             MS. HARWIN:  I think what's critical is Canal cannot

20     retroactively revoke broad authorization that it gave, that

21     Mr. De Niro gave to Ms. Robinson during her employment just

22     because Mr. De Niro's attitude towards Ms. Robinson had

23     changed.  Mr. De Niro authorized the transactions.  It can't

24     then go back and say, well, those ones now, in retrospect, I

25     wish I hadn't authorized.  That's not a basis for a claim.

1          THE COURT:  Let's go through each of these categories.

2     Tell me -- you have given me the pages and lines that you want

3     me to focus on with respect to SkyMiles that you say speak to

4     consent.

5          MS. HARWIN:  Can I give you the rest?

6          THE COURT:  Yes.

7          MS. HARWIN:  Because there are many more.

8          THE COURT:  Just your best ones.

9          MS. HARWIN:  OK.

10          At same exhibit, Exhibit 2, 386, 8 through 19.  Mr. De

11     Niro saying:  She told me I'd like to put some of them, meaning

12     the SkyMiles, onto mine, meaning her account.  She said:  I

13     need them.  I said:  OK.  You do what you think is right.

14     That's how I left it.  Another one, which is Exhibit 3, 589, 1

15     through 7., Mr. De Niro testifies:  She said look.  There is a

16     lot of SkyMiles that I should put into my thing, meaning her

17     account, in case I need it and so on.  I said:  Well, if that's

18     what you think you should do, go ahead.

19          Then, additionally, 588-7 through 12, along similar

20     lines.  And then there are multiple conversations in which

21     Mr. De Niro specifically approved the transfers in 2019.

22     Mr. De Niro provided testimony --

23          THE COURT:  But you don't have any evidence that as to

24     the particular transfers at issue, Mr. De Niro -- that your

25     client asked Mr. De Niro for permission.

1          MS. HARWIN:  Yes.

2          THE COURT:  Remind me how much each of the transfers

3   were for.  There were three of them.

4          MS. HARWIN:  There were a series of transfers.

5          THE COURT:  That totaled the 4 million.

6          MS. HARWIN:  Yes.  Hold on one second, your Honor.

7   I'll get you the numbers.  Sorry, your Honor.  I am just

8   looking for the numbers.

9          In January of 2019, there was one for 999,000 and

10  three more of that amount and then a smaller number in March.

11         THE COURT:  What was the conversation in January of

12  2019 where she said I am taking 999,000 miles?

13         MS. HARWIN:  Mr. De Niro testified that there were

14  conversations with Ms. Robinson in which she specifically talks

15  about --

16         THE COURT:  Do you have testimony from Ms. Robinson

17  that in January of 2019 she said, I'm taking 999,000 miles?

18         MS. HARWIN:  We have testimony from Mr. De Niro --

19         THE COURT:  Do you have testimony from Ms. Robinson

20  that she said to Mr. De Niro, I am taking this amount of miles

21  now?  Do I have your consent?

22         MS. HARWIN:  There were not specific conversations

23  about the exact numbers of miles.  Mr. De Niro confirmed that

24  there were discussions about the trips, including Ms. Robinson

25  talking about the specifics of exactly what these trips were

1     for.

2            THE COURT:  And it's understood that the miles that

3     were taken far exceed what was necessary for those trips.

4            MS. HARWIN:  That is not understood.  There is no

5     evidence at all that Canal has presented that it's in any way

6     in excess of what was needed for those trips.

7            THE COURT:  For the particular trips that she was

8     taking while she was employed.

9            MS. HARWIN:  For the particular trips that she spoke

10    to Mr. De Niro about --

11           THE COURT:  Why hasn't she returned the miles or paid

12    Mr. De Niro back for the value of the miles?

13           MS. HARWIN:  Miles cannot be returned.

14           THE COURT:  Or the value of the miles.

15           MS. HARWIN:  There is no value that's been established

16    for the miles, and Ms. Robinson cannot return the miles.

17           THE COURT:  What efforts has she made to do that?

18           MS. HARWIN:  Your Honor, there is no evidence in this

19    record, and it's ultimately Canal's burden to prove that these

20    can't be returned -- I'm sorry -- that they can be returned.  I

21    misspoke.

22           THE COURT:  Why don't you go to the other charges.

23           MS. HARWIN:  If I could just finish up with page

24    numbers for you, your Honor, because there are discussions

25    specifically about these trips.  That's in Mr. De Niro's

1    testimony at pages -- essentially 272 through -- 572 through

2    576 and then 590 to 591 of his deposition.  Mr. De Niro's

3    testimony confirmed a series of trips that he approved Ms.

4    Robinson to take, and it is Canal's burden to identify that the

5    trips or that the transfers were in excess of what Mr. De Niro

6    authorized.  They don't present any information establishing

7    that, and there was no evidence that the transfers were in any

8    way in excess of what Mr. De Niro specifically authorized.

9            With respect to the specific number of miles, I think

10   it's worth noting where -- Mr. De Niro's testimony is that he

11   allowed Ms. Robinson to use Canal's SkyMiles for her personal

12   travel.  He gave her broad authorization to use the SkyMiles as

13   she saw fit and specifically authorized Ms. Robinson to make

14   the transfers of SkyMiles in 2019 for multiple trips.

15   Testimony from Mr. De Niro that there is not a specific

16   discussion about the aggregated value of the miles transfers or

17   the aggregated sum --

18           THE COURT:  I suppose what you would tell me is that

19   it was not incumbent upon the corporation employee to actually

20   ask permission with respect to each transfer because the

21   comments that were made on particular occasions was specific

22   blanket consent.

23           MS. HARWIN:  I'm sorry, your Honor.  I missed the last

24   part.

25           THE COURT:  I suppose what you are telling me is that,

1  as a matter of law, your client, as a corporate fiduciary, had

2  no duty to tell the company with respect to each transfer, or

3  did she have a duty to tell her employer with respect to each

4  transfer that she was taking those miles.

5          MS. HARWIN:  Mr. De Niro did not --

6          THE COURT:  Did she have a duty with respect to each

7  time that miles were taken to tell her employer that miles were

8  taken?

9          MS. HARWIN:  No, your Honor.  Where Mr. De Niro gave

10  authorization and was not interested in the minutia of exactly

11  what moment transfers were being made, the exact number of

12  miles, when he gave permission to use miles for these trips,

13  that was permission.

14          THE COURT:  Why doesn't that raise a jury question,

15  whether the language that Mr. De Niro used would be sufficient

16  to convey blanket authorization, as opposed to being more on a

17  one-off basis.  I don't care for this one, I don't care for

18  that one.  Maybe he doesn't -- your client would think he

19  doesn't want to be bothered, but many companies, people ask,

20  even when their bosses think that they don't -- that the boss

21  wouldn't want to be bothered.

22          The question is, why isn't it a jury question whether

23  what Mr. De Niro said is sufficient to have conferred consent?

24          MS. HARWIN:  To go with that hypothetical about

25  essentially asking, anyway, that is what Ms. Robinson did.

1   Even though Mr. De Niro had given this broad authorization in

2   2019, she still had specific conversations with him about

3   specific trips before making the transfers.

4        Now, it's Canal's burden to show that the transfers

5   made somehow exceeded the authorizations Mr. De Niro provided.

6   But Canal doesn't provide that evidence.  There is no evidence

7   contravening the authorizations and it not plaintiff's burden

8   to show --

9        THE COURT:  There actually is testimony from Mr. De

10  Niro, paragraph 20 of his declaration:  Nor did we ever

11  discuss, nor did she ever ask my permission to move

12  approximately 5 million Canal SkyMiles into her personal

13  account in 2019.  Likewise, there should have been no

14  reasonable belief or expectation that upon her sudden

15  resignation she would be permitted to retain the SkyMiles she

16  transferred without my knowledge or permission.

17       Let's leave aside whether she had a reasonable belief

18  or not.  But with respect to that first sentence, isn't that

19  enough to create a jury question?  I have read Mr. De Niro's

20  testimony.  There are plenty of things that you could point to

21  in Mr. De Niro's testimony to say, well, paragraph 20 --

22  jurors, you shouldn't believe paragraph 20.  It seems to me

23  that should raise a jury question.

24       MS. HARWIN:  Your Honor, it doesn't.  Because there is

25  testimony that there were authorizations, both broad and

1   specific.  The testimony that there was not a specific

2   discussion about the aggregated value of the many transactions

3   he approved does not create a material disputed fact.  He

4   authorized the transfers.  Even if he did it without thinking

5   through what the total value --

6          THE COURT:  I agree without thinking through the total

7   value, but I don't know.  I would think you would, as a

8   corporate employee, you'd say and that the law would require

9   you to tell your boss when you are taking money from them how

10  much money you are taking.

11         MS. HARWIN:  Your Honor, that's not the way that their

12  conversations were.  They didn't talk about it --

13         THE COURT:  What you are asking me to do is to

14  establish a rule of law that would say that a corporate

15  employee isn't required to do that, that the employer takes the

16  risk and not the employee.  It seems to me the better rule of

17  law is one that says that the employee, who has the

18  information, is the one who takes the risk.

19         MS. HARWIN:  Your Honor, this isn't something that

20  needs to create a broad rule of law.  We are talking about a

21  specific place of employment and a specific relationship

22  between Mr. De Niro and Ms. Robinson and the specific policies

23  there.  There is not a general rule of law that needs to be

24  created.  The issue is, what were the policies?  Because that

25  is --

1          THE COURT:  That might make sense if you can point to

2     a policy that says that you can take company property, no

3     matter how much you are taking and no matter what its worth is,

4     as long as it's in the form of SkyMiles.  You don't have to

5     tell me how much it is, if there was undisputed evidence to

6     that effect.  But I don't know that there is undisputed

7     evidence to that effect.

8          The company surely can establish guidelines that says,

9     as long as the meal is under $200, that's fine.  As long as

10    you're working, whether it's at home or at the office, as long

11    as it's under $200, you don't need to get any separate, new

12    permission.  But if a company doesn't have that policy, then I

13    would have thought that the background's law would be that, if

14    you are taking company property, would need to get the consent.

15         MS. HARWIN:  And here there is the consent.  There is

16    no question.  Mr. De Niro's testimony is that he approved

17    trips.  So the only thing that Canal is relying upon is

18    essentially conjecture and metaphysical doubt that somehow the

19    transfers were in excess of what Mr. De Niro approved.  But

20    they don't present evidence of that.  There is no evidence of

21    that.

22         And I think while there might be some sticker shock

23    about the idea of 4 million miles, the reality is, one of these

24    trips would take on the order of half a million miles.  This is

25    not an amount that in any way is excessive, given what miles --

1     what trips cost in terms of miles and what he proposed.

2     Ultimately, it's Canal's burden.

3              THE COURT:  Are there more cites on the trips or do

4     you want to go to the next category?

5              MS. HARWIN:  I think those are sort of principal

6     citations on the trips.  I'm happy to go into other categories.

7              With respect to transportation --

8              MR. DROGIN:  Your Honor, may I just be heard for a

9     moment?  Would you like us to respond?

10             THE COURT:  No.  I think what may make sense is that

11    after I hear from the plaintiffs with respect to the motion on

12    the counterclaims, I will hear from defendants on those and

13    then we will go to plaintiff's complaints.

14             MR. DROGIN:  Addressing each item while it's fresh.

15             THE COURT:  Not with respect to each item.

16             MR. DROGIN:  OK.

17             MS. HARWIN:  With respect to transportation charges,

18    Canal's Rule 30(b)(6) witness testified that Canal's policy was

19    to pay for all taxis and Ubers that Canal employees needed to

20    take for work.  So Canal must present the Court with persuasive

21    evidence that the taxis and Ubers at issue were charged by Ms.

22    Robinson and unnecessary for her work, including, at a minimum,

23    evidence identifying the times and places where the taxis and

24    Ubers were taken and describing what Ms. Robinson was doing at

25    the time of the charges.  Canal presents none of this and

1    instead admits that the approximate 32,000 --

2                THE COURT:  Slow down.

3                MS. HARWIN:  I'm sorry.

4                Canal does none of this and admits that the 32,000 in

5    personal transportation costs that it accuses Ms. Robinson of

6    improperly charging is just the sum total of all credit card

7    charges with the word taxi or Uber on the Canal credit card in

8    Ms. Robinson's name over a nearly two-year period.

9                In addition, Canal presents no evidence creating a

10   dispute as to ratification.

11               THE COURT:  Let me ask you, on the consent and on your

12   client's testimony that all of these were authorized, can an

13   inference be drawn just from the simple magnitude of the trips

14   that some of them were not authorized?

15               MS. HARWIN:  That's a great question and the answer is

16   no.  Where there is no evidence that any particular charge was

17   unauthorized, the Court can't extrapolate from the aggregate

18   that somehow the total was unauthorized.  It's Canal's burden

19   and the case law is clear that where there is some authority,

20   the proponent of the claim bears the burden of showing proof

21   about specific unauthorized charges.

22               THE COURT:  That can't be.  It may be that Canal's

23   proof falls short.  That's going to be a question I've got for

24   them on the trips.  But it can't be that they would have to

25   show as to each -- any particular trip that that trip was

1     unauthorized as to the particular trip because, frankly, the

2     only person who knows it would be your client.  If you are

3     talking about the misuse of corporate assets, it has to be that

4     an inference can be drawn from evidence other than what the

5     employee was doing on a particular occasion.  Doesn't that have

6     to be the case?

7          MS. HARWIN:  No, your Honor, not when the policy is

8     that these charges are authorized in connection with work.

9     Under those circumstances, when the issue is authorization,

10    Canal bears the burden of showing it was unauthorized.  And

11    what that means in the context of this specific policy is that

12    Ms. Robinson wasn't using the transportation for work.

13         THE COURT:  Your proposition can't be right.  Let's

14    extrapolate it now not to the taxis but to the restaurants.  I

15    am going to ask you a hypothetical that you will say is not the

16    facts of this case, and I understand it's not the facts of this

17    case.  I ask hypotheticals to test legal propositions.

18         Let's assume that there are ordered on the company's

19    credit card an amount of meals that a human being could not

20    over time consume.  You couldn't prove as to any particular

21    meal that that meal was not eaten while the employee was

22    working.  But if you look at it in the aggregate, you know that

23    the employee cannot be ordering simply for herself.

24         In that event, I take it the employer can go to trial

25    and say to the jury, listen, you can draw an inference from

1   this evidence that there was a misuse of corporate assets,

2   right?

3        MS. HARWIN:  If they did in fact present that kind of

4   evidence, that this amount exceeds what any individual could be

5   charging for their own personal use, then I would say that that

6   would be a circumstance.

7        But here defendants don't present that type of

8   evidence at all.  They simply added up what the charges were

9   without consideration of whether they were authorized or not.

10  They just added them up.  And so that is clearly something that

11  the case law finds to be wholly deficient when we are dealing

12  with these kinds of claims.

13       And I will say, your Honor, I think that the focus of

14  a lot of our discussion has been on the issue of authorization,

15  essentially the approval *ex ante*.  But I do think, really

16  critically, Canal does not refute the extensive evidence of

17  ratification here.

18       THE COURT:  Ratification requires your client to

19  disclose all of the facts.

20       MS. HARWIN:  Ratification can come through many

21  different forms.  And there is ratification where there are

22  active steps taken by the employer, as there were here, which

23  is, logging expenses in Canal's general ledger and treating

24  them for tax purposes --

25       THE COURT:  I've got that point.  I don't find that

1  particular point persuasive because that particular point would

2  tell me that the CEO, who repeatedly misuses the company's

3  expense account, can get away with it because he doesn't tell

4  the accountant that he has been misusing the company's expense

5  accounts.

6      MS. HARWIN:  Your Honor, another way that ratification

7  is classically shown is through inaction and through willful

8  blindness.  Here, what we have are transactions that occurred

9  in the open for 11 years of employment.  There was no secrets

10 here.

11     THE COURT:  Mr. De Niro is not in the office, so he

12 doesn't know what she is doing.  He trusts her to run the

13 office.

14     MS. HARWIN:  Mr. De Niro employed an external

15 accounting firm that functioned as its external CFO and did

16 this work.

17     THE COURT:  They were not running the office.  They

18 were paying the bills and they were doing the accounting.  They

19 weren't in charge of monitoring whether all of the expenses

20 were proper and whether people were in fact working when they

21 said that they were working.

22     MS. HARWIN:  Mr. De Niro's testimony is that they

23 were --

24     THE COURT:  The accountant doesn't say that.

25     MS. HARWIN:  The accountant didn't subscribe to that

1    language, but Mr. De Niro did.

2            THE COURT:  Who cares?  Mr. De Niro is not the

3    30(b)(6) witness.  Right there you've got a disputed issue of

4    fact.

5            MS. HARWIN:  Canal's accountants did confirm what the

6    standard process was, which is that these bills went directly

7    to the accountants.  They didn't come from Ms. Robinson to the

8    accountants.  They went directly to the accountants.

9            THE COURT:  Your proposition is way too overbroad as a

10   matter of law.  It just is overbroad as a matter of law because

11   what it does, and maybe that in this case you are able to show

12   that there is consent, but the legal proposition that you are

13   just now offering is one that would permit the CEO to steal and

14   never be held to account.

15           MS. HARWIN:  What we are talking about here with

16   respect to credit cards are what was considered at Canal

17   standard stuff:  Ubers, taxis, meals.  This is what day in day

18   out is charged by all Canal employees.  There was nothing

19   outside of the ordinary that's clear from the testimony of the

20   accountants, and the Canal accountants would flag expenses that

21   were considered suspicious or warranting further inquiry.

22   These were not those.  And in a situation where these are

23   treated as standard, Canal has manifested its consent and

24   acquiescence to the charges.  No one was telling Ms. Robinson

25   that in any way these charges were out of whack or outside the

1   bounds of what was proper at Canal.

2        That's a situation why ratification exists as a

3   doctrine, so that you don't have a situation where people go

4   about their day-to-day business with an understanding that

5   certain things are acceptable, and then to have Canal come back

6   and turn around and now offer a totally different take on what

7   it has knowingly and fully accepted for, again, 11 years of her

8   employment.

9        Ratification, I think, is really critical, and I think

10  it's important also in that it allows the Court to not weigh in

11  on essentially the lack of evidence Canal has presented on the

12  *ex ante* question of authorization.  This is really classic

13  ratification.  There is nothing that Canal presents that was

14  not known in real time to the accountants.  These are just

15  tabulations of charges with no new information about any

16  circumstances.  There is no new information that Canal acquired

17  after the fact about Ms. Robinson's activities.

18        To the contrary, as we have said, they present no

19  evidence at all about Ms. Robinson's activities to establish

20  that any of the charges, transportation, meals were

21  unauthorized in any way.

22        THE COURT:  I think I've got what you say with regard

23  to transportation.

24        MS. HARWIN:  I think with respect to the meals,

25  Canal's 30(b)(6) witness again provided testimony establishing

1    that Canal's policy was to pay for the meals that employees

2    took when they were working or on call.

3          THE COURT:  I have looked at Mr. Tasch's testimony at

4    340 to 341.  That's what you would be taking me to, which is

5    the answer that says:  As far as I know, the policy would be if

6    they were working, and especially at night or on call, for Mr.

7    De Niro that their meals would be taken care of.

8          MS. HARWIN:  That's correct, and Mr. De Niro confirmed

9    that.  When asked about whether this included dinners, he said

10   yeah, of course.  That the common sense.

11         THE COURT:  I'm not actually all that convinced by

12   Mr. De Niro's testimony because -- and maybe I'll ask you to

13   respond to that because I read Mr. De Niro's testimony to be --

14   deposition testimony would be ambiguous.  You never nailed him

15   down on, even if she was working at home, do you agree that

16   even -- for all of the meals at home, that could be -- those

17   could be charged to the company.

18         MS. HARWIN:  Ultimately, the testimony from the

19   30(b)(6) witness does not make any -- it does not identify any

20   point of differentiation based on where the employee was

21   working.  It was just a policy.

22         THE COURT:  If I were to just look at Mr. De Niro's

23   testimony, Mr. De Niro in his deposition says:  If they were

24   working, sure, that would make sense for them to bill the

25   company.  In his declaration he says:  At no time did Ms.

1   Robinson ever discuss with me the concept that her ability to

2   work remotely also came with the added benefit of having her

3   meals and food bills paid by Canal.

4           I would think that if I were just looking at Mr. De

5   Niro's testimony, there would be an issue of fact as to whether

6   meals were authorized when she was working from home.

7           MS. HARWIN:  Your Honor, Mr. De Niro's testimony

8   doesn't create a material issue of fact on that.  When you have

9   general policies that authorize conduct, it's not surprising or

10  unexpected that Ms. Robinson wouldn't have a particular

11  conversation with Mr. De Niro about what was standard practice

12  for the office for the entirety of her employment.  So the

13  policy did not limit meals to in-office meals.  That was very

14  clear from the 30(b)(6) testimony.  It wasn't specific about

15  the location.

16          THE COURT:  I don't know what law firm you're at, but

17  a lot of times law firms have policies that say, you know, if

18  you are working, you can order food in and we will pay for it.

19  It's not unheard of for lawyers to sometimes have to do work at

20  home over the weekends, read emails, look at a brief for an

21  hour or so.  Would you understand the law firm's policy that

22  says you can order in while you're working to apply to those

23  weekend meals, or would you say that your employees who are

24  working at your firm should, in that instance, tell you and ask

25  the question whether the policy extends?

1          MS. HARWIN:  I think in that instance, where what we

2     are talking about is sort of one off, atypical conduct, I think

3     that certainly we could imagine that what we would want the

4     lawyer to do is look at what the policies actually say or

5     inquire.

6          But, here, again, there is no confusion about this.

7     This is just a clear policy.  And remember that Ms. Robinson's

8     home office was her home from 2017 onward.  So what we have is

9     years of transactions where that is her home base.  If there

10    was any question or concern at all about these charges, those

11    could and should have been raised at any point, but they

12    weren't.  This was standard -- this is what she understood

13    absolutely to be authorized.  This is what the 30(b)(6) witness

14    said was authorized.  And Canal never gave any manifestation

15    that that was not its interpretation of the policy.

16          THE COURT:  How relevant is it as a legal matter what

17    she reasonably believed was authorized?

18          MS. HARWIN:  You know, with respect to the motion for

19    summary judgment that we have brought, our reliance is on the

20    testimony of the 30(b)(6) witness.

21          THE COURT:  The legal test isn't whether you had a

22    reasonable belief that what you were doing was authorized.

23    It's actually whether it was authorized, right?

24          MS. HARWIN:  I think that that's correct.  I will note

25    at Canal there was latitude for her to make judgment calls.

1    That's clear from Mr. De Niro's testimony, as to the details of

2    sort of the timing of when to charge or what to charge, that

3    wasn't the kind of thing that Canal was interested in and

4    something that she needed to clear with anyone.  That was left

5    to her judgment.

6          So, in this case, where we are talking about

7    essentially Canal seeking to revoke that kind of authorization,

8    I think, again, ratification is an important doctrine because

9    these are transactions that were fully accepted.  Again,

10   reviewed by the accountants every month, considered to be

11   typical, not something that even required inquiry.  They were

12   an amount that were considered standard and ultimately were

13   recorded in the general ledger and were, again, claimed as a

14   deduction on tax returns.  I do think it's significant.  They

15   never disclaimed those.  They never amended their tax returns.

16   They have never said anything otherwise to the government and

17   never went back and said that these were not legitimate

18   business expenses.

19         THE COURT:  Do you have a case for the proposition

20   that you are required to amend your tax returns when you find

21   out that somebody has stolen from you at the risk that if you

22   don't amend your tax returns, the theft would be considered to

23   be ratified?

24         MS. HARWIN:  The *Niosi* case is about ratification

25   through acceptance of tax benefits, so it doesn't go on, as far

1   as I know, to say sort -- to make the additional point that --

2   about not amending.

3         But I do think that at this juncture, where Canal has

4   fully explored its claims, it is significant that they have

5   never gone back and disclaimed tax deductions, and they do that

6   with eyes wide open in their submissions to the government.

7         I will also note, again, that this is not the case of

8   Canal finding out anything new after the fact.

9         THE COURT:  I was just picking up on the bit about the

10   tax returns.

11         MS. HARWIN:  Yes.

12         THE COURT:  I think the next subjects are the trip to

13   California and the state, the Montage, and then Netflix.  I am

14   not sure how much time you need to spend on Netflix.

15         MS. HARWIN:  Thank you, your Honor.

16         With respect to the California trip, at deposition

17   Mr. De Niro had no recollection of the discussions that he had

18   with Ms. Robinson about the trip.  Ms. Robinson and her

19   colleague both recount what that trip was about, which had to

20   do with Mr. De Niro's former partner who was undergoing medical

21   treatment.  And Mr. De Niro wanted Ms. Robinson to scout

22   hotels.

23         Mr. De Niro had no recollection of those discussions

24   and, under the sham affidavit rule, his affidavit purporting to

25   contradict his prior testimony should be disregarded.

1          But even if the Court were not to disregard the

2     affidavit and were to consider it, it is notable that Mr. De

3     Niro's affidavit doesn't say that he didn't authorize this

4     trip.  All it says is that he didn't -- that he didn't direct a

5     trip for that purpose.  But it confirms that Ms. Robinson was

6     going to be in California at the time of the delivery of these

7     books.  It wholly contradicts the claims the defendants made in

8     this litigation.  Mr. De Niro simply does not contravene that

9     he directed her to take this trip.

10          THE COURT:  I understand the bit about -- some of

11    Mr. De Niro's testimony seems to suggest that your client

12    suggested that she could go to California to accept delivery of

13    the taxi driver books.  That's what you are referring to.  Is

14    that right?  When you say that Mr. De Niro doesn't remember the

15    conversation, but he said that he let her go to California for

16    some other purpose.  Is that what I heard you say?

17          MS. HARWIN:  There is no question that this taxi

18    driver books idea was tacked onto a trip that Ms. Robinson was

19    already going to be taking to California, and that's actually

20    something that Mr. De Niro confirms in that affidavit, that

21    this was a trip that was already -- that she was already going

22    to be in California.

23          Now, Mr. De Niro, in his affidavit, disputes the trip

24    being authorized for the purpose that --

25          THE COURT:  He doesn't remember there being any

1    conversation.

2           MS. HARWIN:  That's right.

3           THE COURT:  If I accept the portion of his declaration

4    that says that I didn't tell her to go to California -- let me

5    put up his declaration.  Hold on for a second.

6           He actually is consistent, I think, that there would

7    have been no reason for Ms. Robinson to go to California to

8    scout out a hotel for his former partner because there was a

9    hotel, the Marriott, that the former partner regularly stayed

10   at.

11          Why wouldn't that be enough to create an issue of

12   fact?  He doesn't remember the conversation.  She remembers the

13   conversation.  If that was all there was, then it may be that

14   there is no issue of fact.  He can't contradict her on what she

15   says about that conversation, asking on that hypothetical.

16          But there is evidence that what she says she was doing

17   is not something that he would ever allow her to do because

18   there would be no reason for her to scout out a hotel when

19   there already was a hotel that was booked that was the regular

20   hotel for the partner.

21          MS. HARWIN:  Mr. De Niro's affidavit, what he says is

22   that he did not ask or direct her to travel to California for

23   that purpose.

24          But even if there is a dispute as to the purpose of

25   the trip, and we would contest -- we would contend that there

1   isn't really a dispute because he couldn't recall, and this

2   after-the-fact affidavit, we believe, should be disregarded.

3   But, again, even if there was any dispute as to the purpose of

4   the trip, this affidavit does not dispute that he did authorize

5   the trip.  It's simply contests the purpose of the trip.

6          And there is testimony from Ms. Robinson that he

7   directed her to take this trip.  There is testimony from her

8   colleague confirming what this trip was about.  While Mr. De

9   Niro may not remember it that way, again, he doesn't contest

10  that he directed her to take the trip.  Paragraph 16 has to do

11  with the purpose of travel to California.

12          THE COURT:  Is there evidence of authorization about

13  the amount of the hotel bill or the rental car?  I don't think

14  there is anything about rental cars, that she has got

15  authorization for rental cars.

16          MS. HARWIN:  Mr. De Niro testified, generally, that

17  when there was a trip that he directed that the employee was

18  entitled to charge food, lodging, travel transportation.

19          THE COURT:  Rental car.

20          MS. HARWIN:  Rental car in Los Angeles is a key mode

21  of transportation.

22          THE COURT:  I suppose that's right, if you don't take

23  Ubers all over the place, which I gather she did.

24          What about the hotel bill at the Montage?

25          MS. HARWIN:  Again, Mr. De Niro provided general

1  authorization to make hotel, so lodging, transportation, meal

2  charges during trips that he directed.

3       And there weren't specific limits on what the --

4  weren't specific guidelines on what the actual charges were

5  and, importantly, no evidence that this is inconsistent with

6  the types of accommodations that Ms. Robinson was authorized to

7  stay at during her 11 years of employment.

8       THE COURT:  I think that just leaves Netflix.

9       MS. HARWIN:  And vacation days as well, your Honor.

10      THE COURT:  Vacation days.

11      MS. HARWIN:  Would you like to hear about that first?

12      THE COURT:  Whichever one you want to do.

13      MS. HARWIN:  I think the Netflix stuff is pretty

14  simple.  Mr. De Niro testified he didn't care if Ms. Robinson

15  had Netflix on while she was doing her work.  So to withstand

16  summary, Canal would need to provide evidence identifying --

17      THE COURT:  Slow down.

18      MS. HARWIN:  Apologies, your Honor.

19      Canal would need to provide evidence identifying dates

20  and times when Ms. Robinson actually accessed Netflix during

21  working hours and, more importantly, evidence that she wasn't

22  working when Netflix was being accessed.  Canal doesn't do

23  this.  It has admitted it can't prove what Ms. Robinson was

24  doing when the account was accessed.  It says -- they don't

25  even contend she was just staring at the TV and not doing any

1    work and concede that she could have always been working.

2           The bottom line is, Mr. De Niro doesn't care about

3    this, there is no reason for a Court to or a jury to.  This is

4    something that simply was not anything improper at Canal.  And

5    if the Court were to look at the hundreds and hundreds and

6    hundreds of pages of Netflix viewing, what the Court will see

7    is largely just viewing late at nightly, viewing on weekends,

8    sort of ordinary stuff that --

9           THE COURT:  You can make your argument without saying

10   that 34 episodes of Frasier is ordinary, or 26, or whatever it

11   is that would run together.

12          MS. HARWIN:  What the Netflix records show over and

13   over again is long series of shows that auto play in the middle

14   of the night, and you have hours and hours and hours and hours

15   of auto plays.  That's what is the bulk of the Netflix viewing,

16   is just auto plays in the middle of the night, which I

17   certainly have experienced and I think --

18          THE COURT:  It's a long night that has that many

19   episodes.

20          MS. HARWINB:  It's just auto play.  When you fall

21   asleep, it keeps on playing.  That's nothing improper.  That's

22   what Netflix would do.

23          Ultimately, the records that you will see specifically

24   says in the data that no user action detected, auto play.

25          With respect to the vacation days, there is no dispute

1   Canal had a policy of paying certain employees, including Ms.

2   Robinson, for unused vacation days.

3        Mr. De Niro's testimony was that the concept of

4   vacation day payback was that Ms. Robinson would be paid for

5   working while she was on vacation or trips.  So to survive on

6   these allegations, Canal has to present the Court with

7   persuasive evidence that Ms. Robinson didn't work during the

8   days for which she sought and obtained reimbursement for unused

9   vacation.

10       At a minimum, this would require Canal to identify all

11  the days when Ms. Robinson purportedly took vacation, days that

12  were not ones where the office was closed, and provided

13  admissible evidence that Ms. Robinson didn't perform work on

14  those days.

15       THE COURT:  Is there enough to create a fact issue

16  that she asked for pay for a day on which there is an email

17  that she says that she was on vacation?

18       MS. HARWIN:  No, your Honor.  Because Mr. De Niro's

19  testimony is clear.  If she did end up working, even when she

20  was on vacation, or especially when she was on vacation, that's

21  when she would get the payback for unused vacation days.

22  That's absolutely consistent with the policy.  If she is on

23  vacation and then works, she gets paid back.  That's what

24  Mr. De Niro approved.

25       They had conversations at the end of every year where

1   they talked through it, and he, someone who was very aware of

2   her travels, because he was talking to her 'round the clock

3   throughout the course of each year, he approved these vacation

4   day reimbursement payments.  It was only after they discussed

5   it and it was -- he had any opportunity to ask any questions,

6   then it was sent to the accounts for processing with him cc'd.

7   There was nothing here in secret.  These were explicit

8   conversations with him.

9           We have presented mountains of emails and time records

10  showing the work she was doing on all these days that Canal

11  claims she shouldn't have been paid for.  And Canal has

12  presented nothing showing that Ms. Robinson wasn't working or

13  that in any way this fell outside the bounds of what Mr. De

14  Niro authorized.  Again, ratification is important here as

15  well.

16          I know I've been going on a long time and covered --

17          THE COURT:  Let me hear from your adversary.  Thank

18  you.

19          MS. HARWIN:  Thank you.

20          THE COURT:  Let me hear from counsel for Canal.

21          MR. DROGIN:  Thank you, your Honor.

22          We have heard a lot here about policies.  Ms. Robinson

23  ran the office.  She created the policies.  You can't create a

24  policy that you are going to steal.  You can't create policies

25  for an office that only favor you, especially when they are not

1    known or cleared by your employer.

2        THE COURT:  Let's talk about some things specifically

3    because with respect to the meals, there is the 30(b)(6)

4    testimony.  In response to the question of what was Canal's

5    policy when it came to paying for employees' working meals that

6    the policy was that if they were working, and especially at

7    night or on call, for Mr. De Niro that their meals would be

8    taken care of.  And the 30(b)(6) witness uses that language of

9    uncalled more than once.

10       That's binding on you and isn't that enough, with

11   respect to the meals, for me to grant summary judgment to Ms.

12   Robinson?

13       MR. DROGIN:  No.  If anything, it's not a clear policy

14   because when you look at all of the testimony, what they were

15   talking about there was for people who were in the office who

16   are working through a meal period.

17       THE COURT:  On call is different from being at the

18   office.

19       MR. DROGIN:  It may be.  But on call, by definition,

20   means you are not working.  And Ms. Robinson is saying she was

21   working all of this time.  She is not saying I was on call.

22   She is saying, I'm working 13 hours a day.  I never have a day

23   off.

24       THE COURT:  If you had a written policy that said, as

25   long as you are on call for the company, then you can order

1  your meals, and it so happens that the employee was working,

2  would you say that that means that it doesn't fall within the

3  policy because you're actually working, as opposed to just

4  being available to work?  That doesn't make sense.

5          MR. DROGIN:  I would because I think there is a

6  difference between somebody who is on call, which is

7  essentially meaning they are being paid to wait to see if they

8  are going to have to work.  But there is something critical

9  here that needs to be brought up.  On call itself has a

10  specific meaning in Canal.  There is a separate telephone, and

11  the in-office employees would take turns, set a schedule as to

12  who was on call.  That's what on call means.

13          THE COURT:  Is there something from the 30(b)(6)

14  witness that indicates that that's what on call means?

15          MR. BENNETT:  Mr. Kaplan, I believe, testified about

16  that.  It is referred to as the bat phone, I believe, in the

17  testimony.

18          THE COURT:  But not from the 30(b)(6) witness.

19          MR. DROGIN:  I am not sure that they ever asked for

20  that distinction, but there is certainly evidence in the record

21  as to what on call meant.  If that's what the 30(b)(6) witness,

22  if that's the term that's being used, that was within his

23  understanding as to what "on call" meant.

24          THE COURT:  Let's march through the different charges

25  because Mr. De Niro did -- let me hear what you have to say

1  with respect to the miles first and then go through the others.

2  And specificity with respect to record cites is helpful.

3       MR. DROGIN:  That's why I asked if you wanted us to

4  respond one at a time.  We have got a lot of pages here.

5       On page 8 of our opposition brief, with regard to the

6  SkyMiles, Mr. De Niro testified, it's on page 366:  One time

7  she asked me if she could put some mileage on.  She said, can I

8  just tack on miles on for me when I need them?  I said yes,

9  well, whatever you need.  And lo and behold, I see later and

10  before she quit, she tacked on a couple of million miles to her

11  account.  So can she explain that.

12       He was then asked at page 365:

13  "Q.  I'm asking you whether there came a time after 2014 when

14  you no longer required Ms. Robinson to run by you each

15  individual flight she was purchasing with SkyMiles.

16  "A.  Well, if she is taking a trip, she would have to run that

17  by me.  And if it is with SkyMiles, I kind of have to know

18  what's going on.

19  "Q.  What do you mean, you would have to kind of know?  You

20  told her you had to kind of know?

21  "A.  Yes.  However you want to interpret kind of know.  It is

22  what I want to know, what's happening.  It is her obligation to

23  explain to me that she is going to go here or there and how she

24  is paying for it or how I am paying for it."  That's page 365.

25       But the issue with the SkyMiles is conflated.  There

1    is no dispute about what happened, trips that she took,

2    business trips, vacations, personal trips, using SkyMiles.

3    That's not at issue here.

4         The issue here is these serial transfers that she made

5    during early 2019, leading up to her resignation, where she

6    emptied Canal's account, not in anticipation of taking a trip,

7    authorized or not, for 4,999,000 SkyMiles.  It was simply to

8    have them, and she admits there was never a discussion with

9    Mr. De Niro about what happens to the SkyMiles if I leave.  Can

10   I just empty them all and then leave?  Is that OK?  No such

11   conversation.

12        THE COURT:  Why would you need to have that kind of a

13   conversation?  Assume that she was given consent to transfer

14   the SkyMiles to her account for future use while she was an

15   employee and to do it in bulk so that she didn't have to do it

16   for each trip.  They were available.  Let me finish.  And that

17   she did it for that purpose, consistent with the authorization.

18   And then she quit, but she wasn't able to return the SkyMiles.

19   There is no evidence you've offered that she is able to return

20   the SkyMiles.  So why is what you told me relevant?

21        MR. DROGIN:  Couple of things.

22        First of all, historically, that's not how the

23   SkyMiles were taken, where she loaded up, emptied the account,

24   loaded them up into her account for future use.  There is no

25   evidence of that.  That's number one.

1          Number two, there is no evidence that they were taken

2    for a particular purpose, with permission or not.  It's not

3    like I'm traveling around the world and I need to use these

4    miles.  It doesn't matter.  She just left with them all.  Once

5    she left with them, remember, her position is, I didn't have to

6    ask.  I could use them.  I thought I could.

7          In one of her recorded conversations with Robin

8    Chambers, Robin Chambers tries to explain to her.  No.  It's

9    like when you are using an office computer.  You don't leave

10   with the computer.  She hung up on Ms. Chambers when that was

11   explained to her.

12         In the letter -- in the June 9 phone call she recorded

13   with Mr. Harvey, Mr. Harvey says he is not signing the

14   recommendation letter.  He is really annoyed that you took the

15   SkyMiles.  And she says:  What are you talking about?  I could

16   do that.  And he says:  No, that's not what he's saying.  There

17   is a dispute right there.

18         THE COURT:  That can't be sufficient because that's

19   after she has left, and you can't create a fact issue by that

20   kind of testimony.

21         MR. DROGIN:  I am not trying to create a fact issue

22   after she resigned.  I'm simply saying that it was made known

23   to her.  You asked why she didn't return it.  I am saying, I

24   agree with you, because after she left, it was requested back

25   in Mr. Harvey's letter.

1          THE COURT:  I got an answer to why she didn't return

2    it, so why don't you respond to that.  The answer that I got

3    was that once they are transferred, they can't be returned and

4    that you have not offered contrary evidence.

5          MR. DROGIN:  I don't know the extent that they

6    actually tried to return them.  I understand that there may be

7    a policy that when someone transfers them from one account to

8    another, the policy may be, no, you can't transfer them back.

9    That's a policy.  As we know, policies are flexible.  They have

10   to be flexible.

11         She has never tried to return them, as far as we know.

12   She has never tried to say, look, here is the value.  I will

13   repay them.  Her position is, no, no, no, they are absolutely

14   worth nothing.  They are worth nothing if -- they are worth

15   nothing if only you can use them to travel however many flights

16   you can pay for with almost 5 million miles.

17         THE COURT:  Is there evidence in the record that Ms.

18   Robinson used any of the SkyMiles that she took after she left?

19         MR. DROGIN:  My recollection is, yes, that when she

20   went overseas to, I think it was, Isle of Skye to participate

21   in some filmmaker's -- I forget exactly -- it was a filmmaker

22   gathering, that that was -- she used several hundred thousand

23   SkyMiles for that trip.

24         THE COURT:  Maybe the plaintiffs will reply to this,

25   that when she took the SkyMiles and used them, that at that

1   point she converted them to her personal use.  Otherwise, it

2   sounds like she was just a bailee holding those SkyMiles

3   without the ability to return them.  Maybe not the ability to

4   use them for her own personal benefit, but that wouldn't

5   entitle you to the full 4 million if they have not been used.

6          MR. DROGIN:  Only she can use them, apparently, and

7   they have value to her.

8          THE COURT:  I don't know whether, and maybe we will

9   hear from the plaintiff, whether any of those SkyMiles actually

10  have been used after the time of her departure.

11         MR. DROGIN:  I think we can answer.  They were used

12  over that summer, and we have asked for the records as to

13  whether they were used.  I believe she stopped using them,

14  perhaps recognizing that they were at issue in this case.

15  Ms. Harwin can really speak to that.

16         Again, I think the key point here has to do, as was

17  discussed, with authorization and any quote/unquote

18  authorization to stockpile or leave with miles was never

19  discussed by Ms. Robinson with Mr. De Niro.  She simply just

20  assumed that she could.

21         THE COURT:  What about the transportation, the Ubers?

22  Do you have any evidence that any of the trips that she took

23  and charged to Uber were not for business purposes?

24         MR. DROGIN:  I am going to quote you back to you,

25  Judge, because I thought it was a terrific phrase.  You said

1  inference by magnitude.

2       THE COURT:  Maybe there is an inference that one could

3  draw by magnitude in a particular case.  Tell me what the

4  circumstantial evidence is, your most powerful circumstantial

5  evidence that you are going to present to a jury, and then I

6  can decide whether a reasonable jury could find in your favor.

7       MR. DROGIN:  The American Express card that she had in

8  her possession was supposed to be used for business charges,

9  not personal charges.

10       During the investigation, the American Express charges

11  were being reviewed.  They coupled together the taxis.  They

12  coupled together the Ubers.  Remember, in 2017 and forward, she

13  is working remotely.  They backed out those charges where she

14  went from home on those limited occasions to the office.  That

15  leaves a narrower group of charges which cannot be explained

16  because she is working remotely.  When she is coming to the

17  office, she is not being charged with that.  When they say that

18  we simply added up all the charges, we added up the charges

19  that had been extracted.  They were color coded.  And that's

20  what's being added up.

21       What we have left then are this group of unexplained

22  business charges and some, in 2019, she is saying was relating

23  to the townhouse and she was taking cabs or Ubers back and

24  forth for some of her duties regarding the townhouse.  But the

25  rest goes unexplained.

1      THE COURT:  But doesn't she say that these were all

2   for business purposes?  Tell me, is there something about the

3   magnitude of them?  What is it that would show that these are

4   unauthorized?  The burden is on you, isn't it, to show that

5   these were unauthorized?

6      MR. DROGIN:  What is she doing?  Why she taking Ubers

7   around for business if her job is remote and she is at home?

8   There is nothing that would really require her, with the

9   frequency that these charges appear, to be traveling around in

10   Ubers and in taxicabs.

11      THE COURT:  Do you have from the Uber records where

12   she was being picked up and where she was dropped off?

13      MR. DROGIN:  I believe the office, the Canal staff who

14   did the investigation did that to remove the charges from her

15   home to the office.

16      THE COURT:  I hear the other side, see them shaking

17   their head, and they will have an opportunity.

18      But let me assume that that is what was done.  Do you

19   have evidence with respect to the remainder of the charges,

20   based upon where the trip was to and from, that it was not for

21   business purposes?

22      MR. DROGIN:  No.

23      THE COURT:  You would say to me you are not required

24   to do that?

25      MR. DROGIN:  I am going to quote you back to you which

1   is inference by magnitude.  I have an employee who is working

2   from home who is supposed to be charging things only for

3   business, and there is no business explanation as to why she is

4   using these modes of transportation.  Other people are using

5   the subway.  But she is using Uber and taxi.

6           THE COURT:  The fact that other people are using

7   subways is really neither here nor there if the policy was that

8   she could use Uber.  Maybe that was not a wise use of company

9   resources, but that doesn't establish a conversion or breach of

10  fiduciary duty.

11          MR. DROGIN:  We view this as a picture of abuse, that

12  you are right, I can't say that on a particular date where

13  there was a particular charge she was sitting in the back of an

14  Uber and this is what she was actually doing.  I can't go down

15  to that granular level.

16          I am looking at the totality of the circumstances.  I

17  am looking, for example, and we will get to this, to her time

18  sheets, to Netflix.  There just aren't enough hours in the day

19  for her to be doing what it is that she is supposed to be doing

20  and she says that she is doing.

21          THE COURT:  Meals.

22          MR. DROGIN:  Counsel said that there was a

23  quote/unquote clear policy about meals.  The policy was, if

24  you're in the office if you're at your desk, we touched on this

25  before, you can order your meals on the company --

1          THE COURT:  What do you want me to look at for that

2    being the policy?  If you're in the office --

3          MR. DROGIN:  The support for that proposition comes

4    from the 30(b)(6) witness.  It's in the deposition testimony

5    from Sabrina Weeks Brittan at pages 121 to 122 and 126 to 128,

6    as well as 276.  Mr. De Niro's declaration, paragraph 9 --

7    supplemental declaration addresses this, as does Mr. Kaplan's

8    deposition at page 67, lines 6 through 25.

9          In our brief on page 21 we wrote:  The very clear

10   office policy was that when an employee was working in the

11   office, lunch should be ordered and Canal would pay for it.

12   Canal paid for lunch when they were in the office.  Canal paid

13   for working lunches based on the assumption that the employee

14   would be at their desk working.  There is no evidence such

15   policy extended to employees who worked from home and ate lunch

16   at home.

17         And the only one who did that, that's on page 21 --

18   which brief is this?  Our opposition to their motion for

19   summary judgment.

20         This notion that because I'm working from home,

21   assuming that I'm working, meant that I could order lunch from

22   Paola's Restaurant or do grocery shopping at Whole Foods, is

23   simply a fiction.  It is a policy, to the extent it is one,

24   that has been created by the policy maker to benefit only

25   herself and which contradicts the policy that every single

1    other office employee was following.

2           THE COURT:  This really goes to the point of

3    ratification.  I mean at least the accountants would have known

4    that there were a whole bunch of credit card charges to Paola's

5    from Ms. Robinson.

6           MR. DROGIN:  That's not what their job was and that's

7    not what they said their job was.  What they said was, they

8    looked at the bills, they added them up to make sure that the

9    amounts were right, and then they paid them.  There was no

10   concept of oversight.  There was no concept of quote/unquote

11   checks and balances.  It wasn't their job.

12          They relied on Ms. Robinson to do her job and not to

13   pass off as business expenses things that were not legitimate

14   business expenses.  The exception was if they saw a large

15   charge or something that seemed very out of the ordinary, they

16   would ask about it.  But routine charges that were passed

17   through by the vice-president of production and finance as

18   business charges, it was not their role to question them and

19   certainly, I think, as your Honor pointed out, there is no

20   evidence Mr. De Niro even knew this was going on.  I don't see

21   you can ratify something that which you don't know about.

22          THE COURT:  Let me hear from you on the others.

23          MR. DROGIN:  Next, the LA trip.  You've got the facts

24   right.  There was a history here.

25          THE COURT:  They made actually a pretty powerful point

1      that there is no testimony from your client that your client

2      disapproved the trip to California or didn't authorize it.

3              MR. DROGIN:  The question is why was she actually

4      going to California.  That's the dispute right there.  She says

5      she was going to scout hotels and we are saying absolutely not.

6      Not only was she not going to scout hotels, there was no need

7      for her to scout hotels because we all knew where this person

8      stayed when they were out there, and we have evidence in the

9      record to show that that reservation was already booked.  And

10     there is no evidence in the record that when Ms. Robinson went

11     out to LA, staying at the Montage, not a hotel that was being

12     scouted, eating at Nobu, and taking Ubers around --

13             THE COURT:  Nobu has sort of some atmospheric impact,

14     and I can understand how for a jury it would have an

15     atmospheric impact.  But it was his restaurant.  He was an

16     owner of Nobu, and she was authorized to go to Nobu if she was

17     on a business trip, so I'm not sure exactly how much that adds.

18             MR. DROGIN:  $600 dinner.  It's not eating her alone.

19     Maybe with a really expensive bottle of wine.  She says she is

20     not a big drinker.

21             I think the critical part here is, on that trip she

22     has never explained what she actually did there.  We know what

23     she didn't do.  She never actually picked up --

24             THE COURT:  She didn't pick up the books and,

25     presumably, didn't check out the hotel.

1          MR. DROGIN:  One of the other things is, why do you

2     need to pick up the taxi driver books.  If you want to get them

3     to Los Angeles and you are going to Los Angeles, just take them

4     and deliver them.  The whole thing makes no sense.

5          THE COURT:  Actually, I do have a question about some

6     of Mr. De Niro's testimony.  On page 355 of his deposition the

7     question is asked:  You don't recall Ms. Robinson ever asking

8     you to take a trip to Los Angeles, correct?  And the answer is:

9     Well, she would have suggested I can go out.  She would say --

10     I'm speaking as if I'm her.  I can go out there and bring the

11     taxi driver books out there or send them out ahead of time, and

12     then I'll deliver them to the people who they have to be

13     delivered to.

14          Isn't that enough to suggest that she did ask Mr. De

15     Niro if she could go to California for the purpose of accepting

16     the books and delivering them and that he gave the consent,

17     that snippet of testimony?

18          MR. DROGIN:  No.  Because you have got to look at the

19     broader picture.  The broader picture is, what she says, which

20     is disputed, is, I was going out there to scout hotels and

21     quote/unquote, I think the language was add on -- as an add on,

22     I can do the second pickup of books and then deliver them.

23          THE COURT:  If each side says the trip was authorized,

24     your client says it's authorized to accept the books and to

25     deliver them, she says it's authorized in order to scout out

1    the hotel.  There may be a difference between the two of them,

2    but explain to me how it's material.

3            MR. DROGIN:  They are two completely different things.

4    She is explaining the purpose as to why the trip was authorized

5    and what we are saying is, there is absolutely no reason, that

6    makes no sense, because you had already booked the hotel.  You

7    knew the hotel that was going to be stayed at.  You never

8    scouted anything.  It's completely fallacious and that is where

9    the dispute is.  What she has done is, she has offered to pick

10   up the books.  And our position was, great.  You are going to

11   be out there.  Terrific.  Pick them up, deliver them.

12           It's not that that was the purpose of the trip.  If

13   that was the purpose of the trip, she could have taken them out

14   there herself.  She is already going.  She was going for

15   completely different reasons than the ones that she says.  We

16   think she was going out there for a birthday party, which

17   explains the hotel, which explains the car, which explains the

18   lifestyle.

19           I also want to respond to one thing counsel said.  She

20   said there was supporting testimony from the colleague.  That

21   is not correct.  There is no supporting testimony.  That would

22   be Robin Chambers, and Robin Chambers' testimony was along the

23   lines, of, oh, yeah I think that's what Chase told me.  She did

24   not have direct knowledge other than what Chase had

25   subsequently told her.

1          Netflix.  Listen.  You've covered --

2          THE COURT:  Is there any law to the effect that theft

3     of time constitutes either a conversion or a breach of

4     fiduciary duty?  It's a point that the other side makes in a

5     footnote.  I don't think you responded to it.  I am not sure

6     what the limiting principle would be for such a claim.

7          MR. DROGIN:  We are not claiming conversion and theft

8     of time.  If that's not clear, it's clear now.  There is no way

9     that I can say this is how much she says she was working.  This

10    is how much she was actually working.  That's not really the

11    issue.

12         What we are looking at here is the totality of her

13    body of work as to what she was and wasn't doing.  It is not

14    credible to believe that someone who says who they are working

15    the excessive hours that they are, that they are always

16    working, and her time sheets reflect these massive amounts of

17    hours, that in comporting with her duty of loyalty and in

18    comporting with her other -- her fiduciary duty, she is

19    supposed to be working.

20         THE COURT:  Do you have a claim with respect to the

21    watching of the Netflix?  There is no charge to the company.

22         MR. DROGIN:  No.

23         THE COURT:  Are you just saying the Netflix is going

24    to be evidence that if your case goes forward, is evidence of

25    her breach of fiduciary duty but it's not an independent

1   breach?

2          MR. DROGIN:  Yes.  The media picked up on this.  There

3   is no claim tied to Netflix viewing, per se.  It's simply part

4   and parcel with all of the other excesses, and it undermines

5   the claim that she was actually doing what she says she was

6   doing.

7          THE COURT:  Just to make it crystal clear, if I were

8   to conclude with respect to the remainder of your claims that

9   there is no genuine issue of fact and the plaintiffs are

10  entitled to judgment, then the case would not survive based

11  upon Netflix alone.

12         MR. DROGIN:  On Netflix alone, that is correct.

13         THE COURT:  If that's the case, and maybe this becomes

14  a question for plaintiff, but do I need to rule with respect to

15  Netflix at this time?  Wouldn't it be something that I would

16  rule on as an *in limine* motion if the case goes forward and not

17  at summary judgment?  You may have an argument that the Netflix

18  comes in.  I can understand their argument for why it would be

19  terribly prejudicial and misleading and etc., because it can be

20  played in the backgrounds or at night in auto play.

21         MR. DROGIN:  Which, by the way, Netflix, as I think we

22  have put in our brief, according to Netflix, and I think we

23  have all experienced this, after I think three or four shows or

24  90 minutes, it prompts you, are you still watching.

25         THE COURT:  Actually, that's a very helpful

1  explanation, and I confess that I have never been in that

2  situation.

3          MR. DROGIN:  There is a footnote linking to the

4  Netflix site that explains that -- you are prompted, are you

5  still watching?  You click yes and it continues.

6          Unless there is more on Netflix, I will just turn to

7  vacation.

8          THE COURT:  Why don't you, on vacation days, tell me

9  whether there is any day that you want me to look at.  This is

10  not like the taxicab trips or the dinners at Paola's.  There is

11  a discrete number of unused vacation days.  What's your best

12  day for the proposition that it was unused?

13          MR. DROGIN:  My best day is any day where Chase

14  Robinson says, I am on vacation.  Because every time she says

15  she is on vacation, she has made it her policy to be reimbursed

16  for that day, whether she took a five-minute phone call or

17  whether she actually had to do three hours worth of work.  This

18  is a policy that she has invented for herself and one other

19  employee.  It is not a company policy.  As Mr. Kaplan

20  testified, who was the other beneficiary of this policy, it was

21  a nice little bump at the end of the year.  So for every year

22  in question here, she says -- there were a couple of years --

23          THE COURT:  Doesn't Mr. De Niro testify that if she

24  was working while on vacation, then she was not required to

25  take that as a vacation day and was entitled to be paid for it?

1          MR. DROGIN:  Yes.  The question is, at what point in

2     time does a reasonable human being, with a fiduciary duty, in

3     this position, in this senior executive position, decide, you

4     know what, I have worked enough today that I am going to credit

5     myself with not having actually used a vacation day.

6          THE COURT:  I understand that proposition.  You will

7     tell me sort of what the limiting principle is to it.  It seems

8     to give up the argument that you just made that every day in

9     which she emailed that she was on vacation is a breach of

10    fiduciary duty or a conversion because, hypothetically, if she

11    said, I'm on vacation and then she worked eight hours while she

12    is on vacation, what you just told me says that she would not

13    have to take that as a vacation day.

14         MR. DROGIN:  We have inserted eight hours.

15         THE COURT:  I'm testing your proposition that it's

16    sufficient for you to make out your claim that she emailed that

17    she is on vacation.

18         MR. DROGIN:  One of the other witnesses testified, and

19    I think she was one of the other people that understood this

20    concept as to when are you actually working on vacation.  And

21    it all comports with Mr. De Niro's overarching policy of, be

22    honest, do what's right, do what's reasonable, don't take

23    advantage.

24         THE COURT:  What is your best day for the proposition

25    that she misused the vacation days?

1            MR. DROGIN:  Put that way, I am going to need a moment

2     to try to find one particular day.  But what I can do, and I'm

3     not trying to duck your question at all, is to say, show me a

4     year where she says, I've taken no vacation days but in fact

5     there is evidence that she did.  I think it's for 2016, where

6     we only have half of the records for the year.  And she is

7     putting in, I think, 22 days of unpaid vacation because she

8     kept increasing her allotment every year.  Yet, in fact, in her

9     time sheet she is showing that she is on vacation.

10           THE COURT:  I think your colleague is giving you the

11    day.

12           MR. DROGIN:  It's on page 15.  She claims on December

13    12, 2016, in that email, which is dated December 12, 2016.

14    It's ECF 322-57 at page 6.  She claims to have taken zero of 19

15    days.  And consequently she was paid for 19 unused days.  But

16    her time records reflect that she was on holiday in London and

17    Lisbon between the 26th of December and Friday the 30th, where

18    she worked a total of two hours, one hour on the 26th, one hour

19    on the 29th.  By her own admissions, her time records, she did

20    no work on the 27th, the 28th, or the 30th, because she is on

21    vacation.

22           And I imagine counsel is about to tell you or wants to

23    tell you that the office was closed during that period of time.

24    So what.  The fact that the office may be closed and you're on

25    vacation doesn't entitle you to say that I worked on vacation

1    and, therefore, I didn't use the vacation day.  Just because

2    the office is closed, it doesn't mean she is not working.

3            THE COURT:  Are you required to take vacation days on

4    days that the office is closed?  Isn't that the issue?

5            MR. DROGIN:  No, not to my knowledge.  That would have

6    been a policy that Chase Robinson could have effectuated.

7    Nobody else had that.

8            THE COURT:  Maybe I'm misunderstanding the point.  If

9    she listed the 27th and the 28th and the 30th as vacation days,

10   as days against her allotment, and those days were days that

11   the office was closed, then she has effectively not used three

12   of the days that she was entitled to.

13           MR. DROGIN:  Only if the policy is that when the

14   office is closed, that is essentially a free day and you don't

15   have to charge your vacation.  That's not a policy that's in

16   this record.  That's made up.

17           THE COURT:  I am still not sure I understand your

18   point, but maybe I've got the plaintiff's point wrong.

19           Let's use December 25.  If she counted December 25 as

20   a vacation day and the email showed that she was on vacation,

21   and that was the only day that she took off, then I would

22   presume that she would get paid for that day as a vacation day

23   because the office was closed.

24           MR. DROGIN:  She would get paid for the day for two

25   reasons.  Number one, because it's a holiday.  Number two is

1  because she was an exempt employee.  She was paid a salary.

2  She got paid whether she worked or not.

3         THE COURT:  I will hear from the other side on that

4  one.

5         Is there anything else?  I think we have covered all

6  of your points.

7         MR. DROGIN:  One other one, if I may.  It wasn't

8  addressed, but I think it's important to look at.  That is, you

9  used the word, your Honor, with a qualifier stole.

10         The case is not just limited to these charges and the

11  Netflix and the vacation.  It should not go unnoticed that in

12  Mr. Harvey's letter he requested back, in addition to the

13  SkyMiles, cash, gift cards, and other company property that she

14  had in her possession.  And she was specifically told, if you

15  do in the return this, legal action will follow.  It was

16  suggested that she retain counsel.  She never returned any of

17  that.  She didn't return any of that until one day before the

18  close of discovery in this case.  And when we asked her, why

19  didn't you just return it when you were asked --

20         THE COURT:  She invoked the advice of counsel.  I saw

21  that.

22         I take it your point would be that I don't need to go

23  through each of these items item by item with respect to

24  summary judgment.  If a bunch of stuff survives, then the rest

25  of it is for *in limine*, or something like that.

 1          Let me hear from plaintiff.  Just for planning

 2   purposes, I am going to hear from plaintiff until noon, and

 3   then we are going to take a break and then come back about ten

 4   minutes after noon, and we will conclude with the remainder of

 5   the summary judgment arguments.

 6          Let me hear from plaintiff.

 7          MS. HARWIN:  Thank you, your Honor.

 8          I am going to spend this time just walking through, as

 9   quickly as possible for the Court, just a rejoinder to various

10   things that counsel has said.

11          A lot of the argument that was just made is

12   essentially trying to recast allegations as not being about

13   whether Ms. Robinson was authorized or not, but essentially

14   whether Canal's policies were a bad idea or not.  But that's

15   not what this case is about.  There is no allegations about the

16   adoption of policies and Canal's efforts to essentially say,

17   well, notwithstanding whatever the policy said, it was a bad

18   idea.  That isn't a basis for them to survive summary judgment.

19   It's not even allegations that are at issue in this case.

20          On SkyMiles, one thing that counsel said that was

21   absolutely inaccurate is that the way in which Ms. Robinson

22   transferred SkyMiles in 2019 was in any way different from what

23   had happened previously.

24          What counsel said was that it wasn't previously

25   transferred in batches.  That's absolutely not the case.  The

1   testimony is very clear.  That is exactly what would happen.

2   When Ms. Robinson would have time, she would transfer a batch

3   of SkyMiles.  That was the practice historically.  There is

4   documentation confirming it and testimony confirming it.

5          There is no evidence that Canal presents at all that

6   the way in which the transfers occurred in 2019 were in any way

7   different from the way in which they had occurred for years

8   before.

9          With respect to the Ubers and taxis, Canal has claimed

10  that there was somehow some kind of backout of certain charges.

11  That is 100 percent false.  If the Court reviews the

12  spreadsheet, what was presented by Canal is 100 percent of

13  charges on the Amex, and they highlighted 100 percent of Ubers,

14  100 percent of the Paola's charges, 100 percent of Dean &

15  DeLuca, Whole Foods, taxis.

16         It is not the case that there was any kind of backout.

17  In fact, we analyzed the Excel file containing every single

18  American Express charge and confirmed it to the number.  When

19  you add up every single charge in each of these categories, it

20  matches what Canal has asserted it's entitled to in this

21  litigation.

22         THE COURT:  I'll obviously look at the materials, but

23  I don't know that that fully answers the question as to

24  whether, with respect to Uber charges that were not to and from

25  the office, whether the claims should survive on the basis of

1   those charges, whether or not they were backed out of the

2   charge that was presented to me.  If they are backed out in

3   what goes to the jury, isn't that enough?

4          MS. HARWIN:  But the issue is, and Canal's 30(b)(6)

5   witness confirmed, they treated all taxi charges as improper,

6   all Uber charges as improper.  They didn't remove charges of

7   certain kinds.

8          THE COURT:  That may mean that when the case goes to

9   trial they don't get everything, but doesn't it mean that they

10  still can survive to go to the jury?

11         MS. HARWIN:  There is no question, and Canal's brief

12  concedes that this includes valid charges.

13         THE COURT:  Answer my question.  Is there a

14  justification for the charges that are not to and from the

15  office?

16         MS. HARWIN:  Absolutely.  There is extensive

17  testimony.  It is not simply the case, and the 30(b)(6) witness

18  testimony is not that it was only Ubers to and from the office

19  that were authorized.  It was Ubers that needed to be taken,

20  taxis that needed to be taken for work-related reasons.

21         Ms. Robinson's job, as everyone agrees, was being

22  Mr. De Niro's point person, his head assistant.  She ran

23  errands for him all the time.  She needed to be in Ubers and

24  taxis to meet him, to go to his home.  As counsel has just

25  conceded, she was running errands for him all the time.  There

1    is no evidence at all that any of the Uber or taxi charges are

2    unrelated to that work, were unnecessary for that work.  There

3    is none.

4         And ultimately if this were to be before a jury, a

5    jury -- how could a jury award damages of any kind without any

6    ability to assess whether taxis, Ubers were authorized or not.

7    They simply do not present that evidence.  They do not have

8    that evidence.  They confirm.  They didn't crosscheck all these

9    charges with work.  And Mr. De Niro has conceded that he would

10   need to review.  He was the only one who knew the details of

11   her day-to-day work, not the others in the office, and he never

12   vetted these charges.

13        Again, Canal concedes now that their tabulation

14   includes valid charges.  There is no way for the Court to

15   identify what is claimed to be valid, what is not, what is used

16   by Ms. Robinson, what is not.  There is simply no evidence.

17        I will say that with respect to the meals, Canal

18   attempts to rewrite the policy into something that the 30(b)(6)

19   witness did not testify.

20        THE COURT:  Help me with your argument on the meals

21   because they have pointed out that testimony at 340 with

22   respect to on call is at least ambiguous with respect to

23   whether that means at home.

24        MS. HARWIN:  There is no evidence that there is

25   ambiguity in any way.  There is no evidence at all.

1          THE COURT:  Is there anything other than 340 and 341

2     with respect to the consent issue, not with respect to the --

3     after-the-fact authorization issue?

4          MS. HARWIN:  Well, the policy is -- here is what the

5     testimony from the 30(b)(6) witness says.  If they were

6     working, and especially at night or on call --

7          THE COURT:  I asked you whether there is anything

8     other than --

9          MS. HARWIN:  I apologize.

10          One of the things, essentially, Canal relies on very

11     heavily is the testimony of this new employee, Sabrina Weeks

12     Brittan, who was employed at Canal for only a short amount of

13     time.  She specifically disclaimed knowledge of Canal's general

14     policies, only testified about what she observed, and in fact

15     Canal's counsel objected repeatedly to her testimony because

16     she wasn't the 30(b)(6) witness.  So that isn't testimony that

17     creates any dispute about Canal's policies.

18          But I will say that the testimony from Michael Kaplan,

19     a transcript the defendants produced, confirmed that Canal

20     employees were authorized to take the work-related taxis and

21     Ubers that Canal would pay for working meals for employees,

22     including lunches and dinners, and confirmed that Ms. Robinson

23     purchased her working meals from Paola's, Dean & DeLuca and

24     Whole Foods, as well as other people also making purchases from

25     places like Dean & DeLuca and Whole Foods for working lunches,

1    including Mr. Kaplan himself.

2              THE COURT:  Mr. Kaplan doesn't have the authority to

3    consent on behalf of Canal, does he?

4              MS. HARWIN:  No.  He is simply -- they cite his

5    testimony to in some way limit the policy --

6              THE COURT:  Let's assume everybody was stealing from

7    Canal.  That still wouldn't provide a defense for Ms. Robinson.

8              MS. HARWIN:  I certainly agree that the Court can

9    simply rely on the testimony of the Rule 30(b)(6) witness.  And

10   while counsel has tried in argument to create some kind of

11   ambiguity about that policy, there is no testimony, there is no

12   evidence at all that that was ambiguous or that it means what

13   they characterize it to mean.  On call meant what any

14   common-sense interpretation would mean if you're awaiting work

15   or in anticipation of work.

16             With respect to meals, I believe that defense counsel

17   has now conceded that they can't even establish where she was

18   working at the time of the charges.  There is just simply no

19   information they present to establish that the charges were in

20   any way outside the bounds of the policy.

21             With respect to the Los Angeles trip, what defendants

22   are offering is just speculation.  Maybe she attended a

23   birthday party.  That's not evidence.  There is nothing there.

24   Ultimately, there is no dispute of fact they have generated

25   that Mr. De Niro directed her to take that trip.  The only --

1            THE COURT:  Is the $600 at Nobu out of the range of

2     ordinary in terms of what her charges would be?  Can't I infer

3     something for $600 at Nobu that she took her friend out for a

4     nice birthday dinner?

5            MS. HARWIN:  You can't infer anything from it because

6     Mr. De Niro was specifically questioned whether he authorized

7     Ms. Robinson to take this other former employee, Amelia Brain,

8     to Nobu, and he testified he might have.  There is no dispute

9     about authorization.  He actually confirmed that this was a

10    charge that he might have approved.  Simply didn't recall.  So

11    no material dispute of fact with respect to that.

12           On the Netflix, from counsel's discussion, it appears

13    that they have never looked.

14           THE COURT:  Sounds like Netflix I don't need to

15    decide.  Either their claim survives or it doesn't survive.

16    But it's not going to survive on the basis of Netflix.  If it

17    survives, you will argue to me at *in limine*.

18           MS. HARWIN:  Your Honor, I would say, though, that the

19    Court can and should address it at this juncture because what

20    Canal is speculating or offering is just squarely refuted by

21    the documents.  I mean, there are records.  They refute what

22    counsel is saying.

23           Counsel speculates that you have to click a button

24    every 90 minutes.  If you look at the records, it shows hours

25    and hours of auto plays, not any active user effort.  It just

1    appears that they never looked at these records that were

2    subpoenaed.  They show not what they are speculating about, but

3    largely viewing on weekend, days the office is closed, and at

4    night, with auto plays throughout the night, after Ms. Robinson

5    had gone to sleep.

6           On the vacation days, the arguments here really now

7    are sort of totally unmoored in that the idea that Ms.

8    Robinson --

9           THE COURT:  Explain to me a bit about the 27th, 28th,

10   and 30th.  What is your argument on that?

11          MS. HARWIN:  If the office is closed and employees are

12   not working that day, Ms. Robinson doesn't need to use a

13   vacation day to not work that day.  It's an office holiday.

14   The whole office was closed for that entire week.  There is

15   no --

16          THE COURT:  I got the point.

17          MS. HARWIN:  Ms. Robinson doesn't need to use a

18   vacation day to not work on Christmas.  That's just common

19   sense.  When the entire office was closed, no one used their

20   vacation days.  If they weren't working on those days, of

21   course, they weren't.  The office was closed.

22          Ultimately, your Honor, what we have from defendants

23   is a whole lot of conjecture and assumptions and metaphysical

24   doubt, but no actual evidence that Ms. Robinson wasn't

25   authorized to undertake the specific transactions at issue.

1          Canal hasn't presented affirmative, persuasive

2    evidence that substantiates its claims.  Canal had the

3    opportunity under local rule 56.1 to submit its own recitation

4    of facts, to present its evidence identifying any one issue

5    that would present a genuine issue for trial.  They didn't.

6    They didn't present a single one.

7          Mr. De Niro has conceded that he would need to do this

8    kind of detailed line-item review individual charge by

9    individual charge to know whether they were proper.  He never

10   has.  There is no evidence from which the Court can conclude

11   that Canal can sustain its burden of showing a lack of

12   authorization.  That is really something that is -- and that is

13   what warrants dismissal of all of Canal's claims.

14         THE COURT:  Thank you.  It's now noon.  We will take a

15   ten-minute break, and then we will come back for argument with

16   respect to the motion for summary judgment on the complaint.

17         MR. DROGIN:  Judge, may I give you two citations?

18         THE COURT:  If during argument you want to mention

19   citations, you can.

20         MR. DROGIN:  Thank you.

21         (Recess)

22         THE COURT:  Let me hear now from defendants on their

23   motion for summary judgment.

24         MR. BENNETT:  Thank you, your Honor.

25         Your Honor, the defendants have moved for summary

1   judgment on all the claims in the plaintiff's complaint.

2          I'd like to begin with the circumstances preceding Ms.

3   Robinson's resignation on April 6, 2019.

4          Without getting too deep into the standard, obviously,

5   from a constructive discharge standpoint, it is not an easy

6   standard to meet.  You have to demonstrate that there is an

7   intolerable work atmosphere that was created deliberately by an

8   employer as a result of a protected class.  When you're

9   analyzing those circumstances, it's always analyzed through the

10  lens of what a reasonable person would have done under the same

11  circumstances.

12         We have gone through a little bit already this morning

13  about what Ms. Robinson's job duties were throughout the course

14  of the relevant time period.

15         In Mr. De Niro's perspective, and counsel mentioned

16  this earlier, from his perspective, Ms. Robinson served as the

17  head assistant.  In Ms. Robinson's own words from her

18  deposition, she acknowledged that she thought it was a core job

19  duty of all employees to do what Mr. De Niro asked to be done.

20         Throughout her employment and for right now I am just

21  going to make a distinction before or the time periods

22  preceding the fall of 2018 for reasons I'll explain in a

23  moment.  She was regularly communicating with the individuals

24  that were on Mr. De Niro's crew, so to speak, hair, makeup,

25  wardrobe, etc.  She was in regular communication with them with

1       regard to Mr. De Niro's various productions.  She would go to

2       various locations and scout out before Mr. De Niro had to go

3       there for filming purposes.  She would go and act as a scout to

4       ensure that she found an appropriate place for her.

5               She was quite involved, even beyond being involved

6       with Canal's external employment counsel on wage-and-hour

7       issues, setting up the wage-and-hour compliance structure

8       within Canal and supervising the employees.  She also had a

9       good degree of involvement with Mr. De Niro's films.

10              In late October, early November 2018, Mr. De Niro

11      moved into what we have been all referring to as the townhouse.

12      The townhouse is very important in terms of the circumstances

13      prior to Ms. Robinson's resignation.

14              It's really important to note, though, that the work

15      surrounding the townhouse was a finite period of time.  This is

16      not something that was ever envisioned to be a 17-year

17      construction project where it's going to be continually revised

18      from an architectural standpoint or an interior design

19      standpoint.

20              He was moving into a new residence, and he needed some

21      help with furnishing it, with painting it.  They hired an

22      interior decorator through Ms. Robinson's recommendation.

23              THE COURT:  Slow down.

24              MR. BENNETT:  It was never contemplated to be a

25      permanent thing.

1          I am going to skip ahead a little bit.

2          On December 17, 2018, Ms. Robinson met with Mr. De

3    Niro, and they had a conversation.  And one of the results of

4    this conversation was that Ms. Robinson wanted to try and

5    explore -- expand upon her career and continue to progress.  So

6    there was a tentative plan that was agreed upon where Ms.

7    Robinson would gradually phase out and transition her duties to

8    new personnel that would come in and take over.  There was a

9    two-year period specifically that was discussed.  That would

10   take you to, roughly, December 2020, if it panned out that way.

11         The next day, December 18, she emailed Mr. De Niro and

12   conveying her hope that he viewed her as more valuable so that

13   her base compensation would go up.  She invokes and uses the

14   word parity, and then she compares herself to three people.

15         One is Dan Harvey.  He was a male Canal employee who

16   served with Mr. De Niro as his trainer for decades, 30 years, I

17   believe, at that point.

18         The other two individuals that she compared herself

19   two were not even Canal employees.

20         One was an external accountant, Mr. Tasch, who works

21   for Burden and doesn't even obviously -- Mr. De Niro is not

22   paying Mr. Tasch directly.  He is paying the firm itself.

23         The second person that she compared helpful of herself

24   to outside of the Canal world was a female employee who was the

25   COO that served as another entity Mr. De Niro has an

1    affiliation with, Jane Rosenthal.

2         She wanted an increase in pay.

3         On January 3, 2019, and it's after a couple of

4    conversations, or at least one conversation that we will get

5    into later, when it comes to the retaliation piece, Mr. De Niro

6    gives Ms. Robinson a raise of $100,000.  This is following the

7    meeting on December 17 and the email on December 18 comparing

8    herself to three individuals.

9         Between late 2019 into late -- between late February

10   2019 and up through the end of March 2019, there is a lot of

11   work going on in the townhouse.  Mr. De Niro's then girlfriend,

12   Tiffany Chen, was communicating with Ms. Robinson.  She was

13   communicating with other Canal personnel as well.  There was a

14   lot going on.  There were -- furniture was being acquired.

15   Things were being rearranged.  It was pretty hectic.

16   Communication was admittedly, I think, amongst everyone a

17   little bit unclear, as happens in many work places throughout

18   the world.

19        As of March 29, 2019, Ms. Robinson testified -- this

20   is at the end.  This is really eight days before she resigned.

21   That's when she identified her perception or developed a

22   perception that Ms. Chen, she felt as though Ms. Chen did not

23   want her to be part of the townhouse, putting aside for the

24   moment that Ms. Robinson also testified that she hadn't been in

25   the townhouse since December, but that's the perception that

1   she testified to as of March 29.

2       On the same day, March 29, Ms. Robinson emailed Mr. De

3   Niro and said, obviously, I'm having some issues with the

4   communications with Ms. Chen.  Specifically, Ms. Robinson said,

5   quote -- excuse me.  This is not about "me throwing in the

6   towel."  I simply want to ensure that "everything runs

7   smoothly."  She wanted to speak to Mr. De Niro.  She wanted

8   clarity with respect to what was going on.

9       On the same day, March 29, Ms. Robinson is exchanging

10  emails with Canal personnel relating to acquiring, picking up,

11  basically, tickets for the upcoming -- the event upcoming

12  Tribeca Film Festival which was scheduled to go from April 24

13  to May 4.  So at least as of March 29, Ms. Robinson is still

14  sticking around for quite a while at that point.  At least

15  that's her perception based on the emails.  I don't think there

16  is any other logical conclusion to take from these

17  communications.

18      The next day, March 30, she is planning an office

19  party with her Canal staff for a "fun office dinner/drinks" and

20  "to try a new restaurant," suggesting that they try to schedule

21  this for the following week, which, as it turns out, was the

22  week that Ms. Robinson resigned.

23      On April 2, three days later, Ms. Robinson emailed

24  Mr. De Niro conveying to him that she loved her job.  However,

25  she wanted to discuss with Mr. De Niro the possibility of

1   transitioning to, effectively, work remotely.  I think at the

2   time Ms. Robinson was hoping to work from London or somewhere

3   else throughout the world, so she wanted to have a discussion

4   with him about that.

5          Two days later, April 4, 2019, Ms. Robinson emailed

6   Mr. De Niro again to say that, in light of certain allegations

7   about missing pots and pans and aircraft cratering, she was

8   confused.  And she suggested that "if you desire to realign my

9   position again, based on current circumstances, we should

10  speak."

11         I emphasize the word again, your Honor, because this

12  was something that came up in the course more than once during

13  Ms. Robinson's two days of testimony.  There were instances

14  throughout her tenure, and it was a lengthy tenure at this

15  point, 11 years roughly, where Ms. Robinson wanted to try and

16  stay on track to really focus on production-related work with

17  Mr. De Niro's films, and sometimes she would veer out and do

18  personal tasks and personal errands for him.

19         During those situations, they would have a realignment

20  discussion.  That's where that comes into play.  Based on her

21  language, I don't think there is any other logical conclusion

22  other than to say she had been through this before and

23  rectified it, so this seems to be just something similar.

24         The same day, an acquaintance of Ms. Robinson's texts

25  her:  "Just quit."  Ms. Robinson responds:  "I will soon.  I

1    just need to set myself up better.  I just can't walk out."

2           Same day, April 4, two days before she resigned,

3    during a recorded phone call that she made with her confidant

4    Ms. Chambers, Robin Chambers, she told Ms. Chambers

5    emphatically, which you can hear with the actual audio files

6    that we have provided to chambers, your Honor, emphatically, I

7    am not going to resign.  Mr. De Niro is going to need to fire

8    me if he wants me gone.

9           April 6, two days later, Ms. Robinson testified she

10   woke up that morning, no plans to resign.  Midday, roughly

11   12:30 in the afternoon, she emails Mr. De Niro about some

12   work-related issues.  Normal day so far.

13          At some point thereafter, she speaks to another Canal

14   personnel by the name of Lulu White.  During the conversation

15   with Ms. White, Ms. Robinson became suspicious.  I don't know

16   exactly why.  Some of the responses that Ms. White provided to

17   her threw up some red flags for Ms. Robinson.

18          Ms. Robinson then decided, based on those red flags, I

19   am going to use my administrator access, and I am going to look

20   at everyone's emails.  So she looked at emails that were sent,

21   obviously not to her, but from Ms. Chen to various Canal

22   personnel, I believe all three of them:  Ms. White, Jillian,

23   and Sabrina at the time, essentially saying -- actually not

24   essentially.  Explicitly saying and conveying to all three of

25   them that Ms. Robinson is no longer going to be associated with

1    the townhouse.  Ms. Robinson then resigns later that evening.

2            Again, I am trying to steer -- keep the focus on what

3    would a reasonable person have concluded or in those

4    circumstances, somebody who went through the same circumstances

5    and had the same historical knowledge of realigning that they

6    have done in the past.  What would they have done?  Would they

7    have come to the conclusion that the work environment is so

8    intolerable and it was deliberately created by the employer,

9    based on a protected class, that they would have felt no other

10   way to function.  They simply have to walk away.

11           THE COURT:  You told me a very nice account, but I'm

12   required to take the evidence in the form most favorable to the

13   other side.  If I took the evidence in the form most favorable

14   to the other side, isn't there a lot of evidence that Ms. Chen,

15   in particular, made life pretty intolerable for Ms. Robinson in

16   that Ms. Robinson could have perceived that she was being

17   stripped of some of her responsibilities?  Those are two

18   separate points.  Let me hear from you on them.

19           MR. BENNETT:  I'll try to take each one, your Honor,

20   and if you have any questions, please stop me.

21           There is no question that the communications between

22   Ms. Chen, Ms. Robinson, and others, actually, Mr. Tasch

23   included, was rough.  It was direct and on occasion it was

24   aggressive.

25           But if you look at the tasks that are mentioned -- if

1    I step back for a moment.  There is almost no it -- as far as I

2    understand it, from December 2018 forward, there is no

3    face-to-face interaction between Ms. Robinson and Ms. Chen.

4    Maybe there is some phone calls, but not much.  I think it was

5    nearly exclusively either by text or by emails.

6          If you look at the words in the emails -- and I'll

7    acknowledge that this is a unique situation.  This is not

8    somebody working for Wal-Mart and sending interdepartmental

9    emails to somebody else.  It is unique.  I fully acknowledge

10   that.  But if you look at the emails, Ms. Chen wanted work to

11   be done.  It wasn't abusive.  It was asking both Mr. Tasch and

12   Ms. Robinson to do things, and they might -- I think neither of

13   them wanted to do particular aspects of the duties that were

14   being asked of them, but there was nothing gendered about it.

15   It had nothing to do with one's gender.  Ms. Chen wanted things

16   to be accomplished.

17         Certainly, as I said, Ms. Robinson was not the only

18   person who found Ms. Chen's communications to be a little

19   rough.  Mr. Tasch also came to that conclusion as well.

20   Indeed, Mr. Kaplan did later also.  And they are both men.

21         I don't think that -- I don't want to lose sight of

22   the fact of the intolerable working environment that must be

23   created in order to meet the standard for a constructive

24   discharge.  It's not just any old environment.  It has to be

25   because of gender, because of the protected class.

1          THE COURT:  Can't one infer that Ms. Chen created a

2     hostile work environment for Ms. Robinson because of her

3     gender?  There is a bunch of stuff from Ms. Chen's emails that

4     suggest that she didn't want another woman close to Mr. De

5     Niro.

6          MR. BENNETT:  I think there are two points there, your

7     Honor, just to clarify.

8          The first is, and I think -- there is a lot of paper

9     before the Court on all of these motions.  But if you really

10    drill down, some of the text messages that were mentioned in

11    the opposition brief are being presented or it's implied that

12    Ms. Robinson had insight into these messages at the time.  From

13    the standpoint of the constructive discharge piece, she didn't

14    see that.  She didn't see private text messages between Mr. De

15    Niro and Ms. Chen, so those words are not relevant for that

16    purpose.  That's number one.

17         Number two, I know there is the argument on the theory

18    that Ms. Robinson is trying to prosecute in this case when it

19    comes to Ms. Chen is that there was some type of jealousy going

20    on.  I think that Ms. Chen explained that quite well in her

21    deposition testimony, and there is also testimony that Ms. Chen

22    focused attention in that manner to a male worker, albeit not

23    one for Canal.

24         THE COURT:  To your first point, though, about it not

25    being disclosed and Ms. Robinson didn't have any access to the

1    emails, obviously, until after the litigation began, how

2    significant is that?  If a hostile environment is created, it's

3    not explicitly gendered and it's experienced in a way that's

4    not explicitly gendered, but it's motivated by a secret

5    gender-based motive.  Does that do it or not do it?

6              MR. BENNETT:  I don't think it does, your Honor.

7              I think, number one, you can't lose sight that it is

8    focusing on the circumstances that the individual who resigned

9    was aware of at the time.  That's what you have to look at

10   before determining whether or not a constructive discharge is

11   there.

12             Number two, again, just focusing on the email

13   communications between Ms. Chen and Ms. Robinson, they are

14   work-related requests.

15             THE COURT:  Doesn't your argument then conflate the

16   reason for a hostile action with the fact that there was an

17   adverse action taken?

18             If somebody fires you because of a protected

19   characteristic and you don't know what they fired you because

20   of that protected characteristic, you don't have the evidence

21   of that at the time you sue.  Maybe you are not going to be

22   able to survive the motion to dismiss, but let's assume you do

23   survive the motion to dismiss and you get the person to say,

24   the employer to say, yes, absolutely, I fired this person

25   because of the protected characteristic, then you, as the

1    plaintiff, win.

2         MR. BENNETTG:  I think that is a critical distinction

3    between a resignation in the form of a constructive discharge

4    and a termination.  I think you are right.  When it comes to

5    it's an involuntary termination, no employer is going to sit

6    down and say I am firing you because you're X, Y, or Z in terms

7    of their protected classes, and you are certainly allowed to

8    look into that in the course of discovery to see if there is

9    support for it.

10        But the constructive discharge focuses on what was the

11   person aware of at the time preceding the decision to resign.

12   That's not something that they can look now with the benefit of

13   discovery, rely on private messages that Ms. Robinson never

14   saw, as far as we know.  She did have a cloned phone.  As far

15   as we know, she didn't see any of those text messages.

16        THE COURT:  Let me hear the rest of your argument.

17   But, unfortunately, I am going to ask you to keep it to about

18   another five minutes or so.  Then I am going to hear from the

19   other side.

20        MR. BENNETT:  I will try to speed along, your Honor.

21   Unless you have further questions about the constructive

22   discharge, I am going to move on to the retaliation claims.

23        The retaliation claims, I think, while in the

24   surreply --

25        THE COURT:  They are tied to one another, right,

1    because if you don't have an adverse action, you don't have the

2    constructive discharge.  Even if you had protected activity,

3    you are not going to have -- you will have to look to some

4    other action for the retaliation.

5          MR. BENNETT:  Exactly.  As the predicate, correct,

6    your Honor.

7          I know there is some disputes raised in plaintiff's

8    surreply with respect to particular items that were included in

9    the defendants' reply, but I think the timeline really does lay

10    it out quite well.  And whether it's late November or in

11    December, when the conversation between Mr. De Niro and Ms.

12    Robinson was held, where she mentioned that she would like an

13    increase in pay and allegedly Mr. De Niro responded, well,

14    whether it's Ms. Rosenthal or Mr. Harvey --

15          THE COURT:  Let me ask you something specific.  The

16    communication to Mr. De Niro on April 2 where she says:  I'm

17    worried that my presence in the house meetings, amongst other

18    things, is not working for Tiffany and therefore you.  I felt

19    this way since September and November.  And then she goes on to

20    say she has been thinking about what happened to Robin with

21    grace.

22          Isn't that sufficient to create protected activity?

23    Basically, what she is saying is, I think Tiffany, just like

24    what happened in the previous situation, is acting against me

25    in a hostile way because of perceived jealousy, because I'm a

1    woman, and seems to me to be protected activity.

2            MR. BENNETT:  Your Honor, I don't think it is.

3            And I think both Ms. Robinson and Ms. Chambers -- most

4    importantly, because Ms. Chambers was the person to whom Ms.

5    Robinson compares herself for purposes of what happened with

6    Mr. De Niro's now exwife -- both Ms. Chambers in her deposition

7    testimony and Ms. Robinson, I believe, in a recorded phone

8    call, I can dig for the cite, both say specifically, Tiffany

9    wants control.  She wants control.  She wants Mr. De Niro's

10   ear.  There is no mention of gender.  This is an after-the-fact

11   creation.  This is something that came up after litigation was

12   filed.

13           THE COURT:  But the email that is sent is before her

14   termination and the email on its face, you tell me why I'm

15   wrong, seems to me a reasonable jury could conclude that that

16   email suggests that she is concerned she is being discriminated

17   against on the basis of gender.  It may be that in point of

18   fact it's not what she believed.  Maybe you have some argument

19   that she was not saying that in good faith.  But on its face an

20   employer who gets this seems like, maybe I should investigate

21   whether you are being treated in a hostile way because of your

22   gender.

23           MR. BENNETT:  I don't think the email is that

24   explicit, that a reasonable person would have equated or

25   understood it or interpreted it in that manner.

1              However, by that point, I believe, in the timeline, a

2      conversation -- according to Ms. Robinson, she had a

3      conversation with attorney Harvey regarding being targeted and

4      what she referred to as downright harassment.  Mr. Harvey spoke

5      to her about it and explored the factual basis for her

6      perception and came to the conclusion, like he did with

7      Mr. Tasch, that Ms. Robinson was annoyed that she was being

8      asked to do things that she didn't want to do or did not

9      believe was within the scope of her responsibilities.  So I

10     think that's really the only reasonable interpretation for that

11     particular email.

12             There are notations, your Honor, as well, on Ms.

13     Robinson's time sheets which, contrary to ultimate assertions

14     that have been made by the plaintiff in the briefs during this

15     summary judgment process, that Ms. Robinson did, according to

16     her time sheets, speak with Mr. De Niro throughout that time

17     period.  So while much ado has been made about, in desperation

18     Ms. Robinson was reaching out to Mr. De Niro in the hopes that

19     the situation would be rectified, according to her own records,

20     they did talk.  So I am not sure where the argument comes from

21     that she was pleading for help with no response.

22             I think when it comes to the various forms of

23     protected activity that they are pointing to, they miss the

24     mark.  They serve as an inadequate basis for the retaliation

25     claims.

1        THE COURT:  The other thing that they spend a lot of

2   time on, and I understand why they do, is the conversation

3   about the girls and the girls not being paid overtime.  Why is

4   that not protected activity?

5        MR. BENNETT:  Your Honor, the standard under the FLSA

6   and the New York Labor Law, which is essentially identical for

7   retaliation scope purposes, is, you need to convey a

8   sufficiently detailed amount of information so that a

9   reasonable employer will understand that that person is

10  invoking the protections of the act.  That's the standard.  I

11  am not going to get into too much of the weeds.  I am sure your

12  Honor doesn't need that anyway.

13       THE COURT:  I have read the cases.

14       MR. BENNETT:  On March 6, 2019, allegedly, Ms.

15  Robinson, on her way out the door, as she described it, from

16  the townhouse, offhandedly mentioned, in response to Mr. De

17  Niro's request about ensuring that there was someone in the

18  townhouse available over the course of the weekend -- I believe

19  there was some painting going on, and they wanted to ensure

20  that somebody could watch over the painters -- she offhandedly

21  mentioned to him, well, if you have someone there, Jillian or

22  Sabrina, you are going to have to pay them overtime, and

23  allegedly he didn't like that response and said something like,

24  well, I pay them enough.  That's what Ms. Robinson's account of

25  it is.  Mr. De Niro has no recollection of this.

1          THE COURT:  The testimony was that Ms. Robinson said

2     you are going to have to pay them overtime and he said, I am

3     not going to pay them overtime.  I pay them enough.

4          MR. BENNETT:  Right.

5          In response, your Honor -- and I understand that's Ms.

6     Robinson's account as of the time that she was deposed in this

7     deposition on two different days.

8          However, those employees were paid overtime throughout

9     their employment.  We have submitted records to show that.

10    Mr. De Niro had zero involvement in the overtime process.  That

11    was exclusively handled by Ms. Robinson and Mr. Tasch.  Really

12    by Ms. Robinson.  Mr. Tasch would simply flip a button and they

13    would get paid.

14         This particular comment or conversation never came up

15    again, not once.  Nobody ever instructed Ms. Robinson not to

16    pay -- not to ensure that Canal personnel were not paid

17    overtime, and we have documents that we submitted in support of

18    the motion showing Ms. Robinson actually said, you need to bill

19    every single day that you work.  I don't care if it's a

20    holiday.  She is pointing out to the staff, you need to track

21    your hours.  I don't see how any reasonable fact finder could

22    draw an inference that there is some animus in response to a

23    reminder about paying overtime, number one.

24         Number two, just to get into this very quickly, I know

25    you want to move on, your Honor, that's her job.  And we have

1   cited case law --

2           THE COURT:  I have got the cases.

3           Let me hear from the plaintiffs.

4           MR. BENNETT:  Thank you, your Honor.

5           MS. HARWIN:  Thank you, your Honor.  I will try to

6   speak more slowly than I did before.

7           Defendants' motion for summary judgment on Ms.

8   Robinson's claims is really an object lesson in what is not to

9   be done on summary judgment.  Defendants consistently ignore,

10  minimize, and spin evidence in their favor, and I think this

11  argument was an example of that, consistently reviewing the

12  evidence in a manner.

13          THE COURT:  Give me your evidence.

14          MS. HARWIN:  I think I'll start with defendants -- let

15  me step back.  In terms of our evidence, on the gender

16  discrimination claims, the evidence amply demonstrates that

17  defendants treated Ms. Robinson less well, at least in part,

18  based on her gender, which is all that the New York City Human

19  Rights Law requires.  Plaintiff has identified numerous

20  examples and mistreatment that are self-evidently gendered,

21  including Mr. De Niro calling her a bitch, a brat, referring --

22          THE COURT:  Tell me where that goes.  Is that relevant

23  to the constructive discharge claim, or do you have a hostile

24  work environment claim?  I didn't see there being briefing on

25  hostile work environment.

1              MS. HARWIN:  Thank you, your Honor.

2              Under the New York City Human Rights Law, all claims

3    are evaluated under a discrimination rubric, so there is not a

4    separate hostile work environment rubric under the New York

5    City Human Rights Law.  The claim under the New York City Human

6    Rights Law is for gender discrimination, that's what we bring,

7    and that standard is simply whether someone was treated less

8    well, at least in part based on gender.

9              The evidence --

10             THE COURT:  With respect to that, you've got evidence

11   of, I think, the word bitch being used five times over the

12   three-year period, another gender-based slang word being used

13   with respect to another employee on one occasion, and then what

14   else do you have taking her evidence favorably?

15             MS. HARWIN:  Sure.  Mr. De Niro repeatedly referred to

16   his female employees as girls.

17             THE COURT:  As to that, so did your client.  Your

18   client probably referred to them as girls more than he did.  So

19   I would think there is just as good a claim against your client

20   as against him on the reference to the girls.

21             MS. HARWIN:  The evidence is that Ms. Robinson did

22   that because that was Mr. De Niro's preferred term.  But

23   ultimately on summary judgment the Court only construes the

24   evidence in a manner favorable to plaintiff and disregards --

25             THE COURT:  Your client admitted that she used the

1    word girls.

2            MS. HARWIN:  She used that word.  It was Mr. De Niro's

3    preferred word and she used it as well.

4            Mr. De Niro joked to Ms. Robinson about his Viagra

5    prescription, told her to get sperm from a colleague, directed

6    her to picture him in a toilet.

7            THE COURT:  On the toilet bit, nothing that violates

8    New York City Human Rights Law in terms of wanting to have a TV

9    in the bathroom, correct?

10           MS. HARWIN:  That is the case, sure.

11           THE COURT:  I take it there is no dispute that this

12   conversation occurred in the context of the TV being placed in

13   the bathroom.

14           MS. HARWIN:  That was the context for the

15   conversation, but Mr. De Niro made a lurid comment --

16           THE COURT:  Maybe we don't have to spend all that much

17   time on this particular one.  I am not really sure how you

18   indicate where the TV should go unless you're saying, if you

19   want to know where the TV goes and it's in the bathroom, which,

20   if it's in the bathroom because I want to watch it while I'm

21   taking care of myself, picture me on the throne.

22           MS. HARWIN:  Ultimately, this is a matter of

23   interpretation of Mr. De Niro's words.  The interpretation the

24   defendants offer is, picture me on the toilet is a neutral

25   direction, but picture me on the toilet is something that,

1  construed in the manner most favorable to Ms. Robinson, is an

2  extremely degrading and humiliating and invasive thing for an

3  employer to say, and that's what she experienced.  That's

4  certainly how she perceived it.

5       Likewise, the repeated -- Mr. De Niro repeatedly

6  urinating while on the phone with Ms. Robinson, directing her

7  to scratch his back and otherwise initiating gratuitous

8  physical conduct, giving his girlfriend free reign to demean

9  Ms. Robinson as a bitch and single white female to all of her

10 colleagues.

11      There are many more examples that we present of gender

12 discriminatory conduct.  Any of these alone, and certainly all

13 of them aggregated, provide ample basis for a jury to conclude

14 that defendants engaged in gender discrimination.

15      THE COURT:  So that's entirely apart from the

16 retaliation claim.

17      MS. HARWIN:  That's correct.  There is a gender

18 discrimination claim and a retaliation claim.

19      Now, constructive discharge is a component of the

20 claims.

21      THE COURT:  Do I need to find that there is a

22 constructive discharge in order for you to win -- to go to the

23 jury on gender discrimination?

24      MS. HARWIN:  No.  The Court doesn't need to decide

25 constructive discharge at all at this juncture.  The Court can

1    simply allow the gender discrimination.

2              THE COURT:  I might in terms of retaliation.

3              MS. HARWIN:  The Court can decide both the gender

4    discrimination and retaliation claims but doesn't need to make

5    any specific determination concerning constructive discharge.

6              THE COURT:  You need to show for retaliation that

7    there was some adverse action taken against her because of

8    protected activity.

9              MS. HARWIN:  For purposes of retaliation, we do need

10   to show adverse actions taken --

11             THE COURT:  One is the constructive discharge.

12             MS. HARWIN:  One is.

13             THE COURT:  What are the others?

14             MS. HARWIN:  What we describe is really a cascade of

15   retaliatory acts.

16             THE COURT:  Don't give me the cascade because actually

17   some of the cascade, if it takes place prior to the protected

18   activity, actually cuts against you.

19             MS. HARWIN:  This is a cascade of retaliatory acts

20   that included constructive discharge, refusing to provide Ms.

21   Robinson with a recommendation, sending her a threatening

22   letter that was riddled with false accusations, conducting a

23   sham investigation to try to manufacture evidence of

24   wrongdoing, bringing --

25             THE COURT:  Let me hear your response with respect to

1    the constructive discharge, because right now all you are doing

2    is telling me what is in your brief, which I have read.

3            MS. HARWIN:  Understood.  I wanted to make sure that

4    it was clear that the retaliation claim is not solely based on

5    the constructive discharge.  There are other acts of

6    retaliation.

7            THE COURT:  But, for example, if I find that there

8    wasn't a constructive discharge, then it may be relevant

9    whether how much time there is between any protected activity

10   and the adverse action.

11           MS. HARWIN:  Yes.  I'm happy to address the temporal

12   proximity issue.

13           THE COURT:  First address whether there is a

14   constructive discharge at all.

15           MS. HARWIN:  Absolutely.

16           Defendants spin the events of April 6, 2019 as

17   essentially a benevolent gesture to remove Ms. Robinson from

18   the townhouse or it's something --

19           THE COURT:  Didn't Ms. Robinson want to be relieved of

20   responsibilities with respect to the townhouse?

21           MS. HARWIN:  Ms. Robinson very much objected to

22   aspects of her work with respect to the townhouse.  But the

23   text messages are very clear that the reason she was removed

24   from these responsibilities was not as a benevolent gesture but

25   to, quote, put in her fucking place, to put her in, quote,

1   serious check.

2          THE COURT:  Now you're reading to me Ms. Chen's emails

3   that you didn't get until discovery.  What is it that she

4   perceives that makes work intolerable for her such that they

5   are telling her she has to go?

6          MS. HARWIN:  There is this extensive objective

7   evidence of an interest on the part of Mr. De Niro and Ms. Chen

8   in ousting Ms. Robinson, but also Ms. Robinson subjectively

9   perceived that she was being targeted.  That's why she was

10  reaching out to Mr. De Niro, to try to address the work

11  situation.

12         THE COURT:  Go to what an objective and what a

13  reasonable person would view as so intolerable that she could

14  no longer work there.

15         MS. HARWIN:  What happened is that there were a series

16  of messages sent that contained extremely broadly, were not

17  limited to the townhouse, that appeared to divest Ms. Robinson

18  of all of her job responsibilities.

19         THE COURT:  These are the ones that she sees that Lulu

20  White is on on April 6?

21         MS. HARWIN:  Not only Lulu White, there were emails to

22  multiple people, including Lulu White, but not only her; also

23  other Canal colleagues, contacts outside of Canal who were all

24  being told essentially the same message, that Ms. Robinson is

25  not to be involved with anything going forward.  You deal only

1    with myself and Bob personally.  You are not to discuss

2    anything with Ms. Robinson that you discuss with us.  And

3    emails between us are not to be shared with chase.

4         Ms. Robinson was Mr. De Niro's head assistant and his

5    point person, and she reasonably understood her job was being

6    taken away where everyone was told that they could not

7    communicate with her and that she wouldn't be involved with

8    anything going forward.  Construing --

9         THE COURT:  What's the best case for the proposition

10   that you -- what you have told me so far is stuff that she

11   discovers but has not experienced.  What is your best case for

12   the notion -- let's assume that an employer decides they are

13   going to terminate somebody's employment and they actually have

14   not told the employee that yet, and the employee's job doesn't

15   change.  Can the employee then sort of preempt things and quit

16   and treat that as a constructive discharge?

17        MS. HARWIN:  A resignation in the face of an

18   inevitable or what appears to be an inevitable --

19        THE COURT:  Let's say it doesn't appear to be

20   inevitable.  Your name is on the RIF list.  You are going to be

21   reduced in force.  Nobody has told you that.  And you go ahead

22   and before it actually happens, you quit.  Is that enough for a

23   constructive discharge?  I am asking because it's a legal

24   question in my mind.

25        MS. HARWIN:  I think that scenario -- I think would

1   depend on the perception of the employee, whether they

2   perceived a termination to be imminent or not.  If there is no

3   change in work conditions and no one -- there is no perceived

4   imminent change in work conditions, no knowledge at all of

5   anything along those lines and the working conditions are not

6   in any way objectionable, I don't think that scenario would --

7          THE COURT:  Then change it a little bit, which is that

8   the employee then decides to snoop around because the employee

9   has access to emails because the employee is the IT

10  administrator and learns that the employee is on the RIF list.

11  Does that now create the circumstances that are sufficient for

12  a constructive discharge?

13         MS. HARWIN:  Absolutely.

14         THE COURT:  What do I look at for that proposition,

15  that it's not something that the employee has -- it's actually

16  been done to the employee yet.  It's just something that is

17  being planned to be done.

18         MS. HARWIN:  I will find authority for you, your

19  Honor, maybe when I'm not speaking, because I want to give you

20  a case.

21         But resignation in the face of a perceived or

22  inevitable termination is really a classic quintessential

23  constructive discharge scenario.  Those are the scenarios where

24  it's most apparent that this is a constructive discharge.  And

25  here she saw very clearly that she was having her job

1    responsibilities wholly divested.  That's what she understood.

2    And it wasn't something that she -- it was an idea that was

3    based on everyone's communications with her in the office.

4    That day the communications --

5            THE COURT:  What you have got is some vague testimony

6    about Lulu White acting strange towards her, which is what

7    prompts her to look at the emails.

8            MS. HARWIN:  The test ultimately is a fact-specific

9    determination about whether someone in her position would have

10   felt compelled to resign.  She did in fact see those emails.

11   That is not a fact that can be ignored here.  She saw emails

12   that in fact --

13           THE COURT:  I understand.  That's the reason why I'm

14   asking the question about the employee who comes across the RIF

15   list.

16           MS. HARWIN:  I will just note that the standard for

17   constructive discharge is unsettled under the New York City

18   Human Rights Law.  Of course Title VII and the New York State

19   Human Rights Law provide a floor for protections for employees,

20   but it isn't defined, what the standard is, under New York City

21   Human Rights Law.  I just want to point that out, that there is

22   no authority establishing that plaintiff has to satisfy the

23   Title VII standard under the New York City Human Rights Law

24   when the court evaluates constructive discharge.

25           THE COURT:  Can you address for me the protected

1   activity.  There are two points that the other side raised.

2   I'm interested particularly in the protected activity that

3   occurs prior to Ms. Robinson's departure from the company.

4          MS. HARWIN:  Sure.

5          What we have is protected activity involving pay

6   claims, involving a male, Dan Harvey, who was being paid more

7   than her.  So there were communications between Ms. Robinson

8   and Mr. De Niro in December 2018, in January 2019 concerning

9   Mr. Harvey's pay, which is protected at this point --

10          THE COURT:  Is that protected activity because -- she

11   was an at-will employee, correct?

12          MS. HARWIN:  That's correct.

13          THE COURT:  Under New York law, she could quit without

14   providing notice or providing a reason.  For the same reason,

15   the employer could fire her without providing any reason; just

16   on a whim.  The only reason we are here saying -- them having

17   to provide a reason is because of there being protected

18   activity.  I would have thought, all the time in the workplace,

19   if I'm asking for a raise, I am going to compare myself to

20   others, and sometimes those people will be male, sometimes they

21   will be females.  Unfortunately, I'm in a position now where I

22   can't ask for a raise.  But it seems to me that that argument

23   is overbroad in terms of protected activity.  If I deem that to

24   be protected activity, I would sweep in all kinds of

25   conversations that happen all the time in the workplace.

1          MS. HARWIN:  Ms. Robinson didn't simply ask for a

2     raise.  She specifically raised concerns about pay parity.

3     That's language -- and did so in relation specifically focusing

4     on a male employee, Dan Harvey.

5          THE COURT:  If she had said, I want to be treated

6     equally with Dan Harvey, that fails.

7          MS. HARWIN:  Not necessarily, your Honor.  I think

8     that's a claim that might be sustained as well.  But I think

9     Ms. Robinson was even more --

10          THE COURT:  How do you say that you want to be treated

11     the same as a male employee without using the word equal or the

12     same or parity?  How do you make that pitch?

13          MS. HARWIN:  Courts have used all -- have upheld all

14     kind of claims with all kind of language.

15          THE COURT:  I understand.  What I'm asking is, how do

16     you make the pitch without it being protected activity?  How do

17     you, as an employee, ever say, I want to be treated the same as

18     somebody who is paid more than me, without that being protected

19     activity?  Is there a way to do that?

20          MS. HARWIN:  I think if you just ask for a raise,

21     without any comparison to a male employee, for instance,

22     without a comparison to anyone, that certainly would be

23     something that I don't think would necessarily be within the

24     ambit.

25          THE COURT:  Is there a way to do it for a male

1    employee to say that they want a pay raise so that they are

2    equal to somebody else who happens to be a woman without it

3    being protected activity?

4              MS. HARWIN:  I certainly would imagine that there

5    would be scenarios like that.

6              THE COURT:  How would you do that under your test for

7    protected activity?

8              MS. HARWIN:  It's a hypothetical I want to give some

9    thought to, but I will say that that's not the sum totality of

10   Ms. Robinson's claim here.  She objects to Mr. De Niro stating

11   that the reason he was paying Mr. Harvey more was, you know,

12   effectively because he was a male bread winner, and she

13   objected.  That has no relevance to what's paid to her and, in

14   conjunction with her request for pay parity, that is sufficient

15   under the Equal Pay Act and the New York Labor Law.  But,

16   ultimately, it's not the last of her complaints.

17             And when evaluating temporal proximity, for instance,

18   courts consider the last in a sequence of protected activity

19   when deciding whether there is close enough temporal proximity,

20   not the earliest in a series of protected activity.

21             THE COURT:  The other one is the conversation about

22   overtime.

23             MS. HARWIN:  Yes.  There is this discussion about

24   overtime in March 2019, so shortly before her constructive

25   discharge and this other sequence of events that gives rise to

1      her retaliation claim.  And with respect to that, the testimony

2      is very clear.  She overtly objected to what Mr. De Niro was

3      planning as being illegal.

4              THE COURT:  What would you have expected her to say

5      under that circumstance?  That it was legal?  There is nothing

6      wrong with Mr. De Niro expressing the sentiment that he doesn't

7      want to pay somebody overtime.  Is there?

8              MS. HARWIN:  What Mr. De Niro expressed is not that I

9      don't want to pay overtime.  It's not, I am not going to pay

10     overtime.

11             THE COURT:  Nothing wrong with that either, is there?

12     At that point in time -- that's not a violation, to say I am

13     not going to pay somebody overtime.  It is a violation to not

14     pay the person overtime.

15             MS. HARWIN:  But an objection --

16             THE COURT:  Frankly, there are all kinds of

17     circumstances why you wouldn't want to pay somebody overtime.

18     Including, you might not want them to work overtime.

19             MS. HARWIN:  Here, what Mr. De Niro was asking was for

20     his employees to come to his house after hours without pay.

21             THE COURT:  Let's say the CEO says to the general

22     counsel, I'm not going to pay these people overtime.  General

23     counsel says, sir, that would be illegal and I'm not going to

24     participate in it.  General counsel is an at-will employee.  At

25     that point, at that moment in time, has the general counsel

1    conferred upon herself the protected status that comes from

2    being engaged in protected activity?

3            MS. HARWIN:  Potentially, your Honor.

4            THE COURT:  Isn't that conduct that general counsels

5    engage in all the time as part of their job responsibilities?

6            MS. HARWIN:  But this wasn't the general counsel and

7    this wasn't the head of HR.  This was Ms. Robinson, working as

8    Mr. De Niro's head assistant, where what he is saying is not a

9    discussion about overall pay practices.  He is saying, give

10   them a key, have them come here.  And then when she says, we

11   are going to have to pay them overtime, he says, I am not going

12   to do that.

13           THE COURT:  It's not a grievance.  She is not saying,

14   there is something going on, sir, that you should be aware of

15   and investigate that's illegal.  She is in her job

16   responsibilities doing what would be expected of her as an

17   employee saying, sir, that is illegal.  I am not going to do

18   it.  No different from the general counsel.  It just so happens

19   that she was asked the question, not Mr. Harvey.  But she was

20   asked it because she was the one who was responsible for the

21   girls, in quotes.

22           MS. HARWIN:  She was asked to do this, and she

23   objected that it is illegal.  Refusal to participate in a

24   wage-and-hour violation is a quintessential --

25           THE COURT:  You make an interesting point because you

1    refer to Title VII, and Title VII has the language about

2    opposing and that is -- there might be, if this was something

3    in terms of discrimination under the opposing language for

4    retaliation under Title VII, there is some force to that

5    argument.  But Congress used different language for Title VII

6    than for FLSA and didn't have that language about opposing, so

7    shouldn't I draw some significance from that?

8         MS. HARWIN:  What we have here ultimately is a refusal

9    by Ms. Robinson to do what she rightly understands would be

10   illegal under wage-and-hour laws.  There just could not be a

11   clearer expression of protected activity under those laws.

12        Drawing inferences in Ms. Robinson's favor, as the

13   Court needs to do, she objected that it was illegal.  She

14   stormed out when he was refusing and said she wouldn't go along

15   with anything illegal, and that he needed to pay them for the

16   hours worked.  He was angry in that conversation, as the

17   testimony supports.

18        Drawling all inferences in Ms. Robinson's favor, this

19   is quintessential protected activity, and the conversation is

20   reflecting Mr. De Niro's animus and upset at Ms. Robinson

21   raising this complaint.

22        THE COURT:  It's a little bit after 1.  If there are a

23   couple of last points that you want to make.  And then for

24   either side, if you want to just tell me cites from the

25   transcript of the record that you want me to jot down, I'll jot

 1    them down.  This has been extremely helpful.

 2              MS. HARWIN:  Your Honor, I would simply note that with

 3    respect to defendants' motion for summary judgment, the courts

 4    have admonished that both gender discrimination claim and a

 5    retaliation claim need to be evaluated as a whole and that the

 6    Court looks at the cumulative impact of a course of conduct.

 7              And what we have here is a cumulative course of

 8    conduct that is really remarkably overt, both on the gender

 9    discrimination piece and on the retaliation piece.  So I would

10    simply just remind the Court that those courses of conduct need

11    to be evaluated holistically with the evidence construed in Ms.

12    Robinson's favor.

13              I would simply note one other thing, which is, going

14    back to our earlier discussion about plaintiff's motion for

15    summary judgment, I would simply ask that the Court -- insofar

16    as there is any doubt that the Court harbors as to any aspects

17    of defendants' claims, I would just remind the Court that

18    defendants allege numerous totally distinct transactions

19    involving transportation, involving meals, involving vacation

20    days, involving Netflix, involving a Los Angeles trip,

21    involving SkyMiles, and partial summary judgment is really an

22    essential tool in order to streamline claims before trial,

23    before a motion *in limine* stage so that all parties are

24    prepared and understand what issues would actually go before a

25    jury.

1         So I would simply request that, to the maximal extent

2    possible, if summary judgment isn't granted as to all of

3    defendants' claims, that summary judgment be granted as to

4    particular claims, including the duplicative ones, but also as

5    to the categories of transactions that defendants have not

6    carried their burden on.

7         MS. HARWIN:  Thank you.

8         THE COURT:  Thank you.  I think you had a couple of

9    cites that you wanted me to jot down.

10        MR. DROGIN:  I am going to pass on the cites.  If I

11   can just have a few moments of the Court's time for some brief

12   rebuttal.  May I?

13        THE COURT:  Three minutes.

14        MR. DROGIN:  Number one, and I'll make very really

15   brief, on gender, the first time the word gender appears in

16   this litigation is in Ms. Robinson's deposition testimony.

17        Your Honor, you pulled out a particular email here

18   comparing a situation to a prior situation with a prior wife.

19   We have no idea what that is.  It has not been answered what

20   they were even talking about.  It's completely speculative to

21   tie that into gender.  That's the gender discrimination claim.

22        On the retaliation claim, your Honor, I ask that you

23   examine the timeline that we created because it shows why the

24   constructive discharge claim must --

25        THE COURT:  I have looked at that timeline.

1          MR. DROGIN:  The last points I will make on pay

2     parity, Judge Parker saw this on day one when she says, what

3     does a personal trainer have --

4          THE COURT:  I have got that point also.

5          MR. BENNETT:  Your Honor, three legal cites.

6          THE COURT:  Yes.

7          MR. BENNETT:  Thank you.

8          The first point, to your question before, is a threat

9     of termination enough.  The answer is no.  The Southern

10    District and the Eastern District are quite clear about that.

11    There are a couple of cases where they collect and discuss

12    other cases.  The first is *Ciullo*.

13         THE COURT:  Just give me the cites.

14         MR. BENNETT:  Sure.  It is 2012 WL 2676080 (E.D.N.Y.

15    2012).  The second is *Dall*, 966 F.Supp.2d, 167 (E.D.N.Y. 2013).

16    The last point, your Honor, the Southern District in 2021 held

17    quite clearly in the case of *Aiken* that the constructive

18    discharge standard under the CHRL is identical to Title VII.

19    That case cite is -- I only have the Lexis, your Honor.  It's

20    18 CV 11756.  Plaintiff's name is Aiken.  The presiding

21    district judge was GBD.  Magistrate judge was DF.

22         Thank you, your Honor.

23         THE COURT:  Any cites from the plaintiff you want

24    me --

25         MS. HARWIN:  On constructive charge, I am happy to

1   refer you to a citation about resignation in the face of

2   termination or inevitable termination.  *Bader v. Special Metals*

3   *Corp.*, 985, F.Supp.2d 291.  It's a 2013 case.

4        THE COURT:  Terrific.  I would ask the parties to stay

5   around and order a copy of the transcript on an expedited

6   basis.  This has been very helpful.

7        Thank you also to the court reporter.

8        (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25