UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

GRAHAM CHASE ROBINSON,

                        Plaintiff,

      -v-

ROBERT DE NIRO and CANAL PRODUCTIONS,
INC.,

                        Defendants.

----------------------------------------------------------------------X

CANAL PRODUCTIONS, INC.,

                        Counterclaim-Plaintiff,

      -v-

GRAHAM CHASE ROBINSON,

                        Counterclaim-Defendant.

----------------------------------------------------------------------X

19-cv-09156 (LJL)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/25/2023

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Graham Chase Robinson ("Plaintiff") initiated this action on October 3, 2019 by

filing a complaint against Canal Productions, Inc. ("Canal") and Robert De Niro ("De Niro")

(collectively, "Defendants") asserting various claims, including claims for gender discrimination

and retaliation under federal and New York City law.  Dkt. No. 1.  In response, Canal asserted

counterclaims against Plaintiff for breach of fiduciary duty, breach of the duty of loyalty, and

conversion.[1]  Dkt. No. 73.

---

[1] Canal also asserted a claim for fraud, Dkt. No. 73 ¶¶ 230–35, but later withdrew that claim,
Dkt. No. 268.

Before the Court are cross-motions for summary judgment.  Plaintiff moves for summary judgment on Canal's counterclaims.  Dkt. No. 281.  Defendants move for summary judgment on Plaintiff's claims for retaliation and discrimination.  Dkt. No. 284.

Plaintiff's motion for summary judgment on Canal's counterclaims is denied and Defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are taken from parties' Rule 56.1 Statements[2] and the materials submitted in connection with the motions.  In each instance, the facts are construed in favor of the non-moving party.

## I.  The Parties and Other Relevant Individuals

De Niro is an actor, director, and producer.  P's 56.1 Statement ¶ 1; D's Counterstatement ¶ 1.  Canal is a company that is owned by De Niro; De Niro is Canal's President and sole shareholder.  P's 56.1 Statement ¶ 2; D's Counterstatement ¶ 2; Ds' 56.1 Statement ¶ 2; P's Counterstatement ¶ 2.  Defendants describe Canal as a "loan out" company that contracts De Niro's services with production companies in connection with his acting, producing, and directing services.  Ds' 56.1 Statement ¶ 2.  Plaintiff, however, notes that Canal provided services for De Niro to support all aspects of his professional and personal life.  P's Counterstatement ¶ 2.

---

[2] The Court refers to (1) Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 306, as "P's 56.1 Statement," (2) Canal's Counterstatement to P's 56.1 Statement, Dkt. No. 343, as "D's Counterstatement," (3) Defendants' Statement of Facts in Support of Defendants' Motion for Summary Judgment, Dkt. No. 326, as "Ds' 56.1 Statement," (4) Plaintiff's Response to Ds' 56.1 Statement, Dkt. No. 341, as "P's Counterstatement," (5) Plaintiff's Statement of Additional Material Fact, Dkt. No. 329, as "P's Add'l Statement," and (6) Defendants' Counterstatement in Response to Plaintiff's Statement of Additional Material Fact, Dkt. No. 357, as "Ds' Counterstatement to P's Add'l Statement."

Plaintiff was employed by Canal for over eleven years from February 4, 2008 to April 6, 2019.  P's 56.1 Statement ¶ 3; D's Counterstatement ¶ 3.  De Niro characterized Plaintiff, at least in part, as his "point person" and "head assistant."  P's 56.1 Statement ¶ 4; D's Counterstatement ¶ 4.  During her employment at Canal, De Niro was Plaintiff's supervisor.  P's 56.1 Statement ¶ 5; D's Counterstatement ¶ 5.  Between April 2011 and 2017, De Niro granted Plaintiff's requests for new titles.  Ds' 56.1 Statement ¶ 21; P's Counterstatement ¶ 21.  For example, in 2018, Plaintiff's title changed from Director of Production to Vice President of Production and Finance.  Ds' 56.1 Statement ¶ 21; P's Counterstatement ¶ 21.  Plaintiff testified that the majority of her job did not change with the title changes.  Dkt. No. 160 at 20–21.

Plaintiff's job responsibilities included running an array of errands for De Niro, his family, and Canal's office.  P's 56.1 Statement ¶ 7; D's Counterstatement ¶ 7.  In connection with her job, Plaintiff was available to De Niro "around the clock" and was in frequent communication with De Niro.  P's 56.1 Statement ¶¶ 8–9; D's Counterstatement ¶¶ 8–9.  Starting in 2017, Plaintiff maintained a home office as her official office.  Dkt. No. 247-1 at 15.

Canal employed various persons other than Plaintiff.  The key current and former Canal employees for purposes of the instant motions are listed below:

- Sabrina Weeks-Brittan served as an executive assistant at Canal from mid-July 2018 until January 2021 when she was promoted to the position of Manager of Production and Development.  Ds' 56.1 Statement ¶ 7; P's Counterstatement ¶ 7.

- Gillian Spear served as an executive assistant at Canal at least from the period between mid-July 2018 to April 2021.  Ds' 56.1 Statement ¶ 8; P's Counterstatement ¶ 8 (claiming that she started in March 2017, not July 2018).

- Lulu White was hired on or about August 23, 2018 as an executive assistant at Canal and, according to her offer letter, reported to Plaintiff.  Ds' 56.1 Statement ¶ 9; P's Counterstatement ¶ 9.

- Michael Kaplan worked as an assistant at Canal between 2006 and April 2020.  Ds' 56.1 Statement ¶ 10; P's Counterstatement ¶ 10.

- Dan Harvey was employed as De Niro's personal trainer beginning in February 1984. Ds' 56.1 Statement ¶ 11; P's Counterstatement ¶ 11.  The parties dispute the exact nature of Dan Harvey's job responsibilities.  Dan Harvey testified that he would help De Niro prepare for movies with regards to "memorizing the scripts thoroughly and making sure that he was prepared physically for whatever character he was playing, whether he had to put on weight, lose weight or just look healthier" and claimed that running "errands" "was never part of [his] job."  Dkt. No. 327-4 at 169–70.  However, Plaintiff claims that Dan Harvey's role was more similar to her own and the other executive assistants, although she admitted that "an hour or two a couple of times a week" he trained De Niro for certain periods of time and worked with production on De Niro's needs when it came to a gym or anything related.  Dkt. No. 339-8 at 211–12, 224–25.  She claims that Dan Harvey, like herself, did what De Niro directed them to do, including picking up coffee or newspapers, or at times organizing meetings for De Niro, although she admitted that she was not sure of the full extent of what De Niro asked Dan Harvey to do.  *Id.*

- Robin Chambers commenced employment for De Niro as an assistant in 1989 and left in 2003, although she worked for De Niro in some capacity between 2003 to 2020.  Ds' 56.1 Statement ¶ 12; P's Counterstatement ¶ 12.  Chambers testified that her employment was terminated in 2003 based on a request from De Niro's then-wife, Grace Hightower, who did not want a female assistant around.  Dkt. No. 339-5 at 22, 335.

- Tom Harvey is a longtime attorney for De Niro and Canal.  Ds' 56.1 Statement ¶ 4; P's Counterstatement ¶ 23.

- Michael Tasch is a partner at a public accounting firm, Berdon LLP ("Berdon"), that does work for De Niro and Canal.  Ds' 56.1 Statement ¶ 6; P's Counterstatement ¶ 6.

During the periods relevant to the present lawsuit, De Niro was in a relationship with Tiffany Chen.  Ds' 56.1 Statement ¶ 5; P's Counterstatement ¶ 5.  Chen has never been formally employed by Canal.  Dkt. No. 327-90 at 33.  She has never received a salary or benefits from Canal and has never held a job title at Canal.  *Id.* at 33–34.  However, in 2019, she started to have regular communications with Canal employees and would direct Canal employees to perform certain tasks for her and De Niro and, in 2022, she began to receive health insurance from Canal.  *Id.* at 34–41; P's Counterstatement ¶ 5; Dkt. No. 335-8 at 38; Dkt. No. 335-20; Dkt. No. 335-50.

## II.     Evidence Relevant to Plaintiff's Claims

### A.     Timeline Leading Up to Plaintiff's Resignation and Immediate Aftermath

In late November or December 2018, Plaintiff informed De Niro that she would be resigning from Canal.  Ds' 56.1 Statement ¶ 33; P's Counterstatement ¶ 33.  De Niro, however, asked Plaintiff to stay as he was moving into a new residence and was in the midst of a divorce.  Ds' 56.1 Statement ¶ 33; P's Counterstatement ¶ 33.  Plaintiff ultimately agreed to stay for up to two additional years and to "make sure that items were handled for [De Niro] and he was comfortable with whatever needed to be transferred over to someone else," Dkt. No. 160 at 107, but exactly what De Niro said that convinced Plaintiff to stay is disputed.  At her deposition, Plaintiff claimed that De Niro told her that "he would give [her] a bad recommendation" if she left, although she later stated that he told her "if you leave me in the lurch I'll give you a bad recommendation."  Dkt. No. 335-12 at 102, 104.  In a recorded audio call between Plaintiff and Chambers, Plaintiff recalled that De Niro had said that "if [she] didn't give him any notice . . . he would give [her] a bad recommendation."  Dkt. No. 322-73.  De Niro, however, denied saying anything of the kind at his deposition.  Dkt. No. 322-91 at 112–13.

On December 18, 2018, Plaintiff emailed De Niro to ask for an increase to her annual base salary, which at that time was $200,000.  Ds' 56.1 Statement ¶ 34; P's Counterstatement ¶ 34.  Specifically, she stated: "I have worked for you for 11 years, and I don't begrudge anyone their salary, but I want parity.  To give you an example, I make less than your trainer who is at $250,000 base salary and expenses that exceed $70k a year."  Ds' 56.1 Statement ¶ 34; P's Counterstatement ¶ 34.  De Niro and Plaintiff discussed Plaintiff's request on January 3, 2019.  Dkt. No. 322-2 at 223; Dkt. No. 336 ¶ 3.  Plaintiff states that De Niro told her that he did not have to pay her as much as Dan Harvey because "Chase, you don't have kids.  Dan has a family to support."  Dkt. No. 336 ¶ 3.  Plaintiff claimed that she responded, "That has no relevance to

what you pay me." *Id.*; *see also* Dkt. No. 335-15.  After the meeting, De Niro increased

Plaintiff's base annual compensation to $300,000 effective January 2019.  Ds' 56.1 Statement

¶ 36; P's Counterstatement ¶ 36.

On or about August 1, 2018, De Niro leased a residential property known by Canal staff

as, and will hereafter be referred to as, the "Townhouse."  Ds' 56.1 Statement ¶ 37; P's

Counterstatement ¶ 37.  In late-September/early October 2018, Plaintiff, Weeks-Brittan, and

White began helping to furnish the Townhouse.  Ds' 56.1 Statement ¶ 41; P's Counterstatement

¶ 41.  The parties dispute whether Plaintiff volunteered to work on the Townhouse or instead

whether Plaintiff was directed to perform such work.  Ds' 56.1 Statement ¶ 41; P's

Counterstatement ¶ 41.  Plaintiff testified that De Niro had redirected her to work on the

Townhouse instead of her other work and it became a majority of her workload.  Dkt.

No. 335-11 at 43.  Plaintiff also testified that she objected on multiple occasions to being

involved with the Townhouse as it "was his domestic life" and did not fall under the title Vice

President of Production and Finance.  Dkt. No. 160 at 43.

Plaintiff testified that in early March 2019, De Niro discussed with Plaintiff having one

of the "girls on call"—seemingly a reference to his on-call assistants—stop by the Townhouse

and check on it while he and Chen were away.  Dkt. No. 336 ¶ 7.  Plaintiff testified that she

"reminded [De Niro] that it was something that he would have to pay extra for in overtime, and

he got very upset and said I am not going to pay them for the work that they do in checking for

his house, that he pays them enough[,] and doesn't want to pay them overtime."  Dkt. No. 335-12

at 87–88.  Plaintiff states that she walked out of the apartment and said that she would not do

anything that was illegal and he had to pay them for the hours that they worked.  *Id.* at 88.

Plaintiff, nevertheless, testified that she believed that De Niro did pay his employees for all of

6

the hours that they worked.  *Id.*  There is no evidence in front of this Court that Canal failed to pay any employee the overtime such employee was owed.

Chen and Plaintiff exchanged emails and text messages relating to various aspects of work on the Townhouse.  Ds' 56.1 Statement ¶ 48; P's Counterstatement ¶ 48.  Chen testified that when she first remembered meeting Plaintiff, she thought "[t]here is something wrong with her, very seriously wrong with her."  Dkt. No. 327-90 at 35–36.  Chen testified that Plaintiff could not look her in the face and that Plaintiff would move furniture and prune their trees without asking permission, and that it all "seemed very jealous and territorial."  *Id.* at 36–49. Chen further testified that she believed that Plaintiff was "jealous of everyone's relationship with Mr. De Niro" and she "spoke ill of everyone.  She hated everyone.  She was nasty to everyone. She was rude to everyone, including his children."  *Id.* at 52.  Chen continued that between the time she met Plaintiff and Plaintiff's eventual resignation, Plaintiff did nothing except make complaints and create trouble.  *Id.* at 60.  For example, Chen testified that Plaintiff refused to give her the security code for the home so "if there was a problem[, Chen] couldn't access the security pad and the security panel."  *Id.* at 63.  Chen also testified that she eventually became aware of Plaintiff overspending and buying a number of items that were not necessary for the Townhouse.  *Id.* at 78.  Due to Plaintiff's conduct, Chen testified that she wanted Plaintiff "out of the townhouse and [to] go back to the office because she was becoming very aggressive and annoying to have in the house."  *Id.* at 57.

In private text messages and emails, Chen called Plaintiff a "bitch" to De Niro in March and early April of 2019, Dkt. Nos. 335-25, 335-27, as well as to Kaplan on April 2, 2019, Dkt. No. 335-28.  Chen described the situation involving Plaintiff as having become "very 'single white female'" to Kaplan.  Dkt. No. 335-29.  There was also some talk around this time between

Chen and De Niro that Plaintiff was in love with De Niro and the two speculated between themselves whether Plaintiff wanted to move in with De Niro.  Dkt. No. 339-1 at 136–37.  Chen wrote to De Niro via text message in January of 2019 about Plaintiff:

> Her possessive manner over the house makes me very uncomfortable, down to having the cable bill and the security system password be [in] her name. It's all very weird and she is not easing up with the weird shit either.  I do feel it's getting worse.  Her sense of entitlement stems from this imaginary intimacy she has with you and I'm seeing it in her texts about the house all over again.  She thinks she's your wife and I'm tired of her rearranging things and throwing my stuff on the floor in chaos whenever she decides she wants to be the "lady of the house" it's very bizarre and it really has to stop.

Dkt. No. 339-17.  On March 28, 2019, Chen told De Niro about Plaintiff, "I'm not gonna be happy until you tell me she is looking for her replacement" and "[i]f you keep [Robinson], you and I will eventually have problems . . . ."  P's 56.1 Statement ¶ 21; D's Counterstatement ¶ 21.

Plaintiff stated that toward the end of her employment in April 2019, she got the "sense" that Chen did not like her and did not want Plaintiff involved in work related to the Townhouse.  Dkt. No. 327-2 at 76–77.  Plaintiff stated that Chen would demean and denigrate her work.  Dkt. No. 160 at 70.  In a text message from April 6, 2019 to someone named Alexandra, Kaplan stated that "Bob[']s new girlfriend made it her singular mission" to get rid of Plaintiff and that Chen "felt [Plaintiff] was in love and a psycho."  Dkt. No. 335-29.

Plaintiff also testified that in 2019 De Niro's behavior toward her got worse.  Dkt. No. 160 at 47.  At one point, there was a mold situation at the Townhouse and, according to Plaintiff, De Niro's behavior "got worse and more abusive during the mold situation."  *Id.* at 46, 48.

Plaintiff testified that she had conversations with De Niro about not being involved in personal items related to the Townhouse and with his kids.  Dkt. No. 160 at 90.  She stated that "[m]y job at Productions kind of had been redirected to all of this gender female role where I was

handling this housework, and vacuuming, and doing all of these things . . . .  It had nothing to do with VP production of finance.  That was incredibly demeaning and frustrating for me to deal with."  Dkt. No. 160 at 100.

Plaintiff also testified that there were "many occasions that [she] spoke to [De Niro] about being harassed, whether it was by him, by his wife" or by others.  *Id.* at 45.  She testified that she spoke to him in 2019 about how he was harassing her about her work on the Townhouse and had been berating her about items that needed to be done for the Townhouse.  *Id.* Throughout March 2019, Robinson complained to Tom Harvey that she was facing "down right harassment" and she feels "constantly. . . harassed."  P's 56.1 Statement ¶¶ 34–35; D's Counterstatement ¶¶ 34–35.  Plaintiff also testified at her deposition that she "recall[ed] an incident in speaking to Tom Harvey and Michael Tasch" where she told them that she "was being targeted base[d] on [her] gender by [Chen], and being blamed for people not getting back to [Chen]."  Dkt. No. 335-12 at 129.

On March 27, 2019, after Chen emailed Plaintiff stating "[i]t's becoming increasingly difficult to understand what you do or don't know," Plaintiff emailed De Niro stating:

> It has been pretty obvious for a while that there is an issue with me working for you.  And I've tried really hard (without bothering you) to get out of the middle and out of your home and get back to my job.  It's not working.
>
> When you can, let's talk.  It's not a heart attack conversation; it's not about throwing in the towel—I just want to make sure that everything runs smoothly.

Dkt. No. 322-22.  Plaintiff followed up again on April 2, 2019 stating:

> I'm worried that my presence in the house amongst other things is not working for Tiffany, and therefor[e] you—and I've felt this way since September/November. It's been very difficult.  Part of me worrying is thinking about what happened to Robin with Grace.  And I don't want it to get to that point.  I want to be able to finish what we agreed upon and fulfill my commitment to you and to the job.
>
> So I came up with this idea and I hope we can discuss it if you think it has merit.  It reminds me of how we dealt with the friction between Grace and me years ago.  It's

out of sight, out of mind.  As you know from our conversation in January, I planned on being based outside of New York after I fulfilled our commitments, but I believe this could be the solution and would work for everyone involved.  What do you think?  Can we discuss.

You know how much I love this job, and even when I was based away from New York I was always there if you needed me.  I want to go back to that arrangement.

Dkt. No. 335-41.  On that same date, Plaintiff wrote to an acquaintance that she was "[a] bit nervous.  I really think [Chen] wants me gone after that email."  Dkt. No. 322-32.  In a text message from that same day, Kaplan wrote to a person named Morgan stating: "assume u wouldn't want to work for bob again post [Plaintiff]," to which Morgan responded, "Hahaha why do you say that.  Is this really her demise?"  Dkt. No. 335-44.  Kaplan then responded:  "i think so.  We have never been closer to this" and then later wrote "she . . . gave chase a lot of shit via email with Bob copied and so I think she's getting it from all angles."  *Id.*

On April 4, 2019, Plaintiff wrote to De Niro again:

I've worked for you for 11 years.  I've bent over backwards and done everything and anything you've asked.  We addressed part of an issue yesterday [April 3, 2019] and I thought we were in a better place through mutual understanding.  You suggested that you, Tiffany and I were going to sit down and discuss the issues today or Friday.  Are we still having that meeting?

Of course I won't go to London if you need me.  You have always come first, but I need to sit down with you and we need to discuss the going forward expectations for me and my position.

Under the circumstances, the current responsibilities of my position are unclear.  Although I thought we had clarified them in January.  As you will recall in January, you increased my salary and we altered the duties of my position effective for the next two years—I turned down another position in reliance upon our understanding.

In the context of recent unfounded and untrue accusations (missing pots and pans & missing aircraft catering)[,] the situation is confusing to say the least.  If you desire to realign my position again based on current circumstances, we should speak.

P's 56.1 Statement ¶ 63; D's Counterstatement ¶ 63.

10

On April 4, 2019, the interior designer who was retained to work on the Townhouse texted Plaintiff with the messages "[j]ust quit[,]" to which Plaintiff responded "I know. I will soon."  The interior designed continued "Ok but I think you will be so much happier," to which Plaintiff quickly replied, "I need to set myself up better."  Ds' 56.1 Statement ¶ 64; P's Counterstatement ¶ 64.

On April 4, 2019, Chen wrote to Spear and Weeks-Brittan about Plaintiff.  She stated:

> [i]t was brought to our attention that during Chase's spending spree here, instead of returning items, she often times would give things away.  Bob asked me to ask you both to please try and make a list of anything you could recall since you were here during that period.  Even if you guys ended up with things, we are happy for you to keep them, we just need to find out what she purchased and gifted without our permission.

Spear and Weeks-Brittan agreed to think about it and share anything they saw.  Dkt. No. 322-35.

At some point, Chen and De Niro made the decision that Plaintiff would not be involved with anything regarding the Townhouse.  Dkt. No. 32-90 at 166.  Accordingly, on April 5, 2019, Chen wrote to White concerning the Townhouse and said: "Make sure you get a list of everything chase had yet to follow up with and/or complete.  Especially a list of things she was supposed to have followed up with Rachel. . . .  Bob wants to see this list and make sure you have everything from Chase.  She is not to be involved with anything going forward.  You deal only with myself and Bob personally now."  Dkt. No. 335-50.

Plaintiff resigned on April 6, 2019.  As of the morning of April 6, 2019, she had not planned to resign from Canal.  P's 56.1 Statement ¶ 67; D's Counterstatement ¶ 67.  During that day, Plaintiff became aware from speaking to Kaplan that Chen was emailing the office.  Dkt. No. 355-12 at 164.  Plaintiff also had a conversation with White that she felt was "sort of a red flag or a distance" and she had "this gut feeling that there was something going on with White." *Id.* at 177.  Prompted by the conversation with White, Plaintiff used the administrator access she

had been given by Canal to review White's emails and noticed an email from Chen to White. P's 56.1 Statement ¶ 69; D's Counterstatement ¶ 69.  In that email dated April 6, 2019, Chen wrote to White, copying Spear, Weeks-Brittan, and De Niro:  "Chase is no longer involved with anything regarding the townhouse or the twins.[3]  You are not to discuss anything with her that you discuss with us.  Any emails between us are not to be shared with Chase."  Dkt. No. 335-92. Chen later wrote to the same individuals:  "I would like to remind you that we all work for Bob and you are not Chase's assistant."  *Id.*

That same day, Plaintiff sent De Niro her resignation via email.  The email was titled "Important" and stated, in relevant part:

> In November, I informed you that I wanted to leave Canal Productions and take another opportunity.  You implored me to stay.  We worked out an agreement in January of what my job would be going forward for the next two years.  I stayed with the best of intentions to help and support you during this very stressful time for you and your family.  Throughout all the years I've worked for you, I've been loyal, protective (to the point of alienating others), honest, and beyond hard working (80-90 hour weeks).  I poured my heart and soul into this job, and as a result, other parts of my life and opportunities were put on hold.  You always came first.

> Since our agreement, my job has changed to something that wasn't what we agreed on and doesn't work for either of us.  I have emailed you several times about discussing it but it's obvious you haven't wanted to address it.  As a result, I'm not able to do preform [sic] my job and succeed in fulfilling the expectations of the agreement we had with each other.  In addition, I have been accused of ridiculous things like withholding information, sabotaging catering on a plane, stealing pots and pans, and not being diligent, professional or helpful.  This email is to inform you that I am resigning effective immediately.  Thank you for the last 11 years, Bob.  I wish you all good things in the future.

P's 56.1 Statement ¶ 69; D's Counterstatement ¶ 69.  Plaintiff's resignation became effective immediately and she provided no notice to De Niro or Canal.  P's 56.1 Statement ¶ 70; D's Counterstatement ¶ 70.

---

[3] The "twins" refers to two of De Niro's children.

De Niro forwarded Plaintiff's resignation to Chen stating "now we just have to work out severance[.]" Chen suggested, in response, that what would otherwise be offered to Robinson as severance instead be used "for the therapy everyone needs because of the ptsd every[one] has suffered as a result of her." P's 56.1 Statement ¶ 72; D's Counterstatement ¶ 72.

The next day, Plaintiff called Tom Harvey concerning her resignation. Dkt. No. 335-42. She described her working situation as having become "untenable" and that "the agreement" she made with De Niro "and the job" they had discussed she would "be doing" "was not honored," and she felt like her "responsibilities were starting to be taken away." *Id.* She continued: "He wasn't speaking to me. He wasn't replying to my emails. He seemed so incredibly angry at me." *Id.*

### B.    Events Post-Resignation

Following the end of Plaintiff's employment, Tom Harvey instructed Canal employees to review Plaintiff's emails, documents, and computers for appointments and other information concerning De Niro's activities and obligations. Dkt. No. 335-6 at 32, 43–44. Tom Harvey testified at his deposition that this review eventually resulted in an investigation into Plaintiff:

> [E]ach of those people, Sabrina Weeks, Michael Kaplan, and Jillian would say to me, ["]Hey, by the way, you should look at this,["] for example, she charged Bob to go to California for Amelia's birthday party. And it just kept coming up with more and more items that looked more and more ridiculous that she had hidden over the years. And at that point, we started to look or conduct as you call it, a, quote, "investigation" over time.

*Id.* at 33. Kaplan, at his deposition, recalled the investigation starting in the same manner. Dkt. No. 340-8 at 288. On April 9, 2019, Chen emailed Tash, copying De Niro, and stated: "Bob wants all of Chase's charges and expenses. Everything she had been spending." Dkt. No. 322-43.

The next day, on April 10, 2019, Plaintiff emailed Tom Harvey informing him:

> I've been thinking that it's best we enter into a severance agreement that includes financial compensation, confidentiality provisions and provisions for recommendations and other mutually agreeable terms. This would assist us all during this transition period since I have not been an employee since April 6, 2019. Please let me know your thoughts.

P's 56.1 Statement ¶ 76; D's Counterstatement ¶ 76. It is not clear whether Tom Harvey responded to this email.

On May 7, 2019, Plaintiff emailed Tom Harvey stating: "I'm in the process of submitting my business school applications and would like to get a few business school recommendations from Bob—this is time sensitive so I don't miss the application deadlines." Dkt. No. 322-45 at ECF p. 4. After some back and forth, Tom Harvey responded on May 16, 2019: "Why don't you put it together and then I will make sure bob gets it." *Id.* at ECF p. 2.

On June 4, 2019, Plaintiff sent an email entitled "London School of Economics" to De Niro, copying Tom Harvey, and attaching a draft letter of the recommendation. P's 56.1 Statement ¶ 79; D's Counterstatement ¶ 79. In the attached proposed letter of reference, Robinson describes her role at Canal as follows:

> So much of what Chase contributed to my company was visible not only in her leadership and how she managed a team, but in her analytical abilities. Chase was able to identify areas of vulnerability and implement new systems not only for financial matters but in the areas of compliance and employee benefits. She also excelled at handling the production work for my films. Chase was instrumental in working closely with my lawyers and agents on deals and contracts. At times she negotiated directly with studios and producers and oversaw the budgets on my projects. In addition, Chase helped advise me on several of my other companies including a non-profit. She has a unique and proactive approach to all she does and has proven that she has the ability to handle an enormous workload requiring a level of dedication and discipline that is hard to find.
>
> Several years ago, Chase took on the problem of benefits and the rising cost of health care for both employees and the company. She not only found a way to balance the two at Canal Productions but also at my other companies. The result was seen in a restructured system and the morale of the employees that work so hard for me.

P's 56.1 Statement ¶ 79; D's Counterstatement ¶ 79.  Plaintiff followed up on her request to De

Niro concerning the letter of recommendation on June 7, 2019.  P's 56.1 Statement ¶ 80; D's

Counterstatement ¶ 80.  On June 9, 2019, Tom Harvey responded by sending Plaintiff a draft

release of claims and stating about the recommendation letter: "I am trying to get Bob to sign but

he is having some reservations.  I will try and rework the letter so he will sign but also wanted

you to think about having Peter Grant or me signing."  Dkt. No. 307-30.

On June 9, 2019, Tom Harvey called Plaintiff to state that De Niro was upset about

Plaintiff transferring Sky Miles from Canal's account to her personal account.  Dkt. No. 247-1 at

201; P's 56.1 Statement ¶ 81; D's Counterstatement ¶ 81.  Harvey testified that in that call he

told Plaintiff that De Niro was not going to sign her letter of recommendation and one of the

reasons was because De Niro claimed Plaintiff "stole from him."  Dkt. No. 322-89 at 429–30.  A

transcript of part of that call reveals that Harvey stated[4]: "I'm just telling you, in his mind,

transferring—he knew you used them, but he didn't know you were transferring them out.  I

mean, there are like 4 million miles, according to him, that were transferred out," to which

Plaintiff responded, "He knew."  Dkt. No. 322-85.

On June 11, 2019, Plaintiff emailed De Niro stating:

I am very sad that this is where we find ourselves after 11 years of working so
closely together.  This is not what I wanted, but at this point, all we can do is move
forward.

I felt forced to resign the way I did—you are very aware of why; there was no
choice.  Within hours of the emails being sent on April 6th, I was made aware of
them—everyone at Canal knew.  It was incredibly unprofessional and the cost to
me was humiliating to say the least.

When I resigned in November of 2018, you refused to let me exit in good standing,
telling me, in front of Robin, that you would give me a bad recommendation if I
left you.  Because of your current personal circumstances and the challenges you

---

[4] Plaintiff began recording her phones calls in March 2019, specifically those related to the
Townhouse.  Dkt. No. 160 at 52.

faced I turned down an opportunity and we made an agreement of how I would exit over a period of two years, transitioning the office and other items to a new system that you and I had agreed on.

Now I've been told by Tom Harvey that you are unwilling to sign the letter of recommendation for the London School of Economics. I've also been given a release to sign by Laurent and Tom Harvey.

Dkt. No. 322-49. Plaintiff then set forth a proposal in exchange for her signing the release. *Id.* The proposal consisted of nearly two years pay at the salary of $300,000 per year, nearly two years of medical coverage, a meeting with De Niro, a mutual release with an indemnity clause, recommendation letters for four business schools and for future employment signed by De Niro, the retainment of all miles in her Delta SkyMiles account, a mutually agreed upon press release, and reimbursement of legal expenses incurred in connection with the release and separation. Dkt. No. 327-49.

The next day, June 12, 2019, Kaplan sent a text message to Spear and Weeks-Brittan, stating that Tom Harvey wanted him to "to spend 24/7 thinking of crazy chase shit and write it down." Dkt. No. 307-32 at ECF p. 4.

On July 2, 2019, Plaintiff sent De Niro and Tom Harvey an email advising them that she would involve a lawyer in order to protect her interests and "will assume that you have no interest in amicably resolving the situation[]" unless she heard back from them by July 12, 2019. P's 56.1 Statement ¶ 41; D's Counterstatement ¶ 41. On that same day, after receiving Plaintiff's email, Chen texted De Niro stating: "Chase emailed. She's threatening legal action if she still does not get a response by the 12th. Tom is getting ready to hit her hard with his letter." Dkt. No. 307-33. De Niro responded: "Can you believe chase. As I said to Tom: who the fuck does she think she is?!?!" *Id.* Chen responded: "She thought she was your wife. I saw it from the beginning. I told you," to which De Niro stated: "The balls. the nerve. the chutzpah. the sense of entitlement, how dare her!" *Id.*

16

Harvey sent Plaintiff a letter on July 11, 2019 that accused her of wrongdoing.  P's 56.1

Statement ¶ 44; D's Counterstatement ¶ 44.  In that letter, Harvey stated:

> A review of Canal Productions Inc.'s ("Canal") various credit card, petty cash, and other accounts, reveals that you were involved in widespread abuses and unauthorized transactions during your employment.
>
> It now appears that for more than four (4) years you have, without authorization, charged to Canal an extraordinary number of personal expenses.  These include food, transportation (such as Uber and taxis), dog-sitting, groceries, cameras, iPhone, subscriptions to magazines and newspapers, Pilates classes, dry-cleaning, flowers for your residence, an unknown number of gift cards, and helped your[self] to petty cash.
>
> In addition, you converted Canal's and Bob's American Express Membership Rewards Points into more than Seven (7) Million Delta SkyMiles over the past two (2) years without permission of authorization. . . .  I strongly suggest you speak to an attorney and return the SkyMiles immediately.

Dkt. No. 307-34.  The letter further alleged that Plaintiff had misrepresented that she had only

taken one vacation day over the past four years, which allowed her to be paid out for more

unused vacation days than she was entitled to, among other alleged offenses.  *Id.*  The letter

continued by urging Plaintiff to "mitigate the damages you have caused and return the various

computers, iPhones, cameras and other property in your possession that belongs to Canal" and

stated that De Niro believed that Plaintiff had breached her fiduciary duty and obligation of

loyalty and improperly enriched herself.  *Id.*  The letter further stated that she should "return the

SkyMiles immediately to avoid legal action."  *Id.*

On or about July 25, 2019, Plaintiff's counsel reached out to Canal's counsel.  P's 56.1

Statement ¶ 45; D's Counterstatement ¶ 45.  On July 31, 2019, Plaintiff, through her counsel,

stated that she had claims against Canal and De Niro for "sex discrimination, sexual

stereotyping, hostile work environment and retaliation arising under NYHRL, NYLL and the

Civil Rights Act of 1964, as amended, as well as claims implicating numerous wage-hour

violations arising under NYLL and the FLSA."  P's 56.1 Statement ¶ 47; D's Counterstatement ¶ 47.

On August 17, 2019, Canal filed a lawsuit against Plaintiff in New York Supreme Court. P's 56.1 Statement ¶ 53; D's Counterstatement ¶ 53.  In the lawsuit, Canal accused Plaintiff of conversion, breach of fiduciary duty, breach of the duty of loyalty, and fraud and sought to recover $6 million from Plaintiff.  P's 56.1 Statement ¶¶ 53–54; D's Counterstatement ¶¶ 53–54. De Niro testified at his deposition that he was the person who decided to file the lawsuit against Plaintiff.  Dkt. No. 335-2 at 424.  He testified "I wanted her to return the stuff.  Do what's right." *Id.*  The lawsuit was eventually withdrawn after Plaintiff filed the instant lawsuit in federal court and Canal reasserted its claims from the lawsuit in New York Supreme Court as counterclaims in this action. *See infra* Procedural History.

Around September of 2019, De Niro met with the Manhattan District Attorney's Office concerning accusations that Plaintiff stole from him.  P's 56.1 Statement ¶¶ 56–57; D's Counterstatement ¶¶ 56–57; Ds' 56.1 Statement ¶ 100; P's Counterstatement ¶ 100.  After reviewing a binder that Canal prepared to document its claims and conducting interviews with De Niro, Tom Harvey, and other Canal employees, the Manhattan District Attorney's Office declined to prosecute Plaintiff.  P's 56.1 Statement ¶ 57; D's Counterstatement ¶ 57.  In her declaration, Plaintiff claims that the investigation at the Manhattan District Attorney's Office was "lengthy and harrowing" for her and she was not notified until April 1, 2021 that the District Attorney's Office had closed its investigation into her.  Dkt. No. 336 ¶ 12.

## C.   Allegedly Discriminatory Conduct at Canal

Plaintiff testified that during the course of her employment with De Niro, there "were times that [De Niro] was incredibly abusive and it was very difficult to work at Canal."  Dkt. No. 307-11 at 28.  She stated that he consistently yelled, screamed, and berated her, but rarely yelled

or berated Kaplan.  *Id.* at 48; Dkt. No. 336 ¶ 2.  Plaintiff also testified that during the last three

years of her employment, De Niro called her a "bitch" on approximately five occasions.  Dkt.

No. 307-12 at 31.  Plaintiff testified that during the same period of time, De Niro called her a brat

"[m]ultiple times," Dkt. No. 303-8 at 31, often referred to his female employees as "girls," Dkt.

No. 327-3 at 32–33, and called a female business partner a "cunt," *id.* at 31–32.  Plaintiff also

testified that De Niro would joke with her about "his Viagra prescription" and stated that the last

time such a joke had been made was in 2018.  *Id.* at 35.

Plaintiff testified that De Niro had told her to imagine him on a toilet once in 2018.  *Id.*

Specifically, she testified that he brought her into the bathroom in the Townhouse to show her

where he wanted to put the television in the bathroom; he asked her to imagine him sitting on the

toilet so she would understand where he wanted the television to be placed.  *Id.* at 35–36.

Plaintiff also testified that one time in 2018, De Niro responded, after hearing that she had lifted

a very large flat screen television up two flights of stairs, "that's what makes a man out of you

Chase."  *Id.* at 36–37.  Plaintiff testified that there was an incident when she and De Niro were

sitting in a drawing room and discussing her career and her desire to focus on it and have "some

personal time," and De Niro stated, "Chase, women can get pregnant whenever they want.  You

just need to get some sperm."  *Id.* at 37.  According to Plaintiff, De Niro then paused and said

"you know, you can get some free sperm from Michael Kaplan."  *Id.*  Plaintiff testified that she

was horrified.  *Id.*

According to Plaintiff, De Niro would urinate during telephone calls with her and "had

absolutely no boundaries."  *Id.* at 39.  Plaintiff claims that she told De Niro to stop doing it but

that he did not.  *Id.*  Plaintiff also testified that De Niro directed her to scratch his back more than

a dozen times, with the last such request made in 2017 or 2018.  *Id.* at 40–41.  Plaintiff stated

that while she did not ever tell him that she did not like it or did not want to do it, her "face and how awkward it was could be seen," and she at one point suggested that he use a back scratcher that he had been gifted but "he preferred" that she "scratch his back." *Id.* at 41.  Plaintiff also testified that De Niro would ask her to button his shirts "dozens of times when he was getting ready for an event or press," "fix his collars," "tie his ties," "things like that," and would direct her to come into the bathroom in his office, close the door, and "ask [her] to do these things." *Id.* According to Plaintiff, De Niro also asked her to go into his bedroom and wake him up on occasion. *Id.* at 42.

Plaintiff testified that despite being named Vice President of Production and Finance, her role and job were redirected in late 2018. *Id.* at 86–87.  She stated that her job "had been redirected to all of this gender female role where I was handling this housework, and vacuuming, and doing all of these things, and organizing closets, and washing bed sheets and making his bed." *Id.* at 99.  She testified that it was "incredibly demeaning and frustrating" for her. *Id.*  She also testified that this was consistent with how other female executive assistants were treated. *Id.* at 82.  Specifically, she stated that "female executive assistants handled [work] more centered on typically female-gendered roles.  Helping [De Niro] with kid's schedules," picking out Christmas presents, creating photo albums for his anniversary, etc. *Id.* at 85–86; *see also id.* at 40.

De Niro disputes much of Plaintiff's testimony.  He stated that he never joked about his Viagra prescription, disputed telling Plaintiff that she could use Kaplan's sperm to get pregnant, and stated that he never called Plaintiff a "bitch" or his business partner a "cunt."  Dkt. No. 322-91 at 59, 131, 134–35.  De Niro did not remember if he stated that manual labor would make a man out of Plaintiff, but stated "if I did, what's wrong with saying that?" *Id.* at 135.  De Niro stated that he "might have" called Plaintiff a brat and that if he urinated while on the phone

with Plaintiff, it was unintentional.  *Id.* at 131, 148.  De Niro further stated that he never would

have asked Plaintiff to come into his bedroom to wake him up, button his shirts, fix his collars,

or tie his tie.  *Id.* at 152.

## III.   Evidence Relevant to Canal's Allegations

Canal's claims largely revolve around various actions Plaintiff took during her

employment at Canal.  Specifically, they concern: (i) Plaintiff's alleged improper use of Canal's

credit card for transportation and food charges; (ii) payments to Plaintiff for unused vacation

days that Canal claims Plaintiff was not entitled to; and (iii) a trip to Los Angeles that Plaintiff

took in March 2018, which Canal claims resulted in various improper charges to Canal.[5]  Canal's

claims also involve Plaintiff's alleged improper transfer and retention after she resigned of

approximately five million Delta SkyMiles that were generated by Canal's credit cards.  The key

underlying evidence relevant to each allegation is below.

### A.   Background Concerning Canal's Policies and Practices Concerning Employee Spending

According to De Niro, Plaintiff had "wide berth and flexibility" in her job at Canal.  Dkt.

No. 242 ¶ 6.  De Niro noted that Plaintiff was expected to apply "principles of common sense,

honesty, integrity, and diligence with Canal's best interests being first and foremost.  My job was

not to police her, or to suspect or operate with the assumption that she was cheating, stealing or

deceiving Canal."  *Id.* ¶ 4.  He declared that "[t]hese principles also applied to office policies

which she determined.  Such policies were expected to confirm to reasonable and sound business

---

[5] In their papers, the parties also brief the issue of whether Plaintiff improperly binge watched Netflix while working.  Dkt. No. 305 at 32; Dkt. No. 337 at 16.  However, at oral argument, Canal stated that it was not claiming that Plaintiff's viewing of Netflix constituted an independent breach of fiduciary duty, breach of loyalty, or act of conversion entitling Canal to damages but rather constituted evidence of her breach of duty.  Accordingly, the Court does not address whether this constitutes a claim of breach of duty for appropriation of time and defers consideration of the admissibility of the evidence until trial.

practices and would not operate or be applied in a manner that somehow gave Robinson unique and special privileges and that benefitted only her." *Id.* ¶ 8.

Canal had two American Express ("Amex") cards. One was in Plaintiff's name and was to be used only for business expenses and the other was in Kaplan's name and was to be used primarily for personal expenses for De Niro. P's 56.1 Statement ¶ 88; D's Counterstatement ¶ 88; Dkt. No. 322-88 at 67–69.

At all relevant times, Canal did not have a written policy concerning the use of Canal's credit cards. P's 56.1 Statement ¶ 91; D's Counterstatement ¶ 91 (controverting that Plaintiff's cited testimony supports this proposition but not contesting the factual proposition). De Niro described himself as "generous" with Plaintiff with regard to paying for expenses. P's 56.1 Statement ¶ 93; D's Counterstatement ¶ 93. He noted that he relied on Plaintiff's "judgment" about what to charge and stated that he did not go "into detail with" Plaintiff about what could or could not be charged, but did say to her "use your best judgment" and "let's not waste—let's not overindulge and, you know, use common sense." Dkt. No. 322-92 at 276–79.

Canal employed accountants from Berdon to provide an array of services for Canal. One of those services was paying bills for Canal, including Amex bills. Dkt. No. 285-4 at 60, 63. Tasch from Berdon testified that Berdon would look at Canal's credit card statements before paying the credit card bills. Dkt. No. 344-14 at 107. He testified that they looked at the bills to make sure they were correct on their face, that the "totals [were] correct," that there "[we]ren't duplicate charges," and "[t]hings like that." *Id.* at 111–12. He stated that if there was a suspicious charge on the credit card statements, they would talk to Plaintiff about it. *Id.* at 114. He also stated that they never received the underlying receipts for the charges on the credit cards and would generally not review expenses on the credit card statements with De Niro. *Id.* at 115.

### B.      Credit Card Charges for Transportation and Food

The Amex card in Plaintiff's name shows ninety charges to a restaurant on the Upper East Side of Manhattan named Paola's between May 2017 and April 2019, amounting to $12,696.65 for the two-year period. Dkt. No. 337 at 22; Dkt. No. 344-37. Weeks-Brittan testified that Paola's is a restaurant where Plaintiff ate dinner "often." Dkt. No. 344-12 at 226. Likewise, $8,923.20 was charged to grocery stores, Dean & DeLuca and Whole Foods, on the same Amex card. Dkt. No. 337 at 22; Dkt. No. 344-37. During the same period, Plaintiff also charged $31,814.17 in Ubers/taxis and $5,513.05 for car services on the Amex card in her name. Dkt. No. 337 at 22; Dkt. No. 344-37. Defendants contend that while not "every charge was improper," these charges were excessive "both in frequency and amount" and "reflect systemic abuse by an employee, who exploited and exceeded the bounds of her authority." Dkt. No. 337 at 22–23.

Harvey and Tasch testified that it was Canal's policy that if an employee needed to take a taxi, Uber, or Lyft for a work-related reason, Canal would pay for that taxi, Uber, or Lyft. Dkt. No. 344-14 at 341; Dkt. No. 344-16 at 225. De Niro also testified that Canal would pay for employees to take taxis, Ubers, or Lyfts "if it was at night or some time which is not normal work hours." Dkt. No. 344-2 at 276.

As to Canal's policy for paying for employee meals, Tasch, Canal's 30(b)(6) witness, stated that "as far as [he knew,] the policy" was "if they were working and especially at night or on call for Mr. De Niro that their meals would be taken care of." Dkt. No. 307-4 at 340. Similarly, De Niro testified at his deposition that "if you're working, you could charge for dinner, of course." Dkt. No. 307-2 at 279. Kaplan testified that "if you were working through lunch, you could charge it. Dinner was supposed to be if you were working late at the office or working late at a thing. It really wasn't working from home on something." Dkt. No. 322-88 at

109.  Weeks-Brittan testified that she was "told that Canal paid for lunch in the office and that we should order from one place" and that she only remembered dinners being paid for "once or twice around Christmas when it was really busy."  Dkt. No. 322-86 at 128.

When Canal assistants were working in the office, they ordered their lunches on an application named Caviar.  Dkt. No. 344-8 at 67.  Weeks-Brittan testified that "[w]e were logged into a Caviar account on our work computers. . . .  And we could order lunch, like, from one place to the office on Caviar, which we did."  Dkt. No. 344-12 at 127.  Weeks-Brittan also testified that "[w]e got group lunch in the office.  If [Plaintiff] wasn't there, she would get her own lunch either on—often on Caviar.  When I was with her at the apartment, she ordered on Caviar."  *Id.* at 146, 225–26.  Weeks-Brittan testified that Canal staff generally did not buy De Niro's groceries as he had "home staff."  *Id.* at 222.

The expenses at issue were classified and logged by Canal's accountants as business expenses in Canal's general ledger.  P's 56.1 Statement ¶ 102; D's Counterstatement ¶ 102. Since Plaintiff's employment at Canal ended, Canal has not amended its tax returns to disclaim these tax deductions.  P's 56.1 Statement ¶ 104; D's Counterstatement ¶ 104.

### C.    Payments for Unused Vacation Days

#### 1.    Canal's Policy/Approach to Payment for Unused Vacation Days

Canal had a policy of paying certain employees for unused vacation days, P's 56.1 Statement ¶ 153; D's Counterstatement ¶ 153, which Kaplan claims that Plaintiff instituted, Dkt. No. 327-88 at 185.  While Plaintiff was employed by Canal, Robinson was one of the two employees who Canal paid for unused vacation days under this policy.  P's 56.1 Statement ¶ 154; D's Counterstatement ¶ 154.  There is no evidence that Canal had a written policy concerning the circumstances under which employees were entitled to be paid for unused vacation days and holidays.  P's 56.1 Statement ¶ 155; D's Counterstatement ¶ 155.  Harvey also

testified that he was not aware of De Niro ever orally spelling out the circumstances in which

Canal employees would be paid back for unused vacation days or holidays.  Dkt. No. 307-6 at

255.  The idea for the policy, according to Kaplan, was that they were "working all the time and

missed out on vacation."  Dkt. No. 327-88 at 188.

     De Niro's testimony on exactly what his expectations were concerning unused vacation

days is the following.  At his deposition, De Niro testified that he would pay Plaintiff for days

she worked regardless of where she performed the work.  Dkt. No. 307-3 at 501.  Accordingly,

he stated that if Plaintiff performed work for him in London, Spain, or Los Angeles, she would

be paid just as much as if she had been working in New York.  *Id.*  De Niro also testified, in

response to the question of whether if Plaintiff ended up working on a day that she was supposed

to be on vacation, it would be treated it as a working day or a vacation day:

> I would—if she said it was a vacation day and she is working, I would say "Okay.
> Then you know what you do.  You charge me for the time that you're working."
>
> She—what I always noticed is that she was always working, always working, doing
> this, doing that, always kind of intimating to everybody how hard she worked.
>
> I said okay.  She was charging me.  I paid her well.  Probably more than I should
> have, but I said okay.
>
> So what can I say?  If she tells me she is working or she claims she is working, ["]I
> top of it [sic], so I'm owed a vacation day."
>
> She, to me, as I learned as time went on, finagled a little bit, schemed a little.  Okay.
> You know, even that I will allow.
>
> But there is a point where you just are doing too much.  You're overreaching too
> much, taking advantage too much.  And you get tired of it.  That's all.  So that's
> why I was relieved when she, she resigned.

*Id.* at 508.  De Niro testified further: "I left it up to her totally.  She decided her work hours.  She

decided everything.  And I trusted her.  Do you understand?"  *Id.*

De Niro also testified that it was common, "if need be," for him and Plaintiff to speak on holidays.  Dkt. No. 307-1 at 94–95.  De Niro testified that Plaintiff would keep him apprised if she left New York but that he wanted "to accommodate her" by letting her work remotely and "make her happy" and so "with the internet and technology these days, [he] said okay."  *Id.* at 95–96.  De Niro also testified that when Plaintiff was away from New York, she was still available to work for him.  *Id.* at 96.  Plaintiff similarly testified that De Niro and she had an agreement that she would work for him while she was away.  Dkt. No. 307-12 at 83.  She stated that "[t]here were very, very, few vacation days or days off that [she] took while [she] worked Canal" and she was "expected to be on call 24/7."  *Id.*

In a supplemental declaration submitted in opposition to Plaintiff's motion for summary judgment, De Niro states that:

> Principles of trust and integrity [] applied to my expectations regarding paid vacation days. Ms. Robinson managed Canal's office and was charged with administering its vacation policies. I trusted Ms. Robinson to set and administer such policies in an honest and ethical manner. Important to me was that Canal operated smoothly and efficiently as my schedule is complicated, fast-moving and can change abruptly. If an employee was literally unable to take allotted vacation time, it would be my expectation that they should be paid for the unused day(s).

Dkt. No. 351 ¶ 23.  He continues that "applying honesty, integrity, logic and common sense, I would expect that if Ms. Robinson was able to travel to take a vacation four weeks per year, incidental work while she was away would not negate the fact that she was on vacation."  *Id*.  He states that during vacations, Robinson also was not required "to perform tasks that were either unnecessary or which could be performed upon her return" and "she had full discretion to assign more important tasks or those that required immediate attention to other Canal employees that were in Canal's office was [sic] she was vacationing."  *Id*.  He also notes that Plaintiff was aware of his vacation schedule and was instructed to align her vacation with his own as work would

26

"ease while" he was on vacation, and thus it was "even less likely that she would be required to work while on vacation." *Id.* ¶ 24.

## 2.    Plaintiff's Payment for Unused Vacation Days

At the end of each year, Plaintiff would have a discussion with De Niro about the reimbursement that she would receive for unused vacation days.  P's 56.1 Statement ¶ 166; D's Counterstatement ¶ 166.  De Niro testified that he would generally take her at her word for how many days she worked while on vacation.  Dkt. No. 327-94 at 514–17.  Following these discussions, Plaintiff sent emails to De Niro and Canal's accountant setting forth the amounts to be paid for her unused vacation days.  P's 56.1 Statement ¶ 167; D's Counterstatement ¶ 167.  De Niro authorized the payments to Plaintiff for all of the unused vacation days that she identified in the emails that she sent to De Niro and Canal's accountant.  P's 56.1 Statement ¶ 168; D's Counterstatement ¶ 168.

While she was employed by Canal, Plaintiff traveled frequently and logged vacations on her timesheets.  *See* Dkt. No. 344-12 at 86 (Weeks-Brittan testifying that Plaintiff "would turn down vacation day requests for me and Gillian, and went to Spain, and London during her time. I viewed those as vacations."); Dkt. Nos. 308-1–308-3.  However, in 2014, Plaintiff claimed that she took three of her nineteen vacation days; in 2015, Plaintiff claimed that she took one of her nineteen vacation days; in 2016, Plaintiff claimed that she took zero of her nineteen vacation days; in 2017, Plaintiff claimed that she took zero of her twenty vacation days; and in 2018, Plaintiff claimed that she took zero of her twenty-three vacation days.  Dkt. No. 322-57 at ECF pp. 2, 5, 6–9.

Canal claims that Plaintiff's representations that she took none of her vacation days for these years was improper as "she equated *any* work performed on vacation as negating it as a vacation day."  Dkt. No. 337 at 13 (emphasis in original).  Canal also argues that Plaintiff would

work without being asked or expected to do anything and Canal disputes that Plaintiff accurately reported her working time. *Id.*

### D. Los Angeles Trip

Plaintiff booked a round trip ticket from New York to Los Angeles using 327,500 of Canal's SkyMiles, which was scheduled to leave on Friday, March 9, 2018, and to return via a red eye leaving the night of Monday, March 12, 2018, and arriving the morning of Tuesday, March 13, 2018. Dkt. No. 344-26 at ECF pp. 1–5, 7–9, 11–12. On Sunday, March 11, 2018, the trip was rescheduled so that Plaintiff would return via a red eye flight arriving in New York on the morning of Monday, March 12, 2018. *Id.*; Dkt. No. 344-6 at 242.

During the trip, Plaintiff rented a BMW for two days for a total cost of $729.28, Dkt. No. 344-29 at ECF p. 7, charged $2,608.86 at the Montage Hotel in Beverly Hills, and charged a $604.91 meal and an approximately $156 meal at Nobu Los Angeles on March 9, 2018. Dkt. No. 344-31 at ECF pp. 17–18; Dkt. No. 344-6 at 242. During her deposition, Plaintiff stated that the dinner at Nobu was a dinner with Amelia Brain, a former Canal employee, and one or two friends. Dkt. No. 344-6 at 75–76, 242. Kaplan testified that it was Brain's birthday the week of Plaintiff's trip. Dkt. No. 327-88 at 340.

The parties have differing accounts of the purpose of this trip. According to Plaintiff, De Niro directed her to travel to Los Angeles in March 2018 because he was encouraging his former partner to undergo medical treatment there, and he wanted Plaintiff to scout potential hotels to accommodate her. Dkt. No. 304 ¶ 4. Plaintiff states that prior to the trip, she asked De Niro's travel agent to place the JW Marriott on hold to have as one potential hotel option for De Niro's former partner, and that she did so as a precaution to ensure that the room would be available for De Niro's former partner starting in early April 2018, less than a month after the trip. Dkt. No. 363 ¶ 4. She claims that after De Niro directed her to take the trip to Los Angeles, he suggested

that, as an additional task during the trip, Plaintiff could accept a delivery of books related to De Niro's movie "Taxi Driver" that De Niro was having sent to Los Angeles. Dkt. No. 344-6 at 242. However, Plaintiff claims that after arriving in Los Angeles, she learned that a snowstorm was expected to hit New York on March 12, 2018. *Id.* She states that she then spoke to De Niro on Sunday, March 11, 2018, and he authorized her to return to New York that day so that she would not get stranded in Los Angeles, even if it meant that she would not be able to scout the JW Marriott and accept delivery of the so-called "Taxi Driver" books. *Id.*

Kaplan testified that "scout[ing] hotels is not something we ever did" and he recalled that Plaintiff was "going out there to bring the Taxi driver books." Dkt. No. 327-88 at 340–41. Kaplan also testified that De Niro's former partner had stayed in Los Angeles "plenty of times" and regularly stayed at the JW Marriott in Santa Monica. *Id.* at 484–85.

There are some discrepancies between De Niro's declaration and his deposition testimony concerning the purpose of the trip. In his declaration, De Niro asserts the following. In or about February 2018, Canal purchased several limited-edition photographic books titled "Taxi Driver" that were going to be autographed by himself and others involved with the film. Dkt. No. 351 ¶ 12. The books were to be donated to charity or given as gifts. *Id.* By the end of February 2018, the Taxi Driver books had been signed by actors in New York City and signatures were required from some individuals in California, although there was no rush or deadline by which the signatures had to be obtained. *Id.* ¶ 14. Originally, the plan was for Brain, a former Canal employee in California, to take delivery of the books and gather autographs, but Plaintiff offered to accept delivery of the books when they arrived, as she would be in California at that time. *Id.* ¶ 15. De Niro states that at no time in 2018 did he ever ask or direct Plaintiff to travel to California to "scout" hotels for his former partner and it was known by him and others

at Canal that accommodations were made at the JW Marriott in Santa Monica.  *Id.* ¶ 16.  He also states that he did not authorize Plaintiff, for purposes of the Los Angeles trip, to stay at the Montage in Beverly Hills, rent a car, or dine at Nobu—all at Canal's expense.  *Id.* ¶ 17.

In his testimony, however, De Niro stated that he was not sure whether he reached out to Plaintiff in March 2018 to identify a hotel that would accommodate his former partner, but stated at his deposition that he had "some thoughts about it."  Dkt. No. 344-2 at 352.  He stated that the hotel for his former partner was already booked before Plaintiff went on the trip and recalled that the purpose of the trip was "for the Taxi Driver books."  *Id.*  He then stated that Plaintiff "would have suggested" she could go out to Los Angeles to pick up "the Taxi Driver books."  *Id.* at 352–55.  De Niro did not remember whether he approved Plaintiff coming back early from the trip due to a snowstorm.  *Id.* at 356–57.  De Niro, who is a part owner of Nobu, also stated that if a Canal employee went to Nobu, it was not a "hard and fast rule across the board" that he would "pay for it"; it was "something that was asked" and he would say it was okay.  Dkt. No. 344-3 at 488.  He also testified that he rarely authorized Plaintiff to take employees out for meals at Nobu, although he "might have" authorized Plaintiff to take Brain out for dinner at some point in time (although he did not specify when that would have been).  *Id.* at 489.

### E.   Transfer of Delta SkyMiles

Canal's Amex credit cards generated Delta SkyMiles that could be used for travel.  P's 56.1 Statement ¶ 214; D's Counterstatement ¶ 214.  Canal would at times pay for certain of Plaintiff's air travel using SkyMiles generated by its credit cards.  P's 56.1 Statement ¶ 218; D's Counterstatement ¶ 218; Dkt. No. 303-2 at 357–58 (De Niro's deposition).  Plaintiff was also able, on or after January 10, 2019, to transfer SkyMiles from Canal's Amex credit cards to her personal account.  P's 56.1 Statement ¶¶ 233–34; D's Counterstatement ¶¶ 233–34.  De Niro testified that he had flown on Delta only a "few times."  P's 56.1 Statement ¶ 218; D's

Counterstatement ¶ 218 (not disputing this statement, although claiming that this fact is "immaterial").[6]  De Niro preferred to travel on private, rather than commercial, flights.  When flying commercial, De Niro preferred to travel in first class, but Delta flights do not offer first class travel.  P's 56.1 Statement ¶ 218; D's Counterstatement ¶ 218 (not disputing this statement, although claiming that this fact is "immaterial").

De Niro testified that he never communicated any hard and fast limits on Plaintiff's use of SkyMiles, although Plaintiff had to keep him informed of what she was doing.  Dkt. No. 303-2 at 380–81.  He stated:

> I never, I never communicated that because I trusted her.  So, but she had to tell me if she was intending to go say to Australia, are you going for business for me or are you going to look for a hotel.  If that was the case, if I was doing a movie there, which I wasn't, or are you going there for own [sic] private thing.

> Then you say well, can I use the air miles.  How many air miles is that and what does it cost me because I want my kids to be able to use them.  Well, it would be this.  Well, that's dipping into my kids' things.  So I you [sic] better just—well, I think you can take part and that's it.

> No, we would and could negotiate like that.  So I trusted her, though, but she knew she had to tell me where she's going, what's she is doing.

*Id.* at 384.  De Niro also testified that Plaintiff could book her travel using Canal's SkyMiles "if it related to the business for me, for what I'm doing for Canal."  Dkt. No. 322-92 at 384.

In the ten weeks prior to Plaintiff's resignation, Plaintiff transferred 4,995,000 SkyMiles to her own personal account from Canal's.  Dkt. No. 344-25 at 9–16.  Plaintiff did not return those SkyMiles after she resigned.  Dkt. No. 351 ¶¶ 19–25.  De Niro states in a declaration that he never discussed such a transfer with Plaintiff.  Nor did Plaintiff ask for permission to move approximately five million of Canal's SkyMiles to her personal account in 2019.  *Id.* ¶ 20.  He

---

[6] Where the opposing party does not specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted."  Local Rule 56.1(c).

also states that neither he nor Robinson had a conversation about whether she could retain any SkyMiles that remained in her account should she resign her employment.  *Id.* ¶ 19.

## PROCEDURAL HISTORY

On August 17, 2019, Canal filed a complaint against Plaintiff in the Supreme Court of the State of New York, County of New York ("State Court Action"), asserting claims for breach of fiduciary duty, breach of the duty of loyalty, conversion, and fraud.  Dkt. No. 322-96.  On October 3, 2019, before answering the complaint in the State Court Action, Plaintiff filed a complaint in this Court against Defendants ("Complaint"), asserting the following claims: (1) gender discrimination in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107; (2) retaliation in violation of NYCHRL, N.Y.C. Admin. Code § 8-107; (3) violation of the Equal Pay Act, 29 U.S.C. § 206(d); (4) violation of the New York Equal Pay Law, N.Y. Labor Law § 194; (5) unlawful failure to pay overtime compensation in violation of New York Labor Law ("NYLL"); (6) retaliation in violation of NYLL; and (7) retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215.  Dkt. No. 1 ¶¶ 50–105; *see also* Dkt. No. 72 at 2.  On January 21, 2020, Defendants filed an answer to the Complaint.  Dkt. No. 12.

Plaintiff then filed a motion to dismiss or, alternatively to stay, the State Court Action on the basis that there was substantial overlap between the claims in the two lawsuits and the claims were more appropriately tried in the federal case.  Dkt. No. 72 at 2.  On December 2, 2020, the motion for a stay was granted and, in April of 2021, Defendants moved to amend the answer in the present lawsuit so as to assert counterclaims identical to the claims asserted in the State Court Action.  Dkt. Nos. 43, 45, 58; Dkt. No. 72 at 2–3.  Magistrate Judge Katharine Parker, to whom this case was referred for general pretrial work, granted the motion.  Dkt. No. 72.

Defendants filed their amended answer and counterclaims on July 28, 2021.  Dkt. No. 73.

In that amended answer, Canal included the same claims it had asserted against Plaintiff in the

State Court Action as counterclaims, specifically claims for breach of fiduciary duty, breach of

the duty of loyalty, conversion, and fraud.  Dkt. No. 73.  Plaintiff filed her answer to the

counterclaims on August 18, 2021.  Dkt. No. 77.

On April 1, 2022, Defendants filed a motion for sanctions requesting that the Court

dismiss, with prejudice, Plaintiff's equal pay claims under federal and state law and Plaintiff's

claim seeking overtime compensation under NYLL on the basis that they were frivolous and

should never have been filed.  Dkt. Nos. 195, 196.  On July 13, 2022, Magistrate Judge Parker

issued a report and recommendation, recommending that this Court deny the motion.  Dkt.

No. 240.  As to Plaintiff's equal pay claim, Magistrate Judge Parker found that the claim

"passe[d] the red face test" although she noted "[i]t may ultimately be a long shot to survive

summary judgment."  *Id.* at 7.  As to Plaintiff's overtime claim, Magistrate Judge Parker stated

that "while it is clear Defendants have strong arguments on the merits to defend against

Plaintiff's overtime claim, the claim is not so frivolous that Plaintiff should be sanctioned for

raising it or not withdrawing it up to now."  *Id.* at 13.  This Court adopted Magistrate Judge

Parker's report and recommendation in its entirety and denied Defendants' motion for sanctions

on October 12, 2022.  Dkt. No. 272.

On September 28, 2022, the parties jointly filed a stipulation of dismissal of certain

claims.  Dkt. No. 268.  Specifically, Plaintiff stipulated that her claims for unequal pay under the

Equal Pay Act and the New York Equal Pay Act as well as her claim for failure to pay overtime

under NYLL were voluntarily dismissed with prejudice.  *Id.*  Canal, in turn, voluntarily

dismissed, with prejudice, its counterclaim for fraud.  *Id.*

On October 30, 2022, Plaintiff filed her motion for summary judgment on Canal's remaining counterclaims along with supporting documentation.  Dkt. Nos. 281–83, 285–87.  On the same date, Defendants filed their motion for summary judgment on Plaintiff's remaining claims along with supporting documentation.  Dkt. Nos. 284, 288–97.[7]  Plaintiff filed a memorandum of law in opposition to Defendants' motion for summary judgment on November 20, 2022, as well as supporting documentation.  Dkt. Nos. 333–36, 338–39, 341.  On the same date, Canal filed its memorandum of law in opposition to Plaintiff's motion for summary judgment as well as supporting documentation.  Dkt. Nos. 337, 340, 342–44.  Defendants filed a reply memorandum of law in support of their motion for summary judgment as well as supporting documentation on December 15, 2022.  Dkt. Nos. 356–57, 359, 361.  On that same date, Plaintiff filed a reply memorandum of law in support of her motion for summary judgment as well as supporting documentation.  Dkt. Nos. 360, 362–64.[8]

On December 22, 2022, Plaintiff filed a motion for leave to file a surreply to Defendants' motion for summary judgment.  Dkt. No. 365.  In that motion, Plaintiff argued that the Court should disregard Defendants' arguments, asserted for the first time in their reply, for summary judgment on Plaintiff's claims that they retaliated against her for complaining about gender-based pay disparities in violation of federal and New York State and City law.  *Id.* at 1.  Plaintiff also argued that even if the Court elected to consider these arguments, Defendants' arguments failed on their merits.  *Id.* at 2.  Plaintiff also moved to strike Defendants' appendix filed with its

---

[7] These documents were refiled after Magistrate Judge Parker denied the parties' motion to temporarily file all summary judgment papers under seal without regard to the confidentiality or the sensitivity of the material contained therein.  Dkt. No. 298; *see also* Dkt. Nos. 302–09, 313–17, 321–22, 324, 327–29.

[8] The parties have filed various motions to seal in connection with the motions for summary judgment.  Dkt Nos. 301, 323, 325, 330, 332, 349, 355, 358, 367.  The Court will address those motions in a separate order.

reply brief.  *Id.* at 8.  On April 10, 2023, the Court granted the motion in part and denied it in part.  Dkt. No. 373.  The Court noted:  "The request to file a surreply is granted and the surreply shall be deemed filed.  The requests, however, to strike Defendants' argument regarding retaliation concerning gender-based pay disparities and the Appendix are denied."  *Id.*  The Court noted that Defendants could respond to any arguments in the surreply at oral argument on the motions.  *Id.*  Oral arguments on the motions occurred on April 20, 2023.

On May 9, 2023, the Court asked for supplemental briefing as to Defendants' motion for summary judgment.  Dkt. No. 378.  Specifically, the Court asked that the briefing "focus exclusively on the question whether, assuming that the Court concludes that no reasonable jury could find that Canal's filing of the State Court Action itself constituted illegal retaliation in violation of the Fair Labor Standards Act, the New York Labor Law, or the New York City Human Rights Law, Plaintiff's claim can be sustained on the grounds that the request for $3 million on a faithless servant theory and $3 million for the value of funds and property allegedly misappropriated by Plaintiff, for a total of $6 million, constitutes illegal retaliation."  *Id.*  The parties each submitted supplemental briefs addressing this question on May 17, 2023.  Dkt. Nos. 379–80.

## LEGAL STANDARD

The standards applicable to these motions are well settled.  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'"  *Id.* at 114 (quoting *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).  When more than one party moves for summary judgment, "each party's motion must be examined on its own merits and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Century Sur. Co. v. Franchise Contractors, LLC*, 2016 WL 1030134, at *3 (S.D.N.Y. Mar. 10, 2016) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in affirming summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockerfeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)); *see Wilkerson v. Metro. Transp. Auth.*, 2021 WL 5761649, at *5 (S.D.N.Y. Dec. 3, 2021).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *see Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

**DISCUSSION**

As noted, Plaintiff brings claims for retaliation under the NYCHRL, retaliation under the FLSA, retaliation under the NYLL, and gender discrimination under the NYCHRL.  Dkt. Nos. 1, 268.  Defendants move for summary judgment in their favor as to each of these claims.  Canal, in turn, bring claims for breach of fiduciary duty, breach of the duty of loyalty, and conversion.  Dkt. Nos. 268, 743.  Plaintiff moves for summary judgment in her favor as to each of these claims.

The Court will first address Defendants' motion for summary judgment as to Plaintiff's claims and then Plaintiff's motion for summary judgment as to Canal's claims.

**I.      Plaintiff's Claims**

**A.      Retaliation**

**1.      FLSA and NYLL**[9]

In their memorandum of law in support of summary judgment, Defendants move to dismiss Plaintiff's claims for retaliation under the FLSA and the NYLL on the grounds that Plaintiff did not engage in protected activity related to those statutes and, even if she did, she cannot present admissible evidence of any causal link between such activity and any "employment action disadvantaging her."  Dkt. No. 328 at 3.  In response, Plaintiff claims that she engaged in several instances of protected conduct under the FLSA and the NYLL.  Dkt. No. 333 at 20.  First, Plaintiff points to evidence that in late 2018 and early 2019, Plaintiff sought pay "parity" with a male employee and objected to De Niro's rationale for paying a higher salary

---

[9] "Because the FLSA and NYLL retaliation provisions are 'nearly identical,' claims under both statutes are analyzed using the same framework."  *Perry v. High Level Dev. Contracting & Sec. LLC*, 2022 WL 1018791, at *9 (E.D.N.Y. Mar. 16, 2022), *report and recommendation adopted*, 2022 WL 1017753 (E.D.N.Y. Apr. 5, 2022).

to her male co-worker.[10]  *Id.* at 20.  Second, Plaintiff points to her testimony that in early March

2019, Plaintiff objected to De Niro's statement that he "doesn't want to pay them overtime,"

which was made in response to Plaintiff's comment that he would have to pay his executive

assistants "extra . . . in overtime" for checking on his apartment.  *Id.*; Dkt. No. 335-12 at 87.

Third, Plaintiff points to her and her counsel's communications to Defendants after her

termination in which she complained about her treatment at Canal and raised claims under the

NYLL and FLSA.  Dkt. No. 333 at 26.  Plaintiff also contends that in response to her protected

activity, Defendants engaged in a number of retaliatory acts against her—including

constructively discharging her, refusing to provide her with a recommendation, sending her a

threatening letter, investigating her for evidence of wrongdoing, bringing a lawsuit against her,

and attempting to have her criminally prosecuted.  *Id.* at 29–30.

Section 215(a)(3) of FLSA makes it unlawful "to discharge or in any other manner

discriminate against any employee because such employee has filed any complaint or instituted

or caused to be instituted any proceeding under [the FLSA]."  29 U.S.C. § 215(a)(3).  Under the

NYLL, employers may not "discharge, threaten, penalize, or in any other manner discriminate or

---

[10] In her opposition to Defendants' memorandum of law in support of summary judgment, Plaintiff notes that Defendants did not address this theory of her FLSA and NYLL retaliation claims (*i.e.*, unequal pay) and thus it must be treated "as undisputed that Defendants retaliated against her for those complaints, and Defendants cannot command summary judgment on any of Plaintiff's retaliation claims."  Dkt. No. 333 at 19.  However, although it is true that Defendants, in their opening memorandum of law, did not address this theory of Plaintiff's FLSA and NYLL retaliation claims, they did address it in their reply memorandum of law.  Dkt. No. 356 at 4. Plaintiff then filed a surreply responding to Defendants' new arguments.  Dkt. No. 365 at 3–7. This Court, thus, held on April 10, 2023, that it would consider Defendants' argument that summary judgment should be granted on Plaintiff's retaliation claim based on unequal pay, noting that "[a]lthough arguments raised for the first time on reply are usually deemed waived, courts may consider them where the opposing party has a fair opportunity to respond," including through filing a surreply.  Dkt. No. 373 at 1 (quoting *Mizel v. Royal Caribbean Cruises Ltd.*, 2019 WL 13247284, at *1 (E.D.N.Y. Apr. 29, 2019)).

retaliate against any employee" "because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter."  NYLL § 215(1)(a).

The Second Circuit has held that retaliation claims under the FLSA are subject to the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).  "[A] plaintiff alleging retaliation under FLSA must first establish a prima facie case of retaliation by showing (1) participation in protected activity known to the defendant . . . ; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Id.*; *see also Velazquez v. Yoh Servs., LLC*, 803 F. App'x 515, 517 (2d Cir. 2020) (summary order).  "In the event that a plaintiff has established a prima facie case of retaliation, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Quintanilla v. Suffolk Paving Corp.*, 2019 WL 885933, at *19 (E.D.N.Y. Feb. 22, 2019).  "If successful, the burden shifts back to the employee to produce evidence showing that the employer's proffered reason is pretextual."  *Id.*  "The burden-shifting standard for a retaliation claim under the NYLL is the same as that under the FLSA."  *Rodriguez v. Nat'l Golf Links of Am.*, 2020 WL 3051559, at *2 (E.D.N.Y. June 8, 2020); *see Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020) (analyzing NYLL and FLSA claims together); *Ozawa v. Orsini Design Assocs., Inc.*, 2015 WL 1055902, at *9 (S.D.N.Y. Mar. 11, 2015) ("The elements of a retaliation claim under the NYLL are comparable to those of a FLSA retaliation claim.").[11]

---

[11] "However, '[t]he protection afforded to workers under the NYLL retaliatory termination provision is "more broadly worded" than in the FLSA.'"  *Chan v. Big Geyser, Inc.*, 2018 WL

To succeed on both her FLSA and NYLL claims, Plaintiff must show that she engaged in protected activity and that, because of such conduct, she suffered an adverse employment action. Thus, whether Plaintiff engaged in protected activity is the threshold question for such claims. Accordingly, the Court first analyzes whether any of Plaintiff's activity was protected. It then turns to the questions of adverse action and causation.

### a.   Participation in Protected Activity

With respect to the first element of Plaintiff's FLSA and NYLL retaliation claims, the question is whether Plaintiff engaged in protected activity. Prior to 2011, the Second Circuit held that "[t]o serve as a predicate for an FLSA retaliation claim . . . a complaint must be 'formal[ly]' filed"—*i.e.*, there must be a "(1) a written complaint, that is (2) filed with a government agency." *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 106 (2d Cir. 2015) (internal citation omitted). However, in 2011, after the Supreme Court's decision in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), the Second Circuit reversed course and held that "an employee may premise a section 215(a)(3) retaliation action on an oral complaint made to an employer, so long as—pursuant to *Kasten*—the complaint is 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Greathouse*, 784 F.3d at 107 (quoting *Kasten*, 563 U.S. at 14).

Under this standard, "a complaint is 'filed' [only] when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Id.* at 116 (quoting *Kasten*, 563 U.S. at 14). "The employee need not invoke the Act by name, but . . . '[t]o fall within the scope of the anti-

---

4168967, at *12 (S.D.N.Y. Aug. 30, 2018) (quoting *Aflalo v. Cantor Fitzgerald, L.P.*, 298 F. Supp. 3d 688, 698 (S.D.N.Y. 2018)).

retaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Id.* (quoting *Kasten*, 563 U.S. at 14).  The Second Circuit went on to say that it would thus exclude from the concept of filing a complaint "a mere passing comment" as Section  215(a)(3) of FLSA requires "some degree of formality."  *Id.* (quoting *Kasten*, 563 U.S. at 14).

"[U]nder the New York Labor Law, Plaintiffs must show that they 'complained about a specific violation of the Labor Law.'"  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (quoting *Castagna v. Luceno*, 2011 WL 1584593, at *12 (S.D.N.Y. Apr. 26, 2011)); *see also Epifani v. Johnson*, 882 N.Y.S.2d 234, 244 (2d Dep't 2009).  "An informal complaint to an employer that the employer is violating a provision of the Labor Law suffices." *Grant v. Abbott House*, 2016 WL 796864, at *9 (S.D.N.Y. Feb. 22, 2016) (citation omitted).

As previously noted, Plaintiff points to the following instances of allegedly protected activity in support of its FLSA and NYLL retaliation claims: (1) communications in late 2018 and early 2019 in which Robinson sought pay parity with Dan Harvey; (2) Plaintiff's testimony that De Niro told her that he did not want to pay overtime to his employees who spent time off-hours checking on his home and her response that it would be illegal not to pay overtime and that she would not participate in such activity; (3) emails on April 6, June 11, and July 2, 2019 in which Plaintiff discussed the reasons for her resignation; and (4) communications from Plaintiff's counsel to Defendants' counsel raising claims for violations of the FLSA.  Dkt. No. 333 at 20, 25–28.

Defendants dispute that these communications between the parties (and which Plaintiff claims constitutes protected activity under the FLSA and NYLL) are, in fact, protected.  *Id.* at 3–

12; Dkt. No. 356 at 4.  First, Defendants argue that Plaintiff's request in late 2018 to early 2019 for pay "parity" with De Niro's trainer does not constitute an "equal pay complaint."  Dkt. No. 356 at 4.  They state that Plaintiff "asked for a raise and was given a gender-neutral and lawful explanation as to why her pay differed from that of De Niro's personal trainer."  *Id.*  In response, Plaintiff argues that seeking pay "parity" with a higher-paid male worker whose job required no greater skill, effort, or responsibility than Plaintiff "undoubtedly invokes a colorable statutory claim" under the equal pay provisions of the FLSA.  Dkt. No. 365 at 4; Dkt. No. 333 at 20.

The Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), a statute that amended the FLSA,[12] states:

> No employer . . . shall discriminate. . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex

29 U.S.C. § 206(d).  "An employer's retaliation for filing EPA complaints, like retaliation for filing FLSA complaints, is analyzed under section 215(a)(3)."  *Greathouse*, 784 F.3d at 110 n.7. The NYLL contains a similar provision.  *See* NYLL § 194.  "An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act."  *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 (2d Cir. 2020) (summary order) (quoting *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 690 n.1 (2d Cir. 2017) (summary order)).

---

[12] *See Greathouse*, 784 F.3d at 109.

Construing the evidence in favor of the non-moving party, it demonstrates that in December of 2018, Plaintiff's salary was $200,000, which was $50,000 less than the then-salary of De Niro's "trainer," Dan Harvey.  Dkt. No. 339-25.  Dan Harvey had been employed by De Niro as his personal trainer for approximately thirty-six years as of December 2018.  Ds' 56.1 Statement ¶ 11; P's Counterstatement ¶ 11. Although Harvey worked as De Niro's personal trainer, his role shared similarities with Plaintiff's and De Niro's other personal assistants.  Like Plaintiff, he would do what De Niro directed him to do, including picking up coffee or newspapers, or at times organizing a meeting for De Niro.  Dkt. No. 339-8 at 211–12, 224–25. In late 2018 and early 2019, Plaintiff made a series of requests to De Niro to be paid the same as Harvey:  (1) Plaintiff sent a December 18, 2018 email to De Niro in which she wrote "I want parity," and "I make less than your trainer [Dan Harvey]," and stated that she was also a "bargain" compared to De Niro's Chairman/CEO and "accountants," Dkt. No. 335-33, (2) Plaintiff told De Niro in 2018 and 2019 that she wanted pay parity when it came to Dan Harvey, Dkt. No. 335-11 at 246; and (3) on January 3, 2019, Plaintiff again reiterated her desire to be paid the same as Dan Harvey.  De Niro defended the disparity on the basis that she "d[idn't] have kids" and that Dan Harvey "ha[d] a family to support," to which she objected and responded: "That has no relevance to what you pay me," Dkt. No. 336 at ¶ 3.  After the meeting, De Niro increased Plaintiff's base annual compensation to $300,000 effective January 2019.  Ds' 56.1 Statement ¶ 36; P's Counterstatement ¶ 36.

This evidence is insufficient to raise a triable issue of material fact that Plaintiff's request for pay parity was protected conduct under the FLSA and NYLL.  As a matter of law, no reasonable employer would understand Plaintiff's complaints as an assertion of rights under the equal pay provisions of the FLSA and the NYLL.  Employees in the workforce ask their bosses

for raises or pay equity all the time.  And in doing so, they draw comparisons between their work and their pay and the work and pay of others.  Sometimes those employees are of the same gender as the employee making the request and sometimes they are not.  But the mere request for a pay raise or "parity"—meaning similar pay—cannot constitute protected activity without making all routine workplace behavior into protected activity.  Nor can it be sufficient that the comparator to whom the employee is comparing herself is of a different gender.  Although Plaintiff requested that she be paid similarly to an employee, Dan Harvey, who happened to be a man, Plaintiff never mentioned that the difference in their salaries was possibly related to their genders or even attributed the difference in pay to the fact that he was a man and she was a woman.  29 U.S.C. § 206(d); NYLL § 194; *see* Dkt. No. 336 at ¶ 3; Dkt. No. 335-11 at 246; Dkt. No. 335-33.  In fact, that Dan Harvey was a man was not raised by Plaintiff in the conversation and Plaintiff does not appear to have ever raised issues of gender or sex or any similar words at any point in her discussions with De Niro about her pay relative to Dan Harvey's.  She also never claimed that she and Dan Harvey were performing substantially similar work and thus their differential pay was unfair on that basis.  The mere fact that Plaintiff "complained about a man's salary does not convert [her] complaint into an allegation of discrimination." *Talwar v. Staten Island Univ. Hosp.*, 2016 WL 1298969, at *10 (E.D.N.Y. Mar. 31, 2016).  Plaintiff's complaint is thus best characterized as an "amorphous expressions of discontent related to wages," which is not protected activity.  *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999); *see Cooke v. Rosenker*, 601 F. Supp. 2d 64, 76 (D.D.C. 2009); *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 986 (N.D. Ill. 2014) ("A complaint about dissatisfaction with one's compensation in general does not trigger protection of the statute.").

Plaintiff's objection to De Niro's response that Plaintiff "d[idn't] have kids" and that Dan Harvey "ha[d] a family to support" as justification for the difference in pay also does not constitute protected activity under these statutes.  Dkt. No. 336 ¶ 3.  Discrimination based on caregiver status is not actionable under the EPA or the NYLL.  *See Kassman*, 925 F. Supp. 2d at 473 ("[I]t is possible, and perhaps even likely, that the alleged complaints concerned . . . caregiver . . . which are not actionable under the EPA or NYSEPA and therefore could not support a retaliation claim under those statutes.").  An employer can provide increased pay or other benefits to an employee who has responsibilities at home without incurring liability under the EPA or the NYLL's similar provision to an employee who does not have similar responsibilities, so long as the employer does not discriminate on the basis of gender in providing those benefits.  Here, De Niro explicitly attributed the differences in the pay to the fact that Dan Harvey had a family he had to support and Plaintiff did not.  Neither gender nor sex were ever raised by either De Niro or Plaintiff during this conversation.  Accordingly, when Plaintiff objected to De Niro's explanation by stating "[t]hat has no relevance to what you pay me," such an objection would most naturally be interpreted as an objection to unequal pay on the basis of caregiver status, not on the basis of gender.  *Kasten*, 563 U.S. at 14.  Plaintiff's objections to these alleged statements therefore cannot support a retaliation claim under the FLSA or NYLL.  They cannot be reasonably be viewed as "sufficiently clear and detailed for a reasonable employer" to understand them as raising an objection to gender-related pay disparities for substantially similar work.  *Kasten*, 563 U.S. at 14; *see Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 315 n.17 (S.D.N.Y. 2016).

The cases Plaintiff cites in arguing that her "complaints are equivalent to or more explicit than other pay complaints deemed to qualify as protected activity under the EPA" do not support

that proposition.  Dkt. No. 365 at 6 & n.7.  In all of the cases but one,[13] the plaintiffs specifically mentioned issues of gender in making their complaints to their employers, unlike Plaintiff here. *See Mitchell v. Ceros, Inc.*, 2022 WL 748247, at *7 (S.D.N.Y. Mar. 10, 2022) (complaint to employer that plaintiff was paid less than another employee "because of her gender" constituted protected activity under FLSA); *Xanthakos v. City Univ. of New York*, 2020 WL 5026930, at *2 (S.D.N.Y. Aug. 24, 2020) (involving repeated complaints that plaintiff was not being paid "as much as her male colleagues"); *Johnson*, 224 F. Supp. 3d at 315 n.17 (Plaintiff "questioned whether 'all of the men' who reported to Martinez had, like her, received a pay cut in the form of reduced bonus.").  These cases thus do not compel a contrary conclusion.

Second, Defendants argue that Plaintiff's assertion to De Niro that he was legally required to pay overtime to the female assistants for off-hours spent checking on his home does not constitute protected activity under the FLSA or the NYLL.  Dkt. No. 328 at 5.  Defendants contend that Plaintiff was merely reminding De Niro of his legal obligations and performing her job as a person whose job responsibilities included administrating wage and hours law for Canal and was not lodging a complaint.  *Id.* at 5–7.  In response, Plaintiff contests that Robinson's job was to serve as a human resources professional on overtime issues and notes that the Second Circuit has rejected a "manager rule" in the Title VII context, holding that "an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively support[s] other employees in asserting their Title VII rights or personally complain[s] or is

---

[13] In the remaining case, the complaint does not appear to have provided much detail on the precise nature of the complaint but instead largely notes that Plaintiff raised a "pay inequity complaint" with his employer.  *See Servello v. New York State Off. of Child. & Fam. Servs.*, 2019 WL 974972, at *2 (N.D.N.Y. Feb. 28, 2019).  While the court found that this stated a plausible claim for relief under the retaliation provision of the FLSA for purposes of a motion to dismiss, the plaintiff in that case was *pro se* and thus the Court was obligated to construe the complaint liberally.  *Id.*

critical about the discriminatory employment practices of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015) (cleaned up).

This claim centers on Plaintiff's testimony that in early March 2019, De Niro discussed with Plaintiff having one of the "girls on call" stop by the Townhouse and check on it while he and Chen were away.  Dkt. No. 336 ¶ 7.  Plaintiff testified that she "reminded [De Niro] that it was something that he would have to pay extra for in overtime, and he got very upset and said I am not going to pay them for the work that they do in checking for his house, that he pays them enough[,] and doesn't want to pay them overtime." Dkt. No. 335-12 at 87–88.  Plaintiff states that she walked out of the apartment and said that she would not do anything that was illegal and he had to pay them for the hours that they worked.  *Id.* at 88.  There is no evidence that De Niro did not, in fact, pay them required overtime.

This conduct, even viewed favorably to Plaintiff, is, as a matter of law, not protected activity under the FLSA because it does not constitute a "complaint" under *Kasten* or *Greathouse*.  The anti-retaliation provision of FLSA, as it has been interpreted in *Kasten* and *Greathouse*, carves out a limited exception to the rule applicable in New York and most other states that an employee who is at will can be terminated by an employer for any reason or no reason at all.  *See Murphy v. Am. Home Prod. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983); *Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 445 (N.Y. 1982); *see also Geldzahler v. New York Med. Coll.*, 663 F. Supp. 2d 379, 388 (S.D.N.Y. 2009) (collecting cases).  That rule, which protects the freedom of contract, has its roots in the proposition that absent an agreement as to term, an employer has no duty to continue to hire an employee just as the employee has no duty to continue to work for the employer and has the right "to quit his job at any time." *Murphy*, 448

N.E.2d at 96 n.7.  In the absence of "'a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired.'  Thus, either the employer or the employee generally may terminate the at-will employment for any reason, or for no reason." *Smalley v. Dreyfus Corp.*, 882 N.E.2d 882, 884 (N.Y. 2008) (citation omitted) (stating that New York courts have "repeatedly refused to recognize exceptions to, or pathways around, these principles").  Under Section 215(a)(3), however, if an employee has "filed any complaint" "under or related" to the FLSA, the employer's freedom of action is limited. 9 U.S.C. § 215(a)(3).  It can take an adverse employment action, or terminate the employee's employment, but the employee can then bring the employer to federal court and, under the *McDonnell-Douglas* test applicable to claims of FLSA retaliation, require the employer to justify that decision.  *See Kim v. Lee*, 576 F. Supp. 3d 14, 30 (S.D.N.Y. 2021), *aff'd*, 2023 WL 2317248 (2d Cir. Mar. 2, 2023).  Effectively, under FLSA, once the employee has engaged in protected activity, the employer can no longer terminate employment on a whim or without giving a reason.  The employer must proffer a legitimate reason for taking that employment action and the plaintiff has an opportunity to challenge that reason as pretextual.

That exception is based on a very real "functional consideration[]." *Kasten*, 563 U.S. at 11.  FLSA depends for its enforcement on "information and complaints received from employees seeking to vindicate rights claimed to have been denied." *Id.* (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).  The Act's "antiretaliation provision makes this enforcement scheme effective by preventing 'fear of economic retaliation' from inducing workers 'quietly to accept substandard conditions.'" *Id.* at 12.

To that end, in *Kasten*, the Supreme Court held that complaints that confer protection against retaliation included oral complaints:

> To limit the scope of the antiretaliation provision to the filing of written complaints would also take needed flexibility from those charged with the Act's enforcement. It could prevent Government agencies from using hotlines, interviews, and other oral methods of receiving complaints. . . . [I]t would discourage the use of desirable informal workplace grievance procedures to secure compliance with the Act.

*Id.* at 12–13. And in *Greathouse*, the Second Circuit expanded the type of complaints that confer federal protection against adverse employment action to internal complaints made to an employer, reasoning "[p]rohibiting retaliation against employees who make internal complaints furthers the purposes of FLSA by encouraging speedier and more efficient resolution of employee grievances, and resolving FLSA-related issues before employees have lost significant wages or other benefits." 784 F.3d at 114. The court held that the provision "includes lodging an internal complaint with an employer." *Id.*

At the same time, it is not sufficient to invoke protection under the Act for the employee merely to refer to rights under or related to FLSA. FLSA is a broad statute. Literally, any pay request could be deemed to be related to rights under FLSA. The statutory language is more limited. It refers to an employee who has "filed any complaint." 9 U.S.C. § 215(a)(3). This language "contemplates some degree of formality." *Kasten*, 563 U.S. at 14. The statement must give the recipient "fair notice that a grievance has been lodged and does, or should reasonably understand the matter as part of its business concerns." *Id.* "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context as an assertion of rights protected by the statute and a call for their protection." *Id.*

That limitation is important.  Conversations about wages and hours and pay parity—which are rights protected by FLSA—are abundant in a workplace.  If any such conversation, no matter how casual, touching on one's legal rights had the potential to constitute protected activity, few employers could properly function.  The discipline of an employee would routinely raise potential legal risk.  The "at-will" relationship of employer to employee would be fundamentally transformed.  In all but a few cases, the employer's hands would be tied, while the employee could depart for any reason or no reason at all.  In particular, and as relevant here, companies routinely employ persons in human resources or in other functions who naturally would be expected to be asked or to respond to questions about rights that are protected under FLSA, whether those rights belong to themselves or to others, including what an employee would have to be paid when performing certain work and whether she would have to be paid overtime.  *See McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996); (no protected activity where plaintiff was "merely performing her job as a personnel director"); *Aflalo v. Cantor Fitzgerald, L.P.*, 298 F. Supp. 3d 688, 697 (S.D.N.Y. 2018).  Some of those employees are at-will.  The FLSA anti-retaliation provisions could not be extended to their advice in response to such questions without conferring on them special federal protections against adverse employment actions simply for doing their jobs—protections that are not available to other employees whose jobs do not put them in a position where they would convey that advice.

In this case, based on their "content and context," Plaintiff's comments to De Niro cannot be viewed as ones asserting a grievance or that would "subject the employer to a later claim of retaliation." *Kasten*, 563 U.S. at 13–14.  Plaintiff was responding to a comment made by De Niro in the context of her being asked to perform one of her employment duties.  It is irrelevant in this context the exact scope of Plaintiff's compliance responsibilities; the conversation

occurred in the context of Plaintiff's job-related duties in paying "the girls." *See* Dkt. No. 344-17 at 250 (Plaintiff testifying that she "was asked to collect [Jillian and Sabrina's] time sheets and send the overtime to Burton"); Dkt. No. 344-6 at 65 (Plaintiff testifying that she "helped facilitate when Bob was in violation of overtime"), 72–73, 84–85 (Plaintiff testifying that she was asked by "Michael Tasch" to send him "how many hours overtime the employees would receive").  In the course of that job-related conversation, De Niro made a comment about what he wanted to pay the employees and, in particular, what he did not want to pay them.  De Niro's statement on its own was neither wrongful nor illegal.  Plaintiff then responded accordingly and appropriately with an understanding of the company's overtime obligations.  Plaintiff's comment and her response to De Niro cannot be characterized as protected activity without converting virtually all conversations between a boss and a subordinate regarding what an employee should be paid into a protected activity.  Nor can it be said to have provided "fair notice" to her employer that Plaintiff was filing a complaint.  Rather, without more, De Niro "naturally would understand [Plaintiff's] report as carrying out his or her duties." *See Rosenfield v. GlobalTranz Enterprises, Inc.*, 811 F.3d 282, 286 (9th Cir. 2015).[14]

---

[14] Contrary to Plaintiff's contention, the Second Circuit's decision in *Littlejohn*, 795 F.3d 297, is inapposite.  That case concerned retaliation under Title VII and Title VII's retaliation provisions include both an opposition clause and a participation clause. *Id.* at 316.  "The opposition clause makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Id.* at 316 (citation omitted).  The Court held that in light of Title VII's inclusion of a "participation clause," "protected activity" under the retaliation provisions of Title VII includes instances in which an employee "even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer." *Id.* at 318 (cleaned up).  FLSA, however, does not include a similar participation clause.  Thus, this holding does not apply to Plaintiff's claims in this action.

Notably, unlike in each of the cases relied upon by Plaintiff,[15] the statement alleged to constitute a complaint or a grievance was not initiated or volunteered by Plaintiff. It was uttered in response to a statement about De Niro's preferences in terms of the pay of employees made by De Niro to Plaintiff in the course of Plaintiff performing her job functions. Also tellingly, Plaintiff did not lodge a complaint about an employment practice that Canal had undertaken. She responded in her role as an employee to a statement about an action Canal wanted to take— but did not. No reasonable juror could understand the statement other than as advice that she believed that what De Niro wanted to do violated FLSA and that—if he ordered it—she would not undertake the employment action. It was prospective only. Finally, the statement was uttered only to De Niro and not repeated to anyone else. It was therefore not akin to an employer hotline or grievance procedure, or something that could reasonably launch an investigation.

It thus falls far afield from what the Supreme Court held in *Kasten* could constitute an oral complaint. In that case, Kasten, the employee, repeatedly complained that the location of timeclocks "prevented workers from receiving credit for the time they spent putting on and taking off their work clothes—contrary to the Act's requirements." 563 U.S. at 5. He "repeatedly called the unlawful timeclock location" to his employer's attention in accordance with his employer's "internal grievance-resolution procedure." *Id.* Specifically, he raised this concern to his shift supervisor, told a human resources employee, told his lead operator, and told the human resources manager and the operation managers that he thought the location was illegal and that the company would "lose" in court. *Id.* at 5–6; *see also Greathouse*, 784 F.3d at 127

---

[15] *See Starnes v. Wallace*, 849 F.3d 627, 632 (5th Cir. 2017); *Coker v. Goldberg & Assocs. P.C.*, 2022 WL 874719, at *5 (S.D.N.Y. Mar. 24, 2022); *Gangadharan v. GNS Goods & Servs.*, 2022 WL 824135, at *13 (E.D.N.Y. Mar. 18, 2022); *Mitchell*, 2022 WL 748247, at *7; *Mestizo v. H2 Candy & Nuts*, 2019 WL 2209203, at *2 (S.D.N.Y. May 21, 2019).

(Korman, D.J., concurring in part) (describing facts of *Kasten*). Kasten's complaint, made repeatedly and through internal grievance-resolution procedures, is a far cry from Plaintiff's complaint here made only to De Niro as part of an informal conversation about wages.

These statements also do not constitute protected activity under the NYLL § 215. Leaving aside the reasons why Plaintiff's response cannot constitute a complaint, all of which also apply under NYLL § 215, that statute by its terms protects complaints concerning unlawful conduct that has already occurred. It provides that no employer may retaliate against an employee because she made a complaint to her employer that "the employer has *engaged* in conduct that the employee. . . believes violates any provision of this chapter." NYLL § 215 (emphasis added). Here, importantly, Plaintiff did not complain that De Niro had engaged in any unlawful conduct. She instead warned Plaintiff that if he did pay the employees at a rate that did not include overtime pay, she would not participate in the conduct. Even if such warning could constitute a "complaint," it does not fall within the plain language of the provision, and thus does not qualify as protected activity therein.

Third, Defendants claim that Plaintiff's emails on April 6, June 11, and July 2, 2019 in which Plaintiff emailed De Niro concerning her resignation are not, as a matter of law, post-employment protected activity as the emails do not mention "any claim, express or implied, about wage and hour matters." Dkt. No. 328 at 9. The Court agrees. In these emails, which are summarized *supra* pp. 12, 15–16, Plaintiff never mentions any facts or allegations that even arguably could be interpreted as raising wage or hour issues protectable under the FLSA. Instead, she states that her resignation was due to the fact that her "job has changed to something that wasn't what we agreed on" and because she has been "accused of ridiculous things like withholding information . . . and not being diligent, professional or helpful," P's 56.1 Statement

¶ 69; D's Counterstatement ¶ 69, and complains about De Niro's failure to sign her drafted recommendation letter, Dkt. No. 322-49.  While Plaintiff does note in her July 2, 2019 email that she will involve a lawyer to protect her legal interests unless she hears back by July 12, 2019, P's 56.1 Statement ¶ 41; D's Counterstatement ¶ 41, Plaintiff has presented no evidence nor does she even try to argue that a reasonable employer could have understood this to mean her legal interests under the FLSA or the NYLL.  She was in an employment dispute with Defendants over *her* departure from Canal and she raised the issues that any prudent former employee would raise in connection with that employment dispute—that if Defendant did not accede to her demands, she would involve counsel to protect her rights and interests.  She did not describe those rights and interests or suggest that they relate to the FLSA or NYLL.  These communications are far too vague "for a reasonable employer to understand [them], in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'"  *Greathouse*, 784 F.3d at 107 (quoting *Kasten*, 563 U.S. at 14); *see also Talwar*, 2016 WL 1298969, at *11 ("No reasonable jury could conclude that Dr. Talwar's generic complaints of unfairness at the January and August 2009 meetings were sufficient to put the Hospital on notice that she was complaining about discrimination."); *Ramos v. City of New York*, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) (complaint that plaintiff was treated "unfairly" does not constitute protected conduct).  They are therefore not protected activity under the FLSA or NYLL.

Fourth, Defendants contend that the post-resignation communications from Plaintiff's counsel to Defendants' counsel raising claims for violations of the FLSA and NYLL cannot be protected activity as they were not made in good faith.  Dkt. No. 328 at 10.  Defendants note that Plaintiff's counsel only raised these claims and sent these emails after Tom Harvey emailed

Plaintiff a letter in which he, on behalf of Canal, accused Plaintiff of "widespread abuses and unauthorized transactions during [her] employment" and ordered her to return the SkyMiles "immediately to avoid legal action." Dkt. No. 307-34. Defendants thus argue that Plaintiff's counsel's emails to Canal were "a set-up," creating the appearance of protected activity in order to dissuade Canal from taking legal action. *Id.* at 10. In response, Plaintiff contends that Defendants present no evidence that Plaintiff had any improper motive or lacked good faith in asserting these claims. Dkt. No. 333 at 27. She also notes that "[i]n any event, it is inappropriate to grant summary judgment against Plaintiff on the issue of her good faith, which is a triable issue of fact." *Id.*

Leaving aside the question of Plaintiff's good faith, certain of Plaintiff's counsel's communications to Defendants would seem to qualify as protected activity.[16] On July 31, 2019, Plaintiff's counsel wrote to Defendants' counsel stating that he believed that the earlier letter from Tom Harvey to Plaintiff was "designed to inhibit Ms. Robinson from asserting various employment and other claims against Mr. De Niro, Canal Productions, and other related entities" including "claims implicating numerous wage-hour violations arising under NYLL and the FLSA effecting Ms. Robinson and other persons."[17] Dkt. No. 335-63 at ECF p. 6. Plaintiff's

---

[16] The parties do not appear to dispute that the FLSA applies to Plaintiff's proposed retaliation claims even though Plaintiff was a former employee of Defendants when she engaged in certain of her protected activity. In the context of Title VII of the Civil Rights Act of 1964, the Supreme Court held in *Robinson v. Shell Oil Co.*, 519 U.S. 337, that a party may assert a retaliation claim based on protected activity that took place after the employee was no longer employed by his or her former employer. *Id.* at 339. "[D]istrict courts in this Circuit have applied the Supreme Court's reasoning in *Robinson* to FLSA retaliation claims." *Rodriguez*, 2020 WL 3051559, at *3 (quoting *Li v. Oliver King Enters., Inc.*, 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015)).

[17] Defendants state in a footnote that if the case proceeds to trial, it will move *in limine* to have these emails from Plaintiff's counsel to Defendants' counsel excluded as settlement communications under Federal Rule of Evidence 408 and thus asks that the Court consider this in deciding the present motion. Dkt. No. 296 at 11 n.7. But, to the extent these are settlement

counsel thus made clear that Plaintiff believed that she had claims against them under the FLSA and the NYLL.  A juror could thus reasonably find that this invocation of the statute qualified "as an assertion of rights protected by the statute and a call for their protection." *Greathouse*, 784 F.3d at 107 (quoting *Kasten*, 563 U.S. at 14); *cf. Gupta v. Al Jazeera Am., LLC*, 2018 WL 1605571, at *16 n. 18 (S.D.N.Y. Mar. 29, 2018) ("[G]iven the email's express references to the anti-discrimination laws, Chang reasonably should have understood the email to be a complaint about unlawful discrimination.").

Nonetheless, Defendants point to various cases involving Title VII and the NYCHRL, which stand for the proposition that for a complaint to qualify as "protected activity," "the employee must also show that she had 'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Tang v. Glocap Search LLC*, 2015 WL 5472929, at *2 (S.D.N.Y. Sept. 16, 2015) (quoting *Fattoruso v. Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 581 (S.D.N.Y.2012)); *see also Wolf v. Time Warner, Inc.*, 2011 WL 856264, at *8 (S.D.N.Y. Mar. 3, 2011) (Sullivan, J.); *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 367 (S.D.N.Y. 2007) (Lynch, J.).  Under this case law, "if a plaintiff complained, not in good faith, but rather to protect her job or extort money from her employer, the activity is not protected under the statute." *Tang*, 2015 WL 5472929, at *2.

---

communications, Rule 408 only precludes their use to "prove or disprove the validity or amount of a disputed claim" or for impeachment purposes.  Fed. R. Evid. 408(a).  Here, the communications are used for "another purpose"—*i.e.*, to show protected activity for purposes of Plaintiff's retaliation claim.  Fed. R. Evid. 408(b); *see Calise v. Casa Redimix Concrete Corp.*, 2022 WL 355665, at *4 (S.D.N.Y. Feb. 4, 2022) (settlement communication not barred by Rule 408 when admitted as evidence of retaliation); *see also King v. Wang*, 2021 WL 5232454, at *9 (S.D.N.Y. Nov. 9, 2021).

The Court starts by noting that it is not entirely clear how this case law applies—and if it does at all—in the FLSA context.[18]  In the context of a Title VII retaliation claim, the Second Circuit has expressly held that the relevant inquiry is not whether the conduct that is the subject of the complaint actually constituted a violation of the law, but whether the plaintiff had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (citation omitted).  But, the Second Circuit has never stated that this same standard applies to FLSA retaliation claims.  Instead, it has stated that while it is also possible "to state an anti-retaliation claim under the FLSA without proving an actual violation of the FLSA," "[t]o do so, however, the claimant must show that that 'a reasonable employer' could find that her complaint would fall under the scope of the FLSA's protection."  *Marcotte v. City of Rochester*, 677 F. App'x 723, 726 (2d Cir. 2017) (summary order) (quoting *Kasten*, 563 U.S. at 14).

Yet, while the Second Circuit has never expressly held that the good faith, reasonable belief of the complainant is relevant to whether a complainant has engaged in protected activity under the FLSA, that does not necessarily mean that it is not.  Such a requirement is, in no way, inconsistent with the *Kasten* requirement that a "reasonable employer" must be able to understand the complaint as an assertion of rights under the FLSA.  *Kasten*, 563 U.S. at 14.  The focus of the *Kasten* requirement is to ensure that the employer had "fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation," *id.* at 13, whereas the requirement that a complainant bring his or her complaint in "good faith" ensures

---

[18] Unlike the FLSA antiretaliation provision, the NYLL expressly includes a "good faith" requirement.  NYLL § 215(a)(1) (applying where "employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in *good faith*, believes violates [the NYLL]" (emphasis added)).

that retaliation statutes do not become a "tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies," *Spadola v. New York City Transit Auth.*, 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003); *see also Tang*, 2015 WL 5472929, at *2, and that employees who make good faith, but mistaken, complaints are protected.

A good faith requirement for FLSA retaliation claims also makes sense and is consistent with the statutory objectives. The good faith standard furthers the free flow of information regarding practices that only arguably violate the labor laws by relieving the plaintiff from having to show that the practice about which she complains is actually unlawful. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009). At the same time, however, as the D.C. Circuit has stated in the context of the good faith requirement for Title VII retaliation actions, "[c]ourts have recognized the need to balance the employer's interest in smooth functioning of his business against employees' interest in achieving internal resolution of discrimination disputes." *Parker v. Baltimore & O. R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981). "The employer is [] protected against malicious accusations and frivolous claims by a requirement that an employee seeking the protection of the opposition clause demonstrate a good faith, reasonable belief that the challenged practice violates Title VII." *Id.* Similarly, Judge Marrero stated in *Spadola*:

> The statute is designed to protect the right of employees in good faith to protest discrimination they reasonably perceive they suffered, and to encourage reporting of serious offenses free from fear of reprisals, by proscribing retaliatory misconduct by the employer. In this framework, Congress could not have contemplated a contrary scheme as a legitimate purpose of Title VII retaliation claims: to arm employees with a tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies, and thereby extract employment concessions on account of minor social lapses or harmless infractions in the workplace, or even to escape appropriate disciplinary measures.

242 F. Supp. 2d at 292 (internal citation omitted).

The same reasoning applies to FLSA retaliation claims.  An employer's interest in the smooth functioning of her business would be upset if employers were continually put in legal jeopardy any time an employee made a complaint in bad faith.  It would also not further the purposes of the statute.  The purpose of the antiretaliation provision in the FLSA is to protect plaintiffs with legitimate labor condition claims and to prevent "'fear of economic retaliation' from inducing workers 'quietly to accept substandard conditions.'"  *Kasten*, 563 U.S. at 12 (citation omitted).  Such a purpose would, in no way, be furthered—and potentially would be undermined—if the antiretaliation provision was also used to protect complainants who made their complaints as a way to  "extract employment concessions on account of minor social lapses or harmless infractions in the workplace, or even to escape appropriate disciplinary measures." *Spadola*, 242 F. Supp. 2d at 29.

Finally, the adoption of a good faith requirement in the FLSA retaliation context is consistent with the Second Circuit's decision in *Marcotte*, 677 F. App'x 723.  In that case, although the Court did not expressly adopt a good faith requirement, it implied that the good faith of the complainant was relevant.  In affirming the dismissal of the plaintiff's FLSA retaliation claim, the court noted that plaintiff has not provided "sufficient evidence of a *good faith* assertion of statutory rights that a reasonable employer would have understood as an assertion of rights under the FLSA." *Id.* at 726 (emphasis added).  It is also consistent with the decisions of other courts.  *See Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 895 (7th Cir. 2018) ("For her conduct to be protected, she must have held a good-faith belief that her suspension violated the FLSA."); *Mestizo v. H2 Candy & Nuts, Inc.*, 2019 WL 2209203, at *2 (S.D.N.Y. May 21, 2019) ("[T]o state a claim for retaliation, a plaintiff need not prove that the

conduct he or she protested actually violated the FLSA, but only that he or she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." (cleaned up)).  The parties also do not appear to dispute that a good faith requirement applies to both NYLL and FLSA claims.  Dkt. No. 324 at 10–11; Dkt. No. 333 at 27–28.

Concluding that the good faith of Plaintiff in having her counsel assert FLSA and NYLL claims on her behalf is relevant to whether Plaintiff has engaged in protected activity, the Court next turns to whether there is a triable issue of material fact as to Plaintiff's good faith.  As noted, in arguing that the claims were not asserted in good faith, Defendants largely focus on the timing of the letter and the fact that it was not sent until after Tom Harvey had already accused Plaintiff of wrongdoing.  The Court is skeptical that this alone constitutes bad faith.  As this Court has stated in a parallel context, "no reasonable employee should expect that the employer," with potentially valid claims, "would simply surrender in the face of litigation."  *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31, 2020).  The same is true here.  That an employee waited until her employer asserted claims against her does not mean that the employee's claims were not made with a good faith belief that the employer's conduct was unlawful.  An employee, facing allegations of unlawful conduct from her employer, may for the first time feel emboldened to draw the employer's attention to its own unlawful conduct.  This is particularly true where the employee's claims were neither implausible nor baseless.  *See Wolf*, 2011 WL 856264, at *8 (declining to find no protected activity on the basis of lack of good faith "where Plaintiff's discrimination claim has survived a motion to dismiss").  And, here, the evidence indicates that Plaintiff's NYLL and FLSA claims were plausible and had a basis in law and fact, even if unlikely to prevail.  Not only did Plaintiff bring such claims in the present lawsuit against Defendants, but Magistrate Judge Parker, in a report and recommendation which

this Court adopted in full, addressed Plaintiff's equal pay and overtime claims (which Plaintiff eventually voluntarily withdrew), noting that they were plausible although they may be a long shot to survive summary judgment.  Dkt. No. 240.  Thus, the mere fact that the communications were sent after Defendants had already sent the Tom Harvey letter does not mean that they cannot constitute protected activity.  "At best, it creates a dispute of fact as to [Plaintiff's] good faith, which is sufficient to defeat summary judgment."  *Gupta v. Al Jazeera Am., LLC*, 2018 WL 1605571, at *16 n.18 (S.D.N.Y. Mar. 29, 2018).  There therefore exists a disputed issue of fact whether the July 31, 2019 email from Plaintiff's counsel to Defendants' counsel constitutes protected activity under the FLSA and NYLL.

### b. Employment Actions Disadvantaging the Plaintiff and Causal Connection

With respect to the second element of Plaintiff's FLSA and NYLL retaliation claims, the question is whether Plaintiff suffered an employment action disadvantaging Plaintiff.  The standard for an employment action disadvantaging plaintiff under the FLSA and the NYLL is identical to that under Title VII: "An employment action disadvantages an employee if 'it well might have dissuaded a reasonable worker form making or supporting [similar] charges.'" *Mullins*, 626 F.3d at 53 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (hereafter, "*Burlington Northern*")); *see also Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 471 (S.D.N.Y. 2021).

Even if the Plaintiff suffers an employment action disadvantaging her, that alone is not sufficient to raise a triable issue of fact unless Plaintiff has also presented sufficient evidence of a causal connection between the protected activity and the adverse employment action.  *See Mullins*, 626 F.3d at 53.  "[T]he causal connection may be established by (1) 'evidence of retaliatory animus directed against a plaintiff by the defendant'; or (2) 'a close temporal

proximity between the protected activity and the adverse employment action.'" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) (quoting *DeCintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).  Once the plaintiff establishes a prima facie case of causation, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action." *Mullins*, 626 F.3d at 53 (cleaned up).  "If the defendant meets this burden, the plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Id.* at 53–54 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

Here, while Plaintiff asserts a host of employment actions that she claims disadvantaged her, most of actions took place before Plaintiff engaged in protected activity under the FLSA and NYLL and thus cannot form the basis of Plaintiff's retaliation claim.  *See Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013) ("Because this adverse action took place before Plaintiff engaged in any protected activity, she cannot establish a causal link between her termination and her complaints.").  Adverse action that preceded protected activity cannot be adverse action taken because of protected activity.  *See id.*  As noted, the only protected activity that Plaintiff has sufficiently shown that she engaged in was (1) the July 31, 2019 email from Plaintiff's counsel to Defendants' counsel first raising that Plaintiff had claims against De Niro, Canal, "and other related entities" including "claims implicating numerous wage-hour violations arising under NYLL and the FLSA effecting Ms. Robinson and other persons"; and (2) the

instant lawsuit, which was filed on October 3, 2019.[19]  Dkt. No. 335-63 at ECF p. 6.  However, it

is undisputed that Plaintiff's resignation (occurring on April 6, 2019), De Niro's refusal to

provide Plaintiff a recommendation letter (occurring in June of 2019), and Defendants'

investigation of Plaintiff for wrongdoing and its allegedly threatening letter (which was sent on

July 11, 2019 and detailed Plaintiff's alleged "widespread abuses and unauthorized

transactions") all occurred before both of these dates.

Thus, the only employment actions that could constitute retaliation are (1) Defendants'

bringing of the State Court Action against Plaintiff, which was initiated on August 17, 2019; and

(2) Defendants' discussions with the Manhattan District Attorney's Office, which Defendants

claim first occurred in late-June/early-July and which Plaintiff claims could have occurred as late

as August of 2019.  Ds' 56.1 Statement ¶ 99; P's 56.1 Counterstatement ¶ 99.  These actions also

can only constitute retaliation for the July 31, 2019 email from Plaintiff's counsel to Defendants'

counsel and not Plaintiff's initiation of the present lawsuit, which was filed after these actions

took place.

The Court will now turn to whether these employment actions are adverse actions under

the FLSA and NYLL and whether there is a triable issue of fact as to causation.

### i.      State Court Action

Plaintiff argues that the State Court Action as a whole and the claim for damages in the

State Court Action constitute adverse employment actions giving rise to claim for retaliation.

Dkt. No. 333 at 38–39.

"[C]laims or lawsuits designed to deter claimants from seeking legal redress" may, under

certain circumstances, "constitute impermissibly adverse retaliatory actions.'"  *Kim*, 576 F. Supp.

---

[19] Defendants do not contest that Plaintiff's filing of her lawsuit constituted protected activity under the FLSA and NYLL.  Dkt. No. 328 at 12.

3d at 31 (quoting *Torres*, 628 F. Supp. 2d at 472). That is because they may have an "*in terrorem* effect." *Torres*, 628 F. Supp. 2d at 473. "[B]y suing an employee who files charges [or engages in other protected activity], an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit." *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 740 (1983).

However, "[t]o sustain a claim of retaliation based on the filing of a lawsuit or a counterclaim, the plaintiff must allege [] that the lawsuit or counterclaim was filed both 'with a retaliatory motive' and that it was filed 'without a reasonable basis in fact or law.'" *Kim*, 576 F. Supp. 3d at 31 (quoting *Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008)) (citing cases); *see Rodriguez*, 2020 WL 3051559, at *3; *Chan v. Big Geyser, Inc.*, 2018 WL 4168967, at *11 (S.D.N.Y. Aug. 30, 2018). The requirement that the lawsuit be filed without a reasonable basis in law or fact derives, in part, from the protection the First Amendment affords the employer, as well as an employee, to petition the Government for redress of grievances and, in particular, to have access to the courts for the redress of those grievances. *See Bill Johnson's Restaurants, Inc.*, 461 U.S. at 741. But, "baseless litigation is not immunized by the First Amendment right to petition." *Id.* at 743. "The first amendment interests involved in private litigation—compensation for violated rights and interests, the psychological benefits of vindication, public airing of disputed facts—are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims." *Id.* (quoting Thomas A. Balmer, *Sham Litigation and the Antitrust Laws*, 29 Buffalo L. Rev. 39, 60 (1980)). In addition, an employee who engages in conduct that gives rise to a colorable claim by his employer that she engaged in tortious or wrongful conduct cannot immunize herself from a lawsuit seeking relief for that conduct by the expedient of filing a grievance. *Id.*; *see also BE&K Constr. Co. v. N.L.R.B.*, 536

U.S. 516, 527 (2002); *Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 360 (E.D.N.Y. 2021); *Arevalo v. Burg*, 10 N.Y.S.3d 231, 231 (1st Dep't 2015) ("[D]efendant's interposition of what appear to be valid counterclaims would not dissuade a reasonable worker from suing his or her employer for violating the Labor Law."). The risk of a lawsuit for wrongful conduct on the job is one that "all employees experience," *Burlington Northern*, 548 U.S. at 68; it is an incident of the employment relationship. When it is a sham or baseless lawsuit, on the other hand, it is not one of those "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Construing the evidence in Plaintiff's favor, there is insufficient evidence for a reasonable jury to conclude either that Defendants filed the State Court Action with a retaliatory motive or that it was filed without a basis in law or fact. In arguing that the State Court Action was retaliatory, Plaintiff relies largely on the timing of the filing of the State Court Action on August 17, 2019, after the letter from Plaintiff's counsel of July 25, 2019, implicitly threatening a lawsuit, and, on a text message from Kaplan to a person named Amy Weinblum on August 19, 2019 (days after the State Court Action was initiated).[20] In the text message, Kaplan sends Weinblum an article from the *New York Post* newspaper reporting on the State Court Action. Dkt. No. 339-53. Weinblum responds with a question referring to the request for relief in the

---

[20] The remaining communications that Plaintiff points to as evidence of a retaliatory motive for filing of the lawsuit also could not support a jury verdict in Plaintiff's favor. For example, Plaintiff notes that "[s]hortly before Canal filed its claims, GC Harvey openly admitted that 'he ha[d] "literally no evidence"' to bring to court." Dkt. No. 333 at 39 (citation omitted). But, this statement is taken out of context. In context, it is clear that the statement meant that Tom Harvey believed that he did not have evidence readily available to him in support of Canal's claims, not that no such evidence existed. To the contrary, in that same conversation, Weeks notes that she talked to Tom Harvey on the phone and he stated that "he's overwhelmed and knows he has the info but doesn't have time to string it all together so he wants it set up like [] a presentation lol." Dkt. No. 335-65.

State Court Action, asking "Omg is it $3m or $6m."  Kaplan replies "3 but it's just a random number.  To humiliate her.  It's not actually like they plan for this to go to court.  She was threatening to sue.  So this was tons plan to strike first." *Id.*  The reference to "tons" could be viewed as a typo for "Tom" and meant to refer to Tom Harvey.

While these text messages may support that the interest in retaliation motivated Defendants' request for relief, *see infra* p. 68, the evidence cannot support the conclusion that Defendants filed the State Court Action itself with a retaliatory motive.  Well before Plaintiff engaged in the protected conduct of threatening to sue Defendant, Canal itself had sent Plaintiff a letter accusing her of "widespread abuses and unauthorized transactions" and threatening that she must "return the SkyMiles immediately to avoid legal action."  Dkt. No. 307-34.  That communication made clear that Defendants were planning to institute legal action against Plaintiff unless she remediated what Defendants alleged was her misconduct.  And Plaintiff did not remedy her alleged misconduct.  Specifically, she did not return the SkyMiles.  Thus, the State Court Action, as a whole, cannot be "chalked up to retaliation" because it was "part and parcel of a course of conduct that began well before any protected activity took place." *Varughese v. Mount Sinai Med. Ctr.*, 2015 WL 1499618, at *66 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 693 F. App'x 41 (2d Cir. 2017).  Defendants had already invested in the allegations of Plaintiff's misconduct.  Defendants' investigation gave it a basis to sue well before the protected activity; the process was already in motion.  In that respect, it is telling what Kaplan says in the text messages and what he does not state.  His message is largely specific to the damages figure and to the timing of the lawsuit (that Defendants would sue Plaintiff before Plaintiff would sue

Defendants).  He does not state or suggest that the decision to sue at all was retaliatory or was made to deter Plaintiff from suing.[21]

There is also no evidence from which a reasonable jury could find that the State Court Action itself was baseless or a sham.  As detailed in Discussion Section II, this Court has sustained the counterclaims here, which largely mirror the claims in the State Court Action, against a motion for summary judgment and largely on the basis of evidence that was in Canal's possession at the time of the initiation of the State Court Action.  *See Conahan v. MedQuest Ltd.*, 2022 WL 16748585, at *11 (S.D.N.Y. Nov. 7, 2022) ("Defendants' counterclaim is not 'totally baseless' and, in fact, has survived summary judgment as a material issue of fact exists.").  The state court complaint detailed the results of Canal's investigation.  It alleged that Plaintiff (a) "charged hundreds of thousands of dollars in personal expenses on Canal's American Express card; (b) used and converted millions of Canal's frequent flyer miles for her personal use; (c) improperly 'reimbursed' herself from Canal's petty cash account for personal and luxury items; (d) submitted false information in order to be paid for 96 days of 'unused' vacation time; and (e) loafed during working hours, binge-watching astounding hours of TV shows on Netflix." Dkt. No. 53-2 ¶ 2.  The complaint then detailed Canal's allegations regarding Plaintiff's alleged improper reimbursement for personal expenses, unauthorized charges on Canal's American Express card, conversion of SkyMiles, falsification to obtain paid vacation time, and "binging, loafing, and theft of time."  *Id.*  ¶¶ 22–63.  There is no genuine dispute that Canal had facts to support each of the allegations.  It is largely not disputed that Plaintiff charged substantial sums

---

[21] It is unclear what Kaplan intended to convey by stating: "It's not actually like they plan for this to go to court," Dkt. No. 339-53, as the case obviously already was in state court at the time he sent the text message.  It could have just meant that Canal hoped to settle the case before any trial.  Regardless, no reasonable juror could find, based on this message alone, that the State Court Action was retaliatory.

to Canal's American Express card, moved millions of frequent flyer miles to her personal account, was paid for days of unused vacation time where she said that she was working while she was on vacation, and played Netflix shows for extended periods of time.  For the most part, Plaintiff disputes only the conclusions that Canal drew—that the reimbursements were improper or the charges unauthorized or that she was watching Netflix when she should have been working.  But the inferences are ones that could reasonably be drawn from the evidence and there is no counterevidence from which a reasonable jury could conclude that Canal believed those assertions to be untrue when they were made.

It is a closer question whether Canal's request for monetary damages, specifically, its request on a faithless servant basis "in an amount to be determined at trial, but not less than $3 million," and "monetary damages for the value of the funds and property misappropriated by [Robinson] during her employment in an amount to be determined at trial, but not less than $3 million,"  Dkt. No. 53-2 at 14, constitutes a material adverse action under *Burlington Northern*. There is no case squarely on point.

The jury could infer from Kaplan's text message that the request for $6 million in monetary relief was inserted into the complaint with a retaliatory motive—because Plaintiff was going to sue—and that it was inserted not to recover those damages but solely to deter Plaintiff from pursuing her claims.  Kaplan comes close to saying as much.  While Defendants have identified some basis for the claim for recovery of $3 million on a faithless servant basis in that Plaintiff was employed by Canal for eleven years and in her last several years had salaries hovering close to and then above $200,000, Dkt. No. 53-2 ¶ 17, Defendants have identified no basis upon which they could recover an additional $3 million for funds and goods allegedly misappropriated by Plaintiff.  In addition, when De Niro was asked during his deposition

whether he believed that Plaintiff stole $6 million or even $3 million from him, he said "[n]o" although he noted he believed that his attorneys' "had a reason" for asking for $6 million but could not say what it was.  Dkt. No. 307-2 at 429–31.

However, Plaintiff fails to identify a case in which a court has sustained a claim for retaliation where the state court lawsuit itself had potential merit and was not baseless but the particular monetary damages sought by the state court plaintiff (and the federal defendant) had no basis in law or fact.[22]  Courts considering whether a state court lawsuit is a material adverse action generally analyze the merits of the lawsuit as a collective whole (or perhaps the claims or causes of action asserted in it) and not the specific request for relief in isolation.  *See, e.g.*, *Nunez v. Metro. Learning Inst., Inc.*, 2021 WL 1176219, at *4 (E.D.N.Y. Mar. 29, 2021); *Karlin v. MCS Mortg. Bankers, Inc.*, 2019 WL 1586861, at *4 (E.D.N.Y. Apr. 12, 2019).

That is for good reason.  The filing by an employer of an entirely or largely frivolous lawsuit is not one of "those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington Northern*, 538 U.S. at 68.  It may be that no employee has a protectible expectation that he can engage in misconduct or arguable misconduct

---

[22] In fact, the only case which Plaintiff cites, which the Court through its independent review has located, where a court suggested that a meritless request for damages alone may constitute an adverse action rejected the requirement that the plaintiff demonstrate baselessness at all.  In *Spencer v. International Shoppes, Inc.*, 2010 WL 1270173 (E.D.N.Y. Mar. 29, 2010), the court denied summary judgment on plaintiff's claims for retaliation on the basis of defendants' filing of a lawsuit that sought "very large damages, here, over six million" *Id.* at *12–13.  In doing so, the court dismissed the defendants' argument that the lawsuit could not be retaliatory because it was not frivolous.  *Id.* at *12–13.  The *Spencer* court held that "[e]ven if the litigation is not frivolous, it still may be considered retaliatory if motivated, even partially, by a retaliatory animus."  *Id.* at *12.  The court's decision in *Spencer*, however, is not persuasive.  The *Spencer* court held that the defendant's filing of the lawsuit could be the basis of a retaliation claim on the basis that the lawsuit was filed with a retaliatory motive based on the size of the damages request and the timing of the lawsuit without requiring that the lawsuit be meritless.  But, for the reasons discussed at the beginning of this section, this holding is in direct tension with *Bill Johnson's Restaurants, Inc.*  *Spencer* therefore cannot support Plaintiff's argument here.

in the workplace without being held to account.  But all employees do and should have an expectation that they will not be sued without basis by the employer to whom they devote their time and effort.  A baseless lawsuit also is "material"—it "produces an injury or harm."  *Id.* at 67–68.  "[T]he employee will most likely have to retain counsel and incur substantial legal expenses to defend against it."  *Bill Johnson's Restaurants, Inc.*, 461 U.S. at 740–41.  The employee will need to take time away from work or home and faces the risk of liability and the risk that a lawsuit places with respect to future employment.

By contrast, an exaggerated request for damages with respect to a lawsuit that is otherwise potentially meritorious cannot easily be deemed material or outside the realm of ordinary conduct that an employee who has engaged in wrongdoing should be deemed to expect. The demand for relief reflects a *legal* conclusion that based on the facts asserted a party is entitled to a particular type and quantum of relief.  In New York state court, unlike in federal court, a plaintiff generally must plead the damages to which it is entitled  *Compare* NYCPLR § 3017(a) ("[E]very complaint . . . shall contain a demand for the relief to which the pleader deems himself entitled."), *with* Fed. R. Civ. P. 54(c) ("Every other final judgment [except for a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); *see also Kensington Pub. Corp. v. Kable News Co.*, 474 N.Y.S.2d 524, 526 (1st Dep't 1984) (holding that, although there is no requirement that the specific measure of damages be pleaded, facts must be alleged from which damages may be properly inferred).  Serious consequences may follow from the failure to request damages or the decision to request too low an amount of damages.  Although the state courts will grant a motion to amend the ad damnum claim even after trial in the absence of a showing of prejudice, *see Loomis v. Civetta Corinno Const. Corp.*, 429 N.E.2d 90, 91–92 (N.Y. 1981); *see also*

70

*Commissioners of State Ins. Fund v. Serv. Unlimited, USA, Inc.*, 857 N.Y.S.2d 231, 232 (2d Dep't 2008), the damage amount alleged in the complaint, in the absence of a formal motion to amend, constitutes the upper limit on the damages that a plaintiff may obtain, *see Reid v. Weir-Metro Ambulance Serv., Inc.*, 595 N.Y.S.2d 40, 41 (1st Dep't 1993) ("In the absence of a formal motion to amend the ad damnum clause, damages must be limited to the amount sought in the complaint."); *Braun v. Ahmed*, 515 N.Y.S.2d 473, 475 (2d Dep't 1987) ("[C]ounsel still may not ask for damages in an amount exceeding the sum demanded in the ad damnum clause."). The ad damnum clause also performs a valuable notice function. The "specification of a comparatively small sum in the original ad damnum clause might lull the defendant and his counsel into a false sense of security." *Loomis*, 429 N.E.2d at 91.

The request for a particular sum of damages thus is categorically different from the filing of a complaint that the filer knows to be without basis in law or fact. It does not require the defendant to hire a lawyer; the defendant already will have been required to hire a lawyer from the filing of the lawsuit itself. In the ordinary case, it also will not require additional time away from work or home, require the defendant to defend against an additional set of facts, or accuse the defendant of additional wrongdoing—it just identifies the maximum relief that the plaintiff can obtain from the wrongdoing as to which there is a basis in law and fact. The request for relief, and the request for relief in a large amount, which gives the state court plaintiff room to obtain maximum relief without seeking an amendment, also might be deemed an ordinary incident of the lawsuit which itself is not a materially adverse action. *See Aggarwal v. Ponce Sch. of Med.*, 745 F.2d 723, 729 (1st Cir. 1984) ("Modern litigation practices being what they are, the monetary demand which caps a plaintiff's complaint is likely to be sanguine at best—and more often than not, the merest of velleities."); *Murray v. Coleman*, 232 F. Supp. 3d 311, 318

(W.D.N.Y. 2017).  Plaintiffs often seek more damages than that which they believe they will ultimately be able to obtain so that, in the unusual circumstances in which they are able to obtain that relief, they are not precluded from recovering it by virtue of the ad damnum clause.  In those circumstances, the ordinary remedy for the state court defendant who believes that the plaintiff's request for relief is without basis is that available to all state court litigants—she can use the tools of discovery in the state court to demonstrate that the claim for relief is meritless.  For these reasons, a somewhat inflated request for damages will generally be nothing more than a "petty slight[] or minor annoyance[] that often take[s] place" and not actionable retaliation.  *Burlington Northern*, 548 U.S. at 68.

Indeed, it is difficult to believe that the rule could be otherwise.  The paradigmatic lawsuit that is the subject of a federal retaliation claim—including this one—is one that is filed in state court.  *See, e.g.*, *Rodriguez*, 2020 WL 3051559, at *4; *Nunez*, 2021 WL 1176219, at *4.[23] The effect of the federal claim is to give the federal plaintiff the opportunity to litigate in federal court the merits of the underlying state court case and to wrest control of that case from the state court.  This result causes no great offense to interests of comity where the lawsuit is baseless or a sham.  The state law plaintiff (the employer) would not have had the right to file the state court case in the first instance and the question whether the lawsuit is baseless is likely to be rather simple.  But, in this case, the Court has concluded that there is no evidence that the State Court Action was without merit.  Defendants had the right to file that lawsuit.  The effect of adopting a rule such as that effectively urged by Plaintiff here then would be to permit parallel litigation in two different fora of the identical issue—the damages to which the state court defendant (*i.e.*, the

---

[23] This case is slightly unusual in that Defendants here, *i.e.*, the plaintiffs in the State Court Action, withdrew that action in favor of pursuing their state claims as counterclaims in this Court.

employer) is entitled.  What is more, while there will be no duplication of resources or insult to comity in this case by virtue of the fortuity that Defendants chose not to continue to pursue their claims in state court and filed them as counterclaims in this case and by virtue of the fact that the question whether the State Court Action was an adverse employment action arises on a motion for summary judgment after the conclusion of discovery, that will not always or even often be the case.  The rule for which Plaintiff advocates would force the state court plaintiff (the employer) to defend in federal court, and at an early stage, the claim for damages the state court processes would give it the time to develop.  It would potentially give the state court defendant (the employee) the right to press for the information in the employer's possession regarding damages at the time of suit and the work product that gave rise to the decision to make a particular claim for damages, information ordinarily shielded from production in state court by the attorney work product doctrine.  It would thus force the employer to litigate in federal court not its right to the ultimate claim for damages that it is simultaneously litigating in state court but the reasonableness of its request for those damages when it originally made that request.  All of those inquiries might make sense where the employer never had the right to file the state court action in the first place and where the state court lawsuit has a material deterrent effect.  The state court presumably can reach the same result that the state court action was without a basis in law or fact and dismiss the state lawsuit.  Plaintiff's argument and the inquiries it would allow make no sense as an interpretation of a federal statute in the context of a case that is not meritless and that will proceed in any event regardless of the outcome of whether the particular request for relief is exaggerated or not.

This is not to say, of course, that the attachment of a meritorious claim to an otherwise baseless lawsuit filed with a retaliatory motive can always immunize that lawsuit from attack.

No litigant has the right to file a baseless claim.  If the potentially meritorious claim is truly the tail wagging the dog or if the lawsuit would never have been filed based on the potentially meritorious claim alone, then there may be a basis to consider the lawsuit as a whole a "sham." *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972); *cf. Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 505 (2d Cir. 1989) ("To adopt [this] standard . . . would allow a party with one or more patently meritorious claims to pepper his complaint with one or more highly advantageous, yet wholly frivolous, claims, for that party would be assured that the weight of his meritorious claim(s) would shield him from sanctions."); *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 101 (2d Cir. 2000) (discussing what a sham lawsuit is for purposes of the Sherman Act and asking whether "the legal filings [were] made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment" and noting "it is immaterial that some of the claims might, as a matter of chance, have merit" (cleaned up)). Likewise, and relatedly, if a complaint is filed solely for embarrassment purposes—if the employer has no intention to pursue it and just uses the lawsuit improperly to embarrass the employee—then perhaps a materially adverse employment action would arise.  In that instance, it would not be the filing of the lawsuit itself, but the employer's conduct in ensuring that it receive attention that would be the adverse employment action.  *See Emmons v. Broome Cnty.*, 2018 WL 2364286, at *8 (N.D.N.Y. May 24, 2018) (assuming that a public, post-employment mailing about former employee could constitute a sufficient adverse employment action under the Americans with Disabilities Act); *Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 2016 WL 1449543, at *3 (D. Conn. Apr. 12, 2016) ("When an employer disseminates an employee's administrative charge of discrimination to the employee's colleagues, a

reasonable factfinder could determine that such conduct constitutes an adverse employment action.").

Here, Plaintiff has failed to adduce evidence from which a jury could find that the request for relief was itself a materially adverse action. There is no evidence that Defendants filed the State Court Action solely to embarrass Plaintiff with a $6 million figure without any intention of pursuing it. The claims asserted in the State Court Action for which Canal had a reasonable basis in law and fact were serious ones. Canal had a basis to believe Plaintiff breached her fiduciary duties and acted as a faithless servant over a period of years. It had a basis in fact and law to believe that Plaintiff stole at least approximately $250,000 worth of funds and property and had engaged in pervasive fraud against Canal, and that it was entitled to return of hundreds of thousands of dollars from Plaintiff on a faithless-servant basis.[24] Even if at the time of filing, and with the evidence adduced through discovery, those sums do not total $6 million, they ran at least into the hundreds of thousands. In addition, while Canal may not have known of anywhere near $3 million worth of misconduct when it filed the State Court Action, it could have reasonably expected to discover significantly more alleged fraud against itself during discovery and as the case progressed. Canal's fraud claim, which was asserted in the State Court Action, had a six-year statute of limitation and thus had the potential to stretch back and include a host of Plaintiff's conduct while employed at Canal. There is no reason to believe—and Plaintiff has

---

[24] In its factual section, the complaint recites what it claims Robinson misappropriated or unlawfully received: salaries ranging from $175,000 to $300,000 a year, Dkt. No. 53-2 ¶ 17, almost $5,000 plus frequent flyer miles for an unnecessary visit to Los Angeles, *id.* ¶¶ 28–34, $12,696.65 for food, drinks and gratuities at Paola's, *id.* ¶ 37, $3,000 for flowers, *id.* ¶ 39, $8,923.20 for groceries, *id.* ¶ 42, approximately $32,000 for personal taxis and Uber rides, *id.* ¶ 43, 8 million frequent flyer miles valued at more than $125,000, ¶ 48, and $70,000 for claiming that she had not used 96 vacation days, *id.* ¶ 54.

offered none—that the State Court Action was filed without any intention to pursue it and solely for publicity value.  Indeed, Defendants have pursued it.

Nor is there evidence that the State Court Action itself caused Plaintiff any incremental harm or injury.  Given the gravity of the underlying allegations and the sums of money involved, Plaintiff already was subject to the need to hire counsel, to spend time and effort on the case, and to confront the factual allegations.  Adding a number to it did not make her conduct—if proven—more or less wrong even if it increased the quantum of potential damages.  Further, there is no evidence that Defendants took any action to publicize the State Court Action.  To be sure, it did attract attention and could reasonably have been expected to attract attention.  De Niro is a well-known movie actor.  Everything he does attracts attention.  And state court actions are open to the public to view.  But the First Amendment right of access applies to famous movie stars as well as to ordinary citizens and Plaintiff identifies no evidence that Defendants themselves sought out publicity for this lawsuit.

For these reasons, the Court holds that no reasonable juror could find in Plaintiff's favor on its claims for retaliation under the FLSA/NYLL based on Canal's filing of the State Court Action.  Summary judgment is therefore granted as to this aspect of these claims.

### ii.   Criminal Investigation

Next, the Court turns to the question whether Canal's instigation of a criminal investigation into Plaintiff also may constitute an adverse employment action.  The parties dispute exactly when Canal first referred the matter to the District Attorney's Office and thus whether it can properly constitute retaliation for the July 31, 2019 email from Plaintiff's counsel to Defendants' counsel.  This issue revolves around Tom Harvey's testimony, which is slightly internally inconsistent as to the exact timing of the referral.  During his first deposition, Tom Harvey testified that he first spoke to the Manhattan District Attorney's Office about Plaintiff in

in "either July o[r] August '19" and stated that he had no "way to distinguish between those months." Dkt. No. 322-89 at 397. In his second deposition, however, Harvey testified that he "had spoken with the District Attorney [in] late June/early July" about Plaintiff and had his second communication with them in mid-July. Dkt. No. 280 at 279–80. The parties point to no other documentary evidence, including from the District Attorney's office itself, concerning when the first conversation took place. Based on these inconsistent accounts, and construing the evidence in favor of Plaintiff, it is plausible that a jury would find that Canal first raised its claims against Plaintiff in August, after Plaintiff's protected conduct on July 31, 2019. Therefore, to the extent it constitutes an adverse employment action, initiation of the criminal investigation could form the basis for a retaliation claim based on such protected activity.

Plaintiff claims that "it is well recognized as retaliation for an employer to 'instigate[] government action against a former employee,' including by reporting her to criminal authorities." Dkt. No. 333 at 36 (citation omitted). The law does not support this broad proposition. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Moreover, as previously noted, "[a]n employee's decision to report discriminatory behavior [or purported FLSA violations] cannot immunize that employee from those petty slights or minor inconveniences that often take place at work and that all employees experience." *Id.* The Second Circuit and courts in this Circuit thus have generally held that the initiation of either an internal investigation or a government investigation may constitute a materially adverse action only "if it results in 'a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to "dissuade a reasonable worker from making or supporting a charge of discrimination."'" *Tillery v. New York*

*State Off. of Alcoholism & Substance Abuse Servs.*, 739 F. App'x 23, 27 (2d Cir. 2018)

(summary order) (quoting *Cox v, Onondaga Cty. Sherrif's Dep't*, 760 F.3d 139, 147 (2d Cir.

2014)); *see also Bain v. Wrend*, 2020 WL 1316660, at *8 (D. Vt. Mar. 20, 2020) (holding that

"an investigation which does not result in workplace discipline does not qualify as an adverse

employment action" and that "a referral to a third-party such as a police department for

investigation of work-place conduct is not an adverse employment action"); *Abdulaziz v.*

*Bremby*, 2018 WL 3764260, at *4 (D. Conn. Aug. 8, 2018) (holding that internal investigation

did not adversely affect plaintiffs where the most generous inference was that they received

requests to produce documents and complied with those requests); *Boylan v. Arruda*, 42 F. Supp.

2d 352, 356-57 (S.D.N.Y. 1999) ("simply undergoing an investigation is not sufficient to

constitute 'adverse employment action'").[25]   In the context of government investigations, there is

also some suggestion in the law that the plaintiff must allege and prove that the report was made

based on false information.  *See, e.g.*, *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 158 (3d Cir.

1999) (employer allegedly sent "information" to the government agency "mistakenly indicating

that [plaintiff] had committed a serious offense."); *Lynch v. N.Y. State Urban Dev. Corp.*, 2018

WL 7918226, at *8 (E.D.N.Y Aug 10, 2018) ("Courts have found that termination, *filing false*

*charges*, negative references, and placement on probation constitute materially adverse actions."

---

[25] Although none of this case law arises specifically in the FLSA/NYLL context and some of it
does not use the language of *Burlington Northern*, what constitutes a materially adverse action
under Title VII is the same as under the FLSA/NYLL, *see Mullins*, 626 F.3d at 53, and is a "less
demanding" standard for Section 1983 actions than for Title VII or FLSA/NYLL actions,
*Brown v. Off. of State Comptroller*, 456 F. Supp. 3d 370, 400 (D. Conn. 2020); *see also Bain*,
2020 WL 1316660, at *7 n.5 (describing standard as "essentially identical" as the *Burlington*
*Northern* standard).  Therefore, to the extent an action is not an adverse employment action for
purposes of Title VII or Section 1983 retaliation claims, it would also not constitute an adverse
action for FLSA/NYLL retaliation claims.

(emphasis added)); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 192 (S.D.N.Y. 2001), *aff'd*, 48 F. App'x 363 (2d Cir. 2002) (summary order) (concerning potentially false charges).[26]

Thus, for example, where an employer makes an incorrect report, a claim for retaliation will lie where the incorrect report results in charges which have a "negative effect" on the plaintiff's ability to continue her work, *Durham Life*, 166 F.3d at 158, or results in a criminal trial that "is necessarily public and therefore carries a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects," *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996). Courts have also stated that an investigation may form the basis of an adverse employment action claim where the "charges at issue [resulted in] subsequent employment consequences." *United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 408 (S.D.N.Y. 2018) (quoting *Anemone v. Metropolitan Transportation Authority*, 410 F. Supp. 2d 255, 266 (S.D.N.Y. 2006)); *Jones v. Fitzgerald*, 285 F.3d 705, 715 (8th Cir. 2002) (an internal investigation is no adverse employment action where employee "suffered no material disadvantage in a term or condition of employment as a result of the investigations"). Further, "[b]eing forced to defend against disciplinary charges may constitute an adverse employment action." *Rolon v. Ward*, 345 F. App'x 608, 610 (2d Cir. 2009) (citing *Albert v. City of Hartford*, 529 F. Supp. 2d 311 (D. Conn. 2007)).[27]

---

[26] In the analogous area of false arrest, courts have held that "a defendant who causes an unlawful arrest or prosecution may be held responsible civilly, if he does so by maliciously providing false information." *Friedman v. New York City Admin. for Children's Servs.*, 2005 WL 2436219, at *8 (E.D.N.Y. Sept. 30, 2005); *see also TADCO Const. Corp. v. Dormitory Auth. Of State of N.Y.*, 700 F. Supp. 2d 253, 268-69 (E.D.N.Y. 2010).

[27] In *Albert*, the district court held that a plaintiff who was charged with a violation that defendants knew lacked merit and was forced to defend himself in a disciplinary hearing that could have led to a suspension was subject to an adverse employment action. 529 F. Supp. 2d at 334.

These holdings reflect a recognition that, in the modern world, corporations frequently are charged with the responsibility either to investigate or to report to governmental authorities suspected wrongdoing. *See, e.g.*, U.S.S.G. § 8C2.5(g)(1) (taking into consideration company's voluntary self-disclosure of offense to prosecutors); *Szwalla v. Time Warner Cable LLC*, 670 F. App'x 738, 739 (2d Cir. 2016) (summary order) ("An employer may avoid liability for a supervisor's sexual harassment where it shows that []'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior.'" (citation omitted)); Sec. & Exch. Comm'n Div of Enf't, Enforcement Manual 98 (Nov. 28, 2017) (detailing decision not to take enforcement action against public company based on company's cooperation and identifying "four broad measures of a company's cooperation" including "self-reporting of misconduct, when it is discovered"). The law positively encourages those who believe they have witnessed or been the victim of a crime to report it to the appropriate authorities. *See, e.g.*, *Loughlin v. Goord*, 558 F. Supp. 3d 126, 152 (S.D.N.Y. 2021) (citing cases), *reconsideration denied*, 2021 WL 4523504 (S.D.N.Y. Sept. 30, 2021), *and aff'd*, 2022 WL 9575656 (2d Cir. Oct. 17, 2022). That an employee might have to answer questions, either during or after the term of his employment, thus might be viewed as one of those "minor inconveniences that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 67. Although the specter of having to answer questions from a lawyer hired by the company or by a government prosecutor might not appear "minor" at the time, it is one of those consequences that all employees might be deemed to have accepted at the time they assumed their responsibilities and were entrusted with corporate assets. It also reflects, and may rest upon, a recognition that investigations—whether internal or governmental—will be confidential unless and until they result in charges.

Construing the evidence favorably to Plaintiff, Plaintiff has not presented a genuine issue of material fact that would require trial as to her claim of retaliation based on the initiation of a criminal investigation into her.  The evidence supports that in August 2019, representatives of Canal met with representatives of the New York District Attorney's Office and provided them with materials that they believed constituted evidence of theft.  It also reflects that the District Attorney's Office, at Canal's instigation, commenced a lengthy criminal investigation, during which it spoke to a number of different individuals.[28]  It further reflects that, at the conclusion of the investigation, the District Attorney's Office declined to bring charges against Plaintiff. Plaintiff does not identify any intentionally false information that Defendants provided to the District Attorney's Office about her.  Moreover, although Plaintiff expresses that the experience was harrowing, Dkt. No. 333 at 10, there is no evidence that it was conducted in an egregious manner or had any employment consequences for Plaintiff.  All that Plaintiff alleges is that she at some point become aware of the District Attorney's Office's investigation.

Furthermore, even if the initiation of a criminal investigation did constitute an adverse employment action under the FLSA or the NYLL, there is insufficient evidence from which a reasonable jury could conclude that it was initiated in retaliation for Plaintiff's protected conduct. Although Plaintiff claims that the report to the District Attorney was in retaliation for the July 31, 2019 email from Plaintiff's counsel, Canal had begun its investigation into Plaintiff long before then and had obtained information which it claimed showed Plaintiff's improper use of Canal's credit cards, SkyMiles, and vacation days.  Indeed,  on July 11, 2019, before the alleged protected conduct, Tom Harvey had already sent Plaintiff an email detailing her alleged

---

[28] It is unclear whether the District Attorney's Office ever spoke to Plaintiff or how Plaintiff learned of the investigation.  Dkt. No. 336 ¶ 12.

"widespread abuses and unauthorized transactions" during her employment.  Dkt. No. 327-50.

In that letter, he wrote: "I strongly suggest you speak to an attorney and return the SkyMiles

immediately" and further noted "[p]lease return the SkyMiles immediately to avoid legal action."

*Id.*  He then noted:  "Feel free to have your attorney contact me."  *Id.*  It thus is clear that, prior to

the alleged protected conduct, Canal believed that Plaintiff had engaged in illegal conduct and

intended to pursue legal action on the basis of it.

Plaintiff attempts to argue that this explanation is mere pretext and that Defendant went

to the Manhattan District Attorney's Office, not because of the evidence it had already

uncovered, but because of the letter from Plaintiff's counsel that followed Tom Harvey's email.

However, the primary evidence she points to in support of that argument is the timing of the

report to the Manhattan District Attorney's Office and, it is well-established that "where timing

is the only basis for a claim of retaliation, and gradual adverse job actions began well before the

plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Clark Cty. Sch.*

*Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[P]roceeding along lines previously contemplated,

though not yet definitively determined, is no evidence whatever of causality.").  There is no

evidence that Canal did not believe the statements in Tom Harvey's email when he sent it on

July 11, 2019.  It had already conducted an investigation that led to those findings.  There is no

evidence that others at Canal thought the charges were without merit.  To the contrary, internal

communications reveal that Canal believed Plaintiff had engaged in illegal conduct.  *See, e.g.*,

Dkt. No. 335-62 (internal text message from Chen on July 26, 2019 to Weeks-Brittan and Spear

stating:  "Basically everything she has done would put her in jail and we think that's a great

idea").

Finally, Plaintiff complains that Canal did not initiate a criminal investigation into two other Canal employees accused of financial wrongdoing around the same time. Although in some circumstances the enforcement against a complaining plaintiff of a rule not enforced against others who did not engage in protected conduct could give rise to a claim of retaliation, *see Cook v. CBS, Inc.*, 47 F. App'x 594, 596 (2d Cir. 2002) (summary order) (retaliation may be shown through evidence that plaintiff "was treated differently from other employees who engaged in similar conduct"); *Grant v. United Fed'n of Tchrs.*, 2014 WL 978444, at *13 (E.D.N.Y. Mar. 12, 2014), Plaintiff fails to identify evidence that gives rise to a genuine issue of material fact here. Plaintiff does not identify evidence that such employees engaged in misconduct much less that it was of the magnitude of that suspected by Plaintiff. To the contrary, concerning allegations against Chambers, De Niro testified that Canal employees did not "think they saw that there was anything" justifying the allegations. Dkt. No. 335-3 at 559. Summary judgment is therefore granted on Plaintiff's claims for retaliation under the FLSA and NYLL.

### c.    Retaining Federal Jurisdiction

Having found that Plaintiff's federal claim—and the only federal claim remaining in the case—cannot survive Defendants' motion for summary judgment, the court must determine whether to maintain supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367, which provides that this court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." "Supplemental jurisdiction is a doctrine of discretion and a doctrine of flexibility, which is designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Drake v. Lab'y Corp. of Am. Holdings*, 323 F. Supp. 2d 449, 452 (E.D.N.Y. 2004) (cleaned up). "[A] district court should

consider [the following factors] when deciding whether to exercise supplemental jurisdiction: (1) whether state law claims implicate [ ] the doctrine of preemption; (2) judicial economy, convenience, fairness, and comity; (3) the existence of novel or unresolved questions of state law; and (4) whether state law claims concern the state's interest in the administration of its government." *Id.* (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305–06 (2d Cir. 2003)).

Having considered these factors, the Court concludes that retaining jurisdiction of the state law claims is appropriate. Although the state law claims do not implicate the doctrine of preemption, judicial economy, convenience, and fairness all strongly weigh in favor of this Court resolving this case. This case has been pending since 2019, discovery has long-since been complete, and the parties have filed hundreds of pages of briefing and hundreds of exhibits in connection with the present summary judgment motions. This Court has spent significant time reviewing this briefing and these exhibits in connection with deciding the present motions and held oral argument on the parties' claims, which lasted for hours. In addition, certain of the state law claims in this case concern the same facts that this Court considered in connection with its decision as to Plaintiff's FLSA retaliation claim. It would result in a significant waste of judicial resources for this Court to dismiss the remaining claims at this point in time and require a state court to start from scratch. Judicial economy thus strongly favors this Court retaining jurisdiction. "Given the lengthy history of [this] litigations, and the Court's familiarity with every aspect of his lawsuits, judicial economy, convenience and fairness—notwithstanding basic concerns for comity—would be served by keeping the case with the Court." *Drake*, 323 F. Supp. 2d at 455.

This case also does not concern any novel issues of state law or implicate any state interest in the administration of its government. *See Lee*, 316 F.3d at 308 (finding federal court's

resolution of state-law claims inappropriate where case involved the "issue of general tort liability for municipalities and the interplay between the responsibilities imposed by municipal law and those imposed by state law are fundamental and complex questions involving the balancing of important policies of state government"). The standards for breach of fiduciary duty, conversion, and retaliation and discrimination under the NYCHRL are well-worn. This Court thus exercises its discretion to retain jurisdiction of the remaining state law claims in this lawsuit.

### 2. NYCHRL

The Court now turns to Plaintiff's claim for retaliation under the NYCHRL. Section 8–107(7) of the NYCHRL states that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). "'[T]o make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct.'" *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021). "Individual employees who actually participate[d] in the conduct giving rise to the plaintiff's claim may be found liable for retaliation under NYCHRL." *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 662 (E.D.N.Y. 2015) (internal quotation marks omitted). "New York courts have broadly interpreted the NYCHRL's retaliation provisions." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (citation omitted); *see also Albunio v. City of New York*, 947 N.E.2d 135,

137 (N.Y. 2011) ("[W]e must construe Administrative Code § 8–107(7), like other provisions of the City's Human Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.").

"Summary judgment dismissing a claim under the NYCHRL should be granted only if no jury could find [the] defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." *Sanderson-Burgess v. City of New York*, 102 N.Y.S.3d 678, 680 (2d Dep't 2019) (quoting *Persaud v. Walgreens Co.*, 76 N.Y.S.3d 613, 615 (2d Dep't 2018)); *see also Mihalik*, 715 F.3d at 116 (assessing a retaliation claim under both the pretextual analysis of *McDonnell Douglas* and the mixed motive framework, and stating that "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision"); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 862 (S.D.N.Y. 2013) (assessing NYCHRL retaliation claim under a mixed-motive analysis). With respect to "mixed motive" analysis, "the newer mixed motive framework . . . imposes a lesser burden on a plaintiff opposing such a motion." *Sanderson-Burgess*, 102 N.Y.S.3d at 680 (quoting *Persaud*, 76 N.Y.S.3d at 615). "[U]nder the mixed motive analysis, the plaintiff may defeat the defendant's evidence of legitimate reasons for the challenged action by coming forward with evidence from which it could be found that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision." *Hamburg v. N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 32 (1st Dep't 2017).

"[O]ppos[ing] any practice can include situations where a person, before the retaliatory conduct occurred, merely made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong."

*Mihalik*, 715 F.3d at 112.  "Implicit references to unlawful conduct may suffice to establish protected activity."  *Marseille v. Mount Sinai Hosp.*, 2022 WL 14700981, at *2 (2d Cir. Oct. 26, 2022) (summary order).  "Moreover, the plaintiff 'need not prove that her underlying complaint . . . had merit, but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful.'"  *Id.* (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)).

"Challenged conduct may not be deemed nonretaliatory" unless "a jury could not reasonably conclude from the evidence that such conduct was . . . 'reasonably likely to deter a person from engaging in protected activity.'"  *Mihalik*, 715 F.3d at 112 (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).  This inquiry should be "made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities."  *Williams*, 872 N.Y.S.2d at 34.

The Court starts by analyzing whether there is a triable issue of material fact as to whether Plaintiff opposed unlawful practices and, if so, whether "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action" and there is a causal connection between the employer's action and the Plaintiff's opposition to unlawful practices.  *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) (summary order).

### a.    Opposed Unlawful Practice

In claiming that Plaintiff opposed unlawful practices under the NYCHRL, Plaintiff points to the following evidence: (1) communications in late 2018 and early 2019 in which Robinson sought pay parity with Dan Harvey; (2) Plaintiff's complaints to De Niro that she was being harassed, (3) Plaintiff's report to Tom Harvey that she was experiencing "down right harassment" and felt "constantly . . . harassed"; (4) Plaintiff's complaint to Tom Harvey that she

"was being targeted based on [her] gender"; (5) Plaintiff's email to De Niro on April 2, 2019 in which she stated "[p]art of my worrying is thinking about what happened to Robin with Grace"; (6) emails on April 6, June 11, and July 2, 2019 in which Plaintiff discussed the reasons for her resignation; and (7) communications from Plaintiff's counsel to Defendants' counsel raising claims for violations of gender discrimination and hostile work environment.  Dkt. No. 333 at 22–28; Dkt. No. 335-41.

As to the communications in late 2018 to early 2019 in which Robinson sought pay parity with Dan Harvey, the Court reaches the same conclusion that it did as to these complaints in the FLSA and NYLL context.  *See supra* pp. 42–46.  The mere fact that Plaintiff "complained about a man's salary does not convert [her] complaint into an allegation of discrimination." *Talwar*, 2016 WL 1298969, at *10 (involving NYCHRL retaliation claim); *see also Rommage v. MTA Long Island Rail Rd.*, 2010 WL 4038754, at *14 (E.D.N.Y. Sept. 30, 2010), *aff'd*, 452 F. App'x 70 (2d Cir. 2012) ("The mere fact that the person or people 'making the complaints [were] African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination.'" (citation omitted)).  "Filing a grievance complaining of conduct other than unlawful discrimination . . . is simply not a protected activity subject to a retaliation claim under [NYCHRL]." *Marseille v. Mount Sinai Health Sys., Inc.*, 2021 WL 3475620, at *13 (S.D.N.Y. Aug. 5, 2021), *aff'd sub nom. Marseille*, 2022 WL 14700981.

The Court also reaches the same conclusion as it did in the FLSA and NYLL context with respect to the emails on April 6, June 11, and July 2, 2019 in which Plaintiff discussed the reasons for her resignation.  *See supra* pp. 53–54.  In none of these emails does Plaintiff mention any facts, words, or allegations that even arguably could be interpreted as raising claims of

gender discrimination or other unlawful practices under the NYCHRL. *See Ramos*, 1997 WL 410493, at *3 (granting summary judgment on NYCHRL retaliation claim because complaint that supervisor was "treating [plaintiff] unfairly" did not put employer on notice of perceived race discrimination). "There is [thus] simply no evidence from which a reasonable jury could conclude that Plaintiff's email[s] amounted to a complaint about discrimination as opposed to [them] being a general complaint about" workplace conditions. *Marseille*, 2021 WL 3475620, at *13.

Plaintiff's complaints to De Niro and Tom Harvey that she was being harassed also do not constitute protected activity under the NYCHRL. This claim centers on the following evidence: First. Plaintiff testified that she spoke to De Niro on "many occasions about being harassed, whether it was by him, by his wife, by his business partner Jane Rosenthal, by um, a house manager Peter Lambert." Dkt. No. 335-12 at 45. Specifically, she stated that she spoke to him about being harassed on the "apartment work in 2019" and that he was "berating [her] about items that needed to be done for the apartment." *Id.* She also stated that she told him that he or his wife were targeting and harassing her on "items." *Id.* Plaintiff further stated that she talked to De Niro about "being harassed and Jane Rosenthal creating a toxic work environment including refusing to allow me entry through a door, her berating me, there were multiple complaints with her" and had "spoken on many occasions to" De Niro "about Peter Lambert and the harassment that [she] received from him and on Grace Hightower-De Niro targeting me." *Id.* at 46. Second, Plaintiff sent a text message on March 5, 2019 to Tom Harvey, in which she states "[t]his insanity has got to stop. It's so uncomfortable and just down right harassment . . ." Dkt. No. 335-36. Third, during a phone call to Tom Harvey, Plaintiff stated that she feels

constantly like she is harassed, and that Chen is "saying things about [her] to [De Niro] that aren't true." Dkt. No. 335-40.

Although such evidence indicates that Plaintiff opposed harassment in the workplace, the evidence does not support that Plaintiff opposed or intended to oppose harassment based on her *gender*. While Plaintiff did use certain buzzwords like "harassment" and "toxic work environment," Plaintiff said nothing that could be understood, even in context, to be about her gender or other protected characteristics. Instead, her complaints seem to have been largely about harassment she received related to her work on the apartment. *See Farzan v. Wells Fargo Bank, N.A.*, 2013 WL 6231615, at *28 (S.D.N.Y. Dec. 2, 2013), *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015) (summary order) (granting summary judgment on NYCHRL claims because "[w]hile Farzan did tell Chan that he would file a 'discrimination complaint' when told he would not be kept on at Wells Fargo, even in his own account of the conversation, he said nothing beyond this one remark that in context could be 'understood to have been about race' or other protected classifications" (citation omitted)); *see Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012) ("While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." (citation omitted)).

That Plaintiff, in making these complaints, does not appear to have been opposing unlawful discrimination in violation of the NYCHRL, as opposed to general working conditions, is further supported by Plaintiff's deposition testimony. During her deposition, Plaintiff was asked what she meant by the term "toxic work environment. Dkt. No. 322-3 at 52. She testified that a "[t]oxic work environment, I would say it's a very toxic place to work. I think that it can be contributed to an employer, to you know—again, a very uncomfortable place for an employee

to work." *Id.* at 52–54.  In other words, Plaintiff herself—even after the fact—did not connect the phrase "toxic work environment" to discrimination based on a protected characteristic such as gender.

The cases Plaintiff cites are not inconsistent with this conclusion.[29]  None of these cases support the broad proposition for which Plaintiff argues that merely mentioning the words "harassment" or "toxic work environment" is sufficient to constitute protected activity.  In one of the cases, the employee used the term "hostile work environment" and stated that she was "going to bring charges" against the employer.  *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015).  The court concluded that plaintiff's use of the term "hostile work environment" which was coupled with the statement that he was going to sue his employer was sufficient to constitute protected activity because "the context objectively reveal[ed] the employee [wa]s using the expression to complain about repeated abusive discriminatory comments or treatment," and the plaintiff "used and intended the phrase . . . to reference discriminatory treatment because he was aware of the legal significance of the term and meant it to be a complaint about national-origin or religious discrimination."  *Id.*  Two of the other cases Plaintiff cites also merely stand for the proposition that, when considered in the broader context of the complaint and past complaints, use of the words harassment or discrimination may constitute protected activity.  In *Crawford v. Chipotle Mexican Grill*, 773 F. App'x 822 (6th Cir. 2019), for example, the Sixth Circuit found that "an African-American woman [who] approached her Hispanic manager and accused him of 'discriminating against' an African-American co-worker" could be protected activity under Title VII because "a jury could appropriately consider

---

[29] Although the court in *Dutton v. Penske Logistics*, 2010 WL 2775843 (W.D.N.Y. July 14, 2010), did state that Plaintiff's complaint "about harassment to her supervisor" was protected activity under Title VII, it is unclear exactly what the content of that complaint was.  *Id.* at *5.

the context—specifically, that Crawford had previously told Torres about complaints that he favored Hispanic crew members." *Id.* at 827. Similarly, in *Okoli v. City of Baltimore*, 648 F.3d 216 (4th Cir. 2011), the Fourth Circuit found that the plaintiff's complaint of harassment along with her "description of 'unethical,' 'degrading and dehumanizing' conduct [which suggested] severe misbehavior related to her identity" was protected activity. *Id.* at 224. In this case, by contrast to those cases, Plaintiff did not use the term "hostile work environment," there is nothing about the context of the statements that would suggest that she was complaining about discrimination on the basis of gender, and even her own deposition testimony suggests that she intended the reference to a "toxic work environment" as one that was difficult without being harassing on the basis of gender.

Plaintiff's *single* comment made during her deposition that she "can recall an incident in speaking to Tom Harvey and Michael Tasch about [] being targeted base[d] on my gender by Tiffany, and being blamed for people not getting back to her" also does not change this Court's conclusion. Dkt. No. 335-12 at 129. "A plaintiff alleging discrimination claims cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts." *Bloomberg L.P.*, 967 F. Supp. 2d at 831 (cleaned up). "The party opposing the motion [for summary judgment] must set forth 'concrete particulars.'" *Marseille*, 2021 WL 3475620, at *10 (quoting *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996)). This evidence is too vague to forestall summary judgment or to raise an issue of genuine fact. Not only is it unclear based on this statement alone what exactly Plaintiff said to Tom Harvey and Tasch about being targeted based on her gender or whether she even mentioned the word gender at all, but, more importantly, Plaintiff provides no detail as to when this incident occurred (*i.e.*, whether it was before or after her resignation and, if before, how long

before).  This poses an issue for Plaintiff's retaliation claim.  Without some greater indication of

the date that this complaint was made, it is wholly unclear which adverse actions of Defendants

would have come before (and therefore cannot be retaliatory) or after this incident.  A jury would

have to speculate.  *See Cohen v. Equifax Info. Servs., LLC*, 2019 WL 5200759, at *4 (S.D.N.Y.

Sept. 13, 2019), *aff'd*, 827 F. App'x 14 (2d Cir. 2020) ("The remainder of plaintiff's testimony

regarding supposed inaccuracies, however, is too vague and conclusory to preclude summary

judgment."); *Woods v. Miller*, 2017 WL 4181383, at *5 (N.D.N.Y. Aug. 1, 2017), *report and

recommendation adopted*, 2017 WL 4155357 (N.D.N.Y. Sept. 18, 2017) ("Plaintiff's allegations

are simply too vague to survive summary judgment.  As Defendants point out, the only date

Plaintiff is able to identify on which he requested and was denied boots is February 20, 2014.

Aside from this date, Plaintiff estimates that he requested boots from Defendant Fuller on twelve

to sixteen occasions and from Defendant Warrington on eight to twelve occasions, but he is

unable to specify the date of any of those requests."); *Maharan v. Berkshire Life Ins. Co.*, 110 F.

Supp. 2d 217, 223 (W.D.N.Y. 2000) ("This testimony is too vague and too speculative to defeat

defendant's motion for summary judgment.  Plaintiff cannot recall the date and time of the phone

call . . . .").

The Court, however, reaches a different conclusion with respect to Plaintiff's email to De

Niro on April 2, 2019 in which she stated "[p]art of my worrying is thinking about what

happened to Robin with Grace."  Dkt. No. 335-41.  As to the April 2, 2019 email, the evidence,

construed in Plaintiff's favor is the following.  On April 2, 2019, Plaintiff wrote to De Niro, in

part,

> I'm worried that my presence in the house amongst other things is not working for
> Tiffany, and therefor[e] you—and I've felt this way since September/November.
> It's been very difficult.  Part of my worrying is thinking about what happened to

> Robin with Grace.  And I don't want it to get to that point.  I want to be able to finish what we agreed upon and fulfill my commitment to you and to the job.

> So I came up with this idea and I hope we can discuss it if you think it has merit.  It reminds me of how we dealt with the friction between Grace and me years ago.  It's out of sight, out of mind.

Dkt. No. 335-41.  The reference to "Robin" appears to be a reference to Robin Chambers who worked as an assistant for De Niro between 1989 and 2003.  Ds' 56.1 Statement ¶ 12; P's Counterstatement ¶ 12.  The reference to "Grace" appears to be a reference to Grace Hightower, De Niro's former wife.  Chambers testified that she was terminated in 2003 by De Niro at the request of his then-wife Grace Hightower as "Grace didn't want . . . a female assistant around." Dkt. No. 339-5 at 21–22, 225.  The view that Hightower targeted De Niro's female assistants also appears to have been shared by Plaintiff, who testified that her intent in sending the April 2, 2019 email was to propose staying "out of sight out of mind as a possibility to help with Tiffany targeting me and my gender as Grace did in the beginning."  Dkt. No. 344-6 at 156–57.  Plaintiff also testified that she had spoken on many occasions to De Niro about Hightower targeting her. *Id.* at 46.

As previously noted, "[i]mplicit references to unlawful conduct may suffice to establish protected activity" under the NYCHRL.  *Marseille*, 2022 WL 14700981, at *2.  For example, in *Albunio v. City of New York*, the New York Court of Appeals addressed whether there was sufficient evidence to support a verdict of retaliation under the NYCHRL based on the opposition of a New York City Police Department employee, Lori Albunio, to her employer's discrimination against another employee, Robert Sorrenti, on the basis of Sorrenti's perceived sexual orientation.  16 N.Y.3d 472 (N.Y. 2011).  In that case, certain evidence showed that James Hall, a commanding officer, had made numerous comments to Albunio indicating that he believed Sorrenti was gay and did not "want him around kids."  *Id.* at 475.  At an October 31

meeting, Albunio was told that Hall and another employee were contemplating replacing her, to which she responded, "[w]hy am I losing my command?" and "Hall interjected to say that Albunio 'utilized poor judgment when requesting personnel,' citing Sorrenti as the primary example." *Id.* Albunio then told Hall that "'Sorrenti was the better candidate,' adding: 'If I had to do it all again, I would have recommended Sorrenti again.'" *Id.* at 476. The court concluded that Albunio's statement to Hall at the October 31 meeting could be viewed as protected activity under the NYHCLR bearing in mind its broad remedial purpose. The court noted: "While she did not say in so many words that Sorrenti was a discrimination victim, a jury could find that both Hall and Albunio knew that he was, and that Albunio made clear her disapproval of that discrimination by communicating to Hall, in substance, that she thought Hall's treatment of Sorrenti was wrong." *Id.* at 479.

Here, too, although it is a close call, a reasonable jury could find that Plaintiff's statement to De Niro that "[p]art of my worrying is thinking about what happened to Robin with Grace. And I don't want it to get to that point" constituted an implicit reference to and objection to unlawful conduct that had happened in the past and an expression of concern that the same type of conduct was happening to Plaintiff in the present. Dkt. No. 335-41. Construed in favor of Plaintiff, evidence supports that it was understood by former and current employees of Canal that Hightower had targeted executive assistants based on their gender and that Chambers had been terminated because Hightower did not want a female assistant present. Evidence, construed in Plaintiff's favor, also supports that De Niro would have understood that the reference to Grace and to Chambers pertained to an alleged act of discrimination on the basis of gender. Plaintiff testified that she had complained to De Niro on many occasions about Hightower and Chambers herself testified that she was terminated by De Niro at Hightower's request as "Grace didn't

want . . . a female assistant around." Dkt. No. 339-5 at 21–22, 225. It is therefore possible that a reasonable juror would conclude that in comparing Chen to Hightower and worrying if something similar was going to happen to her as happened to Chambers, Plaintiff was implicitly suggesting to De Niro that she too was being discriminated against based on her gender by Chen and opposed it. This email would not have protected Plaintiff against adverse employment action for wholly legitimate, non-retaliatory, and non-discriminatory reasons. However, it raises a triable issue of fact as to whether Plaintiff engaged in protected activity under the NYCHRL, sufficient to require Defendants to proffer a legitimate reason for any adverse action taken towards Plaintiff after and proximate to the email.

Plaintiff's counsel's communications to Defendants' counsel post-resignation also arguably constitute protected activity under the NYCHRL. As previously noted in its discussion of Plaintiff's FLSA/NYLL retaliation claims, on July 31, 2019, Plaintiff's counsel wrote to Defendants' counsel stating that counsel believed that the earlier letter from Tom Harvey to Plaintiff was "designed to inhibit Ms. Robinson from asserting various employment and other claims against Mr. De Niro, Canal Productions, and other related entities" including "claims including sex discrimination, sexual stereotyping, hostile work environment and retaliation." Dkt. No. 335-63 at ECF p. 6. Plaintiff's counsel thus made clear that Plaintiff was opposing practices "forbidden under" the NYCHRL. N.Y.C. Admin. Code § 8-107(7). For the reasons detailed in the context of Plaintiff's FLSA/NYLL retaliation claims, the fact that this communication was not sent until after Defendants had accused Plaintiff of unlawful conduct at

most "creates a dispute of fact as to [Plaintiff's] good faith, which is sufficient to defeat summary judgment." *Gupta*, 2018 WL 1605571, at *16 n.18.[30]

### b.  Adverse Conduct

Plaintiff points to various actions of Defendants that Plaintiff claims would be "reasonably likely to deter a person from engaging" in protected activity under the NYCHRL. *Alvarado*, 685 F. App'x at 8.  Those are: (1) Plaintiff's resignation on April 6, 2019, which Plaintiff claims constituted a constructive discharge; (2) De Niro's refusal to provide Plaintiff a recommendation letter after she resigned; and (3) Defendants' investigation into Plaintiff for wrongdoing, discussions with the Manhattan District Attorney's Office, and bringing of the State Court Action against Plaintiff.  Dkt. No. 333 at 30–36.  The Court will address each in turn.

### i.  Constructive Discharge

In arguing that Defendants constructively discharged Plaintiff as retaliation for her protected conduct, Plaintiff claims that she was "forced to resign on April 6, 2019" after she became aware "of the crushing messages forecasting her termination."  Dkt. No. 333 at 17.  Plaintiff points to the following messages that were sent on April 5, and April 6, 2019:

- Text messages from Chen to White dated April 5, 2019 in which Chen writes to White: "Bob wants to see this list and make sure you have everything from Chase. She is not to be involved with anything going forward" and "You deal only with myself and Bob personally now."  Dkt. No. 335-50.

- An email on April 6, 2019 from Chen to Rachel Humphreys, a designer working on the Townhouse, copying De Niro and stating: "Bob and I would like to inform you that Chase is no longer involved with any of our projects.  You will be working directly with me.  Nothing is to be discussed with Chase going forward, you should not contact her about anything, or for anything."  Dkt. No. 335-52.

---

[30] Unlike in the FLSA context, the law is clear that an opposition to an unlawful practice under the NYCHRL must be made in good faith.  *See Marseille*, 2022 WL 14700981, at *2 (quoting *Kwan*, 737 F.3d at 843).

- An email on April 6, 2019 from Chen to White, copying Spear, Weeks-Brittan, and De Niro and stating: "Chase is no longer involved with anything regarding the townhouse or the twins.  You are not to discuss anything with her that you discuss with us.  Any emails between us are not to be shared with Chase."  Dkt. No. 335-51.

According to Plaintiff, she became aware of Chen emailing the office through Kaplan, logged into White's email after speaking to White on April 6, 2019 and noticing something was off, and then came across Chen's April 6 email to White.  *Id.* at 164–77.

"New York state courts have articulated an NYCHRL constructive discharge standard that is identical to the Title VII standard."  *E.E.O.C. v. Bloomberg L.P.*, 29 F. Supp. 3d 334, 338–39 (S.D.N.Y. 2014); *see also Ibrahim v. Fid. Brokerage Servs. LLC*, 2020 WL 107104, at *7 n.10 (S.D.N.Y. Jan. 9, 2020).  "To establish a constructive discharge," a plaintiff is "required to produce evidence that her employer 'deliberately created working conditions so intolerable, difficult or unpleasant that a reasonable person would have felt compelled to resign.'"  *Short v. Deutsche Bank Sec., Inc.*, 913 N.Y.S.2d 64, 66 (1st Dep't 2010); *Kaplan-DiNola v. Bd. of Educ. of City Sch. Dist. of City of New York*, 2019 WL 5593286, at *2 n.4 (S.D.N.Y. Oct. 30, 2019).  "[A] constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer.  Nor is the test merely whether the employee's working conditions were difficult or unpleasant."  *Id.*  "[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 361 (2d Cir.1993)).

Courts have held that an employer can make working conditions intolerable by presenting the employee with a decision to resign or be fired.  *See Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 271 (E.D.N.Y. 2012); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188–

89 (2d Cir. 1987) ("The record in this case amply demonstrates that Lopez has raised a genuine issue of fact as to whether he was constructively discharged when, as he alleges, Hunsberger told him he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance.  A trier of fact might find that Hunsberger's statement alone suffices to establish a constructive discharge."); *Welch v. Univ. of Texas & Its Marine Sci. Inst.*, 659 F.2d 531, 534 (5th Cir. 1981) ("A reasonable person would certainly resign employment after being ordered to leave.").

At the same time, a threat of termination or an employee hearing rumor of her possible termination generally does not constitute constructive discharge.  *See Murray*, 853 F. Supp. 2d at 270–71.  "[A]though threats of termination alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign, those cases involved a direct and/or repeated threats from the employer, along with some other adverse conduct."  *Id.* at 270.

No reasonable jury could find that Defendants constructively discharged Plaintiff.  Plaintiff was not faced with a demand to resign or be fired.  *See Nakis v. Potter*, 422 F. Supp. 2d 398, 416 (S.D.N.Y. 2006) (no constructive discharge where "defendant never threatened her with termination if she did not retire."); *Leiman v. New York*, 2000 WL 1364365, at *9 (S.D.N.Y. Sept. 21, 2000), *aff'd*, 9 F. App'x 37 (2d Cir. 2001) ("The most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge.").  The email was private.  Defendants did not communicate the message to Plaintiff or convey them in any way intended to reach Plaintiff.  Plaintiff learned, through reading the email of her assistant on Plaintiff's own initiative, that certain work had been reassigned from her—work that Plaintiff herself had repeatedly asked that she not be assigned to perform—that her assistant would no

longer report to her, and that employees were told not to speak with her.[31]  There is no evidence

that Plaintiff's title was taken away from her or that her salary would be decreased as a result of

any of these actions.  There also is no evidence at the time Plaintiff tendered her resignation,

how, if at all, those changes would have affected her work environment.  Although Plaintiff may

have been humiliated or embarrassed by the message in the email, the planned actions do not

create "working conditions so intolerable, difficult or unpleasant that a reasonable person would

have felt compelled to resign.'"  *Short*, 913 N.Y.S.2d at 66; *see also Shultz v. Congregation

Shearith Israel of City of New York*, 867 F.3d 298, 308 (2d Cir. 2017) (evidence that Plaintiff

overheard a call in which she was "disparaged," "her name was removed from a wall and a

newsletter," and certain people "did not speak to her" insufficient "to raise an issue of fact with

respect to whether [she] can meet 'the high standard to establish that [s]he was constructively

discharged.'" (citation omitted)); *Petrosino v. Bell Atl.*, 385 F.3d 210, 231 (2d Cir. 2004)

(holding that change in plaintiff's job responsibilities was not sufficient to state constructive

discharge claim even where they resulted in reduced promotion opportunities because it would

not have diminished her "job title, pay, or seniority" or placed "her in a more gender-hostile

environment").

There is also another reason why the working conditions, prior to Plaintiff's resignation,

do not constitute a constructive discharge.  Defendants did not "deliberately create[]" the

working conditions that allegedly made Plaintiff's working conditions intolerable.  *Short*, 913

N.Y.S.2d at 66.  There is no evidence that Defendants made her aware, at the time she

---

[31] Although some of the language in the text message between White and Chen on April 5, 2019 could be read to suggest that broader action was being taken against Plaintiff (*i.e.*, "She is not to be involved with anything going forward"), there is no evidence that Plaintiff read these text messages before resigning or was otherwise aware of them.

precipitously resigned, that work had been reassigned from her or presented her with any demands regarding her employment that would have made the conditions intolerable.  Rather, her claim is based on her discovery—through her access to another employee's emails—that work was in the process of being transferred away from her, and not anything that she actually experienced.

Yet, even though such actions (*e.g.*, the removing of certain responsibilities) may not be sufficiently intolerable to give rise to a constructive discharge, they nonetheless may constitute retaliatory action under the NYCHRL.  Under the NYCHRL, the retaliation complained of "need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."  NYCHRL § 8–107(7).  New York courts have therefore stated that "the language of the City HRL does not permit any type of challenged conduct to be categorically rejected as nonactionable" and courts should be mindful that "a jury is generally best suited to evaluate the impact of retaliatory conduct."  *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009).  Accordingly, courts have found that being "shut out of meetings" and "forced to take a position viewed as a demotion" may constitute an adverse action under the NYCHRL.  *Albunio v. City of New York*, 889 N.Y.S.2d 4, 6 (1st Dep't 2009), *aff'd*, 947 N.E.2d 135; *see Bloomberg L.P.*, 967 F. Supp. 2d at 851 ("[U]nder the NYCHRL, public reprimands can constitute adverse action.").  Thus, a reasonable juror could find that Defendants' decision to take away Plaintiff's responsibilities related to the Townhouse and her assistant as well as telling employees not to speak with Plaintiff constituted acts "reasonably likely to deter a person from engaging in protected activity" under the NYCHRL.  NYCHRL § 8–107(7).

In light of the liberal construction that NYCHRL claims must be given,[32] a jury could also conclude under the NYCHRL that this conduct was at least partially motivated by Plaintiff's protected conduct—her email to De Niro sent on April 2, 2019.[33]  *See Bloomberg L.P.*, 967 F. Supp. 2d at 851.  Although Chen had expressed dissatisfaction with Plaintiff for months prior to the email and Plaintiff had during those months repeatedly asked to be removed from her duties related to the Townhouse, it was not until April 6, 2019, mere days after Plaintiff sent this email that her responsibilities with respect to the Townhouse and her assistant were taken away from her and Chen instructed other employees not to speak with Plaintiff anymore.  *See Reed v. Nike, Inc.*, 2019 WL 2327519, at *4 (S.D.N.Y. May 31, 2019) ("Because of the particularly close temporal proximity between Plaintiff's protected activity and her termination, a reasonable jury could find that Plaintiff was terminated at least in part because of her complaint of discrimination."); *id.* (rejecting claim that summary judgment was unwarranted "based on Defendants' asserted nondiscriminatory justifications for terminating Plaintiff's employment" because "a reasonable jury could find these problems all existed well before the decision to terminate Plaintiff's employment").  While it is true that "evidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL," *Forrester v. Corizon Health, Inc.*, 752 F. App'x 64, 66 (2d Cir. 2018) (summary order), there is additional evidence of retaliatory intent.  After Plaintiff sent the April 2, 2019 email to De Niro, De Niro forwarded it to Chen who

---

[32] *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 629 (E.D.N.Y. 2017), *aff'd*, 752 F. App'x 64 (2d Cir. 2018).

[33] No reasonable jury could find that this conduct was in retaliation for Plaintiff's counsel's communications to Defendants' counsel following Plaintiff's resignation in which Plaintiff's counsel mentioned that Plaintiff had claims for gender discrimination among others.  Those July 2019 communications, which this Court held a jury could find were protected activity under the NYCHRL, were not written until months after Plaintiff's responsibilities were taken away from her.  This conduct thus could not have been retaliation for those communications.

responded: "This shit really pisses me off that is so manipulative and nasty that she has the gaul [sic] to place blame on me for her lies. *This Bitch needs to get put in her fucking place*." Dkt. No. 322-31 (emphasis added). In light of the temporal proximity and this communication from Chen to De Niro, a reasonable jury could conclude that Chen's and De Niro's decision to take away Plaintiff's responsibilities and to instruct employees not to talk to her were made, at least in part, in retaliation for Plaintiff's email. Summary judgment is therefore denied with respect to this theory of retaliation under the NYCHRL.

### ii.     Recommendation Letter

Plaintiff also claims that Defendants retaliated against her when De Niro refused to provide her with a recommendation letter for business school. Dkt. No. 333 at 1. Defendants, however, claim that declining to provide a recommendation letter is not an adverse action because an adverse action must impact a plaintiff's "job prospects" and Plaintiff's recommendation letter was to be used "expressly and exclusively in support of her application for admission to the London School of Economics." Dkt. No. 296 at 14. Defendants also argue that, even if it were an adverse action, Defendants have articulated unrefuted legitimate, non-discriminatory reasons for De Niro's failure to provide her with a recommendation letter. Specifically, Defendants points to the fact that (1) De Niro had warned Plaintiff in late-2018— prior to engaging in the protected activity—that if she resigned without notice, De Niro would not provide her with a recommendation letter; and (2) that De Niro stated that he would not sign the recommendation letter because of Plaintiff's conduct including transferring the SkyMiles to herself prior to resigning without authorization. *Id.* at 15–16. In response, Plaintiff states that there is ample evidence that these reasons for denying a recommendation were pretextual. Dkt. No. 333 at 31.

Although Defendants are correct that, at one point in time, adverse employment actions in the post-employment retaliation context had to impair a plaintiff's job prospects, this appears to no longer be good law. *See Rosas v. Balter Sales Co. Inc.*, 2015 WL 12915807, at *11 (S.D.N.Y. Mar. 30, 2015). In 1997, the Second Circuit held that to constitute an adverse action in the Title VII retaliation context, the action must be "injurious to *current* employment or the ability to *secure future* employment." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (emphasis in original). Accordingly, the Second Circuit stated that "plaintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company 'blacklists' the former employee, wrongfully refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." *Id.* (cleaned up). However, subsequent to that decision, the Supreme Court in *Burlington Northern* held that the "scope of the antiretaliation provision [in Title VII] extends beyond workplace-related or employment-related retaliatory acts and harm." 548 U.S. at 67. The Supreme Court clarified that instead "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (cleaned up). It further noted that whether an employer's action constitutes retaliation will "often depend upon the particular circumstances." *Id.* at 69. Relying on *Burlington Northern*, the Second Circuit has since clarified that Title VII's anti-retaliation protection "extends beyond workplace-related or employment-related retaliatory acts and harm" and thus "[p]rior decisions of this Circuit that limit unlawful retaliation to actions that affect the terms and conditions of employment, no longer represent the state of the law." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (cleaned up).

In light of *Burlington* and *Hicks*, it appears that the strict approach to what constitutes an adverse employment action in the Title VII context—which focused on the action's impact to current or future employment—no longer applies.  Instead, the relevant inquiry for purposes of Title VII is whether the employer's action would dissuade a reasonable employer from making or supporting a charge of discrimination.  "Under the NYCHRL, the standard is even lower, as an adverse action need not even be material, but only nontrivial."  *Rosas*, 2015 WL 12915807, at *11.

With this in mind the Court declines to hold, as Defendant requests, that the fact that Plaintiff's recommendation was for business school as opposed to for a future job means that it cannot constitute an adverse action under the NYCHRL.  It is well-established that failure to provide a recommendation letter to a former employee for future employment may constitute an adverse action for purposes of a retaliation claim.  *See Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) ("[T]he Second Circuit and courts in this district have concluded that an employer's refusal to provide a letter of reference for a former employee constitutes an adverse employment action.") (collecting cases).  There is no reason why this same rule should not apply to recommendations to a former employee for professional schools.  In many professions, the next logical step in an employee's career is a professional school like business or law school.  In that context, an employer's refusal to provide a recommendation letter to a graduate program for employees who engage in protected activity is likely to have just as much of a deterrence effect on future employees from engaging in such activity as a refusal to provide a recommendation letter to a future employer.

De Niro's failure to provide a recommendation letter therefore may constitute an adverse action for purposes of Plaintiff's retaliation claim under the NYCHRL.  The Court next turns to

whether Plaintiff has sufficiently alleged a causal relationship between Plaintiff's email to De

Niro sent on April 2, 2019,[34] and De Niro's decision not to provide her with a reference letter.

"[U]nder the NYCHRL, summary judgment is inappropriate where a reasonable jury could

conclude 'defendant's stated reasons were not its sole basis for taking action, and that its conduct

was based at least 'in part on [retaliation].'" *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 802

(S.D.N.Y. 2020) (citations omitted).  "However, even under the more relaxed NYCHRL

standard, when 'Plaintiff's sole evidence of pretext' is 'the temporal proximity between

Plaintiff's complaints and Defendants' discipline,' a NYCHRL retaliation claim cannot survive

summary judgment if the employer has shown a non-retaliatory reason for the plaintiff's

mistreatment." *Id.* (quoting *Tomizawa v. ADT LLC*, 2015 WL 5772106, at *32 (E.D.N.Y. Sept.

29, 2015)).

The undisputed evidence indicates that Plaintiff reached out to Tom Harvey on May 7,

2019 stating that she would like business school recommendation letters from De Niro and the

request was time sensitive.  Dkt. No. 322-45 at ECF p. 4.  The evidence also indicates that, in

response, Tom Harvey encouraged her to put the letter together and he would make sure De Niro

received it.  *Id.* at ECF p. 2.  Approximately one month later, Plaintiff replied with a draft letter

to the London School of Economics.  P's 56.1 Statement ¶ 79; D's Counterstatement ¶ 79.  Tom

Harvey first communicated that De Niro had reservations about providing Plaintiff with a

recommendation letter on June 9, 2019.  Dkt. No. 307-30.  Later that day, Tom Harvey called

---

[34] No reasonable jury could find De Niro's refusal to provide a recommendation letter was in
retaliation for Plaintiff's counsel's communications to Defendants' counsel following Plaintiff's
resignation in which Plaintiff's counsel mentioned that Plaintiff had claims for gender
discrimination among others.  Those July 2019 communications, which this Court held a jury
could find were protected activity under the NYCHRL, were not written until a month after De
Niro first refused to provide Plaintiff with a recommendation letter.  This conduct thus could not
have been retaliation for those communications.

Plaintiff to state that De Niro was upset about Plaintiff transferring SkyMiles from Canal's

account to her personal account and would not provide her a recommendation letter as a result.

Dkt. No. 247-1 at 201; Dkt. No. 322-89 at 429–30.  Specifically, on June 9, 2019, Tom Harvey

told Plaintiff that De Niro said he would not sign the letter and explained:

> I had a very brief conversation with him and he's like I'm not [signing] it.  And part
> of the problem—well, part of his thing is[,] there were air miles that you transferred
> out of an account, and he's convinced that he didn't approve it. . . .  Well, I'm just
> telling you.  In his mind uh, transferring, he knew you would use them, but he didn't
> know you were transferring out; I mean there are like 4 million miles according to
> him that were transferred out.

Dkt. No. 296 at 16 (citation omitted).

Even assuming that Plaintiff has made out a prima facie case of retaliation, Defendants

have proffered non-retaliatory reasons for De Niro not signing the recommendation letter.  First,

they point to evidence that in 2018, before engaging in the protected activity, De Niro had told

Plaintiff that if she left him in the lurch (or without notice), as she did, he would "either refuse to

provide a recommendation or might give her a bad one."  Dkt. No. 296 at 15.  Second, they point

to the reason Tom Harvey gave to Plaintiff contemporaneously as to why De Niro would not

provide her with a recommendation letter—*i.e.*, that she transferred the 4 million SkyMiles out

of Canal's account prior to her resignation.  *Id.* at 16.

Plaintiff, however, claims that these reasons were pretextual.  Specifically, Plaintiff

points to (1) the short time period between Plaintiff's protected activity and De Niro's

reservations about signing the letter, (2) the fact that De Niro had previously assured her, "[a]ll

you need is a letter of recommendation from me" and "I would give you the highest

recommendation," but refused to do this after she had engaged in protected activity; (3) that De

Niro generally expressed willingness to support the career of former employees including by

writing letters; (4) that Plaintiff did not leave De Niro in the "lurch" because De Niro testified

that he thought Plaintiff should have resigned at the time she did and Plaintiff reached out to De Niro after she left to offer her assistance; and (5) that De Niro's explanation that he would not sign the recommendation letter based on her SkyMiles activity is "implausible given Mr. De Niro's testimony that he gave her broad authorization to use SkyMiles." Dkt. No. 333 at 31–32 & 32 n.32.

This evidence is insufficient for any reasonable juror to find that Defendants' reasons for not providing Plaintiff with a recommendation letter were pretextual or that retaliation played any role in Defendants' decision.  First, as noted, "even under the more relaxed NYCHRL standard, when 'Plaintiff's sole evidence of pretext' is 'the temporal proximity between Plaintiff's complaints and Defendants' discipline,' a NYCHRL retaliation claim cannot survive summary judgment if the employer has shown a non-retaliatory reason for the plaintiff's mistreatment." *Sivio*, 436 F. Supp. 3d at 802  (quoting *Tomizawa*, 2015 WL 5772106, at *32). Moreover, here, over two months lapsed between Plaintiff's April 2, 2019 email (*i.e.*, her protected activity) and De Niro's refusal to sign the recommendation letter in June of 2019, and "most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."  *De Figueroa v. New York*, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019); *see also Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 62 (S.D.N.Y. 2021).  Second, while De Niro testified that he had told Plaintiff that he would provide her with his "highest recommendation," De Niro also testified that he had conditioned it on Plaintiff doing things "honorably."  Dkt. No. 335-1 at 109.  And, while De Niro had testified that he had given recommendations to some former Canal employee, he did not testify that he did so as a matter of course and without regard to their conduct.  *Id.* at 223.  It is therefore entirely

consistent with his testimony that De Niro refused to provide Plaintiff with a recommendation if he believed that she had stolen SkyMiles from the company.

The Court is also not convinced by Plaintiff's other claims of pretext. As to Plaintiff's claim that De Niro's explanation that he would not sign the recommendation letter based on her SkyMiles activity is "implausible given Mr. De Niro's testimony that he gave her broad authorization to use SkyMiles," Dkt. No. 333 at 31–32 & n. 32, the Court disagrees. While evidence does support that De Niro did give her authorization to use SkyMiles, as explained further *infra* Discussion Section II.E.5, evidence also indicates that the authorization was not so broad as to give Plaintiff the authority to transfer the millions of SkyMiles that she took and no evidence indicates that she had explicit authority to keep the SkyMiles after she ended her employment with Canal. Plaintiff has identified no evidence that De Niro did not genuinely believe that Plaintiff's conduct was improper. The claim of pretext is further undermined by the fact that Canal instituted a State Court Action against Plaintiff based on this activity, which Canal continues to litigate as the basis of its counterclaims in the present action. Plaintiff has therefore not pointed to sufficient evidence from which a reasonable juror could find that De Niro's belief that Plaintiff had improperly taken and held onto the SkyMiles was other than honestly held and constituted mere pretext.

Plaintiff has also not proffered sufficient evidence from which a reasonable juror could find that Plaintiff did not, in fact, leave Defendants in the "lurch." According to Plaintiff's deposition testimony, during her meeting with De Niro in late-November or December of 2018 in which she informed De Niro she would be resigning, De Niro told her "if you leave me in the lurch I'll give you a bad recommendation." Dkt. No. 335-12 at 102, 104. Plaintiff appears to have understood the phrase "leave in the lurch" to mean leave without notice. Plaintiff described

her conversation with De Niro in a phone call to another Canal employee as De Niro telling her that if she did not "give him any notice," he would give her a bad recommendation.  Dkt. No. 322-73.  Yet, this is exactly what Plaintiff did in April of 2019.  It is undisputed that when Plaintiff resigned in April 2019, her resignation became effective immediately and she provided no notice to De Niro or Canal.  P's 56.1 Statement ¶ 70; D's Counterstatement ¶ 70.  Thus, De Niro's refusal to provide her with a positive recommendation letter is entirely consistent with his prior statement to her.  Plaintiff has not shown that this reason was pretext.

This conclusion is also not undermined by the fact that De Niro testified during his deposition that he thought Plaintiff should have resigned around the time that she did.  Dkt. No. 335-1 at 191.  While De Niro testified that he thought Plaintiff should have resigned, he did not testify that he thought Plaintiff should have resigned without notice.  Nor is it undermined by the fact that Plaintiff agreed to provide a "list of open issues and projects she was working on" after she had resigned.  Dkt. No. 335-71.  Agreeing to provide a list of open issues and projects after you have left employment is different than providing notice to an employer.  In the former, the employee is under no obligation to address the open issues.  In the latter, the employee is committed to stay for a period of time in order to address those issues.

Plaintiff therefore has not raised a triable issue of fact as to her claim that De Niro's failure to sign her recommendation letters for business school was retaliatory.

### iii.   Internal and Criminal Investigation and State Court Action

Plaintiff also claims that Defendants retaliated against Plaintiff by launching a sham "investigation" into her, sending her a letter threatening legal action, mounting a baseless lawsuit against her, and pushing for her criminal prosecution.  Dkt. No. 333 at 33.

No reasonable juror could find that such actions were retaliatory, even in part, for Plaintiff's pre-resignation, April 2, 2019 email to De Niro.  The letter threatening legal action (which was sent on July 11, 2019), the State Action Complaint (which was initiated on August 17, 2019), and the criminal prosecution (which, at the earliest, was initiated in late-June) all took place approximately three or more months after Plaintiff sent the email.  Therefore, no casual connection between such actions and this particular protected activity arises from the timing of the actions relative to the April 2, 2019 email.  *See De Figueroa*, 403 F. Supp. 3d at 157 ("[M]ost courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."); *see also Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) ("The time lapses between Brown's protected activities and the alleged retaliatory acts—ranging from two months to several years—were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations.").  Chen's comment in response to Plaintiff's April 2, 2019 email in which she stated, "This Bitch needs to get put in her fucking place," also is not a sufficient basis from which a reasonable juror could find that such actions were retaliatory for Plaintiff's email.  Dkt. No. 322-31.  Not only was this email sent months before any of these actions were taken, but there is also no evidence that Chen was the motivating force behind Canal's decision to send the letter, initiate legal action, or initiate the criminal investigation.  Instead, Tom Harvey appears to have been the motivating force behind many of these decisions.  There is therefore no clear nexus between Chen's comment and these later adverse actions.

As to the initiation of the investigation, it is doubtful that it, on its own, can constitute an adverse employment action, even under the NYCHRL.  *See Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 227 (E.D.N.Y. 2016) ("[C]ourts in this Circuit have held that

investigations alone are [also] not adverse employment actions.").  While an "employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to dissuade a reasonable worker from making or supporting a charge of discrimination," *Cox*, 760 F.3d at 147, Plaintiff had already resigned prior to the initiation of the investigation.  It therefore posed no risk of creating a hostile work environment or any other negative employment consequences for Plaintiff.  There is also no evidence that it was conducted in a manner to make other employees fear making a charge of discrimination.

Yet, even if it could constitute an adverse action, no reasonable juror could find that it was carried out in retaliation for Plaintiff's April 2, 2019 email.  Although the temporal connection is much closer as evidence supports that some form of an investigation was initiated shortly after Plaintiff resigned, Dkt. No. 335-6 at 32–33, 43–44, Defendant offers evidence of a nonretaliatory motive for the investigation.  Both Tom Harvey and Kaplan recalled that the investigation started after Canal employees reviewed Plaintiff's emails, documents, and computers for appointments and other information concerning De Niro's activities and obligations and discovered "more and more ridiculous [things] that she had hidden over the years."  Dkt. No. 335-6 at 32–33, 43–44; Dkt. No. 340-8 at 288.  In other words, evidence supports that it grew out of discovery of Plaintiff's alleged conversion and breaches of duty.

Plaintiff has also offered insufficient evidence from which a reasonable jury could find pretext.  First, "allegations of temporal proximity alone are [] insufficient to demonstrate pretext even under the NYCHRL."  *See Rogers*, 2016 WL 4362204, at *22 (collecting cases).  Second, Plaintiff argues that "Canal dredged up old matters that it had never considered improper before

Plaintiff engaged in protected activity."  Dkt. No. 333 at 37.  But, none of the evidence Plaintiff

cites supports that Canal employees had full knowledge of Plaintiff's various alleged improper

transactions and the circumstances surrounding them, including most notably any knowledge of

her transfer of approximately five million SkyMiles, prior to her resignation.  Plaintiff largely

worked from home and, while she billed expenses to Canal, there is no evidence that anyone at

Canal had knowledge of those charges.  To the contrary, Canal conducted an investigation and

the evidence supports that Canal employees were generally surprised by Plaintiff's alleged abuse

of her position.  Third, Plaintiff argues that "Canal's investigation was patently biased and lacked

procedural safeguards and objective guidelines to ensure an accurate result."  *Id.*  But, the fact

that the investigation, conducted by a small company, did not involve outside investigators but

instead was conducted in a relatively casual manner by company employees does not establish

retaliation, particularly when there is no evidence that such an approach was unusual.

Regarding the other potential protected conduct, *i.e.*, the July 31, 2019 email from

Plaintiff's counsel to Defendants' counsel, the Court reaches the same conclusion that it did in

Discussion Section I.A.1.b.  As noted in that Section, the only allegedly retaliatory conduct that

arguably occurred after this email was the initiation of the State Court Action and the initiation

of the Criminal Investigation.  Because Plaintiff has not raised a triable issue of fact that the State

Court Action was both retaliatory and baseless, Plaintiff cannot assert a retaliation claim on the

basis of the filing of the State Court Action, generally, even under the NYCHRL.  In addition,

although Plaintiff may have raised a triable issue of fact that the *damages request* in the State

Court Action was both retaliatory and baseless, this does not constitute an adverse action for

purposes of a retaliation claim the NYCHRL.  "[A]s with Title VII, the NYCHRL 'is not a

general civility code,' and where . . . the defendant demonstrates that the alleged conduct did not

exceed 'petty slights or trivial inconveniences,' plaintiff's claim must fail." *Livingston v. City of New York*, 563 F. Supp. 3d 201, 234 (S.D.N.Y. 2021) (quoting *Ramirez v. Michael Cetta Inc.*, 2020 WL 5819551, at *18 (S.D.N.Y. Sept. 30, 2020)); *LeBlanc v. United Parcel Serv.*, 2014 WL 1407706, at *11 (S.D.N.Y. Apr. 11, 2014) (*Mihalik*, 715 F.3d at 113).  Here, for the reasons discussed in Discussion Section I.A.1.b.i, the inclusion of a somewhat inflated request for damages, in an otherwise potentially meritorious lawsuit, absent additional facts, cannot be characterized as anything more than a petty slight or trivial inconvenience.  Plaintiff's retaliation claim thus fails as no reasonable juror could find that the damages request in the State Court Action "would be 'reasonably likely to deter a person' from engaging in protected activity." *Ndongo v. Bank of China Ltd.*, 2023 WL 2215261, at *7 (S.D.N.Y. Feb. 24, 2023).

Regarding the initiation of the criminal investigation, the Court reaches the same conclusion that it did with respect to Plaintiff's FLSA and NYLL claims.  The Court, for the reasons explained, is again skeptical that initiation of a criminal investigation, absent additional facts, can constitute an adverse action under any law for purposes of a retaliation claim.  But, to the extent it can, Plaintiff has nonetheless failed to proffer sufficient evidence from which a jury could conclude that it was initiated, even in part, in retaliation for Plaintiff's counsel's July 31, 2019 email.  As noted, "under federal and state law, where 'gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Varughese*, 2015 WL 1499618, at *66.  "The same is true under the NYCHRL."  *Id.* (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (1st Dep't 2012)).  The Court therefore grants summary judgment with respect to this portion of Plaintiff's claim.

## B.     Gender Discrimination Under the NYCHRL

To state a discrimination claim under the NYCHRL, "a plaintiff must show that she was treated less well than other employees because of her membership in a protected class." *Wilson v. JPMorgan Chase Bank, N.A.*, 2021 WL 5179914, at *5 (S.D.N.Y. Nov. 8, 2021). "Under the NYCHRL, an 'employer may prevail on summary judgment if it shows that a reasonable jury could conclude only that the conduct amounted to no more than a petty slight. Thus, courts may still dismiss truly insubstantial cases[ ] where the defense is clear as a matter of law.'" *Alvarado*, 685 F. App'x at 8 (quoting *Mihalik*, 715 F.3d at 111). "Isolated incidents of unwelcome verbal and physical conduct . . . constitute the kind of 'petty slights and trivial inconveniences' that are not actionable even under . . . NYCHRL." *Bautista v. PR Gramercy Square Condo.*, 2022 WL 17156628, at *9 (S.D.N.Y. Nov. 22, 2022). However, severe or pervasive hostility is not required. "The NYCHRL imposes liability for harassing conduct that does not qualify as 'severe or pervasive,' and 'questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability.'" *Milord-Francois v. New York State Off. of Medicaid Inspector Gen.*, 2022 WL 10653757, at *13 (S.D.N.Y. Oct. 18, 2022) (quoting *Espinosa v. Weill Cornell Med. Coll.*, 2021 WL 1062592, at *9 (S.D.N.Y. Mar. 19, 2021)). "Plaintiff nonetheless has the burden of showing that the . . . conduct complained of was caused by a discriminatory motive; 'it is not enough that a plaintiff has an overbearing or obnoxious boss.'" *Id.* (quoting *Dillon*, 85 F. Supp. 3d at 657). Moreover, while the NYCHRL should not be applied as a "general civility code," "even a single comment may be actionable in the proper context." *Id.* (citations omitted).

While the NYCHRL "does not require either materially adverse employment actions or severe and pervasive conduct," it still requires that any such allegedly "unequal treatment" be "based on gender [or race]." *Goodwine v. City of New York*, 2016 WL 3017398, at *9 (S.D.N.Y.

May 23, 2016) (quoting *Mihalik*, 715 F.3d at 114).  "[A] discriminatory motive can be shown either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that comparators were treated better than the plaintiff was."  *Bautista*, 2022 WL 17156628, at *9 (quoting *Wilson*, 2021 WL 5179914, at *5).  A plaintiff, however, need only show that "she has been treated less well at least *in part* 'because of her gender."  *Mihalik*, 715 F.3d at 110 (citation omitted) (emphasis added).

In asserting that a reasonable jury could find that Defendants subjected Plaintiff to gender discrimination unlawful under the NYCHRL, Plaintiff points to evidence that De Niro on numerous occasions called Plaintiff a "bitch" and a "brat," that he referred to female employees as "girls," and that he called a business partner a "cunt."  Dkt. No. 333 at 15.  Plaintiff also points to Plaintiff's testimony that De Niro directed her to picture him on the toilet, laughed about "mak[ing] a man out of [her]," told her "you just need to get some sperm," joked about Viagra, urinated while talking to her, and initiated unwelcome physical contact.  *Id.*  Plaintiff also notes that De Niro assigned Plaintiff more "stereotypically female tasks," berated her "more frequently than he did his male subordinates," and indicated that he paid her less because she did not have a "family to support."  *Id.* at 15–16.  Plaintiff further states that evidence indicates that De Niro's girlfriend, Chen, "targeted Robinson based on her gender."  *Id.* at 16–17.

In response, Defendants contend that "[a]s to Ms. Chen, there is not a single piece of evidence that she ever made a gender-based comment to or about Plaintiff" and De Niro's comments "are not gender-based."  Dkt. No. 328 at 29.  Defendants also point out that there is no evidence of male comparators being treated more favorably than Plaintiff.  *Id.* at 32.

Drawing all inferences in Plaintiff's favor, Plaintiff has proffered sufficient evidence to create a triable issue of fact as to her NYCHRL discrimination claim.  Although Plaintiff points to various pieces of evidence in support of her claim, the strongest evidence of gender discrimination relates to De Niro's girlfriend, Chen.  In 2019, Chen appears to have adopted the view that Plaintiff was in love with De Niro, which a jury could view as motivated, in part, by Plaintiff's gender.  *Cf. Edwards v. Nicolai*, 60 N.Y.S.3d 40, 42 (1st Dep't 2017) (adverse employment action based on "desire to appease [an employer's] wife's unjustified jealousy" states a claim under NYCHRL).  Chen wrote to De Niro in July of 2019 about Plaintiff: "Her sense of entitlement stems from this imaginary intimacy she has with you," "[s]he thinks she's your wife," and "she wants to be the 'lady of the house.'"  Dkt. No. 339-17.  Chen described the situation involving Plaintiff as having become "very 'single white female'" to Kaplan, Dkt. No. 335-29, and speculated about whether Plaintiff was in love with De Niro, Dkt. No. 339-1 at 136–37.  On March 28, 2019, Chen told De Niro about Plaintiff, "I'm not gonna be happy until you tell me she is looking for her replacement" and "[i]f you keep her [Ms. Robinson], you and I will eventually have problems . . . ."  P's 56.1 Statement ¶ 21; D's Counterstatement ¶ 21.  In a text message from April 6, 2019 to someone named Alexandra, Kaplan stated that "Bob[']s new girlfriend made it her singular mission" to get rid of Plaintiff and that Chen "felt [Plaintiff] was in love and a psycho."  Dkt. No. 335-29.

Coinciding with Chen's views that Plaintiff was in love with De Niro in 2019 and her requests to De Niro that he get rid of Plaintiff, Plaintiff testified that De Niro's "behavior and his berating [toward her] had gotten worse."  Dkt. No. 160 at 13.  Plaintiff also testified that De Niro and Chen gave her "additional work that was not something that" she and De Niro had discussed, Dkt. No. 327-3 at 126, and that Chen would assign her "demeaning jobs," having her "do things

for her for the house," even though Plaintiff had the title of Vice President of Production and

Finance.  Dkt. No. 327-2 at 65.  Plaintiff further testified that Chen would "demean and denigrate

her work," make comments to Plaintiff that made her feel uncomfortable such as trying to set her

up on a date, *id.* at 68–71, and began to accuse Plaintiff of "stealing pots and pans," *id.* at 97.  In

addition, right before her termination, Plaintiff's assistant and her duties related to the

Townhouse were taken away from her.  In an email dated Aril 6, 2019, Chen wrote to White

(who Plaintiff testified was hired to be her assistant), copying others including De Niro, and

stated:  "I would like to remind you that we all work for Bob and you are not Chase's assistant."

*Id.*; Dkt. No. 327-3 at 66–67.[35]

These facts create a triable issue of material fact as to Plaintiff's discrimination claim

under NYCHRL.  A reasonable jury could infer from Chen's private comments about Plaintiff

that, based in part, on Plaintiff's gender and status as a single female, she inferred that Plaintiff

---

[35] The fact Chen was not an employee of Canal at this time is not fatal to Plaintiff's claim.  The NYCHRL provides that a discrimination claim may be based on conduct of an "agent" and that an employer "shall be liable for an unlawful discriminatory practice" of an agent where an employee "who exercised managerial or supervisory responsibility" "knew of the employee's or agent's discriminatory conduct."  NYCHRL § 8-107(1)(a), (13).  "[B]ecause the NYCHRL does not define 'agent,' common law principles apply."  *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013); *People v. King*, 463 N.E.2d 601 (N.Y. 1984) ("[I]f a statute uses a word which has a definite and well-known meaning at common law, it will be construed with the aid of common-law definitions, unless it clearly appears that it was not so intended.").  "Under New York law, 'an agency relationship exists . . . when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent.  The element of control often is deemed the essential characteristic of the principal-agent relationship.  [In addition, to] bind a principal, an agent must have authority . . . ."  *White*, 973 F. Supp. 2d at 377.  Here, a jury could reasonably find that Chen acted as an agent for Canal and that De Niro, a manager, knew of Chen's discriminatory conduct.  Specifically, evidence supports that in 2019 Chen started to have regular communications with Canal employees and would direct Canal employees to perform certain tasks for her and De Niro at De Niro's behest.  Dkt. No. 327-90 at 34–41; P's Counterstatement ¶ 5; Dkt. No. 335-8 at 38; Dkt. No. 335-20; Dkt. No. 335-50.  The intimate relationship between De Niro and Chen and the correspondence they exchanged would support an inference that De Niro was aware of Chen's activity and that it was not concealed from him.

must be in love with her boyfriend and consequently wanted her terminated.  A reasonable jury

also could infer that Plaintiff's worsening treatment throughout 2019 was, in part, a result of

Chen's discriminatory views and that such treatment constituted more than petty slights and

inconveniences.  *See Richards v. Dep't of Educ.*, 2023 WL 2876585, at * 6 (S.D.N.Y. Apr. 10,

2023) (holding that it is sufficient under New York City law to show that employee was treated

less well on the basis of a prohibited characteristic).

In reaching this conclusion, the Court is guided by the decision in *Edwards v. Nicolai*,

60 N.Y.S.3d 40.  In that case, the court held that the plaintiff had stated a claim for gender

discrimination under the NYSHRL and NYCHRL where plaintiff was fired four months after

Defendant allegedly "informed Plaintiff that his wife might become jealous of Plaintiff, because

Plaintiff was 'too cute.'"  *Id.* at 41.  The court noted that "Nicolai was motivated to discharge her

by his desire to appease his wife's unjustified jealousy" and that "adverse employment actions

motivated by sexual attraction are gender-based and, therefore, constitute unlawful gender

discrimination."  *Id.* at 42.  While, here, Plaintiff's allegedly unlawful treatment does not rise to

the level of the termination in *Nicolai* and does not appear to have been motivated by Chen's fear

of De Niro's sexual attraction toward Plaintiff, a jury could view Plaintiff's negative treatment

by Chen as motivated by Plaintiff's alleged attraction toward De Niro.  The Court sees no reason

to differentiate between these two scenarios, particularly when both could be equally viewed as

"based on gender."  Plaintiff thus may try this claim to a jury.

## II.    Canal's Counterclaims

The Court next turns to Plaintiff's motion for summary judgment as to Canal's

counterclaims.

Canal's first counterclaim is for breach of fiduciary duty.  "To state a cause of action to

recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a

fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (quoting *U.S. Fire Ins. Co. v. Raia*, 942 N.Y.S.2d 543, 545 (2d Dep't 2012)). "[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989). "This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.* (citation omitted).

Canal's second counterclaim asserts a breach of the duty of loyalty under New York's faithless servant doctrine.[36] "New York's faithless servant doctrine holds that '[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary.'" *CBRE, Inc. v. Pace Gallery of New York, Inc.*, 2021 WL 1198644, at *11 (S.D.N.Y. Mar. 30, 2021) (quoting *Yukos*, 977 F.3d at 229).

"'New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture,' and the New York Court of Appeals has not resolved which one applies in particular circumstances." *Id.* (quoting *Yukos*, 977 F.3d at 237). The key distinction between the two concerns whether the breach of fiduciary duty must be "substantial." *Yukos*, 977 F.3d at 237.

---

[36] "New York courts are far from clear regarding the contours of—and interplay between—a claim for breach of fiduciary duty and the faithless servant doctrine." *Ebel v. G/O Media, Inc.*, 2021 WL 2037867, at *4 (S.D.N.Y. May 21, 2021) (quoting *Yukos*, 977 F.3d at 242). "[S]ome lower New York courts and some federal courts treat breach of fiduciary duty claims and claims based on the faithless servant doctrine as doctrinally distinct," whereas others do not distinguish the two claims and treat them essentially as the same. *Yukos*, 977 F.3d at 242 (collecting cases).

Under the first standard, named the *Turner* standard, the misconduct must be substantial. "A disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness . . . substantially violates the contract of service.'" *Id.* (citing *Turner v. Konwenhoven*, 2 N.E. 637, 639 (N.Y. 1885)). "Under the *Turner* standard, courts have found disloyalty not to be substantial only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Id.* (cleaned up). The second standard is known as the *Murray* standard and does not require that the misconduct be substantial to justify forfeiture of compensation—even a single disloyal act may be sufficient. That standard "suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture." *Id.* (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 202 (2d Cir. 2003)).[37]

Canal's third counterclaim is for conversion. "To establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights." *Halvatzis v. Perrone*, 156 N.Y.S.3d 428, 430 (2d Dep't 2021) (quoting *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138, 138 (2d Dep't 2012)). "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Id.* (quoting *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006)).

---

[37] The Court does not resolve which of these two standards applies at this point, as under either standard a reasonable jury could find that Plaintiff's alleged misconduct—which consisted of much more than a single act—was substantial.

The Court first addresses certain procedural attacks relevant to Plaintiff's motion for summary judgment as to Defendants' counterclaims and then addresses Plaintiff's motion on the merits.

### A.  Canal's Local Rule 56.1 Response

In her reply, Plaintiff argues that Canal's Response to Plaintiff's Rule 56.1 Statement is riddled with deficiencies and thus certain statements in Plaintiff's Rule 56.1 Statement must be deemed admitted.  Dkt. No. 364 at 3.

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires the party moving for summary judgment to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  LR 56.1(a).  These statements shall be "deemed to be admitted" by the opposing party "for purposes of the motion" "unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  LR 56.1(c).  Each statement "must be followed by citation to evidence which would be admissible."  LR 56.1(d).  "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz*, 258 F.3d at 73.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." at 74.  "The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Id.*  Accordingly, where the "record does not support the assertions

in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." *Id.*

Although not every part of Canal's Counterstatement to Plaintiff's Rule 56.1 Statement is in strict compliance with Local Rule 56.1, the Court exercises its discretion to overlook these deficiencies. Canal's Counterstatement does, for the most part, comply with the Rule. In the Counterstatement, Canal includes each paragraph from Plaintiff's Rule 56.1 Statement, indicates whether the statement in the paragraph is controverted or uncontroverted, and then, for the most part, cites record testimony where the statement is controverted. Dkt. No. 343. Although some of the record testimony cited is multiple pages long, it appears that this was done for the purpose of ensuring that the Court was able to understand and review the full context in which the statement was made. In many instances, the testimony cited by Canal includes helpful and important context. In other instances, where Canal did purport to controvert or dispute a statement but did not cite any countervailing evidence, it appears that citation to such countervailing evidence was unnecessary as Canal explained that the evidence Plaintiff cited in favor of her statements in these paragraphs in her Rule 56.1 Statement did not support the statements contained therein or had been pulled out of context. For example, for paragraph 58, Canal states that it "controverts that the cited testimony supports the factual assertion" and "encourage[s] the Court to review the testimony" itself. D's Counterstatement ¶ 58. Similarly, in paragraph 87, Canal states that it "controverts that the cited testimony supports the entirety of the broad factual assertion." *Id.* ¶ 87. And, in paragraph 91, Canal states that "Defendant controverts that Mr. De Niro's testimony can possibly support the factual assertion when he was not Canal's Fed. R. Civ. P. 30(b)(6) representative." *Id.* ¶ 91. Canal thus did not need to recite

the testimony that was already cited directly above.[38]  In deciding the instant motion, the Court

also has reviewed the underlying factual material cited in the parties' papers, including their Rule

56.1 Statements and Counterstatements, to confirm that the factual material, in fact, supports the

propositions made in these papers.  Thus, to the point that Plaintiff argues that certain statements

in Canal's Counterstatement "grossly misrepresents the record," the Court relies on the portions

of the record that are cited in the Counterstatement by Canal and, for that matter, also by

Plaintiff.  Dkt. No. 364 at 4.

> **B.**     **De Niro's Supplemental Affidavit**

Plaintiff also asks this Court to disregard De Niro's Supplemental Declaration, Dkt. No.

343, as a sham affidavit.

"[A] party may not create an issue of fact by submitting an affidavit in opposition to a

summary judgment motion that, by omission or addition, contradicts the affiant's previous

deposition testimony."  *Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014)

(summary order) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).  "If

a party who has been examined at length on deposition could raise an issue of fact simply by

submitting an affidavit contradicting his own prior testimony, this would greatly diminish the

utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* (quoting

*Hayes*, 84 F.3d at 619).  Accordingly, a factual issue that is created solely by an affidavit that

contradicts the affiant's previous deposition testimony is not a genuine issue precluding

summary judgment.  *Id.*  The Second Circuit has "applied this principle to affirm a grant of

summary judgment against a party who testified in his deposition that he was unable to

---

[38] Where Canal does not expressly admit or deny Plaintiff's statements but just stated that the
fact was "immaterial," the Court does not treat these issues as disputed.  *See* footnote 6.

remember a particular fact, and then, in response to a summary judgment motion, submitted an affidavit claiming a recollection of events that would have raised an issue for trial." *Id.* at 84–85.

Some tension, however, between the affidavit and the deposition testimony does not always make the affidavit a sham. The Second Circuit "has declined to disregard an affidavit as a sham in cases where there is a readily apparent, plausible explanation for the inconsistency, or where the deposition is only arguably contradictory to the affidavit." *Brandon v. Kinter*, 938 F.3d 21, 34 n.9 (2d Cir. 2019). In addition, the sham affidavit principle does not apply when "an issue was not fully explored in the deposition, or the deponent[']s responses were ambiguous." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309 (E.D.N.Y. 2013), *aff'd*, 578 F. App'x 51 (2d Cir. 2014) (summary order) (quoting *Giliani v. GNOC Corp.*, 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006)). "Further, 'where a party's conflicting affidavit statements are corroborated by other evidence, the affidavit may be admissible, since the concern that the affidavit is a 'sham' is alleviated.'" *Id.* (quoting *Giliani*, 2006 WL 1120602, at *3).

Plaintiff points to five primary examples of where she claims De Niro's declaration "materially and directly contradicts his three days of testimony." Dkt. No. 364 at 7. Most of the examples do not actually support Plaintiff's contention. First, Plaintiff claims that De Niro's statements in his declaration that Plaintiff determined office policies and "was charged with administering [Canal's] vacation policies," Dkt No. 342 ¶¶ 8, 22, contradicts his testimony that Plaintiff could not "implement an office policy of significance without [his] approval" and that he was "the final decision maker" on "how many vacation days employees at Canal received," Dkt. No. 362-1 at 129–30. But, a review of the relevant statements shows that they are actually not in contradiction. Although De Niro testified at his deposition that Plaintiff "could not implement an office policy of significance without [his approval]," Dkt. No. 362-1 at 129,

Plaintiff may have been able to implement office policies that were not of significance. Accordingly, De Niro's statement in his declaration that principles of "honesty, integrity, and common sense" applied to the "office policies which [Plaintiff] determined" is not inconsistent with his prior testimony, as he could have been referring in his declaration to the office policies that were not of significance and that Plaintiff could implement without his approval.  Dkt. No. 351 ¶¶ 7–8.  Similarly, De Niro's testimony that he was the final decision maker as to "how many vacation days employees at Canal received," Dkt. No. 362-1 at 129–30, is entirely consistent with his declaration statement that Plaintiff "was charged with administering [Canal's] vacation policies," Dkt. No. 342 ¶ 22.  Being the final decision maker as to a company policy is not tantamount to being the administrator of the policy.

Second, Plaintiff claims that De Niro's statement in his declaration that "[w]hen I dine [at Paola's], I pay with my own credit card," *id.* ¶ 11, contradicts "his testimony that there were times when Ms. Robinson paid for his meals at Paola's," Dkt. No. 362-2 at 331–333.  Dkt. No. 364 at 7.  Again, these statements are not in contradiction.  While De Niro admitted at his deposition that certain of his meals at Paola's were charged to the Canal credit card when he would have "it delivered to the house or something like that," he stated that he "normally" "paid for it with [his] own credit card when" he went there, "which was most of the time."  Dkt. No. 362-2 at 331.  This testimony is thus consistent with the statement in his declaration that when he dined at Paola's he would pay with his own credit card.  Dkt. No. 342 ¶ 11.

Third, Plaintiff claims that De Niro's statement in his declaration that "he learned that Ms. Robinson transferred SkyMiles in 2019 only after her resignation," Dkt No. 342 ¶ 21, diverges from his testimony that Canal paid for her air travel using SkyMiles generated by its credit cards and that, before she resigned in April 2019, he approved various trips that she

planned to take in 2019, including multiple trips to London.  Dkt. No. 364 at 8.  Again, these two

statements are not inconsistent.  That De Niro may have known that Plaintiff took several trips

on SkyMiles does not mean that Plaintiff sought his permission or discussed with him moving

"appropriately 5 million of Canal's SkyMiles to her personal account in 2019."  Dkt. No. 351 ¶

20.

Fourth, Plaintiff contends that De Niro's statement that "employees would be paid for

unused vacation days only if they were 'literally unable to take allotted vacation time'"

contradicts "testimony that Plaintiff was entitled to compensation if she 'was working on her

vacation day.'"  Dkt. No. 364 at 8 (citing Dkt. No. 342 ¶ 22).  These statements are not

necessarily inconsistent.  The statement that "[i]f an employee was literally unable to take

allotted vacation time, it would be my expectation that they should be paid for the unused

day(s)" can easily be interpreted as expressing that if an employee was unable to not work while

on vacation, then they should be paid for that day.  Dkt. No. 342 ¶ 22.  Interpreted in this way,

the statement in De Niro's supplemental declaration is consistent with his testimony that Plaintiff

was entitled to compensation for days she worked on vacation.

One of the five primary examples that Plaintiff identifies does raise sham affidavit

concerns.  Plaintiff claims that De Niro's statement in his declaration that he never asked

"Plaintiff to 'scout' hotels in Los Angeles in 2018" deviates "from his testimony that he was "not

sure" whether he did so and that he "[does not] remember much" regarding his conversations

with Plaintiff about the March 2018 trip."  Dkt. No. 364 at 6–7 (citation omitted).  The Court

agrees that De Niro's testimony and his declaration are in contradiction on this point.  At his

deposition, De Niro testified in response to the question of whether he remembered asking

Plaintiff "to look for hotels in Los Angeles" for his former partner, "I'm not sure."  Dkt. No.

362-2 at 350.  This differs from De Niro's statement in his declaration in which he seems to remember definitively that he "[a]t no time in 2018" asked Plaintiff "to travel to California to 'scout' hotels for my former partner."  Dkt. No. 342 ¶ 16; *see Kennedy*, 570 F. App'x at 83.  The Court will therefore not consider this statement along with any other statements in the declaration that directly contradict De Niro's previous deposition testimony.  *See Aptive Env't, LLC v. Vill. of E. Rockaway, New York*, 2020 WL 9211148, at *7 (E.D.N.Y. Dec. 23, 2020), *report and recommendation adopted*, 2021 WL 837273 (E.D.N.Y. Mar. 5, 2021), *aff'd*, 2022 WL 211091 (2d Cir. Jan. 25, 2022) ("To the extent either attorney affidavit contradicts the Village's previous deposition testimony, the Court will not consider it, either in support of its motion or in opposition to Aptive's cross-motion.").

The Court now turns to the merits of Plaintiff's motion for summary judgment.

### C.     Breach of Fiduciary Duty and Faithless Servant Counterclaims

First, Plaintiff argues that the Court should dismiss Canal's breach of fiduciary duty and faithless servant claims as a matter of law because these claims are limited to cases where the employee misuses the employer's resources to compete with the employer.  Dkt. No. 305 at 22. Plaintiff thus contends that the allegations against Plaintiff, which are essentially allegations of theft, do not bear the traditional hallmarks of such claims and accordingly that these counterclaims should be dismissed.  *Id.* at 22–23.

The Court disagrees that faithless servant claims are limited to cases where the employee actually competes with the employer.  "The faithless servant doctrine provides that an agent is obligated 'to be loyal to his employer and is "prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.""  *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007) (Lynch, J.) (quoting *Western Elec. Co. v. Brenner*, 360 N.E.2d

1091, 1094 (N.Y. 1977)).  Under the *Turner* standard, while petty pilfering from a company

cannot form the basis of a faithless servant claim,[39] courts have routinely held that stealing

money from a company, if sufficiently serious, may.  *See Ametepe v. Peak Time Parking, Corp.*,

2021 WL 1172669, at *8 (S.D.N.Y. Mar. 29, 2021) (finding dispute of material fact as to

faithless servant affirmative defense where evidence indicated that the plaintiff stole from the

defendant); *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 730 (3d Dep't 2016) (ordering

forfeiture of compensation where defendant stole from employer); *Sansum v. Fioratti*, 8

N.Y.S.3d 311, 313 (1st Dep't 2015) (granting summary judgment to employer on faithless

servant claim after evidence conclusively established defendant had embezzled not less than

$100,000 from his employer over two years); *William Floyd Union Free Sch. Dist. v. Wright*,

877 N.Y.S.2d 395, 396 (2d Dep't 2009) (ordering permanent forfeiture of compensation under

the faithless servant doctrine where defendant stole from plaintiff while in plaintiff's employ).

There also is no material difference between the employee who steals from his company by

appropriating a corporate asset in a self-interested transaction or by sending funds to a shell

company in which he has a secret interest and the employee who steals by diverting funds

directly to his personal use.  In both instances, the employee is acting for his own interests and in

a manner inconsistent with his agency.  Here, Canal alleges that Plaintiff did much more than

petty pilfering.  Canal alleges that Plaintiff made tens of thousands of improper charges on

---

[39] Most of the cases Plaintiff cites in support of this argument stand only for the proposition that petty pilfering does not constitute a breach of loyalty.  *See, e.g.*, *Stefanovic v. Old Heidelberg Corp.*, 2022 WL 3928370, at *7 (S.D.N.Y. Aug. 31, 2022) (involving petty pilfering); *Doe v. Solera Cap. LLC*, 2019 WL 1437520, at *10 (S.D.N.Y. Mar. 31, 2019) ("[T]he faithless servant doctrine doesn't apply on the facts of this case because Defendants have not cited, and the Court has not found, a case where the doctrine was applied to the type of garden-variety, petty pilfering by an employee as alleged here."); *Torres*, 628 F. Supp. 2d at 466 ("Gristede's claims are small beer.").

Canal's credit card, sought payment for unused vacation days that she was not entitled to, and improperly transferred approximately 5 million of Canal's Delta SkyMiles to her account.

Plaintiff nonetheless points to certain case law in this District that states that "[t]he duty of loyalty 'has been limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.'" *Farricker v. Penson Dev., Inc.*, 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010); *see Grewal v. Cuneo*, 2016 WL 308803, at *7 (S.D.N.Y. Jan. 25, 2016).  Support for this legal proposition appears to trace back to two cases from the New York County Supreme Court.  *See Veritas Cap. Mgmt. L.L.C. v. Campbell*,2008 WL 5491146 (N.Y. Sup. Ct. Nov. 24, 2008) and *Sullivan & Cromwell LLP v. Charney*, 2007 WL 1240437 (N.Y. Sup. Ct. Apr. 30, 2007).  The first case held only that making personal investments and not disclosing them and making investments that violated the terms of the confidentiality did not violate an employee's duty of loyalty, *see Campbell*, 2008 WL 5491146, at *10, while the second held that saying embarrassing things and leaking confidential documents to the press to bolster a discrimination lawsuit does not constitute a breach of the duty of loyalty, *see Charney*, 2007 WL 1240437, at *7.  Importantly, neither addressed whether stealing money from a company, if sufficiently serious, could constitute a breach of the duty of loyalty.  The Court therefore refuses to hold, as Plaintiff requests, that the type of conduct that Plaintiff allegedly engaged in here cannot constitute a breach of loyalty.

The Court also reaches the same conclusion with respect to Canal's breach of fiduciary duty claim.  While Plaintiff cites to certain cases where the allegations of breach of fiduciary duty concerned an employee's unfair competition with the employer, Plaintiff cites to no case law that stands for the proposition that these are the only types of cases to which claims for

breach of fiduciary duty apply.  Dkt. No. 305 at 23.  To the contrary, courts have routinely held

that a breach of fiduciary duty claim may be premised on allegations that an employee stole

money from her employer or improperly used corporate assets for her personal benefit.  *See*

*Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 723 (S.D.N.Y. 2022) (denying summary

judgment on evidence of plaintiff's "falsification of his timecards, resulting in Zurich paying him

unearned overtime compensation"); *Wright*, 877 N.Y.S.2d at 396 (defendant's stealing from

company "established the plaintiff's entitlement to judgment as a matter of law on its breach of

fiduciary duty cause of action"); *see also Conahan*, 2022 WL 16748585, at *6.

The Court accordingly denies summary judgment as to these claims on this basis.

**D.    Canal's Claims Are Not Duplicative**

**1.    Breach of Fiduciary Duty and Breach of Loyalty Claims**

Next, Plaintiff claims that summary judgment should be granted because Canal's twin

"breach of duty" claims are duplicative of one another.  Dkt. No. 305 at 25.  Specifically,

Plaintiff claims that Canal relies on all of the same facts and allegations in support of both claims

and is seeking the same remedy for both claims, since Canal is no longer seeking disgorgement

of Plaintiff's compensation under the faithless servant doctrine.  *Id.* at 26.

The Court denies summary judgment as to either of Canal's breach of fiduciary duty or

breach of loyalty claims on this basis.  Magistrate Judge Katharine Parker already addressed this

exact argument from Plaintiff in addressing Defendants' motion for leave to amend its answer

and to replead the claims in the State Court Action as counterclaims in this action.  Dkt. No. 72

at 1.  In opposing that motion, "Plaintiff argue[d] that the proposed Breach of Duty of Loyalty

claim is redundant of the proposed Breach of Fiduciary Duty claim and that the Breach of

Fiduciary Duty claim should not be permitted for this reason."  *Id*. at 8.  Magistrate Judge Parker,

however, rejected this argument.  She stated that while "[a] court may dismiss a claim as

duplicative if relying on the same alleged acts, the claim simply seeks the same damages or other relief already claimed in a companion cause of action," *id.* (quoting *Supreme Showroom Inc. v. Branded Apparel Grp. LLC*, 2018 WL 3148357, at *12 n.14 (S.D.N.Y. June 27, 2018)), here, the two claims were seeking different relief.  Specifically, she noted that "Defendants seek additional, and different, relief pursuant to the faithless servant doctrine in the form of 'the return of all wages, bonuses and other compensation paid to Plaintiff,'" whereas "[f]or the breach of fiduciary duty, Defendants seek return of miles and amounts charged by Plaintiff on the corporate credit card, among other damages."  *Id.* at 9.

This ruling is law of the case.  "Decisions of magistrate judges to which no party objects become the law of the case."  *Glogowski v. Organix Indus., Inc.*, 2015 WL 13574335, at *9 (W.D.N.Y. June 9, 2015); *Elam v. Ryder Auto. Operations, Inc.*, 2004 WL 2202588, at *2 (W.D.N.Y. Sept. 30, 2004); *S.E.C. v. Forma*, 1987 WL 33385, at *1 n.1 (S.D.N.Y. Dec. 21, 1987) ("Since no timely objections were filed to Magistrate Francis' decision, presumably ratification by this Court was not required for the Magistrate's decision to become the law of this case.").  "The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'"  *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).  Plaintiff argues that the law of the case is not implicated because, since Magistrate Judge Parker's decision, Canal has stated that it is no longer seeking disgorgement of Plaintiff's compensation under the faithless servant doctrine.  Dkt. No. 305 at 26 & n.8.  In support of this point, Plaintiff points to De Niro's testimony at his deposition, in which he stated:

> Q. Mr. De Niro, do you think Ms. Robinson should be ordered to pay back any of the salary that you paid her over the years?

A. No.

. . .

Q. Do you believe that Ms. Robinson should be ordered to pay back any of the bonuses you paid her during her employment?

A. I don't—I don't care about that.  Let's move on.  You know, let her enjoy whatever bonuses I gave her.  Good luck, you know.  Period.

Dkt. No. 307-2 at 431–32; Dkt. No. 307-3 at 587–88.

The testimony is insufficient to show that Canal either abandoned or waived its right to seek forfeiture of Plaintiff's compensation as a remedy for its breach of loyalty claim.[40]  When De Niro made these statements, he was not testifying as a 30(b)(6) witness on behalf of Canal but in his individual capacity.  His answers therefore are not binding on Canal.  *See Goldberger Co., LLC v. Uneeda Doll Co., Ltd.*, 2017 WL 3098110, at *8 (S.D.N.Y. July 21, 2017) ("A deposition pursuant to Rule 30(b)(6) is substantially different from a witness's deposition as an individual.  A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity." (citation omitted)); *see also S.E.C. v. Stoker*, 873 F. Supp. 2d 605, 612 (S.D.N.Y. 2012) ("The fact that one of the SEC's expert witnesses only identified omissions in the Marketing Materials, rather than misstatements, is not dispositive at this stage.  The expert is not a 30(b)(6) witness, and the SEC is not bound by his testimony.").  In addition, even if De Niro's statements could bind Canal, De Niro merely stated that he personally did not "believe" or "think" Plaintiff should have to forfeit her past compensation.  In other words, he expressed his personal view.  He did not indicate that Canal would no longer seek this relief as part of its

---

[40] The parties disagree as to whether this should be viewed as waiver or abandonment of a claim. Dkt. No. 337 at 36; Dkt. No. 364 at 20.  The Court does not decide this issue as, under either standard, this claim fails.

breach of loyalty claim, or that the request for such relief in Canal's counterclaim was a mistake. Therefore, viewing the papers and circumstances as a whole, Canal's claim for additional relief for its breach of loyalty claim was not abandoned or waived as a result of De Niro's testimony at his deposition. *See Pertusiello v. Cnty. of Suffolk*, 2019 WL 4228485, at *10 (E.D.N.Y. Aug. 19, 2019), *report and recommendation adopted*, 2019 WL 4220926 (E.D.N.Y. Sept. 5, 2019).

Because this additional relief sought for Canal's claim for breach of loyalty has not been abandoned or waived, there is no reason to depart from Magistrate Judge Parker's prior ruling. *See Haraden Motorcar Corp. v. Bonarrigo*, 2020 WL 1915125, at *12 (N.D.N.Y. Apr. 20, 2020) ("Here, Plaintiff seeks different relief, including punitive damages, for the faithless servant claim than it does for its breach of fiduciary duty claim. [] Accordingly, Plaintiff's breach of fiduciary duty claim is not duplicative of its faithless servant claim."); *Longo v. KeyBank Nat'l Ass'n*, 357 F. Supp. 3d 263, 276 n.11 (S.D.N.Y. 2019) (claims are not duplicative where "the potential damages under each claim is different."). For the reasons stated by Magistrate Judge Parker, these claims are not duplicative and Plaintiff is not entitled to summary judgment as to either claim on this basis.

### 2.    Breach of Duty Claims and Conversion Claim

Plaintiff also seeks to dismiss Canal's claims for breach of the duty of loyalty and breach of fiduciary duty on the basis that they are wholly duplicative of its claim for conversion. Dkt. No. 305 at 24. In making this argument, Plaintiff contends that all three claims are premised on the same alleged acts and seek the same relief. *Id.* at 24–25.

As an initial point, the Court declines to dismiss Canal's breach of the duty of loyalty claim as duplicative of its conversion claim. Plaintiff's argument that these claims seek the same remedy is again based on its contention that Canal has disavowed its request for disgorgement of Plaintiff's compensation as relief for its duty of loyalty claim. *Id.* As previously discussed, the

Court disagrees that Canal has disavowed this form of relief.  Therefore, these claims are not duplicative as "the potential damages under each claim is different."  *Longo*, 357 F. Supp. 3d at 276 n.11.

The question whether Canal's breach of the duty of fiduciary duty claim is duplicative of its conversion claim is trickier.  Even though these claims do appear to be premised on the same facts and request the same relief, their elements are different and thus a party could presumably prevail on one and not the other.  Plaintiff also cites no case and the Court has been unable to locate one in which either of these claims has been dismissed purely because it was duplicative of the other.  In *Gold Sun Shipping Ltd. v. Ionian Transp. Inc.*, 666 N.Y.S.2d 677 (2d Dep't 1997), the court dismissed the breach of fiduciary duty claim as untimely under the "three-year Statute of Limitations applicable to conversion actions."  *Id.* at 678.  The court noted that "because the legal remedy for conversion would have afforded the plaintiffs full and complete relief," plaintiff could not "avoid the Statute of Limitations" by pleading a breach of fiduciary duty claim.  *Id.*  Similarly, in *Samuels v. Greenberg*, 2015 WL 5657565 (E.D.N.Y. Sept. 23, 2015), *aff'd*, 646 F. App'x 38 (2d Cir. 2016), the court held that "the three-year statute of limitations applicable to conversion and replevin" applied to the claim for breach of fiduciary duty.  *Id.* at *8.  And, in *Kapernekas v. Brandhorst*, 638 F. Supp. 2d 426 (S.D.N.Y. 2009), the court dismissed the breach of fiduciary duty claim "as an attempt to plead around the conversion and replevin time limitations with what are really duplicative claims."  *Id.* at 428.  These cases thus only stand for the proposition that a breach of fiduciary duty claim may not be pleaded to circumvent the statute of limitations for conversion claims—an issue which neither party raises here.  They do not stand for the proposition that a fiduciary claim must always be dismissed when a conversion claim is present.  In fact, the only case that this Court can find that has

addressed this question, absent statute of limitations concerns, declined to dismiss a breach of

fiduciary duty claim as duplicative of a conversion claim.  *See Bonarrigo*, 2020 WL 1915125, at

*11.  The Court thus, based on the arguments in front of it, declines to dismiss Canal's breach of

fiduciary duty claim as duplicative.

### E.    Authorization and Consent

Plaintiff also moves for summary judgment on Canal's counterclaims on the basis that

Canal authorized and consented to the alleged transactions and activities.  Dkt. No. 305 at 27.

Plaintiff contends that she "was given broad authority and substantial discretion to engage in all

of the transactions and activities that Canal now challenges," specifically: (1) the credit card

charges for taxis, Uber, and Lyft car rides; (2) the credit card charges for Paola's, Whole Foods,

and Dean & Deluca; (3) payment for unused vacation days; (4) charges during Plaintiff's Los

Angeles trip in March 2018; and (5) Plaintiff's transfer of SkyMiles prior to her resignation.  *Id.*

at 27–35.

Prior to addressing whether there is a disputed issue of fact as to whether Canal

consented to each of these transactions and activities, the Court first outlines the relevant law as

to consent and authorization.

As to the claims for breach of fiduciary duty and the breach of loyalty, "[u]nless

otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the

principal in all matters connected with his agency."  *JN Contemp. Art LLC v. Phillips*

*Auctioneers LLC*, 507 F. Supp. 3d 490, 506 (S.D.N.Y. 2020), *aff'd*, 29 F.4th 118 (2d Cir. 2022)

(quoting Restatement (Second) of Agency § 387 (1958)).  Accordingly, "[t]he agent's duty is not

only to act solely for the benefit of the principal in matters entrusted to him, but also to take no

unfair advantage of his position in the use of information or things acquired by him because of

his position as agent or because of the opportunities which his position affords."  *Int'l Equity*

*Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 499 (S.D.N.Y. 2005), *aff'd and remanded on other grounds*, 246 F. App'x 73 (2d Cir. 2007) (summary order) (quoting Restatement (Second) of Agency § 387 cmt. b). Thus, generally, "[a]n agent is under a strict duty to avoid any conflict between their self-interest and that of the principal to even the slightest extent." 2A C.J.S. Agency § 270; *see Crosby v. Luehrs*, 669 N.W.2d 635, 644 (Neb. 2003) ("The law will not permit an agent to place himself or herself in a situation where the agent may be tempted by his or her own private interest to disregard that of the principal."); *Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 157 (1995). That includes self-interested use of the principal's property "even when the agent's use is beneficial in some sense to the property or to the principal." Restatement (Third) Of Agency § 8.05 cmt. b. (2006). The purpose of this rule is "to protect[] the principal from the vulnerability that any relationship of agency creates by exposing the principal's property or interests more generally to the risk of self-interested action by the agent." *Id.* § 8.01.

An exception to the rule against self-dealing exists where "the principal has consented to the self-dealing after full disclosure by the fiduciary." *Ramsey v. Toelle*, 2008 WL 4570580, at *7 (Del. Ch. Sept. 30, 2008); *see also S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 851 (2d Cir. 1987) ("[C]onsent to self-dealing by a fiduciary must be 'clearly proved' and 'made with a full knowledge of all the material particulars and circumstances.'" (quoting Restatement (Second) of Agency § 392 cmt. b)); *Sterling Fifth Assocs. v. Carpentille Corp.*, 779 N.Y.S.2d 485, 487 (1st Dep't 2004) ("[I]f the asserted self-dealing was actually contemplated and authorized, it would not, *ipso facto*, be impermissible and deemed wrongful." (citation omitted)); Restatement (Third) of Agency § 8.06.

Importantly, "[t]he burden is on the fiduciary to demonstrate fair dealing." *Toelle*, 2008 WL 4570580, at *7; *see also Huang v. Sy,* 2008 WL 553646, at *8 (N.Y. Sup. Ct. Feb. 28, 2008) ("Where, as here, the claim against the managing partner is based on allegations of fraud and self-dealing, or when the managing partner makes decisions affected by an inherent conflict of interest, the burden is upon the defendant to demonstrate the absence of fraud and to show affirmatively that the disputed acts are authorized, that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood." (cleaned up)); *Schock v. Nash*, 732 A.2d 217, 226 (Del. 1999) ("Irma Schock and the other defendants had the burden to establish that Anna Dever consented to the gratuitous transfers to Irma and her family after full disclosure of all the facts.").  It is therefore the agent's burden to show that it obtained the principal's consent and that it disclosed all material facts that would reasonably affect the principal's judgment prior to engaging in the transaction "unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them."  *See* Restatement (Third) Of Agency § 8.06.

The relevant case law in the conversion context is sparse as to this issue, but there is no apparent reason why the same rule would not govern there as well.  Although an element of a claim of conversion is that the defendant possessed the relevant property or money without authorization, *see Perrone*, 156 N.Y.S.3d at 430, lack or authorization or fraud is presumed when an agent uses the principal's property in a manner that is, at least in part, self-interested, *see Schock*, 732 A.2d at 226 ("In a transaction between principal and agent in which an agent obtains a benefit, a presumption arises against its validity which the agent must overcome." (quoting 3 Am. Jur. 2d Agency § 210 (1986))); *Foley v. D'Agostino*, 248 N.Y.S.2d 121, 128 (1st Dep't 1964) ("When it appears that the trustee or officer has violated the moral obligation to refrain

from placing himself in relations which ordinarily produce a conflict between self-interest and integrity, there is in equity a presumption against the transaction, which he is required to explain." (citation omitted)).  It thus follows that, as in the breach of duty context, lack of authorization for purposes of an unlawful conversion claim can be shown by evidence that a fiduciary converted the property or money in a manner that was self-interested or involved self-dealing.  It would be the burden of the fiduciary then to show consent based on a knowledge of all facts to the conversion of the property or money.

That this rule should apply also in the conversion context has support in *Knight v. Delaware & Hudson Co.*, 165 N.Y.S. 583 (1st Dep't 1917), in which the court characterized "consent" as a "defense" to a claim of conversion that the defendant had to show.  *Id.* at 584.  It is also supported by the court's decision in *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889 (N.Y. Sup. Ct. 2008), in which the court found that the plaintiff, the founder of a company called Components, had unlawfully converted Component's loan property based on the fact that plaintiff had used the proceeds of a Bank of America loan to Components to "pay personal expenses."  *Id.* at 893, 897.  In reaching this holding, the court noted: "as the CEO of Components, [plaintiff] was under a fiduciary obligation to use the proceeds of the Bank of America loan for the benefit of the company."  *Id.* at 897.

Because, here, the allegations involve claims that Plaintiff, a fiduciary of Canal, misused Canal's property in a self-interested manner, the burden is on Plaintiff to show consent.  In other words, it is Plaintiff's burden to show that she, upon disclosing all material facts, obtained Canal's consent to engage in these transactions for purposes of the breach of fiduciary duty, breach of loyalty, and conversion counterclaims.  The Court thus turns to whether Plaintiff has met this burden as a matter of law.

### 1.   Credit Card Charges for Taxis, Ubers, and Lyfts

Plaintiff claims that Plaintiff's charges for taxis, Ubers, and Lyfts were authorized because it was Canal's policy to pay for any taxi, Uber, and Lyft used by an employee for a work-related reason.  Dkt. No. 305 at 29.  Plaintiff also notes that De Niro testified that he left it up to Plaintiff to determine the circumstances when Canal would be charged for a taxi or Uber, that De Niro did not nitpick when it came to these charges, and that Plaintiff confirmed under oath that all of the credit card charges she placed for taxis, Ubers, and Lyfts were work-related and therefore authorized.  *Id.*  Plaintiff further notes that Canal has not pointed to a single instance of a taxi, Uber, or Lyft being taken by Plaintiff on Canal's dime for non-work purposes. *Id.*

In response, Canal agrees that while not every charge was improper, the $31,814.17 in Ubers/taxis and $5,513.05 in car service that Plaintiff charged to Canal from between May 2017 and April 2019 reflect excessive charges "both in frequency and amount" and "reflect systemic abuse by an employee, who exploited and exceeded the bounds of her authority."  Dkt. No. 337 at 22–23.  Canal also points to evidence that, when Plaintiff would travel to and from the office, she would charge those taxis or cars taken on her personal card and pay herself back via petty cash.  Thus, these charges, according to Canal, are not included in this total.  *Id.* at 21.

Construed in favor of Canal, the key evidence on this issue indicates that it was Canal's policy that if an "employee *needed* to take a taxi, Uber, or Lyft, for a work-related reason, it was Canal's policy that Canal would pay for that taxi, Uber, or Lyft."  Dkt. 307-3 at 341 (emphasis added).  Tom Harvey clarified what it meant for an employee to *need* to take a taxi, Uber, or Lyft during his deposition.  He stated:  "[Y]ou only get reimbursed for work-related transportation. . . . You don't get paid to come to the office—you don't get paid to go stop by the office.  You don't take transportation when you can take public transportation.  And you certainly don't get to

charge the company when you are away on vacation for Uber or cabs."  Dkt. No. 344-16 at 227.

Tom Harvey also testified that while Plaintiff was allowed to get reimbursed for any charges

incurred on work trips, those trips "were rare."  *Id.* at 228.  De Niro similarly testified that Canal

would pay for employees to take taxis, Ubers, or Lyfts "if it was at night or some time which is

not normal work hours."  Dkt. No. 344-2 at 276.  Another employee, Weeks-Brittan, further

confirmed that it was not normal for Canal employees to charge Ubers with any frequency.  She

stated about Plaintiff's Uber charges on Canal's Amex card in her name: "this is a ridiculous

amount of Ubers.  The rest of us aren't charging Ubers."  Dkt. No. 247-4 at 240.  Weeks-Brittan

also testified that when Plaintiff "took Ubers to and from the work," she would charge them on

her "personal card" and get reimbursed for them.  *Id.* at 239–40.

    The evidence, construed in favor of Canal, indicates that Canal employees were only

permitted to charge car services to the company in rare instances where the use of a car was

*necessary* as opposed to the use of a subway.  A reasonable juror could find that Plaintiff

disregarded this policy based on the frequent Uber, Lyft, and taxi charges on the Canal Amex

card in her name.  Such a conclusion is further supported by the fact that many of the charges on

the Amex card do not appear to be related to *necessary* work travel.  For example, from May 2,

2018 to May 25, 2017, Plaintiff was on what she deemed on her timesheet records a

"work/holiday in" London.  Dkt. No. 304-2 at ECF pp. 20–23.  During her time in London,

Plaintiff's work appears to have largely consisted of calls or emails.  *Id.*  However, despite that

fact, Plaintiff charged numerous Ubers and taxis on her work credit card during that period of

time.  For example, on May 21, 2017, Plaintiff charged an approximately $36 Uber on Canal's

Amex card, even though her sole work for that day appears to have involved reviewing emails

for 30 minutes in the morning and reviewing emails for another 1.5 hours at night.  *Id*. at ECF p.

22; Dkt. No. 375-1 at ECF p. 3.  On May 24, 2017, Plaintiff again charged almost $200 in taxis

and Ubers on Canal's Amex card, which a reasonable juror could interpret as charges to and

from the airport as that day her time records indicate that she traveled back from London to New

York City.  Dkt. No. 304-2 at ECF p. 22; Dkt. No. 375-1 at ECF p. 3.  During another trip to

London on July 7, 2018, Plaintiff charged an approximately $120 taxi on Canal's Amex card

even though she claimed to only spend three hours working that day, which appears to have

consisted entirely of calls and emails.  Dkt. No. 304-1 at ECF p. 33; Dkt. No. 375-1 at ECF p. 23.

Thus, construed in favor of Canal, a reasonable juror could find that Plaintiff exceeded

the bounds of Canal's consent by charging Canal for Ubers or other car services even where such

trips were not strictly *necessary* for work.  Plaintiff therefore has not shown, as a matter of law,

that each of these charges was consented to, with full knowledge of material facts.  The Court

denies summary judgment in favor of Plaintiff on this basis as there is a disputed issue of

material fact.[41]

### 2.     Credit Card Charges for Paola's, Whole Foods, and Dean & Deluca

Plaintiff next argues that Canal cannot establish a lack of consent with respect to charges

at Paola's, Whole Foods, and Dean & Deluca.  Dkt. No. 305 at 30.  Plaintiff points to Canal's

---

[41] Plaintiff submits a declaration that "[a]ny taxis and Ubers that I charged to Canal's American Express card were authorized, work-related expenses.  All of these charges were incurred because I was performing work for Canal or Mr. De Niro at the time, such as running errands for Mr. De Niro."  Dkt. No. 304 ¶ 2.  This does not mandate a grant of summary judgment in Plaintiff's favor for at least two reasons.  First, construed in favor of Canal, the evidence indicates that Plaintiff only had authority to charge for Ubers, Lyfts, and taxis where the use of a car service was *necessary* for work, such as when the employee needed to travel late at night.  The fact that the charges were incurred because Plaintiff was performing work for Canal or De Niro does not necessarily mean that use of a car was *necessary* for work.  Second, just as a non-moving party may not rely on conclusory allegations in an affidavit to defeat summary judgment, neither may such a party obtain summary judgment in its favor by submitting a conclusory affidavit that all charges were "authorized" when evidence exists that the party went beyond the scope of her authority.  *See D3 Int'l, Inc. v. AGGF Cosm. Grp. S.p.A.*, 2023 WL 2390552, at *6 (S.D.N.Y. Mar. 7, 2023).

Rule 30(b)(6) testimony that Canal's policy was to pay for employees' meals if an employee were working or on call for De Niro and to De Niro's testimony that he left it up to Plaintiff and common sense to determine whether meal charges were appropriate. *Id.* Plaintiff also points to evidence that Plaintiff used the Canal Amex card in her name to make purchases for De Niro from Paola's and Whole Foods and confirmed that all credit card charges to these three establishments were authorized. *Id.* Plaintiff therefore contends that Canal has once again offered no evidence that any of the charges were unauthorized spending. *Id.*

In response, Canal argues that the office policy was that if an employee was working in the office, lunch could be ordered and Canal would pay for it, but that the evidence does not indicate that the policy extended to employees who worked from and ate lunch *at home*, which Plaintiff usually did. Dkt. No. 337 at 21. Canal also contends that when Canal employees ate in the office, they would usually charge their lunches to Caviar and that such charges are not included as part of their allegations against Plaintiff. *Id.* Canal also points to evidence that no policy existed permitting employees to charge Canal for dinner, except in rare instances; that Canal's staff did not buy De Niro's groceries as he had home staff who did that; and that if De Niro dined at Paola's, he would generally use his own credit card. *Id.* at 22. Thus, Canal argues that the 90 charges to Paola's between May 2017 and April 2019, amounting to approximately $13,000, and the approximately $9,000 that was charged to Dean & DeLuca and Whole Foods during this period on Canal's Amex card in Plaintiff's name were excessive and, at least in part, unauthorized.

Again, Plaintiff has not demonstrated as a matter of law that all of these charges were consented to by Canal and thus Plaintiff is not entitled to summary judgment on this issue. Construed in favor of Canal, a reasonable juror could find that Canal's policy as to working

meals, at least with respect to the employee's ability to charge for dinner, depended on whether the employee was in or out of the office. While Canal's 30(b)(6) witness generally stated that, as far as he knew, if employees "were working and especially at night or on call for Mr. De Niro that their meals would be taken care of," Dkt. No. 305-4 at 340, the witness did not definitively state whether this policy applied to employees who worked at home (even if home was the employee's official office). And, other evidence in the record indicates that it did not. For example, De Niro stated that while he was aware of and agreed with a policy in which "employees working in the office could order lunch and it would be paid for by Canal," he stated that "[a]t no time did Ms. Robinson ever discuss with me the concept that her ability to work remotely also came with the added benefit of having her meals and food bill paid by Canal." Dkt. No. 304 ¶¶ 9–10. Kaplan testified to something similar at his deposition, specifically that working dinners were generally only charged to Canal if the employee was "working late at the office or working late at a thing." Dkt. No. 322-88 at 109. A reasonable juror could also find that Canal's 30(b)(6) witness's reference to being "on call" did not refer to an employee working from home but instead referred to the requirement that certain executive assistants be in the office to answer the phones for De Niro. Weeks-Brittan testified that she and Spear would have to be in the office to answer calls, including an afterhours phone. Dkt. No. 247-4 at 40. She described the job as "an on-call job" and stated "if I was on call, Chase would ensure that I was actually on call and that my phone was on loud" and would ensure that the executive assistants were "in the office" "answering the phones." *Id.* at 61–62.

In sum, the evidence, construed in favor of Canal, supports that Canal's policy only expressly permitted Canal employees to charge their meals, specifically their dinners, to Canal if the employee was working in the office. This is significant as, starting in 2017, Plaintiff largely

worked from home and accordingly (under this interpretation of the evidence) would not have had express approval to charge her working meals to Canal.  Dkt. No. 160 at 310; Dkt. No. 247-1 at 15.  Yet, despite this fact, multiple meals, including large dollar amounts at grocery stores such as Whole Foods, were frequently charged to Canal's Amex card in Plaintiff's name on a single day.  For example, on March 4, 2019, the Amex credit card in Plaintiff's name includes charges for approximately $63 to Dean & Deluca and $85 to Paola's.  Dkt. No. 375-1 at 40.  Similarly, on February 3, 2018, the Amex credit card lists charges for both approximately $40 at Paola's restaurants and $80 at Whole Foods.[42]  Dkt. No. 344-41 at ECF p. 16.  And on December 10, 2017, the Amex credit card in Plaintiff's name lists charges for approximately $82 at Paola's Restaurant and $96 at Whole Foods.  *Id.* at ECF p. 13.

The evidence, construed in favor of Canal, also supports that these charges were largely made by Plaintiff and on her behalf, as opposed to for De Niro or other Canal employees.  Evidence supports that Canal assistants ordered their lunches while working on an application named Caviar and thus their lunch charges would largely show up as Caviar charges on the Amex card, not as a Dean & Deluca, Paola's, or Whole Foods charge.  Dkt. No. 344-8 at 67.  Weeks-Brittan testified that "[w]e were logged into a Caviar account on our work computers. . . . And we could order lunch, like, from one place to the office on Caviar, which we did."  Dkt. No. 344-12 at 127.  Weeks-Brittan also testified that Canal staff generally did not buy De Niro's groceries as he had "home staff," indicating that the large charges to stores like Whole Foods and Dean & DeLuca were not for De Niro.  *Id.* at 222.  Furthermore, De Niro testified that while he would sometimes have Plaintiff pick up meals for him from Paola's, he would normally go there and pay for it with his "own credit card."  Dkt. No. 322-92 at 328–31.  De Niro also testified that

---

[42] The Court notes that the Amex records are extremely difficult, at times, to make out.

he would only have Plaintiff pick up food and supplies for him from Whole Foods "from time to time" and was not sure about whether he had ever had Plaintiff pick up food for him at Dean & DeLuca.  *Id.* at 334.

Based on this evidence, a reasonable juror could find that Plaintiff, despite working at home, frequently charged her dinners, lunches, and groceries to Canal and that at least certain of those charges were not expressly authorized by Canal.  Accordingly, a triable issue of fact exists as to this issue.

### 3.     Payment for Unused Vacation Days

Next, Plaintiff moves for summary judgment on the claims related to unused vacation days on the basis that Canal had a policy of paying certain employees, including Plaintiff, for their unused vacation days.  Dkt. No. 305 at 31.  In support of her motion, Plaintiff points to De Niro's testimony that it did not matter whether Plaintiff worked in New York or elsewhere and that Plaintiff's records indicate that she worked extensively while on vacation.  *Id.*  In response, Canal notes that while Canal had a policy of paying Plaintiff for unused vacation days, the problem is that Plaintiff "equated *any* work performed on vacation as negating it as a vacation day."  Dkt. No. 337 at 13 (emphasis in original).  Canal further states that Plaintiff points to no evidence that sheds any light whatsoever on how much "work" entitled her to regard the day as a vacation day, but other employees understood that it did not mean that an employee could respond to a few emails on vacation and seek reimbursement for it.  *Id.* at 14.

Construed in favor of Canal, the evidence supports that while Plaintiff was entitled to be reimbursed for vacation days on which she worked usual work hours, there is a disputed issue of fact as to whether Canal had consented to pay Plaintiff for vacation days on which she only worked for one or two hours.  De Niro stated that: "applying honesty, integrity, logic and common sense, I would expect that if Ms. Robinson was able to travel to take a vacation four

weeks per year, incidental work while she was away would not negate the fact that she was on vacation." Dkt. No. 351 ¶ 23. The evidence also supports that while De Niro would approve Plaintiff's requested reimbursement for vacation days, he would generally take her at her word for what days she worked on vacation. Dkt. No. 327-94 at 514–17. A reasonable juror could therefore find that, De Niro, by approving payment for days that Plaintiff worked while on vacation, was not aware of how many hours, if at all, Plaintiff had worked on those days. Therefore, his approval of payment for those days did not constitute implicit approval for Plaintiff being reimbursed for vacation days on which she only performed incidental work.

Construed in favor of Canal, evidence also supports that, despite no explicit authorization for such behavior, Plaintiff requested payment for vacation days where she worked only a small fraction of the day. For example, in 2018, Plaintiff claimed that she took zero of her twenty-three vacation days. Dkt. No. 322-57 at ECF pp. 2, 5–9. However, on Friday, February 23, 2018, while Plaintiff was in Madrid, she only worked for 2 hours based on her time records. Dkt. No. 304-1 at ECF p. 10. This does not appear to have been a day on which the office was closed for a holiday. Dkt. No. 304-4 at ECF pp. 7–11. Similarly, while Plaintiff was in Seville, on Monday, June 25 and Tuesday, June 26, 2018, she worked one hour and 1.5 hours, respectively, based on her time records and then only 1.5 hours on Friday, June 29, 2018. Dkt. No. 304-1 at ECF p. 32. None of these days appear to have been days on which the Canal office was closed for a holiday. Dkt. No. 304-4 at ECF pp. 7–11.

A reasonable juror could also find that Plaintiff took advantage of De Niro's hands off approach and purposely ensured that she was paid out for her unused vacation days contrary to Canal policy. De Niro states that it was his expectation that an employee would only be paid for unused vacation days where the "employee was literally unable to take allotted vacation time,"

that Plaintiff had full discretion to assign tasks to others when she was on vacation, and that Plaintiff was aware of his own vacation schedule so that she could aligns hers with his as workflow often eased at that time.  Dkt. No. 351 ¶¶ 22–24.  Yet, despite that fact, Plaintiff only claimed *one* vacation day between 2015 to 2018.  Dkt. No. 322-57 at ECF pp. 2, 5–9.

A reasonable jury thus could find that Plaintiff exceeded the scope of her authority in seeking payment for vacation days.  *See Nike, Inc.*, 816 F.2d at 851 ("[C]onsent to self-dealing by a fiduciary must be 'clearly proved' and 'made with a full knowledge of all the material particulars and circumstances.'" (citation omitted)).  The Court thus declines to grant summary judgment on this issue on this basis.

### 4.    Los Angeles Trip

Next, Plaintiff claims that her Los Angeles trip in March 2018 was directed and expressly authorized by De Niro.  Dkt. No. 305 at 33.  Plaintiff notes that De Niro was unable to recall the specifics of his discussions with Plaintiff about the trip, that Plaintiff averred that she traveled to Los Angeles at De Niro's request to assist his former partner, that De Niro permitted Plaintiff to cut the trip short before any Taxi Driver books arrived due to inclement weather, and that, in connection with this work trip, Plaintiff was entitled to have her food, transportation, and lodging paid for.  *Id.* at 33.  Canal appears to contend that the purpose of the trip was not work, but for Plaintiff to visit a friend for her birthday.  Dkt. No. 337 at 11–12.

The Court agrees with Plaintiff that the undisputed evidence in this case supports that Plaintiff's trip to Los Angeles in March 2018 was a work trip, even if there is some disagreement about its precise work-related purpose.  Plaintiff testified that De Niro directed her to travel to Los Angeles in March 2018 because he was encouraging his former partner to undergo medical treatment there, and he wanted Plaintiff to scout potential hotels to accommodate her.  Dkt. No. 304 ¶ 4.  And, at De Niro's deposition, De Niro was unable to contradict this account as he stated

that he was not sure whether he reached out to Plaintiff in March 2018 to identify a hotel that would accommodate his former partner.  Dkt. No. 344-2 at 352.  De Niro did, however, seem to recall Plaintiff "suggest[ing]" that she could go out to Los Angeles to pick up the Taxi Driver books for him.  *Id.* at 352–55.  De Niro further testified that if Plaintiff was on a work trip, she was authorized to be reimbursed for her transportation, lodging, and food, but that it was up to her "to responsibly determine what she should pay for certain things."  Dkt. No. 307-3 at 587.

But, while evidence does support that Plaintiff was entitled to take the trip for work and to have certain expenses paid for during it, a reasonable juror could nonetheless find that Plaintiff exceeded the bounds of that authorization, specifically, when she rented a BMW for two days with a total cost of $729.28, Dkt. No. 344-29 at ECF p. 7, charged $2,608.86 at the Montage Hotel in Beverly Hills for a three night stay, and charged a $604.91 meal and an approximately $156 meal at Nobu Los Angeles on March 9, 2018.  Dkt. No. 344-31 at ECF pp. 17–18; Dkt. No. 344-6 at 242.  As noted, while De Niro had stated that Plaintiff was entitled to "responsibly determine" what expenses Canal should incur for her work trips, Dkt. No. 307-3 at 587, a reasonable juror could find that these expenses exceeded the bounds of that authority and that Plaintiff had not obtained consent, upon Canal's full knowledge of material facts, as to the magnitude of these charges.  In fact, to the contrary, De Niro testified that he later learned that "[Plaintiff] had rent[ed] a car when she was in LA, but also using Ubers" and that "was not appropriate.  That was not right.  That was not ethical.  Period."  Dkt. No. 322-92 at 281.  De Niro also stated that he did not authorize Plaintiff, for purposes of the Los Angeles trip, to stay at the Montage in Beverly Hills, rent a car, or dine at Nobu—all at Canal's expense.  Dkt. No. 351 ¶ 17.  The Court thus declines to grant partial summary judgment as to this issue.

5.    **SkyMiles**

Plaintiff also argues that Canal cannot establish lack of consent with respect to Plaintiff's use of Canal's SkyMiles.  Dkt. No. 305 at 34.  Plaintiff notes that De Niro authorized Plaintiff to use Canal's SkyMiles for her own travel, including in 2019 in which he approved trips for which she planned to use SkyMiles.  *Id.*  Plaintiff also notes that De Niro took affirmative steps to ensure that Plaintiff could transfer SkyMiles to herself.  *Id.* at 35.  In response, Canal contends that it is not challenging Plaintiff's authorization to transfer SkyMiles generally, but largely just challenging her transfer of approximately five million SkyMiles to her own personal account from Canal's during the ten weeks before resigning.  Dkt. No. 337 at 6–8.  It notes there is no evidence that Plaintiff ever requested or received approval to perform these specific transfers of SkyMiles, much less that she had permission to keep them after her employment ended.  *Id.* at 8.

There is a disputed issue of material fact as to whether Canal had expressly consented, with full knowledge of material facts, to Plaintiff's transfer of the approximately five million SkyMiles to herself in the months prior to her resignation and to Plaintiff keeping those miles after she resigned.  While De Niro testified that he did not communicate any hard and fast limits on Plaintiff's use of SkyMiles, he did state that she had to keep him informed about the details of her transfers and to ensure that she was not taking too many so that his children would not have any available to them.  Dkt. No. 303-2 at 380–84.  In other words, according to De Niro, while Plaintiff had authorization to transfer miles to her account in anticipation of a trip that she would be taking for business or of which she informed De Niro, she did not have blanket authority to transfer as many miles as she wanted in the event that she might ultimately take a trip and need them.  Yet, despite that fact, Plaintiff testified that she would transfer the "balance of the SkyMiles account into [her] Delta account."  Dkt. No. 327-2 at 293.

De Niro also declared that Plaintiff did not ask him permission to move approximately five million of Canal's SkyMiles to her personal account in 2019. Dkt. No. 351 ¶ 20. He also avers that neither he nor Plaintiff had a conversation about whether she could retain any SkyMiles that remained in her account should she resign from her employment. *Id.* ¶ 19.[43]

That De Niro confirmed in his testimony that he had multiple conversations with Plaintiff in which he approved trips that Plaintiff planned to use on SkyMiles in the last few months of her job does not impact this conclusion. Dkt. No. 305 at 34. De Niro testified that while he did not ask Plaintiff for details about how many SkyMiles these trips would cost, he noted that he did not have to as it was "up to [Plaintiff] to say, listen, I take so many [S]ky[M]iles to go to London." Dkt. No. 307-3 at 574. A reasonable juror could thus conclude that, to the extent Plaintiff obtained consent, it was not upon full disclosure of material facts. It is also not clear that even if

---

[43] Plaintiff presents evidence that she was unable to transfer the SkyMiles back to Canal once they had been transferred out of Canal's account. Specifically, she points to Delta Terms & Conditions that state that "Once you have transferred Membership Rewards® points, they cannot be transferred back to your Membership Rewards account." Dkt. No. 285-80. That argument is insufficient to stave off summary judgment for three independent reasons. First, there is evidence that Plaintiff was not authorized to transfer that quantum of SkyMiles to her account in the first place. If that is so, the fact that Plaintiff is not able to repair the injury she caused may go to the form and quantum of relief that may be awarded. But it would not be an excuse for the conversion in the first place. Second, there is no evidence showing that Plaintiff tried to obtain an exception from this policy and the terms and conditions do not detail whether they have been updated. Dkt. No. 343 at 71. There is also some evidence in the record that SkyMiles may, with effort, be transferred from one account to another. Dkt. No. 322-87 at 118–20, 256–57. Third, even if Plaintiff was originally permitted to transfer the miles to her account, there is evidence that would support the conclusion that she was a bailee—entitled to the possession and use of the SkyMiles only if she used them in connection with her employment. *See Ancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 306 (S.D.N.Y. 2011). And, on that understanding, even if Plaintiff's original possession of the miles was lawful, "the bailor may maintain a claim for conversion if either (1) a separate demand is made for return of the property or (2) there has been an affirmative act of conversion." *Rekor Sys., Inc. v. Loughlin*, 2022 WL 3020148, at *12 (S.D.N.Y. July 29, 2022). Leaving aside the fact that Canal did make a demand for return, there also is evidence that Plaintiff used some of the miles after her departure from Canal and after she ceased to have a Canal-specific business purpose for using them. Dkt. No. 340-26.

De Niro had expressly approved Plaintiff's SkyMiles use for each of these trips, that such consent on a case-by-case basis would account for the entire 5 million SkyMiles that Plaintiff had transferred in the months prior to her resignation.[44]

### F.     Ratification and Acquiescence

Plaintiff also argues that the Court should grant summary judgment in her favor as Canal ratified and acquiesced in all of the transactions and activities at issue.  First, Plaintiff notes that Canal had accountants that provided checks and balances, received, reviewed, and paid Canal's credit card bills as they came in, and at no point raised concerns about any credit card charges by Plaintiff.  Dkt. No. 305 at 38.  Plaintiff also notes that after reviewing the expenses, Canal's accountants classified Plaintiff's food and travel expenses as business expenses in their general ledger, *id.*, and claimed tax deductions based on them, *id.* at 39.  Second, Plaintiff notes that she would discuss her payment for unused vacation days with De Niro, send them to both De Niro and Canal's accountants, and neither De Niro nor Canal's accountants raised any concerns about the vacation day payments that Canal now challenges.  *Id.* at 39.  Third, Plaintiff argues that Plaintiff's transfer of SkyMiles was not a secret, as any transfers were clearly visible on the very same credit card bills that Canal's accountants received, reviewed, and raised questions about; yet, they never conveyed any objection to Plaintiff's use of SkyMiles.  *Id.* at 40.  In response, Canal claims that nothing in the record indicates that Canal had knowledge of the material facts as to each of these transfers and transactions and thus Canal could not have ratified them.  Dkt. No. 337 at 37–38.

---

[44] That there is evidence that De Niro took affirmative steps to ensure that Plaintiff could transfer SkyMiles to herself also does not entitle Plaintiff to summary judgment in her favor.  There is no dispute in this case that De Niro authorized Plaintiff to transfer SkyMiles at certain times in the past.  Instead, the dispute concerns whether Plaintiff had authorization to transfer the approximately five million SkyMiles that she transferred in the months prior to her resignation.

"Ratification quite clearly denotes that the act was not initially taken with the requisite authorization." *Maung Ng We v. Merrill Lynch & Co.*, 2000 WL 1159835, at *8 (S.D.N.Y. Aug. 15, 2000).[45]  "Under New York law, ratification 'may be express or implied, or may result from silence or inaction.'" *Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co.*, 152 F. Supp. 3d 159, 165 (S.D.N.Y. 2016) (quoting *In re Adelphia Recovery Trust*, 634 F.3d 678, 692 (2d Cir. 2011)).  Ratification, however:

> must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts of language . . . .  However, the intent can be implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events.

*Id.* (quoting *Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999), *vacated on other grounds sub nom. Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120 (2d Cir. 2003)).  "[U]nless the relevant facts are undisputed, the question of ratification is one for the jury." *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 588 (S.D.N.Y. 2018) (quoting *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007)).

Here, there is a material dispute of fact as to whether Canal ratified Plaintiff's conduct at issue in Canal's counterclaims, as the evidence does not support, as a matter of law, that Canal had "full knowledge of the material facts relating to the" transactions or "clearly establish[]" that Canal consented to them.  *See Cammeby's Mgmt., Co., LLC*, 152 F. Supp. 3d at 165 (citation omitted).  The evidence, construed in favor of Canal, indicates that Canal's accountants' role to provide "checks and balances" was very limited.  Dkt. No. 344-3 at 490–91.  Tasch, one of the

---

[45] Plaintiff also claims that she is entitled to summary judgment in her favor because Plaintiff acquiesced to the alleged conduct.  Dkt. No. 305 at 36.  However, the term acquiesce merely means that a party gave "implied consent to a transaction." *Maung Ng We*, 2000 WL 1159835, at *8.  The Court has already addressed the issue of consent, implied or explicit, in Discussion Section II.E.

accountants, testified that while the accountants would look at Canal's credit card statements before paying the credit card bills, Dkt. No. 344-14 at 107, they largely just looked at the bills to make sure they were correct on their face, that "totals [were] correct," that there "[we]ren't duplicate charges," and "[t]hings like that." *Id.* at 111–12. He also stated that the accountants never received the underlying receipts for the charges on the credit card and would generally not review expenses on the credit card statements with De Niro. *Id.* at 115. A reasonable jury could thus find that Canal's accountants were not given enough information or even asked to ensure that each individual charge was proper and constituted an authorized business expense. In addition, a reasonable juror could find that it was reasonable for Canal's accountants to assume that all charges on the Amex card in Plaintiff's name were authorized business expenses and thus appropriate to claim as tax deductions.[46] Evidence supports that the Amex card in Plaintiff's name was intended to be used only for business expenses, as opposed to the one in Kaplan's name, which was used primarily for personal expenses for De Niro. P's 56.1 Statement ¶ 88; D's

---

[46] Plaintiff implies that the Court should find ratification because since Plaintiff's departure from Canal, Canal has not amended its tax returns to disclaim these tax deductions. P's 56.1 Statement ¶ 104. In support of this proposition, Plaintiff cites a case from the duress context which stands for the proposition that a party who accepts tax benefits under an agreement procured by duress may be deemed to have ratified the agreement. *Niosi v. Niosi*, 641 N.Y.S.2d 93, 94 (2d Dep't 1996). That rule in the duress context makes sense. To hold otherwise, would allow the party claiming duress to benefit from a "heads I win, tails I win" scenario. The party could both obtain the benefits of the agreement entered into duress for a period of time, while also maintaining the option to disclaim the agreement if it turned out no longer to be beneficial. Here, however, the facts are different. When Canal accepted the tax benefits from Plaintiff's transaction, evidence supports that it did not have full information about the true nature of those transactions. It therefore did not accept the benefit from Plaintiff's transactions, while also understanding that it could later challenge them and seek to recoup the money from Plaintiff. Canal's sole act of ratification based on full knowledge therefore can only constitute its inaction—*i.e.*, its failure to file tax returns. In other words, Plaintiff would have Canal amend its tax returns now on the basis that it has later discovered that the funds it expended were not reasonable business expenses but were stolen. But there has been no showing that it had to amend the returns or its taxable income was misstated or that its inaction therefore should be deemed to constitute consent or ratification.

Counterstatement ¶ 88; Dkt. No. 322-88 at 67–69.  This is also true of the SkyMiles.  Although

Plaintiff claims that SkyMiles transfers "were clearly visible on the very same credit card bills

that Canal's accountants received, reviewed, and promptly raised questions about," Dkt. No. 305

at 40, the evidence which Plaintiff cites in support of this statement does not, in fact, support that

such SkyMiles transfers were visible on those bills.  Nor does Plaintiff point to any evidence that

Canal's accountants were told to look for or review those transfers.  Moreover, even if the

transfers were clearly visible on the credit cards, there is no evidence that the accountants were

aware of the exact details of each of these trips and whether De Niro had authorized Plaintiff's

use of SkyMiles for them.  There is also no evidence that it was their job to confirm these details.

As to Plaintiff's reimbursement for unused vacation days, the Court reaches the same

conclusion.  While it appears to be undisputed that De Niro approved reimbursement for these

days and that neither De Niro nor Canal's accountants raised concerns about Plaintiff's requests

for reimbursement, De Niro, as noted previously, stated that he would generally take her at her

word for what days she worked on vacation.  Dkt. No. 327-94 at 514–17.  There is also no

evidence that Canal's accountants were aware of what hours Plaintiff worked on her vacation

days.  A reasonable juror thus could conclude that when De Niro and the accountants did not

raise concerns about Plaintiff's reimbursement for these unused vacation days, they did not ratify

those transactions as they did not have knowledge of all material facts—specifically, that

Plaintiff was seeking reimbursement for vacation days on which she only worked a few hours.

*See supra* Discussion Section II.E.3.

## G.     Abandonment

Finally, Plaintiff argues that Canal has abandoned all claims in relation to flower

purchases and petty cash.  Dkt. No. 364 at 28–29.  Plaintiff contends that in amended answers to

interrogatories in July 2022, "Defendants responded to a query asking them to identify each

transaction that formed the basis for their claims and indicated that they sought recovery only for certain enumerated acts—omitting floral purchases entirely and stating that 'Canal is electing not to seek reimbursement for any occasions in which Plaintiff reimbursed herself improperly from Canal's petty cash.'"  *Id.* (citation omitted).  Plaintiff also points to a letter from Canal's lawyer stating that that it "has elected not to continue seeking monetary recovery" for flower orders and use of petty cash.  *Id.* (citation omitted).  In response, Canal contends that while it is not seeking *damages* for Plaintiff's alleged misuse of petty cash and florist charges, that evidence of wrongdoing still remains part of Canal's faithless servant and fiduciary duty claims, entitling it to disgorgement of her compensation.  Dkt. No. 337 at 39.

"Waiver requires the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable.  Waiver may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage."  *Lamaka v. Russian Desserts Inc.*, 2021 WL 2188280, at *11 (E.D.N.Y. Feb. 12, 2021), *report and recommendation adopted*, 2021 WL 2184870 (E.D.N.Y. May 28, 2021).  "Such intention must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act."  *Echostar Satellite L.L.C. v. ESPN, Inc.*, 914 N.Y.S.2d 35, 39 (1st Dep't 2010).

Here, while Canal has unmistakably manifested an intention not to seek damages for Plaintiff's misuse of petty cash and florist charges and therefore has abandoned any claim for damages for those items, Canal has not manifested an unmistakable intention not to present evidence of Plaintiff's misuse of petty cash and florist charges as relevant to their claims for breach of fiduciary duty or breach of the duty of loyalty and their request for disgorgement of Plaintiff's compensation.  In amended answers to interrogatories in July 2022, Canal merely

stated that it was "electing not to seek *reimbursement* for any occasions in which Plaintiff

reimbursed herself improperly from Canal's petty cash" but noted that it

> expressly reserves its right, and does not waive in any way, to identify and introduce
> into evidence receipts, documents or other items, including those Plaintiff returned
> to the office of Defendants' counsel in November 2021 for background and/or
> foundational purposes in illustrating Plaintiff's persistent abuse of authority during
> her employment, as support for Canal's breach of the duty of loyalty claim it has
> asserted against Plaintiff.

Dkt. No. 362-27 at 5 (emphasis added).  Canal's failure to list flower purchases explicitly as part

of its claims in these amended answers to these interrogatories similarly did not manifest an

intentional waiver of the right to present evidence related to flower purchases.  Canal noted

generally that "Plaintiff's persistent and unauthorized abuse of Canal's American Express card

for personal items" was part of its claims.  *Id.* at 4.  The Court reaches the same conclusion with

respect to the June 10, 2022 letter from Canal's counsel to Plaintiff's counsel.  Dkt. No. 362-28.

In that letter, Canal noted that it was electing "not to continue seeking monetary recovery"

related to flower orders and Plaintiff's abuse of petty cash, but stated that it reserved, and did not

waive, its "right to introduce evidence—in any form—concerning any of the items or issues that

are the subject of Canal's Counterclaims, as relevant background to convey a fair and complete

picture of Plaintiff's conduct during the employment relationship."  *Id.*  Canal thus did not

abandon its right to present evidence of such conduct as relevant to its breach of fiduciary duty

and loyalty counterclaims and its request for disgorgement of Plaintiff's compensation.  Whether

Canal should be permitted to present evidence on those issues thus will have to await trial or in

limine motions.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN

PART.  Plaintiff's motion for summary judgment is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 281, 284, 313.  For the reasons explained in an accompanying Order, this Opinion and Order will be filed temporarily under seal until the Court can review any redactions the parties propose.  The Clerk of Court is respectfully directed to file this Opinion and Order under seal, viewable only to the Court and the parties to this action

SO ORDERED.

Dated: May 25, 2023
       New York, New York         _____
                                  LEWIS J. LIMAN
                                  United States District Judge