**TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP**
*Attorneys for Defendants Robert De Niro and Canal Productions Inc.*
Gregory Ross Bennett
7 Skyline Drive
Hawthorne, New York 10532
Tel.: (914) 347-8898
Email: gbennett@tsslaw.com

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendant Canal Productions, Inc.*
Laurent Scott Drogin
Brittany Kate Lazzaro
1350 Broadway, 11th Fl.
New York, New York 10018
Telephone: 212-216-8000
Email: ldrogin@tarterkrinsky.com
Email: blazzaro@tarterkrinsky.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GRAHAM CHASE ROBINSON,<br><br>*Plaintiff*,<br><br>- against -<br><br>ROBERT DE NIRO and<br>CANAL PRODUCTIONS, INC.,<br><br>*Defendants*. | Case No. 1:19-cv-09156-LJL-KHP |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................1

I.  Defendants Have Not "Fail[ed] to Address" Allegations Relating
To Plaintiff's Withdrawn Equal Pay Claims Which, In Any Event,
Are Unsupported By Any Protected Activity ......................................2

II.  Plaintiff's Pre-Resignation Actions Do Not Place Disputed
Material Facts In The Path Of Defendants' Motion ...........................5

A.  The Overtime Reminder ..............................................................5
B.  "Harassment" Complaints...........................................................7
C.  Constructive Discharge.............................................................10

III.  Plaintiff's Post-Employment Retaliation Claims Fail Due To The
Absence Of Bona Fide Protected Activity And Casual Connection...............16

A.  Recommendation Letter.............................................................16
B.  June and July Emails..................................................................18
C.  The Harvey Letter .....................................................................21
D.  The Pagano Emails ....................................................................22
E.  Canal's Investigation and Filing of the State Court Action.......23
F.  Providing Information to the District Attorney's Office ...........27

IV.  The Gender Discrimination Claims Should Be Dismissed As There
Is No Objective And Admissible Evidence Plaintiff Was Treated
"Less Well" Than Any Other Employee .........................................28

CONCLUSION...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Big O Tire Dealers v. Goodyear Tire & Rubber Co.*,
   561 F.2d 1365 (10th Cir.1977), *cert. dismissed*, 434 U.S. 1052 (1978)...............................19

*Bill Johnson's Rests., Inc. v. NLRB*,
   461 U.S. 731 (1983) (Opp.) ....................................................................................................25

*Burlington N. & Santa Fe. Ry. Co. v. White*,
   548 U.S. 53 (2006)..................................................................................................................16

*Canal Productions, Inc. v. Graham Chase Robinson*,
   Index No. 654711/2019 ...........................................................................................................11

*Cassino v. Reichhold Chemicals*,
   817 F.2d 1338 (9th Cir. 1987), *cert. denied*, 484 U.S. 1047 (1988)......................................19

*Cayemittes v. City of N.Y. Dept. of Hous. Pres. & Dev.*,
   974 F. Supp. 2d 240 (S.D.N.Y. 2013), *aff'd*, 641 Fed. Appx. 60 (2d Cir. 2016) ...................23

*Ferraro v. Kellwood Co.*,
   440 F.3d 96 (2d Cir. 2006)......................................................................................................11

*Heron v. Medrite Testing, LLC*,
   No. 21-cv-09471, 2022 WL 1214179 (S.D.N.Y. Apr. 25, 2022) ............................................22

*IBM Corp. v. BGC Partners, Inc.*,
   No. 10-cv-128, 2013 WL 1775427 (S.D.N.Y. Apr. 25, 2013) ................................................19

*Kim v. Lee*,
   576 F. Supp. 3d 14 (S.D.N.Y. 2021)........................................................................................27

*Pierce v. F.R. Tripler & Co.*,
   955 F.2d 820 (2d Cir.1992)......................................................................................................19

*Spencer v. Int'l Shoppes*,
   902 F. Supp. 2d 289 (E.D.N.Y. 2012) .....................................................................................25

*Thompson v. Morris Heights Health Ctr.*,
   No. 09-cv-7239, 2012 WL 1145964 (S.D.N.Y. Apr. 6, 2012) ................................................16

**Statutes**

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*.........................................................................1

FLSA ............................................................................................................................2, 4, 27

N.Y. Penal L. §§ 240.50, 240.55, 240.60 ...................................................................27

New York Labor Law § 190, *et seq.* ...........................................................................1

NLRA ............................................................................................................................25

NYLL ........................................................................................................................2, 4, 27

**Other Authorities**

N.Y.C. Admin. Code § 8-101, *et. seq.* .................................................................. *passim*

Rule 408 ........................................................................................................................19

## INTRODUCTION

Defendants Canal Productions, Inc. ("Canal") and Robert De Niro ("Mr. De Niro" and collectively "Defendants") submit this memorandum of law in further support of their motion (ECF #324) ("D Br.") for summary judgment against all four claims in the Complaint (ECF #1) ("Complaint") and in reply to the Plaintiff's opposing brief (ECF #333) ("Opposition" or "Opp.").[1]

This single-plaintiff employee misconduct and discrimination case has generated more than 350 docket entries for one reason: Robert De Niro is a defendant. In reading the Opposition we are reminded of a funhouse with wavy mirrors. Take an object, distort it, and reflect it back upon itself multiple times to create a dizzying illusion. Then add more objects, making it impossible to see reality with clarity. The Court should not be distracted by the massive amount of clutter placed before it in the Opposition. Much is repetitive references to misleading fragments of the record and arguments where undisputed facts are challenged by speculative assumptions. When the undisputed facts are organized and examined free of distortion, the Court ought to conclude that summary judgment is appropriate.

## ARGUMENT

The annexed Appendix is a timeline of the retaliation claims. In this reply, we trace the steps to present a clear picture of the undisputed facts supporting this motion. As to each claim, we ask the Court to consider: (i) was there protected activity; (ii) if so, was there a retaliatory act and, (iii) if so to both, whether a rational juror could find a causal connection between the two?

We begin with Plaintiff's argument that Defendants somehow ignored one of her claims and conceded liability. We offer substantial discussion and analysis on this point because it is an

---

[1]    Summary judgment is sought on Plaintiff's retaliation claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"), New York Labor Law § 190, *et seq*. ("NYLL") and New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et. seq*. ("NYCHRL"); gender discrimination claim under the NYCHRL, and the question of whether she was constructively discharged.

excellent example of how undisputed facts are distorted and manipulated throughout the Opposition. It portrays well the fragility of the Opposition, despite its use of emotional adjectives, hyperbole and incomplete pieces of evidence.

**I.   DEFENDANTS HAVE NOT "FAIL[ED] TO ADDRESS" ALLEGATIONS RELATING TO PLAINTIFF'S WITHDRAWN EQUAL PAY CLAIMS WHICH, IN ANY EVENT, ARE UNSUPPORTED BY ANY PROTECTED ACTIVITY**

In their moving papers seeking summary judgment on the FLSA, NYLL and NYCHRL retaliation claims, Defendants focused on Plaintiff's March 2019 reminder to Mr. De Niro about Canal's obligation to pay overtime, perceiving that event as the alleged "protected activity" used to support the claim. D Br., pp. 3-4. Plaintiff now shifts to a conversation back in November 2018 when Plaintiff asked for a raise and Mr. De Niro allegedly said that he did not have to pay her the same as his male personal trainer who "needs his [higher] salary because he has a family and kids to support." ECF #335-15, at p. 1; ECF #297, at ¶¶ 33-34.

On its face, this is a comment tying salary to financial obligations, not an employee's gender and is gender neutral. Yet the Opposition dubs it a "sexist rationale." Opp., p. 20. Plaintiff *herself* did not interpret it that way, and here is a good example of how the Opposition distorts and manipulates undisputed facts in the wavy mirror. For the purposes of the motion, let us assume Mr. De Niro said this. We have a January 3, 2019, text string between Ms. Robinson and her confidante, former Canal employee Robin Chambers ("Ms. Chambers"), months before Plaintiff resigned or attorneys were involved. Ms. Robinson offered this perception: "I finally realize a big reason why [Mr. De Niro] cap'd [*sic*] my salary … [*sic*] I'm being faulted for not having a family to support. It's god damn hurtful." ECF #335-15, at p. 2. Again, financial obligations are not gender specific, and nor does Plaintiff suggest otherwise. Putting aside the differences between her and

Mr. De Niro's male personal trainer in the duration of their employment (he, more than 30 years;[2] she, 11 years (ECF #336, at ¶ 2)) and differing job responsibilities, paying someone more because they have greater financial obligations is not unlawful.

The text string continues with Ms. Robinson elaborating on her belief that Mr. De Niro equated the financial needs of "kids and divorce" as factors that determined pay. ECF #335-15, at p. 2. Neither of those are gender-based. Male employees have kids and get divorced too. She candidly explained that what bothered her the most was his comment was *disrespectful*. *Id*., at p. 4. Mention is also made of a female employee ("Jane") at a different company of Mr. De Niro's, who was apparently going through a divorce getting paid more, again reflecting that financial need - not gender - was a factor. *Id*. Here is a female employee being offered as an example of one being paid more because of the financial needs surrounding a divorce. The only suggestion of gender is supplied by Plaintiff's counsel who should not be permitted to take their client's own written words and bend them to fit their theory.

Following discovery, Defendants sought sanctions relating to the filing and maintenance of the equal pay claims. ECF #196, pp. 14-16. In her decision denying sanctions, Judge Parker referred to the equal pay claims as "extremely weak" (ECF #240, at p. 6) and wrote: "It may ultimately be a long shot to survive summary judgment and/or for a factfinder to determine that Plaintiff's role was 'substantially similar' to [the personal trainer] but whether or not the claim will succeed is not at issue. The claim at least passes the red face test." *Id*. at 8. This motion puts the

---

[2]     In February 2017, Plaintiff arranged for Mr. De Niro's personal trainer to obtain a visa to enter Canada, explaining he would be providing "physical fitness training and dialogue preparation for Mr. De Niro on an upcoming film" and that he had "worked with Mr. De Niro for than 20 years with respect to the foregoing and is on an annual salary from Canal[.]" Plaintiff also noted that he had been on every production Mr. De Niro participated in over the past two decades." ECF #198-18. As Plaintiff personally explained, "Dan does not have [a] resume or a contract of employment with Canal. He is a salaried (at will) employee who has worked for Bob as his trainer for over 30 years." ECF #198-19.

longshot to the test. Following Judge Parker's decision (ECF #240), Plaintiff voluntarily dropped her equal pay claims. ECF #268.

In the Opposition, Plaintiff asserts Defendants "completely fail to address Ms. Robinson's allegation that they retaliated against her for making complaints of equal pay violations [under the NYCHRL, FLSA, and NYLL]." Opp., at p. 19. From this, they say "the Court must treat it as undisputed that Defendants retaliated against her." *Id.* More mirrors in the funhouse.

First, Defendants' Notice of Motion (ECF #313) sought relief against *al*l of Plaintiff's claims. Second, Plaintiff did not make an equal pay complaint. She asked for a raise and was given a gender-neutral and lawful explanation as to why her pay differed from that of Mr. De Niro's personal trainer. Third, *even if* it was correct that Defendants had not addressed this theory in their motion, they denied the allegations in their Answer (GB Dec., Ex. 61), and the remedy would be to deny that portion of this motion; not to accept the allegations as an admitted violation of the lawNeither of cases cited by Plaintiff on page 19 support her conclusion.

Having children, a spouse, and a family are gender neutral. Nothing supports Plaintiff's position that paying one employee more because of family-related financial obligations is somehow code-speak for gender-based bias. Here, in this case, that would be sheer speculation given the absence of *any* evidence to create an inference that the remark related to gender.

*Even if* Mr. De Niro's remark is viewed as protected activity, Ms. Robinson fails to tell the Court what happened next: It is undisputed that Mr. De Niro raised her annual salary to $300,000, (GB Dec.,[3] Ex. 2, P Tr. I, at 201:14-15 and Ex. 3, P Tr. II, at 98:20–99:11) (compared to $375,000 of the personal trainer (GB Dec., Ex. 4, DH Tr., at 55:25–56:23)). She, unlike the personal trainer,

---

[3]     "GB Dec." refers to the October 30, 2022, Declaration of Gregory Bennett in Support of Defendants' Motion for Summary Judgment. (ECF #322).

also received additional benefits and more favorable terms and conditions of employment.[4]

Most compelling is the undisputed fact that male Canal employee Michael Kaplan never earned more than $88,000 in a year. ECF #317, at ¶ 7. Under Ms. Robinson's assertion that all Canal employees essentially did the same thing—whatever Mr. De Niro requested—Mr. Kaplan (a male) could claim that he was paid a fraction of Ms. Robinson's salary despite performing the same work. GB Dec., Ex. GB Dec., Ex. 2, P Tr. I, at 23:4-17, 83:23–85:24.

All this aside, where is the causal link between any "protected activity" (asking to be paid the same as the personal trainer) and any retaliatory act? It is important to recognize that the equal pay claim has been withdrawn. The limited inquiry is whether there was protected activity, a retaliatory act and causation. The timeline bears this out. How is a rational juror supposed to conclude that subsequent claimed retaliatory acts—such as the letter Mr. Harvey emailed Plaintiff on July 11 2019 (GB Dec., Ex. 50) (the "Harvey Letter")—had any nexus to this comment.  As such, the Court should conclude that Ms. Robinson's request to be paid the same as Mr. De Niro's trainer was not protected activity and regardless, not causally connected to any retaliatory act.

## II.   PLAINTIFF'S PRE-RESIGNATION ACTIONS DO NOT PLACE DISPUTED MATERIAL FACTS IN THE PATH OF DEFENDANTS' MOTION

Plaintiff fills the air with flak, seeking to deprive Defendants of summary judgment on her retaliation claims. A careful review of the record and timeline disperses the distraction.

### A.   The Overtime Reminder

Plaintiff claims that when she reminded Mr. De Niro of Canal's obligation to pay overtime, he "erupted in anger and refused." Opp., at p. 21. In our opening brief we maintain that this is not protected activity. D Br., at pp. 3-11. Even assuming it was, and that Ms. Robinson accurately

---

[4]      According to Plaintiff, she was paid for unused vacation days, had her meals paid for; and unlike him—did not travel with Mr. De Niro away from family months of the year. Opp., pp. 40-41.

recounts Mr. De Niro's response, she undeniably takes credit, through use of Canal's counsel, (GB Dec., Ex. 46), for making Canal wage and hour compliant. GB Dec., Ex. 84, Audio Tr., at 3:14-18 and Ex. 3, P Tr. II, 84:10-21. She did so without any claimed protest, resistance, or objection. In fact, she reminded Mr. De Niro of this accomplishment to support her request for a raise and promotion. GB Dec., Ex. 7. She does not contend anyone ever told her not to report overtime when handling timesheets and submitting information to Canal's accountant Michael Tasch ("Mr. Tasch"), who would have it paid. Responses to Defendants' Requests for Admission identified the employees who were the topic of the discussion (GB Dec., Ex. 64, p. 19, Resp. No. 78), the payroll records were produced in discovery and there is no dispute these employees were paid overtime.

Objectively, we have Ms. Robinson taking credit for making Canal wage and hour compliant and maintaining it as such without objection. We have an alleged comment by Mr. De Niro that he did not want to pay overtime. GB Dec., Ex. 1, Compl., at ¶¶ 28, 36, 100-101, and Ex. 3, P Tr. II, at 87:6–88:10. Put aside the ambiguity as to whether he simply meant he did not want to incur overtime by having employees work more than 40 hours per week. There is a history of overtime being paid and evidence these employees were paid overtime during the time in question.

There is no claim Mr. De Niro subsequently made mention of overtime, ever again referred to this conversation, or that he was even aware or inquired whether Ms. Robinson continued to pay overtime. Canal maintains its position that this set of facts does not constitute protected activity. D Br., at pp. 3-11. What we have here is a single sentence, suspended in time, being pressed into service to infer hostility where all objective evidence undermines such an inference.

Looking at the timeline, what reasonable juror could causally connect this reminder to *any* of the subsequent "retaliatory acts" to which Plaintiff claims to have been subjected? It is easy for

Plaintiff to say so on paper and to theorize, but objectively any connection is complete conjecture.[5]

B.   **"Harassment" Complaints**

Plaintiff wields the word "harassment" without restraint, expecting it to do all the work for her if she repeats it often enough. Briefs can be filled with citations and quotes from court decisions to make generalized statements about how precise or vague words and actions must be to constitute protected activity. Given the breadth of case law that involve innumerable facts and fact patterns, the common denominator is that the facts must be viewed objectively. String cites do not inform a particular case at hand. Whether Plaintiff's gender discrimination claim survives summary judgment is discussed *infra*. Here we focus on whether she engaged in gender-related protected activity in the first instance.

The retaliation claim is founded on an allegation that Plaintiff complained about "gender-based harassment" to multiple people. We first examine evidence of any complaint of "gender-based" harassment and then broaden the inquiry to the use of the generic word "harassment."

The first question ought to be: "To whom did Plaintiff complain about gender-based harassment?" A careful examination of the record provides a surprising answer: *No one*. Here is an example of how the repeated use of the word "harassment" obfuscates the fact that the gender-

---

[5]       On pages 21-22 of the Opposition, Ms. Robinson tries to diminish her role and responsibilities relating to the payment of overtime, downplaying it to "facilitating paperwork" and (with no cite to the record) calls the nature and scope of her accompanying duties "disputed" when they are not. Canal's position is that no reasonable juror could conclude Ms. Robinson was engaging in protected activity. Whether the Court holds the "manager rule" to apply is, frankly, a secondary matter. *See* ECF #296, pp. 10, 45. Downplaying her role at Canal is another wavy mirror technique. The record is replete with evidence of how Ms. Robinson's title and duties evolved. Ex. 2, P Tr. I, at 197:5-10, 199:10-200:7, 231:9-235:6, 236:5-24, 242:17-20, 250:11-23; Ex. 3, P Tr. II, at 64:23–65:25, 66:2-7, 72:12-16; ECF #197-14; ECF #198-10. Her emails to Mr. De Niro show this, as she laid out her expanding roles. GB Supp. Dec., Ex. 22; GB Dec., Ex. 9. Her own resume shows this. GB Reply Dec., Ex. 7. Her self-penned recommendation letter describes her executive functions including her responsibilities *relating to wage and hour compliance*. GB Supp. Dec., Ex. 22. In the Opposition, she walks back her words, labelling herself a mere "head assistant" with menial roles. No reasonable juror can read these documents, written by Plaintiff over many years and discard them in favor of what she is saying now.

based product has been manufactured by Plaintiff's counsel. It is the additional object placed before the mirrors to confuse the picture. The Opposition points to a *single instance* where gender-based harassment was mentioned. Opp. at 24 (citing Ex. 12, at 129:19-22). Ironically, it is *dicta* from Plaintiff's deposition which came as a *non-sequitur* and non-responsive answer to a question.

> Q.     Alright. But if somebody didn't respond fast enough to an e-mail that was sent by Tiffany, you would get blamed for it?
>
> A.     I can recall an incident in speaking to [Canal's counsel] Tom Harvey and [Canal's accountant] Michael Tasch about that I was being targeted base[d] on my gender by Tiffany, and being blamed for people not getting back to her. She blamed me.

(GB Dec., Ex. 3, P Tr. II,[6] at 129:16-22).

Look at how this offhand answer is misleadingly abused in the Opposition (Opp., p. 5), where it is cited as evidence that Plaintiff "clearly testified" about gender-based targeting, and again where this glancing comment is cited as evidence of her having "explicitly reported" gender-based harassment (Opp., p. 24).

Every other reference in Plaintiff's deposition to gender-based harassment was in the farcical context of a programmed response to include the phrase when describing her self-serving perspective; *not* that she communicated this belief to *anyone* before retaining lawyers. GB Dec., Ex. 2, P Tr., at 65:5-10; 67:4-10; 69:4-15; and 6:4-15.It should also be noted that the so-called complaint to Mr. Harvey on March 27, 2019, *was recorded and makes no reference to gender*. GB Dec., Ex. 76. Plaintiff's deposition testimony is betrayed by her own recorded voice. Gender-based harassment is a child conceived by Plaintiff in and for this litigation.

There is simply no evidence that at any point did Ms. Robinson complain about gender-

---

[6]     "P Tr. II" refers to the transcript from the second day of Plaintiff's deposition, taken on February 9, 2022, annexed to the GB Dec. as Ex. 3.

based harassment. Even where she claims to have complained to "other colleagues" *none of them* corroborate this; and nor does the evidence to which she cites.[7] This is another instance where undisputed facts are "disputed" only with the use of adjectives, but unsupported by evidence.

In the end, the Court should recognize that at no time did Ms. Robinson *ever* engage in protected activity about her gender, and has no admissible evidence that gender played a role in any so-called retaliatory act taken or decision made by Canal or Mr. De Niro.

We now broaden the analysis to the use of the term "harassment" in general. In opposing Defendants' motion Plaintiff is entitled to inferences, but they must be reasonable. Harassment is not a self-defining term, and it cannot—on its own—be asked to do all the heavy-lifting. The scattershot, casual, and repeated use of the word by Plaintiff, prior to this litigation and more pronounced as a coached witness at her deposition, ought not mislead the Court. Here, again, a look at the undisputed facts presents a clear and unadulterated picture.

Facts must support a finding of harassment, itself a legal conclusion, and the harassment must be of the type prohibited by the NYCHRL. Merely using and repeating the word "harassment" again and again, unlike rubbing two sticks together, does not create a fire, a disputed fact or support an inference in Plaintiff's favor. The question becomes what objective and admissible evidence reflects protected activity by Plaintiff complaining about "harassment" of a type prohibited by the NYCHRL. The answer is *none*.

During discovery it was established how flippantly and loosely Ms. Robinson would use

---

[7]     Her citations to portions of audio transcripts make no mention of gender, and the "colleagues" are *former* Canal employee Ms. Chambers and *outside* accountant Mr. Tasch. Opp., at pp. 4-5. In another recording between her and Mr. Harvey his response was that Ms. Chen treats everyone the same way; rebuking—without challenge from Plaintiff—any notion that he perceived gender as playing any role. *See* Opp., p. 5 (citing transcripts of audio). Even in all the hours of her recordings with Ms. Chambers, *nowhere* does Ms. Robinson connect her gender to any so-called "harassment." There are no "colleagues[,]" and this is another object in front of a wavy mirror.

the word "harassment." Plaintiff believes she has been subjected to "harassment" for many years, by many people of both genders. GB Dec., Ex. 3, P Tr. II, at 44:24–47:7. The examples of harassment she offers reflect how this label becomes applied indiscriminately and irrespective of any connection to any conduct made unlawful by the NYCHRL.

Even if you give Plaintiff the benefit of the doubt that her use of the word "harassment" really meant "gender-based harassment" there is no evidence that either she or anyone to whom she complained equated or understood it that way, or that any retaliatory act about which she complains can be reasonably linked back to a gender-based harassment complaint. This gap deprives her of claiming any "reasonable inference" to contest Defendants' motion for summary judgment. Again, we are focusing here on the retaliation claim, not the gender discrimination claim addressed *infra*. A review of the timeline bears this out: Where is the gender-based protected activity, and what "retaliatory" act can be related to it either directly or by reasonable inference?

### C.      Constructive Discharge

A key component of Ms. Robinson's case is her claim that she was constructively discharged. But if she voluntarily resigned, this would not be an adverse employment action properly regarded as an act of retaliation.[8] The timeline assists here, demonstrating that any protected activity to support a constructive discharge must have occurred *before* April 6, not after. For example, the filing of the State Court Action in August could not have contributed to an April

---

[8]      Citing page 15 of Defendants' opening brief, the Opposition states that Canal conceded Ms. Robinson's "resignation constituted protected activity." Opp., at p. 25. Canal's brief said no such thing. For clarity, if Plaintiff resigned, that is not protected activity. If she was constructively discharged, that equates to a termination. A termination is indisputably an adverse employment action. A holding that Ms. Robinson voluntarily resigned, by definition, means there was no adverse employment action and, as such, it cannot be linked back to any protected activity that occurred prior. Likewise, an employer who takes a subsequent adverse action against an employee who has *resigned*—such as by refusing to provide a recommendation letter owing to the resignation—has done nothing unlawful. This is why the clarity of Ms. Robinson's actual stated reasons for resigning are so important on this motion, unadulterated by how her counsel try to rewrite them.

6 resignation.[9] What led her to resign? Having the burden of proof on that question, *see Ferraro v. Kellwood Co*., 440 F.3d 96, 100-01 (2d Cir. 2006), Plaintiff crumples the timeline together, and places it in the house of mirrors.

Here are the undisputed facts: Plaintiff did not want to continue having to perform work related to the Townhouse, as this was beyond the scope of her verbal agreement with Mr. De Niro. GB Dec., Ex. 2, P Tr. I, at 76:23-77:17; Ex. 3, P Tr. II, at 118:4-7; Ex. 83, Audio Tr., at 2:1-10. Ms. Chen no longer wanted Ms. Robinson to have anything to do with the Townhouse either. GB Dec., Ex. 90, Chen Tr., at 78:4–9; 105:3–11 and 150; Ex. 73, Audio Tr.; Ex. 76, Audio Tr. On April 6 Ms. Robinson learned by indirect means that she would no longer have duties relating to the Townhouse, and that another Canal employee would assume those duties. GB Dec., Ex. 3, P Tr. II, at 81:8-82:13, 164:11-25, 169–70; Ex. 21. Upon learning this, Ms. Robinson resigned. *Id*., Ex. 37. By her own sworn admission Plaintiff woke on April 6, 2019, with no intention to resign. *Id*., Ex. 3, P Tr. II, at 164:8-10; 168:5-8. *See also id*., Ex. 81, Audio Tr., at 4:20-22. At midday she learned her wish was being granted. *Id*., Ex. 3, at 81, 169-70; Ex. 39. Instead of elation and celebration, there was a resignation. A careful review of the Opposition reveals that she offers no explanation as to why she believes a reasonable person in her position would have resigned. Opp., at pp. 17-19, 25, 30-31. Instead, she makes two arguments that are disproved by unequivocal evidence and a third that is complete conjecture. GB Dec., Ex. 3, P Tr. II, at 168:5-175:11.

Plaintiff first attempts to set the stage by creating the appearance that Mr. De Niro was somehow ignoring her at the end of March into early April. Opp., at p. 25. Look at her so-called contemporaneous time records, which show that she met with him on March 30, March 31, April

---

[9]     The "State Court Action" refers to the state action, entitled *Canal Productions, Inc. v. Graham Chase Robinson*, Index No. 654711/2019. *See* GB Dec., Ex. 55.

2 and April 4; and spoke with him on March 28, March 30, April 1, and even April 6. GB Reply Dec.,[10] Ex. 4 (ROBINSON00001821-1822). There is also Plaintiff's April 4 email to Mr. De Niro, mentioning having "addressed part of an issue yesterday" and acknowledging Mr. De Niro's suggestion that they would sit down "today or tomorrow." GB Dec., Ex. 33. (There is no record in her timesheets of any April 3 communication).

The suggestion she was being ignored is contradicted by her own records.[11] We also know from Plaintiff's own recorded voice, where she tells Robin Chambers on April 4, 2019 (GB Dec., Ex. 81, Audio Tr., at 4:20-22)) that she had no intention of resigning. *See also* GB Dec., Ex. 3, P Tr. II, at 164:8-10; 168:5-8. Hence whatever the situation was at the time; and going back over the 11 years of employment about which she is now complaining in this lawsuit, on April 6, 2019, she was ready, willing, and able to keep working for Canal and Mr. De Niro. In fact, as Exhibit 37 to the Bennett Declaration reflects, at 12:40 p.m. *on April 6*, Plaintiff responded to an email offering her thoughts as to whether Mr. De Niro should accept an invitation to deliver the keynote address at the Town & Country Philanthropy Summit.

Her desire to be off the Townhouse was echoed by Ms. Chen who in very clear terms wanted that as well. GB Dec., Ex. 90, Chen Tr., at 77:24–78:22, 79:2–4, 105:3–11, 150. Mr. De Niro's solution was to give them both what they wanted. Evidence shows he made this decision as early as April 2. In texts between Ms. Chen and Mr. Kaplan on April 2 Ms. Chen explains Ms. Robinson was "getting taken off the house and [her assistant] is getting put on here, to help [Ms.

---

[10]    "GB Reply Dec." refers to the December 15, 2022, Declaration of Gregory Bennett submitted with this reply.

[11]    The accuracy of Plaintiff's time records is also called into question by the opening sentence of her April 6 resignation email which begins: "I know we haven't talked this week …." GB Dec., Ex. 42. As noted just above, her own time records indicate they *met four times and spoke twice by phone* during that week. GB Reply Dec., Ex. 4 (ROBINSON00001821-1822).

Chen]." ECF #335-29 (CANAL_0047504). This was "Bob's idea entirely." ECF #335-29 (CANAL_0047505). As of April 2, Plaintiff was getting what she wanted. No one was being fired.

It should also be recognized that Plaintiff resigned *before* Mr. De Niro was able to communicate his decision to her. Had she not resigned, the matter could have been discussed and any questions she had could have been addressed and answered. But she deprived herself of that opportunity through no fault of the Defendants.

The Opposition returns to its wavy mirrors, arguing Ms. Robinson was being "functionally demoted her by taking away her assistant, permanently taking away her responsibilities, and directing employees to not speak to her." Opp., p. 30. This is all based on her interpretation of an April 6 email not even sent to her, and which she never discussed with Mr. De Niro. Let us unpack these three assertions, as each one is demonstrably false, as evidenced by the email itself.

The operative language in the April 6 email from Ms. Chen to Canal employees Lulu White, Gillian Spear and Sabrina Weeks-Brittan says: "Chase is no longer involved <u>with anything regarding the townhouse or [Mr. De Niro's twin children]</u>. You are not to discuss anything with her that you discuss with us. Any emails between us are not to be shared with Chase." ECF #335-51 (emphasis added).

The Opposition falsely states: "Defendants stripped [her] of *all* of her job duties" Opp., at p. 18. The lie here is unconscionable. No rational juror could read the email and conclude Ms. Robinson was being "stripped … of *all* of her job duties." Opp. at 18 (emphasis in original). It is specifically limited, and nor does her own resignation email even suggest her understanding was comparable to what her attorneys are now contending.

The Opposition claims employees were being "direct[ed] not to speak to her." (Opp. p. 30). But the context of the email shows this was in limited relation to the Townhouse. This was not a

blanket prohibition on speaking with Ms. Robinson and no rational juror could see otherwise.

There is no evidence or even a claim that any of Plaintiff's other job duties (unrelated to the Townhouse), or her compensation, or any other terms or conditions of employment were being *reduced* (or even *changed*) that might lend support to a constructive discharge.

As to her assistant (Ms. White), Ms. Robinson's *own pending proposal* was to relocate to London to work from there "out of sight, out of mind" (GB Dec., Ex. 31) which, by definition, would have separated her from her assistant and placed her at a 5-hour time difference from her job. It is also undisputed that the assistance being given at the Townhouse was temporary, and there is no evidence that Ms. Robinson's assistant would have remained permanently "taken away" from her. Opp., at p. 30. That is sheer speculation.[12]

The same is true of the companion email Ms. Chen sent to Rachel Humphries that day: "Bob and I would like to inform you that Chase is no longer involved with any of our projects." ECF #335-52. Rachel Humphries was a designer working on the Townhouse, not a Canal employee having anything to do with its operations. *See* ECF #335-8 (Ms. Chen testimony makes clear Plaintiff's change in duties is limited to the Townhouse).

The Opposition also invites speculation that Mr. De Niro might have discharged Ms. Robinson in the future. Opp., at p. 18. But that never happened because Plaintiff resigned, and there is no evidence he had decided to do so. There is no basis to speculate as to what "might" have happened had Ms. Robinson not resigned. The Opposition also argues that Ms. Chen made it

---

[12]    Plaintiff's acknowledgement that she had an assistant ought to be compared to how she handled a Request for Admission asking her to admit: "Plaintiff had an assistant to aid in the performance of her duties." The response was: "Plaintiff objects to this Request on the grounds that it is vague and ambiguous insofar as the phrases 'had an assistant' and 'to aid in the performance of her duties' are not defined. Plaintiff understands this Request to ask whether Plaintiff had a personal assistant to assist her in performing all of her job responsibilities throughout the time period specified in Instruction No. 2. Subject to and without waiver of the foregoing objections, **denied**. GB Dec., Ex. 64, p. 13 (RFA Resp. No. 49) (emphasis added). This is the type of gameplaying that has caused this litigation to spiral.

her "singular mission" to force Ms. Robinson to resign—a point raised three times. Opp., at pp. 5, 18, 30. But the "singular mission" language repeated in triplicate was something stated once in a text message from Mr. Kaplan to a third person. Hearsay and its admissibility aside for the moment, it was not something stated by Ms. Chen and is another example of how loose the opposition plays with the record. *See also id.,* at pp. 18 and 30 (where words drawn from a lengthy text exchange are intentionally misconstrued and said to be an "ultimatum").

The Opposition also contends Ms. Chen made it her goal to end Plaintiff's employment but avoids the email Ms. Chen sent to Mr. De Niro on April 4, 2019—two days before Ms. Robinson resigned, and after the decision had been made to free her of the Townhouse. ECF #335-49. There, Ms. Chen wrote to Mr. De Niro:

> I like how things have been put in place. [Ms. Robinson] should finish what she is doing for you, get all the things done she said she would and then when we are ready, then we can talk. After all the stuff I found out today. She's really in no position to make demands. My feeling is we wait until she has finished what her obligations are to you and then, if we feel it's necessary, then we can tell her when we want to talk.

This email followed a series of lengthy texts between Ms. Chen and Mr. De Niro, where she explains her frustration with Ms. Robinson's behavior and attitude, having nothing to do with gender. ECF #335-26 (CANAL_0048618). The Opposition extracts one sentence from the string, depriving it of context. Opp., at p. 18. This tactic also appears in footnote 10, on page 16, where communications between Ms. Chen and Mr. De Niro are falsely insinuated as being made to others (not to each other); and in one thread a communication with Mr. Kaplan is about their shared frustrations with Ms. Robinson but is misidentified as being gender-based. ECF #335-29. The plain language of these documents is misrepresented to the Court to draw focus away from reality.

It should also not escape notice that the resignation email was sent *after* Ms. Robinson learned—and therefore had the knowledge—that she would no longer have to work on the

15

Townhouse, as she wanted. This makes her actions difficult to understand both in the moment and even now. Her resignation is inconsistent with the reality of what was happening around her. While it was her choice to resign at that time and in the manner she did, no reasonable juror could conclude this development made her working conditions so intolerable to warrant her resignation. As such, the Court should grant summary judgment to Defendants on the question of whether Ms. Robinson was constructively discharged.

## III.  PLAINTIFF'S POST-EMPLOYMENT RETALIATION CLAIMS FAIL DUE TO THEABSENCE OF BONA FIDE PROTECTED ACTIVITY AND CASUAL CONNECTION

Canal has noted that courts examine post-employment acts of retaliation by an employer differently from those occurring during employment. D Br., at pp. 8-11. They look to how a post-employment retaliatory action creates harm, which differs from tangible adverse actions that occur while employed. *Thompson v. Morris Heights Health Ctr.*, No. 09-cv-7239, 2012 WL 1145964, at *6 (S.D.N.Y. Apr. 6, 2012) (collecting cases). Ms. Robinson accuses Canal of ignoring *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006), a case that did not address the proposition for which they cite it. Opp. at 28. And while the Opposition tries to distinguish the law cited by Canal, offer none of their own to support their premise. They instead string-cite cases describing only the breadth of the NYCHRL, never addressing Canal's argument that post-employment acts of retaliation land in different places since the individual's employment has already ended.

### A.    Recommendation Letter

Plaintiff plays a shell-game opposing summary judgment relating to Canal's refusal to provide her with a recommendation letter (GB Supp. Dec., Ex. 22). First, nothing in the caselaw cited by Plaintiff stands for the proposition that an employer must provide a former employee with a recommendation letter. Nor do the cited portions of Mr. De Niro's deposition testimony support

opposing counsel's statement that he ever promised her a recommendation, or that an employee believed to have engaged in wrongdoing could count on Canal's support when it came to new employment. Opp., at p. 32. The entire foundation of Plaintiff's point here is cracked.

A pause is also necessary here to ask whether there had been any protected activity before or at the time the letter was requested on June 4. GB Dec., Ex. 46. We are aware of no statutory or decisional law that recognizes the mere act of a former employee requesting a recommendation letter as "protected activity." If not, then declining to sign the letter could not have been an unlawful act of retaliation. The timeline illustrates this concept. Said differently, if no protected activity occurred up until the point Mr. De Niro declined to sign the recommendation letter (June 9), GB Dec., Ex. 85, at 9:18–10:6, then his refusal to do so could not be retaliatory under the law.

Plaintiff is the first to claim that in late 2018 Mr. De Niro told her that if she resigned, he would give her a bad recommendation letter. Opp., at. p. 31. GB Dec., Ex. 3, P Tr. II, at 102:13-19; *id*., Ex. 73, Audio Tr., at 2:1-3, 5, 8-11. If true, perhaps not nice but not illegal. The record was clarified by Plaintiff's own spoken words where she understood him to have said this would happen if she resigned without notice, leaving him in the lurch. *Id*., Ex. 3, P Tr. II., at 105:5-10. Plaintiff cannot dispute her own spoken words, which the Opposition knowingly misstates. Nor can she dispute that she resigned without notice.[13] How can a reasonable juror conclude Mr. De Niro following through on what he told her months earlier was retaliatory?

Even if she had engaged in protected activity, her legal theory is flawed. As it would appear, under her theory a recommendation letter can contain falsehoods, GB Supp. Dec., Ex. 22, ECF #340-22 (CANAL_0049427-28), be inconsistent or hyperbolic, and must support a former

---

[13]   Plaintiff contends the absence of a recommendation letter "torpedoed her career progression." Opp., at p. 31. Putting aside whether Plaintiff was a shoo-in for admission to the London School of Economics, this argument goes to damages not liability.

employee even if the employer has misgivings about the employee's performance. This would set a dangerous precedent. What if the employer's words were not satisfactory in the subjective opinion of the employee? Must this also include verbal recommendations?

      **B.**      **June and July Emails**

Nearly two months to the day after resigning, on June 4, 2019, Ms. Robinson emailed Mr. De Niro a draft recommendation letter. GB Supp. Dec., Ex. 22. Her email notes that Mr. De Niro had ignored prior emails and text messages she had sent him after her resignation. *Id.* On June 7 she again followed up, still having no response from Mr. De Niro. ECF #344-22.

One June 9 Mr. Harvey told her, in a call she secretly recorded, that Mr. De Niro was not going to sign the letter because of the SkyMiles she transferred to her personal account. GB Dec., Ex. 85, at 9:18–10:6. Pause again and look at the timeline. Her request was denied on June 9, two months after she resigned. But the Opposition claims the "denial of the recommendation letter came *swiftly* after [her] protected activity" Opp., p. 32 (emphasis added). What protected activity was there before June 9 that a rational juror could causally connect to that "swift" refusal?

Critically, it was on June 11 *already knowing Mr. De Niro was not going to sign the letter* that Plaintiff sent an email containing demands including his signing *five* recommendation letters, an in-person meeting with him, and a press release among other things. GB Dec., Ex. 49. If Mr. De Niro refused to sign the letter on June 9, *it could not have been in retaliation for an email she sent two days later!* Thus, even if the June 11 email was "protected activity" – which it was not - it could not have prompted a refusal that occurred four days prior.

The June 11 email made no mention of any of the claims now brought by Ms. Robinson. On the contrary, she presented a set of terms which included a request that he "honor the agreement you made with me on January 3, 2019" and additional terms having nothing to do with harassment,

discrimination or—for that matter—any mention of unlawful behavior. GB Dec., Ex. 49. Succinctly stated, while the Opposition now tries to call this June 11 email a settlement communication, no one had mentioned or threatened any kind of claim or wrongdoing. Rule 408 only applies to offers or acceptance of settlement or conduct and/or statements made in compromise negotiations regarding a claim. R. 408(a)(1) and (a)(2). Courts have held that "relevant factors" include "(1) whether a party is represented by counsel, (2) threatens litigation, (3) has initiated the first administrative steps in that litigation, (4) the timing of the offer; and (5)"the existence of a disputed claim. *IBM Corp. v. BGC Partners, Inc*., No. 10-cv-128, 2013 WL 1775427, at *9 (S.D.N.Y. Apr. 25, 2013) (citing) (internal citations and quotations omitted). *See Pierce v. F.R. Tripler & Co*., 955 F.2d 820, 827 (2d Cir.1992) (collecting cases: *Cassino v. Reichhold Chemicals*, 817 F.2d 1338, 1342–43 (9th Cir. 1987) (offer of severance pay conditioned on waiver of age discrimination claim made contemporaneous with discharge not protected by Rule 408), *cert. denied*, 484 U.S. 1047 (1988); *Big O Tire Dealers v. Goodyear Tire & Rubber Co*., 561 F.2d 1365, 1372–73 (10th Cir.1977) (correspondence between parties prior to the filing of an action were not "offers to compromise" and thus outside scope of Rule 408), *cert. dismissed*, 434 U.S. 1052 (1978)). Neither the communication nor the factual circumstances surrounding this time would serve as grounds to preclude the communication under Rule 408.

Mr. De Niro ignored the June 11 email. Three weeks later, on July 2, Plaintiff sent yet another unsolicited email:

> You have not yet respond [sic] to my [June 11] email below. Unless this process moves forward appropriately[,] I will have to seek outside counsel to help me in resolving this situation and protecting the interests of myself and all concerned. Unless I hear from you by <u>Friday, July 12th</u>, I will assume that you have no interest in amicably resolving the situation.

GB Dec., Ex. 49 (emphasis in original).

What process, situation or interests? These are unsolicited emails to which neither Canal nor Mr. De Niro responded. All the while, Canal is investigating Plaintiff's wrongdoing. How is this email or the one from June 11 placing the Defendants on notice that Ms. Robinson is talking about any of the claims she has raised in this lawsuit? And if these are settlement communications as she now contends, they are inadmissible on this motion and not protected activity.

Also contrary to the Opposition, neither the resignation email nor any of these emails made mention of a "constructive discharge." That coating has been affixed in this litigation for effect. In fact, the June 11 email states:

> I felt forced to resign the way I did – you are very aware of why; there was no choice. Within hours of the emails being sent on April 6th, I was made aware of them – everyone at Canal knew. It was incredibly unprofessional and the cost to me was humiliating to say the least.

GB Dec., Ex. 49.

Here again, without the influence of litigation counsel, Plaintiff says even Mr. De Niro knew she resigned because of how she was removed from the Townhouse, not anything relating to her claims in this lawsuit. There is no mention of any other reason and Plaintiff's own words scuttle her lawyers' arguments. This is important because of how the Opposition mischaracterizes Mr. De Niro's text messages from around that time, implying that they were in response to actual threatened claims by an attorney. Mr. De Niro's outrage, reflected in his private text messages came upon learning of the July 2 email that Ms. Robinson (who was being investigated for wrongdoing) had the temerity to made demands of him; *not* that she was threatening to advance any claims; much less those of the type in this action. Particularly deceptive are the citations to Exhibits 2 and 3 referenced on page 7 of the Opposition. They appear at the end of a paragraph discussing a series of emails sent by Ms. Robinson's attorney one month later. A review of the

complete transcript pages (GB Dec., Ex. 92 RDN Tr. II,[14] at 422–24; GB Supp. Dec., Ex. 3, RDN Tr. III,[15] at 528–59) shows Mr. De Niro was *not* aware of any claims, making Plaintiff's contention that his responses were with knowledge that "she levied claims against him" entirely false. This is a good example of how Plaintiff looks to mislead the Court through false impressions.

C.      **The Harvey Letter**

Plaintiff first faults Defendants for not responding to her unsolicited June 11 and July 2 emails (GB Dec., Ex. 49). When they did through the Harvey Letter (*id.*, Ex. 50), she claims the response was a retaliatory act. Opp., pp. 8, 33. To confuse matters further, she tries to argue that her emails were settlement communications. Plaintiff cannot have it both ways. If her emails are settlement communications, then they are inadmissible, not proper on this motion, and not protected activity. If they are not protected activity, then the Harvey Letter cannot be "retaliatory."

Defendants maintain their position that Plaintiff's June 11 and July 2 emails were neither settlement communications nor protected activity. D. Br., at p. 11. Regardless, the plain language of the Harvey Letter also undermines the notion of retaliatory intent as it expressly *encouraged* Plaintiff to seek legal counsel, demanded return of Canal's SkyMiles, cash, gift cards and physical property (which Plaintiff admittedly had), alerted her to *its* claims, warned of legal action and afforded her the opportunity to avoid it. Nor can it be said that the Harvey Letter *itself* adversely impacted Plaintiff in any way. In other words, the letter itself caused no injury.

The State Court Action was filed because she elected not to respond to or refute the Harvey Letter (GB Dec., Ex. 50) other than to have her attorney throw the "entire house" at Canal's counsel

---

[14]     "RDN Tr. II" refers to the transcript from the third day of Mr. De Niro's deposition, taken on April 5, 2022, which is annexed to the GB Dec. as Ex. 92 (ECF #322-92).

[15]     "RDN Tr. III." refers to the transcript from the third day of Mr. de Niro's deposition, taken on October 21, 2022, which is annexed to the GB Supp. Dec. as Ex. 3 (ECF #340-3).

in an attempt to dissuade them from pursuing the very claims identified in the Harvey Letter. *Id.*,
Exs. 51, 52, 53, 54, 58.

### D. The Pagano Emails

Between July 31 and August 13, Plaintiff's then-counsel, Jeffrey Pagano, and Canal's
counsel exchanged emails. Plaintiff contends these are evidence "protected activity." Context here
is important given how Plaintiff treats inconsistently various communications. When Plaintiff sent
an unsolicited set of demands to Mr. De Niro and Mr. Harvey, making no reference to any claims,
she calls these settlement communications. When Mr. Harvey responded to the so-called
settlement communications, this is called retaliation. When Mr. Pagano initiated communications
with Canal's counsel directly, ignored the Harvey Letter, hurled allegations and invited a dialogue,
these emails are somehow protected activity, but not settlement communications. Which is it?

Mr. Pagano had seen the Harvey Letter as he mentioned it in one of his emails. GB Dec.,
Ex. 51, (CANAL_0049427-28). When one attorney invites and engages in a dialogue with another
attorney about legal claims, they bear the hallmarks of settlement discussions. If the Pagano
Emails[16] are settlement discussions, they are inadmissible on this motion and not protected activity.

As important, if they are not settlement communications, then they establish in real time,
prior to the commencement of the State Court Action, that—consistent with the Harvey Letter—
Canal was already in the process of taking legal action against Ms. Robinson. Said differently, the
Pagano Emails were undeniably exchanged at a time when legal action was *already* in the works
(GB Dec., Ex. 50). It was not prompted by, caused by, or motivated by the Pagano Emails. *Heron
v. Medrite Testing, LLC*, No. 21-cv-09471, 2022 WL 1214179, at *5 (S.D.N.Y. Apr. 25, 2022)

---

[16]     The "Pagano Emails" refer to several emails exchanged between Mr. Pagano and Canal's
counsel, which are annexed to the GB Dec. as Exs. Exs. 51, 52, 53, 54, and 58.

(quoting *Cayemittes v. City of N.Y. Dept. of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013), *aff'd*, 641 Fed. Appx. 60 (2d Cir. 2016) (collecting cases)). As Canal argues in its opening brief, the Pagano Emails were intended to stop Canal from exercising its rights, steps towards which were already being taken. D Br., at p. 10. *See also* LD Dec.,[17] at ¶ 3, Ex. A.

### E.    Canal's Investigation and Filing of the State Court Action

Ms. Robinson mocks Canal's investigation and offers it as proof that Canal's State Court Action was a retaliatory act. She does this with hindsight bias, second-guessing and straw-man arguments to contest its findings. But she carefully ignores the undisputed facts that serve to remove the tarnish she seeks to apply. First, page 38 of the Opposition states: "[Canal] began its investigation only after she resigned …." Opp., at p. 38 (citing Ex. 69, at p. 2 and Ex. 9, at 167:24-168:5). But that is indisputably inaccurate and knocks out support for any premise that the investigation began as retribution for post-employment protected activity. Opp., at p. 33. ECF #297, at ¶¶ 142, 146. *See also* ECF #335-29 (CANAL_0047505 (April 2 text with Ms. Chen including criticism of Ms. Robinson's behavior)).

Sequentially, the timeline shows that if commencement of the investigation was retaliatory, it could *only* have been in response to events occurring before Plaintiff resigned, assuming there is any rational basis for a juror to link them together. This aligns with the body of caselaw recognizing that adverse actions that arose prior to protected activity do not support retaliation claims. ECF #296, § I.F.(2). This returns us to the timeline to examine what "protected activity" had occurred that can reasonably be linked to the investigation.

Moreover, the investigation continued and expanded upon her resignation as more details surfaced. For example, on April 11, just five days after the resignation, Mr. Tasch (whom Plaintiff

---

[17]    "LD Dec." refers to the October 30, 2022, Declaration of Laurent S. Drogin (ECF #314)

says was not involved in the investigation) received information from American Express regarding Ms. Robinson's taking the SkyMiles. GB Reply Dec., Ex. 2. This was prior to any of the post-employment protected activities (beginning on June 4) in which she claims to have engaged.

This brings us to Ms. Robinson's dissatisfaction with the investigation. She faults its means and manner, and the individuals who participated. Opp., at pp. 37-38. Of course, had Canal retained a prominent investigation firm it would be claimed as overkill. And if their findings echoed what is alleged in Canal's lawsuit, the same criticisms would be made of them. Her argument benefits only from speculation. An unbiased reading of the passages cited in the Opposition provides perspective that Canal employees were instructed to gather and produce information to Mr. Harvey for evaluation. Opp., at p. 38; ECF #337, at pp. 24-27; GB Dec., Ex. 86, SWB Tr., at 172:18–179:19, 192:7–238:7; Ex. 93, Tasch Tr.,[18] at 410–11; RDN Supp. Dec.,[19] at ¶¶ 19-20; GB Supp. Dec., Ex. 37. As Mr. Kaplan explained, Chase did a lot of "crazy shit." GB Dec., Ex. 88, Kaplan Tr., at 290:6-292:11. Those employees knew where to look, knew of her abuses, and found it.[20]

Beneath her criticism are facts she denies and disputes on one hand, yet on the other seeks summary judgment. The Opposition presents segments of Mr. Kaplan's deposition testimony critical of the manner the investigation was conducted. Opp., at p. 8. A fairer and more accurate explanation can be obtained by reading pages 295 to 301, which present a clearer and more

---

[18]     "Tasch Tr." is the deposition transcript of Michael Tasch from April 7, 2022 (ECF #322-93).

[19]     "RDN Supp. Dec." refers to the November 20, 2022, Supplemental Declaration of Robert De Niro (ECF #342).

[20]     The methods used in the investigation are distorted and mischaracterized. Canal is faulted for just adding up Netflix usage. Opp., at p. 40. No such tabulation occurred. Plaintiff says Canal added up all expenses and attributed them to her. *Id*. This is untrue, as she is aware Canal employees went through the Amex invoices, and color-coded expenses reasonably believed to have been improper. GB Supp. Dec., Ex. 37. For example, her meal charges to Paola's, a restaurant near her home that no one at Canal ordered from. GB Dec., Ex. 86, SWB Tr., at 227:6-9, 245:3-10; RDN Supp. Dec., ¶ 11. Regardless of how slapstick she depicts the investigation, it yielded results that support Canal's claims.

complete picture. GB Dec., Ex. 88, Kaplan Tr. A similar ruse is used by citing snippets of Mr. De Niro's testimony to omit salient exchanges, including his reasons for wanting to have Canal assert claims against Ms. Robinson, and his lack of knowledge about communications from her attorney. *Cf.* Opp., at p. 7 (citing Ex. 2) and GB Dec., Ex. 92, RDN Tr. II., at 419-425.

The Opposition tags the State Court Action as "baseless" and "frivolous." These are legal conclusions, not facts, and are improperly used to oppose Canal's motion. It should also be recognized that Plaintiff did not move to dismiss the State Court Action or seek sanctions when Canal filed it. Nor did her counsel oppose the filing of these causes of action as counterclaims on such grounds. Having had all this time and opportunity to prove Canal's claims are baseless, now attacking the investigation is, well, baseless.

The arguments supporting Plaintiff's position of baselessness and frivolity largely align with those made in her motion for summary judgment against Canal's claims and its positions need not be repeated here with several exceptions. Canal decided not to pursue *damages* for Plaintiff's flower charges and petty cash reimbursements. No "claim" was withdrawn, and no allegations have been abandoned. ECF #268. The Opposition's citation to *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983) (Opp., p. 41), is a gross misuse of that precedent to support the contention that baselessness can be "inferred" by a decision not to seek certain damages. *Bill Johnson's* involved the commencement of a lawsuit, not a party opting not to pursue certain damages. Plaintiff herself cites *Spencer v. Int'l Shoppes*, 902 F. Supp. 2d 289 (E.D.N.Y. 2012), which recognized "*Bill Johnson's* was an NLRA case and the Supreme Court has never held that the test established in that case should be applied in the employment discrimination context." *Id.* at 296.[21]

---

[21]     More chicanery exists where Ms. Robinson claims Mr. Harvey "openly admitted that 'he ha[d] 'literally no evidence'' to bring to court." Opp., at p. 39. Cited is a text containing hearsay, inadmissible here, where a third party—not Mr. Harvey—relays something he supposedly said. ECF #335-65.

Finally, as to the cash, gift cards and physical property returned on the last day of discovery, Plaintiff blames Canal for not making "arrangements or requests for the return of these materials for years." Opp., at p. 41. This argument smells of the lamp, considering the Harvey Letter requested their return in July 2019, before Ms. Robinson's attorney surfaced and before the State Court Action was commenced. Had these items been returned there would be fewer issues to speak of. But her attorney chose to ignore it even after Canal's counsel reiterated them, Exs. 52, 53, 54, 58. Nor did current counsel, with knowledge their client possessed the property, have it returned.

Ms. Robinson was greatly disliked by many of her peers. Many of the text messages and emails among them reflect this, none more poignantly than the party and celebration Mr. Kaplan arranged for current and former Canal employees to rejoice when she resigned. GB Reply Dec., Ex. 5 (CANAL_0036513-515). It is undisputed that many seemed to revel in the fact that Canal's lawsuit gave Ms. Robinson what many felt she deserved.

Opposing counsel bold-faces several texts sent by Mr. Kaplan to individuals not identified, not claimed to have any relationship to Canal, withholds context, and calls them a "smoking gun." Opp., at p. 9. At Mr. Kaplan's deposition Plaintiff's counsel sought no explanation from him. On cross examination by defense counsel, he explained he had no knowledge as to when Canal decided to commence the State Court Action. GB Dec. Ex. 88, at 348. In fact, he had "nothing to do with that." *Id*. at 349. He does not know where he came up with this notion about why Canal sued Ms. Robinson. *Id*. at 482. Nobody associated with Mr. De Niro or Canal told Mr. Kaplan any such information. *Id*. at 482-83. The texts say what they do, however, there is no evidence any of the comments are based on firsthand knowledge or information and attributing them to others renders them hearsay for the purposes of this motion. Colloquially, Mr. Kaplan shot off his mouth, not a gun, when making statements about things for which he had no firsthand knowledge.

F.     **Providing Information to the District Attorney's Office**

Ms. Robinson dubs as "well settled" the principle that it is retaliatory "for an employer to 'instigate[] government action against a former employee' including by reporting her to criminal authorities." Opp., at p. 36. But none of the cited caselaw comes close to supporting that broad proposition. In fact, the absence of law her position is telling. This is unsurprising given the First Amendment's protection of a citizen's right to file a lawsuit, with the requirement of a plaintiff to demonstrate both that the lawsuit was filed with a retaliatory motive and without a reasonable basis in fact or law. *See Kim v. Lee*, 576 F. Supp. 3d 14 (S.D.N.Y. 2021); D Br., at pp. 16.[22] And as a reminder, for this to even matter, there must be evidence Plaintiff engaged in protected activity and contact with the District Attorney's office was proximately caused by it.[23]

For these reasons, the Court should conclude that Ms. Robinson has failed as a matter of law in establishing that she engaged in protected activity under the FLSA, NYLL and NYCHRL, or that any adverse action was taken in retaliatory for her having done so. As such, Defendants motion for summary judgment should be granted against those three claims.

---

[22]    Wavy mirrors are used for effect in Ms. Robinson's argument, claiming the District Attorney's office was "pushed" to prosecute; "prompted" to investigate; and calling its investigation (ongoing when COVID closed the city) "lengthy." Opp., p. 10. These words of embellishment find no citation in the record and are argument that adds nothing to the undisputed fact that Canal presented evidence which the DA evaluated and chose not to prosecute. The DA could have easily declined to investigate in the first place, ended the investigation when Ms. Robinson's attorneys went on national TV to promote their lawsuit, or even turned the investigation against Canal if the evidence was so poor as to constitute the false reporting of an incident, itself a crime. N.Y. Penal L. §§ 240.50, 240.55, 240.60.

[23]    We are confused by Plaintiff's "point" that Canal's 30(b)(6) witness testified contact was first made with the District Attorney's office in July or August of 2019. Opp. at 38. Canal's point was that this occurred *before* Ms. Robinson filed her lawsuit, meaning it could *not* have been motivated by an event that had not yet happened. Canal's conduct here is consistent with the legal action Plaintiff was told would follow if she chose not to return Canal's property. Where is there a reasonable juror who could link Canal's conduct back to events of late 2018 or spring of 2019?

## IV.   THE GENDER DISCRIMINATION CLAIMS SHOULD BE DISMISSED AS THERE IS NO OBJECTIVE AND ADMISSIBLE EVIDENCE PLAINTIFF WAS TREATED "LESS WELL" THAN ANY OTHER EMPLOYEE

A careful review of the gender discrimination claims reveals they have little to do with Canal or Mr. De Niro, but rather with Ms. Robinson's disdain and detest of Ms. Chen. Her attorneys attribute "an onslaught of gender-based hostility" to Ms. Chen. Opp., at p. 3. She supports this with citations to documents where Ms. Chen referred to her as a bitch. Opp., at pp. 3, 6, 17, 30. But if the Court reviews those citations, it will see these references were in private communications from Ms. Chen to Mr. De Niro. There is not a single allegation or piece of evidence that Ms. Chen *ever* uttered or wrote that word—or any derogatory word for that matter––to Ms. Robinson. Not even once. *See also* Opp., at p. 17 (use of the word "bitch" by Ms. Chen falsely cited as if Mr. De Niro used the word).

Under Ms. Robinson's liberal use of the word, Ms. Chen was also "harassing" Mr. Kaplan, Canal's sole male employee and Mr. Tasch, (Canal's male accountant), removing gender from the root of any of her behavior. ECF #297, at ¶¶ 141, 144 There is also evidence Ms. Chen played a role in the termination of Mr. De Niro's longtime male driver, critically damaging the theory that gender-based jealousy was afoot. GB Dec., Ex. 86, SWB Tr., at 278:1–6.

Plaintiff's gender discrimination case is based predominantly on private communications which never singled out gender, but instead routinely criticized Ms. Robinson's work performance and peculiar behavior.[24] Likewise, the Opposition's citation to cases for the concept that "such

---

[24]     This includes Ms. Chen's candid perception of Ms. Robinson as "'very, single white female,'" Opp., at p. 3, a reference to a movie character who becomes obsessed with her roommate. The comparison, including Ms. Chen's views about Ms. Robinson's odd relationship with Mr. De Niro, is exemplified in Ms. Robinson's secret recordings, where she concocts a plan to make Mr. De Niro miss her (GB Dec., Ex. 75, Audio Tr., at 2:6–10, 3:19–4:1, 5:2–22) and realize that Ms. Chen was a "psychopath" (*id*., Ex. 77, Audio Tr., at 3:13-14), a "sociopathic bitch" (*id*., Ex. 74, 2:4–7), among other things (*id*.); her teen-like rejection and sadness when Mr. De Niro did not communicate with her, and her expressions of devotion towards him.

discrimination includes being targeted based on the jealousy or insecurity of an employer's romantic partner" Opp., at p. 14, is *not* supported by the cases cited for that premise and finds no safe harbor here.

Ms. Robinson misunderstands Defendants' argument that there are no "comparators." Opp., at p. 14. It is not that comparators are "required." It is that Plaintiff cannot compare herself to *anyone* to support her claim that she was treated "less well." Less well than who? How? She does not like the way that *she* was treated, but points to no one—male/female, similarly situated or not—who was treated "less well" by any measurable objective criterion. Instead, she resorts to self-serving vague assertions such as claiming to have been "berated … more frequently than … male subordinates." Opp., at p. 15. This is a conclusion and is unsupported by any evidence. And while she accuses Mr. De Niro of assigning her "stereotypically female tasks that were not given to men …" in one sentence (Opp., at p. 15), she also talks about how her duties largely overlapped with Mr. De Niro's male personal trainer in another (Opp., at pp. 16, 4). She must also persuade the Court that these "gendered" duties were in addition to the lengthy list of accomplishments, duties, and responsibilities she claimed to have (GB Reply Dec., Ex. 6), outside of the temporary time period when she and other Canal employees was involved in the Townhouse project.

Finally, she suggests that she was "singled out" for engaging in protected activity because two others "accused of financial wrongdoing" were not investigated, sued or reported to the District Attorney's office. Opp., at p. 38. The two individuals are Mr. Kaplan and Ms. Chambers. In fact, both Ms. Kaplan and Ms. Chambers were suspected of wrongdoing by Ms. Chen. (ECF #297, at ¶ 141-42). Ms. Robinson stops short of saying they did anything wrong, for to do so would establish that she either knew of their wrongdoing and did nothing to stop it; or that it unknowingly occurred on her watch given her that her job duties included "finance (cash flow in the office,

personal & [C]anal finances … and much more." GB Dec., Ex. 7.  Nor is there any suggestion by Ms. Robinson that they were alleged to have done anything even closely resembling her type of misbehavior. In sum, it is easy for Plaintiff to say that she was "targeted" by Ms. Chen because of her gender. But no such allegations or concerns were made during her employment, and no admissible evidence supports that legal conclusion.

Regarding Mr. De Niro's conduct, in opposing Canal's motion Ms. Robinson rehashes the same facts that support her affirmative claims against the Defendants which have already been addressed both in Defendants' moving papers (D. Br., at pp. 28-36), and Canal's brief opposing her motion for summary judgment (ECF #337). She also says: "Mr. De Niro demeaned Ms. Robinson *and other women* in quintessentially gendered terms …." Opp., at p. 15. No evidence supports this statement. Despite tens of thousands of pages of documents, emails, text messages and testimony, the only support for Ms. Robinson's claim that Mr. De Niro *ever* referred to her as a "bitch" is her own rehearsed deposition testimony. Not a single witness corroborated this. Likewise, she unabashedly calls out Mr. De Niro for his reference to the female Canal employees as "the girls," Opp. at 2, knowing well that this was her own common parlance until those "girls" complained to *her* that *she* should stop referring to them as such. GB Dec., Ex. 3, P Tr. II, at 32:21-34:17. If Ms. Robinson thought this was inappropriate, she ought to have stopped using the phrase herself before she was the subject of a complaint.

## CONCLUSION

We recognize that with the abundance of documents that exist in this case, there may be a tendency to assume disputed materials facts must exist somewhere among them. We ask the Court to recognize the lengths and extent the Opposition goes to create confusion by misciting the record to create connections where none exist, and to dismiss Plaintiff's claims accordingly.

Dated: Hawthorne, New York
      December 15, 2022

**TRAUB LIEBERMAN STRAUS
& SHREWSBERRY LLP**

By:   _Gregory R. Bennett_
      Gregory R. Bennett
      Mid-Westchester Executive Park
      Seven Skyline Drive
      Hawthorne, New York 10532
      Tel.: (914) 347-2600
      Email: gbennett@tsslaw.com
      *Attorneys for Defendants*
      *Canal Productions, Inc. and*
      *Robert De Niro*

Dated: New York, New York
      December 15, 2022

**TARTER KRINSKY & DROGIN LLP**

By:   _Laurent S. Drogin_
      Laurent S. Drogin
      Brittany K. Lazzaro
      1350 Broadway
      New York, New York 10018
      Tel.: (212) 216-8000
      Email: ldrogin@tarterkrinsky.com
      Email: blazzaro@tarterkrinsky.com
      *Attorneys for Defendant*
      *Canal Productions, Inc.*

**APPENDIX**

