# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GRAHAM CHASE ROBINSON,<br><br>*Plaintiff*,<br><br>- against -<br><br>ROBERT DE NIRO and<br>CANAL PRODUCTIONS, INC.,<br><br>*Defendants*. | Case No. 1:19-cv-09156-LJL-KHP |

## DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. RULE 56

Defendants Canal Productions, Inc. ("Canal") and Robert De Niro (collectively "Defendants"), respectfully submit the following Statement of Material Facts, pursuant to Local Civil Rule 56.1, in accordance with the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, as to which there is no genuine dispute, in support of their Motion for Summary Judgment:

## I. <u>Background</u>

### A. *Principal Cast Members*

1. Defendant Robert De Niro is an actor, director and producer ("Mr. De Niro"). *See* Deposition Transcript of R. De Niro, dated Apr. 4, 2022, at 19, 29, annexed to the Declaration of Gregory R. Bennett, Esq. in Support of Defendants' Motion for Summary Judgment as **Exhibit 91** (cited herein as either "Bennett Decl." and/or "Ex. __"); Declaration of Robert De Niro, dated Oct. 30, 2022, at ¶ 2 (cited as "De Niro Decl.").

2. Defendant Canal Productions, Inc. ("Canal") is a corporation formed by Mr. De

Niro in or about 1987 that has been licensed to do business in New York since in or about 1991. De Niro Dec. ¶3. Among other things, Canal is a "loan out" company that contracts Mr. De Niro's services with production companies in connection with his acting, producing and directing services. Mr. De Niro is Canal's President and sole shareholder. *Id.*; Ex. 91 at 29.

3.     Plaintiff Graham Chase Robinson ("Ms. Robinson") commenced employment with Canal in or about 2008. Deposition Transcript of C. Robinson, dated Dec. 20, 2021 (Bennett Dec., Ex. 2 at 170). Beginning in 2017, Ms. Robinson mostly worked from her home office in fulfilling her duties for Canal. Deposition Transcript of C. Robinson, dated February 9, 2022 (Bennett Dec., Ex. 3 at 15); Deposition Transcript of S. Weeks-Brittan, dated Jan. 10, 2022 (Bennett Dec., Ex. 86 at 63).

4.     Thomas Harvey, Esq. is an attorney who has represented Mr. De Niro and Canal since the 1990s ("Attorney Harvey"). Deposition Transcript of T., Harvey, dated Mar. 29, 2022 (Bennett Dec., Ex. 89 at 23-24, 27-29). Over the years, Attorney Harvey has advised Mr. De Niro and Canal on legal issues, and he has also represented other entities in which Mr. De Niro has an interest and certain of his family members. *Id.* at 30, 40. Attorney Harvey has never performed any other role for Canal. *Id.* at 30. Neither Canal nor Mr. De Niro have ever paid Attorney Harvey a monthly retainer or a salary. *Id.* at 32-34. Attorney Harvey has no informal or formal role or involvement in Canal's operations. *Id.* at 30; Ex. 86 at 96-97.

5.     Tiffany Chen and Mr. De Niro are, and have been for periods of time relevant to this dispute, involved in a relationship with each other ("Ms. Chen"). Ex. 91 at 20; Deposition Transcript of C. Chen, dated March 30, 2022 (Bennett Dec., Ex. 90 at 12). Canal has never employed Ms. Chen, and she has never had any decision-making involvement in Canal's operations. *Id.* at 33-34; Ex. 86 at 149.

6. Michael Tasch is a Partner at Berdon, LLP ("Mr. Tasch"). Deposition Transcript of M. Tasch, dated Apr. 7, 2022 (Bennett Dec., Ex. 93 at 46). Berdon, LLP is a public accounting firm ("Berdon"). *Id.* at 47. In 2008, Berdon entered into a relationship with Mr. De Niro relating to tax services, bill paying services, and consulting services Berdon would provide, which relationship continues to the present. *Id.* at 48-50. In connection with the services Berdon has provided since 2009, Mr. Tasch has served as the principal contact with Mr. De Niro and Canal. *Id.* at 80-81.

7. Sabrina Weeks-Brittan commenced employment with Canal in mid-July 2018 as an executive assistant ("Ms. Weeks-Brittan"). Ex. 86 at 24. In or about January 2021, Canal promoted Ms. Weeks-Brittan to the position of Manager of Production and Development, where she remains employed as of today. *Id.* at 41.

8. Gillian Spear commenced employment with Canal in mid-July 2018 as an executive assistant ("Ms. Spear"). De Niro Dec. ¶4. Ms. Spear voluntarily left Canal in or about April 2021. *Id.*

9. Lulu White commenced employment with Canal on or about August 23, 2018. Ex. 86 at 52; Ex. 5 (CANAL_49440, 21984-985 and 2706). According to Canal's offer letter, which Ms. Robinson sent to Ms. White via email, Ms. White was being extended an offer to join Canal as an Executive Assistant, reporting to Ms. Robinson. Ex. 5 (CANAL_21984-21985); Ex. 86 at 53.

10. Michael Kaplan commenced full-time employment as an assistant with Canal in 2006 ("Mr. Kaplan"). Deposition Transcript of M. Kaplan, dated Mar. 23, 2022 (Bennett Dec., Ex. 88 at 42, 45). Mr. Kaplan's full-time employment status with Canal ended in April 2020, though he agreed with Mr. De Niro before that time to transition out by Summer 2020. *Id.* at 37-38. Mr.

Kaplan served Canal and Mr. De Niro as a "special ops" and "jack of all trades" type of employee, performing errands and was generally regarded as someone who did "everything and anything" for Canal and Mr. De Niro. Ex. 86 at 48, 279; Deposition Transcript of R. Chambers, dated Jan. 13, 2022 (Bennett Dec., Ex. 87, at 43).

11.     Dan Harvey has served as Mr. De Niro's personal trainer since February 1984. Deposition Transcript of D., Harvey, dated Jan. 5, 2022 (Bennett Dec., Ex. 4 36:4-7; 37:23); *see also* Ex. 92 at 432-434. Mr. Harvey has spent approximately 330 days each year with Mr. De Niro since that time. Ex. 4 at 37:20-25. In this role, he would help Mr. De Niro "prepare for movies with regards to memorizing the scripts thoroughly and making sure that he was prepared physically for whatever character he was playing, whether he had to put on weight, lose weight or just look healthier." *Id.* at 168:25-169:9. Mr. Harvey would also prepare a fitness room on location when Mr. De Niro was shooting a project so they could work out together daily. *Id.* at 64:10-21.

12.     Robin Chambers commenced employment for Mr. De Niro in 1989 as his assistant ("Ms. Chambers"). Ex. 87 at 18. While Ms. Chambers left Mr. De Niro's employ in 2003, she continued to help him with discrete tasks thereafter, up to 2020. *Id.* at 21, 30-31. Since 2003, Ms. Chambers has stepped foot inside Canal's offices possibly once. *Id.* at 33.

## II.     Employment at Canal

### A.     *The Work of a Canal Executive Assistant*

13.     Continuously between 2008 and April 2019, Canal employed at least three executive assistants in its office, up to a maximum of five as of April 2019. De Niro Dec. ¶6. None of the executive assistants' job duties were well-defined because they changed depending on Mr. De Niro's needs at the time. Ex. 86 at 67-68, 79. Working for Mr. De Niro was not simply a 9:00-5:00 job for anyone. Ex. 88 at 130.

14.     A core duty of all Canal executive assistants was to accomplish what Mr. De Niro asked to be completed. Ex. 2 at 22-23, 83-84. According to Ms. Robinson, "[t]hat means everybody." *Id.* at 84; *see also id.* at 210-213. All executive assistants (Mr. Kaplan included) would "run errands," assist with acquiring holiday gifts, schedule medical appointments for Mr. De Niro and communicate with Mr. De Niro's children. Ex. 86 at 32-34, 36; Ex. 88 at 142-43.

15.     When Mr. Kaplan commenced employment with Canal, he generally performed errands and organized storage. Ex. 88 at 43. Over time and throughout his employment with Canal, he assisted with archival and storage issues in certain properties Mr. De Niro owned, assisted Mr. De Niro with the maintenance of Robert De Niro Sr. paintings (the "Sr. Paintings"), videotaped and/or took pictures at birthday and holiday parties and ran errands such as picking up prescriptions a few times a month, among other duties. *Id.* at 44, 141-42, 420, 422. Mr. Kaplan helped Mr. De Niro with aspects of his divorce proceeding. *Id.* at 48. In sum, Mr. Kaplan would attend to whatever it was that Mr. De Niro needed, such as obtaining a bike seat for his daughter, helping him with a phone or technology issue or anything else. *Id.* at 55-56.

16.     Mr. De Niro has always regarded titles as insignificant. Ex. 91 at 85. A philosophy that Mr. De Niro has followed for years is that Canal personnel should perform their job duties, do the right thing, be honest and straightforward, and they would always come out ahead. *Id.* at 85. In all aspects of its operations, Mr. De Niro runs Canal by the code of the "honor system":  "You do the right thing, you get repaid accordingly. It is that simple."  *Id.* As Canal's President, Mr. De Niro expected Canal personnel to continually employ "common sense" in the course of fulfilling their duties to him and Canal. *Id.* at 276-280, 338,

   B.     *Mr. De Niro Hires Ms. Robinson as the Point Person for Canal Executive Assistants*

17.     Ms. Robinson applied to Canal in 2008, at the age of twenty-five, to fill the role of

Mr. De Niro's "point person." Ex. 91 at 83; Ex. 2 at 175. Ms. Robinson was expected to run Canal's office, and if Mr. De Niro required something, his expectation was that Ms. Robinson would delegate the task or assignment to another Canal employee to accomplish. Ex. 91 at 89-92. In other words, Ms. Robinson served as Mr. De Niro's "head assistant," and that remained her role throughout her employment. Ex. 91 at 91-92.

18.     In addition to overseeing the Canal staff, Ms. Robinson assisted Mr. De Niro with personal tasks, such as obtaining presents for children or friends, helping with his living situation, looking for furniture and related work. Ex. 91 at 97-98; Ex. 2 at 171-72. In sum, Mr. De Niro expected Ms. Robinson to do "[a]nything and everything." Ex. 91 at 97-98; *see also id.* 167-68 (Mr. De Niro agreeing that a "significant part" of Ms. Robinson's duties entailed assisting him with his "personal life"). Mr. De Niro "need[ed] her total support. I needed to trust her totally. That's the whole point with a position like this. Period." Ex. 94 at 519 (emphasis added).

19.     With respect to her first year with Canal, Ms. Robinson handled Mr. De Niro's schedule and messages, maintained a birthday list, picked out gifts and otherwise handled whatever personal tasks were asked of her by Mr. De Niro. Ex. 2 at 177, 189. In sum, Ms. Robinson testified that "[w]hatever he asked or directed me to do is what I did." *Id.* at 177, 189.

20.     From the perspective of Ms. Chambers, who served as Mr. De Niro's assistant for decades before Ms. Robinson joined Canal, Ms. Robinson's job was to "do everything that needed to be done with family, with friends, for him, everything surrounding [Mr. De Niro's] life." Ex. 87 at 50-51. He trusted her to do everything, and she did it. *Id.* at 142.

C.      *Ms. Robinson Manages Canal's Office*

21.     Between April 2011 and 2017, Mr. De Niro granted Ms. Robinson's requests for new titles. Ex. 3 at 62:13-16. Between 2017 and 2018, Mr. De Niro also approved two raises in

Ms. Robinson's base compensation, such that she was earning a base of $200,000 by the end of 2018. *See* Ex. 6; Ex. 2 at 183:12-17, 185:6-22-85; Ex. 3 at 201:18-25. As part of her raise in 2018, Ms. Robinson's title changed from Director of Production to Vice President of Production and Finance," so to, in her own words, "reflect the work" she performed. Exs. 7-8. The foregoing was in recognition of the "more responsibility" she had assumed in the office. Ex. 9.

22.     When Ms. Robinson's title changed to Vice President for Production and Finance, her job duties really never changed. Ex. 2 at 259.

23.     Ms. Robinson managed Canal's office. Ex. 87 at 261-67; Ex. 86 at 27; Ex. 88 at 408-09; Ex. 91 at 89. Ms. Robinson was the director supervisor for Ms. Weeks-Brittan and Mr. Kaplan. Ex. 88 at 408-09; Ex. 86 at 22, 27, 63.

24.     Unlike any other Canal employee, Ms. Robinson personally worked with Canal's employment law counsel in connection with various issues, and she approved Ms. Weeks Brittan's hours, including setting her (and other assistants') hours and reviewing/approving overtime. Ex. 86 at  40, 22-23, 62- 64; Ex. 10.

25.     Mr. De Niro expected Canal personnel to employ common sense in fulfilling their duties for Canal, including, but not limited to, when to take an Uber or taxi, when to purchase dinner and related issues. Ex. 91 at 276. Mr. De Niro relied on Ms. Robinson, for herself and in overseeing Canal personnel, not to waste or overindulge and to employ common sense. *Id.* at 277.

1.     Ms. Robinson Oversaw Canal's Overtime Payments

26.     Berdon does not process Canal's payroll. Ex. 93 at 151-152. With respect to overtime, Berdon's role was limited to contacting the payroll administrator to notify them to pay overtime after Ms. Robinson emailed Mr. Tasch to inform him that one or more employees worked overtime. *Id.* at 90, 151-152, 324-25; *see also* Ex. 11 (CANAL_0018093-94) (Ms. Robinson's

email, entitled "Overtime," to Mr. Tasch inquiring, "When do I need to let you know each week if one of the assistants has overtime the week before?").

27.     In April 2017, Ms. Robinson initiated a dialogue with Mr. De Niro about how he wanted her to handle overtime and whether she should "go over each time someone has over time hours or just handle it and mention when they hit higher hours?"  Ex. 12 (CANAL_0018410).

28.     According to Mr. Tasch, "overtime was always available" when a Canal employee worked overtime. Ex. 93 at 326.

29.     Between at least April 2017 and April 2019, Ms. Robinson determined, on Canal's behalf, who was eligible for overtime, checked the timesheets for Canal staff and either approved or rejected overtime. Ex. 93 at 326-27; *see also* Ex. 13 (emails from March 2018 regarding weekly timesheet submissions, payroll issues, and overtime submitted for other Canal employees) (CANAL_0020876-77, 002462, 0002465, 0002466, 22031-032, 0036675 0002713, 0022104, 0002714 0002715, 0002467, 0048069-71, 0002717, 0002468, 0024482, 0022999, 0002718 and 0027338-39); *see also* Ex. 5 (CANAL_0049440).

30.     Between August 2018 and April 30, 2019, Ms. Weeks-Brittan, Ms. White and Ms. Spear all received compensation for overtime hours worked between, after submitting their timesheets to Ms. Robinson. Ex. 86 at 74-76; Ex. 14 (CANAL_27338-27339, 27334-27335, 49343-49344, 49363, 49365, 49441, 49443-49446).

> 2.     Mr. De Niro Compensated Ms. Robinson Significantly
> Above Other Executive Assistants in Recognition of Her Role

31.     Between 2017 and 2018, Canal compensated Ms. Robinson at a rate of between $175,000-$200,000 per year. Ex. 2 at 200-201. Mr. De Niro was the decision-maker for all of Ms. Robinson's compensation decisions. *Id.* at 21.

32.     No other Canal executive assistant performing services in the office, aside from

Ms. Robinson, earned more than $88,000 during that time period, and Ms. Robinson's annual compensation has always been substantially higher than Mr. Kaplan's. De Niro Dec. ¶7; Ex. 88 at 286; Bennett Decl. Exs. 13-14.

33.    In late November or December 2018, Ms. Robinson informed Mr. De Niro that she would be resigning from Canal. Ex. 91 at 105-06, 110. In response to that information, Mr. De Niro asked Ms. Robinson to stay with Canal until after the holidays because he was then moving into a new residence (discussed below), and he was also in the midst of a divorce. *Id.* at 105-06.

34.    On December 18, 2018, Ms. Robinson emailed Mr. De Niro, stating, in relevant part:

> I was happy we finally got to sit down for a heart to heart. While we both hate the thought of them, I think at the end of the day, they are actually nice – I think we both appreciate them. I know I do.
>
> I would like to put the compensation portion of what we discussed in your hands. I would feel better and it would mean a lot more to me.
>
> My life and this job have changed enormously over the past 11 years. I would really like you to consider that and also what the next two years will be if we stay on track with the other items we discussed.
>
> This is a change in base salary – all other items do not need to be adjusted. My base salary is:  $200,000.
>
> I have worked for you for 11 years, and I don't begrudge anyone their salary, but I want parity. To give you an example, I make less than your trainer who is at ███████ base salary and expenses that exceed ████ a year. I want you to feel that I deserve that kind of compensation too. You pay your Chairman/CEO [Jane Rosenthal, a female] ████ and your accountants [an entity, Berdon LLP] $██ for your personal expense. When you compare me to that, I'm a bargain . . . ha
>
> Please don't go to Berdon for advice on this. It would be like me asking Trump for advice on a raise for Mueller for all his hard work.
> . . . .
> I may not be in debt or going through a divorce[ ], but I am youngish, and I have all those things to look forward to…
> . . . .
> Thank you for yesterday [December 17, 2018] and for being so open.

Best,
Chase

Ex. 15 (CANAL_046031).

35.     On January 3, 2019, Ms. Robinson emailed Mr. De Niro "to say thank you for the meeting" they had, and that she would like to have "until tomorrow morning [January 4, 2019] to think [things] through," as they had "discussed a lot." Ex. 16 (CANAL_046038).

36.     As a result of the discussion recited above and following from the December 18, 2018, email, Mr. De Niro increased Ms. Robinson's base annual compensation to $300,000 effective in January 2019. Ex. 2 at 247; Ex. 3 at 98-99.

## III.    **The Townhouse**

37.     On or about August 1, 2018, Mr. De Niro executed an agreement concerning a residential property he leased in order to reside in the premises. Ex. 2 at 38. This residential property was known, and shall be referred to herein, as the "Townhouse."

38.     In late-October/early-November 2018, Mr. De Niro and Ms. Chen moved in to the Townhouse. Ex. 2 at 36; De Niro Dec. ¶8.

39.     Beginning in December 2018, Mr. De Niro and Ms. Chen hired a housekeeper who provided laundry services. Ex. 90 at 79-80; De Niro Dec. ¶9; *see also* Ex. 2 at 41-42; Ex. 88 at 144-45.

40.     At Ms. Robinson's recommendation, Mr. De Niro hired Rachel Humphries to perform interior design work for the Townhouse. Ex. 91 at 104, 171; Ex. 3 at 163.

*A.    Various Canal Employees Assist with the Townhouse*

41.     In late-September/early October 2018, Ms. Robinson, Ms. Weeks-Brittan and Ms. White began helping to furnish the Townhouse. Ex. 2 at 37, 38. Ms. Robinson volunteered for the Townhouse work. Ex. 86 at 69-70; *see also* Ex. 77.

42.    Between 2018 and 2019, Ms. Chen asked Ms. Robinson, Ms. Weeks-Brittan, Ms. White and Mr. Kaplan to help in various ways with the Townhouse. Ex. 2 at 121-22.

43.    Ms. Robinson acted as the "overseer" for Canal employees' work relating to the Townhouse. Ex. 88 at 145.

44.    While Ms. Robinson worked on the Townhouse, her office-related supervision responsibilities did not cease. Ex. 88 at 437.

45.    Ms. Robinson and Ms. Weeks-Brittan together went shopping for furniture and tried to determine how such furniture might fit into the Townhouse. Ex. 86 at 35. Ms. Robinson helped Ms. Chen set up the WiFi and related passwords for the Townhouse. Ex. 90 at 89.

46.    Mr. Kaplan performed Townhouse-related errands, including helping out with purchases and returns. Ex. 86 at 49. He also arranged to hire an exterminator, looked for a housekeeper and helped choose vacuums. Ex. 90 at 84-85, 87. Mr. Kaplan was also responsible for issues relating to maintenance and deliveries at the Townhouse, installation of a gym, security cameras, certain technology-related work (e.g., TVs) and the Sr. Paintings. Ex. 90 at 82-84; *see also* Ex. 87 at 284

47.    Once Mr. De Niro moved into the Townhouse, and before household staff had been hired, Mr. Kaplan, Ms. White and Ms. Robinson assisted with certain household chores. Ex. 88 at 153.

   B.    *Canal Employees Interact with Ms. Chen Concerning the Townhouse*

48.    Once Ms. Chen moved in to the Townhouse, she exchanged multiple emails and text messages with Ms. Robinson relating to various aspects of work on the Townhouse.

49.    On February 10, 2019, Ms. Chen had flowers delivered to Ms. Robinson for her birthday. Ex. 17; Ex. 90 at 73-74.

50.     Between February 10, 2019 and February 13, 2019, Ms. Robinson, Mr. De Niro, and Ms. Chen exchanged emails regarding Ms. Chen's need for an extra two sets of keys for the Townhouse. Ex. 18 (CANAL_0009189-90).

51.     On March 8, 2019, Ms. Chen informed Ms. Robinson via email that she needed additional sets of the same keys for the Townhouse, copying Mr. De Niro, explaining that "[w]e need two extra keys here ASAP. It's an unexpected full crazy house next week, we need extra keys. Thanks[.]" Ex. 19 (CANAL_0023036). Ms. Robinson forwarded Ms. Chen's email to Ms. Chambers, remarking that she thought Ms. Chen "is so rude." *Id.*

52.     In approximately early March 2018, Ms. Chen became concerned that mold existed within, or in close proximity to, the Townhouse. Ex. 2 at 46.

53.     On March 8, 2019, Ms. Chen sent an email entitled "Mold Report" to Ms. Robinson, copying Mr. Tasch and Mr. De Niro, indicating that "[t]here was radio silence" from Ms. Robinson on the previous day, despite follow-ups, regarding some time-sensitive issues. Ex. 20 (CANAL_0044237-38). Ms. Robinson forwarded the email to Attorney Harvey and Mr. Tasch, noting "Dear god, please get back to her asap. This is targeted at me. When you speak to Bob, you need to include [Tiffany Chen]…otherwise she assumes I'm at fault." Ex. 20 (CANAL_0044237).

54.     This mold issue covered "a bit" of Ms. Robinson's time. Ex. 2 at 46. Mr. Tasch, Attorney Harvey and Mr. Kaplan also worked on the mold problem for the Townhouse. Robinson Ex. 2 at 39-40, 45-46.

55.     On March 27, 2019, at 11:20 a.m., Ms. Robinson sent an email entitled "Painting Removal for 3/27 Paint Job" to Ms. Chen and Mr. De Niro, suggesting that no further painting work was needed. Ex. 21 (CANAL_0009193). Ms. Chen and Ms. Robinson exchange emails, with Ms. Chen ultimately stating that "[i]t's sometimes hard to fully understand your hierarchy of

responsibilities of who does what for who and when." *Id.* Ms. Chen then inquires of Mr. De Niro whether he "want[s] to go over [Ms. Robinson's] list of rules of who does what so that we don't have this silliness in the future." (*Id.*).

56.     Later on during March 29, 2019, Ms. Chen emailed Ms. Robinson again, informing her that "[i]t's becoming increasingly difficult to understand what [you] do or don't know. What you will do vs what you don't do." Ex. 21 (CANAL_0009191). Ms. Chen suggested that Ms. Robinson should "make a new guide for both Bob and Myself . . . [so that] he and I know what you have determined your responsibilities to be. This way, going forward, we have less confusion about what you have determined your job responsibilities to be." *Id.* .

57.     Ms. Robinson regarded the above email exchanges with Ms. Chen as demeaning and horrible. Ex. 3 at 154-55. Further, as of this date, Ms. Robinson believed Ms. Chen did not want her working any further work on the Townhouse. *Id.* at 123-24; Ex. 76; Bennett Dec. ¶¶71-72, 75, 78. In fact, Ms. Robinson emailed Mr. De Niro the same day, advising him that it was her perception that it "has been pretty obvious for a while that there is an issue with me working for you," and that it was "not working." Ex. 22 (ROBINSON_1347). Ms. Robinson asked to speak with Mr. De Niro, noting that "it's not about throwing in the towel – I just want to make sure that everything runs smoothly." *Id.*

## IV.     <u>Ms. Robinson Resigns Voluntarily</u>

58.     On March 21, 2019, Ms. White and Ms. Robinson reserved and booked flights to, and from, Denver, Colorado for Saturday March 23, 2019. Ex. 27 (CANAL_28377). This related to a "scouting" trip Ms. Robinson and Ms. White went on to explore lodging in New Mexico, before Mr. De Niro began filming there. De Niro Dec. ¶10.

59.     On March 29, 2019, Ms. Robinson emailed Rich Salvatore and Alton Walpole to "loop in [Mr. De Niro's] assistants Gillian and Sabrina and introduce them." Ex. 28 (CANAL_36238). As of this date, Ms. Robinson planned to attend the Tribeca Film Festival, which was scheduled to take place from April 24-May 4, 2019. *Id.*

60.     After emailing Gillian Spear and Sabrina Weeks-Brittan as to whether they are "around for a fun office dinner/drinks next week," and proposing the restaurant Carbone, Ms. Robinson emailed Mr. Kaplan on March 30, 2019 to inquire whether there was "[a]nyway to help get us in to Carbone?" to which Michael Kaplan responds, "[s]hort notice but I'll ask." Ex. 29 (CANAL_0035492-35494); *see also* Ex. 30 (CANAL_47706-47707) (texting with Mr. Kaplan on March 29 and 30 regarding obtaining tickets for Saturday Night Live and what time they planned on dining at Carbone); *see also* Ex. 86 at 270-71.

61.     On April 2, 2019, Ms. Robinson sent an email entitled "Thoughts" to Mr. De Niro. Ex. 31 (CANAL_34641-34642). In relevant part, the original email from Ms. Robinson states the following:

> I'm worried that my presence in the house amongst other things is not working for Tiffany, and therefor [sic] you – and I've felt this way since September/November. It's been very difficult. Part of me worrying is thinking about what happened to Robin with Grace. And I don't want it to get to that point. I want to be able to finish what we agreed upon and fulfill my commitment to you and to the job.
>
> So I came up with this idea and I hope we can discuss it if you think it has merit. It reminds me of how we dealt with the friction between Grace and me years ago. It's out of sight, out of mind. As you know from our conversation in January, I planned on being based outside of New York after I fulfilled our commitments, but I believe this could be the solution and would work for everyone involved. What do you think? Can we discuss.
>
> You know how much I love this job, and even when I was based away from New York I was always there if you needed me. I want to go back to that arrangement.
>
> Let me know what you think. Maybe this is a place to start.

*Id.*

62.     Also on April 2, 2019, following Ms. Chen's response to Mr. De Niro about Ms. Robinson's email above, Ms. Robinson texted an acquaintance, noting that she was "[a] bit nervous. I really think she wants me gone after that email." Ex. 32 (ROBINSON_6433).

63.     On April 4, 2019, Ms. Robinson was unclear about her job duties and emailed Mr. De Niro, in pertinent part, as follows:

> I've worked for you for 11 years. I've bent over backwards and done everything and anything you've asked. We addressed part of an issue yesterday [April 3, 2019] and I thought we were in a better place through mutual understanding. You suggested that you, Tiffany and I were going to sit down and discuss the issues today or Friday. Are we still having that meeting?
>
> Of course I won't go to London if you need me. You have always come first, but I need to sit down with you and we need to discuss the going forward expectations for me and my position.
>
> Under the circumstances, the current responsibilities of my position are unclear. Although I thought we had clarified them in January. As you will recall in January, you increased my salary and we altered the duties of my position effective for the next two years – I turned down another position in reliance upon our understanding.
>
> In the context of recent unfounded and untrue accusations (missing pots and pans & missing aircraft catering)[,] the situation is confusing to say the least. If you desire to realign my position again based on current circumstances, we should speak.
>
> When you want to talk, I'm here.
>
> Best,
> Chase

Ex. 33 (ROBINSON_1602); Ex. 2 at 134.

64.     On April 4, 2019, at 9:42 p.m., Rachel Humphreys, the interior designer Mr. De Niro retained to work on the Townhouse, texts Ms. Robinson with the messages "[j]ust quit[,]" "[u]gh kit quit[,]" and "ok" (Ex. 34 (ROBINSON00006478-79)), to which Ms. Robinson responds at 9:43 p.m. "I know. I will soon." (*Id.* (ROBINSON00006481)). Rachel Humphreys continues

"Ok but I think you will be so much happier" (*Id.* (ROBINSON00006482)), to which Ms. Robinson quickly replies, "I need to set myself up better" (*Id.* (ROBINSON00006483)) "I just can't walk out[]" (*Id.* (ROBINSON00006484)).

65.     On April 4, 2019, Ms. Chen exchanged text messages with Ms. Weeks-Brittan and Ms. Spear regarding Ms. Robinson, among other issues. Ex. 35 (CANAL_49474).

66.     On April 5, 2019, Ms. Robinson sends an email entitled "TFF - 2019" to Gillian Spear, copying Lulu White, and attaches a Tribeca Film Festival Invite List for 2019. Ex. 36 (CANAL_0025356-25411). Ms. Robinson planned to attend the Festival, which was scheduled to occur from April 24-May 4, 2019. Ex. 86 at 270.

67.     As of the morning of April 6, 2019, Ms. Robinson had not planned to resign from Canal. Ex. 2 at 164. In fact, it was business as usual, as evidenced by the email she sent to Mr. De Niro that day at 12:40 p.m. regarding her views about a philanthropy summit he had been invited to. Ex. 37 (ROBINSON00001637).

68.     On April 6, 2019, Ms. Chen sends an email entitled "Getting on the Same Page" to Lulu White, copying Ms. Spear, Ms. Weeks-Brittan, and Mr. De Niro. Therein Ms. Chen asks Ms. White to work with Gillian to get her "up to speed" on things and to "[p]lease get everything else that you and Chase have been working on and inform Gillian of everything," further noting that "[Ms. Robinson] is no longer involved with anything regarding the townhouse or the twins."  Ex. 38 (ROBINSON_013838).

69.     On April 6, 2019, Ms. Robinson used her administrator access to review Ms. White's emails and noticed the above email from Ms. Chen to Ms. White. Ex. 3 at 164-173, 13838-13843. In fact, Ms. Robinson reviewed more than just the above email when she utilized her administrator access on this date. *See* Ex. 3 at 81, 169-70; Ex. 39 (ROBINSON_13838-13843).

70.     On April 6, 2019, Ms. Robinson writes Mr. De Niro an email entitled "Important" that states, in relevant part:

> In November, I informed you that I wanted to leave Canal Productions and take another opportunity. You implored me to stay. We worked out an agreement in January of what my job would be going forward for the next two years. I stayed with the best of intentions to help and support you during this very stressful time for you and your family. Throughout all the years I've worked for you, I've been loyal, protective (to the point of alienating others), honest, and beyond hard working (80-90 hour weeks). I poured my heart and soul into this job, and as a result, other parts of my life and opportunities were put on hold. You always came first.
>
> Since our agreement, my job has changed to something that wasn't what we agreed on and doesn't work for either of us. I have emailed you several times about discussing it but it's obvious you haven't wanted to address it. As a result, I'm not able to do preform [*sic*] my job and succeed in fulfilling the expectations of the agreement we had with each other. In addition, I have been accused of ridiculous things like withholding information, sabotaging catering on a plane, stealing pots and pans, and not being diligent, professional or helpful.
>
> This email is to inform you that I am resigning effective immediately.
>
> Thank you for the last 11 years, Bob. I wish you all good things in the future.

Ex. 42 (CANAL_35459-35500).

70.     As Ms. Robinson's resignation became effective immediately, she provided no notice thereof to Mr. De Niro or Canal. Ex. 3 at 164-65, 1641.

71.     Thereafter, Mr. De Niro and Ms. Robinson exchange emails regarding Ms. Robinson's resignation. Ex. 41 (ROBINSON_1641).

72.     Mr. De Niro forwarded Ms. Robinson's resignation to Ms. Chen, remarking that "now we just have to work out severance[.]"  Ex. 42 (CANAL_0035499). Ms. Chen suggests, in response, that what would otherwise be offered to Ms. Robinson as severance instead be used "for the therapy everyone needs because of the ptsd every[one] has suffered as a result of her." *Id.*

## V.     **Relevant Events Following Ms. Robinson's Resignation**

### A.     *Ensure Nothing Falls Through the Cracks*

73.     Ms. Robinson and Mr. De Niro operated under a shared understanding that nothing was to fall through the cracks, no matter how busy things got. Ex.86 at 62.

74.     Based on discussions Attorney Harvey had with Ms. Robinson following her resignation, he understood that there were 50 pages of open items with respect to upcoming obligations for Mr. De Niro. Deposition Transcript of Canal Prods. Inc. Pursuant to Fed. R. Civ. P. 30(b)(6), dated Aug. 18, 2022) (Bennett Dec., Ex. 95 at 32); Ex. 2 at 180. As a consequence, Attorney Harvey, on Mr. De Niro's behalf, instructed Ms. Weeks-Brittan, Ms. Spear and Mr. Kaplan to review Ms. Robinson's emails to determine what Mr. De Niro had on his schedule and to note upcoming commitments. Ex. 86 at 267; *see also* Ex. 88 at 287-88; Ex. 95 at 31-32. Attorney Harvey also was interested in ensuring that Ms. Robinson provide all of the passwords to the various Canal accounts she maintained during her employment. Ex. 89 at 427-428.

75.     On April 8, 2019, Ms. Chen emailed Mr. Tasch, copying Mr. De Niro, notifying Mr. Tasch that Mr. De Niro wanted "all of Chase's charges and expenses. Everything she has been spending." Ex. 43 (CANAL_46715).

76.     On April 10, 2019, Ms. Robinson emailed Attorney Harvey, informing him that "I've been thinking that it's best we enter into a severance agreement that includes financial compensation, confidentiality provisions and provisions for recommendations and other mutually agreeable terms. This would assist us all during this transition period since I have not been an employee since April 6, 2019. Please let me know your thoughts." Ex. 44 (ROBINSON_4874); Ex. 3 at 184-85.

77.     On May 7, 2019, Ms. Robinson emailed Mr. De Niro in reference to her purported

need for a recommendation letter for business school. Ex. 3 at 193; Ex. 45 (ROBINSON_5130-

5131).

78.     On May 16, 2019, Attorney Harvey emailed Ms. Robinson concerning her request.

Ex. 45 (ROBINSON_5129-5131).

79.     On June 4, 2019, Ms. Robinson sent an email entitled London School of Economics

to Mr. De Niro, copying Attorney Harvey. In pertinent part, the email sets forth:

> Attached is the reference for the London School of Economics. Tom had asked that
> I draft the letter for you. This letter is time sensitive as my application is due this
> week. I've included the additional form as well.
>
> I'd appreciate it if you consider signing it, adjusting it if you need to, and retuning
> it to me. If you would like to go through it or discuss, please let me know. I can
> also have a hard copy sent to you if that is easier for you.
>
> I'm focused on trying to get my MBA and after 11 years I would hope to have your
> support.

Ex. 46 (CANAL_0049267); Ex. 3 at 193-94; *see also* Ex. 46 at CANAL_0049268-71. In the

attached proposed letter of reference, Ms. Robinson describes her role at Canal as follows:

> So much of what Chase contributed to my company was visible not only in her
> leadership and how she managed a team, but in her analytical abilities. Chase was
> able to identify areas of vulnerability and implement new systems not only for
> financial matters but in the areas of compliance and employee benefits. She also
> excelled at handling the production work for my films. Chase was instrumental in
> working closely with my lawyers and agents on deals and contracts. At times she
> negotiated directly with studios and producers and oversaw the budgets on my
> projects. In addition, Chase helped advise me on several of my other companies
> including a non-profit. She has a unique and proactive approach to all she does and
> has proven that she has the ability to handle an enormous workload requiring a level
> of dedication and discipline that is hard to find.
>
> Several years ago, Chase took on the problem of benefits and the rising cost of
> health care for both employees and the company. She not only found a way to
> balance the two at Canal Productions but also at my other companies. The result
> was seen in a restructured system and the morale of the employees that work so
> hard for me.

*Id.* (CANAL_0049268-69).

80.     Ms. Robinson followed up on the same request on June 7, 2019. Ex. 47 (CANAL_49890).

81.     On June 9, 2019, Attorney Harvey informed Ms. Robinson that Mr. De Niro was displeased that Ms. Robinson abused her access to his SkyMiles account. Ex. 3 at 201-203; Ex. 89 at 429-30; *see also* Ex. 85. In fact, Mr. De Niro regarded Ms. Robinson as "crazy" in light of the proposed recommendation letter she prepared, and he was not inclined to sign it at the time. Ex. 90 at 215-16.

82.     On June 11, 2019, Ms. Robinson emailed Mr. De Niro acknowledging that he would not sign the proposed recommendation letter. Ex. 49 (ROBINSON_0001669). In addition, Ms. Robinson and demanded the following, in exchange for entering into a severance agreement she proposed previously:  $600,000; two years medical coverage; a "Meeting with Robert De Niro"; a mutual release and indemnity clause; reimbursement for certain medical bills; to "Retain all Miles in [her] Delta Sky Miles Account"; two signed recommendation letters from Mr. De Niro; a "Mutually Agreed Upon Press Release" regarding Ms. Robinson's departure; and reimbursement for legal fees to review the proposed severance agreement. Ex. 3 at 194-95; Ex. 49 (ROBINSON_0001669).

83.     Mr. De Niro regarded Ms. Robinson's request for $600,000, along with the proposed recommendation letter, as an attempted shakedown. Ex. 91 at 78.

B.     *Canal Identifies Ms. Robinson's Systemic Abuse of Her Authority and the Trust Mr. De Niro Placed in Her*

84.     In the course of reviewing Ms. Robinson's emails following her resignation, Mr. Kaplan identified what he perceived as a "lot of crazy shit" regarding Plaintiff's behavior while she worked for Canal. Ex. 88 at 292. In addition to Mr. Kaplan, Ms. Weeks-Brittan and Ms. Spear

brought items to Attorney Harvey's attention relating to Ms. Robinson's activities. Ex. 95 at 32-33. For example, one employee referred to a trip that Ms. Robinson took to California for a friend's birthday. *Id.* at 33. Canal personnel continued to identify to Attorney Harvey additional issues that Ms. Robinson had obscured from others over the years. *Id.*; *see also* Ex. 89 at 486-88; Ex. 86 at 86.

85.     At this point in time, Canal began investigating Ms. Robinson. Ex. 95 at 33, 42-44. The genesis of the investigation began by identifying that Ms. Robinson had transferred nearly five million SkyMiles from Mr. De Niro's account to her own, progressively from January-March 2019, which was identified within approximately two weeks. *Id.* at 38. Thus, the investigation began on or around April 20, 2019.

86.     The individuals who were involved in the investigation included Canal personnel Mr. Kaplan, Ms. Spear, Ms. Weeks-Brittan and Dan Harvey, as well as Amelia Brain, and for financial items, Mr. Tasch. Ex. 88 at 295; Ex. 95 at 53-54. Ms. Chen was not involved in the investigation. Ex. 90 at 194.

87.     On Canal's behalf, Attorney Harvey directed the investigation. Ex. 95 at 54-55. Attorney Harvey did not provide Canal personnel with explicit instructions regarding the methodology for the investigation because they brought issues to his attention without him asking for them to do so. Ex. 95 at 59-60; *see also* Ex. 88 at 296. However, Attorney Harvey did provide them with guidance. Ex. 95 at 60.

88.     Mr. Kaplan did not update Mr. De Niro about the investigation. Ex. 88 at 301.

89.     In the course of the investigation, Mr. Kaplan compiled totals for how much Ms. Robinson spent for each particular category; he did not identify which charges were proper or improper. Ex. 88 at 309-10. However, Mr. Kaplan, Ms. Spear and Ms. Weeks-Brittan collectively

thought Ms. Robinson's March 2018 trip to see Amelia Brain in Los Angeles was improper. *Id.* at

337-38.

> C.    *Mr. De Niro Determines that Ms. Robinson Systemically Abused Her Discretion*
> *Over a Period of Years, and Invokes Canal's Legal Rights to Address the Abuse*

90.    On July 11, 2019, Attorney Harvey sent Ms. Robinson a letter demanding the return

of various Canal property. Ex. 50. Among other things, Attorney Harvey informed Ms. Robinson

of the following:

> A review of Canal['s] . . . credit card, petty cash, and other accounts[ ]
> reveals that you were involved in widespread abuses and unauthorized
> transactions during your employment.
>
> [Y]ou have, without authorization, charged to Canal an extraordinary
> number of personal expenses," including "food, transportation (such as
> Uber and taxis), dog-sitting, groceries, cameras, iPhone, subscriptions to
> magazines and newspapers, Pilates classes, dry-cleaning, flowers for your
> residence, an unknown number of gift cards, and helped yourself to petty
> cash.
> In addition, you converted Canal's and Bob's American Express
> Membership Rewards Points into more than Seven (7) Million Delta
> SkyMiles over the past two (2) years," and you "without permission . . .
> transferred approximately 4.5 Million SkyMiles into your personal account
> . . . . The value of the foregoing is approximately $300,000.
> . . . .
> I suggest you speak to an attorney and return the SkyMiles immediately.
> . . . .
> I strongly urge you to mitigate the damages you have caused and return the
> various computers, iPhones, cameras and other property in your possession
> that belongs to Canal.
> . . . .
> I strongly urge you to speak to an attorney . . . .
>
> Please return the SkyMiles immediately to avoid legal action.
> . . . .

Ex. 50 (CANAL_0001-0003).

91.    On July 31, 2019, Jeffrey Pagano, Esq. sent an email to Laurent Drogin, Esq., in

which he notifies Attorney Drogin that he is representing Ms. Robinson. Ex. 51

(CANAL_0049426-0049429). Throughout August 1 through August 13, 2019, various emails are sent by Jeffrey Pagano, Esq. regarding the purported claims and allegations. Ex. 52 (CANAL_0049391-98); *see also* Ex. 53 (CANAL_0049419-425); Ex. 54 (CANAL_0049401-49408).

92.     On August 17, 2019, Canal commenced suit against Ms. Robinson in the New York Supreme Court, County of New York, captioned *Canal Prods., Inc. v. Graham Chase Robinson a/k/a Chase Robinson*, Index No. 654711/2019 (the "State Action"). Ex. 96 (Complaint). In the State Action, Canal asserted four causes of action against Ms. Robinson, sounding in fraud, conversion and breaches of the duty of loyalty and fiduciary duty she owed to Canal. *See id.* at 11-14. Mr. De Niro was the decision-maker for the State Action. Ex. 92 at 424.

93.     Canal commenced the State Action, in part, because it believed that Ms. Robinson engaged in fraud. Ex. 89 at 69. Among other things, Canal based its claims on such things as false statements Ms. Robinson made with respect to personal expenses, unauthorized charges on the American Express card, Flowers by Philip, groceries, personal transportation, and various misstatements with respect to air miles and falsification of her vacation time, and generally statements about doing work when, in fact, she wasn't doing work, but rather watching Netflix. Ex. 89 at 75-77; *see also* Ex. 56 (Third Am. Interrogatory Resps.); Ex. 57 (ROBINSON_9964, 9969, 9971, 9972, 8228, 8096 and 8625-26).

94.     Mr. De Niro wanted to file civil claims, and pursue criminal charges, against Ms. Robinson in May or June 2019. Ex. 89 at 394, 431-32. From his perspective, if you break trust, it is over. Ex. 92 at 297-98. Mr. De Niro lived by the "honor system" within Canal: "Do the right thing by me; I do the right thing by you. Don't shake me down, don't threaten me, try to intimidate me." Ex. 91 at 48.

95.     There is no evidence regarding the precise date that a decision was made to file the State Action. Ex. 92 at 421. From Mr. De Niro's perspective, it was not important to him that Canal or he pursue legal claims against Ms. Robinson first. *Id.* at 421-22. In fact, Mr. De Niro was not aware that Ms. Robinson had asserted legal claims regarding discrimination, harassment or wage and hour violations. *Id.* at 422-23. More specifically, Mr. De Niro denied ever seeing any correspondence from Attorney Pagano. *Id.* at 423.

96.     On August 20, 2019, Jeffrey Pagano, Esq. and Laurent Drogin, Esq. continued to exchange emails with one another to discuss the purported dispute. Ex. 58 (CANAL_0049409-0049411).

97.     Mr. Kaplan has no knowledge as to when Canal decided to commence the State Court Action against Ms. Robinson. Ex. 88 at 348. In fact, he had "nothing to do with that." *Id.* at 349.

98.     Canal personnel compiled a binder containing various forms of information which Canal relied on, among other information, to commence the State Action. Ex. 95 at 15-17. The binder was completed in June 2019. *Id.* at 99.

99.     Attorney Harvey was the first person to communicate with the District Attorney regarding Ms. Robinson, which was in late-June/early July 2019 when Mr. De Niro authorized him to explore going in that route. Ex. 89 at 396; Ex. 95 at 279-280. Attorney Harvey provided the binder compilation to the DA at some point. *Id.* at 19-20.

100.     Mr. De Niro met with the DA once on or about September 16, 2019. Ex. 89 at 400-401, 408-409. Mr. De Niro informed the DA representative that Ms. Robinson stole from him. *id.* at 402. Beyond that, he generally advised the DA that he did not authorize Ms. Robinson to engage in certain transactions for him or Canal. *Id.* at 403; *see also* Ex. 95 at 293-94.

101.    The DA declined to prosecute. Ex. 89 at 411-12.

102.    Ms. Weeks-Brittan and Ms. Spear may have also met with the DA. Ex. 89 at 406-07.

103.    Mr. Kaplan was interviewed by the DA in the late-Summer/early-Fall in 2019. Ex. 88 at 24.

104.    To date, Ms. Robinson has never returned the SkyMiles to Mr. De Niro or Canal. Ex. 3 at 207-08.

## VI.    Procedural History in Related and Instant Actions

105.    On August 17, 2019, Canal commenced the State Action against Ms. Robinson. Ex. 96.

106.    October 3, 2019, Ms. Robinson filed her Complaint in this action. Ex. 1.

107.    In response to a request from Defendants' counsel, Plaintiff's counsel arranged for a courier from the law firm of Tarter Krinsky & Drogin LLP to pick up from their office on February 28, 2020 *two* Apple laptops belonging to Canal which Plaintiff failed to return after she resigned. Bennett Decl. ¶73.

108.    On March 6, 2020, Defendants served their Response to Plaintiff's First Set of Interrogatories. Ex. 59.

109.    On April 7, 2020, Plaintiff served her Objections and Responses to Defendants' First Set of Interrogatories. Ex. 60.

110.    On July 9, 2021, the Court granted Defendants' motion to amend their Answer for leave to replead the claims Canal asserted against Ms. Robinson in the State Action as counterclaims in this action (ECF #72). Defendants filed their First Amended Answer With Counterclaims on July 28, 2021. Ex. 61.

111.    On August 18, 2021, Plaintiff filed her Answer to Defendant Canal Productions, Inc.'s Counterclaims. Ex. 62.

112.    On November 5, 2021, Plaintiff personally dispatched an individual to deliver to the office of Defendants' counsel numerous "hard copy documents and tangible materials" that belonged to Canal and/or Mr. De Niro. Bennett Decl. ¶74. Aside from invoking the attorney-client privilege, Ms. Robinson could not provide any explanation for why she waited more than two years to return this property. Ex. 3 at 210-213.

109.    On October 29, 2021, Defendants served their First Requests for Admission on Plaintiff. Ex. 63.

110.    On November 29, 2021, Plaintiff served her Objections and Responses to Defendants' First Requests for Admission. Ex. 64.

111.    On December 16, 2021, Plaintiff served her Amended Responses to Defendants' First Request for Admission. Ex. 65.

112.    In response to the Court's December 16, 2021 Order (ECF Doc. #103), Plaintiff's counsel served Defendants' counsel on December 24, 2021 with an "inventory" of documents and other property and cash that was produced by truck delivery on November 5, 2021. Bennett Decl., Ex. 66. According to this inventory, Ms. Robinson had possession of the following items for more than two years following Attorney Harvey's July 11, 2019 letter to her (with emphases added):

- **Recorder**
- **iPhone**
- Petty cash envelopes and receipts re Canal/117A (**$1,827**)
- Petty cash envelopes and receipts re Toukie Smith (**$2,683**)
- Bankers boxes (4) containing credit card receipts and other hard copy files
- Gift cards (72, face value $**19,425**)
- **Cameras (2) with lenses (4), flash, and accessories**
- Gift wrapping supplies
- Paper shredder
- Safe with keys (2)

- Key ring with keys
- Hard drive
- Office supplies
- Credit card ending -9079
- Books
- Holiday cards and gifts
- Black bag

113.    On February 7, 2022, Plaintiff served her Objections and Responses to Defendants' Second Set of Interrogatories. Ex. 67.

114.    On July 27, 2022, Defendants served their Third Amended Response to Plaintiff's Second Set of Interrogatories. Ex. 56.

115.    On August 5, 2022, Plaintiff's counsel provided Defendants' counsel with a document entitled "Overlay," which counsel described as a "metadata overlay with updated metadata for the audio files" produced in discovery. This was provided in response to an outstanding dispute arising out of Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories. Ex. 68.

116.    On June 1 and August 15, 2022, the parties' counsel filed joint status letters with the Court in which it is noted that Defendants had concerns regarding relevant metadata which was to have been produced with all of the audio recordings Plaintiff produced in discovery. *See* ECF Nos. 235, 250.

117.    On September 7, 2022, Defendants served a Declaration of Canal Productions, Inc. Re Certain Topics Relating to Fed. R. Civ. P. 30(b)(6) Deposition. Ex. 69.

118.    On December 20, 2021, Defendants conducted the first day of Ms. Robinson's deposition. Ex. 2.

119.    On January 5, 2022, Plaintiff conducted the deposition of Daniel Harvey. Ex. 4.

120.    On January 10, 2022, Plaintiff conducted the deposition of Sabrina Weeks-Brittan.

Ex. 86.

121. On January 13, 2022, Plaintiff conducted the deposition of Robin Chambers. Ex. 87.

122. On February 9, 2022, Defendants conducted the second day of Ms. Robinson's deposition. Ex. 3.

123. On March 23, 2022, Plaintiff conducted the deposition of Michael Kaplan. Ex. 88.

124. On March 29, 2022, Plaintiff conducted the deposition of Thomas A. Harvey, Esq. Ex. 89.

125. On March 30, 2022, Plaintiff conducted the deposition of Tiffany Chen. Ex. 90.

126. On April 4, 2022, Plaintiff conducted the first day of the deposition of Robert De Niro. Ex. 91.

127. On April 5, 2022, Plaintiff conducted the second day of the deposition of Robert De Niro. Ex. 92.

128. On April 7, 2022, Plaintiff conducted the deposition of Michael Tasch. Ex. 93.

129. On August 17, 2022, Plaintiff conducted the Fed. R. Civ. P. 30(b)(6) deposition of Canal Productions, Inc., through Canal's designated representative, Attorney Harvey. Ex. 95.

130. On October 21, 2022, Plaintiff conducted the final session of the deposition of Robert De Niro. Ex. 94.

**VII.  Miscellaneous Undisputed Facts Relating to Various Claims**

131. Ms. Robinson, Mr. Kaplan and Ms. Chambers used "the girls" in reference to the executive assistants in Canal's office. Ex. 3 at 33. Ms. Robinson used the term "the girls" far more than Mr. De Niro. Ex. 86 at 108. Ms. Spear asked Ms. Robinson to stop using the term. Ex. 86 at 109-110. Mr. De Niro never learned from any Canal personnel that one of the executive assistants

complained to Ms. Robinson about being referred to as "the girls." Ex. 3 at 34.

132.    At the latest, any comment Mr. De Niro said regarding Viagra was in 2018. Ex. 3 at 35.

133.    Mr. De Niro suggested to Ms. Robinson that she try to envision him on the toilet once, and it was during a conversation in which he was explaining to her how he would like a TV to be installed inside a bathroom in the Townhouse. Ex. 3 at 35.

134.    Plaintiff has no knowledge whether any male Canal employee, such as Dan Harvey, has ever been asked to scratch Mr. De Niro's back, button his shirts, fix his collars, tie his ties or prod him awake when he was in bed. Ex. 3 at 42.

135.    Ms. Robinson has never understood what legal significance the terms "hostile" or "toxic," when used in reference to a work environment represent, or that differential treatment must be based on a protected class in order to be unlawful. Ex. 3 at 48-53.

136.    Mr. De Niro utilized Ms. Robinson the most because it was more expedient to have her act as the person who disseminated information to the rest of Canal's personnel. Ex. 87 at 283. Mr. De Niro trusted Ms. Robinson more to implement his plans than Mr. Kaplan. Ex. 87 at 283.

137.    Mr. De Niro yelled at Attorney Harvey and Mr. Kaplan. Ex. 87 at 135-36, 283, Ex. 88 at 151, 384, 483; Ex. 86 at 112.

138.    Mr. De Niro occasionally uttered disparaged or critical comments regarding Mr. Kaplan's performance of his job duties. Ex. 87 at 285-87.

139.    Ms. Robinson never used the word "discrimination" or explained to Ms. Chambers the basis for why she perceived she may have been treated in a particular manner, during their discussions. Ex. 87 at 287-88. Moreover, Ms. Robinson never used the term "pay parity" in any meeting between Ms. Chambers, herself and Mr. De Niro. *Id.* at 289.

140.    Neither Ms. Chen nor Mr. De Niro had any plan for Ms. Robinson's employment with Canal to end involuntarily. Ex. 88 at 250-252; 257-261; Ex. 90 at 129-30; Ex. 91 at 204, 206. Ms. Robinson still had the responsibilities at the office, even when she was not performing work on the Townhouse. Ex. 91 at 204; Ex. 94 at 595-97. Ms. Chen has never discussed any such issue with Bob. Ex. 90 at 132-33. Ms. Chen's interest was in educating Mr. De Niro as to how Ms. Robinson spent money for him/Canal, the way she used SkyMiles, the way she would demean people. *Id.* at 252-53.

141.    Ms. Chen investigated Mr. Kaplan. Ex. 88 at 373. Ms. Chen accused him of stealing and lying about tips and making false statements. Ex. 90 at 374; Ex. 88 at 31. She also accused him of stealing petty cash, lying about a lamp purchase, a leak situation involving Sr. Paintings. Ex. 88 at 31-32.

142.    Before Ms. Robinson resigned, Ms. Chen was questioning finance issues involving Ms. Robinson, Mr. Kaplan and Ms. Chambers. Ex. 87 at 295. Ms. Chen thought Mr. Kaplan was spending PC inappropriately and not accounting for it properly. Ex. 90 at 195-96. Ms. Chambers was also accused of taking advantage of her relationship with Canal and Bob. *Id.* at 202-03. Ultimately, Ms. Chen, Bob, Tasch, Kap and Robin met at Berdon and the latter blamed everything on Chase. *Id.* at 207-08.

143.    Ms. Robinson delegated most errands to other Canal personnel, rather than performing them herself. Ex. 88 at 142-43.

144.    Mr. Tasch complained about alleged harassment directed at him by Ms. Chen. Ex. 89 at 416.

145.    To the extent Ms. Robinson ever overheard Mr. De Niro using the restroom to urinate while on the phone, it was inadvertent. Ex. 91 at 148.

146.     As of March 28, 2019, Ms. Chen wanted Mr. De Niro to confront Ms. Robinson about the lying, the stealing, and the work at the Townhouse that had not been done and about being disrespectful to everyone. Ex. 90 at 132.  The plan was to have a meeting with Ms. Robinson and the other assistants and call her out for her lies. *Id.* at 149-50. The whole point would be for her to settle in the office again. *Id.* at 150.

147.     Ms. Robinson never believed that Ms. Chen controlled Mr. De Niro. Ex. 2 at 64.

148.     From Ms. Chen's perspective, "Everything I observed from her was unprofessional, deranged, really crazy, aggressive, and angry all the time. So I realized I didn't want Bob to lose a person at the office that he valued so much. So what I do when I am at my wits end with a person, and I can't quite understand what is going on with them, is that I just try to be very kind. And that is all I was trying to do here. And this came after a whole lot of horrible behavior from Chase." Ex. 90 at 48-49.

149.     Ms. Chen had no intention of ever influencing any aspect of Ms. Robinson's work for Canal, outside of the Townhouse. Ex. 90 at 49.

150.     Around March 27, 2019, Ms. Robinson began to feel that Ms. Chen did not like her. Ex. 2 at 76. However, she only felt targeted by Ms. Chen during the last week of her employment (i.e., March 31-April 6, 2019). *Id.* at 78. Ms. Robinson is not aware of any other female executive assistants that Ms. Chen "targeted." *Id.* at 79.

151.     Ms. Robinson characterized Ms. Chen as psychotic, one who suffers from Munchausen (someone who acts sick and wants to the center of attention), a sociopath, at times "drunk with power," "mean," "manipulative" and "insecure." Ex. 2 at 75-76.

152.     At one point, Ms. Chen was upset with Mr. Kaplan because he could not be present at the Townhouse for some work relating to a dishwasher. Ex. 2 at 81-82.

153.    On June 9, 2019, Ms. Robinson determined that Ms. Chen also wanted Mr. Kaplan and Mr. Tasch out. Ex. 76; Ex. 3 at 140-143.

154.    On or about December 6, 2018, Ms. Robinson read a private text message between Mr. De Niro and Ms. Chen relating to Ms. Chen's disapproval of a Christmas tree Ms. Robinson selected for the Townhouse. Ex. 3 at 146-148 and Ex. 97. Ms. Robinson reviewed this because she had a cloned phone of Mr. De Niro's. Ex. 3 at 147. Ms. Robinson had been reviewing this cloned phone for Mr. De Niro's divorce in January/February 2019. Ex. 3 at 147; Ex. 92 at 323. Mr. De Niro authorized Ms. Robinson to clone his phone for the limited purpose of reviewing *past* text messages and/or emails in connection with his then-pending divorce proceeding. Ex. 92 at 323. Ms. Robinson exceeded that authority and reviewed personal exchanges between Mr. De Niro and Ms. Chen (and likely others). *Id.*

155.    Mr. De Niro could never prove that Mr. Kaplan or Ms. Chambers engaged in financial wrongdoing. Ex. 94 at 536, 550-551, 558-61.

156.    In December 2018, during a meeting with Ms. Robinson, Ms. Chambers and Mr. De Niro, Mr. De Niro stated that he would not give Ms. Robinson a good job recommendation if she left him in the lurch. Ex. 3 at 101-02; *see also* Ex. 73.

157.    Mr. De Niro will help current or former employees with their future job prospects if they behave honorably and honestly. Ex. 91 at 109-110.

158.    Canal did not place any cap on the amount of hours personnel could work, as it relates to overtime. Ex. 95 at 302-04.

159.    Mr. De Niro did not provide Ms. Robinson with severance or a reference letter because Ms. Robinson tried to shake him down by requesting payment of $600,000, stole his SkyMiles and asked him to sign a recommendation letter which was false. Ex. 91 at 219-220. He

made this decision well before July 25, 2019. Ex. 92 at 444.

160.    Mr. De Niro did not view Ms. Robinson's accusation that he engaged in discrimination and other violations of employment laws as a breach of trust. Ex. 94 at 527.

161.    Mr. De Niro was the decision-maker regarding salaries at Canal, and for any terminations. Ex. 91 at 126, 128. Mr. De Niro has never expected any employees to perform overtime without being properly compensated. Ex. 91 at 130.

162.    Ms. Weeks-Brittan has never learned of any problems relating to overtime within Canal or that Canal did not want to pay employees overtime. Ex. 86 at 76-77. Mr. De Niro never expressed concern to her regarding the issue of overtime. Ex. 86 at 77-78.

163.    Mr. Kaplan is not aware of whether Canal ever conducted an investigation into any former employee like it did with Ms. Robinson or of anyone who resigned under the same type of circumstances that Plaintiff did. Ex. 8 at 301-02.

164.    Mr. De Niro has not spread any rumors about Ms. Robinson in the entertainment industry. Ex. 3 at 217. Ms. Robinson has not spoken to any prospective employer about reputational damages done by Canal's lawsuit. Ex. 2 at 162.

165.    Mr. Kaplan exchanged text messages with Mercedes Tahir. Ex. 88 at 292. Mr. Kaplan did not speak to Mr. De Niro or Ms. Chen regarding Ms. Robinson's threat of legal action. Ex. 88 at 293-94. In fact, Mr. Kaplan does not recall if he had any discussions with Mr. De Niro regarding Ms. Robinson throughout Summer 2019. Ex. 88 at 294. He does not know where he came up with this notion about why Canal sued Ms. Robinson. Ex. 88 at 482. Nobody associated with Mr. De Niro or Canal told Mr. Kaplan any such information. Ex. 88 at 482-83.

166.    Mr. De Niro and Ms. Robinson never had a discussion about what would happen to SkyMiles in her account if she left Canal. Ex. 3 at 205-06.

167.     No one from Canal, including Mr. De Niro, or anyone associated with Canal, such as Stan Rosenfield, or Attorney Harvey communicated with the media concerning the State Court Action. Ex. 89 at 388-390.

168.     Ms. Weeks-Brittan has never perceived that she has been discriminated against or harassed by Mr. De Niro due to her gender. Ex. 86 at 22. Ms. Weeks-Brittan never perceived Canal's workplace to be hostile, except for Ms. Robinson's conduct/behavior. Ex. 86 at 103-04.

169.     Following Chase's departure, Mr. De Niro increased Ms. Weeks-Brittan's compensation by $20,000. Ex. 86 at 46.

170.     Jane Rosenthal, Berry Welsh and Mr. De Niro were involved in the process leading up to Ms. Weeks-Brittan's promotion. Ex. 86 at 42. The promotion came about after Ms. Weeks-Brittan explained to Mr. De Niro her career goal in production and development work in the entertainment industry. *Id.* at 43. Jane Rosenthal has high standards, and she has never perceived her to be biased against women. *Id.* at 281. She helped Ms. Weeks-Brittan quite a bit with her promotion. *Id.* at 282.

171.     Ms. Robinson used the term "the girls" far more than Mr. De Niro. Ex. 86 at 108. Ms. Spear asked Ms. Robinson to stop using the term. Ex. 86 at 109-110.

172.     Ms. Robinson used to yell at Mr. De Niro. Ex. 86 at 277.

173.     On certain film productions, Mr. De Niro's perk budget would include monetary amounts corresponding to Mr. Harvey's work for Canal and Mr. De Niro. Ex. 3 at 19-20. In other words, Canal would be reimbursed for portions of Mr. Harvey's salary on these productions. *Id.* at 20.

174.     Ms. Robinson produced numerous audio files in discovery, which consisted of recordings she made of telephone calls between her and other individuals, including, but not

34

limited to Mr. Tasch, Attorney Harvey, Mr. Kaplan and Ms. Chambers. Bennett Decl. ¶¶ 72, 75.

175.  Ms. Robinson is aware that audio recordings she made were produced in discovery. Ex. 2 at 49-52. Ms. Robinson began making those recordings in March 2019. Ex. 2 at 50-52. These recordings were phone calls between Ms. Robinson and third-parties performing services for Canal and/or Mr. De Niro, including, but not limited to Michael Tasch and Thomas Harvey, Esq, as well as Canal personnel such as Michael Kaplan and Robin Chambers. *Id.* at 53. She made these recordings through a "Voice" application on her personal computer, while the phone was on speaker phone. *Id.* at 53-54, 59. Except for perhaps one, Ms. Robinson believes she was in New York when she made all of the recordings. *Id.* at 54. Ms. Robinson never informed anyone on these phone calls that they were being recorded. *Id.* at 57. Ms. Robinson was honest on these phone calls, and she does not believe she exaggerated anything. *Id.* at 60. If she expressed her opinion about a topic during these calls, it was an accurate reflection of her state of mind at the time at that moment. *Id.* Ms. Robinson acknowledges it is her voice on the recordings. Ex. 3 at 56-58. Ms. Robinson made these recordings because she wanted some "backup with some of the items for the [Townhouse]." Ex. 2 at 52-53. The reason Ms. Robinson wanted backup is because some of the work that was being done and/or decisions being made regarding the Townhouse had nothing to do with her core job for Canal. *Id.* at 53.

176.  Mr. De Niro does not appreciate it when he perceives he is being "shaken down." For example, years ago a photographer tried to extort money from Mr. De Niro, and he went to the district attorney's office to put a half to the extortionist's attempt. Ex. 91 at 24-25. In addition, he testified before a grand jury in connection with an art dealer's malfeasance. *Id.* at 25-26.

177.  Ms. Chambers characterized Mr. De Niro as very generous and inclusive. Ex. 87 at 26.

178.     Canal instituted a nondiscrimination policy in November 2018. Ex. 95 at 95-96. Canal enforced a similar policy before November 2018 through Tribeca Enterprises. *Id.* at 96-98.

179.     Between 2014 and 2018, Ms. Robinson informed Mr. Tasch that she had a certain amount of unused vacation days, thereby entitling her to compensation for the same. ROBINSON_9964, 9969, 9971, 9972, 8228, 8096 and 8625-26. Ex. 57.