UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GRAHAM CHASE ROBINSON,

     *Plaintiff*,

- against -

ROBERT DE NIRO and
CANAL PRODUCTIONS, INC.,

     *Defendants*.

Case No.: 1:19-cv-09156 (LJL) (KHP)

---

### SUPPLEMENTAL DECLARATION OF ROBERT DE NIRO
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROBERT DE NIRO declares the following to be true pursuant to 28 U.S.C. §1746:

1. I am submitting this Supplemental Declaration in opposition to plaintiff Graham Chase Robinson's ("Ms. Robinson") Motion for Summary Judgment. The statements below are based on my own personal knowledge and experience, except where indicated that they are based on my information and belief.

2. Canal Productions, Inc. ("Canal') is my loan-out company. Individuals and entities wishing to retain my services do so through Canal. Canal has historically maintained a small office in Tribeca, where it employs a handful of people. At the times relevant to this litigation, Ms. Robinson managed Canal and its employees.

3. Ms. Robinson was familiar with my needs and those of Canal, as her position evolved over time. Since 2008 she took on more and greater responsibilities, and certainly understood both the demands of the position and that it was one requiring the utmost trust.

4. She was expected to apply principles of common sense, honesty, integrity and diligence with Canal's best interests being first and foremost. My job was not to police her, or to suspect or operate with the assumption that she was cheating, stealing or deceiving Canal.

5. My schedule was and is such that I do not have a routine presence in Canal's office,

nor have I ever. I rely on Canal's employees to coordinate my and Canal's needs, and during her employment they did so under Ms. Robinson's direct supervision.

6. Over the years, I gave Ms. Robinson wide berth and flexibility. I permitted her to work for extended periods of time from places such as London, Madrid and Los Angeles. I trusted her assurances that Canal's work would be done in a timely and satisfactory manner despite her own absence from Canal's office.

7. In or around 2017, at Ms. Robinson's request, I permitted her to work remotely from her New York City apartment on an as-needed basis. I did so, given that I was frequently out of the office, and under the belief that Ms. Robinson would continue to act within bounds of honesty, integrity and common sense.

8. These principles also applied to office policies which she determined. Such policies were expected to conform to reasonable and sound business practices and would not operate or be applied in a manner that somehow gave Ms. Robinson unique and special privileges and that benefitted only her.

9. For instance, she apparently implemented a policy that employees working in the office could order lunch and it would be paid for by Canal. This seemed reasonable, as it would eliminate the need for employees to travel out of the office to get lunch, and they would not have to bring food from their own homes.

10. At no time did Ms. Robinson ever discuss with me the concept that her ability to work remotely also came with the added benefit of having her meals and food bills paid by Canal.

11. I do enjoy a good meal at Paola's from time to time. When I dine there, I pay with my own credit card. I did not order take-out from Paola's or eat there approximately 90-times during the nine-month period between July 5, 2018, and April 5, 2019.

12. In or about February 2018, Canal purchased several limited-edition photographic

books titled "Taxi Driver" that were going to be autographed by myself and others involved with the film. The books were to be donated to charity or given as gifts.

13. By the end of February 2018, the Taxi Driver Books had been signed by actors in New York City and signatures were required from some individuals in California. There was no rush or deadline for these signatures to be obtained.

14. Arrangements had been made to transport the books to Los Angeles via a private plane, courtesy of a private carrier when it had a flight flying to Los Angeles, California. Amelia Brain, a former Canal employee who lived in California, was going to take delivery of the books and gather the autographs.

15. My recollection is that Ms. Robinson offered to accept delivery of the books when they arrived, as she was going to be in California at that time.

16. At no time in 2018 did I ever ask or direct Ms. Robinson to travel to California to "scout" hotels for my former partner. It was known by me, Ms. Robinson and others at Canal that accommodations were made at the JW Marriott in Santa Monica.

17. Nor did I ever authorize her to stay at the Montage in Beverly Hills, rent a car, or to dine at Nobu – all at Canal's expense.

18. To the best of my recollection, and having been shown certain emails, I was scheduled to fly from New York to Los Angeles on March 13, 2018 on American Airlines.

19. It is true and correct that from time to time I would authorize Ms. Robinson to transfer and use Canal's SkyMiles for business and personal travel. Ms. Robinson and I never had a conversation about whether she could retain any SkyMiles that remained in her account should she resign her employment.

20. Nor did we ever discuss, and nor did she ever ask my permission to move approximately 5-million of Canal's SkyMiles to her personal account in 2019. Likewise, there

3

should have been no reasonable belief or expectation that upon her sudden resignation, she would be permitted to retain the SkyMiles she transferred without my knowledge or permission.

21. I learned soon after her sudden resignation that she had made those transfers and still had the SkyMiles. I was outraged, and became more so in the weeks thereafter as I began to learn about Ms. Robinson's other abuses.

22. Principles of trust and integrity also applied to my expectations regarding paid vacation days. Ms. Robinson managed Canal's office and was charged with administering its vacation policies. I trusted Ms. Robinson to set and administer such policies in an honest and ethical manner. Important to me was that Canal operated smoothly and efficiently as my schedule is complicated, fast-moving and can change abruptly. If an employee was literally unable to take allotted vacation time, it would be my expectation that they should be paid for the unused day(s).

23. Again, applying honesty, integrity, logic and common sense, I would expect that if Ms. Robinson was able to travel to take a vacation four weeks per year, incidental work while she was away would not negate the fact that she was on vacation. Certainly, she would not be required to perform tasks that were either unnecessary or which could be performed upon her return; and she had full discretion to assign more important tasks or those that required immediate attention to other Canal employees that were in Canal's office was she was vacationing.

24. It is also true and correct that Ms. Robinson, who was aware of my own vacation schedule, would align hers with mine as it was reasonable to expect and believe that workflow would ease while I was on vacation, making it even less likely that she would be required to work while on vacation.

25. As more information about Ms. Robinson's wrongdoing came to my attention, I grew angrier. At one point I was made aware she was demanding that I allow her to ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████ I viewed this as extremely arrogant as she, the wrongdoer, had no business demanding anything from me.

26. At no time prior to her making these demands had Ms. Robinson ever complained to me that she attributed any of her treatment while employed as being based in any way on her gender. Nor at the time she made these demands had I ever been made aware that she was threatening to take legal action against me for anything relating to the manner in which she had been compensated or in any way relating to the fact that she was a woman.

27. From my perspective, she had been caught with her hand in the cookie jar and had the temerity and gall to demand things from me.

Dated:   New York, NY
         November 20, 2022

                                          _____
                                          Robert De Niro
                                          For: Himself and Canal Productions, Inc.
                                          Its: President