NB26ROB1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GRAHAM CHASE ROBINSON,

 4                    Plaintiff,              New York, N.Y.

 5              v.                            19 Civ. 9156 (LJL)

 6   ROBERT DE NIRO, et al.,

 7                    Defendants.

 8   ------------------------------x

 9                                           November 2, 2023
                                             9:00 a.m.
10
     Before:
11
                        HON. LEWIS J. LIMAN,
12
                                             U.S. District Judge
13

14                                           -and a Jury-

15
                              APPEARANCES
16

17
     SANFORD HEISLER SHARP, LLP
18        Attorneys for Plaintiff
     BY:  BRENT HANNAFAN
19        ANDREW MACURDY
          KATE MACMULLIN
20        VINCENT MCKNIGHT, JR.

21   TARTER, KRINSKY & DROGIN, LLP
          Attorneys for Defendants
22   BY:  RICHARD C. SCHOENSTEIN
          INGRID CARDONA
23        LAURENT DROGIN
          BRITTANY LAZZARO
24            -and-
     TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP
25   BY:  GREGORY BENNETT
```

NAK5robC

1           (Trial resumed; jury not present)

2           THE COURT:  Be seated.

3           A few things before we bring in the jury.  First, we

4    received a note from one of the jurors.  It reads as follows:

5           We, the members of the jury, would like to request

6    from the Court a brief explanation of the following legal terms

7    which have been used several times by counsel for both parties:

8    Quote, impeachment and, quote, privilege.  Please also provide

9    some brief context for their use in these proceedings.

10          So with respect to that, first of all, the note will

11   be available for your inspection.  I propose that I will give

12   them some explanation of what those terms mean.  Privilege is

13   pretty straightforward.  Impeachment I want to think about a

14   little bit in terms of how I explain it to them.

15          I will tell them that I will give them an explanation

16   after the next break.  But I will also caution them that they

17   are not to discuss the facts of the case amongst themselves,

18   that the evidence is still being submitted, and that is as I

19   instructed them at the beginning.  It comes in in bits and

20   pieces and the case is not submitted to them yet for their

21   deliberations.

22          Second, I received the competing request for a

23   limiting instruction with respect to the recordings.  I'm still

24   working on exactly what I'm going to say.  But my intent is to

25   give that instruction when I give the final instructions in

NAK5robC

1    this case because I think given the fact that the recordings --

2    there's been mention of the recordings several different times

3    already.  I think that rather than give undue prominence to the

4    limiting instruction with respect to any particular witness,

5    the right way to do it is at the close of the case.

6        Next, with respect to Defense Exhibit Number 10, I've

7    reviewed the competing redactions, and I'm prepared to permit

8    the defendants to use either the copy of DX10 with the more

9    limited redactions, or a copy of DX10 without any redactions

10   whatsoever.

11       When I say that, I'm saying that if the plaintiffs

12   would prefer that the document be used without any redactions,

13   then I'm not going to restrict the defendants to use the

14   version of DX10 with redactions.  The two of you can meet and

15   confer with respect to that.  The way I analyze it is it's a

16   403 issue.

17       I can and will give the jury a limiting instruction,

18   but the exhibit is not being received for the truth of any of

19   the matters asserted therein, but simply for the fact that

20   counsel for Mr. De Niro made those assertions in a letter to

21   Ms. Robinson of July 11, 2019, and it is to be taken by them

22   only for that limited purpose.  With that limiting instruction,

23   I think the prejudicial, potential prejudicial impact of a

24   jury, nonetheless taking the statements in it for its truth,

25   is -- would be addressed.

NAK5robC

1          With respect to the competing versions of DX10, the

2     version of DX10 that has the defendants' redactions, just

3     redacts things that have not already been mentioned in the

4     case.  The version that was submitted to me from the plaintiffs

5     redacts things that already have been mentioned many times in

6     the case and, therefore, it is way overbroad.

7          Next, with respect to exhibits -- I assume from

8     plaintiffs that there's not a problem with blacking out the

9     picture of Mr. De Niro's minor child from that text?

10          MR. MACURDY:  No, your Honor.

11          THE COURT:  Okay.  Good.

12          And then there's a reference on some of the exhibits

13     to redacting references to the former President of the

14     United States.  When I've reviewed the exhibits, it looked like

15     there was already those redactions made.

16          Is there an issue between the parties with respect to

17     that?

18          MR. MACURDY:  As long as those redactions are made,

19     those are withdrawn on those particular ones, your Honor.

20          THE COURT:  Okay.  And then there's also in the

21     objections references to one party or another not knowing which

22     portion of an audio tape is going to be used or, you know,

23     ensuring that it's only excerpts.

24          I assume the two of you are going to meet and confer

25     with respect to that issue, Mr. Schoenstein?

NAK5robC

1          MR. SCHOENSTEIN:  Yes, your Honor.  We're trying to

2     identify more specifically the portions of the audio we're

3     going to use with Ms. Robinson, but it's unlikely we'll get to

4     that until tomorrow anyway.  But we'll try to provide that

5     information.

6          THE COURT:  Okay.  The final thing that I have is that

7     there are an awful lot of objections, each side, to particular

8     exhibits.  What I propose is that either during the mid-morning

9     break or more likely for a couple of minutes when the jury

10    breaks for lunch, if there are particular exemplars or

11    particular documents that are important to each side that they

12    expect are going to be used during the immediate forthcoming

13    testimony, that you can bring them to my attention and

14    highlight for me the nature of the objections.

15          I did notice, going through some of the objections,

16    that the plaintiffs have a number of hearsay objections to

17    exhibits that the defendants want to use.  So it's not clear to

18    me whether those exhibits would be -- are being offered for

19    their truth or simply for the fact that statements are made.

20    There are statements in them that do look like they're

21    statements of fact that could be taken for their truth if there

22    was not a limiting instruction.  And I just am going to need

23    some education from the parties as to the nature of the

24    objection and the basis on which the proponent of the exhibit

25    is offering the exhibit.

NAK5robC

1            Is there anything from plaintiff we need to address

2    before we bring in the jury?

3            MR. MACURDY:  Your Honor, just back on DX10 because

4    Mr. Harvey is about to go up.  Plaintiff's position would

5    certainly be that we prefer the redactions as to no redactions.

6            THE COURT:  Okay.

7            MR. SCHOENSTEIN:  That's fine, your Honor.

8            THE COURT:  That's what we'll do.

9            MR. MACURDY:  And one other thing that defense counsel

10   flagged for us is that actually Ms. Robinson's address at the

11   top would need to be redacted too.

12           THE COURT:  That should be redacted.

13           I assume Mr. Schoenstein that you'll do that?

14           MR. SCHOENSTEIN:  Yes, Ms. Card, can you do that?

15           MR. DROGIN:  And we'll call that 10A, if that's okay.

16           THE COURT:  Okay.

17           MR. DROGIN:  Your Honor, before I commence questioning

18   of Mr. Harvey, there are a number of exhibits that I plan to

19   use with him for which there are objections.  So can we clean

20   those up first?

21           THE COURT:  All right.  Let's go through those.

22           MR. DROGIN:  Before I do, I just want to make one

23   other matter with the Court.  I was informed by Mr. Harvey that

24   he was making a telephone call this morning from his contact

25   and he inadvertently hit plaintiff's cell phone number,

NAK5robC

```
 1   consecutive names in his contact list.  And I don't know if
 2   she's even aware of it.  I don't know if she has her telephone,
 3   but I wanted to assure the Court that that was inadvertent and
 4   bring it to the Court's attention, so it did not appear that
 5   there was anything nefarious about it.
 6           THE COURT:  Is there anything I need to address from
 7   plaintiff's perspective with respect to that.
 8           MR. HANNAFAN:  Your Honor, I'll say this, the second
 9   time it's happened in the past week.  Frankly, I don't know why
10   he still has her phone number in his phone.  But we'll accept
11   the representation it was just an accident.
12           MR. DROGIN:  With that said, Mr. Harvey is going to
13   delete her from his contact information so it will not happen.
14           THE COURT:  It seems like a wise decision.  May be one
15   that might have been better made earlier.  Okay.
16           MR. DROGIN:  The first exhibit would be
17   Defendant's 19.
18           THE COURT:  Okay.
19           MR. DROGIN:  Can we pull it up?
20           THE COURT:  You'll tell me what the exhibit is --
21           MR. DROGIN:  If it's okay we'll pull it up for you.
22           THE COURT:  After you do that, you'll tell me what it
23   is and why you're offering it.
24           MR. DROGIN:  Yes.
25           THE COURT:  And I'll hear from plaintiff.
```

NAK5robC

1          MR. DROGIN:  So this is an e-mail from Ms. Robinson on

2    April 10, 2019.  And in it, she indicates, in her first full

3    paragraph:  I've been thinking that it's best that we enter

4    into a severance agreement that includes, dot, dot, dot.

5          Yesterday, you admitted the severance or draft

6    severance waiver and release agreement that was sent to

7    plaintiff.  Our point with this exhibit, and that I would like

8    to ask Mr. Harvey about, is to demonstrate that the request

9    came from Ms. Robinson and was not initiated by Mr. De Niro or

10   Canal.

11         They have raised -- I guess perhaps they'll withdraw

12   their objection, but they did object.

13         THE COURT:  Okay.

14         MR. MACURDY:  No objection.

15         THE COURT:  So it will be received.  Actually, why

16   don't we, instead of going through this colloquy, what I have

17   is the next exhibit as to which there is an objection is DX60.

18   Is there still an objection to DX60?

19         MR. DROGIN:  60.

20         THE COURT:  DX60, does plaintiff still object to DX60?

21         MR. MACURDY:  Yes, your Honor, this is --

22         THE COURT:  So let me then hear from plaintiff about

23   that.  Put that up and then I'll hear from -- defendant put it

24   up and tell me about it and I'll hear from plaintiff.

25         MR. DROGIN:  So one of the issues that is one of the

NAK5robC

```
1    items that's at issue in this case is the return of property.
2    And this ties into the Harvey letter where the request for the
3    return of the property was made.
4          It's -- this document -- can you scroll down?
5          The property was returned late in 2021.  And the
6    Magistrate Judge Parker directed plaintiff's counsel to provide
7    an inventory of what had been returned.  This was the
8    transmittal letter.  It was e-mailed on Christmas Eve with this
9    bullet point list.
10          So this is relevant because it shows, in fact, what
11    Ms. Robinson had in her possession in late 2021.  This was the
12    property that Canal requested that she return before it sued,
13    and for which she was told she would be sued if she did not
14    return the property.
15          The actual prejudice here would be to Canal if it was
16    unable to show that Mr. Harvey sent the letter, identified the
17    property, demanded its return, it was not returned until after
18    Canal commenced its lawsuit.
19          I can also -- there's a foundation objection as I
20    understand it.  I can call the author of the letter, who is one
21    of plaintiff's counsel, we can bring in the property, which is
22    voluminous but we do have it.  Or we can instruct the jury that
23    there's no dispute as to what was returned based on this
24    document which we view as counsel's admission on behalf of the
25    plaintiff that she was, in fact, in possession of this.
```

NAK5robC

1          THE COURT:  Let me hear from plaintiff.

2          MR. MACURDY:  Your Honor, that -- this is just

3    contrary to all the rules of evidence.  This is an e-mail from

4    counsel in the course of the lawsuit.  This is hearsay, this

5    witness can't authenticate it.

6          And beyond that, the list of things returned is not

7    relevant to this case.  It's not part of any of their damages.

8    They've said that on the record.  It's prejudicial, it would be

9    confusing to the jury.  It would be a waste of time.  And it's

10   just completely not a proper document to introduce at trial.

11         THE COURT:  So I do think that the objection with

12   respect to authenticity is a well-founded objection.

13         The plaintiff in a way is choosing her poison.  And

14   you can use the document if the witness doesn't remember what

15   was returned in order to refresh the witness' recollection.

16   But from what I have heard from defendants, the witness can't

17   authenticate the document.

18         It is an admission, so it's admissible on that basis,

19   if it's authenticated.  It's relevant.  I have already ruled

20   with respect to the relevance.  The plaintiff has their

21   objection with respect to that.  But I've ruled with respect to

22   that.

23         And it's a matter of indifference to me whether you

24   put in all of the materials and just show it to the witness,

25   whether you call the lawyer who sent it, and have it

NAK5robC

 1    authenticated that way.  But you can't do it through Mr. Harvey

 2    as I hear it.  So that's my ruling.

 3            MR. DROGIN:  Can I ask Mr. Harvey whether he knows

 4    whether -- and then just go down the list, whether this was

 5    returned?

 6            MR. MACURDY:  Your Honor, can Mr. Harvey step out of

 7    the room while we discuss this?

 8            THE COURT:  Yes, Mr. Harvey should step out of the

 9    room.

10            You can ask Mr. Harvey whether material was returned.

11    You can't lead him.  And if he remembers that seems to me to be

12    fine.  If he doesn't remember, you can refresh him.

13            MR. MACURDY:  Your Honor, the problem with injecting

14    this into the case is that this is years into the litigation,

15    and the reason of the timing for the return gets into

16    attorney-client conversations.

17            THE COURT:  Didn't I already address this?  You made

18    your argument and I think I rejected it.

19            MR. MACURDY:  Your Honor, I understood you to be

20    reserving so that they could talk about property that was

21    missing -- or that was retained at the time so that instigation

22    of their investigation.  But as we discussed pretrial,

23    your Honor, there was a meet-and-confer in January of 2020

24    where it was brought to counsel for Canal's attention that

25    there were items that Ms. Robinson had and that they could

NAK5robC

```
1    inspect.  And they did not after that meeting --

2              THE COURT:  She didn't return this property of theirs

3    until there was litigation that was brought.  The circumstances

4    under which she -- as I understand it from defendants, what you

5    want to point out is that she took the property, not that --

6    not necessarily the circumstances of its -- of its return.  Is

7    that correct?

8              MR. DROGIN:  And that the Harvey letter was accurate.

9    It wasn't that he was accusing her of things just out of the

10   blue.  They were not false allegations in the letter.

11             THE COURT:  I mean, this has been plainly inserted

12   into the case by the plaintiff.  The plaintiff is the one who

13   has been going through all of these allegations being sort of

14   contrived.  And now the defendant has the right to say, well,

15   actually, the allegations weren't contrived.  There was stuff

16   that she took from the office that she did not immediately

17   return.

18             MR. MACURDY:  Just to clarify factually, she worked

19   from home and had items at home and then resigned.  So nothing

20   was physically taken from the office.  Just to clarify.

21             THE COURT:  Okay.  Clarification's noted.

22             All right.  That's my ruling with respect to that

23   exhibit.

24             DX81A, is there still an objection?

25             MR. DROGIN:  That's in evidence already.
```

NAK5robC

1            THE COURT:  All right.  I think DX96 is the next one.

2    Is there still an objection to DX96?

3            MR. SCHOENSTEIN:  I think you ruled on that yesterday.

4            THE COURT:  I think I did also.

5            MR. MACURDY:  Not to my recollection, your Honor, this

6    is --

7            THE COURT:  Okay.  So is that in?  Let me check if

8    that's in evidence.

9            MR. DROGIN:  I'm sorry.  I was thinking PX.

10            THE COURT:  Okay.  DX96 post it, please.

11            MR. DROGIN:  So this document has to do with the

12    investigation that Mr. Harvey, in connection with the Canal

13    employees, were conducting.  This is a -- he will testify that

14    this is a key document that was presented to him by one of the

15    Canal employees, which represents their explanation to him as

16    to what had happened during this March 2018 trip to

17    Los Angeles, and the testimony relating to whether or not this

18    was to scout out hotels.  And there was mention of the

19    transportation of certain *Taxi Driver* books.

20            What we intend to show through this exhibit, and

21    connect it to other exhibits, some of which we're going to ask

22    you to rule on momentarily, is, in fact, this was a trip to

23    California for a friend's birthday party, and that this was not

24    a business-related trip.

25            The hotel scouting explanation was contrived and, in

NAK5robC

1    fact, we have a document showing that the hotel reservation was

2    actually booked before Ms. Robinson ever left.  And that she --

3    there's an admission by her that she actually never did

4    anything work-related on the trip.

5          So this -- the point here is that this ties into, A,

6    the investigation; and B, specifically with regard to the

7    so-called *Taxi Driver* books and the LA trip.

8          And it also shows there really was an investigation,

9    they really were pulling these documents.

10         THE COURT:  Let me hear from plaintiff.

11         MR. MACURDY:  Your Honor, first of all, when you look

12   at this document, the highlighted typing at the top of it is

13   not part of the original e-mail.  So this is -- the e-mail

14   itself is hearsay without a hearsay exception.

15         And then writing has been typed onto the document.

16   Somebody who wasn't on the e-mail chain typed onto it on the

17   top, so March 12 was a Monday and the books landed in LA at

18   6:30 p.m. PT that day.  The Delta miles confirmed she flew back

19   from LA to New York on March 11.  So injecting more hearsay

20   statements.

21         And then the red text was typed in below that:  Went

22   to LA for work because the *Taxi Driver* books were sent there.

23   This confirmed she left before the books arrived.

24         So putting this into evidence would be like

25   essentially --

NAK5robC

1          THE COURT:  Let me ask the defense.  It seems to me

2     that the language in red at the top is plainly hearsay.

3          MR. DROGIN:  We're not offering it for the truth.

4          THE COURT:  But how can -- with that language in red,

5     how could a jury put it out of their minds?  I mean, I

6     understand I can give a limiting instruction, you're not

7     offering it for the truth.  But the relevance of it for the

8     fact that it was said and there was -- an investigation was

9     done is -- there is a relevance.

10         But it seems to me that with that red, the prejudicial

11    impact of putting in front of a jury the out-of-court statement

12    by somebody that the plaintiff went to LA for, quote, work

13    before the *Taxi Driver* books were sent there, and she left

14    before the books arrived, is pretty immense.

15         MR. DROGIN:  What if we just redact the portion in

16    red.  I don't have a problem doing that then if that would be a

17    ruling.

18         THE COURT:  Let me see the rest of the document.  He's

19    going to be able to authenticate this as an e-mail that was of

20    Canals; is that right?

21         MR. DROGIN:  Yes, provided to him, yes.

22         THE COURT:  So isn't this an e-mail -- I mean, e-mails

23    are usually considered to be business records and the content

24    of this one really does look like it's a business record.

25         Let me hear from the plaintiff with respect to that.

NAK5robC

1          MR. MACURDY:  Well, to start with the yellow

2     highlighting in the top is in the same category as the red

3     text, so that should be redacted as well.

4          THE COURT:  Okay.  Let just -- I assume that's right,

5     is that correct, from defense counsel, that you're going to

6     redact the yellow?

7          MR. DROGIN:  We can redact that too.  That's fine.

8          MR. MACURDY:  And then, your Honor, the top e-mail

9     time, Juanita Contreras is not a Canal employee, so it's a

10    hearsay statement.  It's offered for its truth, but they want

11    to prove for a non-Canal employee.  So we haven't had anybody

12    who can authenticate or certify as a business record an e-mail

13    from Juanita Contreras.

14         THE COURT:  I'm going to overrule the objection to

15    DX96 except that with respect to the portion in highlighted

16    yellow and in red in which the objection is a well-founded and

17    that needs to be redacted.

18         DX97, is there still an objection?

19         MR. DROGIN:  We'll call that 196A.

20         THE COURT:  Is there still an objection to DX97?

21         MR. DROGIN:  Well -- no -- I guess -- sorry.

22         MR. MACURDY:  Once again, this is -- I do have an

23    objection.

24         THE COURT:  So let me hear from defendants.

25         MR. DROGIN:  Let me just pull it up.

NAK5robC

1          This is, again, part of the same trip to Los Angeles.

2     If you -- let me first explain what it is.

3          This is a string of e-mails showing that in connection

4     with this trip, Ms. Robinson rented a car while there, again,

5     so-called business trip, which was then charged to Canal.  And

6     this is part of the damages claim.

7          THE COURT:  Okay.  And does the plaintiff have a

8     different objection to this than it does to 96?

9          MR. MACURDY:  I also object to this as hearsay,

10     your Honor.  One thing I would add for the -- any of these that

11     are being admitted that are hearsay, but for the nontruth as

12     was the case with 96, we would ask for a limiting instruction.

13          THE COURT:  Well, I don't understand this to be not

14     for the truth, but I'll hear from defendants.  I understand

15     that these are coming in as business records.  So as an

16     exception to the rule against hearsay -- let me hear from

17     defendants.

18          MR. DROGIN:  Well, that is true.  However -- or -- and

19     the suggestion here, by the plaintiff, is that this was a

20     completely work-related trip.  And the evidence that we're

21     going to present through Mr. Harvey and likely through

22     plaintiff herself, is that, in fact, it wasn't.  And,

23     therefore, she had no authority to charge maybe the hotel.

24          THE COURT:  I -- you answered my question.  I mean, I

25     take it, from defendants, you're not going to ask Mr. Harvey

NAK5robC

 1    what other employees said to him about the trip during the

 2    course of his investigation.

 3             MR. DROGIN:  I will ask him about what other employees

 4    told him.  I intend to.

 5             THE COURT:  Why wouldn't that be hearsay?  Because if

 6    there's a witness who said to him, listen, when she went to LA

 7    she wasn't working.

 8             MR. DROGIN:  Because that, again, we get into this

 9    sort of gray area where he's collecting this evidence as to

10    what she was actually doing there.  And in all cases, he was

11    asking them for the documents to support it because this

12    ultimately, again, he sort of changed hats, and then it turned

13    into collecting evidence and the determination as to whether or

14    not there was a good-faith basis to bring the lawsuit.

15             THE COURT:  So let me ask you a different

16    hypothetical -- plaintiff's counsel can sit for a moment.

17             Different circumstance.  Criminal case, FBI agent gets

18    on the stand, is it your proposition that the FBI agent can

19    testify not just to the documents that were recovered during

20    the search, but what every witness said to him about whether

21    the defendant committed the crime, him or her -- as to whether

22    the defendant committed the crime?  Or, you know, somebody

23    doing an internal investigation, what every witness said to

24    that investigator about whether the other side committed the

25    tort?

NAK5robC

1          MR. DROGIN:  I'm going to duck your question because I

2    can't speak to how a criminal proceeding would go.

3          But we do have a situation here where documents and

4    information is being provided to the attorney, who then, based

5    on what he's told, is asking for additional documents, and

6    ultimately forms an opinion that there's sufficient grounds to

7    pursue certain of these claims, not all of them.  And that's

8    part of his testimony as well.

9          So I'm only going to ask him, ask Mr. Harvey about the

10   specific documents.  I'm not, for example, going to ask him

11   necessarily, tell me everything that they told you about the

12   trip because he's now got that information from his own

13   independent review of the documents.

14         But this is -- you know, this is one that specifically

15   relates to one of the charges that Canal contends is improper.

16         Let me give you another example.  There's no

17   allegation here relating to, for example, an American Express

18   charge at Taco Bell or something like that.  That's not part of

19   this case.  So if he's not going to say -- well, someone told

20   me look at the American Express card, you'll see there's a

21   charge for Taco Bell and this was a -- this was a vacation

22   occasion or pleasure trip, that's not part of this case.

23   That's not where I'm going with this.

24         I'm confining it to the things that Canal is seeking

25   to recover for.  That's what we're focusing in on.

NAK5robC

1          THE COURT:  All right.  So I'm going to permit

2     plaintiff to respond both with respect to DX97 if there's

3     anything new, but also with respect to this proposed line of

4     examination.

5          MR. MACURDY:  We oppose, your Honor.  They have

6     accused Ms. Robinson of stealing.  She is entitled to put on a

7     defense and they have the burden of proof.  And they need to

8     come in here and show, prove that with admissible evidence.

9     And what they're trying to do is completely back-door evidence

10    controverting the rules.

11         They can't have Mr. Harvey come in here and talk about

12    what people told him.  They need to bring in actual records

13    that are admissible or have witnesses come and say we saw

14    Ms. Robinson doing this, or we know this from our personal

15    knowledge.  They can't --

16         THE COURT:  That objection is a well-founded.  So, you

17    know, defendants can ask about the thoroughness of Mr. Harvey's

18    investigation; how many people did you talk to, how much time

19    did you spend on it and after you did that investigation, did

20    you come to a conclusion.

21         And with respect to the conclusion, I'm going to

22    instruct the jury that that conclusion is -- a conclusion that

23    you would express to the plaintiff.  And when I -- when you

24    elicit that last bit of testimony, I'm going to give a limiting

25    instruction with respect to the use of that, which is that

NAK5robC

1    that's not coming in for the fact that any of what Mr. Harvey

2    said is true.  That will have to be determined by the jury

3    through other evidence.

4            It will come -- it will be taken by them just for the

5    fact that Mr. Harvey did that investigation and communicated it

6    to the plaintiff.  That's the limit.

7            All right.  And with respect to DX97, I conclude

8    that's a business record and so the objection is overruled on

9    that.

10           321, is there still an objection on that?

11           MR. DROGIN:  Yes.

12           THE COURT:  I'm asking plaintiff's counsel.

13           MR. MACURDY:  No objection.

14           THE COURT:  Okay.  And what about 322?

15           MR. MACURDY:  Well, your Honor, for these last two

16   documents, I'll put it that I would object to it being shown to

17   this witness because he is not on these e-mail chains, but I

18   understand they would follow your Honor's ruling.  So I object

19   to them for lack of foundation.

20           THE COURT:  Okay.  And on the assumption that he can

21   authenticate them, that these are, in fact, e-mails from Canal

22   that were kept in the ordinary course of business, and whatever

23   business record questions you think you need to ask, then I

24   will receive them — again, if you establish that these are

25   business records.

NAK5robC

1          I should mention one other thing before we bring in

2     the jury.  We did receive a media request last night.  A member

3     of the media approached the Court staff asking that paper

4     exhibits hyperlinked in ECF be made accessible to the public.

5     Apparently, they are still restricted.  And they wanted to know

6     if there was any way to access the audio exhibits that have

7     been entered into evidence.

8          We're looking into the issues regarding this request.

9     And if anybody wishes to be heard with respect to that, you can

10    do that towards the end of the day.

11          All right.  Anything else from plaintiff before we

12    bring in the jury?

13          MR. MACURDY:  No, your Honor.

14          THE COURT:  From defendants?

15          MR. SCHOENSTEIN:  No, your Honor.

16          THE COURT:  Good.  Get Mr. Harvey, please.

17          Let's bring in the jury.

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Good morning, members of the jury.

3    Apologies that we got started a little bit late this morning.

4    I had a couple of legal matters I had to discuss with the

5    parties.  I also have the note from one of you asking for me to

6    provide an explanation with respect to the terms impeachment

7    and privilege.  And I'll do that after the mid-morning break.

8    I appreciate the note.

9              Let me also remind you that with respect to the facts

10   of the case, you're not to have any discussion amongst

11   yourselves.  As I told you at the beginning, the case comes in

12   in bits and pieces, and the case has not been submitted to you

13   for your deliberations and your consideration.

14             All right.  Mr. Harvey, you're reminded you're still

15   under oath.

16             Counsel, you may inquire.

17   THOMAS HARVEY,

18   CROSS-EXAMINATION CONTINUED

19   BY MR. DROGIN:

20   Q.  Good morning, Mr. Harvey.

21   A.  Good morning.

22   Q.  When we concluded yesterday, you were testifying about

23   April 10, I believe it's April 10, that Monday after

24   Ms. Robinson resigned.  And you went to Canal's office and at

25   that time, you spoke with certain employees?

1    A.  Yeah, I believe it was April 8th?

2    Q.  I think you'd be right.

3         And you testified in part about sort of the demeanor

4    of the employees.  Did they give you other information that day

5    or in the following days?

6    A.  Yes.

7    Q.  What kind of information did they give you, just generally?

8         MR. MACURDY:  Objection, hearsay.

9         THE COURT:  Sustained.  What subjects did you discuss

10   with them without telling us what they actually said to you.

11        THE WITNESS:  The subjects of expenses by Ms. Robinson

12   that they didn't think were appropriate in the past.

13   BY MR. DROGIN:

14   Q.  Did you give them any instructions?

15        MR. MACURDY:  Objection, your Honor.

16        THE COURT:  Overruled.

17   A.  I asked them to provide me with documents to back up what

18   they were saying because I had no idea whether it was true or

19   had any basis in fact.

20        THE COURT:  Members of the jury, let me give you an

21   instruction.  With respect to this testimony, the witness is

22   testifying about the investigation that he conducted.  The

23   statements that were made to him during the course of that

24   investigation, to the extent that he happens to mention them,

25   are not to be taken by you for their truth.  They are to be

1    taken by you for the fact that they were said to him and for

2    what conclusions that he reached and then for its statements

3    that he made afterwards to the plaintiff.  But, they are not to

4    be taken for the truth.

5            In order for those statements to be taken for the

6    truth, the people who made the statements to him would have to

7    come into court and testify in front of you and be

8    cross-examined.

9            Go ahead, Counsel.

10   BY MR. DROGIN:

11   Q.  What specific -- withdrawn.

12           Were there specific topics that you instructed the

13   employees to look -- to provide you information on?

14   A.  After they alerted me to certain items, then I started to

15   ask them to break it down into groups.

16   Q.  Okay.  And can you tell us the types of information you

17   sought from them?

18   A.  Well, sure.  On the Ubers and whatnot, to see if they could

19   provide me with information or backup to any of the uses of the

20   Ubers under the Chase Robinson credit card.  They kept talking

21   about the, quote, *Taxi Driver* trip, flower deliveries, meals at

22   various places, things like that.

23   Q.  What about SkyMiles?

24   A.  Yes, Mr. Kaplan raised that issue with me.

25   Q.  Following that, do you begin to receive documents?

NB26ROB1                         T. Harvey - Cross

 1    A.  Yes.

 2    Q.  I'd like to show you Defendant's Exhibit 19.

 3              Okay.  Is this document familiar to you?

 4    A.  Yes.

 5    Q.  Can you identify it?

 6    A.  Yes.  It's an e-mail Chase Robinson sent to me on April 10,

 7    2019.

 8              MR. DROGIN:  I would offer Defendant's 19.

 9              THE COURT:  Received.

10              (Defendant's Exhibit 19 received in evidence)

11    BY MR. DROGIN:

12    Q.  In this e-mail, Ms. Robinson says to you:  I've been

13    thinking that it's best we enter into a severance agreement

14    that includes financial compensation, confidentiality

15    provisions, provisions for recommendations and other mutually

16    agreeable terms.

17              Do you see that?

18    A.  I do.

19    Q.  And at that point, she also points out:  This would assist

20    all of us during this transition period since I've not been an

21    employee since April 6, 2019.  Please let me know your

22    thoughts.

23              Do you see that?

24    A.  I do.

25    Q.  Prior to April 10th when the e-mail was sent, had you

1    raised the prospect of paying any severance to Ms. Robinson?

2    A.  Not with Ms. Robinson, no.

3    Q.  Had you discussed with Ms. Robinson the prospect of

4    offering her any form of financial compensation?

5    A.  No.

6    Q.  In April 10th, at that point had you already received the

7    passwords back?

8    A.  I do not believe so.

9    Q.  At or around that time, were there any communications

10   between you and Mr. De Niro about whether or not any form of

11   severance pay would be offered to Ms. Robinson?

12             MR. MACURDY:  Objection.

13             THE COURT:  Basis.

14             MR. MACURDY:  Hearsay.

15             THE COURT:  How is this not hearsay?

16             MR. DROGIN:  I'm asking what he may have said to

17   Mr. De Niro.

18             MR. MACURDY:  It's still hearsay, your Honor.

19   Out-of-court statement.

20             THE COURT:  Are you offering it for the truth?

21             MR. DROGIN:  I will not offer it for the truth.

22             THE COURT:  Okay.  The objection is overruled.

23   A.  I just inquired of Mr. De Niro whether I should be offering

24   severance to Ms. Robinson.

25

1    BY MR. DROGIN:

2    Q.  What did he say?

3    A.  He said hold back.  He wasn't sure.  He said something was

4    strange going on and he didn't trust her.  He'd like to see

5    what she does in the next few days.

6    Q.  At this point in time, did you have an awareness that

7    Mr. De Niro and Ms. Chen had inquired of Mr. Tasch about

8    Ms. Robinson's spending related to the townhouse?

9              MR. MACURDY:  Objection.

10             THE COURT:  Overruled.

11   A.  I wasn't involved in the petty cash at the townhouse.  But

12   I was aware they had asked for that information.

13             MR. DROGIN:  May we show the witness Defendant's 81A?

14   BY MR. DROGIN:

15   Q.  Is this one of the documents you received from Canal

16   employees?

17   A.  From Canal and/or Mr. Tasch.

18   Q.  Was this document part of the investigation that you were

19   conducting at the time?

20   A.  It was.

21             MR. DROGIN:  I offer Defendant's 81A.

22             MR. SCHOENSTEIN:  It's already in.

23             THE COURT:  It's in evidence.

24             MR. DROGIN:  Apologies.

25

NB26ROB1                          T. Harvey – Cross

1   BY MR. DROGIN:

2   Q.  Did you review the document at the time?

3   A.  Yes.

4           MR. DROGIN:  Can you scroll down, Ms. Cardona?

5           There we go.  That's fine.

6   BY MR. DROGIN:

7   Q.  Having reviewed the documents, specifically this portion of

8   the document, did you reach any conclusion in your mind?

9   A.  Yes.

10  Q.  What was that?

11  A.  That Ms. Robinson had taken air miles and transferred into

12  her personal account out of the Canal account without

13  permission.

14  Q.  Did you make inquiries as to whether or not any of these

15  transfers were authorized?

16  A.  Yes.

17  Q.  What did you learn?

18  A.  They were not.

19  Q.  Take it down.

20          You mentioned something about *Taxi Driver*?

21  A.  Yes.

22  Q.  What is *Taxi Driver*?

23  A.  *Taxi Driver* is a word that the assistants Michael Kaplan

24  and Gillian Spear and -- not Sabrina, Gillian Spear and Michael

25  Kaplan kept saying, do you know about the *Taxi Driver*.  And

NB26ROB1                         T. Harvey – Cross

1   they informed me that Ms. Robinson --

2              MR. MACURDY:  Objection.  Hearsay.

3              THE COURT:  Sustained.

4   BY MR. DROGIN:

5   Q.  I was being more generic, I was talking about the film.

6   A.  No.

7   Q.  What is that --

8              THE COURT:  The question is simply what is *Taxi*

9   *Driver*, not what did somebody say to you?

10             THE WITNESS:  *Taxi Driver* is a well-known movie that

11  Mr. De Niro appeared in.

12  BY MR. DROGIN:

13  Q.  And as it relates to this day, what are the *Taxi Driver*

14  books?

15  A.  In 2018, someone came out with a coffee table size *Taxi*

16  *Driver* book which is essentially pictures and whatnot of the

17  production of *Taxi Driver*.  They were a collectable item that

18  Mr. De Niro apparently was given a bunch of books and was going

19  to have them signed by various people who were in the movie,

20  and then donate them to charity.

21  Q.  And as part of your investigation, what did you learn about

22  the travel arrangements for the *Taxi Driver* books?

23  A.  Well, that the books needed to get to California because

24  some people associated with the film and other people, other

25  well-known actors were out --

 1              MR. MACURDY:  Objection.

 2              THE COURT:  The objection is sustained.  And the

 3    question and answer are stricken.

 4    BY MR. DROGIN:

 5    Q.  Do you know who Toukie Smith is?

 6    A.  I do.

 7    Q.  Who is she?

 8    A.  Toukie Smith is Bob's former girlfriend.  He has two

 9    children with her.

10    Q.  Do you have knowledge as to when Ms. Smith travels to

11    California, where she typically stays?

12    A.  Yes, I do.

13    Q.  How do you come to have that information?

14    A.  From -- Canal uses a specific travel agent that does all

15    the travel arrangements for Mr. De Niro's family as well as his

16    employees or anyone else.

17    Q.  Do you have knowledge as to where -- which specific hotel

18    Ms. Smith stays at in Los Angeles?

19    A.  Yes, there are two hotels in California that Ms. Smith

20    regularly stays at.

21    Q.  What were they?

22    A.  One was the JW Marriott.  I forget off the top of my head

23    the other hotel.

24    Q.  In connection with your investigation, did you come to have

25    a belief as to whether or not a reservation had been booked for

NB26ROB1                              T. Harvey – Cross

1    Ms. Smith at the JW Marriott?

2    A.  Yes.

3              MR. MACURDY:  Objection.  Hearsay.

4              THE COURT:  Sustained.

5    BY MR. DROGIN:

6    Q.  As part of your investigation, did you look at any business

7    records relating to where Ms. Smith was supposed to stay?

8    A.  Yes.

9              MR. MACURDY:  Objection to the form.

10             THE COURT:  Overruled.  I think in this area some

11   leading is okay to avoid hearsay issues.

12             MR. DROGIN:  Can we have Defendant's 321, please?

13   BY MR. DROGIN:

14   Q.  Mr. Harvey, is this a document you reviewed in connection

15   with your investigation?

16   A.  Yes.

17   Q.  Where did you obtain this document?

18   A.  From the assistants at the Canal -- Michael Kaplan.

19             MR. DROGIN:  I offer Defendant's 321.

20             MR. MACURDY:  Objection, your Honor.  I haven't heard

21   any of the authentication required under 803(6) for the

22   business record.

23             THE COURT:  Sustained.

24   BY MR. DROGIN:

25   Q.  How did you come to receive this document from the

NB26ROB1                        T. Harvey – Cross

1   assistants, as you just testified?

2   A.  Michael Kaplan had produced it for me -- I'm sorry?

3            MR. DROGIN:  I'm offering the exhibit again.

4            MR. MACURDY:  Same objection, your Honor.

5            THE COURT:  Same ruling.

6   BY MR. DROGIN:

7   Q.  As part of your investigation, did you come to learn a

8   particular date that Ms. Smith had a reservation made at the

9   Marriott?

10           MR. MACURDY:  Objection.

11           THE COURT:  Sustained.

12           MR. DROGIN:  Can we see Defendant's Exhibit 97?

13           You know what?  If we can go to 96, I'll have another

14  try at it.  I'm sorry, 321.

15           THE COURT:  You're displaying 321 at the moment.

16  BY MR. DROGIN:

17  Q.  Is this a document that's maintained in the ordinary course

18  of Canal's business?

19  A.  Yes.  It's maintained on their e-mail server.

20           MR. DROGIN:  May I offer it again?

21           MR. MACURDY:  Same objection, your Honor.

22           THE COURT:  Same ruling.  306 has a number of

23  requirements, Counsel.

24  BY MR. DROGIN:

25  Q.  Following your investigation, what, if anything, did you

NB26ROB1                         T. Harvey – Cross

1   tell Mr. De Niro regarding the results of your investigation?

2   A.  I told him that I thought --

3           MR. MACURDY:  Objection.

4           THE COURT:  Overruled.

5           Members of the jury, this is not being taken for the

6   truth of any of the statements that are being made by

7   Mr. Harvey, but just simply that he told it to Mr. De Niro.

8   A.  I told Mr. De Niro that I thought Ms. Robinson had

9   defrauded him by suggesting that she was taking a work trip and

10  instead attending a birthday party in Los Angeles.  And that

11  she had used corporate assets to stay at a hotel for $1500 a

12  night, a rental car, and Ubers, had dinner at Nobu two nights

13  in a row, including a birthday party -- or people from a

14  birthday celebration had on Friday night at Nobu in

15  Los Angeles.

16          THE COURT:  That answer goes far beyond what I had

17  anticipated, so I'm going to sustain the objection and strike

18  the answer.  I think you can do it in a more generic way.

19          THE WITNESS:  I told Mr. De Niro that I believe

20  Ms. Robinson had defrauded Canal.

21  BY MR. DROGIN:

22  Q.  Could you specify the way in which you believe that she had

23  defrauded Canal?

24          MR. MACURDY:  Objection, your Honor.

25          THE COURT:  Sustained.

NB26ROB1                          T. Harvey – Cross

BY MR. DROGIN:

Q.  Based on your belief, did you believe that she had

defrauded Canal?

          MR. MACURDY:  Objection.

          THE COURT:  Overruled.

A.  I did.

BY MR. DROGIN:

Q.  How did you come to form that basis, or that belief,

rather?

          MR. MACURDY:  Objection.

          THE COURT:  The question is a little bit vague, so the

objection is sustained.

BY MR. DROGIN:

Q.  As part of your investigation, did you receive a summary of

the charges on -- that were incurred on Ms. Robinson's Canal

American Express card?

A.  Yes, I reviewed those and other documents.

Q.  What, if anything -- I'm sorry, there was a summary?

A.  There were credit card charges with respect to the bills

that she incurred while she was in Los Angeles.

Q.  Were you provided with a summary of charges that had been

incurred at a restaurant call Paola's?

A.  Yes.

Q.  What inference, if any, did you draw from those charges?

          MR. MACURDY:  Objection.

1           THE COURT:  Overruled.

2    A.   Looking at all the charges at Paola's, I believe that they

3    were unauthorized charges -- the sheer volume of meals at

4    Paola's incurred on the Chase Robinson credit card.

5    Q.   What happened with regard to Ubers?  Did you see charges

6    for Ubers?

7    A.   I did.

8    Q.   What inference, if any, did you draw from the Uber charges?

9           MR. MACURDY:  Same objection, your Honor.

10          THE COURT:  Same ruling, overruled.

11   A.   I concluded that Ms. Robinson had used Ubers, unauthorized

12   Ubers based upon those documents, the review, the sheer

13   magnitude of the use of the Ubers and the fact that there were

14   no reimbursables that everyone else had to put in with respect

15   to their use of Ubers at Canal.

16          THE COURT:  Again, all of testimony is not being

17   received for the truth.

18   BY MR. DROGIN:

19   Q.   Okay.  Next is car services.  Were there car service

20   charges that you reviewed?

21   A.   There were.

22   Q.   What inference, if any, did you draw from this?

23   A.   The sheer --

24          MR. MACURDY:  Just to make my objection for the

25   record.

1           THE COURT:  You've got your objection.  Again, I'm

2    going to instruct the jury that this is coming in for only a

3    limited purpose, that he reached a conclusion, which he then

4    conveyed and the timing of which he conveyed it.  But not that

5    any conclusion that he reached was an accurate conclusion.

6           The fact that he reached a conclusion has no bearing

7    whatsoever as to whether Ms. Robinson did the things that he

8    concluded that she did, no bearing whatsoever.

9    BY MR. DROGIN:

10   Q.  Okay.  What about taxis?

11   A.  With respect to taxis, again, the sheer volume, without any

12   support that everyone else at Canal had to submit whenever they

13   used a taxi or Uber or any other means, they would hand in the

14   receipt, together with their weekly expense sheet to identify

15   where they had been and where they used a particular mode of

16   transportation.

17   Q.  What about Whole Foods?

18   A.  Again, the same thing.  The sheer volume of it was not

19   reflected anywhere with any backup, and the fact that it was on

20   Ms. Robinson's credit card.

21   Q.  What about Dean & DeLuca?

22   A.  The same thing.

23           (Continued on next page)

24

25

NB25rob2                    Harvey – Cross

1    BY MR. DROGIN:

2    Q.  Were you provided with information, a summary of charges

3    relating to certain flowers?

4    A.  I was.

5    Q.  Canal is not seeking reimbursement in this lawsuit for any

6    charges relating to flowers; is that correct?

7    A.  That's correct.

8    Q.  Why not?

9            MR. MACURDY:  Objection.  Relevance?

10            THE COURT:  Sustained.

11    Q.  Did you draw the same inference upon your review of the

12    flower charges?

13            MR. MACURDY:  Objection.

14            THE COURT:  Sustained.

15    Q.  The American Express bills also showed charges for, that

16    were treated as petty cash; is that correct?

17            MR. MACURDY:  Objection, your Honor.  He is leading

18    the witness through all of this.

19            THE COURT:  Overruled.

20    A.  With respect to petty cash, you were reimbursed if you had

21    a $100 taxi ride.

22            MR. MACURDY:  Your Honor, I'm sorry.  I need to

23    object.

24            THE COURT:  The objection is well-founded.  Why don't

25    we have a proper question so that the witness can give an

NB25rob2                         Harvey - Cross

1    answer to the question.

2    BY MR. DROGIN:

3    Q.  Did you review any petty cash charges that you felt

4    appeared on the AmEx summary?

5    A.  Yes.

6    Q.  At that point in time were you out to get Chase?

7    A.  No.

8    Q.  Had anyone instructed you to get Chase?

9    A.  I was simply instructed to get the things that were missing

10   back from Ms. Robinson.

11   Q.  I want to move ahead now to June 9.  On or before June 9,

12   did you have a conversation with Ms. Robinson about the London

13   School of Economics' recommendation letter?

14   A.  Yes.

15   Q.  And during that, was that by telephone?

16   A.  Yes.

17   Q.  What, if anything, did you tell her?

18   A.  I told her that Mr. De Niro was refusing to sign the letter

19   of recommendation because he believed that Ms. Robinson had

20   stolen air miles and other things.

21   Q.  As of June 11, 2019, had Ms. Robinson made you aware that

22   she believed that she had been the victim of any form of gender

23   discrimination?

24   A.  No.

25   Q.  As of June 11, 2019, had Ms. Robinson made you aware that

1   she believed she was the victim of any form of retaliation?

2   A.  No.

3   Q.  As of June 11, had you or Canal, to your knowledge as its

4   general counsel, been contacted by any attorney representing

5   Ms. Robinson?

6           MR. MACURDY:  Objection.

7           THE COURT:  Overruled.

8   A.  No.

9   Q.  I would like to show you Plaintiff's Exhibit 70.  This is

10  in evidence.  Did you receive this e-mail on June 11?

11  A.  I did.

12  Q.  When you received it, did you review it?

13  A.  Yes.

14  Q.  And did you have a conversation with Mr. De Niro about this

15  e-mail?

16  A.  Yes.

17  Q.  What did you say to Mr. De Niro?

18  A.  I explained to him that it appeared Ms. Robinson was not

19  returning the air miles and the other items and, instead, she

20  was looking to get an agreement, severance agreement of some

21  sort and a letter of recommendation.

22  Q.  Did you discuss the e-mail with him specifically?

23  A.  Yes.

24  Q.  And after that conversation, what if any actions did you

25  take on behalf of Canal?

NB25rob2                          Harvey - Cross

1    A.  Drafted a letter to send back to Ms. Robinson.

2    Q.  How shortly after June 11 did you begin to prepare that

3    letter?

4    A.  Within two days.

5    Q.  Did you, or to your knowledge Mr. De Niro, ever respond

6    directly to this June 11 e-mail?

7    A.  No.

8    Q.  Why not?

9    A.  Because we said she had stolen stuff, asked for it to be

10   returned, and her response was give me stuff, give me more.

11   Q.  Let's back up.  In this e-mail you had not asked?

12   A.  I had not directly asked; that is correct.

13   Q.  Were you instructed by anyone, following this e-mail and at

14   the time you were preparing the letter, to "get" the plaintiff?

15   A.  No.

16   Q.  What instructions, if any, had you received regarding

17   property that you believed -- or you had been led to believe

18   Ms. Robinson possessed?

19   A.  Simply to get it back.

20              MR. DROGIN:  Can we bring up Plaintiff's Exhibit 18

21   which is in in evidence?

22   Q.  Is this is a July 2nd e-mail from Ms. Robinson?

23   A.  It is.

24   Q.  This is an e-mail you received?

25   A.  Yes, I did receive this.

1  Q.  And you reviewed it?

2  A.  I did.

3  Q.  And does it appear to you that this e-mail is on the same

4  chain as the June 11th e-mail?

5  A.  Yes.

6  Q.  And Ms. Robinson here begins by saying:  Dear Bob, you have

7  not yet respond to my e-mail below.

8          Do you see that?

9  A.  I do.

10  Q.  To your recollection, is that a true statement?

11  A.  Yes.

12  Q.  She says:  Unless this process moves forward appropriately,

13  I will have to seek outside counsel to help me in resolving

14  this situation and protecting the interests of myself and all

15  concerned.

16          Do you see that?

17  A.  I do.

18  Q.  Did you, at the time, have an understanding as to what

19  process she was talking about?

20  A.  I did not.

21  Q.  At the time that she said she would have to seek outside

22  counsel, had you been contacted by any attorney representing

23  her?  This being by July 2nd.

24  A.  No.

25  Q.  And when she used the phrase "resolving this situation,"

1  did you have an understanding at that time as to what situation

2  she was talking about?

3  A.  No.

4  Q.  And when she said "protecting the interests of myself," did

5  you have an understanding of what interests she was talking

6  about?

7  A.  No.

8  Q.  And when she said, "all concerned," did you know who she

9  was talking about?

10  A.  No.

11  Q.  In the next line she says:  Unless I hear from you by

12  Friday, July 12, I will assume that you have no interest in

13  amicably resolving this situation.

14        At the time that you read this, did you have an

15  understanding as to what situation she was talking about?

16  A.  No.

17  Q.  As of July 2nd, had she ever complained to you that she

18  believed she was the victim of gender discrimination?

19  A.  No.

20  Q.  Had she complained to you at that time or any time before

21  it that she believed she was the victim of unlawful

22  retaliation?

23  A.  No.

24  Q.  Did you have a conservation on or around July 2 with

25  Mr. De Niro?

NB25rob2                          Harvey - Cross

1    A.  Yes.

2    Q.  Can you describe for the jury, without telling us what he

3    said, what his physical reaction was?

4    A.  He was clearly upset.

5    Q.  And how did you know that?

6    A.  Just looking at him.  I should say listening to him.

7    Q.  Can you tell us what Mr. De Niro said?

8    A.  Yes.

9    Q.  What did he say?

10   A.  He was very upset.

11              MR. MACURDY:  Objection.

12              THE COURT:  Overruled.

13   A.  He was very upset and he said just get my stuff back.

14   Q.  Ultimately, did you send a letter?

15   A.  Yes.

16   Q.  Plaintiff had set a deadline of July 12.  Did you meet her

17   deadline?

18   A.  Yes.

19   Q.  You sent the letter on July 11?

20   A.  Yes.

21   Q.  Between July 2 and July 11, had plaintiff complained to you

22   that she believed she was the victim of gender discrimination?

23   A.  No.

24   Q.  Between July 2 and July 11, had Ms. Robinson complained to

25   you that she believed she was the victim of unlawful

NB25rob2                    Harvey - Cross

1    retaliation?

2    A.  No.

3    Q.  Before July 11, had you been contacted by any attorney

4    representing Ms. Robinson?

5    A.  No.

6    Q.  Can we show the witness Defendant's Exhibit 10-A?

7         Do you recognize Exhibit 10-A?

8    A.  Yes.  It is a letter I wrote, drafted, and sent to

9    Ms. Robinson on July 11, 2019.

10        MR. DROGIN:  I would offer 10-A.

11        THE COURT:  Received.

12        (Defendant's Exhibit 10-A he received in evidence)

13        MR. MACURDY:  Your Honor, may I ask for a limiting

14   instruction?

15        THE COURT:  The letter is not received for its truth

16   but simply for the fact that it was -- these were statements

17   that Mr. Harvey made to Ms. Robinson.

18   BY MR. DROGIN:

19   Q.  In the letter you say:  I was asked to respond to your

20   recent e-mails addressed to Bob.

21        What e-mails were you referring to?

22   A.  To the two earlier e-mail communications Ms. Robinson sent

23   to Mr. De Niro.

24   Q.  June 11 and July 2?

25   A.  Yes, sir.

NB25rob2                         Harvey - Cross

Q.   You wrote:  Please note that Bob does not wish to

communicate with you.  As such, please direct correspondence

regarding this matter to me.  A review of Canal Production

Inc.'s various credit cards and other accounts reveals that you

were involved in widespread abuses and unauthorized

transactions during your employment.

         You wrote that?

A.   Yes.

Q.   It now appears that you have, without authorization,

charged to Canal an extraordinary number of personal expenses;

these include food, transportation such as Uber and taxis,

groceries, an unknown number of gift cards, and petty cash.

         Do you see that?

A.   Yes.

Q.   At the time that you wrote that, what was the basis for

your belief that that, in fact, had occurred?

A.   Review of various documents, e-mails, discussions with

other Canal staff.

Q.   You then wrote:  In addition, you transferred approximately

4.5 million SkyMiles into your personal account without

authorization.  The value of the foregoing is approximately --

blank.

         At the time that you wrote that and sent the letter,

what was the basis for your belief that that was an accurate

statement?

1           MR. MACURDY:  Objection.

2           THE COURT:  Overruled.

3   A.  By looking at the statements generated by American Express

4   and Delta SkyMiles and speaking with Canal staff personnel.

5   Q.  Speaking with Mr. De Niro?

6   A.  Mr. De Niro and Mr. Kaplan; yes.

7   Q.  You wrote:  Simply, you wrongly took the SkyMiles and seem

8   intent on depriving Canal/Bob of same.  I strongly suggest you

9   speak to an attorney and return the SkyMiles immediately.

10          Do you see that?

11  A.  Yes.

12  Q.  Can we go to the next page?

13          A review of Canal's payroll records and e-mails

14  indicate that you represented that over the past four years you

15  took only one vacation day.  This is false.  And, upon

16  information and belief, approximately four years ago you

17  improperly implemented a benefit for your civil whereby you

18  were paid by Canal for unused vacation days.

19          What was the basis for your belief making that

20  statement at the time?

21  A.  The review of documents, e-mails, and discussions with

22  Canal personnel.

23  Q.  You then write:  I could go on, but the reality is that you

24  took extensive vacations over the past four years and used

25  Canal SkyMiles and credit card.  Notwithstanding the foregoing,

1    you were paid for unused vacation based on your

2    misrepresentations.

3           What was the basis for your belief at the time you

4    made that statement?

5    A.  The documents I had reviewed in speaking to various Canal

6    personnel.

7    Q.  You wrote:  Interestingly, you received authorization to go

8    to Los Angeles on Canal business from March 9, 2018, to March

9    12, 2018, because you said that you needed to have various

10   people autograph a number of limited edition Taxi Driver books

11   which you didn't wish to ship.  However, the books that you

12   supposedly needed to have signed were not even available until

13   after your trip.  It now appears that the real reason you

14   traveled to Los Angeles during this time frame was to attend a

15   friend's birthday party.  This type of misrepresentation does

16   not appear to be limited.

17          Do you see that?

18   A.  Yes.

19   Q.  What was the basis for your belief at the time you made

20   that statement?

21   A.  Again, review of various documents and discussions with

22   Canal personnel.

23   Q.  You wrote:  Please note that during the foregoing trip you

24   charged the following expenses:  $2,600 for your stay at the

25   Montage Hotel; $156 to eat at Nobu L.A.; $604 to eat at Nobu

1   L.A. a second night; and $729 for a rental car.  Worse, even

2   though you had rented a car, you also spent several hundred

3   dollars on Uber in Los Angeles and showed your appreciation by

4   tipping $190 to people who made your stay more comfortable.

5           What was the basis for your belief in making that

6   statement?

7   A.  Again, review of documents and discussion with Canal

8   personnel.

9   Q.  Skipping over the next line you write:  I strongly urge you

10  to mitigate the damages you have caused and return the various

11  computers, iPhones, cameras, and other property in your

12  possession that belongs to Canal.

13          What was the basis for your belief that Ms. Robinson

14  had computers, iPhones, cameras, and other property in her

15  possession that belonged to Canal?

16  A.  Review of documents and discussions with other Canal

17  personnel.

18  Q.  Go to the next page?

19          Reading the middle paragraph there:  I strongly urge

20  you to speak to an attorney and understand that saying "Bob

21  said it is OK" is not going to work.  The reality is that you

22  used your position to enrich yourself at Bob's expense.

23          What was the basis for your belief when you made that

24  statement?

25  A.  Review of documents and discussions with other Canal

NB25rob2                          Harvey - Cross

1   personnel.

2   Q.  And then what did you ask her to do?

3   A.  Return the SkyMiles.

4   Q.  Please return the SkyMiles immediately to avoid legal

5   action; correct?

6   A.  Correct.

7   Q.  And then you said:  Feel free to have your attorney contact

8   me; correct?

9   A.  Yes.

10  Q.  Did Ms. Robinson ever return the SkyMiles?

11  A.  No.

12  Q.  Was a lawsuit filed in court on behalf of Canal in 2019?

13  A.  Yes.

14          MR. DROGIN:  Can we scroll back up to the top of the

15  letter?  We can go down a bit more, keep going -- stop.

16  Q.  After your letter was sent, did Canal receive back any

17  computers from Ms. Robinson?

18  A.  Yes.

19  Q.  After your letter was sent, did Canal receive back any

20  iPhones from Ms. Robinson?

21  A.  Yes.

22  Q.  Did Canal receive back any cameras?

23  A.  Yes.

24  Q.  Did Canal receive back any other property?

25  A.  Yes.

1   Q.  Can you tell the jury what property you were aware of that

2   Ms. Robinson returned?

3   A.  Cash, unused gift cards, a safe, hard drive, external hard

4   drives.  Things of that nature.  Personnel files and other

5   things.

6   Q.  Approximately how much cash did she return?

7   A.  Several thousand dollars.

8   Q.  Approximately what was the value of the gift cards that she

9   returned?

10  A.  Well over $10,000.

11  Q.  And do you remember what year she returned them?

12          MR. MACURDY:  Objection.

13          THE COURT:  Overruled.

14  A.  It was in 2021, I believe, Christmas Eve.

15          MR. DROGIN:  I don't have any further questions.

16          THE COURT:  Further examination by plaintiff?

17  REDIRECT EXAMINATION

18  BY MR. MACURDY:

19  Q.  Good morning, sir.

20  A.  Good morning.

21  Q.  What we just heard in August 2019 Canal filed its lawsuit

22  against Ms. Robinson?

23  A.  Yes.

24  Q.  Prior to that filing you communicated with Canal employee

25  Sabrina Weeks-Brittan about evidence for the case, correct?

1   A.   Yes.  I would have, yes.

2   Q.   Before you brought that lawsuit you told Sabrina

3   Weeks-Brittan that you literally had no evidence for the case

4   against Chase Robinson, right?

5   A.   I wouldn't have brought the lawsuit without any evidence.

6   I think whatever you are referring to is meaning I don't have

7   documents and stuff in my possession, they have to get it to

8   me.

9            MR.. MACURDY:  If we could pull up Plaintiff's Exhibit

10  25, Mr. Kelly?  Can you focus on the text at 12:07 p.m.?  Can

11  you also grab through 12:11?

12  Q.   Mr. Harvey, do these text messages, in August 2019,

13  Ms. Weeks-Brittan writing:  Tom needs Chase evidence for court

14  proceeding Monday morning; and then she goes on to say:  He

15  claims he has literally no evidence, refresh your memory that

16  you told that to Sabrina Weeks-Brittan?

17  A.   No.

18  Q.   Prior to the filing of Canal's lawsuit you believe that

19  Ms. Robinson was threatening to sue Mr. De Niro; is that right?

20  A.   Did I believe Ms. Robinson's attorney --

21            MR. DROGIN:  Objection.

22            THE COURT:  Basis.

23            MR. DROGIN:  Calls for speculation of her state of

24  mind.  I don't know what she believed.

25            THE COURT:  Overruled.

1    A.  I'm sorry?

2    Q.  Prior to the filing of Canal's lawsuit you believed

3    Ms. Robinson was threatening to sue Mr. De Niro, correct?

4    A.  I knew that Ms. Robinson had hired an attorney, so if

5    hiring an attorney means someone might sue, I guess so.

6    Q.  Well, you communicated that belief to Michael Kaplan,

7    correct?

8    A.  That Chase had hired an attorney?  I'm not sure I would

9    have communicated that to Michael Kaplan.

10   Q.  Well, you were, as we discussed yesterday, you were working

11   with Michael Kaplan on what you called an investigation;

12   correct?

13   A.  Yes.

14        MR.. MACURDY:  Mr. Kelly, can we pull up Plaintiff's

15   Exhibit 28?

16        MR. DROGIN:  Your Honor, when we have a moment, the

17   last document had not previously been identified so I would

18   like just a moment to confirm that these are documents that

19   have been identified for us ahead of time.

20        THE COURT:  I don't think they need to be, so.

21        MR. DROGIN:  Then I would ask if they're going to do

22   that, if we can at least have a brief moment to review what it

23   is they're showing the witness because we were not previously

24   advised that these were going to be shown.

25        THE COURT:  That's fair for both sides, when you show

NB25rob2                          Harvey - Redirect

1   an exhibit, that you give the other side an opportunity to

2   object.

3          Go ahead.  Next question.

4          MR. MACURDY:  Mr. Kelly, can you grab the last couple

5   texts on this page and the top of the next?

6          THE COURT:  Is there an exhibit number of what you are

7   showing?

8          MR. MACURDY:  This is Plaintiff's Exhibit 28, your

9   Honor.

10  BY MR.. MACURDY:

11  Q.  Does it refresh your memory of what you told Michael Kaplan

12  in your text of August 2019 when he wrote:  I put a lot of work

13  into this --

14         MR. DROGIN:  Objection.

15  Q.  -- as she was threatening to sue Bob so they wanted to ruin

16  her first.

17         MR. DROGIN:  Objection.

18         THE COURT:  Overruled.

19  A.  Does it refresh my recollection as to what?

20  Q.  That you said that to Michael Kaplan.

21  A.  No.

22  Q.  In August 2019, as we have mentioned, you had discussed

23  with Michael Kaplan about this, what you called, investigation

24  into Ms. Robinson; correct?

25  A.  Yes.

1  Q.  You discussed with Mr. Kaplan the amount of damages that

2  Canal sought in its lawsuit against her, right?

3              MR. DROGIN:  Objection.

4              THE COURT:  Basis.

5              MR. DROGIN:  I didn't believe we were going into

6  damages with this witness.

7              THE COURT:  That's not an objection.  What's the legal

8  objection?

9              MR. DROGIN:  Well, it is really privilege and goes to

10  work product.

11             THE COURT:  That objection is sustained.

12             Let me give the jury an instruction about privilege

13  and then I will see the parties at side bar.  When the parties

14  use the language of privilege, what that means is that -- what

15  that refers to is that when a client communicates information

16  to that client's lawyer, in confidence, for the purpose of

17  receiving legal advice, or when the lawyer communicates legal

18  advice to the client, again, in confidence, that information is

19  privileged from disclosure to any third-parties.  So that's one

20  of -- so, when they evoke the word "privilege" that means

21  they're maintaining confidence over confidential communication.

22             Let me see the parties at side bar.

23             (Continued next page)

24

25

1              (At side bar)

2              THE COURT:  Let me better understand the objection and

3     then let me hear from plaintiffs.

4              MR. DROGIN:  Well, they're taking the position --

5     excuse me -- that Mr. Kaplan is an agent and have questioned

6     him as an agent of Canal.  So if he is having a discussion with

7     Mr. Harvey about damages that Canal might seek, that should be

8     a privileged communication.  That's the basis for my objection.

9              MR. MACURDY:  Your Honor, I'm simply trying to lay

10    the foundation under your Honor's ruling for Plaintiff's 29

11    where Mr. Kaplan wrote:  It's just a random number to humiliate

12    her, it is not like they actually plan to go to court.  She was

13    threatening to sue so this was Tom's plan to strike first.  I

14    am trying to lay foundation under your Honor's --

15             MR. DROGIN:  I object to that.

16             MR. SCHOENSTEIN:  They're trying to back-end, your

17    Honor, into their allegation that the amount of damages she was

18    initially sued for is somehow actionable or relevant to this

19    case.  Your Honor has already ruled extensively on summary

20    judgment that the amount of the initial damages claimed in the

21    claim filed by Canal is not relevant to any claim left in this

22    dispute.  They had a claim based on it, they came to court

23    arguing that that itself was retaliation, and your Honor

24    dismissed that claim.  So, he wants to go into how much she was

25    sued for and who came up with the number, and none of that is

1    relevant to the issues that remain in this case.

2              THE COURT:  As to Mr. Schoenstein's point, my question

3    to you is how is what you are exploring in any way within the

4    scope of what the defendant covered in their examination of

5    this witness?

6              MR. MACURDY:  Well, your Honor, I heard extensive

7    testimony about the letter that he sent and the investigations

8    and that entire investigation served as the basis for the

9    lawsuit that they then brought and they elicited testimony

10   multiple times that he was not trying to get Ms. Robinson and

11   no one told him to get Ms. Robinson.  And in this text message

12   it is explicitly saying she was threatening to sue so this was

13   Tom's plan to strike first.

14             THE COURT:  I am going to sustain the objection as to

15   being outside of the scope.  As I understood the examination

16   from defendant's counsel, the thrust of the examination, and my

17   limiting instructions, was directed to the fact that the

18   plaintiff did not raise issues of gender discrimination until

19   after there were allegations made against her of misuse of

20   corporate assets and breach of fiduciary duty.  It was not

21   directed to the question of whether the lawsuit filed in state

22   court was retaliatory which is an issue as to which, as

23   Mr. Schoenstein has pointed out, I have ruled on on summary

24   judgment.

25             So, that's my ruling.

NB25rob2                          Harvey – Redirect

1              MR. SCHOENSTEIN:  Thank you.

2              MR. MACURDY:  Your Honor, when might you take the

3      mid-morning break?

4              THE COURT:  Let's go for about another 15 minutes.

5              MR. MACURDY:  OK.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2      BY MR. MACURDY:

3      Q.  Mr. Harvey, do you recall yesterday we discussed Canal's

4      policy regarding employee complaints of discrimination and

5      harassment in the workplace?

6      A.  Yes.

7      Q.  And Canal does in fact have a policy?

8      A.  I believe so, yes.

9      Q.  And do you recall when that was implemented?

10     A.  Well, I know that they had always had a policy of some sort

11     through the prior HR, the Tribeca Enterprises, and that was in

12     mid-2018 there was a new policy put in place.

13              MR. MACURDY:  Mr. Kelly, can we pull up Plaintiff's

14     Exhibit 61?

15     Q.  Sir, this is that Canal Production's non-discrimination and

16     anti-harassment policy?

17     A.  I wouldn't know.  I don't know the document.  I don't have

18     any reason to doubt it, I just don't know it.

19     Q.  You're Canal's general counsel?

20     A.  I am.

21     Q.  And matters like non-discrimination and anti-harassment

22     fall under your purview?

23     A.  It can rise to that level.  There is a policy as, again,

24     you have a policy up, I believe the reporting person was to

25     report to Chase Robinson but I don't even know that.

1          THE COURT:  So what you are being shown is not yet in

2     evidence so you are not to read from a document that is not in

3     evidence, you are just to answer the questions that the counsel

4     asks you.

5          THE WITNESS:  Understood.

6     BY MR. MACURDY:

7     Q.  So you have never seen this document that is Canal's

8     non-discrimination and anti-harassment policy?

9     A.  I'm sure it was sent to me as an attachment in an e-mail or

10    I may have physically been handed it but I certainly have never

11    reviewed it.

12    Q.  So, as Canal's general counsel you never reviewed the

13    company's non-discrimination and anti-harassment policy?

14    A.  No.  They paid an employment law firm to handle it and

15    assigned a partner from the employment law section that dealt

16    with this that would have done all of that.

17    Q.  Isn't it true -- let's back up a second.  You testified

18    yesterday --

19          MR.. MACURDY:  If your Honor would permit, I would

20    like to pull up the certified transcript of a couple lines of

21    Mr. Harvey's testimony from yesterday.

22          THE COURT:  OK.  You may do so.

23          MR. MACURDY:  Mr. Kelly, can you provide me with the

24    lines -- here it is, your Honor, it is 636, lines 11 to 15.

25    BY MR. MACURDY:

1    Q.  Mr. Harvey, yesterday you testified here in court:

2    "Q  In 2018, you were the person to investigate complaints of

3    discrimination and harassment?

4    "A  I don't know if that's true.

5    "Q  So when did you become the person?

6    "A  I don't know if I ever, quote, became the person."

7              Do you remember that from yesterday?

8              MR. DROGIN:  Objection.  It is improper impeachment.

9              THE COURT:  Overruled.  He is not impeaching the

10   witness.

11             Why don't I give the jury and instruction with respect

12   to impeachment if you will give me a second.  So, members of

13   the jury, you have asked the question.  Impeachment of a

14   witness refers to the process of discrediting or undermining

15   the credibility of a witness during trial by presenting

16   evidence or asking questions that contradict their testimony or

17   reveal a bias, inconsistency, or falsehood in their statement.

18   It is a common strategy used by lawyers to cast doubt on the

19   reliability of a witness' testimony.  The word "impeachment" is

20   important because attorneys may use evidence for the limited

21   purpose of impeaching a witness.  Even though that evidence

22   would not ordinarily be admissible as evidence, even though

23   those statements are not admissible as evidence, they're

24   admissible solely for the purpose of undermining the witness'

25   testimony.  As I understand what counsel is doing here, he is

1  just trying to situate the witness in terms of his prior

2  testimony in order to then ask some follow-up questions.

3          Am I correct about that?

4          MR. MACURDY:  Yes, your Honor.

5  BY MR. MACURDY:

6  Q.  So my question is, sir, do you recall giving this testimony

7  yesterday?

8  A.  I do.

9          MR.. MACURDY:  And now, your Honor, I would like to

10  read from his deposition.

11          THE COURT:  What page and line?

12          MR. MACURDY:  Day two, page 298, starting at 21.  And

13  context, your Honor, for up to 299, line 22.  Or I can do the

14  final Q&A.

15          THE COURT:  Tell me what you are wanting to do and

16  then we will see if there is an objection.

17          MR. MACURDY:  I will focus, your Honor, on page 299,

18  line 17 to 22.

19          THE COURT:  Any objection?

20          MR. DROGIN:  No objection.

21          THE COURT:  Go ahead.

22          MR. MACURDY:  (reading)

23  "Q  Under Canal's policy, if Ms. Robinson was the person

24  complaining of discrimination or harassment, who was authorized

25  to investigate those allegations?

1    "A   I was, through Mr. De Niro."

2              Is that your testimony, sir?

3    A.   Yes.

4    Q.   And, sir, are you aware that under Canal's policy you were

5    required to create written documentation of the final

6    resolution of any complaint and corrective action after

7    complaint of discrimination or harassment?

8              MR. DROGIN:  Objection.

9              THE COURT:  Sustained.

10             MR. MACURDY:  Basis, your Honor?

11             THE COURT:  Assuming facts not in evidence.  Framing

12   of it:  Are you aware.  You can ask wasn't it the case.

13   BY MR. MACURDY:

14   Q.   Well, wasn't it the case, sir, that you were required,

15   under Canal's anti-discrimination policy, to create written

16   documentation including the final resolution of any complaint

17   and any corrective action when you undertook an investigation?

18   Right?

19   A.   I'm not sure of that.

20   Q.   And isn't it also the case that after doing an

21   investigation you were required, under the policy, to notify

22   the complainant and the relevant parties about the final

23   results of an investigation?

24   A.   Again, I'm not sure of that.

25             MR. MACURDY:  Your Honor, I would like to read from

1    Mr. Harvey's deposition at page 300, starting line 17, to 301,

2    line 22.

3                UNIDENTIFIED SPEAKER:  Which day?

4                MR. MACURDY:  Day two.

5                THE COURT:  Any objection?  You may do so.

6                MR. MACURDY:  What is on the screen I don't think is

7    correct.  Perhaps it is day one.  My apologies.

8                May I proceed, your Honor?

9                THE COURT:  Yes.

10                MR.. MACURDY:  (reading)

11    "Q  Under Canal's policy, if an employee complained of

12    discrimination or harassment, Canal was generally supposed to

13    create written documentation of the investigation including the

14    final resolution of a complaint and any corrective actions,

15    correct?

16    "A  Yup."

17    A.  Yes.  Oh.  I'm sorry.

18    "Q  Under Canal's policy, if an employee complained of

19    discrimination or harassment, Canal was generally supposed to

20    promptly notify the complaint and the individual about who the

21    complaint was made, about the final determination?

22    "A  Yep.

23                You gave that testimony, sir?

24    A.  Yes.

25    "Q  Under Canal's policy, retaliation was prohibited against

1    the individual who reported an allegation of harassment or

2    discrimination, correct?

3    "A   That is correct.

4    "Q   Under Canal's policy, if the employee complained of

5    discrimination or harassment, was Ms. Robinson to whom could

6    she have presented her complaint to?

7    "A   To me."

8          That was your testimony, sir?

9    A.   Yes.

10   Q.   Sir, you didn't take any of the steps listed there in

11   addressing Ms. Robinson's complaint of harassment to you --

12          MR. DROGIN:  Objection.

13   Q.   -- in March of 2019?

14          THE COURT:  Sustained.

15   Q.   Sir, are you aware that at the time Ms. Robinson departed

16   Canal she worked from her home in New York City?

17   A.   Was I aware that Ms. Robinson had ever worked out of her

18   home?  Yes.

19   Q.   She was based out of her home in 2019 rather than out of

20   Canal's office, correct?

21   A.   I don't know if that's correct.  I know she worked from

22   home and I know she worked from the office so I'm not sure,

23   when you say "based out of" what you mean.

24   Q.   So you are not aware that she worked most days out of her

25   house in 2019, correct?  Is that what you are saying?

1    A.  I wouldn't know where she was on any particular day.

2    Q.  I just want to be clear, sir.  You are sitting here, right

3    now, not aware that Ms. Robinson had an arrangement with

4    Mr. De Niro that she could work out of her home in New York in

5    2019?

6    A.  I knew Ms. Robinson worked from home occasionally as she

7    worked from the office, too.  What specific understanding or

8    arrangement, I don't know the specifics.  I know she worked

9    from home a lot.

10   Q.  Well, you were in court when Mr. De Niro testified, right?

11   A.  I was.

12   Q.  And you heard him testify about that?

13   A.  Yes, I did.

14   Q.  So now is the first time you are learning of it?

15           MR. DROGIN:  Objection.

16           THE COURT:  Overruled.

17   A.  I know she worked from home.  You are asking about the

18   arrangements, like did she get the cable or anything like that,

19   I heard of those things, too.  I wasn't privy to any actual,

20   quote, arrangement.  There was nothing written.

21   Q.  Correct.  You were not privy to any actual arrangements

22   between Mr. De Niro and Ms. Robinson; correct?

23           MR. DROGIN:  Objection.

24           THE COURT:  Sustained.  Argumentative.  You got the

25   testimony.

NB25rob2                        Harvey - Redirect

1  Q.  So I am clear, when you heard Mr. De Niro testify about

2  that in court, that was the first time you heard of

3  Ms. Robinson being based out of her home?

4           MR. DROGIN:  Objection.

5           THE COURT:  Sustained.

6  Q.  So it is true, sir, that Ms. Robinson, in the course of her

7  work, had items stored at her home because it was her home base

8  for working for Canal; correct?

9  A.  I know we got stuff back from her from her home, so I

10 understand she had items of Canal's at her home.

11 Q.  So, sir, are you aware that in the ordinary course of her

12 business being based from her home, she had work-related items

13 stored there?

14          MR. DROGIN:  Objection.

15          MR.. MACURDY:  His awareness.

16          MR. DROGIN:  I withdraw the objection.

17 A.  Yes.  When we got the gift cards back and the safe and the

18 cash and all of those other things, I knew that they were

19 stored at Ms. Robinson's home so I'm not sure what you are

20 getting at.

21 Q.  So in no way did Ms. Robinson, on April 6, put a bunch of

22 items in a bag, to your knowledge, and bring it to her home;

23 correct?

24 A.  She had already done that prior to that day, I believe.

25 Q.  The items were there in the regular course of her business?

NB25rob2                        Harvey - Redirect

1    A.  When you say "there," where is there?

2    Q.  Sir, you would agree, after hearing Mr. De Niro's

3    testimony, that Ms. Robinson worked based out of her home in

4    2019, correct?

5              MR. DROGIN:  Objection.

6              THE COURT:  Overruled.

7    A.  When you say "based out of your home," she worked from

8    home.  I'm not sure what you mean by "based."

9    Q.  So in the ordinary course of her business, there were items

10   that would be stored at her home during 2019; correct?

11             MR. DROGIN:  Objection.

12             THE COURT:  Sustained.

13             MR. DROGIN:  Can counsel just clarify?

14             THE COURT:  Sustained.  We don't need to have speaking

15   objection.

16             MR. DROGIN:  I apologize, your Honor.

17             MR. MACURDY:  Your Honor, would now be a good time for

18   a break?

19             THE COURT:  My preference would be that you go for

20   about another 10 minutes but if, for you, if you can shorten it

21   by me taking a break now, then that's --

22             MR. MACURDY:  I could be more efficient if we take a

23   break now and come back.

24             THE COURT:  OK.  I will take that deal.

25             Members of the jury, we will take a 15-minute break

NB25rob2                           Harvey – Redirect

1    now.

2               (Continued on next page)

NB25rob2                          Harvey - Redirect

1                  (Jury not present)

2                  THE COURT:  Sir, you may step down.  See you all back

3    here by 11:00.

4                  MR. MACURDY:  Thank you, your Honor.

5                  (Recess)

6                  THE COURT:  Let's put the witness back on the stand

7    and bring in the jury.

8                  (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB3                         T. Harvey - Redirect

1          (Jury present)

2          THE COURT:  Counsel, you may continue.

3          MR. MACURDY:  Thank you.

4          Mr. Kelly, can we pull up Defendant's 10?  Can you go

5    to the next page.

6    BY MR. MACURDY:

7    Q.  Is this the letter that you sent Ms. Robinson in July 11,

8    2019, sir?

9    A.  It is.

10          MR. MACURDY:  Can you go to the second name,

11   Mr. Kelly, actually?  Highlight the top paragraph, please.

12   Q.  Sir, this is about the vacation day reimbursements,

13   correct?

14   A.  That's correct.

15   Q.  You wrote approximately four years ago you improperly

16   implemented a benefit for yourself whereby you were paid by

17   Canal for unused vacation days; isn't that right?

18   A.  That's right.

19   Q.  So you actually thought that the policy itself was

20   something that Chase made up without authorization.  Right?

21   A.  That's correct.

22   Q.  So you never spoke to Mr. De Niro about that?

23   A.  I did.

24   Q.  And Mr. De Niro told you there was no such policy?

25   A.  He did not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NB26ROB3                         T. Harvey – Redirect

1   Q.  Sir, did you review the e-mails that we've seen in this

2   case where Ms. Robinson sent Mr. De Niro for his approval at

3   each year end, 2018, 2017, 2016, approval for vacation day

4   reimbursement?

5   A.  Yes, I've seen it.

6   Q.  Your testimony here, sir, is that she created that policy

7   without his authority; is that correct?

8   A.  When you say she, I assume you mean Chase Robinson?

9   Q.  Yes, sir.

10  A.  She created the policy.  And he certainly was on e-mails,

11  et cetera, with respect to her alerting him that she had not

12  been on vacation or not taken any vacation during those

13  four years.

14  Q.  It's your testimony, sir, that your understanding is that

15  Mr. De Niro had no idea about that arrangement?

16  A.  I'm not sure what you mean by "that arrangement."

17  Q.  Is it your testimony that your reception, your

18  understanding, your observation, based on your conversation

19  with Mr. De Niro is that he was unaware of a policy whereby

20  Ms. Robinson would be reimbursed for leftover vacation days

21  from 2016 to 2018?

22           MR. DROGIN:  Objection.

23           THE COURT:  Basis.

24           MR. DROGIN:  Compound.

25           THE COURT:  Sustained.

1   BY MR. MACURDY:

2   Q.  Let's focus on 2018.  Based on your conversations with

3   Mr. De Niro, was it your understanding, sir, that he had no

4   idea about a policy whereby Ms. Robinson would be reimbursed

5   for leftover vacation days?

6   A.  At what time period?  I know you're talking about the 2018

7   time period.  But what time period are you talking about

8   Mr. De Niro's knowledge?  I wouldn't have spoken to him in 2018

9   about this.

10  Q.  I'm talking to you.  When you spoke to him before sending

11  out your June 11 letter, you spoke to him about Ms. Robinson's

12  vacation days?

13  A.  Yes.

14  Q.  And based on your conversations with him, was it your

15  understanding, sir, that he was unaware of this policy whereby

16  Ms. Robinson would be reimbursed for vacation days in 2018?

17  A.  He was aware that he received e-mails from Ms. Robinson

18  saying that she had not taken any vacation days in any

19  particular year.  He was shown that e-mail and acknowledged it

20  was sent to him.  What he didn't know is that, in fact, she had

21  gone on vacation.  He wasn't monitoring her vacation days.

22  Q.  That's not what you wrote in your letter.

23          MR. MACURDY:  Mr. Kelly, can you bring that back up?

24  Q.  You wrote, approximately four years ago, you improperly

25  implemented a benefit for yourself whereby you were paid by

1    Canal for unused vacation days; isn't that right, sir?

2    A.  Yes, it is.

3    Q.  Isn't that different than what you just said?

4    A.  They are two different things.

5    Q.  You stand by your statement in this letter that she

6    improperly implemented the benefit without Mr. De Niro's

7    approval?

8    A.  You keep trying to condition your question on Mr. De Niro's

9    approval.  I'm saying she improperly instituted that benefit.

10   She told him the benefit was for everyone when, in fact, it was

11   for her and Michael Kaplan alone.

12              MR. MACURDY:  Mr. Kelly, can we bring up Plaintiff's

13   36B in evidence?  It's in evidence, so it can be published to

14   the jury.

15   Q.  You have seen this e-mail.  Right?

16   A.  Yes, I have.

17   Q.  This is December 2018.

18              You can actually zoom out, Mr. Kelly.

19              And Ms. Robinson is sending Mr. De Niro bonuses and

20   vacation day payback -- if you grab the last page, Mr. Kelly --

21   for Chase Robinson and Michael Kaplan, right?

22   A.  I see that, yes.

23   Q.  Mr. De Niro writes back, okay.  B.

24   A.  Yes.

25   Q.  Ms. Robinson writes with a question, meaning these amounts

1   are okay, and I'll submit them.  Right?

2   A.  Yes.

3   Q.  And he writes back yes?

4   A.  Okay.

5   Q.  How many days in 2018 did Ms. Robinson actually take based

6   on your investigation, as you call it, actually take in 2018?

7   A.  I believe -- I don't have the exact dates with me on the

8   stand, but she took plenty of vacations.  In 2018, I know there

9   were trips to, for example, Los Angeles for a four-day trip

10  relative to her stay in Los Angeles at the Montage Hotel on

11  Canal's dime.

12  Q.  Any of those weekend days?

13  A.  Yes.

14  Q.  Do those count as vacation days?

15  A.  Well, we count them, Friday, Monday, and she came back

16  early.  It was actually Tuesday she was supposed to be in LA,

17  but she had to rush back because she was going to London on

18  Wednesday of that week.  So then take the next two weeks after

19  that, then you're already getting close -- very close to how

20  many days does she have?  23.

21  Q.  So to be clear, from your testimony, two days plus another

22  two weeks is the amount of vacation she took in 2018?

23  A.  No.  There was more than that.

24  Q.  More than two weeks and two days?

25  A.  Yes.

1          MR. MACURDY:  Your Honor, I'd like to read from

2    Mr. Harvey's deposition.  I believe it's Day 1, your Honor.

3    It's Page 227.  No, it's Day 2.  I apologize.  227, Lines 13 to

4    23.

5          THE COURT:  Any objection?

6          MR. DROGIN:  None.

7          THE COURT:  All right.  You may do so.

8    BY MR. MACURDY:

9    "Q. Any date when Canal claims Ms. Robinson was on vacation in

10   2018?

11   "A. I need a calendar.  But the second week in July, she went

12   to London again on vacation.  She was also in Spain and would

13   have been -- on October 3, 2018, she is on vacation.  I'm

14   sorry.  We are in '18.  Yeah, so during that time period in

15   October and July of 2018."

16          Did you hear that testimony, sir?

17   A.  Oh, yes.

18   Q.  So you identified a week in July and a day in October,

19   correct?

20   A.  That's correct.

21   Q.  So six weekdays?

22   A.  I'd have to look at a calendar.

23          MR. MACURDY:  Can we pull up DX10 again, Mr. Kelly?

24   Highlight the portion on the LA trip.

25          MR. DROGIN:  Is it in evidence?

1              MR. MACURDY:  It is in evidence.

2              THE COURT:  It's DX10A.

3              MR. MACURDY:  Thank you, your Honor.

4              Next page, please.  Bottom half.

5    BY MR. MACURDY:

6    Q.  Sir, you write in that second paragraph about how

7    Ms. Robinson went to LA to deal with Taxi Driver books, right?

8    A.  Yes.

9    Q.  And based on your investigation is what you believed the

10   primary purpose of her trip there to be, correct?

11   A.  That's incorrect.

12   Q.  That's incorrect?

13   A.  The primary purpose of her visit was to attend a birthday

14   celebration and pick up the tab at Nobu and hang outside with

15   her friends.

16   Q.  Well, you write here, you received authorization to go to

17   Los Angeles on Canal business from March 9, 2018, to March 12,

18   2018, because you said that you needed to have various people

19   autograph a number of limited edition Taxi Driver books, which

20   you didn't wish to ship.

21   A.  That's what I said, correct.

22   Q.  That's what you wrote?

23   A.  That's what I wrote, yes.

24   Q.  That was the business purpose that you believed to be the

25   primary purpose of the trip?

1    A.   That is that I -- I knew it was a personal trip.  I'm not

2    sure of your question.  That's what she told Mr. De Niro.

3    Q.   Well, sir, you heard Mr. De Niro's testimony, right?

4    A.   Yes.

5    Q.   And Mr. De Niro testified that the purpose of the trip was

6    to help Toukie Smith with a potential medical visit to LA;

7    isn't that right?

8    A.   I don't recall.  I don't dispute that.  But I know that

9    Ms. Robinson also earlier had told her she wanted to go to LA

10   because she wanted to help Toukie, and she wanted to scout a

11   hotel.

12   Q.   So was that the first time that you learned of that reason

13   for going to LA, was Mr. De Niro's testimony?

14   A.   When you say that reason, I don't know what you're talking

15   about.

16   Q.   For the purpose of scouting a hotel for Toukie Smith for a

17   potential medical visit for the March 2018 trip, was

18   Mr. De Niro's testimony here in court the first time that you

19   learned of that purpose for the trip?

20   A.   Again, I'm sorry.  I know the purpose of the trip was for

21   her to go to Amelia's birthday party.  I'm not sure what you're

22   getting at.  I know that she had also used the excuse that she

23   needed to go to LA that weekend to book -- to look at a hotel

24   for Toukie Smith; a hotel that had already been booked, a hotel

25   she didn't stay at, a hotel she didn't go see.

NB26ROB3                          T. Harvey - Redirect

1   Q.  Mr. De Niro testified, sir, in court, while you were here,

2   did he not, that he spoke with Ms. Robinson about going,

3   related to Toukie Smith, to LA.  Right?

4   A.  Sir, she said she had to go look at a hotel that was

5   already booked, and she didn't go to the hotel.  That is what

6   happened.

7   Q.  You didn't write anything about Toukie Smith in your

8   letter; did you?

9   A.  No.  Should I put down the other fraudulent statements she

10  made?  No.

11  Q.  Sir, I'd like to bring up just for the witness

12  Plaintiff's 235.  Highlight the top third or so.

13          Sir, is this an e-mail that you reviewed during your

14  investigation?

15  A.  Yes.

16  Q.  Is this Ms. Robinson writing February 28, 2018, to

17  Imbriani?  This is a travel agent.  Right?

18  A.  That's correct.

19  Q.  Okay.  We'll let you know by end of day.  Trying to

20  coordinate with a delivery to coincide with trip.  Thanks.

21          You read that during your investigation?

22  A.  I did.

23  Q.  And did you take that to mean that there was a trip, and a

24  delivery would be coordinated with it?

25  A.  No.

NB26ROB3                          T. Harvey - Redirect

1   Q.  So you didn't consider the possibility that there was a

2   purpose for the trip and then a delivery would be a secondary

3   purpose?

4            MR. DROGIN:  Objection.

5   Q.  Is that correct?

6            THE COURT:  Overruled.

7   A.  I considered all possibilities and spoke to everyone

8   involved, except Ms. Robinson.

9            MR. MACURDY:  Mr. Kelly, can you bring up Plaintiff's

10  86?

11           The left side of that page -- well, first, let me ask,

12  before you highlight it.

13  Q.  Sir, did you review this in the course of your

14  investigation, this e-mail?

15  A.  I'd have to look at it.

16  Q.  It's an e-mail for a Delta flight.

17  A.  Yes.  I've seen this.

18  Q.  And the date of this e-mail is March 9, 2018?

19  A.  I see that.

20           MR. DROGIN:  Objection.

21           THE COURT:  Overruled.  He's just identifying the

22  document.  It's not yet in evidence.

23  BY MR. MACURDY:

24  Q.  The date on it is March 9, 2018?

25  A.  It is.

NB26ROB3                           T. Harvey - Redirect

1   Q.  That's the date when Ms. Robinson went to LA, what we've

2   been talking about?

3   A.  Yes.

4           MR. MACURDY:  Mr. Kelly, can we enlarge the bottom

5   half of that page?

6           THE COURT:  This is not yet being published for the

7   jury?

8           MR. MACURDY:  Correct, your Honor.

9   BY MR. MACURDY:

10  Q.  Sir, did you review this document that shows --

11          THE COURT:  Don't say what it shows.  Ask him if he

12  reviewed it.

13  Q.  Did you review this, sir?

14  A.  I did.

15  Q.  Did you have an understanding that Ms. Robinson's flight

16  when she left on Friday, March 9, was returning at midnight on

17  Monday, March 12?

18  A.  Yes.  I've seen this, yes.

19  Q.  And on the time on this e-mail -- Mr. Kelly, if you could

20  go back up -- that was as of 9:22 on the bottom.  Right?

21  9:22 a.m.?

22  A.  Correct.

23  Q.  And were you aware in the course of your investigation that

24  the Taxi Driver books were supposed to arrive on Sunday,

25  March 11?  Are you aware of that?

NB26ROB3                          T. Harvey - Redirect

1  A.  I understand what happened with the Taxi Driver books, yes.

2          MR. MACURDY:  Mr. Kelly, can you pull up

3  Plaintiff's 402.

4  Q.  Did you review this e-mail in the course of your

5  investigation?

6  A.  I did.

7  Q.  And this is an e-mail between Ms. Robinson and the vendor

8  who would be transporting the books; is that right?

9  A.  That's correct.

10  Q.  Can you enlarge that?

11          THE COURT:  Are you asking these questions because you

12  intend to offer the document into evidence?

13          MR. MACURDY:  No, your Honor.  I'm just asking the

14  scope of his investigation.

15          THE COURT:  Okay.  You can do that without reading

16  from the document.  You can ask him if he considered the

17  document.  Although, without anybody knowing what the document

18  is, because you're not offering it, you know, it's up to you as

19  to whether it is any probative force for the moment.

20  BY MR. MACURDY:

21  Q.  So it's your testimony that you reviewed this document, and

22  your position was that the Taxi Driver books were not going to

23  be arriving while Ms. Robinson was scheduled to be in LA; is

24  that true?

25  A.  Say that again.

NB26ROB3                          T. Harvey - Redirect

1   Q.  So after reviewing this document -- you reviewed this

2   document in the course of your investigation, correct?

3   A.  I did.

4   Q.  And was it your conclusion, based on your investigation,

5   that the Taxi Driver books were not initially scheduled to be

6   in LA when Ms. Robinson was scheduled to be there?

7   A.  Well, you have to unpack that a little bit because -- and

8   this is why it was so difficult for Mr. De Niro to catch the

9   fraud.  Because initially, it starts with Toukie Smith and

10  seeing the hotel room in Santa Monica.  And then she changes

11  the story, that I'm going to give up my weekend to go to

12  Los Angeles to make sure these books get delivered.  Now,

13  ironically, she was going to Amelia Brain's birthday party,

14  Amelia was an assistant at Canal earlier and a good friend of

15  Chase's.  Prior to this week, two or three weeks prior to

16  that --

17          MR. MACURDY:  Your Honor, objection.  It's

18  nonresponsive.

19          THE COURT:  The objection is sustained.  New question.

20  BY MR. MACURDY:

21  Q.  Sir, you were in the weeds about the details of Canal's

22  operation; weren't you?

23          MR. DROGIN:  Objection.

24          THE COURT:  Overruled.

25  A.  If you mean generally was I aware of what was happening in

1   that office 7 days a week, 24~hours a day, certainly not.  Was

2   I aware generally from hearing or speaking to people, yes, but

3   I'm not sure by what you mean "in the weeds."

4   Q.  Well, you're the general counsel, right?

5   A.  Yes.

6   Q.  You are a lawyer?

7   A.  I am.

8   Q.  You wouldn't know the logistics about expenses at Canal,

9   like when credit cards versus petty cash would be used to

10  charge expenses; isn't that true?

11  A.  Only after the fact.

12  Q.  You didn't know the details about the time when

13  Ms. Robinson worked remotely from places like Spain or England?

14  A.  I'm sorry.  What do you mean by "the details."

15  Q.  Sir, from 2016, '17, '18, '19, you were not aware where

16  Ms. Robinson was physically located doing her work, correct?

17          MR. DROGIN:  Objection.

18          THE COURT:  Basis.

19          MR. DROGIN:  It's speculation.

20          THE COURT:  Overruled.

21  A.  At certain times, I certainly was, yes.

22  BY MR. MACURDY:

23  Q.  You weren't privy to phone calls that Mr. De Niro and

24  Ms. Robinson had throughout the day, correct?

25  A.  Privy to phone calls between Mr. De Niro and Ms. Robinson?

NB26ROB3                          T. Harvey - Redirect

1    Q.  Correct.

2    A.  Were we on a three-way conversation at times?  Yeah,

3    sure --

4    Q.  There were phone calls that you were not involved with --

5    A.  I'm sorry, sir.  What is it?

6    Q.  Ms. Robinson and Mr. De Niro would have phone calls that

7    you were not involved in, correct?

8    A.  Most certainly.

9    Q.  You were not in the weeds on what she was doing for him

10   every day; were you?

11   A.  Again, I just don't know what you mean by "in the weeds."

12   They are an office that does scheduling for him.  I was not

13   aware of what they were doing on a daily basis, no.

14            MR. MACURDY:  Can we pull up Defendant's 10.

15            Next page, Mr. Kelly.

16            THE COURT:  Am I correct that this is 10A.

17            MR. MACURDY:  10A, I'm sorry.

18   BY MR. MACURDY:

19   Q.  Sir, you gave testimony earlier a couple times that you

20   were not trying to get Chase Robinson.  Right?

21   A.  Yes.  I gave the testimony.  I said we were just trying to

22   get back our items, yes.

23   Q.  And you testified that no one told you from Canal to get

24   Chase Robinson.  Right?

25   A.  The only one who could have given me direction from Canal

1  is Mr. De Niro.  And he never said anything other than to get

2  his items back.

3  Q.  Isn't it true that this letter was meant to scare

4  Ms. Robinson?

5  A.  No.

6  Q.  Isn't it true that you were instructed to send this letter

7  whether it was true or not?

8  A.  Absolutely not.

9        MR. MACURDY:  No further questions, your Honor.

10        THE COURT:  Okay.  Dr. Drogin, any further

11 examination?

12        MR. DROGIN:  Very brief.

13 CROSS-EXAMINATION

14 BY MR. DROGIN:

15 Q.  You were asked some questions about Canal's harassment and

16 discrimination policy.  Under that policy, while employed, did

17 Chase Robinson ever complain to you that she believed she was

18 the victim of gender-based discrimination?

19 A.  No.

20 Q.  Same question with regard to retaliation.

21 A.  No.

22 Q.  Do you have other clients for whom you're the general

23 counsel?

24 A.  Yes.

25 Q.  As general counsel, when a client alerts you -- let me back

1    up.

2              Has a client ever alerted you that they received a

3    complaint from an employee of harassment or discrimination?

4    A.   Absolutely.

5    Q.   Do you have a policy or practice as to what you do?

6    A.   Yes.

7    Q.   What is it?

8    A.   I pick up the phone.

9              MR. MACURDY:  Objection.

10             THE COURT:  Overruled.

11   A.   I pick up the phone and call outside counsel and say, here

12   is the situation, please handle it.

13   Q.   At the time from 2016 to Ms. Robinson's resignation, did

14   Canal have outside counsel for labor and employment matters?

15   A.   They did.

16   Q.   And do you know personally whether Chase Robinson knew who

17   those counsel were?

18   A.   Yes, I do know that.

19   Q.   Do you have personal knowledge as to whether or not

20   Ms. Robinson ever interacted directly with Canal's labor and

21   employment counsel?

22   A.   Yes.

23   Q.   Ms. Cardona, can you pull you up Plaintiff's Exhibit 36,

24   please?

25             Can you scroll down to the page, please, that shows

NB26ROB3                          T. Harvey - Recross

1    vacation days for 2015?  I think it's up from there, yep.

2              MR. MACURDY:  Your Honor, is this in evidence?

3              MR. DROGIN:  It's 36.

4              MR. MACURDY:  This looks like Defendant's 36.

5              MR. SCHOENSTEIN:  Plaintiff has submitted portions of

6    36 designated as 36A, B, C.  They've chosen to break it out.

7    This Exhibit 36 is a compilation of all of those exhibits.

8              MR. MACURDY:  It includes --

9              MR. SCHOENSTEIN:  I think Mr. Drogin is offering it

10   into --

11             THE COURT:  We'll, let Mr. Drogin make the application

12   himself.  But right now, I think it's not being displayed to

13   the jury, so you're just showing it to the witness for

14   identification?

15             MR. DROGIN:  I actually thought it was in evidence.

16   So I would move it into evidence.

17             THE COURT:  Don't you need to have the witness

18   identify it first?

19             MR. DROGIN:  Forgive me, your Honor.  Again, I was

20   under the impression it was in.

21   BY MR. DROGIN:

22   Q.  Mr. Harvey, can you take a look at Plaintiff's Exhibit 36?

23   A.  Yes.

24   Q.  And have you seen it before?

25   A.  Yes.

NB26ROB3                          T. Harvey - Recross

1    Q.  When was the first time you had seen it?

2    A.  Shortly after April 6, 2019.

3    Q.  How did you come to receive it?

4    A.  I received it from Canal employees.

5    Q.  What did you understand it to be?

6    A.  It is the e-mails from Chase Robinson to Mr. De Niro and/or

7    Michael Tasch regarding unused vacation days for various

8    people.

9    Q.  From your understanding, were these e-mails taken,

10   maintained in the ordinary course of Canal's business?

11   A.  Yes.

12   Q.  In fact, if you can scroll up to the top, this particular

13   page and the next one show the amount of vacation days that

14   Ms. Robinson claimed for 2018.  This is on a separate exhibit,

15   but the same document.  Those two pages have been shown to you.

16   A.  Yes.

17   Q.  And you can go down to 2017.  Is that the same as the

18   exhibit that's already been shown to you from 2017?

19   A.  Correct.

20   Q.  Can you go down to 2016?  Is this the same document that's

21   been shown to you in this case by plaintiff's counsel?

22   A.  Yes.

23   Q.  2016?  Okay.  And then can we go down to the next one?

24              MR. DROGIN:  Your Honor, this is a document, which is

25   a compilation, that plaintiff's counsel have put together,

1   albeit they have broken it out into separate exhibits.

2              THE COURT:  You're offering it?

3              MR. DROGIN:  I am.

4              THE COURT:  Any objection?

5              MR. MACURDY:  Your Honor, I think they can certainly

6   use what's in evidence.  This one is from 2015, so I'm not sure

7   of the relevance.

8              THE COURT:  Overruled.  They are all admissions of a

9   party opponent, and it comes within the scope of the

10  plaintiff's examination.

11             So is this 36A or 36?  What is this?

12             MR. DROGIN:  I think they marked -- they had marked it

13  as 36.  So I would offer it as plaintiff's 36.

14             THE COURT:  Received.

15             (Plaintiff's Exhibit 36 received in evidence)

16             THE COURT:  Ladies and gentlemen of the jury, whether

17  it's marked as a plaintiff or defendant's exhibit should be a

18  matter of irrelevance.  Same thing as you'll hear in my final

19  instructions whether an exhibit is offered by the plaintiff or

20  the defendant is a matter of irrelevance.  Your job will be to

21  assess the evidence regardless of who offered it.

22             Go ahead.

23  BY MR. DROGIN:

24  Q.  Mr. Harvey, is it your understanding that it is

25  Ms. Robinson's contention in this lawsuit that she, in fact,

1    did not take vacation?

2              MR. MACURDY:  Objection.

3              THE COURT:  Overruled.

4    A.  That's correct.

5    BY MR. DROGIN:

6    Q.  In your letter, Defendant's 10A, you talked about plaintiff

7    having taken one day over the last four years.  Do you recall

8    that?

9    A.  I do.

10             MR. DROGIN:  If you could take a look at -- can we

11   show this to the jury now?

12             THE COURT:  Yes.

13   BY MR. DROGIN:

14   Q.  If you can take a look at the e-mail from Chase Robinson to

15   Mr. Tasch and Mr. De Niro dated December 21, 2015, do you see

16   that?

17   A.  I do.

18   Q.  It says there "Chase used one of 19 days"?

19   A.  Correct.

20   Q.  When you wrote that letter, was that the basis for you

21   saying she had used one day?

22   A.  Yes.

23   Q.  Can we go to 2016?  Can you show the witness the portion

24   where the number of vacation days appears?  Got it.

25             In 2016, plaintiff said she received zero of 19 days?

NB26ROB3                          T. Harvey - Recross

1    A.  Correct.

2    Q.  Can we go to 2017, please?  Stop, I think you went past it.

3           For 2017, Ms. Robinson claimed she used zero of

4    20 days?

5    A.  Correct.

6    Q.  Do you have any knowledge as to why plaintiff increased

7    from 19 days to 20 days?

8    A.  I don't have personal knowledge of that, no.

9           MR. DROGIN:  Can you go to 2018.

10          Stop.

11   Q.  For 2018, Chase said she used zero of 23 days.  Do you see

12   that?

13   A.  Yes, I do.

14   Q.  Do you have personal knowledge as to why plaintiff's

15   vacation allotment was increased to 23 days?

16   A.  I don't.

17   Q.  Do you have any idea why Ms. Robinson would be increasing

18   the number of vacation days each year --

19          MR. MACURDY:  Objection.

20   Q.  -- when she wasn't taking any?

21          THE COURT:  Overruled.

22   A.  I have no idea.

23   BY MR. DROGIN:

24   Q.  And to your knowledge, was Ms. Robinson paid for all of the

25   vacation days, unused vacation days she claimed for 2018, 2017,

NB26ROB3

1    and 2016?

2    A.   Yes.

3    Q.   So 23, plus 20, plus 19?

4    A.   Yes.

5            MR. DROGIN:  Nothing further.

6            THE COURT:  Nothing further?

7            MR. MACURDY:  No, your Honor.

8            THE COURT:  You're excused.

9            THE WITNESS:  Thank you, Judge.

10           (Witness excused)

11           THE COURT:  Plaintiff will call their next witness.

12           MR. MCKNIGHT:  Your Honor, we call Tiffany Chen,

13   please.

14           THE COURT:  Let's bring Ms. Chen into the courtroom.

15           Ms. Chen, please step up to the witness box.  Remain

16   standing.  My deputy clerk will swear you in.

17           MR. SCHOENSTEIN:  May I approach with water?

18           THE COURT:  Yes, you may.

19    TIFFANY CHEN,

20        called as a witness by the Plaintiff,

21        having been duly sworn, testified as follows:

22           THE COURT:  Ms. Chen may be seated.  Try to speak

23   loudly and clearly into the microphone, pause after you are

24   asked a question so the court reporter can get down both the

25   question and the answer.

1            THE WITNESS:  Okay.

2            THE COURT:  Counsel, you may inquire.

3            MR. MCKNIGHT:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. MCKNIGHT:

6    Q.  Good morning, Ms. Chen.

7    A.  Good morning.

8    Q.  Ms. Chen, you're a resident of New York City, correct?

9    A.  Yes.

10   Q.  And presently you reside with Mr. Robert De Niro, correct?

11   A.  Yes.

12   Q.  How long have you lived with Mr. De Niro?

13   A.  It's about five years now.

14   Q.  And what's your relationship with Mr. De Niro?

15   A.  I'm his girlfriend, he's my boyfriend.

16   Q.  But you're not married?

17   A.  No.

18   Q.  What's your educational background, ma'am?

19   A.  I went to Brooklyn Technical High School, and then I went

20   to CUNY Potsdam for a few years, and then I transferred back to

21   New York City to Baruch.

22   Q.  When did you meet Mr. De Niro?

23   A.  In 2014.

24   Q.  And how did you meet him, what were the circumstances?

25   A.  We worked on a movie together.

1    Q.  And you started an intimate relationship with Mr. De Niro

2    in 2017, correct?

3    A.  What do you mean by Internet relationship?

4    Q.  Intimate, intimate?

5    A.  Oh, intimate.

6            We were in a relationship.

7    Q.  You entered a relationship with Mr. De Niro while he was

8    still married, correct?

9    A.  On paper, yes.

10   Q.  And in the beginning, you concealed that relationship from

11   Mr. De Niro's family and from his office workers for some

12   period, correct?

13   A.  Can you repeat that one more time.  I missed the first

14   part.

15   Q.  And in the beginning you concealed that relationship from

16   Mr. De Niro's family and his office workers, correct?

17   A.  Yes.

18           MR. SCHOENSTEIN:  Objection.

19           THE COURT:  A little bit late, so the answer stands.

20   BY MR. MCKNIGHT:

21   Q.  In 2018, you met Ms. Chase Robinson, correct?

22   A.  Yes.

23   Q.  And Chase Robinson was working as Mr. De Niro's assistant

24   at Canal Productions, correct?

25   A.  Yes.

1    Q.  And you understood Ms. Robinson's job duties as doing

2    whatever he asked her to do in the office, whatever job she was

3    assigned to do, and whatever he asked her to do, which was in

4    the townhouse also, correct?

5              MR. SCHOENSTEIN:  Objection.

6              THE COURT:  Basis.

7              MR. SCHOENSTEIN:  Compound.

8              THE COURT:  Compound?

9              MR. SCHOENSTEIN:  Yes.

10             THE COURT:  Sustained.

11             MR. MCKNIGHT:  Pardon me, I didn't hear the basis.

12             THE COURT:  Objection is sustained as to form.

13             MR. MCKNIGHT:  Sure.

14   BY MR. MCKNIGHT:

15   Q.  Did you have an understanding of what Ms. Robinson's job

16   duties were in 2018?

17   A.  I did.

18   Q.  And you understood that her job duties were to do whatever

19   Mr. De Niro asked her to do in the office, correct?

20   A.  What do you mean by whatever?

21   Q.  Ma'am, you asked, you understood that he was supposed --

22   she was supposed to do whatever he asked her to do in the

23   office and whatever job she was assigned to do by him, correct?

24   A.  I'm confused by your use of "whatever."

25   Q.  And, ma'am, you understood that he was -- she was also

NB26ROB3                         Chen - Direct

1    supposed to do whatever he asked her to do in the townhouse,

2    correct?

3    A.  I don't understand what you mean by "whatever."

4    Q.  Could I have the deposition of Ms. Chen, Page 128, Line 2

5    to Page 129, Line 10?  I'm focusing on Page 129, Lines 5

6    through 9.

7              MR. SCHOENSTEIN:  Improper impeachment.

8              THE COURT:  Just give me a second.

9              MR. MCKNIGHT:  Would you please capture the last --

10   the prior page, sir.  Thank you.

11             THE COURT:  Overruled.  I'll permit it.

12   BY MR. MCKNIGHT:

13   Q.  Ms. Chen, your deposition was taken on March 30, 2022,

14   correct?

15   A.  Yes.

16   Q.  And at that time you were under oath, correct?

17   A.  Yes.

18   Q.  All right.  And at that time, you were asked the question:

19             Ms. Chen, what did you understand Ms. Robinson's job

20   responsibilities to be --

21   A.  Mm-hmm.

22   Q.  -- as Mr. De Niro's assistant?

23   A.  Mm-hmm.

24             THE COURT:  Ma'am, ma'am, hold on a second.  You have

25   to answer either yes or no.

1          THE WITNESS:  Okay.  I'm sorry.

2          THE COURT:  Mm-hmm does not work.

3          Go ahead, Counsel.

4   BY MR. MCKNIGHT:

5   Q.  Answer:  Whatever he asked her to do in the office, and

6   whatever job she was assigned to do, which was the townhouse,

7   which she stepped into very willingly and would not go away.

8   A.  Yes.

9   Q.  Did you give that answer?

10  A.  Yes, I did.

11  Q.  Was it true?

12  A.  Yes.

13  Q.  Thank you.

14          So you would agree, then, that her job was to do

15  whatever Mr. De Niro asked her to do, then?

16  A.  Within professional reasoning, yes.

17  Q.  Were you aware that Mr. De Niro asked her to manage his

18  schedule?

19  A.  Yes.

20  Q.  All right.  And were you aware that she did this?

21  A.  Yes.

22  Q.  Were you aware that Mr. De Niro asked her to manage his

23  contact list?

24  A.  Yes.

25  Q.  And were you aware that she did this?

NB26ROB3                          Chen - Direct

1    A.  Yes.

2    Q.  Were you aware that Mr. De Niro asked her to field media

3    requests on his behalf?

4    A.  I'm sorry, repeat that again.

5    Q.  Were you aware that Mr. De Niro asked her to field media

6    requests on his behalf?

7    A.  To feel media requests?

8    Q.  Media, media, M-E-D-I-A, like press?

9            THE COURT:  I think it may have come across as feel,

10   maybe try it again.

11   BY MR. MCKNIGHT:

12   Q.  Oh, field, field as in receive and accept, I apologize.

13   Those were the words that were used.

14   A.  Just repeat the question one more time.

15   Q.  I'll be happy to, I'm sorry.

16           Were you aware that Mr. De Niro asked her to receive

17   and process media requests on his behalf?

18   A.  I wasn't aware of anything that specific.

19   Q.  All right.

20           Were you aware that Mr. De Niro asked her to hire

21   other assistants at Canal Production?

22   A.  Yes.

23   Q.  And were you aware that she did this?

24   A.  Yeah, yes.

25   Q.  Were you aware that Mr. De Niro asked her to arrange his

1    travel on private jets?

2    A.  Yes.

3    Q.  And were you aware that she did this?

4    A.  Yes.

5    Q.  Were you aware that Mr. De Niro asked her to scout hotels

6    for him whenever he had to shoot on location?

7    A.  Yes, he asked her, but I also understood that the other

8    assistants did much of the work.

9    Q.  Excuse me.  I'm just asked you a simple question.

10            MR. MCKNIGHT:  Move to strike the other part as

11   unresponsive, your Honor.

12            THE COURT:  No, I think it's actually responsive the

13   way in which you asked the question.

14            MR. MCKNIGHT:  Fair enough.

15            THE COURT:  So the witness can finish the answer.

16            MR. MCKNIGHT:  Very well, your Honor.

17            THE COURT:  So you were saying you understood the

18   other assistants did much of the work.  Will you finish that,

19   please?

20            THE WITNESS:  Yeah, he would direct her and she would

21   delegate to other people.

22            MR. MCKNIGHT:  All right.

23   BY MR. MCKNIGHT:

24   Q.  Were you aware that Mr. De Niro asked her to vet vacation

25   rentals for him?

NB26ROB3                         Chen - Direct

```
 1   A.  I was -- I never went over anything that specifically with

 2   him.

 3   Q.  All right.

 4           Were you aware that Mr. De Niro asked her to walk

 5   through apartment rentals for him to review?

 6   A.  Yes.

 7   Q.  Were you aware that Mr. De Niro asked her to research

 8   schools for his children?

 9   A.  No.

10   Q.  Were you aware that Mr. De Niro asked Ms. Robinson to

11   assist him with vetting housekeepers?

12   A.  Yes.

13   Q.  Were you aware that Mr. De Niro asked her to research and

14   help purchase plants for his home?

15   A.  I don't think it was said that way.  There was no research

16   for getting plants for the house.  She wanted to go to -- she

17   wanted to be everywhere with him shopping, so she would just go

18   to the store when he said, "Let's go look at plants."

19   Q.  Were you aware that Mr. De Niro asked her to do that?

20   A.  No.

21   Q.  Were you aware that Mr. De Niro asked her to pick out

22   photos to be framed in his home?

23   A.  No.

24   Q.  Were you aware that Mr. De Niro asked her to run errands

25   for him and his family?
```

1   A.  Yes.

2   Q.  Were you aware that Mr. De Niro asked her to remind him

3   about gifts for certain people?

4   A.  That was something the whole office knew.

5   Q.  Were you aware that Mr. De Niro asked Ms. Robinson to do

6   this?

7   A.  He had.

8   Q.  Were you aware that Mr. De Niro asked Ms. Robinson to help

9   him shop for gifts?

10  A.  She volunteered to do that on her own.

11  Q.  Were you aware that he asked her to help him shop?

12          THE COURT:  I think the answer was responsive.  Next

13  question.

14          MR. MCKNIGHT:  All right.

15  BY MR. MCKNIGHT:

16  Q.  Were you aware that Mr. De Niro asked Ms. Robinson to send

17  flowers to people for him?

18  A.  Yes.

19  Q.  All right.  Were you aware that Mr. De Niro asked

20  Ms. Robinson to do various tasks for his former partner,

21  Toukie Smith?

22  A.  I know she volunteered to do that.

23  Q.  You're not aware that Mr. De Niro asked her to do it?

24  A.  From how I understand it and how Chase had spoke of it, she

25  volunteered.

NB26ROB3                          Chen - Direct

1   Q.  So you're saying that Mr. De Niro did not ask her to do

2   that?

3   A.  That's not a discussion I had with him.

4   Q.  Are you aware that Mr. De Niro asked Ms. Robinson to help

5   collect evidence to use in divorce proceedings against

6   Ms. Hightower?

7   A.  No.

8   Q.  Are you aware that Mr. De Niro asked Ms. Robinson to

9   communicate with his divorce attorney?

10  A.  I can't remember that detail.

11  Q.  Are you aware that Mr. De Niro asked Ms. Robinson to go to

12  doctor's appointments with him?

13  A.  She volunteered.

14  Q.  Are you aware of whether Mr. De Niro specifically asked her

15  to do this, ma'am?

16  A.  No.

17  Q.  Are you aware if Mr. De Niro asked Ms. Robinson to

18  accompany him to the emergency room?

19  A.  No.

20  Q.  Are you aware of whether Mr. De Niro asked Ms. Robinson to

21  complete medical forms for him?

22  A.  I never had that discussion with him regarding her

23  specifically.

24  Q.  Are you aware that Mr. De Niro asked Ms. Robinson to fill

25  out medical forms and list herself as the emergency contact?

NB26ROB3                              Chen - Direct

1    A.  No, I never had that discussion with him.

2    Q.  So you're not aware of whether he made that request of her?

3    A.  No.

4    Q.  Now, you are aware that beginning in 2008 [sic],

5    Ms. Robinson, at least to your knowledge, had been involved in

6    setting up the townhouse for --

7    A.  2008?

8    Q.  2018.  I apologize.  I misspoke.

9            THE COURT:  You said 2008.

10           MR. MCKNIGHT:  I realize I made a mistake.

11   BY MR. MCKNIGHT:

12   Q.  In 2018, she was involved in setting up the townhouse,

13   correct?

14   A.  Yes.

15   Q.  And you're aware that Mr. De Niro asked her to assist in

16   setting up the townhouse?

17   A.  Yes, that I am aware of.

18   Q.  And you're aware that Mr. De Niro asked Ms. Robinson to

19   help with the decoration of that home?

20   A.  I know she volunteered that.

21   Q.  Different question.  Are you aware whether Mr. De Niro

22   specifically asked her to do that?

23   A.  No.

24   Q.  Are you aware whether Mr. De Niro asked her to order

25   furniture for him and arrange for furniture delivery at the

1  townhouse?

2  A.  Yes.

3  Q.  Are you aware that Mr. De Niro asked her to coordinate

4  deliveries to the townhouse?

5  A.  I never had this specific discussion with Bob, but I know

6  she volunteered all the time to do these things and --

7  Q.  Different question.

8  A.  -- to be there.

9  Q.  Are you aware of whether Mr. De Niro specifically asked her

10  about this?

11  A.  No.

12  Q.  Are you aware whether Mr. De Niro asked her to unpack his

13  belongings at the townhouse?

14  A.  She was complaining.  Yeah, I remember she was complaining

15  about it, and I had said to her, don't bother doing it then.

16  But she never -- Bob never told me that specifically.  And she

17  never said that he had asked her.

18  Q.  All right.  I'm asking you whether you have any knowledge

19  of whether Mr. De Niro asked her to do this?

20  A.  No.

21  Q.  Do you have any knowledge as to whether Mr. De Niro asked

22  her to make photo albums for his children's birthday?

23  A.  No, she always volunteered that.

24  Q.  I'm asking you whether you have any knowledge of whether

25  Mr. De Niro made the request, ma'am?

1    A.  No.

2    Q.  Are you aware of whether Mr. De Niro asked Ms. Robinson to

3    make photo cards for his former wife?

4    A.  No, that's not a discussion we had.

5            MR. MCKNIGHT:  Your Honor, at this time I'd like to

6    look at Plaintiff's Number 2.  There's no objection to it.

7            THE COURT:  Okay.  Is PX2 in evidence?

8            MR. MCKNIGHT:  No, your Honor.  I'd like to move it

9    into evidence.

10           THE COURT:  Any objection?

11           MR. SCHOENSTEIN:  Nope.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 2 received in evidence)

14   BY MR. MCKNIGHT:

15   Q.  Ms. Chen, I ask you to take a look at what's been marked as

16   Plaintiff's Exhibit Number 2?

17   A.  Mm-hmm.

18   Q.  Do you recognize it?

19   A.  Yes.

20   Q.  This is a text message dated -- text messages dated

21   October 26, 2018.

22   A.  Mm-hmm.

23   Q.  Between you and Ms. Robinson.  Correct?

24   A.  Mm-hmm.

25           THE COURT:  Again, ma'am, you have to --

 1              THE WITNESS:  Oh, yes.  I'm sorry.  I apologize.  Yes.

 2     BY MR. MCKNIGHT:

 3     Q.  All right.  And looking at the text messages, the blue

 4     section is the section from Ms. Robinson and the gray section

 5     is you, correct?

 6     A.  Mm-hmm, yes, sorry, yes.

 7     Q.  And so as I look at this particular document, I see:

 8     Great, thanks.  Bob told me about my name on things, et cetera.

 9              And you wrote that section.  The section starting

10     "Great, thanks.  Bob told me about my name on things."  You

11     wrote that?

12     A.  Yes.

13     Q.  Can I go down to the next gray section, please?

14              And, Ms. Chen, you wrote this part too, correct?

15     A.  Yes.

16     Q.  And so you wrote:  Who the hell are you?

17     A.  Yes.

18     Q.  "We need to repopulate the planet with your DNA."

19              You wrote that, correct?

20     A.  Yes, I did.

21     Q.  And you wrote:  We'll totally clear out the closet Sunday,

22     thanks for stashing the baking soda.  You and Bob have done the

23     craziest design job together.  I wish we had the whole process

24     on tape.

25              You wrote that?

1    A.  Mm-hmm, yes.

2    Q.  You also wrote:  You guys, guys have such a great dynamic

3    and chemistry.  It comes across so nicely in everything you two

4    do together.

5            You wrote that too, didn't you?

6    A.  Yes.

7    Q.  You wrote that too?

8    A.  Yes, yes.

9    Q.  You also wrote:  There's zero way on earth I could have

10   done anything you've done.  It's all so amazing.

11           You wrote that too?

12   A.  Yes, yes.

13   Q.  "Really fun seeing everything come together that the two of

14   you have been working so much on."

15   A.  Yes.

16   Q.  "Every time I see how great it all is, I completely feel

17   such gratitude and relief for having not been involved."

18           You wrote that too?

19   A.  Yes.

20   Q.  And then you wrote:  He speaks so glowingly of you and it's

21   nice to see that not even his most complimentary moments have

22   done you justice.

23           You wrote that too, right?

24   A.  Yes.

25   Q.  Ms. Chen, do you need some water, ma'am?

NB26ROB3                         Chen – Direct

1    A.  I'm okay.  I just have a cold.  I'm negative, though.  I

2    tested, so everyone knows.

3    Q.  Okay.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB25rob4                        Chen - Direct

1    BY MR. McKNIGHT:

2    Q.  Ms. Chen, when you wrote this, did you believe what you

3    were saying?

4    A.  Yes and no.  I wrote it because she was -- she was very

5    strange from the beginning and always very uncomfortable to be

6    around.  I was killing her with kindness in this because there

7    was a lot she had done --

8    Q.  I have a different question for you.

9           THE COURT:  No, let her finish the answer.

10   A.  No, I was killing her with kindness here.  There was a lot

11   of good that got initiated with her help but I started to see,

12   from the very beginning, that she was very angry all the time

13   in a certain way and just sort of mean-spirited and bitter, and

14   I thought maybe I have to just try to be a little nicer.  I am

15   new coming into this whole dynamic and I have to show gratitude

16   for what they had done together, how they had worked together.

17   Bob had always spoken really, really well of her.  I had not

18   seen evidence of this.  She was a hot mess all the time, her

19   scheduling was completely off with everything so there were

20   frustrations because things weren't getting done in the

21   townhouse, we were delayed several weeks moving in because she

22   kept promising that the place was going to be ready and then,

23   when I finally saw it, when we were given our first move-in

24   date, there was no furniture there.

25          MR. McKNIGHT:  Your Honor --

NB25rob4                        Chen – Direct

1    A.  So this was an attempt that I was trying to smooth things

2    over, letting her know I do recognize the things that you have

3    done.  You can chill out, and if we work together, maybe we

4    would get more done.

5    Q.  What I want to figure out is what is true and what is false

6    in this particular passage you wrote.  You wrote:  We need to

7    repopulate the planet with your DNA.

8            Is that true or false?

9    A.  False.

10   Q.  When you wrote:  You and Bob have done the craziest design

11   job together and wish we had the whole process on tape.

12           Is that true or false?

13   A.  I was being sarcastic.

14   Q.  So it's not true?

15   A.  I said that -- well, everything that she was involved with

16   was -- I'm sorry, I have trouble speaking a bit because I'm

17   getting over facial paralysis after giving birth so sometimes I

18   will twitch or it is hard for me to say certain words -- but

19   she -- everything was a hot mess that she had done.  I know

20   that there was a lot that they had worked on together.  I said

21   that it wasn't -- it was kind of amazing what a crazy mess she

22   was making of everything.

23   Q.  Ma'am, I want to focus on what sentences are true and what

24   sentences are false.

25   A.  OK.

NB25rob4                         Chen - Direct

Q.  You will have a chance to explain?

A.  OK.

Q.  I just want to know what is true and what is false in here.

          THE COURT:  So if you can answer true or false, then

answer it.  If you can't answer true or false, then say you

can't answer true or false.

          THE WITNESS:  OK.

Q.  You said:  You guys, guys, have such a great dynamic and

chemistry, it comes across so nicely in everything you do, you

two do together.

A.  False.

Q.  True or false?

A.  False.

Q.  There is zero way on earth I could have done anything you

have done -- could done anything you have done.

          Is that true or false?

A.  True.

Q.  It is all so amazing.

          True or false?

A.  True.

Q.  Really fun seeing everything come together that the two of

you have been working on so much on.

          True or false?

A.  Sarcastic, but true.

Q.  Every time I see how great it all is, I completely feel

NB25rob4                        Chen - Direct

1    such gratitude and relief for having not been involved.

2            True or false?

3    A.  Sarcastically true.

4    Q.  He speaks so glowingly of you and it is nice to see that

5    not even his most complimentary moments have done you justice.

6            True or false?

7    A.  Very sarcastically true.

8    Q.  You are really as great as he has built you up to be and

9    then some.

10           True or false?

11   A.  Very, very sarcastic, but true in my sarcasm.

12   Q.  Now, when Mr. De Niro spoke glowingly of Ms. Robinson, he

13   said that he was very happy that she always seemed to get the

14   job done; isn't that true?

15   A.  Yes.

16           MR. McKNIGHT:  Could I have Plaintiff's Exhibit

17   no. 163, please?

18           MR. SCHOENSTEIN:  No objection.

19           THE COURT:  Received.  I take it you are offering it?

20           MR. McKNIGHT:  Yes, your Honor.

21           THE COURT:  It is received.

22           (Plaintiff's Exhibit 163 received in evidence)

23   BY MR. McKNIGHT:

24   Q.  Now, Ms. Chen, this is another text message between you and

25   Ms. Robinson, correct?

NB25rob4                        Chen - Direct

1    A.  Yes.

2    Q.  And the gray box has the things that you were saying,

3    correct?

4    A.  Yes.

5    Q.  Now, let's go through this one.

6    A.  OK.

7    Q.  With all of the entertaining going on here we ended up

8    needing more cleaning supplies and garbage bags, which got us

9    to talking about when we get a housekeeper, and the fact that

10   you do absolutely everything and what made sense going forward.

11        Now, when you said:  Which got us to talking about

12   when we get a housekeeper and the fact that you do absolutely

13   everything and what made sense going forward; is that true or

14   false?

15   A.  Half true, half false.

16   Q.  Which part is half true?  Which part is half false?

17   A.  Well, we are talking about when we get a housekeeper,

18   that's true.  The part that is false is that she does

19   absolutely everything.

20   Q.  Bob thought it might be better for me to start getting the

21   necessary household supplies so that I would start to

22   understand more about this place so that when we got a

23   housekeeper I would just -- just have a better handle on

24   everything.

25        True or false?

NB25rob4                        Chen - Direct

1    A.  True.

2    Q.  We were just thinking out loud and didn't know if it made

3    more sense for you to tell me what the current housekeeper

4    needs to get me more familiar with what we anticipate the

5    natural flow to be.

6            True or false?

7    A.  True.

8    Q.  And then there is a sentence at the bottom:  Or do you

9    think we should keep things the way they are to avoid any

10   confusion?

11           True or false?

12           MR. SCHOENSTEIN:  Objection.

13           THE COURT:  Give me one moment.  Basis.

14           MR. SCHOENSTEIN:  True or false doesn't make any sense

15   with that sentence.

16           THE COURT:  Sustained.

17   BY MR. McKNIGHT:

18   Q.  Did you believe that sentence when you wrote it?

19   A.  What do you mean by that?

20   Q.  You said:  Or do you think we should keep things the way

21   they are to avoid any confusion?

22           You were writing that to Ms. Robinson.  I'm asking you

23   whether you believed that statement when you made it.

24           MR. SCHOENSTEIN:  Same objection.

25           THE COURT:  Same ruling; sustained.

1    Q.  I also understand that it just might be easier for things

2    to stay the way they are because it will be a little while

3    longer before things become more normal.

4            Did you believe that when you wrote that?

5            MR. SCHOENSTEIN:  Objection.

6            THE COURT:  Basis.

7            MR. SCHOENSTEIN:  Same.

8            THE COURT:  Overruled.

9            You can answer that.

10           THE WITNESS:  Could you ask me that again, please?

11   BY MR. McKNIGHT:

12   Q.  I'm asking you whether you believe the last section that is

13   highlighted there.

14   A.  Yeah.  Yes.

15           MR. McKNIGHT:  Can we have Plaintiff's Exhibit 171,

16   please?

17           THE COURT:  Are you going to be offering 171?

18           MR. McKNIGHT:  I will be.

19           MR. SCHOENSTEIN:  No objection.

20           THE COURT:  171 is received.

21           (Plaintiff's Exhibit 171 received in evidence)

22           THE COURT:  Ms. Chen, if you need a break at any time

23   because of your cold, you will let us know.

24           THE WITNESS:  Thank you.

25   Q.  Directing your attention to the entry at 12/3/2018.  First

NB25rob4                          Chen – Direct

1    let me identify the document.  I apologize.  Plaintiff's

2    Exhibit 171 are text messages between you and Mr. De Niro,

3    correct?

4    A.  Yes.

5    Q.  Now, we are going to have a series of these so I want to

6    ask you a question about that.

7    A.  OK.

8    Q.  In your text messages with Mr. De Niro, you were being

9    truthful in these text messages, correct?

10            MR. SCHOENSTEIN:  Objection.

11            THE COURT:  Sustained.

12   Q.  Mr. De Niro is your boyfriend, correct?

13   A.  Yes.

14   Q.  And you intended to be honest with him in your

15   communications, correct?

16            MR. SCHOENSTEIN:  Objection.

17            THE COURT:  Sustained.

18   Q.  Directing your attention to that section on the next page

19   there, please, 12/3/2018:  Spoke with Chase.  She gave me the

20   locksmith info to make an appointment.  Let's discuss.  Also

21   asked her to arrange with Force One to put the gym furniture

22   back tomorrow since they are already coming back to return the

23   table.  We also need to discuss everything happening later in

24   the week.

25            Now, here you are talking about working with Chase on

NB25rob4                          Chen - Direct

1    a few items that involve the townhouse; is that correct?

2    A.  Yes.

3    Q.  That's on 12/3/2018; right?

4    A.  Yes, I see that.

5    Q.  Any problem with the fact that she gave you the locksmith

6    info so that you could make an appointment?

7    A.  What do you mean by that?

8    Q.  Well, she gave you some information and she helped you out;

9    is that accurate?

10   A.  I don't -- I think at this point whenever I asked her for

11   information I would often find out the information was not

12   accurate so --

13   Q.  Well, was this information accurate?

14            THE COURT:  Was the witness done with her answer?

15            MR. McKNIGHT:  I'm sorry.  I apologize.

16            THE COURT:  You can't cut off each other.

17            THE WITNESS:  I was starting to learn that I had to be

18   careful with her because she would give you the wrong

19   information sometimes so I would get the information, go over

20   it with Bob, but there was always -- you know, we always sort

21   of knew that we would probably have to do a little bit more

22   legwork because she was becoming very difficult.

23            MR. McKNIGHT:  Objection to the going over with Bob

24   and what they said, your Honor.

25            THE COURT:  That's sustained.

NB25rob4                    Chen - Direct

1              MR. McKNIGHT:  I would like to move on to Exhibit

2    no. 172.  It has already been admitted into evidence, your

3    Honor.

4              THE COURT:  OK.

5    BY MR. McKNIGHT:

6    Q.  Now, Ms. Chen, this is a text message dated 12/6/2018?

7    A.  Yes.

8    Q.  And they're text messages between you and Mr. De Niro,

9    correct?

10   A.  Yes.

11   Q.  And here you start at 12/6/2018:  In all honesty, I don't

12   like her having to do with anything that contributes to the

13   feeling of our place.  She was an a-hole when she came over to

14   help with Marty's birthday?

15   A.  Yes.

16   Q.  You wrote that?

17   A.  Yes.

18   Q.  Telling me not to go somewhere, sending me where they

19   didn't have anything for parties, and then sending you to the

20   store I originally said to go to and then watching her perform

21   over the phone with you, is just too ridiculous, while she

22   tells me about how she handles your clutter is creepy.

23              You wrote that?

24   A.  Yes.

25   Q.  I understand you want this tree decorated a certain way and

NB25rob4                              Chen - Direct

1   you have a dependence on her but she really has done way too

2   many things to me at this point.

3   A.  Yes.

4   Q.  Is it true that Mr. De Niro had a dependence on her at this

5   time?

6   A.  They've known each other for over 10 years.

7   Q.  And you recognize that or acknowledge that as a certain

8   dependence, correct?

9   A.  Yes.

10  Q.  And the next sentence you said:  And I don't need to hear

11  any more about how Helen should pick the tree.  She is so out

12  of line and lost in her fantasy.  She talks like she's the

13  stepmother.

14           Who are you referring to in that sentence?

15  A.  Chase.

16  Q.  OK.  And so when you say she is out of line and lost in her

17  fantasy, is that what you said?

18  A.  Yes.

19  Q.  I have to look out for myself here, nobody else does.  She

20  has been pulling this s--- on me for too long.  When she spoke

21  to me about getting stuck in the elevator she should have told

22  me about the key.  I don't want to be difficult for you but I

23  have to be very honest at this point.  I'll always compromise

24  when I need to and keep it professional, regardless of her high

25  school games.

NB25rob4                         Chen - Direct

1          You wrote that?

2    A.  Yes.

3    Q.  But I am really done with her fooling with me and her doing

4    it with your indirect consent.

5    A.  Yes.

6    Q.  Did you believe that she was acting with Mr. De Niro's

7    indirect consent?

8    A.  I believed that Mr. De Niro thought she was going to do the

9    right thing all the time and she took it upon herself to take

10   advantage of that and quite often didn't do the right thing and

11   was very abusive.

12   Q.  Did you believe that she was acting with Mr. De Niro's

13   incorrect consent?

14         MR. SCHOENSTEIN:  Objection.  Asked and answered.

15         THE COURT:  Sustained.

16   Q.  I know you don't want me to be effed with deliberately, but

17   for you to even tell me again to ask Chase is just weird at

18   this point.

19         Do you see that?  You wrote that?

20   A.  Yeah.

21   Q.  Was Mr. De Niro in the habit of telling you to ask Chase

22   when you needed things in connection with the townhouse?

23   A.  During this period of time, because she kept making it seem

24   like that it was very dangerous letting anybody around the

25   office around me because of the fact we were in a relationship

NB25rob4                          Chen - Direct

1    and we wanted to keep it quiet.

2    Q.  Simple question:  Did Mr. De Niro often, at this particular

3    time, tell you to ask Chase?

4    A.  Yes.

5    Q.  Then you went on to say:  Especially when you know and

6    agree that she has been deliberately unkind, inappropriate, and

7    a straight up b----.

8            Correct?  You wrote that?

9    A.  Yes.

10   Q.  She's a freaking employee and she's been pulling her weight

11   because you allow her.

12           Was it your view that Mr. De Niro was allowing her to

13   act in the way that she was behaving?

14   A.  No, I don't think he was aware because she acts one way in

15   front of him and when he is not in the room it is a complete

16   flip, Dr. Jekyll and Mr. Hyde.

17   Q.  But you wrote "because you allow her," correct?

18   A.  I did write that.

19   Q.  Right.

20           And you wrote that she wouldn't do what -- she

21   wouldn't do --

22   A.  You wouldn't tolerate.

23   Q.  I will look at this one.  I apologize.

24           She wouldn't do what you wouldn't tolerate; right?

25   A.  Yes.

NB25rob4                          Chen - Direct

1    Q.  And then you wrote:  It's like you can't make decisions

2    with me but you can't make them without her.

3              Is that how you felt at that time?

4    A.  Yes, because I felt like she was always trying to confuse

5    the situation and try to make it seem like there was something

6    that was going to come really, really bad of things if anybody

7    knew about me in the office.

8    Q.  Was Mr. De Niro, at that time, continuing to make decisions

9    with Ms. Robinson?

10   A.  What kinds of decisions are you talking about?

11   Q.  Well, you wrote:  It's like you can't make decisions with

12   me but you can't make them without her.

13   A.  I'm sorry.  What was your question again?

14   Q.  I'm asking you whether at that time whether Mr. De Niro was

15   making decisions with Ms. Robinson.

16   A.  I'm sure they were making some decisions together.

17   Q.  And at this time did you feel like Mr. De Niro was

18   excluding you from certain decisions?  Is that why you wrote:

19   "It is like you can't make decisions with me."

20   A.  No, I didn't feel like he was doing it.  I knew she was

21   doing her crazy double-talk to try and always sway him away

22   from what she felt I wanted done.

23   Q.  But you did write:  "It is like you can't make decisions

24   with me."

25   A.  I did write that, in a personal text.

NB25rob4                          Chen - Direct

Q.  "This bothers me."  You wrote that, right?

A.  Yes.

Q.  And so, this was upsetting to you?

A.  Well, I wasn't happy.

Q.  I'm going to go down further.  You said:  It's a very

uncomfortable situation that seems to get a little better and

then she thinks of something again and you allow her.

        Did you believe that at the time that you wrote it?

A.  Yes.

Q.  I don't work for her, I'm not in a relationship with her,

and I'm not having her mess with me anymore.  You tell me what

you need and I don't want to know if you are telling me what

Chase tells you to do.

        Is that how you felt at the time?

A.  Yes.

Q.  Now, you believe -- you can take this down right now -- you

believe that Ms. Robinson had some fantasy about Mr. De Niro,

correct?

A.  I believe she lives her whole life in a fantasy.

Q.  But you believe specifically that Ms. Robinson had a

fantasy about Mr. De Niro?

A.  Yes.

Q.  And you weren't sure exactly what that fantasy was,

correct?

A.  I was pretty sure it was about control.  And herself, too.

NB25rob4                          Chen - Direct

1   It wasn't just about Mr. De Niro, it was about herself and how

2   she thought of herself because she had personal contact with

3   Mr. De Niro.

4   Q.  And you concluded whatever her fantasy was, whatever she

5   wanted, you were going to make it more difficult for her to

6   achieve her fantasy, correct?

7   A.  Well, if her fantasy is going to infringe on my personal

8   life and she works in the office, of course I'm going to make a

9   change.  That's too weird.

10  Q.  I'm asking a specific question.  But whatever she wanted

11  you were going -- whatever she wanted with her fantasy, you

12  were going to make it more difficult for her to achieve her

13  fantasy?

14         MR. SCHOENSTEIN:  Objection.  Asked and answered.

15         THE COURT:  Overruled.

16         THE WITNESS:  What do I do now?

17         THE COURT:  When I say "overruled" you have to answer

18  the question.

19         THE WITNESS:  Oh, OK.

20         Could you ask me that one more time, please?

21  BY MR. McKNIGHT:

22  Q.  Whatever she wanted with respect to her fantasy, you were

23  going to make it more difficult for her to achieve her fantasy,

24  correct?

25  A.  If it affects my personal life in my private home, of

NB25rob4                         Chen - Direct

1   course I was going to do that.  Anybody would.

2              MR. McKNIGHT:  Could I have Plaintiff's Exhibit

3   no. 93, please?

4              Your Honor, this has already been admitted into

5   evidence.

6              THE COURT:  Proceed.

7   Q.  This is another text message between -- go to the front

8   page, please -- you and Mr. De Niro?

9   A.  I don't see anything yet.

10             THE COURT:  You have to scroll down.  Keep going.  I

11  think you have to blow it up.

12  Q.  I just want to identify this for the record.  This is a

13  text message between you and Mr. De Niro?

14  A.  These are our personal text messages.

15             MR. McKNIGHT:  Can we go to Plaintiff's Exhibit no. 1,

16  please?

17             MR. SCHOENSTEIN:  No objection.

18             THE COURT:  I think it is in evidence.  It is

19  received.

20             MR. McKNIGHT:  It is not in evidence, right?  It is

21  received in evidence?

22             THE COURT:  I take it you are offering it, is that

23  right?

24             MR. McKNIGHT:  I am offering it, PX-1.  I can't

25  receive anything in evidence, I can only ask permission.

1              (Plaintiff's Exhibit 93 received in evidence)

2    BY MR. McKNIGHT:

3    Q.  Plaintiff's Exhibit no. 1 is another series of text

4    messages on December 23, 2018 between you and Ms. Robinson;

5    correct?

6    A.  Yes.

7    Q.  And again, the gray boxes are you and the blue box is

8    Ms. Robinson; correct?

9    A.  Yes.

10   Q.  Here you say:  You are just an incredible human and your

11   skills, talent, and efforts always leave such a lasting

12   impression.  Bob and I can't stop marveling at what an amazing

13   effort you always manage to accomplish.  So grateful that I get

14   to experience the benefits of your hard work because of the

15   relationship you two have built over the years.

16              Did you write that?

17   A.  I wrote it.

18   Q.  Is it true?

19   A.  Sarcastic, but true.

20   Q.  But you wrote it?

21   A.  Yes.

22   Q.  It is so rare to meet people who are not just hard working

23   but talented and incredibly intelligent.

24              Did you write that?

25   A.  I wrote it.

NB25rob4                          Chen - Direct

1   Q.  Is it true?

2   A.  It is sarcastic and very true in my sarcasm, but I did feel

3   bad for her, too.

4   Q.  Can we go down to the next box that is attributed to you,

5   this time on December 25, 2018?  It starts off:  Merry

6   Christmas.  You start off:  I just want to let you that without

7   you it would have just been Christmas.

8         Did you write that?

9   A.  Yes.

10  Q.  Thank you for always being the kind of person who goes

11  above and beyond.  Your heart is o so good and you are a rare

12  find.

13        Did you write that?

14  A.  Yes, I did.

15  Q.  Was it true when you wrote it?

16  A.  Yes.  Sarcastic, but also I felt bad for her.  I was

17  starting to feel, like, really bad for her because she was

18  acting really nasty at times and -- I just felt bad for her, it

19  was the holidays.

20  Q.  When you are hard-working it is sometimes easy to feel that

21  your efforts sometimes get taken for granted.  I just want to

22  let you know that you are the one person, from the very

23  beginning, that Bob always speaks so highly of and appreciates

24  so much.

25        Did you write that?

NB25rob4                          Chen - Direct

1   A.  Yes.

2   Q.  Is it true?

3   A.  Yes.

4   Q.  I have always heard the highest praise, appreciation, and

5   gratitude for you.

6           Did you write that?

7   A.  Yes.

8   Q.  Is it true?

9   A.  Yes.

10  Q.  Again, I am so grateful to the able to experience the

11  wonderful results of the beautiful relationship you two have

12  built over the years and I am so grateful for you being so

13  patient and gracious with the addition of me.

14          Did you write that?

15  A.  I wrote it.

16  Q.  Is it true?

17  A.  No.

18  Q.  Your presence and hard work has been one of the best

19  Christmas gifts I could have never known to hope for.

20          Did you write that?

21  A.  Yes.

22  Q.  True?

23  A.  No.  I just felt bad for her.

24          MR. McKNIGHT:  Can I see Plaintiff's Exhibit no. 161,

25  please?

1          Your Honor, Plaintiff's Exhibit 161 has not been

2     admitted but I believe there is no objection and I would like

3     to offer it.

4          MR. SCHOENSTEIN:  No objection.

5          THE COURT:  It is received.

6          (Plaintiff's Exhibit 161 received in evidence)

7     BY MR. McKNIGHT:

8     Q.  Ms. Chen, this is a text message on 1/19/2019, I believe,

9     between you and Ms. Robinson; correct?

10    A.  Yes.

11    Q.  And on this day you left something on the stove and it

12    started to smoke, correct?

13    A.  Yes.

14    Q.  And because of the smoke, the smoke detectors went off in

15    the building; correct?

16    A.  Yeah, the security system went off.

17    Q.  And that's what this text is about, because Ms. Robinson

18    went over there; correct?

19    A.  Well, she put herself as the point of contact on the

20    security system so she was the only person that they had to

21    call.

22    Q.  I just asked you whether she went over there.  Did she go

23    over there?

24    A.  Yes.

25    Q.  And when she got over there, she let your dogs outside,

NB25rob4                          Chen - Direct

1    correct, and took care of the situation?

2    A.  She put them on the patio.  She got them out of the smoke

3    first.

4           MR. McKNIGHT:  Can we go down to the bottom of that,

5    please?

6    Q.  And here in the middle you say:  I have can't believe I

7    spaced like this.

8           That's you, right?

9    A.  Yes.

10   Q.  And when you say "I can't believe I spaced like this," you

11   were referring to the fact that you left some pots on the

12   stove?

13   A.  Yes.

14          MR. McKNIGHT:  Can we go to Plaintiff's Exhibit

15   no. 173, please?

16          Your Honor, Plaintiff's Exhibit 173 has been admitted

17   into evidence already.

18          THE COURT:  OK.

19   Q.  Ms. Chen, do you recognize this series of text messages?

20   A.  Yes.  It is more personal messages between me and my

21   boyfriend.

22   Q.  And here you are still referring to the smoke incident -- I

23   will call it the smoke incident -- and you say that:  Well, I

24   just hugged Chase and told her that I love her.  Call me.

25          That "her" there, you hugged Chase Robinson who is the

NB25rob4                         Chen - Direct

1    plaintiff in this case; correct?

2    A.  Yes.

3    Q.  You know first thing Chase did was take care of the boys.

4    I saw it on the cameras.  That means everything to me.  Her

5    heart is really good.

6            Did you mean that?

7    A.  In the moment, yes.

8    Q.  And this was on January --

9    A.  It is the same day as the smoke.

10   Q.  Same day.  OK.  January 19, 2019; correct?

11   A.  That's what the time stamp says.

12           MR. McKNIGHT:  Can we go to Plaintiff's Exhibit no. 4,

13   please?

14           Plaintiff's Exhibit no. 4, your Honor, has already

15   been admitted into evidence?

16           THE COURT:  You may proceed.

17   Q.  Now, Ms. Chen, this is text messages between you and

18   Mr. De Niro that's on 1/22/2019; correct?

19   A.  Yes.

20   Q.  And I am directing you to an entry that is at 1/22/2019,

21   6:08 p.m., and here you write to Mr. De Niro --

22           Are you all right?  Do you need some water?

23   A.  No, I'm OK.  Thanks.

24   Q.  Here you start:  Not to pick on Chase more than necessary,

25   but the whole thing with the private jet back to New York made

NB25rob4                          Chen - Direct

1    no sense and her reason to you didn't make sense to me either.

2              This involves a private jet back from your vacation,

3    correct?

4    A.  Yes.

5    Q.  And there was a problem with the food service on the jet,

6    correct?

7    A.  Yes.

8    Q.  And for some reason or another, the food service --

9    A.  No, it wasn't for some reason or another.

10   Q.  OK.  What was the reason for it then?

11   A.  They specifically said that there had been requested -- I

12   had spoken to the flight attendant on the plane, that it was

13   specifically requested that there be no catering available on

14   that flight at all.  She said that it was very, very strange to

15   hear.

16             MR. McKNIGHT:  Your Honor?

17   A.  She said I even double-checked with the --

18             THE COURT:  It is responsive to the question which was

19   "raised for some reason or another," so she can answer.

20             MR. McKNIGHT:  Right, your Honor, but she is talking

21   about an out-of-court statement, your Honor.

22             MR. SCHOENSTEIN:  Goes to her state of mind, your

23   Honor.

24             THE COURT:  It is received for her state of mind, not

25   for the fact that this in fact happened.

1              MR. McKNIGHT:  All right.  Go ahead.

2              THE COURT:  You can answer.

3              THE WITNESS:  OK.  So I spoke to the flight attendant,

4     and on private planes everything is so specific and requested

5     and they have a profile, so they kind of know what your habits

6     are, what to have on the plane and not on the plane.  And the

7     flight attendant even said for this plane it was very strange

8     that it be requested there be absolutely no catering on the

9     plane.  I said, that is really weird because it's not an

10    incredibly short flight, we counted on it because we were in a

11    time crunch.  And I said this is -- this is a little upsetting

12    that this request was made.  And she was so concerned about it,

13    because you pay for the convenience of this travel, that one of

14    pilots came out and said he said this was all really, really

15    weird.  He said they got specific request not to have any

16    catering on the plane and they said for Mr. De Niro that's very

17    strange, but it was done in such an adamant way they listen and

18    they apologized, said I'm sorry, but somebody from the office

19    called and had said it.  So I have the flight attendant and a

20    pilot that came out to confirm that.

21             THE COURT:  So, members of the jury, that's not

22    received for the purpose that somebody from the office actually

23    did do that but just for the fact that it was said to the

24    witness and how it affected her state of mind.

25             Go ahead.

1    BY MR. McKNIGHT:

2    Q.  And you believed that Ms. Robinson was responsible for

3    this?

4    A.  Yes.

5    Q.  You believe that Ms. Robinson, who just saved your dogs two

6    days before, had somehow or another decided not to order

7    food --

8    A.  Yeah, but this flight did not happen during this time

9    period.

10    Q.  All right.

11    A.  You don't even know when the flight happened, your timing

12    is inaccurate.

13    Q.  But you believe that Ms. Robinson did this?

14    A.  Oh, well -- the only thing she ever did nice was for the

15    puppies to protect them.  Everything else she had done within

16    her time with Bob was -- it was mean, it was so nasty, it was

17    angry but it was -- you see that she's hurt inside, you feel

18    bad for her sometimes, but then she targets you and she's nasty

19    she speaks -- she's cursing at everybody all the time.  She

20    shows one face when Bob is there, when Bob is not there she has

21    another face, she is rolling her eyes, she is talking about

22    putting stuff up in the house saying, *oh, we want it to go*

23    *there* and *we want it to go there*.  And there is a time where I

24    was wondering maybe it looked better -- she goes, *We already*

25    *discussed that we want it over here.*  We are putting up

1    paintings in the house and she comes into the -- sorry.

2              THE COURT:  I'm going to strike the answer.

3              THE WITNESS:  OK.

4              THE COURT:  Ms. Chen, you know, just answer the

5    questions that are asked --

6              THE WITNESS:  OK.

7              THE COURT:  -- by the lawyer.

8              You will have an opportunity --

9              THE WITNESS:  OK.

10             THE COURT:  -- when the lawyer for the other side asks

11   you questions.

12             THE WITNESS:  OK.

13             THE COURT:  Each side is entitled to ask you questions

14   and to have you just answer the question that is asked.

15             THE WITNESS:  OK.  I understand.  Sorry.  I'm sorry.

16   What did you ask me again?

17   BY MR. McKNIGHT:

18   Q.  I have actually forgotten, ma'am.

19             Can we go down to the middle where it begins:  I am

20   grateful for her assistance Saturday.

21   A.  Yes.

22   Q.  Here you wrote:  I am grateful for her assistance Saturday

23   but I don't trust her when it comes to me.

24   A.  Yes.

25   Q.  You wrote that?

NB25rob4                        Chen - Direct

1  A.  Yes.

2  Q.  She will do things going forward.  She's smart and her

3  excuse will be there was a mix-up.

4  A.  Yes.

5  Q.  You wrote that?

6  A.  Yes.

7  Q.  It's up to you what you want to do.  I don't want to lay

8  any more pressure on you than is necessary, but I think her

9  true colors have made themselves abundantly clear.  It is up to

10  you what you want to do but she's a mean, insecure, territorial

11  girl, and her behavior hasn't just affected me, she does it to

12  everyone in your life in different ways.

13         You wrote that?

14  A.  Yes.

15  Q.  And you are writing about Ms. Robinson?  You are writing

16  about Ms. Robinson?

17  A.  Yes.

18  Q.  Her possessive manner over the house makes me very

19  uncomfortable.

20  A.  Yes.

21  Q.  You wrote that?

22  A.  Yes.

23  Q.  I do feel it's getting worse.  Her sense of entitlement

24  stems from this imaginary intimacy she has with you and I am

25  seeing it in her texts about the house all over again.

1          You wrote that?

2   A.  Yes.

3   Q.  And, again, you thought that she had some imaginary

4   intimacy or fantasy involving Mr. De Niro; correct?

5   A.  Yes.

6   Q.  She thinks she's your wife and I'm tired of her rearranging

7   things and throwing my stuff on the floor and chaos whenever

8   she decides she wants to be the lady of the house.  It's very

9   bizarre and it really has to stop.

10          You wrote that?

11  A.  Yes, I did.

12  Q.  You believe that she thinks that she is Mr. De Niro's wife?

13  A.  I never said that I think she believes that.  I think

14  that's what she wants to achieve.  She's crazy.

15  Q.  You wrote:  She thinks she's your wife.

16  A.  Yes.  In her mind she thinks a lot of things.

17  Q.  Do you believe that Ms. Robinson thinks that she's

18  Mr. De Niro's wife?

19  A.  I think she knows she's not, which is what makes her angry,

20  but that's what she was striving to be.

21  Q.  So you believe that she was striving to be Mr. De Niro's

22  wife?

23  A.  At some -- yeah.  Yes.

24          MR. McKNIGHT:  Could I have Plaintiff's Exhibit

25  no. 32?

NB25rob4                          Chen - Direct

```
1              MR. KELLY:  Defendant?

2              MR. McKNIGHT:  That's right, DX 32.  I apologize.

3              THE COURT:  DX 32?

4              MR. McKNIGHT:  DX 32, your Honor.

5              Any objection to this, counsel?

6              MR. SCHOENSTEIN:  No objection.

7              THE COURT:  Received.

8              MR. McKNIGHT:  Thank you, your Honor.

9              (Defendant's Exhibit 32 received in evidence)

10     BY MR. McKNIGHT:

11     Q.  Now, Ms. Chen, this is an e-mail that you sent to Bob --

12     that would be Mr. De Niro -- on February 10, 2019; correct?

13     A.  Yes, another one of our personal messages to each other.

14     Q.  And you just sent Chase a giant flower arrangement with

15     chocolates.

16     A.  Yes.

17     Q.  And whose idea was that?

18     A.  I think -- it must have been her birthday and Bob may have

19     told her it's her birthday and I felt bad for her.  Again, I

20     went back and forth from realizing she has serious mental

21     health issues and she was just nuts to be around to just

22     feeling really, really bad for her also, and it's her birthday,

23     so why not do something nice.

24     Q.  So you sent -- you sent the flowers and you think it was

25     Mr. De Niro's idea or was it your idea?
```

NB25rob4                      Chen - Direct

```
 1   A.  It was my idea.  Regardless, it's a nice idea, whoever it
 2   came from first, and it was executed.
 3           MR. McKNIGHT:  Could I have Plaintiff's Exhibit
 4   no. 416, please?
 5           MR. SCHOENSTEIN:  Did we implement the redaction we
 6   spoke about this morning?
 7           THE COURT:  Is it redacted?
 8           MR. McKNIGHT:  I will come back to it, your Honor, to
 9   make sure we have taken care of it.  Can we move on to
10   Plaintiff's Exhibit 5?  I will go back to it.  Your Honor, I
11   would like to offer Plaintiff's Exhibit 5 into evidence if
12   there is no objection, as I understand.
13           MR. SCHOENSTEIN:  It is in evidence, your Honor.
14           MR. McKNIGHT:  It is already admitted.  You are
15   absolutely correct about that.
16   BY MR. McKNIGHT:
17   Q.  Now this is a text message between you and Mr. De Niro,
18   too, correct?
19   A.  They all are in this case, aren't they?
20   Q.  And it's dated 3/27/2019; correct?
21   A.  That's what I see on the time stamp of this personal
22   e-mail.
23   Q.  And if you look at the time dated 3:27 p.m. on 3/27, you
24   say:  Did you see Chase's bitchy e-mail?
25           Do you know what e-mail that is right now?  Do you
```

NB25rob4                          Chen - Direct

1   recall it?

2   A.   I think it was the e-mail from when she was redirecting

3   stuff to Kaplan because we had to have paintings taken down in

4   the townhouse because there was the fire incident, and she made

5   such a big deal after the fire incident that you can't touch

6   the paintings, it has to be a certain company that does it

7   because of the insurance.  And I'm just learning here so I

8   remembered that and I said, well, I can't just take paintings

9   off the wall, I have to make sure -- they're Bob's dad's, too,

10  I want to make sure everything is done right.  And when I just

11  wanted -- I wasn't even really asking her to do anything, I

12  just said give me the contact numbers, I will do it because I

13  could see at this point she resented anything having to do with

14  me.  And Kaplan -- Michael Kaplan had just had heart attack on

15  vacation with his family.  I think he had just kind of come

16  back, but I was very concerned about him just recovering, he

17  has two small children and almost died and I think that was the

18  e-mail where she was just:  That's a Kap question.

19  Q.   And if you go down to March 27, 2019 you write at, 8:17 --

20  A.   At 8:17?  I don't have that.

21       THE COURT:  There is no 8:17 p.m.

22  Q.   3/27/2019, 8:17 p.m.:  She acts like she's your boss and

23  she is setting the effing rules all the time.

24  A.   Yes.

25  Q.   Did you believe Ms. Robinson was acting like Mr. De Niro's

NB25rob4                         Chen – Direct

1    boss?

2    A.  Or she definitely thought she was in charge of everything

3    and everyone.

4    Q.  Looking further down at 8:31 p.m., again you say:  I sense

5    an undertone of worry blanketed by her imaginary intimacy?

6    A.  Yes.

7    Q.  And that's referring to Ms. Robinson again?

8    A.  Yes.

9    Q.  And when she says that she's in the middle, it's odd.  I

10   always think the direct approach is best, and since the latest

11   e-mail exchanges calls her to now seek your guidance when she

12   has run accustomed to throwing her weight, around even with

13   you, it is an odd desire to instigate her personal relationship

14   with you which, in her mind, is far more developed and weird

15   than what is really happening.

16          So you believed that Ms. Robinson had an imaginary

17   intimacy or fantasy about Mr. De Niro?

18   A.  And herself, yes.

19   Q.  I feel like she needs a dose of reality and needs to be

20   called out on how shitty she has been, and inappropriate.

21          Do you believe that?

22   A.  Yes.

23   Q.  She is scared now because her persistent manner and

24   demented imaginary intimacy with you has finally pissed me off.

25          Did you believe that?

NB25rob4                          Chen - Direct

1    A.  Yeah.  I wrote it.

2    Q.  All right.

3            MR. McKNIGHT:  Can we have Plaintiff's Exhibit no. 6,

4    please?

5            THE COURT:  PX- 6 in evidence?

6            MR. McKNIGHT:  Yes, it is, your Honor.

7            THE COURT:  Good.

8    Q.  This is on 3/28/2019 at 2:04 a.m.:  When you are away and I

9    need help coordinating, she deliberately refuses to step up.

10   She puts it on Kap.  She said she didn't have contact info.

11   Then she says, again, I'm sure Kap will get it done.  He hadn't

12   responded.  She had a passive aggressive way of saying it's not

13   her job or she doesn't answer me.  I had this problem with her,

14   you know it, and it is never going to get any better.

15           You wrote that?

16   A.  Yes.

17   Q.  And in the next section at 2:09 a.m. you write:  If you

18   keep her, you and I will eventually have problems because you

19   have allowed her to become this disrespectful to you and now

20   she's telling you what she will do and what her job is.

21           Did you believe that?

22   A.  Yes.

23   Q.  When you are away, her response to me is in e-mails and

24   it's effing rude.  She is dismissive and is a bitch.  I don't

25   know how you don't see it.  I think you don't want to see it

1    because you're too attached to her and that bothers that you

2    don't even think her responses are inappropriate.

3             At this time did you think that Mr. De Niro was too

4    attached to her?

5    A.  Yes.

6    Q.  Did you think Ms. Robinson was too attached to Mr. De Niro

7    at this time?

8    A.  She was attached to the control she felt she had in this

9    dynamic.

10   Q.  At this time did Mr. De Niro think that her responses

11   weren't inappropriate?

12   A.  I'm sorry.  That they were what?

13   Q.  Well, you said:  You don't even think her responses are

14   inappropriate.

15            I'm trying to find out whether that's true or not.

16   A.  Oh no, that he -- he agrees with me in the text right below

17   in our personal text right here so he does agree with me and he

18   was going to address it.

19   Q.  At your urging, correct?

20   A.  I'm not sure if it was just my urging but I think that

21   there are a lot of people that have complained about Chase.

22   Q.  Then you go on:  The level she took it to in those e-mails

23   with me today is it for me.

24            Right?  You wrote that?

25   A.  Yes.

NB25rob4                          Chen - Direct

1   Q.  I'm not going to be happy until you tell me she is looking

2   for her replacement.

3          Did you write that?

4   A.  Yes.

5   Q.  She does not respect me at all, she thinks she controls you

6   by having the nerve to be like this today.  I will not tolerate

7   this last exchange with her.  I'll wait to see what you do, but

8   keeping her around is just a slap in my face.

9          Did you write that?

10  A.  Yes.

11  Q.  Did you believe it?

12  A.  Yes.

13  Q.  After how she has felt entitled to act toward me today, I

14  have tolerated enough on many levels.

15         Did you write that?

16  A.  Yes.

17  Q.  Did you believe it?

18  A.  Yes.

19         MR. McKNIGHT:  Can I have Plaintiff's Exhibit no. 7,

20  please?  Let's go to the front page, please, Mr. Kelly, just

21  for a second.

22  Q.  Now, Ms. Chen, this is text messages between you and --

23  A.  I don't see anything, just so you know.

24  Q.  You don't see anything yet?

25  A.  I just see short message report.

NB25rob4                        Chen – Direct

1    Q.  You don't see on the next line chat and the date or

2    anything?

3    A.  Yeah, that's all I see.  I don't see any messages, though.

4    Q.  I know.  I was just trying to identify the parties to the

5    message, ma'am.

6    A.  OK.

7                THE COURT:  Oh, I see, it has Mr. Kaplan and Ms. Chen.

8                MR. McKNIGHT:  Yes, your Honor.  That's all I was

9    trying to do here.

10               Could we go to the entry at April 1, 2019 at

11   1:13 p.m.?

12   Q.  And just for the record, Mr. Kaplan is an employee of

13   Canal; correct?

14   A.  I believe he was.  I don't think he is.

15   Q.  At the time that you wrote this he was an employee at

16   Canal?

17   A.  Yes.

18   Q.  And you were having an exchange with him, correct?

19   A.  Yes.

20   Q.  And you say that the minute my clothes were there, she

21   started to refuse to go into the master bedroom.  Whenever she

22   would go do things in the house, she would disconnect all of my

23   charges and anything on my side of the bed.  The whole

24   situation has become very "Single White Female."

25               Correct?

NB25rob4                          Chen – Direct

1    A.  Yes.

2    Q.  And that's in quotes.

3    A.  It's referencing the movie with Bridget Fonda.

4    Q.  Right, and in that movie you were using this term to

5    describe a woman who has become psychotic, obsessive and

6    jealous; correct?

7    A.  Yes.

8              MR. SCHOENSTEIN:  Objection.

9              THE COURT:  What's the objection?

10             MR. SCHOENSTEIN:  Compound.

11             THE COURT:  Sustained.

12             MR. McKNIGHT:  I will take it one at a time.

13   BY MR. McKNIGHT:

14   Q.  Using this reference to "Single White Female" you were

15   using it to describe a woman who has become psychotic?

16   A.  I don't know if she became psychotic but I think that's

17   always had mental health issues so I don't know that she

18   became.

19   Q.  I am talking about the reference to the movie at this

20   point.

21   A.  Someone who is obsessive and crazy and scary; dangerous,

22   potentially.

23   Q.  Jealous?

24   A.  Yes.

25   Q.  Obsessive?

NB25rob4                          Chen – Direct

 1   A.  Yes.

 2   Q.  Psychotic?

 3   A.  Yes.

 4   Q.  And when you used that term "Single White Female," you were

 5   referring to Ms. Robinson; correct?

 6   A.  Yes.

 7   Q.  Going over to Plaintiff's Exhibit no. 155?

 8          THE COURT:  It is 12:58.  Is now a good time for our

 9   lunch break?

10          MR. McKNIGHT:  That would be great, your Honor.

11          THE COURT:  Members of the jury, we will take our

12   lunch break now.  Please don't look into anything about the

13   case on the Internet or otherwise, don't talk to anybody,

14   including amongst each other about the case, and have a good

15   lunch.  Try to be back here a couple minutes before 2:00 so we

16   can get started promptly.

17          (Continued on next page)

18

19

20

21

22

23

24

25

NB25rob4                          Chen – Direct

1                    (Jury not present)

2                    THE COURT:  Ms. Chen, you may step down.

3                    (witness steps down)

4                    THE COURT:  Counsel, you may be seated.

5                    How much longer does plaintiff expect with this

6          witness?

7                    MR. McKNIGHT:  I guess I would say I would be half an

8          hour or an hour I guess.  Depends how quick things are going.

9                    THE COURT:  And then, Mr. Schoenstein, I understand

10         this is your witness?

11                   MR. SCHOENSTEIN:  Yes, sir.

12                   THE COURT:  There are a number of exhibits that you

13         have said that you want to use with this witness to which the

14         other side objects.  I welcome both your suggestions and

15         plaintiff's suggestions in terms of how and when I should

16         handle those.

17                   MR. SCHOENSTEIN:  Well, I would like plaintiff to

18         reconsider.  You know, a number of the ones they objected to

19         are exhibits that they've already used today, exhibits that are

20         already in evidence, exhibits that they had in their exhibit

21         binder.  They just dumped on me objections basically to my

22         whole list.  So they should reconsider and tell me during lunch

23         if they actually object to any exhibits on the list and not

24         just dump on me a bunch of objections.

25                   THE COURT:  Are there exhibits in Mr. Schoenstein's

NB25rob4                          Chen - Direct

1   list that you either used in your direct examination or that

2   were already in evidence?

3              MR. MACURDY:  Well, your Honor --

4              THE COURT:  That should be a yes or no.

5              MR. MACURDY:  I'm not trying to be --

6              THE COURT:  Are there exhibits on his list that either

7   you used in your examination of Ms. Chen or that were already

8   in evidence?

9              MR. MACURDY:  I would have to check about the question

10  about whether they were used with Ms. Chen, but on the other

11  one I received a list from defense counsel that included

12  evidence, documents that were in evidence.  I knocked them out

13  so I do not believe that at the time there was anything that

14  was in evidence.  I would have to check on the other.

15             THE COURT:  You will have a supremely upset Judge if

16  that's the case because, just so it is clear, when I get that

17  list, I try to go through every one of the exhibits.  I get it

18  from you late at night, I come in early in the morning.  It is

19  work for the Court.  And if you are making me do work that, you

20  know, because you are going to use the exhibit or it is already

21  in evidence, then I think it's within my right to disregard the

22  entire set of objections.

23             MR. MACURDY:  Your Honor, I represent to you that when

24  I received their list I knocked out -- went through it and

25  knocked out ones that were in evidence already.  As for the

NB25rob4                          Chen – Direct

1    other question, I can look into that.  But I have to put on the

2    record that they sent us over 200 exhibits yesterday to use

3    with Ms. Robinson and there is just no way they're going to use

4    even a third of those.  So, that's –– I agree, it is work for

5    me as well.  Under your Honor's ruling, I have to preserve my

6    objections and stay up late at night going over those.  There

7    is no way they're using more than 50 of those.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB5

1              (Jury not present)

2              THE COURT:  There's a difference between you staying

3     up late and night and the Court staying up late at night.

4              MR. MACURDY:  That's true.

5              THE COURT:  So here's what we're going to do.  During

6     the lunch hour, you're going to go through your list, and we'll

7     reconvene at quarter of 2:00.  And by then, you will have

8     submitted to me a revised list of the exhibits to which you got

9     an objection and the basis to which you got an objection.  And

10    I will see you all at a quarter of 2:00.

11             Have a good lunch.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB5

AFTERNOON SESSION

1:52

        THE COURT:  All right.  I received the list of

plaintiff's objections to the Chen exhibits, and then

Mr. Schoenstein's e-mail indicating the exhibits that he was

going to withdraw.  We have got a couple of minutes, I think,

before we bring the jury in.  I'm prepared to go through at

least some of these exhibits and see if I can make a ruling

with respect to them.

        Mr. Schoenstein, is the first exhibit to which there

is a defendant's objection PX31, or is that no longer an issue?

        MR. SCHOENSTEIN:  No longer an issue.

        THE COURT:  So what's the first one that I need to

address?

        MR. SCHOENSTEIN:  Would be Plaintiff's 152.

        THE COURT:  Do you want to put that up on the screen?

        MR. SCHOENSTEIN:  For background, your Honor, this is

an e-mail from Ms. Chen regarding the Antigua flight.  And it's

admitted for her state of mind, not necessarily for the truth

of the matter asserted.  But plaintiff has delved into this

topic.

        THE COURT:  Give me one moment.  Was there a response

from Ms. Robinson?

        MR. SCHOENSTEIN:  Hold on, can you go back-up to the

top?  Wait a minute.  Oh, I just want the first -- no, I think

NB26ROB5

1   it's just the first page.

2           MR. MACURDY:  It's just one page, your Honor.

3           THE COURT:  Okay.  What's the plaintiff's objection?

4           MR. MACURDY:  It's hearsay, your Honor.  It's an

5   out-of-court statement.  It's offered for the truth of what's

6   happened here, and, you know, it's not a business record.  I

7   don't believe Ms. Chen could authenticate it as a business

8   record.

9           THE COURT:  No, but she can authenticate it as an

10  e-mail presumably that she sent.  And it's not being offered

11  for the truth but for her state of mind, which is a central

12  issue in the case.  So I'll receive it for her state of mind

13  and give an appropriate instruction to the jury.

14          MR. SCHOENSTEIN:  Thank you, your Honor.  Next one is

15  Defendant's 112.

16          THE COURT:  Okay.

17          MR. SCHOENSTEIN:  This is -- these are texts between

18  Mr. De Niro and Ms. Chen about plaintiff's birthday.  The

19  question came up as to whose idea it was to send her flowers on

20  the birthday.  Again, this was raised by the plaintiff in these

21  texts or e-mails are relevant to that.

22          THE COURT:  Let me see them and I'll hear you.

23          MR. SCHOENSTEIN:  Scroll down, please.  There we go.

24  Scroll down a little more, Ms. Card, because it starts with

25  Mr. De Niro.  Back up.  Okay.  And then keep on going up.

NB26ROB5

1          THE COURT:  I'll hear from plaintiff then defendant.

2          MR. MACURDY:  This is also hearsay, your Honor,

3     out-of-court statements offered for the truth.

4          THE COURT:  Is it actually a statement offered for the

5     truth?  "I'm going to send her a birthday e-mail" seems like a

6     statement of future -- of present intent, you know, that falls

7     within that exception that goes back to Cardoza, really.

8          MR. MACURDY:  I think it's also relevance, your Honor.

9     I don't know what is the relevance that they're talking about,

10    Ms. Robinson's birthday.

11         MR. SCHOENSTEIN:  They opened the door about

12    relevance.  They asked questions about this precise gift.

13         THE COURT:  What's the defendant's argument on the

14    hearsay objection.

15         MR. SCHOENSTEIN:  It is a statement of present

16    intention.  I mean, it's happy birthday.  It's almost an

17    excited utterance, but it's more a statement of present

18    intention.

19         MR. MACURDY:  Your Honor, that's not --

20         THE COURT:  I missed what everyone is laughing about,

21    but maybe it's appropriate that I miss it.

22         Is there something further from the plaintiff on it?

23         MR. MACURDY:  No, your Honor.

24         THE COURT:  All right.  It is a statement of present

25    intention.  "I'm going to send her a birthday e-mail, can you

1    get me her mailing address," so it's admissible.

2            MR. SCHOENSTEIN:  Last one, your Honor, is plaintiff's

3    383.  And, again, these were communications between Ms. Chen

4    and Mr. De Niro, and this one is really pivotal because you'll

5    see it's at 8:20 a.m. that Ms. Chen is writing to Mr. De Niro

6    "maybe now is a good time to transition to Lulu," which is,

7    again, a statement of her present intention.  And critical on

8    the issue in this case is to the timing of the decision to take

9    Chase Robinson off the townhouse.

10           Your Honor will find out in our directed verdict

11   motion that this precedes the e-mail that plaintiff now says is

12   protected activity.

13           THE COURT:  From the plaintiff.

14           MR. MACURDY:  Yes, your Honor.  It is hearsay, and I'm

15   reading from Rule 803 on present sense impression which is the

16   exception that defense offers.  And that reads:  A statement

17   describing or explaining an event or condition made while or

18   immediately after the declarant perceived it.

19           And the statement "maybe now is a good time to

20   transition to Lulu," I'm just not sure what event or condition

21   that is describing.  It's offered for the truth of the matter,

22   Ms. Chen thought that at that time.

23           MR. SCHOENSTEIN:  It is not offered for the truth of

24   the matter, your Honor.  It's offered for the fact that it was

25   said.  For the fact that Ms. Chen and Mr. De Niro were

NB26ROB5

1    communicating at 8:00 o'clock in the morning about

2    transitioning Ms. Robinson off of the townhouse before she had

3    any communication that she now describes as a protected

4    activity.

5         MR. MACURDY:  Right, your Honor, it's offered for the

6    truth of what it says.

7         THE COURT:  That doesn't make it hearsay, that the

8    document -- that the letters that are on the document are, in

9    fact, on the document.  That's an authenticity issue.

10        The question is whether the words on the document are

11   offered for the truth of any statement, and it is admissible on

12   the basis of that is what, in fact, Ms. Chen said at that time.

13   So the objection is overruled.

14        MR. SCHOENSTEIN:  Those are all of them, your Honor.

15   The other documents both sides agree are not admissible for any

16   purpose.

17        MR. MACURDY:  Your Honor, I do not adopt that.  Many

18   of these documents, a majority of them are statements by

19   Ms. Chen or Mr. De Niro and so that would be nonhearsay if we

20   were to use it because that's a statement of a party opponent.

21        There may be other exceptions your Honor could rule,

22   but as a standard matter, they can't put in their own

23   statements.

24        THE COURT:  I think the way to handle that, unless

25   someone wants to make an argument to the contrary is that with

NB26ROB5

1     respect to the remainder of the documents, if on redirect

2     examination, plaintiff offers them and they are received, then

3     defendant can have at them on recross examination.

4            Is that -- any objection to that from plaintiff's

5     perspective?

6            MR. MACURDY:  No, your Honor.

7            THE COURT:  Mr. Schoenstein.

8            MR. SCHOENSTEIN:  Yeah, I still object a little bit to

9     them telling me exhibits they plan to use are not admissible.

10    So they've now sent you another list with documents on it

11    telling me they are not admissible, and now I'm hearing that

12    they plan to use them in the next half hour.

13           THE COURT:  But it may be that they can use it as an

14    admission, which would mean that they can use it, but you can't

15    use it.  So I realize that that's inconvenient, but I think as

16    a matter of law, the plaintiff has it right that what may be

17    inadmissible for you, may be admissible for them, so...

18           MR. SCHOENSTEIN:  All right.

19           THE COURT:  Let's see if the jury is here.

20           Let's put the witness back on the stand.

21           My comment earlier about the sending a document that

22    listed exhibits that plaintiff intended to offer into evidence

23    was that if you are going to offer an exhibit into evidence and

24    you knew it was going to come into evidence on the -- from the

25    plaintiff offering it, because it was either in evidence or the

NB26ROB5

1    defendant hadn't objected, you were going to make me do work in

2    terms of then ruling on the admissibility of it.  But that's --

3    I'm not making any judgment as to whether that was the case or

4    not.  So let's bring in the jury.

5              MR. SCHOENSTEIN:  Oh, there she is.  Thank you.

6              THE COURT:  You can be seated.

7              When the jury comes in, you stand up like everybody

8    else.

9              THE WITNESS:  Okay.  I'll copy you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB6                          Chen - Direct

1          (Jury present)

2          THE COURT:  Counsel, you may proceed.

3          MR. MCKNIGHT:  Thank you, your Honor.

4          Your Honor, before the break, we were discussing

5  Plaintiff's Exhibit Number 7, but I think I neglected to move

6  it into evidence.

7          THE COURT:  Okay.  It's received.

8          (Plaintiff's Exhibit 7 received in evidence)

9          MR. MCKNIGHT:  Thank you.

10          MR. MCKNIGHT:  Could I see Plaintiff's Exhibit

11  Number 57, please?  I believe it's already been admitted into

12  evidence.

13  BY MR. MCKNIGHT:

14  Q.  Ms. Chen, we were talking earlier in text messages about

15  your reaction to a particular e-mail?

16  A.  Yes.

17  Q.  I believe the e-mail was March 27, 2019.  Is this the

18  e-mail that was the subject of that earlier text message that

19  we talked earlier today about?

20  A.  No.  I was referencing the one that she -- not the one to

21  Bob.  The one she responded to me where she was saying this is

22  -- "I don't know anybody from Force," even though she knows

23  everybody by name.  "This is a Kap question," pushing the

24  responsibility off to somebody else.

25  Q.  Would you move further down, please?

1              If you look at the e-mail there dated March 27, 2019,

2     were you discussing the painting and Kap, does that refresh

3     your recollection that that's the issue you were talking about?

4     A.   Yeah, I was fully aware that this was -- this was -- but

5     this isn't -- this is the e-mail I sent to her.  You were just

6     talking about the e-mail that I was referencing from those

7     texts which was the e-mail, the bitchy e-mail she sent to me in

8     response to this.

9     Q.   All right.  But this is what set it off, right?  When you

10    wrote to her on March 27?

11              MR. SCHOENSTEIN:  Objection.

12              THE COURT:  Sustained.

13    A.   No.

14    BY MR. MCKNIGHT:

15    Q.   That's fine.  I was just trying to identify the time

16    period.  We can move on.

17              Let's go to 155.

18              MR. MCKNIGHT:  Your Honor, I believe this has not yet

19    been admitted into evidence, but I don't think there's an

20    objection.

21              MR. SCHOENSTEIN:  No objection.

22              THE COURT:  Received.

23              (Plaintiff's Exhibit 155 received in evidence)

24    BY MR. MCKNIGHT:

25    Q.   Now, Ms. Chen, this is an e-mail that starts off at the

NB26ROB6                        Chen - Direct

1   bottom, Chase Robinson writes to Bob and Bob would be

2   Mr. De Niro, correct?

3   A.  I'm sorry, say that again, the last part.

4   Q.  I said here -- we start off at the bottom, just to keep it

5   in chronological order.  And Ms. Robinson wrote an e-mail to

6   Bob about her --

7   A.  Yes.

8   Q.  -- thoughts, April 2, 2019, correct?

9   A.  Yes.

10  Q.  All right.  And then Mr. De Niro forwarded that to you?

11  A.  Yes.

12  Q.  All right.  And then your response to that was:  She's a

13  real piece of work.

14  A.  Yes.

15  Q.  And you wrote that to -- in response to reviewing the

16  e-mail that Ms. Robinson wrote, correct?

17  A.  That's exactly what the document is showing, yes.

18  Q.  All right.  And do you believe that?

19  A.  Yes.

20          MR. MCKNIGHT:  Okay.  Could we see Plaintiff's Exhibit

21  Number 8, please?

22  BY MR. MCKNIGHT:

23  Q.  Now, we have April 2, 2019, at the bottom again, in

24  Plaintiff's Exhibit Number 8?

25  A.  Mm-hmm, yes.

NB26ROB6                              Chen – Direct

1   Q.  Where Chase Robinson is writing to Mr. De Niro again,

2   correct?

3   A.  Yes.

4   Q.  And that, again, was forwarded to you?

5   A.  Yes.

6   Q.  And then your response to that was –– oh, excuse me.  Your

7   response is at the top of the page?

8   A.  Yes.

9   Q.  Is that:  This shit really pisses me off.  That is so

10  manipulative and nasty that she has the gall to place blame on

11  me for her lies.

12  A.  Yes.

13  Q.  Do you believe that?

14  A.  Yes.

15  Q.  All right.  And then you state:  This bitch needs to get

16  put in her f'ing place.

17  A.  Yes.

18  Q.  The "B" word applies to Ms. Robinson?

19  A.  Yes, very much so.

20  Q.  All right.  I want to ––

21          THE COURT:  Are you offering ––

22          MR. MCKNIGHT:  I'm offering Plaintiff's Exhibit 155

23  and Plaintiff's Exhibit Number 8.

24          THE COURT:  Okay.  Any objection?

25          MR. SCHOENSTEIN:  No objection, your Honor.

1          THE COURT:  Received.

2              (Plaintiff's Exhibits 155 and 8 received in evidence)

3          MR. MCKNIGHT:  Thank you, your Honor.

4          Could I have Plaintiff's Exhibit Number 95, please?

5     And for the record, this is text messages, again, between

6     Michael Kaplan and Tiffany Chen, and the date is 4/2/2019 to

7     4/3/2019.  And I believe there's no objection, so I'd like to

8     move it into evidence, your Honor.

9          MR. SCHOENSTEIN:  No objection.

10         THE COURT:  Received.

11             (Plaintiff's Exhibit 95 received in evidence)

12         MR. MCKNIGHT:  Mr. Kelly, can we look at the entry

13    at 8:31.

14    BY MR. MCKNIGHT:

15    Q.  Now here, Ms. Chen, you write:  He's pissed about the

16    e-mail she sent, he's really pissed.

17         The "he" in this e-mail that you're referencing is

18    Mr. De Niro; is that correct?

19    A.  Yes.

20    Q.  All right.  And then you say:  He's going to have her come

21    in so that I can set her straight.

22         Again, the "he" that you're referencing there is

23    Mr. De Niro?

24    A.  Yes.

25    Q.  And the "her" that you're referencing there is

NB26ROB6                              Chen - Direct

1    Ms. Robinson?

2    A.  Yes.

3            MR. MCKNIGHT:  Can I see 4/22/19 at 8:53, Mr. Kelly?

4    BY MR. MCKNIGHT:

5    Q.  Why don't we start there at the top at 8:41.  Here you

6    wrote:  She's in a two year-commitment.  I think she's going to

7    make sure she finishes some things.  Don't think he's going to

8    fire her unless she really starts lying some more.

9            The "he" there that you're referencing is Mr. De Niro?

10   A.  Yes.

11   Q.  And the "she" that you're referencing there is

12   Ms. Robinson, correct?

13   A.  Yes.

14   Q.  Correct?

15   A.  Yes.

16   Q.  All right.  Then you said:  Not fire her on the spot is

17   what I mean.  But there are going to be a lot of changes.

18           The "her" that you are referencing is Ms. Robinson?

19   A.  Yes.

20   Q.  All right.  And the Tiff section at 10:01:  No, she is

21   working on some non-office stuff.  I think the idea is to call

22   her out on her stupid lies she keeps manufacturing.  He doesn't

23   want her to think she's going to get away with all the story

24   telling.  Then when that happens, he is going to tell her that

25   she is getting taken off the house, which she probably wants,

1  and Lulu is going to take over.  Then he is going to phase her

2  out, but she is going to have to teach her replacement.

3          The "he" there you are representing -- that you're

4  representing in this particular text is Mr. De Niro, correct?

5  A.  Yes.

6  Q.  And the "she" there that you're representing or referring

7  to is Ms. Robinson, correct?

8  A.  Yes.

9          MR. MCKNIGHT:  Could I see Plaintiff's Exhibit

10  Number 65, please.

11          And make sure that I move Plaintiff's Exhibit 95 into

12  evidence?

13          THE COURT:  I think you did, but it's received.

14          MR. MCKNIGHT:  I'm just checking.

15  BY MR. MCKNIGHT:

16  Q.  All right.  Ms. Chen, this is a text message chain between

17  you and Lulu White.  Who is Lulu White?

18  A.  She was somebody that Chase told Bob she needed to hire as

19  her assistant to help her out with the townhouse.  And then

20  after I talked to Lulu, I found out that Lulu was told by Chase

21  that she was hired to protect Bob from an audit.

22  Q.  All right.  But Lulu worked for Canal, correct?

23  A.  Yes.  Although she was instructed by Chase that she did not

24  work for Canal, she did not work for Bob, she did not work for

25  the office, and Lulu was to never do any work that was directed

1  by Bob or the other ladies in the office.

2           MR. MCKNIGHT:  Move to strike as nonresponsive,

3  your Honor.

4           THE COURT:  No.  It is responsive.

5           MR. MCKNIGHT:  All right.  Very well, your Honor.

6           Could I have Exhibit 9, please?

7           I believe there's no objection to Exhibit 9?

8           THE COURT:  Any objection?

9           MR. SCHOENSTEIN:  No, your Honor.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 9 received in evidence)

12          MR. MCKNIGHT:  All right.  Can I look at 5:37 on

13 4/2/2019, please?

14 BY MR. MCKNIGHT:

15 Q.  Ms. Chen, this is another text message series, and this one

16 is between you and Mr. Kaplan?

17 A.  Mm-hmm, yes.

18 Q.  And there you say:  I'm going to give this -- I'm going to

19 f'ing give this bitch what she deserves face to face, let me

20 send you the e-mail.

21 A.  Yes.

22 Q.  Is that what you said?

23 A.  Yes.

24 Q.  And that's what you intended?

25 A.  Yes.

1    Q.  All right.  And at this time, the "B" that you're referring

2    to, the woman you're referring to is Ms. Robinson, correct?

3    A.  Yes.

4            MR. MCKNIGHT:  I'd like to move to admit, I think you

5    already accepted it.

6            THE COURT:  I received Exhibit 9.

7            MR. MCKNIGHT:  Okay.  I thought you had.

8            Can I look at 4:34 p.m., please?

9    BY MR. MCKNIGHT:

10   Q.  Now, Ms. Chen, here, at 4:34 p.m. on 4/22/19, you're

11   speaking to Mr. Kaplan:  We have to work together to make this

12   transition happen, to show him we can work together to work

13   much more efficiently than having Chase making everyone

14   miserable.  She plays like that she's the one keeping

15   everything running.  She's actually the person who's keeping

16   everyone disconnected and upset.

17           In this particular text, the "she" you're talking

18   about is Ms. Robinson?

19   A.  Yes.

20   Q.  All right.  And when you say "we have to show him we can

21   work together," the "him" you're referring to is Mr. De Niro?

22   A.  Yes.

23           MR. MCKNIGHT:  I'd like to see Plaintiff's Exhibit 98,

24   please.

25           Your Honor, this has been admitted already.

NB26ROB6                          Chen - Direct

 1              THE COURT:  Okay.

 2    BY MR. MCKNIGHT:

 3    Q.  Ms. Chen, on April 4th, you sent this e-mail to Mr. Tasch,

 4    right?

 5    A.  Yes.

 6    Q.  And Mr. Tasch works for the accounting firm that supports

 7    Canal, correct?

 8    A.  Yes.

 9    Q.  And you wrote to him and you said:  Bob wanted me to get

10    the Amex bills for the spending, some during the setting up of

11    the townhouse, specifically a record of Chase's spending done

12    here.  I'm looking to find purchase and returns made.

13              Correct?

14    A.  Yes.

15    Q.  And so the Bob you're referring to is Mr. De Niro?

16    A.  Yes.

17    Q.  Mr. De Niro instructed you to send this e-mail to

18    Mr. Tasch?

19    A.  Yes.

20    Q.  Okay.  Thank you very much.

21              Could I have Plaintiff's Exhibit Number 156, please?

22              Do you see this e-mail dated April the 6th on 2019?

23    A.  Yes.

24    Q.  "I was also talking to Bob about the amount of petty cash

25    that was gone through during that period.  Could you also look

1    that up?"

2            So you're looking for more information from Mr. Tasch

3    again?

4    A.  Yes.

5    Q.  And Bob, Mr. De Niro, directed you to do that?

6    A.  Yes.

7    Q.  All right.  Plaintiff's Exhibit Number 157, please.

8            Ms. Chen, you wrote this on April 8, 2019, to

9    Mr. Tasch?

10   A.  Yes.

11   Q.  All right.  You said:  Bob wants all of the Chase charges

12   and expenses, everything she had on spending.  Lulu is to be

13   terminated today without severance.

14           Did you write that?

15   A.  Yes.

16   Q.  And you did this at the direction of Mr. De Niro?

17   A.  Yes.

18   Q.  Can I have Plaintiff's Exhibit Number 65, please?

19           MR. MCKNIGHT:  I believe it was already in evidence,

20   your Honor.  I was just checking.

21           MR. SCHOENSTEIN:  It's not in evidence.

22           THE COURT:  Any objection, Mr. Schoenstein?

23           MR. SCHOENSTEIN:  I'm sorry, your Honor.  I'm having

24   trouble pulling it up.  Ms. Cardona thinks it's already in

25   evidence, so no objection.

1           MR. MCKNIGHT:  Thank you.

2    BY MR. MCKNIGHT:

3    Q.  I direct your attention to 4/5/2019 at 3:32 p.m.

4           Here, you're in a text message with Ms. Lulu White,

5    who you have already identified?

6    A.  Yes.

7    Q.  And at 3:32 p.m. you say:  Make sure you get a list of

8    everything Chase had yet to follow-up with and/or complete,

9    especially a list of things she was supposed to have followed

10   up with Rachel.  Thanks.  See you soon.

11          Correct?

12   A.  Yes.

13   Q.  Then:  Bob wants to see this list and make sure you have

14   everything from Chase.  She is not to be involved with anything

15   going forward.

16          Correct?

17   A.  Yes.

18   Q.  "You deal only with myself and Bob personally now."

19          Correct?

20   A.  Yes.

21          MR. MCKNIGHT:  Could I have Plaintiff's Exhibit

22   Number 66 which I believe has already been admitted into

23   evidence.

24   BY MR. MCKNIGHT:

25   Q.  Ms. Chen, you sent this on April 6th in the morning at

1    9:36 a.m., correct?

2    A.  Yes.

3    Q.  And this was sent to Gillian Spear who works for Canal,

4    correct?

5    A.  Yes.

6    Q.  She's an executive assistant there, right?

7    A.  Was.

8    Q.  Was.  Sabrina Weeks-Brittan, who was also an executive

9    assistant at the time, correct?

10   A.  Yes.

11   Q.  And Bobby.  That refers to Mr. De Niro, correct?

12   A.  Yes.

13   Q.  And here you say:  Chase is no longer involved with

14   anything regarding the townhouse or the twins.

15           And then your next sentence says:  You are not to

16   discuss anything with her that you discuss with us.  Any

17   e-mails between us are not to be shared with Chase.

18           And you told them that on April 6, 2019, at 9:36 a.m.?

19   A.  Yes.

20           MR. MCKNIGHT:  Can I see Plaintiff's Exhibit

21   Number 68, please.

22   BY MR. MCKNIGHT:

23   Q.  Ms. Chen, you wrote this also on 4/6/2019 in the morning at

24   10:31 a.m., correct?

25   A.  Yes.

NB26ROB6                          Chen - Direct

1    Q.  And you wrote this to Lulu White?

2    A.  Yes.

3    Q.  Yes?

4    A.  Yes.

5    Q.  Gillian Spear, Sabrina Weeks-Brittan, and cc'd to Bobby,

6    correct?

7    A.  Yep.

8    Q.  And we've identified Bobby as Mr. De Niro.

9            And what you wrote them is:  I would like to remind

10   you that we all work for Bob and you are not Chase's assistant.

11   We need to get on the same page about everything and we need

12   you to work under the guidance of both Gillian and Sabrina.

13           Did you write that?

14   A.  Yes.

15   Q.  Plaintiff's Exhibit Number 395, please.

16           You also wrote this on April 6th in the morning at

17   9:46 a.m., correct, Ms. Chen?

18   A.  Yes.

19   Q.  All right.  And you wrote this to Rachel Humphreys, and

20   she's an outside vendor, correct?

21   A.  Also the wife of Chase's best friend at the time.

22   Q.  Okay.  And you cc'd it to Bobby who is Mr. De Niro?

23   A.  Yes.

24   Q.  "Chase is no longer involved with any of our projects.

25   Nothing is to be discussed with Chase going forward.  You

NB26ROB6                    Chen - Direct

1    should not contact her about anything or for anything."

2         Correct?

3    A.  Yes.

4    Q.  "Should she contact you about anything, you should

5    reinforce that Bob and I have removed her from our projects."

6         Correct?

7    A.  Yes.

8    Q.  All right.  Plaintiff's Exhibit Number 75, please.

9         These are text messages between you, Sabrina

10   Weeks-Brittan and Gillian Spear, also on the morning of

11   4/6/2019, correct?

12   A.  Yes -- well, I mean, I don't see the text right now.  I

13   just --

14   Q.  We'll get to them.  I just wanted to identify the

15   participants.

16        Move to the second page, please, Mr. Kelly.

17        And look at the text at 4/6/2019 at 10:23 a.m.

18   A.  Mm-hmm.

19   Q.  "I'm sure you guys saw the e-mails or will see them soon.

20   Any support you need in the office should come from Lulu.  I

21   will make this very clear in an additional e-mail.  If there

22   are any problems on your end, if Chase tries to step in and

23   delegate in any way, you should simply take control and say

24   Lulu is to assist and provide support for you too.  Assert your

25   authority.  If you deem it appropriate for Lulu to help her for

NB26ROB6                        Chen - Direct

1   a moment, it's up to you.  But Lulu is your support, not

2   Chase's.  This comes from Bob and you can say that if she tries

3   to get out of line, of course, contact me in the event of

4   drama."

5        Mr. De Niro directed you to do this or instructed you

6   to do this?

7   A.  Yes.

8   Q.  Looking at the next entry at 10:28 a.m.

9        MR. MCKNIGHT:  I'd like to move this into evidence.  I

10  don't think it's been accepted.

11        THE COURT:  PX75?  Any objection, Mr. Schoenstein?

12        MR. SCHOENSTEIN:  No, your Honor, although I may

13  object to some of the individual statements depending on the

14  questions.

15        THE COURT:  Well, I don't understand what that means,

16  so PX75 is coming into evidence.

17        (Plaintiff's Exhibit 75 received in evidence).

18        MR. MCKNIGHT:  Thank you, your Honor.

19  BY MR. MCKNIGHT:

20  Q.  Looking at the entry of 4/6/2019 at 10:28 a.m.  All right?

21        Ms. Spear responds to you:  Good morning.  Yes, will

22  do.  I think she's starting to catch on and hopefully we will

23  make some progress on Monday.

24        Do you have an understanding about what Gillian Spear

25  meant when she said, "I think she's starting to catch on"?

1    A.  Yeah.

2    Q.  And --

3    A.  She's talking about the stuff I just texted them both

4    about.  She's responding to it.

5    Q.  All right.  Is she referring to Ms. Robinson?

6    A.  Well, she's responding to my text and my text is about

7    Chase, yes.

8            MR. MCKNIGHT:  Could I see Plaintiff's Exhibit

9    Number 102, please?

10            Your Honor, I believe there's no objection to this.

11    I'd like to have it received in evidence.

12            MR. SCHOENSTEIN:  Sure.

13            THE COURT:  It's received.

14            (Plaintiff's Exhibit 102 received in evidence)

15    BY MR. MCKNIGHT:

16    Q.  Now, the bottom e-mail is an e-mail from Chase Robinson to

17    Bob De Niro, correct?

18    A.  Yes.

19    Q.  And here she advises you -- let's go down to the very

20    bottom.

21            You see what the subject of the e-mail is:  Since our

22    agreement, my job has changed to something that wasn't what we

23    agreed on and doesn't work for either of us.  I have e-mailed

24    you several times about discussing it, but it's obvious you

25    haven't wanted to address it.  As a result, I am not able to

1    perform my job and succeed in fulfilling the expectations of

2    the agreement we have with each other.  In addition, I have

3    been accused of ridiculous things like withholding information,

4    sabotaging catering on a plane, stealing pots and pans, and not

5    being diligent, professional, or helpful.

6              Go down to the next part, please.

7              "This e-mail is to inform you that I'm resigning

8    effective immediately."

9              Do you see that?

10   A.  Yeah.

11   Q.  Let's go back-up to the time that this was sent, please.

12             So this e-mail was sent to Mr. De Niro at 6:17 p.m.,

13   correct?

14   A.  That's what the timestamp shows, yes.

15   Q.  And then he forwarded it to you at what time?

16   A.  I don't remember.

17   Q.  All right.  6:48 you get it.

18   A.  Okay.

19   Q.  And you write back:  I think she knows what was coming and

20   none of it was going to be in her favor.

21             Right?

22             What was coming before this e-mail?

23   A.  We had -- I talked to Bob and he spoke to her about getting

24   together face to face with the ladies in the office, me,

25   because we all had issues with her.  And I even asked Lulu if

NB26ROB6                          Chen - Direct

1    she had wanted to confront Chase about certain things.  That

2    was what was going to happen.  You do the wrong thing, people

3    have the right to say it to you, and you have the right to

4    stand up for yourself.  If we're wrong, you can say it.  But

5    she was avoiding all that for obvious reasons.

6    Q.  All right, ma'am.

7                MR. MCKNIGHT:  Plaintiff's Exhibit Number 170, please.

8    I think there is an objection.

9                THE COURT:  Is there an objection to 170?

10               MR. SCHOENSTEIN:  No, your Honor.

11               THE COURT:  No objection?

12               MR. SCHOENSTEIN:  No, your Honor.

13               THE COURT:  170 received.

14               (Plaintiff's Exhibit 170 received in evidence)

15               MR. MCKNIGHT:  Thank you, your Honor.

16   BY MR. MCKNIGHT:

17   Q.  It's text messages between Tiffany Chen, Gillian Spear,

18   Sabrina Weeks-Brittan.  Going down to 4/6/2019 at 10:32 p.m.

19   Ms. Chen, you write:  I'm so happy to be able to share the good

20   news.

21   A.  Yes.

22   Q.  Right?  "It's a beautiful thing that she was able to make

23   us all so happy in the end."

24               You wrote that?

25   A.  Yes.

NB26ROB6                          Chen - Direct

1    Q.  Okay.  And going down to 4/7/2019 at 10:30 a.m.?

2    A.  At 10:30 a.m.?  I don't see that.  It goes from 10:29 to

3    10:31.

4    Q.  That's it.  10:30 a.m., my bad.  That's the next day.

5         "I feel so relieved that we don't have to maneuver

6    around under her BS anymore.  Everything is so much more

7    peaceful suddenly.  Sabrina, Tasch is coming in tomorrow

8    afternoon.  Bob still wants to go through her charges and

9    figure things out.  Looking forward to having you uptown with

10   us."

11        You wrote that?

12   A.  Yes.

13   Q.  Plaintiff's Exhibit 158, please.  It's been admitted.

14        On April 6, 2019, at 7:24, you wrote:  If she resigns

15   you don't have to pay her severance, right?

16        That's what you wrote?

17   A.  Yes.

18   Q.  And you were writing that to Mr. De Niro, correct?

19   A.  Yes.

20   Q.  Mr. De Niro responds:  I know, but I'll do what's right.

21   A.  Yes.

22   Q.  Plaintiff's Exhibit 106, please.

23        These are text messages between you and Mr. De Niro

24   and at 8:38 on 4/11?

25   A.  I don't have that yet.

1              MR. MCKNIGHT:  This has not been accepted in evidence

2       yet, your Honor.  I move it into evidence.

3              MR. SCHOENSTEIN:  I think it's already in.  Wait, it's

4       106.

5              THE COURT:  It's received if it's not in evidence.

6              (Plaintiff's Exhibit 106 received in evidence)

7       BY MR. MCKNIGHT:

8       Q.  You write at 8:38 p.m.:  I really hope you didn't give

9       Chase severance.

10             Right?  That's what you wrote to Mr. De Niro?

11      A.  Yes.

12      Q.  Then you wrote at 8:39 on 4/11:  Yo, she doesn't f'ing

13      deserve severance.

14             Right?

15      A.  Yes.

16      Q.  And then you wrote in caps:  She resigned, like an a-hole.

17             That was at 8:39 p.m., correct?

18      A.  Yes.

19      Q.  Plaintiff's Exhibit Number 20, please.

20             This is more text messages between you and

21      Mr. De Niro, correct?

22      A.  Yes.

23      Q.  And this one is dated 7/2/2019, and here you write:  Chase

24      e-mailed she's threatening legal action if she still does not

25      get a response by the 12th.  Tom is getting ready to hit her

1    hard with his letter.

2              Did you write that?

3    A.  Yes.

4    Q.  Okay.  And "Tom" refers to Tom Harvey, correct?

5    A.  Yes.

6    Q.  Thank you.

7              Plaintiff's Exhibit Number 22, please.

8              MR. SCHOENSTEIN:  No objection.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 22 received in evidence)

11   BY MR. MCKNIGHT:

12   Q.  I'm looking at 8:54, please.

13             Ms. Chen, you write:  Tom's too feisty.  Let this go

14   with a few fireworks and big, big bang.

15             You wrote that?

16   A.  Yes.

17   Q.  "Tom" refers to Tom Harvey?

18   A.  Yes.

19             MR. MCKNIGHT:  I have nothing further, your Honor.

20             THE COURT:  Okay.  Mr. Schoenstein.

21             Members of the jury, I'm going to do a stretch break

22   while Mr. Schoenstein sets up.  You're welcome to do the same.

23             (Pause)

24             THE COURT:  Everybody should be seated.

25             Mr. Schoenstein.

NB26ROB6                          Chen - Cross

1    CROSS-EXAMINATION

2    BY MR. SCHOENSTEIN:

3    Q.  Hello, Ms. Chen.

4    A.  Hello.

5    Q.  You know the plaintiff, Chase Robinson, right?

6    A.  Yes, I do.

7    Q.  And you got to know her for a period of time when she was

8    helping out with some stuff in your townhouse?

9    A.  Yes.

10   Q.  You met her personally more than once?

11   A.  Yes.

12   Q.  And Robert De Niro is your boyfriend?

13   A.  Yes.

14   Q.  And he has been, I think you said, for the last five years?

15   A.  Yes.

16   Q.  So let me ask you, did you, at any time, suspect

17   Ms. Robinson was having an affair with Mr. De Niro?

18   A.  No.

19   Q.  Did you at any time suspect Ms. Robinson was romantically

20   interested in Mr. De Niro?

21   A.  His credit card, not him.

22   Q.  Did you at any time suspect Mr. De Niro was romantically

23   interested in Ms. Robinson?

24            THE COURT:  Hold on, Mr. Schoenstein.  There's an

25   objection.

NB26ROB6                              Chen - Cross

1        MR. MCKNIGHT:  I object to the leading nature of the

2   questions.

3        THE COURT:  That's overruled.  This is proper leading

4   to see if the witness denies.

5   BY MR. SCHOENSTEIN:

6   Q.  So my last question was:  Did you at any time suspect that

7   Mr. De Niro was romantically interested in Ms. Robinson?

8   A.  No.

9   Q.  Were you ever concerned that Ms. Robinson might interfere

10  in your romantic relationship with Mr. De Niro?

11  A.  No.

12  Q.  Did you even for a second worry that she was going to push

13  you out and get married to Mr. De Niro?

14  A.  No.

15  Q.  So what's up with saying in e-mails that she's acting like

16  his wife, why would you use that word?

17  A.  It was the control.

18  Q.  Could you explain what you mean by that?

19  A.  It was -- she felt that she had been with him for -- from

20  what I understand of my interaction with her, she had been with

21  him for so many years, she felt a certain closeness, which she

22  always tried to demonstrate in very strange ways.  And it was

23  more control that she wanted.  Control over him and his access

24  to things and the things she could access because she has a

25  connection to him.

1  Q.  And at any point prior to Ms. Robinson's resignation, did

2  you tell Mr. De Niro she should be fired from Canal?

3  A.  No.

4  Q.  Did you tell him she should no longer work in Canal's

5  offices?

6  A.  Never.

7  Q.  Did you tell him that her duties with respect to Canal

8  should be altered?

9  A.  No.

10 Q.  What did you want to happen as far as Ms. Robinson went,

11 prior to her resignation?

12 A.  I wanted her out of the townhouse and out of my personal

13 life.  I didn't want her coming into my home when we're on

14 vacation and flipping the furniture in our living room, and

15 giving Bob --

16 Q.  We'll get to some details.  You wanted her out of your

17 home?

18 A.  Out of my home, out of my personal life.

19 Q.  Okay.  Let's back up a little.

20         You said you went to Brooklyn Tech right across the

21 river, right?

22 A.  Yes.

23 Q.  And after you left college, what did you do?

24 A.  I went away for two years to Upstate New York.  It was

25 really cold and not for me.  I came back to the city and

NB26ROB6                        Chen – Cross

transferred to Baruch, but then I also started full-contact

fighting in our family business.  And then in between finishing

up the last few credits at school and I was just starting to do

full contact, I got invited to fight at a world championship.

         And I didn't understand what that meant, but my dad

was like, look, you can do school for the rest of your life,

whenever, but you can only fight now, and this is the world

games you're getting invited to, and you have to do it.  So

that's what happened with my life and school.

Q.  Okay.  A little less detail I asked you to fill in.

A.  Okay.

Q.  Do I understand you got into Golden Gloves Boxing?

A.  Yes.

Q.  You were a New York Golden Gloves Boxer?

A.  Yes.

Q.  Your family has long history in the business of martial

arts; is that right?

A.  My father is a very well-respected person in what we do.

Q.  And then did you go on and compete for world championships

in martial arts?

A.  There's a few of them in there and stuff.

Q.  Did you obtain some titles along the way?

A.  Yeah.  I got lucky, worked hard.

Q.  What did you do after that, what did you do career-wise

after your fighting was over?

1  A.  We have a school, or we had a school.  My dad just closed

2  it last year, he turned 90.  So I worked teaching in the family

3  business.  I would do workshops with my dad.  I did a lot of

4  private teaching on my own.  I did a couple workout videos and

5  just stuff with the family business.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCHOENSTEIN:

2    Q.  And what was the film that you met Mr. De Niro on?

3    A.  "The Intern."

4    Q.  And when was that?

5    A.  2014.

6    Q.  Shortly, how did you get involved in that film?

7    A.  Because of my dad's reputation, production called my dad

8    directly and said they're shooting a movie in two weeks and

9    they needed a tai chi instructor for it and he had to go in

10   with them immediately.  I went with him and then the director

11   changed the script, she felt that I was just a better fit for

12   the movie.

13   Q.  You stole a part from your dad?

14   A.  Shhhh.

15   Q.  And then Mr. De Niro was working on that film as well?

16   A.  Yes.

17   Q.  You two decided to live together in 2018?

18   A.  Yes.

19   Q.  In New York City?

20   A.  Yes.

21   Q.  By the way, are you still in a relationship with

22   Mr. De Niro?

23   A.  Yes.

24   Q.  And have the two of you expanded your family since that

25   time?

NB25rob6                          Chen - Cross

1    A.   Yes.  We have 15 dogs and a human daughter.

2    Q.   And would you agree with me on the record that your human

3    daughter is the cutest baby anyone has ever seen?

4    A.   Yes.

5    Q.   And you still live in Manhattan?

6    A.   Yes.

7    Q.   Are you familiar with Canal Productions?

8    A.   Yes, I am.

9    Q.   Are you an owner?  Do you know any portion of that company?

10   A.   No.

11   Q.   Are you a shareholder?

12   A.   No.

13   Q.   Are you a director?

14   A.   No.

15   Q.   Are you an officer?

16   A.   No.

17   Q.   Are you or have you ever been an employee?

18   A.   No.

19   Q.   Do you have any authority, as far as you know, to act on

20   behalf of Canal?

21   A.   No.

22   Q.   Did you ever sign checks or other documents on behalf of

23   Canal?

24   A.   No.

25   Q.   Have you ever been given power of attorney to act for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NB25rob6                          Chen - Cross

1  Canal?

2  A.  No.

3  Q.  Do you ever represent the company in any business

4  transactions?

5  A.  No.

6  Q.  When you interact with Canal employees, are you doing that

7  on behalf of Canal?

8  A.  No.

9  Q.  When did you first meet Ms. Robinson?

10  A.  I met her, like, the beginning -- like around Labor Day

11  2018.

12  Q.  This is when you were coming back to New York with Bob?

13  A.  Yes.

14  Q.  And getting ready to move into the townhouse?

15  A.  Yes.

16  Q.  And can you describe what you recall about Ms. Robinson

17  from that first meeting, what you observed?

18  A.  Very angry, very upset.  She wouldn't make eye contact, she

19  was -- she seemed to be in physical pain where I did ask her at

20  one point, I asked her if she was OK, because from the minute

21  she saw me she was gritting her teeth, she wouldn't look at me,

22  she was squeezing her temples and going, *ah*.  And this is,

23  like, very weird from the beginning of meeting her, and walking

24  through the house because I had to get some bags that were at

25  the house and she was angry moving around and I finally just,

NB25rob6                     Chen - Cross

1    I'm like, are you OK?  And she said, I just haven't had my

2    coffee yet.  And that was my first interaction with her.

3    Q.  Did you ever meet with Ms. Robinson anywhere other than the

4    townhouse?

5    A.  One time one block up from us, just to drop the dogs off to

6    her so she could bring them to Bob because he had the children

7    that weekend.

8    Q.  Other than that one occasion a block away from the

9    townhouse, you never had any interaction with Ms. Robinson

10   outside the townhouse?

11   A.  No.

12   Q.  Did you ever meet her at the offices of Canal?

13   A.  No.

14   Q.  Did you ever meet her at her home office?

15   A.  No.

16   Q.  When you first started interacting with her, what was your

17   understanding of her involvement in the townhouse?

18   A.  I know that she helped find a place -- helped us find a

19   place and she was helping Bob with just setting it up so we

20   could live there.

21   Q.  Did she indicate to you any reluctance to work on the

22   townhouse at that time?

23   A.  Only after she found out about me.

24   Q.  What do you mean by that?

25   A.  The whole time when she had found the townhouse and was

1    setting it up, for a good amount of it she didn't know that Bob

2    and I were together and were going to be living together.  So

3    when she found out about me and met me that day, I think it all

4    came as an unpleasant shock to her.

5    Q.  Now, did you have an understanding -- let me ask you a

6    question.

7         Were you supervising her work back at the beginning?

8    A.  No.

9    Q.  Did you ever supervise any of Ms. Robinson's work relating

10   to her office duties?

11   A.  No.

12   Q.  Did you ever supervise any of her work relating to Bob's

13   acting --

14   A.  No.

15   Q.  -- his movies, or his hotels or restaurant?

16   A.  No.

17   Q.  Could you order her to do something?

18   A.  Could I order?  No.  I mean -- I don't -- I could say if I

19   wanted to, I guess, but it wasn't something that I would choose

20   to do.  It's not -- I wouldn't go there with her.

21   Q.  So let's focus on the time period from September through

22   December of 2018.  I want to talk about your interactions in

23   the first three-month period with Ms. Robinson.  OK?

24   A.  Yes.

25   Q.  Generally speaking, how did you interpret her behavior

1    towards you?

2    A.   She was very territorial.  Very territorial, very angry,

3    and just very confrontational.

4    Q.   Was she nice to you?

5    A.   Nope.

6    Q.   What, if anything, did Ms. Robinson do to make you feel

7    welcome?

8    A.   Nothing.

9    Q.   There was mention in one of the e-mails about Marty's

10   birthday?

11   A.   Yeah.  It was --

12   Q.   Who is Marty?

13   A.   One of Bob's oldest friends -- Scorsese.  It is his

14   birthday and his daughter is born the day after, so we thought

15   it is so nice, we moved in together, let's share our home with

16   our friends.

17   Q.   Let me ask you questions.

18   A.   OK.  Sorry.

19   Q.   Let me ask you questions.

20   A.   OK.

21   Q.   So you had him and some people over for his birthday?

22   A.   Yes.

23   Q.   And do you remember when that was?

24   A.   It was like, late November because it was literally, like,

25   16th or 17th I think.  It was literally on the birthday I

NB25rob6                            Chen - Cross

1    think.

2    Q.  Did you have issue with Chase Robinson's conduct at that

3    birthday party?

4    A.  She wasn't at the birthday party.

5    Q.  Did you have issue with Chase Robinson's conduct with

6    respect to the birthday party?

7    A.  Yes and no.

8    Q.  Those blanks you can fill in, please.

9    A.  She was acting just very temperamental and angry all the

10   time.  She doesn't mask the fact that he is upset at the world

11   constantly and so busy and walking in circles that I couldn't

12   figure out what to do with her.  I felt bad for her on the one

13   hand because I'm the new person coming in.  They have this

14   long-standing relationship and I didn't know if she was

15   territorial because she was afraid that I was going to get in

16   between whatever she felt their relationship was in her head,

17   so I was always trying to be very respectful.  And I know she

18   had helped out with a lot of things with regard to Bob, and I

19   didn't know how well she knew his friends at all or not, I just

20   knew that they had been together for a long time.  So I

21   mentioned to Bob, I said maybe -- she's been so angry all the

22   time, do you want to ask her if she wants to help set up for

23   it?  It might be fun for her and it will give me a chance to

24   maybe have a little bit more time with her and we can just

25   build from here because it is not going very nicely.  And Bob

NB25rob6                          Chen - Cross

1   said yeah, sure.  Fine.  I said, but you know, if she wants to,

2   she can.  If she doesn't have to, she doesn't have to.  It is

3   not a big deal, I can take care of it myself.  I don't want her

4   to feel like she is being pushed out of anything but she is not

5   respecting boundaries, so may be if we spend this time together

6   I can find a way to meet in the middle somehow and not have it

7   be so hostile from her.

8          MR. SCHOENSTEIN:  Let me back up a little bit.  We are

9   going to show Plaintiff's Exhibit 2, it is already in evidence,

10  your Honor.  This is an October 26th text exchange with

11  Ms. Robinson.  Go to the bottom one, please.

12  Q.  Do you remember seeing this text earlier this morning?

13  A.  Yes.

14  Q.  In this time period, in October, how were you trying to get

15  along with Ms. Robinson?

16  A.  I was trying to really be very nice to her, like kill her

17  with kindness, and she was making a lot of ridiculous decisions

18  and just acting a bit nutty and nothing was making sense from

19  her.  So I was like maybe if I just am nice to her and I speak

20  to what I think her strengths might be, maybe that will bring

21  her back down to earth and she will realize that we can have a

22  respectful relationship together and work on things together

23  instead of her always trying to want to control everything.

24  So, I was just trying to kill her with kindness and, you know,

25  there is a little bit of sarcasm and sometimes more sarcasm

NB25rob6                    Chen - Cross

1   here and there because these are personal texts.

2   Q.  Yes.

3   A.  I needed time to vent because this one was like

4   unstoppable, it was just negativity.

5   Q.  We will get to some of those texts.

6        MR. SCHOENSTEIN:  Please scroll down to the bottom of

7   this one please, Ms. Cardona.

8   Q.  I want you to see at the bottom there you say:  Hope you

9   like the products.  I'm making some rose-based serums next

10  week, I will pass them along with you.

11       What does that refer to?

12  A.  I have a skin product line that I worked on and it's all

13  natural organic stuff that I make, and I had stopped for a bit

14  and I was getting back into it so -- that's all.

15  Q.  Did you give some of those products to Ms. Robinson?

16  A.  Yes.

17  Q.  Was that part of being nice?

18  A.  I thought it was.

19  Q.  Did she ever let you know that she found that offensive in

20  some way?

21  A.  No.

22       MR. SCHOENSTEIN:  Let's take a look at Plaintiff's

23  Exhibit 163.  Actually, you can skip 163, let's go to

24  Plaintiff's Exhibit 171, that was in evidence this morning.

25       MR. MACURDY:  Your Honor -- withdrawn.

NB25rob6                        Chen - Cross

1  Q.  So, I want to scroll -- now we saw some of these texts

2  before but I want to show you there are some pictures of some

3  plates here, and if you go to the second page, Ms. Cardona --

4  there you go, stop right there, there is a text from Bob:

5  Where are the place with love under them?  And then some more

6  pictures of plates?

7  A.  Yes.

8  Q.  Can you tell me what the -- tell us what the love plates

9  issue was?

10  A.  So, these were bought before she knew I was in the picture

11  and living here.  She put these -- someone who is always, like,

12  going over every single little detail in the kitchen, places

13  these plates that have "love" written on the underside of the

14  lip and on the inside of the cup, which I just found to be

15  strange to place in your boss' home, I didn't think it was very

16  professional.  So that was -- also, there was so much of her

17  behavior that made these plates stand out because at first I

18  didn't really notice until I started to see how nutty she was

19  getting with him.

20  Q.  OK?

21  A.  And with me.

22  Q.  Let me take you all the way down to the third page and

23  there is a text right above the picture of the dog.  There is a

24  lot of dog pictures in your texts, Ms. Chen.

25  A.  I know.  They're my babies.

NB25rob6                        Chen - Cross

1    Q.  Do you see the 8:38 p.m. text that starts with:  Spoke with
2    Chase?
3    A.  Uh-huh.
4             THE COURT:  You have to answer yes.
5             THE WITNESS:  I'm sorry.  Yes.  I'm sorry.
6    Q.  There is a reference there to:  Also asked her to arrange
7    with Force One to put the gym furniture back tomorrow.
8             What is Force One?
9    A.  It is the moving company that Bob has used and they have
10   had a long-standing relationship.  Chase knows every single guy
11   by name and is very palsy-walsy with them and they do all the
12   moving of the stuff.
13   Q.  So you understood, by December 3rd 2008 -- withdrawn.
14            What was your understanding, as of December 3, 2008,
15   of Ms. Robinson's relationship with the Force One movers?
16   A.  Oh, she's buddies with them.  She's like happy to see them
17   and she loves to tell you they all know Bob, and I know them
18   too and it is like she's best friends with them.  She makes it
19   very clear.  Weird.
20   Q.  Let's take a look at Plaintiff's Exhibit 172 that's in
21   evidence earlier.  Then I am going to look at the first long
22   e-mail or text.  You have said a couple of times today these
23   are texts that you were having with your boyfriend at the time?
24   A.  Yes.  They're personal -- personal messages between a
25   couple that is -- we're maneuvering our life together, we vent

NB25rob6                          Chen - Cross

1    to each other, we go to each other for advice.  Yeah.

2    Q.  So it wasn't your intent to share them with the world when

3    you wrote them, I take it?

4    A.  No.  I never thought I would be reading so many of these

5    with all of you.

6    Q.  Let's look at a couple of things in this first one and this

7    is dated December 6, 2018 and you wrote:  In all honesty, I

8    don't like her having to do anything that contributes to the

9    feeling of our place.

10          Was that your feeling by early December?

11   A.  Yeah, because she's coming in and she's switching furniture

12   around when we are on vacation without permission and then

13   telling Bob it is because she likes the way it looks that way

14   in our house.  She is coming into the house and pruning our

15   trees without us asking until they were, like, naked.  It's so

16   weird.

17          She's coming into the house and it's very obvious,

18   like we have our stuff hung but if my stuff is there, Bob's

19   stuff is there, if she was ever in the house you would see my

20   stuff on the floor, you see all my things unplugged from my

21   side of the bed.  And there are shelves on the table next to

22   the bed and the undershelf she would knock everything off of.

23   So I -- she was making the feeling in the place terrible.  Bob

24   and I can't even have a conversation about certain furniture we

25   wanted to place in certain places without her interjecting and

NB25rob6                          Chen - Cross

1    being like, *No, I hate that chair. I don't want it here, I*
2    *want is upstate*, *upstate, upstate*. We both looked at her,
3    like, what are you doing?
4    Q.  Let me ask you another question.  There is a sentence about
5    halfway down about Lulu:  If she wants to come with Lulu,
6    someone she said couldn't tie her shoelaces unless I tell her
7    how, she said the same thing about Michael.
8    A.  Yes.
9    Q.  Were those -- when you say "she said," who had said those
10   things?
11   A.  Chase.  She insults everyone.
12   Q.  Let me ask the next question.
13   A.  Oh.  Sorry.
14   Q.  So, by December 6, 2018, had Ms. Robinson made disparaging
15   comments to you about Lulu?
16   A.  Yeah.
17   Q.  And about Mr. Kaplan?
18   A.  Yes.
19   Q.  Had she made disparaging comments about others?
20   A.  Yeah.  She would say things about Bob to me.
21   Q.  What would she say about Bob to you?
22   A.  She would -- every opportunity to get into the space Bob
23   and I are in, she made the excuse she had to come meet him at
24   the townhouse before he went to the office, she was going to
25   come down to the office with him.  And he just shouted -- she

NB25rob6                          Chen - Cross

1  was on the main level, he was getting out of the shower and
2  stuff on the second level, he just shouted down, *Hey, Chase.*
3  *Can you just tell me what my schedule is today?*  His schedule
4  is insane.  So he said just remind me what the schedule is and
5  she -- and I was on the main level where she turns and she
6  goes, *Oh, I swear to God.  He is so fucking annoying.  He*
7  *annoys me all the time.  I can't stand it.*  And I looked at her
8  I was -- I didn't even say anything.  I was so shocked that she
9  spoke that way about him in our home when he was just asking
10  her what his schedule was, it was so -- it was just nothing, it
11  was like just let me know what the schedule is.
12  Q.  Let me ask you another question.  There is a statement
13  about two thirds of the way down where you say:  She's been
14  deliberately unkind, inappropriate, and a straight up bitch.
15  A.  Yes.
16  Q.  So I know that counsel asked you about the last part of
17  that, the colorful part of that statement.
18  A.  Of course.
19  Q.  But was that your view at the time, that she had been
20  deliberately unkind and inappropriate?
21  A.  Of course.  Yes.  From the beginning.
22  Q.  And then a couple lines down from that you wrote:  I find
23  it weird and it makes me feel like she does live with us more
24  than I exist here.
25  A.  Yeah.

NB25rob6                     Chen - Cross

1   Q.  And that's how you felt?

2   A.  Well, when somebody is switching the furniture around in

3   your house when you go on a trip and you come back and the

4   whole room is flipped, or telling your boyfriend that she needs

5   to schedule rug cleaner to come in because the place smells

6   like disgusting wet dog, and I'm living there and I'm like it

7   does not smell like disgusting wet dog.  When somebody is

8   coming in and doing this, she is all of these things.

9   Q.  Let's take a look at Plaintiff's Exhibit 1, please, these

10  we saw earlier today as well.  And these were some

11  Christmastime texts?

12  A.  Yes.

13  Q.  You sent her a fairly effusive text a couple days before

14  Christmas; do you see that?

15  A.  Yes.

16  Q.  And counsel asked you if various statements were true?

17  A.  Yes.

18  Q.  And then Ms. Robinson wrote:  Tiffany, your words meant so

19  much to me.  Thank you.  I hope you both have a Merry

20  Christmas.  xx.  What did you understand the xx to mean?

21  A.  I thought it was oddly placed; kiss kiss.

22  Q.  Right.  "xx" is kisses, right?

23  A.  Yeah, and I have to say that was weird coming from her.

24  Q.  All right, but as of Christmas 2018, you are being nice to

25  her and she's giving you kisses; is that right?

NB25rob6                          Chen - Cross

1    A.  It looks this way in this text right now.

2    Q.  Had she told you by December of 2018 that she had any

3    problems with you?

4    A.  She never ever said anything straightforward, she just was

5    not nice or gives false information when you ask for it.

6           MR. SCHOENSTEIN:  Your Honor, I am about to turn the

7    calendar year.  Do you want to take --

8           THE COURT:  Let's go a bit longer.

9           MR. McKNIGHT:  Let's go to Plaintiff's Exhibit 152

10   which I am offering, your Honor.  This is one of the documents

11   we discussed over lunch?

12          THE COURT:  It is received.

13          (Plaintiff's Exhibit 152 received in evidence)

14          MR. MACURDY:  Your Honor, inquiring whether it is

15   being published to the jury before it's admitted.

16          THE COURT:  It is received so it can be published.

17   Any objections that were made outside the presence of the jury

18   are preserved.

19   BY MR. SCHOENSTEIN:

20   Q.  We talked before or you spoke before about the trip to

21   Antigua?

22   A.  Yes.

23   Q.  And this is an e-mail you wrote to Ms. Robinson on January

24   10, 2019?

25   A.  Yes.

NB25rob6                          Chen - Cross

1    Q.   And you copied Bob?

2    A.   Yes.

3    Q.   And --

4            THE COURT:   Members of the jury, this is just being

5    received for the witness' state of mind and not for the truth

6    of the statements contained in it.

7            Go ahead.

8    Q.   And you said, you told Ms. Robinson that the flight

9    attendant said that it was specifically requested that there be

10   no catering on is this flight and she thought it was strange.

11           Was that a true statement?

12   A.   Yes.

13   Q.   And then you were giving Ms. Robinson a report on what

14   happened on the flight?

15   A.   Yeah.

16   Q.   So you brought it to her attention at the time?

17   A.   Yes.

18   Q.   Does she respond to this?  Did she write you back to this

19   e-mail that you can remember?

20   A.   Not that I can recall.

21           MR. McKNIGHT:   Let's take a look at Plaintiff's

22   Exhibit 161.

23   Q.   This is the smoke incident, as we called it before?

24   A.   Yes.

25   Q.   So in January 2019 your smoke alarm went off when you were

1   out of the townhouse; is that right?

2   A.  Yes.

3   Q.  So just to make sure I understand it, how come you didn't

4   get the notification about the smoke alarm going off?

5   A.  Because, one, Chase never told us about the alarm system in

6   the house, never gave us the codes, and then she only listed

7   herself as the point of contact on everything.

8   Q.  When you say on everything, did that issue come up in other

9   places?

10  A.  Yes.  She started changing the bills at the townhouse over

11  to her name, which Kaplan told me --

12  Q.  Tell us what Kaplan told you, just say what you know.

13  A.  OK.  Well, the bills were either in Canal's name or under

14  Michael Kaplan's name, and then all of a sudden I started

15  seeing them come in under her name, which was just strange.

16  And then we eventually also had trouble with our cable in

17  upstate New York -- where she never goes and was never a part

18  of -- and found out that she went so far as to put all of the

19  cable stuff under her name for the house upstate and passworded

20  it so ferociously that we ended up having to cancel, which

21  knocked out our cable and Wi-Fi for a bit, because she had

22  everything so locked up in such a nutty way.

23  Q.  What about the Wi-Fi in your townhouse, did you have the

24  login information for that?

25  A.  No.  I had to ask her a lot.

1    Q.  And what about the elevator for the townhouse?  Was there

2    an issue there?

3    A.  Oh.  So you needed a key for the elevator -- we didn't have

4    the whole townhouse, you needed a key to control it or to

5    unlock it.  She didn't tell us any of this, didn't tell us

6    where the keys were.  We moved in and I didn't know this, I

7    took the elevator, and I got stuck in the elevator.

8    Q.  Were there any issues relating to your closet, your bedroom

9    closet?

10   A.  She -- when we moved in and I put all of my stuff in the

11   closet finally, she got very angry when she walked into the

12   master bedroom when she saw it and she came out and said that

13   all of my stuff had to be removed because Bob wanted the safe

14   painted a certain color.

15   Q.  And do you keep electronics on your bedside?

16   A.  Yes.

17   Q.  Was there an issue with that?

18   A.  Every time she went into the house she would destroy my

19   side of the bed.  She would unplug everything, things would be

20   knocked under the floor, knocked under the table.

21           MR. McKNIGHT:  Let's turn to Plaintiff's Exhibit 4,

22   please.  Let's go to the long text on the third page.

23   Q.  By the way, these private texts that you had with Bob, did

24   you know at the time you were writing to him whether or not

25   plaintiff was reading these texts in secret?

1            MR. McKNIGHT:  Objection, your Honor; leading.

2            THE COURT:  Overruled.

3            MR. McKNIGHT:  Foundation.

4            THE WITNESS:  Does that mean I answer?

5            THE COURT:  Yes.

6    BY MR. SCHOENSTEIN:

7    Q.  Yes, please.

8    A.  Could you ask the question one more time?

9    Q.  Did you know, when you were texting Bob privately in

10   January of 2018 -- let me ask it a different way.

11           Did you think that Ms. Robinson was reading these

12   texts in January of 2018?

13   A.  Not -- not then.

14   Q.  Now, I will ask you a couple of questions about this.

15   About halfway down there is a sentence that starts:  The

16   rearranging... the rearranging she keeps doing of the house has

17   really reached a point of severely overstepping boundaries in a

18   very creepy manner and she still has to keep leaving her mark

19   in some insight into how bold she is willing to get.

20           Is the rearranging that furniture issue you mentioned?

21   A.  Yes; rearranging the furniture, pruning our plants without

22   us asking to, and also just when I have -- we had people in

23   putting up paintings in the house and Bob said, you know, just

24   go around, maybe you see you want something there, it doesn't

25   look right there.  And I was like all right, fine, and I just

1    made a mention maybe -- right when I said the "maybe" she cuts

2    me off and she goes:  *Bob and I decided it looks best here,*

3    *this is where we want it.*  And even directing in the master

4    bedroom, we want this over the bed.  I'm like, what is this?

5    We want this over the bed?  It is so strange and it was so

6    uncomfortable, all you could do was cringe, and the guy --

7    Q.  Wait for another question.

8    A.  OK.

9    Q.  So the last bit at the end, the bit starting with her

10   possessive manner you wrote:  Her possessive manner over the

11   house makes me very uncomfortable down to having the cable bill

12   and security system password be her name.  It is all very weird

13   and she's not easing up on the weird shit either.  I do feel it

14   is getting worse.

15        Were those concerns you had at that time?

16   A.  Yes.

17        THE COURT:  Why don't you try to avoid some of the

18   leading, Mr. Schoenstein.

19        MR. SCHOENSTEIN:  Fair enough.

20        Let's put in Defendant's Exhibit 112, this is another

21   one we discussed at lunch.

22        THE COURT:  That's received.

23        (Defendant's Exhibit 112 received in evidence)

24   BY MR. SCHOENSTEIN:

25   Q.  We were talking about --

 1  A.  I don't see anything.

 2  Q.  It is coming up, I am going to orient you and then we will

 3  get the document on the screen.  We spoke before, you talked to

 4  counsel about Ms. Robinson's birthday?

 5  A.  Yes.

 6  Q.  And the question was asked how you came to send her

 7  flowers?

 8  A.  Yes.

 9  Q.  So we have some e-mails here from February 10, 2019.

10        MR. McKNIGHT:  Can you scroll down, Ms. Cardona?  Keep

11  going down a little bit -- stop.

12  Q.  Do you see the February 10, 12:23 p.m. e-mail from Bob that

13  says:  Remember, it's Chase's birthday today.

14  A.  Yes.

15        MR. McKNIGHT:  And then scroll up, please,

16  Ms. Cardona.

17  Q.  Do you see then you wrote shortly thereafter:  I forgot.

18  I'm going to send her a birthday e-mail.

19  A.  Yes.

20  Q.  And does that refresh your recollection as to how you came

21  to send her flowers that day?

22  A.  Yeah.  Yes.

23  Q.  So how did that happen?

24  A.  Bob reminded me that it was her birthday so I said let me

25  do something nice and maybe she'll stop being so nasty.

NB25rob6                         Chen - Cross

 1              MR. McKNIGHT:  OK.  Let's put up Defendant's Exhibit

 2    33, please.  I believe there is no objection to this one, your

 3    Honor.

 4              THE COURT:  Any objection?

 5              MR. McKNIGHT:  No, your Honor.

 6              THE COURT:  Received.

 7              (Defendant's Exhibit 33 received in evidence)

 8              MR. McKNIGHT:  Let's scroll down, this is now February

 9    13th, and go down a little more please, Ms. Cardona.

10              MR. MACURDY:  Your Honor, we can't see it over here.

11              MR. SCHOENSTEIN:  That's not good.  You want to see

12    it.

13              THE COURT:  Can plaintiff's see it now?

14              MR. McKNIGHT:  Now we can.

15              THE COURT:  Can the jurors see it?

16              THE JURY:  Yes.

17              MR. SCHOENSTEIN:  Go all the way up to the e-mail.

18    BY MR. McKNIGHT:

19    Q.  You wrote to Ms. Robinson and asked for two extra keys?

20    A.  Yes.

21    Q.  And then she wrote that they would be messengered up?

22    A.  Yes.

23              MR. McKNIGHT:  Scroll up a little bit?

24              MR. MACURDY:  Your Honor, I don't recall talking about

25    this document earlier.

1          MR. SCHOENSTEIN:  I think it was on our list last

2     night and we got no objection to it.

3          THE COURT:  I think I just -- your colleague said no

4     objection so it is received.

5     BY MR. SCHOENSTEIN:

6     Q.  Then, on February 13th, at 1:23 p.m. you wrote:  They never

7     got here yesterday.

8     A.  Yes.

9     Q.  Do you recall this question of getting the keys from

10    Ms. Robinson?

11    A.  Yeah.  This is the typical way -- this is why she couldn't

12    work at the townhouse, because she never did her job.  She

13    never complied with anything that was asked from her, she was

14    just -- if I asked her to do anything she just wouldn't do it.

15    She'd say yes and then it never gets done.

16    Q.  By the way, help me with this.  When is the last time you

17    remember Ms. Robinson actually physically being at the

18    townhouse?

19    A.  When the mold stuff happened.

20    Q.  And prior to that, what was the last time before that?

21    A.  What -- the only time I remember distinctly, one of the

22    last times before that was when she told Bob -- turns to me and

23    said *he is so fucking annoying, he annoys me all the time*.

24    That was what I remember as being one of the last times.

25    Q.  But you can't help me pinpoint the date of that?  Do you

NB25rob6                        Chen - Cross

1    know when that was temporally?

2    A.  No.  It is so hard to say.

3    Q.  She was -- let me ask it this way.  Was she around over the

4    holidays Christmas of 2018?

5    A.  She was there at Christmas.

6    Q.  And she was in your home once because of the fire alarm in

7    January?

8    A.  Yes.

9    Q.  Between the fire alarm and the mold, do you recall seeing

10   her in the townhouse?

11   A.  No.  Not that I can recall at this point.

12   Q.  So she was dealing with townhouse issues from another

13   location?

14   A.  Yeah.  Yes.

15          MR. McKNIGHT:  Let's pull up Plaintiff's Exhibit 57

16   that's in evidence.  Actually can you take this one down for a.

17   Q.  I have to ask you about mold.  The mold issue came up in

18   early March?

19   A.  Yes.

20   Q.  What was the mold issue, as you remember it?

21   A.  I was getting really, really, really sick for a long time,

22   it was like -- it felt like forever but like for a few months I

23   was starting to -- my allergies were really bad and the worst

24   part was I started getting rashes all over my body, all over my

25   legs, all over my back, and then I started -- I had childhood

asthma.  So then I started wheezing and that's never happened

to me as an adult so I got very, very, very concerned and I

thought that the place could have -- it was an old townhouse, a

lot of townhouses are very old -- and just given the symptoms

that I had and everything else seeming to be clean, it felt

environmental.  And I said it doesn't hurt to get it checked

out.

Q.  And whose assistance did you seek out in that regard?

A.  Well, Chase was having the twins' place tested for mold so

I just asked her, could you also schedule an appointment for

the townhouse?

Q.  And was Mr. Tasch involved in that mold issue?

A.  He ended up getting involved because Chase never answers

about anything, she is just -- if she feels like it, she will.

Most of the time, especially for me, she doesn't want to answer

so I was like, forget it, I have to find another way to get

this done, and I was directed by Bob to talk to Tasch.

Q.  And eventually the issue was taken care of?

A.  Yes.

Q.  What was the outcome?  Was there mold or not?

A.  The place was infested with mold.  Infested.  It was

extremely bad.

Q.  Were you able to eradicate?

A.  Once -- that's the sad thing.  Once a place has mold, you

can never really eradicate.  The spores are always there and

NB25rob6                          Chen - Cross

1    they always multiply at the certain point, given the right

2    environment for it.

3              MR. McKNIGHT:  So now let's put back up Plaintiff's

4    Exhibit 57, now let's move to late March.  And I want to start,

5    Ms. Cardona, all the way at the bottom with the first e-mail in

6    this chain.

7    Q.  You recall there was going to be some painting in the

8    apartment?

9    A.  Yes.

10   Q.  So, from your memory, what was the issue with the Robert

11   De Niro, Sr. paintings?

12   A.  They're insured and they're valuable pieces of artwork and

13   it is also his dad's stuff, like, you want to be really careful

14   with it, it is his memories and everything.

15   Q.  Are they important to Bob, these paintings?

16   A.  They're -- everything with his family is the most

17   important.

18   Q.  And how much of it is on the walls of your house?

19   A.  It is everywhere in our house.  It is his memories it's --

20   I'm sorry, I get emotional, especially after you have a baby,

21   but it's -- he has it in his hotel.  He is so proud and he

22   loves his father so much so I knew these things were very, very

23   important and I wanted to be careful with them.

24   Q.  So in this first e-mail, on March 27 at 11:14 a.m., were

25   you reaching out to Ms. Robinson?

1    A.  Yes.

2    Q.  And then let's go up to the next e-mail, she writes you

3    back:  Jerry and his guys are handling everything so I'm not

4    sure what additional paint removal would need to be done.  I

5    can ask Jerry and have him contact you about the work.

6              Do you see that?

7    A.  Yes.

8    Q.  Do you know who Jerry is?

9    A.  Yes.

10   Q.  Who is he?

11   A.  He is a contractor.

12   Q.  And was he involved in the painting?

13   A.  He was involved with painting the house, not the actual

14   artwork being taken down and stored properly.  There is like a

15   whole -- there are people that come in and do that for

16   insurance reasons, and I actually learned that because of Chase

17   because when the fire happened at the townhouse where she

18   showed up and took care of the puppies, she made a whole big

19   deal about, oh, we have to get this insurance company in and

20   they have to do this because of the valuable artwork on the

21   walls and I remembered that.  Like I said, I just got here, I

22   was learning everything.

23   Q.  Don't get too far away from the question.

24   A.  Sorry.

25   Q.  That's OK.  Did you find that e-mail to be responsive to

1  what you had asked?

2  A.  No.  I mean, in her way responsive, because she's likes to

3  be difficult.

4  Q.  Go to the next e-mail, you write her back:  The paintings

5  that are hanging on the walls.

6           Why did you write that back?

7  A.  Because I knew she was just being a difficult pain in the

8  butt so I told her, the paintings that were hanging on the

9  walls because it has nothing to do with Jerry and she knows it

10 because she is the one who instructed me on that.

11 Q.  She wrote back:  That would be a Kap question.  Kap,

12 possible to get Force over there to take the RDN, Sr.s down?

13          Do you see that?

14 A.  Yes.

15 Q.  Was "Kap" Mr. Kaplan?

16 A.  Yes.

17 Q.  Did you have an understanding -- do you have a memory of

18 Mr. Kaplan's involvement in townhouse issues in March of 2019?

19 A.  He almost died so he was involved, but he has a family, had

20 a heart attack on vacation.  He came back to work but I was not

21 going to put anything on him, especially anything like this

22 where it is time sensitive.  I didn't want pressure on him, I

23 wanted him to get better.

24 Q.  And at the time did you have a reaction to Ms. Robinson

25 asking somebody else to contact Force?

1    A.  Say that again?

2    Q.  Well, she is asking Mr. Kaplan to get Force over there.  Do

3    you see that?

4    A.  Yes.

5    Q.  Did you have a reaction to the fact that she was asking --

6    A.  Yes.

7              MR. McKNIGHT:  Your Honor, objection.

8    A.  She was like best friends with them.

9              THE COURT:  Hold on for a second.

10             MR. McKNIGHT:  The leading is continuing.

11             THE COURT:  Yes.  The objection is sustained.

12   BY MR. SCHOENSTEIN:

13   Q.  What if any --

14             THE COURT:  Let me instruct you, ma'am --

15             THE WITNESS:  Yes.

16             THE COURT:   -- you should pause before you answer so

17   that the other side can object to the question if they want.

18             THE WITNESS:  OK.

19             THE COURT:  And please try to confine yourself to just

20   answering the question asked.

21             THE WITNESS:  OK.

22             THE COURT:  Go ahead, Mr. Schoenstein.

23   BY MR. SCHOENSTEIN:

24   Q.  What, if any reaction, did you have to that e-mail we have

25   highlighted?

1    A.  I thought it was ridiculous.

2    Q.  Why?

3    A.  Because she knows Force, she's told me all about Force.

4    She is slapping high fives with all the time when they come to

5    the house and then all of a sudden she can't do that, which

6    made no sense to me.

7            MR. McKNIGHT:  Scroll up to the next e-mail, please.

8    Q.  And then you wrote a lengthy e-mail back to her?  Do you

9    see that e-mail?

10   A.  Yes.

11   Q.  What was your mental state when you wrote this e-mail?

12   A.  Annoyed.

13   Q.  And in the third line it says:  It is sometimes hard to

14   fully understand your hierarchy and responsibilities of who

15   does what for who and when.

16   A.  Yes.

17   Q.  What did you mean by that?

18   A.  Because Chase, if she doesn't want to do it she's not going

19   to do it.  It doesn't matter what you think her job title is,

20   it is whatever she makes up in her brain that morning.  All she

21   does it make problems, make problems, excuses, doesn't do the

22   job, puts it on somebody else, it is somebody else's

23   responsibility.  You never get a straight answer from her.

24           MR. McKNIGHT:  Scroll up a little Ms. Cardona?

25   Q.  And see the next e-mail on the chain?  Ms. Robinson wrote:

1   Unfortunately, I'm not in touch with Force, nor do I have their

2   direct numbers.

3           What, if any reaction, did you have to that statement?

4   A.  I was pissed, because immediately I was like, this is such

5   bullshit.  I didn't know what game she was playing now but I

6   knew she was being ridiculous.

7   Q.  Let's try to filter ourselves a little more in court.

8   A.  Sorry.

9   Q.  That's OK.

10          MR. SCHOENSTEIN:  Go up to the top, please?

11  Q.  Now, you wrote back a lengthy e-mail, I'm not going to read

12  all of it, but the second paragraph you wrote:  It's becoming

13  increasingly difficult to understand what do or don't do, what

14  you will do versus what you don't do.

15          Did you have that issue at that time?

16  A.  Yes.

17  Q.  And then in the next paragraph you wrote:  Maybe you should

18  make a new guide for both Bob and myself.  This way, he and I

19  know what you have determined your responsibilities to be.

20          MR. McKNIGHT:  Your Honor --

21  A.  Yes.

22          MR. McKNIGHT:  Just continuing the leading.

23          THE COURT:  Yes.  It is.  Objection is sustained.

24  BY MR. SCHOENSTEIN:

25  Q.  Do you see that language I just read?

NB25rob6                          Chen - Cross

1  A.  Yes.

2  Q.  What did you mean by that?

3  A.  What I meant?  Can you just straighten your stuff out,

4  straighten yourself out?  And this way, if you tell us what you

5  do and you don't do, then we don't have to have this ridiculous

6  stuff anymore where I ask to you do something, Bob asks you to

7  do something -- *That's not my job.  That's not my job.*  We need

8  to understand what is going on, can we have a guide so at least

9  we are not guessing whether you going to say yes or no to this.

10 Q.  Did Ms. Robinson, do you recall, respond to you on this

11 e-mail?

12 A.  I don't think she did.

13 Q.  And did there come a time when you received a guide from

14 her, as you had requested?

15 A.  No.

16 Q.  Let's turn now to Plaintiff's Exhibit 5 that is already in

17 evidence.

18         THE COURT:  And this will be the last exhibit before

19 we take our mid-day break.

20         MR. SCHOENSTEIN:  Very good, your Honor.

21 Q.  These are some texts, more of the texts with Bob we were

22 looking at, let's go all the way to the last page -- sorry, I

23 meant second to last page, I guess.  At 3:18 p.m. you wrote --

24 A.  Wait.

25 Q.  I'm sorry, 8:15 p.m.?

NB25rob6                        Chen - Cross

1    A.  Yeah.  OK.

2    Q.  This is stuff Chase knows but she refuses to be helpful.

3           What did you mean by that?

4    A.  All the information we always ask her for -- and I know --

5    I only ask if I know she has that information.

6           THE COURT:  Can you just try to limit yourself to just

7    the question being asked?  What did you mean by what you said?

8    A.  Exactly what I said.  She knows the stuff but she refuses

9    to be helpful.

10   Q.  And then two texts after that you wrote:  You know Kap had

11   a heart appointment today which complicated matters.  She can't

12   even step up.

13          What did you mean by that?

14   A.  That's not a team player.

15          MR. SCHOENSTEIN:  OK, your Honor.

16          THE COURT:  All right members of the jury, we will

17   take our afternoon break for about 15 minutes.  Enjoy the

18   break.  Don't look at anything about the case, don't talk to

19   each other or anybody else about the case.

20          (Continued on next page)

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Ms. Chen, you may step down.

3              THE WITNESS:  Thank you.

4              (witness steps down)

5              THE COURT:  Mr. Schoenstein, how much more do you

6     have?

7              MR. SCHOENSTEIN:  Certainly less than an hour.

8              THE COURT:  OK.  And any sense of what the redirect is

9     going to look like?

10             MR. McKNIGHT:  Probably short, your Honor, but I will

11    wait and see what unfolds here.

12             THE COURT:  It sounds like this will be our last

13    witness for the day.  On that assumption, is the plaintiff the

14    first witness tomorrow?

15             MR. HANNAFAN:  Yes, your Honor.

16             THE COURT:  And then is it the expert after that?

17             MR. HANNAFAN:  Yes, your Honor.

18             THE COURT:  Are there any legal issues with respect to

19    the expert that I should anticipate from defendant's

20    perspective?

21             MR. SCHOENSTEIN:  No, your Honor.  I mean, depending

22    on the testimony but --

23             THE COURT:  I mean, you have got the expert report so

24    you will just be able to let me know if you anticipate any

25    issues.

 1              MR. SCHOENSTEIN:  Nothing we need you to consider at
 2    this time.
 3              THE COURT:  I will see you all back here in about 10
 4    minutes.
 5              Mr. Macurdy, do you have an issue?
 6              MR. MACURDY:  Pertinent to this testimony, we would
 7    ask for a limiting instruction based on Ms. Chen referring to
 8    Ms. Robinson being mentally ill on various occasions and let
 9    the jury know that that is irrelevant, they shouldn't consider
10    it, it should be something -- I don't know that you need to say
11    it specifically but the issue is that they could think about
12    that in terms of damages, her distress.
13              THE COURT:  I mean, I think all we are exploring right
14    now is Ms. Chen's state of mind but let me hear from defendants
15    on that.
16              MR. SCHOENSTEIN:  Yes, your Honor.  That is, and I
17    believe Ms. Robinson's expert is going to testify, that she has
18    a mental illness, as I understood the report.
19              THE COURT:  Yes, so I'm not going to give that kind of
20    limiting instruction now.  It may be that at the time of the
21    charge conference a limiting instruction might be appropriate.
22    I will keep it in mind but I don't think right now, given the
23    state of play, I'm going to give that instruction.
24              MR. MACURDY:  Understood, your Honor.
25              The other thing was I want to be respectful of your

NB25rob6                        Chen - Cross

1  Honor's time and figure out how we can get the best set of

2  objections to their exhibits for Ms. Robinson for you.  Because

3  right now defense has identified many, many exhibits, and if it

4  is possible that they could cut that down to a more realistic

5  list, that would be something more useful.

6          THE COURT:  I take it you have provided your list of

7  exhibits to the defense that you intend to use with

8  Ms. Robinson already?

9          MR. MACURDY:  Yes, your Honor.

10         THE COURT:  Mr. Schoenstein, have you gotten your

11 objections to Mr. Macurdy?

12         MR. SCHOENSTEIN:  I don't think we did object to any

13 of the Robinson exhibits.  Our inclination, throughout this

14 trial, has been to let the evidence come in.

15         THE COURT:  I don't care what anybody's inclinations

16 are.  They can make objections but they can't, you know, the

17 instruction to the jury, which is everybody has a right to

18 object.

19         MR. MACURDY:  Your Honor --

20         MR. SCHOENSTEIN:  I would say this --

21         THE COURT:  Mr. Schoenstein, I am talking to

22 plaintiff's counsel now.

23         MR. MACURDY:  I was referring to the exhibits that

24 they want to use for Ms. Robinson, which are voluminous, and so

25 we provided objections, but if they could cull it down to a

NB25rob6                          Chen - Cross

1    more realistic list of what could be used then we could provide

2    your Honor with something more useful, I believe.

3           THE COURT:  Well, so Mr. Schoenstein, why don't you?

4           MR. SCHOENSTEIN:  Let me say a couple things.

5           One, it is a long list because it is going to be a

6    long cross.  Two, the list we gave them includes -- and now

7    includes even more documents that have been admitted so we will

8    take that list and strike all the exhibits that have already

9    been admitted so nobody needs to look at those.  Then I will

10   take a second look at what's left and see if there is anything

11   I know, sitting here today, we are not going to use, and we

12   will get that back to plaintiffs by 7:00 so that they can take

13   a look.

14          THE COURT:  The other thing that I'm going to ask you

15   to do, and if you need to 7:30 to do it you can do it, is if

16   there is a document that you are seeking to have received for a

17   limited purpose, i.e., not for the truth of what the document

18   says but for the fact that it was said or for some other

19   reason, indicate that you are not offering it for the truth

20   because there are some documents as to which there were 802

21   objections, maybe those are well-founded objections.  As to the

22   previous witness, that it seemed to me on its face that are not

23   being offered for the truth and from the perspective of

24   plaintiff I could well understand, you know, if they just get a

25   document and they don't understand that you are offering it

1    only for a limited purpose, they kind of need to make the

2    broader objection.

3            Mr. Macurdy, I take it that is helpful to you?

4            MR. MACURDY:  That would be very helpful, your Honor.

5            THE COURT:  Why don't you do that.  I will see you

6    back here at 3:45.  We will probably break, depending on how

7    things go at 4:50, 4:55.  I have some conferences beginning at

8    5:00 that I will do from chambers so we will break a couple

9    minutes before 5:00 just in case there is any issues the

10   parties have to raise with me.

11           MR. HANNAFAN:  Your Honor, I am sorry.  Before you go,

12   one brief issue with the exhibits for Ms. Robinson.

13           Mr. Schoenstein has said several times during the

14   trial that we have kicked the door wide open.  I think

15   Mr. De Niro kicked the door wide open when he testified about

16   that recording, the call, the message that he left Ms. Robinson

17   when she was in Spain.  Your Honor previously excluded that but

18   Mr. De Niro gave testimony about it and I can give you the page

19   and lines in the transcript, but he specifically talked

20   about --

21           THE COURT:  No, I remember the testimony quite well.

22           MR. HANNAFAN:  Yes.

23           THE COURT:  So what is your argument?

24           MR. HANNAFAN:  He said:  *You want to play it?*

25   *Everyone heard it over and over.  Play it.  I berated her, it*

NB25rob6                    Chen – Cross

*was abusive, I was annoyed, I was upset. She should have*

*gotten me up, done the right thing, and she didn't. Period.*

I think he has opened the door for us to be able to

play the actual call for two reasons; one, talking about it,

actually requesting we play it; second, the description he gave

as to why she didn't call him we believe is not accurate.  He

makes it sound as though she wasn't doing her job.  I expect

she would give a different explanation as to what happened.

So, again, we request that we be able to play it with

Ms. Robinson.

THE COURT:  I will consider that.  I am not inclined

to do that.  I will also consider, I take it, that you want to

bring out from her her side of the story with respect to that

incident?  Is that what you intend to do, even if the call

doesn't get in?

MR. HANNAFAN:  Possibly, your Honor.

THE COURT:  I mean, I take it the reason why he made

the reference to everybody hearing it is not because the jury

heard it but because it's posted on the Internet.

MR. HANNAFAN:  Well, it's -- really it's that -- it

is -- obviously, it has been public.  He makes this statement

about it:  *Go ahead and play it.  Play it.*

THE COURT:  But that doesn't affect the 403 analysis

in terms of whether this jury should hear it and whether we

need to have a digression into an incident that happened years

NB25rob6                           Chen - Cross

1    ago where somebody lost their temper, which I can imagine

2    everybody in this courtroom has at one point or another lost

3    their temper, including, I think, every counsel and probably

4    members of the court staff.  It just is, has such peripheral

5    relevance to this case where there are issues that matter for

6    this case that, you know, he will look at it.  But you have the

7    basis for my prior ruling.

8              MR. HANNAFAN:  Yes, your Honor.

9              THE COURT:  I will see you back in a couple minutes.

10             MR. HANNAFAN:  Thank you, your Honor.

11             (Recess)

12             (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB7

1          THE COURT:  Let's bring in the jury.  The witness

2     should take the stand.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Counsel, you may proceed.

3   BY MR. SCHOENSTEIN:

4   Q.  All right, Ms. Chen.  Let's stick with the questions.

5   We're going to try to get you finished today.  Okay?

6   A.  Okay.

7   Q.  Prior to March of 2019, had any concerns been raised to you

8   about the engagement of housekeepers at the townhouse?

9   A.  Yes.

10  Q.  What were they?

11  A.  Well, the whole hiring process, they came to me complained

12  about because Chase was the one that initiated all of that.

13  And then they said that they were pretty close to not accepting

14  the position because she had made them meet --

15          MR. MCKNIGHT:  Objection, your Honor.

16          THE COURT:  Overruled.  It goes to her state of mind.

17  All this goes to the witness's state of mind.

18  A.  So they had come and told me that Chase was very strange in

19  her interview process, had them meet with her on three separate

20  occasions, and then she said the whole time all Chase did was

21  talk about herself and how she works with somebody very high

22  profile and how close -- and how close they are, how much he

23  depends on her, so she's going to be around a lot.

24          But they said, what was confusing, is she never

25  mentioned that we were going to be working for this gentleman

NB26ROB7                         Chen - Cross

1    and his girlfriend.  She made it seem like it was for Bob and

2    for Chase.

3               MR. MCKNIGHT:  Your Honor, can we have an instruction

4    on the out-of-court testimony?

5               THE COURT:  I think I did just give them the

6    instruction.

7    BY MR. SCHOENSTEIN:

8    Q.  Prior to March of 2019, did you have any concerns about

9    Ms. Robinson's spending?

10   A.  Yes.

11   Q.  What were they?

12   A.  She loved to flaunt that she had an envelope of cash all

13   the time, and that would be from the accountant for petty cash.

14   And she's flaunting it, waving it around, to my -- from what I

15   saw, overtipping.  Not just her, Michael Kaplan was doing it

16   too.  And then she would brag about misplacing her envelope of

17   cash and having to come to me and ask me if I had cash to do

18   the tipping, because she just doesn't know where she put it,

19   she just -- ugh, she doesn't know where her mind is at.  She

20   just leaves it around.  But that's okay.  She can just get more

21   anytime she wants.  She is just going to tell Tasch.

22               And she would offer all this information in such a

23   strange way to me.  I'm like, you don't have to tell me all

24   that.  Just, you need money to tip, I will do it.  But I don't

25   need to know all these details about how  you can just get

1    money whenever you want, and you don't know what you do with

2    it, you just leave it around.

3    Q.  Do you have any personal observations -- I don't want to

4    know about personal observations -- of her Ubers, taxis, or car

5    services?

6    A.  She --

7            THE COURT:  Hold on a second.  Wait for the questioner

8    to finish the question.

9            THE WITNESS:  Sorry.

10   Q.  You can answer.

11   A.  Yeah.  She always bragged about having her driver -- her

12   car waiting for her.  And I thought that was like -- that was

13   just strange, that she had a driver and a car.  It was her

14   using the Ubers all the time.  Oh, I have my driver.  I have my

15   car waiting, so I can't be here too long.  It's always, I'm so

16   busy, and doing all that, but constantly talking about her

17   driver, her driver, her driver.  And I didn't think that that

18   was the way Bob was okay with, you know, her using the company

19   card for Ubers.

20   Q.  Before the break, we were looking at some March 27 e-mails

21   about the paintings.  Do you remember that?

22   A.  Yes.

23   Q.  Where was Bob that weekend, if you remember?

24   A.  I think he was on vacation with the kids.

25   Q.  Was he out of New York?

1   A.  Yes.  I think they were skiing.  Probably Montana.

2   Q.  Did you have any concerns at that time about Ms. Robinson's

3   spending on household items?

4   A.  Yes.

5   Q.  What were those?  By that I mean, what were the concerns?

6   A.  Well, I had -- while the house was getting set up, I

7   noticed there were certain items that were ordered, and a lot

8   of stuff that was unpacked in piles.  So I was looking at all

9   the stuff, because also a lot of things weren't the things that

10  I had gone over needing for the house.  But then when I looked

11  around the house after everything had been set up, all the

12  sudden all those things that I saw that were in the house were

13  no longer there.  So I had asked somebody else that was

14  involved with helping out with the townhouse, Michael Kaplan,

15  and I just said, were there a lot of things that were returned?

16  And he had informed me nothing can get returned because --

17          MR. MCKNIGHT:  Objection, your Honor.

18          THE COURT:  Sustained.

19          MR. SCHOENSTEIN:  Let's pull up Plaintiff's Exhibit 7,

20  please.

21  Q.  Have you ever seen Single White Female?

22  A.  Yup.

23  Q.  Let's take a look.  I want to start at some earlier texts.

24          MR. SCHOENSTEIN:  Stop right there in the chain.

25  Q.  Do you see there's a 9:35 a.m. text you wrote where you

NB26ROB7                      Chen - Cross

1    said the girls in the office have been complaining to me for

2    years about her.

3              Who are you quoting?

4    A.  Mary Beth Medley.

5    Q.  Were you starting to hear things in this time period about

6    Ms. Robinson?

7    A.  Yes.

8              MR. MCKNIGHT:  Objection, your Honor.

9              THE COURT:  Overruled.

10   Q.  Were they concerning to you what you were hearing?

11   A.  Yes.

12             MR. SCHOENSTEIN:  Let's go down all the way to the

13   text at the bottom of the next page.  There you go.  That 1:13

14   text.

15   Q.  And I want to read this in its entirety.  I think we only

16   read part of it before.  I don't know why.

17             It says:  The minute my clothes were there, she

18   started to refuse to go into the master bedroom.  Whenever she

19   would do things in the house, she would disconnect all my

20   chargers and anything on my side of the bed.  The whole

21   situation had become very "single white female."

22             You wrote that?

23   A.  Yes.

24   Q.  And the clothes and the chargers issue, that's what you

25   testified about a little bit earlier?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yes.

2    Q.  That's what you were referring to in that text?

3    A.  Yes.

4    Q.  You can put down that e-mail.

5            So as this discussion that began on the weekend of

6    March 27th with the paintings, and we saw you had some

7    communications with Bob about it, did you and Bob also talk

8    about the issue?

9    A.  Yeah, yes.

10   Q.  And what I want to know is prior to Ms. Robinson's

11   departure from Canal, had there been a decision made to fire

12   her?

13   A.  Not from Canal.

14   Q.  Were there any talks about getting her out of Canal

15   altogether?

16   A.  Never, about Canal.

17   Q.  What were the discussions?

18   A.  Get her out of the townhouse, get her away from me.

19   Q.  Did you feel at the time that getting her out of the

20   townhouse would adversely affect Ms. Robinson?

21   A.  No, I thought that's what she wanted.

22   Q.  And was that what you wanted?

23   A.  Well, it was what we both wanted, so it would have been

24   great if it worked out that way.  She could do her stuff at

25   Canal and leave us alone at home.

1   Q.  Was there any discussion about altering her other duties?

2   A.  You mean at Canal.

3   Q.  Correct?

4   A.  No.

5   Q.  Was there discussion about telling Canal employees they

6   couldn't talk to her about Canal business?

7   A.  No.

8   Q.  You on direct testimony mentioned a plan to have a meeting.

9   A.  Yes.

10  Q.  What was that plan?

11  A.  The plan was because of all the grievances that everybody

12  had against Chase, and my personal experience with it, and Bob

13  was experiencing more of it to himself.  We said, you know,

14  these are the things that we're upset about, and we have the

15  right to voice them to her.  But at the same time, we also want

16  to give her a voice, face-to-face, to either give us an

17  explanation for this behavior or own up to it, apologize, and

18  we can move on, and figure out something else that would just

19  be better for everyone.  But it was just to figure out a better

20  situation for all of us.

21  Q.  Let's pull up Plaintiff 383, please.

22          MR. SCHOENSTEIN:  This is in evidence, your Honor.

23          Sorry.  We had discussion about this earlier.  We

24  offer it.

25          THE COURT:  You did.  This is received.

1              (Plaintiff's Exhibit 383 received in evidence)

2    Q.  Do you see, Ms. Chen, there's an 8:20 a.m., 8:20 a.m.

3    e-mail from you?

4    A.  Yes.

5    Q.  On April 2.

6              And you write, maybe now is a good time to transition

7    to Lulu.

8              What did you mean by that?

9    A.  To have Lulu start helping at the townhouse instead of

10   Chase.

11   Q.  Was this at all related to the plan to take Chase off the

12   townhouse?

13   A.  Yes.

14   Q.  And then Mr. De Niro wrote back to you at 8:27 a.m.?

15   A.  Yes.

16   Q.  And how did you understand his response?

17   A.  That he agreed with me.

18   Q.  And so by 8:27 a.m. on April 2, was it your understanding

19   that Ms. Robinson was going to be off the townhouse project?

20   A.  Yes.

21   Q.  And was that in accord with your desire?

22   A.  Yes.

23   Q.  Let's look at Plaintiff's Exhibit 9.  This is already in

24   evidence.

25              Let's scroll down to the bottom of the first page.

1    These are some texts with Mr. Kaplan.

2              At the bottom, you write -- and this is at 9:51 a.m.

3    on April 2:  FYI, she's getting taken off the house, and Lulu

4    is getting put on there to help me.

5              Do you see that?

6    A.  Yes.

7    Q.  At 9:51 a.m., you were reporting that to Mr. Kaplan?

8    A.  Yes.

9              MR. SCHOENSTEIN:  Scroll to the top of the next page.

10   Q.  You wrote Bob's idea entirely.

11             What did you mean by that?

12   A.  I don't remember.

13   Q.  Okay.  Fair enough.

14             MR. SCHOENSTEIN:  Let's go to the next page, please.

15   Towards the bottom.  I want to go first to a text at 4:34 p.m.

16   Q.  You wrote:  And she's costing too much money while causing

17   too much commotion.

18             What did you mean by that?

19   A.  I started to find out that from different people that

20   worked at Canal — Lulu — that she was giving away all the stuff

21   at the townhouse that I couldn't find.  And on top of the way

22   she was always bragging about losing all her petty cash and

23   just -- but it was okay, because she could get more whenever

24   she wanted.

25             Hearing all this stuff and the Ubers and everything,

NB26ROB7                        Chen - Cross

1    that her car is always waiting around for her, like, she's

2    costing us a ton of money but making problems.  She's not

3    helping solve anything.  It would be one thing if she used

4    everything to be efficient and things had got handled nicely,

5    but she was being nasty people.  She was being nasty to her

6    boss, her coworkers, and then on top of it, she's spending like

7    crazy and not accounting for it.

8    Q.  Now, I see the e-mail after that, which is written at

9    4:57 p.m.?

10   A.  Mm-hmm, yes.

11   Q.  And you reference an e-mail to Bob.  Do you see that?

12   A.  Yes.

13   Q.  And that's at 4:47 p.m.?

14   A.  Yes.

15   Q.  So you're talking about an e-mail to Bob, and that's seven

16   hours or so after you told Mr. Kaplan that Ms. Robinson was

17   being taken off the townhouse.  Right?

18   A.  Yes.

19            MR. SCHOENSTEIN:  Put up, please Defense Exhibit 231.

20   I don't think there's an objection to this one, your Honor.

21            THE COURT:  Any objection?

22            MR. MCKNIGHT:  I'd like to see it.

23            THE COURT:  Okay.

24            MR. MCKNIGHT:  We don't have the picture.

25            MR. SCHOENSTEIN:  She's getting it.  Scroll down,

NB26ROB7                    Chen - Cross

1    Ms. Cardona.

2            I don't there's any dispute about this document.

3            MR. MCKNIGHT:  No objection.

4            THE COURT:  Received.

5            (Plaintiff's Exhibit 231 received in evidence)

6            MR. SCHOENSTEIN:  Hold on.  Is this 231?  Well, scroll

7    down.

8    BY MR. SCHOENSTEIN:

9    Q.  Do you see the e-mail from Ms. Robinson on April 2 at

10   1:29 p.m.?

11   A.  Yes.

12   Q.  And have you seen that e-mail before?

13   A.  Yes.

14   Q.  Okay.  And that's in the afternoon after those e-mails and

15   texts we saw about Ms. Robinson coming off the townhouse

16   project?

17   A.  Yes.

18           MR. SCHOENSTEIN:  You can take that down, please, and

19   put up Plaintiff's 8, which is already in evidence, and scroll

20   down, please.

21   Q.  Ms. Robinson's e-mail from that afternoon was forwarded to

22   you by Bob at 3:44 p.m.

23           Scroll up a little bit, Ms. Cardona.

24           Do you see that?

25   A.  Yes.

1    Q.  Is that the first time you saw that e-mail?

2    A.  Yes.

3            MR. SCHOENSTEIN:  You can take down that exhibit.

4    Q.  Did there come a time when you started to look more

5    intently at the spending concerns you had with the townhouse?

6    A.  Yes.

7    Q.  And when did you do that?

8    A.  It had to be around the same time period, because I was

9    concerned just -- just about Chase, Michael Kaplan, and

10   Robin Chambers.

11   Q.  So you had concerns about other people who had been

12   involved?

13   A.  Yes.

14   Q.  And with respect to Ms. Robinson's spending, what were your

15   conclusions?

16   A.  Well, what I found out she -- what I know happened, we had

17   dinnerware and other kitchenware that was all laid out in the

18   house, and then they weren't in the house.  She was giving it

19   away to people.  Lulu, one of them.  But she was just giving

20   stuff away.  I'm sure -- I wouldn't be surprised if she kept

21   some stuff for herself.

22           MR. MCKNIGHT:  Objection, your Honor.

23           THE COURT:  I'm going to give an instruction with

24   respect to this.

25           This is not coming for the truth of any of it, but

NB26ROB7                          Chen - Cross

1    just what the witness believed, and to the extent that it helps

2    inform your understanding and your analysis of the e-mails and

3    documents she subsequently sent.

4    BY MR. SCHOENSTEIN:

5    Q.  Did you reach out to Mr. Tasch on or about April 4?

6    A.  Yes, I did.

7    Q.  Pursuant -- I'm sorry.

8            And what did you ask him?

9    A.  I wanted to see all of the Amex charges, and I asked him

10   for expense reports for the petty cash from Chase, Kaplan, and

11   also I wanted to see -- I wanted to understand a little bit

12   more about what Robin Chambers had been doing as well.

13   Q.  Did you have any concerns about Mr. Kaplan or Ms. Chambers

14   being romantically interested in Mr. De Niro?

15   A.  No.

16   Q.  By the way, how did you get along with Mr. Tasch?

17   A.  At the beginning?

18   Q.  Yeah.

19   A.  Oh, we didn't like each other.  I mean, I didn't

20   actually -- let me change that.

21           I didn't dislike him at first, but he was very

22   territorial at the beginning.  But I also realize he's been in

23   this position a lot longer than I've been around.  I just got

24   here, and now there's a new person coming in to create more

25   possible chaos for him.  So we didn't like each other at first.

NB26ROB7                          Chen - Cross

1    But I learned that he was territorial in a way that was

2    protective of Bob, so I appreciated it.

3    Q.  All right.  You mentioned before that there was talk about

4    having a meeting with Ms. Robinson?

5    A.  Yes.

6    Q.  And what was going to be the purpose of that meeting as far

7    as you understood it?

8    A.  Confront her for her abuse --

9           MR. MCKNIGHT:  Objection.  Asked and answered.

10          THE COURT:  Overruled.

11   A.  To confront her about all of the abuse that she had doled

12   out on the office.  Also question her about when she's cursing

13   people out in front of me and speaking extremely rude to Bob,

14   telling me he's so fucking annoying.  I wanted to be like, how

15   could say that in our home to me.

16   Q.  Language, Ms. Chen.  Language.

17   A.  Sorry.

18          She's a pretty horrible person, and she had to be

19   confronted by the people she had really hurt and taken

20   advantage of and abused very, very badly.  But at the same

21   time, I also thought we're all talking about it, right, so we

22   have something in common with each other.

23          We can't just talk about her behind her back.  We have

24   to say it to her face and see what she has to say.  Maybe

25   there's something justifiable there.  I'm always hoping for the

1    best, that there would be some conclusion that wouldn't be

2    harmful to anybody.  But that's what -- I felt everybody had

3    their right to say, how could you speak to me this way?  How

4    could you do this?  How could you do that?  That was the

5    purpose of the meeting.

6    Q.  Did that meeting ever happen?

7    A.  No.

8    Q.  Why not?

9    A.  Because I think Chase knew what was coming.  She didn't

10   want to hear it.

11   Q.  And did she leave the company before the meeting could

12   happen?

13   A.  Yes.

14   Q.  What became of Lulu White?

15   A.  I have no idea.

16   Q.  Well, I just mean from your life.  I don't mean where has

17   she been since.

18   A.  She -- I feel bad for her.  She's --

19   Q.  I just want to know what happened.

20   A.  What happened, she had no idea what was going on.  She

21   literally --

22          THE COURT:  No, I think you want to start again

23   with --

24   Q.  So around this time frame, prior to Ms. Robinson's

25   departure, Lulu White was her assistant, correct?

NB26ROB7                          Chen - Cross

1    A.  Yes.

2    Q.  And was Lulu doing things in relation to the townhouse?

3    A.  No.

4    Q.  And then we saw in some documents that there was some

5    intent to have Lulu White help on the townhouse?

6    A.  Yes.

7    Q.  And then within a few days, she was gone from the company?

8    A.  Yes.

9    Q.  How did that come about?

10   A.  Well, after I sat and spoke with Lulu -- she was hired by

11   Chase, and Chase had told Bob she needed her because she needed

12   help with the townhouse.  Then when I sat with Lulu, Lulu said

13   that was not why she was hired.  And part of her instruction

14   from Chase was to never speak to me and not to be polite to me,

15   to be rude to me if she could.  She wasn't allowed to speak to

16   the other girls in the office either, which defeats the purpose

17   of being an assistant at Canal.

18           And then Lulu then told me that her whole job there --

19   I wanted to see what her strengths are.  What are your

20   strengths, like what could you possibly do here?  She never

21   went to school for finance, but she then told me that Chase had

22   her working with her on protecting Bob from an audit.  And then

23   I didn't know what the hell that meant because that was just

24   strange.  I said, what do you mean you're going to protect Bob

25   from an audit?

1          Chase keeps every single receipt in her house, piles

2     of them, and she instructed me to look up every charge on the

3     Internet and compare that to the charge on the receipt, print

4     out the picture of what was bought or charged, and staple it to

5     the receipt.  This is what we do for hours, and this is how we

6     protect Bob from an audit.

7     Q.  Okay.  So --

8     A.  So then I realize, your services aren't needed here because

9     this is not what is going on.

10    Q.  So she was let go?

11    A.  Yes.

12    Q.  Did you have to replace her?

13    A.  No.

14    Q.  Were you able to get along at the townhouse without the

15    services of Ms. Robinson or Ms. White?

16    A.  Oh, everything went -- actually happened so much smoother

17    then.

18    Q.  Now, you used some salty language in some of these

19    communications we've seen, and even a couple of times in court

20    today.

21    A.  I went to New York City public school.  I'm sorry.

22    Q.  I get it.

23          What I want to know is, did you ever call Ms. Robinson

24    any names directly to her?

25    A.  No, not to her face.

1    Q.  Did you ever insult her or do anything that you thought was

2    treating her badly?

3    A.  To her face?

4    Q.  Yeah.

5    A.  No, I -- it's strange.  I felt bad for her, so I never did

6    anything to make her feel worse about herself.

7    Q.  Did you know prior to -- withdrawn.

8             At any time prior to Ms. Robinson's departure from

9    Canal, did you understand her to be threatening legal claims?

10   A.  No.

11   Q.  Did you hear anything about discrimination or retaliation

12   prior to her leaving Canal?

13   A.  No.

14   Q.  Your view, as we saw in an e-mail you were shown, was that

15   she didn't need to be paid severance?

16   A.  Yes.

17   Q.  Did you have a reason for that view?

18   A.  You've been stealing the whole time.  She took her

19   severance before it was given to her.  She didn't deserve any

20   more.

21   Q.  Were your interactions with Ms. Robinson impacted at all by

22   the fact that she's a woman?

23   A.  No.

24   Q.  Do you have any issues with women in the workplace?

25   A.  No.

NB26ROB7                          Chen - Cross

1   Q.  Does Mr. De Niro work with any other women?

2   A.  A lot.  Yeah.  Yes.

3   Q.  We've heard mention of Jane Rosenthal in this trial.

4   A.  Yes.

5   Q.  Who is that?

6   A.  She runs the film center for him.  She's amazing.

7   Q.  And how long has she been with Mr. De Niro?

8   A.  Oh, my goodness.  Like maybe 30 years, 35 years.  Something

9   like that.

10  Q.  And have you observed that the two of them are close?

11  A.  Oh, yes.

12  Q.  Do you have any issue with that whatsoever?

13  A.  No.  She's amazing.  She actually planned his whole

14  birthday party this year.  She deserves all the credit for

15  that.  She's incredible.

16  Q.  We met Ms. Weeks-Brittan on the stand the other day.  Does

17  she work at Canal?

18  A.  Yes.

19  Q.  She is a woman?

20  A.  Yes.

21  Q.  Do you have any concerns about her working with your

22  boyfriend?

23  A.  Not at all.

24  Q.  Your boyfriend is a movie star.  Right?

25  A.  He's still just human.

NB26ROB7                         Chen - Redirect

1    Q.  Well, no, no.  My question is this:  Does he work with

2    actresses?

3    A.  Yes.

4    Q.  And has that raised any issues with the two of you?  Do you

5    worry about him working with actresses?

6              MR. MCKNIGHT:  Objection.

7              THE COURT:  Overruled.

8    A.  No.

9              MR. SCHOENSTEIN:  I pass the witness, your Honor.

10             THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MR. MCKNIGHT:

13   Q.  Ms. Chen, you believe Ms. Robinson wanted to be the lady of

14   the house when it came to Mr. De Niro?

15   A.  In a way, yes.

16   Q.  And you believe that Ms. Robinson wanted to be the head of

17   the household?

18   A.  Yes.

19   Q.  And you believe that Ms. Robinson was jealous of your

20   relationship with Mr. De Niro?

21   A.  Yes.

22             MR. MCKNIGHT:  I have nothing further, your Honor.

23             THE COURT:  Anything further?

24             MR. SCHOENSTEIN:  No, your Honor.

25             THE COURT:  You are excused as a witness.  You may

NB26ROB7

1    step down.

2              (Witness excused)

3              Let me see the parties at sidebar.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB7

1                    (At the sidebar)

2                    THE COURT:  This ended earlier than I had been

3      informed that it would.  Is there any reason why we can't do

4      about 20 minutes of the plaintiff before we break for the day?

5                    MR. HANNAFAN:  No reason.

6                    THE COURT:  Okay.  Let's do that.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NB26ROB7                        Robinson - Direct

 1                (In open court)

 2                THE COURT:  Members of the jury, we're going to go

 3      till 4:45 today.

 4                Plaintiff, call your next witness.

 5                MR. HANNAFAN:  Chase Robinson, your Honor.

 6                THE COURT:  Ms. Robinson you may step up into the

 7      witness box.  Remain standing.  My deputy is going to swear you

 8      in.

 9       GRAHAM CHASE ROBINSON,

10            called as a witness by the Plaintiff,

11            having been duly sworn, testified as follows:

12                THE COURT:  Counsel, you may proceed.

13                MR. HANNAFAN:  Thank you, your Honor.

14                THE COURT:  Ms. Robinson, let me instruct you.  Try to

15      speak into the microphone, keep your voice up, wait until the

16      question is done, and pause before you answer.  Speak slowly

17      for the benefit of the court reporter, the jury, and myself.

18                THE WITNESS:  Of course.

19                MR. HANNAFAN:  Thank you, your Honor.

20      DIRECT EXAMINATION

21      BY MR. HANNAFAN:

22      Q.  Good afternoon.

23      A.  Hi.

24      Q.  How are you?

25      A.  Good.  How are you?

1    Q.  Good.

2         Where did you go up?

3    A.  I grew up in New York City.

4    Q.  Specifically, where did you grow up in New York City?

5    A.  I grew up in the Upper East Side in Manhattan.

6    Q.  Do you have any siblings?

7    A.  I do.

8    Q.  How many siblings?

9    A.  I have one sibling, a brother.

10   Q.  Older or younger?

11   A.  He's two years younger than I am.

12   Q.  Where did you go to high school?

13   A.  I went to Saddle River Day School in Saddle River,

14   New Jersey.

15   Q.  Did you go to college?

16   A.  I did.

17   Q.  Where did you go to college?

18   A.  I went to St. Lawrence University in Canton, New York.

19   Q.  Did you graduate?

20   A.  I did.

21   Q.  How many years did it take you to graduate?

22   A.  A little over three years.

23   Q.  And what was your major?

24   A.  My major was English writing.

25   Q.  Did you have a minor?

NB26ROB7                         Robinson - Direct

1    A.  I did.  I had two minors, film and speech and theater.

2    Q.  After you graduated, what was your first job out of

3    college?

4    A.  My first job was at Vanity Fair Magazine.

5    Q.  Was that here in New York City?

6    A.  Yes.

7    Q.  What did you do at Vanity Fair in New York City?

8    A.  I worked for Michael Roberts, the fashion and style

9    director.

10   Q.  What did you do for Mr. Roberts?

11   A.  I started as an editorial assistant.  I handled schedule,

12   meeting, calls.  I handled his Fashion Week schedule.  And then

13   eventually, later, I was there for about -- two years later, I

14   ended up working on photo shoots with him, doing production.

15   Q.  When you say doing production on photo shoots, what do you

16   mean?

17   A.  I helped do some scouting, booking, models, things like

18   that, working with photographers and some of the budget stuff.

19   Q.  And when you say you were there for about two years, when

20   exactly was that?

21   A.  That was from 2006 to 2007.

22   Q.  Eventually, did you take another job?

23   A.  Yes.

24   Q.  Why did you leave Vanity Fair?

25   A.  I wanted to get back into the entertainment industry,

NB26ROB7                          Robinson - Direct

1   specifically in film so I could work in film production, but

2   also work on doing my own projects and writing.

3   Q.  You say you wanted to get back into the film industry.  Had

4   you done some work, or a little bit of work, in the film

5   industry before you worked at Vanity Fair?

6   A.  Yes.

7   Q.  Can you tell the jury what that was?

8   A.  After college, I moved to Los Angeles with a friend of

9   mine, and I did sort of whatever I could find, whether it was a

10  PA on set, working for a producer, just sort of the odd jobs to

11  sort of make the ends meet.

12  Q.  Let me ask you this:  When you graduated from college, what

13  were your career goals?

14  A.  My career goals were to work in the entertainment industry,

15  work in production.  I had focused my English writing on script

16  writing.  So I had written a documentary in college my last

17  year, written a bunch of other scripts.  That was sort of the

18  direction I wanted to take, sort of a creative role.

19  Q.  After Vanity Fair, what was your next job?

20  A.  Canal Productions.

21  Q.  And during what period of time did you work at

22  Canal Productions?

23  A.  I worked for Canal Productions between 2008 and 2019.

24  Q.  Are you presently employed?

25  A.  No, I am not.

1   Q.  Was Canal Productions your last job?

2   A.  It was.

3   Q.  So can you tell us, how did you end up at Canal?

4   A.  I had left my job at Vanity Fair, and one of my bosses

5   there was Elizabeth Saltzman.  She had referred me and

6   recommended me to Jane Rosenthal, who ran the Tribeca Film

7   Festival.  She passed along my resume, and next thing I knew I

8   was interviewing.

9   Q.  Interviewing at Canal?

10  A.  Yes.

11  Q.  Who interviewed you at Canal?

12  A.  Lauren Hurst.

13  Q.  What was Ms. Hurst's role at Canal?

14  A.  Lauren Hurst was an executive assistant.  She was the

15  executive assistant that I would be replacing.

16  Q.  Was she Mr. De Niro's executive assistant?

17  A.  Yes.

18  Q.  And what -- you said you were applying for her job,

19  executive assistant?

20  A.  I was.

21  Q.  Other than interviewing with Ms. Hurst, did you interview

22  with anyone else?

23  A.  Yes.

24  Q.  Who did you interview with?

25  A.  I interviewed with Bob -- Robert De Niro and his wife at

NB26ROB7                      Robinson - Direct

1   the time, Grace Hightower De Niro.

2   Q.  When you were interviewing for that position, what was your

3   understanding as to what your duties and responsibilities would

4   be?

5   A.  It was an executive assistant position, so I would be

6   handling phone calls, scheduling meetings, I would be handling

7   travel.  There was a portion of the job that was on-call.

8   There was a third phone that the executive assistants would

9   switch on and off, and you would pick it up 24/7.

10  Q.  I think Ms. Weeks-Brittan had mentioned that, the bat

11  phone.  Is that correct?

12  A.  Yes.  It was called the bat phone.

13  Q.  Is that what you all called it?

14  A.  Yes.

15  Q.  When did you start at Canal?

16  A.  When did I start?

17  Q.  Yes.  Do you remember your start date?

18  A.  February 6, 2008.

19  Q.  Do you recall your starting salary?

20  A.  It was I believe 70 or 75,000.  No overtime.

21  Q.  When you first started at Canal, what were -- again, your

22  initial duties or responsibilities, what were you handling when

23  you first started working there?

24  A.  I was handling calls, schedules, call lists, calendar,

25  travel for both Bob's business and personal/family travel.  I

1   was, of course, on-call.

2   Q.  Okay.  And how old were you at the time?

3   A.  I was 25.

4   Q.  And how much older is Mr. De Niro than you?

5   A.  About 40 years.

6   Q.  So let's just go ahead and get this out of the way.  Were

7   you ever physically attracted to Mr. De Niro?

8   A.  No.

9   Q.  Did you ever want to live with him?

10  A.  Never.

11  Q.  Did you ever want to marry him?

12  A.  Absolutely not.

13  Q.  Did you ever want to have any children with him?

14  A.  No, definitely not.

15  Q.  When you worked for him, what was your relationship with

16  him?

17  A.  He was my boss.

18  Q.  As your boss, did you care about him?

19  A.  Yes.

20  Q.  Did you want the best for him?

21  A.  Yes.

22  Q.  Was there anything between the two of you, anything more

23  than the employer/employee relationship?

24  A.  No.

25  Q.  All right.  Ms. Robinson, can you tell the jury what it was

1    like to work for Robert De Niro?

2                MR. SCHOENSTEIN:  Objection.

3                THE COURT:  Sustained.

4    BY MR. HANNAFAN:

5    Q.  Can you tell us what your experience was working for

6    Mr. De Niro?

7                MR. SCHOENSTEIN:  Objection.

8                THE COURT:  Sustained.

9    BY MR. HANNAFAN:

10   Q.  How many people worked at Canal when you joined?

11   A.  There were three additional employees in the office.

12   Q.  Who else was that?

13   A.  There was Michael Weber, Michael Kaplan and

14   Jessie Spellman.

15   Q.  What did Mr. Weber do?

16   A.  He handled working with Robin Chambers on archive items for

17   Bob's wardrobe and props from movies.  He also handled some

18   other items with her.

19   Q.  How about Mr. Kaplan?

20   A.  He assisted Michael Weber with the archive props and

21   wardrobe with Robin, but he also did some tech item.  He filmed

22   items for Bob's, like, school plays or kids school plays,

23   things like that.

24   Q.  How about Ms. Spellman?  What did she do?

25   A.  Later on in 2019?

1    Q.  Oh.  Sorry?

2    A.  Sorry, Jessie Spellman?

3    Q.  Yes?

4    A.  She was the other executive assistant.  So she handled the

5    same things that I did; call, schedule, travel, being on-call

6    half the time.

7    Q.  Were there any other people who weren't Canal employees but

8    who worked with Mr. De Niro when you first started?

9    A.  At Canal that were not in the office?

10   Q.  Yes.

11   A.  There was Robin Chambers, Dan Harvey, Tony Tevilecci [ph],

12   and I believe Beth Cohen-Kirsch [ph].

13   Q.  And what was Ms. Chamber's role at Canal?

14   A.  She handled some items for Bob in sort of the background.

15   She handled the prop and wardrobe stuff.  She handled bob's

16   personal photos, sensitive personal items such as Bob's license

17   to carry his gun in New York.  And then she did some items for

18   the kids, when it came to sort of like their clothes and toys

19   and things that Bob wanted to keep from their childhood.

20   Q.  How about Mr. Harvey, Dan Harvey?  What was his role?

21   A.  Dan Harvey trained and worked out with Bob.  He also

22   traveled with Bob to set.  So he would handle -- went on

23   location with Bob, grabbing Bob coffee or a newspaper or going

24   over lines with him.  He also handled some of, like, the

25   medical stuff such as, like, Bob's physical or anything that

1  had to do medical with, like, him physically.

2  Q.  Okay.  When you started at Canal, did you plan to work as

3  an executive assistant for the rest of your career?

4  A.  No.

5  Q.  And at the time you started Canal, what were you hoping to

6  do?

7  A.  I was hoping to work there for a couple of years and move

8  on and work in production — in film production, I should

9  specify.

10  Q.  When you first started working at Canal, did you work out

11  of Canal's office?

12  A.  Yes.

13  Q.  Where is that located?

14  A.  That's located at 375 Greenwich Street.

15  Q.  What were your hours when you first started?

16  A.  I would be in the office probably around 8:30, and I'd stay

17  till at least 8:30, sometimes 9:00, 10:00, 11:00.  On two

18  occasions, I was there until 7:00 in the morning.  It depended

19  when the work was done.

20  Q.  You mentioned you had to work nights.  Did you have to work

21  weekends?

22  A.  Yes.

23  Q.  How often would you have to work weekends?

24  A.  When Jessie Spellman was another executive assistant, I

25  worked every other weekend.

1   Q.  How long was Ms. Spellman there -- let me ask you this:

2   Did Ms. Spellman leave Canal?

3   A.  Yes.

4   Q.  How long after you started did she leave?

5   A.  About three months.

6   Q.  Were you the only executive assistant at Canal after

7   three months of being on the job?

8   A.  Yes.

9   Q.  All right.  You had mentioned being on-call.  Can you tell

10  the jury what being on-call meant as the executive assistant to

11  Mr. De Niro?

12  A.  After you left the office, you -- the family, Bob and his

13  family, would call the bat phone.  And whenever it rang,

14  whether it was 5:00 in the morning or 10:00 o'clock at night,

15  you would pick it up.  And that is Monday through Sunday.  It

16  didn't matter if you were in New York and the family was in

17  Doha.  It didn't matter if, you know, you were in New York and

18  they were in Australia, you picked it up regardless of the

19  time, and then helped them with whatever they needed.

20  Q.  When you first started at Canal, how often would

21  Mr. De Niro contact you during the evenings?

22  A.  Almost every single evening.

23  Q.  Okay.  Weekends as well?

24  A.  Yes.

25  Q.  Holidays?

NB26ROB7                          Robinson - Direct

1    A.  Yes.

2    Q.  When you say in the evenings, what sort of time are you

3    talking about?

4    A.  Between 8:30 and 11:30.

5             And I'm so sorry.  Can I ask if I can have my water?

6             THE COURT:  Yes, you may approach.

7             THE WITNESS:  Such a quick walk up here, I forgot.

8             (Pause)

9    BY MR. HANNAFAN:

10   Q.  Did the frequency of the number of times Mr. De Niro would

11   call you increase over your time at Canal?

12   A.  Yes.

13   Q.  Let's talk about the last three years that you were working

14   at Canal, 2016 to 2018 time period.

15   A.  Okay.

16   Q.  In any given day, approximately how many times would

17   Mr. De Niro call you?

18   A.  We would talk by phone.  I would say five to ten times a

19   day.

20   Q.  Mr. De Niro testified the other day that he only called

21   during civilized hours.

22   A.  No.  Sorry.

23   Q.  Excuse me.  Did you hear that testimony?

24   A.  Yes.

25   Q.  Okay.  And do you agree with that?

NB26ROB7                      Robinson - Direct

1   A.  Absolutely not.

2   Q.  All right.  And during the last three years you worked for

3   him, when would he typically first call you during the day?

4   A.  Somewhere between 5:00 and -- 5:30 and 7:00 a.m.

5   Q.  During the last three years you worked there, how late

6   would he typically call you on any given day?

7   A.  Somewhere between 8:30 and 10:30 at night.  It depended,

8   again, if he was on production or if he was just in New York.

9   Q.  Would he ever call you later than 10:30 at night?

10  A.  Yes.

11  Q.  And how often would that happen?

12  A.  Possibly like ten times a month.  It just, again, depended

13  on where he was located.  If he was in New York, he could be in

14  another country, and it -- you know, the time difference.

15  Q.  When Mr. De Niro called you and you didn't pick up right

16  away, what would happen?

17  A.  A couple of things.  He would be incredibly annoyed.  He

18  would continue to call and call and call.  And then he would

19  ask me every question, where are you?  Why didn't you pick up?

20  Why didn't you pick up my call?  Now I forgot what I was going

21  to tell you.

22  Q.  Did you hear Mr. De Niro's testimony the other day that he

23  never yelled at you?

24  A.  Yes.

25  Q.  Is that accurate?

NB26ROB7                           Robinson - Direct

1   A.  He yelled at me two days ago.

2   Q.  When you said he yelled at you two days ago, when he was

3   sitting in that same chair?

4   A.  Yes.

5   Q.  Talking about when you worked at Canal, did Mr. De Niro

6   ever yell at you?

7   A.  Yes.

8   Q.  Did he ever yell at you for not picking up the phone fast

9   enough?

10  A.  Yes.

11  Q.  What were some of the other things he yelled at you about?

12  A.  Not picking up the phone.  Sometimes I would e-mail him,

13  and he couldn't find the e-mail, and he would be yelling and

14  screaming saying, I didn't receive it, when he did.  When he

15  got frustrated, when he couldn't find his driver.  There are

16  various different reasons why he would get angry.

17  Q.  Are you saying --

18  A.  He got frustrated quite often.

19  Q.  Thank you.

20          Based upon Mr. De Niro's reaction when you wouldn't

21  pick up right away, how often would you have your phone on you?

22          MR. SCHOENSTEIN:  Objection.

23          THE COURT:  Sustained.

24  Q.  What did you do in reaction to Mr. De Niro being upset with

25  you for not picking up your phone fast enough?

1           MR. SCHOENSTEIN:  Objection.

2           THE COURT:  Overruled.  What, if anything.

3    Q.  What, if anything?

4    A.  I had my phone on next to me with me at all times, 24/7.

5    Q.  When you say next to me at all times 24/7, can you give us

6    an example?

7    A.  I never turned my phone off in the mornings.  When I go and

8    take a shower, I would bring my phone into the bathroom with me

9    in case he called.  I sort of avoided going to places where

10   there was no cell phone service just in case he called.  My

11   phone was just attached to me.  It was sort of -- it was

12   connected to me.

13   Q.  How did that make you feel?

14   A.  It was really difficult.  It was sort of a huge burden.

15   You don't have that personal space or time being away from your

16   phone where you're not thinking it could possibly ring.  So it

17   was draining and difficult at times.

18   Q.  Did Mr. De Niro ever text you?

19   A.  Yes.

20   Q.  Did he ever e-mail you?

21   A.  Yes.

22   Q.  Last three years you were working there, approximately how

23   many times would you get a text or an e-mail from him in

24   addition to the calls?

25           MR. SCHOENSTEIN:  Objection.

1           THE COURT:  Basis.

2           MR. SCHOENSTEIN:  Best evidence.

3           THE COURT:  Sustained.

4    BY MR. HANNAFAN:

5    Q.  Would you ever exchange e-mails with Mr. De Niro?

6    A.  Yes.

7    Q.  How frequently did you do that?

8    A.  Quite often.  Each day.

9    Q.  Approximately how many times each day?

10   A.  It could be -- I would say the average 25, if not more.

11   Q.  I'm sorry.  Was that text or e-mails?

12   A.  E-mails.  Texts was less.  It was more we would -- we

13   mostly spoke on the phone, but I did a lot of e-mailing where

14   he would respond.

15   Q.  Did Mr. De Niro expect you to respond quickly to his texts

16   and e-mails?

17          MR. SCHOENSTEIN:  Objection.

18          THE COURT:  Sustained.

19   Q.  How quickly would you respond Mr. De Niro's texts or

20   e-mails?

21   A.  Pretty quickly.  If I didn't, we would speak on the phone

22   about it.

23   Q.  Would there be times when you would tell Mr. De Niro that

24   you weren't going to be available for a certain period during

25   the day?

NB26ROB7                          Robinson - Direct

1    A.  Yes.

2    Q.  All right.  Would he respect your -- let me ask you this:

3    Would he contact you even though you told him you were not

4    available?

5            MR. SCHOENSTEIN:  Objection.

6            MR. HANNAFAN:  What's the objection?

7            THE COURT:  What's the objection?

8            MR. SCHOENSTEIN:  Time frame.  Specific events.

9            THE COURT:  Let's limit it.  Can you limit it to a

10   specific time frame, maybe something that's relevant to the

11   case?

12           MR. HANNAFAN:  Sure.

13   BY MR. HANNAFAN:

14   Q.  Within the last three years that you worked there.

15   A.  I'm sorry.  Could you repeat your question?

16   Q.  Yes.

17           I was asking about moments when you would tell him

18   you're not going to be available.  During the last three years,

19   even when you would tell him you were not going to be

20   available, would he contact you during those time --

21           THE COURT:  Was there ever an occasion during the last

22   three years when, after you told Mr. De Niro you would not be

23   available, he contacted you?

24           THE WITNESS:  Yes.  Many times.

25   Q.  Could you give us an example?

NB26ROB7                        Robinson - Direct

1   A.  When I would go to a doctor's appointment, he would call

2   me.  When I would go for a run, he would call me.  When I was

3   taking my mother to the emergency room and let him know, he

4   called me.  When I told him I wasn't going to be available for

5   my grandmother's funeral, he called me twice.

6   Q.  What happened with your grandmother's funeral?

7            MR. SCHOENSTEIN:  Objection.  Relevance.

8            THE COURT:  Sustained.  It is irrelevant.

9   Q.  You mentioned a time where you told him you were taking

10  your grandmother to the hospital.

11  A.  My mother.

12           MR. SCHOENSTEIN:  Objection.  Relevance.

13           THE COURT:  Sustained.

14  Q.  Was there ever a time Mr. De Niro contacted you while you

15  were out to dinner?

16           MR. SCHOENSTEIN:  Objection.  Relevance.

17           THE COURT:  Overruled.

18  A.  Yes.  Frequently.

19  Q.  Can you give us a specific example when that occurred?

20  A.  I had -- I had taken my friend's daughter for her 21st

21  birthday with a couple of friends to Bob's restaurant, Nobu.

22  I, of course, paid personally.  And Bob had called me and asked

23  where I was, who I was with, what I was doing.  And I told him

24  I was at Nobu, and he asked that I bring a martini to him after

25  I finished dinner.

NB26ROB7                    Robinson - Direct

1          THE COURT:  Actually, since the witness testified she

2    paid for dinner, I'm striking the testimony and sustaining the

3    relevance objection.  I had thought this went to her charging

4    the dinner to the company.  So the objection is sustained.

5          MR. HANNAFAN:  Your Honor, I was asking with respect

6    to the claim of duty of loyalty.

7          THE COURT:  I understand.  And the objection is

8    sustained.

9          MR. HANNAFAN:  Okay.

10   BY MR. HANNAFAN:

11   Q.  What did you do -- did you do anything for Mr. De Niro

12   after that dinner?

13   A.  Yes.

14   Q.  What did you do for him?

15   A.  He asked me to bring him a martini on my way home.

16   Q.  What time of the night was this?

17   A.  11:00 o'clock p.m.

18   Q.  Did you drop him off a martini at 11:00 at night?

19   A.  Yes.  I met him downstairs.  He was in his pajamas and

20   slippers, and I handed him the martini.

21   Q.  I'm sorry?

22   A.  And I handed him the martini in a plastic container.

23   Q.  Did Mr. De Niro call you later that night?

24   A.  Yes.

25   Q.  About what time was that?

NB26ROB7                    Robinson - Direct

1           MR. SCHOENSTEIN:  Objection.  Relevance.

2           THE COURT:  Overruled.

3   A.  1:00 a.m.

4   Q.  Did you take the call?

5   A.  Yes.

6           MR. HANNAFAN:  Your Honor, this may be a good point to

7   take a break.

8           THE COURT:  All right.  Members of the jury, it is

9   about 4:45, so we're going to take our break.  Enjoy the

10  evening.  Please be back here a little bit before 9:00.

11          Please follow my instructions not to look at anything

12  regarding this case and not to talk to anybody, including

13  family members or friends or amongst yourselves about the case.

14          See you back here at 9:00 o'clock.

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  All right.  Ms. Robinson, you may step

3    down.

4           For planning purposes, how long does plaintiff expect

5    to have with this witness?

6           MR. HANNAFAN:  I'd say at least several hours.

7           THE COURT:  Okay.  And Mr. Schoenstein, do you expect

8    that if they've got several hours, that you'll occupy the rest

9    of the day?

10          MR. SCHOENSTEIN:  I do, your Honor.

11          THE COURT:  Okay.  Is there anything else from

12   plaintiff before we break for the day?

13          MR. HANNAFAN:  Your Honor, just with respect to some

14   of the questions I was asking her about, you know, the times he

15   would call, even when she said she was unavailable, I believe

16   that's relevant with respect to the duty of loyalty claim.

17   Claiming she's a faithful servant.  I expected the testimony

18   would be that despite these times, or despite these moments,

19   she would still take his calls.  I think that's relevant to

20   that claim.

21          THE COURT:  I permitted a lot of questions in terms of

22   taking calls late at night and overruled some objections.  I

23   think there are some questions that verge into the question of

24   whether Mr. De Niro was a good boss or a bad boss.  And that, I

25   think, is really entirely irrelevant to the issues in this

1    case, as I understand it, and prejudicial.  So that's how I've

2    been drawing the line.  If you want to correct me, but that's

3    the way in which I've been drawing the line.

4                MR. HANNAFAN:  Understood, your Honor.

5                THE COURT:  Mr. Schoenstein, anything before we break

6    for the day?

7                MR. SCHOENSTEIN:  I don't think so, your Honor.

8                THE COURT:  Okay.  Have a good evening, everybody.

9    And see you here by 9:00 o'clock.

10                (Adjourned to November 3, 2023, at 9:00 a.m.)

11                            * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    THOMAS HARVEY

 4    Cross By Mr. Drogin  . . . . . . . . . . . . 770

 5    Redirect By Mr. Macurdy  . . . . . . . . . . 798

 6    Cross By Mr. Drogin  . . . . . . . . . . . . 833

 7     TIFFANY CHEN

 8    Direct By Mr. Mcknight . . . . . . . . . . . 841

 9    Cross By Mr. Schoenstein . . . . . . . . . . 929

10    Redirect By Mr. Mcknight . . . . . . . . . . 995

11     GRAHAM CHASE ROBINSON

12    Direct By Mr. Hannafan . . . . . . . . . . . 998

13                         PLAINTIFF EXHIBITS

14    Exhibit No.                             Received

15     36    . . . . . . . . . . . . . . . . . . 837

16     2    . . . . . . . . . . . . . . . . . . . 853

17     163    . . . . . . . . . . . . . . . . . . 860

18     171    . . . . . . . . . . . . . . . . . . 863

19     93    . . . . . . . . . . . . . . . . . . . 874

20     161    . . . . . . . . . . . . . . . . . . 877

21     7    . . . . . . . . . . . . . . . . . . . 907

22     155    . . . . . . . . . . . . . . . . . . 908

23     155 and 8  . . . . . . . . . . . . . . . . 911

24     95    . . . . . . . . . . . . . . . . . . . 911

25     9    . . . . . . . . . . . . . . . . . . . 914
```

```
 1    75     . . . . . . . . . . . . . . . . . 922

 2    102    . . . . . . . . . . . . . . . . . 923

 3    170    . . . . . . . . . . . . . . . . . 925

 4    106    . . . . . . . . . . . . . . . . . 927

 5    22     . . . . . . . . . . . . . . . . . 928

 6    152    . . . . . . . . . . . . . . . . . 949

 7    383    . . . . . . . . . . . . . . . . . 983

 8    231    . . . . . . . . . . . . . . . . . 986

 9                      DEFENDANT EXHIBITS

10    Exhibit No.                          Received

11    19     . . . . . . . . . . . . . . . . 773

12    10-A he   . . . . . . . . . . . . . . 792

13    32     . . . . . . . . . . . . . . . . 886

14    112    . . . . . . . . . . . . . . . . 954

15    33     . . . . . . . . . . . . . . . . 956

16

17

18

19

20

21

22

23

24

25
```